# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:05-cv-00329-GKF-SAJ |
| | ) | |
| TYSON FOODS, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MOTION OF TYSON FOODS, INC., TYSON POULTRY, INC., TYSON CHICKEN, INC., COBB-VANTRESS, INC., SIMMONS FOODS, INC., WILLOW BROOK FOODS, INC., CAL-MAINE FOODS, INC., CAL-MAINE FARMS, INC., GEORGE'S, INC., GEORGE'S FARMS, INC., AND PETERSON FARMS, INC. FOR JUDGMENT AS A MATTER OF LAW IN LIGHT OF PLAINTIFF'S CONSTITUTIONAL VIOLATIONS AND INTEGRATED OPENING BRIEF IN SUPPORT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................................... iii

I. BACKGROUND ...................................................................................................... 1

II. LEGAL STANDARDS ............................................................................................ 4

III. ARGUMENT ......................................................................................................... 6

    A. The Contingency Fee Contract Violates Due Process ................................... 6

        1. Due Process Forbids Those Who Exercise the Power of the State From Profiting From the Exercise of That Power ................................................................ 6

        2. A Private Attorney Representing the Government is Bound by the Same Constitutional Standards as A Government Attorney .................................... 8

        3. The Unconstitutional Contingency Fee Contract Cannot Authorize the State Contingency Lawyers to Appear in This Case .......................................... 15

    B. The Contingency Fee Contract Violates The Separation-of-Powers Provisions of the Oklahoma Constitution ........................................................................... 15

    C. The Court Must First Interpret CERCLA's Natural Resource Damage Provisions (as Interpreted By The Tenth Circuit) in a Manner That Seeks to Avoid Constitutional Issues ................................................................................................................ 21

IV. CONCLUSION ..................................................................................................... 23

## **TABLE OF AUTHORITIES**

### **CASES**

*Aetna Life Ins. v. Lavoie*, 475 U.S. 813 (1986)....................................................................14

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138 (10th Cir. 2000) .................................................................................................................2, 5

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................................7

*Boswell v. State*, 74 P.2d 940 (Okla. 1937) ........................................................................17

*Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648 (10th Cir. 2002).....7, 13

*Conley v. Gibson*, 355 U.S. 41 (1957) ..................................................................................5

*In re Corn Derivatives Antitrust Litig.,* 748 F.2d 157 (3d Cir. 1984)....................................5

*Davis v. Childers*, 74 P.2d 930 (Okla. 1937) ......................................................................17

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568 (1988) ......................................................................................22

*Freeport-McMoRan Oil & Gas v. FERC*, 962 F.2d 45 (D.C. Cir. 1992) .............................8

*Golden Day Schools, Inc. v. Pirillo,* 118 F. Supp. 2d 1037 (C.D. Cal. 2000) ..............9, 10

*In re Goodman*, 208 B.R. 145 (W.D. Va. 1997)........................................................5, 15, 21

*Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276 (10th Cir. 2004) ........................2

*Indep. Sch. Dist. No. 1 of Oklahoma Cty v. Scott*, 15 P.3d 1244 (Okla. App. 2000).........16

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974).............................................................8

*Huston v. Imperial Credit Commercial Mortgage Inv. Corp.,* 179 F. Supp. 2d 1157 (C.D. Cal 2001)......................................................................................................6

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).............................10

*Liteky v. United States*, 510 U.S. 540 (1994)........................................................................7

*Marsh v. Alabama*, 326 U.S. 501 (1946) ..............................................................................8

*McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001) ...........................................................2

*Menefee v. Askew*, 107 P. 159 (Okla. 1910) ...................................................................16

*Meredith v. Ieyoub*, 700 So. 2d 478 (La. 1997) .........................................................20, 21

*Meredith v. Ionian Trader*, 279 F.2d 471 (2d Cir. 1960).................................................15

*Miner v. New York State Dep't of Corr. Servs.,* 479 N.Y.S.2d 703 (N.Y. Sup. Ct. 1984) ...............................................................................................................................10

*Morgan v. Daxon*, 49 P.3d 687 (Okla. 2001)....................................................................16

*In re Murchison*, 349 U.S. 133 (1955) ..............................................................................14

*Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238 (10th Cir. 1999) ...............................................5

*New Mexico v. General Electric*, 467 F.3d 1223 (10th Cir. 2006) ..........................1, 21, 22

*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) ..............................................................7, 13

*People ex rel. Clancy v. Superior Court*, 705 P.2d 347 (Cal. 1985)..................... 6, 8, 10-12

*Ex Parte Pope*, 242 P. 290 (Okla. Crim. App. 1925) ........................................................16

*Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927)................................................5, 15, 21

*Realmonte v. Reeves*, 169 F.3d 1280 (10th Cir. 1999) .........................................................5

*In re Retail Chemists Corp.*, 66 F.2d 605 (2d Cir. 1933) .......................................5, 15, 21

*Sand Springs v. Dep't of Pub. Welfare*, 608 P.2d 1139 (Okla. 1980)................................17

*Schweiker v. McClure*, 456 U.S. 188 (1982) ......................................................................6

*Shelton v. State ex rel. Caldwell,* 162 P. 224 (Okla. 1917)................................................19

*Terry v. Adams*, 345 U.S. 461 (1953) .................................................................................8

*Tumey v. Ohio*, 273 U.S. 510 (1927) ...................................................................................6

*Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560 (10th Cir. 2000) ...........................2

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972)......................................................6, 14

*Welch v. Sirmons*, 451 F.3d 675 (10th Cir. 2006)...............................................................6

*Young v. United States*, 481 U.S. 787 (1987) ...................................................................8

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ......................................................................22

## STATUTES AND CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV § 1 ........................................................................................6

Comprehensive Environmental Response Compensation and Liability Act,
42 U.S.C. § 9601 ("CERCLA") ...................................................................................1

Okla. Const. art. II § 7 .................................................................................................6

Okla. Const., art. IV, § 1 .............................................................................................16

Okla. Const., art. V, § 55 ...................................................................................16, 17, 20

