## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, *et al.*,          )
                                      )
                    Plaintiffs,       )
                                      )
v.                                    )     Case No. 4:05-cv-00329-GKF-SAJ
                                      )
TYSON FOOD, INC., *et al.*,           )
                                      )
                    Defendants.       )

## BRIEF OF CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE AMERICAN TORT REFORM ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW IN LIGHT OF PLAINTIFF'S CONSTITUTIONAL VIOLATIONS

Gary S. Chilton. OBA No. 1662*
HOLLADAY CHILTON & DEGIUSTI , PLLC
204 North Robinson, Suite 1550
Oklahoma City, OK 73102
Telephone:    (405) 236-2343
Facsimile:    (405) 236-2349

Victor E. Schwartz, D.C. Bar No. 406172
*(admitted pro hac vice)*
Cary Silverman, D.C. Bar No. 473658
*(admitted pro hac vice)*
SHOOK, HARDY & BACON L.L.P
600 14th Street N.W., Suite 800
Washington, D.C. 20005-2004
Telephone:    (202) 783-8400
Facsimile:    (202) 783-4211

ATTORNEYS FOR AMICI CURIAE

Robin S. Conrad, D.C. Bar No. 342774
*(admitted pro hac vice)*
NATIONAL CHAMBER
 LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
Telephone:    (202) 463-5337
Facsimile:    (202) 463-5346

OF COUNSEL
*Counsel of record

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... ii

I.   INTEREST OF *AMICI CURIAE* ..................................................................... 1

II.  INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 2

III. ARGUMENT ............................................................................................. 3

A.  The Purpose of Contingency Fees is to Provide Access to Justice to Individuals
    Who Cannot Otherwise Afford to Bring a Lawsuit; Government Use is Suspect..... 3

B.  State Use of Contingency Fee Lawyers Often Leads to Conflicts of Interest, Exorbitant
    Fees, and a "Revolving Door," and Reduces the Public's Faith In Government . .... 5

    1.  Political Patronage and the Hiring of Friends and Colleagues .......................... 6

    2.  A Well-Documented History of Exorbitant Fees at the Public's Expense ......... 10

    3.  Contingency Fee Awards Take Away Public Dollars ......................................... 13

    4.  The Revolving Door Between Government Agencies and Private Law Firms .. 14

C.  State Hiring of Contingency Fee Lawyers is Unethical and Unconstitutional .......... 15

D.  Better Choices for State Attorneys General Exist Than
    Using Contingency Fee Lawyers ............................................................................ 17

    1.  Actions Involving the State's Police Power Should be Pursued by State Attorneys 17

    2.  Outside Counsel Should be Available Only in a Supportive Role, On an
        *Hourly* Basis With Well-Defined Responsibilities and Close State Supervision 19

    3.  Attorneys General Have Better Options Than Hiring Contingency Fee Lawyers 20

E.  The Growing Use of Contingency Fee Lawyers by State Attorneys General
    is Contrary to Public Policy .................................................................................... 21

IV. CONCLUSION.......................................................................................... 25

## TABLE OF AUTHORITIES

*Page*

### CASES

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................. 17-18

*Berger v. United States*, 295 U.S. 78 (1935) ......................................................... 2, 18

*Butler v. Legro*, 62 N.H. 350 (1882) ....................................................................... 3

*Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*,
    273 F.3d 536 (3rd Cir. 2001) ............................................................................ 23

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004) .................................. 23

*City and County of San Francisco v. Philip Morris*, 957 F. Supp. 1130 (N.D. Cal. 1997) .. 5

*City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3rd Cir. 2002) ........................ 23

*County of Santa Clara v. Atlantic Richfield Co.*, Case No. 1-00-CV-788657
    (Cal. Super. Ct., Santa Monica Cty., Apr. 4, 2007) ......................................................... 16

*Freeport-McMoran Oil & Gas Co. v. Federal Energy Regulatory Comm'n*,
    962 F.2d 45 (D.C. Cir. 1992).............................................................................. 18

*Ganim v. Smith & Wesson Corp.*, 780 A.2d 98 (Conn. 2001) ................................................. 23

*Lewis v. Casey*, 518 U.S. 343 (1996)....................................................................... 4

*Meredith v. Ieyoub*, 700 So. 2d 478 (La. 1997) .................................................................10, 16-17

*Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042 (Fla. App. Ct. 2001) ....................................... 23

*People ex rel. Clancy v. Superior Ct.*, 705 P.2d 347 (Cal. 1985)........................................... 15-16

*Rhode Island v. Lead Indus. Ass'n, Inc.*, 898 A.2d 1234 (R.I. 2006) .................................... 23

### CONSTITUTIONAL PROVISIONS, STATUTES & REGULATIONS

Executive Order 13433, "Protecting American Taxpayers From Payment of
    Contingency Fees," 72 Fed. Reg. 28,441 (daily ed., May 18, 2007).............................. 21

La. Const., art. II, §§ 1-2........................................................................................ 17

La. Const., art. III, § 16......................................................................................... 17

Okla. Const., art. XV, §1 ...................................................................... 18

Okla. Const., art. IV, § 1 ..................................................................... 17

Okla. Const., art. V, § 55 ..................................................................... 17

Okla. Stat. tit. 74, § 18a ....................................................................... 18

Okla. Stat. tit. 74, § 21b ....................................................................... 18

Okla. Stat. tit. 74, § 250.4 .................................................................... 18

Okla. Stat. tit. 74, Ch. 62 App., Standard 257:20-1-4........................... 18-19

Okla. Stat. tit. 74, Ch. 62 App., Standard 257:20-1-10.......................... 18-19

Okla. Stat. tit. 74, Ch. 62 App., Standard 257:20-1-9............................ 19

Okla. Stat. tit. 74, Ch. 62 App., Standard 257:20-1-1............................ 19

Comprehensive Environmental Response Compensation and Liability Act,
    42 U.S.C. §§ 9601-75 ...................................................................... 2

## **PUBLICATIONS**

Assoc. Press, *Lawyer Fees Weren't S.C.'s, Official Says*, Charlotte Observer,
    May 2, 2000, at 1Y ......................................................................... 8

Alex Beam, *Greed on Trial*, Atlantic Monthly, June 1, 2004, at 96 ..................................... 13

Susan Beck, *The Lobbying Blitz Over Tobacco Fees: Lawyers Went All Out in
    Pursuit of Their Cut of a Historic Settlement and the Arbitrators Went Along*,
    Legal Times, Jan. 6, 2003, at 1 ....................................................... 22

Lester Brickman, *Contingency Fees Without Contingencies: Hamlet
    without the Prince of Denmark*, 37 UCLA L. Rev. 29 (1989) ........................................ 3, 4

Sheila R. Cherry, *Litigation Lotto*, Insight on the News, Apr. 3, 2000, *available at*
    http://www.insightmag.com/news/2000/04/03/CoverStory/Litigation.Lotto-208397.shtml 11

Connecticut Gen. Assem., Office of Legal Research, Research Report, *Attorney General
    Hiring Practices and the Tobacco Settlement,* No. 2000-R-0879, Sept. 15, 2000,
    *available at* http://www.cga.ct.gov/2000/rpt/olr/htm/2000-r-0879.htm ......................... 7

Guillermo Contreras, *Ex-State AG Enters Halfway House*, Houston Chronicle,
    Dec. 23, 2006, at B1........................................................................ 11-12

Pamela Coyle, *Tobacco Lawyers Reveal How They'll Divvy Up Fee,*
New Orleans Times Picayune, May 12, 2000, at A1 .................................................. 12

Editorial, *Ieyoub's Expedition,* New Orleans Times Picayune, Nov. 28, 1994, at B6 ......... 10

Editorial, *All Aboard the Gravy Train,* St. Louis Post-Dispatch, Sept. 17, 2000, at B2 ....... 9

Editorial, *Angel of the O's?,* Richmond Times Dispatch, June 20, 2001, at A8 ................... 21

*For the Record,* Wash. Post., Feb. 14, 2000, at F35 .............................................. 15

Sara Fritz, *Another N.Y. Official Making National Name for Himself,*
St. Petersburg Times, Nov. 29, 2002, at A1 ................................................... 20

John Fund, *Cash In, Contracts Out: The Relationship Between State Attorneys General
and the Plaintiffs' Bar* (U.S. Chamber Inst. for Legal Reform, 2004), *available at*
http://www.instituteforlegalreform. com/pdfs/Fund%20AG%20report.pdf ................... 9

