IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel.,      )
W.A. DREW EDMONDSON, in his      )
capacity as ATTORNEY GENERAL     )
OF THE STATE OF                  )
OKLAHOMA, et al.,                )
                                 )
            Plaintiffs,          )
                                 )
-vs-                             ) No. 05-CV-329-GKF-SAJ
                                 )
TYSON FOODS, INC., et al.,       )
                                 )
            Defendants.          )

TRANSCRIPT OF MOTION HEARING

**BEFORE THE HONORABLE SAM A. JOYNER**
**UNITED STATES MAGISTRATE JUDGE**

MAY 6, 2008

*REPORTED BY:*          ***BRIAN P. NEIL, CSR-RPR, CRR, RMR***
                        *United States Court Reporter*

**United States District Court**

```
1                    A P P E A R A N C E S

2

3    For the Plaintiffs:          Mr. Robert A. Nance
                                   Mr. Louis W. Bullock
4                                  Mr. Bob Blakemore
                                   Mr. M. David Riggs
5                                  Mr. J. Trevor Hammons
                                   Ms. Kelly Burch
6                                  Mr. Daniel P. Lennington

7
     For the Defendant
8    Cargill:                      Mr. John H. Tucker
                                   Ms. Theresa Hill
9

10
     For the Defendant
11   Peterson:                     Mr. A. Scott McDaniel
                                   Mr. Nicole Longwell
12                                 Mr. Philip Hixon

13
     For the Defendant
14   Tyson:                        Mr. Robert George
                                   Mr. Bryan Burns
15

16   For the Defendant
     Cal-Maine:                    Mr. Robert Sanders
17                                 Mr. David C. Senger

18
     For the Defendant
19   Simmons Foods, Inc:           Mr. John Elrod

20

21

22

23

24

25
```

```
 1                    Tuesday, May 6, 2008

 2                       *  *  *  *  *

 3               THE CLERK:  This is Case No.

 4   05-CV-329-GKF-SAJ, State of Oklahoma v. Tyson Foods.

 5          Will counsel make their appearance for the

 6   record, please?

 7               MR. BULLOCK:  Louis Bullock for the

 8   State of Oklahoma.

 9               MS. BURCH:  Kelly Burch, State of

10   Oklahoma.

11               MR. NANCE:  Bob Nance for the State of

12   Oklahoma.

13               MR. BLAKEMORE:  Bob Blakemore for the

14   State of Oklahoma.

15               MR. RIGGS:  David Riggs, State of

16   Oklahoma.

17               MR. LENNINGTON:  David Lennington, State

18   of Oklahoma.

19               MR. HAMMONS:  Trevor Hammons for the

20   State of Oklahoma.

21               THE COURT:  Okay.  That's the State of

22   Oklahoma.

23               MR. GEORGE:  Robert George for Defendant

24   Tyson Foods and related entities.

25               MR. MCDANIEL:  Scott McDaniel, Nicole
```

**United States District Court**

1    Longwell, and Philip Hixon here for Peterson Farms.

2                MS. HILL:  Theresa Hill and John Tucker

3    for the Cargill defendants.

4                MR. GRAVES:  James Graves here for

5    George's, Inc. and George's Farms.

6                MR. SANDERS:  Bob Sanders for Cal-Maine

7    Farms.

8                MR. ELROD:  John Elrod for Simmons

9    Foods, Inc., Your Honor.

10               THE COURT:  All right.  There are a few

11   folks behind the bench that are with us, which is just

12   fine.  Well, actually it looks like we've got it down

13   to the real workers.  I mean, we don't have the 60

14   lawyers this time, we've got the 25 real workers.

15               It's good to see everyone, it's been awhile,

16   but you've been otherwise involved with Judge

17   Frizzell.  In fact, I guess now you're involved with

18   both of us.  You're two-timing us on a regular basis.

19               We have four motions set on the docket today.

20   Beginning chronologically seems to me might be the

21   best way to go beginning with the motion 1418, which

22   is the status conference, whatever that is, on the

23   motion to expand the discovery period, then move to

24   document 1605, defendant's motion to compel

25   plaintiff's compliance with data production order,

1   then 1683 and 1684, which are Cargill defendant's

2   motions to quash 30(b)(6) notices, and then end up

3   with 1687 which is Oklahoma's motion for protective

4   order to quash deposition notice.  So maybe

5   they're -- well, I don't know.  I guess the first two

6   are both probably equally time-consuming.

7          Does anyone have any objection with that

8   order of proceeding?

9          All right.  Well, if not, let's chew the fat

10  for awhile on 1418, which is the State of Oklahoma's

11  motion for discovery period.  We converted this to a

12  status conference -- actually, we sort of thought we'd

13  talk about a status conference to begin with.  I'm not

14  sure the order said that and so we tried to make it

15  clear.  Basically, we need to find out today what it

16  is we're going to do in regard to motion 1418.  It is

17  the plaintiff's motion at this stage.

18         It looks like to me that there's like three

19  positions procedurally available to us on motion 1418.

20  The first one would be that you could spend time on a

21  small amount of argument today and we can decide it on

22  the briefs.  I mean, if that's what you think ought to

23  happen, then express that.

24         The second option is, you may want it set

25  down for a further complete oral argument by counsel

1    when we have more time and more detailed preparation

2    for that.  That's an option.

3        Or you may think that we need a further

4    evidentiary hearing with expert testimony to examine

5    the Daubert issues.  That's an option.  So let me know

6    what you think when you present your position.

7        And with that, I think probably we can just

8    recognize counsel for the plaintiff for argument in

9    support of the motion to let us know what they think

10   should happen.

11       The defendants' responses all seem to fall

12   within one of three categories.  They either say the

13   evidence isn't relevant, they say they've already

14   produced it all, or they say production is not worth

15   the cost of obtaining -- the probative value is

16   outweighed with the cost of production.

17       So with that, at this time we'll recognize

18   plaintiff for argument in support of their motion and

19   to let us know how you think we should proceed.

20           MR. NANCE:  Well, Your Honor, I came

21   more prepared to talk about status than to argue the

22   merits of it but I can touch on some of it, if you

23   like.

24           THE COURT:  Well, no.  If we only want

25   to talk about the status, that's fine with me.  I

1    just --

2              MR. NANCE:  Well, here's where we are,

3    whether it's argument or status.  I'll try to explain

4    the way you're right, the responses shake out.

5              We submitted an affidavit of Shannon

6    Phillips, who is an official at the Oklahoma

7    Conservation Commission in the water quality

8    department.  She summarized both her own personal

9    knowledge and the results of numerous studies of the

10   impact of nonpoint sources and poultry litter on the

11   watershed.  That was done in response to your order, I

12   think No. 1207, where you invited evidence on that

13   question.

14             No defendant has submitted any substantive

15   response to Ms. Phillips' affidavit.  This is a

16   question that is of obvious importance in the case,

17   and it's a question where evidence and expert

18   testimony is equally available to both sides, we don't

19   have a monopoly on that, and had they had something to

20   offer, they could have offered it and should have

21   offered it but they have not.

22             So I believe that her testimony at this point

23   by affidavit is uncontroverted and that establishes

24   the relevance to the case and to the documents of the

25   practices of the defendants in land-applying poultry

1   waste more than five years ago.

2         I think there is no -- at this state and at

3   this state of the record there is no dispute on the

4   factual issue and really can be none, given the state

5   of the science, that land application of poultry

6   litter more than five years ago has impacted the

7   watershed both in the past and in the present.  We

8   think there is no need for any hearing or evidence,

9   any further evidence, on that issue because at this

10  point it's uncontested.

11        As regard to the cost issue, no defendant has

12  submitted any evidence that there is an excessive cost

13  or burden in responding to the state's interrogatories

14  or in educating 30(b)(6) deposition witnesses beyond

15  the five-year limit.  So I believe that is not an

16  issue in the case.

17        Tyson and George's claim they produced all

18  the responsive documents regardless of date;

19  therefore, there should be no additional cost to them

20  certainly in responding to interrogatories and

21  educating 30(b)(6) witnesses.  Their statement is that

22  they've already gathered the documents and either

23  produced them or stand ready to do so.

24        I would note that Tyson at least has not

25  indexed the boxes they have produced to us in the

1    fashion required by the court but that may be an

2    argument for another day.

3          I think as regards responding to the

4    interrogatories and 30(b)(6) witnesses, there is no

5    dispute of fact before the court that would indicate

6    that that is overly burdensome or expensive.  So the

7    state's motion should be sustained on that basis -- or

8    for those forms of discovery.

9          Cargill is the only defendant that submitted

10   any evidence of cost of document production, and they

11   only submitted evidence in the form of affidavits

12   regarding the cost of document production.

13         Now, in footnote 3 to their response at page

14   6, they admit essentially that they have withheld 200

15   boxes of documents which contain documents on

16   corporate knowledge and/or areas which they have

17   agreed to produce and are just awaiting the outcome

18   of this hearing or whatever happens on our motion to

19   produce those.  We think there's no reason whatsoever

20   for them to hold up on that.  They haven't articulated

21   one other than perhaps their own convenience.

22         Cargill as well has not indexed document

23   production in the boxes as the court has ordered.

24              THE COURT:  Okay.  Are these 200 boxes

25   outside the five-year limit or are there other reasons

1    they haven't been produced?

2              MR. NANCE:  As I understand that

3    footnote, they're saying that within -- they're

4    corporate knowledge, which doesn't have a five-year

5    limit, or they are areas whereas between the parties

6    they have agreed to make production beyond the

7    five-year limit.

8              THE COURT:  Okay.

9              MR. NANCE:  And Tyson and George's claim

10   at least that they have either produced or stand ready

11   to produce their documents.  We wonder why it is so

12   expensive for Cargill to do so, and we suspect that

13   it's been because it's been very lawyer-intensive.

14   That would be Cargill's option to produce them that

15   way.

16        Unlike the question of the state of the

17   Illinois River or the science behind the way

18   phosphorus is transported from waste application sites

19   to the water, Cargill's costs in assembling these

20   documents and such is not a matter of public knowledge

21   or it's not something that we can counter with an

22   affidavit of our own.

23        Therefore, I think if Cargill wants to go

24   forward on the basis of resisting production of

25   documents, as opposed to answering interrogatories or

1   30(b)(6) witnesses, I think there needs to be some

2   discovery to understand and prepare for a hearing on

3   that.

4        Peterson says that it has no per se objection

5   to producing things more than five years ago but

6   claims they need a more focused list of items and that

7   certain of our items that we've asked for are not

8   relevant.  We've addressed that in the materials.  I'm

9   not here to argue that.  I'm just -- I'm reminding the

10  court where they're coming from.

11        The remaining defendants, besides Tyson,

12  George's, Cargill, and Peterson, did not respond, and

13  so we believe the court should deem our motion

14  confessed as to those defendants.  They made no legal

15  argument.  They made no factual presentation.  Under

16  the local rules, the motion is confessed as to the

17  remainder.

18        Your Honor, no defendant has submitted any

19  authority to counter our original argument that the

20  statute of limitations does not run against the state.

21  They all pooh-pooh it.  They all say we're wrong.

22  They all say they'll deal with it at some appropriate

23  time, but the appropriate time has come and has gone.

24             THE COURT:  Okay.  Are these defendants

25  that have not responded defendants that have produced

1    discovery?

2              MR. NANCE:  Willow Brook has not

3    produced discovery.  Cal-Maine has produced some.

4    Who's our other one?  Simmons.  I'm personally not

5    knowledgeable about the extent of Simmons' production.

6    I just can't answer your question.  I apologize.

7              THE COURT:  Okay.

8              MR. NANCE:  The issue of statute of

9    limitations was one that was posed in your order 1207

10   which kind of started this process.  We have briefed

11   it repeatedly, we've given you the applicable Oklahoma

12   authority on that, and no defendant has come up with

13   counter-authority because it just is the law that when

14   the sovereign state is acting in its sovereign

15   capacity, neither latches nor the statute of

16   limitations apply.  We think that is something that is

17   ready for decision in our favor.

18            The defendants for the most part -- well, I

19   think universally took this to deal with document

20   production, and they just overlooked the fact that we

21   have sets of interrogatories out there, including one

22   which you have ordered to be answered, and that is the

23   number of birds.

24            You've ordered them -- and I'm not limiting

25   my request on that but I'm using that as an

1    example -- you have ordered them to produce

2    interrogatory answers under certain conditions

3    regarding the number of birds in the watershed going

4    back five years.  On the state of the pleadings and

5    the record right now, every defendant should produce

6    interrogatory answers -- every defendant -- going back

7    as far as they have knowledge or they have a presence

8    in the watershed.

9            So there are other things just besides the

10   documents.  There's the 30(b)(6) depositions for

11   witnesses that need to be moved past the five-year

12   limit.  Right now, they're limited to educating them

13   for a five-year period.

14           I mean, you've said corporate knowledge goes

15   back as far as it goes back.  Knowledge and action in

16   this case, I think, go hand in hand.  We need to know

17   not only what they knew, but what they did about what

18   they knew, and we can't really do that adequately

19   without discovery going beyond five years.

20           THE COURT:  Okay.  Let's say -- and I

21   don't want to interrupt your presentation, but

22   eventually I'd like you to address the question of

23   let's say you win this argument, you get evidence back

24   from the beginning of time.

25           How do you see that proceeding from this

1    point forward?  Number one, we have production of

2    documents, so I think they're saying they've produced

3    everything that is relevant from the beginning of

4    time.

5              MR. NANCE:  Tyson and George's say that,

6    Cargill is obviously contesting that, and Peterson

7    says it doesn't have any objection -- per se objection

8    but it hasn't produced.  That's kind of a rundown on

9    the ones that responded so it varies by defendant.

10             THE COURT:  Do you have objections to

11   Tyson and George's saying that production has not

12   included everything from the beginning of time?

13             MR. NANCE:  We think, at least in

14   Tyson's case, we need an adequate index to see what

15   we've got, the sort of index that you've required us

16   to do and I think is the universal rule in the case.

17   There are some documents that Tyson has made available

18   to us that we have not looked at.  The last batch we

19   looked at in Fayetteville was not indexed.

20             THE COURT:  Okay.

21             MR. NANCE:  We're not eager to go

22   through that exercise again.  That's, without more

23   argument than absolutely is necessary, I think where

24   the status is.

25             Now, is there anything else I can tell the

1    court by way of relevancy of it?  Is that a question

2    in your mind?

3                    THE COURT:  Well, the real question is,

4    where do we go from here?  Production, Tyson and

5    George's says they've done it, Peterson says they want

6    specifics, and Cargill is a little different.

7                    Okay.  So interrogatories, what do you think

8    would happen interrogatory-wise if you win this

9    argument?

10                   MR. NANCE:  They would supplement their

11   interrogatories to sweep in -- and I haven't looked at

12   all of them in preparing for this -- but they would

13   sweep in any evidence they have going back beyond the

14   five-year rule and particularly with the bird

15   numbers.

16                   THE COURT:  Do we know how many

17   interrogatories that includes at this point?

18                   MR. NANCE:  You know, I wrote a letter

19   limiting those -- it would be a number of

20   interrogatories.

21                   THE COURT:  Have you got a guess?  I

22   mean, I don't remember.  I haven't --

23                   MR. NANCE:  I think the way we limited

24   them -- because we had both a limitation in geography

25   and we had a limitation in time.  From memory, two or

1    three dozen.

2                THE COURT:  Oh, okay.

3                MR. NANCE:  At least.  And I can -- I

4    don't know if I have that letter with me, I may; and

5    if I do, I'll advise you if I get a chance to reply on

6    the way we framed that record.

7                THE COURT:  And then we have deposition

8    testimony, and you would just like for them to be able

9    to testify in regard to issues beyond the five-year

10   period --

11               MR. NANCE:  Correct.

12               THE COURT:  -- in deposition?

13               MR. NANCE:  And that may or may not

14   require in the case of an individual defendant a

15   redeposition, but that's certainly possible because

16   some of them have put up people that may not have been

17   educated beyond the five-year limit.

18               THE COURT:  Yeah.  Okay.  Well, the

19   original question was, do you want another hearing on

20   this issue?  It sounds like you're saying no, I mean,

21   you think you've got everything you want in at this

22   point, if the defendants don't put anything else in.

23               MR. NANCE:  The only issue that might

24   need a hearing is if Cargill wants to press the cost

25   item.  I think everything else, putting aside the

1    adequacy of indices and things like that that really

2    aren't tee'd up for this motion, I think everything

3    else in all other regards the court should grant our

4    motion.  If we need to go further with Cargill alone,

5    then we will.

6                THE COURT:  All right.  That's clear.

7    Thanks.

8                MR. NANCE:  Thank you, sir.

9                THE COURT:  Okay.  Mr. Peterson.

10               MR. MCDANIEL:  Good morning, Your Honor.

11   Scott McDaniel for Peterson Farms.

12               THE COURT:  The Peterson response is the

13   more amorphous of the four or five so it's probably

14   best that you start.

15               MR. MCDANIEL:  Well, I appreciate that

16   we've afforded the court an intellectual challenge

17   with our response so I'm grateful to get the

18   opportunity to address you.

19          Now, obviously the different defendants are

20   coming at this time differently based upon their

21   position and their viewpoint on the discovery and how

22   the law applies so I can only speak for Peterson

23   Farms.  I would like for that to be clear to the court

24   from the beginning.

25               Of the options you offered at the beginning

1   of your comments, what I would suggest is most

2   suitable to Peterson Farms is your first option, that

3   I would like to present you with a bit of argument and

4   status and how I request the court resolve the motion

5   as to Peterson.  Then we believe the brief -- our

6   brief addresses the issue we'd like the court to

7   consider in resolving the motion.  So on behalf of

8   Peterson, I don't think an evidentiary hearing,

9   particularly on Ms. Shannon's affidavit, is necessary

10  and I can explain that further.

11       I think the status can be fairly summarized

12  by the communication that I had with Mr. Garren,

13  counsel for the plaintiffs, back in mid March.  We

14  made an attempt to resolve this motion short of our

15  response and this hearing and an evidentiary hearing.

16       The approach we took in dealing with

17  plaintiffs, which is reflected in the attachments to

18  the brief, is I was operating under the assumption

19  that in the case of Peterson -- and I was trying to

20  broker an agreement that would be suitable to all the

21  defendants -- I'm operating under the assumption that

22  the plaintiffs have got my client's operational

23  documents, which is really all we're talking about.

24  We know the knowledge documents are not at issue here.

25  So it's this Illinois River Watershed poultry

1    operational documents and information.

2          I was operating under the assumption that

3    plaintiffs have had this, they've got multiple,

4    multiple years of my client's documents, more than I

5    think they wanted or needed but they've got years of

6    it.  So they know the kind of information my client

7    develops and maintains relating to poultry operations

8    and its relationships with growers, feed production,

9    etcetera.

10         They've taken our client's 30(b)(6)

11   deposition, they got our ESI production, and they took

12   the deposition of our custodian of records.  My

13   approach to the attempt to negotiate a resolution with

14   the plaintiffs was, you know what my client's all

15   about.  If you want to go back older in time, tell me

16   what information you're looking for and then you

17   provide that to me.  I will take it to my client, I

18   will present it to the counsel for the other

19   defendants, and see if we can come up with a list that

20   we can all say, okay, fine.

21         That discussion gained a little bit of

22   momentum for a brief period of time, and I was under

23   the impression that Mr. Garren was taking that

24   proposal to his colleagues, they would discuss it, and

25   get back to me.  Then in the response -- I think

1   you've seen it attached to our brief -- they said, no,

2   no, no, we're not going to do that, and the only thing

3   we can do is you must provide us exemplars of every

4   document that you maintain and then we'll decide which

5   of those we want.  That didn't seem very productive so

6   we couldn't resolve it.

7          From that conversation with Mr. Garren, a

8   couple things were clear.  The plaintiffs do not want

9   another mass of boxes of grower files.  Those were

10  Mr. Garren's words:  "I don't want anymore growers'

11  records.  I've seen enough of that."

12         I said, "I understand.  So tell me what you

13  want."  So it's clear they don't want that.

14         Peterson Farms has no interest in spending

15  more time and money identifying those historical

16  growers, finding their documents, reviewing them,

17  redacting the confidential stuff pursuant to the

18  protective order, going through the expensing of

19  producing it if the plaintiffs aren't going to review

20  it and aren't going to use it.  So that was a reason

21  why I asked for this list of the specific information

22  they believe they need in their case.  I'm still

23  waiting on that list; that's the status.

24         But as far as the merits of the motion, these

25  discussions highlight for me -- and I hope it will

1    highlight for the court -- how this issue has really

2    changed a bit since the court entered its first order

3    setting the five-year limitation.  And what I mean by

4    that is this whole issue -- I believe it was raised

5    within the context of the Cargill discovery but it

6    could have been Tyson.  It doesn't matter.  Your order

7    applied to us all -- and that is, we got some big, big

8    sets of requests for production of documents and then

9    some interrogatories.

10         On behalf of my client, there were a number

11   of those requests -- not all of them -- but a number

12   of them that we objected that they were overly broad

13   because there was no time limitation in the request.

