**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, ex rel. | ) | |
| W. A. DREW EDMONDSON, in his capacity as | ) | |
| ATTORNEY GENERAL OF THE STATE OF | ) | |
| OKLAHOMA and OKLAHOMA SECRETARY | ) | |
| OF THE ENVIRONMENT J. D. STRONG, | ) | |
| in his capacity as the TRUSTEE FOR NATURAL | ) | |
| RESOURCES FOR THE STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 05-CV-0329 GKF-PJC |
| | ) | |
| TYSON FOODS, INC., TYSON POULTRY, INC., | ) | |
| TYSON CHICKEN, INC., COBB-VANTRESS, INC., | ) | |
| AVIAGEN, INC., CAL-MAINE FOODS, INC., | ) | |
| CAL-MAINE FARMS, INC., CARGILL, INC., | ) | |
| CARGILL TURKEY PRODUCTION, LLC, | ) | |
| GEORGE'S, INC., GEORGE'S FARMS, INC., | ) | |
| PETERSON FARMS, INC., SIMMONS FOODS, INC., | ) | |
| and WILLOW BROOK FOODS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

WITHDRAWN

## DEFENDANT TYSON FOODS, INC.'S MOTION TO COMPEL PRODUCTION OF PEER REVIEW MATERIALS OF PLAINTIFFS' EXPERTS HARWOOD AND OLSEN

Defendant Tyson Foods, Inc. ("Tyson") hereby moves the Court for an Order pursuant to Federal Rule of Civil Procedure 37 directing Plaintiffs to produce documents, materials and communications responsive to "Tyson Foods, Inc.'s April 3, 2008 Requests for Production to the State of Oklahoma."  Tyson has, in good faith, met and conferred with Plaintiffs regarding the subject matter of the instant Motion.  Plaintiffs have nonetheless refused to produce the requested peer review materials and, further, object to this Motion.  In support of its Motion, Tyson will show the Court as follows:

## I.      INTRODUCTION AND BACKGROUND

In the instant case, Plaintiffs' claims against Tyson are based almost exclusively on multiple avenues of expert proof, including many expert opinions which may fairly — and, indeed, may only — be characterized as novel, untested and, thus, inherently unreliable.  Two of the lynchpins of "proof" underlying all of Plaintiffs' claims are the purported "poultry biomarker" work performed by Dr. Valerie Harwood and the purported "poultry signature" developed by Dr. Roger Olsen.  The only putative "evidence" Plaintiffs have developed in the course of this litigation allegedly linking Tyson to the injuries alleged is the "cutting edge" opinions of Drs. Harwood and Olsen.  Both pieces of work were developed under the direction of, and funded by, Plaintiffs' contingent fee attorneys for the purposes of this lawsuit, necessarily rendering their conclusions suspect.  The specific methodologies employed by Drs. Harwood and Olsen have not been generally accepted in the scientific community and have not be subjected to vigorous peer review beyond the criticisms leveled by experts retained by Tyson in this case. Neither piece of work has, to date, been published in a reputable scientific journal or otherwise *independently* validated.  However, the works have been submitted to at least one scientific journal for peer review and, if Plaintiffs' strategy is successful, potential publication is forthcoming.

Presumably, Plaintiffs are attempting to remedy the deficiencies the Court found with Drs. Harwood's and Olsen's expert opinions in support of Plaintiffs' Motion for Preliminary Judgment.  *See* Order and Opinion (Dkt. #1765) at 6-7 (holding that "the testimony and conclusions of expert witnesses Harwood and Olsen presented at the hearing are not sufficiently reliable under the standards enunciated in *Daubert*.  The expert witnesses' work has not been peer reviewed or published.  The testimony before this Court reveals no one outside this lawsuit

who has either validated or sought to validate Harwood's or Olsen's scientific work).[1]  However,

Plaintiffs have not been forthcoming with materials arising from and related to the purported

peer review process arising from their attempts to have the Harwood and Olsen works published,

despite the obvious relevance of such materials.

Nonetheless, in an attempt to obtain these materials, Tyson served Plaintiffs with

Requests for Production on or about April 3, 2008, seeking production of materials related to the

peer review process of Drs. Harwood's and Olsen's litigation-developed opinions, to wit:

> **REQUEST FOR PRODUCTION NO. 2:**  Please produce all correspondence
> between Plaintiffs, Plaintiffs' Experts, Plaintiffs' Attorneys, or any person or
> agent acting on Plaintiffs' behalf and any publication, association, journal, or
> other entity regarding the submission for peer review and/or publication as an
> article, poster, abstract, or in any format of the scientific opinions provided or to
> be provided by Dr. Valerie J. Harwood in this Lawsuit, including but not limited
> to Dr. Harwood's development or identification of a "poultry litter marker,"
> Harwood Supplemental Aff. ¶¶ 2-3.

