# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

**F I L E D**

FEB 2 4 2009

Phil Lombardi, Clerk
U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| **STATE OF OKLAHOMA,** *et al* | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Case No. 4:05-CV-329-GKF-PJC** |
| | : | |
| **TYSON FOODS, INC.,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

**APPENDIX 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT COURT OF OKLAHOMA**

| | | |
|---|---|---|
| <u>STATE OF OKLAHOMA</u>, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:05-CV-329-GKF-PJC |
| | ) | |
| v. | ) | |
| | ) | |
| <u>TYSON FOODS, INC.</u>, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF OF COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS, INC. AND AMERICAN ASSOCIATION OF PUBLIC OPINION RESEARCH AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER**

Duane L. Berlin, CT Bar No. 302216
Lev & Berlin, P.C.
200 Connecticut Avenue
5th Floor
Norwalk, CT 06854
Telephone:  (203) 838-8500
Facsimile:   (203) 854-1652

Attorney for Amici Curiae

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ……………………………………. ii.

I.      INTRODUCTION ……………………………………. 1

II.     INTEREST OF THE AMICI CURIAE ……………………. 1

    A.  Council of American Survey Research
        Organizations……………………………………. 1

    B.  American Association of Public Opinion Research…. 2

    C.  Impact on Survey and Public Opinion Research……. 4

III.    BACKGROUND OF MOTION FOR PROTECTIVE
    ORDER …………………………………………………. 4

IV.     ARGUMENT …………………………………………. 5

    A.  Public Interest Demands Confidential Treatment
        of Survey Research Sources ……………………….. 5

    B.  Courts Have Repeatedly Recognized the Importance
        and Legitimacy of Respondent Confidentiality ……. 10

V.      CONCLUSION …………………………………………. 16

EXHIBITS

A.      CASRO: "Who we are. What we do."

B.      CASRO Code of Standards for Survey Research

C.      AAPOR Code of Professional Ethics & Practices
    Best Practices for Survey and Public Opinion Research

## TABLE OF AUTHORITIES

Page

**Cases**

Andrews v. Eli Lilly & Co.,
    97 F.R.D. 494 (N.D. Ill. 1983) ……………………………… 6, 10

Apel v. Murphy
    70 F.R.D. 78 (D.R.I. 1976) ……………………………………. 14

Apicella v. McNeil Laboratories, Inc.
    66 F.R.D. 78 (E.D.N.Y. 1975) ………………………………... 7

Applera Corporation v. MJ Research, Inc.
    389 F. Supp. 2d 344 (D. Conn. 2005) ……………………… 9

Army Times Pub. Co. v. Dept. of Air Force
    998 F.2d 1067 (D.C. Cir. 1993) …………………………….. 10

Baker V. F. & F. Investment
    470 F.2d 778 (2d Cir. 1972)
    cert. denied, 411 U.S. 966 (1973) ………………………….. 7

Cimino v. Raymark Industries, Inc.
    751 F. Supp. 649 (E.D. Tex. 1990) ………………………… 6, 9

Comm-Tract Corp. v. Northern Telecom, Inc.
    143 F.R.D. 20 (D. Mass. 1992) …………………………….. 14

Deitchman v. E.R. Squibb & Sons, Inc.
    740 F.2d 556 (7th Cir. 1984) ……………………………… 11

Dow Chemical Co. v. Allen
    672 F.2d 1262 (7th Cir. 1982) ……………………………… 6

EEOC v. U. of Notre Dame de Lac
    715 F.2d 331 (7th Cir. 1983) ……………………………… 14

Farnsworth v. Procter & Gamble Co.
    758 F.2d 1545 (11th Cir. 1985) …………………………….. 10

Harris v. Upjohn Co.
    115 F.R.D. 191 (S.D. Ill. 1987) …………………………….. 14

In re Data General Corp. Antitrust Litigation
    MDL 369 (N.D. Cal. 1981) ………………………………... 10

In re Eli Lilly & Co., Prozac Products Lit.
    142 F.R.D. 454 (S.D. Ind. 1992) …………………………… 11

Marrese v. American Academy of Orthopedic Surgeons
    726 F.2d 1150 (7th Cir. 1984)………………………………. 11

|  | Page |
|---|---|
| Mt. Sinai School of Medicine v. The American Tobacco Co.<br>880 F.2d 1520 (2d Cir. 1989) ………………………………… | 10 |
| Plough, Inc. v. National Academy of Sciences<br>530 A2d 1152 (D.C. Ct. App. 1987) ………………………… | 14 |
| Richards of Rockford Inc. v. Pacific G.E. Co.<br>71 F.R.D. 388 (N.D. Cal. 1976) …………………………… | 10, 13 |
| Solarex Corp. v. Arco Solar, Inc.<br>121 F.R.D. 163 (E.D. N.Y. 1988) ………………………… | 11 |
| Star Editorial, Inc. v. USDC for the Central District of California<br>7 F.3d 856 (9th Cir. 1993) ………………………………… | 7 |
| Summit Technology, Inc. v. Healthcare Capital Group, Inc.<br>141 F.R.D. 381 (D. Mass. 1992) ………………………… | 14 |
| Thornbury v. Delta Airlines, Inc.<br>No. C-76-0798 RFP (N.D. Cal. 1979) …………………….. | 10 |
| Times Journal Co. v. Department of Air Force<br>793 F. Supp. 1 (D.D.C. 1991) ………………………………… | 10 |
| United States v. ALCOA<br>35 F. Supp. 820 (S.D. N.Y. 1940) ………………………….. | 14 |
| United States v. Angiulo<br>847 F.2d 956 (1st Cir. 1988) ………………………………… | 14 |
| United States v. IBM Corp.<br>83 F.R.D. 92 (S.D. N.Y. 1979) …………………………….. | 10 |
| United States of America; State of California,<br>ex rel. v. Montrose Chemical Corp. of Cal. et al.<br>Case No. CV 90-3122 AAH (C.D. Cal. 1995) …………… | 15 |
| Upjohn Company v. United States<br>449 U.S. 383 (1981) ................................................................ | 8 |
| Wright v. Patrolmen's Benevolent Assn.<br>79 F.R.D. 161 (S.D. N.Y. 1976) ……………………….......... | 10 |
| Zippo Mfg. Co. v. Rogers Imports, Inc.<br>216 F. Supp. 670 (S.D. N.Y. 1963) ........................................... | 14 |

**Federal Rules**

| Fed. R. Civ. P. 26……………………………………………. | 11, 13 |
| Fed. R. Evid. 501 …………………………………………… | 11, 13 |

Page

**Miscellaneous**

H. Barksdale, The Use of Survey Research
     Findings as Legal Evidence (1957) ..............................    9, 13

Federal Judicial Center, The Reference Manual on
     Scientific Evidence, (2nd, 2000) ...................................    2, 8

W. Finfrock & D. Spradlin, How to Organize
     and Present Statistical Evidence,
     24 Prac. Law. 67 (1978) ..........................................    9

M. Finkelstein, Quantitative Methods in Law (1978)..................    9

M. Hansen, W. Hurwitz & W. Madow, Sample Survey
     Methods and Theory (1953) ......................................    13

Hendel & Bard, Should There Be a Researcher's Privilege?
     59 Am. A. U. Professors Bull. 398 (1973) ....................    8

I. McCarthy, Trademarks and Unfair
     Competition, (2d ed. 1984) .....................................    9

McCormick, Evidence (Cleary ed. 1972) ..............................    8

Note, Protection from Discovery of
     Researcher's Confidential Information,
     9 Conn. L. Rev. 425 (1977) .....................................    14

Wigmore, Evidence (McNaughton rev. ed. 1961) ....................    12

## I.    INTRODUCTION

The Council of American Survey Research Organizations, Inc. ("CASRO") and the American Association for Public Opinion Research ("AAPOR") appear in this litigation as amici curiae for the limited purpose of supporting plaintiffs' motion for a protective order protecting the identities of respondents and any respondent identifiable information from disclosure. For the reasons set forth below, CASRO and AAPOR urge that the Court issue a protective order protecting the identities of respondents and any respondent identifiable information from disclosure. Mandating the disclosure of respondent identifiable information would be devastating to all forms of survey research and contrary to public interest. The reliability of any survey evidence may be fully and fairly litigated by the parties without infringing upon the privacy of survey respondents and without threatening important social interests advanced by survey research.

## II.    INTERESTS OF THE AMICI CURIAE.

A.    CASRO:

CASRO is a not-for-profit trade association representing over three hundred (300) United States survey research companies engaged in professional survey research regarding a wide variety of technical, scientific, economic, and other public and private issues. (See Exhibit A.) CASRO's members are in aggregate responsible for the overwhelming majority of the survey research conducted each year in the United States. Two of CASRO's principal purposes are (1) to promote the establishment, maintenance, and strict observance of professional and ethical standards in survey research and (2) to protect the privacy interests of those who volunteer to participate in survey research activities. These principles reflect the social utility of survey research and our need to protect this valuable resource.

In furtherance of its purpose, CASRO has established a detailed Code of Standards for Survey Research (the "CASRO Code") (set forth herein as Exhibit B), which establishes specific requirements and responsibilities for professional survey researchers to maintain the confidentiality of information that might reveal the identities of survey respondents. The

1

CASRO Code includes carefully drawn rules of ethical and professional conduct for survey research organizations. Among other things, the CASRO Code provides that the survey research organization has the responsibility to protect the identities of respondents and to insure that individuals and their responses cannot be related in published or publicly-available survey reports or other information. See Section A(3) of the CASRO Code. The CASRO Code strictly limits access to information identifying respondents, and imposes restrictions upon post-research retention of such identifying information. See Section A(3) of the CASRO Code. Further, the CASRO Code states that "the use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-Identifiable Information or lessen the importance of Respondent anonymity." See Section A(3)(f) of the CASRO Code. The CASRO Code's provisions regarding confidentiality are consistent with professional practice and standards within the survey research industry, as well as consistent with the legal trend recognizing the importance of this issue as evidenced by reasoned judicial precedent. In acknowledgment of this legal trend, *The Reference Manual on Scientific Evidence*, published by the Federal Judicial Center, directs that based on the ethical obligations of survey researchers, all identifying information, such as a respondent's name, address and telephone number, should be redacted to ensure respondent confidentiality. Federal Judicial Center, *The Reference Manual on Scientific Evidence* (2nd 2000) (the "Reference Manual").

  B.  AAPOR:

AAPOR is a leading professional organization of public opinion and survey research professionals in the United States, consisting of seven (7) chapters, with members from academia, media, government, the non-profit sector and private industry. AAPOR's members embrace the principle that public opinion research is essential to a healthy democracy, providing information crucial to informed policymaking and giving voice to the nation's beliefs, attitudes and desires. Two of AAPOR's principal purposes are (1) to promote the establishment, maintenance, and strict observance of high ethical and professional standards in survey and public opinion research and (2) to protect the privacy interests of respondents.

2

In furtherance of its purpose, AAPOR has established a detailed Code of Professional Ethics and Practices (the "AAPOR Code") and the Best Practices for Survey and Public Opinion Research ("AAPOR Best Practices") (both set forth herein as Exhibit C), both of which establish specific responsibilities for professional survey and public opinion researchers to maintain the confidentiality of information that might identify survey respondents. The AAPOR Code includes carefully drawn rules of ethical and professional conduct for survey and public opinion research organizations. Among other things, the AAPOR Code provides that the survey and public opinion research organizations shall respect respondents' concerns about their privacy, shall hold as privileged and confidential all information that might identify a respondent with his or her responses and shall not disclose or use the names of respondents for non-research purposes unless the respondents grant permission for such disclosure or use. See Section II(D) of the AAPOR Code. Further, similar to the CASRO Code, the AAPOR Code explicitly states that the ethical and professional obligation to maintain the confidentiality of respondent identifiable information is not extinguished or relieved by legal proceedings. See Section II(D)(6) of the AAPOR Code. The AAPOR Code's provisions regarding confidentiality are consistent with professional practice and standards within the survey research industry, as well as consistent with the legal trend recognizing the importance of this issue as evidenced by reasoned judicial precedent.

Similarly, the AAPOR Best Practices establish important procedures and practices for the industry. The AAPOR Best Practices require research organizations to establish clear intentions and meticulous procedures to assure privacy of respondents and the confidentiality of the information provided by respondents. The AAPOR Best Practices state that "Exemplary survey research practice requires that one literally do 'whatever is possible' to protect the privacy of research participants and to keep collected information they provide confidential or anonymous." Additionally, the AAPOR Best Practices require that all interviewers and other research staff be carefully trained and indoctrinated to uphold and maintain the confidentiality of respondents' identities and information they provide and take/sign an explicit oath or pledge of confidentiality to do so before beginning work.

