1

```
 1         IN THE UNITED STATES DISTRICT COURT FOR THE
                 NORTHERN DISTRICT OF OKLAHOMA
 2
         STATE OF OKLAHOMA, ex rel. W.A.      )
 3       DREW EDMONDSON, in his capacity as   )
         ATTORNEY GENERAL OF THE STATE OF     )
 4       OKLAHOMA and OKLAHOMA SECRETARY OF   )
         THE ENVIRONMENT C. MILES TROBERT,    )
 5       in his capacity as the TRUSTEE FOR   )
         NATURAL RESOURCES FOR THE STATE OF   )
 6       OKLAHOMA,                            )
                                              )
 7                       Plaintiff,           )
                                              ) Case No.
 8       -vs-                                 ) 05-CV-329-GKF-PJC
                                              )
 9       TYSON FOODS, INC., TYSON POULTRY,    )
         INC., TYSON CHICKEN, INC., COBB-     )
10       VANTRESS, INC., AVIAGEN, INC., CAL-  )
         MAINE FOODS, INC., CAL-MAINE FARMS,  )
11       INC., CARGILL, INC., CARGILL TURKEY  )
         PRODUCTION, LLC, GEORGE'S, INC.,     )
12       GEORGE'S FARMS, INC., PETERSON       )
         FARMS, INC., SIMMONS FOODS, INC.,    )
13       and WILLOW BROOK FOODS, INC.,        )
                                              )
14                       Defendants.          )

15

16               TRANSCRIPT OF PROCEEDINGS,

17       held before the Honorable Paul J. Cleary, Magistrate

18       Judge in the United States District Court for the

19       Northern District of Oklahoma on February 26, 2009.

20               A P P E A R A N C E S

21       For the Plaintiff:       Mr. Louis Bullock
                                   Mr. David Riggs
22                                 Ms. Ingrid Moll
                                   Ms. Kelly Burch and
23                                 Mr. Trevor Hammons
                                   Attorneys at Law
24
         (Appearances continued . . .)
25
```

```
 1      (Appearances continued . . .)

 2      For the Defendant Cargill:   Mr. Del Ehrich
                                     Ms. Theresa Hill and
 3                                   Mr. Kerry Lewis
                                     Attorneys at Law
 4
        For the Defendant Peterson:  Ms. Nicole Longwell and
 5                                   Mr. Scott McDaniel
                                     Attorneys at Law
 6
        For the Defendant Tyson:     Mr. Robert George and
 7                                   Mr. Bryan Burns
                                     Attorneys at Law
 8
        For the Defendant Cal-Maine: Mr. Robert Redemann
 9                                   Mr. Robert Sanders
                                     Attorney at Law
10
        For Simmons Foods:           Mr. John Elrod
11                                   Attorney at Law

12      For George's:                Mr. James Graves
                                     Attorney at Law
13

14               P R O C E E D I N G S

15           COURTROOM DEPUTY:  Case Number

16      05-CV-329-GKF-PJC, Attorney General of the State of

17      Oklahoma, et al. versus Tyson Poultry, Inc., et al.

18      Counsel, please state your appearances for the record.

19           MR. BULLOCK:  Louis Bullock for the State of

20      Oklahoma.

21           MS. MOLL:  Ingrid Moll for the State of

22      Oklahoma.

23           MR. HAMMONS:  Trevor Hammons for the State of

24      Oklahoma.

25           MR. RIGGS:  David Riggs for the State of
```

1    Oklahoma.

2          MS. HILL:  Theresa Hill for Cargill, Inc. and

3    Cargill Turkey Production, LLC and with me I've got Del

4    Ehrich from Faegre & Benson in Minneapolis.

5          THE COURT:  All right.

6          MR. ELROD:  John Elrod with Simmons Foods.

7          MR. McDANIEL:  Scott McDaniel representing

8    Peterson Farms.

9          MR. GRAVES:  James Graves for George's and

10    George's Farms.

11          MR. REDEMAN:  Robert Redeman for Cal-Maine.

12          MR. SANDERS:  Your Honor, I'm Bob Sanders for

13    Cal-Maine.

14          MS. LONGWELL:  Nicole Longwell on behalf of

15    Peterson Farms, Your Honor.

16          MR. BURNS:  Bryan Burns for the Tyson

17    defendants.

18          MR. GEORGE:  Robert George also for with the

19    Tyson defendants.

20          MR. LEWIS:  And Kerry Lewis for the Cargill

21    defendants.

22          THE COURT:  All right.  We've got several

23    motions to deal with today and then I guess we're

24    scheduled for another session on Monday.  Let me hit a

25    couple of things initially.

1          Although I don't think we listed it as on the

2     docket for today, there was a motion for attorney fees.

3     Docket Number 1729 has been referred to me.  It's the

4     attorney fee motion that emanates from Judge Joyner's

5     ruling on the motion to order compliance or to compel

6     compliance with a previous Court order and it was on

7     appeal to Judge Frizzell.  He's made some rulings and

8     resolved it and it's now back before me.  I guess the

9     question I have is the fee request is about $13,000, and

10    so my question to you is:  Is that something that the

11    parties can stipulate to or are we going to have to have

12    a hearing on that issue or where are going on that one?

13          MR. BULLOCK:  Judge, I'd like to look at that.

14    Could we make or announcement on Monday as to that?

15          THE COURT:  Sure.  Sure.  I did want to bring

16    it up so that we can try and move as many of these things

17    forward as possible.

18          And then CASRO, the industry group, has filed a

19    motion for leave to file an amicus brief.  Is there any

20    opposition to that?

21          MR. EHRICH:  Your Honor, Del Ehrich for the

22    Cargill defendants.  I will note this is rather unusual

23    in a non-dispositive motion, a motion to compel, the

24    amicus concedes, in fact, that what it's asking this

25    Court -- is to create a new evidentiary privilege.  It

```
 1   doesn't exist under Rule 501.  If the Court would find it
 2   useful as it considers these issues, however, we don't
 3   have an objection.  We would like to consider response as
 4   a group and will note that that issue is distinct from, I
 5   think, the issues about the extension of a damage
 6   deadline today so that we would be reluctant to see the
 7   Court's consideration of that part of the motion delayed.
 8   In fact, all of these motions ought to be promptly
 9   decided because, of course, we are mindful of the
10   remaining pretrial deadlines.
11            THE COURT:  Well, you said you wanted
12   opportunity perhaps to respond to it and then you told me
13   that you want a ruling, so which one is it?
14            MR. EHRICH:  Well, I don't think I said quite
15   that.  Let me try again.  What's in front of Your Honor
16   is a motion to extend the March 2nd damage --
17   (Interrupted)
18            THE COURT:  Right.  That's part of it --
19   (Interrupted)
20            MR. EHRICH:  -- that's part of it.  We believe
21   there are grounds independent for the grant of that
22   motion that is separate and apart from the considered
23   materials issues, one part of which the amicus brief or
24   the proposed amicus brief touches.  We would be able to
25   submit a prompt response, Your Honor, on that issue, on
```

1     the amicus issue.

2          THE COURT:  Doesn't anybody else have any

3     objection to the Court granting leave for CASRO to submit

4     that brief for whatever it may be worth?  If not, then

5     I'll grant the motion for leave to file an amicus and if

6     you folks want to file a response to it, can you -- how

7     quickly can you do that because we do want to move this

8     along?

9          MR. EHRICH:  I would expect we can do it

10    tomorrow morning.

11         THE COURT:  That seems fast enough.  The

12    defendants will respond to the amicus brief by Friday.

13         Then as far as the remaining motions for

14    hearing today, we have the motions by Peterson and

15    Simmons for protective order which really, I think, are

16    all one issue and we can take them up together.  Who

17    wants to start with a discussion of those motions?  Will

18    I hear from one person on behalf of Simmons and Peterson

19    or will I hear from two?

20         MR. McDANIEL:  Your Honor, I would like to

21    start, but I think the company -- the two defendants may

22    have a slightly different perspectives so the Court would

23    hear argument from both.  We appreciate it.

24         THE COURT:  All right.  And you're on behalf of

25    Simmons?

1          MR. McDANIEL:  Peterson Farms.  Scott McDaniel

2     for Peterson Farms.  Thank you, Your Honor.

3          May it please the Court.  Your Honor, I think

4     the motion, the motions, together present a rather simple

5     matter.  This past July Peterson Farms and Simmons Foods

6     consummated and executed an asset purchase agreement

7     whereby Peterson Farms sold the bulk of its live

8     production assets to Simmons Foods.  Peterson Farms still

9     remains in business, is still a member of the poultry

10    industry, has focused its business at this time in its

11    breeding and genetics and research and development.  So,

12    all those other assets were sold pretty much lock, stock

13    and barrel to Simmons Foods.  In July there was a little

14    bit of press coverage and about a month later we received

15    this request for production from the plaintiffs.  We

16    received those September 18th.

17         There were four requests that can be summarized

18    very briefly.  The first request asked for all the

19    transactional documents; second request asked for all

20    environmental due diligence documents related to all the

21    assets; the third asked for all documents that relate to

22    the reasons that Peterson entered this transaction; the

23    fourth asked for all documents related to the lawsuit

24    that were exchanged between the parties as part of this

25    transaction.

1               Right off the bat we recognized and felt very

2       strongly these were grossly overly-broad and that they

3       seek irrelevant and highly confidential materials.  And

4       as to the fourth request, it clearly seeks to invade the

5       joint defense and common interest privilege.

6               Now, Your Honor, the factual setting is

7       obviously important for the analysis of whether this is

8       appropriate discovery in the case.  I think one of the

9       most important points is there is no dispute between

10      Peterson, Simmons and the plaintiffs on the fact that

11      Peterson Farms' only assets within in Illinois River

12      Watershed were the live chickens that at the time of the

13      sale had been placed on the farms of contract growers.

14      Peterson does not have, never has had, company farms in

15      the watershed.  All of the other assets Peterson employed

16      in its live production business were basically in

17      Decatur, Arkansas.

18              THE COURT:  Which is outside the IRW?

19              MR. McDANIEL:  Correct, sir.  The other

20      operational asset that was transferred was LP Gas

21      Company, has little to do with the issues in the case.

22      But nonetheless, that is situated in Jay, Oklahoma, also

23      outside the watershed.

24              It was an asset sale.  There was no stock

25      exchanged.  There was no agreement about transferring or

```
 1        assumption of liability to Simmons.  And Peterson and
 2        Simmons' counsel conferred, agreed that our positions
 3        were similar.  We approached plaintiff's counsel
 4        collectively for a meet and confer process.  We had a
 5        conference with two of plaintiff's counsel.  It was
 6        productive for the first few minutes.  And during the
 7        discussion -- and I have to be candid with Your Honor and
 8        I think we were candid in the papers, that we acknowledge
 9        there is information about this transaction that the
10        plaintiffs are entitled to have.  There has been a change
11        in the operations of two of the defendants in this
12        lawsuit, chiefly being that Peterson Farms no longer
13        operates.  They need to know that.  They need to know
14        that Simmons Foods has not accepted liability
15        contractually or otherwise for any operations of Peterson
16        Farms prior to the closing date.  And we think that the
17        plaintiffs have a right to know generally what was
18        transferred.  And we went into that meet and confer with
19        an understanding that within this very broad range of
20        documents there's something there the plaintiffs are
21        entitled to.  So our goal was to see if we can focus on
22        that.
23            During the conversation the plaintiff's counsel
24        articulated some of these reasons I just shared with you,
25        and I think we reflected that, okay, that's sounds
```

1    reasonable and we can work with those issues.  We need

2    you gentlemen to put this in writing, narrow your

3    request, then we can respond and we can proceed to

4    produce.  The request to put these specific relevant

5    topics in writing as rejected.  They asked for a quick

6    peek, we declined a quick peek.  They asked then, well,

7    maybe they could narrow their request if we could provide

8    them an index of the transactional documents.  Well, at

9    that time I didn't know whether there was an index or

10   not.  I didn't have the transactional package.  I wasn't

11   the Peterson's representation on the matter.  Shortly

12   after that in conferring with Simmons' counsel and asked

13   them, well, what do you have in your package.  I know in

14   my packages there's no index.  So, we couldn't take the

15   approach of giving them an index.

