1

```
 1     IN THE UNITED STATES DISTRICT COURT FOR THE
       NORTHERN DISTRICT OF OKLAHOMA
 2
       STATE OF OKLAHOMA, ex rel. W.A.      )
 3     DREW EDMONDSON, in his capacity as   )
       ATTORNEY GENERAL OF THE STATE OF     )
 4     OKLAHOMA and OKLAHOMA SECRETARY OF   )
       THE ENVIRONMENT C. MILES TROBERT,    )
 5     in his capacity as the TRUSTEE FOR   )
       NATURAL RESOURCES FOR THE STATE OF   )
 6     OKLAHOMA,                            )
                                            )
 7                    Plaintiff,            )
                                            ) Case No.
 8     -vs-                                 ) 05-CV-329-GKF-PJC
                                            )
 9     TYSON FOODS, INC., TYSON POULTRY,    )
       INC., TYSON CHICKEN, INC., COBB-     )
10     VANTRESS, INC., AVIAGEN, INC., CAL-  )
       MAINE FOODS, INC., CAL-MAINE FARMS,  )
11     INC., CARGILL, INC., CARGILL TURKEY  )
       PRODUCTION, LLC, GEORGE'S, INC.,     )
12     GEORGE'S FARMS, INC., PETERSON       )
       FARMS, INC., SIMMONS FOODS, INC.,    )
13     and WILLOW BROOK FOODS, INC.,        )
                                            )
14                    Defendants.           )

15

16              TRANSCRIPT OF PROCEEDINGS,

17     held before the Honorable Paul J. Cleary, Magistrate

18     Judge in the United States District Court for the

19     Northern District of Oklahoma on March 2, 2009.

20              A P P E A R A N C E S

21     For the Plaintiff:         Mr. Louis Bullock
                                  Ms. Claire Xidis and
22                                Ms. Kelly Burch
                                  Attorneys at Law
23
       For the Defendant Cargill: Mr. John Tucker
24                                Attorney at Law

25     (Appearances continued . . .)
```

```
 1      (Appearances continued . . .)

 2      For the Defendant Peterson:  Mr. Philip Hixon and
                                     Mr. Scott McDaniel
 3                                   Attorneys at Law

 4      For the Defendant Tyson:     Mr. Robert George
                                     Attorney at Law
 5
        For the Defendant Cal-Maine: Mr. Robert Redemann and
 6                                   Mr. Robert Sanders
                                     Attorneys at Law
 7
        For Simmons Foods:           Ms. Vicki Bronson
 8                                   Attorney at Law

 9      For George's:                Mr. James Graves
                                     Attorney at Law
10

11                 P R O C E E D I N G S

12             COURTROOM DEPUTY:  Case Number

13      05-CV-329-GKF-PJC, Attorney General of the State of

14      Oklahoma, versus Tyson Foods, et al.  Counsel, please

15      state your appearances for the record.

16             MS. XIDIS:  Your Honor, Claire Xidis on behalf

17      of the state.

18             MR. BULLOCK:  Louis Bullock for the State of

19      Oklahoma.

20             MS. BURCH:  Kelly Burch, State of Oklahoma.

21             MR. TUCKER:  John Tucker for the Tyson

22      defendants -- I mean, for the Cargill defendants.  I'm

23      sorry, Your Honor.  I get confused.

24             THE COURT:  You're Cargill?

25             MR. TUCKER:  Cargill, yes.
```

```
1                  THE COURT:  All right.

2                  MR. GEORGE:  Good morning, Your Honor.  Robert

3       George.  I do represent the Tyson defendants.

4                  MR. GRAVES:  James Graves for George's Farms.

5                  MS. BRONSON:  Vicki Bronson for Simmons

6       defendants.

7                  MR. McDANIEL:  Scott McDaniel for Peterson

8       Farms.

9                  MR. HIXON:  Philip Hixon for Peterson Farms.

10                 MR. REDEMANN:  Robert Redemann for Cal-Maine.

11                 MR. SANDERS:  Bob Sanders for the Cal-Maine

12      defendants.

13                 THE COURT:  All right.  Let's see.  Mr.

14      Bullock, last time I raised the issue that -- attorney

15      fees motion and I know you were going to mull it over.

16      Have you had an opportunity to do so?

17                 MR. BULLOCK:  I took a look at that, Judge.

18      I'd like to have a chance to have a conference with the

19      defendants.  But in looking at it, I have some confidence

20      that we should be able to resolve our differences.

21                 THE COURT:  We'll probably hold off then

22      setting that for any kind of a hearing and maybe within a

23      few weeks if you can talk to them and see if that can be

24      worked out, then we won't need to belabor everybody with

25      a hearing on that.
```

1         We have a number of motions and then -- motions

2    to compel and motions for protective order all basically

3    relating to the same issues.  And have you folks

4    considered or discussed how to address those topics?  And

5    I guess I'm particularly interested in whether the status

6    right now with respect to each of these -- the defendants

7    at issue here, Cargill, George's, Simmons and Peterson,

8    whether they're all similarly situated at least in the

9    sense of what you have produced to the plaintiffs in this

10   case or are there variations in that regard that need to

11   be addressed.  Ms. Xidis, you look like you --

12   (Interrupted)

13        MS. XIDIS:  Yes, Your Honor.  I'm going to

14   address each of those four motions for the state and to

15   go to the common issues and then to point out the factual

16   circumstances that vary between the defendants.

17        THE COURT:  Okay.

18        MS. XIDIS:  Prepared to address those --

19   (Interrupted)

20        THE COURT:  All right.  And then we'll

21   obviously give the defendants their opportunity to

22   respond.  And those of you that have also filed motions

23   for protective order, I think the arguments are going to

24   be the same.  So we'll roll all that up in your response.

25   Do you want to start, Ms. Xidis?

1          MS. XIDIS:  Yes, Your Honor.  Your Honor,
2    Claire Xidis from Motely Rice on behalf of the state.
3    What we have pending before us are the four motions which
4    address the state's motion to compel for Cargill,
5    George's, Simmons and Peterson.  As I mentioned, I think
6    the most efficient way to address it is to discuss the
7    common issues and then follow up on the individual
8    circumstances of each production.
9          Across the board today, Your Honor, the state
10   is seeking two types of financial information from these
11   defendants.  Specifically, that's financial statements
12   and tax returns for the last two years.  When I say
13   financial statements, Your Honor, what I mean is the
14   three part financial statement which is the Standard and
15   Generally Accepted Accounting Practices which is -- the
16   first part is a balance sheet, the second part is an
17   income statement, and the third part is a cash flow
18   statement.  We would be seeking those, including
19   accountants' or auditors' notes which explain -- flesh
20   out the meanings of the numbers that are set forth in
21   those financial statements.
22         First, Your Honor, I'd like to address
23   financial statements.  The defendants have produced in
24   varying states different types of balance sheets.  And,
25   Your Honor, the reason the state does not believe that

1      balance sheets standing alone present a full picture of

2      financial condition -- which is the relevant issue we're

3      looking at here.  I don't think there's disagreement

4      among the parties that a financial condition is the

5      relevant issue for the punitive damage -- scope of that.

6              A balance sheet standing alone only presents a

7      very limited snapshot picture of -- on the assets and the

8      liabilities of the company at a specific point in time.

9      It essentially presents the value of that company if its

10      doors were to be closed and those assets and liabilities

11      were to be liquidated, what would be that value.  That's

12      what we see when we look at a balance sheet.  So

13      essentially, it's very quantitative information but not

14      very qualitative information about those assets and

15      liabilities and about the overall health and financial

16      condition of a company.

