**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **STATE OF OKLAHOMA, et al.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 05-CV-329-GKF-PJC |
| ) | |
| **TYSON FOODS, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**ORDER**

Before the Court are the Motion for Protective Order filed by Plaintiffs State of Oklahoma, ex rel. W.A. Drew Edmonson, in his capacity as Attorney General of the State of Oklahoma and Oklahoma Secretary of the Environment C. Miles Tolbert, in his capacity as the Trustee for Natural Resources for the State of Oklahoma (hereafter, the "State") (Dkt. #1853), and the Motion to Compel Production of Expert Materials filed by Defendants Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., (the "Tyson Defendants"), Cobb-Vantress, Inc., Cal-Maine Foods, Inc., Cal-Maine Farms, Inc., Cargill, Inc., Cargill Turkey Production, LLC, George's, Inc., George's Farms, Inc., Peterson Farms, Inc., Simmons Foods, Inc., and Willow Brook Foods, Inc. (hereafter "Defendants") (Dkt. #1854).

At the February 26, 2009 hearing, the State represented it had produced all the materials sought by the Defendants except for the personal identification information of the survey respondents for which it seeks a protective order. Defendants have sought this information from the State and the Tyson Defendants have also subpoenaed the three independent contractors hired by the State's experts, Stratus Consulting ("Stratus"), for their materials: Wilson Research Strategies ("WRS"), Consumer Logic, Inc. ("Consumer Logic") and Westat, Inc.("Westat").

The remaining issue in both motions, therefore, is whether the identifying information of respondents to the survey conducted by the State's experts and their polling firms should be produced.

Defendants also filed a Motion for Extension of Time to File their Expert Reports on Damages (Dkt. #1857). They contend that they need three additional months (March 2 until June 2, 2009) from the disclosure of the requested identifying information of all the survey respondents in which to interview these respondents, depose the State's experts and have their damages expert evaluate the volume of materials that have already been produced. At the hearing, the Court granted an extension until March 31, 2009, subject to further extension of time should the Court determine that Defendants are entitled to the respondent information they seek.

## Background

The expert report at the heart of this discovery dispute is the *Natural Resource Damages Associated with Aesthetic and Ecosystem Injuries to Oklahoma's Illinois River System and Tenkiller Lake* (hereafter, the "CV Report")*,* a study undertaken by the State's damages experts at Stratus Consulting, Inc. - David J. Chapman, Richard C. Bishop, W. Michael Hanemann, Barbara J. Kanninen, Jon A. Krosnick, Edward R. Morey and Roger Tourangeau (the "Stratus experts") - to measure the natural resource damages "associated with excess phosphorus from poultry waste and other sources entering the Illinois River system and Tenkiller Lake." *See Exhibit D to* State's Motion for Protective Order (Dkt. #1853). To estimate the amount of money damages for future injuries resulting from past and current land applications of poultry waste to the Illinois River Watershed ("IRW"), the Stratus experts conducted a contingent

valuation survey (the "CV survey").

> [A contingent valuation] is a survey-based approach to the valuation of nonmarket goods and services that relies on a questionnaire for the direct elicitation of information about the value of the good or service in question. The value obtained for the good or service is said to be contingent upon the nature of the constructed (hypothetical or simulated) market and the good or service described in the survey scenario. In the natural resource damage assessment context, CV studies generally derive values through elicitation of respondents' willingness to pay (WTP)[1] to prevent injuries to natural resources or to restore injured natural resources.

Dept. of Interior ("DOI"), *Natural Resource Damage Assessments*, 59 Fed.Reg. 23098, 23100, 1994 WL 163004 (May 4, 1994); *see also* Dept. of Commerce, National Oceanic and Atmospheric Admin. ("NOAA"), *Natural Resource Damage Assessments under the Oil Pollution Act of 1990*, 58 Fed.Reg 4601-4602, 1993 WL 6073 (Jan. 15, 1993).

