```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE
                   NORTHERN DISTRICT OF OKLAHOMA
 2
          STATE OF OKLAHOMA, ex rel. W.A.      )
 3        DREW EDMONDSON, in his capacity as   )
          ATTORNEY GENERAL OF THE STATE OF     )
 4        OKLAHOMA and OKLAHOMA SECRETARY OF   )
          THE ENVIRONMENT C. MILES TROBERT,    )
 5        in his capacity as the TRUSTEE FOR   )
          NATURAL RESOURCES FOR THE STATE OF   )
 6        OKLAHOMA,                            )
                                               )
 7                         Plaintiff,          )
                                               ) Case No.
 8        -vs-                                 ) 05-CV-329-GKF-PJC
                                               )
 9        TYSON FOODS, INC., TYSON POULTRY,    )
          INC., TYSON CHICKEN, INC., COBB-     )
10        VANTRESS, INC., AVIAGEN, INC., CAL-  )
          MAINE FOODS, INC., CAL-MAINE FARMS,  )
11        INC., CARGILL, INC., CARGILL TURKEY  )
          PRODUCTION, LLC, GEORGE'S, INC.,     )
12        GEORGE'S FARMS, INC., PETERSON       )
          FARMS, INC., SIMMONS FOODS, INC.,    )
13        and WILLOW BROOK FOODS, INC.,        )
                                               )
14                         Defendants.         )

15                  TRANSCRIPT OF PROCEEDINGS,

16      held before the Honorable Paul J. Cleary, Magistrate

17      Judge in the United States District Court for the

18      Northern District of Oklahoma on April 7, 2009.

19                  A P P E A R A N C E S

20      For the Plaintiff:        Mr. Louis Bullock
                                  Mr. David Riggs
21                                Ms. Ingrid Moll
                                  Ms. Claire Xidis
22                                Mr. Robert Nance
                                  Mr. Robert Blakemore and
23                                Mr. Dan Lennington
                                  Attorneys at Law
24
        (Appearances continued . . .)
25
```

```
 1    (Appearances continued . . .)

 2    For Defendant Cargill:      Mr. John Tucker and
                                  Mr. Del Ehrich
 3                                Attorneys at Law

 4    For Defendant Peterson:     Mr. Philip Hixon
                                  Attorney at Law
 5
      For Defendant Tyson:        Mr. Robert George
 6                                Attorney at Law

 7    For Defendant Cal-Maine:    Mr. Robert Redemann
                                  Attorney at Law
 8
      For Defendant Simmons:      Mr. John Elrod and
 9                                Mr. Bruce Freeman
                                  Attorneys at Law
10
      For Defendant George's:     Mr. James Graves
11                                Attorney at Law

12

13                  P R O C E E D I N G S

14         COURTROOM DEPUTY:  Case Number

15    05-CV-329-GKF-PJC, Attorney General of the State of

16    Oklahoma, et al. versus Tyson Foods, et al.  Counsel,

17    will you please state your appearances for the record.

18         MR. BULLOCK:  Louis Bullock for the State of

19    Oklahoma.

20         MS. MOLL:  Ingrid Moll for the State of

21    Oklahoma.

22         MR. RIGGS:  David Riggs for the State of

23    Oklahoma.

24         MR. LENNINGTON:  Dan Lennington for the State

25    of Oklahoma.
```

1               MR. NANCE:  Bob Nance for the State of

2       Oklahoma.

3               MR. TUCKER:  John Tucker for the Cargill

4       defendants.

5               MR. GEORGE:  Robert George for the Tyson

6       defendants.

7               MR. EHRICH:  Del Ehrich for the Cargill

8       defendants.

9               MR. GRAVES:  James Graves for George's

10      defendants.

11              MR. FREEMAN:  Bruce Freeman for Simmons.

12              MR. REDEMANN:  Robert Redemann for the

13      Cal-Maine defendants.

14              MR. HIXON:  Philip Hixon for Peterson Farms.

15              MR. ELROD:  John Elrod for Simmons.

16              THE COURT:  All right.  Let me start off with

17      two preliminaries.  729, motion for attorney fees.  Mr.

18      Bullock, do you have anything to report on that?

19              MR. BULLOCK:  I spoke to, I believe, Mr.

20      Tucker.  He said he was going to get some folks together.

21      I believe it was Mr. Tucker.

22              THE COURT:  This is the attorney fee --

23      (Interrupted)

24              MR. BULLOCK:  Yes.  This is the attorney fees.

25      We're supposed to have a conference -- I'm sorry.  In the

1    chaos of this, it has fallen through the cracks.  But I

2    did speak with one of the defense lawyers and he said he

3    was going to get some folks together and then both of us

4    got otherwise diverted.

5            THE COURT:  All right.  On 1921, which is the

6    motion to reconsider the ruling about the attorney

7    general's deposition with respect to e-coli in Locust

8    Grove, I'm going to deny the motion to reconsider.  I

9    think it's irrelevant.  Locust Grove is not within the

10   Illinois River Watershed and we're so late in the day to

11   be opening the door to that issue that I just don't think

12   that's appropriate.  So the motion to reconsider will be

13   denied.

14           Now, we have a host of discovery issues here

15   which are presenting a real problem, as you can see, with

16   the efficient adjudication of this case.  I mean, we have

17   had a schedule in place here for quite some time.  I

18   think the last schedule was set in March of '08, so for

19   more than a year now we've known well the deadlines were

20   discovery cutoff is to be April 16th.  And now we've got

21   a host of motions that would reopen document discovery

22   and tie into orders that Judge Joyner entered months and

23   even years ago as well as 30(b)(6) depositions, and then

24   we have all these experts and everybody else that needs

25   to be scheduled.  I guess the message out of all this is

```
 1    that we're going to try and adhere to the schedule.  So
 2    if that means that we have to do a lot of deposition
 3    between now and April 16th, then that's what we'll have
 4    to do.  But there's going to have to be some rational
 5    recognition on everybody's part that that may mean some
 6    tough choices here in terms of how we get certain
 7    information and if we have to go past the April 16th
 8    deadline which we've allowed for certain expert
 9    depositions, if we're going to do that, obviously that
10    could impact the dispositive motion deadline.  And so for
11    example, on the Joint Motion 1953 for discovery beyond
12    April 16th in which it's proposed that six depositions of
13    state experts take place between April 23rd and June
14    30th, certainly some of those if not all of them would be
15    close to or past the dispositive motion deadline which
16    might mean, fine, you can take them but you're not going
17    to be using them in support of the motion for summary
18    judgment.  I don't know whether you're planning on doing
19    that or not, but if you're going to change the schedule
20    as it were by agreement and say, okay, we'll take
21    depositions in June and that's the only time it can be
22    done, then we're going to have to make some accomodation
23    between that and the fact that Judge Frizzell is
24    expecting dispositive motions to be filed on the 18th and
25    we're not going to want supplementation stretching that
```

1    out because it's going to bust every other deadline on

2    this schedule and it will affect the trial date of

3    September.  So, that's kind of the starting point for the

4    analysis here.

5         Let me ask a question about the 30(b)(6)

6    deposition Cargill wants to take as well as the

7    discovery.  And let me ask first:  As I understand it,

8    there were 30(b)(6) depositions taken by Cobb-Vantress in

9    April of '08 and by Peterson Farms in July of '08; is

10   that correct?

11        MR. NANCE:  Actually, Your Honor, the August

12   '08 depositions were taken on behalf of all of the

13   defendants and not just Peterson.

14        THE COURT:  I show that as July, but it was in

15   August of '08?

16        MR. NANCE:  I think they noticed the date in

17   August, but it may have come out in July.

18        THE COURT:  All right.  And then the

19   Cobb-Vantress was specific to Cobb-Vantress?

20        MR. NANCE:  Yes.

21        THE COURT:  That was April of '08?

22        MR. NANCE:  Yes.  Although in out view, they

23   were done jointly in keeping with the agreement we had

24   before Magistrate Joyner.

25        THE COURT:  Could I have you step up to the

1    microphone just so I can make sure that your voice --

2    (Interrupted)

3                MR. NANCE:  Certainly, Your Honor.

4                THE COURT:  How many witnesses did the state

5    provide to respond to those 30(b)(6) topics?

6                MR. NANCE:  Your Honor, I don't have a count.

7    It would have been in excess of a dozen.  They each had

8    multiple points and we had to educate people.  And

9    obviously, we chose the people we thought who had the

10   best subject matter knowledge to start with but then we

11   had to educate them.

12               THE COURT:  So, is it fair to say that in April

13   of '08 when Cobb-Vantress did their 30(b)(6) that more

14   than a dozen people were produced over what period of

15   time, a day or two or three?

16               MR. NANCE:  We scattered them out a couple of

17   days at a time.  They had topics like waste water

18   treatment plants on a variety of subjects and we started

19   rolling with our various people and kept agreeing as to

20   dates to do the next one.  But it took weeks to prepare

21   them and many days to present them.  We presented one guy

22   twice as a 30(b)(6) witness and a third time as an

23   individual.  So he was deposed three times.  It was an

24   elaborate operation both times.

25               THE COURT:  And in August of '08 when you say

1    all the defendants did their questioning, again are we

2    talking about a dozen witnesses there again?

3              MR. NANCE:  Yes.  It was in excess of a dozen.

4    Between a dozen and two dozen on both go arounds, I would

5    say.

6              THE COURT:  Altogether?

7              MR. NANCE:  Altogether, yes, sir.

8              THE COURT:  So, if now that Cargill says, well,

9    we didn't get to ask or didn't ask for whatever reason

10   our specific Cargill questions, I think it's been

11   proposed the state would be willing to produce a 30(b)(6)

12   on April 13th?  Is that the date that was suggested?

13             MR. NANCE:  The original date that had noticed

14   by the Cargill defendants was April 3rd.  Of course, it's

15   our proposal that they should not get to take this at

16   all.  But if the Court decides otherwise, we have offered

17   the date of April 13th which is Monday of next week to

18   put up a witness.

19             THE COURT:  A witness?

20             MR. NANCE:  We believe we would have a single

21   witness and believe under the rules that a single day

22   would be appropriate.

23             THE COURT:  But on these other occasions you

24   had, you say, a dozen witnesses to handle all these

25   various topics.  How is it we're going to be able to get

1    through the Cargill material with just one witness?  I

2    mean, is that reasonable?

3         MR. NANCE:  It will be a challenge.  If we had

4    to go into a second day or after we start prepping the

5    witness that we find that we can't get one witness to do

6    it, we'd have to offer a second one.  But at this point

7    with everything else going on, that's the time that we've

8    had available and we've got a witness available.  And in

9    the alternative if you don't grant the motion in its

10   entirety, that's when we would propose to do it unless

11   their motion to extend beyond the deadline -- tomorrow,

12   perhaps that's not going an issue.  We would go ahead and

13   have to get it done next week.

14        THE COURT:  I'm trying to figure out if there's

15   a way to shortcut the 1933 and 1941 which is all this

16   paper discovery that they want supplemented and added to.

