## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-cv-329-GKF-PJC |
| | ) | |
| TYSON FOODS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is defendants' Motion to Dismiss for Failure to Join the Cherokee Nation as a Required Party or in the Alternative, Motion for Judgment on the Pleadings.  For the reasons set forth below, defendants' Motion to Dismiss is granted in part and denied in part and defendants' alternative Motion for Judgment on the Pleadings Based on Lack of Standing is granted in part and denied in part.

## I.  Claims/Procedural Status

Plaintiff State of Oklahoma seeks monetary damages and injunctive relief against the Poultry Integrator Defendants for injury caused to the Illinois River Watershed ("IRW") by defendants' practice of storing and disposing of hundreds of thousands of tons of poultry waste on lands within the IRW.  *See* Second Amended Complaint, ¶ 1.  Specifically, the State seeks recovery of response costs and natural resource damages pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 *et seq.* (Counts 1 and 2); injunctive relief and civil penalties under the Solid Waste Disposal Act ("SWDA"), 42 U.S.C. §6972 *et seq.* (Count 3); damages and injunctive relief under Oklahoma's law of nuisance (Count 4); damages and injunctive relief under federal common law of nuisance (Count 5); damages and injunctive relief under state common law of trespass (Count 6); civil penalties and injunctive relief for violation of

state environmental and agricultural statutes and regulations (Counts 7 and 8); and claims for restitution and disgorgement of profits under state common law of unjust enrichment (Count 10). [Second Amended Complaint, Doc. No. 1215, ¶¶69-146].[1]

Defendants move for dismissal pursuant to Fed.R.Civ.P. 19 because the State has failed to join the Cherokee Nation as a required party. Defendants contend the Cherokee Nation possesses significant, legally protected interests in lands, waters, and other natural resources in the IRW that will be impaired or impeded by its absence. Alternatively, defendants seek judgment as a matter of law, alleging the State lacks standing to assert claims of injury over properties it does not own or hold in trust.

Defendants argue in their motion that Rule 19 requires dismissal of *all* claims for damages and injunctive relief. However, at the hearing on the motion held July 2, 2009, defendants stated they do not seek dismissal of the State's claims for injunctive relief. Therefore, Counts 1 and 2, and claims for damages under Counts 4, 5, 6 and 10 are at issue in the motion to dismiss. Count 3 (a claim for injunctive relief and civil penalties[2] under SWDA), the State's claims for injunctive relief under Counts 4, 5 and 6, and the State's claims for state civil penalties and injunctive relief under Counts 7 and 8 are not at issue.

---

[1]On May 12, 2009, the court dismissed Count 9 on the State's motion.

[2]The parties do not address whether Rule 19 issues impact the claim for civil penalites under SWDA.

## II.  Rule 19

Rule 19 of the Federal Rules of Civil Procedure sets forth a three-step process for determining whether an action should be dismissed for failure to join a purportedly indispensable party.  *Citizen Potawatomi Nation v. Norton,* 248 F.3d 993, 997 (10th Cir. 2001).  First, the court must determine whether the absent party is "required."  A person is "required" if:

    (A)    in that person's absence, the court cannot accord complete relief among existing parties; or

    (B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

        (i) as a practical matter impair or impede the person's ability to protect the interest; or

        (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed.R.Civ.P. 19(a)(1).

Second, if the absent party is required, the court must determine if joinder is "feasible."  *Citizen Potawatomi Nation,* 248 F.3d at 997.  In this case, if the Cherokee Nation is a required party, joinder is not feasible because the Cherokee Nation, as a domestic dependent nation, is immune from suit absent waiver by the tribe or abrogation by Congress.  *Id.*

Third, if joinder of the absent party is not feasible, the court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed.R.Civ.P. 19(b).  The factors for the court to consider include:

    (1)    the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

    (2)    the extent to which any prejudice could be lessened or avoided by:

        (A) protective provisions in the judgment;

        (B) shaping the relief; or

        (C) other measures;

    (3)    whether a judgment rendered in the person's absence would be adequate; and

    (4)    whether the plaintiff would have an adequate remedy if the action were dismissed

for nonjoinder.

