1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   STATE OF OKLAHOMA, ex rel,    )
    W.A. DREW EDMONDSON, in his   )
5   capacity as ATTORNEY GENERAL  )
    OF THE STATE OF OKLAHOMA,     )
6   et al.                        )
                                  )
7              Plaintiffs,        )
                                  )
8   vs.                           )         CASE NO. 05-CV-329-GKF-PJC
                                  )
9                                 )
    TYSON FOODS, INC., et al.,    )
10                                )
                                  )
11             Defendants.        )

12

13

14                    TRANSCRIPT OF PROCEEDINGS
15                        JULY 29, 2009
        BEFORE THE HONORABLE GREGORY K. FRIZZELL, DISTRICT JUDGE
16                    MOTION HEARING, VOLUME II

17

18
    APPEARANCES:
19

20
    For the Plaintiffs:           MR. DAVID RIGGS
21                                MR. DAVID P. PAGE
                                  MR. RICHARD T. GARREN
22                                Riggs Abney Neal Turpen
                                  Orbison & Lewis
23                                502 W. 6th Street
                                  Tulsa, OK  74119
24

25

```
1    (APPEARANCES CONTINUED)

2    For the Plaintiffs:              MR. ROBERT A. NANCE
                                      MS. KELLY FOSTER
3                                     Riggs Abney Neal Turpen
                                      Orbison & Lewis
4                                     5801 Broadway, Extension 101
                                      Oklahoma City, OK  73118
5
                                      MR. LOUIS W. BULLOCK
6                                     Bullock Bullock & Blakemore
                                      110 W. 7th St.
7                                     Suite 770
                                      Tulsa, OK  74119
8
                                      MR. FREDERICK C. BAKER
9                                     MS. ELIZABETH CLAIRE XIDIS
                                      Motley Rice LLC
10                                    28 Bridgeside
                                      P.O. Box 1792
11                                    Mount Pleasant, SC  29465

12

13   For Tyson Foods:                 MR. ROBERT W. GEORGE
                                      Tyson Foods, Inc.
14                                    2210 West Oaklawn Drive
                                      Springdale, AR  72701
15
                                      MR. JAY THOMAS JORGENSEN
16                                    MR. GORDON D. TODD
                                      Sidley Austin LLP
17                                    1501 K St. NW
                                      Washington, DC  20005
18
                                      MR. PATRICK MICHAEL RYAN
19                                    Ryan Whaley Coldiron and
                                      Shandy PC
20                                    119 N. Robinson, Rm 900
                                      Oklahoma City, OK  73102
21
     For Cargill:                     MR. JOHN H. TUCKER
22                                    MS. THERESA HILL
                                      Rhodes Hieronymus Jones
23                                    Tucker & Gable
                                      100 W. 5th St., Ste 400
24                                    Tulsa, OK  74103

25
```

```
 1   (APPEARANCES CONTINUED)

 2   For Cargill:                  MR. DELMAR R. EHRICH
                                   MS. KRISANN C. KLEIBACKER LEE
 3                                 Faerge & Benson
                                   90 S. 7th St., Ste 2200
 4                                 Minnaepolis, MN  55402

 5   For Simmons Foods:            MR. JOHN R. ELROD
                                   MS. VICKI BRONSON
 6                                 Conner & Winters
                                   211 E. Dickson St.
 7                                 Fayetteville, AR  72701

 8   For Peterson Farms:           MR. A. SCOTT MCDANIEL
                                   MR. PHILIP HIXON
 9                                 MS. NICOLE LONGWELL
                                   McDaniel Hixon Longwell &
10                                 Acord PLLC
                                   320 S. Boston, Ste 700
11                                 Tulsa, OK  74103

12   For George's:                 MR. WOODY BASSETT
                                   MR. VINCENT O. CHADICK
13                                 Bassett Law Firm
                                   P.O. Box 3618
14                                 Fayetteville, AR  72702

15   For Cal-Maine:                MR. ROBERT SANDERS
                                   Young Williams P.A.
16                                 P.O. Box 23059
                                   Jackson, MS 39225
17
                                   MR. ROBERT P. REDEMANN
18                                 Perrine McGivern Redemann
                                   Reid Berry & Taylor PLLC
19                                 P.O. Box 1710
                                   Tulsa, OK  74101
20

21

22

23

24

25
```

PROCEEDINGS

1

2    JULY 29, 2009.

3         THE COURT:  I apologize.  I was waiting for the word

4    that you were ready, and finally came out wondering what was

5    the holdup.  So I think we first need to address this Fisher

6    declaration which was part of the motion to strike.  There are

7    only a few paragraphs in there that are, arguably, new, from my

8    review:  The paragraphs regarding the Ed Fite property

9    controversy, paragraphs 11 and 12 explaining why the Fite

10   property which was originally characterized as being poultry-

11   free showed up as being part of the poultry PCA signature, now

12   explained by Mr. Fisher as -- Dr. Fisher, excuse me -- as being

13   the result of ground water because the Fite property apparently

14   has, what, two springs on it.  Those are paragraphs 11 and 12,

15   so we'll have little mini trials within this whole matter.

16        Paragraph 16 is alleged to have been a summary of

17   paragraphs 1, 2, and then 6 through 29 of the original Rule 26

18   expert report.  Parts of it clearly are.  Other parts are a bit

19   different.  This paragraph contains a statement that poultry

20   waste contains substantial amounts of phosphorus, copper and

21   zinc.  I don't know that anyone would dispute that it contains

22   substantial amounts of phosphorus.

23        But in any event, the statement that it contains

24   substantial amounts of copper and zinc, it is a bit different

25   from what he said in the first Rule 26 statement.

1       In addition, in the latter part of the paragraph, he

2  lists eight different things, as he calls them, which he says

3  are all methods for determining sources of contamination and

4  the fate and transport of contaminants in an environment such

5  as the Illinois River Watershed.  So this raises the same basic

6  question.

7       As I understand it, Mr. Bullock, with respect to

8  these statements that are used to show that certain

9  methodologies are common and to support a co-expert's opinion

10  in a Daubert analysis, the argument essentially is that, Judge,

11  even if this person isn't going to testify as to these matters,

12  the Court ought to consider it in regard to the Daubert motion

13  to determine the reliability.

14       MR. BULLOCK:  I think that's correct.  The other

15  issue, of course, is being allowed to have rebuttal at this

16  point in terms of arguments advanced by the defendants, and so

17  an expert ought to be allowed to, as it were, answer the

18  questions asked where those follow the report and challenge the

19  report in some way.  He ought to be able to answer that, I

20  believe, Judge.

21       THE COURT:  Who cares to respond here?  I mean, it

22  does raise bigger questions, too, as to the appropriateness of

23  this type of forum for resolving these types of issues, but in

24  any event, we're all here.  Any response?

25       And I'm specifically referring to the Fisher

 1  affidavit.  I've done my best to identify that which appears to

 2  be new materials or potentially new materials.  But how do the

 3  defendants respond to this argument that, Judge, we ought to be

 4  able to respond here, with regard to Fite, we want to be able

 5  to reply as to why the test showed up to be poultry

 6  contaminated on what was thought to be a pure piece of property

 7  on which Ed Fite never applied poultry litter?

 8          MR. JORGENSEN:  We really have just two thoughts,

 9  Your Honor.  First, we believe your order was right.  The

10  Supreme Court itself, the Tenth Circuit, a number of courts

11  have said the problem with new testing is it's never-ending, or

12  new analysis or new anything.  Then we want to say something

13  back, then they want to say something back.  So we think your

14  order is right.

15          But on that specific issue that Mr. Bullock has

16  addressed, the Fite farm and the allegation of that two wells

17  contaminated the entire farm with bubbling poultry waste.  If

18  you want to let that in and we'll talk about it today, we would

19  be fine with that.  We would give Mr. Bullock what he wants.

20  It is new, but we think it could go to the weight.

21          THE COURT:  I think it's fair.  It does raise a

22  relatively interesting question.

23          MR. JORGENSEN:  Right.

24          THE COURT:  And then secondly, what about the

25  remaining portions of the Fisher declaration appended as

1   Exhibit H?  Any objection to its consideration in the matters

2   here today?

3            MR. JORGENSEN:  Just one moment, Your Honor.

4            THE COURT:  Yes, sir.

5            MR. JORGENSEN:  We're fine to talk about it,

6   Your Honor.  We feel strong in what we've got, and rather than

7   waste time, we'd just rather move on with it.

8            THE COURT:  Well, it does raise an interesting

9   procedural question.  I mean, how long does this go on?  Which

10  then raises the question:  Maybe this is not the place where

11  these sorts of issues ought to be resolved.

12           But we're here.  The motion to strike plaintiffs' new

13  and undisclosed expert opinions, number 2241, is denied with

14  respect to the declaration of Jay Burton Fisher, Ph.D.,

15  appended as Exhibit H to the response.

16           I don't have the number to the Daubert motion on

17  Dr. Olsen.  I'd like to get for the record specifically what

18  number that is.

19           MR. PAGE:  Your Honor, it's -- David Page.  It's

20  document 2198.

21           THE COURT:  Very well.  2198 dash what?

22           MR. PAGE:  Well, it's Exhibit H, so it's 2198-5.

23  Exhibit H.

24           THE COURT:  Thank you very much.  The record will

25  reflect that that's denied.

1            Let's get into whichever of these Daubert motions you

2    would prefer.

3            MR. JORGENSEN:  Thank you, Your Honor.  I think we'll

4    start with Roger Olsen.

5            THE COURT:  Very well.

6            Mr. Todd.

7            MR. TODD:  Good morning.  Just waiting for the

8    PowerPoint to pop up.

9            THE COURT:  Yes, sir.

10           MR. PAGE:  Mr. Todd, do you have a copy of that?  I

11   have a difficult time reading that screen.

12           MR. TODD:  Unfortunately, I only have one printout.

13   You can see it on the screen here.

14           MR. JORGENSEN:  I apologize for the delay,

15   Your Honor.

16           THE COURT:  Not at all.  I apologize for my delay.

17           MR. TODD:  Ready, Your Honor?

18           THE COURT:  Yes, sir.

19           MR. TODD:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           MR. TODD:  Your Honor, Dr. Olsen arrives in much the

22   same boat as Dr. Harwood did yesterday.  He is the State's

23   other causation source-tracking expert.  He, much as she,

24   offers a novel theory of source tracking that was devised

25   solely for this litigation, and it has been unreviewed.  It's

1   not been peer reviewed.  It's not been reviewed by anyone not

2   connected to this litigation.  Your Honor previously found it

3   to be unreliable under Daubert .  The Tenth Circuit affirmed

4   that ruling, and we suggest the same ruling should obtain

5   here.

6           Before I turn to the substance of Dr. Olsen's theory,

7   though, Your Honor, let me touch briefly on the legal

8   standard.  And this is obviously well-known to Your Honor.  But

9   we heard some suggestion yesterday that the Daubert test goes

10  purely to a methodology in the abstract; in general, whether

11  someone somewhere has applied something similar in vaguely

12  similar circumstances, and that's it.

13          Well, Your Honor, the State took that argument to the

14  Tenth Circuit in this case when they appealed you and said that

15  the district court had erred by striking -- by finding

16  unreliable the specific application of a methodology in this

17  case.

18          Now, the Tenth Circuit disagreed, and they wrote that

19  "Any step that renders the analysis unreliable, renders the

20  expert's testimony inadmissible whether the step completely

21  changes a reliable methodology or merely misapplies that

22  methodology."  That's 565 F.3d. 780, Your Honor.

23          So what we're talking about here is not just whether

24  principal component analysis generally could be used in some

25  environmental case somewhere, but whether it's been used

1  appropriately and responsibly in this case.

2         Your Honor, the key Daubert issues with regard to

3  Dr. Olsen's testimony are these:  First, there is no general

4  acceptance of his methodology.  He's the only person who has

5  ever discovered this through principal component analysis as a

6  unique signature.

7         THE COURT:  But is that his methodology?  I mean, his

8  methodology is independent of the specific target, right?

9         MR. TODD:  Well, the methodology, Your Honor, what he

10 proposes is a method for identifying poultry contamination.

11 That's his words:  A method for identifying poultry

12 contamination.  And what that method uses is principal

13 component analysis.

14         He says if you go out into the environment and you

15 find these 26 or 32, depending on what media you're looking at,

16 constituents in the environment in certain proportions, in

17 certain amounts and in certain ratios, then you can rest

18 assured in this watershed that that indicates that poultry

19 litter is present.  That's his methodology.  That's what he's

20 offering the Court, a means of source tracking poultry litter,

21 that no one else has ever done that.

22         In addition, Dr. Olsen's work, we would submit, is

23 not reliable because it is inconsistent, it is internally

24 inconsistent and illogical.  And finally, Dr. Olsen's work does

25 not flow logically from the data.

265

1            Now, Your Honor, let me get through the first slide,

2    the first issue pretty quickly, the signature is novel.  Your

3    Honor, we go back to Dr. Olsen's first deposition in this case

4    back in February of 2008.  I put his testimony up here on the

5    screen.

6            He was quite honest that no one else had ever done

7    what he's done.  No one else has ever applied principal

8    component analysis in this matter in this watershed or to

9    poultry litter and has found that this connection -- this

10   combination of constituents and coefficients and ratios equal

11   poultry litter in the environment.

12           He gave the same testimony at the preliminary

13   injunction proceeding.  Sat here in this Court and again was

14   quite open that this poultry signature is specific to this

15   basin and he's the only one who's ever found it.  So it's

16   novel, Your Honor.

17           THE COURT:  So he's saying that it is specific to

18   this basin, this particular signature?

19           MR. TODD:  That's what he said at the PI hearing.

20   Now, in part, I don't think he's looked for it anywhere else,

21   so I'm not that sure he has a basis to say that it is anywhere

22   else.  But there's no effort to do that.  Insofar as the work

23   that he's done, that his colleagues have done, they've only

24   looked for it here.  So that's where that comes from.

25           Of course, they've only looked for it here because

1    they looked for it in the context of this litigation.  We've

2    made the argument and pointed out that this was developed

3    solely for this litigation.  And Your Honor has seen this

4    memorandum before.  And I don't mean to suggest that anyone has

5    done anything inappropriately when I say that a methodology is

6    litigation-driven.  The Daubert test looks for indicia of

7    reliability that are external to the litigation.  Have other

8    scientists who don't have the same incentives that paid experts

9    do performed similar work, come to similar conclusions?  And

10   here, they have not.  Rather, Dr. Olsen has been paid quite

11   handsomely for his work.  We believe the number is on the order

12   of 8 to $9 million now for Camp Dresser McKee's work in this

13   case.  And he discussed his conclusions with counsel before he

14   took any samples or ran any analysis.  And so we think that

15   goes very much, Your Honor, to reliability.

16          Finally, the next issue is that it's not been

17   subjected to peer review.  At the preliminary injunction

18   proceeding, Dr. Olsen told you that he actually planned on

19   submitting his methodology to peer review, but as he confirmed

20   at his deposition in September of last year, he has not done

21   so.  And we believe that to still be the case.

22          So, Your Honor, Dr. Olsen's methodology arrives here

23   today in much the same disposition as it was in the preliminary

24   injunction hearing.  It's novel, it's developed solely for this

25   litigation, and it's not been peer reviewed or tested by anyone

1    unconnected with this lawsuit.

2          Let me move on to the next point, Your Honor, our

3    principal criticism of Dr. Olsen, and that is that Dr. Olsen's

4    work is inconsistent.

5          Before I turn to that though, let me just recap what

6    is it that Dr. Olsen does, just so we're all on the same page.

7    I've put up on the screen Your Honor a chart, and you've

8    seen these charts before.  These are Dr. Olsen's scatter

9    charts, scatter plots.

10          Dr. Olsen takes a dataset gathered through testing in

11    the IRW, they take a bunch of samples and test them for

12    different constituents and measure different things.  He takes

13    that data and he plugs it into a program called sYSTAT,

14    S-Y-S-T-A-T, I think -- which is a statistical package which

15    can run principal components.  And he derives principal

16    components -- he actually calculates five of them for each

17    sample, and he takes those numbers, and what this plot shows is

18    his principal component 1 plotted against principal component 2

19    score for each plot and he puts that on the chart.  And that's

20    what the PCA actually develops.

21          But the other thing we see here are these elongated

22    ovals.  Those are not calculated by the PCA.  Those are not

23    mathematically or statistically derived.  Those are Dr. Olsen's

24    own subjective evaluation of the data.  Those come from his

25    head.  And that's important as we move forward.

1           What Dr. Olsen says with those circles, with those

2     ovals, is that every sample in one of those ovals is

3     characterized by a dominant source.  The larger one he says is

4     poultry waste.  And the smaller one, he suggests, has a

5     wastewater treatment impact.

6           Now, Dr. Olsen has consistently throughout this case

7     seen this unique poultry signature.  But that's one of the few

8     things that is actually consistent about his testimony.

9     Dr. Olsen had, I think, three years to get his story straight,

10    to get his ducks in a row before this methodology was unveiled

11    to the defendants.  He had a lot of time to do his testing, to

12    do his analysis, to figure out the source of his samples, what

13    was impacted by what.

14          And as Your Honor knows, we learned of this -- we

15    learned the guts of his methodology shortly before the PI

16    hearing.  So it's been -- defendants have been familiar with it

17    for about 18 months now.

18          And over that time, Dr. Olsen has consistently seen

19    in his data -- he has consistently seen a unique poultry

20    signature, but a lot of other things have changed.  He's used

21    -- he's looked at different constituents; he's looked at

22    different rotations of his charts; he's looked at the principal

23    components from different angles; he's used different data.

24          Your Honor will recall shortly before the PI hearing,

25    Dr. Olsen had to remove a bunch of bad data that his colleagues

1    had rejected, had to remove that from his PCA.  He's made a

2    math error that --

3            THE COURT:  But that's not to be considered today.

4    An expert is permitted to correct aspects of their opinion

5    prior to submission to the Court, correct?

6            MR. TODD:  That's absolutely correct, Your Honor, but

7    what we submit it goes to is reliability.  I'm a lawyer.  I'm

8    not a mathematician.  I'm not a scientist.  Your Honor said

9    yesterday you've got a liberal arts background as well.

10           Our task is to figure out whether this is reliable,

11   whether this is the kind of evidence that a court wants to let

12   in.  And we submit that an expert who consistently reaches the

13   same conclusion but on vastly different data and manages to

14   reach the same conclusion, despite having used data that is

15   thrown out, or despite making math errors that are so

16   fundamental that every expert in the case agrees they

17   invalidated all of his mathematical results, we suggest that

18   goes very much to reliability.

19           And what I'd like to do, Your Honor, the first part

20   of my presentation, is walk you through several examples of how

21   Dr. Olsen has consistently had to force his conclusion to match

22   new and evolving data, if I may.

23           So let me go right into the first one, Your Honor.

24   The crux of Dr. Olsen's analysis is this PC score.  PC1, he

25   says that equals poultry litter, that's poultry impact.

1          At his February 2008 deposition -- this is the first

2    time we heard about PC scores -- Dr. Olsen said that anything

3    higher than a PC score of one, a PC1 score of one, up to a

4    range of about nine to ten, well, that was poultry impact.

5          Then in his Rule 26 report, he told us that it's

6    actually 1.3.  He honed it down a little bit.  That was fine.

7    PC1 larger than 1.3.  Any sample measuring higher than PC1, 1.3

8    equals poultry impacted.

9          Then at his September 10 deposition when Mr. George

10   spent two days questioning him, Dr. Olsen sharpened that even

11   further.  He said, in fact, it's 1.30226.  He took it to five

12   decimal places.  But then in literally that same breath, he

13   told us, but there may be a few minor exceptions.  And we'll

14   talk in a minute, Your Honor, where those minor exceptions came

15   from, why he admitted that those existed.

16          And then a little later in the deposition -- this

17   whole side, Your Honor, has suggested they put a shock collar

18   on me, but there's going to be a debate over who gets to hold

19   the clicker.  I think Mr. Jorgensen is probably going to win

20   that.  Maybe Your Honor should have the clicker.

21          THE COURT:  I think we allow Terri to do it.

22          MR. TODD:  Throughout the depositions, Your Honor, I

23   had a standing agreement with the court reporter that she

24   should kick me in the shin when I did this, and my right shin

25   was bruised for quite a while.  But, Terri, I apologize.

1          Back to the fun.  After having told us that the PC

2    score was accurate to five decimal places, Mr. George asked

3    Dr. Olsen:  Well, so is any sample under that not poultry

4    impacted?  He said, no, I can't say that.  They could be

5    poultry impacted, too, but I can't tell you.

6          So Mr. George said, well, can you tell us if any

7    sample is not poultry impacted?  He said, well, maybe the

8    reference samples, maybe the stream -- samples taken from

9    streams where there hasn't been a chicken there in a million

10   years, maybe those are not impacted.

11          So basically we came out of that deposition with

12   everything, everything in the IRW being poultry impacted

13   despite having a PC1 score cutoff of accurate to five decimal

14   places.

15          And then the final contribution, Your Honor, was the

16   February 2009 errata that Dr. Olsen served in which he actually

17   came up with two different cutoffs.  He never explained why he

18   went from one cutoff to two cutoffs, but suddenly it was 2 for

19   surface water and 2.6 for groundwater.  And so the core

20   criterion in Dr. Olsen's evaluation has morphed over time and

21   it's changed over time.  And I'd like to show Your Honor why;

22   why that is, is the data has changed.

23          THE COURT:  All right.  Now, what impact -- as I was

24   reading all this -- what impact did the logarithmic change have

25   to these scores?  Did it have any?

1          MR. TODD:  It did, Your Honor.  And I can actually --

2    that was going to be the last thing that I talked about, but

3    I'm happy to go straight there now, if you'd like to.

4          THE COURT:  I was trying to reach back into junior

5    high mathematics and see if I could dig log paper out of the

6    recesses of my mind, and I vaguely recall that it would have an

7    impact numerically.  So if you could explain that to me.

8          MR. TODD:  Jay, could we go to slide 23, please.

9          The way this came about -- let me just set the

10   background first.  The way this came about is that Dr. Olsen

11   made an error.  Basically he performed his PCA analysis with

12   log transformed data.  It's just an easier way to use numbers

13   if you would take them on a log scale.  But once you run the

14   PCA, you come out -- what it produces is something called a PCA

15   factor score, which you then have to take and apply back to

16   your original data to get the actual PC score, the 1.3, the 2.

17          But multiplying or using a log value with a nonlog

18   value is not something you should do.  He forgot to take the

19   log values of his original data.  He forgot to log transform

20   those before doing that calculation.

21          THE COURT:  I see.

22          MR. TODD:  So our experts, Dr. Cowan and Dr. Johnson,

23   both noticed this and they point it out in their reports.  And

24   Dr. Olsen, to his credit, said, yes, I made a mistake.  And so

25   he submitted the February 2009 errata which purported to fix

1    the mistake.

2           THE COURT:  Would that not explain the change in the

3    scoring?

4           MR. TODD:  It wouldn't, Your Honor.  And let me make

5    a couple of points on this.  First, Dr. Olsen acknowledged --

6    or Dr. Olsen made this mistake in every single one of the runs

7    that he included in his expert report.  I want to say there's

8    about 30 of them.  These are the SW, SD, all the different runs

9    are in his report.

10          THE COURT:  Until you pointed the mistake out and he

11   reran it.

12          MR. TODD:  He only fixed two of them.  His errata

13   only addresses SW3 and SW17.

14          THE COURT:  I see.  So that's why there's reference

15   to these other important runs that they've dropped.

16          MR. TODD:  Exactly.

17          THE COURT:  They're only focusing on the two because

18   those are the only two that have been transformed so that

19   logarithmic data is both in the numerator and the denominator.

20          MR. TODD:  Exactly.  So by his own admission, the

21   other 28 or however many there are, are mathematically invalid.

22          THE COURT:  So why have the other two or three been

23   dropped?

24          MR. TODD:  I couldn't tell you, Your Honor.  He

25   doesn't tell us.

1         THE COURT:  Well, they were described as important

2    runs, right?

3         MR. TODD:  Yeah.  Let me walk through that.  He

4    identifies four as important, and those are the ones that are

5    the basis for the conclusions in his report.  He has

6    conclusions as to water and as to solids.  The two important --

7    the ones in his errata are the two water runs.  He drops solids

8    completely.  But in his report, he also talks about a whole

9    host of --

10        THE COURT:  But if he dropped solids, he has a new

11   standard for solids, does he not?

12        MR. TODD:  No, Your Honor, he now has two standards

13   for water.

14        THE COURT:  Oh, I'm sorry.

15        MR. TODD:  He's got one for surface water and one for

16   groundwater.

17        THE COURT:  Thank you.

18        MR. TODD:  But strictly as to water, if all he did

19   was change -- was change the log, he would conform one set of

20   data and then reperform his calculation, as we understand it,

21   the cutoff should have come out the same.

22        What this does, Your Honor, is it underscores how the

23   cutoff, what lets him draw those ovals, is not the product of

24   the PCA, it's the product of his own subjective evaluation.

25        He decided, for reasons unbeknownst to us, that with

1   the new math, the new plots, he had to pick a different cutoff

2   for groundwater.

3          We have some speculation as to why he did that.  It

4   allowed him to pick -- to have the same percentage of samples

5   as being impacted as being unimpacted.  But that's our

6   speculation, Your Honor.  We don't know why he did that, but

7   it's not mathematically required.  So that goes to the water.

8   The solids, he ignores completely.

9          But the other thing he doesn't do in his errata is he

10  doesn't revisit all of the other runs that are discussed in his

11  report.

12         And this is important because Dr. Olsen tells you in

13  his report that his principal runs and the conclusions he draws

14  are reliable, are trustworthy because he ran all these other

15  runs, and they were sensitivity runs and they were scoping runs

16  and they were testing runs.  And he used different permutations

17  to see how different data combinations would affect his

18  outcome.  And he consistently reached the same conclusion:

19  They confirmed his poultry signature.  But he doesn't revisit

20  any of those with the new data.  He doesn't fix the error.  So

21  all Your Honor is left with is these two principal runs hanging

22  out there with no support.

23         That's the problem, Your Honor.

24         Let me touch a little more on the errata, since we're

25  there.

1          THE COURT:  The two runs that were dropped were

2    solids and what else?

3          MR. TODD:  The rest of them were additional water

4    runs and additional solid runs, but he didn't identify them as

5    principal or as important runs; he calls them sensitivity

6    analyses.  He suggests that they were runs that he did to

7    confirm that his principal runs were accurate, were important,

8    but he never revisited them.

9          THE COURT:  Does he explain how he differentiates

10   between the principal runs and the other sensitivity runs?

11         MR. TODD:  That's another point we make in our

12   pleadings, Your Honor:  He doesn't.  He seems to just pick

13   them, you know, out of the air.  Why SW3 and SW17 are the

14   important ones instead of SW1 and SW24 -- I'm not even sure

15   there is an SW24 -- but you get my point.  He doesn't explain

16   why those are the principal runs.  Perhaps Mr. -- whoever

17   argues for the State could do so today.

18         The other thing he tells the Court in his errata is

19   that it was simply a programing error, this failure to log

20   transform the data.  It was just a programing mistake, and it

21   had no effect on the outcome.

22         If you bore down into the data, Your Honor, it

23   actually does have a substantial fact on the inner workings of

24   his analysis.  This slide here shows a shift in the surface

25   water runs, SW3, from 1.3 to 2.  Making that change changed the

1  classification of 64 different samples.  64 samples were either

2  -- that Dr. Olsen previously told the Court were poultry

3  impacted that are now not poultry impacted, or he previously

4  said were not poultry impacted that now are poultry impacted.

5        THE COURT:  Now, go back to that same slide.  Would

6  the oval be applied normally to this plotting of data?

7        MR. TODD:  That would be his next step, Your Honor.

8  This is his revised scores plot for SW3.  We just didn't put

9  the ovals on this one.

10        And what's interesting, if I may continue --

11        THE COURT:  Yes.

12        MR. TODD:  And what's interesting -- if I may

13  continue, Your Honor.

14        THE COURT:  Yes.

15        MR. TODD:  What's interesting about these plots is,

16  you'll see two maps of the IRW here; we've plotted on here the

17  scores that change.  And as Your Honor can see, they plot all

18  across the water, all across the watershed.  They're not

19  clustered anywhere in particular.  These are -- on the right

20  are points that were previously impacted -- I'm sorry,

21  previously not impacted that now are impacted.  And on the left

22  is the converse of that:  Previously impacted that now are not

23  impacted.

24        And this affects the data underlying Dr. Olsen's

25  conclusions.  He previously concluded that every single sample

1    that he took from Lake Tenkiller was poultry impacted.

2         Well, the February 2009 errata changed that by 30

3    percent.  That's a pretty substantial change for just a

4    programing error, Your Honor.

5         Let's do the same analysis with the groundwater.

6    Here we've got the same map, Your Honor, but this shows where

7    the 95 samples, groundwater samples changed.  Again, they plot

8    across the IRW, they're not clustered anywhere, there's no

9    rhyme or rhythm to them.

10         And again, Your Honor, this changed substantially the

11    data that Dr. Olsen was getting from various sources.

12         This slide shows that the deltas -- but the bottom

13    line is that the GeoProbe samples, the number that he claimed

14    were poultry impacted, decreased by 23 percent.  The spring-

15    impacted samples increased by 16, and the existing well

16    impacted decreased by 27 percent.

17         MR. PAGE:  Your Honor, I hate to interrupt, but if I

18    could just inquire where these last set of five or six slides

19    were put in the response to the Daubert motion.

20         MR. TODD:  These are all in Dr. Olsen's -- sorry,

21    Dr. Johnson's report and his errata -- or his declaration.

22         MR. PAGE:  Is it attached to your response?

23         MR. TODD:  Truly, I'm not sure because we put these

24    slides together as demonstratives for the argument today, but

25    the substance --

 1          THE COURT:  All of this data is contained in

 2   Johnson's report?

 3          MR. TODD:  That's correct, Your Honor, and the

 4   declaration that he put in.

 5          MR. PAGE:  And the demonstratives are also in the

 6   report, these exhibits?

 7          MR. TODD:  No.  We put these together as

 8   demonstratives for this argument.

 9          MR. JORGENSEN:  No, that's not true.  The exhibits

10   are.  They're in there.  The only thing that's new is the

11   PowerPoint.

12          MR. TODD:  The PowerPoint, how --

13          MR. PAGE:  The plots are all in the Johnson report?

14          THE COURT:  Do we have any way of telling Mr. Page

15   where they are in this --

16          MR. PAGE:  In the response.

17          THE COURT:  In the response?

18          MR. TODD:  They would be in the -- Your Honor,

19   everything that I've just covered is set out in Exhibit 12 to

20   our motion to strike Dr. Cowan's testimony.  You'll see all

21   these charts.

