**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  4:05-cv-00329-GKF-PJC |
| | ) | |
| TYSON FOODS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF OKLAHOMA'S TRIAL BRIEF**

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................1

II.   Law and policy regarding water pollution ..........................................................1

III.  Land-applied poultry waste is polluting the waters of the IRW .........................3

IV.   Claims to be litigated and relief being sought ....................................................6

V.    Overview of the State's causes of action to be tried. ..........................................8

      A.    RCRA ..........................................................................................................8

      B.    State law public nuisance. ........................................................................11

      C.    Federal common law nuisance. ................................................................13

      D.    Trespass ....................................................................................................14

      E.    Violations of 27A Okla. Stat. § 2-6-105 ................................................14

      F.    Violations of 2 Okla. Stat. § 2-18.1 .......................................................16

VI.   Causation ............................................................................................................16

VII.  Vicarious liability ..............................................................................................19

      A.    Restatement (Second) of Torts, § 427B principles. ................................19

      B.    Employer-employee and agent-principal principles. ..............................20

VIII. Injunctive relief and appropriate factors. ..........................................................22

IX.   Conclusion ..........................................................................................................25

# TABLE OF AUTHORITIES

Cases

American Mining Congress v. EPA, 824 F.2d 1177 (D.C. Cir. 1987) ..................................... 9, 10

B.H. v. Gold Fields Mining Corp., 506 F. Supp. 2d 792 (N.D. Okla. 2007) ............................... 11

Bennett v. Fuller, 2008 U.S. Dist. LEXIS 58198 (N.D. Okla. July 31, 2008) ............................. 14

Briscoe v. Harper Oil Co., 702 P.2d 33 (Okla. 1985) .................................................................... 12

Burlington Northern & Santa Fe Railway Co. v. Grant, 505 F.3d 1013 (10th Cir. 2007) ..... passim

California Oil Co. v. Davenport, 435 F.2d 560 (Okla. 1967) ......................................................... 16

City of Oklahoma City v. HTB, Inc., 769 P.2d 131 (Okla. 1988) ................................................... 7

City of Tulsa v. Tyson Foods, Inc., 258 F. Supp. 2d 1263 (N.D. Okla. 2003) ................. 17, 18, 21

Coleman v. J.C. Penney Co., 848 P.2d 1158 (Okla. 1993) ........................................................... 21

Colorado Wild, Inc. v. U.S. Forest Service, 523 F. Supp. 2d 1213 (D. Colo. 2007) .................... 25

Cooperative Refinery Association v. Young, 393 P.2d 537 (Okla. 1964) ...................................... 14

Cox. v. City of Dallas, Texas, 256 F.3d 281 (5th Cir. 2001) ........................................................ 11

Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) ......................................................................... 16

Dillon v. Fibreboard Corp., 919 F.2d 1488 (10th Cir. 1990) ....................................................... 16

Drague v. City of Burlington, 935 F.2d 1343 (2d Cir. 1991), rev'd on other grounds, 505 U.S.
    557 (1992) ............................................................................................................................... 11

Duncan v. Powers Imports, 884 P.2d 854 (Okla. 1994) ............................................................... 21

Eckardt v. Gold Cross Services, Inc., 2006 WL 2545918 (D. Utah Aug. 31, 2006) .................... 11

Enterprise Management Consultants, Inc. v. State of Oklahoma ex rel. the Oklahoma
    Tax Commission, 768 P.2d 359 (Okla. 1988) ........................................................................ 22

Environmental Defense Fund, Inc. v. Lamphier, 714 F.2d 331 (4th Cir. 1983) ........................... 24

Fischer v. Atlantic Richfield Co., 774 F. Supp. 616 (W.D. Okla. 1989) ...................................... 12

Georgia v. Tennessee Copper Co., 206 U.S. 230 (1907) .............................................................. 13

Harper-Turner Oil Co. v. Bridge, 311 P.2d 947 (Okla. 1957) ..................................................... 16

Herd v. Asarco, Inc., 2003 U.S. Dist. LEXIS 27381 (N.D. Okla. July 11, 2003) ................. 17, 18

Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d 248
    (3d Cir. 2005) ........................................................................................................................... 8

Johnson v. Ford Motor Co., 45 P.3d 86 (Okla. 2002) .................................................................. 17

Lambert v. Rainbolt, 250 P.2d 459 (Okla. 1952) ......................................................................... 14

Lyons v. McKay, 313 P.2d 527 (Okla. 1957) ............................................................................... 11

Meghrig v. KFC Western, Inc., 516 U.S. 479 (1996) .................................................................. 6, 8

Montana Wilderness Association v. Fry, 310 F. Supp. 2d 1127 (D. Mont. 2004) ....................... 24

N.C. Corff Partnership v. Oxy USA, Inc., 929 P.2d 288, 294 (Okla. Civ. App. 1996) ............... 12

Oklahoma v. Tyson Foods, Inc., 565 F.3d 769 (10th Cir. 2009) .................................................. 18

Page v. Hardy, 334 P.2d 782 (Okla. 1959) .................................................................................. 21

Peppers Refining Co. v. Spivey, 285 P.2d 228 (Okla. 1955) ....................................................... 16

Philips Petroleum v. Vandergriff, 122 P.2d 1020 (Okla. 1942) ................................................... 17

Phoenix Mutual Life Insurance Co. v. Adams, 30 F.3d 554 (4th Cir. 1994) .......................... 13, 14

Shafer v. United States, 229 F.2d 124 (4th Cir. 1956) ................................................................. 24

Sharp v. 251st Street Landfill, 925 P.2d 546 (Okla. 1996) .......................................................... 23

State of Illinois v. City of Milwaukee, 599 F.2d 151 (7th Cir. 1979) .............................. 13, 23, 24

Tankersley v. Webster, 243 P. 745 (Okla. 1925) .......................................................................... 19

Texas v. Pankey, 441 F.2d 236 (10th Cir. 1971) .................................................................... 13, 23

Union Oil Co. v. Heinsohn, 43 F.3d 500 (10th Cir. 1994) ..................................................... 12, 13

United States v. Aceto Agricultural Chemicals Corp., 872 F.2d 1373 (8th Cir. 1989) ............ 8, 11
United States v. Bethlehem Steel Corp., 38 F.3d 862 (7th Cir. 1994) .......................................... 24
United States v. Valentine, 856 F. Supp. 621 (D. Wyo. 1994) ..................................................... 16
United States v. Valentine, 885 F. Supp. 1506 (D. Wyo. 1995) ................................................... 11
Wathor v. Mutual Assurance Administrators, Inc., 87 P.3d 559 (Okla. 2004) ............................. 22

<u>Statutes</u>
2 Okla. Stat. § 2-18.1 ............................................................................................................ 6, 7, 16
2 Okla. Stat. § 2-18.1(A) ............................................................................................................... 16
27A Okla. Stat. § 2-1-102(12) ................................................................................................. 15, 16
27A Okla. Stat. § 2-1-102(15) ......................................................................................................... 1
27A Okla. Stat. § 2-3-504 ................................................................................................................ 7
27A Okla. Stat. § 2-3-504(C) ........................................................................................................... 7
27A Okla. Stat. § 2-6-102 .......................................................................................................... 2, 14
27A Okla. Stat. § 2-6-105 ........................................................................................................ passim
27A Okla. Stat. § 2-6-105(A) .................................................................................................. passim
50 Okla. Stat. § 1 .......................................................................................................................... 11
50 Okla. Stat. § 2 .......................................................................................................................... 12
50 Okla. Stat. § 7 .......................................................................................................................... 12
60 Okla. Stat. § 60(A) ................................................................................................................... 14
82 Okla. Stat. § 1084.1 .............................................................................................................. 2, 14
42 U.S.C. § 6901(b)(2) ................................................................................................................... 2
42 U.S.C. § 6903(27) ...................................................................................................................... 9
42 U.S.C. § 6972(a) ........................................................................................................................ 6
42 U.S.C. § 6972(a)(1)(B) ..................................................................................................... 2, 8, 23
42 U.S.C. § 6972(e) ........................................................................................................................ 6

<u>Rules</u>
OUJI No. 6.8 .................................................................................................................................. 22
OUJI No. 6.9 .................................................................................................................................. 22
OUJI No. 6.10 ................................................................................................................................ 22
OUJI No. 6.13 ................................................................................................................................ 22
OUJI No. 7.3 ............................................................................................................................ 20, 21
OUJI No. 9.7 .................................................................................................................................. 17

<u>Regulations</u>
Okla. Admin. Code § 785:45-3-2(a) ............................................................................................... 2

<u>Other Authorities</u>
H.R. Rep. No. 94-1491, 2d Sess. .................................................................................................... 9
Restatement (Second) of Torts, § 427B .................................................................................... 19, 20
Restatement (Second) of Torts, § 821B ......................................................................................... 11
Restatement (Second) of Torts, § 822 ............................................................................................ 12
Restatement (Second) of Torts, § 825 ............................................................................................ 18
Restatement (Second) of Torts, § 834 ............................................................................................ 12
Restatement (Second) of Torts, § 840B(2) ..................................................................................... 18
S. Rep. No. 98-284, 98th Cong., 1st Sess. at 59 (1983) .................................................................. 8
S. Rep. No. 96-172 (1980) ............................................................................................................. 10

The State of Oklahoma ("the State") respectfully submits the following trial brief for the Court's consideration.

