IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
             Plaintiffs,        )
                                )
vs.                             )    No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
             Defendants.        )

VOLUME VI - PM

TRANSCRIPT OF TRIAL PROCEEDINGS

OCTOBER 1, 2009

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE

*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                      *United States Court Reporter*

```
 1                    A P P E A R A N C E S

 2

 3   For the Plaintiffs:          MR. W.A. DREW EDMONDSON
                                  Richardson Law Firm
 4                                312 W. Broadway
                                  Muskogee, OK  74401
 5
                                  MR. DAVID RIGGS
 6                                MR. DAVID P. PAGE
                                  MR. RICHARD T. GARREN
 7                                Riggs Abney Neal
                                  Turpen Orbison & Lewis
 8                                502 W. 6th Street
                                  Tulsa, OK 74119
 9
                                  MR. ROBERT A. NANCE
10                                MS. KELLY FOSTER
                                  Riggs Abney Neal
11                                Turen Orbison & Lewis
                                  5801 Broadway
12                                Oklahoma City, OK 73118

13                                MR. LOUIS W. BULLOCK
                                  MR. ROBERT BLAKEMORE
14                                Bullock Bullock &
                                  Blakemore
15                                110 W. 7th St.
                                  Suite 770
16                                Tulsa, OK 74119

17                                MR. FREDERICK C. BAKER
                                  MS. ELIZABETH CLAIRE XIDIS
18                                MS. INGRID L. MOLL
                                  Motley Rice LLC
19                                28 Bridgeside
                                  P.O. Box 1792
20                                Mount Pleasant, SC 29465

21

22

23

24

25
```

United States District Court

*597*

1              A P P E A R A N C E S  (Cont.)

2

3    For Tyson Foods:              MR. ROBERT W. GEORGE
                                   Tyson Foods, Inc.
                                   2210 West Oaklawn Drive
4                                  Springdale, AR 72701

5                                  MR. FRANK R. VOLPE
                                   MR. MARK D. HOPSON
6                                  MR. THOMAS C. GREEN
                                   MR. JAY THOMAS JORGENSEN
7                                  MR. GORDON D. TODD
                                   ERIC J. IVES
8                                  Sidley Austin LLP
                                   1501 K St. NW
9                                  Washington, DC 20005

10                                 MR. PATRICK MICHAEL RYAN
                                   Ryan Whaley Coldiron and
11                                 Shandy PC
                                   119 N. Robinson, Rm 900
12                                 Oklahoma City, OK 73102

13

14   For Cargill:                  MR. JOHN H. TUCKER
                                   MS. THERESA HILL
                                   Rhodes Hieronymus Jones
15                                 Tucker & Gable
                                   100 W. 5th St., Ste 400
16                                 Tulsa, OK 74103

17                                 MR. DELMAR R. EHRICH
                                   MS. KRISANN KLEIBACKER LEE
18                                 Faerge & Benson
                                   90 S. 7th St., Ste 2200
19                                 Minnaepolis, MN 55402

20

21   For Simmons Foods:            MR. JOHN R. ELROD
                                   MS. VICKI BRONSON
                                   Conner & Winters
22                                 211 E. Dickson St.
                                   Fayetteville, AR 72701

23

24

25

598

```
 1              A P P E A R A N C E S  (Cont.)

 2

 3   For Peterson Farms:        MR. A. SCOTT MCDANIEL
                                MR. PHILIP HIXON
                                MS. NICOLE LONGWELL
 4                              McDaniel Hixon Longwell &
                                Acord PLLC
 5                              320 S. Boston, Ste 700
                                Tulsa, OK 74103
 6

 7   For George's:             MR. GARY V. WEEKS
                               MR. WOODY BASSETT
 8                             MR. VINCENT O. CHADICK
                               Bassett Law Firm
 9                             P.O. Box 3618
                               Fayetteville, AR 72702
10

11   For Cal-Maine:            MR. ROBERT SANDERS
                               Young Williams P.A.
12                             P.O. Box 23059
                               Jackson, MS 39225
13
                               MR. ROBERT P. REDEMANN
14                             Perrine McGivern Redemann
                               Reid Berry & Taylor PLLC
15                             P.O. Box 1710
                               Tulsa, OK 74101
16

17

18

19

20

21

22

23

24

25
```

**United States District Court**

599

# I N D E X

Page

*WITNESSES ON BEHALF OF THE PLAINTIFF*

**GERALD HILSHER**

Continued Direct Examination by Mr. Garren          600
Cross-Examination by Mr. Elrod                      620
Cross-Examination by Mr. McDaniel                   630
Cross-Examination by Mr. Volpe                      631
Cross-Examination by Mr. Weeks                      632
Redirect Examination by Mr. Garren                  636


**EDWARD FITE, III**

Direct Examination by Mr. Garren                    639

**United States District Court**

*600*

1          Thursday, October 1, 2009

2                  * * * * *

3          THE COURT:  Mr. Garren.  Mr. Bullock.

4          MR. BULLOCK:  One quick matter.  We

5  received this morning about the time we came over a

6  bench brief from the defendants regarding the

7  admissibility of the ads.

8          THE COURT:  Yes.

9          MR. BULLOCK:  If we could have until

10  Saturday to file a response to that.

11          THE COURT:  Any objection?

12          MR. VOLPE:  No objection.

13          THE COURT:  Very well.  Thank you.

14          MR. BULLOCK:  Okay.

15          THE COURT:  Mr. Garren.

16          **CONTINUED DIRECT EXAMINATION**

17  **BY MR. GARREN:**

18     Q.   Mr. Hilsher, you talked about certain

19  representatives that have attended the task force when

20  you were attending it, and you mentioned Mr. Schaffer,

21  Mr. Rutherford and Mr. Simmons by name, and

22  Mr. Harriman.  Did those gentlemen attend a single

23  meeting?

24          MR. ELROD:  Your Honor -- Rick, just a

25  second.  I'm sorry to interpose an objection.  I hate

601

1    to interrupt counsel, but he misstates the evidence.

2    That's not what the state of the evidence is.

3                    THE COURT:  I think that's exactly --

4                    MR. ELROD:  He said he wasn't sure who

5    was there.

6                    THE COURT:  Well, I think that's

7    exactly -- he precisely related the testimony.

8    Overruled.

9         Go ahead.

10    Q.    *(BY MR. GARREN)*  Did they attend a single

11    meeting or multiple meetings, if you can remember?

12    A.    I know Mr. Rutherford was there on several

13    occasions.  I believe Mr. Schaffer was there on

14    several occasions.  I couldn't tell you about

15    Mr. Simmons or Mr. Harriman.

16    Q.    Let's talk a little bit now about the Scenic

17    Rivers Commission and your participation on that

18    commission.

19            Generally, what is its role, and I mean

20    briefly?  Mr. Fite's going to have an opportunity to

21    tell us in detail, but just some background for Your

22    Honor.

23    A.    The role of the Scenic Rivers Commission our

24    purpose, is to protect the environmental aesthetic

25    conditions of the scenic rivers with regard to

1    their -- you know, the economic surrounding them,

2    canoe operators, and all that sort of thing.

3        Q.    How often do you meet?

4        A.    We meet anywhere from four to six times a

5    year.

6        Q.    And at those meetings, are you provided

7    information that is collected, either by the Scenic

8    Rivers Commission its staff, or other agency of the

9    State of Oklahoma, that deal with that river?

10       A.    Oh, yes.

11       Q.    Tell us just briefly, if you would, what kind

12   of materials that you would expect to see as a

13   commission member about the river.

14       A.    We receive reports from the U.S. Geological

15   Survey.  We receive reports from the Oklahoma Water

16   Resources Board.  Both of those have to do with water

17   sampling events.  And USGS, for instance, Judge, comes

18   to us seeking funding for water-sampling projects, and

19   we receive reports back from the USGS on what sort

20   of --

21             MR. VOLPE:  Judge, I'm going to object.

22   Excuse me.  I'm sorry.  It's okay if he wants to say

23   what reports he received, but this witness can't

24   testify about what the reports contain.  That's

25   hearsay.

1          THE COURT:  I don't believe he was

2    attempting to.  Overruled.  Go ahead.

3       A.   It's just in the nature of what their results

4    are from the sampling projects they take on.  OWRB,

5    for instance, will also come in and make presentations

6    based on -- you know, one that comes to mind is when

7    they were considering --

8          MR. VOLPE:  Objection, Judge.  I'm

9    sorry.  He is getting into what the reports say or the

10   presentations say.

11         THE COURT:  I don't believe so yet.  But

12   I'm sure you'll be ready when he does.

13         MR. VOLPE:  I'm standing by, Judge.

14         THE COURT:  Go ahead.

15      A.   Generally, those presentations have to do

16   with things like setting a numerical standard.  So

17   there would be a presentation on that.  We've had

18   other scientists, Dr. Riley Needham, for instance,

19   come and provide reports on bacteriological findings.

20   From the USGS that he did some work on making

21   correlation analysis on.

22         We receive -- we receive reports from the

23   conservation commission.  We'll receive reports on

24   occasion from members of academia.  We had, for

25   instance, an OSU professor come and give a report of

1    some findings he made about transport of waste

2    products to the river, that sort of thing.

3        Q.   Are you also provided the data that underlies

4    these reports that you've just described?

5        A.   The data comes in -- we don't see every sheet

6    but it comes in compilations.  You'll see a chart, a

7    graph of what the data is with representations of when

8    it was collected and all that sort of thing.

9        Q.   As a commission, is it your role to ask

10   questions and obtain information in order to carry out

11   the purposes of the Scenic Rivers Commission?

12       A.   Sure.

13       Q.   And has the Scenic Rivers Commission

14   identified any major water quality problems in the

15   IRW?

16       A.   Yes.  I mean, beginning from my time on the

17   commission in 1998, we received reports from USGS

18   concerning high-water flow transport of phosphorus

19   into -- into the river and the tributaries.

20       Q.   In addition to phosphorus -- well, let me ask

21   you this. When you receive these kind of reports and

22   information, do you have any responsibility on the

23   commission to do anything with it?

24       A.   Well, yes.  I mean, our role is we receive

25   information and then we react to it in one way or

 1    another.  Or we make a decision not to react to it.

 2         This '99 report that I'm recalling is what

 3    led us to change the sampling protocol from simply a

 4    base flow, you know, every Wednesday type of an

 5    analysis to, well, we going to start measuring high

 6    rainfall events to see what storm water events do in

 7    terms of whether there's an increase in nutrients or

 8    no difference.  So that is what prompted us to start

 9    spending our money differently on what we were

10    tracking in the watershed.

11         Q.  Has the Scenic Rivers Commission identified

12    major sources of contributors to the phosphorus you

13    described earlier?

14         A.  Well, you know, we haven't made a list, but

15    the reports that we've seen have identified the

16    poultry industry as a --

17              MR. ELROD:  Your Honor, without laying a

18    foundation, I'm going to have to object to this line.

19              MR. VOLPE:  Judge, may I add to this,

20    please?

21              THE COURT:  You may, sir.

22              MR. VOLPE:  It calls for expert opinion.

23    It also calls for a recitation of hearsay.

24              THE COURT:  The question only is whether

25    or not the Scenic Rivers Commission has identified

```
 1   major sources.  The objection's sustained as to the

 2   answer. You may answer the question.

 3        A.   If the question is again, had we identified,

 4   the answer is yes.

 5        Q.   (BY MR. GARREN)  And can you tell the court

 6   what those major sources are that you have

 7   identified?

 8                  MR. VOLPE:  Judge, the same objection.

 9                  MR. ELROD:  Same objection, Your

10   Honor.

11                  THE COURT:  Sustained.

12        Q.   (BY MR. GARREN)  With regard to the major

13   sources that may or may not have been identified, does

14   the commission itself undertake any sampling events on

15   its own?

16        A.   I'm not exactly sure what you mean by "on its

17   own."

18        Q.   Let me --

19        A.   We contribute money to people who sample.

20        Q.   And give me an example of those who do

21   sampling for the commission.

22        A.   Okay.  We have partnered with other state

23   agencies, like Water Resources Board, to fund USGS

24   sampling.  So it's actually the USGS that's doing that

25   sampling.  We have had occasions where in order to
```

1  make our dollars go farther, Ed Fite has actually done

2  sampling.  Last summer, summer before that.  But

3  primarily it's USGS that's done the sampling programs.

4      Q.   Does the Scenic Rivers Commission itself

5  prepare written reports on basically data collection?

6      A.   No.

7      Q.   All right.

8      A.   I mean, we have minutes, of course, of our

9  meetings that reflect information that's been provided

10 to the commission.

11     Q.   Does the Scenic Rivers Commission report to

12 any other agency in the State of Oklahoma's

13 government?

14     A.   I'm not understanding the question, do we

15 report to.

16     Q.   All right.  Do you -- are you a part of any

17 other agency structure within the Oklahoma government

18 or are you freestanding?

19     A.   Well, we are responsive to the Secretary of

20 the Environment.  We have relationships with, you

21 know, the tourism department.  For instance, at times,

22 we've had different personnel who have been actually

23 attached to tourism.  Our rangers, for instance, in

24 the past.  You know, we have working relationships

25 with OWRB.  We have working relationships with DEQ,

1    with the conservation commission.  But other than the

2    Secretary of Environment's downward organizational

3    thrust, we don't report to anybody.

4         Q.   Let me ask this then.

5              Does the Scenic Rivers Commission have any

6    regulatory authority?

7         A.   We have -- we have some limited regulatory

8    authority.

9         Q.   Just tell us what the nature of that

10   regulatory authority is.

11        A.   Well, we have -- we have the -- we have

12   the -- our rangers enforce rules and regulations up

13   and down the river, Styrofoam, glass, etcetera.  We

14   have authority under the statute to recommend, I

15   think, nuisance actions.  We've got authority with

16   regard to the canoe outfitters or flotation device

17   outfitters.  So we've got a whole host of different

18   authorities under our statutes and regs.

19        Q.   You mentioned that the purpose of this

20   commission is to preserve and protect the water

21   quality in the Illinois River; is that correct?

22        A.   Correct.

23        Q.   And do you have any regulatory authority over

24   land-applied poultry waste?

25        A.   No.

**United States District Court**

 1          Q.   Let's talk again a little bit about your

 2     history and involvement in the scenic river area.

 3               When did you first see the Illinois River?

 4          A.   First saw it spring break 1974.

 5          Q.   And what caused you to be here in this area

 6     to see it?

 7          A.   I was a sophomore in college at the

 8     University of Houston.  I traveled up here to visit a

 9     friend of mine in Tahlequah.

10               MR. VOLPE:  Judge, objection.

11               THE COURT:  We've been over this.  Let's

12     move on.

13               MR. GARREN:  I understand.  We'll move

14     on.

15          Q.   *(BY MR. GARREN)*  How long did you live in the

16     Tahlequah area at that time?

17          A.   I came to live in Tahlequah in August of 1974

18     and lived there until August of 1976.

19          Q.   All right.  And you mentioned you lived in a

20     cabin on the river; correct?

21          A.   Right.

22          Q.   Did you float the river?

23          A.   Regularly.

24          Q.   Did you observe people recreating in the

25     river?

1          A.   Oh, yeah.

2          Q.   What would you describe as the condition of

3     the water observed when you were either floating it or

4     recreating it -- recreating in that river?

5          A.   Water was clear.  More than that, the gravel

6     base -- I mean, this is an Ozark Mountain stream with

7     a gravel base -- the rocks were distinct.  I mean, you

8     could tell if a rock was light gray or if it was black

9     or if it was brown, and there wasn't, you know, algae,

10    green algae, growing on it or dead brown algae growing

11    on it.  It was a clear-bottom stream.

12         Q.   After you left college, what was the next

13    time for you to come back to the Illinois River and

14    observe it?

15         A.   I don't believe I got back out onto the river

16    until probably mid to late '90s.

17         Q.   And just tell the court, if you would,

18    please, in comparison to the description you've just

19    provided us as to the water quality and its condition,

20    how did you observe those same characteristics in that

21    time in the '90s?

22         A.   The water was murky.  The bottom is what was

23    probably more startling, and that is that the rocks

24    were now covered with either a green live algae or a

25    brown dead algae.  You know, there were other

1   occasions when you were there that the water wasn't so

2   murky.  I mean, you could still have clear water, but

3   you still had the algae on the bottoms, either green

4   or brown, depending on whether it's live or dead.

5        Q.   Have you observed the river since 1998, sir?

6        A.   Yes.

7        Q.   And how would you compare what you -- well,

8   when was the last time you observed it?

9        A.   Probably in the spring of this year or

10  possibly in the fall of last year.  I forget.  We had

11  a -- we had a subcommittee meeting at one of our

12  commissioner's homes that lives up -- lives up on the

13  north stretch of the river and I saw it then.  I've

14  seen it on other occasions, probably a couple of years

15  ago, when we were doing -- had some sampling protocols

16  that we were looking at.

17       Q.   How would you -- are you able to characterize

18  the -- any difference in the water quality that you

19  observed recently compared to 1998?

20            MR. MCDANIEL:  Excuse me.  Objection,

21  Your Honor.  Given that we're looking at potentially

22  more than a hundred miles of the Illinois River in the

23  state, I don't think Mr. Hilsher's testimony about

24  what he saw at some unidentified location is

25  particularly relevant or probative.

1          THE COURT:  Overruled.

2     A.   It was basically as I had seen it in the

3     '90s.  It was, you know -- the water was -- I think on

4     that occasion at Commissioner Randall's, the water was

5     clear, it wasn't murky, but you still had that green

6     and brown algae that was covering the bottom.

7     Q.   *(BY MR. GARREN)*  Let's talk about your

8     knowledge and experience in the capacity as chairman.

9     Scenic Rivers Commission. Do you have a view what may

10    be the greatest threat to the quality of the water in

11    the Illinois River Watershed?

12              MR. VOLPE:  Objection, Your Honor.

13              THE COURT:  Sustained.

14              MR. GARREN:  Oh, I'm sorry, Judge.  I

15    was interrupted.  It was sustained?

16              THE COURT:  Yes.

17              MR. GARREN:  Judge, I would offer that

18    we continue to hear this argument that the agencies

19    are at war with each other.  In order to show this

20    particular agency's view, at least from its head of

21    the agency at this time, I think it would be very

22    probative and relevant.

23              THE COURT:  Response?

24              MR. VOLPE:  Still opinion, Judge.  It's

25    opinion testimony, it's expert testimony, it's not

*613*

 1   relevant, and --

 2           THE COURT:  Well, of course, we can get

 3   to that in terms of just asking whether or not this

 4   particular agency is supportive of the lawsuit --

 5           MR. GARREN:  I think this is a different

 6   issue, Judge.

 7           THE COURT:  -- rather than getting

 8   causation. In fact, your question was, do you have a

 9   view as may be the greatest threat.  Sustained.

10      Q.   *(BY MR. GARREN)*  Based upon your personal

11   observations, do you have an opinion, sir, what

12   appears to be, or what is, a threat to the Illinois

13   River today?

14           MR. VOLPE:  I'm going to object to that

15   as well, Judge.  That's an opinion.  Not been

16   qualified as an expert to offer opinions in this

17   matter.

18           MR. GARREN:  He's the chairman of the

19   Scenic Rivers Commission, Judge.  He's gathering data.

20   He's looking at information.  He has an authority to

21   report that information, other agencies act on it.

22           THE COURT:  Sustained.  Personal

23   observation as to what appears to be or what may be a

24   threat?  The objection's sustained.

25      Q.   *(BY MR. GARREN)*  All right.  In reviewing the

1    reports and data that's supplied to the commission for

2    its purposes in performing its functions, have you

3    read that material when supplied, sir?

4         A.   Yes.

5         Q.   And do you use it in the functions of the

6    Scenic Rivers Commission and as its chairman?  As you

7    sit here today, have you done so?

8         A.   Yes.

9         Q.   And is that material discussed at the

10   commission?

11        A.   Yes.

12        Q.   And does the commission have an opinion, if

13   you know, with regard to what may be, or what is, a

14   threat to the water quality in the Illinois River

15   Watershed?

16             MR. VOLPE:  Judge, I think

17   that's -- objection.  I believe that that is just a

18   back-door to what we've just previously excluded.

19             THE COURT:  It's hearsay.  It precludes

20   the defendants from an opportunity to cross-examine

21   the source.  The objection's sustained.

22        Q.   *(BY MR. GARREN)*  Let me ask you this.

23             What, if anything, has the commission done to

24   address any source of phosphorus or bacteria in the

25   Illinois River Watershed?

**United States District Court**

1    A.   One of the things we did as a commission was

2 to recommend to the Oklahoma Water Resources Board

3 a .02 phosphorus standard for the Illinois River.

