1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   STATE OF OKLAHOMA, ex rel.    )
    W.A. DREW EDMONDSON, in his   )
5   capacity as ATTORNEY GENERAL  )
    OF THE STATE OF OKLAHOMA,      )
6   et al.                         )
                                   )
7              Plaintiffs,         )
                                   )
8   vs.                            )        CASE NO. 05-CV-329-GKF-PJC
                                   )
9                                  )
    TYSON FOODS, INC., et al.,     )
10                                 )
                                   )
11             Defendants.         )

12

13

14            TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
15                      OCTOBER 5, 2009
       BEFORE THE HONORABLE GREGORY K. FRIZZELL, DISTRICT JUDGE
16                  VOLUME VIII, P.M. SESSION

17

18
    APPEARANCES:
19

20
    For the Plaintiffs:          MR. W.A. DREW EDMONDSON
21                               Attorney General
                                 MS. KELLY FOSTER
22                               Assistant Attorney General
                                 State of Oklahoma
23                               313 N.E. 21st St.
                                 Oklahoma City, OK  73105
24

25

```
 1  (APPEARANCES CONTINUED)              MR. M. DAVID RIGGS
                                         MR. DAVID P. PAGE
 2                                       MR. RICHARD T. GARREN
                                         Riggs Abney Neal Turpen
 3                                       Orbison & Lewis
                                         502 W. 6th Street
 4                                       Tulsa, OK  74119

 5

 6                                       MR. ROBERT A. NANCE
                                         MS. SHARON GENTRY
 7                                       Riggs Abney Neal Turpen
                                         Orbison & Lewis
 8                                       5801 Broadway, Extension 101
                                         Oklahoma City, OK  73118
 9
                                         MR. LOUIS W. BULLOCK
10                                       MR. ROBERT BLAKEMORE
                                         Bullock Bullock & Blakemore
11                                       110 W. 7th St.
                                         Suite 770
12                                       Tulsa, OK  74119

13                                       MR. FREDERICK C. BAKER
                                         MS. ELIZABETH CLAIRE XIDIS
14                                       MS. INGRID MOLL
                                         Motley Rice LLC
15                                       28 Bridgeside
                                         P.O. Box 1792
16                                       Mount Pleasant, SC  29465

17

18  For Tyson Foods:                     MR. ROBERT W. GEORGE
                                         Tyson Foods, Inc.
19                                       2210 West Oaklawn Drive
                                         Springdale, AR  72701
20
                                         MR. JAY THOMAS JORGENSEN
21                                       MR. THOMAS GREEN
                                         MR. MARK HOPSON
22                                       MR. GORDON D. TODD
                                         Sidley Austin LLP
23                                       1501 K St. NW
                                         Washington, DC  20005
24

25
```

```
 1   For Cargill:                   MR. JOHN H. TUCKER
                                    MS. THERESA HILL
 2                                  Rhodes Hieronymus Jones
                                    Tucker & Gable
 3                                  100 W. 5th St., Ste 400
                                    Tulsa, OK  74103
 4

 5                                  MR. DELMAR R. EHRICH
                                    MS. KRISANN C. KLEIBACKER LEE
 6                                  MR. BRUCE JONES
                                    Faerge & Benson
 7                                  90 S. 7th St., Ste 2200
                                    Minnaepolis, MN  55402
 8
     For Simmons Foods:             MR. JOHN R. ELROD
 9                                  MS. VICKI BRONSON
                                    Conner & Winters
10                                  211 E. Dickson St.
                                    Fayetteville, AR  72701
11
     For Peterson Farms:            MR. A. SCOTT MCDANIEL
12                                  MR. PHILIP HIXON
                                    MS. NICOLE LONGWELL
13                                  MR. CRAIG MIRKES
                                    McDaniel Hixon Longwell &
14                                  Acord PLLC
                                    320 S. Boston, Ste 700
15                                  Tulsa, OK  74103

16   For George's:                  MR. WOODY BASSETT
                                    MR. VINCENT O. CHADICK
17                                  MR. JAMES GRAVES
                                    MS. K.C. TUCKER
18                                  MR. GARY WEEKS
                                    Bassett Law Firm
19                                  P.O. Box 3618
                                    Fayetteville, AR  72702
20
     For Cal-Maine:                 MR. ROBERT SANDERS
21                                  Young Williams P.A.
                                    P.O. Box 23059
22                                  Jackson, MS 39225

23                                  MR. ROBERT P. REDEMANN
                                    Perrine McGivern Redemann
24                                  Reid Berry & Taylor PLLC
                                    P.O. Box 1710
25                                  Tulsa, OK  74101
```

1                              INDEX

2    WITNESSES ON BEHALF OF THE PLAINTIFF          PAGE

3    ED FITE

4         Continued Cross-Examination by Mr. Green      886
          Cross-Examination by Mr. Sanders             888
5         Cross-Examination by Mr. Tucker              910
          Cross-Examination by Ms. Longwell            921
6         Redirect Examination by Mr. Garren           944
          Recross Examination by Mr. Green             961
7         Recross Examination by Mr. Weeks             963
          Recross Examination by Mr. Sanders           969

8

9    SHANON PHILLIPS

10        Direct Examination by Mr. Nance              972

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS

 2                    *  *  *  *  *  *  *

 3   OCTOBER 5, 2009:

 4          THE COURT:  Mr. Green.

 5          MR. GREEN:  Yes, sir.

 6                          ED FITE,

 7   having been previously duly sworn, was called as a witness and

 8   testified as follows:

 9                  CONTINUED CROSS-EXAMINATION

10   BY MR. GREEN:

11   Q.   Mr. Fite, I'd like to ask you just a couple of more

12   questions about this testing that was done on your property,

13   sir.  As a predicate to the question I'm going to ask, I want

14   to just represent to you one more time that the two samples

15   that were taken from your property were tested on April 15,

16   2008.  If you'll just accept that as a benchmark date.

17          I want to ask you:  At any time on or after that date

18   of April 15, 2008, have you had any conversation whatsoever

19   with any representative of the State of Oklahoma about the

20   sampling on your property by plaintiffs?

21          MR. GARREN:  Object to form to the extent it might

22   lead to privileged communications with counsel, Your Honor.

