IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,       )
W.A. DREW EDMONDSON, in his      )
capacity as ATTORNEY GENERAL     )
OF THE STATE OF OKLAHOMA,        )
et al.                           )
                                 )
            Plaintiffs,          )
                                 )
vs.                              )    No. 05-CV-329-GKF-PJC
                                 )
TYSON FOODS, INC., et al.,       )
                                 )
            Defendants.          )


VOLUME 65 - AM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

DECEMBER 8, 2009

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE


*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                     *United States Court Reporter*


**United States District Court**

7596

```
1                    A P P E A R A N C E S

2

3    For the Plaintiffs:        MR. W.A. DREW EDMONDSON
                                MS. KELLY FOSTER
4                               Office of Attorney General
                                State of Oklahoma
5                               313 N.E. 21st St.
                                Oklahoma City, OK  73105
6

7                               MR. DAVID RIGGS
                                MR. DAVID P. PAGE
8                               MR. RICHARD T. GARREN
                                Riggs Abney Neal
9                               Turpen Orbison & Lewis
                                502 W. 6th Street
10                              Tulsa, OK 74119

11
                                MR. ROBERT A. NANCE
12                              MS. KELLY FOSTER
                                Riggs Abney Neal
13                              Turen Orbison & Lewis
                                5801 Broadway
14                              Oklahoma City, OK 73118

15
                                MR. LOUIS W. BULLOCK
16                              MR. ROBERT BLAKEMORE
                                Bullock Bullock &
17                              Blakemore
                                110 W. 7th St.
18                              Suite 770
                                Tulsa, OK 74119
19

20                              MR. FREDERICK C. BAKER
                                MS. ELIZABETH CLAIRE XIDIS
21                              MS. INGRID L. MOLL
                                Motley Rice LLC
22                              28 Bridgeside
                                P.O. Box 1792
23                              Mount Pleasant, SC 29465

24

25
```

**United States District Court**

7597

1              A P P E A R A N C E S  (Cont.)

2

For Tyson Foods:              MR. ROBERT W. GEORGE
3                                Tyson Foods, Inc.
                                 2210 West Oaklawn Drive
4                                Springdale, AR 72701

5

                                 MR. FRANK R. VOLPE
6                                MR. MARK D. HOPSON
                                 MR. THOMAS C. GREEN
7                                MR. JAY THOMAS JORGENSEN
                                 MR. GORDON D. TODD
8                                ERIC J. IVES
                                 Sidley Austin LLP
9                                1501 K St. NW
                                 Washington, DC 20005
10

11                               MR. PATRICK MICHAEL RYAN
                                 Ryan Whaley Coldiron and
12                               Shandy PC
                                 119 N. Robinson, Rm 900
13                               Oklahoma City, OK 73102

14

15   For Cargill:                MR. JOHN H. TUCKER
                                 MS. THERESA HILL
16                               Rhodes Hieronymus Jones
                                 Tucker & Gable
17                               100 W. 5th St., Ste 400
                                 Tulsa, OK 74103
18
                                 MR. DELMAR R. EHRICH
19                               MS. KRISANN KLEIBACKER LEE
                                 Faerge & Benson
20                               90 S. 7th St., Ste 2200
                                 Minnaepolis, MN 55402
21

22

For Simmons Foods:            MR. JOHN R. ELROD
23                               MS. VICKI BRONSON
                                 Conner & Winters
24                               211 E. Dickson St.
                                 Fayetteville, AR 72701
25

**United States District Court**

7598

1           A P P E A R A N C E S  (Cont.)

2

3    For Peterson Farms:          MR. A. SCOTT MCDANIEL
                                  MR. PHILIP HIXON
                                  MS. NICOLE LONGWELL
4                                 McDaniel Hixon Longwell &
                                  Acord PLLC
5                                 320 S. Boston, Ste 700
                                  Tulsa, OK 74103
6

7

8    For George's:               MR. GARY V. WEEKS
                                  MR. WOODY BASSETT
                                  MR. VINCENT O. CHADICK
9                                 MS. K.C. TUCKER
                                  Bassett Law Firm
10                                P.O. Box 3618
                                  Fayetteville, AR 72702
11

12

13   For Cal-Maine:              MR. ROBERT SANDERS
                                  Young Williams P.A.
                                  P.O. Box 23059
14                                Jackson, MS 39225

15

                                  MR. ROBERT P. REDEMANN
16                                Perrine McGivern Redemann
                                  Reid Berry & Taylor PLLC
17                                P.O. Box 1710
                                  Tulsa, OK 74101
18

19

20

21

22

23

24

25

**United States District Court**

1                          I N D E X

2

3                                                    Page

4

5    *WITNESSES ON BEHALF OF THE PLAINTIFF*

6
     **DENNIS COOKE, PH.D.**
7
     Continued Cross-Examination by Mr. McDaniel      7602
8    Cross-Examination by Mr. Green                   7648
     Voir Dire Examination by Mr. Page                7672
9    Voir Dire Examination by Mr. Green               7686
     Continued Voir Dire Examination by Mr. Page      7689
10   Cross-Examination by Mr. Elrod                   7692
     Redirect Examination by Mr. Page                 7695

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

**United States District Court**

7600

```
 1                  Tuesday, December 8, 2009
 2                        * * * * *
 3           THE COURT:  Ms. Xidis, how are we doing
 4    on our situation that we discussed last night?
 5           MS. XIDIS:  Your Honor, yesterday
 6    evening we received some cuts from the Tyson
 7    attorneys.  We're now down to about 140 exhibits.
 8           THE COURT:  All right.  Well, that's
 9    progress.
10           Part of the problem, as Mr. Green mentioned,
11    and as I'm sure that he's unaware obviously of how the
12    court's going to rule, or the court's unaware of how
13    it's going to rule, on whatever motions they raise at
14    the end of plaintiff's case as to certain elements of
15    the case.  I suspect that has something to do with it.
16           Right, Mr. Jorgensen?
17           MR. JORGENSEN:  That's right, Your
18    Honor.  There's a couple of witnesses left to go in
19    the case and then the motions.  So we really are
20    trying to cut deeply, but we do have to hedge a little
21    bit for just what might come up.
22           MS. XIDIS:  And I guess just for way of
23    perspective, thus far in the case there have been
24    roughly 300 exhibits admitted and we're at 140 here.
25    So I think this is still pretty unrealistic and --
```

1            THE COURT:  I've got a whole lot more

2    than 300 here behind me.

3            MS. XIDIS:  Admitted thus far, Your

4    Honor.

5        I guess my concern is just that this is not

6    really the spirit and the purpose of the 72-hour

7    disclosure and they've cut this back, but they're now

8    kind of at what they wanted point as our worst

9    example, in which we've admitted were overly ambitious

10   first disclosures on our part.

11       So I guess we would ask that we hope this

12   isn't a precedent for the oncoming disclosures as we

13   would move forward, and we hope that we'll get some

14   real disclosures, which will enable us to prepare

15   better, also to help work through some of the 1006

16   issues we're now facing on the defense side.

17            THE COURT:  Well, as I said before, the

18   judge that I worked for here in this very courtroom

19   was always of the belief -- and he was a great trial

20   lawyer -- that any case, no matter how complex, could

21   be boiled down to ten or fewer documents.  And

22   although that may not apply to this extraordinary

23   case, the same principle applies.

24       Many of the documents frankly that have been

25   admitted into evidence here are just unnecessary, just

7602

 1   totally unnecessary.  So I'd urge Mr. Jorgensen to

 2   keep that principle in mind and let's keep whittling.

 3            MR. JORGENSEN:  Yes, Your Honor.

 4            MS. XIDIS:  Thank you.

 5            THE COURT:  Thank you.

 6         All right.  Let's move.  Mr. McDaniel.

 7            MR. MCDANIEL:  Good morning, Your Honor.

 8            THE COURT:  Good morning.

 9            **CONTINUED CROSS-EXAMINATION**

10   BY MR. MCDANIEL:

11     Q.  Good morning, Dr. Cooke.

12     A.  Good morning.

13     Q.  Just to get us back in the mood, I just want

14   to remind us all, your opinion is that phosphorus

15   loading is the problem with Lake Tenkiller and it's

16   phosphorus that's driving eutrophication and algae

17   growth; right?

18     A.  Not exactly.  It's not only phosphorus

19   loading, but water loading as well, and phosphorus is

20   driving eutrophication.

21     Q.  All right.  In your opinion, the level of

22   phosphorus in Lake Tenkiller is much higher than it

23   should be?

24     A.  Yes.

25            MR. MCDANIEL:  May I approach, Your

 1   Honor?

 2                   THE COURT:  You may.

 3       Q.   *(BY MR. MCDANIEL)*  Dr. Cooke, I've handed you

 4   what's been marked for identification as Defendants'

 5   Joint 707.  Can you identify this four-page group of

 6   documents here?

 7       A.   What do you want me to do?

 8       Q.   Can you identify -- well, let's do it this

 9   way.

10            Do you recognize this as e-mail

11   communications between yourself and Dr. Jones

12   pertaining to the work on this case?

13       A.   Yes.

14       Q.   And these are a series of e-mails that you

15   produced with your considered materials as evidenced

16   by the Bates numbers at the bottom of the page; is

17   that right?

18       A.   Yes.

19                   MR. MCDANIEL:  All right, Your Honor.

20   I'll offer Defendants' Joint Exhibit 707.

21                   THE COURT:  Any objection?

22                   MR. PAGE:  No objection.

23                   THE COURT:  Defendants' 707 is admitted.

24       Q.   *(BY MR. MCDANIEL)*  All right.  Dr. Cooke,

25   turn to the second page of the exhibit, if you would,

1    please.  I want to start by asking about the message

2    from Dr. Jones to you that was dated December 18,

3    2007.  Do you see that one?  The first word is "TK."

4         A.   I do.

5         Q.   All right.  Would you read aloud Dr. Jones'

6    message to you?

7         A.   "We are doing what we can with the data we've

8    got."

9         Q.   No.  I'm sorry, sir.

10        A.   I'm sorry.  I'm in the wrong place then.

11        Q.   Yes, you are.  If you'll move down the page

12   to the message on December 18th at 2:25 p.m.  I should

13   have been more specific.

14        A.   Okay.  I have it.

15        Q.   Okay.  Read that one, please.

16        A.   "TK has about the P that one would expect in

17   an Ozark reservoir of its size and hydrology, perhaps

18   a bit on the high side but not enough information to

19   show that.  The N values bewilder me but Burt and

20   Roger were to have made a final determination – I have

21   not seen anything that we can run with."

22        Q.   All right.  Move up the page and read aloud

23   your response to him just a few minutes later.

24        A.   "Jack:  Just to clarify your e-mail, are you

25   saying that TK P concentration is what you would

**United States District Court**

1  expect without chickens – that litter has had no

2  impact on concentration?  If so, what are we doing

3  here?"

4      Q.   And how did Dr. Jones respond to your

5  question?  Move up.

6      A.   "We are doing what we can with the data we've

7  got.  The fig above is Fig 4 from the 2004 CJFAS

8  paper" --

9      Q.   I'm sorry.  You can stop there.  It was just

10  the first sentence I wanted you to read.

11      A.   Okay.

12      Q.   "We're doing what we can with the data we've

13  got."

14          And when he says "the data we've got," this

15  message is at the end of 2007 and your expert report

16  includes analysis of data through 2007; correct?

17      A.   Yes.

18      Q.   Okay.  Now, Dr. Jones expressed some concerns

19  about what the data was showing in this project,

20  didn't he?

21      A.   It appears that he did.

22      Q.   Let's turn to the first page of the exhibit.

23  And Dr. Jones writes to you on December 17th, 2007,

24  and he says, "You decide about the TK 04 plot.  I

25  think it might be presented at text and make the same

7606

1   point.  This finding somewhat undercuts the idea that

2   conditions are 'worse' because of litter application.

3   It points out that the confounding influence of

4   hydrology is a factor masking a simple,

5   straightforward interpretation."

6          Do you agree that those were his views in

7   December of 2007, Dr. Cooke?

8      A.   That's what he wrote so I assume they're his

9   views.

10     Q.   All right.  And you and Dr. Jones also

11  discussed some problems with the quality and type of

12  data Dr. Olsen's group was providing for your use;

13  correct?

14     A.   I don't recall.  We'll have to -- I don't

15  know that.

16             MR. MCDANIEL:  May I approach?

17             THE COURT:  You may.

18     Q.   *(BY MR. MCDANIEL)*  All right, sir.  I've

19  handed you what's been marked as Defendants' Joint

20  699, a three-page document.

21         Is that also some e-mail communications

22  between yourself and some communications with also

23  Dr. Welch pertaining your work in this project?

24     A.   Yes.  It appears so.

25     Q.   All right.

 1          MR. MCDANIEL:  Your Honor, I offer

 2   Defendants' Joint Exhibit 699.

 3               THE COURT:  Any objection?

 4          MR. PAGE:  No objection, Your Honor.

 5               THE COURT:  Defendants' 699 is

 6   admitted.

 7               MR. MCDANIEL:  Your Honor -- excuse

 8   me.

 9     Q.   (BY MR. MCDANIEL)  Dr. Cooke, the very first

10   message at the top is a message from Dr. Jones to

11   Malena Foster, Dr. Welch, and yourself.  Do you see

12   that --

13     A.   Yes.

14     Q.   -- on October 8th?

15     A.   I do.

16     Q.   Now, Malena Foster, is this the CDM employee

17   that was performing the computations for your report?

18     A.   Yes.

19     Q.   All right.  Let's start with Dr. Jones'

20   message to you there on the first page on December

21   7th, 2007.  Would you kindly read that entire message

22   into the record?

23     A.   I think you mean October 7th?

24     Q.   I did.  I obviously misspoke.

25     A.   "Denny and Gene, I'm concerned about the data

1    we are working with.  I got a file from Robert showing

2    historical data from Tenkiller.  Out of curiosity I

3    started looking through the information by date, year,

4    and section to see if the histograms that Malena

5    prepared squared with the data set.  I was always a

6    bit curious about the 1992 TP value from Section 1 in

7    Tenkiller – it seemed high given the strong

8    longitudinal pattern.  As you can see – the value in

9    the data set on 1 Aug is listed as 140 ug/L, but only

10   20 ug/L was measured at Sec 2.  I suspect that value

11   is not correct – and may be 14 ug/L.  Malena used this

12   value in the seasonal mean of 50 ug/L.  Without it,

13   the average is only 28."

14        Q.   Please continue.

15        A.   "The data file gives detailed information on

16   Section 4 TP measurements.  If I average values by

17   date across the season I come up with 219 ug/L for

18   this site in 1992, but Malena reports 75 ug/L.  I

19   played around with the data and discovered that if I

20   delete the remarkably high values from the replicates

21   on each date from 1992 I can reproduce her value.  Did

22   you know the data were screened this way?"

23        Q.   Next paragraph, please.

24        A.   "The other issue that we need to deal with is

25   the TKN value in Tenkiller."

1      Q.   Can you pause there?  Can you tell us what

2   TKN is?

3      A.   Total Kjeldah nitrogen.

4      Q.   All right.  Proceed.

5      A.   "I got excited when I found really high

6   nitrogen values relative to the" region "(Most Ozark

7   regions have about 500 ug/L TN" --

8      Q.   Excuse me.  Is that "Ozark reservoirs"?

9      A.   -- "Ozark reservoirs have about 500 ug/L TN,

10   and the eastern OK reservoirs seem to be very

11   similar).  The > 1 ug/L TKN value reported by Malena

12   struck me as a potential impairment – nitrogen from

13   litter seemed like an explanation.  But, when I review

14   the historic TKN values they are in line with the

15   region – what's going on?  Is CDM getting bad lab

16   data?  Historic data shows Broken Bow has about 350

17   ug/L TKN.  Jack."

