IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel,        )
W.A. DREW EDMONDSON, in his       )
capacity as ATTORNEY GENERAL      )
OF THE STATE OF OKLAHOMA,         )
et al.                            )
                                  )
              Plaintiffs,         )
                                  )
vs.                               )    No. 05-CV-329-GKF-PJC
                                  )
TYSON FOODS, INC., et al.,        )
                                  )
              Defendants.         )

VOLUME 67 – AM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

DECEMBER 9, 2009

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE

*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                      *United States Court Reporter*

7864

1                          A P P E A R A N C E S

2

3   For the Plaintiffs:          MR. W.A. DREW EDMONDSON
                                 MS. KELLY FOSTER
4                                Office of Attorney General
                                 State of Oklahoma
5                                313 N.E. 21st St.
                                 Oklahoma City, OK  73105

6

7                                MR. DAVID RIGGS
                                 MR. DAVID P. PAGE
8                                MR. RICHARD T. GARREN
                                 Riggs Abney Neal
9                                Turpen Orbison & Lewis
                                 502 W. 6th Street
10                               Tulsa, OK 74119

11

12                               MR. ROBERT A. NANCE
                                 MS. KELLY FOSTER
                                 Riggs Abney Neal
13                               Turen Orbison & Lewis
                                 5801 Broadway
14                               Oklahoma City, OK 73118

15

16                               MR. LOUIS W. BULLOCK
                                 MR. ROBERT BLAKEMORE
17                               Bullock Bullock &
                                 Blakemore
                                 110 W. 7th St.
18                               Suite 770
                                 Tulsa, OK 74119

19

20                               MR. FREDERICK C. BAKER
                                 MS. ELIZABETH CLAIRE XIDIS
21                               MS. INGRID L. MOLL
                                 Motley Rice LLC
22                               28 Bridgeside
                                 P.O. Box 1792
23                               Mount Pleasant, SC 29465

24

25

**United States District Court**

```
 1              A P P E A R A N C E S  (Cont.)

 2

 3   For Tyson Foods:           MR. ROBERT W. GEORGE
                                Tyson Foods, Inc.
                                2210 West Oaklawn Drive
 4                              Springdale, AR 72701

 5

                                MR. FRANK R. VOLPE
 6                              MR. MARK D. HOPSON
                                MR. THOMAS C. GREEN
 7                              MR. JAY THOMAS JORGENSEN
                                MR. GORDON D. TODD
 8                              ERIC J. IVES
                                Sidley Austin LLP
 9                              1501 K St. NW
                                Washington, DC 20005
10

11                              MR. PATRICK MICHAEL RYAN
                                Ryan Whaley Coldiron and
12                              Shandy PC
                                119 N. Robinson, Rm 900
13                              Oklahoma City, OK 73102

14

15   For Cargill:              MR. JOHN H. TUCKER
                                MS. THERESA HILL
16                              Rhodes Hieronymus Jones
                                Tucker & Gable
17                              100 W. 5th St., Ste 400
                                Tulsa, OK 74103
18
                                MR. DELMAR R. EHRICH
19                              MS. KRISANN KLEIBACKER LEE
                                Faerge & Benson
20                              90 S. 7th St., Ste 2200
                                Minnaepolis, MN 55402
21

22

23   For Simmons Foods:        MR. JOHN R. ELROD
                                MS. VICKI BRONSON
                                Conner & Winters
24                              211 E. Dickson St.
                                Fayetteville, AR 72701
25
```

**United States District Court**

```
 1                    A P P E A R A N C E S  (Cont.)

 2

 3   For Peterson Farms:            MR. A. SCOTT MCDANIEL
                                    MR. PHILIP HIXON
                                    MS. NICOLE LONGWELL
 4                                  McDaniel Hixon Longwell &
                                    Acord PLLC
 5                                  320 S. Boston, Ste 700
                                    Tulsa, OK 74103
 6

 7

     For George's:                 MR. GARY V. WEEKS
 8                                  MR. WOODY BASSETT
                                    MR. VINCENT O. CHADICK
 9                                  MS. K.C. TUCKER
                                    Bassett Law Firm
10                                  P.O. Box 3618
                                    Fayetteville, AR 72702
11

12

     For Cal-Maine:                 MR. ROBERT SANDERS
13                                  Young Williams P.A.
                                    P.O. Box 23059
14                                  Jackson, MS 39225

15

                                    MR. ROBERT P. REDEMANN
16                                  Perrine McGivern Redemann
                                    Reid Berry & Taylor PLLC
17                                  P.O. Box 1710
                                    Tulsa, OK 74101
18

19

20

21

22

23

24

25
```

7867

1                          I N D E X

2

3                                                    Page

4

5    *WITNESSES ON BEHALF OF THE PLAINTIFF*

6

**EUGENE WELCH, PH.D.**

7

Cross-Examination by Mr. Elrod              7871
8    Cross-Examination by Mr. Tucker             7881
Redirect Examination by Mr. Page            7893
9    Recross-Examination by Mr. Chadick         7913
Recross-Examination by Mr. McDaniel        7917

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

**United States District Court**

```
 1              Wednesday, December 9, 2009

 2                      *  *  *  *  *

 3              THE COURT:  Before we begin this

 4    morning, the attorneys may have noticed that I'm

 5    trying to deal with whatever motions have arisen

 6    during the course of the trial.  There's one left.

 7    It's the state's motion for reconsideration of the

 8    court's September 4, 2009, minute order which deals

 9    with Section 427B, and you'll recall the long

10    discussion we had with Mr. Baker and Mr. Bullock and

11    Mr. Jorgensen.

12              And as I'm sure you've all experienced, it's

13    an interesting profession that we're in, insofar as a

14    new day may dawn and you may see things in a different

15    light.  It seems to me that it may have been error for

16    the court to preclude the plaintiff from attempting to

17    put on any evidence with regard to that particular

18    theory.  It does not mean that the court may not

19    ultimately interpret 427B in the fashion that it did,

20    but I am concerned because we don't want to try this

21    over again, if we don't have to.

22              It seems to me that I need to give the

23    plaintiff the opportunity to present whatever evidence

24    it wishes to present -- I think Mr. Baker was the

25    point man here -- with regard to this foreseeability
```

1    argument.

2           The plaintiff has shifted ground a bit in the

3    motion to reconsider from the previous motion, insofar

4    as I think at least one time the plaintiff in the

5    motion to reconsider reads this phrase:  "One who

6    employs an independent contractor to do work which the

7    employer knows, or has reason to know, to be likely to

8    involve a trespass."

9           I think at the time of the hearing we talked

10   about employment of these independent contractor

11   growers to do the work of growing chickens.  And

12   unless I'm mistaken, I think at least one point the

13   reference to "do work" was to do work of disposing of

14   poultry waste.  I'm not sure that's the case here.

15          But even if we don't go that far, Mr. Baker's

16   foreseeability argument potentially allows the

17   application of 427B, even when an independent

18   contractor, for instance, hires another independent

19   contractor to dispose of the waste.  And it should not

20   be a safe harbor under 427B for the independent

21   contractor then in turn to do that which was

22   foreseeable from the integrator's standpoint.

23          So I'm going to grant the state's motion for

24   reconsideration, which is No. 2623, to allow whatever

25   evidence the state wishes to present to the court with

**United States District Court**

 1    regard to its theory under 427.

 2              And I know it comes late, but as you point

 3    out, Mr. Baker -- and Ms. Moll, I think, may have

 4    written this brief.  I don't know.  Mr. Baker.  As you

 5    point out, Mr. Baker, these motions in limine may be

 6    reconsidered at any time, and I think it's important

 7    to do this now before the close of plaintiff's case to

 8    allow you to present whatever additional evidence you

 9    wish.  You may not wish to present any additional

10    evidence with regard to that because you may be

11    satisfied with that which has already been presented.

12    In any event, No. 2623 is granted.

13              All right.  Let's proceed.

14              MR. ELROD:  May I approach the witness,

15    Your Honor?

16              THE COURT:  You may.

17              MR. ELROD:  Your Honor, I move for

18    introduction by stipulation Defendants' Joint Exhibit

19    98, which is the 2009 Lake Tenkiller Visitor's Guide.

20              THE COURT:  There is no objection?

21              MR. PAGE:  It's the Christmas season,

22    Your Honor.  No objection.

23              THE COURT:  May the spirit spread.

24    Joint Exhibit No. 98 is admitted.

25              MR. ELROD:  Thank you, Counsel.

1            **CROSS-EXAMINATION**

2  **BY MR. ELROD:**

3      Q.   Dr. Welch, my name's John Elrod.  I'm not

4  sure whether we've met or not, but I don't think I

5  was --

6      A.   I'm sure I heard your name.

7      Q.   It's nice to -- I've heard your name too.

8  It's nice to meet you, sir.

9            I've handed you a document entitled:  "2009

10  Visitor's Guide for Lake Tenkiller."  I'd like to ask

11  you some questions to see whether you disagree or

12  agree with some of the statements in here regarding

13  fish.

14      A.   Okay.

15      Q.   If you'll look at the inside front cover --

16  actually it's page 4 in the lower left-hand corner --

17  you'll see, sir, that this publication was put

18  together by an entity called the "Greater Tenkiller

19  Area Association," something like that -- I butchered

20  it -- but the Greater Tenkiller Area Association.

21  They have board members, including Ed Brocksmith and a

22  number of other people, and that it's produced in

23  cooperation with the Oklahoma Tourism and Recreation

24  Department, 75,000 copies printed.

25            Do you see where I'm reading that, sir?

1      A.   Yes.

2      Q.   Okay.  Now, understanding, of course, that

3  this is not a scientific journal, I'd like to ask you

4  some questions about statements made on page 51, 5-1,

5  which you'll find in the lower right-hand corner.

6           Before we get into the reading of this,

7  Dr. Welch, are you aware that the state record

8  smallmouth bass was caught within the last couple of

9  years in the Horseshoe Bend area of Lake Tenkiller?

10     A.   I've heard that.

11     Q.   And do you suppose he grew up there or she

12  grew up there or do you think somebody put it there?

13     A.   I think it probably grew there.  But no, I

14  don't think anybody put it there.  When they stock

15  smallmouth, they're small fish.

16     Q.   Okay.

17     A.   Nobody could afford to plant large fish.

18     Q.   Thank you.  Now, let's talk about crappie.

19  It says here, "Crappie fishing is usually best in the

20  spring as the fish prepare for spawning.  Look for

21  small pea-gravel-type banks and shallow Willow trees.

22  During the hot summer months, crappie can be found in

23  deep water about 25 to 40 feet deep.  In the fall,

24  crappie move back to the shallow waters and can be

25  found around submerged brush.  Crappie can be caught

7873

1    from one of the heated fishing docks around the lake

2    in the wintertime."

3          Do you agree that the statement regarding

4    crappie behavior in this visitor's guide is possible

5    in Lake Tenkiller?

6        A.   Yes.  In certain parts.

7        Q.   Okay.  Now, moving on to white and striped

8    bass, white bass --

9        A.   Just a minute.  What were the depth ranges?

10       Q.   Twenty-five to forty feet in the hot summer

11   months.

12       A.   All over the reservoir or --

13       Q.   All I know is what I'm reading in this

14   document, sir.

15       A.   I'm trying to think what the -- in some parts

16   of the reservoir, I think that's possible.

17       Q.   Moving on to white and striped bass, "White

18   bass, or sand bass, (sandies), provide excellent

19   fishing opportunities in the spring as they head for

20   the upper Illinois River to spawn.  From Carter's

21   Landing to Horseshoe Bend is an excellent area to

22   catch the spring run.  During the summer months, the

23   sandies begin to school.  Areas near Cookson, Chicken

24   Creek, and Snake Creek are good choices."

25          Now, do you agree that that kind of behavior

1    by sand bass, sandies, as described in this visitor's

2    guide is possible in Lake Tenkiller?

3        A.   Is -- there's no scientific names in here so

4    I don't know what -- there's a picture that could

5    be --

6        Q.   I think that's a picture of a striper but I

7    could be wrong.

8        A.   Yeah, it's a striped bass.  Well, they stock

9    striped bass in --

10       Q.   Okay.

11       A.   Well, can I comment or --

12       Q.   Sure.  Go ahead.

13       A.   They stock striped bass but they haven't

14   taken.  So I've seen -- I've seen this advertisement

15   about striped bass, if it's the marine species that

16   they've stocked in a number of reservoirs around the

17   country.  It's not a good fishery in Tenkiller, to my

18   knowledge.

19       Q.   Are you aware that the state-record striped

20   bass was caught in Lake Tenkiller?

21       A.   No, I'm not.

22       Q.   Forty-eight pounds, something like that?

23       A.   I can say the water quality that exists in

24   Lake Tenkiller is not good for striped bass.  There

25   are several reservoirs in the country that show that

1    if striped bass have to live in water that's more than

2    24 degrees centigrade, or even more than 20 degrees

3    centigrade, and the oxygen content --

4        Q.   Can you give that us to in Fahrenheit?

5        A.   Twenty degrees centigrade is 68.

6        Q.   Okay.  So you're saying that the water has to

7    be above 68 degrees for striped bass to live?

8        A.   Yeah.  Below, below.  Because what's been

9    shown is if they grow in this stressed -- if you have

10   them in a stressed environment and they reproduce, the

11   young are abnormal.

12       Q.   Okay.

13       A.   There's a high survival.  It's amazing.  But

14   this study has been done in Tennessee where the

15   striped bass existing in stressed, squeezed conditions

16   have produced damaged young; that is, they're abnormal

17   and have low survival rates.

18       Q.   Now, I'm about to correct something I just

19   told you, and I'm sorry if I misled you.

20            How cold is the water that comes out from the

21   penstock?

22       A.   It's probably 15 degrees.

23       Q.   Celsius?

24       A.   Celsius.

25       Q.   Less than 20?  So it's colder?

 1          A.    So 10 is 50, so you add -- so it's about

 2     60.

