IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )   No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )




VOLUME 82 – AM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 4, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE








*REPORTED BY:*        *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                 *United States Court Reporter*

1                    A P P E A R A N C E S

2

3   For the Plaintiffs:        MR. W.A. DREW EDMONDSON
                               MS. KELLY FOSTER
4                              Office of Attorney General
                               State of Oklahoma
5                              313 N.E. 21st St.
                               Oklahoma City, OK  73105
6

7                              MR. DAVID RIGGS
                               MR. DAVID P. PAGE
8                              MR. RICHARD T. GARREN
                               Riggs Abney Neal
9                              Turpen Orbison & Lewis
                               502 W. 6th Street
10                             Tulsa, OK 74119

11
                               MR. ROBERT A. NANCE
12                             MS. KELLY FOSTER
                               Riggs Abney Neal
13                             Turen Orbison & Lewis
                               5801 Broadway
14                             Oklahoma City, OK 73118

15
                               MR. LOUIS W. BULLOCK
16                             MR. ROBERT BLAKEMORE
                               Bullock Bullock &
17                             Blakemore
                               110 W. 7th St.
18                             Suite 770
                               Tulsa, OK 74119
19

20                             MR. FREDERICK C. BAKER
                               MS. ELIZABETH CLAIRE XIDIS
21                             MS. INGRID L. MOLL
                               Motley Rice LLC
22                             28 Bridgeside
                               P.O. Box 1792
23                             Mount Pleasant, SC 29465

24

25

```
1              A P P E A R A N C E S  (Cont.)

2

3   For Tyson Foods:           MR. ROBERT W. GEORGE
                               Tyson Foods, Inc.
                               2210 West Oaklawn Drive
4                              Springdale, AR 72701

5

6                              MR. FRANK R. VOLPE
                               MR. MARK D. HOPSON
                               MR. THOMAS C. GREEN
7                              MR. JAY THOMAS JORGENSEN
                               MR. GORDON D. TODD
8                              ERIC J. IVES
                               CARA R. VIGLUCCI LOPEZ
9                              Sidley Austin LLP
                               1501 K St. NW
10                             Washington, DC 20005

11

12                             MR. PATRICK MICHAEL RYAN
                               Ryan Whaley Coldiron and
                               Shandy PC
13                             119 N. Robinson, Rm 900
                               Oklahoma City, OK 73102

14

15

16  For Cargill:               MR. JOHN H. TUCKER
                               MS. THERESA HILL
                               Rhodes Hieronymus Jones
17                             Tucker & Gable
                               100 W. 5th St., Ste 400
18                             Tulsa, OK 74103

19                             MR. DELMAR R. EHRICH
                               MS. KRISANN KLEIBACKER LEE
20                             Faerge & Benson
                               90 S. 7th St., Ste 2200
21                             Minnaepolis, MN 55402

22

23  For Simmons Foods:         MR. JOHN R. ELROD
                               MS. VICKI BRONSON
24                             Conner & Winters
                               211 E. Dickson St.
25                             Fayetteville, AR 72701
```

9459

1                    A P P E A R A N C E S  (Cont.)

2

3   For Peterson Farms:          MR. A. SCOTT MCDANIEL
                                 MR. PHILIP HIXON
                                 MS. NICOLE LONGWELL
4                                McDaniel Hixon Longwell &
                                 Acord PLLC
5                                320 S. Boston, Ste 700
                                 Tulsa, OK 74103
6

7

8   For George's:               MR. GARY V. WEEKS
                                 MR. WOODY BASSETT
                                 MR. VINCENT O. CHADICK
9                                MS. K.C. TUCKER
                                 Bassett Law Firm
10                               P.O. Box 3618
                                 Fayetteville, AR 72702
11

12

13  For Cal-Maine:              MR. ROBERT SANDERS
                                 Young Williams P.A.
                                 P.O. Box 23059
14                               Jackson, MS 39225

15

16                               MR. ROBERT P. REDEMANN
                                 Perrine McGivern Redemann
                                 Reid Berry & Taylor PLLC
17                               P.O. Box 1710
                                 Tulsa, OK 74101
18

19

20

21

22

23

24

25

9460

1                          I N D E X

2

3                                                      Page

4

5    *WITNESSES ON BEHALF OF THE DEFENDANTS*

6

7    **EARL SMITH, JR.**

     Direct Examination by Mr. Bassett            9462
8    Cross-Examination by Mr. Nance               9564

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*9461*

```
 1                    Monday, January 4, 2010

 2                         *  *  *  *  *

 3              THE COURT:  A question.

 4              MS. VIGLUCCI LOPEZ:  Good morning, Your

 5   Honor.

 6              THE COURT:  Good morning.

 7              MS. VIGLUCCI LOPEZ:  Happy 2010.

 8              THE COURT:  Decided to join Mr. Nance.

 9   It's getting cold.

10              MR. NANCE:  Looks very good, Your

11   Honor.

12              MS. VIGLUCCI LOPEZ:  I wish I could join

13   you in that.  I'm here -- Cara Viglucci Lopez -- on

14   behalf of the Tyson defendants just to make a request

15   of the court to rule on the objections of the

16   deposition of Terry Peach, taken April 9th -- April

17   10th, 2009, at the court's convenience, but the

18   defendants would like to use that as early as next

19   week.

20              THE COURT:  Thank you very much.

21              MS. VIGLUCCI LOPEZ:  Thank you.

22              THE COURT:  Who's our next witness?

23              MR. BASSETT:  Your Honor, the defendants

24   would call Earl Smith.  Mr. Smith.

25
```

*9462*

| | |
|---|---|
| 1 | **EARL SMITH, JR.**, |
| 2 | *after having been first duly sworn, says in reply to* |
| 3 | *the questions propounded as follows, to-wit:* |
| 4 | THE COURT:  State your full name for the |
| 5 | record, please, sir. |
| 6 | THE WITNESS:  Earl Travis Smith, Jr. |
| 7 | THE COURT:  Mr. Bassett, you may |
| 8 | inquire. |
| 9 | MR. BASSETT:  Your Honor, may I |
| 10 | approach? |
| 11 | THE COURT:  You may, sir. |
| 12 | MR. BASSETT:  Judge, I do like the |
| 13 | beard.  If I had the capability to grow one, I think I |
| 14 | would too.  Happy New Year to Your Honor and Happy New |
| 15 | Year to counsel. |
| 16 | **DIRECT EXAMINATION** |
| 17 | **BY MR. BASSETT:** |
| 18 | Q.   Mr. Smith, where are you employed? |
| 19 | A.   I'm employed by the Arkansas Natural |
| 20 | Resources Commission. |
| 21 | Q.   And what is your position at that agency? |
| 22 | A.   I'm chief of the water management division. |
| 23 | Q.   Is the Arkansas Natural Resources Commission |
| 24 | an Arkansas state agency? |
| 25 | A.   It is. |

 1     Q.   Has the agency ever had another name?

 2     A.   Yes.  Previously, we were known as the

 3  Arkansas Soil and Water Conservation Commission.

 4     Q.   Okay.  And when did that name-change occur?

 5     A.   It's been about six years ago, I guess.

 6     Q.   Okay.  How long have you been employed at the

 7  agency, Mr. Smith?

 8     A.   Since 1985.

 9     Q.   When you were hired there in 1985, what was

10  your position at what was then called the Arkansas

11  Water and Soil Commission?

12     A.   I was engineering supervisor in the water

13  planning division.

14     Q.   Have you held any other positions since then

15  in the agency?

16     A.   Yes.  I was subsequently promoted to the

17  chief of the water management division.

18     Q.   Is there a difference between the water

19  planning division and the water management division?

20     A.   Yeah.  The water -- the water planning is a

21  section of the division that encompasses other

22  sections in our water management division.

23     Q.   And when did you become chief of that

24  division?

25     A.   Oh, gosh.  It's been ten, fifteen years ago,

1  something like that.

2      Q.   Mr. Smith, when you began at the Arkansas

3  Soil and Water Commission in 1985, what did your

4  division have responsibility for?

5      A.   In the water planning section there, was

6  responsible for water planning, looking at the water

7  resources of the state, trying to make projections

8  about our water use-type things for future planning,

9  make sure we had sufficient water for the state.

10         We also worked with some of the federal

11  agencies on water project water development projects

12  and that sort of thing.  My section also contained the

13  dam safety and flood plain management responsibilities

14  of the state.

15     Q.   Did your agency have any responsibility in

16  the 1980s for nonpoint-source management?

17     A.   No.

18     Q.   In the mid and late 1980s, Mr. Smith, was

19  there any legislation or other legal authority that

20  provided your agency with regulatory authority over

21  nonpoint-sources?

22     A.   No.

23     Q.   Okay.  Now, let's talk for a moment, if we

24  could, about the Arkansas-Oklahoma Arkansas River

25  Compact Commission.

1          Would you briefly explain for the record what

2   that is?

3      A.   Well, it's a compact between Arkansas and

4   Oklahoma.  It required federal legislation to form the

5   compact as well as state legislation to form the

6   compact.  It basically looks at the apportionment of

7   the water in the compacted area of the states --

8   between the two states, apportions the flow in the

9   subwatersheds.  It also speaks to some of the water

10  quality aspects of the area.

11     Q.   And did that commission meet annually?

12     A.   It does.

13     Q.   All right.  And did you have any involvement

14  with the Compact Commission as part of your duties at

15  the Arkansas Soil and Water Commission in the mid to

16  late 1980s?

17     A.   Yes.  I've been a member of the engineering

18  committee of that Compact since that time.

19     Q.   And as a member of the engineering committee,

20  did you attend all the meetings?

21     A.   I did.

22     Q.   All right.  What purpose, Mr. Smith, did the

23  engineering committee have with respect to the Compact

24  Commission in the 1980s?

25     A.   Well, the Compact has within its structure

1    several committees in which the commissioners can

2    assign items to discuss and bring back to them, assign

3    questions or assignments to work on and respond back

4    to them.  That was our main function, was to provide

5    technical support and be able to answer different

6    items that were assigned to us to report back to the

7    commissioners.

8        Q.   In respect to your involvement with the

9    Compact Commission in the mid to late 1980s, do you

10   know whether there was a particular nutrient that was

11   a concern over others?

12       A.   Well, back in the 1980s, that far back,

13   nitrogen was the primary element of concern when you

14   were looking, for example, at trying to decide on

15   fertilizer rates that you were -- that you were

16   spreading.  That far back nitrogen was the primary

17   element of concern.

18       Q.   Okay, sir.  Did you continue to serve on the

19   engineering committee of the Compact Commission into

20   the early 1990s?

21       A.   I did.

22       Q.   All right.  And did the Compact Commission

23   adopt any kind of nutrient-reduction goals that

24   affected any part of the Illinois River Watershed

25   during the time frame of the early 1990s?

1    A.   In 1997, the Compact did adopt a

2 nutrient-reduction goal.

3    Q.   And what was the goal adopted by the Compact

4 Commission?

5    A.   The goal was to try to achieve a 40 percent

6 reduction in phosphorus from the annual loading of the

7 river.

8    Q.   Okay.  And that goal was adopted, as you

9 said, in 1997?

10    A.   That's my memory, yes, sir.

11    Q.   Okay.  Was this goal focused on any

12 particular source or sources of phosphorus or was it

13 just total loading?

14    A.   We were concerned with total loading of the

15 river and total loading on it.

16    Q.   Okay.  And was this a goal that was set for

17 the IRW?

18    A.   It was.  And the basis for that goal was the

19 Clean Lakes study on Lake Tenkiller that was done by

20 EPA and Oklahoma state.

21    Q.   Okay.  Did Oklahoma officials approach

22 Arkansas officials about the 40 percent goal

23 reduction?

24    A.   The genesis of that was Oklahoma requested

25 that the commission adopt that goal.

1          Q.   Did the Compact Commission include officials

2     from both the states of Arkansas and Oklahoma?

3          A.   It does.  It's made up by appointees by the

4     governor of the states with a federal chairman that's

5     appointed by the President.

6          Q.   All right.  Has that goal that you just

7     referenced ever been changed by the Compact Commission

8     since it was first adopted?

9          A.   No, sir.  It's still in effect.

10         Q.   All right.  What role, Mr. Smith, if any, did

11    your engineering committee play with regard to the 40

12    percent goal of the Compact Commission?

13         A.   Well, once the goal was adopted, then one of

14    the assignments that was made to the engineering

15    committee was to -- how are we going to monitor

16    progress toward making that goal?  So one of our first

17    points was to decide how we were going to portray

18    that, how we are going to see if progress was made

19    toward that goal.

20              So what the engineering committee did was

21    ultimately we decided to select monitoring sites in

22    Arkansas and Oklahoma.  We chose four sites in

23    Arkansas and we chose four sites in Oklahoma.  We were

24    to take -- we decided we would monitor those points,

25    continue the sampling in the same manner that the

1    Clean Lakes study monitoring was done, and this was so

2    we could compare apples to apples, compare the results

3    of those monitoring stations to the study that was

4    done and the conclusions that were reached in

5    that -- in that Clean Lakes study.

6        Q.   Do you know, Mr. Smith, if the monitoring was

7    done at the same frequencies and intervals as the EPA

8    had done?

9        A.   It was.  We were careful to make sure that

10   the procedures -- everything was done in accordance

11   with the same way the regimes that were done with

12   that -- the data from 1980 to '93 that was considered

13   in the Tenkiller report because we wanted a direct

14   comparison.

15       Q.   Now, I think you've already referenced this,

16   and forgive me if I'm being repetitious.  It's a bad

17   habit I have from time to time, part of the trade, I

18   guess.  Did the Arkansas officials, including you,

19   that were on this Compact Commission, select the four

20   sites in Arkansas for monitoring?

21       A.   Well, it was done through the committee.  But

22   yes, they were selected.

23       Q.   And were four sites selected on the Oklahoma

24   side?

25       A.   They were.

**United States District Court**

1    Q.   Okay.   And were those sites on the Oklahoma

2  side selected by the Oklahoma officials on the

3  commission?

4    A.   They were.

5    Q.   All right.   Did your engineering group or

6  your agency actually do the monitoring itself after

7  those sites and protocols were selected?

8    A.   No.   There again, what we were doing was

9  careful to utilize the same regimes as much as we can

10  for sampling.   So the sampling was in accordance with

11  the same procedures that our department -- our DEQ,

12  Department of Environmental Quality, had done for that

13  same time frame.

14    Q.   Now, at about this same time, Mr. Smith, did

15  your agency decide to do any additional intensive

16  monitoring in the IRW aside from the monitoring that

17  was being done for the Compact Commission reduction

18  goal?

19    A.   We did.   By this time, there was, of course,

20  quite a bit of interest as phosphorus as a nutrient in

21  the watershed as well as others, so we felt that it

22  would be well to gather some intensive data.   So we

23  contracted with the University of Arkansas to

24  establish a monitoring point to do some rigorous and

25  real intensive sampling at the state line in order to

1    have a little better understanding of things like

2    flow -- a little better understanding of how flow

3    regimes might enter into the picture as well as

4    some -- perhaps some idea of the fate of phosphorus in

5    the watershed itself.

6         Q.   And was this monitoring for total loading?

7         A.   We -- we monitored for total loading as well

8    as a suite of other elements that we tested for, but

9    total loading was one thing that we did test for.

10        Q.   So would that include both point and nonpoint

11   sources?

12        A.   It certainly would.  That point of the river,

13   the contribution that you're sampling, are both from

14   point source as well as nonpoint elements.

15        Q.   All right.  What involvement, if any, did the

16   Arkansas Department of Environmental Quality have in

17   attempting to reach the 40 percent reduction goal?

18        A.   Well, when we were looking at the goal, since

19   we were looking at point and nonpoint sources by this

20   time, my agency had become the lead agency for the

21   nonpoint program in Arkansas.  DEQ then looked at what

22   we could do with point sources.  So we -- then we

23   moved toward that regime of reducing the phosphorus

24   discharges to a part for the municipal treatment

25   sources.

1      Q.   Was your committee and the full Compact

2   Commission periodically advised of the status of the

3   project and whether any strides were being made toward

4   the goal?

5      A.   We did an annual report to the commissioners

6   on progress toward making that goal.

7      Q.   And was progress made towards the 40 percent

8   reduction in nutrients goal?

