IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,    )
W.A. DREW EDMONDSON, in his   )
capacity as ATTORNEY GENERAL  )
OF THE STATE OF OKLAHOMA,     )
et al.                        )
                              )
            Plaintiffs,       )
                              )
vs.                           )    No. 05-CV-329-GKF-PJC
                              )
TYSON FOODS, INC., et al.,    )
                              )
            Defendants.       )


VOLUME 84 - AM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 5, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE


*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                     *United States Court Reporter*


**United States District Court**

1                          A P P E A R A N C E S

2

3    For the Plaintiffs:          MR. W.A. DREW EDMONDSON
                                  MS. KELLY FOSTER
4                                 Office of Attorney General
                                  State of Oklahoma
5                                 313 N.E. 21st St.
                                  Oklahoma City, OK  73105
6

7                                 MR. DAVID RIGGS
                                  MR. DAVID P. PAGE
8                                 MR. RICHARD T. GARREN
                                  Riggs Abney Neal
9                                 Turpen Orbison & Lewis
                                  502 W. 6th Street
10                                Tulsa, OK 74119

11

12                                MR. ROBERT A. NANCE
                                  MS. KELLY FOSTER
13                                Riggs Abney Neal
                                  Turen Orbison & Lewis
14                                5801 Broadway
                                  Oklahoma City, OK 73118

15

16                                MR. LOUIS W. BULLOCK
                                  MR. ROBERT BLAKEMORE
17                                Bullock Bullock &
                                  Blakemore
18                                110 W. 7th St.
                                  Suite 770
19                                Tulsa, OK 74119

20                                MR. FREDERICK C. BAKER
                                  MS. ELIZABETH CLAIRE XIDIS
21                                MS. INGRID L. MOLL
                                  Motley Rice LLC
22                                28 Bridgeside
                                  P.O. Box 1792
23                                Mount Pleasant, SC 29465

24

25

United States District Court

1              A P P E A R A N C E S  (Cont.)

2

   For Tyson Foods:              MR. ROBERT W. GEORGE
3                                Tyson Foods, Inc.
                                 2210 West Oaklawn Drive
4                                Springdale, AR 72701

5

                                 MR. FRANK R. VOLPE
6                                MR. MARK D. HOPSON
                                 MR. THOMAS C. GREEN
7                                MR. JAY THOMAS JORGENSEN
                                 MR. GORDON D. TODD
8                                ERIC J. IVES
                                 CARA R. VIGLUCCI LOPEZ
9                                Sidley Austin LLP
                                 1501 K St. NW
10                               Washington, DC 20005

11

                                 MR. PATRICK MICHAEL RYAN
12                               Ryan Whaley Coldiron and
                                 Shandy PC
13                               119 N. Robinson, Rm 900
                                 Oklahoma City, OK 73102

14

15

   For Cargill:                  MR. JOHN H. TUCKER
16                               MS. THERESA HILL
                                 Rhodes Hieronymus Jones
17                               Tucker & Gable
                                 100 W. 5th St., Ste 400
18                               Tulsa, OK 74103

19                               MR. DELMAR R. EHRICH
                                 MS. KRISANN KLEIBACKER LEE
20                               Faerge & Benson
                                 90 S. 7th St., Ste 2200
21                               Minnaepolis, MN 55402

22

23 For Simmons Foods:            MR. JOHN R. ELROD
                                 MS. VICKI BRONSON
24                               Conner & Winters
                                 211 E. Dickson St.
25                               Fayetteville, AR 72701

**United States District Court**

9729

```
 1                A P P E A R A N C E S  (Cont.)

 2

 3    For Peterson Farms:          MR. A. SCOTT MCDANIEL
                                   MR. PHILIP HIXON
                                   MS. NICOLE LONGWELL
 4                                 McDaniel Hixon Longwell &
                                   Acord PLLC
 5                                 320 S. Boston, Ste 700
                                   Tulsa, OK 74103
 6

 7

 8    For George's:               MR. GARY V. WEEKS
                                   MR. WOODY BASSETT
                                   MR. VINCENT O. CHADICK
 9                                 MS. K.C. TUCKER
                                   Bassett Law Firm
10                                 P.O. Box 3618
                                   Fayetteville, AR 72702
11

12

13    For Cal-Maine:              MR. ROBERT SANDERS
                                   Young Williams P.A.
                                   P.O. Box 23059
14                                 Jackson, MS 39225

15

16                                 MR. ROBERT P. REDEMANN
                                   Perrine McGivern Redemann
                                   Reid Berry & Taylor PLLC
17                                 P.O. Box 1710
                                   Tulsa, OK 74101
18

19

20

21

22

23

24

25
```

*9730*

1                                I N D E X

2

3                                                                Page

4

5    *WITNESSES ON BEHALF OF THE DEFENDANTS*

6

7    **STEVEN LARSON**

     Continued Direct Examination by Mr. McDaniel        9731
8    Cross-Examination by Mr. Garren                      9750

9

     **BILLY R. CLAY, DVM.**
10
     Direct Examination by Mr. Tucker                     9802
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

**United States District Court**

1                    Tuesday, January 5, 2010

2                          *  *  *  *  *

3                    MR. MCDANIEL:  Morning, Your Honor.

4                    THE COURT:  Good morning.  Mr. Daniels,

5    you may resume.

6                    MR. MCDANIEL:  Thank you.

7                 **CONTINUED DIRECT EXAMINATION**

8    **BY MR. MCDANIEL:**

9         Q.   Good morning, Mr. Larson.

10        A.   Good morning.

11        Q.   When we ended yesterday, we had just finished

12   talking about Defendants' Joint Exhibit 1629 which is

13   figure 6 to your report, the histogram displaying the

14   distribution of ratios of phosphorus to copper

15   comparing the edge-of-field samples to the water well

16   samples; right?

17        A.   The ratio of copper to phosphorus, yes.

18        Q.   Right.  Did you use this analytical technique

19   for any of the other key constituents that Dr. Fisher

20   used in his analysis?

21        A.   Yes.  I also did the same evaluation using

22   the ratios of zinc to phosphorus.

23        Q.   All right.  Would you look, sir, at what's

24   been marked for identification as Defendants' Joint

25   1630 and identify that for the record?

9732

1       A.   Yes.   This is a figure that I prepared for my

2  report.

3       Q.   Okay.   Figure 7 from your report?

4       A.   Yes.

5       Q.   Sir, was this figure based upon Dr. Fisher's

6  data?

7       A.   Yes, it was.

8       Q.   Was the figure prepared by you or under your

9  direction?

10       A.   Yes, it was.

11            MR. MCDANIEL:   Your Honor, defendants

12  offer Defendants' Joint Exhibit 1630 for admission.

13            MR. GARREN:   No objection, Your Honor.

14            THE COURT:   1630 is admitted.

15       Q.   *(BY MR. MCDANIEL)*   All right, Mr. Larson.

16  Would you explain, please, your figure 7, Defendants'

17  Joint Exhibit 1630, what you're portraying for the

18  court here?

19       A.   Well, as with the figure associated with the

20  ratios of copper to phosphorus, I made the same

21  calculations for each of the different samples for the

22  ratio of zinc to phosphorus.   On this figure, I've

23  displayed the results of those ratios for two

24  different groups, the edge-of-field samples in red and

25  for the groundwater well samples in blue.

1          Again, this is a histogram where I group the

2    results; that is, the different ratios, into different

3    categories as shown by the horizontal axis.  Then

4    based on the count of the number of samples that are

5    within that group, I calculate the frequency of

6    occurrence, which is the vertical axis, and plot them

7    and that plots as a histogram, and you can see the

8    distribution and central tendency then of the ratios.

9    That's what the diagram shows, the edge-of-field

10   distribution in red and the groundwater well samples

11   distribution in blue.

12       Q.   So this analysis, what does it tell you about

13   the relationship or differences between these two

14   groups of samples, if anything?

15       A.   Well, you can see that the groundwater well

16   samples, in terms of the central tendency and majority

17   of the ratios computed for zinc to phosphorus there,

18   are displaced to the right of the edge-of-field sample

19   distribution.  The central tendency of that is

20   generally down in the range of .03 to .1.  With

21   respect to the groundwater well samples, the central

22   tendency is in the range of .3 to 1.

23          So there's over an order of magnitude

24   difference between the central tendency of the two

25   distributions, and so you can then see the difference

1    in the distributions of those results.  The conclusion

2    is that the distributions are different, significantly

3    different.

4         Q.   All right, sir.  In the course of your

5    testimony yesterday and what we've just gone through

6    with the second histogram, you've described two

7    different types of analyses you did by looking -- by

8    plotting on a linear fashion the relationships between

9    Dr. Fisher's constituents and the different media as

10   one technique that you used and the second technique

11   being using these histograms to look at the

12   distribution of the relationships.

13        Based upon these two types of analyses, did

14   you form an opinion as to whether or not Dr. Fisher

15   had shown that groundwater samples were related to the

16   edge-of-field samples?

17        A.   Yes, I did.

18        Q.   What is that opinion?

19        A.   That these data do not demonstrate a

20   relationship between the edge-of-field samples and the

21   groundwater samples.

22        Q.   Did you form any opinion as to whether or not

23   Dr. Fisher's fingerprint ratio analysis can support

24   any conclusion about the source of any constituents in

25   the groundwater in the Illinois River Watershed?

 1            MR. GARREN:  Judge, I want to object to

 2   this.  Both it mischaracterizes the word

 3   "fingerprinting" as used by Dr. Fisher, which he did

 4   not use, and it's misleading and very prejudicial.

 5   That word does not appear anywhere in Dr. Fisher's

 6   report nor in his testimony.

 7            THE COURT:  Any response?

 8            MR. MCDANIEL:  Well, I can rephrase the

 9   question --

10            THE COURT:  Very well.  If you would.

11            MR. MCDANIEL:  Thank you.

12     Q.   *(BY MR. MCDANIEL)*  All right.  Reask the

13   question then, Mr. Larson.

14            Did you form any opinion as to whether or not

15   Dr. Fisher's ratio analysis using arsenic, copper,

16   zinc, and phosphorus can support any conclusion that

17   the source of any constituents -- excuse me -- can

18   support any conclusion about what is the source of any

19   constituents in the groundwater in the Illinois River

20   Watershed?

21     A.   Yes, I did.

22     Q.   And what's that opinion?

23     A.   That these data do not support such a

24   conclusion.

25     Q.   Did you perform any other analysis using the

1  plaintiff's data to test the hypothesis that poultry

2  litter use has caused an impact to groundwater in the

3  Illinois River Watershed?

4      A.   Yes, I did.

5      Q.   And what was that?

6      A.   Well, in some of the work conducted by

7  Dr. Olsen, there were analyses that attempted to

8  portray -- or that portrayed the relationship between

9  sample results -- in his case surface water samples --

10  and poultry house density.

11          The concept generally seemed to be that if

12  you saw an increasing trend in the concentrations with

13  poultry house density that was significant, that that

14  was an indication that there was a link between

15  poultry litter and the concentrations found in the

16  samples.  And although I don't believe that that

17  relationship is as simple as that, I wanted to test

18  whether or not the groundwater data would exhibit such

19  a relationship.

20      Q.   All right.  So let's be clear about what you

21  did and what you didn't do.

22          You testified that you're aware that

23  Dr. Olsen has testified about some relationship

24  between the supposed poultry house density and surface

25  water quality parameters.  Did you look at that aspect

1   of Dr. Olsen's analysis?

2       A.   In his report, yes, I did.

3       Q.   Well, what I mean is, are you here to

4   critique or offer opinions in rebuttal to that aspect

5   of Dr. Olsen's analysis?

6       A.   No.

7       Q.   All right.

8       A.   No.

9       Q.   Now, what did you use for the poultry house

10  density data that you considered in your analysis?

11      A.   I used data that we obtained from Dr. Olsen's

12  materials that related poultry house density to the

13  different sampling locations.

14      Q.   Are you contending, sir, that Dr. Olsen's

15  poultry house density data is correct or reliable?

16      A.   No, I'm not.

17      Q.   Well then, why did you use it?

18      A.   Because I wanted to test the concept that

19  they had to see if, in fact, the groundwater data

20  would show such a relationship.

21      Q.   All right, sir.  Would you look at what's

22  been marked for identification as Defendants' Joint

23  1633 and identify that, please?

24      A.   Yes.  This is a graph that I prepared for my

25  report.

1       Q.   Is this figure 10 from your report?

2       A.   Yes, it is.

3       Q.   Where did the data come from that was used to

4    generate this figure, sir?

5       A.   The data for active poultry house density

6    associated with the different samples was taken from

7    Dr. Olsen's materials, and the data on the

8    concentrations of the different constituents were

9    taken from the data we obtained from the plaintiffs,

10   the CDM data.

11      Q.   All right.  Was this figure prepared by you

12   or under your direction?

13      A.   Yes, it was.

14              MR. MCDANIEL:  Your Honor, defendants

15   offer Defendants' Joint Exhibit 1633 for admission.

16              THE COURT:  Any objection?

17              MR. GARREN:  No objection.

18              THE COURT:  1633 is admitted.

19      Q.   *(BY MR. MCDANIEL)*  All right, Mr. Larson.  If

20   you could please, sir, explain the elements of this

21   figure for the court.

22      A.   Well, what I've plotted is, along the

23   horizontal axis, I've plotted the value of the poultry

24   house density in houses per square mile that I

25   obtained from Dr. Olsen's information for each of the

1    sampling locations.  And on the vertical axis, I

2    plotted the total dissolved phosphorus concentration

3    associated with each of those samples so that I could

4    look at the distribution of those concentrations as it

5    relates to the poultry house density.  And that's

6    what's shown by each of the red circles.

7        Q.   When we were looking at your previous linear

8    plots that were plotted on the logarithmic scale, you

9    said you could not display the nondetect results on

10   those figures.

11            Are nondetect results portrayed on this

12   figure?

13       A.   Yes, they are.

14       Q.   All right.  How would we identify those?

15       A.   Well, if you look over at the far-left axis

16   under zero, you'll see a distribution of red points

17   basically going up the vertical axis.  Those would

18   represent non -- or indicate nondetects for the -- or

19   I'm sorry -- the zero, the line there, would represent

20   locations where the active poultry house density value

21   was zero.

22            If you go along the horizontal axis, you will

23   see locations where the total dissolved phosphorus

24   concentration was below the detection limit, and it's

25   plotted on the zero line along with its corresponding

1    value for the poultry house density.

2        Q.   All right, sir.  Did you undertake with this

3    data a regression analysis or an analysis to determine

4    the best-fit line for the data?

5        A.   Yes.  I looked at the degree of linear

6    correlation between the two variables.

7        Q.   And how is that reflected on the figure?

8        A.   It's reflected by the solid line you see

9    sloping downward from left to right, and the

10   statistics associated with that line are shown inside

11   the box.

12       Q.   All right.  What did you determine was the $R^2$

13   for the relationship between the plaintiff's active

14   poultry house density and total dissolved phosphorus?

15       A.   It was .0099.

16       Q.   All right.  I notice on the legend on the

17   phosphorus scale you have in parenthesis "4500PF."

18       A.   Yes.

19       Q.   Would you tell us what that means?

20       A.   That's the particular method for analyzing

21   the phosphorus that were used for this set of data.

22       Q.   And why did you use the 4500PF data?

23       A.   Well, generally speaking, that method has a

24   lower detection limit than some of the other methods

25   and is, I guess, oftentimes a preferred method.  So

 1  that's why I plotted that information.

 2      Q.  Did Dr. Olsen indicate, in either his

 3  testimony or his report, his own view of a

 4  preferential method for analyzing for phosphorus?

 5      A.  Yes.  In his report, he described the various

 6  methods and this one seemed to be his preferred

 7  method.

 8      Q.  All right, sir.  When you see a linear -- or

 9  a fit line like we see in your figure, Exhibit 1633,

10  that slopes downward from left to right, what does

11  that indicate?

12      A.  Well, the line would suggest, for what it's

13  worth, that as active poultry house density increases

14  the concentration -- the dissolved concentration of

15  phosphorus actually decreases.  However, the

16  statistical significance of that line is very, very

17  low.  Consequently, from a statistical viewpoint, it

18  could just as easily be zero because of the low value

19  of $R^2$ that you see.  So there really isn't any

20  relationship that the statistics can detect.

