IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )    No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )


VOLUME 87 – PM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 6, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE


*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                  *United States Court Reporter*

10129

1                    A P P E A R A N C E S

2

3   For the Plaintiffs:          MR. W.A. DREW EDMONDSON
                                 MS. KELLY FOSTER
4                                Office of Attorney General
                                 State of Oklahoma
5                                313 N.E. 21st St.
                                 Oklahoma City, OK  73105
6

7                                MR. DAVID RIGGS
                                 MR. DAVID P. PAGE
8                                MR. RICHARD T. GARREN
                                 Riggs Abney Neal
9                                Turpen Orbison & Lewis
                                 502 W. 6th Street
10                               Tulsa, OK 74119

11
                                 MR. ROBERT A. NANCE
12                               MS. KELLY FOSTER
                                 Riggs Abney Neal
13                               Turen Orbison & Lewis
                                 5801 Broadway
14                               Oklahoma City, OK 73118

15
                                 MR. LOUIS W. BULLOCK
16                               MR. ROBERT BLAKEMORE
                                 Bullock Bullock &
17                               Blakemore
                                 110 W. 7th St.
18                               Suite 770
                                 Tulsa, OK 74119
19

20                               MR. FREDERICK C. BAKER
                                 MS. ELIZABETH CLAIRE XIDIS
21                               MS. INGRID L. MOLL
                                 Motley Rice LLC
22                               28 Bridgeside
                                 P.O. Box 1792
23                               Mount Pleasant, SC 29465

24

25

**United States District Court**

```
 1              A P P E A R A N C E S  (Cont.)

 2

 3   For Tyson Foods:            MR. ROBERT W. GEORGE
                                 Tyson Foods, Inc.
                                 2210 West Oaklawn Drive
 4                               Springdale, AR 72701

 5

 6                               MR. FRANK R. VOLPE
                                 MR. MARK D. HOPSON
                                 MR. THOMAS C. GREEN
 7                               MR. JAY THOMAS JORGENSEN
                                 MR. GORDON D. TODD
 8                               ERIC J. IVES
                                 CARA R. VIGLUCCI LOPEZ
 9                               Sidley Austin LLP
                                 1501 K St. NW
10                               Washington, DC 20005

11

12                               MR. PATRICK MICHAEL RYAN
                                 Ryan Whaley Coldiron and
                                 Shandy PC
13                               119 N. Robinson, Rm 900
                                 Oklahoma City, OK 73102

14

15

16   For Cargill:               MR. JOHN H. TUCKER
                                 MS. THERESA HILL
                                 Rhodes Hieronymus Jones
17                               Tucker & Gable
                                 100 W. 5th St., Ste 400
18                               Tulsa, OK 74103

19                               MR. DELMAR R. EHRICH
                                 MS. KRISANN KLEIBACKER LEE
20                               Faerge & Benson
                                 90 S. 7th St., Ste 2200
21                               Minnaepolis, MN 55402

22

23   For Simmons Foods:         MR. JOHN R. ELROD
                                 MS. VICKI BRONSON
24                               Conner & Winters
                                 211 E. Dickson St.
25                               Fayetteville, AR 72701
```

```
 1                  A P P E A R A N C E S  (Cont.)

 2

 3   For Peterson Farms:           MR. A. SCOTT MCDANIEL
                                   MR. PHILIP HIXON
                                   MS. NICOLE LONGWELL
 4                                 McDaniel Hixon Longwell &
                                   Acord PLLC
 5                                 320 S. Boston, Ste 700
                                   Tulsa, OK 74103
 6

 7

 8   For George's:                 MR. GARY V. WEEKS
                                   MR. WOODY BASSETT
                                   MR. VINCENT O. CHADICK
 9                                 MS. K.C. TUCKER
                                   Bassett Law Firm
10                                 P.O. Box 3618
                                   Fayetteville, AR 72702
11

12

13   For Cal-Maine:                MR. ROBERT SANDERS
                                   Young Williams P.A.
                                   P.O. Box 23059
14                                 Jackson, MS 39225

15

16                                 MR. ROBERT P. REDEMANN
                                   Perrine McGivern Redemann
                                   Reid Berry & Taylor PLLC
17                                 P.O. Box 1710
                                   Tulsa, OK 74101
18

19

20

21

22

23

24

25
```

**United States District Court**

1                          I N D E X

2

3                                                    Page

4

5    *WITNESSES ON BEHALF OF THE DEFENDANTS*

6

     **GORDON C. RAUSSER, PH.D.**
7

     Continued Direct Examination by Mr. Hopson      10133
8    Cross-Examination by Mr. Garren                 10170
     Redirect Examination by Mr. Hopson              10214
9

10   **DEREK SMITHEE**

11   Testimony by Videotaped Deposition              10218

12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

**United States District Court**

1          Wednesday, January 6, 2010

2                  * * * * *

3          THE COURT:  Tell me about the Rausser

4   Research Institute.

5               THE WITNESS:  Oh, you have?

6          THE COURT:  I just did a quick Google.

7   It's a lovely place.  Tell me about it.

8               THE WITNESS:  It's a ranch.  I've got

9   cattle, beef cattle, a lot of horses that my children

10  don't ride.  In addition, there is a vineyard.

11              THE COURT:  You spread poultry litter?

12              THE WITNESS:  I buy poultry litter for

13  fertilizer on the grass that's fed to the -- to the

14  beef cattle.

15              THE COURT:  Do you soil test before you

16  put them down?

17              THE WITNESS:  No.  But my ranch manager

18  does.

19              THE COURT:  Okay.  Mr. Hopson.

20          **CONTINUED DIRECT EXAMINATION**

21  **BY MR. HOPSON**

22      Q.   All right.  Before we broke, Dr. Rausser, we

23  were about to turn to a discussion of oligopsony

24  power.  And I'd like to just start by having you

25  define for His Honor the term "monopsony power."

 1       A.   Monopsony power is when you have a single

 2   buyer --

 3                THE COURT:  I think we've covered

 4   that.

 5       A.   -- and it's total symmetrical with monopoly

 6   power on the other side of the market.

 7       Q.   *(BY MR. HOPSON)*  And oligopsony power is

 8   symmetrical then with the --

 9       A.   Oligopoly power.  But there have got to be

10   many buyers in that case.  Not many, but more than

11   one.

12       Q.   Are there in your field of study fairly

13   standard and well-accepted methods or approaches to

14   studying whether or to what extent a group of buyers

15   has oligopsony power?

16       A.   Yes, indeed.

17       Q.   Okay.  And have you prepared a demonstrative

18   exhibit to walk us through the steps or methodology

19   that would be involved in that analysis?

20       A.   I have.

21       Q.   Okay.

22                MR. HOPSON:  Let's see Tyson Defendants

23   Demonstrative 341.  And if we could just zoom in on

24   that a little bit, particularly the five points down

25   below, yes.

**United States District Court**

1    Q.   *(BY MR. HOPSON)*   So, Dr. Rausser, again, just

2   using this as a reference point, what's the first step

3   an economist would have to undertake in order to begin

4   an analysis of whether a buyer or a group of buyers

5   had monopsony or oligopsony power?

6    A.   The first step is to find the scope, the

7   product scope and the geographic scope, of the

8   relevant market.  You can't determine whether it's

9   possible to exercise power unless you know the limits

10   of the product scope.

11        If, for example, a monopsonist came along and

12   attempted to lower prices but that seller could easily

13   switch to some other product -- the production of some

14   other product, then you have the wrong relevant market

15   and you can't do the analysis.  So the first step is

16   to identify the product and geographic scope of the

17   relevant market.

18    Q.   And the second step referencing

19   concentration, what is that about?

20    A.   If you're looking at oligopsonistic power,

21   you have to look at what is the concentration.

22   Suppose you're attempting to evaluate if there are

23   eight buyers in a particular market but the

24   distribution is uniform across those eight buyers.

25   That's a much different possible consequence than if

1    it's very concentrated.

2        Q.   Your third point is switching.  Why is

3    switching relevant to this analysis?

4        A.   Switching is critical.  Because it goes to

5    what can a grower do in response to an attempt by a

6    processor to in effect exercise power and take away

7    some of the rents or returns that the grower would

8    otherwise achieve.  But if the grower has options,

9    other alternatives, then that limits in a dramatic way

10   any attempt to exercise oligopsonistic power.

11       Q.   Why, if it is, is cost of entry relevant to

12   this analysis?

13       A.   That's particularly important because think

14   about the logic.  If, in fact, someone is attempting

15   to exercise oligopsonistic or monopsonistic power and

16   it turns out that they're successful in lowering the

17   price, that invites entry of other processors to come

18   in because they can offer a still higher price and

19   still make large profits.

20            So as a result, the entry barriers are

21   critical.  You can't do a monopsonistic or

22   oligopsonistic analysis without looking at the

23   incentive for new entrants to come in and dissipate

24   whatever power you're attempting to exercise.

25       Q.   Okay.  And finally, to what extent does an

**United States District Court**

1    examination of price suppression or prices below

2    anticompetitive levels, to what extent is that

3    necessary to this analysis?

4        A.    That's the ultimate conclusion, to look at

5    the actual world versus the counterfactual or but-for

6    world.  In the but-for world, the presumption is

7    they're competitive determination of prices.

8            Now, in the actual world, are the prices that

9    are being paid, are they different than the

10   counterfactual competitive world?  And that must be

11   tested statistically to see whether or not there's a

12   significant difference.

13       Q.    And to what extent is what you've reflected

14   on Demonstrative 341 a standard analysis in the field

15   of economics?

16       A.    It's a standard analysis.  In every handbook

17   on industrial organization or market power, you'll

18   find these steps outlined in one form or another.

19       Q.    To the extent that Dr. Taylor testified in

20   this courtroom that such an approach was unnecessary

21   because he was not offering an antitrust analysis,

22   would you agree with that assertion?

23       A.    No.

24       Q.    Why not?

25       A.    Because you're focusing on a hypothesis that

1  monopsonistic or oligopsonistic power is being

2  exercised.  You've got to be able to analyze whether

3  that question is supported by the empirical facts.  As

4  a result, you have to go through these steps antitrust

5  or not.

6      Q.  Well, to the extent that Dr. Taylor asserted

7  that the approach reflected in Demonstrative 341 was

8  not necessary because he was engaged in descriptive

9  economics, rather than normative economics, would you

10  agree with that assertion?

11      A.  No, I do not.

12      Q.  Why not?

13      A.  First of all, normative economics is a value

14  judgment.  It focuses on what ought to be which

15  requires someone's value judgment.  Economists are not

16  in the business of advancing value judgments.  They

17  can determine what the consequences are of a

18  particular value judgment.

19          For example, suppose a particular society

20  decides they want an even distribution of income, an

21  economist can evaluate what the possible consequences

22  would be with regard to economic growth of such a

23  value judgment.  Descriptive economics is as the name

24  suggests, describing.  It doesn't do any formal

25  analysis.

1          What's required if you're going to assess

2     whether power is being exercised in the IRW by the

3     integrators you have to do positive economics, explain

4     what is, what is going on.  That's what these steps,

5     these five steps, are designed to do.

6          Q.   Okay.  Let me turn the page slightly here and

7     ask if you recall in Dr. Taylor's report and his

8     testimony an assertion that integrators have power or

9     leverage over growers because growers undertake a very

10    long-term investment in building houses and acquiring

11    equipment, and yet they're entering into contracts

12    that only guarantee them one flock of birds.

13         Let me just ask you first:  Do you recall

14    that assertion or argument in Dr. Taylor's analysis?

15         A.   Yes, I do.

16         Q.   Do you agree that that indicates a form of

17    market power or potential leverage in this case?

