IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )   No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )




VOLUME 89 - PM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 7, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE









*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                      *United States Court Reporter*



**United States District Court**

10317

1                      A P P E A R A N C E S

2

3   For the Plaintiffs:        MR. W.A. DREW EDMONDSON
                               MS. KELLY FOSTER
4                              Office of Attorney General
                               State of Oklahoma
5                              313 N.E. 21st St.
                               Oklahoma City, OK  73105
6

7                              MR. DAVID RIGGS
                               MR. DAVID P. PAGE
8                              MR. RICHARD T. GARREN
                               Riggs Abney Neal
9                              Turpen Orbison & Lewis
                               502 W. 6th Street
10                             Tulsa, OK 74119

11
                               MR. ROBERT A. NANCE
12                             MS. SHARON GENTRY
                               Riggs Abney Neal
13                             Turen Orbison & Lewis
                               5801 Broadway
14                             Oklahoma City, OK 73118

15
                               MR. LOUIS W. BULLOCK
16                             MR. ROBERT BLAKEMORE
                               Bullock Bullock &
17                             Blakemore
                               110 W. 7th St.
18                             Suite 770
                               Tulsa, OK 74119
19

20                             MR. FREDERICK C. BAKER
                               MS. ELIZABETH CLAIRE XIDIS
21                             MS. INGRID L. MOLL
                               Motley Rice LLC
22                             28 Bridgeside
                               P.O. Box 1792
23                             Mount Pleasant, SC 29465

24

25

**United States District Court**

1                    A P P E A R A N C E S  (Cont.)

2

  For Tyson Foods:            MR. ROBERT W. GEORGE
3                             Tyson Foods, Inc.
                              2210 West Oaklawn Drive
4                             Springdale, AR 72701

5
                              MR. FRANK R. VOLPE
6                             MR. MARK D. HOPSON
                              MR. THOMAS C. GREEN
7                             MR. JAY THOMAS JORGENSEN
                              MR. GORDON D. TODD
8                             ERIC J. IVES
                              CARA R. VIGLUCCI LOPEZ
9                             Sidley Austin LLP
                              1501 K St. NW
10                            Washington, DC 20005

11
                              MR. PATRICK MICHAEL RYAN
12                            Ryan Whaley Coldiron and
                              Shandy PC
13                            119 N. Robinson, Rm 900
                              Oklahoma City, OK 73102

14

15
  For Cargill:               MR. JOHN H. TUCKER
16                            MS. THERESA HILL
                              Rhodes Hieronymus Jones
17                            Tucker & Gable
                              100 W. 5th St., Ste 400
18                            Tulsa, OK 74103

19                            MR. DELMAR R. EHRICH
                              MS. KRISANN KLEIBACKER LEE
20                            Faerge & Benson
                              90 S. 7th St., Ste 2200
21                            Minnaepolis, MN 55402

22

23  For Simmons Foods:         MR. JOHN R. ELROD
                              MS. VICKI BRONSON
24                            Conner & Winters
                              211 E. Dickson St.
25                            Fayetteville, AR 72701

1              A P P E A R A N C E S  (Cont.)

2

3    For Peterson Farms:          MR. A. SCOTT MCDANIEL
                                  MR. PHILIP HIXON
                                  MS. NICOLE LONGWELL
4                                 McDaniel Hixon Longwell &
                                  Acord PLLC
5                                 320 S. Boston, Ste 700
                                  Tulsa, OK 74103

6

7

     For George's:               MR. GARY V. WEEKS
8                                 MR. WOODY BASSETT
                                  MR. VINCENT O. CHADICK
9                                 MS. K.C. TUCKER
                                  Bassett Law Firm
10                                P.O. Box 3618
                                  Fayetteville, AR 72702

11

12

     For Cal-Maine:              MR. ROBERT SANDERS
13                               Young Williams P.A.
                                 P.O. Box 23059
14                               Jackson, MS 39225

15

                                 MR. ROBERT P. REDEMANN
16                               Perrine McGivern Redemann
                                 Reid Berry & Taylor PLLC
17                               P.O. Box 1710
                                 Tulsa, OK 74101

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                                                      Page

4

5    *WITNESSES ON BEHALF OF THE DEFENDANTS*

6
     **VICTOR BIERMAN, PH.D.**
7
     Continued Direct Examination by Mr. George      10321
8    Cross-Examination by Mr. Page                    10322
     Redirect Examination by Mr. George               10415
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**United States District Court**

```
 1                    Thursday, January 7, 2010

 2                          *  *  *  *  *

 3              THE COURT:    Mr. George.

 4              MR. GEORGE:   Thank you, Your Honor.

 5              CONTINUED DIRECT EXAMINATION

 6    BY MR. GEORGE

 7        Q.   Good afternoon, Dr. Bierman.  Before lunch,

 8    we discussed some of the errors and problems that you

 9    had noted in the work of Dr. Engel and Dr. Wells.

10        A.   Yes.

11        Q.   Do any of these errors and problems impact

12    the work of other experts retained by the State of

13    Oklahoma?

14        A.   Yes, they do.

15        Q.   And which experts?

16        A.   Drs. Stevenson, Cooke, and Welch.

17        Q.   And could you explain the impact of the

18    things that we've discussed regarding Dr. Engel and

19    Dr. Wells' modeling on those experts' opinions?

20        A.   Right.  The flawed and unreliable results

21    that flowed from Dr. Engel's work flowed into

22    Dr. Wells' work, and the flawed and unreliable results

23    resulting from Dr. Wells' model flowed into the work

24    by Drs. Cooke and Welch.

25             And backing up one step, Dr. Engel's flawed
```

**United States District Court**

1  predictions for total phosphorus flowed in the work of

2  Dr. Jan Stevenson.

3          MR. GEORGE:  Your Honor, I'll pass the

4  witness.

5          THE COURT:  Cross-examination.

6          MR. PAGE:  Yes, Your Honor.  Thank you.

7                  **CROSS-EXAMINATION**

8  **BY MR. PAGE:**

9     Q.   Good afternoon, Dr. Bierman.  It's good to

10  see you again.

11     A.   Good afternoon, Mr. Page.  My pleasure.

12     Q.   Dr. Bierman, before we get started in some of

13  my cross-examination, I would like to ask you -- I

14  have a couple questions on Defendants' Joint Exhibit

15  2415.

16          MR. PAGE:  Would someone please put that

17  up for us?

18     Q.   *(BY MR. PAGE)*  And, Dr. Bierman, I don't

19  remember what tab it was, but it's the one where you

20  had -- you were talking about the sensitivity analysis

21  that you did -- excuse me?

22          *(Discussion held off the record)*

23     Q.   *(BY MR. PAGE)*  Tab 3.  Thank you.  Yeah,

24  there it is up on the board.

25          MR. PAGE:  Thank you, Mr. Todd.

1    Q.   *(BY MR. PAGE)*  Now, I have just a couple

2  questions just about how the graph works.

3        The blue lines at the top are what you

4  proposed as a sensitivity analysis for

5  wastewater-treatment plant inputs; correct?  That's

6  what you assumed for the sensitivity analysis?

7    A.   Well, yes.  I pulled out Dr. Engel's

8  wastewater-treatment plant loads, and I put in the

9  wastewater-treatment plant loads corresponding to my

10 blue lines in the top panel of this exhibit.

11   Q.   Okay.  And that's a hundred-million pounds;

12 is that correct?

13   A.   I think it is.  I can't quite read

14 the -- yes, I believe that's correct.

15   Q.   Okay.  And so you tried to do the same thing

16 with nonpoint source; that is, in the lower graph on

17 the same exhibit, you wanted to put in a

18 hundred-million pounds also for nonpoint source?

19   A.   No.  That wasn't the way these were derived.

20   Q.   I guess my question, though, sir, is, it

21 shows here in your exhibit that you have a

22 hundred-million pounds -- the top one's

23 wastewater-treatment plant inputs, right, the blue

24 bars?

25   A.   Yes.

1    Q.  And the bottom one is nonpoint-source inputs

2  that you used.  Was it your intent to put the exact

3  same phosphorus input changes for both

4  wastewater-treatment plant and nonpoint source?

5    A.  No, that was not my intent.

6    Q.  So is this a mistake on the bars?

7    A.  No, I don't think the bars are in error.

8  These two sensitivity analyses were conducted

9  independently.

10    Q.  Okay.  But your inputs for

11  wastewater-treatment plant, if I understand your

12  testimony, was a hundred-million pounds for each of

13  these years, '98 through 2006, as shown in the top

14  graph; correct?

15    A.  I don't know the exact number.  And as I

16  pointed out, it's a log scale.  It's very difficult to

17  draw -- to pull out the absolute numbers off of these

18  graphs.  If I can --

19    Q.  Well, no.  Dr. Bierman, it just appears to me

20  that you used the same hypothetical for both nonpoint

21  source and point source, at least that's what it shows

22  here by looking at your graph, but that wasn't your

23  testimony; is that correct?

24    A.  No.  I don't accept the premise of your

25  question, Mr. Page.  I would have to look at the

1    actual numerical values in the model files I used to

2    confirm what the numbers were.  They appear

3    approximately the same on this log scale, but the

4    numbers were not exactly the same.  That was not my

5    intention to make those numbers the same at all.

6        Q.  Okay.  Well, let me look at something else,

7    another apparent similarity, and that has to do with

8    Engel's wastewater-treatment plant loads in the upper

9    graph versus Engel's nonpoint-source loads in the

10   lower graph.  Those are the red bars.

11           Is it your position, sir, that Dr. Engel's

12   loading analysis from his model is that the point

13   sources and the nonpoint sources are the same?

14       A.  No, sir.  That's not --

15       Q.  Isn't that what this graph here shows?

16       A.  I don't share the opinion that that's what

17   this graph shows.  Because, again, this is a log

18   scale, and one cannot attribute numbers accurately to

19   the heights of these bars.

20           Furthermore, Dr. Engel's wastewater-treatment

21   plant loads and the nonpoint-source loads, as they're

22   depicted in these graphics, were taken directly from

23   his -- the third version, the October 15 version, of

24   his P routing model.

25       Q.  Well, Dr. Bierman, when you say it's a log

1    scale, both charts are log scales; correct?

2        A.   Yes.

3        Q.   Okay.  So the location for the red bar for

4    sample under 1998 on the lower chart, if it has the

5    same location in the upper chart, it represents the

6    same value, does it not?

7        A.   If it had the same location, but I'm not sure

8    we can draw that inference just by visually inspecting

9    these graphs.

10       Q.   Well, do you know, sir, today whether or not

11   Dr. Engel's model showed that the point-source

12   phosphorus discharges for each year were equivalent to

13   the nonpoint-source loadings in this watershed?

14       A.   I don't recall the relative magnitudes of his

15   point-source loads and his nonpoint-source loads that

16   he put into his routing model.

17       Q.   So sitting here today, you don't even recall

18   whether or not Dr. Engel's point-source results from

19   his model were the same as the nonpoint source?

20       A.   No, that's not what I said.  My recollection

21   is -- and I don't have the specific numbers to put to

22   it -- but my recollection is that the nonpoint source

23   numbers that he put into his routing model, which are

24   computed by his GLEAMS model, were, in fact, higher

25   than the point-source loadings that he put into that

*10327*

1    model.

2         Q.   And you're saying that the fact that you've

3    got it looking similar here today is kind of -- we

4    just can't read it properly because it's hard to tell

5    from this chart?

6         A.   To say that they're similar on a log plot is

7    not to say that the numbers are the same.

8         Q.   Okay, sir.  I want to talk to you a little

9    bit about your experiences with regard to watershed

10   runoff modeling.

11        Isn't it true, sir, that you have limited

12   experience in running watershed models?

13        A.   No, sir.  I disagree that premise.

14        Q.   Well, you mentioned a couple of examples of

15   your experience during the qualification part of your

16   testimony.  One was the Calahoochie -- I don't know if

17   I can pronounce that right -- the Calahoochie?

18        A.   Caloosahatchee.  It took me awhile to learn

19   how to pronounce that as well.

20        Q.   Thank you very much.  Caloosahatchee -- we'll

21   let the court reporter learn how to spell that --

22   estuary.  You mentioned that one.

23        Isn't it true in that case, you just actually

24   reviewed the modeling application, you didn't do it

25   yourself?

1       A.    That's correct.  I reviewed the data, I

2   reviewed the model, and I reviewed the underlying

3   science.

4       Q.    But you didn't actually run the model there,

5   did you, sir?

6       A.    Not for that project, no.

7       Q.    And about the Saginaw Bay project, was that

8   also one of the projects you mentioned also as part of

9   your experience?

10      A.    I mentioned the Sag -- I mentioned today that

11  had I worked on Saginaw Bay, but I don't think I put

12  that forth as an example of watershed experience.

13      Q.    Okay.  So you wouldn't claim that.

14            How about Chesapeake Bay?  You mentioned

15  that.  But you didn't do any watershed modeling in

16  that case, did you, sir?

17      A.    I didn't conduct any.  We used the results

18  from the Chesapeake Bay watershed model.

19      Q.    And the Everglades model I think you

20  mentioned as a piece of experience for watershed

21  modeling.

22            But isn't it really true, sir, that in that

23  case you worked with the South Florida Water

24  Management District, and as far as the runoff portion;

25  that is, the watershed runoff portion, the South

1  Florida Watershed Management District actually did

2  that watershed modeling.  Correct?

3      A.   Not completely correct.

4      Q.   Not completely correct.

5      A.   We used the -- the hydraulic chassis for that

6  model was the South Florida Water Management District

7  two-by-two hydrology model.  That model existed before

8  we started our project.  My assignment was to build a

9  phosphorus transport fate -- overland transport and

10 fate and transport and fate model through the canal

11 and network system for phosphorus.

12     Q.   Right.  But the runoff component was already

13 built for you, you just incorporated that into your

14 model, you linked them together; correct?

15     A.   Not exactly.  The hydrology component -- we

16 built upon the hydrology component.  But when we added

17 phosphorus, we computed phosphorus runoff and that was

18 new, that was not given to us.

19     Q.   Is it true, sir, for that particular model

20 that the folks that actually determined the quantity

21 of field runoff were the South Florida Water

22 Management District folks?

23     A.   Do you mean experimentally measured?

24     Q.   Yes.

25     A.   Yes.  Because we did the modeling.  We did

1    not do any sampling or experimental measurements as

2    part of that program.

3        Q.    And it was the South Florida Water Management

4    folks that actually identified the particular sources

5    of field runoff for phosphorus also in that

6    application; is that also correct?

7        A.    They gave us the data and we processed the

8    data and quantified the sources.

9        Q.    Now, Dr. Bierman, you mentioned that you've

10   been working in the modeling area for about 36 years.

11           Isn't it true, sir, that during that whole

12   36-year period of time you've actually run an upland

13   watershed model yourself just a small number of times?

14       A.    My actual hands-on experience?

15       Q.    Yes, sir.

16       A.    Well, the 36 years of experience you refer to

17   involves the science behind the physics, the

18   chemistry, and the biology of the models that you

19   refer to.

