1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    STATE OF OKLAHOMA, ex rel.  )
     W.A. DREW EDMONDSON, in his )
5    capacity as ATTORNEY GENERAL)
     OF THE STATE OF OKLAHOMA,    )
6    et al.                       )
                                  )
7              Plaintiffs,  )
     vs.                           )CASE NO. 05-329-GKF-PJC
8                                  )
     TYSON FOODS, INC., et al.,   )
9                                  )
                                  )
10             Defendants.  )

11

12

13

             TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
14                    JANUARY 7, 2010
       BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE
15              VOLUME 88, A.M. SESSION

16

17   APPEARANCES:

18

19   For the Plaintiffs:      MR. W.A. DREW EDMONDSON
                              Attorney General
20                            MS. KELLY FOSTER
                              Assistant Attorney General
21                            State of Oklahoma
                              313 N.E. 21st St.
22                            Oklahoma City, OK  73105

23

24

25

```
 1   (APPEARANCES CONTINUED)       MR. M. DAVID RIGGS
                                   MR. DAVID P. PAGE
 2                                 MR. RICHARD T. GARREN
                                   Riggs Abney Neal Turpen
 3                                 Orbison & Lewis
                                   502 W. 6th Street
 4                                 Tulsa, OK  74119

 5

 6                                 MR. ROBERT A. NANCE
                                   MS. SHARON GENTRY
 7                                 Riggs Abney Neal Turpen
                                   Orbison & Lewis
 8                                 5801 Broadway
                                   Extension 101
 9                                 Oklahoma City, OK  73118

10                                 MR. LOUIS W. BULLOCK
                                   MR. ROBERT BLAKEMORE
11                                 Bullock Bullock &
                                   Blakemore
12                                 110 W. 7th, Ste 770
                                   Tulsa, OK  74119
13
                                   MR. FREDERICK C. BAKER
14                                 MS. ELIZABETH CLAIRE XIDIS
                                   MS. INGRID MOLL
15                                 Motley Rice LLC
                                   28 Bridgeside
16                                 P.O. Box 1792
                                   Mount Pleasant, SC  29465
17

18
     For Tyson Foods:             MR. ROBERT W. GEORGE
19                                 Tyson Foods, Inc.
                                   2210 West Oaklawn Drive
20                                 Springdale, AR  72701

21                                 MR. JAY THOMAS JORGENSEN
                                   MR. THOMAS GREEN
22                                 MR. MARK HOPSON
                                   MR. GORDON D. TODD
23                                 Sidley Austin LLP
                                   1501 K St. NW
24                                 Washington, DC  20005

25
```

```
 1   (APPEARANCES CONTINUED)

 2   For Cargill:              MR. JOHN H. TUCKER
                               MS. THERESA HILL
 3                             Rhodes Hieronymus Jones
                               Tucker & Gable
 4                             100 W. 5th St., Ste 400
                               Tulsa, OK  74103
 5
                               MR. DELMAR R. EHRICH
 6                             MS. KRISANN KLEIBACKER LEE
                               MR. BRUCE JONES
 7                             Faerge & Benson
                               90 S. 7th St., Ste 2200
 8                             Minneapolis, MN  54402

 9   For Simmons Foods:        MR. JOHN R. ELROD
                               MS. VICKI BRONSON
10                             Conner & Winters
                               211 E. Dickson St.
11                             Fayetteville, AR  72701

12   For Peterson Farms:       MR. A. SCOTT MCDANIEL
                               MR. PHILIP HIXON
13                             MS. NICOLE LONGWELL
                               MR. CRAIG MIRKES
14                             McDaniel Hixon Longwell &
                               Acord PLLC
15                             320 S. Boston, Ste 700
                               Tulsa, OK  74103
16
     For George's:            MR. WOODY BASSETT
17                            MR. VINCENT O. CHADICK
                              MR. JAMES GRAVES
18                            MS. K.C. TUCKER
                              MR. GARY WEEKS
19                            Bassett Law Firm
                              P.O. Box 3618
20                            Fayetteville, AR  72702

21   For Cal-Maine:           MR. ROBERT SANDERS
                              Young Williams P.A.
22                            P.O. Box 23059
                              Jackson, MS 39225
23
                              MR. ROBERT P. REDEMANN
24                            Perrine McGivern Redemann
                              Reid Berry & Taylor PLLC
25                            P.O. Box 1710
                              Tulsa, OK  74101
```

1                              INDEX

2

3   WITNESSES ON BEHALF OF THE DEFENDANTS          PAGE

4

5   DEREK SMITHEE

6        By Videodeposition                     10224

7

8   DR. VICTOR J. BIERMAN, JR.

9        Direct Examination by Mr. George       10225

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       PROCEEDINGS
 2   JANUARY 7, 2010:
 3            THE COURT:  Mr. Smithee.
 4            MS. TUCKER:  Yes, sir.  We'd like to
 5   continue with the videotaped deposition of Derek
 6   Smithee.  For your reference, we'll begin with clip
 7   No. 27.
 8            THE COURT:  All right.
 9            (Video deposition of Mr. Derek Smithee was
10   continued.)
11            THE COURT:  Exhibits?
12            MS. TUCKER:  No.
13            THE COURT:  The defendants may call their
14   next witness.
15            MR. GEORGE:  Your Honor, the defendants
16   call Dr. Victor Bierman.
17            (Witness sworn.)
18            THE COURT:  State your full name for the
19   record, please, sir.
20            THE WITNESS:  My full name is Victor Joseph
21   Bierman, Jr.
22            THE COURT:  That's B-I-E-R-M-A-N?
23            THE WITNESS:  Yes, sir, it is.
24            THE COURT:  You may proceed.
25
```

