1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    STATE OF OKLAHOMA, ex rel.  )
     W.A. DREW EDMONDSON, in his )
5    capacity as ATTORNEY GENERAL)
     OF THE STATE OF OKLAHOMA,   )
6    et al.                      )
                                 )
7                  Plaintiffs,   )
     vs.                         )CASE NO. 05-329-GKF-PJC
8                                )
     TYSON FOODS, INC., et al.,  )
9                                )
                                 )
10                 Defendants.   )

11

12

13

           TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
14                  JANUARY 11, 2010
      BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE
15              VOLUME 91, P.M. SESSION

16

17   APPEARANCES:

18

19   For the Plaintiffs:       MR. W.A. DREW EDMONDSON
                               Attorney General
20                             MS. KELLY FOSTER
                               Assistant Attorney General
21                             State of Oklahoma
                               313 N.E. 21st St.
22                             Oklahoma City, OK  73105

23

24

25

```
 1   (APPEARANCES CONTINUED)      MR. M. DAVID RIGGS
                                  MR. DAVID P. PAGE
 2                                MR. RICHARD T. GARREN
                                  Riggs Abney Neal Turpen
 3                                Orbison & Lewis
                                  502 W. 6th Street
 4                                Tulsa, OK  74119

 5

 6                                MR. ROBERT A. NANCE
                                  MS. SHARON GENTRY
 7                                Riggs Abney Neal Turpen
                                  Orbison & Lewis
 8                                5801 Broadway
                                  Extension 101
 9                                Oklahoma City, OK  73118

10                                MR. LOUIS W. BULLOCK
                                  MR. ROBERT BLAKEMORE
11                                Bullock Bullock &
                                  Blakemore
12                                110 W. 7th, Ste 770
                                  Tulsa, OK  74119
13
                                  MR. FREDERICK C. BAKER
14                                MS. ELIZABETH CLAIRE XIDIS
                                  MS. INGRID MOLL
15                                Motley Rice LLC
                                  28 Bridgeside
16                                P.O. Box 1792
                                  Mount Pleasant, SC  29465
17

18
     For Tyson Foods:            MR. ROBERT W. GEORGE
19                                Tyson Foods, Inc.
                                  2210 West Oaklawn Drive
20                                Springdale, AR  72701

21                                MR. JAY THOMAS JORGENSEN
                                  MR. THOMAS GREEN
22                                MR. MARK HOPSON
                                  MR. GORDON D. TODD
23                                Sidley Austin LLP
                                  1501 K St. NW
24                                Washington, DC  20005

25
```

```
 1   (APPEARANCES CONTINUED)

 2   For Cargill:              MR. JOHN H. TUCKER
                               MS. THERESA HILL
 3                             Rhodes Hieronymus Jones
                               Tucker & Gable
 4                             100 W. 5th St., Ste 400
                               Tulsa, OK  74103
 5
                               MR. DELMAR R. EHRICH
 6                             MS. KRISANN KLEIBACKER LEE
                               MR. BRUCE JONES
 7                             Faerge & Benson
                               90 S. 7th St., Ste 2200
 8                             Minnaepolis, MN  54402

 9   For Simmons Foods:        MR. JOHN R. ELROD
                               MS. VICKI BRONSON
10                             Conner & Winters
                               211 E. Dickson St.
11                             Fayetteville, AR  72701

12   For Peterson Farms:       MR. A. SCOTT MCDANIEL
                               MR. PHILIP HIXON
13                             MS. NICOLE LONGWELL
                               MR. CRAIG MIRKES
14                             McDaniel Hixon Longwell &
                               Acord PLLC
15                             320 S. Boston, Ste 700
                               Tulsa, OK  74103
16
     For George's:            MR. WOODY BASSETT
17                             MR. VINCENT O. CHADICK
                               MR. JAMES GRAVES
18                             MS. K.C. TUCKER
                               MR. GARY WEEKS
19                             Bassett Law Firm
                               P.O. Box 3618
20                             Fayetteville, AR  72702

21   For Cal-Maine:            MR. ROBERT SANDERS
                               Young Williams P.A.
22                             P.O. Box 23059
                               Jackson, MS 39225
23
                               MR. ROBERT P. REDEMANN
24                             Perrine McGivern Redemann
                               Reid Berry & Taylor PLLC
25                             P.O. Box 1710
                               Tulsa, OK  74101
```

1              **INDEX**

2

3    **WITNESSES ON BEHALF OF THE DEFENDANTS          PAGE**

4

5    **DR. TIMOTHY SULLIVAN**

6         Direct Examination by Mr. George          10564

7

8    **DR. MICHAEL DICKS**

9         Cont'd Cross-Examination by Mr. Garren    10638
         Redirect Examination by Mr. Elrod         10642
10        Direct Examination by Mr. McDaniel        10652
         Cross-Examination by Mr. Garren           10654

11

12   **DR. TIMOTHY SULLIVAN**

13        Cont'd Direct Examination by Mr. George   10656

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      PROCEEDINGS
 2   JANUARY 11, 2010:
 3                   *  *  *  *  *  *  *
 4          THE COURT:  Good afternoon, Mr. George.
 5          MR. GEORGE:  Good afternoon, Your Honor.
 6   We have a new witness on the stand.  Would you like
 7   to ask him the first questions you traditionally do?
 8          THE COURT:  Let me -- before we begin with
 9   the new witness, let me just ask plaintiff's counsel
10   here real briefly, we were going to finish up with
11   one of the witnesses that the defendants called
12   live.  You were going to call him live.  Is that
13   going to be in rebuttal?
14          MR. BULLOCK:  No, I think the plan is --
15   Mr. Nance isn't here, he's been working with
16   Mr. McDaniel.  I think there's arrangements for him
17   to be put on on Thursday morning.
18          THE COURT:  So that's six witnesses.
19          MR. BULLOCK:  No, I got it wrong.
20          MR. MCDANIEL:  If I might, Your Honor.
21   Mr. Nance and I did talk today, and Mr. Thompson,
22   Steve Thompson is available tomorrow.  So the plan
23   is, assuming that Dr. Dicks resumes his cross and is
24   finished today, we will -- the State can put
25   Mr. Thompson on the stand after Dr. Sullivan.  So we
```

1  anticipate that being tomorrow morning sometime,

2  depending the length of cross.

3          THE COURT:  But that will be six witnesses,

4  not five.  Mr. Green had mentioned four.  Then we've

5  got Peach, then we've got Thompson.  So that's six

6  witnesses.  We're not going to finish it this week,

7  gentlemen, and then get into rebuttal.  It's far too

8  ambitious.

9          Mr. George, let me ask the witness to raise

10  his right hand to be sworn, please.

11          (Witness sworn.)

12          THE COURT:  State your full name for the

13  record, please.

14          THE WITNESS:  Timothy Joseph Sullivan.

15          THE COURT:  Mr. George, you may inquire.

16          MR. GEORGE:  Thank you, Your Honor.

17                  DR. TIMOTHY SULLIVAN,

18  having been first duly sworn, was called as a

19  witness and testified as follows:

20                  DIRECT EXAMINATION

21  BY MR. GEORGE:

22  Q.  Dr. Sullivan, before we get too far, I want to

23  make sure the record is clear as to who you are.

24  You're not a the stunt double for Dr. Dicks; is that

25  right?

A. That's correct.
Q. Doctor, where do you hail from? What's your home town?
A. Corvallis, Oregon.
Q. Are you employed?
A. Yes.
Q. Who are you employed with?
A. E&S Environmental Chemistry, Inc.
Q. What is your current position with that firm?
A. I'm the president of E&S.
Q. And when did you join E&S?
A. I cofounded it in 1988.
Q. Doctor, do you hold any educational degrees?
A. Yes.
Q. Could you provide the court with a brief summary of what degrees you have obtained, what they're in, and what from institutions.
A. A bachelor's in history with a minor in education from Stonehill College. Master's in biology from Western State College of Colorado. Ph.D. from Oregon State University, and it was a multidisciplinary Ph.D. in biological sciences with three areas of emphasis rather than the standard one, and those areas were ecology, zoology and environmental chemistry.

1   Q.   Doctor, how does a young man go from a BA in

2   history to a Ph.D. in biological science?

3   A.   It's a tortuous path.  After obtaining my BA in

4   history, I changed my plans from being a history

5   teacher and coach to pursuing sciences, and that

6   involved taking a number of courses to make up for

7   undergraduate deficiencies in the sciences.  So I

8   did that over a number of years while working.  But,

9   actually, I found that the background in history has

10  been enormously helpful for me in my career because

11  of some of the things I learned in history rather

12  than science.

13          THE COURT:  I was going to say, you're not

14  implying that a bachelor's in history is a deficient

15  education?

16          MR. GEORGE:  That's where we were going

17  next.

18          THE WITNESS:  I should not imply that at

19  all, Your Honor.  I apologize if it sounded that

20  way.  But in terms -- sciences have such a core of

21  classes that must be taken in any natural science,

22  that it's a rather full schedule.

23  Q.   (By Mr. George)  Doctor, did the realization of

24  what history teachers make have anything to do with

25  your changing your degree?

1  A.    I don't believe it did, actually.

2  Q.    Okay.  Doctor, you mentioned that you have a

3  Ph.D.  Did you complete a dissertation to obtain

4  that?

5  A.    Yes.

6  Q.    Could you describe the topic or the subject

7  matter of your dissertation?

8  A.    It was on the production and fate of a class of

9  chemicals called polycyclic aromatic hydrocarbons,

10  some of which are carcinogenic, or cancer causing.

11  Q.    How long did you work on the completion of your

12  Ph.D.?

13  A.    It was a five-year program between the

14  coursework and doing the research for my

15  dissertation.

16  Q.    Was there a particular industry that was

17  involved in your Ph.D. work?

18  A.    It was the forestry industry.  The study that I

19  did for my dissertation had to do with the

20  production and fate of these compounds on slash burn

21  sites in the mountains.  After logging, the logging

22  companies will often burn the remainder of the woody

23  material on site, and that helps to promote a better

24  regrowth of a replanted forest.

25  Q.    As part of your Ph.D. work, did you study the

1  movement of those constituents through water

2  pathways?

3  A.   Yes.  The primary focus was on the production

4  and then the movement from the area that was burned,

5  which is the duff layer of the forest down into the

6  various layers of the forest soil.  Then an

7  additional component of what I did was to look at

8  movement of those chemicals into streams that

9  were -- ran through the sites.

10  Q.   Doctor, what did you do after you obtained your

11  Ph.D. in terms of work?

12  A.   Well, the first thing I had to do was make some

13  money because I was quite broke at that point, so I

14  went back to construction, did that for a period of

15  probably six or eight months, had a small painting

16  and drywall business.

17        And then I did some more teaching.  I had

18  done teaching prior to that on a couple of

19  occasions.  I taught for half a year at the school

20  where I had earned my master's degree.  One of my

21  professors there had taken ill and was not able to

22  complete his courses, and they asked me to come and

23  take over his coursework for the rest of the year,

24  which I did.

25  Q.   Doctor, where were you employed next after you

 1    obtained your Ph.D., laying aside the construction

 2    and teaching?

 3    A.    At that time, I was busy applying for what's

 4    called postdocs, postdoctoral research, associate

 5    physicians in various places.  And I obtained a

 6    postdoc in Norway -- in Oslo, Norway and spent two

 7    years working there.

 8    Q.    What type of work were you involved in, in your

 9    postdoc in Norway?

10    A.    I would characterize it mostly as aluminum

11    biogeochemistry with a major focus on hydrological

12    flow paths in watersheds, movement of various

13    chemicals, primarily aluminum, but other chemicals

14    as well, through the watershed system.

15    Q.    Doctor, did you do any work in connection with

16    that postdoc research that would be fairly described

17    as storm chasing?

18    A.    I did quite a lot of storm chasing.  Took

19    thousands of samples of streams, occasionally lakes,

20    precipitation, throughfall in the forest, snow pack

21    samples.

22    Q.    Doctor, after you completed your postdoc

23    research, did you take employment somewhere?

24    A.    Yes.  I worked at for two years at the

25    Environmental Protection Agency research laboratory

1   in Corvallis, Oregon.

2   Q.   What did you do, or what type of work did you

3   focus on in your two years at the U.S. EPA research

4   lab?

5   A.   I was hired primarily to publish the results of

6   some rather large water surveys that had just been

7   conducted, what's called the Eastern Lake Survey and

8   the Western Lake Survey.  And combined, they called

9   it the National Lake Survey at that time.

10         The EPA had sampled thousands of lakes and

11  also streams, but my focus at that point was on the

12  lakes.  Selected that using a randomized process

13  throughout the United States.  It was part of what

14  was called the National Acid Precipitation

15  Assessment Program .  It was the U.S. National Acid

16  Rain Program.

17  Q.   Would you describe that as a large research

18  project?

19  A.   At the time, it was the largest environmental

20  research program ever conducted anywhere in the

21  world.  It was ten years and half a billion

22  dollars.  It's been surpassed many fold by climate

23  change and perhaps some other programs since then,

24  but at that time, that's what it was.

25  Q.   Doctor, I believe you mentioned that part of

1  your work was the -- encouraging publication as a --

2  with respect to the data that came from that

3  research; is that right?

4  A.   Correct.  The samples had been collected,

5  laboratory work done, databases built, some reports

6  prepared.  And then the next step was to get those

7  results into the open scientific peer-reviewed

8  literature to share as much as possible that

9  information with other scientists in the United

10 States and elsewhere.  So I was hired to come in and

11 work with analyzing the data, helping to evaluate

12 what kinds of publications should be written,

13 analyzing the data, writing the publications and

14 getting them out.

15 Q.   Were you successful in getting the

16 peer-reviewed literature populated, if you will,

17 with data and analysis from that research program?

18 A.   Yes.  There were quite a few publications that

19 came out of that.

20 Q.   Let's talk about your current employment with

21 E&S Environmental.  Can you provide the court with

22 an overview of the type of work and projects that

23 you have been involved in at E&S?

24 A.   It's a wide diversity of projects.  I would say

25 the main focus over the past 20-plus years has been

1  on water quality issues, on the influence of

2  different stressors on water quality, in particular,

3  acidifying substances, nutrients, fecal indicator

4  bacteria, stream temperature, some of those kinds of

5  things.

6         A lot of work on looking at the connections

7  between human activities and the quality of water,

8  and those activities would include agriculture,

9  especially livestock operations, forestry, urban

10  development, rural residential housing impacts,

11  those kinds of things.

12         I've also done quite a lot of work in terms

13  of environmental restoration, on-the-ground

14  restoration projects.  A lot of work with synthesis

15  and integration of environmental data,

16  multidisciplinary data that makes some sense of the

17  overview of what the data have to tell.  And a lot

18  of work related to that on watershed assessments

19  where we would go in and evaluate the various issues

20  in the watershed and the stressors there.

21  Q.   Doctor, you used a term "multidisciplinary."

22  Do you consider your work to be multidisciplinary?

23  A.   Very much so.

24  Q.   For the benefit of the record, could you

25  provide an explanation of what you mean by that?

1   A.   It means dealing with multiple disciplines and

2   multiple media.  So for example, the world I live

3   in, my research world is a lot of biology and a lot

4   of chemistry, but there's also quite of bit of

5   soils, hydrology, sometimes some geology.  Fisheries

6   and wildlife issues come into it, a lot of work with

7   vegetation, and then a lot of work with the water of

8   chemistry.  My work on the effects of various

9   pollutants on lakes, streams, soils, forests and

10  other types of vegetation.

11  Q.   Doctor, do you bring this multidisciplinary

12  approach to any of your current work?

13  A.   Yes.  I think that some of the projects that

14  I'm involved with now where I'm the project manager

15  and/or a co-principal investigator illustrate a

16  variety of projects.

17  Q.   Doctor, are any of those projects projects on

18  which you're working for federal environmental

19  agencies?

20  A.   Yes, very many of them are.

21  Q.   Could you pick out a handful of current

22  projects where you're working with the federal

23  government that would illustrate the

24  multidisciplinary nature of your work, and provide a

25  little description as to those projects.

1  A.    Okay.   For the National Park Service, I'm in

2  the middle of a project we call the nitrogen

3  screening project.   And what that involves is there

4  are 273 -- 272 national parks throughout the country

5  that they call inventory monitoring parks, those are

6  all the major parks, that are grouped into 32

7  networks, park networks.   And so this is a study to

8  prioritize and rank all of the networks from 1 to 32

9  and all the parks from 1 to 272 in terms of their

10 vulnerability to being damaged by nitrogen input

11 from outside the watershed.

12        And that's nitrogen input -- and the

13 component of that would be nutrient enrichment

14 eutrophication kinds of environmental effects.   So

15 what we're doing is we're evaluating a number of

16 source terms of nitrogen pollution, we're evaluating

17 a number of terms that reflect the sensitivity of

18 the parks to being damaged by nutrient enrichment

19 aspects.   And that includes the distribution of

20 vegetation types.   Some types are far more sensitive

21 to those kinds of effects than others.   So we

22 tabulate and quantify and map how much of these

23 various types of vegetation that are most sensitive

24 are present in the various parks.

25        We also map and tabulate the locations of

1  high elevation lakes, which are often nitrogen

2  limited rather than P limited, as we're dealing with

3  in this case.  So we're trying to identify the

4  locations of the lakes that are likely to be most

5  sensitive to that kind of damage.

6  Q.   Doctor, what federal agencies are you working

7  with currently other than the Forest Service?

8  A.   Well, that one was the Park Service.

9  Q.   I'm sorry, the Park Service.

10 A.   Forest Service is a good example.  I'll give

11 you one for the Forest Service.  I'm a project

12 manager of developing protocols -- nationwide

13 protocols for the Forest Service Air Program.  So

14 this would be -- the different offices of the Forest

15 Service, when they're involved in environmental

16 sampling, they collect the data using whatever

17 methods, and it's not standardized, and that's

18 problematic.

19      So they've asked us to establish protocols

20 in five areas.  One is lake and stream sampling

21 protocols.  The second one is laboratory analysis

22 protocols.  Quality assurance, quality control

23 protocols, data analysis protocols, and then some

24 biological protocols that have to do with benthic

25 invertebrates in streams and zooplankton in lakes.

1  Q.   Do you have any current projects ongoing with

2  the Environmental Protection Agency?

3  A.   Yes, a couple.  One example would be as part of

4  the new National Lake Survey which was conducted in

5  the summer of 2007, I'm still involved in some work

6  on that.  And what that entails is that was a

7  statistical or a random-based sampling of over a

8  thousand lakes around the country from looking at

9  responses of lakes to a number of different kinds of

10  stressors.

11       And the statistical design is important

12  because that allows them to make estimates across

13  all lakes in the entire country, what percentage of

14  the lakes do this or are like that, for example.

15       But what it doesn't tell is what the

16  background or reference conditions might be or what

17  might be an achievable goal and for different

18  chemical and biological parameters in those lakes.

19  So there's a desire by EPA to sample other lakes to

20  try to find relatively pristine sites and call them

21  reference lakes that they can compare the results of

22  the statistical sampling to.

23       We were hired in working with collaboration

24  with scientists from Oregon State University to help

25  them to do that, to evaluate available data in a

1  number of regions around the country in terms of the

2  chemistry, looking at aerial photos, land use, land

3  cover to identify groups of candidates.

4       So we would tell the agency, if you want to

5  find candidate reference lakes in the northeastern

6  United States, this is our list of the ones based on

7  the information we have that we think are your best

8  bet.

9       The reason that's important is because if

10  they go out and search haphazardly and they're

11  spending $20,000 apiece to do these lakes, and they

12  turn out not being referenced and not part of the

13  statistical part, they can't use the information.

14  So it's about helping them to save money by giving

15  them a tool that will better enable them to find

16  reference lakes in the various regions.

17  Q.   Doctor, are you presently involved in any work

18  around something that's called critical loads?

19  A.   Yes.

20  Q.   Could you describe that briefly?

21  A.   Yes.  I have a number of projects on critical

22  load.  The critical load is the level of pollution

23  above which ecosystem damage is expected.  And the

24  flip side is, if the pollution levels are high, is

25  how low do you need to reduce the pollution so that

