1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4  STATE OF OKLAHOMA, ex rel.  )
   W.A. DREW EDMONDSON, in his )
5  capacity as ATTORNEY GENERAL)
   OF THE STATE OF OKLAHOMA,    )
6  et al.                       )
                                )
7              Plaintiffs,  )
   vs.                          )CASE NO. 05-329-GKF-PJC
8                               )
   TYSON FOODS, INC., et al.,   )
9                               )
                                )
10             Defendants.  )

11

12

13

         TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
14                  JANUARY 12, 2010
     BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE
15               VOLUME 92, A.M. SESSION

16

17  APPEARANCES:

18

19  For the Plaintiffs:       MR. W.A. DREW EDMONDSON
                              Attorney General
20                            MS. KELLY FOSTER
                              Assistant Attorney General
21                            State of Oklahoma
                              313 N.E. 21st St.
22                            Oklahoma City, OK   73105

23

24

25

```
 1  (APPEARANCES CONTINUED)     MR. M. DAVID RIGGS
                                MR. DAVID P. PAGE
 2                              MR. RICHARD T. GARREN
                                Riggs Abney Neal Turpen
 3                              Orbison & Lewis
                                502 W. 6th Street
 4                              Tulsa, OK  74119

 5

 6                              MR. ROBERT A. NANCE
                                MS. SHARON GENTRY
 7                              Riggs Abney Neal Turpen
                                Orbison & Lewis
 8                              5801 Broadway
                                Extension 101
 9                              Oklahoma City, OK  73118

10                              MR. LOUIS W. BULLOCK
                                MR. ROBERT BLAKEMORE
11                              Bullock Bullock &
                                Blakemore
12                              110 W. 7th, Ste 770
                                Tulsa, OK  74119
13
                                MR. FREDERICK C. BAKER
14                              MS. ELIZABETH CLAIRE XIDIS
                                MS. INGRID MOLL
15                              Motley Rice LLC
                                28 Bridgeside
16                              P.O. Box 1792
                                Mount Pleasant, SC  29465
17

18
    For Tyson Foods:            MR. ROBERT W. GEORGE
19                              Tyson Foods, Inc.
                                2210 West Oaklawn Drive
20                              Springdale, AR  72701

21                              MR. JAY THOMAS JORGENSEN
                                MR. THOMAS GREEN
22                              MR. MARK HOPSON
                                MR. GORDON D. TODD
23                              Sidley Austin LLP
                                1501 K St. NW
24                              Washington, DC  20005

25
```

```
 1   (APPEARANCES CONTINUED)

 2   For Cargill:              MR. JOHN H. TUCKER
                               MS. THERESA HILL
 3                             Rhodes Hieronymus Jones
                               Tucker & Gable
 4                             100 W. 5th St., Ste 400
                               Tulsa, OK  74103
 5
                               MR. DELMAR R. EHRICH
 6                             MS. KRISANN KLEIBACKER LEE
                               MR. BRUCE JONES
 7                             Faerge & Benson
                               90 S. 7th St., Ste 2200
 8                             Minnaepolis, MN  54402

 9   For Simmons Foods:        MR. JOHN R. ELROD
                               MS. VICKI BRONSON
10                             Conner & Winters
                               211 E. Dickson St.
11                             Fayetteville, AR  72701

12   For Peterson Farms:       MR. A. SCOTT MCDANIEL
                               MR. PHILIP HIXON
13                             MS. NICOLE LONGWELL
                               MR. CRAIG MIRKES
14                             McDaniel Hixon Longwell &
                               Acord PLLC
15                             320 S. Boston, Ste 700
                               Tulsa, OK  74103
16
     For George's:            MR. WOODY BASSETT
17                             MR. VINCENT O. CHADICK
                               MR. JAMES GRAVES
18                             MS. K.C. TUCKER
                               MR. GARY WEEKS
19                             Bassett Law Firm
                               P.O. Box 3618
20                             Fayetteville, AR  72702

21   For Cal-Maine:            MR. ROBERT SANDERS
                               Young Williams P.A.
22                             P.O. Box 23059
                               Jackson, MS 39225
23
                               MR. ROBERT P. REDEMANN
24                             Perrine McGivern Redemann
                               Reid Berry & Taylor PLLC
25                             P.O. Box 1710
                               Tulsa, OK  74101
```

```
1                        INDEX

2   WITNESSES ON BEHALF OF THE DEFENDANTS          PAGE

3

4   DR. TIMOTHY SULLIVAN

5        Cont'd Redirect by Mr. George            10737

6

7   STEPHEN THOMPSON

8        Cross-Examination by Mr. Nance           10768
         Redirect Examination by Mr. McDaniel     10778
9        Redirect Examination by Mr. Elrod        10826
         Redirect Examination by Mr. Hopson       10829
10       Recross Examination by Mr. Nance         10835

11

12  DR. TIMOTHY SULLIVAN

13       Cross-Examination by Mr. Bullock         10839

14

15

16

17

18

19

20

21

22

23

24

25
```

*Terri Beeler, RMR,FCRR*
United States Court Reporter
333 W. 4th St.
Tulsa, OK 74103 * 918-699-4877

```
 1                    PROCEEDINGS
 2  JANUARY 12, 2010:
 3            THE COURT:  When is this matter being
 4  argued before the Tenth Circuit?  It's this week, is
 5  it not?
 6            MR. GEORGE:  Someone else may speak to it.
 7  I don't believe there's been a date set for --
 8            MR. BULLOCK:  The Cherokees still have to
 9  file their reply brief, and argument hasn't been
10  set.
11            THE COURT:  I thought it had been set for
12  argument in January.
13            MR. BULLOCK:  No.
14            MR. GEORGE:  Not to my knowledge.
15            MR. BULLOCK:  We're probably going to be
16  late and incur some anger if, in fact, you're
17  right.
18            MR. GEORGE:  I'm not allowed to go to
19  Denver very often, Your Honor, so I've entrusted
20  that to someone else.  But to my knowledge, there's
21  no argument set.
22            THE COURT:  Very well.  Thank you.
23                    DR. TIMOTHY SULLIVAN,
24  having been previously duly sworn, was called as a
25  witness and testified as follows:
```

1      **CONTINUED DIRECT EXAMINATION**

2    BY MR. GEORGE:

3    Q.   Doctor, could you take your notebook and turn

4    to tab 11, the aerial photograph of the Watts

5    lagoons.

6    A.   Yes.

7    Q.   Is it true, Doctor, that you mentioned to me

8    this morning that you think you may have misspoke in

9    an exchange we had about this particular exhibit?

10   A.   That's correct.

11   Q.   I want to clear up the record here, if we can.

12   Doctor, this particular photograph that has been

13   introduced as Defendants' Joint Exhibit 1454, I

14   believe at one point yesterday you said you thought

15   this was in your report, this photograph?

16   A.   Correct.

17   Q.   Was this particular photograph in your report?

18   A.   No.

19   Q.   You did evaluate aerial photography of this

20   location; is that right?

21   A.   Yes, I did, and it was in my considered

22   materials.

23   Q.   Just that this one photo was not an actual

24   exhibit in your report, correct?

25   A.   That's correct.

1  Q.   Thank you.  Doctor, we talked a little bit

2  yesterday about overland flow, and I want to kind of

3  pick up there, if we can.

4         Are there some substances that are more

5  susceptible to various types of overland flow than

6  others?

7  A.   I think the way I would phrase it is not so

8  much susceptibility to overland flow as an issue

9  whereby the flow paths followed by the water will

10  have different likelihoods of carrying substances.

11         In particular, the flow paths that have a

12  lot of contact with the soil, the deep flow paths

13  that -- the interflow through the shallow soils lose

14  a lot of opportunity for interaction between the

15  water and the soils.

16         In those flow paths, substances that are

17  what we call conservative, like nitrate, for

18  example, or chloride, they tend to not adsorb to

19  soil particles, and they move right with the water.

20  But substances like phosphorus tend to adsorb to

21  soils and not move with that water when it has a lot

22  of contact with soil.

23         But for the overland flow where there's

24  less contact with soil, there's more opportunity to

25  transport the phosphorus.  But in that overland

1  flow, you also can transport the conservative

2  substances as well.

3  Q.   Doctor, what factors on a field, say a pasture,

4  control the propensity of phosphorus to move off a

5  field in overland flow?

6  A.   Well, the main controlling factor is whether,

7  in fact, you have overland flow.  That is, by far,

8  the most important consideration.  There will be

9  some pasture areas that may have it, and there will

10  be many pasture areas that will not.

11         And whether or not you have overland flow

12  is determined by, in particular, the soil

13  characteristics, the infiltration rate, the

14  distribution of sediment sizes, soil texture, and

15  the steepness of the slope.  So those are all

16  involved in determining if you have overland flow.

17         Then plus the hydrology we talked about

18  yesterday is the groundwater coming up during storms

19  in certain locations to the point where it saturates

20  the soil.

21  Q.   Doctor, I've already been handed a note that

22  you and I both need to slow down again, so I'm

23  reminding myself.  Now I'll remind you.

24         MR. GEORGE:  Sorry, Your Honor.

25         THE WITNESS:  Thank you.

1  Q.   (By Mr. George)  Doctor, are you familiar with

2  the term "critical source area"?

3  A.   Yes.

4  Q.   And what does that mean with regard to the

5  movement of nutrients?

6  A.   A critical source area is an area where you

7  have an overlap of source and opportunity for

8  transport.  So with respect to phosphorus, in order

9  for phosphorus to move in any appreciable quantity

10  to a stream, you need to have a quantity of

11  phosphorus at that particular site, and the

12  transport has to be able to move that phosphorus

13  from that site to the stream.  And that's what we

14  discussed; that largely is the overland flow

15  process.  So when those two overlap, that's the

16  critical source area.

17          If you've got the supply but no transport,

18  there's not a major risk to movement into the

19  stream.  If you've got the transport and not the

20  source, similarly, there's not a major risk of

21  movement.  It's where the two overlap.

22  Q.   Doctor, in light of that, in order to

23  understand the potential for phosphorus to run off

24  of a particular field, is it sufficient to look only

25  at soil test phosphorus?

1    A.    No.   Soil test phosphorus is one way to get a

2    handle on the source, but it tells you nothing about

3    the transport.   You have to look at the two together

4    to identify where those critical source areas are.

5    They are also called hotspots by a lot of

6    scientists.

7    Q.    Doctor, let's talk about some of the factors

8    that may influence the transport potential of the

9    critical source discussion that we've been having.

10           To what extent does the water flow path

11   impact the transport potential?

12   A.    That's the most important determination is the

13   flow path.

14   Q.    As we were discussing yesterday, we defined

15   some terms including "overland flow" and different

16   types of overland flow.   One thing I think we missed

17   and I want to cover now is runoff.   You're aware the

18   term "runoff" has been used throughout this trial?

19   A.    Yes.

20   Q.    And do you have a working definition of

21   "runoff," and can you explain how it may be

22   different from overland flow?

23   A.    Okay.   There are a couple of issues here.   One

24   is, is that the term "runoff" is used in different

25   ways.   It's my belief that those differences can

 1    introduce a lot of confusion.  And in reviewing the

 2    testimonies in this trial, that was apparent to me

 3    that people were using the term in different ways.

 4           Runoff is a hydrological term, and what it

 5    means is during storms, water that moves into the

 6    stream, that's runoff.  And so you can quantify

 7    runoff as the total amount of stream flow.  And that

 8    gives you an indication of all the water that -- for

 9    example, we can talk about the runoff to Lake

10    Tenkiller.  What's the total amount of stream water

11    during a storm, storm runoff that gets to Lake

12    Tenkiller.  But for -- the water gets there from

13    rainfall, but it follows different pathways to get

14    there.

15           And we talked about the overland flow.  We

16    talked about the interflow and the deep flow, these

17    different pathways.  And with a substance like

18    phosphorus, the pathway followed has a very

19    important influence on the transport of that

20    phosphorus.

21           But in terms of breaking runoff down so we

22    can say, well, we've got the overland flow part and

23    we talked about two different types of overland

24    flow, but the end result is the same.  We've got

25    interflow, which is shallow and lateral, then the

1  deep flow.

2       Some people, when they use the term

3  "runoff," they're talking -- I believe they're

4  talking about the overland flow component by

5  itself.  And that's really an incorrect way to

6  evaluate that.

7       Also sometimes when people use the term

8  "runoff," what they mean is movement of phosphorus

9  or some other constituent into a stream.  And I

10 recognize that people commonly use the term that

11 way, but in the scientific evaluation like this, I

12 think we have to be more precise about the words

13 that we use.  And "runoff" is really a hydrological

14 term.  It's talking about movement of water, not

15 moving of phosphorus.  I think we need to be careful

16 to keep those distinctions in mind.

17 Q.  Doctor, are all pastures and all areas of all

18 pastures created equal in terms of their propensity

19 to generate overland flow?

20 A.  No.

21 Q.  Does it require a site-specific evaluation?

22 A.  Yes, very much so.

23 Q.  Doctor, if phosphorus moves off of a field,

24 does it necessarily reach flowing waters?

25 A.  No.

1    Q.    Why not?

2    A.    Well, if the water moves off the field -- like,

3    for example, on a field, you can have areas that

4    generate overland flow.  And then as you move

5    further down the field, you may get to an area where

6    it no longer generates overland flow in that

7    particular storm size and the water infiltrates down

8    into the soil there.  So you may have a hill slope,

9    you have some overland flow at the top, and it

10    percolates and infiltrates down into the soil where

11    it's no longer overland flow.

12          So somewhere in that hill slope, it had the

13    chance to interact with soil, thereby removing much

14    or all of that phosphorus that was in the overland

15    flow originally.  So that's one issue.

16          But another issue is that the fields are

17    located at variable distances from streams.

18    Sometimes there's a stream right in the field or

19    right below the field.  Other times, the nearest

20    stream might be a mile away or more.  So you can

21    have overland flow in different places that

22    eventually infiltrates and never gets to a stream

23    without that soil contact.

24          You can also have overland flow go into a

25    ditch line, but that ditch line can have multiple

1  fates.  It may flow into a stream, it may not.  It

2  may -- it may be dug all the way to a stream, but

3  before the water gets there, it infiltrates down

4  into the soil in the bottom of the ditch.

5          There's all different types of situations

6  in terms of whether or not that water will

7  eventually reach a stream.

8  Q.   Doctor, you've reviewed the testimony of

9  Dr. Engel in this courtroom, have you not?

10  A.   Yes, I have.

11  Q.   And you saw that Dr. Engel testified that once

12  phosphorus begins to move off of a field, it will

13  necessarily continue in motion until it reaches the

14  reservoir at the bottom of the watershed?  Did you

15  see that?

16  A.   Yes, I've seen that.

17  Q.   Do you agree with that assumption?

18  A.   No.  There's no basis for that claim at all, in

19  my view.

