IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )   No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )




VOLUME 90 - AM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 11, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE






*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                        *United States Court Reporter*


**United States District Court**

10429

1                           A P P E A R A N C E S

2

3   For the Plaintiffs:          MR. W.A. DREW EDMONDSON
                                 MS. KELLY FOSTER
4                                Office of Attorney General
                                 State of Oklahoma
5                                313 N.E. 21st St.
                                 Oklahoma City, OK  73105

6

7                                MR. DAVID RIGGS
                                 MR. DAVID P. PAGE
8                                MR. RICHARD T. GARREN
                                 Riggs Abney Neal
9                                Turpen Orbison & Lewis
                                 502 W. 6th Street
10                               Tulsa, OK 74119

11

12                               MR. ROBERT A. NANCE
                                 MS. KELLY FOSTER
12                               Riggs Abney Neal
                                 Turen Orbison & Lewis
13                               5801 Broadway
                                 Oklahoma City, OK 73118
14

15

16                               MR. LOUIS W. BULLOCK
                                 MR. ROBERT BLAKEMORE
16                               Bullock Bullock &
17                               Blakemore
                                 110 W. 7th St.
18                               Suite 770
                                 Tulsa, OK 74119
19

20                               MR. FREDERICK C. BAKER
                                 MS. ELIZABETH CLAIRE XIDIS
21                               MS. INGRID L. MOLL
                                 Motley Rice LLC
22                               28 Bridgeside
                                 P.O. Box 1792
23                               Mount Pleasant, SC 29465

24

25

United States District Court

```
 1              A P P E A R A N C E S  (Cont.)

 2

 3   For Tyson Foods:          MR. ROBERT W. GEORGE
                               Tyson Foods, Inc.
                               2210 West Oaklawn Drive
 4                             Springdale, AR 72701

 5
                               MR. FRANK R. VOLPE
 6                             MR. MARK D. HOPSON
                               MR. THOMAS C. GREEN
 7                             MR. JAY THOMAS JORGENSEN
                               MR. GORDON D. TODD
 8                             ERIC J. IVES
                               CARA R. VIGLUCCI LOPEZ
 9                             Sidley Austin LLP
                               1501 K St. NW
10                             Washington, DC 20005

11
                               MR. PATRICK MICHAEL RYAN
12                             Ryan Whaley Coldiron and
                               Shandy PC
13                             119 N. Robinson, Rm 900
                               Oklahoma City, OK 73102
14

15
     For Cargill:              MR. JOHN H. TUCKER
16                             MS. THERESA HILL
                               Rhodes Hieronymus Jones
17                             Tucker & Gable
                               100 W. 5th St., Ste 400
18                             Tulsa, OK 74103

19                             MR. DELMAR R. EHRICH
                               MS. KRISANN KLEIBACKER LEE
20                             Faerge & Benson
                               90 S. 7th St., Ste 2200
21                             Minnaepolis, MN 55402

22

23   For Simmons Foods:        MR. JOHN R. ELROD
                               MS. VICKI BRONSON
24                             Conner & Winters
                               211 E. Dickson St.
25                             Fayetteville, AR 72701
```

**United States District Court**

10431

```
 1              A P P E A R A N C E S  (Cont.)

 2

 3    For Peterson Farms:        MR. A. SCOTT MCDANIEL
                                 MR. PHILIP HIXON
                                 MS. NICOLE LONGWELL
 4                               McDaniel Hixon Longwell &
                                 Acord PLLC
 5                               320 S. Boston, Ste 700
                                 Tulsa, OK 74103

 6

 7

 8    For George's:             MR. GARY V. WEEKS
                                MR. WOODY BASSETT
                                MR. VINCENT O. CHADICK
 9                              MS. K.C. TUCKER
                                Bassett Law Firm
10                              P.O. Box 3618
                                Fayetteville, AR 72702
11

12

13    For Cal-Maine:            MR. ROBERT SANDERS
                                Young Williams P.A.
                                P.O. Box 23059
14                              Jackson, MS 39225

15

16                              MR. ROBERT P. REDEMANN
                                Perrine McGivern Redemann
                                Reid Berry & Taylor PLLC
17                              P.O. Box 1710
                                Tulsa, OK 74101
18

19

20

21

22

23

24

25
```

10432

1                              I N D E X

2

3                                                    Page

4

5      *WITNESSES ON BEHALF OF THE DEFENDANTS*

6

7      **MICHAEL DICKS, PH.D.**

       Direct Examination by Mr. Elrod              10440
8      Cross-Examination by Mr. Garren              10501

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     _____

**United States District Court**

1    Monday, January 11, 2010

2    * * * * *

3    THE COURT:  We had our pretrial in the

4    criminal matter Friday.  It is going to trial.  That

5    would have been only a three-day week for you anyway,

6    and it's likely that that case will take three days as

7    well.  It's a child pornography-type case.

8    Mr. Green.

9    MR. GREEN:  Well, that probably impacts

10   a little bit of what I was going to discuss with you

11   this morning, and that is to give you some further

12   insight into our assessment on the schedule.

13   THE COURT:  Yes, sir.

14   MR. GREEN:  We have four witnesses left,

15   Your Honor.

16   THE COURT:  Yes, sir.

17   MR. GREEN:  Mike Dicks from OSU; Tim

18   Sullivan, one of our experts; Herman Gibb, one of our

19   experts, and Mike McGuire, one of our experts.

20   It's our best assessment that we will finish

21   all that testimony, both direct and cross, fingers

22   crossed, by the end of Wednesday, although there could

23   be some spillover to Thursday of this week.  We were

24   contemplating asking the plaintiffs to provide us as

25   much guidance as they could about rebuttal and the

1    length of rebuttal and disclosures concerning any

2    rebuttal.  It was our contemplation that rebuttal

3    would be reasonably brief and to the point and we

4    were banking on perhaps a day or day and a half of

5    rebuttal because we have some serious reservations

6    about whether there is room for a lot of rebuttal in

7    this case.

8         That would take us into the early part of

9    next week, absent what you just told us.  And then I

10   was going to suggest that we all stay here and we

11   would make a -- at the close of the evidence we would

12   renew or motions but it would be a formality, it would

13   not be any real extensive argument at all, but to

14   renew our motions for the record.

15        And then we had caucused and decided to

16   abandon asking you for the opportunity to submit any

17   briefs and instead ask you if we could move directly

18   to closing, the more orthodox and traditional format,

19   because we're all here and the evidence is fresh in

20   everyone's mind.

21        Now that scheduling now is a little bit

22   skewered by virtue of your schedule, unless there was

23   any possibility -- and I don't mean to be

24   presumptuous -- that perhaps that -- if we could

25   finish next week whether that trial could be pushed a

 1  week.  But, I mean, I --

 2          THE COURT:  As you know having, as I

 3  understand it, lots of criminal experience, those

 4  matters take priority.

 5          MR. GREEN:  Yeah.

 6          THE COURT:  So we need to attend to

 7  that.  This will afford you all the opportunity to

 8  embrace this massive amount of evidence and maybe put

 9  it in a better perspective and edit in your own minds

10  that which is most important --

11          MR. GREEN:  Right.

12          THE COURT:  -- and try to put it

13  together.  I think by taking a few days and actually

14  thinking about all this, it will distill it perhaps a

15  bit better.  So let's approach it in that fashion.

16          MR. GREEN:  Okay.  And then the last

17  observation is simply that with respect to time for

18  closing, we feel, given what plaintiffs have

19  indicated, that we're in for with your indulgence

20  probably a full day, we think that collectively the

21  defendants will need somewhere between three and three

22  and a half hours to get everyone their opportunity to

23  talk specifically about their own client.

24          THE COURT:  So we're basically talking a

25  full day for both sides?

 1          MR. GREEN:  Full day of closing.

 2          THE COURT:  For a case like this, I

 3  don't think that's unreasonable.

 4          MR. GREEN:  It would be helpful if, you

 5  know -- at some time before we adjourn this week, it

 6  would helpful to us if we could somehow, you know,

 7  schedule these remaining days, I mean, you know, when

 8  we will reconvene for rebuttal, how many days and when

 9  closing will be.  Because we have, you know, a big

10  logistical operation here and we have to keep that

11  kind of running until --

12          THE COURT:  Well, we may well have

13  rebuttal beginning next week --

14          MR. GREEN:  Well, that would be -- I

15  mean, that would be great.

16          THE COURT:  -- if your correct.  And

17  then if it works out that way, then we begin with

18  argument on the 25th; correct?

19          MR. GREEN:  Yes.  So you would

20  contemplate that next week we're off the entire week?

21          THE COURT:  I think without question.

22  It's a three-day week because of Martin Luther King.

23  The prosecution has eleven witnesses.  They're going

24  to bring them in from Peru, you know, and they have to

25  bring these officers in to show that these are truly,

 1   you know, little girls under the age of ten, that sort

 2   of thing.

 3                   MR. GREEN:  Yeah, yeah.  Okay.

 4                   THE COURT:  So --

 5                   MR. GREEN:  All right, sir.  Thank

 6   you.

 7                   THE COURT:  Mr. Bullock.  Just one

 8   second.  I'm sorry.

 9              *(Discussion held off the record)*

10                   THE COURT:  The rulings on the Peach

11   deposition will be entered here within the next half

12   hour.  So I take it Peach is another witness in

13   addition to the four; correct?

14                   MR. GREEN:  Yes.

15                   THE COURT:  All right.  Mr. Bullock.

16                   MR. BULLOCK:  We are working on -- we

17   first got notice that they might wrap up this week

18   yesterday and we're working on the rebuttal.  I think

19   probably Mr. Green's right in terms of I would expect

20   a day and a half of rebuttal.  Those things that we're

21   talking about are appropriately discreet.  It's a

22   matter of getting witnesses and scheduling them, and

23   I'm not quite sure where that process is this morning.

24              As for the schedule, though, in terms of

25   argument and briefing, it's just -- the court might

1    consider something that I know I've had in several of

2    these bench trial cases, that we file our findings,

3    which the court has said ten days after the close of

4    the evidence, and that we then have argument.

5         That might allow the court -- the parties,

6    first of all, to do what the court suggests, and that

7    is to work through this pile of evidence and sort out

8    what they see as most important concepts for the court

9    to grasp, and also for the court to then be in a

10   position to be able to anticipate and ask us

11   questions.  It is my belief on oral argument is that

12   if it serves any purpose, it is to give the judge a

13   chance to question the lawyers so that we can give him

14   our view of the things which are concerning the bench.

15        So that's my suggestion in terms of how we

16   might handle that part.

17             THE COURT:  That's compelling.  As

18   you've all experienced here, there are so many issues

19   that in many cases, as the court's been presented with

20   certain issues and had an opportunity really to focus

21   on a particular issue, there's been more clarity than

22   one previously understood.  There are just so many

23   individual issues you have to focus on them one at a

24   time to really get your arms around this case.  So

25   there's some merit in that suggestion.

 1          And, Mr. Green, I take it that you've not

 2   been presented with that suggestion until now?

 3              MR. GREEN:  No.  I heard that from

 4   Mr. Bullock moments before Your Honor came to the

 5   bench.

 6          I can't speak for the group, but I know the

 7   consensus from this morning was strongly held that we

 8   would like to have argument as close as possible to

 9   the end of the -- end of the case, believing that the

10   evidence would be as fresh as possible in everyone's

11   mind and it would be the best possible --

12              THE COURT:  It may be impossible going

13   back to September.

14              MR. ELROD:  We want a hot jury, Your

15   Honor.

16              THE COURT:  Well, let's see how things

17   play out this week.  Obviously, if we don't get on all

18   the rebuttal, then that plays havoc with the one

19   suggestion.

20          So let's take our first witness.

21              MR. ELROD:  Call Dr. Michael Dicks.

22          **MICHAEL R. DICKS, PH.D.,**

23   *after having been first duly sworn, says in reply to*

24   *the questions propounded as follows, to-wit:*

25              THE COURT:  State your full name for the

 1  record, please.

 2              THE WITNESS:  Michael Richard Dicks.

 3                    **DIRECT EXAMINATION**

 4  **BY MR. ELROD:**

 5      Q.   Good morning, Dr. Dicks.

 6      A.   Good morning.

 7      Q.   How are you, sir?

 8      A.   Pretty good.

 9      Q.   Start with your qualifications and your

10  educational background.  You did testify at the PI

11  hearing in this case; is that correct, sir?

12      A.   That's correct.

13      Q.   And is a lot of your testimony today going to

14  be along the same lines as your PI testimony?

15      A.   I believe so.

16      Q.   And, Doctor, are we going to try to

17  accomplish your direct in about an hour?

18      A.   I would hope.

19      Q.   Yes, sir.  Doctor, what is your educational

20  background, please?

21      A.   I have a bachelor's degree in animal science

22  and in biochemistry from California Polytechnic State

23  University, and a master's degree and Ph.D. in

24  agricultural economics from the University of

25  Missouri.

1    Q.   And what was your master's thesis?

2    A.   My master's thesis was about the

3  waste methane production from waste in Tunisia.

4    Q.   And what was your doctoral thesis?

5    A.   The doctoral thesis pertained to conservation

6  programs -- the conservation easement program, now the

7  Conservation Reserve Program, as it applied and the

8  impacts of the program on the corn belt in the United

9  States.

10    Q.   Dr. Dicks, I have -- there's a note right

11  here that says "slow down."  That's for both of us.

12    A.   I got a big one right up here, John.

13    Q.   All right.  Thank you.  What's your current

14  employment, sir?

15    A.   I'm currently the Lou and Wes Watkins Endowed

16  Chair of International Trade and Development at

17  Oklahoma State University.

18    Q.   Wes Watkins was the well-known Oklahoma

19  congressman?

20    A.   Yes, sir.

21    Q.   So what is your area of specialization, if

22  you have one, at OSU right now?

23    A.   My specialty area has been, and continues to

24  be, agricultural policy and within that my area is

25  land use.

1      Q.   And you've been at OSU since 1989; is that

2    correct, sir?

3      A.   That's correct.

4      Q.   What courses -- what senior-level courses do

5    you teach?

6      A.   I teach a senior-level course in American

7    agricultural policy and one in advanced farm and ranch

8    management.

9      Q.   And what does the advanced farm and ranch

10   management class entail, sir?

11     A.   Basically, that class prepares the students

12   to be able to do a business plan and a financial

13   analysis of farming and ranching operations.

14     Q.   How many students do you have in that class?

15     A.   It depends on the year.  Somewhere between 20

16   and 45.

17     Q.   And from how many states are they in the

18   United States?

19     A.   There's a number of -- over the years, I

20   think we've probably had students from as many as 40

21   different states.

22     Q.   What do you have them do in that class?

23     A.   Each student is required as a -- as a project

24   to do an actual business plan and financial analysis

25   of a specific farm, ranch, or agribusiness.

1    Q.   All right.  Do they normally make those plans

2    based on their own individual backgrounds?

3    A.   Some of them do their own family farms, some

4    of them find farms other places, and sometimes they

5    come to me and ask me for farms or ranches or

6    agribusinesses that they can do.

7    Q.   Have you also been involved in something

8    called the "Great Plains Agricultural Policy

9    Center"?

10   A.   That's correct.

11   Q.   What is that?

12   A.   One of my former colleagues and I started

13   that center at Oklahoma State University, I believe,

14   in 1990.  I was the director of that center for five

15   years.  The purpose of that center was to provide

16   Congress with the economic analysis of various farm

17   programs and policies.

18   Q.   And have you worked in Washington, D.C. for

19   periods of time?

20   A.   Yes, sir.

21   Q.   Tell the judge what your USDA experience is.

22   A.   I was employed by United States Department of

23   Agriculture's Economic Research Service for about five

24   years.

25   Q.   Between what year and what year?

1      A.   From 1984 to 1989, I believe.

2      Q.   Immediately prior to coming to OSU?

3      A.   Correct.

4      Q.   All right, sir.  And what did you do while

5   you were at the Department of Agriculture, please?

6      A.   My first assignment there was as a natural

7   resource policy analyst.

8      Q.   What does a natural resource policy analyst

9   do when he shows up for work at nine o'clock in the

10  morning.

11     A.   Well, a natural resource policy analyst

12  actually shows up to work at about five o'clock in the

13  morning and stays until about ten at night, seven days

14  a week.