Okla. Const., art. VI, § 1 .............................................................................................18

62 Okla. Stat. § 7.1.B .............................................................................................19, 20

## SECONDARY SOURCES

H. 1143, 50th Leg., 2nd Extra. Sess. (Okla. 2006) ...................................................19

S. 181, 50th Leg., 1st Reg. Sess. (Okla. 2005) .........................................................19

Okla. Att'y Gen. Op. No. 00-33 (2000) .....................................................................17

Okla. Att'y Gen. Op. No. 00-47 (2000) .....................................................................17

Okla. Att'y Gen. Op. No. 01-52 (2001) .....................................................................17

Transcript of Hearing on Dec. 15, 2006 ...................................................................12

27A Fed. Proc. § 62:520 (2003) ..................................................................................2

*Michie's Jurisprudence*, Vol. 2A .......................................................................5, 15, 21

ABA Committee on Prof. Ethics (1939) .....................................................................8

ABA Model Code of Prof. Responsibility, EC 8-8 ..............................................9

Restatement of the Law Governing Lawyers (2000) ..........................................9

Restatement (Second) of Agency § 20 (1958) ..................................................10

## NEWSPAPERS AND OTHER MEDIA

*AG Claims Conflict of Interest*, Tulsa World, Feb. 25, 2007 .............................14

*Blank Check, Legal Pacts Miss a Little Sunshine,* Daily Oklahoman,
Feb. 25, 2007 ....................................................................................................14

*Sunshine for Hoods,* Wall St. Journal, Feb. 20, 2007 .........................................14

Pursuant to Federal Rule of Civil Procedure 12(c), Defendants Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., and Cobb-Vantress, Inc. ("Tyson Defendants") and Simmons Foods, Inc., Willow Brook Foods, Inc., Cal-Maine Foods, Inc., Cal-Maine Farms, Inc., George's, Inc., George's Farms, Inc., and Peterson Farms, Inc. respectfully move this Court to dismiss Plaintiff's First Amended Complaint ("FAC").  The State of Oklahoma seeks millions of dollars in damages and injunctive relief for alleged injuries to properties and natural resources in the Illinois River Watershed ("IRW").  To prosecute these claims, the Oklahoma Attorney General entered into a contingency fee contract with several private law firms purportedly authorizing them to represent the State and promising them a substantial portion of any recovery the State may obtain ("Contingency Fee Contract" or "Contract").  The Contingency Fee Contract violates both the United States and Oklahoma constitutions.  As a consequence, the FAC should be dismissed or the contingency fee attorneys disqualified from further proceedings in this case.

This motion addresses part of the relief sought in the Motion for Judgment on the Pleadings in Light of *New Mexico v. General Electric* (Dkt. No. 1004).  In particular, *New Mexico v. General Electric*, 467 F.3d 1223 (10th Cir. 2006), prohibits the State from using any damages it might recover in this case, *inter alia*, to compensate private lawyers.  In other words, both *New Mexico v. General Electric* and due process prohibit the State from using any potential damages to pay the private law firms who are parties to the Contingency Fee Contract.

## I.    BACKGROUND

The State seeks damages and injunctive relief under, *inter alia*, the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C.

§§ 9601-75 ("CERCLA") and various Oklahoma state claims.  *See* FAC ¶¶ 70-147.  To prosecute this action, the State of Oklahoma, by and through Attorney General Drew Edmondson, entered into the Contingency Fee Contract with the private law firms of (a) Miller & Keffer, LLP, (b) Riggs, Abney, Neal, Turpen, Orbison & Lewis, and (c) Motley Rice ("State Contingency Lawyers").  *See* Contract for Legal Services, a copy of which is annexed hereto as Exhibit A.[1]  Pursuant to the Contract, the State Contingency Lawyers may "prosecute such an action, through investigation, settlement discussions, trial and any necessary appeals, under the direction and control of the Oklahoma Attorney General."  *Id.* ¶1.  The State Contingency Lawyers' compensation depends on how they use the State's power and the outcome of the case.  Under the Contract, the State Contingency Lawyers are entitled to at least 33 1/3% of the total value of any monetary damages recovered and injunctive relief obtained by the State in this case, but they may recover as much as 50% of the monetary damages recovered.  *See id.* ¶¶ 3.c-e.  Simply put, the Contract provides a monetary incentive to the Contingency Fee Lawyers to maximize damages at the expense of any equitable remedies or other non-monetary resolution.  A fair reading of the Contract leads to the inescapable conclusion

---

[1] The Contingency Fee Contract also is an exhibit to Defendants' *Reply on the Motion for Judgment on the Pleadings in Light of New Mexico v. General Electric* (Dkt. No. 1037). The Court may take judicial notice of the Contract. *See* Reply at 4. Federal Rule of Evidence 201(b) provides that "a judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Facts subject to judicial notice include facts that are a matter of public record. *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by *McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001). Courts may consider such facts in a Rule 12(b) or Rule 12(c) motion without converting it into a motion for summary judgment. *See Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 n.1 (10th Cir. 2004) (*citing* 27A Fed. Proc. § 62:520 (2003)); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).

2

that the Contingency Fee Lawyers are in this case for the money. The Contingency Fee Contract is at war with the public interest and the rules and standards governing how public officials prosecute litigation in the name of the People.

The Contingency Fee Contract transgresses due process under both the U.S. and Oklahoma constitutions because it inextricably commingles use of the State's power by private attorneys with an executory obligation on the part of the State to provide these attorneys with massive private profit that varies depending on the results of the litigation. The State Contingency Lawyers wield the State's power, and they control their ultimate compensation by deciding how they will use that power. Thus, the State Contingency Lawyers also possess the power to determine the amount and type of relief the People of the State of Oklahoma will recover. Such an abhorrent arrangement offends the very foundations of due process. More particularly, the federal and state constitutions prohibit the State from entering into agreements that allow the government's agents to prosecute this action based on their private interests, rather than the public good. This prohibition applies even where government officials insist they will resist the inherent temptation to base decisions on their personal financial needs or those of their agents, employees, or other staff.