John Fund & Martin Morse Wooster, *The Dangers of Regulation Through Litigation:
The Alliance of Plaintiffs' Lawyers and State Governments* (American Tort Reform
Found. 2000), *available at* http://www.heartland.org/Article.cfm?artId=8162 ............. 21-22

William Hathaway, *State Sues Drug Companies, Claiming Price Gouging,*
Hartford Courant, Mar. 14, 2003, at B7.......................................................... 23

Bruce Hight, *Lawyers Give up Tobacco Fight,* Austin American-Statesman,
Nov. 20, 1999, at A1 ...................................................................... 11, 13

*Judge Stops Louisiana's Environmental Bounty Hunt,* Gas Daily, Dec. 19, 1994 .. ............. 10

Glen Justice, *In Tobacco Suit, Grumblings Over Lawyer Fees,*
Philadelphia Inquirer, Oct. 4, 1999 .......................................................... 9, 12

Robert A. Levy, *The Great Tobacco Robbery: Hired Guns Corral
Contingent Fee Bonanza,* Legal Times, Feb. 1, 1999, at 27 ........................... 7, 13

John P. McDermott, *Ness Motley Tobacco Suit Fee $82.5M,*
Charleston Post & Courier, June 30, 2000 ..................................................... 8

Jim McLean, *A.G.'s Firm to Share $54 Million Fee Award,* Topeka Cap. J.,
Feb. 1, 2000, at 1 ............................................................................ 11

Manhattan Inst., Center for Legal Pol'y, *Trial Lawyers, Inc.:
A Report on the Lawsuit Industry in America 2003* (2003) ............................... 22

John Monk, *Lawyers May Get $1.48 Million from State; Controversial Fees
is for Work S.C. Hired Them to Do in Wake of Reedy River Oil Spill
in 1996,* The State (Columbia, S.C.), Nov. 17, 2000, at A1 ...........................8, 13-14

John Moritz, *Morales Gets 4 Years in Prison*, Ft. Worth Star Telegram,
Nov. 1, 2003, at 1A ......................................................................................................... 11

David Nitkin & Scott Shane, *Angelos to Get $150 Million for Tobacco Lawsuit*,
Baltimore Sun, Mar. 23, 2002, at 1A ............................................................................. 12

Office of the State Auditor, Mississippi, Informational Review: MCI Tax Settlement
With the State of Mississippi (2006), *available at*
www.osa.state.ms.us/documents/performance/mci-tax-review06.pdf ............................ 14

Michael Y. Park, *Lawyers See Fat Payoffs in Junk Food Lawsuits*,
Fox News Channel, Jan. 23, 2002 .............................................................................. 23-24

John L. Peterson, *Attorneys for Kansas Collect $55 Million In Tobacco Case,
Stovall's Ex-Firm Expects $27 Million*, Kansas City Star, Feb. 1, 2000, at B1 ............. 10-11

John L. Peterson, *Payment for Law Firm Draws Fire; Hearing Continues In Case
Involving Tobacco Litigation*, Kansas City Star, Feb. 17, 2000, at B3 .......................... 7

Emily Wagster Pettus, *Auditor, Attorney General Feud Over $14M Fee
to Private Attorneys*, Assoc. Press, Oct. 23, 2006 ........................................................... 14

Robert B. Reich, *Don't Democrats Believe in Democracy?*, Wall St. J.,
Jan. 12, 2000, at A22 ...................................................................................................... 24

Robert B. Reich, *Regulation is out, Litigation is in*, USA Today, Feb. 11, 1999, at A15 .... 21

Manuel Roig-Franzia, *Attorneys Hired for Suit Gave to Ieyoub Campaigns*,
New Orleans Times Picayune, Nov. 21, 1998, at A8 ....................................................... 10

Miriam Rozen & Brenda Sapino Jeffreys, *Why Did Dan Morales Exchange
Good Judgment for the Good Life?*, Tex. Law., Oct. 27, 2003, at 1 ............................... 7

Thomas Scheffey, *Winning the $65 Million Gamble*, Conn. L. Trib., Dec. 6, 1999, at 1 ....8, 12-13

Victor E. Schwartz et al., *Tort Reform Past, Present and Future: Solving Old Problems
and Dealing With "New Style" Litigation*, 27 Wm. Mitchell L. Rev. 237 (2000) ......... 22

Victor E. Schwartz, *Trial Lawyers Unleashed*, Wash. Post, May 10, 2000, at A29 ............. 24

Scott Shane, *Angelos Says Panel Can't be Impartial*, Baltimore Sun, Nov. 30, 2001, at 1B    12

Scott Shane, *Judge to Rule on Dispute Over Legal Fees*, Baltimore Sun,
Dec. 10, 1999, at 2B ........................................................................................................ 13

Jeff Shields, *Taking Law into Their Own Hands*, Philadelphia Inquirer, Oct. 4, 2004 ......... 24

Jim Sullinger, *Kansas Paid $2 Million for Legal Aid; Unusual Report Fulfills a Promise by Attorney General*, Kansas City Star, Dec. 29, 2004, at B1 ........................................ 19

Stuart Taylor, *How a Few Rich Lawyers Tax the Rest of Us*, Nat'l J., June 26, 1999........... 10

Alfred D. Youngwood, *The Contingency Fee – A Reasonable Alternative?*, 28 Mod. L. Rev. 330 (1965) ............................................................................ 4

John J. Zefutie, Jr., Comment, *From Butts to Big Macs--Can the Big Tobacco Litigation And Nation-Wide Settlement With States' Attorneys General Serve as a Model for Attacking the Fast Food Industry?*, 34 Seton Hall L. Rev. 1383 (2004) ........................ 24

## MISCELLANEOUS

33 A.B.A. Rep. 80 (Canon 13 of the Canons of Ethics) ........................................................ 3

Model Code of Prof'l Responsibility EC 2-20 (1979)............................................................. 4

Model Code of Prof'l Responsibility EC 7-14 (1981)............................................................. 18

Hearing on H.B. 2893, Before the Kansas House Taxation Comm., Feb. 14, 2000 (testimony of Carla Stovall, Attorney General of Kansas), *at* http://www.kslegislature.org/committeeminutes/2000/house/HsTax2-14-00b.pdf ........ 6-7

Hearing on H.B. 2893, Before the Kansas House Taxation Comm., Feb. 17, 2000 (testimony of Andrew W. Hutton & Mark B. Hutton, Hutton & Hutton), *at* http://www.kslegislature.org/committeeminutes/2000/house/HsTax2-17-00b.pdf ........ 7

Hearing on H.B. 2893, Before the Kansas House Taxation Comm., Feb. 17, 2000 (testimony of Jerry Levy, of Jerry K. Levy Law Offices), *at* http://www.kslegislature.org/committeeminutes/ 2000/house/HsTax2-17-00b.pdf ....... 11

Manhattan Inst., Center for Legal Pol'y, *Regulation Through Litigation: The New Wave of Government-Sponsored Litigation*, Conference Proceedings (Wash., D.C., June 22, 1999) ................................................................ 19-20, 21

William H. Pryor, Jr., *Curbing the Abuses of Government Lawsuits Against Industries*, Speech Before the American Legislative Exchange Council, Aug. 11, 1999 ............... 4-5

State of Connecticut, Attorney General's Office, Request for Proposals: Litigation Services Involving Compensatory and Punitive Damages and Injunctive Relief Against Manufacturers, Designers, Refiners, Distributors, and Sellers of Methyl Tertiary Butyl Ether ("MTBE") for Pollution and Contamination of the Waters of the State of Connecticut, RFP No. 04-01 (MTBE), Feb. 25, 2004 ..................................................... 23

State of Connecticut, Attorney General's Office, Request for Proposals: Litigation Services Involving Claims for Restitution and Other Relief Authorized by Law With Respect to

Unfair and Deceptive Sales and Marketing Practices by Pharmaceutical Companies With Respect to the Sale, Marketing and Reporting of the Average Wholesale Price of Their Drugs and Which Conduct Has Caused harm to the State of Connecticut and to Consumers, RFP No. 04-02, Dec. 20, 2004 ...................................................................    23

## I.    INTEREST OF AMICI CURIAE

The Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation, representing an underlying membership of more than three million companies and professional organizations of all sizes and in all industries. In addition to the nearly three thousand Chamber members which are located in Oklahoma, countless others do business within the state and are directly affected by its litigation climate. The Chamber advocates the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files amicus briefs in cases that raise issues of vital concern to the nation's business community.