14   That's what tee'd the issue up for the court, and the

15   court decided to impose a five-year limitation, which

16   was a reasonable approach, to deal with that

17   objection.

18         Now, what's now apparent to Peterson is the

19   issue is not -- from Peterson's perspective, the issue

20   is not whether information older than five years old

21   should be produced, and Mr. Nance accurately

22   represented our position to the court, that we don't

23   have an objection per se to information older than

24   five years old.  That doesn't mean we don't have an

25   objection to the discovery or overbreadth.  But it is

1     the nature of the information being sought that will

2     determine whether the plaintiffs' discovery is still

3     overbroad and I think should be the basis for the

4     court's decision.

5              As we discussed in our response brief, there

6     are courts in this circuit that have held that

7     discovery requests that are not limited to a

8     reasonable time period are overbroad on their face.

9     That's what we're dealing with here.

10             What I would encourage the court -- it's

11    reinforced in my mind from what I heard from

12    Mr. Nance -- is I would encourage the court to not

13    treat this discovery as one categorical, single issue

14    because their discovery -- the types of documents they

15    seek, the types of information they seek -- are across

16    a broad array.  We've only raised this objection to

17    certain requests and we have -- and that, I think,

18    should be the basis -- for the plaintiff's motion, it

19    shouldn't be the basis for the court's decision.

20             THE COURT:  Okay.  Well, what would

21    happen if the court granted the plaintiff's motion and

22    said, you must update all production requests and

23    interrogatories since the beginning of time?

24             MR. MCDANIEL:  From my client, what we

25    would have to do is a process that we've explained to

1    the plaintiffs in our multiple disclosures, including

2    ESI.  We're going to have to undertake a process of

3    identifying historical growers.

4            In the time period prior to 2002, Peterson

5    Farms didn't track its growers by watershed, so it's a

6    manual process -- interviewing service techs, looking

7    on maps -- to try to generate a list, which we can do

8    with as much accuracy as people's memories will abide.

9    Then we're going to have to find those documents, find

10   the responsive information, and produce it.

11           That exercise, Your Honor, I'm not saying

12   that the court under no terms should require any part

13   of that to be done; that's not my argument.  My

14   argument is, the plaintiffs have a burden to address

15   the facial overbreadth of their requests by showing

16   what information in which requests the court should

17   require us to answer because it has a reasonable

18   possibility of being probative in their case --

19                   THE COURT:  Okay.

20                   MR. MCDANIEL:  -- rather than this being

21   a make-work exercise.

22                   THE COURT:  So you're asking for a

23   supplemental motion to produce and supplemental

24   interrogatories which are more focused in the

25   beginning?

```
 1               MR. MCDANIEL:  Not necessarily.  And if

 2    I can continue, I can explain briefly what I'm

 3    suggesting the court do.

 4               What the plaintiffs -- the approach the

 5    plaintiffs have taken to this issue is they've talked

 6    about it solely in the temporal sense and whether five

 7    years is an appropriate limit or it's not as if that's

 8    all -- that's the sine qua non of the issue and it's

 9    not.

10               This affidavit from Ms. Phillips, the reason

11    that Peterson doesn't think we need an evidentiary

12    issue and we need to put up a rebuttal expert is even

13    if you read it, it doesn't respond to the question

14    that I'm suggesting the court consider.

15               In one aspect, she makes a number of

16    conclusory statements about what historical water

17    quality was and what historical causes for that water

18    quality issues were, but she doesn't provide the court

19    any guidance for the answer -- to answer the question,

20    well, if it's not five years, then what should it be?

21    She doesn't provide you anything for you to adjust

22    your ruling.  She just simply says, you know, there's

23    been water quality problems out there since the '70s

24    or '80s or '90s.  Well, I don't think we have to fight

25    about that in the discovery process; those are
```

1    ultimate issues.

2         But what she doesn't tell the court is that

3    there is a basis for concluding that poultry

4    operations ten years ago is the source of a

5    present-day injury, and you framed that very question

6    for the plaintiffs when you invited them to take this

7    to the next level.

8         The --

9              THE COURT:  Okay.  While you're on that

10   point, you have not disputed their

11   statute-of-limitation arguments, and so if they argue

12   that damages committed 30 years ago can now be

13   recompensed --

14              MR. MCDANIEL:  I definitely want to

15   address that issue and that's because that's not at

16   issue here.  I would encourage the court not to accept

17   the invitation to make a ruling that would be the law

18   of the case on statute of limitations that would bind

19   the parties and potentially Judge Frizzell.  That is a

20   summary judgment issue that the parties will raise.

21         The plaintiffs have made their argument

22   categorically that they're not bound by the statute of

23   limitations, but there's authority out there that

24   clearly establishes equitable remedies for -- from

25   remedies for damages.  The defendants don't see that

1    as being a decisional issue for the court in order to

2    decide the probative value.

3              THE COURT:  How do I find that evidence

4    from 30 years ago is relevant if I don't rule on the

5    statute of limitations?

6              MR. MCDANIEL:  Well, because I think the

7    court made the right call back in July of last year

8    when you said that it needs to be relevant to a

9    current injury.  I mean, the plaintiffs haven't put

10   anything before you about an historical injury they're

11   seeking recompense for; it's a current injury.

12        They're arguing there are historical actions

13   that caused a current injury, so if that action

14   occurred 30 years ago, the injury is present today and

15   we have a cause of action.

16              THE COURT:  Okay.  So there's enough

17   evidence in the record to find relevance based upon

18   damage 30 years ago but injury today?

19              MR. MCDANIEL:  The question for the

20   court, Your Honor, is relevance of what?  The "of

21   what" is defining the scope of individual discovery

22   requests that have been propounded.  That's the point

23   I made earlier.

24        I would encourage the court not to make a

25   blanket decision like that because there are aspects

1    to the discovery that clearly are not going to assist

2    the plaintiff's case in any way if it's 20 years old,

3    30 years old.

4              A good example is, Mr. Nance mentioned

5    interrogatory No. 1, tell us the number of birds.

6    That is exactly the type of information I was asking

7    from the plaintiffs, focus your discovery, tell us

8    what you want.  I've heard one answer, and you just

9    heard it too, we want to know the number of birds back

10   in time.

11             Well, if that's the court ruling, okay, we're

12   going to go back and do the best we can do to answer

13   that interrogatory.

14                  THE COURT:  Okay.

15                  MR. MCDANIEL:  So let's assume for the

16   sake of argument, Your Honor -- not necessarily

17   conceding it because of my position -- but if you rule

18   that the number of birds I find to be relevant to the

19   plaintiff's claims, give it to me as far back as you

20   can, that is a response that we can work with.  If you

21   came -- that's it.  Tell us specifically the

22   information that relates to the claims.

23             Why do they want to see temperature records

24   in poultry houses for the last 50 years?  That's an

25   example of ridiculous stuff that -- and there are tons

1    of those records.

2              That's what I tried to lay out in my brief,

3    is the scope of their specific discovery gets to so

4    much more than the heart of this case.  If we can

5    focus this to the heart of the case, then I have the

6    ability to respond on behalf of my client.

7              THE COURT:  All right.  Well, you are

8    not disputing then the relevance of the number of

9    birds in the watershed 20 years ago?  You don't want

10   to concede that, but you don't want the opportunity to

11   present expert testimony or argument in opposition to

12   that relevance argument?

13             MR. MCDANIEL:  Let me answer it this

14   way, Your Honor.

15             When I consulted with Mr. Garren, if he would

16   have said, Scott, if you'll on behalf of Peterson

17   Farms tell me the number of birds produced back as far

18   as you've got the data, that item on the list, the

19   focus list, I wouldn't have argued with him about

20   that, we would have set about doing it, but I never

21   got that answer.

22             The issue on the 30(b)(6) depositions, I

23   think there's a little bit of an error in the record

24   there at least as far as Peterson.  What's been

25   created for Your Honor is this impression that at

1    these depositions anytime there was a question asked,

2    the defense lawyer said, "We're only answering within

3    the last five years" and that it was an issue.

4            Well, you can review the record in the

5    Peterson Farms' deposition and, you know, we stated

6    all of our objections in writing to the notice and

7    time limit was one of the objections.  But in the

8    deposition, there was, to my recollection, never a

9    question that was asked and was not answered because

10   its scope exceeded five years.

11           So I think if the plaintiffs are going to

12   contend that they should be able to renotice and

13   retake my client's deposition, then they need to come

14   forth with specifics on the areas they believe they're

15   entitled to inquire into further.

16           Plaintiff's counsel has conceded that the

17   full production that they seek from Peterson will net

18   them a mass of documents they don't have any use for.

19   As we mentioned in our brief, you know, we've sent

20   them -- I think we produced something like about a

21   hundred-thousand pages to date.

22           Our client's 30(b)(6) deposition, there

23   weren't any grower file documents even used at the

24   deposition.  The live production manager is sitting

25   there in the chair and they don't pull documents out

1    of growers' files in his deposition.  None of them

2    were offered to Judge Frizzell in the motion for

3    preliminary injunction.  These are not -- that's not

4    the information they seek.

5          From our perspective, Your Honor -- and this

6    is what I request the court do with response to the

7    motion -- we think it can be quickly and easily

8    resolved if the court will direct the plaintiffs to

9    provide Peterson Farms with a list carefully crafted

10   of the information they seek focusing on the issues

11   underlying their theories of the case and set a time

12   period, short as the court feels is appropriate, we'll

13   confer and hopefully agree.  That will very much focus

14   this issue for the court.  Either we'll resolve it and

15   get it done or not.

16          THE COURT:  Okay.  On page 6 of your

17   brief, you listed examples of overbroad requests, and

18   then page 5 of their reply brief they sort of went

19   over those one by one, did they not?

20          MR. MCDANIEL:  Well, they went over

21   them.  They glossed over them.

22          THE COURT:  Okay.  So you think that

23   what they have done on page 5 and 6 of their brief is

24   not sufficiently specific for what you're talking

25   about?

1          MR. MCDANIEL:  That's correct.

2          Basically what they've done in their reply is

3   just justified their prior requests.  They didn't say,

4   well, in that request that is this big, Your Honor, we

5   really only want this, this, and this.  That would be

6   a meaningful response.  They just simply try to

7   explain to the court that our brief was wrong, that

8   those aren't overly broad.

9          But what you have to bring to the analysis of

10  the discovery requests is an understanding of the

11  documents they reach.  When you say, provide all

12  documents related to your production of feed, well, on

13  its surface that seems to make sense.  Feed goes into

14  the birds, manure comes out the back end, and that

15  seems relevant.  But do you know all the documents

16  that goes into the operation of a feed mill?  Corn

17  purchases, every single additive purchases, feed mill

18  documentation, so much more than just a feed formula.

19  You know, we raised this with them the first time:  I

20  don't think we're going to give you the documents for

21  every time we bought a carload of corn from Iowa.

22          So the same is true for the growers'

23  documents, that the company generates a lot of

24  documents related to the weekly operations of these

25  growers that had to do with simple efficiencies and

1    husbandry:  temperature, you got your waterers too

2    high, too low, etcetera, Your Honor.  So it's not a

3    function of time, it's a function of what they want.

4              And, Your Honor, if the plaintiffs are

5    unwilling to take that step and cure this overbreadth,

6    I think it should be overruled, but I'm more than

7    willing on behalf of Peterson to engage in this next

8    step.

9              THE COURT:  All right.  Thanks.  One

10   last question.

11             What do you think the impact is of this

12   ruling on plaintiff's production to discovery?

13             MR. MCDANIEL:  That's an excellent

14   question, not that your others weren't just as good.

15             The defendants believe that there is

16   information older than five years old that is relevant

17   to their affirmative defenses and their claims against

18   third parties.

19             We believe we have the same obligation, and

20   that is we have to focus that discovery on what goes

21   to the heart and is probative on those issues.

22             THE COURT:  All right.  Well, of course

23   that's --

24             MR. MCDANIEL:  I think it is a

25   goose-and-gander proposition.

1        THE COURT:  That issue is not tee'd up

2    for today, but it's a curious question as to

3    how -- what law of the case we might create that would

4    impact the plaintiff's production as well.

5        All right.  Thanks.

6        MR. MCDANIEL:  Thank you.

7        THE COURT:  I understand.

8        All right.  Who's next?

9        MR. GEORGE:  Your Honor, Robert George

10   for the Tyson defendants, and I'll be brief.  I really

11   just want to emphasize a couple points that I think

12   Mr. McDaniel touched on, but I want to make sure that

13   we surface them squarely for the court's attention.

14       First of all, I think it's dangerous and

15   anytime you get into a discovery fight to ask the

16   court, which is what the plaintiffs are doing in this

17   case, to make discovery decisions in abstract.  I

18   think this is the point that Mr. McDaniel was making

19   regarding the lack of specificity in the discovery

20   dispute as the plaintiffs are trying to frame it.

21       Your Honor, you'll recall the five-year rule

22   as it was originally announced by this court came up

23   in the context of disputes over document production,

24   and that was the setting in which this court

25   determined that that is an appropriate balance between

1    the two positions of burden and relevance to require

2    the defendants to produce documents.

3          That, frankly, has been the limited context

4    in which this issue has been discussed with the court

5    all the way up until the reply brief filed by the

6    plaintiffs in this case, where for the very first

7    time, in my estimation or recollection, we begin to

8    see an attempt to broaden the controversy out into

9    unidentified disputes regarding 30(b)(6) depositions

10   that have occurred sometime in the past, and now this

11   morning, interrogatories.

12         And, Your Honor, I think it's perilous for

13   this court without specific interrogatories being

14   identified for which the plaintiffs can come forward

15   and establish relevance as to the information sought

16   in that interrogatory prior to five years ago and the

17   defendants can then respond with burden -- because as

18   this court can well appreciate, the burden of

19   responding to an interrogatory inherently depends upon

20   that particular interrogatory.  Some are more

21   burdensome than others.

22         And so for Mr. Nance to take the podium, as

23   he did this morning, and suggest to the court that the

24   five-year rule ought to be abandoned with respect to

25   interrogatories -- and there are several dozen

1    interrogatories where he would like the defendants to

2    go back and provide responses, substantive responses,

3    encompassing information more than five years ago --

4    really is not helpful.  It's not helpful to the

5    defendants because we're not in a position to evaluate

6    the burden associated with that.

7         It's also, Your Honor -- this is the second

8    point I want to emphasize -- the way in which the

9    plaintiffs have approached this dispute, particularly

10   in the areas of interrogatories and 30(b)(6)

11   depositions, runs contrary to this court's prior

12   statements and the federal rules' statements on the

13   importance of meet and confer.  These are the issues

14   around particular interrogatories and particular

15   deposition questions that lend themselves uniquely to

16   conversation between lawyers to try to work things out

17   cooperatively.

18        I'll represent to the court that the 30(b)(6)

19   depositions of the Tyson defendants, my clients,

20   occurred many, many months ago in this case, and I

21   have not once had a single conversation with

22   plaintiff's counsel about an answer that they

23   perceived was unfairly limited in time or inadequate

24   because of concerns over the preparation of those

25   witnesses.  This reply brief filed in connection with

1    this status conference is the first time where that

2    issue has been raised.

3            The same is true, Your Honor, with respect to

4    the only one interrogatory that I can identify they're

5    concerned with.  They're speaking broadly, but the one

6    that was mentioned specifically was the one that is

7    subject to this court's prior order, where the

8    defendants were required to identify and quantify the

9    amount of birds.  That has indeed been the subject of

10   many discussions and then, of course, an order by this

11   court.

12           But since the defendants have complied with

13   that order, I have not had a single conversation with

14   plaintiff's counsel where they suggested that my

15   answer on behalf of my client was inadequate.

16                THE COURT:  Okay.  Is your response

17   limited by five years to that question or does it go

18   beyond that?

19                MR. GEORGE:  The court's order was

20   expressly limited to five years and we complied with

21   that.  That's absolutely correct.

22                THE COURT:  Mr. McDaniel said he's not

23   going to fight that issue.  How do you feel about --

24                MR. GEORGE:  I would like -- Your Honor,

25   if you're inclined to revisit in the context of

1    interrogatories, and in that one particular, the

2    five-year rule, I would like an opportunity to create

3    a record on burden.

4         Because, Your Honor, the ability to answer

5    that question -- as you'll recall, your order was very

6    detailed in terms of what the defendants must do to

7    attempt to answer that and what they must say about it

8    in terms of even requiring, I believe, the defendants

9    to state if a rate of error could be determined on

10   their method for quantifying.  That was a burdensome

11   process, Your Honor.  That's the reason we opposed

12   that in the first instance.

13        If we're going to roll that obligation back

14   to 1952, where records are even less readily available

15   and in some instances nonexistent, and the same

16   expectation for responsiveness is going to apply to me

17   and my client in answering that, I want an opportunity

18   to explain to the court in tangible terms what that

19   means in terms of burden.  The way in which this issue

20   has been brought to the forefront in a reply brief has

21   not allowed me to do that.

22        THE COURT:  All right.  Well, you seem

23   to be diverging from Mr. McDaniel a bit on the number

24   of birds argument.  But you do need to pick door

25   No. 1, door No. 2, or door No. 3 as far as the

1     original issue.

2            Do you think we need additional evidentiary

3     material or do you think another argument at a later

4     date or do you think we can do it based on

5     presentations today?

6            MR. GEORGE:  I don't think we need an

7     additional evidentiary record around the Shannon

8     Phillips' affidavit, which was one of the issues

9     discussed.  I do think to the extent the court is

10    interested in revisiting and we're going to weigh the

11    relevance and the necessity against the burden, then

12    we do need an opportunity to flesh that issue out

13    further.

14            THE COURT:  Okay.  So it sounds like

15    your position is that some data information prior to

16    five years may be relevant to this case?

17            MR. GEORGE:  Correct, correct.  I think

18    the court regrettably is going to have to take that on

19    a discovery-request-by-discovery-request basis.

20    That's unfortunate.

21            THE COURT:  Okay.

22            MR. GEORGE:  But, Your Honor, with

23    respect to any subsequent hearing, briefing, or

24    evidentiary matters that may be held around this, I'd

25    ask that we not -- that we not limit our thinking

1    about the evidence that should be presented to the

2    burden on the defendants because I think the

3    plaintiffs have not yet presented any evidence to

4    support the necessity of the information for their

5    experts, which is what I understand this motion to be

6    about.  There are certain experts that need

7    information in order to offer opinions to this court.

8           Well, Your Honor, there's not a single

9    affidavit attached by an expert who has said, I need

10   an answer to interrogatory No. 1 going back to 1952 in

11   order to offer a causation opinion in this case, and I

12   don't think we should presume necessity.

13          The plaintiffs have an obligation to create a

14   record that establishes both the relevance and the

15   necessity of that information and they simply haven't

16   done it yet.  So I would hope that any future hearings

17   on this would encompass both lines of evidence.

18              THE COURT:  Well, now you stepped a step

19   back on me here.

20              MR. GEORGE:  I'm sorry.

21              THE COURT:  I thought we were not going

22   to have to any evidentiary presentations in the

23   future?  I mean, I think what you're saying is, as of

24   the current level of the evidence, you do not desire

25   to present responsive evidence?

1           MR. GEORGE:  I think the court ought to

2    deny the motion on its face today.  But if the court

3    is willing to proceed further down the path and

4    believes that additional evidence is necessary, I'd

5    ask that both evidence as to burden and necessity be

6    presented.

7           THE COURT:  Okay.  But you're not asking

8    for an opportunity to present additional evidence --

9           MR. GEORGE:  I'm not, Your Honor.

10          THE COURT:  -- on this issue?

11          MR. GEORGE:  I'm not, Your Honor.  I

12   apologize for the ambiguity.

13          THE COURT:  I understand it's mushy

14   necessarily so but --

15          MR. GEORGE:  Right.

16          THE COURT:  -- we'll clear it up.

17          MR. GEORGE:  Thank you, Your Honor.

18          THE COURT:  You bet.

19       All right.  Is it turkey time?

20          MR. TUCKER:  Gobble, gobble, Your

21   Honor.

22          THE COURT:  Mr. Cargill.

23       Well, I didn't ask Mr. George, but I assume

24   he agrees with Mr. Peterson in regard to the impact of

25   this ruling on plaintiff's production?

1            MR. GEORGE:  I do agree with that, Your

2    Honor.

3            THE COURT:  Okay.

4            MR. TUCKER:  Your Honor, I'd first like

5    to put to rest the issue of these 200 mystery boxes.

6            THE COURT:  Okay.

7            MR. TUCKER:  We did indeed footnote our

8    docket 1645 filed on March 21st advising that there

9    were 200 boxes that we were not spending the time,

10   effort, and money on because we believed that they

11   contain predominantly materials that were outside the

12   five-year discovery range and did not apply to the

13   corporate knowledge issue for which Your Honor did not

14   have a five-year limit.

15        As all this fuss has continued, rather than

16   contribute to the tenor of the ranker and the fuss, we

17   undertook to go ahead and go through those 200 boxes

18   without awaiting the outcome of the hearing.