> **REQUEST FOR PRODUCTION NO. 3:**  Please produce all correspondence
> between Plaintiffs, Plaintiffs' Experts, Plaintiffs' Attorneys, or any person or
> agent acting on Plaintiffs' behalf and any publication, association, journal, or
> other entity regarding the submission for peer review and/or publication as an
> article, poster, abstract, or in any format of the scientific opinions provided or to
> be provided by Dr. Roger Olsen in this Lawsuit, including but not limited to Dr.
> Olsen's development or identification of a "definitive poultry waste signature,"
> Olsen Aff. ¶ 6.

> **REQUEST FOR PRODUCTION NO. 5:**   Please produce all materials,
> including but not limited to any drafts or versions of any article, poster, abstract,
> or material in any other format, with all supporting data, figures, tables,
> illustrations, references, and appendices, submitted or made available to any
> publication, association, journal, or other entity for peer review and/or publication
> regarding the scientific opinions provided or to be provided by Dr. Valerie J.
> Harwood in this Lawsuit, including but not limited to Dr. Harwood's
> development or identification of a "poultry litter marker," Harwood Supplemental
> Aff. ¶¶ 2-3.

---

[1] The Court's ruling on this issue is currently on appeal before the Tenth Circuit Court of
Appeals. *See Attorney General, et al. v. Tyson Foods, et al.*, Case No. 08-5154.

4814-2984-2435.1

**REQUEST FOR PRODUCTION NO. 6:**   Please produce all materials, including but not limited to any drafts or versions of any article, poster, abstract, or material in any other format, with all supporting data, figures, tables, illustrations, references, and appendices, submitted or made available to any publication, association, journal, or other entity for peer review and/or publication regarding the scientific opinions provided or to be provided by Dr. Olsen in this Lawsuit, including but not limited to Dr. Olsen's development or identification of a "definitive poultry waste signature," Olsen Aff. ¶ 6.

State of Oklahoma's Responses to Tyson Foods, Inc.'s April 3, 2008 Requests for Production to the State of Oklahoma at 4-7, attached hereto as Ex. A;[2] State of Oklahoma's Supplemental Responses to Tyson Foods, Inc.'s April 3, 2008 Requests for Production to the State of Oklahoma at 2-5, attached hereto as Ex. B.

To date, in response to the foregoing Requests, Plaintiffs have produced a single manuscript of an article submitted by Drs. Harwood and Olsen and two employees of North Wind, Inc., Drs. Jennifer L. Weidhass and Tamzen W. Macbeth, Ex. B, Harwood00000092.0001-29, and a related poster, Ex. B, Harwood00000094.0001-2. North Wind, Inc. is among Plaintiffs' stable of retained experts in this matter. The manuscript (hereinafter the "first Manuscript") was submitted to *Applied and Environmental Microbiology* ("AEM") on June 11, 2008, but it was not produced to Tyson until July 16, 2008, two days before Dr. Harwood's second deposition. Ex. B; *see* Depo. of Valerie Harwood, 7/18/08, at 14-15, attached hereto as Ex. C. Of note, Dr. Harwood is a member of AEM's editorial board. AEM Editor Roster, attached hereto as Ex. D.

At the time the first Manuscript was submitted to AEM, Dr. Harwood recommended to the journal that one or more of her colleagues serve as peer reviewers. While she did not recall

---

[2] Requests for Production Nos. 4 and 7 seek similar materials for any of Plaintiffs' other experts besides Drs. Harwood and Olsen. To date, Plaintiffs have not produced any responsive materials for their other experts. To the extent that such responsive materials exist, those materials are likewise subject to Tyson's instant Motion.

at the time who she recommended, she agreed to check her records and provide the information. Ex. C. at 15. That information has yet to be provided. Dr. Harwood also noted that it would not be proper for her to discuss her article with any of her colleagues on the AEM editorial board. Ex. C. at 14. Yet, around this same time, Plaintiffs retained Dr. Michael Sadowsky of the University of Minnesota to "independently" peer review, evaluate and validate Dr. Harwood's biomarker work. *See id*. at 31-32. Dr. Sadowsky is a colleague of Dr. Harwood and serves with her on the editorial board of AEM. Ex. D at 2. Plaintiffs have not, to date, produced any of Dr. Sadowsky's work product in response to the April 2008 Requests. Plaintiffs have also apparently retained other "independent" scientists to review the novel work conducted by Dr. Olsen for the lawsuit. Depo. of Roger Olsen, 9/11/08, at 306-307, attached hereto as Ex. E. No materials from any other such reviewer have been produced.

As noted, Plaintiffs did produce a manuscript of Dr. Harwood's article. That manuscript, however, departed in several material respects from the claims and data that Plaintiffs have produced in this litigation. For example, while Plaintiffs tested their purported poultry-specific biomarker on more than 200 samples, the manuscript presented the results of only 40 samples. Those 40 samples painted a much more positive picture of Plaintiffs' results than the full data set would support. At her deposition, Dr. Harwood explained away this truncated data set on the basis that the article had been drafted the year before, when less data was available. Ex. C. at 18-19. But, subsequent discovery from North Wind, Inc. made clear that the article had been drafted in the few months preceding its submission, when the full data set was available. Similarly, in this litigation, Dr. Harwood has told the Court that in her view "land application [of poultry litter] in the IRW presents a substantial, serious and immediate threat to human health." Harwood Expert Report ¶ 56, attached hereto as Ex. F. Yet, the manuscript concludes only that

5

the extent to which poultry litter impacts the watershed "cannot be quantified with the limited number of environmental samples processed to date." Manuscript at 14, attached hereto as Ex. G.