3

C.    Impact on Survey and Public Opinion Research.

Adherence to these industry codes, guidelines and principles impose substantial costs and burdens upon survey and public opinion researchers. The willingness of survey and public opinion researchers to accept and assume such additional costs and burdens reflects the great importance that the survey and public opinion research industry places on respondent confidentiality and indirectly the great importance that the clients of survey and public opinion researchers and the general public, place on respondent confidentiality. Without such protection, members of the public who are asked to participate in survey projects may be reluctant to do so because of fear of harassment and possible invasions of privacy. Those who do agree to participate may respond less candidly or reliably in order to portray themselves in a more favorable light and may represent an inappropriate or unrepresentative population sample. Such a result would create a distortion; it would devalue the benefit of statistical data, rendering it unnecessarily deficient.

Confidentiality, therefore, is an <u>essential</u> prerequisite to reliable and accurate survey and public opinion research. Such research contributes significantly to the public interest by assisting the analyses of a wide variety of technical, scientific, economic, sociological, psychological, and political issues. In short, survey and public opinion research is the lifeblood in this information age.

As leading representatives of the United States survey and public opinion research industry, CASRO and AAPOR have direct and unique interests in articulating the strong need for preserving the confidentiality of survey data that would reveal the identity of individual respondents. This memorandum is submitted by CASRO and AAPOR to describe the relevant public needs for, and advantages of, such confidentiality.

### III.    BACKGROUND OF MOTION FOR PROTECTIVE ORDER

CASRO and AAPOR understand that the proceedings in this litigation are subject to various confidentiality provisions. Indeed, CASRO's and AAPOR's interest in this case is limited to the issue of respondent confidentiality as it is herein challenged. CASRO and AAPOR understand that the defendant in this case seeks disclosure of the identities of the respondents in connection with surveys, focus groups and interviews conducted by Status Consulting, Consumer Logic, Inc., Westat, Inc., and Wilson Research Strategies, as well as

4

information which would connect the individual respondent with his or her specific responses. CASRO and AAPOR also understand that in this survey research, the respondents were assured that their responses would not be attributed to them personally and that their identities would remain confidential. In accordance with professional survey research standards, the State of Oklahoma, Status Consulting, Consumer Logic, Inc., Westat, Inc., and Wilson Research Strategies have declined to breach that assurance of confidentiality. CASRO and AAPOR further understand that the plaintiffs have provided substantial materials relating to the results, methods and manner of the survey research, excluding respondent-identifiable information.

Accordingly, it is CASRO's and AAPOR's belief that important public interests demand that the court issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure. Some or all of the survey respondents undoubtedly agreed to participate in these surveys only because of the assurance of confidentiality and that their responses would not be connected with their identities. The interests involved in this matter therefore are not merely those of the litigants, nor even those of the survey and public opinion research industries. Those interests <u>are</u> relevant and important, but no less important are the interests of the survey respondents themselves and the public in general. As we explain below, courts have often held that in situations similar to the situation in this matter both the public interest and the legitimate private expectations of survey respondents require careful protection of respondent identifiable information.

## IV.   ARGUMENT

A.   <u>Public Interest Demands Confidential Treatment of Survey Research Sources</u>.

The public plainly has an important interest in the conduct and reliability of survey and public opinion research. Such research is now widely used by universities (in the fields of medicine and social sciences, for example), corporations, research institutes, litigants, as well as governmental agencies, to assist in the analyses of technical, scientific, economic, and other questions. No other tool permits researchers to obtain comparable data. Without such data many issues affecting both public and private interests could not be addressed as intelligently or resolved as reliably. There is, as one court rightly summarized the situation, "undoubtedly a

5

compelling social interest in promoting research." <u>Andrews v. Eli Lilly & Co.</u>, 97 F.R.D. 494, 500 (N.D. Ill. 1983). <u>See also</u>, <u>Dow v. Allen</u>, 672 F.2d 1262 (7th Cir. 1982).

In <u>Cimino v. Raymark Industries, Inc.</u>, 751 F. Supp. 649 (E.D. Tex. 1990), the court articulated the value of survey data as a unique and important research tool:

> ". . . the science of statistics is now universally accepted, exerting the most profound influence on our daily lives. 'The objective of statistics is to make an inference about a population of interest based on information obtained from a sample . . . of that population.' For example, statistical sampling plays a critical role in medical and pharmaceutical research. . . [a]s in medical research, private industries employ statistical techniques in the development and testing of new products . . . [it is used] for many diverse tasks, such as maintaining the dimension requirements for the plastic cards used in automatic bank teller machines or testing the specific gravity of laundry detergent. Statistical techniques are particularly valuable in the field of marketing . . . the insurance industry . . . education . . . in the administration and evaluation of various standardized tests . . . [and] in the political arena." <u>Id</u>. at 660.

It is therefore clear that quantitative research, as well as qualitative research, is extremely valuable; it cannot however be effectively conducted without meaningful assurances of confidentiality to cooperative sources. Such assurances are essential for two purposes. First, many individuals will not participate in a study if they believe that the information given by and attributed to them may be used for purposes other than research. For many respondents, any rewards for participation in a survey, which typically are merely the satisfaction of having provided helpful information, would not outweigh the real or imagined risks and burdens of public disclosure. Furthermore, even if some individuals might still be induced to participate in a research project without assurances of strict confidentiality, the researcher could not be certain that those who do agree to participate fairly represent the larger population that is to be sampled. The simple fact is that survey and public opinion research must guarantee strict confidentiality in order to preserve the representative nature of his or her research sample and correspondingly the value of the quantitative and qualitative data. Given the enormous value of survey data, and the social importance inherent therein, protection of the statistical source, i.e., survey respondents, is of utmost importance, and only for an extremely compelling reason should a court jeopardize the usefulness of survey results by infringing on the confidential relationship which exists between the researcher and respondent.

6

In many respects the researcher's needs in terms of source protection is analogous to those of a news reporter. In both situations, the researcher and the reporter face the reality that without meaningful promises of confidentiality they would have many fewer sources of reliable information. Both the researcher and the reporter depend for their effectiveness upon the willingness of the public to volunteer help; neither can offer anything in return except anonymity and protection against harassment.[1] The news reporter is generally afforded a constitutionally-derived privilege to maintain the confidentiality of his sources unless the party seeking disclosure can show a compelling need, which is unlikely to exist in most civil actions. See Baker V. F. & F. Investment, 470 F.2d 778 (2d Cir. 1972), cert. denied, 411 U.S. 966 (1973); Apicella v. McNeil Laboratories, Inc., 66 F.R.D. 78 (E.D. N.Y. 1975); and Star Editorial, Inc. v. USDC for the Central District of California, 7 F.3d 856 (9th Cir. 1993).[2]

Another important reason to preserve strict confidentiality of the identities of research respondents is to protect the results of the research against inaccuracies or bias. In this respect, survey research is analogous to the communications between attorney and client, where the courts have long recognized the overriding importance of encouraging full, open and honest Another important reason to preserve strict confidentiality of the identities of research respondents is to protect the results of the research against inaccuracies or bias. In this respect, survey research is analogous to the communications between attorney and client, where the courts have long recognized the overriding importance of encouraging full, open and honest disclosure by promising and respecting the communications' confidentiality. See, e.g., Upjohn Company v. United States, 449 U.S. 383 (1981); McCormick, Evidence, Section 87, at 176 (Cleary Ed. 1972). In survey research, respondents who believe that their answers may be publicly attributed to them may hedge, qualify or even wholly alter their responses to avoid harassment or to present themselves or others in a more favorable light. Consciously or not, the candor of their responses may be inhibited by the likelihood of public disclosure.

---

[1] The same principles apply to informers who reveal criminal or other abuses, and the public interests supporting protection for such informers also support protection for the privacy of survey respondents.

[2] In these cases, there was strong evidence that the reporters' confidential sources could provide information important for the resolution of the underlying disputes. Nonetheless, the courts held that the public interest in confidentiality outweighed the litigants' individual interests in disclosure.

disclosure by promising and respecting the communications' confidentiality. See, e.g., Upjohn Company v. United States, 449 U.S. 383 (1981); McCormick, Evidence, Section 87, at 176 (Cleary Ed. 1972).

Another important reason to preserve strict confidentiality of the identities of research respondents is to protect the results of the research against inaccuracies or bias. In this respect, survey research is analogous to the communications between attorney and client, where the courts have long recognized the overriding importance of encouraging full, open and honest disclosure by promising and respecting the communications' confidentiality. See, e.g., Upjohn Company v. United States, 449 U.S. 383 (1981); McCormick, Evidence, Section 87, at 176 (Cleary Ed. 1972). In survey research, respondents who believe that their answers may be publicly attributed to them may hedge, qualify or even wholly alter their responses to avoid harassment or to present themselves or others in a more favorable light. Consciously or not, the candor of their responses may be inhibited by the likelihood of public disclosure.

To diminish this natural impulse, the researcher must credibly reassure the respondent that neither approval nor disapproval will attach to his responses. The respondent must be reliably assured that his response will be combined with those of many others in the form of statistical data, the overall significance of which will be scientifically evaluated on the basis of cumulative trends. The respondent must be, and must understand himself to be, the source of statistical data and not a witness. He must believe himself to be merely one datum, submerged among many others. To provide such an assurance, the researcher must effectively guarantee the respondent that his individual identity will remain strictly confidential.

The importance of confidentiality to ensure the free flow of information and to provide the foundation for unbiased survey data is widely recognized by professional researchers. See generally, Hendel & Bard, Should There Be a Researcher's Privilege?, 59 Am. A. U. Professors Bull. 398 (1973); See also The Reference Manual. Moreover, because the credibility of any researcher's promise of confidentiality is affected by the conduct of other researchers, any breach of confidentiality by any researcher, whether because of a court order or any other cause, adversely affects all survey research. Accordingly, CASRO and AAPOR have incorporated strict confidentiality provisions in their respective codes of standards, and the U.S. survey and public opinion research industry has embraced them wholeheartedly. The promises

8

of confidentiality that professional researchers make both to their respondents and to their fellow research professionals are only meaningful if courts recognize the public interest in validating those promises. In Applera Corporation v. MJ Research Inc., 389 F. Supp. 2d 344, 350 (D. Conn. 2005), the court acknowledged researchers' ethical prohibition on disclosure of the actual individual identities of the survey respondents as a legitimate need for confidentiality.

Our society has a strong public interest in protecting the confidential relationship between researcher and respondent. It has no interest in discouraging and inhibiting that relationship by unwarranted intrusions upon the respondent's privacy.  As described above, survey research plays an increasingly important role in public and private planning.

The judicial process itself is a significant beneficiary of survey and public opinion research.  In Cimino v. Raymark Industries, Inc., 751 F. Supp. 661 (E.D. Tex. 1990) it was reported that ". . . [a]cceptance of statistical evidence is now commonplace in the courts . . . [it] occurs frequently in Title VII employment discrimination cases, most often demonstrating a pattern or practice of discrimination on the part of the employer . . . it has been used in anti-trust cases to project pre and post merger market share and market concentration . . . [and] in trademark infringement suits [it] is useful in determining consumer product identification and confusion regarding trademarks . . ." These and other valuable applications of survey research[3] can only be effectively fostered, as the public interest plainly requires, if the confidentiality necessary for their continued success is guaranteed. CASRO and AAPOR urge, therefore, that respondent confidentiality be afforded the protection it needs and that in the instant case the Court issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure.

---

[3]See generally M. Finkelstein, Quantitative Methods in Law (1978), quantitative techniques of proof as applied in various legal claims; H. Barksdale, The Use of Survey Research Findings as Legal Evidence (1957) (same); W. Finfrock & D. Spradlin, How to Organize and Present Statistical Evidence, 24 Prac. Law. 67, 67-68 (1978), antitrust evidence increasingly economic and statistical; I. McCarthy, Trademarks and Unfair Competition, Section 32:46 ff. (2d ed. 1984), important and growing role of survey evidence.

9

B.    Courts Have Repeatedly Recognized the Importance and Legitimacy of
      Respondent Confidentiality.

The important public interest in the confidentiality of research respondents' identities has been frequently recognized by the courts. For example, in a survey regarding economic issues and military personnel, the United States District Court for the District of Columbia found that ". . . the survey presents a unique opportunity for candid exchange…..[i]f survey respondents are not promised confidentiality they will . . . be less likely to express their opinions candidly, thus depriving . . . policy makers of valuable and necessary information. The absence of these candid opinions would likely result in the implementation of . . . policies which do not respond to the actual needs of Department personnel." Times Journal Co. v. Department of Air Force, 793 F. Supp. 1 (D.D.C. 1991). See also Army Times Pub. Co. v. Dept. of the Air Force, 998 F.2d 1067 (D.C. Cir. 1993).