16          So, I made a proposal and we submitted that to

17   Your Honor as Exhibit 2 to the brief, my e-mail.  What we

18   suggested and still suggest as a solution to this is that

19   we will be glad to provide them with a redacted version

20   of the asset purchase agreement so that the information

21   that they'll be provided will provide them the elements

22   that we think are relevant, and that is, that it was an

23   asset sale that did not transfer any potential

24   liabilities arising in the case from Peterson and

25   Simmons.  It will describe the summary list of assets

1     sold to show that none of them were in the Illinois River

2     Watershed.  It will also identify for the plaintiffs that

3     the poultry grower contracts which is Peterson's

4     relationship to the IRW were note treated as an asset and

5     they were not assigned.  Any poultry grower under

6     contract with Peterson Farms at the time of the sale had

7     their own personal right and decision to make whether to

8     enter a new contract with Simmons or to negotiate a

9     contract with one of the other companies operating in the

10    area or to sell their farm.  In any event, they were not

11    assigned and were not transferred.

12          We offered that.  And the alternatives at that

13    time were either, plaintiffs, we need you to refine your

14    request or failing those two then we're going to have to

15    seek relief from the Court.  And we didn't get a response

16    to that, and given that this is what we view to be highly

17    confidential information regarding a private transaction

18    between two closed family corporations, we had to do

19    something before our response time, so hence here's the

20    motion.

21          Given the factual setting and that the assets

22    at issue here are just these chickens and there was no

23    change of liability position for Peterson Farms, Peterson

24    Farms hasn't nor will it assert that any exposure in this

25    litigation is altered by virtue of this sale for any

 1    pre-closing liabilities.  That's all the plaintiffs need

 2    to know, and that is that it does not change who the

 3    party defendants are, it doesn't change who their claims

 4    are asserted against.  What it does change is that from

 5    July 16th, 2008 Peterson Farms isn't in that watershed.

 6    So, all their theories regarding agency and their

 7    theories regarding pollution don't apply to Peterson from

 8    that point forward.

 9         So, with that factual setting and those legal

10    issues, Your Honor, we submit that the proposal that I

11    made with Simmons' consent was reasonable and it was

12    fair, and we think that's what they were entitled to.

13         Taking up how plaintiffs chose to respond to

14    our motion for protective order, they made basically one

15    statement on the second page of their response where they

16    articulate for the Court what they believe is their basis

17    for being able to invade these confidences.  On page two

18    they claim a right to four things.  The nature of the

19    assets transferred, that's number one.  We don't dispute

20    that.  We agreed to give that to them.  Number two, the

21    manner of the transfer.  Again, don't dispute that, we

22    offered to give that to them.  Number three, whether the

23    fair market value given for the assets was fair and

24    appropriate.  Your Honor, we disagree with that one.

25    It's irrelevant to any claim or defense in the case.  The

1     last one, number four, is any agreements regarding the

2     liability or indemnity.  Again, Your Honor, we offered to

3     give them that through the redacted asset purchase

4     agreement.

5          When the plaintiffs rejected our proposal and

6     did not respond, it brings us to the point we are today

7     and that is, we would submit to Your Honor, that their

8     requests now have to be adjudicated by you on their face.

9     And it's on their face that we believe the over-breadth

10    would lead the Court to the conclusion that Peterson

11    doesn't need to respond.  Now, with the exception of this

12    request number four which we believe clearly gets into

13    the joint defense and common interest privilege, we do

14    not deny that there is potentially relevant, potentially

15    discoverable information conceptually within the other

16    three categories.  But the way the plaintiffs are asking

17    Your Honor to view this and to analyze it is by giving

18    you some very narrow examples from those categories and

19    then suggesting because they have hypothesized something

20    narrow that may be by discoverable, you should grant

21    discovery of the whole.

22         And let me give you a couple examples.  On

23    request for production number two which is the

24    environmental due diligence request, the plaintiffs

25    provide this argument in their brief that Peterson's

1     assets at the time of the sale in the watershed,

2     chickens -- chickens defecate, chicken manure is a source

3     of pollution, so therefore, to the extent there are

4     documents evaluating manure production, land application,

5     any manure or chicken litter impacts of any waters, that

6     should be discoverable.  Well, if they had spent as much

7     time crafting their requests for production to say what

8     they said in the brief, Peterson could have responded to

9     that and I wouldn't dispute the relevance and

10    discoverability of that.  But the problem is, Your Honor,

11    when they asked for all due diligence, that potentially

12    reaches to any due diligence documents that relate to a

13    processing plant which includes its own waste water

14    treatment plant in the Eucha Watershed, feed mill, truck

15    shop, multiple hatcheries, gas storage facility.  All

16    these are outside the Illinois River Watershed and

17    they're clearly irrelevant.

18          Another example, this request for production

19    number three, the reason that Peterson Farms entered the

20    sale.  They make an argument in the brief that says,

21    well, there may be documents in there discussing that

22    Peterson was motivated to enter the sale because of

23    exposure to liability in the lawsuit.  Well, if that had

24    been the request for production I could have responded

25    without the need for the protective order.  But they

1    didn't.  They asked for documents regarding the reason

2    without regarding to whether it has anything to do with

3    this lawsuit.  And, Your Honor, I submit that gets about

4    as -- that invades about the most intimate of Peterson

5    Farms confidentiality at that point.

6         The last one is this request for production

7    number four.  To the extent there are any documents

8    exchanged between Peterson and Simmons during the period

9    that they were negotiating this transaction, this lawsuit

10   was ongoing, active, and I suspect the parties did

11   communicate as they are allowed to do within the

12   privilege during that time.  How you would decide which

13   of those are related to the transaction, which are

14   related to the common defense, I don't know how to do

15   that.  But I do know that whether it was tangentially

16   related to the sale does not take it outside the

17   privilege, and I don't think plaintiffs are contending

18   that the privilege is not valid.  And if that's the case,

19   then they need to show there's been a waiver and there

20   has been none.  So as to number four, I would suggest to

21   Your Honor the answer is rather absolute as to that

22   analysis.

23        Frankly, Your Honor, we're here because this is

24   ill-conceived discovery.  It's a fishing expedition

25   that's going to place potentially into the hands of our

 1     opponent very sensitive documents.  We offered a fair

 2     solution that would allow plaintiffs to know how this

 3     transaction affects their proceeding forward in this

 4     case, how it would potentially affect how they would

 5     present their claims.  How they -- if they were to

 6     achieve a judgment at the end of the day, who will stand

 7     for that judgment, and that was rejected.  So therefore,

 8     Your Honor, I think based upon the requests, and they

 9     appear willing to stand on them, then we would suggest

10     they're facially over-broad and we'd ask that you sustain

11     our motion.

12             THE COURT:  Mr. McDaniel, as to number four,

13     you suggest that's a fairly absolute.  But don't the

14     documents exchange or the communication exchange have to

15     be in furtherance of the common defense to be covered by

16     the joint defense agreement or the common defense?

17             MR. McDANIEL:  Well, I think, Your Honor,

18     that -- I think we all agree that the joint defense is

19     not in and of itself a privilege.  It prevents a waiver

20     of a privilege that otherwise exists.  And so, in that

21     case, those communications whether they're involving

22     counsel for the two parties and their clients are

23     involved, their can be an attorney/client communication

24     privilege that's not waived by virtue of sharing it with

25     Simmons as it relates to their common defense in this

```
 1    case.  If the companies share their assessment of
 2    exposure in this case with each other so that each
 3    company can evaluate what's an appropriate price, do we
 4    need an indemnity, I'd say that is all part of mill
 5    impressions of the counsel, it's work product, it can be
 6    co-party communication.  I think there's a line there
 7    that we cannot objectively carve out.  And I don't want
 8    to give the impression to either you or opposing counsel
 9    that there are such analysis.  Obviously, I'm dealing
10    with these requests on their face.  My concern is if
11    there is some standard articulated by the Court that says
12    that communication must be in furtherance of the defense,
13    we'll end up back here arguing over whether a particular
14    communication is or not.  If we log it, the plaintiff's
15    position will be, well, you didn't describe it well
16    enough to substantiate that it was in furtherance.  I
17    think we're going to make this a lot messier.
18                THE COURT:  Do you know at this point what the
19    universe of documents would be that would be responsive
20    to number four?
21                MR. McDANIEL:  I believe I know what they would
22    be for my client, yes.
23                THE COURT:  And how extensive is that universe?
24                MR. McDANIEL:  It's not extensive at all.
25                THE COURT:  So in other words, if the Court
```

1     wanted to look at these documents in camera, for example,

2     just to make -- give us all some comfort level that at

3     least they had been screened to some degree, it wouldn't

4     take me until the end of my time on the bench whenever

5     that might be?

6              MR. McDANIEL:  No, it wouldn't.  And when you

7     see what there is, you may say, well, what's the big

8     deal.  Why are we here on this.  The issue is not

9     specifically these documents, the issue is how this joint

10    defense common interest privilege will be viewed by the

11    Court is my -- I'm sorry.

12             THE COURT:  That's all right.  Go ahead and

13    finish.

14             MR. McDANIEL:  What I was going to say is what

15    I would -- what clearly what I have viewed is the only

16    document that mentions this litigation that was exchanged

17    that my client has provided me, that one document doesn't

18    concern me substantively.  What concerns me is what I

19    said before, is that obviously there is a lot of

20    communication between these companies and counsel in

21    joint defense, is that we're going to step out of what

22    was actually exchanged in the transaction into another

23    very soft realm that the plaintiffs will seek to invade

24    further into mental impressions of counsel,

25    attorney/client communications, joint defense

1    communications that may have occurred during the period

2    that the parties were discussing it.  But the transaction

3    itself wasn't a motivation.  And just based upon our

4    history where we have succeeded in working out some

5    disputes, but often we're here seeking the Court's

6    advice, that's my primary concern.

7        THE COURT:  Do I understand that -- I think

8    Judge Joyner looked at the joint defense agreement

9    previously?

10        MR. McDANIEL:  That is correct.

11        THE COURT:  Of course, I haven't seen it, so I

12    don't know exactly.  I assume it's probably a standard

13    JDA, but I don't know.  I haven't seen the document.

14        MR. McDANIEL:  If my recollection is correct --

15    and I invite any of the counsel to correct me -- there

16    was an issue about should it be produced to the other

17    side.  Judge Joyner looked at it in camera and his

18    decision was that it did not need to be produced.  Am I

19    correct about that?  So I know that was the context in

20    which he viewed it.