17              The notes to a balance sheet are very important

18      for a couple of reasons.  Those notes explain what

19      accounting practices and methods were used to create that

20      balance sheet.  They also explain inter-company debts, if

21      there's a parent company and subsidiary companies,

22      whether those are treated as arms-length transactions or

23      are treated differently because that impacts the

24      company's bottom line.  The notes also explain the terms

25      and condition of the debts and assets with is important

1     when looking again at those bottom line numbers.  So,
2     Your Honor, that's why balance sheets plus notes are an
3     important part of the first part of a financial
4     statement.
5              However, to understand the value of a
6     company -- intrinsic or the real value of a company, one
7     must also look to the other two parts of a financial
8     statement.  That's income statements and cash flow
9     statements.  Those actually are what really speak to the
10    health of a company which is relevant to financial
11    condition.
12             An income statement explains how good the
13    company is at making money, how it's controlling its
14    expenses and whether its assets are making a profit.
15    Whether a company is making money and how much is a key
16    issue for financial condition.
17             Cash flow is another part of that standard
18    financial statement which is again maintained in the
19    ordinary course of business and part of, you know, GAAP,
20    General Accounting Principles, they're maintained.
21    Income is sometimes very similar to cash flow but
22    sometimes cash flow can look very different in a balance
23    sheet or in an income statement.  The cash flow statement
24    reports cash actually flowing in and out of the company
25    and whether the cash provided by a company's operations

1    covers the cash the company is putting into other things.
2    So a company could have a lot of assets reflected on the
3    balance sheet or even a lot of receivables reflected on
4    an income statement, but it could still have a negative
5    cash flow and that's something important to understanding
6    financial condition.
7            Again, I want to touch on the notes issues.
8    Those notes that I talked about for balance sheets, those
9    would be seen throughout the three parts of a financial
10   statement and we think those would be important across
11   the board.
12           Your Honor, the state cites two cases in
13   support of its motions to compel.  The first case is the
14   City of Tulsa case which the defendants have interpreted
15   in different ways.  But when we looked at the actual text
16   of that order, that order says -- calls for the
17   production of financial statements which would contain
18   the three parts that I've just discussed.  What happened
19   down the line in that case, perhaps the city didn't
20   pursue those after that order.  I can't speak to that.
21   But I can speak to the words that were chosen by the
22   court in assessing this issue in that case and I think
23   that's noteworthy.
24           Also, Your Honor, the state cited the American
25   Benefit Life Insurance case, which there was a

1    typographical error, Your Honor.  We recognize that's a

2    Western District case, and we apologize for that, not a

3    Northern District case.  But in that case the plaintiff

4    sought production of balance sheets, profit and loss

5    statements which are like income statements and other

6    financial statements, and the motion for protective order

7    in that case was denied, Your Honor.

8          The state recognizes that there have been cases

9    in this district where the courts have limited production

10   to balance sheets.  However, Your Honor, I want to submit

11   two things on that.  A couple of these cases, I think,

12   are distinguishable.  For example, in the Toussaint-Hill

13   case, that was a pro se litigant who had encountered some

14   entanglements in previous discovery disputes.  I was

15   looking through the orders on that case in preparation

16   for today.  And in that case the Court also veered from

17   typical discovery practices and did not allow the

18   discovery of the financial information until after

19   dispositive motions.  I think the Court was kind of

20   treating that issue with kid gloves because of the nature

21   of the dispute.  The other two cases, Your Honor,

22   unfortunately there's really no analysis provided from

23   the court about the factual conditions and the reasoning

24   for those decision.

25         In this case, Your Honor, we're dealing with

1       extremely large, complex defendants.  We're also dealing

2       with extremely large consequences and damages, and so

3       something that perhaps didn't call for delving into quite

4       as deeply in these other cases.  In our case a line item

5       or the way these assets and liabilities are treated could

6       have implications of millions of dollars.  So we think to

7       really understand the financial condition it's important

8       to go a level deeper into these financial statements

9       beyond just the balance sheet.

10              Your Honor, the next thing I'd like to address

11      is tax returns.  The state included in its motions to

12      compel a request for tax returns.  The defendants have

13      across the board said they would not produce these and

14      the state believes we're entitled to these because they

15      contain information that's not available from any other

16      source.  In my preparations for today, Your Honor, I

17      found a case that very nicely sets forth the standard for

18      addressing and weighing the production of tax returns.  I

19      have copies for you all, and hand one up.  It's a

20      District of Kansas case.  Unfortunately I did not find a

21      Northern District case that adopts this specifically, but

22      this is the Cruce v. Schuchmann case.  That's

23      S-h-u-c-h-m-a-n-n.  Difficult to pronounce.  But it

24      articulates the standard for production of tax returns

25      nicely.  Your Honor, it explains what while discovery of

1     tax returns -- this is at headnote two.  While discovery

2     of tax returns are not privileged, the law disfavors

3     their disclosure unless the tax returns are relevant to

4     the subject matter of the litigation and the information

5     contained therein is not readily available from other

6     sources.  The party seeking discovery of the tax returns

7     bears the burden of establishing relevance.  The party

8     resisting disclosure should bear the burden of

9     establishing alternative sources of the information.

10          Your Honor, in this case the amount of

11     compensation to inside officers and executives for these

12     private companies is not available from any other source

13     except the tax returns.  Officers are in a position to

14     cover deductions and manipulations in the amount of

15     assets and liabilities portrayed on a balance sheet.

16     We're not saying that has or hasn't happened with any of

17     these particular defendants, but the only way to know

18     whether there's some economic issue impacting financial

19     condition is to get those tax returns and see whether

20     that's an issue.  Whether executive pay is an issue

21     that's impacting the bottom line that's being presented

22     on the balance sheet.  Your Honor, those are, I think,

23     the overall issues and the reasoning why the state is

24     seeking this information.  So I'm now going to turn to

25     the defendants' specific circumstances in the case today.

```
 1              I'll start with the Cargill defendants, Your
 2     Honor.  Cargill, Inc. and Cargill Turkey Production are
 3     the two separate Cargill defendants.  Cargill, Inc. is
 4     one of if not the largest private corporation in the
 5     United States, and the state sought through proper
 6     request for production financial statements.  And instead
 7     what it got is what appears to be either an accountant or
 8     attorney-created summary with eight line items which
 9     Cargill represents can provide a full and complete
10     picture of its financial condition.  We dispute that.  We
11     think even if -- even according to the balance sheet only
12     standard that the defendants advocate, that's an
13     insufficient production.  There's simply no way that
14     those eight line items are a full pictures.  It's the
15     picture we have.  It's the picture Mr. Payne has got and
16     we provided a report based on that, but we think we're
17     entitled to more, Your Honor.
18              For Cargill Turkey, Cargill presented a
19     similar -- I think it's seven line items in the Cargill
20     summary which is again not the document maintained in the
21     ordinary course of business but something created by
22     counsel and/or accountants.  For Cargill Turkey, Your
23     Honor, which is a subsidiary of Cargill, Inc., we
24     requested consolidating format financial records.  That's
25     an accountant's term for the records maintained by a
```

1     subsidiary that report its financial condition to its
2     parent so that it can create consolidative financial
3     records.  Again, this is standard practice and something
4     that should be readily available at their fingertips.  So
5     that's why we're asking for Cargill Turkey consolidating
6     format financials which would be similar to what we've
7     talked about, but probably a slightly different format.
8     It may not be as thorough, but again, something that they
9     should have available.  And it's important for Cargill,
10    Your Honor, that we have -- these are two distinct
11    defendants in this case.  We may end up at the end day
12    with one and not the other which is why we think it's
13    important to have the information for both.
14            For the George's defendants, Your Honor,
15    there's a slightly varied situation from Cargill in that
16    the George's defendants also had their account -- it's
17    clear the accountants created revised and redacted
18    balance sheets that were produced to the state.  Your
19    Honor, what the state received from George's were these
20    balance statements from their accountants which were
21    created in December once there was a meet and confer
22    between the parties.  Again, we ask for a request for
23    production.  We should have received the documents
24    maintained in the ordinary course of business, but we
25    received these redacted statements which contain on the

 1      front page of the disclaimer which is quoted in our

 2      papers which -- I think it stands for what it stands for.

 3      I think the defendants are trying to say that it means

 4      something else or it doesn't mean what it says.  But it

 5      says that integral important information to understanding

 6      this document has been removed.  So again, we think we're

 7      entitled to that complete information with those integral

 8      accountant's notes to explain the line items.

 9              George's did produce income statements to us,

10      Your Honor, and we appreciate we were able to reach an

11      understanding on that.  However, they contain the same

12      disclaimer.  So for the income statements for George's,

13      we would request simply the full and complete original

14      copies, not the ones created specifically for the

15      discovery purposes.