The CV methodology determines a use/nonuse valuation rather than a restoration assessment of damages and has been employed when there is injury to a nonmarketable resource.[2] The Stratus experts used a total valuation framework including a use value, *e.g.*, "if

---

[1] The CV Report explains the difference between willingness to pay ("WTP") and willingness-to-accept ("WTA") as a measure of value of natural resource injury:
> There are two alternative ways to frame an exchange: WTP and willingness-to-accept (WTA). WTP is the *maximum* amount those affected by natural resource injuries would be willing to pay to be rid of them. The WTA measure of damages is the *minimum* compensation those affected by the natural resource injuries would require to be as well off as they would have been had the injuries not occurred.

*CV Report*, p. 2-5. The CV Report points out that the WTA is generally much greater than the WTP and although the NOAA Panel in its report on CV methodology acknowledged that WTA is the "conceptually correct measure of lost passive-use value for environmental damage that has already occurred," it nonetheless recommended the use of WTP as the "conservative choice." *Id*. The Stratus experts, therefore, adopted WTP for the CV survey, in accordance with the 1993 NOAA guidelines.

[2] There are a variety of economic methods to value natural resources, including market valuation which calculates damages based on market value of the resources and nonmarket valuation that often employs surveys to ascertain the total value one may derive from a resource.
> A natural resource has both use values and nonuse values. Use values derive from the actual use of the resource. Only someone who actually uses the resource receives use value benefits from that resource. In contrast, anyone - whether they use the resource or not - can receive nonuse value benefits from a resource. Nonuse values include both an

3

excess algae in Tenkiller Lake reduces the aesthetics of the lake, or reduces catch of favored fish in the lake, enjoyment of the lake by anglers may decline, which would reduce the angler's use and/or enjoyment of the lake," and nonuse values, *e.g.*,

> people may value natural resources of the Illinois River System and Tenkiller Lake in an uninjured state (e.g., without compromised aesthetics or ecosystem) because they want to bequeath them to future generations. This component of nonuse value is referred to as "bequest value." Or, they may place a value on simply knowing that a resource exists in an uninjured state, or for other reasons. This is referred to as "existence value."

*CV Report,* pp. 1-4. In determining the total valuation, the CV survey first described the injury to the IRW and then ultimately asked the respondent whether he/she would be willing to pay a one-time tax for alum treatments to the river and lake after the court bans the spreading of poultry litter to decrease the time it would take to return Tenkiller Lake to its 1960 state 40 years sooner than without the treatments. Using the CV method, the Stratus experts estimated damages per household to be $184.55 and with 1,352,878 households in the study area, the estimate of future natural resource damages is $249,673,635.[3]

The Stratus experts used focus groups, one-on-one interviews, pre-testing and pilot tests to develop and refine the questionnaire that was used in the final survey. WRS was retained for logistical support for one night of focus groups. Consumer Logic was used for all remaining

---

> *existence* value, the value someone derives from knowing that a resource exists, and an
> *option* value, the value someone derives from having the opportunity to use the resource
> in the future. Nonuse value is sometimes referred to as "passive use" value.

Dale B. Thompson, *Valuing the Environment: Courts' Struggles with Natural Resource Damages*, 32 Envtl. L. 57, 89 n.3 (Winter 2002) (emphasis added). Typically, a CV survey asks whether the respondent would vote to support a project that would protect a natural resource and cost the respondent a certain amount of money.

[3]These damages do not include additional damages for injuries to groundwater or human health or any damages for the years prior to the study.

focus groups, one-on-one interviews, pretesting and a telephone survey.  And Westat was retained to implement two pilot field studies as well as the final in-person door-to-door survey of Oklahoma residents.

As "precursor" studies to the main CV survey, the Stratus experts conducted an intercept recreation study in 2006 "to gain an understanding of the levels of use of the natural resources at issue and the public thoughts about those resources." *State's Response to Defendants' Motion to Compel*,  p.2 (Dkt. #1885).  Also in 2006, a "telephone study to gain (1) an understanding of people's knowledge of and use of Oklahoma rivers; (2) an understanding of people's knowledge of the Illinois River Watershed and (3) to gain un understanding of the impacts of the Defendants' media campaign" was undertaken.  *Id*.