17   And frankly, as I go back and look at that, it takes me

18   back through all these previous orders that Judge Joyner

19   entered and whether documents were Bates numbered or

20   whether they were clipped and filed.  And it seems to me

21   that going down that road at this stage of the game is

22   going to be highly unproductive.  Now, if we could

23   accomplish the same thing by expanding the scope of the

24   30(b)(6) deposition and allowing it and perhaps giving

25   some additional time to get it done, that might be the

```
 1    fastest way to cut through this because having you people

 2    chase down documents and supplement stuff -- and I've

 3    looked at, for example, the request for admission and I

 4    find a lot of those problematic.  I just don't think that

 5    request for admission that were served in this case in

 6    February are -- many of them seem to be inappropriate.  I

 7    think on the first one the state answered it as best it

 8    could given the vagueness of the some of the terms.  I

 9    think there's one in which the state could maybe have to

10    do a better job of whether or not they're got evidence of

11    tracing the pollutants to specific defendants through DNA

12    or whatever.  I can't -- frankly, when I read your

13    answer, I couldn't tell whether you were denying or

14    admitting it.  But I think with some clarification on

15    those, that's my only comment.  On other stuff, it gets

16    so labor intensive for both the Court to go back and try

17    and figure out what you people were doing way back when,

18    in 2007, and what Judge Joyner ruled, that if would

19    accomplish that 30(b)(6) I think would have been the

20    fastest way to do it.  Mr. Tucker, do you have any

21    comment on that?  If you talk in the microphone there at

22    the table, you can stay seated.

23         MR. TUCKER:  I think Your Honor's suggestion is

24    probably the common sense thing to do.  I was prepared to

25    go through them point-by-point with you this afternoon,
```

1      but your position is certainly understandable and I think

2      the position is well-taken.

3              THE COURT:   From what I've read in the state's

4      response and I think there's validity to all of it on

5      both sides, that to go forward now and try and tell you

6      specifically where chicken litter was put on a piece of

7      land in the IRW, one, I just -- after four years of

8      litigating this case or three and a half years, if we

9      don't have a pretty good idea of that then --

10     (Interrupted)

11             MR. TUCKER:   I guess the whole point behind all

12     this, that the 30(b)(6) deposition is as good a way to

13     accomplish it as any is that it's our position that in

14     order for the state to recover against Cargill, it's got

15     to prove that Cargill participated, that Cargill was a

16     contributing cause or a proximate cause of the damages,

17     of the harm, the violations they're complaining about.

18     And the state sums it's case up to me the clearest way in

19     document 1963 at page 23 when they say the state has

20     alleged and will prove that the Cargill defendants as

21     well as the other defendants have all polluted the waters

22     creating an indivisible injury and therefore are jointly

23     and severally liable.   The state will present a

24     circumstantial case showing production of massive

25     quantities of waste by the defendants including Cargill.

```
 1    Transport of that waste to the waters and resulting
 2    injury.
 3              Well, their theory of the case is, as we
 4    understand it, that don't have to prove any specific acts
 5    or commissions by Cargill or its growers.  Our belief is
 6    that they do.  In order to frame that case, that
 7    position, for Judge Frizzell to decide, they have to take
 8    an up or down position of whether they do or do not have
 9    Cargill specific evidence.  That's all we hope to
10    accomplish by the 30(b)(6) depositions.
11              THE COURT:  Mr. Nance.
12              MR. NANCE:  Your Honor, if that's all they hope
13    to accomplish, they don't need a 30(b)(6) deposition,
14    they simply file a summary judgment motion setting forth
15    their theory and they're either right or they're wrong.
16    And we meet it with whatever evidence we have.  If we
17    don't have adequate evidence to plead a circumstantial
18    case or any other kind of case, they'll win.
19              THE COURT:  Well -- (Interrupted)
20              MR. NANCE:  And we don't have to go through
21    this belated discovery, you know, two weeks before the
22    close of discovery to have to put up a 30(b)(6) witness
23    that marshals the entire case against Cargill.
24              THE COURT:  Well, having looked at this, I
25    agree.  I think a lot of this comes so late in the game
```

```
 1      that it's problematic.  However, I think that there
 2      probably is an entitlement to additional information and
 3      I'm just trying to find a way to advance the ball here so
 4      that we get this thing going down the road.  One of the
 5      parties or maybe both of you cited this case out of
 6      Colorado that Magistrate Judge Mix had an issue with
 7      30(b)(6) depositions coming late in the game and she
 8      basically said, okay, I'm not going to bar you from
 9      taking the 30(b)(6), but here's what you do, you sit
10      down -- the taking party -- you sit down and prioritize
11      the topics and you tell the other side ahead of time the
12      sequence in which you're going to take up those topics
13      and that's the sequence they will be taken up and you go
14      through them.  And in her case, she said when you hit the
15      seven hour mark, you're done.  Period.  You're done.
16      Now, that's similar to what I'm thinking about here is to
17      give Cargill the opportunity to get some specific
18      information if they really want additional discovery that
19      would have been provided in the form of interrogatories
20      or whatever, they can use that opportunity.  But at least
21      they'll prioritize it and have seven hours, let's say, or
22      maybe a little bit more than that if need be to run
23      through this stuff and get it and just get it done.  And
24      when the time -- when the gun goes off, they game is over
25      and that discovery is done.
```

```
 1              MR. TUCKER:  Your Honor, if I might observe,
 2     the plaintiffs took six and a half days of their 30(b)(6)
 3     depositions of the Cargill witnesses and I think seven
 4     hours is going to be plainly inadequate to get this
 5     accomplished.
 6              THE COURT:  What are you suggesting?
 7              MR. TUCKER:  I'm not suggesting that we have
 8     six and a half days, but I'm suggesting that we be
 9     permitted to started out with two days and see how well
10     they perform and how well we're able to move through and
11     I think prioritizing and giving the plaintiff some order
12     in which we'll ask those questions is entirely
13     reasonable.
14              MR. NANCE:  I think if it's going to happen at
15     all, prioritizing is a great idea.  However, the Cargill
16     defendants have the benefit of our entire -- or soon will
17     have our entire case with the completion of other
18     depositions that people will talk about.  They don't need
19     to get from us -- if I understand the intent of their
20     30(b)(6) notice, they don't need to get our general case,
21     they need to get the instances of Cargill specific cases.
22     And I don't know that you need two days to do that.
23              THE COURT:  The reason I was expanding it a
24     little bit beyond the seven hours is because I'm also
25     trying to roll into this anything that's left over in the
```

1    paper discovery that they say they need, any information

2    there to give them a little more leeway on that side so

3    that we don't have you guys having to go chase down

4    rabbit trails on that side.   Interrogatory answers and

5    supplementation, interrogatory answers and request for

6    production and doing things that it sounds to me as I go

7    back and read the record here, it's going to be very

8    difficult to do given that, you know, early on Judge

9    Joyner said, well, we can produce documents that are

10   Bates numbered in response to each interrogatory.   Then

11   we find out that they're not Bates numbered.   So then

12   they're clipped and filed and indexed.   And then the last

13   thing I read is if that physical representation is not

14   really being done any more, they need copies of those or

15   how are we going to accomplish this supplementation and

16   additional information.   I don't think you can do a

17   30(b)(6) -- fastest way.

18          MR. NANCE:   Judge, in effect what we would have

19   to do in the 30(b)(6) route is gather those documents

20   because there's no way you can educate a human being that

21   farmer Jones' waste from his barns went to thus and such

22   location.   You've got to have the documents with you.   A

23   human being cannot memorize that.

24          THE COURT:   Are you suggesting it would be

25   easier for the state to go the document route --

```
1    (Interrupted)
2             MR. NANCE:  I don't think so, but I wanted you
3    to appreciate what the preparation would be.
4             THE COURT:  Right.  So we may need some
5    additional time for preparation.  I understand that.
6             MR. NANCE:  I would think so.  But if they
7    wanted to prioritize and say, you know, here's our order
8    of priority and we had a reasonable time to educate a
9    witness on that, we'd be doing much the same thing maybe
10   killing two birds with one stone.
11            THE COURT:  That's what I'm hoping to do.  Mr.
12   Tucker, how long would it take Cargill to prioritize both
13   on the 30(b)(6) topics you've listed and any, we'll call
14   it, supplemental or mop up discovery that was included in
15   Document 1941?
16            MR. TUCKER:  Your Honor, we could get those
17   prioritized possibly by Friday but certainly by Monday.
18            THE COURT:  All right.
19            MR. TUCKER:  The only reason I say possibly by
20   Friday is we've got some days as many as five depositions
21   this week.
22            THE COURT:  So if they prioritize by Monday,
23   Mr. Nance, how long do you think it would take to do the
24   preparation for the 30(b)(6)?
25            MR. NANCE:  I can't really see what pig is in
```

1    that poke, Judge, or in their case turkey.  It depends on

2    the list.  If it's a relatively simple, straight forward

3    list, then we could do it pretty quickly.  If --

4    (Interrupted)

5            THE COURT:  If they originally said the 3rd and

6    you were offering up somebody on the 13th, I mean,

7    somebody, I assume, is ready to go on some of these

8    topics -- (Interrupted)

9            MR. NANCE:  Or would be on Monday.

10           THE COURT:  Yes.

11           MR. NANCE:  I wouldn't represent that they're

12   ready here on Tuesday afternoon.

13           THE COURT:  Right.  So I'm just thinking even

14   if you had to do your two days but they were split apart

15   and you had to prep somebody for the first round and then

16   prep somebody for the second round, maybe the thing to do

17   is have you folks try and work out maybe prioritizing I

18   think is a good idea, but then some topics you may say we

19   can do this one, this area, pretty quickly but we're

20   going to have to prep somebody on this second priority --

21   (Interrupted)

22           MR. NANCE:  That very well could be the case.

23           THE COURT:  Why don't we have Cargill give you

24   a list of -- prioritize the topics that you would have

25   for a 30(b)(6), Mr. Tucker, by Monday and then give the

```
1    state an opportunity to look at that and then confer

2    about it and see if you can come up with a plan for,

3    we'll say, two days of 30(b)(6) to get through whatever

4    topics were in the 30(b)(6) notice originally and if

5    there's something specific in the discovery that rather

6    than go going the road of compelling complete responses

7    that would mop it up in the 30(b)(6) and see if that will

8    get it done.  And get that -- you folks try to work that

9    out and lay out a schedule by next week.

10             MR. TUCKER:  By Wednesday say, Your Honor?

11             THE COURT:  Can you do that, Mr. Nance?  Do you

12   think Wednesday is realistic?

13             MR. NANCE:  I really don't, Judge, because one

14   of my compatriots in the attorney general's office is

15   going to be -- he's going to be doing some depositions,

16   I'm going to be doing one next week.  I don't know

17   whether we're going to see each other.  I would suggest

18   either Friday of next week or Monday of the following

19   week.

20             THE COURT:  Let's say by Friday because we do

21   want to try and move this along.  We're talking about

22   Monday is the 13th, and then -- (Interrupted)

23             MR. NANCE:  17th?

24             THE COURT:  17th.  And then work out that

25   schedule and then you can start taking those -- I guess
```

1       you better report back to the Court what you're taking

2       about, because the depositions get too far out there,

3       then we've got another problem.  I mean, we're trying --

4       right now we've extended at least some of this discovery

5       until mid-May.  I have no problem with going through the

6       end of April on fact witnesses, 30(b)(6).  When we start

7       pushing beyond that, then we're going to have to -- may

8       have to talk about it.  We've got some experts that we're

9       going to allow you the finish up by, I think, May 15th,

10      so maybe May 15th is a reasonable deadline for as much of

11      this discovery as possible.