*Id.*  Because Rule 19(b) does not state the weight to be given each factor, the court in its discretion

must determine the importance of each factor in the context of the particular case.  *Thunder Basin*

*Coal Co. v. SW Pub. Serv. Co.,* 104 F.3d 1205, 1211 (10th Cir. 1997).  The standards set out in Rule

19 for assessing whether an absent party is indispensable are to be applied in a practical and

pragmatic but equitable manner.  *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.,* 94 F.3d 1407,

1411 (10th Cir. 1996).  The moving party has the burden of persuasion in arguing for dismissal.  *Id.*

### III.  The State's Supplemental Filing

On May 20, 2009, the State filed a "Notice of Filing of Document Related to Defendants'

Motion to Dismiss for Failure to Join the Cherokee Nation as a Required Party or, in the Alternative,

Motion for Judgment as a Matter of Law Based on a Lack of Standing" [Doc. No. 2108].  Attached

to the Notice is a purportedly binding agreement between the State of Oklahoma and the Cherokee

Nation.  In that Agreement, the State agrees "the Cherokee Nation has substantial interests in lands,

water and other natural resources located within the Illinois River Watershed though the extent of

those interests has not been fully adjudicated." [Doc. No. 2108-2, p. 1].  The Agreement, signed May

19, 2009, also provides:

> WHEREAS the Cherokee Nation is assigning to the State of Oklahoma the right
> to prosecute any of the Nation's claims relating to the causes of action brought by
> the State in *State of Oklahoma v. Tyson Foods, Inc., et al.*, 05-cv-329, N.D.Okla.
> and upon signing of this Agreement the Nation agrees that the continued prosecution
> of this action by the State of Oklahoma would not impair or impede the Nation's
> interests such that it is a necessary party under Rule 19(a);
>
> *            *            *            *
>
> 1. The Cherokee Nation, to the extent of its interests in lands, water and other
> natural resources in the Illinois River (including any regulatory authority

4

incident thereto), delegates and assigns to the State of Oklahoma any and all
claims it has or may have against Defendants named in *State of Oklahoma v.
Tyson Foods., Inc., et al.,* 05-cv-329, N.D. Okla., for their alleged pollution
of the lands, water and other natural resources of the Illinois River Watershed
resulting from poultry waste.

*   *   *   *

8.  The effective date of this Agreement shall be deemed June 13, 2005.

[*Id.,* pp. 1-2].  The document is signed on behalf of the Nation and the State by their respective

Attorneys General.  Upon review, the court concludes the State's supplemental filing does not moot

the need to address the Rule 19 issues raised in the pending motion for the following reasons:

First, Oklahoma law explicitly sets forth the requirements the State must follow when entering

into cooperative agreements with Indian Tribes:

C.  1.  The Governor, or named designee, is authorized to negotiate and enter
into cooperative agreements on behalf of this state with federally recognized
Indian Tribal Governments within this state to address issues of mutual interest.
Except as otherwise provided by this subsection, such agreements shall become
effective upon approval by the Joint Committee on State-Tribal Relations.

2.  If the cooperative agreements specified and authorized by paragraph 1 of this
subsection involve trust responsibilities, approval by the Secretary of the Interior
or designee shall be required.

3.  Any cooperative agreement specified and authorized by paragraph 1 of this
subsection involving the surface water and/or groundwater resources of this
state or which in whole or in part apportions surface and/or groundwater ownership
shall become effective only upon the consent of the Oklahoma Legislature
authorizing such cooperative agreement.

74 Okla. Stat. §1221.  The State has not shown that the Governor designated the Attorney General

to negotiate and enter the cooperative agreement on behalf of the State, that the Joint Committee on

State-Tribal Relations has approved the Agreement, that approval by the Secretary of the Interior has

been sought and obtained with respect to Cherokee lands held in trust, or that the Oklahoma

Legislature has consented to the cooperative agreement to the extent the agreement "involv[es] the

5

surface water and/or groundwater resources of this state."

Second, the State provides no authority for the proposition that the Attorney General of the Cherokee Nation may execute binding cooperative agreements on behalf of the Nation.[3]  A review of the Cherokee Nation Environmental Quality Code Amendments Act of 2004 reveals that cooperative agreements with state authorities on matters dealing with environmental management or environmental enforcement require approval of the Principal Chief and/or the Council of the Cherokee Nation.  63 Cherokee Nation Code § 101 (D)(2) & (D)(5).

Third, Oklahoma law prohibits assignment of state law claims not arising out of contract.  12 Okla. Stat. §2017(D).  The Cherokee Nation's rights to prosecute the trespass and nuisance causes of action arise under Oklahoma common law and may not be assigned to the State.

Fourth, the Agreement attempts to make its effective date retroactive to June 13, 2005, the date this action was filed.  Section 1221 expressly prohibits retroactive effect, stating that cooperative agreements between the State and Indian Tribes "shall become effective upon approval" of the Joint Committee on State-Tribal Relations, except for cooperative agreements involving surface water and groundwater resources, which "shall become effective only upon the consent of the Oklahoma Legislature authorizing such cooperative agreement."  Standing is a jurisdictional requirement, *see Keyes v. School Dist. No. 1*, 119 F.3d 1437, 1445 (10th Cir. 1997), and jurisdiction ordinarily depends on the facts as they exist at the time a complaint is filed.  *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989).  Because events occurring after the filing of a complaint

---

[3]  At the hearing held July 2, 2009, counsel for the State argued that Cherokee statutory law confers authority on the Cherokee Nation's Attorney General to bind the tribe.  The statute read to the Court at the hearing merely authorizes the Attorney General to initiate, defend and represent the Nation in civil and criminal legal proceedings–not to execute binding agreements on its behalf.  *See* 51 Cherokee Nation Code § 104 (B)(2).