22          MR. PAGE:  Thank you, Mr. Todd.  I appreciate that,

23   Your Honor.

24          MR. TODD:  You're quite welcome, Mr. Page.  I'm sorry

25   I didn't have that at my fingertips.

1          THE COURT:  Thank you.

2          MR. TODD:  And that's actually all I had to say about

3    that, Your Honor.  Our basic line is that Dr. Olsen's errata

4    had a substantial effect on his data and should have had an

5    effect on his conclusions and is an example of him being

6    inconsistent.

7          Now, let me go back, Your Honor, to talk about a

8    couple of other examples, a few other examples of where

9    Dr. Olsen seems to be forcing his conclusion onto the data.

10         Your Honor may recall at the PI hearing there was

11   some question as to whether there is a distinct cattle

12   signature in the IRW.

13         Let me take you back on this slide to Dr. Olsen's

14   deposition on February 2, 2008.  At that deposition, Dr. Olsen

15   was insistent that he could see a unique cattle signature.  And

16   this was important because it allowed him to look at other

17   samples and say, I know what a cattle signature looks like, and

18   it's not here; the only thing here is poultry.

19         And I put this slide together, Your Honor, I would

20   say I had about a dozen times that he said that.  I've only

21   given you two.  But he was insistent that in the IRW, he sees a

22   definitive cattle signature in a handful of samples, and that

23   allows him to make this distinction.

24         I'll let Your Honor read that and then I'll move on.

25         He was extremely emphatic about that.  He said he

1   went to certain samples that he knew were cattle impacted.

2          Then came to the PI hearing, Your Honor, and he told

3   you the same thing.  Again, he said, I went to specific samples

4   that I knew had cattle waste in it, and I could see a distinct

5   difference, particularly with the poultry waste.  So I knew

6   what I was looking for, and it just wasn't a dominant signature

7   across the basin.

8          So he's saying, I know what the cattle signature

9   looks like, I know it when I see it, and it's not in these

10  other samples.

11         Let's move forward to April, 2008.  And this is where

12  Ed Fite's farm becomes relevant, Your Honor.  Plaintiffs went

13  out to Ed Fite's farm because they had identified it as a

14  location where poultry litter had not been used.  They wanted

15  to gather cow samples, cow pie samples.  And while they are out

16  there, they also gathered two edge-of-field runoff samples, and

17  they characterized these as cattle edge-of-field samples so

18  they would have something to compare to the poultry edge-of-

19  field samples.

20         What you've got on the slide here is Camp Dresser

21  McKee's field notes from that sampling where it says, "no

22  chicken waste to property applied."  That's what Ed Fite told

23  them.  That's what Dr. Olsen knew when he ran his analysis.

24         So they go back to the lab and they take these

25  cattle-only edge-of-field samples and they run them through the

1    process.

2           And what happens?  They plotted right in the middle

3    of Dr. Olsen's poultry edge-of-field samples.

4           Well, this, of course, would be inconsistent with

5    Dr. Olsen's testimony that there is a unique cattle signature.

6    And so Dr. Olsen and his staff spend a day or more trying to

7    break out the cattle samples.

8           This is a back-and-forth with Dr. Olsen and one of

9    his colleagues.  Dr. Olsen says, I think we should run an edge-

10   of-field-only sample -- or edge-of-field-only run and see if

11   the cattle will break out.  The cattle samples, it turned out,

12   didn't break out.  So they looked at the chemistry to see if

13   there was some way of distinguishing these samples.

14          And then they did something interesting.  Dr. Olsen's

15   testimony, Your Honor, is that the signature consisted of 26

16   variabilities, 26 constituents, that's what makes up his

17   signature.  They tried running fewer variables.  They took it

18   as low as 14 to see if they could come up with some permutation

19   that would support Dr. Olsen's PI testimony that there was a

20   distinct cattle signature.  Well, Your Honor, they were

21   unsuccessful.

22          So we move forward to Dr. Olsen's report, his Rule 26

23   report in this case, where we see no discussion of the distinct

24   cattle signature.  In fact, we see no discussion of the cattle

25   edge-of-field samples.  What Dr. Olsen tells us now is that

1   cattle data plots vary in a varied manner across the scree

2   plot, and so there is no clear signature that can be identified

3   for cattle.

4           He attached to his report a number of charts.  Let me

5   show you one of them here, Your Honor.  I'm sorry, when you're

6   done reading, of course.

7           THE COURT:  Two questions.  I anticipate from what

8   I've read, number one, they'll say the cattle signature is

9   impacted or the potential cattle signature is impacted by

10  poultry-influenced forage, because apparently Fite fed his with

11  hay grown in the IRW, which presumably had been fertilized by

12  poultry.  That's number one.

13          Number two, as I understand it, we have springs that

14  have leached the poultry contaminants, and the cows drink that

15  water.  So your response?

16          MR. TODD:  Yes, Your Honor.  That's why this goes to

17  reliability, because Dr. Olsen has consistently changed his

18  methodology, changed his conclusions or changed the way he uses

19  the data to continue to reach the same conclusion.

20          And this is, of course, the problem with bolstering

21  and you come back later and do more field work.  They went to

22  the Fite farm specifically to get cattle-only samples.  They

23  should have looked.  That was their opportunity to see if these

24  springs were there, if these other impacts were there.  But

25  they didn't.

 1          They recorded that no poultry litter had ever been

 2    put down, and that's was what was known to Dr. Olsen at the

 3    time he did this analysis.

 4          The question is whether at the time he wrote a Rule

 5    26 report sharing this opinion whether what he was telling you

 6    was consistent with the data known to him at the time.

 7          And as to the subsequent work, Dr. Fisher apparently

 8    went back to the farm and they identified a spring,

 9    Your Honor.  And we put this in our reply brief and we actually

10    gave you all the photographs and the field notes to accompany

11    the most recent sampling because it's very interesting reading,

12    Your Honor.

13          They found a spring, which if you look at the GIS

14    coordinates, appears to be about a half mile away from the

15    field.  And this spring was really -- hard to even call it a

16    spring; it's a mud puddle.  They had to dig into the ground to

17    get a single water sample from this thing, but yet they claim

18    that water from this mud puddle flowed half a mile or so and

19    impacted a field that had only been inhabited by cattle and put

20    a dominant poultry signature on that spring.

21          Now, Your Honor, maybe that's what happened.

22          THE COURT:  Well --

23          MR. TODD:  Maybe that's what happened, but the fact

24    is that -- Your Honor, go ahead.  I'm sorry.

25          THE COURT:  Well, I take it you're from D.C.

1          MR. TODD:  I am, Your Honor.

2          THE COURT:  Well, I graduated from high school in

3   D.C., so I don't hold any prejudice against those from D.C.,

4   but in any event, springs run here in Northeastern Oklahoma

5   more at certain times of the year than others.  So it's not

6   impossible for that to have occurred.

7          MR. TODD:  That's true, Your Honor, and my

8   assumption -- and I am from D.C. and I'm not totally familiar

9   with springs, but I would think they would run more in November

10  than in the summer because it's rained more.  This was in

11  November that the sampling was done.  This wasn't the middle of

12  the summer.

13         THE COURT:  So the sample was in November?

14         MR. TODD:  We can look at the exhibit, but the date

15  is on there.  My recollection is that it was November that this

16  was done.

17         But I don't mean to quibble as to which part of the

18  story is right.  Our point is that there are several stories

19  going on here.  And at the time Dr. Olsen wrote his Rule 26

20  report, it was inconsistent with the data known to him.

21         Let me show you the next slide, which I think will

22  help you, will help underscore this.

23         This is a plot that Dr. Olsen attached to his Rule 26

24  report.  And if you squint real hard and look at the bottom,

25  you can see the first thing on the legend is edge-of-field

1  sample.  Doesn't say poultry edge of field; doesn't say

2  cattle.  There's no separate entry for cattle edge of field; it

3  just says edge of field, all the black diamonds.  Two of those

4  black diamonds, Your Honor, are the cattle samples, the cattle

5  edge-of-field samples before Dr. Fisher went back and did his

6  subsequent analysis.  That's how Dr. Olsen treated the

7  inconsistent data at the time he wrote his report.

8            And we suggest, Your Honor, that that should call

9  into question the assumptions he was making.

10           THE COURT:  Go back a second.

11           MR. TODD:  To which slide, sir?

12           THE COURT:  The one you just showed me.  Now, these

13  were originally his cattle edge of field, or is this what was

14  appended to the Rule 26?

15           MR. TODD:  This was attached to his Rule 26 report.

16  This is one of his plots of the SW3 data.  And you can see that

17  the samples are coded by their source.  So you've got high

18  flow, low flow, reference samples and the black diamonds.  The

19  black diamonds are the edge-of-field samples.  And he nowhere

20  breaks out the two cattle samples.  Nowhere in his report does

21  he say, we took these two samples from Ed Fite's farm, we

22  believe they're cattle impacted.  These are cattle edge-of-

23  field samples, not poultry edge-of-field samples, that's what's

24  known to us right now; but yet we're going to go ahead and plot

25  them with the edge-of-field samples generally.

1           So we asked Dr. Olsen about this at his September

2   deposition.  And we asked him specifically -- throughout the

3   testimony here, we asked him about the existence of the cattle

4   signature which had been dropped from his report.  And he now

5   confirmed that, in his view, it just isn't there, period.

6   There's no cattle signature.

7           And at his deposition, he offered the speculation

8   that Dr. Fisher's report was designed to confirm with his new

9   analysis, his new field work.

10          Mr. George asked him, sir -- Mr. Olsen said, well,

11  maybe they were poultry contaminated.  Mr. George said, sir,

12  are you speculating?  And Dr. Olsen said, yes, I am.

13          The fact of the matter is, Your Honor, that what he

14  wrote in his report was inconsistent with the data known to him

15  at the time.

16          I have a couple of other examples of this,

17  Your Honor.  Whenever you're done, let me know and we'll move

18  on to the others.

19          THE COURT:  So the last three lines here are

20  specifically referring to the Fite samples?

21          MR. TODD:  Yes, Your Honor.  There's a long colloquy

22  which I didn't want to --

23          THE COURT:  Go ahead.

24          MR. TODD:  The next point I want to talk about,

25  Your Honor, is wastewater treatment.  The plaintiffs gathered

1   four samples, took samples in four locations which were

2   designed to characterize wastewater treatment.  Three of them

3   came straight out of the end of a pipe that comes out of a

4   wastewater plant, that's just a pure effluent sample.  The

5   fourth one from the Lincoln wastewater treatment plant was

6   actually a river sample that was taken a short distance

7   downstream from the effluent pipe.  But the four of these were

8   designed to characterize wastewater treatment, to let Dr. Olsen

9   know what that would look like perhaps as distinct from poultry

10  signature.

11          In his expert report, Dr. Olsen classified all of the

12  wastewater treatment plant samples as poultry impacted because

13  they all had a PC1 score of higher than 1.3, and so that is

14  what his methodology demanded that he do.

15          So we asked him at his deposition, Dr. Olsen, is this

16  correct?  Are these wastewater effluent samples actually

17  poultry impacted?  And he said, I actually -- I included

18  inadvertently some of the wastewater treatment plant

19  discharges, so I need to take those out of my analysis.  I

20  would say -- his words -- I would say that these probably

21  weren't contaminated by poultry.  So that seemed fine to us.

22          Then we fast forward to the declaration that

23  Dr. Olsen submitted as part of the State's response to this

24  motion, and the wastewater effluent samples are now again

25  classified as poultry impacted.

1          And it is his theory, based on Dr. Fisher's latest

2    field work, new field work, that now the poultry -- the

3    wastewater treatment samples may be contaminated by poultry-

4    related constituents because maybe some water from chicken

5    farms -- and I'm not sure if this is house water or water from

6    the barns or whatever -- maybe it gets to the wastewater

7    plant.

8          So, again, Your Honor, the treatment has varied and

9    hasn't always been consistent with the data.

10          THE COURT:  I take it you haven't been able to take

11    any depositions with regard to that.

12          MR. TODD:  Exactly, Your Honor.

13          THE COURT:  I saw something yesterday about some

14    permitting which indicates that poultry processing waste, or

15    effluent, was, in fact, permitted to go through some of these

16    wastewater treatment plants; is that correct?

17          MR. TODD:  Exactly, Your Honor.

18          THE COURT:  That's a recent revelation, correct?

19          MR. TODD:  That's what's in the Fisher declaration.

20    This is why, as Mr. Jorgensen said, we're happy to talk about

21    this because it's relevant to the way Dr. Olsen's methodology

22    has developed.

23          Dr. Fisher recently, long after his report --

24          THE COURT:  Just within the last month; that was a

25    June declaration, correct?

1          MR. TODD:  Mr. George has clarified for me, it's

2   actually processing of meat, not waste from chicken farms or

3   water from chicken farms.

4          THE COURT:  All right.  That's all very interesting,

5   and it is before the Court.  Go ahead.

6          MR. TODD:  The last one I want to talk about,

7   Your Honor, is Tahlequah.

8          THE COURT:  Now, we don't have anything in the record

9   to indicate it's from a meat processing plant, correct?

10         MR. TODD:  Well, Mr. George, in his capacity as

11  counsel, maybe will be familiar with those, those NPDS permits,

12  which is what Dr, Fisher looked at.

13         Do you want to speak to that?

14         MR. GEORGE:  I believe, Your Honor, and it may be in

15  the record in connection with another motion, but I don't think

16  there's any dispute that the only contribution that's been

17  identified to wastewater treatment plants has been done by

18  Dr. Engel related to poultry and its poultry processing

19  plants.

20         If Your Honor wants me to try to find a reference in

21  the record, I'll be happy to.

22         THE COURT:  Well, it may have been the Fisher recent

23  declaration where I saw a reference there.  Do you recall that,

24  Mr. Todd?

25         MR. TODD:  I'm sorry, Your Honor?

1          THE COURT:  Do you recall a reference in the recent

2   Fisher declaration?

3          MR. TODD:  Yes.  Give me a minute and I'll tell you

4   exactly where it is, Your Honor.

5          It is in paragraph -- it's paragraph 17 and 18 of his

6   declaration.

7          THE COURT:  See if I can find it.

8          MR. TODD:  And then it's referred to, I think, in

9   paragraphs 19 and 20 of the new declaration that provided the

10  citations where the stuff came from.

11         THE COURT:  This is a constantly shifting set of

12  facts.  But he does say poultry processors, so "processors"

13  would imply a meat processing plant.

14         MR. GEORGE:  That's correct.

15         THE COURT:  Go ahead.

16         MR. TODD:  Thank you, Your Honor.  The final thing I

17  want to talk about is Tahlequah, Your Honor.  The plaintiffs

18  took five samples, five water samples in the middle of

19  Tahlequah.  And at the bottom left-hand part of the slide here,

20  Your Honor, you can see the PC scores for those samples.  Each

21  one of them came back higher than 1.3.

22         So by Dr. Olsen's analysis, they should have been

23  poultry impacted.  The red dot/green dot map that you're

24  looking at here shows the red points are higher than 1.3,

25  poultry impacted.  The green dots are less than 1.3, not

1  poultry impacted.

2          But if Your Honor will look at the left-hand side of

3  the screen, you'll see that all five Tahlequah samples are

4  green.  They're not red, as the analysis suggest that they

5  should have been.

6          So we asked Dr. Olsen at his deposition about this.

7  First we had the long colloquy about the wastewater, and he

8  admitted he made a mistake there.  But he affirmed, after that

9  discussion, he affirmed that any other sample that was higher

10 than 1.3 was poultry impacted.

11          Then Mr. George asked Dr. Olsen about Tahlequah.  He

12 said, Sir, will you turn to your table that reports your

13 principal component one scores.  And Dr. Olsen knew exactly

14 where Mr. George was going.  And he said, "Yeah.  Let me cut

15 you short here, now that we brought those up.  Those were above

16 1.3, but based on the spatial analysis, I decided that those

17 were not impacted by poultry."

18          So, Your Honor, Dr. Olsen changed the classification

19 of these scores, because the fact they were from Tahlequah

20 where Dr. Fisher's poultry house density analysis showed zero

21 poultry activity.  Dr. Olsen changed the coding to -- maybe

22 "hide" is too strong a word, but to massage the facts on the

23 ground to his theory that anything higher than 1.3 was poultry

24 impacted.

25          Your Honor, a couple of more steps on this one.

1            In the February, 2009 errata, Dr. Olsen submitted

2    another red dot/green dot map.  We'll show you here.

3            Now you see, Your Honor, those Tahlequah samples,

4    they're all red.  There's no explanation in the text of the

5    errata as to why this change has been made, they've just been

6    changed.  But then in the declaration that plaintiffs submitted

7    from Dr. Olsen in connection with this motion, Dr. Olsen gives

8    an explanation that based on new analysis by Dr. Fisher --

9    again, new analysis done long after expert reports were served,

10   done long after Dr. Olsen and Dr. Fisher were deposed --

11   Dr. Fisher went out and decided that there was some poultry

12   impact in this area as well.

13           And that new analysis contradicts Dr. Fisher's own

14   prior poultry houses density work which was available to

15   Dr. Olsen at the time he wrote his report, at the time he

16   decided these should be green dots, not red dots.  So it

17   changed the story again, Your Honor.

18           THE COURT:  Any indication from Fisher or Olsen as to

19   why?  People raising chickens in their backyard as a result of

20   the recession or what?

21           And frankly, I've seen some discussion out there,

22   particularly in the scientific community, concerned about avian

23   flu, about the increase in chicken raising in the backyard.

24   But in any event, any explanation?

25           MR. TODD:  The only explanation, Your Honor, is the

1    new material we get in Dr. Fisher's declaration which is before

2    the Court, where he suggests that there may be some poultry

3    farming upstream in a subwatershed that could feed to this

4    area, but nothing in Tahlequah itself.

5             THE COURT:  Are these samples taken in the river at

6    Tahlequah?

7             MR. TODD:  They are water samples.  I couldn't tell

8    Your Honor exactly where they're taken from, but they're taken

9    from -- they're different water samples from different areas in

10   the middle of the Tahlequah urban area.

11            If we go back to the map, actually, you can look at

12   the map, you can see that they're in the middle of the urban

13   area there.  Presumably small streams in the area.  So there's

14   certainly a question as to how far back the watershed, any

15   water that's feeding here would go.

16            But the larger point, Your Honor, is that Dr. Olsen

17   simply changed the analysis and conducted additional research

18   long after the time to do so was passed to force his conclusion

19   onto the available data.

20            Let me shift gears here, Your Honor, and talk about

21   something we talked about yesterday.  That's fate and

22   transport.  And I'll speed up here, try to push on through

23   this.

24            Dr. Olsen has the same problem that Dr. Harwood has.

25   Dr. Harwood, as you'll recall, was assuming that two bacteria

1   moved from the environment from chicken farm to Lake

2   Tenkiller.

3          Dr. Olsen is assuming that 26 constituents moved

4   together, including bacteria, incidentally.  But the 26 things

5   moved together through the environment.

6          Now, as Dr. Connelly explains in his report -- and

7   we've submitted that as an exhibit -- that's simply an

8   unrealistic assumption.  I'm not sure you even need to be a

9   scientist to understand this, Your Honor, bacteria die.  Things

10  that are dissolved in water move better with the water than

11  things that are solid in the water.  Heavier metals settle out

12  of the water column faster than lighter metals.

13         So the assumption that these 26 things moved together

14  through the environment in relatively fixed proportions and

15  fixed ratios is not a realistic assumption.

16         Dr. Connelly's report explains -- gives a couple of

17  examples of how that's simply not the case here.

18         In order to make that assumption, to assume that

19  assumption, you have to study fate and transport of these

20  different things and come up with some basis to believe that

21  they move together.

22         But plaintiffs' experts have been honest in the fact

23  that they have not done that analysis.  We've cited all that

24  deposition testimony to Your Honor.

25         We asked Dr. Olsen about it at his deposition this

1    last September, and he said that he didn't actually need to

2    account for the fate and transport characteristics because the

3    way his signature works is, if he finds these things at a

4    certain location in the proper percentage, in the proper

5    ratios, in the proper amounts, then he knows that's cattle --

6    that's poultry signature, despite the fact, Your Honor, that

7    there were alternate sources for most of these things in the

8    IRW.  We talked about bacteria yesterday, fecal indicator

9    bacteria, E. coli, enterococcus.  These are part of Dr. Olsen's

10   PCA, these are constituents that he looks at; but yet there are

11   many sources for these things.  You have no guarantee that the

12   bacteria you find supporting the PCA analysis in the main stem

13   of the Illinois River far downstream from any poultry house

14   actually came from poultry as opposed to a cow or anything

15   else.

16        Let me touch, Your Honor, on the hold time motion

17   because this is where it's relevant.  Your Honor deferred a

18   ruling on that yesterday and said you'd like to take it up with

19   respect to the individual experts.

20        The point of the hold time requirements is to analyze

21   the sample and enumerate the data under conditions that are

22   representative of how the water appears in the environment.

23   Recognize you've got to pull the water out of the river and go

24   to a lab to see how many bacteria there are.  But the longer

25   you defer doing that, the less representative the bacteria

1  count will be of what's actually in the water.

2       Dr. Olsen's PCA assumes, it depends on things being

3  present in certain ratios.  And if the water sample you're

4  enumerating for bacteria is nonrepresentative, if it took too

5  long to get to the lab in California, whether the bacteria grew

6  or whether they died, it doesn't matter which way it went; it's

7  not representative.  And so the ratios Dr. Olsen is measuring

8  for his PCA are not representative of what's going on in the

9  water and the PCA is invalid, Your Honor.  So that's why the

10 hold time motion matters for Dr. Olsen.

11      Let me touch on one final thing, and that's these

12 confirmatory analyses that Dr. Olsen ran.  If you recall, back

13 in the beginning, I put up the scatter plot, it talked about

14 how Dr. Olsen draws the ovals.  The PCA doesn't draw the ovals;

15 Dr. Olsen does.

16      The way he does that is he takes certain points on

17 the map and he says, I know what this sample is.  I know that

18 this sample is cattle or is poultry impacted, I know this

19 sample is wastewater, and so I'm going to analyze that sample

20 and I'm going to see what its PCA score is, and then any other

21 sample that is similar, has a similar PCA score, must also be

22 impacted by the same thing.

23      So he goes out into the IRW and he picks two

24 subwatersheds.  He looks at 23 points, 23 samples from those

25 subwatersheds.  And he says -- and these watersheds --

1   subwatersheds had low poultry house density, so he could say,

2   well, this sample was taken near a poultry farm, so it must be

3   poultry impacted.

4         But these subwatersheds also, Your Honor, had no

5   urban area to speak of, no cattle operations to speak of.  In

6   short, Dr. Olsen took all the other possible impacts off the

7   table as well.  He then comes back to his analysis and he says

8   across the IRW, despite the fact that there were urban areas

9   and cattle and other things elsewhere that could be accounting

10   for these results elsewhere, my spatial analysis shows that,

11   you know, across the IRW, the score 1.3, or now 2 or 2.6 equals

12   poultry impact.

13         So the analysis -- based on the subwatersheds he

14   picked, the analysis is not really -- doesn't really bear out.

15         But let me demonstrate one more thing.  And that's --

16   the assumption of his analysis -- the assumption of this

17   analysis is very important.  He assumes -- in order to do the

18   spatial analysis, you have to assume that you have a sole

19   source sample, i.e., the sample that you're using for your

20   confirmatory analysis actually represents poultry litter,

21   actually represents waste water, actually represents well

22   water, whatever it is you're looking at in the real world so

23   you could then come back to your PCA and say similarly scored

24   samples must be the same thing.

25         But in light of the Fisher declaration, and in light

1  of Dr. Olsen's most recent explanations for these various

2  things we've talked about, Tahlequah and wastewater, he doesn't

3  have any sole source samples left.

4        He's told us the edge-of-field samples are all

5  impacted by cattle.  That was in his deposition, and I think we

6  put in pictures of the photographs of the PI to demonstrate

7  that, they're cattle impact there.  Those samples were impacted

8  by the ground they're sitting in.  They receive runoff from

9  other places.

10        He's acknowledged that the wastewater treatment

11  samples now, in his view, are not purely wastewater treatment.

12        He's told us that the cattle samples are apparently

13  poultry impacted.  The urban -- the Tahlequah samples, they're

14  impacted by poultry.  At his deposition, he told us his

15  residential well samples seem to be like wastewater, so they

16  must be impacted by human waste.

17        In short, Your Honor, he has no source-specific

18  samples.

19        I'm sure you'll hear from the State that Dr. Olsen's

20  PCA methodology has a long pedigree, and they'll cite a bunch

21  of articles, and they're set out in Dr. Olsen's declaration.

22  Those articles talk about the spatial analysis, this need to

23  confirm what your PCA is telling you.  And they make clear that

24  you have to do that with sole-source samples.  Dr. Olsen didn't

25  do that, Your Honor.  Based on the data set he now tells us he

1    has.  He's incapable of performing that analysis.

2           So, Your Honor, to sum up, Dr. Olsen's analysis is

3    new, developed solely for this litigation, it hasn't been peer

4    reviewed by anyone, and it's internally inconsistent.

5           For these reasons, Your Honor, we suggest it's

6    unreliable and should be excluded pursuant to Daubert .

7           If the Court has any more questions, I'm happy to

8    take them.

9           THE COURT:  Now, in terms of the sampling procedures

10   that we discussed yesterday, were all these samples sent to

11   California?

12          MR. TODD:  The water samples?

13          THE COURT:  Yes.

14          MR. TODD:  Initially, no; because they initially made

15   use of a local lab that was called FoodProtech.

16          THE COURT:  Because I thought that had to do with

17   bacteria.

18          MR. TODD:  That's what I'm talking about.  With

19   regard to the hold times, that is just bacteria, Your Honor.

20          THE COURT:  Right.  And this really isn't bacteria at

21   all, is it?

22          MR. TODD:  Right.  This is a different issue.  This

23   is just whether samples -- the last thing I was talking about

24   was just whether samples accurately reflect impact from a

25   single source.

1          THE COURT:  No, I understand that, but in terms of --

2   hold time doesn't really impact Olsen's expert report, does

3   it?

4          MR. TODD:  I'm sorry, Your Honor, I was unclear.  It

5   does, because three of his -- I'm sorry, four of the

6   constituents in his PCA are bacteria.  The things that he looks

7   for in the environment, he looks for -- I may mistake what they

8   are, but arsenic, copper, nickel, they also include

9   enterococcus, E. coli, total coliform and maybe fecal coliform,

10  but I'm pretty confident there's four of them in there.  And

11  his whole theory assumes --

12         THE COURT:  Four of the 26?

13         MR. TODD:  Four of the 26 are bacteria.  And the way

14  the PCA works is it derives a number which represents the

15  relationship between each one of those between the samples.

16         And so for his analysis to work, for his methodology

17  to work, when he goes to a sample in the environment, he's

18  trying to find those 26 things in set ratios, in set

19  proportions.

20         Now, if you take a water sample, its nickel content

21  doesn't change between the river and the lab, but its bacteria

22  content may well.  So if the bacteria have grown or have died

23  over time, and that growing or dying has brought it into

24  conformance with what Dr. Olsen is looking for, he may find his

25  PCA, but he did not measure what's in the water, Your Honor;

1    he measured what made it to the lab.

2           The point of the hold times is to make sure what the

3    lab measures is what's representative of what's in the water.

4    And unless you comply with the hold times, you're not doing

5    that, Your Honor.

6           Any further questions?

7           THE COURT:  I don't believe so.  Thank you.

8           MR. TODD:  Thank you very much, Your Honor.

9           THE COURT:  Mr. Page.

10          MR. PAGE:  Thank you, Your Honor.  David Page for the

11   State of Oklahoma.  I have prepared remarks but I think what

12   I'm going to do is deal with some of the arguments specifically

13   that Mr. Todd provided and then if the Court will allow, allow

14   me to go through my prepared remarks after that.

15          THE COURT:  Yes, sir.

16          MR. PAGE:  I'm going to skip the novelty.  That is --

17   well, in my prepared remarks.  But the second issue that

18   Mr. Todd pointed out was the change in the loading scores.  He

19   noted that it changed from 1.3 in the original Rule 26 report

20   to which, really in his deposition, I think the context of the

21   questioning was, what exactly is it, and he said, well, I

22   rounded it off to 1.3, but it's 1.30226.  But that, Your Honor,

23   I think would be the same from a computer-generated result.

24   But then it changed to 2.  And there's a couple of points that

25   I need to respond to Mr. Todd's comments.

1          First of all, the Court is exactly correct; the

2   reason that the number changed from 1.3 to 2 was the log

3   transform error.  So that failure -- and it was a mistake, it's

4   an oversight, it's an, oops, we made a mistake -- to change the

5   data that came out of Systat and log transform it may change

6   the numbers from 1.3 to 2.  So that was the exact issue there.

7          THE COURT:  Why did it change the results to such an

8   extent if it was merely a log transform change?

9          MR. PAGE:  Your Honor, my understanding -- now what

10  happens once you get those numbers, then you have to do a

11  spatial analysis.  And Dr. Olsen did a spatial analysis based

12  on those numbers, individually, you have to go sample by sample

13  and say, okay, first of all, what were the results for this

14  sample, do the sample constituents in those results mimic the

15  main constituents of poultry waste, the key constituents that

16  transport through the environment.  And I will get to that

17  point also, Your Honor.  And then where was the sample taken in

18  conjunction to what we now know -- now know about this

19  watershed.  Was it taken in an area where there's known poultry

20  house application in a poultry house dense environment or, for

21  example, was it taken in an area like Tahlequah.

22          THE COURT:  Do I understand correctly that he

23  determines his poultry impact threshold after performing his

24  spatial analysis?

25          MR. PAGE:  Yes, that's correct, Your Honor.

1           THE COURT:  Because he has to consider such things as

2    did this sample come from a poultry-rich environment?

3           MR. PAGE:  Yes, sir.  It's not completely that

4    simple, because when you run the Systat and before you do

5    your -- then log transform the numbers, you still get those

6    scatter plots and they show shapes.

7           So the first thing on the principal component

8    analysis, do you see distinct groupings.  So he does identify

9    those distinct groupings and sees where they lay out on the

10   data after it's been log transformed.

11          So the groupings is also important.  You have a

12   wastewater treatment plant grouping and a poultry house

13   grouping that was shown on the plots.  And then is there any

14   grouping for cattle; and there is a grouping for cattle up in

15   the upper right-hand corner of the plot.

16          So he does that analysis.  Then he looks at the

17   spatial analysis sample by sample, the ingredients of that

18   sample, the constituents, multiple constituents and where it

19   was located in the IRW to then determine, okay, where do you

20   draw the line, where do you draw this 1.3 or 2 line.