## I.      Introduction

This is an environmental case about non-point source pollution of the waters of the State[1] in the Illinois River Watershed ("IRW") by Defendants.  Defendants annually place over a hundred million of their birds in the IRW, together with the phosphorus-laden feed that these birds consume.  Defendants are responsible for the safe handling and disposal of the hundreds of thousands of tons of poultry waste that their birds generate annually in the IRW.  Defendants, however, have failed to properly manage these hundreds of thousands of tons of poultry waste. Rather, this poultry waste has been and continues to be land-applied in the IRW.  The United States Department of Agriculture, the United States Geological Survey, Oklahoma state agencies, Arkansas state agencies, and a host of retained and non-retained experts all agree: phosphorus and bacteria from this land-applied poultry waste can, and do, run off and leach into waters of the IRW, and are threatening to cause, and are in fact causing, pollution of the waters of the State in the IRW, including the biota therein.  Defendants are legally responsible for this threatened and actual harm.  Under the claims as currently postured before the Court, the State is seeking injunctive relief, including but not limited to abatement, remediation, and costs associated with quantifying the amount of remediation, as well as civil penalties.

## II.      Law and policy regarding water pollution

---

[1]      Waters of the State means "all streams, lakes, ponds, marshes, watercourses, waterways, wells, springs, irrigation systems, drainage systems, storm sewers and all other bodies or accumulations of water, surface and underground, natural or artificial, public or private, which are contained within, flow through, or border upon this state or any portion thereof, and shall include under all circumstances the waters of the United States which are contained within the boundaries of, flow through or border upon this state or any portion thereof. . . ." *See* 27A Okla. Stat. § 2-1-102(15).

It is the long-standing law and policy in Oklahoma that <u>any</u> pollution of the waters of the

State is unlawful.  There is <u>no</u> acceptable level of pollution.

- ➢ 27A Okla. Stat. § 2-6-105(A): "It shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state. Any such action is hereby declared to be a public nuisance."

- ➢ 27A Okla. Stat. § 2-6-102: "Whereas the pollution of the waters of this State constitutes a menace to public health and welfare . . . it is hereby declared to be the public policy of this state . . . to provide that no waste or pollutant be discharged into any waters of the state or otherwise placed in a location likely to affect such waters without first being given the degree of treatment or taking such other measures as necessary to protect the legitimate beneficial uses of such waters [and] to provide for the prevention, abatement and control of new or existing water pollution . . . ."

- ➢ 82 Okla. Stat. § 1084.1: "Whereas the pollution of the waters of this state constitutes a menace to public health and welfare . . . it is hereby declared to be the public policy of this state to conserve and utilize the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, for the propagation of wildlife, fish and aquatic life and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses . . . ."

- ➢ Okla. Admin. Code § 785:45-3-2(a): "Certain waters of the state constitute an outstanding resource or have exceptional recreational and/or ecological significance. These waters include streams designated 'Scenic River' or 'ORW' in Appendix A of this Chapter, and waters of the State located within watersheds of Scenic Rivers. . . .  No degradation of water quality shall be allowed in these waters."

This law and policy against pollution is echoed in federal law.

- ➢ 42 U.S.C. § 6901(b)(2): "The Congress finds with respect to the environment and health - . . . (2) disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment."

- ➢ 42 U.S.C. § 6972(a)(1)(B): ". . . [A]ny person may commence a civil action on his own behalf . . . (B) against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

Water quality standards, enacted by the State as regulations and approved by the federal

government, are laws that establish antidegradation standards and beneficial uses for waters of

the State, and narrative and numeric criteria designed to protect these beneficial uses.  Water

quality standards are one method of determining whether pollution of waters of the State is

occurring.  If a water quality standard is violated or exceeded, then the waterbody is polluted.

## III.    Land-applied poultry waste is polluting the waters of the IRW

That land-applied poultry waste is threatening to cause, and is in fact causing, pollution

of the waters of the State in the IRW is well recognized by the federal government, the

Oklahoma government, the Arkansas government, and even Defendants themselves, as the

following brief sampling of the overwhelming evidence to be presented at trial demonstrates:

> ➢ USDA Farm Service Agency: "This watershed is a major poultry growing and cattle
> producing area, and waterways are subject to impairments related to these activities. . . .
> The excessive buildup of phosphorus is due to the common practice of fertilizing the soil
> for grazing purposes by applying poultry litter."[2]

> ➢ USDA Farm Service Agency: "The Illinois River Watershed is part of a major poultry
> growing and cattle producing area of the State and the nation.  Poultry litter has been
> applied to the nutrient poor, thin, cherty soils of the area . . . .  Excessive buildup of
> phosphorus over the years has polluted the receiving water bodies to the point they are
> now considered impaired by nutrients.  Phosphorus and pathogenic bacteria now impair
> many of the area streams including the Illinois River. . . .  Nonpoint source impacts
> affecting waters in this segment are primarily from pastureland that is also used for
> application of poultry litter as fertilizer."[3]

> ➢ USDA Farm Service Agency: "Water quality problems in the Tenkiller and Spavinaw
> watersheds are due to excessive nutrients, pathogenic bacteria, and sedimentation.  These
> watersheds are major poultry growing and cattle producing areas, and a common practice
> has been to fertilize the soil for grazing purposes by applying poultry litter.  This practice
> has led to the excessive buildup of phosphorus that currently pollutes waterbodies in the

---

[2]        *Final Programmatic Environmental Assessment for Implementation of the
Conservation Reserve Enhancement Program Agreement for the Illinois River Watershed in
Arkansas* (August 2007), p. 16 (Ex. 100 to DKT #2062).

[3]        *Final Programmatic Environmental Assessment for Implementation of the
Conservation Reserve Enhancement Program Agreement for the Illinois River Watershed in
Arkansas* (August 2007), pp. A-5-A-6 (Ex. 100 to DKT #2062).

ROI [Region of Influence].  Excess nutrients have also caused low dissolved oxygen levels in these waterways."[4]

➢ USDA Farm Service Agency: "The number one cause of water impairments within the ROI is excessive nutrient loading (EPA 2002a).  This is due in large part to the practice of fertilizing grazing land by applying poultry litter."[5]

➢ USDA Farm Service Agency: "The watersheds of Spavinaw and Tenkiller Lakes constitute a major poultry growing and cattle producing area.  Poultry litter has been applied to the nutrient poor, thin, cherty soils of the area and they now grow luxuriant grass and support an important cattle industry.  Excessive buildup of phosphorus over the years has polluted the receiving waterbodies to the point that they are now considered impaired by nutrients.  The Illinois River is impaired by phosphorus and many of the area streams are impaired by pathogenic bacteria.  Downstream reservoirs are impaired by phosphorus (high chlorophyll-a concentrations) and low dissolved oxygen levels, primarily due to excess nutrients."[6]

➢ USDA Soil Conservation Service & Forest Service: "A significant part of the water quality problems in the basin appear to be a precipitate of the large volume of poultry waste generated and disposed of in the basin each year. . . . Nutrients from animal wastes and other sources enter water courses via leaching through the soil or by surface runoff from land applied waste."[7]

➢ USGS: "Production of large numbers of poultry, cattle, and swine in northwestern Arkansas, and increasingly in southwestern Missouri and northeastern Oklahoma, is contributing to elevated nutrient and bacteria concentrations in streams."[8]

---

[4]    *Final Programmatic Environmental Assessment for Implementation of the Conservation Reserve Enhancement Program Agreement for Oklahoma* (July 2006), pp. 18-19 (Ex. 101 to DKT #2062).

[5]    *Final Programmatic Environmental Assessment for Implementation of the Conservation Reserve Enhancement Program Agreement for Oklahoma* (July 2006), p. 40 (Ex. 101 to DKT #2062).