4 This was unanimously passed by the commission as our

5 recommendation on what numerical standard should be

6 applied to the scenic rivers.

7    Q.   When did that occur?

8    A.   I think that was in or about 2002.

9    Q.   To whom was that recommendation made?

10    A.   We made that recommendation to the Oklahoma

11 Water Resources Board.

12    Q.   Does the Scenic River have any authority in

13 causing such a numerical standard to be applied in the

14 watershed?

15    A.   No.   That's -- we have the power to

16 recommend; we do not have the power to promulgate that

17 as a standard.

18    Q.   What is that standard intended to protect the

19 water from?

20    A.   It's to protect the level -- or to limit the

21 amount of phosphorus that would otherwise encourage

22 algae growth.

23    Q.   Based on your experience with the Scenic

24 Rivers Commission and the task force and your exposure

25 to working with environmental law and the reports and

1   materials that you've had opportunity to examine and

2   study, do you have an opinion whether or not

3   land-applied poultry waste ends up the Illinois River

4   water?

5              MR. VOLPE:  Judge, I object.  There are

6   many objections embedded in that question, but my

7   primary objection is it calls for expert testimony and

8   it calls for opinion testimony.  This witness has not

9   been disclosed as offering expert testimony.  It also

10   calls for hearsay.

11              THE COURT:  Mr. Garren.

12              MR. GARREN:  Yes, Your Honor.

13   Obviously, the problem that I'm seeing here is that

14   you can continually make these objections only to

15   muzzle the agencies that have some authority to

16   address and speak to the concerns that they observe.

17              THE COURT:  I'm sorry.  That doesn't

18   address the basis for the objection.  That's argument.

19   It calls for expert testimony is the basis of the

20   objection.  Opinion testimony, and that this witness

21   has not been disclosed as offering expert testimony.

22   Your response?

23              MR. GARREN:  I've made it, Your Honor.

24   I'll move to a new question.

25              THE COURT:  All right.  Sustained.

1    Q.   *(BY MR. GARREN)*   What, if anything, is the

2    commission doing to warn recreators about whether they

3    should or should not be in the waters of the Illinois

4    River?

5    A.   We have had on our agenda a discussion about

6    whether or not there should be bacteria warnings for

7    the Illinois River.   Those discussions ended in a

8    tabled motion.   After that, we were presented with DEQ

9    who was, I think, alerted to the fact that we had

10   discussions about bacteria issues. There was a poster,

11   large poster, with a set of things to do.   If you're

12   going to have primary body contact in the waters, not

13   just in the Illinois River, but in any rivers.   That

14   was produced by DEQ.   I'm not sure how many different

15   agencies were also represented on that poster and/or

16   whether our agency actually had their insignia on

17   there. But I think that was a result as a part of our

18   interest in that to be posted at float operator's

19   locations and at places where -- access points to the

20   river.

21   Q.   Did the Scenic Rivers Commission make a

22   recommendation that that be done?

23   A.   We did not make a recommendation that that be

24   done.   But it was a point of discussion at at least

25   one, if not more, than one of our meetings.

1    Q.   As the chairman of the Scenic Rivers

2   Commission, do you have any authority to speak for

3   that commission?

4    A.   You know, I've taken the position that unless

5   we have a vote that is an affirmative vote, that no

6   commissioner has the right to speak for the

7   commission.

8          It's not a rule that one can enforce because

9   it seems that we have a number of commissioners who

10   speak out with, you know, the tag line "commissioner"

11   after the name.

12    Q.   Let me ask you this.  Do you know a gentleman

13   by the name of Ed Fite?

14    A.   Yes, I do.

15    Q.   How long have you known Mr. Fite?

16    A.   I met Ed in 1997 when we were both members of

17   the governor's Animal Waste Task Force.

18    Q.   Do you have regular dealings with him now?

19    A.   Yes, I do.  Because he remains the

20   administrator of the Oklahoma Scenic Rivers

21   Commission.

22    Q.   Do you consult and confer with him outside

23   your duties of the Scenic Rivers Commission?

24    A.   Yes, I do.  Mr. Fite is also a member of the

25   Oklahoma Water Resources Board.  Mr. Fite is also on

1    the Cherokee Nation Environmental Commission.

2    Mr. Fite is also a personal friend, and, when I need

3    somebody with a chainsaw to come help me at church,

4    Ed's there.

5        Q.   If you needed information about the Illinois

6    River Watershed, who would you ask first for that

7    information?

8        A.   Ed Fite is a walking encyclopedia.  And

9    better than that, he remembers everybody's name.  The

10   judge.  He remembers everything.

11       Q.   Are you aware of anyone more knowledgeable

12   about the river than Mr. Fite?

13               MR. VOLPE:  I'm going to object, Judge.

14   What we have now is a witness vouching for the

15   credibility of a future witness.  I don't think that's

16   proper.

17               THE COURT:  Overruled.  I think we can

18   probably take judicial notice of that. Go ahead.

19       A.   I don't know of anyone with the educational

20   credentials, experience credentials, and time on the

21   river that Ed Fite has.

22               MR. GARREN:  I'll pass the witness, Your

23   Honor.

24               THE COURT:  Cross-examination.

25

1                    **CROSS-EXAMINATION**

2  **BY MR. ELROD:**

3      Q.    Good afternoon, sir.

4      A.    Good afternoon, Mr. Elrod.

5      Q.    Gerald, I take it from your resumé that you

6  have trouble holding down a job?

7      A.    I've had more jobs than Frank Keating.

8  That's saying something.

9      Q.    Just to make the record clear, the litigation

10 that you brought against my client, Simmons Foods,

11 that we lawyered about during the late 1990s had

12 nothing to do with land application of chicken litter,

13 it had to do with the wastewater treatment facility at

14 Southwest City; is that true, sir?

15     A.    That's correct.  But I think we went into the

16 2000s with that litigation.

17     Q.    Yep.  At the time of the Keating's Animal

18 Waste Task Force, you know that Claud Rutherford was,

19 in fact, an employee of Simmons Foods; is that true,

20 sir?

21     A.    I thought -- maybe I've got his title and

22 Mr. Harriman's mixed up.  I thought he was an industry

23 representative.

24     Q.    Okay.  And he served as an informational

25 liaison between information being gathered by the

1    poultry companies for the benefit of the task force

2    and the task force itself; is that true?

3        A.   I don't recall that but that wouldn't

4    surprise me.

5        Q.   And as has already been pointed out, the

6    efforts of the Keating Animal Waste Task Force

7    resulted in the 1998 acts that we've talked about in

8    this courtroom; is that true?

9        A.   Our recommendations did seem to appear to be

10   the motivating point for the legislation.

11       Q.   Yes, sir.  And I think I heard you testify

12   that prior to the Keating Animal Waste Task Force,

13   that you actually observed or saw some Animal Waste

14   Management Plans issued to growers?

15       A.   No, sir.  It was as a part of the task force.

16   If I saw one -- and I'm not certain that I did -- or

17   talked about one, it would have been a part of our

18   field trip that the task force took to Mr. Medford's

19   farm in Cherokee or Delaware County --

20       Q.   So it would be true, sir, that if you saw an

21   Animal Waste Management Plan while you were a member

22   of the Keating Animal Waste Task Force, you would have

23   seen that plan prior to the State of Oklahoma

24   requiring the plans exist?

25       A.   If I saw it as opposed to simply talking

```
 1    about what they were doing with their animal waste.

 2    That's where I'm not clear, Mr. Elrod, whether we saw

 3    it or whether we just talked about what he did at the

 4    facility.

 5        Q.   You know from having been involved with these

 6    issues for some period of time and having lived on the

 7    earth as long as you have, that plans were in

 8    existence on a voluntary basis before being compelled

 9    to be in existence by the State of Oklahoma; isn't

10    that true?

11        A.   I'm not sure if there were written plans or

12    not.  I know that there were, as they were described,

13    best management practices that growers were attempting

14    to deal with.

15        Q.   Now, you testified -- you gave your

16    deposition on March 3, 2009; is that true, sir?

17        A.   Yes.  I think so.

18        Q.   And in the course of that deposition, you

19    testified that the last time that you floated the

20    river was in 1987; is that correct?

21        A.   That is -- that would still be correct.

22        Q.   About 22 years ago?

23        A.   That's right.

24        Q.   And the last time that you had been to Lake

25    Tenkiller was in 1985, some 24 years ago?
```

1    A.   I think if I said "last time been to the

2    lake," that would be in error.  Last time I was in the

3    lake was probably 1985.

4    Q.   And you testified that you would not be able

5    to offer any opinion regarding, quote, murkiness, end

6    quote, in the river between 1998 and 2008; is that

7    true?

8    A.   Tell me the dates again, please.

9    Q.   '98 to 2008.  The last ten years.

10   A.   Yeah.  I may have said that.

11   Q.   Okay.  And that one of your concerns as a

12   commissioner has been the Watts lagoons.  Correct,

13   sir?

14   A.   That was one of the initial concerns we had

15   on the Scenic Rivers Commission when I joined.

16   Q.   Okay.

17   A.   It hasn't been a recent issue.

18   Q.   And I will represent you that His Honor saw

19   some aerial photographs of the Watts lagoons during

20   opening statement.  But to be more precise, the Watts

21   lagoons are just inside the state of Oklahoma; is that

22   correct?

23        MR. GARREN:  Object, Your Honor.  This

24   is outside the scope.  It's not relevant to the

25   issues.

**United States District Court**

1          THE COURT:  Sustained.

2     Q.   *(BY MR. ELROD)*  Let's move to activities of

3  the Scenic Rivers Commission.

4          Many of the defendants sitting at this table

5  offered, and, in fact, have given to, the Scenic

6  Rivers Commission a gift of $1,100,000; isn't that

7  right?

8     A.   Yes.

9     Q.   And the Scenic Rivers Commission total budget

10  provided by the State of Oklahoma on an annual basis

11  is around $500,000 a year?

12     A.   I'm not sure what the annual budget is.

13     Q.   You're chairman of the commission and you

14  can't tell us what the annual budget is, sir?

15     A.   If I had the budget numbers in front of me, I

16  could tell you.  But that's not a number I keep in my

17  head.

18     Q.   You don't know the gross budget of the

19  commission on an annual basis that you oversee?

20     A.   No, sir, I don't.

21     Q.   All right.  If the testimony from Mr. Ed Fite

22  is that the annual budget is around $500,000 a year,

23  then the gift given to the commission to be utilized

24  for good works would be double the amount of money

25  provided by the State of Oklahoma on an annual basis;

1    is that true?

2                    MR. GARREN:  Objection; relevance, Your

3    Honor.

4                    THE COURT:  What's the relevance?

5                    MR. ELROD:  The relevance, Your Honor,

6    is the use to which this money has been put by the

7    Scenic Rivers Commission in terms of what its doing.

8                    MR. GARREN:  That wasn't the question,

9    Your Honor.  If we were doing the math --

10                   MR. ELROD:  Well, I'm leading into it.

11   I'm warming up to it, Judge.

12                   THE COURT:  All right.  On that

13   representation, overruled.

14         Go ahead.

15      A.   Now, your math -- your math is correct.

16      Q.   *(BY MR. ELROD)*  All right, sir.  Now,

17   Mr. Hilsher, the commission has been able to parlay

18   that money, plus some money from the Oklahoma

19   Conservation Commission, I think, and maybe some CREP

20   grant money into about a $4 million pot to be used for

21   riparian conservation easement purchases on the

22   Oklahoma side; is that true?

23      A.   We've used a good part of the poultry money

24   for that purpose.  I'm not sure again how -- whether

25   that equals $4 million of total funds, but there was a

1    matching part and you provided -- and your clients

2    provided the match.

3        Q.   All right.  And that money is presently as we

4    sit here today being utilized by the Scenic Rivers

5    Commission to -- for bank stabilization purposes and

6    to buy conservation easements up and down the river in

7    Oklahoma; is that true?

8        A.   As well as building and improving bathrooms

9    on the river.

10       Q.   Bathrooms?

11       A.   Yes.

12       Q.   Speaking about bathrooms, there was a time

13   prior to about ten years ago when the commission

14   determined that bathrooms up and down the river

15   were -- had leakage problems?  If you don't know about

16   that --

17       A.   Well, I don't know about that.

18       Q.   Okay.  I'll get into that with Mr. Fite.

19            By the way, you voted against acceptance of

20   that gift from the poultry companies, didn't you?

21       A.   Yes, I did.

22       Q.   All right.  Did you bid to become plaintiff's

23   counsel in this case?

24       A.   Yes, I did.

25            MR. GARREN:  Objection; relevance.

1          THE COURT:  Overruled.

2     Q.   *(BY MR. ELROD)*  The answer is?

3     A.   Yes.

4     Q.   Yes, you did?

5     A.   Yes, sir.

6     Q.   You are aware, by virtue of being a

7  commissioner on the Scenic Rivers Commission and

8  attending the meetings, that there exists on the

9  Arkansas side of the line an organization called the

10  Illinois River Watershed Partnership?

11     A.   Yes, sir.

12     Q.   And it is administered by a Ph.D. Delia Haak,

13  H-a-a-k; is that true?

14     A.   Yes, sir.

15     Q.   And she attends many of your meetings and

16  gives -- she attends virtually every meeting and gives

17  reports on activities going on in Arkansas; is that

18  right?

19     A.   She is a frequent visitor to our conference,

20  and she does have a place on the agenda to give a

21  report.

22     Q.   Okay.  And you're aware that Mark Simmons is

23  a member of the board in the IRWP?

24     A.   Yes, sir.

25     Q.   Mr. Simmons has attended many of your

1    meetings?

2        A.   I wouldn't say many of our meetings.

3        Q.   Some?

4        A.   But some, yes.

5        Q.   Mr. Archie Schaffer from Tyson's has attended

6    some of your meetings?

7        A.   I remember he's attended one.

8        Q.   That was when they gave you that great big

9    blown-up check; right?

10       A.   Maybe twice.

11       Q.   All right.  If the Scenic Rivers Commission

12   chose to do it, given the power and the regulatory

13   power you have over concessionaires, people who rent

14   rafts and canoes, you could shut them down, could you

15   not?

16       A.   No.  I don't think we could shut them down on

17   a whim.  I think we would have to shut them down

18   for --

19       Q.   Good cause?

20       A.   -- some good cause.

21       Q.   And you've never done that?

22       A.   Not during my experience, we have not.

23       Q.   And you've been on the commission for over

24   ten years?

25       A.   Yes, sir.

1    Q.   During that period of time, you've never said

2    to the concessionaires, guys, I'm sorry, but we got to

3    shut you down this weekend because people might get

4    sick?  Have you done that?

5    A.   No.

6    Q.   All right.  And as a matter of fact, I think

7    I saw your deposition that you issue about -- you have

8    outstanding about 3900 permits?

9    A.   3900 permits was a limit stated in our

10   regulations.

11   Q.   All right.  And is that the number that are

12   outstanding?

13   A.   I think we were back down to 3900, but there

14   was a time when the commission voted to go in excess

15   of 3900.

16   Q.   And just for record purposes -- I think we

17   all understand what that means -- but that means the

18   concessionaires up and down Highway 10 would not be

19   able to have more than 3900 rafts or canoes on the

20   river at any point in time?

21   A.   Yes.

22   Q.   You hesitated.

23   A.   Well -- well, the permit goes to a flotation

24   device.  So they could have 3900 licensed flotation

25   devices in their inventory.  But what typically

 1   happens is because of the changing river elevations,

 2   some days -- excuse me -- some days are good for

 3   rafts, some days are good for canoes.  So it would be

 4   a -- in fact, I think it's an occasion that's never

 5   happened, that you would have 3900 flotation devices

 6   on the river on any particular day. Ed Fite could tell

 7   you what the maximum number that they have floated, if

 8   that's important to you.

 9        Q.   Mr. Hilsher, those are my questions, I think.

10   Thank you very much.

11             THE COURT:  Other cross-examination?

12   Mr. McDaniel.

13                     **CROSS-EXAMINATION**

14   **BY MR. MCDANIEL:**

15        Q.   Good afternoon, Mr. Hilsher.

16        A.   Good afternoon.

17        Q.   You testified in direct that the commission

18   has the authority to recommend nuisance actions; is

19   that correct?

20        A.   I believe that's true.

21        Q.   Has the Scenic Rivers Commission by a

22   majority vote of its members issued a recommendation

23   or request that this lawsuit be brought against these

24   defendants?

25             MR. GARREN:  Objection, Your Honor.

1           THE COURT:  Overruled.

2       A.   No.

3       Q.   Thank you.

4           THE COURT:  Any further

5   cross-examination?

6           MR. VOLPE:  I just have one question,

7   Your Honor.

8                    **CROSS-EXAMINATION**

9   **BY MR. VOLPE:**

10      Q.   Mr. Hilsher, isn't it true that when the

11  Oklahoma Legislature passed the Oklahoma Registered

12  Poultry Feeding Operations Act, that it followed the

13  recommendation of Governor Keating's Animal Waste Task

14  Force to then follow the U.S. Department of

15  Agriculture, Natural Resource Conservation Service's

16  guidelines for the proper collection and storage and

17  disposal of animal waste?  Isn't that what happened?

18           MR. GARREN:  Objection, Your Honor.

19  This is exactly where we were cut off in asking

20  questions about what the task force did and the

21  reasons for it.  We're obviously looking at historical

22  information again.  That was the basis for us being

23  outside of that.  I'd ask that the objection be

24  sustained.

25           MR. VOLPE:  I'm asking, Judge, when the

 1    Oklahoma Legislature passed the Registered Poultry

 2    Feeding Operations Act whether it followed the

 3    recommendations of the task force.

 4              THE COURT:  Well, if I allow you to do

 5    that, then we need to allow Mr. Garren to ask the

 6    questions he wished to ask about the recommendations

 7    as well.  Sustained.

 8              MR. VOLPE:  Then I'll withdraw my

 9    question.

10              THE COURT:  All right.  Mr. Garren, come

11    back up.

12              MR. WEEKS:  I do have a question, Your

13    Honor.  If I could.

14              THE COURT:  All right.  Go ahead.

15                    **CROSS-EXAMINATION**

16    **BY MR. WEEKS:**

17      Q.   Mr. Hilsher, my name is Gary Weeks and I'm

18    one of the lawyers in this case and I represent

19    George's.  I just had a couple of questions, if I may.

20              I understood you to testify that the Oklahoma

21    Scenic Rivers Commission had no authority to regulate

22    the land application of poultry litter in the Illinois

23    River Watershed; is that correct?

24      A.   That's what I said.

25      Q.   Okay.  Which Oklahoma agency does have the

1    authority to regulate the land application of poultry

2    litter in the Illinois River Watershed?

3                    MR. GARREN:  Objection; foundation.

4                    THE COURT:  Sustained.  Rephrase.

5    Foundation.

6        Q.   *(BY MR. WEEKS)*  Mr. Hilsher, do you know

7    which Oklahoma agency has the authority to regulate

8    the land application of poultry litter in the Illinois

9    River Watershed?

10       A.   The Department of Agriculture.

11       Q.   Okay.  Good.  Thank you.  And I just wanted

12   to ask too:  I understood you to say there was a time

13   in 1974 to 1976 that you lived on or near the Illinois

14   River; is that correct?

15       A.   That's right.

16       Q.   Okay.  And that you left Oklahoma at that

17   time and the next time you saw the river was in 1998;

18   correct?

19       A.   I think we're talking about being in as

20   opposed to being at.

21       Q.   Okay.

22       A.   I may have been at the river, but the next

23   time I was looking at the river --

24       Q.   Right.

25       A.   -- observing the river for these issues --

1    Q.   Right.

2    A.   -- would have been that '97-'98 time frame as

3    part of the task force.

4    Q.   I understand.  And then as I understood your

5    testimony, the next time that you had the opportunity

6    to look at the river was either in the fall of 2008 or

7    the spring of 2009; is that correct?

8    A.   During the time that I was on the Scenic

9    River -- no, I don't think that's correct.  When I'm

10   on the Scenic Rivers Commission from '98 to 2009, I go

11   by the river all the time. In terms of getting down by

12   the river, I believe I told you that in -- oh, two or

13   three years ago we were down at Achota Bend looking at

14   a sampling -- I may not have said "Achota Bend" -- but

15   we were looking at a sampling that was taking place

16   then.  Either in the spring or the fall I was at one

17   of the Scenic Rivers Commissioner's homes.  That would

18   have been in 2008, 2009.  And I was on the river then.

19   As in on the river being right next to it.

20   Q.   Right.  And so it was on that basis that you

21   were able to compare and contrast the condition of the

22   river when you first saw it in '74 to '76 and then

23   subsequently saw it again in '98; correct?