23          THE COURT:  Sustained, but the limited question,

24   however, is as to whether or not Mr. Fite has had any

25   conversation, that's a yes or no question.  Mr. Fite, you may
```

1    answer that limited question.

2            THE WITNESS:  Not that I'm aware of, no.

3    Q.    (By Mr. Green) On or after April 15, 2008, have you had

4    any conversation with any representative of the State of

5    Oklahoma which related to possible reasons for any elevated

6    phosphorus levels detected on your property?

7    A.    Yes.

8    Q.    Pardon?

9    A.    Yes.

10   Q.    You have?

11   A.    Uh-huh.

12   Q.    And with whom did you have those conversations, sir?

13   A.    I don't recall.  Someone brought it to my attention

14   regarding sampling on the poultry waste on my land.

15   Q.    And you don't remember who it is that mentioned this to

16   you?

17   A.    I don't remember who exactly it was.

18   Q.    Was it someone who was employed by the State of Oklahoma?

19   A.    It was an attorney, I believe.

20   Q.    An attorney?

21   A.    Uh-huh.

22   Q.    An attorney in this case, representing the State of

23   Oklahoma?

24   A.    I believe so.

25   Q.    Okay.  And which attorney was that?

1    A.    I take that back.  I had a conversation with an attorney,

2    but I believe it was Dr. Fisher, Dr. Burt Fisher.

3    Q.    Dr. Burt Fisher?

4    A.    Uh-huh.

5    Q.    When did this conversation take place?

6    A.    I don't recall.

7    Q.    Was it within the last --

8    A.    Within the last year.

9    Q.    -- six months?

10   A.    The last year.

11   Q.    Within the last year?

12   A.    Uh-huh.

13   Q.    Where were you and Mr. Fisher when you had this

14   conversation?

15   A.    May have been a phone call.

16   Q.    To your knowledge, were there any other individuals who

17   participated in that phone call?

18   A.    I don't know.

19   Q.    Not to your knowledge, then --

20   A.    Not to my knowledge.

21   Q.    -- is that correct?

22        Okay.  What is it that Mr. Fisher told you?

23   A.    That they found poultry waste signature on my property.

24   Q.    Poultry waste signature on your property?

25   A.    Uh-huh.

1    Q.    Did he tell you any test results with respect to the

2    levels of phosphorus?

3    A.    No, sir.

4    Q.    You didn't ask?

5    A.    No, sir, because I was -- previously had a soil sample on

6    my property that showed I had 44 pounds of phosphorus available

7    on the east side of the Highway 10 corridor through my property

8    and 66 pounds of phosphorus in the riparian area.

9    Q.    That was years ago, correct?

10   A.    No, that was two or three years ago, at most.

11   Q.    So you didn't have any conversation with Mr. Fisher about

12   phosphorus levels; is that your testimony?

13   A.    Not that I recall.

14   Q.    Now, in response to another of Mr. Garren's questions last

15   week, you told us that the rodeo bowls had been fed with hay

16   harvested from fields where poultry litter had been applied.

17   Do you remember that?

18            MR. GARREN:  Objection, Your Honor,

19   mischaracterizes.  I think the testimony -- he's talking about

20   Mr. Fite's fields.

21            THE COURT:  I don't believe so.  Overruled.  Go

22   ahead.

23            THE WITNESS:  Yes.

24   Q.    (By Mr. Green) When you gave that testimony, were you,

25   sir, trying to suggest that that hay that you've referenced is

1    or could be the cause if your property were to test very high

2    for phosphorus?

3    A.    Yes.

4    Q.    Can you shed any light -- any further light on why you

5    were asked about the source of feed for those rodeo bowls?

6    A.    No.

7    Q.    Did you discuss that question with anyone before you were

8    asked it -- let me rephrase it.

9         Did you know you were going to be asked that question

10   before you began your testimony last Thursday?

11   A.    No.

12   Q.    You did not?

13   A.    Not that I recall.

14   Q.    So your conclusion that you are providing a possible cause

15   if your fields tested high in phosphorus is something that has

16   come to you either last Thursday or since that time; is that

17   right?

18   A.    No.  I told you earlier that Dr. Fisher and I had visited

19   and immediately after that visit, I did some inquiries of my

20   own.

21   Q.    You're talking -- are we talking about the same visit or

22   conversation with Dr. Fisher that you said occurred within the

23   past year that you've just testified to?

24   A.    Uh-huh, yes, sir.

25   Q.    And what investigation did you make of your own?

1  A.    I leased my property to Mr. Dale Glory, who runs rodeo

2  stock, and inquired as to where his source of hay would have

3  come from.

4  Q.    And you were motivated to do that because of your

5  conversation with Mr. Fisher; is that your testimony?

6  A.    Yes.

7  Q.    Then did you relate that conversation that you had with

8  the gentleman who leases your property to any of the lawyers

9  for the State?

10  A.    Yes.

11  Q.    And when was that?

12  A.    Sometime in the last year.

13  Q.    Can you pin it down any further?

14  A.    No, sir.

15  Q.    Can you tell me to whom you told that?

16  A.    Rick Garren.

17  Q.    Now, Mr. Fite, you were shown Exhibit 1079 which was moved

18  into evidence, which is the letter that was written on

19  letterhead of the State of Oklahoma Scenic Rivers Commission,

20  signed by you, the administrator, dated August 24, 2004, that

21  generally related to commercial fertilizer.  Do you remember

22  that exhibit that you saw earlier?

23  A.    Yes, sir.

24  Q.    Now, that's not the only letter that you wrote to Mr. --

25  or, rather, to the State in 2004; is that not correct?

1  A.   I've written several letters in 2004.  I don't recall all

2  the letters and to whom they were written.

3  Q.   Do you recall a letter written on April 28, 2004 to Steve

4  Thompson, the executive director of the Oklahoma Department of

5  Environmental Quality, telling him that the commissioners of

6  the Scenic River Commission had voted unanimously to adopt a

7  resolution opposing utilization of industrial or municipal

8  wastewater sludge for land application?

9  A.   Yes.

10 Q.   And did you enclose a copy of the resolution with that

11 letter; do you know?

12 A.   That would have been -- there are no formal resolutions

13 that are signed.  It's a motion that's made by the board in the

14 course of their actions.

15 Q.   Let me show you what has been marked as Defendants' Joint

16 Exhibit 2211-002.

17         MR. GREEN:  Can you put it up on the screen?

18         THE COURT:  Is it admitted?

19         MR. GREEN:  Here's a copy for Your Honor.  May I,

20 Your Honor?

21         THE COURT:  You may.

22 Q.   (By Mr. Green) Do you recognize this as the letter you

23 wrote to Mr. Thompson in April of 2004, sir?

24 A.   Yes.

25         MR. GREEN:  Your Honor, I'd like to move the

1   admission of Joint Exhibit 2211.

2           MR. GARREN:  Lack of relevance, Your Honor.

3           MR. GREEN:  Relevance is that they made a

4   recommendation to the State concerning industrial sludge or

5   biosolid, and I want to elicit whether or not the State reacted

6   to this and did anything.

7           THE COURT:  The objection is overruled.  2211 is

8   admitted.

9   Q.   (By Mr. Green) Now, sir, after you sent this letter to

10  Mr. Thompson, did the State react to this letter and undertake

11  any specific action --

12          MR. GARREN:  Objection, foundation.

13  Q.   (By Mr. Green) -- if you know?

14          THE COURT:  Overruled.  Go ahead.

15          THE WITNESS:  The Department of Environmental Quality

16  has not adopted a standard in response or a policy.

17  Q.   (By Mr. Green) Now, did you ever forward to the executive

18  director of ODEQ, Oklahoma Department of Environmental Quality,

19  or any other Oklahoma agency any resolution from the Scenic

20  Rivers Commission pertaining to restrictions on cattle, whether

21  in the IRW or anywhere else in Oklahoma?

22  A.   I do not recall.

23  Q.   Well, do you think you did?

24  A.   No.

25  Q.   Did you ever forward to the executive director of ODEQ or

1  any other agency in the state of Oklahoma any resolutions from

2  the Scenic Rivers Commission pertaining to restrictions

3  regarding the application of poultry litter to fields and

4  pastures in the IRW or anywhere else in Oklahoma?

5  A.   Don't recall.

6  Q.   Don't you think you would recall if you forwarded to the

7  State a unanimous resolution adopted by your commission which

8  called for restrictions on the application of poultry litter?

9  That's not something you would remember?

10 A.   I would want to say that I would remember it, but I don't

11 absolutely know for certain.  As you saw earlier today, I had

12 to make a correction for the record because I overstated

13 something from last week.

14 Q.   Mr. Fite, if I heard you correctly last Thursday, you

15 said -- I'm not purporting to quote you word-for-word -- but

16 what I recall, the essence of what you said is that the

17 Illinois River and other scenic rivers are the top tier of

18 water quality standards of our state, they are the best of the

19 best, they are the water bodies that the State does everything

20 humanly possible to protect.

21       Do you remember testifying to that?

22 A.   Yes.

23 Q.   I want to explore with you for just a couple of minutes

24 this concept of doing everything humanly possible to protect.

25 And my first question is, sir, to the best of your knowledge,

1    has the State of Oklahoma banned farmers from allowing cattle

2    to defecate in rivers and streams in the IRW?

3    A.    Repeat the question, please.

4    Q.    I will, sir.  To the best of your knowledge, has the State

5    of Oklahoma banned or restricted farmers from allowing cattle

6    to defecate in rivers and streams in the Illinois River

7    Watershed?

8    A.    I don't believe the Oklahoma Department of Agriculture has

9    prescribed such a rule.

10    Q.    Has the State of Oklahoma -- and when I say the State of

11    Oklahoma, I'm embracing any agency of the State.  Has the State

12    of Oklahoma banned farmers from allowing their cattle to graze

13    in the riparian areas of the Illinois River Watershed?

14    A.    No.

15    Q.    To the best of your knowledge, Mr. Fite, has the State of

16    Oklahoma banned farmers from placing mineral stands for cattle

17    in riparian areas?

18             MR. GARREN:  Objection, Your Honor, no foundation,

19    mineral stands.

20             THE COURT:  I know what he's talking about.

21    Overruled.

22             THE WITNESS:  No.

23    Q.    (By Mr. Green) To the best of your knowledge, sir -- and I

24    believe you've already acknowledged it, but let me just, once

25    again, make sure for the record -- has the State of Oklahoma

1  banned or limited in any way the amount of commercial

2  fertilizer that can be used in the watershed?

3  A.    No.

4  Q.    And I believe that we already confirmed, but let me pin it

5  down.  To the best of your knowledge, sir, the State of

6  Oklahoma has not banned the application of poultry litter in

7  the Illinois River Watershed; is that not correct?

8  A.    That is correct.

9  Q.    Has the State of Oklahoma, to the best of your knowledge,

10  in the last ten years, done anything to adopt standards more

11  restrictive than the NRCS standards for the application of

12  litter in the IRW?

13          MR. GARREN:  Foundation again, Your Honor.

14          MR. GREEN:  Pardon?

15          MR. GARREN:  Foundation.

16          THE COURT:  Overruled.

17          THE WITNESS:  The Oklahoma Scenic Rivers Commission

18  has.  The agencies with jurisdiction have not.

19  Q.    (By Mr. Green) Now, are you in a position to confirm that

20  you understand that the State would have authority to adopt

21  more restrictive standards than those set forth in the NRCS if

22  it wanted to?

23  A.    Yes.

24  Q.    Let me ask you this, sir.  Is it true that for the last

25  ten years and continuing up until this very day, in nutrient-

1  limited watersheds, the State of Oklahoma has approved and

2  continues to approve Animal Waste Management Plans permitting

3  the application of poultry litter on soils with a soil test

4  phosphorus of up to 300?

5         MR. GARREN:  Objection, Your Honor, misstates the

6  law.  Mischaracterizes what the ODAFF does or doesn't do with

7  regard to approvals of plans.  That's not what the law

8  requires.

9         THE COURT:  Rephrase, please.

10  Q.   (By Mr. Green) Does it issue plans -- has it issued plans

11  for the last ten years and up to today?

12         MR. GARREN:  Same objection, Your Honor.

13  Mischaracterizes the law on the use of plans.

14         THE COURT:  I believe the question is more limited.

15  Overruled.

16  Q.   (By Mr. Green) Do you need the question again?

17  A.   Please.

18  Q.   I'm asking you whether, during the last ten years and

19  continuing up to today, has the State of Oklahoma approved and

20  issued Animal Waste Management Plans allowing for the

21  application of poultry litter on soils with an STP of up to

22  300?

23         MR. GARREN:  Same objection, Your Honor.

24         THE COURT:  Overruled.

25         THE WITNESS:  I do not know.  That question would

1   need to be referred to Dan Parrish at the Department of

2   Agriculture, Food and Forestry.

3   Q.   (By Mr. Green) Mr. Fite, sitting here today, do you know

4   whether or not the State has ever revoked an Animal Waste

5   Management Plan?

6   A.   No, I do not know.

7   Q.   Do you know whether the State has ever sought to limit the

8   number of waste management plans that can be issued?

9         MR. GARREN:   Your Honor, this is outside the scope of

10   the Scenic Rivers Commission's authority and responsibilities.

11         THE COURT:   Sustained.

12         MR. GREEN:   I am just trying to explore this "humanly

13   possible" concept, Your Honor.

14         MR. GARREN:   He's not talking about a human.   None of

15   his questions have asked about a human.   He's asked about the

16   State.

17         THE COURT:   Let me see if I can cut to the heart of

18   it.  Do you know any of the answers with respect to these

19   Animal Waste Management Plans?   Is that within your authority?

20         THE WITNESS:   No, sir.

21         THE COURT:   Go ahead.

22   Q.   (By Mr. Green) Let me try this question, sir.   To the best

23   of your knowledge, has the State compelled point-source

24   discharges to reduce their phosphorus discharge levels to meet

25   the 0.37 milligrams-per-liter goal?

1    A.    Presently, no.

2    Q.    In your view, would it have been humanly possible for the

3    State of Oklahoma to do all these things which you have

4    acknowledged in answer to these last few questions that it has

5    not done?

6            MR. GARREN:  Objection again, Your Honor.  This

7    obviously calls for agencies, State agencies, governing bodies,

8    not humans necessarily to do what he's asking to be done.

9            THE COURT:  Overruled.

10           THE WITNESS:  All wastewater treatment plants in the

11   Illinois River basin must meet a 1 milligram per liter

12   phosphorus standard.  The 0.037 milligram per liter phosphorus

13   criteria that you mentioned becomes fully effective on June 30,

14   2012.

15   Q.    (By Mr. Green) Maybe you misunderstood my question.  I

16   took you through a series of questions where you acknowledged

17   that the State has not undertaken certain activity or certain

18   action.  Do you recall these questions that I just asked you --

19   A.    Yes.

20   Q.    -- in the last few minutes?

21           And my question to you now is:  Would it have been

22   humanly possible for the State to have taken that action which

23   you have acknowledged it has not?

24           MR. GARREN:  Same objection, Your Honor.

25           THE COURT:  Overruled.

1         THE WITNESS:  As I stated earlier, the Oklahoma

2   Scenic Rivers Commission has done what we can within our

3   limited jurisdiction to do affirmative to those questions that

4   you asked, but there are a lot of those issues that are not

5   within our jurisdiction; and, thus, we have no authority.

6   Q.    (By Mr. Green) I understand that, and I appreciate that.

7   But that really is not the question I'm asking.

8   A.    Well, you're categorizing the entire state.  And the

9   Scenic Rivers Commission has demonstrated that we are willing

10  to take a position when other agencies have jurisdiction.

11  Q.    Do you feel that that answer is responsive to my question?

12  A.    Yes.

13         MR. GREEN:  Nothing further.

14         THE COURT:  Any further cross-examination?

15         MR. SANDERS:  Yes, Your Honor.

16         THE COURT:  Mr. Sanders.

17                     CROSS-EXAMINATION

18  BY MR. SANDERS:

19  Q.    Mr. Fite, do you recall testifying about this last week?

20  This is Plaintiff's Demonstrative 74.

21  A.    Yes.  May I have the original put back up -- my eyesight

22  -- that's not a real clear slide.  I hope that I'm not the only

23  one that sees it that way, but it's not real clear.

24  Q.    Can you see it from this angle?

25  A.    Yes.

1   Q.   You may need to step down.  One of the questions I want to

2   ask you relates to Ballard Creek.  It's on the right-hand side

3   at the bottom.  Can you tell me what date is shown on that

4   photograph.

5   A.   Shows 04-04-2007.

6   Q.   April 4, 2007; is that correct?

7   A.   04-04-2007.

8   Q.   And in your testimony last week, I believe with regard to

9   that photograph of Ballard Creek, you said that that creek was

10  influenced, your words, by the Ozark Egg Company; is that

11  correct?

12  A.   In the past, yes.

13  Q.   And Ozark Egg Company is not a defendant in this case, is

14  it?

15  A.   I don't believe so.

16          MR. SANDERS:  That's all I have.  Thank you,

17  Your Honor.

18          THE COURT:  Any further cross?  Mr. Garren.  I'm

19  sorry.

20          MR. WEEKS:  I do have.  I was waiting for Cargill.  I

21  do have, Your Honor.

22          THE COURT:  All right.  And, Mr. Sanders, for my

23  notes, is that Ballard Creek?

24          MR. SANDERS:  I think it's B-A-L-L-A-R-D.

25          THE COURT:  Thank you, sir.

1                          CROSS-EXAMINATION

2     BY MR. WEEKS:

3     Q.    You almost got away, Mr. Fite.

4     A.    I knew I'd be back.

5     Q.    My name is Gary Weeks.

6     A.    Good afternoon.

7     Q.    I represent George's.  And we met briefly on Thursday, I

8     believe, for the first time, correct?

9     A.    Yes, sir.

10    Q.    Okay.  And I'll bet you know what I'm going to ask you

11    about, don't you?

12    A.    I hope you're going to ask me about my friend Gary.

13    Q.    Yeah.  We're going to go back, and I'm going to ask you a

14    little bit about the incident that you described for Mr. Garren

15    that involved the application of some liquid manure on the

16    Wilmoth property.  You remember that, don't you?

17    A.    Yes, Dean Wilmoth.

18    Q.    Dean Wilmoth?

19    A.    W-I-L-M-O-T-H.

20    Q.    And as I understand your previous testimony, Mr. Fite,

21    that incident occurred back in the late '80s, around 1988; is

22    that your recollection?

23    A.    You're in the neighborhood.  I don't know the exact date.

24    Q.    I'm relying on your testimony, so --

25    A.    That would be correct.

1    Q.    All right.  And the application of that poultry litter,

2    that was a self-contained truck, wasn't it, where it would

3    spray the liquid onto the ground?

4    A.    Honey wagon truck.

5    Q.    We have a picture, I believe, of one of the wagons.  If we

6    could just put it up.  And let me see, is that the kind of

7    vehicle there that you're talking about?

8    A.    Yes, except that truck is red.

9    Q.    Okay.  But it's that type of vehicle that you're talking

10   about?

11   A.    Yes.

12   Q.    As you look at that picture, you can see the material that

13   is being spread from that coming from the rear, correct?

14   A.    Yes, sir.

15   Q.    Okay.  Now, as a consequence of that particular incident,

16   I understand that you made a call to the appropriate agencies

17   to report it?

18   A.    Yes.

19   Q.    And in addition to that, as I understand it, you made a

20   call to Gary George?

21   A.    I visited with Gary, yes.

22   Q.    I assume that you called him and made arrangements to go

23   to Springdale and sit down and visit with him and discuss this

24   incident with him, correct?

25   A.    Yes.

1    Q.    And when you got there and you had this conversation with

2    Mr. George, how did you find him to respond to your concerns

3    here?

4    A.    He was very sincere, very professional and open to the

5    discussion fully.

6    Q.    And since 1988, have you ever had reason to call or

7    complain about the application of this liquid manure on the

8    Wilmoth property by a George's truck?

9    A.    No.

10   Q.    And, of course, that was the goal or the mission that you

11   hoped to accomplish when you went there, wasn't it?

12   A.    Yes.

13   Q.    Now, I want to move forward with you a few years to the

14   early '90s.  And I think it was about that time that you said

15   Governor Clinton's animal task force was getting under way,

16   correct?

17   A.    Yes.

18   Q.    And as I understand it, it was at or about that time that

19   the State of Oklahoma was beginning to discuss, and its

20   legislature was in the process of passing some regulations as

21   it related to the application of poultry litter, correct?

22   A.    The Arkansas task force, I believe, convened in 1990 and

23   consummated their work in 1993.  And Oklahoma, in 1991, started

24   dealing with the commercial farming issues related to hogs and

25   poultry in 1991, I believe it was.

1  Q.   And prior to that time, as I understand it, there were

2  really no Oklahoma laws or regulations that were regulating

3  that activity, was there, with regard to the land application

4  of poultry litter?

5  A.   I believe you're correct.

6  Q.   And so to the extent that growers were addressing that

7  issue or to the extent that the integrators were dealing with

8  that issue, it would have been on a voluntary basis, am I

9  right?

10        MR. GARREN:  Assumes facts in evidence, Your Honor.

11  "Not in evidence" is what I meant to say.

12        THE COURT:  If you know.  Overruled.

13        THE WITNESS:  Please repeat the question.

14  Q.   (By Mr. Weeks) What we're talking about here is Best

15  Management Practices.  You know about those, don't you?

16  A.   Yes.

17  Q.   You know that the government developed a set of Best

18  Management Practices in, let's say, the early '90s to address

19  the land application of poultry litter, correct?

20  A.   Yes.

21  Q.   Okay.  And what I was saying is that to the extent that

22  there were no laws on the books, that these issues about the

23  land application of poultry litter were being addressed on a

24  voluntary basis by the Best Management Practices, am I right?

25  A.   Yes.  And SCS and then NRCS guidelines like Waste

1    Utilization 630.

2    Q.    Correct.  And I take it that you would approve of a

3    integrator, a poultry company, who was providing copies of

4    those Best Management Practices to its growers, would you not?

5              MR. GARREN:  Objection, Your Honor.  I don't think

6    it's relevant what Mr. Fite would approve to in regards to

7    poultry operations on a voluntary basis.

8              THE COURT:  Sustained.

9    Q.    (By Mr. Weeks) Were you aware, Mr. Fite, in the early

10   '90s, that poultry growers were being provided with copies of

11   these Best Management Practices by the poultry companies?

12   A.    Copies of BMPs or copies of farm plans?

13   Q.    Yes, the Best Management Practices, just the list of

14   practices that had been -- that had been created by the

15   government for purposes of managing the land application of

16   poultry litter.

17   A.    The first recollection I have of BMPs being suggested for

18   the management of poultry waste came at, best of my ability to

19   draw out a date, late '80s, early '90s when Dr. Mike Smolen

20   appeared in Colcord, Oklahoma, and was almost run out of town

21   for suggesting BMPs to a roomful of poultry growers.

22   Q.    And if George's attached a copy of those Best Management

23   Practices as an addendum to its contract and provided that to

24   the growers, then you wouldn't have been aware of that?

25   A.    Yes, that's correct.

1  Q.   That's correct that you weren't aware of it?

2  A.   I had not seen a contract at that point.

3  Q.   And you've never heard of what has been referred to in the

4  course of this case as George's Addendum D?  D as in "dog."

5  A.   I have not, no.

6          MR. WEEKS:  Do we have a copy of that?  There it is.

7  Q.   (By Mr. Weeks) Is that something you've seen before,

8  Mr. Fite?

9          MR. GARREN:  He's already indicated, Judge, he wasn't

10 familiar with it, so --

11         THE WITNESS:  No, I have not.

12 Q.   (By Mr. Weeks) Good enough.  Are you familiar with any of

13 those Best Management Practices that were -- that were

14 enunciated by the government at that time?

15 A.   Several, yes.

16 Q.   Okay.  Let me just ask you to review that document and see

17 if it appears that some of those practices there that are on

18 that document is -- are some that you were familiar with.

19 A.   The first one for certain, as it controls runoff, but it

20 also controls loss of nitrogen to volatilization to the

21 atmosphere.  Five tons is a little much.  The third one is very

22 reasonable and expected.  I believe number four should be

23 modified; 15 percent slope is pretty steep.  Wouldn't modify

24 number 5.  Definitely number 6, you should maintain records so

25 you can demonstrate what you did with your waste.  Definitely

1    should be covered and tarped.

2    Q.   Very good.  Do you know who developed those practices,

3    sir?  Do you know which government agency?

4    A.   I do not.

5    Q.   Did you know at that time, in the early '90s, if there

6    were management plans available from the government at all, if

7    a farmer could request a management plan at all?

8    A.   Yes, but they weren't available to the public or to my

9    agency to review.

10         MR. WEEKS:  Let's just pull up the very top portion

11   of that.  First paragraph there, the first -- there you go.

12   Q.   (By Mr. Weeks) And let me ask you if you were aware at

13   that time that George's had recommended that each of its farms

14   have a waste management plan.  Is that something that you would

15   have been aware of?

16         MR. GARREN:  Asked and answered, Your Honor.

17         MR. WEEKS:  I don't believe I asked it about that,

18   Your Honor.

19         THE COURT:  Overruled.  Go ahead.

20         THE WITNESS:  No.

21   Q.   (By Mr. Weeks) Would that have been a good thing for an

22   integrator to ask its grower to do?

23   A.   Yes.

24   Q.   And would it have been a good thing -- or was it a good

25   thing that George's, as early as the 1990s, was providing this

1   information to its growers?

2   A.    If you were, yes.

3   Q.    Very good.  Now, I want to take you up a few more years.

4   As I understood your testimony, you served on Governor

5   Keating's animal waste task force, right?

6   A.    Yes.

7   Q.    That was in 1997?

8   A.    Yes.

9   Q.    As a consequence of that task force, there were certain --

10  there were certain laws passed in the state of Oklahoma?

11  A.    Yes.

12  Q.    What were those?

13  A.    One dealt with the hogs in western Oklahoma, in

14  Holdenville, Oklahoma and southeast Oklahoma, south-central.

15  And the other related to poultry.

16  Q.    What year were those passed?

17  A.    1998.

18  Q.    And they went into effect that year, correct?

19  A.    Yes.