18      Q.   All right.  Thank you for that.

19           Dr. Cooke, did you also share Dr. Jones'

20   concerns about bad data?

21      A.   What we're seeing here is the normal

22   give-and-take between scientists and the vetting of

23   data.

24      Q.   Can you answer my question, sir?

25      A.   And so -- I'm going to answer your

1    question -- and so in doing so we're curious about

2    every number.  And yes, I had concerns about their

3    nitrogen numbers.

4        Q.   All right.  Turn to the next page of the

5    exhibit, and I want to direct your attention to

6    Dr. Jones' message to you on November 8th, 2007.  And

7    in the second paragraph, he states, "I hate to get

8    started with much until I know more about the TN

9    values."

10            Is that total nitrogen, "TN"?

11       A.   Yes.

12       Q.   "I sent a note about my concern but have no

13   response.  I'm not willing to toss the CDM data

14   without input.  The CDM folks put their collective

15   heads down when the discrepancy was pointed out."

16            Now, would you read the first three sentences

17   of your response to that at the top of the page?

18       A.   "I have heard nothing about the TN problem.

19   I have also been questioning the TOC/DOC data, where

20   DOC is consistently higher than TOC.  No answer to

21   that either."

22       Q.   Okay.  You can stop there.

23            Now, briefly tell us, what is TOC and DOC?

24       A.   TOC is total organic carbon, and DOC is

25   dissolved organic carbon.

1     Q.   Now, the TOC and DOC levels, to which of your

2   opinions are they relevant?

3     A.   These opinions were relevant to the

4   disinfection byproduct portion of the report.

5     Q.   All right.  Let's go to the third page of the

6   exhibit.  I'd like to ask you, sir, if you will

7   read -- and if your voice is cracking like mine, I'll

8   be glad to read.  You just let me know.

9     A.   Thank you.

10    Q.   I want to ask you to read your message to

11  Dr. Jones on November 29th, 2007, the one at the

12  top?

13    A.   "Jack:  I don't know what the CDM values

14  mean.  I am assuming that you infer that their quality

15  is suspect.  Probably true.  However it's what we

16  have.  Roger wrote recently that the DOC values are

17  out - he finally agreed that the filters were bad,

18  just as I had been telling him.  So, I don't know what

19  it means, but I am using the N:P as one of the

20  evidences of P limitation as stations 01 and 02.  03

21  and 04 are mixed, probably both N and light being

22  limiting at times.  P concentration at 03 and 04 is

23  high to very high.  I'm in a mood to get this done and

24  do it with what they have given us.  I am going to

25  defer all questions about methods to Roger if it comes

1    up at deposition time.  I asked him to prepare a

2    methods section for the report and all he came back

3    with was to cite the SOP manual.  I have never seen

4    that.  Have you?  And in any case, it won't do.  Hope

5    you are enjoying your trip.  MO/OK game Saturday

6    night."

7        Q.   That's the Missouri/Oklahoma game, I presume.

8    That's important.

9        A.   It is.

10       Q.   Sir, did Dr. Olsen admit to you that the

11   dissolved organic carbon data was bad?

12       A.   I'm having difficulty recalling what he said,

13   but I do know that we discussed those data.

14       Q.   Well, your message indicates on November 29th

15   your belief at that time was that Roger told you that

16   the DOC values are out and he admitted that the

17   filters were bad.  That was your knowledge at that

18   time; do you agree?

19       A.   I remember that, yes.  He agreed with my

20   earlier comment about it.

21       Q.   I'm trying to understand part of your point

22   here, Dr. Cooke, in this message.

23            You indicate that you believe the data's

24   probably suspect, but given that it's all that you

25   have, you told Dr. Jones that you were just inclined

 1    to get the job done with what you had; correct?

 2        A.   What I said was that we're inclined -- I was

 3    inclined to get the job done with what I had, which

 4    would mean the DOC data were out and I had total

 5    organic carbon data which were not influenced by the

 6    filters.

 7        Q.   All right.  But was not having good data on

 8    dissolved organic carbon and total organic carbon, was

 9    that making it difficult for you to fulfill your

10    assignment here?

11             MR. PAGE:  Your Honor, I object.  That

12    mischaracterizes the testimony of the witness.  The

13    witness testified the data that he threw out that was

14    bad was dissolved, did not include total organic

15    carbon --

16             THE COURT:  Sustained.  Rephrase,

17    please.

18        Q.   *(BY MR. MCDANIEL)*  Were you, Dr. Cooke,

19    having a problem getting good dissolved organic carbon

20    and total organic carbon data so that you could

21    fulfill your assignment here?

22        A.   Yes.

23             MR. MCDANIEL:  May I approach?

24             THE COURT:  You may.

25        Q.   *(BY MR. MCDANIEL)*  Dr. Cooke, I've handed you

1    what's been marked for identification as Defendants'

2    Joint 708, a two-page document.

3          Are these some more e-mails between yourself

4    and Dr. Jones relating to the work in this case?

5        A.   Yes.

6        Q.   And you produced these as part of your

7    considered materials; correct?

8        A.   Yes.

9              MR. MCDANIEL:  Your Honor, I'll offer

10   Defendants' Joint Exhibit 708.

11             THE COURT:  Any objection?

12             MR. PAGE:  No objection, Your Honor.

13             THE COURT:  708 is admitted.

14       Q.   *(BY MR. MCDANIEL)*  All right.  Dr. Cooke, I

15   want to direct you to the message that's at the bottom

16   of the page -- begins at the bottom of the page from

17   you to Dr. Jones October 19th, 2007, at 10:58 a.m.

18             Are you there, sir?

19       A.   Yes.

20       Q.   Would you please read that message into the

21   record, and it continues over to the second page?

22       A.   "Gene, Jack:  I just learned from Roger and

23   Drew (separate e-mails) that they apparently did not

24   sample edge of field runoff from any field that did

25   not have litter applied to it.  I thought that we had

1  been explicit about the need for reference samples.

2  This is going to make the interpretation of the THM

3  data even more complicated.  I don't know whether it

4  affects anything that either of you is working on."

5      Q.  All right.  Now, move up and read Dr. Jones'

6  response to you at 11:41 a.m.

7      A.  I have 11:49 a.m.  Oh, I see it, 11:41.

8  "Interesting experimental design!  It complicates

9  comparative analyses somewhat."

10      Q.  All right.  Then what was your response at

11  11:49?

12      A.  "Yes.  For example, how can we prove that the

13  BOD in TK is at least partially from organics in the

14  litter?  Unless I am mistaken (a common occurrence)

15  all that we have now is the so-called 'chicken

16  signature' from some sort of DNA analysis.  And that

17  type of analysis does not show magnitude.  Any ideas?

18  Guess who was in charge of the field work that has

19  produced this dilemma?"

20      Q.  All right.  In your first phrase there, "how

21  can we prove the BOD in TK is at least partially from

22  organics in the litter," what is "BOD"?

23      A.  Biological oxygen demand.

24      Q.  And "TK" is Lake Tenkiller?

25      A.  Tenkiller, yes.

1    Q.   Sir, at this point, are you reflecting that

2  you viewed the objective of your work at this phase of

3  the investigation was to prove that Tenkiller is

4  impaired at least partially from the organics in

5  litter?

6    A.   We were asking that question, or attempting

7  to ask that question.

8    Q.   I note that you didn't say that you needed

9  this data to determine what was impairing Tenkiller,

10  rather it infers that your charge was to prove that it

11  was litter; is that correct?

12    A.   Well, the response is directed to litter.  We

13  recognize that there's other sources of organic

14  matter.

15    Q.   All right.  Let's move up the page, sir, and

16  Dr. Jones' response to you at 12:25 p.m.  Would you

17  read his message, please?

18    A.   The Chief scientist on this effort.  I have

19  no idea how to solve this . . . except to look for

20  cross-system increases with application rates and

21  extrapolate back to the intercept.  That is an

22  approach to science that is akin to kissing your

23  sister.

24    Q.   Yikes.  Okay.  The comments about "the Chief

25  scientist," I assume you're referring to Dr. Olsen; am

1    I correct?

2         A.   Yes.

3         Q.   Now, I detect from this dialogue, Dr. Cooke,

4    that both you and Dr. Jones were being rather

5    sarcastic to your references to Dr. Olsen?

6         A.   We were frustrated, yes, and I think

7    sarcastic possibly.

8         Q.   And you'd have to admit that this does not

9    sound like either of you were very impressed with the

10   chief scientist at that point in time?

11        A.   All I can say is we were having difficulty

12   getting answers to our questions.

13        Q.   Now, would you read your response at the top

14   of the page, sir, at 3:08 p.m.?

15        A.   "Wow!  I thought I would stump you with that

16   question.  Guess not.  I don't have a sister, but if I

17   did, kissing her might not be very high on my list of

18   things to do.

19             "Seriously, this is a major problem for us,

20   in my opinion.  The P loading we can make a good

21   argument because the sources are limited and we can

22   eliminate wastewater as a major source apparently.

23   But organic matter loading goes right to the injury to

24   fish and drinking water.  Please keep thinking on it

25   and maybe there's a way.  I put it back to Roger by

1    e-mail this morning, asking him if he could think of a

2    way to determine percent organic matter from litter.

3    We'll see what he says."

4         Q.   Now, at the moment, Dr. Cooke, were you

5    stumped about how to make your argument tying litter

6    to the organic material in the lake?

7         A.   That's what that says.

8         Q.   And it reflects that you were determined to

9    find a way?

10        A.   It says that we're -- we're attempting to

11   find a way.

12        Q.   So, Dr. Cooke, there was a problem in the

13   experimental design, in that runoff samples had not

14   been collected from fields where litter had not been

15   applied at this time?

16        A.   From my understanding from Dr. Olsen, he had

17   not done that.

18        Q.   Now, eventually you did receive a couple of

19   purported reference runoff samples; correct?

20        A.   Yes.

21        Q.   Isn't it true that at the time you submitted

22   your expert report and gave your deposition, you

23   didn't possess any data or evidence to defend that the

24   reference samples provided to you adequately represent

25   all of the nonlitter-applied lands in the Illinois

1   River Watershed?

2        A.   That's quite a question, sir.  Could you kind

3   of break it up?

4        Q.   At the time you submitted your report, you

5   did not have any data or evidence that would allow you

6   to conclude that those couple reference samples

7   adequately represented all of the nonlitter-applied

8   fields in the Illinois River Watershed?

9        A.   We didn't have that, that's right.

10       Q.   I gather from the e-mail message, another

11  part of the phosphorus strategy was to find a way to

12  eliminate all the sewage plants as a source; is that

13  correct?

14       A.   I don't read it that way.  That certainly

15  wouldn't be the intent.  You understand, I'm thinking

16  back two years -- more than two years ago.  At the

17  time we were writing the report so I --

18       Q.   If my interpretation wasn't correct, you can

19  just tell me that's not your reading.

20       A.   Okay.

21       Q.   Is it true, Dr. Cooke, that you were directed

22  by Mr. Page to stop discussing problems with the work

23  in your e-mail communications?

24       A.   I don't recall that.

25            MR. MCDANIEL:  May I approach?

```
 1              THE COURT:  You may.
 2      Q.  (BY MR. MCDANIEL)  All right.  Dr. Cooke,
 3  what I've handed you is marked for identification as
 4  Defendants' Joint 694.  You recognize this as an
 5  e-mail from you to Dr. Jones copied to Dr. Welch on
 6  December 7th, 2007?
 7      A.  Yes.
 8              MR. MCDANIEL:  Your Honor, I offer
 9  Defendants' Joint Exhibit 694.
10              THE COURT:  Any objection?
11              MR. PAGE:  No objection.
12              THE COURT:  Defendants' 694 is
13  admitted.
14      Q.  (BY MR. MCDANIEL)  All right.  Dr. Cooke, the
15  second paragraph of the message, please read that
16  aloud into the record.
17      A.  "Dave Page has warned me again about using
18  e-mails to discuss such things.  I am deleting a lot
19  of stuff where the three of us have mentioned flaws in
20  the work, etc.  Maybe you'd should call me about this.
21  I want to know whether we can use these graphs to
22  support the idea that stations 01 and 02 are P
23  limited.  I agree that we can use them in the sense
24  that we argue the reduction of P concentration should
25  lead less chlorophyll.  It's crunch time on the report
```

1   so would be grateful for a reply.  Thanks."

2       Q.   Dr. Cooke, do you agree with me that a

3   scientist conducting an unbiased study does not delete

4   information concerning problems proving the

5   hypothesis?

6       A.   Not at all.  I don't agree with you.

7       Q.   Now, one important part of the opinions you

8   expressed on direct is based upon your comparison of

9   Tenkiller to Broken Bow Reservoir; correct?

10      A.   Yes.

11      Q.   All right.  What is the -- what's the common

12  name for the watershed where Broken Bow sits?

13      A.   Mountain Fork.

14      Q.   Okay.  And I understand you contend that

15  Broken Bow provides an example what the water quality

16  would look like in Tenkiller if there had never been

17  poultry litter used in the Illinois River Watershed;

18  is that correct?

19      A.   Not exactly.

20      Q.   The primary attributes that led to your

21  selection of Broken Bow as the reference lake were its

22  size, its location in the same ecoregion, and the fact

23  that phosphorus inputs were low?

24      A.   Those were very important characteristics.

25      Q.   In fact, Dr. Cooke, don't you consider the

*7622*

1      phosphorus concentrations in the Mountain Fork River

2      feeding Broken Bow to be what should be expected from

3      an unimpaired Ozark Highlands stream?

4          A.   They're pretty close.

5          Q.   Now, prior to the time that you issued your

6      report, you'd never visited Broken Bow Reservoir or

7      the Mountain Fork Watershed, had you?

8          A.   No.

9                    MR. MCDANIEL:  May I approach, Your

10     Honor?

11                   THE COURT:  Yes, sir.

12         Q.   *(BY MR. MCDANIEL)*  Dr. Cooke, I want to talk

13     to you about the concept of identifying a control or a

14     reference in order to isolate the effect of the

15     variable, and I have created this little demonstrative

16     for us to use as a tool during the discussion.  If we

17     can look at the first page.

18                   If you're going to study a subject and you

19     want to know the effect of only one of the

20     variables -- and I'm calling it "variable A"

21     here -- then you want to select a control that is

22     comparable in all respects except variable A is

23     absent.  Would that be the ideal?

24         A.   That would be the ideal in laboratory

25     situations.

1      Q.    Okay.

2      A.    Not in field situations.

3      Q.    I understand.  Now, in this case, the

4   objective was to determine the effect of poultry

5   litter use on the water quality of Lake Tenkiller,

6   that was the broad issue; do you agree?

7      A.    Yes.

8      Q.    Would you agree then that the variable is the

9   land use of utilizing poultry litter on pastures in

10   the Illinois River Watershed?

11      A.    That seems to be the principle variable

12   here --

13      Q.    Okay.

14      A.    -- but not the only variable.

15      Q.    All right.  Well, let's go to the next page

16   in the demonstrative.

17          So what I've done here is I've attempted to

18   take the general concept and flesh it out to the type

19   of study at hand; that is, looking at a reservoir to

20   determine the effect of litter application land use in

21   the watershed.