 3          Q.    Now, here's where I made a mistake.    The next

 4     paragraph, sir, says, "Striped bass are caught below

 5     Tenkiller dam in the Lower Illinois River and Arkansas

 6     River near Gore and Marvel Resort.    Striper fishing is

 7     tremendous year-round with the lower Illinois

 8     River" -- that would be the area below the dam --

 9     "producing the state-record 47-pound 8-ounce striper."

10          A.    That's cool.

11          Q.    Your testimony is that's not possible?

12          A.    No.

13          Q.    That water's 15 degrees Celsius, you just

14     said.

15          A.    Yeah.    That's fine.

16          Q.    I thought it had to be warmer than 20 for

17     stripers?

18                THE COURT:    Below.

19          A.    No.    It can't be warmer; it has to be

20     colder.

21          Q.    *(BY MR. ELROD)*    Okay.    I'm sorry.    My

22     mistake.

23          A.    They can't take the warm temperature.

24                THE COURT:    The striper fishing is above

25     Arkansas River up to the dam.

1    MR. ELROD:  Yes.  Right.  Sounds like a

2  man of experience, Your Honor.

3    THE COURT:  Yes, sir.

4    Q.  *(BY MR. ELROD)*  Talk about large and

5  smallmouth bass for a second.

6    "During the summer months, largemouth bass

7  move to deeper water.  Night fishing to popular due to

8  the heavy day use on the lake.  Smallmouth bass

9  provide some scrappy fighting in the summer.  Most

10  successful areas to catch smallmouth bass are in the

11  Upper Illinois River and Baron Fork Creek.  Largemouth

12  bass return to the shallows as water temperatures

13  start to cool down in the fall.  In the wintertime,

14  largemouth bass seek deep water."

15    Now, do you agree, sir, that the behavior

16  described here for largemouth bass and smallmouth bass

17  is possible in Lake Tenkiller?

18    A.  Well, I'd have to know what the temperatures

19  are.  But the fact that -- let's see.  Yeah, they're

20  in the river.  That's fine.  It's cool, cool enough

21  for them.

22    Q.  Now, if you'll turn the page, sir, there's a

23  blurb in here that was mentioned very briefly

24  yesterday; that is, the Field & Stream ranks Tenkiller

25  and the Illinois as the 16th best fishing in the

1    United States.  Do you see that?

2        A.   Uh-huh.  Well --

3        Q.   What are your thoughts about that given your

4    testimony?

5        A.   -- I showed yesterday -- or I talked about

6    the quality fishing of largemouth and it's

7    double -- it's 88 per hour, the catch rate in

8    Tenkiller, and the quality fishery level is 40 so it

9    is a good fishery.  And I used that as an example of

10   largemouth liking eutrophic conditions.  So more food

11   so -- right.  I mean, I'm not denying that largemouth

12   fishing is good in Tenkiller.  This doesn't specify

13   smallmouth as being in the 16th best fishing.

14       Q.   Well, it does.  It says -- if you look on the

15   left-hand column about halfway up, the written part --

16       A.   Let me -- I got to get the hard copy.  I

17   can't read that.  Oh, okay.  Fine.

18       Q.   It says, "Tenkiller to the south and Gibson

19   to the north" -- "as well as some pleasant surprises,

20   like trout fishing and exceptional smallmouth bass

21   fishing in the Illinois River.  At least it talks

22   about smallmouth bass in the Illinois."

23       A.   Yeah.  You know, eastern Oklahoma is the

24   farthest original range of smallmouth bass.  There

25   were no lakes here originally before you built

1    reservoirs and so they were stream fish.

2         Q.    Right.

3         A.    So they existed from the Great Lakes to

4    Connecticut -- I mean, to Quebec and a little bit east

5    and then down in the Tennessee and into eastern

6    Oklahoma.  Largemouth have a much wider distribution.

7    But, you know, that's written -- it was written in

8    1949.

9         Q.    Right.

10        A.    Smallmouth bass like clear, cool water with

11   rocky substrates, whether it's in streams or lakes.

12        Q.    They like streams?

13        A.    They're very picky.

14        Q.    They're naturally a stream fish, aren't

15   they?

16        A.    In the ichthyology texts, it says streams as

17   lakes.  In Michigan, which I'm very familiar with,

18   northern Michigan, it's smallmouth.  Northern Michigan

19   has oligotrophic lakes.  Southern Michigan has mostly

20   eutrophic lakes; it's largemouth.  Smallmouth do not

21   like eutrophic conditions.

22             Studies in reservoirs in Kentucky show that

23   smallmouth distribute in the lower part of the

24   reservoir where it's more oligotrophic conditions.

25   They don't like the upper part; they're not found

*7880*

1  there.

2      Q.   But the largemouth bass, per your testimony,

3  thrive in Lake Tenkiller?

4      A.   Yes.

5      Q.   And that's where the -- those are the fish

6  that these Wal-Mart fishing tournaments gives hundreds

7  of thousands of dollars of prizes to winners.  That's

8  what those fishing tournaments are all about,

9  largemouth bass?

10     A.   Yeah.  If they could catch smallmouth, they'd

11 be smallmouth because they're better, they're

12 scrappier.

13     Q.   You're just not going to give up, are you?

14     A.   That's my opinion.  Well, I fish-farm and I

15 know what they do.  I caught both largemouth and

16 smallmouth, and smallmouth, they pack it.

17     Q.   I coined the term yesterday during your

18 testimony called species envy.  I mean, if you're a

19 carp, you're happy to be a carp, are you not?  I mean,

20 if you're a catfish, you're happy to be a catfish.  I

21 mean, what's the deal?  What gives us the right to

22 judge whether a smallmouth bass is better than a

23 carp?

24     A.   Humans have too much power, absolutely, over

25 nature.

 1      Q.   You're right.  I think I'll sit down.  Thank

 2   you.

 3              THE COURT:  Do we have any catfish

 4   fishermen here?

 5         Any further cross-examination?

 6              MR. JORGENSEN:  Not from us.

 7              THE COURT:  Mr. Tucker, saw you in the

 8   paper today.

 9              MR. TUCKER:  Sorry, Your Honor.  I want

10   to keep you looking forward to the next thing to come.

11   We always have to have something to look forward to;

12   right?

13              THE COURT:  I don't have any work to do

14   here.

15              MR. TUCKER:  I know.  I've been feeling

16   pretty sorry for you at your caseload; you've just had

17   one case all fall.  I can't imagine what the other

18   judges must think.

19         May it please the court.

20                    **CROSS-EXAMINATION**

21   **BY MR. TUCKER:**

22      Q.   Sir, my name is John Tucker.  I think you and

23   I said "hello" in the hallway the other day, but my

24   partner, Ms. Hill, who you do know.

25      A.   Hi, Mr. Tucker.

1    Q.   Nice to see you, sir. There's no way I can

2    follow the act that you just were entertained by, but

3    I did want to ask you a couple of follow-up questions

4    sort of on the same line.

5         And for purposes of just letting the record

6    be more fulsome, I'll hand you over what I've marked

7    for identification as demonstrative -- or Defendants'

8    Demonstrative 276.

9    A.   This looks like that, about a six- or

10   seven-pound smallmouth.

11   Q.   I hope to put a little flesh on --

12   A.   Well, you never can tell how far they're

13   holding it out in front of them.

14   Q.   I hope to put a little flesh on Mr. Elrod's

15   story there, if I might, and represent to you that if

16   you look at that, that's the lake record for the

17   smallmouth bass.  Do you see that, sir?

18   A.   I do.

19   Q.   And can you determine what lake that was

20   caught in from the Department of Wildlife

21   Conservation's printout there?

22   A.   No, I can't.  But I guess it's Tenkiller.

23   Q.   Look right below the picture, the second line

24   below the photograph of --

25   A.   Tenkiller, right.  Okay.

1        Q.    You'd think that man would have a bigger

2    smile on his face, wouldn't you, for catching that

3    fish.

4            Do you know --

5        A.    Oh, he's smiling internally, I'm sure.

6        Q.    There you have it.  And do you notice that

7    fish was also released and returned to the lake?

8        A.    That's the right thing to do.

9        Q.    And it was caught during a tournament.  If

10   you'll turn the next page, it shows you where and when

11   it was caught.  Can you look at that for me, please?

12       A.    Date caught, area caught, Snake Creek.

13       Q.    All right.  Now, are you familiar where Snake

14   Creek is?

15       A.    No.

16       Q.    And when was it caught, sir?

17       A.    April 25th.

18       Q.    Of this year?

19       A.    2009, yeah.

20       Q.    All right.  Now, yesterday you'll recall the

21   judge asked you some questions about the dendritic

22   nature of this lake and other lakes in Oklahoma?

23       A.    Right.

24       Q.    And you said that probably those coves

25   provide good fishing habitat?

1     A.   Right.

2     Q.   And Snake Creek, I'll represent to you, is

3  one of the coves on Lake Tenkiller, so this is might

4  be a demonstrative of that kind of good fishing

5  habitat you were talking about --

6     A.   That's right.  Especially in April when the

7  temperatures are low.

8     Q.   Now, you didn't do any -- but that fish has

9  to live in the lake year-round, he doesn't get to

10  holiday someplace else in the middle of summer, does

11  he?

12     A.   Well, he may decide that there's not much

13  habitat here with this cool water and slip up into the

14  rivers where there is cool water.

15     Q.   I mean, he doesn't take a strip to Colorado

16  to cool off?  I mean, that sounds facetious, but that

17  is his habitat --

18     A.   They can do that.  They can migrate into the

19  rivers if the conditions are bad in the lake.

20     Q.   The lake and the river is his habitat; is

21  that right?

22     A.   What?

23     Q.   The lake and the river would be his habitat?

24     A.   Yes.

25     Q.   All right.  And in that habitat, this fish

7885

1    obviously has flourished for quite some time?

2        A.    That's true.

3        Q.    And when you took tests -- or the tests that

4    you used for the opinions that you gave, those results

5    came from the channel of the lake, didn't they?

6        A.    Yes.

7        Q.    Now, you didn't have matching tests from the

8    various coves such as Snake Creek; is that right?

9        A.    No, we didn't go into Snake Creek.  But we

10   did do cross-sectional measurements of profiles of

11   dissolved oxygen and temperature, and these profiles

12   lay right on top of each other.  So I'm confident that

13   the thermocline is stable horizontally in lakes and

14   reservoirs and that that thermocline extends to the

15   shore, wherever that hits, and that eight to ten

16   meters below that in July and August and September,

17   there's not going to be any oxygen.

18       Q.    But can't we agree that for whatever reason

19   this habitat has proved pretty favorable to that

20   particular fish?

21       A.    Well, you know, he caught it in -- he caught

22   it in April, the temperatures are lower, smallmouth

23   grow in the spring, and it's the summertime when

24   they -- when they go into deep water.  Whether the

25   temperature is limiting or not, they like to go to

1    deep water.

2         Q.   Sir, is that a young fish?

3         A.   What?

4         Q.   Would that be a young smallmouth bass?

5         A.   No.  I --

6         Q.   How old would a fish that size be, a

7    smallmouth bass, based upon your ichthyology

8    expertise?

9         A.   Well, it could be six, seven years, I'd

10   say.

11        Q.   And just -- I don't mean to speak the

12   obvious, but that means that fish has been around for

13   six or seven summers; right?

14        A.   Yeah.

15        Q.   So that fish found some way to apparently

16   thrive for six or seven summers?

17        A.   That's right.

18        Q.   All right.  Now, when you did your study,

19   sir, the pike and the striper that you talked about,

20   neither of those are native fish, are they, native to

21   Oklahoma?

22        A.   True.

23        Q.   And Oklahoma and other states have over the

24   years experimented with stocking fish from other

25   regions to see if they would do well; is that right?

1    A.   True.

2    Q.   And as you pointed out, up until the middle

3 of last century, or perhaps maybe the '20s or '30s,

4 Oklahoma didn't have any lakes at all, did they?

5    A.   True.

6    Q.   This was a stream and river state, then the

7 government came along and dammed everything up and now

8 we have reservoirs?

9    A.   Yeah, that's true.

10    Q.   And so the Department of Wildlife decided,

11 well, let's see what else we can try stocking that

12 didn't live in our streams that people might enjoy

13 fishing that increase recreation; is that right?

14    A.   It appears that that's what went through

15 their heads, yes.

16    Q.   And are pike and stripers the only fish that

17 the Department of Wildlife has attempted to stock

18 since the '30s, 1930s?

19    A.   No.  They stocked smallmouth bass and the

20 stocked largemouth bass.

21    Q.   Let me rephrase that.  Only species they've

22 attempted to introduce?

23    A.   There's trout in -- in the tailrace area, I

24 understand, and I do not think trout were native here

25 to begin with, but, you know, it's possible but I

7888

 1  don't think so.

 2      Q.   And sometimes when you stock non-native fish,

 3  it works and sometimes it doesn't; is that right?

 4      A.   That's true.

 5      Q.   Like the spotted bass, is that a native fish?

 6      A.   I think spotted bass were in the river before

 7  the dams were built.

 8      Q.   The Florida --

 9      A.   But I'd have to go back and check that

10  publication, but I'm -- I'm -- if I had to say yes or

11  no, I think they were.

12      Q.   And when you stock fish that aren't native to

13  a region, when you bring them into a place they've

14  never been, in some reservoirs they do great and some

15  reservoirs they survive and in some reservoirs they

16  just aren't thrifty at all; isn't that right?

17      A.   Yes.

18      Q.   And to go back to the old commercial, that's

19  kind of what happens when you tamper with Mother

20  Nature, sometimes it works and sometimes it doesn't;

21  right?

22      A.   It isn't chance necessarily, just chance.

23  The habitat makes a huge difference in who survives

24  and who doesn't survive.

25      Q.   And you've talked a lot about survival and

7889

 1   about the bountiful largemouth fishery at Lake

 2   Tenkiller.

 3        As a part of your analysis, did you meet with

 4   the stakeholders who are most interested in your topic

 5   of adverse impact on the Tenkiller fishery to confirm

 6   your opinions?

 7        By "stakeholders," let me tell you who I mean

 8   before you answer the question.  Did you meet with any

 9   fishermen?