9      A.   We were quite pleased that we had been able

10   to achieve progress toward that goal, we were.

11      Q.   Okay.  Mr. Smith, if you would -- you have a

12   packet up there -- if you would pull out what's been

13   marked as Joint Defendants' Exhibit No. 3573, please.

14   Do you have it there, sir?

15      A.   I do.

16      Q.   All right.  If you would take a look at that.

17   Do you recognize that document?

18      A.   Yes.  It's one of the annual reports that was

19   prepared for the Compact commissioners.

20      Q.   All right.  And does it include a set of

21   charts that were a part of the monitoring done for the

22   Arkansas River Compact Commission?

23      A.   It does.

24      Q.   All right.  And is this part of what those of

25   you who worked with the commission are provided to

1    determine whether steps towards the 40 percent

2    reduction goal are being met?

3        A.   It is.

4        Q.   Okay.

5            MR. BASSETT:  Your Honor, I'd move for

6    admission of Joint Defendants' Exhibit 3573.

7            THE COURT:  Any objection?

8            MR. NANCE:  No objection, Your Honor.

9            THE COURT:  3573 is admitted.

10       Q.   *(BY MR. BASSETT)*  Okay.  If you would,

11   Mr. Smith, I want to ask you to turn to the second

12   page of that exhibit for the record, Defendants' Joint

13   Exhibit 3573-002.  Do you see that?

14       A.   I do.

15       Q.   All right.  And I want you to look at that.

16   At the top, you'll see it says, "Average annual

17   (phosphorus) loading in kilograms per year."

18       A.   Yes, sir.

19       Q.   All right.  Is this chart reporting on

20   monitoring results for some surface waters in the IRW?

21       A.   It is.  It reflects the computations that

22   were made for the loadings.

23       Q.   Okay.  And which surface waterbodies were

24   being monitored and reported on on the Arkansas side

25   of the border?

1          A.   Well, you'll note that it lists the four

2     stations, the Illinois River station, Baron Fork

3     station, Sager Creek, and Flint Creek.

4          Q.   Okay.   What do you understand the notations

5     under those stream headings, such as ARK06, to mean?

6          A.   Those are designations that DEQ uses to

7     designate their sampling sites.

8          Q.   All right.   Are these particular locations

9     the locations set up on the Arkansas side as part of

10    the monitoring protocols for the Compact Commission

11    that you were involved in setting up?

12         A.   Yes.   Those are the sites that were chosen.

13         Q.   What years has the Compact Commission

14    received reports from monitoring data that had been

15    gathered?

16         A.   Well, since '97, we've provided annual

17    reports back to them.

18         Q.   Okay.   And the monitoring data is -- is the

19    monitoring data presented as five-year rolling

20    averages?

21         A.   It is.   A decision was made -- although we do

22    gather the data and do the computations annually, and

23    those results are displayed in other places in the

24    report itself, but one of the concerns that we had as

25    we looked at the -- as we were portraying the data,

1    the question of climatic conditions, how that impacts

2    those things, was brought up.

3            For example, in dry years, you have less

4    movement of water; in wet years, you have much more

5    movement of water.  So in order to balance that out to

6    get a little truer measure on it, it was decided that

7    we would compute the annual loads and then do a

8    five-year rolling average to dampen out those climatic

9    concerns to give you a little truer picture perhaps of

10   what was happening in the watershed itself.

11       Q.   Okay.  Is it your belief, Mr. Smith, based on

12   the data gathered over those time periods, that those

13   stations used for the Compact Commission monitoring

14   program, that the phosphorus loading has decreased in

15   the IRW since the monitoring program began?

16            MR. NANCE:  Objection as leading, Your

17   Honor.

18            THE COURT:  Sustained.  Rephrase.

19            MR. BASSETT:  Okay.

20            MR. NANCE:  And, Your Honor, it calls

21   for an opinion, and this witness has not been

22   designated to offer any opinion testimony.

23            THE COURT:  I'm not sure he's -- is

24   there a dispute that he is a technical consultant to

25   the Arkansas-Oklahoma Compact Commission and tasked

```
 1   with this responsibility of providing the annual

 2   reports?

 3              MR. NANCE:  I don't -- I don't think

 4   they've established the foundation for exactly what

 5   his role in the annual reporting is, but he has not

 6   been identified under Rule 26 as an expert for any

 7   purpose.

 8              THE COURT:  I don't know that this is

 9   expert testimony.  Mr. Bassett.

10              MR. BASSETT:  Your Honor, I'm not asking

11   for expert opinions.  He is a member of this technical

12   committee, has been a member of this commission, and

13   has testified about the data that's been collected and

14   produced to the Compact Commission.  I'm not asking

15   for an expert opinion.

16              THE COURT:  Overruled.  But as to the

17   first objection, that is sustained.

18         Before we reask the question, this is a 40

19   percent reduction from what, the baseline '80 to '93?

20   What are you seeking a 40 percent reduction from?

21              THE WITNESS:  Well, Your Honor, it's

22   based on that -- I referenced that Tenkiller Clean

23   Lakes study.

24              THE COURT:  Yes, sir.

25              THE WITNESS:  That document utilized
```

```
 1   data from the 1980 to 1993 time period.  The study
 2   itself, if you read it, it goes through and that's the
 3   basis that -- that they did their studies and
 4   calculations on.
 5           Their conclusions were that were we able to
 6   reduce phosphorus loading into the Lake Tenkiller by
 7   40 percent, that that would stabilize the
 8   eutrophication of the lake.  It didn't say it was
 9   going to clean the lake up, so to say, but a 40
10   percent reduction should stabilize so that the
11   eutrophication of the lake was stable.
12           THE COURT:  All right.  But as to my
13   specific question, it's a 40 percent reduction from
14   the baseline from '80 to '93?
15           THE WITNESS:  Yes, sir.  So what we did
16   for each of these sampling stations, we looked at
17   the -- we computed the loading from 1980 to 1993, that
18   gave us a baseline, and then we took 40 percent of
19   that.
20           THE COURT:  Gotcha.
21           THE WITNESS:  And then on each station,
22   we'd compare that annually to see where we were at
23   that 40 percent number.
24           THE COURT:  All right.  Mr. Bassett, if
25   you'd rephrase the leading question, please.
```

1              MR. BASSETT:  Okay, Your Honor.

2         Q.  *(BY MR. BASSETT)*  Has the --

3              MR. BASSETT:  Let me ask it this way, if

4    I can, Your Honor.

5         Q.  *(BY MR. BASSETT)*  Let's look at each -- at

6    each station here which is exhibited there on the

7    exhibit.

8              Has the phosphorus loading at Sager Creek

9    gone up between the time monitoring began in 2007?

10        A.   Yes, it has.

11        Q.   All right.  And do you know why?

12        A.   That has certainly been a question of

13   discussion because the other three Arkansas stations

14   have shown a decrease over the years that we've

15   monitored that.  The only thing that we're aware of

16   that's different on that station is is that Siloam

17   Springs --

18             MR. NANCE:  It appears to be

19   speculation.

20             THE COURT:  Sustained.

21             MR. NANCE:  Let me rephrase.

22        Q.  *(BY MR. BASSETT)*  Based on your involvement

23   on the Compact Commission for many years, Mr. Smith,

24   have you had the opportunity to become familiar with

25   the monitoring locations on the Arkansas side of the

1    border?

2        A.   I have.

3        Q.   Do you know if the Sager Creek monitoring

4    station is near Siloam Springs?

5        A.   It is.

6        Q.   Do you know whether Siloam Springs has

7    expanded the sewage treatment plant since the time the

8    Compact Commission began gathering its own data in

9    1993?

10       A.   Oh, it certainly has.

11       Q.   Do you know whether or not Siloam Springs and

12   West Siloam Springs have experienced growth in

13   population in the past 15 to 20 years?

14       A.   Yeah.  And it parallels the growth that's

15   happened in northwest Arkansas, it certainly has.

16       Q.   As of 2007, Mr. Smith, do you know if Siloam

17   Springs had implemented updated phosphorus reduction

18   technology to its plant?

19       A.   They have planned to do those -- to update

20   some phosphorus treatment units, but those are not yet

21   online.

22       Q.   At the other three locations monitored in

23   Arkansas, had the 40 percent reduction goal set by the

24   Compact Commission been met as of 2007?

25       A.   The data that we've computed shows that we

*9480*

1    are below that 40 percent level.

2         Q.   Okay.   Thank you.   Let me change topics, if I

3    could, for a moment, Mr. Smith.   You can put that

4    down.

5         A.   All right.

6         Q.   Did you have any involvement, Mr. Smith, in

7    the Animal Waste Task Force in Arkansas set up by then

8    Governor Clinton -- or Governor Clinton's

9    administration in the early 1990s?

10        A.   I did.   I was a technical advisor to that

11   task force.

12        Q.   Okay.   And did you attend the meetings of the

13   full task force?

14        A.   I did.

15        Q.   Okay.   How often did that task force meet?

16        A.   They met every few months, every quarter,

17   something of that, but it was frequent meetings that

18   we had.

19        Q.   Did your technical group make presentations

20   or reports to the task force from time to time?

21        A.   We did.   We reported back on questions that

22   were referred to us.   So we presented things like

23   monitoring data to the task force.

24        Q.   Okay.   How long did the task force continue

25   to operate before completing its work?

 1       A.   You know, I believe probably a year, year and

 2   a half, something like that.  It was a lengthy period

 3   that we met.

 4       Q.   And what kind of work was your subgroup

 5   doing, Mr. Smith, in connection with your service on

 6   the task fours?

 7       A.   Well, there again, we were answering

 8   questions that were referred to us, the technical

 9   aspects of the monitoring, and things like monitoring,

10   we were.

11       Q.   Prior to the task force being formed, had any

12   Nutrient Management Plans been drafted or did any such

13   plans exist in the state of Arkansas?

14       A.   Well, sure.  Things like fertilizer

15   recommendations and planning, things like that were

16   being made, yes.

17       Q.   Okay.  Had some people gotten plans

18   voluntarily?

19       A.   They had.

20       Q.   In the late '80s and the very early '90s,

21   would these plans have been written as

22   phosphorus-based plans?

23       A.   No.  Back then the governing parameter was

24   nitrogen by and large.

25       Q.   Were any of these old plans at that time in

1    existence in the Illinois River Watershed?

2         A.    They were.

3         Q.    Okay.  Were any of the people who had those

4    plans poultry-growers?

5         A.    They were.

6         Q.    In the late 1980s and early 1990s, were there

7    any legal requirements in Arkansas for a

8    poultry-grower or anyone else to obtain a

9    nitrogen-based Nutrient Management Plan?

10        A.    No.

11        Q.    Were those plans then obtained voluntarily?

12        A.    They were.

13        Q.    Okay.  Based on your personal knowledge and

14   personal observations and your work at the agency, did

15   the poultry companies or officials at those companies

16   do anything that you interpreted as discouraging of

17   growers obtaining these plans?

18        A.    Not obtaining the plans, no, sir.

19        Q.    Were they supportive?

20        A.    They were supportive of it.

21        Q.    At the time the task force in Arkansas was

22   first assembled in the early 1990s, Mr. Smith, did any

23   agency in either Arkansas or Oklahoma, to your

24   knowledge, have regulatory authority over nonpoint

25   sources?

1        A.    Not to my knowledge.

2        Q.    Okay.   Had either state at that point in time

3    enacted any legislation to attempt to regulate any

4    nonpoint sources prior to the task force being formed?

5        A.    Not to my knowledge.

6        Q.    As a result of your involvement on the task

7    force, Mr. Smith, was there any change in what the

8    Arkansas Department of Environmental Quality did with

9    regard to nonpoint sources in Arkansas?

10        A.    Basically, I think the thrust -- one of the

11    major outcomes of the task force was in our looks at

12    liquid waste.   It resulted in our Department of

13    Environmental Quality's adoption of regulation No. 5

14    which does regulate -- or provide the basis for

15    regulation of liquid animal manures.   The task force

16    did then look at dry litter and made some

17    recommendations about how the management of dry litter

18    could be made.

19        Q.    Why did regulation focus on CAFOs and liquid

20    manure operations at that time?

21        A.    Well, that was the -- that was the one area

22    in which regulatory authority existed.

23        Q.    Okay.   Were poultry farms part of any CAFO

24    regulations in Arkansas at that time?

25        A.    Some of the egg-laying operations, those that

1   disposed of their waste in a liquid manner, like

2   laying operations, some of those did fall under those.

3   The dry litter aspects, of course, did not.

4       Q.   There were no dry litter regulations at that

5   time, were there?

6       A.   There were none, no.

7       Q.   All right.  Was there anything different that

8   your agency, which was then called the Arkansas Soil

9   and Water Commission, began doing after the task force

10  work was completed?

11      A.   Well, we -- at about that same time, we were

12  fortunate in that the federal government did start

13  making funds available through Section 319 of the

14  Clean Water Act, and that's the section of the act

15  that speaks to nonpoint pollution.  That gave us a

16  basis of resources that we could utilize to look at

17  nonpoint pollution.  So we started at that point doing

18  nonpoint projects.

19           One of our priorities in this watershed was

20  to make Nutrient Management Plans available to

21  farmers.  We, for example, contracted with some of the

22  conservation districts in the state so that we could

23  have some technicians to prepare Nutrient Management

24  Plans for growers in that area.

25      Q.   And when you say "this watershed," you're

1    talking about the IRW; is that correct, sir?

2         A.   Yes, sir.   The Illinois River Watershed.

3         Q.   All right.   Did your agency do anything to

4    help provide resources for getting plans written or

5    for teaching people how to use those plans?

6         A.   Yeah.   You know, basically -- and this has

7    kind of been the thrust of our program -- we felt we

8    could be most effective if we did kind of a

9    three-pronged approach to that.   We felt it was

10   important to do some information, education-type

11   things.   We have just found that to be very helpful

12   over different things.

13        We wanted to do some implementation in this

14   arena of confined animal operations.   For example, we

15   looked at -- at providing Nutrient Management Plans.

16   In some of the other areas, in the delta part of the

17   state, for example, we were focusing on siltation-type

18   measures to do that.

19        The other approach was to do demonstration

20   projects to look at the effectiveness of best

21   management practices that could be utilized, what sort

22   of best management practices could we best utilize to

23   help improve and abate some of the pollution --

24   nonpoint pollution aspects.

25        Q.   Were the educational and informational and

1   implementation programs you developed all still

2   voluntary programs at that time when it came to

3   nonpoint sources?

4       A.   Well, certainly there was no authority to do

5   anything but voluntary programs.

6       Q.   All right.  Did the Arkansas Natural

7   Resources Commission, your agency, elect to regulate

8   dry poultry litter application in the IRW, or

9   elsewhere, in the early 1990s following the completion

10  of the work of the governor's task force?

11      A.   Well, following the work of the task force,

12  later on we did view that we wanted to move and to

13  have some regulatory aspect.  We didn't have any

14  regulations at that point in time, but we did start to

15  seek to achieve the authority to have those

16  regulations.

17      Q.   And what did you do to do that?

18      A.   We advocated that the legislature pass

19  legislation that would do that.

20      Q.   And was this just for poultry litter or all

21  nonpoint sources?

22      A.   No, no.  Our program has always been looking

23  at the total aspect of nonpoint pollution.  We felt if

24  we were going to really look at the problem, we needed

25  to approach it in all of its elements.  So the program

1  has always focused on all of the elements of the

2  things, on agricultural-type things, on urban runoffs,

3  on forested area runoffs, things like county roads,

4  runoff from county roads.  All of those things, you

5  know, have some impact on that.  So we just felt that

6  what we needed to do was look at the whole suite of

7  nonpoint areas.

8      Q.   And over what period of time did that take

9  place, what years?

10     A.   Well, from the early '90s on forward

11  really.

12     Q.   All right.  We'll come back to the

13  legislation in Arkansas in just a minute.

14          Back in the early 1990s, Mr. Smith, as far as

15  you were aware, were voluntary programs, such as you

16  have just described to His Honor, were those programs

17  consistent with what other states were doing at that

18  time?

19     A.   I think so.

20     Q.   Was the EPA involved in Governor Clinton's

21  task force?

22     A.   They attended the meetings.

23     Q.   Did the EPA representative on the task force

24  demand or request mandatory regulations at that time?