21      Q.  From this analysis, sir, did you draw any

22  conclusions about the existence of any relationship

23  between dissolved phosphorus concentrations in the

24  water well samples and where those samples were taken

25  as it relates to active poultry house density?

9742

1      A.    The conclusion that I drew -- yes, I did draw

2  a conclusion.

3      Q.    Tell us what that is.

4      A.    And that conclusion is -- and you can sort of

5  see it just by looking at the scatter of the data --

6  that there isn't any significant definitive

7  relationship between increasing poultry house density

8  and the concentrations found in the groundwater well

9  samples.

10     Q.    All right.  Did you do a similar analysis for

11  any of the constituents other than dissolved

12  phosphorus?

13     A.    Yes.  I also looked at other constituents.

14     Q.    All right, sir.  Would you pull out and look

15  at what's been marked for identification as

16  Defendants' Joint 1634 and identify that for the

17  record?

18              THE COURT:  Did Dr. Fisher do a similar

19  analysis regarding the relationship between poultry

20  house density and groundwater?

21              THE WITNESS:  Not that I know of, no.

22              THE COURT:  Now, have you ever done any

23  work with regard to groundwater sampling in karst

24  topography?

25              THE WITNESS:  To some degree, yes.

1          THE COURT:  All right.  And you

2    understand that with the fracturing and the limestone

3    it presents some complexity?

4          THE WITNESS:  Yes, it does.  Most

5    groundwater systems have some degree of complexity.

6          THE COURT:  Right.

7          THE WITNESS:  On the other hand, even in

8    karst topography where you have fractures, groundwater

9    flow is still driven by the water level conditions

10   that you have.  So you've got to be a little cautious

11   about what fracturing means when you look at these

12   kinds of conditions.  Because at first blush it often

13   gives you the indication that you can have rapid flow,

14   and it's possible you could, but it's also driven by

15   the water -- the amount of water that's actually going

16   through the system.  If that amount is relatively low,

17   you may have actually relatively slow movement.

18          Also, when you look at it on a broader scale,

19   obviously there are networks of these fractures, and

20   many times the smaller network of fractures is

21   the -- is more of a significant factor when you look

22   at water wells, for example, because you may not be

23   intersecting, let's say, a major fracture necessarily.

24          THE COURT:  Thank you.  Go ahead.

25      Q.   (BY MR. MCDANIEL)  All right, Mr. Larson.  I

1    think -- let's go back, sir, and ask you again:  Have

2    you pulled out what's been marked for identification

3    as Defendants' Joint 1634?

4         A.   Yes, I have.

5         Q.   All right.  Identify that, please.

6         A.   Well, this is a figure that I prepared for my

7    report.

8         Q.   Is it figure 11 from your report?

9         A.   Yes.

10        Q.   What was the source of data for this figure?

11        A.   The data for this was the poultry house

12   density values that I obtained from Dr. Olsen's

13   materials and the concentrations of dissolved copper

14   from the CDM database.

15        Q.   All right.  Was the figure either prepared by

16   you or under your direction?

17        A.   Yes, it was.

18             MR. MCDANIEL:  Your Honor, defendants

19   offer for admission their Joint Exhibit 1634.

20             MR. GARREN:  No objection.

21             THE COURT:  1634 is admitted.

22        Q.   *(BY MR. MCDANIEL)*  All right, sir.  I think

23   based upon your explanation of the prior figure, we

24   understand how you structured the figure.

25             Can you tell us which constituents you

1    evaluated here and what that analysis shows?

2        A.   This compares the dissolved copper

3    concentrations to the active poultry house density at

4    each of the sample locations.  And, again, visually

5    you can see that the data are just generally

6    scattered, there's no apparent trend.  And as you can

7    see from the statistics, that's what the statistics

8    also show, that there's no apparent trend in the data.

9        Q.   And did you calculate the $R^2$ for your

10   best-fit line?

11       A.   Yes, I did.

12       Q.   And what was that?

13       A.   .0125.

14       Q.   And what does that tell you, sir?

15       A.   Indicates a very low degree of linear

16   correlation.  Basically, these results would show that

17   there's no apparent linear correlation.

18       Q.   And you may have stated this in your prior

19   answer and it may have escaped me:  What constituent

20   were you comparing to the plaintiff's active poultry

21   house density figures here?

22       A.   Dissolved copper in the groundwater well

23   samples.

24       Q.   All right, sir.  From this analysis, did you

25   draw any conclusions?

1      A.   Yes.

2      Q.   And what was that?

3      A.   That when you look at the dissolved copper

4  concentrations relative to the poultry house density,

5  there's no apparent increasing trend in concentration

6  with poultry house density.

7      Q.   All right, sir.  Did you undertake the same

8  analysis to look at arsenic concentrations?

9      A.   Yes, I did.

10      Q.   All right.  Would you pull out and look at

11  what's been marked for identification as Defendants'

12  Joint 1635 and identify that?

13      A.   This is another figure that I prepared for my

14  report.

15      Q.   Figure 12 from your report?

16      A.   Yes.

17      Q.   All right, sir.  And the source of this data,

18  is it the same as your prior answer?

19      A.   Yes.

20      Q.   All right.  Was the figure prepared by you or

21  under your direction?

22      A.   Yes, it was.

23           MR. MCDANIEL:  Your Honor, defendants

24  offer Defendants' Joint Exhibit 1635 for admission.

25           MR. GARREN:  No objection.

1        THE COURT:  1635 is admitted.

2        Q.  *(BY MR. MCDANIEL)*  All right.  Dr. Larson,

3   tell us about this analysis, what you analyzed and

4   what you found.

5        A.  Here, I've compared the arsenic

6   concentrations to -- or related the arsenic

7   concentrations to the poultry house density.  You can

8   see a lot of red dots along the horizontal axis.  That

9   means that the concentration in the sample was below

10  the detection limits, and so you can see a lot of the

11  concentrations found in the water well samples were

12  below the detection limits.  But, again, both visually

13  and statistically you can see there's no apparent

14  trend in the data.

15       Q.  And this is the arsenic -- dissolved

16  arsenic?

17       A.  Correct.

18       Q.  All right, sir.  Did you calculate the $R^2$ for

19  the best-fit line for this data?

20       A.  Yes, I did.

21       Q.  What was the result?

22       A.  .0041.

23       Q.  And what does that tell you?

24       A.  It indicates a very low degree of linear

25  correlation basically as a practical matter showing no

1    apparent linear correlation.

2         Q.   And, finally, did you -- did you use this

3    same technique to look at the dissolved zinc

4    concentrations?

5         A.   Yes, I did.

6         Q.   All right then.  Would you pull out, please,

7    what's been marked for identification as Defendants'

8    Joint 1636 and identify that?

9         A.   This is a figure that I prepared for my

10   report.

11        Q.   Figure 13 from your report?

12        A.   Yes.

13        Q.   Is the source of the data the same, sir?

14        A.   Yes.

15        Q.   All right.  Was this figure prepared by you

16   or under your preparation -- or under your

17   direction?

18        A.   Yes, it was.

19             MR. MCDANIEL:  Your Honor, defendants

20   offer their Joint Exhibit 1636 for admission.

21             MR. GARREN:  No objection.

22             THE COURT:  1636 is admitted.

23        Q.   *(BY MR. MCDANIEL)*  All right, sir.  Would you

24   please explain on this figure what you did comparing

25   the plaintiff's active poultry house density

 1    information to the dissolved zinc concentrations?

 2        A.    As with the other diagrams, I plotted the

 3    zinc versus the poultry house density.  They're shown

 4    by the red dots.  You can visually look at the scatter

 5    in the data values and there's no apparent trend.

 6    That also is indicated by the statistics that you see

 7    in the -- inside the box.

 8        Q.    All right, Mr. Larson.  In summary, using the

 9    plaintiff's data, did you determine whether or not any

10    correlation can be drawn between the plaintiff's

11    poultry house density data and these constituents in

12    groundwater?

13        A.    I did.

14        Q.    And what is that opinion?

15        A.    That there was no apparent correlation

16    between those two variables.

17        Q.    Mr. Larson, does the data establish any

18    cause-and-effect relationship between poultry house

19    density and any of the constituents identified in the

20    groundwater samples collected by CDM?

21        A.    No.

22            MR. MCDANIEL:  I pass the witness, Your

23    Honor.

24            THE COURT:  Cross-examination.

25            MR. MCDANIEL:  I'm sorry.

1           *(Discussion held off the record)*

2                    MR. MCDANIEL:  Pass.  Sorry.

3                    MR. GARREN:  One second, Your Honor.

4    Good morning, Your Honor.

5                    THE COURT:  Good morning.

6                        **CROSS−EXAMINATION**

7    **BY MR. GARREN:**

8         Q.   Mr. Larson.

9         A.   Morning.

10         Q.   Let me establish a few things about yourself

11    and then we'll move into some more substantive

12    matters.

13              First off, you agree you're not a geochemist;

14    correct?

15         A.   That's correct.  I'm not a geochemist.

16         Q.   And you don't hold yourself out as a

17    statistician, do you?

18         A.   No.  I use statistics frequently in my work

19    but I'm not a statistician.

20         Q.   Is it true and you agree that any experience

21    regarding the study of runoff, infiltration, or

22    leaching of poultry waste constituents is not part of

23    your curriculum vitae?

24         A.   Yes, that's correct.

25         Q.   Is it true that you have not worked on

1    matters specifically involving the contamination from

2    animal waste?

3        A.   I think when you -- I think that's correct

4    when you look at it specifically animal waste.

5        Q.   And it's true that in this case, you have not

6    studied the issue of runoff from fields where poultry

7    waste has been land-applied; correct?

8        A.   That's correct.

9        Q.   And have you conducted any study or

10   investigation in order to form an opinion whether or

11   not poultry waste when land-applied in the IRW will

12   leach into the soil?

13       A.   I haven't formed an opinion one way or the

14   other.

15       Q.   And so you've not conducted any study or

16   investigation either; correct?

17       A.   That's correct.

18       Q.   Have you conducted any study or investigation

19   in order to form an opinion whether or not poultry

20   waste when land-applied in the IRW will leach through

21   the soil and into the groundwater?

22       A.   No.   I've only looked at the sampling data

23   that I presented in my testimony.

24       Q.   Have you conducted a study or investigation

25   as to whether land-applied poultry waste is a source

1    of groundwater contamination in the IRW?

2        A.   Only to the extent that I've looked at the

3    relationships in the data that I examined, and my

4    conclusion there was that there was not any indication

5    in that data that that was an impact.

6        Q.   But you've not conducted your own study or

7    investigation creating your own data to do that

8    either; correct?

9        A.   That's correct.

10        Q.   You do agree, though, that based upon your

11    review of the literature, that waste, poultry waste

12    specifically, can be a source of groundwater

13    contamination, do you not?

14        A.   It has the potential to be, yes.

15            (Discussion held off the record)

16        Q.   (BY MR. GARREN)   Now, Mr. Larson, it's also

17    true that you have not investigated whether

18    nonpoint-source pollution can accelerate

19    eutrophication of waterbodies?

20        A.   That's correct.

21        Q.   Have you conducted any scientific study or

22    investigation in the IRW to determine groundwater flow

23    patterns?

24        A.   I haven't conducted a specific study.   I've

25    reviewed information just generally about the

1    groundwater conditions in the basin.

2        Q.   Have you -- or has any other defense expert,

3    to your knowledge, conducted a scientific study as to

4    the investigation in the IRW for groundwater flow

5    patterns?

6        A.   I can't testify as to every expert but --

7        Q.   Are you aware of any is my question?

8        A.   Oh, I'm sorry.  I'm not.

9        Q.   And you're familiar with a company called

10   "Apex"?

11       A.   Uh-huh.  Yes.

12       Q.   And did Apex conduct any scientific study or

13   investigation to determine groundwater flow patterns

14   in the IRW?

15       A.   Not that I'm aware of, no.

16       Q.   Is it true, sir, that you or others have not

17   conducted any sampling at the location of the sites

18   that you visited in the IRW?

19       A.   That's correct.  Or at least I didn't take

20   any samples.

21       Q.   All right.  And when we say you didn't take

22   samples, that would include soil sediment or water;

23   correct?

24       A.   That's correct.

25       Q.   For your work in this case, did you conduct a

1  traditional fate and transport study regarding

2  phosphorus in the IRW?

3        A.    I did not conduct a specific fate and

4  transport analysis.  I did review the sampling data as

5  I've indicated in my testimony.

6        Q.    You've testified that you have modeling

7  experience, much which you learned with and through

8  USGS; correct?

9        A.    That's correct.

10       Q.    And you did not perform any modeling for this

11  case regarding contamination from poultry waste, did

12  you?

13       A.    I did not perform any modeling, no.

14       Q.    Specifically, with regard to some of your

15  opinions about septic tanks, you did not perform any

16  modeling with regard to the constituents from septic

17  tanks; correct?

18             MR. MCDANIEL:  Excuse me, Your Honor.

19  We didn't offer any testimony about septic tanks on

20  the record.

21             MR. GARREN:  That's fine.  It was in his

22  report.  I had it outlined.  I'll move on, Judge.

23             THE COURT:  Thank you.

24       Q.    *(BY MR. GARREN)*  Let's talk about your

25  appearances in the IRW.

1          It's true you have visited the IRW basically

2    a single trip in July of 2008 for approximately the

3    better part of two days; correct?

4          A.    That's correct.

5          Q.    And that trip was simply to accompany

6    representatives of that company called "Apex" to

7    various sites; correct?

8          A.    That's correct.

9          Q.    And you didn't accompany them to all of the

10   sites but some of them; correct?

11         A.    That's correct.

12         Q.    And you've testified you didn't take samples.

13   It's my understanding in our discussions in your

14   deposition that you did suggest they take pictures for

15   you; is that true?

16         A.    I did recommend, I guess, in the discussions

17   about their protocol that they -- that they take

18   photographs of the areas surrounding the sites.

19         Q.    All right.  As I understand then today as

20   part of this trial, you're not giving any opinions

21   with regard to septic tanks and their effect that they

22   may have on groundwater in the IRW; correct?

23         A.    That's correct.

24         Q.    All right.  Now, in response to a couple

25   questions that the judge asked you, you talked about

1    fracturing.  It is true in the IRW that there can be

2    both vertical and horizontal "fractioning"; correct?

3        A.   Fracturing, yes.

4        Q.   All right.  And that fracturing does, in

5    fact, allow groundwater to move both laterally and

6    vertically; correct?

7        A.   That's correct.  The predominant movement in

8    the groundwater tends to be lateral but there's also

9    vertical movement.

10       Q.   Okay.  And so to some degree then, what we're

11   talking about here is that water is dependent upon the

12   gradient; correct?

13       A.   The directions and rate of flow will be a

14   function of the water level gradient.

15       Q.   Okay.  Let's talk about the watershed.  You

16   agree that the Springfield Plateau aquifer is present

17   in the IRW?

18       A.   Yes.

19       Q.   And how do you know that?

20       A.   By reviewing various reports describing the

21   geology of the area.

22       Q.   And those reports are -- you're not talking

23   about reports from the plaintiff's work, but like

24   peer-reviewed or other types of articles?

25       A.   Yeah.  Generally other types of reports.

1      Q.   Did you know that information before you got

2   into this case?

3      A.   I probably did.  I had done some work in

4   southwestern Missouri previously and so generally I

5   was familiar with that.

6      Q.   Okay.  And the Springfield Plateau is

7   referred to as an unconfined aquifer; correct?

8      A.   Yes.  For the most part, I think that's true.

9      Q.   All right.  And you would agree that an

10  unconfined -- the unconfined nature of what is that

11  Springfield plateau aquifer that flows in the IRW make

12  it susceptible to impacts from surface and near

13  surface sources of contamination?

14     A.   Yes.  I think in general the unconfined

15  nature of any aquifer makes it susceptible to sources

16  of surface contamination.

17     Q.   Now, is it correct in my understanding, sir,

18  that the water table actually can occur within this

19  aquifer, what we referred to as the Springfield

20  Plateau?

21     A.   That's the definition of an unconfined

22  aquifer, is that the water table is contained within

23  the aquifer.

24     Q.   And that is because that aquifer is really

25  the closest or nearest to the surface; correct?

1      A.   Yes.

2      Q.   Being the nearest to the surface of the IRW,

3  that would be a predominant reason for its

4  susceptibility to contamination; do you agree?