18         A.   That -- it's possible.  But then you have to

19    go on and ask the question about the long-term

20    investment of the buy side of this market; namely, the

21    integrators and/or processors.  They make long-term

22    investments as well, and you have to stop and look at

23    their economic incentives vis-a-vis the growers'

24    economic incentives.  It is neither necessary or

25    sufficient to infer that power's being exercised

1   because growers make long-term investments.

2       Q.   To what extent are inter -- to what extent,

3   if any, are integrators dependent upon supply of birds

4   for their processing units?

5       A.   It's critical.  Their economics is driven in

6   large part by throughput, by handling a large volume,

7   moving the product, capturing the value downstream

8   either through the food service channel or through

9   grocery store channels.  They are in the business of

10  moving large volumes.

11          And now with the export markets expanding, at

12  least over the course of the last few decades, that's

13  another important source for moving volume.  It's in

14  their interest to have growers that are very efficient

15  that are generating enough volume to fully utilize

16  their existing capital infrastructure.

17      Q.   And to what extent in this industry, based

18  upon your study, are integrators competing among

19  themselves for the best or most efficient growers?

20      A.   You see it in terms of how the incentives in

21  the contracts are designed with regard to the

22  tournament feature of those contracts.  You see it in

23  terms of the testimony from the growers here in this

24  courtroom about the switching that's taking place.

25          There's a declaration by a Simmons official

1   indicating that they lost a large number of growers in

2   one particular year.  It was well over a hundred that

3   they lost in one particular year that switched to

4   another integrator.

5       Q.   Do you recall whether that was a hundred

6   houses or a hundred growers?

7       A.   I believe it was houses.

8       Q.   Okay.  Let me ask you this:  Based on your

9   own review of the record, evidence, and the materials

10  you took into account in preparing your report, have

11  you seen any evidence in the IRW of threatened or

12  actual withholding of flocks being used as an exercise

13  of leverage by the integrators?

14      A.   No, I've seen no evidence.  And I'm sure that

15  if it had existed, it would have been advanced, I

16  presume, by the plaintiffs.

17      Q.   Let me ask you about this:  Dr. Taylor and I

18  talked about what he referred to as a

19  take-it-or-leave-it contract issue.  Do you know what

20  I'm referring to?

21      A.   Yes.

22      Q.   And if I can paraphrase, to the extent that

23  Dr. Taylor suggested that the fact that the individual

24  contracts between growers and integrators are not

25  negotiated as to their substantive terms, that itself

1    reflects a form of market power.  Would you agree with

2    that assertion?

3        A.  No.

4        Q.  Why not?

5        A.  Because there are two reasons.  The first is

6    that in a competitive marketplace, you would find the

7    evolution of the contracts moving toward a

8    standardized contract.  In a market in which there's

9    competitive forces at play, you would expect the

10   contract to be standardized, standardized with regard

11   to pricing, standardized with regard to quality

12   control, standardized with regard to who shares the

13   risk.  And that's, in fact, one reason for why you

14   would find all the contracts to be very similar.

15       A second reason is regulations themselves.

16   GIPSA, for example, has included poultry since, I

17   believe, the late 1980s before it just pertained to

18   the other meats.  But GIPSA as the regulator is out

19   there attempting to create uniform contracts where all

20   growers are treated similarly; that is to say there is

21   no discrimination.  You can't find a particular

22   processor that discriminates across growers depending

23   upon their particular idiosyncratic conditions.

24       As a result, those are the two forces that

25   are out there, the two reasons that lead to uniform

1    contracting, which eliminates the need for costly

2    negotiation.

3        Q.   Let me ask you this:  Can you give me an

4    example of a competitive market outside the poultry

5    industry in which individualized negotiation of

6    contracts is absent?

7        A.   Outside of the poultry industry?

8        Q.   Yeah, yeah.

9        A.   Oh, there's a number of industries.  Fresh

10   fruits and vegetables contracting, Wal-Mart's

11   contracting with regard to suppliers.

12       Q.   Let me turn the question a little bit

13   differently and ask you about this.

14            Based on your review of Dr. Taylor's

15   testimony and the rest of his materials and all you

16   considered, did you find that Dr. Taylor did any

17   analysis of whether price or supply were suppressed to

18   a subcompetitive level in the market between growers

19   and integrators in the IRW?

20       A.   He did not.

21       Q.   Does the fact that there is evidence that

22   growers earn outside income or nonfarm income, does

23   that fact tend to support evidence that prices are at

24   a subcompetitive level?

25       A.   No.

1    Q.   Have you looked at the relationship between

2  off-farm and farm income in connection with your work

3  on this case?

4    A.   Yes, I have.  Because of one of the claims of

5  Dr. Taylor.

6    Q.   If we look at -- did you prepare a

7  demonstrative relating to this issue?

8    A.   I did.

9    Q.   Okay.

10        MR. HOPSON:  Can we please see Tyson

11  Defendants Demonstrative 342?

12    Q.   *(BY MR. HOPSON)*  And could you just tell us

13  briefly what we see on that demonstrative, what that

14  shows us?

15    A.   Yes.  On the horizontal axis is time, years.

16  These are observations that are made each annual

17  calendar year.  On the vertical axis is farm and

18  nonfarm income, and this is reported by the Economic

19  Research Service of the USDA.  And what you have here

20  as the green line -- by the way, this is not just for

21  poultry producers.  This is for --

22    Q.   I was going to ask you:  Is this all farms?

23    A.   All farms.  All farms.  And what the green

24  line shows is off-farm income.  What the red line

25  shows is farm income.  You'll see that for agriculture

1   as a whole in the United States there is -- much of

2   the income that's generated by the household is

3   sourced with off-farm activities in contrast to actual

4   farm activities.

5       Q.   Let me ask you -- and I don't have a

6   demonstrative -- but did you also in your report do an

7   analysis of the percentage of off-farm income for

8   poultry-growers as opposed to other farmers or persons

9   engaged in agriculture?

10      A.   Yes, I did.

11      Q.   And what did that show?

12      A.   What that shows is that if you look at

13  poultry producers themselves, they're generating

14  relatively more income on-farm than off-farm relative

15  to all of agriculture.

16      Q.   Let's go back and explore the issue of

17  switching a little bit.

18           I want to ask you if the available evidence

19  that you've had a chance to review and analyze

20  indicates whether there is switching of growers

21  between integrators going on in the Illinois River

22  Watershed?

23      A.   Yes.  And here, a lot of it's anecdotal

24  evidence.  But also to the extent that the growers who

25  have testified in this court, you'll see that each of

1    those growers speak directly about switching that's

2    taking place with regard to their poultry production.

3        Q.    Okay.  To the extent that Dr. Taylor has

4    testified that the growers' ability to switch or that

5    actual switching is not relevant to his oligopsony or

6    market power opinion, would you agree with that

7    assertion?

8        A.    I would not.

9        Q.    Why not?

10        A.    Because as you go back to the prior two

11   slides ago when I went through those five steps, one

12   of the critical issues is whether or not a grower has

13   the option either to switch to another integrator, or

14   for that matter, to switch to another economic

15   enterprise.  If they have that set of alternative

16   options, then that has a counter effect of any

17   attempts by an integrator to exercise market power.

18        Switching's critical.  If you look at the

19   Department of Justice, each and every time they do an

20   evaluation of possible abuses of monopoly or

21   oligopolistic power, they look at switching.

22   Switching is critical.

23        Q.    Well, to the extent that Dr. Taylor has

24   suggested that the switching in this instance is not

25   significant because all the prices are the same, would

1    that affect your analysis?

2        A.    Well, the prices in terms of the stated

3    contract, but there are lots of other terms and

4    conditions of that contract that influence the actual

5    compensation.  So no, I would not.

6        Q.    Okay.  Let me ask you this:  In the end,

7    Dr. Rausser, do you have an opinion on whether

8    Dr. Taylor's analysis properly captures or describes

9    or evaluates the market power dynamics in the Illinois

10   River Watershed?

11       A.    It does not.

12       Q.    Does anything in Dr. Taylor's economic

13   analysis shed any light on the question of whether

14   integrators have actual or potential control of the

15   litter that's generated as part of this grow-out

16   process?

17       A.    It does not.

18       Q.    Do you know from your own work in this

19   area -- and, again, by that I mean in this

20   industry -- what role the litter has played in the

21   economic relationship or the economic life of growers?

22       A.    Yes.  It is a byproduct that has value to the

23   growers, particularly if they're integrated.  By

24   "integrated," I mean if they have a cow-calf operation

25   along with a poultry enterprise.

1           In fact, as we saw in the testimony of one of

2      the growers, that grower integrated backward into

3      poultry because he wanted access to the fertilizer

4      value of the litter which allowed him to expand his

5      cow-calf operation and generate more than another

6      $40,000 worth of income as a result of the increase in

7      productivity of his grassland with regard to his

8      cow-calf operation.

9           So if you look at all of the cooperative

10      extension circulars that come out of the land-grant

11      universities in Arkansas and Oklahoma, you'll see that

12      when they prepare the various economic issues, or the

13      economics of becoming involved in poultry production

14      at the grower level, they include litter as an

15      economic value.  That's either an internal, imputed

16      value or it has an external value with regard to its

17      marketability.

18      Q.   To the extent that poultry litter has become

19      regulated in many states, certainly here in Oklahoma,

20      does that in any way impact or undermine your analysis

21      that the litter has economic value to the growers?

22      A.   No.  It still has economic value, but now

23      there's some costs associated with it that is borne by

24      the grower because of those regulations.

25           But the economic question that's got to be

1    asked is, what is its substitutability with chemical

2    fertilizers?  Chemical fertilizers have become

3    significantly more expensive as these regulations have

4    increased, which has had the net effect of increasing

5    the economic value of litter.

6              *(Discussion held off the record)*

7         Q.   *(BY MR. HOPSON)*  I want to turn subjects

8    here, Dr. Rausser, and I want to ask you if you

9    reviewed Dr. Gordon Johnson's report, testimony, and

10   considered materials regarding his calculations of

11   average STP levels in Oklahoma and Arkansas?

12        A.   Yes, I have.

13        Q.   Okay.  And specifically, did you review his

14   testimony in this courtroom regarding average STP

15   levels for certain counties in Arkansas and Oklahoma

16   that are within the IRW?

17        A.   Yes.

18        Q.   Okay.  Have you formed an opinion about the

19   reliability and value of Dr. Gordon Johnson's analysis

20   of those average STP levels?

21        A.   Yes, I have.

22        Q.   Let me ask you this:  Is your analysis and

23   evaluation of this based solely on statistical

24   principles, or does it also rely upon expertise in

25   agronomic and soil sciences?

1          A.   Only statistical principles.

2          Q.   Okay.  Are you familiar with issues involving

3    nutrient value and agronomic's and soil science from

4    other aspects of your work?

5          A.   Certainly.  When I was dean of the College of

6    Natural Resources, there are ten or twelve soil

7    scientists that are faculty within the College of

8    Natural Resources.  I had to review their merits every

9    time they came up for a salary evaluation as the dean,

10   and I'm familiar with the methodology that they use,

11   but I'm certainly no expert -- soil scientist expert.

12         Q.   But the analysis you're about to give us is

13   based on statistics?

14         A.   Entirely.

15         Q.   Did you prepare a demonstrative, just as a

16   starting place, that set forth the data sets that were

17   relied upon by Dr. Johnson in his report?

18         A.   Yes, I did.

19         Q.   Is that set forth at Tyson Defendants

20   Demonstrative 349?

21         A.   Yes, it is.

22         Q.   Okay.

23              MR. HOPSON:  Can we see that, please?

24         Q.   *(BY MR. HOPSON)*  What does this show us?

25   And, again, I don't want to spend too much time or get

1    into too much detail, but I just want to have you

2    indicate what's reflected in this demonstrative.