20       Q.    Okay.  Now, Dr. Bierman, what I'd like you to

21   do, please, is just answer my question.  I didn't ask

22   you about whether you understood the science.  I asked

23   you, sir, whether or not just the amount -- the actual

24   hands-on running of a watershed model, you've only

25   done that a few times in your 36 years of experience?

1      A.    A limited number of times, yes.

2      Q.    And it's also true, sir, that you've never

3    published anything in a peer-reviewed journal that

4    relates to uplands watershed modeling; that is, that

5    your piece of that publication related to uplands

6    watershed modeling?

7      A.    That doesn't mean I haven't done good science

8    in that area.

9      Q.    Dr. Bierman --

10              MR. PAGE:   I move to strike as

11    nonresponsive, Your Honor.

12              THE COURT:   Sustained.   Dr. Bierman, if

13    you'll just contain yourself to the substance of the

14    question, and Mr. George will have an opportunity to

15    ask follow-up questions.

16              THE WITNESS:   Okay.   Sorry, Your Honor.

17      A.    Mr. Page, please repeat the question, sir.

18      Q.    *(BY MR. PAGE)*  Sure, Doctor.   Isn't it true,

19    sir, that you haven't ever published anything in a

20    peer-reviewed journal that relates to uplands

21    watershed modeling?

22      A.    We published -- no, that's not true.   The

23    paper we published in ecological modeling represents

24    the overland transport of phosphorus and the

25    phosphorus transport through the canal system for half

1   of south Florida.

2       Q.   Okay.  And that was the Everglades model that

3   we just talked about; correct?

4       A.   Yes, that's correct.

5       Q.   And that's where the South Florida Water

6   Management District, though, actually did the upland

7   portion of the analysis; correct?

8       A.   Please define what you mean by "upland."

9   Because we certainly represented overland and

10  phosphorus transport through the overland areas and

11  the canal system for half of south Florida.

12      Q.   Well, the South Florida Water Management

13  District actually determined the runoff for that piece

14  of work; correct?

15      A.   No, that's not correct.  They told us -- they

16  gave us data which represented the boundary conditions

17  for that model, and we then took those boundary

18  conditions and computed transport throughout the

19  entire Everglades area.

20              MR. PAGE:  Your Honor, may I approach?

21              THE COURT:  You may.

22          *(Discussion held off the record)*

23      Q.   *(BY MR. PAGE)*  Now, Dr. Bierman, do you

24  remember having your deposition taken in this case?

25      A.   Oh, yes, I do.

**United States District Court**

1    Q.   Would you please turn to page 282 of your

2  deposition, which I've handed to you, sir?

3    A.   282.

4    Q.   I'm going to start at the -- start at the

5  bottom of page 282 at line 19 and then go over to the

6  top of page 283.

7    A.   I'm getting there.

8            MR. GEORGE:   Your Honor, I object.   It's

9  not proper impeachment.   The passage that's been

10  identified by Mr. Page is completely consistent with

11  what the witness has testified to on the stand

12  today.

13            THE COURT:   Okay.   Let me take a look.

14            MR. PAGE:   It's 282, line --

15            THE COURT:   Yes, I have it.   Is that

16  inconsistent, Mr. Page, with what he's testified here

17  to today?

18            MR. PAGE:   I believe so, Your Honor.

19            THE COURT:   How so?

20            MR. PAGE:   He testified that he

21  published in a journal article for this particular

22  project work on overshed -- excuse me -- overland

23  runoff modeling, and the people that actually did that

24  work were the South Florida Management Water

25  District.

```
 1            THE COURT:  Let me go back and just take
 2   a look at this specific question and the specific
 3   answer.
 4        I see.  The objection's overruled.
 5            MR. GEORGE:  Your Honor, could I be
 6   heard briefly?
 7            THE COURT:  Yes, sir.
 8            MR. GEORGE:  I do appreciate the court's
 9   ruling, but the testimony that is at issue doesn't
10   relate -- in the deposition does not relate to running
11   the model which is what Mr. Page's premise with the
12   cross-examination is.
13        Dr. Bierman's already testified that the
14   field measurements as to runoff in that particular
15   project were completed by the South Florida Water
16   Management District, and that's what this deposition
17   testimony is discussing.
18            THE COURT:  It may be a simple failure
19   to communicate here.  But the question that Mr. Page
20   put was whether or not the South Florida Water
21   Management District actually determined the runoff,
22   which is actually almost identical to the question
23   asked in the deposition.  The answer in the deposition
24   was "yes."  So the objection's overruled.
25            Go ahead.
```

1      Q.   (*BY MR. PAGE*)  Okay.  Would you follow with

2    me, sir, on the bottom of page 282, line 19?

3           "QUESTION:  Okay.  And so the folks that

4    actually determined the quantity of field runoff was

5    the South Florida Water Management folks; is that

6    correct?

7           "Yes, that's correct.

8           "And they were the ones that also identified

9    the particular sources of field runoff for phosphorus

10   also; correct?

11          "Into this model domain, that's correct."

12          Were you asked those questions and did you

13   give those answers under oath the day of your

14   deposition?

15     A.   Yes, I did.  The --

16     Q.   That's fine, Dr. Bierman.  Thank you.

17          Now, Dr. Bierman, is it also true, sir, that

18   in this case, the IRW, this was the first time that

19   you've ever worked with the GLEAMS model?

20     A.   It's not the first time I've worked with the

21   science, but it's the first time I've worked with the

22   GLEAMS model tool, that's correct.

23     Q.   Okay.  And is it also true, sir, you've never

24   worked with another well-known watershed runoff model,

25   SWAT?

**United States District Court**

1        A.   I have never worked with SWAT, that's

2    correct.

3        Q.   And SWAT has the same com -- at least very

4    similar components for the runoff portion as GLEAMS;

5    is that correct?

6        A.   Some of them are similar.

7        Q.   And would you agree with me, Doctor, that

8    Dr. Engel has much more experience than you do in the

9    area of runoff modeling?

10       A.   I would dispute that he has more experience

11   than I do in the science that underlies runoff

12   modeling because that science is physics, chemistry,

13   and biology and mass balance.  And, sir, I have 36

14   years of experience doing that.

15            MR. PAGE:  Your Honor, I move to strike

16   as nonresponsive.

17            THE COURT:  Overruled.  Your question

18   was to the area of runoff modeling which encompassed

19   the substance of his answer.

20       Q.   *(BY MR. PAGE)*  Dr. Bierman, would you agree

21   that Dr. Engel has more experience with actual

22   operating -- actually running runoff models than you

23   do?

24       A.   Yes.

25       Q.   Now, I want to talk a little bit now, sir,

1  about these assumptions that you critiqued on the

2  GLEAMS model that we've talked about this morning.

3      A.  Yes.

4      Q.  It's true, is it not, sir, that you did no

5  analysis to determine whether or not the conditions or

6  the assumptions that Dr. Engel selected for his GLEAMS

7  model were not representative of site-specific

8  conditions in the IRW?

9      A.  I can't provide an answer to a question that

10 broad.  Could you please be more precise, sir?

11     Q.  Well, I thought it was pretty -- pretty

12 precise.

13         You did no analysis, sir, to determine

14 whether or not the conditions that Dr. Engel selected

15 for his GLEAMS model were not representative of

16 site-specific conditions in the IRW?

17     A.  Well, that depends what conditions.  That

18 model requires a great deal of input.  I just

19 testified to an analysis we did this morning of how

20 Dr. Engel took the NLCD data and classified land uses.

21 I certainly did that analysis and, as I testified to,

22 I discovered numerous errors in those inputs.

23     Q.  Dr. Bierman, would you please turn to page

24 374 of your deposition?

25     A.  I'm here.

 1    Q.   Okay.  At the bottom on line 23, during your

 2  deposition, were you asked this question and did you

 3  give this answer?

 4        Okay.  Did you do any analysis, sir, to

 5  determine that the conditions that Dr. Engel selected

 6  for his GLEAMS model were not representative of

 7  site-specific conditions in the IRW?

 8        "ANSWER:  No, because it wasn't my model."

 9        Were you asked that question and did you give

10  that answer at your deposition, sir?

11    A.   Yes, I did.  And I took that question to mean

12  input coefficents.  I didn't -- at the time I'm sure

13  I didn't take it to mean the land use analysis.

14    Q.   Now, Dr. Bierman, I want to talk a little bit

15  about the phosphorus inputs testimony you did this

16  morning.  Do you remember Tyson Defendants

17  Demonstrative 230?

18        MR. PAGE:  Could we have that, please?

19  I don't recall what tab it was again.

20        *(Discussion held off the record)*

21    A.   I'm sorry.  Which tab, please?

22    Q.   *(BY MR. PAGE)*  Tab No. 9.

23    A.   Okay.  I've got it.

24    Q.   Now, it's true, is it not, sir, that you

25  haven't in your modeling experience actually reviewed

10339

1   soil test phosphorus data for input into a runoff

2   model?

3        A.   That's not correct.

4        Q.   It's not correct.  Okay.

5        A.   I've done -- I have -- in the course of

6   scientific peer review of watershed models, I have

7   reviewed initial condition for soil phosphorus

8   concentrations for watershed models; for example, in

9   Lake Okachobe.

10            And if we're construing soil test phosphorus

11  to mean soil test phosphorus as we've talked about it

12  in this case here, I'm not used to referring to it as

13  "soil test phosphorus."

14       Q.   Okay.  Well, let's turn to page 328 of your

15  deposition, Dr. Bierman.

16       A.   Sure.  I'm sorry.  328 did you say?

17       Q.   Yes, sir.

18       A.   Okay.  I'm there.

19       Q.   Thank you, sir.  On line 4 during your

20  deposition, were you asked this question and were

21  you given -- did you give these answers?

22            "QUESTION:  Have you ever, sir, reviewed soil

23  test phosphorus data for use in a runoff model?

24            "ANSWER:  I reviewed the materials produced

25  in this case.

**United States District Court**

1          "QUESTION:  Prior to the review of this case,

2     have you ever done that analysis in a modeling

3     framework?

4          "ANSWER:  No."

5          Did you provide those answers to those

6     questions during your deposition, sir?

7          A.   Yes, I did.  That's what the transcript says.

8          Q.   Now, I want to talk a little bit about this

9     soil phosphorus that you show here in Tyson Defendant

10    Demonstrative 230.

11         My understanding is, sir, is that you summed

12    all of the phosphorus that's in the soil in the IRW

13    and came up with 6.4 million tons, and that's what's

14    represented by the yellow portion of this -- I don't

15    know -- pie, for example?

16         A.   No, that's not correct.

17         Q.   Okay.  Would you please explain how I got

18    that wrong?

19         A.   I didn't determine all of the phosphorus in

20    the soils of the Illinois River Watershed.  I

21    determined the total phosphorus inside Dr. Engel's

22    GLEAMS model as it represented those soils.

23         Q.   Okay.  And is that then what's shown here on

24    the yellow portion?

25         A.   That is -- yes.  That's -- it's not that

1    specific number.  It's actually Meagan

2    Smith's -- those slices don't correspond to actual

3    masses.  No.  Check that.

4          The 99.91 percent does represent the total

5    phosphorus in the soil in Dr. Engel's GLEAMS model

6    expressed as a relative number compared to the --

7    Q.   Okay.  Now I think we're talking -- I think

8    we're on the same page here, so to speak.

9    A.   I just wanted to be clear.

10   Q.   Yes.  Thank you, sir, for that.

11         So now, the GLEAMS model, you took that.

12   What level of phosphorus; that is, what depth of soil,

13   did you calculate from the GLEAMS model to determine

14   the 6.4 million tons?

15   A.   We looked at -- well, the simple answer is --

16   and I'll add detail -- we looked at the phosphorus

17   that Dr. Engel had inside the model.

18   Q.   Okay.  How deep does that go?  How deep is

19   the soil profile?

20   A.   Some HRUs have three layers.  Some HRUs have

21   five layers.  It's complicated because each of the

22   layers has different thicknesses in different HRUs.  I

23   believe I had a range in terms of inches of bottom

24   depths in my expert report.

25   Q.   Okay.  And so how many inches then did you

10342

1    consider total from the GLEAMS model for phosphorus

2    -- your phosphorus calculation of 6.4 million tons?

3        A.   Well, I captured all of it that was there.

4    If in a given HRU the bottom depth was -- in

5    Dr. Engel's model was 20 inches, I went down to 20

6    inches and stopped because his model stopped.  If his

7    model went to -- I just stopped at the bottom

8    depth -- depths which were in Dr. Engel's model.

9        Q.   Okay.  So then I think I'm starting to

10   understand now.  So then that represents essentially

11   the equivalent of 99.91 percent if you compare that to

12   all of the other watershed sources from the -- from

13   Engel's model; correct?

14       A.   No, that's not correct.

15       Q.   Okay.  I'm trying to understand where it says

16   here 99.91 percent, that's the soil portion.  And what

17   are you comparing it to when you say "all watershed

18   sources," .09 percent?

19       A.   Well, that -- those are -- those are the

20   sources that were in the mass balance.

21       Q.   Oh, okay.

22       A.   The small slice here that says "all watershed

23   sources," those are the sources that Meagan Smith

24   considered entered the watershed --

25       Q.   Okay.

1    A.    -- in the mass balance.

2    Q.    So you're comparing the GLEAMS sources with

3  the mass balance sources?

4    A.    Not exactly.  They're not the GLEAMS sources.

5  That just happens to be the phosphorus mass reservoir

6  that's in the soil in Dr. Engel's GLEAMS model.

7  That's all that is.

8    Q.    Okay.  So you agree with me, Dr. Bierman,

9  that not all of the soil phosphorus that's in the

10  GLEAMS model is likely to be a source of phosphorus in

11  the rivers, streams, and lake of the IRW?

12    A.    What do you mean by "not likely"?  The

13  surface phosphorus is more likely to be a potential

14  source of phosphorus runoff to edge-of-field than is

15  the phosphorus at deeper layers.

16        However, keep in mind that we're not just

17  talking about overland transport here.  It's possible

18  for water to infiltrate into the ground, migrate

19  horizontally through the soil horizon, and be

20  delivered to the edge-of-field.  The GLEAMS model

21  actually represents both of those kinds of transport.

22    Q.    Okay.  And so is it your belief, sir, since

23  you did this analysis, that there is such a subsurface

24  transport occurring in the IRW?

25    A.    I did not form that opinion.  This analysis

1   that I conducted simply consisted of looking at what's

2   in his model and adding up all the boxes and producing

3   that number of 6.4 -- arriving at that number of 6.4

4   million tons.

5       Q.   Well, you agree with me, Dr. Bierman, that

6   the most important source of phosphorus for the

7   waters, the surface waters, of the IRW would be the

8   phosphorus that's closest to the surface of the soils?

9       A.   As a very broad generality, I -- as a very

10  broad generality, I could agree with it.  Whether or

11  not that's the case for the site-specific conditions

12  in this watershed, I have no basis to form an opinion

13  because I didn't conduct that analysis.