```
 1
 2                    DR. VICTOR BIERMAN, JR.,
 3  having been first duly sworn, was called as a
 4  witness and testified as follows:
 5                    DIRECT EXAMINATION
 6  BY MR. GEORGE:
 7  Q.   Good morning, Dr. Bierman.
 8  A.   Good morning.
 9  Q.   Dr. Bierman, can you begin by providing
10  His Honor with a brief summary of your educational
11  experiences and degrees.
12  A.   Yes.  I have an A.B. degree from Villanova
13  University in 1966 with a major in science.  I have
14  a master's degree in physics from the University of
15  Notre Dame in 1971, and a Ph.D. in environmental
16  engineering from Notre Dame in 1974.
17  Q.   Doctor, is it true that there's a bit of a
18  football rivalry between Notre Dame and the
19  University of Michigan?
20  A.   That would call for speculation on my part.
21  But if His Honor is interested, I can provide the
22  name of a football coach who I think is still
23  probably available.
24          THE COURT:  I think we may have your future
25  athletic director in Tulsa.  Go ahead.
```

1  Q.  (By Mr. George)  Just so we're clear, Doctor,

2  you don't personally harbor any animosity against

3  the University of Michigan, do you?

4  A.  Is that a trick question?

5       MR. GEORGE:  I'll withdraw the question,

6  Your Honor.

7       THE COURT:  And you expect me to believe

8  this man?

9       THE WITNESS:  I think what I should say

10  is:  Talk to my lawyer.

11       MR. GEORGE:  Full transparency, Your Honor.

12  Q.  (By Mr. George)  Doctor, you mention that you

13  have a Ph.D.  What's the topic of your Ph.D.

14  dissertation?

15  A.  I developed a novel mathematical model for

16  algal growth in eutrophic lakes.

17  Q.  Was that developed or used in any particular

18  waterbodies or geographic areas?

19  A.  Well, I built the model using data from lakes

20  in Indiana and Wisconsin.

21  Q.  Could you please summarize your professional

22  work history following obtaining your Ph.D. in 1974.

23  A.  My first job was as a systems ecologist in 1974

24  for Cranbrook Institute of Science.  At the time,

25  Cranbrook was a U.S. EPA contractor.  I then spent

1  13 years as an environmental scientist with the U.S.

2  Environmental Protection Agency, eight years at the

3  Great Lakes laboratory in Grosse Ile, Michigan, and

4  five years at EPA's marine laboratory in

5  Narragansett.

6  Q.   Stop there for a moment.  With respect to your

7  work in the '70s and '80s with the Environmental

8  Protection Agency, did your duties involve

9  developing and applying water quality models?

10  A.   Yes.  My principal duties were development and

11  application of water quality models for nutrients

12  and toxic chemicals.

13  Q.   After you left the agency in 1986, what did you

14  do next?

15  A.   I became an associate professor at the

16  University of Notre Dame in the department of civil

17  engineering.  Then in 1990, I left Notre Dame, and I

18  became employed at Limno-Tech.  I retained an

19  appointment at the university as an adjunct

20  professor for a few years to continue conducting

21  research.  And then I transitioned full time to

22  consulting.

23  Q.   Let's talk about your tenure as a professor at

24  the University of Notre Dame.  Did you have teaching

25  responsibilities at the university?

1  A.   Yes, I did.

2  Q.   What types of courses did you teach?

3  A.   I taught a numerical methods course for

4  undergraduates.  Then I taught a senior

5  undergraduate and a graduate course in water quality

6  modeling.

7  Q.   Other than your time as a professor at the

8  University of Notre Dame, were you affiliated in a

9  professional capacity with any other university?

10 A.   When I was at the EPA lab in Narragansett, I

11 also served as an adjunct professor there and did

12 some collaborative research with modeling of metals

13 in Narragansett Bay.  I collaborated with one of the

14 faculty on a metals water quality model for

15 Narragansett Bay.

16 Q.   Doctor, did you have teaching responsibilities

17 at the University of Rhode Island?

18 A.   No, I had no teaching responsibilities there.

19 Q.   Now, let's move to Limno-Tech.  When did you

20 join the consulting firm of Limno-Tech?

21 A.   In 1990.

22 Q.   What type of work have you focused on during

23 your employment at Limno-Tech?

24 A.   The work I do, two principal categories.  I

25 develop -- I conduct applied research on water

1  quality and watershed models, and I do this

2  primarily for government agencies, federal, state,

3  regional government agencies.  And I also do a lot

4  of scientific peer review work for government

5  agencies, sometimes regulatory agencies and, in some

6  cases, regulated parties.

7  Q.   Doctor, can you provide the court with some

8  information about the consulting firm Limno-Tech and

9  how you fit into that firm?

10  A.   Yes.  It's a 75 staff.  We are an environmental

11  science and engineering consulting company.  We --

12  primarily we conduct quantitative assessments and

13  develop models for watersheds and water quality

14  modeling.  The home office is in Michigan; Ann

15  Harbor, Michigan, actually.  We have a regional

16  office in Washington, D.C. with about 10 people.

17  Myself and two other staff work in different

18  locations.  I work out of my home in Greensboro,

19  North Carolina.  And we have two other staff who

20  work in the same fashion.

21  Q.   Doctor, you mentioned that Limno-Tech has a

22  rather large staff.  Did you work with staff members

23  in connection with your responsibilities for this

24  case?

25  A.   Yes, I did.  I had four staff people who

1  constituted my principal core staff, and there were

2  perhaps three or our four other staff who came in

3  and out of the project on a task-specific basis.

4  Q.   Let's talk about your four primary staff

5  members that you work with.  Are these individuals

6  that you have had some experience working with on

7  other projects?

8  A.   Yes.  The four core staff have a combined total

9  of 85 years of professional experience, and I have a

10  combined total of 62 years' professional experience

11  working with these core staff.

12  Q.   And, Doctor, were you the project leader for

13  this particular case and Limno-Tech's involvement in

14  this case?

15  A.   Yes, I was.

16  Q.   As project leader, did you review all work

17  product of the staff members who assisted you?

18  A.   Yes, I did.

19  Q.   And you understand you're here today to offer

20  some expert opinions relative to this case?  You do

21  know that?

22  A.   Yes, I do.

23  Q.   Are the opinions that you are going to express

24  here today your own?

25  A.   Yes, they are.

1   Q.   Doctor, you've issued an expert report in this

2   case; is that correct?

3   A.   Yes.

4   Q.   Did anyone other than yourself contribute to

5   the writing of that report?

6   A.   No, I wrote the entire report.

7   Q.   Doctor, this particular lawsuit involves Lake

8   Tenkiller and the Illinois River.  What other

9   notable waterbodies have you focused on in your

10  professional work?

11  A.   Over the years, I've worked on Chesapeake Bay,

12  the Gulf of Mexico, the Great Lakes, Lake

13  Okeechobee, the Everglades, the Hudson and Columbia

14  Rivers, Potomac and Delaware River estuaries, among

15  others.

16  Q.   You mentioned the Chesapeake Bay.  What work

17  have you done in the Chesapeake Bay, and for what

18  clients?

19  A.   The first -- I'll put it into two broad

20  categories.  The first project was actually a

21  multiyear project, involved conducting a scientific

22  assessment of the Chesapeake Bay water quality model

23  and the use of that model to develop cap loadings

24  for nutrients and sediments to Chesapeake Bay and

25  these -- which were embodied in the Chesapeake 2000

1    agreement.

2    Q.   Who was your client for that particular

3    project?

4    A.   That was the Metropolitan Washington, D.C.

5    Council of Governments.

6    Q.   Did you have another project related to

7    Chesapeake Bay?

8    A.   Yes.  I had actually a series of three research

9    projects that played out over about six or seven

10   years.  They were funded by the U.S. Army Corps of

11   Engineers, and it involved advancing the state of

12   the science of the Potomac portion of the Chesapeake

13   Bay water quality model.  We enhanced the phosphorus

14   kinetics, we put pH-alkalinity into it, and I

15   developed a novel algal speciation submodel for it.

16   Q.   One of the other waterbodies you mentioned is

17   the Gulf of Mexico.  What projects were you involved

18   in related to the Gulf of Mexico?

19   A.   Again, there were long-term projects.  I

20   categorize it by saying that the first of them was

21   development of a water quality model for nutrients,

22   chlorophyll and dissolved oxygen.  And this was in

23   the Gulf of Mexico, and this was directed at the

24   hypoxia problem, the so-called dead zone in the Gulf

25   of Mexico.

 1   Q.   Who was your client for that project?

 2   A.   That was the National Oceanic and Atmospheric

 3   Administration.

 4   Q.   Did you have a subsequent project related to

 5   the Gulf of Mexico?

 6   A.   Yes.   The White House Committee on Environment

 7   and Natural Resources initiated a Gulf of Mexico

 8   hypoxia assessment that involved six work groups.

 9   And I co-chaired one of those work groups.  And that

10   involved using the results of the mathematical model

11   that I had developed previously to help develop the

12   coastal goal, to develop the nitrogen load reduction

13   goal for the Gulf of Mexico to reduce hypoxia.  And

14   that goal was embodied in the 2001 Federal Action

15   Plan.

16   Q.   You mentioned nitrogen.  Is nitrogen the

17   primary nutrient of concern for the Gulf of Mexico?

18   A.   Nitrogen is considered to be the principal

19   nutrient that drives the dissolved oxygen problem.

20   Q.   Doctor, do you have any experience specifically

21   with modeling or evaluating the modeling of

22   nutrients through a watershed system?

23   A.   Yes, I do.

24   Q.   Could you explain that -- can you provide some

25   examples of that experience, please.

1  A.    I can provide some examples.  One example is

2  that I developed what we called an Everglades Water

3  Quality Model.  That was a model that represented

4  about half of the area in south Florida, and it

5  represented the hydrology and it represented the

6  transport of phosphorus in the overland areas and

7  the canal system of south Florida.

8  Q.    Can you provide any other examples?

9  A.    I conducted a review of a coupled watershed

10  receiving water model for the Caloosahatchee River

11  estuary.  I assessed movement of nutrients through

12  the watershed and into the Caloosahatchee River and

13  through the Caloosahatchee River estuary.  This was

14  a model that was used by the Florida Department of

15  Environmental Protection to support a TMDL for the

16  Caloosahatchee.

17  Q.    Have you ever reviewed any watershed models

18  that were used in the state of Minnesota?

19  A.    Yes.  EPA retained me to conduct an independent

20  peer review of a linked watershed water quality

21  model involving HSPF and AQUATOX.  And the agency

22  put forth this model as a demonstration study for

23  the use of models to develop nutrient criteria.  So

24  I conducted a peer review of that model for the

25  agency.

1  Q.   Doctor, do you also have experience in

2  tributary loading estimation models?

3  A.   Yes, I do.

4  Q.   Could you --

5  A.   Would you like me to --

6  Q.   -- summarize that experience.

7  A.   I conducted two applied research projects with

8  funding from the U.S. Geological Survey.  And the

9  purpose of these projects was to develop and test

10 with real data USGS tributary loading estimation

11 methods.  I produced a couple of USGS reports.  We

12 have two papers in the peer review literature.

13          In 2001, I was invited to give a training

14 workshop in tributary loading estimation methods at

15 a national meeting of the Water Environment

16 Federation, and the topic of the meeting dealt with

17 TMDL science issues.

18 Q.   Doctor, has any of your work related to

19 tributary loading estimation been cited by EPA in

20 its guidance documents?

21 A.   Yes.  There's a -- EPA supported the

22 development of a technical guidance document for

23 tributary load estimation, and my published work is

24 cited in the annotated bibliography of that

25 document.

1   Q.   You're here today testifying as an expert

2   witness in litigation.  Has that sort of work been a

3   significant part of your professional career over

4   the last 20 years?

5   A.   Not a significant part.  I've been involved in

6   about 60 different projects with Limno-Tech, and

7   probably 15 percent of them are litigation projects.

8   Q.   Prior to your work in this case, had you ever

9   been retained by any of the poultry companies that

10  are named as defendants in this lawsuit?

11  A.   No, I've not.

12  Q.   Apart from your work for the defendants in this

13  case, have you had any other contact with the

14  counsel for the State of Oklahoma?

15  A.   Actually, yes.  In August of 2007, I received

16  an e-mail from Mr. David Page pertaining to

17  litigation in a case in Oklahoma.  And in response

18  to his request, I telephoned him, and he then

19  inquired about my interest and availability to be a

20  testifying expert in this present case.

21  Q.   I assume you declined?

22  A.   I told Mr. Page that I was conflicted out.

23  Q.   Doctor, have you been retained to evaluate

24  water quality or fate and transport issues by any

25  federal governmental agencies?

1  A.   Yes, I have.

2  Q.   Could you identify some of those federal

3  agencies and provide some examples of your work for

4  them.

5  A.   I'll give you examples involving three

6  agencies, the U.S. Environmental Protection Agency,

7  the U.S. Army Corps of Engineers, and U.S.

8  Department of Justice.

9       For EPA, I developed a transport and fate

10  model for PCBs in the upper Hudson River, and this

11  was part of the remedial investigation feasibility

12  study.  The results of my transport and fate

13  modeling were characterized by EPA as the backbone

14  of their decision, their record of decision to

15  dredge contaminated sediments in the Hudson.

16       Another EPA project was I developed a

17  transport and fate model for PCBs for the Potomac

18  River estuary, and those results were used to

19  develop a PCB TMDL under terms of a court-ordered

20  consent decree.

21       Another project was -- I think I mentioned

22  this, the peer review of the coupled HSPF-AQUATOX

23  model.

24  Q.   Doctor, other than the United States

25  Environmental Protection Agency, have you worked for

1    any other federal agencies?

2    A.   The Corps of Engineers, there are two projects

3    I could cite in response to the question.  One is

4    a -- I'm currently sitting on an independent

5    external peer review panel for -- to review the

6    water quality aspects of a proposed Corps of

7    Engineers flood control project in the St. Johns

8    Bayou/New Madrid Floodway in the state of Missouri.

9              Another project for the Corps of Engineers,

10   they applied a rather sophisticated water quality

11   model to the lower St. Johns River in Florida.  They

12   had some problems with the calibration, and they

13   involved nutrients and algal speciation and nitrogen

14   fixation, and they called me in and retained me to

15   review that work and provide expert assistance to

16   them.

17   Q.   Doctor, have you done any work with the U.S.

18   Department of Justice?

19   A.   Two projects with the Department of Justice.

20   As a follow-on to the PCB transport and fate model I

21   did in the upper Hudson, the Department of Justice

22   initiated an NRDA case, natural resources damages

23   assessment case, in the upper Hudson River

24   pertaining to the PCB contamination, and I was

25   retained as a consulting expert to DOJ for that

1  case.

2  Q.   Doctor, you mentioned a time or two that you

3  have been periodically retained to peer review

4  models.

5  A.   Yes.

6  Q.   When you are retained in that capacity, to peer

7  review a model, is it always a model or an

8  application that you have seen previously?

9  A.   Well, usually it's not an application I've seen

10  previously.  That's why you're normally asked to

11  review these things.  Every site-specific

12  application is unique.  No two are the same.  They

13  all have unique aspects.

14       I may or may not be familiar with the

15  model.  I frequently am.  But if I'm not familiar

16  with the model, I'm certainly familiar with the

17  science underlying the model.

18  Q.   When you encounter a model that you have not

19  had particular experience with that tool, what steps

20  do you take to familiarize yourself with the model?

21  A.   Well, first step would be to review the user

22  manual and any papers or reports that pertain

23  directly to the model, that is the tool, and the