```
 1   you can allow a resource for recovery.  So that's a
 2   critical load.
 3         And there are different ways to estimate or
 4   calculate those.  And they're based on models.  And
 5   we have a number of projects throughout the eastern
 6   United States on calculating those critical loads.
 7   Q.   Who would be your client in those critical load
 8   projects?
 9   A.   We have one that's called the multiagency
10   critical loads project.  We have funding in that
11   project and a cooperative arrangement with Park
12   Service EPA and Forest Service.  USGS is also
13   involved.
14         I have another critical loads project for
15   the New York State Energy Research and Development
16   Authority.  So that's a state project rather than a
17   federal project, and that's on critical loads, too.
18   Q.   Doctor, you mentioned, I believe, briefly
19   earlier that you had done some environmental
20   restoration work.
21   A.   Yes.
22   Q.   Do you recall that?  In addition to E&S
23   Environmental, do you have a business called E&S
24   Restoration?
25   A.   It's called E&S Environmental Restoration,
```

1    Inc.  A business I started in 1996.

2    Q.   Can you describe briefly the type of work and

3    projects in which you have been personally involved

4    as a result of that business.

5    A.    That business has focused on on-the-ground

6    restoration projects.  It's a very small company.

7    It's not a major component of what I do.

8          On-the-ground restoration projects, a

9    number of them have been on agricultural lands that

10   have cattle operations, especially dairy farms.

11         We've also been involved in implementation

12   of Best Management Practices of a variety of sorts

13   on agricultural lands and on forestlands.  They

14   involve things like erosion control, streambank

15   stabilization, invasive weed identification and

16   eradication, fencing cattle out of streams,

17   providing offstream watering for cattle, planting

18   native plants in riparian buffers, modifying roads

19   and culverts to accomplish various objectives like

20   minimizing flooding of ag lands that cause pollution

21   issues, decommissioning logging roads to put them

22   back into vegetative communities.

23         So a variety of different kinds of

24   on-the-ground projects.  Then we also produce native

25   grass seed that we provide to the federal government

1  for restoration work.

2  Q.   Doctor, if I might, could I suggest that you

3  slow down just a tad.  I can tell you're excited

4  about what you do.  The court reporter, I've noticed

5  her grimace a time or two in trying to keep up.

6  I'll try to be more measured in my pace as well.

7          Doctor, we've identified some of the

8  federal agency clients that you have worked for.

9  Have you also worked for environmental stakeholder

10  groups?

11  A.   Yes, quite a few.  I guess the best example is

12  watershed councils.  I've worked for probably about

13  eight or ten watershed councils, and those projects

14  have mostly been focused on constructing watershed

15  assessments and watershed analyses.

16          The other stakeholder group that I've

17  worked with quite a lot is called the Southern

18  Appalachian Mountain Initiative.  That was on a

19  project on a piece of real estate that extended from

20  Virginia and West Virginia in the north to Georgia

21  and South Carolina in the south on the Appalachian

22  Mountains.  That was a model-based project of

23  acidification responsive streams.

24  Q.   Doctor, obviously you're in that chair today

25  because we have a lawsuit.  And your services in

1  this case are provided in connection with a

2  lawsuit.  What percentage of your professional work

3  over the last, let's say, 20 years has been

4  comprised of working with lawyers in connection with

5  litigation?

6  A.    Well, if I take out this never-ending log case

7  I'm involved in right now, I'm sure it's less than

8  five percent.  It's quite small.  Then over more

9  recent years, maybe 10 percent, something like that.

10  Q.    Doctor, have you published the results of any

11  of your scientific work in the peer-reviewed

12  literature?

13  A.    Yes.

14  Q.    Could you provide the court with a brief

15  overview as to the scope and the magnitude of your

16  publication history.

17  A.    About a hundred peer-reviewed publications,

18  roughly including, some books and book chapters, a

19  lot of scientific journal articles, Encyclopedia of

20  Water entry, a variety of different things.

21  Q.    Doctor, we may have touched on this a little

22  bit with some of the questions about your projects,

23  but let me ask this directly.  What experience do

24  you have with regard to evaluating the likelihood of

25  pollutant transport to surface waters in watersheds?

1   A.   I've done that in a number of projects in

2   various ways.   I guess I could start with the

3   earliest one.   That would be some of the work in

4   Norway.   What we did is that work on biogeochemistry

5   was focused quite a lot on water flow paths and

6   changes in water flow paths during what we call

7   hydrological events, and those are rainstorms and

8   snow melt and rain on snow events.

9           So what that involved was looking at the

10  changes in the chemistry of drainage water, starting

11  with the precipitation coming in, the rain and the

12  snow, and then looking at how the chemistry of that

13  changed as it moved through the soil system.

14          So we could collect samples of soil water

15  at different layers in the soil profile during the

16  storms.   We would collect samples of throughfall

17  where the rain goes through the foliage in the

18  forest.   That changes the chemistry of the water.

19  We would analyze that.

20          We would collect samples of the stream and

21  analyze that.   Samples of the snow pack.   So looking

22  at different parts of the system and changes in the

23  hydrology as you move through the system and how

24  that impacts the chemistry, that was a rather

25  significant component of my postdoctoral research.

1    That would be the first one.

2         Another project that I did that was pretty

3    heavily focused on movement of chemicals or

4    constituents to streams would be a project to look

5    at the effectiveness of riparian buffers in

6    agricultural lands, on pasture settings.  And that

7    project, I set up I think it was 23 treatment cells

8    on pasture lands.  Each was about a hundred feet

9    long and about maybe 15 feet wide.  And we would

10   apply dairy cow manure to those plots, and they had

11   -- they were in different slope classes and they had

12   different sizes of riparian buffers installed, and

13   then we would be build gutter systems to collect the

14   runoff as overland flow and shallow groundwater

15   interflow.  So to collect that surface -- those two

16   surface layers of runoff because those were the

17   layers of hydrological flow that would contribute

18   the constituent that we were concerned about into a

19   stream.  It was fecal coliform bacteria that we were

20   focused on in that study.  So there was a lot of

21   that kind of effort there.  I can talk about other

22   examples, if you like.

23   Q.   Doctor, let me ask you about one specifically

24   that I don't think you have discussed yet.  Have you

25   been involved in the Tillamook Bay Watershed?

```
 1   A.    Yes.
 2   Q.    What type of work have you done in the
 3   Tillamook Bay?
 4   A.    I worked on the Tillamook system for about
 5   eight years, and that involved a variety of
 6   projects.  We did several watershed assessments
 7   there.  But a lot -- we did a characterization
 8   study.  The bay has five rivers that flow into it.
 9   There are big concerns there about salmonid
10   fisheries issues and about fecal indicator bacteria
11   getting to the bay where the oyster beds are, people
12   consume raw oysters, there is some health concerns
13   about that.
14         They're also concerned about riparian
15   vegetation integrity and water temperature that is
16   associated with that and erosional issues and also
17   nutrient issues.  So a number of concerns.
18         We did a characterization study for a year
19   where we sampled throughout different parts of the
20   watershed and made an evaluation and assessment of
21   what the chemistry was in each of the five rivers.
22   And as those rivers came out of the forest at what
23   we called the forest/ag interface, then as you moved
24   down through the agricultural lands, then we had
25   some urban lands and then the bay.
```

1            So we looked at data from the forest/ag

2    interface to reflect what was happening up in the

3    forest, and we looked at data just above the bay to

4    see what the intervening impacts were from the ag

5    lands and the urban lands.

6            So we did that characterization study.

7    Then we did episodic projects where we sampled

8    during storms.  I can't remember how many storms we

9    did, but it was a lot over about five or six years.

10   We would go out and sample repeatedly during a storm

11   and evaluate changes in the chemistry, the stream

12   water during that storm.  And the big focus of that

13   part was on the fecal indicator bacteria.

14           We also did a demonstration project.  I can

15   talk about that one, if you'd like.

16   Q.   In your Tillamook Bay Watershed assessment

17   work, did -- you described your sampling efforts --

18   did you bracket suspected sources in your sampling?

19   A.   That was another actually couple of projects

20   that we did in Tillamook was a bracketing-type

21   project.

22           In that, what we did -- I'll talk about two

23   because that was really my major focus, two of the

24   rivers.  What we did was to sample from the

25   forest/ag interface down into the bay and actually

1  into the bay itself at multiple intervals.

2  Depending on the river, there were maybe 12 to 20

3  different locations along the river where we would

4  sample.  And we would sample during storm events.

5  And we would sample at three locations in the middle

6  of the river and on the right and left sides of the

7  river so we could evaluate things coming in from the

8  sides.

9          So we would collect these samples and then

10  evaluate as you move downstream at what location did

11  the concentration of bacteria jump up.  Because if

12  the concentration of bacteria jumps up at that

13  location, especially if it happens repeatedly in

14  lots of storms and during different samplings during

15  the storm, then we would suspect that there's

16  something in that landscape between those two points

17  that's contributing bacteria.

18          So then we would identify all the land that

19  would drain into that reach of river, and we would

20  look at the land cover issues, we would tabulate the

21  housing clusters to evaluate septic system issues,

22  and then try to establish relationships between the

23  various pieces of real estate draining into the

24  slices and what the changes in fecal bacteria were.

25  So that was a way to get at the sources of fecal

1    indicator bacteria.

2    Q.   Doctor, in that assessment work, were you

3    assessing potential nonpoint sources?

4    A.   Yes.  We had some point source -- we had three

5    point sources in the watershed.  That was primarily

6    a nonpoint source project.

7    Q.   Doctor, in your professional experience in

8    assessing potential nonpoint sources, is it helpful

9    to have the sort of localized sampling approach that

10   you've described?

11   A.   It's critical.  Nonpoint source, by definition,

12   is a local issue.  It's a distributed pollutant.  If

13   you're not collecting information that's

14   site-specific and narrowly focused, it's very, very

15   difficult to figure out what's going on.

16   Q.   I'm going to go back for just a moment.  You

17   described this project involving -- I think you

18   described it as a demonstration project where there

19   was some plot studies done.  Do you recall that

20   testimony?

21   A.   Those were actually two projects, but yes.

22   Q.   I'm interested in the study where you were

23   actually evaluating in the field the movement of

24   constituents off of a pasture.

25   A.   Okay.

1  Q.   How would you describe that project?  Give me a

2  term to use.

3  A.   That would be an experimental buffer

4  effectiveness project.

5  Q.   Was that a natural rainfall study?

6  A.   Yes, it was.

7  Q.   I'm interested in how you collected the flow

8  that you were analyzing in those studies.  Could you

9  describe that briefly and keep your pace slow.

10  You're speeding up again.

11  A.   Sorry.  The more I like the project, the faster

12  I go.  So you can gauge which projects I like better

13  than others.

14        So what we did was we built a metal gutter

15  system to install at the base of each of our plots.

16  So we dug it two foot or more -- about two and a

17  half deep trench and then installed this buffer --

18  I'm sorry, installed this gutter.  And what the

19  gutter consisted of was a piece of metal that would

20  slide into the soil profile that would allow us to

21  capture that shallow interflow as well as the

22  overland flow over the top on the pasture

23  vegetation.

24        And then the water that came over the edge

25  and through that shallow interflow would then flow

1   down into the gutter.  And the gutter was divided

2   into various compartments, each of which was

3   connected by a tube to a collection bottle.

4            And so during the course of a rainstorm, we

5   would go out typically multiple times and we would

6   collect the samples and then take them immediately

7   to a laboratory and analyze them for bacteria.

8   Q.   Doctor, you described that project as an

9   assessment of overland flow.  Have any of the other

10  projects that -- it may be some that we already

11  discussed -- fall into that category of professional

12  work in assessing overland flow?

13  A.   Yes.  Overland flow is a pretty important part

14  of the demonstration project, so I want to come back

15  to that.  But overland flow is also a component of

16  what we did in the Norwegian research where we were

17  identifying locations in the watershed where most of

18  that work was focused where we did have some

19  overland flow, and it was overland flow of a

20  particular type where the groundwater table would

21  rise up to the point where when it would rain or the

22  snow would melt, there was nowhere for the water to

23  go, so it would flow over the surface.

24            At that time, I don't think people were

25  using the terms that are being used now.  That's an

1    infiltration excess overland flow.  I don't think

2    that term even existed.  But we were looking at that

3    same mechanism at that time.

4          But the other project where I've done quite

5    a bit of work with overland flow issues was the

6    demonstration project, also in Tillamook.  That was

7    working with farmers on implementing BMPs on their

8    pastureland.  I could talk about that one, if you'd

9    like.

10   Q.   Briefly, how did you evaluate overland flow

11   considerations in that work?

12   A.   In that work, what we did was to target places

13   where we had overland flow and try to remediate

14   those, because the main focus of that effort was to

15   quantify and to demonstrate improvement in bacterial

16   conditions in the stream in response to

17   implementation of Best Management Practices.

18         There were other issues that we were

19   concerned about, too:  Total suspended solids and

20   temperature, for example.  But bacteria was the main

21   one.

22         We identified places where overland flow

23   occurred, and then we tried to fix those areas.

24   Q.   Doctor, let's turn to your work in the present

25   project, this lawsuit.  What was your charge in this

1  case, if you were given one?

2  A.  I think I was given multiple charges.  By far,

3  the most important one, in my view at least, was to

4  evaluate the information that was put forth by the

5  experts from the plaintiffs.  So I was asked to

6  evaluate what they had done, their data, their

7  reports, and provide response -- evaluate those and

8  respond to them.

9       The other things that I was asked to do,

10  early on, I and my company played a major role in

11  pulling together the data because we didn't know

12  really what was going on with this new watershed to

13  us, and I think new watershed to many of the

14  attorneys and other experts as well.

15       So we pulled together data, landscape data,

16  GIS databases that would be used to evaluate the

17  watershed, a number of those.  And then we also

18  pulled together existing stream and lake data.  It

19  was not an exhaustive search, but it was a search to

20  get enough data to look at the patterns and to be

21  able to communicate to the other experts on our team

22  and to the lawyers on our team what the water

23  quality issues were and what things looked like.  So

24  we did quite a lot of that.

25  Q.  Doctor --

1    A.   I think those were my major charges.

2    Q.   Were you asked to evaluate the central

3    tendencies in any of the water quality data?

4    A.   Yes.  I remember we generated a lot of plots of

5    medians and quartiles, box-and-whisker plots of

6    concentrations of this and that in various media for

7    the data that were collected by the State.  So that

8    was further into the case where the State provided

9    data that we were able to look at.  And we did a lot

10   of that summary statistic work, again, to provide to

11   the other folks involved in the team to show them

12   what the data looked like.

13   Q.   Dr. Sullivan, in addition to the water quality

14   data that we've been discussing, what other

15   materials did you review in preparing your opinions

16   for this case?

17   A.   Well, I reviewed a lot of reports on both sides

18   of the case.  I think I reviewed most or all of what

19   we might call the effects reports.  I reviewed

20   deposition testimony, again, from many experts on

21   both sides.  I reviewed trial testimony from many

22   experts on both sides.

23   Q.   Doctor, with respect to the water quality data,

24   did you limit your review to the data that was

25   produced by the State's consultants in this case?

```
 1   A.    No.
 2   Q.    What other sources of water quality data did
 3   you consult for your analysis?
 4   A.    I took a look at some national scale studies
 5   for water quality data so we'd have some perspective
 6   of what the water chemistry in the IRW looked like
 7   in comparison to the country at large and other
 8   portions of the country.  I also looked at some
 9   Oklahoma-specific data.
10   Q.    Doctor, did you retrieve and evaluate any data
11   from the United States Geological Survey?
12   A.    Yes.
13   Q.    Did you retrieve and evaluate any data from the
14   U.S. EPA?
15   A.    Yes.
16   Q.    Okay.  Is there a database -- a water quality
17   database that's maintained by the EPA?
18   A.    Yes.  They maintain a database that's called
19   STORET.  It's not necessarily samples that were
20   collected and analyzed by the EPA, but it's a very
21   large database that people commonly will go to to
22   get an idea of what the patterns are in water
23   quality data.
24   Q.    As part of your work in this case, did you
25   evaluate any land use data?
```

1   A.   Yes.

2   Q.   Can you provide the court and the record with

3   the sum indication of what type of land use data you

4   looked at?

5   A.   Well, we used primarily the National Land Cover

6   Dataset, which is the primary dataset for the United

7   States to look at land cover issues.

8           I think that in terms of land cover, that

9   would be the main one.

10  Q.   Doctor, were you provided any information in

11  connection with your work in this case regarding

12  livestock populations or human populations?

13  A.   Yes.  We looked at human populations from the

14  U.S. Census primarily.  We looked at livestock

15  populations from the Ag census.  Yeah.

16  Q.   Doctor, let's turn to the substantive aspects

17  of your testimony, and let's start with your review

18  of phosphorus data.  Did you review any phosphorus

19  water quality data from watersheds outside of the

20  Illinois River Watershed?

21  A.   Yes.

22  Q.   Okay.  And you have, as part of your work in

23  this case, reviewed some of the testimony from some

24  of the State's experts that have occurred in this

25  trial, have you not?

1  A.    That's correct.

2  Q.    Did you review Dr. Stevenson's testimony?

3  A.    Yes.

4  Q.    Do you recall that Dr. Stevenson suggested that

5  the phosphorus levels in the Illinois River

6  Watershed in the receiving waters were elevated as

7  compared to phosphorus levels elsewhere?

8  A.    Yes, I remember that.

9  Q.    Do you agree with that testimony?

10  A.    No.  I think that it all depends on where you

11  look.  There are certainly streams and rivers around

12  the country that have higher phosphorus, and there

13  are streams and rivers that have lower phosphorus.

14  It's very site-specific.  It depends on where you

15  look.

16  Q.    Could you provide the court with sort of an

17  overview of how you went about your comparative

18  analysis of phosphorus levels in the watershed to

19  other available data.

20  A.    In the watershed, my major comparison for that

21  would be the comparison to Oklahoma statewide.  I

22  did some comparisons with the IRW to national

23  datasets as well, but the Oklahoma one, what I did

24  was to pull together the data from three data

25  sources.

1              These were the sources that had large

2    volumes of data on total phosphorus from different

3    streams throughout Oklahoma.  It was EPA STORET,

4    Oklahoma Water Resources Board, and the U.S.

5    Geological Survey.  So I pulled together data from

6    those agencies for the state, including the Oklahoma

7    portion of the IRW.

8    Q.   Did you look at any regional or national data

9    on phosphorus concentrations?

10   A.   Yes.

11   Q.   And could you identify generally what

12   information and data was available to you for that

13   analysis?

14   A.   There was data from EPA.  There was data from

15   USGS.  There was a study done primarily in Oklahoma,

16   there were over 500 samples.  There were a few in

17   Arkansas, but the vast majority in Oklahoma.

18   Q.   Doctor, based upon the data that you have

19   reviewed, have you formed an opinion as to whether

20   or not phosphorus levels in the Illinois River

21   Watershed streams and rivers are generally higher

22   than phosphorus levels regionally or across the

23   country?

24   A.   Based on the analysis I did, there's no reason

25   to think that those samples are different than what

1   we see other places.  They're in the same range of

2   what we find many places.

3   Q.   Doctor, could you turn -- do you have a binder

4   in front of you with some exhibits in it?

5   A.   Yes.

6   Q.   Okay.

7        MR. GEORGE:  Your Honor, hopefully one has

8   been provided to you and counsel has one.

9   Q.   (By Mr. George)  Could you turn to tab 1 in

10  that notebook, please, and find Tyson Defendant

11  Demonstrative 355.

12  A.   Yes.

13  Q.   Doctor, did you prepare this demonstrative

14  exhibit?

15  A.   Yes, it was prepared under my direction.

16  Q.   And what data is set forth in this exhibit?

17  A.   This would be the median total phosphorus

18  concentration in streams at different locations and

19  from different studies.

20       THE COURT:  Before we go any further,

21  Mr. George's question asked you whether or not you

22  had an opinion regarding phosphorus levels being

23  generally higher than phosphorus levels regionally

24  or across the country.  Just so I have an overview

25  before we get into this, let's focus on this

1    particular ecoregion.

2            Are, in your opinion, phosphorus levels in

3    the IRW generally higher than phosphorus levels

4    within the ecoregion?

5            THE WITNESS:  For the most part, I would

6    say that that's true.

7            THE COURT:  They're higher --

8            THE WITNESS:  They are higher than the

9    ecoregion --

10           THE COURT:  That was a compound question.

11   I wanted it to be a little clarified.  Go ahead.

12           MR. GEORGE:  Thank you, Your Honor.

13           THE COURT:  Go ahead.

14   Q.  (By Mr. George)  Dr. Sullivan -- and I'm glad

15   His Honor asked that question, because we were going

16   to walk through this exhibit which I think will

17   illustrate exactly that point.

18           Dr. Sullivan, can you walk us through Tyson

19   Defendant Demonstrative 355 and explain what it

20   shows in terms of the comparison between phosphorus

21   levels and streams and rivers in this watershed to

22   the other data that was available.

23   A.   Okay, I'll do my best.  It's a little bit of a

24   complicated plot.  In the middle, we have the two

25   brown bars that are the median from Dr. Olsen's

1   master database.  We've got a base flow bar, and

2   we've got a bar to represent all flow.  So that

3   gives an idea from the thousands of samples that

4   Dr. Olsen collected in the IRW what the levels

5   were.  Then the two to the right of that were from

6   streams that were analyzed by Dr. Stevenson in his

7   biological studies.

8           And he sampled, I think it was four or

9   five -- I think it was four points in time.  And the

10  point in time would have been, say, the spring, for

11  example, in a year like 2006.  So he had about four

12  points in time.  And I reported his upper and his

13  lower so we'd see what kind of range he picked up in

14  terms of median phosphorus.

15  Q.   What were his ranges?

16  A.   From essentially 0.6 to 0.8.

17  Q.   Doctor, with respect to Dr. Olsen's water

18  quality data, what were the ranges of medians in

19  terms of phosphorus concentration within that

20  dataset for the Illinois River Watershed?

21  A.   They were both about 0.6.

22  Q.   And if you could continue explaining how those

23  values relate to the other available data.

24  A.   Okay.  So those values compare to a nationwide

25  survey.  We can look at two nationwide surveys.

1    We've got the one on the far left, that's the USGS

2    survey.  And the median concentration there would be

3    about double what we have in the IRW.  Then we could

4    go to -- so that would be the one for the U.S.  Then

5    we would go --

6    Q.  Let me stop you there, Doctor.  The value for

7    the United States of .12 milligrams of liter for

8    total phosphorus, is that what it sounds like, a

9    nationwide survey of streams?

10   A.  It's a nationwide survey of rivers, 250 rivers.

11   Q.  Thank you.

12   A.  So the minimum size was -- I believe it was a

13   thousand square kilometers.  That's quite a bit

14   smaller than the IRW, but it's still a good-size

15   system.  So those are rivers.

16   Q.  Just so we're clear, Doctor, how do the

17   phosphorus levels reported by the State's experts

18   for the Illinois River Watershed streams and rivers

19   compare to the median value nationally for rivers?

20   A.  The IRW is about half of the national level.

21   Q.  Thank you.  If you could continue with the

22   discussion of the USGS and OWRB dataset.

23   A.  Those data were 563 sites in Oklahoma.  There

24   were just four Arkansas sites.  So it's principally

25   an Oklahoma database.  I think this points out an

1   important issue, is that the result that you get

2   depends partially on what size stream you're looking

3   at in many cases.  That's not always the case, but

4   oftentimes that's the case.

5          And so on the larger streams, fourth order

6   and larger, it was actually fairly close to the USGS

7   number.  But then on the smaller streams, it was

8   lower, and it would depend on how steep those

9   streams were.

10          For perspective, the IRW where it flows

11  into Lake Tenkiller is a seventh-order stream.  So

12  that's a bit bigger than the fourth and higher here.

13  Q.   Doctor, if we could turn now to the Wadeable

14  Streams Assessment information that's shown here.

15  Did you have available a database from EPA in

16  connection with this Wadeable Streams Assessment?

17  A.   Yes.

18  Q.   Is that, again, a national database?

19  A.   Yes.  It's another database that was selected

20  with a statistical basis.

21  Q.   I notice you have two different median values

22  reported from that dataset for your comparisons

23  here.  Could you explain that?

24  A.   Yes.  I picked out the sites in Oklahoma and

25  Arkansas.  There were 57 of those, so it's quite a

1    few.  But I do need to provide the caveat that the

2    study was not designed such that the data from any

3    one state would be statistically representative of

4    that state.  But, nevertheless, we have quite a few

5    sites, so I think it's very illustrative.

6    Q.   What were the median phosphorus concentrations

7    in the 57 sites in this survey in Oklahoma and

8    Arkansas?

9    A.   They were about .05.

10   Q.   How does that compare generally to the

11   phosphorus concentrations reported by Dr. Olsen and

12   Dr. Stevenson for the Illinois River Watershed?

13   A.   Very similar.

14   Q.   Now, I notice -- and I think this gets to His

15   Honor's question.  That the last bar on this exhibit

16   is described as Ozark and Ouachita segment of the SA

17   ecoregion.  Do you see that?

18   A.   Yes.

19   Q.   What is the SA ecoregion?

20   A.   That's the Southern Appalachian ecoregion.  The

21   thing we have to be careful of with ecoregions is

22   that there are multiple schemes that are used.  So

23   the ecoregion scheme that was used for EPA's

24   Wadeable Stream Assessment that was published in

25   2006 was what's called an Omernik Level 1 ecoregion.

 1    So they're fairly large.
 2           The ecoregion scheme that was used in the
 3    Wadeable Stream Assessment that was published by EPA
 4    in 2006 was what's called an Omernik, a person's
 5    name, Omernik, O-M-E-R-N-I-C-K, Jim Omernik.
 6    Omernik Level 1.  So those are large.
 7           The southern Appalachian ecoregion that
 8    they used includes the IRW, the Ozarks, and
 9    Ouachita, but it extends all the way up to
10    Pennsylvania.  So it's quite a large ecoregion.
11           Then there are level 2 and level 3
12    ecoregions as well.  The level 3 ecoregion is a much
13    finer scale.  That would be -- the Ozark area would
14    be a level 3.
15    Q.  Is that the ecoregion in which the Illinois
16    River Watershed is situated?
17    A.  It's situated in both.  It depends on what
18    scale you're looking at.  Then there are other
19    regions, too, that are maintained by the Forest
20    Service that are different from Omernik.  But
21    depending on which level you're looking at, the
22    answer is yes.
23    Q.  Doctor, with respect to the Ozark and the
24    Ouachita segments of that ecoregion, what was the
25    reported phosphorus concentration median value

1  within that dataset?

2  A.    That was about .01.

3  Q.    And do you agree that's lower than the

4  phosphorus concentrations that are reported in the

5  data by Dr. Olsen and Dr. Stevenson for the Illinois

6  River Watershed?

7  A.    Yes, I do.

8  Q.    Okay.   Doctor, did you evaluate the land uses

9  within the watersheds that comprise the value of

10  .011 phosphorus in the Ouachita and Ozark segments

11  of the ecoregion?

12  A.    Yes, I did.

13  Q.    How did those land uses, in terms of

14  development and pasture versus forest, compare to

15  the Illinois River Watershed?

16  A.    Well, the big difference is the amount of

17  forest.   The amount of forest is a really important

18  variable in looking at phosphorus in streams, is how

19  much forest is in your watershed.   If the watershed

20  is forested, you typically -- not always, but

21  typically -- will have much lower levels of

22  phosphorus in the water than if your watershed has

23  other land uses that are more impacted by people and

24  their animals:   Urban areas, rural residential

25  areas, agricultural areas of all types.   So that's