20  Q.   Doctor, as part of your work in this case, did

21  you review any regulations or restrictions placed on

22  the use of poultry litter as a fertilizer or soil

23  conditioner in the watershed?

24  A.   Yes, I did.

25  Q.   Specifically, what type of regulations or

1  restrictions did you look at?

2  A.   In terms of the on-the-ground restrictions?

3  Q.   Yes, sir.

4  A.   Setbacks for litter application from streams,

5  instructions to not spread on areas that flood, to

6  not spread on frozen soils, to not spread on steep

7  terrain, to not spread on shallow soils.  So there

8  are a number of rules that are in place that govern

9  the application of litter.

10  Q.   Doctor, did you review the restrictions such as

11  those you've just described in Code 590?

12  A.   Yes.

13  Q.   Did you review Animal Waste Management Plans or

14  Nutrient Management Plans as well?

15  A.   Nutrient Management Plans, yes.

16  Q.   Doctor, are you a legal expert in the rules and

17  regulations governing litter application?

18  A.   No.

19  Q.   Was it necessary for you to be a legal expert

20  on the rules and regulations to perform your work in

21  this case?

22  A.   No.

23  Q.   How were the rules and the restrictions and the

24  plans that you've just described important to your

25  work in this case as a scientist?

1   A.   Well, as a scientist, what was important is for

2   me to see if the rules and regulations made sense

3   relative to the state of the scientific

4   understanding on phosphorus movement.  And the

5   scientific understanding on phosphorus movement has

6   to do with these critical source areas or hotspots

7   and the reasons for those and the different flow

8   paths followed by the water.

9            So what was important to me was to see if

10  those kinds of considerations were appropriately

11  incorporated into the regulations.  And it's my view

12  that they are.

13  Q.   Based upon your review of Animal Waste

14  Management Plans or Nutrient Management Plans and

15  the rules and regulations that we've talked about,

16  do the systems in place from a regulatory standpoint

17  in this watershed account for some of the hydrologic

18  factors that have an effect on the generation of

19  overland flow?

20  A.   Yes, they do.

21  Q.   Did you note any restrictions on the

22  application of litter to frozen or saturated soils?

23  A.   Yes.

24  Q.   Is that important in your analysis?

25  A.   Yes.  If the soils are frozen, then that

1    provides an enhanced opportunity for overland flow,

2    if it rains on frozen soils.

3    Q.   Did you note any restrictions on litter

4    application on areas with steep slopes?

5    A.   Yes.

6    Q.   And how was that important to your analysis?

7    A.   Well, one of the issues that helps regulate the

8    risk of overland flow is the steepness of the

9    slope.  And in general, all things being equal, if

10   the slope is steeper, there's a higher risk.

11   Q.   Doctor, I believe you mentioned that one of the

12   things you noted was some setback requirements from

13   streams; is that right?

14   A.   Yes.

15   Q.   How was that important to your analysis?

16   A.   Well, the hydrologically active areas, the

17   areas that are likely to generate overland flow in a

18   sufficiently large storm, you can find them

19   anywhere, but they tend to be most commonly found

20   close to the streams.

21        And the major reason for that is because

22   the groundwater movement is moving from the hill

23   slope down towards the stream, and so you have a

24   higher likelihood that you will get the type of

25   overland flow that results when the groundwater

1  comes up right to the surface, and then when it

2  rains, there's no place for the water to go except

3  sideways as overland flow.

4        And that's our saturated -- our saturation

5  excess overland flow.  So that type is far more

6  likely to occur in proximity to the stream in those

7  riparian areas.

8  Q.   Doctor, did you note any restrictions in your

9  review on the application of litter to shallow

10 soils?

11 A.   Yes.

12 Q.   And was that important to your analysis?

13 A.   That really was not important to the analysis

14 that I conducted, because I was focused on the

15 potential for impacts on the streams and the soil

16 issues.  I think it's important that that regulation

17 be there as a way of protecting the groundwater

18 resources.

19 Q.   Now, Doctor, based upon the Nutrient Management

20 Plans you reviewed, including those from the state

21 of Arkansas, in your judgment, do those plans take

22 into consideration both source and transport

23 considerations?

24 A.   Yes.

25 Q.   Okay.  All right, Doctor.  Let's move to your

 1  review of some of the specific work of experts for

 2  the State of Oklahoma in this case.

 3          As part of your work in this case, did you

 4  review the reports and work of various State

 5  experts?

 6  A.   Yes, I did.

 7  Q.   Let me ask you about some of the specific lines

 8  of evidence that have been put forward by the State

 9  to support its claims of impact upon streams and

10  rivers from poultry litter.  You reviewed the

11  State's edge-of-field sampling program?

12  A.   Yes, I have.

13  Q.   And in your judgment, how important are these

14  edge-of-field samples to the State's causation case?

15  A.   I think they're critical to the State's

16  causation case because the edge of field is really

17  the type of data that the State uses in a number of

18  these expert reports and analyses to try to

19  establish a connection between what's on the field

20  and what's in the stream.

21  Q.   Doctor, I believe you testified yesterday, but

22  I want to make clear, you have actual field

23  experience in gathering and using edge-of-field

24  samples, correct?

25  A.   Yes, I do.

1   Q.   Based upon your review, are the edge-of-field

2   samples collected by the State in this case

3   representative of what runs off of a litter-amended

4   field?

5   A.   No.

6   Q.   Why not?

7   A.   The edge-of-field samples were collected

8   largely from ditches.  There was no permission

9   granted to go onto the landowner's land and set up

10  an apparatus with which to collect flow coming off

11  of pastureland.  And by and large, those samples

12  were not collected from flowing water; they were

13  collected from a ditch that was convenient to the

14  road where the samplers could get without having

15  permission to get onto the land.

16       So there's no way to know where that water

17  came from.  Perhaps some of it came off a field.  We

18  don't know.  It may have come from something upslope

19  associated with that ditch.  And if it did come off

20  the field, we don't know what the source of

21  phosphorus on the field was that may have

22  contributed the phosphorus to the edge-of-field

23  water.

24  Q.   Doctor, you mentioned that some samples were

25  collected from ditches.  Did you note in your review

1  any samples that were collected from puddles?

2  A.   Yes.

3  Q.   Are those sort of edge-of-field samples

4  representative of what flows off of a litter-amended

5  field?

6  A.   There's no way to know where the water came

7  from.  It could have come from one place or from

8  many different places.  And what that place was,

9  there's no information to really tell us that.

10 Q.   Now, Doctor, in addition to reviewing the

11 photographs, did you look at the field notes from

12 the team that actually collected the samples?

13 A.   Yes, I did.

14 Q.   And in terms of documentation of flow, what did

15 you see in those field notes?

16 A.   I didn't really see documentation of flow.  In

17 terms of documentation of flow, there were, you

18 know, a few instances and testimony that I saw, a

19 few cases that they may have been flowing water, but

20 by and large, that was not the case.

21 Q.   Is that important to your analysis?

22 A.   Well, it is, because -- for two reasons.

23 Number one is trying to figure out where that water

24 came from.  We don't know where it came from.  I'm

25 not sure what value it is in this kind of

1    investigation.

2            But then beyond that, even if we knew where

3    it came from, we don't know whether it was flowing

4    somewhere else or it just stayed in that puddle or

5    that ditch and eventually infiltrated into the soil.

6    Q.   Doctor, did you also review Dr. Engel's and

7    Dr. Stevenson's poultry house density correlation

8    analysis?

9    A.   Yes, I did.

10   Q.   What did you understand to have been the

11   purpose of that analysis?

12   A.   The purpose of that analysis was to evaluate

13   the relationship between poultry house density, as

14   they estimated it, and the phosphorus concentration

15   in the stream and perhaps other parameters as well.

16   But the main focus was phosphorus.

17   Q.   Do you agree that the correlations they

18   calculated between poultry house density and

19   phosphorus concentration show that poultry litter

20   application is responsible for elevated phosphorus

21   concentrations?

22   A.   No.

23   Q.   Why not?

24   A.   Well, for multiple reasons.  One is that a

25   correlation does not demonstrate causality.  It just

1    indicates that two variables are related to each

2    other in space or in time.  We can talk about that

3    in detail, if you want, but that's the first reason.

4    Q.   What is a cross-correlation?

5    A.   A cross-correlation is a situation whereby you

6    look at two variables and they related to each

7    other, but that relationship may be influenced or

8    mediated by a relationship with a third variable or

9    multiple other variables.

10           So if A and B are correlated, you might

11   say, well, A causes B.  But perhaps C causes A -- or

12   C causes B, but A and C are related.  So it

13   confounds the interpretation of what the correlation

14   means.

15   Q.   Did the State's regression analysis account for

16   alternative potential causes that cross-correlate

17   with poultry house density?

18   A.   Well, Dr. Engel actually did report a

19   statistically significant correlation between septic

20   systems and poultry house density.  But then he

21   dismissed that for what I believe to be insufficient

22   grounds.

23   Q.   Does that cross-correlation confound the

24   analysis, in your view?

25   A.   Yes.

1  Q.   Doctor, did you perform any analysis to examine

2  other cross-correlations between poultry house

3  density and potential sources of phosphorus?

4  A.   Yes, I did.

5  Q.   Can you turn in your binder to tab 21.

6  Actually, 22.

7  A.   Yes.

8  Q.   And find Defendants' Joint Exhibit 2257.  Can

9  you identify that document for the record, please.

10  A.   That's a figure from my report.

11  Q.   Was this figure prepared under your direction?

12  A.   Yes.

13  Q.   And can you describe generally the source of

14  the data or information that is shown in this

15  exhibit?

16  A.   Yes.  The source of the information would be

17  Dr. Engel's materials.

18  Q.   Let's do a few of these at a time.  Can you

19  turn to the next tab, Doctor, and find Defendants'

20  Joint Exhibit 2258.

21  A.   Yes.

22  Q.   And can you identify the source of the data

23  that is shown.

24  A.   Yes.  That's also information from Dr. Engel's

25  considered materials presented as a figure in my

1   report.

2   Q.   Was this exhibit prepared under your direction?

3   A.   Yes.

4   Q.   And then the last tab, tab 24, Doctor, could

5   you find Defendants' Joint Exhibit 2259.

6   A.   Yes.

7   Q.   And could you identify generally the source of

8   the information and data that's shown in this

9   figure.

10  A.   This was from -- data from USDA Census of

11  Agriculture.

12  Q.   Is Dr. Engel's poultry house density data also

13  shown?

14  A.   Yes, it is -- oh -- yes, that's right.  Well,

15  that was not restricted to Dr. Engel's poultry house

16  density necessarily; it was the plaintiff's poultry

17  house density data layer.

18  Q.   I'm sorry.  Thank you.  Was this figure also

19  prepared under your direction?

20  A.   Yes, it was.

21          MR. GEORGE:  Your Honor, I'd move for

22  introduction of Defendants' Joint Exhibits 2257,

23  2258, and 2259.

24          THE COURT:  Any objections?

25          MR. BULLOCK:  I have no objection to 2257

1   and 2258.  I do object to 2259, as the caption on

2   that states this is based upon the calculations of

3   Billy Clay, and Billy Clay is not before the court

4   and hasn't presented these matters before this

5   court.

6         MR. GEORGE:  Your Honor, perhaps we could,

7   without objection, have the first two exhibits

8   introduced, and then I'll move to lay a further

9   foundation.

10         THE COURT:  Very well.  2257 and 2258 are

11  admitted.

12  Q.  (By Mr. George) Doctor, let's talk about the

13  first two, then we'll come back to the third

14  exhibit.

15         Can you look at Exhibit 2257 and explain

16  what is shown there and how it is relevant to your

17  analysis of cross-correlations.

18  A.  What's shown is the density of poultry houses.

19  And there are two poultry house densities that are

20  used based on Doctor Engel's characterization as all

21  poultry houses on the top figure, and just the

22  active -- what he identified as what he believed to

23  be active houses on the bottom figure.

24         Then on the X axis, or the horizontal axis,

25  we have the septic density.  And these are based on

1    the subwatersheds that were studied by Dr. Engel.  I

2    believe there were 14 of them.  And he had deleted

3    from consideration in calculating his regression

4    statistics a couple of subwatersheds because they

5    had urban influences in those watersheds.

6    Q.   Do you agree that that was appropriate to

7    delete those subwatersheds?

8    A.   Yes, I do.  I think it's appropriate to zero in

9    on the influence of land that's separate from the

10   urban influence, but I do think it's really

11   important when you do that to make sure you

12   communicate that caveat, that the results of the

13   analyses are purposely excluding whatever impact you

14   may have in the urban environment.  I think it's

15   appropriate to do that.  I would do it the same way,

16   but I think that if you fail to communicate that

17   caveat, that's misleading.

18   Q.   Doctor, were there any other subwatersheds

19   that, in your judgment, were impacted by urban land

20   uses that should have been deleted from the

21   analysis?

22   A.   Yes.  There was one other that had -- I think

23   it was seven percent of land use.  It was more than

24   five percent.  So I thought that for the same

25   reasons as Doctor Engel had deleted the other two,

1  that the third one should be deleted as well.

2          Now, I didn't delete them from the

3  figures.  I showed the data, but I didn't include

4  them in calculating the regression line.

5  Q.  Can you continue to show what -- to describe

6  what your analysis shows.

7  A.  What it shows is a statistically significant

8  relationship between the density of septic systems

9  in these small subwatersheds and the poultry house

10  densities that Dr. Engel estimated for these same

11  small subwatersheds.

12  Q.  I'm a lawyer primarily because I'm not good at

13  statistics.  Can you tell us what it is about this

14  figure that defines statistical significance.

15  A.  It's the P value.  And it's -- both of those

16  plots were P less than 0.01.  The main -- the main

17  standard that's used for evaluating significance on

18  regressions like this would be if the P value was

19  less than .05.  That's what's called the 95 percent

20  significance level.  That's what people typically

21  use.  So a P of less than .01 is of higher

22  significance than that.

23  Q.  Doctor, based upon the analysis shown in this

24  exhibit, are the presence of septic tanks in rural

25  areas where poultry houses are located a confounder

 1  in the analysis?

 2  A.   Yes, because if you're going to try to use a

 3  regression between stream phosphorus and poultry

 4  house density and say from the results of that that

 5  the poultry houses are causing the stream

 6  phosphorus, well, first of all, you can't say that

 7  the significance of the correlation means that those

 8  are causal anyway; but independent of that, the fact

 9  that something else that's a possible source is also

10  correlated is certainly a confounding factor.

11  Q.   Doctor, could you turn to the next tab,

12  Defendants' Joint Exhibit 2258 which is in

13  evidence.  And could you describe the analysis that

14  is shown in this figure and how it's relevant to

15  cross-correlation.

16  A.   Yes.  This is essentially the same analysis as

17  the previous figure, except that on the X axis,

18  we're looking at the density of roads in those

19  subwatersheds rather than the density of septic

20  systems.  But again, we see the correlation between

21  poultry house density and, in this case, road

22  density.