15     Q.   All right.

16     A.   But what we're there to do is, we work for

17  the Secretary of Agriculture and he needs guidance on

18  farm programs and policies, and so those things that

19  Congress envisions doing or that the Secretary of

20  Agriculture envisions doing come to us for analysis.

21     Q.   And have you also advised Congress on farm

22  bills?

23     A.   I have.

24     Q.   What farm bills?

25     A.   1981, 1985, 1990, 1996, 2002, and 2008.

1      Q.   I take it a new farm bill occurs about twice

2   a decade?

3      A.   It has recently, yes.

4      Q.   All right, sir.  And what has been your role

5   in terms of the farm bills?

6      A.   As I said, it's varied depending on what

7   position I've held.  When I was at the University of

8   Missouri, a lot of that was for Senator Bond of

9   Missouri who was on that Senate agricultural

10   committee.  While I was with the Department of

11   Agriculture, it was mostly for the secretary.  And

12   while I've been at OSU, it's been for various

13   representatives and senators.

14      Q.   Have you testified before Congress?

15      A.   Yes, I have.

16      Q.   Approximately how many times?

17      A.   Oral testimony -- the total amount of times

18   that I've addressed Congress has been about ten times.

19   Orally I think five, six times and the others were

20   written.

21      Q.   Have you been involved in the CREP program,

22   Conservation Reserve -- what is CREP?

23      A.   It's the Conservation Reserve Enhancement

24   Program.

25      Q.   All right, sir.  Tell the judge about your

 1    involvement in CREP.

 2        A.   Well, CREP is a component of the Conservation

 3    Reserve Program.  The Conservation Reserve Program is

 4    a program that I instigated in 1982.  It became a

 5    program and the first conservation title in the 1985

 6    Food Security Act.  That program then -- later on that

 7    Conservation Reserve Enhancement Program was brought

 8    forth, I think, in 2002 to provide states the ability

 9    to look at specific environmental concerns that they

10    had that weren't specifically covered by the

11    Conservation Reserve Program.

12            That's a cost-share program where the state

13    provides so much money for that program and the

14    Federal Reserve -- or the federal government provides

15    the addition, and usually that's in about a 20 to 80

16    percent or 25 to 75 percent ratio.

17        Q.   What was your role in developing the CREP

18    program?  Were you there at day one?

19        A.   Let's see.  What was my role?  Basically, all

20    I did was do some of the analysis to show what could

21    be done with the Conservation Reserve Program as a

22    point in looking at the Conservation Reserve Program

23    itself.

24        Q.   All right, sir.  And have you been involved

25    in obtaining research grants for OSU?

1          A.   Yes.

2          Q.   Approximately how many dollars over time?

3          A.   Over 2 million.

4          Q.   Have you also been involved in the

5     development of economic models?

6          A.   Yes, I have.

7          Q.   Start -- how many?  Two or three?

8          A.   Three or four.

9          Q.   All right.  Just briefly tell the court what

10    they are and what they do?

11         A.   The first model system that I developed goes

12    back to my days in the USDA Economic Research Service.

13    It was called a resource allocation summary system.

14    That model was a linear programming model that helped

15    analysts look at the changes in the spatial use of

16    land given various policies.

17         Q.   What else?

18         A.   Second model was a model -- in the old days,

19    we had -- when we had microcomputers and we had a

20    large mainframe, it took many hours to run a lot of

21    these large models, and one of the models we had was

22    the IMPLAN model, which is an input/output model, a

23    spatial equilibrium type of model --

24         Q.   Are you going to use the IMPLAN model in your

25    testimony here today, sir?

**United States District Court**

1           A.   I am.

2           Q.   All right.  Go ahead.

3           A.   And as an analyst, we're required constantly

4    to look at the economic consequences of commodity

5    programs on various congressional districts.

6           Q.   Various what?

7           A.   Congressional districts.  So in order to do

8    that, we use the IMPLAN model.  And rather than having

9    to fly out to Fort Collins where the mainframe model

10   was kept, I developed a comprehensive model that was a

11   micro -- a microcomputer version of that model that

12   allowed you to look at changes in wheat demand,

13   changes in corn demand, those commodities, anything in

14   the agricultural sector, and be able to determine what

15   the multiplier impacts of that would be.

16          Q.   All right, sir.  What other models have you

17   been instrumental in developing?

18          A.   The model that's most widely used continually

19   today is called "POLYSIS."  That model started with

20   Dr. Darrell Ray, who did the demand component of that,

21   and I did the supply component of that.  That model

22   was built at Oklahoma State University and now resides

23   at University of Tennessee.

24          Q.   All right, sir.  Have you -- are you

25   peer-reviewed?

1       A.   Yes, sir.

2       Q.   Approximately how many peer-reviewed articles

3   have you written?

4       A.   In the journals, I have over thirty

5   peer-reviewed journals, and in periodicals, various

6   USDA publications, I probably have over a hundred.

7       Q.   And presentations?

8       A.   Well over a hundred.

9       Q.   Do you have any current involvement with the

10  USDA?

11      A.   I do.  I still advise and do work for Farm

12  Service Agency, Natural Resource Conservation Service,

13  and Economic Research Service.

14      Q.   And what about the Department of Energy; do

15  you do any work with it?

16      A.   Yeah.  Currently, I'm in charge of the data

17  and GIS component of the Sun Grant Initiative for the

18  Department of Energy.

19      Q.   Are you, yourself, a farmer?

20      A.   I am.

21      Q.   What kind of a farmer are you, sir?

22      A.   I'm not a very good one apparently.

23      Q.   All right.  What --

24      A.   I raise -- I raise purebred Angus cattle, do

25  a little bit of small grain production and hay.

1        Q.    How long have you been doing that?

2        A.    How long have I been farming or --

3        Q.    How long have you been --

4        A.    I've had this particular operation since

5   1990, Cimarron Dunes Angus.

6        Q.    Is it near Stillwater?

7        A.    It is.

8        Q.    Where you live?

9        A.    That's correct.

10       Q.    Do you live on the farm?

11       A.    I do.

12       Q.    All right.  Do you advise on agricultural

13   issues in other countries in the world?

14       A.    Yes, sir.

15       Q.    Such as?

16       A.    The countries?

17       Q.    Yes, sir.

18       A.    Currently, I'm working in Costa Rica, Sierra

19   Leone, Kenya, Mozambique, South Africa, Rwanda.

20       Q.    What do you do when you advise in those

21   countries?  Are you advising their governments or are

22   you advising the United States?  What are you doing,

23   please?

24       A.    It depends.  In some case, I'm advising the

25   government in terms of policy.  In some cases, I'm

 1   working with local farm groups or local cooperative

 2   groups.  And sometimes I'm working for our country or

 3   NGOs.

 4            I should have thrown in Afghanistan.  I'm

 5   also working with Oklahoma National Guard in

 6   Afghanistan.

 7        Q.   The Oklahoma National Guard in Afghanistan?

 8        A.   Yes, sir.

 9        Q.   What are you doing?

10        A.   I don't want to go into a lot of detail.  I'm

11   not sure what I can or can't say.  But --

12        Q.   We'll keep it --

13        A.   Yeah.  We've shifted kind of our emphasis

14   into more economic development with our military, and

15   the Oklahoma National Guard is an area of Afghanistan

16   trying to work with the people, much like a Peace

17   Corps volunteer would, in developing local

18   agricultural production.

19        Q.   Were you in the Peace Corps?

20        A.   Yes, sir.

21        Q.   What years?

22        A.   1976 to 1969, about three and a half years.

23        Q.   And where were you?

24        A.   In Kenya.

25        Q.   Dr. Dicks, did you work on this matter with

 1  Dr. Rausser?

 2       A.   Yes, sir.

 3       Q.   And was your report joint?

 4       A.   Yes, it was.

 5       Q.   Did both of you work on it together?

 6       A.   We did.

 7       Q.   In its totality?

 8       A.   Correct.

 9       Q.   You split out your responsibilities in terms

10  of testifying in this courtroom; is that true, sir?

11       A.   That's correct.

12       Q.   What is it that you're going to address with

13  the court today?

14       A.   I'm going to address the economic impacts of

15  the removal of the poultry litter within the IRW on

16  the farmers and the economy of the IRW.

17       Q.   And in order for you to do that, has it also

18  been necessary that you make a rough calculation of

19  the STP levels in the watershed spread evenly over the

20  entire pastureland available to receive chicken

21  litter?

22            MR. GARREN:   Leading, Your Honor;

23  objection to form.

24            THE COURT:   Sustained.

25       Q.   *(BY MR. ELROD)*  Have you -- tell the court

 1    what you've done in terms of calculation of

 2    approximate STP values in the watershed.

 3        A.   In order for me to come up with a value to

 4    put into -- a value of change and final demand in the

 5    IMPLAN model, I had to come up with a statistical

 6    approximation for an average value of STP in the

 7    watershed.

 8        Q.   All right.  To determine whether or not any

 9    is still needed?

10        A.   That's correct.

11        Q.   Now, to be perfectly clear, tell the court in

12    terms of whether you looked at all the pastureland

13    available in the entire watershed to make this

14    calculation.

15        A.   Right.  We did not measure the STP value on

16    any single field.  What we did was determine if

17    the -- if you applied the litter uniformly across the

18    watershed in that standpoint, what would be the STP

19    value that would have been there?

20        Q.   And you've gone back to 1974 in making those

21    calculations; is that correct?

22        A.   That's correct.

23        Q.   All right.  We're going to get into that

24    obviously in a greater particularity in a few minutes.

25             MR. ELROD:  April, would you put up

 1   Demonstrative 360, please?

 2       Q.   *(BY MR. ELROD)*  Okay.  This is a little bit

 3   busy.  What role does the chicken litter play in the

 4   economy of the IRW?

 5       A.   I think the main point of this slide here,

 6   the nutrient value flow in the IRW, is that really you

 7   have a substance, poultry litter, that is a source of

 8   nutrients.  That source of nutrients, the value of

 9   that, is captured and enhanced through the production

10   of forage and the production of hay.  The value of the

11   forage and the hay is enhanced and captured through

12   the production of cattle by consuming that which is

13   sold which provides income for farmers.

14       Q.   All right.  Let's examine these boxes before

15   we get into this in any greater depth, and we're going

16   to come back and revisit this chart in a few minutes.

17          The upper left-hand box says, "poultry

18   provides 295,000 tons of litter"; correct?

19       A.   That's correct.

20       Q.   Where did you get that number?

21       A.   That number was contributed by Billy Clay.

22       Q.   All right.  And if, in fact, the true

23   number -- and I suppose God would only know -- is

24   354,000 tons of litter, does that affect your analysis

25   or is it the same analysis?

1      A.   The analysis would be the same; the outcome

2   might be different.

3      Q.   All right.  Now, if we move to the -- well,

4   would it be different in terms of your ultimate

5   conclusions in this case?

6      A.   Yes.

7      Q.   All right.  Numerically?

8      A.   Numerically.

9      Q.   All right.  We'll talk about that.

10          Move to the right, please.  That box says,

11  "Required forage 2.26 tons per acre."  What is forage?

12     A.   Well, forage is the plant material that

13  cattle consume directly off the land.

14     Q.   By grazing?

15     A.   By grazing.

16     Q.   We'll talk about hay in a second; correct?

17     A.   Correct.

18     Q.   So where did you get the number 2.26 tons per

19  acre being required for forage?  We're going to get

20  into the analysis of the number, but just --

21     A.   Sure.

22     Q.   -- what's the purpose of that number?

23     A.   Well, in order -- in order to feed the number

24  of animals that are in the watershed -- and they would

25  be fed eight months of the out year on that pasture --

1    you'd have to have 2.26 tons per acre on the acres

2    that are available uniformly across the watershed in

3    order to provide the green material for those eight

4    months to feed all those animals.

5        Q.   Then the lower right-hand corner says,

6    "Required hay 1.92 tons per acre"?

7        A.   That's correct.

8        Q.   What's the purpose of that box?

9        A.   The 1.92 tons per acre is the amount of hay

10   that would be required again to feed those animals

11   over a four-month hay-feeding period.

12       Q.   Okay.  And then we move to the lower center

13   box.  Is that the number of cows that you are trying

14   to feed in the watershed with your proposition?

15       A.   That's correct.

16       Q.   And where did you get that number?

17       A.   Again, those numbers were provided by Billy

18   Clay.

19       Q.   All right, sir.  And then the dollar sign is

20   representative of economic impacts of moving these

21   numbers around?

22       A.   Right.

23       Q.   All right, sir.  Now, generally speaking, is

24   poultry litter less expensive or more expensive than

25   the nutrient equivalent of chemical fertilizers?

1      A.   Normally, it would be less expensive.

2      Q.   And how much phosphorus and nitrogen is in

3   one ton of poultry litter on average for your

4   analysis?

5      A.   We used 60 pounds of phosphorus and 60 pounds

6   of nitrogen per ton of litter.

7      Q.   And where did you get that number?

8      A.   I think the literature is widespread in that

9   that's a fairly widespread determination.

10     Q.   And did you include that information in your

11  report?

12     A.   Yes, we did.

13     Q.   Are there some typographical errors in your

14  report?

15     A.   There are.

16     Q.   Just a couple of them?

17     A.   Pardon me?

18     Q.   A couple of them?

19     A.   Yes.

20     Q.   I mean, it's not replete with them, is it?

21     A.   No.

22     Q.   All right.  Would you tell the court and

23  counsel the two that need to be corrected for your

24  analysis?

25          MR. GARREN:  Objection, Your Honor.

1    Since it's not an exhibit and will not be covered in

2    this case, I don't see the relevance of that.

3              MR. ELROD:  That's fine, Your Honor.  As

4    long as he's not cross-examined on it.

5         Q.   *(BY MR. ELROD)*  So are the numbers we're

6    discussing here today actually correct numbers?

7         A.   They are correct.

8         Q.   And you were deposed for a couple of days by

9    Mr. Garren subsequent to your report being issued,

10   were you not, sir?

11        A.   Yes, sir.

12        Q.   All right.

13             MR. ELROD:  Now, April, would you pull

14   up Demonstrative 357, please?

15        Q.   *(BY MR. ELROD)*  Now, this also is a busy

16   chart, and let's spend a couple of minutes with it for

17   absorption time, please, Mike.

18             What is this chart displaying?  And start to

19   the left and let's follow the arrows.

20        A.   Okay.  Just in general, this is a diagram of

21   the modeling framework that we went through.  In

22   summary, there's about 35 Excel spreadsheets that went

23   in to develop the changes in final demand that were

24   necessary to put in the IMPLAN model.

25             On the left-hand side, we had to determine

1    the relative values of poultry litter and chemical

2    fertilizers.  We also had do the average STP

3    calculation.  We also needed -- at the bottom left

4    there, the hay and forage requirements, we've just

5    been through those, what would be required in order to

6    feed the cattle and to feed the dairy animals that are

7    in the watershed.

8         In the middle, probably the biggest block,

9    coming up with the cattle and hay production, all the

10   data that was relevant there in terms of poultry

11   numbers and cattle numbers, hay, hay output per year,

12   etcetera.

13        And then probably the key to the analysis is

14   the -- is the poultry, forage, and beef budgets.  We

15   looked at those as separate enterprises and combined

16   them into an aggregate farm.

17   Q.   Now, tell the -- I'm sure the judge knows,

18   but tell the record what a budget is in the sense that

19   you're using this term.

20   A.   Yeah.  A budget is an estimated revenue and

21   expense of all the categories.  So it's just an

22   estimated -- everyone of us makes a budget and at the

23   end of the year, we're hope that we're close to it.

24   Q.   And you've done that for poultry, forage, and

25   beef?

1      A.   That's correct.

2      Q.   Is there a symbiotic relationship between

3   poultry, forage, and beef in the IRW?

4      A.   Yes.

5      Q.   What is that symbiosis?

6      A.   Again, as I showed earlier, the poultry

7   litter, it provides input nutrients for the forage and

8   hay production that is fed to the livestock.  And,

9   again, the point there is to try to capture the

10   value-added component and the increased income of each

11   one of those activities.

12      Q.   And then all of those go into your IMPLAN

13   model; is that true?

14      A.   Well, any changes that we have in that budget

15   from a scenario where we have litter and a scenario

16   where we don't have litter, any of those changes in

17   output, that would be what would go into the IMPLAN

18   model.

19      Q.   Then you push the start button and it spits

20   out information; is that fair?

21      A.   That's correct.

22      Q.   Is this a tried, true, and tested model?

23      A.   I think IMPLAN -- the IMPLAN model itself is

24   probably one of the most written about, used, and

25   published models that we have in the United States.