It is no answer that while the State Contingency Lawyers have a personal financial stake in the case, the ultimate decision maker is immune from thoughts of personal aggrandizement. Indeed, this claim only highlights the illegitimacy of allowing the possibility of personal gain in matters in which the Government is mandated to act solely in the interest of the citizenry. The Attorney General simply may not staff the State's litigation with lawyers, government or private, who have a personal stake in that

litigation.  In any event, the Attorney General is hardly immune from thoughts of personal gain in some form.  The State Contingency Lawyers hired here are the same law firms the Attorney General hired to prosecute the State's claims against the tobacco industry.  These attorneys have donated tens of thousands of dollars to the Attorney General's campaigns in recent years.  In short, the Attorney General has hired his biggest supporters and has thereby violated due process by creating at least a reasonable impression of impropriety.

Moreover, because the Contract commits a large percentage of any damages the State may recover to the State Contingency Lawyers in the absence of a specific legislative authorization, the Attorney General has violated the separation-of-powers provisions of the Oklahoma Constitution.  The Attorney General is an Executive Branch officer who possesses no power or authority over the State's purse.  The Attorney General cannot unilaterally or independently spend the State's future income.  To the contrary, he is mandated by law to obtain an appropriation or similar authorization from the legislative branch (with the normal gubernatorial consent or veto) to spend the State's resources.

The Contingency Fee Contract violates both the Federal and state constitutions.  Accordingly, this Court should dismiss the FAC pursuant to Federal Rule of Civil Procedure 12(c) or disqualify the State Contingency Lawyers from further actions in this case.  However, under the doctrine of constitutional avoidance, the Court must first consider the *New Mexico v. General Electric* motion and should hold that the State is prohibited from using any damages in this case to pay the State Contingency Lawyers.

## II.    LEGAL STANDARDS

When the pleadings are closed, a party may move for judgment on the pleadings.

Fed. R. Civ. P. 12(c).  A court evaluates a judgment on the pleadings as it does a motion

to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Atlantic Richfield Co. v.*

*Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000).  While the Court

must accept all well-pleaded factual allegations as true and view them in a light most

favorable to the plaintiff, *Realmonte v. Reeves*, 169 F.3d 1280, 1283 (10th Cir. 1999),

dismissal is required when it "'appears beyond doubt that the plaintiff can prove no set of

facts in support of [his] claim which would entitle [him] to relief.'"  *Murrell v. Sch. Dist.*

*No. 1*, 186 F.3d 1238, 1244 (10th Cir. 1999) (*quoting Conley v. Gibson*, 355 U.S. 41, 45-

46 (1957)).

In addition, federal courts have the power at any stage in a case to require the

attorneys of record to show that they have valid, legal authority to represent their clients.

*Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927).  A party may object to the legal

authority of opposing attorneys to represent the party in whose name they are proceeding;

and, if the validity of that authority is not demonstrated, the court must dismiss the action

for want of parties before it.  *See In re Retail Chemists Corp.*, 66 F.2d 605, 608 (2d Cir.

1933); *see also In re Goodman*, 208 B.R. 145, 147-48 (W.D. Va. 1997) ("[A]n attorney

may always be called upon to produce satisfactory evidence of this authority, and upon

his failure to produce such authority, the suit or proceeding instituted by such attorney

should be dismissed.") (*quoting Michie's Jurisprudence*, Vol. 2A, Attorney and Client,

§ 17 at 589).

Finally, the Court has inherent power to disqualify any attorneys who have

appeared in a case if their continued representation would violate the constitution or

otherwise compromise the furtherance of justice. *See In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984) (power to disqualify counsel from specific actions arises from the "inherent powers of any federal court [over] the admission and discipline of attorneys practicing before it"); *Huston v. Imperial Credit Commercial Mortgage Inv. Corp.*, 179 F. Supp. 2d 1157, 1166 (C.D. Cal. 2001) ("A trial court's authority to disqualify an attorney derives from the power inherent in every court 'to control in the furtherance of justice . . . in every manner pertaining thereto.'") (internal citation omitted); *People ex. rel Clancy v. Superior Court*, 705 P.2d 347, 350-53 (Cal. 1985) (collected authorities).

## III.    ARGUMENT

### A.    The Contingency Fee Contract Violates Due Process

The State has compromised the integrity of this case by engaging the State Contingency Lawyers for the latters' personal profit through use of the State's power. Put simply, government attorneys cannot be paid on a bounty system and be expected to do justice. The Contingency Fee Contract violates due process.

#### 1.    Due Process Forbids Those Who Exercise the Power of the State From Profiting From the Exercise of That Power

It is well established that constitutional due process forbids judges and their staffs from having any financial interest in the outcome of the cases on which they labor. *See* U.S. Const. amend. XIV, § 1, Okla. Const. art. II, § 7; *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ("[I]t certainly violates the Fourteenth Amendment . . . to subject [a defendant's] liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."); *see also Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Ward v. Village of Monroeville*, 409

U.S. 57, 59-60 (1972); *Welch v. Sirmons*, 451 F.3d 675, 699 (10th Cir. 2006) ("[T]he Due Process Clause of the Fourteenth Amendment establishes a constitutional floor regarding a trial judge's qualifications to hear a case and requires that the trial judge have no actual bias against the defendant or interest in the actual outcome of his particular case." (internal citations omitted)). Allowing a judge or his staff to be paid more or less based on a case's resolution would be improper solely because of the impermissible appearance (even if not the reality) that the government's power is being exercised for reasons of private gain. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 659 (10th Cir. 2002) ("The trial judge must recuse himself when there is the appearance of bias, regardless of whether there is actual bias."); *Nichols v. Alley*, 71 F.3d 347, 350 (10th Cir. 1995) ("'[W]hat matters is not the reality of bias or prejudice but its appearance.'") (*quoting Liteky v. United States*, 510 U.S. 540, 548 (1994)).