Founded in 1986, the American Tort Reform Association ("ATRA") is a broad-based coalition of more than 300 businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation. For more than a decade, ATRA has filed *amicus curiae* briefs in cases before federal and state courts that have addressed important liability issues.

This case is of significant interest to Amici because permitting the state to "contract out" its enforcement power to private attorneys can lead to prosecution of government lawsuits on the basis of profitability, not public interest. Agreements that provide private attorneys with the right to a percentage of the recovery in an action brought on behalf of the state can warp the development of law, are prone to political patronage and exorbitant fees, and create, at minimum, the appearance of impropriety. Amici have a strong interest in ensuring that this practice not be permitted to continue, lest other members find themselves targeted by private attorneys who are clothed in the mantle of state authority, but who are unrestrained by the constitutional checks and

1

ethics obligations on the exercise of that authority.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

This case involves a claim by the State of Oklahoma against several poultry-related businesses seeking damages and injunctive under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601-75 ("CERCLA"), and various state claims stemming from alleged pollution from poultry waste in the Illinois River Watershed. Rather than use his own staff and legislatively appropriated resources to prosecute this environmental litigation, Attorney General W.A. Drew Edmondson entered into a contingency fee agreement delegating the state's enforcement power to three private law firms. The private firms stand to profit through receiving at least one third and as much as half of the monetary damages recovered on behalf of the State.

The interests of government and private contingency fee attorneys are widely divergent. Attorneys for the state are "the representatives not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). Conversely, contingency fee attorneys are legitimately motivated by financial incentives to maximize recovery for their private clients. The two functions – impartial governance and for-profit lawsuits– are irreconcilably conflicted. They should not and cannot mix.

Contingency fee agreements were meant to increase access to courts for individuals without the resources to pay an hourly attorney fee; they were not meant for state governments. The Attorney General does not need to hire lawyers on a contingency-fee basis and has other alternatives available – options that safeguard the government's power. Delegation of the state's enforcement power to private attorneys on a contingency fee basis circumvents core principles

embodied in the Oklahoma Constitution, statutes governing the conduct of public officials, and ethics rules.

The experience of other states that have engaged in the practice of entering contingency-fee contracts demonstrates that government-hired private attorneys are often political donors, friends, or colleagues of the hiring government official – creating the appearance of impropriety, and sometimes worse.    Such practices damage the public's confidence in government. Moreover, these government-endorsed lawsuits have led to financially-motivated litigation and ill-conceived attempts to expand tort law under the cloak of state authority.  This experience repeatedly and persuasively demonstrates that Oklahoma should not set down this path.

### III.    ARGUMENT

**A.    The Purpose of Contingency Fees is to Provide Access to Justice to Individuals Who Cannot Otherwise Afford to Bring a Lawsuit; Government Use is Suspect**

Contingency fees, once viewed as illegal in the United States,[1] gained grudging acceptance in the late nineteenth century. *See, e.g.*, 33 A.B.A. Rep. 80, at 579 (Canon 13 of the Canons of Ethics) (approving of contingency fees, but carefully noting that they "should be under the supervision of the court, in order that clients may be protected from unjust charges"). Contingency fees do have a worthy purpose: providing access to the legal system, regardless of means. *See* Lester Brickman, *Contingency Fees Without Contingencies: Hamlet Without the Prince of Denmark*, 37 UCLA L. Rev. 29, 43-44 (1989).   Contingency fees can allow an individual to assert a claim that he or she might not otherwise afford to bring.  As one

---

[1] *See, e.g., Butler v. Legro*, 62 N.H. 350, 352 (1882) ("Agreements of this kind are contrary to public justice and professional duty, tend to extortion and fraud, and are champertous and void").

commentator observed of the American system, "contingent fees are generally allowed in the United States because of their practical value in enabling the poor man with a meritorious cause of action to obtain competent counsel." *See* Alfred D. Youngwood, *The Contingent Fee-A Reasonable Alternative?*, 28 Mod. L. Rev. 330, 334 (1965). Contingency fees can benefit society because they can "provide the only practical means by which one having a claim against another can economically afford, finance, and obtain the services of a competent lawyer to prosecute his claim. . . ." Model Code of Prof'l Responsibility EC 2-20 (1979). Lawyers who work on the basis of a contingency fee are legitimately motivated by financial incentives to maximize recovery for their private clients. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 374 n. 4 (1996) ("the promise of a contingency fee should also provide sufficient incentive for counsel to take meritorious cases").

When contingency fees do not further access to the courts for those with limited means or create incentives that violate public policy, they should be viewed with skepticism and scrutiny.[2] The traditional justifications for contingency fees do not apply to the State of Oklahoma as the "client" in this case. United States Court of Appeals for the Eleventh Circuit Judge William H. Pryor, Jr., when he was Attorney General of Alabama, observed:

> For a long time, contingent fee contracts were considered unethical, but that view gave way to the need for poor persons with valid claims to have access to the legal system. Governments do not have this problem. Governments are wealthy,

---

[2] Despite the widespread acceptance of contingency fee agreements today, there remain lingering prohibitions based on sound public policy. For example, contingency fees remain prohibited in criminal defense cases. *See* Brickman, *supra*, at 40-41. The bar in criminal cases is due to the creation of mis-incentives that threaten to corrupt justice. For instance, if a lawyer's recovery is based on his or her client's acquittal, the incentive is to win at any cost, possibly by suborning perjury. *See id.* Likewise, contingency fee agreements create improper incentives when they encourage use of the state's enforcement power to obtain the highest monetary award at any broader cost to society.

> because they have the power to tax and condemn. Governments also control access to the legal system. The use of contingent fee contracts allows governments to avoid the appropriation process and create the illusion that these lawsuits are being pursued at no cost to the taxpayers. These contracts also create the potential for outrageous windfalls or even outright corruption for political supporters of the officials who negotiated the contracts.

William H. Pryor, Jr., *Curbing the Abuses of Government Lawsuits Against Industries*, Speech

Before the American Legislative Exchange Council, Aug. 11, 1999, at 8.

Of course, the state of Oklahoma could pay for such a suit without engaging private attorneys on a contingent fee basis: the state takes in several billion dollars of revenue each year, and has the power to raise even more money were this to prove insufficient. But the Attorney General did not use the resources of his office or request an additional appropriation from the people of the state of Oklahoma, through their duly-elected legislators. Instead, by entering into a contingent-fee arrangement that required no immediate out-of-pocket expenditure, the Attorney General circumvented the legislative appropriations process. *See, e.g., City and County of San Francisco v. Philip Morris,* 957 F. Supp. 1130, 1136 n.3 (N.D. Cal. 1997) (finding unconvincing "plaintiff's argument that, as a matter of public policy, a contingent fee arrangement is necessary . . . to make it feasible for the financially strapped government entities to match resources with the wealthy [corporate] defendants"). This is not the type of "access to justice" that contingency fees were meant to promote.

**B.    State Use of Contingency Fee Lawyers Often Leads to Conflicts of Interest, Exorbitant Fees, and a "Revolving Door," and Reduces the Public's Faith in Government**

In determining the constitutionality of the state's contracting out of its powers to private attorneys on a contingency fee basis, this Court should closely consider the practical implications of such an approach. In case after case, experience in other states in entering such behind-closed-door contracts, and the resulting exorbitant legal fees, has more than just raised eyebrows.

It has created the appearance of impropriety, and, in one case, led to a criminal conviction. State hiring of contingency fee lawyers provides equal opportunity for political patronage – both Democratic and Republican Attorney Generals awarded lucrative contracts to their friends, colleagues, and supporters. The practice has damaged the public's faith in government. Oklahoma should avoid this unholy alliance between contingency fee lawyers and the State.

### 1. *Political Patronage and the Hiring of Friends and Colleagues*

When state attorneys general or other government agencies hire contingency fee counsel, they often do so without the open and competitive process used with other contracts to assure the state receives the best value as when awarding other state contracts. Even where state attorneys general have issued some type of request for proposals, as Attorney General W. A. Edmondson did in this case, there are often lax selection standards. Thus, state attorneys general have routinely hired and awarded potentially lucrative contracts to friends and political supporters. This creates a system whereby the state may not receive the most qualified counsel, taxpayers may not have received the best value, and private attorneys benefit at the expense of the public. There are many such examples, many of which come from the multi-state tobacco litigation.