19        And in document 1695 that was filed by this

20   court on May 2nd, which was our surreply on this

21   issue, we submitted a 34-page index that Ms. Hill

22   prepared which box by box describes the contents of

23   each box.

24        Also, that filing 1695 included, as a part of

25   the surreply, as a part of the exhibit that

1    accompanied that index, a letter inviting plaintiffs

2    at their leisure to come and examine the boxes

3    themselves which were in our office, not in a dusty

4    warehouse, having been brought from Arkansas for that

5    express purpose.  That's been there since the last

6    part of April.

7         I would also note with respect to the whole

8    concept of specific questions about documents that

9    relate to operations and not corporate knowledge

10   outside the five-year period, at this court's

11   instruction and direction on July 19th, Ms. Hill met

12   and conferred extensively with the state.

13        As a consequence of that meet-and-confer, a

14   certain selection of documents were identified or

15   certain topics were identified and a further

16   production was made.  Everything that was agreed to

17   being produced at that July 19th meet-and-confer

18   outside the five-year period has been produced and no

19   specific requests remain pending.

20        We also have several letters to plaintiff in

21   which we identify -- or which we ask them that if they

22   have other specific requests, if they'd please let us

23   know what they are then we would address them.

24        With respect to the concept of evidence, I

25   believe our evidence is before the court that it would

1   be extraordinarily expensive for the Cargill to review

2   the remaining 2,000 boxes, which I would describe as

3   the ancient documents.

4        Ms. Smith has reviewed those boxes in a

5   preliminary sampling fashion, and she says they are in

6   a warehouse, which is not climate-controlled, not

7   rodent-controlled, nor otherwise pest-controlled, and

8   is a very unsavory place.

9        Our affidavits that have been filed in the

10   case have estimated through the Faegre Law Firm, which

11   does this on a national basis and knows what it costs

12   to do these things, the cost that would be required to

13   make the analysis of these 2,000 boxes, which are all

14   older and have to do with operational materials, not

15   corporate knowledge, and that affidavit goes

16   unchallenged except by a response that says, we can't

17   challenge your affidavit.

18        So accordingly, if the plaintiffs wish to go

19   forward, other than on a point-by-point basis, which

20   offer remains outstanding to them, and they want this

21   blanket discovery that they've talked about, then we

22   would like to have them agree to pay the cost of doing

23   so based upon our affidavit.

24             THE COURT:  Okay.  Do you recite the

25   cost in your affidavit?  I don't recall.

```
 1              MR. TUCKER:  Yes, Your Honor.

 2              THE COURT:  Do you remember what it was?

 3              MR. TUCKER:  I don't want to quote it

 4    off the top of my head.  Let me so find it in the

 5    affidavit.

 6              THE COURT:  Well, I can pull the

 7    affidavit out.

 8              MR. TUCKER:  $2 million, Your Honor.

 9              THE COURT:  Good round figure.

10              MR. TUCKER:  That's a minimum, Your

11    Honor.

12              THE COURT:  Okay.  Mr. Tucker, you

13    didn't pick door No. 1, 2, or 3, just to pin somebody

14    down.

15              MR. TUCKER:  Your Honor, since my

16    affidavit as to cost is uncontroverted, I would say

17    door No. 1.

18              THE COURT:  Okay.  So you do not want an

19    evidentiary hearing at the current status of things?

20              MR. TUCKER:  Yes, Your Honor.

21              THE COURT:  Yeah.  Okay.  Thanks.

22         Well, it's a standard question, but do you

23    have a response in regard to the impact of the court's

24    ruling in this case in regard to plaintiff's

25    production?
```

```
 1              MR. TUCKER:  Your Honor, I believe that
 2   the State of Oklahoma, if they want to take the
 3   position that historic data is important, historic
 4   data goes back to prestatehood time in the state's
 5   archives, then I think they'd be obligated to produce
 6   all that material.
 7              THE COURT:  Okay.  Of course that's not
 8   tee'd up at this point.
 9              MR. TUCKER:  No, sir, it's not.
10              THE COURT:  Okay.  Thank you.
11              MR. TUCKER:  But I would assume if the
12   court entered that order, doing a supplement would
13   cause them to immediately begin that process.
14              THE COURT:  All right.  Other
15   defendants?  We got Cargill, we got George's, we
16   got -- we have George's, yeah.
17              MR. GRAVES:  Your Honor, James Graves
18   for George's.  I will be extremely brief.
19         Our views coincide with those expressed by
20   Mr. George and Mr. McDaniel already.  The state is
21   asking the court to take a shotgun approach
22   essentially -- a blind shotgun approach to the
23   temporal scope issue without teeing up specific
24   discovery requests with the specific defendants.
25              The issue I have probably goes maybe a little
```

1    bit beyond what's been expressed by Mr. McDaniel and

2    Mr. George.  It's not only that there haven't been

3    specific interrogatories or requests for production

4    where they've contacted the defendants and stated, we

5    have some issue with the way these are responded to as

6    far as how far back you've gone, but they haven't done

7    it with the individual defendants either.

8            There's always a tendency by the state to

9    lump everybody together and make one presentation to

10   the court that defendants are or aren't doing

11   something as opposed to, you know, George's isn't

12   doing something or Tyson isn't doing something.

13           With regard to the status conference this

14   morning, I understand that Mr. Nance has made

15   representations about individual defendants, but if

16   you back to the original motion on this issue, there

17   was a lot of representations about what the defendants

18   were and weren't doing.  Not until we got to the reply

19   brief stage did we have some argument about individual

20   defendants.

21           In those, same as Mr. George represented with

22   regard to Tyson, George's was suddenly presented with

23   some information in the reply brief about issues that

24   had never been discussed or a meet-and-confer had

25   never been scheduled or had never taken place.

```
 1              And with regard to the issues that are raised

 2     in the reply brief, you know, we have the

 3     same concern.  We didn't object on the basis of

 4     temporal scope.  We presented a 30(b)(6) deponent a

 5     number of months ago.  This deponent testified

 6     extensively when he was asked questions about

 7     operations in the Illinois River Watershed going back.

 8     We had him prepared to testify to the extent that we

 9     had any knowledge about that information, and when he

10     was asked about it he testified to it, including

11     property ownership in the watershed back in the '60s

12     and grower contracts in the '60s and '70s.  So there

13     were no objections to those questions.

14              And so, again, if there's some issue that the

15     state has with the 30(b)(6) testimony of George's,

16     there hasn't been a meet-and-confer on it and there

17     ought to be some presentation to this court of

18     specific questions and answers and objections that

19     took place during that deposition that they feel were

20     inappropriate on the basis of this five-year issue.

21              With regard to the court's question about

22     which door, I don't see a need for an evidentiary

23     hearing.  I think that because of the reply brief,

24     with regard to George's, there should be a further

25     hearing on these issues.
```

1          If the state's taking the position that

2    George's has not produced information or has brought

3    an ill-prepared 30(b)(6) deponent or someone who

4    didn't or refused to testify about these issues, then

5    that ought to be specifically presented to the court

6    so we can take it up with the court and the court's

7    not having to blindly deal with the issue.

8          I will say with regard to the interrogatory

9    that was brought up this morning, our response -- our

10   original written response was not limited on a

11   five-year basis and it was dependent on documents that

12   were produced; that is, schedules and reports going

13   back a number of years, however far back we had them.

14   But with regard to the totaling up, that is not

15   something that George's tracked routinely in its

16   business, a totally up by watershed.

17         And so in going through that gyration to

18   comply with the court's order, we did only go back

19   five years on that specific -- to comply with that

20   order as far as the totaling up went.  But the

21   documents from which those totals came go back beyond

22   that five years and the state has them.

23             THE COURT:  How do you feel about

24   totaling those figures up prior to the five years?

25             MR. GRAVES:  I don't have an issue with

1    doing that, if that's what the court decides we need

2    to do.

3                    THE COURT:  Okay.  But as I recall, the

4    problem before was the plaintiffs were not smart

5    enough to add it up based on the documents.

6                    MR. GRAVES:  Well, that took -- I mean,

7    it does take some work.  I mean, a lot of these

8    records are paper, you've got to get them electronic

9    somehow, get them in a spreadsheet, and create

10   formulas for them and everything else.  It's not

11   something you can just do.

12                   THE COURT:  All right.  Thanks.

13                   MR. GRAVES:  Thank you.

14                   THE COURT:  I just realized that it's a

15   good thing Mr. George doesn't represent George's.

16                   MR. GRAVES:  We're smaller.  He has a

17   lot more numbers to deal with than we do.

18                   MR. SANDERS:  Your Honor, Bob Sanders

19   for Cal-Maine.  Cal-Maine did not respond to the

20   motion but I would like to explain our position, if I

21   could.

22           Cal-Maine is unique in a couple of respects

23   in this litigation.  One, all of our birds were in the

24   IRW so we don't have the problems some of the other

25   defendants have of figuring out which of the birds

1    were in this watershed.  Also, we were only in this

2    watershed from 1989 until -- through 2004.  We sold

3    our very last flock and turned off the last light

4    switch in January of 2005.

5          Now, the Cal-Maine defendants presented to

6    the plaintiffs the total number of birds by category

7    of birds.  We had breeders, pullets, and layers.  We

8    gave them the total number of birds in each of those

9    categories for each of the years that we were in the

10   IRW in our core disclosures.  That's how long ago we

11   gave it to them.  We've given them our feed formula

12   and so forth.

13         Now, when we left the IRW in January of 2005,

14   we destroyed most of the data that we had.  We have

15   some flock records that just didn't get destroyed,

16   they were in a warehouse and we've gone through those

17   and produced that, but we don't have very much

18   material.

19         The "dear responsible party" letter that went

20   out announcing the onset of this litigation came two

21   or three months after we closed shop and destroyed

22   documents.  So we didn't respond because we already

23   gave them all the information well.

24         But so far as door 1, 2, and 3, Cal-Maine

25   does not wish to have an evidentiary hearing to

```
 1   present any evidence on behalf of Cal-Maine.  I don't
 2   know if the plaintiffs would need to have an
 3   evidentiary hearing or not, but we would take the same
 4   position that Tyson and Peterson and George's have
 5   taken.
 6            Also, we certainly think that if the court
 7   ultimately rules that the temporal scope will go back
 8   to the beginning, then the same obviously should apply
 9   to the plaintiff.
10            That's all I have.  Thank you, Your Honor.
11                 THE COURT:  All right.  Thank you,
12   Mr. Sanders.
13            All right.  Anything else for the defendants?
14            All right.  Plaintiffs, you wish to respond?
15   I mean, based upon the presentations by the
16   defendants, it sounds like the motion to compel would
17   be granted, it's just a question of with what
18   parameters.  I think each of them has said some
19   evidence prior to the five years may be relevant
20   sufficient to allow some discovery prior to the five
21   years.
22                 MR. NANCE:  I think that's correct, Your
23   Honor.  And I did not contemplate that today was the
24   day to get into the trenches and talk about individual
25   interrogatories and things like that.
```

```
1                    THE COURT:  No, it's not.

2                    MR. NANCE:  I did misspeak very early on

3    and I want to correct that.

4           I sent out a letter that limited the temporal

5    scope of interrogatories and I listed them by number.

6    We're not challenging any part of the court's order

7    that says -- excuse me -- the spatial scope and we're

8    not challenging that.  You said we can't get

9    operational details from Maryland or wherever.

10                   THE COURT:  Right.

11                   MR. NANCE:  So I was saying these are

12   the interrogatories that we will limit to the IRW.  I

13   just had that wrong in my mind when I told you it was

14   two or three dozen that we were still interested in.

15   We're interested in the whole ball of wax, but I

16   wanted to correct that because I just had that wrong

17   in my mind.

18                   THE COURT:  How big is that ball of wax?

19                   MR. NANCE:  Well, it's a fair-sized ball

20   of wax.

21                   THE COURT:  You mean as far as number of

22   interrogatories or --

23                   MR. NANCE:  Yes.  We have served -- and

24   I wish I had thought to give you those numbers -- but

25   we have served several sets and there's comprehensive
```

1    discovery out there.

2            I think when you were talking to Mr. McDaniel

3    of Peterson, he said in his brief that certain of

4    these requests were irrelevant, and in our reply we

5    said, no, they're not and here's why.

6            Without going through all of that, I mean, we

7    asked questions because the defendants contest their

8    responsibility for the waste their birds produce, and

9    so it gets into trying to establish the element of

10   control that they have over the growers.  I'm not

11   arguing that right now.  I'm just saying that's one of

12   the reasons why we asked some of the questions we

13   asked.

14           You know, I don't specifically remember the

15   temperature in a house being one but it may have been.

16   But if an integrator dictates to a contract grower

17   that the temperature in the house is going to stay

18   within a certain band or parameter, then that's an

19   indicia of the amount of control they have over the

20   grower.  I'm not going to go through all of that, but

21   that's why that can be important not so much that we

22   care about the temperature, but we care about the fact

23   that it's being dictated by the integrator.

24               THE COURT:  Does it matter whether it

25   was done for five years or ten years?

1              MR. NANCE:  Yes, it does.  Because if --

2      I mean, if there were a material change -- I doubt

3      there were -- but I think they've pretty well

4      controlled these growers from the get-go.  But I would

5      not want to face a situation where they say, well, we

6      only started doing that five years ago and we don't

7      have any evidence to rebut that.

8              Mr. Garren is not here, he's out of town

9      today, and I can't really say a whole lot about the

10     conversations that have been taking place.  Except if

11     you look at Exhibit 1 to Peterson's response,

12     Mr. Garren says, "Clearly, as you point out,

13     birds/house counts are one item the state requests."

14             There's never been any question that we want

15     that, and the tendency is still to kind of dither and

16     want us to be more precise and that's been on the

17     table from the get-go.

18             No question we're wanting damages going back

19     as far as we can produce evidence.  Prospective

20     equitable relief may be a different thing and we may

21     not need to go back 20 years, although we may, but

22     certainly the damage question goes back as far as the

23     evidence exists.

24             THE COURT:  Okay.  What would be wrong,

25     Mr. Nance, with asking the plaintiff to rephrase their

1    interrogatories or renew those interrogatories and

2    those motions to produce which they now knowing

3    everything they know about these defendants and their

4    operations that they still think is relevant beyond

5    the five-year period?

6              MR. NANCE:  Well, Judge, we think

7    everything is relevant beyond the five-year period.

8    If we started the process over, we would be here

9    having this conversation a year from now because

10   they'd say, well, you sent out the new ones and we had

11   time and we've objected and we've had to have our

12   meet-and-confer.

13        If they have substantive beefs about the

14   interrogatories, other than the five-year issue, they

15   can and should have presented them.  But we're here

16   today on the five-year issue and we shouldn't have to

17   start our discovery all over again just because I

18   think we're now concluding that things beyond five

19   years are relevant.

20             THE COURT:  Well, it bothers me a bit

21   that you think everything is still relevant beyond the

22   five years.  Surely there's something in there that's

23   not relevant beyond five years, especially if the ball

24   of wax is as big as you just said it is.

25             MR. NANCE:  And if the defendants have

1     an individual concern about that on an individual

2     interrogatory, they need to pick up the phone and call

3     us.  But today we're talking about the five-year

4     proposition, and if -- Mr. Garren has kind of been the

5     point on that part of the discovery.  I haven't been

6     on that myself as much as I have on other things.

7              We all have the obligation to meet and

8     confer, but on the overarching question of whether or

9     not the five-year rule should stand, we think that it

10    shouldn't for the reasons we've talked about before.

11             The Tyson 30(b)(6) deposition was

12    specifically limited to five years but we haven't had

13    the ability to question that, to challenge that, until

14    such time as you rule because at the time it was taken

15    five years was the operative rule.

16             THE COURT:  But the problem is, we're

17    now getting down to the nitty-gritty and neither side

18    really, I think, has given the evidence that the court

19    needs.

20             The question is, who's going to start this

21    ball rolling, whether or not we're just going to say,

22    okay, defendants, you got to respond beyond five years

23    on every interrogatory and every motion to produce; or

24    whether or not the plaintiffs should be obligated to

25    say, what we really want is the answers to

1    interrogatory 1, 2, 22, 84, and 63 beyond the

2    five-year period.

3           You're not giving me any information with

4    which to make that decision.  I mean, are we talking

5    about 246 interrogatories?

6           The defendants haven't provided that either.

7    I just need to know how to make that decision.  We

8    need something -- we need some information on the

9    burdensomeness of the response.

10           MR. NANCE:  Well, one of the defendants

11   has submitted something on burdensomeness, none of the

12   others have.  They've all had that opportunity.

13   That's clearly tee'd up by your original order.

14           THE COURT:  Does it respond to all

15   motions to produce and all interrogatories?  I don't

16   recall it.  I just was wondering.

17           MR. NANCE:  That's what the five-year

18   rule has -- it has specifically been applied to

19   documents and it's specifically been applied to

20   deposition and it's specifically been applied on

21   interrogatory No. 1 to bird counts.  So it's been

22   applied to every form of discovery that we're engaged

23   in.

24           THE COURT:  I mean, is that what Cargill

25   did in their affidavit?

1          MR. NANCE:  Cargill addressed documents

2     only.

3          THE COURT:  Okay.  So we still got the

4     rest of that ball of wax?

5          MR. NANCE:  Well, why would they need a

6     do-over now?  I mean, if this was the day we were

7     going to have the status conference and the responses

8     are all in, it seems like maybe only now they're

9     considering, well, we should have written a better

10    response or we should have --

11         THE COURT:  No.  The problem is the

12    court needs the information.  I mean, if it's 245

13    interrogatories, I need to know where they are

14    and that there are that many.  I mean, I'm from the

15    government, I'm here to help.  I just need the

16    information with which to do it.

17         MR. NANCE:  Actually so am I today.

18         *(Discussion held off the record)*

19         MR. NANCE:  Mr. Hammons reminds me,

20    again, I may have been confused between RFPs and

21    interrogatories.  They're limited to 25 per company.

22    Both sides may have gone over that a little bit but it

23    hasn't been astronomical.

24         So with interrogatories it's going to be a

25    discreet number and requests for production have been

1    a great deal more, I think, on both sides.  Of course

2    No. 1 is No. 1 for a reason and that's the bird count

3    one.

4                    THE COURT:  All right.

5                    MR. NANCE:  And if there are defendants

6    that have already given us everything, then, I mean,

7    it's no longer an issue.  I mean, the court can rule

8    that the five-year rule doesn't apply and if they've

9    already provided everything, it will not affect them

10   at all.  It's only in those areas where it's been

11   contested.

12               As regards Cargill ever so briefly, I mean,

13   you can read their footnote that -- footnote 3, "The

14   Cargill defendants' only document production remaining

15   out the court's current orders pertain to

16   approximately 200 boxes.  These 200 boxes are a

17   portion of the storage documents believed to contain

18   documents relevant to corporate knowledge and the

19   limited categories discussed in the parties' July 19th

20   meet-and-confer."  That's the ones they said they

21   would produce.

22               As to the index of that, that is in their

23   surreply, and you can take a look at it as well as I

24   can.  It does not tie any of these boxes to any of our

25   requests as required by the court.  And, again, that's

1    maybe a battle for another day but it's simply not a

2    proper index.

3              THE COURT:  Okay.  How soon would you

4    like to see a supplemental response from the

5    defendants if we go beyond the five years?

6              MR. NANCE:  Without giving up any of

7    the other interrogatories or requests for production,

8    I think a response to interrogatory No. 1 within two

9    weeks?  Thirty days?

10             THE COURT:  Okay.  Is there something

11   going on that makes that time crucial?

12             MR. NANCE:  Well, even two weeks or

13   thirty days may prove a problem for us in our expert

14   reports.  Experts need those numbers to fine-tune what

15   they're doing and the opinions they're forming and our

16   expert reports are due next week.  But that's

17   probably -- if I had to prioritize, that's the first

18   priority we'd like to get.

19             THE COURT:  Well, obviously you're not

20   going to have that in time for your expert reports.

21             MR. NANCE:  And we may either have to

22   ask leave to supplement that or whatever, that may be

23   something for another day, but that is the most

24   important thing for us.

25             THE COURT:  Okay.

1          MR. NANCE:  Any other question on that,

2    Your Honor?

3          THE COURT:  No, no.  Thank you.  I was

4    going to ask the defendants what they think about a

5    time line.

6          Mr. George?

7          MR. GEORGE:  Your Honor, it may be

8    helpful to a fault, but I want to address the court's

9    question, which is a logical one, in terms of how big

10   the ball of wax is.

11         I have some command of the number of

12   discovery requests that my clients have received.  And

13   with respect to interrogatories, the Tyson defendants

14   have received over a hundred interrogatories from the

15   state, all of which we have responded to, and we have

16   received over 450 motions to produce or document

17   requests.  So that gives you some sense at least with

18   respect to the clients that I represent.  I think

19   there's probably some similarities given that there's

20   a pretty standard set being sent to each of the

21   defendants.

22         With respect to the timeliness question, Your

23   Honor, I think it depends on what the order is in

24   terms of, are we talking about interrogatory 1 or are

25   we talking about all interrogatories?  Obviously, the

1  answer would be different.  I would say this, though.