These discrepancies suggested that the manuscript was drafted not to present Plaintiffs' scientific case to peer review but rather to secure publication. Concerned with Plaintiffs' failure to present their full claims, Tyson wrote to AEM to bring to its editors' attention some of the shortcomings Tyson had identified in the authors' work, including:  the flaws in Plaintiffs' sampling regime; the failures to abide by appropriate standard methods such as hold time requirements; the failure to account for alternate sources of bacteria in the IRW; the failure to use statistically significant sample sizes; the failure to conduct any traditional fate and transport studies; the failure to develop appropriate correlations between different types of bacteria; and, of course, the authors' reliance on an incomplete data set. Letter of August 11th, attached hereto as Exhibit H.[3]  Subsequently, Tyson learned that AEM had provided Plaintiffs with critical comments regarding the first Manuscript, including noting specifically the need to include more data. *See* Depo. of Tamzen Wood Macbeth, 10/30/08, at 44-46, attached hereto as Ex. I. These comments were submitted "blind", *i.e.*, the comments did not disclose the identity of the reviewer. Ex. I at 45. Despite repeated requests from Tyson, Plaintiffs have declined to produce AEM's comments.  In response to these comments, Dr. Harwood began work on a revised manuscript (hereinafter the "second Manuscript") which presumably addressed and/or corrected the deficiencies identified in the comments. Ex. I at 44-46.  Upon information and belief, the

---

[3] Tyson later again wrote to AEM to transmit copies of several of Tyson's own experts' reports that had bearing on the work reported in Dr. Harwood's manuscript. These included the report of Dr. Charles Cowan, which explains the importance of Plaintiffs' failure to use statistically significant sample sizes; and the report of Dr. Samuel Myoda, who describes his work identifying the Plaintiffs' purportedly poultry-specific biomarker in samples from geese, ducks, and cattle. Letter of December 8, 2008, attached hereto as Ex. J.

second Manuscript has been submitted to AEM. Plaintiffs likewise have declined to produce a copy of the second Manuscript. Clearly, the AEM's comments and the second Manuscript fall within the scope of the April 2008 Requests and, thus, they should be produced to Tyson.

Tyson has corresponded with Plaintiffs seeking production of the various peer review materials, but the efforts have been unsuccessful. The parties also had a meet and confer telephone conference on January 12, 2009 to discuss these discovery issues among others. During that meet and confer, Plaintiffs' counsel refused to produce any of the remaining peer review materials until Drs. Harwood's and Olsen's work had been accepted for publication and, then, only thirty days before the actual publication date. Plaintiffs maintained that withholding the peer review materials was purportedly necessary to "protect" the peer review process and to prevent others outside the peer review process from offering scientific views contrary to the novel and untested theories of Drs. Harwood and Olsen.

Neither the Federal Rules of Civil Procedure nor the extant case law support Plaintiffs' contention that a party to litigation may withhold relevant and, thus, discoverable peer review materials of its experts relating to opinions developed in the course of the litigation simply because the party desires to shield those opinions from meaningful scrutiny. To the contrary, the federal rules charge a litigant under such circumstances with an affirmative duty to produce the peer materials to substantiate the reliability of its experts' litigation-driven research and opinions. That duty, which arises under Federal Rule of Civil Procedure 26(b) and *Daubert*, is separate and independent of the peer review process; and in this case, Plaintiffs' duty to produce the peer review materials related to their experts' work were triggered by the April 2008 Requests for Production.

Nonetheless, Plaintiffs have failed, and flatly refused, to perform voluntarily their duty to produce the peer review materials.   Accordingly, Tyson is entitled to an Order of this Court compelling Plaintiffs to produce the peer review materials.

## II.      ARGUMENT AND AUTHORITY

### A. Tyson is Entitled to Production of All Materials Responsive to the April 3, 2008 Requests for Production

#### 1.   The peer review materials are within the permissible scope of discovery

Federal Rule of Civil Procedure 26(b) defines the permissible scope of discovery, in pertinent part, as follows:

> Parties may obtain discovery regarding any party's claim or defense — including the existence, description, nature, custody, condition, and location or any documents or other tangible things and the identity and location of persons who know of any discoverable matter.   For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.

Fed. R. Civ. P. 26(b)(1).   "Courts should liberally construe the scope of discovery under rule 26: 'the rule contemplates discovery into any matter that bears on or that reasonably could lead to other matter[s] that could bear on any issue that is or may be raised in a case.'"   *Anaya v. CBS Broadcasting, Inc.*, 251 F.R.D. 645, 649 (D.N.M. 2007) (quoting *Board of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 621 (N.D. Cal. 2006)).   Where, as here, a party fails or refuses to comply with its obligation under Rule 26, the party seeking discovery may move the trial court for an order compelling the discovery.   *See* Fed. R. Civ. P. 37(a)(1), (3)(B)(iv).