Further support is found in Richards of Rockford Inc. v. Pacific G. & E. Co., 71 F.R.D. 388 (N.D. Cal. 1976); where the court rejected a demand for confidential data precisely because effective assurances of confidentiality are imperative for the continuation of accurate and reliable research. Similarly, the court in Farnsworth v. Procter & Gamble Co., 758 F.2d 1545 (11th Cir. 1985), rejected an effort to compel the disclosure of respondent identities because such disclosures could have seriously damaged the voluntary reporting program involved there. In the same way, the court in Andrews v. Eli Lilly & Co., 97 F.R.D. 494, 500 (N.D. Ill. 1983), found that such disclosures might well "chill []" research projects that depend for their effectiveness on strict confidentiality. In Mt. Sinai v. American Tobacco, the Second Circuit Court upheld the redaction of the identities of medical subjects in health studies. Mt. Sinai School of Medicine, et al. v. The American Tobacco Company, et al., 880 F.2d 1520 (2d Cir. 1989). See also In re Data General Corp. Antitrust Litigation, MDL 369 (N.D. Cal. 1979); Thornbury v. Delta Airlines, Inc., No. C-76-0798 RFP (N.D. Cal. 1979); United States v. IBM Corp., 83 F.R.D. 92, 95n. (S.D. N.Y. 1979); Wright v. Patrolmen's Benevolent Assn., 79 F.R.D. 161, 163 (S.D. N.Y. 1976).

The courts in deciding cases similar to the instant case, wherein they must choose between protecting the identities of research sources and compelling their disclosure, necessarily engage in a balancing test between two competing interests. The court in Solarex Corp. v. Arco Solar, Inc., 121 F.R.D. 163 (E.D. N.Y. 1988) (a case wherein the discovery of the identity of research sources was denied) articulates the balancing process: "Under Rule 26 of the Federal Rules of Civil Procedure, the court is required to compare the potential hardship to the party against whom discovery is sought if discovery is granted, with that to the party seeking discovery if it is denied." The court goes on to recognize that the court must balance the need for the information against the injury that would result from disclosure, and "[i]n balancing conflicting interests, courts are admonished not only to consider the nature and magnitude of the competing hardships, but also to 'give more weight to interests that have a distinctively social value than to purely private interests.'" Id. at 169. (Quoting from Marrese v. American Academy of Orthopedic Surgeons, 726 F.2d 1150, 1159 (7th Cir. 1984) See also, Summit Technology, Inc. v. Healthcare Capital Group, Inc., 141 F.R.D. 381 (D. Mass. 1992) wherein the court rightly recognized the importance of the public's interest in the free flow of information and the role it plays in the court's application of the balancing test in deciding discovery matters affecting non-party research sources.

All these cases illustrate the courts' recognition that the confidentiality of respondent identities is consistent with the respondents' own privacy expectations and, even more importantly, in the public interest. See also Deitchman v. E.R. Squibb & Sons, Inc., 740 F.2d 556 (7th Cir. 1984); In re Eli Lilly & Co., Prozac Products Lit., 142 F.R.D. 454 (S.D. Ind. 1992).

Relatedly, the inappropriateness of compelling the disclosure of respondent identities is further confirmed by the rules that have been developed to decide whether a privilege should be granted. Under Fed. R. Evid. 501, federal courts are required to decide such issues in nondiversity cases by applying the common law, as interpreted in light of "reason and experience." A four (4) part test has been developed for this purpose. As articulated in Wigmore's classic formulation, those standards are:

(1)    The communications must originate in a confidence that they will not be disclosed.

11

(2)     This element of <u>confidentiality must be essential</u> to the full and satisfactory maintenance of the relation between the parties.

(3)     The <u>relation</u> must be one which in the opinion of the community ought to be sedulously <u>fostered</u>.

(4)     The <u>injury</u> that would inure to the relation by the disclosure of the communications must be <u>greater than the benefit</u> thereby gained for the correct disposal of litigation.

<u>See</u> 8 Wigmore, <u>Evidence</u> Section 2285 at 527 (McNaughton rev. ed. 1961).

The relationship between researcher and survey respondent clearly satisfies all four branches of the test. The confidentiality of that relationship is an essential prerequisite to its success; it is plainly in the public interest to foster the relationship; the communications originated in a confidence that the respondents would not be identified; and any breach of confidentiality would result in public losses that would far outweigh any short-term benefit that might be thought to result from an invasion of the respondents' privacy. In these circumstances, a privilege is obviously appropriate, and <u>a fortiori</u> it would be contrary to the public interest to breach the relationship's confidentiality by complying with defendants' discovery request.

Moreover, no litigant has a genuine need to discover the identities of research respondents (or information which would match sources to their individual responses). If a litigant wishes to challenge survey evidence, it can readily attempt to do so without breaching the confidentiality promised to the survey respondents. It can, for example, depose some or all of the researchers who conducted the research, or retain its own expert regarding the proper conduct of such research, or conduct its own research to check the accuracy of the survey's findings. Such steps offer ample protection to a litigant's interests without any breach of respondent confidentiality.

Efforts to breach survey respondents' privacy are based upon a misconception of the function of such respondents. Survey respondents are not witnesses, but merely sources of statistical data. Survey and public opinion research does not depend on the unique or personal characteristics of each individual in the sample; its usefulness lies instead in the evidence it offers of statistical trends; a summary description of the degree to which certain characteristics are common to the population under study. It provides an entirely different kind of information from the usual testimony of witnesses. Disclosure of the individual identities of survey

12

respondents could not "improve" the statistical information offered by the survey; it would only supply access to the unique and, usually irrelevant, characteristics of individual respondents.

Moreover, survey research is conducted on the basis of standardized methodologies for selecting a representative sample from the population of possible subjects, designing the instruments to record the data, gathering data and analyzing the results. See, e.g., H. Barksdale, The Use of Survey Research Findings as Legal Evidence (1957); M. Hansen, W. Hurwitz & W. Madow, Sample Survey Methods and Theory (1953). Accordingly, the weakness of specific methodologies, and any cures for those weaknesses, are widely known to experts in the field. In this case, for example, defendants can cross-examine plaintiffs' experts on the methodologies used in performing the surveys, focus groups and interviews, and can engage its own expert to testify regarding any shortcomings in their methods. Since there is, in CASRO's and AAPOR's view, no professional objection to the disclosure of all of the data and records regarding the survey and public opinion research, other than that which identifies the source(s) and matches identity with a response(s), the defendants' expert could reanalyze the resulting data. Finally, no litigant is confined merely to criticism of his opponent's research. The litigant can draw his own samples and replicate the research. Alternatively, the litigant can counter the opponent's research by conducting his own study using another design or methodology.

The defendants have numerous methods available to them by which they might seek to challenge the underlying methods and findings. The availability of those alternative methods is analogous to Richards of Rockford, Inc. v. Pacific G. & E. Co., 71 F.R.D. 388 (N.D. Cal. 1976); where there was an attempt to discover respondent identifiers in interviews, obtained under a pledge of confidentiality, conducted by an academic researcher of PG&E's employees regarding PG&E's decision to purchase equipment manufactured by Richards. The court was unable to apply a privilege under federal common law because the case arose in diversity under state law, See Fed. R. Evid. 501, but nonetheless the court denied the motion to compel by applying principles derived from Fed. R. Civ. Proc. 26. Explaining its refusal to permit the discovery, the court stated that the case was a civil proceeding and that the relevant facts were "independently and readily adducible" so that the information sought [was] largely supplementary." Id. at 390. The court emphasized that any contrary rule requiring the disclosure of respondent identities would "severely stifle research into questions of public

13

policy . . ." Id.; See also Apel v. Murphy, 70 F.R.D. 651, 653 (D.R.I. 1976), discovery related to an insubstantial assertion may be refused; Summit Technology, Inc. v. Healthcare Capital Group, Inc., 141 F.R.D. 381 (D. Mass. 1992), while identity of research source was relevant for discovery purposes, the identity was more tangential than primary; Note, Protection from Discovery of Researcher's Confidential Information, 9 Conn. L. Rev. 425 (1977).

Furthermore, it has been held that survey evidence is admissible, notwithstanding the confidentiality of the respondents' identities, whenever the survey was conducted by professionals according to professional standards and was disclosed in a fashion that permits the court and opposing party to evaluate the professionalism and reliability of the survey. See, e.g., Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 683-84 (S.D. N.Y. 1963); United States v. ALCOA, 35 F. Supp. 820, 823-28 (S.D. N.Y. 1940).

In these circumstances, public policy mandates against the intrusion on the confidential nature of the researcher/source relationship. That is, the public's need, in this age of information, for professional, reliable research far outweighs the defendant's need for survey respondent identifiers. See generally, EEOC v. U. of Notre Dame de Lac, 715 F.2d 331 (7th Cir. 1983); Harris v. Upjohn Co., 115 F.R.D. 191 (S.D. Ill. 1987); United States v. Angiulo, 847 F.2d 956 (1st Cir. 1988); Plough, Inc. v. National Academy of Sciences, 530 A.2d 1152 (D.C. Ct. App. 1987).

It would be remiss not to mention Comm-Tract Corp. v. Northern Telecom, Inc., 143 F.R.D. 20 (D. Mass. 1992). In Comm-Tract Corp, the court evaluated the need for survey respondent identifiers based on the manner the particular survey would be utilized as evidence. The court bases its evaluation on the notion that the survey report was hearsay. This ruling is not authority in this District. CASRO and AAPOR vigorously disagree with the notion that a survey report is hearsay. The survey report is the raw data in the aggregate, in conclusory form, based on expert analysis and management by the survey researcher. The survey researcher is a social scientist. The declarant of the evidence offered is the survey researcher, not the respondents in the survey. The survey and public opinion researcher(s) in the instant case are available for cross-examination and confrontation by the defendant.

14

In February 1995, CASRO appeared as <u>amicus curiae</u> on the limited issue of respondent confidentiality in <u>United States of America; State of California, ex rel. v. Montrose Chemical Corporation of California, et al.</u>, Case No. CV 90-3122 AAH, U.S. Dist. Court, Central Dist. of California. In that case, before it was later dismissed for unrelated reasons, the Honorable Harry V. Peetris, Special Master, ruled on this identical issue. During the discovery hearing, Judge Peetris stated, in sum and substance, that although respondent identifiers should be turned over, it would be only for the limited purpose of re-surveying the respondents; not for deposition or trial or investigation. He stated, ". . . and in balancing the need for the information against the injury to the public, generally, I find that confidentiality must be retained" (from Transcript of Hearing, <u>U.S.; Cal. v. Montrose et al.</u>, CV 90-3122 AAH, Feb. 28, 1995, p. 12, lines 23 and 24).

Finally, in contrast to these substantial public interests, litigants have only the most insubstantial basis for seeking to breach the respondent's confidentiality. In this case, the plaintiffs have been provided with a substantial amount of materials and information, on the results, methods and manner of the survey and public opinion research, which are more than sufficient to advance any argument questioning the reliability of the research. Therefore, disclosing respondent identifiable information does not provide any advantage, whether material or not, to aid the defendants in this case. Disclosing respondent-identifiable information would seriously erode important public interests and depart unjustifiably from well-settled and soundly reasoned legal principles. Accordingly, we respectfully ask this Court to issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure. At trial, the parties may dispute the weight and significance of the survey evidence without the use of respondent-identifiable information.

15

## V.    CONCLUSION

Disclosure of the identities of survey research respondents and of respondent-identifiable information would invade a confidential relationship whose continuing privacy is of vital social importance and essential to the public interest. It is urged that this Court not jeopardize the usefulness, validity and reliability of survey results. Accordingly, we respectfully urge that this Court issue a protective order protecting the identities of respondents and respondent identifiable information from disclosure.