21        THE COURT:  Okay.  Is there anything else from

22    Peterson?

23        MR. McDANIEL:  No, thank you.

24        THE COURT:  All right.  Mr. Elrod.

25        MR. ELROD:  Thank you, Your Honor.  Welcome to

```
 1      the case.  I have nothing further to say regarding the
 2      argument.  I'd just like to put a little more meat on the
 3      bones in terms of who these parties and the milieu in
 4      which they operate.  Simmons Foods, my client, is a
 5      company that's about 60 years old.  It's in the second
 6      and third generation of operation right now.  Peterson
 7      Farms is probably 70 to 75 years old.  As a matter of
 8      fact, the founder of Peterson just passed away last year.
 9      He was approaching 100 years of age and made it to 100.
10      So these truly are privately-owned family enterprises
11      which operate within a very competitive poultry
12      production environment in northwest Arkansas and
13      northeast Oklahoma, in fact, in the United States.  While
14      I love my sisters and brothers on the same side of the
15      table as me in this lawsuit, and while I have a great
16      deal of respect and have known most of the owners of all
17      the defendants except for Cargill for my entire life and
18      have a great deal of respect for people like Don Tyson
19      and Mr. Peterson when he was alive and the George family,
20      we compete each other.  And the financial information
21      that is contained within these transactional documents is
22      totally irrelevant to the issues in this lawsuit.  And it
23      is kept closely to the -- it is kept closely to the chest
24      of the people involved in the transaction of the people
25      who work for them.  In fact, it's just nobody's business.
```

1    The only people we have to answer to without two

2    shareholders are the Internal Revenue Service and our

3    bankers.  And so, this is very sensitive information that

4    we -- and that's probably the reason we reacted the way

5    we have.

6            In regard to request number four, outside of

7    the issues of this lawsuit, outside of the joint defense

8    agreement that exists, Your Honor, there were

9    transactional lawyers involved in this case in this

10   transaction who have nothing to do with this litigation.

11   So I'm assuming that the attorney/client privilege is

12   going to apply for communications between counsel inside

13   Simmons and counsel inside Peterson that were involved in

14   the transaction.  And communications between counsel for

15   Simmons and Simmons and counsel for Peterson and Peterson

16   within this transaction that still would remain

17   privileged regardless of the exist -- nonexistence of the

18   joint defense agreement.

19           I think those are my comments.  I obviously

20   adopt all of the words from Mr. McDaniel as if I had said

21   them myself.  I'd be glad to answer any questions.

22           THE COURT:  All right.  Let's move on and let

23   me hear from the state on this issue.

24           MR. BULLOCK:  Judge, let me first make a point

25   in terms of the way that we went about trying to get this

```
 1     down to core documents.  Our proposal that an index be
 2     provided appeared to be a good way to sort through some
 3     of these issues.  And while counsel says the documents
 4     don't have an index, first of all, I suppose that the
 5     documents have some type of internal categories labeled
 6     sub-parts or whatever that could create an index or that
 7     counsel could provide us with an index allowing us to
 8     sort out.  We don't have any interest in the gas company,
 9     they're absolutely right.  But we do have an interest in
10     the transfer of the live production, not merely because
11     it is solely what -- or it is what is solely in the IRW,
12     but it is important in terms of issues in this company
13     that particularly as to Peterson that counsel has on
14     numerous occasions interjected in arguments before this
15     Court and which we anticipate or believe may be offered
16     at the jury as to both the burden that this litigation
17     has posed upon this company, the small size of the
18     company operations, and all with the suggestion of a lack
19     of sophistication of you as to the scope of this
20     company's live production operations that were
21     transferred to Simmons in total, apparently, is important
22     as to all of those issues.  And so, just as a general
23     matter, I think that the relevancy of the information in
24     these documents is much broader than what counsel
25     suggests.
```

1           I'd further point out that as for their
2    suggestion as to how to resolve this and the letter which
3    the Court will find attached to their motion, there is no
4    response as to our request two, three and four.  That is,
5    they offer nothing in terms of environmental due
6    diligence, offer nothing in terms of reasons for sale and
7    offer nothing as to the facts relevant to the case
8    contained in those documents.  And as to that category,
9    counsel's right.  If it's a letter between the
10   transactional -- Peterson's transactional lawyer and
11   Peterson's board or Peterson officials, no one would
12   suggest here that we have a right to see that.  But if it
13   is a letter from Peterson's transactional lawyer to
14   Simmons' transactional lawyer relating to the facts of
15   this case, certainly we do have a right to see that
16   provided that the subject matter is relevant.  And by
17   definition, that is a relevant area for us to see and
18   they offer us nothing in that regard even though counsel
19   now says they have at least a document which does.
20           So, as I said, the asset purchase agreement,
21   since it is the transfer of all of the live production
22   including that within the IRW is on its face a relevant
23   document that we have a right to see and we're certainly
24   willing to work with the defendants in terms of narrowing
25   that so that it doesn't capture such things as transfer

1    of the gas company.

2            THE COURT:  Isn't that what Mr. McDaniel was

3    offering?

4            MR. BULLOCK:  No, I don't think that that is.

5    I mean, he very clearly said that he was -- what I read

6    his proposal was that it would be a very narrowly

7    redacted document, not merely taking out such things as

8    the gas company, but rather posing it as the narrowest of

9    offers and it was a take it or leave it type of offer.

10   That is, once you agree to this, then we have satisfied

11   it.  We did a similar -- there is also an asset purchase

12   of Willowbrook, a defendant in this case and Cargill.

13   And in that case what we did was made an agreement where

14   Cargill produced a rather heavily redacted copy of the

15   asset purchase agreement.  It did have an index, it also

16   had the subheadings.  We got all of the subheadings, some

17   of the document and with the proposal that we could go

18   forward from there once we saw what was there.  That was

19   not the nature of this -- of their offer as we read it.

20   It was a take it or leave it.  We will redact it and that

21   will satisfy your request.

22           We received nothing, as I said, in terms of the

23   environmental due diligence.  And again, that on its face

24   is something that we should have been entitled to.  And

25   when they made their offer there's no mention of that.

 1           And the other issue are the reasons for sale.

 2      That's particularly important should we meet at trial as

 3      we have met in arguments before this Court suggestions

 4      that this litigation somehow unfairly burdened this

 5      company.  I think that we have a right to know the

 6      reasons that they stated for the sale, and similarly and

 7      related to it, what did they get for it.  If you're going

 8      to claim that we caused this then the relevance would be,

 9      well, what was your operation worth.

10           And so, I believe that our request was properly

11      formed, that we worked with the defendants to meet their

12      requests and the result was a very narrow take it or

13      leave it proposal.  And we'd ask the Court to deny their

14      protective order, have them respond and provide the

15      documents as we've described here.

16           THE COURT:  All right.  Anything in response?

17      Mr. McDaniel.

18           MR. McDANIEL:  Your Honor, Peterson Farms has

19      not put at issue in this case anything that would allow

20      the plaintiffs to invade its reasoning for this sale

21      beyond the fact of whether or not it was related to this

22      case.  And as I said in my opening argument, had that

23      been the request we could have responded.  Mr. Bullock

24      has not so limited his argument.

25           The question of the burden that defending this

1    case or being a member of the poultry industry in

2    northwest Arkansas and eastern Oklahoma at times such as

3    this, the size and sophistication of Peterson Farms are

4    all issues that Peterson has responded to through its

5    presenting 30(b)(6) witnesses, et cetera, that's not

6    illuminated by this asset purchase agreement.

7         Your Honor, the reason -- and I think Mr.

8    Bullock makes one valid point and that is in my proposal

9    to them, I did not make a suggestion how to handle the

10    environmental due diligence request, so let me make that

11    clear.  And the reason that I didn't be it by oversight

12    is there are no documents in that category because the

13    only assets were chickens.  My client advises me as part

14    of the transaction there was not environmental due

15    diligence conducted of the chickens.  My client does not

16    own the farms, and therefore there was no environmental

17    due diligence of the contract poultry farms.  So there's

18    documents in that category and that's the reason that I

19    didn't have anything to propose with regard to that.

20    That's all I want to add, Your Honor.

21         THE COURT:  Was Mr. Bullock ever told that we

22    have no documents in that category, so there's no need to

23    discuss this?

24         MR. McDANIEL:  Honestly, I think not.  Because

25    I think at the time I was doing this I didn't know the

1    universe of documents.

2           THE COURT:  I mean, that would have been

3    helpful, certainly even up to this morning to convey that

4    information so that we weren't, you know, playing tennis

5    with an imaginary ball here.  That's kind of what we're

6    doing.

7           Mr. McDaniel, let me ask you something because

8    we have a confidentiality order in place with two levels

9    of confidentiality.  Now, I understand and I think I

10   agree in large part with the argument, I think you posed

11   it, that before we ever get to that issue, we've got to

12   get over the relevancy and burdensomeness hurdles.  That

13   just because there's a protective order in place, that

14   doesn't mean that everything is fair game and we can just

15   say, well, we've got a protective order so don't worry

16   about it.  We've got other issues.  It's got to go

17   through the Rule 26 analysis before we can get to the

18   protective order part of that.  But on some of this

19   material, clearly we've got that in place and I wanted to

20   ask you.  There's a provision in that order, paragraph

21   seven that says:  No party may withhold information from

22   discovery on the ground that it requires protection

23   greater than that afforded about this order unless the

24   party moves for an order providing such special

25   protection.

1     How does that provision play, if at all, into

2     this whole discussion we're having this morning?

3         MR. McDANIEL:  My reading of that order which I

4     believe the parties did stipulate to is it doesn't have

5     any bearing, Your Honor.  The reason being is the issue

6     of the confidentiality and sensitivity of the information

7     is part of the way we ask the Court to balance prejudice

8     versus probative value.  The threshold issue on these

9     requests one, two, and three is the overbreadth and that

10    there's a narrow band of information that is arguably

11    relevant, should be discoverable.  This greater bandwidth

12    that's going to be pulled in, the reason we're so

13    concerned about that is because of the confidentiality.

14    Granted, you articulated my argument better than I did.

15    If the Court orders it produced, we have a mechanism for

16    trying to protect it.  That is only going to be of

17    limited value.

18        First off, if -- I have to view this from my

19    client's perspective.  These people -- no personal

20    offense.  But these people, this client, above all is who

21    they do not want to have personal financial information

22    unless the Court specifically determines that it's

23    relevant and probative.  So the fact that they have to

24    manage it in a certain way is not much solace to my

25    client.

1          Second is, once it is outside of Peterson Farms

2     there is a mechanism for it being managed, but it doesn't

3     mean that it won't see the light of day in this

4     courtroom.  So the idea is, Your Honor, rather than put

5     our sensitive documents at risk in our opponents' hands,

6     then there should be some inquiry as to whether there is

7     any potential -- that it is discoverable, that it's

8     relevant and it meets the Rule 26 guidelines as being

9     relevant to a claim or defense.  Our position is the

10    plaintiffs have not carried the burden to expand beyond

11    that threshold and I think they have to show good cause.

12    I think the case law shows that.

13          THE COURT:  But you moved for the protective

14    order, so isn't the burden on you to show good cause for

15    a protective order?

16          MR. McDANIEL:  Well, I think we have.  I think

17    it's on the face of the request, Your Honor, because

18    regardless of who's the movant, the party propounding

19    this discovery has an obligation to narrowly craft their

20    discovery to seek the information that fits within Rule

21    26.  On its face this discovery doe not do that and we

22    believe we're entitled to relief.

23          THE COURT:  Are there aspects the asset

24    purchase agreement itself, that document itself, that you

25    contend are so sensitive that they can't be produced even

 1     under the existing confidentially order?