16              Turning to Peterson and Simmons, Your Honor,

17      those defendants appear to have produced actual documents

18      maintained in the ordinary course of business.  They each

19      produced balance sheets, and those balance sheets,

20      however, do contain redactions.  The Simmons' sheet, they

21      state clearly the integral notes need to be included and

22      those were not included.  For Peterson, however, there

23      seems to be an ongoing misunderstanding between counsel

24      about what exactly has been redacted.  The Peterson sheet

25      simply state they have a redacted stamp on them.  We

 1    can't tell it's been redacted.  We haven't received a

 2    redaction log.  In conversation with counsel it was

 3    represented that only L&L Cattle business -- if I'm

 4    saying that correctly -- is the only thing redacted from

 5    those sheets.  However, Your Honor, there was one sheet

 6    produced in response to the original discovery which had

 7    three columns of information that has been removed, and

 8    so we need a clear understanding of what has been

 9    removed.  And frankly, Your Honor, I don't think there's

10    really grounds for any of the redactions.  This is all

11    protected by the confidentiality order in this case and

12    there's really no reason to keep that information out

13    because it's relevant to the financial condition.

14           That's something across the board, Your Honor,

15    I want to stress.  We've had for a long time a very

16    thorough confidentiality order in this case to provide

17    adequate production for all the information the state is

18    seeking.

19           Finally, Your Honor, I want to address some of

20    the defendants' allegations about the timing of this

21    motion and alleged ulterior motives.  The state did start

22    this discovery in '06 and '07, but the state determined

23    that the most prudent and efficient way to go forward was

24    to seek this information from the defendants when it was

25    time to deal with the damages issues in the case.  Had

1        the state received this earlier, we would have

2        been dealing with quarterly supplements -- excuse me,

3        Your Honor -- quarterly supplements every quarter from

4        these defendants.  So -- and also recognizing the

5        defendants surely would resist in terms of the timing in

6        the case as defendants often do in these scenarios, let's

7        deal with it later, let's deal with it later, so let's

8        deal with it when it's time to deal with damages.  So

9        once that third quarter of '08 wrapped up and we were

10       preparing for that January deadline, it's time to tee

11       this up, approach the defendants and said, okay, it's

12       time to address this.  There's no getting around it now.

13       Let's deal with it.  Unfortunately, this was a lot more

14       difficult than the state ever imagined to get what we

15       consider very base line basic accounting information.

16       Information leaks through to the state throughout the

17       month of December.  We received productions up until

18       January 5th, the actual deadline for the production and

19       then we were promised documents in mid-January that we

20       never received.  Follow-ups went un-responded to and so

21       in late January we realized we've got no choice but to

22       get this in front of the Court.

23              Your Honor, the state is not seeking to somehow

24       backhandedly supplement Mr. Payne's reports.  The state

25       stands by them and we believe they meet the Rule 26

1    disclosures.  However, as we tried to explain in our

2    responses, the defendants are putting the cart before the

3    horse.  If the Court determines this information is

4    discoverable, we'll provide it to Mr. Payne and if he

5    determines that there's something contradictory or

6    something that conflicts with the information we

7    previously had on a case-by-case basis, we would approach

8    the Court about how to deal with that if we can show good

9    cause for an amendment to address those contradictions.

10   Hopefully, Your Honor, that -- only be an issue.

11          Also it's worth noting that the reason the

12   state needs this information is not limited to Mr. Payne.

13   Defendants, I believe, will be addressing their part of

14   this case and rebutting him and we're entitled to have

15   this information to address with whoever they present on

16   this issue for cross examination.

17          THE COURT:  All right.  Anything further from

18   the state?

19          MS. XIDIS:  Not at this time.  Thank you.

20          THE COURT:  Who wants to step up first for the

21   defendant?

22          MR. TUCKER:  I think my number is the lowest,

23   Your Honor.

24          THE COURT:  All right.

25          MR. TUCKER:  John Tucker for defendants

```
 1    Cargill.  I tried to steal Robert's client but was
 2    unsuccessful.  I guess I'm stuck with the one I came
 3    with.
 4             THE COURT:  All right.
 5             MR. TUCKER:  Your Honor, as counsel for the
 6    state alluded, documents regarding financial information
 7    were first requested two years ago and again one year
 8    ago.  In October of '08, as our paper reflect, the
 9    parties met to narrow the state's discovery request to
10    something we thought more in the line of what this
11    district had found to be appropriate in the past.
12    Cargill on December 4th of '08 submitted a report that
13    contained not only its net worth but much, much more.  As
14    I would indicate from our response to a motion to compel,
15    at page three for Cargill, Inc., for five years -- not
16    one year, but for the previous five years -- we reported
17    all sales and other revenues, net earnings.  We culled
18    out '05 and '06 earnings that were not reflected by a
19    special charge.  In other words, they weren't reduced by
20    a special charge.  Current assets, net property and other
21    assets, total assets, current liabilities and net worth
22    not for one year, as I say, but also five years.  Then on
23    December 23rd of '08 Cargill Turkey Production provided
24    essentially the same documents.  These were filed under
25    seal and copies are attached under seal to our -- by
```

1     incorporation by reference to our response.

2             The plaintiff's damage reports were not due

3     until January 5th of '09.  Neither side has been shy in

4     seeking application for time to extend the filing date

5     for reports.  Plaintiffs did not make any requests for

6     further time to file Mr. Payne's report.  Plaintiff did

7     not file any motion to seek a more detailed financial

8     statement prior to the time Mr. Payne's report was filed.

9     It was only six weeks after Mr. Payne's report was

10    filed -- and we could make a joke about perhaps that

11    there was buyer's remorse on Mr. Payne's report.  But be

12    that as it may, there was no application made for an

13    extension of time to file a report later.  There was no

14    application made to the Court for further financial

15    information prior to the filing of Mr. Payne's report.

16    Only six weeks later did someone step up and say that

17    they wanted this information.  The only purpose that they

18    would have for seeking this information would be some

19    sort of a hindsight test to bolster the report of Mr.

20    Payne.  Judge Frizzell has previously indicated that this

21    case, he wants to have the trial date protected.  He's

22    also indicated that he does not believe it's appropriate

23    to do supplemental reports to bolster your report based

24    on later actions.

25            The compliance by Cargill and Cargill Turkey

```
 1          Production was total.  It was totally within the mandate
 2     of the City of Tulsa case which was Judge McCarthy.  It
 3     was totally within and beyond the mandate of the other
 4     cases that are presented this same issue in this
 5     district.  For example, Cartoons two -- and I refer to
 6     Cartoons two because Cartoons two reversed Cartoons one
 7     on the issue of whether parity baseball cards did or did
 8     not state a cause of action.  But in that case Judge
 9     Joyner found that what was relevant was one year's
10     balance sheet.  In the Heritage Academy case Judge
11     McCarthy found the balance sheet and net worth for the
12     current year only.  In the Montereau case Judge Joyner
13     found the balance sheets showing net worth for a single
14     year.  In the City of Tulsa case documents reflecting the
15     defendant's net worth for five years.  That's the only
16     case that went beyond one year.  And I would represent
17     that the reason that it was five years in that case was
18     because the City of Tulsa was talking about going back
19     five years to recover excess water treatment costs
20     brought about, they believed, by the phosphorous in the
21     water.  As the other Tenth Circuit case -- another Tenth
22     Circuit case, another Kansas case, which was cited in our
23     brief, what's at issue is the party's financial
24     condition, not their financial history.  It's not really
25     relevant to determine anything more than net worth.  That
```

1        is the standard in this district.

2                In summary, Your Honor, I believe that the

3        plaintiff's motion is not timely, it was not based upon

4        any showing of need, it was not based any showing -- upon

5        any showing of good cause, certainly no showing of need

6        or cause that would cause the Court to consider changing

7        what has been the established rule in this district for

8        many years.

9                THE COURT:  Mr. Tucker, the discovery cutoff in

10       this case, I guess, is coming up in April?

11               MR. TUCKER:  That's correct.

12               THE COURT:  So in that sense -- I mean, as

13       purely as a discovery matter, isn't the motion timely or

14       the request timely?

15               MR. TUCKER:  If it were as a discovery matter,

16       but it has absolutely no purposes of the case, Your

17       Honor, save and except as a basis for Mr. Payne's

18       opinion.  The net worth of the defendant can only be

19       useful to this plaintiff if it's a part of Mr. Payne's

20       report.  And in fact, that was what the plaintiff told

21       you today.  They have used a phrase putting the cart

22       before the horse.  I'm not sure exactly how that fits,

23       but what they're saying is we want to get this

24       information then we'll let Mr. Payne look at it and then

25       see if he wants to amend his report.  They've raised no

1    other purpose for it other than that.