The State states that it timely produced (1) all the materials that exist pertaining to the intercept recreation study, (2) a copy of the script, phone numbers of individual contacted and results for the telephone survey, (3) all the scripts and other materials the Stratus experts created for the focus groups and one-on-one interviews, (4) all the materials used by and the results gathered by Stratus experts during the pretests, (5) Westat's two reports on the pilot tests and all the information the Stratus experts reviewed regarding the pilot tests, and (6) the Stratus experts' interviewer training materials, the script and the show cards for the main survey.  And at the February 26, 2009 hearing, the State represented that the only materials  not produced are the identifying information about the survey respondents.

## Analysis

Defendants move to compel this identifying information which the State seeks to protect.  The State seeks a protective order pursuant to Rule 26© of the Federal Rules of Civil Procedure

which states in pertinent part:

> (1) *In General*. A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>> (G) requiring that a trade secret or *other confidential research, development, or commercial information* not be revealed or be revealed only in a specified way . . .

Fed.R.Civ.P. 26(c)(1)(G)(emphasis added). To resist disclosure of confidential information, a party must first establish that the information is confidential and that its disclosure might be harmful. *Centurion Indus., Inc. v. Warren Steurer and Associates*, 665 F.2d 323, 325 (10th Cir. 1981). If this is demonstrated, then the burden shifts to the party seeking disclosure to show that the requested information is relevant and necessary. *Id*. Finally, the Court must balance the need for discovery of the confidential material against the claims of injury resulting from disclosure. *Id.*; 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2043, p. 559 (2d ed. 1994) ("If it is established that confidential information is being sought, the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause to the person from whom he is seeking the information").

The State contends that the code of professional ethics governing the conduct of surveys mandates that identifying information of survey respondents be kept confidential. *See* Council of American Survey Research Organizations Code of Standards and Ethics for Survey Research (Rev.2008) ("CASRO Code"), *Exhibit H to Plaintiff's Motion for Protective Order* (Dkt.

#1853)[4] and American Association for Public Opinion Research Code of Professional Ethics & Practices ("AAPOR Code"),[5] *Exhibit I to Plaintiff's Motion for Protective Order* (Dkt. #1853). CASRO and AAPOR have filed a joint amicus brief further emphasizing the importance of confidentiality of the identities of survey respondents. They explain that preservation of this confidentiality is warranted (1) to protect research results against inaccuracies or bias as the candor of the respondents' answers may be inhibited by public disclosure and (2) "to ensure the free flow of information and to provide the foundation for unbiased survey data."[6] *Amici Curiae Brief*, pp. 6-9 (Dkt. #1890) (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)).

The Federal Judicial Center's Reference Manual on Scientific Evidence (2d ed. 2000) ("FJC Reference Manual") recognizes the ethical obligation on the part of survey researchers to maintain the confidentiality of respondents' identities.

The respondents questioned in a survey generally do not testify in legal

---

[4] The CASRO Code provides:
The use of survey results in a legal proceeding does not relieve the Survey Research Organization of its ethical obligation to maintain in confidence all Respondent-identifiable information or lessen the importance of Respondent Anonymity. Consequently, Survey Research firms confronted with a subpoena or other legal process requesting the disclosure of Respondent-identifiable information should take all reasonable steps to oppose such requests, including informing the court or other decision-maker involved of the factors justifying confidentiality and Respondent anonymity and interposing all appropriate defenses to the request for disclosure.
CASRO Code §I.3.f., *Exhibit H to Plaintiff's Motion for Protective Order* (Dkt. #1853)

[5] The AAPOR Code contains a similar provision:
We understand that the use of our survey results in a legal proceeding does not relieve us of our ethical obligation to keep confidential all respondent identifiable information or lessen the importance of respondent anonymity.
AAPOR Code §II.D.6, *Exhibit I to Plaintiff's Motion for Protective Order* (Dkt. #1853).

[6] Defendants state that the amicus position is not pertinent here because the State's attorneys specifically removed the boilerplate confidentiality provisions in the draft documents of the survey instruments. At the hearing, the State explained that the provisions were removed because it could not guarantee that the Court would not allow the respondents' identities to be disclosed.