12              MR. TUCKER:  Responding to Your Honor's

13      concerns -- and we share those same concerns -- that

14      subject to the state's being able to accomplish it, we'd

15      like to try to do this the week of the 20th which would

16      be the week after next.

17              THE COURT:  Week of April 20th.

18              MR. TUCKER:  That would give us -- that would

19      not be that pressing the other dates.

20              THE COURT:  Why don't you see with that in mind

21      as the target goal?

22              MR. NANCE:  I'm sorry.  I was conferring with

23      the attorney general.  What was the date?

24              THE COURT:  He's talking about the week of

25      April 20th.

```
 1            MR. NANCE:  I will see what we can do.
 2   Obviously, Your Honor, we're not having so much fun that
 3   we want to prolong it.
 4            THE COURT:  All right.  So why don't we see if
 5   we can get the Cargill 30(b)(6) done somewhere in that
 6   timeframe of the week of April 20th, either at least the
 7   first day or hopefully both days and get it finished.
 8            MR. NANCE:  Judge, may I clarify one thing?
 9   This is going to be Cargill specific information and not
10   every defendant specific -- (Interrupted)
11            THE COURT:  That's right.
12            MR. NANCE:  Thank you.
13            THE COURT:  This is Cargill's only.  The
14   others, as far as I know, have either taken or
15   participated in the other depositions.  The only motion
16   that I've got was -- has to do with your motion for
17   protective order against the Cargill defendants only who
18   served this 30(b)(6) notice, so it's only Cargill.
19            MR. NANCE:  All right, sir.  Thank you.
20            THE COURT:  All right.  Let's take a look at
21   Number 1940 which is Cargill's motion to compel complete
22   expert disclosures.  And if I recall correctly, is this
23   the one where we've got the issue of what expert is
24   espousing what opinion?  Is that the issue here?
25            MR. EHRICH:  Del Ehrich for Cargill.  It is,
```

1    Your Honor.

2              THE COURT:  Okay.

3              MR. EHRICH:  Your Honor, the question presented

4    to you is whether these defendants should get less than

5    what Rule 26(a) requires the plaintiff to disclose to us.

6    And seven testifying experts and -- (Interrupted)

7              THE COURT:  This is on the natural resource

8    damages, isn't it?

9              MR. EHRICH:  It is.  You'll remember end of

10   February we were in front of you regarding the

11   plaintiff's damage expert reports prepared by Stratus and

12   several other experts.  A contingent valuation --

13   estimated future damages and then forecasting

14   hind-casting them into the past.

15             THE COURT:  Right.

16             MR. EHRICH:  Your Honor, first of all, we've

17   been criticized for bringing this up on an untimely

18   basis.  If there's some -- if the Court has felt

19   inconvenienced by that, you have our -- my apologies.  We

20   hesitated to bring this before you because it seems to us

21   that the mandate of Rule 26 is so clear.  If a party has

22   an expert witness, Rule 26(a) requires the identification

23   of that witness and a statement of what that testifying

24   expert will testify to and the bases therefore.  And what

25   the plaintiff has consistently told us is, we've got

1    seven testifying experts.  We can tell you who maybe lead
2    authors are, and that's it.  And further, they've been
3    unwilling to accommodate us as we've -- bring this issue
4    before the Court and so we already yesterday started
5    depositions of the person -- the member of that seven
6    person team who supposedly could give us the roadmap --
7    (Interrupted)
8             THE COURT:  Was that mister -- (Interrupted)
9             MR. EHRICH:  Mr. Chapman.
10            THE COURT:  So you did start with Chapman.
11            MR. EHRICH:  We did start with Mr. Chapman.
12   And let me describe it this way:  Not only do we not have
13   a proper Rule 26(a) written disclosure, Mr. Chapman
14   really was not able to give us the roadmap, not if by
15   roadmap you mean who is the testifying expert, whether he
16   indeed is a testifying expert and if so, what opinions he
17   may be asked to render.  Instead, he has said, well, you
18   know, I was essentially a traffic cop.  That's my
19   characterization.  I don't think he used those words.  He
20   can tell us who started drafting various portions of
21   those reports, but thereafter what he said was it was a
22   collaborative process, an iterative process, we all
23   worked on it together.  We've got no reason to think,
24   Your Honor, that that wouldn't be the same result for the
25   remaining six.  And at the end of the day we will not

1    know who the testifying expert or experts is or are, not
2    know what they are going to say, and in fact, this all
3    will have been a pointless exercise.  Now, why we place
4    so much emphasis on this.  Well, not only because we
5    don't want to take seven depositions at the end if we
6    don't have to.  Mr. Nance has complained about the
7    deposition blitzkrieg.  Well, why should we be wasting
8    resources?  We want to know who is the testifying expert
9    or experts and what role they're going to be called to
10   testify, what their opinions are so that we can test
11   whether they truly are qualified to offer those opinions,
12   whether they were involved enough in the preparation of
13   the report to offer those opinions, or instead whether
14   they are relying on undisclosed experts.  I mean, the
15   last time I looked at Judge Frizzell's courtroom, Your
16   Honor, there's a single witness chair.  All seven are not
17   going to be perched up there at trial testifying.  And I
18   think it is clear, clear, that they cannot call --
19   plaintiffs can't call each one of these seven experts to
20   testify about the same things.  I mean, they're
21   experienced trial counsel.  They know that after the
22   first one Judge Frizzell is likely to sustain an
23   objection that this is cumulative under 403.  So, if
24   they -- they either intend to call one as an integrated
25   expert or they intend to call, you know, one, two, four,

1    I don't know, in discrete roles building on each other.

2    Either way, we're entitled to know so that we can test

3    those opinions, test whether anybody says, you know what,

4    I'm the expert, I'm responsible for those opinions,

5    here's what I did.  So, our worry is that we're being

6    forced to waste resources that at the end of this process

7    without relief from this Court we are still not going to

8    know what we're entitled to under Rule 26.

9            Now, everybody's been -- everybody's throwing a

10   lot of resources at this case.  What happens at the end

11   of the big case?  We started yesterday Mr. Chapman's

12   deposition under protest, tomorrow we've got one

13   deposition scheduled, Mr. Tourangeau.  Here's what we

14   propose.  We go forward with Dr. Tourangeau, we vacate

15   the depositions scheduled for Friday, next Wednesday and

16   Thursday, that the Court be required to tell -- that the

17   Court require the plaintiff to tell us who are the

18   testifying experts, what are their opinions and what

19   roles.  Once we've assessed that, we decide which ones go

20   forward.  We might do the remaining five or we might not.

21   But we will then be in a position to make an informed

22   decision and that what whatever these depositions are the

23   Court allows, we be allowed basically to finish them

24   before May 1.  That's what we suggest, Your Honor.  And

25   indeed, we're willing to live with that.  We've disclosed

1    rebuttal expert reports on March 31, two reports, the

2    first one prepared by two eminent economists, Bill

3    Desvousges, Gordon Rousser, a second prepared by three of

4    our liability experts, Connolly, Sullivan, Colbert.  Sort

5    of sounds like a band.  As to Desvousges and Rousser what

6    we said is, look, Desvousges, he's the testifying expert.

7    He'll testify to all matters in this report.  Now, we may

8    call Dr. Rousser to testify about certain statistical

9    analyses an econometric analyses or not, depending on

10   time limitations.  But Desvousges is a testifying expert.

11   And as to the liability experts, Connolly for certain

12   sections, Cole for a discreet section, meaning the third

13   author, Dr. Sullivan, isn't to be called.  So with that

14   information, the plaintiffs can make a decision.  They

15   may choose to depose only Dr. Desvousges.  They may

16   choose to depose Desvousges, Dr. Rousser.  On the

17   liability side, Connolly, Cole, probably not Sullivan, or

18   if they want Sullivan for some reason, they can.  But

19   they can make an informed decision and that's not what

20   they've allowed us to do.

21             THE COURT:  Mr. Nance, are you going to address

22   that one too?

23             MR. NANCE:  Ms. Moll.

24             THE COURT:  Again, as a predicate, as I

25   interpret Rule 26, I would think you would be obligated

1    to say what experts are going to testify as to what

2    opinions.  Let me ask you first.  Have you decided -- has

3    the state decided at this point that any of these

4    witnesses on any of these various topics whether some of

5    them are just not going to be called to testify?  Has

6    there been any decision in that regard that might help

7    us?

8           MS. MOLL:  We have not, Your Honor.  This is

9    not an issue of, you know, we have information and we're

10   just being cute and not willing to share it with the

11   Cargill defendants.  That's not the case.  As Your Honor

12   knows, there is no pretrial order that's been put in

13   place in terms of identifying trial witnesses, and so we

14   have not made a decision as to which of the seven will

15   testify within their areas of expertise.  And of course,

16   the Court at some point will decide how much time each

17   side gets.  And so, depending on that order, it may be

18   that the state decides to put on a more fulsome

19   presentation.  But until we know that information we're

20   not able to commit.  And Rule 26 -- as the expressed

21   language of Rule 26 requires, you simply have to disclose

22   who may testify at trial, doesn't say who will but who

23   may, and we've done that.  And we have produced the

24   reports that outline the opinions of those experts.

25              And I would, if I could, Your Honor, like to

1    take a moment to talk about the timeliness of their
2    motion.  As we have set forth in our position brief, the
3    state feels that that motion is untimely.  And although
4    the rules do not expressly provide for a timeline by
5    which a motion to strike or in the alternative compel has
6    to be filed, there is a reasonableness standard that's
7    within the rules.  And when you look at the time line and
8    we've set it out in our brief thoroughly, but if I could
9    highlight a few dates.  On January 5th of this year the
10   state produced its expert reports on damages, and of
11   course, two of those are at issue in Cargill's motion to
12   strike.  I'll refer to them as the CV report and the past
13   damages report as we've described them in our brief.  So
14   that was on January 5.  Let me make one comment about a
15   statement that Cargill makes in their motion.  They make
16   the statement that I'm quoting from page two of their
17   motion:  The plaintiffs provided two natural resource
18   damages reports in January and February of 2009.  That is
19   simply false.  Those reports were both provided on
20   January 5th in a timely manner and that's just beyond
21   dispute.  Five and a half weeks past following January 5.
22   And we only then heard for the first time that the
23   Cargill defendants had any issue with those reports
24   compliance with Rule 26, so five and a half weeks later.
25   The following day the state made its position clear that

 1      Rule 26 had been complied with and that it was not
 2      appropriate to ask for separate disclosures on behalf of
 3      each author of the report above and beyond the
 4      multi-authored report, reports that had been filed or
 5      produced rather.  The same day that the state made its
 6      position clear on that issue, as Your Honor may recall,
 7      the Cargill defendants filed a separate motion to compel
 8      on a separate issue relating to the survey respondents
 9      identities.  That motion could have but did not challenge
10      the state's compliance with Rule 26 in the manner that's
11      now described and at issue in their motion to strike.
12      So, going back, we produced the reports on January 5th,
13      we didn't hear from anyone about Rule 26(a) until five
14      and a half weeks later.  Another three and a half weeks
15      pass and the issue only then resurfaced.  The parties
16      went round and round for another two and a half weeks
17      beating the meet and confer horse to death, and then when
18      we -- you know, with three weeks left in the discovery
19      deadline do we see the Cargill defendant's motion to
20      strike the report and the alternative to compel a
21      separate report.  So based on that history, we feel that
22      the motion to strike should be denied as untimely.
23              THE COURT:  It was filed -- I mean, the motion
24      to compel was filed within the discovery time period.
25              MS. MOLL:  That is true.