6

cannot retroactively create jurisdiction, and because Section 1221 does not permit retroactive effect, the State may not retroactively acquire standing to prosecute the Cherokee Nation's claims relating to the Nation's admitted "substantial interests in lands, water and other natural resources located within the [IRW]."

Accordingly, the court concludes the purported agreement is invalid and does not resolve or moot the Rule 19 issues raised in defendants' motion.

### IV.  Rule 19 Analysis

### A.  Is the Cherokee Nation a Required Party?

As mentioned above, the first step in evaluating whether the Cherokee Nation is an indispensable party is determining whether it is "required."  Under Rule 19(a)(1), the court must determine whether the Cherokee Nation claims an interest relating to the subject of the action and is so situated that disposing of the action in the Cherokee Nation's absence may impair or impede its ability to protect the interest or leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations.

### 1.  Does the Cherokee Nation Claim an Interest Relating to the Subject of the Action?

To determine whether an absent party has an "interest" in an action, a court "must begin by correctly characterizing the pending action between those already parties to the action."  *United Keetoowah Band of Cherokee Indians of Okla. v. United States,* 480 F.3d 1318, 1326 (Fed Cir. 2007). As previously discussed, the State brings this action under federal and state statutory and common law and seeks money damages, injunctive relief and civil penalties for defendants' alleged "injury and damage to the IRW (including the biota, lands, waters and sediments therein) . . .".  *See* Second

7

Amended Complaint, ¶ 1.[4]

"Rule 19, by its plain language, does not require the absent party to actually *possess* an interest; it only requires the movant to show that the absent party '*claims an interest* relating to the subject of the action.'" *Citizen Potawatomi Nation*, 248 F.3d at 998, *modified on reh'g*, 257 F.3d 1158 (10th Cir. 2001) (*quoting Davis v. United States,* 192 F.3d 951, 958 (10th Cir. 1999) ("*Davis I*") (emphasis in original and quoting Fed.R.Civ.P. 19(a)(l)(B)).  The Agreement signed by the respective Attorneys General of the State and Cherokee Nation acknowledges "the Cherokee Nation has substantial interests in lands, water and other natural resources located within the Illinois River Watershed though the extent of those interests has not been fully adjudicated[.]"   Insofar as this action is one for damage to those lands, water and other natural resources, the agreement by Oklahoma's Attorney General, one of two Oklahoma officials who brought this action, operates as an admission of the Cherokee Nation's interest in this action.  If for some reason the admission is insufficient, there are other, independent, factors showing the Cherokee Nation's claimed interest:

First, one of the explicit goals set forth in the Cherokee Nation's Environmental Quality Code is to "prohibit the improper storage, transport, generation, burial or disposal of any solid, liquid or gaseous waste, . . . within the jurisdiction of the Cherokee Nation, or that could affect lands, air, water, natural resources or people of the Cherokee Nation."  63 Cherokee Nation Code § 302 (B)(8).

---

[4]The State alleges that as a sovereign state of the United States, it, "without limitation, has an interest in the beds of navigable rivers to their high water mark, as well as all waters running in definite streams" and "holds all natural resources, including the biota, land, air and waters located within the political boundaries of Oklahoma in trust and on behalf of and for the benefit of the public."  [Second Amended Complaint, ¶5].  However, the subject matter of the State's action is not the nature and extent of the State's interests in the lands, water and natural resources of the IRW.  Rather, the subject matter of this action are claims for relief against the Poultry Integrator Defendants for pollution of the lands, water and other natural resources in the IRW.

The Environmental Quality Code makes it "unlawful for any person to cause pollution of any air, water, land or resources of the Nation, or to place or cause to be places any wastes or pollutants in a location where they are likely to cause pollution of any air, water, land or resources of the Nation. Any such action is hereby declared to be a public nuisance." 63 Cherokee Nation Code §1004 (A). "Lands of the Cherokee Nation" are defined as

> tribal lands and those lands under the jurisdiction of the Cherokee Nation, including but not limited to the territory legally described in the treaties of 1828, 1835 and 1838 and the Cherokee Nation patent issued in 1846, [and] other such lands acquired by the Cherokee Nation since 1838. For purposes of this Chapter, the term "lands" shall include the earth, air and waters associated with such lands.