21          Now, Your Honor, this is an environment.  We're not

22   talking a laboratory, where you collected a sample in a

23   laboratory from a pure result.  So when the defendants argue

24   that the loadings are solely poultry house, that's not what

25   Dr. Olsen's Rule 26 report is nor his testimony.

1          What he's saying is, this is an environment with a

2    mixture of a lot of things going on.  But is there certain

3    samples that have been dominated by poultry waste.  So when he

4    drew the line at 1.3 or 2, based on his judgment and opinion

5    and work in the scientific area as a geochemist and

6    understanding what the circumstances are in the IRW, how these

7    chemicals react and where the sample was taken, he says, I

8    believe that after the log transform, a sample above 2 is

9    dominated by poultry waste.  That doesn't mean it couldn't have

10   some wastewater treatment plant mixed into that river sample

11   also.  In fact, it would.  But is the dominant of that, is the

12   dominant constituents in that waste from poultry house.

13          So the key issue here is that the defendants' experts

14   were then shown scatter plots before and after the logarithmic

15   change.

16          What Dr. Olsen did do is he reran the PCA with the

17   log change, performed the scatter plots.  We put those in front

18   of defendants' experts, Cowan, Johnson and Murphy -- and that's

19   all in the record before the Court in our response -- and they

20   all agreed that the clusters remained the same.  They looked

21   different because of the log transform in the data, but the

22   clusters remained the same.

23          Now, this all goes to an errata issue, Your Honor,

24   and I think it's fair that this Court not consider errata

25   changes in the context of Daubert .  But let me explain exactly

1    why not all 15 runs were not changed.

2            THE COURT:  Except perhaps to the extent that it

3    reflects unreliability in the methodology.  I mean, I agree

4    that in terms of the errata change, it and of itself can't be

5    considered here, but I think Mr. Todd is suggesting that Mr. --

6    Dr. Olsen is forcing his conclusions to meet the data.

7            So to the extent that the history of the litigation

8    shows a history of forcing conclusions to meet the data under

9    his methodology, does not -- does that not reflect

10   unreliability in the methodology itself?

11           MR. PAGE:  No, Your Honor.  I don't know where the

12   forcing comes from.  Dr. Olsen -- the scatter plots have the

13   basic same relationships.

14           Now, once you do transform the loadings and you have

15   a different number, you look at those numbers -- and, again,

16   there is a judgment call as to whether or not some of those are

17   dominated -- again, dominated by poultry waste.  Some of them

18   may change after you log transform.

19           But, Your Honor, the essential methodology was

20   reliable.  It was an oversight error that was corrected.  So --

21           THE COURT:  All right.

22           MR. PAGE:  So --

23           THE COURT:  If that's the case, though, I mean, he

24   had identified four principal runs, correct, out of his -- out

25   of the total number of runs that he had performed?  Why did he

1    not convert the other two principal runs after log transforming

2    his data?  Doesn't that call into question itself the

3    reliability of this methodology?

4              MR. PAGE:  No.  His opinion is based on the two runs

5    he converted.  They deal with groundwater --

6              THE COURT:  But he said the other two were principal

7    before.  If they were principal before, they ought to be

8    principal now, shouldn't they?

9              MR. PAGE:  No.  It's not the runs; it's the number of

10   principal components that were identified in the runs.  All of

11   the principal components -- and there's 26 of them -- are

12   identified in each run.  It depends on how they're weighted in

13   each run.  You have principal 1 through 26.

14             THE COURT:  Doesn't that suggest -- it raises a

15   question:  After log transforming the data on the other two

16   runs that he had identified previously as principal, suddenly

17   it doesn't match his theory.

18             MR. PAGE:  No, Your Honor.

19             THE COURT:  Well, then where are they?  Why didn't he

20   log transform them?

21             MR. PAGE:  Because we talked about it, and it was

22   late in the game, and the defendants, frankly, had complained

23   vociferously every time we did an errata.  And I said, how long

24   is it going to take you to get them done?  And he said, well, I

25   need to do the two that support my opinion, which is

1    groundwater and surface water.  And so that's what he did.

2          He can do all the rest of the runs now and provide it

3    to the Court.  Those runs are still valid to look at how the

4    loadings -- excuse me, not the loadings, how the principal

5    components come out.

6          It's just if you want to go then and look at a map

7    and look at it sample by sample to see where it plots, that is

8    the difficulty, and it takes a lot of time to do that.

9          So, Your Honor, his opinion as to effect on

10   groundwater and surface water, he converted it and showed the

11   changes.  And that's what is the basis for his opinion in this

12   case originally and still is.

13          The other runs were in the nature of sensitivity

14   analysis to see if you get different groupings if you did the

15   other runs.  And you still produce scatter plots on each of

16   those runs.  And they have those scatter plots.  The question

17   is, is you produce a different scatter plot with the log

18   transform data and then do that comparison.  And that just

19   simply wasn't done.

20          If you believe that's necessary and important, I

21   suggest that you ask Dr. Olsen why he didn't do it directly.

22   But my understanding was, frankly, is I told him we've got

23   another mistake here, let's get it to them as soon as possible.

24          THE COURT:  Well, he's been working on this since

25   2004 or '5?

1    MR. PAGE:  Yes.  And the error, the log transform was

2  disclosed when the defendants submitted their expert reports in

3  December 1st of 2008.  And he reran these, redid the

4  calculations and provided that to the defendants in February,

5  2009.

6        THE COURT:  On the two runs.

7        MR. PAGE:  On the two.  He could have run them all.

8  It makes no difference to his result.  And if that's key, I'd

9  suggest we take testimony from Dr. Olsen on this.

10        THE COURT:  I was just wondering why, if it was a

11  mere -- I thought it was a mere transformation -- or log

12  transformation and then replotting with the log transform

13  data.  And you're stating to me -- and that makes sense -- that

14  it requires some subjective analysis of each of the individual

15  plot points to determine whether those are poultry-rich

16  samples, in his judgment.

17        MR. PAGE:  Take a lot more time, Your Honor.  I was

18  trying to move things along.

19        THE COURT:  I understand.

20        MR. PAGE:  Now -- if I may now address the Fite farm

21  issue.  In the deposition, Mr. George -- and I think

22  properly -- said, hey, you've got some areas here.  And there

23  was more than just Mr. Fite's farm -- where you've got what

24  appear to be poultry house signature, yet they're -- your

25  spatial analysis indicates there's no poultry house influence

1    in that area.

2          And Dr. Olsen agreed that is true, that there was

3    not, as far as he could tell from the record today, evidence of

4    poultry application in that area.  What happened here, the Fite

5    farm sample was not to go out and find a cattle signature.

6    That's important, Your Honor.  The Fite farm sample was to go

7    out and sample soils and any water that was there, but it

8    wasn't intended originally to have water, to determine what a

9    nonpoultry-impacted area would constitute.

10         The field notes, when they're out there, said they

11   saw cattle grazing on the field, which is pretty typical of

12   every field in the IRW.  But the Fite samples were to find

13   hopefully an area where there's no poultry house.  When we got

14   the samples back and we ran the analysis in the PCA, Dr. Olsen

15   found that they barely -- they hit the 1.3 marker run on 1.3.

16   So they barely showed poultry house dominance.

17         When Mr. George -- it wasn't -- I mean, the Fite

18   samples are right there, the number is there.  It's a clear

19   apparent that that was -- it showed, in Dr. Olsen's opinion,

20   some poultry house dominance.

21         THE COURT:  That's under the original threshold.

22   Under the new threshold with log transform data, do those

23   samples fall within the new threshold?

24         MR. PAGE:  Yes, right on the edge, but they fall

25   within poultry house dominance.  So that was a good question by

 1   Mr. George; you know, why.  And we believe it was fair to be

 2   able to respond to that.  It was raised in his deposition.  It

 3   was raised in the rebuttal reports.  Can the expert be quiet

 4   and say, gee, I just can't explain that, that's an

 5   inconsistency?  Or is there in explanation out there that we

 6   weren't aware of that explains this result?

 7           So what we did is Dr. Fisher went out and evaluated

 8   the area, and he determined there were two springs; not just

 9   one, but two springs.  One was -- would flow in periods of high

10   rainfall.  That's the one I think that you and Mr. Todd talked

11   about.  And the other one was free flowing all the time.  And a

12   sample from that spring showed poultry house contamination.

13           So the belief is, is that those springs with the

14   poultry house contamination contributed to the soil samples

15   creating this poultry house signature in the water that was

16   ponding.  The sample was from a water ponding on the field,

17   apparently from where the springs were ponding on the field in

18   that area.

19           The other -- other thing that was learned is -- you

20   already mentioned, Your Honor, and that is that even though

21   Mr. Fite's family has owned that property for a long time and

22   they don't know of any poultry waste application, he does get

23   cut fields from areas where he understands the farmers use

24   poultry waste on their fields, and that was used.

25           But I think Dr. Fisher's opinion, which is in the

1   declaration, is that it's primarily the spring influence that's

2   creating the contamination signature from those waters that are

3   ponding on Dr. -- on Mr. Fite's property.

4           So, Your Honor, it's not like this -- there's not a

5   cattle signature there.  I think Dr. Olsen has cattle

6   signatures.  It's the same key samples that he identified in

7   the preliminary injunction that plot up in the upper right-hand

8   corner that he's identified as unique to cattle.

9           He also has the ability to -- he's taken cattle

10  manure and had it analyzed.  And he's taken poultry waste and

11  had it analyzed.  And he's taken wastewater treatment samples

12  and had them analyzed.  He has a list of constituents.

13          In addition to the spatial analysis, I think you'll

14  remember those -- I call them bar charts where you saw which

15  chemicals -- there was the red and the orange ones, which ones,

16  which chemicals loaded highest on those charts.

17          Dr. Olsen also looks at which chemicals in these

18  different source -- soil source samples are the highest

19  influence in the basin.  That is, for poultry waste, you have

20  lots of phosphorus but, frankly, Your Honor, you have lots of

21  copper, zinc, arsenic, and nickel, but primarily copper, zinc

22  and arsenic in poultry waste also.  This is confirmed -- lots

23  in compared to what?  Lots in compared to any other source in

24  the IRW.

25          Cattle waste doesn't have the level of those metals.

1   Other researchers, peer-reviewed published papers who have

2   evaluated putting poultry waste on a field, a test plot, and

3   cattle waste, and then they use rainfall simulations,

4   identified that poultry waste has high runoff, much higher than

5   cattle, of phosphorus, but also high levels of dissolved

6   copper, zinc and arsenic.

7           And the belief is, is that it's in a dissolved phase

8   because of all the organic materials that are in the waste.

9   But when they compare the runoff from cattle, you don't have

10  those chemicals.

11          So the one comment that Dr. Fisher -- you noted in

12  his declaration was substantial amounts, I think that should be

13  read in the context of in relationship to other sources of

14  potential copper in the IRW or zinc or arsenic.  So we don't

15  have a --

16          THE COURT:  As I recall, there was testimony at the

17  preliminary injunction hearing about those components being in

18  the feed, right?

19          MR. PAGE:  Yes, sir, they're added to -- that was

20  part of Dr. Engel's preliminary injunction and Rule 26 report

21  where he evaluates, okay, why do we have these increased levels

22  of copper, zinc and arsenic in the environment; not levels

23  enough to actually cause an injury yet, but they are present in

24  the environment above background.  And he identified that those

25  constituents are added to feed as micronutrients for the

1    poultry also as biocides.  They kill a lot of the bugs that are

2    in the stomach that would prohibit good nutrient growth for the

3    poultry, for the chicken or the turkey.  So that's all been

4    part of the analysis.

5            So to bring it back now to Dr. Olsen's analysis, is

6    that those chemicals are important because then Dr. Olsen can

7    look at what -- he has cattle, he can -- he has poultry in his

8    wastewater treatment plant, and he can evaluate those key

9    constituents in the signature.

10           The poultry signature shows key constituents of

11   phosphorous, but also of copper, zinc and arsenic.  They're the

12   highest -- the biggest bars at the top.  And so that's another

13   part of this analysis.

14           It's kind of like -- but more sophisticated

15   statistically -- when I would take a sample of an area that's

16   never been impacted, we call a reference or a background

17   sample, and see how that compares to an area where I know the

18   waste or -- this generator has done it -- and if I see

19   increased chemicals there, between there, then I can say, okay,

20   that one has been impacted; now let me compare those two

21   samples with what we know is in the waste.

22           That's essentially what Dr. Olsen is doing when he

23   does his loadings analysis.  He's looking at actual waste

24   samples, which he has, actual representative samples in the

25   environment that would be strongly influenced by poultry

1   waste.  And those samples are the edge-of-field samples where

2   we have known poultry waste application in recent rainfall.  We

3   have collections of those.  And he looks at those, and those

4   are his baseline analysis for the water to say, okay, what does

5   poultry waste water look like.

6           And again, we see those high levels of phosphorus,

7   zinc, copper and arsenic in those runoff samples.  We see other

8   researchers finding those high levels of those constituents in

9   their research.

10          And Dr. Olsen went and -- this is in his Rule 26

11  report -- actually did leachate tests for cattle -- it's a

12  sample analysis where you see what will leach while you add a

13  lot of water to the sample.  And he also found that cattle

14  tended to have much less leachate of those four principal

15  constituents than does poultry.  So that explains, I think,

16  Your Honor, the different sampling constituents.

17          Let me talk a little bit about the wastewater

18  treatment plant discharge.  Dr. --

19          THE COURT:  Mr. Page, just a second.

20          MR. PAGE:  I'm sorry.

21          THE COURT:  Looks like the U.S. Attorney needs to

22  talk to me.  We'll take a short recess.

23          (Whereupon a recess was had.)

24          THE COURT:  Mr. Page.

25          MR. PAGE:  Thank you, Your Honor.  I was going to

 1    look at some of the other arguments that were made by the

 2    defendants on what they found inconsistent in the spatial

 3    analysis.  The other one was the wastewater treatment plants,

 4    and there were four wastewater treatment plant discharge

 5    samples that they were concerned with.  Three also showed some

 6    poultry waste impact.  They were actual -- three from Rogers,

 7    Springdale, and Siloam Springs I believe was the third one,

 8    that actually showed some -- didn't say -- had some poultry

 9    waste impact to them as far as the score was concerned.

10            I think Mr. George accurately, as well as Dr. Fisher,

11    pointed out is that each of those plants received poultry waste

12    contributions.  And that was also part of Dr. Engel's expert

13    report.

14            Now why is that significant?  This is a slaughter

15    house, a processing facility for poultry.  And in slaughter

16    houses and processing facilities, there are waste and manures

17    in those, part of that activity.  So it makes sense that those

18    constituents from waste in processing plants as well as the

19    other things, these same basic constituents that are key such

20    as phosphorus, nickel, zinc and arsenic would also be

21    potentially there in the poultry waste because those are

22    actually part of the feeds that make up the poultry that's

23    being slaughtered.

24            With regard to the Lincoln wastewater treatment

25    plant, that sample we could not get access to a actual

 1    discharge, so the samplers went downstream approximately a mile

 2    and took a sample.

 3              That sample is influenced by runoff.  In fact, there

 4    are poultry houses in that subwatershed region, so we have to

 5    suspect the Lincoln wastewater treatment plant sample would

 6    also be -- have some poultry influence.

 7              Now, they still score as being dominated by

 8    wastewater treatment plant, but there is the possibility in an

 9    environment such as this to have other influences as well, and

10    that's why you'll have a dot that will score sometimes both

11    poultry house dominant and wastewater treatment plant dominant

12    where there will be a mixture of the waste at that location.

13               Tahlequah is similar to Ed Fite.  Those samples came

14    back borderline poultry waste dominant.

15              On further investigation, as scientists tend to like

16    to do to explain why there's an anomaly in their analysis, it

17    turns out that there was poultry waste land application

18    upstream on fields that drain into those creeks.  And the

19    samples were taken from Tahlequah Creek, not the main stem of

20    the Illinois River there, Your Honor.

21              So that analysis was done to evaluate those anomalies

22    in Dr. Olsen's results to see if there's an explanation.

23              THE COURT:  Why did he take them out in the first

24    place and then put them back in?

25              MR. PAGE:  Because he didn't have an explanation.  He

1    didn't think it was fair to characterize them as red dots.  He

2    did disclose them as 1.3, but in the deposition, as would be

3    appropriate in an examination of why does this have a 1.3 but

4    not a red dot, is because Dr. Olsen said, I don't see any -- at

5    this point in my analysis -- any basis for a poultry house to

6    score like that, so I have to show it that way.

7           The fate and transport issue is an interesting one

8    that Mr. Todd raised.  Your Honor, there's 26 parameters or

9    constituents or elements that are part of the PCA.  The PCA

10   does not contend that and does not show that they all traveled

11   together, nor would that be normal.

12          The PCA selected -- the 26 constituents were selected

13   as constituents where there was complete data.

14          I think you'll recall from the preliminary injunction

15   hearing and also in Dr. Olsen's Rule 26 report is that there's

16   some data screening analysis; you have to have sufficient

17   number of detections, do you have enough across the watershed

18   so that the data would qualify, the parameter would qualify.

19          You're not going to put, for example, radon in your

20   analysis when you don't have any radon in your samples or some

21   other -- PCBs.

22          So those constituents are part of the 26.  The 26 are

23   the ones -- the constituents that are regularly found in all

24   the environments throughout the IRW.

25          So then what is the key for fate and transport?  It's

 1  the same key constituents.  It's the same key constituents that

 2  I just mentioned to you.  It's the ones that load the highest

 3  on the bar chart:  Phosphorus, nickel, zinc, copper and

 4  arsenic.

 5          Those charts are provided in Dr. Olsen's Rule 26

 6  report.  They were testified to in this court before.  And it's

 7  those constituents that are found together and load highest

 8  that are indicative of poultry waste contamination because, as

 9  other researchers have found, and other analysis performed by

10  Dr. Olsen, those constituents are added to the environment in

11  significant amounts by poultry waste and they do travel

12  together, according to the analysis and studies done by

13  Dr. Olsen, Dr. Fisher and other researchers, including

14  researchers at the University of Arkansas that are cited by

15  them.

16          THE COURT:  What of the argument that with regard to

17  those components, Dr. Olsen substitutes the mean of all other

18  values for that constituent and the dataset when that

19  particular value is absent?

20          The argument is that, as I understand --

21          MR. PAGE:  The nondetect, Your Honor?

22          THE COURT:  -- he biases the dataset and alters the

23  variability of the dataset when he substitutes the mean for an

24  absent constituent in that sample.

25          MR. PAGE:  Those are all the arguments that Dr. Cowan

 1  raised, and go to -- and we're going to show how they're

 2  unreliable.  Let me deal with that one in particular.

 3         There's two substitution issues here, Your Honor.

 4  One is for nondetects and the other one is how does Systat deal

 5  with a -- the situation when there is not a constituent among

 6  the 26 in that particular sample.

 7         And I think it's the second point that you're raising

 8  here, Your Honor; it's the pairwise deletion.

 9         THE COURT:  That's what Systat does.

10         MR. PAGE:  Systat does that.  Dr. Cowan erroneously

11  claimed in his report that Dr. Olsen didn't use pairwise

12  deletion but did actually modify, just kind of made up a number

13  and put a mean substitution in there.

14         When we confronted Dr. Cowan with that in his

15  deposition and pointed out that's not an option under Systat --

16  and our reply brief on our motion to exclude Dr. Cowan actually

17  shows the options for Systat, that pairwise deletion was

18  chosen.  And what happens there is Systat continues to do the

19  correlations for all the other chemicals, but does not do the

20  correlation for that one.  So it runs, for example, 24

21  correlations and does the analysis that way.

22         So that is what is done under Systat.  It's a

23  standard procedure.  And, frankly, Dr. Cowan just got it wrong.

24         THE COURT:  So pairwise deletion, then, is not

25  substituting the mean.

1           MR. PAGE:  No, sir.  There's another mistake that

2    Dr. Cowan made and now he's kind of backed away from, and the

3    defendants, interestingly enough, in their arguments, seem to

4    continue to make it, and it shows a lack of understanding of

5    how analytical results and what they mean, how they convey

6    information.

7           Dr. Olsen, when he had a nondetect that was -- that

8    the sample was there, but it was nondetect for the sample, what

9    he did is he substituted in those samples -- he put in the --

10   half of the difference between zero and the detection rate.

11          THE COURT:  Right.  And I put two big question marks

12   here in that reference.  I don't know what that means.

13          MR. PAGE:  Your Honor, these chemicals, these 26

14   chemicals are well known to be in this environment.  We have to

15   let that sink in a little bit.  The chemicals -- the 26

16   parameters are things you find in the natural environment out

17   there.

18          THE COURT:  Generally.  But in a specific sample, you

19   may have a nondetect.

20          MR. PAGE:  Yes, sir.

21          And what does a nondetect, then, mean?  It means the

22   analytical procedure that was used to evaluate the quantity of

23   that sample, that constituent in that sample; say copper.  The

24   copper was not detected at a level that would be high enough to

25   show it as a detect.  So here's the detection rate.  Let's say

1   it's one.  Here's a real zero, actual zero.  The detection rate

2   could be one, but anything below the detection rate, which

3   could be half, three-quarters, one-quarter, it still shown as a

4   nondetect.

5           THE COURT:  This plugs in the -- that constituent at

6   the midpoint, between the detection rate and zero?

7           MR. PAGE:  Dr. Olsen did it in his data preparation.

8   It's not automatic like Systat.  This is something that's done

9   by researchers, and this is shown in all the peer-reviewed

10  literature that it's standard practice if you have a nondetect,

11  to substitute one half a detection level.  In fact, even

12  Dr. Johnson's book that he was a coauthor with says, yes, that

13  particular procedure which we pointed out.

14          So that was another error that Dr. Cowan raised as

15  a -- frankly, Your Honor, a very capable statistician, but not

16  understanding environmental statistics, raised that error and

17  now he's kind of backed away on it.

18          The third point is averaging of results.  The only

19  results that were averaged were the ones where they were split

20  samples.

21          THE COURT:  Where you have actual samples, but

22  multiple --

23          MR. PAGE:  Analytical results.  You have one sample,

24  you took one cup of water out of the stream and you split it in

25  two and you run it.  And that's a standard methodology to do to

```
 1   make sure your analytics are working properly along with

 2   controls and stuff.

 3            THE COURT:  Got you.

 4            MR. PAGE:  So if you didn't average those, then all

 5   of a sudden you'd be weighting more samples for phosphorus than

 6   you actually really have.  More samples for that particular

 7   location.

 8            So again, the literature, standard environmental

 9   techniques is, is when you evaluate this data statistically,

10   you average split samples together and make it back into one

11   sample.  That was a point that Dr. Cowan made.

12            So those were the points -- and that saves a little

13   time on the Dr. Cowan argument, Your Honor.

14            Mr. Todd mentioned hold times.  And I'd just like to

15   make a short point about that.  Bacteria is part of Dr. Olsen's

16   analysis.  It was part of his PCA, the 26 factors.  Absolutely

17   no doubt about that.

18            So what's the issue with hold time?  And I think this

19   was discussed a little bit yesterday, and I want to bring the

20   point home.  I've had the opportunity to practice environmental

21   law for almost 25 years.  And not all requirements for agencies

22   necessarily make scientific or environmental health risk issues

23   a requirement.

24            This particular hold time that's being relied upon by

25   the defendants is for point sources under the Clean Water Act.
```

1    And, again, the Clean Water Act regulates point source

2    discharges.  And it would particularly be relevant, frankly, to

3    wastewater treatment plants, and it's six hours.

4           And why it's six hours?  I believe, Your Honor, it's

5    one of the bureaucratic requirements where the state or the

6    environmental agency wants to know quickly -- get the results

7    back quickly as to whether there's a violation.

8           And why do I believe that?  The point is that the

9    same EPA, when it looks at hold times for bacteria for drinking

10   water, now that's the water that comes out of our tap, the hold

11   time there is 30 hours.

12          Now, if there really was a concern, as long as you

13   keep it cold, of the hold times and the six hours was critical

14   to the changes, what's going on in that bacteria, EPA would not

15   have issued for the Safe Drinking Water Act a 30-hour hold time

16   for samples under the drinking water act.

17          THE COURT:  As I recall yesterday, it was 30 hours on

18   some constituent.

19          MR. PAGE:  The bacteria constituents.  It was the

20   indicator constituents, as I recall, Your Honor.  Indicator

21   bacteria.

22          THE COURT:  Even under Safe Water Drinking Act, it

23   was six hours on some constituents, correct?

24          MR. PAGE:  I don't recall that, Your Honor.  I recall

25   that the bacteria results I think for enterococci and E. coli

1    were 30 hours.  That's my recollection, Your Honor, but I can't

2    recall.

3             But even if it was for just two bacteria instead of

4    all three, there's not any scientific understanding that I'm

5    aware of that would have a different hold time for different

6    bacteria.

7             THE COURT:  And maybe I jumped to a conclusion.  What

8    does the acronym SWDA stand for?

9             MR. PAGE:  SDWA, Safe Drinking Water Act.  SDWA.

10   That's the act that regulates public water supplies, make sure

11   we get good, clean water.

12            If I may, Your Honor, now I'll turn a little bit to

13   some of my prepared remarks, and I won't try to repeat what

14   I've already said, but I think there's a couple of other issues

15   that should be pointed out.

16            I think that we need to make sure we understand what

17   the challenge is today, do a little scoping.  The challenge

18   here today is on Dr. Olsen's PCA.  And he has multiple other

19   sections of his report that deal with the source of phosphorus

20   that are not being challenged here today.  I think that makes

21   clear in the title of their paper and other -- but I didn't

22   hear that directly, and I think that's true, Your Honor;

23   there's much more in Dr. Olsen's report that goes beyond the

24   PCA.

25            THE COURT:  Let me ask Mr. Todd:  Is that correct?

1          MR. TODD:  That's correct, Your Honor.

2          THE COURT:  Thank you.  Mr. Page.

3          MR. PAGE:  Thank you, Your Honor.  One of the ways

4   that -- we talked with Dr. Engel yesterday -- that you judge

5   the validity of reliability of a methodology is to see if it

6   coincides with other lines of evidence and the facts.  And this

7   PCA analysis by Dr. Olsen is supported by the other lines of

8   evidence.

9          The fact that there is poultry waste applied all over

10  the watershed, many, many different locations on fields.  In

11  fact, the reason we finally went to Ed Fite was it was the only

12  place in the watershed frankly, Your Honor, that we believed

13  that poultry waste that we could identify after three years of

14  investigation did not have poultry waste applied to it

15  directly.

16         So the whole concept of why does Dr. Olsen see

17  poultry waste dominant signature throughout the watershed is

18  supported by the amount of waste and the way it's distributed

19  throughout the watershed.

20         Second of all, the geology and hydrology of the IRW,

21  which is in part of Dr. Fisher's report, and Dr. Olsen studied

22  and relied upon, indicates that it's certainly probable, likely

23  and typical that poultry waste, once it's land applied, moves

24  through the surface and the subsurface waters and that

25  sometimes those surface waters and subsurface waters become one

1    or the other and back and forth.  But that, again, supports the

2    widespread nature of his PCA.

3            We've already talked about chemical compositions of

4    the waste, Your Honor, when I talked about the actual samples

5    of cattle manure and poultry manure and then the other analysis

6    from feed and the analysis from other researchers.  The fact

7    that his loadings, his highest loadings that create the

8    signature are consistent with those dominant chemicals,

9    supports the PCA.

10           The mass balance that Dr. Olsen did with the

11   assistance of Ms. Smith shows, again, that the mass of

12   phosphorus contribution in this watershed is poultry.

13           The overall -- you talk about fate and transport.

14   These are all, I believe, fate and transport evidences.  But

15   Dr. Olsen, as part of his testimony and his report, talks about

16   the gradients, the different -- he called them environmental

17   compartments before, that if you look at the levels of these

18   key constituents at the edge of field, then down gradient, you

19   see his grading approach where phosphorus levels are very high

20   on the edge of fields; as they move down to first streams,

21   second streams, they reduce as they go down through.

22           So that gradient or overall pathway sampling approach

23   shows that these key constituents are present in each of the

24   pathways, and the levels of their concentrations are the

25   appropriate gradient from the location where the waste is first

1    disposed of to when it gets into Lake Tenkiller.  The lowest

2    gradients are in Lake Tenkiller; the highest ratings are edge

3    of field concentrations.  That's consistent --

4         THE COURT:  Just curious; it's not particularly

5    pertinent.  In the gradient, the result of deposition and usage

6    by plants, in the case of phosphorus, if the gradient is --

7    just for my own education here -- is largely because of what

8    factors?

9         MR. PAGE:  You mean the different amounts of

10   concentrations?

11        THE COURT:  The gradient you were talking about.  Are

12   we merely talking about dilution.

13        MR. PAGE:  Yes, and repeated applications.  Poultry

14   -- phosphorus that runs off and including also copper and zinc

15   that runs off of a field, is influenced by the current

16   application, but then if you have one application a year and

17   that's all, the researchers have shown over the years, it's

18   leaching of phosphorus, in the next year, even though there's

19   no new application is higher than a field that's never been

20   applied, but it's not as high as the field that got another

21   application the next year.

22        So when phosphorus goes onto a field from poultry

23   waste, about one-third of it, the agronomist will point out to

24   you, about one-third of it is used that year in uptake, and

25   two-thirds of it is either part of the runoff or stored in the

1    soils, in the soils themselves that will eventually leach out

2    or be used by the plants in subsequent years.

3            I hope that answered your question, Your Honor.

4            THE COURT:  Yes, sir.  Go ahead.

5            MR. PAGE:  There was also a small basin analysis that

6    indicated the -- I think I mentioned it yesterday in

7    Dr. Engel's analysis.  Actually, Your Honor, I don't think I'm

8    going to go through all the different slides of evidence

9    because I've got two more pages, but they are set out in

10   Dr. Engel's declaration there as to all those different lines

11   of evidence.

12           And we just wanted to point out to the Court that the

13   PCA doesn't stand out there all by itself as being unusual in

14   the results, that there are all these lines of evidence that

15   others and the State's experts have gathered that supports it.

16           THE COURT:  Is it fair to characterize them as fate

17   and transport evidence or just other lines of evidence?

18           MR. PAGE:  I think most of them -- and I have to play

19   them through my head -- are fate and transport.  Because, Your

20   Honor, we're talking about what influences the fate and how

21   it's moved to the environment.  Clearly the mass -- as we just

22   talked about how phosphorous works -- affects fate and

23   transport.

24           THE COURT:  Copper?

25           MR. PAGE:  Yes, sir.  So all of these that we've gone

1  through help explain fate and transport.  Now, I wouldn't think

2  the poultry house density is necessarily a fate and transport

3  analysis.  What that just points out is there's a high

4  correlation with phosphorus concentrations in streams where

5  there's a high number of poultry house operations.  That just

6  tends to establish the fact that poultry operations affect

7  phosphorus concentrations in streams.