[6]    *Final Programmatic Environmental Assessment for Implementation of the Conservation Reserve Enhancement Program Agreement for Oklahoma* (July 2006), p. A-5 (Ex. 101 to DKT #2062).

[7]    *Illinois River Cooperative River Basin Resource Base Report* (March 16, 1992), p. 32 (Ex. 102 to DKT #2062).

[8]    *Environmental and Hydrologic Setting of the Ozark Plateaus Study Unit, Arkansas, Kansas, Missouri, and Oklahoma*, Water Resources Investigations Report 94-4022 (1995), p. 61 (Ex. 103 to DKT #2062).

➢ USGS: "Phosphorus concentrations in Ozark streams are typically greater in streams draining agricultural lands than in those draining forested lands (Petersen and others, 1998; 1999) because runoff from pastures fertilized with animal manure are probably substantial sources of phosphorus to the rivers in this basin (Arkansas Department of Environmental Quality, 2000)."[9]

➢ Office of the Oklahoma Secretary of the Environment: "The single largest contributor of nonpoint source phosphorus pollution is surplus poultry litter generated by the integrators' flocks."[10]

➢ Arkansas Natural Resources Commission: "Nonpoint source impacts affecting waters in [the Illinois River and its tributaries within Arkansas] are primarily from pasture land that is also used for application of poultry litter as fertilizer."[11]

➢ Arkansas Soil & Water Conservation Commission: "Runoff water from areas where manure is improperly managed can carry excessive amounts of nutrients, bacteria, and sediments.  These pollutants can enter streams and leach into the underground water."[12]

➢ Several Defendants: "Lately, a good deal of concern has been raised about the effect of excess nutrients on the land and waters of Eastern Oklahoma.  So where do these nutrients come from?  Nutrients can come from many sources, one of which is the use of poultry litter as an organic fertilizer. . . ."[13]

➢ Several Defendants: "[W]e have been working with the State of Oklahoma on a multi-million-dollar voluntary proposal to improve the management of poultry-related nutrients that might find their way into Eastern Oklahoma's Scenic River Watersheds. . . .  We are prepared to do our part to take care of the poultry portion of the nutrient equation."[14]

---

[9] *Phosphorus Concentrations, Loads, and Yields in the Illinois River Basin, Arkansas and Oklahoma, 2000-2004*, Scientific Investigations Report 2006-5175 (2006), p. 4 (Ex. 88 to DKT #2062).

[10] *Coordinated Watershed Restoration and Protection Strategy for Oklahoma's Impaired Scenic Rivers* (2007 Update), p. 4 (Ex. 104 to DKT #2062).

[11] *Arkansas NPS Management Program 2006-2010 Update*, (Oct. 1, 2005), p. 10.1 (Ex. 105 to DKT #2062).

[12] *Comprehensive Management Plan for Nonpoint Source Pollution -- Illinois River Basin in Arkansas* (1996), p. 16 (Ex. 76 to DKT #2125).

[13] 12/5/04 advertisement (Ex. 59 to DKT #2062).

[14] 9/10/04 advertisement (Ex. 60 to DKT #2062).

Because a substantial portion of the phosphorus and bacteria contributing to pollution of waters in Oklahoma originates in Arkansas, the State cannot address the problem through administrative actions taken pursuant to regulatory authority in Oklahoma. The State is seeking relief pursuant to state and federal law to address the entirety of the threats of and actual harm that Defendants' improper waste management creates to human health and the environment in the IRW. This Court is the only forum where such relief may be secured.

## IV.    Claims to be litigated and relief being sought

As the case is currently postured under the Court's orders, the following claims are currently set for trial beginning on September 24, 2009: (1) RCRA (Second Amended Complaint ("SAC"), Count 3); (2) state law public nuisance (SAC, Count 4); (3) federal common law nuisance (SAC, Count 5); (4) trespass (SAC, Count 6); and (5) violations of 27A Okla. Stat. § 2-6-105 and violations of 2 Okla. Stat. § 2-18.1 (SAC, Count 7).

Under its RCRA claim, the State seeks injunctive relief.[15 & 16]  *See* SAC, ¶ 95.  Under its state law nuisance claim, as that claim has been narrowed by the Court's orders, the State seeks injunctive relief, including but not limited to abatement, remediation, and costs associated with quantifying the amount of remediation.  *See* SAC, ¶ 104.  Under its federal common law

---

[15]    Specifically, 42 U.S.C. § 6972(a) provides that "[t]he district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both . . . ."  "Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA."  *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996).

[16]    Under RCRA, the State may recover all costs of litigation (including reasonable attorneys and expert witness fees).  *See* 42 U.S.C. § 6972(e).

nuisance claim, as that claim has been narrowed by the Court's orders, the State seeks injunctive relief, including but not limited to abatement, remediation, and costs associated with quantifying the amount of remediation.  *See* SAC, ¶ 115.  Under its trespass claim, as that claim has been narrowed by the Court's orders, the State seeks injunctive relief, including but not limited to abatement, remediation, and costs associated with quantifying the amount of remediation.  *See* SAC, ¶ 123.  Under its claim for violations of 27A Okla. Stat. § 2-6-105, as that claim has been narrowed by the Court's orders, the State seeks injunctive relief and civil penalties.[17]  *See* SAC, ¶ 131.  And under its claim for violations of 2 Okla. Stat. § 2-18.1, as that claim has been narrowed by the Court's orders, the State seeks injunctive relief.  *See id.*

The only temporal limitation applying to these claims arises with respect to the State's claim for civil penalties for violations of 27A Okla. Stat. § 2-6-105(A).  The State's claim for civil penalties (but not injunctive relief) under 27A Okla. Stat. § 2-6-105 is restricted to violations occurring after July 1, 1993, the enactment date of the civil penalties provision, but is not otherwise limited by a statute of limitations defense.  *See* 27A Okla. Stat. § 2-3-504; *City of Oklahoma City v. HTB, Inc.,* 769 P.2d 131, 133-34 (Okla. 1988) ("Since 1913, this court has followed the general rule that statutes of limitation do not apply to a government entity seeking in its sovereign capacity to vindicate public rights . . . . We distill the general rule that statutes of limitation shall not bar suit by any government entity acting in its sovereign capacity to vindicate public rights, and that public policy requires that every reasonable presumption favor government immunity from such limitation").

---

[17]     Under its 27A Okla. Stat. § 2-6-105 claim, the State may recover attorneys fees and costs associated with its recovery of civil penalties.  *See* 27A Okla. Stat. § 2-3-504(C).

V.      **Overview of the State's causes of action to be tried**

A.      **RCRA**

42 U.S.C. § 6972(a)(1)(B) provides that:

. . . [A]ny person may commence a civil action on his own behalf . . . (B) against
any person . . . who has contributed or who is contributing to the past or present
handling, storage, treatment, transportation, or disposal of any solid or hazardous
waste which may present an imminent and substantial endangerment to health or
the environment.

RCRA is "a comprehensive environmental statute designed to make certain that solid and

hazardous wastes are not disposed of in a manner harmful to the public health or the

environment." *Burlington Northern & Santa Fe Railway Co. v. Grant*, 505 F.3d 1013, 1019

(10th Cir. 2007). "RCRA is a remedial statute, which should be liberally construed." *United

States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1383 (8th Cir. 1989), *reh'g denied*.

The focus of RCRA is risk avoidance in the disposal of solid and hazardous wastes. *See, e.g.,*

*Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 485 (1996) (Section 6972(a) was "designed to

provide a remedy that ameliorates present or obviates the risk of future 'imminent' harms . . .");

*Burlington Northern*, 505 F.3d at 1021 ("given RCRA's language and purpose, if an error is to be

made in applying the endangerment standard, the error must be made in favor of protecting

public health, welfare and the environment") (citations and internal quotation marks omitted);

*Interfaith Community Organization v. Honeywell International, Inc.,* 399 F.3d 248, 260 (3d Cir.

2005) (Section 6972(a)(1)(B) is "'intended to confer upon the courts the authority to eliminate

any risks posed by toxic wastes . . .'") (quoting S. Rep. No. 98-284, 98th Cong., 1st Sess. at 59

(1983)).

Liability under 42 U.S.C. § 6972(a)(1)(B) requires proof that:

(1) the defendant must be a person, including, though not limited to, one who was
or is a generator or transporter of solid or hazardous waste, or one who was or is

8

an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that this defendant contributed to, or is contributing to, the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that such waste may present an imminent and substantial endangerment to health or the environment.