24   A.   Right.

25   Q.   And you compared that for Mr. Garren about

1    the water quality conditions, and then you again made

2    that comparison again in 2008; is that correct?

3         A.   Correct.

4         Q.   When you were next on the river or at the

5    river?

6         A.   Well, I guess it was actually probably 2006

7    when I was at Achota doing sampling.

8         Q.   Okay.

9         A.   Not 2008, 2009.

10        Q.   Now, when were you appointed to the Oklahoma

11   Scenic Rivers Commission?

12        A.   1998.

13        Q.   Okay.  So would it be fair to fair to say,

14   sir, that while you were a member of the Oklahoma

15   Scenic Rivers Commission saw the river in 1998 and

16   then you did not see it again until 2006?

17        A.   Not to -- not but -- just to go by it, but

18   not to get down in it or on it.

19        Q.   So as the chairman of the Scenic Rivers

20   Commission for eight years, you never took time to go

21   down and take a look at the river.  Is that what

22   you're telling us?

23        A.   That's right.

24             MR. WEEKS:  No further questions, Your

25   Honor.

1          THE COURT:  Any further

2   cross-examination?

3          Mr. Garren.

4                **REDIRECT EXAMINATION**

5   **BY MR. GARREN:**

6      Q.   Mr. Hilsher, you indicated that money was

7   used to buy conservation easements.  Do you remember

8   that testimony?

9      A.   Yes.

10     Q.   What's the purpose?

11     A.   Actually, it's a lease of an easement.  Lease

12  of an easement.

13     Q.   All right.  What's the purpose of purchasing

14  or leasing a conservation easement?

15     A.   Well, it's to create a buffer zone.  Because

16  what happens with these cow pastures is, the trees and

17  the brush are taken off the property to grow hay.

18  When it's cleared all the way to the river, there's

19  nothing to protect the stream banks so stream banks

20  are lost.  There's nothing to prevent whatever is

21  flowing downhill in terms of runoff to slow that.

22  There's no tall grass, there's no trees, there's no

23  root system to hold that stuff in.  So that's the

24  purpose, is to take it out of hay production and

25  create a buffer.

1          THE COURT:  How wide are the easements

2   you lease?

3          THE WITNESS:  You know, I'm thinking

4   it's either between 100 -- 100 feet off the river.

5   Could be 300.  Ed Fite would have a better idea of

6   exactly the feet off the river, Judge.

7          THE COURT:  One of the things I've

8   noticed when I've been down there is that oftentimes

9   you'll have a buffer, but then you'll have a slough

10   running back from the river and there will not be a

11   buffer around that slough.

12          Ever address that situation?

13          THE WITNESS:  We have not.  Judge, in

14   terms of -- I have not.  Now, what happens in the

15   course of negotiating these buffer zones or riparian

16   areas, Ed Fite is the guy on the ground, he's talking

17   to the landowner.  You know, he comes out with

18   the -- with the lease term, or in some instances,

19   we'll -- we may see a map of it.  But the

20   commissioners themselves don't go out and say, well,

21   you need to go up the slough another 100 feet or back,

22   you know, 50 feet.

23          THE COURT:  Mr. Fite attends to those

24   details?

25          THE WITNESS:  Yes, Your Honor.

1              THE COURT:  All right.  Mr. Garren.

2              MR. GARREN:  I have no other questions,

3    Your Honor.

4              THE COURT:  Cross -- or recross.

5              MR. VOLPE:  Nothing, Your Honor.

6              MR. ELROD:  No, Your Honor.

7              MR. WEEKS:  Nothing further, Your Honor.

8              THE COURT:  Very well.  You may step

9    down.  The state may call its next witness.

10             MR. GARREN:  May I step out for a

11   minute, Judge?

12             *(Discussion held off the record)*

13             THE COURT:  Mr. West, I would be remiss

14   if I didn't say welcome.

15             MR. WEST:  Thank you, Your Honor.

16             THE COURT:  Good to see you, sir.

17                  **EDWARD FITE, III,**

18   *after having been first duly sworn, says in reply to*

19   *the questions propounded as follows, to-wit:*

20             THE COURT:  State your full name for the

21   record, please

22             THE WITNESS:  Excuse me?

23             THE COURT:  State your full name for the

24   record, please.

25             THE WITNESS:  Edward Halsell Fite,

1  III.

2              THE COURT:  And the middle name?  I'm

3  sorry.

4              THE WITNESS:  H-a-l-s-e-l-l.

5              THE COURT:  Thank you.  Mr. Garren.

6              MR. GARREN:  Thank you, Your Honor.

7                    **DIRECT EXAMINATION**

8  **BY MR. GARREN:**

9      Q.  Mr. Fite, tell the court what your current

10  employment is.

11      A.  Administrator for the Oklahoma Scenic Rivers

12  Commission.

13      Q.  And how long have you been such an

14  administrator?

15      A.  Approximately 26 years.

16      Q.  Where do you currently live?

17      A.  15307 North Swannanoa Road.

18      Q.  Where is that located, sir?

19      A.  Tahlequah, Oklahoma.

20      Q.  How close to the river is that?

21      A.  My home is approximately a quarter mile from

22  the river.

23      Q.  Do you have land adjoining the actual

24  Illinois River?

25      A.  Yes.

*640*

 1      Q.   And how long have you owned that land?

 2      A.   It's been in my family since approximately

 3   1905, 1906.

 4      Q.   And you've lived how long on that property?

 5      A.   Since March 1st of 1982.

 6      Q.   Did you access or visit that property before

 7   you lived on it in 1982?

 8      A.   Yes.

 9      Q.   And tell the court what were the

10   circumstances for that occurring.

11      A.   Visiting my grandparents when they were

12   recreating there, going to the river to float, fish,

13   camp, hunt.

14      Q.   Let's talk a little bit about your education.

15   Where did you go to high school?

16      A.   Muskogee, Oklahoma.  Muskogee High School.

17      Q.   Did you attend college?

18      A.   Yes, sir.

19      Q.   Where?

20      A.   I attended Oklahoma State University.

21      Q.   And did you --

22      A.   Concord College in Athens, West Virginia, and

23   Northeastern State University in Tahlequah.

24      Q.   And did you observe a degree?

25      A.   Yes, sir.

1     Q.   And at which institution?

2     A.   Northeastern State University.

3     Q.   And what is that degree?

4     A.   Accounting with a business minor.

5     Q.   Okay.  Are there other -- are there other

6   educational or certification diplomas, evidence of

7   educational experiences, obtained by you at any time?

8     A.   Yes.

9     Q.   And tell the court generally what those might

10  be.

11    A.   I'm a federally-accredited floodplain

12  manager.  I also teach swift-water rescue for law

13  enforcement, fire service, and emergency medical

14  services.

15    Q.   Have you participated in classes, other than

16  those that would have resulted in a degree or further

17  certification, in the area of your job duties?

18    A.   Yes.

19    Q.   Can you tell the court generally what those

20  may be?

21    A.   I've attended classes by Dr. David Roskin on

22  applied fluvial geomorphology techniques.  I've been

23  involved in an array of different curriculum related

24  to rivers and have participated up until the mid to

25  late 1980s -- excuse me; strike that -- the mid to

1    late 1990s with the National Association of State and

2    Local River Conservation Programs.

3          After that, the organization combined with

4    the American River Management Society, which are the

5    federal agencies that oversee or manage the federal

6    wild and scenic rivers program, and the two programs

7    merged and now it's River Management Society and have

8    participated there.

9          Have participated with the American

10   River -- excuse me -- American Water Resources

11   Association, which is a collective group of folks that

12   work on water issues throughout the United States.

13       Q.   Where is that association headquartered or --

14       A.   I'm not real sure where that is.

15       Q.   Where do they conduct their meetings --

16       A.   The meetings move around the United States.

17       Q.   How often do you attend those?

18       A.   I have only attended a couple of their

19   meetings.  Most generally, I read their journals.

20       Q.   All right.  Have you had any course

21   presentations from a gentleman -- or let me ask you

22   this.

23          Have you had any course presentions with

24   regard to water quality issues?

25       A.   Yes.

1    Q.   Can you tell the court generally what those

2  are?

3    A.   Well, there's been an array of those,

4  Mr. Garren.  In 26 years, I have learned things that I

5  believe you would not find in a college setting just

6  through the osmosis of my day-to-day job, attending

7  conferences, and working with different professionals

8  across the United States.

9    Q.   Did you attend the Governor Clinton Animal

10  Waste Task Force?

11    A.   I did not.

12    Q.   Did you have knowledge of its existence?

13    A.   Yes.

14    Q.   Have you been provided any information or

15  data that was generated out of that task force?

16    A.   Yes.

17    Q.   What time frame was that -- would that have

18  been that you would have obtained that information?

19    A.   I received a copy of the recommendations from

20  that task force.  I believe the task force convened in

21  1990 and consummated their work in 1993, and I

22  received a copy of that report from Claud Rutherford,

23  was my earliest receipt of that.

24    Q.   Did you read it?

25    A.   Yes, sir.

1       Q.   Have you participated in what's referred to

2   as the Oklahoma Arkansas River Compact Commission

3   meetings?

4       A.   Yes.

5       Q.   And what generally -- what time frame are we

6   talking about?

7       A.   Being throughout my career, generally the

8   Compact would meet in September of each year, once a

9   year.

10      Q.   And have you attended those meetings

11  frequently or regularly?

12      A.   Most annually, yes.  There have been a couple

13  that I have missed.

14      Q.   What is the -- what was the purpose behind

15  the Compact Commission, if you know?

16      A.   The compact, I believe, was negotiated in

17  1970 and it was to -- between Arkansas and Oklahoma --

18  to administer the appropriation of water within the

19  Arkansas River basin.

20      Q.   Does that particular commission gather data

21  and publish any reports to your knowledge?

22      A.   Yes.

23      Q.   And have you participated in that gathering

24  of data and publishing of reports?

25      A.   I participated in discussions with the

**United States District Court**

1    Compact.  As far as actively a participant in writing

2    a document, no.

3        Q.    All right.  Have you had an opportunity to

4    comment on the documents that were, in fact,

5    published?

6        A.    Yes.

7        Q.    Have any of your comments been accepted?

8        A.    Yes.

9        Q.    Has the Compact done anything to solve

10   nonpoint-source pollution to your knowledge?

11       A.    No.  Other than the adoption of some

12   resolutions and some instructions to state agencies

13   participating.

14       Q.    All right.  Let's talk a little bit about

15   symposia, conferences, and workshops that you may have

16   attended.

17            I believe you mentioned -- and correct me if

18   I'm wrong -- the national, state, and local River

19   Managers Association?

20       A.    Yes.

21       Q.    And have you attended that?

22       A.    That organization no longer exists.

23       Q.    What is it now?

24       A.    It is the River Management Society.

25            MR. VOLPE:  Excuse me, Mr. Fite.  Excuse

1  me.  Judge, I'm not sure what we're doing here.

2  Sounds like we're qualifying an expert witness.  I

3  mean, I'm sure Mr. Fite has had a storied career, and

4  hopefully it will continue, but I'm not sure this

5  symposiums and what he's read and what he's commented

6  on is relevant to any issue that he's competent to

7  testify about.

8              THE COURT:  Mr. Garren.

9              MR. GARREN:  Well, Your Honor, obviously

10  it is because Mr. Fite has a great deal of experience

11  on the river.  He obtains data and information.  I'm

12  trying to establish that even though he has a degree.

13  A nonscientific degree, that he has information that

14  gives him the ability to read, digest, and conclude

15  from data information that assists him in his

16  occupation and profession, and in particular, giving

17  guidance to the Scenic Rivers Commission relative to

18  water quality issues that may occur.  I'm trying to

19  establish that's what he needs to do in his job.

20              MR. VOLPE:  Well, Judge, that sounds an

21  awful lot like expert testimony, and to the extent

22  it's not expert testimony, it certainly is opinion

23  testimony.  Mr. Fite has not been disclosed as an

24  opinion witness.  He's a fact witness.

25              THE COURT:  All right.  And

1    specifically, what has he been disclosed to testify

2    about?

3                MR. GARREN:  He's a fact witness, Your

4    Honor.  We've not disclosed him as a nonretained

5    expert.

6                THE COURT:  All right.

7                MR. GARREN:  We can ask him -- I'm

8    sorry.

9                THE COURT:  I think it is pertinent to

10   have this background.  On one hand.  You know, someone

11   may live and grow up around the river and know a lot

12   about it.  And this testimony goes to show that

13   Mr. Fite not only knows the river, but has involved

14   himself in the River Management Society, etcetera.

15         The objection's overruled.  Obviously, the

16   question is, how far do you expect that to go, and

17   we'll just have to see.

18                MR. GARREN:  We'll try and pick it up,

19   Your Honor.

20       Q.   *(BY MR. GARREN)*  Does the River Management

21   Society compile data and issue reports or memoranda;

22   do you know?

23       A.   Yes.

24       Q.   And have you been privy to that information,

25   sir?

1      A.    Yes.

2      Q.    And how long did you say you were a

3  participant in that society that merged from a

4  previous society?

5      A.    Since the merger in the late 1990s.

6      Q.    All right.

7      A.    Mid 1990s.  Excuse me.

8      Q.    Did you participate in the association prior

9  to its merger?

10     A.    Yes.  We had joint meetings.

11     Q.    All right.  Have you ever attended any

12  National Poultry Waste Management Symposiums?

13     A.    Yes.

14     Q.    And how many have you attended?

15     A.    Two.

16     Q.    And when were they?

17     A.    Don't remember the actual dates, but they

18  were in Arkansas.

19     Q.    Would '98 -- or 1998 and 2006 be an accurate

20  description of the time periods?

21     A.    I believe so, yes, sir.

22     Q.    They were both presented in Arkansas; is that

23  correct?

24     A.    Yes, sir.

25     Q.    All right.  Did you attend all of those

1    meetings when they were being conducted in both of

2    those occasions?

3         A.   Not all of the meetings, no, sir.

4         Q.   Were you there fairly regular as to the

5    meetings that were being presented?

6         A.   I believe so, yes.

7         Q.   Let me ask you this, sir.

8              Did you have an opportunity to meet and see

9    people who also attended at those symposiums?

10        A.   Yes.

11        Q.   And did you observe any poultry

12   representatives, poultry industry representatives in

13   particular, any of those that might be representatives

14   to the defendants in this case?

15        A.   Yes.

16        Q.   And can you tell the court the names of those

17   company representatives that you observed at one or

18   more of those symposia?

19        A.   That's been -- there have been so many

20   meetings, Mr. Garren, where I've met with poultry

21   representatives during my career that I might speak

22   out of turn.  But I do know that they were there.

23   Specifically who was at what meeting, I couldn't say.

24        Q.   When you say you know they were there, who

25   are you referring to?

650

1      A.   I'm sorry.  Poultry companies that are

2    being --

3      Q.   And what poultry companies in particular, if

4    you can recall?

5      A.    It would have been Simmons and Tyson's, most

6    likely Cargill, some of those that I'm familiar with

7    that operate in the Illinois River basin.

8      Q.   Do you know a gentleman by the name of Gary

9    George?

10     A.   Yes, sir.

11     Q.   And how do you know him?

12     A.   He's an individual that I've talked to on a

13   number of occasions about different processes within

14   the poultry industry.

15     Q.   Is he connected to the company that is

16   George's, Inc. that's a defendant in this case?

17     A.   Yes.

18     Q.   And how do you know his connection -- or do

19   you know what his connection is?

20     A.   I believe he's the owner.

21     Q.   All right.  Did you attend a conference

22   called "Focus on Phosphorus" in 1993?

23     A.   I did not.

24     Q.   Were you aware of its -- were you aware of a

25   publication arising from that?

1    A.   Yes.

2    Q.   And did you obtain a copy of that?

3    A.   Yes.

4    Q.   And did you use it, or have you used it, in

5    executing your duties and responsibilities for the

6    Scenic Rivers Commission?

7    A.   Yes.

8    Q.   And in what way would you do that?

9    A.   I -- I actually used that document during the

10   Animal Waste Task Force and Water Quality Protection

11   Task Force -- excuse me -- for Governor Keating in

12   1997 here in Oklahoma.  That was one of the documents

13   that I used.

14   Q.   And how did you use it?

15   A.   Just reference material.

16   Q.   Mr. Hilsher recently testified that there

17   were various defendants, or representatives of the

18   various defendants, in this lawsuit attending one or

19   more meetings at that task force.

20        Do you recall that same fact?

21   A.   Yes, yes.

22   Q.   Do you recall the names of any persons that

23   you observed at the Keating task force meetings?

24   A.   Mark Simmons, Archie Schaffer, Bill Mueller

25   from Tyson.  There were others.

1    Q.  Are you familiar with an organization called

2  the Arkansas Water Resource Center?

3    A.  Yes.

4    Q.  And tell the court what that is.

5    A.  The Arkansas Water Resource Center is a -- is

6  a quasi-University of Arkansas organization that

7  focuses on water issues in the state of Arkansas.

8    Q.  Have you presented at that Water Resource

9  Center there in Arkansas?

10   A.  Yes.

11   Q.  And tell the court what it is you presented

12 there.

13   A.  I presented a -- I think that I've spoke to

14 them twice.  Once was on the history of the Illinois

15 River, some of the issues, and the -- one was on

16 phosphorus and other issues affecting the river.

17   Q.  Who was the subject or the parties interested

18 or attending that particular presentation on

19 phosphorus?  Who was it geared to present to?

20   A.  It was geared towards academia, it was geared

21 towards lake groups, river groups.  It was targeted

22 towards poultry and animal issues.

23   Q.  Were any poultry defendants' in this case

24 representatives in attendance at either of your

25 presentations in the Water Resource Center?

1      A.   Yes.

2      Q.   Can you name any of them?

3      A.   I presented at a -- as I recall, I presented

4   at one in Little Rock and John Elrod was there and he

5   also spoke.

6      Q.   When he spoke --

7           MR. ELROD:  It was a good speech too,

8   Your Honor.  Was it a good speech.

9      Q.   *(BY MR. GARREN)*  When you spoke at the Water

10  Resource Center on phosphorus, what was the general

11  subject matter in which you spoke about?

12     A.   As I recall, I talked about the history of

13  the Illinois River, but I got into discussions about

14  point source and nonpoint source issues.  Cited some

15  of the data that had been -- some of the data results

16  from United States Geological Survey sampling.

17  Illinois River basin, some of the data points that

18  came from the beneficial use monitoring program that

19  is administered by the Oklahoma Water Resources Board

20  and other issues that would present a general

21  understanding to the public that I was speaking to --

22  or the group I was speaking to about the Illinois

23  River and scenic rivers at large.

24     Q.   Have you made other preparations to other

25  groups involving the Illinois River Watershed?

1      A.   Yes.

2      Q.   Just give a quick list, if you would, for the

3  court what those presentations would be and who would

4  be the attended audience.

5      A.   Well, I have spoken at the national level to

6  the River Management Society about Oklahoma's river, I

7  have -- rivers -- I have been very active in the

8  Department of Interior's Interagency Wild and Scenic

9  Rivers Coordinating Council as the only state

10 representative for a few years.  So I had the

11 opportunity to represent all the states that had state

12 and local river programs.

13      I have presented in Arkansas to the Arkansas

14 Environmental Law Review.  I have spoken to the

15 Arkansas Farm Bureau on a couple of occasions.  Spoken

16 to a litany of many folks here in Oklahoma, different

17 groups, across the state.

18      Q.   Have you ever been invited to guest lecture

19 at any universities?

20      A.   Yes.

21      Q.   And what universities and what would be the

22 subject?

23      A.   I have spoken in Texas, Arkansas, Oklahoma.

24      Q.   At various universities?

25      A.   Oklahoma University, Oklahoma State

1    University, University of Arkansas, University of

2    Texas proceedings in Austin.  I'm trying to think.

3    There's other universities but I'm --

4         Q.   In your job and duties as administrator of

5    the Scenic Rivers Commission, do you rely on

6    information from other agencies, whether state or

7    federal, to perform your tasks?

8         A.   Yes.

9         Q.   What kind of agencies do you look to to

10   receive information that's useful for that purpose?

11        A.   For the most part, I try to -- anytime

12   there's a publication that's related to water quality

13   or techniques or programs that would avail themselves

14   to Oklahoma to do a better job in the preservation and

15   protection of scenic rivers in our state, I try to

16   access that information and read it.  And understand

17   it.

18        Q.   And during this case, sir, the defendants and

19   the state visited your Scenic Rivers Commission

20   office, did they not?