20  Q.    And as I understood your testimony, it was after the

21  passage of that Act and the promulgation by the Arkansas

22  Department of Agriculture of those regulations that you had

23  conversations with various representatives about what you

24  thought was a good idea to begin to transport poultry litter

25  out of the Illinois River Watershed?

1  A.    Yes.

2  Q.    And you specifically testified that you had a meeting and

3  a conversation with your friend Gary George again in his

4  office?

5  A.    And Otto Jech.

6  Q.    Otto Jech.  Otto is still there.  I told you that the

7  other day, didn't I?

8  A.    O-T-T-O, J-E-C-H.

9  Q.    Tell me, when you went to have a conversation with Gary

10  George in 2002 about that, what was it that you hoped to

11  accomplish with him in that conversation?

12  A.    Management of poultry waste within the Illinois River

13  basin.

14  Q.    And specifically, you talked about the transportation of

15  the litter out of the watershed, correct?

16  A.    Yes.

17  Q.    And ways, I assume -- other ways, whatever they may be, to

18  minimize the amount of litter that was available for

19  application in the watershed?

20  A.    Yes.

21  Q.    Is that fair?

22  A.    Yes.

23  Q.    Okay.

24        MR. WEEKS:  Do we have the State's exhibit with

25  regard to the transportation of poultry litter out of the

1  watershed?

2          (Off-the-record discussion was had.)

3  Q.   (By Mr. Weeks) Have you seen this document before,

4  Mr. Fite?

5  A.   I don't know that I've seen this exact document, but I've

6  seen something similar.

7  Q.   I don't represent to you that those numbers up there are

8  correct, because I have reason to believe that they aren't

9  correct.

10 A.   You believe they are or aren't?

11 Q.   That they aren't correct.  But this is the State's

12 representations --

13 A.   Are not.

14 Q.   -- on this document with regard to poultry litter that has

15 been transported out of the watershed for those particular

16 years.  You see that, don't you?

17 A.   Yes, sir.

18 Q.   And you see George's name in particular on there, don't

19 you?

20 A.   Yes.

21 Q.   Now, your conversation with Gary George occurred in 2002,

22 am I right?

23 A.   1998 through 2002, yes.

24 Q.   Do you see in 2003 that George's began to take litter out

25 of the watershed?

1   A.    To Pocahontas, Arkansas.

2   Q.    Correct.  You know they do, don't you?

3   A.    To Pocahontas, Arkansas.

4           THE COURT:  Mr. Weeks, just a houskeeping matter.  Is

5   this previously admitted into evidence?

6           MR. WEEKS:  I believe it was a demonstrative that the

7   State used in its opening.

8           MR. GARREN:  I can't say that it was, Judge, and I

9   don't have a recollection of seeing that particular document.

10  The reason I'm confused is because there are other similar

11  tables to that that do go to a different entity.  So...

12          MR. WEEKS:  Well, do we know if this document is in

13  evidence?

14          MS. XIDIS:  It is not in evidence.

15          MR. GARREN:  I know this particular document hasn't

16  been offered, I do know that.

17          MR. WEEKS:  Do you have an objection if we offer it

18  at this point?  It's your document.

19          MR. GARREN:  No.

20          MR. WEEKS:  We'll offer it into evidence at this

21  point, Your Honor.

22          THE COURT:  It will be the entire document.

23          MR. WEEKS:  Whatever this one is right here.

24          THE COURT:  I take it this is a portion of the

25  document, correct?

1          MR. WEEKS:  It's Demonstrative 130, I'm told.

2          THE COURT:  So just to be clear, are you moving the

3    admission of the entire document 1231?

4          MR. WEEKS:  I would just move for the admission of

5    this demonstrative that was used by the State.

6          THE COURT:  We're not going to admit demonstratives,

7    so I don't believe this is -- according to Ms. Xidis, this is

8    not a demonstrative exhibit, correct?

9          MR. WEEKS:  We had it listed as 130.

10         (Off-the-record discussion was had.)

11         MR. WEEKS:  That is it right there.

12         THE COURT:  Is this a demonstrative exhibit?

13         MS. XIDIS:  1231 is an actual trial exhibit.

14         THE COURT:  Any objection to 1231?

15         MR. GARREN:  No, Your Honor.

16         THE COURT:  Very well.  Plaintiff's 1231 is admitted.

17         MR. WEEKS:  Very good.  Thank you.

18   Q.   (By Mr. Weeks) So, I take it, then, Mr. Fite, that you're

19   familiar with the efforts of George's to transport litter out

20   of the watershed?

21   A.   Yes.

22   Q.   And according to the State's exhibit, that began in 2003,

23   correct?

24   A.   Based on this chart, yes.

25   Q.   And according to that chart, it continued through 2006,

1  correct?

2  A.    Yes.

3  Q.    And, to your knowledge, do you have reason to believe that

4  it continues to this day?

5  A.    Yes.

6  Q.    Very good.  With regard to those quantities there, I mean,

7  it suggests that George's has taken out 50,000 tons during

8  those four years.  I would suggest that perhaps that -- some of

9  those numbers are incorrect.

10          But you have reason to believe that -- do you have

11  any reason to believe that those numbers there are more or less

12  correct?

13          MR. GARREN:  Objection, Your Honor, foundation.

14          THE COURT:  Sustained.

15          MR. WEEKS:  He says he knows about it, Your Honor.

16          THE COURT:  Generally that he knew that George's

17  began in or about 2003.

18          MR. WEEKS:  Okay.

19          THE COURT:  Now you're starting to call into question

20  your own exhibit here.

21          MR. WEEKS:  Well, I'm just sort of taking advantage

22  of it, I reckon.

23  Q.    (By Mr. Weeks) Now, did you view the transportation of

24  poultry litter out of the watershed as a good thing?

25  A.    Yes.

1    Q.   Good.   Now, you testified previously that you have been in

2    most places in this watershed, although it's a big one, and

3    that you had seen a lot of poultry houses here or a lot of

4    poultry houses there.

5         Have you seen any poultry houses that have been shut

6    down or closed or retired or that are no longer in use in the

7    watershed?

8    A.   Yes.

9    Q.   Were you aware that George's had undertaken a program to

10   retire houses in the watershed?

11   A.   Are they replacing those houses?

12   Q.   No, sir.

13   A.   No to your answer, too.

14   Q.   I guess my question -- go back, then.   Were you aware that

15   George's had undertaken a program to retire older houses in the

16   watershed and not replace them?

17   A.   No.

18   Q.   Then you wouldn't know, then, would you, sir, that they

19   have actually retired 83 houses in the watershed, would you?

20        MR. GARREN:   Objection, Your Honor.   I think we have

21   the testimony from the wrong end of the room here.   I object to

22   the form.

23        THE COURT:   Sustained.   He's already said he wasn't

24   aware.

25   Q.   (By Mr. Weeks) Now, another thing that we heard from the

1    State during another exhibit that we saw from the State during

2    the opening was some newsletter from my client, George's.  Do

3    you know Monty Henderson?

4    A.    I do.

5    Q.    Monty, as you know, is president of George's, correct?

6    A.    If you say so.

7    Q.    Okay.  Okay.  Okay.  Were you aware or has any -- well,

8    let me just put it this way.  If Mr. Henderson undertook to

9    write newsletters addressing concerns and issues with regard to

10   phosphorus in watersheds, would that be a good thing?

11   A.    Yes.

12   Q.    Would you commend that?

13   A.    Yes, as proactive.

14   Q.    Thank you.  I understand that you -- during your

15   testimony, you said that you had had various reasons to call in

16   and make complaints to the Oklahoma agencies with regard to

17   things that you had observed in the watershed and in the river,

18   correct?

19   A.    Yes.

20   Q.    That was -- dead cattle in the river was one of the things

21   you mentioned?

22   A.    Well, one of the issues about dead cattle in the river, if

23   the water is up high enough that would push cattle in the

24   river, just think of the tons and tons of waste that are being

25   washed in the river, too.

1  Q.   I understand that, but that's not how you described it

2  previously.  You just talked about seeing a dead cow in the

3  river and calling that in and complaining about it, correct?

4  A.   Yes.

5  Q.   Okay.  And you talked about the lagoons or the dikes

6  breaching and some flooding that occurred, correct?

7  A.   Yes.

8  Q.   Okay.  If, in fact, the application of biosolids or sludge

9  was occurring in the Illinois River Watershed, what Oklahoma

10 agency would approve or permit that?

11 A.   The Oklahoma Department of Environmental Quality.

12          MR. WEEKS:  Can we get the picture of that truck up

13 again.

14 Q.   (By Mr. Weeks) This truck here that's spraying, were you

15 aware that that's actually sludge coming out the back of it and

16 not manure?

17 A.   I --

18          MR. GARREN:  Objection, Your Honor, as to what truck

19 he's referring to.  The truck that's applying it at this

20 time -- there's been no foundation or the truck they identified

21 that drained into the river.

22          THE COURT:  Sustained.

23 Q.   (By Mr. Weeks) You identified this truck previously as the

24 kind of truck that you observed putting liquid manure in the

25 river, correct?

1  A.    I made reference that the truck is red, and George's are

2  white.

3  Q.    Correct.  But you said it was this kind of truck, right?

4  A.    Similar.

5  Q.    Well, are you aware that the stuff coming out of the back

6  of this truck is actually -- is actually sludge?

7           MR. GARREN:  Objection, Your Honor, there's been no

8  foundation for him to know that.

9           THE COURT:  Absolutely sustained.  We need to stop

10  this kind of -- we have great lawyers here.  This needs to

11  stop.

12  Q.    (By Mr. Weeks) This is the kind of activity, though,

13  however, Mr. Fite, that you attempted to stop, isn't it?

14  A.    Yes.

15  Q.    Unsuccessfully, correct?

16  A.    No.  George's stopped.

17  Q.    George's stopped.  But the State didn't, did it?

18  A.    I don't know.

19           MR. GARREN:  Objection, Your Honor.  State didn't

20  stop what?  I'm confused.

21           THE COURT:  Sustained.  Rephrase.

22  Q.    (By Mr. Weeks) Is the State continuing to put down sludge

23  in the Illinois River Watershed?

24  A.    Biosolids from municipalities or industry?

25  Q.    Yes.

1   A.   Not that I'm aware of.  I think most of the communities

2   have moved it outside of the basin.

3   Q.   Okay.  Other things that you've had reason to complain

4   about would have been the Westville Wastewater Treatment Plant,

5   wouldn't you, sir?

6   A.   Yes.

7   Q.   And as late as 2007, didn't you say that it was

8   discharging five times as much phosphorus into the basin as was

9   allowed by water quality standards?

10         MR. GARREN:  Ask that he put it in perspective, Your

11  Honor, as to when and where the statement was made.  If, in

12  fact, it was from some deposition or something, it's improper

13  impeachment.

14  Q.   (By Mr. Weeks) Let's pull up the 2007 -- I apologize.

15         Were you aware, sir, that as late as 2007, ODEQ was

16  reporting that?  I'm sorry.

17  A.   I've had a long history with the City of Westville.  We

18  just wrapped up last year building a brand-new SBR, or

19  Sequential Batch Reaction wastewater treatment facility there

20  to replace an antiquated system to meet a one part per million

21  phosphorous standard.

22  Q.   But in '07, it wasn't, was it?

23  A.   The new plant was not operational in 2007.  It was not.

24  Q.   Was it operational in 2008?

25  A.   Yes.

1    Q.    Okay.  When in 2008?

2    A.    Sometime late spring, midsummer, 2008.

3    Q.    So for all those years prior to late spring or early

4    summer 2008, it was pouring that phosphorus out into the

5    Illinois River, wasn't it, sir?

6    A.    They had an antiquated lagoon system, three-cell system,

7    and it was not operating properly.  You are correct.

8    Q.    I want to ask you about the water you passed out there at

9    the Oklahoma Scenic Rivers Commission headquarters.  I got the

10   impression from the questions Mr. Garren asked you that somehow

11   -- you passed that water out because of the land application of

12   poultry litter; is that right?

13   A.    Bacteria in the water column within our well.

14          MR. WEEKS:  Can we pull up the Oklahoma Scenic Rivers

15   Commission minutes from 2/19/02.  I believe that's page 4.

16          MR. GARREN:  Do you have a copy of that?

17          MR. WEEKS:  I do.

18   Q.    (By Mr. Weeks) Can you read that one, or do you need a

19   hard copy, Mr. Fite?

20   A.    May I borrow yours?

21   Q.    You sure can.

22   A.    Thank you.

23          MR. GARREN:  Do we have a Bates number on this,

24   Mr. Weeks?

25          MR. WEEKS:  There is no Bates number on this.

1          MR. GARREN:  Is this an exhibit listed on the

2    exhibit -- on your list --

3          MR. WEEKS:  This is cross-examination.

4          THE COURT:  Then take it off.

5    Q.   (By Mr. Weeks) Have you ever said, Mr. Fite, in contrast

6    to your testimony here today, that the current well at the

7    Oklahoma Scenic Rivers Commission headquarters does not meet

8    minimum Oklahoma Health Department regulations because it is

9    located too close to the septic system?

10          MR. GARREN:  We object, Your Honor.  He's now

11    backdooring the exhibit that he didn't mark and provide for

12    purposes of evidence with a statement from that same document.

13          MR. WEEKS:  I can impeach him, Your Honor, from

14    anything.  He can say yes or no.

15          THE COURT:  I believe it's proper impeachment.

16    Overruled.  Go ahead.

17          THE WITNESS:  Yes.

18    Q.   (By Mr. Weeks) Now, the fact that the headquarters is

19    located too close to your septic system, that has nothing to do

20    with the land application and of poultry litter, does it,

21    Mr. Fite?

22    A.   Had to do with the standard that had been updated by the

23    ODEQ.

24    Q.   Now, you talked about the warnings that the Oklahoma

25    Scenic Rivers Commission had issued, was it last summer?

1    A.    (Witness nods head.)

2    Q.    That was because of what you said -- let's see, how did

3    you -- body contact --

4    A.    Primary body contact for recreation.

5    Q.    Correct.  Correct.  And that was the subject -- has that

6    been the subject of some of your discussions there at the

7    Oklahoma Scenic Rivers Commission meetings?

8    A.    Yes.

9    Q.    And in the course of those meetings, did you learn that 82

10   percent of the streams tested statewide did not meet the

11   primary use for the primary body contact recreation?

12           MR. GARREN:  Object, Your Honor.  There's no

13   relevance to that, and we're outside the Illinois River

14   Watershed, which is the subject of this suit.

15           THE COURT:  Sustained.

16   Q.    (By Mr. Weeks) Now, did Mr. Smithee ever appear before the

17   Oklahoma Scenic Rivers Commission to talk about this issue?

18   A.    Talked about phosphorus.

19   Q.    He never talked to you about these warnings that you guys

20   were going to put out there?

21   A.    I don't recall Mr. Smithee talking about it.  He may have

22   been in attendance when we talked about it.

23   Q.    So you don't remember a comment from him that more people

24   get sick from community swimming pools than from Oklahoma

25   streams and lakes?

1  A.    That sounds like something John Craig would say.

2  Q.    Your notes attribute it to Mr. Smithee, so I won't argue

3  with that.

4        MR. GARREN:  Objection, Your Honor, those notes

5  aren't in evidence nor have they been offered nor presented to

6  this witness.

7        THE COURT:  Sustained.  That's improper.

8  Q.    (By Mr. Weeks) Now, do you have a commissioner on there in

9  '08 named Randall, Mr. Randall, Commissioner Randall?

10  A.    Yes, sir, he's an elected commissioner, one of 12 that

11  represents the Delaware County.

12  Q.    Okay.  He wasn't much in favor of that poster, was he?

13  A.    Nor were the commercial flotation device operators.

14  Q.    Yeah, I bet.  But Mr. Randall was at least fair about it.

15  He just said it ought to apply all across the state, not just

16  to the Illinois River, correct?

17  A.    That's correct.  But, unfortunately, our jurisdiction is

18  only for those three counties and three rivers.

19  Q.    I understand.  Your hands are tied.  That's all I have.

20  Thank you.

21  A.    Thank you.

22        THE COURT:  Mr. Tucker.

23        MR. TUCKER:  Your Honor, it's been brought to my

24  attention that it's a good thing I didn't come from a large

25  family, because I seem to be confused about birth order in this

1  lawsuit.  I actually follow Tyson and precede these other

2  folks, so I apologize to the Court.  I'll try to get it

3  straight.

4        THE COURT:  I was trying to figure out why you're

5  always at the tail end, Mr. Tucker.

6        MR. TUCKER:  It just seemed like the place to be, but

7  it was pointed out to me that I got confused because Mr. Elrod

8  started it.  Anyway, I just got confused.  As I say, it's a

9  good thing I didn't come from a large family.  I would have

10  gotten lost in the shuffle and probably would have starved to

11  death.

12                    CROSS-EXAMINATION

13  BY MR. TUCKER:

14  Q.   Would you agree, Mr. Fite -- and good afternoon, sir, by

15  the way.  I'm John Tucker.  You and I have met before?

16  A.   Yes, sir.  Good afternoon.

17  Q.   I'm one of the many names that you've met once or twice

18  that you still remember six months or a year later, and I

19  appreciate that.

20  A.   You left an inevitable impression upon me from our first

21  meeting.

22  Q.   Well, are we thinking in terms of, like, seeing the Taj

23  Mahal for the first time or more like a bad meal?

24  A.   Unfortunately, I've only been out of the United States

25  once, and that was to Canada.

1  Q.   Well, let me just ask you, you've been dealing with that

2  river for an awfully long time and been in and around, on and

3  working with the Scenic Rivers Commission for an awfully long

4  time.  Would you agree with me, Mr. Fite, that there are an

5  awful lot of competing interests that have an interest in that

6  river and in Lake Tenkiller?

7  A.   Oh, yes.

8  Q.   Just listening to the testimony today, listening to the

9  lawyers asking questions and also Mr. Garren asking you

10  questions the other day, we've obviously got the

11  environmentalists.  We know about that.  We've got -- the

12  ranchers have a big interest in what's going on in that river

13  because they water their cows from it, right?

14  A.   Some do.

15  Q.   And the tributaries that go to the river and the streams

16  and so forth?

17  A.   Yes.

18  Q.   Some of those guys have stock ponds, as -- or are

19  encouraged by the government to put in stock ponds as a

20  conservation measure, and they're using the water, right?

21  A.   Yes.

22  Q.   Then you've got the canoe operators and the

23  concessionaires who are using the water?

24  A.   Yes.

25  Q.   They've got a set of interests that have to do with how

1  the water is managed and how it's used, right?

2  A.    Yes.

3  Q.    Then you've got people that want to do developments along

4  the river, like Flint Ridge and some of those other places?

5  A.    Yes.

6  Q.    Every time you put in a development, that's kind of like

7  urban runoff; you change the character of what's happening to

8  the stream a little bit, don't you?

9  A.    Yes.

10  Q.    On the other hand, it would be a whole lot better if it

11  was all still woods like it is over there in the park in

12  Arkansas where nobody lives.  We can just go back and see what

13  it looked like back before statehood?

14  A.    Or the Nickel Preserve at the Nature Conservancy.

15  Q.    Which is pretty close to the way it was.  But we have all

16  those competing interests in the watershed, and one of the

17  things that you try to do at the Scenic Rivers Commission is to

18  try to find a way to balance all those competing interests,

19  isn't it?

20  A.    Yes.

21        MR. GARREN:  Object to the form, Your Honor.  It's

22  not what the "charge admission" testimony was previously.  It

23  was to preserve and protect.

24        THE COURT:  He'd already begun answering.

25  Overruled.  Go ahead.

1  Q.    (By Mr. Tucker) Is that right, Mr. Fite?

2  A.    I said yes.  Yes.  Sorry.

3  Q.    The -- it's clear to say that both the river and the lake

4  would be described as multiuse waterways, wouldn't it?

5  A.    Yes.

6  Q.    You would encourage such things -- some of the things you

7  see that have to do with the use of the river, the -- there's

8  no regulation against it, but the Commission would prefer that

9  it not be done, like overgrazing, for example.  You prefer that

10  not be done?

11  A.    Wish that, but, unfortunately, I only have control of

12  about 50 percent of the basin.  It's outside of my

13  jurisdiction.

14  Q.    You really can't prevent overgrazing in your part of the

15  basin, can you?

16  A.    No but we're bringing tools to bare to hopefully mitigate

17  some of that.

18  Q.    That's the voluntary crep program?

19  A.    Yes.

20  Q.    That's to encourage ranchers to do a better job of

21  managing their pastures and a better job of building in buffer

22  strips and things like that?

23  A.    Yes.

24  Q.    Of course, you prefer that ranchers not let cattle graze

25  right on down to the banks of the stream?

1  A.   Yes, that's correct.

2  Q.   It would be better if, since -- stream bank erosion is a

3  huge problem with the watershed, isn't it?

4  A.   Yes.

5        MR. GARREN:  Object to the form "huge," Your Honor.

6        THE COURT:  Overruled.

7  Q.   (By Mr. Tucker) Well, it's a big problem.  Is that

8  better?  A big problem?

9  A.   Erosion, sedimentation has associated with it nutrients,

10 particularly phosphorus attaches itself.  So when there's

11 erosion, you have a direct conveyance in addition to runoff

12 into the river.

13 Q.   You would prefer, for example, that livestock not

14 contribute to that stream bank erosion?

15 A.   Yes.

16 Q.   But to stop it is not within your jurisdiction.  All you

17 can do is encourage people to take measures so that it doesn't

18 happen?

19 A.   You're correct.

20 Q.   Now, the end result that you're talking about, of course,

21 when you have stream bank erosion, as I understand it, it also

22 changes the nature of the river, it makes it wider, puts in

23 more gravel banks, takes away some of the deeper pools.  Is

24 that right?

25 A.   Yes.

1  Q.   And that's not a good thing to keep a river young, because

2  a river starts to age immediately when it's born, doesn't it?

3  A.    It accelerates sedimentation and streambank accretion.

4  Q.   I'm probably the only person that ever enjoyed my geology

5  field trip to the Arbuckle Mountains because I got to see my

6  first explanation of an oxbow lake.  It stuck with me ever

7  since.  One of these days, probably none of us will still be

8  here, but one of these days, the Illinois River is going to

9  have a whole lot of oxbow lakes, isn't it?  Probably long past

10 our lives.  But in the future, the Illinois River, just like

11 any other river, will ultimately become an aging river and it

12 will have meanders and become a river that has oxbow lakes?

13 A.    It already has oxbows.

14 Q.   I guess it's older than I thought.  But all these

15 things -- one of the things you're concerned about as an

16 immediate concern right now is that a lot of these things cause

17 nutrients, such as phosphorus, to get in the waterway.  And

18 those nutrients can come from cows, it can come from something

19 that's on the surface of the pasture, it could come from

20 natural phosphorus that's naturally occurring in the soil,

21 couldn't it?

22 A.    Some of it could, yes.

23 Q.   Sure.  And some other sources have been mentioned, too,

24 but I don't want to go back over that.  But my point is this --

25 A.    You left out poultry waste.

1    Q.    Pardon?

2    A.    You left out poultry waste.

3    Q.    I thought I said the soil that was in -- the phosphorus

4    that was on the soil in the pastures.  I'm assuming that's what

5    you were talking about.

6    A.    You mentioned cows.

7    Q.    I was thinking more of a direct deposit by the cows on the

8    pasture, that 60 pounds a day you talked about.

9    A.    The cows are eating the grass that the poultry waste grew,

10   passing through the cow, putting it back on the ground.

11   Q.    Wasn't that grass also grown from commercial fertilizer?

12   A.    Some was, yes.

13   Q.    I mean, grass contains phosphorus, doesn't it?

14   A.    Some.

15   Q.    Well, does the fact --

16   A.    Grass is not a real good user of phosphorus.

17   Q.    Does the fact that you fertilize grass, if you have a bale

18   of alfalfa --

19   A.    That's different than grass.  Alfalfa is different.

20   Q.    A bale of Fescue, a bale of Fescue that has been grown in

21   a pasture, does it make a difference how much phosphorus is in

22   that grass, whether or not that field has been fertilized?

23   A.    Most of your grass is going to uptake nitrogen.

24   Q.    Can you answer my question?  Does it make a difference how

25   much a pasture has been fertilized as to the amount of

1   phosphorus that a plant uptakes?

2   A.    No.

3   Q.    So grass is grass when a cow eats it, isn't it?  Cow

4   doesn't care where the grass comes from?

5   A.    That's true.

6   Q.    Grass is going to contain phosphorus, whether it comes

7   from the Illinois River Watershed or Waxahatchee?

8   A.    I don't know if there's any poultry farms down there.

9   Q.    Is there any grass down there?

10  A.    Some.

11  Q.    You can buy hay places other than the Illinois River,

12  right?

13  A.    True.

14  Q.    Hay is always going to contain phosphorus, right?

15  A.    Probably so.

16  Q.    When the cow eats the hay, wherever it comes from, the

17  cow's poop is going to contain phosphorus?

18  A.    Poop?

19  Q.    What would you prefer I call it?  We've been asked to stay

20  away from the phrase "cow patty" for the duration of the case.

21  A.    I actually call them meadow muffins.

22  Q.    What?

23  A.    Meadow muffins.

24  Q.    Meadow muffins?  I think I'll just stick with "poop," if

25  you don't mind.

918

1          Let me get back to the point I'm trying to make

2     here.  There are a lot of different places that phosphorus can

3     get into the water, but what you're concerned about the

4     phosphorus, as you've told us, is that when you fly over it,

5     you see different colors in the winter than in the summer.  You

6     see kind of a green cast, which indicates that there's algal

7     growth taking place in the river and taking place in the lake,

8     right?

9     A.    Yes.

10    Q.    And the algal growth, of course, is stimulated by

11    photosynthesis?

12    A.    Yes.

13    Q.    Warm water in the summer compared to the winter?

14    A.    An abundance of nutrients, direct sunlight.

15    Q.    A recreational user, like a canoer or, say, a scuba diver

16    in the lake, his goal is going to be to have the water as clear

17    as he can have it, isn't he?

18    A.    Yes.

19    Q.    And so for water clarity, what you want to do is you want

20    to get as few nutrients as possible to minimize the algal

21    growth as much as you can; is that right?

22    A.    Yes.

23    Q.    Would you agree also, on the other hand, that you have a

24    fisheries manager or a fisherman, they desire more algal growth

25    to support a larger warm-water fishery?