22          Now, what I'm showing here in this

23   demonstrative -- and this is Tyson Demonstrative

24   237 -- what I'm showing here is a partial list of

25   reservoir and watershed characteristics.  And I

1    haven't necessarily attempted to list them all, but

2    this is some of the ones that came to mind to me that

3    I want to talk to you about.

4         So some of the characteristics, litter

5    application being the variable of interest, but other

6    potential variables would include point sources; do

7    you agree, sir?

8         A.   I agree.

9         Q.   The amount of forest versus pasture

10   acreage?

11        A.   No.

12        Q.   You don't agree to that?

13        A.   No.

14        Q.   How about the presence of cattle?

15        A.   No.

16        Q.   How about the presence of swine?

17        A.   No.

18        Q.   How about the human population?

19        A.   No.

20        Q.   How about the watershed to reservoir area?

21        A.   No.

22        Q.   How about the age of the reservoir?

23        A.   That possibly could be a variable that should

24   be comparable.

25        Q.   How about residence time?

1      A.   Be nice if they're comparable.

2      Q.   All right.  These factors where you answered

3  "no" to me -- point sources, cattle, swine, humans --

4  you agree all those are potential contributors of

5  nutrient loading or phosphorus loading into the waters

6  of the watershed, don't you, sir?

7      A.   They could be.

8      Q.   Okay.  Let's take this to the next step.

9  Let's show the next page of the exhibit.

10          MR. MCDANIEL:  And I want to point out

11  for the court and the state's counsel that on the

12  cited references at the bottom, I just spotted a

13  mistake.  Everywhere it makes a reference to "Wells

14  Depo," that should be "Dr. Welch's Depo."  I apologize

15  for that.

16      Q.   *(BY MR. MCDANIEL)*  All right.  I want to

17  flesh out this comparison chart even further by adding

18  the information that you have about the two reservoirs

19  and watersheds.

20          Now, let's look at litter application.  We

21  know there's litter applied in the Illinois River

22  Watershed.  Now, how about the Mountain Fork Watershed

23  feeding Broken Bow; what do you know about litter

24  application in that watershed?

25      A.   Well, I know there's around 200 poultry

7626

1  houses there so there may well be some litter

2  application, but -- let me finish -- the percent of

3  pasture there is small.  So relative to the percent of

4  pasture to Broken Bow, there may not be a lot of

5  litter.

6          MR. MCDANIEL:  May I approach, Your

7  Honor?

8          THE COURT:  Yes, sir.

9      Q.  *(BY MR. MCDANIEL)*  Now, Dr. Fisher provided

10  you some information about poultry operations in the

11  Mountain Fork Watershed, did he not?

12     A.  Yes.

13     Q.  All right.  What I've handed you is marked

14  for identification as Defendants' Joint 5654.  Would

15  you identify that?

16     A.  It looks like it's a map of the Mountain Fork

17  River Watershed poultry house count.

18     Q.  All right.  And the X's, did you understand

19  this to represent poultry houses?

20     A.  I frankly don't recall his -- his map.

21     Q.  Is this the information you received from

22  Dr. Fisher?

23     A.  Same answer:  I just don't recall what was in

24  that report in terms of figures.

25     Q.  All right.  This document says poultry house

**United States District Court**

1    count 292.  Is that consistent with your recollection?

2        A.   That number -- for me, I had a number of 218

3    but we're close.

4        Q.   All right.  Did he represent to you that many

5    of the poultry houses in the Mountain Fork Watershed

6    were actually clustered along the river feeding Broken

7    Bow Reservoir, or was that an observation you made

8    yourself?

9        A.   That was an observation that I made in

10   conversation with him.

11       Q.   All right.  I gather that you don't have any

12   specific information about how much poultry litter is

13   land-applied each year in the Mountain Fork Watershed,

14   do you, sir?

15       A.   I do not.

16       Q.   And despite your own observation that poultry

17   houses are clustered along the Mountain Fork River,

18   you still consider the water quality of the river to

19   be relatively unimpaired; correct?

20       A.   The concentration of total phosphorus in the

21   river averages 27 micrograms, and that's very, very

22   close to its ecoregional potential.  So yes, it's

23   unimpacted by poultry litter.

24       Q.   Okay.  Let's go back to the Demonstrative

25   237.3, please.  Next on my list is poultry sales.

1           *(Discussion held off the record)*

2                   MR. MCDANIEL:  May I approach again,

3    Your Honor?

4                   THE COURT:  Yes, sir.

5        Q.   *(BY MR. MCDANIEL)*  Dr. Cooke, what I've

6    handed you is Bates-stamped CookeWelch00001342.0001.

7           Do you recognize this from your considered

8    materials?

9        A.   Yes.

10       Q.   It's a table where you have a multitude of

11   attributes that you have answered for a number of

12   different reservoirs apparently that you or you and

13   Dr. Welch looked at?

14       A.   Yes.

15       Q.   Okay.  This is what -- at the bottom of the

16   Tyson Demonstrative 237.3, where I refer to the

17   watershed comparison chart --

18       A.   Yes.

19       Q.   -- that's what I'm referring to, sir.  And I

20   wanted you to have it so you could refer to it to

21   check the numbers that I put on the demonstrative.

22          So the 2002 poultry sales in the Illinois

23   River Watershed was -- you report almost 114 million,

24   that's the information you had --

25       A.   Yes.

1      Q.   -- is that right?

2           And the information you had is something just

3   shy of 31 million birds sold in 2002 in the watershed

4   for Broken Bow?

5      A.   Yes.

6      Q.   Okay.  So based upon this information in

7   2002, the Illinois River Watershed has on the order of

8   three and a half times as much poultry production as

9   the Mountain Fork by your numbers; do you agree?

10     A.   Yes.

11     Q.   All right.  Next on my list are sewage plants

12  or point-source discharges.  The Illinois River

13  Watershed has around ten and the Mountain Fork has

14  just two tiny ones; do you agree?

15     A.   Yes.

16     Q.   Do you know how many millions of gallons per

17  day of wastewater are discharged into the streams of

18  the Illinois River Watershed by the sewage plants in

19  the watershed?

20     A.   I know it only as pounds of phosphorus and

21  not in terms of volume.

22     Q.   Well, do you recall Dr. Engel's estimate on

23  that?

24     A.   No.

25     Q.   All right.  Let's look at table 6.5 of

1    Dr. Engel's report, which she's going to blow it up

2    for you, Dr. Cooke.

3        A.    Thank you.

4        Q.    Table 6.5, do you see that, sir, on your

5    monitor?

6        A.    Yes.

7        Q.    Do you recall reviewing that information when

8    you looked through his report?

9        A.    I recall seeing this.

10        Q.    Do you accept Dr. Engel's estimates related

11    to the sewage plants in the Illinois River Watershed?

12        A.    I didn't use these values.  We used other

13    data for this.

14        Q.    All right.  Do you accept his values as being

15    reasonable?

16        A.    I cannot comment on that because we never

17    looked at volume; we looked at pounds or kilograms of

18    phosphorus.

19        Q.    All right.  Well, let's -- then let's just at

20    least identify what his estimates were.  Let's go down

21    the list here.

22             He's got Springdale at 12.4 million gallons

23    per day; correct?

24        A.    Yes.

25        Q.    Siloam Springs at basically 2.7 million

1    gallons per day; right?

2        A.   Yes.

3        Q.   The Fayetteville Noland plant at essentially

4    5.2 millions of gallons per day?

5        A.   Yes.

6        Q.   Rogers at 5.7 million gallons her day;

7    right?

8        A.   Yes.

9        Q.   Lincoln at .4 million gallons per day?

10       A.   Okay.

11       Q.   Prairie Grove at .3 million gallons per day?

12       A.   Okay.

13       Q.   Tahlequah at 2.7 million gallons per day?

14       A.   Okay.

15       Q.   Stilwell at .8 million gallons a day?

16       A.   Okay.

17       Q.   Westville at .1 million gallons per day?

18       A.   Okay.

19       Q.   And Gentry at .4?

20       A.   All right.

21       Q.   All right.  When I add this up, I've got

22    30.77 million gallons per day for these ten

23    dischargers.  Can you accept my addition?

24       A.   Yes, I will.

25       Q.   Okay.  And his figure, just to be clear, it's

1   wastewater-treatment plant water discharges since

2   2003, just for the record to be clear what his table

3   says.

4           So there's almost 31 million gallons of

5   wastewater per day discharged into the streams of the

6   Illinois River Watershed; do you agree?

7       A.   Yes.

8       Q.   Now, the two sewage plants in the Mountain

9   Fork are putting out about a tenth of a million

10  gallons per day; do you agree?

11      A.   I have no information on that, unless it's in

12  this chart somewhere.

13              *(Discussion held off the record)*

14      Q.   *(BY MR. MCDANIEL)*  Dr. Cooke, while we're

15  giving the court just a moment here, in your December

16  4th, 2008, deposition, turn to page 116, please.

17      A.   116, sir?

18      Q.   Yes, sir.

19      A.   Okay.

20      Q.   All right.  Beginning on line 24, the

21  question was, "Can you tell me the number and size of

22  sewage treatment facilities that are present in the

23  Illinois River watershed compared to the number in the

24  Broken Bow watershed?"

25              Your answer:  "The Broken Bow watershed has

1  two tiny wastewater treatment facilities.  They're

2  putting out less than one MGD, less than a tenth of a

3  MGD.  They're very tiny.  In the Illinois River

4  watershed, there are ten wastewater treatment plants."

5       Q.  Do you recall that testimony now, sir?

6       A.  If it's on here, I said it.

7       Q.  All right.  So if your testimony is that the

8  Mountain Fork sewage treatment plants are putting out

9  a tenth or less of a million gallons per day, that

10 would mean that the wastewater output into the

11 Illinois River stream system is on the order of 307

12 times higher than the Mountain Fork stream system; do

13 you agree?

14      A.  I'll accept your arithmetic.

15      Q.  All right.  Let's go back to the

16 Demonstrative 237.3.

17      A.  A moment, sir.  Can I put this back?

18      Q.  You can reassemble that and set it aside.

19 Thank you.

20      A.  Go ahead.

21      Q.  All right.  Next on the list in the

22 demonstrative is the percent forest -- or the extent

23 to which the two watersheds are covered in forest.

24 Maybe that's a better way of putting it.

25           Do you agree, sir, with the general

1    proposition that the more forest in a watershed, the

2    less tendency to have issues with nonpoint-source

3    pollution?

4         A.   The more forest --

5         Q.   The more forest you have, the less tendency

6    to have issues with nonpoint-source pollution?

7         A.   Yes.

8         Q.   And forest as a land use is one of the lowest

9    contributors of nonpoint-source runoff?

10        A.   Yes.

11        Q.   All right.  So the Illinois River Watershed

12   you report as 43 percent forest and the watershed for

13   Broken Bow is nearly twice that at 79 percent;

14   right?

15        A.   Yes.

16        Q.   So the Mountain Fork Watershed, Dr. Cooke,

17   it's largely undeveloped, isn't it?

18        A.   That's correct.

19        Q.   Now, there are significant differences in the

20   size of the cattle industry in these two watersheds;

21   do you agree?

22        A.   Yes.

23        Q.   According to your information, the 2002

24   cattle population in the Illinois River Watershed was

25   almost 213,000 head, whereas the Mountain Fork has

*7635*

1    only 50,000 head.  That was your information?

2        A.  Yes.

3        Q.  And that makes the cattle industry slightly

4    more than four times larger in the Illinois River

5    Watershed; right?

6        A.  Yes.

7        Q.  Okay.  Now, the percentage of the watershed

8    covered with pasture is another relevant factor for

9    the potential contribution of nonpoint-source runoff;

10   correct?

11       A.  Correct.

12       Q.  Now, according to you, the Illinois River

13   Watershed is 45 percent pasture, whereas the Mountain

14   Fork is only 12 percent, or less than a third, of the

15   Illinois River Watershed's pasture coverage; do you

16   agree?

17       A.  Yes.

18       Q.  All right.  Let's look at swine.

19           According to the information you have,

20   there's a large difference in the size of the swine

21   industry in the two watersheds; do you agree?

22       A.  Yes.

23       Q.  According to you, the hog sales in the

24   Illinois River Watershed are about 147,000 head per

25   year, whereas the sales in the Mountain Fork Watershed

**United States District Court**

1    are about 82,000 head?

2        A.   Right.

3        Q.   Do you know, sir, whether or not the typical

4    use for swine manure is land application for

5    fertilizer?

6        A.   It can be.

7        Q.   Do you know if that's typically how it's

8    used?

9        A.   It's -- I don't believe it's typically how

10   it's used.

11       Q.   Did you assess the extent to which swine

12   manure is used as a nutrient source for lands in the

13   Mountain Fork Watershed?

14       A.   I did no work on the watershed.

15       Q.   Okay.  Now, according to you, the human

16   population in the Illinois River Watershed is nine and

17   a half times larger in the Illinois River Watershed

18   than it is in the Mountain Fork; do you agree?

19       A.   Yes.

20       Q.   So you've got 285,000 people in the Illinois

21   River Watershed and 30,000 people in the Mountain

22   Fork; right?

23       A.   Yep.

24       Q.   Now, I don't suppose there's much question

25   that humans, their habitats and activities, can have a

1    negative effect on water quality?

2        A.    They certainly can.

3        Q.    Now, the watershed area to reservoir surface

4    area ratio is another factor that scientists in your

5    field look at when assessing watersheds and lakes and

6    reservoirs; correct?

7        A.    Yes.

8        Q.    All right.  You already testified that for

9    the Illinois it's 80 acres of land for every surface

10   acre of Lake Tenkiller; right?

11       A.    Yes.

12       Q.    Now, for Broken Bow, the ratio is less than

13   one-half that at 34 to 1; right?

14       A.    Right.

15       Q.    So that means in Broken Bow, there's only 34

16   acres draining to every surface acre of that

17   reservoir?

18       A.    Yes.

19       Q.    Would you agree then that as between the two

20   reservoirs, Broken Bow bears less than half of the

21   burden from runoff from the land surface in its

22   watershed than does Tenkiller?

23       A.    That would have to be computed.

24       Q.    All things being equal?

25       A.    Well, you can't do all things equal because

*7638*

1   they're not.

2       Q.   There's a significant difference in the

3   amount of acreage draining into each surface acre of

4   each of those two reservoirs; you do agree with

5   that?

6       A.   There's a significant difference in the area

7   draining, yeah, that's correct.

8       Q.   All right.  When we look at the age,

9   Tenkiller's 18 years older than Broken Bow; right?

10      A.   Yes.

11      Q.   In 2009, Tenkiller's 57 years old; right?

12      A.   Yes.

13      Q.   Older than some of us in here, younger than

14  some of us in here?

15      A.   Younger than some of us in here, sir.

16      Q.   Okay.  Now, the residence time, now that's

17  another factor that can affect whether the reservoir

18  has phosphorus problems; right?

19      A.   The age of it?

20      Q.   No, sir.  The residence time.

21      A.   Oh, the residence time.  I'm sorry.  Yes.

22      Q.   Okay.  Now, you agree that Broken Bow has

23  approximately twice the residence time of Tenkiller?

24      A.   Yes.

25      Q.   Thus, the sediments and sediment-bound

1    phosphorus have a much greater opportunity to settle

2    out of the water column in Broken Bow than they do in

3    Tenkiller?

4         A.   On average, that would be true.

5         Q.   All right.  Tell me, sir, what does it mean

6    for a reservoir to be dystrophic?