10      A.   No.

11      Q.   Did you meet with any of the fishing guides

12   that operate at Lake Tenkiller or on the Illinois

13   River?

14      A.   No.

15      Q.   Did you meet with any of the Department of

16   Wildlife Conservation game rangers?

17      A.   Game rangers, no.  Through Dr. Gendusa, we

18   contacted the fisheries biologists in the Department

19   of Wildlife Conservation.

20      Q.   As to the people that are actually using the

21   lake, though, you didn't talk to any of them?

22      A.   No.

23      Q.   Would their opinions of how fishing is be

24   available to confirm or invalidate your opinion?

25      A.   Well, in my experience dealing with fisheries

7890

1    in reservoirs, I never got very good information from

2    the public.  They always wanted information from me

3    and I -- I'm not saying it's not possible, but I'm a

4    fisherman and fishermen tell lots of lies.

5        Q.   There is a certain level of exaggeration,

6    I'll admit.  Fish do seem to grow quite a bit once

7    they got into your memory and out of your sight.

8            But in any event, you made no effort to

9    contact any of the actual stakeholders who use that

10   lake to determine whether their belief is that fishing

11   is getting better or getting worse?

12       A.   I did not.

13       Q.   All right.  Now, again, you have made an

14   analysis, a scientific analysis, and you've talked to

15   us about temperature, you've talked to us about the

16   plunging river, and I'm assuming the river plunges all

17   over the lake, including in Snake Creek, this river

18   diving down and --

19       A.   Well, I don't know how deep Snake Creek is in

20   that inlet.  So if -- you know, if it's in the

21   metalimnion area, yeah, it could be move out into

22   the -- into the cold --

23       Q.   You told us all about that.  As a matter of

24   theory, it's obvious that this is -- you tell us that

25   that is a challenged fishery; is that correct?

1       A.   I'm telling you that the growth of cool water

2   species is inhibited --

3       Q.   All right.

4       A.   -- from the standpoint of oxygen and

5   temperature.

6       Q.   Okay.  Do you know whether the people that

7   use the lake are pleased with the fishing there?

8       A.   I would guess they probably are judging from

9   the derbies with the largemouth and all that.

10              MR. TUCKER:  I think that's all I have.

11   Thank you.

12              THE WITNESS:  Thank you.

13              THE COURT:  Thank you.  Any further

14   cross-examination?

15              MR. TUCKER:  I'm sorry.  I have one

16   more, Your Honor.

17       A.   Do you know what the age of that smallmouth

18   is?

19       Q.   *(BY MR. TUCKER)*  No, sir.  They returned him

20   to the water so we can't really tell.

21              I want to further validate Mr. Elrod's

22   tourist publication with Demonstrative Exhibit 277, if

23   I may.  Looking at Demonstrative 277, can you identify

24   what kind of fish that is?

25       A.   Well, it says it's a striped bass.

 1        Q.   Okay.

 2        A.   It looks like a striped bass.

 3        Q.   As we talked yesterday, we call those -- so

 4   we just don't get confused, we call those stripers.

 5        A.   Okay.

 6        Q.   Striped bass, you go to the restaurant and

 7   you get it and it comes from the East Coast someplace.

 8        A.   Okay.

 9        Q.   A striper we catch here.

10             Does that appear to be the record fish that

11   Mr. Elrod was talking about?

12        A.   Sure could be.

13        Q.   It's the right weight, isn't it, 47 pounds, 8

14   ounces?

15        A.   Yeah.  It looks like it would be that much.

16        Q.   And that's a happy fisherman on the outside

17   too; correct?

18        A.   Yes.

19        Q.   And that fish shows it was caught on the

20   lower Illinois in 1996; is that right?

21        A.   In June 1996.

22        Q.   So in June of '96, we have a record striper,

23   and then in April of 2009, we have a record

24   smallmouth, all in connection with this fishery; is

25   that correct?

1        A.   Yes.

2               MR. TUCKER:   Thank you.

3               THE COURT:   Any further cross?

4    Mr. Page.

5               MR. PAGE:   Thank you, Your Honor.

6                **REDIRECT EXAMINATION**

7    **BY MR. PAGE:**

8        Q.   Dr. Welch, I want to ask you some questions

9    concerning your testimony yesterday on

10   cross-examination.

11       A.   Okay.

12       Q.   Do you recall some questions about the lack

13   of -- or at least the fewer data that you had in

14   Broken Bow concerning DO, do you believe, sir, that

15   you had enough data to assess Broken Bow Lake's DO

16   level and compare it with Lake Tenkiller?

17       A.   I do.

18       Q.   Would you please explain to the court why you

19   believe that is the case?  And if you want to look at

20   some of those DO profiles --

21       A.   Well, I can first say that the progression of

22   dissolved oxygen in a reservoir or a lake each year is

23   pretty similar, especially in the hypolimnion.  One

24   could confidently look at a couple of profiles during

25   the same time in one reservoir and the same time in

 1    another reservoir, and if there's enough difference in

 2    those you can be -- you can feel fairly certain that

 3    that difference is real.  I think that's the case

 4    between Broken Bow and Tenkiller, even though there's

 5    fewer data -- data points.

 6        Q.   Okay.  Could you use the data that we have

 7    here before the court and explain that or --

 8        A.   I can.

 9        Q.   Can you demonstrate that from the data that's

10    on the Oklahoma exhibits that you've looked at?

11        A.   I can.

12        Q.   Okay.  Which exhibits do you want to look at?

13        A.   Whatever one they're -- I don't know what the

14    numbers are.

15             MR. PAGE:  May I approach, Your Honor?

16             THE COURT:  You may, sir.

17        A.   Can you hand them to me?

18             *(Discussion held off the record)*

19        A.   Okay.  728 and the last one, 721.

20        Q.   (*BY MR. PAGE*)  Okay.  Dr. Welch, looking

21    at -- those are -- just to make the record clear,

22    those are the DO profiles for Lake Tenkiller, that's

23    721, and 728 is the profile for Broken Bow; correct?

24        A.   Yes.

25        Q.   Okay.  Could you explain to us, sir, how this

1   data would show you had sufficient information to be

2   able to compare these lakes?

3       A.   Well, if I picked a similar time in July and

4   August, I think they'd be comparable.  So if we look,

5   say, at the end of July, July 26th, and August 9th,

6   those two profiles in Tenkiller, you'll see that

7   there's a small part of the hypolimnion that has DO

8   concentrations of one or less; the rest of it, they're

9   less than a half in those months.

10          If you look at Broken Bow, say, during August

11  13th and July 18th, even though they're in different

12  years, these are similar profiles, and you'll notice

13  in the whole hypolimnion those concentrations are

14  above 4 milligrams per liter.

15          So that's why I say that you can compare

16  these two bodies of water.

17      Q.   Okay.  Now, Dr. Welch, do you recall -- and

18  we've touched on this a little bit this morning also,

19  I think -- but do you recall questions yesterday

20  concerning habitat -- available habitat for game fish

21  and where you were asked about whether you evaluated

22  prey and predator circumstances?

23      A.   Right.  I was.

24      Q.   Can you explain the prey and predator

25  differences between Broken Bow and Tenkiller?

1      A.   Well, here's my thinking on that.  We just

2   heard how successful the largemouth fishery is in

3   Broken Bow.  They're both predators, they eat foraged

4   fish, both smallmouth and largemouth.  And my thinking

5   is, if the largemouth can grow fat and sassy in

6   Tenkiller eating prey -- and they prefer minnows, they

7   will eat sunfish -- then smallmouth can eat the same

8   thing.  Smallmouth also like crawfish and -- but a

9   largemouth will eat crawfish too.

10          So if the largemouth are doing well, I see

11   there's no reason why there's not enough prey for

12   smallmouth in Tenkiller.  And if the -- if the

13   survival of largemouth fry and juveniles is

14   satisfactory in Tenkiller to, you know, build a

15   population -- build a fishery, then the predation rate

16   on smallmouth shouldn't be any greater than the

17   predation rate on largemouth.

18          So that's how I would look at the comparison

19   of predator/prey problems.

20      Q.   And do you have an opinion as to whether or

21   not there's a factor that's involved in Lake

22   Tenkiller's water quality that affects smallmouth's

23   ability to effectively consume food?

24      A.   Well, I think if they -- yes.  I mean,

25   there's a -- here's the way you have to look at it.

1          You can have some survival of fish.  As we

2     just saw, probably these fish are using -- using the

3     river during the cool times and the reservoir -- in

4     the summertime when it's cooler and the reservoir when

5     it's cooler in the spring, and most of the -- and a

6     lot of the growth occurs in the spring.  And if -- you

7     could look at it this way.

8          If there were oxygen in the hypolimnion down,

9     you know, below 8 to 10 meters, then you've got a lot

10    more habitat for these fish to exist in rather than

11    squeezing them into whatever possible nooks and

12    crannies may exist or into the stream, and it's

13    possible to grow a large fish.

14         But if you looked at the production per unit

15    area of the reservoir, my estimate would be the

16    production would be higher if you had that habitat

17    available with oxygen in it so that there's more

18    space.  And, in fact, that is -- that is the basis for

19    which -- from the standpoint of fisheries, aeration is

20    applied in bodies of water that don't have enough

21    oxygen.  The justification is, you're increasing the

22    habitat in which these fish can thrive.

23         Q.   Okay, sir.

24         A.   Not -- not restricting them to small -- small

25    parts of the habitat.

1      Q.   Dr. Welch, do you recall yesterday some

2   questions addressed to you concerning the reliability

3   of the CDM data that was collected for you for both DO

4   and temperature?

5      A.   Yes.

6      Q.   Do you believe that the data that you

7   obtained from CDM was reliable and valid to base your

8   opinions in your report?

9      A.   I believe it's valid.  I would not have put

10   it in my report if I did not think it was valid.

11         Now, when Cooke and I went out with

12   these -- with Brian Bennett and Drew Santini, we

13   gained a lot of respect for these fellas.  We thought

14   that they were hard-workers and careful.  And

15   subsequent experience with their knowledge of where

16   the data are and how they can present it to us, we had

17   a lot of good service from these guys and we -- Denny

18   and I insisted that they take Winkler measurements.

19         That is an old, tried and true wet chemical

20   determination for oxygen, and it's the basis -- a lot

21   of people don't want to mess with it anymore, they

22   want to trust their standardization of the oxygen

23   probe without double-checking it against the wet

24   method, but we insisted that they did.

25         We never heard back from them that there was

7899

1    any problems and they continued to do that, as far as

2    I know, and double-checked that data, and it looks to

3    me like these data are valid.

4        Q.    Now, Dr. Welch, during this investigation,

5    did you ever discover any data that you felt was

6    invalid?

7        A.    Dr. Cooke has already described the Corps of

8    Engineers phosphorus data.  But when we first started

9    on this project, the May samples for total phosphorus

10   came in and they were too high.  I was really suspect

11   that these -- that we were getting bad numbers and --

12       Q.    This is May of 2005?

13       A.    2005, May of 2005.  So we didn't have any

14   data from May of 2005 because we threw it out and we

15   changed laboratories.  We changed laboratories to

16   the -- to the one in Seattle that I have confidence

17   in, and so there was no doubt in my mind about

18   phosphorus after that.

19       Q.    Do you remember the questions that have been

20   addressed to you about whether or not Broken Bow Lake

21   was a good reference lake for Lake Tenkiller?

22       A.    Do I remember questions about it?

23       Q.    Yes.

24       A.    Yes, I do.

25       Q.    Okay.  Do you have an opinion as to whether

1    or not Broken Bow Lake is a good reference lake?

2        A.   I think it's a good reference lake.

3        Q.   Why is that, sir?

4        A.   Let me wet my whistle here.

5            Well, I've already said that the morphometric

6    characteristics of Tenkiller and Broken Bow are

7    similar.  They're steep-sided basins.  The mean depths

8    are fairly similar.  Broken Bow is a little deeper,

9    it's a little over 19 meters, and Tenkiller

10   is -- excuse me -- 15.6 meters.  There's some other

11   -- and the areas are similar, very similar, something

12   over 50 square kilometers a piece.

13           There's some other things that you can look

14   at.  I calculated the volume in each lake below 6

15   meters, and one is 88 percent of the volume, the other

16   is 86 percent of the volume.  And I calculated the

17   volume of the hypolimnion, and Broken Bow has -- I

18   think Broken Bow has 43 percent and Tenkiller 40

19   percent or it might be the reverse.

20           These are very, very similar basins and

21   should provide rocky drop-off areas for smallmouth

22   bass to inhabit and walleye.  Walleye need gravelly

23   bottoms as well.

24       Q.   Now, was there one factor in particular that

25   was important to you in selecting Broken Bow as a

1   reference for Lake Tenkiller?

2       A.   Well, as Dr. Cooke has emphasized, the

3   basis -- the important thing, aside from these other

4   characteristics, is that the inflow concentration over

5   a three-year period was 27 micrograms per liter and

6   the range was 15 to 38.

7       Q.   You're talking about phosphorus, total

8   phosphorus?

9       A.   I'm talking total phosphorus entering through

10  Mountain Fork River into -- into Broken Bow Reservoir.

11  In Tenkiller, there was a nine-year average of 166.

12  Now, this is spring through summer, not the annual.

13  I've told you before the annual volume-weighted inflow

14  to Tenkiller is 220-something, 227.

15          We don't have a full year of data in Broken

16  Bow so we can't -- can't compare 227 against 27, so

17  we're comparing it 166 against 27.

18      Q.   Now, on this similar topic of comparing

19  reservoirs and watersheds, do you recall -- I think it

20  was Mr. McDaniel's questions to you yesterday --

21  concerning whether watershed-to-lake-area ratios can

22  explain the differences between Broken Bow and

23  Tenkiller's trophic state?  Do you recall that

24  discussion?

25      A.   Right.  I do.

1          MR. MCDANIEL:  Excuse me, Your Honor.

2   That discussion was with Dr. Cooke.  I didn't ask

3   those questions of Dr. Welch.

4          MR. PAGE:  Your Honor, my recollection

5   is this same Tyson defendant exhibit was used for

6   both --

7          THE COURT:  My recollection is that

8   someone asked a question of Dr. Welch of that.  I

9   don't know that it was Mr. McDaniel but someone did.