25     A.   No.

9488

1          MR. NANCE:  Objection; calls for

2     hearsay.

3          MR. BASSETT:  Your Honor -- oh, excuse

4     me.  I don't want to interrupt.

5          THE COURT:  Any response?

6          MR. BASSETT:  Well, Mr. Smith was in the

7     room.  I don't know that that's hearsay.  He was in

8     the room and was a part of the discussion.  Not

9     offered really for the truth of the matter asserted.

10    Just trying to show what -- what took place in that

11    task force, the fact that the EPA had a representative

12    in there, and was not pushing for mandatory

13    regulations seems to be relevant.

14          THE COURT:  I believe it is sought for

15    the truth.  Sustained.

16          MR. BASSETT:  Very well, Your Honor.

17      Q.  *(BY MR. BASSETT)*  Did the voluntary program,

18    Mr. Smith, that you have described in Arkansas for

19    poultry litter management predate the regulatory

20    requirements in both Arkansas and Oklahoma?

21      A.  Oh, yes, it did.

22      Q.  And I think you've already testified that the

23    poultry-growers did participate -- or many of the

24    poultry-growers did participate in the voluntary

25    program?

1      A.   They did.

2      Q.   Okay.  Did the poultry companies, Mr. Smith,

3  or the officials with those companies, based on your

4  observations and knowledge, present any obstacle to

5  your agency in getting growers to participate in the

6  voluntary program?

7      A.   No.  They encouraged their growers to

8  participate in the voluntary program.

9      Q.   Did the poultry companies provide education

10  and information to their growers about the program?

11      A.   They did.

12      Q.   Okay.  Now, you mentioned that aside from

13  education and information, your agency also wanted to

14  do some monitoring to get more data on nonpoint

15  sources in places like the IRW; correct?

16      A.   Uh-huh.  That's correct.

17      Q.   What kinds of monitoring was the Arkansas

18  Soil and Water Commission doing, Mr. Smith, or

19  involved in after the task force work was completed?

20      A.   Well, we -- as -- we really did it in two

21  arenas.  One was the intensive monitoring that we did

22  at the state line.  For example, we've already talked

23  about that.

24           The other part of that was to look to monitor

25  individual best management practices to get a feel for

1    what sort of results we were seeing on an on-farm or

2    on-a-field type of level.  We did that not only

3    because it would be quite useful for us to get that

4    knowledge, but part of our EPA projects needs -- or

5    required to contain a certain monitoring element of

6    those also.

7         Q.   And who actually performed the monitoring

8    that you just described?

9         A.   Basically, we -- we contracted with different

10   individuals to do that monitoring.  We didn't -- our

11   staff did not do the monitoring itself, but in this

12   watershed basically the University of Arkansas.

13        Q.   Okay.  What was your agency's role then in

14   that monitoring?

15        A.   We were, of course, looking to acquire the

16   funds to do these projects as well as administration

17   oversight of the projects and then to receive the

18   results, the deliverables that were called for in the

19   contracts.

20        Q.   Okay.  You've already touched on this, I

21   think, but would you briefly describe what the 319

22   program is?

23        A.   Well, 319 is a section of the Clean Water Act

24   that speaks solely to nonpoint pollution.  It is the

25   vehicle in the early '90s that Congress started giving

1    some appropriations for that specific purpose.  So

2    that's when the states started receiving funding from

3    the federal government that we could dedicate toward

4    nonpoint pollution abatement.

5        Q.   Were other projects for education,

6    plan-writing, and things of that nature also part of

7    different 319 cost-shares?

8        A.   Oh, certainly.

9        Q.   Now, you mentioned that coming out of the

10    task force, that the IRW was identified as one place

11    that your agency wanted to look at to do these kind of

12    programs; is that correct?

13        A.   It was one of our priority watersheds, yes.

14        Q.   And why is that?

15        A.   Well, because it was -- it was

16    certainly -- it has been for years at that time an

17    area of concern.  The Supreme Court case focused

18    attention on it.  We had had the poultry litter -- the

19    poultry waste task force.  The governor's animal task

20    force had focused attention on that.  It was the

21    leaders in the watershed were interested in it.  We

22    had identified it is an area of concern.  We knew

23    through our discussion with the leaders that we felt

24    we could have acceptance, you know, in the voluntary

25    program itself.  So it was a natural for us to begin

1  our work with the 3 -- with the nonpoint programs in

2  that area -- on those areas.

3      Q.   Was the EPA 319 grant program something that

4  your agency used, Mr. Smith, to either get grants or

5  set up cost-share programs for projects to benefit the

6  waters in the IRW during the 1990s?

7      A.   It was a vehicle that we could get federal

8  resources to couple with our state resources to do

9  some of these nonpoint projects.

10     Q.   Were there any other federal grant programs

11  used by Arkansas in the IRW to help -- to try to help

12  improve water quality?

13     A.   Well, we've always tried to piggy-back on

14  whatever programs and resources are available to do

15  that.  Interestingly, the work on designation of these

16  things as priority areas led them to be priorities for

17  other USDA programs, such as EQUIP, for example.  It

18  made it a little easier to acquire some other

19  resources for nonpoint programs.

20     Q.   What's EQUIP?

21     A.   That's the USDA environmental quality

22  incentive program.

23     Q.   Okay.  Was there a time, Mr. Smith, when you

24  and your agency, the Arkansas Natural Resources

25  Commission, decided to regulate dry animal manure

1  rather than issues, recommended practices, and grant

2  programs?

3      A.  Well, it has been our judgment for a long

4  time that we needed to move into that arena, but we

5  did start advocating early on that we needed -- that

6  the state needed to adopt some regulations.

7      Q.  And about what time period would that have

8  been?

9      A.  In the early -- in the early 2000s.

10     Q.  Okay.  Is it your understanding, Mr. Smith,

11 that the statutes that were passed by the Arkansas

12 Legislature established the policy objectives for the

13 state?

14     A.  They did.

15     Q.  Do they lay out the framework for how litter

16 use, among other things, should be managed in

17 Arkansas?

18     A.  It did.  The legislation in 2003, for

19 example, designated what was called surplus nutrient

20 areas.  Those were areas in which we could -- that

21 regulations would apply.

22         The other pieces of the legislation, for

23 example, required that -- legislation requires that in

24 those nutrient surplus areas, that anyone that spreads

25 nutrients on the land, that they do it in accordance

1    with a Nutrient Management Plan.  It also requires

2    certification of the people that draw up those

3    Nutrient Management Plans as well as the people -- and

4    requires a certification for people that spread the

5    nutrients on the land.

6              And here again, I'd point out that we're not

7    talking about just dry poultry litter; this is any

8    nutrients.  This is commercial fertilizer.  It could

9    be compost.  It's any form of nutrients that's spread

10   on the land, you're required to do that in accordance

11   with a Nutrient Management Plan.

12        Q.   And what year did the Arkansas Legislature

13   pass those statutes?

14        A.   2003.

15        Q.   All right.  Was there an acreage criteria in

16   the statutes?

17        A.   The statute says that anything above two and

18   a half acres is where the Nutrient Management Plans

19   are required.

20        Q.   And do you know why there was an acreage

21   criteria in the statutes?

22        A.   Well, the judgment was made if you go below

23   that, then you're looking at such things as individual

24   city lots, individual residential lots on there,

25   to -- it was just the judgment that to prepare a

1    unique Nutrient Management Plan for that small an

2    area, for that many different lots was just not

3    feasible.

4         Q.   Okay.  Following the passage of the

5    legislation, Mr. Smith, in 2003, were there also

6    regulations that were subsequently enacted to fill in

7    the details?

8         A.   Well, certainly anytime that enabling

9    legislation is passed, then the responsible agency

10   then prepares rules and regulations to detail how

11   you're going to administer that authority that's given

12   to you.  So we did, after the passage of that, start

13   drafting our rules and regulations.

14        Q.   And was that the work done by your agency?

15        A.   It was.

16        Q.   All right.  And when were those regulations

17   enacted?

18        A.   2005.

19        Q.   All right.  And were you involved in setting

20   up those regulations, working on those regulations?

21        A.   I was a part of the team that worked on that,

22   yes.

23        Q.   Okay.  And did your agency retain anybody or

24   any institution to help draft and prepare those

25   regulations?

1        A.   Yeah.   With the details that we had to have

2    with -- for example, in the preparation of Nutrient

3    Management Plans, we had to develop phosphorus

4    indices.  For example, a decision was made to base

5    those plans on the phosphorus index.  That had to be

6    developed.

7             At the same time, we felt that rather than

8    wait until the growers -- focus on growers, the people

9    receive the plans, rather than just continue to let

10   them utilize and spread the -- spread the nutrients

11   that they had in the past, we needed -- it would be

12   well to have a protective rate to give people the

13   options of either spreading the nutrients with their

14   Nutrient Management Plan that they had or to do a

15   protective rate.

16            So we contracted with the University of

17   Arkansas to do both of those things, to give us a

18   phosphorus index to be able to draft the plans

19   themselves, and to provide a protective rate that

20   people could utilize while they were waiting for their

21   plans to be developed.

22            The idea there was you do two things.  You

23   give a measure of protection that wouldn't exist if

24   they waited until the plans are developed, and it gave

25   the individuals something to quantify that they could

```
 1    utilize while their plans were being developed.

 2         Q.   Okay.  What specific U of A scientists were

 3    involved in developing the phosphorus index that was

 4    incorporated into the Arkansas regulations?

 5         A.   At that time, I believe it would have been

 6    Phillip Moore and Tommy Daniels.  Those two professors

 7    are what comes to my mind.

 8         Q.   All right.  Now, Mr. Smith, I know you're not

 9    a soil scientist -- you are not a soil scientist, are

10    you?

11         A.   I am not, no.  No, sir.

12         Q.   Okay.  But despite the fact that you're not a

13    soil scientist, can you give us just generally your

14    understanding of what a phosphorus index is and how it

15    works generally?

16              MR. NANCE:  Lack of foundation, Your

17    Honor.

18              THE COURT:  Sustained.

19         Q.   (BY MR. BASSETT)  You have been with the

20    Arkansas Natural Resources Commission since 1985;

21    correct?

22         A.   I have, sir.

23         Q.   And you worked, along with others in your

24    agency, to develop these regulations; correct?

25         A.   I did.
```

1          MR. BASSETT:  Your Honor, I'm not asking

2     for an expert opinion.  I'm just asking for a general

3     layman's opinion -- his layman's understanding, just

4     very general, of what the phosphorus index is.

5          THE COURT:  I think that's fine.

6     Frankly, it would be helpful to me because I don't

7     know that I've had a sufficient explanation.

8          MR. BASSETT:  And that was the only

9     reason for doing it.  I'm not trying to make a man

10    into a scientist who isn't a scientist, but I think a

11    general overview would be helpful to the court.

12    That's the only reason.

13         MR. NANCE:  You've telegraphed what you

14    wanted, Your Honor, but I want to go down swinging on

15    this and say they still have not established that he

16    knows anything about a phosphorus index.  He may have

17    helped with the rules and the regs, but he's not a

18    soil scientist and he's not with U of A and there's no

19    foundation that he knows anything about how the

20    phosphorus index was developed or what it does.

21         THE COURT:  Well, I've got a get a fix

22    on it, I haven't really been given anything to get me

23    there, so overruled.  This may not be the definitive

24    explanation, but at least I'm not comfortable with

25    what the phosphorus index is.

1          So go ahead?

2      Q.   *(BY MR. BASSETT)*   Let me just repeat the

3   question for you, Mr. Smith.

4          Can you give us -- give the judge your

5   understanding generally of what a phosphorus index is

6   and how it works?

7      A.   Basically, the index is a risk-based

8   calculation on being able to reduce the risk of runoff

9   from a -- from a farm, for example, for whatever

10   you're drawing up a Nutrient Management Plan for.  We

11   think it's more flexible and more useful --

12          MR. NANCE:  Your Honor, this is opinion

13   testimony, and he's definitely not an expert on its

14   usefulness or its flexibility.

15          THE COURT:  This is basically Arkansas

16   policy.  I'll take it as that.  Overruled.

17      Q.   *(BY MR. BASSETT)*   You may continue.

18      A.   It allows you to look at -- at a suite of

19   things in developing a Nutrient Management Plan.  You

20   start with the soil test phosphorus, you look at the

21   uniqueness of the individual's land, you look at his

22   soil types, you look at the topography of the land,

23   you look at the slopes of the land, you look at best

24   management practices that he might want to incorporate

25   in his plan -- or has incorporated in his plan.  And

1  looking at that whole suite of things, then you can

2  take those and compute a Nutrient Management Plan from

3  those.  But it allows you looks at all of those areas,

4  and we think that's the strength of the -- of the

5  phosphorus index procedures.

6      Q.  And is each field looked at individually and

7  uniquely?

8      A.  Oh, certainly.  It's -- it -- with

9  the -- with the complicated things that you look at

10  from that, it simply is not -- you're not able to do a

11  cookie-cutter approach.  You have to look at the

12  uniqueness of each farm in itself.  So it

13  takes -- that's why, for example, that we wanted the

14  people that draw those plans up to be certified.

15  There -- you got to bring some expertise to that.

16      Q.  Is each field scored using the index?

17      A.  It is.

18      Q.  Okay.  And then is a recommendation made

19  regarding nutrient use on that field taking all those

20  factors into consideration?

21      A.  Yes, sir, it is.

22      Q.  Okay.  Do you know if Arkansas, Mr. Smith, is

23  the only state that manages litter

24  applications through the phosphorus index?

25      A.  Oh, no.  There are many, many states that

1    utilize the phosphorus index.

2         Q.    Do you know how many states use the

3    phosphorus index?

4                   MR. NANCE:  Your Honor, I don't believe

5    this is relevant to any consideration before this

6    court.

7                   THE COURT:  Overruled.

8         Q.    *(BY MR. BASSETT)*  Do you know how many states

9    use the phosphorus index, Mr. Smith?

10        A.    The number's up into the 40s.  I've heard as

11   high as 48 of the states utilize the phosphorus index.

12        Q.    All right.  Now --

13                  MR. BASSETT:  Just one moment, Your

14   Honor.

15                  THE COURT:  Yes, sir.

16                  MR. BASSETT:  I'm not as organized as

17   the rest of these good lawyers are here.

18        Q.    *(BY MR. BASSETT)*  Mr. Smith, the court has

19   been very patient for a number of months now and has

20   heard about something called the NRCS Code 590 from

21   the USDA.

22              Do you know what the NRCS is and what Code

23   590 is?

24        A.    Well, NRCS is the Natural Resources

25   Conservation Service, an agency of the USDA.

1      Q.   Do you know what the NRCS recommendations are

2   to state agencies, such as yours in Arkansas, as far

3   as guidance to states on how they can manage nutrient

4   application?

5      A.   As with most bureaucracies, guidance

6   documents are prepared and sent down so that

7   each -- that there will be some uniformity in the way

8   the programs are carried out across the states, and

9   590 is one of those guidance documents that NRCS has

10  prepared.

11     Q.   Does the NRCS recognize different approaches

12  to managing nutrient applications?

13     A.   Yeah.  They basically look at -- my

14  recollection is that there are three areas in which

15  they recognize the development of Nutrient Management

16  Plans.  One is the soil test phosphorus, one is the

17  phosphorus index, and one is a phosphorus threshold.

18  Each of those options are available through their

19  documents in the preparation of Nutrient Management

20  Plans.

21     Q.   Just so for the record, is a phosphorus index

22  one of the legitimate approaches or options a state

23  can elect to use under NRCS recommendations?

24     A.   It is.

25     Q.   Okay.  Do you know what approach the State of

1    Oklahoma has elected to use for managing nutrient

2    applications in the IRW?

3        A.    Oh, I understand they're utilizing soil test

4    phosphorus.

5        Q.    And would it be fair to say that's also an

6    approach or an option that fits within the NRCS

7    options given to the states?

8        A.    Certainly it's one of the three options

9    that's available to any state.

10       Q.    Does the NRCS assist in writing any of the

11   Arkansas Nutrient Management Plans?

12       A.    They do.  The -- I mentioned the technicians

13   that we contract with the conservation districts.

14   They are housed in the USDA field offices and NRCS

15   field offices.