5           MR. MCDANIEL:  Excuse me, Your Honor.

6  Since we were talking principles, now we're talking

7  about the IRW, we didn't cover any of this on direct.

8  We didn't offer his assessments of the geology or

9  hydrogeology specifically in the IRW on direct.  He

10  spoke specifically to the analytical data.  So I think

11  it's outside the scope.

12           MR. GARREN:  My response would be, Your

13  Honor, these are certainly important premises and the

14  understanding of his knowledge of this watershed, for

15  him to take data and do his analysis on it and draw

16  opinions only from data that was gathered by others.

17           THE COURT:  I understand.  The

18  objection's overruled.

19      Go ahead.

20      A.   Could you repeat the question?

21      Q.   *(BY MR. GARREN)*  Yes.  Is the unconfined

22  nature of the aquifer in the IRW near the surface a

23  predominant reason for its susceptibility to

24  contamination?

25      A.   Well, I think, as I testified, the unconfined

1    nature of any aquifer makes it potentially susceptible

2    to surface contamination.

3        Q.    Okay.  And you mentioned, in response to

4    questions to the judge, that the fracturing and the

5    solution openings that essentially exist in the IRW do

6    allow for some rapid water transfer or transport;

7    correct?

8        A.    It can happen from place to place.  I think

9    you have to be a little cautious, as I indicated to

10   the -- to the judge, that it's controlled by where

11   water comes from and where it goes and water level

12   gradient.  So it isn't as simple as just having

13   fractures.

14       Q.    Do you know what kind of construction the

15   wells are in the IRW?  Did you investigate that?

16       A.    I didn't investigate it in detail.  My

17   general understanding is they're cased down --

18   generally cased down to certain depths and then open

19   holes below those depths.

20       Q.    And so we would refer to that as an open

21   borehole-type construction with some casing at the

22   top?

23       A.    Correct.

24       Q.    Okay.  And you would agree that the open

25   borehole allows mixing of groundwater from multiple

9760

1    horizontal conduits in the IRW?

2              MR. MCDANIEL:  Your Honor, asking him

3    about well construction, and specifically in the IRW,

4    is not within the scope of his testimony.  So --

5              MR. GARREN:  If may respond, Your

6    Honor.

7              THE COURT:  Go ahead.

8              MR. GARREN:  The opinions that he's

9    giving are predicated on the flow of water.  As you

10   understand that his opinions deal with the

11   groundwater, I think it's important to understand how

12   that groundwater operates, how it reacts, and when

13   you're collecting it in a well, the construction of

14   that well and how it interacts with these fractures

15   and the movement of subsurface waters would be

16   important.

17             THE COURT:  Well, I'll give you some

18   latitude here, although I don't know that it's been

19   established that this portion of northeastern Oklahoma

20   is an area where we have a lot of open boreholes.  But

21   I understand.

22        Go ahead.

23             MR. GARREN:  We have collection from

24   wells -- sampling from wells and that's -- and that's

25   why I asked him whether or not he had any knowledge

1   about the construction.

2            THE COURT:  All right.  Overruled.

3       A.   Could you repeat the question, please?

4       Q.   *(BY MR. GARREN)*  Yeah.  I may ask you

5   differently here.  Just a second.

6            Is it true that with an open borehole well

7   that this can allow for mixing of groundwater from

8   multiple horizontal conduits in the IRW?

9       A.   Well, with any well, whether it's an open

10  borehole or whether it has a screen in it, when you

11  pump water out of that well the water that comes to

12  the well as a consequence of that pumping will be

13  distributed throughout the interval of either the

14  screen or the open borehole depending on the relative

15  hydraulic conductivities outside the borehole areas.

16  Higher hydraulic conductivity will tend to contribute

17  more water, areas of lower hydraulic conductivity will

18  tend to contribute less water.

19      Q.   It's true and you agree, do you not, sir,

20  that surface water and groundwater in the IRW

21  interact, they can be one in the same?

22      A.   I wouldn't consider them one in the same.

23  There are certainly areas where they do interact.

24            MR. GARREN:  May I approach, Your Honor?

25            THE COURT:  You may.

1    Q.   *(BY MR. GARREN)*  Mr. Larson, I've handed you

2    an article, a published paper, by James Adamski

3    entitled:  "Geochemistry of the Springfield Plateau

4    Aquifer of the Ozark Plateaus Province in Arkansas,

5    Kansas, Missouri and Oklahoma, USA."

6         Have you seen this paper before, sir?

7    A.   Yes, I believe I have.

8    Q.   This document speaks to the Springfield

9    Plateau which is what we've been talking about;

10   correct?

11   A.   Yes.

12   Q.   Looking at the abstract, I wanted to direct

13   your attention to the -- be approximately the fourth

14   line up from the bottom of the abstract where it

15   starts "water from springs generally flows."  Do you

16   see that sentence?

17   A.   Yes, I do.

18        MR. GARREN:  For the record, Your Honor,

19   I'm referring to Demonstrative 291.  I don't think I

20   made that clear.  I apologize.

21        THE COURT:  Yes, sir.

22   Q.   *(BY MR. GARREN)*  It says -- I'll read it to

23   you -- "Water from springs generally flows rapidly

24   through large conduits with minimum water-rock

25   interactions.  Water from wells flow through small

9763

1    fractures which restrict flow and increase water-rock

2    interactions.  As a result, springs tend to be more

3    susceptible to surface contamination than wells."

4             Do you agree with that principle or that

5    concept?

6             MR. MCDANIEL:  Your Honor, this is

7    inappropriate cross-examination just to read from a

8    document that is not in evidence.  It's not impeaching

9    an opinion that Mr. Larson has offered.

10            THE COURT:  Sustained.

11            MR. GARREN:  If I may respond just

12   briefly, Your Honor?

13            THE COURT:  Go ahead.

14            MR. GARREN:  The opinions with regard to

15   the groundwater that he's rendered in this case I

16   think are important with respect to how they interact,

17   and that this particular statement shows that the

18   contamination that you would see in a well would be

19   less and would be a basis for no correlation that

20   Mr. Larson was not able to find when he opined on two

21   or three of the exhibits that they entered into this

22   case.

23            It would follow that when you're tracing

24   concentrations through the gradients in the IRW of a

25   surface contamination, that that would be greater at

1    the surface but lesser as you go deeper which would be

2    in a groundwater well.  And so I'm trying to build a

3    basis here to impeach his opinion that there is no

4    correlation when, in fact, you wouldn't expect to find

5    one.

6              THE COURT:  Hold on just a second.  Let

7    me just read what you said because I'm not sure I'm

8    following where you're going.

9              MR. GARREN:  Okay.  It takes awhile to

10   get there.  I'm sorry.

11             THE COURT:  Yeah.  Mr. McDaniel, go

12   ahead.

13             MR. MCDANIEL:  Yes, Your Honor.  With

14   all due respect to Mr. Garren, his view of the

15   technical evidence is not really relevant to the

16   evidentiary procedural questions that's before the

17   court.  In fact, what he just described impeaches his

18   own expert, not Mr. Larson, because Mr. Larson's here

19   because Dr. Fisher testified that the edge-of-field

20   samples and the groundwater samples blended seamlessly

21   together indicating that they're related to the

22   constituents.

23             So simply reading something from a document

24   suggesting that somehow it impeaches Mr. Larson is not

25   proper cross-examination without setting it up through

1    prior questions and answers from Mr. Larson.

2                    THE COURT:  As to the specific

3    objection, it is again sustained.

4                    You may rephrase.  Go ahead.

5        Q.   *(BY MR. GARREN)*  Would you agree with me,

6    Mr. Larson, that if you're looking at a surface

7    contamination, that generally speaking the

8    concentrations of that contamination will be greater

9    at the surface than they would be in groundwater?  I'm

10   trying to limit that to the IRW too, sir.  I don't

11   want to go astray on this.

12       A.   Well, I think as a general matter, that may

13   be true.  I don't know if it would always be true.

14       Q.   So if you're trying to draw a correlation

15   with regard to certain chemical elements, there may be

16   less of a correlation as you go into the groundwater

17   at the groundwater depths that you might see in these

18   wells as opposed to those more near surface water such

19   as springs; correct?

20       A.   Well -- well, first of all, when you look at

21   the movement of these elements through the subsurface,

22   as I think I testified in my direct testimony, the

23   relative amounts of these will change and the

24   relationships will change.  That's one of the reasons

25   that, I think, you see a difference in the

1   relationships in the data.

2            In terms of springs being surface water, they

3   are surface water once they emerge from the ground.

4   Prior to that, the flow that emerges from those

5   springs is groundwater.

6       Q.   Do you agree, sir, with the principle that

7   concentrations from a surface contaminant will

8   generally be greater at the surface levels than in

9   deep groundwater areas?

10      A.   I would agree that concentrations nearer to

11  the source of the concentration -- or nearer to the

12  source of the contamination will typically be higher

13  than they are further away.

14            THE COURT:  Mr. Garren, remind me, but

15  Dr. Fisher's groundwater samples came from wells?

16            MR. GARREN:  Yes.  And geoprobe.  So we

17  have a combination of -- the materials that were used

18  in the data that Mr. Larson speaks to includes

19  springs, geoprobes, groundwater, and edge-of-field.

20            THE COURT:  All right.  Mr. Garren

21  basically is getting to this point that generally

22  interactions between surface -- or I'm

23  sorry -- materials in the soil and the water are

24  greater when you're dealing with water from wells as

25  opposed to water from springs because typically

1   springs are following those fractures and there's less

2   water surface interaction.  When I say "surface," I

3   mean surface of the rock interaction.  Obviously,

4   you're familiar with these sorts of dynamics.

5           What's your response?

6               THE WITNESS:  Well, I think you got -- I

7   think you have to be cautious about the flow in the

8   fractures that, say, leach to a spring as to where did

9   this flow originate?  Obviously, it all didn't

10  originate from infiltration right along the alignment

11  of the fracture.  It was collected from broader areas

12  via smaller fractures.

13          So typically what will happen is you will

14  have recharge distributed over a larger area.  That

15  will tend to flow toward, say, major fractures that

16  may provide easier pathways for the water to move, but

17  in getting there that water would have to go through

18  smaller fractures similar to what you might find in

19  wells.

20          Now, once it reaches, say, the major fracture

21  and if it's a collection of water, it may be moving

22  more rapidly and may have less rock-water interaction

23  along that portion of the pathway but that's only part

24  of the pathway.  So I don't think you can draw a

25  general conclusion that just because it's emerging

1    from a spring it hasn't had much rock-water

2    interaction.

3                THE COURT:  Once again going back to

4    your answer, you've got to look at -- to your previous

5    answer -- you've got to look at where the water's

6    coming from, where it's going, and it's not quite as

7    simple as only looking at fracturing.

8                THE WITNESS:  That's absolutely

9    correct.

10               THE COURT:  All right.  Go ahead.

11           But you would agree with Mr. Garren's premise

12   that with regard to water coming from springs, at

13   least during a portion of its travel, there was less

14   interaction with rock and soil than generally found

15   with well water?

16               THE WITNESS:  I would agree that, you

17   know, as it's collected along those fractures it may

18   tend to move more rapidly, and in that zone where it's

19   moving more rapidly there may be less interaction

20   before it emerges as water on the surface.

21               THE COURT:  Okay.  Go ahead, Mr. Garren.

22       Q.   (BY MR. GARREN)  Based upon your responses to

23   the judge, you're not disputing that the presence of

24   surface contaminants do reach the groundwater in wells

25   in the watershed, do you?

9769

1      A.   I don't know whether the contaminants have or

2  have not.  I haven't -- the data I reviewed didn't

3  provide any evidence that it did, but I don't have a

4  conclusion whether it did or did not.

5      Q.   And you've not studied it yourself

6  independently; correct?

7      A.   That's correct.

8      Q.   And when the company Apex was out visiting

9  various sites, they didn't collect any samples for you

10  to study on your own; correct?

11      A.   That's correct.

12      Q.   And were you aware there were split samples

13  provided to the defendants from the state's collection

14  of samples in the watershed?

15      A.   I do recall something about that, yes.

16      Q.   Did you analyze any of the data that was

17  provided to the defendants?  Did they provide that to

18  you?

19      A.   I'm sorry.  Which data are you referring to,

20  the split samples?

21      Q.   The split samples that may have been

22  provided -- that were provided from the state to the

23  defendants, were you provided that data set to

24  investigate?

25      A.   I believe so.  But I don't recall

1    specifically --

2         Q.   It wasn't in your considered materials;

3    that's why I'm asking.

4              You only looked at Olsen and Fisher's work;

5    correct?

6         A.   I did.  But among the documents that I

7    reviewed were some reports associated with people who

8    accompanied some of the sampling, and I don't recall

9    offhand if there were descriptions in there of those

10   split samples or not.

11        Q.   What I'm really trying to key to is, is that

12   there were split samples provided to the defendants.

13   Do you know whether or not analytics were provided --

14   or performed on those split samples?

15             MR. MCDANIEL:  Your Honor, I want to

16   object a little bit.  It's a little bit misleading,

17   Your Honor.  Because as Mr. Garren knows, the

18   defendants did not get split samples of all the

19   groundwater samples they took, only those on the

20   subpoenaed poultry-grower's property.  So I just want

21   to make sure the record is fair.

22             MR. GARREN:  That's fine.  And I agree

23   with that, Your Honor.  I'm only asking whether or not

24   he's obtained any data from any of the split samples

25   that may have been provided to the defendants in this

 1    case.

 2                    THE COURT:  I understand.

 3         A.   I don't recall offhand.

 4         Q.   (BY MR. GARREN)  Okay.  Do you agree, sir,

 5    that in identifying inputs to a watershed, that mass

 6    balance can be a tool in understanding the nature and

 7    source of contaminants?

 8                    MR. MCDANIEL:  Clearly outside the

 9    scope, Your Honor.  This is not even a hydrogeologic

10    question.

11                    THE COURT:  Sustained.

12         Q.   (BY MR. GARREN)  All right.  Based on your

13    testimony here today and yesterday, is it correct,

14    sir, that you're not providing any opinion as to the

15    effectiveness of any nutrient management practices in

16    the IRW?

17         A.   That's correct.

18         Q.   Now, you're familiar with the term "principle

19    component analysis," are you not?

20         A.   Generally, yes.

21         Q.   And do you agree that it's a

22    scientifically-accepted methodology for determining

23    source contamination?

24                    MR. MCDANIEL:  Your Honor, it's a topic

25    that is not even at issue in this trial, as well as

```
 1      Mr. Larson hasn't offered any opinions about principle
 2      component analysis.  I don't understand why we're
 3      spending time asking him if he's offering opinions
 4      about things the man clearly did not offer opinions
 5      about on direct.
 6                  THE COURT:  Sustained.
 7           Q.   (BY MR. GARREN)  Just so the record is clear,
 8      you did not perform any such PCA analysis; correct?
 9           A.   I did not.
10           Q.   Let's talk a little bit about outliers in
11      data collected.
12                  Did you include all of the data when you did
13      your analysis?
14           A.   Yes.  All the data for those particular
15      sample results.
16           Q.   All right.  Let's talk now about your work
17      regarding Dr. Fisher's opinion and his correlations.
18                  You agree that Dr. Fisher's opinion is based
19      on the correlation of the components when plotted
20      together; correct?
21           A.   My understanding is that the correlation that
22      he drew was based on all the sample results grouped
23      together.
24           Q.   Did you determine what were the constituents
25      of poultry waste in your work, sir?
```

United States District Court

1        A.    Not specifically as part of my work.

2        Q.    All right.  And you didn't determine what

3   might have been the predominant chemicals found in the

4   poultry waste constituents; correct?

5        A.    That's correct.

6        Q.    I'm trying to get an exhibit number so we're

7   on the same page.  Your figures 1 through 5 are

8   generally Defendants' Joint Exhibit 1624, 25, 6, 7,

9   and 8.  In reference to those figures, let me ask you

10  some questions, sir.

11            What exactly was your hypothesis that you

12  were testing for when you isolated these chemical

13  components of the poultry waste?

14       A.    I was investigating whether or not the

15  relationship that was exhibited in Dr. Fisher's figure

16  22 was the same when you looked at -- or similar when

17  you looked at the individual components or individual

18  groups of sample results separately.

19            As I think I testified during my direct, a

20  lot of the results for the groundwater samples have

21  relatively low concentrations, and so they're very

22  difficult sometimes to see whether or not they have

23  the same relationships.  So I was testing whether that

24  relationship held for the individual sample groups.