3        A.    This demonstrative shows the data sets that

4    were available to Dr. Johnson that he evaluated.  And

5    it's particularly -- I want to make one thing very

6    clear.  Anytime you evaluate data and you do a

7    statistical analysis because you're trying to draw

8    inferences, the question is for what purpose?

9            His stated purpose is to infer what is the

10    distribution of STPs within the IRW.  That's the

11    purpose.  So anytime we evaluate whether this is the

12    best available data, is this data efficient, is it the

13    only data that's available, it must be evaluated in

14    the context of the purpose.

15            Now, what I did is I looked at these data

16    sets and I looked and reviewed his report, his

17    deposition testimony, and his trial testimony with

18    regard to the stated purpose.

19        Q.    Okay.  And to what extent, sir, based upon

20    your work in statistics, is understanding the source

21    of data part of a statistical analysis?

22        A.    It's critical.  You have to know how the data

23    was collected.  Were there measurement errors in the

24    data?  Is the data stratified and representative of

25    the population for which you're attempting to draw

1   inferences given your stated purpose?  All of those

2   factors must be taken into account.

3       Q.   Okay.  And is evaluation of sampling design

4   and data-gathering also part of a statistical

5   analysis?

6       A.   No.  It's crucial.

7       Q.   Let me ask you this:  Just so the record's

8   clear, Dr. Johnson didn't actually rely on all of this

9   data in providing the opinions he offered in the

10  courtroom; is that correct?

11      A.   That is correct.

12      Q.   Can you just tell us, just so we have a

13  starting point, what data sets he did rely upon?

14      A.   Yes.  If you look at this Exhibit 349, he

15  focused on 3 and 4.  That is the data that he reported

16  in his trial testimony.

17      Q.   Okay.  Well, let's start with an analysis of

18  the data itself.

19          Were you able to discern based on the trial

20  testimony, considered materials, and report how the

21  data relied upon by Dr. Johnson were, in fact,

22  collected?

23      A.   Yes.  There was -- with regard to those two

24  data sets that you just asked me about?

25      Q.   Yes, yes.

1        A.    Yes.   These were actual soil samples that

2   were collected by growers, submitted to the University

3   of Arkansas and/or Oklahoma State University to run

4   tests on that particular data or samples.

5        Q.    Okay.  Does that fact, as you've just

6   described it, speak in any way to the reliability,

7   consistency, or representativeness of those samples?

8        A.    No.   Because anytime that you're collecting

9   data, soil samples or any other data, that is

10  distinguishable from one sample to another -- that is

11  to say it comes from a different size of the field, it

12  comes from a different soil depth, it comes from a

13  different topology, it comes from a different set of

14  conditions with regard to litter applications, one

15  field has litter applications, another field does

16  not -- all of those factors make the individual

17  readings, STP readings, distinguishable and you have

18  to adjust for those factors to make them comparable.

19       Q.    Well, what methodologies, if any, would be

20  followed by a statistician in working with a

21  statistical analysis of data such as you've just

22  described?

23       A.    Ideally, what you would do is you would

24  characterize the complete population; that is to say

25  the entire land area within the IRW.  You would

10154

1   stratify it in accordance with litter applications,

2   degree of litter applications.  You would stratify it

3   with regard to topology.  You would stratify it with

4   respect to where regulations are being imposed versus

5   where they're not.  You would stratify it with regard

6   to the protocol for different soil depths of the

7   samples taken.

8           Then you would select a random sample from

9   each one of those strata, and the sample that you

10  would take in terms of each strata would be

11  proportional to that strata relative to the total

12  population.

13      Q.   To what extent, if any, have you evaluated

14  the representativeness of the samples that were used

15  by Dr. Johnson?

16      A.   Dr. Johnson himself in his deposition

17  testimony recognizes that the data that he had is not

18  representative of the entire IRW.  I've evaluated the

19  representativeness to the extent that it can be done.

20  The readings themselves don't give you details with

21  regard to the size of the field from which the sample

22  was taken.  As a result, if there's any bias at all

23  with regard to fields or land areas, it is bias with

24  regard to those fields for which there are litter

25  applications.

1    Q.  And why is that, Doctor?

2    A.  In large part, because of nutrient plan

3  requirements that have come through regulations over

4  the course of the last decade, those kinds of samples

5  are required for those nutrient plans.

6    Q.  Okay.  So the people who are taking those

7  samples are people who apply litter?

8    A.  Generally speaking, yes.

9    Q.  You mentioned a moment ago the size of the

10  field.  Why would the size of the field on which

11  samples are taken be relevant to a statistical

12  analysis of average STP levels?

13    A.  Because if I'm taking a sample on a 300-acre

14  farm, that sample is -- the attempt is to use that

15  sample as being representative for 300 acres.  Suppose

16  I take another sample and it's only two acres.  The

17  weighting of those two particular samples should be

18  dramatically different.

19       In this particular case, Dr. Johnson didn't

20  have the data with regard to the size of the field so

21  he couldn't make any adjustments associated with size.

22  However, if you're going to serve the purpose for

23  which he was doing his analysis and you want

24  representativeness, you should know the size of the

25  field from which the samples were drawn.

**United States District Court**

 1      Q.   Okay.  So did Dr. Johnson do any weighting at

 2   all of the data he used to compute his average?

 3      A.   No.  Not to my knowledge, no.

 4      Q.   Did you review the statistical techniques

 5   applied by Dr. Johnson to the data set we've just

 6   discussed?

 7      A.   Yes, I have.

 8      Q.   Okay.  What, if any, observations did you

 9   make about the statistical techniques that were used

10   in providing this average?

11      A.   Yes.  I've prepared a demonstrative that goes

12   to my assessment.

13      Q.   Okay.  Let's look at those one at a time.

14           First, let me ask you to just pull out of the

15   pile and look at, before we display, Defendants' Joint

16   Exhibit 3125.  Do you have that in front of you?

17      A.   I do.

18      Q.   And without describing it further, can you

19   just tell me, is this a figure or a chart that's

20   contained in your report?

21      A.   It is.

22      Q.   And did you prepare this from data provided

23   to Dr. -- used by Dr. Johnson?  I'm sorry.

24      A.   Yes, I did.

25           MR. HOPSON:  Okay.  Your Honor, at this

1   time I would move the admission of Defendants' Joint

2   Exhibit 3125.

3               MR. GARREN:  No objection.

4               THE COURT:  3125 is admitted.

5       Q.  *(BY MR. HOPSON)*  Okay.  Let's take a look at

6   3125.  Why don't you begin by telling us what data is

7   displayed on this diagram.

8       A.   This data covers the two counties, Benton and

9   Washington County, and it covers the years 2005

10  through 2007 and it's all the individual observations.

11  If you look at the horizontal axis here, the

12  horizontal axis reports the STP readings of the

13  samples.  That's what along the horizontal axis.

14  What's on the vertical axis is the number of

15  observations at that reading.

16          And the only distinguishable information that

17  you have with regard to this -- these STP readings or

18  samples is the county from which they were taken as

19  well as the year in some cases or the specific date in

20  other cases.

21      Q.   Okay.  And what did Dr. Johnson conclude or

22  testify to based on his analysis of these individual

23  STP readings?

24      A.   He concluded that the measure of central

25  tendency was an STP reading or an average -- simple

1    average of 402.

2        Q.   Okay.  Can you tell us whether, or to what

3    extent, you believe the data represented on this

4    Defendants' Joint Exhibit 3125 is skewed?

5        A.   Yes, it is skewed.  There's no question about

6    it.

7        Q.   All right.  Describe what you mean when you

8    say the data is skewed.

9        A.   What it means is the underlying probability

10   distribution for the sample itself is skewed in one

11   direction.  In this case, it's skewed to the higher

12   values.  You could have it skewed to the left as well,

13   which means it's not a symmetric distribution or it's

14   not a normal probability distribution.

15            What it also means is that the average -- the

16   simple average is going to give you a false signal

17   about what the central tendency is.  Why is it a false

18   signal?

19       Q.   You took my question.

20       A.   Okay.  Fair enough.

21       Q.   Why is it a false signal?

22       A.   Because when you compute the simple average,

23   you give every observation a weighting in terms of its

24   size, and its size is along the horizontal axis here.

25   So if you have a very large reading, which in this

1    chart you'll see that there's some readings that go as

2    high as 1500, for example, well, that is going to be

3    used in the averaging process and it's going to draw

4    the mean to the right in the direction in which the

5    probability distribution is skewed.

6        Q.    Okay.  You have a red line that I see over

7    there to the right that says "outliers."  What is that

8    about?

9        A.    Outliers is a standard statistical

10   methodology with regard to eliminating some of the

11   observations because there are measurement errors.

12   There are measurement errors that take place when

13   you're collecting data and summarizing the data, and

14   there are lots of different mechanisms for determining

15   outliers.

16           The simplest one is simply to eliminate the

17   extreme values.  One way of doing that is to

18   eliminate, say, the very extreme tails of the

19   probability distribution.  What I've labeled here as

20   outliers are those that are above 99 percent -- 99 and

21   a half percent approximately on both ends of the

22   distribution.

23       Q.    And are those type of outlier techniques

24   sometimes referred to in terms of standard deviations?

25       A.    Yes.  That's one methodology that's out there

1    is to look at the standard deviation and do your

2    analysis based on all of the observations that fall,

3    both plus three standard deviations from the mean and

4    less than three standard deviations from the mean, and

5    drop the other extreme values on both ends.

6        Q.   When you undertook to calculate the mode and

7    the median, did you do an outlier technique such as

8    you've just described?

9        A.   Yes.

10       Q.   Did you do it at the low end as well as the

11   high end?

12       A.   Yes, I have.  Yes, I did.

13       Q.   Okay.  And based upon that analysis -- is

14   that a standard statistical analysis?

15       A.   Yes.  There are other methodologies for

16   detecting outliers as well but that's the simplest,

17   yes.

18       Q.   Okay.  What do you think among the mode,

19   median, and mean best represents the central tendency

20   or better represents the central tendency of this

21   data?

22       A.   For this particular data, a much better

23   measure of central tendency is the median and/or the

24   mode, and that is because the distribution is not

25   normal.  If it was a normal distribution, the median

1    and the average, the simple average, would be

2    precisely the same.

3        Q.   Be a bell curve?

4        A.   Yes.  And they're not here in large part

5    because of the skewness to the right dragging the

6    simple average upward.

7        Q.   Did you prepare a similar analysis for data

8    relating to the four counties in Oklahoma?

9        A.   Yes, I did.

10       Q.   Okay.  Is that set forth in Tyson Defendants

11   Demonstrative 352?

12       A.   It is.

13       Q.   And is it exactly the same thing with

14   different data set?

15       A.   The same computations, yes.

16       Q.   Okay.  Now, what year's data is this based

17   on?

18       A.   This particular chart is based on my report

19   with Dr. Dicks and it's for the year 2007.

20       Q.   And to be clear, when Dr. Johnson testified

21   in the courtroom and presented his data, he didn't use

22   '07 data, did he?

23       A.   No.  My recollection is he used 2004 through

24   2007.

25       Q.   Okay.  What did he calculate as the mean

1    using '04, '05, '06, and '07 data?

2        A.   It was below the mean that I've reported here

3    for 2007.  For 2007, it's 107.  My recollection for

4    the full data set that he used, it was around 102 or

5    so.

6        Q.   Why did you prepare a demonstrative with only

7    '07 data rather than '04 through '07 data?

8        A.   Because I was informed by counsel that I had

9    to use what was included in my report with Dr. Dicks.