14      Q.   So you don't know either way on that, but

15  generally that would be correct.

16           Would it also be correct, sir, that anything

17  that's put on top of the land, such as disposal of

18  poultry waste, would also be the most likely source of

19  phosphorus going into the waters of the IRW?

20           MR. GEORGE:  I'm sorry.  Objection, Your

21  Honor.  The witness has just said he didn't do that

22  analysis and hasn't formed an opinion.

23           THE COURT:  Sustained.  And in that

24  regard, this is captioned as "plaintiff's percentage

25  of annual watershed phosphorus additions."

1      Based upon your testimony, it would appear to

2  more accurate that you're calculating all of the

3  phosphorus contained in the GLEAMS model that may well

4  be banked for a period of years in the soils; right?

5  This isn't necessarily annual watershed phosphorus

6  additions; correct?

7      THE WITNESS:  Right.  If I may explain.

8      The annual addition that's referred to is the

9  annual addition of phosphorus to the Illinois River

10  Watershed that was taken from Meagan Smith's mass

11  balance report.  So that's the new phosphorus.  The

12  new phosphorus that's coming into the watershed --

13  this bubble that encompasses the whole watershed,

14  that's the new phosphorus that comes in in one year.

15  And this --

16      THE COURT:  And that's what this yellow

17  portion of the pie represents?

18      THE WITNESS:  No.  Actually, that

19  portion, Your Honor, is just the small slice, the .09

20  percent slice.

21      The whole point here is that what comes

22  in -- what Meagan Smith or what Dr. Engel assumed --

23  the amount of new phosphorus that they assumed comes

24  into the watershed in each year there's a very, very

25  small fraction; in fact, .09 percent of the total

1    phosphorus that is already in Dr. Engel's GLEAMS

2    model.

3                 THE COURT:  All right.  But 99.91

4    percent, according to your calculation of the total

5    phosphorus shown in the model, Engel's model, could be

6    accurately characterized as banked phosphorus?

7                 THE WITNESS:  Well, it's total

8    phosphorus reservoir, yes.  That would be one way to

9    think of it.

10                THE COURT:  Go ahead.

11       Q.   *(BY MR. PAGE)*  And the sources of that banked

12   phosphorus can be the same sources that are shown here

13   on your demonstrative; that is, that this banked

14   phosphorus could very well have been previous years'

15   contributions as shown from the mass balance analysis?

16       A.   Some of that phosphorus certainly is, but a

17   relatively small percentage of it.

18       Q.   And what is your basis for that, sir?  Did

19   you actually calculate what the background phosphorus

20   levels are in the IRW that would be represented by

21   Dr. Engel's banked phosphorus and compare that to the

22   number you have here?

23       A.   Well, I'll tell you what I did.

24       Q.   Did you do that, sir?  Did you do that

25   analysis?

1      A.   I did the analysis that forms the basis for

2    the opinion I just expressed.  Would you like me to

3    explain what I did?

4      Q.   No.  I'd like you to answer my question,

5    Dr. Bierman.

6      A.   Please repeat the question, sir.

7      Q.   Did you actually compare the amount of banked

8    phosphorus that's in Dr. Engel's model that you came

9    up with, 6.4 million tons --

10     A.   Yes.

11     Q.   -- to what would be banked if there had been

12    no contributions such as those that have been

13    contributed through the mass balance analysis?

14     A.   I did that for poultry litter.

15     Q.   And did you do it for the rest?

16     A.   No.  I -- I went to table 11 in Appendix B of

17    Dr. Engel's expert report, and that table contains his

18    numbers for the amount of poultry P that's been

19    applied in the IRW for the past 50 years.  I simply

20    added that number up and I got a number that I believe

21    was about 161,000.  I can check it exactly.

22         But that number -- the accumulated total of

23    poultry P application to the land surface in the IRW

24    from Dr. Engel's expert report is approximately .02

25    percent of the total phosphorus reservoir that is

1    sitting there contained in his GLEAMS model.

2        Q.   Okay, sir.  And the GLEAMS model obviously is

3    not showing that all this phosphorus that you're

4    showing there is going to the river very quickly, is

5    it?

6        A.   No.  Excuse me, sir.  May I correct the

7    record?

8            I think that number was two percent.  I said

9    0.2.  I think I misspoke.

10       Q.   So it's your point, sir, that two percent of

11   the banked phosphorus is from poultry litter; that's

12   your testimony?

13       A.   No, sir, that's not what I meant.  I'm saying

14   that if one takes the cumulative total of poultry P

15   that has been applied in the IRW for 50 years from

16   Dr. Engel's own expert report, that number happens to

17   be two percent of the total phosphorus reservoir or

18   the total phosphorus that's banked in his GLEAMS

19   model.  I'm forming no opinion about transport and

20   fate of that phosphorus.

21       Q.   Now, your testimony about the HRUs, sir,

22   earlier today --

23       A.   Yes, sir.

24       Q.    -- did you perform any tests to determine

25   whether the size of the HRUs used by Dr. Engel were

1   too large to accurately represent nonpoint sources

2   from local sources?

3       A.   I didn't need to perform a test --

4       Q.   Sir, if you could just answer my question,

5   please.  Did you or did you not perform any tests?

6       A.   It -- sir, it depends what one means by

7   "test."  I consulted the manual that was written by

8   the developers of the GLEAMS model and the developer

9   of the CREAMS model, which shares the same science,

10  and those manuals are very clear as to the size of the

11  field for which CREAMS and GLEAMS were designed for.

12  And then I looked at the sizes of the HRUs that

13  Dr. Engel used in his model and determined that they

14  were orders of magnitude too large.

15      Q.   Okay, sir.  But you didn't perform any -- you

16  didn't revise the HRUs in Dr. Engel's GLEAMS model and

17  determine whether the size that you're being critical

18  of had any impact on the modeling results, did you,

19  sir?

20      A.   I did not conduct any such analysis, sir.

21      Q.   I want to talk to you a little bit about the

22  criticism you had about Dr. Engel's use of GLEAMS for

23  the urban characterizations.

24      A.   Yes.  Yes, sir.

25      Q.   Are you testifying, sir, that the GLEAMS

 1    model cannot be used to characterize urban areas?

 2        A.   It's my testimony that the developer stated

 3    that it was designed for ag fields of small size, not

 4    for urban land.  It's also my testimony that the EPA

 5    manual which describes these models states

 6    specifically that it's intended for ag use, not urban

 7    use.

 8        Q.   And this was your first experience with the

 9    GLEAMS model, correct, sir, this case?

10        A.   It's my first experience with the GLEAMS

11    model.  That doesn't mean I can't read the manual.

12        Q.   Okay, sir.  And isn't it not true, and you

13    would agree with me, that an experienced modeler can

14    make modifications to a model and can add capabilities

15    for it to do something for which it might not have

16    been originally designed?

17        A.   As a -- as a hypothetical, sir, I agree with

18    that.

19        Q.   Okay, sir.  Now, have you performed any

20    scientific investigations relating to urban runoff?

21        A.   I investigated the way in which Dr. Engel

22    used the GLEAMS model to represent urban land for the

23    IRW.

24        Q.   I'm sorry.  My question was somewhat

25    ambiguous.

1          Have you performed any scientific
2    investigations prior to work in this case relating to
3    urban runoff?
4        A.   I've done some simple spreadsheet modeling of
5    different land use areas, including urban.
6        Q.   But you've never published any of your
7    investigations, or any investigation, concerning urban
8    runoff in a peer-reviewed paper?
9        A.   Yes, that's correct.
10       Q.   Now, Dr. Bierman, is it your opinion that
11   GLEAMS cannot be used to model urban runoff?
12       A.   My opinion is consistent with the developers
13   of the model who stated that it was not designed for
14   that intended purpose.
15       Q.   I know you've told me what the model designed
16   purpose was.
17          But my question is, based on your experience
18   as a modeler, can the GLEAMS model be used to model
19   urban runoff?
20       A.   Are we speaking of the hydrology, or are we
21   speaking of the nonpoint-source phosphorus runoff?
22       Q.   Nonpoint-source phosphorus runoff.
23       A.   I don't know if the GLEAMS model, which is
24   designed to be an ag model, can in a scientifically
25   defensible manner be modified to represent

1    nonpoint-source phosphorus runoff.  But I do know that

2    the way Dr. Engel used it to represent that runoff in

3    this case was incorrect and was flawed.

4         Q.  So just so the record's clear, you don't know

5    whether or not GLEAMS can be used to model nonpoint

6    source nutrient runoff; correct?

7         A.  Whether one can do it is one thing.  Whether

8    one can do it and have it be done in a scientifically

9    acceptable manner is another question.

10         Q.  Dr. Bierman, we'll get through this a little

11   bit faster if you just answer my question.  We'll take

12   it stepwise.

13            I first just want to know whether you have an

14   opinion as to whether one can modify the GLEAMS model

15   in order to model urban runoff?

16         A.  I suppose.  Yes, I suppose one could do

17   that.

18         Q.  Okay.  Now, let's talk about what your

19   concerns are with Dr. Engel.

20         A.  Uh-huh.

21         Q.  You mentioned that you were concerned about

22   the crop selection for urban runoff?

23         A.  I was concerned -- no, my concern was broader

24   than that.

25            The GLEAMS model -- for each land use type it

1    requires two sets of inputs, one is hydrology and one

2    is nutrients.  The nutrient parameter input file that

3    Dr. Engel used for his GLEAMS model was taken from an

4    example in the GLEAMS manual and it represented a crop

5    type of alfalfa hay.

6        Q.   Okay.  And what was wrong with that?

7        A.   Because alfalfa hay doesn't grow

8    in -- doesn't cover the urban land use area in the

9    Illinois River Watershed.

10       Q.   Okay.  But those language or verbal

11   descriptors aren't all of the variables that are part

12   of the land use aspect of the GLEAMS model, are they,

13   sir?  I mean, there's all kinds of different curves

14   and different inputs beyond just the name "alfalfa";

15   correct?

16       A.   Yes.  And that's precisely the point.  This

17   is not just a labeling issue.  Because the nutrient

18   input file, it's not just a label that says "alfalfa

19   hay."  It contains specifications for phosphorus

20   concentrations, nitrogen concentrations, how

21   phosphorus cycles, how nitrogen cycles, how phosphorus

22   and nitrogen interact.

23       When one makes that designation for urban

24   land, one invokes all of that nutrient cycling, and,

25   sir, that simply doesn't occur in pavements and

1   highways in the Illinois River Watershed.

2       Q.   But, the alfalfa -- you can adjust those

3   subparameters, can you not?  Those can be adjusted?

4       A.   Dr. Engel did not do that in a nutrient

5   parameter input file; he used it straight up.

6       Q.   Oh, that's your testimony, sir, he did not

7   make any adjustments in those parameters?

8       A.   He did not adjust -- he used the nutrient

9   parameter input file.  The adjustments he made, sir,

10  were in the hydrology file.

11      Q.   Okay.  Isn't the curve number also part of

12  like, for example, soil moisture?

13      A.   The curve number is very important for the

14  hydrology, yes.

15      Q.   Okay.  Did you consider whether or not there

16  were modifications in the hydrology concerning soil

17  moisture content?

18      A.   I didn't look at soil moisture consent.  I

19  looked at curve number, which is very -- far more

20  important.

21      Q.   Okay.  Well, you can also modify the soil

22  moisture content to make a difference also; is that

23  correct, sir?

24      A.   Yes, sir, you can.

25      Q.   Did you do any tests; that is, rerun the

1    GLEAMS model, with changes in the assumptions that you

2    claim Dr. Engel made to see if it had any material

3    effect on the model output?

4        A.    With the GLEAMS model?

5        Q.    Yes, sir.

6        A.    No, sir.  Dr. Engel made those changes

7    himself.

8        Q.    Okay.  Now, I just -- Dr. Bierman, please.

9    "Yes" or "no" is fine.

10       A.    No, I didn't -- yes.

11       Q.    Did you rerun the GLEAMS model to see if it

12   had a material impact?

13       A.    No, I did not.

14       Q.    Thank you, sir.  Now, Dr. Bierman, I remember

15   you raising a concern that Dr. Engel did not calibrate

16   the GLEAMS model to the edge-of-field using the

17   hundred or so samples that he had for edge-of-field.

18   Was that one of your concerns?

19       A.    My concern is that yes, he should have

20   compared the output of his GLEAMS model to those

21   data.

22       Q.    Is it standard practice in the watershed

23   modeling community to calibrate to the edge-of-field?

24       A.    It's standard practice to use the data when

25   they're available.

1          MR. PAGE:  Move to strike.

2      Q.  *(BY MR. PAGE)*  I asked you a specific

3  question, sir, with regard to the watershed modeling

4  community.

5          THE COURT:  Sustained.

6      A.   Well, it was standard practice apparently for

7  Dr. Storm because he published a paper in 2007, sir,

8  in which he -- he did three site-specific studies in

9  the Eucha-Spavinaw Watershed right here in Oklahoma

10  where he specifically -- he modeled and measured

11  edge-of-field concentrations and compared his model

12  output to those edge-of-field concentrations.

13      Q.   Are you aware of any other published

14  peer-reviewed articles where there's a watershed model

15  where they did a calibration to edge-of-field?

16      A.   I'm not personally aware of any peer-reviewed

17  publications save for this work by Dr. Storm.

18          And I might add, sir, that in that paper,

19  he -- part of that he not only did site-specific

20  studies in those three watersheds, but he gathered

21  together data which represented 280-some years of

22  edge-of-field measurements for other locations in the

23  south.

24          MR. PAGE:  Your Honor, I move to strike

25  as nonresponsive, the part where he went on to talk

1    about Dr. Storm's analysis.

2                   MR. GEORGE:  Your Honor, with all due

3    respect, the witness was asked about his understanding

4    of the peer-reviewed literature and he's discussing

5    the subject.

6                   THE COURT:  Overruled.  And also with

7    regard to the last question and answer where the court

8    struck the answer, it did, in fact, appear responsive

9    upon the court's review.  The question was, "Is it

10   standard practice in the watershed modeling community

11   to calibrate to the edge-of-field?"  The answer was,

12   "It's standard practice to use the data when they're

13   available."

14           That's directly responsive.  The court

15   reverses its previous ruling.  That's overruled.

16           Go ahead.

17                   THE WITNESS:  Thank you, sir.

18       Q.   *(BY MR. PAGE)*  Dr. Bierman, you did not

19   conduct any independent analysis of potential

20   phosphorus sources in the IRW, did you, sir?

21       A.   I conducted no quantitative analysis, no.

22       Q.   And you can't tell us, sir, today what the

23   relative contribution of phosphorus sources are within

24   the IRW?

25       A.   No, I cannot.  I did not conduct that

 1  analysis.

 2      Q.  And did you actually perform a water quality

 3  model of the IRW, actually do a water quality model --

 4      A.  A watershed model?

 5      Q.  Yes, sir.

 6      A.  No, sir, I did not.

 7      Q.  Well, did you do an in-stream model?

 8      A.  No, sir, I did not.

 9      Q.  Did you do a lake model for the IRW?

10      A.  No, sir.  My assignment in this case was to

11  review Dr. Engel's body of work, not to develop my own

12  independent model.