24  science underlying that tool.

25       The second step would be to review any

1    papers and reports pertaining to the particular

2    site-specific application of the model in question.

3         The next later layer would be to actually

4    review the model files themselves, the data inputs,

5    the model files, the model outputs.  And, again,

6    depending on the nature of the review, depending on

7    the rigor, the last level would be actually running

8    the model itself and testing it and conducting

9    diagnostic analyses.

10   Q.   Did you follow a similar process in this case

11   with regard to Dr. Engel's models?

12   A.   Yes, I did.  I followed exactly that process.

13   Q.   Let's talk about your publication history.

14   Have you published the results of your professional

15   work over the years in any scientific journals?

16   A.   Yes.  I have a total of over a hundred

17   publications, and they would be journal articles,

18   book chapters, technical reports.  About half of

19   those are peer reviewed, were peer reviewed, most of

20   them in journals.  Some of them have appeared as

21   peer-reviewed book chapters.

22   Q.   Doctor, have you served on any editorial boards

23   of peer-reviewed journals?

24   A.   Yes.  I've served on two editorial boards:

25   *Journal of Great Lakes Research* and *Aquatic*

1  *Ecosystem Health and Management*.

2  Q.   In addition to serving on those boards, are you

3  periodically asked to review technical papers as

4  part of the peer review process for other journals?

5  A.   Yes.  I routinely review manuscripts for

6  journals, *Environment Science and Technology*, *Lake*

7  *and Reservoir Management*, *Estuaries and Coasts*, to

8  name three of them.

9  Q.   Doctor, are you a member of any respected

10  professional associations that you believe are

11  relevant to your work in this case?

12  A.   Yes, I am.

13  Q.   Could you identify a few of those, please.

14  A.   The American Chemical Society.  They produce,

15  among other things, the *Journal of Environmental*

16  *Science and Technology.*  It's probably the most

17  widely read journal in the field.

18         North American Lake Management Society,

19  American Society of Limnology and Oceanography.

20  Water Environment Federation.

21  Q.   Thank you.  Are you, Doctor, currently serving

22  on any technical or scientific advisory committees

23  for EPA?

24  A.   Yes, I am.

25  Q.   What is that committee?

1    A.    That is the Environmental Processes and Effects

2    Committee.  It's a standing committee of the U.S.

3    EPA Science Advisory Board.

4    Q.    What is the charge or the task for that

5    committee?

6    A.    Our task is to conduct an independent peer

7    review of a draft technical guidance document that

8    EPA prepared for the development of nutrient

9    criteria.

10   Q.    And do I understand that there are some

11   standing members to that committee?

12   A.    Yes.  The committee has 14 standing members.

13   And for this particular task, they decided to bring

14   on six additional consultants with specialized

15   expertise in this particular peer-reviewed topic.

16   Q.    Could you briefly describe the process that you

17   underwent to become one of the six consultants for

18   this EPA committee?

19   A.    EPA put out a public notice in the Federal

20   Register soliciting nominations for this

21   assignment.  There were 27, short list of nominees

22   at the next step, and these 27 nominees along with

23   short bibliographies were put out, were publicly

24   noticed on EPA's website.  There was a 60-day public

25   comment period, and at the end of that process, EPA

1  selected six of the 27.

2  Q.   Is Dr. Andrew Sharpley also one of the

3  consultants hired by the EPA Science Advisory Board

4  to work on this peer review process?

5  A.   Yes, he's one of the six.

6  Q.   Doctor, let's turn to the scope of your work in

7  this particular lawsuit.  What issues or subjects

8  were you asked by the defendants to evaluate in this

9  case?

10 A.   I was asked to evaluate and review and to make

11 a determination about the validity and the

12 reliability of the watershed and water quality

13 models put forth by Dr. Engel and Dr. Wells.

14 Q.   What information or data did you review as part

15 of your analysis in this case?

16 A.   Well, I followed the stepwise process that I

17 discussed previously.  The first step was -- well, I

18 guess for the particular case, where I started was

19 the expert reports, the paper reports.  And then

20 there was a considerable amount of produced

21 material, electronic files.  We reviewed those.

22       I reviewed many papers and reports

23 pertaining to data and water quality on the Illinois

24 River Watershed.  And I also reviewed the current

25 and relevant EPA guidance.  EPA has a number of

1  guidance manuals.  One of them pertains specifically

2  to the development and evaluation and the

3  application of environmental models.

4  Q.   Doctor, you mentioned that one of the first

5  things you reviewed was expert reports.  You're

6  referring to experts from the State of Oklahoma?

7  A.   Yes.  The reports -- most of my attention was

8  focused on Drs. Engel and Wells, but I also reviewed

9  the portions of the reports by Drs. Stevenson and

10  Cooke and Welch that used modeling results from

11  either Dr. Engel or Dr. Wells.

12  Q.   Obviously today, Doctor, our discussion is

13  going to focus on the models.  Can you explain,

14  before we get too far into this, what Dr. Engel's

15  model consisted of, just generally.

16  A.   Right.  In general terms, Dr. Engel's model was

17  actually two models.  The GLEAMS model represented

18  the flow and the nonpoint source phosphorus loads

19  that -- to the edge of the field.  The second model,

20  his so-called routing model, seeks to establish a

21  connection between those edge-of-field loads plus

22  wastewater treatment plant loads, which were

23  determined separately and added in, and the loadings

24  to Lake Tenkiller at the three outlet stations at

25  the base of the watershed.

1  Q.   You mentioned Dr. Engel's routing model.   Is

2  his routing model really a model, as you would use

3  that term?

4  A.   I wouldn't call it a model.   I would call it an

5  empirical equation.

6  Q.   When Dr. Engel provided his expert report in

7  May of 2008, what did you receive in terms of the

8  models?

9  A.   We received a very large number of files:

10  Input files, model files and output files.   We

11  received many different versions of each file:

12  Inputs, coding and outputs.

13  Q.   Doctor, once you received those computer files,

14  did you and your staff have to assemble those files

15  into a working version of the models as part of your

16  work?

17  A.   Yes.   Consistent with the stepwise process I

18  discussed earlier, we reviewed the model files and

19  then we took the next step, and attempted to test

20  the model by actually running it.

21  Q.   Doctor, could you briefly describe the process

22  and some of the difficulties that were encountered

23  in trying to assemble those electronic files into a

24  working version of the model.

25          MR. PAGE:  Objection, leading, Your Honor.

 1          MR. GEORGE:  I asked him to describe,

 2  Your Honor.

 3          THE COURT:  Overruled.

 4          THE WITNESS:  We could run the model

 5  without any trouble.  That was not the problem.  The

 6  problem was we could not run the model in such a way

 7  that we could reproduce the results in Dr. Engel's

 8  report.  And some of the difficulties were there

 9  were very many different versions of input files,

10  there were many different versions of model code,

11  and there were many different versions of output

12  files.  And Dr. Engel's report did not document in

13  sufficient detail which pieces were which, how to

14  put them together, in what order to put them

15  together.

16          So as I said, we could run the model, but

17  we had no way of knowing how to run it, how to

18  assemble the pieces in such a way as to reproduce

19  the results in his report.

20  Q.   Did you participate in some back and forth with

21  the lawyers and Dr. Engel to try to get some clarity

22  and some gaps filled?

23  A.   Yes, we did.

24  Q.   Could you briefly describe that process.

25  A.   Well, I think it started with e-mail

1    exchanges.  I prepared some e-mails with questions

2    pertaining to asking for more specific descriptions

3    of files, more specific descriptions of what version

4    was used and how it was used, how they were used.

5           I should say that as we got deeper into the

6    process, it became apparent that it was not just an

7    assembly problem; we were actually missing important

8    files which, in fact, we never would have been able

9    to run the model in such a way as to produce the

10   results in the expert report, because the original

11   production simply did not contain the files that

12   allowed us to do that.

13   Q.   In the midst of that process, did you receive

14   an errata report from Dr. Engel?

15   A.   Yes, we received the report in September of

16   2008.

17   Q.   Okay.  And can you provide the court with your

18   understanding of what necessitated that errata.

19   A.   My understanding --

20           MR. PAGE:  Objection, Your Honor, lack of

21   foundation.

22           MR. GEORGE:  I'll ask the question to

23   establish foundation.

24           THE COURT:  Very well.

25   Q.   (By Mr. George) Doctor, did you review the

1   errata?

2   A.   Yes, I did.

3   Q.   Does Dr. Engel provide a description of why the

4   errata was necessary in that report?

5   A.   Yes, he did.

6   Q.   Can you provide the court, by way of

7   background, with your understanding the need for the

8   errata in September 2008.

9   A.   Yes.  I need to back up and set some

10  foundation.  Dr. Engel applied his GLEAMS model to

11  the Illinois River Watershed -- he broke the

12  watershed up into 50 different spatial units, and

13  those are called hydrological response units.  I'll

14  call them HRUs.

15          And my understanding of the problem was

16  that in attempting to answer our questions and in

17  pulling together the missing files for us, Dr. Engel

18  discovered what was actually a serious flaw with the

19  GLEAMS model results that had been given to us with

20  his original expert report.

21          The simplest way to describe it is that he

22  discovered that the results in his original expert

23  report only represented 27 of the 50 HRUs.  He had

24  left out 23 of them.

25  Q.   Now, Doctor, with respect to Dr. Engel's errata

1  that he produced in September of 2008, did he

2  purport to have corrected that mistake?

3  A.   He stated that he corrected the mistake, and

4  included all 50 HRUs, that's right.

5  Q.   In the errata, did Dr. Engel reach results that

6  were substantially different from his original

7  report?

8          MR. PAGE:  Objection, leading, Your Honor.

9          THE COURT:  Sustained.  Rephrase.

10 Q.   (By Mr. George)  How would you describe the

11 results that Dr. Engel reached as between his first

12 errata -- his original report and his first errata?

13 A.   Answer the question in two parts.  All the

14 numbers were different.  And we got a whole new set

15 of model files.  However, Dr. Engel characterized

16 those differences as not significant, and he stated

17 that none of his opinions changed from the original

18 report.

19 Q.   Dr. Bierman, were you concerned that

20 Dr. Engel's model could support similar results with

21 half the watershed missing?

22         MR. PAGE:  Objection, Your Honor, leading.

23         MR. GEORGE:  Can be answered yes or no.

24         THE COURT:  Sustained.

25 Q.   (By Mr. George)  Dr. Bierman, did that

1  explanation provide you any -- cause you any

2  concern?

3          MR. PAGE:  Same objection, Your Honor.

4          THE COURT:  Overruled.

5  Q.  (By Mr. George) Please answer.

6  A.  Well, it caused concern because basically

7  Dr. Engel's model gave the same answers for the

8  entire Illinois River Watershed as it gave when half

9  the watershed was left out.  I mean, common sense

10 told me that this is a red flag.  There's a serious

11 flaw somewhere in that model.

12 Q.  Now, Doctor, we've talked about the first

13 errata.  Was that the final answer, if you will, of

14 Dr. Engel with respect to his modeling work?

15 A.  No.  No, there was another errata or -- this

16 was in October.  We were again provided with

17 different numbers and new model files.

18 Q.  Doctor, did you run a series of simulations

19 using Dr. Engel's routing model?

20 A.  Yes, I did.

21 Q.  What was the purpose of those simulations?

22 A.  The routing model relates the nonpoint source

23 phosphorus loads computed by Dr. Engel's GLEAMS

24 model plus wastewater treatment plant loads to his

25 observed total phosphorus loads at the three outlet

1    stations at the bottom of the watershed.

2            And the purpose for me conducting -- I

3    wanted to check the routing model.  I wanted to

4    confirm or determine whether or not it could

5    actually pin down the loadings from the watershed

6    and relate them to the loadings at the outlet

7    stations.

8    Q.   What approach did you use to confirm or test

9    the routing model?

10   A.   Well, I did some sensitivity analyses with the

11   model, and that involved putting in different input

12   loadings to determine how the model would respond.

13   Q.   And without going into a lot of detail, because

14   we'll come back to these in a moment, can you list

15   for the court the specific tests or sensitivity

16   analysis that you performed on the routing model?

17   A.   Yes.  I did four tests.  The first test

18   consisted of not changing the magnitudes of the

19   input loads that Dr. Engel put into the routing

20   model, but just reversing the time order.  This

21   model was applied to the period from 1998 through

22   2006, so I just took -- I took the load on the last

23   day, made it first, and reversed everything and ran

24   the time series backwards.

25           The second thing I did was I then modified

1   the changed -- I changed the loadings from the

2   loadings that Dr. Engel put into the model, and I

3   put my own loadings into the model.  I increased the

4   wastewater treatment plant loads by a very

5   substantial amount.  I then increased the nonpoint

6   source loading component.  And then finally, I

7   decided to just use made-up numbers, put them in and

8   see what would happen, and that was -- the numbers I

9   chose to use were the S&P 500 Stock Index values for

10  the period 1998 through 2006.

11  Q.   Let's talk about each of these in order.  Let's

12  start with where you ran the model load -- with the

13  loads backwards.  What was the purpose of that

14  analysis?

15  A.   Dr. Engel explained that the one thing the

16  routing model does is it redistributes -- it

17  distributes loads and time to make sure that the --

18  not only that the right -- that the loads are the

19  right magnitude make it to the bottom of the

20  watershed, but they there at the right time.

21         So I thought this would be a test of the

22  timing of the model.  Basically it was a test to see

23  whether the model could tell the difference between

24  days on which it's not raining, on days which it is

25  raining, because on days on which it's raining, you

1  can get nonpoint source runoff.

2  Q.   Doctor, did you have an expectation as to

3  whether the results would change, having reversed

4  the loads?

5  A.   Well, certainly, yes, I expected the results

6  would change.

7  Q.   Doctor, did you prepare for your report a chart

8  showing the results of this first test or analysis?

9  A.   Yes, I did.

10  Q.   Do you have a binder with the exhibits?

11         MR. GEORGE:  David, you have the exhibits,

12  don't you?

13         MR. PAGE:  Yes.

14         MR. GEORGE:  Your Honor, you have a binder

15  as well?

16         THE COURT:  Yes.

17  Q.   (By Mr. George) Could you turn to tab 2 in the

18  binder and find Defendants' Joint Exhibit 2414.

19  A.   Yes, I'm there.

20  Q.   Can you identify for the record Defendants'

21  Joint Exhibit 2414.

22  A.   Yes.  This is Figure 19 from my expert report.

23  Q.   And did you prepare this exhibit?

24  A.   Yes, I did.

25  Q.   And can you identify the source of the

1   information of data that's shown on this exhibit.

2   A.   Yes.  Again, some more foundation.  Dr. Engel

3   applied his linked GLEAMS routing model system

4   separately to each of three subwatersheds in the

5   Illinois River Watershed.  He -- these three panels

6   here show results for each of these three

7   subwatersheds.  The top panel represents the results

8   for the Illinois River subshed, the middle is Barren

9   Fork, the bottom was Caney Creek.

10            In each of these plots, the X axis, the

11  horizontal axis here, represents Dr. Engel's