```
 1   not a surprise.
 2          The level of forest in the watersheds that
 3   were sampled by EPA in this study, I think that the
 4   average was about 72 percent of the watersheds that
 5   were included in that Ozark/Ouachita were forested.
 6   Q.   How does that compare to the percentage of
 7   forestland in the Illinois River Watershed?
 8   A.   Illinois River Watershed forest is much lower,
 9   it's in the 40s; maybe 43, 45 percent, something
10   like that.
11   Q.   Does that difference in percent forest have any
12   impact on your comparative analysis and the
13   conclusions you draw from this reported value for
14   the ecoregion of .011?
15   A.   Well, it does.  It's partially a function of
16   how much forest you have, and it's also partially a
17   function of the watershed area.  The watersheds that
18   were included in the EPA study tended to be very
19   small.  They were all quite a bit smaller than the
20   IRW, but they tended to be a very small fraction of
21   the size of the IRW.
22   Q.   How does the watershed size impact the
23   relationship one would expect to see with phosphorus
24   concentrations?
25   A.   Well, in larger watersheds, you're far more
```

1    likely to be picking up agricultural and urban lands

2    as you move downslope.  The typical situation in the

3    United States is that if you're looking at your

4    watersheds, the top sections -- if you're in a

5    forested region or generally forested region, the

6    top sections of your watershed are most likely to be

7    forested and on steeper slopes.  Then as you move

8    downhill to lower elevations, you tend to get more

9    flat terrain that's more suitable for agriculture.

10         So in the larger watersheds that pick up

11   that additional real estate downslope, you're more

12   likely to get more urban and agriculture

13   development.

14         I want to point out something that's really

15   important in this evaluation is that the IRW is in a

16   lot of ways upside down in the sense --

17         MR. BULLOCK:  I'm going to ask that the

18   witness restrain himself to only ask questions --

19   answer the question asked rather than giving long

20   soliloquies.

21         THE COURT:  Sustained.  Mr. George, go

22   ahead.

23   Q.   (By Mr. George) Dr. Sullivan, is there another

24   aspect of difference between this watershed and the

25   watersheds included in the ecoregion data that you

1   looked at that you believe is important and may

2   explain some of the differences?

3   A.   Yes.  I think this business of the IRW being,

4   to some extent, upside down and that the more

5   typical pattern -- it's not universal, by any means,

6   but the more typical pattern is in the watershed,

7   you have your forested land at the top and steeper

8   slopes, and as you move downhill, if you're going to

9   have ag lands, you'll pick it up generally at the

10  lower elevations that tend to be flatter.  Same

11  thing for the urban areas.  That's the typical

12  pattern that I'm used to seeing in lots of places

13  around the country and lots of studies.

14          In the IRW, in contrast, most of the urban

15  development is concentrated at the very top of the

16  watershed.  And so you have urban impacts

17  influencing the headwaters of the system.  And then

18  as you start to move downstream, you're picking up

19  more and more of the agricultural influences.

20          Actually, most of the forests are the

21  furthest downstream.  So you have -- whatever

22  pollutants might be associated with human activity,

23  you're seeing them at the top, in the beginning,

24  which is the opposite of what we normally find.

25  Q.   Doctor, when I look at Demonstrative 355, I

1   notice on the vertical axis that your analysis is

2   based upon total phosphorus; is that right?

3   A.   That's correct.

4   Q.   Why did you use total phosphorus in your

5   analysis?

6   A.   For multiple reasons.  I think the most

7   important one is because the water quality standard

8   that's scheduled to take effect in a couple of years

9   in the IRW is based on total phosphorus, and that's

10  what this lawsuit is about.  So I mean, that was

11  good justification.

12        But in addition to that, when I'm looking

13  for data, there typically are more data available

14  for total phosphorus because it's more commonly

15  measured than other forms, like soluble reactive

16  phosphorus or other forms of phosphorus.

17        Then the final issue is that, to some

18  degree, the forms are interconvertible.  I didn't do

19  calculations to evaluate how long that would take or

20  the way that might occur, but there are

21  interconversions that can take place, so if you do

22  total phosphorus, then you're capturing all of the

23  phosphorus that's there.

24  Q.   Doctor, did you also undertake any comparison

25  of phosphorus concentrations in streams and rivers

1    in the Illinois River Watershed to phosphorus

2    concentrations reported for streams and rivers

3    throughout the state of Oklahoma?

4    A.    Yes, I did.

5    Q.    And what sources of data did you use in that

6    analysis?

7    A.    I used EPA STORET, Oklahoma Water Resources

8    Board and U.S. Geological Survey.

9    Q.    Doctor, in that analysis, that comparative

10   analysis, did you compare individual samples or did

11   you aggregate the data?

12   A.    I aggregated the data.

13   Q.    Why did you do that?

14   A.    So that we could see the spatial patterns.  I'm

15   interested in what the phosphorus concentrations are

16   like at different locations.  And it's a much more

17   robust analysis if you include a number of data

18   points for each location.

19        There are many reasons why you might see a

20   particularly high or particularly low value for any

21   parameter, including phosphorus.  So to best capture

22   of what's going on at a particular location, you'd

23   like to have multiple samples.  And so that's why I

24   aggregated them.

25   Q.    That comparative analysis for the statewide

1    work in Oklahoma, did you compute something that's

2    referred to as geomeans?

3    A.    Yes, I did.

4    Q.    What is a geomean?

5    A.    It's also called a geometric mean.  It's a

6    measure of central tendency for the data.  There are

7    basically three measures of central tendency that

8    are commonly used in environmental data.  There's a

9    fourth, but it's very seldom used.  One is the mean

10   or the average.  There's the median, and the third

11   is the geomean.

12   Q.    Doctor, are you aware that the .037 criterion

13   that you mentioned earlier is expressed as a

14   geometric mean, or geomean?

15   A.    Yes.

16   Q.    Do you have an understanding as to whether, for

17   that purposes of that standard, there is some time

18   frames around the number of samples over a period of

19   time to compute the geomean?

20   A.    That's correct.

21   Q.    What are those time constraints and

22   requirements?

23   A.    Five or more samples over a 30-day period.

24   Q.    Doctor, did you limit your geometric mean

25   analysis of the statewide phosphorus concentration

1  data to samples collected at a site within 30 days?

2  A.   No, I did not.

3  Q.   Why not?

4  A.   Well, the main reason I didn't was because I

5  wouldn't have had enough data points to do the

6  spatial analysis that I was trying to do.  And if I

7  had had enough data points, I would be restricting

8  them further by eliminating a lot of my data by that

9  restriction.  Again, when you have more data, it's a

10 much more robust analysis of spatial patterns.

11        But the final reason was that it's really

12 not necessary or useful for me to do that.

13 Environmental studies are typically not conducted

14 that way for looking at spatial patterns.  I was not

15 trying to evaluate regulatory compliance of any

16 sort.  I was trying to evaluate the spatial patterns

17 and available data.

18 Q.   You used a phrase that I'm not sure has been

19 used in this case yet, but "spatial patterns."

20 Could you, for the benefit of the record, describe

21 what that is.

22 A.   Spatial pattern analysis is something that I do

23 quite a lot of in my field.  And it's a way of

24 looking at the data that we have, either we collect

25 it ourselves or we obtain it from government

1  agencies or other groups, and trying to see how the

2  concentrations -- typically what we look at, how

3  those concentrations change across space.  Are they

4  going up as you move downhill?  Are they going

5  down?  Are they high in one region?  Low in another

6  region?  What are the patterns in the concentrations

7  expressed as a measure of central tendency across

8  space?  And how are those patterns related to the

9  things that we believe might influence those

10 patterns, different kinds of land uses, different

11 activities, different pollution sources or

12 whatever?

13 Q.   Doctor, did you include in your report maps

14 plotting the geometric means for total phosphorus

15 levels in streams and rivers across the state?

16 A.   Yes.

17 Q.   Could you turn in your notebook or binder to

18 tab No. 2.

19 A.   Yes.

20 Q.   And could you identify for the record what's

21 been marked as Defendants' Joint Exhibit 2221.

22 A.   Yes.  That's a map from my report.

23 Q.   And was this figure prepared under your

24 direction?

25 A.   Yes, it was.

1   Q.   Doctor, could you identify the source of the

2   data that's represented on this figure?

3   A.   Oklahoma Water Resources Board.

4        MR. GEORGE:  Your Honor, I move for the

5   admission of Joint Exhibit 2221.

6        MR. BULLOCK:  No objection.

7        THE COURT:  Defendants' 2221 is admitted.

8   Q.   (By Mr. George)  Doctor, could you explain how

9   this figure was prepared and explain what it shows

10  in connection with your spatial analysis.

11  A.   Yes.  The -- on the map of Oklahoma, there are

12  small black dots at the base of each of these bars.

13  And those dots represent the locations where samples

14  were collected.  And we plotted all the locations

15  where there were five or more samples available to

16  evaluate that were collected during the time period

17  between 2000 and 2007, and then the data for each

18  location would be represented as a geomean of those

19  available data.

20        So each location has a bar.  The location

21  of the site is identified by the black dot.  The

22  height of the bar is proportional to the

23  concentration.  And the scale bar is down at the

24  bottom middle.  It shows you the height of a bar

25  that would be 0.5 milligrams per liter of total

1   phosphorus.  Then there's an inset map that blows up

2   the IRW so you can see it a little bit better.

3   Q.   Doctor, the Illinois River Watershed and the

4   data from OWRB related to that watershed is shown on

5   this map; is that right?

6   A.   That's correct.

7   Q.   Doctor, what does this analysis show about the

8   levels of total phosphorus in streams and rivers in

9   the Illinois River Watershed compared to levels of

10  total phosphorus in other streams and rivers

11  throughout the state of Oklahoma?

12  A.   Well, it shows a number of things.  One is, I

13  neglected to point out in your earlier question,

14  that the color of the bars has some meaning.  If the

15  bar is colored green, that means that the geomean

16  concentration was below the .037 value.  If the bar

17  was orange, that was above the .037 value.

18  Q.   Let me stop you there, Doctor.  You're not

19  suggesting, are you, that the .037 standard applies

20  throughout the state of Oklahoma, are you?

21  A.   No.  The .037 is a scenic river standard.  It's

22  applicable in the IRW and some other places.

23  Q.   Continue on with your answer, please.

24  A.   So in terms of spatial patterns, we see several

25  things.  Most important to me in the context of this

1  case is that what we see for geomean concentrations

2  in the IRW are not unusual compared to geomean

3  concentrations elsewhere throughout the state.  That

4  would be the first thing.

5          The second thing is that where there is

6  evidence that there are particularly high

7  concentrations, they're not in the IRW but, rather,

8  in the central part of the state.  That would be the

9  second conclusion.  I can go into more detail if

10 you'd like me to.

11 Q.  Let me ask you to focus on the eastern third of

12 the state of Oklahoma in this map, Dr. Sullivan.

13 Based upon your review of the data, have you formed

14 an opinion as to whether the waters in the eastern

15 third of the state of Oklahoma demonstrate markedly

16 higher phosphorus concentrations when compared to

17 the rest of the state?

18 A.  They do not.

19 Q.  As part of your work in this case, did you

20 evaluate levels of poultry production across

21 Oklahoma?

22 A.  Yes, I did.

23 Q.  What did you learn as a result of that

24 evaluation?

25 A.  That the poultry densities are highest by a lot

1   in the eastern part of the state.

2   Q.   Did you include a figure in your report that

3   shows a representation of that data?

4   A.   Yes, I did.

5   Q.   Let me ask you to turn to tab 6, please.

6   A.   Yes.

7   Q.   And let me ask you to identify for the record

8   what's been marked as Defendants' Joint Exhibit

9   2225.

10  A.   That's a figure from my report.

11  Q.   Okay.  Was this report prepared under your

12  direction?

13  A.   Yes, it was.

14  Q.   And what data is shown on this report?

15  A.   Total poultry numbers by county throughout

16  Oklahoma for the year 2002.

17  Q.   What's the source of that data?

18  A.   The Oklahoma 2002 Census of Agriculture.

19          MR. GEORGE:  Your Honor, I move for

20  admission of Defendants' Joint Exhibit 2225.

21          MR. BULLOCK:  No objection.

22          THE COURT:  Defendants' 2225 is admitted.

23  Q.   (By Mr. George)  Dr. Sullivan, does this map

24  illustrate what you were just saying regarding

25  poultry production being largely confined to the

1  eastern third of the state?

2  A.   Yes, sir.

3  Q.   Now, let's go back, if we can.  And could you

4  turn to tab 3.  Find what's been marked as

5  Defendants' Joint Exhibit 2222.

6  A.   Yes.

7  Q.   And could you identify that document for the

8  record, please.

9  A.   That's a figure from my report.

10 Q.   Was this figure prepared under your direction?

11 A.   Yes.

12 Q.   And does it show some data represented on the

13 figure?

14 A.   Yes, it does.

15 Q.   What's the source of that data?

16 A.   EPA STORET.

17 Q.   Doctor, does this figure follow the same format

18 as Defendants' Exhibit 2221, just uses a different

19 dataset?

20 A.   That's correct.

21        MR. GEORGE:  I move for the admission of

22 Defendants' Joint Exhibit 2222.

23        MR. BULLOCK:  No objection.

24        THE COURT:  2222 is admitted.

25 Q.   (By Mr. George) Doctor, why do we have two maps

1  of the state of Oklahoma with these bars of

2  phosphorus concentrations?

3  A.   There are two different data sources.

4  Q.   And the data source with respect to Defendants'

5  Joint Exhibit 2222 is EPA STORET; is that right?

6  A.   That's right.

7  Q.   Doctor, what conclusions do you draw from your

8  review of this data?

9  A.   The same conclusions that I drew from the

10  Oklahoma Water Resources Board data, that the

11  concentrations of total phosphorus expressed as a

12  geomean are not unusual in the IRW compared to the

13  rest of the state.  In fact, where we do see a

14  pattern -- a spatial pattern of somewhat higher

15  values, it's in the central part of the state.

16  Q.   If you could turn back to tab 2, which is

17  Defendants' Joint Exhibit 2221, and look at the

18  inset of the Illinois River Watershed.  Can you find

19  that, please.

20  A.   Yes, sir.

21  Q.   I notice that there is one bar in this dataset

22  that appears to be higher than the rest.  Do you see

23  that?

24  A.   Yes.

25  Q.   What's the location of the water quality

10619

1   sampling site that is reflected by those higher

2   concentrations of phosphorus?

3   A.   It's on Sager Creek about three miles below the

4   Siloam Springs wastewater treatment plant.

5   Q.   Now if we could turn to tab 4, please.  If you

6   could find Defendants' Joint Exhibit 2223.

7   A.   Yes.

8   Q.   Could you identify that document for the

9   record, please.

10  A.   It's a figure from my report.

11  Q.   And was this figure prepared under your

12  direction?

13  A.   Yes, it was.

14  Q.   Does this figure involve the same formatting of

15  data statewide that we've seen in the prior two

16  exhibits?

17  A.   Yes.

18  Q.   Doctor, what's the source of the data shown on

19  this figure?

20  A.   U.S. Geological Survey.

21           MR. GEORGE:  I'd move for the introduction

22  of Defendants' Joint Exhibit 2223.

23           MR. BULLOCK:  No objection.

24           THE COURT:  2223 is admitted.

25  Q.   (By Mr. George)  I note on this map we have

1  fewer bars than some of the ones we've seen

2  previously.  Do you have an explanation for that?

3  A.   There's just fewer data available in terms of

4  number of locations with the USGS data than the

5  other two data sources.

6  Q.   Doctor, do you draw any conclusions from this

7  dataset regarding how phosphorus levels in the

8  watershed compare to phosphorus concentrations

9  statewide?

10  A.   I wouldn't draw conclusions in a spatial

11  analysis from this dataset.  There simply are not

12  enough data points represented to do that.  But I

13  would say that they're not inconsistent with what

14  we've seen elsewhere.

15  Q.   Last map, Doctor.  If you could turn to tab 5

16  in your binder and find Defendants' Joint Exhibit

17  2234.

18  A.   Yes.

19  Q.   Can you identify for the record this exhibit.

20  A.   It's a figure from my report.

21  Q.   Was it prepared under your direction?

22  A.   Yes.

23  Q.   And, Doctor, can you identify the source of the

24  data that is shown in Defendants' Joint Exhibit

25  2234.