23  Q.   Doctor, does the presence of roads in areas

24  where poultry houses are located constitute a

25  confounder in the analysis?

1  A.   Yes, for the same reason as we discussed with

2  septic systems.

3  Q.   Doctor, I note there's one other statistic on

4  these figures that we haven't discussed yet, which

5  is the $R^2$ value.  Do you see that?

6  A.   Yes.

7  Q.   That's present on both of the exhibits that

8  we've been discussing?

9  A.   Yes.

10  Q.   What is the $R^2$ value, and what does it tell us?

11  A.   It tells us what percent of the variation

12  between the two variables is explained by the

13  relationship by the regression.  So we're on this

14  Figure 8-6, and if we look at the top, the top

15  panel, it gives an $R^2$ of 0.57.  That means that 57

16  percent of the variability in the poultry house

17  density can be explained by its relationship with

18  road density.

19  Q.   Thank you.  Now, Doctor, did you also evaluate

20  -- let me back up.

21       Based upon your review of cattle

22  populations in the watershed and your own personal

23  observations in the watershed, are cattle generally

24  associated with the rural areas in which poultry

25  houses are situated?

1  A.   That's been my observation, yes.

2  Q.   Doctor, as part of your review of the work of

3  Dr. Stevenson and Dr. Engel, did you investigate the

4  statistical correlation between where cattle are

5  located and where poultry houses are located in the

6  watershed?

7  A.   Yes, I did.

8  Q.   And as part of that analysis, were you provided

9  with data from Dr. Clay regarding cattle locations?

10  A.   Yes.

11  Q.   Doctor, is the -- if you could turn to tab 24

12  and find Defendants' Joint Exhibit 2259.

13  A.   Yes.

14  Q.   With respect to the information provided by

15  Dr. Clay, can you provide us with a description of

16  that information and how it was assembled for your

17  use.

18  A.   Well, the information would be the cattle

19  densities from the census of agriculture.  And

20  Dr. Clay aggregated those by ZIP code because that

21  was a way to give us a number of spatial units

22  within the overall IRW that we could use to evaluate

23  relationships between cattle and some other

24  variable.  We did not have cattle estimates by Engel

25  subwatersheds.

1         So then the next step would be, well, what

2   other units of geography can we use to evaluate the

3   spatial relationship.  And the best that we could

4   come up with to do that was the cattle by ZIP codes.

5   Q.   Doctor, when you looked across the watershed at

6   poultry house density and cattle by ZIP code, did

7   you find the statistical relationship?

8   A.   Yes.

9         MR. GEORGE:  Your Honor, I move for the

10  introduction of Defendants' Joint Exhibit 2259.

11        MR. BULLOCK:  Judge, even by his own

12  testimony today, it remains hearsay as to the cattle

13  density.  I don't believe that he can testify as to

14  cattle densities.

15        MR. GEORGE:  Your Honor, under Rule 703, an

16  expert is entitled to rely upon hearsay for purposes

17  of his analysis.  We're not offering the underlying

18  ZIP code statistics by Dr. Clay for the truth of the

19  matter.  We're simply offering them as the basis for

20  an opinion and an analysis that this expert has

21  done.  I think that's proper.

22        THE COURT:  This is part of his report?

23        MR. GEORGE:  It is, Your Honor.

24        THE COURT:  Rule 703 would permit it not

25  for the truth of the matter asserted, but as being

1   of a type reasonably relied upon by experts in a

2   particular field.  The Exhibit 2259 is admitted.

3   Q.   (By Mr. George) Doctor, we heard testimony, and

4   I think you reviewed it, by Dr. Engel that his

5   analysis was based on 14 subwatersheds within the

6   million-acre watershed.  Did you see that?

7   A.   Yes.

8   Q.   Did you see any analysis in Dr. Engel's work

9   that would support the extrapolation of his results

10  for the 14 subwatersheds to the watershed as a

11  whole?

12  A.   No.

13  Q.   Doctor, did you also analyze the manner in

14  which Dr. Engel and Dr. Stevenson counted poultry

15  houses in their correlations?

16  A.   Yes.

17  Q.   And what did they do generally?

18  A.   Well, they had a database of poultry house

19  locations that was obtained, it's my understanding,

20  from aerial photography.  And they did some analyses

21  to try to determine which ones were active and which

22  ones were not.  I have no idea how valid that is,

23  but that's something they did, and I took it at face

24  value.

25          But in performing their analyses, their

1  correlations, they also assigned a two-mile buffer

2  around each of the subwatersheds.  So you'd have a

3  subwatershed for study, and then expand that out two

4  miles in all directions and create a buffer.

5        And then in calculating the number for the

6  density of poultry houses, what they did was, for

7  some analyses, they just did the poultry houses in

8  the subwatersheds, and I don't have a problem with

9  that.  But for other analyses, they tabulated the

10  number of poultry houses in the subwatersheds plus

11  in those two-mile buffers.

12        I can stop there and see where you want to

13  go from there.

14  Q.  Doctor, what is your understanding of the

15  purpose of these two-mile buffer zones in their

16  analyses?

17  A.  How it was explained was that there's a

18  possibility that poultry litter is trucked from the

19  poultry house location to the area it's going to be

20  spread, and they contend that that area is rather

21  short, and they identified two miles as what they

22  believed to be the area from which poultry litter

23  may be imported into the subwatershed.

24        But they did not account for the fact that

25  there's an equal possibility or probability that

1  poultry litter from a house inside that subwatershed

2  could be trucked the same two miles outside.  So it

3  was a very biased analysis.

4  Q.   Doctor, what is the impact -- and maybe you got

5  there just a moment ago.  What is the impact of that

6  accounting method on the reliability of the results?

7  A.   My opinion is it renders those results

8  unreliable, because it's a faulty logic constraint

9  on the analysis.  If there's an equal possibility or

10  probability of trucking poultry litter in as

11  trucking poultry litter out, then if you want to

12  conclude half of that in your analysis, you need to

13  somehow include consideration of the other half as

14  well.  Otherwise, you're biasing your analysis.

15  Q.   Doctor, did you review the impact that these

16  buffer zones had on the actual poultry house counts

17  used in the subwatershed analysis?

18  A.   Yes, I did.

19  Q.   And what was that impact?

20  A.   Well, the end result was that the total number

21  of poultry houses that they counted in their

22  subwatersheds plus buffers was about the same as the

23  total number of poultry houses that they estimated

24  for the entire IRW.  That was because they were

25  double and triple counting poultry houses within

1  those buffers.

2  Q.   Now, Doctor, did Dr. Stevenson present any

3  density regression analysis that did not use these

4  buffer zones?

5  A.   I don't believe so, no.

6  Q.   Doctor, based upon all the data and the reports

7  and studies and testimony that you've reviewed and

8  the work that you've done in this case, do you agree

9  with the State's proposition that poultry litter is

10  responsible for injuring water quality in the

11  Illinois River Watershed?

12  A.   No, I've not seen any indication that that

13  proposition is proved at all.

14         MR. GEORGE:  Thank you, Your Honor, I'll

15  pass the witness.

16         THE COURT:  Cross-examination.

17         MR. BULLOCK:  Judge, we asked defendants if

18  we could interrupt Dr. Sullivan.  At this time, we

19  ask rather than defendants asking, so we could go

20  ahead and do Mr. Thompson's cross.  He has a dental

21  appointment that he has to make, so we thought we'd

22  drill him without Novocaine before he gets the

23  treatment.

24         THE COURT:  Very well.

25         MR. GEORGE:  Your Honor, the defendants are

1   agreeable to that with one qualification, and

2   Mr. Bullock and I discussed this.  That is,

3   notwithstanding the interruption, we will complete

4   the cross-examination and direct of this witness

5   today so he can leave town.

6           MR. BULLOCK:  Yes, sir.  Steve Thompson.

7           (Witness sworn.)

8           THE COURT:  State your full name for the

9   record, please, sir.

10          THE WITNESS:  Stephen A. Thompson.

11          THE COURT:  I understand you have a dentist

12  appointment; is that correct?

13          THE WITNESS:  I do.

14          THE COURT:  We'll try to get you out of

15  here.

16          Mr. Nance.

17          MR. NANCE:  We appreciate the accommodation

18  and appreciate the defendants' accommodation as

19  well.

20                  **STEPHEN A. THOMPSON,**

21  having been first duly sworn, was called as a

22  witness and testified as follows:

23                  **CROSS-EXAMINATION**

24  BY MR. NANCE:

25  Q.  Mr. Thompson, are you the director of the

1    Department of Environmental Quality?

2    A.   Yes.

3    Q.   And are you the same Steve Thompson whose

4    deposition was played to the court just before

5    Christmas?

6    A.   Yes.

7    Q.   In that deposition that was played, you said

8    you believed that the TMDL process would result in

9    an unfair allocation of load reductions.  Do you

10   remember that testimony?

11   A.   Yes.

12   Q.   Let's pursue that in a little greater detail.

13   Do you anticipate that a completed TMDL on -- in the

14   IRW in Oklahoma would result in a determination that

15   phosphorus loadings need to be reduced?

16   A.   Yes.

17   Q.   And why is that, sir?

18   A.   Well, the waterbody is impaired for phosphorus,

19   so definitionally, you would need -- it would

20   require reductions.

21   Q.   Do you anticipate that a completed TMDL for the

22   Oklahoma portion of the Illinois River Watershed

23   would result in required loading reductions for both

24   point sources and nonpoint sources?

25   A.   Yes.

1  Q.   Would you tell the court, please, what point

2  sources exist in the Oklahoma portion of the IRW.

3  A.   For the Illinois River, the city of Tahlequah

4  and the city of Westville, city of Stillwell

5  discharges to an arm of Lake Tenkiller.

6  Q.   Do each of these point sources have Clean Water

7  Act NPDES permits?

8  A.   Yes, they do.

9  Q.   Do each of these permits have phosphorus

10 limits?

11 A.   Yes.

12 Q.   Would you tell the court what your agency's

13 authority and responsibility is regarding these

14 permits to ensure any load reductions that might be

15 required by a TMDL?

16 A.   It's our responsibility to set limits in the

17 permit to meet the requirements of the TMDL.

18 Q.   And if a reduction was required in loading,

19 would there have to be lower limits in the permits?

20 A.   Yes.

21 Q.   Would any phosphorus limit reductions be merely

22 voluntary, or can they be legally required of permit

23 holders?

24 A.   They are legally required.

25 Q.   Can you give the court, please, an example of

1   how such a point source load reduction might be

2   achieved in order to comply with the TMDL?

3   A.   Well, there's probably three basic ways that

4   that would be done:  An addition to the current

5   treatment, a change in the treatment, change in

6   technology.  In extreme cases, taking the discharge

7   out of the watershed.

8   Q.   Would either of these alternatives be expensive

9   for the municipalities involved?

10  A.   Yes.

11  Q.   Can permit holders avoid a required permit

12  reduction if that reduction is too expensive?

13  A.   No.

14  Q.   Is there any agency of the state of Oklahoma

15  that provides loans to municipalities needing to

16  meet permit requirements?

17  A.   Yes, the Oklahoma Water Resources Board.

18  Q.   Now, what is the DEQ's authority and

19  responsibility regarding -- we'll focus on

20  poultry -- regarding reducing poultry litter-based

21  nonpoint source phosphorus loadings to ensure load

22  reductions required by a TMDL?

23  A.   Well, we have no authority.  We can make

24  recommendations in the TMDL, but we have no

25  authority to make those reductions.

1  Q.   And why is that, sir?

2  A.   Because the -- those provisions of the Clean

3  Water Act have been assigned to the Oklahoma

4  Department of Agriculture.

5  Q.   Does the Clean Water Act itself give the State

6  any additional authority other than in state law to

7  reduce nonpoint source pollution?

8  A.   No.

9  Q.   If you can't require a nonpoint source load

10 reduction under a TMDL, what can be done?

11 A.   Well, you can make recommendations and you can

12 implement Best Management Practices.

13 Q.   To your knowledge, does any agency of the

14 Oklahoma government have the legal authority to

15 enforce an agricultural nonpoint source load

16 reduction that might be required in a TMDL for the

17 Oklahoma part of the watershed?

18 A.   If that does exist, it exists with the

19 Department of Agriculture.

20 Q.   Do you know specifically what their authority

21 might be?

22 A.   No.

23 Q.   You indicated in your deposition testimony that

24 was played before Christmas that you believe the

25 process, as presently constituted, is unfair or

1  inequitable.  Would you tell the court why that is,

2  please.

3  A.  I think there are two reasons.  The current

4  process tends to ignore higher levels of loading on

5  both sides.  And by cutting out those higher levels

6  of loading, I believe it skews --

7        THE COURT:  What do you mean by both sides,

8  on both sides?

9        THE WITNESS:  It cuts out for both -- those

10  for low flow and high flow.  High flow generally

11  attributed to nonpoint source.  Low flow attributed

12  to point source.  It cuts out, as anomalous, the

13  higher readings.

14        Because point sources are taken -- are

15  constant in their discharge, the anomalies are not

16  as great for point sources as they are for nonpoint

17  sources.  So we believe that it skews the process in

18  favor of nonpoint source.

19        The second issue is that there is no

20  specific number of samples that are required on

21  either side.  There are some general requirements,

22  but no specific requirements.  And the DEQ believes

23  until there's some specificity brought to that

24  issue, that it will continue to be skewed in favor

25  of nonpoint sources.

```
 1            THE COURT:  Would you see if you can

 2   clarify that a little bit.

 3            MR. NANCE:  Okay.  I will.

 4   Q.  (By Mr. Nance) In the sampling protocol --

 5   first of all, is the sampling protocol something

 6   that your agency does, or does some other agency

 7   determine that?

 8   A.   Most of the sampling is done by either the

 9   Oklahoma Water Resources Board or the Conservation

10   Commission.  The DEQ does very limited sampling.

11   Q.   But the protocols about how the sampling is

12   done, who is responsible for that?

13   A.   The protocol is the responsibility of the

14   Oklahoma Water Resources Board.

15   Q.   In that protocol, and I'm talking about the

16   Illinois River Watershed here, a scenic river and an

17   impaired waterbody, does the protocol call for a

18   certain number of high-flow-samples if you can get

19   them?

20   A.   Yes.

21   Q.   Does it set any number of low flow or

22   base-flow-samples that need to be taken?

23   A.   No.

24   Q.   As a result in that, are there more

25   base-flow-samples or high-flow-samples that are
```

1    taken?

2    A.    Generally, there are more base-flow-samples

3    taken.

4    Q.    And is this -- as the standard works out, is it

5    some sort of a rolling average of all of those

6    samples, monthly rolling average?

7    A.    Yes.

8    Q.    As a result of having more low-flow-samples

9    taken and this rolling average, does that tend to

10   weight more heavily for high-flow-samples or

11   low-flow-samples?

12   A.    Low-flow-samples.

13   Q.    Now, as we study the watershed, have we

14   determined or has -- are you aware of whether or not

15   most of the phosphorus loading occurs during

16   high-flow-times or low-flow-times?