**United States District Court**

1    Q.   And could it apply to the impact of the

2  downturn of General Motors on Flint, Michigan, for

3  instance, as well as it could apply to what we're

4  talking about in this courtroom?

5    A.   Yes, sir.

6    Q.   All right.  Now, were you -- to what decimal

7  point does the IMPLAN model take your numbers, your

8  input numbers?

9    A.   Well --

10    Q.   Did you have to do some rounding?

11    A.   You know, throughout the -- throughout all

12  the spreadsheets and throughout the IMPLAN model, you

13  know, it's a spreadsheet and so it's going to

14  calculate out to ten decimal points, you know, if you

15  want to -- if you want to capture that.

16        When you start rounding up to whole numbers,

17  you are going to have some problems in columns not

18  adding -- not coming out the way that you'd expect

19  them to come out.

20    Q.   With absolute precision?

21    A.   Yeah.

22        MR. ELROD:  Now, April, if you'd please

23  pull up Demonstrative 358.

24    Q.   *(BY MR. ELROD)*  Have you also calculated the

25  cost of poultry litter in the watershed?

1      A.   Yes, we have.

2      Q.   And by the way, is your testimony and your

3 presentation here today basically captive of the date

4 of your report?

5      A.   Yes, it is.

6      Q.   And your report was issued in December of

7 2008?

8      A.   That's correct.

9      Q.   All right, sir.  So as of that time, the cost

10 of poultry litter was calculated by you to be what,

11 sir?  And go through this chart, if you would.

12      A.   Okay.  So we looked at the cost of that

13 litter as it would be collected and applied on the

14 field.  It would cost $7 a ton to load it, $2.50 to

15 market it, 17.8 cents per ton mile to transport it, $7

16 per ton to spread it, if you did not own it and you

17 had to purchase it, it would cost $12 per ton to

18 purchase.

19           So the total cost there, if you did not own

20 it within a ten-mile area, would be $30.28.  Now, if

21 you didn't -- if you did own it and you didn't have to

22 transport it, not only would you be able to subtract

23 out the $12, but you'd also be able to subtract out

24 the $1.78 transportation cost?

25      Q.   So if you -- excuse me.  Go ahead.

 1     A.   I think the numbers we used for ownership and

 2     nonownership, if you owned the litter we assumed that

 3     the cost was $18.28; if you didn't own it, it was

 4     $30.28.

 5     Q.   All right.  And transportation costs are

 6     included in that number?

 7     A.   That's correct.

 8               THE COURT:  That assumes a ten-mail

 9     radius?

10               THE WITNESS:  That's within a ten-mile

11     radius.

12     Q.   *(BY MR. ELROD)*  Why did you pick a ten-mile

13     radius?

14     A.   Just, you know, any farmer that wanted to

15     move it, if he had a farm, that's about as far as

16     you'd get from a home place to someplace that you're

17     running.  It might be only five miles.  It might be

18     three miles.  Ten miles is about as far as we'd expect

19     somebody to carry their own litter.

20     Q.   Their own litter for their own use on their

21     own farm?

22     A.   Correct.

23     Q.   Okay.

24               MR. ELROD:  April, would you pull up

25     Demonstrative 359, please?

1     Q.   *(BY MR. ELROD)*  Now, compared to the cost

2   that you've just described for chicken litter, again

3   using the numbers in your 2008 report, what are the

4   costs of chemical fertilizer to replace the phosphorus

5   nutrient and nitrogen nutrients of litter?

6     A.   Well, this is the cost of, assuming that

7   we're going to replace the same nutrients, 60 pounds

8   of nitrogen and 60 pounds of phosphorus.  The

9   diammonium phosphate is the most commonly used form of

10   phosphorus.  It's formulation is 18-46-00, which means

11   that it has 18 percent nitrogen, 46 percent

12   phosphorus.  At the time we did the report, the cost

13   of that diammonium phosphate was $1200 per ton.  In

14   order to put on 46 -- sorry -- 60 pounds of phosphorus

15   with 46 pounds per hundred pounds of substance, you

16   would have needed to have put on 130.43 pounds of

17   substance.  The cost of doing that would be $78.26.

18         When you put on that 18-46, keep in mind

19   you've put on 130 -- now you've put on 130.43 pounds

20   of substance which has 18 percent nitrogen in it.  So

21   now that you have roughly 22 pounds of nitrogen, you

22   don't have to put on as much Urea.

23         So the next calculation would be, how much

24   Urea then do I have to put on in order to make up the

25   difference between the amount of nitrogen that was

1    applied by the diammonium phosphate and the amount of

2    nitrogen that I need which is 60 pounds.  So in that

3    case, you would need 79.4 pounds of Urea, which is 46

4    percent protein, at $800 a ton which would be a price

5    of $31.76.

6        Q.   You said 46 percent protein.  Did you

7    misspeak?

8        A.   Sorry.  Forty-six percent nitrogen.

9        Q.   Okay.  Go ahead.

10       A.   That then would give you a mix that weighed

11   209 pounds and a cost of about $110.02.  To apply that

12   per acre and transport it would cost $2.26 of

13   transport and $1.59 to spread per acre, for a total

14   cost of delivery for 60 pounds of nitrogen and 60

15   pounds of phosphorus and a chemical fertilizer of

16   $113.86.

17       Q.   That's versus $30.28 for the same nutrients

18   in chicken litter?

19       A.   That's correct.

20       Q.   Now, if counsel will permit, just tell us how

21   the price has changed from the date of your report

22   to -- for DAP and for Urea.

23       A.   Well, of course, the current price -- because

24   of the economic situation the current price of

25   diammonium phosphate has fallen to about $480 a ton

1    and the price of Urea has fallen to about $420 a ton.

2    Those are bulk prices available at the Port of

3    Catoosa.

4        Q.   And based on your investigation, Dr. Dicks,

5    are bulk fertilizers available inside the IRW?

6        A.   I was not able to find a location within the

7    IRW for bulk fertilizers.

8        Q.   Have to buy it bagged?

9        A.   Have to buy it bagged.

10       Q.   And what difference does that make, if any?

11       A.   Well, normally bagged -- first of all, bagged

12   fertilizer, just the bagging is going to cost you

13   about $20 a ton more, $20 to $30 a ton more.

14            And then you can understand that if I go and

15   pick up a spreader and have somebody load it with a

16   front-end loader of that chemical fertilizer, that's a

17   much different task than if I have to go and buy a ton

18   of bags.  That's 40 bags, 40 50-pounds, and I have to

19   open up each one of them and dump them into a

20   spreader.

21       Q.   Now, Doctor, is it your expectation that

22   these prices per ton for DAP and for Urea are going to

23   increase in the future back to where they were in

24   2008?

25            MR. GARREN:  Objection; speculation,

*10467*

```
 1    Your Honor.
 2               THE COURT:  Sustained.
 3         Q.   (BY MR. ELROD)  Do these prices typically
 4    come and go in terms of cost?
 5         A.   Yes.
 6         Q.   And in 2008, was it one of the highest-priced
 7    years in recent times?
 8         A.   It was.  It was on trend to increase and will
 9    probably return that way.
10         Q.   And Urea --
11               MR. GARREN:  Objection, Your Honor.  Ask
12    that that be stricken as to what it probably will do.
13    That was not responsive to the question.  It would
14    call again for speculation.
15               THE COURT:  Sustained.
16         Q.   (BY MR. ELROD)  The price of Urea is
17    dependent upon the price of what basic resource?
18         A.   Natural gas.
19         Q.   All right.  And is DAP, that phosphorus, a
20    mined phosphorus, m-i-n-e-d?
21         A.   Diammonium phosphate is a -- comes from a
22    mined product that is then chemically mixed.
23         Q.   And so it's an extracted resource?
24         A.   It's an extracted resource, correct.
25         Q.   Are we about to run out of it?
```

 1              MR. GARREN:  Objection, Your Honor;

 2   foundation.

 3              MR. ELROD:  Your Honor, I think that's

 4   already in evidence.  Somebody -- it may have been

 5   Gordon Johnson -- it was the cross-examination of

 6   somebody that -- Taylor, Dr. Taylor.

 7              THE COURT:  There was talk about that.

 8              MR. ELROD:  All right.

 9              THE COURT:  Overruled.  Go ahead.

10      A.   Yeah.  I believe there is current estimates

11   of a 15- to 25-year lifetime for the available

12   phosphorus.

13      Q.   *(BY MR. ELROD)*  Now, what if I didn't want

14   any phosphorus and only wanted to apply an equivalent

15   amount of 60 pounds of nitrogen using chemical

16   fertilizer?

17      A.   Well, you could certainly purchase just the

18   Urea and apply it.

19      Q.   So if I just bought Urea, what would the

20   equivalent amount, including transportation and

21   spreading costs, be?

22      A.   Well, at the prices that we had when we did

23   the report at $800 a ton, for 920 pounds of nitrogen

24   in that ton, the cost would be close to 90 cents a

25   pound for that Urea.  And if you had to put on 130.43

1    pounds in order to get -- of substance in order to get

2    that, you could see that that would be a fairly large

3    expense.

4        Q.   You're still -- are you still above the cost

5    of the nitrogen content of chicken litter?

6        A.   That's correct.  I think we calculated in our

7    report that to purchase it and to spread it, that cost

8    would be $55.17 for just the nitrogen.

9        Q.   For just the nitrogen?

10       A.   Correct.

11       Q.   Does the price that one has to pay for

12   chicken litter in order to land-apply it, if you don't

13   already own it, does it also rise and fall

14   historically with the cost of chemical fertilizers?

15       A.   Yes, it would.  It's a substitute for

16   chemical fertilizers.  As the price of chemical

17   fertilizers rise, certainly the demand for poultry

18   litter would increase, and thus the price of poultry

19   litter would increase.

20       Q.   So to wrap up this part of your testimony,

21   if --

22              MR. ELROD:  April, if you'd put 372 up,

23   please.

24       Q.   *(BY MR. ELROD)*  Okay.  These bar charts,

25   working from left to right, if you'd explain what they

1   display.

2       A.   Again, as you said, this is a summary of what

3   we've just been through.  If I look at 60 pounds of

4   nitrogen and 60 pounds of phosphorus, if I owned the

5   litter, I'm calling the cost $18.28.  If I have to

6   purchase the litter, the cost of that would be $30.28.

7   And if I have to go and get chemical fertilizer and

8   the cost to apply it, the cost of that same chemical

9   mix would be $113.86.

10      Q.   All right, Dr. Dicks.  Let's return to 360,

11  please, the nutrient value flow in the IRW, and let's

12  kind of get down in the weeds of this thing a little

13  bit.

14          You've already testified that you

15  calculated -- the boxes in the right-hand corner are

16  the forage and the hay necessary to maintain the

17  cattle in the IRW at its current levels?

18      A.   That's correct.

19      Q.   So you have shown in this chart your opinion

20  that's in your report, that the nutrients to produce

21  forage would require 63.1 pounds of nitrogen per acre

22  and 30.2 pounds of phosphorus per acre; is that

23  correct?

24      A.   That's correct.

25      Q.   And for hay, it would be 45.8 pounds of

1    nitrogen per acre and 45.7 pounds of phosphorus per

2    acre?

3        A.    That's correct.

4        Q.    Now, how do you -- why is there a difference

5    between the amount required to produce forage and the

6    amount required to produce hay?

7        A.    Well, there's two reasons that are given

8    here.  First of all, in the -- in the pasture versus

9    the hay, we have 2.26 tons of pasture forage per acre,

10   where we only have 1.92 tons per acre of hay.

11          And secondly, when you produce forage, the

12   cattle will consume that and some of those nutrients

13   are returned to the pasture.  For the hay meadow, for

14   every ton of hay that you produce, according to the

15   literature, 13.7 pounds of phosphorus is removed per

16   ton of forage.  So if you're producing 1.92 tons of

17   hay, you're going to remove roughly 26 to 27 pounds of

18   phosphorus per hayfield per acre?

19       Q.    Now, forage would be grazing land?

20       A.    Correct.

21       Q.    And hay would be hay meadows?

22       A.    That's correct.

23       Q.    And how did you take the recycling assumption

24   of the State of Oklahoma for cattle into consideration

25   when you calculated the required forage amounts?  That

1    was not a very good question.  Did you understand

2    it?

3         A.   I think I know what you're asking.  But --

4         Q.   All right.

5         A.   So I guess what you're asking is, we've said

6    that the pasture's grazed, some of that's returned,

7    some of that phosphorus is picked up by the animals

8    and returned to the pasture.

9              First of all, when a cow consumes the forage,

10   10 percent of that phosphorus -- 10 percent of the

11   nutrients in that forage is being deposited in the

12   animal's body.  Then that animal moves around

13   typically -- Billy Clay testified to the fact -- and

14   we're using that number and I think it's probably a

15   very conservative number -- that 40 percent of the

16   manure is excreted or deposited in loafing areas.

17   Those areas are not in the farm field.

18             And so that litter -- sorry -- that manure

19   has been moved from the farm field to another area,

20   what we call another area, some part of the watershed

21   that is not a productive field.  In fact, some parts

22   of that pasture will be -- will be deposited directly

23   in the streams and so those stream areas also are

24   those areas.

25             We do know that -- and I think Billy Clay

1    testified to this -- I think most farmers know that,

2    particularly in the summertime, cattle tend to stand

3    in the water and when they're in the water they

4    defecate and urinate.  They also tend to defecate and

5    urinate when they get up from loafing.  And so those

6    are the areas that are deposited.

7          We used all of those pieces of information to

8    determine how much of the phosphorus, how much of the

9    nutrients that has been captured by the forage has

10   been returned to the land in those pastures.

11        Q.   Have you seen that behavior with your own

12   eyes?

13        A.   Yes.

14        Q.   So what amount of phosphorus did you remove

15   from the actual forage areas in making your

16   calculations?  Ten percent of the body weight;

17   right?

18        A.   Ten percent of body weight.

19        Q.   And what percentage --

20        A.   And I think 40 percent of redeposition to

21   other areas.

22        Q.   So did you leave 50 percent of the cattle

23   forage phosphorus back in the fields?

24        A.   I think the estimate was less than 50

25   percent.

1          Q.   All right, sir.  Now, same question for hay

2     meadows.

3          What assumptions did you make in your

4     calculations in terms of phosphorus movements in hay

5     meadows and cattle impact on hay meadows?

6          A.   Again, in the hay meadow, you have a constant

7     removal of material from the field, off of the field,

8     and away from the field so those nutrients are no

9     longer available in that hay meadow.

10          Farmers typically prize those hay meadows as

11     being places that they minimize the amount of

12     disturbance on them because when you -- when you're

13     out there running those tractors, nothing's worse than

14     to be going six or seven acres fast and hit a hole or

15     hit some part of that.  So those hay meadows

16     are -- try to be kept as hay meadows.

17          Now, that's not to say that cattle sometimes

18     don't get on them, but it's typically that you will

19     not feed hay back in a hay meadow.  And those of you

20     that have seen a round bale sitting out in the middle

21     of a field, especially after it's rained, will be

22     immediately able to identify why that is the case

23     because they'll leave a heck of a mess there.

24          So, again, in that hay field, you're

25     producing roughly two tons of hay.  That's going to

1  be, you know, again 13.7 pounds of phosphorus per ton,

2  and so that's going to be roughly 27 and a half pounds

3  of phosphorus that's removed.

4          And then in order to produce that to have

5  that kind of a yield, you're going to have to make

6  sure that that field has got 65 STP in it.  And so if

7  it doesn't, you'll have to add enough phosphorus to

8  get it up to that 65.

9          One thing that's important about that 65

10 number is, remember that if you have a 65 STP on that

11 field before you begin to cut that hay, after you've

12 cut that first ton of hay, you've pulled 13.7 pounds

13 of phosphorus off.  So it's no longer at STP 65, it is

14 now less than STP 65.  If you get below 45, now you're

15 not getting the nitrogen response that you should have

16 gotten by having the proper STP.

17     Q.   Dr. Dicks, the exercise that we're going

18 through right now is to make your average STP

19 calculation in the watershed; is that true, sir?

20     A.   That is correct.

21     Q.   Why was it necessary that you go through this

22 exercise?