This due process disqualification is not limited to the judiciary. Courts have held that attorneys general and their staffs also must wield the state's power without any consideration of private gain. Simply put, a government attorney is required to pursue the public interest even if that means refusing to bring a case, dismissing a case, or seeking a settlement or judgment that benefits the public but does not maximize the State's monetary damages. Thus, the role of government attorneys is markedly dissimilar from that of an advocate for private interests. A state lawyer "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore . . . is not that it shall win a case, but that justice shall be done." *See Berger v. United States*, 295 U.S. 78, 88 (1935).

Nor is this rule limited to the State's highest legal officer or the government lawyer who supervises a case. It extends to every lawyer who assists the attorney general in exercising the State's authority and applies in both the criminal and civil contexts. *See Freeport-McMoRan Oil & Gas v. FERC*, 962 F.2d 45, 47 (D.C. Cir. 1992) ("no one . . . has suggested that the principle does not apply with equal force to the government's civil lawyers"). Accordingly, the legal profession and the public are entitled to expect that "an attorney holding public office should avoid all conduct which might lead the layman to conclude that the attorney is utilizing his public position to further his professional success or personal interests." ABA Committee on Prof. Ethics, opn. No. 192 (1939). Under these principles, the public has "assurance that those who would wield [the state's] power will be guided solely by their sense of public responsibility for the attainment of justice," and will not be influenced by considerations of personal benefit. *Young v. United States*, 481 U.S. 787, 814 (1987).

## 2. A Private Attorney Representing the Government is Bound by the Same Constitutional Standards as A Government Attorney

As noted above, due process governs every attorney who represents the State and thereby wields its authority, including private lawyers who, while not holding public office, are retained by the Government to work on cases involving the Government. It is well settled that private parties exercising powers that are "traditionally the exclusive prerogative of the States," *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974), must adhere to the same requirements that bind government actors. *See, e.g.*, *Terry v. Adams*, 345 U.S. 461, 469-70 (1953) (private actor conducting election primary violated Fifteenth Amendment by discriminating against African-Americans); *Marsh v. Alabama*, 326 U.S. 501, 508-10 (1946) (private company-owned town must abide by First and Fourteenth

Amendments); *People ex rel. Clancy v. Superior Court*, 705 P.2d 347, 351 (Cal. 1985) (private attorney retained by government bound to "heightened ethical requirements" of public officials).  Indeed, arrangements where government attorneys retain private attorneys to represent the people should be thoroughly scrutinized to ensure that the private attorneys are not authorized to do by contract that which the government attorneys would be prohibited from doing pursuant to law and his or her oath.  *See*, *e.g.*, *Golden Day Schools Inc. v. Pirillo*, 118 F. Supp. 2d 1037, 1048 (C.D. Cal. 2000) ("Unconstitutional acts are not within a government agent's express or implied powers because the government has no power to confer on its agent the authority to act unconstitutionally.").  Were it otherwise, government officials could easily evade the duties imposed on all public officials—whether constitutionally imposed or otherwise— by delegating their responsibilities to non-governmental agents, free from such restrictions.  In so doing, they could avoid complying with the obligations under which they are bound, including maintaining the public trust, accountability, impartiality and dispensing justice.

The Contingency Fee Contract violates these constitutional standards.  The duty of an attorney general—and every other government lawyer—to act impartially in serving justice and the public interest is fundamentally incompatible with having a personal stake in the outcome of a case.  *See* Restatement of the Law Governing Lawyers (2000) § 35 cmt. a ("A contingency fee contract is one providing for a fee the size or payment of which is conditioned on some measure of the client's success.").  The very nature of the Contingency Fee Contract encourages the State Contingency Lawyers to pursue a course of conduct that will maximize their personal stake in the litigation.

A government attorney is not permitted to consider his own pecuniary interest in state litigation; he or she must consider only the public interest. *See* ABA Model Code of Prof. Responsibility, EC 8-8 ("A lawyer who is a public officer, whether full or part-time, should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties."). If a government attorney may not have a pecuniary interest in litigation, *a fortiori*, he or she has no power to delegate such an interest to a non-government attorney. Stated differently, one may not delegate a power which one does not possess. *See* Restatement (Second) of Agency § 20 (1958) (principal may not delegate to his agent or nominee authority which he himself does not possess); *Miner v. New York State Dep't of Corr. Servs.*, 479 N.Y.S.2d 703, 704 (N.Y. Sup. Ct. 1984) (An "individual may not create an agent who has greater power than the individual himself possesses."); *see also Golden Day Schools*, 118 F. Supp. 2d at 1048; *cf. Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690-92, 696-97 (1949) (government agents that act unconstitutionally are inherently beyond the scope of their authority). Due process is violated when a government attorney has a personal or pecuniary interest in the litigation. Neither the State nor its employees may contract with a private party to violate due process by giving the private party a pecuniary interest in the litigation.

*Clancy*, 705 P.2d 347 (Cal. 1985), is identical to this case. In *Clancy*, city officials hired a private attorney pursuant to a contingency fee agreement. As in this case, the private attorney was authorized to represent the government in filing and litigating abatement actions under a public nuisance ordinance. *Id*. at 350. As in this case, the fee agreement provided that the private attorney was entitled to increased

compensation depending on the result achieved. *Id.* As in this case, the private attorney faced the risk of smaller fees, or even no compensation, if the city lost its case. *Id.*

The California Supreme Court held that government attorneys "must act with the impartiality required of those who govern . . . [and] refrain from abusing [the available power of the government] by failing to act evenhandedly." 705 P.2d at 350. The court ruled that while the private attorney was an independent contractor and not a city officer or employee, he could not "escape the heightened ethical requirements of one who performs governmental functions merely by declaring he is not a public official . . . if [he] is performing tasks on behalf of and in the name of the government to which greater standards of neutrality apply" *Id.* at 351. The court further held that "[w]hen a government attorney has a personal interest in the litigation, the neutrality so essential to the system is violated." *Id.* The court ultimately ruled that "[a]ny financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated" under the constitution, *id.* at 352-53, and that the incentive aspects of the contingency fee arrangement at issue were "antithetical to the standards of neutrality that an attorney representing the government must meet." *Id.* at 353.