For instance, in 1996, then-Attorney General Carla Stovall of Kansas hired her former law partners at Entz & Chanay to serve as local counsel in the State's tobacco lawsuit. *See* Hearing on H.B. 2893, Before the Kansas House Taxation Comm., Feb. 14, 2000, at 16 (testimony of Carla Stovall, Attorney General of Kansas), *at* http://www.kslegislature.org/committeeminutes/2000/house/HsTax2-14-00b.pdf. Attorney General Stovall testified that she asked her former law firm to take the case "as a favor" in part due to their "personal loyalty." *Id.* at 17. In addition to accepting the case that resulted in a "jackpot" fee award, Entz & Chanay performed other "favors" for Attorney General Stovall

during her campaign. First, Entz & Chanay's basement housed Ms. Stovall's Attorney General campaign. *Id.* at 16. In addition, Entz & Chanay also contributed money to her campaign effort. *See* John L. Peterson, *Payment for Law Firm Draws Fire; Hearing Continues In Case Involving Tobacco Litigation*, Kansas City Star, Feb. 17, 2000, at B3. Attorney General Stovall selected her former firm at the expense of another Kansas firm, Hutton & Hutton, which specializes in large product liability cases, and had experience in tobacco litigation. *See* Hearing on H.B. 2893, Before the Kansas House Taxation Comm., Feb. 17, 2000, at 27-88 (testimony of Andrew W. Hutton & Mark B. Hutton, Hutton & Hutton), *at* http://www.kslegislature.org/ committeeminutes/2000/house/HsTax2-17-00b.pdf.

Then-Texas Attorney General Dan Morales also hired contingency fee lawyers to file his state's tobacco litigation in 1996. Four of the five hired firms together had contributed nearly $150,000 in campaign contributions to Morales from 1990 to 1995. *See* Robert A. Levy, *The Great Tobacco Robbery: Hired Guns Corral Contingent Fee Bonanza*, Legal Times, Feb. 1, 1999, at 27. After hiring the firms, Morales reportedly asked them to make an additional political contribution of $250,000. *See* Miriam Rozen & Brenda Sapino Jeffreys, *Why Did Dan Morales Exchange Good Judgment for the Good Life?*, Tex. Law., Oct. 27, 2003, at 1.

Connecticut Attorney General Richard Blumenthal requested letters from individual firms or consortia of firms to represent the state in the tobacco litigation.[3] The Attorney General selected four of sixteen firms that expressed interest. As reported in the local media, the three Connecticut-based firms included:

---

[3] *See* Connecticut Gen. Assem., Office of Legal Research, Research Report, *Attorney General Hiring Practices and the Tobacco Settlement*, No. 2000-R-0879, Sept. 15, 2000, *available at* http://www.cga.ct.gov/2000/rpt/olr/htm/2000-r-0879.htm.

    (1)    General Blumenthal's own former law firm, Silver, Golub & Teitell in Stamford, where he served for six years prior to becoming Attorney General. Partner David S. Golub is a long-time friend and law school classmate of the Attorney General;

    (2)    Emmet & Glander in Stamford, whose name partner, Kathryn Emmet, is married to partner David Golub of Silver, Golub & Teitell; and

    (3)    Carmody & Torrance of Waterbury, whose managing partner, James K. Robertson, served as personal counsel and counselor to Governor John Rowland.

*See* Thomas Scheffey, *Winning the $65 Million Gamble*, Conn. L. Trib., Dec. 6, 1999, at 1. Other firms that wanted to be considered for the litigation publicly stated they did not have a fair chance at the contract. For example, Robert Reardon of New London, a former president of the Connecticut Trial Lawyers Association, reportedly could not even get in the door for a meeting. *See id.*

South Carolina Attorney General Charles Condon came under fire for cronyism after he handpicked seven law firms to represent the state in the tobacco litigation, six of which included the attorney general's friends or political supporters. *See* Assoc. Press, *Lawyer Fees Weren't S.C.'s, Official Says*, Charlotte Observer, May 2, 2000, at 1Y.[4] Attorney General Condon's practice of hiring contingency fee attorneys was not limited to the tobacco suit. He faced heavy criticism after two attorneys with close ties to his party received lucrative fees based on a contingency fee contract by which the lawyers pursued an environmental case on behalf of the state. *See* John Monk, *Lawyers May Get $1.48 Million from State; Controversial Fees is for Work S.C. Hired Them to Do in Wake of Reedy River Oil Spill in 1996*, The State (Columbia, S.C.), Nov. 17, 2000, at A1.

---

[4] Condon, accused of cronyism in his hiring of the firms, later proposed legislative oversight and competitive bidding for the government's hiring of private attorneys. *See* John P. McDermott, *Ness Motley Tobacco Suit Fee $82.5M*, Charleston Post & Courier, June 30, 2000.

Missouri Attorney General Jay Nixon selected five law firms that had made over $500,000 in political contributions over the preceding eight years, most to him and his party, to handle the state's participation in the tobacco litigation. Editorial, *All Aboard the Gravy Train*, St. Louis Post-Dispatch, Sept. 17, 2000, at B2. Those firms eventually received $111 million in fees, an amount decried as "out of proportion to the work performed and the risk involved," given that Missouri was the 27th state to join the litigation, coming in only after the hard work had been done by other states and settlement was inevitable. *Id.* Nixon refused to provide state officials with the criteria used to select the firms and claimed it was "privileged information." *See* John Fund, *Cash In, Contracts Out: The Relationship Between State Attorneys General and the Plaintiffs' Bar* 8 (U.S. Chamber Inst. for Legal Reform, 2004), *available at* http://www.instituteforlegalreform.com/pdfs/Fund%20AG%20report.pdf. And when Nixon ran unsuccessfully for the United States Senate in 1998, numerous attorneys in those firms made $1,000 contributions to his campaign, the maximum individual donation permitted by law. *See id.* at 7.

Likewise, the two firms selected by then Pennsylvania Attorney General Mike Fisher to handle the tobacco lawsuits also happened to be among his largest campaign donors, placing in the top ten on a list of more than two hundred contributors. *See* Glen Justice, *In Tobacco Suit, Grumblings Over Lawyer Fees*, Philadelphia Inquirer, Oct. 4, 1999, at A1. Both firms also gave to General Fisher's inaugural committee. *See id.* When asked how he selected the two firms, General Fisher said "there was a familiarity factor" and "that was how the decision was made." *Id.* (quoting Attorney General Fisher).

While the tobacco litigation provides some of the most blatant examples of political favoritism, contingency fee contracts between states and private lawyers have raised controversy

and concern in other areas as well. For instance, in 1994, Louisiana Attorney General Richard Ieyoub proposed to hire fourteen law firms – including many past contributors to his campaigns – to pursue environmental claims on behalf of his office. Editorial, *Ieyoub's Expedition*, New Orleans Times Picayune, Nov. 28, 1994 at B6. The private firms, which did not specialize in environmental law, were to receive 25% of the amounts recovered. *Id.*; *Judge Stops Louisiana's Environmental Bounty Hunt*, Gas Daily, Dec. 19, 1994. When the propriety of these contracts was challenged in court, the Louisiana Supreme Court invalidated the contingency fee agreements. *See Meredith v. Ieyoub*, 700 So. 2d 478 (La. 1997) (discussed *infra* pp. 15-16). Nevertheless, Ieyoub received more than $84,500 for his successful 1991 and 1995 attorney general races and his failed 1996 bid for the U.S. Senate from twelve of the seventeen law firms he hired to pursue the state's tobacco case. *See* Manuel Roig-Franzia, *Attorneys Hired for Suit Gave to Ieyoub Campaigns*, New Orleans Times Picayune, Nov. 21, 1998, at A8.

### 2.    *A Well-Documented History of Exorbitant Fees at the Public's Expense*

Delegation of state authority to profit-motivated attorneys has predictably resulted in exorbitant fee awards at the public's expense. Contingency fee agreements have siphoned recovery that would otherwise go to the state treasury that could be used to support public programs or reduce taxes. Instead, such agreements have transferred millions of dollars to private lawyers with little relation to the number of hours actually spent working on the state's behalf. History has shown that lawyers chosen to represent the state by attorneys general are "often from the ranks of their own campaign contributors and cronies." Stuart Taylor, *How a Few Rich Lawyers Tax the Rest of Us*, Nat'l J., June 26, 1999.