2           With respect to interrogatory No. 1, my

3  client would not be capable of answering that in two

4  weeks if the court's order were:  Tell us the number

5  of birds in the watershed from the beginning of your

6  operation.  The reason for that, Your Honor -- and I

7  want to make sure the court has a full appreciation of

8  this process -- those are not standard reports.

9           What we had to go through -- and it was a

10  lengthy process in order to comply with the court's

11  order to provide that information for a five-year time

12  period -- was take information from reports, piece it

13  together, and feed it into a program, an Excel

14  program, and perform some mathematics.  The data entry

15  piece of that is substantial, particularly for my

16  client who has a considerable presence in the

17  watershed.

18           But, Your Honor, the other thing I want to

19  make sure is not lost on the court, if the order is to

20  provide that information to the best of our ability

21  going back to 1952, I want to be completely forthright

22  so there's no confusion.  My client will not be able

23  to competently answer that question for all periods of

24  time going back historically.  The records simply do

25  not exist to re-create information that has not been

1    maintained because it wasn't necessary for the

2    business practices.

3           So I don't want the court or the plaintiffs

4    to be under any illusion as to the effectiveness of

5    this court's order, and I say that with all due

6    respect.  It's one thing to order a defendant to

7    respond to an interrogatory, but it's entirely another

8    to suggest that a party must acquire knowledge that

9    they don't have.

10          And sometimes I believe -- the state may

11   differ with me on this -- it is an acceptable answer

12   to an interrogatory to say, "I do not know."  But the

13   requirements of this court's prior order left very

14   little room for that within the context of recent

15   history, five years.

16          So I'd ask the court to at least consider

17   that in terms of how you would phrase any obligation.

18              THE COURT:  All right.  And you can't do

19   two weeks, so what can you do?

20              MR. GEORGE:  I think it would take at

21   least a month, Your Honor.

22              THE COURT:  Okay.  Thirty days.

23          Yes, Mr. Tucker.

24              MR. TUCKER:  Your Honor, if I may, I'd

25   like to ask the court to consider door No. 4.

```
 1              THE COURT:  Okay.

 2              MR. TUCKER:  I call the court's

 3   attention to document 1645-4, which is filed on March

 4   21 of '08.

 5              THE COURT:  45-4?

 6              MR. TUCKER:  Yes.  Page 1 of 5, which is

 7   a letter dated August 2nd from Cargill to Mr. Nance

 8   and Mr. Hammons that essentially commemorates the

 9   meet-and-confer that took place on July 19th at this

10   court's order with regard to this issue and other

11   issues regarding production of documents.

12              I would suggest that at page 2, item E, a

13   feasible and workable solution to the court's concern

14   and the plaintiff's concern was expressed as a

15   consequence of the agreement reached by those parties

16   at that meeting.

17              "During the meet-and-confer" -- and I'm

18   reading from this page -- "the state's request for

19   document production without regard to date was

20   confined to a discussion about contract grower files,

21   flock evaluation reports, and breeder farms.  However,

22   the state reserved the question of whether there were

23   other categories of documents as described in the

24   Cargill defendants' production cover letters and

25   detailed index provided to the state from which the
```

1    state would like documents produced prior to 2002.

2              "Examples of other potential categories

3    include prime cost files, feed formulas, job tickets,

4    microtickets, mixing sheets, run reports, usage

5    reports, batching pulleting sheets, feed ticket sales

6    invoices, ingredient usage summaries, production

7    reports, receiving tickets, lab certificates, or

8    miscellaneous ticket sales invoices.

9              "It is our understanding that the state will

10   get back to us in the near future with its proposed

11   additional categories for consideration, if any.

12   Through this letter, the Cargill defendants confirm

13   that if confined to the contract grower files, flock

14   evaluation reports, and environmental audits as

15   discussed above, they may withdraw your burdensomeness

16   objection with regard to date limitation.  However, we

17   are not able to make a final determination regarding

18   cost and burden until we have the state's complete

19   list of proposed categories."

20             Nothing further has been received from the

21   state in regard to that, Your Honor.

22                  THE COURT:  Is that a copy that you can

23   present to the court at this time?  I mean, I'm sure

24   we can dig it out, but it seemed to be so deep in the

25   files that it might be safer to -- I don't want to

1    take your only copy.

2              *(Discussion held off the record)*

3              THE COURT:  Oh, that's fine.  I just

4    want you to be able to hang on to it.  We're not going

5    to talk about it.  Thank you very much.

6              MR. TUCKER:  Thank you, Your Honor.

7              *(Discussion held off the record)*

8              THE COURT:  All right.  We've got it.

9              MR. TUCKER:  I simply suggest that as a

10   door No. 4 that requires the plaintiff to take some

11   specificity with regard to what they want as they were

12   agreeable to do in July of 2007.

13             THE COURT:  All right.  That's helpful.

14   I appreciate it.  We could do door No. 4.

15        Mr. Nance, you know, I just thought that, you

16   know, you said everything needed to be included.

17   Apparently, Mr. Garren's already said he doesn't want

18   grower files.

19             MR. NANCE:  Your Honor, as always, we're

20   willing to talk with them, but the things they agreed

21   to provide in that letter are the things in the 200

22   boxes that we still haven't seen.  They're holding

23   back acknowledging that they've agreed to produce them

24   and that there are corporate knowledge documents in

25   there.

1          I mean, I think the motion should be as to

2     everything.  Then we can discuss with them, if they

3     say, oh, my gosh, we just can't do that, let's find

4     something sensible, we'll try to work with that.

5          As regards -- Ms. Burch reminds me I didn't

6     answer your whole question earlier.  I did as to

7     interrogatory No. 1.  We would think in terms of a

8     45-day target date for the balance of it with

9     discussions and to meet and confer if they can't -- if

10    they can't do it or if they have discreet issues that

11    we need to discuss.  I didn't want to leave, you know,

12    no target for the balance of it.

13          THE COURT:  You know, 450 motions to

14    produce, that's a lot.

15          MR. NANCE:  It is a lot because we have

16    dealt with that many as well.  The Tyson defendants

17    have, I assume, 25 interrogatories a piece, not a

18    hundred a piece.  There's four companies.

19          THE COURT:  Right.

20          MR. NANCE:  But it is a great deal and

21    we have dealt with it and sometimes have come before

22    you because the other side doesn't think we've dealt

23    with it well enough.

24          THE COURT:  But you don't think you

25    could pick a hundred out of there that were

1    specifically relevant to the excessive temporal

2    limits?  You think all 450 need consideration for the

3    expanded period?

4                    MR. NANCE:  I'm honestly not sure.  If

5    the court would like us to prioritize, we can try.

6    But just as I stand here right now, I'm not sure that

7    we could.

8                    THE COURT:  All right.  Thanks.

9           All right.  We'll assume all the argument is

10   submitted.  Mr. Elrod, you've done a good job.

11                   MR. ELROD:  Your Honor, I'm not going to

12   select a door without knowing what's behind it.

13                   THE COURT:  That's a good decision.

14   Well, we will let you know what's behind that door in

15   the near future.

16          We'll come up with an order that hopefully

17   does the right thing.  That's our goal, in the words

18   of Spike Lee.

19          We're determined to get all of these issues

20   finished this morning so we'll assume that issue is

21   submitted.  Let's move on to the other more meaty

22   issue, which I think is 1605, the defendant's motion

23   to compel.  This is the defendant's motion to compel

24   plaintiff's compliance with the court order on data

25   production --

1              MR. SANDERS:  Are you ready, Your Honor?

2              THE COURT:  -- jointly presented by the

3    defendants.

4              MR. SANDERS:  Yes.  Are you ready?

5              THE COURT:  Yes, sir.

6              MR. SANDERS:  Bob Sanders representing

7    the Cal-Maine defendants, Your Honor.

8         I know a lot of paper is generated in this

9    motion and it's an extremely important motion to the

10   defendants, but I think it's a fairly simple motion at

11   the same time.  The interesting thing to me about it

12   is that it's a motion not to compel responses to

13   discovery, but is a motion to compel adherence to a

14   court order.

15        The order, of course, is docket No. 1016.

16   It's your order of January the 5th of 2007.  And in

17   that order, you instructed the plaintiffs to give the

18   defendants data, testing, sampling materials -- I

19   mean, sampling results, lab results, assay reports,

20   QA/QC documents, sampling protocols, photographs, and

21   site schedules.  The court ordered the plaintiff to

22   produce all existing material in those categories by

23   February the 1st, 2007.

24        We got some information on February the 1st,

25   2007, but even to date we don't have all of the

1   information that the plaintiffs have.

2               THE COURT:  Mr. Sanders, could I do a

3   very charitable act?

4               MR. SANDERS:  Sure.

5               THE COURT:  I just realized we have not

6   taken a morning break.  It's really not fair.  I

7   usually don't need one but the poor court reporter is

8   over here in pain.  Let's take a ten-minute break and

9   be back here at five, seven after and give us a little

10  fresh start.

11              All right.  We'll be in recess.

12                       *(Short break)*

13              THE COURT:  Linda said we're mostly

14  ready so I guess that's close enough.  I didn't

15  acknowledge Brian Neil, our court reporter, this

16  morning when we started.

17              All right.  Mr. Sanders, everyone has a smile

18  on their face now.

19              MR. SANDERS:  All right.  Thank you,

20  Your Honor.

21              The motion that we have filed covers all of

22  the data that we believe we're entitled to and that we

23  believe has not been produced.  But I do want to

24  highlight or at least talk about one instance that was

25  highlighted in the defendant's original motion, and

**United States District Court**

1    that's the issue of the DNA sampling.  If I can just

2    go through a little bit of the history on that.

3            From information that we have obtained, it

4    looks like the plaintiffs had their DNA protocol as

5    early as April of 2006.  Then the first production

6    that we got from the plaintiff on this was in August

7    of 2007.  Then we got what was to be the plaintiff's

8    file production on December the 20th, 2007.  Then we

9    deposed Dr. Harwood, the lady who was using this DNA

10   material, on January 29, 2008, just shortly before the

11   preliminary injunction hearing.

12           At that deposition, we handed her a handful

13   of e-mails that we had received in production in

14   conjunction with her work and asked her if that was

15   all the e-mails that there were, and she said that no,

16   there were tons of e-mails.  So we asked to see those

17   e-mails and the plaintiff made a fairly hurried

18   production of e-mails that related to Dr. Harwood.

19           In that e-mail production, we found this

20   e-mail of December the 12th, 2006.  This is an e-mail

21   from Dr. Olson to Dr. Harwood and it -- the language

22   in the e-mail makes it very plain that the plaintiffs

23   were trying to agree upon wording that would conceal

24   the nature of this DNA testing.

25           The plaintiffs in their response say that

1      there was no need for them to produce some of this DNA

2      material at the time because it was privileged, but

3      this e-mail doesn't talk about privilege and it

4      doesn't talk -- it doesn't say anything like the

5      lawyers will address this on privilege.  It's clear

6      that the language in this e-mail was designed to

7      conceal the data and deceive the defendants about the

8      existence of the data.  Obviously, if we didn't know

9      that data was there, then there's not much that we can

10     do that would even trigger a privilege argument from

11     the defendants.

12            We highlight this particular e-mail because I

13     think that this e-mail and the story that this e-mail

14     tells should inform the court's consideration of this

15     entire motion.

16            Now, one of the -- another big problem that

17     the defendants have is that the plaintiff has taken

18     the position that it will not produce scientific data

19     to us until that data has gone through a QA/QC

20     process, and I don't think that there's any authority

21     for the plaintiff to take that position.

22            The court's order of January of 2007 talks

23     about separate items.  It says, data sampling, lab

24     results, QA/QC results.  It indicates that they all

25     should be sent to us, but it does not say that the

1   plaintiffs can hold out material until some other

2   process has occurred.  The fact is that the QA/QC

3   process takes months, sometimes it takes more than

4   months.  In the meantime, we don't have the raw data.

5   We only get what the plaintiffs give to us when they

6   want to give it to us.  They give it to us after the

7   QA/QC process is completed.

8        And the real problem is that we don't

9   have -- we're running out of months here.  Our expert

10   disclosures are going to be due three months after the

11   plaintiff's expert disclosures and we can't keep

12   waiting periods of months for the QA/QC process to run

13   its course.

14        Also, these motions to compel take months.

15   The present motion was filed, I think, February the

16   29th of this year and it's May the 6th now that we're

17   arguing the motion.  And, again, these delays in terms

18   of months are going to be critically prejudicial to

19   the defendants.  We have to get -- we're starting to

20   run up against some hard deadlines and we have to get

21   our experts up to speed and we can't do it if we don't

22   have the data.

23        Now, the plaintiff's response to this motion,

24   I think, demonstrates the merits of the motion.  The

25   plaintiff's response came on March the 25th, 2008.

1    The first thing they did when they responded was give

2    us a large production of data that should have been

3    produced much earlier.  Then the written response, the

4    pleading they filed, said, okay, now this motion is

5    moot, they have everything.

6        Well, about a week later on April the 4th,

7    2008, they made another -- they sent another batch of

8    production materials to us.  Then they made two more

9    productions since then, one on April the 29th, which

10   is like five working days before this argument, and

11   then again on May the 2nd, which is like two working

12   days before this argument.

13       So it's pretty clear to us that the motion to

14   compel has merit.  These last-minute productions would

15   not have occurred, I think, without the motion to

16   compel and the notion that the motion is moot is

17   just -- is simply wrong.

18       Now, after we got the second production of

19   documents, one on March 25th and one on April the 4th,

20   we filed our joint reply.  The joint reply contained

21   an affidavit from an attorney named Kristen Carney,

22   and she attached a chart to her affidavit.

23       Ms. Carney went through the productions of

24   March 25th and April 4th and set out in her chart 85

25   rows of descriptions of materials that should have

1    been produced before March the 25th.

2              In the plaintiff's surreply, they said that

3    they had produced most of the material that was

4    produced on March the 25th earlier in electronic

5    format.  They didn't say they produced all of it; they

6    said that they produced most of it.

7              So between the time that we got the surreply

8    and today, we have tried to do a hurried audit of the

9    material that was actually sent earlier by electronic

10   means and contrast that with the material that we

11   received on March the 25th.

12             It turns out that of the 85 rows of

13   descriptions of materials in Ms. Carney's affidavit,

14   the plaintiffs had, in fact, earlier produced

15   electronically 26 rows of information.  The other 59

16   rows had not been earlier produced but they should

17   have been.

18             The plaintiffs characterize that as most of

19   the March 25th discovery having been previously

20   produced electronically and that just seems -- it's

21   just not clear.

22                  THE COURT:  Now, I have Ms. Carney's

23   affidavit in front of me and let's talk again about

24   what she's done.

25                  MR. SANDERS:  All right.  Your Honor, if

1      you'll look, attached to the affidavit is a chart.

2                    THE COURT:  Right.

3                    MR. SANDERS:  All right.  And the chart

4      has horizontal rows and that's what I'm referring to.

5      There are 85 of those horizontal rows.

6           Now, I got this information from Ms. Carney

7      yesterday evening after I got to Tulsa with another

8      e-mail this morning.  I can point out to you the rows

9      that Ms. Carney tells me the plaintiffs actually had

10     produced information for electronically.

11                   THE COURT:  Okay.  What was their

12     original goal in the preparation of this table?

13                   MR. SANDERS:  To try to -- in the

14     plaintiff's -- in the plaintiff's reply or response,

15     they said that they had produced a lot of the March

16     25th production earlier electronically.

17          Ms. Carney tried to figure out -- I'm sorry.

18     I got that wrong.

19                   THE COURT:  Yeah.  Hard copy.

20                   MR. SANDERS:  In the reply, our reply to

21     the plaintiff's original response, Ms. Carney looked

22     at the March 25th production of documents that came

23     with the plaintiff's response and she prepared this

24     chart to say, okay, the items on this chart represent

25     what we got on March the 25th from the plaintiffs.

1    All these items in this chart, these 85 rows, all

2    contain material that should have been produced much

3    earlier than March 25, 2008, but had not been

4    produced.  So that's what this chart is.

5         Now, the plaintiffs then sought and received

6    permission to file a surreply and they filed a

7    surreply.  The surreply says that most of the

8    information that they produced on March 25th had been

9    previously produced electronically.

10        Now, Ms. Carney took that surreply and she

11   looked to try to audit and see whether, in fact, the

12   plaintiffs had produced most of this material

13   electronically prior to March the 25th.  What she

14   found was that for the 85 rows of information that are

15   in her chart that they say that they had produced most

16   of it previously electronically, they had actually

17   produced information that covered only 26 rows of

18   descriptions of information.

19        And I can point those out for the court if

20   the court wants to --

21             THE COURT:  Oh, you might do a couple.

22             MR. SANDERS:  All right.  Well, they're

23   in a block.  They start on page 5 of the chart

24   attached to Ms. Carney's affidavit.

25             If you look at page 5, if you look at the

1    fourth row -- the fourth row from the top, it's the

2    one -- the first one that says "n/a, n/a," and then it

3    says "20."

4                    THE COURT:  Page 5?

5                    MR. SANDERS:  Of the chart.

6                    THE COURT:  Of the chart.  Oh, "n/a,

7    n/a."  I see that.

8                    MR. SANDERS:  All right.  If you take

9    that one, the first "n/a," and go to the bottom of the

10   page, all of those, and then on page 6, all of the

11   entries down to the third line from the bottom, and

12   that's the one that says "n/a, n/a, 50."

13                   THE COURT:  Okay.

14                   MR. SANDERS:  Ms. Carney's audit

15   indicates that the items that are described by those

16   rows were, in fact, produced electronically previously

17   by the plaintiff -- and by "previously," I mean

18   previous to March 25, 2008 -- but the other 59 rows of

19   descriptions of documents had not been produced

20   earlier.  We saw those the first time -- for the first

21   time on March the 28th -- March the 25th of 2008.

22                   THE COURT:  Okay.  Who is Ms. Carney?

23                   MR. SANDERS:  She's an attorney for

24   Cargill.  She works, I believe, in Denver -- is it

25   Denver? -- the Denver offices of Faegre Benson.

```
 1              THE COURT:  Oh, okay.

 2              MR. SANDERS:  Now, the plaintiffs in

 3   their surreply also attached an affidavit from a

 4   fellow named Burgesser.  Mr. Burgesser is the general

 5   manager of the CDM lab in Denver, Colorado.  CDM is

 6   the lab that oversaw, I think, most of the data

 7   production on behalf of plaintiffs.  I want to take

 8   just a minute to go through Mr. Burgesser's affidavit

 9   because --

10              THE COURT:  Okay.  Let me get it.  Where

11   are we going to find it?

12              MR. SANDERS:  It's attached to the

13   plaintiff's surreply, which is document 1691.

14              THE COURT:  Okay.

15              MR. SANDERS:  Let me just highlight a

16   few things in Mr. Burgesser's affidavit, and let me

17   tell you, Your Honor, all of the things that he says

18   in this affidavit were adopted in the plaintiff's

19   surreply.

20         The first thing I want to mention to you is

21   paragraph 5 of the Burgesser affidavit.  He says that

22   data from February of '08 was produced on March the

23   25th, 2008, and then he says that defendant's

24   complaint on this issue is unclear, meaning that

25   there's a short time lag there and what are the
```

1    defendants complaining about?  The defendants in their

2    surreply use that very word, that they were unclear

3    about what we were complaining about.

4         Well, this data in part was bacterial data.

5    The thing that we're complaining about is that between

6    the time that the plaintiffs got this data in February

7    of '08 and the time that they gave it to us, March 25,

8    '08, there was a preliminary injunction hearing on the

9    issue of health.  That's what our concern is.  This

10   bacterial data is obviously relevant and important in

11   the PI and they held it from us until after the PI

12   hearing.

13        The next paragraph is paragraph 8 --

14             THE COURT:  Okay.  Well, you're probably

15   going to get to this, but what do you want to do about

16   that?

17             MR. SANDERS:  Well, I'm not sure what we

18   can do -- we can't do anything in terms of the

19   preliminary injunction hearing, but the relief that we

20   want is relief that includes the exclusion of

21   evidence.  Ultimately, we want the court to enter an

22   order that says that all scientific data that is

23   presently in the possession of the plaintiff shall be

24   given over to the defendants within ten days of the

25   date of this hearing.

1          Now, if the plaintiffs say they've given us

2    everything, well, fine, they suffer no harm then.  But

3    when data pops up a few months from now that shows

4    they had it in their position before today and they

5    didn't give it to us within ten days from the date, we

6    want that excluded from use by the plaintiff.

7               THE COURT:  Why can't we make that

8    decision then instead of now?

9               MR. SANDERS:  Because, Your Honor, that

10   comes to -- that brings us to another motion to compel

11   and another delay of several months and we just don't

12   have the luxury of time any longer.