In the instant case, the materials sought through the April 3, 2008 Requests clearly bear on an issue in this case: namely, the novel, untested and inherently unreliable expert opinions of Drs. Harwood and Olsen.   *See In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 249 F.R.D. 8,12 (D. Mass. 2008) (noting that peer review "materials are within the scope

of discovery generally permitted by Rule 26(b)(1)").  Accordingly, Tyson requests an Order of

the Court compelling Plaintiffs to produce any comments evaluating the first Manuscript, the

second Manuscript, any comments evaluating the second Manuscript and any and all other

materials generated through the peer review process of the Manuscripts or other work performed

by Plaintiffs' experts in this case.

### 2.   The requested materials are relevant to *Daubert* and other considerations

As noted, the peer review materials sought in the April 3, 2008 Requests are, without

question, relevant to and have bearing on issues in this case.  Foremost, the requested materials

go directly to the issue of the ultimate admissibility of the novel, untested and inherently

unreliable opinions of Drs. Harwood and Olsen under *Daubert*.  *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) (hereinafter "*Daubert II*").  Moreover, in the

unlikely event those opinions pass the *Daubert* threshold for reliability, the peer review materials

may nonetheless be relevant and pertinent to impeaching Drs. Harwood's and Olsen's work in

this case.  *See In re Bextra*, 249 F.R.D. at 12 (D. Mass. 2008).  In either event, Tyson is entitled

to the comments regarding the first Manuscript, the second Manuscript, and any other peer

review materials generated by submission of either Manuscript and any other peer review work

product generated in this case.

As an initial matter, lawyer-driven scientific theories created solely for the purpose of

litigation — such as those proffered by Drs. Harwood and Olsen — are suspect, *see Norris v.*

*Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005), and necessarily raise questions of

credibility with regard to both the theories and their lawyer-chosen mouthpieces.  *See Behler v.*

*Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) (noting that "no intellectually honest argument" can

be made that evidence pertaining to credibility of an expert witness does not fall within the scope

9

of Rule 26(b)(1)).  As the Ninth Circuit observed, "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert II*, 43 F.3d at 1317.  Indeed, hired expert testimony can "turn[] scientific analysis on its head[,] reason[ing] from an end result in order to hypothesize what needed to be known but what was not." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 783 (10th Cir. 1999) (quotations omitted); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420-21 (9th Cir. 1998); *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994).

Ultimately, "the examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the field of science or medicine." *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985).  Nonetheless, such lawyer-driven "proof" is precisely what Plaintiffs have offered to the Court in the form of the novel and untested theories of Drs. Harwood and Olsen. *Cf.* Effie J. Chan, Note, *The "Brave New World" of* Daubert*: True Peer Review, Editorial Peer Review, and Scientific Validity*, 70 N.Y.U. L. REV. 100, 133-34 (1995) (arguing that "the adversarial process may inject an element of bias in such true peer review").

Consequently, federal trial courts serve as gatekeepers responsible for identifying and eliminating the types of unreliable "junk science" that Plaintiffs seek to introduce here from consideration by a jury. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7 (1993).  The standards for assessing *Daubert* reliability are well established:   A trial court should examine a number of factors including,

> (1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; (4) whether the theory has been accepted in the scientific community.

*Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004).  The *Daubert* analysis seeks to ground expert testimony in some basis *external* to the litigation.  Accordingly, whether an expert developed a theory independent of litigation and whether it has been subjected to peer

review are "important *Daubert* considerations." *Norris*, 397 F.3d at 886. Peer review and publication provide "a significant indication that [an expert's work] is taken seriously by other scientists." *Daubert II*, 43 F.3d at 1318; *accord Truck Ins.*, 360 F.3d at 1210; *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004). Moreover, although peer review does not guarantee validity, it "increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593.

Indeed, where the expert opinions at issue are lawyer-driven, as they are here, the peer review process becomes all the more important to the trial court's role as gatekeeper:

> If the proffered expert testimony is not based on independent research, *the party proffering it must come forward with other objective, verifiable evidence* that the testimony is based on "scientifically valid principles." One means of showing this is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.

*Daubert II*, 43 F.3d at 1317-18 (emphasis added). In other words, under *Daubert*, the party offering the novel scientific theory has an affirmative duty to produce materials from the peer review process where that theory is not based on the expert's work independent of litigation. *See id.* at 1317.

Of particular note, nothing in *Daubert* or its progeny suggest that the sponsor of a novel scientific theory may choose to "lay behind the log" or otherwise delay the execution of its duty with regard to these peer review materials for any purpose. Indeed, the notion that a litigant has the discretion to "protect" its novel scientific theories from scrutiny, as Plaintiffs have suggested here, is antithetical to the plain requirements of the discovery code and *Daubert*.