Dated: <u>February 23, 2009</u>                    Respectfully submitted,

Duane L. Berlin, CT Bar No. 302216
LEV & BERLIN, P.C.
200 Connecticut Avenue
5th Floor
Norwalk, CT 06854
(203) 838-8500

Attorney for Amici Curiae
Council of American Survey
Research Organizations, Inc.
and American Association of
Public Opinion Research

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February, 2009, I served a true and correct copy of this Amicus Brief in Support of Plaintiff's Motion for a Protective Order on the Clerk of Court for filing and a copy of this Amicus Brief in Support of Plaintiff's Motion for a Protective Order on the following:

| | |
|---|---|
| W. A. Drew Edmondson, Attorney General | fc_docket@oag.state.ok.us |
| Kelly H. Burch, Assistant Attorney General | kelly_burch@oag.state.ok.us |
| J. Trevor Hammons, Assistant Attorney General | trevor_hammons@oag.state.ok.us |
| Daniel P. Lennington, Assistant Attorney General | daniel.lennington@oag.ok.gov |
| | |
| M. David Riggs | driggs@riggsabney.com |
| Joseph P. Lennart | jlennart@riggsabney.com |
| Richard T. Garren | rgarren@riggsabney.com |
| Sharon K. Weaver | sweaver@riggsabney.com |
| Robert A. Nance | rnance@riggsabney.com |
| D. Sharon Gentry | sgentry@riggsabney.com |
| David P. Page | dpage@riggsabney.com |
| RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS | |
| | |
| Louis Werner Bullock | lbullock@bullock-blakemore.com |
| Robert M. Blakemore | bblakemore@bullock-blakemore.com |
| BULLOCK, BULLOCK & BLAKEMORE | |
| | |
| Frederick C. Baker | fbaker@motleyrice.com |
| Lee M. Heath | lheath@motleyrice.com |
| Elizabeth C. Ward | lward@motleyrice.com |
| Elizabeth Claire Xidis | cxidis@motleyrice.com |
| William H. Narwold | bnarwold@motleyrice.com |
| Ingrid L. Moll | imoll@motleyrice.com |
| Jonathan D. Orent | jorent@motleyrice.com |
| Michael G. Rousseau | mrousseau@motleyrice.com |
| Fidelma L. Fitzpatrick | ffitzpatrick@motleyrice.com |
| MOTLEY RICE, LLC | |
| **Counsel for State of Oklahoma** | |
| | |
| | |
| Robert P. Redemann | rredemann@pmrlaw.net |
| PERRINE, MCGIVERN, REDEMANN, REID, BARRY & TAYLOR, P.L.L.C. | |
| | |
| David C. Senger | david@cgmlawok.com |

| | |
|---|---|
| Robert E Sanders | rsanders@youngwilliams.com |
| Edwin Stephen Williams | steve.williams@youngwilliams.com |
| YOUNG WILLIAMS P.A. | |
| **Counsel for Cal-Maine Farms, Inc and Cal-Maine Foods, Inc.** | |
| | |
| | |
| John H. Tucker | jtucker@rhodesokla.com |
| Theresa Noble Hill | thill@rhodesokla.com |
| Colin Hampton Tucker | ctucker@rhodesokla.com |
| Kerry R. Lewis | klewis@rhodesokla.com |
| RHODES, HIERONYMUS, JONES, TUCKER & GABLE | |
| | |
| Terry Wayen West | terry@thewestlawfirm.com |
| THE WEST LAW FIRM | |
| | |
| Delmar R. Ehrich | dehrich@faegre.com |
| Bruce Jones | bjones@faegre.com |
| Krisann C. Kleibacker Lee | kklee@faegre.com |
| Todd P. Walker | twalker@faegre.com |
| Christopher H. Dolan | cdolan@faegre.com |
| Melissa C. Collins | mcollins@faegre.com |
| FAEGRE & BENSON, LLP | |
| | |
| Dara D. Mann | dmann@mckennalong.com |
| MCKENNA, LONG & ALDRIDGE LLP | |
| **Counsel for Cargill, Inc. & Cargill Turkey Production, LLC** | |
| | |
| | |
| James Martin Graves | jgraves@bassettlawfirm.com |
| Gary V Weeks | gweeks@bassettlawfirm.com |
| Woody Bassett | wbassett@bassettlawfirm.com |
| K. C. Dupps Tucker | kctucker@bassettlawfirm.com |
| BASSETT LAW FIRM | |
| | |
| George W. Owens | gwo@owenslawfirmpc.com |
| Randall E. Rose | rer@owenslawfirmpc.com |
| OWENS LAW FIRM, P.C. | |
| **Counsel for George's Inc. & George's Farms, Inc.** | |
| | |
| | |
| A. Scott McDaniel | smcdaniel@mhla-law.com |
| Nicole Longwell | nlongwell@mhla-law.com |
| Philip Hixon | phixon@mhla-law.com |

| | |
|---|---|
| Craig A. Merkes | cmerkes@mhla-law.com |
| MCDANIEL, HIXON, LONGWELL & ACORD, PLLC | |
| | |
| Sherry P. Bartley | sbartley@mwsgw.com |
| MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC | |
| **Counsel for Peterson Farms, Inc.** | |
| | |
| | |
| John Elrod | jelrod@cwlaw.com |
| Vicki Bronson | vbronson@cwlaw.com |
| P. Joshua Wisley | jwisley@cwlaw.com |
| Bruce W. Freeman | bfreeman@cwlaw.com |
| D. Richard Funk | rfunk@cwlaw.com |
| CONNER & WINTERS, LLP | |
| **Counsel for Simmons Foods, Inc.** | |
| | |
| | |
| Stephen L. Jantzen | sjantzen@ryanwhaley.com |
| Paula M. Buchwald | pbuchwald@ryanwhaley.com |
| Patrick M. Ryan | pryan@ryanwhaley.com |
| RYAN, WHALEY, COLDIRON & SHANDY, P.C. | |
| | |
| Mark D. Hopson | mhopson@sidley.com |
| Jay Thomas Jorgensen | jjorgensen@sidley.com |
| Timothy K. Webster | twebster@sidley.com |
| Thomas C. Green | tcgreen@sidley.com |
| Gordon D. Todd | gtodd@sidley.com |
| SIDLEY, AUSTIN, BROWN & WOOD LLP | |
| | |
| Robert W. George | robert.george@tyson.com |
| L. Bryan Burns | bryan.burns@tyson.com |
| TYSON FOODS, INC | |
| | |
| Michael R. Bond | michael.bond@kutakrock.com |
| Erin W. Thompson | erin.thompson@kutakrock.com |
| Dustin R. Darst | dustin.darst@kutakrock.com |
| KUTAK ROCK, LLP | |
| **Counsel for Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., & Cobb-Vantress, Inc.** | |
| | |
| | |
| R. Thomas Lay | rtl@kiralaw.com |
| KERR, IRVINE, RHODES & ABLES | |
| Frank M. Evans, III | fevans@lathropgage.com |
| Jennifer Stockton Griffin | jgriffin@lathropgage.com |

| | |
|---|---|
| David Gregory Brown | |
| LATHROP & GAGE LC | |
| **Counsel for Willow Brook Foods, Inc.** | |
| | |
| | |
| Robin S Conrad | rconrad@uschamber.com |
| NATIONAL CHAMBER LITIGATION CENTER | |
| | |
| Gary S Chilton | gchilton@hcdattorneys.com |
| HOLLADAY, CHILTON AND DEGIUSTI, PLLC | |
| **Counsel for US Chamber of Commerce and American Tort Reform Association** | |
| | |
| | |
| D. Kenyon Williams, Jr. | kwilliams@hallestill.com |
| Michael D. Graves | mgraves@hallestill.com |
| HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON | |
| **Counsel for Poultry Growers/Interested Parties/ Poultry Partners, Inc.** | |
| | |
| | |
| Richard Ford | richard.ford@crowedunlevy.com |
| LeAnne Burnett | leanne.burnett@crowedunlevy.com |
| CROWE & DUNLEVY | |
| **Counsel for Oklahoma Farm Bureau, Inc.** | |
| | |
| | |
| Kendra Akin Jones, Assistant Attorney General | Kendra.Jones@arkansasag.gov |
| Charles L. Moulton, Sr Assistant Attorney General | Charles.Moulton@arkansasag.gov |
| **Counsel for State of Arkansas and Arkansas National Resources Commission** | |
| | |
| | |
| Mark Richard Mullins | richard.mullins@mcafeetaft.com |
| MCAFEE & TAFT | |
| **Counsel for Texas Farm Bureau; Texas Cattle Feeders Association; Texas Pork Producers Association and Texas Association of Dairymen** | |
| | |
| | |
| Mia Vahlberg | mvahlberg@gablelaw.com |
| GABLE GOTWALS | |
| | |
| James T. Banks | jtbanks@hhlaw.com |
| Adam J. Siegel | ajsiegel@hhlaw.com |
| HOGAN & HARTSON, LLP | |
| **Counsel for National Chicken Council; U.S. Poultry and Egg Association & National Turkey Federation** | |

20

| | |
|---|---|
| | |
| John D. Russell | jrussell@fellerssnider.com |
| FELLERS, SNIDER, BLANKENSHIP, BAILEY & TIPPENS, PC | |
| | |
| William A. Waddell, Jr. | waddell@fec.net |
| David E. Choate | dchoate@fec.net |
| FRIDAY, ELDREDGE & CLARK, LLP | |
| **Counsel for Arkansas Farm Bureau Federation** | |
| | |
| | |
| Barry Greg Reynolds | reynolds@titushillis.com |
| Jessica E. Rainey | jrainey@titushillis.com |
| TITUS, HILLIS, REYNOLDS, LOVE, DICKMAN & MCCALMON | |
| | |
| Nikaa Baugh Jordan | njordan@lightfootlaw.com |
| William S. Cox, III | wcox@lightfootlaw.com |
| LIGHTFOOT, FRANKLIN & WHITE, LLC | |
| **Counsel for American Farm Bureau and National Cattlemen's Beef Association** | |
| | |

21

# EXHIBIT A

We represent 350 research companies in the U.S., the
Americas and abroad, all of which must abide by the
CASRO Code of Standards, the research industry's
enforceable ethical standard for businesses for 35 years.

**HOME | ABOUT US | FOR THE PUBLIC/MEDIA | GOV'T & PUBLIC AFFAIRS | EVENTS | CARE**

# CASRO - Who We Are - What We Do

Founded in 1975, the Council of American Survey Research Organizations (CASRO) represents over 300 companies and research operations in the United States and abroad.

CASRO is the "Voice and Values" of the survey research industry.

- We promote a rigorous code of conduct that enhances the image of survey research and protects the public's rights an privacy

- We advocate our industry's effective self-regulation when legislators propose bills that threaten legitimate survey research

- We champion legitimate research companies and marginalize disreputable research "pretenders" who threaten to tarni the industry's reputation and alienate respondents

CASRO requires members to adhere to the CASRO Code of Standards and Ethics for Survey Research, a tough, internationally-cited set of standards, which has long been the benchmark for the industry.

CASRO provides its members with numerous benefits, including access invaluable industry data, and superb staff training and networking opportunities at workshops and conferences throughout the country.

CASRO has achieved unique status among all North American associations by serving as an active representative on numerous global initiatives and as chief liaison with several leading international associations.

CASRO's "Research Career Development" initiative reaches out to colleges and universities with information and resource to attract the best and brightest students and to make the survey research profession a career of choice.

# EXHIBIT B



# CASRO®

## *CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH*

Council of American Survey Research Organizations® (CASRO®)
170 North Country Road, Suite 4
Port Jefferson, New York 11777 USA
(631) 928-6954  •  Fax: (631) 928-6041
www.casro.org  •  email: casro@casro.org

©1997 - 2009 CASRO - Council of American Survey Research Organizations. All Rights Reserved. First Adopted 1977.  Revised as needed. This document is
protected under the copyright laws of the United States and other countries and may not be reprinted or reproduced without permission from CASRO, provided that
it may be referenced and quoted with attribution and credit given to CASRO.

The Voice and Values of Research

**CASRO**  *CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH*
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.   Responsibilities to Respondents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   A. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   B. Privacy and the Avoidance of Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      Internet Research . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      Privacy Laws and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.  Responsibilities to Clients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. Responsibilities in Reporting to Clients and the Public . . . . . . . . . . . . . . . . . . . . 17

IV.  Responsibilities to Outside Contractors and Interviewers . . . . . . . . . . . . . . . . . . . 19

Appendix: Personal Data Classification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Addendums** (for CASRO Members Only)

*Found on Members Only section of CASRO website:*

1. Standards regarding disclosure of respondent-identifiable data to clients
   (Suggested Client Agreement)

2. Suggested CASRO Client Certification of Email Sample List Compliance



CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH

The Voice and Values of Research
CASRO
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

3

## INTRODUCTION

This Code of Standards and Ethics for Survey Research sets forth the agreed upon rules of ethical conduct for Survey Research Organizations. Acceptance of this Code is mandatory for all CASRO® Members.

The Code has been organized into sections describing the responsibilities of a Survey Research Organization to Respondents, Clients and Outside Contractors and in reporting study results.

This Code is not intended to be, nor should it be, an immutable document. Circumstances may arise that are not covered by this Code or that may call for modification of some aspect of this Code. The Standards Committee and the Board of Directors of CASRO® will evaluate these circumstances as they arise and, if appropriate, revise the Code. The Code, therefore, is a living document that seeks to be responsive to the changing world of Survey Research. To continue to be contemporary, CASRO® advocates ongoing, two-way communication with Members, Respondents, Clients, Outside Contractors, Consultants and Interviewers.

Please also refer to other CASRO® Publications, which may provide detail relevant to many sections of the CASRO® *Code of Standards and Ethics for Survey Research.*

# I. RESPONSIBILITIES TO RESPONDENTS

**Preamble**

Researchers have professional and legal responsibilities to their respondents that are embodied in the procedures of a research study. Underlying these specific responsibilities are four fundamental ethical principles:

Respondents should be:

  a. willing participants in survey research;

  b. appropriately informed about the survey's intentions and how their personal information and survey responses will be used and protected;

  c. sufficiently satisfied with their survey experience;

  d. willing to participate again in survey research.