 2          MR. McDANIEL:  Well, to the extent Your Honor's

 3     question suggests that the confidentiality order affects

 4     discoverability, I'm not sure that's what you're

 5     suggesting.

 6          THE COURT:  Well, no.  But I don't know.  If

 7     we're going to argue the relevance part one it, I mean,

 8     one of the main reasons for the Rule 37 conferences is

 9     for you folks who know better than I the specific

10     relevance of materials in this case and you can kind of

11     hash that out and that didn't work, so you're here.  But

12     the question I guess I have is I don't know -- you've

13     said that they're entitled to know the assets that were

14     purchased.  That would be in the asset purchase

15     agreement, I assume?

16          MR. McDANIEL:  Correct.

17          THE COURT:  I'm just trying to figure out

18     what's in the asset purchase agreement itself, that

19     document itself, that would be problematic beyond that.

20     I mean, obviously, there's probably a provision in there

21     for sale of the LP Gas Company, and clearly I think the

22     understanding I hear -- I think Mr. Bullock said that

23     they have no interest in that.  So that's clearly

24     irrelevant.  But whether it necessarily requires that we

25     go through a redaction process, I don't know.

1          MR. McDANIEL:  Well, no, not on that point.  As

2     a matter of fact, even though we think there are a lot of

3     assets that are irrelevant to the case, we don't mind

4     disclosing there -- I believe there's an attachment that

5     is a general list of these operations and facilities,

6     structures, sites -- (Interrupted)

7          THE COURT:  -- Decatur, Arkansas, aren't there?

8          MR. McDANIEL:  And with the exception of the

9     gas companies, yes, that's right.

10          THE COURT:  While those buildings, et cetera,

11     are not within the Illinois River Watershed, there are

12     documents in there that relate to operations within the

13     Illinois River Watershed; isn't that fair to say?

14          MR. McDANIEL:  Documents in the buildings?

15          THE COURT:  Yes.  As I understood, and I think

16     I read some deposition testimony that someone offered --

17     maybe it was Ms. Wilkinson, to the extent describing

18     what's there, that there are files, et cetera, kept.  I

19     mean, it's not a total disconnect between what's in the

20     Decatur offices and the IRW operations?

21          MR. McDANIEL:  That's true.  In fact, the feed

22     mill produced feed that was fed to chickens in the

23     Illinois River Watershed.  There's only -- Peterson only

24     has one complex.  So, the question is if you know -- for

25     instance, if you know that the processing plant is

 1      transferred, now Simmons operates it.  If you know that

 2      that feed mill feeding those chickens is operated by

 3      Simmons, beyond that where do we go?  Now, the documents

 4      that contained within them to the extent they are

 5      Peterson's, they are still Peterson's.  Now, granted,

 6      Simmons needs certain transferred documents related to

 7      growers that transferred.  We've been all through the

 8      document discovery on the merits.  I'm not sure that's

 9      really what we're arguing about.

10          But back to the Court's prior question in the

11      asset purchase package, what else is sensitive.  The

12      price, the payment terms, how funding is to be handled

13      between the parties on both sides of the transaction I

14      think are matters that both parties feel are private.

15      Mr. Bullock makes an argument about, well, are we

16      entitled to know what it's worth, I guess we can argue

17      that.  But we're going to be here Monday talking about

18      financial disclosure and so the net worth of Simmons

19      Foods and Peterson Farms, that information is -- has been

20      produced, is being produced.  I think that's where the

21      answer to that question is to the extent that's relevant

22      to any question that will come up in this proceeding.

23          And the question the Court asked about what

24      else in there could be sensitive, I think I hit on what

25      are most important.  But what we're asking the Court to

1     do is to agree with us about what are the relevant issues

2     for the plaintiffs.  And if the Court elects not to

3     simply grant the motion as presented, if the Court wants

4     to articulate a solution, then what we'd ask the Court to

5     do is something along the lines of the proposal and that

6     is these topics are relevant for the plaintiffs and

7     Simmons and Peterson go to the APA package, go to in any

8     other documents that address these specific documents and

9     produce and that gives us something to work with.

10         THE COURT:  Okay.  Anything else on this one?

11         MR. ELROD:  Judge, in regard to the

12    confidentiality agreement between the parties, to be

13    frank with you, I don't recall whether there's a

14    mechanism within that document that permits us to keep

15    information from each other on this side of the table.

16    And on a scale of one to 10, if not wanting the state to

17    our sensitive information is nine, me not wanting them to

18    see it is a 10 which goes back to the point I made

19    earlier about the competition between these defendants in

20    the marketplace.  That's the only point I would have to

21    make.

22         THE COURT:  Anything further from the state?

23         MR. BULLOCK:  No, Your Honor.

24         THE COURT:  Okay.  Here's what I think we

25    should do on this one.  I'll grant the protective order

1    in part.  I think with respect to number one, the

2    defendants should produce any transaction documents or

3    contracts regarding the asset purchase in June of 2008,

4    including indemnification agreements, that regard the

5    assets purchased and any agreements related to the

6    liabilities of their respective parties for poultry

7    operations in the Illinois River Watershed.  That would

8    not exclude financial information.

9         MR. ELROD:  It would not exclude?

10         THE COURT:  Would not include financial

11    information.  In other words, let's let them look at the

12    asset purchase agreement and any indemnification

13    agreements or any other contracts that relate to this,

14    but limited to what's being purchased, the assets

15    purchased, and anything that involves liabilities.  Those

16    seem to be the primary concerns here.

17         Number two, any environmental reports, et

18    cetera, regarding poultry waste or poultry operations

19    that were done in connection with the June 2008 asset

20    purchase or July 2008.  In other words, not necessarily

21    limited to the IRW, although I can't imagine why

22    documents that weren't specifically related to this -- to

23    the IRW would be included in that.  But it could be

24    broader than that.  Any environmental studies that were

25    done in connection with this asset purchase that regard

1    poultry waste or poultry operations, produce those.

2          Three, if there are documents that indicate

3    that Peterson's decision to sell its poultry operations

4    in June of '08 were motivated or influenced by

5    environmental issues related to poultry operations,

6    produce those.  Mr. McDaniel has indicated that he

7    doesn't think -- he's convinced there aren't any.  But if

8    there aren't, then just say that.  We probably could have

9    skipped over that one if that's the case.

10          On number four, I want you to produce any

11    responsive documents for in camera review.  I want to

12    take a look at them.  That should give the state some

13    assurance that at least they're being looked at for

14    relevance, et cetera, whether there's privilege attaching

15    to them, whether any of that privilege may have been

16    weigh waived.  But at least there will be a review by the

17    Court and we'll determine whether or not there's anything

18    that needs to be produced.  Mr. Bullock.

19          MR. BULLOCK:  If I might just clarify, Judge,

20    did you say as to number one that it was limited to

21    assets in the IRW?

22          THE COURT:  It was limited to -- regarding the

23    assets that were purchased, all the assets purchased, and

24    so that you'll know what was purchased and what wasn't.

25    I think that's fair game.  It may be that attachment that

 1    lists everything will do that.  And any agreements

 2    related to liabilities for poultry operations.

 3            MR. BULLOCK:  All right.

 4            THE COURT:  So that's relative.  How long do

 5    you think that it will take to do that?  Can you do that

 6    within 10 days?

 7            MR. ELROD:  Yes, Your Honor.

 8            MR. McDANIEL:  Elrod can.  I'm just teasing.

 9    That's fine.

10            THE COURT:  Ten days and then the number four

11    documents produced to the Court and we'll take a look at

12    them.  Okay.  So, we'll show that Docket Number 1775 and

13    1779 are granted in part, denied in part.  Hopefully that

14    will get you along the same lines with -- apparently you

15    worked out something with Cargill and maybe this will do

16    the same thing and we can get over this one and move on

17    down the road.  This one seems like one that should have

18    been worked out before here, but I don't know the whole

19    history of this.  I'm the new guy on the block as far as

20    chicken waste goes.

21            Okay.  We've got Numbers 1853, 1854, 1857.

22    They're somewhat interrelated.  Have you folks on 1854 --

23    which is defendants' motion to compel production of

24    expert materials.  As I read these briefs, the state said

25    we produced everything but these items identifying

1    information on the survey respondents.  And you've got

2    all that and I know that there was something going back

3    and forth and there were some files that there was a

4    problem getting into.  Are we down now to that issue on

5    the materials?

6            MR. EHRICH:  If I may, Your Honor.

7            THE COURT:  Okay.  And if you would -- I guess

8    we have a court reporter here, but still if you'd speak

9    into a microphone just to make sure we've got you on tape

10   as well.

11           MR. EHRICH:  Thank you, Your Honor.  Del Ehrich

12   for Cargill.  I don't think your description is entirely

13   accurate.  I think there remains a dispute about what we

14   mean by survey respondents.  As we set forth in our

15   papers, Your Honor, the state has been at this damage

16   assessment in one form or another for more than two and a

17   half years.  So, first, they did a so called recreational

18   use intercept study.  Found people on holiday weekend

19   using the IRW, Lake Tenkillier, stopped and asked them

20   questions.  They apparently didn't like the answers to

21   those questions.  They moved on to a telephone survey.

22   They have talked to as many as 400 people.  Again, the

23   record reflects the state's experts didn't like those

24   answers.  They found that, in fact, the people they

25   talked to, you know, didn't know much about water quality

1    issues.  In fact, one of the survey authors, Ed Morey,

2    there's a note in his file that says, well, we've got to

3    educate these people on this, right?  And that led to the

4    development through multiple phases of the surveying

5    instrument that was actually identified.  I have

6    communicated with Mrs. Xidis, you know, our expectation

7    that they will have produced everything as to each step

8    in the process, and I don't think we've got an answer to

9    that question.

10         Now, as to each step in that process, we want

11   to know as well the identity of the people who are

12   contacted and the people who actually took those various

13   surveys or participated in those phases.  So in short,

14   when we talk about survey broadly speaking, we mean all

15   of those phases, and I don't know that the -- that I've

16   ever heard from the plaintiffs that they understand that

17   that's what we're asking and they've actually produced

18   all documents as to other phases.  I don't know that

19   that's happened.  Then you're correct, Your Honor, as to

20   the identity of the folks that were contacted.  The

21   universe of people contacted to participate and that

22   subset that actually did participate in these various

23   phases.  I think we are down to that question about their

24   identity, their contact information, particularly

25   addresses, telephone numbers.

 1          We also had a dispute about production of

 2     records kept, we presume, by the survey company, but

 3     maybe also by the -- some or all of the plaintiffs'

 4     testifying experts at Stratus and these various

 5     universities as to how many times these people were

 6     contacted, when, what they were offered, reasons for

 7     joining the survey or refusing.  Indeed, we've seen

 8     references in the materials to a so called record of

 9     actions or words to that effect -- there is some

10     variation -- which we believe means that whoever is

11     contacting these folks and making notes about what

12     they're told.  You know, if Mrs. Smith doesn't want to

13     participate, well, why not.  Well, they don't know.  So

14     again, that's the universe.  By no means are we talking

15     only about the identity of these respondents either

16     narrowly as I think the plaintiffs would have it or

17     broadly as we would have it.

18          THE COURT:  All right.  Well, that answers at

19     least that.  But other than the respondent, the materials

20     that you've just mentioned, there are other things, I

21     think, mentioned in one of the affidavits I saw that had

22     to do with some more technical material and I understood

23     from the state's papers that that's been provided, visual

24     aides, photographs.