2              THE COURT:  If, for example, the decision was

3    made at trial not to use Mr. Payne, not to use an expert

4    on this issue, but instead to put damage or net worth

5    information before the jury and let them make the call,

6    wouldn't it then be relevant discovery at some point,

7    some amount of it, for that purpose?

8              MR. TUCKER:  The discovery that we provided

9    would be, yes, because that does provide net worth and

10   that is the test for determination of punitive damages in

11   this district.

12             THE COURT:  But that's all based on unaudited

13   financial information, right?

14             MR. TUCKER:  No, that's not correct at all.

15             THE COURT:  One I'm looking at for Cargill

16   Turkey says at the bottom:  Summarized from unaudited

17   financial information.

18             MR. TUCKER:  The Cargill is and Cargill Turkey

19   isn't.  Cargill, Inc. is audited.  In fact, the Cargill,

20   Inc. -- the fact that the Cargill, Inc. statement is

21   audited appears as does this information on the Cargill,

22   Inc. website.  That is not even considered to be

23   confidential.  Cargill, Inc. information is as public as

24   if it were a public company.

25             THE COURT:  For Cargill Turkey then, what is

1    there that would rise to the same sort of level audited

2    information, or is there anything?

3                 MR. TUCKER:  I don't know that they audit.  I

4    can't answer that question, Your Honor.  I can say that

5    the numbers that are presented for Cargill Turkey

6    Production are those that are relied upon by Cargill,

7    Inc. in preparing its audited financial statements.

8    There's not a separate set of books kept for reporting to

9    the parent company for them to use -- to their auditors

10   as opposed to this.  I just don't think that the CTP is

11   independently audited.  But the issue would be, of

12   course, the net worth and that's the number that's been

13   disclosed.

14                THE COURT:  Is the net worth number -- there's

15   a separate net worth number for Cargill Turkey?

16                MR. TUCKER:  Yes, Your Honor.

17                THE COURT:  Is that also included in the

18   Cargill, Inc. numbers?  I mean, how much of this

19   information is then rolled into all of Cargill, Inc.'s?

20                MR. TUCKER:  It would all be rolled into

21   Cargill, Inc.  As far as independently breaking out

22   Cargill Turkey Production, that part was filed under

23   seal.  The other part was not.

24                In our sense, Your Honor, is that they made no

25   showing of a need for it.  What they seek goes beyond

1    what this district has previously required, and its only

2    purpose would be to bolster an expert report that they

3    had time to do something else with had they chosen to.

4              THE COURT:  All right.  Who wants to step up

5    next?

6              MR. GRAVES:  I guess I will, Your Honor.  The

7    next number on the docket sheet.  James Graves for

8    George's and George's, Inc.  I won't spend time

9    reiterating my agreements with the comment issues that

10   Mr. Tucker has already addressed.  The primary concern

11   that my client has here is that it has been complied with

12   Rule 26, financial disclosures as interpreted in the

13   Northern District of Oklahoma.  And the main points I

14   wanted to address were that the state wants additional

15   information from George's, it seems, without a

16   demonstration of need which Mr. Tucker just alluded to.

17   There's been some statements of what they would do with

18   them, but not a demonstration that that's something

19   that's needed in order to do the analysis that Mr. Payne

20   claims he's trying to do which is an ability to pay

21   analysis.  The state also complains specifically about

22   what George's has produced as lacking certain information

23   that's needed.  And then again my client agrees with the

24   timeliness issue that Your Honor has just inquired about.

25             As the first issue with regard to whether

1    George's has already complied, the state seems to think

2    that alleging punitive damages and putting that in the

3    complaint gives a free pass to look at every financial

4    statement that George's produces, including what is

5    essentially would be bank statements if you're talking

6    about cash flows as well as income tax returns.  And we

7    were handed a Kansas case during the hearing that cites a

8    lot of New York cases where there's apparently been an

9    allowance of production of some limited income tax

10   information.  But aside from that not being cited in the

11   papers and us having to react to it right now, that case

12   really has nothing to do with the Northern District or

13   what the standards that have been established in the

14   Northern District for establishment of the punitive

15   damages case that the state intends to make.

16           So my client would simply state that that case

17   is not the law in this case.  There has to be some

18   relevance demonstrated and some need demonstrated to make

19   the information discoverable.  The existence of the

20   confidentiality order which we discussed on Thursday is

21   primarily for management of documents that are

22   discoverable and are being produced in some way that are

23   sensitive.  It doesn't make a front end determination

24   whether the documents are discoverable in the first

25   place.

1          What George's did produce in this case is five

2     years of balance sheets and five years of income

3     statements which the Court has been provided.  Those

4     balance sheets show the assets, liabilities and equity of

5     the company, including the company's net worth for both

6     George's, Inc. and George's Farms, Inc.  The income

7     statements show income and expenses and debts, and so all

8     of those -- all of that information that would be needed

9     to get a snapshot of the company's condition including

10    over the past five years is right there.

11         The state has raised the issue of executive

12    compensation and potential manipulation of executive

13    compensation.  There hasn't been any evidence or

14    information established along those lines, nor has there

15    been a demonstration that that information would be

16    needed.  But I would think that production of five years

17    worth of information would be preventative against that

18    type of manipulation if it had been going on over the

19    last couple of years since this case came along.  You've

20    got five years worth of information to look at to see

21    whether there's anything that looks strange or unusual or

22    out of the ordinary.

23         As to the state's complaints about the

24    particular balance sheets and income statements and the

25    notation at the front of it that George's made, the state

 1     suggests that George's has made up some excuse for why

 2     that note is there.  Actually, George's presented an

 3     affidavit from the accountant that prepared those balance

 4     sheets, the accountant that prepared those income

 5     statements and the accountant that audits George's course

 6     of business financial statements, Mr. Greg Flesher.  And

 7     Mr. Flesher is the one who provided that explanation and

 8     Mr. Flesher in fact read the state's papers in the motion

 9     to compel and it was on that that he based his opinion

10     that they already have what they need in order to do the

11     analysis they claim they're trying to do.  So that's

12     where that explanation came from.  It isn't something

13     that's been ginned up by George's.  It's in fact the

14     opinion of its accountant who created those documents and

15     who audits George's ordinary course documents.  And the

16     rationale for not providing ordinary course documents is

17     that George's produces consolidated financial statements.

18     Those consolidated financial statements are going to

19     include subsidiary affiliates that are not part of this

20     case, that are not in poultry operations even in some

21     cases.  For example, George's has a gas company that are

22     not involved in any operations on the Illinois River

23     Watershed.  And so, to include those in a production of

24     financial information to the state would then require

25     redaction.  The state has described what we produced as

1    redacted financial statements.  There's not any blackouts

2    on these financial statements or anything hidden in them.

3    They were produced with -- you know, clearly, concisely

4    so that you could see the numbers and see the entries.

5    If we were to produce consolidated financial statements,

6    we would be in the position of needing to black out a lot

7    of things that have nothing to do with this case because

8    particularly the parent company, George's, Inc., would

9    have swept up within it financial information for a lot

10   of other companies that aren't sued in this case and

11   don't have anything to do with poultry operations or the

12   Illinois River Watershed.

13          THE COURT:  Do the numbers that are in your

14   reports, compilation report, for property, land and

15   equipment -- property, plant and equipment -- does that

16   include these other entities or not?

17          MR. GRAVES:  For George's, Inc.?

18          THE COURT:  Yes.

19          MR. GRAVES:  It would.  And it's been

20   summarized in a line item and that's what Mr. Flesher's

21   describing is that the ordinary course financial

22   statements with the typical disclosures would then break

23   that out further as to what it is and where it is perhaps

24   and what the allocation is within that entry, and that

25   the presentation of the total amount is really all you

1    need in order to give a complete financial picture of the

2    company, that you don't need to know which entity owns

3    that piece of property under the George's, Inc. umbrella

4    in order to get an assessment of what the net worth of

5    George's, Inc. is.

6              THE COURT:  So where this balance sheet, for

7    example, has current assets, total current assets, those

8    total current assets include these other subsidiaries

9    that are not parties to this lawsuit -- (Interrupted)

10             MR. GRAVES:  They do -- they do, Your Honor.

11   They just make it -- this makes it legible and

12   intelligible to read and also protects details about

13   individual corporations that haven't been sued.  I don't

14   know any other way to put it than that.  The affidavit,

15   Mr. Flesher describes that and what he's saying is -- or

16   what he seems to be saying to me, I'm not -- I have an

17   accounting degree, but never used it.  What he's saying

18   to me is that he prepared these documents.  He used the

19   real numbers.  These aren't ginned up numbers.  He used

20   the real numbers off of the real financial statements,

21   but he produced something that protected the details of

22   underlying information, but to still give the state what

23   they needed based on what they've described in their

24   papers as needing.  And in fact, it complies with what

25   the law is in this district as far as proof of punitive

1    damage and that is net worth.  And so, George's is in the

2    position -- we feel like George's has produced more than

3    that standard in providing the income statements as well.