>proceedings and are unavailable for cross-examination. Indeed, one of the advantages of a survey is that it avoids a repetitious and unrepresentative parade of witnesses. To verify that interviews occurred with qualified respondents, standard survey practice includes validation procedures, the results of which should be included in the survey report.
>
>Conflicts may arise when an opposing party asks for survey respondents' names and addresses in order to reinterview some respondents. The party introducing the survey or the survey organization that conducted the research generally resists supplying such information. Professional surveyors as a rule guarantee confidentiality in an effort to increase participation rates and to encourage candid responses. Because failure to extend confidentiality may bias both the willingness of potential respondents to participate in a survey and their responses, the professional standards for survey researchers generally prohibit the disclosure of respondents' identities.

*Id*. at 271-72.

A number of courts have similarly recognized the need to preserve the confidentiality of survey participants. *See, e.g., Applera Corp. v. MJ Research, Inc.*, 389 F.Supp.2d 344, 350 (D.Conn. 2005) ("researchers are prohibited by ethical rules from disclosing the actual individual identities of the survey respondents and instructed to defend against Court orders compelling disclosure")*; Farnsworth v. Proctor & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985)(prohibiting disclosure of respondent identities because of potential harm to social research surveying); *Lampshire v. Proctor & Gamble Co.*, 94 F.R.D. 58, 60 (N.D. Ga. 1982) (finding good cause to redact the personal identifying information of survey respondents and rejecting defendant's claim that this information was necessary to adequately test the validity of the survey); *but see Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 2007 WL 102088 (E.D.Ky 2007) (affirming the Magistrate Judge's ruling that identifying information of the participants of a survey conducted by a party in litigation should be disclosed); *United States Surgical Corp. v. Orris, Inc.*, 983 F.Supp 963, 969 (D.Kan.1997) (affirming Magistrate Judge's order to disclose

the identities of the survey participants).

The State has established that the identifying information of the respondents is confidential material under Rule 26© and that its disclosure would be harmful. The burden thus shifts to Defendants to show that the confidential information is sufficiently relevant and necessary to their case to outweigh the harm resulting from disclosure. *Centurion Indus.*, 665 F.2d at 325-26.

Defendants submit the affidavit of their expert in the preparation and evaluation of NRD assessments, William H. Desvousges, ("Desvousges"). Desvousges attests that the identity of the individuals surveyed or questioned during the course of the State's damage evaluation is necessary to fully critique the State's NRD assessment. *Desvousges Affidavit*, ¶25, *Exhibit 4 to Defendants' Motion to Compel* (Dkt. #1854) (hereafter "*Desvousges Affidavit*). Specifically, Desvousges cites the need for the identifying information for evaluation of the following:

(1) how interviewers actually administered the survey,
(2) how accurately interviewers recorded respondent answers,
(3) how Plaintiffs went about "educat[ing]" survey participants about the phosphorous "problem" in the wake of the 2006 telephone survey,
(4) how much uncertainty interviewers injected into the damages calculation based on the nonuse values collected after that "educat[ion]" process, and
(5) bias resulting from the actual (versus ideal or scripted) interviews, including interviewers' narrative descriptions of the injury, the way interviewers identified and presented the cause of the "problem" and the proposed solution, the manner in which interviewers asked questions, what interviewers told respondents during the survey, and how the respondents' answers were processed.

*Defendants' Response to Plaintiff's Motion for Protective Order,* pp. 2-3 (citations to *Desvousges' Affidavit* omitted) (Dkt. #1883). Defendants note that what the State has provided are the materials that state what the interviewers *were supposed to say* to the respondents and not what was *actually conveyed* or the *actual response*s which are needed to determine whether the

9

survey is free of bias.

The State submits the affidavits of two of their Stratus experts, Jon A. Krosnick ("Krosnick")and Roger Tourangeau ("Tourangeau") to refute Desvousges' testimony. Both experts attest that (1) they did not personally administer the CV survey to any respondents or potential respondents; and (2) they are unaware of any standard procedures in survey research that require using respondents' personal identifying information to evaluate any of the following:

    a.    bias and non-response bias;
    b.    the effect of survey questionnaire design on the interviewees' responses and the State's damages calculation;
    c.    the rationale behind selecting a CV methodology after completing the telephone survey and recreational study;
    d.    the totality of information provided to respondents during the interviews.