1          THE COURT:  That generally is somewhat the

2     bright line rule.  I can understand that when we're

3     talking a case of this complexity even to wait until the

4     10th hour if not the 11th hour may be pushing it in terms

5     of enabling the Court to make any rational analysis of

6     the issues and get orders done in time to keep you on

7     track with this schedule Judge Frizzell has entered.

8     Having said all that though, at least in most of the

9     orders I've seen, if you file a motion to compel before

10    the discovery cutoff, at least you can argue that you've

11    been timely.  So, I understand your position.

12         MS. MOLL:  Yes, Your Honor.  As a substantive

13    matter though, Rule 26 -- and the Cargill defendants

14    admit this.  Rule 26 does not prohibit multi-authored

15    reports.  And as we've laid out in our brief, the

16    defendants themselves have produced multi-authored

17    reports and have not produced separate disclosures for

18    each of the authors.

19         Let me address quickly if I could some of the

20    case law that the Cargill defendants cite in their brief.

21    They simply do not cite any authority for the notion that

22    any multi-authored report is improper and admit that it's

23    not improper.  But they also cite -- they do not cite any

24    authority for the principle that when you have a

25    multi-authored report, that there is some obligation to

1    go above and beyond that and produce separate disclosures

2    for each author.  They cite a handful of Rule 26 related

3    cases.  And let me just address them quickly if I could.

4    In the In Re: Sulfuric Acid case -- and all these cases

5    notably are not from this jurisdiction.  But in the In

6    Re: Sulfuric Acid case the defendants in that case moved

7    to bar the testimony of two experts and that motion was

8    denied.  So that's of little instructive value here to

9    the Cargill defendants.  The remaining three cases that

10   they cite for their Rule 26 proposition have no

11   application at all because the issue in those cases was

12   the brevity of the expert reports that were produced in

13   the case and no one has suggested that the CV report is

14   brief.  In the Krischel case there was a one and a half

15   page letter from one of the experts and the other one --

16   and the other expert didn't produce an expert report at

17   all.  In the Reed case the expert reports did not include

18   issues of compensation, did not provide the materials

19   considered, did not identify prior testimony or documents

20   relied on.  And in the Smith case the reports amounted to

21   nothing more than, you know, two pages plus the

22   incorporation of the interrogatory response.  So, in

23   their reply they take us to task for not responding to

24   their case log, but it simply does not support them.

25            As I mentioned earlier, Rule 26 uses the word

1    may and requires the disclosure of experts that a party

2    may call at trial.  And the Cargill defendants and any

3    others who join this morning are suggesting that the

4    state at this juncture, five months prior to the trial,

5    that the state must commit to who will testify at trial

6    and otherwise limit itself regardless of any court order

7    on the length of trial and also keeping in mind that, you

8    know, I'm sure there will be an active motions in limine

9    practice in this case.  So as we stand here today, we

10   don't know what will be in, what will be out, how long

11   the trial will be.  And it may be that if the Court gives

12   us more time, we would decide to put on a more fulsome

13   presentation as to the CV study.  And so, as I stand here

14   today, I cannot commit to who will testify on which

15   topics, but we have disclosed all the opinions which

16   appear in the damages reports.

17            THE COURT:  Could you not at least disclose if

18   you're not going to disclose which witness is necessarily

19   going to testify as to which opinion?  Could you not at

20   least identify for the defendants which opinions each

21   particular witness would be able to testify should they

22   testify at trial?  In other words, say, all right, here's

23   the seven of them.  We don't know who for sure is going

24   to be the witness, but we will tell you this, that

25   Chapman who would be -- could testify on the following

1       list of opinions, Bishop could testify on this list,

2       Hanemann on this, but maybe not on this other one.   In

3       other words, narrow it down so that if they have to go

4       through and take seven depositions, if as they say for

5       example, Mr. Chapman hasn't been able to really give them

6       a roadmap, and I don't know whether the roadmap is who

7       specifically is going to testify on this opinion, but at

8       least the roadmap it seems to me should include who could

9       testify on those opinions.  So that at least when they go

10      in and start a deposition of Morey, let's say, they know

11      that that the area to focus on would be opinions two,

12      four and five not these other ones.  Could not that be

13      done?

14            MS. MOLL:  Your Honor, I submit that we've

15      already done that.  Attached to -- (Interrupted)

16            THE COURT:  I know you've broke down some

17      things by chapter and -- (Interrupted)

18            MS. MOLL:  That's right.  But those chapters

19      relate to specific phases of the work that was down, for

20      example, in implementation of the main survey.  There's a

21      limited number of the experts who would testify on that

22      and I would suggest that we've already done that by

23      producing the breakdown by chapter.

24            THE COURT:  But for example, if it's -- say it

25      is implementation, the main survey.  I don't know how

```
 1   many opinions are contained within that chapter.  I don't
 2   know if -- I don't recall.  As I remember the CV study, I
 3   mean I know it's voluminous.  I don't recall whether
 4   opinions were broken out under each chapter.  If they
 5   were not, is there a listing of opinions to be offered
 6   under implementation of main survey and are Chapman,
 7   Krosnick and Tourangeau all equally prepared to offer any
 8   opinions that would come under that chapter?
 9           MS. MOLL:  Well, let me answer you this way,
10   Your Honor.  Particular authors, of course, have
11   particular areas of expertise.  So for example, Drs.
12   Krosnick and Tourangeau, their area of expertise -- I'm
13   painting with a wide brush I realize here -- but is
14   survey methodology.  So, for issues relating to survey
15   methodology one of them is a likely candidate although in
16   the description of what was done here, you know, Mr.
17   Chapman is certainly capable of describing what happened
18   here.  Let me comment if I could -- (Interrupted)
19           THE COURT:  Let me stop you for just a second.
20   If for example you told the defendants, all right, with
21   respect to implementation of the main survey, opinions on
22   survey methodology would be offered by Krosnick,
23   Tourangeau, possibly Chapman.  Opinions on other issues
24   under that chapter would be handled by Chapman.  Would
25   that not at least break it down for them so that -- I
```

```
 1    mean, I don't know how many opinions are within that
 2    chapter, but say there were 10 opinions to be on offered,
 3    I mean, at least if it gave them some heads-up.  If
 4    they're going to have to depose all seven and under the
 5    circumstances then they may have to depose all seven.
 6    What I'm trying to figure out is a way to enable them to
 7    do that in the most efficient fashion and not burden
 8    them, and I think it would be helpful whether -- it might
 9    be an open question whether Rule 26 requires specifically
10    that every expert -- if there's a collaborative type
11    report that every expert identify his specific opinions.
12    But I think in fairness whatever you can give them and
13    give them something here, but if you can give them
14    something more specific on the areas of testimony for
15    these particular witnesses, it would be helpful in
16    getting this whole thing done.  And I think one could
17    read Rule 26 as requiring that.
18              MS. MOLL:  I guess then the question is, Your
19    Honor, what kind of breakdown is the state going to be
20    obligated to produce?  I don't want there to be an open
21    question on that.
22              THE COURT:  Mr. Ehrich, I think, outlined what
23    they apparently have done on his side in terms of -- he's
24    gone on farther and said here's who our testifying
25    expert's going to be.  He will be relying on -- for
```

```
 1    certain parts, he'll be relying on these other witnesses
 2    and they may be called to testify on those particular
 3    subjects.  I guess that's what he's done.  I think that's
 4    the way he broadly outlined it.  Could not the state do
 5    similar to that?
 6              MS. MOLL:  If the state is ordered to do the
 7    equivalent, I guess, of what they produced just a couple
 8    of days ago, I think we can.  Anything more than that I
 9    think is not appropriate and probably not even possible
10    at this juncture.
11              THE COURT:  How are you interpreting what they
12    did a couple days ago?
13              MS. MOLL:  Well, forgive me, Your Honor.  I
14    think we've produced it as an exhibit to our response
15    brief.  But what they did in -- when they produced their
16    most recent expert reports, they included a letter.
17    We've attached it as Exhibit 15.
18              THE COURT:  Which document are you looking at?
19    Which docket number?  Because I'll never track all this
20    down.
21              MS. MOLL:  It's Exhibit 15 to Document Number
22    1952.  What they did there was say that this report is a
23    collaborative effort of the authors and each may address
24    all matters in the report.  But then they go on to say
25    recognizing the possible time limitations at trial, the
```

1     defendants may call at trial William Desvousges to
2     testify as to all the matters addressed in the report.
3     The defendants may further call a trial Gordon Rousser to
4     testify specifically as to the statistical an econometric
5     analysis and the results therefrom in the report.  With
6     regard to a separate report, they say this report is a
7     collaborative effort of Drs. Connolly, Sullivan and Cole,
8     recognizing the possible time limitations at trial,
9     whoever the defendants may call at trial, John Connolly
10    to testify to the matters addressed in Sections One, Two
11    and Three of this report and Frank Cole to testify to the
12    matters addressed in Sections One and Four of the report.
13    So that's what they've done there.  And I think it's
14    important to note though that even the defendants have
15    acknowledged some overlap potentially of witnesses
16    testifying on the same chapters and we would have to do
17    the same.
18         THE COURT:  Sure.  I think that's fine.  I
19    think if you did what they've done, if that's the
20    model -- first of all, the only defendants, I think, that
21    have really pushed the issue is Cargill.  The other
22    defendants seemed to be -- seemed to have been marching
23    forward to taking these depositions.  But Cargill wants
24    more specific information.  But if they've broken down
25    their expert report to that extent to give you who would

1    be the overall -- kind of the overall witness and then

2    potentially maybe there's more than one, and then who

3    would testify as to subparts, if you could do the same

4    thing, I think that would be fair game.  If that was fair

5    for them it should be fair for you.  Give them that

6    information and then it sounds like they're going to have

7    to go on and take all seven depositions, but at least

8    they could do that with a better handle on specifically

9    what each witness is going to be addressing.  Do you

10   think you can do that?

11            MS. MOLL:  If that's the Court's order, we'll

12   certainly comply with that.