63 Cherokee Nation Code § 201. "Waters of the Nation" are broadly defined as

> all streams, lakes, ponds, marshes, wetlands, watercourses, waterways, wells, springs, irrigation systems, drainage systems, storm sewers and all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, which are contained within, flow through, or border upon the Cherokee Nation or any portion thereof, and shall include under all circumstances waters which are contained within the boundaries of, flow through or border upon this Nation or any portion thereof.

*Id.* Thus, the Cherokee Nation claims in its written Code an interest in protecting the Illinois River and in vindicating its claimed rights for any pollution of the watershed.

Second, the Cherokee Nation claims an interest in recovering for itself civil remedies – including monetary damages – for the injuries to the IRW claimed in this action. Its stated policy, again set forth in its Environmental Quality Code, is to "provide civil and criminal remedies and santions in favor of Cherokee Nation against any persons who violates [sic] this chapter or any regulations adopted hereunder and, to maximum extent possible, enforce these remedies and sanctions against such persons." 63 Cherokee Nation Code §302 (B)(7). The policy states the

9

Nation's intent to obtain such civil remedies in its own favor.  In that light, the Nation has an interest in deciding for itself whether to pay half the monetary damages that may be recovered for damages to the tribe's natural resources to the State's private counsel under the State's contingency fee agreement.

Third, the Cherokee Nation claims an interest in "provid[ing] for regulation and taxation of interests, actions and omissions that adversely affect the environment of the Cherokee Nation."  63 Cherokee Nation Code § 302 (B)(9).  The Cherokee Nation may, as a domestic dependent sovereign, seek to forego claims for money damages and, instead, regulate and tax the application of poultry waste to lands within its jurisdiction.

Fourth, the Cherokee Nation claims water rights in the Illinois River established under federal laws and treaties which are unaffected by statehood.  *See* Correspondence dated April 20, 2004, from Principal Chief Chad Smith to Colonel Robert L. Suthard, Jr. of the U.S. Army Corps of Engineers, Tulsa District asserting its claim to Illinois River water impounded in Lake Tenkiller [Doc. No. 1788-8, pp. 5-7].  One of the State officials who brought this action admitted at the Preliminary Injunction Hearing  that "there are some members of the Cherokee Nation who think they have a claim to the water."  Testimony of Miles Tolbert, Oklahoma Secretary of the Environment [Doc. No. 1788-2, p. 5].

The claimed interests of the Cherokee Nation in the water rights portion of the subject matter of this action are substantial and are neither fabricated nor frivolous.  *See Davis I*, 192 F.3d at 959.  The State admits that, as of 1986, 92,405.97 acres were held in trust by the United States for the Cherokee Nation.  *See Indian Reservations: A State and Federal Handbook*, McFarland & Company, Inc., 1986, p. 215.  When the federal government set land apart in trust, it arguably reserved or

10

recognized sufficient "reserved water rights" to fulfill the purposes of the land validly set apart in trust. All formal Indian reservations have reserved water rights, also known as *Winters* rights, established in *Winters v. United States*, 207 U.S. 564 (1908). "If the land held by or for Indian tribes in Oklahoma is equivalent to formal reservations, then that land also has reserved water rights." Taiawagi Helton, Comment, *Indian Reserved Water Rights in the Dual-System State of Oklahoma*, 33 Tulsa L.J. 979, 993 (1998). No reported case has involved the application of reserved rights in a riparian jurisdiction. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 2005 Edition, §19.01[2]; 4 Waters and Water Rights § 37.01(c)(2). However, in 2007, a Virginia state judge is said to have recognized the applicability of *Winters* rights in a riparian jurisdiction. *Id.* The *Winters* basis for Indian water rights in riparian and dual-system states continues to attract academic attention as a viable legal claim. *See* Judith V. Royster, *Winters in the East: Tribal Reserved Rights to Water in Riparian States*, 25 Wm. & Mary Envtl. L. & Policy Rev. 169 (2000); Hope M. Babcock, *Reserved Indian Water Rights in Riparian Jurisdictions: Water, Water Everywhere, Perhaps Some Drops for Us*, 91 Cornell L. Rev. 1203 (2005).

In addition to *Winters* rights, the Cherokee Nation appears to have an arguable, non-frivolous claim it owns much of the surplus water within its historic boundaries. When the Indian Territory was set aside for the Five Civilized Tribes, the United States promised that the lands set aside would "in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory." Treaty with the Cherokee, Dec. 29, 1835, U.S.-Cherokee, art. 5, 7 Stat. 478, 481. The Cherokee Nation owned all the lands (approximately 7 million acres) in fee simple, including lands underlying the navigable portion of parts of the Arkansas River. *Choctaw Nation v. Oklahoma*,

11

397 U.S. 620 (1970).[5]  If the Nation owned all the land and water for its absolute and exclusive use, the question to be asked

> is not, How much water was reserved to the tribes? but how much water has been taken away?  The shift in the nature of the question transfers the burden of establishing a right to water from the tribes to the state.  The shift also creates a presumption that surplus water is the property of the tribes rather than the state.