8           It would be supportive, I guess, of the analysis that

9  where is that waste going, it must be being put on the ground

10  and it's running off and getting into the streams.

11           So in some respect, you can look at a fate and

12  transport analysis; but fate and transport analysis,

13  Your Honor, is unique to each type of contamination problem and

14  each environmental situation you have.  And so you are going to

15  have a unique fate and transport analysis, depending on the

16  constituents and the waste management practices and the

17  location.  It's going to be different because each of those

18  three factors will have an influence on the fate and transport

19  of those chemicals.

20           Let me jump over to this issue about being novel and

21  not fundamental.  Your Honor, I know we've talked a lot about

22  this; and with all due respect, I will go to my grave, I know,

23  believing that what Dr. Olsen did here is not novel.

24           In fact, if you accept the definition of defendants'

25  novelty, then every time you run PCA in any situation to

1  evaluate environmental contamination, whether it's in Italy or

2  Texas or the IRW or California, it's going to be unique.  And

3  you're looking at different constituents in those locations, so

4  it's always going to be unique because it's focusing on what

5  are the sources of contamination in that location and with

6  those issues or contaminants of concern.  And that's how

7  they've defined "novel."

8          And I don't believe that would be appropriate for

9  this Court or Daubert or any scientist to believe that all of a

10 sudden makes it novel because this is the first time anyone has

11 looked at poultry waste moving through the environment and PCA

12 in the IRW.  I think that's just not fair and it doesn't make

13 any sense.

14         The fact is, Your Honor, is that poultry waste --

15 well, let me ask this -- let me pass this.  Agricultural waste

16 in particular and nonpoint source waste in less particularity

17 have been used as PCA analysis multiple times.

18         In fact, Dr. Olsen in his Rule 26(a) report lists 25

19 articles he was able to find.  And ten of those dealt with

20 agricultural waste.

21         Now, if I do a PCA analysis here and I find that

22 poultry waste is a key constituent, and then I go to Cimarron

23 County because we're having a problem with some other chemicals

24 concerned, do PCA, under the defendants' analysis, this would

25 have to be, then, another unique application.

1          So no matter how often or wherever you do the PCA,

2     it's always going to be unique unless someone happened to do a

3     similar investigation on that same watershed prior to you.

4          THE COURT:  To a certain extent, this is rhetorical.

5     It's already a law of the case here where the Tenth Circuit has

6     said that when experts apply methodologies in novel ways, they

7     may arrive at conclusions that result in, "too great an

8     analytical gap between the data and the opinion proffered" to

9     be determined reliable.

10          So -- and, in fact, they didn't even use the term

11     "novel" with regard to Dr. Olsen.  They did with regard to

12     Harwood, but focused on the discretionary decisions in his

13     methodology, etcetera.

14          So I agree with you; the methodology itself is

15     novel.  It seems to me that with respect to Olsen, the question

16     is, has he arrived at conclusions that result in too great an

17     analytical gap between the data and the opinion proffered.

18          MR. PAGE:  So you believe, Your Honor, this isn't a

19     novel application of this methodology.

20          THE COURT:  I'm sorry?

21          MR. PAGE:  Am I hearing the Court to say that you

22     don't believe Dr. Olsen's use of PCA is not a novel application

23     of a --

24          THE COURT:  I don't know.  I think that's one of the

25     things to be decided here.  It's not a question of whether the

1    methodology is novel; it's whether the methodology has been

2    applied in a novel way.

3            MR. PAGE:  Well, Your Honor, I think, first of all, I

4    just want to say that those peer-reviewed articles we provided

5    show agricultural applications, nonpoint sources applications

6    of PCA, and the application methods, how they extracted data,

7    how they did spatial analysis, is consistent with how Dr. Olsen

8    did his PCA here.

9            So I think, first of all, I'll say the peer-reviewed

10   literature supports the application.

11           Second of all, Your Honor, neither Dr. Johnson or

12   Dr. Murphy offer an opinion that use of PCA in the Illinois

13   River Watershed to determine whether or not poultry

14   contamination is a dominant contaminant is novel or unique.

15   They disagree with the results.  And actually, we take issue in

16   our Daubert motions as to how they've reached their results.

17   But they both used PCA in this watershed.

18           Dr. Murphy used Olsen's data and did a multiphase, or

19   solid and a liquid, multimedia PCA with the same data and he

20   says, see, that shows all the phosphorus is natural.  That's

21   his opinion.

22           And Dr. Johnson did a PCA analysis and came to the

23   conclusion that Dr. Olsen's PCA result is not really poultry,

24   it's really muddy waters, a high TDS.  And we'll talk about

25   that in our challenge.

1            But the point here, Your Honor, is both of these

2    experts by the defendants used PCA in this watershed.  They

3    have a different interpretation.  But they don't say, gee whiz,

4    we just can't do it.  They did a PCA analysis and came up with

5    a different interpretation of the analysis.

6            THE COURT:  Okay.  First step, though, you'll agree

7    no one else has applied the PCA methodology and has arrived, by

8    using PCA methodology, at a conclusion that one has identified

9    a poultry signature.

10           MR. PAGE:  Your Honor, I don't know.  I don't know if

11   it's been done or not.  It certainly can be done, by the

12   literature, and has been done for agricultural waste, other

13   types of agricultural waste.

14           So I don't see what would be so unique, and I don't

15   think the defendants have identified how poultry waste would

16   distinguish itself from any other kind of agricultural waste

17   that's been evaluated PCA.

18           THE COURT:  I think, in part, they're saying that PCA

19   is more suited -- and they quote some authority -- more suited

20   for smaller fields and is not appropriate for a million-acre

21   watershed.  Your response?

22           MR. PAGE:  Well, there are articles cited by

23   Dr. Olsen that cover about the lower half of Italy, I think, is

24   one of the river systems there.  So I'm not aware of any

25   limitation on PCA based on the size of a watershed.

1           PCA is -- if you have data, sufficient data, and if

2    there is a dominant contaminant source, then it should show up

3    as scatter plots results.  And Drs. Murphy and Connelly and

4    Johnson all agree that PCA is regularly applied in

5    environmental situations they've done themselves.

6           And they actually tested Dr. Olsen's and they said,

7    well, we don't agree with the interpretation of his results.

8    It's a question of interpretation, though, not whether or not

9    it can be used in this context.

10           Your Honor, those papers are all set out in Table

11    611-1 of docket 2198, and his report -- Dr. Olsen's original

12    report 6-32.  And also in his declaration, he summarized those

13    for you as Exhibit C in response.

14           Dr. -- the reliability of its application,

15    Your Honor, was also confirmed by how the defendants' experts

16    made mistakes.  When Dr. Cowan evaluated the PCA, he said that

17    the application was wrong because of nondetects.  Well, we've

18    talked about that.

19           He said the application was wrong because of

20    averaging samples.  We've talked about that.

21           He said the application was wrong because of log

22    values.  Well, that's been corrected.  The log transformation

23    has been corrected.

24           And he complained about the meanwise substitution.

25    And that, he was just wrong.  The Systat does allow that

1    substitution, but doesn't substitute the means.  So that,

2    Your Honor, I believe, shows that the application was

3    appropriate.

4           Now, what about the use of spatial analysis?  We've

5    talked about that somewhat on particular examples.  But

6    Dr. Olsen used the spatial analysis, he used contamination

7    gradients and he looked at the chemical compositions to

8    identify the sources.

9           This method of determining what the source is has

10   been used by others in the literature, the source

11   identification methodology by spatial analysis and chemical

12   analysis in the literature, and it's set forth in Exhibit A to

13   our response of the Olsen Daubert motion at paragraphs 10 and

14   21.

15          Dr. Johnson's concerns about spatial analysis that

16   were raised that were -- some weren't talked about here, and

17   others -- where he claims that, gee whiz, there's not any

18   poultry house in the area where Dr. Olsen found poultry houses

19   are just mistaken.  He used the wrong poultry house density.

20   He didn't know how to draw subwatersheds, so he wasn't

21   capturing areas that were poultry house influenced.  So that

22   was just a flaw, an error on his part.

23          So all of these analyses show that poultry -- the use

24   of the PCA in this context was appropriate.

25          One of the claims that defendants make was also about

 1    the multiple tests.  And I didn't hear this in argument today,

 2    but it's in their brief that Dr. Olsen kept on running these

 3    different tests just so he'd get the right result.  Well, those

 4    different tests were sensitivity analyses to see and to confirm

 5    whether or not the statistical model was working properly.

 6            That's all set out also in Dr. Olsen's declaration

 7    attached to our response.

 8            So, Your Honor, in conclusion -- and I'm going to

 9    talk specifically about the application more in the Murphy and

10    Johnson when we do that.  I'd like to kind of continue my Olsen

11    response by critiquing Johnson and Murphy then.

12            In conclusion, there have been numerous studies of

13    the IRW that support Dr. Olsen's results.  And I think if there

14    weren't a lot of studies out there that suggest that poultry

15    waste was a substantial contributor of phosphorus in the basin

16    and affected the basin, then there would be some grave concern

17    about Dr. Olsen's PCA analysis.  But his PCA analysis is

18    consistent with all these other lines of evidence.

19            Dr. Murphy and Johnson, they, as I'll point out, also

20    have worked PCA in this watershed.  They just have a different

21    interpretation of the results.  Dr. Johnson thinks it's muddy

22    water as PCA signature, and Dr. Murphy says, gee, there's no

23    contamination at all, it's just natural runoff.

24            Actually, important, Your Honor, to this

25    consideration of the validity of their two opinions, their

1    opinions contradict with each other.  The defendants' experts

2    actually contradict each other, and I'll point that out in a

3    moment.

4            Finally, Your Honor -- and I know you struck the

5    declaration, but I will make an offer of proof.

6            THE COURT:  Which one specifically?  Because some are

7    and some are not.

8            MR. PAGE:  Dr. Loftis' declaration in response to

9    the -- this particular Daubert was stricken, and it was

10   attached as our response.  I think it was Exhibit --

11           THE COURT:  Exhibit D.

12           MR. PAGE:  -- D.  Thank you, Your Honor.  Actually --

13   he actually did run independently Dr. Olsen's PCA using his

14   data on a separate program and got similar results.  And,

15   Your Honor, that opinion is not being offered for trial but

16   just for the purpose of Daubert .

17           So in conclusion, Your Honor, I believe that

18   Dr. Olsen's analysis does -- PCA analysis does meet all the

19   Daubert tests.

20           And I implore and ask the Judge to consider this

21   evidence as a more full record today than what we had back in

22   March of 2008.

23           THE COURT:  There's no question we've got more to

24   analyze.  We can't rely on the earlier preliminary

25   determination for those limited purposes.

```
 1              In any event, you come to a rest at an opportune

 2   time, which gives us all an opportunity to eat lunch.  We'll be

 3   in recess until 1:15.

 4              (Whereupon a recess was had.)

 5              HE COURT:  Mr. Page.

 6              MR. PAGE:  Thank you, Your Honor.  Before we proceed

 7   with Cowan, Murphy and Johnson, I just want to correct some

 8   statements I made just before lunch concerning the rerunning of

 9   the PCA after the log transformation error was found.

10              I talked to Dr. Olsen during the lunch hour, and I

11   made some mistakes on what I told the Court and I want to

12   correct it.

13              There were 30 total runs originally done in his

14   report; 22 water and 8 solids.  The two most critical ones were

15   SW3 and SW17, which dealt with surface water and groundwater.

16              There were two other runs that he identified in his

17   report, so it would be a total of four.  There were two solids

18   runs that he also thought were important because they helped

19   him distinguish between cattle and poultry waste, but he had

20   other lines of evidence that also showed the distinctions.

21              When we got Dr. Cowan's report and the log

22   transformation error was discovered, he reran all of them, all

23   30 of them, but it was my decision to only include two of them

24   because it would have been 30 additional plots plus three plots

25   as opposed to two in February.
```

1            It was my judgment that those were the two that

2    related directly to his testimony as to contamination in the

3    IRW in the waters, and that's why only two were submitted.

4            THE COURT:  So the others were run?

5            MR. PAGE:  Yes, they were.

6            THE COURT:  And plotted?

7            MR. PAGE:  They were -- most of those other runs were

8    sensitivity runs.  For example --

9            THE COURT:  But I'm specifically interested in SD1,

10   SD6 and SW22, which were previously delineated by Dr. Olsen as

11   important runs.  It was your decision not to submit them; is

12   that correct?

13           MR. PAGE:  That's correct.

14           THE COURT:  Okay.

15           MR. PAGE:  And Dr. Olsen reviewed those and

16   determined that they were not important, they did not have any

17   difference in change; that is, they were not important in the

18   sense they did not change the results.  That is, the scree

19   plots still showed the clusters as the previous unlogged

20   transformed clusters were shown.

21           THE COURT:  But what we have left -- or what we have,

22   rather, is SW3 and SW17; is that correct?

23           MR. PAGE:  Yes.

24           THE COURT:  All right.

25           MR. PAGE:  It was my decision, Your Honor, based on

1  the fact it was February 10th and it was -- we had been,

2  frankly, criticized quite a bit by the defense counsel for

3  submitting errata, and I asked him which were the ones

4  important to his testimony, and he said these two.  And so we

5  submitted those two.

6         THE COURT:  I think I had already entered my order

7  saying errata is one thing; new stuff is different, right, in

8  January?

9         MR. PAGE:  I think Judge Joyner entered an order to

10 that effect, I recall, Your Honor, on errata.

11         THE COURT:  I wrote two orders on the same day.  In

12 any event, let's move on.

13         MR. PAGE:  With regard to Dr. Cowan, Your Honor,

14 we've already discussed briefly his experience, and I would say

15 that the errors that he committed in data extraction that we've

16 already identified indicate that statistics are not simply

17 statistics; that there are universities that teach specifically

18 statistical analysis.

19         For example, Colorado State University, they talk

20 about how do you handle nondetects, what do you do with split

21 samples, and how you extract data for environmental analysis.

22         THE COURT:  Frankly, your explanation of those three

23 subsets is satisfactory to me and, frankly, they pass -- they

24 sound reasonable.

25         MR. PAGE:  So there are just two other things that he

 1  did, Your Honor --

 2           THE COURT:  In fact, Mr. Todd dropped it.  He didn't

 3  even argue it to me this morning, right, as to split samples

 4  and dropped means and the -- whatever you call the --

 5           MR. PAGE:  Pairwise deletion.

 6           THE COURT:  -- averaging between zero and the

 7  detection?  What is the shorthand for that?

 8           MR. PAGE:  That's the one-half detection limit.

 9           THE COURT:  He didn't even raise that this morning,

10  right?

11           MR. PAGE:  He did not.  So I won't raise -- in fact,

12  the only one he did raise was the mean substitution, and we've

13  already talked about that.

14           There were a couple of other errors in Dr. Cowan's

15  analysis with regard to combining the datasets.  He had a

16  criticism of Dr. Olsen that he combined the USGS data with the

17  data that TDM collected, and he thought that the analytical

18  results for phosphorus were different.  He didn't understand

19  that even though there were two different analytical methods

20  proposed, one by EPA and one by USGS, for example, they were

21  the exact same tests; they were just different nomenclatures.

22           So he was complaining that you couldn't add the

23  datasets together and do one PCA because he thought the

24  analytical results were different for phosphorus and, in fact,

25  they were not.

1                And so that concludes my presentation on Dr. Cowan,

2    Your Honor.  I think that these criticisms, many of which were

3    part of the defendants' initial motion for Dr. Olsen and, in

4    fact, are part of the issue about whether it's properly been

5    applied in this watershed, indicate that those criticisms are

6    unfounded.

7                Now, with regard to Dr. Johnson, Your Honor, and

8    Dr. Murphy, they both, as I mentioned to you earlier, both ran

9    a PCA, but they have different interpretations.  I think they

10   do have one thing in common that I think is rather astounding,

11   and that is that neither Dr. Johnson or Dr. Murphy said they

12   found a significant poultry waste contamination in the IRW,

13   which is, frankly, contrary not just to what Dr. Olsen says but

14   to what USDA has said, United States Geological Service, the

15   State of Oklahoma DEQ and ADQ have both attributed poultry

16   waste as being a significant contributor of phosphorus

17   contamination in the watershed.  And neither of them, through

18   their PCA analysis, could identify poultry waste as being a

19   significant contributor.  They both -- neither one actually

20   gave an opinion as to the sources of phosphorus in the

21   watershed.

22               So with regard now first to Dr. Johnson, Your Honor,

23   he did a -- first of all, where does he disagree?  I think it's

24   important that both Dr. Johnson and Dr. Murphy disagree.

25   Dr. Murphy -- excuse me, Dr. Johnson criticizes the use of a

1  multimedia PCA.  And let me define that.  That's where you

2  combine both your solid samples and your water samples together

3  and run that into one PCA.

4          Dr. Olsen did not do that because he understands and

5  understood, and I guess Dr. Johnson does also, that if you put

6  those two together, some of those chemicals that are part of

7  the PCA run would change once they were diluted with water.

8          THE COURT:  Perhaps I'm confused.  I thought it was

9  Murphy that had the multimedia approach.

10         MR. PAGE:  He did.

11         THE COURT:  But you're saying Johnson did as well?

12         MR. PAGE:  No.  Johnson criticizes that approach.  In

13 his report, which is docket 2169, Exhibit 1, Johnson report at

14 page 70, there is a statement in there by Dr. Johnson

15 recognizing that you cannot do a multimedia; that is, you

16 cannot combine your solids and your water samples into one PCA

17 run.

18         And so I'm just pointing out in my Dr. Johnson

19 presentation that he and Dr. Murphy disagree on that point.

20 And Dr. Johnson, frankly, agrees with Dr. Olsen on that point,

21 that multimedia is inappropriate, and the reason for that is,

22 is because of the change of phosphorus and other chemicals once

23 they are added to water in the environment.

24         Also, Dr. Murphy and Dr. Johnson contradict each

25 other in the sense that Dr. Johnson recognizes that there are

1    high phosphorus levels in the IRW, but he doesn't know what the

2    source is.  He testifies that he never did an analysis of

3    sources that was in his job, so he doesn't know why there's

4    high levels of phosphorus in the IRW.

5            Dr. Murphy claims that the high levels of phosphorus

6    are probably just natural runoff from fields and they're not

7    attributable to phosphorus.  So that's a contradiction.

8            Also with regard to Dr. Johnson, Your Honor,

9    Dr. Johnson did the PCA analysis, and he claims that rather

10   than we have two signatures that are poultry and wastewater

11   treatment waste, really they're just simply muddy waters and

12   salty waters.

13           And during the deposition -- and that's found,

14   Your Honor, in his -- both his opinion and his deposition,

15   which is Exhibit B to our motion at pages 144, 148 to 151, 444

16   to 445, and 454 to 455 of Johnson's deposition.

17           When I examined him about this, I asked him, well,

18   then, what is your definition of a muddy water?  How much total

19   dissolved solids is sufficient if you're characterizing this

20   analysis of the PCA that Olsen has done and you've done with

21   his data as muddy water, and he said he didn't have an opinion

22   about that.  He didn't evaluate whether -- how much TDS would

23   be in muddy water or how much TDS or how much actual

24   particulates were actually in samples that Dr. Olsen identified

25   as poultry waste so he could say, look, all of these poultry

1   waste samples just have a lot of particulates in it.

2          This goes to the point, Your Honor, that he never did

3   any specific evaluation of the IRW data, so he didn't

4   understand that his analysis was not confirmed with the actual

5   data in the IRW.

6          And probably the point, the key point on this, has to

7   do with then his opinion that the phosphorus in these muddy

8   waters is in all particulate form because phosphorus from

9   poultry waste is in particulate form.

10         And we confronted him during this deposition with the

11  samples and analysis from USGS and the State of Oklahoma's

12  sampling and other agencies' sampling, and what it turns out,

13  Your Honor, is that the dominant portion of phosphorus in the

14  IRW rivers and streams is in dissolved phase, not particulate

15  phase.

16         So that fact in the IRW about dissolved versus

17  particulate and what is the dominant type of phosphorous

18  contradicts his muddy water theses; but on the other hand, the

19  fact that it's dissolved base supports Dr. Olsen's analysis.

20         Finally, Your Honor, Dr. Johnson did submit an

21  affidavit, another declaration in response to the -- to our

22  Daubert motion, and it's attached as part of the defendants'

23  response.  We did not move to strike it.

24         We thought it was appropriate that Dr. Johnson give a

25  shot at defending himself, and so it's in the record.  And that

1    is -- it's in the record at 2169, Exhibit 7, submitted by the

2    defendants.  And a new declaration on June 5, 2009.

3           In that declaration, he continues to misapprehend

4    basic concepts of phosphorus and these chemicals in the IRW so

5    that his opinions as to muddy and salty water interpretation

6    are suspect.

7           And he states this, and this is in the declaration of

8    June 5:  "I assert that the variability" -- I'm quoting,

9    Your Honor.  "I assert that the variability of total phosphorus

10   in Olsen's PCA, regardless of source, is primarily a function

11   of partitioning between particulate and dissolved phase."

12          Now, he's suggesting that total phosphorus change

13   when you adjust the ratios of particulate to dissolved

14   phosphorus in that statement.

15          Well, Your Honor, that's nonsensable because total

16   phosphorus is the sum of particulate and dissolved phosphorus.

17   So if the ratio between those two changes, it does not increase

18   or decrease the total phosphorus.  Total phosphorus remains the

19   same.

20          This statement from his declaration at pages --

21   page 7 of Exhibit 2 to 2169 shows that he still fails to

22   understand these basic geophysical concepts.

23          Finally, Your Honor, Dr. Johnson does not offer any

24   opinion as to how the sources of phosphorus that he identifies

25   but he claims is particulate, but it's not, came about.

1          And we pointed that out, that he doesn't have an

2   understanding of what the potential sources are, how much they

3   are, any kind of a mass balance background.  How could he then,

4   you know, basically understand, even without even looking at

5   the data of the IRW concerning particulate versus dissolved,

6   how could he make this decision.

7          The defendants, in their reply brief, tried to

8   buttress his experience by claiming that he really did

9   understand sources, contrary to what he said in his deposition,

10  and that understanding came from a drive around the IRW looking

11  out the windshield, and that he looked at other experts'

12  opinions in this case concerning sources.  But, of course, none

13  of those expert opinions are cited in his Rule 26(a) report as

14  being relied upon.

15         So, Your Honor, it's our belief that Dr. Johnson,

16  although he does perform a PCA, it's faulty, and his

17  criticisms, much of which are relied upon by the defendants in

18  their attack on Dr. Olsen, should be disregarded.

19         Now moving quickly to Dr. Murphy, Your Honor.  Again,

20  Dr. Murphy did not, to the surprise, I think, of all

21  investigators in this watershed, that he did not identify a

22  poultry waste signature or any poultry waste contamination as

23  being a problem.

24         His multimedia analysis, his conclusion is, is that

25  the phosphorus that you find is natural background.  And when

1   he was examined concerning, well, how does he clarify or

2   understand that as natural background phosphorus, did he

3   actually look at reference samples and do a comparison, he did

4   not.

5          Now, the interesting thing about Dr. Murphy in his

6   multimedia analysis is that he did it and he stands by it; yet

7   he admitted in his deposition that actually chemicals do change

8   from media to media, and if that happens, like chemicals change

9   with reaction and dilution, such as what happens with

10  phosphorus -- phosphates, that would be detrimental to a

11  multimedia analysis.  He concedes that in his deposition.  It's

12  Exhibit B to docket 2074 at pages 50 and 410.

13         And to Dr. Murphy's credit, he admitted he'd never

14  done a multimedia PCA ever before in the past personally.  He's

15  done PCAs, but he never did a multimedia.

16         He was able to identify through work with one of his

17  colleagues at Exponent one published article where they did a

18  multimedia PCA.  In that article, Your Honor, they were looking

19  at PCBs.  PCBs -- even though phosphorus is conserved in the

20  environment, PCBs are very conservative.  Their chemicals do

21  not change when you add water to them.  They're so strongly

22  bound together, the chlorinated and carbon molecules are so

23  strongly bound together that water and air will not create a

24  reaction.  And that was the only support he had for multimedia

25  PCBs -- I mean PCA.  I think that's a reasonable use of a

1  multimedia PCA if you had a chemical like pHs or PCBs but not

2  certainly with phosphorus and the constituents we have in this

3  case.

4          If I may conclude with Dr. Murphy.  Dr. Murphy also

5  offers an opinion that doesn't relate to PCA, except he uses

6  PCA to determine that the Cargill -- several Cargill farms that

7  are near points that were sampled by Dr. Olsen actually do not

8  have poultry house signature.

9          And so he says he takes his PCA and he says, you

10 know, I looked at the sample now near where the plaintiffs took

11 a sample, and then there's a poultry farm that's owned by

12 Cargill in that area, and he's saying, look, that had a low

13 chicken house -- poultry house dominant signature from

14 Dr. Olsen; therefore, Cargill's operations -- supposedly, I

15 guess, different from other poultry operations -- are not

16 contributing to the contamination in the IRW.

17         Now I asked him whether or not he'd done any research

18 and discovered anything about turkey waste that would mean its

19 properties would travel differently in the environment than

20 poultry, and he said they looked into that and they could not

21 find anything different.

22         So then, of course, I asked him in his deposition,

23 well, then how do you conclude that the Cargill operations are

24 not affecting this particular sampling point?  He said, well,

25 because the house is near there.  And I said, well, do you have

 1  any evidence that Cargill waste or even poultry waste has been

 2  applied upstream, and he said he did not.  He did not do that

 3  evaluation, he had no evidence.

 4          And he conceded that obviously something is either

 5  upstream or not, and that an upstream application would be

 6  important to determine whether or not there was an impact by

 7  that waste application downstream.

 8          So that, in addition, would, I think, suspect any of

 9  his opinions at trial in this case concerning the effect of

10  Cargill's operations on contamination in the IRW.

11          With that, Your Honor, I'm here to answer any

12  questions you have.  That concludes my presentation.

13          THE COURT:  Thank you very much.

14          MR. TODD:  Your Honor, I have very little to say.

15          First, as to the Cowan and the Johnson motions,

16  defendants are pretty much happy to rest on the pleadings.  We

17  think the issues have been well joined, and I don't want to

18  rehash what's there.

19          The only thing I'd say as to Cowan is, you're right,

20  I didn't make those arguments in my opening statements for two

21  reasons.  One, I didn't want to take 45 minutes to an hour of

22  the Court's time to talk about the intricacies of nondetects.

23          I also wanted to demonstrate to Your Honor that the

24  Olsen motion could be resolved without getting into the Cowan

25  motion and the Johnson motion.  So I didn't talk about Cowan at

 1    all.  And the Johnson Daubert motion only goes to his

 2    alternative interpretation.  It doesn't go to the rest of his

 3    analysis, so -- and as we represented, if Dr. Olsen is out,

 4    then we have no intention of calling Dr. Cowan or Dr. Johnson.

 5              But to Olsen, Your Honor --

 6              THE COURT:  Before you do, let's talk briefly about

 7    Johnson.

 8              MR. TODD:  Sure.  Your Honor, I'm going to have to

 9    defer that to Mr. George, then, because he's prepared to argue

10    the Johnson motion.

11              THE COURT:  Mr. George, are the defendants saying

12    that Johnson's opinion is that IRW water quality problems are

13    the result of natural processes?

14              MR. GEORGE:  No, Your Honor.

15              THE COURT:  I didn't read it that way either.  I just

16    wanted to see what the response was.

17              MR. GEORGE:  That's absolutely correct.  And as we

18    pointed out in our response, Your Honor, we view that as a bit

19    of a straw man argument or at least a misunderstanding as to

20    perhaps his opinion.

21              Dr. Johnson's alternative interpretation is nothing

22    particularly unexpected.  It's been fairly well recognized in

23    PCA projects and work done by others.  And Dr. Johnson has an

24    extensive history in doing PCA for environmental forensic work

25    in other settings that sometimes what you see is a trend on a

1    scores plot like we've been looking at today is the function of

2    a source impacting the chemistry, but sometimes it is simply a

3    function of the way in which chemicals change in group in the

4    environment after they're exposed to water, the geochemical

5    processes.

6           So Dr. Johnson investigated the actual dataset that

7    was used by Dr. Olsen in this case and looked at the samples

8    that tended to plot high on PC1 or high on PC2 and discovered

9    that there were some very natural -- in terms of the way in

10   which chemicals operate in the environment, natural processes,

11   geochemical processes that more aptly explain the variability

12   in the data as opposed to source, which was the conclusion

13   drawn by Dr. Olsen.

14          So that is the sum total of his alternative

15   interpretation of the data is simply recognizing on a subject

16   he's been published on before that geochemical processes can,

17   in fact, derive the variability that one sees in PCA.  And

18   there's some history, and he points it out in his report, for

19   folks mistakenly interpreting that variability in PCA as a

20   source when, in reality, it's simply geochemical processes,

21   so...

22          That's his opinion, Your Honor.  It's not an opinion

23   that the Illinois River watershed or the waters as they exist

24   today are impacted only by natural sources.

25          THE COURT:  Geochemical partitioning phosphorous from

1   any source?

2        MR. GEORGE:  Correct, Your Honor.  In fact, Your

3   Honor, I believe we heard Mr. Page today -- in fact, during

4   this last argument -- talk about adsorption, desorption of

5   phosphorus.  I don't believe there's any dispute in this case

6   that phosphorus sometimes is found in particulate form and

7   sometimes is found in soluble form and, you know, there's some

8   other chemicals or constituents that are important to

9   Dr. Olsen's PCA that tend to signal the presence of sediment or

10  TSS, and those would be things like iron and aluminum.

11       And what Dr. Johnson's analysis found is that when

12  you had a high PC1 score, you tended to have total phosphorus

13  with very little dissolved phosphorus, which meant it was

14  particulate-bound phosphorus; and you tended to also have the

15  things associated with sediments, such as iron and aluminum.

16       And so if you look toward the top of that PC1 graph

17  and you actually dig into the samples, that's what you see

18  there are samples that are associated with sediments as if you

19  scooped up some muddy water; whereas if you look along the

20  bottom trend, which is the PC1 trend, you tend to find things

21  that are more readily dissolved in water.  As you go along,

22  those things increase, which suggests that you've got water

23  that does not have a lot of turbidity in it; you've got

24  dissolved constituents, such as sodium and potassium and

25  chlorides.

1         And his analysis is based upon a review of the data

2    and simply providing the Court with an alternative view of what

3    may be driving the placement of a particular sample.

4         Dr. Olsen's view is that a sample places in a place

5    on his chart by virtue of the source that impacts it.  And

6    Dr. Johnson's observation is that regardless of the sources

7    that contributed those things to the environment, the placement

8    on the chart is a function of geochemical processes.