*See Burlington Northern*, 505 F.3d at 1020.

The statutory definition of "solid waste" provides:

The term "solid waste" means any . . . other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from . . . agricultural operations . . . .

42 U.S.C. § 6903(27) (emphasis added).  RCRA does not define "discarded."  "The ordinary, plain-English meaning of the word 'discarded' is 'disposed of,' 'thrown away' or 'abandoned.'" *American Mining Congress v. EPA*, 824 F.2d 1177, 1184 (D.C. Cir. 1987).  The determination of whether a material is discarded is an objective, and not a subjective, inquiry.[18]  In the complaint filed in *United States v. Seaboard Foods, LP*, No. 5:06-cv-00990-HE (W.D. Okla.), the United States alleged that animal waste "that has been over-applied on fields or otherwise permitted to leach into ground water" was a solid waste for the purposes of RCRA.  *See* DKT #2062 (Ex. 123).  This Court has indicated that this *Seaboard* formulation determines whether land-applied poultry waste is "discarded" and hence a RCRA solid waste.[19]  *See* Aug. 14, 2009 Transcript, pp.

---

[18]    Contrary to Defendants' assertions, factors such as beneficial reuse, market value, and an intent to discard are not relevant to determining whether a material is a solid waste.  *See* DKT #2253, pp. 6-7.

[19]    Defendants' argument that poultry waste is not a RCRA solid waste originates from a single line in the Senate Report.  The report states as follows: "Agricultural wastes which are *returned to* the soil as fertilizers or soil conditioners are not considered discarded materials in the sense of this legislation."  *See* H.R. Rep. No. 94-1491, 2d Sess. at 2 (emphasis added).  Poultry waste indisputably does not originate from the IRW soil, so by definition it cannot be "returned to" the IRW soil.  Moreover, apropos to the *Seaboard Foods* formulation, land-applied animal waste that is overapplied or that leaches / runs off is, by definition, not being returned to the soil as a fertilizer or soil conditioner.

5-7 & Aug. 18, 2009 Transcript, pp. 5-6. The State submits that under this formulation,[20] over-application of poultry waste equates to any application of poultry waste in the IRW at rates greater than that necessary to reach agronomic levels for phosphorus, or any application to fields that have a soil test value in excess of 65 for phosphorus, the limiting nutrient constituent in poultry waste.[21] An STP limit that allows application in excess of agronomic need is neither scientifically based nor successfully protective of water quality. The evidence at trial will show that poultry waste is being land applied in excess of agronomic rates. Likewise, poultry waste is plainly discarded when otherwise permitted to runoff or leach. The evidence at trial will show that poultry waste is being permitted to run-off and leach.

Contributor liability under RCRA is extremely broad. *See, e.g.,* S. Rep. No. 96-172 (1980) ("Some terms and concepts, such as persons 'contributing to' disposal resulting in a

---

[20]    The State does not waive its position that poultry waste is, without regard to whether it is over-applied or runs off / leaches, a solid waste because when it is removed from the poultry growing houses it has "become part of the waste disposal problem." *See AMC I,* 824 F.2d at 1186. It is undisputed that poultry waste is not "destined for beneficial reuse or recycling in a continuous process by the generating industry itself." *See id.* First, poultry waste has no further role in the poultry growing process; it is not reused or recycled in the poultry growing industry itself. Second, poultry waste is not actively or immediately reused. Clean-outs of poultry houses generally occur less than once a year. And third, poultry waste is not being used by its original owner (*i.e.,* Defendants). *See* DKT #2062 & #2253.

[21]    The evidence at trial will show that at a soil test phosphorus level of 65 lbs. / acre or higher, there is virtually no agronomic benefit gained from applying additional phosphorus. *See* DKT #2062 at Ex. 73 (Zhang 1/16/08 Depo., p. 189); DKT #2062 at Ex. 74 (Mullikin 7/18/02 Depo., pp. 119-20) (testifying that STPs between 50 and 70 are sufficient for crops being grown in northwest Oklahoma and northeast Oklahoma); DKT #2062 at Ex. 75 (Johnson Rpt., ¶ 5). Science-based fertilizer recommendations by Oklahoma State University, based on decades of field and laboratory research, show that an STP value of 65 lbs. / acre is adequate for production of most crops. Above STP 65, there is no benefit to crop production, but there is an increased risk to water quality by runoff and / or erosion. *See, e.g.,* DKT #2062 at Ex. 77 (Chaubey 3/2/09 Depo., pp. 231-35) (testifying that application of poultry waste above agronomic rate for phosphorus is disposal, even if there is an agronomic need for other nutrients); DKT #2062 at Ex. 74 (Mullikin 7/18/02 Depo., pp. 49-50) (testifying that from an agronomic and environmental standpoint there is no reason to apply more phosphorus on a field than the plants can uptake).

substantial endangerment, are meant to be more liberal than their common law counterparts"). "Contribute" under RCRA means to "have a part or share in producing an effect." *See Cox. v. City of Dallas, Texas*, 256 F.3d 281, 294-95 (5th Cir. 2001). The existence of control is not necessary in order to find contributor liability. *See United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1383 (8th Cir. 1989); *United States v. Valentine*, 885 F. Supp. 1506, 1512 (D. Wyo. 1995).

The RCRA "may-present-an-imminent-and-substantial-endangerment-to-health-or-the-environment" standard contains "expansive language." *See Burlington Northern*, 505 F.3d at 1019-21. The language of the RCRA endangerment standard has been dissected and explained in great detail by the Tenth Circuit. *See id.* (setting forth extensive analysis of the terms "may," "imminent," "substantial" and "endangerment").

A RCRA endangerment claim is not superseded by any state regulatory program. *See, Drague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991), *rev'd on other grounds,* 505 U.S. 557 (1992); *Eckardt v. Gold Cross Services, Inc.*, 2006 WL 2545918, *2 (D. Utah Aug. 31, 2006).

### B.    State law public nuisance

A public nuisance is "an unreasonable interference with a right common to the general public." *See* Restatement (Second) of Torts, § 821B; *see also B.H. v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792, 800 (N.D. Okla. 2007) (common law nuisance is the "'unwarrantable, unreasonable or unlawful use by a person of his own property to the injury of another'") (quoting *Lyons v. McKay,* 313 P.2d 527, 529 (Okla. 1957)); 50 Okla. Stat. § 1 ("[a] nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either . . . [a]nnoys, injures or endangers the comfort, repose, health, or safety of others; or . . . [i]n any way renders

other persons insecure in life, or in the use of property . . .");[22] 50 Okla. Stat. § 2 (public nuisance is "one which affects at the same time an entire community or neighborhood, or any considerable number of persons . . ."). "Pollution of waters of the state constitutes a public nuisance under Oklahoma law." *Fischer v. Atlantic Richfield Co.*, 774 F. Supp. 616, 619 (W.D. Okla. 1989) (citing 82 Okla. Stat. § 926.2); *see also* 27A Okla. Stat. § 2-6-105(A).

It is not necessary that the State establish that Defendants' actions were unreasonable, but rather, that the resulting burden on the State or the public was unreasonable. *See N.C. Corff Partnership v. Oxy USA, Inc.*, 929 P.2d 288, 294 (Okla. Civ. App. 1996) (citing Restatement (Second) of Torts, § 822 cmt b).

A person is subject to liability for a nuisance caused by an activity not only when that person carries on the activity, but also when that person participates to a substantial extent in carrying it on. *See* Restatement (Second) of Torts, § 834.

There is no prescriptive right to maintain a public nuisance. *See Fischer v. Atlantic Richfield Co.*, 774 F. Supp. 616, 620 (W.D. Okla. 1989) (citing 66 C.J.S. Nuisance § 92). No lapse of time can legalize a public nuisance amounting to an actual obstruction of a public right or the pollution of waters of the State. *See* 50 Okla. Stat. § 7.

Possession of a license or a permit issued by a regulatory body is not a defense for that person to avoid liability under nuisance law for interfering with the rights of others. *See Briscoe v. Harper Oil Co.*, 702 P.2d 33, 36 (Okla. 1985); *Union Oil Co. v. Heinsohn*, 43 F.3d 500, 504 (10th Cir. 1994). A license or permit to do a certain act cannot protect the licensee or permittee who abuses the privilege by erecting or maintaining a nuisance. *See Briscoe*, 702 P.2d at 36;

---

[22]    Defendants have disclaimed any effort to avail themselves of Oklahoma's so-called "right to farm" law. *See* DKT #2185 at p. 16, fn. 10. In any event, the facts would show that it is inapplicable here.