21        A.   Yes.

22        Q.   Do you, sir, throw anything away when you've

23   collected it for purposes of reading and using it in

24   your work?

25        A.   I think you should ask John Elrod and his

*656*

1    team.  He'll tell you no.

2        Q.    Do you constantly refer to materials that

3    have been produced and published --

4        A.    Yes.

5        Q.    -- that are relative to your job functions?

6        A.    Yes.

7        Q.    Do you know a gentleman by the name of Martin

8    Maner?

9        A.    Yes.

10       Q.    How do you know him?

11       A.    Martin and I have been friends for many

12   years.  He was water quality representative for the

13   old Arkansas Department of Pollution Control and

14   Ecology and was headquartered out of

15   northeast -- excuse me -- northwest Arkansas.  And

16   during the ramping up to the U.S. Supreme Court case

17   on the Fayetteville issue, I had an opportunity to

18   interact with Mr. Maner many, many times.  And we

19   became friends and have discussed and debated issues

20   for many years.

21       Q.    Are you familiar with a paper that he

22   prepared with regard to phosphorus in the Illinois

23   River Watershed area?

24       A.    I believe he wrote a paper in 1988 about

25   that.  And he cited quite extensively about the issues

1    that were impacting the water quality within Benton

2    and Washington Counties in Arkansas.

3                    MR. GARREN:  May I approach the witness,

4    Your Honor?

5                    THE COURT:  You may.

6        Q.   *(BY MR. GARREN)*  I hand you Exhibit No. 3312

7    of the state.  Do you recognize that document?

8        A.   Yes, sir.

9        Q.   Tell the court what that document is by first

10    describing the title.

11        A.   Agricultural land use, nutrients, and water

12    quality in Benton and Washington Counties, by Martin

13    Maner, P.E., Arkansas Department of Pollution Control

14    and Ecology.  March 1988.

15                    MR. GARREN:  Judge, we've handed up some

16    folders with those exhibits in them, if you wish to

17    reference those.

18                    THE COURT:  I can.  I'm just trying to

19    see if there's an objection to it.

20                    MR. ELROD:  Your Honor --

21                    THE COURT:  Just one second.  All right.

22    Yes, sir.

23                    MR. ELROD:  It very well may be that

24    this paper comes in but not through this witness.

25    It's authored by Dr. Martin Maner.  His deposition was

 1   taken.  His deposition is going to be read, and that

 2   would be the appropriate time to interpose objections

 3   to it all.  But trying to authenticate it and bring it

 4   in through this particular witness we think is

 5   improper.

 6                    MR. VOLPE:  It's hearsay, Judge.

 7                    THE COURT:  Yeah.  Sustained.  We don't

 8   really need to waste our time in this type of

 9   effort --

10                    MR. GARREN:  That's not what the purpose

11   is for.  It's a submission to him, Your Honor.  I

12   haven't even asked a question about it.  So these

13   peremptory objections when I haven't asked the

14   question are kind of difficult to respond to.

15                    THE COURT:  Well, it's coming in through

16   this witness.  So go ahead.

17                    MR. GARREN:  I have no intentions of

18   offering it through this witness, Your Honor.  I just

19   want to ask him a couple of questions about it.

20                    THE COURT:  Let's see.  Go ahead.

21       Q.   *(BY MR. GARREN)*  Did you have an opportunity

22   to discuss the contents of this document with

23   Mr. Maner at any time?

24       A.   Yes.

25       Q.   And having discussed that with him, what, if

**United States District Court**

*659*

1   anything, did you do with this paper?

2       A.   Martin and I discussed this paper, but we

3   also specifically discussed why he came to this paper.

4                MR. VOLPE:  I'm going to object, Judge.

5   What Mr. Maner and Mr. Fite discussed is hearsay.

6                THE COURT:  Well, to the extent it were

7   to reveal the content of this unadmitted document, it

8   would be.  I suspect we're going to the substance;

9   correct

10               MR. GARREN:  No.

11               THE COURT:  All right.  Overruled.

12  Let's --

13      Q.   *(BY MR. GARREN)*  As a result of your

14  discussion with Mr. Maner, what did you do with this

15  paper?

16      A.   I disseminated it to others.

17      Q.   And can you tell the court who may have been

18  a recipient of this paper on your behalf?

19      A.   At the time it would have been the Department

20  of Health for the State of Oklahoma, and that agency

21  predated the present-day Oklahoma Department of

22  Environmental Quality.  It would have gone to the

23  chief of the water quality division at the Water

24  Resources Board.  I know I gave it a copy of it to Ron

25  Suttles who is now retired and was chief of the

1    national resources section for the Department of

2    Wildlife Conservation in the state.  And I'm certain

3    that I probably gave a copy to the Attorney General's

4    Office, to our liaison within that office.

5         Q.   Do you know a gentleman by the name of Jerry

6    Barker?

7         A.   I do.  Quite well.

8         Q.   What does he do or what is his position?

9         A.   He works at the Department of -- oh, it's

10   called now the Oklahoma Department of Agriculture,

11   Food and Forestry.

12        Q.   And did you share that document with him?

13        A.   Yes.

14        Q.   Did you share it with a gentleman by the name

15   of Jim Curtis?

16        A.   I believe Jim probably got his copy from

17   Jerry.

18        Q.   All right.  And is there a gentleman by the

19   name of Sancho Dickerson that you know?

20        A.   Sancho Dickerson, yes.

21        Q.   And where does he work?  What does he do?

22        A.   Same agency.

23        Q.   And did you distribute a copy to him?

24        A.   I think it went directly to Jerry.

25        Q.   All right.

```
 1        A.   Now, there were a lot of times, Mr. Garren,
 2   that Sancho and Gary would come to my office together.
 3   I may have given it to them collectively.  That's a
 4   question they'd have to answer.
 5        Q.   Did you ever an opportunity to discuss the
 6   contents of this paper with any other people?
 7        A.   Yes.
 8        Q.   In what setting or context would that occur?
 9        A.   Generally, when I -- may I digress and depart
10   for just a second to tee up what I want to tell you?
11             This particular issue that Dr. Maner came up
12   with in '88 was during the time that we were engaged
13   in point source issues in the Illinois River basin.
14   But we were beginning to talk about nonpoint-source
15   pollution in the Illinois River --
16        Q.   When you say "we," who are you talking about?
17        A.   The State of Oklahoma.
18        Q.   All right.
19        A.   And the State of Arkansas.
20        Q.   All right.
21        A.   We had focused all of your attention on
22   wastewater treatment plants, point-source dischargers,
23   places where you can go to a discernible site and see
24   the outfall from a pipe or a ditch that's carrying
25   effluent or treated wastewater.
```

1          And as we were going through the process with

2     the Fayetteville case, and for that matter with the

3     City of Tahlequah -- City of Tahlequah was trying to

4     build a new wastewater treatment plant to increase

5     their discharge into the Illinois River -- we began to

6     focus on nonpoint-source pollution issues as well.

7          We realized -- we, the State of Oklahoma,

8     realized in the 1980s that when we got through the

9     administrative processes with doing what needed to be

10    done to deal with Tahlequah's wastewater treatment

11    plant and to resolve what was going on with the

12    Fayetteville issue, we knew at the end of those

13    avenues that we were going to have to come back and

14    start focusing on nonpoint-source pollution.  Because

15    point source, we'd spent many, many dollars on trying

16    to correct that, and we weren't catching up on the

17    pollutants.  And we knew we were going to have to

18    focus than

19    Q.   How did you know you weren't catching up on

20    the pollutants?

21    A.   Because of the monitoring.

22    Q.   And who was doing the monitoring?

23    A.   Back then our agency had been monitoring, the

24    state health department had been monitoring, Water

25    Resources Board had been monitoring, and others.

1      Q.   How was that monitoring occurring?

2      A.   It was to grab samples at my agency on a

3   monthly basis at a number of sites.

4      Q.   And were those samples then tested?

5      A.   Yes.

6      Q.   And where did the test results go when they

7   were concluded?

8      A.   The state Health Department would run the

9   tests for us and those samples would come back to your

10   agency, but they also went on the STORET program that

11   USEPA monitors or maintains, and all the agencies,

12   whether it be the State of Oklahoma or Arkansas, can

13   get into that information.

14      Q.   Is that data publicly available that you just

15   referred to?

16      A.   Yes, sir.

17      Q.   Is that data that you referred to in the

18   performance of your job and duty functions as the

19   Scenic Rivers chairman?

20      A.   Restate that, please.

21      Q.   Do you -- let me ask it this way.

22           Do you rely on or use or utilize in any way

23   that publicly-stored data, monitoring data, in the

24   performance of your functions as the chairman of the

25   Scenic Rivers Commission?

1    A.   Yes.

2    Q.   Have you, yourself, ever been published,

3 sir?

4    A.   Yes.

5    Q.   And what was the subject of the paper and

6 where was it published?

7    A.   It was published by Dr. Soerens and I

8 participated in a paper with him and -- I'm trying to

9 remember what year that was.  But --

10    Q.   About 2003?

11    A.   Approximately early 2000.

12    Q.   What was the nature of the subject of that

13 paper?

14    A.   It had to deal with nutrients in the Illinois

15 River basin.

16    Q.   And what did you do in participating in the

17 preparation of that paper?

18    A.   I consulted with Dr. Soerens and his

19 associate and provided information to them and

20 collaborated with them on pulling together that

21 report.

22    Q.   Were there any conclusions drawn from that

23 study?

24    A.   Yes.

25    Q.   And can you tell the court generally what

1    they were?

2                    MR. HOPSON:   Objection, Your Honor.

3    That is clearly hearsay.

4                    THE COURT:   Sustained.

5       Q.   *(BY MR. GARREN)*  Did you participate in the

6    study, Mr. Fite?

7       A.   I participated with Dr. Soerens in compiling

8    the report, yes.

9       Q.   And did you have firsthand knowledge of the

10   information that went into that report?

11      A.   Yes.

12      Q.   And is your name on the paper that described

13   the conclusions that I just asked you about?

14      A.   Yes.

15      Q.   And do you know what those conclusions are?

16      A.   Yes.

17      Q.   And can you tell the court what they are?

18                    MR. VOLPE:   Objection, Your Honor.   That

19   is hearsay.

20                    THE COURT:   Improper foundation.   I

21   mean, if he did the data collection, then perhaps.

22   But having collaborated with a scientist and having

23   his name on the report does not allow him to testify

24   as an expert here.   He's not identified as an expert

25   witness.   He's a fact witness.   The objection's

*666*

1    sustained.

2                    MR. ELROD:  Your Honor, Ms. Bronson also

3    tells me, Your Honor, that using this would be a

4    violation of the 72-hour rule because it was not

5    disclosed to us --

6                    *(Discussion held off the record)*

7                    THE COURT:  Well, Mr. Elrod, I don't

8    know if it's your Arkansas accent, but our court

9    reporter can't understand you, sir.

10                   MR. ELROD:  I didn't know I had an

11   accent, Judge. The 72-hour rule that we've all agreed

12   to, the court has agreed to, this particular document,

13   I'm advised by Ms. Bronson, is not on that list from

14   this witness.

15                   MR. GARREN:  I'm not even using the

16   document.  I'm simply trying to establish that this

17   gentleman has some other experiences in other areas

18   and how he's used that experience.

19                   THE COURT:  Well, I think you're going

20   beyond that.  He clearly has experience in other

21   areas.  But as to the scientific conclusions, the

22   objection's sustained. Go ahead.

23                   MR. GARREN:  All right.

24      Q.   *(BY MR. GARREN)*  Let's talk again about the

25   property you own on the Illinois River Watershed, sir.

1          Do you run any cattle on that property?

2     A.   I personally do not.

3     Q.   Is there cattle on the property?

4     A.   Yes.

5     Q.   And why is that?

6     A.   I lease to an individual.

7     Q.   And how much property is there leased?

8     A.   Approximately 100 acres that's leased to this

9 person.

10    Q.   How many cattle does he run there; do you

11 know?

12    A.   According to my farm plan with the

13 Conservation Commission, he has 20 bulls, rodeo-stock

14 bulls, in one field -- that comprises approximately 50

15 acres -- he has approximately 15 head of yearlings in

16 one pasture, and has approximately 20 heifers in

17 another pasture.

18    Q.   Have you ever been a poultry-grower,

19 Mr. Fite?

20    A.   No.

21    Q.   Have you ever used poultry waste on the land

22 that you own there in the Illinois River Watershed

23 area?

24    A.   No.

25    Q.   Has there been a past occasion for poultry

*668*

1    waste to have been applied on that property?

2        A.   Yes.

3        Q.   And what was the purpose of that?

4        A.   Rainfall simulator demonstration by Oklahoma

5    State University and then some work by the University

6    of Arkansas.

7        Q.   All right.  Do you know what the source of

8    the feed is that is provided to the cattle that are

9    run on your property?

10       A.   Yes.

11       Q.   And generally what is that?

12       A.   Either cattle cubes or hay.

13       Q.   All right.  And is hay brought into your

14   property at any time for feeding those cattle?

15       A.   Yes.

16       Q.   And do you know the source of that hay at any

17   time?

18       A.   Excuse me?

19       Q.   Do you know the source of that hay?

20       A.   Yes.

21       Q.   And can you tell the court what you know the

22   source to be?

23       A.   Be from areas where poultry waste has been

24   land-applied.

25       Q.   How do you know that?

```
 1        A.   I've seen it applied.

 2        Q.   And you know that's where it's been hayed?

 3        A.   Some of the hay.

 4        Q.   All right.  Let's talk a little bit about the

 5   historical physical description of the Illinois River

 6   that you might remember as a younger person.

 7             Did you have an opportunity to play or

 8   recreate in the Illinois River Watershed?

 9        A.   Yes.

10        Q.   Have you ever swam in the river?

11        A.   Yes.

12        Q.   And how old were you when you recall an event

13   at the river when you were a child?

14        A.   Been several of them.  But one in particular

15   that stands out to me is when I was approximately five

16   years of age.

17        Q.   And tell the court briefly what happened on

18   that event.

19        A.   It was a fall afternoon.  I was with my

20   grandfather, Dr. Halsell Fite, my father, and my

21   uncle, Coleman Fite, and we were walking adjacent to

22   the river.  A little bluff area that I own that

23   overlooks the river.

24             And I, as all these other men in this room

25   probably recall, had a pair of pot metal with
```

1    white-handled cap guns, and I accidentally dropped one

2    into the river.  I remember seeing that gun to this

3    day laying there on the bottom of that stream.  The

4    water's crystal clear, the gravels were just like they

5    were six inches deep.

6           And after my father spanked me, he left me in

7    the care of my grandfather and my uncle, and my father

8    went down this declining bluff area and took off their

9    clothes, and I remember it quite well because they got

10   down to their underwear and their T-shirts, and they

11   went out to retrieve my gun in what appeared to me

12   from the bluff to be just a few inches.  They had to

13   dive down under the water to get the gun.

14        Q.   Are you familiar with that location today --

15        A.   Yes.

16        Q.   -- or since then?

17        A.   Yes.

18        Q.   Do you know approximately how deep that water

19   was or is even at a later time?

20        A.    It's approximately -- depending on scour at

21   the time, I would say it was probably over six feet

22   because they had to dive under the water, go

23   completely submerged, to get to the gun.

24        Q.    And did you have any other experiences as a

25   child diving into the water at the Illinois River?

1    A.   Oh, yes.

2    Q.   How would you describe the waters and

3    approximately when would those be?

4    A.   Retrieving -- we would throw quarters in the

5    water, retrieve those.  We would pick up beer cans and

6    Coke cans and occasionally lose a lure while fishing

7    or drop something in the water and be able to go and

8    retrieve it.

9    Q.   Do you visit that same location where your

10   cap gun sunk below the surface of the water?

11   A.   Yes.

12   Q.   And where is that generally?

13   A.   I own the property so I go there

14   frequently.

15   Q.   All right.  How would you describe the

16   general nature and the quality of the water that you

17   observe today as compared to what you remember seeing

18   as a young child?

19   A.   Funny that you ask that question.  I was

20   there yesterday evening and took a reporter that's

21   doing a piece on Tahlequah, wanted to go to the river.

22   So we went to the area and I looked off that bluff and

23   I couldn't see the bottom of the stream.

24   Water -- water is not clear as it used to be.

25              THE COURT:  You were five in what year?

 1              THE WITNESS:  I believe that would have

 2    been '62.  '63.

 3              MR. GARREN:  I was getting ready to ask

 4    him his age, but you did that much more politically

 5    correct, Judge.

 6              THE WITNESS:  I'm 52.

 7       Q.   *(BY MR. GARREN)*  As part of your functions in

 8    the Scenic Rivers Commission, do you have an

 9    obligation in the event a drowning occurs?

10       A.   Yes.

11       Q.   Tell the court what that obligation is.

12       A.   To recover the body and take care of the

13    family's needs.

14       Q.   In recent times, have you had to do that,

15    sir?

16       A.   Yes.

17       Q.   Have there been times when there have been

18    difficulties associated with that?

19       A.   Yes.

20       Q.   Can you describe to the court what kind of

21    difficulties you've encountered?

22       A.   There have been a number of drowning events

23    in my career where individuals have gotten onto the

24    river or have floated the river, swam in the river

25    when the river was above normal flows and have

1    subsequently drowned.  And because of water clarity in

2    those events, it's taken several days, on a couple of

3    them, it's taken well over a week to recover the

4    bodies.  I wouldn't wish that on anybody in this

5    courtroom to have to do that.

6         But generally water clarity is one of the

7    causations for not being able to immediately recover

8    someone that has drowned.

9    Q.   Have you, in fact, located a body in -- well,

10   let me ask you this.

11        What is the depth of the river in which

12   you've located a body that was obstructed due to

13   clarity?

14   A.   It depends on the river reach that

15   you're -- would refer to in any of those drownings.  I

16   know that I have been involved in over 40 different

17   types of drowning events, from cars being washed over

18   a low-water slab where the mother and children drown,

19   to individuals who were swimming when they shouldn't

20   have been without a personal flotation device.  And

21   they range from finding an infant floating in a

22   treetop, to bodies that have been built up gas, are

23   floating on the surface, to bodies that are in 15, 20

24   feet of water.

25   Q.   Have you observed -- what's the shallowest

1    depth at which you've had to recover a body that you

2    couldn't see because of water clarity?

3         A.    Three to four feet.

4         Q.    Do you recall approximately when that was in

5    time?

6         A.    Be last summer.  At Chewey Bridge, downstream

7    of Chewey Bridge, where the river turns back to the

8    west.

9         Q.    Based on your personal observations, would

10   you say that there has been a change or deterioration

11   to the water quality since you've been a child?

12        A.    Yes.

13        Q.    When did you last tour the basin?

14        A.    This past weekend.

15        Q.    And what was the reason for doing so?

16        A.    I wanted to go and take a thorough look at

17   the Illinois River basin last Saturday and Sunday just

18   so that when I got to court today, that I'd have a

19   fresh recollection of what the river is.

20        Q.    Did you have an opportunity to view some

21   videos that I presented to you that was used in

22   opening statements in this case?

23        A.    Yes.

24        Q.    And tell the court what those videos showed.

25        A.    I believe the individual's name was

1    Mr. Duncan, a representative of the Arkansas

2    Department of Wildlife -- or Fish and Game Commission

3    board member, retrieving, I believe in March 23rd of

4    2009, this year -- getting pitchers of water out of

5    the river at different sites.

6        Q.   In your tour of the basin, did you visit

7    those same sites that were shown in those videos?

8        A.   His sites and more, yes.

9        Q.   All right.  Let's talk about what you

10   observed in the video with regard to the condition of

11   the river, its flows, and that sort of thing, and

12   compare it to what you just recently observed, if you

13   would, please.

14       A.   For this water year, 2008-2009 -- when I

15   refer to "water year," I say water year because the

16   United States Geological Survey reports their water

17   reports or their statistical information on gauging

18   throughout the basin from October 1st through

19   September 30th annually.

20            This has been a very wet year.  And

21   Mr. Duncan, when he pulled his samples on the 23rd of

22   March, I remember commenting to you about the clarity

23   of the water.  And what has happened this year is

24   we've had a number of runoff events, or what I would

25   call bank-full frequencies, where we're above the

1    hydrograph, we're moving gravels, and thus cleaning

2    the bottom of the stream.

3         And for the last -- since March of 2008,

4    we've had a number of events that have moved a lot of

5    gravel in the Illinois River, and thus the bottom of

6    the stream substrate is very clear.  And the rocks are

7    clean.

8         Q.   Let's talk a little bit about some of the

9    data that you obtained and review as chairman of the

10   Scenic Rivers Commission. Do you have access to flow

11   data from the river?