```
1    A.    To a point.

2    Q.    To a point.

3    A.    When you go past the saturation point, then your fishery

4    declines.

5    Q.    In other words, my point is, sir -- and I'm not going to

6    go through the fishing statistics with you because, believe it

7    or not, we have fish experts coming in to testify about how

8    many fish there are, among the dozens of experts lined up for

9    somebody to tell us about fish.

10          But my point is, is that what you just said is an

11   example of how we're always trying to balance the interest in

12   the use of the waterway, aren't we, between the fisheries group

13   that wants some algal growth and the recreational group that

14   wants none; would you agree with that?

15   A.    I'm trying to balance what's best for the river.

16   Q.    Would you agree with what I just said?

17   A.    Those other groups, yes.

18   Q.    Thank you.

19          THE COURT:  Mr. Fite, your discussion about alfalfa

20   raised the issue, because it had been discussed in the past

21   that a possible way to uptake some of this phosphorus is to

22   plant alfalfa.  Has that been tried at all by the Scenic Rivers

23   Commission?

24          THE WITNESS:  We have not tried that to date.

25          THE COURT:  Do you know any agencies or organizations
```

1    that have tried that?

2        THE WITNESS:  The crux of the problem in the Illinois

3    River basin on the Oklahoma side is that the soils are

4    marginal, at best.  And so it's hard to grow crop.  And that's

5    the reason that we don't have the row cropping on the Illinois

6    River, like you would see in the Arkansas river bottom.

7        THE COURT:  Without plowing, is there a method by

8    which one could do no-till farming, seed-drill the alfalfa in?

9    At a point, it comes uneconomical, I'm sure.  But you're aware

10   of no programs to try to do that?

11       THE WITNESS:  I'm not familiar if any programs that

12   have done that to date.  There's been some limited growing of

13   squash, hay grazer, corn and so forth in some of the bottom

14   areas right adjacent to the Illinois River.  One of the areas

15   that comes to mind is the Buck Ford area where there has been

16   some corn introduced in the past and grown.

17       We had a -- actually had a commercial flotation

18   device operator who attempted to grow a crop this year to make

19   ethanol out of it, the Combs Bridge area, and that did not work

20   for him.  He spent about $15,000 putting the crop in, and was

21   not able to utilize that particular crop.

22       There are some areas I know on the Arkansas side

23   where there is some row cropping going on, and there is some

24   alfalfa.  So I don't want to mislead you that there's not

25   alfalfa in the basin.

1          THE COURT:  But that's a plow situation?

2          THE WITNESS:  Most generally.

3    Q.    (By Mr. Tucker) With alfalfa, is it also a problem that

4    you have to have a particular depth of soil because of the

5    extremely deep-rooted nature of the way alfalfa grows?

6    A.    Yes.

7    Q.    Thank you, sir.

8                        CROSS-EXAMINATION

9    BY MS. LONGWELL:

10   Q.    How are you today?

11   A.    Fine.  And you?

12   Q.    Good.  I think I might be the last at our table for right

13   now for you.  My name is Nicole Longwell.  We've met before,

14   haven't we?

15   A.    Hi, Nicole.

16   Q.    I want to follow up on a couple of topics, maybe just get

17   a little more detail from you on a couple of topics that have

18   been hit on today.  One of those is the restroom facilities

19   along the Illinois River.  Now, you've been an administrator at

20   the Oklahoma Scenic Rivers Commission since 1983, correct?

21   A.    Yes.

22   Q.    And at the time you came to the Oklahoma Scenic Rivers

23   Commission, there were only a couple of restroom facilities

24   along the river for the recreators; is that correct?

25   A.    Yes.

1  Q.   And you had some concerns about the ability of those

2  facilities to handle all the human wasteload from the

3  recreators, didn't you?

4  A.   Yes.

5  Q.   And, in fact, the individuals weren't even taking

6  advantage of those particular restroom facilities, were they?

7  A.   They were pretty poor facilities.

8  Q.   So is it fair to say that one of your missions when you

9  came into office was to upgrade the restroom facilities along

10 the river?

11 A.   Yes.

12 Q.   In fact, without those facilities, many recreators

13 relieved themselves within the waters and also on the stream

14 banks of the river, correct?

15 A.   Yes.

16        MR. GARREN:   Objection, form.   No foundation.

17        THE COURT:   Overruled.

18 Q.   (By Ms. Longwell) Is it fair to say that approximately

19 400,000 or more people actually recreate in the Illinois River

20 area annually?

21 A.   Yes.

22 Q.   And with regards to the people who actually recreate on

23 the river, those individuals spend a significant portion of

24 their day on the river, correct?

25 A.   Those individuals that are floating.

1   Q.    I'm sorry, thank you for the correction.  That's exactly

2   what I meant.   The people who are floating the river spend a

3   significant portion of the day on the river?

4   A.    Yes.  Not all the 400,000 are floating.

5   Q.    Right.   In 1991, you sought funds from the Oklahoma

6   Conservation Commission to build 10 new restroom facilities at

7   different public access points along the river, didn't you?

8   A.    Yes.

9   Q.    And did you obtain the funds for those 10 facilities?

10  A.    I believe to date, we have built 12.

11  Q.    Twelve permanent facilities?

12  A.    Let me stop and do some math in my head for a moment.

13  Since John has got the calculator, I'll have to do it in my

14  head.   Twelve.

15  Q.    At the time, in 1991, was it -- were you seeking funds for

16  10 new public restroom facilities?

17  A.    Yes.

18  Q.    And four of those facilities were going to replace the

19  inadequate facilities that previously existed, correct?

20  A.    Yes.

21  Q.    And, in fact, those facilities opened sometime in and

22  around May of 1994; is that correct?

23  A.    We have some facilities that go back to 1988 coming

24  forward through 1994, new facilities.   Actually, we have two

25  facilities that are since 1994.

1   Q.   Okay.  So let me go back.  Let's -- just so we can be

2   clear on the chronology of this.  Prior to seeking funds in

3   1991 from the Oklahoma Conservation Commission, there were four

4   facilities in the Illinois River Watershed for those who were

5   recreating the water; is that correct?

6   A.   Yes.

7   Q.   And those four facilities were inadequate to address the

8   amount of humans that were partaking on the river, correct?

9   A.   Yes.

10  Q.   And in 1991, you sought funds for 10 new facilities?

11  A.   Yes.

12  Q.   Those facilities were put in place by 1994; is that

13  correct?

14  A.   I believe you're correct.

15  Q.   Okay.  And within the first year, is it fair to say that

16  approximately 12,000 gallons of human waste were pumped out of

17  those 10 new facilities?

18  A.   Yes.

19  Q.   Let me go back.  Four -- four of those facilities that

20  were part of the 10 new facilities for 1991 replaced the four

21  existing facilities prior to that date, correct?

22  A.   No.

23  Q.   Were the four that were inadequate still in place in 1994?

24  A.   We replaced two at Peavine public access area,

25  P-E-A-V-I-N-E, and two at Round Hollow previous to that.  Those

1   would have been constructed in 1988, approximately.

2   Q.   So let me go back to talking about the facilities.  These

3   facilities were built away from the actual floodplain of the

4   river, correct?

5   A.   They are in the floodplain.  They're not in the floodway.

6   Q.   So were you having -- were you seeing -- strike that.

7         Is it fair to say that even though the Oklahoma

8   Scenic Rivers Commission had built these 10 new facilities as

9   of 1994, you were noticing that there were still people who

10  weren't utilizing those facilities because of their location to

11  the river?

12  A.   Yes.

13  Q.   So at that point in time, did you address the Oklahoma

14  Scenic -- I mean the Oklahoma Conservation Commission again for

15  funds to provide additional bathroom facilities along the

16  river?

17  A.   Yes, portable bathrooms.

18  Q.   So you decided that those 10 permanent facilities that had

19  been built, along with any existing facilities that were in

20  place prior to 1994, were inadequate to meet the -- still were

21  inadequate to meet the visitors annually along the river?

22  A.   Yes.

23  Q.   And in 1995, you sought funds to place 10 porta-potties

24  along the river; is that correct?

25  A.   Sometime in that time span, yes, ma'am.

1  Q.    Then the funding, however, for those 10 facilities were

2  not provided until approximately 1998?

3  A.    I don't have that knowledge in my head, but you're

4  probably in the ball park as far as dates.

5  Q.    And, in fact, at some point, you decided to increase the

6  number of porta-potties from 10 to 17 because you didn't feel

7  10 was adequate; is that correct?

8  A.    That's correct.

9  Q.    So from 1998 to 2001, there were approximately 27 restroom

10 facilities available to the recreators on the Illinois River;

11 is that correct?

12 A.    Provided by the Scenic Rivers Commission.  That does not

13 include the commercial flotation device operations'

14 facilities.

15 Q.    That were available to their customers?

16 A.    Uh-huh.

17 Q.    But these were on various locations along the river,

18 correct?

19 A.    Yes, ma'am.

20 Q.    So at the time you came to the Oklahoma Scenic Rivers

21 Commission in 1983, and by 2001, you had made it your mission

22 to get these 27 facilities in place; is that correct?

23 A.    Well, it was a team effort.  My staff included.

24 Q.    Was there a four-year period of time in the 19- -- from

25 about 2001 to 2004 where you didn't have sufficient funds to

1  provide some of these portable facilities?

2  A.   Yes.

3  Q.   Okay.  So not all 27 restroom facilities were available

4  between 2001 and 2004, correct?

5  A.   Yes.

6  Q.   Is it fair to say -- let me hand you -- I'm going to hand

7  you a document I'm going to put into evidence.  Defendants'

8  Exhibit 2542.

9         MS. LONGWELL:  Your Honor, may I approach the

10  witness?

11         THE COURT:  You may.

12  Q.   (By Ms. Longwell) Mr. Fite, have you seen this document

13  before?

14  A.   Yes.

15  Q.   Are you familiar with the contents of the document?

16  A.   Yes.

17  Q.   And the title of the document is "Portable Toilet Use

18  Along Illinois River, October 25, 2004," correct?

19  A.   Yes.

20         MS. LONGWELL:  I'd move for the admission of

21  Exhibit 2542.

22         MR. GARREN:  Relevance, Your Honor

23         MS. LONGWELL:  It goes to the number of portable

24  toilets available on the river that we've been discussing.

25         THE COURT:  Overruled.  Defendants' Joint Exhibit

928

1   2542 is admitted.

2   Q.   (By Ms. Longwell) Mr. Fite, what I'd like to do is address

3   -- have you turn to the second page of this exhibit.  And

4   looking at the first full paragraph where it starts "17 units

5   replaced this year in the highest use locations during mid to

6   late May and removed in mid-September," these are the portable

7   units we were discussing, correct?

8   A.   Yes, ma'am.

9   Q.   I wanted to draw your attention to the last sentence in

10  this paragraph.  It says, "This year, there were 3500 gallons

11  of waste per week removed from the 17 portable units."  Do you

12  see that?

13  A.   Yes.

14  Q.   Did I read that correctly?

15  A.   Yes.

16  Q.   And then I'd like to draw your attention to the last

17  sentence of the last paragraph.  Says, "However, the removal of

18  over 60,000 gallons of waste this year from the river can only

19  be seen as a positive outcome of these portable units on

20  site."

21       So these portable units have removed over 60,000

22  gallons of waste from the river on a yearly basis; is that

23  accurate?

24       MR. GARREN:  Object.  That's not what it says,

25  Your Honor.