7         A.   That would mean that the water has color to

8    it; that is, it has dissolved organic matter in it

9    that produces a color.

10         Q.   Well, could it also mean that the water has

11    humic -- h-u-m-i-c -- humic acids in the water that

12    come from plant life around the reservoir?

13         A.   Yes.

14         Q.   And humic acids can come from evergreen

15    forests; correct?

16         A.   They could.

17         Q.   The Mountain Fork Watershed has a lot of

18    evergreen trees, whereas Tenkiller is surrounded by

19    deciduous forest; do you agree with that?

20         A.   No.

21         Q.   Which part of that don't you agree with?

22         A.   Well, they have -- they each have some of

23    that kind of vegetation.  Their climax vegetation

24    includes a pine forest --

25         Q.   Is there a greater percent -- I'm sorry.

7640

1      A.   -- and oaks.

2      Q.   Is there a greater percentage of evergreen

3   trees in the forest in the Mountain Fork Watershed

4   than there are in the Illinois River Watershed?

5      A.   Yes.

6      Q.   Now, as a consequence of the humic acids and

7   organic water -- excuse me -- as a consequence of

8   these humic acids and organic water, the water in a

9   dystrophic lake tends to be stained brown?

10     A.   Yes.

11     Q.   And dystrophic lakes do not tend to be highly

12  productive of algae, are they?

13     A.   They can be highly productive, yes, they can.

14     Q.   That wasn't my question.  They do not

15  tend -- they're not typically high productive in

16  algae?

17     A.   I don't know the answer to that; I simply

18  don't.

19     Q.   Do you agree that Broken Bow is dystrophic?

20     A.   No.

21     Q.   You know that Tenkiller is not dystrophic;

22  correct?

23     A.   Tenkiller is not dystrophic and Broken Bow

24  isn't either.

25          MR. MCDANIEL:  May I approach, Your

**United States District Court**

1  Honor?

2                THE COURT:  Yes.  Is the term "humic

3  acids"?

4                MR. MCDANIEL:  H-u-m-i-c.

5                THE COURT:  All right.  And is it clear

6  that evergreens tend to produce humic acid?  Is that

7  correct?

8                THE WITNESS:  I don't know that they do.

9                THE COURT:  Oh, okay.  All right.  Thank

10  you.

11      Q.   *(BY MR. MCDANIEL)*  All right.  Dr. Cooke,

12  what I've handed you is figure 14 from Dr. Horne's

13  report.  Do you remember looking at these photographs?

14      A.   Yes.

15      Q.   And in particular -- I'm sorry.

16           *(Discussion held off the record)*

17      Q.   *(BY MR. MCDANIEL)*  In particular, I want to

18  draw your attention to the top two photos --

19      A.   Okay.

20      Q.   -- where Dr. Horne at least purports that he

21  took photos on the 1st and 3rd of October of 2008 off

22  the stern of a boat, on the left, Lake Tenkiller; and

23  on the right, Broken Bow.

24           Do you see an apparent difference in the

25  color of the water between the two reservoirs?

1    A.    There is an apparent difference.

2    Q.    With Broken Bow appearing brown?

3    A.    Well, I don't see brown there but it

4   certainly is darker.

5    Q.    All right.  But you've never personally been

6   to Broken Bow and seen the color of the water?

7    A.    No.  I relied on the OWRB to do that.

8    Q.    Dr. Cooke, despite the differences in these

9   two watersheds that we walked through here and the

10  differences in the reservoirs that we've discussed, do

11  you still maintain that Broken Bow represents what

12  Tenkiller would look like if there had never been a

13  poultry industry in the Illinois River Watershed?

14   A.    It's pretty close.  The only difference is

15  that there is a small percentage of phosphorus going

16  into Tenkiller from wastewater.  That is a phosphorus

17  source but that is the only difference.

18   Q.    Now, isn't a built-in assumption in your

19  answer that in your view if the poultry industry had

20  never developed any operations in the Illinois River

21  Watershed, you don't think that there would have been

22  a cattle industry developed and you don't think that

23  the watershed would have experienced deforestation?

24  Are those assumptions?

25       MR. PAGE:  Objection; compound, Your

**United States District Court**

 1   Honor.

 2              THE COURT:  Sustained.

 3        A.   I didn't make those assumptions.

 4        Q.   *(BY MR. MCDANIEL)*  Just a second, sir.  I

 5   need to reask the question.  He sustained the

 6   objection.

 7              Is it built in -- are you assuming, sir, that

 8   if it had not been for the poultry industry, that the

 9   cattle industry wouldn't be as widespread as it is in

10   the Illinois River Watershed?

11        A.   I hadn't thought that way.  We're thinking of

12   a different kind of question.  The poultry industry

13   is, in fact, there and is the major contributor of

14   phosphorus to Tenkiller Reservoir.  That's the

15   issue.

16              MR. MCDANIEL:  Yeah, I move to strike

17   that last answer, Your Honor.  There's no foundation,

18   what is the primary source.  That wasn't covered on

19   direct.

20              THE COURT:  Sustained.

21        Q.   *(BY MR. MCDANIEL)*  Does your assumption that

22   Tenkiller would look like Broken Bow assume that the

23   land uses in the two watersheds would be the same?

24        A.   Close to the same.

25        Q.   Which means there wouldn't be the extent of

1    deforestation in the Illinois River Watershed as has

2    occurred over its history since the dam was closed?

3        A.   Well, I can answer that by saying the

4    deforestation in the Tenkiller watershed became

5    pastures which were then covered with chicken litter.

6        Q.   That's my point, sir.  In your mind, those

7    are all tied in together with the presence of the

8    poultry industry; isn't that true?

9        A.   It's true.  You're asking me if the poultry

10   industry wasn't there, would Tenkiller's watershed be

11   covered with trees?  I can't know that.

12               MR. MCDANIEL:  May I approach, Your

13   Honor?

14               THE COURT:  Yes, sir.

15       Q.   *(BY MR. MCDANIEL)*  All right.  Dr. Cooke,

16   I've handed you what's marked for identification as

17   Defendants' Joint 698, a six-page grouping of e-mails.

18        Do you recognize these as e-mails between

19   yourself and Dr. Jones and Dr. Welch relating to the

20   work in this project?

21        A.   Yes.

22               MR. MCDANIEL:  Your Honor, I offer

23   Defendants' Joint Exhibit 698.

24               THE COURT:  Any objection?

25               MR. PAGE:  May I just have a minute,

1    Your Honor, just to go through the pages?

2               THE COURT:  Yes, sir.

3               MR. PAGE:  No objection, Your Honor.

4               THE COURT:  Exhibit 698 is admitted.

5        Q.  *(BY MR. MCDANIEL)*  All right.  Dr. Cooke,

6    let's focus on the message from Dr. Jones to you and

7    Dr. Welch on December 14th, 2007, there on the very

8    first page.

9            Would you read Dr. Jones' message, please?

10       A.   "These reservoirs are remarkably different.

11   The TK watershed has 43% forest, 45% grass and .14%

12   cropland.  The BB watershed has 79% forest, 12% grass

13   and .03 cropland.  Twice the forest and one-quarter

14   the grass explains a lot."

15       Q.   Now, did Dr. Jones not approve of the choice

16   of Broken Bow as the reference watershed for this

17   project?

18       A.   I don't recall that he disagreed about it at

19   all.

20       Q.   Well, he did point out several of the major

21   differences in the two watersheds, just like what you

22   and I went through; correct?

23       A.   Yes.

24       Q.   His opinion he expressed here, is it true

25   that what his opinion was is that the difference in

1    the water quality between Tenkiller and Broken Bow

2    could largely be explained by the fact that the

3    Mountain Fork Watershed was mostly forest with little

4    pasture?

5        A.   I don't see that in this message, and I know

6    he didn't mean to say it.

7        Q.   All right.  Let's turn back to Exhibit 707 in

8    front of you, please, Dr. Cooke.  It's one of the

9    e-mails we went through at the beginning of the

10   morning.  Let me know when you've found it.

11       A.   Yes.

12       Q.   All right.  Turn to the second page, sir.

13   And the message at the top from Dr. Jones to you on

14   December 18th, 2007, at 3:59, the second paragraph

15   there, he says, "The fig above is Fig 4 from the 2004

16   CJFAS paper on land use and nutrients in Missouri

17   reservoirs.  Simply put, high forest and low

18   nutrients.  The BB situation is likely explained by

19   the massive amount of forest cover in the watershed."

20           Those were his words; correct?

21       A.   Yes.

22       Q.   So he reurged his point to you again in this

23   message four days later, and he stated that "the

24   (Broken Bow) situation is likely explained by the

25   massive amount of forest cover in the watershed."

1   That was his opinion at that time; correct?

2       A.   Yes.   The opinion means that there was a

3   small amount of pasture, which is where the litter is

4   applied.

5                MR. MCDANIEL:   I move to strike as

6   nonresponsive.

7                THE COURT:   Overruled.

8       Q.   *(BY MR. MCDANIEL)*   All right.   You associated

9   with Dr. Jones on this project because he's an expert

10  in Ozark Highlands lakes; right?

11      A.   I wouldn't say he's an expert in Ozark

12  Highlands lakes more than any other area.   He's a

13  tremendous reservoir limnologist and he knows the

14  Midwest reservoirs.

15      Q.   And he has studied Ozark Highlands

16  reservoirs, hasn't he, sir?

17      A.   Yes, he has.

18      Q.   Now, in these two messages from Dr. Jones to

19  you about Broken Bow, he didn't state in either of

20  these messages that the differences in water quality

21  could be explained by the use of poultry litter, did

22  he?

23      A.   I don't know.   I guess I could sit here and

24  read these but --

25      Q.   The two that we went through where he

1    mentioned Broken Bow, he did not say that you could

2    explain the water quality as a function of poultry

3    litter use, did he, sir?

4        A.    I don't recall.  I don't see it here.

5        Q.    Now, the fact of the matter is, Dr. Cooke, in

6    this investigation you've not compared the Illinois

7    River Watershed to any other Ozark Highlands watershed

8    that's comparable in all respects to the Illinois

9    River Watershed with the exception that there was no

10   poultry litter being used; correct?

11       A.    Correct.

12             MR. MCDANIEL:  I'll pass the witness.

13   Thank you for your patience.  Thank you.

14             THE COURT:  Further cross?  Mr. Green.

15             MR. GREEN:  Thank you, Your Honor.

16                   **CROSS-EXAMINATION**

17   **BY** MR. GREEN:

18       Q.    Good morning, Dr. Cooke.  My name is Tom

19   Green, one of the lawyers representing Tyson.

20       A.    Good morning to you.

21       Q.    And I would just like to pick up with a

22   couple of questions on Broken Bow, since that's where

23   we were, and just show you what's been marked as

24   Defendants' Joint Exhibit 672.

25             MR. GREEN:  May I approach, Your?

**United States District Court**

```
 1     Honor.

 2                  THE COURT:  Yes, sir.

 3         Q.   (BY MR. GREEN)  And I'm going to apologize,

 4     Dr. Cooke, for the -- the reproduction here is not

 5     perfect.

 6         A.   I can read it, though.

 7         Q.   Okay.  So can you tell us what you're looking

 8     at there, sir?

 9         A.   It's an e-mail from me to Robert van

10     Waasbergen.

11         Q.   Okay.  And can you tell us who he is, please?

12         A.   Van Waasbergen is an employee on this

13     project, a consultant on this project, for the

14     plaintiffs.

15         Q.   All right.  And this is an e-mail that you

16     sent him on Friday, September 28th, in the year 2007;

17     is that right?

18         A.   Yes.

19         Q.   And this concerns disinfectant byproducts,

20     trihalomethane levels that were detected in Broken

21     Bow; is that not right?

22         A.   I haven't read it.  May I?

23         Q.   Sure.

24         A.   Okay.

25         Q.   All right.  Is that correct that --
```

**United States District Court**

1      A.   Yes.

2      Q.   -- you're discussing trihalomethane values

3   found in Broken Bow?

4      A.   Yes.

5           MR. GREEN:  Your Honor, I move the

6   admission of Defendants' Joint Exhibit 672.

7           THE COURT:  Any objection?

8           MR. PAGE:  No objection.

9           THE COURT:  672 is admitted.

10     Q.   *(BY MR. GREEN)*  Would you be good enough,

11  sir, to read the beginning of that e-mail at the top

12  of the page that starts "Robert:  Yes, this is more

13  manageable"?  Can you read that message into the

14  record, please?

15     A.   "Robert:  Yes, this is more manageable though

16  it was too wide by one column and thus I have 32

17  pages.  Thanks for making it smaller and thus more

18  useful.

19           "I am amazed at the very high THM values from

20  Broken Bow.  That reservoir is supposed to be our

21  reference reservoir.  What do we know about the

22  location of this utility - where river or some spot on

23  the reservoir do they get their water?  Now that we

24  have obtained these data, it is likely that we will

25  have to use them.  We need to find an explanation for

1    this.  Maybe the utility does not do a good job of

2    treating water.  I wonder what type of plant they

3    have.  Is this type of inquiry within your scope of

4    expertise and assignment.  I ask that because the

5    confusion level is high regarding who is doing what."

6         Q.    And you signed it "Denny"; right?

7         A.    Yes, correct.

8         Q.    Okay.  Now, you never came up with an

9    adequate explanation for this very high level of

10   trihalomethane, and so you just attributed that to

11   operator error at the water utility; isn't that right,

12   Doctor?

13        A.    No.  We did come up with an explanation for

14   it.

15        Q.    You did?

16        A.    Yes.

17        Q.    And what was that?

18        A.    The explanation is that the operator is using

19   three separate doses of chlorine in the treatment

20   train and this is guaranteed to push THM levels up.

21        Q.    So that's just what I said, you came up with

22   an explanation that it was operator error; correct?

23        A.    Okay.

24        Q.    All right.  And you didn't discuss the

25   disinfection byproduct sampling results from Broken

*7652*

1  Bow in your report, did you, sir?

2      A.   No.

3      Q.   Now, I just want to cover a couple of other

4  small points.

5           You're not a certified engineer, are you?

6      A.   No.

7      Q.   And you do not consider yourself to be a

8  sanitary engineer?

9      A.   I'm not.

10     Q.   And you're not certified in any state as a

11  drinking water utility operator; isn't that correct?

12     A.   I'm not.

13     Q.   Now, there was some discussion with Mr. Page

14  about whether or not the EPA considered embryotoxicity

15  in setting disinfection byproduct standards.  Do you

16  remember that?

17     A.   Yes.

18     Q.   And you said they did?

19     A.   Yes.

20     Q.   But, sir, the truth is that you're on record

21  as saying that the EPA's protocol for sampling DBPs is

22  part of a cover-up to cover up single sample

23  exceedances; isn't that right?

24     A.   No.

25     Q.   You've never said that?

1          A.   I've never said the word "cover-up," I hope.

2               MR. GREEN:  Just bear with me a moment,

3    Your Honor.

4          Q.   *(BY MR. GREEN)*  Let me give you your

5    deposition, sir.

6          A.   I have both depositions here.

7          Q.   Do you?  All right.

8               MR. GREEN:  Does Your Honor have a copy

9    of the deposition?

10              THE COURT:  I don't -- yes, I do.  I'm

11   sorry.  I've got Volume 1.

12         Q.   Okay.  I want you to turn to page 206 in your

13   deposition.