10         MR. PAGE:  Might have been

11  Mr. Chadick.

12         THE COURT:  Yes, it was.  Very briefly

13  but he did ask.  It was Mr. Chadick.

14      Overruled.  Go ahead.

15    Q.   (BY MR. PAGE)  Okay.  Do you believe that

16  those ratios -- that watershed-to-lake-area ratios

17  explain the difference in the trophic state between --

18    A.   I do not think that.

19    Q.   Why is that?

20    A.   One can think of a way to look at that

21  problem assuming that the land uses are the same in

22  the two watersheds, and the only difference is the

23  watershed-to-lake-surface ratio.

24         So right away you'd think that, well, the

25  watershed is double in Tenkiller what it is in Broken

1    Bow, so there's going to be double the loading if the

2    land uses are the same.  And that's okay in terms

3    of -- that's probably a reasonable assumption in terms

4    of kilograms of phosphorus coming in per year.

5            However, that doubling of the watershed in

6    Tenkiller also means it's the doubling into the water

7    runoff.  So if one is interested in what the inflow

8    concentration would be, the volume-weighted inflow

9    concentration, which is what determines the phosphorus

10   concentration in the lake which is what determines the

11   concentration of algae, then you've got to divide that

12   loading by volume.  And if you do that, even if the

13   runoff is say 4/10 or 5/10 of the total rainfall, you

14   come out with the same concentration if the land uses

15   are the same.  So double the watershed area does not

16   explain the difference in concentrations 27 versus

17   166.

18       Q.   Between the two reservoirs?

19       A.   Between the two reservoirs.

20       Q.   Okay, sir.  Do you recall the question about

21   whether land use in and of itself explains the

22   difference between Broken Bow and Tenkiller

23   phosphorus?

24       A.   Yes, I do.

25       Q.   Do you believe that that provides an

1    explanation for the different trophic states?

2        A.   Not if you look at land use as it's been

3    studied, different types of land use, such as urban

4    runoff.  I've done this.  I've studied in many lake

5    situations urban runoff, pasture, forest, high

6    density, low density, urban runoff.

7        What people use to do that -- and I've done

8    that myself -- is you go in -- it's complicated to

9    figure out how much phosphorus is coming from what

10   kind of land use, but there's a lot of published data

11   showing that there are runoff coefficients or yields

12   in terms of mass of phosphorus coming off the

13   different kinds of land uses per year.

14       But in addition to yields, there's been EPA

15   surveys, and one was -- some of these results were

16   published by EPA, Omernik -- McDowell and Omernik in

17   1979, for example.

18            MR. MCDANIEL:  Your Honor, I object.

19   This is getting into hearsay, Your Honor.

20            THE COURT:  Sustained.

21       Q.   (BY MR. PAGE)  Would you just explain your

22   analysis of Broken Bow and Tenkiller?

23       A.   Okay.  I took representative stream runoff

24   concentrations from different land uses, and I can

25   specify those.  On average, forest land use yields

 1  water runoff with about 18 micrograms per liter on

 2  average.  Rangeland that is -- or land use that has

 3  more than 50 percent rangeland is something like 34

 4  micrograms per liter.

 5           MR. MCDANIEL:  Excuse me, Your Honor.  I

 6  have to object to this because this specific analysis

 7  here I don't believe is set forth in Dr. Welch's

 8  report.

 9           THE COURT:  Overruled.  He's giving an

10  overall perspective on land use and how it might

11  affect trophic states.

12           Go ahead.

13           *(Discussion held off the record)*

14     A.   So these are typical values.  They

15  range -- they vary from one site to the other, the

16  standard deviations around these numbers.  But 18 from

17  forest, 34 from rangeland, and 92 from urban runoff.

18  I've studied urban runoff.  The urban runoff around

19  Seattle has got about 100 micrograms per liter in it

20  on average.

21           If we apply those to the land uses in the two

22  watersheds and weight them for the land area in those

23  two watersheds, you come out --

24           MR. MCDANIEL:  Your Honor, this is an

25  application to the specific watersheds at issue, Your

1  Honor.  This is not a generalization.  This is not set

2  forth in his report.  So I do object to this.

3            THE COURT:  Any response, Mr. Page?

4            MR. PAGE:  Your Honor, this is a

5  response in response to the cross-examination that

6  used this -- these land uses and asked him about the

7  differences.

8            MR. MCDANIEL:  That examination, Your

9  Honor, was simply the basic attributes of the two

10  watersheds.  Individual analysis of loading from those

11  land uses was not part of the cross and it's not part

12  of his report.

13            THE COURT:  I think it opens the door to

14  this and naturally demands this type of response.

15  Overruled.

16        Go ahead.

17     A.   Anyway, if you take these average values and

18  weight them according to land use, you come out with a

19  value of about 21 micrograms per liter in the water

20  going into Broken Bow and 32 going into Tenkiller.  So

21  I don't believe that land use alone explains the high

22  concentration in the inflow of Tenkiller Reservoir.

23     Q.   (BY MR. PAGE)  And just to be clear, the 21

24  for Broken Bow compares to what we're actually seeing

25  there now as what?

**United States District Court**

```
 1        A.   Twenty-seven.

 2        Q.   And the -- what did you say for Tenkiller

 3   was --

 4        A.   Thirty-two.

 5        Q.   Thirty-two compares to what we're actually

 6   seeing in Tenkiller?

 7        A.   166.

 8        Q.   Thank you, sir.  Now, you've had chance this

 9   morning to talk about transectional sampling, and I

10   believe you testified this morning --

11        A.   Yes.

12        Q.   -- that you felt that the -- that even though

13   there were some samples that were down the deep part

14   of the watershed, that you also did transectional

15   sampling in order to evaluate the littoral zones or

16   the edges of the reservoir; correct?

17        A.   Right.  We wanted to see if the profiles were

18   taken in the -- at the main stations, if they could be

19   extrapolated across the reservoir.

20        Q.   Would you just briefly describe what was done

21   to evaluate that?

22        A.   There were, I think, six sites across the

23   reservoir at the various stations, and if you plot

24   these profiles from those different sites on

25   top -- against each other, they fall -- they're very
```

1    similar in terms of oxygen and temperature.  So it

2    tells you that the thermocline is very constant

3    horizontally at a constant depth across the reservoir.

4              This is typical in lakes.  The thermocline is

5    very stable unless there's extremely strong wind, and

6    then you can get seiches in a large body of water that

7    flop back and forth, but when the wind stops blowing

8    that thermocline is very stable.  In deep bodies of

9    water like these reservoirs, you don't see the

10   dropping of the thermocline until you start getting

11   cooling in the fall then it -- then they start going.

12   Otherwise, in the summertime when you got that warm

13   water in the top, they're very stable.

14        Q.   And you've testified you looked at Dr. Wells'

15   modeling results of the temperature and DO?

16        A.   I talked to him about it.

17        Q.   Okay.

18        A.   Well, yes, I've looked at his -- his -- his

19   oxygen temperature profiles.

20        Q.   Does that support your transectional

21   analysis; that is, his modeling results support this

22   transectional --

23        A.   Well, his model just doesn't predict.  I

24   mean, it's a hydrodynamic model that predicts the

25   oxygen, temperature distributions throughout the

 1    basin, not just at the individual sites where we

 2    monitored.

 3          So that also helps describe the consistency

 4    of the horizontal distribution of oxygen and

 5    temperature?

 6    Q.   Changing topics on you, Dr. Welch, you were

 7    asked about whether or not you looked at creel data as

 8    part of your evaluation of the fisheries; correct?  Do

 9    you recall those questions?

10    A.   Yeah.

11    Q.   Okay.  I don't know if you had a chance to

12    answer why you chose not to focus on the creel data

13    that was available for Lake Tenkiller and Broken Bow.

14    Would you please explain?

15    A.   Well, we did look at a lot of fisheries data,

16    and there was -- there was not a consistent pattern

17    that you could say that the sampling techniques and

18    the effort were comparable across a long period of

19    time.

20          And so we did a lot of work and plotted this

21    information, but it just didn't allow us to -- to make

22    any firm conclusions about -- about the status of the

23    fishery.

24    Q.   And finally, Dr. Welch, I think early on

25    yesterday you were asked questions concerning whether

```
 1    or not you validated Dr. Wells' modeling results, and
 2    you said you didn't look at the validations to my
 3    recollection.
 4            Did you do anything yourself, sir, though, to
 5    evaluate the reliability of Dr. Wells' modeling
 6    results?
 7       A.  Well, I did.  I stated that in -- in
 8    deposition, as I recall, and also it's in our report,
 9    that my -- I mentioned yesterday when I showed that
10    line diagram that evaluated the seasonal change in the
11    volume of habitat --
12       Q.  Which diagram are you referring to here?
13       A.  Well, it compared -- well, I can just tell
14    you.  It compared walleye, suboptimal, the volume for
15    suboptimal conditions for walleye, the volume for
16    optimal conditions and suboptimal conditions for
17    smallmouth bass.
18       Q.  Okay, sir.  Can I just make sure for the
19    record, is it -- if you just look, is it Oklahoma
20    Exhibit 733?
21       A.  That's it, yeah.
22       Q.  Okay.  Thank you, sir.  Please continue.
23       A.  So in the upper left-hand corner where there
24    is suboptimal conditions, the June through -- the June
25    through September average volume for suboptimal
```

 1   conditions for smallmouth bass is -- average for

 2   2005-2006 averaged 25 percent for suboptimal.  For

 3   optimal, it was ten percent for smallmouth.  For

 4   walleye, it was less than 1 percent.

 5       Q.   And that's based on your observations?

 6       A.   That's on the observation data of 2005-2006.

 7            Wells' model predicted for his ten-year

 8   average 8 percent for optimum for smallmouth, 33

 9   percent for suboptimal, and one and a half percent for

10   walleye.  So those estimates were very close to what

11   we calculated for '05 and '06.

12            So I thought, Wow, this looks good.  I think

13   the model is doing pretty good on oxygen and

14   temperature.

15                 MR. PAGE:  Your Honor, I pass the

16   witness.

17                 THE COURT:  One question before recross.

18            Dr. Welch, the last question that Mr. Tucker

19   asked you was with regard to the record smallmouth

20   bass and the record striper.

21            Snake Creek is on the lower eastern part of

22   the lake.  Looks to me to be probably the largest

23   creek coming into the lacustrine.

24                 THE WITNESS:  Okay.  Near the dam.

25                 THE COURT:  Yes.  Relatively.

1   It's -- it enters the lacustrine part of the lake.

2          Now, your answer to Mr. Tucker was that those

3   fish came out of this fishery, and I was surprised

4   frankly as to the answer because the striper came out

5   of the lower Illinois River below the dam and above

6   the Arkansas River.

7          THE WITNESS:  That's what I found out

8   later.

9          THE COURT:  Now, is that area considered

10  part of the same fishery?

11          THE WITNESS:  I wouldn't consider it

12  part of the same fishery.

13          THE COURT:  All right.  Well, that's

14  why --

15          THE WITNESS:  You mean the tailrace

16  fishery?

17          THE COURT:  Well, of course the tailrace

18  to my understand is essentially where they have the

19  trout.

20          THE WITNESS:  The outflow, yeah.

21          THE COURT:  Yes.  And then the stripers

22  are in the lower Illinois above the Arkansas River.

23          Is that part of the same fishery in your

24  terms as that presented in Lake Tenkiller in the

25  Illinois River above Lake Tenkiller?

**United States District Court**

 1              THE WITNESS:  No.  Different habitat.

 2              THE COURT:  All right.

 3   Cross-examination -- or recross.

 4                    **RECROSS-EXAMINATION**

 5   **BY CHADICK:**

 6       Q.   Good morning, Dr. Welch.

 7       A.   Good morning.

 8       Q.   I want to make sure that I understand your

 9   testimony.

10            First of all, with regard to habitat --

11   differences in habitat, prey availability, and

12   interspecific competition, that can affect the

13   smallmouth bass in the Tenkiller reservoir; correct?

14       A.   Yes, yes.  Largemouth as well.

15       Q.   All right.  And you did not study the

16   differences in habitat, prey availability, or

17   interspecific competition in either Tenkiller or

18   Broken Bow; correct?

19       A.   I did not study it, no.

20       Q.   Also making clear -- I think you said this

21   yesterday in your deposition.  You did not know

22   whether Dr. Wells' model had been validated; correct?

23       A.   I don't -- let's see.  I don't think it was

24   validated.

25       Q.   Okay.

1    A.   No.  By "validated," I mean you take a whole

2  new set of data and check the model against the whole

3  new set of data.  I don't -- I don't believe it was.

4    Q.   And Mr. Page asked you about your comparing

5  the DO profiles -- and I just want to make sure that I

6  get these right -- you had referred to in redirect

7  State's Exhibit 721 and 728.  Can you pick those up,

8  please?

9    A.   Yeah.  I got them, I think.  Yeah.

10    Q.   Okay.  And so I'm looking first at State's

11  Exhibit 721.  Those are all profiles at LK-01 --

12    A.   Correct.

13    Q.   -- that site 01 in Tenkiller; correct?

14    A.   Right.

15    Q.   And then on State's Exhibit 728, there is the

16  comparable site in Broken Bow, BBL-01, that's on the

17  left-hand side of the page; correct?

18    A.   Yes.

19    Q.   And for the year 2005 in Tenkiller at site

20  LK-01, you ran -- I believe I've counted these -- 12

21  dissolved oxygen profiles; correct?

22    A.   True.

23    Q.   And that was from the period of time from May

24  18, 2005, until November 16th, 2005; correct?

25    A.   True.

1    Q.   And you are, as you described to Mr. Page,

2  making a reference comparison of DO profile of

3  Tenkiller to Broken Bow based upon one oxygen profile

4  at BBL-01 in that same year, 2005; correct?

5    A.   Let me see.   There are no profiles in 2005

6  from Broken Bow.

7    Q.   Look at the very last -- is that not October

8  17, 2005?

9    A.   I didn't use that one to compare.

10    Q.   You didn't even use it?

11    A.   I used the July and August --

12    Q.   Okay.

13    A.   -- to try to get dates that were similar in

14  the two bodies of water.