16       Q.    Do you think those NRCS plan writers could

17   write plans for Arkansas if Arkansas was using it as a

18   basis for those plans some methodology that was not

19   authorized as an option?

20       A.    No, they could not.

21       Q.    Do you know whether the NRCS recommends

22   anything with regard to the role of the primary land

23   grant university in each state?

24       A.    Yes.  They depend on the land grant

25   institutions to make recommendations for nutrient

 1    management planning.

 2         Q.   And the primary land grant university in the

 3    state of Arkansas is what?

 4         A.   The University of Arkansas at Fayetteville.

 5         Q.   Okay.  Go Hogs.  We finally found a

 6    field-goal kicker on a team that's worse than ours.

 7                   THE COURT:  And you won in overtime.

 8                   MR. BASSETT:  Yes, we did.  Mr. Graves

 9    went to the game.  He's still thawing out, I think,

10    Your Honor.  But anyway, that's an aside.  We're just

11    happy to win a game -- a bowl game for a change.

12                   THE COURT:  I see Mr. Green is missing.

13    He must be lamenting the Skins' loss yesterday.  I

14    understand the coach is about to lose his job too.

15              Go ahead, Mr. Bassett.

16                   MR. BASSETT:  Thank you, Judge.  Sorry

17    for the interruption there.  A little humor never

18    hurts.

19                   THE COURT:  No, sir.

20                   MR. BASSETT:  Particularly when you have

21    a field-goal kicker like ours who's struggled all

22    year.

23         Q.   *(BY MR. BASSETT)*  Okay.  Mr. Smith, did your

24    agency in developing the Arkansas phosphorus index

25    look to the primary land grant university in Arkansas

 1   to assist you in selecting the use of a phosphorus

 2   index for regulating nonpoint-source phosphorus in

 3   Arkansas?

 4        A.   We did.

 5        Q.   Okay.  Has Arkansas adopted, Mr. Smith, Code

 6   590 specific to Arkansas?

 7        A.   Well, it's -- it's certainly the guidance

 8   that we have utilized in the development of the

 9   phosphorus index.

10        Q.   Okay.  If you would just look in your folder

11   up there, the very last folder -- actually it says

12   "Tyson" -- here, let me just show it to you.

13             MR. BASSETT:  May I approach, Your

14   Honor?

15             THE COURT:  You may, sir.

16             THE WITNESS:  Thank you.

17        Q.   *(BY MR. BASSETT)*  Do you have that in front

18   of you?

19        A.   Yes, sir, I do.

20        Q.   Okay.  Do you recognize that as Code 590

21   that's been adopted by Arkansas?

22        A.   Yes, it is.

23             MR. BASSETT:  Your Honor, at this point,

24   we would like to ask the court to take judicial

25   notice, and I think there is a copy of that in your

 1   packet, but obviously it's not appropriate to enter it

 2   as an exhibit.  We would just simply like the court to

 3   take judicial notice of Code 590 as adopted by the

 4   State of Arkansas.

 5          Your Honor, it would be the last one.  I

 6   think it was Tyson Demonstrative 315.1.  I've got a

 7   copy up here if you'd like another copy that doesn't

 8   have any exhibit mark on it or demonstrative marking.

 9               MR. NANCE:  Your Honor, I object to

10   offering this for judicial notice.  It was listed as a

11   demonstrative, it's not listed as an exhibit, and it's

12   a complete surprise that they would want you to take

13   judicial notice of it at this point.

14               MR. BASSETT:  Well, Your Honor --

15               MR. NANCE:  It's not adopted by the

16   State of Arkansas.  It's handed down by the NRCS.

17               THE COURT:  Mr. Bassett.

18               MR. BASSETT:  Your Honor, the witness

19   has testified that this has been -- that this

20   is -- that this Code 590 has been adopted by the State

21   of Arkansas.  All we're asking the court to do is to

22   take judicial notice.  We're not trying to enter this

23   into evidence.

24               THE COURT:  Well, his argument is that

25   it's a surprise that you're asking the court to take

9507

 1   judicial notice of this.  Your response?

 2              MR. BASSETT:  Well, I guess certainly

 3   we're not intending to surprise anybody and I don't

 4   know really that this would -- could be a surprise.

 5   The court did take judicial notice of Oklahoma Code

 6   590.  All we're trying to do is --

 7              THE COURT:  Of course, the Oklahoma

 8   statute incorporates Code 590 in terms of -- and I'd

 9   have to go back and find the specific reference.  I

10   think it incorporates 590 in its entirety, not simply

11   the STP aspects, doesn't it, Mr. Nance?

12              MR. NANCE:  That's correct, Your Honor.

13   And Oklahoma Code 590 was listed as an exhibit by both

14   sides.  There was no surprise.  Everybody knew that it

15   was going to come in.

16              THE COURT:  But only the STP side of it?

17              MR. NANCE:  I think the whole document's

18   in.  I don't remember the exhibit number.

19              THE COURT:  All right.  But refresh my

20   recollection.  That's the Oklahoma Code 590?

21              MR. NANCE:  Correct.

22              THE COURT:  All right.  Mr. Bassett.

23              MR. BASSETT:  Well, again, Your Honor,

24   we're not trying to surprise anybody.  We thought this

25   would be helpful to the court.

1          THE COURT:  Right.

2          MR. BASSETT:  Since these are

3    various -- they are various options that are given to

4    the states under NRCS, and we thought since the court

5    had the benefit of Oklahoma Code 590, that it would be

6    helpful to have the counterpart for Arkansas.

7          THE COURT:  No.  Is this actually

8    promulgated in the Code of Federal Regulations?

9          MR. BASSETT:  No, I don't believe it is,

10   Your Honor.  Arkansas --

11          *(Discussion held off the record)*

12          MR. BASSETT:  Arkansas' ARC office has

13   adopted it.

14          THE COURT:  Well, unless this is set

15   forth in the pretrial order as a document -- or as an

16   exhibit and unless it's in the form of some sort of

17   document that I can take judicial notice of --

18   certainly I can take judicial notice of a statute or

19   reg -- I don't know that I can take notice of

20   Arkansas' Code 590, can I?

21          MR. BASSETT:  Well, I thought you could,

22   but I may be wrong.

23          THE COURT:  No.

24          MR. BASSETT:  I think unless one of

25   these smart guys over here can come whisper in one of

```
 1    these big ears and help me right now, Your Honor, I
 2    don't have many more bullets to fire on this in an
 3    effort to try to get the court to take judicial
 4    notice.
 5              THE COURT:  Well, without anything more,
 6    the objection's sustained.  Go ahead.
 7              MR. BASSETT:  Thank you, Your Honor.
 8       Q.   (BY MR. BASSETT)  Mr. Smith, what is your
 9    understanding generally of what the Arkansas
10    regulations require a poultry-grower or user of
11    commercial fertilizer in the IRW to do?
12              MR. NANCE:  Your Honor, I object for
13    lack of foundation.  He has not testified that he's
14    familiar with the regulations or that his job with the
15    ANRC in with the water management division, or
16    whatever it is, has anything to do with those
17    regulations.
18              THE COURT:  Well, I think he's touched
19    on it, but we'll see if we can lay a more firm
20    foundation.  Sustained.
21              MR. BASSETT:  Yes, sir.  Thank you,
22    Judge.
23       Q.   (BY MR. BASSETT)  Mr. Smith, are you familiar
24    with the Arkansas regulations with respect to what's
25    required from poultry-growers or users of commercial
```

 1    fertilizer?

 2         A.   Yes, sir.

 3         Q.   And do you work with that in your office day

 4    in and day out?

 5         A.   Yes, sir.

 6         Q.   All right.  And you help put together these

 7    regulations; is that true?

 8         A.   There again, I was part of the team that

 9    worked on that.

10         Q.   And you are familiar with those regulations?

11         A.   Yes, sir.

12         Q.   And do you know what those regulations

13    require a poultry-grower to do?

14         A.   Within any of the surplus nutrient areas, a

15    poultry-grower is required to obtain a Nutrient

16    Management Plan in order to apply nutrients to the

17    soil, to the land.

18         Q.   Okay.  Does the plan have to be written by a

19    certified nutrient management specialist?

20         A.   They do.

21         Q.   Okay.  And does the site have to be evaluated

22    using the criteria in the Arkansas phosphorus index?

23         A.   That's certainly part of the development of a

24    Nutrient Management Plan.

25         Q.   Were these regulations, Mr. Smith, set up

1   because you and your agency concluded that poultry

2   litter was, in fact, polluting the IRW or that there

3   was too much of it in the IRW?

4       A.   It was a factor in there, but there again, we

5   looked at the whole suite of nonpoint.  That's the

6   reason, for example, that the regulations speak to

7   commercial fertilizers and not just to poultry litter.

8   It speaks to the whole suite of nutrient management

9   and to whatever nutrients are applied in those surplus

10  nutrient areas.

11      Q.   Had your agency, Mr. Smith, received any kind

12  of charge to fulfill in terms of addressing potential

13  sources of problems that might challenge natural

14  resources?

15      A.   Well, certainly we -- we have.

16      Q.   And were these regulations a part of the

17  response to that?

18      A.   Yeah.  That -- yes.  The whole -- basically

19  from two parts.  One from our responsibilities with

20  the 319 program itself, as with the legislation that

21  was passed in the state.

22      Q.   Okay.  Let me ask you this because I'm sure

23  there will be those who will be interested in it.

24           Why were the regulations that were adopted by

25  the ANRC rolled out over a period of time following

 1    the passage of the statutes in 2003?

 2        A.    Well, first of all, it was -- it was not an

 3    easy piece of legislation to pass.  There were

 4    certain -- there were certainly some opposition to the

 5    passage of the law itself so there had to be some

 6    gathering of people to support the legislation itself.

 7            Once legislation's passed and we spoke to the

 8    need, for example, to develop protective rates and to

 9    develop a poultry index, that needed to be within the

10    rules and regulations themselves so that comments

11    could be made to that.

12            Our Administrative Procedures Act in the

13    State of Arkansas then requires us to go forward and

14    hold public hearings.  We went through a series of

15    public hearings, received comments back from that.

16            It is a controversial piece of legislation.

17    There were, for example, some property rights groups

18    that were opposed to the enactment of those rules and

19    regulations.  So we had one series of public hearings,

20    received a huge amount of comments back from that,

21    went through another realm of doing some modification

22    to our rules and regulations, and went out to another

23    series of public hearings on there.  So it took

24    a -- that span of time in order to develop those rules

25    and regulations.

1        Q.   Did the property rights people that came to

2    these public hearings express quite vocally their

3    opposition?

4        A.   They were not shy about speaking their

5    opposition to it.

6        Q.   All right.  Was there any consideration also

7    in terms of the roll-out over time as to the need to

8    give the University of Arkansas scientists time to

9    develop the phosphorus index?

10       A.   Well, that was certainly part of it because

11   they, as well as us, wanted sufficient time to make

12   sure that the proper looks of science was put into the

13   development of that phosphorus index.

14       Q.   Was there any consideration also as to the

15   time that would be needed after the development of the

16   phosphorus index for farmers and others to obtain a

17   plan based on it?

18       A.   Yeah.  Certainly that was a consideration.

19   As a matter of fact, the legislation specifically

20   speaks that the commission could allow some time to do

21   that.  It was our judgment that we needed to allow

22   some time just because of the number of poultry -- of

23   Nutrient Management Plans that had to be developed.

24            So that's why the rules and regulations allow

25   the use of the protective rate, for example, until

1    such time as the plans could be developed.

2         Q.   All right.  This may have already been

3    covered --

4              MR. BASSETT:  And, Your Honor, I

5    apologize if this is repetitious.  But I want to ask

6    Mr. Smith --

7         Q.   *(BY MR. BASSETT)*  Or, Mr. Smith, I want to

8    ask you -- of course there's been some discussion

9    about the Arkansas litter laws having a protective

10   rate -- but do you know anything about this protective

11   rate?  Obviously you do because you've already talked

12   about it, but do you know something about the

13   protective rate?  Do you know what it is?

14        A.   Well, certainly it was -- it was an option

15   that we wanted to put in place to give until such time

16   as plans develop.

17        Q.   Who determined the protective rate?

18        A.   We worked with the University of Arkansas in

19   developing that protective rate.

20        Q.   All right.

21        A.   The numbers for the protective rate.

22        Q.   And was the protective rate intended to be

23   something used on an interim basis only?

24        A.   Yes.  It could only be used until 2007.  So

25   there's a specific time frame span in which that

1    protective rate could be utilized.

2        Q.    Was the protective rate more or less

3    restrictive than what had previously been allowed or

4    than what was then allowed under a Nutrient Management

5    Plan?

6        A.    Well, until the time the legislation was

7    adopted, there was -- there was no restriction at all

8    on there other than voluntary-type measures.    In

9    general, I think the protective rate is probably more

10   restrictive than the phosphorus index would be because

11   it does not -- it doesn't take into account the other

12   things that a phosphorus index can look at.

13       Q.    The factors you talked about earlier?

14       A.    Yes, sir.

15       Q.    Can farmers or others still use a protective

16   rate for litter applications?

17       A.    No, sir.    That option expired in 2007.

18       Q.    Not to quibble here, but did it actually

19   expire on December 31st, 2006?

20       A.    Yes, sir.    That's true.

21       Q.    All right.    Now, the Arkansas regulations

22   have recently been revised, have they not?

23       A.    Yes, sir.    Just within the last few days.

24       Q.    Do the revised regulations allow poultry

25   litter to be applied at a protective rate?

1    A.   No, they do not.

2    Q.   All right.  To your knowledge, did Arkansas

3 seek input or comments from Oklahoma related to its

4 poultry litter regulatory statutes or regulations?

5    A.   Well, we had the -- since we meet via the

6 Compact, we meet with Oklahoma annually on there, and

7 our commissioners at that time, this period of time

8 that you're speaking of, we would report annually to

9 the Compact progress toward our -- we spoke about the

10 legislation that was being passed, we spoke about the

11 development of our rules and regulations, and reported

12 to the Compact itself.  That encompassed, of course,

13 those Oklahoma individuals that were sitting on the

14 Compact.

15    Q.   Okay.  And I don't want to be confusing about

16 the dates.  I'm really referencing now prior to the

17 laws that were passed in 2003.

18         Do you know if copies, draft statutes, were

19 provided to Oklahoma officials before the legislation

20 was passed in 2003 in Arkansas?

21    A.   I'm not sure.  I suspect they were but I'm

22 not sure.

23    Q.   Okay.  So do you know if draft copies were

24 provided to any Oklahoma officials?

25    A.   I couldn't tell you for sure.

1    Q.   All right.  To your knowledge, did any
2    Oklahoma official identify any particular aspects of
3    the proposed statutes or regulations in Arkansas that
4    they found objectionable or unreasonable?
5    A.   No, sir.  I don't recall any.
6    Q.   You testified that you have participated in
7    meetings in which Oklahoma officials were there also;
8    is that correct?
9    A.   Yes, sir.
10    Q.   Okay.  In leading up to the passage of the
11    laws in Arkansas in 2003, Mr. Smith, did you ever
12    participate in or witness anything that you believe
13    would have constituted intimidation of Oklahoma
14    officials that would have made them nervous about
15    providing comment on the Arkansas regulations?
16    A.   No, sir.
17    Q.   Okay.  Did you ever try to intimidate an
18    Oklahoma official?
19    A.   I don't think a minor official can intimidate
20    an Oklahoma official.
21    Q.   You don't strike me as the intimidating sort
22    either.
23       But did you ever witness anybody else, any
24    other official, or anybody else at all, from Arkansas
25    that tried to do that?

1        A.   No, sir.

2              MR. BASSETT:  Your Honor, if I might

3    have a moment here, there's a couple of questions I

4    had that I think Mr. Smith's already covered and I

5    don't want to be repetitious.

6              THE COURT:  Yes, sir.

7        Q.   *(BY MR. BASSETT)*  Mr. Smith, are you aware

8    that -- and I'm sure you are since you're sitting in

9    this courtroom -- aware that several poultry companies

10   are being sued in this case by the State of

11   Oklahoma?

12       A.   I am.

13       Q.   Those companies are represented by these

14   lawyers over here.  Let me just name them for you very

15   briefly.  Tyson Foods, Cobb-Vantress, Cargill,

16   Simmons, Peterson, George's, and Cal-Maine.  I think

17   that's the lineup.