25       Q.    Because you isolated these chemicals, is part

1  of your hypothesis is that the surface water and

2  groundwater are not connected?

3       A.   No.  I isolated them because they represent

4  different types and groups of samples.

5       Q.   Okay.  You do agree then that surface water

6  and groundwater can be connected in the IRW, though;

7  correct?

8       A.   In places it can be, yes.

9       Q.   Did you perform what's referred to as a water

10 balance for your work in this case?

11      A.   No, I did not.

12      Q.   What did you do to determine what happens to

13 the water in the IRW after it enters the watershed?

14      A.   May I amend that last answer?

15      Q.   Sure.

16      A.   I did look at in my report somewhat of a

17 water balance associated with individual wells to look

18 at how large of an area a well might draw its water

19 from.

20      Q.   Other than that, you didn't perform any other

21 water balance; correct?

22      A.   That's correct.

23      Q.   All right.  And tell the court just basically

24 what a water balance is.

25      A.   Well, it's basically writing the statement of

1    inputs minus outputs equals the change in the storage.

2    You have a general balance statement like that.  So

3    you'll accumulate all of the different components that

4    are inputs to a system, you will also accumulate data

5    for all the different components that are outputs, you

6    will subtract those two, and then you will see if the

7    difference represents the change in the accumulation

8    of the material within whatever system it is you're

9    looking at.

10       Q.   Would you agree with me that's commonly a

11   first step when looking at water resources

12   contamination?

13       A.   I don't think I can agree that it's

14   necessarily a first step.  It may be done at some

15   point for various reasons, but I wouldn't agree that

16   it's necessarily a first step.  It's often used in

17   water resource investigations.  My experience is it's

18   not so common when you're looking at groundwater

19   contamination.

20       Q.   So in looking at the water balance, it's

21   true, is it not, that there's basically only three

22   things the water can do when it reaches this

23   watershed.  It can evapotranspire; correct?

24       A.   Correct.

25       Q.   It can infiltrate downward into the

1    groundwater; correct?

2        A.   Correct.

3        Q.   And then it can exit the exit point of the

4    watershed, which in this case would be the dam; right?

5        A.   Well, it can discharge -- groundwater can

6    discharge to streams at certain points and become

7    surface water.

8        Q.   Which eventually leads to the dam or the

9    lake, and then to leave the watershed it would have to

10   go through the dam; correct?

11       A.   Well, as it goes through the watershed, it's

12   going to be exposed to, for example, evaporation from

13   the reservoir itself.  So it's hard to judge where it

14   necessarily might go after it reaches the streams.

15       Q.   There's no question but with regard to the

16   movement of water it moves downgradient -- is that a

17   fair statement? -- in this watershed.

18       A.   Well, water, both surface water and

19   groundwater, move under the influence of gravity so

20   they'll tend to go downhill.

21       Q.   And any contaminants in that water would

22   follow that flow path; correct?

23       A.   They will follow a flow path.  They may

24   interact, of course, along that flow path with the

25   materials that the water comes into contact with.

1        Q.   Do you agree, sir, that concentration

2   gradients can identify pathways?

3                  MR. MCDANIEL:  Excuse me, Your Honor.

4   This is outside the scope.  Mr. Larson didn't come

5   here to talk about fate and transport analysis, per

6   se.  That's not part of his direct.

7                  MR. GARREN:  Again, I think it

8   undermines the premise from which he's drawing his

9   opinions, that he's failed or doesn't look at many of

10  these things in the IRW in order to draw such an

11  opinion.

12                 MR. GREEN:  Your Honor -- I'm sorry.

13                 MR. GARREN:  That's all right.

14                 THE COURT:  Just one second.  Go

15  ahead.

16                 MR. MCDANIEL:  Mr. Garren is stating

17  what he thinks should be the elements or the premise

18  of Mr. Larson's work, and I think that's a flawed

19  statement in and of itself.  But nonetheless, it needs

20  to come from the witness.  In fact, what he's

21  describing now is gradient analysis and it's

22  Dr. Olsen's work, not Dr. Fisher's work.

23                 MR. GARREN:  Well, I would have to

24  disagree with that, Your Honor.  I mean, that is the

25  premise with regard to Dr. Fisher's work, to show that

1    this relationship exists and that, in fact, his work

2    shows the concentration levels greater at the surface

3    and they get less as it goes deeper into the

4    groundwater and that there is a relationship.

5                    THE COURT:  Correct.  Mr. Green.

6                    MR. GREEN:  I just have a quick

7    observation, Your Honor.

8              The questions that are being put to the

9    witness imply that Dr. Fisher did these things which

10   the -- which Mr. Garren is trying to see if Dr. Larson

11   did, and so we've flipped the analysis on its head

12   here.

13             I don't think there's any foundation for

14   Mr. Garren's question because there's certainly no

15   evidence in this case that Dr. Fisher did any -- did

16   any of this that's implicit in the question.  So I

17   think the question is fundamentally unfair.

18                  Number two, it's crystal clear --

19                  THE COURT:  Now, just to be clear, you

20   say you have a quick observation.  Is this a -- number

21   one, is this an objection; number two, is it quick?

22                  MR. GREEN:  I'm sorry, sir.  It is an

23   objection based on the lack of foundation in the

24   question, and it is crystal clear what the doctor

25   testified to.  His opinions are well-marked out here

1    in this examination, and I think again I concur with

2    Mr. McDaniel that it's completely outside the scope.

3              THE COURT:  I understand Mr. Garren's

4    point here.  The objections are overruled.

5         Go ahead.

6              MR. GARREN:  I think I need to have him

7    read back that question, Judge.  I apologize.

8              THE COURT:  Had to do with gradient

9    analysis.  Just one second.  The question was, do you

10   agree, sir, that concentration gradients can identify

11   pathways?

12   A.   I think as a general matter, if you look at,

13   say, groundwater contamination and you have a

14   well-defined -- I'll call it plume of contamination,

15   that gradients may be helpful in identifying the

16   origins of the contamination.

17   Q.   *(BY MR. GARREN)*  And perhaps even a simple

18   example of that would be what's referred to as a dye

19   test, that if you put some dye in one area, trace it

20   to where it might end up, that kind of shows you a

21   pathway, does it not?

22   A.   A dye test can be used to evaluate pathways.

23   Q.   With regard to analysis of these data, you

24   would agree with me that a lesser number of data

25   points plotted will also lower a correlation among

1    that data?

2         A.    No.    I don't think I would agree that that

3    would necessarily be the case.    It's possible but it

4    isn't necessarily -- the correlation is a function of

5    the degree to which in this case the line explains the

6    data, whatever it is.    And so I don't think

7    necessarily just because you have fewer data points,

8    that you will lower the correlation.

9         Q.    Is it true then, though, by separating data

10   into smaller sets, you run the risk of actually

11   lowering the correlations?

12        A.    Not necessarily.    The correlation is a

13   function of whatever the data are in terms of how well

14   they explain the variability in whatever the data is,

15   whether it's a fewer number of samples or more number

16   of samples.    It's a statistical measure.

17        Q.    All right.    Let's talk a little bit about

18   what you do with nondetects in this case.

19             You agree that nondetects are a value

20   basically below a detection limit or reporting limit?

21        A.    Yes.    Basically, nondetects indicate that the

22   laboratory couldn't measure any of the substance at

23   that concentration.

24        Q.    And sometimes these are referred to as

25   censured data; correct?

1      A.   They can be, yes.

2      Q.   Do you agree to actually analyze

3  environmental conditions that estimates of summary

4  statistics which best represent the entire

5  distribution of data, both below and above the

6  reporting limit, are necessary?

7      A.   Could you repeat that, please?

8      Q.   Yeah.  Did you agree to accurately analyze

9  environmental conditions that estimates of summary

10  statistics which best represent the entire

11  distribution of the data, those both below and above

12  the reporting limit, are necessary?

13      A.   Well, there are various statistical methods

14  for dealing with censured data, as you point out, and

15  summary statistics can include those data -- or should

16  include those data.

17      Q.   Would you agree with me, sir, that there are

18  different methods of estimating summary statistics

19  when data includes less than -- or those nondetects as

20  we've called them?

21      A.   There are different assumptions that can be

22  used about the nature of the nondetects in terms of

23  trying to compute these statistics.

24      Q.   One of those methods would be referred to as

25  "the substitution method"; correct?

1      A.   I don't know if it's called "the substitution

2   method."  But basically, depending on what kind of

3   statistical analysis you're doing, if it's going to be

4   quantitative, you have to assume a value.  For

5   example, if you're going to calculate regression

6   statistics or means or standard deviations, then you

7   have to assume a value for the nondetects.

8      Q.   And basically what you're doing is, you're

9   substituting what is the data with a value that you've

10   assigned to it, correct, for your analysis?

11      A.   No.  I wouldn't characterize it that way.  I

12   would say that for nondetects, a value has to be

13   assumed, either zero or some other value, depending on

14   your judgment about what to use for that value when

15   you make the summary statistics calculations.

16           Now, some statistics are not impacted by that

17   assumption.  For example, nonparametric statistics are

18   things like -- well, basically nonparametric

19   statistics may not be effected.

20      Q.   You didn't use those, though, in your

21   analysis?

22      A.   Well, in a sense, the histograms that I

23   prepared are essentially that, because there we're

24   just -- the groups that are nondetects are all grouped

25   down at the lower end of the graphic so they're shown

1  basically separately.  The remainder of the values

2  then are whatever those ratios were.

3      Q.  But that's plotted against a log normal -- or

4  log scale; correct?  Isn't that what you do?

5      A.  It's not exactly.  They're logarithmic

6  groups.  And so because I'm not actually plotting on a

7  logarithmic scale, I can actually show the population

8  that goes from the zero to the first interval.  That's

9  what I actually showed on my diagrams.

10     Q.  Is it true, though, in using this method that

11  we've talked about -- and I'm using the term

12  "substitution" where you substitute a nondetect for

13  one of these assumed values -- that that can create

14  large gaps that do not appear realistic?

15     A.  I'm not following your question about

16  substituting.  When you -- when I did the

17  calculations, I used the nondetect values.  I used

18  them as zeros and made my statistical calculations

19  based on that.

20     Q.  Okay.  And that's my point.  You substituted,

21  by your choice, a nondetect with a zero value;

22  correct?

23     A.  I used a value of zero.  I mean --

24     Q.  Well, you didn't use the actual data because

25  it's a nondetect; correct?

1           MR. MCDANIEL:  Excuse me, Your Honor.

2   He cut the witness off.  I would like him to have an

3   opportunity to finish his answer.

4           THE COURT:  Sustained.  Go ahead.

5       A.   I used the nondetects.  For purposes of the

6   calculation, I used a value of zero to represent the

7   nondetects.

8       Q.   *(BY MR. GARREN)*  So you substituted what they

9   would have been as a nondetect with a zero; correct?

10      A.   Well, a nondetect is basically a result that

11  says the concentration is below some very low number,

12  and so I used zero to represent that number.

13      Q.   Isn't it true that there are studies that

14  have determined that this substitution method that

15  you've used performs poorly in comparison to other

16  procedures?

17      A.   I don't know specifically what you're

18  referring to.

19      Q.   Are you aware of any studies that have

20  determined that using this substitution of the

21  nondetects with your zero choice value, that that is

22  in fact a -- that that method performs poorly in

23  comparison to other procedures?

24      A.   I don't know if I could say necessarily

25  performs poorly.  I think what -- what I would say is

1    that there are certain methods, nonparametric methods,

2    that are not potentially impacted by your selection of

3    the nondetect values as opposed to quantitative ones

4    which do have the potential to be affected.

5        Q.   Do you agree, though, that substitution of

6    zero produces an estimate of the mean or median which

7    are biased low?

8            MR. MCDANIEL:  I don't understand the

9    relevance, Your Honor.  This is not relevant to the

10   analysis that Mr. Larson presented in his direct.  He

11   didn't analyze medians and means.  So how this

12   technique may be relevant to that isn't particularly

13   relevant to the analysis.

14           THE COURT:  Well, I think the point is,

15   as I recall Dr. Fisher, he did not use zeros.  He used

16   the lowest point of detection; correct?

17           MR. GARREN:  Or, in fact, didn't use the

18   nondetects and used only that data that was, in fact,

19   a value.

20           THE COURT:  Overruled.  I should have

21   taken that statistics course back in college.

22       Go ahead, Mr. Garren.

23       Q.   *(BY MR. GARREN)*  I don't know that you

24   answered that question so if I may ask it again.

25           You agree that substitution of zero -- the

1    zero for nondetects produces an estimated mean or

2    median which are biased low?

3        A.   I doubt that it would necessarily affect the

4    median, although it's possible.  In terms of the mean,

5    it's possible it may have a slight bias in the mean,

6    although typically detection limits are quite low.

7    And so when you look at whether you, say, use the

8    value of zero or whether you used a value of half the

9    detection limit or the detection limit itself,

10   oftentimes it doesn't have much impact on that

11   statistic.

12       Q.   But it can, can it not?

13       A.   It's possible it can.

14       Q.   Sure.

15            MR. GARREN:  May I approach, Your Honor?

16            THE COURT:  You may.

17            MR. GARREN:  Your Honor, I'm going to

18   represent to the court that this is a 555-page

19   document.  It is a defendants' exhibit.  I do

20   have -- and it was reported as disclosed for this

21   witness.  I have taken an excerpt and, in fact, I may

22   have a second one.

23            I'm happy to bring in 555 pages, Your Honor,

24   but I worry about the hernias that might occur as a

25   result of having to move it around.  But I'm

1    prepared -- I do have a single copy of the entire one

2    here.

3                    THE COURT:   Thank you.

4         Q.   *(BY MR. GARREN)*   Mr. Larson, you recognize

5    this USGS -- I'm calling it a manual or book called

6    "Statistical Methods in Water Resources" that was in

7    your considered materials?

8         A.   Yes, I do.

9         Q.   And this is shown as Defendants' Joint

10   Exhibit 1617; correct?

11        A.   Correct.

12        Q.   I would direct your attention to -- and we'll

13   use the Bates number at the lower right-hand

14   corner where it says Exhibit 1617-0374.

15             Now, you would agree -- and, in fact, you've

16   testified -- that you've had training with the USGS;

17   correct?

18        A.   That's correct.

19        Q.   And this book is in part, I assume, utilized

20   by the USGS in teaching statistical methods in water

21   resources; correct?

22        A.   I would assume, yes.

23        Q.   Looking at that page 374 of this exhibit,

24   where it says in the paragraph below the figures

25   there, "Studies cited above determine that simple

1  substitution methods perform poorly in comparison to

2  other procedures," do you agree with that statement or

3  not, sir?

4       A.   Well, I don't know if I can agree with it as

5  a general matter.  It is possible that it could occur.

6       Q.   All right.  And it goes on to say,

7  "Substitution of zero produced estimates of mean and

8  median, which were biased low, while substituting the

9  reporting limit resulted in estimates above the true

10  values."

11            Do you see that statement?

12       A.   Yes.

13       Q.   Do you believe that to be a true statement?

14       A.   It can be as I indicated.  Not necessarily

15  but it can be.

16       Q.   Did you, sir, perform any other computations

17  of more complex calculation to prove or show the

18  probability of the plotting procedures used by your

19  substitution method?

20       A.   I did look at alternatives in terms of

21  whether I selected, for example, half the detection

22  limit or zero for those in terms of how they would

23  affect the general statistics.

24       Q.   Did you perform what's referred to as a

25  maximum likelihood estimation?

1    A.   No, I did not.

2    Q.   Did you perform any probability plotting

3  procedures at all on the work that you did?

4    A.   Yes.

5    Q.   And what did you do?

6    A.   Two of the exhibits that I showed you, the

7  histogram exhibits, are probability plots.

8    Q.   Okay.  Did you do any others?

9    A.   No.

10    Q.   And in doing the histograms --

11    A.   Well, maybe I should qualify that.  I didn't

12  present others.  I did do others in some of my work.

13    Q.   I'm sorry.  Can you say that again?

14    A.   I didn't present any others other than the

15  two histograms in my testimony.  As part of my work, I

16  did do other comparisons.

17    Q.   You agree that the choice of the value used

18  to substitute for the nondetects is arbitrary with a

19  person making that choice?