10       Q.   Okay.

11       A.   And I did not include an analysis of 2004

12   through 2007, only 2007.

13       Q.   All right.  Well, let's walk through this

14   quickly then.

15           Did you apply the same type of outlier

16   analysis for this Oklahoma data?

17       A.   Yes, I did.

18       Q.   And did you engage in the same type of

19   calculation of mode, median, and mean?

20       A.   Yes, I did.

21       Q.   And, again, which of these numbers, in your

22   opinion, represents a best or better representation of

23   the central tendency of this data?

24       A.   Once again, given the skewness of the

25   underlying probability distribution for the sample --

1    for the sample -- not the population but for the

2    sample -- a median is a far better measure.

3                    THE COURT:  Doctor, on both of these,

4    the Joint Exhibit 3125, which was admitted, and this

5    demonstrative, it indicates that the outliers were

6    removed on the top end but no indication that outliers

7    were removed on the bottom end.

8                    THE WITNESS:  No.  But we did it on both

9    sides.

10                    THE COURT:  All right.

11                    THE WITNESS:  We did it on both sides,

12    yeah.

13        Q.   *(BY MR. HOPSON)*  Is that just because it's

14    hard to get a line in there with those very low

15    numbers?

16        A.   Yes, yes.  It's right at zero, yes.

17        Q.   And were there actually some numbers that

18    were reported that were negative?

19        A.   Yes.  But not for these two data analyses

20    that Dr. Johnson used.

21        Q.   Okay.

22        A.   But there were some negative values, and

23    there were some outrageously absurd values that were

24    very large, 3,000, 5,000.  I don't recall the actual

25    number.  But those were not included in Dr. Johnson's

1    analysis and testimony in this court.

2        Q.    In your application of these statistical

3    techniques in Demonstrative 352 and 3125, does that

4    address the other issues about representativeness and

5    bias and the other things you discussed at the outset

6    of your testimony?

7        A.    It does not.

8        Q.    Is it just the best you can do with this

9    data?

10        A.    With regard to reporting central tendency.

11    But I don't believe you can use this data to draw

12    inferences about the entire IRW with regard to STP

13    levels.

14        Q.    Okay.

15            MR. HOPSON:    That's all I have, Your

16    Honor.   Thank you, Dr. Rausser.

17            THE COURT:    Doesn't the central tendency

18    itself allow one to draw inferences about the entire

19    IRW?

20            THE WITNESS:    If you had a

21    representative random sample, yes.

22            THE COURT:    All right.

23            THE WITNESS:    Yes.   But it can only tell

24    you what the location parameter is for the probability

25    distribution.   And because the samples that were

**United States District Court**

1    available to Dr. Johnson were very biased, you

2    can't -- you shouldn't even use the central

3    tendency -- any central tendency measures based on the

4    sample data that was available to him to draw

5    inferences for the entire IRW.

6              THE COURT:  All right.  But let's assume

7    for the purposes of a hypothesis that -- or a

8    hypothetical that only those lands on which poultry

9    litter is applied is relevant here, with the

10   assumption that if we're going to focus on the

11   application of poultry litter that the other areas --

12   and I know that may be to a certain extent an

13   unrealistic assumption -- but assuming that that was a

14   proper hypothesis, then the central tendency would

15   allow you to draw inferences about the entire IRW at

16   least with respect to the effect of the application of

17   poultry litter; correct?

18             THE WITNESS:  But then you have a

19   problem.  Suppose you collected given your

20   hypothetical -- if I could elaborate on the

21   hypothetical -- supposed you collected all of your

22   samples for only those land areas where there's litter

23   application, all right?  Now, you take that and you

24   say, now, with respect to the entire IRW, my mean STP

25   is 110.  Let's take --

1       THE COURT:  As to those lands onto which

2  poultry litter has been applied?

3       THE WITNESS:  Right, right.  But now the

4  question is, can I redistribute that litter to the

5  land for which it's not applied and still achieve the

6  maximum productivity with regard to the needed

7  phosphorus nutrients for the entire IRW?

8       Any inferences that you draw -- if you only

9  care about drawing inferences with regard to the land

10  at which litter is being applied, then only draw

11  inferences on that, don't try to infer that it's for

12  the entire IRW.  If you don't have any data for the

13  nonlitter-applied land, you can't draw inferences for

14  that land --

15       THE COURT:  But you're assuming that

16  those -- the lands on which poultry litter has been

17  overapplied and that poultry litter can be

18  redistributed on other lands --

19       THE WITNESS:  Yes.

20       THE COURT:  -- right?

21       But to the extent -- and you probably have

22  read enough here -- that it is uneconomical to

23  transport this beyond a certain distance --

24       THE WITNESS:  Distance.

25       THE COURT:  -- then it may be

1   unreasonable to assume that one could redistribute to

2   other lands at the far reaches away from poultry

3   houses?

4               THE WITNESS:  Still within the IRW?

5               THE COURT:  Yes.

6               THE WITNESS:  That could -- that's very

7   possible.  But then that, in turn, depends on the

8   price of substitutable chemical fertilizer.  And given

9   those prices have gone up, that economic distance that

10  you refer to in your hypothetical is now changed

11  dramatically.

12              THE COURT:  All right.  Mr. Garren.

13              MR. GARREN:  Before we start -- and I

14  really want to jump into this conversation because

15  you've jumped into the heart of my questions -- but,

16  Your Honor, originally Dr. Dicks was noticed to us for

17  testimony in this case.  That's been changed.  I was

18  informed informally that perhaps he's not available in

19  January.

20          Based on the announcement today, which is the

21  first time we've heard this, that Dr. Rausser's

22  testifying and he's limited to basically two sections

23  of a seven-section report, I must inquire because I

24  think we're prejudiced in not knowing is, are we

25  limited just to Dr. Rausser and there will be no

1    Dr. Dicks coming?  Because there are some overlap, and

2    Dr. Dicks has testified that they worked together on

3    parts of this and some parts Dr. Dicks couldn't

4    remember whether he did it or not.

5           So I think we're entitled to know that and

6    what the position is.  I have an outline here that I

7    tried to chop it down from Dr. Dicks and fit it now to

8    Dr. Rausser.

9           THE COURT:  I think that's a fair,

10   pragmatic, practical question.

11          MR. ELROD:  Your Honor, we intend that

12   Dr. Dicks will testify next week.  That's our

13   intention at this point in time.  But, you know, what

14   happens in terms of our 72-hour disclosure obligation

15   is a moving target in terms of our internal

16   discussions.  I'm not playing games with Mr. Garren at

17   all, but it's our intention that he will be here next

18   week --

19          THE COURT:  Well, but we don't want

20   Dr. Rausser to get out of hand and then Mr. Garren

21   will have lost his opportunity to ask questions as to

22   which Dr. Dicks then disclaims any responsibility or

23   primary responsibility.  Am I understanding that?

24          MR. GARREN:  That can be a problem, Your

25   Honor.  There's some overlap as to who actually did

 1  the work.  My understanding from Dr. Dicks' testimony

 2  is that most of all the calculations were done in

 3  Dr. Rausser's facilities and by his staff and those

 4  matters were used by Dr. Dicks.

 5            THE COURT:  Well, practically Dicks is

 6  only going to testify as to that which he is qualified

 7  to testify to, and to the extent that they've limited

 8  Dr. Rausser's testimony, do we really have a problem

 9  here?  I mean, you simply just cross-examine him on

10  the areas in which he's provided direct testimony;

11  correct?

12            MR. HOPSON:  I was going to say, isn't

13  this governed by the scope of direct?  I don't know

14  what confusion there would be here.

15            THE COURT:  I think pragmatically isn't

16  that the answer?

17            MR. GARREN:  Well, that can be.  But I

18  didn't want to be in that switch where I'm the cock in

19  the badminton game and now that Dr. Rausser is gone,

20  Dr. Dicks says, well, you know, I'm really -- I don't

21  have any knowledge about that.  There's overlap.

22            THE COURT:  Well then, he won't be able

23  to testify on it.

24            MR. HOPSON:  Right.

25            THE COURT:  And you'll be able to

**United States District Court**

1    cross-examine as to whatever Dicks testifies on.

2                 MR. MCDANIEL:  And, Your Honor, this

3    doesn't vary at all from the situation we had during

4    plaintiff's case, where both Drs. Cooke and Welch

5    submitted a joint report.  We simply had to try to

6    cover the waterfront, listen to the direct, and do a

7    cross that fit the direct.  That's the same situation

8    that the plaintiffs are now in.

9                 THE COURT:  All right.  I think that

10   answers the question.

11        Go ahead.  Cross-examination.

12                    **CROSS-EXAMINATION**

13   **BY MR. GARREN:**

14        Q.   Welcome to Oklahoma, Dr. Rausser.

15        A.   Thank you.

16        Q.   In quick follow-up to some questions and

17   comments you were making to His Honor, it's possible

18   in the -- let me define some things.

19             Population is all of the samples, correct, in

20   your terminology?

21        A.   No.

22        Q.   Population then is what in relation to

23   samples?

24        A.   Population is the entire land area of the

25   IRW.  So that is the population.

1      Q.    Okay.

2      A.    A sample is, as the word suggests, a subset

3  of the population.

4      Q.    Okay.  So the judge pointed out to you that

5  the emphasis, or at least the focus, is on those lands

6  where land-applied poultry waste has occurred, and

7  then there is rather a few data sets -- several data

8  sets on that information.  You agree with that?

9      A.    I do.

10      Q.    And to that extent, there may be lands out

11  there that because of their prior levels of phosphorus

12  had not been tested for some time, and therefore,

13  would not be in that sample data set.  Likewise, there

14  may be lands where there is no desire nor need to have

15  sampling occur because there will be no fertilization

16  either by poultry litter or commercial fertilization;

17  correct?

18      A.    All of those things are possible.  But can

19  you determine whether it's empirically relevant from

20  the actual data that Dr. Johnson used?  And then the

21  answer is no, it cannot.

22      Q.    But it does indicate, does it not, because

23  those facts are more likely true than not, that the --

24          MR. HOPSON:  Objection.  This assumes

25  facts in evidence, what's more likely true than not.

**United States District Court**

1          THE COURT:  Rephrase, please.

2      Q.   *(BY MR. GARREN)*  In the form of a

3  hypothetical, assuming that those facts are true,

4  about the two different sets of fields that we use

5  discussed, that in a sense would create a larger

6  population available for that defined data set that

7  doesn't show up in the data; correct?

8      A.   Yeah.  I'm having trouble with your

9  terminology.  It would create a larger sample for the

10  population of your interest.

11      Q.   All right.  But not all of it would have been

12  in the data?

13      A.   That is correct.

14      Q.   Okay.  I'm going to have to skip around

15  because I've got an outline here with a lot of holes

16  in it anticipating something different than occurred

17  so bear with me.  It may be a little bit disjointed

18  and I apologize in advance.

19          With regard to control and integrators as it

20  pertains to the growers, are you aware of a case we

21  commonly referred to as the Eucha-Spavinaw case, or

22  the *City of Tulsa* case, that occurred involving

23  poultry litters and these -- and most of these

24  integrator defendants?

25      A.   At the very beginning of my engagement with

1    Dr. Dicks in this matter, we reviewed that -- this is

2    back in 2006 or so -- but it's not something that I

3    have reviewed for my testimony here in court today.

4         Q.   Are you aware, sir, that the integrators in

5    that particular case and in that instance, in that

6    abutting or adjoining watershed, caused the land

7    application of waste to cease based upon certain of

8    all the growers?