13      Q.  And did you do any independent investigation

14  of transport or delivery of phosphorus from poultry

15  litter fields in the IRW to Lake Tenkiller?

16      A.  No.

17      Q.  Did you or your team perform any sampling or

18  other field investigations, other than a site visit,

19  of the IRW?

20      A.  No, we did not.

21      Q.  Now I want to talk a little bit about your

22  testimony concerning the land use land cover database.

23      A.  Yes, sir.

24      Q.  What database did Dr. Engel use?

25      A.  My understanding is that he used the national

1    land cover data set.

2        Q.   Have you ever used that data set before, sir?

3        A.   My staff have used it.  I have not personally

4    used it.

5        Q.   Is it traditionally the data set that is used

6    for watershed modeling?

7        A.   Yes.  That's my understanding.

8        Q.   So Dr. Engel followed the standard practice

9    when he used for his GLEAMS model the national land

10   cover data set?

11       A.   I don't know if he followed standard

12   practice, but he used the same data set that's widely

13   used by others.

14       Q.   In fact, your staff uses it when it does

15   watershed modeling; correct?

16       A.   Yes, sir, they do.

17       Q.   Now, I just want to make sure the record's

18   clear on this.

19            You personally did not do the evaluation of

20   whether or not the land use data was correct from the

21   national land use database; correct?

22       A.   Those work products were developed by my

23   staff and I reviewed them but I did not personally

24   conduct the analysis.

25       Q.   And, in fact, sir, you don't have any

 1   experiencing -- experience -- excuse me, sir -- in

 2   interpreting land use to aerial photos, do you, sir?

 3       A.   I have experience in interpreting land use

 4   photos.  It's the first time I've ever seen those

 5   types of photos.  It's not the first time I've ever

 6   seen the NLCD -- I've used NLCD data and I've seen and

 7   interpreted georeference data.

 8            I have knowledge in that area, sir, but I

 9   don't consider myself an expert.

10       Q.   You don't consider you an expert on aerial

11   interpretation?

12       A.   Not as expert as someone with specific formal

13   training in it.  I have no formal training in it.

14       Q.   Okay.  Now, did you do any specific

15   analysis -- these errors that your staff claimed told

16   you that they found, did you do any specific analysis,

17   like rerun the GLEAMS model, to determine whether or

18   not those errors in the national land cover database

19   had a material effect on the GLEAMS output that

20   Dr. Engel performed?

21       A.   We did not fix his errors and then -- we

22   didn't -- we -- we discovered errors.  This was a

23   concern.  I did not fix the errors and rerun the model

24   to determine what quantitative difference that made.

25   No, sir, I did not do that.

1      Q.   So you don't know whether it was a material

2   problem or not?

3      A.   It depends what one means by "material."

4   When I saw the numbers of mistakes and when I saw the

5   numbers of the inconsistencies -- internal

6   inconsistencies in Dr. Engel's GLEAMS model input

7   files, this is a concern, and it's not just a labeling

8   concern.

9      Q.   But you could have tested that by rerunning

10   the model with these changes in the so-called errors;

11   correct?  Could you have done that, sir?

12      A.   We did run the GLEAMS model.  We could run

13   the GLEAMS model.

14      Q.   Could you have done it with this data that

15   you claim was erroneous to see if it had a material

16   effect in the output?

17      A.   Okay.  What I could have done and whether

18   that would have had -- whether that would have helped

19   me to form my opinion about the validity and

20   reliability of Dr. Engel's results are two separate

21   questions, sir.  I could have run the GLEAMS model.  I

22   could have run the GLEAMS model with different land

23   use classifications.

24      Q.   And that wasn't done; correct?

25      A.   I didn't do that because my job was not to

1    fix Dr. Engel's mistakes and correct his model.

2             MR. PAGE:  Move to strike the last part

3    of his answer, Your Honor.

4             MR. GEORGE:  Your Honor, I believe

5    that's directly responsive.

6             THE COURT:  Overruled.  The answer may

7    stand.  Go ahead.

8        Q.  *(BY MR. PAGE)*  Have you ever used empirical

9    equations or models in your work, sir?

10       A.   Yes, sir, I do.

11       Q.   Okay.  So it's standard in the modeling

12   community to use empirical equations to describe fate

13   and transport activities?

14       A.   It's standard to use empirical equations.

15   It's not standard to use empirical equations to

16   describe transport and fate if what we're speaking

17   about is moving water or moving material from point A

18   to point B through a pathway.

19       Q.   So it's your testimony today that Dr. Engel's

20   use of an empirical equation or model for the routing

21   portion of his model is not standard practice?

22       A.   The specific routing model that Dr. Engel

23   used in this case and the way he used it to connect

24   his edge-of-field loadings to the loadings at the

25   downstream gauges in the Illinois River Watershed is

```
 1    certainly not standard practice.
 2         Q.   Well, let's talk about your sensitivity.  I
 3    think you called it a sensitivity test of the routing
 4    model?
 5         A.   That would be one way to refer to it, yes,
 6    sir.
 7         Q.   Yeah.  Now, did you actually run these
 8    sensitivity tests or did someone from your staff do
 9    this work?
10         A.   Both.  I ran some and one of my staff ran
11    them as well.
12         Q.   All right, sir.  Let's -- let's -- you
13    mentioned that you calibrated Dr. Engel's model; is
14    that correct, sir?
15         A.   I recalibrated I think was the --
16         Q.   You recalibrated.  So you changed the model,
17    did you not?
18         A.   In my opinion, I didn't change the model; I
19    recalibrated the model.
20         Q.   When you recalibrated the model, you changed
21    the routing coefficients, at least some of them, for
22    that model, did you not?
23         A.   I changed the coefficients, but in my
24    opinion, that's not changing the model.  Because in
25    Dr. Engel's expert report on page D-21, he presents
```

1    what he represents as his routing model.  The routing

2    model, as represented in his expert report, it doesn't

3    have specific numerical values attached to the

4    coefficients A, B, C, or P accumulation.

5         Q.   So it's your testimony, sir, that

6    Dr. Engel -- if you changed the coefficients in

7    Dr. Engel's routing model, it does not change the

8    model?

9         A.   It doesn't change the model; it changes the

10   site-specific application of the model.

11        This is what's done every day in

12   environmental modeling.  You have a set of equations,

13   these equations have coefficients, and the calibration

14   process consists of applying that model to a site to

15   data and determining the coefficients through

16   calibration.

17        That's what Dr. Engel did in his expert

18   report, and that is exactly what I did, sir, when I

19   conducted my sensitivity analysis.

20        Q.   Are you saying you don't know what the

21   coefficients were -- when Dr. Engel calibrated his

22   model, he identified the coefficients for that model,

23   correct, that routing model?

24        A.   When he calibrated the model, each time he

25   calibrated it -- and we're speaking of three different

1    versions now -- each time he did that, he ended up

2    with a set of coefficients.

3        Q.   But the final version that supported his

4    testimony in this case, he had specific coefficients

5    for that routing model; correct?

6        A.   Yes, sir, he did.

7        Q.   And then he used independent data, a separate

8    set of data, to check that model's calibration to

9    validate it; correct?

10       A.   That's incorrect.

11       Q.   Okay.  Well, he didn't change the cal -- he

12   calibrated it and then used it for this case.  He used

13   the same coefficients then as he did his model

14   predictions; is that correct?

15       A.   Okay.  I'm taking issue with a different part

16   of your statement, sir.

17       Q.   Okay.

18       A.   Dr. Engel represented his work as calibration

19   validation.  Actually, when he calibrated -- his

20   calibration and validation steps were completely

21   separate for the hydrology portion of his GLEAMS

22   model.

23       Q.   Okay.  Let me get on to the point here.

24       A.   The running model --

25       Q.   Let me get on to the point here, sir.

1       MR. MCDANIEL:  Your Honor, excuse me.

2    If Mr. Page could extend the witness the courtesy of

3    allowing him to finish his answer.

4            THE COURT:  Well, he began to -- the

5    objection's sustained.

6            Go ahead and finish.

7       A.   Okay.  Let me cut back to the routing model,

8    sir.  Your question was about the routing model.

9            Before I answer the question you asked, I

10   have to -- one of the premises in your question is not

11   correct and I can't answer the question as asked.  So

12   I would have to point out Dr. Engel represented that

13   he calibrated and validated his routing model.

14           Sir, the way you asked the question, you

15   represented it to me as though a calibration step was

16   conducted and then a separate validation step was

17   conducted, but that's not what Dr. Engel did.

18      Q.   Let me ask a different question.

19      A.   Yes, sir.

20      Q.   After Dr. Engel calibrated his model for

21   testimony in this case, he didn't modify the

22   coefficients in the routing model, he maintained them

23   the same way; correct?

24      A.   For use in his forecast scenarios, yes, sir,

25   he did.

1      Q.   Yes, he did.  But when you did these

2   sensitivity analyses, you changed those coefficients,

3   did you not?

4      A.   Yes.  Because I recalibrated, and therefore,

5   it was the same model with different coefficients.  It

6   was a different realization of the same model.

7      Q.   Well, if you change the coefficients in a

8   water quality model, that changes the results, does it

9   not?

10     A.   It doesn't change the model; it changes the

11  numerical results.  It's the same model.

12                MR. PAGE:  May I approach, Your Honor?

13                THE COURT:  You may.

14     Q.   (*BY MR. PAGE*)  Okay.  Now, Dr. Bierman, I

15  handed you what's marked as Demonstrative 361.

16     A.   Yes, sir.

17     Q.   Do you recognize that as being Dr. Engel's

18  routing model?

19     A.   Yes.  This is how Dr. Engel represented

20  what's on this demonstrative.

21     Q.   Okay, sir.  And so there's certain

22  coefficients there.  There's the A, B, and C

23  coefficients; correct?

24     A.   Yes, that's correct.

25     Q.   And depending on what numbers you have in

```
 1   those coefficients, that will affect the results;

 2   correct?

 3       A.   That's correct.

 4       Q.   Okay, sir.

 5            MR. PAGE:  May I approach, Your Honor?

 6            THE COURT:  You may.

 7       Q.   (BY MR. PAGE)  Now, Dr. Bierman, I've handed

 8   you Demonstrative 362.  The top is Dr. Engel's model

 9   with the coefficients he used.  Do you recognize that,

10   sir?

11       A.   I recognize those coefficients as being the

12   coefficients in one of the several versions of his

13   routing model, yes, sir.

14       Q.   Well, do you recall whether this is the

15   version he used to testify in court here for his

16   opinions?

17       A.   I can't recall specifically which version

18   this is.

19       Q.   Okay, sir.  And just so we understand here,

20   coefficient A is 0.1; correct?

21       A.   Yes, that's correct.

22            MR. GEORGE:  Excuse me, Your Honor.  I

23   apologize, Mr. Page.

24            There's no foundation for the use of this

25   exhibit.  It's not being used as a demonstrative,
```

**United States District Court**

1    rather for the truth of the matter asserted, and the

2    witness has not embraced its accuracy.  So absent

3    further foundation, I don't believe it can be used in

4    this manner.

5                MR. PAGE:  Your Honor, he said he

6    recognized it, at least one of them.  I think it's

7    appropriate here for me to test and cross-examine this

8    witness as to what he did in the sensitivity analysis

9    to show the differences between Dr. Engel's model and

10   coefficients and what he used.

11               THE COURT:  Well, this is not a document

12   to be used to be admitted into evidence; correct?

13   You're simply using it to demonstrate the different

14   coefficients used by Dr. Engel and Dr. Bierman?

15               MR. PAGE:  Yes, sir.

16               THE COURT:  Overruled.  Go ahead.

17       Q.   *(BY MR. PAGE)*  So the .1 in Dr. Engel's model

18   is the coefficient A; correct, sir?

19       A.   Yes, that's correct.

20       Q.   And for your model using -- for the Baron

21   Fork, just the nonpoint source, what coefficient did

22   you have for coefficient A?  Excuse me, sir.

23       A.   On this demonstrative, it's 0.1.

24       Q.   Do you recall that that was the coefficient

25   you used for the Baron Fork?

1          THE COURT:  Let me ask:  These

2    coefficients don't differ.  Why are we even focusing

3    on those?

4          MR. PAGE:  Well, they do, Your Honor.  A

5    does not differ, but B and C do substantially.

6          THE COURT:  Why are we spending time on

7    the coefficients that don't differ, Mr. Page?

8          MR. PAGE:  I apologize, Your Honor.

9          THE COURT:  Let's move on.

10     Q.   *(BY MR. PAGE)*  Okay.  Let's look at

11   coefficient B, sir.

12     A.   Yes, sir.

13     Q.   Is there a difference between the coefficient

14   that Dr. Engel's model used and the one that you used?

15     A.   I don't know for certain.  These coefficients

16   are different on this piece of paper but, as I

17   mentioned, I can't recall sitting here.  I did this

18   analysis a year ago, and I can't recall exactly what

19   the numbers were that he used or I used.  They look

20   close but I can't swear that they're the same

21   numbers.

22          MR. PAGE:  May I approach, Your Honor?

23          THE COURT:  Yes, please.

24     Q.   *(BY MR. PAGE)*  Dr. Bierman, I've handed you

25   what's marked as Demonstrative 365.  Do you recognize

**United States District Court**

1    this as a screenshot from your Baron Fork routing

2    model where you made a change in the nonpoint source?

3        A.   I recognize it as a screenshot of Dr. Engel's

4    routing model.  If the title is correct, it is a

5    screenshot from the routing model -- the sensitivity

6    analysis that I conducted, yes, sir.

7        Q.   Okay.  And did you see on there, sir, that

8    for the B and C -- under column O for B and C, your

9    coefficients are the same as we find on Demonstrative

10   362; that is, four times ten to the minus 13 for B?

11       A.   Yes.

12       Q.   And 1.2 times 10 to the minus 12 for C?

13       A.   What's on Demonstrative 365 does, in fact,

14   match what's on Demonstrative 362, yes, sir.

15       Q.   Okay, sir.  And so are you saying that it

16   does not refresh your recollection as that being your

17   actual changes that you made in Dr. Engel's equation

18   when you did the sensitivity analysis for nonpoint

19   source?

20       A.   I'm sorry, sir.  Please repeat the question.

21       Q.   Well, I'm just trying to determine whether

22   you recall your own sensitivity analysis and whether

23   or not these are the changes that you made in

24   Dr. Engel's coefficients for B and C.

25       A.   I've already testified that when I

1    recalibrated, the recalibration resulted in different

2    values for the coefficients A, B, C, and P

3    accumulation.  Whether these are those specific

4    coefficients, I'm not sure.  But yes, sir, I changed

5    the coefficients.

6         Q.   And so isn't it --

7         A.   Excuse me, sir.

8         Q.   I'm sorry.  Isn't it true, sir, that when you

9    changed these coefficients, you created a different

10   routing model?