12  observed phosphorus loads at the bottom of the

13  watershed at the USGS station at the bottoms of each

14  of these three respective watersheds.

15            The vertical axis represents the predicted

16  loads from the routing model.

17            MR. GEORGE:  Your Honor, at this time, I

18  move for the introduction of Defendants' Joint

19  Exhibit 2414.

20            THE COURT:  Any objection?

21            MR. PAGE:  No objection, Your Honor.

22            THE COURT:  2414 is admitted.

23  Q.   (By Mr. George) Doctor, with reference to this

24  exhibit, could you please explain what that figure

25  shows about the results of the first test.

1  A.   Yes.   The test I conducted was, one, I changed

2  the order of the loads; and then, two, I attempted

3  to calibrate -- recalibrate the model exactly the

4  way Dr. Engel claims to have calibrated it and

5  validated it in his expert report.   And basically I

6  did a regression analysis of predicted versus

7  observed phosphorus loads, exactly as Dr. Engel had

8  done it.   And these plots here depict the results.

9         The lines in each plot represent the fitted

10  regression line.   The metric that I used to

11  determine how -- the goodness of fit is the

12  so-called $R^2$   it's the same the metric Dr. Engel

13  used for his calibration validation.   And the type

14  is a bit small, but the $R^2$ is reported for each of

15  fits for each of these three subwatersheds.

16  Q.   How does your $R^2$ compare to the $R^2$ reported by

17  Dr. Engel?

18  A.   As good or better.

19  Q.   What conclusion, if any, do you draw from this

20  analysis, Doctor.

21  A.   Simply put, Dr. Engel's routing model can't

22  tell the difference between dry days and rainy days

23  in the Illinois River Watershed.

24  Q.   Let's talk about the test that you ran where

25  you -- I think you said you increased the wastewater

1  treatment plant loads and the nonpoint source

2  inputs, right?

3  A.   Yes, I did.

4  Q.   What was the purpose of that analysis?

5  A.   Well, the purpose was to check the model to

6  determine -- the question I was asked is this:  Can

7  that routing model -- can it actually pin down the

8  loadings from the watershed and relate -- and make

9  them fit, tightly constrain them to the observed

10  loads at the bottom of the watershed.

11        And to test whether -- to test how tight

12  the connection is between the loads Dr. Engel put in

13  and his observed loads at the bottom of the

14  watershed, I changed the loads that he put in and

15  determined whether or not the model could still fit

16  the loads at the bottom of the watershed.

17  Q.   For your expert report, Doctor, did you prepare

18  a chart illustrating the magnitude of the increases

19  that you applied to these input values?

20  A.   Yes, I did.

21  Q.   Could you turn to tab 3 in your binder and find

22  Defendants' Joint Exhibit 2415.

23  A.   Yes, I'm there.

24  Q.   And for the record, could you identify

25  Defendants' Joint Exhibit 2415.

1  A.   Yes.   That's Figure 20 from my expert report.

2  Q.   And what's the source of the information or

3  data shown on Defendants' Joint Exhibit 2415?

4  A.   The top panel contains the inputs that I used

5  for wastewater treatment plants for the second of my

6  four tests.   The bottom panel contains the nonpoint

7  source phosphorus loadings I used for the third of

8  my four tests.

9  Q.   Doctor, did you prepare Defendants' Joint

10  Exhibit 2415?

11  A.   Yes, I did.

12         MR. GEORGE:   Your Honor, at this time, we'd

13  offer into evidence Defendants' Exhibit 2415.

14         MR. PAGE:   No objection.

15         THE COURT:   2415 is admitted.

16  Q.   (By Mr. George) Doctor, what does this figure

17  show about the magnitude of the increases in this

18  particular test that you applied to the wastewater

19  treatment plant loads and the nonpoint source

20  loads?

21  A.   Again, I'll note again that the model was run

22  for 19- -- for each year from 1998 to 2006.   So we

23  see bars for each year.   Let's look at the green

24  bars.   The green bars are there just for reference.

25  They represent Dr. Engel's observed phosphorus loads

1  to Lake Tenkiller.

2          The red bar -- let's go to the top panel.

3  For the top panel, the red bar represents the

4  magnitudes of the wastewater treatment plant loads

5  that Dr. Engel put into his routing model.  And the

6  blue bars represent the substantially increased

7  wastewater treatment plant loads that I put into his

8  model to conduct that test.

9  Q.   Your Honor -- I'm sorry.  Doctor, are these

10  plots linear or log scale?

11  A.   No, it should be noted that they're log scale.

12  The loads that I put in are much, much larger than

13  the loads Dr. Engel put in.  That is apparent from

14  looking at these plots.

15  Q.   With respect to the bottom panel, can you

16  describe the magnitude of the increases you applied

17  to the nonpoint source loads in this test?

18  A.   Yes.  The convention is the same.  The green,

19  for reference, represents Dr. Engel's observed

20  phosphorus loads at the bottom of the watershed.

21  The red in this case on the bottom panel represents

22  the nonpoint source loads from Dr. Engel's GLEAMS

23  model, by the way, that he put into his routing

24  model.  And, again, the blue bars represent the

25  nonpoint source loads that I put into his model.

1  Q.  Doctor, after these loads were increased and

2  the model was reran, did you compare the results to

3  the results of Dr. Engel?

4  A.  Yes.  I did the same thing here.  I -- with my

5  loads, I attempted to recalibrate Dr. Engel's

6  routing model.

7  Q.  And how did those loads compare?

8  A.  The -- the wastewater treatment plant load was

9  -- the load that I put in was, I think, 345 times

10 the load that Dr. Engel put into the model.  The

11 nonpoint source load was 15 times higher than his

12 nonpoint source load.

13 Q.  And how did the results of that test compare,

14 observed versus predicted, with Dr. Engel's?

15 A.  I was able to recalibrate Dr. Engel's routing

16 model for both of these cases, and achieved R

17 values that were equal to or better than his.

18 Q.  Doctor, what, if any, conclusions did you draw

19 from this test?

20 A.  Well, I guess, simply put, Dr. Engel's routing

21 model can't tell the difference between the loads he

22 put into the model and the wildly unrealistic loads

23 that I put into the model.

24 Q.  Let's talk about -- I think you referred to it

25 as the S&P 500 test?

1  A.  Yes.

2  Q.  What was the purpose of that analysis?

3  A.  Well, after seeing results from these first

4  three tests, it became apparent to us that we could

5  put in numbers over extremely wide ranges, and the

6  model could still be calibrated to the observed

7  data.

8       So I guess we decided to see how far we

9  could push it, and we said -- I just -- I took

10  made-up numbers that had nothing to do with

11  phosphorus loads, we put them into the model, and

12  that was the S&P 500 test.

13  Q.  Doctor, when you did that, were you able to

14  produce loads that matched the observed loads of the

15  downstream?

16  A.  Yes.  Again, I was able to recalibrate that

17  model and achieve calibrated -- results as good as

18  Dr. Engel's original model.

19  Q.  Doctor, did you provide in your expert report a

20  chart setting out the results of this analysis?

21  A.  Yes, I did.

22  Q.  Could you turn in your binder to -- I believe

23  it's tab 4, and find Defendants' Joint Exhibit

24  2416.

25  A.  Yes.

1  Q.   For the record, could you identify Defendants'
2  Joint Exhibit 2416.
3  A.   That's Figure 21 from my expert report.
4  Q.   Doctor, did you prepare Defendants' Exhibit
5  2416?
6  A.   Yes, I did.
7  Q.   Can you identify the source of the information
8  or data that is shown in this exhibit?
9  A.   I ran this test only for the Illinois River
10  subwatershed, which is the largest of the three.
11  The top panel actually contains the same results.
12  They contained Dr. Engel's results for his
13  calibration and purported validation for his routing
14  model.  That's from his expert report.  The bottom
15  panel contains the results from the S&P test I
16  conducted.
17          MR. GEORGE:  Your Honor, at this time, we'd
18  offer into evidence Defendants' Joint Exhibit 2416.
19          THE COURT:  Any objection?
20          MR. PAGE:  No objection.
21          THE COURT:  Defendants' 2416 is admitted.
22  Q.   (By Mr. George)  Doctor, what conclusions, if
23  any, did you draw from this analysis?
24  A.   I guess the simplest way to state it is,
25  Dr. Engel's routing model can't tell the difference

1   between phosphorus loads that are realistic and

2   numbers that are completely made up.

3   Q.   What is it, Doctor, about Dr. Engel's routing

4   model that allows it to consistently produce similar

5   results, despite changes in the inputs?

6           MR. PAGE:  Objection, Your Honor.  This

7   witness said he recalibrated the model.  It's not

8   the same model.  That question is misleading.

9           MR. GEORGE:  Your Honor, I think that's

10  material for cross-examination, if he wants to

11  explore it.

12          THE COURT:  Overruled.

13  Q.   (By Mr. George)  Can you answer the question,

14  please?

15  A.   Please repeat the question.

16  Q.   Sure.  What is it about Dr. Engel's routing

17  model that allows it to consistently produce similar

18  results, regardless of the changes in the inputs?

19  A.   Well, there are two things.  It's an empirical,

20  statistical equation.  It does not explicitly

21  represent any of the physical, chemical and

22  biological processes that actually influence the

23  transport, fate, delivery, the journey, the pathway

24  of phosphorus through the Illinois River stream and

25  network.  In a sense, it's a free-spinning wheel.

 1          Another reason is that in each case when
 2  Dr. Engel conducted his calibration and purported
 3  validation, he compared what he called his predicted
 4  loads to observed loads.  I need to take a step back
 5  and set a foundation again.
 6          The phrase "observed loads" is widely used,
 7  but it's -- strictly speaking, that's a misnomer.
 8  One doesn't observe loads.  One observes flow, and
 9  one observes concentration.  And when you multiply
10  the two together, you get load.
11          So the X axis on all these plots we've
12  looked at are Dr. Engel's observed loads at the
13  outlet station at the bottom of the watershed, and
14  they were computed by multiplying USGS flow times
15  concentration.
16          What Dr. Engel did is his predicted loads
17  on the vertical axis were not independently
18  determined, because he also used the measured USGS
19  flows at the bottom of the watershed to determine
20  the predicted loads on the Y axis.  So we have
21  measured flow on the Y, measured flow on the X.  And
22  flow is a dominant influence on loads to Lake
23  Tenkiller.  So if you've got the same -- if you've
24  got flow on the vertical and flow on the horizontal,
25  then, in a sense, when you do these regressions,

1    you're almost regressing flow on itself, and you're

2    almost guaranteed to get good results.

3    Q.    Doctor, as a scientist with 36 years of

4    experience with models, what do these tests that

5    we've been discussing tell you about the integrity

6    and reliability of Dr. Engel's models?

7    A.    Well, in my opinion, the results from

8    Dr. Engel's models are not scientifically

9    defensible, they're not valid, and they're simply

10   not reliable.

11   Q.    Doctor, does that opinion you just expressed

12   apply to both the GLEAMS application and the routing

13   model?

14   A.    Yes, it does, for reasons I set forth in my

15   report.

16   Q.    Did the corrections that Dr. Engel made to his

17   work between his original report and his errata

18   report confirm your opinion in any way?

19   A.    Well, they actually did, because all the tests

20   that we've been speaking about that I conducted were

21   the basis for my own opinions, but Dr. Engel's

22   errata represents the product of his own work.  And

23   he independently confirmed that his models give the

24   same answer whether he includes the entire watershed

25   or leaves half of it out.  And that's completely

1  independent of anything I did.

2  Q.   Dr. Engel testified on direct in this case that

3  he omitted, I think, 23 hydrologic response units in

4  the model runs to support his original report.

5  You've reviewed that testimony, haven't you?

6  A.   Yes, I did.

7  Q.   As part of your work in this case, did you

8  evaluate the size of each of Dr. Engel's HRUs?

9  A.   Yes, I did.

10  Q.   And what percentage of the total land area in

11  the watershed did Dr. Engel omit from his original

12  report?

13  A.   Fifty-four percent.

14  Q.   Now, Dr. Engel explained in his testimony from

15  that stand how it was that his model could omit half

16  the watershed and still generate the same answer.

17  Have you reviewed that testimony?

18  A.   Yes, I have.

19  Q.   And I've reviewed it as well.  Can you help us

20  by explaining your understanding of what Dr. Engel

21  is describing as the explanation for that.

22  A.   Yes.  The code was originally set up with a do

23  loop index to go from one to nine to capture all the

24  HRUs.  It was set up first on Caney Creek.  There

25  are -- in Dr. Engel's GLEAMS model, there were 21

 1  HRUs in the Illinois River subshed, 20 in Barren

 2  Fork, and 9 in Caney.  Code was developed for Caney,

 3  copied over into the other folders.  The do loop

 4  index wasn't changed.  It remained at 9, so it

 5  captured all 9 in Caney, and only the first 9 of 20,

 6  21 in Illinois, and the first 9 of 20 in Barren, so

 7  it left out 23.

 8          So to answer your question, how could it

 9  give the same answer, well, the -- Dr. Engel had a

10  calibration algorithm called the shuffled complex

11  evolution algorithm.  I'll call it SCE for short.

12          The SCE algorithm was given a model

13  calibration target, and the model calibration target

14  was where the loads -- Dr. Engel's observed loads to

15  Lake Tenkiller at the bottom of the watershed.

16          And what the SEC algorithm did, it iterated

17  through the GLEAMS model, it ran it over and over

18  again, and it changed the values of seven model

19  input parameters so as to ensure that the output of

20  the GLEAMS model matched that target.

21  Q.   Doctor, is that an appropriate adjustment, in

22  your view?

23  A.   Well, not -- well, not in this case, because

24  what the parameter that that algorithm adjusted, the

25  way it worked is that it adjusted primarily the rate

1    of application of animal waste phosphorus.

2            And basically what it did in this case, to

3    give the same answer, is the algorithm added more

4    load, it added all the load it needed to the parts

5    of the watershed that Dr. Engel did include to

6    compensate for the half that he left out.  And that

7    just simply is not scientifically defensible nor

8    does it represent the reality of how animal waste is

9    actually applied in the Illinois River Watershed.

10   Q.   Doctor, you've mentioned a time or two

11   calibration targets.  What were the calibration

12   targets for Dr. Engel's models?

13   A.   The calibration targets were his observed

14   phosphorus loads at the bottom of the watershed at

15   the three outlet stations, and he used these targets

16   for both his GLEAMS model and his routing model.

17   Q.   Could you turn in your binder to tab 5 and find

18   Tyson Demonstrative 248.

19   A.   Yes, I'm there.

20   Q.   Doctor, did you prepare this demonstrative

21   exhibit?

22   A.   Yes, I did.

23   Q.   And can you describe generally what this

24   exhibit is.

25   A.   Yes.  Let's work backwards from the locations

1  of the three USGS gauges at the bottom of the

2  watershed.  The watershed area above each -- there

3  are three gauges, three subwatersheds, one above

4  each of these gauges, and one is the Illinois, one

5  is Barren Fork, and one is Caney Creek.  What the

6  graphic shows, it actually shows the stream and

7  river networks within each of these subwatersheds.

8  Q.   Doctor, using this demonstrative, can you

9  explain the problems, in your view, with Dr. Engel's

10  calibration approach?

11  A.   Well, the calibration approach -- and I'm

12  speaking specifically with GLEAMS here.  The

13  calibration targets that Dr. Engel used for his

14  GLEAMS model simply do not correspond to what the

15  GLEAMS model actually computed.  That's the

16  problem.

17          The GLEAMS model actually computes runoff

18  of nonpoint source phosphorus to edges of fields.

19  And those represent locations that are spatially

20  distributed throughout the entire watershed.  Some

21  of them intersect these tributaries, some don't.

22          However, the calibration target that

23  Dr. Engel used was the loadings to Lake Tenkiller.

24  As I said, one, that's apples and oranges; that's

25  not what GLEAMS is computing.