```
 1  A.   This is a combination of all the data shown on
 2  the three previous figures with data from EPA
 3  STORET, Oklahoma Water Resources Board and USGS.
 4  Q.   Why, Doctor, did you combine all of that data
 5  into one map?
 6  A.   I think it's, again, the more data you have,
 7  the better you can resolve your spatial patterns and
 8  see what's going on spatially across the area of
 9  interest.  There's no reason why they have to be
10  separated simply because they're different
11  datasets.  I thought it was useful to look at them
12  separately, but then a combined map is -- I think is
13  even more illustrative simply because you've got
14  more data.
15        MR. GEORGE:  I move for the introduction of
16  Defendants' Joint Exhibit 2234.
17        THE COURT:  Any objection?
18        MR. BULLOCK:  No objection.
19        THE COURT:  2234 is admitted.
20        Doctor, in terms of comparison and --
21  wouldn't a more helpful comparison have been those
22  waterbodies within this Ozark subecoregion?
23  Oklahoma has quite a variety of different
24  hydrological systems.
25        THE WITNESS:  Yes.
```

```
 1              THE COURT:  Now Oklahoma River, formerly
 2   the Canadian, that goes through Oklahoma City is
 3   quite different.  The Arkansas comes across the
 4   Great Salt Plains and Kansas.  This is quite a
 5   different type of waterbody than those out in
 6   western and central Oklahoma, aren't they?
 7              THE WITNESS:  Yes, they are.
 8              THE COURT:  In terms of phosphorus.  Now,
 9   your focus on the west coast, the Tillamook,
10   T-I-L-L-A-M-O-O-K; is that right?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  That focus was basically on
13   bacterium because of oyster production, or what was
14   it?
15              THE WITNESS:  Different studies focused on
16   multiple things.  We focused on total suspended
17   solids, nutrients, temperature in some of the
18   studies.  But the fecal indicator bacteria, fecal
19   chloroforms was a major part of what we did.
20              THE COURT:  What was the instigator of
21   that?  Was that oyster beds?
22              THE WITNESS:  Oysters.
23              THE COURT:  I remember sometime in the
24   past, they were suggesting that one not eat oysters
25   from certain areas.
```

1              THE WITNESS:  Correct.

2              THE COURT:  Was this one of those areas?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.

5              THE WITNESS:  But I would say, Your Honor,

6    if I may, is that the question of the ecoregion

7    comparison, it really depends on what the question

8    is that you're asking.  And the reason is because

9    people and their animals can put phosphorus into any

10   stream.  It doesn't matter what ecoregion you're

11   in.

12             In terms of evaluating the phosphorus in

13   the IRW compared to other watersheds, the best

14   comparison would be to look at watersheds that had

15   similar land use and similar populations of cattle

16   and people and whatnot, and different levels of

17   poultry.  That would really be a way to get at the

18   questions that the court is most concerned with.

19             THE COURT:  Hopefully with a similar

20   geology, right?

21             THE WITNESS:  Well, the similar geology is

22   important mainly with respect to what the background

23   or pristine level would be.

24             THE COURT:  Of course, that's what

25   generates a lot of the concern here, because

1   everybody remembers how pristine this area was.  It

2   was crystal clear.

3            THE WITNESS:  Uh-huh.  But to me, the issue

4   there is that what's assumed -- we don't know what

5   the background level is, but what's assumed to be

6   the background level throughout most of the U.S.,

7   really not a large variation there.

8            THE COURT:  This is -- with all due

9   respect, this isn't most of the U.S.  It's really

10  not.

11           THE WITNESS:  Right.

12           THE COURT:  This was a -- there's testimony

13  on this record that this was pristine water, all

14  right?

15           THE WITNESS:  Correct.

16           THE COURT:  It's not the rest of the United

17  States.  And so you really have to look at the

18  background at what the reference was, right?

19           THE WITNESS:  Exactly, Your Honor.  That

20  was the point I was trying to make, but not very

21  well, I think.  The point is that the background,

22  even though there are various geologies, probably

23  didn't differ all that much.

24           People have been throwing out background

25  levels in this case for the IRW.  Nobody knows what

1  it was, but you're looking at .01 to .02 milligrams

2  per liter, something like that for phosphorus.  So

3  we're looking at values that are higher than that.

4          THE COURT:  As part of your analysis here,

5  did you look at those argued reference points,

6  Nickel's Preserve, etcetera?

7          THE WITNESS:  I certainly looked at the

8  Nickel Preserve, but I was thinking in terms of the

9  background levels for the stream themselves and for

10  the lakes.  There have been numbers bantered about.

11  And in terms of the ecoregional specificity, that's

12  really, to me, what would be most important is that

13  would have an influence on what the background level

14  is.  But when you rise above that background

15  anthropogenic influence, then the ecoregional

16  foundation becomes less important and less useful.

17          THE COURT:  Go ahead.

18          MR. GEORGE:  Thank you, Your Honor.

19  Q.  (By Mr. George)  Dr. Sullivan, are you aware of

20  another watershed in this particular ecoregion that

21  has the same percent forest, for example, that you

22  believe would be a classically appropriate reference

23  watershed?

24          MR. BULLOCK:  I don't recall this opinion

25  in his expert report.  If counsel could --

1          MR. GEORGE:  I actually was trying to

2   follow up on the questions the court asked, because

3   I think they are important.  And that was the

4   purpose of the question, Your Honor.

5          THE COURT:  I'm going to sustain.  I

6   probably went farther than I ought to have.

7          MR. GEORGE:  No, I wanted to address

8   Your Honor's questions, if I could, but I appreciate

9   the court's ruling.

10          THE COURT:  No, I appreciate it.

11  Q.  (By Mr. George) Doctor, let's turn to another

12  comparative analysis that you did in your work in

13  this case.  Did you conduct an evaluation of

14  phosphorus levels in Lake Tenkiller as opposed to

15  phosphorus levels in the streams and rivers?

16  A.  I compared -- not quite -- a comparison with

17  the lakes rather than streams and rivers.

18  Q.  I'm sorry.  Let me clean up my question.

19  Doctor, did you conduct an evaluation of the

20  phosphorus levels in Lake Tenkiller as opposed to

21  the phosphorus levels in the rivers and streams?

22  Did I ask the same question?

23  A.  Yes.

24  Q.  Let me try it again.  Doctor, did you compare

25  water quality data for Lake Tenkiller to water

1   quality data for any other lakes or reservoirs?

2   A.   Yes, I did.

3   Q.   Did you focus on other lakes in the state of

4   Oklahoma?

5   A.   No.

6   Q.   Okay.  Why not?

7   A.   I wanted to follow up on some of the

8   comparisons that I had done in those larger regional

9   comparisons.  And Dr. Connolly was focused on a

10  comparison with the rest of Oklahoma, and I didn't

11  want to duplicate the work he was doing.

12  Q.   Did you have available some data on other

13  reservoirs in what's referred to as the central

14  states region?

15  A.   Yes.

16  Q.   And for the benefit of the record, what

17  geographic area is comprised in the central states

18  region, just generally?

19  A.   Well, for the reservoirs, those actually were

20  not focused on the central states together.  They

21  were focused on the state of Missouri.

22  Q.   Okay.  What data did you have available on

23  reservoirs from the state of Missouri?

24  A.   Data in a publication by Jones, et al. in 2004.

25  Q.   Doctor, is this the same Jack Jones who there's

1  been some testimony about being a consultant for the

2  State of Oklahoma in this case?

3  A.   I've heard that, but I don't know that for a

4  fact.

5  Q.   Okay.  You had this dataset on reservoirs from

6  Missouri.  Did you compare that to any water quality

7  data for Lake Tenkiller?

8  A.   Yes, I did.

9  Q.   And, Doctor, did you compare it to water

10  quality data from all of the sampling stations in

11  Lake Tenkiller?

12  A.   No.

13  Q.   Why not?

14  A.   Well, the data represented in the Jones, et al.

15  publication was for 135 reservoirs in Missouri, and

16  they were each sampled at a location near the dam.

17  And that's important when you're comparing

18  information among lakes,

19  If you're going to collect a sample to characterize

20  a lake, not to do an in-depth study across the

21  lake.

22        But to characterize a lake for a regional

23  study, you typically sample at one location, that's

24  the deepest part of the lake.  It's called the index

25  sample by EPA.  That's how they do all their broad

1  surveys.  In a reservoir, the deepest part of the

2  lake is generally quite close to the dam.

3         And this particular study I was comparing

4  to -- had data that were collected close to the

5  dam.  So that would be analogous to the index sample

6  of EPA and analogous to the LK-01 site in the

7  Tenkiller database.

8  Q.   Doctor, based upon the analysis you've just

9  described, how do the phosphorus levels at this

10 location in Lake Tenkiller compare to the phosphorus

11 levels in this report on Missouri reservoirs at

12 similar locations?

13 A.   Well, the median concentration in the Missouri

14 reservoirs was quite a bit higher than the data that

15 were presented by the plaintiff's Drs. Cooke and

16 Welch in their report for the years 1974, '92, '93,

17 2005, 2006 and 2007.

18 Q.   Doctor, did you include in your report a figure

19 that displayed the data that we've been discussing?

20 A.   Yes.

21 Q.   Could you turn in your notebook to tab 7.

22 A.   Yes.

23 Q.   Could you find Defendants' Joint Exhibit 2275.

24 A.   Yes.

25 Q.   Could you identify this figure for the record.

1  A.    It's a figure from my report.

2  Q.    Was this figure prepared under your direction?

3  A.    Yes, it was.

4  Q.    Does it contain the water quality data from

5  lake station 1 in Tenkiller and the 135 Missouri

6  reservoirs that we've just been discussing?

7  A.    Yes.  The point of that was to compare apples

8  with apples on the plot.

9            MR. GEORGE:  Your Honor, I'd move for the

10  introduction of Defendants' Joint Exhibit 2275.

11            THE COURT:  Any objection?

12            MR. BULLOCK:  I'm going to object to this

13  in terms of hearsay as to representing what this

14  other study says about 135 Missouri reservoirs.

15            MR. GEORGE:  May I respond?

16            THE COURT:  Yes.

17            MR. GEORGE:  Neither Dr. Sullivan nor this

18  exhibit is offering hearsay testimony about any

19  conclusions or statements made in this study.  He is

20  simply using the data that is available, which is

21  common practice for scientists, and I believe,

22  therefore, qualifies under Rule 703.

23            MR. BULLOCK:  It's not his data and he has

24  not done the analysis, and so to arrive at what he

25  claims to be the median value clearly is hearsay

1  from somebody else's work and calculations.

2          THE COURT:  All right.  Is it clear -- did

3  the witness on the stand come to the conclusion

4  regarding the median or was that reported?

5          MR. GEORGE:  Let me lay the foundation,

6  Your Honor.

7  Q.  (By Mr. George) Dr. Sullivan, is the median

8  value that is shown on Defendants' Joint Exhibit

9  2275 the product of a computation that you

10 performed?

11 A.  No.

12 Q.  Okay.  Is it the value that is reported with

13 the sampling data in this study?

14 A.  Yes.

15 Q.  Okay.

16         MR. GEORGE:  There you go, Your Honor.

17         THE COURT:  I believe it's permissible

18 under 703 for an expert -- Exhibit 2275 is

19 admitted.  What are we going to do since we're

20 halfway between another witness?  Is there some sort

21 of agreement as to whether or not we're going to get

22 the previous witness or attempt to get through with

23 the previous witness today?

24         MR. GEORGE:  Mr. Elrod and I were going to

25 fight it out.  No, actually, Your Honor, I'm about

1   five minutes away from a natural breaking point in

2   the direct.  If it's appropriate and the court is

3   agreeable --

4            THE COURT:  That would be fine.  We're

5   going to go back, correct?

6            MR. ELROD:  Correct.

7            THE COURT:  Mr. George.

8            MR. GEORGE:  Thank you, Your Honor.

9   Q.  (By Mr. George) Doctor, can you, using

10  Defendants' Joint Exhibit 2275, explain how the

11  phosphorus concentrations that you had available for

12  lake station 01 and Lake Tenkiller compare over time

13  to the reported values from the 135 Missouri

14  reservoirs?

15  A.  Yes, sir.  During the period -- well, the three

16  data points for 1974 through 1993 were all

17  relatively comparable, and they were about .025

18  milligrams per liter of TP.

19           The most recent three years that were

20  sampled by the plaintiffs and included by Drs. Cooke

21  and Welch in their report for 2005, 2006 and 2007,

22  they were all right around or right above .01.  Both

23  the values from the 1970 and through 1990 periods of

24  time and the more recent values, they're both

25  substantially less than the median.

1          In fact, the most recent values are

2   substantially less than the 25th percentile of the

3   Missouri data which is represented by that bar that

4   extends above and below the median point.

5   Q.   Doctor, did you limit your comparison of

6   phosphorus levels in Tenkiller with other reservoirs

7   to the 135 Missouri reservoirs, or did you look

8   elsewhere?

9   A.   I'm sorry, can you repeat that?

10  Q.   I'm sorry.  Did you, as part of your work in

11  this case, provide a comparison of water quality at

12  lake station 01 with any other data on reservoirs?

13  A.   Yes, I'm sorry.  Yes, I did that.

14  Q.   And, Doctor, could you identify the other data

15  that you had available to you to provide further

16  insight into this comparative analysis?

17  A.   Yes.  It was the dataset from the central

18  states.  They were -- the samples were collected in

19  Missouri, Iowa, Nebraska, Kansas and the southern

20  part of Minnesota.  It was in the study published by

21  Graham, et al. in 2004.

22          In this case, these were not restricted to

23  reservoirs.  A reservoir is a type of lake.  These

24  are lakes.

25  Q.   Doctor, within that other dataset that you

1  reviewed, did you have available any data on lakes

2  in the Ozark Highlands?

3  A.   I -- I'm not sure, to tell you the truth, if

4  any of the Missouri data were in the Ozarks.

5  Q.   I'm referring now to the central states study,

6  Doctor.  And perhaps if you could look at tab 8 in

7  your binder and find Tyson Defendant Demonstrative

8  35 -- I'm sorry, 354.

9  A.   Yes, I have it.

10  Q.   And, Doctor, does this demonstrative -- first

11  of all, was it prepared by you?

12  A.   Under my direction, that's correct.

13  Q.   And, Doctor, does it report the data that you

14  had available from this other source on lakes and

15  reservoirs outside of Missouri?

16  A.   Yes.

17  Q.   And does it include data on a region --

18        MR. BULLOCK:  Judge, before we get any

19  further into this, the same objection as previous.

20  This clearly is hearsay being represented for the

21  truth of the matter asserted.

22        MR. GEORGE:  Your Honor, it would be the

23  same response.  The witness has simply taken data

24  that's publicly available and has analyzed that, as

25  experts are permitted to do.  He's not going to

 1  testify as to any conclusions or statements drawn by

 2  the authors in any study or report.

 3          THE COURT:  Overruled.  Go ahead.

 4  Q.  (By Mr. George) Doctor, could you walk us

 5  through Tyson Demonstrative 354.

 6  A.  Yes.  If we go to the green bar in the middle

 7  of the figure, those would be the same data from the

 8  Jones, et al. study we just talked about.  That's

 9  placed there for context, as are the three blue bars

10  on the right side, which would be the Lake Tenkiller

11  data from lake site 01 from Cooke and Welch from

12  their expert report.

13          The orange bars on the left side of the

14  figure are different subsections of that study

15  within the central states, so we have median total

16  phosphorus concentrations reported for four

17  different regions including the Ozark Highlands at

18  the lower end on the left all the way up to what

19  they call the Western Lake section on the right.

20  Q.  Since we're creating a written record here,

21  could you identify some of the numeric values on the

22  median phosphorus concentrations, beginning in the

23  data that you had available for lake station 1 in

24  Tenkiller and then continuing on through the other

25  available data.

1  A.   Yes.   The Tenkiller data for lake station 1,

2  they were all around or a little bit above .01

3  milligrams per liter of total P.   .01, .011 and

4  .012, so very similar.

5          The Missouri values, again, were close to

6  .04 for median.   Then for the Graham, et al. study,

7  the values ranged from Ozarks Highlands, which was

8  about .012; Osage Plains, which was .045; dissected

9  Till Plains, which is .079; and Western Lake

10  section, which is .141.

11  Q.   Doctor, the lowest value I see on there outside

12  of the data reported for Lake Tenkiller is the .012

13  for Ozark Highlands; is that correct?

14  A.   That's correct.

15  Q.   How do the Lake Tenkiller data that's shown on

16  this demonstrative compare to that value?

17  A.   The recent values for Lake Tenkiller are very,

18  very similar to that value.

19  Q.   Doctor, what conclusions, if any, do you draw

20  from the data that you have reviewed regarding lake

21  phosphorus concentrations as compared to the Lake

22  Tenkiller data?

23  A.   I see no evidence that Lake Tenkiller is

24  particularly unusual in terms of having high

25  phosphorus; and, if anything, is actually low

1  compared to other lakes and reservoirs with the

2  exception of Ozark Highlands, where it's comparable.

3  Q.   Once again, Doctor, you applied your analysis

4  in this demonstrative to the data that's available

5  at the deepest part of the lake, correct?

6  A.   In this study, they didn't specify that it was

7  collected from the deepest part of the lake.  They

8  specified they were mostly pelagic samples, which is

9  open-water samples.  So we don't know to what extent

10  is exactly analogous, you know, a la all EPA style

11  of the index site.  But clearly it's skewed in that

12  direction based on how it was described.

13  Q.   Doctor, I believe you have reviewed the

14  testimony of Dr. John Connolly regarding the

15  riverine portion of Lake Tenkiller.  Did you see

16  that testimony?

17  A.   Yes, I have.

18  Q.   Have you conducted any particular comparative

19  analysis on the riverine section of the lake?

20  A.   No, I have not.

21       MR. GEORGE:  Your Honor, this is a good

22  place to perhaps reinterject the witness that we

23  were examining before lunch.

24       THE COURT:  Very well.  Let's do so.

25       Mr. Garren, you may resume your

```
 1  cross-examination of Dr. Dicks.
 2              DR. MICHAEL DICKS,
 3  having been previously duly sworn, was called as a
 4  witness and testified as follows:
 5              CONTINUED CROSS-EXAMINATION
 6  BY MR. GARREN:
 7  Q.  Dr. Dicks, you'll be glad to hear that I've
 8  made judicious use of my time while we've been
 9  waiting here, and have cut a lot of questions out of
10  my questions this afternoon, so we should move
11  through this fairly quickly.
12          In following up about some more IMPLAN
13  model questions, Dr. Rausser discussed in his
14  testimony the term "externalities," and I want to
15  ask you a question about that.
16          You agree it's generally understood an
17  externality would be where a company shifts some of
18  its operating costs or byproducts or even negative
19  effects to others in the market and that's generally
20  what we would refer to as externality?
21  A.   I believe an externality is a benefit or a cost
22  that's not captured in the market.
23  Q.  Okay.  But it's one that one company may shift
24  to another, correct?
25  A.   No.
```

```
1   Q.   You don't believe that?

2   A.   I don't believe that.

3   Q.   Okay.  You agree that the IMPLAN model has been

4   criticized for the fact that it assumes full

5   employment?

6   A.   It's been criticized for a lot of things.  I'm

7   not sure I'm aware of all of them.

8   Q.   Would that be one of them?

9   A.   I don't recall that, no.

10  Q.   You don't agree that the assumption of full

11  employment is one of the criticisms as to its base

12  or at its base?

13  A.   I think it depends on what you're using the

14  model for, whether that's a criticism or not.

15          MR. GARREN:  May I approach, Your Honor?

16          THE COURT:  You may, sir.

17  Q.   (By Mr. Garren)  I've handed you State's

18  Exhibit 3169, which I believe is in evidence in this

19  case.  And with regard to your calculation of a 45

20  STP average, in looking at Dr. Johnson's Exhibit

21  3169, would you agree with me that the average

22  you've calculated would show that the percent

23  sufficiency for both Fescue and cool-season grasses

24  is in excess of 95 percent?

25  A.   If -- again, I think we've been through this
```

1  before, but if you have a 65 STP at the time that

2  you harvest a ton of forage, you're now below that.

3  So if you start off with a 45 STP and you harvest a

4  ton of forage, you're substantially below the

5  sufficiency.

6  Q.   Would you agree with me, sir, that if you are

7  at a 45 STP, that based upon this exhibit, that

8  would exceed 95 percent sufficiency?

9  A.   Yes.

10 Q.   All right.  Now, are you aware of the rule of

11 diminishing returns?

12 A.   Yes.

13 Q.   You agree that the cost to apply any fertilizer

14 to raise STP from a 45 to 65 would be a good example

15 of that rule or its application?

16 A.   It could be.

17 Q.   And you're bang for the buck is not -- it's

18 clearly diminished if you're trying to just raise

19 this STP level another five percent; would you

20 agree?

21 A.   At the moment you do it, but that doesn't take

22 into consideration the time factor.

23 Q.   You admit, don't you, Doctor, that your

24 assumptions as to the land use, soil uniformity,

25 livestock and agronomic practices are certainly

1  uncharacteristic for the IRW?

2  A.   I'm sorry, can you repeat that.

3  Q.   You admit that many of your assumptions as to

4  the land use, soil uniformity, livestock and

5  agronomic practices are uncharacteristic of the IRW?

6  A.   I would say that the statistical approximations

7  are certainly uncharacteristic, yes.

8  Q.   You said that the nutrient czar -- and that was

9  a term, I think, started by you and the judge in a

10  set of questions -- was the Nutrient Management

11  Plan, which determines spatial allocation of a

12  litter; do you remember that testimony?

13  A.   Yes.

14  Q.   Would you agree that that spatial allocation is

15  focused only on the field or fields within the plan?

16  A.   Yes.

17  Q.   And do you also agree it does not compare or

18  analyze that field's condition and STP level to any

19  adjoining field or fields?

20  A.   Well, that depends.

21  Q.   Have you seen a Nutrient Management Plan that

22  compares it to a field or fields of another farmer?

23  A.   No.

24  Q.   All right.  And the Nutrient Management Plan

25  does not take into consideration the cumulative

```
 1   effect of multiple fields; would you agree with
 2   that?
 3   A.   I have no way of commenting on that.  It would
 4   depend on the person that's writing the plan.
 5            MR. GARREN:  I'll pass the witness.
 6            THE COURT:  Redirect.
 7            MR. ELROD:  Just a little bit, Your Honor.
 8   Appreciate your accommodation --
 9            THE COURT:  Certainly.
10            MR. ELROD:  -- again.
11            April, would you put up Demo 352.
12                    REDIRECT EXAMINATION
13   BY MR. ELROD:
14   Q.   What is the header for this?  Phosphorus levels
15   for Adair, Cherokee, Delaware and Sequoyah Counties
16   based on 2007 OSU soils data?
17   A.   Correct.
18   Q.   Correct?
19   A.   Yes.
20   Q.   Was this produced by -- information produced by
21   Dr. Johnson, Gordon Johnson?
22   A.   Yes, it was.
23   Q.   For the counties of Adair, Cherokee, Delaware
24   and Sequoyah, what was the median STP that
25   Dr. Johnson opined existed?
```

```
 1            MR. GARREN:  Your Honor, this is outside

 2   the scope both of direct and cross-examination.  We

 3   looked at a different one similar for the Benton and

 4   Washington, but this one is certainly new.

 5            THE COURT:  I don't recall Mr. Garren even

 6   getting into this on cross.

 7            MR. ELROD:  Yes, sir.  This is an attempt

 8   to respond to Mr. Garren beating up the witness on

 9   his 45.5.

10            THE COURT:  Mr. Garren, any response?

11            MR. GARREN:  Well, understanding that the

12   45.5 is across the entire watershed, we're now

13   focusing on half of it through this exhibit, and

14   we've already talked about the other exhibit, so I

15   still think it's outside any scope.

16            THE COURT:  Overruled.  Go ahead.

17   Q.  (By Mr. Elrod)  So in response to the

18   proposition that there are very few fields under

19   45.  I know we all know the answer to it this

20   question, but the median means that the same number

21   of samples on one side of the number as on the other

22   side; is that correct?