17   A.    Most of the phosphorus loading occurs during

18   high-flow-times.

19   Q.    So if the sampling regime just works in favor

20   of low-flow-times , does that mean that we're just

21   not capturing for that purpose a lot of the

22   high-flow-loading?

23   A.    Yes.

24          MR. NANCE:  Your Honor, does that meet your

25   need?

1          THE COURT:  Well, I see now where he's

2    coming from.  Go ahead.

3    Q.  (By Mr. Nance) Now, if just the way the

4    sampling is done and if a TMDL were completed, would

5    that mean that point sources that are included in

6    that TMDL would incur an unfairly expensive

7    requirement to meet a TMDL load reduction?

8    A.   Yes.

9    Q.   What steps, if any, have you taken to try to

10   resolve this unfair situation?

11   A.   I asked our retired water quality division

12   director Jon Craig to work with the water board to

13   resolve the issue.

14   Q.   And has it been resolved, to your knowledge, at

15   this point?

16   A.   No.

17   Q.   In your deposition that was played before

18   Christmas, you said that a TMDL was the best way we

19   have to manage multiple sources in a watershed to

20   achieve a water quality objective.  Do you remember

21   that testimony?

22   A.   Yes.

23   Q.   Based upon your years in the environmental

24   protection business in this state, does the Oklahoma

25   portion of the IRW receive phosphorus loading that

1  originates in the state of Arkansas?

2  A.   Yes.

3  Q.   To your knowledge, does any agency of the state

4  of Oklahoma have the authority to enforce TMDL

5  restrictions for that Arkansas-based loading?

6  A.   No.

7  Q.   Do you know to what extent any agency of the

8  state of Arkansas has legal authority to enforce

9  nonpoint source loading for its side of the

10 watershed?

11 A.   No.

12        MR. NANCE:  Nothing further, Your Honor.

13        THE COURT:  When did you ask Jon Craig to

14 work with the water board to resolve this issue?

15        THE WITNESS:  I don't know the exact date,

16 but it's probably been a couple of years ago.

17        THE COURT:  How many years?

18        THE WITNESS:  Two.

19        THE COURT:  So 2007 or 2008?

20        THE WITNESS:  I would say 2007.

21        THE COURT:  Do you know whether Jon Craig

22 has done anything to attempt to resolve the issue?

23        THE WITNESS:  He reported to me that he

24 continues to work with the Oklahoma Water Resources

25 Board to resolve the issue.

1          THE COURT:  Cross-examination -- or

2    redirect, rather.

3                **REDIRECT EXAMINATION**

4    BY MR. MCDANIEL:

5    Q.   Good morning, Mr. Thompson.  How are you?

6    A.   Good morning.

7    Q.   I appreciate you working with us on the

8    schedule so we can try to get this done.

9          Mr. Thompson, let me follow up on several

10   things Mr. Nance asked you.  And in particular, I

11   want to follow up on this status of the Oklahoma

12   TMDL.  You said that Mr. Craig is retired.

13   A.   Yes, he retired at the end of the year.

14   Q.   2009?

15   A.   Yes.

16   Q.   Okay.  So if he's retired, who now has that

17   mantle for ODEQ to carry your message to the water

18   board?

19   A.   Our new water quality division director is

20   Shelly Chard, C-H-A-R-D, hyphen, McClary,

21   M-C-C-L-A-R-Y.

22   Q.   Have you had a conversation with her, sir,

23   about the issues you've discussed with us with

24   regard to the TMDL?

25   A.   Yes.

1    Q.    And do you and she have an action plan?

2    A.    I -- she is relatively new in her job, but her

3    action plan would be to continue the effort that

4    Mr. Craig had to work with the Water Resources

5    Board.

6    Q.    As part of your role as director of the

7    Oklahoma Department of Environmental Quality, do you

8    have a direct conduit of communication with the

9    director of the Water Resources Board?

10   A.    Yes.

11   Q.    And is that Mr. Smith?

12   A.    Yes.

13   Q.    Duane Smith.  Have you and Mr. Smith discussed

14   these issues you have with the protocols for the

15   Scenic River criteria?

16   A.    I don't recall that conversation, no.

17   Q.    Is there a particular reason the two of you

18   have not spoken about this?

19   A.    Well, this was an issue that was worked out in

20   a technical work group that included other agencies,

21   so that's the reason.

22   Q.    Is there anything prohibiting you from speaking

23   directly with Mr. Smith to try to get this resolved?

24   A.    No.

25   Q.    If I understand -- let me back up before I

1  change gears here.  Is it your intention to speak to

2  Mr. Smith to get this resolved?

3  A.   It may become necessary, yes.

4  Q.   What would precipitate, in your view, it

5  becoming necessary, if it's not necessary today?

6  A.   I think Ms. McClary should continue to work

7  with the staff of the water board to resolve the

8  issues, and if that doesn't occur at some point,

9  well, then, I would speak with Duane.

10  Q.   If I understand where we are, sir, the status

11  of this issue really hasn't changed since you and I

12  spoke at your deposition in April?

13  A.   That's correct.

14  Q.   April of 2009.  At the time we spoke at your

15  deposition, you had not established a time period by

16  which this needs to be resolved.  Have you now, sir?

17  A.   No.

18  Q.   Your -- I appreciate your explanation of why

19  you think the current formulation would not provide

20  for an equitable treatment between point and

21  nonpoint sources.

22       Let me make sure I understand what the

23  source of the specific requirements are that are

24  causing you the problem.  And so tell me if I'm

25  correct in this, sir, that, first off, this relates

1    to the Scenic Rivers criterion of 0.037 milligrams

2    per liter of phosphorus?

3    A.    No, it does not.

4    Q.    Tell me where the protocols reside that are

5    causing you the problem.

6    A.    They are in the implementation plan for

7    development of TMDLs, the sampling protocols that

8    are within the -- the responsibility of the Oklahoma

9    Water Resources Board.

10   Q.    This set of protocols, is it specific to the

11   waters of the Illinois River Watershed, or is this a

12   statewide protocol?

13   A.    It is a statewide protocol.

14   Q.    Is it within the power -- to your knowledge, is

15   it within the power of the Water Resources Board to

16   adjust those protocols?

17   A.    Yes.

18   Q.    Is it within the power of the Water Resources

19   Board to adjust those protocols to adapt to the

20   circumstances present in the Illinois River

21   Watershed?

22   A.    Yes.

23   Q.    Would the Water Resources Board need to do that

24   through a rule-making process?

25   A.    I'm not sure.

1  Q.  They have it within their statutory power to do

2  it.  We wouldn't need legislation, I guess is the

3  question.

4  A.  We would not need legislation, that's correct.

5  Q.  If they made the decision -- if the water board

6  agreed that adjustments needed to be made, and

7  agreed with your view, given your experience in

8  Oklahoma government, about how long would it take to

9  effect a change in those protocols?

10 A.  This resides within a implementation plan.  And

11 whether that -- a change in that implementation plan

12 would need to go through the rule-making process, I

13 don't know.

14 Q.  I'm trying to make sure I understand the

15 testimony you gave with regard to sampling.  Your

16 concern is that you think the implementation plan

17 should required a minimum number of

18 high-flow-samples within the average?

19 A.  We think -- I think -- we believe that there

20 should be a specific number of samples for both high

21 flow and low flow.  We also believe that once the

22 data is captured, it should be considered.

23 Q.  Explain that last statement, sir.  I don't

24 understand that.

25 A.  If you capture data at high flow or low flow,

1  the current protocol cuts out what they believe to

2  be anomalies.  We believe that it should consider

3  all of that data.

4  Q.   If I think -- I think I understand what you

5  just said, sir.  Is that because the standard is

6  based upon a geometric mean of the data where you

7  take out the highest and lowest values?

8  A.   Yes.

9  Q.   I just want to make sure we're clear and -- the

10  geometric mean is an element of the Scenic Rivers

11  standard, right, 30-day geometric mean?

12  A.   I'm not sure of that.

13  Q.   All right.  So you think all data should go

14  into that rolling average?

15  A.   Sure.  Yes.

16  Q.   Do you -- are you aware, sir, of what the Water

17  Resources Board opinion is about that?

18  A.   They believe that they should use the geometric

19  mean.

20  Q.   Do you know, sir -- do you have any experience

21  or knowledge whether water quality standards in

22  other states typically use the geometric mean

23  approach or whether they use just the raw average,

24  as you suggest?

25         MR. NANCE:  Object as beyond the scope of

```
1   cross.
2           THE COURT:  Overruled.
3           THE WITNESS:  No.
4   Q.  (By Mr. McDaniel)  You're just not aware?
5   A.  I'm not aware, no.
6   Q.  Has there someone from your technical staff
7   given you their technical viewpoint that this
8   geometric mean is not an appropriate methodology?
9   A.  Yes.
10  Q.  Who is that, sir?
11  A.  Jon Craig.
12  Q.  If the Water Resources Board does not respond,
13  what course of action do you have?
14  A.  Well, we have continued to do TMDLs.  We have
15  500 or more of those to do.  We are concentrating on
16  watersheds that do not have point sources or where
17  there is a need by a community to have a TMDL done.
18          So it is really a matter of priority in
19  order to meet -- in order to try to work through
20  this issue.
21          We will continue to do TMDLs as required by
22  federal law.
23  Q.  Well, my question specifically, sir, was
24  addressing the issue with the Illinois River
25  Watershed.  First let me ask this:  How does the
```

1  Illinois River Watershed rank in the list of

2  priorities for TMDLs?

3  A.   It would be a high priority if we could work

4  through this issue.

5  Q.   Okay.  Returning to my prior question.  If the

6  Water Resources Board does not respond and engage

7  you or your staff in the discussion of these

8  concerns, what options under law do you have?

9  A.   We have the -- we have no option but to do a

10  TMDL.

11  Q.   According to the standards as written?

12  A.   Yes.

13  Q.   If you are engaged by the Water Resources Board

14  in a technical discussion of these different

15  viewpoints and you simply cannot agree, or the Water

16  Resources Board does not agree, are your positions

17  the same, that being you must proceed by law to

18  generate the TMDL?

19  A.   Yes.

20  Q.   Sir, how will we know when we are at that point

21  where you recognize that you are at an impasse and

22  that you have no other choice but to comply with law

23  and release this project for completion?

24  A.   Well, we will continue -- I've asked

25  Ms. McClary -- Chard-McClary to work with the water

1    board.  At some point when we are told -- it's my

2    understanding they've continued to evaluate it and

3    have not made that decision.

4         If at the point the water board makes the

5    decision that they're not going to change it, that's

6    when we would do so.

7    Q.  Okay, sir.  And my specific question is, we're

8    in a court of law, we have the judge on the bench

9    who's a decision maker, and I think it's important

10   to know, sir, can you tell this court, give this

11   court a time frame or a date by which this will

12   either be resolved between your two agencies or not,

13   meaning that you will then have to proceed to

14   develop the TMDL as required by law?

15   A.   It would depend upon the water board making a

16   final decision that they are not going to change.

17   Q.  I don't want to argue with you, sir.  Do you

18   understand my question?  How long will this go on

19   until you recognize it's not going anywhere with the

20   water board and you're going to have to issue the

21   order to your staff to develop the TMDL?

22        MR. NANCE:  I object as asked and answered,

23   Your Honor.

24        THE COURT:  Overruled.

25        THE WITNESS:  I -- we will continue to work

1    with the water board to establish a change.  At the

2    point where the water board decides that they are

3    not going to change, definitively they are not going

4    to change -- it's not my understanding that that has

5    occurred -- but at the point when they make that

6    decision, we will have no choice but to go forward.

7    Q.  (By Mr. McDaniel)  All right.  Out of respect

8    for you and your position, sir, I'm not going to

9    argue with you further.  But you can't give the

10   court a date, can you?

11   A.  Well, I can tell you that we are going to

12   pursue it.  I can tell you that we will continue to

13   try to work through the technical issues.  I can't

14   tell you when the water board will definitively make

15   that decision.

16   Q.  All right.

17          THE COURT:  A couple of questions here.

18   Down to brass tacks here.  In terms of point source,

19   because you contend that requiring the geometric

20   mean unfairly points to point sources, which of

21   these wastewater treatment plants do you suspect

22   would require these expensive upgrades or changes in

23   the event that the sampling regime or protocol is

24   not changed?  Tahlequah?

25          THE WITNESS:  Tahlequah and Westville.

```
 1            THE COURT:  Westville.  Those two
 2   primarily?
 3            THE WITNESS:  Yes.
 4            THE COURT:  Now, you also said, both in
 5   your deposition and here today, that you're
 6   concentrating -- you're doing TMDLs on watersheds
 7   that do not have point sources, correct?
 8            THE WITNESS:  That's correct.
 9            THE COURT:  All right.  But you also said
10   you're doing TMDLs "where there is a need by a
11   community to have a TMDL done."  So that would
12   suggest to me that in some cases, you are doing
13   TMDLs where there are point sources; is that
14   correct?
15            THE WITNESS:  That is correct.
16            THE COURT:  All right.  How are you
17   distinguishing, then, between those watersheds on
18   which there are point source discharges where you've
19   decided to ignore this problem that you have with
20   the geometric mean and you're doing the TMDLs, and
21   those watersheds where you've made, as you say, the
22   policy decision yourself?
23            And to your credit, in your deposition,
24   you've taken the responsibility here.  How are you
25   distinguishing?  Because I have in my hand the TMDL
```

1   that you recently did on Spavinaw.  And Spavinaw, as

2   you point on page 14 of that TMDL, city of Decatur

3   is a point source discharge.

4             So just within the last few months, you did

5   a final TMDL on Lakes Eucha and Spavinaw; is that

6   correct?

7             THE WITNESS:  That's correct.

8             THE COURT:  So how are you distinguishing

9   between those TMDLs where you've decided to ignore

10  your problem with geometric mean and those

11  watersheds in which you've held up on the TMDL?

12            THE WITNESS:  If I could give a couple of

13  examples.

14            THE COURT:  Please.

15            THE WITNESS:  We are currently engaged in a

16  TMDL on the North Canadian River in Oklahoma City.

17  That waterbody is --

18            THE COURT:  It's the Oklahoma River now,

19  right?

20            THE WITNESS:  I'm sorry, the Oklahoma

21  River, that's correct.  Old habits die hard, I

22  suppose.

23            THE COURT:  I'm the same way.  Go ahead.

24            THE WITNESS:  That waterbody is impaired

25  for bacteria.  And as you may recall, last summer

1    there was an event in Oklahoma City in which people

2    got in the river and became ill as a result of that.

3            THE COURT:  That was the --

4            THE WITNESS:  Triathlon.

5            There is an interest, an overriding

6    interest by the City of Oklahoma City to address

7    bacteria in the Oklahoma River.