23     A.   Well --

24     Q.   We got a lot of numbers in this case.

25     A.   Right.  In order for me to determine the

1    value of phosphorus that would be needed in the

2    watershed -- and, of course, I had to determine the

3    value because in order for me to determine what the

4    impact would be on farmers of taking the poultry

5    litter out, I have to know what the value of that

6    poultry litter would be to them in the watershed.  And

7    so I had to come up with some value that would be a

8    statistical approximation for what the average value

9    of STP would be in the watershed.

10        Q.   Now, you just used a word I'd like for us to

11   focus on for a second, statistical approximation.

12        A.   That's correct.

13        Q.   Do you have to be a soil scientist to do that

14   exercise?

15        A.   No, sir.

16        Q.   What data did you -- strike that.

17             MR. ELROD:   Could you go ahead and put

18   up that Arkansas-Oklahoma -- or Benton County,

19   Arkansas, and Washington County, Arkansas?

20        Q.   *(BY MR. ELROD)*   This is Demo 351 from

21   Dr. Rausser's testimony, for instance.   It shows

22   distribution of Benton and Washington Counties' 2005

23   and 2007 STP values; correct?

24        A.   That's correct.

25        Q.   Now, there's already been testimony about

1    this, and I don't want to dwell on it, but will you

2    tell the court the number of acres that are

3    represented by the totality of samples that are in

4    this demonstrative?

5        A.   Well, I can't tell the number of acres

6    because we don't know that.

7        Q.   Well, for Benton and Washington Counties do

8    you?

9        A.   We have a different set of data, the PFO

10   data, that, has so many fields that have been sampled

11   and that data had 38,000 acres.  But this particular

12   data set --

13       Q.   Wait a minute.  Let's dwell on this for a

14   second.

15       A.   There's three data sets.

16       Q.   All right.  But the PFO data set has 38,000

17   acres in Arkansas; is that true?

18       A.   In Benton and Washington County, correct, in

19   IRW.

20       Q.   And out of a total of how many pasture acres

21   in Benton and Washington Counties?

22       A.   Excuse me?  How many --

23       Q.   Out of a total of how many pasture acres in

24   Benton and Washington Counties?

25       A.   I believe that the estimate was somewhere

1    around 400 -- 400,000 acres of pastureland, cropland,

2    and --

3        Q.   So is it your testimony then -- let me -- I

4    won't tell you what your testimony is.  Let me ask you

5    a question.

6        A.   This would be --

7        Q.   What then would be the percentage of sampled

8    acres giving us STP values in the Gordon Johnson

9    testimony, for instance, compared to the total number

10   of acres available to be sampled in Benton and

11   Washington Counties that have no data?

12       A.   Right.  In that particular data set, we're

13   talking about --

14           MR. GARREN:  Your Honor, I apologize,

15   but I don't think a proper foundation has yet been

16   laid about what he would have done in order to try and

17   ascertain available acres, what that number is.  We're

18   just jumping to an assumption here.

19           THE COURT:  Overruled.  It's pretty

20   clear that 38,000 out of 400,000 is about one-tenth, I

21   would think; right?

22           THE WITNESS:  Correct.

23           THE COURT:  Let's move on.

24           MR. GARREN:  I believe the question was,

25   what was the acreage in Benton and Washington

1    Counties, and I think his testimony was 400,000

2    acres.

3                    THE COURT:  Correct.

4                    MR. GARREN:  I believe that's IRW

5    acreage.  Now, I don't know whether we're on the same

6    page --

7                    THE COURT:  You can cross-examine.

8       Q.   *(BY MR. ELROD)*  Now, Doctor, the other two

9    data sets that are in the record, do they have any

10   acreage of the sampled areas attached to them or

11   described to them at all?

12      A.   No, they don't.  In fact, this is the data

13   set -- one of the two data sets that you're talking

14   about that we have in front of us that has 6,558

15   observations, which covers a period of 2005 to 2007.

16           One of the problems with the data set is you

17   don't know whether those observations represent 6,558

18   individual observations on fields or whether they

19   represent the same field sampled three times in

20   each of the -- one time in each of the years.

21      Q.   Okay.

22      A.   Again, if you were to say how many fields are

23   there in the watershed, our estimate, based on Farm

24   Service Agency common land unit data, would suggest

25   that there's somewhere between thirty-five and

 1    forty-five thousand fields in that watershed.  So this

 2    being somewhere in the neighborhood of perhaps 2500 to

 3    6,000 fields would be a small sample --

 4         Q.   Okay.

 5         A.   -- of those -- of all those fields.

 6         Q.   All right.  So your calculation then is

 7    deemed -- is necessary in order to overcome the

 8    paucity of data?

 9              MR. GARREN:  Leading, Your Honor.

10         A.   That's correct.

11              THE COURT:  Sustained.

12              MR. ELROD:  That was leading.

13         Q.   *(BY MR. ELROD)*  We can do it shirts and

14    skins, if you want to.

15              MR. GARREN:  Outside?

16              THE COURT:  I'll sell tickets.

17              MR. ELROD:  I've been involved in cases,

18    Judge, where we called our own fouls but this is not

19    one of those.

20         Q.   *(BY MR. ELROD)*  All right, Mike.  Let's go

21    back.

22              I don't want to get too deep into it, but was

23    it -- was it necessary to reach your STP calculations

24    spread evenly over the entire watershed of pastureland

25    available that you calculate the amount of chicken

1    litter produced from '74 to 2007 in the watershed?

2         A.   It was, and that's correct.

3         Q.   Right.  And in your calculations, did you

4    assume that all that chicken litter was land-applied

5    inside the IRW?

6         A.   Yes, I did.

7         Q.   And did you assume it was spread evenly all

8    across the pastureland in the IRW?

9         A.   Yes.

10        Q.   And what was the purpose of that calculation

11   and those assumptions?

12        A.   Again, we needed to -- we assumed virtually

13   that every acre in the IRW would be the same acre,

14   that would have the same amount of application to it,

15   and the same amount of use on it for purposes of that

16   statistical approximation.

17        Q.   And can you tell the judge how you calculated

18   the amount of total chicken litter produced in the

19   watershed and assumedly land-applied in the watershed

20   from '74 to 2007?

21        A.   Sure.

22        Q.   What did you start with?

23        A.   We took -- we started with the 2007 amount of

24   poultry litter of 295,114 tons, and we then used the

25   total amount of birds in inventory from census of 51

1    million birds.  That gave us a pounds of poultry

2    litter per bird.

3           We then determined using census and NASS data

4    the total amount of birds that were available in the

5    watershed from 2007 back to 1974, which then gave us

6    an approximation of about 8 million tons of litter

7    that was available in the watershed --

8         Q.   Eight million tons?

9         A.   Yes.

10        Q.   Okay.  Sorry.

11        A.   -- that was available in the watershed

12   between the period 1974 and 2007.  That would be the

13   supply of nutrients.

14        Q.   All right.  And you applied 60 and 60 to that

15   8 million tons?

16        A.   Correct.

17        Q.   And you spread that resulting phosphorus and

18   nitrogen evenly across all pastureland in the

19   watershed?

20        A.   Correct.

21        Q.   All right.  Now, what did you start out with

22   in '74 as an STP level?

23        A.   Well, in order to pick a starting point --

24   and we didn't just randomly select 1974 -- we did, you

25   know, a small calculation based on what we've already

 1   told you about, the supply and demand, the use -- the

 2   use and application.  We determined how much litter

 3   was available in 1974, how much demand of that

 4   nutrient would be there, and it turns out in 1974

 5   you'd have needed about 100,000 pounds more of

 6   phosphorus to meet the requirements for the forage in

 7   the watershed than was supplied by the -- by the

 8   litter.  So there was no need to go further back

 9   because that had no impact at that time previous on

10   the STP level.

11        Q.   All right.  Now, then in '74, what was your

12   starting point for STP in the watershed?

13        A.   Twenty.

14        Q.   And where did you get twenty?

15        A.   That came from -- I think Dr. Engel was the

16   one that provided that.

17        Q.   And that was his assessment of STP in virgin

18   Nickel Reserve property?

19        A.   That's correct.

20        Q.   So then in running your spreadsheets from '74

21   to 2007, using the methodology that you've just

22   described, what was your resulting STP -- average STP

23   number in the watershed for all pastureland available?

24        A.   45.5.

25        Q.   All right.  So does that number of 45.5 feed

1    right back into the necessity for using chicken litter

2    today to obtain phosphorus in the watershed?

3        A.    That's correct.

4        Q.    Now, in reality, Dr. Dicks, are some fields

5    much greater than 45.5?

6        A.    Absolutely.  We've seen from the data that's

7    from the defendants -- sorry -- from the plaintiffs

8    from Gordon Johnson that that data indicates there's

9    fields out there that have a higher STP than 45.5.

10       Q.    All right.  But for your purpose, you're

11   spreading it across the entire watershed; correct?

12       A.    That's correct.

13       Q.    Why is that legitimate?

14       A.    Well, there's also fields -- obviously, if

15   given what I've told you about the amount of inflow of

16   nutrients and the amount of outflow of nutrients, if

17   there's fields that are greater -- that we know that

18   have an STP greater of 45.5, there's obviously fields

19   there that are less than 45.5.

20            I think even Dr. Johnson pointed in his

21   data -- I think his estimate for Oklahoma was that the

22   average STP was 55.

23       Q.    In the IRW?

24       A.    In the IRW.

25       Q.    All right.

 1        A.   And that was on the select fields.

 2        Q.   Do you dispute the high STP numbers that

 3   we've seen in some of the evidence in this case as an

 4   example of what we're looking at on the screen right

 5   now?

 6        A.   Do I dispute that they exist --

 7        Q.   Yes.

 8        A.   -- that the data showed that?  No.

 9        Q.   Okay.  In your view, is there a -- is there a

10   sample -- well, Gordon Rausser testified about that.

11             Is that biased?

12             MR. GARREN:  Objection to form.  Is

13   what?

14        Q.   *(BY MR. ELROD)*  The demonstrative on the

15   screen, is that biased?

16             THE COURT:  Overruled.

17        A.   Yes, I believe this data would be considered

18   biased.

19        Q.   *(BY MR. ELROD)*  Why?

20        A.   Well, for one, the data is a sample that is

21   highly skewed to the people that are required to have

22   Nutrient Management Plans.  So only the people that

23   are likely to have an STP that's high are the ones

24   that are providing the soil samples.  The ones that

25   are not above 65 that are not -- have not and will not

1   or did not apply poultry manure have not turned in any

2   soil samples.

3       Q.   Okay.

4       A.   And, again -- just, again, this is a small

5   sample compared to the total number of acres and the

6   total number of fields that are in that watershed.

7       Q.   Is your 8 million tons of litter produced a

8   conservative number?

9       A.   Very conservative.

10      Q.   What do you mean by that?

11      A.   Again, this was a statistical approximation

12  so we're going to try to keep our estimate

13  conservative.  Several things changed from 1974 to

14  2007 that we didn't include going backwards.

15          One of those would be that in 2007, we had a

16  six-pound chicken; in 1974, we might have had a four-

17  to four-and-a-half-pound chicken which produced a lot

18  less manure.

19          We also looked at the amount of sales per

20  inventory.  During 2007, that sales to inventory ratio

21  would be about six.  Going back, it was likely to be

22  four, four and a half.  So those things would have

23  meant that the total amount of litter available would

24  have been smaller than we estimated, but we felt

25  comfortable with that estimate being that that would

1    give us the most conservative approach.

2        Q.   Did you also assume, in order to be

3    conservative, that all of the nutrients contained in

4    the IRW came from chicken litter, not from other

5    sources?

6        A.   That's correct.

7        Q.   All right.

8        A.   And one other thing, John.  We didn't -- you

9    know, we did not have any loss of nutrients.  We know

10   that the cattle are leaving the watershed to be -- to

11   be eaten, to be consumed, to be harvested, and

12   they -- they have phosphorus in them that's come from

13   this watershed, that's come from those farm fields,

14   and we didn't add that into the estimate.

15       Q.   You just left it there?

16       A.   We just left it there.

17       Q.   And the higher the animal manure, the chicken

18   litter number, in the watershed, the higher the STP

19   would be raised, and therefore, by having a higher

20   number, you're being biased in favor of the State of

21   Oklahoma?

22       A.   That's correct.

23       Q.   All right.  And you used the number 65.  Is

24   that also deemed conservative?

25       A.   Well, that's the number, you know, that we've

 1   been given to us that -- that's the number that seems

 2   to be the one everybody wants to hang on.  Although,

 3   you know, the number I could have used would have been

 4   the state's 300 STP, which is what's the allowable

 5   level.  Or I could have used a STP of 120, which is

 6   the level of STP you'd have to have to have a uniform

 7   level of 65 pounds of phosphorus per acre.

 8       Q.   And if you'd have used those numbers, would

 9   there be even more pastureland or less pastureland

10   available in the IRW to receive phosphorus?

11       A.   Well, there would have been -- the way we've

12   done it, there would be the same amount of land.  It

13   just would require a lot more phosphorus for sure.

14       Q.   You're correct.  I'm sorry.

15           All right, sir.  So after making all those

16   calculations --

17           MR. ELROD:  If we could go back to 360,

18   please, April.

19       Q.   *(BY MR. ELROD)*  Your ultimate conclusions in

20   regard to nutrients to provide forage and hay

21   sufficient to feed the animals in the watershed are on

22   this exhibit, Demo 360; correct?

23       A.   Correct.

24       Q.   All right.  Now, how does this feed into your

25   economic impact on the watershed as a whole in the

**United States District Court**

1   agricultural community?

2       A.   So, again, what we've done is, this shows

3   that we have 171,630 tons of litter that's required

4   for the forage, so that's the nutrients that we'd have

5   to substitute chemical fertilizer for, and 114,167

6   tons of litter for the hay production.  Again, those

7   are chemicals that we'd have to substitute through

8   chemical fertilizer if we were to get rid of the

9   litter.

10          So the value of those things then is a loss

11  value within the watershed, a loss income that then

12  would impact the economy of the watershed.

13          MR. GARREN:  Your Honor, we'd object on

14  these ultimate conclusions of the impact.  We'd make

15  our record with regard to the argument previously

16  made, and that is, the balance in harms in this case

17  is inappropriate for several reasons that have been

18  previously cited in our briefs.  But essentially

19  because the state is a sovereign and that activity

20  complained of may endanger public health, that balance

21  of harms is not appropriate.

22          Likewise, that even if the purported harms to

23  third persons, that the balance of law is clear that

24  third persons -- potential financial damages generally

25  do not outweigh the potential harm to the environment.

```
 1                    THE COURT:  All right.

 2                    MR. ELROD:  I think you've already ruled

 3     on that, Your Honor.

 4                    THE COURT:  I have.  The objection is

 5     overruled.  This being a matter in equity, we'll take

 6     those into consideration to the extent that they're

 7     appropriate.

 8                Assuming that the amount of production is

 9     354,000 tons a year, your 286,000 tons, which you say

10     are necessary, if spread evenly across the acreage,

11     amounts to, if my arithmetic is correct, about 81

12     percent; correct?

13                    THE WITNESS:  That would be correct.

14                    THE COURT:  So that would assume, even

15     under your model, that some 19 percent needs to be

16     transported out of the watershed; correct?

17                    THE WITNESS:  Yes.

18                    THE COURT:  All right.  But who's going

19     to be the czar to spread this out evenly over the

20     watershed?

21                    THE WITNESS:  Well, that's a good

22     question.

23                    THE COURT:  I don't know that I want to

24     be the chicken litter czar.

25                    THE WITNESS:  I think that you've -- I
```

1    mean, I think the czar already exists.  The Natural

2    Resources Conservation Service requires nutrient

3    management plans.  Those nutrient management plans

4    are, in fact, the czar.  They're the ones that mandate

5    how much litter can be applied on that land, and thus

6    are determining the spatial allocation of that litter.

7              THE COURT:  And yet, I went over a

8    deposition last night where the head of the Department

9    of Agriculture admits he doesn't have enough people to

10   oversee that program.

11             MR. ELROD:  Judge, if you're going to

12   try my case for me, don't lose it.

13             THE WITNESS:  Are you asking me for an

14   alternative or a solution?

15             THE COURT:  Well, sure.  That's what

16   we're all looking for.

17             THE WITNESS:  Well, that's good.  You

18   know, since I deal in policy quite a bit, this is

19   obviously an equity issue; correct?

20             THE COURT:  You worked with -- was Block

21   the Secretary of Agriculture?  Who was the Secretary

22   of Agriculture when you were there.

23             THE WITNESS:  I think Dick Lane was the

24   secretary while I was at USDA.