*Clancy* is directly applicable here. Like the city in *Clancy*, the Attorney General has entered into the Contract with the State Contingency Lawyers that conditions their remuneration on the amount of any monetary recovery. Unlike in *Clancy*, however, where a relatively small hourly fee was at issue, the possibility of draining substantial amounts from the public coffers is present here. The Contingency Fee Contract guarantees the State Contingency Lawyers between 33 1/3% and 50% of the monetary damages recovered by the State in this case. *See* Ex. A ¶¶3.a.-c. The State Contingency

Lawyers and the Oklahoma Attorney General have told this Court they intend to seek millions of dollars in damages, which means the Attorney General has already committed to paying the State Contingency Lawyers millions of dollars from the State treasury. Thus, there is a real and substantial incentive for the State Contingency Lawyers to consider their own interests in litigating this case.

Moreover, the State Contingency Lawyers' real and substantial pecuniary interest in this case further perverts and violates due process as a result of the vast sums the State Contingency Lawyers have spent to date. For example, the State Contingency Lawyers represented to this Court that they already have spent $4 million in expenses relating to sampling and testing. *See* Transcript of Hearing on Dec. 15, 2006, at 125, lines 2-5. Pursuant to the Contingency Fee Contract, the State Contingency Lawyers are entitled to first priority in recovering these expenses from any damages paid in this case. *See* Ex. A ¶ 3.a ("costs and expenses shall be the first priority of use of any settlement, recovery, or award by the Court"). Under the Contract, the State Contingency Lawyers' fees are second in priority for any monies recovered. *See id.* ¶ 3.b ("[t]he fee as agreed to herein shall be the second priority of use for of any settlement or monetary recovery in the suit."). The State's interests are last. This Contract not only violates due process, it is illegal because the Attorney General has no authority to commit state monies in this fashion. *See* Section III(B), *infra.*

It is undeniable that the State Contingency Lawyers, like the private attorney in *Clancy*, hold a significant financial stake in the outcome of this litigation that is "antithetical to the standards of neutrality that . . . attorney[s] representing the government must meet." *Clancy*, 705 P.2d at 353. *Clancy* makes clear that such a

personal financial stake violates due process regardless of whether the State Contingency Lawyers act on the inherent incentive to place their personal interests ahead of the public interest. Stated differently, defendants are not required to show (and this Court is not required to find) that the State Contingency Lawyers have acted in a manner that puts their personal financial gain ahead of the public interest. The mere fact that the State Contingency Lawyers have a personal financial stake in government litigation violates due process and bars them from handling this case.

The due process concerns here are particularly heightened because the Attorney General (who orchestrated the Contingency Fee Contract on behalf of the State) likely will realize great personal gain from the enterprise. Official public records reveal that the State Contingency Lawyers have contributed tens of thousands of dollars to the Attorney General's political campaigns. *See, e.g.*, Monetary Contributions from individuals or families to Edmondson for Attorney General Candidate Committee (Nov. 2001 – April 2004) (filed by the Edmondson for Attorney General Committee with the Oklahoma Ethics Commission) (showing that attorneys employed by one of the State Contingency Lawyers in this case, Riggs, Abney, Neal, Turpen, Orbison & Lewis, donated more than $43,000 to Attorney General Edmondson from 2001-04); Monetary Contributions from individuals or families to Edmondson for Attorney General Candidate Committee (April 2004 – Aug. 2006) (filed by the Edmondson for Attorney General Committee with the Oklahoma Ethics Commission) (showing that attorneys at Riggs, Abney, Neal, Turpen, Orbison & Lewis donated more than $19,000 to Attorney General Edmondson from 2004-06). As noted above, arrangements that merely create the appearance of bias in the

prosecution of public affairs violate due process.  *See Bryce*, 289 F.3d at 659; *Nichols*, 71 F.3d at 350.

Significantly, the Attorney General has recently proclaimed that no lawyer should be allowed to vote in the legislature on a matter if that lawyer ever represented one of the parties in a controversy in other matters.  The Attorney General has stated that even this attenuated, potential personal stake in a controversy should prevent a lawyer from playing any role in exercising the state's authority in that matter.  *See* Barbara Hoberock, *AG Claims Conflict of Interest*, Tulsa World, Feb. 25, 2007, at A13 (quoting Attorney General Edmondson that a legislator who also works as a lawyer representing the poultry industry in other matters has a conflict of interest in matters relating to poultry litter: "Anyone receiving money from Tyson should not be voting.").  If this assertion is true, then certainly lawyers who stand to gain millions of dollars from the same controversy cannot exercise the State's power in that matter.

The public has already begun properly to question the propriety of arrangements wherein elected officials grant potentially lucrative contingency fee contracts to large contributors.  *See Sunshine for Hoods*, Wall St. Journal, Feb. 20, 2007, at A16 (noting that some attorneys general have awarded state litigation contracts to campaign contributors and questioning the propriety and fairness of this arrangement).  Indeed, the public has questioned the propriety of the Attorney General's Contingency Fee Contract in this case.  *See Blank Check, Legal Pacts Miss A Little Sunshine*, Daily Oklahoman, Feb. 25, 2007, at 18A (questioning the propriety of the Attorney General awarding the Contingency Fee Contract without competitive bidding and without public review).  At

bottom, the Contingency Fee Contract violates due process and undermines confidence in the neutrality and impartiality of justice.

As in *Clancy*, the Contingency Fee Contract here violates due process and is invalid. For that reason, the FAC must be dismissed. *See Aetna Life Ins. v. Lavoie*, 475 U.S. 813, 822 (1986) (vacating an opinion rendered by a justice whose interest in the case was "'direct, personal, substantial, [and] pecuniary'") (*quoting Ward*, 409 U.S. at 60); *In re Murchison*, 349 U.S. 133, 137 (1955).