For example, Kansas Attorney General Stovall's former firm, Entz & Chanay, reportedly received $27 million in legal fees for its "favor" of serving as local counsel in the State's tobacco

lawsuit. *See* John L. Peterson, *Attorneys for Kansas Collect $55 Million In Tobacco Case, Stovall's Ex-Firm Expects $27 Million*, Kansas City Star, Feb. 1, 2000, at B1. Because Entz & Chanay was not required to keep detailed billing records, the arbitration panel that set the firm's fees estimated that 10,000 hours of work was performed. *See* Jim McLean, *A.G.'s Firm to Share $54 Million Fee Award*, Topeka Cap. J., Feb. 1, 2000, at 1. Others have argued that the firm did much less work on the case. *See, e.g.*, Hearing on H.B. 2893, Before the Kansas House Taxation Comm., Feb. 17, 2000, at 10-12 (testimony of Jerry Levy, of Jerry K. Levy Law Offices); *id.* at 44-45 (Testimony of Andrew W. Hutton), *at* http://www.kslegislature.org/committeeminutes/2000/house/HsTax2-17-00b.pdf. Regardless, accepting the arbitration panel's estimate, Entz & Chanay was paid the equivalent of $2,700 per hour for simply acting as local counsel in the State's case.

The tobacco settlement awarded the lawyers hired by then-Texas Attorney General Dan Morales fifteen percent of the State's $15.3 billion recovery – about $2.3 billion, which ultimately was increased by an arbitration panel adjudicating the fee dispute to $3.3 billion. *See* Bruce Hight, *Lawyers Give up Tobacco Fight*, Austin American-Statesman, Nov. 20, 1999, at A1. That amounted to $105,022 per hour, assuming the lawyers worked eight hours per day, seven days per week, for eighteen months. *See* Sheila R. Cherry, *Litigation Lotto*, Insight on the News, Apr. 3, 2000, *available at* http://www.insightmag.com/news/2000/04/03/CoverStory/Litigation.Lotto-208397.shtml. The eight-year Attorney General and former state representative and prosecutor was ultimately sentenced to four years in federal prison for attempting to funnel millions of dollars worth of legal fees to a long-time friend who did little work on the case. *See* John Moritz, *Morales Gets 4 Years in Prison*, Ft. Worth Star Telegram, Nov. 1, 2003, at 1A. He was recently released to a halfway house. *See* Guillermo Contreras, *Ex-State AG Enters Halfway*

*House*, Houston Chronicle, Dec. 23, 2006, at B1.

In Maryland, Attorney General J. Joseph Curran, Jr. entered into a contingency fee agreement with personal injury attorney (and Baltimore Orioles owner) Peter Angelos. Angelos demanded the full 25 percent share of the state's $4.4 billion of the national settlement, as provided in his 1996 contract, and refused to submit his claim to arbitration. *See* David Nitkin & Scott Shane, *Angelos to Get $150 Million for Tobacco Lawsuit*, Baltimore Sun, Mar. 23, 2002, at 1A. This would have entitled Angelos to more than $1 billion, the equivalent of $30,000 per hour. *See* Scott Shane, *Angelos Says Panel Can't be Impartial*, Baltimore Sun, Nov. 30, 2001, at 1B. After a three-year legal battle, Angelos settled with the state for $150 million. *See* Nitkin & Shane, *supra*.

In Pennsylvania, the twenty-fourth state to join the tobacco litigation, the two private firms handpicked by Pennsylvania Attorney General Mike Fisher in that case split $50 million in fees, the equivalent of about $1,323 per hour. *See* Justice, *supra*. "It's hard to see $50 million worth of value there," said Yale Law School Professor Peter Schuck. "I don't know what they did to advance the ball. Most of the work was done." *Id.*

The list goes on. The seventeen firms hired by Louisiana Attorney General Ieyoub divvied up $575,000, the equivalent of about $6,700 per hour, for their services. *See* Pamela Coyle, *Tobacco Lawyers Reveal How They'll Divvy Up Fee*, New Orleans Times Picayune, May 12, 2000, at A1. The three firms hired in Connecticut, each having a close personal, political, familial, or financial relationship to Attorney General Blumenthal or the Governor, divided $65 million in legal fees. "I know how it [looks]," conceded the lead attorney, David Golob. *See* Thomas Scheffey, *Winning the $65 Million Gamble*, Conn. L. Trib., Dec. 6, 1999, at 1.

The deals between state attorneys general and private personal injury lawyers have spawned bitter fee disputes. These disputes have occurred in Florida, Kansas, Massachusetts, Maryland, Texas, and other states. *See, e.g.*, Alex Beam, *Greed on Trial*, Atlantic Monthly, June 1, 2004, at 96, Scott Shane, *Judge to Rule on Dispute Over Legal Fees*, Baltimore Sun, Dec. 10, 1999, at 2B; Levy, *Tobacco Robbery*, *supra*; Hight, *supra*. In Massachusetts, for example, the firms representing the state challenged the $7,700 an hour awarded by the arbitration panel in fees, arguing they were entitled to the full 25 percent provided in the contingency fee contract – $1.3 billion more. *See* Beam, *supra*. These controversies force government officials to waste taxpayer dollars, divert their attention from other matters, and engage in unnecessary litigation.

### 3. Contingency Fee Awards Take Away Public Dollars

Contingency fee awards are often misrepresented as coming at no cost to the public, with no need for state resources – allowing prosecution of litigation for free. These contracts are, of course, not free. The cost, the fees paid to private lawyers as a result of the litigation, is money that would otherwise fund government services or offset the public's tax burden. When state governments make the unwise decision to enter into a contingency fee arrangement that can yield multi-million dollar payouts to private firms when they could either use their own lawyers or supplement their resources with private attorneys at a competitive hourly rate, the public loses.

For example, South Carolina Attorney General Charlie Condon was criticized by environmental groups after a contingency fee contract he entered resulted in a $1.48 million fee to two private lawyers. *See* Monk, *supra*. The suit, a result of a 1996 oil spill, was initially handled by the South Carolina Department of Natural Resources, which usually handles suits against polluters, but then handed over to the private lawyers. *See id.* The contingency fee

lawyers did not file the lawsuit, make any motions or engage in pretrial discovery. *See id.* The company quickly settled for $6.5 million, with the amount of the settlement placed in a trust fund while the private attorneys haggled with the state about their cut of the recovery. *See id.* Even accepting the attorneys' unsubstantiated claim that they worked 1,500 hours on the suit, the $1.48 million fee would result in the equivalent of nearly $1,000 per hour in a case in which there appeared to be little contingency. Dell Isham, the Executive Director of the South Carolina Sierra Club, said that the state should have used government lawyers. *See id.* "This fee is offensive because it goes outside the system to benefit individuals, and it harms the environment by taking money away from it." *Id.* (quoting Mr. Isham). Common Cause blamed the Attorney General for "giving away the house." *Id.* (quoting John Crangle, Director of Common Cause in South Carolina).

In Mississippi, Attorney General Jim Hood recently came under fire by the state's auditor after he hired the law firm of his top campaign contributor to pursue back taxes owed by MCI related to the collapse of its predecessor, WorldCom, then entered a settlement directing MCI to pay the private attorneys $14 million. *See* Office of the State Auditor, Mississippi, Informational Review: MCI Tax Settlement With the State of Mississippi (2006), *available at* www.osa.state.ms.us/documents/performance/mci-tax-review06.pdf. The Auditor found that the Attorney General acted beyond the scope of his constitutional and statutory authority by paying the private lawyers out of funds not in his legislatively-approved budget. *See id.* at 2-4. That money, the Auditor stated, should have been placed in the general treasury for the benefit of the public. *See id.* at 13; *see also* Emily Wagster Pettus, *Auditor, Attorney General Feud Over $14M Fee to Private Attorneys*, Assoc. Press, Oct. 23, 2006.

4.      *The Revolving Door Between Government Agencies and Private Law Firms*

When states award lucrative contingency fees to outside lawyers, talented government attorneys can be left feeling they received the raw end of the deal. For example, in Washington State, the State's antitrust chief, Jon Ferguson, announced that he was leaving his post to join the private Seattle law firm of Chandler, Franklin & O'Bryan to work on a class action lawsuit against the tobacco industry. The announcement came after Ferguson and the Chandler firm's Steve Berman led Washington State's lucrative lawsuit against the tobacco companies. When asked why he was leaving his post to go work for the firm that handled the State's case, Mr. Ferguson succinctly explained: "Steve Berman got $50 million and I got a plaque." *For the Record*, Wash. Post., Feb. 14, 2000, at F35.