13          Then going forward, we want an order that

14   says that whenever the plaintiffs generate data, that

15   we get that data within ten days of the generation of

16   that data, not sometime after the QA/QC process is

17   completed, but within ten days of the generation, and

18   that any information, any data, that comes into the

19   possession of the plaintiffs going forward that is not

20   given to us within ten days of the generation shall be

21   excluded from use by the plaintiffs.  I think that's

22   the only thing that's going to be effective here.

23          In the motion, we asked for attorneys' fees.

24   Frankly, in a case of this magnitude, the advantage to

25   be gained by delaying the disclosure of information

1    far outweighs the harm that the assessment of a few

2    thousand dollars in attorneys' fees can do.

3              THE COURT:  Now, you're not asking for

4    sanctions as a result of the preliminary injunction

5    hearing?

6              MR. SANDERS:  No, no, Your Honor.  But

7    the sanction that we're asking for is the exclusion of

8    evidence by the plaintiff in the event that this

9    material -- that material is not turned over to us

10   within ten days of the generation.  Once they generate

11   this data, it's very easy to get it to us.

12             But let me go back to the Burgesser affidavit

13   just for a second.

14             THE COURT:  Okay.

15             MR. SANDERS:  The next paragraph I

16   wanted to talk about was paragraph 8.  Mr. Burgesser

17   says that sampling done in April and May of 2007 was

18   given to the plaintiffs in the summer and fall of

19   2007.  You know, that's a lag there of several months

20   between the time the data was generated and the time

21   we got it.  That's because they wait until the QA/QC

22   is done before they give us any of the raw data.

23             Paragraph 9 of the Burgesser affidavit, he

24   says that sampling done in June, July, and August of

25   '07 was given to the plaintiffs on November the 19th

 1    of '07 and December the 28th, '07.  Again, that's a

 2    lag of five or six months there between the generation

 3    of the data and the time that we first see it.

 4           Paragraph 10 says that sampling done in

 5    August of 2007 was produced to the plaintiffs in March

 6    of '08, that March 25, 2008, production.  He says it

 7    was because the QA/QC was not completed until February

 8    '08.  Well, that's an eight-month lag between the time

 9    of the generation of the data and the time that we

10    received it.

11           Paragraph 11 says that the January 8th

12    sampling was produced to us on March the 25th, 2008.

13    And, again, he says he doesn't understand what the

14    defendants are complaining about.  And, again, we go

15    back where there was a preliminary injunction hearing

16    in that interim there.

17           And finally on paragraph 15, Mr. Burgesser

18    admits that one-half of the diatom and macroalgae

19    sampling that was done between September of 2006 and

20    May of 2007 was not produced until March 25, 2008.

21    That's what -- Mr. Burgesser admits that half of it

22    wasn't.

23           Well, it turns out we don't have the other

24    half so we still don't know where the other half is.

25    All we have gotten it appears on the diatom and

1    macroalgae production is what was produced on March

2    the 25th.

3                    THE COURT:  Okay.  Which paragraph were

4    you talking about?

5                    MR. SANDERS:  That was paragraph 15,

6    Your Honor, of the Burgesser affidavit.

7                    THE COURT:  Okay.  Gotcha.

8                    MR. SANDERS:  Now, there's another

9    category of sampling that we have just recently found

10   out about.  The Oklahoma Conservation Commission is

11   working -- I believe it's with the U.S. Department of

12   Agriculture on doing some studies of riparian buffer

13   strips and looking at the possibility of buying up

14   riparian buffer strips.

15        The Oklahoma -- it's called a CREP program,

16   C-R-E-P.  It stands for Conservation Reserve

17   Enhancement Program.  It turns out that the Oklahoma

18   Conservation Commission is doing a lot of water

19   sampling and they're looking for the things that are

20   at issue in this litigation, phosphorus in the water,

21   other nutrients in the water, and that sort of thing.

22        Now, I don't know exactly how the CREP

23   program is being administered, but it appears that

24   some of the riparian landowners are being furnished

25   with copies of testing data, and some of that testing

1    data that has gone to them has found its way to us but

2    we haven't gotten anything from the State of Oklahoma

3    regarding this CREP testing.

4         Now, the CREP testing, because it's between

5    the Oklahoma Conservation Commission and the U.S.

6    Department of Agriculture, it may be that this is not

7    controlled by the plaintiff's lawyers in this

8    courtroom or the plaintiff's experts, but it is

9    testing that is being done by the plaintiff, the State

10   of Oklahoma, through its agency, the Oklahoma

11   Conservation Commission.  It's highly relevant and the

12   State of Oklahoma should be producing it to us as it

13   is being generated but it is not.

14        So this leads us where we are.  We have to

15   come to the court to try to get enforcement of a court

16   order, which to me is a very unusual circumstance.

17   That's why I say that the normal types of sanctions --

18   attorneys' fees and so forth -- they haven't been

19   effective, we don't have any reason to believe that

20   they will be effective from this point forward, and

21   that's why we are asking the court for relief which

22   includes the exclusion of evidence.

23        If we don't get that, the defendants are

24   going to be severely prejudiced and I'm not

25   exaggerating.  We simply will not be able to have our

1    experts fully informed and we will not be able to

2    fully prepare unless we have some assurance that the

3    information that the court has already ordered to be

4    produced actually be produced.

5            So we would ask for relief that has that

6    sanction attached to it, Your Honor.

7                    THE COURT:  All right.  The prejudice is

8    relevant.  Can you describe specifically prejudice

9    suffered by this late production?  I mean, you have

10   not asked Judge Frizzell to reopen the evidence in the

11   preliminary injunction.

12                   MR. SANDERS:  Oh, no, Your Honor.  Well,

13   we haven't got a ruling on the preliminary injunction.

14   But --

15                   THE COURT:  You ought to ask for a

16   reopen before the ruling.

17                   MR. SANDERS:  Well, to describe the

18   prejudice -- I mean, this motion is prophylactic in a

19   sense, I suppose.  You know, we need going forward to

20   get a better result than we've had in the past.

21           Now, the court's order was entered January of

22   '07.  We tried not to come back to the court.  The

23   motion explains all the different ways we've tried to

24   approach the plaintiff and so forth.  But like I said

25   earlier, we're simply running out of time.  We don't

1   have the luxury of more months to come back to the

2   court.

3          It's hard to describe the specific prejudices

4   because we don't know specifically what evidence and

5   what data we don't have.  That's another reason we

6   want the raw data without having to wait until the

7   QA/QC process is finished.  Because, you know, there's

8   no reason that we should not think that there's not

9   plenty of exculpatory evidence in there that may not

10  make it through the QA/QC.  We don't know.  But that's

11  why we want the raw data, so we can do our own

12  assessment of it as early as we can.

13         But to describe the specific prejudice, I

14  can't really do it because I don't know exactly what

15  we aren't getting but we know we aren't getting a lot.

16              THE COURT:  All right.  Looks like to me

17  there's two issues.

18         One is, did they produce substantive data

19  after the motion to compel was filed?  If so, you're

20  asking for attorney fees which is appropriate in some

21  situations.

22              MR. SANDERS:  We are.

23              THE COURT:  And the second issue is, are

24  there productions not yet even made?

25              MR. SANDERS:  Yes, Your Honor.  I think

1    in their response, they say that CDM is going to do

2    some more testing.  We know they're doing some more

3    testing.  And they also say that USGS is going to do

4    some more testing.  USGS, I think, has contracted with

5    the plaintiffs to do some --

6              THE COURT:  Okay.  So you're just

7    wanting a general order that says, "Data to be

8    produced within ten days of generation"?

9              MR. SANDERS:  Yes, Your Honor.

10             THE COURT:  You're not wanting me to

11   describe a specific data that has not been produced

12   and direct its production?

13             MR. SANDERS:  No, Your Honor.  I mean,

14   this motion applies across the waterfront.  Any of the

15   scientific data that they have, we need it -- we need

16   it quickly and we want an order of exclusion if it's

17   not given to us quickly.  You're right, it's all

18   data.

19             THE COURT:  All right.  And they argue

20   that your absence of a meet-and-confer would wipe out

21   your right to attorney fees?

22             MR. SANDERS:  Well, Your Honor, we have

23   met and -- well, we have met and talked with the

24   plaintiffs numerous times since January '07 about the

25   need to get this data to us.  The motion itself

1   describes the many instances that there have been

2   telephone calls, letters, and so forth.  They didn't

3   complain about any meet-and-confer in their original

4   response.

5         Keep in mind, our reply was filed after they

6   gave us all of these documents on March 25th and April

7   the 4th.  That's when it became so obvious that they

8   had been withholding materials that we added the

9   request for attorneys' fees as simply as part of the

10  original motion.  I don't think that there needs to be

11  a separate meet-and-confer on the question of

12  attorneys' fees.

13        In our view, the plaintiff's behavior has

14  been so egregious that we think that attorneys' fees

15  are warranted.  But, again, I think attorneys' fees

16  are not truly the effective relief that we need.  We

17  need the threat and the order of exclusion of evidence

18  when they do not promptly give us the material we

19  need.

20              THE COURT:  All right.  Thank you.

21              MR. SANDERS:  All right.  Thank you,

22  Your Honor.

23              THE COURT:  Mr. Bullock.

24              MR. BULLOCK:  Thank you, Your Honor.

25        Let me start by setting out what I think is

1   the history of the production on this, and that is

2   that when the court entered its order for us to

3   produce the data, you set a date for that which was

4   February 1st.  We made that date except for some

5   limited things that we got to them on the 8th by

6   agreement of the parties.  We called them and said we

7   were having some delay and asked to complete it and

8   had an agreement to make it for the 8th.

9          After that, the question of supplementing --

10  of course your order didn't have any time for

11  supplementing.  It was certainly understood under the

12  rules that there's a duty to timely supplement, so we

13  began a process of approximately every thirty to

14  forty-five days of supplementing our production.  That

15  continued until perhaps December of this year when due

16  to the involvement of the preliminary injunction, it

17  frankly fell off the radar, folks were busy doing

18  that.  And so once the preliminary injunction was

19  through, I instructed everybody to get everything

20  together, that I wanted everything completed.  That

21  was what we ended up with with the March 25th

22  production.

23          I believe that the record shows -- and

24  whether you look at Todd Burgesser's affidavit or

25  whether you look at the affidavit produced by the

1    defendants -- that, in fact, we have a record of

2    timely producing these matters.

3           Before I get too deep into that, I do want to

4    explain the question of the QA/QC.  The quality

5    assurance and quality control that we're talking about

6    here is the one performed by the CDM lab, and the

7    purpose of that is to make certain that each sampling

8    event or each -- all of the sampling data has with it

9    the chain of custody and check the quality assurance

10   from the labs and be sure that that is all contained.

11          There have been a few samples which have been

12   delayed by getting that data together, but it was

13   important that we get that data together.  In fact,

14   until data has completed that QA/QC, it isn't given to

15   the plaintiff's experts to be used.  So virtually

16   contemporaneous with our experts getting this, the

17   defendant's experts have gotten it.  There may have

18   been a few weeks' delay in that depending on when we

19   gathered the stuff up at the lab.  It is the

20   completion of that process which makes the data

21   usable.

22          So that's the reason why we did that, and we

23   made clear that we were doing that from the beginning.

24   And, of course, no motion to compel has been filed on

25   that.

1          THE COURT:  But can you be more specific

2    about the QA/QC?  You say they're checking on chain of

3    custody.

4          MR. BULLOCK:  Okay.  Well, yeah.

5          THE COURT:  What else are they doing?

6          MR. BULLOCK:  Well, they also were

7    checking that the laboratory -- the outside laboratory

8    performed their QA/QC; that is, the CDM lab gets the

9    data from these outside laboratories and then makes

10   certain that we have a chain of custody for that

11   sample and that the sample was submitted to the

12   outside lab's quality assurance process.  Those are

13   the fundamental things that are done by the CDM lab.

14          THE COURT:  This is like bacteria

15   samples from water?

16          MR. BULLOCK:  Right.  When they're

17   collected, a chain of custody is begun.  In that case,

18   it's sent direct to the bacteria lab, I believe

19   generally EML.  They then -- there are certain

20   protocols and certain quality assurance protocols that

21   the EML lab is required to implement.

22          We then get the data from the lab at the CDM

23   lab, and at that point the process is to match up the

24   chain of custodies and to go back and be sure that the

25   outside lab has performed the type of quality

1   assurance that's required.

2                    THE COURT:  Okay.  Does CDM receive the

3   water samples themselves and test them?

4                    MR. BULLOCK:  No.  No, they don't.  They

5   receive the data from the outside lab and then check

6   on those other things.

7                    THE COURT:  Okay.  Do the defendants get

8   a water sample?

9                    MR. BULLOCK:  On a few occasions, they

10  have.  As a general matter, no.

11                    THE COURT:  So they don't receive the

12  water samples, all they get is the data that comes

13  from CDM?

14                    MR. BULLOCK:  Right, right.  And so the

15  defendants, on the one hand, complain as to the

16  orderliness of the production, while at the same time

17  complaining that we take the production through this

18  QA/QC process before making it.

19                    I urge the court that all of that has been

20  done in order to provide some orderliness to the

21  production.

22                    THE COURT:  Okay.  After the sample is

23  taken, when is the testing done?

24                    MR. BULLOCK:  Well, the testing, it

25  depends -- it all depends on a number of things.  I

1      think that some of that is weeks or perhaps past a

2      month before it's tested depending on what it is.

3                    THE COURT:  And that's done by EML?

4                    MR. BULLOCK:  And then that -- but even

5      once that testing is done doesn't necessarily mean

6      that we get the results from the lab.  On occasion,

7      some of those have been delayed getting the results

8      actually from the outside lab and I don't have an

9      explanation for that.

10                   Once we have received these at the CDM lab,

11     we then put the packages together and do the quality

12     assurance there, the second level of quality

13     assurance.  And then within that periodically we've

14     updated the production, and I think that that has been

15     done in a timely manner historically.

16                   I recognize the defendant's concern presently

17     about the question of getting it going forward as we

18     end up with this in this critical time, but I think

19     historic criticism of the timeliness is neither

20     appropriate nor itself timely.  This has been the

21     process that we've used.

22                   And while the defendants necessarily -- I

23     won't represent that they have appreciated it -- I

24     think that it's been important to provide some type of

25     order and cohesion to these so that when they have

1    gotten these large data packages with the results,

2    they also have received the chain of custodies and the

3    quality assurance.

4         Now, no data has been withheld, Judge.  I can

5    say that categorically.  We haven't done it.  We won't

6    do it.  It's just something that neither would make

7    sense nor it just is beyond the pale that anybody

8    would consider doing that.

9         There have been limited lapses.  Frankly,

10   when we talk about whether something has been

11   prejudicial, I think that it's very difficult to make

12   a case that they have been prejudicial.  When you look

13   at what the defendants say they complain about in

14   terms of the timeliness, most of the delay was the

15   result of this period of time from December until

16   March during which we were involved in the preliminary

17   injunction.  And, in fact, the data which they

18   complain about not receiving was that data, unless it

19   was specifically produced as considered materials by

20   the experts, that was foreclosed by the court from

21   being used in the preliminary injunction.  And so

22   that -- that really -- there was no prejudice there.

23        THE COURT:  Is there still testing going

24   on?

25        MR. BULLOCK:  Yes, there is, and it's

1    very limited.

2            When Mr. Sanders brought up the production of

3    April 29th and May 7th, those were the most recent

4    data that we received.  I know that from talking to

5    the CDM lab at the end of last week, that there are a

6    few samples that they're still trying to match up with

7    the -- or get some information from the sending lab.

8    Hopefully, within the next few days we will have that.

9            I was asked whether or not they ought to hold

10   that until -- or hold the entire package and I

11   suggested we do it piecemeal, because I understand

12   that the last hours are always more important than the

13   first hours and have sought to expedite getting that.

14   We've contacted the labs where we're waiting for the

15   information to tell them to expedite the processing of

16   that so that we can get this to them in the most

17   timely fashion.

18            There are only -- there's very limited

19   categories of information which in the March

20   production I discovered in the process of scraping the

21   bottom, as it were, which had failed to be produced

22   and admittedly should have been produced earlier.

23   Those were, one, some field books by an employee of

24   CDM, they were not the field books of the people

25   supervising the sampling, but certainly they were

 1    entitled to them.  She didn't understand that anybody

 2    would be interested in her field books perhaps because

 3    she was a student.  When we found out about them, we

 4    provided those.

 5         There was some what is called "synoptic

 6    sampling," which was done early in the case, and

 7    somehow when I got the information to copy, they had

 8    overlooked that.

 9         What that was was some preliminary

10    investigation.  No data was produced as a result of

11    that.  What it was they sent students out and what

12    they did was they collected some mud or the sediment,

13    and from that later sampling sites were designated and

14    then the sampling data from those sites has been

15    produced.  So it was this preliminary investigation

16    that was done.

17         Defendants clearly were entitled to it.

18    There was no reason for us to withhold that.  It

19    doesn't have any great shakes in terms of the case,

20    but they were in entitled to it and somehow it was

21    overlooked.

22         The other main class of information that Todd

23    Burgesser references was the diatom information.  The

24    way that that got overlooked, so far as my

25    investigation says and tells me, is that those

```
 1    were -- that particular type of sampling is not

 2    processed through the CDM lab because it doesn't have

 3    the type of formal QA/QC that you would -- such as the

 4    metal data, metals, or the bacteria or the other.

 5    This is a counting of diatoms and the classification

 6    of diatoms.

 7             And so that data when in the process somebody

 8    thought, have we asked Dr. Stevenson for that data?

 9    As it turned out, he had been overlooked and we

10    gathered that together.

11             Now, this is the first time I've heard, and

12    from what I knew coming in here I do not believe it

13    so, but I certainly would sit down and meet with the

14    defendants concerning their still missing other diatom

15    data.  If there is, we want to get it to them.  I'm

16    not aware of any that they're missing, but Mr. Sanders

17    says there is and there's an issue to sort out.  Those

18    were clearly overlooked.

19             We've produced well over a hundred-thousand

20    pages, and this isn't just copies of files, these are

21    individually-produced and important pieces of data.

22    We produced that in a routine matter.  I think that

23    it's gone well.

24             Did it turn out that we had overlooked a few

25    things?  Yes.  And I apologize for that but it
```

1   happened, and that's all I can say is that.

2                   THE COURT:  What time limit do you think

3   is appropriate for the future?

4                   MR. BULLOCK:  In light of the fact that

5   there's a limited amount, I don't have any problem

6   with supplementing the production every ten days with

7   the data as received from the outside labs, and then

8   we will follow up with the QA/QC and the chain of

9   custody.  This is going to be a small enough amount

10  that getting that stuff paired up it shouldn't cause

11  too much chaos.  That should be workable going

12  forward.

13          Let me address, though, another piece of it

14  that is a problem and needs to be addressed

15  separately, and Mr. Sanders referred to it as the data

16  from the CREP program being collected by OCC and the

17  USDA.

18          I have no idea what that's about, but I don't

19  believe that that is covered by this order; in fact,

20  it is not covered by this order.  This order, while

21  not explicitly, overwhelmingly implicitly was

22  addressed solely to the data, the sampling data, being

23  generated by our experts, where we were sending people

24  out into the field specifically for the purpose of

25  gathering data for this case.

1          All along before that, since then, and

2     continuing on the agencies of the State of Oklahoma

3     have done their own routine sampling and that has

4     never been suggested in the course of this as being

5     covered by this order.  They've been getting this data

6     since February of '07, and it's been plain on its face

7     that this has not been data produced by the OCC, by

8     the water board, by the DEQ.  None of that has been

9     included in it and this order was never intended to

10    cover that.

11         Now, as to how the agencies handle that, how

12    to supplement it is well beyond my expertise.  We are

13    more than happy to sit down with the defendants and

14    talk to them about those issues, and if necessary,

15    present it to Your Honor.  I don't think that will be

16    necessary.  But that shouldn't be included in this.

17    It certainly never has been in the past and has never

18    been understood to include it.

19              THE.  COURT:  Okay.  Well, the OCC has

20    produced other data --

21              MR. BULLOCK:  That's right.

22              THE COURT:  -- in connection with this

23    lawsuit.

24              MR. BULLOCK:  Right.

25              THE COURT:  So you would think that

1   maybe this data is a part of the supplementation of

2   prior production?

3            MR. BULLOCK:  That would be my belief,

4   is that it would be part of -- just as OWRB and DEQ

5   have continued to collect data, the OCC's data would

6   be part of that and those are going to need to be

7   supplemented.  That's outside my area of

8   responsibility here, but I know that we have had

9   conversations concerning the need to supplement and I

10  think some work's being done to get that done.

11           Oh, the one other area is the USGS sampling.

12  The USGS sampling falls into its own category; that

13  is, the -- in response to this litigation -- there's

14  an ongoing sampling program between the Oklahoma Water

15  Board and USGS to do sampling in the IRW.  There was

16  decades before this case was filed and long after the

17  case is resolved, I'm sure that that type of routine

18  sampling will go on.