Notwithstanding the *Daubert* considerations, the peer review materials sought in the April 2008 Requests nonetheless fall within the scope of Rule 26(b)(1) for purposes other than the Court's gatekeeper function. For instance, an opponent may use the peer review materials to

impeach an expert witness, in the event that expert's opinions pass muster under *Daubert*.  *See Behler*, 199 F.R.D. at 556 ("The importance of credibility of witnesses to the trial of cases cannot be overstated, and this is especially true with respect to expert witnesses"); *In re Bextra*, 249 F.R.D. at 12.  To the extent that the peer review materials could make the expert's testimony more or less credible, they would fall within the scope of allowable discovery under the Federal Rules of Civil Procedure.  *See Behler*, 199 F.R.D. at 561.  Moreover, when the requested peer review materials are part of ongoing research funded by a litigant, the materials are the proper subject of discovery and should be produced.  *See Smith v. Dow Chem. Co.*, 173 F.R.D. 54, 58 (W.D.N.Y. 1997) (citing *Simon v. G.D. Searle & Co.*, 119 F.R.D. 680, 682 (D. Minn. 1987)) (requiring the production of litigant-funded research materials).

In the instant case, the peer review materials related to and arising from the submission of Drs. Harwood's and Olsen's first and second Manuscripts are discoverable and should be produced.  Foremost, the opinions of Drs. Harwood and Olsen are the types that demand a rigorous review by the Court under *Daubert* and its progeny: Plaintiffs' counsel conceived them and Plaintiffs' experts formulated them for purposes of this litigation.  Drs. Harwood's and Olsen's opinions, including those in the first and second Manuscripts, are being funded by Plaintiffs and their private, out of state contract counsel.  First Manuscript at 15, attached hereto as Ex. G.  Plaintiffs' team of private contract counsel developed and outlined the scope of the work of these experts.  David Page Memoranda, attached hereto as Ex. K.  Indeed, with regard to Dr. Harwood, much of the work underlying her opinions in this case began before she was retained.

Most significantly, Dr. Harwood — along with the other authors of the first Manuscript — has recognized the issues with the "biomarker" opinions:  "This is method development in a

relatively novel research area — nothing standard about it." Harwood Email, 12/11/06, attached hereto as Ex. L; *see* Harwood P.I. Hrg. Testimony, 2/21/08, at 713-14, attached hereto as Ex. M (testifying the "biomarker" work is not a "standard analytical procedure" and is considered "developmental and cutting edge").

In the course of this litigation, Dr. Harwood has likewise opined on the importance of the peer review process to novel scientific opinions such as those she and Dr. Olsen have proffered in this case, to wit:

> Peer-reviewed publications are the scientific community's way of sharing their data and their results and disseminating progress in science among the community. So the peer-reviewed – peer review occurs when one sends the work out to a journal for potential publication, and the editors of the journal, in turn, send that report out to peer reviewers who critique the work and decide whether it is worthy of publication and/or open to suggestions or improvement.
> . . . .
> Peer review adds the – confirms the interpretation of the author, in other words, are the data sufficient to support the author's interpretation.  Peer review also reviews the form in which it's presented, so is this understandable.  Is there enough data presented so that the reader can gauge for themselves the validity of the work.

Depo. of Valerie Harwood, 1/29/08, at pp. 60-61, attached hereto as Ex. N; *accord Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 744-45 (M.D. Pa. 2005) (describing the "exquisitely important" part peer review plays in ensuring sound science).   The peer review process is also important, in Dr. Harwood's opinion, to identify errors in the scientific work.  Ex. N at 61.

Based on the deposition testimony, Tyson knows that the work of Drs. Harwood and Olsen have been found, at least in part, to suffer from the deficiencies which Dr. Harwood identified in her prior testimony:

> Generally there were some comments about needing to expand. We only provided a subset of the data, the actual field data in this first paper, and the general comment was they [AEM] wanted us to expand the data that we provided or provide more data in terms of actual field application of the marker. That was the majority of comments that we received.

Ex. I at 45. Of course, Plaintiffs have not produced the document(s) containing these comments, and those who have seen them, by all accounts, may very well have selective memory when it comes to their work on this case. *See id*. Nonetheless, Plaintiffs' teams of experts concede that the peer review process has resulted in some criticism of Drs. Harwood's "cutting edge" opinions for this case. *See id*. Tyson is entitled to know the full extent of that criticism and the manner in which Plaintiffs' experts have addressed the criticism.

To the extent that Plaintiffs may attempt to validate the opinions of Drs. Harwood and Olsen through the work of the other "independent" scientist(s) retained by them, this additional body of work is not a suitable substitute for the peer review process. Foremost, these "independent" scientists were also retained by Plaintiffs. Ex. C at 31-33; Ex. I at 221-23. Moreover, at least one of them, Dr. Sadowsky, is a colleague of Dr. Harwood. Ex. D at 2. Any scientific analysis under these circumstances is, at best, fraught with bias and is, at worst, fertile ground for other questionable conduct.[4] *Cf.* Chan, *supra*, at 128-29 (noting that, "with the high volume of scientific publication being generated today, modern day scientific literature seems particularly vulnerable to such fraud").