A. Confidentiality

  1. Since individuals who are interviewed are the lifeblood of the Survey Research Industry, it is essential that Survey Research Organizations be responsible for protecting from disclosure to third parties—including Clients and members of the Public—the identity of individual Respondents as well as Respondent-identifiable information, unless the Respondent expressly requests or permits such disclosure.

  2. This principle of confidentiality is qualified by the following exceptions:

  a. A minimal amount of Respondent-identifiable information will be disclosed to the Client to permit the Client: (1) to validate interviews and/or (2) to determine an additional fact of analytical importance to the study (including the practice of appending Client-owned database information to the Survey Research Organization's data file as an analytic aid). Where additional inquiry is indicated, Respondents must be given a sound reason for the re-inquiry; a refusal by Respondent to continue must be respected.

  Before disclosing Respondent-identifiable information to a Client for purposes of interview validation or re-inquiry, the Survey Research Organization must take whatever steps are needed to ensure that the Client will conduct the validation or recontact in a fully professional manner. This includes the avoidance of multiple validation contacts or other conduct that would harass or could embarrass Respondents. It also includes avoidance of any use of the information (e.g., lead generation) for other than legitimate and ethical Survey Research purposes or to respond to Customer/Respondent complaints. Assurance that the Client will respect such limitations and maintain Respondent confidentiality should be confirmed in writing before any confidential information is disclosed.

  Where Respondent-identifiable data is disclosed to clients so that the Survey Research Organization may analyze survey data in combination with other respondent-level data such as internal customer data, respondent-level data from another survey, etc., it is understood that the information will be used for

model building, internal (Survey Research Organization) analysis, or the like and not for individual marketing efforts and that no action can be taken toward an individual respondent simply because of his or her participation in the survey. To assure Client compliance, the Survey Research Organization must obtain written confirmation from the Client before releasing any data. (A suggested CASRO® Client agreement clause is available.)

Further, with respect to such research uses as Database Segmentation and/or Modeling (see preceding paragraph), specific action(s) may not be taken toward an individual Respondent as a result of his/her survey information and participation beyond those actions taken toward the entire database population group the Respondent by chance has been selected to represent. In order for such specific action, the following two elements must be met:

The Respondent has first given his/her permission to do so, having been told the general purpose and limitations of such use; and

The research firm has obtained a written agreement from the Client assuring that no other use will be made of Respondent-identifiable information.

Predictive equations which integrate a segmentation scheme into a Client database may be applied so long as no action is taken toward an individual Respondent simply because of his or her participation in the survey. Respondents must be treated like all other individuals in the database according to the segment(s) to which they belong or have been assigned.

b. The identity of individual Respondents and Respondent-identifiable information may be disclosed to other Survey Research Organizations whenever such organizations are conducting different phases of a multi-stage study (e.g., a trend study). The initial Research Company should confirm in writing that Respondent confidentiality will be maintained in accordance with the Code.

c. In the case of research in which representatives of the Client or others are present, such Client representatives and others should be asked not to disclose to anyone not present the identity of individual Participants or other Participant-identifying information except as needed to respond, with the Participant's prior specific approval, to any complaint by one or more of the Participants concerning a product or service supplied by the Client.

3. The principle of Respondent confidentiality includes the following specific applications or safeguards:

a. Survey Research Organizations' staff or personnel should not use or discuss Respondent-identifiable data or information for other than legitimate internal research purposes.

b. The Survey Research Organization has the responsibility for insuring that Subcontractors (Interviewers, Interviewing Services and Validation, Coding, and Tabulation Organizations) and Consultants are aware of and agree to maintain and respect Respondent confidentiality whenever the identity of Respondents or Respondent-identifiable information is disclosed to such entities.

   c. Before permitting Clients or others to have access to completed questionnaires in circumstances other than those described above, Respondent names and other Respondent-identifying information (e.g., telephone numbers) should be deleted.

   d. Invisible identifiers on mail questionnaires that connect Respondent answers to particular Respondents should not be used. Visible identification numbers may be used but should be accompanied by an explanation that such identifiers are for control purposes only and that Respondent confidentiality will not be compromised.

   e. Any Survey Research Organization that receives from a Client or other entity information that it knows or reasonably believes to be confidential, Respondent-identifiable information should only use such information in accordance with the principles and procedures described in this Code.

   f. The use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent anonymity. Consequently, Survey Research firms confronted with a subpoena or other legal process requesting the disclosure of Respondent-identifiable information should take all reasonable steps to oppose such requests, including informing the court or other decision-maker involved of the factors justifying confidentiality and Respondent anonymity and interposing all appropriate defenses to the request for disclosure.

B. Privacy and the Avoidance of Harassment

   1. Survey Research Organizations have a responsibility to strike a proper balance between the needs for research in contemporary American life and the privacy of individuals who become the Respondents in the research. To achieve this balance:

      a. Respondents will be protected from unnecessary and unwanted intrusions and/or any form of personal harassment.

      b. The voluntary character of the Interviewer-Respondent contact should be stated explicitly where the Respondent might have reason to believe that cooperation is not voluntary.

   2. This principle of privacy includes the following specific applications:

      a. The Research Organization, Subcontractors and Interviewers shall make every reasonable effort to ensure that the Respondent understands the purpose of the Interviewer/Respondent contact.

         (1) The Interviewer/Research Company representative must provide prompt and honest identification of his/her research firm affiliation.

         (2) Respondent questions should be answered in a forthright and non-deceptive manner.

b. Deceptive practices and misrepresentation, such as using research as a guise for sales or solicitation purposes, are expressly prohibited.

c. Survey Research Organizations must respect the right of individuals to refuse to be interviewed or to terminate an interview in progress. Techniques that infringe on these rights should not be employed, but Survey Research Organizations may make reasonable efforts to obtain an interview including: (1) explaining the purpose of the research project; (2) providing a gift or monetary incentive adequate to elicit cooperation; and (3) re-contacting an individual at a different time if the individual is unwilling or unable to participate during the initial contact.

d. Research Organizations are responsible for arranging interviewing times that are convenient for respondents.

e. Lengthy interviews can be a burden. Research Organizations are responsible for weighing the research need against the length of the interview and Respondents must not be enticed into an interview by a misrepresentation of the length of the interview.

f. Research Organizations are responsible for developing techniques to minimize the discomfort or apprehension of Respondents and Interviewers when dealing with sensitive subject matter.

g. Electronic equipment (taping, recording, photographing) and one-way viewing rooms may be used only with the full knowledge of Respondents.

3. Internet Research

The unique characteristics of Internet research require specific notice that the principle of respondent privacy applies to this new technology and data collection methodology. The general principle of this section of the Code is that survey Research Organizations will not use unsolicited emails to recruit survey respondents or engage in surreptitious data collection methods. This section is organized into three parts: a. email solicitations, b. active agent technologies, and c. panel/sample source considerations.

a.  Email Solicitation

(1) Research Organizations are required to verify that individuals contacted for research by email have a reasonable expectation that they will receive email contact for research. Such agreement can be assumed when ALL of the following conditions exist:

(a) A substantive pre-existing relationship exists between the individuals contacted and the Research Organization, the Client supplying email addresses, or the Internet Sample Providers supplying the email addresses (the latter being so identified in the email invitation);

(b) Survey email invitees have a reasonable expectation, based on the pre-existing relationship where survey email invitees have specifically opted in for Internet research with the research company or Sample Provider, or in the case of Client-supplied lists that they may be contacted for research and invitees have not opted out of email communications;

(c) Survey email invitations clearly communicate the name of the sample provider, the relationship of the individual to that provider, and clearly offer the choice to be removed from future email contact.

(d) The email sample list excludes all individuals who have previously requested removal from future email contact in an appropriate and timely manner.

(e) Participants in the email sample were not recruited via unsolicited email invitations.

(2) Research Organizations are prohibited from using any subterfuge in obtaining email addresses of potential respondents, such as collecting email addresses from public domains, using technologies or techniques to collect email addresses without individuals' awareness, and collecting email addresses under the guise of some other activity.

(3) Research Organizations are prohibited from using false or misleading return email addresses or any other false and misleading information when recruiting respondents. As stated later in this Code, Research Organizations must comply with all federal regulations that govern survey research activities. In addition, Research Organizations should use their best efforts to comply with other federal regulations that govern unsolicited email contacts, even though they do not apply to survey research.

(4) When receiving email lists from Clients or Sample Providers, Research Organizations are required to have the Client or Sample Provider verify that individuals listed have a reasonable expectation that they will receive email contact, as defined, in (1) above.

(5) The practice of "blind studies" (for sample sources where the sponsor of the study is not cited in the email solicitation) is permitted if disclosure is offered to the respondent during or after the interview. The respondent must also be offered the opportunity to "opt-out" for future research use of the sample source that was used for the email solicitation.

(6) Information about the CASRO Code of Standards and Ethics for Survey Research should be made available to respondents.

b. Active Agent Technology

(1) Active agent technology is defined as any software or hardware device that captures the behavioral data about data subjects in a background mode, typically running concurrently with other activities. This category includes tracking software that allows Research Organizations to capture a wide array of information about data subjects as they browse the Internet. Such technology needs to be care-fully managed by the research industry via the application of research best practices.

Active agent technology also includes direct to desktop software downloaded to a user's computer that is used solely for the purpose of alerting potential survey respondents, downloading survey content or asking survey questions. A direct to desktop tool does not track data subjects as they browse the Internet and all data collected is provided directly from user input.

Data collection typically requires an application to download onto the subjects' desktop, laptop or PDA (including personal wireless devices). Once downloaded, tracking software has the capability of capturing the data subject's actual experiences when using the Internet such as Web page hits, web pages visited, online transactions completed, online forms completed, advertising click-through rates or impressions, and online purchases.

Beyond the collection of information about a user's Internet experience, the software has the ability to capture information from the data subject's email and other documents stored on a computer device such as a hard disk. Some of this technology has been labeled "spyware," especially because the download or installation occurs without the data subject's full knowledge and specific consent. The use of spyware by a member of CASRO is strictly prohibited.

A cookie (defined as a small amount of data that is sent to a computer's browser from a web server and stored on the computer's hard drive) is not an active agent. The use of cookies is permitted if a description of the data collected and its use is fully disclosed in a Research Organizations' privacy policy.

(2)  Following is a list of unacceptable practices that Research Organizations should strictly forbid or prevent. A Research Organization is considered to be using spyware when it fails to adopt all of the practices in set forth in Section 3 below or engages in any in the following practices:

(a)  Downloading software without obtaining the data subject's informed consent.

(b)  Downloading software without providing full notice and disclosure about the types of information that will be collected about the data subject, and how this information may be used. This notice needs to be conspicuous and clearly written.

(c)  Collecting information that identifies the data subject without obtaining affirmed consent.

(d)  Using keystroke loggers without obtaining the data subject's affirmed consent.

(e)  Installing software that modifies the data subject's computer settings beyond that which is necessary to conduct research providing that the software doesn't make other installed software behave erratically or in unexpected ways.

(f)  Installing software that turns off anti-spyware, anti-virus, or anti-spam software.

(g)  Installing software that seizes control or hijacks the data subject's computer.

(h)  Failing to make commercially reasonable efforts to ensure that the software does not cause any conflicts with major operating systems and does not cause other installed software to behave erratically or in unexpected ways.

(i)  Installing software that is hidden within other software that may be downloaded.

(j)  Installing software that is difficult to uninstall.

(k)  Installing software that delivers advertising content, with the exception of software for the purpose of ad testing.

(l)  Installing upgrades to software without notifying users.

(m)  Changing the nature of the active agent program without notifying user.

(n)  Failing to notify the user of privacy practice changes relating to upgrades to the software.

(3)  Following are practices Research Organizations that deploy active agent technologies should adopt. Research Organizations that adopt these practices and do not engage in any of the practices set forth in Section 2 above will not be considered users of spyware.

(a)  Transparency to the data subject is critical. Research companies must disclose information about active agents and other software in a timely and open manner with each data subject. This communication must provide details on how the Research Organization uses and shares the data subject's information.

i.  Only after receiving an affirmed consent or permission from the data subject or parent's permission for children under the age of 18, should any research software be downloaded onto the individual's computer or PDA.

ii.  Clearly communicate to the data subject the types of data if any, that is being collected and stored by an active agent technology.

iii.  Disclosure is also needed to allow the data subject to easily uninstall research software without prejudice or harm to them or their computer systems.

iv.  Personal information about the subject should not be used for secondary purposes or shared with third parties without the data subject's consent.

v.  Research Organizations are obligated to ensure that participation is a conscious and voluntary activity. Accordingly, incentives must never be used to hide or obfuscate the acceptance of active agent technologies.

vi.  Research Organizations that deploy active agent technologies should have a method to receive queries from end-users who have questions or concerns. A redress process is essential for companies if they want to gauge audience reaction to participation on the network.

vii.  On a routine and ongoing basis, consistent with the stated policies of the Research Organization, data subjects who participate in the research network should receive clear periodic notification that they are actively recorded as participants, so as to insure that their participation is voluntary. This notice should provide a clearly defined method to uninstall the Research Organization's tracking software without causing harm to the data subject.

*CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH*    The Voice and Values of Research
CASRO
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

11

(b) Stewardship of the data subject is critical. Research companies must take steps to protect information collected from data subjects.

  i. Personal or sensitive data (as described in the Personal Data Classification Appendix) should not be collected. If collection is unavoidable, the data should be destroyed immediately. If destruction is not immediately possible, it: (a) should receive the highest level of data security and (b) should not be accessed or used for any purpose.

  ii. Research Organizations have an obligation to establish safeguards that minimize the risk of data security and privacy threats to the data subject.

  iii. It is important for Research Organizations to understand the impact of their technology on end-users, especially when their software downloads in a bundle with other comparable software products.

  iv. Stewardship also requires the Research Organization to make commercially reasonable efforts to ensure that these "free" products are also safe, secure and do not cause undue privacy or data security risks.

  v. Stewardship also requires a Research Organization that deploys active agent technologies to be proactive in managing its distribution of the software. Accordingly, companies must vigorously monitor their distribution channel and look for signs that suggest unusual events such as high churn rates.

  vi. If unethical practices are revealed, responsible research companies should strictly terminate all future dealings with this distribution partner.

c. Panel/Sample Source Considerations

The following applies to all Research Organizations that utilize the Internet and related technologies to conduct research.

(1) The Research Organization must:

  (a) Disclose to panel members that they are part of panel.

  (b) Obtain panelist's permission to collect and store information about the panelist.

  (c) Collect and keep appropriate records of panel member recruitment, including the source through which the panel member was recruited.

  (d) Collect and maintain records of panel member activity.

(2) Upon Client request, the Research Organization must disclose:



(a) Panel composition information (including panel size, populations covered, and the definition of an active panelist).

(b) Panel recruitment practice information.

(c) Panel member activity.

(d) Panel incentive plans.

(e) Panel validation practices.

(f) Panel quality practices.

(g) Aggregate panel and study sample information (this information could include response rate information, panelist participation in other research by type and timeframe, see Responsibilities in Reporting to Clients and the Public).

(h) Study related information such as email invitation(s), screener wording, dates of email invitations and reminders, and dates of fieldwork.

(3) Stewardship of the data collected from panelists is critical:

(a) Panels must be managed in accordance with applicable data protection laws and regulations.

(b) Personal or sensitive data should be collected and treated as specified in the Personal Data Classification Appendix.

(c) Upon panelist request, the panelist must be informed about all personal data (relating to the panelist that is provided by the panelist, collected by an active agent, or otherwise obtained by an acceptable method specified in a Research Organization's privacy policy) maintained by the Research Organization. Any personal data that is indicated by panel member as not correct or obsolete must be corrected or deleted as soon as practicable.

(4) Panel members must be given a straightforward method for being removed from the panel if they choose. A request for removal must be completed as soon as practicable and the panelist must not be selected for future research studies.

(5) A privacy policy relating to use of data collected from or relating to the panel member must be in place and posted online. The privacy policy must be easy to find and use and must be regularly communicated to panelists. Any changes to the privacy policy must be communicated to panelists as soon as possible.

(6) Research Organizations should take steps to limit the number of survey invitations sent to targeted respondents by email solicitations or other methods over the Internet so as to avoid harassment and response bias caused by the repeated recruitment and participation by a given pool (or panel) of data subjects.

(7) Research Organizations should carefully select sample sources that appropriately fit research objectives and Client requirements. All sample sources must satisfy the requirement that survey participants have either opted-in for research or have a reasonable expectation that they will be contacted for research.

(8) Research Organizations should manage panels to achieve the highest possible research quality. This includes managing panel churn and promptly removing inactive panelists.

(9) Research Organizations must maintain survey identities and email domains that are used exclusively for research activities.

(10) If a Research Organization uses a sample source (including a panel owned by the Research Organization or a subcontractor) that is used for both survey research and direct marketing activities, the Research Organization has an obligation to disclose the nature of the marketing campaigns conducted with that sample source to Clients so that they can assess the potential for bias.

(11) All data collected on behalf of a Client must be kept confidential and not shared or used on behalf of another Client (see also Responsibilities to Clients).

4. Privacy Laws and Regulations

a. Research Organizations must comply with existing state, federal, and international statutes and regulations governing privacy, data security, and the disclosure, receipt and use of personally-identifiable information (collectively "Privacy Laws"). Some of the Privacy Laws affecting Survey Research are limited to specific industries (e.g., financial and health care industries), respondent source (e.g., children), and/or international venues.

b. In instances in which privacy laws apply to Survey Research operations for specific industries or respondent source, Research Organizations will:

(1) Always enter into a confidentiality or "chain of trust" agreement when receiving and using legally-protected, personally-identifiable information from a source other than the data subject, insuring that the Research Organization will protect the information and only use it for the purposes specified in the agreement;

(2) Always require subcontractors and other third parties to whom they disclose personally-identifiable information to enter into confidentiality or "chain of trust" agreements that require such party(ies) to provide the same level of security and limitations of use and disclosure as the Research Organization;

(3) Always store or maintain personally-identifiable information in a verifiably secure location;

(4) Always control and limit accessibility to personally-identifiable information;

(5) Always use reasonable efforts to destroy personally-identifiable information once the survey is complete and validation has been conducted, unless the personally-identifiable information relates to Respondents in panels, to ongoing studies, or for some other critical research reason, or the research Client is legally or contractually obligated to require its service providers to maintain such information for a certain period of time and contractually imposes this requirement on the Research Organization;

(6) Never knowingly receive, use or disclose personally-identifiable information in a way that will cause the Research Organization or another party to violate any Privacy Law or agreement.

c. In order to conduct international research that requires either transmitting or receiving personally-identifiable information of Respondents, Research Organizations must comply in all material respects with international privacy laws and regulations, by, in the case of data transfers with a person or entity in the European Union, either (i) certifying their compliance with the privacy provisions described in the United States Safe Harbor Principles of the European Union Directive on Data Protection or (ii) satisfying an alternative method of complying in all material respects with the Directive.  The EU Safe Harbor privacy principles are contained in the CASRO Model Privacy Policy and are as follows:

(1) Notice: A description of what information is collected, how it is collected, its purpose, and its disclosure to third parties.

(2) Choice: A statement of and procedures for allowing individuals to choose not to participate in the research and/or to have their personal information used or disclosed to a third party.

(3) Onward Transfer: A statement that personal information will be transferred only to third parties who are also in compliance with the Safe Harbor Principles.

(4) Access: Procedures to provide individuals with access to their personal information in order to correct, amend, or delete that information where it is inaccurate.

(5) Security: A description of the reasonable precautions taken to protect personal information from loss, misuse and unauthorized access, disclosure, alteration, and destruction.

(6) Data Integrity: A statement that information will be used consistent with the purpose for which it was collected.

(7) Enforcement: A description of internal and external mechanisms for assuring compliance, and addressing and resolving disputes and complaints.

d. Research Organizations will, to the extent required by law or as necessary to fully and completely comply with the principles set forth in the section of this Code entitled Responsibilities to Respondents, adopt effective and comprehensive legal and operational policies, such as those set forth in CASRO's Privacy Protection Program, which will be updated as necessary to conform with additions to and changes in Privacy Laws.

## II. RESPONSIBILITIES TO CLIENTS

A. Relationships between a Survey Research Organization and Clients for whom the surveys are conducted should be of such a nature that they foster confidence and mutual respect. They must be characterized by honesty and confidentiality.

B. The following specific approaches describe in more detail the responsibilities of Research Organizations in this relationship:

1. A Survey Research Organization must assist its Clients in the design of effective and efficient studies that are to be carried out by the Research Company. If the Survey Research Organization questions whether a study design will provide the information necessary to serve the Client's purposes, it must make its reservations known.

2. A Research Organization must conduct the study in the manner agreed upon. However, if it becomes apparent in the course of the study that changes in the plans should be made, the Research Organization must make its views known to the Client promptly.

3. A Research Organization has an obligation to allow its Clients to verify that work performed meets all contracted specifications and to examine all operations of the Research Organization that are relevant to the proper execution of the project in the manner set forth. While Clients are encouraged to examine questionnaires or other records to maintain open access to the research process, the Survey Research Organization must continue to protect the confidentiality and privacy of survey Respondents.

4. When more than one Client contributes to the cost of a project specially commissioned with the Research Organization, each Client concerned shall be informed that there are other Participants (but not necessarily their identity).

5. Research Organizations will hold confidential all information that they obtain about a Client's general business operations, and about matters connected with research projects that they conduct for a Client.

6. For research findings obtained by the agency that are the property of the Client, the Research Organization may make no public release or revelation of findings without expressed, prior approval from the Client.

C. Bribery in any form and in any amount is unacceptable and is a violation of a Research Organization's fundamental, ethical obligations. A Research Organization and/or its principals, officers and employees should never give gifts to Clients in the form of cash. To the extent permitted by applicable laws and regulations, a Research Organization may provide nominal gifts to Clients and may entertain Clients, as long as the cost of such entertainment is modest in amount and incidental in nature.

16

The Voice and Values of Research
CASRO    *CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH*
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS

# III. RESPONSIBILITIES IN REPORTING TO CLIENTS AND THE PUBLIC

A. When reports are being prepared for Client confidential or public release purposes, it is the obligation of the Research Organization to insure that the findings they release are an accurate portrayal of the survey data, and careful checks on the accuracy of all figures are mandatory.

B. A Research Organization's report to a Client or the Public should contain, or the Research Organization should be ready to supply to a Client or the Public on short notice, the following information about the survey:

1. The name of the organization for which the study was conducted and the name of the organization conducting it.

2. The purpose of the study, including the specific objectives.

3. The dates on or between which the data collection was done.

4. A definition of the universe that the survey is intended to represent and a description of the population frame(s) that was actually sampled.

5. A description of the sample design, including the method of selecting sample elements, method of interview, cluster size, number of callbacks, Respondent eligibility or screening criteria, and other pertinent information.

6. A description of results of sample implementation including (a) a total number of sample elements contacted, (b) the number not reached, (c) the number of refusals, (d) the number of terminations, (e) the number of non-eligibles, (f) the number of completed interviews.

7. The basis for any specific "completion rate" percentages should be fully documented and described.

8. The questionnaire or exact wording of the questions used, including Interviewer directions and visual exhibits.

9. A description of any weighting or estimating procedures used.

10. A description of any special scoring, data adjustment or indexing procedures used. (Where the Research Organization uses proprietary techniques, these should be described in general and the Research Organization should be prepared to provide technical information on demand from qualified and technically competent persons who have agreed to honor the confidentiality of such information).

11. Estimates of the sampling error and of data should be shown when appropriate, but when shown they should include reference to other possible sources of error so that a misleading impression of accuracy or precision is not conveyed.

12. Statistical tables clearly labeled and identified as to questionnaire source, including the number of raw cases forming the base for each cross-tabulation.

13. Copies of Interviewer instructions, validation results, code books, and other important working papers.

C. As a **minimum**, any general public release of survey findings should include the following information:

1. The sponsorship of the study.

2. A description of the purposes.

3. The sample description and size.

4. The dates of data collection.

5. The names of the research company conducting the study.

6. The exact wording of the questions.

7. Any other information that a lay person would need to make a reasonable assessment of the reported findings.

D. A Survey Research Organization will seek agreements from Clients so that citations of survey findings will be presented to the Research Organization for review and clearance as to accuracy and proper interpretation prior to public release. A Research Organization will advise Clients that if the survey findings publicly disclosed are incorrect, distorted, or incomplete, in the Research Organization's opinion, the Research Organization reserves the right to make its own release of any or all survey findings necessary to make clarification.

## IV. RESPONSIBILITIES TO OUTSIDE CONTRACTORS AND INTERVIEWERS

A. Research Organizations will not ask any Outside Contractor or Interviewer to engage in any activity which is not acceptable as defined in other sections of this *Code of Standards and Ethics for Survey Research* or related CASRO® publications.