25          MR. EHRICH:  We understand, Your Honor, that we

1    have received not just the final survey instrument

2    that -- (Interrupted)

3                THE COURT:  I've looked at this thing.

4                MR. EHRICH:  All 57 questions?

5                THE COURT:  I've looked at most all of it.  I

6    can't say that I've read every word, but I've looked at

7    the scope of the development phase and the focus group

8    phase and the one-on-one phase and all that sort of

9    thing.  So I've got some, at least, passing familiarity

10   with what we're talking about here.  There's a lot of

11   information there.  In fact, on one hand you folks say,

12   gosh, we've gotten so much information that we can't

13   respond to it timely, and then on the other hand say we

14   need more information.  So I'm a little curious as to are

15   you asking -- be careful what you ask for.  If you can't

16   handle what's already been provided, how far out are we

17   ultimately going to look on this?  Because I will tell

18   you this much, that Judge Frizzell is pretty adamant

19   about wanting to make sure that this case is ready for

20   trial in September.

21                MR. EHRICH:  I understand, Your Honor.  And

22   certainly we are not suggesting here that a grant of an

23   extension for the damages expert deadline will affect

24   that trial date.  In fact, we believe that working

25   together we can accomplish what needs to happen.  I will

1    note that -- (Interrupted)

2            THE COURT:  The date you're proposing right now

3    is past the discovery cutoff by a month and a half.

4    Probably not that -- yes, about a month and a half.

5            MR. EHRICH:  If I may, Your Honor, we already

6    previously -- the Court has already entered orders

7    allowing for additional liability reports due at the end

8    of May for so called spring sampling.  And we will all

9    just have to work out how that works.

10           THE COURT:  Is that new reports or is that

11   supplementation?

12           MR. EHRICH:  Well, frankly, it depends on what

13   happens.  I mean, it may be -- I mean, I don't know that

14   it makes much difference.  We asked for the opportunity

15   to sample in spring because the plaintiffs' contention is

16   that it is the spring rains which caused runoff which

17   caused litter constituents to flow into the Illinois

18   River.  And we would not have had under the existing

19   orders at the time the opportunity to do if we wanted to

20   our own spring sampling.  So a number of our liability

21   and causation experts who have been disclosed either

22   December 1 or January 30 may have, may have, additional

23   reports, and if that's happens, we will simply have to

24   deal with it.  We would presume that we would put those

25   experts up for deposition, we produce all the considered

1    material, and we just -- we would work it out.  And if we

2    needed the Court's assistance to accommodate some of

3    those deadlines for certain subsets of information, we

4    would do that.

5            Let me point this out as well, Your Honor.  If

6    one does a little archeology on this damage deadline, you

7    will find that the defendants really from the initial

8    conference with the Court expressed concern about the

9    length of time that might be required to respond to

10   plaintiffs' damage experts.  Now, you know that a number

11   of the pretrial deadlines have already been extended and

12   I think it is fair to say, or at least my recollection

13   is, that whenever those issues came up before the Court,

14   we would note, yes, but there's the damage deadline as

15   well.  It's only 60 days, that might not be enough.  And

16   the Court noted that but kept the deadline.  Obviously a

17   prudent management of the docket.  Maybe some time is

18   necessary, maybe it isn't.  But that record wasn't

19   developed.

20           In addition, I would suggest that these

21   defendants have done what they could do to prevent today

22   from ever happening.  I mean, as far back as 2006, I know

23   Cargill and I believe other defendants as well have asked

24   damage interrogatories and corresponding document

25   requests.  Tell me what your damages are.  Tell me what

1    documents you have.  How do you calculate them.  And the

2    responses were what you might expect.  Well, that's the

3    subject of expert testimony.  The pretrial deadlines are

4    set by the Court order.  You'll get it when you get it.

5    Okay.

6          So, the other thing I would add is this seems

7    to be a suggestion by the plaintiffs in their brief, that

8    we should somehow have been anticipating this.  Well, if

9    we were supposed to anticipate it, then with all due

10   respect, so were they.  They didn't submit a supplement

11   to the interrogatory answers that I've just described.

12   So if they hadn't yet arrived at any understanding, any

13   conclusions, what should we have arrived at?

14         I would also say that in this realm of valuing

15   so called natural resource damages there are many, many

16   ways at least theoretically -- I'm not saying that

17   they're all reliable -- but at least theoretically to do

18   this.  Indeed, the plaintiffs' record suggests that they

19   did try a number of ways.  I spent, Your Honor, a lot of

20   time with our natural resource damage economist and it's

21   severely taxing my, you know, undergraduate economics

22   degree, but I'll do my best.

23         Basically there are ways to value natural

24   resource injuries or injuries to natural resources that

25   are, what, revealed.  Revealed preferences.  That is, you

1      can measure how people deal with these resources.  So

2      markets might be one thing.  Where there is a market,

3      actions speak louder than words.  Willing buyer, willing

4      seller.  There are other techniques.  One could go about

5      measuring the use of the various resources in this

6      watershed and in Lake Tenkillier.  How many people fish?

7      How many people rent cabins?  How many people participate

8      in the bass fishing tournament?  You could do that.  And

9      indeed, the Army Corps of Engineers collects, keeps a lot

10     of that data.  That's not what they did.  You could do

11     what they did in the Residential Intercept Study, that is

12     actually go to people using various resources in the

13     watershed in 2006 and try to gauge, you know, what you're

14     seeing.  You could also do a telephone survey.  Again,

15     try to gauge what people's actions actually are with

16     respect to the resources in the watershed.

17          So I guess a couple points.  One point is how

18     were we, the defendants, to anticipate what the

19     plaintiffs' experts ultimately would do recognizing that

20     we were told by the plaintiffs in their answers -- their

21     answers to our interrogatories that this would all be

22     subject to the expert testimony.  So how would we

23     anticipate that?

24          The other point, I think, is relevant to the

25     length of time necessary.  After the plaintiffs' experts

1    concluded, presumably, that they couldn't make use of

2    this -- these direct measurements, these use

3    measurements, they turned to developing contingent

4    valuation methods which are essentially hypotheticals.

5    There isn't any -- there's no way to measure, you know,

6    actual transactions, actual use.  You go out and you ask

7    people what their stated preferences are and those depend

8    entirely on what's stated in the survey instrument.  And

9    you will see, Your Honor, in fact, you've referenced it,

10   the state took tremendous pains to tweak and to test and

11   to sample.  They had one-on-one interviews with people.

12   We don't know who they are.  Want to know --

13   (Interrupted)

14           THE COURT:  The one-on-one interviews were to

15   develop the questionnaire.

16           MR. EHRICH:  To development the questionnaire,

17   that's right.  Focus groups, they pretest --

18   (Interrupted)

19           THE COURT:  But the people whose input was

20   gained in that one-on-one interview, that wasn't part of

21   the ultimate survey on which the damage calculation is

22   based.

23           MR. EHRICH:  Well, I disagree with that,

24   because presumably they did that because they wanted to

25   test how descriptions of the watershed, the baseline

1     conditions, what the injuries are, what caused the

2     injuries, what the restoration may be, how long it may

3     take and then what people would value an enhanced

4     restoration.  They wanted to test all those things.  So

5     they needed to do that in order to, we say -- I'll be

6     blunt about this -- we say to get the answers that they

7     hoped for.  It's like Dr. Morey said, if there's going to

8     be significant damages we've got to educate these people.

9     So, this is all of the people that they talked to in

10    order to tweak and to test and to design the study to

11    accomplish what they wanted to accomplish are part of the

12    process and part of the methodology.

13           Now, you're right.  There are folks who

14    ultimately took the survey and you've seen the cards,

15    you've seen the script.  What we don't have is the

16    information about the people who refused.  And our

17    economists say non-response bias is critical.  You have

18    to know why people didn't take the survey.  We think the

19    list of actions that I've referred to before, I envision

20    that as kind of category on some spreadsheet somewhere,

21    some database somewhere, that's going to be critical to

22    us to evaluate in order to determine why people didn't

23    want to do the survey, take the survey.

24           THE COURT:  Plaintiffs' experts say they don't

25    know -- no way to use this respondent information on that

1     kind of non-response bias, don't they?

2          MR. EHRICH:  They do.  But with all due

3     respect, they -- well, what they say is they know of no

4     reason why you would need the identity of those persons

5     in order to do that.  But what they don't tell you and

6     what Dr. Desvousges, our expert, says is, well, you need

7     the identity of the people so that you can do two things.

8     One, the least important thing, you can gain some more

9     demographic information.  That's why you need to know

10    where people live.  But beyond that, you know, you need

11    potentially to contact these people to conduct perhaps

12    the same sort of things that the plaintiffs did.  If you

13    changed X to Y, does that change the result?

14          I'll give you an example.  We know -- you've

15    seen it.  In the survey respondents are told the Court

16    will enter an injunction stopping poultry litter from

17    being applied.  Well, our natural resource damage

18    economist because of 30 years of doing this says, well,

19    look, I can tell you from my experience that that's a

20    signal, that is a signal for respondents that there is

21    something wrong with poultry litter application.  It

22    biases the response, and I'll note that, in fact, in the

23    survey you don't find a description of the legal

24    structure, the regulatory structure, that's been in place

25    in the state for more than 10 years.  You don't find

1      that.  So, he can tell those sort of things.  But again,

2      you can't entirely measure it without actually going to

3      the respondents, and that's what the plaintiffs' experts,

4      Krosnick and Tourangeau say, are not telling you.  They

5      sort of ruled out resurveying.  What they say is, oh,

6      just knowing that contact information won't tell you.

7      Well, you know, in a narrow sense that's probably right.

8      But they're ruling out using that contact information to

9      actually go and talk to people and potentially resurvey

10     them.

11          At bottom here's what -- I've struggled with

12     this, and here's the concept I've come up with.  Judge,

13     in many ways this is not a new issue for this Court.  In

14     2006 the state sought leave to conduct expedited

15     sampling, environmental sampling, and generated mountains

16     of data.  We were getting none of that.

17          THE COURT:  That was the sampling on the

18     mineral content or pollution content of the --

19     (Interrupted)

20          MR. EHRICH:  Correct.  Eventually we moved

21     compel and the Court entered the January 5th, 2007 order

22     and essentially said, you know what, data are facts.

23     Data are facts.  Data have to be disclosed.  There's no

24     work product protection, or if there is, well, you've

25     waived it because, state, you put this at issue.  I'm

1    shorthanding here, Judge.  Well, what the state has been

2    engaged in for the last two and a half years on the

3    damage side is generating facts, generating responses

4    from people.  And there is no -- there's no principled

5    reason why these responses should be considered something

6    other than facts.

7            THE COURT:  You've got the responses.

8            MR. EHRICH:  Well, we do -- well, yes, in part

9    we know we've got what the responses are.  But here's

10   what I'm getting at, Your Honor.  This is not the same --

11   if there's a difference, it's this difference.  Whereas

12   you go out to a stream, you know, pluck up a grab sample,

13   bottle it up, send it to the lab.  In this case you've

14   got real people, you know, living, breathing human beings

15   who are responding to questions designed over a course of

16   years by state experts and, yes, they're running the

17   script.  But remember, that script's been designed,

18   frankly, to elicit responses and the script itself allows

19   for the interviewer to react to interaction with the

20   subject.