4         THE COURT:  What about Mr. Xidis's statements

5    that there are other details that might affect that, that

6    the balance sheet may be fine, but cash flow, et cetera,

7    is really needed to know basically the picture of the

8    financial health of George's and the other defendants?

9         MR. GRAVES:  Well, I would cite again to, first

10   of all, the affidavit from Mr. Flesher who says it's not

11   needed and to the case law in this district, which I'm

12   not aware of a case that the state has come up with where

13   cash flow statements were required to be produced.  And

14   so, we're again back to net worth and George's produced

15   five years worth of net worth and then on top of that

16   produced five years worth of income and expense.  The

17   state says they need it, but they haven't said why they

18   need it other than just they would like to see how much

19   cash is going in and out of the company.  They've got a

20   complete picture of the net worth of the company and a

21   complete picture of how much money the company has made

22   over the last five years, for both companies, George's,

23   Inc. and George's Farms.

24        My only other -- I just wanted to make it clear

25   that those are the real numbers, that those are the

 1    numbers that they said they needed and those are the

 2    numbers that George's provided.  And then we would also

 3    agree with the timeliness issue that Mr. Tucker

 4    discussed.  And again, it may be that the state would

 5    choose to or elect to present some net worth information

 6    as the Court has suggested.  In that case, they've

 7    already got it, even before the January 5th deadline, but

 8    certainly before the April 15th deadline.  The additional

 9    information that they're seeking now we would state is

10    untimely because it is beyond the time period when the

11    person who could provide that analysis for them is

12    allowed to do that type of analysis under the Court's

13    deadlines.  They would be right back here, I assure you.

14    It's not a cart before the horse.  They would be right

15    back here asking for additional time to produce a

16    supplemental report and the defendants would need to

17    respond to it and then we're running into deadline issues

18    which is why the Court set the scheduling order the way

19    it did.

20              THE COURT:  All right.

21              MR. GRAVES:  Thank you.

22              THE COURT:  Simmons, I guess, is next.

23              MR. HIXON:  Your Honor, Phil Hixon for Peterson

24    Farms.  Just to shorten this, I agree with Mr. Tucker and

25    Mr. Graves with regard to these timing issues and some of

```
 1    those generalized arguments.  I would like to address
 2    some Peterson specific issues, however.
 3          Ms. Xidis's reference to documents being
 4    promised in mid-January and not being produced, I
 5    believe, was a reference to Peterson Farms.  That
 6    situation arises from the asset sale between Peterson
 7    Farms and Simmons which occurred in July-August of 2008.
 8    Peterson operates on a fiscal year calendar which runs
 9    from October to the following September.  What had been
10    promised in mid-January was the fiscal year 2008 balance
11    sheet which would run from October 2007 to the September
12    2008 date.  At the time that was promised, that balance
13    sheet had not been prepared.  It was believed that that
14    would be available in mid-January.  It was not.  And in
15    fact at the present time, that balance sheet is still not
16    available.  That said, we promised to produce that
17    balance sheet and we will produce that balance sheet once
18    it's available.
19          THE COURT:  When does that look like it's going
20    to happen?
21          MR. HIXON:  I don't have a word as to when.
22    It's in process.  It was expected that it would be
23    prepared by mid-January.  It hasn't been.  Peterson -- at
24    the operation of the asset sale, Peterson was a company
25    of 1100 employees approximately.  In its current state,
```

1    it's a company of about 50 employees.  So it's -- there

2    are other priorities, operational priorities, for

3    Peterson.  I believe that that's the issue.

4           That being said, the last conversation that Ms.

5    Xidis had with Peterson on these issues was in

6    mid-December.  The next conversation that we had was the

7    motion to compel that was filed in February.  There's no

8    meet and confer on these issues.  State didn't follow up

9    to see what the status of this balance sheet was or these

10   other issues.  The state has been told numerous times on

11   these redaction issues that what's been redacted was

12   information for L&L Farms which is a cattle operation.  I

13   note that the state didn't produce to you what had been

14   produced to the state with regard to Peterson Farms.  Had

15   those statements been produced to you, it's clear that

16   what had been redacted was a column on the right-hand

17   side.  I mean, its assets, Peterson Farms, a blank space,

18   liability, Peterson Farms, a blank space, net worth, and

19   so on.  The information that was redacted is

20   non-responsive.  It's operations outside of the scope of

21   this lawsuit and the conversations that I had with Ms.

22   Xidis and Ms. Ward in her office on the issues, they

23   indicated L&L Farms' information was not information that

24   they wanted.  And yet, it keeps appearing in these

25   pleadings.

```
 1              THE COURT:  The net worth or whatever numbers

 2      you gave for net worth for Peterson, does that include

 3      L&L Farms in it somewhere or is that a totally separate

 4      entity?

 5              MR. HIXON:  I can't answer that question this

 6      morning.  I believe it's -- I don't want to say one or

 7      the other because I'm not sure that it's included or if

 8      it's not included.  For purpose of those balance sheets,

 9      it is broken out and what we represent what has been

10      presented is a net worth for Peterson Farms knowing that

11      the basis would be used for this punitive damage --

12      (Interrupted)

13              THE COURT:  What's the relationship between

14      Peterson and L&L Cattle?  Is that a subsidiary or is

15      that -- (Interrupted)

16              MR. HIXON:  Peterson Farms has a number of

17      family owned businesses and it's an affiliated company is

18      my understanding.  I mean, it's a cattle operation.  It

19      was not involved in the broiler production side of the

20      business or the chicken breeding, that portion.

21              THE COURT:  I guess the question would be

22      whether any of the assets of L&L Farms would be at issue

23      if the punitive damage awards were entered after trial

24      against Peterson.

25              MR. HIXON:  Well, and that raises a new issue
```

1      and where I'm headed.  Because of this asset sale,

2      Peterson Farms as it exists right now and as it will

3      exist at the time of trial is a very different company

4      than it was in 2004 which is the beginning period for

5      which we produced balance sheets.  On this fiscal year

6      balance sheet which the 2008 balance sheet which hasn't

7      been produced yet which we will produce when it's

8      available, it's going to have August-September

9      operations.  It will show what Peterson Farms looks like

10     as of September 2008.  With regard to the cash flow,

11     income statement, tax returns, that's not going to be

12     probative of the issues that Ms. Xidis has referred to

13     here earlier today with regard to these other defendants.

14     It's going to have -- there will be two months of

15     operations with Peterson Farms in its new form.  So, it's

16     not probative.  It can't be probative.  What might be

17     probative -- well, it's not.

18            THE COURT:  Is this balance sheet going to

19     reflect the price that was paid for Peterson?

20            MR. HIXON:  I haven't seen the balance sheet.

21     It hasn't been prepared.  I can't represent what it will

22     and will not portray.  The balance sheets that have been

23     produced today have been audited financial statements,

24     they're audited balance sheets.  I assume that they'll be

25     -- the 2008 statement will be produced or compiled in a

1    similar manner that the 2004 through 2007 balance sheets

2    have.

3              The comment on the City of Tulsa order.  Ms.

4    Xidis focuses in on this financial statements language

5    that Judge McCarthy used in that order.  Putting that in

6    context, that sentence reads:  Financial statements

7    showing net worth.  That net worth is by definition

8    assets minus liabilities, that's your net worth.  That's

9    a balance sheet.  That's what was ordered to be produced,

10   that's what was produced.  Judge McCarthy further states

11   that the plaintiffs in that case had not sustained their

12   burden to show that any additional information was

13   relative or probative, that they had not provided any

14   sound reason for producing or compelling production of

15   information beyond these balance sheets, and the same is

16   true in this case.  The plaintiffs are wanting this

17   information for their punitive damage claim, yet that's

18   the same reason that was present in the City of Tulsa

19   case, the Hightower case, this Montereau case, and the

20   other cases slipped my mind, the Cartoons case.  All of

21   those plaintiffs wanted this wide array of financial

22   information for punitive damages and in each of those

23   cases they were limited to one balance sheet, City of

24   Tulsa case, five balance sheets, which is what Peterson

25   has promised to produce here or has already produced.