*Krosnick Affidavit*, ¶¶8 and 9, *Exhibit G to the State's Response* (Dkt. #1885); *Tourangeau Affidavit*, ¶¶8 and 9, *Exhibit H to the State's Response* (Dkt. #1885). The State explains that the participant identifying information was never in the possession of the Stratus experts and thus does not constitute testifying experts' "considered materials." [7] And, in any case, personal identifying information of participants in the survey development and administration is not subject to disclosure because it constitutes "confidential research."

Although the identity of the survey participants is relevant, Defendants have failed to

---

[7] Defendants point out that the Stratus experts had the personal identifying information for at least 189 of the CV survey participants. The produced materials show at least four of the Stratus experts were provided with this identifying information by Westat on December 1, 2008 in a file containing the contact information of people who initially declined to complete the CV survey and Krosnick and Tourangeau actually contacted some of these participants in making their "conversion" calls. Krosnick and Tourangeau attest that they were the only Stratus experts who attempted conversion of a *subset* of the 189 and they were unaware of any specific individual of those they were able to reach who ultimately participated in the survey. "Conversion," they explain, "is a standard survey practice whereby individuals who initially decline participating in a survey are contacted following their initial decline for the purpose of encouraging participation." *Krosnick Affidavit* ¶¶6 and 7, *Exhibit G to the State's Response* (Dkt. #1885); *Tourangeau Affidavit*, ¶¶6 and 7, *Exhibit H to the State's Response* (Dkt. #1885).

persuade the Court that such is "sufficiently relevant and necessary to their case" to outweigh the harm of undermining the public interest in insuring the ability of surveys to elicit accurate information from respondents.  Not surprisingly, the affidavits of the State's experts dispute the necessity of the identifying information claimed by Defendants' expert, Desvousges, to test the reliability of the CV survey.  Defendants do not adequately explain how re-contacting all or any of the ~2000 CV survey respondents would "forensically test this more than two-year shaping process to evaluate the CV method" the State employed.  The survey was conducted in compliance with the NOAA Panel Guidelines and takes into account the interviewer effect and the understanding and acceptance of the respondents.  The CV Report details the training and supervision of the interviewers as well as the validation procedures and their results.  In addition, the State produced three reports from Westat explaining its work as well as its prior drafts of reports it provided to the Stratus experts.  Defendants have not articulated what they would ask these respondents to test the reliability of the survey or what would result from their "re-survey" of respondents, other than the possibility of up to ~2000 " mini-trials" to determine whether the polling firms' interviewers significantly deviated from the detailed survey instructions and materials in sufficient numbers to skew the results.  Yet, they offer no basis for this unlikely scenario.

      Defendants cite their Exhibit 19, the zip file of the names, addresses and phone numbers of 189 respondents in the possession of the Stratus experts as evidence that the State's "CV survey workers often had multiple contacts with many of the survey respondents (including one respondent who was contacted at least 13 times) and these workers (sometimes multiple workers) contacted members of the survey sample households by telephone and in-person."  The

Court sees little if any additional value Defendants could extract from yet another contact of a "multiple-contact" respondent over cross-examination of the Stratus experts as to possible bias resulting from those contacts.

Finally, as is clear from the briefing, Defendants have ample material to prepare a defense against the CV study. Defendants can attack the CV survey by challenging the sample size, survey questions and design, sampling techniques and other scientific challenges to the adequacy of the survey and its CV methodology.

For the reasons set forth above, the Court **GRANTS** the State's Motion for Protective Order (Dkt. #1853), and **DENIES** Defendants' Motion to Compel (Dkt. #1854). Because the Court finds that Defendants are not entitled to the identifying information of the survey respondents, the Court sees no justification for any further extension of time for the Defendants' expert report(s) on damages. The report(s), accordingly, will be due on March 31, 2009.

IT IS SO ORDERED, this 11th day of March, 2009.

_____
Paul J. Cleary
United States Magistrate Judge