13            THE COURT:  Mr. Ehrich?

14            MR. EHRICH:  Well, Your Honor, if I may, maybe

15   talk a bit more about that.  You have seen, Your Honor,

16   the lead authors -- (Interrupted)

17            THE COURT:  I've seen the -- (Interrupted)

18            MR. EHRICH:  -- disclosure that they made.

19            THE COURT:  On the chapters?

20            MR. EHRICH:  Yes.

21            THE COURT:  Yes, I've got that right here.

22            MR. EHRICH:  Well, you know, if I can direct

23   the Court's attention to that specifically in reference

24   to the suggestion that the plaintiff do something, do

25   what we have done.  It doesn't help us if all the

1     plaintiff says is, well, look at Chapter 7, the ultimate
2     chapter, where the ultimate conclusions are contained.
3     Chapman, Hanemann, Kanninen, Morey and Tourangeau, they
4     all might testify to that.  That doesn't help us any --
5     they're not going to call, you know, all five of those
6     people at trial.  That doesn't help us and that's not
7     what we did.  We said Dr. Desvousges, which is going to
8     testify as to all matters in the report.  Now we might
9     find it necessary because of developments to focus on the
10    econometric analysis that we think demonstrates the bias
11    that we built into the study, and we might find it
12    necessary to call him, but we said otherwise you go right
13    at Dr. Desvousges.  So it doesn't help us if they say on
14    Chapter Seven, here's all five of them, on Chapters --
15    Chapter Six, well, any one of these six can give us the
16    opinions.
17          Why doesn't that help us?  For one thing, they
18    don't all have the same credentials.  There's a survey
19    methodology folks, if memory serves, there's a
20    psychologist, there's a three economists.  They can't
21    possibly testify to everything.  So, you know, I --
22    here's where I come out and here's where the Cargill
23    defendants come out and Peterson, Simmons, George's
24    joined the motion today.  So it isn't just a Cargill
25    motion.  That is -- the state focuses on the main part.

1    Well, that -- (Interrupted)

2              THE COURT:  They've got to have a -- they've

3    got to list the experts who may -- (Interrupted)

4              MR. EHRICH:  Who may, but then the opinions and

5    the bases therefore.  So, just because there's some

6    uncertainty as to who you might call at trial doesn't

7    excuse you from identifying the opinions and bases

8    therefore for every testifying expert.  And so, that

9    requires more than them to simply say you know on Chapter

10   Seven, here's five people, they all might testify to

11   that.  That doesn't tell us anything.

12             Your Honor, if I may, we've got a rough

13   transcript here from the deposition of Chapman yesterday.

14   I think this illustrates the point that I just made.

15   This is -- I believe this is at page 112, line 19.

16   Question:  Do you intend to testify at trial about the

17   conclusions of this expert report?  Answer:  I'm

18   available to testify.  I don't know whether I'll be

19   called to testify.  I'm available to be testified if I'm

20   asked.  Question again on page 113:  Do you have an

21   understanding about what you will testify at trial about?

22   Again, I don't know specifically what I would be asked to

23   testify about.  Can you point to any particular sections

24   of the report that you would testify about at trial?

25   Again, I don't know what I'm going to be asked to testify

1    so I can't tell you.  I would be willing to testify about
2    any portions of the report that would be appropriate.
3           Well, then, the balance the afternoon was spent
4    focused on this and the bottom line is -- this is my
5    characterization, but we'll introduce the rough
6    transcript if you want.  Chapter One, well, I worked on
7    that Dr. Chapman said.  Well, what happened?  Well, a
8    junior person drafted and then I looked at it and then I
9    sat around with the rest and we all got on the -- you
10   know, on a web ex together and we wrote it.  Well, can
11   you map out what each person wrote?  I can't map out what
12   each person wrote.  So, at the end of the day, Your
13   Honor, just being told any one of these six in these
14   chapters or five or four could testify to this doesn't
15   allow us to get at who the expert is, whether the
16   expert's qualified, whether he's relying on material that
17   an expert in his or her field would normally rely on and
18   whether anything they have to say is admissible at all.
19   So it doesn't help us.  I think instead what they need to
20   do is to say we may call doctor blank to testify about
21   the following sections or the opinions in this section of
22   the report.  They call doctor, who knows, Hanemann, to be
23   the integrating expert that capstone of our damage case
24   to testify about this sort of thing.  Once we have that
25   disclosure we can determine how to depose these folks.

 1    Does what Dr. Tourangeau said about survey methodology,

 2    can Dr. Hanemann truly rely on that?  Does he know enough

 3    about it?  That's the sort of inquiry that we're allowed

 4    to have.  We're not saying, as the plaintiff suggests,

 5    that multi-authored reports are invalid.  No, of course,

 6    in this incredibly complicated litigation, you know,

 7    they're not only necessary, but they're allowed.  We have

 8    done it too.  But that doesn't excuse noncompliance with

 9    the rule.  We have the right to know what people are

10    going to say so we can test that before we actually get

11    in front of the Court and a jury at trial.  So, those are

12    my thoughts, Your Honor.

13          THE COURT:  Ms. Moll, anything else?

14          MS. MOLL:  Well, Your Honor, it remains unclear

15    to me what the Cargill defendants actually want.  Do they

16    want a breakdown subsection by subsection of the report

17    and who may testify as to the findings therein or are

18    they suggesting that separate reports be produced for

19    each -- (Interrupted)

20          THE COURT:  Well, if Mr. Ehrich just said and

21    what he quoted from the deposition, I mean, if that's an

22    accurate sort of synopsis of what went on, it mean to ask

23    Chapman as kind of the -- as I understood it, was going

24    to be the leadoff witness on this report and from him all

25    the coordinating parts would be identified in some way,

1    and to ask him what are you going to testify to and what

2    opinions are you going to offer and he says I don't -- I

3    can't really say whatever would be appropriate, I don't

4    know that that satisfies Rule 26.  I mean, these folks

5    are supposed to be coming forward laying out their

6    opinions and laying out the basis for those opinions.

7    Now, so it's in the report.  But if he's going to testify

8    to it and then I think he has to essentially adopt the

9    report and say here's what the opinions that I'm adopting

10   and here's what they're based on, and I think that's true

11   of all these folks.  If they can't get up there and at

12   least tell them what opinions they're going to offer,

13   then I don't know that there's been as much good --

14   (Interrupted)

15            MS. MOLL:  Well, I was at Mr. Chapman's

16   deposition yesterday.  And I think -- (Interrupted)

17            THE COURT:  You have a different view of it.

18            MS. MOLL:  I do.  Mr. Chapman in the context of

19   the excerpt that Mr. Ehrich just read from, he was asked

20   what are you going to testify to.  As Mr. Chapman sat

21   there yesterday, did he know what particular portions of

22   the report he would be asked to testify about for certain

23   when the trial comes up in September?  No.  But could Mr.

24   Chapman walk through the report and say I worked on this,

25   let me describe my involvement in the project, let me

1    describe my area of expertise and let me walk through,

2    you know, the different chapters and, you know, the

3    Cargill defendants had the opportunity to depose him in

4    that manner -- (Interrupted)

5              THE COURT:  In the report is there a specific

6    list of the opinions to be offered?  I don't recall.  I

7    mean, it seems like the report -- the opinions are sort

8    of integrated throughout the report and it's not --

9    (Interrupted)

10             MS. MOLL:  They're integrated but there is a

11   breakdown in the report.

12             THE COURT:  These are the opinions to be

13   offered?

14             MS. MOLL:  Yes.  I mean, it's not an isolated

15   list or anything like that.  But there is a breakdown

16   within each chapter of the analysis.

17             THE COURT:  Not the specific opinions, expert

18   opinions.  But there's no link from that to a specific

19   witness?

20             MS. MOLL:  We've provided that mapping at

21   Exhibit 5.  So we know from -- (Interrupted)

22             THE COURT:  That's the chapter breakdown?

23             MS. MOLL:  Correct.

24             THE COURT:  But within that chapter, I mean, if

25   there's a multiple of opinions within that chapter and

1    there's five people listed, someone of those five may not

2    be competent or prepared to testify in every one of those

3    opinions.  So what I'm trying to find out is there

4    anything that would say -- I mean, when you list these

5    people are you saying that every one of these witnesses

6    can testify and will be prepared to testify as to every

7    opinion in that chapter?

8         MS. MOLL:  I'm not suggesting that, Your Honor.

9         THE COURT:  Then I think short of that, then

10   I've got -- you know, I've got some difficulty with

11   letting -- making sure that they have enough information

12   about who's going to say what.

13        MS. MOLL:  Understood.  And we can work quickly

14   to provide a further breakdown.  But I don't want the

15   entire schedule to be thwarted because of that.

16        THE COURT:  Nor do I.  And I think the solution

17   to that is to do that as quickly and thoroughly as

18   possible so that we can get this thing back on track.  I

19   don't want to be fighting about whether a two sentence

20   description of Dr. Bishop's opinions under Chapter Two is

21   sufficient or not.  But some amount of information has to

22   be given to them so they can march forward with a better

23   handle on what opinions Bishop is going to offer under

24   economic theory and measurement and then they'll know --

25   and then again on what opinions he's going to offer under

```
 1        development of the survey instruments particularly where

 2        his opinions may not be exactly the same as Dr.

 3        Krosnick's.  And so, if Krosnick can be interrogated on

 4        his and is he relying on Bishop for this part of it and

 5        is Bishop relying on Krosnick, how is that going to work

 6        because it all dovetails into the issue of what's the

 7        basis for the opinions they're offering and they're

 8        supposed to have that.  So if Bishop has formulated

 9        opinions and analysis that Krosnick is then relying on

10        for further opinions, I think that needs to be made

11        clear.  Again, I'm not saying -- I'm certainly not

12        suggesting that we redo reports here, but I think some

13        fleshing out of specific areas and opinions that are

14        going to be offered by each of these people under these

15        chapters is necessary for them to really be prepared to

16        go forward at the depositions.

17                MR. MOLL:  If I could make a suggestion, Your

18        Honor.

19                THE COURT:  All right.  Good.

20                MS. MOLL:  Mr. Ehrich has suggested that Dr.

21        Tourangeau's deposition go forward tomorrow.  He is in

22        fact already in Tulsa and ready to go tomorrow.  So I

23        would agree that we do that.

24                THE COURT:  I think that makes sense.

25                MS. MOLL:  We could endeavor to provide the
```

1     breakdown that Your Honor has just described by the end
2     of this week.  But if I could suggest that the depos that
3     have been held for next week, that they go forward.
4              THE COURT:  Let me see.
5              MS. MOLL:  I'll give you the specifics, Your
6     Honor.  For April 14th which is next Tuesday, we have
7     held that date open for Dr. Rich Bishop.  The following
8     day, April 15th, we have held for Dr. Hanemann, and the
9     following day we have held for Dr. Kanninen.  I would
10    suggest that we keep those dates in place.
11             THE COURT:  When would you be able to give them
12    this more fulsome explanation of the opinions?
13             MS. MOLL:  By the end of this week.
14             THE COURT:  By the end of this week.  So they
15    would have that by Friday and then would take up the
16    depositions Tuesday, Wednesday, Thursday.  That's your
17    proposal.
18             MS. MOLL:  And with regard to Dr. Morey's
19    deposition which is on Friday, we could agree to suspend
20    that.
21             THE COURT:  He's set for this Friday?
22             MS. MOLL:  Correct.
23             THE COURT:  He's set for the 10th?
24             MS. MOLL:  Yes.
25             THE COURT:  All right.  Mr. Ehrich.  I mean,