Helton, 33 Tulsa L.J. at 995.  Under this approach, known as the "Five Tribes Water Doctrine," the state is entitled only to water appurtenant to land which it holds.  *Id.*  "In such a case, the court would have to determine what fraction of the land is owned by the state and attach that same fraction of the region's water."  *Id.*  Suffice it to say that, because the IRW is a "checkerboard" area of both tribal and non-tribal lands, the Cherokee Nation continues to claim a real and substantial interest in some as-yet undetermined portion of the waters of the Illinois River.

Fifth and finally, CERCLA permits tribal claims for pollution to natural resources belonging to or held in trust for the benefit of the tribe:

> In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) of this section liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State *and to any Indian tribe for natural resources belonging to, managed by, controlled by, or appertaining to such tribe, or held in trust for the benefit of such tribe, or belonging to a member of such tribe if such resources are subject to a trust restriction on alienation.*

42 U.S.C. §9607(f)(1) (emphasis added).  Based upon the above and foregoing, the Court concludes

---

[5]In *Choctaw Nation*, the Supreme Court rejected Oklahoma's argument that the United States had retained title to lands underlying the navigable portion of the Arkansas River and had passed title to the State upon its admission to the Union in 1906.  In this case, the State initially alleged it "has an interest in the beds of navigable rivers to their high water mark," [Second Amended Complaint, ¶ 5] but now admits in its response that the Illinois River is non-navigable.

the Cherokee Nation claims an interest relating to the subject of this action for Rule 19 purposes.

### 2.  Rule 19(a)(1)(B) Factors

The court must next determine whether, under Rule 19(a)(1)(B), disposing of the action in the Cherokee Nation's absence may, as a practical matter impair or impede the Cherokee Nation's ability to protect its interest, or leave defendants subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations.  Rule 19(a)(1)(B)(i) and (ii)**.**

### a.  Impairment of or Impediment to the Ability to Protect the Interest

Adjudication of this action in the Cherokee Nation's absence would impair or impede the Nation's sovereign and stated interest in recovering for itself civil remedies for pollution to lands, waters and other natural resources within its tribal jurisdiction.  The State seeks damages for pollution to the IRW as a whole; it does not attempt to differentiate, segregate and/or exclude damages to tribal lands and water rights.  The State's pursuit of such claims for money damages absent the Cherokee Nation ignores the Nation's sovereign right to manage the natural resources within its jurisdiction and seek redress for pollution thereto.

The State seeks an award of monetary damages for the lost value of natural resources of the IRW, and for remediation of the injury to natural resources in the IRW.  The State's most recent damages reports identify natural resources damages to the IRW totaling $611,529,987.00.  In the absence of the Cherokee Nation as a party to this action, the State may distribute any award of monetary damages (for damage to both tribal and non-tribal resources) as the State alone sees fit.  A large portion of the damages awarded for injury to tribal lands and natural resources would not benefit the Nation, as the State has contracted to give private counsel up to half of all monetary recovery as a contingency fee.  In the Cherokee Nation's absence, the State officials bringing this

13

action are the only persons determining whether the contingency fee arrangement is appropriate, and the Cherokee Nation's ability to decide for itself how to prosecute its claims for natural resources damages is impaired.

The State contends that "the State and the Cherokee Nation share a desire for natural resources that are not polluted," and that an award of damages to the State would not impair or impede the Cherokee Nation's ability to protect its interests.  In some cases, "the interests of the absent person are so aligned with those of one or more parties that the absent person's interests are, as a practical matter, protected."  *Davis II,* 343 F.3d at 1291-92.  This type of representation is permissible only so long as no conflict exists between the representative party and the nonparty beneficiaries.  *Citizen Potawatomi Nation,* 248 F.3d at 999.  In light of the factors outlined above, as well as the State's and the Nation's disparate views relating to jurisdiction and ownership of lands and natural resources in Northeastern Oklahoma, this court is unpersuaded that the State can adequately protect the absent tribe's interest.

Finally, although the State says the Cherokee Nation is a "potential co-trustee under CERCLA," and although CERCLA prohibits "double recovery under this chapter [CERCLA] for natural resource damages, including the costs of damage assessment or restoration, rehabilitation, or acquisition for the same release and natural resource," *see* 42 U.S.C. § 9607 (f)(1), the State makes no attempt to differentiate the natural resources "belonging to, managed by, controlled by, or appertaining to the State" and the natural resources "belonging to, managed by, controlled by, or appertaining to the tribe."  As recognized in *Coeur D'Alene Tribe v. Asarco Incorporated*, 280 F.Supp.2d 1094 (D. Idaho 2003), "the only feasible way to compensate the co-trustees and avoid a double recovery or unjust enrichment to one trustee at the expense of another is to award damages

in the ratio or percentage of actual management and control that is exercised by each of the various co-trustees."   In this case, the State has made no attempt to determine the relative ratios or percentages attributable to itself and the Nation.  Furthermore, this Court can make no determination of the ratio or percentage of actual management and control exercised by the Cherokee Nation in the Nation's absence.  One trustee – the State – is therefore likely to be unjustly enriched at the expense of the Nation, thereby impairing the Cherokee Nation's ability to protect its interests.