9         So that is his opinion, and I do think it's been

10   misunderstood perhaps by the plaintiffs because I don't believe

11   it's controversial in the least.

12        The other thing I wanted to comment on -- well,

13   Your Honor, let me stop there and not waste the Court's time.

14   If you have additional questions, I would certainly welcome the

15   opportunity to answer them.

16        THE COURT:  Specifically how do you respond to the

17   argument that Johnson misapprehends concepts of dissolved

18   phosphorus?

19        MR. GEORGE:  I don't think that any of the opinions

20   that he's offering require any advanced chemical understanding

21   of phosphorus.  He is simply reviewing the data, and the data

22   reports both total and dissolved.  And so Dr. Johnson is simply

23   working within the data.

24        And as was set forth in the declaration that was

25   mentioned by Dr. Page, Dr. Johnson does have some experience

 1    working with datasets that include phosphorus.

 2            So, Your Honor, I believe that there's a bit of a

 3    false premise in the State's motion.  In fact, if you look at

 4    the beginning of their motion on page 6, they set up their

 5    entire argument by saying that Dr. Johnson's opinion rests on

 6    the premise -- his process-based opinion rests on the

 7    premise -- false premise, they say -- that most of the

 8    phosphorus in the Illinois River is particulate bound.

 9            And that's simply not the platform for his opinion.

10    He's not quantifying phosphorus in one form or another in the

11    watershed.  He's simply taking the 500 samples that have been

12    used by Dr. Olsen and looking at where those samples plot if

13    they have high portions of dissolved phosphorus as opposed to

14    where they plot if they have low dissolve, but high total.

15            THE COURT:  Do I understand correctly that the

16    State's Daubert motion on Johnson goes only to his sixth

17    opinion, which is that Dr. Olsen failed to recognize the

18    influence of total concentration in geochemical partitioning?

19            MR. PAGE:  Your Honor, it goes to his interpretation

20    of Dr. Olsen's application of all the PCA, including this --

21    where he claims that what Dr. Olsen says as what Dr. -- as what

22    Mr. George points out, that what Dr. Olsen sees as poultry, he

23    sees it as muddy water.

24            Your Honor, if I misspoke before, I meant to say that

25    Dr. Murphy is the one that says its natural process is

1  phosphorus, but that it's the geochemical processes, as we

2  pointed out in our brief -- and what I meant to say in case I

3  misspoke is what Dr. Johnson states as what's going on rather

4  than poultry waste contamination.  And our point --

5        THE COURT:  Does your Daubert motion go to all of

6  Dr. Johnson's opinions?

7        MR. PAGE:  Yes, because his opinions are focused on

8  PCA and interpretation of PCA.

9        THE COURT:  All right.

10        MR. GEORGE:  Your Honor, with all due respect, we

11  read their motion, and obviously in our response set forth how

12  we interpreted it.  And the only criticism in the motion

13  related to this alternative interpretation, and we very clearly

14  stated in our response that was our understanding of the only

15  opinion being challenged, then when we see the plaintiffs'

16  reply, that there's no disagreement with that, and regardless

17  of the position taken here today, there's certainly been no

18  scientific basis that has been put forward by the State to

19  challenge any opinion other than opinion No. 6, although

20  obviously the defendants believe opinion No. 6 is well-founded

21  as well.

22        That's a long way of saying -- I apologize for the

23  length -- that what I just heard from Mr. Page is inconsistent

24  with everything I've read coming into today.

25        THE COURT:  Thank you very much.

1          MR. GEORGE:  Thank you.

2          THE COURT:  Mr. Todd, will you be addressing Olsen or

3    Murphy or both?

4          MR. TODD:  Cowan, Your Honor.  And Ms. Kleibacker Lee

5    will take Murphy for Cargill.

6          THE COURT:  Great.  I just need a chart.

7          MR. TODD:  A flow chart.  I know.  Sorry.  And if

8    Your Honor has any questions as to Cowan, obviously I'm happy

9    to answer them.

10          THE COURT:  Other than the three topics that I

11    discussed here with regard to the use of the mean and the

12    substitution when there was no -- no indication they substitute

13    a number between zero and the detectable amount and then the

14    average of the split samples -- first of all, how do you

15    respond to that?  And then is there anything else there that

16    Cowan criticizes of Olsen's report?

17          MR. TODD:  Dr. Cowan criticizes the manner in which

18    Dr. Olsen assembled and manipulated his dataset.  The State's

19    first argument about Cowan is that he can't testify in

20    environmental cases.  And Your Honor dealt with that somewhat

21    yesterday with Dr. Harwood.

22          As I tried to make clear in my presentation,

23    Dr. Olsen's subjective analysis, which requires some knowledge

24    of chemistry and environmental sciences, that doesn't start

25    until Dr. Olsen starts drawing the circles on the graph.

1  Everything Dr. Cowan says comes before that.  It's all pure

2  statistics.

3         With regard to the nondetects and the averaging and

4  the missing data, the briefs, unfortunately, argue past each

5  other somewhat.  The plaintiffs take Dr. Cowan to task for what

6  they perceive as him offering opinions on the proper way to

7  handle nondetects or missing data in an environmental dataset.

8         Dr. Cowan, Your Honor, offers no opinion whatsoever

9  regarding the proper manner to massage -- I was given a lot of

10 grief for the way I said "massage" earlier, Your Honor -- was

11 to treat an environmental dataset.

12        All he says is that if you understand how a PCA

13 works, you should understand that if you have to fill in for

14 missing values, if you -- whether it's by non -- sticking in

15 half of the detection limit or replacing a missing value with

16 some number, no matter where you get it from, whether it's from

17 plugging in zero or pairwise deletion or what have you, if you

18 do that, you necessarily change the variability in the

19 dataset.  And PCA is designed to measure variability in the

20 dataset.

21        So Dr. Cowan's only point, and as a matter of math

22 and a matter of statistics, you're not actually measuring the

23 variability in the dataset, which is what you're trying to

24 measure.  That's his only point.  He's perfectly qualified to

25 offer that, as a statistician.

1           The only other point that the State makes as to

2    Dr. Cowan's argument is they suggest that he analyzed the wrong

3    dataset because he discusses how following Dr. Olsen's

4    instructions set out in his report, you can actually take their

5    master database and run the queries, the data queries he says

6    he ran and end up with SW3.  You have to do other things.

7    Dr. Olsen -- Dr. Cowan demonstrated that.

8           He then ran some tests on SW3.  And the plaintiffs

9    say, well, if he couldn't reconstruct SW3, he must have run

10   those tests on the wrong dataset.

11          Well, the State separately produced SW3.  They gave

12   us an Excel chart which had all the SW3 data on it.  So that's

13   what Dr. Olsen -- Dr. Cowan used to run those analyses,

14   Your Honor.  But that's the sum total of Dr. Cowan.

15          THE COURT:  I'd forgotten he contends that the --

16   that there have to be additional manipulations of the data to

17   get the results, because he's run it and he can't get where

18   Dr. Olsen got.

19          MR. TODD:  Right.  And in the briefs, we gave you

20   some examples, some attachments showing where they don't add

21   up.  If Your Honor has any other questions on Cowan?

22          THE COURT:  No.

23          MR. TODD:  To conclude with Dr. Olsen relatively

24   quickly then, Your Honor, let me go back to the first question

25   you asked:  What is methodology?  What is he actually selling

361

1  here?

2         What Dr. Olsen is selling is a test for going out in

3  the environment, testing a sample for 26 things and seeing if

4  it appears in certain proportions, in certain ratios; and if it

5  does, saying, well, that must be poultry litter.

6         The difficulty, Your Honor, is that every time we've

7  poked a data point and we've said, what about this one, let's

8  talk about this one, Dr. Olsen has had to go back into the

9  field to do more analysis to either shore up his original

10  opinion or come up with a new opinion.

11         Mr. Page's argument made much more clear than I ever

12  could that Dr. Olsen's ultimate determination that anything

13  from PCA 1.3 or higher, anything within that red oval, his

14  determination that that's poultry litter, that's his subjective

15  analysis.  That's nothing that the PCA dictates, Your Honor.

16  That's based on his subjective evaluation of the data and of

17  his field work.

18         And that's what's changed over time.  That's why in

19  the third errata, we see points moving in both directions,

20  things that were impacted are now not impacted, things that are

21  not impacted now are impacted.  That's because it's all

22  subjective.  It's not at all driven by the PCA.

23         But what he's selling is the PCA, Your Honor.  But

24  the problems with the data, the problems with the points that

25  don't match up, don't satisfy his own criteria, demonstrate

1    that at end of the day what he's selling is not reliable.

2        Mr. Olsen talked a lot about -- he talked for some

3    length about their feed theory and how this is reliable because

4    they looked at what was in poultry litter and looked at the

5    chemicals, and he talked about poultry leachate and how they

6    did the test to know just what was in poultry.

7        Well, this brings you back to a point I made in the

8    beginning, which is that Dr. Olsen ran a lot of runs, most of

9    which are not in his report.  He ran a report -- he ran a run

10   early on where they looked at the poultry leachate.  They took

11   the results of those samples and they ran the PCA, and those

12   samples didn't plot anywhere near the allegedly poultry edge-

13   of-field samples.

14       And so, Your Honor, that run was not included as a

15   principal run or even discussed in Dr. Olsen's report.  It's

16   another example of something that was inconsistent.

17       THE COURT:  What was it?

18       MR. TODD:  The run where he took the poultry litter

19   leachate results that Mr. Page talked about, they ran those.

20   And the edge-of-field samples are here, and the poultry

21   leachate samples are up here.  They weren't close at all,

22   suggesting, Your Honor, that the edge-of-field poultry samples

23   are not reflective of what actually runs off poultry litter, at

24   least according to their lab tests.  That's just another one

25   that didn't make it and wasn't important in the final report.

1          To sum up, Your Honor, Dr. Olsen is offering a

2     subjective analysis.  It's novel.  It's never been tested

3     outside this litigation.  And I think we've pretty convincingly

4     shown that he consistently has to force his conclusion onto

5     whatever data he is presented with at any moment in time.

6     Your Honor, this is unreliable.  Thank you.

7          THE COURT:  Thank you very much.

8          Anything else?

9          MS. KLEIBACKER:  Your Honor, I was just going to

10    address Dr. Murphy.

11         THE COURT:  Good.  Thank you.

12         MS. KLEIBACKER:  I'm Krisann Kleibacker Lee here on

13    behalf of the Cargill defendants.  I'll be very brief.

14         Dr. Murphy's report, as you've seen, has two distinct

15    functions.  One is to criticize Dr. Olsen's PCA.  Most of those

16    criticisms have been thoroughly covered in the Olsen discussion

17    earlier this afternoon, and only one of the many criticisms

18    levied is at issue at all here on Daubert .

19         The State has only challenged one singular ground on

20    which Dr. Murphy criticizes Dr. Olsen, and that's the use --

21    Dr. Murphy's use of multimedia PCA.

22         The other piece of Dr. Murphy's opinions are an

23    affirmative analysis that he ran using the State's data, a PCA

24    analysis that he ran.  And the Cargill defendants submit that

25    it's the conclusions that that analysis reached that the State

1    now wants to exclude.

2           The important thing to consider as to that second

3    point about the Cargill defendants is that over the last day

4    and a half, you've heard a lot of problems with the State's

5    expert case against the "industry" and the poultry integrators.

6    But this, of course, is not a class action; and to prevail, the

7    State is going to have to prove causation against each

8    individual company.  This is going to be an issue at summary

9    judgment.

10          The defendants believe that the State cannot prove

11   such specific causation.  And the Cargill defendants in

12   particular have disclosed company-specific experts on this

13   point.  One of those such experts is Dr. Brian Murphy, another

14   is a Dr. Andy Davis.  There will be similar criticisms levied

15   against Dr. Davis that will be discussed later this afternoon.

16   I just wanted to preview that.

17          THE COURT:  You might not be surprised that I haven't

18   had time to dig into the motions for summary judgment yet.

19          MS. KLEIBACKER:  Not at all, Your Honor.

20          THE COURT:  My understanding is that Dr. Murphy was

21   retained solely to examine and rebut Dr. Olsen's expert

22   opinions, correct?  Or are his opinions going to be -- or are

23   you wishing to offer him in connection with summary judgment?

24          MS. KLEIBACKER:  Dr. Murphy was retained with two

25   goals, and he was retained specifically by the Cargill

1  defendants, which is why I previewed --

2          THE COURT:  I'm aware of that.  You-all are the only

3  poultry-specific, or the only ones I'm aware of, with regard to

4  company-specific exerts, right?

5          MS. KLEIBACKER:  Yes.

6          THE COURT:  All right.

7          MS. KLEIBACKER:  So, yes, Dr. Murphy renders both a

8  critique of Olsen, which certainly, just as with Drs. Cowan and

9  Johnson, if the testimony of Olsen is not at trial, we

10  certainly would not put any of that portion of his report

11  critiquing Dr. Olsen in --

12          THE COURT:  I understand that.

13          MS. KLEIBACKER:  -- but in addition, Dr. Murphy

14  renders affirmative opinions with respect to the Cargill

15  defendants, and those opinions are challenged on Daubert today.

16          THE COURT:  That's in connection with your motion for

17  summary?

18          MS. KLEIBACKER:  Yes.

19          THE COURT:  All right.  And it's basically for the

20  proposition that there's no evidence of any determinable

21  downstream concentrations of chemical and bacterial content

22  emanating from a Cargill-related grower; is that correct?

23          MS. KLEIBACKER:  Yes.  And none of the evidence of

24  the State's shows that, yes.  Dr. Murphy limited his work to

25  the same evidence on which Dr. Olsen relied, the same

 1  parameters and the same data.  So the critique is in absence of

 2  evidence essentially.  And --

 3          THE COURT:  You're not saying that there's not

 4  phosphorus from Cargill-related growers getting into the IRW;

 5  you're just saying they haven't proved it?

 6          MS. KLEIBACKER:  Yes, Your Honor.  And specifically

 7  on the phosphorus point, this is a -- Dr. Murphy has made pains

 8  during his deposition to explain that he wasn't retained to

 9  look at source issues.  He has no opinion as to the source of

10  phosphorus.  So the State's arguments which they just raised

11  for the first time on reply about this conflict -- supposed

12  conflict between Drs. Murphy and Johnson hinging in part on an

13  opinion that the State attributes to Dr. Murphy, an opinion

14  that he has not made that they cannot cite to anything in his

15  report or deposition that supports it, that the opinion that

16  the pervasive phosphorus pollution in the IRW is the result of

17  native soil runoff -- that's quoting from the State's reply

18  brief at page 3 -- it's not supported.  In fact, in Murphy's

19  deposition, he repeatedly stated he was rendering no source

20  opinion.

21          THE COURT:  You're telling me that whether he says

22  that explicitly or not, you're contending that Murphy is not

23  taking that position?

24          MS. KLEIBACKER:  Right.  His position is absence of

25  evidence.  I should also point out --

367

 1              THE COURT:  Okay.  How do you respond to Dr. Johnson,

 2    your codefendant's expert's statement, that a multimedia

 3    approach is inappropriate in this setting?

 4              MS. KLEIBACKER:  Well, I don't think Dr. Johnson made

 5    that statement.  Dr. Johnson and Dr. Murphy work together on

 6    PCA issues.  Dr. Johnson wrote the chapter on PCA in

 7    Dr. Murphy's environmental treatise.  They're on the same page

 8    literally and figuratively on PCA.

 9              And we point out in our response brief that --

10    actually, no, we don't, because this argument wasn't raised.  I

11    think that what they're pointing to there, the section in his

12    report -- in Dr. Johnson's report, I should say, is that a

13    poultry signature isn't preserved from solid to liquid media.

14              Dr. Murphy doesn't disagree with that point.  He, in

15    understanding that the signature will change between the media,

16    accounted for that in his sophisticated PCA, multimedia PCA

17    that he ran.  That's what his MM PC1 line does, it accounts for

18    that change.  I think this is summarized well in the

19    declaration that we submitted in support of our response, which

20    has not been at all challenged.  That's Exhibit E to our

21    response brief, paragraph 8.

22              I don't think -- I think really that this is a

23    situation of straw man versus straw man and that --

24              THE COURT:  A lot of straw men being set up on both

25    sides here.

1              MS. KLEIBACKER:  I really don't think there's --

2              THE COURT:  A lot easier to knock down a straw man

3   than the real thing.  All right.  Anything else?

4              MS. KLEIBACKER:  Well, your Honor, I would just point

5   out that the two criticisms levied against Dr. Murphy are in

6   the opening brief expressly based on opinion by Dr. Loftis that

7   has now been excluded.

8              And there is -- there's not even an offer of proof

9   actually as to the declaration to Dr. Loftis that pertains to

10  Johnson, Murphy, Cowan and Davis.  It's off the table.

11             And without that support, all that the State can

12  offer are assertions of counsel, arguments by lawyers.

13             And we heard some criticism yesterday of Daubert

14  motions rested on that ground.  I would just say that's all

15  that's left with respect to Dr. Murphy.

16             I've got a lot more in my notes, Your Honor, but I

17  know we're running out of time.  I'd be happy to answer any of

18  your questions on that.

19             THE COURT:  It's 2 o'clock, and I think we've ruled

20  on four of the 17 motions.  I don't believe so.  I think I'm

21  adequately -- anybody want to take all these guys' testimony

22  for this hearing?

23             Anything else?

24             MR. PAGE:  No, Your Honor.

25             THE COURT:  I'm going to step back and see if we can

1  put together some reasonable thoughts on this.  We'll take a

2  short recess.

3            (Whereupon a recess was had.)

4            THE COURT:  As to Dr. Cowan and the Daubert motion

5  pertaining to him, No. 2072, again, the Court finds that the

6  reasoning and methodology underlying his statistical testimony

7  at this time with regard to Dr. Olsen is statistically and

8  mathematically valid and can properly be applied to the facts

9  and discipline in issue.

10           Although Mr. Page has called some of Mr. Cowan's

11  conclusions into question, Cowan's reasoning may be considered

12  in connection with the issues raised with Dr. Olsen's report.

13           Dr. Cowan's reasoning regarding incomplete data and

14  the incomplete dataset is reliable and may be heard by the

15  Court.

16           Motion No. 2072 is denied as to Dr. Cowan's opinions

17  pertaining to Dr. Olsen.

18           With regard to the motion in limine to preclude the

19  expert testimony of Brian Murphy, No. 2074, Dr. Brian Murphy

20  was retained by the Cargill defendants to examine and rebut

21  Dr. Roger Olsen's expert opinions, including Dr. Olsen's use of

22  PCA, and to analyze whether Dr. Olsen's work supports a

23  conclusion that any Cargill-related grower is responsible for

24  determinable downstream concentrations of chemical and

25  bacterial content.

370

1          Dr. Murphy made four principal conclusions on these

2     topics.  As the Court understands it, the State's Daubert

3     challenge goes to Dr. Murphy's fourth conclusion, which is as

4     follows:  Because Dr. Olsen did not combine solid and liquid

5     samples in the same analysis, his PCA is not a true "pathway"

6     analysis.  A multimedia analysis indicates that Cargill-related

7     growers are not contributing determinable downstream

8     concentrations.

9          The State alleges the multimedia approach advocated

10    and apparently used by Murphy in this case is not acceptable

11    science.  The State also alleges Dr. Murphy's opinion is flawed

12    because his multimedia approach ignored important information

13    about sources such as mass balance and chemical transport

14    modeling.

15         Finally, the State contends Dr. Murphy's conclusions

16    regarding Cargill-related growers are flawed because Dr. Murphy

17    failed to inquire whether poultry waste was applied on the

18    Cargill growers' property.

19         Dr. Murphy conducted his own PCA using Dr. Olsen's

20    data to determine whether any poultry litter signature in fact

21    carried through the environmental media when a PCA is, in his

22    view, properly performed.

23         Dr. Murphy included the sample data for the actual

24    source of alleged contaminants -- that is, poultry litter -- in

25    his analysis in order to determine whether there exists any

1  signature from the putative source and whether the signature is

2  actually present in soil sediment or water samples collected.

3  Dr. Murphy concluded there is no such signature.

4        Dr. Murphy has testified that multimedia approaches

5  are scientifically acceptable and that the usefulness of such

6  an approach depends on the types of contaminants and the media

7  in which they are found.

8        Dr. Murphy testified that the multimedia approach was

9  helpful here because it was one way to incorporate the alleged

10  source -- that is, poultry litter -- into the PCA to determine

11  if it carries through the media.

12        Although this Court has serious doubts regarding the

13  proposition that there can be no evidence by which a fact

14  finder could conclude that any Cargill-related grower may be

15  responsible for downstream chemical and/or bacterial content,

16  the Court concludes that Dr. Murphy's use of a multimedia

17  approach to conduct PCA is not scientifically invalid and,

18  therefore, meets the Daubert requirement for reliability.

19        As with other experts, his opinion will be subject to

20  challenge and cross-examination.  If the issue gets to trial;

21  however, the State's motion to exclude the testimony of

22  Dr. Murphy, No. 2074, is hereby denied.

23        As to Glenn W. Johnson, motion No. 2083, Dr. Glenn

24  Johnson was retained by defendants to review and critique the

25  opinion of the State's expert, Dr. Roger Olsen, that Dr. Olsen

1  had identified a unique chemical signature for poultry litter

2  using a principal component analysis.

3         The State's Daubert motion on Dr. Johnson appears to

4  go primarily to his sixth opinion, which is that Dr. Olsen

5  failed to recognize the influence of total concentration and

6  geochemical partitioning upon the PCA.

7         Specifically, Dr. Johnson, in his expert report,

8  contends that Dr. Olsen's PCA approach was doomed from the

9  start because he assumed a geochemical system controlled by

10 unchanging ratios of source diagnostic chemicals and bacteria,

11 whereas certain of these substances and source materials will

12 dissolve in water.

13         Johnson contends that regardless of source, placement

14 on Dr. Olsen's chart is largely the result -- or placement on a

15 chart is largely the result of geochemical processes.

16         The State, in its motion, contends that this opinion

17 is invalid because Johnson clearly does not understand

18 phosphorus, and this alleged misunderstanding led him to base

19 his opinion on the false premise that most of the phosphorus in

20 the IRW is particulate in nature when, in reality, it is mostly

21 dissolved.

22         Further, the State characterizes Dr. Johnson's

23 opinion as being that IRW water quality problems are a result

24 of natural processes.

25         This Court has reviewed the report and other

1   materials submitted by the parties.  The Court does not believe

2   Dr. Johnson has, as alleged by the State, opined that IRW water

3   quality problems are a result of natural processes.  Rather,

4   Dr. Johnson has criticized Dr. Olsen's approach and, thus, his

5   conclusions because Olsen's PCA methodology does not take into

6   account the question of whether and which components and source

7   material, such as poultry litter, cow manure and wastewater

8   treatment plant effluent, dissolve in water.

9         Dr. Johnson characterizes this failure as a flaw that

10  compromises the reliability of the PCA and, thus, the

11  conclusions of Dr. Olsen.

12        The Court, having reviewed Dr. Johnson's report,

13  declaration and deposition testimony, finds that Dr. Johnson's

14  methodology is sufficiently reliable to meet the requirements

15  of Daubert .  Therefore, the State's motion to strike

16  Dr. Johnson's testimony is denied.

17        The Court has to do -- put together its thoughts with

18  regard to Dr. Olsen.  I will download some thoughts here that I

19  had on the computer, go back and work on those a bit more.  And

20  we'll take a recess.

21        (Whereupon a recess was had.)

22        THE COURT:  As to the motion to exclude Dr. Roger

23  Olsen's principal component analysis testimony, No. 2082, the

24  Tenth Circuit has recognized in this case that an expert's

25  testimony is unreliable when it misapplies a reliable

1   methodology.

2          Number 1, Dr. Olsen has applied the PCA methodology

3   in a novel way and has arrived at conclusions that result in

4   too great an analytical gap between the data and the opinions

5   proffered to be determined reliable.

6          Despite decades of poultry research, no one else has

7   applied the PCA methodology in such a way as to identify a

8   "poultry signature."

9          Number 2.  The application of the methodology has not

10  been subjected to peer review by anyone unconnected with this

11  lawsuit.  PCA is a statistical method of analyzing data.  It

12  uses a series of equations to identify patterns common to a

13  large dataset.

14         As a result, Dr. Olsen was required to make

15  discretionary, subjective decisions about which data he would

16  enter into his calculations.  The discretionary, subjective

17  decisions in his methodology have not been tested or peer

18  reviewed.

19         Number 3.  Dr. Olsen's methodology is subjective and

20  inconsistent; thus, unreliable.  The materials before this

21  Court suggest he has forced his conclusions to match new and

22  evolving data.

23         In reaching this conclusion, the Court has considered

24  the following:

25         A.  Olsen does not sufficiently explain his criteria

1  regarding how he differentiates his principal runs and his

2  other sensitivity runs.

3       B.  Dr. Olsen does not sufficiently explain why he

4  has very recently changed his poultry impact threshold which

5  results in a significant shift in allegedly "poultry-impacted"

6  samples changing previously poultry-impacted samples to

7  nonimpacted samples.

8       C.  Dr. Olsen's ovals are subjective evaluations of

9  the data.

10      D.  Dr. Olsen's treatment and explanations of certain

11  wastewater treatment plant samples and cattle samples have

12  shifted and changed in the face of data, showing such samples

13  to be poultry impacted.

14      He first claimed to see a definitive cattle

15  signature, but has now backed off that position.

16      E.  Though Dr. Olsen ran the log adjusted runs SD1

17  and SD6, and SW22, which Dr. Olsen had previously determined to

18  be "important," plaintiff has submitted only two runs

19  previously determined to be important.

20      Specifically, Dr. Olsen ran SW3 and SW17 after log

21  adjustment, which was required after defendants' experts

22  pointed out a fatal math error.  Dozen of samples changed

23  classifications in a nonuniform manner across the IRW after the

24  correction, indicating that the math error did, in fact, affect

25  the results.

1            Number 4.  Dr. Olsen's approach does not account for

2     alternative sources of most of the constituents in his PCA.

3            Number 5.  The published literature states that --

4     and before I do this, let me find out, did the -- do the

5     defendants contend that the software package actually now

6     replaces the missing values with a mean, Mr. Todd?

7            MR. TODD:  Your Honor, it's our understanding that

8     Dr. Olsen works -- we accept the representation by plaintiffs

9     that he used the pairwise deletion function.  Because of the

10    manner in which Dr. Olsen had treated the data, he had done

11    something called a Z transformation, which basically wraps the

12    data around zero.  So the mean was zero.  So it was a

13    mathematical equivalent.  Running the pairwise was the

14    mathematical equivalent of replacing everything with a mean.

15    So we're happy to accept their representation.

16            THE COURT:  Does that eliminate your objection?

17            MR. TODD:  No, it doesn't, Your Honor, because our

18    objection was to the effect of having missing data.

19            THE COURT:  That's what I understood.

20            So Number 5.  The published literature states that

21    when a software package replaces missing values with means of

22    the variables, this can bias statistical analysis if these

23    values represent a significant number of the data being

24    analyzed.  Here, the replaced data represent a significant

25    number of the data analyzed; thus, rendering the data

1    unreliable.

2          Number 6.  The sampling procedures underlying

3    Dr. Olsen's report add to the unreliability.  Four of the PCA

4    components are bacteria and are unreliable, given the violation

5    of hold time standards previously discussed yesterday by this

6    Court.

7          I have not taken a break.  I'm going to do so at this

8    time.  We'll be in recess.

9          (Whereupon a recess was had.)

10         THE COURT:  Mr. Overton reminds me that I need to

11   rule on that motion.  The motion to exclude Dr. Roger Olsen's

12   principal component analysis testimony, No. 2082, is granted.

13         Our next set of motions here are the Sullivan, Teaf

14   and McGuire motions.  Have you-all talked about how you wish to

15   take that up?

16         THE COURT:  Mr. Ryan.

17         MR. RYAN:  Thank you, Your Honor.  May it please the

18   Court.  My name is Pat Ryan for Tyson Foods.  I've had a little

19   bit of deja vu here today, Your Honor.  I'm reminded sort of my

20   first day of law school when I walked in and looked around and

21   thought I was clearly the dumbest person in the courtroom.

22   I've certainly been made to feel that way today by Mr. Todd and

23   Mr. Page and others.

24         I'll do my best to present our position on Dr. Teaf,

25   who we believe is unqualified under Daubert.  We believe, A,

1   he doesn't meet -- he doesn't have the essential qualifications

2   to testify as an expert on the topics in which he is addressing

3   in this case.  Secondly, we believe his methodology is flawed.

4        Your Honor, briefly touching on his qualifications,

5   he has never written a peer-reviewed article on salmonella,

6   campylobacter, E. coli, bacteria in poultry, bacteria in

7   poultry litter, on indicator bacteria or cyanobacteria, all

8   topics upon which he professes to have opinions in this case.

9        While he has testified extensively, he has never

10  testified on the topics of bacteria, salmonella, campylobacter,

11  E. coli, pathogenic bacteria, effective bacteria in surface

12  water, bacteria in poultry, bacteria in poultry litter,

13  cyanobacteria, indicator bacteria or disinfection byproducts.

14       He has no expertise in water modeling movement,

15  modeling water body movement with respect to bacteria in

16  identifying risks from waterborne microbiological diseases or

17  microbiological issues associated with the application of

18  biosolids to soil.

19       He is the quintessential litigation expert.  Look at

20  slide one.  He was asked in his deposition:  "Do you consider

21  yourself an expert on the topic of bacteria in poultry or

22  poultry litter?"

23       His answer was:  "As a result of my activities in

24  this case, I feel like I do have that knowledge, yes.

25       "QUESTION:  Did you have it before you started this

1  case?

2         "ANSWER:  No, I would say not."

3         I don't need to read the Court the bottom of that

4  slide, which is the Daubert standard which states it's an

5  extremely important fact for the Court to consider whether the

6  expert became an expert in the lawyer's office or in the

7  laboratory.

8         With respect to his testimony and proposed opinions

9  in this case, it clearly came in the lawyer's office.

10         THE COURT:  Well, he does have a Ph.D. in toxicology,

11  right?

12         MR. RYAN:  He does, Your Honor, but as I'm going to

13  helpfully address, I don't believe that he applies those

14  toxicological approaches to this case.  The toxicology, which

15  is the study -- as I understand, the study of poison, just

16  simply has no application or very little application to this

17  case.

18         He did no dose response analysis, which is I've

19  always understood to be sort of basic to toxicology.  None of

20  that was done in this case.

21         What he does do is he takes the State's sampling data

22  and tries to draw conclusions based off that data.  As

23  Your Honor, I know, is very familiar, you've heard a lot about

24  the indicator bacteria at the preliminary injunction hearing,

25  and while we tried to cross-examine Dr. Teaf about that data at

 1    his deposition, he was largely unfamiliar with it in the sense

 2    that he couldn't tell you, for example, how many times the

 3    State tested for campylobacter or salmonella or anything else

 4    in groundwater or surface water.  He couldn't answer any of

 5    those questions.  He couldn't tell you how many of those were

 6    positive, although he thought there wasn't very many.