*Heinsohn*, 43 F.3d at 504.  In any event, the State does not permit or authorize the land application of poultry waste in the Oklahoma portion of the IRW generally, or any land application of poultry waste in the Oklahoma portion of the IRW in particular.  *See, e.g.*, DKT #2422 & #2591 (motion and briefing detailing the Oklahoma Registered Poultry Feeding Operations Act, and explaining that animal waste management plans are not permits or authorizations and that the State does not promote the land application of poultry waste in the IRW).

### C.     Federal common law nuisance

"The elements of a claim based on the federal common law of nuisance are simply that the defendant is carrying on an activity this is causing an injury or significant threat of injury to some cognizable interest of the complainant."  *See State of Illinois v. City of Milwaukee*, 599 F.2d 151, 165 (7th Cir. 1979) (vacated by 451 U.S. 304 (1981) on CWA preemption grounds) (citing *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907).

The State's federal common law nuisance claim pertains to conduct occurring in Arkansas and causing harm and threatened harm in Oklahoma.  *Texas v. Pankey*, 441 F.2d 236, 242 (10th Cir. 1971) ("Federal common law and not the varying common law of the individual States is, we think, entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside its domain.  The more would this seem to be imperative in the present era of growing concern on the part of a State about its ecological conditions and impairments of them").  "[F]ederal courts may draw on state common law in shaping the applicable body of federal common law."  *Phoenix Mutual Life Insurance Co. v. Adams*, 30 F.3d 554, 564 (4th Cir. 1994).  However, in fashioning federal common law, courts do not look to the law of a particular state, but rather

should apply common-law doctrines best suited to furthering the applicable goals.  *See id.*

"[F]ederal common law should be consistent across the circuits."  *Id.*

### D.    Trespass

A claim for trespass "involves an actual physical invasion of the real estate of another

without the permission of the person lawfully entitled to possession."  *Bennett v. Fuller*, 2008

U.S. Dist. LEXIS 58198, *16 (N.D. Okla. July 31, 2008).  Here, the State's claim for trespass is

based upon its possessory property interest in waters flowing in definite streams in the Oklahoma

portion of the IRW.  *See* SAC, ¶ 119 & 60 Okla. Stat. § 60(A).

A possessory property interest need not be "exclusive" to support a trespass claim.

Instead, a trespass claim may be brought by a person with a possessory interest against anyone

with any inferior possessory property right (or no possessory property right at all).  *See*

*Cooperative Refinery Association v. Young*, 393 P.2d 537, 540 (Okla. 1964); *Lambert v.*

*Rainbolt*, 250 P.2d 459, 461 (Okla. 1952).  Stated another way, any so-called "exclusivity" must

merely be as to persons with no possessory interest or a lesser possessory interest in the property.

The State's interests in the water are most assuredly superior to and exclusive as to Defendants

and their pollution-causing activity.

The State has not consented to the pollution of its waters.  *See, e.g.,* 27A Okla. Stat. § 2-

6-105(A); 27A Okla. Stat. § 2-6-102; 82 Okla. Stat. § 1084.1; *see also* DKT #2422 & #2591.

The State's trespass claim pertains to conduct occurring in Oklahoma and Arkansas that

causes a trespass in Oklahoma.

### E.    Violations of 27A Okla. Stat. § 2-6-105

27A Okla. Stat. § 2-6-105(A) provides that:

It shall be unlawful for any person to cause pollution of any waters of the state or
to place or cause to be placed any wastes in a location where they are likely to

cause pollution of any . . . waters of the state. Any such action is hereby declared
to be a public nuisance.

This prohibition on conduct causing pollution and conduct likely to cause pollution is both well-

established and far-reaching.  As explained by the Tenth Circuit, "[t]he Oklahoma Legislature's

intent that conduct that causes or is likely to cause pollution be declared a public nuisance is

longstanding . . . ."  *Burlington Northern*, 505 F.3d at 1025.  Further, "[i]t is clear that the intent

of subsection A is to deem as a public nuisance conduct that either has caused or is likely to

cause pollution.  Accordingly, pollution need not have already occurred before conduct 'likely to

cause' pollution can be deemed a public nuisance."  *Id.* at 1024.

From the plain language of the statute, there are three independent grounds of liability

under 27A Okla. Stat. § 2-6-105(A).  They are:

>    (1)      "It shall be unlawful for any person to cause pollution of any waters of the
>    state . . . ."
>
>    (2)      "It shall be unlawful for any person . . . to place . . . any wastes in a
>    location where they are likely to cause pollution of any . . . waters of the state."
>
>    (3)      "It shall be unlawful for any person . . . to . . . cause to be placed any
>    wastes in a location where they are likely to cause pollution of any . . . waters of
>    the state."

27A Okla. Stat. § 2-6-105(A).

For purposes of 27A Okla. Stat. § 2-6-105(A), the term "pollution" is broadly defined.  It

is a two-part, disjunctive definition.  *See* 27A Okla. Stat. § 2-1-102(12).  First, "'[p]ollution'

means the presence in the environment of any substance, contaminant or pollutant, or any other

alteration of the physical, chemical or biological properties of the environment . . . ."  *Id.*

Additionally and alternatively, "'[p]ollution' means . . . . the release of any liquid, gaseous or

solid substance into the environment in quantities which are or will likely create a nuisance or

which render or will likely render the environment harmful or detrimental or injurious to public

health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or

other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, or

to property[.]" *Id.*

The State's claim for violations of 27A Okla. Stat. § 2-6-105, as limited by the Court,

pertains to conduct occurring in Oklahoma.  While Arkansas-based conduct cannot itself be a

violation of 27A Okla. Stat. § 2-6-105, Arkansas-based evidence can be a basis for finding that

Oklahoma-based conduct is a violation of 27A Okla. Stat. § 2-6-105, and therefore Arkansas-

based evidence (including watershed-wide evidence) is relevant to establishing whether there has

been a violation of 27A Okla. Stat. § 2-6-105.

### F.    Violations of 2 Okla. Stat. § 2-18.1

2 Okla. Stat. § 2-18.1(A) provides that:

> It shall be unlawful and a violation of the Oklahoma Agricultural Code for any
> person to cause pollution of any air, land or waters of the state by persons which
> are subject to the jurisdiction of the Oklahoma Department of Agriculture, Food,
> and Forestry pursuant to the Oklahoma Environmental Quality Act.

The State's claim for violations of 2 Okla. Stat. § 2-18.1(A) pertains to conduct occurring

in Oklahoma.

## VI.    Causation

The State will prove its claims by both direct and circumstantial evidence.

"[C]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and

persuasive than direct evidence." *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003); *see also*

*Dillon v. Fibreboard Corp.,* 919 F.2d 1488, 1490 (10th Cir. 1990); *California Oil Co. v.*

*Davenport,* 435 P.2d 560, 563 (Okla. 1967); *Harper-Turner Oil Co. v. Bridge,* 311 P.2d 947,

950-51 (Okla. 1957); *Peppers Refining Co. v. Spivey,* 285 P.2d 228, 231-32 (Okla. 1955); *United*

*States v. Valentine,* 856 F. Supp. 621, 627 (D. Wyo. 1994).

16

There may be more than one direct cause of a harm. *See* OUJI No. 9.7. When a harm is the result of the combined conduct of two or more persons, the conduct of each person is a direct cause of the harm regardless of the extent to which each contributes to the harm. *See* OUJI No. 9.7. Put another way, where the separate and independent acts or wrongdoing of several persons combine or contribute to produce directly an indivisible harm -- here, the pollution of the waters of the State -- each person is responsible for the entire result, even though its act or wrongdoing alone might not have caused it. *See Philips Petroleum v. Vandergriff*, 122 P.2d 1020, 1023 (Okla. 1942) (citation omitted). As explained by Chief Judge Eagan in *City of Tulsa v. Tyson Foods, Inc.*, 258 F. Supp. 2d 1263, 1297 (N.D. Okla. 2003), *vacated in connection with settlement*: "The injury alleged herein is a single, indivisible injury -- the eutrophication of the lakes from excess phosphorus loading. . . . [W]here there are multiple tortfeasors and the separate and independent acts of codefendants concurred, commingled and combined to produce a single indivisible injury for which damages are sought, each defendant may be liable even though his / her acts alone might not have been a sufficient cause of the injury." A harm is indivisible when it is incapable of apportionment. *See Johnson v. Ford Motor Co.*, 45 P.3d 86, 91 (Okla. 2002). The harm to the waters of the State in the Oklahoma portion of the Illinois River Watershed is indivisible. *See Herd v. Asarco, Inc.,* 2003 U.S. Dist. LEXIS 27381, *41 (N.D. Okla. July 11, 2003) ("With respect to environmental nuisances, such as pollution of a stream or pollution of the air surrounding a community, courts have commonly found that such pollution constitutes an indivisible injury").