12        A.   Yes.

13        Q.   How's that data compiled or collected?

14        A.   At least once a week during the floating

15   season, I provide at Savoy, Arkansas, Arkansas 16,

16   Arkansas 59, U.S. 59 at Watts, Chewey Bridge, Combs

17   Bridge, Tahlequah Bridge, Eldon on Baron Fork at

18   Highway 51, and U.S. 412 on Flint Creek an advisory to

19   the public that I publish weekly at least once.

20        Q.   Have you had an opportunity to review the

21   flow data over a period of years?

22        A.   Yes.

23        Q.   And have you done so recently?

24        A.   Yes.

25        Q.   And can you describe to the court what kind

1    of flow rates that we -- or you have observed at the

2    river from 2005 or 6 to present; and describe, if you

3    would, what effect that has in the river?

4        A.   We had a --

5            MR. VOLPE:  Excuse me, sir.  I'm going

6    to object.  He can -- the first part of the question I

7    don't object to.  I object to the second part of the

8    question, which he's going to be offering an opinion

9    drawn from the data.

10            THE COURT:  So you don't object to flow

11   rates, but what effect that has had on the river?

12            MR. VOLPE:  Exactly.

13            MR. GARREN:  And those would be personal

14   observations, Your Honor.  That he's familiar with.

15            THE COURT:  Obviously, he just testified

16   to the effects of a flow rate.  Something that this

17   witness is particularly qualified to testify about.

18   So because you have more knowledge of what's coming

19   here, tell me what your concern is.

20            MR. VOLPE:  Well, I don't think that's

21   how the question was set up.  The question was not set

22   up as to his personal observations.  I believe -- I

23   don't have the transcript in front of me, Judge -- but

24   I believe it was set up in his role as the

25   commissioner of the Scenic Rivers -- well, as

1   commissioner.  I believe that's how the question was

2   set up.

3          THE COURT:  Let's address the first.

4   What kind of flow rates he's observed at the river

5   from 2005 or 6 to the present.  We'll just take it

6   piece by piece.

7          Go ahead, Mr. Fite.

8   A.   In 2005-2006, we were coming off an extended

9   period of time when the flow rates on the hydrograph,

10  or on the gauge stations throughout the basin, had

11  been below the average mean for those -- for -- set it

12  up for everyone in the room.

13         There are a number of gauges in the Illinois

14  River basin that are maintained by the United States

15  Geological Survey and different agencies cooperate for

16  the cost of operating those gauges.

17         The Tahlequah gauge has been online since

18  1936; there's 73 years of record there.  You can take

19  that information, you can twist it anyway that you

20  want to, and come up with whatever information you

21  need on a daily basis, hourly basis, monthly basis,

22  annual basis.  Come up with a mean over the period of

23  record.

24         Then you can go upstream to Watts.  I believe

25  that gauge has been on record now approximately 53

1    years -- 50 years, 53 years.  Got the U.S. 412 gauge

2    at Flint Creek just east of Kansas, Oklahoma.  That

3    gauge has been operating well over 40 years.  The

4    Arkansas 59 bridge that I relayed -- or alluded to has

5    only been of record of 14 years.  So these different

6    gauges interact.

7         And one of the things Dr. Roskin taught me in

8    applied fluvial geomorphology techniques -- does

9    anyone need any help with that?

10        Okay.  Basically, you understand the width

11   and depth ratios of a stream.  Entrenchment rates, and

12   so forth.  And you determine what the sinuosity of a

13   stream should be. So if Arkansas 59 is approximately a

14   hundred feet across, it should not run longer than

15   about five to seven widths long before you have a

16   riffle or a pool or a meander or some kind of

17   alteration in a stream.

18        What stream gauges are important for is when

19   you have extended periods where we've been wet and

20   we've had these bank-full frequencies or we've had

21   these 25-year rain events where we have two inches or

22   more in the basin, you're moving gravel and you're

23   scouring the bottom, and so that affects the entire

24   community of the river.

25        And what has happened in a period of time

1   leading up to 2006 is we were below the hydrograph,

2   and so we had no movement going on within the river

3   column, water column, or the substrate, the gravels,

4   and so we had nothing being moved.

5         Then we move into late 2007 and we start

6   getting in the rains in October, and the hydrograph

7   has been for the most part for several -- several days

8   each month over a thousand cubic feet per second.  A

9   cubic foot per second equates to 450 gallons per

10  minute passing a point. So some people rely on gauge

11  heights, some people rely on cubic feet per second.

12  Cubic feet per second is an exercise of width times

13  depth times velocity.  That's how you come up with

14  cubic feet per second.

15        And the hydrograph is the most important tool

16  that I have at my avail because it tells me whether

17  nutrients are moving through the system, it tells me

18  whether floaters should be on the river, it tells me

19  whether I have erosion going on, it tells me whether I

20  have public safety issues, so forth.

21              THE COURT:  Help me out, Mr. Fite.  You

22  talk about obviously CFS gauge heights.  When you say

23  "hydrograph," are you saying measurement of CFS?  Is

24  that what the hydrograph does?

25              THE WITNESS:  Yes.

1          THE COURT:  Okay.

2     Q.   *(BY MR. GARREN)*  How is it you know that

3  there's nutrients running through the water based upon

4  a hydrograph, sir?

5     A.   I've done a lot of reading.  I've seen a lot

6  of reports.  Dr. Sharpley's report; I look in -- going

7  back to 1968, look at Dr. Vollenweider's work;

8  Dr. Kratzer's work in '79; Dr. Meybeck in '82.

9  Dr. Gakstatter, who was here during the Fayetteville

10  days when we were ramping up for that case.  USEPA

11  brought in Dr. Gakstatter from the Duluth, Minnesota,

12  lab and some help from the Corvallis, Oregon, lab to

13  try to resolve the issues and to be able to condition

14  the MPS permit for Fayetteville so there wouldn't be

15  the brouhaha between the two states.

16          Anyway, of all of this information I have

17  picked up and read over time, and that's how I know

18  all this, is that I've looked at these other authors'

19  work and I've looked at other river programs and

20  talked to other river managers.

21          From 1995 until just a few years ago, I was

22  the only state representative to the Interagency

23  Council for Wild and Scenic River Coordinating

24  Council.  I worked with the National Park Service.  I

25  worked with the Bureau of Land Management, U.S. Fish

1    and Wildlife Service, and the Park Service.  I was the

2    only state representative and I had a lot of

3    information that came my way as a part of that work.

4         Q.   Have you ever been invited to attend a

5    meeting directly with an EPA -- the United States EPA

6    chairman or director?

7         A.   Yes.

8         Q.   When did that occur?

9         A.   It's been a number of years ago.  I met with

10   Bill Ruckelshaus.

11        Q.   What was the purpose for going?

12        A.   The Fayetteville, Arkansas, case.

13        Q.   And what did you talk about to him?

14        A.   Talked about water quality, nutrients,

15   wastewater treatment plants.

16             THE COURT:  Mr. Garren, we're halfway

17   through.  Let's take our mid-afternoon break.

18             MR. GARREN:  Thank you, Your Honor.

19                  *(Short break)*

20             THE COURT:  Mr. Garren.

21             MR. GARREN:  Thank you, Your Honor.

22        Q.   *(BY MR. GARREN)*  Mr. Fite, we've gotten a

23   little off stray, but I want to try and get us circled

24   back around.  Because we were talking about the Duncan

25   videos that we observed when you made a tour of the

1   basin and you tried to describe what the water was as

2   you seen it.

3        How do you compare the condition of the water

4   this last weekend when you made the tour to what you

5   observed on the videos presented for March of 2009?

6        A.   Definitely the water column for the Illinois

7   River and its tributaries this past weekend is

8   different than that that was shown in the videos from

9   March, in that you have a function of photosynthesis

10  going on this time of year, we have direct sunlight,

11  warmer temperatures, nutrients in the water, and thus

12  you have algae production.  With that algae

13  production, you also have decay.

14       As one cycle -- one series of algae thrives

15  and starts to die off, the others start to decay, new

16  replace it, and so you have what I consider to be a

17  green cast to the water as opposed to what you would

18  see in a period like February, March.

19       Q.   Do you know, sir, whether phosphorus in water

20  is colorless?

21       A.   Yes.  It's a nutrient that the algae rely on.

22       Q.   So holding up a pitcher of water wouldn't

23  tell you whether it's high in phosphorus levels, would

24  it?

25       A.   No.

684

1      Q.   When do you see high levels of phosphorus at

2  the river, sir?

3      A.   Well, based on my review of --

4           MR. VOLPE:  Objection, Your Honor.  I'm

5  going to object.  Excuse me.  I think we're going to

6  get into --

7           THE COURT:  Sustained.

8      Q.   *(BY MR. GARREN)*  Does the agency as part of

9  its functions and duties compile sampling data from

10  the river over periods of time?

11     A.   Yes.

12     Q.   Is that data available to the commission to

13  perform its duties and obligations in preserving and

14  protecting the Illinois River Watershed?

15     A.   Yes.

16     Q.   Is that data available to you and do you use

17  it in your functions as a chairman of the Scenic

18  Rivers Commission?

19     A.   Yes.

20     Q.   Describe generally the nature of that data

21  that you're looking at.

22     A.   Well, we pay for that data.  We want to

23  know -- from the day arrived at the river commission

24  in 1983, I've always held to these following

25  principles:  Is the river getting better or is it

1    getting worse?  If we know that one of the two is

2    happening, can we discern is it between Arkansas or

3    Oklahoma or both?  Is the water suitable for primary

4    body contact for recreation?

5        Q.   Is it?

6        A.   Periods of the year, yes; periods of the

7    year, no.

8        Q.   What periods of the year is it not suitable?

9        A.   I would suggest to you that it would be

10   somewhere in the order of when the river is 2,000

11   cubic feet per second or greater.

12       Q.   And why is that?

13       A.   That's when we start seeing the phosphorus --

14   or excuse me -- the bacterial levels for E-coli and

15   enterococcus exceeding the standard.  We have three

16   standards -- or excuse me -- three bacterias housed

17   within the water quality standards of the state.  They

18   are fecal coliform, E-coli, and enterococcus.

19            I pay attention to the E-coli and

20   enterococcus because those are indicators of bacteria

21   that are those particular bacteria housed within the

22   water quality standards of the two that we look to at

23   indicators when people should not be in the river.

24            When those numbers exceed on the order of --

25   things are wonderful when E-coli is under about 150

1    and enterococcus is under 61.  Then we have some

2    periods where we allow for some warnings, but when

3    those numbers elevate, when we see E-coli in the

4    neighborhood of 575, we're thinking that that's

5    something that you don't want to be in the water for,

6    and when we're over about 151, 152, in that ballpark,

7    on enterococcus.

8        Q.  What do you mean by "warnings"?  What were

9    you referring to as warnings?

10       A.  If you go to our Web site, you'll see that

11   for the last two years the Scenic Rivers Commission,

12   in partnership about the Secretary of Environment's

13   office and the Department of Environmental Quality

14   have been putting out advisories to the public on our

15   Web site, plus a weekly advisory contained within my

16   reports to floaters about conditions for the river.

17       Q.  We were talking about cubic feet per second,

18   and you've looked at data from 2005, 6 up until

19   present.

20           How does the 2,000 cubic feet flow rate

21   compare to what you see as what I call a typical or

22   average flow at the Illinois River?

23       A.  Well, 2,000 CFS in the summer months is

24   considerably greater than what the -- what historical

25   records have been.  That would be -- that would exceed

1    what most of the commercial outfitters are floating on

2    the Illinois River when you want to rent a canoe.

3    They don't generally don't want to float children ten

4    years of age or older -- or excuse me -- ten years of

5    age or younger in conditions when the river is greater

6    than about five feet because --

7        Q.   How does that relate to the cubic feet per

8    second?

9        A.   Well, that's about right where we are.

10       Q.   Okay.

11       A.   And we have been as an agency for a number of

12   years been talking back and forth with our sister

13   agencies and the United States Geological Survey about

14   bacteria, and we have been trying to develop a

15   surrogate to where when we have a hydrograph reading

16   that's X number, that we can -- we can tie bacteria

17   levels to that.  We're moving down that path right

18   now, we have not developed it fully.

19       Q.   How long have you been working on that

20   project in order to be able to provide that warning?

21       A.   Several years.  We got really specific last

22   summer with USEPA grant that Secretary Tolbert when he

23   was at the Secretary of Environment's office was able

24   to arrange for us to do our twice-a-week sampling.

25       Q.   Is your commission compiling that data that

**United States District Court**

1    you've just referred to?

2        A.   Yes.   There's a report that's published and

3    approved by EPA.

4        Q.   All right.  Back to the flow rates and the

5    nutrient statement you made that you say nutrients are

6    flowing at that time, what is occurring that causes

7    the nutrients to be in the river that you've

8    described?

9            MR. VOLPE:  I'm going to object, Your

10   Honor.  Sorry.

11           MR. ELROD:  Object.

12           THE COURT:  Sustained.

13       Q.   *(BY MR. GARREN)*  Let's get back to -- because

14   I'm not sure you've -- we've completed this -- did you

15   compare the flow rates leading up to the time period

16   in which Mr. Duncan pulled his pitcher of water out of

17   the river in those videos?

18       A.   Yes.

19       Q.   And what did you find in making that

20   observation?

21       A.   For the month of March, I believe he was able

22   to grab his samples on one of three days that existed

23   during the entire month where the hydrograph was under

24   1,000 cubic feet per second.

25       Q.   And what is the difference if it were above

1    that 1,000 cubic feet per second?  What would you be

2    seeing differently?

3        A.   As I've said previously, since water year

4    2000 --

5              MR. ELROD:  I'm sorry to interrupt, but

6    here's the problem, Judge.

7         You'll hear me say it again and I've said it

8    before:  Ed Fite is one the most highly-qualified

9    people that I know.  The problem is that they have not

10   disclosed him to give expert opinions in this case,

11   he's not a nonretained expert, and what we're hearing

12   now is an intermixture between observations of facts

13   and ultimately an opinion that tries to tie what

14   certain facts mean together.

15        I simply think that it's improper under the

16   circumstances of the case with the expert report

17   deadline has passed, disclosure deadline has passed.

18   It's absolutely no reflection on Mr. Fite and his

19   expertise, except he's not disclosed as giving these

20   opinions.

21              THE COURT:  Response.

22              MR. GARREN:  Yeah, Your Honor.

23         Under 701, we're not limited in that sense.

24   This witness can talk about materials, understandings

25   of information, and give his opinions or inferences

*690*

1    from it based upon his knowledge that we have tried to

2    establish he has given today.

3              THE COURT:  Yes.  But by his own

4    testimony, a lot of that understanding is from

5    reading, which is to be commended, but it is hearsay

6    which cannot be cross-examined.

7              There's a line here.  Obviously, he can

8    testify from his own observation that in times where

9    the flow is under a thousand cubic feet per second,

10   the water is more clear.  That is entirely proper.

11             Now, when we get into the area of phosphorus

12   and source, that's scientific.  He can certainly

13   testify as to his observations, as I've said

14   previously.  If you can find somebody more

15   knowledgeable than the man on the witness stand about

16   this river, I think that's going to be very difficult.

17   But there is a line.

18             The objection is sustained as to scientific

19   matters.  But obviously, I think the question more

20   particularly was to the differentiation between

21   clarity and lack of clarity of the water above and

22   below a thousand feet -- cubic feet per second;

23   correct?

24             MR. GARREN:  My response is a couple of

25   things, Judge.

1       First off with the objection by Mr. Elrod,

2   they had an opportunity to depose him, they did depose

3   him, and if these questions were asked or answered,

4   that was their opportunity to do so.

5       Secondly, the one thing that I keep coming

6   back to, and have difficulty with, and that is the

7   rules this is hearsay, Judge.  We have a commission

8   that must have data in order to function.  What needs

9   to be shown and what would be appropriate under the

10  objection would be the reliability of the data and

11  whether or not it's reliable for this agency to

12  utilize that data in its function.

13          THE COURT:  I disagree.  An agency is

14  entirely -- it is entirely proper for an agency to

15  rely on hearsay in performing its function.  That does

16  not make that testimony of such a quality as it can be

17  presented to a federal court in

18  determining -- determining causation or scientific

19  theories.

20      The objection's sustained with regard to

21  scientific matters.  Anything further?

22          MR. VOLPE:  I don't want to step on that

23  ruling, Your Honor, but I would point out that the

24  additional thing that's going on here is they're

25  eliciting opinion testimony from this witness, and

*692*

1    there was an opportunity for the parties to

2    disclose -- I'll just read it -- list of nonretained

3    witnesses who may offer opinion testimony.  I have the

4    State of Oklahoma's list of nonretained witnesses who

5    may offer opinion testimony.  Mr. Fite is not on that

6    list.

7              So to the extent they're trying to offer

8    opinion testimony through this witness, it is both

9    improper under the Federal rules of Evidence, but it's

10   also improper under the disclosures in this case.

11              THE COURT:  All right.  I sustained the

12   objection as to scientific matters.  Obviously, if the

13   question goes to clarity above and below one thousand

14   CFS, he may answer.

15              Go ahead, Mr. Fite.

16              MR. GARREN:  Do I understand, though,

17   Your Honor, if he's giving an opinion that's based

18   upon inferences which are rationally based on his

19   perception, are those admissible or not --

20              THE COURT:  The objection is sustained

21   as to the question asked.  Your next question.

22              Go ahead.

23        Q.    *(BY MR. GARREN)*  Mr. Fite, you've lived in

24   the Illinois River basin for many years.  Do you have

25   an opportunity in your travels around the basin to

*693*

1    observe agricultural practices occurring?

2        A.   Yes.

3        Q.   And have you observed yourself personally the

4    land application of poultry waste?

5        A.   Yes.

6        Q.   On more than one time?

7        A.   Yes.

8        Q.   And in doing so, are you able to identify

9    that which is occurring from senses other than just

10   your sight?

11              THE COURT:   Please restate that for

12   him.

13       Q.   *(BY MR. GARREN)*   Are you able to smell it

14   when it's occurring also?

15       A.   Yes.

16       Q.   And is it very -- is it a very noticeable

17   smell?

18       A.   Yes.

19       Q.   Is it one that is confused with other smells

20   you might have available to you in the Illinois River

21   basin?

22       A.   No.

23       Q.   Is that one way of identifying piles of

24   poultry waste that may be sitting in a field through

25   your sense of smell?

*694*

1    A.   Yes.

2    Q.   Are you familiar, sir, in the Illinois River

3  Watershed of any sub-basins that do not have water

4  treatment plants in them?

5    A.   Yes.

6    Q.   Can you give me an example of a couple or

7  three?

8    A.   Steeley Hollow, Peavine Hollow, Ballard

9  Creek, Fagan Creek, Telemay Hollow, Oil Springs.

10   Q.   Have you, sir, ever observed the presence of

11  algae or scum or nonclarity of a water in those areas

12  that you just described?

13   A.   Yes.

14   Q.   What time of year do you generally see that,

15  if you do?

16   A.   Generally April, May, through the summer

17  months.

18   Q.   And how often does that occur?

19   A.   The last significant recollection of that

20  would have been calendar year 2006.

21        MR. GARREN:  Bring up Demonstrative 31,

22  please.

23   Q.   *(BY MR. GARREN)*  Did you have an opportunity

24  to observe an event on or about April 20th of 2006

25  dealing with algae in a particular area?

 1      A.   Yes.

 2      Q.   I'll ask you to look at the demonstrative

 3  exhibit that's shown there in front of you.  Do you

 4  recognize that?

 5      A.   Yes.

 6      Q.   Can you tell the court what happened or what

 7  was occurring that day?

 8      A.   We had just come off -- the river had just

 9  been through a series of days of overcast skies where

10  there wasn't direct sunlight, we had an enormous

11  amount of algae that was growing that time of the

12  year, and the dissolved oxygen levels dropped to a

13  point that there was a fish-kill.

14      Q.   Where is this located?

15      A.   I believe that's site is going to be the Camp

16  Rockaway area just upstream of Round Hollow.

17           MR. ELROD:  Pardon me once again, Your

18  Honor.  I'm sorry for interrupting.

19         You say this is Demonstrative 31?

20           MR. GARREN:  That's what I thought it

21  was.

22           MR. ELROD:  That's not on our 72-hour

23  list.