```
 1            THE COURT:  Sustained.  Rephrase.
 2   Q.   (By Ms. Longwell) Do you agree with this statement
 3   contained in Exhibit 2542?
 4            MR. GARREN:  For the record, the statement is the
 5   last sentence of this page; is that correct?
 6            MS. LONGWELL:  Yes.
 7            THE COURT:  Correct.
 8            THE WITNESS:  I want to say that includes the
 9   permanent facilities as well.
10   Q.   (By Ms. Longwell) Is it fair to say approximately 60,000
11   gallons of human waste containing fecal bacteria were removed
12   from the river during those years when all these restroom
13   facilities are available?
14   A.   Yes.
15   Q.   So can I reasonably draw from this that when there were
16   not restrooms available -- 27 restrooms available, that the
17   human sewage that were removed from these facilities was
18   actually deposited directly within the river or immediately
19   adjacent to it on the streambanks?
20            MR. GARREN:  Objection, Your Honor, improper form.
21   Doesn't -- it excludes the idea that this is a current number
22   and that the prior numbers may have had less visitors to the
23   watershed.  There might have been different uses available for
24   those who did use it at different times.  Too many variables
25   here in that assumption.
```

 1           THE COURT:  Rephrase, please.

 2  Q.   (By Ms. Longwell) Prior to these restrooms being

 3  available, is it fair to say that these 60,000 gallons of human

 4  waste were directly deposited somewhere within the watershed

 5  outside of these restrooms?

 6           MR. GARREN:  Your Honor, that could assume, then,

 7  that they would have gone into town and used an appropriate

 8  facility there, and that would have been properly treated, as

 9  it's supposed to be.  There's just too many assumptions there.

10  The form is bad.

11           THE COURT:  Overruled.  Go ahead.

12           THE WITNESS:  If the river users did not use a

13  facility offered by one of the licensed commercial flotation

14  device operations that were required by rule to provide

15  bathrooms to their users, that is a possibility.  Yes.

16  Q.   (By Ms. Longwell) The number of users -- the number of

17  recreators along the Illinois River, from the time you took

18  office to the present date, has not changed that much, has it?

19  A.   It has not.

20  Q.   Is it true that a portion of the $1.1 million that the

21  poultry companies gave to the Oklahoma Scenic Rivers Commission

22  was supposed to be earmarked for constructing new bathrooms?

23  A.   Used for bathrooms.

24  Q.   Used for bathrooms.  Were some of those funds used for

25  those portable facilities that we talked about?

1   A.    $100,000 of the four-year contribution of $1.1 million was

2   used for bathrooms for recreationists during that four-year

3   period.

4   Q.    And the Oklahoma Scenic Rivers Commission does not have

5   the ability to remove those portable facilities during a high-

6   flow event; is that correct?

7   A.    We work with a contractor to remove them.

8   Q.    So you have to contact the contractor to get those 17

9   portable facilities out of the --

10  A.    We have moved them as well.

11  Q.    And even after all the efforts that the Oklahoma Scenic

12  Rivers Commission has undertaken, there is still recreators

13  along the Illinois River who don't take advantage of the

14  restroom facilities that have been provided, aren't there?

15  A.    Yes.

16  Q.    I just want to touch briefly on a couple of points with

17  regard to the Watts sewage lagoon.  At one point in time, the

18  -- there was a proposal to connect West Siloam Springs to the

19  Watts sewage lagoon, correct?

20  A.    Yes.

21  Q.    And that was back in 1999?  Is that approximately the

22  right date?

23  A.    Somewhere in that time span, yes, ma'am.

24  Q.    And you contested that?

25  A.    The Oklahoma Scenic Rivers Commission did protest that

1   proposal.

2   Q.   And would some of the waste that would have come from West

3   Siloam Springs have included waste from Natural Falls State

4   Park?

5   A.   Yes.

6   Q.   Is it fair to say that the Oklahoma Scenic Rivers

7   Commission had concerns that the lagoon system at Watts could

8   not handle the additional volume of waste from West Siloam

9   Springs?

10  A.   Yes.

11  Q.   Additionally, you expressed concerns about the lagoon

12  effluent concerning environmental harm?

13  A.   Yes.

14  Q.   And you had that concern outside of this proposition to

15  connect West Siloam Springs to Watts sewage lagoon, didn't you?

16  A.   Yes.

17  Q.   Let me see if I can ask you a couple of questions about

18  your concerns regarding the specific concerns you raised with

19  the ODEQ about the Watts sewage lagoon connection to

20  Westville.  Let me direct your attention to Defendants' Joint

21  Exhibit 1400.

22          THE COURT:  Ms. Longwell, you actually have slowed

23  down considerably from the last trial that we were in

24  together.  But I'm getting notations from the court reporter,

25  who is absolutely one of our finest, that you have the capacity

933

 1   of speaking so fast that you overload the court reporter.  So,

 2   I know it may be hard for her to believe, but you were much

 3   faster the last time around.  So if you could try to put some

 4   more brakes on, please.

 5          MS. LONGWELL:  I apologize.  It's the product of

 6   being the middle child, Your Honor.

 7          THE WITNESS:  Middle or mental?

 8          THE COURT:  Middle.

 9          THE WITNESS:  I just wanted to make sure.

10          MS. LONGWELL:  May I approach the witness?

11          THE COURT:  You may.

12          As I recall, she whipped somebody in a jury trial who

13   had three times the experience.  So she's not mentally

14   challenged.

15          MS. LONGWELL:  Thank you, Your Honor.  Appreciate

16   that.

17   Q.  (By Ms. Longwell) Mr. Fite, just as some background

18   information, did you submit to the ODEQ your concerns about the

19   connection of the -- West Siloam Springs to the Watts sewage

20   lagoon?

21          MR. GARREN:  Asked and answered.

22          THE COURT:  Sustained.

23   Q.  (By Ms. Longwell) Since you have -- let me ask you:  This

24   letter that I provided you, Defendant's Joint Exhibit 1400,

25   have you seen this document before?

1  A.    I would say yes, I have.

2  Q.    In fact, on page 3 of that document, are you not listed as

3  one of the individuals receiving this document?

4  A.    Yes.

5         MS. LONGWELL:  I move for the admission of

6  Defendants' Joint Exhibit 1400.

7         THE COURT:  Any objection?

8         MR. GARREN:  Relevance, Your Honor.  He's already --

9  he's already mentioned that he's made a comment.  Cumulative.

10        MS. LONGWELL:  Your Honor, this goes into the

11 specific concerns of Mr. Fite, which I have not asked yet.

12        THE COURT:  Just one second.  Do we actually have

13 Mr. Fite's concerns memorialized in this document?

14        MS. LONGWELL:  Your Honor, if you'll look at page 10

15 of the document.

16        THE COURT:  Overruled.

17        MR. GARREN:  I would note, Your Honor, that these

18 aren't necessarily Mr. Fite's.  If you'll notice on page 24 of

19 this exhibit, 104-24, these are actually comments from Thomas

20 Alexander of Enercon Services in 1998.  I believe those are the

21 comments that are alluded there, just transmitted through

22 others.

23        THE COURT:  All right.  How about -- what about

24 that?

25        MS. LONGWELL:  I can ask the witness.

935

1  Q.   (By Ms. Longwell) Mr. Fite, did you relay certain concerns

2  on behalf of Mr. Alexander or on behalf of yourself to the

3  ODEQ -- or the Oklahoma Scenic Rivers Commission?  I

4  apologize.

5  A.   On behalf of the Oklahoma Scenic Rivers Commission.

6          MS. LONGWELL:  I move for the admission of this

7  exhibit.

8          THE COURT:  Did you actually present these comments

9  to ODEQ, Mr. Fite?

10          THE WITNESS:  If I did, it would have been through

11  our liaison, Jeannine Hale, who worked for the Attorney

12  General's office at the time.  At that point in time, Jeannine,

13  Your Honor, would convey most of our concerns to other agencies

14  on our behalf.

15          THE COURT:  Any objection?

16          MR. GARREN:  Just same, Your Honor, with regard to

17  relevance.

18          THE COURT:  Well, I think in terms of relevance, the

19  objection is overruled.  Defendants' Joint Exhibit 1400 is

20  admitted.

21          MS. LONGWELL:  April, turn to page 10 of this

22  exhibit, please.

23  Q.   (By Ms. Longwell) Mr. Fite, I know you are already there,

24  so let's discuss the comments that are held here on Exhibit

25  1400 at page 10.  You just discussed with the judge that these

1  were comments of the Oklahoma Scenic Rivers Commission that

2  were provided through Jeannine Hale; is that correct?

3  A.   Yes.

4  Q.   Did the Oklahoma Scenic Rivers Commission commission the

5  services of Thomas Alexander to evaluate the Watts sewage

6  lagoon in this proposal?

7  A.   No.

8  Q.   Was there -- when you look at the -- let's go through the

9  questions that are posted here, and you tell me if this was a

10  concern of the Oklahoma Scenic Rivers Commission.

11         Looking at question 1, was one of your concerns that

12  the lagoons and the irrigation system located in the flood

13  plain of the -- was located in the floodplain of the Illinois

14  River?

15  A.   Yes.

16  Q.   Was one of the Oklahoma Scenic Rivers Commission's

17  concerns that the lagoon was inadequate to handle the volume of

18  the sewage flow?

19  A.   Yes.

20  Q.   Was one of the concerns of the Scenic Rivers Commission

21  that this filtration system at the Watts sewage lagoon -- there

22  was no -- excuse me, strike that.  That there is no primary bar

23  screening or preliminary filtration of the raw sewage effluent

24  from Watts?

25  A.   Yes.  That means to take out materials that would come

1  through the wastewater conveyed in the pipe, things that you

2  wouldn't want to talk about.

3  Q.    Those things made it into the actual lagoon because of the

4  filtration system?

5  A.    Yes.

6  Q.    Questions 5 and 6:  Was one of your concerns that the

7  lagoon and irrigation system were apparently built over an area

8  where natural seeps and springs occur?

9  A.    Yes.

10  Q.    And that because the lagoons were built on top of these

11  natural seeps and springs, there's a direct communication

12  between the material contained in the lagoons and the

13  groundwater?

14  A.    That was a potential, yes.

15  Q.    Was one of the concerns of the Oklahoma Scenic Rivers

16  Commission that there were areas where the side berms of the

17  lagoons were leaking or seeping?

18  A.    Yes.

19          THE COURT:  Before we go through all of these, this

20  was in '98.  Has this been addressed?

21          MS. LONGWELL:  That's a follow-up question that I had

22  for Mr. Fite.

23          THE COURT:  All right.  Go ahead.

24  Q.    (By Ms. Longwell) And wasn't one of the concerns of the

25  Oklahoma Scenic Rivers Commission that there was a low-lying

1  east-west swale that was located north of the irrigation arm's

2  central pivot point?

3  A.    Yes.

4  Q.    And that this swale could encourage the overland flow of

5  applied and pooled wastewater into adjacent properties to the

6  west and subsequently to the Illinois River?

7  A.    Yes, from the irrigation site.

8  Q.    Does that irrigation site still exist today for the Watts

9  sewage lagoon?

10  A.    Yes.

11  Q.    Has any changes been made, to your knowledge, with regards

12  to that irrigation site?

13  A.    Yes.

14  Q.    What changes have been made?

15  A.    For the system or just for the irrigation site?

16  Q.    The irrigation site.

17  A.    They are very limited at the town of Watts when they

18  utilize the irrigation site.

19  Q.    But it's still utilized?

20  A.    Occasionally.  Not like it was, not the frequency.

21  Q.    Do you know when they began to cut back on utilizing that

22  irrigation?

23  A.    After this period of time.

24  Q.    So sometime in 2000?

25  A.    '99, 2000, that time span.

939

1   Q.    Prior to that point, there was no control with regards to

2   the land application of this sewage effluent; is that correct?

3   A.    The irrigation system was supposed to be used only during

4   the growing seasons of the year for crop uptake for

5   promulgation of hay.

6   Q.    And the growing seasons of the year are usually also the

7   most rainiest seasons of the year, are they not, Mr. Fite?

8   A.    No.

9   Q.    They're not?

10  A.    No.  June, July, August are generally pretty dry.

11  Q.    Let's look at the next page.

12  A.    Okay.

13  Q.    Page 11 at the top.  Was one of the concerns of the

14  Oklahoma Scenic Rivers Commission that when high-water

15  conditions are present, water in the river can actually back up

16  into the swale and inundate the land application area?

17  A.    Yes.

18  Q.    Does that potential still exist today?

19  A.    Yes.

20  Q.    Are you aware of any updating that has been undertaken by

21  Watts with regards to the lagoon system?

22  A.    Yes.  A new Crawford dam has been built that was

23  demonstrated earlier in the flyover of the lagoon system that

24  cut off of one of the seeps that were filling up the primary

25  lagoon cell number 1, spilling over to lagoon number 2 and

1    filling up the finishing lagoon, then causing the system to be

2    at capacity with no freeboard.

3            When that particular improvement was made, that

4    stopped some of the infiltration from groundwater seepage into

5    the system.

6    Q.    When was that done?

7    A.    It's been a number of years ago.

8    Q.    In the early 2000s?

9    A.    I'm not certain, but I remember it was done.  There have

10   been new hydraulic gates installed in the facility that

11   regulate the hydraulic levels of all three.  And there has been

12   considerable management of the irrigation site, better

13   management than there has ever been.

14   Q.    Okay.  And do you still have concerns, however, about the

15   Watts sewage lagoon's ability to manage any additional sewage

16   from any other source outside of --

17   A.    Yes.

18   Q.    That's for the same reason as you had an issue with the

19   Westville connection proposal?

20   A.    Yes.

21   Q.    I want to briefly talk to you just a moment about gravel

22   mining.  Is it true that the Oklahoma Scenic Rivers Commission

23   adopted a rule which prohibited mining in the Illinois River?

24   A.    Yes.

25   Q.    However, as you discussed previously, there is still some

1    mining that's going on in the Barren Fork; is that correct?

2    A.    Not within our jurisdiction.

3    Q.    But it's still occurring with in the watershed?

4    A.    Yes.

5    Q.    Isn't it true that the State of Oklahoma permits the

6    removal of gravel out of the creek and riverbeds at Barren

7    Fork?

8    A.    There is a very limited permit.  I don't know what the

9    modifications have been since the court case, but Jock Worley

10   operation to the east of the Barren, Oklahoma area is still

11   located there, and he can remove a certain amount of gravel per

12   year on an annual basis.

13   Q.    You would agree with me that removing gravel from the

14   creek and riverbeds can present turbidity issues, can it not?

15   A.    Yes.

16   Q.    Can release sediment into the system?

17   A.    Yes, and it increases erosion upstream and downstream of

18   the burrow area.

19   Q.    It was this concern that caused the Oklahoma Scenic Rivers

20   Commission to adopt the rule prohibiting mining in the Illinois

21   River; isn't that true?

22   A.    Yes, April 20, 1993.

23   Q.    Despite your best efforts, however, there have been people

24   who have been found to have built dams and dug up gravel out of

25   the creekbeds to create dams in the Illinois River Watershed;

1   isn't that true?

2   A.   Yes.  We brought action against those individuals within

3   our jurisdiction.

4   Q.   With regards to Jock Worley's operations in the Barren

5   Fork, has the Oklahoma Scenic Rivers Commission expressed

6   concerns about those activities and the effect on the Illinois

7   River?

8   A.   We have expressed our concerns primarily on its direct

9   impact on the scenic river Barren Fork Creek immediately

10  downstream about one mile from the burrow area that Mr. Worley

11  operates from.

12  Q.   Does this type of activity also affect fish and fish

13  habitat?

14  A.   Whenever you have gravel mining or gravel burrowing in a

15  water body like the Illinois River, you're impacting the

16  chemical, physical and biological biota and characteristics of

17  the stream.

18  Q.   Let's talk for a moment about nurseries.  You had said

19  something during your pervious testimony that I wanted to talk

20  to you about.  Is it your understanding, Mr. Fite, that -- or

21  is it your belief, Mr. Fite, that there is monitoring going on

22  with regards to any outflow from the nurseries in the Illinois

23  River Watershed?

24  A.   At this point in time, I don't know what the relationship

25  is between the Department of Ag and the nursery operations.

1   Q.   Would it surprise you to know that there is no monitoring

2   of any outflow from the nurseries?

3   A.   It would.

4   Q.   If Mr. Sancho Dickinson testified that there is no

5   monitoring, would you have any reason to disagree with him?

6   A.   No.

7   Q.   Thank you, Mr. Fite.  I appreciate your time.

8   A.   Thank you.

9           THE COURT:  Mr. Garren.

10          MR. GARREN:  I didn't know whether you wanted to

11  break for Terri or not.

12          THE COURT:  We'll wait for about seven to eight

13  minutes.

14          MR. GARREN:  A little bookkeeping issue here, Judge.

15  I believe the Defendants' Exhibit 2211-02 was the only page

16  offered, but is a two-page document.  I believe you indicated

17  that the entire document was admitted.  I just wanted to clear

18  that up.

19          THE COURT:  Which one?

20          MR. GARREN:  2211-02 was the document being offered,

21  as I understood, and not the entire two pages.

22          THE COURT:  That is what was offered, this one page.

23  I did notice it's the second of two pages.  I don't have the

24  first page, so I don't know whether it would be hearsay.

25          MR. GARREN:  I think you said 2211 will be admitted,

1    but I think in actuality since it's two pages, it would be 02

2    of 2211.

3            THE COURT:  Good point.  That's Defendants' Joint

4    Exhibit 2211, page 2 is admitted.

5            MR. GARREN:  Thank you, Your Honor.

6                      REDIRECT EXAMINATION

7    BY MR. GARREN:

8    Q.   Mr. Fite, you've had an opportunity to list a lot of your

9    concerns here today on cross-examination, and I'd like to ask

10   you about some of those myself.

11           With regard to the written concerns that were

12   submitted through Enercon to this Watts facility, how many

13   people or -- sewage is treated at Watts, do you know?

14   A.   I would estimate between 3- and 400 individuals.

15   Q.   All right.  And with regard to some of the concerns that

16   you express on the Watts lagoon, it talks about natural seeps

17   and springs occurring in the area.  Is that comment with regard

18   to certainly the Oklahoma side of the Illinois River Watershed,

19   you find seeps and springs occurring in all of the watershed?

20   A.   Yes.

21   Q.   And if land-applied poultry waste was land applied on or

22   near those particular areas, would that cause concern to you

23   for the poultry waste being introduced into the watershed?

24   A.   Yes.

25   Q.   And with regard to your concern as expressed to this being

1    a hydrogeologically sensitive area, would you express that

2    concern for poultry waste being land applied also?

3    A.    Yes.

4    Q.    And you've expressed concern that the river can actually

5    back up and inundate land application areas.  Have you

6    personally observed areas of land application that were in a

7    floodplain?

8    A.    Yes.

9    Q.    And, likewise, would there be concern with floods or high

10   waters occurring, cleansing those fields of the poultry waste

11   that's been land applied on it?

12   A.    Yes.

13   Q.    Would you also have concerns that there is no runoff

14   prevention controls provided by the various users of the

15   poultry land-applied waste?

16   A.    Yes.

17   Q.    Have you observed many or any applying any type of

18   prevention controls for runoff on various fields that you

19   observed in the Illinois River Watershed?

20   A.    Only the establishment of riparian buffer zones.

21   Q.    Your agency is doing its best to re-establish those, is it

22   not?

23   A.    Yes, in cooperation with stakeholders.

24   Q.    Do you have any concern with regard to inadvertent or

25   advertent negligence of land-applied poultry waste occurring

1    within the watershed and proposing or causing concern to the

2    water quality of the river?

3           MS. LONGWELL:  Objection, Your Honor.  The question

4    calls for a legal conclusion and then negligent conduct of an

5    individual.

6           THE COURT:  Overruled.  Go ahead.

7    Q.   (By Mr. Garren) Does that cause concern for you with

8    regard to the handling and disposition of poultry waste, sir?

9    A.   Yes.

10   Q.   Do you know whether or not there are contaminants found in

11   poultry waste such as heavy metals, organic matter, bacteria,

12   viruses, etcetera?

13          MR. ELROD:  Your Honor, I object.  We can't let this

14   case get into things that are not contaminants of concern,

15   which they've clearly said are bacteria and phosphorus.  We'll

16   be here for an extra week.

17          MR. GARREN:  I'll rephrase.

18   Q.   (By Mr. Garren) With regard to bacteria and phosphorus,

19   does that cause concern for you for contaminants reaching the

20   Illinois River Watershed or its tributaries from land-applied

21   poultry waste?

22   A.   Yes, as I've demonstrated through my testimony.

23   Q.   In fact, sir, you have -- for many years had taken the

24   opportunity and the efforts to speak directly with many of the

25   poultry integrator defendant representatives, corporate

947

1   officers and executives, have you not?

2         MR. GREEN:  Your Honor, we've had a series of leading

3   questions.  This is another example.

4         THE COURT:  Sustained.

5   Q.  (By Mr. Garren) What effort have you taken, sir, to

6   express your concerns of those items that we've just talked

7   about to corporate representatives and executives of poultry

8   integrator defendants?

9         THE COURT:  I think we've been over that, haven't we,

10  adequately, Mr. Garren?

11        MR. GARREN:  I'd just like to hear it again, Judge.

12        THE COURT:  You stand alone, Mr. Garren.

13        MR. GARREN:  But I am standing.  All right.  I'll

14  move on.

15  Q.  (By Mr. Garren) Do you consider -- as in your letter to

16  Mr. Thompson discussing excessive nutrients on lands adjacent

17  to scenic rivers, do you consider that to include land-applied

18  poultry waste, sir?

19  A.   Yes.

20  Q.   You wrote a letter in August of 2004 on the stationery of

21  the Scenic Rivers Commission addressing the issue of commercial

22  fertilizer, correct?  That's Defendants' 1079.

23  A.   Yes.

24  Q.   Did you voluntarily write that letter, or were you

25  instructed to?

948

1   A.   This was a letter as a result of action taken by the board

2   of directors that I report to on their August 17 regular

3   business meeting.

4   Q.   And what is the concern with the commercial fertilizer

5   used in the basin, sir?

6   A.   The Board of Commissioners and staff believe that it

7   should be all-encompassing, not to pick out just one party.

8   That if there's going to be too much fertilization in the

9   basin, for instance, the poultry waste, then the same should

10  hold for the commercial fertilization.  It's a nutrient-

11  sensitive watershed.

12  Q.   That concern about that particular commercial nutrient is

13  just what?

14  A.   It's just as dangerous -- or not as dangerous.  But it

15  will grow algae just as well as the poultry waste will.

16  Q.   How does it do that when you put it on the land?

17  A.   It will wash off with runoff from the rains.

18  Q.   Not any different than poultry waste, is it?

19  A.   No difference.

20  Q.   You made a comment about this 60,000 gallons of waste this

21  year in '04 that was being removed.  Did that include permanent

22  facilities, did I hear you to say?

23  A.   Yes.

24  Q.   And there are how many permanent facilities?

25  A.   There's 12 or 13.  I'm having trouble with my math today.

1    Q.   Do any of those permanent or portable facilities come

2    loaded already with gallons of treating-type liquids,