14         A.   This is Volume 1?

15         Q.   Yes.

16         A.   Okay.

17         Q.   All right.  Let us pick up on the text here

18   at line 22 on page 206, and let me ask you whether or

19   not you were asked the following questions --

20              MR. PAGE:  Your Honor, before we go, can

21   I just interpose an objection here as beyond the

22   scope?  He's being examined here on the very chart and

23   the very type of information that this court sustained

24   an objection on from Mr. Green.  So if he's going to

25   go into this, Your Honor, I should be allowed on

1    redirect then to bring that exhibit in and do a full

2    examination.

3                    MR. GREEN:  May I respond to that?

4                    THE COURT:  Of course.

5                    MR. GREEN:  Actually, what I plan to do

6    is, after I ask a few questions, I'm going to make a

7    motion to strike the entirety of Dr. Cooke's testimony

8    for the reasons which I'll articulate at that time.

9            I don't believe that I'm opening the door

10   here to his chart.  I'm opening the door to the

11   inherent rationality of his views.  This is a -- this

12   is an expert witness who, among other things that I

13   will talk about in a moment, is telling the court that

14   he believes that the EPA is engaged in a cover-up with

15   respect to how it regulates disinfection byproducts.

16           I'm really not invading the table, I don't

17   intend to invade the table, but we're testing now the

18   contours and fringes of his views because I think it

19   goes to the reliability of his testimony and his

20   status as an expert who is deserving of belief in this

21   courtroom.  I think that I can test the rationality

22   with that with his own concession on the record that

23   he believes that the EPA is engaged in a cover-up.

24                   THE COURT:  I see on page 207 where he

25   says, "that's how they" -- referring to the

1   EPA -- "essentially cover up these exceedances."  He's

2   not using the term that it is a cover-up.  He just

3   says -- he's saying that running averages, as he

4   states later, "means that the utility is not forced to

5   make any kind of changes, they don't have to, and

6   because the guidelines, including running

7   four-quarters average are not only based on health

8   risks but are based upon costs to get it down,"

9   etcetera.

10          I think Mr. Page's point is a good one.  The

11  reference to dangers to embryos was solely admitted

12  for the purpose of explaining to the court why DBPs

13  are measured by the EPA.  It seems to me we're trying

14  to use a very small crack in the door to get into this

15  area and I understand your attempt to paint Dr. Cooke

16  as an extremist.

17          But Mr. Page is entirely correct, that I

18  think it's an improper use.  The objection is

19  sustained.

20     Q.    *(BY MR. GREEN)*  Doctor, you did not sit on

21  any of the EPA's committees that considered whether to

22  adopt a standard for cyanobacteria; is that correct?

23     A.    Correct.

24     Q.    And it is true --

25     A.    Excuse me.  A standard for cyanobacteria?

*7656*

1      Q.   Yes.

2      A.   Could you tell me what that standard is?

3      Q.   I'm asking you whether you sat on any

4  committee that considered whether to adopt a standard

5  for cyanobacteria, an EPA committee?

6      A.   I did not.

7      Q.   Okay.  It's true, is it not, that in this

8  country -- tell me if I'm right -- that neither the

9  EPA nor the State of Oklahoma has set regulatory

10  limits on cyanotoxins in drinking water or surface

11  water?

12      A.   That's correct.

13      Q.   And are you aware that the Safe Drinking

14  Water Act requires the EPA to make periodic

15  determinations on whether additional substances in

16  drinking water should be regulated?

17      A.   Yes.

18      Q.   And are you aware whether or not the EPA has

19  expressly considered whether cyanobacteria and

20  cyanotoxins should be regulated in drinking water, and

21  they've done this on at least three occasions, in

22  1998, in 2005, and as recently in 2008?  Are you aware

23  of that?

24      A.   Yes, they have considered that.

25      Q.   Okay.  And are you also aware that each time

1    when that was considered, the EPA determined that the

2    state of the science still does not support a drinking

3    water standard for cyanobacteria or cyanotoxins?

4        A.    I agree.

5        Q.    And just a couple more questions on this

6    subject.

7              As far as you know, the State of Oklahoma has

8    not shut down any water treatment utility, water

9    treatment plant on account of microcystin; isn't that

10    right

11        A.    To my knowledge.

12        Q.    And you've not seen any Oklahoma state

13    Department of Health or Centers for Disease Control in

14    a prevention bulletin reporting any disease outbreaks

15    due to cyanobacteria in Oklahoma in the last ten

16    years?

17        A.    I have not.

18        Q.    And finally, sir, you have no information

19    that the State of Oklahoma has closed Lake Tenkiller,

20    or for that matter the Illinois River, for swimming

21    due to alleged cyanobacteria problems?

22        A.    No knowledge.

23        Q.    Okay.

24              MR. GREEN:    Now, Your Honor, in view of

25    the certain questions that were asked by Mr. McDaniel

1  and the answers given by the doctor, and in particular

2  the discussion about the flaws in his data and that he

3  had deleted -- I'm quoting from Defendants' Joint

4  Exhibit 694 -- that he had deleted "a lot of stuff

5  where the three of us have mentioned flaws in the

6  work," etcetera, I'm very concerned that all of

7  that -- all of those attendant circumstances do not so

8  rob this testimony of its inherent reliability that

9  it -- that it should be allowed to remain on the

10  record.

11          This is just not a cross-examiner's point.

12  This is, in my mind, a much more serious --

13          THE COURT:  It's a serious concern,

14  Mr. Green.

15          I take it, Mr. Page, you did not direct any

16  of the scientists to destroy any of the extant

17  e-mails?

18          MR. PAGE:  That's correct, Your Honor.

19          And in this same deposition, Dr. Cooke was

20  asked that and he stated he never did that, he never

21  deleted it all.  His testimony under oath --

22          THE COURT:  No, no, no.  Wait a minute.

23  He never deleted it all?

24          MR. PAGE.  No.  He didn't delete the

25  e-mails.

1              THE COURT:  Oh.  Despite his statement

2     in --

3              MR. PAGE:  Despite his statement, all

4     his e-mails were produced to the other side, and

5     that's under oath in his deposition.

6              THE COURT:  All right.  Mr. Green, your

7     response?

8              MR. GREEN:  I can only take the words at

9     face -- at face value.  It sounds to me when you read

10    that e-mail that that's a pretty bold and

11    straightforward concession that he had deleted

12    material.  Plus --

13             THE COURT:  Well, because it is

14    important and I need to get to the truth, so let's

15    turn to the e-mail and also turn to the portion in the

16    deposition.  I think we need to take this time.  This

17    process is one to try to get to the truth.  So which

18    exhibit?

19             MR. GREEN:  694, Your Honor.

20             THE COURT:  Thank you.  All right.  He

21    says "I am deleting."  He doesn't say, "I have

22    deleted."

23          Let's go to the deposition.  What page of the

24    deposition --

25             MR. GREEN:  We're looking for it, sir.

*7660*

1          THE COURT:  Thank you.  Dr. Cooke, let

2   me just ask you this -- and I expect I know the

3   answer -- but Mr. Page did not tell you to delete any

4   e-mails in which you had discussed opinions relating

5   to the process; is that true?

6          THE WITNESS:  Yes, sir, it is.

7          THE COURT:  All right.  Did you, in

8   fact, delete any e-mails?

9          THE WITNESS:  I think I did delete some

10  e-mails.

11          THE COURT:  All right.  And what portion

12  of the deposition -- I appreciate your candor here.

13          THE WITNESS:  And I'd like to explain

14  about what this means.

15          THE COURT:  We'll get to that.  I need

16  to get to the portion of the deposition here.

17      Mr. Green.

18          MR. PAGE:  Your Honor, the portion I was

19  looking at was page 14.

20          THE COURT:  In the deposition?

21          MR. PAGE:  Yes, sir.

22          THE COURT:  Thank you.

23          MR. GREEN:  There seems to be two

24  discussions of this, Your Honor.

25          THE COURT:  All right.  Let me read

**United States District Court**

1    14.

2              MR. GREEN:  I'm looking at Volume 1 of

3    Dr. Cooke's deposition dated the 4th day of December,

4    2008, and I'm looking at pages 14 and 15.

5              THE COURT:  Yes, sir.  All right.  Let

6    me read those.

7              MR. PAGE:  And if you would, Your Honor,

8    read 16 also, please.

9              THE COURT:  All right.

10             MR. PAGE:  And on to 17, Your Honor,

11   please.

12             THE COURT:  All right.

13             MR. PAGE:  And 18.

14             THE COURT:  All right.

15             MR. PAGE:  There's a lot of examination

16   on this, Your Honor.

17             THE COURT:  I suspect so.

18             MR. PAGE:  And also, Your Honor, I found

19   some more references on 236.

20             THE COURT:  All right.  Thank you.

21             MR. JORGENSEN:  Your Honor, the 236

22   reference goes on to 237.

23             THE COURT:  Thank you.  All right.

24        Mr. Green, how do you propose addressing this

25   matter?  Should we focus on this and allow Mr. Page to

1    voir dire the witness?

2              MR. GREEN:  I think that that's a

3    perfectly acceptable approach.  I do note that the

4    witness is -- my quick assessment of this is he's all

5    over the place.  I don't mean to be demeaning here in

6    any way, but the --

7              THE COURT:  Well, I'll be the judge of

8    that.

9              MR. GREEN:  The sands seem to be

10   shifting, as I see it, and then we have the answer

11   given directly to Your Honor's question that he did

12   delete material.  There's also some reference to

13   whether he's -- you know, it's clear that he deleted

14   something.  There's movement --

15             THE COURT:  He admits that.  Let's see

16   if we can clarify that.

17        You know, this is a complicated matter.  The

18   world's a complicated place.  I mean, we need to

19   pursue the truth wherever it leads us.  Let's go.

20        Mr. Green.

21             MR. GREEN:  All right.  Permit me just

22   to ask a couple of questions.

23        Q.   *(BY MR. GREEN)*  Doctor, you have that e-mail

24   in front of you.  I've reviewed your deposition

25   testimony here.  Tell us, sir, whether or not you

1    deleted e-mail discussions, or for that matter text

2    discussions, or any other kind of material that you

3    may have discarded discussing flaws in the data.

4        A.    Let me first define what I used the word

5    "delete" to mean.  I think you're considering it to be

6    an active -- an activity to cover up, to eliminate

7    information that would be damaging to any position we

8    might have.  In fact, this is normal scientific

9    dialogue between investigators.  As testimony

10    yesterday revealed on concentrations of phosphorus in

11    Tenkiller Reservoir, we chose not to use five years of

12    phosphorus data in Tenkiller Reservoir because the

13    method was flawed.  We deleted that material from our

14    graphs.

15                THE COURT:  But that's different,

16    Doctor, with all due respect.  You say here that

17    you're "deleting a lot of stuff where the three of us

18    have mentioned flaws in the work."

19                THE WITNESS:  Yes.

20                THE COURT:  You know, it's fine in the

21    scientific process to analyze different approaches,

22    but it's another thing entirely to delete references

23    or mentions of flaws in the work.  Would you agree

24    with me?

25                THE WITNESS:  So --

1          THE COURT:  I mean, simply because you

2    talk about potential flaws --

3          THE WITNESS:  Right.

4          THE COURT:  -- doesn't undermine the

5    eventual approach that you take, but you can't delete

6    mention of the flaws when you've already made them in

7    discussions with one another.  Do you understand?

8          THE WITNESS:  I understand.  I'm afraid

9    I'm being pushed into a corner that I don't believe I

10   got there.  We deleted materials that were no longer

11   useful to us; I did.

12         THE COURT:  But you say you deleted "a

13   lot of stuff where the three of us have mentioned

14   flaws in the work."

15         THE WITNESS:  Yes.

16         THE COURT:  What did you delete?

17         THE WITNESS:  Well, we -- this is

18   material no longer of any use to us so I discarded it,

19   including the discussions of it.

20         THE COURT:  Mr. Green.

21         THE WITNESS:  Does that make sense to

22   you, sir?

23         THE COURT:  Well, I need Mr. Green to

24   ask questions, Mr. Page to ask questions to see if we

25   can make a determination of what exactly was deleted.

1          Go ahead, Mr. Green.

2     Q.   *(BY MR. GREEN)*   This exhibit, Doctor, which

3    is Defendants' Joint Exhibit 694, the one that

4    references your conversation with Mr. Page and your

5    deleting lots of stuff that the three of us have

6    mentioned flaws, that occurred on December 7th of

7    2007; correct?

8     A.   Yes.

9     Q.   All right.  But as you may recall,

10   Mr. McDaniel indicated and took you through a number

11   of e-mails that preceded that date and which occurred

12   as early as October of 2007, where you and Jack Jones

13   and maybe even Dr. Welch are going back and forth

14   about problems with the data; isn't that correct?

15    A.   Yes.

16    Q.   Okay.  So you're obviously concerned about

17   the integrity of the data and whether or not the data

18   that you're using is correct, and those conversations

19   are documented right here in these exhibits?

20    A.   Yes.

21    Q.   All right.  So now we move to December, and

22   when you make a reference to David Page warning you

23   about using e-mails to discuss these things, what

24   things is he warning you not to discuss?

25    A.   I do not know what the context of that first

1   sentence was.  The next sentence I do understand.

2        Q.   Well, don't you -- doctor, would it be unfair

3   for me to assume that what Mr. Page desires you to

4   stop doing is to discuss in e-mails with your

5   colleagues, the other experts in this case, the

6   problems you're having with this data, the flaws that

7   you're having with this data, because like any, you

8   know, sensible lawyer, he'd prefer not to have you

9   entering into these kinds of discussions?  Isn't that

10  what he's telling you to do?

11       A.   I believe so.

12       Q.   Okay.  So now we've established that.

13            And so what happens is, is your reaction to

14  that is, by golly, I'm going to go back and get rid of

15  this stuff where we've done just exactly that.  And

16  you, perhaps not thinking it through, write an e-mail

17  where you say, "I'm deleting a lot of stuff where the

18  three of us have mentioned flaws in the work."

19            So what you're doing is, you're obviously

20  reacting to the admonition that you received from

21  Mr. Page; isn't that correct?

22       A.   No, sir, it's not.

23       Q.   Okay.

24       A.   And it can't be obvious.  The next sentence

25  is an entirely different thought:  "I am deleting a

1    lot of stuff where the three of us have mentioned

2    flaws in the work, etc."

3        Q.   So this e-mail -- this paragraph that I'm

4    focused on is a collection of disconnected --

5        A.   Yes, it is.

6        Q.   -- thoughts?

7        A.   What's going on at that time, December 7th,

8    we are writing a report with great intensity.  We were

9    told that the report was due, final copy, on January

10   4th --

11       Q.   Well, let's look at the -- go ahead.

12       A.   -- which would be less than thirty days from

13   that point.  We hadn't even received all of the data

14   so we're working as hard as we can to write this and

15   we are finding flaws in our analysis.  Why keep them?

16   We have better paragraphs, we have better graphs, we

17   have better statements.  That's exactly what's going

18   on here.

19       Q.   So this is just -- we're just going to get

20   rid of little typos; is that right?

21       A.   Not at all, sir.

22       Q.   Okay.  Let's look at the third thought in

23   this paragraph and see if they connect up.

24            So thought No. 1 -- or portion No. 1, "Dave

25   Page has warned me again about using e-mails to

1    discuss such things," and you and I have just

2    established what that was about.

3              Next thought:  "I am deleting a lot of stuff

4    where the three of us have mentioned flaws in the

5    work, etc.," and I've heard your explanation.

6              Third thought:  "Maybe you should call me

7    about this."

8              Now, what's that refer to?

9         A.   That means simply that; let's talk about

10   it.

11        Q.   So let's talk about the flaws rather than

12   sending e-mails about the flaws; is that right?