15    Q.   So if I understand you then, you had 12

16  oxygen profiles run at LK-01 in 2005, and you compared

17  that to zero dissolved oxygen profiles at BB-01 in

18  2005; correct?

19    A.   Yes.

20    Q.   And just in terms of that sampling, of

21  course, the 2005 sampling was the product of work from

22  CDM and none of your BBL profiles that you looked at

23  was the result of sampling from CDM; correct?

24    A.   No, that's correct.   We could look at

25  October, though, if you want to.

1    Q.   Well, I'm just wanting to make sure for

2  purposes of your redirect examination to Mr. Page that

3  I'm covering what I understand.

4    A.   Okay.

5    Q.   And, again, you don't know about the sampling

6  efforts and how they got these DO profile data for any

7  of these years on State's Exhibit 728, right, because

8  it wasn't CDM?

9    A.   Well, I mean, I see the results.  They went

10  out with a -- I mean, I don't know what kind of a

11  probe they used, but these -- they measured oxygen

12  with depths and they reported the results so I'm

13  taking them at face value.

14    Q.   And then you had discussed yesterday about

15  the habitat squeeze and your concern with the

16  smallmouth bass being habitat-squeezed in June through

17  August when growth is prohibited, in your opinion;

18  correct?

19         MR. PAGE:  Your Honor, this goes beyond

20  the scope of my redirect.

21         THE COURT:  I believe it does.  I don't

22  believe he went into that in redirect.

23         MR. CHADICK:  Okay.  I'm sorry.

24    Q.   *(BY MR. CHADICK)*  Let me just see if this

25  hits on your direct.  I was trying to lead up to it,

 1    your redirect.

 2            Is April when that record smallmouth bass was

 3    caught the growing season?

 4        A.    They're going to -- the growth is temperature

 5    controlled so they don't -- they won't be growing at

 6    temperatures beyond 29 for sure and it will be -- be

 7    reduced.

 8            And so as soon as -- so temperature also keys

 9    when they reproduce.  So when the temperature reaches

10    some level in their optimum, then that's when they

11    start to feed and reproduce.  Well, I know crappie

12    come in close to shore.  The temperature is 60 degrees

13    Fahrenheit when you start fishing.  So it controls

14    their reproduction and their growth.

15            MR. CHADICK:  Thank you, Dr. Welch.

16            THE COURT:  Further recross?

17            MR. MCDANIEL:  Yes, Your Honor.

18            THE COURT:  Mr. McDaniel.

19                    **RECROSS-EXAMINATION**

20    **BY MR. MCDANIEL:**

21        Q.    Good morning, Mr. Welch.

22        A.    Good morning.

23        Q.    When you came down here, did you think you'd

24    still be enjoying our fine city on Wednesday?

25        A.    You know how long I've been here?

1      Q.    Yeah, I do.

2      A.    Yeah.

3      Q.    I do.  That's why I asked.  And your tone of

4  voice says it all.

5      A.    I'm looking for my mail every day at the

6  motel.

7      Q.    Has it shown up yet?

8      A.    My wife is not as mad as Cooke's is, though.

9      Q.    Well, I'm sure he's going home a happy man

10  so I -- all right.  Let me touch upon a couple points.

11          With Mr. Page, he asked you whether the

12  differences in watershed area explained the

13  differences in the concentration of phosphorus in the

14  streams.

15      A.    Uh-huh.  Yes.

16      Q.    And you answered the question saying all else

17  being the same, the watershed-to-lake ratio does not

18  explain the concentration.  Is that your testimony?

19      A.    It is.

20      Q.    All right.  But --

21      A.    All other things being the same, like land

22  use, you mean?

23      Q.    Correct.  That's what I understood your

24  testimony to be.

25      A.    Right.

1      Q.   But if the question is phosphorus load, the

2   mass of phosphorus that goes into the two reservoirs,

3   all things being the same, watershed area, because

4   there is a greater volume of runoff from a bigger

5   ratio watershed, it does explain a difference in the

6   load, doesn't it?

7      A.   If the land use were the same and the slopes

8   were the same and all this, yes, you'd get more load.

9      Q.   Okay.  These dissolved oxygen plots in your

10  report that you've discussed, those were actually

11  prepared by -- is it Dr. Santini or Drew Santini?

12     A.   Drew Santini.  Either him or Brian Bennett.

13  I'm not sure which one does this.

14     Q.   From Camp, Dresser & McKee; correct?

15     A.   Yes.

16     Q.   Did they actually provide you the actual

17  results data from the dissolved oxygen?

18     A.   Yeah.  We've got raw data from the DO.

19  Everything we used in our report is in our appendix.

20     Q.   You mention this alternate process that you

21  insisted that they run for dissolved oxygen.  What did

22  you call that?

23     A.   The Winkler test.

24     Q.   Winkler?

25     A.   Goes back to 1800 and something.

1          Q.   All right.  Did you actually receive the

2    original raw Winkler data?

3          A.   No, I have not received the raw Winkler data.

4          Q.   Okay.

5          A.   It was used to, you know, compare and make

6    sure they were close -- that the probe measurement was

7    close.  I mean, it's a way to standardize.

8          Q.   Okay.  But they never provided it so you

9    don't know what it shows?

10         A.   No, I do not know what it shows.

11         Q.   Now, let's talk briefly about this analysis

12   you did where you said you area-weighted three land

13   uses -- forest, range, and urban -- between the two

14   watersheds.

15         A.   Uh-huh.

16         Q.   And if you understood your testimony, you

17   applied sort of a standardized coefficient for runoff

18   that you've either developed through your own research

19   or from the literature?

20         A.   Well, I did that also but this was more

21   simple.  I just said, here are the concentrations in

22   water running off of this land use, and I took those

23   concentrations and weighted them for that amount of

24   land use.

25              For example, the highest concentration 92,

1   for example, and there's 7 percent land use in urban

2   area in Tenkiller.  So I just -- I weighted it that

3   way.

4        Q.   Well, let's talk about the urban.

5             Now, obviously we've had several of the other

6   state's experts have testified and we've talked about

7   lots of different types of sampling and data that have

8   been generated in the course of this investigation.

9             But my recollection of the testimony is that

10  no one actually sampled urban storm water runoff in

11  the Illinois River Watershed to either determine

12  concentration or loading.  Have you seen any such

13  data, sir?

14       A.   Engel's -- as far as the rangeland, the range

15  value I used was -- was 34.  And Engel's cited some

16  work from --

17       Q.   I want to know about measured data from this

18  watershed.  That's my question.

19       A.   I don't know of any.

20       Q.   Okay.  So what you used in this analysis you

21  testified to with Mr. Page this morning was not based

22  upon data from the Illinois River?

23       A.   It was not.

24       Q.   Okay.  Now, when you analyzed those -- or did

25  your analysis of those three land uses, you didn't

1    consider the nurseries in the Illinois River

2    Watershed, did you, sir?

3        A.   I did not.

4        Q.   Now, when you gave your deposition in this

5    case, you recall being asked about the big Greenleaf

6    Nursery?

7        A.   I do.

8        Q.   And at that time, you were not familiar that

9    that facility existed in the Illinois River Watershed,

10   were you?

11       A.   I think I said no.  I can't remember what I

12   said.  I think I asked somebody afterwards.  I asked

13   Engel about it.

14       Q.   It's your understanding that that nursery

15   sits right beside the lake up in the upper zone?

16       A.   I assume that it does, yes.

17       Q.   Okay.

18       A.   I actually haven't looked at it so I -- I

19   know it's on the shore somewhere.

20       Q.   Well, and you use this analysis of these

21   three land uses in your discussion with Mr. Page to

22   say that those three land uses don't explain the

23   difference between 21 micrograms per liter in Broken

24   Bow and 32 micrograms per liter in Tenkiller, can't be

25   explained by those three land uses.

1          That was your testimony; right?

2      A.   I didn't say that.  I said I used -- I used

3   the percentages of land use that were presented to

4   Cooke and I by Robert Van Waasbergen, and they're in

5   our report, and it's 7 percent urban and, I think, 43

6   percent forest, and the rest were pasture in

7   Tenkiller.

8          I took those numbers and I was only trying to

9   illustrate and discuss this issue of different land

10   uses in the two watersheds as explaining the -- you

11   know, aside from any other waste going on these lands

12   and aside from wastewater or anything else, can this

13   explain the difference between 27 and 166?  That's the

14   reason I did it.  Just the expected runoff from those

15   kinds of land uses, on average, doesn't do it.

16      Q.   All right.  That's how I understood your

17   testimony.

18      A.   Yeah.  And no, it doesn't include any other

19   kinds of sources.

20      Q.   Well, and that's -- that's my next question,

21   sir.

22          That analysis that you just gave us doesn't

23   consider the 31 million gallons a day of treated

24   wastewater dumped into the streams of the Illinois

25   River Watershed by the sewage plants versus --

1      A.   It does not.

2      Q.   -- the less than one-tenth of a million a

3  gallon a day in Broken Bow, does it?

4      A.   It doesn't.

5      Q.   All right.  Those are my questions.  Thank

6  you, sir.

7                THE WITNESS:  Okay.

8                THE COURT:  Any further recross?

9                MR. TUCKER:  No, thank you.

10               MR. ELROD:  No, Your Honor.

11               THE COURT:  Doctor, one more question.

12  I presume I know the answer to this.

13        You've not done any follow-up on your

14  previous work at Eucha-Spavinaw, I take it; correct?

15               THE WITNESS:  Correct.

16               THE COURT:  And that wasn't an area you

17  were asked to look at in the context of this lawsuit?

18               THE WITNESS:  True.

19               THE COURT:  All right.  Very well.  You

20  may be excused.

21        The state may call its next witness.

22               MS. MOLL:  Good morning, Your Honor.

23               THE COURT:  Good morning.

24               MS. MOLL:  May it please the court,

25  Judge, I'm sorry to say that this won't be nearly as

```
 1   fun as listening to Dr. Welch.

 2                 THE COURT:  All right.

 3                 MS. MOLL:  But there are two

 4   stipulations that the state has reached with various

 5   defendants that need to be reflected on the record.

 6                 THE COURT:  All right.

 7                 MS. MOLL:  Perhaps we could get through

 8   those before our break.

 9                 THE COURT:  Please.

10                 MS. MOLL:  And this will suspend the

11   need to move into evidence a handful of exhibits, and

12   this relates to certain of the state's claims

13   requiring proof that a defendant is a person or a

14   corporation.

15                 THE COURT:  All right.

16                 MS. MOLL:  So the first is -- and I

17   see Mr. George is in the courtroom.  He has agreed to

18   stipulate on the record that Tyson Foods, Inc.,Tyson

19   Chicken, Inc., Tyson Poultry, Inc., and Cobb-Vantress,

20   Inc. are corporations.  I would ask Mr. George to

21   acknowledge his agreement on the record.

22                 THE COURT:  Mr. George.

23                 MR. GEORGE:  More Christmas spirit, Your

24   Honor.  I struggled with that request but that's

25   agreed.
```

1          THE COURT:  Thank you.  Ms. Moll.

2          MS. MOLL:  The second stipulation is

3   that Mr. McDaniel has agreed to stipulated on the

4   record that Peterson Farms, Inc. is a corporation.

5          THE COURT:  Mr. McDaniel.

6          MR. MCDANIEL:  It took us 12 e-mails,

7   Your Honor, but I agree.

8          THE COURT:  Thank you.

9          MS. MOLL:  It was close to 12.

10          Your Honor, we have another matter to take

11   up.  I don't know if you want me to get into it now,

12   it's going to take some time, or whether or not you

13   want to take the morning break now.  It's your

14   pleasure.

15          THE COURT:  Well, why don't you give me

16   a heads-up on whatever it is.

17          MS. MOLL:  Okay.  The state would like

18   to move into evidence a series of records from ODAFF.

19   We do not have a foundation witness for it because we

20   have a declaration signed by Mr. Dan Parrish from

21   ODAFF pursuant to Federal Rule of Evidence 902(11).

22   So I'm happy to get into that now but it's your

23   pleasure.

24          THE COURT:  All right.  How many records

25   are we talking about?

 1             MS. MOLL:  There are a couple dozen, I

 2   believe, Your Honor.

 3             THE COURT:  All right.  And I take it

 4   here that there is no stipulation as to this matter;

 5   correct?

 6             MS. MOLL:  That is correct.  We tried to

 7   obtain one but that was not successful.

 8          Shall I go ahead and distribute the exhibits,

 9   Your Honor?

10             THE COURT:  Please.  All right.  This is

11   all regularly-conducted activity issues; correct?

12             MS. MOLL:  Yes, sir.

13             THE COURT:  And I take it that the

14   defendants dispute whether or not the activities were

15   regularly conducted?

16             MR. HOPSON:  No.  I think the activities

17   were as regular as can be, Your Honor.  I have a

18   different objection.

19             THE COURT:  All right.

20             MR. HOPSON:  I have an objection that

21   dumping in hundreds of pages of soil test phosphorus

22   results that are not representative, not random, not a

23   statistical sample, not tied to any expert testimony

24   is simply irrelevant.

25          If they want to put these into evidence, I

1    can assure you they can put Mr. Parrish on the stand,

2    ask him three questions, and they can come into

3    evidence if you overrule my relevance objection.  But

4    at that point, I want to interrogate Mr. Parrish about

5    how these documents were selected, who selected them,

6    and what they're supposed to represent.

7         Because all we really have here is a

8    selection by plaintiff's counsel of the highest STP

9    soil test phosphorus results they could find on

10   certain growers' farms.  The same growers have very,

11   very low soil test phosphorus results on other fields

12   which also goes to the relevance of this whole

13   exercise.

14                    MR. TUCKER:  Your Honor --

15                    THE COURT:  Yes.

16                    MR. TUCKER:  -- if I may be heard as

17   well.

18        In addition to the objection Mr. Hopson makes

19   under Rule 106, which talks about the remainder of

20   related writings, it's our position that that applies

21   to if you have a grower file, then other documents in

22   that grower's file are equally important as a part of

23   the record that's being offered.  The example given by

24   Mr. Hopson was that -- that growers would have a

25   different STP, a lower STP on other fields.