18            Is it your recollection that any of these

19   poultry companies, or any officials connected to these

20   poultry companies, were opposed to the regulations or

21   somehow held up the process of developing and passing

22   regulations back during the 2003, 2004, 2005 time

23   period?

24       A.   No.  They were supportive of the legislation

25   and the rules and regulations.

**United States District Court**

1    Q.   Was there any resistance from any of the

2  poultry-growers to those regulations?

3    A.   Well, yes, there were, and that was evidenced

4  in our public hearings.  There were -- you know,

5  certain individuals just felt that the government was

6  straying into areas they didn't need to be moving

7  into.

8    Q.   All right.  Mr. Smith, do you know anything

9  about an agreement between Arkansas and Oklahoma

10  called the Joint Statement of Principles from 2003?

11    A.   Yes, sir, I do.

12    Q.   Were you involved in any discussions

13  surrounding the entry into that agreement?

14    A.   Yes.  I participated and I was at the

15  meetings in which those discussions with Arkansas and

16  Oklahoma took place.

17    Q.   And what was the purpose of that agreement,

18  Mr. Smith, as you understood it?

19    A.   Well, it was -- when we were made aware that

20  Oklahoma intended to adopt those rules and

21  regulations, it was the consensus of the Arkansas

22  agencies that that was a standard that was just not

23  achievable.

24    Q.   Now, let me stop you there for just a second.

25        When you're talking about those regulations,

1    are you talking about the numeric criteria for

2    phosphorus in the scenic rivers in the IRW?

3         A.   Yeah.   The .037.

4         Q.   Thank you.   Now you may continue.

5         A.   Yeah.   In lieu of that, I guess the choices

6    there was to either file suit, to do that, or enter

7    into an agreement with Oklahoma regarding that, which

8    we did.   That document, for example, set forth some

9    criteria that Arkansas would agree to do.   It looked

10   at -- for example, it mentions that the standard would

11   be adopted by 2012 and sets forth some agreements

12   between the two states.

13        Q.   What is your understanding of what Arkansas

14   agreed to do in this agreement?

15        A.   Basically, we -- we agreed to look at

16   reducing our point sources to one part per million and

17   to go forward with looking at reducing nonpoint

18   pollution abatement by doing things like the Nutrient

19   Management Plans.

20        Q.   Okay.   So were the Arkansas litter management

21   statutes also a part of this agreement?

22        A.   Well, that became a part of it.

23        Q.   Okay.   To the best of your knowledge,

24   Mr. Smith, has Arkansas fulfilled its duties under

25   this agreement?

9521

1    A.   We really feel that we've -- that we've not

2  only met the spirit of the agreement, but gone beyond

3  it.  A lot of our point sources are able to achieve

4  below the one part.  We felt that we have really been

5  able to bring some resources to bear and have achieved

6  a lot in the nonpoint arena.

7    Q.   Has Arkansas done anything beyond what was

8  discussed or required under this 2000 agreement to try

9  to reduce phosphorus loads to streams and rivers in

10  the IRW?

11    A.   I think so.

12    Q.   Tell us what.

13    A.   Well, by bringing the point sources down

14  below the one part, for example, with enacting the

15  legislation that requires the Nutrient Management

16  Plans and the certifications that we talked about, by

17  not only addressing those type of things, but looking

18  and putting resources in to do urban nonpoint

19  projects, to look at adoption of best management

20  practices in the arena of timber harvesting and things

21  like that.

22    Q.   And how about CREP grants?

23    A.   Well, one other -- we were extremely happy

24  to -- that we were successful in getting the CREP

25  grant for the Illinois River Watershed, which will

1   allow us to utilize $24 million of federal resources

2   to cost-share in best management practices on the

3   Arkansas side of the Illinois River.

4       Q.   And the $30 million in grants, some of that

5   was 319 federal money; is that right?

6       A.   Well, it is -- it's really not 319 money;

7   it's a separate category.

8       Q.   Okay.  I apologize.

9       A.   It's -- it's through -- FSA and NRCS are the

10  two federal agencies, but it's a separate pot of

11  money, it's not an EPA pot of money, but it

12  does -- it's a total of $30 million.  Of that $30

13  million, there's $6 million dollar nonfederal

14  cost-share, if you will.  The purpose of that is to

15  give some extra incentives to allow individuals to put

16  best management practices in place on their land.

17      Q.   Okay.  And was there some money -- match

18  money contributed from northwest Arkansas

19  industries?

20      A.   It was really -- in order to garner that

21  nonfederal option, state agencies in Arkansas, for

22  example, are able to contribute some in-kind

23  contributions toward that.  The general assembly

24  designated some money to be utilized for that.  The

25  poultry industry contributed some money.  I believe

1  the Walton Family Foundation contributed some money

2  also.  So it was a widespread effort, if you will, to

3  garner that $6 million so that we could capture that

4  $24 million in federal funding.

5      Q.  All right.  Let me ask you this, Mr. Smith.

6  You touched on this already.

7          When did the -- officially on what date did

8  the revisions to the Arkansas phosphorus index go into

9  effect?

10     A.  Just a few days ago, the first of the year.

11     Q.  January 1st, 2010?

12     A.  2010, Yes, sir.

13     Q.  Or 2010, whatever we're supposed to say.

14 That would have been last Friday; correct?

15     A.  Yes, sir.

16     Q.  Do you have any understanding of what the

17 revisions to the regulations do?

18     A.  Well, they look at -- they allow us to get

19 into the newest scientific work that the university

20 has done and allow us to capture those type things, to

21 revise our index to the state-of-the-art, if you will,

22 as far as the science is going today.

23     Q.  And did the scientists at the University of

24 Arkansas work on this revision to the

25 phosphorus -- Arkansas phosphorus index?

1      A.   They did.

2      Q.   Now, you're not personally involved in the

3  specifics of the science part of those regulations,

4  are you?

5      A.   As you pointed out, I'm not a soil scientist,

6  so no.

7           MR. BASSETT:  Your Honor, just one

8  moment here.

9           THE COURT:  Just a few questions here,

10  Mr. Bassett, while you're looking.

11           These new revisions, do you have any

12  understanding whether they tighten up or loosen the P

13  index?

14           THE WITNESS:  It's really site-specific,

15  Your Honor.  It depends on the individual and the

16  individual characteristic of each farm itself.  There

17  are going to be farms in which those regulations are

18  tightened up, where they're not going to be able to

19  use as much.

20           Conversely, there could be some areas,

21  depending on the circumstances, where, you know, more

22  fertilizers, for example, could be applied.  But it's

23  a very unique thing --

24           THE COURT:  The revisions went to what

25  aspects of the P index, soil type?  Because you

1   described it as a complex amalgam of factors.  What

2   were the revisions focused on?

3                 THE WITNESS:  Well, it was really to

4   look at the research that the University of Arkansas

5   had done through those soil scientists to incorporate

6   those revisions into place there.

7                 THE COURT:  Whatever those may be?

8                 THE WITNESS:  Whatever they may be.  And

9   I can't give you the -- you know, the exact details

10  that have since that --

11                THE COURT:  All right.  You agreed in

12  your Joint Statement of Principles to, you say, look

13  at reducing point sources to one part per million;

14  correct?

15                THE WITNESS:  Yes, sir.

16                THE COURT:  All right.  Is Siloam

17  Springs there?

18                THE WITNESS:  They have not brought

19  their treatment plant online yet.  It's the one plant

20  that has not yet constructed their treatment

21  facilities.

22                THE COURT:  All right.  So no treatment

23  facilities there whatsoever?

24                THE WITNESS:  Oh, yes, sir.  There are

25  treatment facilities that --

1              THE COURT:  Right, right.  It was the

2    upgrade you were talking about?

3              THE WITNESS:  I'm talking about the

4    specific phosphorus removal units.

5              THE COURT:  All right.  Now, that

6    particular tributary dumps into Flint Creek which

7    ultimately dumps into the Illinois; correct.

8              THE WITNESS:  I believe Sager Creek

9    is --

10             THE COURT:  No.  That's what I'm saying.

11   Sager dumps into Flint; correct?

12             THE WITNESS:  I believe that's correct,

13   Your Honor.  I'm not sure but --

14             THE COURT:  All right.  I'm seeing our

15   Secretary of the Environment, he's saying yes.

16        All right.  When are those improvements

17   supposed to go online?

18             THE WITNESS:  They're scheduled to go

19   online this year.

20             THE COURT:  You testified that in any of

21   the surplus nutrient areas poultry-growers are

22   required to obtain a Nutrient Management Plan.  Are

23   you aware of what percentage of the Arkansas portion

24   of the IRW is designated a surplus nutrient area?

25             THE WITNESS:  Well, the entire Illinois

1   River Watershed is designated as a surplus

2   nutrient --

3                  THE COURT:  All right.  I just wanted

4   that to be clear.

5           Go ahead, Mr. Bassett.

6                  MR. BASSETT:  Judge, at this point, we

7   would like -- the defendants would like to ask the

8   court to take judicial notice of the new rules

9   governing the Arkansas soil nutrient and poultry

10  litter application and management program that went

11  into effect on January 1, 2010.  This is the new

12  revised Arkansas phosphorus index.  These are the

13  regulations which -- which, as I said, are now in

14  effect.

15          I have -- I think, Mr. Nance, you've got a

16  copy of this, do you not?

17                  MR. NANCE:  I do.

18                  MR. BASSETT:  Let me just show you what

19  I have here.  Have you got this?

20              *(Discussion held off the record)*

21                  MR. BASSETT:  Your Honor, let me do this

22  one at a time.

23          First of all, I'd like the court to take

24  judicial notice of the new rules which went into

25  effect January 1st, 2010.  I think there is a copy in

9528

1   the court's packet.  Yeah, it's actually -- I think we

2   actually had identified it as Defendants' Joint

3   Exhibit 8133.  I have a clean copy here, Your Honor,

4   that has no exhibit number on it.  It's however the

5   court would prefer to do it.

6            THE COURT:  Well, I have a copy here.

7   It doesn't matter that it has an exhibit sticker on

8   it.

9        Any objection to such judicial notice --

10           MR. NANCE:  Your Honor, I don't object

11  to the court taking judicial notice of the rules.

12  These were indicated last night at 9:16 p.m. that they

13  wanted to use these with this witness, and I am -- and

14  I am manifestly unprepared to cross-examine him on

15  these rules if he is going to testify about them.  I

16  don't mind the court seeing them, but I do object to

17  any testimony based on the rules.

18           THE COURT:  He is not, of course, the

19  only witness to have mentioned these.  It's been

20  mentioned a number of times that these rules would go

21  into effect.  I think it's necessary that the court

22  take judicial notice.  So without objection, the court

23  will do so.

24       Let me see if I can get the proper citation

25  here under the Arkansas, I take it, Administrative

1    Code -- Arkansas Code Annotated here, it appears,

2    Section 2201.1 through -- no.  I'm sorry.  That's the

3    statutory citation.

4            Is there an Oklahoma -- or Arkansas

5    Administrative Code section here?  It's 2201.1 through

6    2206.4, looks like Title 22.

7            MR. BASSETT:  Yes, sir.

8            THE COURT:  The court will take judicial

9    notice of those administrative rule revisions.

10            MR. BASSETT:  Your Honor, yes, I have

11    also as a part of that -- and it's also in that same

12    packet -- you'll see another document at the top.  It

13    says, "Revised Arkansas Phosphorus Index."  It has

14    some several names on there, Phillip Moore, Andrew

15    Sharpley, and others.  It should be attached to

16    the -- let me just -- perhaps I can just hand up a

17    copy of it.

18            THE COURT:  I notice that protective

19    rates are part of this supposed new regulation.  I

20    thought the testimony was that protective rates are

21    out the window as of December 31st, 2006?

22            MR. TUCKER:  Judge, that relates to

23    commercial fertilizer, chemical fertilizer.

24            THE COURT:  All right.  Please.

25            MR. BASSETT:  I'll just hand this up, if

 1    that will be helpful.

 2                MR. NANCE:  Your Honor, we do object to

 3    use admission of what was designated to us as Exhibit

 4    8132 after 9 p.m. last night.  We've had less than 12

 5    hours' notice that this would be used today.

 6    Obviously, that violates the pretrial order and is

 7    prejudicial to the state, particularly if there's

 8    going to be any substantive testimony about it.

 9                THE COURT:  Is 8132 an exhibit

10    designated in the pretrial order?

11                MR. NANCE:  It is not.

12                MR. BASSETT:  No, sir.  But, Your Honor,

13    it wouldn't have been available at that time.  This

14    is -- this is in connection with the new phosphorus

15    index.

16                In response to what Mr. Nance just said,

17    yeah, I don't think we inadvertently did not get them

18    a copy until late last night.  I'm not going to ask

19    this witness any questions about it.  What I do want

20    to point out and what I think is most important is,

21    let me refer the court to the -- to what just was

22    taken in by judicial notice and refer the court to

23    page 2, Section 2201.4B.  I think you're there, Your

24    Honor.

25                THE COURT:  Yes, sir.

 1              MR. BASSETT:  You're usually faster than

 2     the rest of us getting there.

 3              At Section 2201.4B, this is the section on

 4     the new regulations on definitions, and it explains

 5     the revised phosphorus index and how it works.  What

 6     we are now asking the court to also take judicial

 7     notice of is clearly referenced here in the

 8     regulations -- and Your Honor can read what it says

 9     there -- but that needs to be a part of what the court

10     is receiving in order to get the full context and to

11     understand what these new regulations are saying.

12     It's incorporated in the law --

13              THE COURT:  All right.

14              MR. BASSETT:  -- just like Oklahoma Code

15     590.

16              THE COURT:  I'm going to give Mr. Nance

17     a bit of time to consider that.  We're not going to

18     take judicial notice of that at this point given the

19     timing.  It's a good question as to whether or not

20     reference to this specific article in the regulation

21     means that the article should be taken into

22     consideration and the court should give judicial

23     notice to it given that it's basically the heart and

24     soul and guts of the rule.

25              But I take it it's something of a surprise

 1   here, Mr. Nance?

 2              MR. NANCE:  It is, Your Honor.  And it's

 3   not listed in the pretrial order, even though

 4   evidently it was written sometime in 2009.  If you

 5   read the -- if you read the very rule you've just been

 6   referred to, this is in the --

 7              THE COURT:  Of course we've been going

 8   for quite some time in 2009.  I don't know when this

 9   was adopted.  Let me give you a little time to gather

10   your response to that, Mr. Nance.

11              MR. NANCE:  Yes, sir.

12              MR. TUCKER:  If I may, Your Honor, just

13   for record just so there's no misunderstanding.  That

14   is the identical documents that I offered to the court

15   and suggested judicial notice be taken at the

16   conclusion of Mr. Taylor's testimony prior to the

17   Christmas recess.

18              THE COURT:  Yes, sir.

19              MR. TUCKER:  So it's actually quite a

20   bit -- it's several days' notice as opposed to a few

21   hours' notice of the existence of it.

22         As to the second point about timing, public

23   comments for written changes were still being accepted

24   as recently as mid November of 2009 so it would be

25   rather difficult to list it on the pretrial order.

1    THE COURT:  All right.  It's about time

2    for a break.  Let's take our mid-morning recess.

3    *(Short break)*

4    THE COURT:  Mr. Bassett.  Do we want to

5    proceed on this issue with regard to taking judicial

6    notice of the index referenced in the rule, Mr. Nance?

7    MR. NANCE:  Yes, Your Honor, we do.  We

8    object to taking judicial notice of it.  One, because

9    the pretrial order has a 72-hour rule that needs to

10   mean something and 12 hours is not 72 hours; secondly,

11   whenever this thing came out, the defendants could

12   have down in good order a motion to amend the pretrial

13   order to add it as an exhibit.

14        In doing so, they would -- they would have to

15   meet the stringent standard of manifest injustice by

16   not putting it in.  They did not do that.  Instead,

17   they surprised us with it last night in a posture

18   where we can't very well deal with it.

19        The fact that the regulation refers to it

20   doesn't change the fact that it's hearsay, it's

21   not -- it's not an exhibit -- is not on the exhibit

22   list, I mean, the pretrial order exhibit list, and the

23   timing is calculated to surprise the state.  If they

24   knew about it when Mr. Tucker first tried to get

25   judicial notice taken, they could have -- they could

 1  have been more timely in their presentation of it to

 2  us.