20    A.   Well, it's a judgment that you make when you

21  deal with nondetects.

22    Q.   Are you familiar with the distributional

23  method?

24    A.   Not offhand.

25    Q.   Okay.  Looking at page 375 of this same

1    document under the heading "Distributional Methods,"

2    paragraph 13.1.2, do you see that?

3         A.   Yes.

4         Q.   And it says, "The use of characteristics" --

5              MR. MCDANIEL:  Excuse me, Your Honor.

6    What is the purpose of reading from this document

7    that's not in evidence?  It's not impeaching.  He's

8    not refreshing the recollection.  He's just reading

9    from the document.

10             THE COURT:  Sustained.

11        Q.   *(BY MR. GARREN)*  All right.  In your

12   criticism of Dr. Fisher, you did not use the

13   distributional method; correct?

14        A.   I did not.

15        Q.   I think you testified that there were, in

16   fact, quite a few nondetects in the various categories

17   of the samples, groundwater, springs, geoprobes;

18   correct?

19        A.   In some of them there were, yes.

20        Q.   And so if we were to look at your spreadsheet

21   for the underlying data, rather than seeing a blank,

22   you've put in a value of zero in order then to make

23   your analysis; correct?

24        A.   To compute the summary statistics or the

25   regression statistics that I showed, yes, that's

9791

1    correct.

2         Q.    So under groundwater, it's my understanding

3    that there were 55 total samples, but in your work you

4    assumed 23 as zero; is that a fair approximation?

5         A.    Those numbers don't ring a bell, no.

6         Q.    Well, you talked about springs being 49 total

7    observations; correct?

8         A.    Correct.

9         Q.    And do you remember how many zeros you

10   assumed in your analysis for the springs?

11        A.    Well, that depends on which element you're

12   looking at.  I think for the zinc and the copper

13   concentrations something on the order of about 80

14   percent of them were nondetects.

15             MR. GARREN:    If I may approach, Your

16   Honor?

17             THE COURT:    Yes.

18        Q.    *(BY MR. GARREN)*   Mr. Larson, in order to help

19   refresh your recollection, I've pulled just a single

20   spreadsheet at random in your considered materials

21   that you used and I've highlighted some zeros and this

22   happens to do with zinc versus phosphorus.

23             Do you see that?

24        A.    Yes, I do.

25        Q.    And in the upper right-hand corner of this

1    document, you have what is shown as "ND=0."  Does that

2    mean nondetect?

3        A.   Correct.

4        Q.   So as we look through -- this is, in fact,

5    part of your spreadsheet.  If we look through this,

6    we'll see a number of pairs or individual zeros that

7    appear in your analysis; correct?

8        A.   That's correct.

9        Q.   And as I understand it, you agree that the

10   use of these zeros will create a bias to the low side

11   just as stated in the USGS handbook we looked at?

12       A.   It can create biases on certain statistical

13   measures; it has that possibility.

14       Q.   And would you agree that it would do so in

15   the analysis that you performed?

16       A.   Not according to the evaluations that I did.

17   It didn't -- it didn't really matter whether I used

18   zero or half the detection limit in terms of assessing

19   the general trends or lack of trends in the data.

20       Q.   Did you, in fact, use a running analysis on a

21   half limit for your detection for the nondetects as

22   opposed to zero?

23       A.   I think at some point in time I did, yes.

24       Q.   Is it in your considered materials?

25       A.   I don't recall if I did it before my report

 1    or after my report so it may or it may not.  If I did

 2    it before, it would be in my considered materials.

 3        Q.   Do you agree that Dr. Fisher's analysis with

 4    regard to these components of poultry waste -- the

 5    arsenic, zinc, copper, and phosphorus -- was in an

 6    effort to try and track those waste constituents?

 7        A.   My understanding of the -- of Dr. Fisher's

 8    analysis was to try to establish a link between the

 9    concentrations found in the edge-of-field samples and

10    the concentrations found in the other samples, the

11    geoprobe, the spring, and the groundwater samples.

12        Q.   And that is done in an effort to show

13    pathways, is it not?

14        A.   No.  I don't think there was any pathway

15    analysis that I'm aware of.  It was basically just

16    looking at the relationships of the different data

17    groups.

18        Q.   Well, you would agree with me, sir, that

19    poultry waste when it's removed from the barn is not

20    just dumped into groundwater someplace, is it?

21        A.   Not that I know of.

22        Q.   All right.  And so when it's put on the

23    surface, in order to try and find whether or not

24    there's a pathway to these other water resources, the

25    geoprobe area, which is not quite as deep as the

1    wells, this would be a method for tracking those

2    constituents?

3        A.   No, I don't believe it would be.

4        Q.   All right.  Now, as I understand, part of

5    your hypothesis is that it's different in that your

6    criticism of Dr. Fisher is that these constituents are

7    not good for tracing water; correct?

8        A.   They are not good environmental tracers,

9    yes.

10       Q.   Okay.  But if we're trying to trace something

11   other than water and these are predominant

12   constituents of that other thing, that being a

13   contaminant, you would want to look for constituents

14   of the contaminant in order to trace its pathway,

15   would you not?

16       A.   If you're looking for a contaminant, you

17   would analyze for the -- I don't understand that

18   question.

19       Q.   You know, we have a premise that the

20   contaminant is poultry litter and it's comprised

21   predominant -- it has some predominant makeup of

22   arsenic, copper, zinc, and phosphorus.  Do you agree

23   with that?

24       A.   That's my understanding, yes.  Or at least it

25   has some of those elements in it.

9795

1     Q.   Right.  And so if you're trying to trace or

2  find pathways for that constituent through the

3  environment, you're not going to run a dye test to

4  show water path, are you?

5     A.   Well, if you're looking for the path of the

6  water, that's one of the ways you actually do it.

7     Q.   And, in fact, Dr. Fisher wasn't looking for a

8  path of water, he was looking for pathways related to

9  these constituents, wasn't he?

10     A.   I don't recall, at least the portion of his

11  work that I reviewed in evaluation of pathways.  What

12  I reviewed was an attempt to show a relationship

13  between groups of samples and that's what I analyzed.

14     Q.   In your observations of the data, did you

15  determine that edge-of-field samples were higher in

16  phosphorus than found in the springs?

17     A.   I think, generally speaking, if you look at

18  the concentrations, that edge-of-field samples had

19  higher phosphorus concentrations than the samples from

20  the springs.

21     Q.   And did you find that the springs had higher

22  phosphorus levels than found in the wells?

23     A.   I don't recall offhand.  Let me check.  I

24  don't know that they would necessarily be higher.

25  Some of them were higher.

1      Q.   And so that I'm clear and the record's clear,

2   with regard to your criticisms of Dr. Olsen's work on

3   the house densities, you're not opining in any way

4   with regard to his analysis as to the surface water;

5   correct?

6      A.   That's correct.

7      Q.   And to the extent that these contaminants

8   when leaving the surface and making their way to the

9   groundwater may see lower concentrations, that may be

10   reasons for your not finding a correlation in your

11   analysis of the house density; correct?

12      A.   When these materials, if they do leach into

13   the ground, they will interact with the rock and that

14   will change their compositions, and that certainly

15   could affect the concentrations that you see in

16   samples.

17      Q.   You talked about the cattle edge-of-field

18   that was plotted and you mentioned it a couple of

19   times on a couple of your figures.

20         Do you know where that sample came from?

21      A.   Not specifically, no.

22      Q.   Did you do anything to try and verify the

23   source of that sample in all of the data that was

24   provided to you?

25      A.   No, I did not.

1      Q.   So you don't know that it came from Ed Fite's
2   property, do you?
3      A.   I remember seeing a reference to that name,
4   but I didn't do any investigation of it.
5      Q.   Okay.  Did you make any investigation as to
6   what Ed Fite testified to in this case relating to the
7   use of his land where that sample was taken?
8      A.   No, I did not.
9      Q.   You don't know then that that sample may
10   have, in fact, been mislabeled, do you?
11      A.   No, I do not.
12              MR. ELROD:  Your Honor, I object.  That
13   assumes facts not in evidence.  That's the first time,
14   I take it, we've ever heard that in this court and I
15   don't think it came from the witness.
16              THE COURT:  I think the objection comes
17   too late.  Overruled.
18         Go ahead.
19              MR. GARREN:  If I may have a moment,
20   Your Honor.  I'm trying to get regathered here and --
21           (Discussion held off the record)
22              MR. GARREN:  Why don't I take a moment,
23   Your Honor, and we can take our break, I think, for
24   the morning and regroup and --
25              THE COURT:  Let's get over this hump.

1    Go ahead and take your break -- go ahead and take a

2    minute.

3                    MR. GARREN:  All right.

4         Q.   *(BY MR. GARREN)*  Did you make, Mr. Larson,

5    any consideration -- or take any consideration or

6    examination as to groundwater flows in your analysis?

7         A.   Well, that's kind of a broad question.  I did

8    make evaluations and some calculations, as I spoke

9    about earlier, about the size of the area that a

10   typical well might draw its water from.  So in that

11   sense, yes.

12        Q.   That's the only analysis you did, though;

13   correct?

14        A.   That's the only quantitative analysis that I

15   did, yes.

16        Q.   Did you make any determination or

17   investigation as to where waste was disposed of as

18   part of your analysis?

19        A.   I didn't make any independent investigation.

20   I did in looking through the materials see maps

21   of -- that had been prepared by others of where that

22   might have occurred.

23        Q.   With regard to the house density analysis you

24   did, you did not perform any statistical testing of

25   that to determine the validity of your analysis, did

1   you?

2        A.   I'm not sure I understand the question.   I

3   did compute statistics on each of the figures, and

4   that was the extent of the statistical evaluations

5   that I did.

6        Q.   Did you compute any statistical measure of

7   the central tendency then?

8        A.   I did look at some of the median

9   concentrations in some of the histograms that I -- I

10  should say ratios in some of the histograms that I

11  prepared.

12       Q.   Did you compute a statistical measure of the

13  central tendency is what I'm asking you, sir?

14       A.   Yes, I did.  In my work, I did calculate the

15  medians for the populations that I presented in my

16  histograms.

17       Q.   What was the statistical analysis that you

18  used or performed?

19       A.   I took the median of the collection of values

20  of the different ratios that I computed and looked at

21  those medians.

22       Q.   Are you familiar with the Wilcox test?

23       A.   I'm familiar with a Wilcox rank sum test, if

24  that's what you're referring to.

25       Q.   And you didn't perform that, did you?

*9800*

1      A.   I did at one time look at that to make sure

2  that visually what I saw -- and I'm not sure if I used

3  that particular rank sum test, but I did look at a

4  statistical test to make sure that what I saw on the

5  histograms was statistically appropriate; in other

6  words, that there were significant differences in the

7  populations that I portrayed on the diagrams.

8      Q.   Is that statistical analysis in your

9  considered materials, sir?

10      A.   It should have been.

11           MR. GARREN:  I'll pass the witness, Your

12  Honor.

13           THE COURT:  Very well.  Let's take our

14  recess.

15           MR. MCDANIEL:  I was going to tell you

16  that we have no redirect, if you would -- if that's of

17  use to you.

18           THE COURT:  Very well.  You may be

19  excused.

20           THE WITNESS:  Thank you.

21               *(Short break)*

22           THE COURT:  The defendants may call

23  their next witness.

24           MR. TUCKER:  Dr. Billy Clay, Your

25  Honor.

 1            MR. MCDANIEL:  Your Honor, I was just

 2    going to ask you, would it be any trouble for the

 3    court if I was excused at about five minutes to

 4    twelve?  I've got a client matter I need to --

 5            THE COURT:  That would not bother the

 6    court at all.

 7            The other thing I need to alert you to is

 8    that I've had an eye appointment for about a year set

 9    for 4:15 tomorrow.  So we'll need to adjourn to give

10    me enough time to get out to 101st and Harvard or

11    something like that because you all are presenting

12    enough briefs that my eyes need a new prescription.

13                    **BILLY R. CLAY, DVM,**

14    *after having been first duly sworn, says in reply to*

15    *the questions propounded as follows, to-wit:*

16            THE COURT:  Sir, if you'll please state

17    your full name for the record.

18            THE WITNESS:  Billy R. Clay.

19            THE COURT:  Mr. Tucker.  Mr. Tucker,

20    you'll be pleased to know that the court's just been

21    reassigned the Arrow Trucking case this morning as

22    well.  Lucky me.

23            MR. TUCKER:  Well, you'll have to do

24    that one all by yourself, Your Honor.  I'll take care

25    of your SemGroup case for you.

1          THE COURT:  Okay.

2          MR. TUCKER:  I hope.

3                 **DIRECT EXAMINATION**

4    **BY MR. TUCKER:**

5      Q.   May it please the court, Dr. Clay, would you

6    tell the court something about your education.

7      A.   Yes, sir.  I'm a graduate of a high school

8    just south of here and a B.S. and M.S. at Oklahoma

9    State University in agricultural sciences with an

10   emphasis on agronomy, later a DVM degree, and then a

11   certification -- a board certification in veterinarian

12   toxicology.

13     Q.   And where did you obtain your veterinary

14   medicine degree?

15     A.   Also at Oklahoma State University.

16     Q.   Now, we've had several comments in this

17   courtroom about the recent football contest that

18   Oklahoma State University played for three quarters

19   and we don't need to go back into that.  So we are

20   just going to talk about the educational aspects of

21   the university, if you please.

22     A.   I don't care to comment about the football.

23     Q.   What is required to become board-certified in

24   veterinary toxicology?

25     A.   Well, it requires a study -- a period of

1    study of at least five years post-DVM degree and then

2    an application to the examining board for it

3    credentials, and after approval by credentials then

4    setting for an exam, take the exam, which

5    involves -- it can involve both written and oral.

6         Q.   It's been said that there is a direct

7    relationship between the amount of education a person

8    receives and the likelihood that that person goes on

9    to teach.  Did that saying apply to you?

10        A.   Well, I have taught, but only as a part of my

11   history.

12        Q.   Well, tell me about your teaching experience,

13   if you would.

14        A.   Well, as a -- as the study of agronomy, I was

15   a graduate assistant, a National Science Foundation

16   graduate assistant, and I taught forage crops.  That

17   was a course for undergraduates pertaining to the

18   establishment of forages -- or actually pastures and

19   range.  It was a pasture and range study.

20             Then while I was working on my board

21   certification, I taught at the College of Veterinary

22   Medicine.  Again, I taught things predominantly

23   related to food animal or herbivorous animal, which

24   included the consumption of forages.  I also taught

25   some others too.  I also taught a section in

 1   toxicology.

 2       Q.   Did you have any teaching experience in

 3   agronomy?

 4       A.   Yes.  That was the earliest one I mentioned.

 5   It was in agronomy as a graduate assistant, National

 6   Science Foundation graduate assistant.

 7       Q.   Are agronomy and veterinary medicine

 8   disciplines that are related?

 9       A.   Well, very much so.

10       Q.   Could you tell us how?

11       A.   Yes.  Agronomics pertain to both crops and

12   soils, and crops include forages for livestock.  A

13   veterinarian's focus is the health and management of

14   livestock as well as those, of course, that graze the

15   forages so it's important to understand the things

16   they eat.

17       Q.   Okay.  Does that also include the behavior of

18   livestock?

19       A.   That is a part of it, yes.

20       Q.   Are you a member of any professional

21   societies?

22       A.   Yes, I am.

23       Q.   Could you tell the court what societies you

24   are a member of?

25       A.   Well, locally I'm a member of the Oklahoma

1    Veterinary Medical Association, nationally the

2    American Veterinary Medical Association, the Academy

3    of Veterinary Consultants, the Crop Science Society of

4    America, American Society of Agronomy, Soil Science

5    Society of America.  There are some others.  But

6    American Board of Veterinary Toxicology and American

7    Academy of Comparative Toxicology.

8         Q.   Tell me about your other employment other

9    than teaching.

10        A.   Well, I've been employed at varied ways.  I

11   did some work for the Oklahoma Agricultural Experiment

12   Station.  I did work for -- I've done work for

13   pharmaceutical companies and I've done work for many

14   different private enterprise entities.

15        Q.   What kind of work did you do for

16   pharmaceutical companies?

17        A.   Most of that work was research and

18   development work for the purpose of developing

19   pharmaceuticals, and it was gathering data to submit

20   to the Food and Drug Administration for approval of

21   pharmaceuticals.