9              MR. MCDANIEL:  Objection.  There's

10   nothing in the evidence --

11             MR. HOPSON:  Objection.

12             THE COURT:  All right.  One at a time,

13   gentlemen.  Mr. Hopson, you get --

14             MR. HOPSON:  No.  Go ahead.

15             MR. MCDANIEL:  I said there's nothing in

16   evidence in this trial with regard to the City of

17   Tulsa settlement and what integrators did or didn't do

18   or what the agreement said or anything to do with the

19   contract growers.

20             THE COURT:  Mr. Elrod.

21             MR. ELROD:  I agree.

22             MR. HOPSON:  I would also object it's

23   misleading, Your Honor, because what happened in the

24   settlement of that case involved negotiation and

25   consultation with growers as well.

1              THE COURT:  All right.  Response?

2              MR. GARREN:  Your Honor, I think all I'm

3     trying to do is show whether or not this gentleman has

4     all of the basic information that would be helpful in

5     making a decision about the control issue.  And, if,

6     in fact, in an adjoining watershed where similar

7     practices occurred, that, in fact, these growers were

8     required to stop, based upon certain conditions, the

9     application of poultry waste which were -- which arose

10    out of this settlement.  I don't care about the

11    details of the settlement.  That might have something

12    to do with the element of control.

13             THE COURT:  Well, except the growers

14    were involved in that agreement; correct?

15             MR. GARREN:  Well, they weren't a party

16    to the lawsuit, Your Honor.  So if they can be a party

17    to a settlement, I find that a little hard to believe.

18             THE COURT:  Well, I've not reviewed the

19    terms of the settlement, but it's my understanding

20    that the growers were involved to the extent that

21    poultry litter was ceased or limited; correct?

22             MR. GARREN:  It's my understanding that

23    they were not a signatory to anything, but in fact

24    they were told that the order is that there should be

25    not land application pursuant to these requirements.

 1            THE COURT:  All right.  We're going to

 2    have to get into this.  Mr. McDaniel.

 3            MR. MCDANIEL:  Your Honor, this is the

 4    reason that I objected.  There's no evidence here.

 5    Mr. Garren is expressing his belief.  You know, the

 6    court obviously has had -- wasn't involved in the case

 7    so you had to pick up what you could.

 8            THE COURT:  No.  Right.

 9            MR. MCDANIEL:  And the fact of the

10    matter is the -- to the extent each of the companies

11    had interactions were growers relevant to that

12    settlement, no one's testified about that.

13            THE COURT:  It's not part of the

14    evidence in this case.  The objections are sustained.

15        Go ahead.

16     Q.    (BY MR. GARREN)  Would it be unusual to get a

17    hundred-percent agreement of all growers with regard

18    to their control or disposition of poultry waste in

19    your opinion?  You're looking over at my shoulder.

20    Are people standing behind me --

21     A.    No, no, no.  I'm not looking over your

22    shoulder.  I'm looking at the ceiling in large part

23    because I want guidance from God to answer your

24    question.

25            It's unimaginable that a hundred percent of

1  farmers or growers could agree on anything.

2      Q.   Thank you.  Now --

3            THE COURT:  How about lawyers?

4            MR. RIGGS:  How about economists?

5      Q.   *(BY MR. GARREN)*  Did you, sir, in preparation

6  for your case -- or in this case have any personal

7  conversations with any growers in the IRW?

8      A.   I did not.

9      Q.   Do you know how many active integrators there

10  are currently in the IRW?

11     A.   I know how many were active when I began the

12  case.

13     Q.   How many was that?

14     A.   There was more than seven.  I don't recall

15  the exact number, but there were certainly more than

16  seven.

17     Q.   Do you know whether or not they were all

18  chicken-growers or a combination?

19     A.   Combination.

20     Q.   And do you know how many chicken-growers

21  there are, integrators?

22     A.   How many --

23     Q.   Chicken integrators.

24     A.   Integrators?

25     Q.   Integrators.

 1        A.   Integrators.   Just chicken by poultry

 2   integrators?

 3        Q.   Yes, sir.   Not turkey, not --

 4        A.   Yeah, I understand.   I understand the

 5   question.

 6             Yes.   My recollection with regard to the

 7   location of feed mills, hatcheries, and processing

 8   facilities, there is now at least five.

 9        Q.   Are you aware of a takeover or a purchase of

10   Simmons and Peterson?

11        A.   Yes.

12        Q.   Okay.   Now, with regard to this concept that

13   protein has become inexpensive or cheap, you have a

14   chart, I believe, that you addressed --

15        A.   Right.

16        Q.   -- and talking about how poultry has grown

17   and beef has not on that chart.   Do you recall that

18   chart?

19        A.   I do.

20        Q.   Isn't it true that what we're talking about

21   there is the production of protein, correct, when

22   you're comparing pork, beef, and poultry?

23        A.   You're talking about more than that.   There

24   are a number of studies that focus on just protein,

25   but you're also talking about the substitutability in

1    terms of cross-price elasticities between poultry,

2    beef, and pork.  There have been a number of studies,

3    and they are all considered by the entire universe, or

4    at least a subset of the universe, of consumers with

5    regard to their purchasing patterns.

6        Q.   Is the beef industry integrated, vertically

7    integrated?

8        A.   No.

9        Q.   Okay.  The last time I went to the grocery

10   store, I could get all kinds of cuts of meat, just

11   kind of like in a chicken.  In fact, there's probably

12   more cuts of beef in a cow because they're bigger.

13   Would you agree?

14       A.   Naturally, yes.

15       Q.   So there's a lot of choices in that industry,

16   too, without being vertically integrated; correct?

17       A.   Yes, there is.

18       Q.   As a result of the poultry industry demanding

19   quality controls, in particular on the growing

20   process, in order to have a good product, that has an

21   effect, does it not, on in return having some control

22   over that product?

23       A.   And providing the incentives for that control

24   to be exercised by the grower in terms of his or her

25   management of those flocks, yes.

1      Q.   But there is -- there is a necessity of

2    control on the part of the integrator in order to have

3    that quality control that you talked about; correct?

4      A.   Well, I wouldn't characterize it so much as

5    control, but incentives that are put in place and the

6    fact that the integrator actually owns the birds.

7      Q.   Doesn't incentives in the form of maybe money

8    for a lot of people give direction and control for

9    those people?

10      A.   Gives direction.  Control depends upon the

11    ultimate discretion that each of the parties to a

12    contract have.

13      Q.   And the way the incentives are structured;

14    correct?

15      A.   Correct.

16      Q.   Now, we talked about exports and the effect

17    of supply as it relates to oligopsony power.

18           What is the geographic area that you're

19    applying for your opinions as to the oligopsony power

20    that you say doesn't exist in this case?

21      A.   I'm not coming -- I haven't offered any

22    opinions about the geographic scope of the relevant

23    market, as you well know.

24      Q.   Isn't that important?

25      A.   If I was doing the analysis that Dr. Taylor

1    indicated he was doing, yes.

2        Q.    What is the perspective being used in order

3    to determine that power exists or not?  Is it from the

4    integrator or is it from the grower?

5        A.    Oh, it's from the integrator.  If you're

6    looking at monopsonistic or oligopsonistic power, it

7    is power that's being exercised by the buyer, by the

8    purchaser, under the contractual relationship with the

9    grower.

10        Q.    Well, in this case, they already own the

11    birds so they're not buying anything, are they --

12        A.    Oh, yes.

13        Q.    -- they're just paying for a service?

14        A.    They're paying for a service, yes, indeed.

15        Q.    All right.

16        A.    And they're buying that service.

17        Q.    Now, you haven't spoken to any

18    integrator -- I'm sorry -- any growers in the IRW.

19            Would it surprise you to learn that all that

20    have testified here in trial have said that they were

21    not able to negotiate the terms of their contract?

22        A.    It would not surprise me.  I read that

23    testimony.

24        Q.    Okay.

25        A.    I didn't talk to any of those growers.  But

 1    no, that doesn't surprise me at all.

 2        Q.   And a few of them even described it as you

 3    either sign it or you don't, it's a

 4    take-it-or-leave-it contract; correct?

 5        A.   Yes.

 6        Q.   You talked a little bit about to expect the

 7    standardized contract there are three things that you

 8    discuss, and one of them is pricing, who shares the

 9    risk, and the quality control.

10             In that regard, what did you do to compare

11    the pricing with regard to whether or not these

12    contracts are standardized in the IRW?

13        A.   I'm sorry.  What did I do that --

14        Q.   Yes, sir.  Did you look at IRW contracts that

15    are of recent vintage?

16        A.   No, I did not.  I evaluated Dr. Taylor's

17    analysis and determined that the conclusions that he

18    reached are not supported by the analysis that he

19    conducted.

20        Q.   You mentioned one other element of this

21    standardized contract issues, that it's who shares the

22    risk.  Can you identify what that risk is and the IRW

23    contract that creates that?

24        A.   Yes.  As I indicated, and as the economic

25    research service has documented, the risk that is held

1    in the hands of the integrator is the price of the

2    inherent value of the broiler or the eggs or the

3    turkey meat that comes out of the grower process.

4              Moreover, they take the risk with regard to

5    feed --

6         Q.   Let me stop you.

7         A.   -- the cost of feed.

8         Q.   Can I stop you?  Maybe I'm not very clear and

9    maybe I didn't understand completely what you said

10   earlier.

11             Weren't you talking about that you expect

12   there to be a standardized contract in order for this

13   power to exist?  Isn't that what I heard you say?

14        A.   No, no.

15        Q.   That isn't?

16        A.   No, it is not.

17        Q.   Let's move on then.

18        A.   Do you want me to clarify?

19        Q.   No.  I just want to make sure.  I'm trying to

20   understand correctly what I thought you said.

21        A.   No.

22        Q.   All right.  Now, you talked about the Simmons

23   situation where you said there was a hundred houses

24   that changed hands.

25             Are you familiar with the reasons for which

1    that occurred?

2        A.   Yes.  I think it's specified in the

3    declaration that it calls for a change associated with

4    additional requirements for quality control of the

5    birds themselves.

6        Q.   There was a major upgrade required for many

7    houses in order to continue growing for that

8    integrator; correct?

9        A.   Ventilation, as I recall.

10       Q.   And if they didn't conform to those

11   specifications, Simmons wasn't going to renew them

12   anyway; isn't that your understanding?

13       A.   Yes.  But --

14       Q.   All right.

15       A.   -- as a result, they had the opportunity,

16   other options, to move in a different direction and

17   not be subjected to any power or control on the part

18   of that integrator.

19       Q.   Did you evaluate whether or not they were

20   paid more or less as a result of that switch from one

21   integrator to the next?

22       A.   I did not.

23       Q.   You made the comment that the growers have

24   the opportunity to switch even to another enterprise.

25   What is your basis for that statement?

1    A.   Well, to the extent that the growers that

2  have testified in this court were selected by the

3  plaintiffs and to the extent that they're

4  representative -- I have not done that

5  evaluation -- but assuming they are representative,

6  there was one grower that terminated his activities as

7  a poultry-grower and became a transporter and marketer

8  of litter.  That's an indication of other enterprises

9  that were available that have more economic value to

10  that particular grower.

11        Now, that's one grower, but there are only a

12  few growers that testified.  But if those growers are

13  representative, then that's an indication of other

14  opportunities that exist with regard to enterprises

15  that these growers can avail themselves of.

16    Q.   And, in fact, sir, Mr. Collins testified that

17  he changed enterprises because he did not want to

18  elect to spend tens of thousands or maybe more dollars

19  on old barns, but instead he invested a half a million

20  dollars in trucks.  Were you aware of that?

21    A.   Yes.  No.

22    Q.   Okay.

23    A.   That's in his testimony.

24        THE COURT:  To the extent a grower has a

25  long-term financial obligation on an existing barn or

1    barns, how is switching substantively meaningful if,

2    in fact, the prices for services provided are

3    essentially the same?