11        A.   I disagree with that opinion.  It's the same

12   model but the -- it's a different calibration of the

13   same model.  I guess we can get hung up on semantics

14   here.

15        So the terms -- I will concede that my

16   coefficients are different.  I should also point out

17   that Dr. Engel during his deposition stated that these

18   coefficients have no physical meaning and there were

19   no constraints on what values they could take when he

20   calibrated the model.

21        Q.   Dr. Bierman, isn't your routing model really

22   different because Dr. Engel's routing model and his

23   coefficients were created based on empirical

24   observations in the IRW, and your routing model

25   coefficients are based on a hypothetical increase of

 1    100 times the phosphorus in GLEAMS?

 2                    MR. GEORGE:  Objection, Your Honor.

 3    Asked and answered.  We've been around the tree

 4    several times on whether Dr. Bierman believes this is

 5    a different routing model.  I believe he made it clear

 6    on that.

 7                    THE COURT:  I believe this is a

 8    different question.  Overruled.

 9         Go ahead.

10         A.   Please repeat the question, sir.  I lost

11    track.

12         Q.   *(BY MR. PAGE)*  Isn't it different, because

13    Dr. Engel's routing model, his coefficients, were

14    created based on an empirical observations in the IRW

15    and your routing model coefficients are based on a

16    hypothetical increase of a hundred-fold phosphorus in

17    GLEAMS?

18         A.   I'm not sure I would -- I agree with your

19    representation of the inputs.  But certainly my inputs

20    were different than his inputs and the coefficients

21    were different -- my coefficients were different than

22    his.

23         Q.   And your inputs for phosphorus were

24    substantially greater; correct?

25         A.   Yes, sir, they were.

Q.  But you assumed that the loading; that is,
the observed loadings, would be the same when you did
your recalibration?

A.  I calibrated to the same -- I calibrated to
Dr. Engel's observed loads which were the same
calibration targets he used.

Q.  Does it make sense to you, sir, that if you
increase the nonpoint-source loading of 100 or 18 or
how many times you did it, that you'd have the same
phosphorus going into the lake?  Does that make sense
to you, sir?

A.  That doesn't make sense and that's precisely
the point.  Because one could put loadings that were
unrealistically high, one could put numbers into
Dr. Engel's routing model, and still get the same
results.  Those fictitious loads would still
correspond to what went in the lake.

Q.  You only get the same results, Dr. Bierman,
if you change the coefficients and retain more
phosphorus in the river by changing those coefficients
as you did; isn't that correct?

A.  No, that's not correct.

Q.  Well, let's just test that, sir.

MR. PAGE:  May I approach?

A.  Sir, I did test it.  You asked me the

 1    question, would things change.  I tried -- I tried --

 2    I did two analyses.  I redid the reversed order

 3    analysis and I put the S & P 500 numbers back into

 4    Dr. Engel's routing model with the same equations and

 5    exactly the same coefficients and I got exactly the

 6    same results.

 7        Q.   *(BY MR. PAGE)*  Okay.  Well, in the nonpoint

 8    source example here, sir, that we're talking about,

 9    when you put in your change in inputs --

10        A.   Yes.

11        Q.   -- you made changes in the routing model, you

12    said you recalibrated.  Did you ever run those

13    additional inputs, nonpoint source or

14    wastewater-treatment plant, with the same

15    coefficients; that is, the same model, that Dr. Engel

16    had to see what the results would be?

17        A.   Not for those, but I did for the S & P 500,

18    sir.  I got calibration results which were just as

19    good as the calibration results in Dr. Engel's expert

20    report.  I also did so, sir, for the sensitivity

21    analyses where I reversed the order of the loads from

22    first day to last day, and I got the same results when

23    I did that with the same coefficients and the same

24    equation.

25        Q.   Is it your testimony, sir, that you used the

**United States District Court**

1    same exact coefficients in the same routing model when

2    you did the S & P loadings for Dr. Engel's model?

3        A.   Not in my expert report, sir.  You just asked

4    me, though -- you asked me that if I put different

5    loads into the model with the same equation and same

6    coefficients, would I get the same results, would I

7    expect different results?  And I said, no, I tried

8    that and I got exactly the same results.

9        Q.   That's not part of your expert report?

10       A.   No, sir.  It was an answer to your question.

11       Q.   So you never gave that opinion in your expert

12   report?  You never provided that analysis as part of

13   your expert report?

14       A.   That's correct, that is not in my expert

15   report.  I simply answered your question, sir.  The

16   reason I did that was because in the Daubert motion, I

17   was surprised when Dr. Engel expressed --

18       Q.   I think you've answered my question.  Thank

19   you, sir.

20       A.   Thank you, sir.

21            MR. PAGE:  May I approach, Your Honor?

22            THE COURT:  You may.

23       Q.   *(BY MR. PAGE)*  Now, Dr. Bierman, I've

24   provided you Demonstrative 363.  What I've shown here

25   is, we ran your routing model with your inputs but

 1    didn't hold the same observed amount.

 2        A.   Excuse me?

 3        Q.   Did not use the same observed numbers.  We

 4    just ran the model with your routing model, used your

 5    inputs and ran the model, and the upper numbers are

 6    what we came up with.

 7            Now, sir, does it surprise you --

 8            MR. GEORGE:  I'm sorry, Mr. Page.  Your

 9    Honor, it's a little unclear to me, but I believe the

10    demonstrative is apparently the work product of maybe

11    Dr. Engel that has been done outside of the confines

12    of his direct testimony, files that have not been

13    produced in this case.  There's simply no foundation.

14            This is not a demonstrative exhibit.  It's

15    not an impeachment.  It's Mr. Page seeking to get in

16    some analysis who's done by an expert who's not here

17    to testify to.

18            THE COURT:  Sustained.  Now, let me ask,

19    because all of this raises the distinct possibility

20    that I need to hire a special master to compare these

21    two and to make you all pay for it frankly, but do I

22    understand that with regard to the S & P analysis that

23    you did in reversing the times, that you did so in

24    your report using the different coefficients and not

25    the same coefficients as Dr. Engel did?

 1                    THE WITNESS:  Yes, sir, that's what I

 2   did.

 3                    THE COURT:  And why is that?  I don't

 4   understand that.  Why did you change the coefficients?

 5   And I understand your distinction between the model

 6   and the coefficients.  But if you want to compare

 7   apples to apples, why didn't you keep the coefficients

 8   the same?

 9                    THE WITNESS:  The objective was, to

10   answer the question, could the model be recalibrated

11   to connect Dr. Engel's loads from the watershed to the

12   observed loads?  So the purpose was to see if I could

13   calibrate it with loads that made no sense.

14                    THE COURT:  And you did that because

15   Dr. Engel was recalibrating; is that correct?

16                    THE WITNESS:  Well, when Dr. Engel

17   developed his model initially, he calibrated to

18   observed data.

19                    THE COURT:  Yes.

20                    THE WITNESS:  I simply repeated that

21   same exact process.  I --

22                    THE COURT:  Observed data at the three

23   locations below?

24                    THE WITNESS:  Observed data at three

25   locations.

 1                      THE COURT:  All right.  So you simply,

 2    in your view, did the same thing he did, recalibrated

 3    using different data?

 4                      THE WITNESS:  Yes, sir.  And that's the

 5    whole point of my analysis, is that he did his

 6    calibration with his phosphorus inputs and got a match

 7    and said he got a good fit.  I put very wildly

 8    unrealistically numbers in and still got a good

 9    match.

10                      THE COURT:  And you believed you were

11    free to alter the coefficients because that was part,

12    in your view, of Dr. Engel's model because he felt

13    free to alter the coefficients; is that a fair

14    layman's observation?

15                      THE WITNESS:  It is, sir.  We both

16    calibrated the same model.  He calibrated his and I

17    calibrated his.

18                      THE COURT:  Now that I'm kind of on the

19    same page, maybe we can avoid a special master.

20          Go ahead.

21                      MR. PAGE:  I don't know, Your Honor.

22    We'll see.

23          Q.   (BY MR. PAGE)  Dr. Bierman, isn't it true,

24    though, that when you multiply -- listed a nonpoint

25    source by a hundred times, or the wastewater-treatment

1    plant, it was unrealistic then to use the one percent

2    or the one-time wastewater-treatment plant observed

3    loads to calibrate your model?  Because you knew when

4    you did your calibration that you've increased the

5    phosphorus loading to the system a hundred-fold, yet

6    you used the observed data that was actually going on

7    in the IRW?

8         A.   No.  Because that wasn't the point of my

9    analysis.  My analysis did not consist of computing

10   phosphorus loads to Lake Tenkiller.  My analysis

11   consisted of simply reconducting Dr. Engel's own

12   calibration with his own model.

13        Q.   No.  Because his model had the GLEAMS input

14   and the actual wastewater-treatment plant phosphorus

15   input and then he calibrated based on observed.  Your

16   model increased those by a hundred-fold, changed the

17   coefficients, so you could match the observed.

18             That isn't the same analysis, is it, sir?

19             MR. MCDANIEL:  Object.  It's compound,

20   it's argumentative, and it assumes facts not in

21   evidence.

22             THE COURT:  Well, I need the

23   argumentation frankly on this subject to go on because

24   I need this dialogue.  It is -- I don't think it's

25   unfairly compound.  Overruled.

1          Go ahead.

2               MR. GEORGE:  Your Honor, may I request

3     that the exhibit that the court has sustained the

4     objection on be taken off the screen?

5               THE COURT:  Oh, yes.  Absolutely.

6          Do you remember the question?

7               THE WITNESS:  No, sir, not at this

8     point.

9               THE COURT:  Okay.  I guess you're going

10    to have to rephrase by necessity.

11              MR. PAGE:  I'll do my best, Your Honor.

12              *(Discussion held off the record)*

13         Q.   *(BY MR. PAGE)*  Dr. Bierman, isn't it true,

14    though, when you multiply by the nonpoint source by a

15    hundred times; that is, the input, and the

16    wastewater-treatment plant by a similar amount, it was

17    unrealistic then to use the one percent or the

18    one -- the basis of one for wastewater-treatment plant

19    observed loads when you did your analysis?  That is,

20    was it reasonable for you to assume that the observed

21    loads would remain the same if you increased the

22    phosphorus inputs a hundred-fold?

23         A.   First of all, that's not exactly what I did;

24    I didn't increase.  I increased nonpoint source 15

25    times and wastewater-treatment plant 345 times.  What

10382

1    I did was completely consistent with the purpose of my

2    test.

3            The purpose of my test was not to compute

4    loads to Lake Tenkiller.  My purpose was not to

5    develop a new model.  My purpose was to ask a very,

6    very simple question.  Could the model that Dr. Engel

7    developed and applied and calibrated, could that model

8    also be calibrated for loads that don't make sense?

9            And if it -- what I expected to see was that

10   the model simply can't be calibrated to loads that

11   made sense.  But the model, given its conceptual

12   construction and the way he set it up, it was able to

13   be calibrated.  And, sir, I did so in a way that was

14   exactly consistent with how Dr. Engel explained he did

15   his calibration in his deposition.

16       Q.   If you had used Dr. Engel's routing model --

17       A.   Yes, sir.

18       Q.    -- and used the 345-time

19   wastewater-treatment plant inputs --

20       A.   Yes, sir.

21       Q.    -- would you expect to see his model then

22   show much greater loading into Lake Tenkiller?

23       A.   I don't know because I didn't do that.  But I

24   did it for the S & P 500 --

25       Q.   Just please just stick to the answer.

1      And if you had increased nonpoint source 15

2  times, as you said you did, and used Dr. Engel's

3  routing model, wouldn't you expect it to have an

4  increase in the loading to Lake Tenkiller?

5      A.   I actually don't know what to expect.

6  Frankly -- well, let me answer it two ways.

7      My analyses did not, sir, involve computing

8  phosphorus loads to Lake Tenkiller.  At no point did I

9  use that model to compute loads to Lake Tenkiller.  I

10  was simply trying to determine could I or could I not

11  calibrate it to real data with loads that made no

12  sense?  And I showed that it could be calibrated to

13  real data with loads that made no sense.

14      Q.   So --

15      A.   And that tells me the model is fundamentally

16  and conceptually flawed.

17      Q.   So when you did that calibration, where do

18  you suppose that extra phosphorus went?  When you

19  recalibrated, based on observed loads, and multiplied

20  the point source by a hundred-fold -- excuse me --

21  345-fold and the nonpoint source by 15-fold, where did

22  that phosphorus go?

23      A.   It didn't go anywhere in this model, sir.

24  This is not a mass balance model; it's simply an

25  empirical equation.  I don't know where it went.

1    Q.  So didn't it end up as retained phosphorus in

2    the river?

3    A.  I don't know.

4              MR. PAGE:  May I approach, Your Honor?

5              THE COURT:  Yes, sir.

6    Q.  *(BY MR. PAGE)*  Now, Dr. Bierman, I've handed

7    you Demonstrative 366, which is another screenshot

8    from this scenario, this nonpoint source Baron Fork

9    scenario.  So 365 is a screenshot from your considered

10   materials, and you see there under 365 first where it

11   shows column M?

12   A.  I'm sorry, sir.  365?

13   Q.  Yes, start at 365.  And then 366 is a

14   continuation of this column as it goes down.

15             MR. GEORGE:  I'm sorry, Mr. Page.  I

16   only have 366.

17             MR. PAGE:  Well, I think I earlier

18   handed you 365, Mr. George.

19             MR. GEORGE:  I'm sorry.  My mistake.

20   A.  Yes, sir.  Okay.  I'm with you now.

21   Q.  *(BY MR. PAGE)*  We have to look at these

22   together, 365 and 366.

23        Column M is the LOADEST P accumulation;

24   correct?

25   A.  I don't know what --

1      Q.   Do you see under Baron Fork Creek on 365 --

2      A.   Yes.

3      Q.   This is your work product; correct, sir?

4      A.   It's my -- it's the results of my sensitivity

5   analyses with Dr. Engel's model, not my model.

6      Q.   Okay.

7      A.   And, sir, column M is P accumulation, but

8   that has absolutely nothing to do with LOADEST.

9      Q.   Okay.  So that's your P accumulation.  So

10  that means that's the phosphorus has accumulated in

11  Baron Fork at that point in time in the model run;

12  correct?

13     A.   Within the framework of Dr. Engel's routing

14  model, yes, sir, that's exactly what it is.

15     Q.   Okay.  And it corresponds with page --

16  Demonstrative 362 that you showed your starting P

17  accumulation of 20,000 kilograms?  Do you see that,

18  sir?

19     A.   Yes, I do.

20     Q.   Okay.  Now, look now with me on 365, as you

21  complete the model on your sensitivity analysis --

22     A.   Yes.

23     Q.   -- at the bottom, line 3291, what is the

24  total accumulation of phosphorus in the Barron Fork

25  Creek after this ten-year period?

1    A.   Oh, okay.  It's the -- it's a lot of numbers

2    588964733.1.  That's the phosphorus accumulation in

3    the model at the end of the run, and if the phosphorus

4    went anywhere, that's the only place it could go.