```
 1          Number two, the locations at which GLEAMS
 2 is computing these loads to edges of field are
 3 spatially distributed throughout the watershed, and
 4 they are located in some cases up to a hundred miles
 5 away from the points in space where his calibration
 6 targets were computed.  So that makes no sense.
 7 Q.   Is this calibration approach scientifically
 8 defensible, in your view?
 9 A.   Not in my opinion, no.
10          MR. GEORGE:  Your Honor, this is sort of a
11 transition point, if we'd like to take our
12 midmorning break.  It would be convenient for me,
13 but I'd defer to you, obviously.
14          THE COURT:  It would be convenient.  And
15 back here in the gallery, we have Mr. John Boozer,
16 who's a student at the University of Oklahoma.
17 Welcome.  And, gentlemen, feel free to introduce
18 yourselves to Mr. Boozer.  If he has any questions,
19 please make yourself available.
20          MR. GEORGE:  Thank you, Your Honor.
21          THE COURT:  We'll be in recess.
22          (Whereupon a recess was had.)
23          THE COURT:  You may proceed.
24          MR. GEORGE:  Thank you, Your Honor.
25 Q.   (By Mr. George)  Dr. Bierman, I want to go back
```

1   for just a moment to Demonstrative 248, which is a

2   map of the watershed.  And I want to ask you, if you

3   could, to get out of your chair and go to the

4   screen.  And I want to go back through and have you

5   explain again because, frankly, I got a little lost,

6   and maybe some others did, too, the issue with the

7   spatial distribution of edge-of-field locations in

8   reference to these algal stations.  Okay?  Could you

9   do that, please.

10  A.   So the context is the calibration of

11  Dr. Engel's GLEAMS and routing models?

12  Q.   Yes, sir.

13  A.   Okay.  First, what Dr. Engel's GLEAMS model

14  actually computes are nonpoint source phosphorus

15  loads to edges of fields.  And those locations are

16  distributed throughout the entire watershed.  Some

17  of them abut these tributaries, and some of them

18  don't.  But they're spatially distributed throughout

19  the Illinois River, Barren Fork and Caney creek.  So

20  that's the first point.

21        The calibration targets -- this is an

22  important point.  The calibration targets that

23  Dr. Engel used for both of his models are the same,

24  the -- his observed phosphorus loads to Lake

25  Tenkiller at the three outlet stations at the

1  bottoms of the watersheds.

2          So for the GLEAMS model, even though it

3  computed runoff and nonpoint source phosphorus loads

4  at the edges of fields that were spatially

5  distributed throughout the entire watershed, he

6  calibrated them by comparing them to loads at the

7  very bottom.  That's not what GLEAMS computed,

8  number one.  And number two, those locations are up

9  to a hundred miles away from the locations where the

10 GLEAMS model was actually computing its results.

11         So in my opinion, that's not a credible

12 approach.

13         The -- should I proceed --

14 Q.  One more question, Doctor.  Did he have

15 available data that is more close in proximity to

16 some of these locations?

17 A.  Well, yes.  The plaintiffs collected almost 150

18 edge-of-field samples, and Dr. Engel did not use

19 those samples to compare with the results of his

20 GLEAMS model.

21 Q.  Thank you.  Could you retake the chair,

22 please.

23 A.  You asked me about the routing model?

24 Q.  I'm sorry.  Doctor, please explain the issue

25 with respect to the routing model.

A.    The routing model -- the inputs to the routing

model are the nonpoint source phosphorus loadings

from Dr. Engel's GLEAMS model plus wastewater

treatment plant loadings that he determined

separately, all outside the model.

He puts those into the routing model.  And

again, the calibration targets are the three -- are

his observed phosphorus loads at the bottom of the

watershed.

So the routing model makes the connection

between the loads he computed at the edges of

fields, again, distributed throughout the watershed,

and these three stations at the base of the

watershed.

And the issue there is that he ignores

everything that happens in between the edges of

those fields and these three stations.  He does not

explicitly represent any of the transport, fate or

delivery processes in over 3,000 miles of the

watershed.

And, furthermore, those weren't the only

data available to him, because distributed

throughout the watershed in the stream and river

network, there are almost -- there are about 250

sampling stations, and there are over 3,000

1  measurements of total phosphorus available that he

2  could have used and, in my opinion, should have used

3  to calibrate the routing model, but he ignored them

4  all and leap-frogged the whole system and went right

5  down to the three stations at the base of the

6  watershed.

7  Q.   Thank you, Doctor.  Let's turn now to

8  Dr. Wells' work.  You reviewed Dr. Wells' work as

9  well; is that right?

10  A.   Yes, I did.

11  Q.   Dr. Wells testified on direct examination that

12  his model runs on phosphorus loads at the three USGS

13  stations.  Did you review that testimony?

14  A.   Yes.  The end point for Dr. Engel's model is

15  basically the starting point for Dr. Wells' model.

16  Q.   What is the source of the phosphorus loading

17  inputs that feed into Dr. Wells' lake model?

18  A.   The loadings that Dr. Wells used to calibrate

19  his model for Lake Tenkiller were provided by

20  Dr. Engel.

21  Q.   Did some of those loadings come from the output

22  of Dr. Engel's model?

23  A.   None of the loads that Dr. Engel provided to

24  Dr. Wells for calibration of his model came from

25  Dr. Engel's model.

1  Q.   What about the loads that were used for some of

2  the prediction scenarios?

3  A.   All of the loads that Dr. Wells used for all of

4  his prediction scenarios, as well as his long-term

5  hindcast scenario, they were predictions and

6  hindcasts from Dr. Engel's model.

7  Q.   In your opinion, are Dr. Wells' modeling

8  predictions from his lake model adversely affected

9  by the phosphorus load predictions from Dr. Engel?

10  A.   Yes.  All of Dr. -- the input loadings that

11  Dr. Wells used for all of his predictions are flawed

12  and unreliable and, hence, all of Dr. Wells'

13  calculations with his lake model for water quality

14  in the lake are flawed and unreliable.

15  Q.   Doctor, did you evaluate the CE-QUAL-W2 model?

16  A.   Yes, I did.

17  Q.   In particular, did you evaluate the application

18  of Dr. Wells of that model to Lake Tenkiller?

19  A.   Yes, I did.

20  Q.   Prior to your work in this case had you had any

21  experience with CE-QUAL-W2?

22  A.   Prior to this case, I personally never operated

23  CE-QUAL-W2.  This goes back to a statement I made

24  previously.  I've not used that modeling tool.  In

25  fact, for my work in Chesapeake Bay, the Potomac, I

1  used CE-QUAL-ICM, which is a far more sophisticated

2  version of CE-QUAL-W2.

3          And the second point is that the science

4  underlying CE-QUAL-ICM and the science underlying

5  every water quality and watershed model I've ever

6  done is the same science that's in CE-QUAL-W2.

7  Q.   Did Dr. Wells use the official released version

8  of CE-QUAL-W2 for his evaluations in this case?

9  A.   No, he did not.

10  Q.   What type of model did he use?

11  A.   Well, he used what's called a beta version.

12  Q.   What is a beta version of a model?

13  A.   A beta version is a version that has passed

14  preliminary testing and then it's released to a

15  limited number of users for further usability

16  testing.  It provides the opportunity for any bugs

17  to be discovered and reported back to the developers

18  and then fixed.

19  Q.   What is your understanding of the differences

20  or changes between this beta version used by

21  Dr. Wells and the official release version at that

22  time?

23  A.   There was a pretty long list of enhancements

24  and bugs in the transition from the official

25  released version to the beta version, but the

1  enhancement that's most relevant to Dr. Wells' use of

2  the model in this case is that the beta version was

3  given the capability to exploit computers with dual

4  processors, and it allowed it to run much faster.

5  Q.   Do you know whether Dr. Wells ran his beta

6  version of the model for this case on a dual

7  processor?

8  A.   Yes.  He told us that that's what he did.

9  Q.   Doctor, have you ever heard of the concept of

10 code verification as it relates to computer-driven

11 environmental models?

12 A.   Yes, I have.

13 Q.   Could you explain what that is.

14 A.   Well, code verification, it involves focusing

15 on the computer code, the numerical solution method

16 and ensuring that the computer code solves the

17 equations correctly and provides the correct

18 mathematical answers.

19 Q.   Did you run any tests on the beta version lake

20 model used by Dr. Wells?

21 A.   Yes, I did.

22 Q.   And could you describe why you ran those tests

23 and what type of tests they were?

24 A.   Yes.  We took a similar approach with

25 Dr. Wells' model, and that is we reviewed his model

1  files.  We had no problem running his model.  We

2  must have run his model -- several hundred times, we

3  ran his model.  But in seeking to reproduce the

4  results in his expert report, we simply couldn't do

5  it.  We got close, but we couldn't get there.

6        And Dr. Wells had given us -- his files

7  were well documented, well organized.  He gave us

8  very specific instructions about what files he used,

9  how he put them together.  And we followed his

10 instructions exactly.  We still couldn't get there.

11 So we took one step back and said basically let's

12 verify the code.

13 Q.  And have you heard of the term called

14 "replication test"?

15 A.  Well, yes.  Basically that's what we did.  Out

16 of frustration, actually, that we couldn't reproduce

17 the results, we backed up and said, let's see if we

18 can take this model, same input file, same model,

19 run it once on the computer and then run it again,

20 same thing, and see if we get the same answer twice

21 in a row.

22        And, in fact, we tried that.  And to our

23 surprise, we got different results the second time.

24 Q.  How significant were the differences between

25 the consecutive model runs and your replication

1  tests?

2  A.   Well, it depends on what parameter one looks

3  at, and it depends on what point in time and what's

4  space on the lake.  So it depends.

5        For example, we looked -- we did a detailed

6  analysis of temperature.  On average, the run-to-run

7  differences with the same model were on the order of

8  one to two percent.  Some were higher; some were

9  lower.  In absolute terms, .1, .2 degrees

10 centigrade.

11 Q.   Are percent changes in those ranges significant

12 in terms of the reliability or validity of

13 Dr. Wells' model?

14 A.   Well, again, it depends.  Depends on context.

15 For the calibration, those differences would be less

16 significant.  For example, if the lake is at -- if

17 lake water is at 20 degrees centigrade, which is

18 about 68 degrees, then a tenth, two-tenths of a

19 degree absolute difference is only about a percent,

20 so that's not -- probably would not affect the

21 calibration very much.

22        But if one is using that calibration to

23 compare two different scenarios in which temperature

24 is important -- and it was in this case because the

25 fish habitat volumes that Dr. Welch worked with

 1  depended on both temperature and dissolved oxygen.

 2  If the difference between two scenarios is, say, two

 3  degrees centigrade, then a discrepancy of .2 degrees

 4  is, of course, much more significant.

 5         But I think that really the overarching

 6  issue to me is that the scientific community would

 7  simply not accept the results from any model if the

 8  model couldn't -- if the results were not capable of

 9  being replicated.  That's just not consistent with

10  the scientific method.

11  Q.  Doctor, are you the only one who has discovered

12  this replication problem?

13  A.  No, we're not.

14  Q.  Who else?

15  A.  This problem occurred --

16         MR. PAGE:  Objection, Your Honor, hearsay.

17         THE COURT:  Sustained.

18  Q.  (By Mr. George)  Do you have any personal

19  knowledge of this issue being discovered

20  independently by other scientists?

21         MR. PAGE:  I think that still calls for

22  hearsay.

23         MR. GEORGE:  Let me back up and lay a

24  foundation.

25         THE COURT:  Thank you.

1  Q.   (By Mr. George)  Doctor, have you been involved

2  in a TMDL that EPA is conducting in the state of

3  Washington?

4  A.   It's the Spokane River.

5  Q.   You've been involved in that?

6  A.   My company is involved, Dr. David Dilks is

7  involved, and he's one of the four core members of

8  my project team in this case.

9  Q.   Do you know whether or not this issue of

10  replication has been one of the issues that has come

11  up in the context of that Spokane River EPA TMDL?

12          MR. PAGE:  Your Honor, it still calls for

13  hearsay.  I have no ability to cross-examine

14  Dr. David Dilks.  He's going to repeat what he heard

15  from Dr. Dilks.

16          THE COURT:  I think that's correct.

17  Sustained.

18  Q.   (By Mr. George)  All right.  Dr. Bierman, do

19  you know whether or not Dr. Wells has released a

20  correction on his website related to CE-QUAL-W2?

21  A.   Yes.  There are updated release notes that

22  appear on the Portland State University website

23  pertaining to this version of the model.

24  Q.   And do those updates attempt to address the

25  replication issue?

1  A.   There's an update that appears to relate to the

2  replication issue, because the whole purpose -- one

3  purpose of developing the beta version was to give

4  the model the capability to utilize dual

5  processors.

6         This update now allows the user the option

7  of simply backstepping and selecting only a single

8  processor.  That doesn't seem to make sense on its

9  face, because if the purpose of the enhancement was

10  to make it run faster, you put out an update that

11  allows you now to run it slower.

12  Q.   Let's move away --

13         MR. PAGE:  Your Honor, I move to strike

14  that answer.  I think it was speculation on his

15  part.  He didn't link up how the dual processor

16  option had any relationship to a replication issue

17  that he has testified to.

18         THE COURT:  When you -- let me get a

19  clarification here.

20         The question here on real-time was, Do

21  those updates attempt to address the -- says

22  "representation issue," but "replication issue,"

23  right?

24         MR. GEORGE:  Correct, Your Honor.

25         THE COURT:  And the answer didn't appear to

 1   address replication but, rather, the fact that it

 2   didn't make sense because you could take a back step

 3   to use a single processor, and it doesn't make sense

 4   to use an update to run it slower.  I think the

 5   objection is proper.  Sustained.  Go ahead.

 6           MR. GEORGE:  Let me rephrase, Your Honor.

 7   Q.  (By Mr. George)  Dr. Bierman, what's your

 8   understanding of the issues that were addressed by

 9   the update to the CE-QUAL-W2?

10   A.  My understanding of the update is that it

11   pertained to the issue of the dual processor versus

12   single processor.  And if I could add that we not

13   only determined there was a replication problem, we

14   actually dove deeper.  We ran the -- as we

15   discovered by accident, we ran the model on

16   dual-processor machines --

17           MR. PAGE:  Your Honor --

18           THE COURT:  Go ahead.

19           MR. PAGE:  -- I object.  It's not

20   responsive to the question asked.

21           THE COURT:  I'm not sure it's not.

22   Overruled.  Go ahead.

23           THE WITNESS:  We drilled deeper.  We have a

24   large number of modeling computers at LimnoTech,

25   most of them are dual-core processors.  Some of them

1  are single core.  We ran some of these tests on

2  single-core processors and discovered that if we ran

3  it twice -- if we ran it multiple times on a single

4  processor machine, it did, in fact, replicate.  If

5  we ran it multiple times on dual-core processor

6  machines, it did not replicate.  And those files are

7  in my produced materials.

8  Q.   (By Mr. George)  Thank you, Doctor.  Let's move

9  away from the inner workings of these models for a

10  moment and talk about input data and assumptions.

11       Did you review Dr. Engel's testimony in

12  this case that once phosphorus begins to move off of

13  a field, it will necessarily continue in motion and

14  reach the reservoir at the bottom of a watershed?

15  A.   Yes, I did.

16  Q.   Do you agree with that assumption?

17       MR. PAGE:  Objection, Your Honor, this is

18  not part of his expert report.  This is new

19  analysis.

20       MR. GEORGE:  I'm asking the witness to

21  comment on something that Dr. Engel said from the

22  stand.

23       THE COURT:  Overruled.

24  Q.   (By Mr. George)  Doctor, do you agree with that

25  assumption?

1  A.   Please state the question again.

2  Q.   Sure.  You reviewed Dr. Engel's testimony that

3  once phosphorus begins to move off of a field, it

4  will necessarily continue in motion and reach the

5  reservoir at the bottom of a watershed.  You

6  reviewed that testimony?

7  A.   Yes, I did.

8  Q.   Do you agree with that assumption or statement?

9  A.   No, I don't.

10  Q.   Why not?

11  A.   Well, I'll answer it in three parts.  If

12  there's a molecule of phosphorus in the middle of a

13  field, and it begins moving toward the edge of

14  field, it's not correct to assume that it will

15  necessarily and inevitably make it there.

16        One reason is that there are many physical,

17  chemical and biological processes that can impact

18  the transport and fate of the journey.  Another

19  reason is that there might not be a pathway for it

20  to make it there.

21        Another reason could be that as it gets

22  near the edge of field, it might see a buffer strip

23  and be unable to penetrate.

24        I should point out that buffer strips

25  aren't the only best management practice.  There's a

1  whole universe of Best Management Practices out

2  there that have been developed by federal and state

3  agencies to be put in place on land simply for the

4  specific purpose of preventing that from happening.

5       The second part of my answer is -- let's

6  jump head, let's suppose it makes it to the edge of

7  field.  It may or may not enter a stream and river

8  network.  For one reason, the edge of field may or

9  may not intersect a stream.  It might intersect a

10  puddle, a lake, a ditch, a pond.  It might intersect

11  a road.

12       Finally, let's take the third step.  If it

13  does enter -- manage to enter the stream and river

14  network -- and in this case, it would have to travel

15  a hundred or so miles to make it to Lake

16  Tenkiller -- again, there are many physical,

17  chemical and biological processes that influence the

18  fate, pathway and delivery, and impact the journey.

19  Q.   Doctor, does Dr. Engel's routing equation

20  actually model any of the fate and transport

21  processes that you just described?

22  A.   It does not explicitly model any of them.

23  Q.   Are there computer models out there that

24  actually account for and represent the fate and

25  transport processes affecting a substance such as

1  phosphorus as it moves through a stream system?

2  A.   Yes, there are.

3  Q.   Could you provide the court with just a couple

4  of examples of those.

5  A.   AQUATOX, WASP, the stream and river network

6  component of the HSPF model, just to name three.

7  Q.   Doctor, have you ever heard the phrase "garbage

8  in, garbage out" applied to computer-driven

9  environmental models?

10  A.   Yes, I have.  I think I use that occasionally

11  myself.

12  Q.   What does that term -- what does that phrase

13  mean in terms of input data?

14  A.   Well, take a step back.  Models synthesize

15  data.  Models are not a substitute for data.  Given

16  that, if you put flawed and unreliable data into the

17  model, you're going to get flawed and unreliable

18  results out.

19  Q.   Doctor, you saw in my cross-examination of

20  Dr. Engel that I covered a lot of the assumptions he

21  made about litter applications.  And I don't want to

22  drill into necessarily that area and repeat that

23  with you.  But let's talk about the input data that

24  Dr. Engel used for land cover or land uses in the

25  watershed.