23   A.   That's correct.

24   Q.   So when with a median of 55 in those four

25   counties in Oklahoma from samples actually taken of
```

1  fields -- not nonsampled fields, not calculated, but

2  actual samples -- half the fields would be under 55,

3  and half of them would be over 55, according to

4  Dr. Johnson?

5  A.   That's correct.

6  Q.   You testified about this ten-mile

7  transportation area.  And just to reemphasize --

8  A.   Yes.

9  Q.   -- was it your testimony, sir, that that

10  assumed that the same farmer who produced the litter

11  was going to put it on his own land?

12  A.   Not necessarily, no.

13  Q.   Why did you use the ten miles again?

14  A.   Again, the farmer that owns that litter that

15  sells it is going to sell it to a source that's

16  closest to him, probably a neighbor.  Based on what

17  all the farmers have told me, it's going to

18  someplace very close.  So that we put a ten-mile

19  limit on there as -- really as an exaggeration of

20  the cost.  It works against us to have that $1.78 in

21  there, so I -- it's a conservative estimate.

22  Q.   When you testified about biasing your -- being

23  conservative in your numbers and biasing in favor of

24  the State of Oklahoma, is it true, sir, that the

25  effect of having calculated less litter would mean

 1   less increase in STP, which would mean more

 2   available land to apply phosphorus and, therefore,

 3   the less litter that you calculated would be

 4   favorable to the State?

 5   A.   I guess what you're saying there, John -- let

 6   me try this.  Certainly if we would have estimated

 7   less litter supplied, that would mean we would have

 8   a lower statistical approximation for the average

 9   STP, which would mean that the impacts would have

10   been larger.

11   Q.   Now, let's talk about this young lady named

12   Lisa who actually punched the button on the

13   computer; is that true?

14   A.   That's correct.

15   Q.   She works for Dr. Rausser?

16   A.   Yes.

17   Q.   And had for a long time?

18   A.   Yes.

19   Q.   Did you consult with her and him extensively

20   throughout this process?

21   A.   Yes.

22   Q.   Are, generally speaking, cattle producers

23   losing money right now at this point in history?

24   A.   Yes.

25   Q.   Are we at a down part of the cycle?

1    A.   Yes.  We're, unfortunately, at the down part of

2    the cycle as well as a bad economy.  Both things

3    have worked against us -- against cattle producers.

4    Q.   Have you yourself, as a cattle producer,

5    reacted to the downturn in the economy?

6    A.   Yes.

7             MR. GARREN:  Objection.  I'm too late.

8    Relevance.

9             THE COURT:  Little late.  Go ahead.

10   Overruled.

11   Q.   (By Mr. Elrod)  What did you do?

12   A.   I reduced my cattle herd --

13            MR. GARREN:  I am on time for that one.

14   It's not relevant, Your Honor.

15            THE COURT:  Sustained.

16   Q.   (By Mr. Elrod)  Has the -- have the states of

17   Arkansas and Oklahoma reacted to a concern about

18   phosphorus in these nutrient-rich watersheds?

19            MR. GARREN:  Objection, outside the scope,

20   Your Honor.

21            THE COURT:  Sustained.

22   Q.   (By Mr. Elrod)  Are the IMPLAN results or the

23   economic impacts that you testified to an annual

24   impact?

25   A.   They are an annual impact, yes.

1            MR. ELROD:  Could you pull up Demo 371,

2   please, April.

3   Q.   (By Mr. Elrod)  The $88 million negative impact

4   on the bottom scenario --

5   A.   Yes.

6   Q.   -- to what extent, if any, will the $88 million

7   economic impact be offset by economic activity

8   outside the five counties?

9   A.   Well, it wouldn't.

10  Q.   Why is that?

11  A.   This is the economic activity within the

12  five-county area.  Any economic activity outside of

13  the area would not necessarily offset that.

14            Now, if you want to look at -- if you

15  wanted me to do an IMPLAN run on the entire United

16  States and say what would be the impact of this,

17  well, you know, it's going to depend upon where all

18  those activities fall out.  There's definitely going

19  to be a redistribution of those activities.

20            You'll find the same numbers for this

21  location, for this five-county area, but you might

22  find an increase in the trucking activity, you might

23  find an increase in fuel expenses, you might find a

24  lot of things.  But you probably won't find a whole

25  lot of increase in cattle output or cattle income.

1   Q.    That's the impact on the cattle economy of

2   northeast Oklahoma, northwest Arkansas that you are

3   principally addressing in this exercise?

4   A.    Yes.

5   Q.    Doctor, can you explain to the court how a

6   nutrient-surplus notion can co-exist with your

7   opinion of 45.5?

8   A.    Well, I mean, what I've studied is the farm

9   fields within the IRW.  And again, what we're

10  talking about is what is the STP that's likely to

11  exist, given the production practices that have been

12  there.

13         I think -- I think I've demonstrated and

14  shown quite handsomely with the results that are

15  there from Johnson that there's a small number of

16  fields that are biased and skewed to the right that

17  represent those fields that have had lots of litter

18  applied to them.

19         That means that because you have all those

20  fields with lots of litter applied to them and you

21  have a whole lot of fields must be, because if the

22  average as we've computed is 45.5, if you have a

23  large group that is -- have high numbers to the

24  right of that mean, that means you have a whole lot

25  of fields to the left side of that mean that have

1  very low STPs.

2          So my point is, is that there's a lot of

3  fields in that IRW that still need to have

4  phosphorus, whether you apply it as chemical or

5  poultry litter, that's going to need that phosphorus

6  in order to produce the forage they need to sustain

7  the cattle in the watershed.

8  Q.   You voiced -- what you said was that there was

9  some criticism IMPLAN -- let me ask you this

10  question.   How widely used is IMPLAN?

11  A.   IMPLAN --

12          MR. GARREN:  Cumulative, Your Honor.  He's

13  already described its use.

14          THE COURT:  Overruled.  It was a matter on

15  cross-examination.

16          THE WITNESS:  IMPLAN is probably one of the

17  most widely used models there is in the United

18  States.  It's used by businesses, it's used by

19  county governments, it's used by state governments.

20  Anytime there's an economic activity that somebody

21  wants to consider, it's used to look at that

22  impact.

23          Yes, there's lots of people that use the

24  model that don't know what they're doing that

25  produce results that may be a bit unscrupulous, but

Terri Beeler, RMR,FCRR
United States Court Reporter
333 W. 4th St.
Tulsa, OK 74103 * 918-699-4877

1    I think that having been involved in design of the

2    model and building the ag sector in that model, I

3    think I have a pretty good enough understanding of

4    how the model works and how it runs.  And I think

5    we've come up with results that are certainly

6    reasonable.

7           Anytime you have a multiplier in the 1.7 to

8    2 range, I think you're on target.

9    Q.  All right, sir.  Thank you, sir.

10          MR. ELROD:  I'll pass the witness to

11    Mr. McDaniel.

12          THE COURT:  Before you do, refresh my

13    memory.  You say whenever we have a multiplier of

14    1.7 to 2.  What was your reference there?

15          THE WITNESS:  The total impacts -- in other

16    words, we've calculated here $88 million of total

17    impacts and about a 45 -- $44 million direct

18    impact.  That ratio is two to one in this case, and

19    that's a fairly common multiplier that you'll come

20    up with.

21          Usually at the high end, when you have a

22    lot of processing activities, you'll get a higher

23    multiplier.  It'll push 2.1, 2.2.

24          In Oklahoma, as a general rule, when you're

25    talking about cattle, because most the cattle are

 1  shipped outside of the watershed, you may have down

 2  to a 1.7 multiplier.

 3          THE COURT:  All right.  Just to be clear

 4  here, because I thought you were also touching upon

 5  cattle production in Arkansas --

 6          THE WITNESS:  In Oklahoma, sorry.

 7          THE COURT:  Solely in Oklahoma?

 8          THE WITNESS:  In Oklahoma, when we looked

 9  at the Oklahoma industries, one of the problems we

10  have in Oklahoma is that most of the products are

11  not processed here in the state.

12          THE COURT:  I understand that statement.

13  But relative to your overall work here, you also

14  took into consideration the cattle production on the

15  Arkansas side, correct?

16          THE WITNESS:  That's correct.

17          THE COURT:  Okay.  All right.

18          THE WITNESS:  That's correct.

19  Q.  (By Mr. Elrod)  So when you see City boosters

20  saying there's going to be a seven-time multiplier

21  by building a stadium downtown, that's something you

22  might be suspicious of?

23  A.  I'd say that the builder probably produced

24  that.

25          MR. ELROD:  Thank you.

 1          MR. GARREN:  I object to any further

 2   examination by the defendants.  It's a joint

 3   witness.

 4          MR. MCDANIEL:  Each of us -- just like we

 5   each had the right to cross-examine the plaintiff's

 6   witnesses.

 7          MR. GARREN:  This is a witness that they're

 8   presenting in their case as a joint witness on

 9   behalf of the joint defendants.  We have had a

10   direct.  We've had a cross.

11          THE COURT:  I think they've accommodated

12   you in that sense.  You sued a dozen poultry

13   companies.  I think they're entitled to, if they

14   wish.

15          Mr. McDaniel, go ahead.

16                    DIRECT EXAMINATION

17   BY MR. MCDANIEL:

18   Q.  Dr. Dicks, good afternoon.  I want to return

19   very briefly to the notion of soil test phosphorus

20   sufficiency for forage production.

21          Mr. Garren, in particular, asked you about

22   Oklahoma Exhibit 3169.  We've looked at that

23   multiple times during the case, laying out different

24   soil test phosphorus levels and levels of -- and how

25   it meets agronomic need.

```
 1          You mentioned earlier that there was a

 2  recommendation or another criteria that could be

 3  employed of 120 STP.

 4  A.   Correct.

 5  Q.   Can you explain what that is?

 6          THE COURT:  We don't -- that was

 7  Dr. Johnson's analysis.  We don't need to go into

 8  that.

 9          MR. MCDANIEL:  He mentioned it here as a

10  criteria, and it's a basis for my next question.

11          THE COURT:  He talked about that, plus

12  300.  He used the more conservative term, 65.

13  Right, Doctor?

14          THE WITNESS:  Yes.

15          THE COURT:  Rather than using the alternate

16  120 of Dr. Johnson or 300 from the code.

17          MR. MCDANIEL:  Right.  That --

18          MR. GARREN:  That's not in cross.  I

19  object, then.  It's not part of cross.

20          THE COURT:  Sustained.

21          MR. MCDANIEL:  I haven't asked my question.

22  Q.   (By Mr. McDaniel)  The point is, had you,

23  Dr. Dicks, employed the 120 recommendation for

24  ensuring a hundred percent sufficiency fieldwide,

25  would that have required more poultry litter to meet
```

1  that management scenario than the one you ran using

2  65?

3          MR. GARREN:  Same objection.  That was not

4  inside the cross.

5          THE COURT:  That's correct.  It was brought

6  up in direct.  It wasn't touched upon in cross.

7          MR. MCDANIEL:  Thank you.

8                    CROSS-EXAMINATION

9  BY MR. GARREN:

10 Q.   Dr. Dicks, with regard to the Demonstrative

11 352, that's only 1700 samples or observations in

12 that particular dataset; do you agree?

13 A.   That's a good point, yes.  I agree.

14 Q.   It's much lower than the one we looked at that

15 you criticized for being small at 6500 observations;

16 do you agree?

17 A.   Absolutely.

18 Q.   Now, if the herds are reduced, there would be

19 less need for litter to grow more grass, wouldn't

20 there?

21 A.   There would be less need for nutrients,

22 exactly.  That's why the herds would be reduced.

23         MR. GARREN:  No other questions.

24

25

FURTHER REDIRECT EXAMINATION

BY MR. ELROD:

Q. If the herds are reduced, Dr. Dicks --

THE COURT: I'm sorry, reredirect?

MR. GARREN: I don't know that we've done that.

THE COURT: We're not going to. We're not going to start it now.

MR. ELROD: You are telling me to sit down?

THE COURT: Yes, sir.

MR. ELROD: All right, thank you. That, I understand.

MR. GARREN: You should have seen our depositions, Judge.

THE COURT: I'm trying to digest here the recross here. 352 is what tab? Demonstrative 352?

MR. GARREN: Do you want me to show you?

THE WITNESS: The one-year soil samples for the four Oklahoma counties.

MR. GARREN: The blue bar chart with the Oklahoma counties at the top.

(Off-the-record discussion was had.)

THE COURT: All right. May this witness be excused?

```
 1          MR. ELROD:  Yes.
 2          THE COURT:  Now would be a good time to
 3  take a break.  We're halfway through.  Let's take
 4  our recess.
 5          (Whereupon a recess was had.)
 6          THE COURT:  Mr. George, you may resume.
 7          MR. GEORGE:  Thank you, Your Honor.
 8                  DR. TIMOTHY SULLIVAN,
 9  Called as a witness, being previously duly sworn,
10  testified as follows:
11                  CONTINUED DIRECT EXAMINATION
12  BY MR. GEORGE
13  Q.   Dr. Sullivan, as part of your work in this
14  case, did you review the sampling program and
15  analysis performed by the State's various expert
16  witnesses?
17  A.   Yes.
18  Q.   And in conducting that review, did you form any
19  opinions as to the appropriateness of their sampling
20  approach for purposes of evaluating potential
21  sources of phosphorus that may impact water quality?
22  A.   Yes, I did.
23  Q.   And what was that opinion?
24  A.   My opinion is that the sampling approach was
25  very inadequate for doing that.
```

Q.   How so?

A.   Well, I think it's necessary to explain a
little bit about how you might go about identifying
sources.

        Especially when we're talking about nonpoint
sources, there are many different kinds, and they are
located in many different places.  That requires a very
site-specific analysis.  You need to bracket what you
think might be sources, or your probable sources, and
collect samples that will reveal whether they truly are
sources or not.

        So you would bracket your various land uses and
your various activities, which could include your
wastewater treatment plants; your urban areas with urban
nonpoint source pollution; locations with high densities
of cattle; locations with high densities of rural
residential housing, septic systems; areas with a lot of
road erosion; areas with streambank erosion, and on and
on.

        There are so many different possible source
types.  And a proper approach to evaluate that is to
bracket those, collect samples above and below the
locations of the sources.  That's one tool that you can
use.

        But in terms of the overall sampling program for

1    the state, I just really didn't see much of that at

2    all.  It makes it very difficult to try to evaluate

3    those sources.

4    Q.    Based upon your review of the State's sampling

5    program, did the State focus more closely on a

6    particular source?

7    A.    Yes, they did.

8    Q.    What source, in your judgment, was the focus of

9    the State's sampling?

10   A.    The State's sampling was focused on their

11   assumed linkage between poultry litter and water

12   quality issues, especially phosphorus.

13   Q.    What, if any, impact did that focus or that

14   assumption have on the comprehensiveness of their

15   investigation, in your view?

16   A.    In my view, it wasn't comprehensive at all

17   because there really was very little or, in some

18   cases, no focus on these other issues in terms of

19   where the samples would be collected.

20   Q.    Doctor, as I understand it, one of the things

21   you identified earlier as part of your work in this

22   case is evaluation of potential sources; is that

23   right?

24   A.    That's right.

25   Q.    And the court has heard some testimony from

1    Dr. John Connolly about potential sources and fate

2    and transport.  How is your analysis different from

3    Dr. Connolly's, in a general way?

4    A.   In a general way, Dr. Connolly, he focused a

5    lot of work on Lake Tenkiller.  I focused almost no

6    work on Lake Tenkiller.  He focused quite a lot on

7    the issue of growing algae, that biological

8    response, which is not something I addressed.

9           In terms of water quality, his work was

10   mostly on point sources in the Illinois River and

11   their influence on Lake Tenkiller and the influence

12   of the total phosphorus on Lake Tenkiller.  My focus

13   was more on the entire watershed and looking at

14   the -- some of the field issues and some of the more

15   local issues for both point and nonpoint source

16   pollution.

17   Q.   Doctor, as part of your work in this case, did

18   you review the mass balance analysis sponsored in

19   this courtroom by Dr. Engel?

20   A.   Yes, I did.

21   Q.   What is your understanding of the role of this

22   mass balance in the State's overall expert theory of

23   the case?

24   A.   My view is that the mass balance is very

25   critical to the State's approach to the case.

1   Q.   Doctor, is a mass balance analysis a tool that

2   you have used in your work previously?

3   A.   Yes.

4   Q.   Can you explain what the concept of mass

5   balance means to you.

6   A.   Mass balance means balancing the inputs and the

7   outputs to and from a system.  You can construct

8   mass balance on lots of different things.

9          For this case, the mass balance that was

10  presented by Dr. Engel, calculated by Meagan Smith,

11  was a mass balance on the watershed.  So that would

12  look at their estimates of phosphorus coming into

13  the watershed and then phosphorus leaving the

14  watershed primarily at this spillway at Lake

15  Tenkiller.

16         But you can construct a mass balance on

17  other things.  You can construct a mass balance on

18  the drainage water.  And for the questions at hand

19  in this case, I think the mass balance on the

20  drainage water is really what's appropriate.  What's

21  going into the stream water, what's going into the

22  lake water, what's coming out of the water, that's

23  the mass balance that's really relevant to the case,

24  in my view.

25  Q.   Doctor, do you have an opinion as to whether

1    the State's mass balance is at all useful in

2    evaluating potential impacts on water quality?

3    A.    I think that a mass balance on the watershed

4    can be of use.  I don't really have a problem with

5    somebody constructing one.

6            The problem I have is the way you use the

7    results of that mass balance.  And if you use that

8    to try to say that because my mass balance says more

9    phosphorus is coming into the watershed than is

10   leaving the watershed, you know, therefore, that

11   phosphorus is going into a stream, I think that's a

12   big problem.

13           I can give you an analogy of that, if you

14   would like.

15   Q.    Sure.

16   A.    If I built a warehouse in Fayetteville and I

17   put 10 million tons of phosphorus in my warehouse

18   and then lock the door, by the lines of argument

19   that I've seen from the plaintiffs in this case,

20   their conclusion would be, therefore, I'm polluting

21   the Illinois River with phosphorus because I am the

22   largest source of phosphorus coming into the

23   watershed.

24           So it's mass balance on the water, on the

25   drainage water in the stream and in the lake that's

1  really relevant to the case, not the mass balance --

2  out of the watershed.

3  Q.   Doctor, you mentioned in your testimony

4  previously land use.  Did you evaluate land use in

5  the Illinois River Watershed?

6  A.   Yes, I did.

7  Q.   Could you turn to tab 9 in your binder,

8  please.

9  A.   Yes.

10  Q.   And find what's been marked as Defendants'

11  Joint Exhibit 2238.  And can you identify that

12  exhibit for the record, please.

13  A.   That's a map figure from my report.

14  Q.   Okay.  And was this map prepared under your

15  direction?

16  A.   Yes, it was.

17  Q.   And can you identify the source of the land use

18  data that is shown on this map?

19  A.   It's the National Land Cover Dataset of EPA.

20  Q.   Doctor, is that data shown geographically on

21  this map?

22  A.   Yes, it is.

23        MR. GEORGE:  Your Honor, I move for the

24  introduction of Defendants' Joint Exhibit 2238.

25        THE COURT:  Any objection?

1          MR. BULLOCK:  No objection.

2          THE COURT:  Defendants' 2238 is admitted.

3   Q.   (By Mr. George) Doctor, using this map, how

4   would you characterize the land uses in the Illinois

5   River Watershed?

6   A.   I think that there are a couple of ways that I

7   would characterize the land uses that are, in my

8   view, quite important.  The first one is, it's a

9   patchwork of land use, it's a very interdigitated --

10  there's a lot of diversity of land uses across --

11  not the entire watershed, but many portions of the

12  watershed.

13  Q.   Let me stop you there, because you used a word

14  that I'm not familiar with, "interdigitated."  What

15  does that mean?

16  A.   If I take my fingers and I take my fingers

17  where they do this, where they're inter -- my digits

18  and put them together, that's -- sorry.

19  Q.   In Arkansas, we could call that intermixed.

20  Are you okay with that?

21  A.   "Intermixed" is good.

22  Q.   Same thing?

23  A.   Same thing.

24  Q.   Go ahead.

25  A.   The other spatial issue that I think is

1    important is one that I actually mentioned before

2    when I said that the watershed, in some sense, was

3    upside down.  And we can see that quite easily with

4    this map because the top of the watershed is to the

5    upper right, that's the main area, the headwaters,

6    the main stem of the Illinois River.  And then

7    things move down to the lower portion of Lake

8    Tenkiller.

9            As we can see on the map, most of the urban

10   land is concentrated at the top, and then we have a

11   fairly high density of agricultural land.  And most

12   of our forest land is more towards the bottom, which

13   is the exact opposite of what we typically see.

14   Q.   What impact, if any, does that reality in this

15   watershed have on a scientist's ability to evaluate

16   the impact of different sources of phosphorus?

17   A.   It seriously messes with our ability to do

18   that.  The reason is because, as I mentioned before,

19   the land use that's typically associated with your

20   lowest phosphorus values is forest.  That's almost

21   universally true.

22           And at the top of the watershed, if you

23   have urban land use, which is typically associated

24   with one of the highest phosphorus contributors as a

25   land use, and then you move to the agricultural

1    lands where you also can get more phosphorus than

2    typically from the forest, so what happens is you

3    get relatively high concentrations of phosphorus in

4    the streams right from the beginning.

5            And that makes it difficult because if you

6    start in the forest and you have low phosphorus,

7    which you don't always, but often, then you move

8    down and you start to pick up other sources, it's

9    easier to identify those, along the lines of what I

10   explained earlier of what I did in Tillamook.

11           When you start out with high values from

12   the beginning and you've got things that are taking

13   those values in different directions, you have new

14   sources that are coming in at the same time that you

15   maybe have phosphorus settling to the stream bed and

16   that sort of thing.  It makes it really difficult to

17   figure out what the sources might be.

18   Q.  Doctor, are you saying it's impossible to

19   evaluate the impacts of different sources in this

20   watershed?

21   A.  No, it's not impossible.  It's much more

22   difficult, and it requires a lot more focus, in my

23   view, on site specificity of your approach to

24   tackling the problem.

25   Q.  Doctor, are there sources, point versus

1  nonpoint, that due to the intermixing of land uses,

2  are more or less difficult to identify in this

3  watershed?

4  A.   I would say that it's much more difficult to

5  identify the nonpoint sources because of the

6  distributed nature.

7  Q.   Doctor, as part of your work in this case, did

8  you evaluate impacts from urban areas in the

9  watershed?

10  A.   Yes, I did.

11  Q.   I think you testified that the most significant

12  urban areas are located in the headwaters; is that

13  right?

14  A.   That's correct.

15  Q.   Did you evaluate the potential sources of

16  phosphorus that are present in urban areas that may

17  impact phosphorus concentrations in rivers and

18  streams?

19  A.   Yes.

20  Q.   And I don't want to elicit -- I'm sorry, did

21  you review Dr. Connolly's report and testimony that

22  wastewater treatment plants are the dominant source

23  of phosphorus that negatively impacts water quality

24  in the watershed?

25  A.   Yes.

1  Q.   I don't want to elicit cumulative testimony, so

2  let me step through this in a summary fashion, if I

3  can.

4         Did you undertake a related analysis of the

5  impact of wastewater treatment plants on water

6  quality?

7  A.   Yes.

8  Q.   What did you do?

9  A.   For the wastewater treatment plants, I did a

10  couple of things.  One is that I retrieved from

11  Dr. Olsen's database for the state, data that he had

12  and collected on the same day above and below

13  wastewater treatment plants so we could compare the

14  concentration of total phosphorus in the stream

15  above the wastewater treatment plant, some couple of

16  yards above the wastewater treatment plant or less,

17  with comparable data collected a short distance

18  below the wastewater treatment plant.

19         MR. BULLOCK:  I object to this line of

20  testimony.  They said it's different than Connolly.

21  My recollection of Dr. Connolly's is that this is

22  exactly the analysis which he did was above and

23  below.

24         THE COURT:  At least part of it, I believe,

25  was.

1          MR. GEORGE:  There are some similarities in

2     the sense that Dr. Connolly looked at water quality

3     gradients.  He did not do the analysis that

4     Dr. Sullivan did, which was -- there were a couple

5     of places -- I don't want to pre-empt the testimony,

6     but there were a couple of places where we actually

7     had paired bracketed samples on a few wastewater

8     treatment plants.

9          THE COURT:  I think Connolly testified to

10     that, did he not?

11          MR. GEORGE:  I believe -- and I'm happy to

12     be corrected if my memory is incorrect -- that his

13     analysis was more based on looking at stream

14     segments and where one joins another as opposed to

15     looking at two discrete sampling locations.  This is

16     very brief, and I don't want to be cumulative.

17          MR. BULLOCK:  If it is brief, let's go

18     ahead and do it rather than spend our time worrying

19     about cumulative.

20          THE COURT:  Go ahead.

21          MR. GEORGE:  Thank you, Your Honor.

22     Q.  (By Mr. George) Dr. Sullivan, did I just

23     describe what you did in your analysis?

24     A.   Yes.  I was in the middle of answering the

25     question as of what things did I do, and I had

1   briefly described one of them.

2   Q.   Okay.  Doctor, did you prepare a chart showing

3   your analysis of the paired sampling locations for

4   the few wastewater treatment plant locations?

5   A.   Yes.

6   Q.   Could you turn to tab 10.

7   A.   Yes.

8   Q.   And for the record, could you identify what's

9   been marked as Defendants' Joint Exhibit 2240.

10  A.   That's a figure from my report.

11  Q.   And could you identify the source of the data

12  and information that is shown on that figure or

13  exhibit.

14  A.   Dr. Olsen's master database.

15  Q.   And was this exhibit prepared under your

16  direction?

17  A.   Yes.

18         MR. GEORGE:  Your Honor, I'd move for

19  introduction of Defendants' Joint Exhibit 2240.

20         MR. BULLOCK:  No objection.

21         THE COURT:  Exhibit 2240 is admitted.

22  Q.   (By Mr. George)  Dr. Sullivan, I notice that

23  there are three facilities that are shown,

24  Stillwell, Prairie Grove and Siloam Springs; do you

25  see that?

1   A.    Right.

2   Q.    There are two bars associated with each of

3   those facilities.  What does that represent?

4   A.    The orange bar represents the concentration of

5   total phosphorus in the stream directly above the

6   wastewater treatment plant outflow pipe location.

7          The blue bar represents that same total

8   phosphorus location but immediately below the

9   wastewater treatment plant location.

10  Q.    And, Doctor, you understand there are more than

11  three wastewater treatment plants in the watershed,

12  correct?

13  A.    Correct.

14  Q.    Why did you focus your analysis on these three

15  facilities?

16  A.    These were the three facilities for which we

17  had the data available for Dr. Olsen's database

18  where -- on the same day he collected these

19  samples.  There were one or two other plants where I

20  believe there was one, either the above or the

21  below, but the corresponding data point was not

22  there.  These were the only three where we had both

23  above and below.

24  Q.    And, Doctor, did you form any opinions based

25  upon your review of the sampling data above and

1   below these wastewater treatment plants?

2   A.   Yes, I did.

3   Q.   And what were those opinions or conclusions?

4   A.   At all three sites, the concentration of total

5   phosphorus in the stream water, all three sites

6   above the wastewater treatment plants were all

7   relatively low.  They were in the vicinity of the

8   .037 benchmark standard value.

9            And in all three cases, the samples

10  collected below the wastewater treatment plant were

11  substantially higher than that .037 standard.

12  Q.   Based upon those observations, did you draw any

13  conclusions about the impact of wastewater treatment

14  plants on phosphorus concentrations?

15  A.   Well, this indicates to me that these plants

16  are important sources of phosphorus to the stream.

17  And beyond that, that the quantity of phosphorus is

18  actually quite high for two of them.  The Siloam

19  Springs one is over three milligrams per liter.

20  That's an extremely high value of phosphorus.

21  Q.   Doctor, these three facilities, do I understand

22  that they actually have pipes that discharge into

23  the river?

24  A.   Correct.

25  Q.   Is there any facility, wastewater treatment

1  plant or sewage treatment facility in the watershed

2  that is not designed to be a discharging facility?

3  A.    One that I'm aware of, yes.

4  Q.    Which one is that?

5  A.    It's at Watts.

6  Q.    What type of sewage treatment system is present

7  in Watts?

8  A.    It's a total retention lagoon system.

9  Q.    Total retention, does that mean, Doctor, that

10 all of the wastewater and all of the phosphorus in

11 that wastewater from the city of Watts stays in that

12 lagoon?

13 A.    No.  The wastewater is periodically, after

14 partial treatment, land-applied on a plot that's

15 adjacent to the plant.  It's sprayed on the plot.

16 Q.    Are you familiar with the location of the Watts

17 sewage lagoon and this application area that you

18 just described?

19 A.    Yes.

20 Q.    And is it in close proximity to the Illinois

21 River?

22 A.    Yes, it is.

23 Q.    Now, Doctor, as part of your work in this case,

24 did you retrieve any aerial imagery of the Watts

25 lagoons and the application area?