8            My staff has been asked to discuss with the

9    cities like that what we believe is an unfair --

10   this unfair issue.  But the desire by the City was

11   so overriding in that particular case that they were

12   willing to have us go forward with the TMDL in spite

13   of what we believed was an unfair -- an unfair issue

14   with point sources.

15           There are times when, because of growth or

16   because of new industries or because of some other

17   issue, that a City must increase its load and we

18   must do a TMDL on an impaired stream so that we can

19   -- so that they can treat -- take care of either

20   growth or industries coming into that community.

21           In those cases, we have gone forward with

22   the TMDL process, again, because of -- in spite of

23   our warning to these cities, there's an interest in

24   those cities or, in some cases, with industries to

25   go forward.

1            In the case of Eucha-Spavinaw, there was --
2    I believe there was a statutory requirement.  There
3    was -- the City of Tulsa went to the legislature and
4    asked that this TMDL process be done so that they
5    could address the impairments in that particular
6    watershed.
7            In all honesty, Your Honor, I don't
8    remember whether that legislation passed or not, but
9    there was clearly interest on the part of the City
10   of Tulsa to do a TMDL for that -- for those
11   purposes.  And so in spite of these -- what we
12   considered to be unfair treatment to those
13   communities, they decided that there was an
14   overriding policy issue important to them to go
15   forward with it, and so we decided to go forward.
16            THE COURT:  Mr. McDaniel.
17   Q.  (By Mr. McDaniel)  Mr. Thompson, I know you
18   weren't necessarily involved in filing this lawsuit,
19   but would you agree, sir, that this lawsuit
20   indicates the State of Oklahoma is interested in the
21   Illinois River Watershed?
22   A.   Yes.
23   Q.   Can you tell me, sir, how the initiative that
24   the EPA has started this fall is affecting, if at
25   all, your decisions with regard to promulgating the

1    Oklahoma TMDL?

2            MR. NANCE:  Object as beyond the scope of

3    cross.

4            THE COURT:  Overruled.

5    Q.  (By Mr. McDaniel)  Did you understand my

6    question?

7    A.  No, I don't understand.

8    Q.  I realize from your expression, I may have

9    asked a poor question.  Are you aware that EPA has

10   engaged the process with both Oklahoma and Arkansas

11   to develop a two-state TMDL?

12   A.  Yes.

13   Q.  How is that relevant, if at all, to the

14   decisions you are pondering with regard to any TMDL

15   for the Oklahoma side?

16   A.  Well, it is an artifact, but the policy extends

17   statewide.  And so we view this as a statewide

18   policy, as a statewide issue to try to solve this

19   problem.  So it is -- I don't know exactly how to

20   answer your question, honestly.  It is in our mind,

21   but the policy relates not to just phosphorus, to

22   all criteria where there's an impact from nonpoint

23   sources.  So it's a broader issue for us than just

24   the Illinois River.

25   Q.  Even if you agree with the water board on a

1    change in the implementation plan, the Scenic River

2    criteria still requires a geometric mean.  How are

3    you going to address that?

4    A.    I don't know.

5    Q.    That's statutory, isn't it?

6    A.    I don't know that.

7          MR. MCDANIEL:  May I approach, Your Honor?

8          THE COURT:   You may.

9    Q.    (By Mr. McDaniel)  Mr. Thompson, I've handed

10   you what's been admitted into evidence as

11   Defendants' Joint Exhibit 8090.

12   A.    Uh-huh.

13   Q.    I assume you received a copy of the letter

14   dated October 1, 2009 from Miguel Flores, acting

15   deputy regional administrator of EPA Region 6 that

16   was addressed to Teresa Marks at Arkansas Department

17   of Environmental Quality and J.D. Strong at the

18   Oklahoma Secretary of Environment's office?

19   A.    Yes.

20   Q.    Can you tell me how and when you received a

21   copy of this?

22   A.    Not specifically.  It wasn't addressed -- I

23   wasn't copied on the letter.

24   Q.    I notice Mr. Jon Craig at the Oklahoma

25   Department of Environmental Quality was copied.  Did

1  he provide you materials?

2  A.   I suspect it was either Mr. Craig or

3  Mr. Strong.

4  Q.   This letter says on its face -- it's got a date

5  stamped on it, October 1, 2009.  Do you recall when

6  you received a copy of this?

7  A.   Not specifically.

8  Q.   Before the time you had this letter in hand,

9  were you aware that Region 6 was moving in this

10  direction?

11  A.   Yes.

12  Q.   So this -- the information in this letter

13  itself wasn't a surprise to you?

14  A.   No.

15  Q.   Now, for how long have you had an understanding

16  that EPA Region 6 was going to work on this

17  two-state effort?

18  A.   Oh, I -- probably not more than a couple of

19  months before the letter.

20  Q.   Let's look at the very first sentence in the

21  letter.  It says, "Over the past several months, our

22  agencies have focused considerable attention on

23  nutrient concerns in the Illinois River Watershed in

24  northeast Oklahoma and northwest Arkansas."

25          Sir, is ODEQ included within that

 1  description?  Has ODEQ been focusing considerable

 2  attention on nutrient issues in the Illinois River

 3  Watershed?

 4  A.   On point sources, yes.

 5  Q.   All right.  The second paragraph, the first

 6  sentence, Mr. Flores states, "As we have recently

 7  been discussing, over the next 12 to 18 months, EPA

 8  will develop a scientifically robust model of the

 9  Illinois River Watershed, incorporating all relevant

10  segments and nutrient sources in both Arkansas and

11  Oklahoma."

12         Is this consistent, sir, with your

13  understanding of EPA's plans to issue a two-state

14  total maximum daily load within 12 to 18 months?

15  A.   Yes.

16  Q.   And is it your understanding, sir, that EPA's

17  intention is that this TMDL will address all

18  nutrient sources in Arkansas and Oklahoma, both

19  point and nonpoint?

20  A.   Yes.

21  Q.   All right.  Let's continue in that paragraph.

22  He says, "EPA's purpose in this effort is to provide

23  a technically sound basis upon which regulatory and

24  nonregulatory decisions can be confidently based,

25  decisions which will lead to reductions of nutrients

1    from both point and nonpoint sources of nutrients in

2    the watershed."

3           Sir, do you agree that EPA's desire for the

4    outcome of this TMDL is a technically sound basis

5    for making regulatory and nonregulatory decisions to

6    address the reduction of nutrients from both point

7    and nonpoint sources in the watershed?

8    A.   Well, I can tell you that that's what the

9    letter states, yes.

10   Q.   Okay.  Do you have -- do you have a belief that

11   EPA's intention is different than stated here, sir?

12   A.   Well, not their intention, no.

13   Q.   All right.  Now, in the third paragraph at the

14   bottom, there's mention here that Oklahoma is

15   requested to name a technical liaison for the TMDL

16   project.

17   A.   Yes.

18   Q.   Who has Oklahoma designated for that purpose?

19   A.   Well, at the beginning of this, it was Jon

20   Craig.  It will now be Shelly McClary.

21   Q.   Now, what will her duties and assignments be

22   through the course of this project with relationship

23   to this project?

24   A.   She will coordinate with the Environmental

25   Protection Agency in the state of Arkansas.  She

1    will provide information.  And she will assess the

2    technical basis on which the model and the process

3    will proceed.

4    Q.  As far as Oklahoma's comments, feedback, will

5    she be the conduit into the EPA process for -- let

6    me put it this way.  Will she be Oklahoma's voice at

7    the table in this process?

8    A.  Yes.

9    Q.  Turn to the second page of the letter, please,

10   sir.  Let me read a little bit from this top

11   paragraph.  Mr. Flores says, "We expect this

12   modeling effort may lead to the development of one

13   or more Total Maximum Daily Loads for the Illinois

14   basin.  EPA will take the lead in developing such

15   TMDLs, and we encourage active participation by both

16   Oklahoma and Arkansas.  Along with the modeling

17   work, we are now initiating other factors that may

18   influence future TMDL decisions for the basin."

19          Sir, do you know what Mr. Flores is

20   referring to when he says, "other factors that may

21   influence future TMDL decisions for the basin"?

22   A.  Not specifically, no.

23   Q.  Well, if you look in that -- continuing in the

24   paragraph, he makes reference here to a

25   reevaluation -- excuse me, "Oklahoma's reevaluation

10798

1  of the phosphorus criteria for Scenic Rivers

2  pursuant to the 2003 statement of joint principles

3  and actions."  Do you see that?

4  A.   Yes.

5  Q.   Do you believe that may be one of the factors

6  Mr. Flores is referring to?

7  A.   It may be.

8  Q.   Sir, to your knowledge, did Oklahoma commit in

9  the 2003 statement of joint principles to reevaluate

10  the 0.37 Scenic River phosphorus standard by 2012?

11  A.   Yes.

12  Q.   If I understand the dialogue that we had at

13  your deposition and that we've had this morning

14  before the court, your desire that the criteria or

15  implementation criteria be reevaluated is something

16  that could be addressed as part of reevaluating the

17  Scenic Rivers standard; do you agree?  Particularly

18  the geometric mean and the number of samples.

19  A.   It could be, yes.

20  Q.   Sir, to your knowledge, does the State of

21  Oklahoma intend to fulfill this commitment by

22  reevaluating the Scenic Rivers standard?

23  A.   It does not fall within my jurisdiction, but to

24  the best of my knowledge, it does, yes.

25  Q.   Tell me, if you can, sir, what you know about

1  the timing for reevaluating the Scenic Rivers

2  standard.

3  A.   I don't know anything about it.

4  Q.   Sir, do you know whether the Oklahoma Water

5  Resources Board is now accepting comments with

6  regard to its triennial review of Oklahoma water

7  quality standards?

8  A.   I don't know that specifically.

9  Q.   Does ODEQ have any role in that process?

10  A.   Well, we, as with any state agency, will have

11  comments on the process.

12  Q.   Is it normal for your office to remain apprised

13  of what's going on in the Water Resources Board with

14  regard to water quality standards?

15  A.   Yes.

16  Q.   But you don't know if OWRB is in the midst of

17  its triennial review as we speak?

18  A.   I know there's been some discussion of it, but

19  whether they are in the midst of it, I don't know.

20  Q.   Sir, do you know whether the Water Resources

21  Board has included the 0.37 milligram per liter

22  scenic river standard among the standards it intends

23  to review during this triennial review?

24  A.   No.

25  Q.   Now, with regard to the EPA initiative, sir,

1  were you aware that EPA convened a meeting on

2  November 20, 2009 in Dallas to discuss the project?

3  A.   Yes.

4  Q.   And who was present for the State of Oklahoma?

5  A.   Jon Craig was present, Mark Derichsweiler was

6  present.

7  Q.   You've already told us who Jon Craig is.  Who

8  is Mark Derichsweiler?

9  A.   He is a program manager in the water quality

10  division.

11  Q.   And I've had the pleasure of meeting

12  Mr. Derichsweiler and actually deposing him three

13  times in this case.  Part of his job in his

14  division, sir, is the TMDL work; is that right?

15  A.   Yes, that's correct.

16  Q.   So when Oklahoma issues contracts and receives

17  work product relative to TMDLs, that is

18  Mr. Derichsweiler's department?

19  A.   That's correct.

20  Q.   He's certainly knowledgeable on TMDLs?

21  A.   Yes.

22  Q.   Okay.  To your knowledge, were representatives

23  of the state of Arkansas also at this meeting in

24  Dallas?

25  A.   They were.

1  Q.   Tell me, sir, what were the objectives of the

2  meeting?

3  A.   It's my understanding --

4         MR. NANCE:  Your Honor, we have gone well

5  beyond the scope of cross at this point.

6         THE COURT:  I understand.  Your response.

7         MR. MCDANIEL:  Well, Your Honor, there's

8  really two aspects of this that Mr. Nance has opened

9  the door to.  Number one is the whole question of

10 TMDL and what is going to be the future with TMDL in

11 the IRW is very much what we've been talking about.

12        Number two, Mr. Nance made the point with

13 Mr. Thompson that essentially the State of Oklahoma

14 and the agencies such as ODEQ and ODAFF had no power

15 to have an effect on what is going on in Arkansas.

16 What's going on with the EPA is very much relevant

17 to that, and I think the court would be well served

18 by being informed on the process.

19        THE COURT:  I think the door has been

20 opened to this subject.  It's central to this

21 dispute.  Overruled.  Go ahead.

22        MR. MCDANIEL:  Thank you.

23 Q.   (By Mr. McDaniel)  Do you recall the question

24 that was pending, sir?

25 A.   I don't.

1  Q.   The question was:  Tell us what you can about

2  the purposes of the meeting in Dallas.

3  A.   It was, to the best of my knowledge, an

4  organizational meeting.  It was a meeting in which

5  all the parties got together.  They discussed the

6  processes -- or at least the models.  There was some

7  discussion of schedule, things of that nature.

8  Q.   Kind of a kickoff meeting?

9  A.   Kind of a kickoff meeting.

10  Q.   Good enough.  Now, did Mr. Craig or

11  Mr. Derichsweiler bring back to you and provide you

12  a copy of the official meeting notes?

13  A.   Yes.

14        MR. MCDANIEL:  May I approach, Your Honor?

15        THE COURT:  You may.

16  Q.   (By Mr. McDaniel)  Mr. Thompson, I've handed

17  you what's marked for identification as Defendants'

18  8125.  Do you recognize this as the attendance

19  roster and the meeting notes issued by EPA from the

20  meeting in November, 2009?

21  A.   Yes.

22  Q.   Were -- to your knowledge, were these notes

23  provided to all attendees of EPA?

24  A.   To my knowledge.

25        MR. MCDANIEL:  Your Honor, this document,

 1   this Exhibit 8125 was not listed on the pretrial

 2   order clearly because it didn't exist at the time

 3   the pretrial order was prepared.  Defendants do

 4   offer 8125 for admission.  We think in the interest

 5   of justice, it is justified, given how central to

 6   the issues in this case this information is, and the

 7   fact that defendants obviously couldn't list it by

 8   the pretrial deadline.

 9          And secondly, Your Honor, offering this --

10   or accepting this into evidence is not going to

11   prejudice the State.  The State was present at the

12   meeting and, in fact, knew about it before we did.

13          THE COURT:  Well, is there anything about

14   this particular document that does more than simply

15   reflect Mr. Craig's and Mr. Derichsweiler's

16   attendance at the meeting?

17          MR. MCDANIEL:  Yes, sir, it reflects the

18   intentions -- it reflects EPA's plan that I think we

19   have not been able -- up to this point been able to

20   provide to the court much detail about EPA's

21   intended course of action.  And I think --

22          THE COURT:  Well, the letter file-stamped

23   October 1 has been admitted into evidence here,

24   correct?

25          MR. MCDANIEL:  That is correct.

 1          THE COURT:  Does this document do anything

 2   further?

 3          MR. MCDANIEL:  Well, it does, Your Honor.

 4   It speaks in terms of models that are going to be

 5   considered, contractor that's been retained, data

 6   that is going to be collected, information about

 7   stakeholder meetings that are anticipated, roles

 8   that each of the states will play in the process.