25             It is an equity question and so the question

1    comes down to if it's a substantial enough problem,

2    that the costs are greater than the -- the costs of

3    having that litter in the watershed is greater than

4    the cost of limiting it.  Then presumably those

5    benefits will pay for the people to come and manage

6    it, but if it's not, they won't.

7         So I guess what we're saying here is, if the

8    state is not doing its job in terms of managing the

9    problem, then it must not be a big enough problem to

10   the state.

11        THE COURT:  Well, but we have the

12   additional complication of another state which

13   doesn't, according to the plaintiff, suffer the same

14   impacts as the downstream state.  Your policy analysis

15   take that into consideration?

16        THE WITNESS:  At a federal level, it

17   would, yes.

18        THE COURT:  Well, of course the focus of

19   the EPA has been point source, hasn't it?

20        THE WITNESS:  Well, I think I'm not

21   sure -- I'm not sure it would be correct to say its

22   focus has only been --

23        THE COURT:  No, no, no, no.  I say the

24   focus has been point source over nonpoint source;

25   correct?

**United States District Court**

```
 1                     THE WITNESS:  Again, you know, I think
 2      that's a typical strategy for EPA.  Obviously, the
 3      most relevant form of pollution is the point source,
 4      it's the largest.  But then they have always -- every
 5      problem we've had in the United States about
 6      pollution, whether it's air, water, whatever, since
 7      1965 since we began down this road, was to first
 8      identity the point source, clean up the point source,
 9      then move to the nonpoint source.
10                     THE COURT:  Can't do it all at once?
11                     THE WITNESS:  You cannot do it at all
12      once.
13                     THE COURT:  Go ahead.
14                     MR. ELROD:  Thank you, Judge.
15         Q.   (BY MR. ELROD)  Dr. Dicks, then did you look
16      at the macroeconomic impacts on the agriculture
17      community of the watershed under two polar scenarios?
18         A.   Yes.
19         Q.   And one polar scenario is what?
20         A.   Well, one scenario would be that the farmers
21      faced with the elimination of poultry litter and the
22      elimination of these nutrients, which would mean
23      they'd have an inability to produce enough forage to
24      feed their cattle, would then go and purchase chemical
25      fertilizers.
```

 1        Q.   One hundred percent substitution?

 2        A.   One hundred percent substitution so that they

 3   could continue to produce the same amount of forage to

 4   have the same number of cattle.

 5        Q.   The other polar scenario is what?

 6        A.   That they would realize that the cost of

 7   chemical fertilizer was too great and they would

 8   simply downsize their herds.

 9        Q.   Okay.

10             MR. ELROD:  Could you put up, please,

11   370, April?

12             MR. GARREN:  370?

13             MR. ELROD:  370.  Thank you, ma'am.

14        Q.   *(BY MR. ELROD)*  Now, is this a graphic of

15   what you've just testified to?

16        A.   That's correct.  We have two scenarios:  one

17   hundred percent replacement of the nutrients by

18   chemical fertilizer, and then zero replacement where

19   no chemical fertilizer is used to replace the

20   nutrients lost in the poultry litter.

21        Q.   All right.  And you used the IMPLAN model?

22        A.   We -- to determine the impacts, yes, we used

23   the IMPLAN model.

24        Q.   Are either of these scenarios, based on your

25   years of experiences as an agricultural economist and

 1    policy advisor for the federal government, USDA

 2    likely, either polar?

 3        A.   No.

 4        Q.   What is your view that would be the most

 5    likely scenario?

 6        A.   Well, given that we have producers in the

 7    watershed that are both high-cost and low-cost

 8    producers, immediately some people will cut back on

 9    their herds and some people won't.  Over time, I think

10    you'd start with, of course, most people believing

11    that perhaps they could get away with the chemical

12    substitution.  When they tried it, they'll find out

13    that their returns drop and they'll move away from

14    that.

15        So I think what we've done is try to set up

16    two scenarios here, where one would be -- the hundred

17    percent replacement would be the more typical

18    immediate response, but over time we'll be moving

19    towards all the producers towards the zero

20    replacement.

21             MR. ELROD:  Now if you'd put up 371,

22    please, April.

23        Q.   *(BY MR. ELROD)*  Does this display the polar

24    extreme results of your IMPLAN analysis?

25        A.   Yes, it does.

**United States District Court**

1      Q.   All right.  The top one is what would happen

2   upon one hundred percent replacement of poultry litter

3   with chemical fertilizer; is that true?

4      A.   That's correct.

5      Q.   All right.  Moving from left to right, would

6   you describe to the court what direct costs are at $25

7   million negative?

8      A.   Well, those direct costs came from our use of

9   an increase in chemical fertilizer; our reduction in

10  revenues, profits, to the farmers; our increase in the

11  use of cubes, cake, protein feed supplement; and the

12  increase in operating interest that would be paid

13  because of the increased cost of the chemical

14  fertilizer.

15     Q.   And indirect costs are a positive 600,000.

16  What are indirect costs in the IMPLAN model and why is

17  it positive here?

18     A.   Well, the indirect costs are the goods and

19  services that are used that are -- that are -- how do

20  you say it? -- spun-off or created by trying to

21  produce the things that went into the direct impacts.

22          It's positive here basically because you've

23  now -- you're moving a lot of material, in terms of

24  chemical fertilizer, and the volume of that material

25  and the economic activity of that is greater than the

1    economic activity lost from the movement of poultry

2    litter.

3       Q.   And induced costs are a negative 6 million?

4       A.   That's correct.

5       Q.   What are induced costs?

6       A.   In both the direct and indirect impacts, you

7    have people that are making a living, that are gaining

8    an income, and they use that income to purchase a

9    market basket of goods, whether it's car insurance or

10   their groceries, and that then is the economic

11   activities that is involved in the induced impact.

12      Q.   So does that negative $6 million induced

13   represent the $25 million rippling through the

14   economy?

15      A.   That's correct.  It's a net of both, John.

16      Q.   All right, sir.  Now, your total for 2006

17   dollars is $31 million?

18      A.   That's correct.

19      Q.   And then you extrapolate it to 2008 dollars;

20   is that true?

21      A.   Right.  We use a deflator to get back to the

22   2008 value, which would be a minus 34 million.

23      Q.   And the IMPLAN model, does it tell you that

24   there are 501 jobs lost under that scenario?

25      A.   That's correct.

1     Q.   And just briefly, tell the court how it comes
2   to that conclusion.
3     A.   How it comes to the jobs lost conclusion?
4     Q.   Yeah.   How does the interworkings of the
5   model spit out that conclusion?
6     A.   So every industry just -- labor is an input
7   to every industry.   So every time an industry loses so
8   much economic activity, so much output, it loses a
9   proportionate number of jobs.
10    Q.   All right.   Now, the other polar scenario is
11  that you do not replace lost nutrients from poultry
12  litter with chemical fertilizer at all; correct?
13    A.   That's correct.
14    Q.   So there would be no nutrients available to
15  be annually applied in the watershed at all under this
16  scenario?
17    A.   That's correct.
18    Q.   All right, sir.
19    A.   Well, sorry, John.   No, that's not exactly
20  correct.   There are already -- in both circumstances,
21  there are chemicals that are being applied, even in
22  our -- even in our -- the amount of litter that's
23  being applied does not provide enough nitrogen in the
24  watershed.   So you're still providing chemical
25  nitrogen on top of the litter.

1      Q.   Okay.

2      A.   So all we've done is remove the litter.

3  There's still chemical nitrogen at that rate being

4  applied, no more.

5      Q.   All right, sir.  I'm sorry.  Correct.

6           So under that scenario then, the direct cost

7  is what?

8      A.   The direct cost is simply the loss in cattle

9  sales, loss of $43 million.

10      Q.   And because of lower stocking rates?

11      A.   Correct.

12      Q.   Because you don't have enough to feed them?

13      A.   That's correct.

14      Q.   And the indirect costs of $31 million,

15  describe what that's all about.

16      A.   Well, everybody that is involved in providing

17  inputs to raise those things, whether it's

18  veterinarian services or the feed store, is going to

19  have less sales because of the loss of those -- those

20  cattle.

21      Q.   And induced costs here are a negative 6

22  million again?

23      A.   That's correct.

24      Q.   And that's, again, the ripple effect of --

25      A.   That's the ripple effect.

1      Q.    -- those numbers going through the economy?

2            And your total 2008 dollars lost under that

3      scenario is 88 million?

4      A.    That's correct.

5      Q.    Jobs lost 1192?

6      A.    Yes.

7      Q.    All right, sir.

8            MR. ELROD:  Your Honor, I'm going to

9      move the introduction of two exhibits.  First one is

10     6356, which is --

11           THE COURT:  Any objection to 6356?

12           MR. GARREN:  No, Your Honor.

13           THE COURT:  6356 is admitted.

14           MR. ELROD:  And move the introduction of

15     6357.

16           THE COURT:  Any objection?

17           MR. GARREN:  No objection.

18           THE COURT:  6357 is admitted.

19           THE COURT:  And I do have one follow-up

20     in regard to His Honor's 20 percent removal of litter.

21           THE COURT:  Yes, sir.

22     Q.    (BY MR. ELROD)  The numbers you have used,

23     are they before or after removal of litter by BMP's,

24     Inc. of 70,000 tons?

25     A.    They're before removal of it.  We do not

1    include that as part of our estimate.

2        Q.   All right, sir.  And that would be more than

3    20 percent of 295,000?

4        A.   That's correct.

5            MR. ELROD:  Pass the witness, Your

6    Honor.  Thank you, Dr. Dicks.

7            THE COURT:  Cross-examination.

8            MR. GARREN:  Give me a moment, Judge, to

9    set up, if you would.

10           THE COURT:  Yes, sir.  Well, this might

11   be an appropriate time.  We'll give you the moment

12   during the break.

13               *(Short break)*

14           THE COURT:  Cross-examination,

15   Mr. Garren.

16           MR. GARREN:   Thank you, Your Honor.

17                   **CROSS-EXAMINATION**

18   **BY MR. GARREN:**

19       Q.   Dr. Dicks, before we get started here, I want

20   to try and clear up a couple facts.

21           The number of birds that you said you used

22   for your calculation was 50 million birds; correct?

23       A.   Fifty-one, yes.

24       Q.   Fifty-one million.  And that is just an

25   inventory number; correct?

1      A.    That's a January 1st inventory number,

2  correct.

3      Q.    And, in fact, we have more than that sitting

4  in the houses throughout the year; would you agree?

5      A.    I'd agree.

6      Q.    And for a typical broiler operation, you're

7  seeing a flock turn of about five to six times a year;

8  correct?

9      A.    Correct.

10     Q.    And would that impact your numbers if you put

11 in the total bird sales as opposed to an inventory

12 number?

13     A.    No.

14     Q.    Did you calculate your poultry based upon

15 bird numbers -- I mean, your poultry waste based upon

16 that bird number of 51 million?

17     A.    Did I calculate the poultry waste number?

18     Q.    Yes.

19     A.    The tons of poultry litter?

20     Q.    Yes, sir.

21     A.    No.

22     Q.    The number of acres that you said was used

23 for land application, I believe, you testified was

24 400,000.  Is that the number of acres in the entire

25 watershed or is that just Arkansas?

1        A.   I think that was the Arkansas.

2        Q.   What is the total number of acres that you

3   used for your estimations that land would be -- or

4   poultry waste could be land-applied on?

5        A.   491,000, I believe, is the accurate number.

6        Q.   And that is for the entire watershed;

7   correct?

8        A.   That's for the entire watershed.  That's the

9   total number of cropland, pasture, hay land, and

10  pasture acres, correct.

11       Q.   I noticed in some of your spreadsheets the

12  number of 670,000 and 698,000 acres.

13            Was that a number that's actually used as

14  part of your calculations?

15       A.   No, it was not.  That was the five-county

16  area.

17       Q.   All right.  Do you consider yourself to be a

18  resource economist, Dr. Dicks?

19       A.   Yes.

20       Q.   And as a resource economist, would you agree

21  it's important to take into consideration the impacts

22  of agricultural practices and what they will do to

23  resources such as water quality?

24       A.   Yes.

25       Q.   You'd agree, and it is your opinion, that you

1    think more phosphorus can be added into this

2    watershed; correct?

3         A.   I believe I stated that I feel my estimates

4    show that more phosphorus could be added to the farm

5    fields in the watershed, correct.

6         Q.   And is that your opinion, that more

7    phosphorus then could and should be added to this

8    watershed?

9         A.   Yes.

10        Q.   All right.  To what extent, in forming that

11   opinion, did you take into consideration that the IRW

12   is a nutrient-limited or surplus area?

13        A.   That didn't come into my determination.

14        Q.   Okay.  You're aware that both states have

15   determined the IRW to be a nutrient-surplus or

16   nutrient-limited area; correct?

17        A.   I agree, yes.

18        Q.   Would you agree that your opinion goes only

19   to the economics and not the environmental impact of

20   adding more litter to the watershed?

21        A.   Correct.

22        Q.   And you would agree that your focus in making

23   that opinion is on a field STP as opposed to the

24   watershed as a whole?

25        A.   Correct.

1    Q.   You agree that it's -- that agricultural

2   nutrient transport in runoff is an environmental

3   concern, correct, in the IRW?

4    A.   Yes.  It could be.

5    Q.   Do you think it is today?

6    A.   For some people, certainly.

7    Q.   And who are those people?

8    A.   Well, I read about it.  I've not measured it.

9   So I couldn't tell you that I know for sure it is.

10    Q.   Okay.  Is it your opinion then that the

11   economic value of the litter is a justification to

12   continue phosphorus loading in this watershed which

13   has been designated nutrient-surplus or limited?

14    A.   I'm sorry.  Can you repeat that?

15    Q.   Yes.  Is it -- are you saying that the

16   economic value of the litter is a justification for

17   continued phosphorus loading in a

18   nutrient-surplus-designated watershed, the IRW?

19    A.   Yes.

20    Q.   You agree you've not conducted any scientific

21   survey or investigation to determine where in the IRW

22   there may be fields, if any, which have tested less

23   than 65 STP; correct?

24    A.   Correct.

25    Q.   You have not conducted any scientifically

 1   valid survey of landowners to determine if there are

 2   any in the IRW that would accept land-applied poultry

 3   waste and who are not already using it; true?

 4       A.   True.

 5       Q.   And that is a premise of one of your major

 6   assumptions in your opinion, that it would be applied

 7   uniformly throughout the watershed; correct?

 8       A.   That it could be, yes.

 9       Q.   All right.  You or others have not

10   conducted -- let me put it this way.

11          You, or others for you, have not conducted

12   any scientific study or investigation to determine the

13   environmental impact from the additional phosphorus

14   you propose be added to this watershed?

15       A.   No, we have not.

16       Q.   You're not a soil scientist; correct?

17       A.   Correct.

18       Q.   You're not a hydrologist?

19       A.   No.

20       Q.   And you're not an agricultural engineer?

21       A.   No.

22       Q.   And you do not conduct or have not conducted

23   river or watershed modeling; correct?

24       A.   That's not correct.  I have.

25       Q.   Okay.  What have you conducted in that

1    regard?

2        A.   I completed just recently a Fort Cobb

3    watershed study.  Again, one of the roles of the

4    Economic Research Service, as far back as the '60s,

5    was watershed analysis.

6        Q.   Okay.  Well, I'm just asking what you've

7    done.

8             Have you done a watershed analysis in Fort

9    Cobb?

10       A.   Yes.

11       Q.   And did you apply a model to that analysis?

12       A.   Yes.

13       Q.   Is that the only model you've operated with

14   or used in a watershed?

15       A.   That's the only one I can recall at the

16   moment, yes.

17       Q.   Okay.  And you've not conducted any model or

18   similar model in the IRW, have you?

19       A.   No, I have not.

20       Q.   Did you have an opportunity to review the

21   testimony of Dr. Dwayne Edwards in this case?

22       A.   I don't recall that, no.

23       Q.   Are you aware that he -- then you're not

24   aware that he's testified in this case that runoff

25   from rainfall events after manure application can

1    transport manure constituents, such as phosphorus, to

2    downstream waters; correct?

3                    MR. HOPSON:  Objection; beyond the scope

4    of this witness' direct.

5                    MR. GARREN:  It goes to the fundamental

6    assumptions he's used, Your Honor, in order to apply

7    the input/output model and to calculate his STP values

8    as to what impact or effects we might have.