### 3. The Unconstitutional Contingency Fee Contract Cannot Authorize the State Contingency Lawyers to Appear in This Case

As noted above, the Contingency Fee Contract is unconstitutional and, therefore, invalid. Private attorneys must have some authorization to represent the interest of the public in government litigation. *See Meredith v. Ionian Trader*, 279 F.2d 471, 473-74 (2d Cir. 1960) ("A suit initiated without authority from the party named as plaintiff is a nullity and any judgment obtained in such a suit is void."); *In re Retail Chemists Corp.*, 66 F.2d at 608 ("The Supreme Court has consistently treated a judgment based upon an unauthorized appearance for the defendant by an attorney as a nullity."). Absent a valid fee agreement with the Oklahoma Attorney General, the State Contingency Lawyers lack authority to raise claims on behalf of the State in this case.

When the attorneys appearing before a court lack authority to represent the interests of their clients, the case must be dismissed. *See Pueblo of Santa Rosa*, 273 U.S. at 319-20; *In re Retail Chemists Corp.*, 66 F.2d at 608; *In re Goodman*, 208 B.R. at 147-48; *Michie's Jurisprudence*, Vol. 2A, Attorney and Client, § 17 at 589. Accordingly, the Court should dismiss the FAC.

15

**B.**     **The Contingency Fee Contract Violates the Separation-of-Powers Provisions of the Oklahoma Constitution**

In addition to violating due process under the U.S. and Oklahoma constitutions, the Contingency Fee Contract violates the separation-of-powers provisions of the Oklahoma Constitution.  Because the Contingency Fee Contract cannot legally be implemented or enforced under Oklahoma law, the State Contingency Lawyers have no authority to act on the State's behalf in this case.

"The separation of powers is preserved in the Oklahoma constitution." *Indep. School Dist. No. 1 of Oklahoma Cty v. Scott*, 15 P.3d 1244, 1250 (Okla. App. 2000).  The Oklahoma Constitution provides that "[t]he powers of the government of the State of Oklahoma shall be divided into three separate departments:  The Legislative, Executive, and Judicial."  Okla. Const., art. IV, § 1.  Except as otherwise provided in the Constitution, these departments "shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."  *Id.*

The Oklahoma Constitution expressly grants the Oklahoma Legislature exclusive control over the state treasury.  Oklahoma's Constitution provides that "[n]o money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management except in pursuance of an appropriation by law."  Okla. Const., art. V, § 55.  *See also Morgan v. Daxon*, 49 P.3d 687, 698 (Okla. 2001) (noting that Article 5, Section 55 is a self-executing prohibition against payment of any money out of the state treasury "except in pursuance of an appropriation by law").  "[I]t is apparent that the sovereign people who framed the Constitution intended to keep a firm hand on the public purse strings, by limiting the power to spend money without an appropriation." *Ex Parte Pope*, 242 P. 290, 294 (Okla. Crim. App. 1925).  That "firm hand" belongs to the

16

Oklahoma Legislature.  "An appropriation is an authority from the Legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum out of a designated fund in the treasury in a given year to a specified object or demand against the state."  *Menefee v. Askew*, 107 P. 159, 161 (Okla. 1910).  Stated simply, the Oklahoma Constitution delegated to the Legislature the exclusive power to pass appropriations and provide the revenue necessary to fund them.  *Davis v. Childers*, 74 P.2d 930, 932 (Okla. 1937).

Ironically, the Oklahoma Attorney General has issued several opinions emphasizing the state Legislature's exclusive power over the state treasury.  According to the Attorney General, "'[i]t is conceded that the control of the fiscal affairs of the state is a legislative function and that the power of the Legislature in the exercise of such control is plenary, subject only to constitutional restrictions, and the power of the people to legislate by means of the initiative and referendum.'"  Okla. Att'y Gen. Op. No. 01-52, *3 (2001) (*quoting Boswell v. State*, 74 P.2d 940, 942 (Okla. 1937)).  No other state officer can decide how to allocate the State's resources because, according to Drew Edmondson himself, "Article V, § 55 [of the Oklahoma Constitution] vests the function of appropriating public funds exclusively in the Legislature."  Okla. Att'y Gen. Op. No. 00-47, *2 (2000).  And this exclusive power over fiscal affairs cannot be side-stepped by the other branches of government.  "A constitutional process strictly controls State expenditures.  First, '[n]o money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of its funds under its management, except in pursuance of an appropriation by law[.]'  Okla. Const. art. V, § 55.  An agency may not spend money

without this legislative appropriation." Okla. Att'y Gen. Op. No. 00-33, *2 (2000) (citing *Sand Springs v. Dep't of Pub. Welfare*, 608 P.2d 1139, 1140 (Okla. 1980)).

Eschewing his own pronouncements on this issue, the Attorney General deliberately and knowingly entered into the Contingency Fee Contract in direct contravention of the Oklahoma Constitution in order to line the pockets of his favorite private attorneys and campaign contributors. The Contract makes clear that the Attorney General (not the Legislature and Governor) are the parties participating in the contracting process. *See* Ex. A opening and closing recitals & ¶¶1-6, 8. The Contract makes clear that the Attorney General and the private lawyers alone negotiated and agreed on the amounts to be paid to the State Contingency Lawyers. *See id.* Moreover, the Contract provides that the Attorney General and the State Contingency Lawyers may agree among themselves (without the involvement of the Legislature) on the value of any injunctive relief in this case, so that the State Contingency Lawyers may take a larger share of any monetary recovery to reward them for their work. *See id.* at ¶3.d. In the event that the Attorney General and the State Contingency Lawyers have any difficulty dividing up the State's money, the Contract provides that they can select their own arbitrators to help divvy up the loot. *See id.* In other words, the Attorney General has completely excluded the Legislature from all phases of his agreement to spend the State's resources. The Attorney General has taken upon himself the power to hire outside lawyers, select those lawyers, commit to pay those lawyers millions of state dollars, specify the priorities for paying the State's money, and work with the private lawyers to resolve any disputes over whether the private lawyers are being sufficiently compensated from the state treasury.