C.      **State Hiring of Contingency Fee Lawyers is Unethical and Unconstitutional**

The Defendants' motion for judgment as a matter of law provides in detail the reasons that the State's entrance into a contingency fee arrangement is an improper conflict of interest and violates the Oklahoma Constitution. Other courts have reached similar conclusions.

For instance, when faced with a parallel situation, the California Supreme Court found it inappropriate for the City to hire a private attorney on a contingency fee basis to bring a public nuisance claim. *See People ex rel. Clancy v. Superior Ct.*, 705 P.2d 347 (Cal. 1985). Citing principles of American Bar Association Code of Prof. Responsibility, the court recognized, "the contingent fee arrangement between the City and [the private attorney] is antithetical to the standard of neutrality that an attorney representing the government must meet when prosecuting a public nuisance claim." *Id.* at 746-47, 750. Unlike cases brought for private plaintiffs, the court recognized that enforcement actions "involve a balancing of interests" and a "delicate weighing of values" that "demands the representative of the government to be absolutely

- 15 -

neutral." *Id.* at 749. The court concluded that "[a]ny financial arrangement that would tempt the government attorney to tip the scale cannot be tolerated," which "precludes the use in such cases of a contingent fee arrangement." *Id.* at 748-49. The fundamental principles of legal ethics are equally relevant in Oklahoma.

Recently, a California trial court applied *Clancy* to invalidate a contingency fee arrangement between the County of Santa Clara to disqualify private law firms from representing the state in a lawsuit against the lead paint industry. *See* Order Regarding Defendants' Motion to Bar Payment of Contingent Fees to Private Attorneys, *County of Santa Clara v. Atlantic Richfield Co.*, Case No. 1-00-CV-788657 (Cal. Super. Ct., Santa Monica Cty., Apr. 4, 2007) (attached as Exh. 1). The court found unpersuasive the government's claim that it maintains control over the litigation, as Attorney General Edmondson argues here, recognizing the practical difficulty of monitoring the reality of such an arrangement:

> [A]s a practical matter, it would be difficult to determine (a) how much control the government attorneys must exercise in order for the contingent fee arrangement with outside counsel be permissible, (b) what types of decisions the government attorneys must retain control over, e.g., settlement or major strategy decisions, or also day-to-day decisions involving discovery and so forth, and (c) whether the government attorneys have been exercising such control throughout the litigation or whether they have passively or blindly accepted recommendations, decisions, or actions by outside counsel. . . . Given the inherent difficulties of determining whether or to what extent the prosecution of this nuisance action might or will be influenced by the presence of outside counsel operating under a contingent fee arrangement, outside counsel must be precluded from operating under a contingent fee agreement, regardless of the government attorneys' and outside attorneys' well-meaning intentions to have all decisions in this litigation made by the government attorneys.

*Id.* at 3-4.

The Supreme Court of Louisiana has struck down a contingency fee agreement entered into by the state on constitutional grounds. Rather than consider the conflicting obligations, loyalties, and motivations of government and private lawyers, the Louisiana court found that

- 16 -

such an agreement violated the separation of powers established by the state constitution. *See Meredith v. Ieyoub*, 700 So. 2d 478 (La. 1997). The case, much like the one at bar, involved the state's hiring of private lawyers to prosecute and enforce environmental laws. *See id.* at 479-80. "[U]nder the separation of powers doctrine, unless the Attorney General has been expressly granted the power in the constitution to pay outside counsel contingency fees from state funds or the Legislature has enacted such a statute, then he has no such power," the court held. *Id.* at 481. The separation of powers provisions of the Louisiana and Oklahoma Constitutions are nearly identical. *Compare* La. Const., art. II, §§ 1-2 *with* Okla. Const., art. IV, § 1. Likewise, both state constitutions invest the legislature with exclusive control over the state treasury. *Compare* La. Const., art. III, § 16 *with* Okla Const., art. V, § 55. The Louisiana court rejected the bases similar to those offered by the State of Oklahoma in this case as sources of its power, such as its "inherent authority" to hire outside attorneys or a statute generally permitting attorneys to use of contingency fee contracts. *See Meredith*, 700 So. 2d at 482-43. Nor is there any authority in the Oklahoma Constitution providing the attorney general with such power absent legislative approval.

### D.    Better Choices for State Attorneys General Exist Than Using Contingency Fee Lawyers

Restricting the ability of the Attorney General to hire private counsel on a contingency fee basis will not impede his or her ability to represent the state and protect the public interest. The Attorney General can make better choices when pursuing litigation on behalf of the State.

### 1.    Actions Involving the State's Enforcement Power Should be Pursued by State Attorneys

When an action involves use of the state's enforcement power, the Attorney General must use the resources of his or her own office to pursue the litigation. The government attorney's

duty is not necessarily to prevail, or to achieve the maximum recovery, in a particular case; rather, "the Government wins its point when justice is done in its courts." *Brady v. Maryland*, 373 U.S. 83, 88 n.2 (1963). A government attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all," and therefore the government attorney is required to use the power of the sovereign to promote justice for all citizens. *Berger v. United States*, 295 U.S. 78, 88 (1935).[5]

Assistant Attorneys General, under the direction of the Attorney General, are best suited to carry out the State's responsibility, particularly when an action involves assertion of the state's police powers. The Attorney General and Assistant Attorneys General, like other attorneys in Oklahoma, take an oath to "support, protect and defend the Constitution of the United States, and the Constitution of the State of Oklahoma." Okla. Const. art. XV, §1; Okla. Stat. tit. 74, § 18a. Unlike other attorneys, however, they are paid in full through the annual appropriation adopted by the general assembly to ensure that their loyalty is to the people of the State. *See* Okla. Stat. tit. 74, § 250.4 (stating compensation for the Attorney General); Okla. Stat. tit. 74, § 21b (setting forth Assistant Attorneys General duties and compensation). Furthermore, ethics rules prohibit the Attorney General and his or her staff from using their official positions to secure compensation for themselves, receiving any compensation that would impair their independence

---

[5] It is beyond dispute that this solemn duty applies "with equal force to the government's civil lawyers." *Freeport-McMoran Oil & Gas Co. v. Federal Energy Regulatory Comm'n*, 962 F.2d 45, 47 (D.C. Cir. 1992) (Mikva, C.J.). Thus, it has long been recognized that a government lawyer in a civil proceeding should be held to a higher standard than a private lawyer, and that in civil proceeding "government lawyers have 'the responsibility to seek justice, and 'should refrain from instituting or continuing litigation that is obviously unfair.'" *Id.* (citing Model Code of Professional Responsibility EC 7-14 (1981)).

of judgment as state officials, or from entering into contracts on behalf of the state in which they have a "substantial financial interest." *See* Okla. Stat. tit. 74, Ch. 62 App., Standards 257:20-1-4(a), (c), 257:20-1-10(a)(1). Moreover, no state officer or employee may directly or indirectly receive or agree to receive anything of value in return for being influenced in the performance of an official act. *See* Okla. Stat. tit. 74, Ch. 62 App., Standards 257:20-1-9. These ethics rules exist to ensure that state officers and employees are independent and impartial, to avoid action that creates the appearance of impropriety, to protect public confidence in the integrity of its government, and to protect against conflicts of interest. *See* Okla. Stat. tit. 74, Ch. 62 App., Standard 257:20-1-1. Private attorneys are not bound by these principles of ethics in government, and the very nature of a contingency fee is directly contrary to the letter and spirit of prohibitions applicable to Attorney General actions under Oklahoma law.

### 2. *Outside Counsel Should be Available Only in a Supportive Role, On an Hourly Basis With Well-Defined Responsibilities and Close State Supervision*

There may be some tasks that are either routine or require special expertise for which the use of outside counsel on an *hourly* basis by the Attorney General may be appropriate. For example, under former Kansas Attorney General Phill Kline most legal work was undertaken by attorneys on his staff, but his office hired outside counsel to assist state attorneys when expertise in certain areas was needed, such as in water rights disputes between states and to defend the state in a school finance suit. *See* Jim Sullinger, *Kansas Paid $2 Million for Legal Aid; Unusual Report Fulfills a Promise by Attorney General*, Kansas City Star, Dec. 29, 2004, at B1.