19           What we did as part of this case, though, was

20  that we supplemented the requirements for that

21  sampling by the USGS and so we have been producing

22  USGS sampling as part of this program.  In fact,

23  defendants complained about the lateness of it.  As

24  soon as I got the USGS data, as soon as it was

25  provided to us, it was provided to the defendants.  I

```
1    believe that at this point that data is also

2    simultaneously published on their Web site.  Is

3    that -- well, we don't know.  We don't know.

4            But we don't have any control over any of

5    that, Judge.  When they give it to us, they give it to

6    us, and until we get it, we don't have it.  Certainly,

7    that can be subject to the duty to supplement within

8    ten days because when I get it, I'm going to give it

9    to them.

10           But let me address the issue of sanctions.

11   Mr. Sanders seems to be less than clear as to the

12   issue of fees -- of sanctions for fees.  That was

13   first injected in the reply -- in their reply brief

14   for the first time.  I don't believe that there's

15   anything in this record -- in fact, I know there's

16   nothing in this record to warrant sanctions.

17           There is the fact that some things were

18   overlooked in spite of our obvious and palpable good

19   faith and due diligence in gathering this stuff and

20   producing it.  And while they complain about the time,

21   they actually have not -- I don't believe that they

22   have made a case of any lack of due diligence and I

23   know that there hasn't been one.  Those limited

24   categories of data that I addressed, I think that

25   they're set out fully.
```

1           The idea that we were not being diligent is

2    spoken to by the massive and the important data that

3    we have produced in this matter and our willingness on

4    every occasion when we received a letter from the

5    defendants to respond to those completely and to

6    invite further conversation if it wasn't.  If you look

7    at the correspondence, you see that on December 19th,

8    I responded in detail to the defendants' concerns and

9    invited them to discuss it with us if they had any

10   issue.

11          And as for this concept that there have been

12   ongoing meet-and-confers, I contest that.  Early on,

13   we had some phone calls between Mr. George and myself

14   which focused on the issue of the PCR data, the DNA

15   data.  Now, that was -- contrary to what's been

16   presented in this court, there was nothing

17   surreptitious about that; that is, we put it on the

18   privilege log.

19          The privilege log, if you look at Exhibit 3

20   to our response brief, what you will see is that it

21   says something to the effect that the plaintiff is

22   investigating whether DNA can be used to track poultry

23   waste as it moves through the environment of the IRW.

24   We made that objection and there was nothing subtle or

25   indirect about it.  That's what prompted the

1    conversations between me and Mr. George.

2           As soon as we developed a method, decided

3    what to test for, developed a method for testing, and

4    got data from that, we produced that data.  That was

5    prompt and reasonable and went uncontested.

6           And so I don't think that there's anything in

7    this record that suggests any lack of diligence.  I

8    know for a fact that we've worked hard to comply with

9    the court's order, have done so in good faith and

10   without reservation, and certainly without the

11   duplicity which is described here.

12              THE COURT:  All right.  Mr. Sanders

13   argues that the productions of March 25th, April 4th,

14   April 29th, and May 2nd were generated because of his

15   motion to compel.

16              MR. BULLOCK:  We had already put that

17   into process to update the discovery before -- well,

18   no, I can't say that because in the midst of the

19   preliminary injunction hearing we received this

20   motion.  But I think our history of producing

21   materials speaks for itself.

22           We certainly did find out after the motion to

23   compel was filed that we had overlooked a few things,

24   but that certainly -- we were trying to produce things

25   and had been diligent about producing things.  So to

1    say that we only made a production because of the

2    motion to compel is to completely ignore the record of

3    ongoing productions.

4         The fact that from December until March they

5    don't receive anything, they don't call us and say,

6    when are you going to update your production again,

7    ought to obviate this motion itself, much less speak

8    to any need for sanctions.

9         Yes, we found in the course that there had

10   been some things overlooked.  Did it happen after the

11   motion to compel was filed?  Yes.  But do we have a

12   record of producing the information?  Yes, we do.  And

13   that record speaks for itself in terms of the question

14   of motivation in this production.

15        THE COURT:  Okay.  Well, what do we do

16   about Rule 37 that says that if there is a production

17   made in response to a motion to compel, that attorney

18   fees are to be awarded?

19        MR. BULLOCK:  Well, the cases on that

20   say that the court should look to the question of

21   whether or not, number one, there was a conferring in

22   good faith prior to the filing of the motion to

23   compel; no, there was not.

24        Then the question is one of whether this was

25   any lack of diligence on the part of the plaintiff or

1    whether the plaintiff actually performed in good

2    faith.  The record here speaks to our good faith and

3    our diligence in doing this task and no sanctions

4    should be awarded.

5              THE COURT:  Okay.  What about the Carney

6    affidavit?  As I recall, your brief does say that a

7    great majority of the data was already previously

8    produced.

9              MR. BULLOCK:  Judge, I don't know

10   exactly how they came up with these categories for

11   these different groupings that they have here.  But if

12   you go to the first page of that exhibit that we

13   looked at earlier --

14             THE COURT:  All right.

15             MR. BULLOCK:  -- those first are those

16   field books and the synoptic sampling that I spoke of

17   that had just been overlooked -- I'll wait for you to

18   get to it.

19             THE COURT:  I'm actually there.

20             MR. BULLOCK:  Okay.  Those first parts

21   are the field books and the synoptic sampling.

22             THE COURT:  Right.

23             MR. BULLOCK:  Okay.  But you go down to

24   the one -- to that first large line, that sampling

25   field work date -- this is the date that the sample

1    was actually gathered -- was December 4, 2007.

2          Now, I don't see how, in light of our history

3    of producing things and in light of the fact that the

4    court didn't have any rule in terms of supplementing,

5    that that which didn't receive -- we didn't receive in

6    our lab -- or the lab report, the external lab report,

7    was not dated until December 21st and so we received

8    it in the CDM lab right before Christmas, and I've

9    explained why there was a delay after that, that

10   simply does not speak to a lack of diligence on our

11   part.

12          THE COURT:  I understand that.  My

13   problem is the statement that the great majority of

14   the data had already been produced.

15          MR. BULLOCK:  Well, that's absolutely

16   true, overwhelmingly true, over overwhelmingly is

17   true.

18          What we had in terms of the data was that

19   there was the data from the -- that our lab had from

20   about December until the March production, December

21   '07 to the March production.  While that looks like a

22   lot, Judge, that is a very small percentage, a very

23   small percentage of it.

24          And so what you're really -- then what they

25   get were some large quantity of electronic data that

1    we had produced before in hard copy.  They had asked

2    if we had any in electronic form, to provide it to

3    them; we did that.  I don't know that that was

4    required by the court order, but if we have it, we're

5    going to give it to them.

6                     THE COURT:  But they're saying only 26

7    out the 85 lines.

8                     MR. BULLOCK:  Well, that's a question of

9    how you categorize the lines, that's not a question of

10   the amount of data, okay?

11        You look at these and I guess perhaps this

12   gives you an idea as to how much data we produced in

13   the history of this case.  And I believe that attached

14   to our exhibit was the -- or attached to our response

15   was a listing of all the data that we've produced.

16        They're talking about 27 out of 85 lines in

17   terms of, number one, arbitrary classifications of the

18   most recent production.  This is important that you

19   understand.

20                When those -- okay.  See how I can put it?

21        The last production, these 85 lines, it

22   included back data that was electronic.  That was the

23   27 that they talk about.

24                     THE COURT:  Right.

25                     MR. BULLOCK:  The rest of that was

1    current; that is, the December to March data with the

2    exception of those categories that I told you about,

3    the diatoms, the synoptic sampling, and those field

4    books.  The production prior to this production was

5    well over a hundred-thousand pages --

6                    THE COURT:  Right.

7                    MR. BULLOCK:  -- that was supplemented

8    every 30 to 40 days.

9            So don't be misled that because this was

10   supplemented in March, it doesn't suggest at all that

11   we were withholding or not producing on an ongoing

12   matter; we did.

13                   THE COURT:  All right.  The question I

14   guess is obvious.  Apparently, we have a production

15   dispute here and not a privilege dispute?  I mean,

16   you're not arguing there are things you have not

17   produced because of privilege?

18                   MR. BULLOCK:  No.  I'm not sure that we

19   have anything, Judge.  We claim the privilege only as

20   to two things.  One was an analysis by Dr. Fisher --

21   this is what I recall off the top of my head -- an

22   analysis by Dr. Fisher of the ag census data.  They

23   asked for that.  I said, no, you're not entitled to

24   our analysis.  The ag census data is available on the

25   web.  We weren't withholding anything other than the

1   analysis of experts, it wasn't included.

2          And then there was the PCR DNA data, which

3   I've explained that, and we've produced it.  I

4   understand that.  Soon I'm going to get another data

5   report from that lab.  As soon as we have it, we'll

6   provide it to the defendants.

7          But it is a discovery dispute or -- well, I

8   say it's a dispute.  I'm not sure how much of a

9   dispute it is than the question of whether we should

10  be sanctioned because we've always produced the data

11  of whatever sort regardless of what we thought about

12  it when we got it.

13          THE COURT:  Do you want to explain the

14  e-mail?

15          MR. BULLOCK:  Yeah.  That e-mail was --

16  the experts obviously heard that we were talking about

17  having a little different line drawn for the court in

18  terms of the question of whether or not this was from

19  a routine lab analysis or was of a different type of

20  lab analysis such that we asked the court to define it

21  earlier.  That's what that reflects.  You remember

22  that fight.

23          Then what the court does is the court said,

24  produce this information, and if you have something

25  else that you're going to withhold, if there's some

 1    type of data that you don't think you should have to

 2    produce because you still believe that it is

 3    privileged, put it on the privilege log and defendants

 4    can contest it.

 5           We put it on the privilege log and defendants

 6    never contested it.  We produced all the data as we

 7    got it.  We went further than producing the data.

 8    This is an important example in terms of our good

 9    faith.  Let me explain.

10           When we got the first data, I knew defendants

11    were anxious for it.  I hand-delivered it to

12    Mr. George.  Later came back at a hearing, I believe

13    before you, and then went back and had it

14    Bates-stamped and substituted.  Didn't even have it

15    Bates-stamped.

16           Then I believe when we produced the second

17    piece of data, which as soon as we got it we provided

18    it to the defendants, then they complained about the

19    description of how this was, what it meant, how you

20    calculated it, why you chose this particular bacteria.

21    They had a lot of questions about it.

22           We had a right, I believe, to withhold that

23    until we did our expert reports.  Instead, we paid to

24    have our scientists prepare a very detailed report

25    concerning the entire process of producing that and

1    provided that to them, and then we updated one more

2    time with further data.  So I don't think that e-mail

3    says anything.

4              THE COURT:  Okay.

5              MR. BULLOCK:  Okay.  Judge, we've done

6    this.  We've worked hard to comply with your order,

7    even an order which had no time lines.  We have

8    routinely supplemented it.  We're certainly willing

9    going forward to work with the defendants because of

10   the clear change in the exigencies of time, but

11   there's been no failure on our part and no sanctions

12   are warranted.

13             THE COURT:  All right.  Thank you.

14          Mr. Sanders.

15             MR. SANDERS:  Just very briefly, Your

16   Honor.

17             THE COURT:  Apparently, they've agreed

18   to your ten days.

19             MR. SANDERS:  Well, I want to -- I'm not

20   exactly sure.  I think Mr. Bullock said that he is

21   willing to give us a production every ten days.  I

22   don't know if he means ten days within the generation

23   like we're talking about, or whether he's just willing

24   to give us a report every ten days about information

25   that may be three months old.

1          THE COURT:  I think he's saying ten days

2    from the generation of the data.

3          MR. SANDERS:  All right.  Well, if

4    that's what the plaintiffs are offering, then we

5    certainly -- we agree to that, but we still want the

6    exclusion device to be attached to the ruling.

7          Let me talk just very briefly about the CREP

8    data.  This is the Oklahoma Conservation Commission.

9    Mr. Bullock says that he's not aware of it, but this

10   is extremely important and very relevant testing.

11         The OCC is a state agency.  When the original

12   discovery was propounded to the plaintiff that

13   resulted in the court's January 5, 2007, order, that

14   discovery was propounded to the State of Oklahoma.

15         Now, the plaintiff's lawyers have taken the

16   position that all of the state agencies are one

17   unified body, the State of Oklahoma, and I think

18   that's probably correct.

19         THE COURT:  Okay.  I think he said

20   they're going to give you the CREP data.

21         MR. SANDERS:  Well, that's fine, Your

22   Honor.  I'd like to go a little bit beyond that.

23         We need a supplementation of all state agency

24   data that might be out there, if there's other besides

25   OCC.  We need to have it by May the 15th.  That's when

1    they're going to give us their expert reports and

2    that's -- I think that can easily be done.  They have

3    complete control of the OCC, whether they are working

4    on this particular discovery or not.

5              THE COURT:  Okay.

6              MR. SANDERS:  Now, Mr. Bullock also said

7    that the data that's reflected in the Carney

8    affidavit -- that's the affidavit that the defendants

9    attached that was newly produced or that was -- he

10   said that the stuff had not been produced and was

11   first produced on March the 25th was data from new

12   testing in December, January of this year; I don't

13   know.

14        If you go back and look at the Carney

15   affidavit, all of those sampling dates -- almost all

16   of those sampling dates -- and the material we

17   received for the first time on March 25th, those

18   sampling dates are all in '06 and '07.  It's just not

19   correct that the stuff that we had not received

20   previously was stuff from new testing.  The Carney

21   affidavit has a -- one of the columns has a heading

22   "sampling date" and the court can look at that.

23        Also, I think Mr. Bullock indicated that he

24   gets data from USGS and then he sends it to us when he

25   gets it.  Well, the USGS, as I understand it, has

1    contracted with the plaintiff to provide testing data.

2    I think some of the -- Mr. Bill Cauthron from the

3    Oklahoma Water Resources Board testified to that

4    effect.  We need that data within ten days of the

5    generation, not ten days from when Mr. Bullock gets

6    it.  I guess Mr. Bullock or the plaintiffs would have

7    to make arrangements with the USGS to make sure that

8    that happens but that needs to happen.

9         And finally, Your Honor, with regard to

10   attorneys' fees, I'd just point out that the present

11   motion could have been brought as a motion for

12   sanctions for contempt of court in which case

13   attorneys' fees would clearly be appropriate.  We

14   think attorneys' fees are appropriate now and we ask

15   for that.  But more than anything else, we still want

16   the device of exclusion attached to the court's order.

17        Thank you, Your Honor.

18             THE COURT:  All right.  Mr. Sanders, I'm

19   looking at the Carney affidavit, and it looks like the

20   vast majority of this is December 2007.  There's one

21   2006, another 2006.  But unless I'm looking at it

22   wrong --

23             MR. SANDERS:  Let me catch up with you.

24   Just a second, Your Honor.

25        All right.  If you'll look on the very first

1     page of her chart, this page -- remember, it's on

2     pages, I think, 5 and 6 where the block was that had

3     been produced to us in electronic format.

4                    THE COURT:  All right.

5                    MR. SANDERS:  This first page represents

6     data that we saw for the first time on March the 25th,

7     2008.  If you look over at 1, 2, 3, 4, 5 -- the fifth

8     column gives the date for the sampling and these are

9     all 2006, 2007.

10                    THE COURT:  Right.  Well, those are the

11    field books and synoptic field sheets but you're

12    correct.

13                    MR. SANDERS:  Right.  But it's all 2006

14    and 2007 stuff that they had that they didn't give us

15    until March of 2008.

16                    THE COURT:  Right.  But when you get

17    there to the bacteria sampling, it appears to be more

18    current.

19                    MR. SANDERS:  I believe those are some

20    of the ones that were in the block -- hang on a

21    second.  What page are you in, Your Honor?

22                    THE COURT:  Page 1.  The bacteria starts

23    December 2007.

24                    MR. SANDERS:  All right.  You're

25    correct, it does.

**United States District Court**

1            THE COURT:  Okay.  And it kind of stays

2    there and then goes into 2008.

3            MR. SANDERS:  That's correct, I think,

4    for the bacteria.  Then you go over to page 4 and

5    it -- some of the testing for chloride and nitrates is

6    back in August 2007 and so on.  Yeah, there's some.

7            THE COURT:  Mr. Elrod.

8            MR. ELROD:  I just want to revisit -- I

9    want to make sure that nothing is slipping between the

10   cracks and that we're not ships passing in the night

11   or any other metaphors that I can think of, I suppose.

12            Based on the grunts and groans that are

13   coming from this table when the OCC issue was raised,

14   I want to make sure that we're crystal clear that what

15   they are willing to supplement is all agency-created

16   sampling data in the Illinois River Watershed, whether

17   it come from the DEQ, the OWRB, or the OCC or any

18   other state agency that's doing any sampling.

19            It's been the historic position of the

20   Attorney General in this case that he represents all

21   of the agencies of the State of Oklahoma.  He has

22   invoked the attorney-client privilege in terms of our

23   ability to contact any state agency personnel.  To my

24   knowledge, the only people in the State of Oklahoma

25   he's graciously exempted from that privilege are the

1    universities, which, of course, are not actually state

2    agencies.  I just want to make sure that's clear.

3           For instance, it's my understanding that

4    Dr. Dan Storm is doing work in the Illinois River

5    right now as we speak probably on behalf of OWRB and

6    that we also know that sampling is being done on

7    behalf of the OCC.  So surely if the State of Oklahoma

8    is, in fact, a unitary entity, then we ought to be

9    entitled to that information.

10           MR. BULLOCK:  Judge, I didn't question

11    at all what they're entitled to, but I urge the court

12    not to enter an order on this that's never been

13    briefed, never been argued, there's never been a

14    meet-and-confer on it.

15           Now, we're willing to have a prompt

16    meet-and-confer, but we're going to end up with a

17    messy record that's unclear as to what's to be

18    supplemented, how it's to be supplemented, and the

19    reasonableness in terms of time.  I don't have any

20    experience with this and the court doesn't have any

21    pleading in front of you.  This is a "throw that on

22    top and grab an order" and then we've got another

23    thing to fight about after the fact.

24           I really urge the court that this is

25    something that while clearly there's a feeling that it

1   needs to be tended to with some promptness, also needs

2   to be tended to with some level of detail and

3   expertise and sort out what the disagreements are

4   before the court just enters an order which none of us

5   really know how to even advise the court as to how to

6   enter that order, much less what times are reasonable.

7              THE COURT:  Well, you've got two issues.

8   One is whether or not OWRB and the OCC are part of the

9   State of Oklahoma.

10             MR. BULLOCK:  Absolutely.  We have

11  produced from them and we're prepared to supplement

12  from them.  That's not an issue.

13             THE COURT:  Right.  That's what I

14  thought.

15         The other issue is the federal rules require

16  regular supplementation of any discovery responses.

17             MR. BULLOCK:  Right.

18             THE COURT:  So I suppose now that

19  Mr. Elrod is just reminding everyone that that's what

20  the federal rules require and that is putting notice

21  on record that -- I mean, I would assume that you'd be

22  able to stand up and say, Your Honor, we have

23  supplemented every discovery response that's required

24  under the federal rules.

25             MR. BULLOCK:  Well, that's outside of my

```
 1    particular -- I'm not going to make a certification in
 2    something that I don't deal with every day.
 3                     THE COURT:  Right.
 4                     MR. BULLOCK:  I can certify what we have
 5    done in terms of the scientific data production
 6    because I have overseen that.  But we are certainly
 7    willing to sit down with the defendants promptly and
 8    get them the things that they're entitled to.
 9                     THE COURT:  All right.  Well, I'll just
10    remind both sides that there's full obligation of
11    supplementation under the rules.  We've now mentioned
12    that on the record, which would tee the issue up if
13    somebody feels the need that they have not been
14    properly supplemented.
15         Mr. Elrod, did that take care of the issue
16    you had in mind?
17                     MR. ELROD:  Judge, I guess I'm a
18    dinosaur.  But, you know, if he says we're entitled to
19    it and he says he'll give it to us, I don't need to
20    sit and meet and confer with them.  I mean, that's one
21    of the reasons that the modern method of trying
22    lawsuits --
23                     THE COURT:  I think he's agreed that --
24                     MR. ELROD:  -- drives me nuts, Judge.
25                     MR. BULLOCK:  And the reason why I say
```

1    that is, when you talk about all the things generated

2    in these agencies, we can overwhelm them with that.

3    I'd like to get them the things that they have the

4    real interest in fast and not overwhelm them.  That's

5    not our purpose to play that game.

6                    MR. SANDERS:  Your Honor, if I can just

7    say one thing.

8              The motion to compel was directed to the

9    State of Oklahoma and it's for all scientific data

10   that the State of Oklahoma has and that's what we

11   want.

12                   THE COURT:  All right.  Well, I think

13   they have on the record admitted that OWRB and OCC is

14   a part of State of Oklahoma and will appropriately

15   comply.

16             All right.  Well, I think that issue is

17   submitted.  Hopefully, no one has further argument.

18   We will not rule from the bench.  We do need to do an

19   appropriate order in regard to that particular motion

20   to compel.