Notwithstanding that the Court has previously determined that the opinions of Drs. Harwood and Olsen do not pass the reliability threshold of *Daubert* (Dkt. #1765), the Court remains in its designated role as gatekeeper. Since Plaintiffs are unlikely to volunteer materials to the Court, which will allow it to perform its evaluation of the reliability, or lack thereof, of Drs. Harwood's and Olsen's opinions, that task necessarily falls to Tyson. As such, Tyson has requested and is entitled to receive the peer review materials related to the novel and untested

---

[4] Of course, Tyson is <u>not</u> suggesting at this time that Plaintiffs, anyone retained by them or anyone involved in the peer review process of Drs. Harwood's and Olsen's work have engaged in any such questionable conduct.

opinions of Drs. Harwood and Olsen.   Indeed, Dr. Harwood attests to the necessity of an independent peer review process to ensure scientific validity of cutting edge work, such as hers. Moreover, because the work of Dr. Sadowsky and others falls short of independent review and validation, the requested peer review materials become all the more necessary for Tyson's education of the Court regarding the continued unreliability of Drs. Harwood's and Olsen's work in this case.

As such, Tyson has irrefutably set forth the *prima facie* relevance of the peer review materials which Plaintiffs have heretofore refused to produce.   In turn, Plaintiffs have not, as further discussed below, come forth with any valid reason for withholding materials that are necessary for the Court's *Daubert* function and which may otherwise be used to impeach the novel, untested and "cutting edge" opinions of Drs. Harwood and Olsen.   Accordingly, Tyson maintains that it is entitled to an Order of the Court compelling Plaintiffs to produce all materials responsive to the April 2008 Requests.

### B. Plaintiffs' contention that they must "protect" the peer review process is without merit

In opposition to Tyson's request for peer review materials, Plaintiffs have only expressed an interest in "protect[ing] the scientific process."   Louis Bullock Email, 1/06/09, attached hereto as Ex. O.   While the extant case law contains some authority discussing the scientific process and "academic freedom" under circumstances somewhat similar, but by no means identical, to those in this case, that authority does not shield Plaintiffs from producing materials that are discoverable under Rule 26.

Of particular note, the cases thus far located by Tyson addressing the discoverability of peer review materials are limited to circumstances where the materials are sought by a litigant from a nonparty, who is typically, but not always, the scientific journal.   *See Cusumano v.*

*Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) (Microsoft seeking information from nonparty authors of a book under Rule 45); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 249 F.R.D. 8 (D. Mass. 2008) (drug manufacturer seeking peer review information from nonparty journal publishers under Rule 45); *Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163 (E.D.N.Y. 1988) (litigant seeking identity of peer reviewer from nonparty journal publisher under Rule 45); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, No. 08 C 402, 2008 WL 4345158 (N.D. Ill. Mar. 14, 2008) (drug manufacturer seeking peer review information from nonparty journal publishers under Rule 45).[5]   Notably, among the pervasive themes of these cases is that neither peer review materials nor the peer review process enjoys an absolute privilege, which might otherwise shield them from the discovery.

In any event, to the extent that the materials and/or process are afforded some level of confidentiality or protection, the reasons cited for extending even limited protection do not apply to Plaintiffs as litigants in this case and as putative representatives of the State of Oklahoma.  For instance, among the reasons cited for shielding the peer review process from discovery is a generalized concern for the First Amendment rights and confidentiality of, *inter alia*, the peer reviewed journals and direct participants in the editorial process.  *See Cusumano*, 162 F.3d at 710; *but cf. Solarex Corp.*, 121 F.R.D. at 169-70 (requiring the party resisting discovery to first demonstrate harm from production of withheld materials); *In re Bextra*, 2008 WL 4345158, at *4 (discounting applicability of constitutionally related protections afforded the press).  The courts also cite the burden of production placed on the journals as nonparties.  *See Solarex Corp.*, 121 F.R.D. at 179.

---

[5] In one or more of the cited cases, the peer-reviewed journal produced at least some documents from the peer review process. *See, e.g.*, *In re Bextra*, 249 F.R.D. at 11; *In re Bextra*, 2008 WL 4345158, at *1.

Neither of these issues are implicated by the April 2008 Requests.  First, Plaintiffs do not have standing to assert the First Amendment rights of those involved in the peer review process, *cf. United States v. Simon*, 664 F. Supp. 780, 785 (S.D.N.Y. 1987) (citing *Radio & Television News Ass'n of S. Cal. v. U.S. Dist. Ct. of Cal.*, 781 F.2d 1443, 1448 (9th Cir. 1986) (noting lack of standing of litigant to assert First Amendment right of nonparty)), and Tyson is not seeking to interfere with the editorial process of AEM.[6]  Moreover, the concerns regarding confidentiality do not hold where the peer review materials are sought from those outside the editorial process, such as the author whose work is being peer reviewed, *see, e.g., In re Bextra*, 249 F.R.D. at 12, or another litigant.  *See, e.g., Cusumano*, 162 F.3d at 716 (noting the subject materials were also available through direct discovery); *see also Smith v. Dow Chem. Co.*, 173 F.R.D. 54, (W.D.N.Y. 1997) (citing *Simon v. G.D. Searle & Co.*, 119 F.R.D. 680, 682 (D.Minn. 1987) (requiring production of ongoing research of a litigant's expert).  Likewise, the peer reviewers, of which Tyson is aware, submitted their comments "blind" thereby protecting the confidentiality of the peer reviewer. Ex. I at 45.