# APPENDIX: PERSONAL DATA CLASSIFICATION

| Classification Level Name | "Ordinary Personal Data"[1] | "Sensitive Personal Data"[2] | "Hyper-Sensitive Personal Data"[3] |
|---|---|---|---|
| Criteria | Data that is identifiable to an individual person but is not "Sensitive Personal Data." | Data that is (1) identifiable to an individual person and (2) has the potential to be used to harm or embarrass the person. | Individually identifiable data that typically has no legitimate survey research value or purpose and has a very high potential to harm or embarrass the data subject. |
| Examples | Name<br>Telephone # (work & home)<br>Address (work & home)<br>E-mail address (work and home)<br>Internal Company ID numbers<br>Gender<br>Marital status<br># of Children<br>Date of Birth, Age<br>Citizenship<br>Education<br>Income range<br>Veteran status<br>Immigration status<br>Languages spoken<br>Country of residence<br>Non-medical benefits information<br>Purchase history, buying patterns, shopping patterns, hobbies<br>All other personal data not "Sensitive Personal Data"<br>IP address | Criminal arrests or convictions<br>Judgments in civil cases<br>Administrative sanctions<br>Race, ethnicity, national origin<br>Political opinions<br>Religious or philosophical beliefs<br>Union & Trade-union membership<br>Data concerning health or medical treatment<br>Data concerning sexual orientation or activity<br>Financial data (such as credit rating, excluding items listed as Hyper-Sensitive Personal Data)<br>Salary & Compensation<br>Disability status | Social Security Numbers<br>National ID Numbers<br>Driver's License #<br>Financial Information (Credit card #s, Account #s)<br>Passwords |
| Administrative Access Restrictions (e.g., access granted only to employees with a demonstrable need to know) | Access restricted to persons with a need to know for legitimate business purposes, and who have signed a confidentiality agreement. | Access restricted to persons with a need to know for legitimate business purposes, and who have signed a confidentiality agreement, and who have been specifically designated by management. | Do not collect if at all possible; implement processes to eliminate data that's not used or ask client to provide only essential data. If collected and not eliminated do not disclose to third parties and apply the same Administrative Access requirements as Sensitive Personal Data. |
| Physical Labeling (e.g., papers and diskette or tape label) | "Personal Data" label in a conspicuous location on each document. | "Sensitive Personal Data" label in a conspicuous location on each document. | Same as Sensitive Personal Data. |
| Electronic Labeling (e.g., digital file, e-mail, or web page) | "Personal Data" label in a conspicuous location on each digital file, e-mail, or web page, and on subject line of messages. | "Sensitive Personal Data" label in a conspicuous location on each digital file, e-mail, or Web page, and on subject line of messages. | Same as Sensitive Personal Data. |

| Classification Level Name | "Ordinary Personal Data"[1] | "Sensitive Personal Data"[2] | "Hyper-Sensitive Personal Data"[3] |
|---|---|---|---|
| **Physical Storage** (e.g., secure room, locked drawer) | Storage in a secure office or other location. Room need not be locked if access to the building or floor is restricted to persons who are authorized to see the data. | Storage in a locked drawer, file cabinet, or office required. If stored in an open-file storage area, access to the area must be restricted to persons who are authorized to see the data. | Same as Sensitive Personal Data. |
| **Electronic Storage** (e.g., password protection, encryption) | Stored in a directory or folder with restricted access, e.g., password protection. | Stored in a directory or folder with restricted access, e.g., password protection. | Same as Sensitive Personal Data. |
| **Physical Transmission** (e.g., sealed envelope, bonded courier) | Sealed envelope. | Sealed double envelopes with bonded courier, and data encrypted with minimum 128 bit key. | Same as Sensitive Personal Data. |
| **Electronic Transmission** (e.g., encrypted, authentication of recipient) | Information should be transmitted to a verified account (email address or login ID). | Information should be transmitted to a verified account (email address or login ID) and the data should be transmitted in encrypted form (minimum 128-bit key). | Same as Sensitive Personal Data. |
| **Physical Disposal** (e.g., shredding of paper or other media) | After applicable Electronic Disposal, secure onsite disposal (including shredding of paper). | After applicable Electronic Disposal, secure onsite disposal (including shredding of paper). Disposal audit trail required. | Same as Sensitive Personal Data. |
| **Electronic Disposal** (e.g., wiping of disk, degaussing) | Where feasible and possible, removal of directory entry for file, and overwriting of file space with other data. Alternatively, security certification where data becomes embedded in archives and cannot be selectively deleted. | Where feasible and possible, degaussing (wiping) of media or physical destruction of media. Alternatively, security certification where data becomes embedded in archives and cannot be selectively degaussed (wiped). | Same as Sensitive Personal Data. |

[1] Standard demographic data included in surveys are only considered "Ordinary Personal Data" if it is identifiable to an individual person.

[2] Standard demographic data included in surveys are only considered "Sensitive Personal Data" if it is identifiable to an individual person. It may be necessary to create additional classification levels for data that is subject to specific statutory requirements, such as "personal health information" subject to HIPAA.

[3] It may be necessary to create additional classification levels for data that is subject to specific statutory requirements, such as "personal health information" subject to HIPAA.

For more information about

The Voice and Values of Research



COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS ®

## CODE OF STANDARDS AND ETHICS FOR SURVEY RESEARCH

please visit

**www.casro.org**

or contact

Council of American Survey Research Organizations® (CASRO®)
170 North Country Road, Suite 4
Port Jefferson, New York 11777 USA
(631) 928-6954 • Fax: (631) 928-6041

email: casro@casro.org





The Voice and Values of Research

# CASRO®
COUNCIL OF AMERICAN SURVEY RESEARCH ORGANIZATIONS®

© CASRO, 2009

www.casro.org

# EXHIBIT C



AMERICAN ASSOCIATION FOR PUBLIC OPINION RESEARCH

# AAPOR Code of Professional Ethics & Practices

Home > About AAPOR> Standards & Ethics > AAPOR Code of Professional Ethics & Practice

We, the members of the American Association for Public Opinion Research, subscribe to the principles expressed in the following code. Our goals are to support sound and ethical practice in the conduct of public opinion research and in the use of such research for policy- and decision-making in the public and private sectors, as well as to improve public understanding of public opinion and survey research methods and the proper use of public opinion and survey research results.

We pledge ourselves to maintain high standards of scientific competence and integrity in conducting, analyzing, and reporting our work; in our relations with survey respondents; with our clients; with those who eventually use the research for decision-making purposes; and with the general public. We further pledge ourselves to reject all tasks or assignments that would require activities inconsistent with the principles of this code.

## THE CODE

### I. Principles of Professional Practice in the Conduct of Our Work

A. We shall exercise due care in developing research designs and survey instruments, and in collecting, processing, and analyzing data, taking all reasonable steps to assure the reliability and validity of results.

1. We shall recommend and employ only those tools and methods of analysis that, in our professional judgment, are well suited to the research problem at hand.

2. We shall not knowingly select research tools and methods of analysis that yield misleading conclusions.

3. We shall not knowingly make interpretations of research results that are inconsistent with the data available, nor shall we tacitly permit such interpretations.

4. We shall not knowingly imply that interpretations should be accorded greater confidence than the data actually warrant.

B. We shall describe our methods and findings accurately and in appropriate detail in all research reports, adhering to the standards for minimal disclosure specified in Section III.

C. If any of our work becomes the subject of a formal investigation of an alleged violation of this Code, undertaken with the approval of the AAPOR Executive Council, we shall provide additional information on the survey in such detail that a fellow survey practitioner would be able to conduct professional evaluation of the survey.

## II. Principles of Professional Responsibility in Our Dealings With People

A. The Public:

1. When preparing a report for public release we shall ensure that the findings are a balanced and accurate portrayal of the survey results.

2. If we become aware of the appearance in public of serious inaccuracies or distortions regarding our research, we shall publicly disclose what is required to correct these inaccuracies or distortion including, as appropriate, a statement to the public media, legislative body, regulatory agency, or other appropriate group, to which the inaccuracies or distortions were presented.

3. We shall inform those for whom we conduct publicly released surveys that AAPOR standards require members to release minimal information about such surveys, and we shall make all reasonable efforts to encourage clients to subscribe to our standards for minimal disclosure in the releases.

B. Clients or Sponsors:

1. When undertaking work for a private client, we shall hold confidential all proprietary information obtained about the client and about the conduct and findings of the research undertaken for the client, except when the dissemination of the information is expressly authorized by the client, or when disclosure becomes necessary under the terms of Section I-C or II-A of this Code.

2. We shall be mindful of the limitations of our techniques and capabilities and shall accept only those research assignments that we can reasonably expect to accomplish within these limitations.

C. The Profession:

1. We recognize our responsibility to the science of survey research to disseminate as freely as possible the ideas and findings that emerge from our research.

2. We shall not cite our membership in the Association as evidence of professional competence, since the Association does not so certify any persons or organizations.

D. The Respondent:

1. We shall avoid practices or methods that may harm, humiliate, or seriously mislead survey respondents.

2. We shall respect respondents' concerns about their privacy.

3. Aside from the decennial census and a few other surveys, participation in surveys is voluntary. We shall provide all persons selected for inclusion with a description of the survey sufficient to

permit them to make an informed and free decision about their participation.

4. We shall not misrepresent our research or conduct other activities (such as sales, fund raising, ( political campaigning) under the guise of conducting research.

5. Unless the respondent waives confidentiality for specified uses, we shall hold as privileged and confidential all information that might identify a respondent with his or her responses. We also sh not disclose or use the names of respondents for non-research purposes unless the respondents gra us permission to do so.

6. We understand that the use of our survey results in a legal proceeding does not relieve us of ou ethical obligation to keep confidential all respondent identifiable information or lessen the importance of respondent anonymity.

### III. Standards for Minimal Disclosure

Good professional practice imposes the obligation upon all public opinion researchers to include, any report of research results, or to make available when that report is released, certain essential information about how the research was conducted. At a minimum, the following items should be disclosed.

1. Who sponsored the survey, and who conducted it.

2. The exact wording of questions asked, including the text of any preceding instruction or explanation to the interviewer or respondents that might reasonably be expected to affect the response.

3. A definition of the population under study, and a description of the sampling frame used to identify this population.

4. A description of the sample design, giving a clear indication of the method by which the respondents were selected by the researcher, or whether the respondents were entirely self-selecte

5. Sample sizes and, where appropriate, eligibility criteria, screening procedures, and response ra computed according to AAPOR Standard Definitions. At a minimum, a summary of disposition c sample cases should be provided so that response rates could be computed.

6. A discussion of the precision of the findings, including estimates of sampling error, and a description of any weighting or estimating procedures used.

7. Which results are based on parts of the sample, rather than on the total sample, and the size of such parts.

8. Method, location, and dates of data collection.

From time to time, AAPOR Council may issue guidelines and recommendations on best practice: with regard to the release, design and conduct of surveys.

AAPOR Code for Professional Ethics & Practices

*As revised in 200*

Back to top

### 

## READ MORE

Disclosure standards | Ethics

American Association for Public Opinion Research
P.O. Box 14263 | Lenexa, KS 66285-4263
(913) 895-4601 | FAX: (913) 895-4652
Email: info@aapor.org



# Best Practices for Survey and Public Opinion Research

Home > Resources For Researchers > Best Practices

"The quality of a survey is best judged not by its size, scope, or prominence, but by how much attention is given to [preventing, measuring, and] dealing with the many important problems that can arise."

--*"What is a Survey?", American Statistical Association, 1996*

How to produce a quality survey:

1. Have specific goals.
2. Consider alternatives.
3. Select samples that well represent the population to be studied.
4. Use designs that balance costs with errors.
5. Take great care in matching question wording to the concepts being measured and the population studied.
6. Pretest questionnaires and procedures.
7. Train interviewers carefully on interviewing techniques and the subject matter of the survey.
8. Check quality at each stage.
9. Maximize cooperation or response rates within the limits of ethical treatment of human subjects.
10. Use appropriate statistical analytic and reporting techniques.
11. Develop and fulfill pledges of confidentiality given to respondents.
12. Disclose all methods of the survey to allow for evaluation and replication.

Have specific goals for the survey.

The objectives of a high quality survey or poll should be specific, clear-cut and unambiguous. Such surveys are carried out solely to develop statistical information about the subject, not to produce predetermined results, nor as a ruse for marketing, fund-raising, changing voters' minds, or similar activities. Go to the Top of the Page

Consider alternatives to using a survey to collect information.

In its initial conceptualization, the ideal survey takes seriously the important question of whether or not the information needed would best be acquired by conducting a survey or poll. A survey generally originates when an individual or institution is confronted with a need for information for

which existing data appear to be insufficient. At this point, it is important to consider if the required information can even be collected by a survey or whether a survey would actually be the best way to acquire the information needed. If a survey is indeed appropriate, then careful attention must be given as to who is to be sampled and what is to be learned about those sampled.

Select samples that well represent the population to be studied.

A replicable or *repeatable* plan is developed to randomly choose a sample capable of meeting the survey's goals. Sampling should be designed to guard against unplanned selectiveness. A survey's intent is not to describe the particular individuals who, by chance, are part of the sample, but rather to obtain a composite profile of the population. In a bona fide survey, the sample is not selected haphazardly or only from persons who volunteer to participate. It is scientifically chosen so that each person in the population will have a measurable chance of selection. This way, the results can be reliably projected from the sample to the larger population with known levels of certainty/precision.