21           THE COURT:  All of which would be material for

22   your -- (Interrupted)

23           MR. EHRICH:  Exactly.  So this is --

24   (Interrupted)

25           THE COURT:  -- you haven't.

1          MR. EHRICH:  Well, we -- well, but we don't

2     have those responses entirely and we are being precluded

3     from going out because we don't who the survey

4     respondents are.  We can't go out and re-interview those

5     folks.  If you change X, does -- you know, if you change

6     X do you get Y, or what do you get.

7          THE COURT:  What if you went out and did your

8     own survey?

9          MR. EHRICH:  Well, that's what I'm talking --

10    (Interrupted)

11         THE COURT:  You mean of -- you know, admittedly

12    it's perhaps a different pool of people, but a similar

13    sort of survey.

14         MR. EHRICH:  Well, for one thing, it's not

15    uncommon in this industry to resurvey the same folks.

16    From another -- let me pose this thought experiment.

17    Without going out and asking these folks, how do we know

18    that these survey respondents weren't chosen to be

19    friends, relatives, political supporters of the attorney

20    general?  I mean, I think that's a bit ridiculous, but I

21    think there's a point there that the responses generated

22    by this set of people at bottom are the basis for a $600

23    million claim.  And what the state's really saying is

24    that we shouldn't be allowed to go out and contact those

25    folks potentially, resurvey them, test their methodology,

1    figure out what the interaction was.  Again, Mrs. Smith,

2    now, don't you know that those evil poultry companies did

3    this.  Well, yes.  So yes gets recorded.  How do we know,

4    how do we get at, the rest of this communication, Your

5    Honor?  That's what we're talking about.

6         I will note this:  The defendant or the

7    plaintiffs and certainly the amicus rather piously admit

8    that -- or rather piously say, well, you know what, this

9    is all so terribly important.  The republic will fall if

10   survey company -- these polling organizations, you know,

11   have to give up the identity of their respondents.  Well,

12   I've got a couple responses.  One is that the plaintiffs'

13   experts discussed whether they should offer promises of

14   confidentiality to these respondents and they decided not

15   to.  That's the fundamental flaw in the amicus brief,

16   Your Honor.  Repeatedly it makes assertions that these

17   respondents were given promises of confidentiality.  No,

18   they weren't.  There is also no inherent privilege

19   surveyor and the surveyed as the amicus correctly

20   concedes.  So, even the plaintiffs' experts didn't think

21   up front that they should offer confidentiality, so why

22   are they getting out to cloak a survey that is not done

23   for arguably noble causes such as political polling or,

24   you know, trying to figure out what the latest fragrance

25   out to be for the latest brand of soap?  This is purely

1    private litigation.  And you know, we ought to be -- we

2    the defendants who are alleged to have cause in excess of

3    $600 million of damages ought to be allowed to contact

4    these folks and determine in part the basis for those

5    claims.  That's at the heart of our motion.

6           Now, back to your original question about the

7    extension of time.  This was an enormous effort, and

8    enormous undertaking by the plaintiffs.  Two and a half

9    years, 75 people involved, seven experts, three polling

10   companies.  Our expert says, boy, you know, if you gave

11   me that assignment, that would probably cost four and a

12   half million dollars.  We did what we could do to protect

13   ourselves with the answers, we expressed skepticism

14   before, we couldn't have anticipated this, and when we

15   got the material we have been running as hard as we can.

16           If Your Honor chooses -- and I hope you

17   don't -- chooses to keep the deadline at March 2nd, well,

18   you know, we will do the best we can.  We'll have many

19   cogent critiques.  But if we have more time, we will more

20   fully critique, take apart, these analyses.  And if we

21   get the opportunity to talk to the survey respondents

22   every step of the way and decide actually to do that, you

23   know, we will have one heck of a report by June 2nd.

24           Now, I think it fair to characterize the

25   plaintiffs' response in part as, well, these folks just

1    want to go out and harass these people.  I may overstate,

2    if I do they'll correct me.  But nothing could be further

3    from the truth.  You know, the information you get from

4    these respondents is only probative if it's put in the

5    context that an economist, you know, familiar with

6    polling would -- you know, would say is reasonable.

7    Right.  You know, polling one out of the 3,000 people who

8    were contacted and Mrs. Smith says I was brow-beaten by,

9    you know, these interviewers, well, you know, that has

10   marginal relevance, maybe use that cross examine some of

11   these folks, but it's got marginal relevance.  If you

12   asked 500 and they all had that same story, maybe

13   different.

14          So, you know, we certainly do not have any

15   intent to harass, to oppress, to pursue folks.  And I

16   offer you this promise:  We will do it -- we will cause

17   no more inconvenience to the folks than the plaintiffs'

18   expert did.  You've seen the survey.  These folks were

19   pursued with advance letters promising 20 bucks to take

20   the survey.  They were pursued with screeners who would

21   show up on their doorstep who would give them an initial

22   survey and then if they passed that they would give them

23   a full survey.  Up to 30 minutes.  I mean, this is not

24   the Gallup polling company calling on October 31, you

25   know, spending seven minutes trying to determine which

1    presidential candidate you're going talk to.  I mean,

2    this was a major, major undertaking and a major

3    inconvenience for those folks.  And so, the notion that

4    we would do anything more -- frankly would do less.  But

5    if we would do anything more, it just doesn't -- it just

6    has no merit.

7            So, Your Honor, we're asking for an extension

8    to June 2nd.  We will work to accommodate ourselves to

9    those deadlines.  We think that it can be done.  We think

10   it's already in the schedule given we've got May 30 as a

11   deadline for other liability experts.  There isn't any

12   confidentiality here.  No promise of confidentiality, no

13   inherent privilege.  These polling companies, you know,

14   on whose behalf the plaintiffs have sought a protective

15   order, Westat, Consumer Logic, you know, are part of this

16   team.  They're not consulting experts.  They've got no

17   ability to say you can't see the data that I generate

18   including how I dealt with this pool of prospective

19   interviews and their respondents.  And so, that ought to

20   be ordered to be produced as well if it hasn't been

21   already.  I'm happy to take questions, Your Honor.

22           THE COURT:  Well, let me hear from the state.

23           Ms. Moll, is that right?

24           MS. MOLL:  Yes, Moll.  May it please the Court.

25   Ingrid Moll on behalf of the State of Oklahoma.  You're

1    quite right, Your Honor, that these motions are

2    intertwined, so if you'll bear with me, I'd like to start

3    on the motion to compel that the defendants filed.

4         I will put aside for now Mr. Ehrich's

5    speculations about how these state's experts felt after

6    the recreation study and telephone survey after those

7    were done.  That is the subject of deposition testimony

8    whenever the experts are actually deposed.

9         But let me address the question that Your Honor

10   started with which was:  Is there anything really here to

11   your motion to compel.  And I'll steal the phrase you

12   used earlier about playing tennis with an imaginary ball.

13   If the motion were granted, I don't know what I would

14   produce.  Quite frankly, I don't know how to say it any

15   differently or any more times to the defendants that we

16   have produced all materials considered by the authors of

17   what we call the CV report.  They have everything that

18   the authors considered.  To the extent that there were

19   very narrow pieces of information relating to participant

20   identities that were in the hands of the authors, they

21   have it.  It's not as though we're sitting on a few boxes

22   of material and simply refused to produce it.  So with

23   respect to the motion to compel the state -- obviously,

24   because I don't know what we would produce --

25   respectively request that the Court deny that motion.

1            Then of course, part of the motion also

2    incorporates their request for more time.  But when you

3    seek an extension to some piece of a scheduling order,

4    you obviously have to have good cause.  Rule 16 requires

5    it.  This Court has previously said in an order from last

6    summer which we quote in our papers that an extension

7    will only be granted if there's unforeseeable good cause.

8    And good cause, that standard, of course, implicates the

9    principle that the party seeking an extension has

10    exercised due diligence but simply cannot reasonably meet

11    the deadline.  So, let me make just a couple points on

12    the issue of whether the defendants have made a good

13    effort, good faith effort, to even attempt to comply with

14    the March 2nd deadline and I respectfully suggest that

15    they have not.

16            First, with regard to deposition scheduling, as

17    the Court's aware, there are seven authors to the CV

18    report that was produced on January 5 of this year.  One

19    month past, and on the issue of scheduling depos the

20    defendants were radio silent.  So realizing that their

21    deadline was one month away, the state took it upon

22    itself with -- unusual to, you know, try to help out the

23    other side to put depositions together on their own

24    behalf, but we did.  And so, one month later on February

25    3rd having heard nothing from them on the issue of

1    scheduling the depositions of these seven people, who as

2    the Court can understand, have busy schedules as well and

3    a lot of moving pieces here, we put together a proposed

4    schedule, gave that to the defendants and said let us

5    know if you'd like to take us up on any of these dates.

6    There was an e-mail exchange that didn't have much

7    substance to it and there was never any attempt to

8    schedule even one of the seven depositions, and to my

9    knowledge to date, there's been no attempt to do it and

10   March 2nd is just a few days away.

11          Also, on the issue of the non-party subpoenas

12   that Your Honor has read about in the papers, the

13   defendants are, at least the Tyson defendants, issued

14   three subpoenas to Westat, Consumer Logic and Wilson

15   Research to get, among other things, the respondents'

16   identities.  The three parties have retained separate

17   counsel and separately but timely objected to the

18   subpoenas on various grounds, but including the issue of

19   confidentiality of the respondents' identities.  There

20   has been no attempt by the defendants, at least up until

21   Monday, to contact any of the three subpoenaed parties to

22   meet and confer over their objections.  But in any event,

23   the state obviously moved for a protective order to

24   preclude any further disclosure of that confidential

25   information and to prevent the defendants from contacting

1     these people to the extent that they might have bits and

2     pieces of information relating to -- (Interrupted)

3                THE COURT:  -- confidential, why was the

4     confidentiality clause taken out of this agreement that's

5     been referenced?

6                MS. MOLL:  As Your Honor is aware, there was

7     some discussion among the experts as to whether an

8     expressed guaranty of confidentiality should go into the

9     this survey.  And the decision was made that as a matter

10    of survey ethics, that it should not go in even where

11    there was a remote possibility that one day a Court might

12    order their identities disclosed.  So the decision was

13    made, I believe I can safely say, as a matter of survey

14    ethics.  But on that point, that shouldn't change the

15    Court's conclusion, and let me tell you why.

16                The CASRO and AAPOR Standards governing survey

17    ethics, as you know, they have strict requirements of

18    keeping that information confidential, and we cite to the

19    specific provisions.  But the point is that that

20    requirement of confidentiality does not hinge on whether

21    the respondent was guaranteed confidentiality by the

22    interviewer.  Instead, these standards make clear that

23    confidentiality is to be preserved unless -- and this is

24    very important -- unless the respondent expressly

25    consents to the disclosure of their identifying

1    information.  So you cannot infer from the lack of an

2    expressed guaranty by the interviewer of confidentiality

3    that the respondent has expressly consented to further

4    use of their identifying information.

5          THE COURT:  Were they given that option?  Were

6    they given that opportunity to expressly consent to

7    disclosure?

8          MS. MOLL:  I don't believe -- (Interrupted)

9          THE COURT:  -- was not even mentioned.

10          MS. MOLL:  I don't believe it was mentioned,

11   but certainly there's no suggestion that any expressed

12   consent was given.