1     There's not been any sound reason.  Mr. Payne's report

2     which was provided to you, he's formed his opinion on

3     Peterson's purported ability to pay a punitive damage

4     award.  Of note, Mr. Payne only used the last balance

5     sheet that was provided to the state which is the 2007

6     balance sheet.  He didn't qualify that.  He didn't say,

7     you know, in order to make an opinion on this ability to

8     pay, I need a tax return or I need a cash flow or I need

9     an income statement.  He just -- he made his opinion,

10    there it is.  It's not qualified.  Moreover, he didn't

11    raise this executive pay issue that Ms. Xidis raised this

12    morning.  These issues -- it's all a straw man argument.

13          I want to address this timing issue.  In

14    response to the motion for protective order that Peterson

15    Farms filed, the state raises this contention that

16    Peterson Farms was more strongly -- contests this

17    discovery had they raised it earlier.  They've had over

18    two years to raise the issue, waited until after the

19    passage of their expert report deadline to raise it.  At

20    no point in that process did Peterson Farms ever argue

21    that the production of financial statements was

22    premature.  What Peterson Farms stated in 2006 in

23    response to the state's request for productions was it

24    objected on the basis of relevancy, the proprietary and

25    confidential nature of the information sought.  Subject

1    to those objections, Peterson agreed to produce its

2    current financial statements limited to a balance sheet.

3    It produced that, it supplemented that since and it's

4    maintained those same objections throughout.  At no time

5    was prematurity a position for which Peterson argued

6    against production.  Peterson recognizes it has an

7    obligation to produce these balance sheets under the

8    authority of the cases in this district.  It has done so.

9              Unless you have some questions, Your Honor, I

10   believe I'm done.

11             THE COURT:  Mr. Hixon, I think you indicated,

12   frankly, they're running together on me a little bit.  I

13   may have it here.  You indicated that you weren't -- you

14   didn't think the Court had been provided with the balance

15   sheet.

16             MR. HIXON:  I believe that's correct.

17             THE COURT:  I would like to get that.  It can

18   be just submitted in camera -- (Interrupted)

19             MS. XIDIS:  Your Honor, I have a copy here

20   today.  I verified -- (Interrupted)

21             MR. HIXON:  I also have a copy.

22             THE COURT:  If you folks between you have an

23   extra, then I'll take a look at it.

24             MS. XIDIS:  That's the original that was

25   produced in response to discovery.

1          MR. HIXON:  Those appear to be true and correct

2     copies of what was produced to the state.

3          MS. XIDIS:  The one sheet standing letter, Your

4     Honor, was produced in response to the request for

5     production and the pages that are stapled are what was

6     produced in December by Peterson.

7          THE COURT:  Okay.

8          MR. HIXON:  And just to explain those, that

9     initial production, the sheet that's standing alone, was

10    compiled by then CFO Peterson, and the other documents

11    were compiled or were of the audited -- portions of the

12    audited financial statements prepared by Peterson's

13    accountant.  We expect the 2008 production or 2008

14    balance sheet to be in the format the audited financials.

15         THE COURT:  All right.  We'll let the record

16    reflect that I've accepted the production from Peterson

17    Farms of their financial information that was given to

18    the state so I can take a little closer look at that.

19         All right.  That leaves Simmons, I guess.  Ms.

20    Bronson, is that right?

21         MS. BRONSON:  Yes, Your Honor.  Vicki Bronson

22    on behalf of Simmons Foods.  And I won't bore you with

23    repeating all the argument that have been already made

24    and I'll stick -- (Interrupted)

25         THE COURT:  I assume you agree with Mr. Tucker

 1     and everybody else on the defense side who has come

 2     before you?

 3              MS. BRONSON:  Yes, Your Honor.  With regard to

 4     Simmons, we believe that we've fully complied with what's

 5     required by the law in this district.  We provided

 6     balance sheets from 2002 through 2008, and those balance

 7     sheets reflect a net worth which is what the standard is.

 8              I would like to point out this Cruce case that

 9     was brought in this morning, nowhere in that case did it

10     say anything about executive compensation.  The reason

11     that tax returns were ordered in that case is because the

12     defendant didn't provide anything else.  They didn't

13     provide balance sheets or any other financial statements.

14     No other district court in this district has ordered a

15     production of tax returns or anything other than balance

16     sheets which is what we provided for eight years.

17              THE COURT:  The reports that you -- balance

18     sheets that you provided, are they from audited

19     financials?

20              MS. BRONSON:  The ones where we had audited

21     financial statements, those were provided.  I didn't

22     bring a copy of those with me today, but if we had

23     audited financial state -- or audited balance sheets for

24     those particular years, that's what we provided.

25              THE COURT:  Is the Simmons production in the

1    record?

2              MS. BRONSON:  Yes.

3              THE COURT:  Submitted to the Court?

4              MS. BRONSON:  Yes.

5              THE COURT:  Okay.  Anything else?

6              MS. BRONSON:  That's it.

7              THE COURT:  Ms. Xidis, do you want to respond

8    to anything that was said here?

9              MR. XIDIS:  Yes, Your Honor.  A couple things,

10   Your Honor.  Overall, the burden here is for the state to

11   demonstrate that the information it's seeking is

12   relevant.  Your Honor, I think we've done that today in

13   explaining why the different bits -- different three

14   pieces of a financial statement relevant to financial

15   condition.  What the state is trying to avoid here, Your

16   Honor, is a situation where all we have is a balance

17   sheet, especially on a redacted revised balance sheet,

18   but only have a balance sheet and we get to trial and

19   these defendants say, oh, but wait, wait, income's been

20   bad this year.  You know, our cash flow is terrible, our

21   financial condition is poor, we're not in good shape.

22   And, Your Honor, there's definitely the ability for that

23   to happen here unless we get the entire financial

24   statement.  The defendants refer to all their reasonings

25   and say the state hasn't demonstrated its need for it and

1     what not.  Well, they have a burden to show good cause

2     why they have a protective order on this information.  I

3     think we've met our burden to say it's relevant.  They

4     have not demonstrated today why a protective order is

5     necessary.  They have tried to explain -- proprietary,

6     this is confidential.  I think that's clearly covered by

7     the confidentiality order in this case.  That's really a

8     non-issue for us here today.

9          Your Honor, I think another important thing the

10    Court picked up on is this information is not limited to

11    Mr. Payne and his reports.  Frankly, I don't expect -- I

12    don't know that the defendants will have an expert to

13    address this issue.  I think we're going to see corporate

14    representative addressing this issue in response to Mr.

15    Payne, and they've got access to every detail of the

16    defendants' financial information.  The state should at

17    least be entitled to the most base line basic Generally

18    Accepted Accounting Principle three part financial

19    statement.  We're not asking for the moon and the stars

20    here.  This is Accounting 101 that the state is seeking

21    to avoid that situation where we get up to trial and --

22    oh, but we -- actually, we can't pay because obviously

23    we're in a volatile economy, things could change, we've

24    seen that with a lot of companies.  The numbers we see --

25    what you see doesn't always tell the whole story.  I

1    think that's really important as we get ready for this

2    trial in September '09, Your Honor.

3           And perhaps the day is not the day, but I think

4    supplementation is another issue we need to address.  We

5    were dealing with this in October-November-December of

6    '08.  We're going to be going to trial in September '09,

7    so more quarters are going to pass before we get there,

8    and the defendants are going to have a duty to supplement

9    this information so that we have the relevant, current

10   financial condition when we get to trial.

11          I would like to just touch on a couple of the

12   specific issues raised in regards to the productions.

13   Cargill represented to Your Honor in their presentation

14   that compliance was total, and I think especially in the

15   case of the Cargill defendants, Your Honor, that is

16   really a misstatement.  What they have produced is not

17   even a balance sheet.  It's eight line items.  The other

18   balance sheets that have been presented to the Court have

19   about 30 different line items in them.  So I think that

20   at a very base line level, Cargill is by far the least in

21   compliance with any standard we've talked about today.