1     we've got to find a solution here that's going to work

2     and -- (Interrupted)

3             MR. EHRICH:  Well, Your Honor, and we're trying

4     to be part of the solution, not part of the problem.  But

5     just as you heard Mr. Nance a few minutes ago say, well,

6     you know, I'll look at list but I'm going to need some

7     time, I'm supposed to -- you know, I'm supposed to commit

8     to taking the depositions of an additional five experts

9     based on a disclosure I don't even know about, which to

10    be candid, I don't hear a lot of specificity, Your Honor,

11    on what they're supposed to do.  Now, we suggested almost

12    from the first that we be allowed to take -- when this

13    dispute arose, be allowed to put this in front of Your

14    Honor and you resolve it.  It sounds like we're on our

15    way to doing that.  And then be allowed to take

16    depositions out of time as to which ones we think are

17    necessary and we suggest May 1.  I still think that ought

18    to be an appropriate proposal.  If we get an appropriate

19    disclosure and don't have to come back here, Your Honor,

20    and discuss it some more, we may very well conclude that

21    some of these folks are not really going to be testifying

22    experts or we may decide we want to take all of their

23    depositions.  But I'm hesitant to make that decision

24    today.  And I remind you one thing we learned -- you may

25    remember back in February we talked about the vast scope

1     of this effort.  One thing we learned yesterday was just
2     how long the plaintiffs have been working at this.
3     Chapman testified he was already working on this in
4     December of 2004, six months before this case is filed.
5     They've spent more than four years.  They've spent four
6     and a half million dollars just on Stratus and not on all
7     the other economists.  And with all do respect, I think
8     we are doing a great job to get a rebuttal report done in
9     90 days and I would ask the Court's indulgence for us to
10    have a bit longer to consider these depositions and to
11    get ready for them once we finally have the appropriate
12    disclosure.  I mean, the plaintiffs after all said they
13    needed 29 days after we gave them our rebuttal reports in
14    order to be ready to take our expert depositions.  I
15    don't think it's fair for us to be, you know, if you
16    will, held at gunpoint, get this disclosure by close of
17    business Friday and be prepared the following Tuesday to
18    take up these depositions and just march them until
19    they're done.  We have been prejudiced here by this lack
20    of disclosure and the lack of forthcoming by the
21    plaintiffs and we pledge to do this very quickly before
22    May 1.  We're not going to come and ask you for
23    additional time on the dispositive motions.  We'll be
24    ready.  We'll get them done.  But we can't be put to
25    making this decision right now.  That's what I have to

```
 1   say.
 2              THE COURT:  All right.  Look, I think we --
 3   that seems reasonable to me to put off Bishop, Hanemann
 4   and Kanninen as well to give them an opportunity to get a
 5   more specific detail on who's going to testify to what so
 6   they can decide whether they need to take these
 7   depositions or not given they're to be done by May 1.  In
 8   any event, they be done by May 1.
 9              MR. EHRICH:  Your Honor, if I could ask a -- I
10   didn't hear about Morey.  He's scheduled for Friday.  We
11   propose to vacate that one.
12              THE COURT:  Right.  They agreed to suspend --
13   now, Tourangeau would go forward.
14              MR. EHRICH:  Yes, Your Honor.
15              THE COURT:  Morey would be suspended.  Bishop,
16   Hanemann and Kanninen would be suspended with the idea
17   that they be completed by May 1 if they're going to be
18   taken after you've gotten this more detailed explanation
19   of what the individual expert's opinions are going to be.
20              MR. EHRICH:  Yes, Your Honor.  I'm sorry.  Some
21   people say the hair is the first thing to go.  For me is
22   the ears.  Did you say Krosnick too in that list?
23   Krosnick is not yet scheduled.
24              THE COURT:  No, I didn't list him in that one.
25              MR. EHRICH:  Krosnick is not yet scheduled.  He
```

1      is -- (Interrupted)

2              THE COURT:  He would also have to be done by

3      May 1.

4              MR. EHRICH:  Correct.  Yes.

5              THE COURT:  So, the only -- we've got Chapman

6      and then we'll go forward with Tourangeau.  And then

7      Bishop, Hanemann, Morey, Kanninen, Krosnick we'll wait

8      on, but they're to be done by May 1.

9              MR. EHRICH:  Yes.  If that brings us up to

10     seven, that's right.

11             THE COURT:  I think that does.  Yes, that

12     should bring us up to seven.

13             MR. EHRICH:  Thank you, Your Honor.

14             THE COURT:  We will put out a written order

15     that attempts at least to make sure we've got this all

16     memorialized.  Fortunately we've got a court reporter so

17     that should be of great assistance.  All right.  So

18     that's the Court's decision on 1940 which is the motion

19     to compel complete expert disclosures.  We've dealt with

20     141.

21             We've got 146 which all defendants have asked

22     to extend the April 16th discovery deadline for certain

23     depositions.  The response cost witnesses of which you

24     say there are eleven.  The damage experts, are those the

25     seven we just talked about?

```
 1              MR. TUCKER:  Your Honor, they've been -- if I
 2    might kind of refresh where we are, refresh the page on
 3    the browser.  Looking at page one of Document 1946, I
 4    believe that the item one -- as I understand, those are
 5    now scheduled to take place on the 15th and 16th.  And
 6    so, the witness scheduling is most likely moot.  The
 7    reason I say most likely is the documents from the
 8    Oklahoma Water Resources Board that are to go with those
 9    depositions, those witnesses have not yet been produced.
10    Although they have been promised by the plaintiff, they
11    have not yet been produced.  The item number two has to
12    do with Stratus and Your Honor just dealt with the
13    Stratus reports.  Item number three, Mr. Quang or Mr.
14    Pham whichever it is is correct.  Parties have agreed to
15    a new deposition date after the 16th, but we'd like the
16    blessing of the Court on that.
17              THE COURT:  What date did you agree to on that
18    one, do you remember?
19              MR. TUCKER:  No, but we have agreed to it.
20              THE COURT:  You've agreed to something that's
21    after April 16th.
22              MR. EHRICH:  The agreeing parties aren't
23    present, but they did it.
24              THE COURT:  A lot may depend on how far after
25    April 16 we're talking about.
```

1          MR. TUCKER:  I think it's very shortly

2     thereafter.

3          THE COURT:  I thought that the state was

4     opposing that deposition at all because he was part of

5     the initial disclosures and --

6          MR. BULLOCK:  That was the deposition that -- I

7     don't know that.

8          THE COURT:  If there's been some conversation

9     -- (Interrupted)

10          MR. TUCKER:  Well, Ms. Hill advised me that

11     there had been an agreement reached on it on which I

12     would think that likely there would -- he's not here.

13     He's in deposition and he's not here.

14          MR. NANCE:  The two lawyers who may or may not

15     have agreed are both in deposition and no one here is

16     aware that we've agreed to anything.  If we have we

17     certainly will look -- (Interrupted)

18          THE COURT:  Honor it.  But we don't know

19     whether they are or they haven't or -- we do know there's

20     two lawyers that are in deposition.

21          MR. NANCE:  There are at least two, Judge.

22          THE COURT:  That they may or may not have

23     agreed.

24          MR. TUCKER:  Let me put a question mark by that

25     one.  If we may call them, could we address --

1      (Interrupted)

2              THE COURT:  We'll take a break here in a couple

3      minutes.  But as far as -- let me understand.  As far as

4      the response cost witnesses, you say that's been decided

5      that they're going to go forward on the 15th and 16th?

6              MR. TUCKER:  That's correct.

7              THE COURT:  Okay.  Great.

8              MR. TUCKER:  Item four, the poultry and egg

9      association, that has been rescheduled by agreement

10     within the discovery period.

11             THE COURT:  Then we've addressed --

12     (Interrupted)

13             MR. TUCKER:  We've addressed -- (Interrupted)

14             THE COURT -- Cargill's 30(b)(6)?

15             MR. TUCKER:  That's correct.  There is -- then

16     there is the parties have agreed to their witness, the

17     economist witness or accountant witness Payne for the

18     27th and 28th.  The parties have agreed to that, but

19     again we'd like the Court's acceptance of that.

20             THE COURT:  One issue that came up, I think,

21     and that was whether or not the defendants had produced

22     the balance sheet data that the Court had ordered before.

23     Has that been done now?

24             MR. TUCKER:  I know that we have.

25             THE COURT:  Are we all set with that?

1              MR. BULLOCK:  No.  We've not received it.

2              THE COURT:  I think before that deposition that

3       needs to be produced.

4              MR. EHRICH:  May I, Your Honor?

5              THE COURT:  Yes.

6              MR. EHRICH:  Del Ehrich for Cargill.  There's a

7       dispute about this.  Your Honor resolved the state's

8       motion to compel additional financial information --

9       (Interrupted)

10             THE COURT:  Pretty simple.

11             MR. EHRICH:  Balance sheet information

12      sufficient to show net worth.  We believe we have done

13      that for Cargill and we've not had a communication from

14      the plaintiff to the contrary.  Supposedly there are --

15      you know, plaintiff's lawyer has said to me, at least,

16      well, I may be communicating with the defendants, but in

17      the meantime, schedule a deposition.  That's all we know.

18             THE COURT:  I think the order said produce the

19      balance sheet from the last audited financial statement

20      and the most recent balance sheet.  So if you've done

21      that, then you're in compliance and -- (Interrupted)

22             MR. EHRICH:  We -- (Interrupted)

23             THE COURT:  If you haven't done that, then you

24      may not get the chance to depose Mr. Payne.  Yes, ma'am.

25             MS. XIDIS:  Your Honor, Claire Xidis for the

1      State of Oklahoma.  I actually was working on those

2      motions.  Since that hearing and since your order we have

3      not received one additional document from any of the

4      defendants.  As you'll recall, Cargill was, I believe,

5      the most deficient in its production.  They have not

6      produced -- (Interrupted)

7              THE COURT:  Sort of an excerpt as I recall.

8              MS. XIDIS:  Yes, a one page summary with about

9      eight lines of information -- (Interrupted)

10              THE COURT:  I tried to be as specific as I

11      could and not put any terrific burden, I mean, given that

12      what I understand that the plaintiffs are entitled to.

13      So that stuff needs to be done.  And if we're not going

14      to get that done, then Mr. Payne's deposition may just

15      not get to be taken, so I would go ahead and redeliver --

16      deliver if you think you have to.  But it was the balance

17      sheet from the last audited financial and the most recent

18      balance sheet.  Those two things.

19              MR. EHRICH:  We have provided that.  Your

20      Honor, we provided that back in October -- (Interrupted)

21              THE COURT:  What I saw was I thought was sort

22      of an excerpted version.  But go back and check.  If

23      you're comfortable with that, fine.  If you're not I

24      would talk to the other side and make sure that

25      everybody's in agreement on that.