This Court concludes that, with respect to the claims for money damages, disposing of the case in the Cherokee Nation's absence may impair or impede the Cherokee Nation's ability to protect its interests.

### b.  Risk to Defendants of Double, Multiple or Inconsistent Obligations

Permitting this case to go forward on the State's claims for money damages in the Cherokee Nation's absence would leave defendants subject to a substantial risk of double or otherwise inconsistent obligations.  The possibility of being subject to an additional lawsuit brought by the Cherokee Nation is real; it is not unsubstantiated or speculative.  *Sac & Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1259 (10th Cir. 2001) (quoting 7 WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE §1604 at 62).  Not only has the Attorney General of the Cherokee Nation attempted to enter into a cooperative agreement to allow the State to prosecute claims on the Nation's behalf, the tribe's Principal Chief has recently issued a public statement that "The Cherokee Nation, like the State of Oklahoma, has to protect the water quality interests within our jurisdiction."  [Doc. No. 1825-2].       In response to the motion, the State asserts "even if the CN were to sue Defendants, there is no reason to believe that the injunctive relief that it would seek would be more stringent than that which the State is seeking."  The response avoids the real concern here – double recovery of

15

monetary damages.  And although CERCLA prohibits double recovery of monetary damages "under this chapter [CERCLA]," it does not prevent double recovery of monetary damages sought under other state law claims.  Nor does CERCLA prohibit  subsequent litigation of a new CERCLA claim when the parties in the second action are not the same as, or in privity with, the parties in the prior action.   *Coeur D'Alene*, 280 F.Supp.2d at 1118.  Insofar as the Cherokee Nation is the steward of a separate and distinct subset of the natural resources in the IRW, it is not in privity with the State of Oklahoma.

The court concludes that proceeding with this litigation in the absence of the Cherokee Nation will subject defendants to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations with respect to the claims for monetary damages.

### B.  Under Rule 19(b), Should the Action Proceed?

Having concluded the Cherokee Nation is a required party, and the parties having agreed that joinder of the Cherokee Nation is not feasible because of tribal sovereign immunity, this  court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed.R.Civ.P. 19(b).  The factors for the court to consider in making the determination include: 1) the extent to which a judgment rendered in the Cherokee Nation's absence might prejudice the Cherokee Nation or defendants; 2) the extent to which any prejudice could be lessened or avoided by protective provisions in the judgment, shaping the relief or other measures; 3) whether a judgment rendered in the Cherokee Nation's absence would be adequate; and 4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder. This list of factors is not exclusive, but are guides to the overarching equity and good conscience determination.  *Davis II,* 343 F.3d at 1289.  The Rule 19(b) factors represent four distinct interests:

16

> (1) "the interest of the outsider whom it would have been desirable to
> join," (2) the interest of the defendant in avoiding "multiple litigation,
> ... inconsistent relief, or sole responsibility for a liability he shares
> with another," (3) "the interest of the courts and the public in
> complete, consistent, and efficient settlement of controversies[,] ...
> settling disputes by wholes, whenever possible ..." and (4) the
> plaintiff's interest in having a forum in which to present the claims.

*Id.* at 1290 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 109-11

(1968).

### 1. Prejudice to the Cherokee Nation and/or Defendants

The court has noted the Cherokee Nation's interest, as a sovereign, in governing and

regulating resources within its jurisdiction, in recovering monetary damages in its favor for pollution

to natural resources belonging to, managed by, controlled by, or appertaining to the tribe, and in

avoiding unjust enrichment of another CERCLA trustee at its expense.  The Nation would likely

suffer prejudice to its sovereign interests should a money judgment be rendered in its absence.  The

Tenth Circuit has noted the "strong policy favoring dismissal when a court cannot join a tribe because

of sovereign immunity." *Citizen Potawatomi Nation*, 248 F.3d at 1001 (quoting *Davis I,* 192 F.3d

at 960); and *Enterprise Mgmt. Consultants, Inc. v. United States*, 883 F.2d 890, 894 (10th Cir. 1989).