 7            He, nonetheless, relies on the fact that there are

 8    indicator bacteria present for his opinions that poultry litter

 9    containing pathogenic bacteria has gotten into the waters of

10    the IRW, and that's what the root cause of the pathogens --

11    what he considers to be pathogens in the IRW.

12            Of course, the State testing failed miserably to show

13    these pathogens in water.  As Your Honor, I think, generally is

14    aware, with respect to the two pathogens that have been

15    associated primarily with poultry, salmonella and

16    campylobacter, the State, when they combined all of their

17    sampling, evening including the sampling of poultry litter,

18    together with water and soil over -- only three or four percent

19    contained any evidence of salmonella.

20            And the same is true for campylobacter.  They never

21    found campylobacter in groundwater, in soil, in spring water.

22    In fact, they never found campylobacter in poultry litter.

23            Out of 302 surface water samples that was conducted

24    by the State, only two of these 302 found the presence of

25    campylobacter, and those were not -- those were edge-of-field

1    samples, Your Honor.  These were puddles on the side of the

2    field where poultry litter and, no doubt, other animal manure

3    had been laid.

4          The jump that Dr. Teaf makes, and where I think he

5    leaves the reservation, is where he says, okay, since we have

6    indicator bacteria -- he makes two jumps.  One, from indicator

7    bacteria, I'm concluding there's pathogens present.  And then

8    the second jump he makes is, and I'm further going to opine

9    that those pathogens are the result of the application of

10   poultry litter on the fields.

11         All warm-blooded animals, as Your Honor know, produce

12   fecal bacteria.  The simple fact that fecal bacteria is present

13   does not identify the source of that fecal indicator bacteria.

14         At best, Teaf or any other expert could do in this

15   case, given this set of evidence, is to say that the presence

16   of indicator bacteria tells them that there may be a risk, that

17   pathogens of unknown origin are in the IRW waters.  That's the

18   most he can do or anyone else can do, and that's not what he

19   does.

20         As we can see here on slide two, the Tenth Circuit

21   has already commented once on the failure of the State to link

22   land-applied poultry litter to the bacteria in the IRW,

23   stating, "This precludes a finding that such litter may present

24   an eminent and substantial endangerment."

25         So the Tenth Circuit has already recognized on the

1  appeal from the preliminary injunction hearing that the State

2  has to make that connection, and they haven't been able to do

3  it.  And Dr. Teaf cannot supply it for him simply on -- for

4  them simply on their ipse dixit.

5          Now, in our brief, we talked about how other

6  watersheds in Oklahoma and throughout the country have elevated

7  levels of indicator bacteria just exactly like the IRW.

8          Now, the State dismisses that argument, saying it

9  doesn't matter what goes on in other watersheds, the only thing

10 that matters is what's going on in the IRW.  But, of course, as

11 the Tenth Circuit also pointed out, this is important because

12 it demonstrates that you can have these identical conditions

13 without the presence of poultry or poultry litter.

14         Teaf next tries to support his opinions with respect

15 to pathogenic bacteria in the waterways on the basis of county

16 health department records from Adair County.

17         And as Your Honor knows, we have very few incidents

18 of campylobacter and salmonella in any of the counties in

19 Oklahoma other than Tulsa and Oklahoma County.  By no means was

20 Adair County the county that had the highest rate of

21 salmonellosis or campylobacter disease, but it did have -- it

22 did have more than you would expect it to have, slightly.

23         It wasn't statistically significant, and no expert

24 has opined that the statistics in Adair County are

25 statistically significant.

1          I think what is somewhat shocking is that he says

2   this knowing, as Your Honor pointed out yesterday in one of

3   your rulings, that 95 percent of salmonella illness is due to

4   foodborne causes.  This is what the CDC has had to say.  And

5   with respect to campylobacter, it's 80 percent.

6          THE COURT:  Except that this is a recreational area.

7          MR. RYAN:  True.

8          THE COURT:  And, two, if you're the parent of one of

9   the 5 percent, it doesn't give you very much solace that 95

10  percent is foodborne.

11         MR. RYAN:  Well, I appreciate when you're talking

12  about a child's health, Your Honor, you're always going to be

13  sensitive and you want to be careful.  That thought is not lost

14  on me.

15         But here, Dr. Teaf has no evidence whatsoever that

16  these diseases -- these disease -- I think there's like eight

17  in one year, or seven.  I can't remember exact -- depends on

18  what year you're talking about.  We're not talking about very

19  many.

20         There's no evidence at all, he has no information as

21  to whether those were foodborne or waterborne.  There's just

22  simply a dearth of information.  So to jump to the conclusion

23  that, A, these were waterborne and, B, they're waterborne

24  because this person has been exposed to the IRW, which he has

25  no knowledge about, is simply unwarranted.  It's just a leap of

1  faith.

2          You know, I don't know how best to say it.  I think

3  Dr. Lawrence -- if you'll remember Dr. Lawrence from the PI

4  hearing, from John Hopkins University, he testified.  And we

5  took his deposition, and we asked him about this very same

6  data.  And to his credit, he said that this county health data

7  is not useful.  It's not useful information in determining

8  whether there is a connection between the illnesses and the

9  land application of poultry.

10          State Health Commissioner Dr. Crutcher did not find

11  evidence of elevated enteric disease in the IRW.  The ODEQ has

12  never found that the land application of poultry litter created

13  an endangerment to human health in the IRW.  And to all of

14  these points, the State had no response.

15          In their response to our motion to disqualify

16  Dr. Teaf, the State did not respond to what Dr. Lawrence had

17  said, that the county health statistics were irrelevant, did

18  not respond to Dr. Crutcher's points, they did not respond to

19  the point from the ODEQ.

20          Slide number three gives you a little bit more

21  information with respect to what Dr. Teaf really had to say

22  about these statistics from Adair County.  I'll give you a

23  moment, if you want, to read this.  But the importance is down

24  there at the last paragraph where he says, "No, that's not what

25  I said, I phrased it the way I did for a specific reason.  I

1   believe that the link is there between campylobacter and

2   chickens, and the application of that was exposure to human

3   beings, the bacteria levels in the Illinois River in Adair

4   County and the possibility" -- not probability, not

5   likelihood -- "the possibility that it is related, but I don't

6   believe it's been ferreted out in sufficient detail."

7           I would suggest, Your Honor, if it's not been

8   ferreted out in sufficient detail for Dr. Teaf, he shouldn't be

9   opining on it before this Court.

10          Your Honor, you did bring up a point that he is a

11  toxicologist, and that does give him a certain level of

12  scientific knowledge, but I just fail to see where the

13  toxicology is playing any part or any role in his analysis.

14          What he did in this case, what he really did, was he

15  simply read articles written by other people.  He glanced at

16  the state water statistics, and that's about it.  He talked to

17  some of their experts.  And from that, he starts opining on

18  topics of which he is unqualified.

19          After the county statistics on Adair County, he tries

20  to rely on Dr. Harwood and Dr. Olsen.  I'm not going to address

21  those.  Your Honor has dealt with those today.  Obviously,

22  those aren't lifelines available to him any longer.

23          He tries to rely on a TMDL analysis that he

24  performed, he says he performed, in which he concluded that 40

25  percent of the fecal coliform from animals in the IRW was from

386

1   poultry.

2           The problem with that analysis is that he didn't do

3   any kind of fate and transport.  So while that may be what

4   comes from the animal, does not demonstrate in any way that's

5   what got into the waters of the IRW.  He did no analysis on

6   that, as slide 9 demonstrates.

7           We have his testimony there where he -- skipping down

8   again to the bottom:

9           "So there was no fate and transport element to your

10  work?"

11          The answer was:  "No."

12          Page 276 of his deposition.

13          He finally resorts to something again, Your Honor, we

14  heard quite bit about at the PI hearing, this concept of viable

15  but not culturable.

16          And if we could turn to slide 4.  This is really what

17  he's saying.  The plaintiffs have conducted hundreds of tests

18  for campylobacter and salmonella, and they didn't find the

19  bacteria in the vast majority of the samples.  Nonetheless,

20  Teaf intends to testify to the Court that the Court should

21  assume that these negative samples really did contain

22  campylobacter and salmonella, but were in this viable but

23  nonculturable state.

24          Seems this analysis, Your Honor, cannot survive

25  Daubert because there's no way to determine an error rate to

1    such an approach.  We could neither prove nor disprove that a

2    bacteria cell that one can't see, one can't culture really is

3    there and it really is not only there, but it's of a specific

4    origin and type associated with poultry.  That's what Dr. Teaf

5    would have us accept.

6           Now, the National Academy of Sciences has written on

7    this very topic of viable but not culturable, and it's on slide

8    5, and they talk about in this first bullet that it is a

9    concept that is out there in the scientific arena, and these

10   are generally injured bacteria, probably stress from water,

11   predation, ultraviolet rays and the like, and that -- but that

12   they can be identified from samples using various techniques,

13   and they say here biochemical, immunological and nucleic acid

14   and molecular techniques.

15          Again, skipping down to the bottom of the sheet here,

16   the National Academy of Sciences states, "It is important to

17   note that the environmental and public health significance of

18   injured bacteria, especially those that are viable but not

19   culturable, remains controversial and uncertain."

20          So while there may very well be bacterial cells that

21   are there and that we can't culture, that are there that we

22   can't identify, there's absolutely no reason to jump to the

23   conclusion, as Dr. Teaf does, that these are -- that if we

24   could culture them and we could identify them, that they would

25   be pathogens associated with poultry or poultry litter.

388

 1          Your Honor, one of the fundamental things, steps that

 2    the State failed to do in this case -- and this is in the

 3    bacteria case -- is to test further.

 4          Now, on slide -- I believe it's slide 8, this is a

 5    recitation from Dr. DuPont's expert report of the various

 6    things that scientists can do to attempt to recover pathogens

 7    from water.

 8          And I can't begin to explain all of these to

 9    Your Honor.  Dr. DuPont, of course, could.  But these are more

10    sophisticated culture techniques, molecular culture techniques,

11    techniques involving different media that have been identified

12    by the scientific community as further steps one can take

13    besides simply taking ordinary, run-of-the-mill regulatory

14    water samples.

15          If you're really trying to find out whether

16    salmonella or campylobacter is in the water, you would take

17    these additional steps and you would try to determine if they

18    are present.  The State has failed to do that.

19          I asked Dr. Teaf in his deposition about these

20    techniques, and on slide 6 and 7 we have his answer.  Actually,

21    the first question was asked by John Elrod.

22          Now -- said to Dr. Teaf, "Now, what would be the

23    method, the more sophisticated method to test for campylobacter

24    that the State of Oklahoma did not use, if there is one?

25          "I'm not familiar with that."

1          Then he gave some further testimony down below I'll

2   give Your Honor.  I won't read it to Your Honor.  You can read

3   it if you wish.  But it's clear when you read his testimony, he

4   doesn't have a clue about this.  He doesn't know what these

5   sophisticated methods are.  He doesn't know how one goes from

6   the run-of-the-mill water testing to these techniques that are

7   designed to pull out the viable but not culturable bacteria if,

8   in fact, it's really there.  He doesn't understand those steps,

9   and he can't even identify the names of the tests.

10          The reason he can't -- again, I'm not trying to pick

11  on him personally.  I think he is simply someone out of his

12  area of expertise.

13          I know that the plaintiffs will say, oh, well, yeah,

14  but he's really an expert on risk assessment.  It's not just

15  that he's an expert on toxicology; he's an expert on risk

16  assessment, so therefore, he gets to testify about anything to

17  do with risk.

18          And I would submit to Your Honor it's fine to be an

19  expert in risk assessment, but the risks that you're assessing

20  need to be in your area of specialty.

21          Your Honor, Dr. Teaf was in a case that I had last

22  year over in front of Judge Cauthron in Oklahoma City involving

23  Continental Carbon.

24          THE COURT:  Involving what?

25          MR. RYAN:  The name of the defendant was Continental

 1   Carbon Corporation.

 2         THE COURT:  Oh, the one up by Ponca?

 3         MR. RYAN:  Yes, sir.  And Judge Cauthron struck

 4   Dr. Teaf's testimony essentially for the same reasons I'm

 5   asking this Court to strike it.  She found that he really had

 6   not done the necessary work to establish the link in that case

 7   between air emissions and injury -- personal injury.  And his

 8   opinions were struck in that case under Daubert .

 9         THE COURT:  Didn't she certify a class in that case?

10         MR. RYAN:  She did certify a class, Your Honor.  It

11   was a settlement class, but yes.

12         Your Honor, the other two opinions that Dr. Teaf

13   opines on are cyanobacteria and disinfection byproducts.

14         The hour is getting late and the arguments are

15   identical.  There is no proof or establishment by Dr. Teaf that

16   either cyanobacteria or disinfection byproducts in the water

17   are caused from poultry litter.  The link simply is not there,

18   and I won't waste Your Honor's time repeating those arguments.

19         If there's any questions you have, Your Honor, I'll

20   be happy to try to answer them.

21         THE COURT:  I don't believe so.

22         MR. RYAN:  Thank you.

23         THE COURT:  Mr. Bullock.

24         MR. BULLOCK:  I always get them at the end of the

25   day, one of the privileges that I have.

1          Let me first address this question of Dr. Teaf's

2    qualifications.  The Court will recall that contrary to the

3    defendants' statements, he has testified as an expert on these

4    matters.  He testified in this court without a challenge as to

5    his qualifications from the defendants; albeit they challenged

6    his conclusions, but they did not challenge his expertise

7    during a hearing where they felt quite free to make -- to pose

8    Daubert challenges to other experts.

9          As the Court notes, he's a toxicologist and has been

10   a risk assessor since 1983.  And as he testified in this court,

11   he has broad and extensive experience with a variety of risks,

12   and that includes microbiology -- biologic risks involving

13   microbes.

14          THE COURT:  Does biologic risk fall within the

15   general category of toxicology?

16          MR. BULLOCK:  Yes, it does.  In fact, the defendants'

17   brief, much as Mr. Ryan progressed today, by the time that they

18   get to their reply, their definition of Dr. Teaf's lack of

19   experience -- and you'll find this on page 2 of their brief --

20   gets down to Dr. Teaf had not devoted a single day of his

21   professional life to the study of poultry, poultry litter or

22   activities and conditions associated with land application of

23   poultry litter.

24          Until he got in this case, that's true.  But I do not

25   believe in any fashion that that is an appropriate limitation

1    under Daubert as to an expert witness.

2           The question, of course, is whether he's -- whether

3    he has the experience to assist the Court and is applying

4    accepted methods and the expertise to opine on the subject

5    matters that he's opining on.

6           As defendants would have it, in fact, most of their

7    witnesses including, for instance, Dr. DuPont, to whom they

8    rely a great deal both in their brief and in argument here

9    today, he didn't testify as to any such experience and yet

10   feels free to opine on these issues.  And so I submit to the

11   Court that there's really no real question as to his expertise.

12          But what we come down to first is the question of

13   bacterial risk.  Now, as defendants would have it, until we

14   find the salmonella -- and they have some -- or the

15   campylobacter, they have some level that they imagined it needs

16   to be found in before there is a risk in these waters.

17          In fact, Mr. Ryan, in his argument, admitted that

18   there may be a risk, but falls short somehow, he believes, may

19   be a risk is different than there being a risk.  I always

20   thought of a risk as being the maybe, and it is redundant to

21   say there may be a risk.  Because at least on some level -- and

22   I think the proof is greater than this and that the science is

23   stronger.

24          But to some extent, when I think of the issues that

25   we're facing with the bacteria levels in this river, the

1  question which anyone must ask when you see these levels and

2  you understand, as Dr. Teaf will inform the Court, you

3  understand what the various levels are, the risk-based levels,

4  your -- the question for all of us is, is there a significant

5  risk to human health.  And for that, we use the water quality

6  standards.  They are the overwhelming consensus, scientific

7  consensus which continue to this day.

8         And while it is true that the EPA and other

9  scientific bodies continue to look at and reassess those and

10 try to determine how they can be more exact and still serve

11 their purpose, they remain today the scientific consensus.

12 And it would be absolutely -- it is a radical proposal to

13 propose that this Court find that when those are exceeded,

14 there is not a significant risk to human health.

15        That -- the Court would have to go against all of the

16 prevailing scientific consensus to find that because -- but

17 risk, to me, it reminds me of when we were young and we liked

18 to jump off of high things into deep water.  And over the

19 years, they've come and they have posted the signs, do not

20 jump.  But the reason why we were warned not to do that -- now,

21 I've got to tell you, I did that up on Tenkiller; and during

22 that ancient time, you could still see the bottom of Tenkiller.

23        THE COURT:  Was the sign there?

24        MR. BULLOCK:  No.  Today perhaps there should be,

25 because when you jump into water where you can't see the

1  bottom, there's a risk to human health.

2        What the defendants would have you do is order that

3  the sign be removed to say that there isn't; because no one has

4  proven that the rock is there, that the risk should be

5  disregarded by the Court.  And that neither makes good science

6  nor good sense.

7        Now, the reason why a risk assessor uses these water

8  quality standards, and what Dr. Teaf has testified to this

9  Court, is because bacteria risks have turned to be more

10  elusive.  He depends on -- Dr. Teaf does not present himself as

11  a microbiologist.  He depends on Dr. Harwood's opinions,

12  opinions which haven't been challenged in this case in terms of

13  the question of viable but not culturable, and of the other

14  issues in terms of the risks of salmonella and campylobacter

15  being present when you have the -- the risk levels.

16        So when the defendants move to strike on the basis

17  that Dr. Teaf shouldn't be allowed to testify as to the risk,

18  they are in error there.  But that they should not be allowed

19  to attack him from giving evidence which -- where we provide an

20  independent foundation for part of his opinion.

21        And so at the point where you have that evidence,

22  Dr. Teaf can talk about the risk.

23        I want to touch on a subject where I think that our

24  advocacy at the preliminary hearing clearly failed and which

25  this Court and the Court of Appeals both bought an argument

1   that the defendants offered.  And that was that there is

2   relevance to the -- both in terms of causation and perhaps risk

3   as to the fact that there are other rivers and a good number of

4   river segments in Oklahoma outside of the IRW which are

5   polluted.  And this Court, following their lead, found that

6   that was some evidence as to causation.

7        I urge the Court that you should rethink that, and

8   part of the basis of rethinking it is Dr. DuPont.  Dr. DuPont,

9   when I asked him, I said, does the -- and it's referred to in

10  our brief and quoted there.  I asked him, does the fact that

11  other rivers in Oklahoma are polluted with -- have high

12  bacterial levels, does that tell you anything about the cause

13  of bacterial pollution in the IRW?

14       Dr. DuPont, one word:  No.

15       I asked him, does it tell you anything about the

16  risks of recreating in the IRW?

17       Dr. DuPont's answer?  No.

18       And logically, that is true when you think about it.

19  Causation, as we've seen in this case, and as the Court has

20  heard a great deal, is a complex matter in any watershed.  What

21  are the possible sources?  What are the possible transport

22  mechanisms?  And so where does it come from?  How does it get

23  to the water?

24       And those need to be examined individually in a

25  watershed.  To say that Watershed A is polluted by bacteria,

1    therefore, from a feed lot; therefore, the bacteria level in

2    the next river is from a feed lot would make no sense.  And the

3    reverse of that logic makes no sense.

4         THE COURT:  It's an interesting question, because

5    surely you're right if you look at it within that scope, but

6    when one considers the burden of proof in a preliminary

7    injunction, is it not relevant to mention, because there was

8    testimony at that time, of similar or higher levels in other

9    waterways in Oklahoma that did not have the presence of

10   poultry?

11        In terms of reflecting on whether or not the

12   plaintiffs had met the heavy burden on the preliminary

13   injunction, is that not relevant?

14        MR. BULLOCK:  Well, the heightened standard of review

15   and what the burden is on a preliminary injunction is one of

16   those things that I continue to struggle with, and that may be

17   part of the explanation for the Court's reliance on that.

18        What I'm suggesting to the Court, that in terms of

19   this phase of the case, that any relevance of that should

20   itself be given scrutiny because the science doesn't support it

21   in any fashion.

22        There are multiple sources for bacteria in the

23   environment.  This Court found that there were multiple

24   possible sources of bacteria in just this watershed.

25   Recognizing that perhaps you had some doubt as to whether

1  cattle or septic tanks were raised.  All of these other

2  causations were raised.

3        Well, then to leave this watershed that we've focused

4  on and to say that the pollution in other watersheds informs

5  this because one doesn't have poultry, another has maybe a bad

6  sewage plant -- you know, recently talking of risk, perhaps the

7  Court noticed all the swimmers in the Oklahoma river doing the

8  -- who got sick.  That wasn't poultry, I guarantee.  But

9  there's some other cause there, and that's just the importance

10  of sticking to the issues here and not getting diverted by what

11  I think is a canard.

12        THE COURT:  I think your point is correct.  I mean,

13  we have to focus on this particular watershed and in the

14  context of whatever burden is before us at the moment.

15        MR. BULLOCK:  Now -- so, the issue of risk seems to

16  me to be pretty clear, but it needs -- it clearly warrants

17  expert explanation, particularly in the face of challenges such

18  as we've seen here where you get into the question -- the

19  defendants raise the question of is there risk if you don't

20  find campylobacter or salmonella or don't test for it.

21        As I said, clearly the overwhelming scientific

22  consensus is that you don't have to find those for there to be

23  bacterial risk.  In fact, there's good reason to question

24  whether or not they still might be there.

25        So that risk is clear.  Dr. Teaf should be allowed to

1  testify as to that risk.

2       Now, the other question that they raise is the

3  question of causation, that once you get past the concept that,

4  under the water quality standards, the pollution levels in this

5  river pose a risk, defendants then move to, well, Dr. Teaf says

6  it's poultry and there's -- he can't testify as to causation.

7       And Dr. Teaf really offers two things in what is --

8  two facto ids, I would say, or two facts which are important,

9  albeit in and of themselves, they don't prove causation, but

10  they're facts or opinions which are admissible and relevant.

11       First of all, the Court needs to understand that the

12  issue of causation in this case as to bacteria, as it is with

13  phosphorus, those are a -- we intend on proving it with a

14  circumstantial case.

15       Included in that circumstantial case is the fact that

16  every government agency -- and multiple have looked at this

17  issue -- have found that poultry is a cause of the bacterial

18  pollution in this watershed.  That includes the USGS, the

19  forest service, agencies in Arkansas and agencies in Oklahoma.

20  All independent of our evidence here.

21       And we have the basic physics of the watershed, the

22  karst geology, the thin soil, the amount of bacteria thrown

23  onto those soils.  There is where Dr. Teaf provides part of

24  that causation case, and that is he performed what amounts to a

25  mass balance, or the TMDL part of figuring out how much of the

1  full bacteria load of the IRW comes from poultry.

2         Now, he doesn't testify as to the geologic forces and

3  the hydrologic forces which transport that bacteria into the

4  water.  We understand that for Dr. Teaf, a risk assessor, to be

5  able to testify that this is poultry bacteria, there's other

6  parts of that circumstantial case which need to be filled out.

7         Because even though the TMDL process, which as you

8  recall, that was the way the defendants initially slipped the

9  issue of other watersheds into the record at the PI, that is

10  the way that process is done.  It is -- they figure out the

11  bacteria loads in a watershed, and from that, the science is

12  that that informs them as to causation.  And so they write the

13  TMDL based upon those bacteria loads.  That's the way it's

14  done.

15         But that's only part of our causation case, and we're

16  not presenting here that that is the sum total.  And Dr. Teaf's

17  TMDL evidence will not rest -- that is not the sole evidence on

18  which he will be giving his testimony.

19         The other issue that is raised that Dr. Teaf

20  contributes, I think, is the data from the health departments

21  in terms of the incidence of disease.

22         I suggest to the Court that that is a relevant,

23  probative fact; albeit standing alone would not prove

24  causation, but it is a fact which is consistent with our theory

25  and, therefore, continues to fill out the picture.

1              It certainly would be considered relevant if there

2    was no incidence of disease in these counties.  If they had

3    zero reports, under defendants' theory, that would be a

4    relevant fact.  The fact that this is a consistently high

5    incidence of disease, particularly in an area where a great

6    number of people depend on groundwater, groundwater which has

7    been found to be polluted, makes that relevant and admissible

8    evidence.

9              To the extent that -- and Mr. Ryan jumped over the

10   issues involving the cyanobacteria and also the disinfection

11   byproducts.  It appears to me that they have reduced their

12   objections to Dr. Teaf's testimony on those subjects by saying

13   that it was -- that those subjects were the same as the

14   bacteria, that they have reduced their arguments there to the

15   issue of causation.  And if that's true, I will address only

16   the causation piece if --

17             THE COURT:  Mr. Ryan, would that be accurate?

18             MR. RYAN:  That's the primary position, Your Honor.

19   We identified all of our positions in our paper.  I didn't

20   think Your Honor wanted me to go over the papers that we filed.

21             THE COURT:  So --

22             MR. RYAN:  I would say our principal position on the

23   disinfection byproducts and the cyanobacteria is a simple total

24   lack of any evidence whatsoever that those conditions resulted

25   from poultry litter from these defendants.

1          MR, BULLOCK:  In terms of the causation of both of

2    those, those are -- as to the risk, Dr. Teaf will be

3    testifying.  Dr. Teaf is not our witness as to the causation of

4    those.  So his testimony should not be excluded on the basis

5    that he has not proven causation.

6          We will lay a foundation of causation for both the

7    nutrients which caused -- which contribute to the cyanobacteria

8    risk and a foundation as to the causation or the source of the

9    algae and the other matter, which when hit with the -- when

10   taken into a water treatment plant into a -- to be made into

11   drinking water when it's hit with the chlorine creates the

12   disinfection byproducts.

13         So we will prove the causation of those independent

14   of Dr. Teaf, and then Dr. Teaf will pick it up as to the intake

15   pipe or talk about the -- what is known as the likelihood of

16   formation of the disinfection byproducts.  He will pick it up

17   there.

18         The proof that the poultry industry in this

19   watershed, and particularly the individual companies whom we

20   have sued here, the proof as to their liability will be

21   provided elsewhere.

22         THE COURT:  Cyanobacteria, that's a new one on me.

23   Blue-green algae.  Any comments there?

24         MR. BULLOCK:  Unless the Court has some questions.

25         THE COURT:  Could you explain that?

1          MR. BULLOCK:  I can explain what that is.

2          THE COURT:  Because my understanding is that he

3    opines as to the risk related to cyanobacteria.

4          MR. BULLOCK:  Correct.  That blue-green algae is a

5    particular type of algae which is caused in warm nutrient-rich

6    waters is where it grows.  And it can pose significant health

7    risks.  About 24 percent of the samples gathered showed

8    moderate and a few -- a high risk in terms of cyano- -- the

9    cyanobacteria.  I'll get the pronunciation.

10         THE COURT:  I've got the Okie pronunciation of

11   "Daubert," so you are forgiven.

12         MR. BULLOCK:  Judge, it's a whole article on the

13   scientific -- or the admissibility of the phrase itself.

14   But -- or how you pronounce it.

15         THE COURT:  It's just 702.  What's your view there?

16   It's just a further refinement, right?

17         MR. BULLOCK:  Right.  That's the reason why we've

18   been here two days, or will be.

19         THE COURT:  Thank you Supreme Court.

20         MR. BULLOCK:  But a moderate risk -- and it's in our

21   brief, but a moderate risk of cyanobacteria is the potential

22   for long-term illness.  And --

23         THE COURT:  Do we have evidence of impermissible

24   levels or exceedances of cyanobacteria?

25         MR. BULLOCK:  What we have is that 24 percent of the

1  samples were -- that have been examined -- of the samples that

2  have been gathered, showed at least a moderate and some a high

3  risk of cyanobacteria in the waters of the IRW.  And that's a

4  very high level, and that is a risk that we believe that the

5  Court should address.

6          THE COURT:  Did he we have a water quality standard

7  with regard to cyanobacteria?

8          MR. BULLOCK:  The source of those standards is the

9  World Health Organization, and that's part of what Dr. Teaf

10  will testify is what their standards are.  And that's the

11  accepted standard.

12          THE COURT:  Is the WHO's standard something

13  acceptable or accepted regularly by federal district courts in

14  the United States?

15          MR. BULLOCK:  Well, it's regularly accepted within

16  the scientific and regulatory community.

17          THE COURT:  Well, but I guess the question, then, as

18  a bootstrap article, has any federal district court accepted it

19  as a generally accepted scientific standard?

20          MR. BULLOCK:  I have not seen that case, but I

21  haven't seen one where it was presented either.  And, of

22  course, at least as to our RCRA cause of action, the question

23  that it may present an imminent substantial risk to human

24  health, the standards of the WHO would be eminently admissible

25  for the Court to consider in terms of making that judgment.

1              THE COURT:  What other bacterium have exceeded water

2    quality standards other -- let's set aside WHO water quality

3    standards just for the moment.  I take it -- the federal

4    government, obviously, has water quality standards.

5              MR. BULLOCK:  Right.

6              THE COURT:  What water quality standards have been

7    exceeded here?

8              MR. BULLOCK:  Those are the ones -- and we covered

9    that -- those are the enterococcus and the E. coli.  And the

10   State also has a water quality standard for fecal coliforms.

11             THE COURT:  My understanding, having read quite a bit

12   in this case, was that the State of Oklahoma had not found

13   exceedances in the IRW.

14             MR. BULLOCK:  That's not correct, Your Honor.

15             THE COURT:  All right.

16             MR. BULLOCK:  They have found numerous exceedances on

17   -- within this watershed.  I don't remember exactly how many

18   sections there are, but most of these three rivers have been

19   determined to have exceeded.

20             THE COURT:  In areas of recreation?

21             MR. BULLOCK:  Pardon?

22             THE COURT:  In recreational areas --

23             MR. BULLOCK:  Yes.

24             THE COURT:  -- on the IRW?

25             MR. BULLOCK:  Yes.  The Oklahoma water quality

1    standards also have narrative standards which we believe -- and

2    it's clear are applicable also to these waters --

3            (Off-the-record discussion.)

4            THE COURT:  Anything else?

5            MR. BULLOCK:  Well, let me repeat that for the

6    record.  I'm not sure whether the court reporter gets

7    comments -- side bars.

8            THE COURT:  No.

9            MR. BULLOCK:  That the Oklahoma water quality

10   standards, the narratives would -- do cover the cyanobacteria,

11   and so there's a water quality violation there.

12           THE COURT:  You said the narratives.

13           MR. BULLOCK:  Well, there's a numerical standard and

14   then there's a narrative standard.  The narrative standard

15   describing the risks to human health.  And the cyanobacteria

16   would be covered by those -- by that.