Because the harm to the waters of the State in the Oklahoma portion of the Illinois River Watershed is indivisible, the State "need not prove the portion or quantity of harm or damages caused by each particular defendant." *See City of Tulsa*, 258 F. Supp. 2d at 1300; *Herd*, 2003

U.S. Dist. LEXIS 27381, *41-42 ("tracing or quantification is not required").  Rather, the State

need merely show that each defendant has contributed to phosphorus and bacteria loading in the

IRW and that the phosphorus and bacteria in the IRW has resulted in the harm sustained by the

State.  *See City of Tulsa*, 258 F. Supp. 2d at 1300.

Similarly, with respect to Count 3 in particular, RCRA does not require the State to prove

that Defendants' poultry waste is the sole cause of the environmental and human health

endangerments that may be presented.  *See Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 778

(10th Cir. 2009).

Defendants' joint and several liability for the indivisible harm to the waters of the IRW

that the State has suffered is not defeated by any alleged comparative fault by the State because

the State contends Defendants' conduct has been intentional.  *See, e.g.,* SAC, ¶¶ 47-56, 98, 101,

109, 110-12, 114 & 120.  The rule is clear on this point: "'When the harm is intentional or the

result of recklessness, contributory negligence is not a defense.'"  *See City of Tulsa*, 258 F. Supp.

2d at 1302 (quoting Restatement (Second) of Torts, § 840B(2)).  The threshold for establishing

intentionality is not high.  As set forth in Restatement (Second) of Torts, § 825, "[a]n invasion of

another's interest in the use and enjoyment of land or an interference with the public right, is

intentional if the actor . . . (b)  knows that it is resulting or is substantially certain to result from

his conduct."  Thus, it is not necessary for the State to prove that Defendants intended to cause

the specific harm that resulted from their conduct, only that the conduct causing the harm is

intentional.  Whether or not the first invasion is intentional, when the conduct is continued after

the party knows that the invasion is resulting or is substantially certain to result from its conduct,

further invasions are intentional.  *See City of Tulsa*, 258 F. Supp. 2d at 1301.

## VII.    Vicarious liability

Defendants' liability arises not only from their own direct conduct, but also from the conduct of others which can be attributed to Defendants through the application of principles of vicarious liability.  Specifically, the State alleges and will show that Defendants have vicarious liability through application of Restatement (Second) of Torts, § 427B, employer-employee principles, and / or principal-agent principles.

### A.    Restatement (Second) of Torts, § 427B principles

The issue of Defendants' liability under Restatement (Second) of Torts, § 427B principles has been extensively briefed and argued by the parties.  Restatement (Second) of Torts, § 427B provides that:

> One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance.

Comment b to Restatement (Second) of Torts, § 427B explains that:

> . . . It is not, however, necessary to the application of the rule that the trespass or nuisance be directed or authorized, or that it shall necessarily follow from the work.  It is sufficient that the employer has reason to recognize that, in the ordinary course of doing the work in the usual or prescribed manner, the trespass or nuisance is likely to result.

These principles are a part of Oklahoma law.  *See Tankersley v. Webster*, 243 P. 745, 747 (Okla. 1925) (acknowledging the rule that "where the performance of [a] contract, in the ordinary mode of doing the work, necessarily or naturally results in producing the defect or nuisance which caused the injury, then the employer is subject to the same liability as the contractor").

The State contends that Defendants are liable for any land application in the IRW of poultry waste generated by their birds irrespective of who does the land application since (1)

the fact that the removal and disposal of poultry waste generated by Defendants' birds is part of the "work" of the poultry grower, (2) Defendants know or have reason to know that that work includes the land application of poultry waste by and on behalf of their growers on grower property, as well as transfers of poultry waste to third persons for land application on non-grower property, and (3) Defendants know or have reason to known that all such land application of that poultry waste is likely to involve a trespass or the creation of a nuisance.  While the Court has ruled that with respect to the State's common law claims, Restatement (Second) of Torts, § 427B principles do not apply where Defendants' poultry waste has been transferred by poultry growers to third persons for land application on non-grower property in the IRW, this ruling is currently the subject of a motion for reconsideration on the ground that the Court should have awaited the development of a factual record to determine whether such transfers were, as the State alleges, part of and a foreseeable consequence of the work of poultry growing such that Restatement (Second) of Torts, § 427B could and would apply.  *See* DKT #2623.

### B.    Employer-employee and agent-principal principles

The State will also show at trial that the "contract" poultry growers are in reality the employees and / or agents of Defendants.  Specifically, the State will show that Defendants exercise control over all essential aspects of the poultry production and the poultry growing process.  *See, e.g.,* DKT #2062 (Statement of Undisputed Facts).  It is black-letter law that if a person was the employee of a defendant and was acting within the scope of his / her employment at the time of the conduct complained, then any act or omission of that employee at that time is, as a matter of law, the act or omission of the defendant employing that employee.  *See* OUJI No. 7.3.  Similarly, it is black-letter law that if a person was the agent of a defendant and was acting within the scope of his / her agency at the time of the conduct complained, then any act or

omission of that agent at that time is, as a matter of law, the act or omission of that defendant.
*See id.*

The determination of whether there has been an employer / employee relationship depends on the facts of the particular case. The following factors are considered in determining whether an employer / employee relationship existed: (a) the nature of the contract between the parties, whether written or oral; (b) the degree of control which, by the agreement, the employer may exercise on the details of the work or the independence enjoyed by the contractor or agent; (c) whether or not the one employed is engaged in a distinct occupation or business and whether he carries on such occupation or business for others; (d) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (e) the skill required in the particular occupation; (f) whether the employer or the workman supplies the instrumentalities, tools and the place of work for the person doing the work; (g) the length of time for which the person is employed; (h) the method of payment, whether by the time or by the job; (i) whether or not the work is a part of the regular business of the employer; (j) whether or not the parties believe they are creating the relationship of master and servant; and (k) the right of either party to terminate the relationship without liability. *See City of Tulsa,* 258 F. Supp. 2d at 1293 (citing *Page v. Hardy*, 334 P.2d 782, 784-85 (Okla. 1959); *Duncan v. Powers Imports*, 884 P.2d 854, 856 n. 1 (Okla. 1994); *Coleman v. J.C. Penney Co.*, 848 P.2d 1158, 1160 (Okla. 1993)). "A decisive factor is the control exerted by the employer over the work." *City of Tulsa,* 258 F. Supp. 2d at 1293 (citing *Bouziden v. Alfalfa Electrical Cooperative, Inc.*, 16 P.3d 450, 459 (Okla. 2000)).

The determination of whether there has been a principal / agent relationship likewise depends on the facts of the particular case. A principal / agent relationship is determined by the

parties' status, which is found from surrounding facts and is not dictated by the contract.  *See Enterprise Management Consultants, Inc. v. State of Oklahoma ex rel. the Oklahoma Tax Commission*, 768 P.2d 359, 362 n. 12 (Okla. 1988).  In the event of a discrepancy between facts and contract language, facts control over contrary contractual language.  *See id.*  "The central factor in determining whether an agency relationship exists is the principal's right to, as well as its exercise of, control over the agent."  *Wathor v. Mutual Assurance Administrators, Inc.*, 87 P.3d 559, 566-67 (Okla. 2004).  The essence of a principal / agent relationship is the principal's power to give directions and the agent's duty to obey them.[23]  *See id.*

## VIII.  Injunctive relief and appropriate factors

As noted above, the State is seeking injunctive relief, including but not limited to abatement, remediation, and costs associated with quantifying the amount of remediation, with respect to each of its claims.  Specifically, the State seeks an order, *inter alia*:

> ➢ Prohibiting the land application of poultry waste in the IRW to land having a soil test phosphorus level of greater than 65 lbs. / acre and requiring application in accordance with all other applicable laws;

> ➢ Requiring Defendants to transport poultry waste out of the IRW and manage it in accordance with the law;

---

[23]     An agent is acting within the scope of his / her authority if (1) he / she is engaged in the transaction of business that has been assigned to him / her by his / her principal, or (2) if he / she is doing anything that may reasonably be said to have been contemplated as a part of his / her agency.  *See* OUJI No. 6.8.  It is not necessary that an act or failure to act must have been expressly authorized by the principal.  *See id.*

In addition to the express authority conferred on him / her by his / her principal, an agent has the authority to do such acts as are incidental to, or reasonably necessary to accomplish, the intended result.  *See* OUJI No. 6.9.  An agent also has the implied authority to do such acts as are usual and customary in the business, and of which the principal has knowledge or should have had knowledge.  *See* OUJI No. 6.10.