24           MR. GARREN:  It's not?

25           MR. ELROD:  No, sir.

```
 1              MR. VOLPE:  It is, Judge.  It is.  They
 2    sent a second e-mail.
 3              MR. ELROD:  This is 31?  Oh, there's a
 4    second e-mail?
 5              MR. GARREN:  Ten minutes later.
 6              MR. ELROD:  Never mind.
 7        Q.   (BY MR. GARREN)  Are you personally familiar
 8    with this particular event occurring on this time?
 9        A.   Yes.
10        Q.   What else did you observe that -- well, first
11    off, this picture, does it accurately portray what you
12    observed on that day?
13        A.   Yes.
14        Q.   And were there more than one fish laying
15    belly up in that creek at that time?
16        A.   Yes.
17        Q.   What did you do as a result of what you saw?
18        A.   Contacted the 1-800 number for the DEQ
19    hotline, 1-800-522-0206.
20              MR. GARREN:  Let's pull up Demonstrative
21    74, please.
22        Q.   (BY MR. GARREN)  Mr. Fite, have you had an
23    opportunity to look at that demonstrative before
24    today?
25        A.   Yes.
```

1    Q.    And it's been said in this case at one time

2    that it would take somebody to backpack in in order to

3    get pictures of these locations.

4          Are you familiar with these locations?

5    A.    Several of them, yes.

6    Q.    And with regard to the statement of having to

7    backpack in to an area to take a picture, would that

8    really be necessary, sir?

9    A.    No.

10   Q.    Do some of these locations that we see in

11   this picture reflect sub-basins that do not have

12   wastewater treatment plants in them?

13   A.    May I go over and look at the picture?

14   Q.    Please do.

15          THE WITNESS:    Judge, there's something

16   terrible that happens when you get to be 52; you lose

17   your eyesight.

18          THE COURT:    I'm there.

19   A.    Several of them would --

20   Q.    *(BY MR. GARREN)*    Thank you.

21   A.    -- be outside of a wastewater treatment plant

22   discharge.

23   Q.    Can you tell us which ones on there that are

24   identified as to the basin?

25   A.    May I see your hard copy where I can read the

1    print?

2              MR. GARREN:   Let's see if we can -- I'm

3    not sure if -- can we blow that up one at a time?

4              *(Discussion held off the record)*

5        Q.   *(BY MR. GARREN)*  We'll come back to that,

6    Mr. Fite, and try and save some time and we'll have

7    you identify those areas.

8              When do you anticipate the ability of Scenic

9    Rivers to begin posting warnings with regard to

10   bacteria levels, or is that occurring now?

11       A.   We have a general advisory on our Web site

12   that is a poster of the dos and don'ts that you do

13   when you go into waters of the state.

14       Q.   Did I hear you say earlier in your testimony

15   that you had been conducting sampling in order to

16   create a different kind of warning system?

17       A.   Yes.

18       Q.   And when do you anticipate having the ability

19   to put that into operation?

20       A.   We will wait at least another season, summer

21   season, tourist season, in order for us to be able to

22   weekly sample the Illinois River, Baron Fork, and

23   Flint Creek before we put those advisories up on a

24   "green-okay, yellow-warning, orange-probably should

25   not go" basis.

1      Q.   In the role of chairman of the Scenic Rivers

2   Commission, can you tell me who receives complaints,

3   if there are any, with regard to conditions in the

4   river?

5      A.   The entire staff.

6      Q.   What happens --

7      A.   Whoever the public -- whenever the public

8   calls, comes into the office, or e-mails us, whoever's

9   on duty would be the first recipient of that

10   information.

11      Q.   What kind of complaints have you personally

12   experienced with regard to water quality that have

13   occurred in the past?

14      A.   Fish-kill --

15           MR. VOLPE:  I'm going to object, Your

16   Honor.  That's -- that is hearsay.  That is eliciting

17   testimony --

18           THE COURT:  No.  Overruled.

19      Q.   *(BY MR. GARREN)*  Are there any other types of

20   water-quality complaints that you've received in your

21   position at the Scenic Rivers Commission?

22      A.   Yes.

23      Q.   Give a description of those kinds that you

24   might receive.

25      A.   Dikes on a wastewater treatment lagoon, for a

```
 1    municipality failing, a dike on an animal waste lagoon
 2    failing, dead cattle in the river, dead horses in the
 3    river, application of liquid manure next to the river
 4    running into the river, fertilizer truck upside down
 5    at a crossing adjacent to a -- in a tributary to the
 6    river would be some examples.
 7         Q.   Have you had complaints with regard to either
 8    smell or foaming of water?
 9         A.   Yes.
10         Q.   And have you had an opportunity yourself to
11    address those kind of complaints?
12         A.   Oh, yes.  One of the ones that comes to my
13    mind is the foam issue in the winter months.  Folks
14    will stop in the office, call, and want to know what
15    the foam is on the river.
16         Q.   Do you know yourself what it is?
17         A.   Yes.
18         Q.   What is it?
19         A.   It's -- typically during lower flows, it's
20    going to be residual phosphorus, it's going to be --
21              MR. ELROD:  Your Honor, this is -- I
22    object and move to strike.  He's moved over into
23    opinion testimony.
24              THE COURT:  Sustained.
25         Q.   (BY MR. GARREN)  Tell us a little bit about
```

1   the events that you described about the liquid manure

2   application?  Can you tell us when that occurred and

3   what you observed?

4        A.   Had a complaint that came in.  --

5             MR. VOLPE:  Judge, excuse me.  Never

6   mind.

7             THE COURT:  He can see that with his

8   eyes.  I don't think it takes an expert.

9        Go ahead.

10       A.   I had a complaint from Kamp Paddle Trails,

11  the owner, David Pickle, a number of years ago about

12  the river smelling like manure and I responded.

13  Upstream of Kamp Paddle Trails on a property owned at

14  the time by Dean Wilmoth, I found that a company had

15  land-applied liquid manure in such quantities that it

16  was actually running off into the river.

17       Q.   Do you know what company that was?

18       A.   Yes.  It was George's.

19       Q.   And what did you do upon discovering this?

20       A.   I contacted the Department of Agriculture and

21  also the local NRCS office and they came out and

22  investigated the site.

23       Q.   What authority, if any, does the Scenic

24  Rivers Commission have, other than what you've just

25  described, in a circumstance occurring similar to

1    that?

2        A.   We have none.

3        Q.   Let's get back to the board, now that we have

4    it, and perhaps you can describe to the court -- and

5    you may step down, if you would --

6                MR. GARREN:   If that's okay, Your Honor?

7                THE COURT:   You may.

8        Q.   *(BY MR. GARREN)*   -- and describe those

9    pictures on the board that you know are in areas that

10   are sub-basins without wastewater treatment plants.

11   And speak up, please.

12       A.   The site, I guess for everyone's benefit,

13   would be -- call this north -- the northwest corner of

14   the poster and is not going to have a wastewater

15   treatment facility.

16           The Sager Creek photo at the top center,

17   depending on where that was taken in relation to -- it

18   looks like it appears it's upstream of the waste water

19   treatment facility at Siloam Springs.  There's a POTW

20   downstream approximately 200 yards above the state

21   line, so I'm going to say that this -- there is not a

22   wastewater treatment facility here.

23           At Lick Branch, that may be one I have to

24   backpack into.  I have to honestly say I've not been

25   to Lick Branch.

1    Q.   All right.

2    A.   Okay.  But it is not going to have a

3  wastewater treatment facility above it.

4         This is going to be a tributary to the --

5  looks to be the Osage Creek -- Osage Creek, and

6  presently Rogers and Springdale discharge above that

7  confluence.

8         The tributary to the extreme right in the top

9  of the picture on Clear Creek, there's not going to be

10  a wastewater treatment facility there.  However, it's

11  going to confluence with the Clear Creek where the

12  wastewater previously to the new wastewater treatment

13  plant in Fayetteville discharges.  Fayetteville right

14  now does not discharge at this point along --

15    Q.   All right.  But they're still above the

16  confluence of that creek where the discharge would

17  have occurred in the past?

18    A.   Yes, yes.

19    Q.   All right.

20    A.   Okay.  Hamstring Creek, there's not a

21  wastewater treatment facility there.

22         Ballard Creek, there is not a wastewater

23  treatment facility.  However, I talked about the

24  animal waste lagoon that failed.  There is the Ozark

25  egg farm that has previously caused some issues in

1    Ballard Creek and quite a bit of production there.

2        Q.    Were those issues occurring on or about what

3    looks like April 2007 as represented in that

4    picture?

5        A.    No, no.

6        Q.    All right.

7        A.    No.   On Fly Creek, there is not a wastewater

8    treatment facility there.

9              There is not one on Terrapin Creek.   That is

10   a tributary to Lake Tenkiller proper.   It's on the

11   east side.   I have been to that creek before.

12             The Park Hill Branch, Park Hill Branch does

13   not have a wastewater treatment facility.   However,

14   Park Hill Branch does have -- and depending on where

15   that cross-section is -- there is a livestock auction

16   that is operated on Saturdays where there are animals

17   that are sold.   Some of the drainage potentially could

18   get into that creek.

19             Ballard Creek again, we're back in the state

20   of Oklahoma proper, there's not a wastewater treatment

21   facility there.   So I've shown you -- this Ballard

22   Creek here is in Arkansas.   This Ballard Creek here is

23   in -- excuse me -- it's in Arkansas and this one is in

24   Oklahoma.

25             Tahlequah Creek, this is going to be upstream

1    of the wastewater treatment facility for the City of

2    Tahlequah.  I do know in the headwaters of Tahlequah

3    Creek, there is poultry waste that's been applied

4    there.  I've seen that.

5           And then the Cincinnati Creek, it does not

6    have one.  That's going to be upstream of Lake

7    Francis, upstream of Arkansas 59.

8        Q.   All right.  Have you had an

9    opportunity -- you may take the witness chair again,

10   sir.

11          Have you had the opportunity over the years

12   to familiarize yourself with the Ballard Creek

13   watershed?

14       A.   Yes.

15       Q.   And can you describe -- how would you

16   describe the agricultural activities that occur in

17   that sub-basin?  What kind do you see occurring?

18       A.   Poultry and cattle.

19       Q.   And do you have any kind --

20       A.   Some horses.

21       Q.   Pardon me?

22       A.   Some horses.

23       Q.   Do you have any kind of estimate of the

24   numbers of poultry compared to the cattle in that

25   area?

```
 1              MR. VOLPE:  Judge, I'm going to object;
 2   calls for expert testimony.  The latter is lack of
 3   foundation, I believe.
 4              THE COURT:  Well, I don't know how much
 5   foundation it will take, but sustained.
 6         Go ahead.
 7      Q.  (BY MR. GARREN)  How many times did you drive
 8   the Ballard watershed in the past few years?
 9      A.   Many.
10      Q.   Enough that you can't remember how many?  Is
11   it more than the fingers than you have on your hands?
12      A.   I probably go into Arkansas at least twice a
13   month at a minimum.
14      Q.   And does that include the Ballard
15   sub-basin?
16      A.   Yes.
17      Q.   And when you do, have you observed poultry
18   operations there?
19      A.   Yes.
20      Q.   And are there many poultry operations in that
21   sub-basin?
22      A.   Yes.
23      Q.   Let's talk a little bit, if you would, sir,
24   about water quality standards that are applied in the
25   Scenic Rivers.
```

1          Are you familiar with a numerical water

2   quality standard?

3       A.   Yes.

4       Q.   Are there other water quality standards

5   besides the numerical standard?

6       A.   Yes.

7       Q.   And generally, what are they?

8       A.   The Illinois River and other scenic rivers

9   are the top tier of water quality standards of our

10  state, they're the best of the best.  They are the

11  water bodies of our state that the state does

12  everything humanly possible to protect.  There's a

13  prohibition on the introduction of manmade pollutants

14  or new point-source discharges into a scenic river

15  once designated.  Existing dischargers cannot increase

16  loadings.

17          To define that, if a wastewater treatment

18  facility at Tahlequah was discharging in the river,

19  once it was designated as a scenic river, at a million

20  gallons a day with ten pounds of pollutants in it,

21  they can increase their discharge to two or three or

22  four or five million gallons of water potentially, but

23  they can never elevate that ten pounds of pollutants

24  out of the end of the pipe, they are locked in.

25  That's how we treat them.

1      Q.    When was the Scenic Rivers designated?

2      A.    1970.

3      Q.    Does the Scenic Rivers have authority to set

4  water quality standards -- I'm sorry -- the commission

5  itself?

6      A.    No.

7      Q.    Does the Scenic Rivers Commission have any

8  role in what was set as a basis of a numerical water

9  quality standard?

10      A.    The commission was very involved in the

11  establishment of a numeric standard.  They supported

12  my recommendation.

13      Q.    And what was that?

14      A.    0.02 milligrams per liter, or parts per

15  million, in a stream of phosphorus.

16      Q.    And how is it that the Scenic Rivers

17  Commission resolved on that particular number in order

18  to make its recommendation?

19      A.    It was a recommendation that came about in

20  December of 2000 that I made to the Oklahoma Water

21  Resources Board in an informal hearing on the

22  triennial review of our state's water quality

23  standards.

24      Q.    And what was it that the commission did in

25  order to formulate its recommendation to be made to

1    the Water Resources Board?

2         A.   They passed a resolution supporting the

3    staff's position.

4         Q.   And was that then what you took to the Water

5    Resources Board?

6         A.   That was after the fact.  I had suggested

7    that to the water board previous to their resolution.

8         Q.   All right.  What was the basis for the

9    resolution that the Scenic Rivers Commission

10   formulated?

11        A.   I asked for their resolution as their

12   director.

13        Q.   How is it that you came to arrive at a

14   number .002?

15             MR. VOLPE:  I'm going to object, Your

16   Honor.  How Mr. Fite arrived at that would call for

17   hearsay and call for expert testimony and it will call

18   for opinion testimony.

19             THE COURT:  I think strictly he can

20   state the sources.  I don't think he can relate

21   conclusions, but it would not call for the substance

22   of the hearsay if he identified the sources upon which

23   he derived the .02 milliliter standard.

24             Go ahead.

25        Q.   *(BY MR. GARREN)*  Can you answer that

1  question, sir?  What were the sources that you may

2  have used or relied on in order to make what

3  ultimately was a recommendation from the Scenic Rivers

4  Commission on water quality standards?

5      A.   I just happen to be old enough that I

6  remember some of the old programs.  One that folks

7  don't talk about now is the Hydraulic Benchmark

8  Network.  The Hydraulic Benchmark Network was

9  established in 1963.  It basically has looked at -- I

10  think the maximum number of streams that were in that

11  program at any one time were 58.

12          There are streams that are located all over

13  the east United States that were relatively

14  uninhabited or had human influence and were relatively

15  undeveloped and were considered pristine streams.

16  Those are -- those 58 streams are the streams that

17  have the longest historic record known for water

18  quality sampling, uniform, consistent, all of them the

19  same.

20          Following that, the EPA, USEPA, developed

21  what's called NAWQA, N-A-W-Q-A, National Water Quality

22  Assessment Program.  That program has been up and

23  functioning for not as long, but again, the same goals

24  adhered.

25          And when I went to the Water Resources Board

1  and suggested the .02 --

2              MR. VOLPE:  Judge, I'm going to object.

3  First of all, if I may -- I don't mean to be impolite

4  here -- but this standard that Mr. Fite is talking

5  about is not the standard that was adopted by the

6  Oklahoma Legislature so I don't understand the

7  relevance of this.

8              I let it go with Mr. Hilsher, but now we're

9  getting 50 years of history leading up to a standard

10  that is not the law of the State of Oklahoma.

11              THE COURT:  I thought the testimony was

12  this:  He had a role in what was set as the numeric

13  water quality standard.

14              MR. VOLPE:  He had a role in

15  recommending what was then not passed by the Oklahoma

16  Legislature.

17              THE COURT:  Well, what is it -- because

18  you all know this, you've been through discovery, what

19  is its relevance then, Mr. Garren, if it was not

20  adopted as the water quality standard?

21              MR. GARREN:  Basically, Your Honor, it

22  was to show the pristine nature of what the stream

23  should be and that the commission had an understanding

24  of what they wanted it to be.

25              THE COURT:  The objection's sustained.

1   Let's move on.

2                    MR. GARREN:  All right.

3        Q.   *(BY MR. GARREN)*  How long back -- how far

4   back does it go that water quality testing results

5   were available for the Illinois River Watershed on a

6   similar geometric mean testing?

7        A.   1970.

8        Q.   Has, at any time since 1970, the water in the

9   Illinois River basin met this .02 criteria that you

10  discussed?

11                   MR. VOLPE:  Judge, I'm sorry.  You just

12  excluded Mr. Fite from offering testimony on this .02

13  standard.  That's not the law in the State of

14  Oklahoma, and now we're just going at it a different

15  way.

16                   THE COURT:  Yeah.  Sustained.

17                   MR. GARREN:  Your Honor, I'm trying to

18  show some history with regard to the impact and the

19  quality of the water at certain times.  This case is

20  not about pollution occurring at a single snapshot in

21  time, but it's a historic pervasive nature that

22  created what we're seeing.  I'm trying to use that as

23  a predicate to my next question, and that is, what is

24  the water quality measurements that they're seeing in

25  the river.

1           THE COURT:  All right.  I see, but

2   you're trying to -- you're using the term .2 standard.

3   This was a recommendation.  It wasn't adopted.  I

4   didn't know that until you just told me that.  You all

5   have been through five years of discovery.  I'm the

6   third judge on this case, all right?  So don't lead me

7   down these paths where you know we're not going to be

8   able to get this into evidence.

9           Now, in terms of the water quality, if we've

10  got water quality tests since 1970, let's just

11  ask -- I understand now.  I think it is relevant with

12  regard to the water quality.

13          Go ahead.  And let's not refer to it as "the

14  standard."  It's not a standard.  It's just a point

15  that was recommended by resolution of the Scenic

16  Rivers Commission.  Let's move on.

17      Q.   *(BY MR. GARREN)*  Mr. Fite, can you tell us

18  when since 1970 the river has ever been at a .02

19  phosphorus level standard?

20              THE COURT:  Let's rephrase, please.

21              MR. GARREN:  I misstated.

22      Q.   *(BY MR. GARREN)*  With regard to the .03

23  standard -- .037 standard, when was --

24              THE COURT:  No, no.  Ask him about a

25  .02, but it's not a standard.

1          MR. GARREN:  I'm sorry.  I'm sorry,

2     Judge.  I'm looking at something here, not

3     concentrating.

4          Q.   *(BY MR. GARREN)*  What is the measurement that

5     we're looking at when we're looking at .02?  What are

6     you measuring?

7          A.   0.02 is the 50th percentile for what

8     phosphorus should be in a stream like the Illinois

9     River based on Dr. Clark's work and others.

10          MR. VOLPE:  Objection, Your Honor.

11          THE COURT:  Sustained.

12          Mr. Fite, I think all of us -- I think you

13     can tell by the intent listening when you speak, I

14     think everybody in this courtroom understands that

15     you're probably the most knowledgeable in terms of

16     this river, but I can't let you get into scientific

17     matters here.  Basically, we're just trying to inquire

18     as to the degradation, or alleged degradation, of

19     water quality since water quality testing results have

20     been available since 1970.

21          Can you tell us kind of about that and how

22     it's -- in terms of a .2 test result, where have

23     we -- kind of lead us from 1970 to the present.

24          MR. GARREN:  Actually, it's .02, Your

25     Honor, just to clarify the record.

1          THE COURT:  I'm sorry.  That's right.

2   .02 milliliters --

3          THE WITNESS:  Milligrams per liter, or

4   parts her million.

5          THE COURT:  Thank you.

6          THE WITNESS:  Be .02 parts per one

7   million parts.

8     A.   The upper reaches of the Flint Creek and

9   Baron Fork probably met that standard in 1970.  Today,

10  the closest representation to that is going to be

11  Baron Fork at Eldon and it exceeds it.  It's currently

12  at .04.

13    Q.   *(BY MR. GARREN)*  Thank you.  Does the

14  commission have the responsibility for monitoring the

15  water quality in relation to the standard of .037

16  that's been set by the state?

17    A.   Yes.

18    Q.   And what does it do in the sense of

19  monitoring?  Describe what it does.

20    A.   Please restate that question.  He got up and

21  I thought he was going to object.

22          THE WITNESS:  Sorry, Judge.  I'm just

23  playing the game.

24          THE COURT:  No.  You've been

25  well-conditioned.

1           Go ahead.

2                    MR. VOLPE:  Let me -- I'm sorry,

3     Judge.

4                    THE COURT:  You were right.

5                    THE WITNESS:  I was right.

6                    MR. VOLPE:  Just so -- I've not been in

7     this case for five years like my colleagues here, but

8     one thing I know about the standard is that it's

9     not -- it's a voluntary standard up to June 30th,

10    2012.  So we're referring to it as a standard, but I

11    think that's probably imprecise.  But if they want to

12    talk about the 0.37 -- it's a criteria.  It's a

13    criteria that -- it's a goal, I should say.