3    sanitizers, things of that nature?

4    A.   Yes.

5    Q.   So to the extent that you're speaking of gallons of waste,

6    it really includes some of that which is already in the

7    container, correct?

8             MR. ELROD:  Objection, leading.

9             THE COURT:  Sustained.  Rephrase.

10   Q.   (By Mr. Garren) Do they come with contaminant liquids --

11   or disinfecting liquids in the facility when they are

12   delivered?

13   A.   And also smell abatement, yes, to the tune of about 20

14   gallons, 25 gallons.

15   Q.   Is that per facility?

16   A.   Per cleaning.  Those facilities were cleaned twice a

17   week.  17 would be 34 cleaned once a week.

18   Q.   Would that be included in the 60,000 gallon number that

19   you alluded to?

20   A.   Yes.

21   Q.   Do you know how many gallons are contained in the honey

22   wagon similar to the one we saw in the picture earlier?

23   A.   Depends on the size of the tank and vehicle.

24   Q.   Do you have a range of what you know those can contain?

25   A.   Anywhere from 1500 gallons up to 4000.

1    Q.   And do you know, how often is a single truck used for

2    application -- let me restate.  That's kind of crazy.

3           Are multiple applications of a truck utilized on a

4    field when an application occurs using these honey wagons?

5    A.   These trucks will go back and refill and come back and

6    finish a field if they don't complete it with the first load.

7    Q.   Do you have any idea what the per-gallon, per-acre

8    application rate is by those honey wagons?

9    A.   I do not.

10   Q.   You were -- let me go back to when Mr. Elrod was cross-

11   examining you, and he talked about --

12           THE COURT:  Mr. Garren, I'm going to interrupt.  It's

13   time for our midafternoon recess.  We'll take about 15 minutes.

14           (Whereupon a recess was had.)

15           THE COURT:  Mr. Garren.

16           MR. GARREN:  Thank you, Your Honor.

17   Q.   (By Mr. Garren) Mr. Fite, earlier Mr. Elrod took you up

18   the river and pointed out numerous cattle operations.  Do you

19   recall that testimony?

20   A.   Yes.

21   Q.   You have observed the operations in these areas, have you

22   not?

23   A.   Yes.

24   Q.   And have you observed the land application of poultry

25   waste in those cattle operations?

1   A.    On some, yes.

2   Q.    Have you, in fact, received complaints at any time about

3   people becoming sick, having visited the river?

4   A.    Yes.

5   Q.    And as a result of receiving those complaints, what did

6   you do?

7   A.    The most recent would have been this summer and -- just

8   thinking out loud, a lady called in and said there were a

9   couple of individuals from --

10          MR. GREEN:  Your Honor, I object.  Hearsay.

11          MR. WEEKS:  Object.  Hearsay.

12          THE COURT:  Sustained.

13  Q.    (By Mr. Garren) As a result of your receipt of that

14  call --

15  A.    I forwarded that concern to the Department of

16  Environmental Quality.

17  Q.    Do you know whether or not there was any follow-up report

18  made to your agency about that?

19  A.    There has not been.

20  Q.    Mr. Elrod made the point that Benton and Washington County

21  and parts of Delaware and Adair County are, "the largest

22  cattle-producing areas."  How would you characterize those same

23  areas for producing poultry?

24  A.    Poultry waste on the land is what's made those areas able

25  to support the cattle that they have.

1  Q.   And how would you characterize the number or concentration

2  of the poultry-growing operations in those areas?

3  A.   More so than in the Cherokee County where I live.

4  Q.   How would you characterize the volume of commercial

5  fertilizer use, based on your observations from that of the use

6  of land-applied poultry waste in the basin?

7        MR. GREEN:  I don't see how the witness would be in a

8  position to make that assessment.

9        THE COURT:  Sustained.

10 Q.   (By Mr. Garren) Based on your observations, have you

11 observed commercial fertilizer being applied?

12 A.   Yes.

13 Q.   And how do you know that that's what's being done?

14 A.   Type of buggy or vehicle used to land apply the material.

15 There's a difference between poultry waste, which once it's

16 been applied, it's a different type of vehicle, but it leaves a

17 dust stream behind the vehicle as it's land applying; whereas,

18 commercial fertilization has very little associated dust and

19 particulates behind the buggy.

20 Q.   The buggy, what size is it in comparison to a typical

21 spreader truck that you see in the watershed?

22 A.   Typically three to four tons.

23 Q.   How does that compare to a spreader truck?

24 A.   The spreader truck is going to be more bulky material.

25 Poultry waste is bulkier than commercial fertilization.

1   Q.   Is that truck larger than its bed?

2   A.   The poultry applicator vehicle would be bigger than the

3   commercial fertilization.

4   Q.   Now, I believe Mr. Green asked you about what all has been

5   humanly possible to be done.  And other than your writing

6   letters or resolutions coming from your Commission, have there

7   been other things that you have done to attempt to preserve and

8   protect the watershed in particular from poultry waste being

9   land applied in the watershed?

10          MR. GREEN:  Object to the form of the question.  The

11  questions I had of the witness were not what he did that

12  qualifies as the most one humanly can do, but whether the

13  State's activities or particular lack of activity by the State

14  amounted to undertaking all humanly possible initiatives.

15          THE COURT:  Overruled.  This is in the context of

16  Oklahoma Scenic River Commission, correct?

17          MR. GARREN:  Correct.

18          THE COURT:  Overruled.  Go ahead.

19          THE WITNESS:  Please repeat the question.

20          MR. GARREN:  Can I just have you read it back,

21  please.

22          (The requested portion was read back by the court

23  reporter.)

24          THE WITNESS:  Yes.

25  Q.   (By Mr. Garren) Tell the Court what you've done other than

1  things maybe we've already heard today, to make it quicker and

2  easier for the Court.

3  A.   Related to poultry waste?

4  Q.   Yes.

5  A.   Conservation easements.  Visiting with integrators,

6  suggesting that they move the waste to areas that proper

7  disposal or land application for nutrient uptake could be

8  accomplished.  Looking at taking waste to energy possibly.

9  Looking at developing a fuel source out of it outside of

10 burning it.  Looking at it as a feed supplement after it's been

11 composted.  A number of things.

12 Q.   They showed you a list of BMPs.  Have you seen that list

13 before or something similar to it?

14 A.   Yes.

15 Q.   And do you feel like that particular list is, by itself,

16 sufficient to mitigate land-applied poultry waste from entering

17 the waters of the Illinois River Watershed?

18       MR. ELROD:  I object, Your Honor, it calls for

19 opinion testimony.

20       MR. GARREN:  Seems to me the defendants have been

21 asking his opinion all afternoon, Judge, and I thought this was

22 right up the same alley when they talked about the various

23 aspects of the BMPs, whether you would modify it, would you

24 address it differently.  And I'm trying just to follow up on

25 that same question.

1          MR. WEEKS:  I don't believe those questions were

2   asked, Your Honor.  I think he volunteered those answers about

3   the extent to which he may modify or -- but those questions

4   weren't asked.

5          THE COURT:  I think in a way, it's the reverse side

6   of the coin as to whether or not the State has done all that's

7   humanly possible.  Overruled.  You may answer.

8   Q.    (By Mr. Garren) Do you remember the question?

9   A.    I do not.

10          MR. GARREN:  Can you read it back one more time.

11          (The requested portion was read back by the court

12   reporter.)

13          THE WITNESS:  I remember the question now.  No.

14   Q.    (By Mr. Garren) And what do you think would be important

15   as a BMP, if you had an opportunity to add to that list?

16   A.    First and most important thing would be to have an

17   appropriate soil sample of the subject field for which land

18   application is going to be placed thereon.

19   Q.    And how does that, in and of itself, assist or mitigate

20   the problem that you think exists?

21   A.    It controls oversaturation, overapplication, base and --

22   base application on agronomic uptake of the particular plant

23   that's being targeted.  If it's grass, you're going to have one

24   level.  If it's alfalfa, you're going to have a different

25   level, so forth.

956

1   Q.   So you're suggesting that it be applied at the rate that's

2   shown necessary under appropriate soil test?

3   A.   Specific to that field --

4           MR. GREEN:  Objection, leading, Your Honor.

5           THE COURT:  Sustained.  Rephrase.

6   Q.   (By Mr. Garren) What is it you're suggesting with regard

7   to the benefit of the soil test?

8   A.   Soil -- there should be a soil test on every parcel of

9   land in which poultry waste or any other fertilization is going

10  to be land applied or incorporated.  If not, then you're

11  wasting economic value of that resource and you're causing

12  environmental degradation.

13  Q.   We're seeing soil tests being taken now, are we not?  Is

14  it in Oklahoma a requirement to have a soil test?

15  A.   I have an opinion about soil testing, and I don't

16  believe --

17          MR. GREEN:  Objection.  Nonresponsive.

18          THE COURT:  Sustained.

19  Q.   (By Mr. Garren) Is it correct that we do have soil tests

20  being conducted today?

21  A.   Yes.

22  Q.   So how is it that a soil test, based on your previous

23  answer, change --

24  A.   All soil tests are not uniform.

25  Q.   What is the purpose behind having a soil test?

1    A.    To tell you what the constituency of available nutrients

2    within that parcel of land that's being sampled contain.

3    Q.    Once you know that, what -- how does that help?

4    A.    Helps you to develop your strategy for what nutrients that

5    you would incorporate to grow a particular crop or grass.

6    Q.    Now, Mr. Weeks pointed out how George's had, at least by

7    inference, responded to your pleas of changing behavior in the

8    land application of poultry waste.

9          When George's was applying in the property in the

10   Chance, Oklahoma area, do you have personal knowledge of where

11   that waste came from?

12   A.    Yes.

13   Q.    Where was it?

14   A.    It was coming from outside the state of Oklahoma.

15   Q.    Do you know where outside the state?

16   A.    Yes.  At one of their corporate farms.

17   Q.    Mr. Tucker talked about balancing the interest, and he

18   mentioned ranchers, cattleman, developers.  I don't recall --

19   maybe you might -- did he mention poultry growers and handling

20   and disposition of poultry waste?

21   A.    I don't recall.

22   Q.    Do you think his list is adequate, based upon what he

23   believes is necessary to balance the interest in the Illinois

24   River Watershed?

25   A.    I believe all stakeholders should be included.

1  Q.   Would that include the use, handling and disposition of

2  poultry waste?

3  A.   Yes.  Poultry companies and poultry growers are as

4  important to the overall synergy of an approach to the

5  watershed as any other group or stakeholder.

6  Q.   Isn't it a fact, sir, that they might be creating or

7  producing more waste than any other element within the

8  watershed?

9  A.   That is potentially correct, yes.

10        MR. GREEN:  Objection, Your Honor, leading.

11        THE COURT:  I'm sorry.  The basis?

12        MR. GREEN:  Leading.

13        THE COURT:  Leading?  I'm sorry, I didn't hear the

14  basis.  Sustained.  Rephrase.  And the answer is stricken.

15        MS. LONGWELL:  Your Honor, we also object with

16  regards to it asking for a causation opinion.

17        THE COURT:  Sustained on that basis as well.

18  Q.   (By Mr. Garren) Have you seen the numbers of waste --

19        MR. GARREN:  Are you just burning calories,

20  Mr. Green, or are you intimidating the witness?

21        MR. GREEN:  Just burning calories, and this allows me

22  to hear a little better than when I'm seated.  So I hope I'm

23  not bothering --

24        MR. GARREN:  Some witnesses would be intimidated and

25  distracted by it, Judge.  And I know it's been happening --

959

1          THE COURT:  I don't think Mr. Fite is intimidated by

2     much.

3          THE WITNESS:  I just thought he wanted to look at my

4     good looks.

5          MR. GREEN:  Stipulate.

6          THE WITNESS:  Stimulated?  Oh, no, we've got to get

7     out of here.

8     Q.   (By Mr. Garren) Mr. Fite, do you know whether or not,

9     based upon your personal observations, travel and experience in

10    the watershed, poultry waste is tilled into the soil when it's

11    applied?

12    A.   It is not.

13    Q.   You were questioned about 400,000 recreators being within

14    the Illinois River Watershed.  Those are not all floaters; is

15    that correct?

16    A.   That's correct.

17    Q.   So can you kind of categorize some of the recreators or

18    list them for the judge that you're trying to include in that

19    number.

20    A.   Approximately 150- to 180,000 are going to be potential

21    floaters that will utilize the river by inner tube, kayak,

22    canoe, or raft.  The remaining numbers would be swimmers,

23    fisherman, campers, day users, hunters, equestrian tours,

24    mountain bike rides, motorcycle poker runs.  Did I say

25    hunting?  Hunting.  And foliage tours in the fall.  Spring

1    foliage tours.  Church baptisms.  Church retreats.  Groups like

2    Alcohol Anonymous, Narcotics Anonymous, groups like that coming

3    to some of the places along the river.  We have New Life

4    Ranch.  Heart of the Hills Salvation Army camp.  Camp Egan.

5    Camp Lutherhoma.  A number of church outcamps that bring

6    children to the Basin annually for spiritual enhancement and

7    recreation.

8            You have many, many universities that come to the

9    Illinois River to study everything from geography to water

10   quality to other issues from Northeastern State University,

11   Tulsa University, Oklahoma State University, OU.  Have Cameron,

12   Murray State, University of Arkansas, Arkansas State.  The list

13   goes on and on.  But there is approximately 4- to 500,000

14   people that use the river for one purpose or another.

15   Q.   They're not all taking restroom breaks inside the river,

16   are they?

17   A.   No.

18            MR. GARREN:  No other questions, Your Honor.

19            MR. ELROD:  Your Honor, for humanitarian reasons, I

20   have no further questions.

21            THE COURT:  Any other recross?

22            MR. GREEN:  I've got a couple.

23            THE COURT:  Mr. Green.

24            MR. GREEN:  Very quickly.

25

961

<u>RECROSS EXAMINATION</u>

BY MR. GREEN:

Q.    For nonhumanitarian reasons.

        Before the break when Mr. Garren was up here at the lectern, he asked you a number of questions that were designed to have you comment and provide your concerns with respect to certain situations.  Do you remember that?  Talked about whether poultry litter was applied in floodplains or flood zones.  I can't remember the exact language.  And you were invited to tell us if that concerned you.  Do you remember that?

A.    Yes.

Q.    You expressed a number of other concerns, correct?

A.    Yes, sir.

Q.    Now, would it be fair to say that each and every concern that you identified and expressed in answer to those questions of Mr. Garren, you have also communicated those concerns to one or more officials of the State of Oklahoma?

A.    Yes.

Q.    So there's no possibility here that any of your concerns have been kept secret from the State of Oklahoma; is that right?

A.    Pardon me for saying this.  Where do you live?

Q.    I live in Minnesota.  But now I live in Washington.  I grew up in Minnesota.

1   A.    What part?

2   Q.    Central Minnesota.

3   A.    The reason I asked is that everyone knows who I am,

4   apparently, in Oklahoma.  And anyone that knows me by name

5   knows that I have been the one beating the drums to protect our

6   scenic rivers since 1983.  And every week, someone says, this

7   Ed Fite guy says something in the paper.  So I would say yes.

8   Q.    I'm not here to deny you the credit that you deserve for

9   your --

10  A.    I don't want any credit.  I'm just saying --

11  Q.    But it does sound, sir, having listened to your testimony,

12  and having listened to the specific answers that you've given

13  to some of the other lawyers who have stood at this podium here

14  this afternoon and this morning and questioned you, that all

15  roads seem to lead to Rome.  Do you know what I mean by that?

16  A.    When I am in Rome, I do as the Romans do.

17  Q.    All of these concerns that you have exhibited and

18  expressed, they are concerns which can legitimately be dealt

19  with by the government of the state of Oklahoma; is that not

20  correct?

21          MR. GARREN:  Objection, Your Honor, it calls for a

22  conclusion, some speculation, and certainly outside the scope,

23  as evidenced here today from the Scenic Rivers Commission

24  standpoint.

25          THE WITNESS:  I certainly wish that I had --

1          THE COURT:  Overruled.  Go ahead, sir.

2          THE WITNESS:  I certainly wish I had your expertise

3   and all the other lawyers that are in this room to help me wage

4   that battle in the State House.

5   Q.   (By Mr. Green) Okay.  And perhaps that's where it ought to

6   be waged rather than in this courtroom; isn't that correct,

7   sir?

8   A.   I'm talking about if I had your expertise, some of the

9   issues that we're dealing with here today might have been

10  evaded.

11  Q.   Have you been to the State House to petition the State

12  House --

13  A.   Yes.

14  Q.   -- with respect to your concerns?

15  A.   Yes.

16  Q.   And you're still waiting for relief; is that right?

17  A.   It's hard for me to go up against the farm lobby.

18  Q.   Very well, sir.

19          MR. WEEKS:  I can't help myself, Your Honor.  Just a

20  couple of quick questions here.

21                    RECROSS EXAMINATION

22  BY MR. WEEKS:

23  Q.   If we could put Addendum D back up there, because I never

24  intended to suggest to you -- and you understood this, I'm

25  sure, Mr. Fite -- that the BMPs was the answer to the poultry

1  litter application question.  You understood that, didn't you?

2  A.    Yes, sir.

3  Q.    You understood that that predated any regulations or laws

4  that were in place here in the state of Oklahoma, correct?

5  A.    Yes, sir.

6  Q.    And that it was an interim measure in an effort to do

7  something, correct?

8  A.    Yes, sir.

9  Q.    In fact, at the very top of it, it says -- at that time,

10  you could get a nutrient management plan from the government,

11  couldn't you, sir?

12          MR. GARREN:  Object to form.

13  Q.    (By Mr. Weeks) Did you know at that time you could get a

14  nutrient management plan from the government?

15          MR. GARREN:  I'd ask that "the government" be defined

16  here, Your Honor, whether we're talking about the federal

17  government or the state government.

18          THE COURT:  Sustained.

19  Q.    (By Mr. Weeks) Were you aware that the federal government

20  would undertake to provide a plan?

21  A.    Producers didn't understand it under those words.  They

22  either saw it as a farm plan, farm management plan or ranch

23  management plan, but not a nutrient management plan.  That's a

24  new concept.

25  Q.    You understood what I'm talking about, right?  So prior --

1   well, this particular document says it's recommended that a

2   grower get one of those.  But in the interim, until you do,

3   this is what's in place.  And you understood it that way,

4   didn't you?

5   A.   Yes.

6          MR. GARREN:  Judge, I'm going to object because we're

7   talking about a document this witness has failed to be able to

8   identify, said he hadn't seen it before.  We've gone through

9   the document at this point.  Again, he's never seen the

10  document.

11         MR. WEEKS:  He just asked him about how adequate he

12  thought it was, Your Honor, so apparently he's talking about

13  it.

14         THE COURT:  The objection is overruled.  And the

15  answer was elicited prior to the objection.  Go ahead,

16  Mr. Weeks.

17  Q.   (By Mr. Weeks) Now, I wanted to go back to -- you talked

18  about this twice now -- to Chance, Oklahoma.  And you said that

19  there was some application of the liquid manure in Chance,

20  Oklahoma by George's, correct?

21  A.   Yes.

22  Q.   Now, the first time I heard you testify about that, you

23  said this occurred back in the '80s, is my recollection.  Am I

24  right about that?

25  A.   The '80s would have been at Dean Wilmoth's property.

1  Q.   So this has occurred since then, is what you're saying?

2  A.   Yes.

3  Q.   And to your knowledge -- to your knowledge, is the land on

4  which it is applied permitted to accept that?

5        MR. GARREN:  Object to the form "permitted,"

6  Your Honor.

7        MR. WEEKS:  "Permitted" is permit, gets a permit.

8  You've got to have a permit.

9        MR. GARREN:  Ask the foundation be laid as to whether

10  or not this witness knows whether or not a permit is, in fact,

11  required or necessary.

12        THE COURT:  All right.  Sustained.  Rephrase, please.

13  Q.   (By Mr. Weeks) Mr. Fite, you testified earlier that if

14  biosolids were being sprayed in the watershed that you would

15  have to get a permit from Oklahoma Department of Environmental

16  Quality, didn't you, sir?

17  A.   For municipal or industrial biosolids.

18  Q.   Now, do you know if that's the same agency that

19  provides -- that permits the property for this stuff, for the

20  liquid manure to go down?

21  A.   For agricultural biosolids, that's going to be Dan Parrish

22  at the Oklahoma Department of Agriculture, Food and Forestry.

23  Q.   And he actually issues a permit for that, don't they, sir?

24        MR. GARREN:  Objection, Your Honor, failed -- again,

25  failure to have a foundation of what ODAFF does.

1          THE COURT:  Counsel is well familiar with this

2   dispute as to whether this constitutes permit or not.  Let's

3   just --

4          MR. WEEKS:  This is different, Your Honor.

5          THE COURT:  Let's just -- can I finish my sentence?

6          MR. WEEKS:  I'm sorry.

7          THE COURT:  If we're talking about an Animal Waste

8   Management Plan, let's talk about that and get away from this

9   definition of a permit here.  The Court will decide that

10  issue.  Sustained.  Rephrase.

11  Q.  (By Mr. Weeks) With regard to the application of liquid

12  fertilizer, isn't it true, sir, that the State has to issue an

13  actual permit for that liquid manure to be put on that

14  property?

15          MR. GARREN:  Again, Your Honor, my objection is to

16  the foundation for this --

17          MR. WEEKS:  He either knows or he doesn't.

18          THE COURT:  Once again, Mr. Weeks, allow Mr. Garren

19  to complete his sentence so I know the basis for his

20  objection.  We've got two good advocates, and sometimes we have

21  to just allow somebody to finish their sentence.

22          Go ahead, Mr. Garren.

23          MR. GARREN:  We're in Oklahoma on the application

24  side, and I don't think there's been any foundation that a

25  permit, as the term is being used by counsel, is required, let

1    alone that this witness knows that there is such a --

2            THE COURT:  As before, the objection is sustained.

3    You may rephrase.

4    Q.   (By Mr. Weeks) Did you know -- or do you know, Mr. Fite,

5    if in the state of Oklahoma that an actual permit for the land

6    application of liquid fertilizer, poultry fertilizer, is

7    required before it can be land applied?  I'm not talking about

8    a nutrient management plan.  I'm talking about an actual

9    permit.

10   A.   That's a question that I have to rely on Dan Parrish at

11   ODAFF to answer.

12   Q.   So you wouldn't know if the land where this is applied is

13   permitted for this purpose --

14   A.   That's correct.

15   Q.   -- correct?

16   A.   That's correct.

17   Q.   Very good.  Very good.  When we previously talked about

18   the litter that was being transported out of the Illinois River

19   Watershed by George's and which has been transported beginning

20   in 2003 to the present, did you understand that George's has

21   control of that litter that it's actually taking out of the

22   watershed?

23   A.   Yes.

24   Q.   You understood that was coming off of company-owned or

25   operated or managed farms, right?