13        A.   Sir, I can't go beyond making an answer that

14   I have.  This is two years ago under intense pressure.

15   I cannot remember our thinking.

16        Q.   Doctor, let me ask you this.

17             Can you sit in this court and say today under

18   oath --

19        A.   Under oath.

20        Q.   -- under oath that you did not delete any

21   material, whether it be e-mails, text messages, or

22   discard other material that pertained to the

23   discussion that you were having about flaws in the

24   data?

25             MR. PAGE:  Your Honor, he's already

**United States District Court**

```
 1   testified he deleted some materials, and in his
 2   deposition he did also.
 3                 THE COURT:  All right.  What we're
 4   trying to do is delineate exactly what was deleted.
 5   Overruled.
 6           Go ahead.
 7       Q.   (BY MR. GREEN)  Let me show you -- do you
 8   have page 236 in your deposition there?  Can you turn
 9   to that?
10       A.   Yes.
11       Q.   Okay, sir.  Now, there's a question -- do you
12   see the question that begins on line 2?
13       A.   Yes.
14                 MR. GREEN:  And I'm just going to take a
15   moment more, Your Honor, and then I will yield.
16       Q.   (BY MR. GREEN)  That's a question about the
17   same material and same language in this e-mail that
18   I'm talking about; correct?
19                 MR. PAGE:  No, Your Honor.  This
20   is -- he's talking about Exhibit 1, which is his
21   report that's part of the examination.  That's a
22   misrepresentation of what's going on here.
23       Q.   (BY MR. GREEN)  Let me read -- let me read
24   the question and see if I'm understanding things
25   right.
```

1          Now, the second paragraph -- can you follow

2    along with me?  I just want to make sure you see this

3    doctor.

4        A.   Well --

5        Q.   Now, the second paragraph -- I'm going to ask

6    you about the substance of what you're discussing from

7    a substantive standpoint in a second, but I want to

8    revisit this issue in paragraph 2.

9          It says, "I am deleting a lot of stuff where

10   the three of us have mentioned flaws in the work,

11   etc."

12         Now, is that a reference to this e-mail,

13   Defendants' Joint Exhibit 694?

14       A.   It seems to be word for word.

15       Q.   It does.  It does.  And then the interrogator

16   continues:  "I believe your testimony was that you

17   never deleted any e-mails; is that true?

18         "ANSWER:   I never deleted an e-mail to my

19   knowledge, that's right."

20         Now, with respect to that answer, are you now

21   changing that answer in this courtroom and telling us

22   that you did or may have deleted e-mails discussing

23   flaws in the data?

24       A.   I deleted some e-mails, or I may have, but

25   none that discussed flaws in data.

1     Q.   All right.  Then it says, "Did you

2   develop -- did you delete texts, T-E-X-T-S?

3          "ANSWER:  Oh, sure.

4          "QUESTION:  Okay, and what's the difference

5   between a text in electronic form and an e-mail?

6          "ANSWER:  Oh, you didn't say electronic form

7   because --

8          "QUESTION:  Go ahead.

9          "ANSWER:   Welch and I neither one of us want

10  to use anything electronic and not because we have any

11  objection to that, but I can't read the screen, and so

12  a great deal of what we did, we exchanged by Federal

13  Express as text, paper, and we did editing . . . and a

14  lot of stuff you would have to scratch out, bad

15  sentence, whatever it might be.  A lot of stuff was

16  deleted that way."  I'm continuing over on 237.

17         So in addition to some e-mails, you deleted

18  some text messages that discussed flaws in the data;

19  is that right?

20    A.   Text messages, no, sir.  Text, text, meaning

21  written paragraphs written by us.

22    Q.   Written paragraphs.  Okay.  Did you discard

23  some of those that --

24    A.   Yes.

25    Q.   -- mentioned flaws in the data?

1          A.   No.  We -- we discarded flawed paragraphs

2     with flawed data in them.

3          Q.   Flawed paragraphs containing flawed data?

4          A.   That's correct.

5          Q.   All right.

6               MR. GREEN:  All right, Your Honor.  I

7     think that's probably the extent of what I'm going

8     to --

9               THE COURT:  Mr. Page.

10                *(Discussion held off the record)*

11              MR. GREEN:  Well, I'll yield for a

12    moment and then --

13              MR. PAGE:  Your Honor, may I make a

14    short comment first and then --

15              THE COURT:  Let's just get to the

16    testimony, please.

17              MR. PAGE:  Okay, sir.

18                    **VOIR DIRE EXAMINATION**

19    **BY MR. PAGE:**

20         Q.   Dr. Cooke, I want you to explain to the court

21    what was and what wasn't deleted with regard to

22    e-mails first, and then I want to talk about other

23    work that you did in this case where things were

24    changed or as you -- I think sometimes you say

25    deleted.

1          So first, were e-mails deleted, sir?

2     A.   Yes.

3     Q.   And how were they deleted?

4     A.   How, meaning the technique of doing it?

5     Q.   Yes.

6     A.   The answer is that I had a very limited

7  capacity in my inbox with a server that I used at that

8  time and material was coming at me faster than I could

9  store it.  So the materials that I deleted, the

10  e-mails that I deleted were brief letters, a statement

11  back from you saying, okay, we'll call at this point,

12  materials that had no content, no, you know, content

13  at all to them.

14     Q.   Okay, sir.  Now, do you recall me ever

15  telling you about what you needed to retain in this

16  case?

17     A.   Yes.

18     Q.   And what did I tell you?

19     A.   You told me to retain the materials relevant

20  to this case; that is, the text and data and so

21  forth.

22     Q.   Okay.  When you deleted some e-mails because

23  your inbox was getting full, your capacity at Kent

24  State, did you delete anything that was material to

25  your evaluation in this case?

*7674*

1      A.   No.

2      Q.   Okay.   Now, Dr. Cooke, when this issue came

3  up during your deposition, do you recall me asking you

4  to identify every person in this case from which you

5  received or sent an e-mail?

6      A.   I recall that.

7      Q.   And do you recall that as part of your

8  considered materials, we gathered the e-mails from all

9  those persons to make sure that even if it was

10  deleted, based on a superfluous basis, you still were

11  able to reproduce all of your e-mails to the

12  defendants in this case; is that correct?

13      A.   Every e-mail was reproduced.

14      Q.   Okay.   Now, sir, when you were talking --

15  just recently when you were shown your deposition

16  about some deletions, what were you referring to at

17  that point?

18      A.   I mistakenly used the word "deletion."   It

19  seems to have a context here that is different than

20  the one we use.

21           When we have text material that we are not

22  satisfied with, it has to go, and we substituted it

23  with something written more -- more appropriately or

24  better.   This is a scientific process.   It -- you edit

25  and edit and re-edit until you were satisfied?

1    Q.   Well, when you were looking at those texts

2   being changed back and forth, was that part of the

3   drafting process for your report that you're referring

4   to there, sir?

5    A.   Yes.   It's the way I've always done it, 42

6   years of doing it.

7    Q.   So would you explain to the court how you and

8   Dr. Welch drafted this joint report?

9    A.   Well, since we live more than 2,000 miles

10   apart, we did some of the report in electronic form

11   back and forth, but most of it by mailing through

12   Federal Express texts that we have prepared and we'd

13   each consider them.

14    Q.   Okay.   And then so when you refer to

15   "deleting," is this where you scratch out and suggest

16   different language?

17    A.   That's correct.

18    Q.   Okay, sir.   And when you say you deleted some

19   data, does that mean you destroyed the data from your

20   considered materials, that it's no longer present

21   there?

22    A.   No.   The data's still exists, but we were not

23   satisfied with those data for one reason or another

24   and deleted it from the report that we're preparing.

25    Q.   And as an example of the deleted data that

**United States District Court**

1  you referenced here in an e-mail that's been marked as

2  694, would that include the data; for example, the

3  1986 phosphorus data, that you chose not to use

4  because of the HACH data test.

5      A.   That is correct.  We deleted five years of

6  phosphorus data because of the technique that was

7  used.

8      Q.   And just so -- since because the defendants

9  have claimed that you are biased or you're some kind

10  of a radical, I want to ask you --

11              THE COURT:  All right.  We're getting

12  far afield now.

13              MR. PAGE:  Okay.

14              THE COURT:  Let's put 694 up here, and

15  particularly the second paragraph.  We're getting away

16  from the concern here.  The concern is the second

17  sentence here, Doctor, where you say, "I am deleting a

18  lot of stuff where the three of us have mentioned

19  flaws in the work."

20              Now, that's not a reference to the report

21  itself, is it?

22      A.   No, it is a reference to the report itself.

23  Flaws in our report.

24              THE COURT:  The report itself would

25  contain mentions of flaws in the work?

```
 1              THE WITNESS:  "The work" is referring to
 2    our report preparation.
 3              THE COURT:  No, no.  Listen to my
 4    question.  I'm not talking about the work itself or
 5    the report.
 6         Do you have 694 in front of you, sir?
 7              THE WITNESS:  Yes.
 8              THE COURT:  The sentence says, "I am
 9    deleting a lot of stuff where the three of us have
10    mentioned flaws in the work."
11         Now you're attempting to explain that away by
12    saying that you're deleting portions of the report
13    itself; correct?
14              THE WITNESS:  Yes.
15              THE COURT:  But this says, "I am
16    deleting a lot of stuff where the three of us have
17    mentioned flaws in the work"; correct?
18              THE WITNESS:  Yes.
19              THE COURT:  Do you mention flaws in the
20    work in the report itself?
21              THE WITNESS:  No.
22              THE COURT:  So this is a mention to
23    something other than the report, isn't it?
24              THE WITNESS:  I believe so.
25              THE COURT:  So what did you delete when
```

1    you say you "deleted stuff where the three of us have

2    mentioned flaws in the work"?

3                    THE WITNESS:  Sir, my only recollection

4    is of deleting materials out of our report that we

5    were unhappy with.  I'm sorry that I cannot come

6    otherwise with --

7                    THE COURT:  Are you trying to tell me

8    that you mentioned the flaws in the work in the report

9    itself that you deleted?

10                    THE WITNESS:  No, sir.  I -- I

11    cannot --

12                    THE COURT:  We're talking about apples

13    and oranges here, it appears to me, Doctor.  You want

14    to say you deleted aspects of the report, but you're

15    admitting that you didn't mention flaws in the work in

16    the report itself; correct?

17                    THE WITNESS:  I cannot recall the drafts

18    of our report and what it contains.

19                    THE COURT:  We'll get back to this after

20    a recess.

21                        *(Short break)*

22                    THE COURT:  Mr. Page, any further

23    questions?

24                    MR. PAGE:  Yes, Your Honor, if I may.

25        Q.    *(BY MR. PAGE)*  Dr. Cooke, I want you to pull

```
 1    out Defendants' Joint Exhibit 694, the exhibit we've

 2    been looking at.

 3            Okay.  When was this written, sir?

 4        A.   December 7, 2007.

 5        Q.   Okay.  And when was your report due at the

 6    time -- was your report -- when was your report due

 7    based on this --

 8        A.   January 4th of 2008.

 9        Q.   So at the time you're writing this report,

10    you're under the deadline that was originally set by

11    the court of January 2004; is that correct?

12        A.   Yes.

13        Q.   Excuse me.  January 4, 2007; correct?

14        A.   Yes.

15                THE COURT:  2007.

16        Q.   (BY MR. PAGE)  2008.

17                MR. PAGE:  Thank you, Your Honor.

18        Q.   (BY MR. PAGE)  Now, were you writing your

19    report at this time --

20        A.   Yes.

21        Q.   -- when you're e-mailing this to Mr. Jones?

22            What's the subject matter?

23        A.   Subject matter is the total phosphorus

24    chlorophyll regression equation.

25        Q.   Okay.  Now, the subject matter there, sir,
```

1   can you tell me what that -- did that relate to your

2   report that you were writing?

3       A.   It was key to our report.

4       Q.   Okay.  And was there actually an exhibit that

5   you provided us in court yesterday in your testimony

6   that showed the 143 reservoirs and you plotted it?

7   Correct?

8       A.   Yes.  That's our figure 6.

9       Q.   And that was what Dr. Jones was helping you

10  with at this moment?

11      A.   Yes.

12      Q.   Okay.  So your first sentence says, "Jack:  I

13  need your feedback on this."  What are you referring

14  to?

15      A.   I'm asking him to respond back to me about

16  our data and a plot on his equation.

17      Q.   That was going into the report --

18      A.   That was --

19      Q.   -- correct?

20      A.   Yeah, that was going into the report.

21      Q.   Okay.  Next sentence says, "I assume that you

22  have seen the graphs that plot Tenkiller summer mean

23  TP and (chlorophyll) on a line developed from your 148

24  Missouri reservoirs."

25           What does that refer to?

7681

1    A.   Well, that -- a slightly different thought.

2   His -- he had an equation for -- it's 143.  I was

3   wrong at that point.  But at any rate, he had an

4   equation based upon those 143 reservoirs that we were

5   considering using.

6        Q.   Okay.  But that still talks about work you're

7   doing for your report; correct?

8        A.   Yes.  It -- uh-huh.

9        Q.   Okay.  "What do you think of the fit?"

10            Does that relate now to this exhibit that

11   you're trying to put together for your report?

12        A.   Yes.

13        Q.   Okay.  "I sent you some graphs of each

14   Tenkiller station using TP and (chlorophyll) data and

15   produced an equation in $R^2$.  What do you think of

16   those?"

17            What are you referring to there?

18        A.   Well, what is -- the sentence says that I

19   used some data from the various stations at Tenkiller

20   Reservoir, plotted them on this graph, and my question

21   was, "What do you think of those?"

22        Q.   Okay.  So you're still talking about your

23   work in your report?

24        A.   On the report.

25        Q.   Okay.  The next paragraph says, "Dave Page

1    has warned me about using e-mails to discuss such

2    things."

3         What such things are you referring to?

4         A.   Well, such things were our discussion back

5    and forth about this graph, his equation, and the plot

6    of our data.

7         Q.   Okay.  And did that relate to your work on

8    your report?

9         A.   Yes.

10        Q.   Okay.  Do you recall what I asked you to do?

11        A.   Well, you asked me to save the data, you

12   know, not to delete data.

13        Q.   Okay.  Do you recall what I asked you to do

14   with regard to your discussions with Dr. Jones and

15   Welch?  Did I ask you to pick up the phone and talk?

16        A.   Yes, you did.

17        Q.   Was there any issue about timeliness and

18   getting this work done at this point in time?

19        A.   The pressure was enormous.  We were working

20   12- and 14-hour days.

21        Q.   Okay, sir.  The next sentence is the one

22   we've had a lot of discussions about.  It says, "I am

23   deleting a lot of stuff where the three of us" -- now,

24   who is the three of us?

25        A.   Welch, Jones, and Cooke.

1      Q.   What's the stuff you're referring to here?

2      A.   The stuff is trying to put together a text to

3   describe this relationship.

4      Q.   So when you say "deleting," is there another

5   way that some people would use that terminology?

6      A.   I think they would not use the word "delete"

7   because that seems to have an electronic component to

8   it.  We call it eliminating it and replacing it with

9   something better.

10      Q.   Are you referring to your report-writing at

11   this point?

12      A.   Yes.

13      Q.   Okay.  And why would you -- so you're talking

14   about editing the report; is that correct?

15      A.   I am.

16      Q.   So what flaws are you referring to here in

17   this sentence?

18      A.   The flaws mainly had to do with my, let's

19   say, subpar expertise with regard to the development

20   of this equation, in particular this type of

21   statistic.