1          The point Mr. Hopson did not make is, for

2     example, on one of the exhibits the state choose to

3     offer, that particular grower has a lower STP on that

4     field for every year before and every year afterward

5     one particular soil sample was taken, and lower by a

6     factor of 90 percent, indicating a clear aberration

7     for that one test.  Yet, the state only proposes to

8     submit the one test which clearly does not fit the

9     rest of all the tests in that particular field.

10          Additionally, the way in which the state

11     chooses to admit this, we believe that there is

12     a -- it is a hearsay issue.  Because if you look at

13     the description of records of regularly-conducted

14     activity, documents that are being offered by the

15     state include, for example, a filing made by a farmer

16     with the state which contains in there the farmer's

17     understanding of a soil test received from yet a third

18     party.  So it's hearsay within hearsay which is going

19     to be offered by this particular person.

20          Additionally, the --

21               THE COURT:  Now, let me understand here.

22          You say the farmer's understanding of a soil

23     test received from --

24               MR. TUCKER:  A third party.

25               THE COURT:  -- a private third party?

United States District Court

1          MR. TUCKER:  That's correct.  Or in many

2    instances, it's Oklahoma State University.  But that's

3    the farmer's entry on an Oklahoma state form of data

4    which he obtained from yet a third party, which is

5    being offered by the state for proof of the matter

6    asserted, which is the soil test phosphorus level on

7    that particular field to demonstrate a high level at

8    that time on that filing.

9          THE COURT:  Well, remind me how these

10   records are typically gathered.  Does the state itself

11   do these STP tests?

12          MR. TUCKER:  No.

13          THE COURT:  That was my recollection,

14   that the farmer sends these out to the OSU labs and

15   then the farmer reports those results back to the

16   state; correct?

17          MR. TUCKER:  That's correct, on the

18   annual report the farmer fills out, which includes

19   data which the farmer knows about.  It also includes

20   data which the farmer is merely using by reporting the

21   hearsay from a third party.

22          THE COURT:  Right.  But that's the

23   regular conduct of these records; correct?  In other

24   words, that's the way these records are put together

25   normally?

1          MR. TUCKER:  It is the regular -- the

2    way these records are regularly performed, that is

3    correct.

4          THE COURT:  Well, what makes it

5    unreliable?

6          MR. TUCKER:  Well, I don't know that

7    it's unnecessarily unreliable but it is hearsay within

8    hearsay.

9          An example of the potential unreliability of

10    it is the way in which the state chooses to offer it.

11    By referring back to section 2, rule 102, in which

12    they're offering only a particular slice of the record

13    without any opportunity -- the way it's being proposed

14    by Ms. Moll, it's being offered without any

15    opportunity to determine how that slice was selected

16    and what the other slices of the pie look like.

17          THE COURT:  Well, of course that goes

18    back to Mr. Hopson's objection?

19          MR. TUCKER:  Yes, it does.

20          THE COURT:  And that's really a

21    different objection than hearsay.

22          MR. TUCKER:  Those are two different

23    objections, that's correct, Your Honor.

24          THE COURT:  All right.  Anything else?

25          MS. MOLL:  Your Honor, if I may respond?

```
 1              MR. WEEKS:  May I speak, Your Honor?

 2              THE COURT:  Of course, sir.

 3              MR. WEEKS:  Thank you.  On behalf of

 4    George's, Your Honor, I would like to simply reiterate

 5    what has already been brought to the court's

 6    attention, and that is that the documents that the

 7    state seeks to introduce here are selective and

 8    cherry-pick documents from some -- not all -- but some

 9    of the various growers in the Illinois River

10    Watershed.  So what we're seeing here is not

11    representative of anything other than STP levels by

12    which the state would like to misrepresent the facts

13    to the court.

14              And as I understand it, Rule 106 requires

15    fairness in the introduction of these kinds of

16    documents.  And so to the extent that the state is

17    interested in STP levels that exist in the Illinois

18    River Watershed, then I would strongly urge the court

19    that fairness would require that all of the records

20    come in, and specifically all the records as it

21    relates to -- all the STP level records as it relates

22    to the growers that the state is attempting to use

23    here.

24              In addition to that --

25              THE COURT:  Well, even if that were the
```

1    case, it arguably wouldn't be a random or

2    statistically-selected sampling.

3                    MR. WEEKS:  It would not, Your Honor.

4    But, however, with regard to that grower who's going

5    to be painted with some brush here today --

6                    THE COURT:  You're saying at the very

7    least, all the records relative to that grower ought

8    to be presented?

9                    MR. WEEKS:  That particular grower,

10   that's correct.

11                   THE COURT:  But that doesn't address all

12   of Mr. Hopson's objection, 106 objection.

13                   MR. WEEKS:  It does not.  And the

14   question of relevance is still there and the question

15   of the fact that they may and probably are misleading

16   in that respect is still there.

17           I'm not necessarily urging that on the court.

18   I'm just pointing out in the -- if the court does

19   decide to accept some of these documents, that in

20   fairness that would at least be one option or

21   alternative.

22           I would like to further point out that with

23   regard to George's the state has selected documents

24   from a grower by the name of Martin Bayer, B-a-y-e-r.

25                   Now, Mr. Bayer's documents are all

1    indicate -- all indicate that he is located in the

2    Eucha-Spavinaw Watershed.  And so for that reason,

3    these documents are certainly not relevant here in

4    this proceeding.

5         Now, when we brought this to the attention of

6    the state, what we were told was, well, you know,

7    we're going to bring Mr. Parrish in here and by fiat

8    he is going to declare that no, Mr. Bayer is now in

9    the Eucha -- or in the Illinois River Watershed.

10        Well, you know, Mr. Parrish ain't here today

11   and they say he ain't going to be here today.  And so,

12   you know, we have the question of, you know, where is

13   Mr. Bayer's farm and why is it now that they want to

14   put those records in?  Furthermore --

15             THE COURT:  My recollection is that

16   these forms themselves identify which watershed the

17   farms are in.

18             MR. WEEKS:  They do indeed, Your

19   Honor.

20             THE COURT:  Have you looked at the

21   records that the plaintiff seeks to introduce to

22   see --

23             MR. WEEKS:  It says "Eucha" right on his

24   farm management plan, "Eucha."

25             THE COURT:  Okay.

 1            MR. WEEKS:  But as I said, we were -- we

 2    were informed that Mr. Parrish was going to appear

 3    here today and declare that no, he's not in Eucha, but

 4    rather he's in the Illinois River Watershed.

 5            I would further point out -- and the state

 6    knows this as well -- that the reason they want this

 7    guy in here is because he has one field that has a

 8    high STP level that was determined in 2002 when

 9    Mr. Bayer was actually buying the farm.  He had no

10    history with that farm.  George's has no history with

11    that farm.

12            The only history is that there was an attempt

13    to purchase -- or he did purchase this farm in 2002,

14    and on a field there was a high STP level.  Now they

15    want to hang that value on our neck and that's unfair.

16                THE COURT:  Is he a George's grower?

17                MR. WEEKS:  He is indeed a George's

18    grower, and has been since 2002 when he bought the

19    farm.  But the STP level predates him ever purchasing

20    that farm.

21                THE COURT:  You say your understanding

22    is that he's in Eucha-Spavinaw?

23                MR. WEEKS:  That's what the state's

24    documents say.

25                THE COURT:  Does it straddle the

*7936*

```
 1   watersheds.

 2              MR. WEEKS:  It doesn't say it straddles

 3   the watershed.

 4              THE COURT:  All right.  Anything

 5   further?

 6              MR. WEEKS:  Nothing further, Your Honor.

 7              THE COURT:  Okay.  Any other objections?

 8   Ms. Moll, you stirred things up.

 9              MS. MOLL:  Mr. Elrod promises this was

10   going to be a dust-up and it is indeed.

11              MR. TUCKER:  My lawyer advised me,

12   knowing me for the scholar that I am not, that I

13   missed the main point of this whole issue.

14              THE COURT:  I've been accused of the

15   same, Mr. Tucker.

16              MR. TUCKER:  He suggests that I direct

17   the court's attention to Rule 902 having to do with

18   self-authentication, and in particular subparagraph

19   (11), which has to do with certified domestic records

20   of regularly-conducted activities which is what it is

21   the plaintiff wants to do here.

22              The point is made that it's required that the

23   certification be made by a person who has the ability

24   to certify that the record was made at or near the

25   time of the occurrence of the matters set forth or
```

1    from information transmitted by a person with

2    knowledge of those matters.  And it's pointed out that

3    Mr. Parrish is not and cannot be that person.

4              Thank you, sir.

5                   THE COURT:  And remind me of

6    Mr. Parrish's position.

7                   MR. TUCKER:  Mr. Parrish is --

8                   MS. MOLL:  As you can see, Your Honor,

9    on the declaration that he signed, he says, "I am the

10   director of agricultural, environmental management

11   services for the Oklahoma Department of Agriculture,

12   Food and Forestry."

13                  THE COURT:  Now, where is that in this

14   document?

15                  MS. MOLL:  Oh, I'm sorry.  Forgive me,

16   Your Honor.  It should be on the inside cover of the

17   binder.

18                  THE COURT:  Oh, here it is.  So he's the

19   director.

20                  MS. MOLL:  And he goes on to say -- and

21   I'm still in the first paragraph on the third line --

22   I am the custodian of ODAFF's records kept under the

23   Oklahoma Registered Poultry Feeding Operations Act and

24   the Oklahoma Poultry Waste Applicator Certification

25   Act.  All of the facts stated herein are based on my

1    personal knowledge of ODAFF's recordkeeping

2    practices.

3                   MR. TUCKER:  And he would know that,

4    Your Honor, with regard to ODAFF's recordkeeping

5    practices but he would have no knowledge of how, when,

6    or under what circumstances the document which he

7    chooses to certify was made as to the time it was done

8    or whether the person who made it actually had

9    knowledge of those matters.  It would only be the

10   person who had made the record.

11           The comments of that rule points out and

12   Weinstein points out that has to do with records that

13   are generated and kept by the agency, as opposed to

14   something that comes in from the outside.

15                   THE COURT:  All right.  It wouldn't

16   necessarily be the person who made the record, it

17   would be the person who gathered the record or was the

18   actual custodian in your view?

19                   MR. TUCKER:  Well, no.  For example,

20   with respect to the agency, he would know that this is

21   the kind of record that is prepared by -- ordinarily

22   prepared by a member of his agency, not by some

23   outside person.  He could then certify that that's

24   something that -- he would know that because he would

25   know that his person does it, does it when the call

1   comes in, the call log is prepared, and then the call

2   log is preserved.  For example, a 911 log is a good

3   example of that.  The director of that agency would

4   know how that's done.

5         This is like someone mailing in 911 records

6   from somebody's house scattered in various parts of

7   the countryside.  He would have no idea who actually

8   made it, who actually completed it, and under what

9   circumstances or when it was done.  So he would not

10  have the ability to do that.

11        That self-certification is intended to

12  certify records of the agency.  It is not intended to

13  certify records that come into the agency from

14  someplace else.

15              THE COURT:  All right.  Well, let me

16  recess, we'll take a look at 902(11) here because this

17  is hitting me cold, and I'll try to get a better grasp

18  of the outlines of 902(11) and 106 and we'll be back

19  when that's done.

20              MS. MOLL:  Thank you, Your Honor.

21                   *(Short break)*

22              THE COURT:  Ms. Moll.

23              MS. MOLL:  Thank you, Judge.  So quite a

24  few objections obviously have been lodged before I got

25  too many words out, so if you'll bear with me as I go

1  through them.

2            THE COURT:  Yes.

3            MS. MOLL:  So the first objection that I

4  heard was on relevance grounds.  These documents -- I

5  want the record to be very clear on what these are.

6            As Your Honor knows, ODAFF maintains what

7  we've been calling grower files and -- I'm not hiding

8  it.  This is a subset obviously of grower files.

9  The --

10           THE COURT:  I didn't even hear relevance

11  as an objection frankly.

12           MS. MOLL:  Mr. Hopson did.

13           MR. HOPSON:  I did.

14           THE COURT:  All right.  Go ahead.

15           MR. HOPSON:  Probably not very

16  effectively but I intended to lodge that.

17           THE COURT:  All right.

18           MS. MOLL:  So this is a subset of grower

19  files and they're relevant --

20           THE COURT:  Excuse me.  Mr. Overton,

21  having many more years of experience than any of us

22  here frankly in the courtroom, suggested that we refer

23  to what we're talking about.

24           These are Exhibits 2644-A and --

25           MS. MOLL:  Your Honor, there's quite a

1    long list.  I'm happy to go through the numbers for

2    ease of the record, if you'd like me to.

3                 THE COURT:  Well, there are quite a few.

4    Let's do that here.

5                 MS. MOLL:  Okay.

6                 THE COURT:  2660-A, 2685-A, 2686-A,

7    2688-A, 2690-A, 2695-A, 2703-A, 2707-A, 2729-A,

8    2730-A, 2739-A, 2740-A, 2768-A, 2772-A, 2774-A,

9    2780-A, 2798-A, 2815-A, 2821-A, 2825-A, 2830-A,

10   2831-A, 2835-A, 2847-A, 2855-A, 2856-A, 2857-A,

11   2858-A, 2860-A, 2861-A, 2864-A, 2868-A, 2879-A,

12   2880-A, 2885-A, 2890-A, 2891-A, 2899-A, 2907-A,

13   2914-A, 2926-A, 2928-A, 6063-A, 6942-A, and Cargill 79

14   and Cargill 87.

15           Does that cover it?

16                 MS. MOLL:  There was one, I think, you

17   may have missed at the beginning, Your Honor.  So just

18   so the record's clear, it would be the first --

19                 THE COURT:  All right.  You're right.

20                 MS. MOLL:  The first two are Oklahoma

21   Exhibit 2565-A and 2644-A.  I think you may have

22   skipped one of those.

23                 THE COURT:  All right.  Thank you very

24   much.  Just so the record's clear.  Go ahead.