 3              THE COURT:  All right.  Well, let's

 4  separate out the issue of whether or not it's timely

 5  for the purposes of this witness from the issue of

 6  whether or not the court should take judicial notice

 7  of the revised Arkansas phosphorus index as part and

 8  parcel of the rule.  Because I tend to agree with you

 9  in terms of the 72-hour rule, it comes as a surprise

10  for you to prepare.

11              But insofar as it's part of that which

12  arguably needs to be taken into consideration by this

13  court as part of the rule that went into place just a

14  few days ago, January 1st, 2010, the fact that it is

15  just recently developed here, Mr. Tucker says that

16  they were taking comment as late as November.

17  Obviously, we started this trial in late September.

18  Essentially, what Mr. Bassett is asking the court to

19  do is to -- is to revise or amend the pretrial order

20  to take into account this revised phosphorus index,

21  which it doesn't sound to me that there's any dispute

22  that it's now in effect; correct?

23              MR. NANCE:  I'm not disputing that fact,

24  Your Honor, no.

25              THE COURT:  All right.  So if we sustain

1    your motion with reference to allowing this witness to

2    testify about it, as violative of the 72-hour rule, is

3    there any objection to its admission as part and

4    parcel of the new Arkansas rules?

5              MR. NANCE:  If I could have a moment to

6    confer?

7              THE COURT:  Certainly.

8              *(Discussion held off the record)*

9              MR. NANCE:  Your Honor, Mr. Bullock

10   reminds me that coming as it does after the close of

11   our case, we have no way to subject it to any expert

12   testimony on our side of the case.  It could have come

13   in before we rested or we had an opportunity to speak

14   to it.

15        Also, Your Honor, having deposed who I think

16   is going to be their phosphorus index expert -- and

17   that's Dr. Coal -- his report and deposition testimony

18   did not speak at all to the Arkansas phosphorus index.

19   He talked about the index from Maryland.  So they are

20   now injecting at this untimely date a new issue and a

21   new document that we are not -- we're not aware of an

22   expert who's going to opine on it, and if they did, it

23   would be a new opinion that would be prohibited.

24        So we think that the court should not take

25   judicial notice of it, particularly the way it's

1    developed, and we're prejudiced for not being able to

2    have any expert testimony on it, if need be.

3              THE COURT:  Obviously, it's a dynamic

4    set of facts.  Go ahead, Mr. Bassett.

5              MR. BASSETT:  Yeah, Your Honor.  I guess

6    I'll start off -- and I appreciate the comments of

7    counsel over here as a very nice way of presenting

8    himself -- but this is the law we're talking about

9    here, Your Honor.  The phosphorus index that is a part

10   of the revised Arkansas regulations is defined as what

11   is in that -- in that document.

12             Whether the regs use language incorporated or

13   not, the index described in what's before the court,

14   that article, is now the law in Arkansas.  We are

15   simply asking the court to take judicial notice of

16   that law.  We're not -- we're not, you know, intending

17   to ask this witness questions about it.  We simply are

18   trying to inform the court as to what the law is in

19   Arkansas.

20             Because, Your Honor -- and I don't want to

21   give a long speech here -- but I do want to say we

22   started, as you pointed out, this trial back in late

23   September.  It has been going a long time now.  We're

24   into a new year.  There has been an enormous amount of

25   discussion during the course of this case about the

1  regulations, the laws in the state of Arkansas, and

2  that has been well hashed out in this court, as Your

3  Honor well knows.

4         As was pointed out by Mr. Tucker and others,

5  the state really didn't ever get into anything that

6  was going on on the other side of 16th Street to use

7  Mr. Tucker's analogy.  And we are here today and we're

8  asking the court to take judicial notice of these regs

9  and the new Arkansas PI because we simply think it

10  would be useful and helpful to you as the trier of

11  fact to know what the present and existing regulations

12  are in the state of Arkansas, to know what the law is

13  in the state of Arkansas.

14         THE COURT:  Particularly given the fact

15  that this is an action for an injunction, I can't

16  ignore existing realities.  It seems to me that to the

17  extent that the new regulation effective January 1,

18  2010, is specifically referenced and adopted -- let me

19  take a look once again at 2201.4B.

20         To the extent that it's part of the law of

21  the state of Arkansas, I believe it has to be taken

22  into consideration relative to any proposed injunctive

23  relief being sought.  The court will take judicial

24  notice of the revised Arkansas phosphorus index, which

25  is incorporated as part of Section 2201.4B of the

9538

1    rules governing the Arkansas soil nutrient and poultry

2    litter application and management program effective

3    January 1, 2010.

4         But once again, I'm not going to allow this

5    witness to testify about that index for a couple of

6    reasons.  Number one, violation of the 72-hour rule;

7    and number 2, in trying to get the overall explanation

8    from this witness, he admits he's not an expert in

9    that regard.

10         MR. BASSETT:  Yes, sir.

11         THE COURT:  So go ahead.

12         MR. NANCE:  Your Honor, I just -- I

13    understand your ruling and I'm not going to quibble

14    with it.  I'm concerned about future expert testimony

15    they may try to slip in based on this document

16    that would be new opinion or we would be prejudiced

17    because we haven't had a chance to have any discovery

18    on or any expert from our side, as need be, to review.

19    I just flag that as a future issue and --

20         THE COURT:  Well, if that's a concern

21    and if it comes in, in terms of expert testimony from

22    the defense, then you've got the opportunity for a

23    rebuttal witness.

24         So go ahead.

25         MR. NANCE:  Thank you, Your Honor.

**United States District Court**

1          THE COURT:  To further extend this

2    trial.

3          MR. BASSETT:  Oh, boy.  If we do that, I

4    might even be able to grow a beard.  I'm going to need

5    about five or six months, I'm afraid.  I'm embarrassed

6    to tell you about previous efforts in that regard.

7    Didn't work out too well.

8       Q.  *(BY MR. BASSETT)*  Okay, Mr. Smith.  Let's

9    switch topics here.

10          Are you personally involved in the specifics

11    of the enforcement part of these regulations?

12       A.  No.  That's a separate section of our -- of

13    our commission.

14       Q.  Okay.  Are you aware of whether

15    investigations of complaints by the public under the

16    regulations are required to be notarized before your

17    agency will investigate?

18       A.  Yes, sir, I am.

19       Q.  That is a part of the regulations?

20       A.  Part of the regulations, part of the

21    legislation.

22       Q.  Is that something that your agency was in

23    favor of or against when the laws were being

24    discussed?

25       A.  No, we were not in favor of that.

1    Q.   Your agency was opposed to it?

2    A.   We were.

3    Q.   All right.  Do you know why a notarized

4    complaint would be required?

5                MR. NANCE:  Objection; calls for

6    speculation.

7                THE COURT:  Overruled.  Go ahead.

8    A.   It was part of the legislation that was

9    amended into the -- into the legislation as it passed

10   through the general assembly.

11   Q.   *(BY MR. BASSETT)*  Okay.  To your knowledge,

12   Mr. Smith, was this part of the law something that any

13   of the poultry companies or officials with those

14   companies sought to have put in there?

15   A.   Not to my knowledge.

16   Q.   Okay.  Do you know, Mr. Smith, how much

17   manpower your agency devotes to plan-writing,

18   investigation of complaints of violations, or to

19   audits of compliance with plans in the Arkansas

20   portion of the IRW?

21                MR. NANCE:  Object to the form as

22   compound.

23                THE COURT:  Sustained.  Rephrase.

24   Q.   *(BY MR. BASSETT)*  Do you know how much

25   manpower your agency devotes to plan-writing in the

1    Arkansas portion of the IRW?

2        A.   Yes.  We -- approximately in the IRW, that

3    is -- we are -- the way we deal with that is by -- is

4    by contracts with the conservation districts to supply

5    technicians to do that.  Basically, we have at least

6    two -- two plan writers in each of the counties in the

7    IRW.  So for writing the plans itself, we have

8    provided approximately four individuals to write plans

9    in the Illinois River Watershed.

10       Q.   Do you know how much manpower your agency

11   devotes to investigation of complaints of violations?

12       A.   Investigations in the surplus nutrient areas

13   we have -- it's a combination of two things.  We do

14   have staff in our offices, four or five people, that

15   are available to do that.  But we also via our

16   contracts with the -- with placing the technicians in

17   the counties in the surplus nutrient areas, we have

18   another, oh, 15 or so individuals that are kind of our

19   first responders to where they're in place in the

20   counties so that they can be contacted for complaints.

21       Q.   Does your agency contract with the

22   conservation districts in each county?

23       A.   In each county, yes, sir, we do.

24       Q.   Okay.  Mr. Smith, can you give the court an

25   approximation of the amount of money that the State of

1   Arkansas is spending on plan writers and enforcement

2   activity on the Arkansas side of the Illinois River

3   Watershed?

4        A.   Oh, hundreds of thousands of dollars is spent

5   on plan-writing.

6        Q.   You earlier mentioned in your testimony,

7   Mr. Smith, a water quality criteria or standard for

8   scenic rivers implemented by the State of Oklahoma,

9   the 0.37 standard.  You recall that testimony, do you

10  not?

11       A.   I do.

12       Q.   Okay.  Is that something that your agency,

13  the Arkansas Natural Resources Commission, has set as

14  a target to be met in Arkansas at any particular time?

15       A.   We have not set it as a target because, as we

16  discussed before, we believe it to be unachievable.

17       Q.   All right.  Do you know whether any of your

18  counterparts in Oklahoma who you Interact with on

19  these issues through the Compact Commission, or

20  otherwise, share that same belief, that that standard

21  is not achievable?

22       A.   They never vocalized to me that --

23            MR. NANCE:  Objection.  It calls for

24  speculation, particularly if they never vocalized

25  it.

1          THE COURT:  Sustained.

2      Q.  *(BY MR. BASSETT)*  All right.  Mr. Smith, do

3  you know whether a TMDL for the Illinois River

4  Watershed has ever been considered by the State of

5  Oklahoma?

6      A.  It's been discussed several times in the past

7  at our Compact meetings the fact that -- that

8  Oklahoma, for example, their DEQ was considering

9  developing a TMDL for the watershed.

10      Q.  Okay.  Has one been done in Oklahoma to your

11  knowledge?

12      A.  Not to my knowledge.

13      Q.  Now, let me ask you -- or switch topics

14  here -- not really switch topics but move to a

15  different area.

16          Mr. Smith, are you aware that the

17  Environmental Protection Agency has now very recently

18  advised that it's doing a TMDL for the IRW?

19      A.  Yes.  We've been advised by the Dallas region

20  that they -- that they have moved forward with

21  starting their TMDL exercise on the Illinois River,

22  both in Arkansas and in Oklahoma.

23      Q.  That would be Region 6 of the EPA; is that

24  right?

25      A.  That's correct.

**United States District Court**

```
 1        Q.   Are you personally involved in that process,
 2   Mr. Smith?
 3        A.   Yes.   In this particular exercise, it's
 4   somewhat unusual.  But when the notice went out, the
 5   state asked to be involved early on in the writing in
 6   the production of this TMDL.  So representatives from
 7   both our DEQ -- our Department of Environmental
 8   Quality -- and the Natural Resources Commission were
 9   asked to give some technical advisors to work with the
10   contractor that they have selected to do that.  So
11   that's going to be my involvement in this exercise.
12        Q.   All right.  And has the EPA already selected
13   a contractor?
14        A.   They have.  It's AQUA TERRA, I believe.
15        Q.   All right.  Have you met, Mr. Smith, with the
16   EPA or anyone else about this current TMDL process?
17        A.   The EPA did call a meeting in November --
18             MR. NANCE:  Your Honor, I object.
19   That's nonresponsive to the question.
20             THE COURT:  Sustained.  The question
21   was, have you met with the EPA or anyone else about
22   this current TMDL process.
23        Q.   (BY MR. BASSETT)  Have you been to a meeting,
24   Mr. Smith?
25        A.   Yes, I have.
```

1    Q.   Where was that meeting?

2    A.   The meeting was in Dallas.

3    Q.   And on what date was that meeting?

4    A.   November the 20th.

5    Q.   All right.  And can you tell me who -- or

6    strike that.

7         You were there in what capacity?

8    A.   Representing the Natural Resources

9    Commission.

10    Q.   All right.  Are you in the process of getting

11    data and information to the EPA?

12    A.   We were advised that -- yes, we were.  And we

13    were advised at the meeting that this is -- this is --

14    they have initiated the study, they're in the early

15    phases --

16              MR. NANCE:  Your Honor, again it's not

17    nonresponsive and it's a narrative and it sounds a lot

18    like hearsay.

19              MR. BASSETT:  I'm just asking, Your

20    Honor, what data or what information that this

21    gentleman has been asked to provide.

22              THE COURT:  The objection as to the

23    answer is sustained.

24         The question, Mr. Smith, was, are you in the

25    process of getting data and information to the EPA.

1                    THE WITNESS:  Yes.  Yes, I am.

2        Q.   *(BY MR. BASSETT)*  And what would that data

3    and information be?

4        A.   That would be the data that we have

5    contracted for that would be useful to them in their

6    data acquisition.  For example, the data that's been

7    collected by the University of Arkansas through all of

8    the monitoring aspects that we've talked about before,

9    we wanted that to be made available to the contractor.

10       Q.   Okay.  If you've got your folder there, would

11   you please pull out Defendants' Joint Exhibit 8129?

12       A.   Twenty-nine?

13       Q.   Yeah, 8129.  Have you got that in front of

14   you there, Mr. Smith?

15       A.   I do.

16       Q.   All right.  Would you please tell the court

17   what this is?

18                    MR. NANCE:  I object to a reference to

19   this exhibit.  It's not in the pretrial order.  It was

20   just -- it was disclosed 72 hours ago, but there's

21   been no motion to amend the pretrial order to add this

22   exhibit and no demonstration of manifest injustice if

23   it doesn't come in.

24                    MR. BASSETT:  Your Honor, may I respond?

25                    THE COURT:  Yes, sir.

1          MR. BASSETT:  Okay.  To begin, no, it

2   was not on the pretrial order because this is

3   something that just occurred.  Of course, the pretrial

4   order was submitted months ago.

5          The reason why we are interested in

6   showing -- or trying to admit into evidence this

7   particular exhibit and several others is to kind of

8   follow up on the letter that the court allowed in --

9   or that was offered into evidence by the defendants

10  when Secretary Strong was on the witness stand.  That

11  was that letter -- actually, just for the record, that

12  was Defendants' Joint Exhibit 8090.

13         What we're trying to do here -- none of this

14  was available until just recently.  We think this is

15  relevant.  We thought the court might want to receive

16  this exhibit and several others to follow into

17  evidence in the interest of justice just to know what

18  the EPA is doing with respect to the TMDL since that

19  letter of October 1st went to commissioners -- or

20  excuse me -- to Secretary Strong and to Teresa Marks

21  of the Arkansas Department of Environmental Quality.

22         The process of developing the TMDL was

23  further down the road since that letter of October

24  1st, and we simply believe that this information would

25  be helpful to the trier of fact and this is something

1    that the trier of fact ought to know about.

2           And finally, Your Honor, when it comes time

3    for the court to reach a decision in this case, we

4    believe that the work being done by the EPA to develop

5    and prepare a TMDL for the IRW should be something

6    taken into consideration by the court.  This exhibit

7    and several to follow simply show what has transpired

8    since October 1st, what transpired at this meeting,

9    and what is being done.

10          MR. NANCE:  If I may, Your Honor.  The

11   whole point of a pretrial order and discovery cutoff

12   of listing exhibits and witnesses is to frame what's

13   going to be tried.  And, of course, there are things

14   going on outside the scope of this courtroom that

15   might be interesting, but we still have the pretrial

16   order to deal with and the issues that are presented.

17          In addition to the pretrial order issues, I

18   question the relevance of any meeting in Dallas to any

19   issue, even a remedy issue, because a TMDL, I think as

20   we maybe have beat the horse dead, doesn't have any

21   effect on nonpoint sources but only on permits under

22   the NPDES system.