22        Q.   Have you been to the Illinois River Basin

23   before?

24        A.   Yes, I've been there.

25        Q.   Starting when?

1     A.   Many years ago, 40 or more.

2     Q.   Before even this lawsuit began?

3     A.   Long before.

4     Q.   About how many times would you estimate

5   you've been to the basin over your lifetime?

6     A.   I couldn't really estimate it because it's

7   been -- I've been there many, many times.

8     Q.   Have you testified off and on through the

9   years as an expert witness?

10     A.   Yes, I have.

11     Q.   Have you done consulting for companies in

12   connection with matters relating to the environment?

13     A.   I have.

14     Q.   Have you done consulting for companies in

15   matters relating to your specialties of toxicology,

16   veterinary medicine, and agronomy?

17     A.   I have in all respects, yes.

18     Q.   Did you agree to be a consultant and

19   ultimately a witness for us in this case?

20     A.   I did.

21     Q.   Would you tell the court generally what your

22   primary task was that we asked you to look at for this

23   case?

24     A.   Yes.  You were interested in having

25   characterization of the watershed from the

1    agricultural production point of view, and in

2    particular, single out the predominant species of

3    animals that were there and the land usage pertaining

4    to the production of those animals.

5        Q.   Were you asked to evaluate the numbers of the

6    predominant animals in the watershed?

7        A.   Yes.

8        Q.   And you understand that this lawsuit has to

9    do with allegations of manure and phosphorus?

10       A.   Yes.

11       Q.   Were you asked to make evaluations of the

12   predominant species in the watershed and their

13   production of manure and phosphorus?

14       A.   Yes.  To make estimates of those.

15       Q.   Were you asked to compare those with other

16   animals other than the predominant species that are

17   present in the basin?

18       A.   Yes, that's true.

19       Q.   Is that true as well?

20       A.   Yes, that is true.

21       Q.   Were you also asked to consider the behavior

22   of cattle in the Illinois River Basin?

23              MR. GARREN:  Your Honor, it's leading.

24              THE COURT:  Sustained.  Rephrase,

25   please.

1          MR. TUCKER:  Surely, Your Honor.

2      Q.  *(BY MR. TUCKER)*  Did any of your assignment

3  have to do with cattle?

4      A.  Yes.  There was some specific requests about

5  cattle relative to understanding how they function in

6  the watershed, which did include behavior.

7      Q.  How are you qualified to discuss behavior of

8  cattle?

9      A.  Well, I have lots of experience there as well

10  as education pertaining to behavior.  The experience

11  starts as a child in which I was given assignment in a

12  ranch setting to protect a herd of cattle that were

13  grazed in the lowlands.

14      Q.  When you say "a ranch setting," what does

15  that mean?

16      A.  Well, that means it was predominantly forage

17  and cattle.  In this case, it was more than just

18  cattle; there were other livestock.  But I had the --

19      Q.  Who gave --

20      A.  -- cattle responsibility.

21      Q.  Who gave you the assignment?

22      A.  Well, the assignment was actually given by my

23  father.

24      Q.  Is that where you lived?

25      A.  And it wasn't by request; it was mandated.

**United States District Court**

1      Q.   Well, tell me what you -- what that

2   assignment has to do with qualifying you to talk about

3   behavior of cattle.

4      A.   Well, we had a rather unique setting.  We

5   were in a watershed setting in which we -- there was a

6   stream that frequently flooded and in the spring and

7   the fall it was a real issue.

8           A large proportion of the pasture on this

9   property was in the lowlands, and so it was necessary

10  for me to monitor as my assignment.  If the weather

11  was likely to result in rainy weather, it was my

12  obligation to get the cattle out of the lowlands, take

13  them across the stream to the highlands.

14     Q.   All right.  And were the cattle always in the

15  lowlands?

16     A.   Well, they were when we put them there.  But

17  the important thing there was that I -- I may have to

18  go retrieve them any time of the day depending on what

19  the weather forecast is and really my time

20  availability.

21          Because it was from day to day, it might be

22  morning, it might be noon, it might be late in the

23  afternoon, and there have been occasions at night as a

24  matter of fact.  So over time I was able to determine

25  where to expect to find the cattle.  I knew from their

1  behavior where to find them.

2      Q.   Okay.  And generally where would you expect

3  to find them?  You said at different times of the day.

4  When did you -- where did you learn to expect to find

5  cattle?

6      A.   Well, if it were morning, up to about 10:00,

7  10:30, I could find them scattered out across the

8  pasture.  If it were from 6:00 to 8:00 in the evening,

9  I could also find them scattered across the pasture.

10  Anytime in between, I found them in the shade and/or

11  near water or in water if it were spring, summer,

12  fall.

13      Q.   In your years since that early assignment, as

14  you put it, have you had an opportunity to continue to

15  observe the behavior of cattle?

16      A.   Yes.  And, of course, in the course work that

17  I was required to take in order to become an

18  agronomist who had some specialty in forages, it was

19  necessary for me to understand the behavior of the

20  animal as well as a veterinarian it was important that

21  I understand the behavior of the animal.

22          So I had training that confirmed what I

23  already knew.  And in addition to that, I spent a

24  couple of years on a dairy prior to the education and

25  I learned behavior of dairy cattle as well.

1    Q.   And I'm assuming that you consistently

2   thanked your father for that early assignment which

3   led you to the study of veterinary medicine?

4    A.   Well, it was a contributor, no doubt.  And

5   yes, I did thank my father.

6    Q.   Did you determine the size of the land mass

7   of the Illinois River Basin?

8    A.   Yes.

9    Q.   How large is it?

10    A.   About 1.1 million acres.

11    Q.   Did you determine how much of the land in the

12   basin is devoted to farming and agricultural

13   production?

14    A.   Yes.

15    Q.   How did you go about doing that?

16    A.   Using the agricultural census, which is a

17   voluntary completion of the census forms from the USDA

18   in which farmers will fill those out.  And it -- they

19   report how many acres they use that are involved in

20   their farming operation.

21    Q.   And did you say that's sponsored by the

22   federal government?

23    A.   Yes.  It's the U.S. Department of

24   Agriculture.  They have a branch called the National

25   Agricultural Statistic Service.

1    Q.    How often is that census completed?

2    A.    Five years.  Fire-year intervals.

3    Q.    What is the purpose of the census?

4    A.    The purpose is for the U.S. Department of

5  Agriculture to monitor trends in production,

6  agriculture, as well as land usage.

7    Q.    Would you look in your notebook to

8  Defendants' Joint Exhibit 505, please?

9    A.    I have it.

10    Q.    What is Defendants' Joint Exhibit 505, if you

11  can tell us?

12    A.    This is the -- a copy of the census form,

13  yes.

14    Q.    Is that a blank form?

15    A.    Appears to be a complete copy of the -- of

16  the census form for 2002.

17    Q.    Is that the year that you used?

18    A.    That is the year that I used.

19          MR. TUCKER:  Your Honor, the defendant

20  would offer Defendants' Joint Exhibit 505.

21          THE COURT:  Any objection?

22          MR. GARREN:  None, Your Honor.

23          THE COURT:  Defendants' 505 is admitted.

24    Q.    *(BY MR. TUCKER)*  Now, you say you used the

25  census data to make your analysis about how much of

 1    the land in the basin is devoted to farming and

 2    agriculture and you said you used the 2002 census.

 3         Why did you use the 2002 census if they're

 4    completed every five years?

 5         A.   Well, at the time that I was assigned to do

 6    the work that I was doing, this was the most recent

 7    census that was available.

 8         Q.   When is the 2002 census actually published

 9    and made available to folks to work with?

10         A.   Well, in late 2003 or early 2004, you could

11    expect to get the bulk of the data.  At the zip code

12    level, it would have been somewhere in 2004.

13         Q.   How is the data presented?

14         A.   The data is presented in --

15         Q.   That's a poor question.  Let me rephrase the

16    question.

17         Does the data -- when the data's presented

18    for people to have access, are you looking at

19    individual census forms or tabulations of the census

20    forms?

21         A.   No.  It's a summary tabulation that the

22    statistic service provides.

23         Q.   And when you look at that, are you able to

24    make any geographic determinations of how the data's

25    presented?

1     A.   No.  Other than county level or possibly zip

2  code level.

3     Q.   And is it presented that way in the reports?

4     A.   In the reports, they present it at the state

5  level, the county level, and the zip code level.

6     Q.   And the zip code is the smallest unit that's

7  available?

8     A.   That's correct.

9     Q.   Does the farm census include information

10  about land use?

11     A.   Yes.

12     Q.   Is it mandatory to complete this census?

13     A.   No.

14     Q.   Now, the next most recent census would have

15  been the 2007 census?

16     A.   Correct.

17     Q.   Is it even completely available now to the

18  zip code level?

19     A.   I suspect that it is.  I have not checked,

20  but it was not -- it was not available in late 2008.

21  So it would have been somewhere in early 2009, if it

22  was all available.

23     Q.   And when was your report submitted, sir?

24     A.   In -- in early 2008.

25     Q.   All right.  The census, when it breaks these

1   things down by zip codes, is it reported by river

2   drainage basin?

3        A.   No.

4        Q.   So it doesn't separately call out the

5   agricultural uses within the Illinois River Basin?

6        A.   I may need to correct something.  I said my

7   report was in 2008.  I believe it is in 2009, wasn't

8   it?  I've forgotten the date on it.  I'm sorry.

9        Q.   Time flies, Dr. Clay, when you're having fun.

10       A.   I just can't remember the date on it.

11            MR. TUCKER:  If I may, Your Honor, it's

12   dated November 29, 2008.

13       A.   Okay.  Thank you.

14       Q.   *(BY MR. TUCKER)*  So to get back to the

15   question I was asking, does the census report by river

16   basin?

17       A.   No.

18       Q.   How did you determine the use of land areas

19   in the basin using zip codes in the census if it

20   doesn't report by river basin?

21       A.   Well, I had a zip code map in both electronic

22   as well as hard copy, and I was able to overlay that

23   on -- onto the watershed map and determine percentage

24   of zip code that relies -- or did lie within the

25   watershed.

1    Q.   Is that a reliable method to make that

2  analysis in your opinion?

3    A.   I believe it is.

4         MR. GARREN:  Objection, Your Honor;

5  foundation.  This gentleman is a toxicologist,

6  veterinarian toxicologist.  He's not an ag engineer.

7  He's not an ag economist.  He doesn't have the

8  authority or expertise to testify to that.

9         THE COURT:  Sustained.

10    Q.   *(BY MR. TUCKER)*  Can you read a map,

11  Dr. Clay?

12    A.   Certainly can.

13    Q.   What is a zip code map?

14    A.   A zip code map is nothing more than a

15  rendition created by the postal service that shows

16  where they deliver the mail and it is broken into

17  sections with defined boundaries.

18    Q.   Do zip code maps bear any relationship to

19  whatever you call a map that you put up on the wall?

20    A.   Do they vary?

21    Q.   To a road map.  For example, does a zip code

22  map bear any relationship to a road map?

23    A.   Well, you could see a road map -- you could

24  overlay a road map on a zip code map, and many of them

25  are for that matter, so that you can see the roads as

 1   well as the zip codes.

 2        Q.   On zip code maps, are geographic

 3   characteristics like cities and rivers shown?

 4        A.   Sure.

 5        Q.   And in your work in agronomy, have you worked

 6   with watershed maps before?

 7        A.   Well, yes.  I've worked with a variety of

 8   maps, topographic maps, actually road maps, section

 9   line maps.  Typically, everything that we deal with in

10   my business is based on identifying property, at least

11   at the section level, township, and range.  Of course

12   those overlay very well on zip codes also.

13        Q.   When you say "overlay," would you be more

14   descriptive as to what that means?

15        A.   Well, it means if you can acquire maps of

16   similar dimensions, you can overlay them, particularly

17   electronically, and in turn determine their

18   relationship to one and the other.

19        Q.   Is that kind of a map available for the

20   Illinois River Basin?

21        A.   Yes.

22        Q.   Does the zip code map for eastern Oklahoma

23   and zip code map for western Arkansas include the

24   Illinois River Basin?

25        A.   It does.

1        Q.   Were you able to find maps of consistent size

2    that permitted you to overlay those areas?

3        A.   Yes.

4        Q.   What was the purpose of overlaying those

5    areas?

6        A.   To determine which portion of the zip code

7    did lie within the watershed.

8        Q.   Did zip code lines neatly correspond with

9    watershed boundaries?

10       A.   No.

11       Q.   Were some zip codes entirely within the

12   watershed?

13       A.   Yes.

14       Q.   Were some zip codes entirely outside the

15   watershed?

16       A.   Well, many, of course.

17       Q.   As to those zip codes that were within the

18   watershed that did not neatly correspond within the

19   boundary lines, what did you do to make a

20   determination as to the percentage of land in a zip

21   code that was inside or outside the boundaries of the

22   Illinois River Basin?

23       A.   We did a standard --

24            MR. GARREN:  I object to the form, Your

25   Honor.  I don't know whether we're talking about a

 1   hard map; that is, a paper map, or whether we're

 2   talking about an electronic version.

 3                  THE COURT:  Overruled.  Go ahead.

 4        A.   The -- we used a standard method.  And the

 5   standard method was that -- we used a 25, 50, 75, 100

 6   on a percentage basis of zip code that was present or

 7   not present.

 8        Q.   Is that a method which was unique and

 9   developed for this lawsuit?

10        A.   Yes.

11        Q.   Had you ever done that before?

12        A.   I hadn't done that before.

13        Q.   Is it a hundred percent accurate?

14        A.   No.

15        Q.   Would you consider it to be generally

16   reliable for the purposes of the investigation that

17   you made?

18                  MR. GARREN:  Object, Your Honor.

19   There's been no foundation with regard to his ability

20   to testify to the reliability.  In fact, if you'll

21   listen to his testimony, he said that we did this, he

22   didn't do it.

23                  THE COURT:  Overruled.  It's for the

24   court to determine reliability.

25        Q.   *(BY MR. TUCKER)*  Dr. Clay.

1       A.   Please repeat that.

2       Q.   I'll try to do something close to it.

3            Do you believe that that method of

4  determining what percentage of the -- if you call them

5  the boundary zip codes, where the land mass was inside

6  or outside the watershed, was reliable for use for

7  your purposes in determining generally the amount of

8  agricultural uses of this million-some-odd-acre

9  watershed?

10      A.   Yes.  In that I was interested in an

11 estimate.  I knew I could not get the precise number

12 to begin with.

13      Q.   How many agricultural-use acres did you

14 calculate in the watershed as reported in the census?

15      A.   698,000 were tabulated.

16      Q.   About what percent is that?

17      A.   Well, it's approximately two-thirds of the

18 watershed.

19      Q.   Did the ag census capture all the acres

20 devoted to farming?

21      A.   No.

22      Q.   How do you know that?

23      A.   Well, I also did an assessment of the

24 property owners that exist in the watershed in which I

25 tabulated the number of property owners that owned

1    five acres or more.  That total number of property

2    owners was considerably more than was reported.

3                 MR. GARREN:  Your Honor, I'm going to

4    object to this line of questioning.  Again, we have an

5    agronomist and veterinarian toxicologist, and he's

6    opining on matters and things that he has not

7    established any experience, education, or foundation

8    for.

9                 THE COURT:  Overruled.

10   Q.    *(BY MR. TUCKER)*  How did you perform that

11   exercise, Dr. Clay?

12   A.    Used the county plat books as well as a map

13   that was identified at the section level.

14   Q.    Are county plat books something you have used

15   before in your work in agronomy?

16   A.    Many times.  Not only agronomy but other

17   places.

18   Q.    I appreciate -- in this courtroom we're

19   probably all clear about what a plat book is, but

20   there's been a suggestion that this case may end up

21   someplace else eventually.  If that were so, those

22   persons might not be familiar from their jurisdiction

23   with the term "plat book."  Would you explain it?