4                    THE WITNESS:  Well, obviously if a

5    grower's made a commitment in terms of long-term

6    financing, the counterparty to that long-run financing

7    is going to look to the contract that that grower has

8    with an integrator, right, but that bank is also going

9    to look to what other sources of income are available

10   to service that debt, not just the houses.  The

11   cow-cattle operation, the employment of a spouse in

12   another economic activity, all of those factors are

13   going to be taken into account.  It's not just the

14   houses.  They're not locked in.

15                    In fact, if it's a small-scale operator, that

16   doesn't require full-time on the part of the manager

17   of that growing operation providing those services.

18   If it's a small operation, they will have available

19   time to be gainfully employed as a part-time worker in

20   some other economic activity.

21                    It is true, as your question suggests, that

22   once I make these commitments, I am locked in --

23                    THE COURT:  And have little bargaining

24   power in terms of demanding increased pricing?

25                    THE WITNESS:  Correct.  But now the

1   question is, is it in the interest -- the economic

2   interest of the integrator to exercise that power?

3   This is referred to in the economic literature as

4   hold-up.

5        Once you get the grower locked in to the

6   investment and having external financing, you can

7   suddenly exercise some power over that grower because

8   he or she are locked in because of their external

9   commitments beyond the contract, another contract with

10  regard to a financier.

11       But now, what is the economic incentive?  If

12  I've got good growers that are providing very

13  effective management skills, it's not in my economic

14  interest to harm them because I want that volume, I

15  need that throughput because I've got to manage my

16  economics downstream as well.

17            THE COURT:  Well, I understand you may

18  not want to hold them up and further bleed them dry,

19  but your incentive -- you're not going to have an

20  incentive to share the increased potential upside?

21            THE WITNESS:  I believe there is for the

22  following reason.

23       The market's expanding, it's expanding both

24  domestically and it's expanding globally in terms of

25  the export market.  You want new entrants to come into

1    those growing operations, you, the integrator.

2            Now, if you take advantage of your existing

3    growers, you don't think that information is going to

4    become available to all other potential entrants?  A

5    young couple coming along and they got a cow-calf

6    operation and they're thinking about also entering

7    into the poultry-growing business, if there's

8    information floating around -- and by the way, if you

9    spent any time in the farming community, there's lots

10   of rumors half of which is true and half of which is

11   story-telling; right?

12           But once that information gets out, that has

13   a very chilling effect on new entrants.  That's not in

14   the interest of the integrators.  It's not in their

15   interest.

16           THE COURT:  Mr. Garren.

17      Q.   (BY MR. GARREN)  That grower may not

18   understand that, though, when they decide to sign on

19   the line and get poultry houses; correct?

20      A.   Incorrect.

21           MR. ELROD:  I object, Your Honor.  That

22   calls for speculation.  I object.  It calls for

23   speculation.

24           THE COURT:  Overruled.

25      A.   No.  Never underestimate the understanding of

1    the inherent economics by a farmer.  Don't

2    underestimate.

3        Q.   *(BY MR. GARREN)*  I'm not doing that, sir.

4    Because they believe they can make money, don't

5    they?

6        A.   Certainly.

7        Q.   And in many instances, they're not making

8    money; correct?

9        A.   In most instances, those that are efficient

10    are making money.

11        Q.   Okay.  And you weren't at Dr. Dicks'

12    deposition, but, in fact, some of the scenarios you

13    ran with the IMPLAN model that you and Dr. Dicks

14    employed in this case actually show that the beef

15    industry is losing money in the IRW; is that not

16    true?

17            MR. EHRICH:  Objection.  Beyond the

18    scope.

19            THE COURT:  Sustained.

20        Q.   *(BY MR. GARREN)*  Did you participate in the

21    IMPLAN model, sir?

22        A.   Yes, as you well know.

23        Q.   And was that part of the basis of your

24    opinion in this case, relying on the IMPLAN model, or

25    was that Dr. Dicks' solely?

 1        A.    No.

 2              MR. HOPSON:    Your Honor, that's

 3    misleading.    The question is whether it's part of his

 4    opinion that he offered in the courtroom today, not in

 5    the case.

 6              THE COURT:    Sustained.

 7        Q.    *(BY MR. GARREN)*    All right.    You're not

 8    offering any opinions then today that phosphorus can

 9    be added to the soils of the IRW; is that correct?

10        A.    I'm sorry.    Say that again.

11        Q.    Are you offering any opinion that phosphorus

12    can, in fact, be added to the soils in the IRW?

13        A.    I'm not offering an opinion, or I am offering

14    an opinion?

15        Q.    I'm asking either way.    Are you offering such

16    an opinion, that phosphorus can be added to the soils

17    in the IRW?

18        A.    There was nothing in my direct testimony that

19    went to whether phosphorus can be added or not added.

20        Q.    Okay.    And part of it is, I've read your

21    report and I'm dealing in some instances with a report

22    that has other statements in it that kind of

23    intertwine with even the charts we saw here today.    So

24    I just want to make the record clear.

25              You're not saying that we should add

1    phosphorus to the IRW; correct?

2        A.  I am not.

3        Q.  Okay.  Did you make any survey, sir, of the

4    landowners in the IRW about whether they want poultry

5    waste to be applied to their lands?  Did you attempt

6    to quantify the demand for poultry litter to be

7    applied on lands in the IRW?

8        A.  Not in my direct testimony today, no.

9        Q.  And I'm asking you didn't do such a study; is

10    that correct?

11            MR. HOPSON:  Well, objection, Your

12    Honor.  If he didn't testify today in the courtroom,

13    it's not relevant whether he did a study or not.

14            THE COURT:  All right.  Sustained.

15        Q.  *(BY MR. GARREN)*  Would knowing that fact make

16    any difference with regard to the statistical

17    application you applied to Dr. Johnson's testimony or

18    his information concerning the STP values?

19        A.  No.

20        Q.  And that's because it's purely statistical;

21    correct?

22        A.  Correct.

23        Q.  And, in fact, it has nothing to do with the

24    environment, it's all to do with the statistics;

25    correct?

1    A.   Can you be more precise with regard to your

2    use of the word "environment"?

3    Q.   In this case, the water quality in the IRW

4    specifically.

5    A.   Correct.

6    Q.   All right.  You're not providing any

7    testimony with regard to the significant economic

8    benefits to cattle operators, are you?

9    A.   In my direct testimony, no.

10    Q.   No.  All right.  Do you know whether or not

11    Dr. Dicks intends to testify on that subject?

12              MR. HOPSON:  Objection.  It's an

13    improper question.

14              THE COURT:  Sustained.

15              MR. GARREN:  I've got to have a little

16    basis, Judge.

17              THE COURT:  I understand.

18              MR. GARREN:  I apologize.

19    Q.   *(BY MR. GARREN)*  As a resource economist,

20    sir, is it important to take into consideration the

21    impact agricultural practices will have on other

22    resources such as water quality?

23    A.   In a general equilibrium sense, yes.

24    Q.   And that was not part of any of your

25    analyses, though, for this trial; correct?

1          MR. HOPSON:  Objection, Your Honor.

2    It's either in the scope of the direct or not.

3    Whether the analysis is in his report is not relevant.

4          THE COURT:  Well, I essentially asked

5    him the same question before.

6          THE WITNESS:  Yeah, you did.

7          THE COURT:  Go ahead.  The objection's

8    sustained.

9      Q.   *(BY MR. GARREN)*  You have not received from

10   any of the integrator defendants operational or

11   financial data for your use in this case; is that

12   correct?

13     A.   Yes.

14     Q.   And as a result of the growth in the farm

15   size and the new technologies, do you agree that there

16   has been a significant increase in capital

17   requirements for the broiler growers?

18     A.   When you say "significant," can you be more

19   precise?

20     Q.   A large amount of money for growers that are

21   making $45,000 a year maybe.

22     A.   You're suggesting that this additional

23   investment is 45,000?

24     Q.   No.  I'm suggesting that's the level of their

25   income.  And for them, what would be significant in

1    that context?

2        A.   Well, you used the word "significant."  I

3    want to be able to answer your question.

4            What's significant?  Five thousand?  Ten

5    thousand?  Twenty thousand?  What are we talking

6    about?

7        Q.   From an economist standpoint, do you have an

8    opinion what would be significant to a $45,000 income

9    having to making capital improvements to support

10   vertical integration of the poultry business?

11           MR. EHRICH:  Your Honor, objection.

12   There's no evidence in the record as to $45,000 or any

13   other number for an annual income of growers.

14           THE COURT:  That's what he's seeking.

15   Overruled.  Go ahead.

16       A.   That's not an analysis that I've conducted.

17       Q.   (BY MR. GARREN)  Okay.  You would agree,

18   though, that the growers have, for the most part, a

19   substantial investment in the broiler houses and

20   equipment required to grow the birds?

21       A.   Yes.

22       Q.   And the integrators benefit from that

23   investment made by the grower.  Would you agree?

24       A.   Yes.  And the growers benefit from the risk

25   that's assumed by the integrator.  They also benefit

1   by the integrator accepting and demanding a product

2   being produced by the grower.  It's a symbiotic

3   relationship.  There's benefits of the bargain.

4           MR. GARREN:  To the extent that that

5   answer goes past my question, Your Honor, I ask that

6   it be stricken.  I asked for what the integrator

7   benefited and that was the scope of the question.

8           THE COURT:  Sustained.

9       Q.   *(BY MR. GARREN)*  Were you relying, sir, on

10  any of the farm budgets that were prepared as a part

11  of your work in this case to render opinions about the

12  farm and off-farm incomes that you gave today?  Or

13  were you relying just basically on this national scope

14  of data that's reflected solely in that graph or that

15  chart?

16      A.   Certainly national data, as you noted in your

17  question.  But in the report itself, we also had --

18      Q.   I'm trying to limit this because I've been

19  told to do it.  So let's limit it to your testimony.

20          Are you relying on the farm budgets that you

21  did as part of your work in preparation for this case

22  in giving your opinions today about farm and nonfarm

23  incomes?

24      A.   Yes.  With regard to my opinion that in the

25  IRW more of the income is sourced with farm activities

1    than it is for the nation as a whole for all

2    farmers.

3        Q.   And what was the basis of that -- the source

4    of the information on which you base that opinion?

5        A.   Cooperative extension, bulletins with regard

6    to budgets, the work that was done at Oklahoma State

7    University with regard to budgets for different sizes

8    of poultry operations measured in terms of the number

9    of houses.

10       Q.   Was that data gathered by Dr. Dicks for you

11   in order to make that observation?

12       A.   Yes.

13       Q.   You would agree, sir, based upon the Exhibit

14   3121, Defendants' Joint Exhibit, showing consumption

15   of beef and poultry, that the beef industry is

16   generally in a decline and has been since the mid

17   '70s?

18       A.   In terms of per capita consumption, yes.

19       Q.   And as a result of that, would that mean also

20   that production of beef has also gone down?

21       A.   No.

22       Q.   Why not?

23       A.   Because this is per capita consumption.  If

24   the population increases dramatically, which it has,

25   the total size of supply would still go up.  You have

1    to look at both sides of the market before you can

2    draw such conclusions.

3        Q.   Is this data in this chart on Defendants'

4    Exhibit 3121 limited to the United States?

5        A.   Yes.

6        Q.   Do you have an opinion whether or not the

7    beef industry is on a whole declining within the

8    United States?

9        A.   Measured by per capita consumption, yes; but

10   measured by total supply, no.

11              THE COURT:  It begs the question of the

12   economic impact of methane controls around feed lots,

13   but I won't go into that.