5    Q.   It's accumulated in the river?

6    A.   Not really.  Because Dr. Engel's routing

7    model doesn't represent anything physical.  I'm not

8    sure where it is.  It's in that term.

9    Q.   Well, that's the -- that's the difference.

10   Do you know what Dr. Engel's accumulation was after

11   ten years?

12   A.   No, I don't know.  But if I had the

13   spreadsheet and did this analysis, I could figure it

14   out.  I don't know --

15   Q.   But in order to calibrate this model, like

16   you said you could calibrate it, you had to force 588

17   million kilograms of phosphorus to be retained in the

18   Barron Fork -- or at least some point between the

19   edge-of-field and Lake Tenkiller and the Barron Fork

20   in order to make that calibrate; correct?

21   A.   Yes.  And, you know, that's not consistent

22   with Dr. Engel's model.  He told us these

23   coefficients, sir, have no physical meaning.

24   Q.   And, Dr. Bierman, does it make sense to you

25   that that kind of a calibration would make

1    sense -- does that type of calibration make sense to

2    you, that you'd retain 589 million kilograms of

3    phosphorus in the system based on your hypothetical?

4         A.   I actually don't know how much P is

5    accumulated in the IRW so I don't know whether -- I

6    have no basis for forming an opinion, sir, on whether

7    that number is reasonable or unreasonable.

8              I do have a basis for forming an opinion that

9    if one puts all that into Dr. Engel's routing model,

10   it still achieves an excellent calibration as measured

11   by an $R^2$.  That, sir, is what doesn't make sense to

12   me.

13        Q.   Dr. Bierman, do you recall your testimony

14   concerning temperature in the lake and your concerns

15   about variances in that regard?

16        A.   Actually, I do not, sir.

17        Q.   Do you recall when you said you were

18   reviewing Dr. Wells' model, that you reran it and you

19   found that there was some variations in temperature in

20   the model and you found that was important because of

21   Dr. Cooke's and Dr. Welch's opinions concerning the

22   dissolved oxygen temperature squeeze in the lake?

23        A.   I can't recall that testimony, sir.  I recall

24   testimony today, of course, pertaining to temperature

25   discrepancies and the replication issue, but I can't

 1    recall the testimony pertaining to Dr. Welch and

 2    Dr. Cooke.

 3        Q.   Am I mistaken, sir, that you didn't link that

 4    then to question -- because of those potential

 5    discrepancies you said you've observed in Dr. Wells'

 6    model, that you didn't link that to somehow

 7    undermining Dr. Cooke's and Welch's opinion concerning

 8    the habitat available for fish in the lake?

 9        A.   I understand the question now, sir.  I meant

10    to form no opinion whatsoever on Dr. Welch's work.  I

11    was simply pointing out that the replication problem

12    with Dr. Wells' model resulted in discrepancies of

13    perhaps one- to two-tenths of a degree "centimeter,"

14    and that if that -- if temperature was an important

15    output that one wanted to investigate from that water

16    quality model, such as, for example, the temperature

17    oxygen squeeze, then such a discrepancy could be

18    significant.

19          But I did no such investigation of those

20    impacts on Dr. Cooke or Welch's work and am forming no

21    opinion on their work.

22        Q.   Well, regardless of whether or not you're

23    correct about the problem with the temperature

24    predictions of Dr. Wells' model, isn't it true, sir,

25    that Dr. Welch and Cooke based their opinion

10389

1    concerning the temperature squeeze and DO squeeze

2    based on actual observed data in the lake?

3        A.    Are you asking me to recall my understanding

4    of what they did?

5        Q.    Well --

6        A.    Yes.    Let me answer it this way.

7            My understanding, based on my recollection,

8    is that they did use data for temperature and

9    dissolved oxygen to determine the habitat volume in

10    the lake.    However, I do know for a fact that they

11    used the predictions from Dr. Wells' model for the

12    future scenarios.

13            To the extent that they made predictions as

14    to how that habitat volume would change in the future

15    using the results from Dr. Wells' model, then those

16    temperature discrepancies could have played into those

17    results, could have played into that.    In what way?  I

18    don't know because I didn't investigate it.

19        Q.    So you don't know -- even if you're

20    correct -- and that's assuming you were correct that

21    there was some variations -- you don't know whether it

22    had a material impact on the temperature predictions

23    in the future?

24        A.    Well, just to be clear, sir, my opinion is

25    that there were discrepancies.    I've documented those

1    discrepancies, they're in my produced materials, but I

2    have no opinion whatsoever as to their impact or lack

3    of impact on Dr. Welch's work or Dr. Cooke's work --

4    excuse me -- except as -- I'm sorry.  That was

5    incorrect.

6         In my opinion, the replication flaw in

7    Dr. Wells' model, one of the things it impacted was

8    temperature.  I documented that.  Now, what that means

9    to me is that any calculation -- any predictions that

10   Dr. Wells made with that model pertaining to

11   temperature would have been similarly flawed.

12        And to the extent that Dr. Welch or Dr. Cooke

13   used those flawed results, then any opinions that they

14   formed based on those results would also be flawed.

15   Q.   Did you run the model to determine whether

16   there would be any material difference in the future

17   predictions concerning the lake temperature if, in

18   fact, you're correct?  That is, do you have any

19   opinion as to materiality of the change in water

20   temperature?

21   A.   You'd have to define "material," sir.  I just

22   stated that there were discrepancies.  They're on the

23   order of one to two percent.  They're on the order of

24   a few tenths of a degree "centimeter" -- excuse me --

25   centigrade, and that's what I know.

1    Q.   Just a few tenths of a degree centigrade?

2    A.   On average.  It was one- to two-tenths of a

3 degree centigrade on average, some were higher, some

4 were lower.  It depends on time and space in the lake.

5    Q.   Dr. Bierman, I want to talk to you now about

6 when you said you corrected or evaluated the loading.

7 I think it was Exhibit -- the first exhibit on this

8 was Defendants' Joint Exhibit 2413.

9         *(Discussion held off the record)*

10   Q.   *(BY MR. PAGE)*   Tab 11.

11   A.   Yes, I have it.

12   Q.   Okay.  Now, help me understand, sir, exactly

13 what you assumed.  That is, what did you assume was

14 the LOADEST model that was used?  Or what LOADEST

15 model did you use to compare Dr. Engel's observed

16 loads that he calculated to the ones that you

17 recalculated?

18   A.   Well, I used LOADEST model 8.  And I didn't

19 have to assume anything because it was clear from

20 Dr. Engel's produced materials that that's the method

21 he used.

22   Q.   Didn't Dr. Engel do more than one calculation

23 as part of his considered materials?

24   A.   You'd have to define "calculation."

25   Q.   Well, more than one calculation of observed

1  loads as he got additional data.

2      A.   I don't recall that he did that for his

3  calibration and purported validation period for his

4  GLEAMS and routing models.

5      Q.   And you used model 8 every year for your work

6  on 2413; is that correct, sir.  That is, USGS LOADEST

7  model 8 for each year?

8      A.   Not exactly.  Dr. Engel -- I did exactly what

9  Dr. Engel said he did, and what he said he did he said

10 that he did used the approach by -- it was either

11 Tortorelli, et al., or Pickup and Tortorelli.  They

12 are scientists who work for the USGS, they employed

13 LOADEST, and they used -- they applied the model in

14 terms of three-year increments and selected the middle

15 year and it was a rolling three-year period of time.

16     Q.   What I want you to tell me, Doctor, please,

17 is what LOADEST model.  I think on your direct

18 testimony you said you used LOADEST model No. 8.

19     A.   Yes, sir, LOADEST model No. 8.

20     Q.   Did you use that every year, for 1998 through

21 2006, when you did these calculations?

22     A.   I'm sorry, sir.  There's two parts to your

23 question.  We used the LOADEST model for rolling

24 three-year periods of time, LOADEST model 8, and then

25 selected the middle year for insertion into the table

1    I had.  And that is exactly what Pickup, et al., and

2    Tortorelli, et al., did, and that's what Dr. Engel

3    said he did.

4        Q.   So isn't it true, sir, that Pickup and

5    Tortorelli actually used several different models, and

6    then in addition LOADEST model No. 8, and then picked

7    which one had the best fit and used that data each

8    year?

9        A.   They tried several different models, but the

10   model that Dr. Engel used consistently was LOADEST 8.

11   He said he used the approach by Tortorelli and Pickup,

12   and I took that approach to mean the three

13   years -- well, I didn't have to guess, Mr. Page,

14   because it was clear from Dr. Engel's considered

15   materials what he did and I did the same thing.

16       Q.   So you'd be surprised to hear, sir, that

17   Dr. Engel did use Tortorelli's analysis and Pickup and

18   that he used the same model that had the best fit for

19   each year and that didn't always include model No. 8?

20            MR. GEORGE:  Objection, Your Honor;

21   assumes facts not in evidence.

22       A.   Sir --

23            THE COURT:  Just one second.  A response

24   here?

25            MR. PAGE:  Your Honor, he's made an

1    assumption and testified --

2                    THE COURT:  I understand.  But to go to

3    the objection here, do we have in evidence here

4    specifically what model was used?

5                    MR. PAGE:  We have Dr. Engel's testimony

6    that said he followed USGS procedures.  And I believe,

7    Your Honor -- there's been a lot of documents -- but I

8    believe both Tortorelli and Pickup have been admitted

9    into evidence and they used different models.

10                   THE COURT:  All right.  But there's some

11   ambiguity here insofar as if Tortorelli, if that's the

12   correct --

13                   MR. PAGE:  You're probably pronouncing

14   it right.

15                   THE COURT:  -- pronunciation -- I don't

16   know -- but if he used a rolling three-year, I mean,

17   the ambiguity is whether or not he used and hence

18   here -- is this Engel, yeah -- whether Engel used that

19   same three-year as opposed to version 8.

20                   MR. PAGE:  Yes, sir.

21                   THE COURT:  All right.  Can we resolve

22   this easily?

23                   MR. GEORGE:  I don't believe we can,

24   Your Honor.  Because Mr. Page's representation was

25   with respect to what Dr. Engel did, and there is no

1    evidence in the record as to amongst the options

2    available of Tortorelli whether he went one direction

3    or another.

4           This witness is the only witness who can

5    testify as to the files show.  And now Mr. Page is

6    making representations to --

7               THE COURT:  All right.  Without more,

8    the objection is sustained.

9           Go ahead.

10      Q.   (BY MR. PAGE)  What's your basis for saying

11   that Dr. Engel used model 8 each year when he did his

12   observed loads?

13      A.   Well, you keep saying "each year."

14      Q.   Well, but he finally --

15      A.   From his considered -- from -- I'm trying to

16   answer the question, sir.  From his considered

17   materials, I reviewed his analysis and he used LOADEST

18   model 8 for rolling three-year periods and then he

19   selected the middle year.

20          And if I may volunteer a clarification, the

21   LOADEST model 8 and the three-year rolling average are

22   two different things.  They're not different models.

23   I'm sorry.

24      Q.   I understand that.  That's what I'm trying to

25   get to.

1          THE COURT:  I didn't.  I appreciated

2    that.

3          Go ahead.  Because I thought perhaps there

4    were other LOADEST models that were applicable to the

5    middle year that might have fit those -- the middle

6    year.

7               THE WITNESS:  No, Your Honor.

8               THE COURT:  So go ahead, Mr. Page.

9     Q.   *(BY MR. PAGE)*  There other LOADEST models

10   that were used by the USGS during this time period;

11   correct?

12    A.   That's my recollection, yes.

13    Q.   So if Dr. Engel --

14               THE COURT:  Excuse me, Mr. Page.  All

15   telephone equipment needs to be turned off in the

16   courtroom.  And please -- I hate to have to repeat

17   myself -- but when you come into the courtroom, shut

18   them off.

19          Go ahead, Mr. Page.

20               MR. PAGE:  Thank you, Your Honor.

21               THE COURT:  And from henceforth, I'm

22   going to have the marshal take those phones from

23   anybody who continues to violate that.  I just have

24   to.

25          Go ahead, Mr. Page.

1      MR. PAGE:  Thank you, sir.

2      Q.   (BY MR. PAGE)   It is true, sir, that model 8

3  wasn't the only LOADEST model that USGS used when they

4  did the IRW data that's reflected from 1998 to 2006?

5      A.   I believe that's correct, sir.  I was not

6  trying to replicate what the USGS did.  I was trying

7  to understand what Dr. Engel did and to do what he

8  said he did.

9      Q.   And so you -- Dr. Engel testified that he

10 followed the same USGS modeling approach as Tortorelli

11 and Pickup did; correct?

12     A.   You know, sir, he said that, but he did not

13 say it with enough specificity for anyone -- in his

14 expert report for anyone to be certain about exactly

15 what he did.

16     Q.   So if, in fact, with more specificity we know

17 that Dr. Engel did follow the Tortorelli and Pickup

18 and used two different models, model 8 plus another

19 model, then what you reproduced here isn't exactly

20 what Dr. Engel produced for his observed data;

21 correct?

22     A.   I hate to ask this again, sir.  Please repeat

23 the question.

24          MR. PAGE:  Brian, can you help me out

25 here?  Thank you.

1          *(The record was read as requested)*

2          A.   The only answer I can give is that my

3     intention was to do what Dr. Engel said he did.   And

4     if, in fact, I did what he said he did, my results are

5     correct.   If Dr. Engel said he did one thing and did

6     something else, then there are going to be grounds for

7     discrepancies, and I can't sit here now, sir, and

8     eliminate that possibility.

9          Q.   *(BY MR. PAGE)*   So it's possible you

10    misunderstood what Dr. Engel did for observed data?

11         A.   I wouldn't characterize it that way, sir.

12    His documentation for what he did was simply not

13    specific to the level of detail at which you're asking

14    me these questions.

15              So what I had to do was to review his body of

16    work, which was extremely difficult, because it

17    was -- there were multiple files, multiple versions,

18    multiple data errors, and quite frankly it was

19    difficult to navigate my way through exactly what he

20    did and to attempt to reproduce and use the exact same

21    methods that he said he used.

22              *(Discussion held off the record)*

23         Q.   *(BY MR. PAGE)*   Now, was it your testimony,

24    sir, that Dr. Wells because he used Dr. Engel's SRP

25    data -- excuse me -- Dr. Engel's soluble phosphorus

1    data, that that caused a problem in Dr. Wells' model?

2        A.    I'm saying, just to be clear, the loads that

3    Dr. Engel determined that he represented to Dr.

4     -- the loads for which should have been

5    soluble-reactive phosphorus that should have been

6    given to Dr. Wells were in error, Dr. Engel provided

7    soluble phosphorus loads, and yes, that caused a

8    problem -- would have -- that did cause a problem in

9    Dr. Wells' model.

10       Q.    Isn't it true, sir, that Dr. Wells used a

11   regression equation to determine soluble-reactive

12   phosphorus from total phosphorus?  He did not, in

13   fact, use the soluble-reactive phosphorus information

14   from Dr. Engel?