```
 1  A.   Yes.
 2  Q.   What dataset did Dr. Engel use for land cover
 3  or land uses in the watershed?
 4  A.   He began with the National Land Cover Dataset,
 5  NLCD.
 6  Q.   Who maintains that dataset?
 7  A.   My understanding is it's the USDA.
 8  Q.   What generally does that dataset show?
 9  A.   Well, it's remotely sensed imagery, and it
10  shows land, and it comes with a number of codes that
11  represent different operational categories of land
12  cover.
13  Q.   If a modeler is using the National Land Cover
14  Dataset, does the modeler have to make some
15  interpretations of those codes?
16  A.   Yes.  The codes don't correspond directly to
17  urban land, pastureland, forest, cropland.  The user
18  needs to determine first what are the
19  characteristics of the site of the watershed for the
20  particular site-specific application and then make
21  judgments about how to use those codes to classify
22  areas for the particular watershed model.
23  Q.   Now, is the land cover -- I'm sorry, the
24  National Land Cover Dataset a dataset that's
25  commonly used in the watershed modeling community?
```

```
 1   A.   Yes.

 2   Q.   Have you reviewed Dr. Engel's land use

 3   classification inputs into his model to determine

 4   whether his judgments are accurate and realistic

 5   representations of the actual land uses?

 6   A.   Yes.

 7   Q.   How did you conduct that review or

 8   investigation?

 9   A.   Well, we -- I overlaid aerial infrared imagery,

10   looked at overlays of imagery --

11          MR. PAGE:  Your Honor, I'm going to

12   object.  This witness testified in his deposition

13   that he actually did not do this work and that he

14   actually has never done this work before.  I think

15   it's a lack of foundation and it's hearsay.

16          THE COURT:  Response?

17          MR. GEORGE:  Your Honor, Dr. Bierman has

18   testified that -- first of all, that's material for

19   cross-examination.  But, secondly, Dr. Bierman has

20   testified that he worked with a staff and he

21   reviewed all of their work product, and the opinions

22   and testimony he's providing today are his own.