```
 1  A.   Yes.

 2  Q.   Can you turn to Defendants' Joint Exhibit 1454,

 3  please.

 4  A.   Yes.

 5  Q.   Can you identify for the record what is shown

 6  in the photograph in Defendants' Joint Exhibit

 7  1454.

 8  A.   Yes, it's a figure from my report.

 9  Q.   And, Doctor, does this photograph accurately

10  represent the location of the Watts lagoon in

11  relation to the Illinois River?

12  A.   Yes, I believe so.

13          MR. GEORGE:  Your Honor, I move for

14  introduction of Defendants' Joint Exhibit 1454.

15          MR. BULLOCK:  No objection, Judge.

16          THE COURT:  1454 is admitted.

17  Q.   (By Mr. George) Doctor, can you describe

18  generally the features of this photograph and the

19  facility that are important in the consideration of

20  whether it would be a potential source of

21  phosphorus.

22  A.   Well, on the photograph, the land area that's

23  above the three-basin lagoon system, the area above

24  that is -- where you see circles on it, that's the

25  irrigation area where the wastewater is applied to
```

10674

```
 1   the land periodically.  And then the dark line
 2   across the top from left to right, that's the main
 3   stem Illinois River Watershed close to the bridge at
 4   Watts.
 5   Q.   Doctor, has the Watts facility been identified
 6   as a potential source of nutrients to the Illinois
 7   River?
 8   A.   Yes.  They've had some problems at the
 9   facility.  There was one instance that was
10   documented by Dr. Ron Jarman for the defendants, and
11   he provided to me a copy of some of the
12   documentation of that, where the City of Watts was
13   actually fined for leakage and improper distribution
14   of the water, a problem that they had at the site.
15   Q.   Do you know approximately how close the
16   irrigation field for this lagoon system is to the
17   Illinois River?
18   A.   It's about a hundred feet, more or less.
19   Q.   Doctor, did any of the State's experts offer
20   any analysis of the potential impact on phosphorus
21   levels in the Illinois River from the Watts sewage
22   lagoons?
23   A.   Nothing that I saw.
24   Q.   Based upon the data that you've reviewed,
25   should this potential source have been considered
```

1  and evaluated?

2  A.   Yes.

3  Q.   Doctor, did you review any data regarding

4  sewage bypasses at point source facilities in the

5  watershed?

6  A.   Yes.

7  Q.   For the benefit of the record, just briefly,

8  what is a sewage bypass and how can it introduce

9  phosphorus?

10  A.   A sewage bypass can occur from a number of

11  different problems in a wastewater treatment system,

12  but it's a situation whereby raw sewage or partially

13  treated sewage is accidentally released.  So it can

14  be released by a broken pipe or a broken pump

15  station or excessive rain overwhelming the system.

16         There are different ways that bypasses can

17  occur, but it will introduce either raw or partially

18  treated sewage into the environment, which may or

19  may not flow into a stream.

20  Q.   Doctor, would that be phosphorus that is in

21  addition to what comes out of the pipe of the

22  facility that is reported that we've had a lot of

23  testimony about?

24  A.   Correct.

25  Q.   Doctor, there's some evidence in the record of

1  this case regarding sewage bypasses.  And I don't

2  intend to take you through all of that for -- out of

3  respect for the court's time.  But based upon the

4  data and information that you've reviewed, are the

5  sewage bypasses a potentially significant source of

6  phosphorus?

7  A.   Well, they're certainly a potential source.

8  Q.   Did any of the State's experts offer any

9  analysis of the potential impact of sewage bypasses

10  on phosphorus levels in the Illinois River?

11  A.   Nothing that I saw.

12  Q.   In your opinion, should that source or

13  potential source have been considered?

14  A.   Yes.

15  Q.   Now, Doctor, you're familiar with Oklahoma's

16  scenic rivers criterion of .037?

17  A.   Yes, I am.

18  Q.   And do you have some understanding or

19  familiarity as to which stream segments that

20  standard applies to in the Illinois River Watershed?

21  A.   Yes, it's the scenic rivers.

22  Q.   Did you prepare -- let me ask this question

23  first, Doctor.  As part of your work in this case,

24  did you identify the discharge locations of all of

25  the wastewater treatment plants?

```
1   A.   Yes.
2   Q.   Is there any scenic river stream segment in the
3   Illinois River Watershed that is not downstream from
4   one or more of these discharging wastewater
5   treatment plants?
6   A.   No.
7   Q.   Did you prepare some demonstratives to
8   illustrate that?
9   A.   Yes, I did.
10  Q.   And could you turn to tab 12.
11  A.   Yes.
12  Q.   For the record, could you describe what is
13  Tyson Demonstrative 60.
14  A.   It's a map of the Illinois River Watershed.
15  The larger streams are outlined in red from the
16  locations of the wastewater treatment plants which
17  are represented by the triangles, and it shows the
18  flow path.  The red lines would be the flow path of
19  water down the streams from the locations of the
20  wastewater treatment plants to the location of Lake
21  Tenkiller.
22  Q.   Doctor, could you turn to the next tab which
23  has been marked as Tyson's Defendant Demonstrative
24  61.  Did you prepare this demonstrative?
25  A.   Yes.
```

1    Q.    Could you identify the information that is

2    illustrated on that demonstrative.

3    A.    It shows the locations of the designated scenic

4    rivers:  Barren Fork, Illinois River, and Flint

5    Creek.

6    Q.    And so, Doctor, does comparing these two

7    demonstratives that we just looked at illustrate the

8    statement that you made regarding scenic rivers all

9    being downstream of wastewater treatment plants?

10   A.    Yes, it does.

11   Q.    Now, Doctor, is it your testimony that point

12   sources or wastewater treatment plants are

13   responsible for every elevated phosphorus

14   measurement in the watershed?

15   A.    No.

16   Q.    Why not?

17   A.    Well, there aren't many other sources besides

18   the point sources.  There's a whole body of science

19   out there on the importance of nonpoint source

20   pollutants.  We know they're there, and they're very

21   well distributed throughout this watershed.

22   Q.    Based upon your experience, training and the

23   data that you've reviewed, Doctor, as part of your

24   work in this case, what might cause an elevated

25   phosphorus measurement not downstream of a

1  wastewater treatment plant?

2  A.   Well, I think to answer that, I really need to

3  back up and split it into two segments.  One would

4  be the nonpoint sources associated with the urban

5  areas, and the other would be the nonpoint sources

6  associated with -- for this watershed, with the

7  agricultural areas in particular and, to a lesser

8  extent, the forested areas.

9        So for the urban areas, we have a variety

10  of nonpoint source pollution sources in urban

11  areas.  The thing that's really important about

12  evaluating nonpoint source pollution in urban areas

13  is the effect of people's building activities and

14  other activities on the hydrology, on how the water

15  flows in the urban areas.

16        In particular, you have a large --

17  relatively large percentage of the urban land use is

18  occupied by what's called impervious area, or

19  compacted soils.  And the impervious area would be

20  the areas like rooftops, driveways, sidewalks,

21  streets, parking lots, all the places where when it

22  rains, the water cannot infiltrate into the soil.

23        Then the compacted soils, you see a lot of

24  that in conjunction with construction activities.

25  So the more land disturbance and construction that

1    you have in the urban area, the more likely you are

2    to have these compacted soils.  And they can be

3    impervious or semi-impervious.

4          But the key point is that when it rains and

5    the water hits these areas, it's not able to

6    infiltrate into the soils.  And it can pick up all

7    kinds of sources of phosphorus in the process of

8    moving before it gets into a stream.  So it can pick

9    up a lot of dust, it's wind blown and small soil

10   particles that have phosphorus adsorbed to them.

11   There's the waste of pets and wildlife.  There's

12   fertilizer use.

13         So there are all these sources of

14   phosphorus in -- there's breakage in the sewer line

15   system, small leaks, large leaks, you know,

16   accidents.  But there are all these sources of

17   phosphorus that are there from people and their

18   activities and their pets.  And the fact that so

19   much of the surface is impervious provides an

20   opportunity to move that water directly into a

21   stream without the opportunity for the soil to pull

22   the phosphorus out as the water moves down through

23   it.

24         And this is especially complicated by the

25   infrastructure that we install in our cities to deal

10681

1   with rain water.  We don't want the streets to

2   flood, that's a problem.  So we build storm drains

3   and we build ditches and gutters and all kinds of

4   systems to efficiently route the rain water away

5   from our cities and into the streams.

6   Q.   Doctor, let me ask a question.  Mr. Bullock was

7   about to pinch me.  He wanted me to interject some

8   questions to break this up, I think.

9          With respect to rural areas, are there

10  multiple potential sources located in rural areas in

11  this watershed?

12  A.   Yes, very much so.

13  Q.   Do you believe, Doctor, that the causes of

14  elevated phosphorus measurements in the Illinois

15  River Watershed can be evaluated, estimated or

16  quantified on a watershed-wide basis with respect to

17  nonpoint sources in particular?

18  A.   No, there are too many and they're too

19  distributed.  They tend to be small.  They're all

20  over the watershed.  You need a site-specific

21  assessment to really sort that out.

22  Q.   Now, Doctor, as part of your work in this case,

23  did you review data and spatial patterns to attempt

24  to identify potential nonpoint sources of phosphorus

25  in the watershed?

1  A.   Yes, I did.

2  Q.   And could you please describe what it is you

3  reviewed in that regard.

4  A.   Well, I think the main thing that I reviewed

5  would be the data from Dr. Olsen's database on the

6  Illinois River Watershed.  And I looked at the

7  concentrations of phosphorus at different locations

8  within the watershed.

9  Q.   Did you review information regarding the number

10  and location of mammals, including humans?

11  A.   Yes, I did.

12  Q.   Did you review comparable information for

13  livestock such as cattle?

14  A.   Yes.  The first one when you said mammal, so

15  that would have been the humans and the cattle would

16  be the two types of mammals.

17  Q.   Good point.  That's always been tricky for me.

18        Doctor, did you review Dr. Fisher's

19  testimony in this court that the current human

20  population in the watershed is approximately

21  300,000?

22  A.   Yes.

23  Q.   Is that consistent with the human population

24  data that you reviewed?

25  A.   Yes, it is.

1  Q.   Could you turn in your binder to tab 14,

2  please.

3  A.   Yes.

4  Q.   And find Defendants' Joint Exhibit 2280.

5  A.   Yes.

6  Q.   Could you identify Exhibit 2280 for the record,

7  please.

8  A.   That's a table from my report.

9  Q.   And there is some human populations shown on

10 that table; is that correct?

11 A.   That's correct.

12 Q.   Can you identify the source of the population

13 estimates or data that is shown in Exhibit 2280.

14 A.   The data for 1990 and 2000 are from the U.S.

15 Census.  The data from 2007 are data that are

16 provided by ESRI, E-S-R-I, which is the group that

17 produces the main Geographic Information System

18 computer software that's used to analyze spatial

19 data and environmental sciences.  So they will model

20 census data in the interim in between census

21 periods.  So the 2007 data is ESRI's model estimates

22 to the population.

23 Q.   Doctor, are both of these datasets that you

24 described, the census data and the ESRI data,

25 datasets that are commonly used in environmental

1    investigations?

2    A.   Yes.

3    Q.   Doctor, you've provided these estimates by the

4    watershed.  Does the U.S. Census or the ESRI group

5    maintain population estimates by watershed?

6    A.   No.

7    Q.   So what did you do with respect to taking the

8    data from those two sources to arrive and compile it

9    into a figure that is representative, in your view,

10   of the population in the watershed?

11   A.   Okay.  The census data are provided by what's

12   called census block groups, small units.  And so

13   what we did was to look at the population in each

14   census block group that occurred wholly within the

15   IRW.  And we added those up.

16        And then we took the census block groups

17   that were partially in and partially out of the

18   boundary of the Illinois River Watershed, and we

19   computed the percentage of the block group that was

20   inside the watershed and multiplied that by the

21   population for that block group, and that gave us

22   the estimate of the human population in the portion

23   of the block group that was within the IRW.  And

24   then we added them up.

25        MR. GEORGE:  Your Honor, I'd move for

1  introduction of Defendants' Joint Exhibit 2280.

2           MR. BULLOCK:  No objection, Judge.

3           THE COURT:  Not going to step on you this

4  time, Mr. Bullock.  2280 is admitted.

5           MR. GEORGE:  Notice I got out of the way,

6  Judge.

7  Q.  (By Mr. George) Dr. Sullivan, for benefit of

8  the record, what does this analysis show as to the

9  human population in the watershed from 1990 to 2007

10  and how it has changed over time?

11  A.   There's been a very rapid increase in the human

12  population.  Actually, northwest Arkansas, which

13  includes that upper region of the IRW, has been

14  called one of the fastest-growing metropolitan areas

15  in the United States in recent years.  But the

16  increase has been quite dramatic.  Just within the

17  decade of the 1990s alone, the human population

18  increased by more than 40 percent, based on these

19  census estimates.

20  Q.  Doctor, if we compared the change from 1990 to

21  2007 -- I'm by no means a mathematician -- but would

22  it be a growth greater than 40 percent, I assume?

23  A.   Actually, I don't think I've done that

24  calculation.  I mean, the numbers that we can really

25  have the greatest confidence in are the actual