 9          And just so the court can understand where

10   I'm going here, after I ask a few questions about

11   this, there was a PowerPoint presentation provided

12   at the meeting, and my expectation is to want to

13   offer that to the court, which also includes a

14   detailed time line for the work project.

15          THE COURT:  Any objection?

16          MR. NANCE:  Your Honor, it is hearsay, and

17   there's no foundation with this witness because he

18   did not attend the meeting.

19          THE COURT:  Sustained.  I do note, however,

20   that apparently the EPA agrees with the court that

21   the Cherokee tribe has potential interest here.

22          MR. MCDANIEL:  Your Honor, I --

23   alternatively, as far as authentication and

24   identification, this was -- through the testimony of

25   Mr. Thompson, this was brought back to him by the

1    attendees at the meeting.  There's not much question

2    about the apparent reliability that it is what it

3    purports to be.

4          And with regard to the hearsay question,

5    Your Honor, I think the court could accept this not

6    for the truth of the matter asserted but for,

7    rather, its relevance, because the EPA has explained

8    to Oklahoma its view of what needs to be done, what

9    will be done and what its planned time frame is and

10   what it expects from the State of Oklahoma.  So as a

11   matter of notice, I think the court could receive it

12   for that purpose.

13         MR. NANCE:  All of that is for the truth.

14         THE COURT:  I think so.  Mr. Nance is

15   correct.  Sustained.

16         MR. MCDANIEL:  All right.

17   Q.  (By Mr. McDaniel)  The -- Mr. Thompson, do you

18   know, sir, that EPA has determined and, in fact,

19   hired the contractor who will be doing the work?

20   A.  I do not.

21   Q.  You don't know whether that's occurred or not?

22   A.  I do not.

23   Q.  The -- do you know that EPA has narrowed the

24   models that it will consider for use in the project?

25   A.  I do not.

1  Q.   You do know this is about developing a model?

2  A.   Yes.

3  Q.   All right.  You are aware, sir, that in the

4  course of this litigation that Dr. Bernard Engel was

5  working for the State's counsel, purported to model

6  the Illinois River Watershed using a combination of

7  GLEAMS field scale model coupled with a routing

8  equation, are you aware of that?

9          MR. NANCE:  I object, we're beyond the

10 scope.

11          THE COURT:  Sustained.

12          MR. MCDANIEL:  Your Honor, it relates to

13 the EPA modeling, if I might.

14          THE COURT:  Sustained.

15 Q.   (By Mr. McDaniel)  Sir, have you received any

16 notice from Mr. Craig or Mr. Derichsweiler that the

17 work that was performed with the GLEAMS model by

18 Dr. Engel will be any component of the work

19 performed by the EPA?

20          MR. NANCE:  Again, beyond the scope.

21          THE COURT:  Sustained.

22 Q.   (By Mr. McDaniel)  Mr. Thompson, what's ODEQ's

23 role going to be in gathering information for this

24 project?

25 A.   Well, we will -- there's substantial data that

```
 1   is -- has been collected by federal agencies, the --
 2   by the Oklahoma Water Resources Board, by the
 3   Conservation Commission and other sources.
 4           Our role will be, as far as providing data,
 5   to provide that data to the Environmental Protection
 6   Agency.
 7   Q.   What's the status of that work today, sir?
 8   A.   I don't know.
 9   Q.   Who's the lead person to see that that work is
10   completed?
11   A.   That will be Shelly McClary.
12   Q.   Sir, are you aware that the EPA and its
13   contractor have actually issued a draft quality
14   assurance project plan and work plan for the
15   modeling?
16   A.   No.
17   Q.   Sir, did Mr. Craig or Mr. Derichsweiler bring
18   back to you a copy of a PowerPoint presentation that
19   was made by EPA at the November meeting?
20           MR. NANCE:  Your Honor, beyond the scope.
21   And if they did, it would be hearsay.
22           MR. MCDANIEL:  Well, I haven't offered it
23   yet, Your Honor, so I'm just trying to establish --
24           THE COURT:  A little early.  Go ahead.
25   Q.   (By Mr. McDaniel)  Do you recall the question,
```

1  sir?

2  A.   Yes, they did.

3         MR. MCDANIEL:  May I approach, Your Honor?

4         THE COURT:  You may.

5  Q.   (By Mr. McDaniel)  Mr. Thompson, I've handed

6  you what's marked for identification as Defendants'

7  Joint Exhibit 8131.  Do you recognize this?

8  A.   Yes.

9  Q.   What is it?

10  A.   This is the PowerPoint that they brought back

11  from the meeting.

12  Q.   And this -- who put on this presentation?

13  A.   I don't know.

14  Q.   Your people didn't put it on, did they?

15  A.   No.

16  Q.   Who gave this to you, I'm sorry?

17  A.   Mr. Derichsweiler gave it to me.

18  Q.   All right.  And Mr. Derichsweiler told you it

19  was provided to him at the meeting?

20  A.   Yes.

21         MR. MCDANIEL:  Your Honor, based upon the

22  same foundation and reasons discussed with the --

23  Your Honor, based upon the prior foundation and

24  arguments I made with the prior exhibit, in addition

25  to the fact that I think this document qualifies

1  under the hearsay exception as a document and report

2  reflecting activities of the agency, and I think the

3  court can fairly consider the residual exception.

4  It's rather -- the indicia of reliability here, I

5  think, are strong.  And so defendants offer for

6  admission 8131.

7          THE COURT:  Mr. Nance.

8          MR. NANCE:  Your Honor, I believe it is

9  hearsay.  It's certainly not your typical government

10  report.  As far as activities of the agency, this is

11  not the sort of thing that EPA is reporting on its

12  typical activities, but it's about a specific event,

13  the meeting which you have heard described to you.

14  I don't believe it's admissible.  I think it still

15  is hearsay.

16          MR. MCDANIEL:  Your Honor, I think this is

17  the last opportunity in this trial that the court is

18  going to have to gain information about what's going

19  on with this report and the EPA activity.  There's

20  really not much challenge to the reliability of the

21  document.  And whether you want to view this from a

22  hearsay exception standpoint as a report or a

23  statement by the agency, or consider it only for the

24  truth of the matter that EPA said it, I think there

25  are multiple grounds that the court could accept

1    this.  And I think it will be well served by being

2    as informed as possible about this.

3            THE COURT:  For what purpose or purposes is

4    it being offered?

5            MR. MCDANIEL:  I'm offering it to the court

6    first to show that the State of Oklahoma is engaged

7    in a two-state process convened by the Illinois --

8    excuse me, convened by the EPA for purposes of

9    addressing the very concerns that this court is

10   being asked to address.

11           THE COURT:  You've already done that

12   through the testimony and the letter, right?  What

13   other purposes are you seeking to admit this

14   particular document?

15           MR. MCDANIEL:  I think what's most critical

16   about this particular document, Your Honor, is on

17   the final slide, and that is the time frame.  As

18   this court considers the remedies -- or the last two

19   slides, excuse me.

20           As the court considers the remedies that

21   it's being asked to order and assertions by the

22   State with regard to urgency and a need for action,

23   we have a critical paradox that this document shows

24   the court; whereas the State of Oklahoma apparently

25   has no time frame for acting on its own to initiate

 1  a TMDL and asserts that is powerless to do anything

 2  with the state of Arkansas.

 3          The EPA is telling the State of Oklahoma

 4  and the state of Arkansas that it will act and it

 5  will have a TMDL in place, and has set forth the

 6  schedule that it shall be completed by September 15,

 7  2011.

 8          THE COURT:  Point me to the government

 9  activity.  You're talking about 803(6)?

10          MR. MCDANIEL:  (8), sir.

11          THE COURT:  That's public records.  But

12  you've --

13          MR. MCDANIEL:  Records, reports, statements

14  or data compilation in any form of public offices or

15  agencies --

16          THE COURT:  Setting forth (A) the

17  activities of the office or the agency?

18          MR. MCDANIEL:  Correct.

19          THE COURT:  All right.  On that particular

20  point, 803(8)(A) and focusing on time frame, the

21  activities of the EPA relative to a time frame.

22  Mr. Nance.

23          MR. NANCE:  Your Honor, this is not

24  something that sets forth the regular activities of

25  the EPA as an agency.  It's simply the results of a

1  planning meeting, and it may or may not come to

2  pass.  And to the extent that it forecasts a future

3  event, it is not a regular activity of the agency.

4        THE COURT:  Is there a requirement that

5  803(8)(A) reflect a regular activity of the agency?

6  Mr. McDaniel.

7        MR. MCDANIEL:  I'm sorry, Your Honor, I got

8  distracted because it's appearing to me that this

9  copy may not be the right copy of the --

10        THE COURT:  Yes, sir.  I don't see any

11  proposed time frame.

12        MR. MCDANIEL:  That's --

13        (Off-the-record discussion was had.)

14        THE COURT:  We need to give Terri a break

15  here.  We've been going on too long.  And although I

16  intend to get you to your dentist -- you may want me

17  to hold you over here -- but we need to give the

18  court reporter a break here.  We'll be in recess.

19        (Recess was had.)

20        THE COURT:  Mr. McDaniel.

21        MR. MCDANIEL:  Your Honor, I created a

22  little confusion I want to straighten out so the

23  court can render its decision about admitting these

24  documents.  The one I handed you marked as 8131 is

25  -- there were really two components to the

1    PowerPoint.  I handed you the first component.  The

2    second one is marked as 8126.  That includes the

3    dates that I so vigorously argued for.

4            So, Your Honor, the argument that I made

5    with regard to the dates and its relevance and the

6    basis for admissibility apply to what has been

7    marked as Defendants' 8126.

8            The prior exhibit, 8131, the balance of the

9    PowerPoint discussing -- or including the EPA's

10   statements about its activities still assert -- fall

11   within the public records exception, 803(8)(A).  So

12   we offer those both for admission.

13           THE COURT:  Well, the arguments seem to go

14   more directly to 8126 as opposed to 8131.

15   Mr. Nance.

16           MR. NANCE:  Your Honor, Ms. Moll has handed

17   me an excerpt from McCormick about 81 -- 803(A)(8)

18   -- (8)(A), activities of the office.  And McCormick

19   indicates that an example of that sort of record is

20   a record of receipts or disbursements of the

21   Treasury Department as an example, and then

22   comments, "In addition to the assurances of

23   reliability common to public records and reports

24   generally, this group has the assurances of accuracy

25   that characterize business records that are

1    routinely admitted."

2            These are not the sort of things that are

3    like business records or records of routinely

4    conducted activities.  They're specific documents

5    about specific events.  And 8126 is not even a

6    report of the activities of the office; it's a

7    report of the possible future activities of the

8    office.  And I don't think either one, but

9    particularly, 8126 meets the exception that is

10   offered.

11           In addition, there's just a foundational

12   authentication issue because the director wasn't at

13   this meeting, and it's been handed to him by his

14   people.  So we would ask the court to deny the

15   admission of both 8131 and 8126.

16           THE COURT:  Any response to the regularly

17   conducted activities argument?

18           MR. MCDANIEL:  Well, this doesn't say the

19   regularly conducted activities.  It says, "the

20   activities."  And it does include a statement by the

21   agency regarding its activities.

22           But I think, Your Honor, based upon the

23   testimony that you've heard over the 30 minutes

24   before the break, I think the court has been given

25   an ample record with regard to the indicia of

 1  trustworthiness of this document.

 2        So I certainly can continue to argue the

 3  point that this is a public record, but I think the

 4  residual exception is a sound basis for admitting

 5  the document, particularly given how probative it

 6  is, given the fact that all of this transpired while

 7  we were in trial, which is difficult for the

 8  defendants to then bring a custodian, etcetera, here

 9  before the court.

10        THE COURT:  Well, of course, the difficulty

11  of bringing a custodian doesn't necessarily reflect

12  on reliability or make its indicia of reliability

13  stronger.

14        MR. MCDANIEL:  Certainly.

15        MR. NANCE:  Your Honor, I might add, I

16  think they could have brought Mr. Derichsweiler, or

17  I believe some of these Arkansas attendees are on

18  their witness list.  And the director certainly

19  wasn't even at the meeting.

20        THE COURT:  Mr. McDaniel.

21        MR. MCDANIEL:  Well, I think that this

22  comes down to authentication, Your Honor.  I

23  certainly am not trying to exert any type of undue

24  influence on the court.  That sounded horrible.  No,

25  I take that back.  I'm not trying to --

 1          THE COURT:  That's your job, isn't it?

 2          MR. MCDANIEL:  I think the "undue" part is

 3    what sounded bad.  I am trying to influence you,

 4    although not very well.

 5          But when we were going through our pretrial

 6    conference, one of the statements the court made

 7    which I very much took note of, and that is when it

 8    comes to issues of identification and

 9    authentication, the court is not going to allow

10    parties to simply throw up unnecessary roadblocks to

11    getting to the truth.

12          And I think, here, it's -- I understand

13    these are legitimate evidentiary points Mr. Nance is

14    making, so I'm not making that argument, but the

15    State has done nothing to tell this court about

16    this.  And we have worked with every scrap of

17    evidence that we could find and information we could

18    obtain to make the court aware of what's going on in

19    this important work at EPA.

20          Mr. Thompson has testified that his people

21    brought this back, gave it to him, representing that

22    this is what was provided to them at the EPA

23    meeting, with the expectation that he would review

24    it, understanding that's what this meant.

25          THE COURT:  All right.  I don't believe he

1  said that with regard to 8126, however, has he?

2            MR. MCDANIEL:  No, we haven't discussed

3  that, but I will gladly do so.

4            THE COURT:  The objection is sustained as

5  to 8131.  I'll allow further questioning with regard

6  to 8126.

7            MR. MCDANIEL:  Thank you, Your Honor.

8  Q.   (By Mr. McDaniel)  Mr. Thompson, I handed you

9  at the end of the break what's been marked as

10  Defendants' Joint Exhibit 8126, two pages.  Do you

11  recognize that, sir?

12  A.   Yes.

13  Q.   What is it?

14  A.   It's part of the material that was given to me

15  by Mr. Derichsweiler.

16  Q.   Was it your understanding that this material

17  was provided to Mr. Derichsweiler at this EPA

18  meeting in Dallas on November 20, 2009?

19  A.   Yes.

20  Q.   Did Mr. Derichsweiler give this material to you

21  so you could be informed as to what occurred at this

22  meeting?

23  A.   Yes.

24  Q.   All right, sir.

25            MR. MCDANIEL:  Your Honor, defendants offer

1    8126.

2            MR. NANCE:  Same objections, Your Honor.

3            THE COURT:  The court will admit 8126

4    pursuant to 803(8)(A) and the residual exception.

5    The tentative schedule set forth here sets forth the

6    -- a regular activity of the EPA insofar as the EPA

7    engages in modeling projects.  It is not a

8    representation as to activities that have occurred,

9    but it is a regular activity of the EPA to set

10   schedules.