9                    MR. HOPSON:  Testimony about runoff,

10   Your Honor, doesn't go into input/output models.

11                   THE COURT:  The objection's sustained.

12      Q.   *(BY MR. GARREN)*  Did you take into

13   consideration the potential of runoff occurring from

14   the additional phosphorus that you're proposing be

15   added to this nutrient-limited watershed?

16                   MR. MCDANIEL:  Excuse me, Your Honor.  I

17   want to object.  Mr. Garren has asked several

18   questions suggesting that Dr. Dicks is saying that we

19   need to put more poultry litter in this watershed.  He

20   simply analyzed current production.  I think that's

21   misleading.

22                   THE COURT:  Yeah.  This area goes beyond

23   the scope.  Dr. Dicks has not offered himself as an

24   expert with regard to runoff but -- so the objection's

25   sustained.

1    Q.   *(BY MR. GARREN)*  You do, however, recognize

2    the concern voiced by many in published literature of

3    what happens to land-applied poultry waste in the IRW;

4    is that correct?

5         MR. HOPSON:  Objection; beyond the

6    scope.

7         THE COURT:  Overruled.

8    A.   Could you repeat it?

9         MR. GARREN:  I'm going to ask the court

10   reporter to read it back to you so we get it right.

11        *(The record was read as requested)*

12   A.   I know there's -- there's been public

13   periodical information on concerns for litter and its

14   contamination in the IRW.  I don't know that I can

15   recall any published journal articles that state the

16   same.

17   Q.   *(BY MR. GARREN)*  You don't know Dr. Edwards;

18   correct?

19   A.   No, I don't.

20   Q.   So you haven't read any of his papers.  Do

21   you know Dr. Chaubey?

22   A.   Pardon me?

23   Q.   Do you know a Dr. Indrajeet Chaubey who's

24   published on these areas?

25   A.   I don't believe so.

1    Q.   Do you know Dr. Brian Haggard who's published

2    on this area of the IRW?

3    A.   I do not.

4    Q.   Okay.  Now, just so I'm clear, as part of

5    your work in this case, you've not conducted any soil

6    or water sampling in the IRW; true?

7    A.   True.

8    Q.   No one has conducted any soil or water

9    sampling for you to give your opinion in this case;

10   true?

11   A.   That's correct.

12   Q.   Now, you made a comment in your testimony and

13   I want to make sure I understand its context.  You

14   talked about inputs and outputs relative to nutrients.

15        Are you talking about from a concept of a

16   mass balance concept or not?

17   A.   I'm unclear of what you're referring to.

18   Q.   Okay.  Well, I just wrote down quickly that

19   you talked about input and output flows and I thought

20   you said "nutrients."

21        Was that part of your consideration in giving

22   an opinion?

23   A.   I'm still not sure where you're going.  I

24   mean, I'm not sure what you're asking me.

25   Q.   I'm just trying to figure out -- let me ask

1    it this way then.

2            Did you, as part of your work, review any

3    mass balance studies in the IRW on nutrient mass

4    balance?

5        A.   I don't believe so, no.

6        Q.   Did you review any published materials that

7    show the levels of STP in the region of northwest

8    Arkansas that may have been published by like the USDA

9    or others?

10       A.   I don't recall if it was STP.  I did review

11   an Economic Research Service report that showed that

12   there was a nutrient surplus in the county -- in those

13   counties.

14       Q.   You would agree, sir, as part of your charge

15   in doing your work in rendering your opinions in this

16   case to assess the economic effects on the local

17   economy of litter removed, you have ignored any

18   environmental effects of adding more P -- is that

19   correct? -- more phosphorus.

20       A.   Yes.

21       Q.   And you have not performed what's referred to

22   as a net-cost benefit analysis; correct?

23       A.   I have not performed a benefit-cost analysis,

24   no, sir.

25       Q.   You would agree that generally the poultry

1  litter generated in the IRW historically has stayed

2  within the IRW?

3      A.   Yes.

4      Q.   Based upon economics, do you agree it's

5  cheaper to control nutrient sources rather than

6  symptoms of nutrient enrichment in watersheds such as

7  the IRW?

8      A.   Yes.

9      Q.   What were the number of poultry houses -- or

10  let me ask you this.

11          Did the number of poultry houses weigh in any

12  way on the work that you performed in providing your

13  opinions today?

14      A.   No, sir.

15      Q.   Okay.  Was the source of the bird numbers you

16  used -- what was that source?

17      A.   For what purpose the bird numbers?

18      Q.   The 51 million number, what was the source of

19  that number?

20      A.   Census of Agriculture and National

21  Agricultural Statistics Service.

22      Q.   Did you obtain that yourself or did you rely

23  on Billy Clay to get it?

24      A.   I obtained that myself.

25      Q.   Okay.  Do you agree that almost all the feed

1  to support the poultry produced in the IRW is imported

2  to the IRW?

3      A.   Yes.

4      Q.   And was the importation of that feed into the

5  IRW included in the IMPLAN model when you ran it?

6      A.   No.

7      Q.   You agree that the importation of feed into

8  the watershed would and could represent flow of

9  dollars which is what the IMPLAN model measures;

10 correct?

11     A.   Yes.

12     Q.   Why did you not consider it?

13     A.   Well, I didn't have to consider it.  It's

14 included in the model.

15     Q.   All right.  Was it one of the choices of the

16 business sectors that you have an option to choose or

17 not to choose?

18     A.   Well, there is a poultry sector in the model,

19 yes.

20     Q.   All right.  And that would include

21 importation outside the five-county region that you

22 used of feed to support the IRW production?

23     A.   Yes.

24     Q.   Even though your model was restricted to the

25 five-county region, Benton County, Washington County,

1    and three counties in Oklahoma; correct?

2        A.   Yes.

3        Q.   And so it will go out -- you're telling me

4    that the model would go out and grab those flow of

5    dollars from outside the economic region that you

6    used?

7        A.   Oh, I see what you're saying.  No, it would

8    not.

9        Q.   Okay.  In your review of information

10   necessary for your opinion, did you determine whether

11   there was an increased concentration of poultry in the

12   Arkansas side versus the Oklahoma side?

13       A.   Say that again.  Are you asking about --

14       Q.   Maybe let me ask it this way.

15            Does it matter for your purposes of

16   calculating and making your assumptions that there are

17   more poultry produced in the Arkansas side of the IRW

18   than in the Oklahoma side?

19       A.   No.

20       Q.   Given that you said that generally waste is

21   only transported at best the furthest distance around

22   ten miles --

23            MR. ELROD:  Your Honor, I object.  That

24   misstates the evidence.

25            THE COURT:  Rephrase, please.

1      Q.   *(BY MR. GARREN)*  Given your testimony that

2  ten miles is the farthest out that you believed an

3  owner of waste would travel to land-apply it --

4              MR. ELROD:  Object again, Your Honor.

5  That misstates the evidence.

6              THE COURT:  Overruled.

7      Q.   *(BY MR. GARREN)*  Let me ask you, sir:  With

8  regard to the ten-mile radius that you opined to, tell

9  me again what you said it means.

10     A.   It was just the average maximum distance we

11 used to come up with that calculation.

12     Q.   And it's an average based upon what?

13     A.   The size of the watershed and what we know in

14 the past.  I mean, it's just an assumption.

15     Q.   All right.  That's my point.  You only made

16 an assumption as to that radius; correct?

17     A.   That's correct.

18     Q.   Did you review Dr. Engel's work and his study

19 on the average distance that land --

20     A.   No.

21     Q.   -- or Dr. Fisher and Engel showed

22 land-applied poultry waste was transported from the

23 house?

24     A.   No.

25     Q.   Okay.  In operating your IMPLAN model, did

**United States District Court**

1     you include as part of your results the effect, if

2     any, of tourism or recreation -- let me restate that.

3            With regard to removal of litter from the

4     IRW, did your model take into consideration any

5     effects it would have on tourism and recreation

6     dollars?

7        A.   No, sir.

8        Q.   Do you know what the estimated value in

9     annual dollars are in tourism and recreation in the

10    IRW?

11       A.   I do not.

12               MR. GARREN:  May I approach, Your Honor?

13               THE COURT:  Yes, sir.

14       Q.   *(BY MR. GARREN)*  Dr. Dicks, have you had an

15    opportunity to see this USGS report before today?

16       A.   I don't recall.

17       Q.   I'd ask you to look at page 10 of this

18    document under the heading "Water and Local Economy."

19            *(Discussion held off the record)*

20               MR. GARREN:  Let me identify the

21    document, Judge.  I've not done that.

22            It's USGS document demonstrative for the

23    state of No. 360, and it is the summary of surface

24    water quality data from the Illinois River Basin in

25    northeast Oklahoma from 1970 to 2007.

1        Q.    *(BY MR. GARREN)*  And, Dr. Dicks, directing

2   your attention to page 10 under the heading "Water and

3   Local Economy," do you see that?

4        A.    Yes.

5             MR. ELROD:  Your Honor, I'm going to

6   object to the use of this document.  Dr. Dicks said he

7   didn't take it into consideration, he doesn't think

8   he's ever seen it, and this whole line of questioning

9   was not something he even took into consideration in

10   the opinions he's offered.

11             MR. GARREN:  And that's the whole point

12   of my offering it, Your Honor, is to show that he has

13   taken a very myopic view with regard to the effects of

14   litter being removed.  I want to show what the

15   estimated annual revenues are from both tourism and

16   recreation as shown in this document.

17             MR. HOPSON:  Your Honor, I have an

18   additional objection.  The document is hearsay.  The

19   witness has already said he did not take into account

20   recreational impacts so he can't be impeached with a

21   document showing that there may be recreational

22   impacts.

23             THE COURT:  I think that's the point.

24   Sustained.

25             Go ahead.

 1          MR. GARREN:  The document is admitted,

 2    Your Honor, with regard to its use.  So certainly it

 3    would be appropriate, I think, to ask him how that

 4    might change the results that he has given in his

 5    opinion if these other numbers were taken into

 6    consideration.

 7          THE COURT:  I don't know that its

 8    admission makes any difference with respect to its

 9    impeachment value, if he can't be impeached, since he

10    denies he took into consideration recreational values.

11        Counsel.

12          MR. HOPSON:  I agree, Your Honor.  You

13    know, the hearsay objection -- I don't know why we say

14    this document is admitted into evidence since I've

15    been handed a document marked Demonstrative 360.

16    Whether it's in evidence or not, impeachment is

17    confronting the witness with something inconsistent

18    with his testimony.

19        He just said not three questions ago that he

20    does not take recreational impacts into account, and

21    the IMPLAN models showing how much they might be,

22    which frankly is not something this document does, is

23    not proper impeachment?

24          THE COURT:  Right.  You've already

25    impeached him by virtue of the fact that he only takes

1    into consideration agricultural interests, which is

2    part of the alleged problem here.  We're just focusing

3    on ag interests.

4            Sustained.

5        Q.   *(BY MR. GARREN)*  Was it your choice,

6    Dr. Dicks, to limit the scope of the application of

7    the IMPLAN model to only the five-county region and

8    the effect of removing litter --

9        A.   It was --

10       Q.   -- as an economist?

11       A.   It was the task that I was provided, yes.

12       Q.   All right.  And you were told then to limit

13   the applicability of the IMPLAN model to just those

14   subjects, correct, as part of your task?

15       A.   I believe what I was instructed to do was to

16   determine the economic impact on the farmers and the

17   economy from removal of the poultry litter.

18       Q.   And who instructed you to do that?

19       A.   Well, the group of lawyers.  I'm not sure

20   which one exactly.

21       Q.   Okay.  Now, you've talked about calculating

22   STP, and your calculations were to bring it up to a

23   level of 65; is that correct?

24       A.   That's correct.

25       Q.   Do you have an experience regarding the

1    agronomic needs of forage grasses in the IRW?

2         A.   Specifically in the IRW?

3         Q.   Yes, sir.

4         A.   No.

5         Q.   Okay.  For Bermuda and fescue, do you know

6    what the agronomic need of those grasses are for

7    phosphorus?

8         A.   In terms of their uptake or in terms of --

9         Q.   Yes, sir.

10        A.   -- their level for nitrogen consumption?

11        Q.   In terms of the uptake of phosphorus.

12        A.   Again, as I've said, according to literature,

13   it's 13.7 pounds of phosphorus per ton of -- per ton

14   of hay -- of forage.

15        Q.   The agronomic critical level for fescue or

16   Bermuda grasses you understand to be 65 STP; is that

17   true?

18        A.   Correct.

19        Q.   Do you know or understand whether phosphorus

20   when continuously applied over time will build up in

21   the soils in the IRW?

22        A.   Yes.

23        Q.   And will it?

24        A.   Yes.

25        Q.   And was that taken into consideration in your

1   calculations?

2       A.   I don't -- I think in our calculations we

3   didn't allow it to.

4       Q.   And that is because you did what, removed

5   forage at a level consistent with what would allow a

6   continuous application of more litter?

7       A.   Can you repeat that?

8       Q.   Let me ask it this way.

9            What did you do to not allow the buildup in

10  your calculations?

11      A.   Well, we limited the phosphorus that could be

12  applied to the STP of 65.

13      Q.   And do you understand whether or not in

14  fields that are not hayed whether that STP level will

15  rise over time with that continuous application rate?

16      A.   We only applied -- we only allowed -- in our

17  model, we only allowed enough phosphorus to be applied

18  to produce the forages that were required for the

19  cattle and attain an STP of 65.  Beyond that, no more

20  was applied.

21      Q.   Okay.  And your assumption is that it would

22  be uniformly applied throughout the watershed, though;

23  correct?

24      A.   Yes.

25      Q.   And you've already testified that you know

1  and are aware that there are many fields that are

2  already above 65; correct?

3      A.   That's correct.

4      Q.   And so under your assumption, you're now

5  applying on fields in your model or in your

6  calculations that don't need it; correct?

7      A.   Well, not necessarily, no.

8      Q.   Well, if in actuality there are fields out

9  there that have more than 65 and you're uniformly

10  applying on all fields, aren't you applying on those

11  fields that are above 65?

12      A.   Well, in a sense -- in a sense of reality,

13  yes.  But this is a statistical approximation that we

14  determined an average, a statistical average, of 45.5,

15  meaning that if you took all the litter that was

16  available from 1974 to 2007 and applied it in the

17  watershed and that was the only source of nutrients

18  and you had the haying and cattle activities that you

19  had at that time, that the amount of demand would pull

20  out those nutrients and so you would reach across the

21  board 45.5.

22          Now, if I was to go back and say let's

23  calculate -- let's take all the information we have on

24  these high levels and try to add that back in, what

25  I'd find would be still an average of 45.5, but I'd

1    also find fields there that might have close to zero

2    phosphorus level.

3        Q.  Well, you haven't done anything to determine

4    what -- and you've already said that -- you haven't

5    done anything to determine, by way of survey or

6    sampling, what the STP levels are in any field;

7    correct?

8        A.  I don't think anybody has.

9        Q.  Well, in fact, we have STP data that even

10   Gordon Johnson has placed into evidence in this case;

11   true?

12       A.  For a small subset of fields.

13       Q.  Well, at least we have a subset of fields;

14   correct?

15       A.  Not of a sample that you could use to come up

16   with the calculation I did.

17       Q.  But that's the only data that's available;

18   would you agree?

19       A.  That's correct.

20       Q.  All right.  And so sometimes we're dealt the

21   cards, we've got to play them; right?

22       A.  That's what I did.

23       Q.  All right.  But you didn't rely on that STP

24   data, you went out and constructed by assumption and

25   calculation an average STP evaluation; true?

 1         A.   Exactly.  As Dr. Rausser pointed out, that

 2    data is biased and it's not usable for that purpose.

 3         Q.   You would agree with me, sir, that there are

 4    a lot of landowners in the IRW who do not want or

 5    desire any poultry litter to be applied on their

 6    lands; correct?

 7              MR. HOPSON:  Objection; calls for

 8    speculation.

 9              THE COURT:  Asked if has an awareness.

10    Overruled.

11         A.   I have no -- I have not seen a study and I

12    don't think anybody's done a study that would -- would

13    indicate that, no, sir.

14         Q.   (*BY MR. GARREN*)  Okay.  So we must believe in

15    your assumption that everybody wants and will, in

16    fact, apply it as you have done in your calculation;

17    correct?

18         A.   I never made that assumption in my

19    calculations, no, sir.

20         Q.   But you did assume that all fields would be

21    uniformly applied?