As a constitutional officer, the Attorney General's powers to act flow solely from the Oklahoma Constitution and express grants of authority from the Legislature. *See* Okla. Const., art. VI, § 1 ("The Executive authority of the state shall be vested in a[n] . . . Attorney General . . . [who] shall perform such duties as may be designated in this Constitution or prescribed by law."). Since only the Legislature has power over the public purse, the Legislature effectively serves as a check on the Executive Branch (including the Attorney General's office)—restricting or expanding funding for the Attorney General's work as it deems necessary. Indeed, the Oklahoma Legislature has appropriated a specific amount of funds for the Attorney General's use and has dictated how those funds may be spent. *See* H. 1143, 50th Leg., 2nd Extra. Sess. (Okla. 2006) ¶1 (allocating a total amount of funding for the fiscal year ending June 30, 2007, to the Attorney General's Office and specifying the categories (and their corresponding amounts) to which those funds must be budgeted); S. 181, 50th Leg., 1st Reg. Sess. (Okla. 2005) ¶3 (same, for fiscal year ending June 30, 2006). The Legislature's appropriations do not contain a general authorization for the Attorney General to supplement his budget according to his own discretion with the funds he might recover for the State. Should the Attorney General's work conflict with the will of the people, as expressed through the Legislature, the Legislature's refusal to grant funds serves as a check on his powers. *Shelton v. State ex rel. Caldwell,* 162 P. 224, 226 (Okla. 1917) ("[B]efore a public officer can rightfully draw money from the public treasury, either for salary, fees, expenses, or extra compensation, he must be able to point to some constitutional or statutory provision, or some lawful contract, either expressed or implied, which justifies his claim to such money.").

It is irrefutable that any monies the State may recover in this case are state revenues that must be deposited into the state treasury. *See* 62 Okla. Stat. § 7.1.B. By hiring the Contingency Fee Lawyers and unilaterally contracting to pay them an extraordinary percentage of future state revenues, the Oklahoma Attorney General has flouted the Legislature's appropriations process and violated the Oklahoma Constitution by unilaterally financing lawsuits without legislative approval and accountability. Under Oklahoma law, such actions by a public official are blatantly illegal and unconstitutional. *See* Okla. Const., art. V, § 55; 62 Okla. Stat. § 7.1.B. The Oklahoma Constitution vests the Legislature with the power over the public purse strings, Okla. Const., art. V, § 55, and the Oklahoma Attorney General cannot arrogate to himself the power to expand his budget and to pay (potentially millions of state dollars) to his favored private lawyers.

The illegal Contract entered into by the Attorney General must be voided as a matter of law by this Court. This Court should preserve due process and protect the Oklahoma Constitution for the very reason that the Attorney General has used his office to trample due process and the Oklahoma Constitution. A strikingly similar case from the Supreme Court of Louisiana illustrates the point. In *Meredith v. Ieyoub*, 700 So. 2d 478 (La. 1997), the court examined a contingency fee contract under which the Louisiana Attorney General retained private attorneys to investigate and prosecute environmental damage claims on behalf of the state. The *Meredith* court noted that "under the separation of powers doctrine, unless the Attorney General has been expressly granted the power in the constitution to pay outside counsel contingency fees from state funds, or the Legislature has enacted such a statute, then he has no such power." *Id*. at 481. The court acknowledged that while the Louisiana Constitution does not provide for such fee

arrangements, the Louisiana legislature, in certain instances, has allowed the Louisiana Attorney General to enter into particular contingency fee contracts by express grants of statutory authority.  *Id*. at 482.  The court concluded, however, that neither the Louisiana Constitution nor any statute granted the Louisiana Attorney General express authority to pay contingency fees to private attorneys to help enforce Louisiana's environmental laws. *Id*. at 484.  In the absence of such authority, the court held the contingency fee contract invalid.  *Id*.

Here, the Contingency Fee Contract authorizes the State Contingency Lawyers to investigate and prosecute state environmental damage claims.  *See* Ex. 1 ¶1.  Like the Louisiana Attorney General in *Meredith*, the Oklahoma Attorney General had no authority to enter into the Contingency Fee Contract.  The Oklahoma Attorney General, as an officer of the Executive Branch, has no power under the Oklahoma Constitution to honor his commitment under the Contingency Fee Contract to pay the State Contingency Lawyers any portion of what the state might recover in this case, *see id*. ¶¶ 3.a.-c.  Nor has the Oklahoma Legislature expressly granted the Attorney General the power to use public monies for such compensation.  Like the Louisiana Attorney General in *Meredith*, the Oklahoma Attorney General violated the separation-of-powers provisions of the Oklahoma Constitution by entering into the Contingency Fee Contract absent constitutional or statutory authority.

The *Meredith* court concluded that "[u]ntil the legislature enacts a statute authorizing the Attorney General to enter into contingency fee contracts, the Contract is invalid and may not be implemented or enforced."  700 So. 2d at 484.  That constitutional ban applies here.  Without a valid fee agreement under Oklahoma law, the State

Contingency Lawyers lack authority necessary to represent the State in this case.

Accordingly, the FAC must be dismissed.  *See Pueblo of Santa Rosa*, 273 U.S. at 319-20;

*In re Retail Chemists Corp.*, 66 F.2d at 608; *In re Goodman*, 208 B.R. at 147-48;

*Michie's Jurisprudence*, Vol. 2A, Attorney and Client, § 17 at 589.

>    **C.    The Court Must First Interpret CERCLA's Natural Resource Damage Provisions (as Interpreted by the Tenth Circuit) in a Manner That Seeks to Avoid Constitutional Issues**

In *New Mexico v. General Electric*, *supra.*, the Tenth Circuit expressly held that a

contingency fee arrangement such as the one at issue here (in which the State has

committed to pay a significant portion of the damages it recovers to the State's private

attorneys) is preempted by CERCLA's exclusive natural resource damages scheme.  *See*

467 F.3d at 1247 (holding that CERCLA "preempts any state remedy designed to achieve

something other than the restoration, replacement, or acquisition of the equivalent of a

contaminated natural resource.") & 1248 (holding that CERCLA preempts state law

claims where the state is permitted to use the damages to pay attorneys' fees).  As noted

above, the Tyson Defendants and Simmons Food, Inc. have filed a Motion for Judgment

on the Pleadings in Light of *New Mexico v. General Electric* and Integrated Opening

Brief in Support (Dkt. No. 1004).  That motion is fully briefed and ready for this Court's

review.  *See* State of Oklahoma's Response to Defendants' Motion for Judgment on the

Pleadings in Light of *New Mexico v. General Electric* (Dkt. No. 1021) and Defendants'

Reply on the Motion for Judgment on the Pleadings in Light of *New Mexico v. General*

*Electric* (Dkt. No. 1051).