When undertaking litigation requiring extensive resources, the Attorney General may feel the need to hire private attorneys to supplement the resources of his or her office. In such cases, the fee should be *hourly*, the contracting process open and competitive, the lines of authority

clear, and the responsibilities of the private attorneys well-defined in the contract. The private attorneys should work under the close supervision of the Attorney General. Such a procedure maintains the power of the government within the Office of the Attorney General, removes the incentive to make policy based on profitability, and reduces the potential for political patronage. Former Delaware Attorney General Jane Brady followed these principles. After taking office, she eliminated the "cozy relationships" with outside lawyers and implemented a bidding process. Manhattan Inst., Center for Legal Pol'y, *Regulation Through Litigation: The New Wave of Government-Sponsored Litigation*, Conference Proceedings, at 38 (Wash., D.C., June 22, 1999) (transcript of remarks). "The contracts are definite, for either a durational or transactional term, and we negotiate hourly rates, number of hours, and other terms of the relationship. Our new approach is inconsistent with contingency fee arrangements." *Id.*

### 3. Attorney Generals Have Better Options Than Hiring Contingency Fee Lawyers

Experience has proven that state attorneys general do, indeed, have a choice as to whether to contract with lawyers on a contingency fee basis, even when taking on the largest of adversaries. For example, former New York Attorney General Eliot Spitzer was considered one of the most aggressive and activist state attorney generals. *See, e.g.*, Sara Fritz, *Another N.Y. Official Making National Name for Himself*, St. Petersburg Times, Nov. 29, 2002, at A1 (reporting on Spitzer's aggressive approach). Yet, General Spitzer did not enter into contingency fee agreements with private lawyers as a matter of principle and practice. *See, e.g.*, *Regulation Through Litigation, supra*, at 7 ("I would never enter into an agreement with the plaintiffs' bar on a contingency fee basis to give away billions of dollars."), 23 ("I never would have entered into [the tobacco contingency fee] agreements and I criticized my predecessor for the terms, bidding process, and determination method his office used for choosing attorneys.").

- 20 -

In the multi-state tobacco suits, it is notable that the attorneys general of some states, such as Virginia, opted *not* to hire contingency fee attorneys and instead pursued the litigation with available resources. *See* Editorial, *Angel of the O's?*, Richmond Times Dispatch, June 20, 2001, at A8 (comparing the additional benefits gained by Virginia citizens whose Attorney General did not hire outside counsel with the money lost by its neighbor, Maryland, to legal fees). Other attorneys general who were not motivated by contingency fee attorneys, such as Delaware Attorney General Jane Brady, decided that joining the tobacco suits did not have the support of her constituents, despite the potential for a financial windfall. *See Regulation Through Litigation, supra,* at 38.

In fact, the federal government pursues litigation without hiring lawyers on a contingency fee basis. In May 2007, President George W. Bush formalized this policy by promulgating Executive Order 13433, "Protecting American Taxpayers From Payment of Contingency Fees," 72 Fed. Reg. 28,441 (daily ed., May 18, 2007). The President's order states "the policy of the United States that organizations or individuals that provide such services to or on behalf of the United States shall be compensated in amounts that are reasonable, not contingent upon the outcome of litigation or other proceedings, and established according to criteria set in advance of performance of the services, except when otherwise required by law." *Id.* Hiring attorneys on a hourly or fixed fee basis, and not through a contingency fees arrangement, "help[s] ensure the integrity and effective supervision of the legal and expert witness services provided to or on behalf of the United States." *Id.*

E.    **The Growing Use of Contingency Fee Lawyers by
      State Attorneys General is Contrary to Public Policy**

In addition to the constitutional and ethical questions raised by such arrangements, contracting out of the state's enforcement power to private contingency fee attorneys facilitates

what has been called "regulation through litigation." *See* Robert B. Reich, *Regulation is out, Litigation is in*, USA Today, Feb. 11, 1999, at A15; *see also* John Fund & Martin Morse Wooster, *The Dangers of Regulation Through Litigation: The Alliance of Plaintiffs' Lawyers and State Governments* (American Tort Reform Found. 2000), *available at* http://www.heartland.org/Article.cfm?artId=8162. The strategy of the private contingency fee attorneys to select an industry and go after it through tort litigation – as opposed to through legislation – may result in an end-run around representative government. Victor E. Schwartz, et al., *Tort Reform Past, Present and Future: Solving Old Problems and Dealing With "New Style" Litigation*, 27 Wm. Mitchell L. Rev. 237, 258-59 (2000). For example, the private attorney/state attorney general alliance in the tobacco litigation "legislated" by achieving enormous settlements – and did so with private personal injury lawyers working hand in hand with state attorneys general.

The examples of political patronage and outrageous fees in these cases showed that these problematic public-private partnerships are quite lucrative. *See* Susan Beck, *The Lobbying Blitz Over Tobacco Fees: Lawyers Went All Out in Pursuit of Their Cut of a Historic Settlement and the Arbitrators Went Along*, Legal Times, Jan. 6, 2003, at 1 (reporting that at least $13.6 billion in fees were awarded to private attorneys); Manhattan Inst., Center for Legal Pol'y, *Trial Lawyers, Inc.: A Report on the Lawsuit Industry in America 2003* 6 (2003) (estimating that approximately 300 lawyers from 86 firms are projected to earn up to $30 billion total over the next 25 years from the 1998 tobacco settlement).

Despite the claims of most attorneys general during the tobacco litigation that tobacco was a "unique" situation, states and localities have hired contingency fee lawyers to attack a wide range of manufacturers and service providers. Soon after the tobacco settlement, local

governments hired private attorneys to sue handgun manufacturers in a large number of cities.[6] In Connecticut, Attorney General Blumenthal has solicited private attorneys for their services in pursuing litigation against any company connected with the manufacture, distribution, or sale of gasoline with Methyl tertiary butyl ether ("MTBE")[7] and hired private attorneys to sue pharmaceutical companies over prescription drug pricing practices.[8]   Former Rhode Island Attorney General Sheldon Whitehouse's hiring of contingency fee lawyers to attack the lead paint industry has raised serious constitutional questions. *See Rhode Island v. Lead Indus. Ass'n, Inc.*, 898 A.2d 1234, 1238-40 (R.I. 2006) (quashing the writ of certiorari for lack of necessity of deciding matter on an interlocutory basis, but finding the practice "necessarily implicates sensitive questions regarding the proper role of the constitutional office of the Attorney General in relation to the exclusively legislative powers of the General Assembly" and "will not evade review"). Reports suggest that other targets include HMOs, automobiles, chemicals, alcoholic

---

[6] Most of these early cases were unsuccessful. *See, e.g., City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3rd Cir. 2002); *Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 273 F.3d 536 (3rd Cir. 2001) (applying New Jersey law); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98 (Conn. 2001); *Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042 (Fla. App. Ct. 2001).

[7] *See* State of Connecticut, Attorney General's Office, Request for Proposals: Litigation Services Involving Compensatory and Punitive Damages and Injunctive Relief Against Manufacturers, Designers, Refiners, Distributors, and Sellers of Methyl Tertiary Butyl Ether ("MTBE") for Pollution and Contamination of the Waters of the State of Connecticut, RFP No. 04-01 (MTBE), Feb. 25, 2004.

[8] *See* State of Connecticut, Attorney General's Office, Request for Proposals: Litigation Services Involving Claims for Restitution and Other Relief Authorized by Law With Respect to Unfair and Deceptive Sales and Marketing Practices by Pharmaceutical Companies With Respect to the Sale, Marketing and Reporting of the Average Wholesale Price of Their Drugs and Which Conduct Has Caused harm to the State of Connecticut and to Consumers, RFP No. 04-02, Dec. 20, 2004; William Hathaway, *State Sues Drug Companies, Claiming Price Gouging*, Hartford Courant, Mar. 14, 2003, at B7.

beverages, pharmaceuticals, Internet providers, "Hollywood," video game makers, and even the dairy and fast food industries. *See* Michael Y. Park, *Lawyers See Fat Payoffs in Junk Food Lawsuits*, Fox News Channel, Jan. 23, 2002; *see also* John J. Zefutie, Jr., Comment, *From Butts to Big Macs--Can the Big Tobacco Litigation and Nation-Wide Settlement With States' Attorneys General Serve as a Model for Attacking the Fast Food Industry?*, 34 Seton Hall L. Rev. 1383, 1411-13 (2004).