21             It's 12:30, time is moving on, and I have

22   appropriately waited to deal with these last two

23   issues until blood sugar problems have began in hopes

24   that everyone will say, okay, we've got this worked

25   out.  I don't think they're big issues.

```
 1              We've got, well, 1683 and 1684.  This is

 2   what, the Cargill 30(b)(6) depositions?  Has anyone

 3   ever taken a Cargill 30(b)(6) deposition yet?

 4              MR. TUCKER:  No.

 5              MR. ELROD:  Your Honor, I've shown up

 6   for two of them.

 7              THE COURT:  You've done a good job.

 8              MR. TUCKER:  All I was going to say to

 9   the judge was, I may be speaking out of school, Your

10   Honor, but I believe Mr. Garren, who is out on a

11   family mission this weekend -- or this week, and I, I

12   think, resolved this issue, but as sure as I say it,

13   I'll be proven wrong, but Mr. Bullock says that he

14   thinks I might be right.  So when he and I agree, how

15   can anything be wrong?

16              MR. BULLOCK:  I think we do.  We could

17   confer for a few minutes and let the court know.

18              MR. TUCKER:  Would it be possible, Your

19   Honor, if, for example, we aren't able to solve it, if

20   we can just call you for a telephone hearing this

21   afternoon?

22              THE COURT:  Yes.

23              MR. BULLOCK:  That would be great.

24              MR. TUCKER:  Save everybody else's

25   time.
```

**United States District Court**

1           THE COURT:  It's a question of how many

2    people want to be in on that telephone call.  As far

3    as I'm concerned, it only needs to be one lawyer for

4    the government and one for Cargill, unless someone

5    else feels the need to be involved.

6           *(Discussion held off the record)*

7           THE COURT:  Does anyone -- well, do any

8    of the other defendants want to be involved in that

9    telephone hearing, if we have one, in regard to 1684

10   and 1683?

11       Okay.  Seeing none, then, Mr. Tucker, it's

12   just you and the state.

13           MR. TUCKER:  We'll back get to Your

14   Honor if we have a problem.

15           THE COURT:  All right.  It looks to me

16   like it's going to work out.

17       Well, all right.  So my plan did work, which

18   leads us to 1687, and there that is, which is the

19   state's motion to put off Cobb-Vantress until after

20   May 15th, and this is May 5th so you've almost

21   achieved your desire.

22       Mr. Bullock, is this your motion?

23           MR. BULLOCK:  No, it's Mr. Nance.

24           THE COURT:  Mr. Nance.  And

25   Cobb-Vantress is present?

1           MR. GEORGE:  One of my clients, Your

2   Honor, Robert George.

3           MR. NANCE:  Your Honor, in deference to

4   blood sugar, I'll move quickly.  But I think it's

5   important that we do cover a certain amount of

6   material in order to put this in context.

7           THE COURT:  Okay.

8           MR. NANCE:  I'm Bob Nance once again for

9   the State of Oklahoma.

10          The subject of 30(b)(6) depositions of the

11  state began in earnest last August when Cargill

12  noticed five depositions and set them for September 3

13  through 7 of last year, which would have included

14  Labor Day for that matter.  That deposition notice is

15  Exhibit 5 to the Tyson or the Cobb-Vantress response,

16  1697.

17          There were correspondence back and forth and

18  discussions dealing with those notices, but in the

19  fullness of time Cargill moved to compel, which is

20  document No. 1270.  That happened on September 9th.

21  The state moved for protective order which, I believe,

22  is 1309 on October 5th.  Those matters came on for

23  hearing before you on November 6th of last year.

24          At that time, which I believe was your

25  birthday -- wasn't it?  Do I have that correct?

1           THE COURT:  November 3rd.

2           MR. NANCE:  Well then, we were pretty

3    close.

4           And the transcript on page 96 -- and I have

5    copies I can -- do you want one, Mr. George, or -- or

6    I can give one to the court, if you'd like.  The court

7    says, "You may during the noon hour want to spend a

8    little time talking about maybe what these defendants

9    could offer in the way of coordination.  That would

10   help resolve some of the concerns that plaintiffs have

11   before you hear a ruling by the court."  Mr. Ehrich

12   for Cargill said they'd be happy to do that.

13          After lunch -- in fact, lunch was extended

14   awhile while we discussed this in the hall -- you

15   asked Ms. Hill if there was any birthday present that

16   could be offered in this regard.  Ms. Hill reported

17   that there were discussions between the co-defendants.

18   Page 97 of the transcript she reports, "So we're

19   certainly willing to coordinate so when we get topics,

20   all of the defendants can in the same day, or however

21   many days, proceed to ask questions on these topics."

22          She says that in agreeing to coordinate --

23   you know, they're going to talk about the topics and

24   have it done by December 3rd.  We'll get together with

25   our co-defendants and we'll put together a list of

1    topics that we can proceed with.

2              On page 98, she says, "We'll engage in that

3    discussion or work out after we look at these topics

4    that are jointly-agreed topics.  And then after

5    December 3rd when we get the state this list of

6    topics, we'd expect some going back and forth on the

7    propriety of the topics as well as the number of

8    witnesses and the number of time, the amount of time

9    we'll need to complete the depositions, but this is

10   the way to start the conversation."

11             As of December 3rd, defendants as a whole are

12   not representing this as a be-all and end-all.

13             On page 99, she recognizes the state will

14   voice its reservations and we've agreed to engage in

15   conversations and further our meet-and-confer process

16   after a consolidated list is given to them on December

17   3rd.

18             On page 100, I basically said that that was,

19   in fact, the agreement and that the court did not need

20   to rule on any of the motions -- either of the motions

21   that were pending at that time.  That agreement was

22   memorialized in your order of 1375 which came out on

23   November 14th.

24             In either late November or early December,

25   the defendants presented us with a list of 12 notices

1   on various topics.  Those topics were our Exhibit 1 to

2   our motion which is 1687.  It was simply a list of

3   topics, it was not a date.  It was not a formal notice

4   in the sense that you usually get, but it was a list

5   of topics that we were supposed to further in our

6   discussion.

7           The next hearing that mentioned this matter,

8   Your Honor, was on December 6th, once again before

9   you.  At page 40 of the transcript, Mr. Tucker says,

10  "Just by way of report to the court, as Your Honor

11  suggested, the parties have been discussing the topics

12  that will be covered.  We have presented that in our

13  most recent revised list following discussions to the

14  state and they are considering it.  They have not

15  rejected it.  We believe they're considering it in

16  good faith so we have nothing to offer to the court,

17  no controversy to bring to the court at this time."

18          I agreed that there was no action needed on

19  either their motion to compel or our motion for

20  protective order.  Those discussions were basically

21  memorialized in your order of November 7th, which is

22  No. 1409, that the two cross-motions were held in

23  abeyance at the request of the parties.  You recognize

24  that discussions were ongoing between the parties to

25  resolve remaining issues.  We were directed to file

1   motions to withdraw our respective motions or file a

2   status report advising what issues will remain

3   unresolved on or before January 11th.

4          I have one letter that went out that is not

5   currently in the record.  Let me hand one, if I can,

6   to Mr. George and offer it to you, Your Honor.

7          This is my letter of December 31, 2007 --

8   I've got extras if you need a copy -- between -- to

9   Ms. Sutherland, who was at that point acting for

10  Cargill, as I recall, perhaps while Ms. Hill was off

11  on maternity leave.

12         It basically presented our view of their 12

13  topics, and I'm not suggesting that the substance of

14  this is vitally important at the present time.  We did

15  make certain objections.  We did tell them that we

16  understood in the very last paragraph that they were

17  most interested in notices 1 and 2, which were the

18  human health issues.  We told them that we thought we

19  could prepare witnesses in late January or early

20  February on those topics.  That was the last

21  substantive conversation I had with either

22  Ms. Sutherland or Ms. Hill who had been handling it up

23  to that point.

24         On January 11th, in compliance with the

25  court's order, each side presented a status report.

1    Ours was docket No. 1452.  We basically said that --

2    we reported the parties are engaged in discussions

3    regarding scheduling of 30(b)(6) depositions of both

4    Cargill and the state in light of the need of all

5    parties to prepare for the preliminary injunction

6    hearings then scheduled for February 19th.

7         Without prejudice to the right of any party

8    after proper conference to seek relief from the court,

9    the state believes no action on the pending motions --

10   theirs 1270 and ours 1309 -- was required at present.

11        Then you issued a minute order dated the 16th

12   of January -- it's docket No. 1462 -- where you said

13   that based upon the status reports filed on the 11th,

14   the plaintiff's motion for protective order and

15   Cargill's motion to compel are stricken, to be refiled

16   should meet-and-confers fail to resolve the issues

17   following a hearing on the preliminary injunction, and

18   you deemed moot a motion to strike that we had filed.

19        That was in mid January, Your Honor, and of

20   course there's been a lot of water under the

21   preliminary injunction bridge since that time.  But

22   that's where the matter lay as regards 30(b)(6)

23   depositions of the state for three months.

24        There was no response from Ms. Sutherland to

25   my letter.  There was no further meet-and-confer.

1   There was no "pick up the phone."  We had some

2   arguments, I think, that was the subject of a

3   telephone hearing where Mr. Garren was trying to get

4   Cargill to submit to a 30(b)(6) before the hearing and

5   you said no, that's not what's going to happen.

6        We basically got through the preliminary

7   injunction hearing, we had certain arguments about

8   additional time to prepare our expert witness reports,

9   and nothing on the 30(b)(6) front until April 14th of

10  this year.  It wasn't Cargill who had been the party

11  that we had been dealing with on that, but it was

12  Cobb-Vantress who sent us a new notice.  It was a

13  notice for 30(b)(6) depositions to be conducted two

14  weeks from that date, or on the 28th of April, and

15  they gave us five topics to inquire on, each with

16  subparts.

17       Now, these were some of the old topics that

18  we had talked about earlier or we had seen in the 12

19  deposition notices that we got late last year.  But

20  there wasn't, as the court clearly contemplated, any

21  meet-and-confer about that, it was simply an ultimatum

22  that came to us.  You can see those topics and the

23  notice are Exhibit 2 to our motion.

24       There are five areas of inquiry, and it's

25  important for the court to understand the extent to

1   which one -- these weren't the ones that we had began

2   preparing, the human health topics, that we thought we

3   would go with first at their earlier suggestion.  They

4   were some of the other topics that had been brought

5   up.

6         The first was total maximum daily loads.

7   That originally had been four subparts.  Your Honor,

8   if you're looking at our motion, it's 1687-3.  The

9   actual attachment is page 7 of 12.

10              THE COURT:  Let's see.  Exhibit 7 is a

11   bunch of letters, would be Exhibit 3.

12              MR. NANCE:  Are you looking at mine?

13              THE COURT:  I'm looking at document

14   1687.

15              MR. NANCE:  I'm sorry.  It's Exhibit 2.

16   The docketing number on the top is 1687-3.

17              THE COURT:  Yep, I have it.

18              MR. NANCE:  Okay.  And the actual topics

19   to be addressed in these proposed 30(b)(6) depositions

20   are on what's called "attachment A."

21              THE COURT:  I see that.

22              MR. NANCE:  The first four items on

23   total maximum daily loads are based upon the four we

24   got before but they have been beefed up.  The original

25   notice, or the notice from late last year, had four

1    topics on it and these roughly correspond to those but

2    they're more detailed.

3         However, completely new topics, Judge, start

4    at page -- or at No. 5.  I'm going to blow through

5    them they briefly but I think it's important to put

6    this in context.

7         In addition to what they'd asked us before on

8    TMDLs, they wanted the identity and location of all

9    documents generated or received by anyone performing a

10   TMDL in the IRW or any portion thereof, the identity

11   of each person who has at any time been hired or

12   employed to perform work on a TMDL in the IRW, the

13   dates of all work performed in connection with any and

14   all TMDLs for the IRW or any portion thereof.

15        THE COURT:  Okay.  Mr. Nance, I

16   understand the situation now, I think.  Maybe a couple

17   of questions in regard to the lateness of the hour.

18        Is this a combined motion on behalf of all

19   the defendants or just Cobb-Vantress?

20        MR. NANCE:  We asked that because we

21   were afraid that we were just getting one from one

22   defendant.

23        In my letter of, I believe, the 17th, which

24   is our Exhibit 3, posed that question back to Mr. Bond

25   and informed Mr. Bond that because of the expert

1    reports, we couldn't do these before the 15th.

2    Mr. Bond responded on the 18th of April, our Exhibit

3    4.

4              The crucial thing for our purposes today is

5    he says that we are willing to work with the

6    plaintiffs on scheduling of this deposition but we are

7    -- this is the fourth line from the bottom of the

8    first page -- but we are not willing to agree to begin

9    deposing witnesses until after May 15th.

10             THE COURT:  All right.  But we don't

11   know if -- it's not a combined notice on behalf of all

12   defendants.

13             MR. NANCE:  He essentially says in the

14   first paragraph, I'm sorry, they know this is going to

15   be their only notice on these topics.

16             THE COURT:  Okay.

17             MR. NANCE:  And so I am satisfied,

18   unless Mr. George tells us something different, that

19   these are combined notices on these topics.

20             THE COURT:  Okay.  Your argument, it

21   seems to me, is much, much, much broader than your

22   brief.  I mean, your brief just says, we don't have

23   time, we're getting expert reports ready, come see us

24   later.

25             But you're suggesting that some grand

1   organization of depositions need to be put in place,

2   it sounds like to me.  Isn't that correct?  That's the

3   reason you went through the history?

4               MR. NANCE:  There is -- the history is,

5   as we left it in the last order you issued was to meet

6   and confer.

7               THE COURT:  Right.

8               MR. NANCE:  And that has not happened.

9               THE COURT:  In regard to a deposition

10  discovery plan?

11              MR. NANCE:  Right.

12              THE COURT:  Which would include all

13  defendants?

14              MR. NANCE:  Which would include all of

15  the defendants.

16          And the brief does show on page 3 the little

17  chart about how they've expanded the number of

18  subparts and they're asking us to do --

19              THE COURT:  Okay.  So I guess the

20  specific question is, what's the grounds for your

21  motion to quash this notice?  I mean, what do you want

22  to happen?

23              MR. NANCE:  We want the notice to be

24  quashed and these depositions to be scheduled after

25  the expert reports are due next week on the 15th

1    because we are quite legitimately engaged in getting

2    those reports done.

3              THE COURT:  Well, that's probably not a

4    problem.  I mean, you want to do it on the 18th?  I

5    think your objections are broader than that.

6              MR. NANCE:  Well, we would suggest

7    starting them on or about the 1st of June.  It's just

8    a scheduling matter.  We do have some substantive

9    objections, but this has moved with such haste, I

10   haven't put together -- I've got it in draft but I

11   haven't got it out -- a letter similar to the one I

12   sent to Ms. Sutherland earlier.  Those are just

13   routine meet-and-confer and discuss it and see if you

14   can get along.

15        But the crucial thing when I spoke with

16   Mr. George on the 25th, I realized for the first time

17   they weren't going to accommodate us at all in getting

18   past those.  I know Mr. Bond's letter had said that,

19   but there's no objective reason why they would have to

20   make us prep witnesses and start conducting these

21   depositions while we're working on expert reports

22   unless they just want to interfere with our production

23   of the expert reports.

24             We need to get those done.  That's a

25   matter -- a deadline the court has set and it's -- I'm

 1    not prepared to talk about it completely but it may be

 2    a problem as it is.  We're here now instead of working

 3    on expert reports talking to you about it and it's

 4    simply a scheduling matter that should have been

 5    handled in the -- according to your order, and in the

 6    spirit that we were working at late last year, by

 7    meet-and-confer and we arrive at a legitimate workable

 8    schedule.

 9         They say basically that, well, they need this

10    stuff for their expert reports, which are due in three

11    months, when ours are due in nine days.

12              THE COURT:  Well, all right.  Let's see

13    what they've got to say.  I mean, obviously the 15th

14    is only ten days away.  So --

15              MR. GEORGE:  Your Honor, Robert George

16    appearing for Defendant Cobb-Vantress.

17         To clearly answer the court's question with

18    regard to whether the notice is intended to be a

19    consolidated notice on behalf of all defendants, it

20    was.  Certainly, if you look at the style of it, it's

21    issued by a particular defendant.  But as we confirmed

22    with Mr. Nance, all defendants would recognize that

23    that is their opportunity to ask questions on those

24    topics of a state representative.  So we're not trying

25    to hide the ball in that all.

```
1          I guess I would respond -- I don't intend to
2    go jot and tittle on Mr. Nance's history of how we got
3    to this point.  But, Your Honor, I think what it
4    illustrates is we've spent about ten months talking
5    about discovery as opposed to taking discovery.
6          Your Honor, at some point in time, as much as
7    I am an advocate of meet and confer and collaboration,
8    at some point in time all of us as lawyers in the
9    defense side of this case have an obligation to our
10   clients to develop the evidence necessary to prepare a
11   defense.
12         And so after this process had stalled -- and
13   let me give the state some credit -- I believe
14   they -- I can't put this politely, Your Honor -- I
15   think they played the meet-and-confer game effectively
16   to their advantage to push these depositions out to a
17   time that is potentially prejudicial -- I'd say
18   expressly prejudicial to the defendants.
19         At some point in time, Your Honor, that has
20   to come to an end.  That was the reason why I issued
21   the notice in April requesting a deposition.
22         And, Your Honor, for contrast, I think it's
23   important for this court to recognize the defendants
24   have already gone through the 30(b)(6) deposition
25   process.  And as part of that, Your Honor, we handled
```

1    it in the traditional course that is contemplated by

2    rules.

3            The plaintiffs issued 30(b)(6) deposition

4    notices to my clients.  They proposed a date on which

5    they wanted to take those depositions.  We did have

6    some conversations around whether those dates would

7    work for witnesses.  But we did not have a prelude of

8    negotiation around the particular topics that should

9    it be included in their notice or the order of those

10   topics.

11           Your Honor, I think at some point in time, we

12   have to step away from the bureaucracy that lawyers

13   like to create in a case like this and fall back to

14   what the rules provide.

15                   THE COURT:  Okay.  He said he's willing

16   to start June 1st.

17                   MR. GEORGE:  Not soon enough, Your

18   Honor.

19                   THE COURT:  Well, okay.  When do you

20   want it?

21                   MR. GEORGE:  Your Honor, I want it

22   before May the 15th, to be quite honest.

23           I appreciate and I understand the reaction

24   the court's having, Your Honor, but here's my

25   frustration.

```
 1              If this court enters an order that allows the

 2      defendants -- I'm sorry -- the plaintiffs to put off

 3      these depositions until after May the 15th, that's

 4      done two things.

 5              First of all, it has rewarded the plaintiffs

 6      for a unilateral act that is not contemplated under

 7      the rules.  Under the rules, you don't get to file a

 8      motion for protective order and simply thumb your nose

 9      at the deposition process.  We've cited the cases in

10      the briefs that provide that it's a very serious

11      matter that you must actually obtain a protective

12      order and there's a reason for that.

13              The plaintiffs did not even attempt in any

14      way, other than an 11th-hour motion that they knew

15      would not realistically be acted upon, to accomplish

16      that.

17              Secondly, Your Honor, to answer Mr. Nance's

18      question of, what's the objective reason why the

19      defendants would want this before May the 15th, let's

20      think about what happens if we push it out after May

21      the 15th.

22              The plaintiffs have had three years, Your

23      Honor, to work on their expert reports; that's how

24      long this case has been pending.  We've heard from

25      discovery matters that have been before you their
```

1    experts have been fully engaged and working and moving

2    toward a point in time of delivering expert reports to

3    the defendants.  That period of time comes to a close

4    at the end -- I'm sorry -- on May the 15th.

5          At that point in time, Your Honor, the

6    defendants have three months under the current

7    scheduling order to absorb that information and to

8    complete our own process of preparing rebuttal expert

9    reports.

10          What Mr. Nance is saying, Your Honor, is that

11    there ought to be two sets of rules when it relates to

12    discovery and particularly this 30(b)(6) deposition.

13    Mr. Nance's position is that they should not have to

14    simultaneously participate in 30(b)(6) depositions

15    while they're working on expert reports but the

16    defendants should.  It's patently unfair, Your Honor.

17    Every day in that three-month period is important to

18    the defendants and -- I see you have a question.

19          THE COURT:  I understand your

20    frustration, but we don't even have an agreement in

21    regard to the deposition topics at this point, do we?

22          MR. GEORGE:  I don't know that we need

23    an agreement, Your Honor.  I don't believe I'm

24    required under the rules -- any litigant is required

25    under the rules to negotiate topics.

```
1              Your Honor, I've sent a notice.  If they have

2       a problem with a topic that I have proposed, they have

3       a remedy, and that is to file a motion that states

4       what their issue is with a particular topic, why it's

5       not relevant, why it impedes upon privileged matters,

6       why it is unnecessarily burdensome.  They've done none

7       of those things, Your Honor.

8              I don't believe that I should be required,

9       nor did I think the state should be required when they

10      sent me 30(b)(6) notices, to negotiate the topics with

11      the other side.

12                   THE COURT:  So these topics, apparently

13      you've agreed with them among all the defendants?

14                   MR. GEORGE:  Correct, Your Honor.

15                   THE COURT:  All the defendants are happy

16      with these?

17                   MR. GEORGE:  These are all topics that

18      each of the defendants believe are vitally important

19      at this juncture and need to be explored with a

20      representative who can make binding admissions on

21      behalf of the State of Oklahoma.

22                   THE COURT:  All right.  Well, I think we

23      need to talk to Mr. Nance again to get this show on

24      the road.  I mean, I understand your frustration.  I'm

25      not sure I understand the state's position at this
```

**United States District Court**

1   point.