Accordingly, Plaintiffs' contention that it must "protect" the peer review of its retained experts' litigation-generated opinions rings hollow.  The protections or confidentiality that may be afforded to the peer review process itself are not implicated here, especially where the peer review materials are sought directly from another litigant.  Indeed, during the meet and confer process, Plaintiffs did not articulate a single harm that could possibly emanate from *their*

---

[6] In the interest of candor, however, Tyson notes that AEM has been contacted in writing on three separate occasions since Tyson learned that Drs. Harwood and Olsen submitted their work for peer review. *See* Jay Jorgensen Corr., 8/11/08, attached hereto as Ex. H; Gordon Todd Email, 10/01/08, attached hereto as Ex. P; Jay Jorgensen Corr., 12/08/08, attached hereto as Ex. J.  This contact with AEM was necessitated by the less than complete first Manuscript, which wholly failed to address the criticisms of Dr. Harwood's work made by Tyson's experts during the hearing on Plaintiffs' Motion for Preliminary injunction and, indeed, those made by the Court in its Order and Opinion (Dkt. #1765).

production of materials generated in the peer review process. Tyson does not seek to intervene or otherwise interfere with the peer review process. Instead, Tyson simply seeks to obtain the relevant and discoverable materials necessary owing to them under Rule 26(b)(1) and *Daubert* so that they might evaluate the unreliability of, and further impeach, the novel and heretofore untested opinions of Drs. Harwood and Olsen. As such, Tyson requests the Court for its Order compelling production of these aforementioned materials.

### III.   CONCLUSION

The peer review materials requested in the April 2008 Requests fall squarely within the permissible scope of discovery defined by Federal Rule of Civil Procedure 26(b)(1). As discussed, these materials are necessary for the Court's performance of its *Daubert* gatekeeping role, and they are relevant for purposes of impeachment of Plaintiffs' experts. In response, Plaintiffs have not presented any valid reason for withholding these materials. They do not have standing to "protect" the peer review process. Furthermore, Tyson does not seek to interfere with the peer review process. The materials sought in the April 2008 Requests are available from Plaintiffs, and Plaintiffs are the only party or nonparty from whom the materials have been requested. Accordingly, Defendant Tyson Foods, Inc. respectfully requests the Court for its Order compelling the production of all peer review materials responsive to the April 2008 Requests.

4814-2984-2435.1

Respectfully submitted:

**TYSON FOODS, INC.**

By   _/s/ Michael R. Bond_____
     Michael R. Bond, *appearing pro hac vice*
     Erin Thompson, *appearing pro hac vice*
     Dustin Darst, *appearing pro hac vice*
     KUTAK ROCK LLP
     234 East Millsap Road, Suite 400
     Fayetteville, Arkansas  72703-4099
     (479) 973-4200 Telephone
     (479) 973-0007 Facsimile

     -and-

     Robert W. George, OBA #18562
     Bryan Burns, *appearing pro hac vice*
     TYSON FOODS, INC.
     2200 Don Tyson Parkway
     Springdale, Arkansas 72762
     (479) 290-4076 Telephone
     (479) 290-7967 Facsimile

     -and-

     Patrick M. Ryan, OBA # 7864
     Stephen Jantzen, OBA #16247
     RYAN, WHALEY & COLDIRON
     119 North Robinson, Suite 900
     Oklahoma City, Oklahoma 73102
     (405) 239-6040 Telephone
     (405) 239-6766 Facsimile

     -and-

     Thomas C. Green, *appearing pro hac vice*
     Mark D. Hopson, *appearing pro hac vice*
     Timothy Webster, *appearing pro hac vice*
     Jay T. Jorgensen, *appearing pro hac vice*

Gordon Todd, *appearing pro hac vice*
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005-1401
(202) 736-8000 Telephone
(202) 736-8711 Facsimile

## CERTIFICATE OF SERVICE

I certify that on the 12th day of February 2009, I electronically transmitted the attached

document to the following ECF registrants:

| | |
|---|---|
| W. A. Drew Edmondson, Attorney General | drew_edmondson@oag.state.ok.us |
| Kelly Hunter Burch, Assistant Attorney General | kelly_burch@oag.state.ok.us |
| J. Trevor Hammons, Assistant Attorney General | trevor_hammons@oag.state.ok.us |
| Tina L. Izadi, Assistant Attorney General | tina_izadi@oag.state.ok.us |
| Daniel P. Lennington, Assistant Attorney General | daniel.lennington@oag.ok.gov |
| | |
| Douglas Allen Wilson | doug_wilson@riggsabney.com |
| Melvin David Riggs | driggs@riggsabney.com |
| Richard T. Garren | rgarren@riggsabney.com |
| Sharon K. Weaver | sweaver@riggsabney.com |
| Robert Allen Nance | rnance@riggsabney.com |
| Dorothy Sharon Gentry | sgentry@riggsabney.com |
| Joseph P. Lennart | jlennart@riggsabney.com |
| David P. Page | dpage@riggsabney.com |
| RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS | |
| | |
| J. Randall Miller | rmiller@mkblaw.net |
| Louis W. Bullock | lbullock@bullock-blakemore.com |
| MILLER KEFFER BULLOCK PEDIGO LLC | |
| | |
| Frederick C. Baker | fbaker@motleyrice.com |
| Lee M. Heath | lheath@motleyrice.com |
| William H. Narwold | bnarwold@motleyrice.com |
| Elizabeth C. Ward | lward@motleyrice.com |
| Elizabeth Claire Xidis | cxidis@motleyrice.com |
| Ingrid L. Moll | imoll@motleyrice.com |
| Jonathan D. Orent | jorent@motleyrice.com |
| Michael G. Rousseau | mrousseau@motleyrice.com |
| Fidelma L. Fitzpatrick | ffitzpatrick@motleyrice.com |
| MOTLEY RICE, LLC | |
| **COUNSEL FOR PLAINTIFFS** | |
| | |
| A. Scott McDaniel | smcdaniel@mhla-law.com |
| Nicole Longwell | nlongwell@mhla-law.com |

4814-2984-2435.1

Philip D. Hixon                                       phixon@mhla-law.com
Craig A. Mirkes                                       cmirkes@mhla-law.com
MCDANIEL HIXON LONGWELL & ACORD, PLLC

Sherry P. Bartley                                     sbartley@mwsgw.com
MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC
**COUNSEL FOR PETERSON FARMS, INC.**

R. Thomas Lay                                         rtl@kiralaw.com
KERR, IRVINE, RHODES & ABLES

David G. Brown                                        dbrown@lathropgage.com
Jennifer S. Griffin                                   jgriffin@lathropgage.com
LATHROP & GAGE, L.C.
**COUNSEL FOR WILLOW BROOK FOODS, INC.**

Robert P. Redemann                                    rredemann@pmrlaw.net
David C .Senger                                       dsenger@pmrlaw.net
PERRINE, MCGIVERN, REDEMANN, REID, BERRY & TAYLOR, PLLC

Robert E. Sanders                                     rsanders@youngwilliams.com
E. Stephen Williams                                   steve.williams@youngwilliams.com
YOUNG WILLIAMS P.A.
**COUNSEL FOR CAL-MAINE FOODS, INC. AND CAL-MAINE FARMS, INC.**

George W. Owens                                       gwo@owenslawfirmpc.com
Randall E. Rose                                       rer@owenslawfirmpc.com
THE OWENS LAW FIRM, P.C.

James M. Graves                                       jgraves@bassettlawfirm.com
Gary V. Weeks                                         gweeks@bassettlawfirm.com
Woody Bassett                                         wbassett@bassettlawfirm.com
K.C. Dupps Tucker                                     kctucker@bassettlawfirm.com
BASSETT LAW FIRM
**COUNSEL FOR GEORGE'S INC. AND GEORGE'S FARMS, INC.**

John R. Elrod                                         jelrod@cwlaw.com
Vicki Bronson                                         vbronson@cwlaw.com
Bruce W. Freeman                                      bfreeman@cwlaw.com
D. Richard Funk                                       dfunk@cwlaw.com
P. Joshua Wisley                                      jwisley@cwlaw.com
CONNER & WINTERS, PLLC
**COUNSEL FOR SIMMONS FOODS, INC.**

John H. Tucker                                        jtucker@rhodesokla.com
Colin H. Tucker                                       chtucker@rhodesokla.com
Theresa Noble Hill                                    thill@rhodesokla.com
RHODES, HIERONYMUS, JONES, TUCKER & GABLE

| | |
|---|---|
| Terry W. West | terry@thewestlawfirm.com |
| THE WEST LAW FIRM | |
| | |
| Delmar R. Ehrich | dehrich@faegre.com |
| Bruce Jones | bjones@faegre.com |
| Krisann C. Kleibacker Lee | kklee@faegre.com |
| Todd P. Walker | twalker@faegre.com |
| FAEGRE & BENSON LLP | |
| | |
| Dara D. Mann | dmann@mckennalong.com |
| MCKENNA, LONG & ADLRIDGE, LLP | |

**COUNSEL FOR CARGILL, INC. AND CARGILL TURKEY PRODUCTION, LLC**

I also hereby certify that I served the attached documents by United States Postal Service, proper postage paid, on the following who are not registered participants of the ECF System:

Mr. J.D. Strong
Secretary of the Environment
State of Oklahoma
3800 North Classen
Oklahoma City, OK  73118
**COUNSEL FOR PLAINTIFFS**

/s/ *Michael R. Bond*
Michael R. Bond

4814-2984-2435.1