Critical elements in an exemplary survey are: (a) to ensure that the right population is indeed being sampled (to address the questions of interest); and (b) to locate (or "cover") all members of the population being studied so they have a chance to be sampled. The quality of the list of such members (the "sampling frame")whether it is up-to-date and complete is probably the dominant feature for ensuring adequate coverage of the desired population to be surveyed. Where a particular sample frame is suspected to provide incomplete or inadequate coverage of the population of interest, multiple frames should be used.

Virtually all surveys taken seriously by social scientists, policy makers, and the informed media use some form of *random or probability sampling*, the methods of which are well grounded in statistical theory and the theory of probability. Reliable and efficient estimates of needed statistics can be made by surveying a carefully constructed sample of a population, provided that a large proportion of the sample members give the requested information. The latter requires that careful and explicit estimates of potential non response bias and sample representativeness be developed.

Use designs that balance costs with errors.

For example, allocating a survey budget to support a very large sample size, but with insufficient attention to follow-up of non respondents to produce a good response rate (cf. *item 9*, below) generally yields results that are less accurate than surveying a smaller sample with a higher response rate. Similarly, allocating most of one's funds to provide a large sample size but with little or no resources devoted to interviewer training would not be prudent. Although sampling errors can be readily estimated using probability sampling methods, they do not reflect the total error of a survey statistic or estimate, which is a function of many different features of a given survey. Survey professionals practicing at their best carefully seek to balance these various types of error in the design and conduct of a particular survey, in order to minimize the total error given the budget or resources available.

Take great care in matching question wording to the concepts being measured and the population studied.

Based on the goals of a survey, questions for respondents are designed and arranged in a logical format and order to create a survey questionnaire. The ideal survey or poll recognizes that planning

AAPOR Best Practices for Survey and Public Opinion Research

the questionnaire is one of the most critical stages in the survey development process, and gives careful attention to all phases of questionnaire development and design, including: definition of topics, concepts and content; question wording and order; and questionnaire length and format. C must first ensure that the questionnaire domains and elements established for the survey or poll fully and adequately cover the topics of interest. Ideally, multiple rather than single indicators or questions should be included for all key constructs.

Beyond their specific content, however, the manner in which questions are asked, as well as the specific response categories provided, can greatly affect the results of a survey. Concepts should clearly defined and questions unambiguously phrased. Question wording should be carefully examined for special sensitivity or bias. Techniques should be developed to minimize the discomfort or apprehension of both respondents and interviewers when dealing with sensitive subject matter. Ways should be devised to keep respondent mistakes and biases (e.g., memory of past events) to a minimum, and to measure those that cannot be eliminated. To accomplish these objectives, well- established cognitive research methods (e.g., paraphrasing and "think aloud" interviews) and similar methods (e.g., behavioral coding of interviewer-respondent interactions) should be employed with persons similar to those to be surveyed to assess and improve all key questions along these various dimensions.

Pretest questionnaires and procedures to identify problems prior to the survey.

High quality surveys and polls always provide adequate budget and time for pretesting questionnaire(s) and field procedures. A pretest of the questionnaire and field procedures is the o way of finding out if everything "works"especially if a survey employs new techniques or a new of questions. Because it is rarely possible to foresee all the potential misunderstandings or biasing effects of different questions or procedures, it is vital for a well-designed survey operation to include provision for a pretest. All questions should be pretested to ensure that questions are understood by respondents, can be properly administered by interviewers, and do not adversely affect survey cooperation. In circumstances where one is uncertain about the best design or any critical component of such a design, split sample experiments, which systematically compare the effects of two or more alternatives, should be included either prior to or as part of the pretesting process to select the most appropriate or effective design(s) or component(s).

Train interviewers carefully on interviewing techniques and the subject matter of the survey.

Insisting on high standards in the recruiting and training of interviewers is also crucial to conducting a quality survey or poll. For high quality data to be collected, interviewers in telephor or in person surveys must be carefully trained to do their work properly through face-to-face ("classroom") or telephone training, self-study, or some combination of these. Good interviewer techniques should be stressed, such as how to make initial contacts, how to deal with reluctant respondents, how to conduct interviews in a professional manner, and how to avoid influencing o biasing responses. Training should also involve practice interviews to familiarize the interviewers with the variety of situations they are likely to encounter. Time should be spent going over surve concepts, definitions, and procedures, including a question-by- question approach to be sure that interviewers can deal with any misunderstandings that may arise.

Construct quality checks for each stage of the survey.

Excellent surveys and polls are those that collect information carefully, and check and verify each

step of the research process. To assure that the proper execution of a survey corresponds to its design, every facet of a survey must be looked at during implementation. Checks must be made a every step to ensure that the sample is selected according to specifications; that the interviewers c their work properly; that the information from questionnaires is edited and coded accurately; that computer data entry is done correctly; and that the computer programs used for data analysis wor properly.

Sloppy execution in the field, in particular, can seriously undermine results. Controlling the quali of fieldwork is done by observing/monitoring, verifying and/or redoing a small sample of the interviews. At least some questionnaire-by-questionnaire checking (including interviewer "edits" and a review of frequencies to monitor questionnaire performance while in the field are also essential to detect omissions (e.g., skip errors) or other obvious mistakes in the data before it is to late to fix them.

Maximize cooperation or response rates within the limits of ethical treatment of human subjects.

Nonresponse occurs when members of the sample cannot or will not participate in a survey. Care sample management and control to ensure that a large proportion of sample members provide the information requested is essential to good survey practice. A low cooperation or response rate do more damage in rendering a survey's results questionable than a small sample, because there may no valid way scientifically of inferring the characteristics of the population represented by the no respondents. Proper sample management and control entails such things as adding sample in correctly formulated replicates, tracking the disposition of all cases, monitoring the sample while the field for potential problems, and "metering" or rationing resources to ensure the collection of data from harder-to-reach respondents. Interviewers must also be carefully equipped through training with effective responses to deal with concerns that reluctant respondents might express. Specific procedures designed explicitly to stimulate survey cooperation or participation should al be considered, such as (where possible) sending advance letters to sample households or individu to inform them of the pending survey, offering monetary (i.e., cash) or non-monetary (some othe valued reward) incentives to encourage participation, and sending reminders or making follow-up calls to those who do not respond initially. Failure to follow up non respondents and refusals, in particular, can severely undermine an otherwise well-designed survey. To deal with this possibili (a) visits or calls to sample households are scheduled with careful attention to such consideration: as the best time of day to call or visit; (b) allowance is made for repeated attempts (e.g., callbacks different times and days) to thoroughly work the selected sample in not-at home and related situations; and (c) special efforts (i.e, reworking refusals with an experienced interviewer) are ma to persuade persons who are inclined not to participate to respond. In mail surveys, it is usually necessary to send reminders and conduct several follow- up mailings, and at times to contact at le a subsample of the remaining non respondents by telephone or personal visit. Where possible, specific efforts to directly observe or measure the characteristics of non respondents should also included in the overall survey design.

Use statistical analytic and reporting techniques appropriate to the data collected.

Excellence in the practice of survey and public opinion research requires that data analysis and interpretation be competent and clear, and that findings or results be presented fully, understandably, and fairly. The information collected should be critically examined in a search fo meaning processed, refined, and thoroughly analyzed. Routine reliability studies should be conducted for all key measurements.

Special codes should be provided for missing items, indicating why the data are not included. An ideally, the "filling in" or imputation of these missing data items (based on rigorous and well validated statistical methods) should be undertaken to reduce any biases arising from their absenc Statistical tables should be clearly labeled, including identification of questionnaire source, and tl (unweighted) number of cases forming the base for each cross-tabulation. Sampling errors should be included for all statistics presented, rather than only the statistics themselves.

Findings and interpretations should be presented honestly and objectively, with full reporting of a relevant findings, including any that may seem contradictory or unfavorable. Sampling and nonsampling errors including coverage, measurement and reporting errors, response variance, interviewer and respondent bias, non response, imputation error and errors in processing the data should explicitly be taken into account in the analysis of survey data and interpretation of survey results, in a comprehensive effort to assess error from each perspective. Conclusions should be carefully distinguished from the factual findings, and great care should be taken to be sure that th conclusions and the findings presented are consistent.

Carefully develop and fulfill pledges of confidentiality given to respondents.

Establish clear intentions and meticulous procedures to assure the privacy of respondents and the confidentiality of the information they provide. Unless the respondent explicitly requests otherwise,or waives confidentiality for specified uses, one should hold as privileged and confidential the identity of individual respondents and all information that might identify a respondent with his or her responses.

*Exemplary* survey research practice requires that one literally do "whatever is possible" to protect the privacy of research participants and to keep collected information they provide confidential or anonymous. One must establish clear intentions to protect the confidentiality of information collected from respondents, strive to ensure that these intentions realistically reflect one's ability t do so, and clearly state pledges of confidentiality and their realistic limitations to respondents. Th is, one must ensure that the means are adequate to protect confidentiality to the extent pledged or intended, that procedures for processing and use of data conform to the pledges made, and that appropriate care is taken in dealing with directly identifying information (i.e., using such steps as destroying this type of information or removing it from the file when it is no longer needed for inquiry).

Interviewers and other research staff must be carefully trained and indoctrinated to uphold and maintain the confidentiality of respondents' identities and the information they provide and take/sign an explicit oath or pledge of confidentiality to do so before beginning work. In the verification of information, one must protect the identity of respondents from outside disclosure.

One should also assure that appropriate techniques are applied to control for potential statistical disclosure of respondent data. Individual respondents should never be identified or identifiable in reporting survey findings: all survey results should be presented in completely anonymous summaries, such as statistical tables and charts, and statistical tabulations presented by broad enough categories so that individual respondents cannot be singled out.

Disclose all methods of the survey to permit evaluation and replication.

Excellence in survey practice requires that survey methods be fully ddisclosed and reportedin

sufficient detail to permit replication by another rresearcher andthat all data (subject to appropriat safeguards to maintain privacy and confidentiality) be fully documented and made available for independent examination. Good professional practice imposes an obligation upon all survey and public opinion researchers to include, in any report of research results, or to make available when that report is released, certain minimal essential information about how the research was conducte to ensure that consumers of survey results have an adequate basis for judging the reliability and validity of the results reported. Exemplary practice in survey research goes beyond such standard for "mminimaldisclosure," promulgated by AAPOR and several other pprofessionalassociations (e.g., CASRO and NCPP) by (a) describing how the research was done in sufficient detail that a skilled researcher could repeat the study, and (b) making data available for independent examination and analysis by other responsible parties (with appropriate safeguards for privacy concerns).

A comprehensive list of the elements proposed for disclosure by one or more ssources which in combination, exceed the "standards for mminimumdisclosure" proposed by any one of the professional organizations includes:

- who sponsored the survey, and who conducted it;
- the purpose of the study, including specific objectives;
- the questionnaire and/or the exact, full wording of all questions asked, including any visua exhibits and the text of any preceding instruction or explanation to the interviewer or respondents that might reasonably be expected to affect the response;
- a definition of the universe the population under study which the survey is intended to represent, and a description of the sampling frame used to identify this population (includi its source and likely bias);
- a description of the sample design, including cluster size, number of callbacks, informatio on eligibility criteria and screening procedures, method of selecting sample elements, mod of data collection, and other pertinent information;
- a description of the sample selection procedure, giving a clear indication of the methods b; which respondents were selected by the researcher, or whether the respondents were entire self-selected, and other details of how the sample was drawn in sufficient detail to permit fairly exact replication;
- size of samples and sample ddisposition theresults of sample implementation, including a full accounting of the final outcome of all sample cases: e.g., total number of sample elements contacted, those not assigned or reached, refusals, terminations, non-eligibles, ar completed interviews or questionnaires;
- documentation and a full description, if applicable, of any response or completion rates cit (for quota designs, the number of refusals), and (whenever available) information on how non respondents differ from respondents;
- a description of any special scoring, editing, data adjustment or indexing procedures used;
- a discussion of the precision of findings, including, if appropriate, estimates of sampling eerror withreferences to other possible sources of error so that a misleading impression of accuracy or precision is not cconveyed and a description of any weighting or estimating procedures used;
- a description of all percentages on which conclusions are based;
- a clear delineation of which results are based on parts of the sample, rather than on the tot; sample;
- method(s), location(s), and dates of interviews, fieldwork or data collection;
- interviewer characteristics;

- copies of interviewer instructions or manuals, validation results, codebooks, and other important working papers; and
- any other information that a layperson would need to make a reasonable assessment of the reported findings.

Sources

Back to top

### 

## READ MORE

Disclosure standards | Sampling

American Association for Public Opinion Research
P.O. Box 14263 | Lenexa, KS 66285-4263
(913) 895-4601 | FAX: (913) 895-4652
Email: info@aapor.org