13          Let me address another point that Mr. Ehrich

14   raised that they don't intend to use the information or

15   correspond with these people any more than the state's

16   experts and their independent contractors did.  To me

17   that is just not credible.  Last week the defendants

18   submitted the joint fact witnesses list for trial.  And

19   on that list of witnesses that they intend to call at

20   trial, or at least reserve the right to call at trial, on

21   page 38 of that is the category of survey respondents of

22   the Stratus Consulting damages survey.  The notion that

23   these people are now going to be re-interviewed which the

24   two survey experts for the state, Drs. Tourangeau and

25   Krosnick, have said, you know, there is no standard

1    procedure in survey research that requires

2    re-interviewing, or quite frankly, permits it.  But the

3    notion that these people are now going to be

4    re-interviewed and if defendants' fact witness list is

5    going to play out, subpoenaed for trial, potentially

6    deposed and hailed into federal court I would suggest is

7    going beyond what the state has done and is the -- at

8    least at a minimum, one of the very reasons why the state

9    is seeking a protective order to protect these people.

10          Speaking further on the issue of the timeliness

11    of the production of considered materials.  Throughout

12    the defendants' submissions there are suggestions that

13    the state did not comply with the January 5 deadline in

14    the scheduling order.  Let me take that in a few pieces.

15    First, they suggest that we should have produced

16    materials up and to January 5.  We note in footnote nine

17    of our opposition to the motion to compel that they at

18    least knew about the survey last summer.  But in any

19    event, the scheduling order is what it is.  The deadline

20    was set for January 5 and the state complied with it.

21    The defendants are correct that there was a supplemental

22    production on January 8th, but that should not take a

23    life on its own.  That production was a very limited

24    production of e-mails that were exchanged among the

25    experts in the very days leading up to January 5.  So I

1    think the Court can appreciate just the logistical issues

2    that go into gathering the documents of seven authors and

3    preparing them for production.  So it cannot be said that

4    in the three days between January 5 and January 8th there

5    was any prejudice to the defendants resulting from that

6    supplemental production.  That production also included

7    some e-mail attachments for which there were some

8    technical issues which is beyond my expertise.  But in

9    any event, some technical issue arose because of some

10   university e-mail systems and some constraints there.

11        THE COURT:  In other words, whether the

12   defendants would have access to files that were, I think,

13   attached, is that right?

14        MS. MOLL:  Not whether they were attached, but

15   our ability to obtain them and produce them.

16        THE COURT:  Right.  Then there was an issue, I

17   thought, about a corrupted file or some such thing and

18   that ultimately the final production of this material

19   occurred on, I think, February 3rd is what I read.

20        MS. MOLL:  I think that date is correct, Your

21   Honor.  And defendants' statement that, you know,

22   defendants -- that the state's compliance with that

23   January 5 deadline wasn't -- you know, didn't occur for a

24   month after is misleading, quite frankly.  The one file

25   that was produced at the beginning of February was a file

 1    that had some kind of electronic formatting or corruption

 2    problem with it completely unbeknownst to the experts and

 3    the state.  And when it was brought to our attention we

 4    rectified immediately -- (Interrupted)

 5            THE COURT:  How much material are we talking

 6    about -- (Interrupted)

 7            MS. MOLL:  I think it was 20 or so page article

 8    and that's it.  And then they also make an issue about

 9    the password protected files.  This is another

10    nonstarter.  They complain that they didn't have access

11    to certain files.  As soon as we realized that certain

12    files remain password protected, we provided those

13    passwords, but we pointed out at the time that they had

14    the exact same files on January 5 in an un-password

15    protected format so they didn't receive anything new at

16    the end of January.  So there's simply no prejudice that

17    has resulted from any of these, you know, kind of garden

18    variety discovery issues when you're talking about a

19    massive production.

20            I think even more importantly or as importantly

21    as to what I just said, the notion that the remaining

22    deadlines in this scheduling order will remain unchanged.

23    I think that too lacks credibility.  Your Honor pointed

24    out earlier that discovery is set to cut off on April

25    16th.  We have dispositive motions due May 18th and

1    exchange of exhibits and deposition designations due on

2    June 1st.  These are all things that are supposed to

3    occur before their proposed June 2nd deadline.  I don't

4    know how that can occur.  And also, you know, motions in

5    limine are due July 6th.  Obviously after they disclose

6    their experts and produce whatever reports they're going

7    to produce, the state needs some, you know, reasonable

8    amount of time to review the document production, depose

9    these people.

10             THE COURT:  That July 6th in limine deadline,

11    is that -- I don't recall from looking at the schedule.

12    Does that include Daubert motions or is there anything

13    built into the schedule for the Daubert process?

14             MS. MOLL:  Your Honor, frankly, I'm not sure

15    about whether the scheduling order expressly identifies a

16    deadline for Daubert.

17             MR. EHRICH:  Your Honor, if I may.  It doesn't

18    talk about Daubert motions.  July 6th is the motion in

19    limine deadline which I guess we -- (Interrupted)

20             THE COURT:  Would include that.  Okay.  I

21    figured it's got to be in there one place or another, but

22    I didn't know whether there was a specific Daubert

23    deadline or whether it probably was rolled into the in

24    limine deadline.

25             MS. MOLL:  So those are my comments on the

1    motion for extension of time.

2         THE COURT:  One of the defendants' arguments

3    here, Ms. Moll, is that, gosh, you produced so much stuff

4    on January 5th that you took two-and-a-half years to do

5    all this and how are we supposed to respond to that in

6    sixty days, which maybe is an issue that could have been

7    addressed earlier.  But in that event, it's one of the

8    arguments that's put before us today.  Now, I don't

9    imagine that the defendants would be arguing that since

10   it took you two or two-and-a-half years to produce your

11   survey that they get two to two-and-a-half years to

12   respond to it because certainly that's a no-brainer.  But

13   how do you respond to their statement that, gosh, sixty

14   days isn't enough time to respond to all this when we've

15   12 gigs of information and data, and by the way, we want

16   a lot more?

17        MS. MOLL:  A couple points, Your Honor.  As I

18   mentioned before, the defendants knew that this survey

19   was going on at least as early as last summer.

20        THE COURT:  Did they know what kind of survey

21   was going on?

22        MS. MOLL:  That had a draft at the time.

23        THE COURT:  A draft of the CV survey?

24        MS. MOLL:  Correct.  And we highlight that, I

25   believe, in footnote nine of our opposition to the motion

1    to compel.  And simultaneously, they certainly could have

2    engaged in implementing their own survey.  So it should

3    be no surprise or should have been no surprise that the

4    production in January was going to be voluminous when

5    you're talking about a case like this.

6          But in any event, the scheduling order has been

7    in place for quite some time and to my knowledge the

8    defendants did not object to the two month period of time

9    when it was put into place.  And I guess my main point is

10   this should not have come as a surprise.  This is not,

11   you know, a group of defendants that is without an army

12   of counsel.  And as Mr. Ehrich has already said, they've

13   already put some cogent arguments together, I guess if

14   the March deadline stays in place.  And just from the

15   exchanges that we have had with defense counsel about the

16   quality of the production, certain concerns they have, it

17   certainly seems that they've made good headway.  So,

18   those are my comments on that.

19         If I could speak to the state's motion for

20   protective order because we got into the issue of the

21   confidential nature of the survey respondents' identities

22   with Your Honor's --

23              THE COURT:  Sure.

24              MS. MOLL:  Thank you.  As Your Honor knows, the

25   state has filed for a protective order under Rule 26(c).

```
 1    I need not repeat the standard.  Your Honor is certainly
 2    well familiar with it.  So it all comes down to a
 3    weighing of interests.  I think the state in its
 4    submittal has shown that this information concerning
 5    respondent identities is certainly of a confidential
 6    nature even in the absence of an expressed promise of
 7    confidentiality given to the respondents.  And we've
 8    cited a number of sources that reflect a presumption
 9    against disclosure.  The first, of course, is the Federal
10    Judicial Center Reference Manual On Scientific Evidence.
11    I won't repeat what we've quoted on page 10 of our
12    motion.  But it's compelling and it instructs that even
13    in the context of litigation that this information is to
14    remain confidential.  We've also cited the Professional
15    Standards Governing Survey Researchers by the two leading
16    professional survey research associations, AAPOR and
17    CASRO, who, of course, have submitted an amicus brief.
18    And I'll just highlight one thing that occurs or appears
19    in their brief on page one.  The amicus state:  Mandating
20    the disclosure of respondent identifiable information
21    would be devastating to all forms of survey research and
22    contrary to public interest.  The reliability of any
23    survey evidence may be fully and fairly litigated by the
24    parties without infringing upon the privacy of survey
25    respondents and without threatening important social
```

1      interests advanced by survey research.

2            We've also cited a number of cases where courts

3      have refused to permit the disclosure of respondent

4      identities and so this is not, you know, completely

5      unchartered territory.  And of course, the subpoenaed

6      parties have also objected to producing this information

7      and their objections have been attached at Exhibit F to

8      our motion.

9            I've spoken about the issue of the fact that

10     promises of confidentiality were not made, but as I

11     mentioned, the standards clearly say that disclosure

12     really is only to occur if the respondent him or herself

13     expressly grants such disclosure.

14           I would just note one thing on the issue of the

15     fact that there's no promise of confidentiality that was

16     given to these folks.  The 11th Circuit Court of Appeals

17     in the Farnsworth case that we cited prohibited

18     disclosure of that information even in the absence of a

19     promise of confidentiality and the states urges the Court

20     to enter a similar order.

21           I'm happy to take any questions.  Otherwise,

22     the state requests that the Court grant the protective

23     order requested.

24           THE COURT:  Let's take a short break at this

25     point, 10 minutes or so.  You can stretch your legs, go

1    to the restroom.  Then we'll come back and I'll give the

2    defendants here an opportunity to respond.

3             (Whereupon, a short recess was held after which

4    the following record was made.)

5             THE COURT:  Ms. Moll, let me ask you one other

6    question that occurred to me during the break.  The

7    defendants have said, well, there was this Intercept

8    Study and there was a telephone survey and that those

9    things didn't work out so then we went to the CV survey.

10   And what I'm unclear about having read the papers is

11   whether the Intercept survey -- is that the right word?

12            MS. MOLL:  Intercept Study.

13            THE COURT:  Intercept Study was meant to be --

14   to culminate in an expert report if all things went well.

15   And was the telephone survey supposed to culminate in

16   your expert report if all went well or were those two

17   things sort of preliminary steps on the road toward

18   developing and doing the CV survey?

19            MS. MOLL:  My understanding, Your Honor, is

20   that those two activities were engaged in by the experts

21   as precursors to what was eventually arrived at.  It was

22   preliminary in its nature.  It was not as the defendants

23   would suggest, you know, they did these things and then

24   didn't like the results so they tried something new.

25   That's not correct.

```
 1              THE COURT:  I just wanted to clear that up.
 2     I'll hear from the defendants.
 3              MR. EHRICH:  Thank you, Your Honor.  Del Ehrich
 4     for the Cargill defendants.  The state has pointed to the
 5     existing deadlines as an impediment to this Court's
 6     granting an extension of the March 2nd deadline.  In my
 7     remarks I talked about archeology.  That is, the
 8     defendants have been concerned about the narrow gap
 9     between the plaintiffs' disclose and the defendants'
10     disclosure almost from the beginning.  If you go back to
11     the Rule 26(f) reports you'll see that.  But it occurred
12     to me in listening to the state's remarks I should also
13     have added this:  That is, we're squashed up against the
14     discovery deadline and the dispositive motion deadline
15     because the state requested and got an extension of the
16     case management order deadlines this Court originally
17     set.  Back in December of 2007 there's an order issued
18     extending the expert disclosure deadlines, some of the
19     other interim deadlines.  This damage deadline was first
20     set December 1 to something like 2007.  And in --
21     (Interrupted)
22              THE COURT:  How much time -- in that order how
23     much time was there allowed between the provision of the
24     damage report and your expert response?
25              MR. EHRICH:  My recollection is, Your Honor,
```

1    that early February of 2008 was supposed to be the damage

2    -- (Interrupted)

3            THE COURT:  So basically the same -- I mean,

4    the same two month period?