22          The Court also touched on the issue of the

23   audited statements and unaudited statements for Cargill

24   Turkey, Inc.  And just to try to clarify something I

25   mentioned earlier which was the consolidating financials,

1       that's the same thing I think the Court was inquiring

2       about.  Those consolidating financials would be the

3       unaudited financials of Cargill Turkey that are then

4       reported to Cargill, Inc., and so that is something that

5       already preexists, again, basic Accounting 101 that the

6       state thinks it's entitled to, to address that particular

7       Cargill Turkey defendant.

8               Next, Your Honor, I want to turn to the

9       George's production.  In trying to explain these reports

10      we received, I think there's really important information

11      in these accountant's disclaimers on the front of each

12      one of these sheets.  As counsel explained, these were

13      created by the accountant.  The accountant went out of

14      his way to explain what is missing from these

15      consolidated financials and I think that's really

16      important to point out.  If we look at the second

17      paragraph of these disclaimers, it says:  A compilation

18      limited in presenting the form of a balance sheet

19      information.  That is -- I'm sorry.  Mixing up my words

20      here.  A compilation is limited to presenting in the form

21      of a balance sheet information that is the representation

22      of management.  It goes on to say that management has

23      elected to omit substantially all of the disclosures

24      required by Generally Accepted Accounting Principles.  If

25      the amended disclosures were included in the balance

1    sheet, they might influence these conclusions about the
2    company's financial position.

3            Your Honor, this is very important language.
4    This accountant is essentially saying I've taken out
5    information that pertains to the company's financial
6    condition.  I don't know how we can talk around that or
7    get around that.  It's relevant and I don't think
8    George's has explained good cause for why it should not
9    be produced or why it should be protected.

10           Moving on to Peterson, Your Honor, and what has
11   been redacted -- (Interrupted)

12           THE COURT:  The accountant -- as I understand
13   the compilation, the accountant, it's all right for the
14   accountant to produce that documentation in that form as
15   long as he's certainly not aware that there's any
16   material omission that was done to mislead anyone; is
17   that fair to say?

18           MR. XIDIS:  Well, the accountant prepared this
19   at the direction of management is what he's telling us.
20   But what he is required -- (Interrupted)

21           THE COURT:  It would normally be a document
22   that would be a report within a company, I think; isn't
23   that right?

24           MR. XIDIS:  Your Honor, this would be a
25   document -- (Interrupted)

1          THE COURT:  A compilation might be done in that

2     way by the accountant for internal use until final

3     documentation or something is done?

4          MR. XIDIS:  Well, I don't know.  I can't answer

5     that for George's.  But what I can say is that we think

6     that we served a request for production and in response

7     for that request for production we are entitled to

8     documents maintained in the ordinary course of business.

9     So we're entitled to that complete audited financial

10    report with its three parts.  Instead we got this

11    specially created by management, consolidated, redacted

12    version of a financial statement that's fraught with

13    disclaimers.  The accountant has a duty under his

14    professional standards to put this disclaimer and say I

15    haven't followed my general principles and rules, so

16    reader beware.  There's information missing.  That's what

17    happened here and with the other balance sheets where we

18    don't have the notes.  So I think that's important to --

19    the accounting profession has this standard for reason

20    and the disclaimer's there for a reason, is because

21    relevant information is -- needs to be in those notes and

22    it needs to be seen by the reviewer.

23          On Peterson, Your Honor, I've handed you my

24    only copy of those documents, but it's confusing what has

25    been redacted and what hasn't.  When you compare the

1    initial one sheet production that was produced in

2    response to discovery and then the ones that were

3    produced in December, there are three columns missing

4    from the December production, none of which on their face

5    appear to be the L&L Cattle business.  And so, again,

6    Your Honor, we're asking for simply the un-redacted

7    copies maintained in the ordinary course of business.

8    Counsel did not explain good cause for protecting these

9    other columns other than, oh, you know, it's private.

10   Well, we have a confidentiality order that covers that,

11   Your Honor.

12           THE COURT:  For example, Peterson LP Gas

13   Company, that was part of the assets purchased, wasn't

14   it?

15           MR. McDANIEL:  That's correct.

16           MR. BULLOCK:  That's what was described the

17   other day.

18           THE COURT:  Right.  I don't know about the

19   Decatur Discount Center, but I think that was also.

20           MR. HIXON:  That's no part of Peterson, Your

21   Honor.

22           THE COURT:  That's no part of Peterson?  So

23   when the Peterson LP Gas Company doesn't appear on the

24   later -- well, actually, it's not even on the 2004.

25           MR. XIDIS:  Right.

1           THE COURT:  Okay.  But I assume those numbers

2    are rolled into the financial statement numbers.

3           MR. HIXON:  Right, Your Honor.  As I stated

4    when I was at the podium, that one sheet was prepared by

5    Peterson's CFO in response to that initial request for

6    production.  It's not going to exist for any subsequent

7    years.  It was produced for purpose of discovery.

8           THE COURT:  So when it was created, it was not

9    a document kept in the ordinary course of business, it

10   was especially created to provide the information that --

11   (Interrupted)

12          MR. HIXON:  It was not an audited financial

13   statement.  Whether it was kept in the ordinary course of

14   business I can't comment.  But it's not an audited

15   financial statement like the other financial statements

16   are.  The financial -- the audited financial statements,

17   it's -- you know, the column is for Peterson Farms.

18   That's the defendant in this case, that it shows net

19   worth of that defendant.  What was redacted, if you look

20   at pages 93419, for instance, this empty space over here

21   on the right was the L&L Farms information.  That's

22   what's been redacted from this audited financial

23   statement.

24          THE COURT:  Okay.

25          MR. XIDIS:  Your Honor, if it's an audited

1    financial statement there would be notes that correspond

2    to it.  And so again, we are requesting the complete

3    financial statement, all three parts, with the notes.

4    It's very difficult to argue for something that we don't

5    know exactly what it is because it's been redacted, but I

6    think it all just supports the point to understand the

7    full financial condition you've got to see these notes

8    that are integral to the accounting profession.  So, Your

9    Honor, I think that's all.

10        THE COURT:  I think it was in one of your -- it

11   wasn't your letter, it was a letter written in response

12   to, for example, Cargill's discovery responses and we had

13   these seven bullet points of things that the state

14   wanted.  I'm not hearing mention of a number of these

15   things here today.  Are those still the table or have you

16   narrowed it down to --?

17        MR. XIDIS:  The state has made a concerted

18   effort to narrow this down.  And so, the things that the

19   state is seeking today in this motion are those complete

20   financial statements.  So, balance sheets, income

21   statement, cash flow statement with complete set of

22   notes, two years of tax returns and for Cargill Turkey,

23   the consolidating format financials which would -- we

24   also called it, I think, the unaudited financials today

25   that are reported to the parent company Cargill, Inc.

1              THE COURT:  All this other stuff of working

2       trial balance, appraisal valuations, copies of business

3       plans, et cetera -- (Interrupted)

4              MR. XIDIS:  In our attempts to meet and confer

5       and reach an agreement on this we've really tried to

6       narrow our request to what we can consider, you know, the

7       basics of describing a company's financial condition.

8       And to avoid that situation I described earlier where we

9       get to trial and these defendants say, oh, but wait, that

10      balance sheet statement, that doesn't really explain our

11      financial health.  We're actually really having problems

12      and we can't withstand a judgment.  We've got -- it

13      simply wouldn't be fair for the defendants to have that

14      information and be able to use it and for it not to be

15      produced to the state.  If it's not produced in

16      discovery, Your Honor, we would submit that they

17      shouldn't be able to use it in that manner in the trial

18      of this case.

19             THE COURT:  All right.  Anybody on the defense

20      side?  And generally, what about that?  If there's

21      something that you don't produce to the state, are you

22      going to be allowed to try and use it at trial?  Is there

23      going to be any question at trial or are we going to have

24      defendants taking a different view of, say, Mr. Payne has

25      assessed in his valuation?  Obviously, you may take a

1     different view, but is it going to be such a radically

2     different view based on different documentation than what

3     we're dealing with here today?