1          MR. EHRICH:  She needs to -- (Interrupted)

2          MS. XIDIS:  The question is whether anything

3     has been produced since that order.  And unless Mr.

4     Ehrich can tell us that something new has been produced,

5     I think the issue here is very clear.

6          THE COURT:  What I thought I saw from Cargill

7     did not meet the standard I just articulated.  But it's

8     been awhile since I've looked at this stuff.  I thought

9     there was an excerpt of information perhaps taken from

10    what you would say would be the audited -- the balance

11    sheet from the audited financial, but it was excerpted

12    information.  What I ordered was the actual balance sheet

13    from the last audited financial and the last unaudited

14    balance sheet.  So why don't you folks check and see if

15    you've done that?  There's no sense in wasting a lot of

16    time here.  That should be pretty easy to produce.  It's

17    been ordered to be produced, so let's just see whether

18    you've done it or not and go from there.

19          MR. EHRICH:  We'll check, Your Honor.

20          THE COURT:  All right.  So -- (Interrupted)

21          MR. GRAVES:  Your Honor, this is James Graves

22    for George's.  I just have a question about that and I

23    don't want to waste the Court's time either.  But we did

24    produce a balance sheet, a pretty detailed balance sheet.

25    But on the parent company, if you'll recall, we sought a

```
 1    protective order.  I don't know if you're telling me now
 2    that you denied that protective order.  I understood your
 3    order to say that we actually produced more than what
 4    would ordinarily be required.  And the reason we produced
 5    the balance sheet that we did which was not an audited
 6    balance sheet, it was created for the purposes of
 7    litigation was an order to not make a lot of disclosures
 8    about other corporations that aren't defendants in this
 9    case which will be the case we produced a George's, Inc.
10    audited balance sheet.
11         THE COURT:  Well, I think the order said for
12    each of the defendants produce the balance sheet from
13    your last audited financial statement and your last
14    balance sheet and that would get this done.  And it would
15    be put under protective order so there wouldn't have to
16    be all this additional redaction.  And the fact that we
17    cut it all down instead of giving the full financial
18    statements with all that other supplemental information
19    would keep it simple enough that we shouldn't be,
20    frankly, having this conversation.
21         MR. GRAVES:  My other question would be that
22    for some of these private companies, I don't know that
23    they're all on the same boat, but on the subs those
24    balance sheets aren't audited.  They don't get those
25    audited.  So, if the order is ordering an audited balance
```

1    sheet, that's not capable of being complied with.

2           THE COURT:   Okay.  Well, then if that's not

3    possible, then give the other side what you can produce

4    -- (Interrupted)

5           MR. GRAVES:   That's what we did.

6           THE COURT:   -- in compliance with that order

7    and tell them that that's the situation.  You know, we

8    can't force somebody to do what they cannot do.  I'm not

9    going to force somebody to go out and get an audited

10   financial statement between now and Monday so that they

11   can produce the balance sheet.  Do the best they can and

12   there weren't distinctions between these various

13   companies and some of them frankly are fine enough

14   distinctions it's pretty hard for me to understand who's

15   got different types of financial information.  So, the

16   idea is to give you enough information so that you know

17   what the net worth of the company is.  And we're talking

18   about punitive damage issue down the road, so I think

19   that should be sufficient.  Check and see what you --

20   (Interrupted)

21          MR. HIXON:   Your Honor, I don't want to beat a

22   dead horse.  In Peterson's position the last -- the most

23   recent balance sheet and the last audited balance sheet

24   -- 2007 balance sheet has already been produced to the

25   state and we still stand by our representation that we'll

```
 1    produce the fiscal year 2008 balance sheet when it

 2    becomes available.

 3            THE COURT:  I think that's fine.  Again, I'm

 4    not ordering people to do stuff that's impossible to do.

 5    So whatever you've got in hand, give it over and that

 6    should be -- we should be over this hurdle.  Okay.

 7            MR. TUCKER:  The last point that I -- it is my

 8    belief that I think that we have agreed that Dr. Ebber's

 9    deposition will be taken in Kentucky on the 23rd.

10            MR. BULLOCK:  Yes, that's correct.

11            MR. TUCKER:  Got that one right --

12    (Interrupted)

13            THE COURT:  We're on to the -- well, there's a

14    list of agreed depositions -- (Interrupted)

15            MR. TUCKER:  That's on that list as well, Your

16    Honor.

17            THE COURT:  Right.  There's Jones, Chadwick,

18    Cummins, Merritt, Edwards and Rausser.  We're jumping

19    ahead a little bit here.  Those are the ones that go from

20    Edwards on the 23rd all the way to Merritt on June 30th?

21            MR. TUCKER:  That is correct.

22            THE COURT:  Now, that obviously is considerably

23    past the dispositive motion deadline.  So my view on that

24    is don't expect to be using -- if you're going to agree

25    to take those depositions that far down the road, don't
```

1    expect to be adding that into the motion for summary

2    judgment.  You made that -- essentially you made that

3    decision by your conduct if not by agreement.  So you're

4    going to have to live with that part because we want to

5    live with the schedule.

6              MR. BULLOCK:  We understand that, Your Honor.

7              THE COURT:  Is there anything -- well, we

8    jumped ahead now.  Is there anything else we need to

9    touch on?  Do we need to take a break and --

10             MR. BULLOCK:  Mr. George and I have a matter

11   that's come up here in the last few days and we'll need

12   your time.  We might take a break and have folks get a

13   sip of water.  But I know we have that one.

14             THE COURT:  Okay.

15             MR. TUCKER:  We need to figure out --

16             THE COURT:  Yes, I mean --

17             MR. BULLOCK:  We need to call -- (Interrupted)

18             THE COURT:  Why don't you see if you can make a

19   call on that one and see if -- my view is that if you can

20   get these depositions as much done by the 16th, that's

21   great.  We've given you some leeway to the 15th on these

22   experts so I don't have as much heartburn on going out

23   even to the 15th on the fact witnesses.  When we start

24   pushing into June realizing that's going to impact

25   summary judgment, you're just not going to able to use

1    that stuff.  Then with that understanding, we can do

2    that.

3           MR. BULLOCK:  I just want to clarify the

4    Court's instruction on that.  As you can well understand,

5    we're anxious to get discovery closed understanding that

6    there are details.  But the Court's comments, and you've

7    said this a couple of times about not having -- going

8    forward, I'm trying to find out whether the Court is

9    envisioning the general relaxing of the discovery

10   deadline or is it these discovery extensions that have

11   been granted?

12          THE COURT:  I think these specific extensions.

13   I'm certainly not opening the door to a whole lot more

14   discovery of a general nature.  That should have been

15   done and we're holding to the April 16th deadline and

16   making some exception to allow some depositions to be

17   conducted after the 16th that should have been done

18   beforehand, but given the practicalities the case, fine,

19   we'll try to work with you on that.  But the overarching

20   goal here is to adhere to the scheduled dates that Judge

21   Frizzell has set and try to get this thing moving along

22   so that discovery is done in a timely fashion, that

23   you're ready to roll on your dispositive motions on May

24   18th, and that all the things that come thereafter, the

25   exhibits and deposition designations on June 1st,

```
1    instructions July 6th, motions in limine, pretrial
2    briefs, all that sort of thing are done in a timely
3    fashion and then you can set a pretrial conference date
4    and you may need to think about that, too, if you're
5    looking at trial in September when would that pretrial
6    be.  We'll take a short break while you folks mull that
7    over a bit and then hopefully we can come back and wrap
8    up and deal with this last issue.
9               (Whereupon, a short recess was held after which
10   the following record was made.)
11              THE COURT:  Before I forget, I don't know if
12   it's in the schedule or not, but I think there was an
13   indication that the parties should make a request for a
14   pretrial conference by the 16th?
15              MR. BULLOCK:  Yes.  The language wasn't real
16   clear to us.  In fact, Mr. George and I had a
17   conversation about this.  I do recall talking
18   specifically to him.  And -- (Interrupted)
19              THE COURT:  So the parties just make sure that
20   you file something requesting -- you might get together
21   on when you want that or I don't know what was expected,
22   but something was to be requested by the 16th.
23              MR. BULLOCK:  What we were thinking of doing is
24   to ask the Court to actually hold a conference so that we
25   can talk about structuring the remainder of the case.
```

```
 1    And rather than presupposing the Court's calendar or
 2    schedule, it seemed to make sense that we have a
 3    conference to talk about those issues and be sure
 4    everybody's on the same page.
 5              THE COURT:  You know, whether it's called
 6    pretrial conference or status conference, I know that the
 7    Court is anticipating -- and when I say the Court, I mean
 8    I think Judge Frizzell is anticipating they'll be a
 9    request filed for this status or for this pretrial
10    conference.  And I think you can -- you may in your
11    application define it in maybe a little bit broader term
12    and that would make some sense it seems to me.
13              MR. BULLOCK:  There may be some wisdom in
14    having a more complex pretrial conference structure than
15    -- (Interrupted)
16              THE COURT:  Complex is -- maybe there's some
17    wisdom in that.  I guess it depends on your perspective.
18              MR. BULLOCK:  We seem to bring complexity in
19    our wake.
20              THE COURT:  Complexity is here, there's no
21    question about that.  Also, would it be possible for one
22    of the parties -- and let me ask the defendants -- to
23    prepare an agreed order on what we've done today and
24    submit it to the Court, say, by the end of the week?
25    You've got the use of the court reporter.  I've got -- I
```

```
 1      understand what some of the dates are and if we need
 2      to -- if there's a question about that, we can address
 3      that.  It would be helpful to the Court if somebody would
 4      prepare an order kind of memorializing what we've done
 5      here today.
 6                  MR. TUCKER:  May we inquire about the
 7      availability of the transcript?
 8                  THE COURT:  Okay.  It's a deal?
 9                  MR. TUCKER:  Yes, Your Honor.
10                  THE COURT:  All right.  Now, Quang Pham.  Have
11      we figured out whether he's been scheduled up or not?
12                  MR. NANCE:  Your Honor, we have a difference of
13      agreement on whether we have an agreement, so I think we
14      don't have an agreement.  We have a proposal that we are
15      discussing and that is he has been traveling
16      internationally.  We propose to extend for him to the
17      week of the 20th.
18                  THE COURT:  April 20th.
19                  MR. NANCE:  The week of April 20th.  And we're
20      waiting to see availability of someone to take his
21      deposition.
22                  THE COURT:  Who is he, just out of curiosity?
23                  MR. NANCE:  I think no one on our side of the
24      case knows.
25                  THE COURT:  He was in your initial disclosures
```

1      and on your witness list, I think.

2              MR. LENNINGTON:  He's an inadvertent person

3      listed that has later withdrawn -- do this in a case with

4      hundreds of potential witnesses.