As for prejudice to the defendants, the court has noted that defendants face a substantial risk

of double or inconsistent obligations arising from the claims for money damages.  If the State prevails

on its damages claims, nothing will prevent the Cherokee Nation from pressing similar claims against

defendants.  And in the event the State's claims fail, defendants will remain at risk of facing claims

from the Cherokee Nation for damages related to alleged pollution of lands, water and natural

resources within the Nation's jurisdiction in the IRW.

In an analysis of Rule 19(b) factors involving an absent tribe that was a required party, the

17

Tenth Circuit addressed the prejudice resulting from multiple or inconsistent obligations due to the tribe's absence:

> More important, however, is that the Tribe would not be bound by the judgment in this case and could initiate litigation against Defendants if the BIA withheld funds. Thus, Defendants might well be prejudiced by multiple litigation or even inconsistent judgments if this litigation were to proceed without the Tribe.

*Davis v. United States*, 343 F.3d 1282,1292 (10th Cir. 2003) (*"Davis II"*). This case is similar. As previously mentioned, the Nation's Principal Chief has recently stated that the Cherokee Nation will protect the water quality interests within the Nation's jurisdiction. The Nation's Attorney General has attempted, albeit invalidly, to assign the Nation's rights in this action to the State. And, given the increasing importance of water rights in this country, the fact that the Cherokee Nation has not yet brought suit does not warrant a conclusion it will not do so in the future.

The court concludes that the first Rule 19(b) factor – prejudice to the Cherokee Nation or defendants – weighs in favor of dismissal.

## 2.  Avoidance/Minimization of Prejudice

The State has not suggested, and this court has not discovered, a way by which prejudice to the Cherokee Nation and/or defendants could be lessened or avoided by protective provisions in the judgment, shaping the relief, or other measures. Without a legally binding assignment of the Cherokee Nation's rights and interests in the IRW, a damage award to the State either abridges the right of the Cherokee Nation to pursue its own claim for money damages or, to the extent the Cherokee Nation is not barred by issue or claim preclusion, conversely exposes defendants to the risk of multiple, inconsistent judgments. And as previously noted, if the State loses its claim for damages, defendants face a real and substantial risk the Cherokee Nation, unfettered by issue and claim

18

preclusion, would pursue damage claims on its own.

### 3.  Adequacy of a Judgment Rendered in the Cherokee Nation's Absence

The State argues that "[s]hould the State prevail at trial, liability for the pollution will be affixed and the judgment will award injunctive relief and damages aimed at resolving the problems caused by Defendants' poultry waste disposal practices.  Inasmuch as the State and the Cherokee Nation both desire an IRW that is not polluted, the judgment will be plainly adequate."  However, "[t]he United States Supreme Court has explained that Rule 19(b)'s third factor is not intended to address the adequacy of the judgment from the plaintiff's point of view."  *Davis II,* 343 F.3d at 1292-93 (citing *Provident Tradesmens Bank,* 390 U.S. at 111).  "Rather, the factor is intended to address the adequacy of the dispute's resolution."  *Id.*  "The concern underlying this factor is not the plaintiff's interest 'but that of the courts and the public in complete, consistent, and efficient settlement of controversies,' that is, the 'public stake in settling disputes by wholes, whenever possible.'"  *Id.*

In this case, a judgment awarding damages in favor of the State alone would fail to address and resolve the concerns outlined in *Davis II* and *Provident Tradesmens*.  Because the State's claims involve allegations of harm to natural resources in which the Cherokee Nation claims an interest, a judgment for damages in this case would either impinge on the Cherokee Nation's sovereign and statutory rights or leave defendants exposed to subsequent suit by the Cherokee Nation, or both.  The public interest in "complete, consistent, and efficient settlement of controversies" would be violated, and the "public stake in settling disputes by wholes" would be ignored.

The court finds that the third Rule 19(b) factor favors dismissal of the claims for monetary damages.

### 4. Whether the State Would Have an Adequate Remedy if the Claims Were Dismissed

The fourth Rule 19(b) factor is whether, if the monetary claims were dismissed for nonjoinder, the State would have an adequate remedy.  The State is not without an alternative means to obtain monetary relief.  The State could dismiss and refile the action after the State and Cherokee Nation have entered into a legally binding agreement whereby the State may obtain standing to assert the Nation's CERCLA, and possibly other, damage claims.  The dispute could then be resolved "by wholes."  Alternatively, the State can proceed to trial on its claims for injunctive relief.  This factor also favors dismissal.