17           THE COURT:  Does it specifically enumerate

18   cyanobacteria or just generally references risk?

19           MR. BULLOCK:  No, it is a description of a risk-based

20   standard, not particularly enumerating the cyanobacteria.

21           MR. PAGE:  Your Honor, if I may just briefly.

22           THE COURT:  Yes, sir.

23           MR. PAGE:  The narrative standard -- I can't quote

24   off the top of my head, but it says essentially that the waters

25   shall be free of toxic substances.  And that particular

1  standard is used by the Corps of Engineers to evaluate the

2  water, such as on Lake Tenkiller.  It's the Oklahoma narrative

3  standard.

4          THE COURT:  Anything else?

5          MR. BULLOCK:  Judge, I guess there's some concern as

6  to whether the defendants are continuing to urge that the -- on

7  the disinfection byproducts that there's not a significant risk

8  to human health due to the level of those found.

9          There are two standards as to those.  The first is

10 the maximum contaminant load.  And that is not a risk-based

11 standard; that is a compliance standard that was established

12 based upon, in part, the risk, but also issues of technology

13 and cost of making the necessary repairs to water treatment

14 plants.  And so a type of political compromise was reached in

15 term of setting the MCL standard.

16         You also have the maximum contaminant load goals.

17 Those are lower, and those -- that is the risk based standard

18 where when that is exceeded, there is recognized a significant

19 risk to human health, albeit the water company is still allowed

20 to supply the water.

21         And so Dr. Teaf will be testifying as to the fact

22 that there are violations of both standards within the IRW.  Of

23 course, far more significant violations of the MCLGs than of

24 the MCLs.  But we have both violations, and they also pose a

25 risk to human health.  And as I said, we will prove the

 1  causation of that polluted water getting to the intake pipe

 2  through other witnesses.

 3          THE COURT:  Could you explain to me, because these

 4  are new to me as well, the HAA5s, the haloacetic acids.  Those

 5  are disinfection byproducts --

 6          MR. BULLOCK:  Right.

 7          THE COURT:  -- from treatment at wastewater treatment

 8  plants, I take it.

 9          MR. BULLOCK:  Right.

10          THE COURT:  Do you know anything more about those?

11          MR. BULLOCK:  I know the basics of it, Judge --

12  actually, these are water treatment -- freshwater treatment.

13          THE COURT:  Thank you.

14          MR. BULLOCK:  When a water -- freshwater treatment

15  plant will intake water which has a high organic content in

16  order to -- and largely that's algae, but that's not all it

17  is.  When those go into the treatment to be purified, one of

18  the things that they do is hit it with a high dose, in this

19  case most generally, with chlorine.  You can also hit it with

20  bromines and create another group of disinfection byproducts.

21  But both are recognized as posing a risk of cancer.

22          THE COURT:  Is it clear that both are used in water

23  treatment plants that dump into the IRW?

24          MR. BULLOCK:  Yes, sir.

25          THE COURT:  I say "dump into."  Obviously it would go

```
 1   into the freshwater system and then eventually find its way

 2   into the wastewater system, correct?

 3              MR. BULLOCK:  Correct.

 4              THE COURT:  Ms. Burch says no.

 5              MR. BULLOCK:  Well, we'll let her do it.

 6              THE COURT:  Please.  I'm curious.

 7              I'm sorry, it's Ms. Porter -- I'm sorry, Foster.  I

 8   noticed all of the written materials say Burch.

 9              MS. FOSTER:  I just officially changed in the court

10   on Friday -- or Monday.

11              THE COURT:  Congratulations.

12              MS. FOSTER:  I want to be accurate there.  Thank

13   you.

14              Basically what we're talking about are public water

15   supplies located in the watershed that take their water -- they

16   have a water intake from either the river or Lake Tenkiller,

17   and it goes into the water treatment plant where it's treated

18   with chlorine in this instance.

19              In the process of treating the water with chlorine,

20   there are organics in the water.  The reaction causes the

21   formation of disinfection byproducts.

22              THE COURT:  I see.

23              MS. FOSTER:  Then that is supplied to consumers,

24   whoever rely on that water supply.

25              THE COURT:  Now, my understanding, too, here, isn't
```

 1    some of the water that actually winds up in the Illinois taken

 2    from Hudson and then to various residences in the area?

 3          MS. FOSTER:  Not that I'm aware of.  Hudson gets

 4    transferred into another -- I think into Fort Gibson, if that's

 5    what we're talking about.  But the Illinois River -- the public

 6    water supplies that are used in the Illinois River do serve as

 7    purchase water supplies for some other locations, but I don't

 8    think Hudson has anything to do with it.

 9          THE COURT:  There's no import from other basins into

10    the IRW?

11          MS. FOSTER:  Not that I'm aware of.  There may be

12    some, but not in the ones we're talking about here.  The ones

13    we're talking about are water supplies that actually take their

14    water from this particular watershed, treat it and have issues

15    with DBPs?

16          THE COURT:  I'm getting somewhat far afield, but I

17    was just curious.

18          All right.  Anything further?

19          MR. BULLOCK:  No, Your Honor, not unless my

20    co-counsel have some more to add.

21          THE COURT:  Mr. Ryan.

22          MR. RYAN:  Very briefly, Your Honor.  The fact that

23    Dr. Teaf has testified on one occasion about a microbe is

24    hardly grounds and qualifications for him to be testifying at

25    length before this Court on indicator bacteria and pathogenic

410

1   bacteria, specifically campylobacter and salmonella, of which

2   he knows nothing.

3          Now, the plaintiffs suggested that the defense wanted

4   to throw out the water quality standards prevalent in the

5   United States.  That's not the case at all.

6          I think everyone who is knowledgeable on this topic

7   would say that these water quality standards are not very

8   good.  When they started off, the standard was simply fecal

9   coliform.

10         Then it was discovered, well, the problem with that

11  is there are fecal coliforms that -- rather, coliforms that are

12  not from animals, not from warm-blooded animals.  So they

13  tossed that out.

14         The EPA continues to study it, and recently has said

15  they don't think fecal coliforms is a very good standard for

16  freshwater.  They've recently said they don't think

17  enterococcus is a very good standard for freshwater.  They

18  think it's okay for marine water, but for freshwater they think

19  E. coli is the best, but it's not very good.  And WHO is

20  working on improving those standards daily.

21         But we're not suggesting to this Court that you

22  advocate the water standards in the United States.  They are

23  what they are.  They're not very good, but they are what they

24  are.  They are what regulators use.  But they don't source

25  bacteria.

1          And while I appreciate Mr. Bullock's discussion of

2   jumping into water when you can't see the bottom and all that

3   and the risk associated with it, that really doesn't touch on

4   the point of that there's absolutely a complete dearth of proof

5   in this case by the plaintiffs demonstrating that the bacteria

6   that they think is there, which isn't proven -- you understand

7   we can't culture it and we can't find it, we have to take

8   somebody's word it's viable but not culturable, but it's there,

9   kind of like the Emperor's new clothes.

10          But if we could culture it, which they can and chose

11   not to by more sophisticated means, but if we could, then it

12   would be from these defendants.  There's absolutely no proof

13   whatsoever in this record on that point.  And Dr. Teaf simply

14   cannot supply that missing element to the State's case.

15          THE COURT:  That's why I asked Mr. Bullock in terms

16   of whether the water quality standards have been exceeded.  And

17   he says yes with regard to E. coli and enterococcus.

18          MR. RYAN:  The water quality standards for indicator

19   bacteria have been exceeded.  No question about that.  If I led

20   you astray, I apologize.  No question.

21          I'm drawing the distinction now, Your Honor, between

22   indicator bacteria, which are not pathogenic, they're not

23   harmful.  Everybody agrees.  Dr. Teaf agreed on that.  They're

24   not harmful.

25          So indicator bacteria, when tested in these waters

1    and throughout the entire state of Oklahoma, show exceedances.

2    No question about it.  But the problem is, their obligation

3    here is not to just show indicator bacteria; they have to show

4    that there's harmful bacteria, bacteria that harms human health

5    is in these waters.  They haven't done that.  And they most

6    certainly haven't shown that if they could ever find those

7    harmful bacteria and culture them that they would be shown to

8    be, A, associated with poultry or, B, poultry litter.  That's

9    simply a big hole in the State's bacteria case, and one that

10   Dr. Teaf simply cannot -- he simply cannot supply for the

11   State.

12            You know, Mr. Bullock talked about how ODEQ and the

13   health department and whatnot had found violations.  That's

14   just simply not true.  Again, as to bacteria, not pathogenic

15   bacteria.  Yes, on indicator bacteria.

16            But this is the State bringing this suit.  And the

17   State itself has not closed these waters.  The State itself has

18   not found there to be a danger to human health; and yet the

19   State is the plaintiff in this case, wanting the Court to do

20   it.

21            It seems to me it would be more appropriate for the

22   State to make that finding in the first instance instead of

23   asking this Court to make its own finding.  I'm sorry,

24   Your Honor.  I can tell you have a question.

25            THE COURT:  Well, understanding that potential

 1   weakness, I suspect, plaintiffs talk about these other problems

 2   with regard to byproducts of disinfection and cyanobacteria.

 3   Your response there?

 4            MR. RYAN:  I'm going to ask Mr. Jorgensen to respond

 5   to that, Your Honor.  I know about as much about cyanobacteria

 6   and disinfection byproducts to fill a small jigger probably.

 7   It wouldn't be fair to the Court to listen to me talk about

 8   those topics.  I have about as much knowledge as Mr. Bullock

 9   displayed.

10            THE COURT:  The power to have large -- the power to

11   order.

12            MR. RYAN:  I'll sit down, Your Honor, but let me just

13   briefly state that this idea that Arkansas and Oklahoma and the

14   geologic service have found violations of pathogenic bacteria

15   in these waterways is just not a statement founded on fact.

16   There's been no such finding.  So I take issue with, of course,

17   what Mr. Bullock stated in that respect.

18            There is no standard of the World Health

19   Organization -- I do know that much -- on DBPs and

20   cyanobacteria that are applicable in this case.  I think

21   Ms. Burch stated it correctly.  But if I might, I'd like to --

22            THE COURT:  Said that there are no standards.

23            MR. RYAN:  Well, there's the very general standard

24   that she stated about, you know, we should have clean waters,

25   but there's not a standard such as we have with enterococcus

```
 1  and E. coli.  There's not a measurable standard.

 2           THE COURT:  I think her reference was to the Oklahoma

 3  Water Quality Standards and the narrative standard within that.

 4           MR. RYAN:  I think she's absolutely right on that.

 5           THE COURT:  Mr. Jorgensen.

 6           MR. JORGENSEN:  Your Honor, I think we're blending a

 7  little bit the McGuire and Teaf, but they're in the same group

 8  for a reason.  So with that, I'll go ahead and answer your

 9  cyanobacteria question --

10           THE COURT:  Please.

11           MR. JORGENSEN:  -- and then stop, and we can pick up

12  with McGuire from there.

13           THE COURT:  All right.

14           MR. JORGENSEN:  So in the Dr. McGuire challenge,

15  plaintiffs -- one of the challenges they bring against

16  Dr. McGuire is they say Dr. McGuire is not a toxicologist.  He

17  honestly and candidly admitted at his deposition over and over

18  again, I'm not a toxicologist, I don't have a degree in human

19  health.

20           But this argument that Mr. Bullock has put forward

21  shows exactly why the motion against Dr. McGuire should be

22  denied.

23           Dr. McGuire, as you probably know from reading the

24  materials, for more than a decade ran the largest drinking

25  water treatment system in America.  He provided safe drinking
```

 1  water to 16 million people in Southern California.  That was

 2  his job, to run that system.  And cyanobacteria is part of that

 3  process.

 4          So here's some of the points he makes in his report.

 5  And you'll find them, Your Honor, in case you're interested, on

 6  pages 79 to 87 of the McGuire report.

 7          So the Safe Drinking Water Act requires EPA to

 8  research and regulate contaminates that pose a risk to public

 9  health in waters, raw waters that are going to be used for

10  public drinking, that are going to be treated and become part

11  of the drinking water supply.

12          And he points out, because he sat on these

13  commissions, that EPA considered whether or not to regulate

14  cyanobacteria and other freshwater algae and their toxins.

15          Now, this is important to point out, Your Honor.

16  Cyanobacteria and blue-green algae are not the same thing.  I

17  think it might have been said to you a moment ago that they

18  were the same thing, and they're not, and that's in

19  Dr. McGuire's report.  They're, in lay terminology, frequently

20  used interchangeably, but it's not correct.

21          And one of the criticisms that Dr. McGuire offers of

22  Dr. Teaf is that he doesn't -- he evidences a lack of knowledge

23  about cyanobacteria and the treatment of it in drinking water

24  supplies by making this mistake.  And this is, again, one of

25  the attacks plaintiffs bring against him.  You'll see in their

1    motion they say, again, how could he talk about human health,

2    he's not a toxicologist.  But he says, but I am a man who

3    treats drinking water supplies, and this is the context where

4    this comes up.

5            So he says on multiple occasions, EPA -- and he lays

6    this out, the dates the EPA did that -- studied whether or not

7    to regulate cyanobacteria in drinking water.  And specifically,

8    it's not -- the cyanobacteria, it's kind of an odd name,

9    Your Honor.  They're not actually bacteria -- they're not

10   actually algae; they're a kind of bacteria.  They produce a

11   particular kind of toxin.  I think I just said that backwards.

12   They're not bacteria; they're a kind of algae.

13           But anyway, they produce a toxin.  It's not the

14   bacteria itself that is harmful; it's potentially -- what's

15   potentially harmful is microcystin, the substance that they put

16   off.

17           Again, as he explains, on multiple occasions, they

18   decided there was insufficient evidence that this was a human

19   health risk and should be regulated in drinking water.  That's

20   what the EPA decided.

21           THE COURT:  How long ago did they conclude that?

22           MR. JORGENSEN:  The last time -- he points out that

23   it's an ongoing process, and it has been done repeatedly.  The

24   last time was in 2001 and 2008 are the last two that he

25   references on page 80.

1          So then on pages 80 and 81 of his report, he goes

2    through the fact that the World Health Organization has issued

3    provisional guidance concluding that perhaps there's a risk

4    here, but there is no risk in -- or a standard in drinking

5    water systems.

6          Again, this is the criticism that Dr. McGuire brings

7    against Dr. Teaf.  And then again, the plaintiffs say, well,

8    how could he say that, he's not a toxicologist.

9          So Dr. McGuire, again, in these materials lays out

10   some material for you on cyanobacteria.  Mr. Bullock just

11   barely talked about this.  He talked about how in 23 percent of

12   plaintiffs' samples they found either cyanobacteria or the

13   material that puts off microcystin.

14         So Dr. McGuire points out that USGS did a survey of

15   1,150 lakes --

16         THE REPORTER:  Could you please slow down?

17         MR. JORGENSEN:  I'm so sorry to go so fast.  I'll do

18   that over again, just to make sure you got it.  So that

19   Dr. McGuire points out that the USGS did a survey of 1,150

20   lakes, reservoirs and ponds all around the United States.  And

21   essentially the background level that they found is 32 percent

22   of the samples.

23         Now, you've heard Mr. Bullock say, I believe, the

24   plaintiffs found 23 percent of the samples.

25         So again, one of the points that Mr. McGuire's making

1  as a criticism of Dr. Teaf is, you're below background.  Again,

2  the criticism comes to him, how can you say that, you're not a

3  toxicologist.  He doesn't need to be a toxicologist.  This is

4  the realm of treating drinking water.

5          So plaintiffs sampled Lake Tenkiller.  They found

6  very little.

7          And then the last point that he makes, and then I'll

8  stop here and allow plaintiffs to begin their McGuire

9  presentation, but Cooke and Welch claim that the normal

10  drinking water treatment processes that they don't screen out

11  microcystins, that they're ineffective, and so this risk of --

12  this risk that EPA said wasn't there or there was insufficient

13  evidence to decide that there was a risk, that it wasn't being

14  treated here.  And then he points out, I have treated drinking

15  water treatment all my life.

16          We learned at his deposition, at Dr. McGuire's

17  deposition, he's recently been awarded the top prize for

18  drinking water treatment professionals.  Essentially the Nobel

19  Prize of drinking water treatment professionals.

20          So his point is, that's just wrong.  I mean, I've

21  done this -- he said, I've done this all my life, and they are

22  wrong.

23          So that's a flavor of what we're about to get into,

24  but I hope it answers the question you had about cyanobacteria

25  and cyanotoxins.

1          THE COURT:  Thank you.  Let's take a short break, and
2    we'll be back.
3          (Recess.)
4          THE COURT:  Before we continue with regard to this
5    set of experts, I'd like to ask a question that's hopefully a
6    practical one.  It may lead to some efficiencies with regard to
7    the resolution of this set of experts.
8          Has anyone thought whether or not the trial in the
9    light of the damages ruling, the Cherokee Nation ruling, is
10    going to be jury or nonjury?  Because to the extent -- this is
11    my thought.  To the extent that Mr. Bullock has said that
12    Dr. Teaf will not be a causation or source witness as to these
13    matters but merely a risk witness, he stated that they intend
14    to prove causation and source by other means, and if this
15    matter is before the Court, then why can't the Court simply
16    deny these three motions in this set and weigh the testimony at
17    summary judgment?
18          I don't even know if Dr. Teaf is presented at summary
19    judgment in any respect, but -- and/or at trial.
20          MR. BULLOCK:  Judge, I think that as the case
21    currently stands, that might be true, but we are going to file
22    and have -- and are trying to get it done as quickly as
23    possible, a motion to reconsider that order.  We believe that
24    there are some fundamental errors in that, which it's not your
25    standard make your record, counsel.

1          THE COURT:  I understand.  You know, of course we're

2   not discussing it here, and I understand that there may be, and

3   was at the hearing, some dispute as to whether or not the

4   agreement was, although cooperative and although an agreement,

5   whether it was a cooperative agreement; but even if one were to

6   limit the statute on the State side and the law of the statute

7   on the Cherokee Nation side to water transfer, water ownership

8   agreements, you still have the retroactive standing problem, do

9   you not?

10          MR. BULLOCK:  Well, the focus of the motion, and I

11  can't -- we haven't come to a final on it, will be on the

12  Court's CERCLA claim.  Particularly the NRD damages would still

13  entitle us to a jury trial.

14          THE COURT:  Okay.

15          MR. BULLOCK:  So it's a trustee issue.

16          THE COURT:  Well, I've asked that question in

17  chambers:  Where are we in terms of a jury on CERCLA?  And I've

18  gotten -- no one has been able to tell me.  And, frankly, the

19  briefing wasn't very helpful in that regard either, mainly

20  because the issue wasn't raised in the briefing, right?

21          MR. GEORGE:  Correct, Your Honor.  We've been

22  wrestling, as the plaintiffs have, with the same question.  And

23  we have some research and tend to frame it up into a motion to

24  strike the jury demand.

25          Our research has taken us to the conclusion that as

 1   this case is currently postured, it is not a jury trial, it's a

 2   bench trial.  The matters are equitable as opposed to matters

 3   at law, so in keeping with the Court's comment about

 4   practicalities, we see some efficiencies in the direction that

 5   the Court has laid out.

 6           If the Court is interested in further briefing -- or

 7   I guess it would be initial briefing on the jury question

 8   issue, we could be in a position to file it promptly.

 9           THE COURT:  I want briefing to be thorough and well

10   thought out.  Obviously, I don't want any preliminary

11   briefing.  I've got enough briefs to look at, believe me.

12           But what are your thoughts with regard -- just to

13   give me a preview of things to come.  Because I have asked

14   these very same questions here around the courthouse, and no

15   one really knows.  We just don't have that many CERCLA cases

16   here.

17           MR. GEORGE:  True.

18           THE COURT:  Interestingly, we had one of the top

19   lawyers at the Department of Justice here last week from the

20   Environmental and Natural Resources Division who's been there

21   for over 30 years, I think she said 35 years, and she was

22   interviewing my father, who was the head of that division.

23   They're hitting their 100th anniversary here this year, and

24   interviewed him down in Judge Kern's chambers.  And I was

25   thinking, boy, I wish I could ask her this question, but,

1  unfortunately, the judicial ethics that have just recently been

2  revised and issued within the last week make it very clear it

3  is unethical to ask those questions, even if someone who knows

4  the answer, without getting you-all's approval.  So I couldn't

5  ask her the question.

6          So I'm glad, Mr. Bullock, you've raised it.  But

7  apparently you've come to the conclusion that there are still

8  jury issues with regard to CERCLA.

9          MR. BULLOCK:  Well, and particularly that there

10  should be -- and I'd like to see Mr. George's brief, and we'll

11  respond promptly the well thought out on that.  But I think

12  that before we start striking the jury trial and get ourselves

13  off the track that we ought to look at these two issues.  And

14  so that's -- of course, the Court is the one that ultimately

15  will make that call, but we want to be sure that before we get

16  off that track that the Court is informed as to the various

17  positions.

18          THE COURT:  Well, you understand why I ask the

19  question --

20          MR. BULLOCK:  I do.

21          THE COURT:  -- because if you're serious -- if both

22  of you were to agree that this is a nonjury matter -- and,

23  frankly, I've bounced around the idea of an advisory jury here,

24  although I've only used advisory juries in the context of

25  nonjury matters that had issues of fraud.  Advisory juries are

423

 1  very, very helpful in that situation.  We don't have a fraud

 2  claim here.  So I don't know that an advisory jury would be

 3  helpful, although you can think about that as well.

 4          MR. JORGENSEN:  Your Honor --

 5          THE COURT:  I'm sorry, Mr. Jorgensen.  In that

 6  regard, frankly, some of that thought that I've had is in self-

 7  interest because typically when you have a jury before you,

 8  lawyers don't dump documents like they do in a nonjury trial

 9  because you-all realize that jurors can only take so much.

10          So, Mr. Jorgensen.

11          MR. JORGENSEN:  Your Honor, I would be glad to answer

12  your question.  I had to give up my weekend to researching

13  this.  We think it is well thought out and well researched.

14          There's really three issues that you need to

15  address.  The first is as to Counts 4, 5 and 6 which are

16  remaining in an injunctive posture but without damages, if you

17  know what I'm talking about.  This is nuisance, nuisance and

18  trespass.

19          The Supreme Court has ruled repeatedly that in cases

20  where only injunctive relief is sought without damages, even

21  under nuisance, public nuisance and trespass, that there is no

22  right to a jury trial because under the 17th Amendment, of

23  course, you look to the right to a jury trial only attaches if

24  your claim is the kind that would have been tried at law in

25  1791 and injunctions were not.  So that is absolutely settled.

1              Then you've got Count 3, RCRA.  Under Count 3,

2    there's only a handful of cases, but they all go our way and

3    they all say collectively every case ever to address this

4    issues say -- says that RCRA did not exist in 1791 and there is

5    no jury trial.

6              THE COURT:  I think RCRA is very clear, from what

7    little I've looked at.

8              MR. JORGENSEN:  Exactly.  No jury trial under RCRA.

9              THE COURT:  They've only touched on CERCLA.  They're

10   focusing on CERCLA as I understand.

11             MR. JORGENSEN:  Let me move to that then.  On CERCLA,

12   of course, first you would have to reverse what I'm sure is a

13   well thought out and a lot of time into your opinion, you have

14   to reverse yourself on the Cherokee motion, reinsert the CERCLA

15   claims which have been dismissed.  There are none remaining in

16   the case.

17             At that point, if they were reinserted, we could

18   research that and quickly answer your question.  There is a

19   division in CERCLA law; some subsections of CERCLA are entitled

20   to a jury trial, and the Supreme Court has resolved that.  Some

21   subsections are not entitled to jury trial.

22             But I hate to skip ahead, both because I didn't

23   research that recently, that's just based on knowledge, and

24   because it seems to me unlikely that we're going to get there

25   because you have to reverse yourself first.

1          THE COURT:  Well, if you've studied my decisions,

2   I'll do it if I think it's warranted.  I have no pride of

3   authorship at all.  None.  I just prefer to be right.

4          MR. JORGENSEN:  I urge you not to do it when you're

5   right.

6          THE COURT:  Well, there's apparently a division of

7   opinion on that matter.

8          All right.  Well, let's plow on.

9          MR. BULLOCK:  I will be very brief because

10  Mr. Jorgensen really was getting into a preemptive strike in

11  terms of the McGuire Daubert motion, raising issues that, in

12  fact, were not raised as to Dr. Teaf testifying as to his

13  motion.

14          But first of all, let us be very clear:  There is no

15  motion pending before the Court that there are not -- or that

16  -- well, let me post it positively.  There are multiple

17  violations of water quality standards in this watershed, and

18  there has been no pleading filed or argument until today that

19  there are not.  The record is clear, there are.

20          So that ought to be made certain.

21          THE COURT:  Specifically, most clearly, the

22  violations that you point to are the most clear violations,

23  putting aside WHO standards -- I'm not sure I want to be the

24  first in the United States to adopt WHO standards, unless you

25  show me that I should.  The most clear violations are the

1   indicator bacteria.

2           MR. BULLOCK:  Correct.  And those are in the record

3   and are very clear.

4           So second of all, as to the violations of water

5   quality standards, in fact, there are signs posted on these

6   waters warning people of the risk.  And we haven't asked this

7   Court to close the river.  We've asked this Court to take the

8   steps necessary to clean up the river, which is a big

9   difference.

10          THE COURT:  Is that actually in the record here?

11          MR. BULLOCK:  What?

12          THE COURT:  Signs not to swim because of possible

13  bacteriological contamination?

14          MR. BULLOCK:  There is -- no, because it wasn't

15  raised in these, but there is testimony in the record,

16  particularly testimony from former Secretary Miles Tolbert

17  testifying about the posting of those signs.

18          We anticipate there will also be testimony from

19  Mr. Fite concerning the posting of the signs warning of the

20  risk.

21          THE COURT:  Of what?

22          MR. BULLOCK:  Of the risk of the bacteria loads in

23  this water.

24          THE COURT:  I just wanted to be clear.

25          MR. BULLOCK:  Okay.  Judge, I think that there's a

1  little bit of fast dealing here in terms of the issues of the

2  cyanobacteria and the water quality standards that were just

3  discussed.  That is where Mr. Jorgensen says that there's no

4  cyanobacteria in drinking water.

5          Our case is not based upon, and what we have been

6  talking about, is not based upon the cyanobacteria being in

7  drinking water.  It is the kids swimming in the lake, not --

8          THE COURT:  I don't think that was suggested --

9          MR. BULLOCK:  The standard is put up there, and the

10  statement was as to drinking water.  You might ask for that to

11  be put up again.  Now --

12          THE COURT:  I see.  Well, I had understood your

13  concern to be recreational.

14          MR. BULLOCK:  Right.  But the standards that

15  Mr. Jorgensen put up dealt with drinking water.  And I urge the

16  Court -- you know, we've already -- we have run into this issue

17  of the six-hour hold times under the drinking water standards

18  have somehow been imported universally to negate the

19  reliability of bacteria data generally.

20          Now what I'm seeing is that the defendants are trying

21  to get the Court to take another step down that slippery slide

22  in terms of taking drinking water standards and putting them on

23  the lake.

24          THE COURT:  I don't believe it was drinking water

25  standards.  It was, as you said, Clean Water Act, which is

 1  point source.  And you said --

 2          MR. BULLOCK:  Actually --

 3          THE COURT:  I believe there were some other standards

 4  outside of Clean Water Act.

 5          MR. BULLOCK:  Actually, I got it backwards.  The

 6  drinking water standards was a 30-hour hold time.  Somehow

 7  we've ended up with the point source level for six-hour hold

 8  times.  But that's a slippery slope.  The Court has gone

 9  there.

10          What I'm trying to warn the Court is to listen

11  carefully in terms of what standards people are talking about.

12  What Dr. Teaf is talking about are the standards for

13  cyanobacteria in recreation waters.

14          And then they can get into the issue of the fact that

15  there is some issue with the way that the microcystins can

16  survive through the treatment process.  That's another issue

17  that will be handled in McGuire perhaps.

18          THE COURT:  But just to be clear -- I don't know that

19  we need to do this, but just to be clear, you're not attempting

20  to use Teaf to show causation or source.

21          MR. BULLOCK:  Well, the causation piece of Teaf is

22  the TMDL which, as I said, that is one of the accepted methods

23  to prove causation or source, however you wish to say it.  But

24  that is but part of a more complex circumstantial case

25  regarding causation.

1          THE COURT:  Other than TMDL, is your intention to use

2    Teaf in any way on causation or source?

3          MR. BULLOCK:  No, Your Honor.

4          THE COURT:  All right.  Does that satisfy the

5    defendants?  Mr. Ryan or Mr. Jorgensen.

6          MR. JORGENSEN:  I suspect we have two responses,

7    Your Honor.  Can I start -- if I may, I feel like I need to

8    defend myself.  I think I've just been accused of -- the quote

9    was fast dealing.  I want to say that's not true.  I try to be

10   very careful in what I say to the Court and take my

11   responsibilities very seriously.

12         Yesterday I pulled up and would be glad submit to the

13   Court, although it's actually already attached to the relevant

14   motions, the bacterial holding time motion, the fact that there

15   was a standard from point source discharges, then there was

16   EPA's manual from recreational waters, then there was Oklahoma

17   Safe Drinking Water Act materials.

18         And that is the way it is, and I've not tried to

19   mislead the Court on that in any way.

20         THE COURT:  It was the Oklahoma Safe Drinking Water

21   Act that had three 30-hour hold time limits, correct?

22         MR. JORGENSEN:  I believe there were just two, but I

23   could be wrong on that.  But you're exactly right, Your Honor.

24   And the relevant ones, for salmonella, for E. coli, for total

25   coliforms, fecal coliforms, as you pointed out, we had a back

1    and forth were six.

2         I still have it on my computer and can put it back

3    up.  But I just did not want to leave the record with an

4    allegation of "fast dealing."

5         Then the second thing is, I was accused of fast

6    dealing on standards for cyanobacteria.  Let me go through that

7    again.

8         I believe Mr. Bullock conceded when he was up here

9    before that there is not a numeric standard for cyanobacteria

10   or cyanotoxins in recreational drinking waters.  There isn't.

11        There is this general narrative standard:  Don't have

12   toxic materials in the water, which could mean anything.  But

13   there is not a numeric standard.  And without a numeric

14   standard, it hasn't been violated.

15        And now I've just put up the fact that, as

16   Dr. McGuire points out from the panels he sat on at EPA, EPA

17   has considered whether there should be a drinking water

18   standard for cyanobacteria and cyanotoxins, and has concluded

19   that there should not be because there's insufficient evidence

20   that they pose a risk.

21        So I've cleared that up.  I have really not tried to

22   mislead the Court in any way.  And I welcome any questions you

23   have.