When one person acts or purports to act as an agent for another, but does so without authority, and the person for whom he / she acted thereafter confirms such action, by words or conduct, with knowledge of all the material facts, such words or conduct are a ratification of the act, and are the same as if it had been authorized originally.  *See* OUJI, No. 6.13.  If the principal ratifies any part of the act, it ratifies all of it.  *See* OUJI, No. 6.13.

> Prohibiting the land application of poultry waste generated in the IRW on land having a soil test phosphorus level of greater than 65 lbs. / acre in any nutrient vulnerable groundwater area in Oklahoma or in any other scenic river or nutrient limited watershed or nutrient surplus area flowing into Oklahoma;

> Requiring investigation of remedial actions (*e.g.,* buffer strips, drinking water wells, public water supplies, bank stabilization, man-made wetlands, and aeration of Lake Tenkiller), with all such costs of investigation to be borne by Defendants; and

> Requiring implementation of appropriate remedial actions, with all such costs of implementation to be borne by Defendants.

As to enjoining the complained of conduct, the above-cited law makes clear that the threshold for an entitlement to such relief is quite low. In fact, the State need not prove an actual harm from the land application of poultry waste. Rather, under its RCRA claim, state law nuisance claim, federal common law nuisance claim, and 27A Okla. Stat. § 2-6-105(A) claim, the State need merely prove that the land application of poultry waste <u>threatens</u> a harm. *See* 42 U.S.C. § 6972(a)(1)(B) (liability under RCRA arises where disposal of solid waste "<u>may</u> present an imminent and substantial endangerment") (emphasis added); *Sharp v. 251st Street Landfill,* 925 P.2d 546, 548-49 (Okla. 1996) (liability under state law nuisance arises where there is "<u>a reasonable degree of probability</u>" that a defendant's conduct will cause injury to another's interests) (emphasis added); *see also Burlington Northern*, 505 F.3d at 1022-23 (same); *City of Milwaukee*, 599 F.2d at 165 (liability under federal common law nuisance arises where a defendant's conduct is causing "<u>a significant threat</u> of injury" to plaintiff's interest) (emphasis added); *see also Texas v. Pankey,* 441 F.2d 236 (10th Cir. 1971) (recognizing that a threatened nuisance could be enjoined); 27A Okla. Stat. § 2-6-105(A) (liability under 27A Okla. Stat. § 2-6-105(A) arises where a defendant has "place[d] or cause[d] to be placed any wastes in a location where they <u>are likely to cause pollution</u> of any . . . waters of the state"); *see also Burlington*

*Northern,* 505 F.3d at 1024 ("pollution need not have already occurred before conduct 'likely to cause' pollution can be deemed a public nuisance [under 27A Okla. Stat. § 2-6-105(A)").

Because this action involves not only a threat to human health and the environment, but also actual harms, and the State is a sovereign, there should be no balancing of interests when fashioning the injunctive relief to be granted in this case. *See, supra,* Section II (explaining that the law and policy of the State is no pollution of the waters of the State); *see also Burlington Northern,* 505 F.3d at 1020 (42 U.S.C. § 6972(a)(1)(B) "is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes") (citation and quotations omitted) (emphasis in original). As explained in *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 337-38 (4th Cir. 1983):

> [T]he law of injunctions differs with respect to governmental plaintiffs (or private attorneys general) as opposed to private individuals. Where the plaintiff is a sovereign and the activity may endanger public health, "injunctive relief is proper, without resort to balancing." *Illinois v. [City of] Milwaukee,* 599 F.2d 151, 166 (7th Cir. 1979), *rev'd on other grounds*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981).
>
> ***
>
> "The United States . . . is not bound to conform with the requirements of private litigation when it seeks the aid of courts to give effect to the policy of Congress as manifested in a statute. It is a familiar doctrine that an injunction is an appropriate means for enforcement of an Act of Congress when it is in the public interest." *Shafer v. United States,* 229 F.2d 124, 128 (4th Cir. 1956). This rationale applies equally to state enforcement of federal and state health laws.

*See also United States v. Bethlehem Steel Corp.,* 38 F.3d 862, 867 (7th Cir. 1994). Even assuming *arguendo* that a balancing of interests analysis were appropriate, it would be the harms to Defendants, not third persons that should be considered. *See, e.g., Montana Wilderness Association v. Fry*, 310 F. Supp. 2d 1127, 1156 (D. Mont. 2004) ("[a] third party's potential financial damages from an injunction generally do not outweigh potential harm to the

environment"); *Colorado Wild, Inc. v. U.S. Forest Service*, 523 F. Supp. 2d 1213, 1222 (D. Colo. 2007) (finding economic harm does not outweigh environmental harm; collecting cases).

## IX.     Conclusion

The State has endeavored to identify the major legal principles and issues in this case above.  The State submits that the law stands in favor of the State on each of these legal issues. The State further submits that an application of the facts to be adduced at trial to these legal principles will warrant a verdict in favor of the State and against each of the Defendants, jointly and severally.

Respectfully Submitted,

W.A. Drew Edmondson OBA #2628
ATTORNEY GENERAL
Kelly H. Foster OBA #17067
ASSISTANT ATTORNEY GENERAL
State of Oklahoma
313 N.E. 21st St.
Oklahoma City, OK 73105
(405) 521-3921

M. David Riggs OBA #7583
Joseph P. Lennart OBA #5371
Richard T. Garren OBA #3253
Sharon K. Weaver OBA #19010
Robert A. Nance OBA #6581
D. Sharon Gentry OBA #15641
David P. Page OBA #6852
RIGGS, ABNEY, NEAL, TURPEN,
  ORBISON & LEWIS
502 West Sixth Street
Tulsa, OK 74119
(918) 587-3161

Louis W. Bullock OBA #1305
Robert M. Blakemore OBA 18656
BULLOCK, BULLOCK & BLAKEMORE
110 West Seventh Street Suite 707
Tulsa OK 74119
(918) 584-2001

Frederick C. Baker
(admitted *pro hac vice*)
Elizabeth Claire Xidis
(admitted *pro hac vice*)
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC  29465
(843) 216-9280

*/s/ Ingrid L. Moll*
William H. Narwold
(admitted *pro hac vice*)
Ingrid L. Moll
(admitted *pro hac vice)*
Mathew P. Jasinski
(admitted *pro hac vice*)
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT  06103
(860) 882-1678

Jonathan D. Orent
(admitted *pro hac vice)*
Michael G. Rousseau
(admitted *pro hac vice*)
Fidelma L. Fitzpatrick
(admitted *pro hac vice)*
MOTLEY RICE LLC
321 South Main Street
Providence, RI  02940
(401) 457-7700

Attorneys for the State of Oklahoma

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September, 2009, I electronically transmitted the above and foregoing pleading to the Clerk of the Court using the ECF System for filing and a transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| W. A. Drew Edmondson, Attorney General | fc_docket@oag.ok.gov |
| Kelly H. Foster, Assistant Attorney General | kelly_foster@oag.ok.gov |
| | |
| M. David Riggs | driggs@riggsabney.com |
| Joseph P. Lennart | jlennart@riggsabney.com |
| Richard T. Garren | rgarren@riggsabney.com |
| Sharon K. Weaver | sweaver@riggsabney.com |
| Robert A. Nance | rnance@riggsabney.com |
| D. Sharon Gentry | sgentry@riggsabney.com |
| David P. Page | dpage@riggsabney.com |
| RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS | |
| | |
| Louis Werner Bullock | lbullock@bullock-blakemore.com |
| Robert M. Blakemore | bblakemore@bullock-blakemore.com |
| BULLOCK, BULLOCK & BLAKEMORE | |
| | |
| Frederick C. Baker | fbaker@motleyrice.com |
| Elizabeth Claire Xidis | cxidis@motleyrice.com |
| William H. Narwold | bnarwold@motleyrice.com |
| Ingrid L. Moll | imoll@motleyrice.com |
| Jonathan D. Orent | jorent@motleyrice.com |
| Michael G. Rousseau | mrousseau@motleyrice.com |
| Fidelma L. Fitzpatrick | ffitzpatrick@motleyrice.com |
| MOTLEY RICE LLC | |
| **Counsel for State of Oklahoma** | |
| | |
| | |
| Robert P. Redemann | rredemann@pmrlaw.net |
| PERRINE, MCGIVERN, REDEMANN, REID, BARRY & TAYLOR, P.L.L.C. | |
| | |
| David C. Senger | david@cgmlawok.com |
| | |
| Robert E Sanders | rsanders@youngwilliams.com |
| Edwin Stephen Williams | steve.williams@youngwilliams.com |
| YOUNG WILLIAMS P.A. | |
| **Counsel for Cal-Maine Farms, Inc and Cal-Maine Foods, Inc.** | |
| | |
| | |
| John H. Tucker | jtucker@rhodesokla.com |