14           And I'll hand you up the statute just for

15    your information.

16                    THE COURT:  Thank you.

17      Q.   *(BY MR. GARREN)*  Does the commission obtain

18    sampling itself in order to monitor as to this

19    criteria?

20      A.   Yes.

21      Q.   Does it report that information when it's

22    collected?

23      A.   Yes.

24      Q.   To whom does it report it?

25      A.   It goes on the EPA STORET and to the agencies

 1    that access that STORET.

 2                    MR. GARREN:  May I approach, Your Honor?

 3                    THE COURT:  You may, sir.

 4        Q.   *(BY MR. GARREN)*  Mr. Fite, I've handed you

 5    what's been marked as State's Exhibit 3351 which was

 6    admitted yesterday in this court.

 7            Have you had an opportunity to review that

 8    report?

 9        A.   Yes.

10        Q.   And in doing so, have you relied on that

11    report in performing your work as chairman of the

12    Scenic Rivers Commission, or administrator?

13        A.   Yes.

14        Q.   And tell us, if you would, please, what's

15    important about that report as it might pertain to you

16    performing your functions for the Scenic Rivers

17    Commission.

18                    MR. VOLPE:  Judge, the document is in

19    evidence, but what his -- what he thinks is

20    important -- what this witness thinks is important is

21    an opinion.

22                    THE COURT:  All right.  Just one second.

23    Let me get 3351 in front of me.

24            Overruled.  Go ahead.

25        Q.   *(BY MR. GARREN)*  Does this report that we're

718

1    looking at provide to you some basis upon which the

2    commission may act or perform its functions?

3        A.    Yes.

4        Q.    Are other reports similar to this utilized by

5    the commission and you in the performance of those

6    duties to preserve or protect the Illinois River

7    Watershed?

8        A.    Yes.

9        Q.    What steps do you take, sir, to determine

10   whether the reports that you're looking at, especially

11   the one in front of you here today, they are reliable

12   in nature?

13       A.    What steps do I take --

14       Q.    Yes, sir.  Do you do anything before in

15   reliance on a document you determine whether or not

16   that document comes from a reliable source?

17       A.    Yes.

18       Q.    And tell briefly us, what would you do?

19       A.    This particular document is very substantial

20   to my day-to-day operations because it focuses on

21   Arkansas and Oklahoma, and specifically the Illinois

22   River, and it's authored by a number of federal

23   agencies in collaboration with the Arkansas -- now

24   it's the Arkansas Department of Natural Resources,

25   which used to be the Arkansas Water -- excuse

**United States District Court**

1    me -- Soil and Water Conservation Commission, Randy

2    Young's shop, and the Oklahoma Conservation

3    Commission.

4         What's important about those two agencies is

5    they are nonregulatory agencies.  They are the guys in

6    the white hats that go out and work with farmers,

7    stakeholders in the basin.

8         Q.   And what do you mean by "white hat" guys?

9         A.   They don't yield -- they don't yield a stick

10   of regulatory oversight.

11        Q.   And why is that important to you in your

12   consideration?

13        A.   Because this -- this particular document is

14   an approach based on a relationship with stakeholders.

15        Q.   Is there factual data compiled in this report

16   that you've seen?

17        A.   Yes.  This report actually -- previously I

18   cited a number of authors that I read their work in

19   years past, and it's referred to in this report.

20   Dr. Vollenweider in '68, Kratzer in '79, Meybeck in

21   '82, USDA, USEPA's work, it's all housed this here.

22        This predates the release of Dr. Burkes'

23   clean lake study, but it's right in the ballpark with

24   what Dr. Burkes found in the clean lake study in 1996.

25   So it's a very valid document.

 1        Q.   Do you agree with the conclusions that are

 2   stated in that report, sir?

 3                MR. VOLPE:  I'm going to object, Your

 4   Honor.

 5                THE COURT:  Sustained.

 6                THE WITNESS:  I thought I was getting on

 7   a run, Your Honor.

 8                THE COURT:  You rely on it, however;

 9   correct?

10                THE WITNESS:  Yes.

11                THE COURT:  All right.  Go ahead.

12        Q.   *(BY MR. GARREN)*  Are there other types of

13   reports generated from these same agencies that are

14   relied upon routinely by the Scenic Rivers Commission

15   performing its duties and functions?

16        A.   Yes.

17        Q.   And in addition to the ones that we see here,

18   can you give the court some understanding of other

19   agencies you found to be reliable in supplying data

20   and materials to the Scenic Rivers Commission in order

21   to perform its functions and duties?

22                MR. VOLPE:  Thank you, Mr. Fite.  I want

23   to object, Your Honor.

24                THE COURT:  Yes, sir.  Go ahead.

25                MR. VOLPE:  Okay.  I believe that the

1   question calls for Mr. Fite's opinion on the matters

2   that the commission -- on the matters of what the

3   commission relies upon and what the commission

4   considers reliable.  Those are all opinions.

5            THE COURT:  I think that's right.  It's

6   up to this court to determine what weight to give to

7   the data and materials that are admitted to this

8   court.  We're really trying to back-door some of the

9   scientific information.

10           The objection's sustained.

11       Q.   *(BY MR. GARREN)*  You've talked about the

12   Scenic Rivers Commission compiling water quality

13   samples and data.

14           What are the general parameters that the

15   Scenic Rivers Commission is testing for and looking

16   at?

17       A.   Total phosphorus, orthophosphorus, nitratis

18   nitrite, turbidity, dissolved oxygen, salinity, and

19   several others.

20       Q.   And bacteria, as you mentioned earlier?

21       A.   Uh-huh.  Bacteria.

22       Q.   And is this kind of material that is

23   published on the STORET data Web site that you

24   described earlier?

25       A.   Yes.  There are also some stand-alone reports

*722*

1    that have been published.

2        Q.    Let's talk again about the river.

3            What would you describe to be a high-flow

4    event?  What is that as it pertains to the Illinois

5    River Watershed?

6        A.    A Q25, a storm water event that -- or a

7    rainfall event throughout the basin would be two

8    inches or greater.

9        Q.    Is that type of an event measurable as a

10   result of water levels or flow rates in the river?

11       A.    Yes.

12       Q.    And based upon your experience, can you

13   identify when those occur looking at the flows or the

14   levels of the river?

15       A.    Actually, the gauge's reporting a storm water

16   event, a runoff event, when it's at a certain height,

17   but what we look at is precipitation.  If we know that

18   we're going to have a rainfall event that exceeds that

19   two-inch rainfall within a 24-hour period, we're going

20   to start watching the hydrographs because we know we

21   have a rise coming.

22       Q.    And what's the significance of knowing that a

23   rise may be coming?

24       A.    During the recreational period, to be able to

25   give warning, ample warning, to floaters so that we

*723*

1    don't have accidents, possible drownings.

2        Q.   Are there any other reasons that it might be

3    significant?

4        A.   Yes.   That's when we're going to -- we have a

5    contract with USGS and we pay them specifically to

6    come out and monitor five sites six times a year on

7    storm water events catching runoff -- or catching the

8    rain event as the hydrograph is on a rise at crest and

9    on a fall.

10       Q.   And why is that being collected?

11       A.   To discern between ambient conditions -- or

12   excuse me -- base flow events and high water events,

13   what kind of nutrient movement that we're having

14   throughout the basin, what sedimentation movement

15   we're having, so forth.

16       Q.   So as I understand you to say, data is

17   collected at high flows?

18       A.   Yes.

19       Q.   And based upon high-flow events, compared to

20   a base-flow event, what is the level of nutrients seen

21   at a high-flow versus base-flow based on your

22   experience?

23       A.   As the hydrograph increases, then the runoff

24   increases.

25       Q.   Are you familiar with any studies conducted

724

1  regarding the difference in phosphorus concentration

2  loads to the Illinois River Watershed from high-flow

3  sampling?

4      A.   Yes.

5      Q.   Can you tell the court what would be the

6  source of that information or that report that you're

7  referring to?

8      A.   There's several reports out there.  The USGS

9  has published a report for the agency itself that we

10 contracted with them to publish for us.  We have --

11          THE COURT:  When you say "for the agency

12 itself," you mean for the Scenic Rivers Commission?

13          THE WITNESS:  The Scenic Rivers

14 Commission has paid for the report from the USGS.

15      Q.   *(BY MR. GARREN)*  What year was that report?

16      A.   It was just released.

17      Q.   Meaning 2009 or 8?

18      A.   Two weeks ago, 2009.

19      Q.   All right.

20      A.   Going back, Dr. Baxter Vieux and Dr. Moreda

21 have also done some reporting.  Dr. Sharpley, as I

22 alluded to earlier, has done some reporting.

23          One report that really sticks out to me was

24 the work that Mark Nelson did in 2002 over at the

25 Arkansas Water Research Center, a very interesting

 1   report, the movement of nutrients through the basin.

 2       Q.   How does that report -- how is it important

 3   to the Scenic Rivers Commission in its functions and

 4   duties?

 5       A.   I'm going to answer your question this way.

 6            In the 1980s --

 7            MR. VOLPE:  Judge -- Your Honor, I'm

 8   going to interpose an objection here because I think

 9   what we're going to get is some opinion testimony

10   about these reports.

11            THE COURT:  Well --

12            MR. VOLPE:  And none of these reports

13   are in evidence and so it's --

14            THE COURT:  You very well may be

15   properly anticipating.  I'm going to require you to

16   wait until the question is -- the allegedly improper

17   question is asked.  And Mr. Fite is normally not

18   allowed to ask a question, but you didn't object to

19   it.

20            So go ahead, Mr. Fite.

21            THE WITNESS:  Thank you, Your Honor.

22       A.   In the 1980s, we spent a considerable amount

23   of time on wastewater treatment plants, point source

24   issues.  As we moved through the 1980s and we saw what

25   was going on, where we've spent literally billions

1   upon billions of dollars across the United States on

2   wastewater treatment improvements from point source

3   issues, industrial discharges, we started focusing on

4   nonpoint issues.

5          One of the -- one of the issues that we

6   recognized at the Scenic Rivers Commission is that

7   nonpoint source -- potential nonpoint source issues

8   are not going to become an issue until there's a storm

9   water runoff event.  So we wanted to quantify what

10  nutrients are moving through the system, through our

11  scenic rivers, when there are Q25 events or greater.

12         That's what we've been attempting to do with

13  chasing these storm water events, and we have been

14  able to discern that there is --

15             THE COURT:  Well, I think we need to

16  stop there.

17         Go ahead.

18     Q.   *(BY MR. GARREN)*  You've used term "225"

19  event.  Tell the court what that is.

20     A.   That is a 25-year rain event which within a

21  24-hour period there will be two inches of rain that

22  would be uniformly dispersed throughout the receiving

23  basin.

24     Q.   Does that occur more often than 25 years

25  based on your experience?

1      A.    I'm going to answer your question this way.

2            March 20th of 2008, a lot of people remember

3      that the Illinois River was at 22.23 feet.  It was the

4      6th highest recorded flow on the river since

5      recordkeeping at Tahlequah, the third highest at

6      Watts.  That would have been right between a -- that

7      was approximately a 19-year rain event, and the river

8      was flowing approximately 61,000 CFS at Tahlequah.

9      Q.    A record?

10     A.    That was for -- that was a fairly good storm.

11     The most recent storm that would have been close to

12     about a 50-year event would have been in October of

13     1986 when the river at Tahlequah was at 99,000 CFS.

14     And the highest period of record, which would have

15     been just over a one-hundred-year event, would have

16     been in May of 1950 when the Illinois River was at

17     27.94, Tahlequah was flowing 150,000 CFS.

18           Just for extra measure, the lowest of record

19     was in October of 1956 when the river was less than

20     one CFS at Tahlequah.

21     Q.    Let's talk about when people are recreating

22     and put this -- these flows in perspective to what the

23     use of the river -- and what uses of the river are

24     occurring.

25           You've described earlier the 2005 to 2008

 1    range of water flows.  Take us through, if you would,

 2    from low to high what we see in the way of recreation

 3    and the level of the water or its flow rates generally

 4    on the Illinois River Watershed.

 5        A.   When the Illinois River is at about 1200 CFS

 6    and you're standing in the water column at your knees,

 7    you can anticipate there's about 17 pounds of pressure

 8    on your legs.  That's three-mile-an-hour water.  You

 9    double the speed of the water, you quadruple it's

10    power.

11            The water is powerful, it's relentless, and

12    it's predictable.  There's so many people that get

13    into our waters of these United States when they

14    shouldn't be in there, and the power of the water

15    itself leads to a lot of the accidents.

16            That's an issue with us on the Illinois

17    River, people getting on the river when they shouldn't

18    be there.

19        Q.   Okay.  Let's talk about generally in the

20    summertime.  What kind of flow rates are you typically

21    seeing?

22        A.   Less than a thousand CFS.

23        Q.   And how far up, in cubic feet per second,

24    before you see that the recreation use of canoes and

25    rafts is no longer permitted?

1    A.   The commercial outfitters on the river

2   through their association have adopted a standard back

3   in 1993.  When -- it's a two-part standard.  The

4   cut-off point is at -- between War Eagle and Diamond

5   Head Resort.  But upstream of War Eagle, when the

6   Illinois River is at five and a half feet at the

7   Tahlequah gauge, they do not allow children ten years

8   of age and younger to float, they switch them to

9   rafts.

10        When the river gets to six and a half feet to

11   seven, they take the children -- or excuse me -- they

12   take the children out of the rafts and then they will

13   float individuals that want to up to nine and a half

14   feet, and nine and a half feet is an unsafe level.

15    Q.   Between the six-and-a-half and

16   nine-and-a-half-foot level, what kind of rainfall do

17   you see to cause that rise?

18    A.   That's going to be a Q25 or greater event

19   that's brought the river up above base flow to bank

20   full.

21    Q.   Okay.  And from the 1,000 CFS that you

22   described as kind of a normal summer flow, how

23   far -- what is the level of the river in comparison to

24   the four or five feet you've just been talking about?

25   Is it about 18 inches at your knees; is that what

1    you're saying?

2         A.   No.   When you walk out into the water at 18,

3    at your knees you -- I was trying to describe for you

4    what the pressure of the water was.

5         Q.   I'm trying to get some kind of a mental

6    picture, if you would, for the court to understand

7    what is the level of the river at that thousand

8    square -- thousand cubic feet per second versus the

9    four and a half, five and a half feet you talked about

10   earlier?

11        A.   It's going to be approximately four and a

12   half to five feet at the Tahlequah gauge.

13        Q.   And --

14        A.   Or let me rephrase that.

15             At 2,000 CFS, it's going to be a five-foot

16   river at Tahlequah.

17        Q.   Thank you.   Now, given that, are you telling

18   me that people recreate in a five-foot-level river?

19        A.   Yes.

20        Q.   And is that considered a high flow for that

21   river?

22        A.   No.

23        Q.   And what is?

24        A.   High flow is going to be approximately six

25   feet.

1          Q.    All right.  And do you see people -- based

2    upon your years of experience at the Scenic Rivers do

3    you see them recreating in flows at six feet or

4    above?

5          A.    Yes.

6          Q.    And have you as recently, in fact, seen

7    people recreating in high flow waters?

8          A.    Yes.

9          Q.    And when did you last observe that?

10         A.    The first of this month.

11         Q.    And what was occurring?

12         A.    Had a runoff event from rain.

13         Q.    And what kind of activity did you observe

14   occurring in the river during that rainfall event?

15         A.    Rafting, kayaking, canoeing, and swimming.

16         Q.    All right.

17         A.    That would have been for the month of

18   September.  This is October.  I'm sorry.

19         Q.    Okay.

20         A.    I'm off a day.

21         Q.    There's a statement made by one of the expert

22   defendants -- one of the defendants' experts that says

23   that there are fewer recreationists during storm

24   periods when flows are highest, most recreations are

25   not exposed to concentrations of bacteria found to

1    occur during high-flow events.

2          Do you agree or disagree with that statement

3    based on your personal observations and experience at

4    the river?

5          A.    There are fewer?

6          Q.    There are fewer recreationists during storm

7    periods when flows are highest.  Most recreationists

8    are not exposed to the concentrations of bacteria

9    found to occur during high-flow events.

10          A.    There are fewer floaters in those types of

11    events but there are floaters.

12          Q.    All right.  With regard to the cubic feet per

13    second, do you know what it is at five feet in the

14    river at one -- let's try and take the same gauging

15    station to give some correlation to what that means.

16          A.    Tahlequah gauge?

17          Q.    Yes.  Try that.  At five feet, what's the

18    cubic feet per second?

19          A.    I'm going to -- I would have to check

20    the -- my records on that --

21          Q.    Okay.

22          A.    -- to be exact.

23          Q.    What's an estimate based on your experience?

24          A.    It's going to be just over 2,000 CFS.

25          Q.    When you take it up to fix feet, what would

1  you expect to see in CFS at that level?

2      A.   You're in the 4500 range, I believe.

3      Q.   And if you go up to the nine-foot level, what

4  would you expect to see there?

5      A.   Oh, we're going to be 6,000 CFS or better.

6      Q.   All right.

7      A.   Moving on up.  We're going to be -- let me

8  rephrase that.  I think we're going to be up closer to

9  the eight to ten thousand CFS range for a

10  nine-and-a-foot river.

11     Q.   At the nine-foot level?

12     A.   Uh-huh.

13     Q.   We've talked earlier about the particular

14  liquid application runoff event from a George's truck.

15          Have you had opportunity in the years that

16  you've lived in the watershed and traveled throughout

17  to observe piles of poultry waste stacked outside and

18  uncovered?

19     A.   Yes.

20     Q.   And how often have you observed that

21  occurring?

22     A.   In recent years, less; in the 1980s, more.

23     Q.   With regard to your observations in the

24  Illinois River Watershed on poultry activities,

25  poultry-growing activities, other than stockpiles

734

1    being uncovered, have you ever observed any other

2    types of activities that cause concern from the

3    standpoint of the Scenic Rivers Commission in your

4    position at chairman?

5              MR. VOLPE:  I'm just going to object to

6    the characterization of "stockpiles."  I don't think

7    that's what the witness said.

8              THE COURT:  Overruled.

9        A.   Could you restate that for me?

10       Q.   Yeah.

11             MR. GARREN:  Let me ask to pull up

12   Demonstrative 16.  Let's look at that first.

13       Q.   *(BY MR. GARREN)* Mr. Fite, have you had an

14   opportunity to look at this demonstrative before

15   today?

16       A.   Yes.

17       Q.   And you understand that the sections colored

18   orange are what the state contends it has evidence

19   relating to waste -- poultry waste application

20   occurring within that section?

21             Are there -- based upon your knowledge and

22   experience, and in particular, personal observations

23   by you, are there areas on that map that you can see

24   would have had poultry waste applications occur that

25   are not colored orange?

*735*

1          A.   Is this the map for 1998?

2                    MR. VOLPE:  I'm going to object, Your

3      Honor.  I'm sorry.  How can this witness testify to

4      that?

5                    THE COURT:  I agree.  This is a

6      demonstrative.  Sustained.

7          Q.   *(BY MR. GARREN)*  All right.  How would you

8      characterize the level of poultry waste applications

9      occurring before 1998 until after 1998 when the

10     Poultry Feeding Operations Act went into effect?

11         A.   There was more of it.

12         Q.   In relation to what you see today, can you

13     quantify what "more" means?

14         A.   Yes.  There are fewer poultry operations

15     today that I would see in the Oklahoma side of the

16     Illinois River.

17                  Also, participating in the Animal Waste Task

18     Force since 1997 and seeing the ramifications from

19     that, there are a lot of producers that were -- they

20     chose to use their waste produced in their grow-out

21     facilities differently, to send it out of the basin or

22     to not land-apply it.

23         Q.   And you're talking about that that's

24     occurring now is what you're saying?

25         A.   Yes.

*736*

 1          Q.   Okay.

 2          A.   That's the difference.

 3          Q.   Mr. Fite, there's been statements made in

 4     this case with regard to your using poultry waste at

 5     the Scenic Rivers Commission offices.

 6               Do you recall ever having an opportunity to

 7     do that?

 8          A.   Yes.

 9          Q.   Can you tell the court what -- where you went

10     to get the poultry waste to begin with?

11          A.   Went to Earthcare Systems.  It was operated

12     by Phil Fredericks.  He donated to the Scenic Rivers

13     Commission a pickup load of composted poultry waste

14     after it had been composted in a facility trial that

15     he was doing and we used it in our flower beds.

16          Q.   So it was not directly out of a poultry

17     house?