```
 1   A.    Yes.

 2           MR. WEEKS:  No further questions.

 3           THE COURT:  Are we talking -- just for my education

 4   here, are we talking about the permit required of someone who

 5   actually applies the liquid manure?  Is that what we're talking

 6   about here?

 7           MR. WEEKS:  What we're talking about here,

 8   Your Honor, is that that liquid manure can only be applied on

 9   permitted land.

10           THE COURT:  All right.  Well, then, you've got to

11   educate me as to that.

12           MR. GARREN:  I'd like a citation to that,

13   Your Honor.  He may be speaking to Arkansas, but --

14           THE COURT:  I've not seen that, but perhaps it's

15   true.  In any event, another issue for us.

16           Go ahead, Mr. Sanders.

17           MR. SANDERS:  Very briefly, Your Honor.

18                       RECROSS EXAMINATION

19   BY MR. SANDERS:

20   Q.   Mr. Fite, it was the State of Oklahoma that removed the

21   Scenic Rivers Commission's jurisdiction over that segment of

22   the Barren Fork where gravel mining is going on; is that

23   correct?

24   A.    No.  That gravel mining operation for Mr. Worley, if

25   that's who you're alluding to --
```

1    Q.    Yes.

2    A.    -- is located approximately one mile upstream of the

3    portion of the Barren Fork Creek that is designated an Oklahoma

4    scenic river.

5    Q.    Okay.  Well, all right.

6    A.    The Barren Fork is designated from downstream of that

7    gravel operation at the Barren Oklahoma bridge at US 59 where

8    it crosses the Barren Fork Creek.

9    Q.    Let me ask it this way:  Is the scenic river designation,

10   is that controlled by the State of Oklahoma?

11   A.    Yes.

12   Q.    And it is the State of Oklahoma's choice that that segment

13   of the Barren Fork not be included within the scenic river

14   area; is that correct?

15   A.    Yes.  Since 1970, that decision has been made.

16   Q.    Okay.  So it is the State of Oklahoma's policy choice to

17   allow gravel mining to continue at Barren Fork today; is that

18   correct?

19   A.    The State of Oklahoma has been engaged or currently still

20   engaged in litigation against Mr. Worley.  I don't know the

21   resolution of that.

22   Q.    There's an ongoing civil action to enjoin that?

23   A.    Yes.

24   Q.    Thank you.

25            MR. TUCKER:  No thank you, Your Honor

 1            MS. LONGWELL:  I have no questions.

 2            THE COURT:  Very well.

 3            MR. GARREN:  Thank you, Your Honor.

 4            THE COURT:  You may be excused.

 5            THE WITNESS:  Judge, I'd like to invite you to come

 6   to the river take a kayak trip with me, and we will have a

 7   conversation hopefully that won't be objected to.

 8            THE COURT:  Mr. Fite, if it would get me recused, I'd

 9   be happy to.  Maybe after this litigation is all over.  Thank

10   you, sir.

11            The plaintiff may call its next witness.

12            MR. NANCE:  Your Honor, the State of Oklahoma calls

13   Shanon Phillips.

14            (Witness sworn.)

15            THE COURT:  Would you state your full name for the

16   record, please.

17            THE WITNESS:  Shanon Phillips.

18                         SHANON PHILLIPS,

19   having been first duly sworn, was called as a witness and

20   testified as follows:

21            MR, BULLOCK:  While we're doing that, could Mr. Fite

22   be excused from the Rule?  He'd like to stay and watch some of

23   it.

24            THE COURT:  Any objection?

25            MR. WEEKS:  Not from George's, Your Honor.

1          MR. ELROD:  I don't think so, Judge.

2          MR. HOPSON:  No objection, Your Honor.

3          MR. SANDERS:  No objection, Your Honor.

4          MR. TUCKER:  No objection.

5          THE COURT:  Hearing no objection, Mr. Fite, you're

6  welcome to stay, sir.

7          You may inquire.

8                    DIRECT EXAMINATION

9  BY MR. NANCE:

10 Q.   Ms. Phillips, would you tell the Court, please, what you

11 -- what your job is at the present time.

12 A.   I'm the director of the Water Quality Division of the

13 Oklahoma Conservation Commission.

14 Q.   Would you give the Court a brief overview of the mission

15 of the Oklahoma Conservation Commission.

16 A.   The mission of the Conservation Commission is to conserve,

17 protect and restore Oklahoma's natural resources in cooperation

18 with conservation districts and our other conservation

19 partners.

20 Q.   Would you tell the Court, please, what your formal

21 education is.

22 A.   I have a bachelor's degree in biology from Kansas State

23 University and a master's degree in zoology from Oklahoma State

24 University.

25 Q.   When did you get your bachelor's degree from Kansas State?

1  A.    In 1990.

2  Q.    And your zoology master's from OSU?

3  A.    1995.

4  Q.    What kind of work did you do, just very briefly, in your

5  master's degree in zoology?  What were your topics of study?

6  A.    I focused on aquatic ecology, and the topic of my research

7  was nutrient limitation in Lake Tenkiller.

8  Q.    Have you begun any work on a Ph.D.?

9  A.    Yes.

10 Q.    Have you completed that?

11 A.    No.

12 Q.    Let's talk for a moment, if we can, about your

13 professional job history, starting -- well, back when you were

14 at OSU, if you would, please.

15 A.    I was a research assistant for the water quality research

16 laboratory at OSU.

17 Q.    What kind of work did you do in the water quality research

18 lab?

19 A.    We did field work and laboratory analysis, mostly studying

20 lakes in the state of Oklahoma.

21 Q.    What was your next job after you were a research assistant

22 at OSU?

23 A.    I was a Carl Albert executive fellow at the Oklahoma Water

24 Resources Board in their Water Quality Division.

25 Q.    When did you start with the Water Resources Board?

1    A.    In 1995.

2    Q.    As a Carl Albert executive fellow, what did you do for the

3    Water Resources Board?

4    A.    I studied lakes in the state of Oklahoma, field work and

5    focused primarily on clean lake 314 studies.

6    Q.    When you say, "clean lake 314 studies," what do you mean?

7    A.    EPA -- under the Clean Water Act, Section 314 focuses on

8    clean lake studies, their diagnostic and feasibility studies.

9    Q.    What lakes did you look at in doing that work for the

10   Water Board?

11   A.    Lake Wister, Lake Henrietta, and Lake Arcadia primarily.

12   Q.    Did you do any work in Tenkiller?

13   A.    I did participate in summer field sampling as part of

14   their lakes assessment program on Lake Tenkiller.

15   Q.    What was your next professional position after working for

16   the Water Board?

17   A.    I was a technical writer at the Conservation Commission.

18   Q.    When did you begin at the Conservation Commission?

19   A.    In 1997.

20   Q.    What kind of things did you do as a technical writer?

21   A.    We -- I analyzed data that had been collected by our field

22   monitoring staff and wrote reports on that data.

23   Q.    Just in the broad strokes, what kind of reports did you

24   write?

25   A.    Technical reports summarizing data collection for EPA,

1    Clean Water Act Section 319 projects.

2    Q.    What was the next position you held after being a

3    technical writer?

4    A.    I was the senior technical writer and quality assurance

5    officer.

6    Q.    Also at the Conservation Commission?

7    A.    Yes.

8    Q.    What did you do as a senior technical writer?

9    A.    I was in charge of assuring that the various reports we

10   were required to produce for EPA were assigned to the staff of

11   writers and that they were completed according to EPA

12   requirements.

13   Q.    And what position did you next have?

14   A.    I was the assistant director of the Water Quality

15   Division.

16   Q.    What did you do as the assistant director of the Water

17   Quality Division?

18   A.    I assisted the director and drafted the work plans that

19   defined the work that would be completed by the division using

20   EPA 319 funds.

21   Q.    Approximately when did you become the assistant director?

22   A.    Approximately in 2005.

23   Q.    Okay.  Did you have any budgetary responsibilities for the

24   agency?

25   A.    Yes.  My responsibility was to estimate the budgets that

1    would be necessary to complete the work required by EPA and

2    then track the spending related to those work plans and

3    projects and make adjustments if we were off course on budgets.

4    Q.    When did you become director of the Water Quality

5    Division?

6    A.    In March of this year.

7    Q.    And what are your responsibilities as director of the

8    Water Quality Division?

9    A.    I'm responsible for overseeing a staff of over 40

10   individuals who focus on our carbon sequestration program, our

11   319 nonsource program and our wetlands program.

12   Q.    In the broad strokes, just as an overview, Ms. Phillips,

13   could you tell us how the Conservation Commission conserves and

14   protects the natural resources of the state, particularly in

15   the Illinois River Watershed.

16   A.    The Conservation Commission has a water quality monitoring

17   responsibility.  We have monitoring staff who evaluate the

18   status of waters in the Illinois River.  We also have an

19   education program that works to address and educate citizens

20   about nonpoint source pollution in the watershed.  Then we also

21   offer through a cost share program incentives to encourage

22   landowners to adopt Best Management practices.

23   Q.    Is that the 319 program?

24   A.    It is, in part, the 319 program.

25   Q.    Tell the Court, please, what the 319 program is.

1  A.    319 is the section of the Clean Water Act that focuses on

2  nonpoint source pollution and specifically on nonregulated

3  types of nonpoint source pollution.

4  Q.    Tell the Court briefly what nonpoint source pollution is.

5  A.    Nonpoint source pollution, as opposed to point source

6  pollution, is point sources that comes from diffused sources,

7  often results from runoff of pollutants over land surface as

8  opposed to point sources that comes from a specific place in

9  time, such as an outfall from a discharge or a discharge from a

10 wastewater treatment plant or an industrial site.

11 Q.    Does the Oklahoma Conservation Commission, from time to

12 time, work with local conservation districts?

13 A.    Local conservation districts are our primary partners.

14 Q.    Does the Conservation Commission have any regulatory

15 jurisdiction as such?

16 A.    No.

17 Q.    Does the Conservation Commission have any regulatory

18 jurisdiction whatsoever in the state of Arkansas?

19 A.    No.

20 Q.    Has the Conservation Commission ever undertaken any

21 remedial measures for the IRW in Arkansas?

22 A.    The Conservation Commission has cooperated with Arkansas

23 state agencies to offer a litter transfer program that moved

24 litter out of the state of Arkansas in the Illinois River

25 Watershed.

1  Q.   We'll return to that in some detail later.  Has the

2  Oklahoma Conservation Commission studied remedies for nonpoint

3  source pollution in the Eucha-Spavinaw Watershed, next door to

4  the Illinois River?

5  A.   Yes.

6  Q.   Briefly, what has the Commission done there?

7  A.   The Commission has monitored water quality in the Eucha-

8  Spavinaw Watershed and offered education programs, and then on

9  a cautionary basis, demonstrated practices that are necessary

10  to address nonpoint source pollution.

11  Q.   Let's talk for a moment, Ms. Phillips, about your personal

12  experiences in the Illinois River Watershed.  When did you

13  first have any contact with the watershed?

14  A.   As a young child, probably around the age of two.

15  Q.   How did you begin to get to know the watershed?

16  A.   My grandmother taught at Northeastern State University,

17  and so we spent summers on Lake Tenkiller and playing in the

18  river, floating the river.

19  Q.   Do you ever go back to the river these days?

20  A.   Yes.

21  Q.   Just as a lay observer, can you compare and contrast the

22  river and the lake as you knew them as a child and as you know

23  them now.

24  A.   As a child, the waters were clearer and the rocks were

25  brightly colored.  I remember there being yellows and reds, and

1  I collected them as a child.  When we would float the river, my

2  parents would dump the canoe on purpose so they wouldn't have

3  to bring the rocks home.  And the lake, you could see your feet

4  when you're swimming in the lake.  Not just, you know, a

5  two-year-old's, but my parents could see their feet; whereas

6  now, you can't see the colors of the rocks because they're

7  colored -- they're coated with algae, so they're green or

8  brown.  And you can't see past your knees when you swim in the

9  lake.

10  Q.    What's the color of the water in the lake now?

11  A.    It's -- it varies depending on where you are in the lake,

12  but it ranges from a brown to a deep green.

13  Q.    When you were doing graduate school work, did you do some

14  work in the Illinois River Watershed?

15  A.    Yes.

16  Q.    What did the watershed look like in those times, just kind

17  of intermediate from childhood to today?

18        MR. GREEN:  Your Honor, this testimony -- I don't

19  mean to cut short counsel's interrogation, but it does begin to

20  be cumulative.  We've heard quite a bit of testimony from

21  witnesses giving their personal assessments of the quality of

22  the water, both historically and currently, and I respectfully

23  suggest that this -- you know, continuing of this kind of

24  testimony is not leading us forward to the more appropriate

25  topics that this trial needs to reach.