22      Q.   So this relates back to the first paragraph

23   where you're asking Jack Jones to check your equation

24   and whether this is an appropriate fit?

25      A.   That's right.

1        Q.   Okay.  And what work are you referring to in

2   this sentence?

3        A.   Well, the overall work is our report, and

4   this specific work has to do with this equation and

5   our chlorophyll phosphorus data.

6        Q.   Okay.  The next sentence says, "Maybe you

7   should call me about this."

8             What are you referring to?  Call you about

9   what?

10       A.   Well, I asked him, "Maybe you should call me

11  about this," to discuss my problem with understanding

12  this equation.

13       Q.   Are you talking about -- are you suggesting

14  that you get together and talk about deleting flaws in

15  your work?

16       A.   No.  We're talking about getting the work

17  written so that it's intelligible and actually says

18  what the equation --

19       Q.   The next sentence, sir, would you read it out

20  loud and tell us whether that also relates to the same

21  subject matter that was in the subject of this

22  e-mail?

23       A.   Do you want me to read that to you?

24       Q.   Yes.

25       A.   "I want to know whether we can use these

1  graphs to support the idea that stations 01 and 02 are

2  (phosphorus) limited."

3      Q.   Okay.  So was that again part -- was that the

4  whole subject matter of your analysis for your

5  report?

6      A.   That's right.

7      Q.   Okay.  And would you read the next

8  sentence --

9      A.   Excuse me.  And it emphasized my -- my

10  failure to understand how the equation worked.

11      Q.   Okay.  Would you read the next sentence, sir?

12      A.   "I agree that we can use them in the sense

13  that we argue the reduction of (phosphorus)

14  concentration should lead less chlorophyll."

15      Q.   What does that refer to?

16      A.   Well, this was really the thrust of our

17  argument.  This equation shows that you reduce

18  concentration, you'll have less chlorophyll.

19      Q.   And in the next sentence -- will you read

20  that, sir?

21      A.   "It's crunch time on the report so would be

22  grateful for a reply.  Thanks."

23      Q.   So at this point in time, on December 7th,

24  you're actively writing and re-editing the report to

25  be submitted to the court on January 4th; is that

1  correct?

2      A.   That's right.

3      Q.   Okay.  When you mentioned -- when they asked

4  you about deleting e-mails in your deposition, were

5  you talking about this work in your report?

6      A.   I don't recall.  I don't believe so.

7           MR. PAGE:  Okay.  Your Honor, I have

8  nothing further.

9           THE COURT:  Mr. Green.

10                 **VOIR DIRE EXAMINATION**

11  **BY MR. GREEN:**

12      Q.   Just a couple of questions, Doctor.

13           This e-mail, Defendants' Joint Exhibit 694,

14  was the subject of a number of questions on different

15  occasions during your deposition; is that not right?

16      A.   I believe so.

17      Q.   And it is true, is it not, Doctor, that at no

18  time in any of the explanations that you offered with

19  respect to this e-mail did you testify that the

20  reference to mentioning flaws pertained to the initial

21  paragraph of this e-mail?  We've heard that for the

22  first time this morning; isn't that right?

23      A.   No, sir.

24      Q.   Can you find your testimony where you tell

25  those who are in attendance at the deposition that

*7687*

1   mentioning flaws pertains to your discussion in the

2   initial paragraph of that e-mail?  I'd like you to

3   point me to it.

4       A.   I don't know where to look in that.  I have

5   page 236 in front of me where this question is brought

6   up, and my question -- the question to me was, "Did

7   you develop -- did you delete texts, T-E-X-T-S?"  And

8   I said yes.

9       Q.   You were asked, Doctor, were you not, to

10  explain that e-mail on a number of occasions?  You

11  were given an opportunity to explain that e-mail on a

12  number of occasions in your deposition.

13           It is true, is it not, that not at any time

14  did you explain that e-mail by coupling the mentioning

15  of flaws in the second paragraph to the discussion in

16  the first paragraph?

17      A.   I can't find all of the parts of this e-mail,

18  but I can tell you that I did say -- and I said

19  repeatedly -- that I deleted texts that we believed

20  was flawed.

21      Q.   All right.  Now, when I walked into the

22  courtroom --

23           MR. PAGE:  Excuse me, Your Honor.  He's

24  impeaching with the deposition.  I would like to call

25  the court's attention --

1          THE COURT:  I'm sorry.  I'm sorry.

2    These speaking objections and attempts to feed

3    information to the witness are going to stop.  If you

4    have an objection as to the form, you may make it.

5    Mr. Page.

6          MR. PAGE:  Improper use of the

7    deposition in impeachment.

8          THE COURT:  Overruled.

9      Q.   (BY MR. GREEN)  Now, Doctor when I walked

10   into courtroom this morning -- and I don't mean to --

11   not this morning -- just before we reconvened here,

12   you were conferring with Mr. Page; correct?  Is that

13   true?

14     A.   Yes.

15     Q.   Okay.  What were the two of you talking

16   about?

17     A.   He asked me to look at page 236 and page 14

18   of the deposition.

19     Q.   Okay.  And that's the extent of it?

20     A.   Yeah.  He said, "Take a look at these."  I

21   walked back over because I couldn't hear him from here

22   as to what pages.

23     Q.   Did Mr. Page suggest to you that you explain

24   this reference in the second paragraph of this e-mail

25   by linking it to the discussion in the initial

**United States District Court**

1    paragraph of the e-mail in Defendants' Joint Exhibit

2    694?

3        A.   Mr. Page said to me that we're going to go

4    through this entire e-mail and understand its

5    context.

6        Q.   Okay, sir.  And just so that we are

7    absolutely clear of what your present testimony is,

8    Doctor, you are telling the court and those of us in

9    this courtroom that the reference to the three of us

10   mentioning flaws in the work, etc., and deleting a lot

11   of stuff where the flaws are mentioned, pertains to

12   the first paragraph?

13       A.   It does.

14            MR. GREEN:  Your Honor, I renew my

15   motion and --

16            THE COURT:  All right.  And because

17   essentially this is redirect as to this question, I'll

18   give -- as to this matter, I'll give Mr. Page the

19   opportunity to rehabilitate.

20            Go ahead.

21            **FURTHER VOIR DIRE EXAMINATION**

22   **BY MR. PAGE:**

23       Q.   Dr. Cooke, would you look at page 14 of your

24   deposition, please, sir?

25       A.   Okay.

1    Q.   And would you take a moment to refresh your

2    recollection and tell me whether your testimony on

3    page 14 and then 15 related to the e-mail at question,

4    sir?

5    A.   It refers to the e-mail in question.

6    Q.   Okay.  And what lines are you referring to,

7    sir?

8    A.   I was looking at beginning line 6.

9    Q.   Okay.  Would you read that, please?

10   A.   "I am deleting a lot of stuff where the three

11   of us have mentioned flaws in the work and so forth.

12   Maybe you should call me about this.  I want to know

13   whether we can use these graphs to support the idea

14   that Stations 01 and 02 are P limited."

15   Q.   Okay.  There, you're just reading the e-mail;

16   correct?

17   A.   Yeah.

18   Q.   And then later on in the deposition at the

19   bottom of the page, you were asked what flaws you were

20   talking about?

21   A.   Yes.

22   Q.   Would you read your answer to that and see if

23   that refreshes your recollection as to whether you

24   testified on this day concerning the flaws in the

25   e-mail similar to what you just testified to in this

1   court?

2       A.   "I wish I could tell you the answer to that.

3   The flaws that would have been mentioned by me were

4   flaws in what we were writing, in other words, is

5   there a better way to conduct a sentence, were there

6   new at that time data that I could have used, was

7   there a reference to work that someone else had done

8   that I should have included.  Those are what I called

9   flaws."

10      Q.   Does that refresh your recollection as to

11  what you testified on the day of your deposition?

12      A.   Yes.

13      Q.   And what does that refer to, that testimony?

14      A.   Well, it -- what I wrote here about "I'm

15  deleting a lot of stuff" refers to this TP chlorophyll

16  regression.

17      Q.   I want you to turn to page 236, sir.  I want

18  you to take a moment to read your questions and

19  answers on 236 and 237, and I want to ask you again

20  whether that testimony relates to this e-mail

21  and -- are you talking about this e-mail, sir?

22      A.   Yes.

23      Q.   And are you testifying there about the

24  editing process on the report?

25      A.   Yes.

```
 1        Q.   Is that consistent with your testimony you've
 2   given under oath today?
 3        A.   Yes, it is.
 4             MR. PAGE:  Your Honor, I have nothing
 5   further.
 6             THE COURT:  Very well.  With due
 7   respect, the motion to strike the testimony of
 8   Dr. Cooke will be denied.  The arguments obviously can
 9   be made with reference to the weight the court should
10   give to the testimony.
11             Any further cross-examination?
12             MR. GREEN:  No, sir.
13             THE COURT:  Very well.  Any further
14   cross-examination from any others.  Mr. Elrod.
15             MR. ELROD:  I do, Your Honor.  At the
16   risk of returning to the mundane issues, Your Honor, I
17   do have a couple of questions.
18             THE COURT:  Yes, sir.
19                   CROSS-EXAMINATION
20   BY MR. ELROD:
21        Q.   I'd like to talk to you, Dr. Cooke, about the
22   scuba diving part of lake.
23             MR. ELROD:  If you could put up, April,
24   please, 747.
25        Q.   (BY MR. ELROD)  Now, Dr. Cooke, it's true, is
```

*7693*

1    it not, that the LK-01 is the sampling point nearest

2    the dam?

3         A.   Yes.

4         Q.   And there's been testimony in this courtroom,

5    sir, that there has historically been scuba diving

6    activities in that part of the lake.  Do you know

7    about that?

8         A.   I don't know about that testimony.

9         Q.   All right, sir.  Let's focus just on that

10   portion of the lake.

11        That would also be the portion of the lake

12   that would have the greatest volume because of its

13   depth and its width at that point; is that true, sir?

14        A.   It has the greatest volume.

15        Q.   And do you know, as a matter of fact, what

16   total volume of the lake water is represented by

17   LK-01, just that sampling point?

18        A.   I don't have it.  I think it's right here in

19   this pile of paper.

20        Q.   All right, sir.  In any event, if we look at

21   just that part of the bar chart for 1974, we see total

22   phosphorus covering just under 30; is that correct?

23        A.   Yes.

24        Q.   As we move forward in time, for that

25   particular location in 1992, it drops down to about

1    20 -- well, 25, and then in '93 to 24, and then 2005

2    down to 10, and then in 2006 at 12, and then at 2007

3    it's at 11; is that correct, sir?

4        A.   Yes.

5        Q.   That's the clearest part of the lake, is it

6    not?

7        A.   I believe the transparency was the clearest

8    there.

9        Q.   And have you seen a copy of the 2009 Lake

10   Tenkiller Visitor's Guide, sir?

11       A.   No.

12       Q.   Are you aware that it describes Lake

13   Tenkiller as being the cleanest lake in the state of

14   Oklahoma?

15       A.   I haven't read it.

16       Q.   Or the clearest lake in the state of

17   Oklahoma?

18       A.   I haven't read it.

19       Q.   I see.

20            MR. ELROD:  And if we could look at 754

21   for a second, please, April.

22       Q.   *(BY MR. ELROD)*  That's the chlorophyll values

23   for Lake Tenkiller, and, again, if we could just focus

24   on LK-01.

25            As we move across from left to right, the

**United States District Court**

1  chlorophyll levels at LK-01 are well under the

2  eutrophic line; correct, sir?

3      A.   In 1974?

4      Q.   As we move from left to right.  In 2001, it

5  is right at the mesotrophic line, and then it's lower

6  than the mesotrophic line except for one year

7  thereafter; isn't that true, sir?

8      A.   That's correct.

9            MR. ELROD:  All right.  That's all I

10  have.  Thank you.

11            THE COURT:  Any further

12  cross-examination?

13            MR. EHRICH:  No, Your Honor.

14            MR. CHADICK:  No, sir.

15            THE COURT:  Very well.  Redirect?

16            MR. PAGE:  Yes, Your Honor.

17                **REDIRECT EXAMINATION**

18  **BY MR. PAGE:**

19      Q.   Dr. Cooke, I want to go back to some

20  testimony you had yesterday about --

21            MR. PAGE:  May I have a minute, Your

22  Honor?

23            THE COURT:  Yes, sir.

24        *(Discussion held off the record)*

25      Q.   *(BY MR. PAGE)* So I want to talk about 1974.

 1    Remember the examination -- rather extensive

 2    examination by Mr. McDaniel about 1974?

 3        A.   Yes.

 4        Q.   Okay.  I'd like you to pull out, as you do

 5    your evaluation, Oklahoma Exhibit 1090, which was this

 6    chart of flow data, I would like you to look at

 7    Oklahoma Exhibit 747, which is total phosphorus in

 8    Lake Tenkiller, and Oklahoma Exhibit 754,

 9    chlorophyll-a, and I've got a few questions to ask you

10    about this, sir.

11        A.   I'm not having much luck here.

12        Q.   Okay.  These were ones that --

13        A.   Okay.  I have phosphorus, I have chlorophyll,

14    and I have the water flow.

15        Q.   Okay.  Good, sir.

16             Dr. Cooke, now that you know that there's a

17    storm in 1974, how would you interpret the phosphorus

18    and chlorophyll-a data that you've received?

19        A.   The storm, according to the National Weather

20    Service and NOAA, was a storm of the century and the

21    quantity of water was very large.

22        Q.   Is that reflected on the flow data that

23    Dr. Engel provided in figure 5.1?

24        A.   Yes.  His figure 5.1 show this tremendous

25    burst of water in 1974, in June of 1974.  There's

1    enough water there to displace over half the volume of

2    Tenkiller Reservoir.  When it did that, it washed out

3    more than half the volume of the reservoir, including

4    a lot of algae, meaning that the chlorophyll for June

5    of 1974 would be very low.

6            But it also would mean that a storm of that

7    magnitude -- if I recall, 14 inches of rain fell on

8    Siloam Springs in a matter of a day or so, a

9    tremendous amount of water -- this would have scoured

10   the land and brought in a lot of turbidity and a lot

11   of phosphorus.

12           And so that's exactly what we see here in

13   these graphs, higher phosphorus than you would have

14   expected for the kinds of algae that were present in

15   the reservoir in 1974.  Those are algae of an

16   oligotrophic system.  We have phosphorus here that's

17   on the borderline of eutrophic and --

18       Q.   So you're referring now to Oklahoma Exhibit

19   747 and the 1974 values of total phosphorus?

20       A.   Yes.

21       Q.   Is it your testimony -- what is the basis for

22   those high phosphorus levels in 1974?

23       A.   Those high phosphorus levels were caused by

24   this tremendous storm.

25       Q.   Okay.  So let's talk a little bit again about

*7698*

1  the chlorophyll data.  When was that storm?

2      A.   The storm began on, I believe, June 9th.

3      Q.   Okay.  Now --

4      A.   Could have been June 7th.

5      Q.   Okay.  So having that knowledge, is there any

6  data during the summer of 1974 that would be

7  representative of the lake for that time for

8  chlorophyll?

9      A.   Well, the August data, two months -- more

10  than two months later -- it was mid August -- would

11  probably be a very good representation of what

12  Tenkiller was like in that year.

13      Q.   Would you please look at Tyson Defendant

14  Demonstrative 241?  It was a printout from your

15  considered materials of all the EPA legacy storm data.