25                 MS. MOLL:  Okay.  So on the relevance

1    point, what we have selected and are moving to admit

2    are a subset of these grower files.  What they show is

3    soil test results of poultry-growers in the IRW with

4    STPs in excess of any agronomic need, which supports

5    the state's contention which poultry waste has been

6    overapplied in the IRW.  These records link a

7    particular grower to an integrator and so I think that

8    the relevance quite frankly should be obvious.

9            If I could take a step back, Your Honor, and

10    give you a little bit of background on these type of

11    exhibits and how we got to where we are, I think it

12    might be helpful.

13            THE COURT:  All right.  First of all,

14    the relevance objection is overruled.

15            Go ahead.

16            MS. MOLL:  So during the motion in

17    limine proceedings, which seems like years ago by now

18    quite frankly, but there was an argument about kitchen

19    sink exhibits.  I don't know if Your Honor recalls

20    that.

21            But one of the defendant's arguments was that

22    there was numerous exhibits on the state's exhibit

23    list which they described as kitchen sink exhibits,

24    that there was no way that these exhibits would be

25    offered in their entirety simply because of their

*7943*

1   volume.

2          During that hearing, one of the defendant's

3   counsel argued that the ODAFF files fell in that

4   category.  And moving ahead a little bit --

5          THE COURT:  But there's a balance quite

6   frankly.

7          MS. MOLL:  Of course.

8          THE COURT:  I mean, let's cut to the

9   chase.  I mean, obviously ODAFF records might fill a

10  couple of rooms.

11         MS. MOLL:  That's right.

12         THE COURT:  They're absolutely

13  impossible for one fact-finder to deal with.  The

14  question is really a 106 question:  What in fairness

15  needs to be produced here?  And there seems to be a

16  bit of a difference of opinion amongst defense

17  counsel.

18         Now, with respect to counsel's request that

19  the person be brought here personally, obviously as to

20  902(11), if I had Mr. Hopson's cross-examination

21  skills, he could cross-examine Mother Teresa and make

22  her look bad.  I understand his desire to

23  cross-examine, but obviously 902(11) allows a

24  custodian to make a written declaration.  So 902(11)

25  permits this exercise.  It would appear to me that

1    that objection needs to be overruled as well.

2         The question here really cutting to the chase

3    is 106.  I understand we don't want the kitchen sink

4    here, but the question is -- and there's a lot of

5    discretion under Section 106 as to what in fairness

6    should be presented to show a fair and representative

7    picture.

8         It seems to me from the few minutes that I've

9    been given during the break to discuss with a couple

10   of the bright minds back in chambers, it seems to me

11   that instead of a statistically representative sample,

12   which would frankly take you all quite a bit of time

13   to try to develop in terms of how that should be done,

14   it would seem to me frankly that the complete file as

15   to the growers that you want to present a picture

16   about ought to be presented.

17        What's your response there?

18             MS. MOLL:  My response to that, Your

19   Honor, is the defendants are free to call Mr. Parrish

20   in their case and --

21             THE COURT:  But that's not what 106

22   says.  106 doesn't impose that burden on the other

23   side.  All 106 requires is that they show that, A, the

24   truncated version is misleading; and secondly, the

25   material required to be admitted for completeness.  I

1    think they've already done that.

2              MS. MOLL:  Well, my response, Your

3    Honor, would be that what you have in your binder

4    before you with all the exhibits is not misleading

5    because it reflects the purpose for which they're

6    offered.  They are simply offered for the reason I

7    stated, which is to show excessive STPs.

8              I don't think we're under any obligation to

9    do any kind of, you know, sampling or anything like

10   that.

11             THE COURT:  I'm not saying you are.  I'm

12   saying that it appears to me that with respect to

13   these growers, because given the insight that you've

14   given the court from what's been presented thus far,

15   it's not necessary that you -- that you show a

16   representative sampling because obviously you may have

17   excess application of poultry litter in this area,

18   whereas the field next to it may be pristine, and if

19   you're correct, you have phosphorus coming off that

20   field in runoff arguably making it to the stream, the

21   reservoir.

22             So you don't have to show a representative

23   sample from across the IRW.  It just seems to me you

24   need to be able to show me the complete picture with

25   regard to that grower to, in fairness, address the

1    considerations presented by Mr. Tucker.  There's been

2    testimony here that the sampling STP tests aren't

3    always perfect, that you may have a flier in terms of

4    a test.

5         It seems to me that, in fairness, you ought

6    to present records with regard -- and the complete

7    records with regard to that particular grower so we

8    can get a fair picture of what's happening as to that

9    grower.

10        I was presented this at 11:10, and having

11   looked a little bit at Weinstein, that seems to me,

12   Section 106.02(1), that fairness requires presentation

13   of all records from those growers referenced by the

14   records to give a complete picture of the truth as to

15   STP loading by that grower.

16        Mr. Hopson.

17             MR. HOPSON:  Just a quick observation,

18   Your Honor.

19        When you say "all records," I take it you

20   mean all STP soil test phosphorus records in the

21   grower files?  And I raised this because of the burden

22   on the court.

23             THE COURT:  No.  That's what I intended,

24   yes.

25             MR. HOPSON:  All right.  That's just a

 1    point of clarification.

 2              MR. TUCKER:  Your Honor, if I may, as a

 3    part of that point of clarification, one of the issues

 4    that's raised by the state, for example, Ms. Moll said

 5    we want to show that they have high STP litters caused

 6    by the application of poultry litter.

 7              For example, with regard to one of the

 8    growers that they have listed in the long list of

 9    exhibits they read to you, they do indeed show a high

10    STP record.  But not in the STP records, but in the

11    grower's annual registration forms it shows no litter

12    as been applied to that field.  So the state's

13    conclusion would be invalidated by the balance of that

14    grower's file.

15              But that would not be contained just in the

16    STP records, that would be contained in the grower's

17    annual statement.  It's more broad than just the STP

18    records.

19              THE COURT:  Well, how far back do the

20    STP records exist, Mr. Tucker?

21              MR. TUCKER:  Well, the statute went into

22    effect in 1998, and the grower records -- the grower

23    files essentially began following that time when the

24    grower first made an application -- I mean '98 -- when

25    the grower first applied for a Nutrient Management

 1   Plan.

 2              By way of --

 3                   THE COURT:  Have you looked at that

 4   particular grower's file?

 5                   MR. TUCKER:  Yes, Your Honor.

 6                   THE COURT:  All right.  And you're

 7   saying from the very outset there are high STP

 8   results?

 9                   MR. TUCKER:  The first soil test showed

10   a high STP result.  And then all the years that

11   follow, one of the things that we would have presented

12   to Mr. Parrish, if the state offered Mr. Parrish, to

13   let him look at each of the reports as filed and

14   approved by the state inspector every year since that

15   first soil test that demonstrates that litter has

16   never been applied to that property.

17                   THE COURT:  Well, it doesn't mean that

18   litter wasn't applied before; correct?

19                   MR. TUCKER:  No.  But there's no

20   evidence that it was.

21                   THE COURT:  Right.  And I understand we

22   don't have complete records going back to the 40s.

23                   MR. TUCKER:  The Garden of Eden for this

24   project starts with each grower when they apply for

25   their Nutrient Management Plan.  That would be the 7th

1    day.

2                    THE COURT:  Go ahead.

3                    MR. WEEKS:  I would just point out to

4    the court that in addition to the STP results

5    themselves, that there are other documents in the file

6    that I think are relevant and important to the case.

7           For example --

8                    THE COURT:  Well, they may be relevant

9    to the case.  But the question is, what would be

10   required for completeness as to this issue?

11                   MR. WEEKS:  Well, I think in fairness,

12   it would be imminently fair to take into account the

13   documents that the state has -- where the state has

14   undertaken to audit this farm and point it out that

15   this farm and its Nutrient Management Plan is in

16   compliance with state law and that this particular

17   grower and this Nutrient Management Plan has protected

18   against runoff.  That's at the very heart of this

19   case.

20           And so I think in fairness, in addition to

21   those STP levels, whatever they may be, high or low,

22   that it would be important that the state has

23   considered that and made that determination.

24                   THE COURT:  What do you call those?  STP

25   audits?

7950

1              MR. WEEKS:  They are farm audits, Your

2     Honor, annual farm audits.

3              THE COURT:  Well, Mr. Hopson was just

4     suggesting that anything beyond the STP records isn't

5     required.

6              MR. WEEKS:  Well, Mr. Hopson and I

7     disagree in that respect then.  Because I think these

8     are very -- I think in light of the fact that the

9     state wants to put in certain fields that have STP

10    levels that they consider to be high, that in fairness

11    it ought to be shown that despite the fact that there

12    may have been a high STP level, that the state was on

13    that farm and on that year and determined for itself

14    that there was compliance with the Nutrient Management

15    Plan and that the Nutrient Management Plan of this

16    grower was protecting against runoff.

17             THE COURT:  Before I go back to

18    Mr. Moll, Mr. Hopson, do you agree that for

19    completeness, that any farm audits with respect to

20    these particular growers be provided?

21             MR. HOPSON:  Here's what I think, Your

22    Honor.

23         They produced to us and we looked at the

24    complete grower records for these 50 growers.  As I

25    recall, they filled three and a half boxes, okay?  And

1    I'm not going to stand up here and suggest that we

2    ought to move three and a half more boxes of documents

3    into evidence.

4            I think you hit the right point by saying, if

5    you want to look at STP records, let's look at all the

6    STP records that are in the grower's files.  That

7    seems to be a reasonable compromise.

8            With all due respect to Mr. Weeks, if there

9    are particular documents that Tyson or George's or

10   anybody else finds in these files that we think are

11   relevant, we can move them in in our case in chief

12   because I've just heard a representation here that

13   they're business records; that is, assuming your

14   ruling that these are business records and admissible

15   on that ground.

16           THE COURT:  Right.  Now, as to the

17   volume with respect to these, you say, 50 growers,

18   what's the volume of that document -- of that

19   documentation, should they be required for fairness?

20           MR. HOPSON:  I would think that

21   if -- and Ms. Moll can correct me -- but I would think

22   that the average grower has something like ten to

23   twenty, maybe thirty STP test reports in their file.

24   Depends on how many fields they have and how long

25   they've been registered.

1          But say a grower's got three fields.  That's

2     about average in the IRW.  Ten years of registration

3     means thirty STP reports in that grower's files.  Some

4     of the big growers, you know, may have eight, ten

5     fields, and you're going to see a bigger volume.  But

6     it's not going to much more than double the volume of

7     the paper that's going to be moved into evidence.

8                    THE COURT:  All right.  Ms. Moll, I need

9     to give you an opportunity.

10                   MR. WEEKS:  I would just say, Your

11    Honor, in the spirit --

12                   THE COURT:  Well, let me go to Ms. Moll

13    here.

14                   MR. WEEKS:  Okay.  I'm sorry.

15                   THE COURT:  Go ahead.

16                   MS. MOLL:  Your Honor, you can

17    appreciate that the grower files are enormous, and the

18    defendants obviously have other documents in mind that

19    they want to include in this proffer.

20          I think the easiest way to handle this would

21    be for them to identify what documents do they want

22    included in connection with these particular grower

23    files.  Because otherwise, I think we're going to have

24    as a mechanical matter a difficult time, you know,

25    quickly organizing ourselves and doing that.

1          But obviously the defendants have certain

2     documents that they want authenticated, and I don't

3     know that Mr. Parrish could sit on the witness stand,

4     you know, be handed a document by Mr. Hopson, and

5     testify under oath that yes, you know, out of the

6     blue, looking at this document, this is a business

7     record from ODAFF, without being able to compare it to

8     what's in the grower files at ODAFF.

9          THE COURT:  Well then, he's an improper

10    custodian.  But frankly that technical objection

11    strikes me cold.

12         You know, there are some authority for the

13    proposition that if there is a signed certification by

14    the public officer with actual custody of the

15    documents, there is no need for further certification

16    that the custodial authority was delegated to that

17    person from the head of the department or agency

18    entrusted by law with custody of the documents.  Here,

19    we've got the head of that particular agency, ODAFF;

20    correct?  So it seems to me that technical objection,

21    I think, raised by Mr. Tucker should be overruled.

22         But the question is, what in fairness to

23    satisfy the rule of completeness ought be required

24    here?  And I agree, Mr. Hopson has suggested a balance

25    here that instead of, you know, three and a half box

7954

1    loads' worth of documents and requiring you to do the

2    defendants' work, perhaps to the extent that you're

3    wishing to show the court a portion of the truth

4    relative to STP results from these fields, it would

5    seem to me that the balance suggested by Mr. Hopson

6    may be the right balance, that what we need to see is

7    the STP results as to these growers during their

8    history of presenting or filing these records with

9    ODAFF.

10            Any objection there, I mean, since Mr. Hopson

11   suggests that it will not be nearly as great a volume

12   as all of the records relative to those growers?

13            MS. MOLL:  Your Honor, if I can have a

14   moment to confer with Mr. Garren.

15            THE COURT:  Yes.

16            MR. HOPSON:  And, Your Honor, while

17   she's conferring, I've been whispered to by several of

18   my smarter colleagues here that suggests that maybe

19   mechanically the way to do this is for us to begin our

20   case, go ahead and put in a 24-, 25-D that will

21   contain the soil test phosphorus results we want.

22            For example, if Mr. Tucker has a particular,

23   you know, single document that he thinks is important

24   for the case to see, or Mr. Weeks has a particular

25   audit inspection report, we'll include that.  And then

1    the court will have, you know, two parallel sets, if

2    you will, of the soil test phosphorus results that we

3    want you to see and perhaps a selected handful of

4    other documents.

5            THE COURT:  Well, except if I sustain

6    your rule-of-completeness objection here, or argument,

7    then we don't have to have two partial subsets of the

8    entire picture; right?

9            MR. HOPSON:  True.

10            THE COURT:  It seems to me that --

11            MR. HOPSON:  True.

12            THE COURT:  -- rather than getting --

13    and once again, so often, because I know you all have

14    tried lots of cases, but, you know, I'm coming up to

15    300, and so often you get these extreme positions.

16    And so from my simple-minded approach here, instead of

17    getting the extremes on both sides of what you

18    consider to be representative samples, perhaps what we

19    ought to look at is the truth, which covers not only

20    the extremes but the middle ground as well.