23          I think you've ruled earlier on that the

24   Clean Water Act doesn't displace any issue here.  It's

25   not going to take over and solve the problem by a

 1    TMDL.  It's a distraction from the issues as they were

 2    framed.  It doesn't really have anything to do with

 3    any issue in the pretrial order.  It's just a rabbit

 4    trail that does not get us anywhere that the court

 5    needs to go to in dealing with the issues that have

 6    been framed.

 7                    MR. BASSETT:  Your Honor, may -- I'm

 8    sorry.  I didn't mean to interrupt Mr. Nance.

 9            I would like to point out -- and I think this

10    was clear from the Defendants' Joint Exhibit 8090 that

11    already came in -- that the TMDL by the EPA is

12    addressing both point and nonpoint sources of

13    phosphorus throughout the IRW?

14                    THE COURT:  That's what I thought.  I

15    thought that that was clear from the testimony of

16    Mr. Thompson --

17                    MR. BASSETT:  Yes.  Absolutely.

18                    THE COURT:  -- the day before we left;

19    correct, Mr. Nance?

20                    MR. NANCE:  Different -- different TMDL

21    effort.

22                    THE COURT:  No, I understand.  But it

23    all plays into the same issue.  It is a TMDL for the

24    IRW.  Mr. Thompson admits that he made the executive

25    decision to stop work on the TMDL.  They have a draft

1  TMDL in Oklahoma, but he believed it unfairly pointed

2  the finger at point sources rather than nonpoint

3  sources.

4         This obviously came in to this case by virtue

5  of the deposition of Mr. Thompson well before this

6  trial began.  I believe it was what, early in 2009

7  when Mr. Thompson's deposition was taken?

8                 MR. NANCE:  I believe so.  I don't

9  remember the date.

10                MR. BASSETT:  That's correct, Your

11  Honor.

12                THE COURT:  And I believe Mr. Thompson

13  talked about this being -- a TMDL being the best tool

14  we have available for dealing with pollution, point

15  and nonpoint source, did he not?

16                MR. NANCE:  He did.  But he said it was

17  unfair because it allocated the cuts to the point

18  sources rather than to the nonpoint sources.

19                THE COURT:  I understand.  But, I mean,

20  we have to get to the truth here.

21         It seems to me that it begs the question as

22  to how far along in this TMDL process we are.  Any

23  ideas?  Maybe we're trying to look in a crystal ball.

24                MR. BASSETT:  Your Honor, I --

25                THE COURT:  Mr. Bassett.

1              MR. BASSETT:  I can -- are you wanting

2    me to ask the witness or respond to that?

3              The TMDL process is moving forward which is

4    what Mr. Smith who's been at the meeting is prepared

5    to testify to.  They also have a time line that's been

6    established and also have established when they want

7    to complete it, the entire TMDL process.

8              MR. NANCE:  It just started, Judge.

9    This was the organizational meeting.

10             THE COURT:  Well --

11             MR. BASSETT:  I don't want to keep

12   arguing back and forth.  I'll respond if the judge

13   wants anything.

14             THE COURT:  I understand.  I don't know

15   that it's necessary that we know who was at this

16   meeting.  We already had testimony that it occurred on

17   November 20th, 2009.

18             The objection's sustained as to Defendants'

19   Joint Exhibit 8129.

20             MR. BASSETT:  Okay.

21        Q.   *(BY MR. BASSETT)*  Mr. Smith, has the

22   EPA based on -- you attended this meeting; correct?

23        A.   Yes, sir, I did.

24        Q.   And we've already established it was on

25   November the 20th of 2009?

1      A.   Yes, sir.

2      Q.   Has a time frame or time line been

3   established for this TMDL process?

4      A.   Yes.  We were -- we were advised that EPA

5   expects the time frame to be about 18 months to

6   complete the TMDL.

7      Q.   All right.  Now, we're not going to put in --

8   because I've listened very carefully to the judge, I'm

9   not going to put in the attendee list, but you've

10   already told us that you were at that meeting.  Was

11   any representatives from the state agencies in

12   Oklahoma at that meeting?

13      A.   There were.

14      Q.   Who was there from Oklahoma?

15      A.   Jon Craig was there and Mark --

16      Q.   Derischweiler?

17      A.   Derischweiler.  Thank you.

18      Q.   All right.  I hope the court reporter doesn't

19   want me to spell that.

20           Anybody else from Oklahoma that was at that

21   meeting?

22      A.   That was the only Oklahoma attendees that I

23   recall.

24      Q.   Were there other representatives from

25   Arkansas agencies at that meeting?

1    A.    There were.  Our DEQ had several

2  representatives there, including their director,

3  Teresa Marks.

4    Q.    All right.  Obviously, there were

5  representatives there from the Environmental

6  Protection Agency?

7    A.    Oh, several.

8    Q.    Now, the contractor, AQUA TERRA, did they

9  have representatives at that meeting?

10    A.    My recollection is they had two members of

11  their staff there.

12    Q.    Okay.  Was there -- strike that.

13          To your knowledge, has any change to the .037

14  standard been considered so far as a part of the TMDL

15  process now going on with the EPA?

16    A.    Well, going back to our statement of joint

17  principles, we certainly expect Oklahoma to complete

18  their review of that standard.  There was discussion

19  at the meeting itself about what would occur were

20  Oklahoma to change that standard.

21    Q.    Okay.  I'll stop you right there.  I'm not

22  going to ask anything else that was said by anybody.

23          Okay.  Just for the record, Mr. Smith, what

24  is your understanding about whether the TMDL by the

25  EPA will address both point and nonpoint sources of

1   phosphorus throughout the IRW?

2       A.   Yes, it would have to.  You know, it would

3   look at really -- in that arena really three things.

4   It looks at background loading that would -- that

5   occurs.  It also looks at the contribution of point

6   and nonpoint sources.

7       Q.   Do you have an understanding -- based on your

8   involvement in this process and your attendance at the

9   meeting and so forth, do you have an understanding as

10  to whether hydrologic water quality models will be

11  used by the EPA contractor to develop the TMDL?

12      A.   There are actually three models that were

13  discussed as potential models that would be used by

14  the contractor.

15          MR. NANCE:  Your Honor, this is hearsay,

16  discussing what people said at the meeting.

17          THE COURT:  Sustained.

18      Q.   *(BY MR. BASSETT)*  Do you have personal

19  knowledge as to what models are going to be -- are

20  being considered for use, Mr. Smith?

21      A.   I do.

22          MR. NANCE:  It would necessarily be

23  based on hearsay from discussions at the meeting.

24          THE COURT:  Sustained.

25      Q.   *(BY MR. BASSETT)*  When the TMDL is completed,

 1   Mr. Smith, what's your understanding of the effect it

 2   would have on the activities in the IRW?

 3              MR. NANCE:  Your Honor, calls for

 4   speculation.  It's 18 months out.

 5              THE COURT:  Well, regardless of the

 6   number of months out, I do believe it's speculative.

 7   Sustained.

 8       Q.  *(BY MR. BASSETT)*  Well, however --

 9              MR. BASSETT:  Well, strike that, Your

10   Honor.  Just one moment here.  Your Honor, if I could

11   have just one moment?

12              THE COURT:  Yes, sir.

13          *(Discussion held off the record)*

14       Q.  *(BY MR. BASSETT)*  Have goals been set by the

15   EPA in this process?

16              MR. NANCE:  Object to the form.  It's

17   vague.

18       Q.  *(BY MR. BASSETT)*  Are you -- strike that.

19          Are you part of the planning process,

20   Mr. Smith, in connection with the group that's been

21   formed for the --

22       A.  Yes.  I've been named as one of the technical

23   advisors at EPA's request.

24       Q.  All right.  What goals have been set?

25              MR. NANCE:  Relevance, Judge.  And,

1  again, it would be based on hearsay.

2           THE COURT:  Well, he's part of the

3  planning process in this group so he would be -- well,

4  let's firm this up.  Sustained.

5           Go ahead, Mr. Bassett.

6      Q.   *(BY MR. BASSETT)*  Okay.  You have already

7  testified you're a part of the process and you are a

8  part of this group; correct?

9      A.   That's correct.

10     Q.   Okay.  And you were also providing

11 information that's been requested, data and

12 information?

13     A.   That's true.  We were told that this was the

14 initiation of it in the data-gathering phase.

15          It might be good to point out, Your Honor,

16 that typically --

17          MR. NANCE:  He's telling us what he's

18 been told and what's been said at the meeting; it's

19 hearsay.

20          THE COURT:  I don't know that to be the

21 case.  Overruled.

22          Go ahead.

23     Q.   *(BY MR. BASSETT)*  Go ahead.

24     A.   Normally, the TMDLs are done, a contractor is

25 hired, he goes through and he completes his TMDL work,

1    and then that document is presented for comment by EPA

2    before, and then it comes back and EPA either -- it

3    goes through their adoption procedures.

4         This is somewhat unusual in that EPA has

5    allowed the states to have input into the process as

6    the contractor's going through the process itself.  So

7    just pointing out that this is an unusual case and

8    departs from their typical way that a TMDL process is

9    developed.  We're quite grateful that they are because

10   of the importance this TMDL has for the entire

11   watershed.

12       Q.   Okay.  Mr. Smith -- and you may have touched

13   on this briefly earlier -- with regard to the 319

14   programs in the IRW that your agency's been involved

15   in, there was some discussion about the CREP program,

16   conservation reserve enhancement program, you briefly

17   mentioned that earlier.

18        Can you tell us what is now ongoing in the

19   IRW with that CREP program that your agency's involved

20   in?

21       A.   Well, it's -- it has -- we finally got the go

22   ahead.  It's underway right now.  They're going

23   through the sign-up procedure for individuals to sign

24   up for those cost-share provisions on their property

25   right now.  It's in that initiation phase so our task

9558

 1   right now is to get the word out that those are

 2   available.  So we're involved in the information -- in

 3   that information exchange right now as well as

 4   providing administration help to the federal agencies

 5   in that project.

 6       Q.   Okay.  And is the federal government involved

 7   in these 319 programs in any way?

 8       A.   Well, EPA is involved in the 319 programs,

 9   yes, sir, they are, heavily.

10       Q.   All right.  And how are they involved?

11       A.    Well, for two ways.  First of all,

12   they're -- they're the funding vehicle for the

13   projects themselves.  As well as when we receive our

14   allocation for funding in the year we know how much

15   money there is, then we take that and we propose

16   projects to utilize that funding, the funds that are

17   made available.  All of those proposals and

18   applications go to Dallas for approval so each project

19   that we fund through the 319 project has to be

20   approved by Dallas.

21       Q.   Okay.  With regard to the studies of the

22   watershed that are a part of the programs sponsored by

23   your agency in the IRW, does your agency provide

24   reports or results to the federal government or to the

25   EPA on the results of those projects?

1      A.   We do.  We're required to submit an annual

2   report to EPA on the results of those projects

3   annually.

4      Q.   Have there been any nonpoint source

5   comprehensive management plans or strategies developed

6   by your agency for the IRW?

7      A.   Oh, yes, sir, there have.

8      Q.   Such as?

9      A.   Well, I mentioned the annual reports

10  themselves, as well as our overall nonpoint management

11  plan that's also a requirement by EPA.

12     Q.   And why is that a requirement?

13     A.   Well, recently in the last several years, EPA

14  has informed us that a nine-element watershed plan is

15  going to be required in order to continue to receive

16  funds.  So in each of the watersheds that we're

17  having -- we're underway with development of what they

18  call their nine-element watershed plan.

19     Q.   Is it your understanding, Mr. Smith, that

20  your agency, the Arkansas Natural Resources

21  Commission, has legal authority and jurisdiction in

22  Arkansas over agricultural nonpoint-source discharges

23  in nutrient-sensitive watersheds?

24     A.   We do.

25     Q.   Okay.  And in that role, what has been your

1    experience, as far as the EPA's interest and

2    involvement with what your agency does, with regard to

3    nonpoint sources in the IRW?

4        A.   Well, they're certainly quite interested in

5    that, and as I mentioned, we do report those things to

6    them on an annual reports.

7        Q.   Okay.  To your knowledge, has the EPA or any

8    other federal agency ever directed your agency, the

9    Arkansas Natural Resources Commission, that land

10   application of dry poultry litter constitutes a

11   nuisance in the IRW?

12       A.   No, sir.

13       Q.   To your knowledge, has the EPA or any other

14   federal agency ever taken action to eliminate or limit

15   dry poultry litter applications in the IRW?

16       A.   No, sir.

17       Q.   Has the EPA or any other federal agency ever

18   informed you or your agency that a Nutrient Management

19   Plan that Arkansas has adopted or endorsed is

20   violating either state or federal law in any

21   environmental media?

22       A.   No, sir.

23            MR. BASSETT:  Your Honor, might I have

24   just a moment?

25            *(Discussion held off the record)*

**United States District Court**

 1          MR. BASSETT:  Your Honor, I'm just about

 2   done, but I'm going to make one more stab at something

 3   that I fell a little short on and I promise I'll sit

 4   down.

 5          THE COURT:  All right.

 6          MR. BASSETT:  This goes back to the

 7   questions I was asking about the TMDL -- EPA TMDL.

 8      Q.   (BY MR. BASSETT)  Mr. Smith, as part of the

 9   planning process, have you been advised of the models

10   that are being considered by the contractor -- the EPA

11   contractor on the TMDL?

12      A.   Yes, sir.

13          MR. NANCE:  Hearsay, Your Honor.

14          THE COURT:  Sustained.

15          MR. BASSETT:  Okay.  I think, Your

16   Honor, a real smart lawyer might be able to figure out

17   a way to get around that, but I can't.  So I'm going

18   to -- unless somebody over here tells me I have

19   something else -- Your Honor, just one moment.

20          THE COURT:  All right.  Mr. Smith, with

21   regard to one of the questions that Mr. Bassett asked

22   you, he asked whether the EPA had ever directed your

23   agency that land application of dry poultry litter

24   constitutes a nuisance.

25          Does the EPA ever make the determination of

1    whether or not something constitutes a nuisance?

2                    THE WITNESS:  You know, probably not.  I

3    would suspect that it would be through the 305(b)

4    reports where impaired watersheds are listed.

5                    THE COURT:  Yeah.  They don't make

6    determinations of specific nuisances, do they?

7                    THE WITNESS:  Not that I'm aware of.

8                    THE COURT:  Right.

9                    MR. BASSETT:  Your Honor, I apologize,

10   but I want to take one more run here.

11        Q.   *(BY MR. BASSETT)*  Mr. Smith, would you pull

12   out from your packet Defendants' Joint Exhibit 8131?

13             *(Discussion held off the record)*

14        A.   Yes, sir, I have it.

15        Q.   *(BY MR. BASSETT)*  All right.  Let me ask you

16   a few questions about it.

17             At the meeting with the EPA in Dallas on

18   November 20th of 2009, was a PowerPoint presentation

19   made to you and other attendees on water quality

20   modeling?

21        A.   Yes, sir, it was.

22        Q.   And did the PowerPoint discuss the models

23   that were being considered to model the watershed?

24        A.   They were.

25        Q.   Did the PowerPoint discuss the model that was

1   being considered to model the in-stream processes?

2     A.   It did.

3     Q.   Okay.  And Defendants' Joint Exhibit 8131

4   that you're holding in your hands there, is that the

5   PowerPoint that was presented to you and to the other

6   attendees at the meeting in Dallas on November 20th?

7     A.   Yes, sir, it is.

8            MR. BASSETT:  Okay.  Your Honor, I would

9   move into evidence Defendants' Joint Exhibit 8130.

10           MR. NANCE:  In addition to the timing

11   issues and the pretrial order issues we've mentioned

12   before, Your Honor, it's still hearsay.  It's an

13   out-of-court statement that's being offered for the

14   truth of the matter.

15           THE COURT:  Sustained.

16           MR. BASSETT:  I pass the witness, Your

17   Honor.

18           THE COURT:  Mr. Nance.

19           MR. NANCE:  Your Honor, in the spirit of

20   the season, I would like to point out that I've talked

21   with counsel from Ole Miss about how cooperative my

22   OSU Cowboys were in helping them in the Cotton Bowl.

23           THE COURT:  The offense, not the

24   defense.