24   A.    Yes.  Each of the county seats will maintain

25   a record of property ownership within the county, and

```
 1    within that they keep a book that shows the property
 2    owners which in most cases includes a map.
 3         Q.   And then you mentioned a section map?
 4         A.   Yes.  If you -- if you have a map of the
 5    watershed that has the section numbers on it,
 6    township, and range, it's possible to correlate those
 7    directly.
 8         Q.   In doing that, did you make an approximation
 9    of the number of property owners in the basin?
10         A.   Yes.
11         Q.   Would that include homeowners or just or some
12    other classification?
13         A.   Well, it would be property owners of property
14    of five acres or greater.  We purposefully did not go
15    less than that.
16         Q.   Why not?
17         A.   Because we know that there would be lots of
18    lot-sized properties in the watershed.  There would
19    also be several people that liked to buy one acre or
20    two acres for their house.
21         Q.   Approximately how many such property owners
22    did you locate in the basin?
23         A.   About 6 -- excuse me -- about 11,000.
24         Q.   And of that 11,000, how many of those
25    property owners identified them to the census group as
```

1    being engaged in farming?

2        A.   About 4500.

3        Q.   Does the census have any information to

4    report on the use that those 6500 other property

5    owners are making of their property?

6        A.   No.

7        Q.   All right.  In the course of your

8    investigations in this file and for us, did you make

9    any other on-site investigations in the basin?

10       A.   Yes.  Several personal tours as well as

11   communication with a variety of people within the

12   basin, particularly county extension directors, area

13   directors, NRCS folks.

14       Q.   What's an area director?

15       A.   In the extension service, the people have

16   assignments that cover particular points of interest

17   in an area as opposed to just a county.  In other

18   words, they may have multiple counties in which they

19   have a responsibility for.

20       Q.   That category of people that you have just

21   discussed -- let me ask this question another way.

22            Is there a category of people in counties

23   that tend to have the most information about farming

24   activities and agricultural activities within their

25   counties?

1      A.   The ones I just mentioned would have the most

2   information at the local level.

3      Q.   Dr. Clay, what did you determine to be the

4   predominant land use of the land that was devoted to

5   farming?

6      A.   It's for pasture for livestock, or at least

7   forages for livestock.

8      Q.   Did you using the census consider how that

9   pasture or how that livestock land was actually used

10   and broken down?

11      A.   Well, I used the -- or I collected the data

12   from the census that shows their allocation of those

13   uses, yes.

14      Q.   I'd like you to turn to -- and if you'd pull

15   up please -- Tyson Demonstrative 262.  Could you

16   explain what Demonstrative 262 is, please, Dr. Clay?

17      A.   Yes.  This is the summary from the --

18   tabulated summary of the information collected from

19   the census.  They categorize it in the permanent

20   pasture for cattle, and then they show hay and

21   harvested forages, and then they show forages that are

22   planted, typically annually, for grazing, and then

23   woodland pastures.

24      Q.   Let's start at the top, if you would.  And I

25   can see soybeans, corn, and wheat, but let's start at

1    permanent pasture cattle.  And would you define or

2    explain what the census means when they talk about

3    permanent pasture cattle?

4        A.   Well, in the category of asking the people

5    filling out the census is that they identify permanent

6    pasture, meaning this is -- this is designated for one

7    use.  In most cases, that is a perennial plant that's

8    planted in the -- on that land and it is used for

9    cattle.

10       Q.   And the cattle would be expected to occupy

11   that pasture year-round; is that right?

12       A.   That's correct.

13       Q.   Now, the second category is hay/harvested

14   forage.  Would you explain that category?

15       A.   Yes.  That's land that is devoted to the

16   production of hay or to production of forages that

17   could be harvested in various ways.  Could be made

18   into silage.  Could be made into various other

19   forms.

20       Q.   Now, with the hay/harvested forage, we're

21   contemplating there that hay will be harvested or

22   baled; is that right?  Or silage will be collected and

23   baled?

24       A.   Well, silage won't be baled but hay would be

25   baled, yes.  Generally, that's the case.

1      Q.   Can you tell whether the hay that's harvested

2    there will be fed to cattle on that property?

3      A.   No.

4      Q.   Can it tell you whether the cattle -- whether

5    that hay will be sold and consumed within the basin or

6    outside the basin?

7              MR. GARREN:  Leading, Your Honor.

8              THE COURT:  Overruled.  It's "can it

9    tell you."  It's not leading.

10          Go ahead.

11     A.   It cannot tell you where it will be used.

12     Q.   *(BY MR. TUCKER)*  Would the same be true for

13   silage?

14     A.   That is correct.

15     Q.   Would you explain forage for grazing?

16     A.   Yes.  In that there are some stocker cattle

17   in this area -- that's lighter-weight cattle or

18   growing cattle -- and then there are a fair number of

19   dairies, they plant pasture on an annual, basis and

20   some of it is overseeded and others as well, so that

21   planting is what would be forage for grazing.

22     Q.   All right.  Now, how is that different than

23   permanent pasture?

24     A.   Well, permanent pasture comes back from the

25   base of the plant or the crown, if you will, every

1   year regardless of frost.  These plants usually

2   terminate their growth -- they have a growth cycle

3   that ends within a year.

4       Q.   Would you give some examples of what forage

5   for grazing crops would be?

6       A.   Small grains are typically used, wheat, oats,

7   rye, barley, rye grass, sudangrass, millet, things of

8   that nature.

9       Q.   And the fourth category, woodland pastures,

10  would you define that for us, please?

11      A.   That is part of -- part of the property

12  owner's land that they -- that is forested, yet they

13  use it for pasture for cattle.

14      Q.   In other words, the cows can get in between

15  the trees to graze?

16      A.   Correct.

17      Q.   Of those categories -- permanent pasture,

18  harvested, forage, and woodland pastures -- are

19  woodland pastures susceptible to being fertilized by

20  anything, chemical fertilizer or poultry litter or

21  anything else?

22      A.   Not very easily.

23      Q.   Why is that?

24      A.   Well, as it says, it's woodland pasture and

25  generally you have to have equipment access in order

1   to apply fertilization.  It could be done but it would

2   be much more difficult.  It would require hand

3   application.

4       Q.   Did you reach a conclusion as to whether the

5   ag census fully explains and accounts for all

6   agricultural use of land in the basin?

7       A.   Well, no, it doesn't.  But it makes an

8   estimate.

9       Q.   And how does it -- how does it miss the mark,

10  if you believe it misses the mark?

11      A.   Well, as pointed out earlier, I know that

12  there's an additional 6,000 property owners there with

13  acreage five or greater that do not report to the

14  census so they do something with their land.  And

15  so --

16      Q.   Do you know of any of those owners,

17  particularly that have had cattle on their land, that

18  fit in that category?

19      A.   Well, through recent conversation, I learned

20  of one.

21      Q.   Who is that?

22           MR. GARREN:  Objection; hearsay.  Not

23  established also whether we're talking about the IRW,

24  Your Honor.

25           THE COURT:  Sustained.

1    Q.   *(BY MR. TUCKER)*  From reading the transcript

2    in this case, Dr. Clay, did you learn of an individual

3    in this courtroom who does not report to the census

4    but who raises cattle and has more than five acres?

5    A.   Yes.

6    Q.   Would you identify that person, please?

7    A.   Mr. John Elrod.

8    Q.   But as you said, it's not mandatory to

9    report; is that correct?

10   A.   That's correct.

11   Q.   Why is it that people don't report, if you

12   know?

13   A.   Well, they have a variety of reasons for not

14   reporting so I can't tell you why an individual would

15   not report.  I perhaps could tell you why Mr. Elrod

16   didn't report.

17         MR. TUCKER:  I apologize, Your Honor.  I

18   did kind of set that one up for him.

19         THE COURT:  The IRS is no longer with

20   offices in this building.

21   Q.   *(BY MR. TUCKER)*  Did you -- Dr. Clay, did you

22   study the type of cattle production that normally

23   occurs in the basin?

24   A.   Yes, I did.

25   Q.   What did you find is the type of cattle

```
 1   production that predominates?

 2                  MR. GARREN:  Objection; foundation.

 3   What he did to do that.

 4                  MR. TUCKER:  Well, Your Honor, I think

 5   what he said earlier was he conversed with the various

 6   people in the counties who were most knowledgeable as

 7   well as personally going through the watershed.  But

 8   there's also one other thing that we could add to kind

 9   of move that along.

10       Q.   (BY MR. TUCKER)  If we could turn, Dr. Clay,

11   to Defendants' Joint Exhibit 505 -- I think it's 505.

12   Well, actually I'm going to do that later.

13           So let me just go back to saying that the

14   basis of the types of cattle usage that are in the

15   basin was originally determined I think -- well, let

16   me ask you this:  How did you determine it?

17       A.   Well, I have a lot of experience with cattle

18   production in Oklahoma and Arkansas for one thing.

19   The other is that in communication with the county

20   extension directors and area extension directors, I

21   got additional information.

22       Q.   What experience do you have with cattle

23   production before you got to this case?

24       A.   Well, I described some of it earlier.  And

25   then of course in order for me to continue my studies
```

1  over the years, I was interested in cattle in

2  particular, although I'm interested in all the

3  livestock.

4         So I studied what Oklahoma's cattle

5  production looks like, if you will, not once, but many

6  times.  I've looked at the Arkansas cattle production

7  as well as other livestock production, not once, but

8  many times.  I have communicated with university

9  personnel in both the University of Arkansas and

10  Oklahoma State University pertaining to cattle

11  production there.  I've read numerous pamphlets,

12  pieces of research, pieces of information pertaining

13  to livestock production in general in those states.

14         I feel comfortable that I know what the

15  business is in general.

16     Q.   Are there any earth-shattering differences

17  between cattle production that occurs in the Illinois

18  River Basin and cattle production that occurs

19  elsewhere in eastern Oklahoma?

20     A.   No.  And not -- I mean, it's just terrain.

21  You know, there's places in western Oklahoma that

22  would be different, different kinds of forages, but

23  basically they're the same.

24     Q.   All right.  What did you find about the

25  cattle production that occurs generally in the basin?

1        A.    There are three types of -- or groups of

2   cattle that you can expect to find there.  You find a

3   cow-calf operation, which is -- the sole purpose of

4   that business is to produce a baby calf that raises up

5   to weaning weight, which is about generally 210 days,

6   approximately 500 pounds, and that is the item that is

7   sold from that property and that's the sort of income.

8        The other beef cattle operation is called a

9   stocker operation.  That's a situation in which either

10  on planted forages, or permanent pasture in many

11  cases, folks will buy wean-age cattle with the

12  objective of growing them to a level whereby they

13  could be placed in feed yards, and that's generally

14  from the 500-pound range up to about 800 pounds, and

15  then sell them and send them on to the feed yard.

16       In that operation, that is their business.

17  So they set a group of cattle in, raise them to that

18  level, sell them, replace them with a new group of

19  cattle, and so on and so on.

20       And then there is the dairy operation.  There

21  are -- there are dairies in both Arkansas and Oklahoma

22  within the Illinois River Watershed.  The dairy

23  operation in this case is typically a forage-based

24  operation, although they have to have feed imported,

25  and their primary business of course is the production

 1    of milk.  Now, they do produce calves but the calves

 2    generally are not an important economic part of their

 3    business except for the heifers that they would save

 4    for replacement.

 5         Q.   Now, let's go back to the cow-calf.

 6              You indicated that the cow-calf operation

 7    sells the calves off each year; right?

 8         A.   Yes, that's right.

 9         Q.   Does the cow-calf operator sell anything else

10    off besides the calves?

11         A.   Well, they have to sell the cull cows and/or

12    the cull bulls.

13         Q.   What are cull cows and cull bulls?

14         A.   Well, the life of a beef cow is about eight

15    years, and so they have to plan to replace that beef

16    cow every eight years.  So that means that on an

17    annual basis, they'll be culling some percentage of

18    the cows, typically at ten percent, if you will, cull

19    on an annual basis.  And so those culls will either go

20    on pasture for -- so that they can put some weight on

21    and hit a better market condition, or they'll be sold

22    directly from the place and sent to the sale barn or

23    wherever they're sold.

24         Q.   And you say that the working span of a cow is

25    about eight years?

1      A.   Yes.   That's the productive life of a cow.

2      Q.   What is the productive life of a bull?

3      A.   About four years.

4           MR. GARREN:   Relevance, Your Honor, with

5  regard to the productive lives of cattle.

6           THE COURT:   Relevance?

7           MR. TUCKER:   Your Honor, it's important

8  to know how many cattle are on the land.   For example,

9  if you replace a bull every four years, you can't just

10  pick up a bull from your neighborhood and say, would

11  you drop on by on Friday night.   You got to be able to

12  have a bull on stream coming along.   The same thing

13  with heifers.   You have to have replacement heifers.

14           So we're talking about total numbers of

15  animals which leads to totals amounts of manure which

16  leads to total tons of phosphorus.

17           MR. GARREN:   He's also testified that we

18  have a census of that and he's knowledgeable of the

19  census.   He understands that his use of that is solely

20  as an estimate.   I don't see the relevance in the

21  detail that we're getting into, Your Honor.

22           THE COURT:   Yeah.   What's the relevance

23  of the background here?

24           MR. TUCKER:   The relevance is is because

25  the way the census reports, if all cows all weighed a

1    thousand pounds, then all you'd have to do would be to

2    add things up, but all cows don't all weigh a thousand

3    pounds.  So you have to determine what the cow

4    population and the cattle population consists of in

5    order to make the next step which is how much manure

6    which leads to how much phosphorus.

7                    THE COURT:  Overruled.

8         Q.   (BY MR. TUCKER)  With regard to heifers, if

9    you cull -- if you cull a cow in eight years, what is

10   the -- how do you replace the cow that you're

11   culling?

12        A.   Well, it really takes a portion of two

13   heifers, if you will.  You have to have a portion of a

14   heifer that's approaching the calving age, which is

15   two years, and then you have to have a heifer that is

16   lightweight coming on.  So that's the way it's done.

17   They tend to have a heifer saved back each year that

18   is going to contribute to that replacement.

19        Q.   Did you determine the approximate number of

20   cattle total in the watershed?

21        A.   Yes.

22        Q.   And what is that?

23        A.   About 200,000 head.

24        Q.   How did you use the census data to calculate

25   those numbers -- or that number?

1      A.   The census reports cattle as in different

2  categories, reports it in inventory of beef cows, as

3  well as other cattle, and then it has sales data as

4  well.

5          So I used the inventory as a primary source,

6  because cattle that are there the entire year are the

7  primary contributors to the manure and/or phosphorus

8  that exists there.  So I picked out the cattle that

9  would be there the entire year, made an estimate of

10 those, the estimate of the manure that they produce,

11 as well as the phosphorus that's present in the

12 manure.

13          MR. TUCKER:  Could you pull up for me

14 Defendants' Joint Exhibit 505, page 0011?

15      Q.   *(BY MR. TUCKER)*  And that's going back to the

16 blank census form, Dr. Clay.  It's page 0011 of our

17 exhibit numbers.  It's identified here as section 10

18 of the census form.

19          Could you look at the first half of that

20 which relates to inventory and explain that -- how

21 that -- those questions are asked and what they mean

22 to your analysis?

23      A.   Yes, sir.  It has the categories under

24 inventory of -- it has three categories at the top of

25 that -- or top of the page -- top half of the page.

1    And the first one is the beef -- excuse me -- total

2    number of cattle and calves on hand; then beef cows,

3    including beef heifers that have calved; milk cows,

4    both dry and/or milking cows; and then all other

5    cattle after that.

6        Q.   I noticed, for example, other cattle includes

7    heifers, steers, calves, and bulls.

8        A.   Yes.

9        Q.   Well, those clearly aren't -- don't all weigh

10   the same, do they?

11       A.   No.

12       Q.   And they clearly would not all produce the

13   same quantity of manure?

14       A.   No.

15       Q.   Would it have been possible just to take the

16   total of those four and say this is how we're going to

17   calculate manure in the basin?

18       A.   It is possible to do that.

19       Q.   How do you do that?

20       A.   Well, what I did was, in fact, use the --

21            MR. GARREN:  Objection, Your Honor;

22   foundation again.  We have a toxicologist who's now

23   going to give us an accounting or an economist opinion

24   or point of view, and he's not qualified nor does he

25   have -- has he testified to any education, skills, or

1    training specifically with regard to this kind of

2    economics opinion.

3                THE COURT:  All right.  Insofar as this

4    is a continuing objection, any response here,

5    Mr. Tucker?

6                MR. TUCKER:  Your Honor, the man's a

7    veterinarian.  He starts dealing with cattle manure

8    from the time he walks in the first day of his

9    clinical practice.

10                THE COURT:  Overruled.

11        A.   Okay.  Where were we, sir?

12        Q.   *(BY MR. TUCKER)*  Well, I think I was asking

13    you, were you able to calculate the total tons of

14    cattle manure deposited in the basin each year?