14              MR. GARREN:  I have some questions on

15   that, Judge.

16              THE COURT:  Are you kidding me?

17              MR. GARREN:  No, I'm serious.  It's

18   another reason for the decline.

19       Q.   *(BY MR. GARREN)*  Further regulation can cause

20   decline, can it not, Doctor?

21       A.   Depends on the regulations.  Is it possible?

22   Certainly.  Depends on the empirical facts, however.

23       Q.   I think we're just now developing them on

24   that issue.

25              Looking at Defendants' Exhibit 3125, the

1    Benton and Washington Counties STPs, did you look at

2    any other data besides the data that Dr. Johnson had

3    in his considered materials for your work in this

4    case?

5        A.   No.

6        Q.   Do you know if there are other data sets out

7    there for the IRW or parts of the IRW relating to STP

8    values than what you've testified to today?

9        A.   Well, there's other data sources.  I only

10   responded directly to Dr. Johnson's courtroom

11   testimony.

12       Q.   That's my question.  Are there other data

13   sources?

14       A.   Well, we've listed those data sources, I

15   think, in another demonstrative; right?

16       Q.   But you testified about those; correct?

17       A.   I testified about the two that he testified

18   about.

19       Q.   I'm sorry.  You're right.  But you listed

20   five sources, as I recall?

21       A.   Yes.

22       Q.   Did you analyze all five of those sources?

23       A.   We certainly looked at it.  But with regard

24   to the analysis in the report, we only included the

25   two which fortuitously were the only two that he

1    testified to here in court.

2        Q.    Did you take all of the data and run it in a

3    manner that you felt was more statistically accurate,

4    reliable, and consistent in order to compare to the

5    opinion that Dr. Johnson gave in this case?

6        A.    With regard to the signals about central

7    tendency, yes, I did.

8        Q.    So you -- I'm sorry.  So that I'm correct in

9    my understanding of your testimony, you took all of

10   the data sources that are listed in that -- I'm trying

11   to find that schedule here so we can talk about it.

12       A.    It is schedule 349.

13       Q.    Thank you.  So of those five, did you take

14   all of that data -- let's limit it to the IRW because

15   we do have Eucha-Spavinaw listed there.

16       A.    Yes.

17       Q.    -- all of the IRW data and did you put it

18   together, analyze it to determine whether or not

19   Gordon Johnson's opinion would be any different, or

20   should be any different, as to the levels of STP that

21   are shown in the IRW?

22       A.    Should be any different?  That is to say any

23   different with regard to the simple average?

24       Q.    That --

25       A.    Can you be more specific?

1      Q.  Well, we're going to break this down because

2  we're going to start there because that's what his

3  opinion was; correct?  He talked about average?

4      A.  Just simple average.

5      Q.  Correct.  And did you do an analysis to see

6  whether or not that other data would change or compare

7  differently in some way to Dr. Johnson's average?

8          MR. MCDANIEL:  Excuse me, Your Honor.  I

9  want to object because Mr. Garren is asking

10  Dr. Rausser if he has developed an opinion about data

11  that was not employed by Dr. Johnson in his direct.

12  So it's asking him to critique testimony that was not

13  offered on direct by Dr. Johnson.  I think it's not

14  relevant.  So I object.

15          MR. GARREN:  Well, if I might --

16          THE COURT:  Any response?

17          MR. GARREN:  Yes, Your Honor.  If you're

18  going to critique somebody, it seems consistent that

19  you, yourself, would test that data that's available

20  to you to determine if, in fact, Dr. Johnson's opinion

21  is wrong because other data is available.

22          MR. MCDANIEL:  Well, Your Honor, he's

23  here to rebut Dr. Johnson.  Dr. Johnson used two data

24  sets.  Dr. Rausser has testified about those same two

25  data sets.  Any other data is not relevant to either

1    Dr. Johnson or Dr. Rausser.

2              THE COURT:  I believe that's right.  I

3    think that's an essential component of the defensive

4    side of a lawsuit.  It's not necessary that the

5    defense pose other alternative data sets that the

6    plaintiff ought to have chosen.  It's up to the

7    defense to decide what the defense is.

8         So to the extent the doctor didn't consider

9    other data sets, that could have been a criticism but

10   it was not.  So it's sustained.

11             MR. GARREN:  It could be an issue of

12   reliability from the standpoint that I think from his

13   opinion he's questioning the reliability.  If he's

14   questioning the reliability, he has other data that he

15   could look to to determine that it's either more

16   reliable or more complete.  That would go to the

17   substance of his criticism and whether or not it, in

18   fact, is reliable or constructive to the issue.

19             THE COURT:  To the extent it's not part

20   of this witness' criticism, the objection's

21   sustained.

22             MR. GARREN:  All right.  Thank you, Your

23   Honor.

24      Q.   (*BY MR. GARREN*)  Okay.  Let's get back to

25   3125, I believe the histogram that you had and we

1   talked about earlier.

2           Do you know how many samples were a part of

3   this Exhibit 3125?

4       A.   Yes.

5       Q.   What was it?

6       A.   6,558.  It's reported in this histogram.

7       Q.   Can you tell me how many outliers, how many

8   values were eliminated by your drawing a line where

9   outliers should appear?

10      A.   Not many.  As you see to the right of the red

11  bar is the upper observations that were deleted, and

12  there were some observations deleted around zero.  I

13  don't recall and didn't memorize the actual number.

14  It wasn't very many observations.

15      Q.   Do you know how many observations there are

16  that exist below 65 STP in this data set?

17      A.   It's computable.  I haven't computed it.  And

18  it's not possible off this histogram to do so.

19      Q.   This histogram is prepared from an Excel

20  spreadsheet; correct?

21      A.   Produced with our report, yes.

22      Q.   Okay.

23              MR. GARREN:  May I approach, Your Honor?

24              THE COURT:  You may, sir.

25          *(Discussion held off the record)*

**United States District Court**

1      Q.   *(BY MR. GARREN)* Dr. Rausser, I took the

2   spreadsheet from your considered materials, and you'll

3   see the name of the file in the lower right-hand

4   corner placed in there as a footer from your

5   materials.  This is what I understand from the source

6   of your histogram to be the count, if you will, of the

7   total values and this shows 6559.

8          Would this be similar to what you would

9   expect to find from your own materials as to the

10  source of the data to create the histogram?

11     A.   Yes.

12     Q.   Okay.  Now, we can't tell from this how many

13  values are under 65 without having to do a little math

14  and spending some time; correct?

15     A.   Do you want an answer to that question?

16  Yes --

17     Q.   Well, you agree --

18     A.   -- it would take you some time.

19     Q.   I'm going to try and save us some time.

20     A.   Okay.  By the way, this particular

21  demonstrative is incomplete.  There's a jump.  From

22  the readings, it jumps from 113 to 2892.  You've left

23  off some pages, haven't you?

24     Q.   I did that just for the ease of seeing

25  that -- without having to print a bunch of paper.

 1      A.    Okay.  Fair enough.

 2      Q.    I've become environmentally conscious all of

 3  a sudden in this courtroom and the trees I've seen

 4  fallen as a result of it.  So I agree with you.  I

 5  just took the beginning numbers, and, in fact, the

 6  first two pages, so we could identify the first

 7  observations that go to 65 STP.

 8           I've handed you now the next demonstrative,

 9  359.  And it's the same thing, but what I've done is

10  just cut it off now at the level of the 65 STP to get

11  a count, if you will.  And can you see what that

12  subtotal of observations are below 65 from my Excel

13  spreadsheet demonstrative?

14           MR. MCDANIEL:  Excuse me, Your Honor.  I

15  want to object on the basis of relevance.  I know this

16  takes us back down memory lane to October of -- I

17  think it was 2008 when we were in trial.

18           Dr. Johnson testified that in Arkansas, 65

19  STP is not a relative -- is not a relevant criteria,

20  nor is it the one by which Arkansas soil tests are

21  adjudged for a hundred-percent forage yield.  So I

22  think it's misleading.

23           THE COURT:  Well, except we touched upon

24  that before, and the plaintiff is continuing to take

25  the position that 65 is a relevant number here.  So I

1    understand the defendants' position.  The objection's

2    overruled.

3           Go ahead.

4       Q.   *(BY MR. GARREN)*   The observations we see

5    there that would be below 65 STP are 594; correct?

6       A.   Correct.  Well, it's correct in terms of your

7    arithmetic.

8       Q.   And my representations to you --

9       A.   Yeah.

10      Q.   -- which --

11      A.   Yes.

12      Q.   -- I've tried to explain to you what I've

13   done?

14      A.   Yes.

15      Q.   You would do the same thing if you wanted to

16   get that quick sum, by inserting a line, adding a sum,

17   and getting a subtotal; correct?

18      A.   Correct.

19      Q.   All right.  And from the total observations

20   then, the 594 that we see are below 64 is less than 1

21   percent.  Would you agree?

22      A.   You mean below 65?

23      Q.   Below 65.

24      A.   Sixty-five or below to be precise.

25      Q.   Sixty-five or below.

```
 1        A.   Yes.

 2        Q.   Correct.  One percent or less, correct, of

 3   the total 6500 observations?

 4                  MR. MCDANIEL:  I think that's ten

 5   percent.

 6                  MR. GARREN:  I'm sorry.  You're right.

 7   Ten percent.

 8                  THE WITNESS:  That was a great

 9   opportunity for me.  You took it away from me.

10                  MR. MCDANIEL:  But we're all paid to

11   make observations here, sir.

12                  THE COURT:  Mr. Garren.

13        Q.   (BY MR. GARREN)  We're in agreement it's

14   closer to ten percent?

15        A.   That is correct.

16        Q.   All right.  I apologize for that error.

17             Let's talk a little bit about vertical

18   integration.  I know you have, I think, an issue with

19   that term for preciseness, but that seems to be the

20   term that everybody's willing to accept and use in

21   this case.

22             It's true that the choice to become

23   vertically integrated is totally controlled by the

24   companies themselves; correct?

25        A.   The choice?  Whose choice?
```

1      Q.    To fall into the categorization of vertically

2   integrated, they have to make a choice to move towards

3   that model; correct?

4      A.    Who's they?

5      Q.    The integrator.

6      A.    The integrator themselves?

7      Q.    Yes, sir.  Yes, sir.

8      A.    Yes.  Certainly, certainly.

9      Q.    The company.

10     A.    No question about it.

11     Q.    And is it true that one can be vertically

12  integrated where one of the processes involves in that

13  vertical chain an independent contractor?

14     A.    Yes.

15     Q.    Okay.  You talked about stratification in

16  order to have some reliable, consistent sampling data

17  to use.

18          The process that you described to this court

19  today would be an expensive process to conduct --

20  would you agree? -- in the size of a million-acre

21  watershed.

22     A.    Yes.

23     Q.    Sometimes scientists are dealt the

24  unfortunate opportunity of having data that is

25  available to them and that's all that's available;

1    correct?

2        A.    That does happen, yes, it does.

3        Q.    In some of those instances, that data,

4    though, can be sufficient to draw some conclusions.

5    Would you agree?

6        A.    In general.

7        Q.    In general.

8        A.    In general.  But keep in mind the purpose for

9    which you're doing the analysis.

10       Q.    Correct.

11       A.    Let me give you a simple analogy.

12       Q.    I think you've answered my question.

13       A.    Okay.  Fair enough.

14       Q.    We're fine.  But because of the limitations

15   of data sometimes, scientists have to deal with that

16   which is available for their work.  Would you agree?

17       A.    Depending on the purpose for which they're

18   doing the analysis, yes.