15       A.    That's not completely correct, and I'll

16   explain why.

17           Dr. Wells did, in fact, conduct a regression

18   between total phosphorus and soluble-reactive

19   phosphorus.  But he did not, sir, use the results of

20   that regression for his model calibration.  Dr. Engel

21   gave him loads that Dr. Engel represented as total

22   phosphorus and soluble-reactive phosphorus so

23   Dr. Wells could calibrate his model.

24           Then -- please let me finish, sir -- then

25   because Dr. Engel's model only predicted total

10400

1    phosphorus and not soluble-reactive phosphorus, when

2    Dr. Wells went to use his model for 50-year prediction

3    simulations all he had from Dr. Engel was total

4    phosphorus.  So he had to estimate or derive

5    soluble-reactive phosphorus because Dr. Wells' model

6    needs both total phosphorus and soluble-reactive

7    phosphorus in order to run.

8             Therefore, Dr. Wells needed some way to come

9    up with soluble-reactive phosphorus or else he could

10   not have done any of his predictive simulations.  And

11   what he did, sir, was exactly what you said he did.

12   He regressed total phosphorus data to soluble-reactive

13   phosphorus data for the data that he had, and he used

14   the relationship that he developed between total

15   phosphorus and soluble phosphorus to specify

16   soluble-reactive phosphorus loads for his model in all

17   of his predictions.  That's exactly what Dr. Wells

18   did.

19       Q.   Is it your testimony, Dr. Bierman, that the

20   see CE-QUAL-W2 model that Dr. Wells used used total P

21   measurements directly into his model?

22       A.   No, that's not how it works.  What happens

23   is --

24       Q.   That's -- you answered my question.  Thank

25   you.

**United States District Court**

1    Do you know how Dr. Wells used total P for

2    his model?

3        A.   I read what he said he did in his report.

4        Q.   And that was just to calculate the forms of

5    organic matter and the associated P with organic

6    matter; is that correct?

7        A.   Okay.  Let's back up.  Dr. Wells' CE-QUAL-W2

8    model of Lake Tenkiller requires total phosphorus

9    loads and it requires soluble-reactive phosphorus

10   loads.  However, the model's far more sophisticated

11   than just -- the model contains more than just those

12   two forms of phosphorus.

13       What the model really needs to operate is not

14   just total P and not just SRP and not just the

15   difference between the two, but there are organic and

16   inorganic forms and dissolved and particulate forms of

17   phosphorus.  There are six or eight different forms of

18   phosphorus that that model requires to run.

19       What Dr. Wells did is he took the phosphorus

20   loads from Dr. Engel, the soluble-reactive phosphorus

21   loads from Dr. Engel, and he used available data for

22   the incoming tributaries and he used that information

23   to apportion his total phosphorus inputs into the

24   components that were required by the CE-QUAL model.

25       Q.   Isn't it true, sir, that Dr. Wells used the

10402

1   regression analysis from the total phosphorus data to

2   determine SRP and then he used actual observed data to

3   fill data gaps?

4        A.   Dr. Wells implemented in the tributary

5   loading estimation field -- that's referred to as data

6   substitution -- and what Dr. Wells -- I testified as

7   to how Dr. Engel used the wrong form of phosphorus --

8   total phosphorus instead of soluble-reactive

9   phosphorus, and he passed these forward to Dr. Wells

10  to use in his model.

11        Now, Dr. Wells did not use all of that

12  information directly as provided.

13        Q.   Did you -- I'm sorry.

14        A.   In tributary loading estimation, it's partly

15  an art and it's partly a science.  There's always a

16  debate in the field of tributary loading estimation

17  when one uses a statistical method.  When one develops

18  a statistical relationship between flow and

19  concentration data, whether one should use the

20  statistical -- the estimate from the statistical

21  regression equation on a day when one has an actual

22  measurement or should one askew that number and

23  substitute in the actual data number, if one has it.

24  There's a debate about this.  There's no one right way

25  to do it.  It depends on the system, it depends on

1   parameter, it depends on many, many things.

2          Dr. Wells decided when he got the loads from

3   Dr. Engel, which were soluble phosphorus, not

4   soluble-reactive phosphorus; that is, the wrong thing,

5   Dr. Wells employed data substitution.  And when he did

6   that, though, it further confounded problems because

7   he did not data substitute with soluble phosphorus, he

8   data substituted with soluble-reactive phosphorus.

9          So the time series that he actually put in

10   his model was a jumbled hybrid of some of the right

11   data and most of the wrong data.

12      Q.   Didn't he use the regression on the total

13   phosphorus to get the soluble-reactive phosphorus for

14   his inputs?  Correct?

15      A.   Only for the predictions.

16      Q.   Okay.

17      A.   Not for the calibration.

18      Q.   To fill the gaps, he used actually observed

19   data on inflow; is that correct?

20      A.   He used the technique called "data

21   substitution" for soluble-reactive phosphorus for the

22   input loads for his model calibration.  There was no

23   need to do that for his predictions.  There were no

24   data on the predictions.  By definition, there were no

25   data gaps.  He used the regression.

*10404*

1    Q.   Dr. Bierman, when you did your own

2    calculations of SRP, did you use all the data or just

3    use the USGS data?

4    A.   Sitting here right now, sir, I can't recall.

5    Q.   Okay.  Well, isn't it true, though, that

6    Dr. Engel and Wells used both the OWRB and the USGS

7    data when they did their calculations?

8    A.   That's what Dr. Engel stated he did for total

9    phosphorus, and we, in fact, did the same thing.

10   Sitting here right now, I can't recall whether that

11   was also the case for SRP, sir.  I simply can't

12   recall.

13               MR. PAGE:  Your Honor, is this an

14   appropriate time for a break?

15               THE COURT:  It would be.  We are in

16   recess.

17               *(Short break)*

18               THE COURT:  I'm noticing fewer and fewer

19   people.  I can't imagine they're not absolutely

20   fascinated with these topics.

21               MR. PAGE:  We're riveted, aren't we,

22   Your Honor?

23               MR. GREEN:  Only the brave and the bold

24   are still here, Your Honor.

25               THE COURT:  And the well paid.

**United States District Court**

1    Mr. Page.

2              MR. PAGE:   That means I'm brave and

3    bold, Your Honor.

4              *(Discussion held off the record)*

5         Q.   *(BY MR. PAGE)*   Dr. Bierman, I got a couple

6    more things and we'll finish up here.

7         A.   Sure.

8         Q.   You were asked during your direct examination

9    about Dr. Engel's opinion from his testimony where

10   Dr. Engel testified that once phosphorus leaves the

11   field, in his opinion it will eventually move on down

12   the waterways into Lake Tenkiller.  Do you remember

13   those questions?

14        A.   Yes, I do.

15        Q.   Is it your testimony, sir, that you disagree

16   with Dr. Engel, that once phosphorus leaves the field,

17   it will not eventually get to Lake Tenkiller?

18        A.   I disagree with the inevitability of it.

19   That's what I disagree with.

20        Q.   So where is it getting lost, so to speak?

21   Let's say if it gets into the puddles and say there's

22   not enough rainfall to wash from the edge of the field

23   all the way to the stream, let's say it's left in a

24   puddle, is it your testimony that the phosphorus won't

25   eventually the next rainfall -- with sufficient

 1   rainfall it won't be moved on down to the stream?

 2       A.   No.  Well, first of all, phosphorus doesn't

 3   get lost because it's an element that's conserved,

 4   it's neither created nor destroyed, so that doesn't

 5   happen.

 6       Q.   And so it's not like PCBs or other things

 7   that might change in form?

 8       A.   Well, sort of.  But that's, I think -- my

 9   testimony is not -- I don't believe my testimony

10   is -- is as you represented it in the question.  I'm

11   not -- I'm not sure exactly how to answer your

12   question, sir.

13       Q.   Well, let me try it another way then.

14            Will you agree with me, sir, and Dr. Engel

15   that once the phosphorus runs off the field, that a

16   substantial amount of it will continue into the

17   streams and rivers and eventually make its way to Lake

18   Tenkiller?

19       A.   Well, without knowing what "substantial" is,

20   no, I don't agree with the statement as it's

21   represented there.  I think that we're starting -- I

22   think the question you asked me first, the phosphorus

23   was still on the field and now all of a sudden it's in

24   the stream and river network, it's on its way to Lake

25   Tenkiller, and there are some steps I think we

 1   skipped.

 2       Q.   Well, the question you were asked was once it

 3   begins running off a field, but you started at the

 4   middle of the field in your answer.

 5           My question was, I think, more closely

 6   related to what Mr. George asked you --

 7       A.   Okay.

 8       Q.   -- and I want to focus on that.

 9           Once it gets to the edge of the field, is it

10   your testimony that a substantial portion of that

11   runoff of phosphorus will not make it to Lake

12   Tenkiller?

13       A.   I have no opinion on what portion of that

14   phosphorus -- well, if it -- if it comes off the field

15   and if it enters the stream and river network, I have

16   not formed an opinion on what portion of it could

17   possibly reach Lake Tenkiller.

18           And I guess if you're asking me -- if we're

19   talking about the question that Mr. George asked me,

20   if that's what you're doing, I would like to ask that

21   that question be repeated so I fully understand what

22   the premise of his question was.

23       Q.   I think you answered my question, sir.

24       A.   Okay.

25       Q.   And I want to ask you another question.

1          You agree, though, sir, that if there's

2     phosphorus on or in the upper portions of the soil on

3     a field and there's enough rainfall for runoff, there

4     will be some phosphorus in that runoff?

5          A.   There could possibly be phosphorus in that

6     runoff.  But this case is about evidence, and I saw no

7     evidence that such runoff was demonstrated in

8     Dr. Engel's entire body of work.

9          Q.   You're saying that the GLEAMS model did not

10    demonstrate runoff to the edge of the fields; is that

11    your testimony, sir?

12         A.   No, no.  My -- my -- the GLEAMS model

13    computed that phosphorus ran off to the edge-of-field,

14    but it's also my opinion that that model is -- the

15    model itself as applied to this watershed and the way

16    in which Dr. Engel -- is conceptually flawed -- and

17    the way in which Dr. Engel applied it is full of

18    mistakes and he never compared the output of that

19    model to any edge-of-field data.  So therefore, the

20    model may have done some computations, but it was not

21    demonstrated that those computations were

22    scientifically valid correct or reliable.

23         Q.   And you've done no study yourself, sir, that

24    would demonstrate that Dr. Engel's GLEAMS model

25    computations from the GLEAMS model runoff were wrong?

**United States District Court**

 1          A.   They were wrong in that they were full of

 2     mistakes, and I set that forth in my expert report.

 3          Q.   Dr. Bierman, did you do any of your own

 4     studies to determine that Dr. Engel's field modeling,

 5     the GLEAMS model that showed runoff on the edge of the

 6     field, were wrong?

 7          A.   No, sir, I did no such studies.

 8          Q.   Will you agree with me, sir, that as

 9     phosphorus increases in soil, that the runoff from

10     that soil phosphorus concentration will increase?

11               MR. GEORGE:  Objection, Your Honor.

12     We're outside the scope of direct.

13               THE COURT:  Sustained.

14               MR. PAGE:  Your Honor, I think it goes

15     to this question of transport, that he went to

16     Dr. Engel when he complained that there wasn't a

17     runoff that would continue.

18               MR. GEORGE:  May I respond?

19               THE COURT:  Any response?  Yes.

20               MR. GEORGE:  Your Honor, the only thing

21     this witness was asked about in that regard was the

22     assumption made by Dr. Engel regarding the

23     inevitability of delivery.  He wasn't asked about

24     Dr. Engel's beliefs on the relationship between soil

25     test phosphorus and runoff.

 1              THE COURT:  The objection's sustained.

 2       Q.   (BY MR. PAGE)  Dr. Bierman, you mentioned

 3  when you were talking about the processes of

 4  phosphorus in Dr. Engel's assumption or testimony that

 5  it continues to move downstream.

 6              What processes are you aware of in the IRW

 7  that will remove phosphorus from a stream once it's

 8  reached the stream?

 9       A.   Remove it from the water column or remove it

10  from the coupled water column sediment system?  What

11  do we mean by "the stream"?

12       Q.   The latter, sir.

13       A.   Deep burial.

14       Q.   Deep burial?

15       A.   It's -- sedimentation -- excuse me.  Excuse

16  me.  No.  That's -- let's say -- excuse me.  Let me

17  gather my thoughts.

18              Let's say burial in this sense.  Solids with

19  phosphorus attached are in the water column of the

20  Illinois River.  Many things happen to that

21  phosphorus.  Many things happen to the solids.  One of

22  the things that could happen is the solid could settle

23  to the bottom.  Another thing that could happen is the

24  solid to be resuspended and eroded and then carried

25  down field.

1      But another thing that could happen -- and

2  this depends on -- this depends on flow velocity, it

3  depends on the geometry of the river, depends on many,

4  many things -- one of the things that could happen is

5  it could just stop and start collecting in a hole and

6  there would be what's called "sediment burial."

7      There probably are locations in the Illinois

8  River system which are low-energy zones where the

9  sediments and phosphorus are collected.

10     Q.  Okay, sir.  Now, you said there were many

11  things that can happen and you identified one; that

12  is, sediment burial.

13     Now, are there any other things that you say

14  that will happen once phosphorus reaches the stream to

15  prevent it from getting to Lake Tenkiller?

16     A.  Well, I said there were many things that

17  could happen.

18     Q.  Well, how many of those are applicable to the

19  IRW?

20     A.  It's a -- it's a natural system.  So probably

21  as many things are as applicable as I could possibly

22  think about because the ecosystem is extremely

23  complex.

24     One more thing could be -- it could be -- the

25  phosphorus could be taken up by -- by rooted

 1   vegetation.  It could pass up the food chain into

 2   fish.  The fish could be caught and harvested.  There

 3   were many things that could possibly happen to

 4   phosphorus.

 5       Q.  Okay.  Well, let's look at those just briefly

 6   because we want to see if they're really important or

 7   not.  Let's, first of all, talk about the burial.

 8           Now, is it your testimony, sir, that there

 9   are burial locations of phosphorus in IRW rivers and

10   streams that aren't flushed out periodically by high

11   rainfall?

12       A.   No.  I'm saying that in any stream system,

13   including the IRW, these zones of low energy could

14   possibly exist -- and I have no basis for stating they

15   do or do not exist in the IRW -- they could probably

16   exist, and if they do exist, these would be zones

17   where sediment, and hence phosphorus, could

18   accumulate.  That's all I'm saying.

19       Q.   Okay.  So you're just speculating as to

20   whether that's going on in the IRW?

21       A.   Well, you asked me, I thought, to describe

22   processes that could influence the fate of phosphorus

23   as it moves through the system, and I'm trying to be

24   responsive to your question.

25       Q.   But earlier on direct, you said there's a lot

**United States District Court**

 1    of things that can happen to phosphorus in streams.