23          THE COURT:  Overruled.

24   Q.   (By Mr. George) Doctor, could you continue

25   describing how you conducted that investigation.
```

1  A.    Yes.   Aerial infrared imagery was overlaid with

2  portions of Dr. Engel's land use classifications,

3  and we noted a number of discrepancies in his

4  classification of pastureland.

5  Q.    Doctor, did you include any of those overlay

6  figures in your report?

7  A.    Yes, I did.

8  Q.    Could you turn to -- let's talk about them in a

9  group first -- tab 6, 7 and 8 in your binder, which

10  for the record are Defendants' Joint Exhibits 2398,

11  2399, and 2400.

12          Could you identify those exhibits for the

13  record, please.

14  A.    Yes.   Those are all figures from my expert

15  report.

16  Q.    And could you describe generally, without

17  getting into the details of a specific exhibit, the

18  source of the information that is shown in those

19  exhibits.

20  A.    Yes.   They're overlays of Dr. Engel's

21  classifications in his model, GLEAMS model input

22  files that he derived from the NLCD data overlaid

23  with aerial infrared imagery, and we attempted to

24  check Dr. Engel's classifications to determine if

25  they were accurate and correct.

1  Q.   Doctor, are these three exhibits the product of

2  the investigation and review that you just testified

3  about?

4  A.   We found many discrepancies.  These are simply

5  illustrative results.

6          MR. GEORGE:  I move for the introduction of

7  Defendants' Joint Exhibits 2398, 2399 and 2400.

8          THE COURT:  Any objection?

9          MR. PAGE:  Yes, Your Honor.  The objection

10  is on the same basis that I objected to his

11  testimony.  This witness did not do this work nor

12  does he have experience in doing this type of aerial

13  photo interpretation.

14          THE COURT:  Overruled.  Exhibits 2398,

15  2399, and 2400 are admitted.

16  Q.   (By Mr. George) Now, Doctor, let's start with

17  Exhibit 2398 which is behind tab No. 6.

18  A.   Yes.

19  Q.   Can you describe what is shown in Defendants'

20  Exhibit 2398?

21  A.   Yes.  This is an example of how land which was

22  actually forested land was classified by Dr. Engel

23  as pasture in his GLEAMS model input files.

24  Q.   And with reference to the images, could you

25  point out some examples of that misclassification?

1  A.   Yes.  Let's look at the bottommost panel.  And

2  we have a legend there that says, "Engel classified

3  forest as forest," and the arrows point to those

4  dark red portions.  The aerial infrared imagery

5  reveals that, in fact, they are forest; and, in

6  fact, Dr. Engel classified that area as forest.

7         However, if we move over, the arrow that

8  says, "Engel classified forest as pasture," that's

9  the same type of land.  The aerial infrared imagery

10  saw forest.  The shaded overlay indicates that

11  Dr. Engel classified that as pasture.

12  Q.   Turn to Defendants' Exhibit 2399, which is

13  behind tab No. 7.  And could you describe what is

14  shown in that exhibit.

15  A.   This is the same type of format, except here it

16  depicts examples of urban land that Dr. Engel

17  classified as pasture.

18  Q.   Finally, could we turn to Defendants' Exhibit

19  2400, which is behind tab No. 8.

20  A.   Yes.

21  Q.   And, Doctor, could you describe what is shown

22  in this exhibit.

23  A.   Again, the format is the same as the three

24  previous pictures, but here this illustrates that

25  what the infrared imagery saw as roads were actually

1  classified as pastureland in Dr. Engel's GLEAMS

2  input files.

3  Q.   Are the areas shown in the last three exhibits

4  that we just discussed the only instances of

5  miscalculation that you found in your investigation?

6  A.   No.   There were many other instances.   We

7  prepared these as simply illustrative examples.

8  Q.   What is the impact, if any, of these

9  misclassifications of lands as pastures on the

10  reliability of Dr. Engel's modeling work?

11  A.   Well, in watershed models, if you don't get the

12  land use types right, you can't get the nonpoint

13  source runoff right.   And the reason is that if a

14  rainfall event occurs and if runoff occurs, the

15  amount of runoff one gets, the amount of phosphorus

16  per unit area one gets really depends on the type of

17  land cover that the precipitation hits.   So if you

18  want to get the loads right, you need to get the

19  land right.

20       Now, with respect to pasture, Dr. Engel

21  classified more land as pasture in his model than

22  actually exists in the real world in the Illinois

23  River Watershed.

24       So one consequence would be that his model

25  would overestimate the nonpoint source load from

1  pasture.  As another consequence --

2          MR. PAGE:  Objection, Your Honor, this is

3  speculation.  The witness hasn't provided any

4  foundation to support his opinion.

5          THE COURT:  Overruled.

6  Q.  (By Mr. George)  Please continue, Doctor.

7  A.  Another consequence is that inside Dr. Engel's

8  model, animal waste phosphorus is being applied to a

9  larger pasture area than it actually is applied in

10 the real world in the Illinois River Watershed.

11 Q.  Let's move to urban areas.  Doctor, did you

12 review the input values and assumptions that

13 Dr. Engel used in his model to simulate runoff of

14 phosphorus from lands that he classified as urban?

15 A.  Yes, I did.

16 Q.  Does GLEAMS have default values or coefficients

17 designed to represent the physical processes that

18 exist in urban areas?

19 A.  No, because GLEAMS is an Ag model.  It is not

20 designed to represent urban areas.

21 Q.  Based upon your review, did Dr. Engel model

22 urban areas in a manner that's representative of

23 urban areas?

24 A.  He didn't accurately represent the

25 characteristics of urban areas, in my opinion.

1  Q.   Can you explain the basis for that statement?

2  A.   Yes.  The GLEAMS watershed model, for each land

3  use type -- and urban land use is one of the land

4  use types used by Dr. Engel -- the GLEAMS model

5  requires that nutrient inputs be specified and that

6  hydrology inputs be specified.  Let's talk about the

7  nutrient inputs first.

8          The nutrient parameter input file that

9  Dr. Engel input to his GLEAMS model for urban land

10  represented a crop type, ICROP=2, if anyone is

11  taking notes on that specifically.  That corresponds

12  to alfalfa hay and it's based on an example from the

13  GLEAMS manual.

14          Let's turn to hydrology.  The GLEAMS model

15  requires that the user specify a curve number.

16  Simply put, the curve number determines, if a

17  precipitation event occurs, how much runoff occurs

18  per unit area from the land surface, and that's what

19  the curve numbers do.  So the user needs to specify

20  that.

21          Now, I investigated Dr. Engel's hydrology

22  input files.  The initial value he specified for the

23  curve number for his hydrology file for urban land

24  use was, in my opinion, reasonably representative of

25  the impervious surfaces that exist in urban land

1   use.

2        However, the calibration process that

3   Dr. Engel used varied a number of the model input

4   parameters so as to achieve correspondence with the

5   calibration targets.

6        For the hydrology calibration, one of the

7   input parameters that was varied was the curve

8   number.  So after the calibration was completed, the

9   curve number in Dr. Engel's calibrated model was

10  very different than the initial curve number he

11  specified.  It was much lower.  The initial values,

12  I believe, were 85 to 89.  He ended up at values

13  below 50.

14       And in the GLEAMS manual, it's very clear

15  that curve numbers that low correspond to the runoff

16  characteristics of wooded areas.

17  Q.  Are wooded areas, based upon your professional

18  experience, an appropriate surrogate for urban areas

19  in terms of curve numbers?

20  A.   No, they're not.  And basically inside

21  Dr. Engel's model, the hydrology characteristics

22  that were actually operating in his calibrated model

23  represented wooded areas and not urban areas.

24  Q.   Doctor, the last input value used by Dr. Engel

25  that I want to discuss with you is the phosphorus in

1  the soil profiles in the Illinois River Watershed.

2  Did you investigate those input values?

3  A.   Yes, we did.

4  Q.   Does Dr. Engel's GLEAMS model of the watershed

5  require specification of phosphorus concentrations

6  in soils at various depths in the watershed?

7  A.   Yes, it does.  Dr. Engel --

8  Q.   I'm sorry, let me ask a question.  Did you

9  analyze Dr. Engel's GLEAMS model files to determine

10 the total amount of phosphorus in all depths in the

11 IRW soils that was specified for his modeling work?

12 A.   Yes.

13 Q.   And can you explain how you conducted that

14 analysis.

15 A.   Yes.  As I mentioned previously, Dr. Engel

16 divided the Illinois River Watershed into 50 HRUs.

17 Beneath each of these 50 HRUs, there were between

18 three and five vertical layers in the soil, and the

19 depths of these layers varied.

20       So basically the GLEAMS model is basically

21 -- it's a grid of boxes that goes down that

22 represents the soil and phosphorus.

23       I investigated his model files and

24 determined the areas of the HRUs, the number of

25 layers for each HRU, the depth of each layer from

1  which we could compute the volume of each box.  And

2  we investigated the amount of phosphorus,

3  concentration in each of these boxes.  And there's

4  nothing difficult about this.  It's just a tedious

5  bookkeeping exercise where you just compute the mass

6  in each box, and then at the end, you add up the

7  mass in all the boxes.

8  Q.   Did you, in fact, at the end sum up the total

9  amount of phosphorus in the soils that Dr. Engel

10  included in his model?

11  A.   Yes, I did.

12  Q.   How much phosphorus did he assume was in these

13  soils in the watershed at all depths?

14  A.   It was about 6.4 million tons.

15  Q.   Can you explain what that 6.4 million tons

16  represents.

17  A.   That represents basically a snapshot in time

18  corresponding to his calibrated GLEAMS model.

19  Q.   Doctor, do you recall what annual value for

20  poultry litter phosphorus, as Dr. Engel called it,

21  he assumed in his GLEAMS model?

22  A.   Yes.  On page D-18 in Dr. Engel's expert

23  report, he has a number of 4,642 tons of poultry P

24  per year, and that was taken from Appendix B, the

25  mass balance conducted by Meagan Smith.  And that's

1  the number he puts forth as the phosphorus added

2  each year due to poultry P.

3  Q.   In your report, did you provide a comparison of

4  the tons of phosphorus that Dr. Engel assumed was

5  present in the soils in his model with this addition

6  of 4,642 tons of phosphorus annually?

7  A.   Yes, I did.

8  Q.   Can you provide us with the results of this

9  comparison?

10  A.   The 4,642 tons of P that Dr. Engel assumed is

11  added each year is approximately .07 percent of the

12  total phosphorus that's already present in the soil

13  in his GLEAMS model.

14  Q.   You mentioned Meagan Smith's mass balance

15  report.  Did you review that report as well?

16  A.   Yes, I did.

17  Q.   Do you recall seeing her pie chart presenting

18  the various different sources of phosphorus

19  additions to the watershed that she identified?

20  A.   Yes, I did.

21  Q.   Let me ask you to turn to tab 9 and find Tyson

22  Defendants' Demonstrative 230.

23  A.   Yes, I have it.

24  Q.   Did you prepare this demonstrative?

25  A.   Yes.

 1  Q.   Can you explain what it demonstrates.

 2  A.   Well, to set a foundation, the mass balance

 3  conducted by Meagan Smith, the best way to think

 4  about it is it encased the entire Illinois River

 5  Watershed in a bubble -- air, land and water.  And

 6  if phosphorus entered that bubble, it was considered

 7  a source.  If phosphorus left that bubble, it was

 8  considered a sink, or a loss.

 9       If we look at this pie chart here, the

10  small slice which indicates the all watershed

11  sources of 0.09 percent, that slice represents the

12  amount of phosphorus that Meagan Smith assumed comes

13  into that bubble in a year.

14       The large yellow slice, basically the whole

15  pie, the 99.91 percent, represents the amount of

16  phosphorus in the IRW soil in Dr. Engel's GLEAMS

17  model.

18  Q.   Now, Doctor, I want to switch subjects on you

19  for a moment.  You said earlier that Dr. Engel used

20  what he called observed phosphorus loads at the

21  three USGS stations nearest the lake to calibrate

22  and validate his model; is that correct?

23  A.   Yes.

24  Q.   And can you explain where those observed loads

25  come from and whether they're actually measured?

1  A.   I think I mentioned previously the word

2  "observed loads" is frequently used.  But strictly

3  speaking, loads are not observed.  What's observed

4  are concentrations, and what's observed are flows.

5  And when one multiplies flow times concentration,

6  one gets load.

7          I should also point out that the use of the

8  phrase "observed loads" can be convenient because

9  that's often used to distinguish between loads that

10  are based on actual data versus loads that might

11  come out of a model.

12  Q.   Doctor, are you familiar with any regression

13  approaches that are used to calculate observed loads

14  from measured data?

15  A.   Yes, I am.

16  Q.   Is there a method or series of methods that are

17  widely used in the modeling community?

18  A.   Yes.  The U.S. Geological Survey has developed

19  a package of programs that's called LOADEST.  That's

20  L-O-A-D-E-S-T.  And it's a package of statistical

21  programs for tributary load estimation.

22  Q.   Can you turn in your binder to tab 10 and find

23  Oklahoma Exhibit 1237 which is already in evidence.

24  Are you familiar with that document?

25  A.   Yes, I am.

1    Q.    What is it?

2    A.    It's Table 5.3 from Dr. Engel's expert report,

3    and it summarizes on an annual basis his observed

4    phosphorus loads for each of the three subwatersheds

5    he modeled, and then sums them up for a total load.

6    Q.    Doctor, do the loads set forth on this exhibit,

7    Table 5.3 from Dr. Engel's report, correspond to the

8    phosphorus loads that Dr. Engel actually used to

9    calibrate his model?

10   A.    No, they don't.

11   Q.    Did you check Dr. Engel's calculations of daily

12   total phosphorus loads that he actually used in his

13   modeling work?

14   A.    Yes, I did.  I should state that he used daily

15   loads for the actual calibration process.  These

16   loads here in this exhibit are annual.  But what I

17   did is I added up the daily loads and computed

18   annual loads and compared them to what was in Table

19   5.3, and they didn't match.

20   Q.    Can you describe what you discovered when you

21   reviewed the calculations by Dr. Engel to arrive at

22   his observed phosphorus loads?

23   A.    Yes.  Dr. Engel stated that he used the USGS

24   LOADEST program.  And from review of his produced

25   materials, I determined that he used LOADEST model

1    8.   LOADEST has about 12 or 13 different models in

2    it.

3          He also stated in his expert report that he

4    used -- and it's indicated right here in the caption

5    to Table 5.3 in this exhibit -- he used phosphorus

6    data based on -- from the U.S. Geological Survey and

7    from OWRB.

8          And I reviewed his -- again, reviewed his

9    model input files, and I determined that he made a

10   large number of errors in taking the OWRB

11   measurements and organizing them and formatting them

12   for input to the LOADEST program.

13         There were a large number of just flat-out

14   mistakes, numbers were incorrect.  There were a

15   large number of OWRB data that were simply ignored.

16   Q.   Did these errors that you discovered impact the

17   loads that are set out on Table 5.3 and the loads

18   that Dr. Engel actually used for his calibration?

19   A.   Yes, they did.

20   Q.   Did you recalculate the observed phosphorus

21   loads without the data errors that you discovered?

22   A.   Yes, I did.

23   Q.   And did you compare those recalculated loads

24   against Dr. Engel's loads?

25   A.   Yes, I did.

1  Q.   Did you include a chart in your report setting

2  out the results of this analysis?

3  A.   Yes, I did.

4  Q.   Could you turn in your binder to tab 11 and

5  find Defendants' Joint Exhibit 2413.

6  A.   Yes.

7  Q.   Could you identify for the record Defendants'

8  Joint Exhibit 2413.

9  A.   This is Figure 18 from my expert report.

10  Q.   Did you prepare this exhibit?

11  A.   Yes, I did.

12  Q.   And can you describe generally the source of

13  the information that's shown?

14  A.   Yes.  Again, we have results for each year from

15  1998 through 2006.  And what this chart depicts are

16  the differences between my corrected loads and

17  Dr. Engel's incorrect loads.

18        And I compared my corrected loads to two

19  different versions of Dr. Engel's loads.  I -- the

20  blue bars showed the comparison between my corrected

21  loads and the loads in his Table 5.3 in his expert

22  report.

23        The red bars are the differences between my

24  corrected loads and the loads in what I've referred

25  to as the p_model_10_15.xls on the legend, and that