```
 1   census numbers for 1990 and 2000.  That was more
 2   than 40 percent.  But clearly the increase has
 3   continued unabated and it's been a very large change
 4   over a fairly short period of time.
 5   Q.   Thank you, Doctor.  Doctor, how was the
 6   information regarding -- I'm sorry, let me move to
 7   the next exhibit.  Turn to tab 15, please.
 8   A.   Yes.
 9   Q.   Could you find Defendants' Joint Exhibit 2239.
10   A.   Yes, I have it.
11   Q.   And for the record, could you identify what is
12   Defendants' Joint Exhibit 2239.
13   A.   It's a figure from my report.
14   Q.   Was this figure prepared under your direction?
15   A.   Yes, it was.
16   Q.   What's the source of the data that is shown in
17   this exhibit?
18   A.   That would be the same as the previous exhibit.
19          MR. GEORGE:  Your Honor, move for the
20   introduction of Defendants' Joint Exhibit 2239.
21          MR. BULLOCK:  No objection.
22          THE COURT:  2239 is admitted.
23          MR. GEORGE:  Thank you, Your Honor.
24   Q.   (By Mr. George) Doctor, how was the information
25   that we've just looked at in terms of the size and
```

1  the location of the human population in the

2  watershed important to your identification and

3  analysis of potential nonpoint sources?

4  A.   Well, it's very important, because the -- in

5  terms of the nonpoint source contributions from

6  urban areas, it's not just the size of the urban

7  area or the population in the urban area that's

8  important; it's also the development that's taking

9  place.

10         And the reason for that is because where

11  you have a lot of land-disturbing activities, that

12  provides the opportunity to move more phosphorus and

13  other constituents as well from those areas to the

14  streams along nonpoint source flow paths.

15         And the reason is because in the process of

16  disturbing the lands when you're digging things up

17  for construction, you've got equipment working

18  there, you're compacting soils and you're

19  disrupting, you're expanding from areas that were

20  not impervious to make them impervious and

21  introducing all the disturbance at the same time.

22         That generates a lot of opportunity for

23  erosional contributions to the streams, and erosion

24  involves the movement of soil particles, many of

25  which are small.  And the smaller they are, the more

1    likely they are to transport phosphorus adsorbed to

2    them.

3    Q.    Doctor, what does Defendants' Joint Exhibit

4    2239 show about the location of this growing human

5    population and urban development in the watershed?

6    A.    Well, it shows what I think is pretty common

7    knowledge within the watershed, and that is that

8    most of the development in recent years has been

9    concentrated in that upper portion of the watershed

10   basically between Rogers and Fayetteville, and to

11   some extent, around Tahlequah as well in Oklahoma.

12   Q.    Doctor, you've identified some of the things

13   that occur within urban areas that can impact

14   nonpoint source phosphorus.  I don't believe you've

15   yet mentioned commercial fertilizer.  Can commercial

16   fertilizer use in urban areas have an impact?

17   A.    Yes, it can.

18   Q.    How so?

19   A.    Well, it's the same kind of issue.  In these

20   urban areas, there are lots of opportunities to

21   short-circuit the process of water moving down into

22   the soil, infiltrating into the soil, where you

23   provide the opportunity for phosphorus to be

24   adsorbed to the soil particles and remain in the

25   soil as opposed to passing into the stream.

1       So where you have a lot of lawn

2    fertilizing in conjunction with sprinkler systems

3    that are adjacent to sidewalks and the rest of it,

4    you're just providing an enhanced opportunity for

5    phosphorus that people place on the land in this

6    urban environment, and when it rains hard,

7    especially coupled with sprinklers or even

8    independent of the rain, just the sprinklers, you

9    have the chance of moving this water with phosphorus

10   into the conduits that run directly into the streams

11   without the opportunity for soil interaction.

12   Q.   Dr. Sullivan, the court has been treated with

13   some analysis of urban development by Dr. -- or by

14   Wayne Grip.  Are you familiar with Wayne Grip?

15   A.   Yes.

16   Q.   I'm told that His Honor even donned some 3-D

17   glasses, and I wasn't here to see it, which is

18   regrettable.

19       Did you also review Mr. Grip's analysis of

20   aerial photographs in this corridor in northwest

21   Arkansas of urban development?

22   A.   Yes, I did.

23   Q.   How was that information useful to you in your

24   analysis of potential nonpoint sources?

25   A.   Well, it was useful to just reconfirm what the

1  other analyses were suggesting, that there's been a

2  large increase in the human population and in the

3  amount of development in the upper watershed.  And

4  it is the same thing I could see visually when I

5  toured the upper watershed myself.  There was a lot

6  of construction going on.

7  Q.  I've been given -- handed a note that I did not

8  ask you about cats and dogs.  And --

9          THE COURT:  Or Tontitown.

10          MR. GEORGE:  Or Tontitown, which I'm going

11  to stay away from for personal reasons.

12  Q.  (By Mr. George)  Dr. Sullivan, did you review

13  any information to try to get a handle on how many

14  cats and dogs there are in the watershed?

15  A.  Yes, just a rough estimate.  I used national

16  figures of how many dogs and cats per household and

17  number of people per household and did some simple

18  mathematics.  And based on national numbers, if the

19  people who live in the IRW have pets at the same

20  rate as people elsewhere in the country, then there

21  are -- it was over 400,000 cats and dogs.

22          And the reason that's important is not so

23  much because it's 400,000 cats and dogs; it's

24  because they're going to be concentrated where the

25  people are.  And so many of these cats and dogs are

1    going to be in these urban environments.

2         It's the same issue is that if you put

3    fecal material from a pet in a place where your lawn

4    sprinklers and the rain can move that quickly and

5    easily into the flow system independent of the

6    soils, then you've got significant opportunity to

7    transport the phosphorus and other things that are

8    contained in that fecal material into a stream.

9         If the water takes it down into the soil,

10   then you expect most of that phosphorus or all of

11   that phosphorus to be adsorbed.  But in an urban

12   environment, there is much less opportunity for that

13   to happen.

14        THE COURT:  You're not offering a

15   comparison between the contribution of nonpoint

16   source phosphorus from cats and dogs relative to

17   poultry, are you?

18        THE WITNESS:  No, sir, I'm not.  What I'm

19   doing is just trying to indicate that in the urban

20   environment, there are many, many sources.  And

21   because of the hydrology of the urban environment,

22   there's a dramatically enhanced opportunity to move

23   any or all of them into a stream; whereas, in the

24   pasture environment -- not everywhere, but in

25   general, when it rains, the water infiltrates into

1   the soil, and you have that soil contact.

2          THE COURT:  We did broach a new subject

3   here after four months.

4          MR. GEORGE:  Absolutely.

5   Q.  (By Mr. George)  What you're saying,

6   Dr. Sullivan, is if a delightful young man who lived

7   in Tontitown, owned four large Golden Retrievers,

8   that I might be a potential source?

9   A.   I suppose it's possible.

10  Q.   Okay.  Doctor, did you conduct a spatial

11  analysis of water quality in association with the

12  urban areas that we've been discussing?

13  A.   Yes, I did.

14  Q.   And tell us generally how you went about that

15  spatial analysis.

16  A.   Well, I looked at the data from Dr. Olsen's

17  database and plotted the locations throughout the

18  watershed, including around the urban areas, of the

19  total phosphorus that was measured in the samples.

20  And, again, I used a geomean of five or more samples

21  to represent individual locations.

22  Q.   Did you prepare any figures for your expert

23  report demonstrating this analysis?

24  A.   Yes.

25  Q.   And could you turn to tab 16 in your binder,

1  please.

2  A.   Yes.

3  Q.   And could you -- actually, let's take them in a

4  group, if we can.  Could you look at Defendants'

5  Joint Exhibit 2244, which is behind tab 16, and

6  Defendants' Joint Exhibit 2245.  Do you see both of

7  those?

8  A.   Yes, I do.

9  Q.   Can you identify those documents for the

10  record, please.

11  A.   Yes.  Those are figures from my report.

12  Q.   Okay.  Were these figures prepared under your

13  direction?

14  A.   Yes.

15  Q.   And generally, can you describe the data or

16  information that is illustrated or shown on these

17  figures?

18  A.   Well, in both cases, it would be data from

19  Dr. Olsen's database in the IRW.  Five or more

20  samples reported as a geomean for each location

21  where we had five or more samples.

22         The difference between the two maps is the

23  first one shows all of his data regardless of the

24  flow condition, and the second map shows his data

25  for the sampling occasions for which he classified

1    the sample as a base flow sample when it was not an

2    elevated flow because of a rainstorm, for example.

3    Q.    Doctor, to be clear, the data that is

4    represented is phosphorus data; is that right?

5    A.    Total phosphorus.

6    Q.    And there are bars on here.  Do the heights of

7    the bars correspond to concentrations of phosphorus?

8    A.    Yes, it's the same style of presentation as

9    those Oklahoma maps we looked at earlier, that the

10   bars are colored green if they're below the .037

11   standard.  I believe -- yes, and then they're

12   colored orange if they're above.  And the height is

13   proportional to the concentration.  And there's a

14   scale bar that shows you the height of a bar that

15   would be at a concentration of 0.5 milligrams per

16   liter of total phosphorus.

17          MR. GEORGE:  Your Honor, I move for

18   introduction of Defendants' Joint Exhibit 2244 and

19   2245.

20          THE COURT:  Any objections?

21          MR. BULLOCK:  No objection.

22          THE COURT:  2244 and 2245 are admitted.

23          THE WITNESS:  I apologize, Mr. George.  I

24   was explaining what was there, and I neglected to

25   say something important.  The municipal boundaries

1   are also indicated and the locations of the

2   wastewater treatment plants on the figure -- on the

3   map as well.

4   Q.   (By Mr. George)  Why is that information

5   important to your analysis?

6   A.   Well, the question was to what extent was I

7   looking at the potential involvement of the urban

8   areas in the transfer of phosphorus to streams.  So

9   for that, we want to look at both the point and the

10  nonpoint source components of that.

11          The point source would be the wastewater

12  treatment plants, and the nonpoint would be the

13  municipal boundaries.

14  Q.   Doctor, on both of these maps, I notice that

15  there's a bar that's visible, and it's high in

16  comparison to some of the bars on this map right in

17  the middle of the watershed.  Do you see that?

18  A.   Middle top?

19  Q.   Actually, middle-middle.  Let me approach it

20  this way.  Are you familiar with the location of the

21  Westville wastewater treatment plant?

22  A.   Yes.

23  Q.   And is that shown on both of these maps as a

24  triangle?

25  A.   Yes, that's a good point.  It's hard to see

1    behind the bar, isn't it?  It's there.

2    Q.   Just so we're clear, could you go to the map

3    and just point that location out one time, because

4    it is hard to see the triangle.

5    A.   Right there. (Indicating.)

6    Q.   Now, Doctor, what conclusions, if any, do you

7    draw from your spatial analysis of phosphorus

8    concentration downstream from urban areas?

9    A.   There's a very strong pattern in Dr. Olsen's

10   data.  And we see the same pattern with both --

11   considering all flow conditions and also in

12   considering just the base flow conditions.

13          But the pattern is that the highest bars on

14   the map, which correspond with the areas that have

15   the highest total phosphorus concentrations

16   expressed as a geomean of multiple samples, but

17   those are very strongly associated with both the

18   urban area locations and also the wastewater

19   treatment plant outflow locations.

20          We don't have the data that would really

21   allow us to separate out those two very effectively

22   because the data don't bracket the urban areas

23   independent of wastewater treatment plants.  So it's

24   difficult to tease it out.

25          Based on other analyses, our expectation is

1  that much of the phosphorus there is coming from the

2  point source.  But we don't really have a good way

3  of estimating how much additional phosphorus is

4  coming from the urban nonpoint source.

5          But the spatial pattern is very clear that

6  the high bars are uniformly downstream from the

7  urban areas and wastewater treatment plants.

8  Q.   Doctor, do you see that same spatial analysis

9  or association even when you look at Defendants'

10 Joint Exhibit 2244, which you described as having

11 data from all flows, high flows and low flows?

12 A.   Yes.

13 Q.   Now, Doctor, did you review Dr. Jan Stevenson's

14 testimony in this courtroom that urban land use

15 results in a large increase of total phosphorus in

16 streams in the Illinois River Watershed?

17 A.   Yes, I remember that.

18 Q.   Was that testimony consistent with your own

19 observations and conclusions?

20 A.   It is.

21 Q.   Now, Doctor, based upon the data and

22 information that you have reviewed, are urban areas

23 a significant enough potential source of phosphorus

24 that they should have been considered in an

25 investigation of causes of phosphorus loading to the

```
 1   Illinois River Watershed streams and rivers?
 2           MR. BULLOCK:  Leading.
 3           THE COURT:  Sustained.  Rephrase.
 4           MR. GEORGE:  Your Honor --
 5   Q.  (By Mr. George) Dr. Sullivan, did you see any
 6   meaningful analysis of urban areas in the expert
 7   testimony and reports put forward by the State's
 8   experts?
 9   A.   There were analyses that were done that they
10   considered point sources.  I didn't see any analyses
11   that really addressed the nonpoint component of the
12   urban contribution, and I didn't see pairs of
13   samples that would allow me to do that investigation
14   either.  So the data simply were not collected in
15   such a way to allow an investigation of urban
16   nonpoint sources.
17   Q.   Should urban nonpoint sources have been
18   considered in the investigation and evaluation?
19   A.   Definitely.
20   Q.   Now, again, Dr. Sullivan, are you testifying
21   that all elevated phosphorus readings in the
22   watershed correspond to urban areas?
23   A.   No.
24   Q.   Let's move away from urban areas and talk about
25   some potential nonurban impacts on water quality.
```

1          You mentioned erosion from construction

2    sites.  Are there other forms of erosion that we

3    might see even in rural settings?

4    A.   Yes.

5    Q.   Could you describe those, please.

6    A.   The most important ones would be erosion

7    associated with roads, and that's most pronounced

8    for unpaved roads, for dirt roads.

9    Q.   Did you say unpaved roads?

10   A.   Unpaved.  So the dirt roads -- the roads in

11   general are well known as significant sources of

12   phosphorus -- of erosion, and the dirt roads in

13   particular.

14          The other source that would be particularly

15   important, or the second source, would be streambank

16   erosion, of which there's quite a significant amount

17   in this watershed.

18          Then finally, erosion associated with other

19   land-disturbing activities.  And in the nonurban

20   environment in a watershed like the IRW, there's

21   really not much row cropping.  That's a major issue

22   in many places.  There's not too much of that in the

23   IRW.  There's some.

24          But the other issue is activities of the

25   livestock of removing vegetation and trampling the

1   soil and disturbing the soils.  So there can be

2   erosion associated with that.

3   Q.   Have you worked on erosion-related water

4   quality issues outside of this lawsuit?

5   A.   Yes.

6   Q.   Could you describe when you had those

7   experiences.

8   A.   We address erosion -- it's an important part of

9   all of our watershed assessments.  Erosion is a big

10  issue with respect to aquatic habitat health,

11  fisheries, water quality, riparian zone integrity.

12  So there are many aspects of erosion that are

13  important.

14       It's always an analysis that we do in our

15  watershed assessments, watershed analyses for

16  federal agencies and for watershed councils.

17  Q.   I didn't mean to interrupt you.

18  A.   Well, I've done some other research on it

19  myself as well.

20  Q.   Go ahead.  I'm sorry.

21  A.   In some of the Tillamook studies that I

22  described earlier where we collected samples at the

23  forest/ag interface and then at the base of the

24  rivers before they flowed into the bay, that

25  forest/ag interface represented a nice transition in

1    the watershed where, above that, there was no

2    agriculture, there were no urban areas, there was

3    almost no rural residential housing.  It was just

4    forest.

5          And the sources of erosion and phosphorus,

6    which was one of our main interests in that, were

7    really from two things:  From logging, which was

8    prevalent, but was not excessive, and from logging

9    roads, dirt roads, which were very commonplace.  And

10   that -- so we did analyses on evaluating --

11         MR. BULLOCK:  I object to the relevance of

12   this.  It doesn't appear to have -- it's certainly

13   not responsive to the question, and it doesn't

14   appear to have any relevance to the matter we're

15   talking about.

16         THE COURT:  Sustained.  Mr. George.

17   Q.  (By Mr. George) Dr. Sullivan, is it generally

18   recognized that erosion from dirt roads and

19   streambanks contains phosphorus?

20   A.  Yes, it is.

21   Q.  Have you seen any reports from Oklahoma

22   agencies discussing erosion as a source of

23   phosphorus in the Illinois River Watershed?

24   A.  Yes, I have.

25   Q.  Doctor, have you yourself personally seen any

```
 1  evidence of substantial amounts of streambank
 2  erosion, for example, occurring in the watershed?
 3  A.   Yes, I have.
 4  Q.   Could you please describe that and how it was
 5  that you came to see it.
 6  A.   I saw it really three ways.  The first would be
 7  on a canoe trip that I took with a group of defense
 8  lawyers and experts.
 9        MR. BULLOCK:  Judge, I think this is
10  cumulative of our video highlights of the other day
11  of streambank erosion.
12        THE COURT:  I think this is cumulative.
13  Sustained.
14        MR. GEORGE:  Your Honor, and I'll proceed
15  and see how it goes.  But just for the benefit of
16  the court, there is a photograph that was taken that
17  I would like to move into evidence.  I do appreciate
18  there is some evidence in the record, so I'm going
19  to attempt to do that.  And if Mr. Bullock objects
20  and you sustain it, I'll move on, of course.  But I
21  want you to appreciate that I did hear Your Honor.
22  Q.   (By Mr. George) Dr. Sullivan, could you turn to
23  Exhibit 18.
24  A.   Yes.
25  Q.   And you'll find -- I'm sorry, tab 18, which has
```

1  been marked as Defendants' Joint Exhibit 633-0031,

2  633-0055, 633-0072, 633-0075, and 633-0089,

3  633-0015.

4          Dr. Sullivan, do you recognize those

5  photographs?

6  A.  Yes, I do.

7  Q.  Were you present when they were taken?

8  A.  Yes, I believe so.

9          MR. GEORGE:  Let me correct something for

10  the court's benefit.  Which one did I invert,

11  Mr. Todd?

12          I'm told I can't read numbers, Your Honor.

13  The last one is actually 633-0105.  My apologies.

14  Q.  (By Mr. George)  I'm sorry, Doctor.  Were you

15  present when these photographs were taken?

16  A.  Yes.

17  Q.  Were they taken on a float trip along the

18  Illinois River?

19  A.  Yes.

20  Q.  Did you personally observe the streambanks that

21  are shown in these photographs?

22  A.  Yes, I did.

23          MR. GEORGE:  Your Honor, I move for the

24  introduction of those previously identified

25  exhibits.

1          MR. BULLOCK:  While cumulative, we're not

2    going to object.

3          THE COURT:  Very well.  Those exhibits are

4    admitted.  Mr. George.

5          MR. GEORGE:  Thank you, Your Honor.

6    Q.   (By Mr. George)  Doctor, do those photographs

7    show eroded streambanks?

8    A.   Yes, they do.

9    Q.   Doctor, based upon your floating of the

10   Illinois River, are the conditions shown in those

11   photographs common or uncommon along the stretch

12   that you've at least been exposed to?

13   A.   Well, I wouldn't say that the entire stretch is

14   eroded to this extent, but the levels of erosion

15   that we see here are quite commonplace throughout

16   the stretch of river that we canoed.  And I could

17   observe similar conditions from a flyover that I did

18   in the watershed as well.

19   Q.   Doctor, would you expect streambank erosion to

20   contribute phosphorus to streams during high flow or

21   base-flow conditions?

22   A.   Primarily high flow.

23   Q.   Now, the court has heard about these pulses of

24   phosphorus that move through the stream and river

25   system during high flow or runoff conditions.  Would

1  that pulse include phosphorus from eroded

2  streambanks?

3  A.   Yes.

4  Q.   Now, in addition to introducing phosphorus, can

5  erosion and, for that matter, resuspension of

6  sediment material have any other harmful impacts on

7  water quality?

8  A.   Yes.

9  Q.   What are those?

10  A.   It increases siltation, so buildup of

11  sedimentary materials.  In Lake Tenkiller, for

12  example, and other impoundments in certain areas of

13  the stream system, it increases turbidity, can have

14  a detrimental effect on various life forms.  For

15  some fish, there's spawning beds, for example, that

16  would -- for some fish, it's gravelly areas, and if

17  you fill those in with fine sediments from erosion,

18  that can degrade the spawning habitat.  Same thing

19  for some of the insects that provide food for the

20  fish.

21  Q.   Doctor, can erosion have any impact on the

22  color or the appearance of water during high-flow

23  events?

24  A.   Yes.

25  Q.   There's been some testimony in this case and

1  photographs shown of brown water during high-flow

2  events.  Have you seen that?

3  A.   Yes, I have.

4  Q.   Is that a common result of erosion?

5  A.   Yes.  Erosion -- and the color is going to

6  depend on the color of the soil particles that are

7  eroded.  So I've seen rivers and streams that look

8  red in color as a consequence of erosion, and others

9  look brown, and some look tan.  And I mean, it

10  really depends on what the soil is.  But it can

11  impart a substantial color and make it so that you

12  can't see through very much of the water column.

13  Q.   Now, Doctor, you also mentioned erosion from

14  dirt roads.  What is it about dirt roads that makes

15  them a potential source of phosphorus to streams?

16  A.   Several things.  One is that when you have a

17  lot of roads and you have a lot of streams, they

18  cross each other.  Where a stream crosses a road,

19  typically you have a culvert.  I mean, if it's a

20  large stream and a large road, it's typically a

21  bridge.  For the most part, we're talking about a

22  culvert.

23        Also, roads tend to have ditch lines that

24  run parallel to them to carry the water away so they

25  don't flood.  If a lot of water moves to those

1    ditches, sometimes there's no vegetation in them

2    which makes the soil in the ditch more erodible.

3            The road surface is impermeable or

4    relatively impermeable and, therefore, dust blown

5    from adjacent fields or from anywhere that

6    accumulates on the road when it rains can be washed

7    into the ditch and through the culvert and carried,

8    if it flows into a stream -- which it may or may

9    not -- carry the materials into that stream.

10           So it's a case of the locations of the

11   roads relative to the streams and the setting in

12   which the road is placed will determine the extent

13   to which that's going to happen, but it's a very

14   well-understood phenomenon.

15   Q.   Did you review any data or information to

16   determine the degree to which dirt roads are present

17   in the watershed?

18   A.   Yes, I did.

19   Q.   And what information did you review?

20   A.   U.S. Census TIGER files that have the road

21   distribution information.

22   Q.   Doctor, based upon your review of that data,

23   can you provide the court with any information that

24   would put into perspective the magnitude or mileage

25   of dirt roads in the watershed?

1  A.   It's over 5,000 miles of road in the Illinois

2  River Watershed.  5,100-something miles of road in

3  the watershed.  It's close to half and half between

4  Oklahoma and Arkansas, a little bit more in

5  Arkansas, I think.

6           And then we have -- for the Arkansas side,

7  we have data to tell us which ones are paved and

8  which ones are not paved.  We don't have that for

9  the Oklahoma side.

10  Q.   What percentage was paved in Arkansas?

11  A.   About half.

12  Q.   Half of the -- the total number was for the

13  watershed, 5,000, right?

14  A.   Yes.  So the total amount of unpaved road in

15  Arkansas was around 1,300 miles.  And then it's

16  probably a somewhat similar number for Oklahoma.

17  Q.   Okay.  Now, Doctor, based upon the data that

18  you've reviewed, is erosion from streambanks and

19  dirt roads a significant enough potential source of

20  phosphorus that it should have been considered in

21  the investigation in this case?

22  A.   Yes.

23  Q.   Was it considered by the State's experts, based

24  upon your review of their work?

25  A.   No.

1  Q.   Now, let's talk about septic systems.  Did you

2  evaluate the extent to which the human population in

3  the watershed is serviced by septic tanks as opposed

4  to wastewater treatment plants?

5  A.   Yes, I did.

6  Q.   And did you review Dr. Engel's testimony in

7  this courtroom that there are approximately 73,000

8  septic tanks in the watershed?

9  A.   Yes.

10  Q.   And is that consistent with the data that you

11  reviewed?

12  A.   Yes, it is.

13  Q.   Doctor, did you include in your report any data

14  regarding the use of septic systems in the IRW?

15  A.   Yes.

16  Q.   Can you turn to tab 19 in your materials --

17  A.   Yes.

18  Q.   -- and find Defendants' Joint Exhibit 2279.

19  A.   Yes.

20  Q.   Can you identify that exhibit for the record,

21  please.

22  A.   That's a table from my report.

23  Q.   And, Doctor, was this table prepared under your

24  direction?

25  A.   Yes.

1    Q.    And could you identify generally the source of

2    the data and information that is shown in this

3    table.

4    A.    The human population data were taken from the

5    U.S. Census.  And then for the various

6    municipalities, Ron Jarman did an analysis of

7    wastewater treatment plant point sources for the

8    defendants, and he reported to me which ones of

9    these communities were on centralized wastewater

10   treatment systems.

11          The reason for that is if a community is

12   not on a centralized system, then people are using

13   septic systems for the most part.

14   Q.    Did you then take that data and try to remove

15   from the overall human population those that are

16   serviced by wastewater treatment plants to arrive at

17   a number?

18   A.    Correct.

19   Q.    What did your analysis show as to the use of

20   septic systems in the watershed?

21   A.    Well, it certainly varies by the municipality,

22   but overall I came up with an estimate of a little

23   over 76,000 people in the watershed on septic

24   systems.

25          MR. GEORGE:  I'm sorry, Your Honor, I

1  failed to move to introduce this.  At this time, I'd

2  offer Defendants' Joint Exhibit 2279.

3           THE COURT:  Mr. Bullock.

4           MR. BULLOCK:  No objection.

5           THE COURT:  2279 is admitted.

6           MR. GEORGE:  Thank you.

7  Q.  (By Mr. George) Doctor, can septic tanks

8  deliver phosphorus to groundwaters and surface

9  waters?

10  A.  Yes, they can.

11  Q.  Is there one that they're more likely to impact

12  than the other?

13  A.  It really depends.  Again, it's a site-specific

14  thing.  It's going to depend on whether or not the

15  septic system is causing a problem and, if it is,

16  what the nature of that problem is and where it's

17  located.

18  Q.  Do septic systems have to be malfunctioning to

19  contribute phosphorus to groundwater or surface

20  water?

21  A.  Well, I would say that certainly for surface

22  waters, if they're not malfunctioning or improperly

23  located, then it's not likely that they're

24  contributing much or at all.  But the problem is if

25  they're not placed in the proper locations or

1  they're malfunctioning, then there is a possibility

2  of contributing to some stream waters.

3  Q.   What about groundwater; can a septic system,

4  even if it's not malfunctioning, contribute

5  phosphorus to groundwater?

6  A.   Well, again, the answer is it depends.  It's

7  going to depend largely on the depth of the soil and

8  the depth of the location of the lateral lines of

9  the septic system.  And that's going to depend to a

10  large degree, I would assume, on when the system is

11  built and if it was built to proper specifications

12  or not.  So in that instance, we're probably looking

13  at more of a malfunctioning issue.

14  Q.   Doctor, based upon the information and data

15  that you reviewed, are septic tanks a significant

16  enough potential source of phosphorus that they

17  should have been considered?

18  A.   I certainly think that they should have been

19  considered, yes.

20  Q.   Did you see any meaningful analysis of

21  phosphorus from Illinois River Watershed septic

22  tanks and the works completed -- and the work

23  completed by the State's causation experts?

24  A.   I saw some analyses and some discussion that

25  addressed septic systems, but I saw nothing there

1  that I considered to be meaningful.

2  Q.   Did you review the work of Dr. Engel and

3  Dr. Cox on their correlation analysis of phosphorus

4  concentrations with certain things?

5  A.   Yes.

6  Q.   And did you find in that work any information

7  relating to septic tanks as a potential source?

8  A.   Yes.

9  Q.   What did you find?

10 A.   Well, they reported a statistically significant

11 correlation between the density of septic systems

12 across the landscape in their 14 small watersheds

13 that they studied.  So it's a correlation between

14 septic system density and phosphorus concentration

15 in the stream.  They found a significant correlation

16 between those two variables.

17        They dismissed that as an artifact of

18 another correlation that they found with poultry

19 house density, but there was no adequate basis for

20 that dismissal, in my view.

21 Q.   Doctor, you mentioned cattle as another

22 potential source of phosphorus earlier.  Did you

23 review data on the extent and location of cattle in

24 the watershed?

25 A.   Yes.

1           MR. GEORGE:  Your Honor, this is another

2    area where I appreciate the court has been exposed

3    to some information by Dr. Clay on cattle, and I

4    don't intend to repeat any of his testimony, but

5    Dr. Sullivan has taken some of that information and

6    mapped it so that we can have benefit as to where

7    those cows are located generally.  With that

8    understanding, I'm going to proceed.

9    Q.   (By Mr. George)  Dr. Sullivan, did you review

10   Dr. Clay's testimony regarding his calculation that

11   there are approximately 200,000 head of cattle in

12   the watershed, and those cows deposit

13   approximately -- manure containing approximately

14   3,100 tons of phosphorus per year?

15   A.   Yes.

16   Q.   How, if at all, are cattle important to your

17   analysis of potential nonpoint sources?

18   A.   Well, they're very important by virtue of the

19   size of the cattle population coupled with the ways

20   in which cattle behave and the locations in which

21   you find cattle.  So they're very important.

22   Q.   Let's talk about location.  Did you examine

23   data showing cattle concentrations across the state

24   of Oklahoma so that we could have some context as to

25   whether this is a high or a low density cattle

1  area?

2  A.   Yes.

3  Q.   What was the source of the data that you looked

4  at in that analysis?

5  A.   The Oklahoma 2002 Census of Agriculture.

6  Q.   And could you turn to tab 20.

7  A.   Yes.

8  Q.   Find Defendants' 2250.  Could you identify that

9  for the record, please.

10 A.   That's a figure from my report.

11 Q.   And is the USDA census data for the state of

12 Oklahoma that you just described shown graphically

13 on that exhibit?

14 A.   Yes.  It's shown graphically as cattle density

15 by county.

16 Q.   Was this figure or exhibit prepared under your

17 direction?

18 A.   Yes.

19        MR. GEORGE:  Your Honor, I move for the

20 introduction of Defendants' Joint Exhibit 2250.

21        MR. BULLOCK:  No objection.

22        THE COURT:  2250 is admitted.

23 Q.   (By Mr. George) Doctor, what conclusions, if

24 any, did you reach based upon your review of this

25 information?