11           The document is admitted not as proof of

12   that which will be done by those dates but, rather,

13   for proof that the EPA has set the tentative

14   schedule.  8126 is admitted.

15           Also under the residual exception, there's

16   sufficient indicia of reliability as to the setting

17   of a tentative schedule by the EPA.

18           MR. MCDANIEL:  Thank you for allowing us to

19   grind through that, Your Honor.

20   Q.   (By Mr. McDaniel) Let me wrap this particular

21   aspect up, Mr. Thompson.  Thank you for your

22   patience as lawyers do what they do.

23           The -- this EPA process, the two-state

24   process, to your knowledge, is it -- it's not tied

25   to your office's concerns about the TMDL

1    implementation issues with regard to -- that you

2    expressed with regard to completing the Oklahoma

3    TMDL?

4    A.   It is a concern --

5    Q.   Let me try to ask a better question.  The

6    concerns that we discussed when you and I first

7    started talking this morning that you expressed with

8    the implementation program for the Oklahoma TMDL,

9    that is not going to affect the EPA's process,

10   correct?

11   A.   I don't know that that's the case.  Issues will

12   be raised by both states in this process.  How EPA

13   chooses to react to those, I have no way of knowing.

14   Q.   Okay.  Have those concerns been communicated to

15   the EPA as of yet?

16   A.   Not to my knowledge, but they will be.  This

17   was a kickoff meeting.  And I don't know that we've

18   been afforded that opportunity yet, but we will.

19   Q.   All right.  And one thing I want to clear up

20   with regard to the Scenic River standard.

21         MR. MCDANIEL:  And I want to ask you,

22   please, if you can bring up -- Tyson Demonstrative

23   96 which is simply a copy of the Oklahoma

24   Administrative Code, Title 785, Section 45-5-19,

25   Aesthetics.  And if you could blow that up as much

1    as you could so Mr. Thompson can see it on the

2    screen.  The text.

3    Q.  (By Mr. McDaniel)  Can you see it, sir?

4    A.  Yes.

5    Q.  Do you agree that that is the water quality

6    criteria for Scenic Rivers in Oklahoma?

7    A.  Yes.

8    Q.  And under section B -- excuse me, C,

9    subparagraph 2, included within that rule is the

10   30-day geometric mean total phosphorus concentration

11   criteria, correct?

12   A.  Yes.

13   Q.  So this geometric mean methodology is part of

14   the Scenic Rivers criteria, at least by rule,

15   correct?

16   A.  That's correct.

17   Q.  And the Water Resources Board can change this

18   rule, sir?

19   A.  They can.

20   Q.  All right.  Now, is it true, sir, that by

21   statute, each Oklahoma environmental agency must

22   promulgate a water quality standards implementation

23   plan --

24        MR. NANCE:  Judge, we're beyond the scope

25   of cross.

1          MR. MCDANIEL:  If I could complete my

2    question, Your Honor, then I can respond.

3          THE COURT:  All right.  Go ahead and

4    complete the question.

5          MR. NANCE:  I apologize.

6          MR. MCDANIEL:  Just because I was

7    stuttering doesn't mean I was done.

8          THE COURT:  Frankly, I thought you were

9    done as well.

10   Q.  (By Mr. McDaniel) Isn't it true, Mr. Thompson,

11   that, by statute, every environmental agency must

12   promulgate a water quality standards implementation

13   plan for its jurisdictional area of responsibility,

14   specifying how the agency utilizes and enforces

15   Oklahoma's water quality standards for surface water

16   and groundwater?

17         MR. NANCE:  Same objection, beyond the

18   scope of cross.

19         MR. MCDANIEL:  Your Honor, this goes

20   directly to the line of questions Mr. Nance asked of

21   Mr. Thompson, suggesting that even if the TMDL was

22   enacted, there is nothing that could be done with

23   regard to poultry litter in order to bring it within

24   compliance with the TMDL.  And I want to point out

25   that Oklahoma statutes are directly contrary to that

1    point.

2         THE COURT:  Mr. Nance.

3         MR. NANCE:  Your Honor, I don't know what

4    statute he's talking about, but I didn't ask about a

5    water quality implementation plan.  I asked about

6    enforcing a TMDL.

7         MR. MCDANIEL:  It's the water quality

8    standards implementation plan that proves that the

9    statements made are incorrect.  And, in fact, ODAFF,

10   just like ODEQ, is bound to use its jurisdiction to

11   meet TMDL requirements.

12        MR. NANCE:  To the extent he's making an

13   argument about ODAFF, he's way beyond the scope of

14   cross.

15        THE COURT:  As I recall, in your questions,

16   Mr. Nance, you asked who had authority.  And

17   Mr. Thompson said it was ODAFF, correct?  You're not

18   trying to show, Mr. McDaniel, that ODEQ has such

19   authority?

20        MR. MCDANIEL:  Not directly.  ODEQ, as the

21   parent agency over TMDL, is required by statute, as

22   are all the other agencies, to coordinate with ODEQ

23   to achieve the TMDL.  That includes ODAFF.  That's

24   the direction of my questions, sir.

25        THE COURT:  First of all, I don't know that

1   this question really goes to impeach anything that

2   Mr. Thompson said.  He said ODAFF has the authority,

3   to his knowledge, right?

4           MR. MCDANIEL:  Well, the -- he -- Mr. Nance

5   asked whether ODEQ had any authority regarding

6   poultry.  He said they had no authority, they can

7   only make recommendations in the TMDL.  He said

8   ODAFF has -- whatever authority there is, ODAFF has

9   it.

10          And the point what I'm impeaching is, this

11  is -- these TMDL requirements by the interplay of

12  the water quality standards implementation plan are

13  not recommendations, they are legal requirements.

14          MR. NANCE:  Actually, Your Honor, the

15  director said he didn't know what ODAFF's authority

16  was.  This is legal argument rather than trying to

17  develop anything factual from this witness.

18          MR. MCDANIEL:  I'm trying to explore the

19  statutes and how the agencies interrelate in order

20  to satisfy the requirements of the TMDL.  And as a

21  director of ODEQ --

22          THE COURT:  These are legal issues.  The

23  objection is sustained.

24  Q.  (By Mr. McDaniel) Mr. Thompson, is it your

25  understanding that all the Oklahoma environmental

1    agencies are obliged to use their jurisdictions to

2    satisfy the requirements of a TMDL?

3    A.    Yes.

4    Q.    Is it your understanding that ODAFF has

5    regulatory authority over poultry feeding operations?

6    A.    Yes.

7    Q.    And you told Mr. Nance that you expected one

8    outcome of the TMDL would be a requirement for

9    reduced loading, both point and nonpoint --

10   A.    Yes.

11   Q.    -- in the IRW --

12   A.    Yes.

13   Q.    -- right?

14         If that's the case, if the TMDL issued by

15   whomever says there needs to be reduced loading from

16   nonpoint sources, and nonpoint sources were deemed

17   to include activities encompassing poultry litter

18   application, sir, is it your belief that under

19   Oklahoma law that ODAFF would then be obliged to

20   exercise its regulatory authority to change litter

21   application standards in the Illinois River

22   Watershed?

23         MR. NANCE:  Objection.  Calls for a legal

24   conclusion.

25         THE COURT:  Sustained.

1   Q.   (By Mr. McDaniel) If your TMDL or any TMDL

2   issued by the EPA, for that matter, calls for a

3   reduction of nonpoint source phosphorus load in the

4   Illinois River Watershed, what duty, if any, does

5   ODAFF have with regard to poultry feeding

6   operations?

7          MR. NANCE:  Well, same objection.  Calls

8   for a legal conclusion, and there's no foundation

9   that he knows the answer.  In fact, he says he

10  doesn't.

11         THE COURT:  Sustained.

12  Q.   (By Mr. McDaniel) Mr. Thompson, if -- assuming

13  -- assuming EPA fulfills the plans it has set forth

14  for a two-state TMDL, is it your understanding that

15  Oklahoma will take all necessary steps to fulfill

16  the requirements of that TMDL?

17  A.   I can speak for the DEQ, and the answer is yes.

18  Q.   Thank you.

19         MR. MCDANIEL:  I will pass the witness,

20  Your Honor.

21         THE COURT:  I take it you can't speak for

22  ODAFF.  Mr. Nance.

23         MR. ELROD:  Your Honor, I just have a few.

24         THE COURT:  I'm sorry.  Mr. Elrod.

25         MR. ELROD:  I just have a very few.

1                    **REDIRECT EXAMINATION**

2    BY MR. ELROD:

3    Q.   Does Oklahoma have -- I'm sorry, Mr. Thompson,

4    I'm John Elrod, and I represent Simmons Foods.   I

5    met you in the hallway about ten years ago in your

6    offices, but there's no reason why you would

7    remember that encounter.

8          Oklahoma has a governor.

9    A.   Yes.

10   Q.   Do you report to the governor?

11   A.   I report to the Environmental Quality Board,

12   and that board is appointed by the governor.

13   Q.   Yes, sir.  And does Secretary Peach report to

14   the governor?

15   A.   I'm not -- I'm not clear what those lines are.

16   Q.   Does Duane Smith report to the governor?

17         MR. NANCE:  Judge, this is beyond the scope

18   of cross certainly.

19         THE COURT:  Sustained.

20         MR. ELROD:  Your Honor, it has to do with

21   the power of the State of Oklahoma to do what needs

22   to be done, and I'm just --

23         THE COURT:  I understand.  It's beyond the

24   scope.

25         MR. ELROD:  All right.

1  Q.   (By Mr. Elrod)  The statement of joint

2  principles that was entered by Arkansas and

3  Oklahoma, does it not say in there, sir, that

4  Oklahoma will not ask Arkansas to do anything it

5  would not be willing to do itself?

6          MR. NANCE:  Again, beyond the scope,

7  Your Honor.

8          MR. ELROD:  No, Your Honor, it's not beyond

9  the scope.  It has to do with spending money.

10 Well --

11         THE COURT:  I wondered the same question,

12 frankly, Mr. Elrod, but it is beyond the scope.

13 Sustained.

14 Q.   (By Mr. Elrod)  My understanding of your

15 testimony, sir, was that your concern about the bias

16 created by the 30-day geomean in favor of nonpoint

17 sources because of the way that that mathematics --

18 that math occurs would cause, unfairly, Stillwell

19 and Tahlequah to spend money to upgrade their

20 facilities; was that not your testimony?

21 A.   Tahlequah and Westville.  Well, I don't know

22 that I said it would unnecessarily cause them to

23 spend money; I said that there was a bias in the way

24 that the TMDL was done.

25 Q.   Yes, sir.  And that the results of the TMDL may

1   require them to spend money to upgrade their

2   facilities:  Stillwell, Westville and Tahlequah?

3   A.   That's correct.

4   Q.   Are you aware, sir, that the cities of

5   northwest Arkansas, as a result of that statement of

6   joint principles, have spent hundreds and millions

7   of dollars to upgrade their facilities?

8   A.   I am aware that they have upgraded some of

9   their facilities.

10  Q.   Fayetteville has opened a new westside facility

11  that's state-of-the-art, cost over $100 million,

12  correct?

13  A.   I don't know the cost and I don't know -- I

14  know they've opened a new facility.

15  Q.   Rogers has spent money.  And Siloam Springs is

16  currently upgrading its plant, correct, sir?

17  A.   I don't know that specifically.

18  Q.   Would it be a violation of the joint statement

19  of principles for Oklahoma to refuse to upgrade

20  their facilities to meet the standards now being met

21  in Arkansas, sir?

22         MR. NANCE:  Objection.  Calls for a legal

23  conclusion, and it's beyond the scope.

24         THE COURT:  Sustained.

25         MR. ELROD:  That's all I have.

**REDIRECT EXAMINATION**

1
2  BY MR. HOPSON:

3  Q.   The ground has been well trampled, and I know

4  you want to get off to the dentist.  But I've just

5  got to ask you about the time line, okay,

6  Mr. Thompson.

7          How long have you been the head of the DEQ?

8  A.   Six and a half years.

9  Q.   Okay.  And that's far enough back that you'll

10  recall that this TMDL process actually started about

11  '03 or '04; isn't that right?

12  A.   I suspect that's right, yes.

13  Q.   To clarify, I'm talking about the specific

14  Oklahoma TMDL that was being started by your agency,

15  right?

16  A.   Um --

17  Q.   There's the EPA TMDL, and there's the Oklahoma

18  TMDL.  And we're focusing now on the Oklahoma TMDL.

19  That started back in '03 and '04, right?

20  A.   I don't have an independent recollection, I'm

21  sorry, of that.  But I wouldn't deny it.

22  Q.   Okay.  Do you recall that EPA had approved

23  something called a QAAP by 2004?

24  A.   Yes.

25  Q.   And tell His Honor what the QAAP is.

1  A.   It's the quality assurance plan by which any

2  activity would be done.

3  Q.   And by 2004, you'd also retained some

4  scientists at the university to do some preliminary

5  modeling in connection with the TMDL; isn't that

6  right?

7          MR. NANCE:   Judge, it's beyond the scope of

8  cross.

9          THE COURT:   I don't believe so.   Overruled.

10         THE WITNESS:   Yes.

11  Q.   (By Mr. Hopson)   Dan Storm was one of those

12  scientists, right?

13  A.   Yes.

14  Q.   And Dan Storm's report is actually one of the

15  things that caused you to have some concerns about

16  the unfairness inherent in the phosphorus criterion,

17  isn't it?

18  A.   What caused me to have concern was a report

19  given to me by my water quality division director

20  Jon Craig.   Mr. Craig may have -- that's what caused

21  my concern.

22  Q.   Well, let me ask the question this way:   Do you

23  know and do you recall that Dr. Storm actually

24  concluded that 100 percent litter export would have

25  no impact on meeting the phosphorus criterion in the

1   Scenic Rivers?  Do you recall that?

2        MR. NANCE:  Beyond the scope of cross, and

3   it's hearsay.

4        MR. HOPSON:  I'm asking if he recalls

5   something.  How can that be hearsay?

6        THE COURT:  Overruled.

7        THE WITNESS:  I do not.

8   Q.  (By Mr. Hopson)  You don't recall reading

9   Dr. Storm's report or that influencing your concerns

10  about this alleged unfairness in the phosphorus

11  criterion?

12  A.  No.

13  Q.  Do you recall Mr. Nance asking you about what

14  the outcome of a TMDL might be?  Do you recall those

15  questions?

16  A.  Yes.

17  Q.  And you said that there was no federal law that

18  could compel regulation of nonpoint sources; isn't

19  that right?

20  A.  Yes.

21  Q.  But you're not suggesting, by the absence of

22  federal law, that the State of Oklahoma would be

23  powerless to address nonpoint sources, are you?

24        MR. NANCE:  Objection, calls for a legal

25  conclusion.

 1           MR. HOPSON:  From the head of the DEQ,

 2    who's already testified about the law and the

 3    absence of federal law.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  I'm sorry, could you restate

 6    the question.