22         A.   Could be, yes.

23         Q.   Okay.  Could be.

24         A.   I think that's a big difference in words,

25    isn't it?

1          Q.    It's a conditional, isn't it?  It's not

2     categorically that it would be; correct?

3          A.    Could be.

4          Q.    That's right.  So it could be that there are

5     a lot of people who don't want it; correct?

6          A.    Possible.

7          Q.    And it's very possible that the STP data set

8     that we have represents only those who are using it

9     and are needing to take a soil test; correct?

10         A.    That's correct.

11         Q.    Sir, when you made the statement that roughly

12    10 percent of the phosphorus is removed in the

13    development of beef animal, you've not provided any

14    authority for that statement in your report, have you?

15         A.    I believe so, yes.  I believe it's --

16         Q.    Can you tell me what the authority is?

17         A.    Right offhand, I'd have to turn to appendix

18    A, but I believe it's documented in appendix A under

19    one of the OSU publications, yes.

20         Q.    Now, in your opinion, Dr. Dicks, you state

21    that grazing cattle will return the nutrients to the

22    ground but not necessarily in the pasture in which

23    they took the grass and chewed it; correct?

24         A.    That's correct.

25         Q.    But you'd agree with me notwithstanding that,

 1    they will still deposit the nutrients taken --

 2    ingested by them into an area close to the pasture;

 3    correct?

 4         A.   That's correct.

 5         Q.   And we're still within the IRW when those

 6    nutrients are redeposited; correct?

 7         A.   That's correct.

 8         Q.   And those areas that have been referred to as

 9    loafing areas, those are typically trampled and

10    compacted; correct?

11         A.   Yes.

12         Q.   Do you know whether or not that enhances the

13    potential for runoff in those areas?

14              MR. HOPSON:  Objection; beyond the

15    scope.

16              THE COURT:  Overruled.  Go ahead.

17         A.   It could, yes.

18         Q.   *(BY MR. GARREN)*  Does your calculations and

19    model take into effect the amount of phosphorus found

20    in the stream moving downstream to the lake?

21              MR. HOPSON:  Objection, Your Honor.  Now

22    we've got phosphorus in the stream which is clearly

23    beyond the scope of his economic testimony.

24              THE COURT:  Sustained.

25         Q.   *(BY MR. GARREN)*  So the only loss of

1    phosphorus that you're testifying about is where

2    cattle move it from one pasture and into a riparian

3    area or a loafing area; correct?

4        A.   That's correct.

5        Q.   Well, except for the 10 percent we talked

6    about earlier?

7        A.   Right.  Correct.

8        Q.   All right.  So do you -- you recognize then

9    that the cattle when they've ingested the grass that's

10   been fertilized with poultry litter, they're just

11   moving that phosphorus from one place to another; is

12   that your opinion?

13       A.   Yes.

14       Q.   As part of the preparation in this case, were

15   you familiar with a paper published by a Mr. Slaton

16   regarding the nine geographic areas in Arkansas and

17   nutrient input trends?

18       A.   I can't remember if I reviewed it for this

19   case or not but I believe I've seen it.

20              MR. GARREN:  If I may approach, Your

21   Honor?

22              THE COURT:  Yes, sir.

23       Q.   *(BY MR. GARREN)*  After you've looked at the

24   document, can you tell me, sir, whether or not you

25   recognize it?

 1          A.   Yes.

 2          Q.   You've looked at this before, have you not?

 3          A.   Well after our report was done, but yes, I've

 4     looked at it.

 5          Q.   After your report?

 6          A.   Yes.

 7          Q.   When were you first introduced to this?  Was

 8     it at your deposition or before?

 9          A.   I can't recall.

10          Q.   So you didn't go out and search for this

11     document and it wasn't available to you prior to

12     making your opinion; true?

13          A.   I didn't find this document during my search

14     for documents, no.

15          Q.   Having since read this document which

16     describes the nutrient trends in northwest Arkansas,

17     does that have an impact on your opinion today?

18          A.   No.

19          Q.   Okay.

20               MR. GARREN:  For the record, this is

21     Oklahoma Exhibit 5101.  It's a nutrient input removal

22     transfer of agricultural soils in nine geographic

23     regions in Arkansas.  Primary author is Nathan

24     Slaton.

25               MR. MCDANIEL:  For the Record, Your

1    Honor, that may be marked for identification as 5101,

2    but our records don't show that it's been admitted.

3              THE COURT:  Very well.  But he can use

4    it for impeachment.

5        Q.  *(BY MR. GARREN)*  All right.  Now, back to

6    your bird and waste production, Dr. Dicks, is it

7    correct according to your report that you ignored

8    turkey production for the years 1977 to 1985 because

9    you had no data?  Is that right?

10       A.  We ignore -- we didn't -- we didn't use the

11   turkey numbers at all in the 51 million, no.

12       Q.  Okay.  So we don't have any turkey in your

13   waste calculations or bird calculations; correct?

14       A.  Well, we have the total amount of waste of

15   295,114 tons.  All we did was a simple linear

16   approximation given 51 million inventoried birds.

17       Q.  And using that linear regression to determine

18   the amount of birds, that was to supply you where

19   there was missing data; correct?

20       A.  Correct.

21       Q.  And because it's linear, it assumes

22   that -- well, first off, it doesn't represent the

23   actual population, does it?

24       A.  No.

25       Q.  Did you do anything to validate the number of

1    birds that you used in your calculations?

2        A.   Well, we used the census numbers.  I mean, I

3    don't know --

4        Q.   Let me -- that's not a just good question.

5    Let me start over.

6            I know what you used, but with regard

7    to -- you did have to employ linear regression.  Did

8    you do anything to validate your linear regression to

9    determine missing data?

10       A.   No.  It was a simple in-between-the-years

11   extrapolation.

12       Q.   And you didn't discuss with any corporate

13   representatives of the defendants if they had any data

14   to plug in where you had missing data; correct?

15       A.   No, sir.

16       Q.   Your answer would be that's a correct

17   statement?

18       A.   That's a correct statement.  I did not.

19       Q.   Thank you.  Based upon the reduction and the

20   cost of fertilizer since your 2008 report, would that

21   lower the impact that you have opined to today?

22       A.   Yes.

23       Q.   And did you actually perform the model that

24   was run for this case?

25       A.   I'm sorry.  Can you --

1      Q.   Yes.   The IMPLAN model, did you actually

2    operate it or run it or did someone run it for you?

3      A.   I did not run it.

4      Q.   And who ran it for you?

5      A.   Lisa -- Lisa Keating.

6      Q.   And where is she located?

7      A.   Berkeley, California.

8      Q.   And did you state -- let me ask you this:   Is

9    she an employee of yours?

10     A.   She is not.

11     Q.   Have you ever worked with her before?

12     A.   No.

13     Q.   And did you ever observe her work before

14   using her in this case?

15     A.   No.

16     Q.   Do you know her qualifications prior to her

17   doing the work for you in this case?

18     A.   No.

19     Q.   Did anyone explain to you her qualifications

20   before she performed the work?

21     A.   No.

22     Q.   Did anyone explain her experience in running

23   the IMPLAN model before running that for you?

24     A.   We had discussions about it, yes.

25     Q.   Okay.  Did you ask her personally about her

1    experience in operating the IMPLAN model?

2        A.   Yes.

3        Q.   Now, as part of your work in this case, you

4    did not perform any scientific analysis,

5    investigation, or study to determine the economic

6    effects to any of the defendants for not having to

7    deal directly with the disposition of the waste from

8    their -- what their birds generate, did you?

9        A.   No.

10       Q.   Did you undertake any investigation or study

11   to determine the costs saved by the defendants for not

12   having to deal directly with the disposition of waste

13   generated by their birds?

14              MR. MCDANIEL:   Objection.   It's

15   argumentative, Your Honor.

16              THE COURT:   Overruled.

17       A.   No.

18              MR. GARREN:   Excuse me, Your Honor, I

19   apologize.   I've either written a number down wrong

20   or -- give me a couple of seconds.

21              THE COURT:   Yes, sir.

22          (Discussion held off the record)

23              MR. GARREN:   May I approach, Your Honor?

24              THE COURT:   You may.

25       Q.   (BY MR. GARREN)   For the record, Dr. Dicks,

**United States District Court**

1    I've handed you Oklahoma Exhibit No. 0147.  It's a

2    spreadsheet which is a copy of an exhibit used in your

3    deposition.  Do you recall seeing this document?

4        A.  Yes.

5        Q.  Tell the court what this document is, if you

6    would, please.

7        A.  Which sheet?  Both sheets or --

8        Q.  Yeah.  Let me --

9            MR. GARREN:  Your Honor, for the record,

10   I have attached a small version, which actually shows

11   the document as it was used previously, and I've

12   simply blew it up so that we could see it easier in

13   court.

14           THE COURT:  Thank you.

15           MR. GARREN:  It is rather small print.

16           THE COURT:  They're both the same?

17           MR. GARREN:  Yes, they are, short of not

18   having the exhibit sticker on the large volume --

19           THE COURT:  Thank you.

20           MR. GARREN:  -- or the larger copy.

21       Q.  *(BY MR. GARREN)*  So we can ignore the little

22   one, Dr. Dicks, unless you just want to have the eye

23   strain.

24       A.  No problem.

25       Q.  Now, go ahead and explain to the court what

1    this document represents.

2        A.   Well, this would be the sheet that would

3    be -- excuse me -- the spreadsheet that would be set

4    up for looking at the budgets, the aggregate farm

5    budget, for the poultry, forage, and beef cow

6    enterprises, and the estimated change in expenses and

7    outputs as a result of removing poultry litter from

8    the IRW.

9        Q.   Let me ask you about a couple of columns and

10   then we'll dig into this maybe a little bit more.

11        Over to the right of where the spreadsheet,

12   and there is a column of numbers that does not have a

13   column heading on it and the top number is 404.  Do

14   you see that column?

15        A.   Yes.

16        Q.   Tell the court what that column of numbers

17   represents other than where you see the dollar signs

18   in front of the number.

19        A.   Those are the sectors that would be

20   identified in IMPLAN as the -- the -- so, for

21   instance, the supplies there, supplies would fall

22   under sector 404 of the IMPLAN model.  That's the

23   standard industrial code.

24        Q.   And the classification is then the two more

25   columns over, where it says building material and

1   garden equipment and supply dealers?

2       A.   That's a different -- that's a different

3   code.

4       Q.   Okay.

5       A.   And so one of the -- one of the problems of

6   the new model, which we did not use, is that the new

7   model switched to a different code so we were trying

8   make a comparison between the two codes.

9       Q.   So my next question is:  There is another

10  column there just to the left of the written words I

11  just read that starts with code No. 444.  Is that the

12  different code you're referring to?

13      A.   That's the different code, yes, sir.

14      Q.   What is that code called?

15      A.   I can't remember the names of the two codes

16  but they're both -- but are both codes of a sector

17  that is included in one of the two IMPLAN models

18  that's used for creating the impacts.

19      Q.   Is the description of the code for the IMPLAN

20  404 code that's shown there, is that an accurate

21  description, where it says building material and

22  garden equipment?

23      A.   Well, they're different sectors.

24      Q.   What is the sector called that's designated

25  there in 404?

1    A.   I don't have that description in front of me

2   so I can't tell you.

3    Q.   All right.  But that description is set forth

4   in the manual that you can download and easily get

5   your hands on?

6    A.   Correct.  The NAICS is a code that's

7   available even on the Internet.

8    Q.   Okay.  Well, we'll look at that in just a

9   minute but let's talk about the spreadsheet.

10       Based upon the column that's headed "Beef

11   Production Total Cows," just to skip to the bottom on

12   that, you would agree with me that shows that even

13   with the use of litter, beef production on its own is

14   losing some 16 million -- $16,539,458 based upon your

15   work here; is that correct?

16   A.   Not -- not necessarily.  No, that's not

17   really correct.

18   Q.   Well, it is on its own by segregated business

19   as you did in your work; correct?

20   A.   As an enterprise, it is not doing a good job

21   of adding value to the -- to the -- to the forage,

22   correct.

23   Q.   Well, based on this, you're saying that net

24   farm income is a minus 16.5 million; correct?

25            MR. ELROD:  Where are you, Rick?  I'm

1    sorry.  I'm not following --

2        Q.   *(BY MR. GARREN)*  At the same column at the

3    bottom where it says "Net Farm Income," you have a

4    negative 16.5 million for the beef production total

5    cows; correct?  You're characterizing it as net farm

6    income, are you not?

7        A.   Well, I'm trying to decide whether this is

8    scenario one or if this is the base.  So, I mean, I

9    can't tell from what you've given me whether

10    that -- whether those columns -- what I believe is

11    that these columns here to the left that describe the

12    poultry, forage, and beef production enterprises are

13    actually the scenario one and not the base.

14             So when you pull forage -- the poultry litter

15    out, these are the numbers that you would get.  That's

16    what I think that that indicates, but I'm not sure

17    enough to look at it.

18        Q.   Well, it does say at the very top of this --

19    and maybe that will help and maybe it won't -- it says

20    the difference between scenario one and base --

21        A.   Correct.

22        Q.   -- and you have three more columns;

23    correct?

24        A.   That's correct.

25        Q.   So what you're doing is you are finding that

1    difference pulled out of the columns that are shown as

2    poultry, forage, beef production, and aggregate farm,

3    are you not?

4         A.    That's correct.  So there is a base budget

5    that would look identical to this that has the

6    poultry, forage, and beef production and there would

7    be a scenario one set of budgets.

8             What I'm saying is, this aggregate farm that

9    you're showing me here, I don't know and I would

10   presume that this is scenario one and not the base.

11        Q.    We'll come back and we'll try to find some

12   spreadsheets that might identify that.

13             MR. GARREN:  If I may approach then,

14   Your Honor?

15             THE COURT:  You may.

16        Q.    *(BY MR. GARREN)*  Do you recognize the

17   document which has been marked Oklahoma Exhibit 0167

18   entitled, "IMPLAN Input/Output System"?

19        A.    Yes.

20        Q.    This is what you referred to earlier that is

21   available for anyone to download if they're going to

22   employ the use of this input/output model; correct?

23        A.    Correct.

24        Q.    And if we go back to appendix 1 in this

25   document at page 16, you will find the codes that you

1    and I were talking about earlier; true?

2        A.    Correct.

3        Q.    So if we were to look at the prior exhibit of

4    Oklahoma Exhibit 147 in the column of codes, which

5    code classification on the 147 exhibit would we look

6    to identify it in the new Exhibit 167?

7        A.    I'm sorry.  We're looking for what code?

8        Q.    Any of these codes.  You have two columns of

9    codes.  Which column would we use to look at the

10    descriptor under the IMPLAN model?

11        A.    The code on the left would be the IMPLAN

12    code, and the code on the right would be the NAICS

13    code.

14        Q.    All right.  If we were to look at appendix 1

15    in the -- I'm calling it the manual for the

16    input/output system, Exhibit 167 --

17        A.    Correct.

18        Q.    -- we would like for 404 to find the supply

19    code that you've used?

20        A.    Yes.

21        Q.    And that's the first column of the appendix 1

22    where it has the numbers going numerical order from --

23        A.    Yes.

24        Q.    -- top to bottom; correct?

25        A.    Page 24, 404, building materials and garden

 1    supply stores, correct.

 2        Q.   All right.  So we can match those codes of up

 3    what you've used to run your IMPLAN model by having

 4    Exhibit 167 available; correct?

 5        A.   Well, if there was any impacts in that,

 6    that's correct, yes.

 7        Q.   And those impacts would be evidenced by the

 8    spreadsheet whether there are values shown there;

 9    correct?

10        A.   Correct.

11        Q.   So do you see that there is any impact from

12    the code 404 that you have used on the spreadsheet

13    0146?

14        A.   There is none.

15        Q.   Okay.  The first one that we see an impact is

16    under code 425; is that correct?

17        A.   Correct.

18        Q.   And if we looked at the IMPLAN manual, code

19    425 talks about nondepository credit, intermediation,

20    and related activities?

21        A.   Yes.

22        Q.   All right.

23             MR. GARREN:  Your Honor, I move for the

24    admission of Oklahoma Exhibit 147, the spreadsheet.

25             THE COURT:  Any objection?

**United States District Court**

 1              MR. ELROD:  I have no objection, Your

 2     Honor.

 3              MR. GARREN:  I'd also move for the

 4     admission, so we know what we're talking about, as

 5     Oklahoma Exhibit 167.

 6              THE COURT:  Any objection?

 7              MR. ELROD:  I think I do object to that

 8     on the basis of hearsay.