Under the canon of constitutional avoidance, this Court should first apply

CERCLA's statutory provisions (as interpreted by the Tenth Circuit) and construe, if

possible, those provisions in a manner that will avoid the necessity to resolve the

constitutional questions discussed here. *See, e.g.*, *Zadvydas* v. *Davis*, 533 U.S. 678, 696 (2001) (invoking canon of construing statutes to avoid serious constitutional questions); *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (holding that, under the doctrine of constitutional avoidance, courts will adopt any tenable interpretation of a statute that avoids serious constitutional questions, even if the court does not believe the interpretation adopted is the best construction).

Should this Court rule that under *New Mexico* the State may not use any damages from this case to compensate private lawyers, this motion should be rendered moot because the Contingency Fee Contract would be void under federal law.

## IV.     CONCLUSION

This Court should apply the Tenth Circuit's holding in *New Mexico* to conclude that the State may not use any damages in this case to compensate private lawyers. If the Court rejects the Tenth Circuit's *New Mexico* decision, the Court should nevertheless dismiss the FAC in its entirety for the reasons discussed above, or disqualify the State Contingency Lawyers from further proceedings in this case.

Dated: February 28, 2007                    Respectfully submitted,


                                            /s/ Jay T. Jorgensen
                                            Thomas C. Green, *appearing pro hac vice*
                                            Mark D. Hopson, *appearing pro hac vice*
                                            Timothy K. Webster, *appearing pro hac vice*
                                            Jay T. Jorgensen, *appearing pro hac vice*
                                            SIDLEY AUSTIN LLP
                                            1501 K Street, N.W.
                                            Washington, D.C. 20005-1401
                                            (202) 736-8000 (phone)
                                            (202) 736-8711 (fax)

                                            -AND-

                                            Robert W. George, OBA #18562
                                            KUTAK ROCK LLP
                                            The Three Sisters Building
                                            214 West Dickson Street
                                            Fayetteville, AR 72701-5221
                                            (479) 973-4200 (phone)
                                            (479) 973-0007 (fax)

                                            -AND-

                                            Patrick M. Ryan, OBA # 7864
                                            Stephen L. Jantzen, OBA # 16247
                                            RYAN, WHALEY & COLDIRON, P.C.
                                            900 Robinson Renaissance
                                            119 North Robinson, Suite 900
                                            Oklahoma City, OK 73102
                                            (405) 239-6040 (phone)
                                            (405) 239-6766 (fax)

*Attorneys for Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc.*
*and Cobb-Vantress, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2007, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

W. A. Drew Edmondson
OFFICE OF ATTORNEY GENERAL
State of Oklahoma
2300 N. Lincoln Blvd, Suite 112
Oklahoma City, OK  73105
**ATTORNEY FOR PLAINTIFF**

David Phillip Page
James Randall Miller
Louis Werner Bullock
MILLER KEFFER & BULLOCK
222 S KENOSHA
TULSA, OK 74120-2421
**ATTORNEYS FOR PLAINTIFF**

Douglas Allen Wilson
Melvin David Riggs
Richard T. Garren
Sharon K. Weaver
RIGGS ABNEY NEAL TURPEN
ORBISON & LEWIS
502 W 6th St
Tulsa, OK 74119-1010
**ATTORNEYS FOR PLAINTIFF**

Robert Allen Nance
Dorothy Sharon Gentry
RIGGS ABNEY NEAL TURPEN
ORBISON & LEWIS
5801 N Broadway
Ste 101
Oklahoma City, OK 73118
**ATTORNEYS FOR PLAINTIFF**

A. Scott McDaniel
Chris A. Paul
Nicole M. Longwell
Philip D. Hixon
Martin A. Brown
JOYCE, PAUL & MCDANIEL, P.C.
1717 South Boulder Ave., Ste 200
Tulsa, OK  74119
**ATTORNEYS FOR PETERSON FARMS, INC.**

R. Thomas Lay, Esq.
KERR, IRVINE, RHODES & ABLES
201 Robert S. Kerr Ave., Suite 600
Oklahoma City, OK  73102
**ATTORNEYS FOR WILLOW BROOK FOODS, INC.**

Theresa Noble Hill
John H. Tucker
RHODES, HIERONYMUS, JONES, TUCKER & GABLE
POB 21100
100 W. 5th Street, Suite 400
Tulsa, OK  74121-1100
**ATTORNEYS FOR CARGILL, INC., and CARGILL TURKEY PRODUCTION, INC.**

25

I further certify that a true and correct copy of the above and foregoing will be mailed via regular mail through the United States Postal Service, postage properly paid, on the following who are not registered participants of the ECF System:

| | |
|---|---|
| William H. Narwold<br>**MOTLEY RICE LLC**<br>20 Church St., 17th Floor<br>Hartford, CT  06103<br>**ATTORNEYS FOR PLAINTIFF** | Elizabeth C Ward<br>Frederick C. Baker<br>**MOTLEY RICE LLC**<br>28 Bridgeside Blvd<br>Mount Pleasant, SC 29464<br>**ATTORNEYS FOR PLAINTIFF** |
| C. Miles Tolbert<br>**SECRETARY OF THE**<br>**ENVIRONMENT**<br>State of Oklahoma<br>3800 North Classen<br>Oklahoma City, OK  73118 | |

  /s/ Jay T. Jorgensen_____
Jay T. Jorgensen

DC1 918426v.1