This alliance will no doubt continue, because these "new style" cases give the state executive branch a new revenue source without having to raise taxes. These lawsuits also give government officials the chance to achieve a regulatory objective that the majority of the electorate, as represented by their legislators, may not support. *See id.* As Robert B. Reich, Secretary of Labor in the Clinton Administration, has sagely observed, "The strategy may work, but at the cost of making our frail democracy even weaker. . . . This is faux legislation, which sacrifices democracy to the discretion of administration officials operating in secrecy." Robert B. Reich, *Don't Democrats Believe in Democracy?*, Wall St. J., Jan. 12, 2000, at A22; *see also* Victor E. Schwartz, *Trial Lawyers Unleashed*, Wash. Post, May 10, 2000, at A29.

In addition to offending the democratic process, contingency fee agreements by the state pose a danger to the business and legal environment in Oklahoma. They encourage lawsuits against "deep pocket" defendants that are often in industries viewed as unpopular by the public, making it difficult for them to receive a fair trial. This is particularly true when what is essentially private litigation is backed by the state's moral authority and seal of approval. As Michael Greve of the American Enterprise Institute has asked, "Do you want your state attorney general to be an ambulance chaser?" Jeff Shields, *Taking Law into Their Own Hands*, Philadelphia Inquirer, Oct. 4, 2004. Should this Court accept use of contingency fee agreements

by the State, the political patronage and unwarranted payouts seen in other states can be expected in Oklahoma, and exercise of the State's power based on profit, not public interest, will result.

## IV.    CONCLUSION

For the reasons stated herein and in the Motion of the Defendants, Amici respectfully request that the contingent-fee agreement between the Attorney General and the private lawyers should be declared unlawful and void.

Dated: June 12, 2007.

Respectfully submitted,

s/ Gary S. Chilton
Gary S. Chilton. OBA No. 1662
HOLLADAY CHILTON & DEGIUSTI, PLLC
204 North Robinson, Suite 1550
Oklahoma City, OK 73102
Telephone:     (405) 236-2343
Facsimile:     (405) 236-2349

Victor E. Schwartz, D.C. Bar No.406172
(*admitted pro hac vice*)
Cary Silverman, D.C. Bar No. 473658
(*admitted pro hac vice*)
SHOOK, HARDY & BACON L.L.P
600 14th Street N.W., Suite 800
Washington, D.C. 20005-2004
Telephone:     (202) 783-8400
Facsimile:     (202) 783-4211
ATTORNEYS FOR AMICI CURIAE

Robin S. Conrad, D.C. Bar No. 342774
(*admitted pro hac vice*)
NATIONAL CHAMBER
  LITIGATION CENTER, INC.
1615 H Street, N.W.
Washington, D.C. 20062
Telephone:     (202) 463-5337
Facsimile:     (202) 463-5346
OF COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2007, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | | |
|---|---|---|
| Jo Nan Allen | Frederick C. Baker | Tim K. Baker |
| Douglas L. Boyd | Vicki Bronson | Paula M. Buchwald |
| Louis W. Bullock | Lloyd E. Cole, Jr. | Angela D. Cotner |
| John Breian DesBarres | W. A. Drew Edmondson | Delmare R. Ehrich |
| John Elrod | William B. Federman | Bruce W. Freeman |
| Ronnie Jack Freeman | Richard T. Garren | D. Sharon Gentry |
| Tony M. Graham | James M. Graves | Michael D. Graves |
| Thomas J. Grever | Jennifer S. Griffin | Carrie Griffith |
| John T. Hammons | Jean Burnett | Michael T. Hembree |
| Theresa Noble Hill | Philip D. Hixon | Mark D. Hopson |
| Kelly S. Hunter Burch | Stephen L. Jantzen | Mackenzie Hamilton Jessie |
| Bruce Jones | Jay T. Jorgensen | Krisann C. Kleibacker Lee |
| Raymond T. Lay | Nicole M. Longwell | Dara D. Mann |
| Linda C. Martin | A. Scott McDaniel | Robert Park Medearis, Jr. |
| James Randall Miller | Robert A. Nance | John Stephen Neas |
| George W. Owens | David Phillip Page | K. Clark Phipps |
| Marcus N. Ratcliff | Robert P. Redemann | M. David Riggs |
| Randall E. Rose | Patrick Michael Ryan | Robert E. Sanders |
| David Charles Senger | William F. Smith | Jennifer F. Sherrill |
| Colin H. Tucker | John H. Tucker | R. Pope Van Cleef, Jr. |
| Kenneth E. Wagner | David A. Walls | Elizabeth C. Ward |
| Sharon K. Weaver | Timothy K. Webster | Gary V. Weeks |
| Adam Scott Weintraub | Terry W. West | Dale Kenyon Williams, Jr. |
| E. Stephen Williams | Douglas Allen Wilson | J. Ron Wright |
| Lawrence W. Zeringue | Bobby Jay Coffman | Laura Samuelson |
| Reuben Davis | | |

I further certify that a true and correct copy of the above and foregoing will be mailed via

first class U.S. Mail, postage properly paid, on the following who are not registered participants

of the ECF System:

| | |
|---|---|
| C. Miles Tolbert<br>Secretary of the Environment<br>State of Oklahoma<br>3800 N. Classen<br>Oklahoma City, OK  73118<br><br>**PLAINTIFF** | William H. Narwold<br>MOTLEY RICE LLC<br>20 Church Street 17th Floor<br>Hartford, CT  06103<br><br>**ATTORNEYS FOR PLAINTIFF** |
| Monte W. Strout<br>209 W. Keetoowah<br>Tahlequah, OK  74464<br><br>**ATTORNEY FOR CLAIRE WELLS,<br>LOUISE SQUYRES, THIRD-PARTY<br>DEFENDANTS** | Robin Wofford<br>Rt. 2, Box 370<br>Watts, OK  74964<br><br>**PRO SE, THIRD PARTY DEFENDANT** |
| James R. Lamb<br>D. Jean Lamb<br>STRAYHORN LANDING<br>Rt. 1, Box 253<br>Gore, OK  74435<br><br>**PRO SE, THIRD PARTY DEFENDANTS** | Gordon and Susann Clinton<br>23605 S. Goodnight Lane<br>Welling, OK  74471<br><br>**THIRD PARTY DEFENDANTS** |
| Kenneth and Jane Spencer<br>James C. Geiger<br>Individually and dba Spencer Ridge Resort<br>16444 E. 580 Rd.<br>Kansas, OK 74347<br><br>**PRO SE, THIRD PARTY DEFENDANTS** | Ancil Maggard<br>c/o Leila Kelly<br>2615 Stagecoach Dr.<br>Fayetteville, AR  72703<br><br>**THIRD PARTY DEFENDANT** |
| C. Craig Heffington<br>20144 W. Sixshooter Rd.<br>Cookson, OK  74427<br><br>**PRO SE, SIX SHOOTER RESORT AND<br>MARINA, INC., THIRD-PARTY<br>DEFENDANT** | Richard E. Parker<br>Donna S. Parker<br>BURNT CABIN MARINA & RESORT, LLC<br>34996 S. 502 Road<br>Park Hill, OK  74451<br><br>**PRO SE, THIRD PARTY DEFENDANTS** |

| | |
|---|---|
| James D. Morrison<br>Rural Route #1, Box 278<br>Colcord, OK  74338<br><br>**PRO SE, THIRD PARTY DEFENDANT** | Jim R. Bagby<br>Route 2, Box 1711<br>Westville, OK  74965<br><br>**PRO SE, THIRD PARTY DEFENDANT** |
| Marjorie A. Garman<br>5116 Hwy. 10<br>Tahlequah, OK  74464<br><br>**THIRD PARTY DEFENDANT** | Doris Mares<br>Dba Cookson Country Store and Cabins<br>P.O. Box 46<br>Cookson, OK  74424<br><br>**PRO SE, THIRD PARTY DEFENDANT** |
| Eugene Dill<br>P.O. Box 46<br>Cookson, OK  74424<br><br>**PRO SE, THIRD PARTY DEFENDANT** | Linda C. Martin<br>N. Lance Bryan<br>Doerner, Saunders<br>320 S. Boston Ave., Ste. 500<br>Tulsa, OK  74103<br><br>**THIRD PARTY DEFENDANTS** |
| John and Virginia Adair<br>Adair Family Trust<br>Route 2, Box 1160<br>Stilwell, OK  74960<br><br>**THIRD PARTY DEFENDANTS** | Charles L. Moulton<br>Arkansas Natural Resources Commission<br>323 Center St., Ste. 200<br>Little Rock, AR  72206 |

s/Gary S. Chilton
Gary S. Chilton