2          I mean, your brief said, I don't have time,

3   I'm doing expert reports, but now you've mentioned

4   some frustration with the notice and the topics.  I

5   don't think that's in your brief, is it?

6          MR. GEORGE:  Well, that issue was not

7   raised affirmatively in the state's motion for

8   protective order so I didn't respond to that.  That's

9   correct, Your Honor.

10         THE COURT:  Yeah.  So go ahead, yeah.

11         Mr. Nance, I mean, your motion to quash

12   because you're busy doing expert reports basically can

13   be overruled.  But if you have a motion to quash

14   because we need to fight about the coordination of

15   discovery and the -- and the scope of the topic, well,

16   that seems to me is something we do need to resolve.

17         MR. NANCE:  Well, Your Honor, footnote 2

18   to our motion mentioned that we had objections to

19   overbreadth.  I wrote this in one day and I wrote it

20   in haste and borrowed liberally, in fact, from

21   Mr. Tucker's motion on behalf of Cargill.  We have

22   flagged that, but in the haste in which I wrote,

23   that's frankly the best I could do.

24         Now, as regards to any games we've been

25   playing, we put Shannon Phillips up, the lady you've

**United States District Court**

1    heard discussed, because she gave the affidavit.  We

2    put her up as a 30(b)(6) witness when they noticed her

3    as an individual.

4         We said, we'll have her there.  We'll have

5    her talk about these topics because she knew about

6    those topics and they are topics that they had

7    designated late last year.  They refused to question

8    her and they didn't use the whole day, they had plenty

9    of time.  They didn't use the whole day in what they

10   wanted to do.  They had plenty of time to question

11   her.  They didn't do it.

12        In fact, the letter that I handed up to you,

13   Judge, which was the letter I wrote to Ms. Sutherland

14   in December, is based in part upon some language that

15   I admired very much from Mr. George because he wrote a

16   similar letter when we did his 30(b)(6) deposition.

17             THE COURT:  Okay.  Well, my question

18   really is, what do you want to happen now?

19             MR. NANCE:  I want the dates moved back

20   to the 1st of June.  That's the critical thing.

21             THE COURT:  To do what?

22             MR. NANCE:  To do 30(b)(6) depositions

23   on these five topics.

24             THE COURT:  And is it all directed

25   toward one person?

1                    MR. NANCE:  We will have to put up more

2       than one person to cover all five of those topics.

3                    I would like an opportunity when the heat of

4       battle isn't on us to talk with either Mr. George or

5       Mr. Bond, or whoever the appropriate person is, about

6       some of those topics for some of the same reasons that

7       were in my letter to Ms. Sutherland.

8                    If we can't resolve them, I guess we'll make

9       our record when the depositions go or we'll come back

10      before you.  But I don't think the fact that they've

11      rushed this in the middle of our preparation of expert

12      reports should deprive me of the ability to be heard,

13      if I need to, on substantive objections to those

14      topics.

15                   THE COURT:  Well, that's not in your

16      motion.  So the question is whether you're going to

17      file another motion?

18                   MR. NANCE:  I'd like to talk with them

19      before I have to file a motion.  I think that's my

20      obligation.  I've made a commitment that we will go on

21      the 1st of June.

22                   I reserved in that footnote, in the haste I

23      had to write, the fact that we did have some

24      substantive issues with their topics.  In fact, in

25      every letter I wrote to Mr. Bond I said the same

1    thing.

2                    THE COURT:  Okay.

3              *(Discussion held off the record)*

4                    THE COURT:  Well, I mean, on the face of

5    it, I would think your motion for protective order

6    should be overruled because I don't think there's

7    sufficient grounds in that motion to justify quashing

8    the deposition.

9          But having said that, obviously May 15th has

10   passed -- no, it's not -- the deposition itself has

11   passed so it's going to have to be reset at some time

12   anyway.  So I could say, yes, June 1st is an

13   acceptable date or one week before that.  That's not

14   that big a deal.  But we need to know if it's going to

15   go on and who it is and then what's going to happen

16   for other depositions in the future.

17                    MR. NANCE:  Well, it will go

18   on -- again, I would like to talk with them.  If

19   they're dead set on having TMDLs first or if they can

20   do one of the other topics first.  I started with

21   TMDLs because it was just their topic one, it was the

22   first one.

23          We can put someone up on June the 1st and we

24   can continue to work through those topics.  I think

25   that counsel owe each other an element of flexibility

**United States District Court**

1    on that and I think that's what Tyson did.  They said,

2    we'll put this person up on these topics on that date.

3                    THE COURT:  It would seem to be

4    appropriate to come up with a deposition order

5    schedule.

6                    MR. NANCE:  And I think you contemplated

7    some sort of deposition plan when you told us to -- in

8    your last order on this.  And rather than picking up

9    the phone and saying, well, Mr. Nance, it's time to do

10   that, we get the series of events that have been

11   described here.

12                   THE COURT:  Right.

13                   MR. NANCE:  And we're prepared to do

14   that with them on these topics.

15                   THE COURT:  What about requiring a

16   proposed deposition -- a combined deposition notice

17   and schedule proposed by both parties to be filed

18   within 30 days and then let the court enter an order?

19   I mean, I'm asking you if that seems to be an

20   appropriate resolution.  I mean, that's not going to

21   slow down this deposition.  This deposition needs to

22   go full-speed ahead.

23        Do we have any other depositions in the

24   pipeline or is this the only one noticed?

25                   MR. NANCE:  We have no other 30(b)(6)

1    depositions in the pipeline.  I'm not aware of them

2    deposing any of our fact witnesses.

3              MR. BULLOCK:  Of course, part of what

4    we're doing with Mr. Tucker is scheduling some

5    depositions.  I'm sure that once they get our reports,

6    we're going to have to get those scheduled and we've

7    talked to people about setting time aside.  We don't

8    know -- you know, we've been through their question of

9    being able to determine order.  So we probably do have

10   some depositions coming up that we're going to have to

11   start working together to schedule.

12             THE COURT:  Okay.  Well, this is the

13   5th.  I'd be inclined to require this deposition to

14   occur sometime before a week from the end of May.

15             MR. NANCE:  Some --

16             THE COURT:  In other words, you've asked

17   for June 1st.  I'm saying June 1st minus seven days,

18   which, I guess, is May 23rd -- by May 23rd.

19             But two other questions.  The one is whether

20   or not we're going to get a combined discovery order

21   or not in this case.  Obviously, we don't have one and

22   this is the result of that.

23             And the second question that Mr. George

24   raised is, he noticed the deposition and you guys

25   didn't show up for it, which is not appropriate

1    without a court order staying the deposition or

2    quashing the deposition.

3                    MR. NANCE:  And, Your Honor, given the

4    way this was postured going in, that we were going to

5    meet and confer, I thought we could talk about it and

6    we would meet and confer and we would get a date that

7    wasn't during our expert report period because that's

8    what the court had told us to do.  The court didn't

9    tell us to do what happened here.

10                   THE COURT:  Right.

11                   MR. NANCE:  I mean, it's explicit in

12   Mr. Bond's letter, they'll work with us on time, if

13   the 28th doesn't work, just so long as they can

14   interfere with our expert reports and start before the

15   15th.  That's not a legitimate goal.  That's --

16                   THE COURT:  Okay.  Well, just as a

17   general announcement, anybody that files a motion to

18   quash, if you want to stay a deposition until after

19   the ruling, you're going to have to ask for an

20   expedited hearing and an order staying the deposition

21   until after the ruling on the motion to quash.

22   Otherwise, you're really hanging yourself out.

23        Okay.  We're going to take this deposition on

24   or before the 23rd of May and -- I mean, we're not

25   going to quash the deposition.  If you want a hearing

*149*

```
1    on any of these topics, then you're going to have to

2    file an emergency motion for a hearing and see if we

3    can get a telephone hearing of some kind.

4               MR. NANCE:  We'll do.

5               THE COURT:  But other than that, we need

6    to go full-speed ahead on the 23rd.

7         I don't know whether to issue an order

8    requiring a combined deposition schedule.  I mean,

9    I've kind of implied that two or three times and it

10   never has happened.  Everyone said, we don't need

11   that, we can work this out.

12         So what do you think?

13              MR. NANCE:  I think it may be the time

14   to go that route.

15              THE COURT:  All right.  Well, I guess we

16   need to hear from Mr. George one more time.  I mean,

17   I'm sympathetic to your position but there's nothing

18   else I think that I can do to help at this point.

19         Nobody showed up for the deposition, I

20   assume?  I mean, you had no court reporter present --

21              MR. GEORGE:  No.  We actually did have a

22   court reporter appear and counsel for Cobb-Vantress

23   appeared and made a record that no one else

24   appeared.

25              THE COURT:  Oh, okay.  Where was that?
```

1          MR. GEORGE:  Oklahoma City, where the

2     deposition was noticed in the offices of Ryan Whaley,

3     which is co-counsel for Tyson and Cobb-Vantress.  So

4     we were prepared to move forward, Your Honor.

5          And in that regard, given the court, I

6     believe, has indicated that the motion for protective

7     order will be overruled, which I, of course, think is

8     proper, there was an alternative request -- or an

9     additional request in our response to that motion,

10    which was one for sanctions, which I believe are

11    squarely contemplated by Rule 37 in these

12    circumstances, particularly Rule 37, subpart D,

13    discussing the failure of a party -- in this case,

14    there's no doubt it was a party -- to attend a

15    deposition after a proper notice.

16         And, Your Honor, I struggled, to be quite

17    honest with you, in going through the options for

18    sanctions available under Rule 37 because, frankly, in

19    the three that are provided, only one of which makes

20    any sense in this case.

21         You, of course, could find and hold that

22    designated facts shall be taken as established.  I

23    think that's difficult in a deposition setting

24    where those facts would be developed on the record.

25         The court has the ability to enter an order

**United States District Court**

1    prohibiting a party from introducing designated

2    matters into evidence.  Of course that would be

3    counterintuitive because the purpose of the deposition

4    was for the defendant to discover information that we

5    want to introduce.

6            So that leaves us with subpart C which, among

7    other things, allows for striking of pleadings or

8    dismissing the action.  So you saw in our response --

9    and I appreciate the gravity of this request -- that

10   we asked that the court dismiss the action, which is

11   the only remedy contemplated by Rule 37 that makes any

12   sense and would have any hopes of addressing the

13   prejudice on the facts and circumstances of this

14   particular motion.  So I do want to just, before we

15   lose sight of that, go ahead and make a formal request

16   for that once again.

17           Your Honor, with regard to objections -- and

18   I think the announcement of your ruling covers this or

19   at least contemplates it -- if the state has

20   additional objections beyond the timing, which we've

21   now gotten past, that those need to be raised with the

22   parties and then to the court promptly so that they do

23   not impede the deposition by May the 23rd.  I just

24   want to make sure I understand that.  Because in

25   defendant's view, Mr. Nance and the plaintiffs have

1   had 20 days to raise those objections, they've had

2   that notice in their hands since early April, and have

3   had an opportunity, if they had concerns about the

4   topics, to raise those.

5           I'm very fearful, Your Honor, that what's

6   going to happen on the heels of your ruling is we're

7   going to get a five-page letter full of nuance

8   objections to every one of these topics and we're

9   going to be embroiled in another meet-and-confer and

10  the plaintiffs are going to try to use that process to

11  forestall the depositions.

12          So I want to make sure that I'm acting in

13  accord with this court's ruling if I proceed along the

14  following lines, which is absent of them doing

15  something to raise the issues affirmatively with the

16  court, we'll proceed with the deposition as noticed on

17  the topics as noticed on a date that we can agree on

18  between now and May 23rd?

19          THE COURT:  That's correct.

20          MR. GEORGE:  Okay.

21          THE COURT:  Yes.  And I suggest that if

22  they have substantive objections, that they can ask

23  for an expedited hearing.  Obviously, the later that

24  occurs, the less time we're going to have to consider

25  them.

```
 1              All right.  In your request, your response,

 2    you request dismissal?

 3                   MR. GEORGE:  Correct, Your Honor.  And

 4    we, of course, cited cases from other jurisdictions

 5    that establish that as the proper remedy when a party,

 6    in particular, fails to appear for a noticed 30(b)(6)

 7    deposition.  So there's certainly authority for

 8    that.

 9                   THE COURT:  All right.  Well, I can rule

10    from the bench at this time that I'm not going to

11    order dismissal of the plaintiff's case as this

12    particular sanction.

13              Is there any alternative sanction that you

14    have requested?

15                   MR. GEORGE:  You know, two that occur to

16    me, Your Honor.  One would be -- and I think this is

17    pretty nominal in the grand scheme of things but it

18    would recognize at least the impropriety -- would be

19    an award of fees associated -- not just with having

20    someone appear for a deposition for 15 minutes of no

21    event, but the process of issuing the notice that was

22    not complied with, the process of responding to the

23    motion for protective order the court has overruled,

24    and the time associated with making the argument here

25    today.
```

1           As one form of alternative sanction, another,

2   one Your Honor, that's honestly just occurred to me is

3   the court, I believe, could sustain a waiver of the

4   other objections that were not raised in the motion

5   for protective order that we've heard from Mr. Nance

6   may be coming.  Your Honor, certainly that would

7   expedite the process and would have a very practical

8   effect on facilitating a deposition that the

9   defendants very much need to complete.

10          THE COURT:  Now, the problem is the

11  footnote speaks to your objection.

12          All right.  Thank you.

13          MR. GEORGE:  Thank you, Your Honor.

14          THE COURT:  Mr. Nance, Mr. Bullock, do

15  you want to respond to the request for --

16          MR. BULLOCK:  I do hope that in the

17  court considering the issue of sanctions that the

18  court does look at the way the Cargill matter was

19  handling, not only in terms of the questions which

20  we've resolved, including the scheduling, but the fact

21  that Cargill communicated to us that in spite of our

22  notice, they weren't going to produce a witness and

23  filed a motion to quash.  Now, we're here to discuss

24  those things.  We've resolved it.

25          The tendency in this case to go to sanctions

1   upon every sneeze makes it very difficult to work with

2   people to resolve problems, and I think the court

3   should look at the way the plaintiff's being treated

4   by the same people that are urging this in collateral

5   matters in deciding the issue of sanctions.

6           THE COURT:  Do you have any idea why the

7   motion was so dilatory, the motion for protective

8   order, in the scheme of things?

9           MR. BULLOCK:  Ours or Cargill's?

10          THE COURT:  Yours.

11          MR. BULLOCK:  Oh.  Because ours was

12  actually earlier in time than Cargill's was in

13  relation to the depositions.  So Mr. Nance will have

14  to speak -- I'm not conceding that it was dilatory.

15  He's got to speak as to the timing.

16          THE COURT:  Okay.

17          MR. NANCE:  Thank you, Your Honor.

18          Mr. Bond's letter, which is an exhibit to our

19  motion, indicates that he will work with us on the

20  time so long as it's started before the 15th of May.

21  I took that to mean that he would work with us on the

22  time and wanted to get with him and I wrote him a

23  letter about that.

24          If I'd realized the game of gotcha and

25  interrupting our preparation of expert reports that's

1   going on here, I would have filed sooner.  But

2   Mr. George called me, he missed me, I called him back,

3   and we finally talked the Friday before the

4   deposition.  He advised filing this motion, and I

5   realize that they weren't going to work with us so

6   that we could get that date beyond the 15th and they

7   weren't going to go in the sort of meet-and-confer

8   fashion that you had ordered back in January.  And so

9   we filed our motion as quickly as we could thereafter.

10          I let him know in the morning of that Friday

11   that we would not put a witness up.  I e-mailed him

12   but I misspelled his last name so he says he didn't

13   get it, and that's my fault and not his.  But then we

14   wrote the subsequent letter to Mr. Bond later that

15   evening explaining that they had expanded the topics

16   and we that couldn't do this until after the expert

17   reports were done.

18          I, frankly, was surprised by the departure

19   from the cooperative attitude that we had had, and if

20       I --

21              THE COURT:  So you sent an e-mail that

22   morning, he didn't get it?

23              MR. NANCE:  He didn't get it.  And I

24   didn't realize he didn't get it until yesterday when I

25   looked at the address on it.

1          THE COURT:  The deposition was?

2          MR. NANCE:  Monday, the 28th.

3          THE COURT:  Okay.  And so that evening

4    of the 28th you wrote him a letter or something?

5          MR. NANCE:  Yeah.  We spoke on the

6    morning of the 25th, Friday, Mr. George and I did.  I

7    sent the e-mail at 10:25, he didn't get it, 10:25 a.m.

8    confirming that we would not appear, and then I would

9    write Mr. Bond a letter explaining that in more detail

10   later in the day, which I did, and then filed the

11   motion.

12          At his suggestion, when I realized at that

13   point there wasn't any discussion or there wasn't any

14   meet-and-confer that was going to work, they were

15   bound and determined to interrupt our expert witness

16   preparation and that's why it happened that late.

17          THE COURT:  Okay.  So you had not told

18   him a witness was not going to show up?

19          MR. NANCE:  No.  I told him that on the

20   phone on the morning of Friday, the 25th.  I confirmed

21   by the misdirected e-mail and then I wrote a letter to

22   Mr. Bond that evening saying the same thing.  They

23   knew Monday morning that we were not going to put a

24   witness up.

25          THE COURT:  All right.

1          MR. NANCE:  And that we had -- at that

2   point they knew we had gone to court on this motion.

3          THE COURT:  All right.  Mr. George, you

4   knew -- why did you have a court reporter there?

5          MR. GEORGE:  Why, your Honor?  To make a

6   record, which was attached to the response, Your

7   Honor.

8          THE COURT:  Okay.

9          MR. GEORGE:  In my prior practice, a

10  senior lawyer once taught me that if you're going to

11  complain about a deposition that didn't occur, you

12  better have a record of it.  So that was the reason

13  for having it.  Although, we were prepared to go

14  forward with the deposition when Mr. Nance notified

15  me.

16          I do think dates are important here, Your

17  Honor.  The first instance that I had formal notice

18  that a witness would not certainly be produced in

19  accordance with the deposition notice was the Friday

20  before the deposition scheduled for Monday when I

21  reached out to Mr. Nance.  Because the letter-writing

22  between he and Mr. Bond and Mr. Bond, who represents

23  Tyson, had sent the last letter, and the closing of

24  that letter is very clear, Your Honor.

25          It says that if April 28th is not a workable

1    date, the defendants are willing to reschedule but

2    request that plaintiffs provide dates before May the

3    15th.  And then earlier in the letter, Mr. Bond says

4    that the defendants will not agree to put off these

5    depositions until after May the 15th.

6            That was the last written communication

7    between the parties on this.  So when the date

8    approached, I felt the need to reach out to Mr. Nance

9    and ask whether they intended to produce someone or

10   they were going to provide an alternative date before

11   May the 15th.  Mr. Nance at that point advised me that

12   no, neither, they don't intend to produce someone nor

13   do they intend to provide an alternative date before

14   May the 15th.

15           I told him at that point, just to be clear,

16   Your Honor, that not that he should file a motion for

17   protective order, but that he should get a protective

18   order.

19           THE COURT:  All right.  You know, I do

20   not have to rule from the bench on the issue of

21   sanctions.  I think we've got the information I need

22   and I can spend a little time thinking about it and

23   we'll issue an order.  But the order is going to

24   require the deposition be taken before the 23rd as

25   we've discussed on the record.

1        It's 1:15 and we need to get out of here,

2   which I think we can do.  Is there anything else for

3   the plaintiffs at this time?

4              MR. BULLOCK:  Your Honor --

5              THE COURT:  Okay.  Any of the

6   defendants?

7              MR. GEORGE:  None, Your Honor.

8           *(Discussion held off the record)*

9              MR. NANCE:  We would like that admitted

10  in the record, Your Honor.  That's my letter to

11  Ms. Sutherland.

12              THE COURT:  Okay.

13              MR. GEORGE:  No objection, Your Honor.

14              THE COURT:  Okay.  Yes, I see.  Letter

15  dated December 31, 2007.  All right.  It will be

16  admitted, Plaintiff's No. 1.

17        All right.  We'll be in recess.  It's good to

18  see everybody.

19           *(The proceedings were concluded)*

20

21

22

23

24

25

**United States District Court**

1                    C E R T I F I C A T E

2

3

4            I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11           I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16           In witness whereof, I have hereunto set my

17   hand this 15th day of May 2008.

18
                        s/ Brian P. Neil
19           _____
                        Brian P. Neil, CSR-RPR, CRR, RMR
20                      United States Court Reporter

21

22

23

24

25