5            MR. EHRICH:  And so, what the Court did in that

6    December of 2007 order was to move the liability --

7    plaintiffs' liability -- expert deadline to, if memory

8    serves, the end of March, kicked out the damage deadline

9    to January 5th.  Now, as it happens, the state also

10   requested and obtained additional extensions to their

11   expert deadlines so that the liability expert deadlines

12   became May 15th, May 30th for some of them, and then the

13   Court may be aware that this fall we spent a great deal

14   of time on the effect of the plaintiffs' so called errata

15   for their liability experts which moved some of the

16   liability deadlines.  So I mean, the point is, if we're

17   squashed up against these deadlines, it's largely because

18   the Court at the plaintiffs' insistence moved that

19   deadline to January 5th.  That's point one.  Point two.

20           THE COURT:  But at the same time moved your

21   response, obviously, to -- (Interrupted)

22           MR. EHRICH:  That's correct.  But the same 60

23   days.  And that actually leads me to my next point.  You

24   know, the state says that, well, we could have been

25   aware, we should have been aware or maybe we were aware

1    that the state is working on expert damage reports.

2    Well, of course we were.  I mean, they answered our

3    interrogatories and said this is for expert testimony.

4    You'll get it when you get it.  The suggestion also seems

5    to be because they stuck in a draft of the CV survey

6    instrument into the considered materials of one of their

7    liability experts, Dr. Stevenson, that we should somehow

8    have seen that and said I know what they're going to do,

9    we're going to have a $600 million claim.  Well, just

10    stating it that way just illustrates how ridiculous that

11    is.  But it also -- there's a serious point here, too,

12    another serious point, and that is if we were supposed to

13    conclude something from the fact that there is this

14    stray, you know, document stuck in the considered

15    material of a liability expert as meaning something, then

16    so should they have known.  They should have supplemented

17    their interrogatory answers and told us what they now

18    think we should have known.  Of course, they didn't.

19        So the fact is there's many, many ways to value

20    damages.  Defendants, you know, are typically not

21    required to make a damage evaluation before they see the

22    plaintiff's.  And so, when we saw that evaluation on

23    January 5th we have been running as hard as we can.

24        Just a couple of other points, Your Honor, and

25    then I will sit down.  I'm concerned that the plaintiff

```
 1     appears to be conflating, if you will, or maybe confusing
 2     confidentiality with privilege.  Now, the amicus says
 3     there ought to be privilege, there ought to be privilege,
 4     for a surveyor, you know, pulling -- and they're honest
 5     and they say, well, it doesn't exist now.  The state
 6     though seems to be saying because something is
 7     confidential it shouldn't be produced.  Well, we already
 8     have a confidentiality order here.  We spent part of the
 9     morning talking about how to protect confidential
10     business information, competitive information on Peterson
11     and Simmons.  So you know, as I understood that argument
12     these folks were saying not that it is privileged in some
13     sense, might be in a joint defense privilege, but just
14     the fact that it was confidential business information
15     didn't by itself mean it couldn't be disclosed.  So
16     likewise here, the identities of the respondents, you
17     know, they're not privileged in any sense.  Maybe this
18     Court should enter some order -- and indeed, I invite the
19     Court to enter an order -- saying that those identities
20     ought to be kept confidential.  They can't be -- you
21     know, they can't give them to a tele-marketer and, you
22     know, that sort of thing.  But that doesn't mean they
23     shouldn't be produced.
24            Another point, the amicus and the state talk
25     again piously about, you know, the survey.  It's -- the
```

1      sanctity of the survey has to be protected.  But you know

2      what, there are Federal Rules of Civil Procedure that

3      govern lawsuits.  If a private party or a trade

4      association could, you know, formulate rules of ethics

5      for its members that would trump the, you know, Rules of

6      Civil Procedure as to the scope of Rule 26 and what

7      privileges apply, well, then I've got a couple of

8      defendants on the trade associations on the poultry side

9      that maybe would like to try that trek.  So of course

10     that can't be.  And again, we're not talking about

11     privilege, we're talking about confidentiality.  Should

12     something be disclosed in a way that the wider world gets

13     it.  And we're not talking about that.

14          We were criticized for putting the names of the

15     respondents on the witness list.  Well, you know what,

16     here's one example of one of those deadlines.  So,

17     February 19th, we have to put the names of -- we have to

18     put a final witness list out.  We did.  We thought about

19     this.  Well, do you put them on there, do you not.  Well,

20     if you don't put them on there, is there going to have a

21     fight about that.  So we put them on there.  Does that

22     mean that we're going to traipse up 189 folks or 3,000

23     folks here?  No, of course not.

24          I think this is finally, although maybe you'll

25     grant me finallys.  Do you see what plaintiff is saying?

1     The plaintiff is saying, well, because my experts never

2     considered the identity of the contact information, this

3     is not true considered materials and that's what's behind

4     Ms. Moll's statement that honestly, I wouldn't know what

5     to produce.  Well, these polling organizations, the three

6     of them, talked to real people who have real names who

7     live at real addresses who responded -- real people

8     responding to this survey instrument.  And at bottom

9     these experts are relying on there being real people out

10    there with real addresses, real telephone numbers,

11    responding in a particular way to this survey.  So, the

12    notion that somehow we are not entitled to this because

13    it's not considered material is frankly ludicrous.  I'd

14    like to take -- I'd like them to take that stance at

15    trial because we may move, frankly, to exclude all of

16    this report.  Because at bottom they are relying on

17    responses from real people as meaning something --

18    (Interrupted)

19          THE COURT:  Isn't that true in any survey?

20    Isn't that true with any survey that's -- (Interrupted)

21          MR. EHRICH:  But they have to bring somebody

22    from Westat, somebody from Consumer Logic, to testify

23    about how that survey is done.

24          THE COURT:  Wouldn't that be true with any

25    survey?

1          MR. EHRICH:  Yes.  I'm sorry if I didn't get

2     your point.  But that means that there are real people.

3     And in a litigation context where that survey of those

4     real people forms the basis for a $600 million damage

5     claim, Your Honor, I submit that we are equally entitled

6     to the identity of those folks not because we want to

7     oppress, harass, but because we need our economists to

8     evaluate whether they also should be resurveyed to

9     demonstrate the inherent bias and unreliability of this

10    plaintiff's survey.

11         THE COURT:  If you go ahead and resurvey, does

12    the state then have to re-resurvey to counter whatever

13    biases you may have introduced into the whole process?

14         MR. EHRICH:  No.  No.

15         THE COURT:  They may think differently.

16         MR. EHRICH:  Well, Your Honor, we've had a

17    whole history over the last six months about what are

18    rebuttal reports and what are supplemental reports.  And

19    you know, my view is what this Court has said, Judge

20    Frizzell as recently as a few weeks ago said you don't

21    get those sort of rebuttal reports.  There has been to be

22    an end.  Has to be an end.  What we're asking for is a

23    fair opportunity.  If you have anything, Your Honor,

24    otherwise I'm finished.

25         THE COURT:  All right.  Is there anything else

1   from the state?

2           MS. MOLL:  I think one more.

3           THE COURT:  All right.

4           MS. MOLL:  Let me just address one very quick

5   point that Mr. Ehrich raised.  Mr. Ehrich suggests that

6   we conflate the notions of confidentiality and privilege.

7   We don't.  Rule 26 doesn't require there to be a

8   privilege in place, simply requires the Court to

9   undertake a balancing test of competing interests.  And

10  based on the submissions there could be no question that

11  the confidentiality involved here is of a unique nature

12  that designating, you know, information is confidential

13  under the protective order isn't enough.  But my basic

14  point is Rule 26, of course, doesn't require privilege to

15  apply.  Thank you.

16          MR. EHRICH:  Your Honor, if I may --

17  (Interrupted)

18          THE COURT:  All right.  Your final finally.

19          MR. EHRICH:  This truly is my final comment.

20  From what we've been able to see, the plaintiffs' polling

21  companies and experts did not exclude from their efforts

22  residence in the Northern District of Oklahoma.  So,

23  think about that.  You know, by our count, a minimum of

24  3,000 people were contacted and asked about this case and

25  were dosed with information apparently the plaintiffs'

1    version of this case, one sided.  And as an aside, as

2    contrasted to how the federal regulations on natural

3    resource damages estimates say these things should be

4    done which is there ought to be a public process.  Leave

5    that aside.  You've got the plaintiffs' agents out there

6    in the Northern District of Oklahoma telling their

7    stories to potential jurors.  That's another reason why

8    we need that information.

9          THE COURT:  Can't that be handled during voir

10    dire?  And isn't that really where that's going to

11    happen?

12          MR. EHRICH:  Well, certainly we would suggest

13    to the Court that that be handled in voir dire.  But to

14    the extent -- I think we have to assess just how many of

15    these folks were actually resident in this district.  I

16    mean, has this jury pool been contaminated?  That's

17    another issue.  I'm not suggesting necessarily that we

18    need to deal with that today, but that is a grave

19    concern.  It's one of the first things we thought about

20    when we saw this report.  Thank you.

21          THE COURT:  All right.  I'm going to take these

22    matters under advisement.  I will, however, grant the

23    motion for an extension to March 30th given the fact that

24    apparently some material may have been provided or after

25    January 5th or perhaps it wasn't clear to the defendants

1    what they had until after January 5th.  I'll give you

2    some additional time.  I think that's warranted.

3              But I would urge you to live according to the

4    March 30 deadline until you hear otherwise.  I intend to

5    try and move on this rather quickly, to get an order out

6    on the protective orders as quickly as possible.  And if

7    depending on how we rule on that, then we might change

8    those deadlines more.  But I think at this point the most

9    prudent advice would be to live by March 30th and then

10   see what we do.  All right.

11             MR. EHRICH:  So that I'm clear, March 30 is the

12   deadline unless and until you say differently?

13             THE COURT:  Right.  Right.

14             MR. EHRICH:  Thank you.

15             THE COURT:  I guess that takes care of the

16   matters for today.  I'll see some of you, I guess, on

17   Monday.  And hopefully we can get through things at least

18   as expeditiously, maybe even a little faster would be

19   nice.  Thank you.

20             (END OF PROCEEDINGS)

21

22

23

24

25

```
 1                   C E R T I F I C A T E

 2
       STATE OF OKLAHOMA   )
 3                         ) SS.
       COUNTY OF TULSA     )
 4

 5              I, Greg Eustice, Certified Shorthand Reporter

 6       in and for the State of Oklahoma, do hereby certify that

 7       on February 26, 2009 the above Proceedings were held

 8       before the Honorable Paul J. Cleary, Magistrate Judge in

 9       the United States District Court for the Northern

10       District of Oklahoma, and that the same was reduced to

11       writing by me in stenograph, and thereafter transcribed

12       by myself, and is fully and accurately set forth in the

13       preceding 78 pages.

14              I do further certify that I am not related to

15       nor attorney for any of the said parties, nor otherwise

16       interested in said action.

17              WITNESS my hand this 10th day of March, 2008.

18

19                           S-Greg Eustice_____
                             GREG EUSTICE
20                           Certified Shorthand Reporter

21

22

23

24

25
```