4          MR. GRAVES:  I can only speak for George's, but

5     we certainly aren't going to agree with Mr. Payne's

6     analysis or his conclusions about what George's could pay

7     or its ability to pay punitive damages or whatever it is

8     he's saying that we could pay.  And has been alluded to,

9     he didn't even use complete information that he had been

10    provided at the time, he used parts of it that seemed to

11    suit him.  So we're certainly not going to agree with

12    that analysis.  But I can also say that from George's

13    standpoint we're not going to be presenting cash flow

14    statements or income tax returns at trial.  So, that's

15    not something that the state would need to concern itself

16    with because it's not going to happen.

17         THE COURT:  In terms of net worth, is there

18    going to be a fight at trial from George's over whatever

19    Mr. Payne said was the net worth?

20         MR. GRAVES:  I can't speak to whether the net

21    worth is going to change during 2009.  What I can say is

22    that -- if we have a duty to supplement or update that

23    information based on economic circumstances and the

24    company's performance during 2009 we would do that and

25    we're obligated to do.  I can't say that the conditions

1      are going to be better or worse.  We're all dealing with

2      the economy we're dealing with right now and that's a

3      possibility that things could be worse or things could be

4      better than they are in these balance sheets that have

5      been presented at this point in time.  As Ms. Xidis

6      conceded, a balance sheet is just a snapshot of a

7      company's net worth at a point in time, whatever point in

8      time you pick, to produce that balance sheet.  And so,

9      whatever date the balance sheet is that we produced, I

10     think it was in December of '08, that's what the net

11     worth was in December of '08.  I don't know what it would

12     be today.  I doubt it's substantially changed but at this

13     point.  But if we had to supplement, we would if we had

14     intended present information along those lines at trial.

15            I just wanted to briefly, very briefly, address

16     this notation again by the accountant, and Your Honor

17     touched on it, and that is the accountant -- the state

18     continues to maintain that there's information missing

19     and that the accountant put these big warning signs at

20     the front of the financial statements in order to warn

21     people off.  That's not the purpose of those notations

22     and he's explained that in his affidavit.  The reason

23     those notations are there are to let people that there

24     are things that would normally be in a consolidated

25     balance sheet or income statement that aren't there in

```
 1      this case because of the reasons that they were being
 2      prepared in this case, and that was partly management's
 3      desire and counsel's desire to not produce a lot of
 4      financial information and details about companies that
 5      aren't in this case and/or that aren't involved in
 6      poultry operations.  Those accountants would not even
 7      sign or present or prepare an accounting statement if
 8      someone was telling them you've got to admit everything
 9      that's important or everything that's material.  And if
10      there were material omissions, it would be noted as a
11      material omission.  Mr. Flesher has explained in his
12      affidavit very clearly what types of information was
13      omitted.  And so, by virtue of the notation, he's telling
14      people that -- he's telling the person that's going to be
15      reading it for the purposes it was being produced in this
16      case, which is an adverse party in litigation, that some
17      things that might ordinarily be in a financial statement
18      that's presented to internal management for their
19      purposes might not be here and for what your purposes are
20      in this case and he knew what those purposes were because
21      he had read the papers in this case.
22              But I also just wanted to point out GAAP is not
23      the law that I'm aware of in Arkansas or Oklahoma.
24      Certainly it's something that the accountant -- the
25      accounting profession has adopted.  And part of GAAP is
```

1    -- Generally Accepted Accounting Principles.  Part of
2    GAAP is to let users know what's in there and what's not
3    in there and that's what Mr. Flesher was doing.  What is
4    the law in this district is presenting a real net worth
5    number for punitive damages purposes and that's what
6    George's has done.  Thank you.
7              THE COURT:  All right.  Mr. Tucker?
8              MR. TUCKER:  Your Honor, if I may, let there be
9    no mistake.  We do not accept Mr. Payne's
10   characterization of the purpose of Mr. Payne's testimony
11   as being ability to pay.  That is not the standard by
12   which Cargill will expect to be judged when the Court
13   gives instructions in this case if punitive damages are
14   going to the jury.  That may be Mr. Payne's professional
15   opinion, that may be the way he's testified and he's a
16   very successful testifier, we've all heard him and he has
17   lots of on-the-edge ideas about how to present his
18   theories and this is just another one of them.  I'd be
19   very surprised if Mr. Payne survives a Daubert challenge,
20   frankly, with his standard.
21             Be that as it may, we recognize our
22   responsibility to supplement our information with regard
23   to net worth and I would assume that we would have six
24   months of 2009 behind our belts and completed before this
25   trial starts in September and I would expect that that

1    would be information to which the plaintiff, the state,

2    would be entitled.  Net worth is the standard in this

3    district.  We have gone beyond simply providing a number,

4    a net worth.  We've provided, let the Court note, in a

5    pleading form in response to a discovery request.  We

6    have not given someone else's letter or someone else's

7    affidavit.  That is -- Cargill itself has presented this

8    number.  This is its net worth over these periods of time

9    and that complies with what's required in this district.

10   Thank you, sir.

11            THE COURT:  All right.

12            MR. HIXON:  Your Honor, make an additional

13   point on Mr. Payne's opinion on net worth.  First, I

14   would refer you to the Peterson audited financial

15   statements.  If you look at what's Bates numbered

16   PFIRWP-093426, on that page is the total owner's equity

17   which is Peterson Farm's net worth.  I'll let you look at

18   that number.  If you refer to page eight of Mr. Payne's

19   report for Peterson Farms, he has a net worth figure here

20   for the same time period, the September 29th, 2007 time

21   period.

22            THE COURT:  All right.

23            MR. HIXON:  That number, as you can see, is

24   very different than the number in Peterson Farms'

25   financial statements in the audited balance sheet.  So to

1       the extent that, yes, Peterson will contest the net worth

2       figure that Mr. Payne has presented in his report, that

3       will not entail trotting out financial -- additional

4       financial statements, income statements, cash flow or tax

5       returns.

6               Additional comment.  As I stated before, Mr.

7       Payne has only used this September 29th, 2007

8       information.  He was produced information for 2004, 2005

9       and 2006.  If one were to compare the changes in those

10      account balances during those periods, he could obtain

11      much of the information that the state is requesting --

12      now.  It's inherent in the changes in the -- I mean,

13      that's just basic financial information.  So, yes,

14      Peterson will rely on what is produced to the state and

15      if required to supplement, it will supplement as ordered.

16      But the information that the state has -- or the state

17      has currently, it satisfies the obligation --

18      (Interrupted)

19              THE COURT: -- long as there's not other

20      information currently available that one would turn

21      around and say, ah hah, got this information that shows

22      that your numbers are all wrong and we didn't give it to

23      you at the time.  Obviously, we're not going to -- that's

24      not -- (Interrupted)

25              MR. HIXON:  With regard to Peterson, I mean,

1    there's going to be changes between this September --

2    (Interrupted)

3              THE COURT:  I understand that -- (Interrupted)

4              MR. HIXON:  -- 2008 and we promise to produce

5    that when it's available.  Thank you.

6              THE COURT:  Anyone else?  All right.  I will

7    take these motions under advisement and I'll look in a

8    little more detail.  I've tried looking at some of the

9    cases around the country in terms of what has generally

10   been ordered, and frankly, there's not a lot of detail

11   out there.  But I have to say that at least certainly

12   with respect to -- the reason I asked about the seven

13   points, I don't know of anybody that's ordered all that

14   produced.  So I want to look more at the cases that

15   you've cited here in the Northern District and elsewhere

16   as well as the Cruce case and then we'll get an order out

17   as expeditiously as we can.  All right.  Thank you.

18            (END OF PROCEEDINGS)

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2
    STATE OF OKLAHOMA  )
3                     ) SS.
    COUNTY OF TULSA    )
4

5              I, Greg Eustice, Certified Shorthand Reporter

6     in and for the State of Oklahoma, do hereby certify that

7     on March 2, 2009 the above Proceedings were held before

8     the Honorable Paul J. Cleary, Magistrate Judge in the

9     United States District Court for the Northern District of

10    Oklahoma, and that the same was reduced to writing by me

11    in stenograph, and thereafter transcribed by myself, and

12    is fully and accurately set forth in the preceding 57

13    pages.

14             I do further certify that I am not related to

15    nor attorney for any of the said parties, nor otherwise

16    interested in said action.

17             WITNESS my hand this 10th day of March, 2008.

18

19                            S-Greg Eustice_____
                              GREG EUSTICE
20                            Certified Shorthand Reporter

21

22

23

24

25

EUSTICE REPORTING SERVICE
BOX 700488   TULSA, OK 74170  (918)445-2965