5              THE COURT:  So, you're not planning on calling

6      -- (Interrupted)

7              MR. NANCE:  Right.  We've told them we're not

8      planning to call him, but they've persisted in wanting to

9      take his deposition anyway.  And that would not be the

10     only time that's happened but --

11             THE COURT:  Mr. Hixon, your by god torpedoes --

12     (Interrupted)

13             MR. HIXON:  I'm as informed as anyone sitting

14     on this side of the room on -- (Interrupted)

15             THE COURT:  -- anywhere in the room you're

16     probably --

17             MR. HIXON:  Mr. Pham currently works for ODAF

18     and he formerly worked for DEQ and he is somehow involved

19     in the CASRO program and that's the extent of my

20     knowledge as to who he is.  He was noticed on --

21     (Interrupted)

22             THE COURT:  You might take his deposition just

23     to find out who he is as much as anything.

24             MR. HIXON:  Ms. Longwell has his deposition to

25     take.  I'm waiting on her availability.  He was noticed

1    on March 19th for deposition to occur on April 13th.  Mr.

2    Trevor Hammons in the attorney general's office informed

3    Ms. Longwell that he was going to be traveling from April

4    4th until April 15th and we're told today that may be the

5    14th.  And she had corresponded with Mr. Hammons and with

6    Sharon Gentry in the Oklahoma City office of Riggs, Abney

7    and they've corresponded back and forth.  And it was

8    Nicole Longwell's understanding that there was an

9    agreement in principle to do it after the discovery

10   cutoff and she's never been given a date certain.

11           THE COURT:  So you'll get it done by the 20th?

12           MR. HIXON:  I don't know.

13           THE COURT:  That's the proposal.

14           MR. HIXON:  I don't know Ms. Longwell's

15   availability that week.  I proposed to the state that we

16   have it done the first available day prior to May 1st.  I

17   believe he's also on -- Mr. Pham's on the defendants'

18   witnesses list.

19           THE COURT:  I think they've -- (Interrupted)

20           MR. HIXON:  -- withdrew, but I believe he's

21   also on the defendants'.

22           THE COURT:  Well, why don't we say by May 1 try

23   to get that scheduled?  If you can do it by the 20th,

24   fine.  Whatever works by agreement hopefully.

25           MR. NANCE:  Yes, sir.

1          THE COURT:  All right.  Was there one remaining

2     issue, Mr. Bullock?

3          MR. GEORGE:  Robert George on behalf of the

4     Tyson defendants.  And Mr. Bullock and I have conferred

5     before we got here today and then again on the break and

6     I think we have resolution of one of the issues which was

7     a scheduling matter and at least a process for resolving

8     the second.  But way of background, Your Honor, I believe

9     Monday or Tuesday of last week the State of Oklahoma

10    issued two depositions notices for Tyson representatives.

11    One is our chief environmental officer, Kevin Eagley, who

12    has been on or initial disclosures, is on our witness

13    list, is someone who is likely to be called at trial.

14    The date that was selected for that deposition was the

15    last day of discovery period, April the 16th.  I intend,

16    if permitted, to defend that deposition and have a

17    settlement conference with Judge Eagan on the 16th of

18    April in another matter and Mr. Eagley is out of state.

19          THE COURT:  So, you've got a conflict in

20    terms -- (Interrupted)

21          MR. GEORGE:  A conflict as does the witness.

22    Mr. Bullock and I have agreed on the break today that

23    some alternative dates that are beyond the cutoff and not

24    too far in the future, namely May the 1st, I believe, on

25    which both Mr. Eagley and myself are available will be

```
 1    the date of that deposition provided the Court allows us
 2    to take it out of time.
 3              THE COURT:  Okay.  Well, if he's not available
 4    any other time than -- all right, you can take that on
 5    May 1st.
 6              MR. GEORGE:  The second one is a little more
 7    contentious, and in fact, there were likely be a motion
 8    for protective order on it.  On the same date last week
 9    the state issued a deposition notice for John Tyson who
10    is the Chairman of the Board of Directors for Tyson Foods
11    and at some point in the past was our chief executive
12    officer, has not held that possession for several years.
13    But nevertheless, the state issued deposition notice for
14    Mr. Tyson, also setting it for last day of the discovery
15    cutoff, April the 16th.  I have the same conflict that I
16    had before and Mr. Tyson is out of -- not out of state,
17    but out of town on a prior commitment.  But laying aside
18    scheduling issues, it is the position of the defendant
19    that that deposition ought not go forward.  Mr. Tyson is
20    not in a position, has not been in a position, to have
21    knowledge that's relevant to any of the issues beyond our
22    30(b)(6) witness that we put up -- put up several of them
23    on topics relevant to this case.  He's not on any exhibit
24    list -- I'm sorry -- any witness list provided by the
25    defendants.  I believe he is listed on the plaintiff's,
```

```
 1        but not someone we intend to call.  So, Mr. Bullock and I
 2        tried to work through those issues together
 3        unsuccessfully and so we would be filing a motion for
 4        protective order with respect to that.  It was my hope to
 5        get it filed this week.  Your Honor, I'm actually in
 6        Oklahoma City the next three days for depositions in this
 7        case, and so with the Court's indulgence and Mr.
 8        Bullock's as well, I would like to file a motion for
 9        protective order on Monday, and then Mr. Bullock can make
10        his own commitment as to when he could respond to that,
11        and then get another brief audience before Your Honor to
12        try to resolve that one final issue.
13                THE COURT:  We might be able to do that by
14        telephone.
15                MR. BULLOCK:  Yes.
16                MR. GEORGE:  Certainly might, Your Honor.
17                THE COURT:  Mr. Bullock.
18                MR. BULLOCK:  We provided the motion for
19        protective order is filed as presented, I'm sure it will,
20        then we will allow to continue the deposition until the
21        Court can properly resolve it with the understanding that
22        it may extend beyond the discovery deadline.
23                THE COURT:  When would you need -- how much
24        time would you need to respond to the protective order if
25        it's as represented?
```

1           MR. BULLOCK:  You think you'll file yours --
2     (Interrupted)
3           MR. GEORGE:  Monday.
4           MR. BULLOCK:  I guess we probably could get our
5     response filed by Thursday, I think.
6           MR. GEORGE:  What I had told Mr. Bullock, Your
7     Honor, is that in light of the scheduling issues which
8     are separate and apart from the substantive issues we
9     have as to whether that deposition will go forward, the
10    16th is really not an option, at least in my view it's
11    not, and so I'd like to go ahead and strike that date.
12    But if Mr. Bullock prevails on the motion for protective
13    order and this Court allows the deposition to proceed,
14    the defendants will not argue against that deposition
15    based upon the passage of the discovery period, so --
16          MR. BULLOCK:  I thought we offered to continue
17    it until the Court resolves the matter.
18          THE COURT:  All right.  We'll continue it from
19    the 16th until the Court resolves the substantive issue
20    and then we'll see where we are after that.
21          MR. BULLOCK:  There is one other issue.
22    There's clearly some misunderstanding between the two
23    sides as to the effects of the Court's order relative to
24    the financial documents.
25          THE COURT:  If you'd step up to the podium just

1     to make sure we get you on the tape as well as the court

2     reporter.

3             MR. BULLOCK:  There's clearly some

4     misunderstanding or disagreement, at least, as to the

5     effect of the Court's order relative to the financial

6     documents.  I'd ask the Court to order that by the end of

7     the day on the 9th the defendants who are subject to that

8     order either provide us with the required information or

9     tell us why nothing else is required so that that matter

10    can be framed and we can get that detail cleared up if in

11    fact it warrants further clearing.

12            THE COURT:  Okay.  And again, I think we're

13    spending an awful lot of time on this particular issue.

14    I mean, after having looked at what we had done

15    historically in this Court -- I know that some courts

16    take a very different view and give wider, much wider,

17    discovery on the financial matter.  We have generally

18    held it to the net worth number.  Now, to me it seemed

19    like one of the issues that was coming up was, well, that

20    they've given us information but we don't know whether it

21    was audited or not and so to the extent that that was

22    really a legitimate concern, that's why I ordered to

23    provide a balance sheet from an audited financial.

24    Obviously, if an entity doesn't have an audited

25    financial, as I think Mr. Hixon has said with respect to

1      his client, maybe there are others in that boat, then you

2      can't comply with that.  So I would think if you tell Ms.

3      Xidis what -- the best you can do, all I thought was give

4      a -- wind up with two balance sheets, the most recent one

5      and the last audited version.  And if there's not a last

6      audited version, then I think you produce what is

7      available that can comply with the Court's order and then

8      just describe to her, and hopefully that will be good

9      enough.  I can't imagine spending a whole more time on

10     the net worth number because I think even from the

11     information I saw, even though some of it was unaudited,

12     it sure seemed like it was a lot of information in there

13     from everybody that probably pretty much satisfied the

14     net worth request for purposes of punitive damage issue.

15             All right.  We'll go along with Mr. Bullock's

16     suggestion that by the 9th either produce -- if you

17     haven't done so and you check and you find you haven't

18     complied with the Court's order in that regard, go ahead

19     and do so.  And if you feel like you already have

20     complied with the Court's order in that regard and you

21     don't need to produce anything else, then go ahead and

22     tell -- would that be directed to Ms. Xidis?

23             MR. BULLOCK:  That would be best, Your Honor.

24             THE COURT:  Okay.  Then we'll direct that to

25     Ms. Xidis.  And Mr. Hixon, I'm not going -- (Interrupted)

1           MR. HIXON: -- one issue on that.  I

2    communicated that information to Mr. Xidis and Ms. Ward

3    and Mr. Nance earlier this week.  Do I need to

4    re-communicate that would prior notice be sufficient?

5           THE COURT:  I think your prior notice.  If they

6    received it, then I think that should be sufficient.  If

7    there's any question about that, for the price of one

8    xerox copy and a stamp, it might be best to do it if you

9    think they're not going to agree that you've already

10   complied.  But just to cover yourself.  It sounds to me

11   if you've already conveyed that information to them and

12   you've already made that statement, I don't think --

13   (Interrupted)

14          MR. HIXON:  I conveyed that here today and --

15   (Interrupted)

16          THE COURT:  The order was to do it by the 9th.

17   It sounds like you got ahead of us and you've already

18   done it.

19          MR. HIXON:  Thank you.

20          THE COURT:  All right.  If there's nothing

21   else, then we'll be in recess.

22          (END OF PROCEEDINGS)

23

24

25

```
 1                    C E R T I F I C A T E

 2
       STATE OF OKLAHOMA  )
 3                        ) SS.
       COUNTY OF TULSA    )
 4

 5              I, Greg Eustice, Certified Shorthand Reporter

 6     in and for the State of Oklahoma, do hereby certify that

 7     on April 7, 2009 the above Proceedings were held before

 8     the Honorable Paul J. Cleary, Magistrate Judge in the

 9     United States District Court for the Northern District of

10     Oklahoma, and that the same was reduced to writing by me

11     in stenograph, and thereafter transcribed by myself, and

12     is fully and accurately set forth in the preceding 73

13     pages.

14              I do further certify that I am not related to

15     nor attorney for any of the said parties, nor otherwise

16     interested in said action.

17              WITNESS my hand this 13th day of April, 2009.

18

19                            S-Greg Eustice_____
                              GREG EUSTICE
20                            Certified Shorthand Reporter

21

22

23

24

25
```