### 5. Timing of the Rule 19 Motion

In addition to the four traditional factors, the court considers as an additional factor the timing of defendants' Rule 19 motion.  *See Illan-Gat Eng'rs., Ltd. v. Antigua Int'l Bank,* 659 F.2d 234, 242 (D.C. Cir. 1981) (a court should, in equity and good conscience, consider the timing of the motion, and the reasons for the delay).  "The issue of dispensability, generally, is not waivable, and is one which courts have an independent duty to raise *sua sponte."  Symes v. Harris,* 472 F.3d 754, 760 (10th Cir. 2006); *Mescalero Apache Tribe v. State of New Mexico,* 131 F.3d 1379, 1383 (10th Cir. 1997) ("the issue of indispensability can be raised at any time"); *Thunder Basin Coal Co.,* 104 F.3d at 1211; *Enterprise Mgmt. Consultants,* 883 F.2d at 892; *Wyandotte Nation v. Unified Gov't of Wyandotte County,* 222 F.R.D. 490, 500 (D. Kans. 2004).

The Advisory Committee on the Federal Rules of Civil Procedure notes, however, that undue delay in filing a Rule 19 motion can properly be counted against a party seeking dismissal "when the

20

moving party is seeking dismissal in order to protect himself against a later suit by the absent person (subdivision (a)(2)(ii)), and is not seeking vicariously to protect the absent person against a prejudicial judgment (subdivision(a)(2)(i))." *See* Advisory Committee Notes to the Amended Rule. Defendants here are not seeking dismissal in order to protect themselves against a later suit by or on behalf of the Cherokee Nation. Rather, they argue that only a later suit can fully resolve this dispute, a later suit in which the State has standing to assert the interests of the Cherokee Nation. In addition, defendants assert the interests of the Cherokee Nation, as well as their own, against a prejudicial judgment in which the State is the only plaintiff in interest. Moreover, the State resisted for over two years the defendants' efforts to clarify what specific lands and resources the State claims to own and alleges were injured.

The court finds defendants did not unduly delay filing their motion to dismiss, and further finds the other four factors – prejudice to the absent party and to the defendants, the court's inability to lessen the prejudice without the Cherokee Nation's joinder, the inadequacy of a judgment rendered in the Cherokee Nation's absence, and the availability of an adequate remedy – outweigh prejudice to the State resulting from the timing of defendants' motion. Having weighed these factors, the court concludes, in equity and good conscience, the State's claims for monetary damages should not proceed among the existing parties. Accordingly, the court finds the Cherokee Nation to be an indispensable party, and grants defendants' motion to dismiss plaintiff's claims for monetary damages.

## V. Standing

As set forth in Section III, above, the State does not have standing to prosecute monetary damage claims for injury to the Cherokee Nation's substantial interests in lands, water and other

natural resources located in the IRW.  A plaintiff does not have standing to assert a claim of injury to property it does not own or hold in trust.  *See Tal v. Hogan*, 453 F.3d 1244, 1254 (10th Cir. 2006); *Washington Legal Foundation v. Legal Foundation of Washington*, 271 F.3d 835, 848 (9th Cir. 2001).  Although the State has standing to assert its claims relative to its own rights in the IRW, it has no standing as a "quasi-sovereign" to seek damages for injury to lands and natural resources in the IRW that fall within the Cherokee Nation's sovereign interests.

The State contends it has standing under the Arkansas River Basin Compact of 1970 to assert claims relative to all water rights.  In that Compact, the States of Arkansas and Oklahoma equitably apportioned the waters of the Arkansas River Basin.  82 Okla. Stat. §§ 1421.  Congress consented to the Compact in 1973.  The Cherokee Nation was not a party to the Compact.  The Nation's pre-existing water rights are unaffected absent clear evidence that Congress actually considered the alleged conflict between the Compact's intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202-03 (1999).  The State has provided no such clear evidence of intent to abrogate Cherokee water rights acquired by treaty.

## VI.  Conclusion

The Cherokee Nation is a required party under Rule 19 with respect to the State's claims for damages.  Joinder of the Cherokee Nation is not feasible based on the Nation's status as a dependent sovereign.  The Cherokee Nation is an indispensable party and, pursuant to Rule 19(b), plaintiff's claims for damages should not, in equity and good conscience, be allowed to proceed among the existing parties.  The Cherokee Nation is not a required party to the State's claims for violation of state environmental and agricultural regulations.  Movants do not seek dismissal of plaintiff's claims

22

for injunctive relief.  Therefore, defendants' Motion to Dismiss [Doc. No. 1788] is granted with respect to Counts 1, 2 and 10 and the claims for damages asserted in Counts 4, 5 and 6.  The motion is denied with respect to Counts 3, 7, and 8 and claims for injunctive relief asserted in Counts 4, 5 and 6.

Defendants' alternative Motion for Judgment on the Pleadings Based on Lack of Standing [Doc. No. 1790] is granted insofar as the State attempts to retroactively obtain standing to prosecute the Cherokee Nation's interests with respect to Counts 1, 2 and 10.  The Motion for Judgment on the Pleadings is denied with regard to the remaining counts.

IT IS SO ORDERED this 22nd day of July 2009.


Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

23