24        THE COURT:  TMDL.

25        MR. JORGENSEN:  On that, I will defer to my

1  colleague.

2          MR. RYAN:  First of all, there hasn't been a TMDL

3  conducted in the Illinois River Watershed.  You'll recall from

4  the preliminary injunction hearing, we showed how the State of

5  Oklahoma had done TMDLs all over the state and completely

6  surrounded the IRW, and that the conclusion from each and every

7  one of those TMDLs was that cattle was the problem.

8          As I understand it now, we took the deposition of

9  Mr. Dershweiler, and he indicated that there is some activity

10  now going on by the State to do a TMDL.

11          So what I think Mr. Bullock was talking about is that

12  Dr. Teaf claims to -- in conjunction with Dr. Engel, I believe,

13  that some kind of a quasi TMDL of their own that is not a

14  governmental or regulatory one, obviously, and it's highly

15  questionable.  We haven't really gotten into that today

16  because, you know, when I asked Dr. Teaf to support some of the

17  conclusions which he was making about the fecal coliforms, he

18  didn't know when calves were born and he didn't know how long,

19  you know, cattle were on pastures and things like that, so it

20  was a little bit hard to cross-examine him about it.  But he

21  had claimed to have done this sort of TMDL with Dr. Engel.

22          I don't know how, though, a TMDL would in any way

23  establish that, A, there's pathogens, actual pathogens in the

24  water or that, B, it came from these poultry operations.  The

25  TMDL simply makes estimations on a regulatory basis as to the

 1   loads of whatever you're studying to the watershed.

 2            THE COURT:  I guess more --

 3            MR. RYAN:  Maybe I'm not answering your question.

 4            THE COURT:  More practically -- and I should ask this

 5   of Mr. Bullock -- how would Dr. Teaf sponsor any TMDL, whether

 6   it's being done now or has been done in the past?

 7            MR, BULLOCK:  Defendants have not attacked, as I

 8   understand their motion, the methodology that he used to do

 9   that.  And so --

10            THE COURT:  That he used to do that?

11            MR. BULLOCK:  That he -- he and -- with the

12   assistance of Dr. Engel conducted the study, which is a TMDL

13   study.

14            THE COURT:  Recent?

15            MR. BULLOCK:  Yes.  And that's in his expert report.

16   Now, they have questioned, as the Court has heard, the issue of

17   causation, but the way that these work and the very TMDLs that

18   they are citing which point to cattle in other watersheds which

19   I say -- which I recognize is irrelevant, but in terms of the

20   acceptance of the methodology, that is the methodology, and

21   that's what we will present is that methodology.

22            THE COURT:  Well, that question went through my head,

23   to the extent that they're used in the context of cattle, why

24   couldn't it be used in the context of poultry.  Well -- but

25   that issue is not before the Court today, correct?

433

1           MR. BULLOCK:  They have challenged the causation

2   piece, but they haven't challenged the technique of preparing

3   the TMDL.

4           MR. RYAN:  Your Honor, I could be mistaken, and I

5   probably ought to take a moment to look more carefully, but I

6   don't believe there's any mention of TMDLs in Dr. Teaf's expert

7   report.

8           THE COURT:  If there is, I missed it; but then

9   there's a huge volume of materials here.

10          MR. RYAN:  May I look --

11          THE COURT:  Yes, sir, you may.

12          MR. RYAN:  I looked as quickly as I could after

13  Mr. Bullock made that statement, and I don't see it in here.

14          MR. PAGE:  May I explain, Your Honor?

15          THE COURT:  Yes, sir.

16          MR. PAGE:  Dr. Teaf, as part of his regular 26(a)

17  report, did a mass balance for bacteria.  Now, when you do a

18  TMDL for -- that's the EPA program for nonpoint sources, total

19  maximum daily load.  So the EPA looks at all types of

20  contaminates for TMDLs, including bacteria.  And the EPA has a

21  methodology to count bacteria.

22          Dr. Teaf did a mass balance of bacteria that follows

23  the EPA's TMDL criteria for counting bacteria.  So,

24  unfortunately, the word "TMDL" was used as a regulatory basis,

25  but the analysis is -- the more precise statement is Dr. Teaf

1  did the equivalent of a TMDL for the Illinois River watershed

2  for bacteria.

3          Now, why is that causation?  Because under the EPA

4  laws, the Clean Water Act for nonpoint sources, TMDLs are how

5  the EPA determines what are the sources, the nonpoint sources

6  in a watershed.

7          So because EPA finds it as a valid proof of source,

8  we did an analysis, Dr. Teaf did an analysis here as to

9  bacteria for proof of source also.

10         THE COURT:  Has that analysis been provided to the

11  defendants?

12         MR. PAGE:  Yes.  It was in part of the original 26(a)

13  report, and it hasn't been challenged in a Daubert context.

14         THE COURT:  Well, I suppose the answer, from my point

15  of view is, that perhaps this is a battle that has yet to be

16  fought.  But to the extent that it's not placed before me

17  today, I don't know that I have anything to decide in that

18  regard.  Mr. Ryan -- as to TMDL or any challenge to it.

19         MR. RYAN:  You know, again, I don't want to say

20  something, say that -- accuse Mr. Page of saying something

21  incorrectly.  I don't know what he's talking about, this Rule

22  26 report that talks about a TMDL.

23         I've looked through Dr. Teaf's report.  I don't see

24  anything in there.  If there is such a disclosure, I would like

25  to see it.  We don't necessarily need to take up Your Honor's

435

1   time with it.  I'll deal with that after this hearing.

2           THE COURT:  All right.

3           MR. RYAN:  But I would simply say to Your Honor that,

4   as I mentioned in my presentation, that to the extent he did a

5   TMDL -- and we did talk about it at his deposition, so I'm not

6   claiming complete surprise because he did discuss it in his

7   deposition somewhat when he was asked about this, or at least

8   he brought it up.

9           But what he did was simply determine the amount of

10  fecal coliform that comes out of cows, it comes out of

11  chickens, it comes out of geese, it comes out of turkeys,

12  etcetera.  He had nothing to do with fate and transport and

13  nothing to do with what goes in the water.  He admitted that in

14  his deposition.  And I had slides put up on the screen to that

15  effect.

16          So even if he did some kind of quasi nonregulatory

17  TMDL that's not disclosed fully, I don't think it establishes

18  what plaintiffs suggest it does.

19          THE COURT:  It's not clear to me whether it was a

20  TMDL -- or Mr. Page used the term the "equivalent" of a TMDL.

21  I'm not sure what that is, but I suspect that you'll find out.

22          MR. RYAN:  Thank you, Your Honor.

23          THE COURT:  Anything else with regard to either of

24  the pendant witnesses, for lack of a better term, McGuire and

25  Sullivan?

 1             MS. XIDIS:  Your Honor, I'm Claire Xidis for the

 2    State of Oklahoma.  And we really haven't had a chance to

 3    present our motion on Dr. McGuire, and I'd like to do that --

 4             THE COURT:  This is it.

 5             MS. XIDIS:  -- in an attempt to draw kind of a clean

 6    slate here, as we start with Dr. McGuire.  The State's motion

 7    is actually pretty simple and straightforward on Dr. McGuire.

 8             Dr. McGuire has training and experience in

 9    environmental engineering and has spent his career working in

10    water treatment facilities.

11             As we heard Mr. Jorgensen mention earlier, he was

12    indeed the director at one of the largest water treatment

13    utilities in the United States.  I suspect we'll hear some more

14    about that from Mr. Jorgensen.

15             But the State is not challenging Dr. McGuire's

16    qualifications to opine about processes for treating drinking

17    water.  The State is challenging the portions of Dr. McGuire's

18    opinions that reach beyond that area and into human health

19    assessments.

20             The State is also challenging those parts of

21    Dr. McGuire's opinions which do not meet the reliability

22    criteria of Daubert.

23             Dr. McGuire organized his report into five sections

24    which present the five bases for the five opinions he's reached

25    in this case.

 1          The State is challenging Dr. McGuire's opinion No. 1

 2   because methodologies he used in reaching that opinion do not

 3   meet the reliability requirements of Daubert and because his

 4   broad-reaching opinions stretch into areas beyond his

 5   expertise.

 6          The State is also challenging opinion No. 1 because,

 7   in that opinion, Dr. McGuire reaches beyond his experience and

 8   training as an environmental engineer for water treatment

 9   facilities and into the field of human health toxicology.

10          Likewise, Dr. McGuire's opinions numbers 3 and 5

11   should be excluded because they are opinions about human health

12   risks that Dr. McGuire is not qualified to offer.

13          First, Your Honor, I'll address opinion No. 1, which

14   the State challenges on three grounds.

15          THE COURT:  Just to be clear, you're not challenging

16   2 and 4; is that correct?

17          MS. XIDIS:  That's correct, Your Honor.

18          THE COURT:  Go ahead.

19          MS. XIDIS:  The first ground for opinion No. 1,

20   Your Honor, is that the statistical comparisons of total

21   organic carbon data upon which Dr. McGuire relies are performed

22   by another individual, and Dr. McGuire said he did not have the

23   expertise to select the methodologies for this work.

24          In addition, defendants have not demonstrated that

25   the methodology used in the manner it was used here meets the

 1  <u>Daubert</u> reliability requirements.

 2       Dr. McGuire claims that a statistical comparison of

 3  ICR, which is Information Collection Rule, total organic carbon

 4  data, which was collected in a national survey in 1997 and '98,

 5  to recent data collected from the IRW supports his conclusion

 6  that poultry waste application has no impact on the levels of

 7  total organic carbon in the IRW.

 8       I have just a few slides, Your Honor, which are

 9  excerpts of Dr. McGuire's deposition, which were also attached

10  to our <u>Daubert</u> motion.

11       At his deposition, Dr. McGuire testified that he did

12  not perform this statistical comparison himself.  He had

13  someone else, Mr. Clifton Bell, at the private consulting firm

14  where he used to work, determine what type of analysis to use

15  and perform the statistical comparison because Dr. McGuire

16  needed help figuring out what statistical methodology to apply

17  and because, as he testified at his deposition, he is not an

18  expert in statistical analysis.

19       Your Honor, I'll just read some of the highlighted

20  language here.  When Dr. McGuire was asked what Clifton Bell

21  did in this case, Dr. McGuire explained:

22       "ANSWER:  I provided five or six, I guess, datasets,

23  data comparisons of trihalomethane, haloacetic acid, TOC data,

24  and asked him to evaluate whether or not we could use

25  parametric or nonparametric statistics to compare means or

1  determine if these datasets were from the same population or

2  not.  And the results of that are included in my expert

3  report."

4          Further down, Your Honor, he explains that Clifton

5  Bell actually chose what tests to use.

6          "QUESTION:  And what was his answer?

7          "His answer was to use no nonparametric statistics

8  because of the way the data was distributed, and that's why he

9  chose what is called the Mann-Whitney U test, which was

10  conducted on these six data pairs."

11          Further down, Your Honor:

12          "Why didn't you do the statistical analysis?

13          "I can do it.  I'm decent -- decent at statistics,

14  but not an expert.  He is far better than I am and keeps up

15  with it on a daily basis."

16          As the Tenth Circuit has explained, Your Honor, an

17  expert cannot simply adopt opinions of another which are

18  outside his own area of expertise.  That's what Dr. McGuire has

19  done with his opinion No. 1.  He used statistical comparisons

20  of data that he's testified were outside his expertise and used

21  those as a basis for his opinion.

22          Defendants claim that Dr. McGuire supervised and

23  directed the work of Clifton Bell, but his testimony during the

24  deposition speaks for itself.  He needed the expertise of

25  someone with specialized knowledge in performing statistical

1   comparisons to make the most basic decision regarding what kind

2   of analysis to do, that basic decision of parametric versus

3   nonparametric, statistical analysis, a very basic baseline

4   decision.

5           In addition, Dr. McGuire stated in his deposition

6   that he had not performed this type of statistical analysis

7   before.

8           "QUESTION:  Have you ever done anything like that

9   before?

10          "Nothing quite like this.  Like I said, I usually,

11  when I'm trying to do a statistical analysis, I've got maybe

12  six or ten data points I'm trying to compare, not thousands.

13  So it's a -- it's a whole new realm of statistical concerns,

14  which is one of the reasons why I consulted with Clifton

15  because he has done this before."

16          Nevertheless, defendants argue that Dr. McGuire has

17  done such analysis in the past, and they cite to a group of

18  articles.  However, each of these articles has one or more

19  authors than Dr. McGuire.  Some actually have up to six

20  authors.  Some of these articles contain no statistical

21  analysis and some have some statistical material contained in

22  them, but it's unclear which author performed the work.  And

23  defendants offer no explanation beyond their simple listing of

24  the articles.

25          In any event, the fact that Dr. McGuire co-authored a

1  small group of articles containing simple mean and median

2  measurements which are parametric, none of which are the test

3  that was performed here, Your Honor, hardly qualifies him as an

4  expert in this area and certainly does not overcome his own

5  testimony that he needed help in the analysis in this case

6  because it was beyond his abilities.

7      Furthermore, in defendants' response, there is no

8  cite to any evidence that supports Dr. McGuire's position that

9  this method of comparison of IRW and ICR datasets that are

10  different in terms of size, time, purpose and location is

11  reliable under Daubert.

12      Defendants also offer no authority that this type of

13  comparison supports the total exclusion of a potential source

14  of total organic carbons in the waters of the IRW.

15      The only justification offered by defendants is a new

16  declaration attached to the response in which Dr. McGuire

17  claims, without citation to any authorities, that because the

18  total organic carbon levels in certain lakes in California

19  changed little in a 20-year period, that the data comparison

20  performed by Mr. Bell is appropriate.  This anecdotal

21  justification makes little sense, but more importantly, it

22  simply does not meet the standards of Daubert.

23      Your Honor, the second reason the State believes that

24  opinion No. 1 should be excluded pursuant to Daubert is because

25  Dr. McGuire claims that scientific literature is a basis for

1  his opinion that poultry waste has no impact on the levels of

2  total organic carbon in the IRW.  But the conclusions in that

3  literature are contrary to Dr. McGuire's conclusions.

4          In fact, the literature he cites recommends limiting

5  agriculture runoff into watersheds as a method for reducing

6  disinfection byproduct precursors in water supplies.

7          In explaining the background for their work, these

8  authors explained that the sources of total organic carbon have

9  indeed been a difficult question to answer.

10         THE COURT:  Ms. Xidis, we're at the end of a long

11  day.  You're going to have to slow down because we have had one

12  court reporter the entire day, so...

13         MS. XIDIS:  I apologize.

14         In explaining the background for their work, these

15  authors explain that the sources of total organic carbons have

16  indeed been a difficult question to answer, but then these

17  authors answer that question with suggestions for impaired

18  water supply management, specifically the management of

19  nutrient loading.

20         In the Bukaveckas article, the conclusion there --

21         THE COURT:  I think we need to take a recess here.

22  We also need to talk about, because it's a quarter of six, how

23  we intend to proceed here.  We've got quite a number of these

24  Daubert motions that have not been decided.

25         Frankly, you-all are taking me beyond the edge of

1  what I am comfortable in ruling on just here today.  And I

2  suspect that what we need to do here is quickly wrap up the

3  argument with regard to these three motions.

4        I will look at them, try to digest them a bit better,

5  rule on those, and then discuss whether or not the Court can

6  simply issue rulings on the remainder.

7        MR. JORGENSEN:  Your Honor, on that point, we have

8  yet, either side, to get into Dr. Sullivan, and I believe he's

9  actually completely unrelated to the two that have been

10  contested, so we could just finish McGuire and be done.

11        MS. FOSTER:  I would disagree; he's very related to

12  the subject.  That's how he got grouped --

13        THE COURT:  The problem is I've got a major antitrust

14  case on Friday.  I can't hear any -- I don't have any more time

15  for you.  So I don't know --

16        MR. JORGENSEN:  I propose we just finish McGuire and

17  be done.

18        THE COURT:  Let's take a recess, do that and we'll

19  discuss how we're going to discuss the rest of them.

20        (Whereupon a recess was had.)

21        THE COURT:  Ms. Xidis.

22        MS. XIDIS:  I'll try to slow down and abbreviate my

23  comments in the interest of time.

24        The last topic I was addressing was the literature

25  cited by Dr. McGuire.  And the point in here I want to make is

1  that it came out in his deposition that he had cited some

2  literature in which the conclusions completely contradicted the

3  conclusions he reaches in opinion No. 1.

4          There is a premise that determining sources of TOCs

5  is a complicated issue, but in the literature that he cites in

6  his report, those authors make very clear recommendations and

7  suggestions about things that can be done, specifically

8  watershed management issues and limiting nutrients, which

9  contradict his own conclusion.

10         So it became evident during his deposition that he

11  had not even read the conclusions in these articles.  He

12  rejected them.  He recoiled from them.  And it was a little bit

13  incomprehensible, actually.  So if he hasn't even read the

14  conclusions in these articles, they can hardly be a reliable

15  basis for his opinion No. 1.

16         Next, Your Honor, as to opinion No. 1 -- next slide,

17  please -- opinion No. 1 is not just to drinking water, but he's

18  says to the waters of the IRW.  He says there's no endangerment

19  to human health in the waters of the IRW.

20         And the problem with this opinion, Your Honor, is

21  that it takes Dr. McGuire outside of his area of expertise,

22  which is the water treatment facility.  It takes him to edge-

23  of-field samples, limnology, hydrology, other areas where he

24  simply is not qualified to opine.

25         Is he qualified to opine about the processes for

1    treating the water in the plant?  Yes.  And the State is not

2    challenging him on those opinions.  But he can't go further

3    into the source-tracking issues.  Defendants claim that he is

4    qualified to do that.  But in his deposition, we specifically

5    asked him about this.  He was only able to come up with two

6    examples when he'd done this type of work, and they were

7    markedly different from what's going on here.

8          One of those is the Open Pit Asbestos Mine we

9    discussed in our reply brief where the water utility already

10   knew exactly where the contamination was coming from and what

11   it was.  The other, I believe, was the San Joaquin water -- San

12   Joaquin Valley, and the utility was doing some research there.

13         Dr. McGuire specifically testified that he did not do

14   this type of source analysis in that watershed, and he could

15   not remember other details of his work there.  So we do not

16   think that qualifies him to opine into this kind of source

17   tracking area, which he tries to do in his opinion number one.

18         Next slide, please.

19         Finally, Your Honor, is the State's challenge to

20   Dr. McGuire's opinions which, again, reach beyond his

21   engineering, in plant, how do I filter this, how do I meet the

22   standard experience and go into human health.

23         As we can see here on this slide, Your Honor, he was

24   asked point blank about his qualifications to discuss these

25   topics at his deposition.

1          "QUESTION:  And we may have covered this before.

2  Have you -- have you conducted any scientific or medical

3  research on the health effects of disinfection byproducts?

4          "No.

5          "Are you qualified to give opinions on risks to human

6  health from ingesting DBPs?

7          "No."

8          Let's compare that to his opinion No. 1, 3 and 5,

9  which are listed below.  In each of those, he does offer

10  opinions on human health specifically.

11          "It is also my opinion there is no eminent and

12  substantial endangerment to human health associated with

13  disinfection byproducts in drinking water served by IRW

14  utilities."

15          He goes on and does exactly what he testified he is

16  not qualified to do.

17          Defendants are going to try to rehabilitate him on

18  this and claim, oh, you know, he worked at the biggest water

19  utility in the nation.  He's done this for 35 years.

20          When we look at his CV, Your Honor, when we look at

21  his publications and his work experience, he has not done human

22  health work, he has not published on those issues, he has not

23  presented on those issues.  It's not part of what one does as a

24  director of a water utility.

25          His publications deal with filters and corroded pipes

1  and things of that sort.  But he's simply reaching too far.

2          That's what -- all the State is seeking to do with

3  this motion, Your Honor, is to box him in his appropriate areas

4  of expertise.

5          He can talk about those processes in the plant.  He

6  can talk about the standards and what those standards are, but

7  he is reaching too far when he goes into human health and when

8  he goes into source tracking.  And also his reliability gets

9  really shaky when he starts talking about statistical analysis

10  that he cannot do without the expertise of others.

11          With that, Your Honor, I'll rest unless you have any

12  questions.

13          THE COURT:  No.  Thank you very much.

14          Given that we're at six, how much longer -- if we

15  were to conclude this grouping of experts, how much longer

16  would the argument take us?

17          MR. JORGENSEN:  I believe I could wrap up McGuire in

18  15 minutes, Your Honor, and then I would propose that we end at

19  that point.

20          THE COURT:  Well, there's been an objection there

21  with regard to Sullivan.  And given that I want to treat

22  everyone within the grouping similarly, I'd be disposed to

23  hearing whatever argument with regard to Sullivan before

24  ruling.

25          Perhaps the only way to do this because, frankly, I

1    don't have time here -- I've got to get ready for this

2    antitrust matter.  Perhaps what we do is just start cutting

3    into our summary judgment argument time.  We'll continue this

4    on the first day of summary judgment, and it means less

5    argument for summary adjudication, but so be it.

6              Mr. Jorgensen.

7              MR. JORGENSEN:  I quickly surveyed the table, and the

8    defendants would have no objection to that.

9              THE COURT:  Mr. Bullock.

10             MR. BULLOCK:  We certainly are agreeable to that, or

11   you might consider referring this to the magistrate.

12             THE COURT:  No, it would just be -- I guarantee you

13   it would be appealed.  It would just further delay the trial.

14   We're going to start the trial in September.

15             Any other ideas?

16             MR. BULLOCK:  No, sir.

17             MR. GEORGE:  Your Honor, one proposal that might take

18   one matter off the Court's hearing docket.  The Taylor Daubert

19   motion, which is docket No. 2078, a motion filed by the

20   defendants, is one that the defendants are more than

21   comfortable with the Court deciding on the papers, if the Court

22   is comfortable.

23             THE COURT:  Well, I don't know -- is there any

24   absolute requirement that I hear argument as to all these?  I

25   mean, it's lawyer talk.

1            MR. GEORGE:  I don't believe there is, Your Honor.  I

2    believe it's within your discretion.

3            MR. BULLOCK:  I think that it is within your

4    discretion.  We have spent, here it is two days really, on

5    attack experts of some of our key witnesses.

6            Dr. Taylor is another one of our truly key witnesses

7    that we truly feel like, that given the technicalities and the

8    number of different specialties, that some public airing of

9    that should -- would benefit the Court.

10            THE COURT:  Let me just tell you, having looked at

11    Taylor, this is not a _Daubert_ analysis; but in terms of the

12    first prong of 702, frankly, testimony on how the poultry

13    industry works would be helpful to the Court.  So my gut feel

14    is I'd like to hear it if he meets _Daubert_.  But I take it the

15    _Daubert_ motion has to do with reliability and relevance,

16    correct?  I mean, clearly relevant, right?  It's probably

17    predominantly a reliability analysis.

18            MR. JORGENSEN:  It is, Your Honor.

19            MR. ELROD:  It is, Your Honor.  The third issue is --

20    he opines on three things, Your Honor.  John Elrod, madam court

21    reporter.

22            The third opinion is moot because it has to do with

23    unjust enrichment.  Do you agree with that, Louis?

24            THE COURT:  Maybe not, if I reconsider.

25            MR. BULLOCK:  And that's an equitable defense, Your

1   Honor.  You get unjust enrichment only if your claims at law

2   are dismissed.  We can brief that, but that's my recollection

3   of unjust enrichment is, it's one of those little common law

4   back waters that -- in terms of progressing on this, though, I

5   would be willing to submit our Churchill motion on -- I'm

6   getting some backfeed, but I think we'll -- we can submit that

7   one on the brief, Your Honor.

8          THE COURT:  But we also have Grip, Davis, Clay and

9   King.  I don't intend to rule on McGuire, Teaf and Sullivan

10  without further argument.  But is there any strong objection to

11  ruling on Taylor, Grip, Davis, Clay, Churchill and King without

12  argument?

13         MR. JORGENSEN:  I believe on King, we would like

14  argument, Your Honor.

15         MR. BULLOCK:  I think both sides would like it on

16  King.  And also I think on your list was Taylor.  As I said,

17  even though -- we just -- it's important to us that we not have

18  a misfire on Taylor.  We'll try to make that quick, but we're

19  -- we want to be sure that we don't get off the wrong track.

20         THE COURT:  And correct me if I'm wrong, but if the

21  Court reviews these and determines that it can rule on these

22  matters without hearing, is there any law precluding me from

23  doing so?

24         MR. BULLOCK:  I don't believe so, Your Honor.

25         MR. JORGENSEN:  Defendants don't believe so either,

 1  Your Honor.  The only exception I would make is I would like to

 2  give the McGuire response since the McGuire --

 3         THE COURT:  Oh, there's no doubt.  And if that wasn't

 4  clear, that's exactly my thought.

 5         Everyone is -- at least the Court is a little worn

 6  down after these two days, so I think a little respite from

 7  this would help clear the minds.  And we do need to set a

 8  deadline because we're fast approaching trial here.  We need to

 9  set a deadline for any motion to reconsider or motion to strike

10  the jury demand.  Who wishes to broach the subject?

11         MR. BULLOCK:  We will have ours filed on Monday is

12  our target date, Your Honor.

13         THE COURT:  Response by a week later?

14         MR. GEORGE:  That would be fine, Your Honor.

15         THE COURT:  Then a reply a week later?

16         MR. BULLOCK:  Yes, Your Honor.

17         THE COURT:  Where does that put us?

18         THE CLERK:  That puts us on the 17th of August.

19         THE COURT:  That's the workday after we complete the

20  summary judgment.

21         THE CLERK:  Summary judgment hearings are currently

22  set for the 13th and 14th, and should we want to be able to

23  address it, the response -- motion filed on the 3rd, response

24  on the 10th.

25         THE COURT:  Can you reply within three days after?

 1          MR. BULLOCK:  Yes, Your Honor, we can do that on the

 2   reply.

 3          THE COURT:  On the 13th, a reply.  And that

 4   potentially would -- well, not potentially.  That would put it

 5   at issue during the time we're together on the remaining

 6   Daubert motions and summary judgment motions.

 7          MR. GEORGE:  Your Honor, the other motion that has

 8   been discussed is the motion to strike the jury demand.  The

 9   defendants would be amenable to the same schedule, just

10   reversed, with us filing the motion, plaintiffs responding.

11          MR. BULLOCK:  Monday, a week later.

12          THE COURT:  So basically grappling with a number of

13   the same issues perhaps.

14          MR. GEORGE:  We feel that's distinct in the sense

15   that the motion to strike the jury demand is predicated on the

16   cases as it exists today.  And, obviously, the State is seeking

17   reconsideration to turn the clock back, but they're

18   interrelated, obviously.

19          THE COURT:  I see what you're saying.  Very well.

20   We'll establish the same briefing schedule for the motion to

21   strike jury demand.

22          Is there anything else we can do here this evening?

23          MR. JORGENSEN:  Your Honor, Dr. McGuire, as part of

24   his work in drinking water treatment, made a glossary of terms

25   and how they're spelled.  May I submit -- not to you, but to

1  the court reporter -- can I submit it to Howard and then to the

2  court reporter?

3           THE COURT:  Why don't we have the plaintiffs just

4  take a look at it very quickly, make sure it's satisfactory.

5           MR. JORGENSEN:  Page 3 of his report.

6           THE COURT:  Make sure there's no issue there.

7  Obviously the glossary and the dictionary that our reporter

8  produces here is going to carry us through trial, so that's

9  very important.  Very well.

10          MR. TUCKER:  Your Honor, may I ask a question?  I'm

11 not sure where we ended up on what's going to be argument and

12 what's going to be submitted on the papers with respect to the

13 pending motions regarding disqualification of witnesses

14 regarding experts.

15          THE COURT:  Nothing --

16          MR. TUCKER:  Nothing --

17          THE COURT:  Nothing further will be submitted.

18          MR. TUCKER:  I misunderstood.  We were discussing

19 which would be submitted just on the briefs that's already

20 filed.

21          THE COURT:  The Court would take a look at them and

22 decide whether or not it can decide these additional subsidiary

23 -- I don't want to call them subsidiary motions.

24          Other than the grouping that we're wrestling with

25 right now -- McGuire, Teaf and Sullivan -- the Court was going

1    to take a look at Taylor, Grip, Davis, Clay, Churchill and

2    King; and if it felt like it could rule on those motions

3    without a hearing, it would do so.

4              MR. TUCKER:  If I may, Your Honor, with regard to

5    Dr. Davis, Dr. Davis only, the one thing that the Court does

6    not have before it is Dr. Davis' second errata which was

7    furnished to the parties on June 29th.  It was not filed

8    because it wasn't a part of the pleadings that were part of the

9    Daubert motion.  I'd like to offer that as an exhibit for the

10   Court to consider along with Dr. Davis' -- the motions

11   pertaining to Dr. Davis.

12             THE COURT:  A second errata?

13             MR. TUCKER:  Yes, Your Honor.

14             THE COURT:  That was filed when?

15             MR. TUCKER:  That was filed -- or delivered on July

16   1st.  It was signed June 29th and delivered on July 1st to

17   Mr. Page and Mr. Garrin.  And it is a true errata.  It analyzes

18   the -- some data that was improperly downloaded and was then

19   properly downloaded and corrected.  It makes a correction to

20   the report.

21             THE COURT:  Any objection?

22             MR. BULLOCK:  No, Your Honor.

23             THE COURT:  Very well.  And has this -- ought this

24   second errata be marked and filed with the Court, or how do you

25   -- because it's not a part of the record.

455

1           MR. TUCKER:  I was thinking about offering it as an

2    exhibit at the time of the argument on the motion regarding

3    Dr. Davis.

4           THE COURT:  Yes, sir.

5           MR. TUCKER:  So could I offer it as an exhibit to the

6    Court now?

7           THE COURT:  You certainly may.  Let's mark it as --

8    Mr. Overton, as Court Exhibit 2 for this hearing.

9           MR. TUCKER:  Thank you, Your Honor.

10          THE COURT:  And without objection, Court Exhibit 2 is

11   admitted pertaining to the motion numbered 2064 on Davis.

12          What else can we attend to this evening?

13          MR. JORGENSEN:  Defendants are ready to wrap up the

14   evening, Your Honor.

15          MR. BULLOCK:  We're ready.

16          THE COURT:  All right.  We will see you the first day

17   of our summary judgment/Daubert hearing on the -- what is it,

18   13th --

19          THE CLERK:  13th and 24th of August.

20          THE COURT:  13th of August.  We're adjourned.

21          (PROCEEDINGS CONCLUDED.)

22

23

24

25

1                    REPORTER'S CERTIFICATE

2    I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3    TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

4    MATTER.

5

6                               S/Terri Beeler
                                Terri Beeler, RMR, FCRR
7                               United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25