| | |
|---|---|
| Theresa Noble Hill | thill@rhodesokla.com |
| Colin Hampton Tucker | ctucker@rhodesokla.com |
| Kerry R. Lewis | klewis@rhodesokla.com |
| RHODES, HIERONYMUS, JONES, TUCKER & GABLE | |
| | |
| Terry Wayen West | terry@thewestlawfirm.com |
| THE WEST LAW FIRM | |
| | |
| Delmar R. Ehrich | dehrich@faegre.com |
| Bruce Jones | bjones@faegre.com |
| Krisann C. Kleibacker Lee | kklee@faegre.com |
| Todd P. Walker | twalker@faegre.com |
| Christopher H. Dolan | cdolan@faegre.com |
| Melissa C. Collins | mcollins@faegre.com |
| Colin C. Deihl | cdeihl@faegre.com |
| Randall E. Kahnke | rkahnke@faegre.com |
| FAEGRE & BENSON, LLP | |
| | |
| **Counsel for Cargill, Inc. & Cargill Turkey Production, LLC** | |
| | |
| | |
| James Martin Graves | jgraves@bassettlawfirm.com |
| Gary V Weeks | gweeks@bassettlawfirm.com |
| Woody Bassett | wbassett@bassettlawfirm.com |
| K. C. Dupps Tucker | kctucker@bassettlawfirm.com |
| Earl Lee "Buddy" Chadick | bchadick@bassettlawfirm.com |
| Vincent O. Chadick | vchadick@bassettlawfirm.com |
| BASSETT LAW FIRM | |
| | |
| George W. Owens | gwo@owenslawfirmpc.com |
| Randall E. Rose | rer@owenslawfirmpc.com |
| OWENS LAW FIRM, P.C. | |
| **Counsel for George's Inc. & George's Farms, Inc.** | |
| | |
| | |
| A. Scott McDaniel | smcdaniel@mhla-law.com |
| Nicole Longwell | nlongwell@mhla-law.com |
| Philip Hixon | phixon@mhla-law.com |
| Craig A. Merkes | cmerkes@mhla-law.com |
| MCDANIEL, HIXON, LONGWELL & ACORD, PLLC | |
| | |
| Sherry P. Bartley | sbartley@mwsgw.com |
| MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC | |
| **Counsel for Peterson Farms, Inc.** | |
| | |

| | |
|---|---|
| John Elrod | jelrod@cwlaw.com |
| Vicki Bronson | vbronson@cwlaw.com |
| P. Joshua Wisley | jwisley@cwlaw.com |
| Bruce W. Freeman | bfreeman@cwlaw.com |
| D. Richard Funk | rfunk@cwlaw.com |
| CONNER & WINTERS, LLP | |
| **Counsel for Simmons Foods, Inc.** | |
| | |
| | |
| Stephen L. Jantzen | sjantzen@ryanwhaley.com |
| Paula M. Buchwald | pbuchwald@ryanwhaley.com |
| Patrick M. Ryan | pryan@ryanwhaley.com |
| RYAN, WHALEY, COLDIRON & SHANDY, P.C. | |
| | |
| Mark D. Hopson | mhopson@sidley.com |
| Jay Thomas Jorgensen | jjorgensen@sidley.com |
| Timothy K. Webster | twebster@sidley.com |
| Thomas C. Green | tcgreen@sidley.com |
| Gordon D. Todd | gtodd@sidley.com |
| SIDLEY, AUSTIN, BROWN & WOOD LLP | |
| | |
| Robert W. George | robert.george@tyson.com |
| L. Bryan Burns | bryan.burns@tyson.com |
| Timothy T. Jones | tim.jones@tyson.com |
| TYSON FOODS, INC | |
| | |
| Michael R. Bond | michael.bond@kutakrock.com |
| Erin W. Thompson | erin.thompson@kutakrock.com |
| Dustin R. Darst | dustin.darst@kutakrock.com |
| KUTAK ROCK, LLP | |
| **Counsel for Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., & Cobb-Vantress, Inc.** | |
| | |
| | |
| R. Thomas Lay | rtl@kiralaw.com |
| KERR, IRVINE, RHODES & ABLES | |
| Frank M. Evans, III | fevans@lathropgage.com |
| Jennifer Stockton Griffin | jgriffin@lathropgage.com |
| David Gregory Brown | |
| LATHROP & GAGE LC | |
| **Counsel for Willow Brook Foods, Inc.** | |
| | |
| | |
| Robin S Conrad | rconrad@uschamber.com |
| NATIONAL CHAMBER LITIGATION CENTER | |

| | |
|---|---|
| Gary S Chilton | gchilton@hcdattorneys.com |
| HOLLADAY, CHILTON AND DEGIUSTI, PLLC | |
| **Counsel for US Chamber of Commerce and American Tort Reform Association** | |
| | |
| | |
| D. Kenyon Williams, Jr. | kwilliams@hallestill.com |
| Michael D. Graves | mgraves@hallestill.com |
| HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON | |
| **Counsel for Poultry Growers/Interested Parties/ Poultry Partners, Inc.** | |
| | |
| | |
| Richard Ford | richard.ford@crowedunlevy.com |
| LeAnne Burnett | leanne.burnett@crowedunlevy.com |
| CROWE & DUNLEVY | |
| **Counsel for Oklahoma Farm Bureau, Inc.** | |
| | |
| | |
| Kendra Akin Jones, Assistant Attorney General | Kendra.Jones@arkansasag.gov |
| Charles L. Moulton, Sr Assistant Attorney General | Charles.Moulton@arkansasag.gov |
| **Counsel for State of Arkansas and Arkansas National Resources Commission** | |
| | |
| | |
| Mark Richard Mullins | richard.mullins@mcafeetaft.com |
| MCAFEE & TAFT | |
| **Counsel for Texas Farm Bureau; Texas Cattle Feeders Association; Texas Pork Producers Association and Texas Association of Dairymen** | |
| | |
| | |
| Mia Vahlberg | mvahlberg@gablelaw.com |
| GABLE GOTWALS | |
| | |
| James T. Banks | jtbanks@hhlaw.com |
| Adam J. Siegel | ajsiegel@hhlaw.com |
| HOGAN & HARTSON, LLP | |
| **Counsel for National Chicken Council; U.S. Poultry and Egg Association & National Turkey Federation** | |
| | |
| | |
| John D. Russell | jrussell@fellerssnider.com |
| FELLERS, SNIDER, BLANKENSHIP, BAILEY & TIPPENS, PC | |
| | |
| William A. Waddell, Jr. | waddell@fec.net |
| David E. Choate | dchoate@fec.net |

| | |
|---|---|
| FRIDAY, ELDREDGE & CLARK, LLP | |
| **Counsel for Arkansas Farm Bureau Federation** | |
| | |
| | |
| Barry Greg Reynolds | reynolds@titushillis.com |
| Jessica E. Rainey | jrainey@titushillis.com |
| TITUS, HILLIS, REYNOLDS, LOVE, DICKMAN & MCCALMON | |
| | |
| Nikaa Baugh Jordan | njordan@lightfootlaw.com |
| William S. Cox, III | wcox@lightfootlaw.com |
| LIGHTFOOT, FRANKLIN & WHITE, LLC | |
| **Counsel for American Farm Bureau and National Cattlemen's Beef Association** | |
| | |
| | |
| Duane L. Berlin | dberlin@levberlin.com |
| LEV & BERLIN PC | |
| **Counsel for Council of American Survey Research Organizations & American Association for Public Opinion Research** | |
| | |
| | |
| Diane Hammons | Diane-Hammons@cherokee.org |
| Sara Hill | Sarah-Hill@cherokee.org |
| **Counsel for the Cherokee Nation** | |

*/s/ Ingrid L. Moll*
Ingrid L. Moll