18          A.   No, sir.

19          Q.   And you're saying it was a single pickup

20     load?

21          A.   One pickup load.

22          Q.   What was -- what was done with it when you

23     obtained it?

24          A.   We filled two flower beds in front of our

25     office -- three flower beds in front of our office and

*737*

```
1    then one to the north of our office.

2         Q.   Were those flower beds contained?

3         A.   Yes.

4         Q.   Let's talk a little bit about the Keating

5    task force.  We've heard testimony about it so I'm

6    going to try and skip by some of that so as not to be

7    cumulative.

8              Did you attend the Keating task force?

9         A.   Yes.

10        Q.   Did you attend most or all of those

11   meetings?

12        A.   All the meetings but one.

13        Q.   And at those meetings, were there people

14   there from poultry integrator defendants that are the

15   defendants in this case?

16        A.   Yes.

17        Q.   And can you, from your own memory, tell the

18   court names of representatives and their respective

19   companies that you observed present at those -- at the

20   task force?

21        A.   Well, there was Archie Schaffer from Tyson;

22   Bill Mueller from Tyson's; Don Allen, who was the

23   poultry federation executive director, was there; and

24   there were representatives from Simmons.

25        Q.   Do you remember the name?
```

738

```
 1        A.   I believe Claud Rutherford was there once or
 2   twice.  Lynch Butler possibly.  There was a
 3   representative from OK Farms, Rick Pruitt, some of his
 4   staff.
 5        Q.   OK Farms is not a defendant in this lawsuit.
 6   So can you restrict your --
 7        A.   I'm sorry.  I'm sorry.  I'm drawing a blank
 8   on it.
 9        Q.   Do you know a Mr. Ronnie Bradshaw?
10        A.   Yes.
11        Q.   How do you know him?
12        A.   He was on my board of directors for a number
13   of years and was a vice president for Simmons.
14        Q.   Was he also a grower?
15        A.   Yes.
16        Q.   Okay.  Did he attend any of the waste task
17   force for Governor Keating?
18        A.   No.
19        Q.   Do you recall any representatives from
20   Peterson Farms attending any of the task force
21   meetings for Governor Keating?
22        A.   Yes.  And that name is on the tip of my
23   tongue but I can't remember it.  Can't draw it up
24   right now.
25        Q.   Do you recall seeing anybody from Cal-Maine
```

1    Foods?

2        A.   No.

3        Q.   Did you have an opportunity to communicate

4    with the representatives of the defendant integrators

5    at the task force?

6        A.   Yes.

7        Q.   And what were the nature and subject of the

8    conversations that you had with them at that time?

9             MR. VOLPE:  I'm going to object, Your

10   Honor.  I think we're going to get into an area which

11   I'm concerned about, and that is we're going to -- I

12   think what we're going to hear are statements made by

13   some of the poultry representatives that were at the

14   task force.  Of course, I believe that's hearsay, but

15   there's a more fundamental problem with what I believe

16   we're going to hear.  And that is, this task force

17   was -- came about, came into being due to Governor

18   Keating's executive order.  I don't remember the

19   number.

20            But anyway, in that year, he issued an

21   executive order, set up the task force, which had

22   various members of his cabinet and public -- and

23   citizens from the public.

24            When poultry representatives attend those

25   meetings, they are attending essentially a government

1    body, and when they attend a government body, they

2    have the right under the First Amendment to petition

3    the government, to make statements to the government

4    that will not be later used against them in a court of

5    law

6                    MR. GARREN:  Your Honor --

7                    MR. VOLPE:  The doctrine is known as

8    the --

9                    MR. GARREN:  -- may I interject just

10   hearsay?

11        This is another peremptory objection, Your

12   Honor.  I haven't asked the question and I would say

13   that I'm not going to ask that question.

14                    THE COURT:  Yeah.  I think we need to

15   wait -- I think it's proper to anticipate but let's

16   wait until the moment.

17                    MR. VOLPE:  Okay.  I'll wait.

18        Q.  *(BY MR. GARREN)*  Did you have an opportunity,

19   Mr. Fite, to communicate with one or more of the

20   representatives of the poultry integrator defendants

21   in this case?

22        A.   Yes.

23        Q.   And do you recall any specific conversation

24   with any particular one at this time?

25        A.   Yes.

1    Q.   And in that conversation, did you relate to

2    that person any statements?

3    A.   Yes.

4    Q.   And did any of those statements have to do

5    with the poultry -- the practices of poultry waste

6    application as it might affect the water quality in

7    the Illinois River Watershed?

8    A.   Yes.

9    Q.   And what did you tell that person, and if you

10   would please identify that person?

11              MR. VOLPE:  Judge, I'm sorry.  I just

12   had a representation from counsel that they weren't

13   going to get into this and now they're right back

14   where I started.

15              MR. GARREN:  That's not what I

16   represented, Judge.

17              THE COURT:  All right.  Your point was

18   on statements made by poultry industry representatives

19   and their First Amendment rights.  What Mr. Garren's

20   talking about is a statement made by Mr. Fite to a

21   poultry industry representative.  And the question is,

22   who was that person; correct?

23              MR. GARREN:  Correct.

24              MR. VOLPE:  I'm not sure that's --

25              THE COURT:  And what did Mr. Fite tell

```
 1      that person.  I can read the question to you.

 2                  Here.  What did you tell that person, and if

 3      you would, please, identify that person.

 4                        MR. VOLPE:  All right.  So what did you

 5      tell that person?  That is hearsay.  That is not the

 6      First Amendment problem that I -- that I believe will

 7      come from the response from that person.  But the --

 8                        THE COURT:  No, it's not hearsay.

 9                        MR. VOLPE:  No.  What Mr. -- excuse me.

10      With all due respect, Your Honor, if Mr. Fite is going

11      to set -- if the question's going to be, what did you

12      tell the poultry representative, then that is hearsay.

13      What he says what that is --

14                        THE COURT:  No, no.  Overruled.  Go

15      ahead.

16          Q.   (BY MR. GARREN)  Do you recall the question,

17      sir?

18          A.   Yes.

19          Q.   Okay.  Can you tell us who you were

20      communicating with one at a time, if you can, unless

21      they're in a group, and what it is you told them?

22          A.   John Elrod.  He's got his head down.  John

23      and I have talked back and forth about moving waste

24      out of the basin.  A suggestion that I made to him

25      over and over and over was about adding a half cent or
```

1    one cent to the bird in the marketplace to accomplish

2    developing a fund to be able to compensate for moving

3    waste, to which he would offer up ways that we could

4    do a better job of law enforcement in the Illinois

5    River and we went back and forth.  I had these same

6    types of conversations with Archie Schaffer, Bill

7    Mueller --

8                    MR. VOLPE:  Judge, I'm sorry.  Again, I

9    got to -- I'm going to object again to turning

10   Mr. Elrod into a witness and then Mr. Schaffer into a

11   witness.

12                   THE COURT:  No, no.  He's talking about

13   what he said to Mr. Schaffer, Mr. Mueller.  You can

14   cross-examine Mr. Fite.

15                   MR. GARREN:  Thank you, Your Honor.

16                   THE COURT:  Correct?

17                   MR. GARREN:  Correct.

18                   THE COURT:  Correct.  At least that's

19   what I learned in law school.

20                   MR. GARREN:  That's all I'm asking --

21                   THE COURT:  I don't want to create

22   abject error or absolute error here, but you can

23   cross-examine this man.

24        Am I right, Mr. George?

25                   MR. GEORGE:  I've seen no error, Your

1    Honor.

2                    THE COURT:  Thank you.  Go ahead,

3    Mr. Fite.

4        A.   One of the things that I did on the task

5    force is I tried to keep an open line of communication

6    with the poultry companies trying to resolve the

7    issues that related to the Illinois River related to

8    poultry waste land-applied.  I've had many

9    conversations with all of the companies, not just the

10   task force, but in other atmospheres.

11                   THE COURT:  All right.  The question to

12   you is, in the task force, specific conversations or

13   specific statements that you made, not statements that

14   they made to you, but statements that you made and to

15   whom specifically.  You've named Elrod, Schaffer,

16   Mueller.

17       A.   Mueller, Gary George, Otto Jech, Wade Casey.

18       Q.   Who is Otto Jech?

19       A.   He is a long-time staff member, team member,

20   at George's.

21       Q.   All right.  And Mr. Casey, what company is he

22   with?

23       A.   He's with George's.

24       Q.   All right.  Any others that you can recall?

25       A.   That are not -- I've talked to Claud

745

1    Rutherford about this, I've talked to Mark Simmons

2    about this, and we've discussed it as well back and

3    forth.

4        Q.   All right.

5             MR. WEEKS:  Your Honor, just for

6    clarification purposes, I understood that he was going

7    to be testifying about the specific statements that he

8    made to certain people during these task force

9    meetings.  I respectfully believe --

10            THE COURT:  That's what I understood as

11   well.

12            MR. WEEKS:  -- that we've gone far

13   beyond that because I don't believe the people from

14   George's were actually there, these people that he's

15   identified, that I'm aware of.

16            THE COURT:  All right.  Well, you can

17   cross-examine but that was the question.

18        Go ahead.  Let's move on.

19            MR. GARREN:  All right.  Thank you.

20        Q.   *(BY MR. GARREN)*  Now, of that list, sir,

21   we're going to have to test your memory.  And do you

22   recall what you told Mr. Otto Jech?

23        A.   I've talked about the same subject matter to

24   all of them.

25        Q.   And that subject matter is what?

1    A.    Transporting the waste out of the basin,

2    proper handling of the waste, and trying to develop a

3    way to fund the transport of that waste to a proper

4    deposition.

5                    MR. GARREN:  I'm trying to skip through

6    some questions here, Judge, dealing with the task

7    force that are not cumulative, and I apologize for the

8    pause here.

9                    THE COURT:  No, that's fine.

10    Q.    (BY MR. GARREN)  Have you, sir, had any

11    specific discussions regarding the effects of

12    land-applied poultry waste with any company

13    representatives at any time?

14    A.    Yes.

15    Q.    All right.  And with regard to that, did you

16    express what your opinion was that you had observed to

17    them?

18    A.    Yes.

19    Q.    And do you have a specific recollection of

20    any person, and at a time that that type of

21    conversation occurred, with you making that statement?

22    A.    Yes.

23    Q.    Can you tell the court when and who?

24    A.    During the Animal Waste Task Force.

25    Q.    Other than the task force?

1    A.    Yes.

2    Q.    And can you tell me when and who?

3    A.    Gary George in his office at Springdale.

4    Q.    And do you remember when approximately that

5    might have occurred?

6    A.    Probably 2001, 2002.  Back in 1998, Bill

7    Mueller with Tyson Foods in 1998.  Archie Schaffer,

8    1998.

9    Q.    Are these outside of the task force?

10   A.    Yes.  Task force was in 1997.

11   Q.    Let's change the subject a little bit and ask

12   you:  What has the Scenic Rivers Commission done to

13   try and address problems that are associated with the

14   water impairment in the river?

15   A.    Of course we've been monitoring for a number

16   of years.  In recent years, we have -- with the help

17   of the Secretary of Environment, the Conservation

18   Commission, and the poultry industries that do

19   business in the basin, we've been focusing on

20   developing long-term riparian protection strategies by

21   obtaining conservation easements from willing

22   stakeholders for a 30-year period or longer.

23   Q.    Why don't we talk about that and then we'll

24   complete your list.

25         Who specifically is in charge of obtaining

1    these conservation easements?

2        A.    The Oklahoma Scenic Rivers Commission.

3        Q.    And who at the Scenic Rivers Commission does

4    that?

5        A.    Myself.

6        Q.    And there's been some discussion about

7    funding sources in order to make those purchases of

8    easements.  Can you tell the court what those are?

9        A.    The funding sources?

10       Q.    Yes, sir.

11       A.    Be state funds, USEPA funds, and poultry

12   company funds.

13       Q.    All right.  Let's talk a little bit about the

14   specifics of what has been acquired in the way of

15   conservation easements.

16            Can you give us a rundown generally of what

17   you've acquired for the Scenic Rivers Commission?

18       A.    We have been able to successfully negotiate

19   17 agreements for a total of just over 416 acres at a

20   total cost of approximately just under $800,000.  All

21   the agreements are 30 years in duration, with the

22   exception of one tract of land, that's 20.29 acres

23   that's in perpetuity.

24       Q.    I'm sorry.  How many acres?

25       A.    20.29 acres, which is in perpetuity.

1      Q.   Over what period of time did it -- did you

2   have to take in order to acquire these?

3      A.   2007 and 2008, I believe.

4      Q.   How did you go about finding people who would

5   participate in and agree to a conservation easement

6   that you've just described?

7      A.   The initial process that we found ourselves

8   in when we started this conservation easement program

9   was from the period of time 2000 through 2005.  The

10  Oklahoma Conservation Commission had entered into a

11  five-year agreement with stakeholders located in

12  Cherokee and Adair Counties along Baron Fork Creek and

13  the Illinois River to do a like program that was paid

14  on an annual basis of $50 per acre.

15       That program, when it ended in 2005, was

16  immediately before our state was beginning to roll out

17  on new conservation reserve enhancement program.  It's

18  a USDA Farm Service Agency program.  What we found as

19  that program was beginning to ramp up is that those 54

20  stakeholders, those riparian landowners that had been

21  the first ones into a conservation strategy with our

22  state, were going to be excluded from the new program

23  because they'd already been compensated for protecting

24  their lands.

25       We worked with former Secretary of the

1    Environment, Miles Tolbert, and Mike Thralls to

2    develop a strategy where we brought money from EPA and

3    state sources to our agency where we could go out and

4    approach these landowners that were going to be

5    excluded to enter a process with the Scenic Rivers

6    Commission.

7         Of the 54 individuals, we sent two sets of

8    letters to each of the stakeholders inviting them in

9    June and July of 2007 to be enrolled in the program.

10   Q.   How many again were there?

11   A.   Fifty-four --

12   Q.   Thank you.

13   A.   -- that were on the list.  We sent out 54

14   letters two times to those individuals.  We had

15   approximately 23 individuals that responded, said that

16   they wanted to be in the program, of the 54.

17        We started looking at the total amount of

18   acreages that were available to us.  As we were

19   starting that process, several of them backed out

20   because of their age because our program was going to

21   be a flat 30-year program at a minimum.

22        And so we ended up with 19 stakeholders -- or

23   19 parcels of land; one stakeholder represented two

24   parcels so there's 18 -- that wanted to be in the

25   program.  And we started with a pot of money at

1  approximately $626,000 that had been brought to us

2  through the Secretary of the Environment's office, and

3  some additional money had been added to that from the

4  state coffers through the Conservation Commission,

5  where we were able to take the first 14 individuals on

6  that list of 18 and starting with the smallest

7  acreage, working up to the next largest, we entered

8  agreements in November of 2007.

9         After that period of time, then we entered

10  into three additional agreements using the poultry

11  companies' money for approximately 150 acres.

12      Q.  Is that in addition to the 416 you just

13  described, or is that part of it?

14      A.  No.  That would be a total of 416.

15      Q.  Okay.

16      A.  Approximately each acre -- there's going to

17  be a couple of acreages that we were able to obtain at

18  a lower cost, but generally we were paying landowners

19  $75 per acre per year for a 30-year contract.  So we

20  were compensating them $2250 per acre to exclude

21  cattle do, not land-apply animal waste for

22  fertilization, do not graze, do not build a permanent

23  residential structure, and let those riparian areas

24  restore themselves to the tune of about 300 feet back

25  from the water's edge.

1      Q.   That was my next question.  About how far

2   back from the water's edge would that be?  It's 300

3   feet?

4      A.   We targeted three hundred feet, but depending

5   on how the topography of the river area is, it could

6   be a hundred feet or it could be five hundred feet.

7   But on average, three hundred feet was our target.

8      Q.   All right.  Are there any funds left to

9   continue that program?

10     A.   Yes.  Currently, the Oklahoma Scenic Rivers

11  Commission has approximately just under $400,000 that

12  the poultry companies have provided to us that we're

13  going to be expending at some point on additional

14  contracts.

15     Q.   Is that 400,000 you just described part of

16  the $1.1 million gift that was given?

17     A.   Yes.

18     Q.   In relation then to the total dollars that

19  are in this projects, what's the percentage of state

20  or taxpayer monies versus the poultry money gift?

21     A.   Well, of the poultry gift, the $1.1

22  million -- I believe an explanation is due.

23          When the gift was given to the state, it was

24  given to us at $275,000 per year over a four-year

25  period.  Of that money, approximately 100,000 was to

1    be expended on bathrooms for the floating public.

2         Q.   Is that total money -- total --

3         A.   Of the total, $1.1 million, $100,000 was to

4    be expended on bathrooms, $500,000 to be expended on

5    program work, and that can be from law enforcement all

6    the way across the scale at our agency's functions,

7    and half a million dollars to be expended for these

8    stream bank stabilization, repair and protection

9    strategies.

10         The lion's share of the remaining money is

11   targeted towards that process at this point.  We

12   currently have just under $1.4 million in applications

13   pending.  We've had new applications by other

14   stakeholders since this program rolled out.

15        Q.   All right.  So the total of 800,000 that's

16   been spent to date, how much is that state money or

17   taxpayer money contributions versus the poultry

18   money?

19        A.   625,000 would be federal or state money.

20        Q.   Thank you.  What is the goal for the Scenic

21   Rivers in this program with regard to the number of

22   acreage it would attempt to acquire?

23        A.   With the conservation reserve enhancement

24   program included, it's 9,000 acres on the Oklahoma

25   side of the basin.

*754*

1     Q.   Do you have any way to put that in

2  perspective of how many miles of river that might

3  equate to?

4     A.   All -- all of the scenic river and its

5  tributaries --

6     Q.   All right.

7     A.   -- above Lake Tenkiller to the state line.

8     Q.   Is there any additional funds allocated, or

9  to be allocated, in order to continue this program at

10  this time other than the 400,000 you said is there?

11     A.   We're hopeful the new Secretary of the

12  Environment is going to direct some more money to us

13  so we can continue the program.

14     Q.   Does that mean no, there is none allocated at

15  this time?

16     A.   No, there's none allocated presently.

17     Q.   Okay.  What other -- are there any fencing

18  restrictions imposed in these easements?

19     A.   No.

20     Q.   Are there any cattle behavior problems or

21  programs initiated as part of this program?

22     A.   Our contracts are quite extensive.  The

23  stakeholder, once they enter the contract, agree to

24  exclude cattle or other livestock within that zone

25  that the conservation easement has jurisdiction for.

1      Q.   Okay.   Now, we were starting down a list of

2    types of programs or activities that have been

3    conducted or are in the process of being conducted by

4    the Scenic Rivers to protect and preserve the water.

5    We started with vegetative filter strips or

6    conservation easements.

7           Is there any stream bank erosion monies being

8    spent at this time for projects?

9      A.   Not from the Oklahoma Scenic Rivers

10   Commission --

11     Q.   All right.

12     A.   -- but from the Conservation Commission and

13   the Department of Wildlife Conservation.

14     Q.   And do you know the source of the funds for

15   that program?

16     A.   Yes.   Stimulus money.

17     Q.   Pardon?

18     A.   Era money.

19     Q.   And what does that mean?

20     A.   It's the stimulus package that was passed by

21   Congress.   Approximately $2 million is going to be

22   targeted to Lake -- excuse me -- to the Eucha-Spavinaw

23   drainage in the Illinois River within the next year.

24     Q.   And who has the responsibility -- or let me

25   ask you this.

756

 1          Does your commission have responsibility

 2     relating to those funds?

 3     A.    No.   We will be on a working committee to

 4     prioritize and make sure that the right projects are

 5     identified and put in place.

 6               THE COURT:   How's that split between

 7     Eucha-Spavinaw and the IRW?

 8               THE WITNESS:   I'm hoping a million each.

 9     They haven't established that yet.

10               THE COURT:   Mr. Garren, you might find

11     an appropriate place to stop.

12               MR. GARREN:   This is fine.   We're on a

13     list and we can start and pick it up on that.

14               THE COURT:   Very good.   We'll be in

15     recess until 9:30 a.m.

16               MR. GARREN:   Thank you, Your Honor.

17          *(The proceedings were recessed)*

18

19

20

21

22

23

24

25

**United States District Court**

*757*

1                    C E R T I F I C A T E

2

3

4          I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11         I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16         In witness whereof, I have hereunto set my

17   hand this 1st day of October 2009.

18
                     s/ Brian P. Neil
19              _____
                  Brian P. Neil, CSR-RPR, CRR, RMR
20                United States Court Reporter

21

22

23

24

25

**United States District Court**