```
 1              THE COURT:  Can we touch upon it and move on?
 2              MR. NANCE:  We'll move quickly, Your Honor.
 3              THE COURT:  Okay.
 4  Q.  (By Mr. Nance) Quickly tell us what things looked like
 5  when you were a graduate student.
 6  A.   The river rocks were, again, coated with algae, but it was
 7  more of a periphyton or diatom community as opposed to
 8  currently there's more of a filamentous green algae community,
 9  and the lake was not as -- the chlorophyll concentrations
10  weren't as high, so it was clearer than it is now, but not as
11  clear as when I was a child.
12  Q.   If you could bring up Demonstrative No. 169.  First of
13  all, Ms. Phillips, could you tell us if this picture was taken
14  in the Illinois River Watershed?
15  A.   Yes.
16  Q.   And where in the Illinois River Watershed was it taken?
17  A.   This is Peach Eater Creek, a tributary of the Barren Fork
18  and the Illinois River Watershed.
19  Q.   Was this picture taken by a representative or an employee
20  of the Oklahoma Conservation Commission?
21  A.   Yes.
22  Q.   And does it fairly and accurately represent conditions
23  that are commonly found in that part of the Illinois River
24  Watershed?
25              MR. GREEN:  I object to "commonly found,"
```

1  Your Honor.  This is a photograph.  It depicts a condition on a

2  certain day at a certain time.  I have no problem with the

3  witness identifying the date and the time, if she is competent

4  to do so, but to generalize and call this a picture of common

5  conditions, I object.

6         THE COURT:  Sustained.  Rephrase.

7  Q.  (By Mr. Nance) Would you tell the Court, please, what kind

8  of algae appears in this picture.

9  A.  You see attached periphyton growing on the rocks in the

10 water.

11        MR. TUCKER:  If you don't mind, I'd like to have that

12 objection enforced.  We don't know when this was taken or the

13 time of year, the time of day.

14        THE COURT:  Can we find that out, Mr. Nance?

15 Q.  (By Mr. Nance) Can you nail down the time and the location

16 as best you can where this picture was taken?

17 A.  This was taken in the late fall or winter.  I don't have

18 the exact month or year.

19 Q.  Are there any wastewater treatment plants on Peach Eater

20 Creek?

21 A.  No.

22        MR. TUCKER:  I hate to interrupt, but my

23 understanding with a photograph, identify the photograph if

24 we're going to talk about it, we've got to -- if she didn't

25 take the photograph, it's -- she's going to be hard-pressed to

1  identify it specifically.  I object to her talking about the

2  photograph until we have better identified who took it, whether

3  she took it, when she took it, where at Peach Eater Creek she

4  was when she took it, time of day, that kind of thing.

5          THE COURT:  Sustained.

6  Q.   (By Mr. Nance) You didn't take this -- or did you take

7  this picture?

8  A.   No, I did not take this.

9  Q.   Is this sort of situation something -- this sort of algae

10 seen often in the Illinois River Watershed?

11 A.   Yes.

12 Q.   And does it represent what is often seen in the Illinois

13 River Watershed?

14          MR. GREEN:  Objection, Your Honor.

15          THE COURT:  Sustained.  Going back to the original

16 objection.  Could you identify the word that you used

17 identifying the type of algae, however?

18          THE WITNESS:  This is periphyton, or attached algae.

19          THE COURT:  Could you spell that.

20          THE WITNESS:  P-E-R-I-P-H-Y-T-O-N.

21          THE COURT:  As opposed to filamentous?

22          THE WITNESS:  As opposed to phytoplankton, which is

23 free-floating algae.

24          THE COURT:  So --

25          THE WITNESS:  Filamentous algae can be periphyton.

1    Periphyton is attached algae.

2            THE COURT:  All right.  Thank you.  The objection is

3    sustained.

4    Q.   (By Mr. Nance) Let us move to your -- to the graduate

5    school work you did in the Illinois River Watershed.  Could you

6    tell the Court what it was you did when you were working in

7    graduate school in the watershed.

8    A.    I was part of a research team, studying -- participating

9    in the 314 clean lake study on Lake Tenkiller, and I primarily

10   focused on nutrient limitation and algae in the lake.

11   Q.   Would you tell the Court what you mean when you say

12   "nutrient limitation."

13   A.    Nutrient limitation are the nutrients that control the

14   growth of algae community, so they're the nutrients that if you

15   added more of, there would be more algae growth and if you took

16   away, there would be less algae growth.

17   Q.   And as a result of your studies in graduate school and

18   Lake Tenkiller, did you determine what the limiting factor for

19   algae was?

20   A.    The limiting factor varied at certain points and during

21   times of the lake -- times of the year, but overall it was

22   determined to be limited by phosphorus.

23   Q.   Let's pull back just a little bit from what you did in

24   graduate school and talk about what it is -- a little more

25   about what you do as director and how you've come to know about

984

1    the Illinois River Watershed.

2            Would you tell the Court briefly what it is you

3    specialize in as the water quality director.

4    A.    As the water quality director, my main focus is nonpoint

5    source pollution and its effect on water quality.

6    Q.    And as that job applies to the Illinois River Watershed,

7    is there any particular kind of nonpoint source pollution that

8    you specialize in?

9    A.    Most of my work is focused on the effects of nutrients on

10   water quality.

11   Q.    Does that include the effect of nutrients on

12   eutrophication?

13   A.    Yes.

14   Q.    Have your studies and the work you have done since you

15   began in the watershed in 1992 given you specialized knowledge

16   and experience about how nutrients, particularly phosphorus,

17   behaves in the soil, at least as it regards phosphorus's

18   tendency to cause nonpoint source pollution?

19           MR. GREEN:  Objection.  I have several objections.

20           THE COURT:  Yes, sir.

21           MR. GREEN:  One is that that sounds like a perfectly

22   eloquent leading question.  But in addition to that, this

23   witness appears now to be asked questions which are seeking to

24   elicit specific expert opinions which have not been identified

25   and which we are not on notice with respect to specific expert

1  opinions, and I object on that ground as well.

2        THE COURT:  This witness has not been identified as

3  an expert for trial?

4        MR. NANCE:  As a matter of, fact she has been

5  identified as a nonretained expert in our disclosure letter of

6  April 1, 2008.  She's the second name on the list.

7        MR. GREEN:  That does not relieve -- I do not

8  believe, that does not relieve counsel or plaintiffs from the

9  burden of specifying what particular opinions they will seek to

10 elicit from her.

11       THE COURT:  Correct.  There was no disclosure?

12       MR. GREEN:  Not that I know of.

13       MR. TUCKER:  Your Honor, I would join in that

14 objection.  And I would suggest to the Court that the -- this

15 witness was first identified on the Rule 26 disclosure.

16 Perhaps I should come where you can hear me better.

17       THE COURT:  If you'll approach, Mr. Tucker, you can

18 share the mic with Mr. Nance.  I'm just trying to get to the

19 very fundamental question of whether or not proper disclosure

20 of these expert opinions has been made prior to trial.

21       MR. TUCKER:  This was a disclosure of Ms. Phillips in

22 the Rule 26 disclosure as a witness.

23       "Shanon Phillips was a writer, work plan development

24 specialist and data analyst until a month ago.  She is now

25 division assistant director.  She can speak to the statistical

1  and ecological meaning of data, cost of implementation and

2  structure of our relationship with various federal and state

3  agencies and programs.

4        "Subsequently, in April of 2008, the State identified

5  expert witnesses and a list of nonretained witnesses who may

6  offer expert testimony.  At that point, Shanon Phillips was

7  identified as having expertise in nonpoint source pollution,

8  water quality, current historical Illinois River Watershed

9  pollution, effects of remedies and programs on water quality."

10       Our first position is that we believe that with

11 respect to her -- the area in which she can testify as a

12 witness, that was identified in Exhibit A of the Rule 26

13 disclosures.  To the extent that the State may contend that the

14 April 1, 2008 enumeration of those topics which I just read to

15 you are sufficient to encompass the testimony that she's being

16 asked to give here, then it is our contention that under

17 Rule 26, she has become a witness who has been asked to -- the

18 equivalent of a specially retained witness, which requires a

19 Rule 26 report from her.

20       Any way you look at it, it comes back to the point of

21 Mr. Green, that there's been no disclosure of the opinions that

22 she intends to give.

23       THE COURT:  Mr. Nance.

24       MR. NANCE:  Your Honor, she is -- she is not a

25 specially retained expert.  She's been an employee of the State

1    of Oklahoma for 17 years doing water quality work in the

2    Illinois River Watershed.  I'm going to lay a foundation for

3    her expertise, but there's nothing -- there's nothing in the

4    rule that requires a Rule 26 report comparable to a retained

5    expert for a nonretained expert like Ms. Phillips.

6              THE COURT:  Rule 26(a)(2) doesn't make a distinction,

7    does it, between nonretained experts and retained experts?  It

8    simply says that you've got to accompany disclosure with a

9    written report, correct?

10             MR. NANCE:  Actually, (2)(B), Your Honor, the written

11   report section, says, "Unless otherwise stipulated ordered by

12   the court, disclosure must be accompanied by written report,

13   prepared and signed by the witness, if the witness is one

14   retained or specially employed to provide expert testimony in

15   the case or one whose duties as the party's employee regularly

16   involve giving expert testimony."

17             THE COURT:  You're saying although her duties are as

18   the State's employee, it doesn't regularly involve giving

19   expert testimony?

20             MR. NANCE:  That is correct.  She's never given

21   expert testimony.  I will develop what she has done, but she

22   has never given expert testimony in court prior to today.

23             THE COURT:  Did this issue ever come before the

24   magistrate judge or any of the magistrate judges that have been

25   assigned to this case?

1          MR. NANCE:  I don't believe so.  Your Honor, there

2     was a motion in limine that dealt with certain other

3     nonretained experts which was withdrawn by the defendants.

4     There was no motion made on Ms. Phillips at all.  And we

5     believe that we have satisfied our burden of disclosure in our

6     April 1, 2008 letter, which I can hand a copy up to you if you

7     would like to see it.

8          THE COURT:  Yes, please.

9          MR. NANCE:  In that letter, Your Honor, we listed,

10    beginning on the second page, a list of retained expert

11    witnesses who would provide Rule 26 disclosures, beginning with

12    Darren Brown and running through Dr. Winn, who I don't think

13    panned out, but others on that list.

14         Then we gave the second list beginning on page 3 of

15    nonretained witnesses who may offer opinion testimony.  And

16    you'll see that Ms. Phillips was so disclosed, as were the

17    general areas of her expertise.

18         Rule 26(2)(A) requires identification of a witness

19    that may be used at trial to present opinion testimony.  We

20    identified her and we gave the area of her expertise.  But

21    under -- the formal written report is only required under --

22         THE COURT:  I understand.  You've made your point.

23    Anything further?

24         MR. NANCE:  Nothing further on that, Your Honor.

25         THE COURT:  Surely we're not going to have this many

1  nonretained expert witnesses, three pages of them, correct?

2  We'll be here until next June.

3          MR. NANCE:  We will not be here until next June.  We

4  will not have nearly that many, Your Honor.

5          THE COURT:  All right.  Mr. Tucker.

6          MR. TUCKER:  Notice how well we are sharing this

7  podium, by the way, Your Honor.

8          THE COURT:  You-all are doing very well.

9          MR. NANCE:  We try to play well with others,

10  Your Honor.

11          MR. TUCKER:  Well, that's better than too much gray

12  hair, I guess.

13          Your Honor, the point I'm trying to make is this.

14  Certainly Section (2)(B) is the applicable section.  The

15  disclosure that was made -- let me, if I may, hand this up.  I

16  realize you don't want to search on your computer.  If you'll

17  look at the disclosure made on the Rule 26 initial disclosures

18  list for Shanon Phillips, those topics of testimony are the

19  things that Ms. Phillips has identified as what her duties and

20  responsibilities are in her deposition and, to less extent, in

21  this Court here today.

22          She has identified that since that time, since she's

23  no longer assistant director, but now director, she has layered

24  on more administrative responsibilities that she didn't have

25  before.

1          But the point I'm trying to make is that in April,

2    2008 when they decided to make her a Rule 26(b) witness, the

3    test you then have to look at is, is what the person is being

4    asked to testify about what they do every day on the job, are

5    they being listed to talk about things for the purposes of this

6    trial.  Because it's the substance of the expert's testimony,

7    not the fact that they're an employee that determines whether

8    they get converted to a Rule 26(A) expert for purposes of

9    requiring the report.

10          If you will look at the topics that are added in

11    26 -- on April 1 of 2008, it is our belief, for example, the

12    question that's pending before her -- toward her right now has

13    to do with soil behaviors and soil science behaviors and soil

14    chemistry, which is clearly not something that is part of her

15    regular duties which were set out in the Rule 26 disclosure.

16          So it's our belief that when they chose to add these

17    other categories to the area of her testimony, that that made

18    her a person who, under Rule 26(B), is one who is considered by

19    the law to be retained or specially employed.  That doesn't

20    mean she can't testify.  That just means if she wants to give

21    those kind of opinions, she then is required to give a Rule 26

22    report, and that has not happened.

23          THE COURT:  As I'm reading 26(B), however, the

24    written report must be given in the event the individual is

25    employed by the party in those cases where one of the duties as

1   the party's employee regularly involves the giving of expert

2   testimony -- we haven't broached that subject with her here.

3   I'm assuming that is not the case, but that remains to be seen.

4              MR. TUCKER:  I believe that is correct.

5              THE COURT:  Otherwise, it would appear that the

6   question really becomes now whether or not the testimony that's

7   being elicited by the question before the Court is contained in

8   the description of her expertise of April 1, 2008, correct?

9              MR. TUCKER:  That's the first half of the question.

10  The second half of the question -- of it is -- I'll get my

11  grammar straight here in a minute maybe.

12             The second half of the question is when the

13  additional categories were added in April 1 of 2008, does that

14  meet the indicia that's required for determining whether the

15  witness has become retained or especially employed under the

16  meaning of Rule 26.

17             Your Honor, we have -- and this has not been

18  presented before -- although maybe an inconvenience, it may

19  have been better -- because we were uncertain whether she would

20  actually be asked opinions that would be outside the scope of

21  what was listed in the Rule 26 disclosure of actually what her

22  job consists of.  I mean Rule 26 -- the Rule 26 initial

23  disclosure, which is actually what her job is.

24             MR. NANCE:  What her job is is what she testified her

25  job was.

1          THE COURT:  I'm reading, and perhaps because I'm

2   reading this cold, I'm not reading it as you are, Mr. Tucker,

3   but it has the disjunctive "or."  If the witness is one

4   retained or specially employed to provide expert testimony in a

5   case -- which is not the case -- or the disjunctive, one whose

6   duties as the party's employee regularly involve giving expert

7   testimony...

8          So the fact that she was identified on April 1, 2008

9   doesn't mean that she's in the first category.  I suppose it

10  may raise the question as to whether or not she was converted

11  as of April 1, 2008 to an employee whose duties regularly

12  involve giving expert testimony, but if this is her first time,

13  then it doesn't appear that she falls within that category.

14  Correct?

15         MR. TUCKER:  If I might suggest -- and believe me,

16  I'm not pretending to be Jay Jorgensen.  I've only been to the

17  Supreme Court once, and that was for dinner.  And I had to pay

18  to do that.  But it's quite interesting, but I don't pretend to

19  be a legal scholar.  But this whole concept of a nonretained

20  expert, to me, when I read it, I read just as you read.  Well,

21  how could it be a specially retained expert because they

22  already worked for them.  So I asked my smart friends to

23  prepare a bench brief on that -- if I might offer that to the

24  plaintiff and to the Court -- which explains that the plain and

25  simple meaning of the words is not the way -- and it is in the

1  disjunctive, and that's why we believe that under the cases

2  that have been cited, Rule 26 questions like this, that

3  probably the law light version of looking at it would be to say

4  that if what she's talking about is what she does every day in

5  her job, even though there may be some opinion testimony mixed

6  in with it, like the doctor testifying about the patient that

7  he treats, then that's considered to be a nonretained expert.

8  No problem.

9        If, on the other hand, like a doctor that's asked to

10  review the findings of another doctor, even though it may be

11  the same topic, that converts the doctor to a nonretained

12  expert -- or to a specially retained expert.

13        It's our position that when her responsibilities for

14  testifying went beyond her Rule 26 disclosures in 2006, that

15  was -- that was when they converted her.  If she's to testify

16  on those topics, that's when the State chose to convert her

17  because she was now being asked to give opinions about things

18  for the purposes of this litigation.

19        THE COURT:  I can't say that as I sit here right now,

20  I'm particularly convinced.

21        Let me just ask you, Ms. Phillips, because I don't

22  know if the question has been asked:  Have you ever given

23  expert testimony in any other lawsuit?

24        THE WITNESS:  No.

25        THE COURT:  All right.  Are your duties described

1  such as to require you to regularly give expert testimony?

2           THE WITNESS:  No.

3           THE COURT:  All right.  Let me see if I can speed

4  read your bench brief here of six pages.

5           MR. TUCKER:  Mr. Jorgensen has arrived and -- he got

6  to have lunch there without having to pay for it.

7           MR. GREEN:  Would you allow me?

8           THE COURT:  When I went up there last, I took my twin

9  boys, and they put us as close to the edge as possible and put

10  one of the administrators there to make sure my twin boys

11  wouldn't misbehave.

12           Let me read this quickly, and it will give me a

13  chance.  If memory serves me correct, I think they served

14  chicken.

15           All right.  Mr. Tucker, given the fact that this

16  witness did her master's thesis on a related subject, her

17  proposed testimony takes her out of the situation that was

18  presented apparently in B.H. v. Gold Fields Mining Corp.

19  correct, where the individual was determined to be a

20  nonretained expert, but was apparently specially employed for

21  purposes of the case?

22           Here, arguably, it's distinct.  She has a basis of

23  knowledge derived, at least in part, from her master's thesis

24  done at the Oklahoma State University by which she could fall

25  within the definition set forth in B.H., correct?

 1              MR. TUCKER:  Under your analysis, Your Honor, because

 2    it was her master's thesis, she might well have the ability to

 3    satisfy the Daubert test and then testify as an expert.  But

 4    that issue that's covered in her master's thesis is not what

 5    her job is.  The question really is, is she testifying and

 6    giving opinions that naturally follow -- are the kind of

 7    opinions she gives every day in her job, is that the work that

 8    she normally does, or does this question relate to a special

 9    tasking; that is to say, an opinion she doesn't give in the

10    course of her everyday employment.  That's what's been asked

11    here.

12              The no discussion about her being involved in soil

13    science as a part of her everyday employment and her master's

14    thesis, on the other hand, may well qualify her, but not

15    without a report.

16              MR. JORGENSEN:  If I might, Your Honor.

17              THE COURT:  You're being double-teamed here,

18    Mr. Nance.

19              MR. NANCE:  Looks like triple team.

20              THE COURT:  Well, you sued multiple defendants.

21    Mr. Tucker's talking for Cargill and Mr. Jorgensen for Tyson.

22              MR. JORGENSEN:  It is kind of complex.  The issue

23    here is -- and I'm glad you're taking time on it because it's

24    not a one-witness issue.  I think this is going to be a

25    recurring issue in this case.

1           THE COURT:  Obviously.  I've got three pages.

2           MR. JORGENSEN:  So we've objected all along and not

3    thought that this was an appropriate way to go.  Now it's

4    finally come to a head.

5           In Rule 26 -- and, again, we're talking about 2(B) --

6    the issue is which people have to give a written report.

7    Daubert -- who has to give a written report.

8           THE COURT:  But it has to be made, would you agree,

9    on a witness-by-witness basis?

10          MR. JORGENSEN:  Yes.

11          THE COURT:  It can't be a blanket determination.

12          MR. JORGENSEN:  No, and that's why we did not file --

13   I believe it was mentioned that we had filed an omnibus brief,

14   and that's it has to be done witness by witness.

15          What Mr. Tucker says is absolutely right.  If you go

16   to 26(2)(B), it has three "ors" in it, which makes it very

17   convoluted.  But we can break them out.

18          So who has to give a written report in order to be

19   able to testify under Rule 26?  If the witness is one

20   retained -- let's just stop there.  That's the first "or."  If

21   you're being paid in the case -- and the cases that Mr. Tucker

22   has set out in his brief say it doesn't have to deal with

23   money -- but if you're being paid to give testimony, then you

24   have to give a report.  Let me just respectfully submit I don't

25   think that's this witness.

1          THE COURT:  It's not.

2          MR. JORGENSEN:  Then there's "or," or specially

3    employed.  Now, the cases that Mr. Tucker has set out in his

4    brief focus on specially employed.  If you specially employ,

5    these cases say, does not have to involve any giving of money;

6    it has to do with are you going about your daily life like a

7    treating physician -- and that's where these cases really come

8    up the most, Your Honor.

9          If you're the treating physician in an ER and a

10   person comes in and you treat them and then, later, you're

11   asked in court to say what you did, you're an expert in when

12   you did.  You're not being specially employed for this

13   litigation.  You were just doing your job, and you're just

14   giving testimony about your job.  You're not being specially

15   employed to provide expert testimony.

16         So where the problem comes -- and you do see this in

17   the cases about the treating physician -- treating physician

18   will come in, and the treating physician has been asked to say

19   what caused the accident as opposed to what they just did in

20   the course of their job.  Then the courts say it doesn't matter

21   whether you're getting paid, that's totally separate.  It

22   doesn't matter -- the third "or" -- whether you normally give

23   expert testimony as part of your job.  That's separately.  The

24   specially retained is its own standalone.  And if you're coming

25   in as a doctor to give causal testimony, that's not what you do

1  every day in the ER room.  You treat people.  So now you've

2  been specially employed for purposes of this litigation, and

3  you need to give a report.

4          So Mr. Tucker is exactly right.  That's the

5  breakdown.  It has to be witness by witness.  Are they talking

6  about what they do every day with the expertise they have?  As

7  you pointed out, witnesses will come in; the job that they

8  have, they have to have a certain training in order to be able

9  to do that job.  So that's a separate issue.  In the training

10 that they do and the job that they do every day, is that what

11 they're being asked to do, or are they being asked to give some

12 expert testimony that's beyond what they do every day.  If it's

13 beyond what they do every day, then they are specially employed

14 to provide expert testimony in this case.

15         THE COURT:  So your argument is she falls within the

16 second disjunctive "or."

17         MR. JORGENSEN:  As to soil science, I would say yes,

18 unless that's what she does every day with her expertise and

19 the training you've mentioned in her everyday job.

20         It's so complex, but let me lay on one more layer,

21 and that's what Mr. Tucker has mentioned about the disclosures.

22 It doesn't say "soil" in what she was disclosed to us.

23         THE COURT:  It says nonpoint source pollution.

24         MR. JORGENSEN:  Which I understand from the recent

25 testimony does not involve cattle.

1          THE COURT:  I'm sorry?

2          MR. JORGENSEN:  That was a lame attempt at a joke in

3    the document that said --

4          THE COURT:  Late-in-the-day humor.

5          MR. JORGENSEN:  I apologize.

6          THE COURT:  The question before the Court is:  Have

7    your studies and the work you've done since you began in the

8    watershed in 1992, given your specialized knowledge and

9    experience about how nutrients, particularly phosphorus,

10   behaves in the soil, at least as it regards phosphorus'

11   tendency to cause nonpoint source pollution...

12          As I understand, your argument, Mr. Nance, is her

13   specialized knowledge is, and her training and her research is

14   about how nutrients, including phosphorus, behaves and

15   specifically regarding phosphorus' tendency to cause nonpoint

16   source pollution; is that correct?

17          MR. NANCE:  Correct, Your Honor.  She is not a Ph.D.

18   soil chemist, but she does know, and from her work, how

19   phosphorus behaves as a nonpoint source pollutant.  And under

20   702, she is qualified by knowledge, skill, experience, training

21   or education to speak to that limited amount of phosphorus in

22   soil behavior.  I'm sure there's a very elaborate soil

23   chemistry that other people can talk to you about if you want

24   to hear it later on.

25          THE COURT:  How do you respond specifically to their

1  argument that she falls within the second disjunctive "or," as

2  now, even though she works here for the Conservation

3  Commission, that she is specially employed now to provide

4  expert testimony with regard to soil science, which is not --

5  which is not, they contend, within the definition of her

6  opinion testimony when you identify nonpoint source pollution?

7            MR. NANCE:  Well, taking the second point first,

8  Your Honor, how phosphorus behaves as a nonpoint source

9  pollutant is certainly within the topic of nonpoint source

10 pollution.  It is certainly within the topic of current and

11 historical Illinois River Watershed pollution, and it certainly

12 has an effect or remedy on what programs are necessary to

13 remediate water quality.

14            This is a phosphorus case, among other things.

15 There's a bacteria component, but she's not -- she's not

16 talking about that.  Unlike -- it's been a while since I've

17 read B.H. v. Gold Fields, but I believe they had someone there

18 who was specially brought on board to testify.

19            If you have a question in your mind, we'd like to

20 address this with a brief in the morning.

21            THE COURT:  To tell you the truth, I really don't.  I

22 think the -- from what I understand -- and I'm being hit

23 somewhat cold with it -- but my understanding is that she does

24 not fall within this second disjunctive "or."  The objection is

25 overruled.  She may answer.

1       MR. TUCKER:  May I interpose a second objection?

2  Notwithstanding the fact that she may be qualified as a

3  nonretained expert to testify, the defendants would object to

4  her testifying because she does not satisfy the Daubert

5  criteria to testify on the opinions she's been asked to be

6  giving.  A master thesis in and of itself with nothing more,

7  standing alone, is not going to support that.

8       THE COURT:  I wondered when that would come.  Your

9  response, Mr. Nance?

10       MR. NANCE:  Seems a little early to be raising that.

11       THE COURT:  Early or late?

12       MR. NANCE:  It's late in terms of a motion in

13  limine.  She was deposed three times in this case.  They could

14  have deposed her yet again if they wanted to know about her

15  expertise.

16       THE COURT:  She was deposed three times?

17       MR. NANCE:  Three times in this case, each on

18  separate aspects of the case.

19       THE COURT:  After April 1, 2008?

20       MR. NANCE:  The major substantive one would have been

21  before the PI.  But they had a year to do it after April 1,

22  2008 to get in if they wanted to.  They did a deposition of her

23  on broad-ranging subjects before the preliminary injunction

24  hearing.

25       It's either too late to do a Daubert motion, because

1  the Court set a deadline for that, and deadlines and lines mean

2  something.  I have not yet asked her for an opinion.

3          THE COURT:  You're right.  You're just trying to

4  establish the foundation whether her studies and her work that

5  she's done in the watershed since 1992 have given her

6  specialized knowledge and experience about how phosphorus

7  behaves in the soil, especially as it regards phosphorus'

8  tendency to cause nonpoint source pollution.

9          MR. NANCE:  Clearly, Rule 702, in its plain terms,

10  and in the cases that I have looked at but do not have with me,

11  you don't have to have a doctorate or a Ph.D. to give an expert

12  opinion.  You can be qualified by, as the rule itself says,

13  knowledge, skill, experience, training or education.  And she

14  does have considerable formal education, but she has enhanced

15  that a great deal over the years.

16          MR. JORGENSEN:  If I might, Your Honor, then I'll sit

17  down.  We're, once again, mixing two distinct concepts.

18  There's Rule 702 qualification of an expert:  Can you give

19  testimony?  That's what's just been spoken.  Then there's

20  Daubert :  What is your methodology for arriving at the

21  conclusion you are about to give, and is that methodology

22  subject to the four factors?

23          I'll sit down, Your Honor, but I will just say, going

24  forward, what we need to look for with each of these numerous

25  nonretained witnesses is going to be a foundation that they are

 1   testifying only to subjects and work that they do in their

 2   normal course, and that they didn't do anything -- they weren't

 3   asked to do anything to get ready for this case.  That moves

 4   you into specially employed.  And then, separately, a

 5   foundation --

 6           MR. NANCE:  We disagree with that particular

 7   argument.  The Court should know that.  I don't mean to

 8   interrupt, but I don't want my silence to be acquiescence to

 9   that.

10           MR. JORGENSEN:  Separately, a foundation for what

11   your facts and methodology are before the conclusion, because

12   the cases are very clear, Daubert can be raised at any time and

13   should not be raised in the abstract.

14           THE COURT:  All right.  So with regard to both 702

15   and Daubert, we have yet to see whether this witness qualifies,

16   but as to the question objected to, that objection is

17   overruled.

18           You've probably forgotten the question.  Let me read

19   it to you, because it's way back in the transcript.  And it is

20   this:  Have your studies and the work you've done since you

21   began in the watershed in 1992 given you specialized knowledge

22   and experience about how nutrients, particularly phosphorus,

23   behaves in the soil, at least as it regards phosphorus'

24   tendency to cause nonpoint source pollution?

25           Now that's not asking you for your opinion but,

1    rather, whether you have specialized knowledge and experience

2    as to that subject.

3                THE WITNESS:  Yes.

4                THE COURT:  Mr. Nance.

5    Q.    (By Mr. Nance) Has your work with the Conservation

6    Commission given you specialized knowledge and experience about

7    the conservation measures that are appropriate to combat

8    nonpoint source pollution, at least as regards the Illinois

9    River Watershed?

10   A.    Yes.

11   Q.    Have you received any additional training or education in

12   your field since you left your Ph.D. work at Oklahoma State?

13   A.    Yes.

14   Q.    What additional training and education have you received?

15   A.    I've had classes in conservation plan writing from the

16   NRCS in quality assurance, quality control from EPA, in soil

17   and water assessment tool, water quality modeling, in fluvial

18   geomorphology, and in the development of watershed base plans.

19   Q.    Would you tell us briefly what fluvial geomorphology is.

20   A.    Fluvial geomorphology is the study of the natural

21   processes by which rivers transport both volumes of water and

22   pollutants.

23   Q.    When have you last performed any sampling or field work

24   testing yourself?

25   A.    The last field work that I did was probably around 1998 or

1    1999, approximately.

2    Q.    Where did you do that work in 1998 or '99?

3    A.    In the North Canadian River Watershed and the Wister Lake

4    Watershed.

5    Q.    When did you last personally do any field work in the

6    Tenkiller or Illinois River Watershed?

7    A.    Approximately 1995 or 1996.

8    Q.    Please tell the Court what your most recent sampling or

9    field work experience -- what kind of things did you do?

10   A.    We were doing diurnal studies of water quality, both at

11   high-flow and low-flow periods, for purposes of total maximum

12   daily load calibration.

13   Q.    What's diurnal mean?

14   A.    That means that you sample throughout the period of the

15   day, both during the daylight hours and nighttime hours, so

16   that you get a measure of both the effects of photosynthesis

17   and respiration on water quality.

18   Q.    In your work with the Conservation Commission, have you

19   directed any sampling or testing programs?

20   A.    Yes.

21   Q.    Would you describe those programs for the Court, please.

22   A.    The purposes of our monitoring is to assess the overall

23   status of the state's waters as they are affected by nonpoint

24   source pollution.  And then we also design monitoring programs

25   to evaluate the effect of our best management implementation

1  programs.

2  Q.   So would that be just the water quality status and then

3  does your fix work?  Am I understanding that correctly?

4  A.   Yes.

5  Q.   Or how well does it work?

6  A.   Yes.

7  Q.   How do the people working under your direction do this?

8  Do they go out and grab water samples or do they do other

9  things?  Just generally describe the kind of things they do.

10 A.   We rely on a network of automated samplers in our

11 watersheds where we are implementing Best Management

12 Practices.  Those collect samples on a continuous flow-weighted

13 basis that really give us, on a weekly basis, a picture of the

14 actual load that's being contributed for our pollutants of

15 concern.

16       We follow those up with weekly grab samples that

17 assess a more instantaneous information for parameters that

18 can't accurately be measured over time from a weekly composited

19 sample.  So that would be some of the dissolved parameters that

20 dissolve nutrients, dissolve oxygen, temperature, those type of

21 parameters that would change and be affected by being held in a

22 sampling container for a period of a week.

23       We also collect twice yearly benthic

24 macroinvertebrate collections.  Those are aquatic insects.

25       Then we do in our standard sampling, either every two

1    or three years, fish collections and habitat assessments.

2    Q.   Ms. Phillips, in your work at the Conservation Commission,

3    is it your responsibility to review scholarly articles about

4    water quality and nonpoint source nutrient pollution?

5    A.   Yes.

6    Q.   How often do you do that?

7    A.   It varies.  But I receive e-mails daily that list studies

8    that need to be assessed, and I would estimate I look at two to

9    three studies a week, at least.

10   Q.   Do you discuss those studies with your staff and with

11   other peers and state agencies?

12   A.   Yes.

13   Q.   And when you can find them, do you review particularly

14   scholarly articles about water quality or nonpoint source

15   pollution in the Illinois River Watershed?

16   A.   Yes.

17            MR. TUCKER:  Object as leading.

18            THE COURT:  Sustained.

19   Q.   (By Mr. Nance) Does your study include articles about the

20   Illinois River Watershed?

21   A.   Yes.

22   Q.   Is it important to study the scholarly articles to do your

23   job in drafting plans and assessing the success of the plans of

24   the agency?

25   A.   Yes.

1  Q.    Do you review reports on nonpoint source pollution that

2  are generated or drafted by other state agencies?

3  A.    Yes.

4  Q.    And is there any formal way to discuss those with your

5  peers in other agencies as they come around?

6  A.    Yes.

7  Q.    What is that, please?

8  A.    The Office of the Secretary of Environment maintains a

9  peer-review function.  Anytime a report is generated with EPA

10  funding, it is distributed to the peer-review group.  We

11  provide comments that are then sent through the Office of the

12  Secretary of the Environment back to the agency who developed

13  the document, and oftentimes they facilitate an exchange

14  directly between the two parties in order to resolve any

15  concerns or questions.

16  Q.    In the course of your work for the Oklahoma Conservation

17  Commission, do you review government reports from federal

18  authorities or from other states?

19  A.    Yes.

20  Q.    Give me a for-instance of the kinds of reports you look

21  at.

22  A.    For instance, if the State of Arkansas developed a

23  nonpoint source report about a watershed that we shared, we

24  would review that document.  Oftentimes they send it to us

25  directly for our review.  As an EPA program, we are responsible

1  for reviewing reports that they generate, and they often -- our

2  EPA partners often share that information with us and suggest

3  that we review those reports.

4  Q.    Do you, from time to time, review pertinent reports that

5  are generated by the U.S. Geological Survey?

6  A.    Yes.

7  Q.    And are there a number of those that go around?

8  A.    Yes.

9  Q.    Do you, from time to time, review reports that come from

10  the United States Department of Agriculture that are pertinent

11  to nonpoint source pollution?

12  A.    Yes.

13  Q.    In the course of your work for the Oklahoma Conservation

14  Commission, do you review scholarly articles or government

15  reports about phosphorus transport, at least as it pertains to

16  being a nonpoint source pollutant?

17  A.    Yes.

18  Q.    Are there a number of those reports that, over the years,

19  have been circulated?

20  A.    Yes.

21  Q.    In the course of your work for the Oklahoma Conservation

22  Commission, have you reviewed scholarly articles, not

23  necessarily government reports but scholarly articles about

24  phosphorus buildup in the soil and how it can affect phosphorus

25  as a nonpoint source pollutant?

1  A.    Yes.

2  Q.    Are there any particular reports or authors that you have

3  read over the years?

4  A.    Dr. Andrew Sharpley, Dr. Dan Storm and his students,

5  Dr. Mike Smolen.

6  Q.    Have you spoken personally with experts on phosphorus

7  transport in addition to just reading articles, either

8  government articles or scholarly articles?

9  A.    Yes.

10  Q.    With whom have you conferred on these sort of issues as

11  you needed to?

12  A.    Dr. Dan Storm, Dr. Mike Smolen, Dr. Brian Haggard, others,

13  but I can't think of any --

14  Q.    Have you spoken with Dr. Hailin Zhang?

15  A.    Yes.

16  Q.    Tell the Court very briefly who those people are, and then

17  we'll just move on.  Who is Dr. Hailin Zhang?

18  A.    He is a soil specialist at Oklahoma State University.  He

19  runs their soils lab.  And we and other state agencies often

20  send their soil samples to his lab for analysis.

21  Q.    Who is Dr. Mike Smolen?

22  A.    Dr. Mike Smolen is a water quality specialist with

23  Oklahoma State University Extension Service.  And his area of

24  specialty is nonpoint source pollution and its effect on water

25  quality.  Many of their programs focus on education of citizens

1  about nonpoint source pollution.

2  Q.   Who is Dr. Brian Haggard?

3  A.   He is a professor at the University of Arkansas, and he

4  and I were in school together.  He is currently working on a

5  watershed base plan for the Illinois River for the State of

6  Arkansas.

7  Q.   Do you confer with him on that from time to time?

8  A.   From time to time.

9  Q.   Who is Dr. Dan Storm?

10 A.   Oklahoma State University professor in the department of

11 biosystems and agricultural engineering.  His expertise is

12 water quality modeling.

13 Q.   In the course of your work for the Oklahoma Conservation

14 Commission, have you reviewed scholarly articles or government

15 reports about the time required for elevated phosphorus content

16 in soils to diminish?

17 A.   Yes.

18 Q.   And would those be perhaps articles by some of the people

19 you've already discussed?

20 A.   Yes.

21 Q.   And without getting into detail, in dealing with nonpoint

22 source pollution, are the buildup and transport of phosphorus

23 from land-applied wastes, particularly in the Illinois River

24 Watershed, important topics in your professional work?

25 A.   Yes.

1    Q.    And why is that?

2    A.    The purpose of our program is to demonstrate the things

3    that are necessary to reduce the impacts of nonpoint source

4    pollution.  And if we are going to successfully demonstrate

5    those practices, we need to know how phosphorus can be

6    processed through the watershed and transported through the

7    watershed.

8    Q.    Have you done teaching or lecturing in the field of water

9    quality or nonpoint source pollution?

10    A.    Yes.

11    Q.    What have you done?

12    A.    I've made presentations to university classes.  I've also

13    been asked to make presentations to EPA at EPA training

14    symposiums about our work.

15    Q.    Have you made public presentations or demonstrations

16    within the field of nonpoint source pollution or water quality?

17    A.    Yes.

18    Q.    What have you done in terms of public presentations?

19    A.    We periodically hold public meetings to update citizens in

20    our watershed programs about what's going on with a project,

21    our success, and to educate them about what our programs have

22    to offer.  We have participated with the DEQ through their TMDL

23    public meeting process.  Those are the main examples I can

24    think of.

25    Q.    Have you made presentations to the legislature or to

1  legislative committees?

2  A.   Yes.

3  Q.   What have you done before the legislature?

4  A.   We have summarized the results of our demonstration

5  projects to the legislature and to Senate finance committees.

6  Q.   Okay.  Have you helped prepare any materials to be

7  presented to the United States Congress?

8  A.   Yes.

9  Q.   Tell us about that, please.

10  A.   We've prepared -- I've overseen and worked to prepare

11  materials to Congressional -- or Congressional delegations to

12  update them on the successes of our nonpoint source program in

13  Oklahoma and to encourage them to continue to support the 319

14  program.

15  Q.   Are you a member of any governmental working groups that

16  deal with issues of water quality or nonpoint source pollution?

17  A.   Yes.

18  Q.   Which working groups are those, please?

19  A.   I'm currently most active in the Total Maximum Load

20  Working Group.  I have, in the past, participated in the Water

21  Quality Standards Working Group and the Integrator Report

22  Working Group.  I am also, as the director of the Water Quality

23  Division, the chair of the Nonpoint Source Working Group.

24  Q.   What's the Nonpoint Source Working Group, please?

25  A.   The Nonpoint Source Working Group is a group of state,

1  federal, local entities who all have a role in the state's

2  nonpoint source program.  The initial intent of the working

3  group was to help design our State's nonpoint source management

4  plan that lays out the strategies we'll use to address nonpoint

5  source pollution in the state.

6  Q.    Are you a member of any professional societies dealing

7  with water quality?

8  A.    Yes.

9  Q.    What is that, please?

10  A.    The Oklahoma Clean Lakes and Watersheds Association.

11  Q.    Have you made any presentations to any other professional

12  societies?

13  A.    Yes.

14  Q.    Can you give us a for-instance about that.

15  A.    The -- ASIWPCA, which is the Association -- I can't

16  remember what it stands for.  The American -- the AWRA, various

17  nonpoint source EPA meetings, the North American Lake

18  Management Society meetings.

19  Q.    Have you published any scholarly articles on water quality

20  or nonpoint source pollution topics?

21  A.    Yes.

22  Q.    Tell us about that, please.

23  A.    I was the primary author on a study published out of my

24  thesis that was published, I believe, in the Journal of

25  Freshwater Ecology about nutrient limitation in Lake

1  Tenkiller.  I've also been coauthor on studies related to some

2  of our projects and the work that we've done with Dan Storm in

3  the Lake Wister Watershed.

4  Q.    Have you written any governmental reports on water quality

5  or nonpoint source pollution?

6  A.    Yes.

7  Q.    How many have you written?

8  A.    Dozens.

9  Q.    How many of those deal with the Illinois River Watershed?

10  A.    At least five or six.

11  Q.    Have you edited any governmental reports of water quality

12  or nonpoint source pollution?

13  A.    Yes.

14  Q.    Would that be in the Secretary of Environment's peer-

15  review process you mentioned earlier?

16  A.    Under that process.

17  Q.    Do you still do that as Director of Water Quality?

18  A.    Yes.

19          THE COURT:  Mr. Nance, you might want to find a

20  appropriate stopping point, sir.

21          MR. NANCE:  No time like the present.

22          THE COURT:  Very well.  We'll be --

23          MR. GREEN:  Your Honor, before you adjourn --

24          THE COURT:  Yes, sir.

25          MR. GREEN:  With your permission, I would like to

1  suggest that when we reconvene tomorrow, you consider giving us

2  a short opportunity to voir dire on the witness' both

3  qualifications and where we're going.

4          THE COURT:  I understand.  That may be an appropriate

5  situation with regard to these nonretained experts.

6  Particularly -- no, I understand.  Any objection to that

7  approach, Mr. Nance?

8          MR. NANCE:  No, Your Honor.  I have a little bit more

9  to complete, but I anticipated a voir dire would be requested.

10  May I make a suggestion?

11          THE COURT:  Yes, sir.

12          MR. NANCE:  I think that the issue of the 803(8)

13  hearsay objection for government reports is going to be a

14  continuing issue.  I think now you have bench briefs from both

15  sides.

16          THE COURT:  I do.

17          MR. NANCE:  Would it be helpful to the Court to

18  entertain a brief argument on that subject?

19          THE COURT:  Tomorrow morning.

20          MR. NANCE:  Tomorrow morning sounds good to me.  In

21  that connection, if it's not too bold, we'd invite your

22  attention to the Beech Aircraft case which is cited in our

23  brief.

24          THE COURT:  Thank you very much.  We'll see you

25  tomorrow morning.

1          (Whereupon the evening recess was had.)

2              REPORTER'S CERTIFICATE

3 I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4 TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

5 MATTER.

6

7                           S/Terri Beeler
                          Terri Beeler, RMR, FCRR

8                           United States Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25