16          Do you recall that, sir?

17      A.   Yes.  This may take a minute.

18      Q.   Well --

19      A.   I have it.

20      Q.   Okay.  And what was the data for August of

21  1974 as represented by EPA?  This is a couple months

22  following the storm; correct?

23      A.   Yes.

24      Q.   So would you direct our attention to what the

25  data showed at different locations in the lake?

1          A.    In August -- it was August 30th, 1974 -- at

2     LK-01, the concentration of chlorophyll was 6.6

3     micrograms per liter.

4          Q.    And where would that fall on the trophic

5     state analysis from your figure 8 or Exhibit 754?

6          A.    A value of 6.6, as we can see from -- that

7     would be Exhibit 754, would put it in the mesotrophic

8     category.

9          Q.    Now, based on that June flooding event, would

10    you expect the phosphorus in Lake 1 even in August to

11    be elevated over what would typically be for typical

12    rainfall?

13         A.    Yes.  Chlorophyll would have returned to what

14    you would expect by that time, two and a half months.

15         Q.    Okay.  Would you go to the next station, sir?

16         A.    It's station LK-02.  The concentration was

17    5.7 micrograms per liter.

18         Q.    And where is that showed on the trophic state

19    index, sir?

20         A.    And 5.7 shows mesotrophic.

21         Q.    Okay.  And area 3, sir, Lake 3?

22         A.    Lake station 3, 6.6 micrograms per liter,

23    which, again, is in the mesotrophic range.

24         Q.    And finally lake station 4?

25         A.    Lake station 4 had a concentration of 12

*7700*

1   micrograms per liter, which would put it just into the

2   eutrophic category.

3       Q.   Now, is that chlorophyll data consistent with

4   your analysis over the years with regard to 1974?

5       A.   It's -- it's completely consistent with the

6   phytoplankton species.

7       Q.   Okay, sir.  Now, do you remember

8   Mr. McDaniel's examination when he showed you an

9   exhibit that was a markup of one of your charts on

10  total phosphorus and he had the 1986 data in there?  I

11  think it's called Tyson Defendants Demonstrative

12  244 --

13      A.   I recall it.

14      Q.   -- where he added the 1986 data; is that

15  correct?

16      A.   Yes.

17      Q.   And do you recall where he suggested that you

18  manipulated the data to get the result that you wanted

19  to achieve?

20      A.   I recall that he suggested that I manipulated

21  the data.

22      Q.   Now, Dr. Cooke, why did you not use the

23  phosphorus data for 1986?

24      A.   Those data were developed by a method that we

25  considered to be flawed, and even though it supported

1    our case, it showed a high concentration of

2    phosphorus.  We rejected those data because of the

3    methodology.

4        Q.   Okay.  And what in particular was the flaw in

5    the method?  This was the HACH method; correct?

6        A.   They were using test kits and they failed to

7    use controls so that they really didn't operate the

8    test kit correctly.

9            Secondly, those test kits are very imprecise

10   so that the range of data that they reported could

11   have been off by a great deal and they would never

12   have known it.

13       Q.   Now, looking at this revised chart that

14   Mr. McDaniel provided to you, it does show that using

15   this HACH data that Tenkiller got worse between '74

16   and '86; correct?

17       A.   Yes.

18       Q.   But then he suggested, did he not, in his

19   questions that you left that out so that you would not

20   be able to show a decrease in current years this

21   decade; correct?

22       A.   I believe so.  I failed to really understand

23   the charge, it was complicated, and frankly I resented

24   that application that I would manipulate data in any

25   way.

1      Q.  Well, let me ask you:  Did you eliminate,

2   based on this HACH method, any other phosphorus data

3   from your analysis?

4      A.  We eliminated not only that year, but we

5   eliminated 2001, 2002, 2003, and 2004.

6      Q.  On the same basis?

7      A.  On the same basis.

8      Q.  And if you had used that data, what would

9   have shown on this Tyson demonstrative?

10      A.  It would have shown a tremendous amount of

11   phosphorus in these years.

12              MR. MCDANIEL:  Objection.  Excuse me.

13   It's outside the scope of direct.  I didn't ask him

14   about those years of data.

15              MR. PAGE:  Your Honor, he was asking

16   questions on a trend.  He was challenging the doctor's

17   cherry-picking of data.  The doctor is testifying that

18   he consistently uses the same analysis.  He was asking

19   questions about the trend --

20              THE COURT:  I understand.  Overruled.

21         Go ahead.  Anything further?

22              MR. MCDANIEL:  Well, furthermore as to

23   foundation, he asked him what would that data show.

24   Well, that data has not been produced to us, Your

25   Honor --

1              THE COURT:  Well, it's not offered for

2      the truth, but rather to respond to your accusation of

3      cherry-picking data.

4              Go ahead.

5          Q.   *(BY MR. PAGE)*  Dr. Cooke, what did that data

6      show?

7          A.   Those data showed that there was a very high

8      concentration of phosphorus in those years.

9          Q.   And was this data part of your considered

10     materials?

11         A.   I believe it was.  We reported the Army Corps

12     data, so yes, it was.

13         Q.   Now, do you recall this exhibit -- it was

14     Defendants' Joint Exhibit 427 -- where Mr. McDaniel

15     asked you about the third page about the HACH data --

16         A.   I recall that.

17         Q.   -- that was being used by the Water Watchers

18     Program.

19              I think you testified about this but I'm not

20     sure if I understood it correctly.  Looking just at

21     this document, does this indicate that the Oklahoma

22     Water Resources Board when it collects phosphorus data

23     for its BUMP reports or analysis of water quality in

24     its BUMP reports for lakes, does it use the HACH data?

25         A.   That paragraph specifically says it does not

1    use the HACH procedure, but instead takes their data

2    to their own laboratory.  Using the HACH test kit to

3    determine total phosphorus is a good way to head for

4    trouble.

5        Q.   Okay.  Now, Dr. Cooke, do you remember

6    Mr. McDaniel's questions concerning the plankton net

7    that was used in 1960?

8        A.   I recall.

9        Q.   Did you do any investigation to determine

10   whether or not the plankton net would be capable of

11   gathering the blue-green algae that you testified show

12   the change in trophic state of Lake Tenkiller?

13       A.   I did.

14       Q.   And what did you find?

15       A.   Well, I used two sources to investigate that.

16   One, my own personal experience, and the other just a

17   basic common textbook about algae, here's what you

18   find.

19            The mesh size of that plankton net is 64

20   microns, which is very fine.  The size of blue-green

21   algae colonies and filaments can range up to a

22   thousand microns in size, many of them well over a

23   hundred in microns in size.  In diameter, maybe three

24   to five microns.  But then that's like, you know,

25   throwing a spear through a hole at a hundred meters.

```
 1    So some of the cells might have slipped through those

 2    holes, but the vast, vast, vast majority, if they had

 3    been there, would have been caught.

 4          I have sampled literally thousands and

 5    thousands of plankton samples in my career using that

 6    particular plankton net, and many of those were in

 7    lakes and reservoirs that were not very productive and

 8    the net comes up clear.

 9          In the productive reservoirs, the nets clog.

10    You can't use a plankton net in a eutrophic system.

11    The net is so clogged with blue-green algae that no

12    water passes through.

13    Q.  So is it your opinion, sir, that the 1960

14    sampling that you relied upon and the net they used,

15    if there were this problem of blue-green algae, they

16    would have collected and identified?

17          MR. MCDANIEL:  Objection; leading.

18          THE COURT:  Sustained.  Rephrase.

19    Q.  (BY MR. PAGE)  Do you have an opinion as to

20    whether or not the blue-green algae that you

21    identified to show a trophic state to eutrophication

22    would be collected by the algal nets that were used by

23    the 1960 sampling?

24    A.  Yes, they would have been.

25    Q.  So why is that?
```

United States District Court

 1          A.    Because they're so big that they would not

 2    have gone through the mesh.

 3          Q.    Now, Dr. Cooke, I want to turn now with you

 4    to Oklahoma Exhibit 649 which you were asked about.

 5    It was part of your produced materials.  It's a paper

 6    in hydro --

 7          A.    Hydrobiologia.

 8          Q.    Thank you, sir.  And it's called, "Predicting

 9    Cyanobacteria Dominance in Lakes."  Do you have that,

10    sir?

11          A.    I have it.

12          Q.    Did you use this report as part of your

13    evaluation in this case?

14          A.    No.

15          Q.    Okay.  Did you actually -- part of your

16    considered materials this report's there; correct?

17          A.    Let's see if we have the same report.

18    Comparison of sampling and analytical methods.

19          Q.    No, sir.

20          A.    I'm sorry.

21          Q.    This is what has your -- it's called,

22    "Predicting Cyanobacteria Dominance in Lakes."

23          A.    Yes.  I have that in front of me.

24          Q.    Okay.  Now, let me ask the question again.

25    Did you use this as part of an analysis for your

1    report?

2         A.   Yes.

3         Q.   How did you use it?

4         A.   We used the graphs that are on page 1906, and

5    in particular we used graphs B and E, and they're

6    reported as figures 14 and 15 in our report.

7         Q.   Now, do you remember Mr. McDaniel's questions

8    concerning the regression analysis from this report?

9         A.   I do.

10        Q.   What was important to you from this report?

11        A.   What's really important here, if you examine

12   this figure B -- and this is the one in which he asked

13   me a question -- is that at 30 micrograms total

14   phosphorus concentration, if you look at this, you

15   will see that there is a shoulder on that slope at 30

16   micrograms.

17        Q.   What do you mean by a shoulder?

18        A.   That is the -- the line goes up quickly at

19   that point.  In other words, there's a sharp upswing

20   of the trend at 30 micrograms.  At that point at 30

21   micrograms, there's quite a range of cyanobacteria

22   biomass.

23             But above that, as that line goes up -- and

24   it goes up very sharply -- this is an exponential

25   increase in cyanobacteria volume, that you can see

1    that there's no other points below the line.   The

2    range may going up as high as one hundred percent

3    cyanobacteria.

4        Q.   Would this jump up in cyanobacteria at 30

5    micrograms per liter phosphorus affect the regression

6    analysis?

7        A.   Yes.

8        Q.   How so?

9        A.   Well, it would -- it changes the regression

10   analysis significantly.   It makes a significant

11   slope.

12       Q.   So what do scientists, such as yourself --

13   how do they identify this sharp up-tick?   Is that

14   called a particular term in the scientific world?

15       A.   There may be a term that I right now can't

16   generate it.

17       Q.   Have you ever heard the word "threshold"?

18       A.   It is a threshold clearly.

19       Q.   And what does that mean?

20       A.   Well, that means that there's a jump there,

21   that there's a shoulder in the data above which

22   there's a rapid change.

23       Q.   So does that mean there's a rapid growth in

24   the amount of algae, even though there's only now

25   minor additions of phosphorus being added?

**United States District Court**

1          A.    This is the essence of eutrophication, is

2     that there is a jump -- I mean a jump -- from the

3     mesotrophic state into eutrophic.  Reversal of that

4     status is very difficult, and that's what this graph

5     is showing.

6          Q.    Okay.  Dr. Cooke, I've just got one more

7     question.

8                Do you remember being handed this group of

9     pictures?

10         A.    Yes.

11         Q.    Have you seen this before?

12         A.    It's in Dr. Horne's report.

13         Q.    And how does he use this group of pictures in

14    his report?

15         A.    I believe he uses that --

16               MR. MCDANIEL:  Objection; that is

17    clearly outside the scope.  I merely asked him if he

18    had seen the pictures and asked him what he saw as far

19    the color, not anything about Dr. Horne's analysis.

20               MR. PAGE:  Your Honor, Dr. Horne uses

21    this to support the --

22               THE COURT:  Well, I'm tired of testimony

23    from attorneys.  The objection's overruled.

24    Mr. McDaniel brought it up.  Mr. Page is entitled to

25    go through it.

**United States District Court**

1              Go ahead.

2         Q.   *(BY MR. PAGE)*   How does Dr. Horne use this

3    data?

4         A.   He uses it as evidence that Broken Bow

5    Reservoir is dystrophic.

6         Q.   And what does he particularly focus on?

7         A.   The color of the water in the -- behind the

8    prop of the boat.

9         Q.   He's looking at the wake?

10        A.   Yeah.  And the wake.

11        Q.   Are you aware of any scientists anywhere in

12   the world that has ever used the color of the wake to

13   determine whether or not a lake is dystrophic or not?

14        A.   You don't do it that way; no one does.

15        Q.   Okay.  Now, have you evaluated whether or not

16   Lake Tenkiller is dystrophic?

17        A.   Lake Tenkiller is not dystrophic.

18        Q.   You evaluated whether or not Broken Bow Lake

19   is dystrophic?

20        A.   And Broken Bow is not dystrophic either.

21        Q.   Did you use a motor boat wake to determine

22   your analysis?

23        A.   I looked at the BUMP reports year after year.

24   There, they tested both reservoirs for what is called

25   true color; that is, they actually took a water

**United States District Court**

7711

1    sample, went to the laboratory, and analyzed the

2    water.  In every case, they report that neither

3    reservoir has color.

4        Q.  Okay.  And is that a traditional test for

5    dystrophy; that is, the color values?

6        A.  What Dr. Horne did is what they call apparent

7    color, what you and I might say to your neighbors,

8    gee, the water looks a little brown today or

9    something.  There's no measurement there.  What they

10   determine is what scientists call true color.

11       Q.  And is that the traditional test for

12   determining whether or not a waterbody is dystrophic?

13       A.  That is the true test for determining it.

14       Q.  And is it based in NTUs?  Is that the

15   nomenclature that you would see in the BUMP report?

16       A.  No.  It's -- excuse me.  I'm sorry.  It's

17   based on what's called platinum units.

18       Q.  Okay.  And is that described in the BUMP

19   reports for both lakes?

20       A.  Yes, it is.

21       Q.  And what do the BUMP reports find?

22       A.  The BUMP reports find that the mean color for

23   Tenkiller is 11 platinum units, which would mean

24   almost no color.  The mean color for Broken Bow -- I'm

25   struggling -- I think it's 14 platinum units.  So

```
 1    they're not significantly different.  Neither
 2    reservoir is colored.
 3        Q.  The color that would come from a dystrophy;
 4    correct?
 5        A.  Yes.  They're not dystrophic.
 6            MR. PAGE:  Your Honor, I have no further
 7    questions.
 8            THE COURT:  Recross?
 9            MR. MCDANIEL:  No further recross, Your
10    Honor.
11            THE COURT:  Mr. Green.
12            MR. GREEN:  No, sir.
13            THE COURT:  Mr. Elrod.
14            MR. ELROD:  No, Your Honor.
15            MR. EHRICH:  No, Your Honor.
16            THE COURT:  Very well.  You may be
17    excused.
18            THE WITNESS:  Thank you, sir.
19            THE COURT:  Well, we're sitting here at
20    ten minutes of twelve.  What's your preference,
21    Mr. Page?
22            MR. PAGE:  It's up to you, Your Honor.
23    Either way.
24            THE COURT:  Well, let's take our
25    lunch.  We'll go an hour and fifteen.  We'll be
```

*7713*

1   back at 1:05.

2                        *(Lunch recess was taken)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**United States District Court**

1                        C E R T I F I C A T E

2

3

4            I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11           I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16           In witness whereof, I have hereunto set my

17   hand this 8th day of December 2009.

18

                        s/ Brian P. Neil
19          _____

20            Brian P. Neil, CSR-RPR, CRR, RMR
              United States Court Reporter

21

22

23

24

25

**United States District Court**