21            MR. TUCKER:  Your Honor, speaking for

22    Cargill, may I adopt Ms. Moll's suggestion?  I believe

23    it makes the greatest sense because, for example, with

24    regard to those Cargill growers that are in their

25    list, the state intends to offer more than just STP

```
 1    results.  Her --
 2                    THE COURT:  I saw that.  We have more
 3    than STP here, yes.
 4                    MR. TUCKER:  That's correct.  And her
 5    suggestion was that the defendant, at least as to this
 6    defendant, Cargill, we would be more than happy to
 7    identify those exhibit numbers that we believe should
 8    be included to make the exhibit complete for the court
 9    and that would -- that would resolve the issue --
10                    THE COURT:  Well, how do you satisfy my
11    concern that all I'm getting is extreme examples
12    representing the two ends of the -- the two ends of
13    the continuum?
14                    MR. TUCKER:  I understand your concern.
15    Of course I can promise to be reasonable but --
16                    THE COURT:  Well, you're an advocate,
17    Mr. Tucker.  I mean, you're an advocate.
18                    MR. TUCKER:  Yes, sir.
19                    THE COURT:  As is Ms. Moll.  I mean,
20    that's why it seems to me that the rule of
21    completeness is there.
22                Mr. Hopson.
23                    MR. HOPSON:  Yeah.  And what I was going
24    to just suggest, Your Honor, is that if you want to
25    satisfy the rule of completeness -- and I agree that
```

 1    you should -- we should put in all the STP results.

 2    But what I was getting at was an administrative issue.

 3         If Mr. Tucker -- and I'm not picking on

 4    Mr. Tucker who I like very much -- but if he wants

 5    five more pages in one of these grower files.  I was

 6    struggling towards a way where the court could have

 7    one grower file that has all the STP results, has the

 8    pages that the plaintiffs want, and has the pages the

 9    defendants want, rather than technically satisfying

10    the rule of completeness today and then having

11    miscellaneous excepts from grower files admitted in

12    the record later.

13         Maybe that's not a goal that's worth

14    pursuing, but that was all I was trying to suggest, is

15    maybe we could get together for the court one grower

16    file, including all the STP results for that grower.

17              THE COURT:  You're saying one grower

18    file for each of the 50 that --

19              MR. HOPSON:  Right.

20              THE COURT:  Ms. Moll, your thoughts

21    there?

22              MS. MOLL:  I guess I'm hearing a lot of

23    different suggestions, Your Honor, so forgive me.

24              THE COURT:  Yeah.

25              MS. MOLL:  Obviously, we're coming to

 1    the end of the state's case, and I am happy to work

 2    with Mr. Parrish in trying to gather the STP reports

 3    for the growers that we've identified.  I'm trying to

 4    think, though, as a practical matter and as a timing

 5    matter, how do we get that done in a manner that makes

 6    sense?

 7               THE COURT:  Well, we can leave the

 8    state's case open and take arguments after the rule of

 9    completeness has been satisfied.  I mean, that's how

10    you do it mechanically.

11               MS. MOLL:  And that would be fine, if

12    that's what the court wishes.

13               THE COURT:  Well, we've done it many

14    times.  We have to try to be practical here.

15               But Mr. Tucker is correct, you're not only

16    wishing to admit ODAFF records that are STP test

17    results, but other records as well; correct?

18               MS. MOLL:  I think the two exhibits that

19    Mr. Tucker is referring to are those Cargill exhibits

20    that came in at the end.  And so to avoid any

21    objection, at least from the Cargill defendants, we

22    decided to move to admit two exhibits that were on

23    their trial list.  It happens to be that those

24    exhibits contain more than STP results.

25               THE COURT:  Why don't I allow you all to

1    get your heads together and -- my thought is, at least

2    with regard to STP results as to these 50 growers, I

3    want to see everything since '98.  If you want to

4    throw additional records in for a convenience, I have

5    no objection to that.

6            But it seems to me that at least as to the

7    STP results, I want to see the history.  And I want to

8    get a sense, if I grab one of those grower files, to

9    how consistent those STP tests are with regard to

10   field No. 2 on Farmer Jones' property.  You know, I

11   want to see if, for instance, farmer Jones, although

12   prohibited from putting on any poultry litter, is

13   going from a 350 STP to a 450 despite being prohibited

14   in applying poultry litter.

15           That's what I'm interested in seeing, so

16   that's why I want to see all the records.  I want to

17   see them because they may cut either way here.  But if

18   the plaintiff wants to present STP records with regard

19   to 50 growers, fine.  But my ruling under 106 is

20   you're going to provide me all those ODAFF STP records

21   since '98, since inception.

22           Mr. Tucker.

23           MR. TUCKER:  Your Honor, by implication

24   of what you're saying, you also want to be able to

25   validate that litter has not been applied to the

1    property, which would mean that you would need to have

2    the annual filing that demonstrates whether litter was

3    either or whether it was shipped out or sold, which is

4    a separate document but it's also contained in the

5    same file.

6              MR. HOPSON:  It's referred to as the

7    annual inspection report by Mr. Tucker.

8              MR. TUCKER:  That's correct.  But there

9    is only -- would be only one of those for each grower

10   for the year, and they would match up with the STP

11   numbers of the state.

12             THE COURT:  I'm not going to make the

13   plaintiff include those unless there are annual

14   inspection reports in this binder that I have here.

15        Are there such reports here?

16             MS. MOLL:  I don't believe so, Your

17   Honor, but I cannot guarantee that.  I don't believe

18   so.

19             THE COURT:  All right.  The plaintiff

20   seeks primarily to present me soil test phosphorus --

21   or soil test reports.  I see also we have renewal

22   registrations here.

23        What's the significance of providing me some

24   renewal registrations and not others?

25             MS. MOLL:  The purpose of the various

1  submissions within each exhibit, Your Honor, are just

2  those documents that would tie a grower to an

3  integrator.  And then there are also times where

4  within one grower file, you will see property being

5  transferred from one grower to another but it's the

6  same land.

7          And so you might see within the documents

8  we've provided you paperwork for reflecting such a

9  transfer but it would relate to the same land.

10              THE COURT:  All right.  So instead of

11  growers, really what we're looking at is 50 grower

12  operations?

13              MS. MOLL:  I think that's right, yes.

14              THE COURT:  All right.  For instance,

15  I'm looking at No. 2861-A.  And in addition to an STP

16  report and a renewal registration invoice, there's

17  correspondence from Mr. Parrish to Mr. Nubbie,

18  N-u-b-b-i-e, in Westville, Oklahoma.

19              MR. GARREN:  If I might answer your

20  question about that, Judge.

21              THE COURT:  Yes.

22              MR. GARREN:  If you look at the soil

23  test that has no name on it, the correspondence ties

24  to the STP level.  Of that soil test to Mr. Nubbie

25  because not -- because of the name is not on the soil

1   test itself.  They came from his grower file.  So if

2   you read the letter, it will identify the STP level

3   that's on the soil test and identify it to Mr. Nubbie.

4   That's the reason why that's in there.

5           We've tried to link where there wasn't a name

6   or different name in the event of a transfer, that

7   that soil test, in fact, goes to that grower file in

8   the ODAFF records.

9           MR. TUCKER:  Your Honor, I guess that

10  goes to prove the point I'm trying to make is, you

11  can't view these -- these files are not maintained in

12  the perfect fashion.  That is to say, there are lots

13  of tag ends and related letters and correspondences to

14  make sense of a particular grower's operation.

15          You really need to see the annual report, as

16  well as the correspondence that goes with it, as well

17  as the STP reports.  It doesn't -- it doesn't

18  constitute a significant material addition in the

19  number of papers, but it is to the issue area and the

20  issue of completeness.

21          THE COURT:  Well, but Mr. Hopson

22  suggests that in terms of that degree of completeness,

23  we're talking about three and a half legal boxes full

24  of documents.  I don't know about you, but I've got

25  other cases to attend to.  I'm not going to go through

 1  every document in three and a half legal boxes full of

 2  documents.  It's humanly impossible, Mr. Tucker.

 3              MR. TUCKER:  With respect to Mr. Hopson,

 4  I think his estimate is more like our discussion of

 5  the size of fish.

 6              MR. HOPSON:  I'm a fisherman, but I take

 7  offense to that.  I looked at every one of those

 8  documents.

 9              MR. TUCKER:  If we were to add, for

10  example, the annual reports for all the defendants and

11  all the growers that are in there having to do with

12  Cargill, you would have a very small amount of paper

13  to the entire mass.

14              MR. HOPSON:  May we confer?

15              THE COURT:  Yes.

16          *(Discussion held off the record)*

17              MR. TUCKER:  Your Honor, Mr. Hopson

18  suggests that I just apply that to Cargill because I

19  seem to be the one that wants to do that.  I would ask

20  if counsel objects to that; if she does not, perhaps

21  we can reach accommodation.

22              MS. MOLL:  If it's limited to Cargill,

23  I'm happy to do that.  I'm just trying, Your Honor, to

24  -- we're happy to live with your ruling obviously.

25  And if it's limited to STP tests and the addition by

 1    Mr. Tucker, we can do our best to complete that as

 2    quickly as possible.

 3              THE COURT:  Mr. Weeks, I think you wish

 4    the same accommodation.  Mr. Weeks.

 5              MR. WEEKS:  Well, OF course, I've argued

 6    vigorously for the introduction of those, and we only

 7    have three growers and so it wouldn't be like we're

 8    dumping into the record.

 9         But I think I do have a special case with

10    Mr. Bayer, Martin Bayer.  And to the extent that the

11    court is going to permit them to put in those STP

12    records, despite the fact that in every inspection

13    checklist from 2002 to 2005 he's listed in the

14    Eucha-Spavinaw Watershed --

15              THE COURT:  Well, if he's in

16    Eucha-Spavinaw, then you don't have anything to worry

17    about, do you?

18              MR. WEEKS:  Well, I don't think I would

19    have, you know, but they haven't conceded that point

20    yet and the court hasn't ruled quite yet.

21         So, I mean, I would just say that in the

22    event that the court does permit that in, I think that

23    these -- these checklists would be significant to make

24    that record complete to show that they are in the

25    Eucha-Spavinaw Watershed.

 1            Furthermore, as Ms. Moll made her argument

 2    today, she said this was a subset of growers and these

 3    STPs indicated that there were levels in the watershed

 4    that had exceeded the agronomic rate and that linked

 5    it to an integrator.

 6            With regard to this particular grower right

 7    here, they didn't do that and it doesn't do that.  And

 8    so, again, for that reason, too, I would ask that the

 9    Bayer document be excluded altogether

10                 THE COURT:  What about Bayer?  We

11    haven't specifically talked about that, Ms. Moll.

12                 MS. MOLL:  If I'm thinking of the

13    correct grower, Your Honor, there are certain

14    documents where Eucha-Spavinaw is identified in error,

15    but where you look at the property, it is, in fact, I

16    believe, within the IRW.

17            So I think that's probably an issue to be

18    argued another day once these documents eventually

19    come in, but I don't know that Mr. Weeks' concern

20    needs to be addressed right now.

21                 THE COURT:  All right.  How do we

22    determine that as a matter of evidence?

23                 MS. MOLL:  Well, I guess my thinking on

24    that is, if we're going to go through this next step

25    with the ODAFF records, we can take another look at

1    Mr. Bayer and provide the court with enough linkage

2    between grower, integrator, and documents that reflect

3    that he's in the IRW.

4              THE COURT:  Yeah.  I'm not -- Mr. Weeks,

5    if the plaintiff contends that Eucha-Spavinaw is

6    placed on these records in error, although they may

7    not meet their burden of proof with regard to this

8    particular grower, Bayer, I'm not going to preclude

9    them at this juncture from attempting to -- from

10   placing these into evidence.

11        Ms. Moll, will you accommodate Mr. Weeks, as

12   you did with respect to Mr. Tucker, as to the

13   additional documents that Mr. Hopson and the other

14   defendants do not wish to include for Rule 106

15   purposes?

16             MS. MOLL:  If the checklist that

17   Mr. Weeks has identified is, in fact, in the grower

18   file for those George's growers, I'm happy to include

19   it.

20             THE COURT:  All right.  Let's do that.

21   I'm going to give you some time here to tie up the

22   loose ends on that.

23        Is there anything else to put this thing to

24   bed?

25             MS. MOLL:  I don't think so, Judge.

```
 1              THE COURT:  All right.  Let's see if we
 2   can approach it along those lines.
 3              And the Rule 106 objection as to what's been
 4   presented thus far is sustained subject to tying this
 5   all up along the lines that we've been discussing.
 6              Anything else?
 7              MS. MOLL:  No.
 8              THE COURT:  All right.  How close are
 9   we, Mr. Bullock?
10              MR. BULLOCK:  You know, I'm surprised
11   you even call on me on this.  I have such low
12   credibility, at least in my own eyes, on this subject.
13              THE COURT:  Well, you have higher
14   credibility in my eyes.  Go ahead.
15              MR. BULLOCK:  Well, thank you.
16              We have one deposition and I will call the
17   final witness, Mr. Todd King, and that will be about a
18   30-, 45-minute exam.  That one I feel pretty confident
19   in my estimate on, but we have one deposition to read
20   and then we will rest.
21              THE COURT:  Did we not have two experts
22   that we had to let go and that were going to be called
23   back?  I understood that the defendants had waived
24   cross on one of those but not as to the other.
25              MR. BULLOCK:  Dr. Engel was the other
```

United States District Court

1   one that we had to call back whose cross was

2   interrupted, and we called him back and got that

3   completed.

4               THE COURT:  You're right.  Thank you.

5           All right.  Let's take our recess.  We'll be

6   back in an hour and fifteen minutes, which will be

7   1:10.

8               *(Lunch recess was taken)*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*7969*

C E R T I F I C A T E

    I, Brian P. Neil, a Certified Court Reporter for the Eastern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

    I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

    In witness whereof, I have hereunto set my hand this 9th day of December 2009.

s/ Brian P. Neil
_____
Brian P. Neil, CSR-RPR, CRR, RMR
United States Court Reporter

**United States District Court**