25           MR. NANCE:  Enough said.

1                    **CROSS-EXAMINATION**

2    **BY MR. NANCE:**

3        Q.   Good morning, Mr. Smith.

4        A.   Good morning, sir.

5        Q.   You were on the engineering committee for the

6    Compact Commission and such.  In your normal

7    day-to-day work, what sort of engineering do you do

8    for the ANRC?

9        A.   Well, I'm a civil engineer by training.  I'm

10   really in a supervisor role right now, you know, in my

11   context now, but it's basically in the civil

12   engineering connotation.

13       Q.   Well, doesn't your particular part of the

14   ANRC deal more with making sure that sufficient

15   quantities of water are available rather than water

16   quality?

17       A.   Oh, certainly the major thrust of our agency

18   is water quality.  This nonpoint is the one element of

19   the quantity issue that we have.  Our DEQ certainly

20   handles the bulk of the water quality issues in the

21   state of Arkansas.

22       Q.   Isn't most of your work personally quantity

23   rather than quality?

24       A.   Yes, sir, it certainly is.  That's a fair

25   statement.

1    Q.   And is your particular section of the ANRC

2    the one that does the sampling or contracts the

3    sampling?

4    A.   No.  We made the choice long ago rather than

5    to try to staff up to do sampling, that it would be

6    much more efficient for us to rely on data that was

7    being gathered by others and contract those parts that

8    we needed.

9    Q.   But is your particular section the one that

10   does the contracts?

11   A.   Yes.

12   Q.   Okay.  Now, in the monitoring that you

13   do -- well, let me -- you do monitoring for the

14   Compact Commission work, the 40 percent reduction

15   work, that was the same kind of monitoring that was

16   done for the Clean Lakes study; is that right?

17   A.   Yes, sir, that's correct.

18   Q.   And you don't use for that purpose the

19   intensive monitoring that you do at the state line --

20   or your contract done at the state line?

21   A.   That's true, and precisely for that reason.

22   It needed to be gathered in the same manner than the

23   baseline data was gathered for the Clean Lakes

24   study.

25   Q.   And how do you gather that baseline data?

1          A.   We simply utilized the data that had been

2     collected in that same time frame, the 1980 to 1993.

3          Q.   I'm sorry.  I wasn't clear.

4               As you get new data, like the baseline data,

5     how do you collect that new data?

6          A.   Well, since the data back in that time frame

7     was selected by our DEQ, we simply rely on the

8     continued collection of that data by our DEQ to use

9     for the -- for the calculations of the annual

10    loadings.

11         Q.   So does the DEQ go out periodically at these

12    four stations and take a sample?

13         A.   Yes, sir, they do.

14         Q.   How often do they go out, sir?

15         A.   I believe monthly, bimonthly, something like

16    that.

17         Q.   So they go out one or two times a month and

18    take a sample?

19         A.   That's correct.

20         Q.   Do they have a set schedule that they use

21    when they go out there to do those samples?

22         A.   Pretty much the same time every

23    month -- every month.  On the same frequency every

24    month.

25         Q.   And then when they get that data, do they do

1    an average -- or the average readings for the month

2    and that's rolled into your five-year average -- to

3    your year and then into your five-year average?

4        A.   Yeah.   Yes, sir, they were.   And that's the

5    reason these particular stations were utilized because

6    they are at the same point that there is a USGS, U.S.

7    Geological Survey, flow gauge.   So we have available

8    at that point the concentrations of the element that

9    we're monitoring as well as we know what the flow was

10   when that sample was taken.

11       Q.   Okay.   Now, this 40 percent reduction that

12   you told the court about, that would be intended

13   simply to stabilize the level of eutrophication in

14   Lake Tenkiller; right?

15       A.   That's my understanding of the -- of the

16   conclusions of that study was that a 40 percent

17   reduction would stabilize eutrophication in Lake

18   Tenkiller.

19       Q.   Now, the exhibit that was admitted, 3573,

20   that's for calendar year 2007; isn't that right?

21       A.   I believe so, sir.

22       Q.   You've seen the data from -- that was

23   collected during calendar year -- well, calendar year

24   2009 for 2008 data?   Haven't you seen that?

25       A.   Yes.   We -- the Compact meets in September so

1    there's one prepared every year.  So yes, sir, it was.

2        Q.    And in point of fact, didn't the phosphorus

3    levels for 2008 data go back up over the 40 percent

4    reduction?

5        A.    Not with the five-year rolling average, no,

6    sir.

7        Q.    I'm just talking about the data for that one

8    year.

9        A.    Well, for that one year, I'd have to look and

10   make sure.  But as we pointed out, the reason for the

11   five-year rolling average is to dampen out those

12   climatological changes that we see, the variations in

13   rainfall that we have.  That was a key part of the

14   calculations that we agreed to.

15       Q.    Look at Exhibit 3573, if you would, please.

16   Let's flip back to --

17       A.    Seventy-three?

18       Q.    That's the -- that's your report.

19       A.    Yes, sir, I have it here.

20       Q.    Okay.  Let's look at page 8 in particular.

21   That's the one that has the annual readings of the

22   data.

23            Do you see the reading for the Illinois River

24   south of Siloam Springs there on the left-hand side of

25   the page?

9569

1      A.   Yes, sir, I do.

2      Q.   It shows for 19 -- for 2006 rather -- a flow

3  of 290 cubic feet per second; isn't that right?

4      A.   Yes, sir, that's correct.

5      Q.   And that's one of the lower flows that are

6  listed there for that station; right?

7      A.   Certainly it is, yes.

8      Q.   And that's because 2006 was a pretty dry

9  year; right?

10      A.   Yes, sir.

11      Q.   And you're not telling the court that if a

12  wet year came along, that you wouldn't get more

13  loading at that station, are you?

14      A.   Well, yes, sir.  Typically, if you have more

15  runoff, you will -- you will have more phosphorus pass

16  that point.  If you -- as a matter of fact, if you

17  just look up, if you look at 1990 and 1993 in that

18  same table, you will see that there were high flows

19  during -- during those years.

20          So what we experienced -- and that's one of

21  the things the engineering committee struggled with --

22  is how do you account for, how do you understand not

23  only what's happening on the ground, but how does that

24  flow regime, how does the rainfalls, the wet and dry

25  years, interact in that?

1          And not only that, since this is a -- this is

2     a standard that's set up for Lake Tenkiller itself,

3     what happens in those wet years -- the Clean Lakes

4     study didn't address storm flows, for example.  What

5     happens when you have a storm flow?

6          We know from our intensive modeling that

7     sometimes 70 or 80 percent of the phosphorus loading

8     happens in those storm events.  What happens when that

9     gets to Tenkiller?  Does it blow past Tenkiller?  Does

10    it just go on out?

11          There were storm flows in 1980 to '93, but

12    the contractors didn't have this kind of data

13    available to them.  So this whole regime of wet/dry

14    years is one that we struggled with to try to

15    understand and are still trying to understand.  You

16    know, our recent modeling efforts try to encompass

17    some of these storm flow events now.  Both Arkansas

18    and Oklahoma --

19         Q.   Okay.

20         A.   -- are trying to capture that to have a

21    little better understanding of what happens in these

22    storm flow events.

23         Q.   And you say the people that did the Clean

24    Lakes study didn't study storm flow events?

25         A.   Well, they didn't have the data.  There was

 1    not a body of data that specifically recorded those

 2    storm flow events.  They were all done, as you suggest

 3    in your thing, that periodically at set times of the

 4    month they were taken.  So it was hit or miss as to

 5    whether they captured a storm flow event.  If it

 6    occurred on the days that sampling did, then yeah, you

 7    got a reading for a storm flow.  If it didn't occur,

 8    then of course you missed that storm flow.

 9         Q.   Right.  And you have maintained that

10    particular sampling regime in your reports to the

11    Compact Commission?

12         A.   Oh, certainly.  And as I mentioned, it's the

13    only way we can get a true comparison via the Clean

14    Lakes study to compare that to see how we're making

15    progress toward the 40 percent goal.  If we did

16    anything differently, then we would be comparing --

17    the data wouldn't be consistent with what the

18    contractor used in the preparation of the Clean Lakes

19    study.

20         Q.   And you would have to agree with me that the

21    sampling regime you're using now does not catch most

22    of the storm flow?

23         A.   Oh, I'd certainly -- it would be remarkable

24    if it collected -- if it caught all the storm flow

25    events.

1        Q.   Okay.   And so 70 or 80 percent of the flow of

2   the phosphorus loading comes out in storm flow events;

3   right?

4        A.   Typically -- you know, it depends.   For

5   example, if you have a -- if you have a long dry

6   period and then have a real heavy rainfall event,

7   you're going to see a lot of phosphorus movement.   If

8   you've had one storm event and then right behind that

9   another front comes through and then another front

10  comes through, you'll see -- you know, you'll see less

11  of it.   It's that first flash after a long dry period

12  that you typically will see a lot more of the

13  phosphorus movement.

14       Q.   All right.   And that's because the flash

15  after a dry spell moves a lot of phosphorus off the

16  soil surface and into the streams?

17       A.   And stirs up some of the sediments in the

18  stream itself.   So the point being that you got to

19  understand the context of that.   It's not just the

20  storm event.   It's also when the storm event occurred

21  and what's occurred prior to that to really get a good

22  feel for what's happening in the watershed itself.

23  And these are all things that we have learned from

24  that intensive monitoring that we have done.

25       Q.   But at least part of what happens is that

 1    there's a lot of phosphorus that's moved off the land

 2    by that storm and into the streams?

 3              MR. MCDANIEL:  Excuse me, Your Honor.

 4    Mr. Nance objected that this was not a disclosed

 5    witness and the court honored those objections, and

 6    now he's trying to make him into an expert on the

 7    stand.  I object.

 8              THE COURT:  Sustained.

 9              MR. NANCE:  Your Honor, may I approach?

10              THE COURT:  Yes, sir, you may.

11        Q.   *(BY MR. NANCE)*  You said a moment ago you'd

12    have to look at the figures on last year's report.

13    I've handed you what is a draft of the Arkansas water

14    quality monitoring report that shows calendar year

15    2008 data.

16         Are you familiar with that?

17        A.   Yes.

18        Q.   Let us just look -- I didn't give one to the

19    court.

20              MR. NANCE:  Your Honor, would you like

21    one of these?

22              *(Discussion held off the record)*

23              MR. HOPSON:  Is there an exhibit number?

24              MR. NANCE:  No.  I'm just using this for

25    examination of him and for impeachment.

**United States District Court**

 1              MR. MCDANIEL:  Your Honor, I think we

 2    need a little foundation since this is purported to be

 3    from the commission, it's got handwriting on it, a

 4    draft.  I think it's inappropriate to start using it

 5    for cross-examination without any foundation for this

 6    information whatsoever.

 7              THE COURT:  Overruled.  Go ahead.

 8         Q.   *(BY MR. NANCE)*  Does this appear to be a

 9    draft of the Arkansas portion of the report to the

10    commission?

11         A.   Yes, sir, it does.

12         Q.   Okay.  And --

13              MR. TUCKER:  Your Honor, I'd like

14    something a little bit more definitive that it appears

15    to be.

16         Q.   *(BY MR. NANCE)*  Is it a draft?

17         A.   It's a draft, yes.

18         Q.   Okay.  Is it something that someone in your

19    agency has prepared?

20         A.   My staff prepares the Arkansas portion of the

21    report for the Compact Commission.

22         Q.   And is it a true and correct copy of the

23    document that you or your staff prepares?

24         A.   It appears to be.

25         Q.   Let's look at the bottom of the second page

**United States District Court**

1    and talk about the data that was gathered in -- well,

2    the five-year data first for 2008.  Let's again look

3    at that Arkansas River ARK06 station.  Do you see

4    that?

5        A.   I do.

6        Q.   And the five-year average went up

7    substantially from the '03-'07 period to the '04-'08

8    period, did it not?

9        A.   It did.

10       Q.   Okay.  And would that have been as a result

11   of having a wet year like we talked about before?

12       A.   It certainly would, in that there's nothing

13   that's happened on the watershed that would induce

14   that kind of change.

15       Q.   Okay.  Let's look at the next to last page,

16   Mr. Smith, because these are not numbered.

17       A.   Next to last.  Okay.

18       Q.   Again, do you see there on the left side of

19   the page the Illinois River south of Siloam Springs

20   data?

21       A.   I do.

22       Q.   Let's look again at the year 2008.  And would

23   you tell the court what the flow for that year was?

24   Are these average flows, by the way?  I'm sorry.

25       A.   Yeah.  These are annual flows.

1      Q.   Annual flows.

2      A.   Average annual flows.

3      Q.   Okay.  That was a wet year, was it not?

4      A.   Oh, it certainly was.

5      Q.   And so the cubic feet per second went up?

6      A.   It did.

7      Q.   As did the total phosphorus in terms of

8   milligrams per liter?

9      A.   Yes, it did.

10      Q.   And so both flow and concentration went up?

11      A.   Uh-huh.

12      Q.   And as a result, the loading there in the

13   loading column went up; is that right?

14      A.   It did.

15      Q.   Okay.

16      A.   Interestingly, if you look at the 2008 figure

17   and you go back up to, say, the 1990 and 1993 levels

18   where the flows were higher, it's interesting to note

19   that the loadings in 1990 was 0.2; in '93, it was .18;

20   and then in 2008, it was .15.

21           And as you pointed out, those are the three

22   wettest years that we've had, you know, in our listing

23   there.  It's interesting to us that although the flows

24   are back in approaching those things, that the

25   concentrations of phosphorus are lower than they were

1    back a decade ago.

2        Q.    Okay.  Would that be in part because of the

3    reductions in the point-source discharge that you

4    talked about on direct?

5        A.    Oh, certainly the advances that -- the

6    municipalities really should be commended for

7    the -- for the money that they've spent on phosphorus

8    reduction units, and I think that certainly a portion

9    of that has to be attributed to the nonpoint projects

10   that we've put in place, to the Nutrient Management

11   Plans, to the efforts that Arkansas has made to try to

12   reduce the phosphorus in the streams.

13       Q.    Do you review the Oklahoma reports --

14       A.    They're prepared by Oklahoma, but we do --

15   the engineering committee reviews those reports prior

16   to the meeting with the commissioners themselves and

17   we go over that.  Then at the meeting itself, then the

18   total report is given to the commissioners.

19       Q.    Do you recall that the report for calendar

20   year 2008 showed the phosphorus levels going up at all

21   of the Oklahoma stations?

22            MR. MCDANIEL:  Objection; assumes facts

23   not in evidence.

24            MR. NANCE:  I'm asking him if --

25            THE COURT:  Overruled.

**United States District Court**

1    Q.   *(BY MR. NANCE)*   You can answer.

2                  MR. MCDANIEL:   Representation to the

3    witness as a fact.

4                  THE COURT:   Overruled.

5    A.   Yeah.  My memory is that that's true, that it

6    was.  It's going to be interesting, I think, to see

7    what happens in 2009 because many stations in

8    Arkansas -- this is going to be the year of record for

9    rainfall.  Little Rock had over 80 inches of rain.

10   Normally, Arkansas in this area, you know, we see 48

11   to 50 inches of rain.  Be interesting to see what

12   happens this time on such an exceedingly wet year,

13   what happens to these next set of computations as we

14   go through those.

15          But if the point is, do we see more

16   phosphorus flow in wet years and less phosphorus flow

17   in dry years?  The documentation certainly shows that.

18   That's a fact.

19   Q.   And so you would not want the court to leave

20   today with the belief that the 40 percent reduction

21   figure has been arrived at and will be maintained

22   indefinitely into the future?

23   A.   Oh, you can look at the records and say that

24   unless we have record years that keep going like this,

25   that the efforts underway have achieved that 40

*9579*

1    percent reduction goal.

2              MR. NANCE:  Judge, this would be where I

3    would transition, if you'd like to break for lunch.

4              THE COURT:  Let's do so.  Let's be back

5    at 1:15.

6              *(The proceedings were recessed)*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**United States District Court**

*9580*

1                C E R T I F I C A T E

2

3

4          I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11          I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16          In witness whereof, I have hereunto set my

17   hand this 4th day of January 2010.

18
                      s/ Brian P. Neil
19          _____
                Brian P. Neil, CSR-RPR, CRR, RMR
20              United States Court Reporter

21

22

23

24

25

**United States District Court**