15                *(Discussion held off the record)*

16        A.   Yes.

17        Q.   *(BY MR. TUCKER)*  And what did you determine

18    to be the total tons of cattle manure deposited in the

19    basin each year?

20                MR. GARREN:  Objection, Your Honor.  I

21    think a foundation is necessary to show what he did to

22    do that.

23                THE COURT:  Sustained.

24        Q.   *(BY MR. TUCKER)*  All right.  Tell me what you

25    did to determine the amount of manure produced by

United States District Court

1    cattle in the basin.

2        A.   I looked at the cattle there that were going

3    to be there year-round and made an estimate of the

4    amount of manure that each cow unit would -- would

5    produce, as well as the stocker units would produce,

6    and applied the American Society of Agricultural

7    Engineers' manure characteristics and content -- or

8    production and content for phosphorus and made those

9    calculations accordingly.

10       Q.   Is that American Society of Agricultural

11   Engineers data material something that you normally

12   use in your capacity as a veterinarian?

13       A.   Yes, I've used it before.

14       Q.   For how many years?

15       A.   Several.

16       Q.   And based upon that, what did you calculate

17   to be the total tons of cattle manure deposited in the

18   basin each year?

19            MR. GARREN:  Your Honor, I'm going to

20   object again because he hasn't testified that, in

21   fact, the use of that data is for purposes, as we see

22   here in this court, that he's made these calculations.

23   He's drawn it from sources that typically a

24   veterinarian would not use, applied some kind of

25   economics to it.

 1         His answer was to a question about how much

 2    manure is produced, and he answered it, well, I've

 3    calculated phosphorus.  None of this sets the proper

 4    foundation.

 5              THE COURT:  Overruled.  It's subject to

 6    cross-examine.

 7         Go ahead.

 8    Q.   *(BY MR. TUCKER)*  Dr. Clay.

 9    A.   Could I hear it again?  I'm sorry.

10    Q.   Well, let's just start over.

11         You've told us that this ASAE material is

12    something that you normally used as a veterinarian?

13    A.   Yes.  Is that the question?

14    Q.   Is that correct?

15    A.   That is correct.

16    Q.   And is that customarily used by other

17    veterinarians in their practice?

18    A.   Yes.  And, in fact, veterinarians are very

19    much concerned about the economics of a productive cow

20    herd because their entire business depends upon the

21    economic survivability of the owner of the cow.  So

22    it's important to use those data and understand it.

23    Q.   I guess if the rancher doesn't survive,

24    neither does the veterinarian.

25    A.   That is correct.

1      Q.   And I want to ask you about manure.  That's

2   all we're talking about right now.

3           Did you use those materials to determine the

4   amount of manure that's produced by all the cattle in

5   the basin each year?

6      A.   Yes, yes.  The cattle that I considered to be

7   year-round survivors.

8      Q.   And what did you calculate that to be?

9      A.   The number?

10      Q.   Yes.

11      A.   I believe that was about 233,000 dry tons per

12   year.

13      Q.   What is the difference between a dry ton and

14   a wet ton?

15      A.   Well, of course a wet ton is as the weight is

16   produced.  In other words, when an animal excretes the

17   manure, it is wet and drops right on the ground.

18      Q.   And the dry ton would be after the water has

19   evaporated or otherwise gone away?

20      A.   Or by knowing the amount of dry matter that's

21   typically in cattle manure, one can make an estimate

22   of the dry weight, and that is what I did.

23      Q.   Did we ask you to determine, the best you

24   could, in your capacity as an expert the number of

25   tons of poultry manure produced in the basin each

**United States District Court**

1    year?

2        A.    Yes.

3        Q.    Were you able to do so?

4        A.    Yes.

5        Q.    Explain how you determined that tonnage.

6        A.    The tonnage again was based on the number of

7    birds that was determined to be in the watershed from

8    the census data and then using a similar approach as I

9    described earlier.  First of all, how much do the

10   different kinds of birds produce on a daily basis and

11   then how much phosphorus is present in that manure.

12   So both of those calculations can be made.

13       Q.    All right.  Now, are zip codes a hundred

14   percent accurate for poultry?

15       A.    No.

16       Q.    And would you tell us some of the

17   shortcomings of using the zip code method for

18   calculating the numbers of poultry in the basin?

19       A.    The census data is guaranteed by the census

20   people to be confidential.  In order to make it

21   confidential at the zip code level, if there's only

22   four producers there, they won't report it at the zip

23   code level.

24       Q.    For example, with regard to chickens, do you

25   know if that had an effect in this watershed?

1      A.    It did.

2      Q.    Explain that to the court, please.

3      A.    There was some of the chickens -- chicken

4    operations that were not reported.  Or excuse me.

5    Yes, the chicken operations that weren't reported.

6      Q.    All right.  Do you know of any in particular?

7      A.    Well, one in particular that was pointed out

8    to me is Butler Farms.

9      Q.    And is Butler Farms not reported?

10      A.    It is not reported in the census.

11      Q.    Is Butler Farms' production a significant

12    number of birds?

13      A.    Yes, it is.

14      Q.    How large is it?

15      A.    About six million birds.

16      Q.    All right.  And what about with regard to

17    turkeys; are there gaps in the poultry counts using

18    zip codes?

19      A.    There are gaps in the turkeys too.

20      Q.    Okay.  And about what would that gap be?

21      A.    That's about two million birds.

22      Q.    Now, would it have been better to use sales

23    figures?

24      A.    Well, no.  It wouldn't have been reported

25    either.

1      Q.    Would it have been better -- all right.

2            Do you know whether Mr. Butler's litter was

3      applied in the basin?

4      A.    No, it was not.  It was shipped out.

5      Q.    After you delivered your original report, did

6      you prepare and subsequently deliver an errata?

7      A.    I did.

8      Q.    And what kinds of changes were made?

9      A.    There was some -- some spreadsheet changes

10     where there were some errors and those were identified

11     and corrected.

12     Q.    Is your testimony here based upon the

13     original report or the errata?

14     A.    On the errata.

15     Q.    And did you -- you said you did determine the

16     number of tons of poultry manure produced in the basin

17     each year.  What number did you reach as the probable

18     number?

19     A.    I think that was about 210,000 tons dry

20     weight.

21     Q.    With regard to the number of birds in the zip

22     code method, you understand that witnesses for the

23     state used other methods to determine the numbers of

24     poultry; is that correct?

25     A.    Yes.

1    Q.   At the end of the day, what was the

2    percentage difference between the numbers of poultry

3    totaled using your method as compared to the method

4    used by the state witnesses?

5    A.   Less than one percent difference.

6    Q.   All right.  Does it make any difference

7    whether manure is wet or dry when you're trying to

8    determine how much phosphorus is contained in manure?

9    A.   No.

10    Q.   Did you determine the amount of phosphorus

11    that is in cattle manure?

12    A.   Yes.

13    Q.   Would you tell us what method you used to do

14    that?

15    A.   As I explained earlier, I used the 2003 ASAE,

16    the Society of -- American Society of Agricultural

17    Engineers.  They have phosphorus produced on a

18    thousand-pounds-body-weight basis daily, and I used

19    those numbers.

20    Q.   Are these regularly-published numbers that

21    are used in your profession?

22    A.   Yes.

23    Q.   It's like a standardized text reference?

24    A.   It is a reference.

25    Q.   Now, you say it's so much production of

1    phosphorus per thousand pounds.  A thousand pounds of

2    what?

3        A.   Body weight.

4        Q.   And how did you make that determination?  Is

5    that just for phosphorus or is that for manure as

6    well?

7        A.   For manure and phosphorus.

8        Q.   So how did you relate the thousand pounds of

9    body weight to the fact that we have different kinds

10   of animals under the classification of cattle?

11       A.   Well, ultimately convert it to a thousand

12   pounds to make the comparison.  But in order to get

13   there, you have to use each class of animal to make

14   those calculations independently.

15       Q.   And did you do that?

16       A.   Yes.

17       Q.   And how did you reduce those to

18   thousand-pound units?

19       A.   First calculated as to what they would

20   represent in total.  In other words, a basic economic

21   unit would represent so many animal units and -- or

22   portions of animal units and then convert it to

23   thousand-pound units.

24       Q.   Is that the practice that's customarily

25   followed in your profession?

1    A.   Yes.

2    Q.   And using that, did you determine the amount

3   of phosphorus in the cattle manure that's deposited in

4   the basin each year?

5    A.   I did.

6    Q.   And what is that amount?

7    A.   About 3100 tons.

8    Q.   Did you make a determination of how much

9   phosphorus is in the manure produced by poultry in the

10   basin each year?

11    A.   I did.

12    Q.   How did you determine that?

13    A.   In a similar fashion.

14    Q.   Now, we've had jokes about the thousand-pound

15   chicken.  Is that -- is that -- and it seems kind of

16   silly.  But is that the way you have to calculate it

17   in order to be talking about apples and apples?

18    A.   Well, if you're going to use the guide books,

19   it's based on a thousand pounds and that makes it

20   simple, or relatively simple.

21    Q.   So we gather together a thousand pounds of

22   chicken and calculate it that way?

23    A.   Correct.

24    Q.   And based upon that, about how much

25   phosphorus is in the manure produced by poultry in the

1   basin each year?

2        A.   Also about 3100 tons, slightly more.

3        Q.   Now, just to be clear, are tons of litter the

4   same thing as tons of poultry manure?

5        A.   No.

6        Q.   Quickly if you might explain the difference

7   just for the record.

8        A.   Well, manure is that which is excreted from

9   the bird directly onto the bedding, then the bedding

10  and the manure together become the litter.

11       Q.   And the same is true with regard to cattle

12  manure, isn't it, that the tons of phosphorus in

13  cattle manure is not the same as thinking of the -- of

14  the chunk of cow manure on the pasture?

15       A.   Restate that, if you would, sir.

16       Q.   Well, in other words, a cow patty is not

17  composed entirely of phosphorus obviously?

18       A.   Oh, absolutely not, no.  It's the water.  The

19  dry components are the solids, if you will, and the

20  solids would have in it phosphorus.

21       Q.   Did you determine how much of the phosphorus

22  in the poultry manure produced in the basin is

23  available to potentially be applied in the basin?

24       A.   Yes.

25       Q.   And what was that amount?

1      A.   Well, that -- that's -- what I did was

2  calculate the amount that was exported, and that left

3  a number of -- I've forgotten what the number is

4  exactly after export.  It's in my -- I think it was

5  about 2900 tons or 2800, something like that.  I can't

6  remember exactly.

7      Q.   How did you determine the amount of manure

8  that was exported from the basin?

9      A.   There was an accounting made of exported

10  manure from the Illinois River Watershed from about

11  2005 through 20 -- well, currently, and I took the

12  last three years of that data which was available to

13  me.

14      Q.   And that tabulation was made by what

15  organization?

16      A.   BMP, Inc.

17      Q.   How much phosphorus would be in 70,000 tons

18  of exported litter?

19      A.   About 750 pounds -- excuse me -- tons.  750

20  tons of phosphorus in 70,000 tons of litter.  And

21  70,000 tons we're talking about is wet weight, by the

22  way.

23      Q.   Is it possible that some litter with manure

24  may have been imported to the basin?

25      A.   Sure.

1      Q.   Is it possible that some litter may have been

2  exported that was not included in your export total?

3      A.   Sure.

4      Q.   Is there any way to tell what those numbers

5  will be?

6      A.   Probably not without a subpoena.

7      Q.   Is there any certainty that 70,000 tons wet

8  weight will continue to be exported?

9      A.   No.

10      Q.   Did you make a determination of the amount of

11  phosphorus produced by other animals and deposited in

12  the basin each year?

13      A.   I did.

14      Q.   How did you do that?

15      A.   Following a similar method as before

16  using -- using the census.  But in the case of

17  wildlife, I had to use other methods to do that, and

18  much of that information I was able to acquire through

19  recent TMDLs that have been filed.

20      Q.   What does other animals consist of?

21      A.   Well, it's swine, deer -- well, deer in the

22  case of wildlife, horses, sheep, ducks, geese, wild

23  turkeys.

24      Q.   And the domestic animals, I gather, were

25  reported in the census?

1       A.    Yes.

2       Q.    But wildlife is not?

3       A.    That's right.

4       Q.    So for that, what data do you use?

5       A.    I relied on data from the wildlife services

6    from both states.

7       Q.    Taken together, what did you find insofar as

8    the -- well, did you take that calculation on down and

9    also determine the amount of phosphorus that those

10   animals produced from their manure?

11      A.    Yes.

12      Q.    Using the same methods as you've described

13   before?

14      A.    Yes.  In the case of the wildlife, though, as

15   I said, I got the guidelines from the TMDLs.

16      Q.    What did you find as to the total for other

17   animals approximately?

18      A.    About 950 tons of phosphorus.

19      Q.    Okay.

20            MR. TUCKER:  If we could pull up

21   Demonstrative 263.

22      Q.    *(BY MR. TUCKER)*  Would you tell the court

23   what that is intended to show?

24      A.    This is a table from my report, and it shows

25   the dry mass -- the summary of the dry mass or dry

 1   weight of the manure of all of the classes of animals

 2   that I made calculations on.

 3       Q.   Now, let me interrupt you at this point.

 4           For beef cattle, you show 217,000 and for

 5   poultry you show 157,000.  I thought you told us that

 6   the total amounts of manure were about the same?

 7       A.   I did.  But this is -- this has the export

 8   taken out of it.

 9       Q.   So that is net of BMP's 70,000 tons?

10       A.   It is net of BPM.

11       Q.   All right.  And then does this chart also

12   demonstrate the amount of phosphorus contained in that

13   manure?

14       A.   Yes.  It's shown in the fourth column --

15   well, actually fifth column from the left.

16       Q.   And for other animals, would you identify in

17   this sheet, just so we have it clear, which of the --

18   which of the lines relate to other animals?

19       A.   Hogs and pigs, horses and ponies, whitetail

20   deer, sheep and lambs, while turkeys, wild geese and

21   ducks.

22               MR. TUCKER:  Please pull up

23   Demonstrative 265.

24       Q.   *(BY MR. TUCKER)*  Could you tell us what is

25   that intended to illustrate, please, Dr. Clay?

1    A.   This is a bar graph to illustrate the

2  phosphorus production for all cattle, poultry, poultry

3  after export compared to all other animals.

4    Q.   And I see two columns for poultry.   Is

5  one -- one says "less exported" and one just says

6  "poultry."

7    A.   The one that says "poultry" is production,

8  what phosphorus is produced on an annual basis of the

9  poultry in the watershed.   That is produced.   It

10  doesn't say what happens to it.   Likewise with the

11  cattle.

12    Q.   So when you reduce it down to its base

13  question here in this courtroom, which is phosphorus,

14  it looks like, as far as production is concerned, that

15  cattle and poultry is roughly equivalent?

16    A.   Yes.

17          MR. TUCKER:   Please pull up

18  Demonstrative 266.

19    Q.   *(BY MR. TUCKER)*   And could you explain, just

20  for illustrative purposes, what you intend to show

21  with this?

22    A.   Well, in this case, it shows the cattle again

23  at 3136.   It shows the poultry less exported.   So

24  that's poultry litter that is available for

25  application to the watershed.

1    Q.    Now, why do you say "available"?

2    A.    Well, we don't know whether it is applied

3 because something else could be done with it.  It's

4 available.  I have no record of whether it's applied

5 or not.

6    Q.    As a part of your analysis, did you determine

7 whether poultry-growers apply all their litter in

8 their houses every year?

9    A.    Well, poultry-growers certainly don't.

10 Poultry-growers, if they have cattle in pasture, they

11 may apply some.

12              MR. GARREN:  Your Honor, I'm going to

13 move -- I object to this.  We don't have a foundation

14 where he's getting his poultry information and --

15              THE COURT:  Sustained.  Let's take our

16 recess for lunch.

17              *(Lunch recess was taken)*

18

19

20

21

22

23

24

25

*9855*

1          C E R T I F I C A T E

2

3

4          I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11          I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16          In witness whereof, I have hereunto set my

17   hand this 5th day of January 2010.

18

                    s/ Brian P. Neil
19         _____

                Brian P. Neil, CSR-RPR, CRR, RMR
20              United States Court Reporter

21

22

23

24

25

**United States District Court**