19       Q.    Okay.  So in this case, if the soil samples

20   that are being collected in the IRW result from a

21   process that we know exists today, that may be all the

22   data that's available for you to analyze; correct?

23       A.    Yes.  But now the question is, for what

24   purpose?

25       Q.    All right.  And with regard to that data, you

1    recognize that some of that data is now being

2    generated as a result of some regulations being

3    imposed as early as '98 in Oklahoma; correct?

4        A.   Yes.

5        Q.   And that formal regulations did not go into

6    effect in Arkansas until sometime later but there was

7    an increase of data being available.  Did you observe

8    that --

9        A.   Yes.

10       Q.   -- in the date ranges?

11       A.   Yes.  Some of the data sources that

12   Dr. Johnson used go back to the year 2000.  There's

13   more data observations in the latter part of the

14   period, yes.

15       Q.   Okay.  Now, the bias that you speak about in

16   this data really is from the perspective that you

17   criticize Dr. Johnson's inference that the STP average

18   should be applied across the whole watershed as

19   opposed to the sample data set; correct?

20       A.   That's in part --

21       Q.   Okay.

22       A.   -- a criticism.  But that's just part of it,

23   yes.

24       Q.   You talked about some very large numbers and

25   some negative numbers.

1          You're not testifying here today that

2    Dr. Johnson used these extremely large numbers --

3    3,000, 5,000 -- in his data set, are you?

4        A.   No.

5        Q.   And you're not suggesting that he used the

6    negative numbers, are you?

7        A.   No.

8        Q.   And you would agree with me, just as you keep

9    reminding me what is the purpose, your histogram on

10   Exhibit 3125, that has no purpose to demonstrate

11   whether the waters in the IRW are contaminated;

12   correct?

13       A.   No.

14       Q.   You know, we've done this too many times.

15          It is correct that you're not trying to show

16   the water to be contaminated from your histogram that

17   you've prepared under Exhibit 3125?

18       A.   Yes.

19       Q.   Thank you.

20          MR. HOPSON:  Well, that's clear.

21       Q.   *(BY MR. GARREN)*  Did you make any assessment

22   yourself to determine if, in fact, the samples used by

23   Dr. Johnson were not representative?

24       A.   I think there's enough evidence that there's

25   no way of knowing.  That is to say, his samples, you

1    don't know the details with regard to the fields from

2    which the samples were taken, the size of the field,

3    the soil depth, you know none of that information.  So

4    it is not possible to assess the representativeness.

5    Aside from the fact that if your purpose is to draw

6    inferences for the entire IRW, it's not

7    representative.

8        Q.   So you, yourself, didn't do anything also to

9    determine the representative nature of that sampling;

10   correct?

11       A.   Well, I did enough analysis to convince

12   myself that his sample is not representative of the

13   entire IRW.

14       Q.   And --

15       A.   But I did not do a separate, stand-alone

16   analysis to draw a representative sample.

17       Q.   And it's your task in this case to criticize

18   Dr. Johnson; correct?

19       A.   To evaluate his work, yes.

20            MR. GARREN:  I apologize, Your Honor.

21   I'm really on a merry-go-round trying to figure out

22   where I am in this to get everything covered here.  If

23   I can have a moment.

24            THE COURT:  I understand.  But I'm not

25   going to dissuade the defendants from cutting back on

1    all the topics that they could possibly touch upon.

2                    MR. GARREN:  I was trying to get it

3    there.

4        Q.   *(BY MR. GARREN)*  I have a question about

5    Defendants' Exhibit 6354, Dr. Rausser, so that I

6    understand the title to your table 2.

7             When it says "implications of changing

8    methods of vertical coordination of broiler products,"

9    you're not implying that the plaintiffs are, in fact,

10   suggesting a change of vertical coordination, are you?

11       A.   No, I am not.

12       Q.   Okay.

13       A.   What -- can I explain or not?

14       Q.   I think you've answered my question.

15       A.   Fair enough.

16       Q.   Let's look at your Demonstrative 342 just for

17   a second, if you would.

18       A.   Yes.

19       Q.   Are you there?

20       A.   Yes, I am.

21       Q.   As I look at this chart that you've prepared

22   for farm and nonfarm -- or real off-farm and real farm

23   income, would you agree that the real farm income

24   appears to be today, or at the end of your chart here,

25   2004 or 5, to be almost that of what it was in 1960?

1      A.   Yes.

2      Q.   Is this chart -- is it -- it is adjusted

3   based upon consumer price index; correct?

4      A.   Yes.  To make the dollars comparable

5   across --

6      Q.   Okay.

7      A.   -- the years that are recorded on the

8   horizontal axis.

9           THE COURT:  Do you know whether real

10   farm income is based upon reported income on --

11           THE WITNESS:  Oh, that's a different

12   question.  That's a different question.

13           THE COURT:  Go ahead.

14           THE WITNESS:  The data the USDA has is

15   not consistent with the IRS data.

16           THE COURT:  Surprise, surprise.

17           THE WITNESS:  They're not comparable.

18           THE COURT:  Mr. Garren.

19           MR. GARREN:  Thank you.

20      Q.   (BY MR. GARREN)  Look at your Demonstrative

21   352, which was the chart on the Oklahoma STP values.

22      A.   Yes.  I'm there.

23      Q.   With your outlier treatment, you show the

24   median there as 46 STP.

25           Are you familiar with what kind of yield

1   response or sufficiency -- I'm sorry -- sufficiency

2   that you would get on typical IRW forage of Bermuda

3   and fescue?

4       A.   I certainly have looked at that data.   I

5   don't --

6       Q.   Do you remember seeing that little chart that

7   Dr. Johnson has in his report that to obtain 95

8   percent yield sufficiency, you would only need a 40

9   STP?

10              MR. MCDANIEL:  Objection.  That's soil

11  science.  It's outside the scope of direct.

12              MR. GARREN:  Okay.

13              THE COURT:  Sustained.

14              MR. GARREN:  I'll pass the witness, Your

15  Honor.

16              THE COURT:  Redirect?

17              MR. HOPSON:  I have nothing further,

18  Your Honor.  Oh, wait a minute.  I'm going to be told

19  otherwise in just a moment.

20              THE COURT:  While they're talking, off

21  the record.

22              *(Discussion held off the record)*

23              THE COURT:  Mr. Hopson, back on the

24  record.

25              MR. HOPSON:  Back on the record.

**REDIRECT EXAMINATION**

**BY MR. HOPSON:**

Q.   Dr. Rausser, just briefly.   There was some discussion about whether growers had other alternatives other than growing.   Do you recall that discussion?

A.   Yes.

Q.   But based on the record and evidence available in this case, do most growers who switch switch but continue to be poultry-growers?

A.   Yes.

Q.   And was there evidence in the record, if you can recall, of growers switching because of higher compensation?

A.   Yes.

MR. HOPSON:  Okay.  Nothing further, Your Honor.

THE COURT:  Recross?

MR. GARREN:  Nothing, Judge.

THE COURT:  Very well.  You may be excused.

*(Discussion held off the record)*

THE COURT:  We'll take a very short recess because I'm going to have to leave at about 3:45 for that optometrist appointment.  We'll take as

1    short a break as our court reporter requires here.

2                    *(Short break)*

3                    MS. TUCKER:  Good afternoon, Your Honor.

4    K.C. Tucker for the George's defendants.

5              Next, the defendants would like to play a

6    portion of the Derek Smithee videotaped deposition.

7    The clips run about 45 minutes but I understand that

8    we need to stop at 3:45; is that correct?

9                    THE COURT:  Please.

10                   MS. TUCKER:  Okay.  I'll hand up a

11   packet of some of the exhibits that are discussed

12   during the deposition.  I'd like to note that

13   Deposition Exhibits 9 and 27 are not included in your

14   packet because they were not on the pretrial order.

15                   THE COURT:  All right.  You may begin.

16                   MR. BULLOCK:  Judge, before we hear

17   this, I'd like to state an objection that defendants'

18   witness Connolly who has previously testified -- what

19   Mr. Smithee is going to testify as to is Lake

20   Frances.

21                   THE COURT:  Oh, yes.

22                   MR. BULLOCK:  And Dr. Connolly

23   previously testified -- and I'm referring to, oh,

24   pages 9268 really through 9269 -- that his

25   investigation is that Lake Frances has a small, if

1    any, influence in terms of phosphorus issues in the

2    IRW.

3              So it would appear it me that Mr. Smithee's

4    testimony is irrelevant to this matter given the scope

5    of the defense.

6                   THE COURT:  All right.  Let me take a

7    look at 9268 and 9269.

8                   MR. BULLOCK:  Begins at the top of 9267.

9                   THE COURT:  My pagination appears to be

10   a bit different.  What --

11                  MR. BULLOCK:  I'm sorry.  I can read

12   the -- beginning --

13                  THE COURT:  Do you have a page and line

14   number?

15                  MR. BULLOCK:  Yes.  The relevant

16   testimony begins at the top of page 9267, line 1.  I

17   guess I'd call particular attention to the court as to

18   lines 9 through 11 on that but the testimony is a

19   little more fulsome than that.  I don't want to

20   mislead you concerning it.

21                  THE COURT:  Well now, the problem is, I

22   don't have a 9267.  That's -- I have --

23                  MR. BULLOCK:  Oh, you're looking at

24   Smithee's testimony.  I'm talking about --

25                  THE COURT:  Connolly's?

1          MR. BULLOCK:  -- Connolly's testimony,

2    trial transcript 9267.

3          THE COURT:  Oh, I'm sorry.  All right.

4          MR. BULLOCK:  Okay.

5          THE COURT:  Now --

6          MR. BULLOCK:  Mine's sort of annotated.

7    I guess I don't have any problem passing it around to

8    everybody.  I don't have any secrets here.  I haven't

9    managed to keep any in most of my life.  So --

10          THE COURT:  Well, perhaps the most

11    efficient way to do it is to allow defendants to

12    respond.  Go ahead.

13          MS. TUCKER:  Your Honor, I don't feel

14    that the fact that there may be some testimony by

15    Dr. Connolly regarding any contributions that Lake

16    Frances may have to nutrient loading in the watershed

17    bears any weight on the 30(b)(6) deposition testimony

18    of a state agent of the State of Oklahoma.

19          Derek Smithee in his deposition testifies to

20    a number of other issues, including nutrient loading

21    from other sources in the watershed.  If plaintiffs

22    want to argue that defendants have presented

23    inconsistent testimony, they're welcome to do that at

24    closing, but I don't believe it's a basis to exclude

25    Mr. Smithee's deposition.

10218

 1            THE COURT:  All right.  The objection's

 2   overruled.  You may begin.

 3            MR. BULLOCK:  We need -- we probably

 4   ought to give -- did we give an exhibit number to the

 5   Smithee deposition?

 6            THE COURT:  We did not.  It should be

 7   what?

 8            MS. TUCKER:  Fourteen.

 9            THE COURT:  All right.  We will have

10   this marked as Court's Exhibit 14 and admitted.

11            MS. TUCKER:  Thank you, Your Honor.

12            THE COURT:  Yes.

13   *(Videotaped deposition of Derek Smithee is played)*

14            MS. TUCKER:  Your Honor, I think we're

15   at a good stopping point, if it's time for you to

16   go.

17            THE COURT:  Very good.  Thank you very

18   much.  We're in recess.

19            *(The proceedings were recessed)*

20

21

22

23

24

25

10219

1                    C E R T I F I C A T E

2

3

4          I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11         I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16         In witness whereof, I have hereunto set my

17   hand this 6th day of January 2009.

18

                        s/ Brian P. Neil
19                 _____
                      Brian P. Neil, CSR-RPR, CRR, RMR
20                    United States Court Reporter

21

22

23

24

25

**United States District Court**