 2    You were talking about that in conjunction with your

 3    critique of Dr. Engel's opinion.  And I'm trying to

 4    explore how much specific information you have in

 5    order to form your basis of your critique.

 6         A.   I'm not sure I connected it to Dr. Engel's

 7    opinion.  I'm trying to answer the question of are

 8    there processes in streams that could prevent

 9    phosphorus from not making it down?  I mentioned one

10    and I could continue to mention others.

11         Q.   Okay.  Well, on the deep burial, do you have

12    any basis to believe that there's any permanent deep

13    burial of phosphorus in sediments in any stream or

14    river of the IRW?

15         A.   No.  Because I haven't conducted such an

16    investigation and I'm not forming that opinion about

17    the IRW.  I'm simply answering your question that this

18    could be possible.

19         Q.   Okay.  Let me ask you another question.  You

20    talked about plant uptake.

21         A.   Yes.

22         Q.   Be, I guess, aquatic plants?

23         A.   Yes.

24         Q.   Now, you would assume, though, that the

25    plants could be -- they'll live and then they'll die,

1    and then what happens to the phosphorus when the plant

2    dies?

3        A.    Well, we'd be back at your first question.

4    The phosphorus might be in the waterbody.  Now what

5    could happen to it next?

6        Q.    Are you saying that aquatic plants

7    permanently remove phosphorus from the system so it

8    will not move down to Lake Tenkiller?

9        A.    No, I'm not.  It depends what happens to the

10    plant.  If the plant grows and dies in the system, the

11    phosphorus remains in the system.  It may, after the

12    plant dies, end up back in the water column.  It may

13    end up down in the sediments.  They have roots.  It

14    just depends how far down the roots go.  There are any

15    number of things that could happen.

16        Q.    Do you have any basis, sir, from any study

17    that that is a substantial means of removal of

18    phosphorus that's entered streams and rivers of the

19    IRW?

20        A.    No, sir.  I'm not expressing that opinion

21    because I haven't conducted that analysis in the IRW.

22        Q.    And finally, let's look at the one you talked

23    about fish.

24        A.    Yes, sir.

25        Q.    You said they could take up some phosphorus

1    or some algae that had some phosphorus in it and be

2    harvested.

3          Do you have any basis to believe that that is

4    a substantial removal of phosphorus from IRW rivers

5    and streams; that is, harvesting of fish?

6        A.    I have no basis to form any opinion about the

7    quantitative significance of fish removal from the

8    system.

9        Q.    Thank you, Dr. Bierman.

10              MR. PAGE:   I pass the witness.

11              THE COURT:   Redirect.

12                **REDIRECT EXAMINATION**

13   **BY MR. GEORGE:**

14       Q.    Good afternoon, Dr. Bierman.

15       A.    Good afternoon, Mr. George.

16       Q.    At the risk of someone throwing something at

17   me, I want to revisit just briefly this whole

18   coefficient issue, okay?

19       A.    Certainly.

20       Q.    Is it your understanding that Dr. Engel

21   calibrated his model more than once?

22       A.    Well, he calibrated the model at least three

23   times that I know of because he had a routing model

24   spreadsheet with his original report, one with his

25   errata, and one was given to us on October 15th.

```
 1        Q.   Okay.  And when -- and you recalibrated

 2   Dr. Engel's model as part of your test; is that right?

 3        A.   That's correct.

 4        Q.   Okay.  Now back to Dr. Engel.  Did the

 5   coefficients from his calibration for his first report

 6   and his second report change?

 7        A.   Yes, sir, they did.

 8        Q.   Okay.  So, Dr. Bierman, is there anything

 9   magical about those numbers?

10        A.   I wouldn't know about --

11             MR. PAGE:  Objection, Your Honor;

12   ambiguous.

13             THE COURT:  Rephrase, please.

14             MR. GEORGE:  Certainly.

15        (Discussion held off the record)

16        Q.   (BY MR. GEORGE)  Let me approach it this way,

17   Dr. Bierman.

18             From your review of Dr. Engel's expert

19   report, did he contemplate movement in those numbers?

20             MR. PAGE:  Objection, Your Honor;

21   leading.

22        A.   That calls for speculation on my part.

23             THE COURT:  Sustained.

24             MR. PAGE:  Sustained.  Good.

25        Q.   (BY MR. GEORGE)  Work with me, Doctor.
```

1          A.    Please repeat the question, sir.

2          Q.    Certainly.  Did Dr. Engel establish some

3     limits on the range in which those coefficients --

4          A.    Oh, I understand that question.

5          Q.    -- can change?

6          A.    Now I understand.  Unfortunately, the answer

7     has two parts, not one part.  I hate to make this more

8     complicated than it is but full disclosure requires

9     it.

10          In the original expert report and in his

11     errata, Dr. Engel used the SCE, the calibration

12     algorithm, for not just his GLEAMS model, but also for

13     his routing model, whereas in the October 15 version,

14     the current version, the latest version, he told us

15     that he just manually calibrated it.

16          Okay.  So why am I telling you this?  Well,

17     in the SCE algorithm, the algorithm needs to be told

18     what the starting value is and it needs to be told

19     what the search ranges are for the parameters.  So in

20     those first two versions, he had a starting value and

21     he had plus or minus values.  So there were ranges

22     over which those parameters were allowed to be

23     adjusted.

24          In his deposition, he was asked if there was

25     any physical significance to these numbers, if they

1    had to be within certain ranges.  And my recollection

2    is that he said, well, gee, they don't have any

3    physical meaning, they're not really -- they're not

4    really constrained.

5        Q.   Okay.  Did you remain within his limits in

6    making any adjustments that were made as part of your

7    calibration to those coefficients?

8        A.   Yes.  Just to remain faithful to exactly what

9    he did, the sensitivity analyses in my expert report

10   with his routing model, all four of them, I did

11   not -- the values for the coefficients in my

12   recalibrations did not exceed the ranges that

13   Dr. Engel himself actually used, even though he said

14   they weren't physically bounded by these ranges.

15       Q.   Thank you, Doctor.

16            MR. GEORGE:  No further questions, Your

17   Honor.

18            THE COURT:  Recross?

19            MR. PAGE:  Nothing further, Your

20   Honor.

21            THE COURT:  Very well.  You may be

22   excused.

23            THE WITNESS:  Thank you, Your Honor.

24            THE COURT:  The defendants may call

25   their next witness.

1          MR. GEORGE:  Your Honor, I'm pleased to

2    report that we have been more efficient than we could

3    have even anticipated and --

4          THE COURT:  Imagine that happens on a

5    Thursday afternoon?

6          MR. GEORGE:  Yes.  Astonishing, complete

7    coincidence.

8          Yeah, Your Honor, we are pleased to have

9    gotten on nine witnesses this week, but we don't have

10   another one in town or another deposition ready to

11   play.

12         THE COURT:  That's fine.

13         MR. GEORGE:  Your Honor, I believe that

14   Mr. Bullock wants to address the court on the subject

15   generally of planning for closing.  He and I have

16   talked a little bit about it but I'll defer to him.

17         THE COURT:  All right.

18         MR. BULLOCK:  Just in terms of our

19   preparation for what we all I know hope is coming is

20   the issue of closing arguments --

21         THE COURT:  When might we expect that?

22   Have you had discussions in that regard.

23         MR. BULLOCK:  Well, we've had -- the

24   defendants probably are better to speak to that than

25   might I repeat what they said and they're to correct

1   what I said.  So I'll let them say it.

2                   MR. GEORGE:  I slipped away too quickly,

3   Your Honor.

4            We are -- it is conceivable that the

5   defendants will be in a position to have completed

6   calling their witnesses by the end of next week on our

7   four-day trial calendar.  Of course, that depends on

8   the scope of cross.  We are in the process of

9   evaluating the remaining list of witnesses and are

10  trying to decide whether we can pare a few of them

11  down.  But I want to alert the court and the

12  plaintiffs to at least the possibility that we'll be

13  done calling defense witnesses the end of next week.

14           I think -- I mean, candidly I'm not sure that

15  I have seen something that would justify rebuttal, but

16  there's always the auspices of a potential rebuttal

17  case.  And so for planning purposes, it might be

18  helpful to know whether at this moment whether the

19  state has identified any rebuttal witnesses that they

20  intend to call.  That obviously would prolong the date

21  for closing.

22                   THE COURT:  Right.  One moment.

23  Mr. Overton.

24                   *(Discussion held off the record)*

25                   THE COURT:  All right.  The 18th is

1    Martin Luther King.  On the 19th, I still have a

2    criminal case that may go to trial and that would

3    potentially bump you a couple of days.  We have the

4    pretrial tomorrow so I'll know more by Monday as to

5    whether or not that's going to go.

6             Mr. Bullock.

7             MR. BULLOCK:  With those thoughts in

8    mind, in terms of rebuttal, I'm not sure at this

9    point, Judge.  We're still assessing both the

10   testimony that's been offered, and particularly the

11   testimony today, as to whether it's necessary to call

12   any rebuttal.  I'm sure that anything that we do call

13   will be short and not be significant in terms of the

14   length of this.  But I'm certainly not ruling it out

15   and I'm not asking the court to rule on that issue

16   today.

17            As for the length of closing so that we can

18   start getting that constructed, of course Rule 39.1

19   talks about the court setting some limits.  We did

20   have a full day of openings.  We've just had within

21   the last month almost three days of argument on the

22   Rule 52.  And so it's my view that whatever we

23   do -- and then we also have the findings and

24   conclusions that will follow.

25            And so in light of that, I would think some

**United States District Court**

1  reasonable limitations ought to be considered by the

2  court.

3            THE COURT:  Yeah, the Rule 52 motions

4  went longer than I had expected or hoped.  I'm well

5  aware that essentially what boils down to a Title 50,

6  Section 4 issue is still pending before the court, and

7  frankly I'm not entirely comfortable yet with that.

8  We've had folks working on it in chambers, but I'm not

9  entirely comfortable with it yet to rule on.

10  Obviously, in light of what's developed during trial,

11  I'm taking that Rule 52 motion very seriously but I'm

12  not comfortable on it.

13            I understand now that you've raised the

14  issue, I need to rule on it very quickly because

15  you're trying to prepare for these closing arguments.

16            MR. BULLOCK:  Right, right.

17            THE COURT:  Go ahead.

18            MR. BULLOCK:  Okay.  And so it was our

19  thought that in terms of that -- and we have had some

20  discussions with the defendants -- we thought that

21  perhaps if we did like two hours a side, the plaintiff

22  will divide theirs of course some for opening and

23  rebuttal, and then the defendants can divide theirs in

24  terms of their joint defense, which is substantially

25  the case, and then some individual defense.

1          You know, the same argument, of course,

2     applies.  They say, well, there's all of us.  Well,

3     we've got to answer to all of those and prove our

4     case.  And so we were thinking something along the

5     lines of a couple of hours of closing a side would

6     probably, in light of all the other argument and

7     briefing, be sufficient even given the length of this

8     trial.

9               THE COURT:  Your thoughts, Mr. George?

10              MR. GEORGE:  Your Honor, the defendants

11    certainly share the view there ought to be some time

12    constraints placed on closing argument and we don't

13    view closing as a multi-day affair.  I have not yet

14    had an opportunity to circle the group to get a time

15    estimate that I can provide to the court, but I'll be

16    happy to do that and provide it on Monday.  I

17    certainly think something in the range of two to three

18    hours, but that's my personal view and I don't want to

19    short-change some counsel who may have something

20    specific and rather lengthy they want to say for their

21    client.

22              So if the court would grant us that leave to

23    consider that and provide a time estimate on Monday?

24              THE COURT:  Yeah.  Why don't you do

25    that.  I think like page limitations, it does help to

1    focus argument.  So we'll keep that in mind and

2    certainly curtail it substantially from the time taken

3    on the Rule 52(c) motions.

4                 MR. GEORGE:  Certainly, Your Honor.

5                 THE COURT:  Anything else?

6                 MR. GEORGE:  May I raise -- I'm sorry,

7    Louis -- may I raise one other idea for the court's

8    consideration?

9          I've had different experiences, as I'm sure

10   learned counsel on both sides of this room have had,

11   in federal court in a bench trial in terms of how

12   certain judges want their closing conducted and what

13   they want to have in advance.  And I know Your Honor

14   has expressed a desire to receive proposed findings

15   and proposed conclusions after closing, and I also

16   appreciate that Your Honor and your staff is weary of

17   briefing.  So I don't want to presume anything here.

18         But some judges, in my experience, have found

19   some benefit in having some briefing in advance of

20   closing, and I don't know what your view is.

21                 THE COURT:  No.  I do think in this

22   case -- and let me put some thought to it and I'll get

23   to you next week -- I do think that some briefing

24   focusing in on the remaining issues may be helpful.

25   So let me think about that.

*10425*

1          MR. GEORGE:  Certainly.

2          THE COURT:  We'll put our heads together

3  and think whether that's necessary or not.

4          MR. GEORGE:  Okay.

5          THE COURT:  Thank you.

6          MR. BULLOCK:  There was one other thing

7  that I was asked to bring up by some of the staff

8  whose job it is to put this together for the court.

9          In terms of providing the court with copies

10  of the exhibits, I know that the court has gotten and

11  annotated its exhibits, of course, as we've gone

12  along.  I guess our thought would be that we could

13  provide the court pretty easily and quickly with

14  perhaps a DVD with copies of all the exhibits that's

15  hyperlinked to listed exhibits showing admitted or not

16  admitted so that -- and then --

17          THE COURT:  For instance, hyperlinked to

18  the proposed findings and conclusions?

19          MR. BULLOCK:  Well, I think we could

20  even do that, Judge.

21          THE COURT:  Because we've tried to

22  maintain -- although as you've referred to before,

23  we've tried to maintain the exhibits back here that

24  have been admitted.  Personally, I like hard copies to

25  hold on to, but it might be helpful to refer in those

10426

1   findings and conclusions to those exhibits that you

2   believe substantiate the proposed findings.

3                MR. BULLOCK:  Well, I think that might

4   be possible.  I'm not a techie as the court knows, but

5   we will confer and confer with the defendants to see

6   whether that's something feasible.  It certainly is

7   enticing from this end.

8                THE COURT:  All right.  Anything else?

9                MR. GEORGE:  Nothing from our side, Your

10  Honor.

11               THE COURT:  All right.  Very well.  If

12  there's nothing further, we will be adjourned until

13  next Monday.

14               *(The proceedings were recessed)*

15

16

17

18

19

20

21

22

23

24

25

**United States District Court**

1            C E R T I F I C A T E

2

3

4            I, Brian P. Neil, a Certified Court Reporter

5   for the Eastern District of Oklahoma, do hereby

6   certify that the foregoing is a true and accurate

7   transcription of my stenographic notes and is a true

8   record of the proceedings held in above-captioned

9   case.

10

11            I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16            In witness whereof, I have hereunto set my

17   hand this 7th day of January 2009.

18
                    s/ Brian P. Neil
19            _____
                Brian P. Neil, CSR-RPR, CRR, RMR
20              United States Court Reporter

21

22

23

24

25

**United States District Court**