```
 1   is Dr. Engel's routing model, and that's the latest
 2   version of his routing model.
 3   Q.   Doctor, how substantial were the differences
 4   between the loads calculated by Dr. Engel and the
 5   loads recalculated by you, having corrected the data
 6   errors?
 7   A.   It depends on the year and it depends on which
 8   set of Dr. Engel's loads we're comparing.  If we
 9   look at the blue bars, which are the results in his
10   expert report, they range from a low -- they're
11   about 23 percent low to about 15 percent high.
12        If we look at his -- the loads he used to
13   calibrate his routing model, they range from about
14   25 percent low to about 10 percent high.
15        MR. GEORGE:  Your Honor, I move for the
16   introduction of Defendants' Joint Exhibit 2413.
17        THE COURT:  Any objection?
18        MR. PAGE:  No objection.
19        THE COURT:  2413 is admitted.
20   Q.   (By Mr. George) Doctor, let's move to
21   Dr. Wells' lake modeling again, if we could.  It's
22   been established through testimony in this case that
23   Dr. Wells used the output of various forecasts from
24   Dr. Engel's for some of his predictive scenarios.
25   You're familiar with that, aren't you?
```

1  A.   Yes.

2  Q.   Did Dr. Wells use the output of Dr. Engel's

3  model to calibrate his lake model?

4  A.   No, he did not.

5  Q.   What did he use?

6  A.   One step back.  Dr. Wells's model for Lake

7  Tenkiller was calibrated to data for the period

8  2005, 2006 and the first nine months of 2007.

9       Dr. Engel's model computed loads for 2005

10  and 2006, but he did not use those computed loads

11  when he determined the total phosphorus loads that

12  he passed forward to Dr. Wells.

13       What Dr. Engel did was, again, he used

14  LOADEST and he used observed flow and concentrations

15  at the three outlet stations for those three years

16  and computed loads based on data as opposed to his

17  model output.

18  Q.   Just so we're clear, the loads that Dr. Wells

19  used were calculated by Dr. Engel; is that right?

20  A.   The loads that Dr. Wells used for his

21  calibration were calculated by Dr. Engel and they

22  were based on observed data, not Dr. Engel's model

23  output.

24  Q.   Did Dr. Wells use any of the load calculations

25  that we just discussed from the prior exhibit?

1    A.    Yes.  He used the same -- he used the same USGS

2    method, but he applied it to the data in a different

3    way than he applied it to develop his observed loads

4    that he used to calibrate his own model.

5    Q.    Did you check the phosphorus load estimates

6    that Dr. Engel passed to Dr. Wells?

7    A.    Yes, I did.

8    Q.    And what did you find?

9    A.    That they were incorrect.

10   Q.    What types of mistakes or errors did you

11   discover?

12   A.    The total phosphorus loads, again, it was data

13   errors, many data errors in translating the primary

14   observed data as reported by the agency and getting

15   that into the LOADEST input files that Dr. Engel

16   used.

17   Q.    Doctor, did you correct those phosphorus load

18   estimates, the data errors in those estimates, and

19   recalculate them and compare them to Dr. Engel's

20   calculations?

21   A.    Yes, I did.

22   Q.    And did you include in your report a figure

23   that shows the results of that comparison?

24   A.    Yes, I did.

25   Q.    Could you turn to tab 12 and find Defendants'

1    Joint Exhibit 2417.  Can you, for the record,

2    identify that exhibit.

3    A.    Yes.  This is Figure 22 in my expert report.

4    Q.    Did you prepare this exhibit?

5    A.    Yes, I did.

6    Q.    And can you describe generally the source of

7    the information that is shown.

8    A.    Here we have results for only three years,

9    because Dr. Wells ran his model for three years;

10   more specifically, all of 2005 and '6 and the first

11   nine months of 2007.

12            Again, these bars show the differences

13   between my corrected loads and the loads that

14   Dr. Engel computed to pass forward to Dr. Wells.

15   These are for total phosphorus.

16            I've shown four bars for each year.  The

17   first three bars correspond to the individual

18   results for the individual three subwatersheds.  The

19   fourth bar, the purple bar, corresponds to the total

20   load to Lake Tenkiller.

21   Q.    Doctor, how substantial was the impact of the

22   errors made by Dr. Engel on the calculated loads?

23   A.    It depends on year.  And in this case, it

24   depends on subwatershed.  Those loads differ by --

25   they're about five percent low in Barren Fork in

1  2005, and they're about 50 percent too high in Caney

2  Creek in 2007.

3          MR. GEORGE:  Your Honor, I'd move for the

4  introduction of Defendants' Joint Exhibit 2417.

5          THE COURT:  Any objection?

6          MR. PAGE:  No objection.

7          THE COURT:  2417 is admitted.

8  Q.  (By Mr. George)  Dr. Bierman, Dr. Wells

9  testified that his model also uses a specific type

10  of phosphorus known as soluble reactive phosphorus

11  to simulate algae growth in the lake.  You're

12  familiar with that?

13  A.  Yes.

14  Q.  Where did Dr. Wells get his soluble reactive

15  phosphorus loads?

16  A.  Those loads were also computed by Dr. Engel.

17  Q.  And did you review those computations?

18  A.  Yes.

19  Q.  Did you review the primary data from which

20  Dr. Engel made those computations?

21  A.  Yes, I did.

22  Q.  What did you find as a result of that

23  investigation?

24  A.  The SRP loads that Dr. Engel computed were also

25  incorrect.

1  Q.    How were they incorrect?

2  A.    Here, there was a new element.  There were data

3  errors, as there were in the two previous sets of

4  loads that we discussed, but there was actually a

5  more egregious error, because Dr. Engel used the

6  wrong phosphorus data to conduct the load

7  estimation.  He used data for soluble phosphorus,

8  not soluble reactive phosphorus.  They're not the

9  same thing.

10 Q.    Does the USGS capture and report both types of

11 data?

12 A.    Yes, they do.

13 Q.    How do you know that Dr. Engel used the data

14 from USGS for total dissolved phosphorus as opposed

15 to soluble reactive phosphorus?

16 A.    I reviewed carefully Dr. Engel's produced

17 materials for his LOADEST calculations.  Those

18 materials contained the primary data that he got

19 from USGS, and the parameter codes and descriptions

20 of what those codes were was very clear.  One was

21 soluble phosphorus, I believe that's -- I'll have to

22 go from memory.  I believe that's parameter code

23 00661.  It's in my expert report.  And the parameter

24 code for soluble reactive phosphorus is different

25 and the descriptor is different.  I believe that

1  code is 00671.

2  Q.   Dr. Bierman, does this present a problem, a

3  reliability issue with respect to Dr. Wells' model?

4  A.   Well, it does, because soluble phosphorus or

5  total dissolved phosphorus -- those names can be

6  interchangeable -- soluble phosphorus includes

7  soluble reactive phosphorus, the form that algae

8  require directly.  But it also includes other forms

9  of phosphorus, dissolved organic phosphorus, for

10 example, that are not immediately available to

11 algae.

12          So the use of soluble phosphorus in place

13 of soluble reactive phosphorus inevitably will

14 result in overestimation of the phosphorus loads

15 that drive algal growth in the lake.

16 Q.   Doctor, did you recalculate the loads using

17 soluble reactive phosphorus as opposed to soluble

18 phosphorus to determine the significance of the

19 difference between those loads?

20 A.   Yes, I did.

21 Q.   Did you include in your report a figure that

22 shows the comparison between the total dissolved

23 phosphorus loads calculated by Dr. Engel and the

24 actual soluble reactive phosphorus loads?

25 A.   Yes, I did.

1  Q.   And could you turn to tab 13 in your binder,

2  please.

3  A.   Yes.

4  Q.   Could you identify this document for the record

5  which is marked Defendants' Joint Exhibit 2418.

6  A.   Yes.  This is Figure 23 of my expert report.

7  Q.   Did you prepare this exhibit?

8  A.   Yes.

9  Q.   Does this exhibit relate to the analysis that

10  we just discussed?

11  A.   Yes, it does.

12  Q.   Can you identify the source of the information

13  shown on this exhibit?

14  A.   Yes.  The format is identical to the previous

15  graph.  And this shows -- these bars represent the

16  differences between my calculations of correct SRP

17  loads from the watershed to Lake Tenkiller and the

18  soluble phosphorus loads that Dr. Engel actually

19  computed.

20  Q.   And what is the significance or the magnitude

21  of the difference between those two calculations,

22  Doctor?

23  A.   Well, again, it depends on subwatershed and

24  depends on year.  But first we should note that

25  independent of watershed and independent of year,

1  all these loads are too high.  None of them are too

2  low.  And this speaks to my point that soluble

3  phosphorus contains other phosphorus forms besides

4  soluble reactive phosphorus.

5          So in response to your question, if we --

6  these differences range from about a five percent

7  overestimate in 2006 and 2007 for Illinois to almost

8  120 percent overestimate for Caney Creek in 2005.

9  Q.  Doctor, what is the impact of this mistake on

10  the reliability of Dr. Wells' lake model?

11  A.   Dr. Wells' lake model quantifies the

12  relationship between phosphorus loads that come into

13  the lake and the amount of algae that are growing in

14  the lake and water quality in the lake in terms of

15  algae, dissolved oxygen and so forth.

16          If the model is calibrated -- if too much

17  phosphorus load is put into the model, if too much

18  SRP is put into the model, the calibration will be

19  flawed because the model will try to grow too much

20  algae, and the water quality will be computed

21  incorrectly.

22          Basically what this means is that the load

23  response relationship represented by Dr. Wells' lake

24  model is incorrect.  It's flawed.

25          MR. GEORGE:  Your Honor, I'd offer into

 1  evidence Defendants' Joint Exhibit 2418.

 2          THE COURT:  Any objection?

 3          MR. PAGE:  No objection.

 4          THE COURT:  2418 is admitted.

 5  Q.   (By Mr. George)  Doctor, I'm going to take a

 6  step back for a moment and ask you some general

 7  summary-type questions.  Based upon your review of

 8  Dr. Engel's modeling work, do you have an opinion as

 9  to whether Dr. Engel's modeling results provide a

10  realistic and reliable representation of phosphorus

11  loading to Lake Tenkiller for either current,

12  historical or future conditions?

13  A.   Yes, I do.

14  Q.   What is that opinion?

15  A.   My opinion is that Dr. Engel's entire modeling

16  framework is conceptually flawed.  My opinion is

17  that the methods that Dr. Engel used to apply that

18  flawed conceptual framework to the IRW in this case

19  are full of numerous errors and, likewise, are

20  completely flawed.

21          My opinion also is that the results from

22  Dr. Engel's model for his calibration and purported

23  validation period and all of the results for any

24  prediction scenarios he conducted, as well as his

25  100-year hindcast, are not scientifically

1   defensible, they're not valid, and they are

2   unreliable.

3   Q.   Doctor, based upon your review of the modeling

4   work of Dr. Wells, do you have an opinion as to

5   whether Dr. Wells' modeling results provide a

6   realistic and reliable representation of water

7   quality for the lake for either current, historical

8   or future conditions?

9   A.   Yes, I do.

10  Q.   What is that opinion?

11  A.   The water quality computed by Dr. Wells' model

12  for his calibration period, those results are flawed

13  due to the flawed and unreliable inputs for total

14  phosphorus and soluble reactive phosphorus provided

15  to Dr. Wells by Dr. Engel.

16          I'm also of the opinion that because -- let

17  me restate.  For all of Dr. Wells' forecast

18  scenarios and predictions, as well as his 100-year

19  hindcast, he used the flawed and unreliable outputs,

20  predictions, from Dr. Engel's flawed models.

21  Therefore, all of Dr. Wells' forecast results and

22  hindcast results are similarly flawed and

23  unreliable.

24          MR. GEORGE:  Your Honor, this is a

25  transition point for me, and we are at the noon

10315

1    Hour, if this would be an appropriate time for our lunch

2    break.

3            THE COURT:  It would.  Let's be in recess

4    until 1:10.

5            (Whereupon a recess was had.)

6                    REPORTER'S CERTIFICATE

7    I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

8    TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

9    MATTER.

10

11                        S/Terri Beeler
                         Terri Beeler, RMR,FCRR
12                        United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25