```
 1   A.   That the density of cattle across Oklahoma
 2   exhibits certainly some variation.  But the IRW
 3   location is shown with the black line around the
 4   watershed there to the right.  And what that
 5   indicates is that the density of cattle in the IRW
 6   is relatively high or moderate compared to the rest
 7   of the state.  It's certainly not lower.
 8   Q.   Using the key in the left-hand corner for the
 9   benefit of the record, could you identify the cattle
10   density by square mile in the counties that are
11   comprised within the Illinois River Watershed.
12   A.   Yes.  For much of it, it's between 100 and 150
13   cattle per square mile.  For the lower section, it's
14   a little bit lower than that.
15   Q.   Now, Doctor, I believe you testified to this
16   earlier, but if not, I want to make sure.  Have you
17   been involved in the past in any scientific studies
18   on the impact of cattle and cattle manure on water
19   quality?
20   A.   Yes.
21   Q.   Does that relate to the work that you conducted
22   in Oregon watersheds?
23   A.   Yes.
24   Q.   And the BMP project that you discussed earlier?
25   A.   That's correct.
```

```
 1              MR. GEORGE:  Your Honor, with the court's

 2   indulgence, we have a physical model that I would

 3   like to use with this witness.  And I by no means

 4   want to be condescending to the court.  I appreciate

 5   that the court has some familiarity with cattle and

 6   cattle operations and probably has a grasp on much

 7   of the impacts.  And this particular model was

 8   prepared at a time when we believed we might have a

 9   jury.  But I think it might be useful to spend a few

10   minutes with the witness just talking through, with

11   that as a framework, his opinions regarding cattle

12   and the potential impacts.

13              THE COURT:  I've not seen this.  Will it

14   really be helpful, Mr. Bullock?

15              MR. BULLOCK:  I've got an objection to

16   principle on this.  I don't think it's very

17   helpful.  But my principle is this:  Clearly this

18   model was prepared -- this diorama, as they call it,

19   was prepared well in advance of this trial, as

20   counsel says.  We didn't receive notice of this

21   until a quarter of ten on Saturday night.  So it

22   wouldn't even be timely -- it wouldn't be timely

23   until Wednesday.  Now here it is Monday, and they're

24   saying they want to use it.  So I object.

25              THE COURT:  Is this it over here?
```

 1         MR. GEORGE:  It is, Your Honor.  And with

 2    respect to the disclosure, I don't quarrel with

 3    Mr. Bullock's statement.  The circumstances, just so

 4    the court understands, no gamesmanship here, I,

 5    candidly, had forgotten about the diorama until

 6    Dr. Sullivan showed up with it, and it reminded me

 7    that it was something that had been put together.

 8         Again, Your Honor, if the court thinks it

 9    would even be mildly useful, we're happy to use it.

10    We think it would be slightly helpful, but if the

11    court has reservations or is sensitive to

12    Mr. Bullock's concern, we understand that, too.

13         With respect to the disclosure issue,

14    candidly, Your Honor, it's not that difficult to

15    look at the model and understand it.  So I don't

16    think there's any prejudice.

17         THE COURT:  With all due respect, I just

18    don't think it's going to be helpful.  Is there

19    anything special about it that would -- I grew up,

20    as you know, partially on a farm, not a big farm,

21    but, look, I don't know that it's going to be

22    helpful to the finder of fact.

23         MR. GEORGE:  The aspects we wanted to

24    discuss, and that will be shown by the model, is

25    some of the hydrologic considerations with respect

1  to cattle behavior, areas in pastures that can be

2  hydrologically active and that have unique impact on

3  the water quality aspects of cattle.

4          THE COURT:  We've gone over that here.  I'm

5  pretty familiar with it.  With all due respect,

6  Mr. Bullock's objection is sustained.  Go ahead.  I

7  think we can talk about it, but I think we're all

8  familiar with those impacts.

9          MR. GEORGE:  I appreciate that,

10  Your Honor.  I'll move to the questions.

11  Q.  (By Mr. George) Doctor, can you provide the

12  court with an explanation as to how cattle grazing

13  can adversely impact water quality in terms of

14  phosphorus?

15  A.  Yes.  But it's a pretty complicated issue.

16  There's a lot to it.  It mainly has to do with the

17  water flows, where the water moves, and the behavior

18  of the cattle.

19          So let's start with the behavior of the

20  cattle.  So when cattle have access to streams, they

21  tend to spend a disproportionate amount of time in

22  and around those streams.  And when cattle deposit

23  their feces in the stream, that's obviously a direct

24  source of phosphorus to the stream.

25          Also, when they deposit their feces in the

1   riparian area and in areas that are close to the

2   stream, there's an increased likelihood that these

3   feces will be deposited on land that is

4   hydrologically active, because the land in close

5   proximity to a stream has a higher probability of

6   being hydrologically active than does land further

7   upslope.  Frankly, that's the reason for the

8   regulations that say don't spread litter close to

9   streams.

10          And so the fact that the cattle have access

11   to those areas to deposit their feces in locations

12   that are more likely to be hydrologically active and

13   that they disturb the soil in those areas, too, both

14   of those things are going to promote the transport

15   of phosphorus from erosional sources and from cattle

16   to the stream.

17   Q.   Let me interrupt you, Doctor, and ask you a

18   question.  What do you mean by "hydrologically

19   active"?

20   A.   Hydrologically active areas are the areas that

21   are prone to contribute overland flow.  And I guess

22   maybe if we haven't heard much about this in the

23   proceedings, I would need to back up and describe

24   the different types of flow and what overland flow

25   is.  Is that appropriate?

1  Q.   Sure.  Let's take it stepwise, if we can, and

2  let me interject some questions as we go so we can

3  break this up.

4        Can you provide the court with your

5  definition of overland flow.

6  A.   Overland flow is, when it rains, water flow

7  from the rain going over the surface of the ground.

8  So in the case of pastures at issue here, it would

9  be water flowing over the pasture surface during

10 that rainstorm.

11 Q.   Okay.  Are there different types of overland

12 flow?

13 A.   Yes.  There are two primary types of overland

14 flow.  They're similar that in both cases, what's

15 causing it is that the spaces between the soil

16 particles are full of water, and so when additional

17 water comes along from rainfall, it can't go down

18 into the soil, it can't infiltrate because the

19 spaces are already full.  That's why it flows over

20 the surface.  Otherwise, in most soil types, it

21 would -- excluding clay -- but in most soil types,

22 it would tend to infiltrate down into the soil.

23        But if the spaces are full, it can't and,

24 therefore, it's got to go somewhere.  It's going to

25 follow gravity, and that's overland flow.

1          But there are different things that cause
2    the spaces to be full.  One is that it's raining so
3    hard that the rate of rain exceeds the rate of
4    infiltration that the soil are capable of.
5    Q.   What's that called?
6    A.   I'm sorry, what?
7    Q.   Is there a particular term or phrase to
8    describe that?
9    A.   Yes.  That's called infiltration excess
10   overland flow.  It's also called Hortonian overland
11   flow, H-O-R-T-O-N-I-A-N, named after a hydrologist
12   named Horton that described this process.  So that's
13   one type of overland flow.
14   Q.   What's another type?
15   A.   Another type is what's called saturation excess
16   overland flow.  And what causes that is that if the
17   water that's flowing through the soil flows to these
18   relatively lower elevations in the watershed and
19   fills up those soil spaces, then that water table is
20   going to rise and, in some cases, go all the way up
21   to the surface of the ground.
22          It's a phenomenon associated with a rising
23   water table, coupled with flow down in the soil
24   profile itself, which is called interflow.  And that
25   combination of water building up typically in areas

1  closer to a stream, if the water table comes to the

2  surface, then you've got that same situation again

3  where when more rain comes down, it has nowhere to

4  go.  It can't infiltrate into the soil because the

5  spaces are filled with water.  Therefore, it's going

6  to follow gravity and go over the surface.

7        The reason this is important is because

8  overland flow is very well known and recognized to

9  be the principal vehicle for transporting a lot of

10  nonpoint source pollutants, including from

11  pastureland and including the pollutant phosphorus.

12  Q.  How can cattle impact overland flow?

13  A.  Cattle can impact overland flow because the

14  amount of vegetation, the density and the health and

15  vitality of the vegetation has a large influence on

16  the rate of infiltration of rainfall into the soil.

17        So if you have a good stand of vegetation,

18  grasses, hedges, shrubs, trees, whatever, you've got

19  a good stand of vegetation, it provides opportunity

20  for that rainfall to move down into the soil.

21        When you remove that vegetation -- so this

22  is -- it happens gradually as you degrade the

23  vegetation, but it's especially pronounced when you

24  have bare soil.  The bare soil crush over at the

25  top.  You don't have the roots providing avenues for

1  water movement, and you get a dramatically reduced

2  amount of infiltration when it rains.  So you're

3  promoting the occurrence of overland flow that

4  otherwise would not happen there.

5        And that vegetative cover is an important

6  parameter that's used in evaluating phosphorus

7  indices and all of these things.  That's why, is

8  because of its influence on infiltration.

9        Well, the cattle will trample and eat and

10  otherwise destroy the vegetation in the areas where

11  they concentrate, and those areas are often very

12  much associated with the riparian zone around the

13  streams.

14        So when you damage vegetation and when you

15  remove the vegetation near the streams, you're

16  further increasing that overland flow in a situation

17  with that very close proximity to the stream.  So

18  you put any source of phosphorus there, it is going

19  to be, in many cases, but not always, naturally

20  prone to overland flow anyway.  And then you further

21  accentuate that with the behavior of the cattle, and

22  the end result is a much more marked transfer or

23  transport of the constituents, phosphorus, bacteria,

24  whatever you're talking about, into the stream.

25  Q.    Doctor, are you familiar with a term

1  "channelization" as it relates to cattle behavior in

2  riparian areas?

3  A.   Yes.

4  Q.   For the record, what is that?

5  A.   It's a description of an erosional process that

6  occurs.  Cattle, in the areas that they frequent,

7  will tend to follow the same pathways, not always,

8  but often, and those pathways get worn and the

9  vegetation gets degraded or removed.  And that

10 encourages erosion when it rains for the reasons

11 that I just talked about, that it crusts over and

12 you don't have the conduits for infiltration.

13        So that encourages erosion, and as that

14 soil erodes away, you get these little mini canyons

15 across the landscape, and that just further

16 accentuates all of these processes that we're

17 talking about.

18 Q.   Doctor, are you familiar with the term

19 "loafing" as it relates to cattle?

20 A.   Yes.

21 Q.   Is it commonly recognized that cattle tend to

22 loaf in riparian areas?

23 A.   They loaf in areas where they have good access

24 to water and shade, and that's often, but not

25 always, in the riparian areas.

1  Q.   You're familiar with the term "compaction" as

2  it relates to cattle behavior?

3  A.   Yes.

4  Q.   What is compaction?

5  A.   They're pretty heavy animals, and that weight

6  is distributed across relatively small feet, and so

7  the soils get compacted, coupled with the

8  destruction of the vegetation, and that compaction

9  makes the soils less pervious.  They're becoming

10 more like the impervious land that we talked about

11 in the urban areas, although certainly not to that

12 extent.  It's another process that favors overland

13 flow of water and, therefore, overland transport of

14 whatever is available to that water.

15 Q.   Doctor, the State's experts have testified that

16 the potential impact of cattle on water quality can

17 be discounted because cattle are simply recyclers of

18 nutrients.  Do you agree with that?

19 A.   Well, I certainly agree --

20        MR. BULLOCK:  Objection, Your Honor, I

21 don't believe there was anything in his opinions

22 concerning recycling.

23        MR. GEORGE:  He's commenting on testimony

24 that has been provided in this trial.

25        MR. BULLOCK:  That same testimony was in

1  the expert reports to which Dr. Sullivan should have

2  responded to if he had an opinion relative to it.

3          MR. GEORGE:  Your Honor, I'm told that the

4  recycling discussion is, in fact, in Dr. Sullivan's

5  expert report.

6          MR. BULLOCK:  Where, and I'll withdraw my

7  objection?

8          MR. GEORGE:  Page 96.  If Mr. Bullock is

9  not satisfied, I'll provide you a copy.  You may

10  have a copy of his report, Your Honor.

11          MR. BULLOCK:  I forgot about it, Judge.  I

12  withdraw my objection.

13          THE COURT:  Mr. George.

14          MR. GEORGE:  Thank you, Your Honor.  And

15  thank you, Mr. Bullock.

16  Q.  (By Mr. George)  The State's experts have

17  testified that the potential impact of cattle on

18  water quality can be discounted because cattle

19  simply recycle nutrients.  Do you agree with that?

20  A.  Well, I can't give a yes or no answer to that

21  question, and here's why:  When cattle are on the

22  upland pasture away from the stream in areas that

23  are not hydrologically active, they consume forage

24  that contains phosphorus that has been brought up by

25  the plant roots from the soil, and they consume that

1  forage and they defecate.  And that phosphorus is

2  recycling through the system, and the extent to

3  which that phosphorus then is eventually moved back

4  into the soil, then that becomes recycling.  So

5  there are certainly situations under which cattle

6  are recycling nutrients.  I would not dispute that.

7          But with respect to the issues at hand in

8  this case, we're concerned about the transfer of

9  phosphorus from pastureland, from whatever source,

10 to a stream.  When cattle consume forage in the

11 upland pasture and then they walk down to the stream

12 to drink, to loaf, to -- and then they deposit their

13 feces there, that's not recycling in the pasture.

14 That's a transfer process of taking phosphorus that

15 would otherwise be recycled and moving it to the

16 stream itself when they defecate in the stream or to

17 these areas -- riparian areas that are far more

18 likely to be hydrologically active.

19          There's no recycling about it in that case.

20 I mean, you might say relative to the entire

21 watershed, it's still in the watershed.  That's

22 absolutely true.  But relative to -- we talked about

23 this mass balance on streams versus watersheds.

24 Relative to the stream, that is not recycling at

25 all.  That's moving the phosphorus from the upland

1    pasture to the stream.

2    Q.   Based upon the data that you have reviewed, are

3    cattle a significant enough potential source of

4    phosphorus that they should have been evaluated in

5    this case?

6    A.   Yes.

7    Q.   Did you see any meaningful analysis of

8    phosphorus from cattle in the work of the State's

9    causation experts?

10   A.   No, I didn't.

11   Q.   One last potential source I want to discuss

12   with you, Doctor.  To what extent, if any, might

13   people recreating in the Illinois River Watershed

14   impact water quality?

15   A.   I think there's certainly a potential for

16   impact there.

17   Q.   Could you explain that potential, please.

18   A.   Well, there are a lot of people that recreate

19   in the Illinois River Watershed.  I mean, I observed

20   that when I was there myself.  And I read

21   Dr. Caneday's report, and he talked about millions

22   of visitors to the watershed and he talked about

23   some 150-odd (sic) floaters on the river per year, I

24   believe, was the figure, as I remember.

25          And there has been mention in past

1  management reports and whatnot for the IRW that

2  there are inadequate restroom facilities available,

3  and that was my impression when I canoed as well,

4  that it could be rather difficult to find a

5  restroom.

6         And it's a very heavily used recreation

7  area for families.  I know what it's like to

8  recreate in the outdoors with children, and I think

9  that that's -- I don't know how big of an impact it

10 would be, but I think it's something that should

11 have been evaluated.

12 Q.  Did you see any evaluation or analysis of the

13 impact of recreators on water quality by any of the

14 State's experts?

15 A.  No.

16         MR. GEORGE:  Your Honor, this is a

17 transition point for me.  I realize we are still a

18 few minutes before five.

19         THE COURT:  Mr. Bullock, do you care to

20 begin tomorrow morning?

21         MR. BULLOCK:  I think that would be best.

22         THE COURT:  Let's do that.  We'll be in

23 recess until then.

24         (Recess was had.)

25

```
 1                REPORTER'S CERTIFICATE

 2  I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3  TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

 4  MATTER.

 5

 6                          S/Terri Beeler
                            Terri Beeler, RMR, FCRR
 7                          United States Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```