 7    Q.   (By Mr. Hopson)  Sure.  Let me set it up

 8    properly.  In the course of your cross-examination

 9    by Mr. Nance, he was asking you about what the

10    outcomes would be if a TMDL was done.  Do you recall

11    those questions?

12    A.   Yes.

13    Q.   And one of the things that you told us is that

14    there would be no federal law, as I understood you,

15    that would compel the regulation of nonpoint sources

16    as an outcome of the TMDL process.  Do I have that

17    right?

18    A.   That's correct.

19    Q.   And by testifying to that, and by testifying to

20    the absence of your agency's ability to regulate

21    poultry, you weren't suggesting to His Honor that

22    the State of Oklahoma, as a whole, is powerless to

23    deal with nonpoint sources, are you?

24    A.   My recollection is that I said if such

25    jurisdiction existed, it existed with the Department

1    of Agriculture.

2    Q.   So the answer to my question is, no, you

3    weren't suggesting to His Honor that the State of

4    Oklahoma is powerless to regulate nonpoint sources,

5    correct?

6            MR. NANCE:   Objection, asked and answered.

7            THE COURT:   Sustained.

8    Q.   (By Mr. Hopson)  Let me ask you this.  Last

9    thing I want to discuss.  I believe you said to

10   Mr. McDaniel that you were going to express, either

11   personally or through your agency on behalf of the

12   State of Oklahoma, the concerns you had about the

13   phosphorus criterion in the EPA TMDL process; is

14   that correct?

15   A.   That's correct.

16   Q.   That hasn't happened yet, as far as you know,

17   sir?

18   A.   No, it hasn't.  As far as I know, it has not.

19   Q.   But it's also true that nobody at the EPA has

20   said that their time line or their TMDL process is

21   going to wait on you and the Oklahoma resources --

22   Water Resources Board getting together on this

23   issue, right?

24           MR. NANCE:   Objection.  Calls for hearsay

25   and speculation on what the EPA has said or may have

1  said.

2          THE COURT:  Overruled.

3          THE WITNESS:  I'm sorry, would you repeat

4  the question, please.

5  Q.  (By Mr. Hopson)  Sure.  On the one hand, you

6  said -- and I understand and appreciate what you're

7  saying -- that for the EPA TMDL process, you wanted

8  to express your views, your concerns that you've

9  explained to us today about the way the 0.037

10  phosphorus criterion works, right?

11  A.  Yes.

12  Q.  And you're going to explain to the EPA the same

13  thing you explained to His Honor, Judge Frizzell,

14  today, right?

15  A.  That's correct.

16  Q.  My point is simply this:  While I appreciate

17  you're going to do that, you don't have any reason

18  to believe that the EPA's current timetables or the

19  hiring of its experts or the modeling that's going

20  on is going to wait for you and the Oklahoma Water

21  Resources Board to come to some conclusion on that

22  issue, do you?

23  A.  I don't have any way to know either way how

24  that discussion will impact what EPA does.

25  Q.  I have no further questions.  Thank you,

 1   Mr. Thompson.

 2          THE COURT:  I believe that covers the

 3   examination.  Mr. Thompson, thank you very much for

 4   being here today.  You're excused.

 5          MR. NANCE:  May I have a little recross,

 6   Your Honor?  I'll be very brief.

 7          THE COURT:  Well, of course, this is

 8   essentially reredirect.  You -- I'm sorry, no,

 9   you're entirely right.  I'm sorry.  The way this

10   came on, it confused -- you do have an opportunity,

11   I'm sorry.  You do have a recross.

12          MR. NANCE:  We're here in an unusual

13   posture, Your Honor.

14                  **RECROSS EXAMINATION**

15   BY MR. NANCE:

16   Q.   Sir, would you look at the EPA letter, which is

17   Defendants' Exhibit 8090.  Do you still have that in

18   front of you?

19   A.   This is the letter from EPA to Mr. Strong and

20   Ms. Marks?

21   Q.   Correct.

22   A.   Yes, I have it.

23   Q.   The first paragraph there about halfway down

24   mentions recent permitting activities involving the

25   Northwest Arkansas Conservation Authority.  Do you

```
 1  see that language?
 2  A.   I do.
 3  Q.   Are you familiar with that permitting activity?
 4  A.   Generally, yes.
 5  Q.   Is the Northwest Arkansas Conservation
 6  Authority a proposed new nonpoint source discharger
 7  in the watershed?
 8  A.   Yes.
 9  Q.   What action, if any, did the State of Oklahoma
10  or your agency take with regard to that permit?
11  A.   We --
12          MR. MCDANIEL:  Objection, scope,
13  Your Honor.
14          THE COURT:  Overruled.
15          THE WITNESS:  We commented that we believed
16  that it was inappropriate for any discharge -- or
17  that the discharge from this facility be allowed in
18  an impaired waterbody in the state of Arkansas.
19  Q.   (By Mr. Nance)  And has that been something of
20  an issue as between Oklahoma, Arkansas and the EPA?
21  A.   Yes.
22  Q.   In the next paragraph down, I think
23  Mr. McDaniel read a sentence, it begins on the third
24  line, "EPA's purpose in this effort is to provide a
25  technically sound basis upon which regulatory and
```

1    nonregulatory decisions can be confidently based

2    that will lead to reductions in nutrients from both

3    point and nonpoint..."  Do you see that?

4    A.   Yes.

5    Q.   Are the regulatory decisions that are mentioned

6    there those dealing with point sources?

7    A.   Yes.

8    Q.   Are the nonregulatory decisions there the ones

9    dealing with nonpoint sources?

10           MR. MCDANIEL:  I object, Your Honor.  In

11   the court's ruling in sustaining the objection, I

12   was not allowed to explore with Mr. Thompson the

13   agency's jurisdiction to deal with nonpoint sources

14   with regard to TMDLs.  So I think it's inappropriate

15   for Mr. Nance to have the liberty to do that.

16           MR. HOPSON:  And it calls for speculation,

17   Your Honor.

18           THE COURT:  The objection is sustained.

19   Q.   (By Mr. Nance)  On the top of the second page

20   of the letter, Mr. Thompson, where the EPA says, "We

21   expect this modeling effort may lead to the

22   development of one or more Total Maximum Daily Loads

23   for the Illinois basin," do you see that?

24   A.   Yes.

25   Q.   Is it your understanding that it is a done

1  deal, that the EPA will do a single TMDL for both

2  sides of the border?

3  A.   I believe that to be the goal.

4  Q.   Now, on Exhibit 8126, which was the

5  timetable --

6  A.   Yes.

7  Q.   How long have you been involved in

8  environmental protection in the state of Oklahoma?

9  A.   Twenty-five years.

10 Q.   During that 25 years, have you had an

11 opportunity to become acquainted with EPA's track

12 record in meeting its own deadlines?

13 A.   Yes.

14 Q.   Is that a good track record or a bad track

15 record?

16         MR. HOPSON:  Objection, Your Honor, calls

17 for opinion and speculation.

18         THE COURT:  I don't know how much

19 speculation is involved.  Overruled.  Go ahead.  You

20 may answer.

21         THE WITNESS:  I'm torn between answering

22 "rarely" and "never."

23         MR. NANCE:  Nothing further, Your Honor.

24         THE COURT:  I'm interested with the

25 nomenclature.  The Northwest Arkansas Conservation

 1  Authority, that's basically a wastewater treatment

 2  group?

 3          THE WITNESS:  Wastewater treatment plant at

 4  Bentonville.

 5          THE COURT:  Okay.  We're in 1984, ladies

 6  and gentlemen.  Now, I'm sure you're aware of Siloam

 7  Springs.  I've had lots of testimony here with

 8  regard to the wastewater treatment plant there

 9  dumping into Sager Creek which then dumps into Flint

10  Creek.  Are you aware of the -- where they are in

11  the process?

12          THE WITNESS:  This is Siloam Springs,

13  Arkansas?

14          THE COURT:  Yes.

15          THE WITNESS:  No, I'm not.

16          THE COURT:  All right.  You may be excused.

17          THE WITNESS:  Thank you very much, sir.

18          THE COURT:  Dr. Sullivan, you're back.

19          Go ahead, Mr. Bullock.

20          MR. BULLOCK:  Good morning, almost.

21          THE WITNESS:  Good morning, Mr. Bullock.

22                      **CROSS-EXAMINATION**

23  BY MR. BULLOCK:

24  Q.   Doctor, in terms of the scope of your

25  expertise, do you regard yourself as an expert in

1  watershed modeling?

2  A.   I've been involved in a great many projects on

3  watershed modeling, but I'm not a modeler.

4  Q.   So in terms of listing your expertise, it

5  wouldn't be as a watershed modeler, would it?

6  A.   I think I would list it as I have substantial

7  expertise in watershed modeling, but I do not sit at

8  the computer and run a watershed model.

9  Q.   Have you ever run watershed models?

10  A.   No.

11  Q.   How about as a soil scientist, do you regard

12  yourself as being an expert in soil science?

13  A.   A large amount of the work that I do on

14  watersheds, which is much of what I do, involves

15  both modeling and the work on soils.  I have been

16  involved in conducting soil surveys and instructing

17  federal personnel how to conduct soil surveys.  I

18  published research in the Soil Scientist Society of

19  America Journal.

20         So I have a fair amount of expertise in

21  terms of soils.  But, again, I would not classify

22  myself as a soil scientist but, rather, as an

23  environmental scientist, part of which is soils.

24  Q.   Do you regard yourself as an expert in geology?

25  A.   Again, the environmental work that I do does

1    involve geology, not as much probably as it involves

2    soils, but I've done a number of studies that have a

3    strong geological component, and published the

4    research on some of that in the scientific

5    literature.

6            So I don't regard myself as a geologist,

7    but I would say that as an environmental scientist,

8    I have a fair amount of understanding and expertise

9    in geology.

10   Q.   Do you regard yourself as an expert in

11   limnology?

12   A.   I would say that the majority probably, or at

13   least a large percentage of my publications are

14   limnological publications.  So I certainly regard

15   myself as an expert in limnology.  But I don't

16   classify myself -- I don't pigeonhole myself into

17   these various categories but, rather, classify

18   myself as an environmental scientist, which includes

19   these categories.

20   Q.   Have you ever assessed the eutrophic state of

21   lakes?

22   A.   I have evaluated nutrients in lakes, but I

23   would not --

24   Q.   Sir, please --

25   A.   -- I would not say that I classified lakes

1  relative to the trophic status, no.

2  Q.   Do you regard yourself as an expert in

3  hydrology?

4  A.   Again, I do have a lot of expertise in

5  hydrology.  I publish in the Journal of Hydrology.

6  I've conducted a lot of studies with a very strong

7  hydrological component, but I do not classify myself

8  as a hydrologist.

9  Q.   Do you regard yourself as a statistician?

10  A.   I have a fair amount of experience in

11  statistics, but I do not call myself a statistician.

12  Q.   Okay.  So let me be sure that I have this

13  right.  You consider yourself as having expertise in

14  watershed modeling, soils, geology, limnology,

15  hydrology, and statistics?

16  A.   That's correct.  That's called

17  multidisciplinary environmental science.

18  Q.   And those projects where there are substantial

19  questions of, for instance, geology, do those

20  projects generally involve somebody that would be

21  considered an expert in geology?

22  A.   Are you speaking of the projects that I have

23  worked on?  Is that the question?

24  Q.   Yes, sir.

25  A.   I would say that probably the most prominent

1  project I worked on that included a very strong

2  geological component, which was for the Southern

3  Appalachian Mountains Initiative, part of the work I

4  did for them, and I had a geological publication

5  from that, I collaborated with a scientist who would

6  also classify himself as an environmental scientist

7  rather than a geologist.  But I would acknowledge

8  that that scientist did have a lot of involvement in

9  the geological aspects of that project.  We did it

10  together.

11  Q.   That's generally the way these projects work is

12  that because they are multidisciplinary, they

13  involve people with multiple disciplines, correct?

14  A.   It depends on the project.  A great many of the

15  projects that are in my resume and projects that

16  I've talked about involved myself as not only the

17  lead scientist but the only Ph.D.-level scientist.

18  So many of the multidisciplinary environmental

19  projects I've conducted where I would not have had

20  the involvement and participation of other

21  Ph.D.-level scientists.

22        But on the other hand, there also are a

23  number of projects that I've done that did involve

24  collaboration with multiple scientists; in some

25  cases, as many as ten, from a variety of

1  disciplines.  So it depends on which project you're

2  speaking of.

3  Q.   Depends on the scope of the project and how

4  technical the issues are in that project, correct?

5  A.   I think those would be two of the things involved.

6  There would be many other considerations as well in terms

7  of how I would go about selecting other scientists to

8  collaborate with on one of my projects.

9  Q.   In performing your work in this case, did you direct

10  or collect yourself any environmental samples?

11  A.   Did I collect environmental samples?  No.

12  Q.   Did you direct anyone else to?

13  A.   No.

14  Q.   Did you ask for any environmental data other than

15  reviewing the -- let me rephrase.

16         Did you ever ask for any environmental samples

17  to be taken?

18  A.   I would not say I asked for environmental samples to

19  be taken.  I would say I discussed the possibility of

20  collecting environmental samples, and I also discussed

21  the environmental samples that may have been collected in

22  conjunction with some work by Jim Chadwick for the

23  defendants.

24  Q.   Doctor, just to help set the -- prepare the setting

25  here in terms of the issues we're going to deal with,

1   would you pull out your exhibits.  And I'm looking behind

2   tab 18.  It is DJX633-0031 is the first of the exhibits

3   behind that tab.  There are several.

4   A.   Yes, sir.

5   Q.   These are the pictures that you took.  And you

6   offered them concerning areas which might be subject to

7   erosion, correct?

8   A.   I did not take these pictures.

9   Q.   Okay.  You were there when these pictures were

10  taken?

11  A.   That's correct.

12  Q.   And you're representing to this court that these are

13  an accurate depiction of these scenes as you viewed them

14  that day?

15  A.   That's correct.

16  Q.   And when I look at the first picture, that is

17  633-0031, I see that in those sunlight areas, the water

18  there is green.  Is that what you recall seeing that day?

19  A.   My recollection would be that this --

20          MR. ELROD:  Can we all see?

21          MR. BULLOCK:  Could you put up 633-0031 of the

22  defendants'.  Why don't we wait for the gallery to catch

23  up.  Would it help for the moment if we just have the

24  defendants stick it up and --

25          THE COURT:  Tell you what, Mr. Bullock, we're

1   sitting at straight up noon, let's just take a recess and

2   we'll get back to the picture after lunch.

3           MR. BULLOCK:  Thank you, Your Honor.

4           (Whereupon a recess was had.)

5

6                   REPORTER'S CERTIFICATE

7   I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

8   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

9   MATTER.

10

11                          S/Terri Beeler
                            Terri Beeler, RMR, FCRR
12                          United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25