 9              THE COURT:  Well, at least part of it is

10     necessary for deciphering the codes; correct?

11              MR. ELROD:  I'll withdraw the objection,

12     Your Honor

13              THE COURT:  147 and 167 are admitted.

14       Q.   *(BY MR. GARREN)*  Now, Dr. Dicks, in your

15     considered materials, there is a publication that

16     we've talked about before by Dr. Ogishi and

17     Dr. Zilberman.

18          Do you recall that the integrated

19     agribusiness and liability for animal waste

20     publication by those gentlemen?

21       A.   No, sir.

22       Q.   All right.

23              MR. GARREN:  If I may approach, Your

24     Honor?

25              THE COURT:  Yes, sir.

1     Q.   *(BY MR. GARREN)*  Dr. Dicks, I've handed you

2  Oklahoma Exhibit 151.  It's an article entitled

3  "Integrated Agribusiness and Liability for Animal

4  Waste."  Principle author is Aya, A-y-a; Ogishi,

5  O-g-i-s-h-i, and the secondary one is David Zilberman.

6          Do you recall the name David Zilberman, sir?

7     A.   I know who David Zilberman is, yes.

8     Q.   And he's a colleague of Dr. Rausser at

9  Berkeley, is he not?

10     A.   Yes.

11     Q.   Have you read this paper before?

12     A.   I don't believe so, no.

13     Q.   You and I discussed it in your deposition,

14  did we not?

15     A.   I think you tried to, yes.

16     Q.   Do you agree, sir, that there are -- well,

17  let me ask you this, sir.

18          Do you have an opinion whether or not the

19  integrators have any responsibility for the cost of

20  handling and disposing of the poultry waste generated

21  by their birds in the IRW?

22              MR. ELROD:  Object, Your Honor; outside

23  the scope of direct.

24              MR. HOPSON:  Your Honor, I was just

25  going to say it might have been an appropriate

10543

1    question for Dr. Rausser, but he's not talking about

2    integrator responsibilities in his testimony.

3              THE COURT:  Sustained.

4        Q.   *(BY MR. GARREN)*  Have you in your work, sir,

5    made any determination on a per-bird basis or a

6    per-pound basis what the difference of income is for a

7    grower versus an integrator on the production of

8    birds?

9        A.   No, I have not.

10       Q.   Have you been provided that information by

11   others?

12       A.   No.

13       Q.   In your implementation of the IMPLAN model,

14   did you take into consideration the economics of scale

15   relative to the handling and disposition of poultry

16   waste in the IRW?

17       A.   No.

18       Q.   Now, I talked about this a little bit

19   earlier.  I just want to clarify it.

20            The IMPLAN model is based upon political

21   boundaries essentially; correct?

22       A.   That's correct.

23       Q.   And so you can run it for a county, a state,

24   or a multiple states area; correct?

25       A.   Correct.

1    Q.   And you chose the five counties that we're

2  talking about.  Did you make any runs outside -- let

3  me ask it this way.

4         Did you apply the IMPLAN model on any area

5  other than the five counties at any time?

6    A.   No, sir.

7    Q.   And did you apply any of the codes that you

8  can find under IMPLAN, the manual we looked at

9  earlier, that would have a direct or an indirect

10  effect from the -- from water quality issues?

11         Let me rephrase it.  Obviously, I've caught a

12  deer in a headlight and I apologize.  It wasn't very

13  well-crafted.

14         Are water quality issues any part of the

15  IMPLAN business sectors that you chose when running

16  your model?

17    A.   No.

18    Q.   Did you make any determination whether or not

19  hay and cattle producers are all also poultry-growers?

20    A.   No.

21    Q.   Do you have any knowledge of your own whether

22  or not in the IRW all hay and cattle producers are

23  also poultry-growers?

24    A.   They are not.

25    Q.   All right.  You have some experience with the

1    NRCS and the extension services in the IRW, do you

2    not?

3        A.   Yes.

4        Q.   And so based on that, you know that not all

5    hay and cattle producers are also poultry-growers?

6        A.   Correct.

7        Q.   Now, would you agree with me that those who

8    do raise hay and cattle within the five-county region

9    that you chose to use may, in fact, sell their cattle

10   outside that region?

11       A.   Yes.

12       Q.   And your IMPLAN model did not capture the

13   flow of dollars that would occur as a result of that

14   transaction; correct?

15       A.   Does it capture the flow of dollars outside

16   of the IRW?

17       Q.   Yes, sir.

18       A.   No, it does not.

19       Q.   I noticed materials -- I noticed documents in

20   your materials that related to the hauling out of

21   litter in the IRW.

22            You're aware that's occurring at this time;

23   correct?

24       A.   Yes.

25       Q.   And did your IMPLAN model take into

1    consideration the flow of dollars from the sale of

2    that litter to those outside the IRW?

3         A.   No.

4         Q.   So to kind of summarize on that point, if

5    activity dealing with flow of dollars occurs as a

6    result of something in the IRW but is connected to

7    something outside the IRW, your model doesn't pick

8    that up; correct?

9         A.   The model only captures the economic activity

10   in the five-county area.

11        Q.   So if Roger Collins, who testified in court

12   in this case that he invested half a million dollars

13   in hauling equipment and, in fact, hauls to Enid, to

14   areas near Texas, and other areas, when he takes that

15   and sells it someplace, the litter, we're not

16   capturing those dollars in your IMPLAN model;

17   correct?

18        A.   Some of them, yes.

19        Q.   But not all of it?

20        A.   But not all of them, correct.

21        Q.   Let me ask you this, sir:  As an economist,

22   is it your opinion that the economic effects to the

23   hay and beef industry in the IRW are truly reflective

24   of the value of the litter by solely limiting that

25   model to a five-county region?

1         A.   I'm sorry.  Can you rephrase that?

2         Q.   Yeah.  As an economist, is it your opinion

3    that the economic effects to the hay and beef industry

4    that you've opined to in the IRW are truly reflective

5    of the value of that litter by solely limiting the

6    model to the five-county region?

7         A.   It certainly measures the impact in the

8    five-county region, absolutely.

9         Q.   But that's all it does?

10        A.   That's correct.

11        Q.   All right.  Have you done any independent

12   research on how far poultry waste can be shipped and

13   sold?

14        A.   No.

15        Q.   If the model were run to represent sales of

16   litter outside the IRW, would that show as a positive

17   effect in the results of the model?

18        A.   I'm sorry.  Can you say that again?

19        Q.   Yeah.  Would the sale to those outside of the

20   IRW -- the sale of litter to those outside the IRW be

21   reflected as a positive in the flow of dollars in your

22   IMPLAN model?

23        A.   I guess what you're asking is, is there

24   economic activity from selling the litter outside the

25   watershed; is that correct?

1      Q.   I thought we assumed that that's the case in

2   my question.

3           What I'm trying to ask is, if you included

4   these other regions, would it pick up as a positive

5   effect the sale of that litter in these other regions?

6      A.   That's a good question.  There would be a

7   redistribution of income, both regionally and within

8   sectors.

9      Q.   Okay.  And since you didn't perform what we

10   talked about earlier as a net cost-benefit analysis,

11   you don't know what the net benefit of removing litter

12   from the IRW is; correct?

13      A.   I have not done a benefit-cost analysis.

14      Q.   All right.  Now, this type of plan, the

15   input/output model, the IMPLAN model, that you

16   actually performed does not take into consideration

17   things such as personal safety or security or other

18   quality of life improvements, does it?

19      A.   There's no positive or negative externalities

20   considered, no.

21      Q.   But this IMPLAN model does have the ability

22   to model the effects of tourism and recreation;

23   correct?

24      A.   It could, yes.

25      Q.   And it has the ability to model the effects

1    of loading, handling, and hauling litter outside the

2    IRW, if you chose to do so; correct?

3        A.    It does, yes.

4        Q.    And would you agree that if you're, in fact,

5    removing some litter from the IRW, you would have

6    those kind of activities that should be modeled?

7        A.    I don't believe so, no.

8        Q.    Okay.  So you don't think if litter needs to

9    be removed, that there would be additional activity --

10   economic activity, the flow of dollars, from the

11   hauling of that litter?

12       A.    Not necessarily in the -- in the five-county

13   area, no, sir.

14       Q.    Okay.  You did not ask the model to perform

15   any effects from business sectors associated with

16   pollution abatement; correct?

17       A.    Correct.

18       Q.    And you did not ask the model to perform the

19   effects of any environmental cleanup or associated

20   business sectors; correct?

21       A.    I really didn't ask the model to do anything.

22   I mean, you keep --

23       Q.    When a model runs --

24       A.    I didn't input any of those things into the

25   model, no, sir.

1      Q.   But you chose which ones to display for the

2   results; correct?

3      A.   That's correct.

4      Q.   And you chose not to display those, the

5   environmental impacts, the cleanup, or associated

6   business sectors?

7      A.   I don't know what you mean by display them.

8   I did not -- I was not asked to do that.  I did not

9   put any impacts in the model to change the final

10  demand for any of those products, no, sir.

11     Q.   Okay.  Is it true that increased business in

12  the five-county region would be viewed as a positive

13  in the model?

14     A.   I'm sorry.  Say that --

15     Q.   Increase in business, economic increase in

16  the business --

17     A.   Yes.

18     Q.   -- say a business grows, is that viewed in

19  the model as a positive, positive dollars?

20     A.   Yes.  Growth in economic activity and an

21  increase in economic activity would be a positive.

22     Q.   So to the extent that new businesses are

23  either added or businesses that exist grow further,

24  they would reflect that positive number, if you would,

25  in the model; correct?

1    A.    That's correct.

2    Q.    So if we had new businesses, such as

3 environmental operations, trucking or hauling, if you

4 chose to reflect those in the model, that would likely

5 show a positive input?

6    A.    It could, yes.

7    Q.    Likewise, the recreation and tourism

8 industry, if it increased, it would reflect a positive

9 input?

10    A.    Yes.

11    Q.    Okay.

12         MR. GARREN:  If I may approach, Your

13 Honor?

14         THE COURT:  Yes, sir.

15    Q.    *(BY MR. GARREN)*  Dr. Dicks, I've handed you

16 what's been marked Oklahoma Exhibit 0144, a document

17 that was reviewed in your deposition.

18         Can you tell the court what this is?

19    A.    0144 looks to be a budget for the beef

20 production activity.

21    Q.    Is this a document that you would have

22 prepared in your work in this case?

23    A.    Yes.

24         MR. GARREN:  Move for the admission of

25 Oklahoma Exhibit 0144.

1          MR. ELROD:  No objection, Your Honor.

2          THE COURT:  144 is admitted.

3     Q.  *(BY MR. GARREN)*  Now, when you performed

4     these budgets, you did so with the intent to be

5     accurate as possible, did you not?

6     A.  Yes.

7     Q.  And looking at this beef production budget,

8     does it show a return above all specified costs as a

9     negative $23.5 million to the beef production

10    business?

11    A.  Yes.

12    Q.  So this spreadsheet does not employ the use

13    of any chemical fertilizers, correct, in its

14    consideration?

15    A.  It doesn't appear to be, no.

16    Q.  And, in fact, this is under a scenario if

17    there was just the use of litter by this beef operator

18    who owned it; correct?

19    A.  The base scenario, yes.

20    Q.  So based on this, we see another example in

21    your calculations where a beef operator who owns his

22    litter is actually losing money in the watershed; do

23    you agree with that?

24    A.  Well, I'll just take exception to that.  I

25    think one of the things that you're missing here is

1  that there's a shadow price in there for pasture and

2  hay.  If this person was actually purchasing that

3  pasture and hay -- if you look up there where it says

4  pasture and hay, it's $35 a ton for the pasture and

5  $70 a ton for the hay.  They're going to purchase 6.94

6  tons of that pasture and 2.52 tons of that hay.

7       This is a shadow price so that we can look at

8  the enterprise budget of beef with respect to the

9  enterprise budget of hay.  What this really tells me

10  is is that while the guy is making a good deal of

11  money on his hay enterprise, he is losing money on his

12  beef enterprise.  And so consequently, you'd be

13  correct that he is losing money, but what it says is

14  that he's not doing a very good job of marketing his

15  hay.

16     Q.  But, in fact, he may be using his hay under

17  your scenario; correct?

18     A.  He is using the hay to feed his cattle, his

19  hay.  But I guess what I'm saying is, he'd be better

20  off at this point if he got rid of all the cattle and

21  sold the hay.

22          *(Discussion held off the record)*

23          MR. ELROD:  Your Honor, can I beg the

24  court for indulgence, please?  I have a funeral at one

25  o'clock, unavoidable.  What my proposal would be is

**United States District Court**

1    that we complete -- we interrupt the witness on the

2    stand this afternoon at 2:30, or whenever your

3    afternoon break is, and complete Dr. Dicks immediately

4    after that afternoon break and then put the witness

5    back on the stand.  If the court would do that for me,

6    I sure would appreciate it.

7                 THE COURT:  Any objection?

8                 MR. GARREN:  We talked earlier.  I don't

9    have any objection to that because it would be during

10   the direct of Dr. Sullivan that that would be

11   interrupted.  So I don't have a problem, Judge.

12                THE COURT:  All right.

13            *(Discussion held off the record)*

14       Q.   *(BY MR. GARREN)*  Again, talking about the

15   IMPLAN model, Dr. Dicks, you agree, and it's true,

16   that the IMPLAN model does not take into consideration

17   what is referred to as pecuniary economies; that is,

18   purchasing at bulk rates or volume pricing; correct?

19       A.   Well, yes and no.  It does not take into

20   effect pecuniary economies, but no, you didn't get the

21   definition right.

22       Q.   All right.  I'll come back to that then and

23   let's try and clean that up.

24            Tell the court what pecuniary economies is by

25   definition.

1      A.   Pecuniary economies means that you can

2   purchase large quantities at a cheaper price or you

3   can sell larger quantities and gain a better price.

4      Q.   A lot of times that is a function of scale of

5   a business and its operations; correct?

6      A.   Correct.

7      Q.   Did you make any adjustments in your model

8   for the pecuniary economies in this case?

9      A.   No, sir.

10      Q.   Could the pecuniary economies be relevant to

11   a hub-and-spoke concept for the use in hauling and

12   disposing of poultry waste outside the watershed?

13      A.   Yes.

14      Q.   And so the record's clear, you didn't specify

15   any business sectors for that concept of loading and

16   hauling litter out of the watershed?

17      A.   There is -- again, in the poultry sector,

18   there is -- part of that is -- there is hauling of

19   litter.  And so as you look at the production function

20   that goes along with poultry, litter and litter

21   activities are part and parcel to that activity.

22      Q.   That litter activity, though, I'm assuming,

23   based upon what you've told us earlier, would be

24   limited generally within the scope of the IRW;

25   correct?

1    A.    That's correct.  But keep in mind that the

2    tons of litter that -- every one of those dollars of

3    value of poultry has a dollar value with it as an

4    input in terms of the poultry litter handling and

5    storage and all those capabilities.

6         It doesn't matter whether -- for the model,

7    it doesn't matter whether that is shipped outside or

8    inside.  Every -- every dollar value of poultry that

9    you stimulate that economy to is going to just -- it's

10   going to take out that amount of litter.

11   Q.    But it's missing the other side of the

12   equation if it goes outside the IRW; correct?

13   A.    Well, to the extent that there's expenditures

14   outside of the IRW.  So if he stops for fuel, if he

15   has a -- if he buys another apparatus outside, it does

16   not take that into account, no, sir.

17   Q.    And what if he receives income from outside

18   the IRW; that's not picked up either, is it?

19   A.    Well, if he lives inside the IRW, it's part

20   of that, yes, sir.

21   Q.    Okay.  Now --

22        THE COURT:  Mr. Garren, it's apparent

23   we're going to go beyond lunch here.  Let's take our

24   lunch recess at this time.

25        MR. GARREN:  Okay.  Thank you, Your

**United States District Court**

*10557*

1    Honor.

2                    *(Lunch recess was taken)*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*10558*

C E R T I F I C A T E

1

2

3

4          I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11          I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16          In witness whereof, I have hereunto set my

17   hand this 11th day of January 2010.

18
                         s/ Brian P. Neil
19          _____
                    Brian P. Neil, CSR-RPR, CRR, RMR
20                  United States Court Reporter

21

22

23

24

25

**United States District Court**