IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )      No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )


VOLUME 93 - PM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 12, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE


*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                    *United States Court Reporter*


**United States District Court**

10848

1                       A P P E A R A N C E S

2

3   For the Plaintiffs:           MR. W.A. DREW EDMONDSON
                                  MS. KELLY FOSTER
4                                 Office of Attorney General
                                  State of Oklahoma
5                                 313 N.E. 21st St.
                                  Oklahoma City, OK  73105
6

7                                 MR. DAVID RIGGS
                                  MR. DAVID P. PAGE
8                                 MR. RICHARD T. GARREN
                                  Riggs Abney Neal
9                                 Turpen Orbison & Lewis
                                  502 W. 6th Street
10                                Tulsa, OK 74119

11
                                  MR. ROBERT A. NANCE
12                                MS. KELLY FOSTER
                                  Riggs Abney Neal
13                                Turen Orbison & Lewis
                                  5801 Broadway
14                                Oklahoma City, OK 73118

15
                                  MR. LOUIS W. BULLOCK
16                                MR. ROBERT BLAKEMORE
                                  Bullock Bullock &
17                                Blakemore
                                  110 W. 7th St.
18                                Suite 770
                                  Tulsa, OK 74119
19

20                                MR. FREDERICK C. BAKER
                                  MS. ELIZABETH CLAIRE XIDIS
21                                MS. INGRID L. MOLL
                                  Motley Rice LLC
22                                28 Bridgeside
                                  P.O. Box 1792
23                                Mount Pleasant, SC 29465

24

25

**United States District Court**

1          A P P E A R A N C E S  (Cont.)

2

  For Tyson Foods:              MR. ROBERT W. GEORGE
3                               Tyson Foods, Inc.
                                2210 West Oaklawn Drive
4                               Springdale, AR 72701

5
                                MR. FRANK R. VOLPE
6                               MR. MARK D. HOPSON
                                MR. THOMAS C. GREEN
7                               MR. JAY THOMAS JORGENSEN
                                MR. GORDON D. TODD
8                               ERIC J. IVES
                                CARA R. VIGLUCCI LOPEZ
9                               Sidley Austin LLP
                                1501 K St. NW
10                              Washington, DC 20005

11
                                MR. PATRICK MICHAEL RYAN
12                              Ryan Whaley Coldiron and
                                Shandy PC
13                              119 N. Robinson, Rm 900
                                Oklahoma City, OK 73102
14

15
  For Cargill:                  MR. JOHN H. TUCKER
16                              MS. THERESA HILL
                                Rhodes Hieronymus Jones
17                              Tucker & Gable
                                100 W. 5th St., Ste 400
18                              Tulsa, OK 74103

19                              MR. DELMAR R. EHRICH
                                MS. KRISANN KLEIBACKER LEE
20                              Faerge & Benson
                                90 S. 7th St., Ste 2200
21                              Minnaepolis, MN 55402

22

23  For Simmons Foods:          MR. JOHN R. ELROD
                                MS. VICKI BRONSON
24                              Conner & Winters
                                211 E. Dickson St.
25                              Fayetteville, AR 72701

10850

1                        A P P E A R A N C E S  (Cont.)

2

3    For Peterson Farms:           MR. A. SCOTT MCDANIEL
                                   MR. PHILIP HIXON
                                   MS. NICOLE LONGWELL
4                                  McDaniel Hixon Longwell &
                                   Acord PLLC
5                                  320 S. Boston, Ste 700
                                   Tulsa, OK 74103
6

7

8    For George's:                 MR. GARY V. WEEKS
                                   MR. WOODY BASSETT
                                   MR. VINCENT O. CHADICK
9                                  MS. K.C. TUCKER
                                   Bassett Law Firm
10                                 P.O. Box 3618
                                   Fayetteville, AR 72702
11

12

13   For Cal-Maine:                MR. ROBERT SANDERS
                                   Young Williams P.A.
                                   P.O. Box 23059
14                                 Jackson, MS 39225

15

16                                 MR. ROBERT P. REDEMANN
                                   Perrine McGivern Redemann
                                   Reid Berry & Taylor PLLC
17                                 P.O. Box 1710
                                   Tulsa, OK 74101
18

19

20

21

22

23

24

25

**United States District Court**

10851

I N D E X

Page

*WITNESSES ON BEHALF OF THE DEFENDANTS*

**TIMOTHY SULLIVAN, Ph.D.**

Continued Cross-Examination by Mr. Bullock          10852
Redirect Examination by Mr. George                  10950

**TERRY PEACH**

Testimony by Videotaped Deposition                  10961

**United States District Court**

1          Tuesday, January 12, 2010

2                  *  *  *  *  *

3          THE COURT:  Mr. Bullock.

4          MR. BULLOCK:  Thank you, Judge.

5              **CONTINUED CROSS-EXAMINATION**

6    **BY MR. BULLOCK:**

7       Q.   Doctor, before we get to the picture and the

8    question that you had an opportunity to contemplate,

9    first of all, do you recall -- well, actually in terms

10   of that picture, do you recall where on the river that

11   was?

12      A.   Well, we canoed two reaches of the scenic

13   river in Oklahoma.  I couldn't tell you the exact

14   location, no.

15      Q.   But all on this canoe trip -- by the way, was

16   it a day?  A half day?

17      A.   It was a half day to a half day-plus.

18      Q.   Okay.  Now, were you in the back of the canoe

19   or the front of the canoe?

20      A.   I was in the back --

21      Q.   Okay.

22      A.   -- of the canoe in which I was sitting.

23   There were other canoes there also.

24      Q.   Have a good day?

25      A.   For the most of the day.  The very tail end

**United States District Court**

10853

1  of it was a little bit disconcerting.  We can talk

2  about that if you'd later.

3      Q.   We'll talk about that later.  Leave us

4  hanging.

5           MR. BULLOCK:  But, you know, one thing

6  I've learned is don't ask when they dangle a lure.

7           THE COURT:  That was a teaser,

8  Mr. Bullock.

9           MR. BULLOCK:  I saw it.

10     Q.   *(BY MR. BULLOCK)*  Now, who did take this

11 picture?

12     A.   The pictures were discussed often and

13 sometimes at length by myself, Dr. Vic Bierman, John

14 Elrod --

15     Q.   Doctor, I'm sorry.  I was asking who took the

16 picture.

17     A.   Well, that's what I'm trying to respond to.

18 I need to provide a little bit of background.  I don't

19 remember exactly who took the photo but I'm pretty

20 sure I know so I can tell you --

21     Q.   Well, I don't want any -- I'm not asking for

22 guessing.  If you don't know, you don't know.

23     A.   I'm pretty sure I know.  So I can tell you

24 that, if you want.

25     Q.   Well, then who took the picture?

**United States District Court**

1        A.   I believe it was Scott McDaniel.

2        Q.   Was that the general process that day, that

3   the lawyers took the pictures?

4        A.   One of the lawyers did the photography; I

5   think it was Mr. McDaniel.  I don't remember for sure

6   if -- a scientist may have also had a camera.  I think

7   someone did but I'm not sure.

8        Q.   Okay.  And who was on this float trip -- or

9   these two float trips?

10        A.   Well, I can certainly remember some of the

11   people but not all.

12        Q.   Okay.  And the ones you remember?

13        A.   Okay.  Mr. Elrod and Mr. McDaniel, Mr. Tim

14   Jones, Dr. Vic Bierman, Dr. Billy Clay, I think, and

15   Dr. Ron Jarman.  I'm pretty sure those are all

16   accurate.  I don't know who else.

17        Q.   Okay.  Do you recall which reaches of the

18   river you canoed that day?

19        A.   Well, I remember looking at the reaches on

20   the map, but it's been several years now and I can't

21   tell you exactly what reaches it was.

22        Q.   All right.  Now, as to the particular picture

23   that we have in front of us, which is DJX633-0031,

24   what I asked you was whether the water along there

25   was, in fact, green?

1       A.    Should I look at the screen or should I look

2   at the notebook?

3       Q.    All right.  Whichever one you believe to be

4   accurate in terms of portraying the picture that you

5   saw, Doctor.

6       A.    Okay.  Because how it's printed can influence

7   the color.

8       Q.    Well --

9       A.    I will look at the screen.  I can't tell you

10  for sure what the color looked like at this specific

11  location.  I did take note --

12      Q.    Okay.  Thank you.

13      A.    -- I did take note of color on the trip --

14      Q.    Okay.  Now --

15      A.    -- but not the specific location.

16      Q.    Doctor, then when you represented to the

17  court that this picture was an accurate representation

18  of what you saw that day, you're now telling us that,

19  in fact, it may not have been at least in terms of the

20  colors portrayed?

21      A.    No, that's not correct.

22      Q.    Okay.  Well, let's go on to 633-0105, which

23  is the last of the pictures in that group.

24      A.    Should I wait for the screen or should I

25  look at the --

1    Q.   Doctor, I want your testimony as to what is

2    accurate, okay?

3    A.   Well --

4    Q.   I'm not asking what -- the pictures are

5    merely representations of what you saw, are they

6    not?

7              MR. GEORGE:   Objection; argumentative.

8              MR. BULLOCK:   I'm sorry, Judge.   I'll

9    back off a little bit.

10             THE COURT:   Rephrase, please.

11    Q.   *(BY MR. BULLOCK)*  Doctor --

12    A.   Well, I --

13    Q.   Just a second, Doctor.   What I would like for

14    you to do is to tell me, between the picture on the

15    screen and the one in the book that the judge and the

16    record has, which is the more accurate in color -- in

17    representing the colors that day?

18    A.   I'm sorry.   Am I back to the first photo now?

19    Q.   No.   We're at 633-0105.

20    A.   Okay.   All right.   Well, I mean, there are

21    two issues you're asking me about.   You're asking me

22    representative that day and you're asking me about

23    this particular location.

24    Q.   No.   I'm asking you what you saw that day as

25    to which one of those images best represents what you

1    saw that day.

2         A.   At this location or in general?

3         Q.   At that location.

4         A.   At this -- I cannot tell you for any of these

5    specific locations what color I noted.  I can tell you

6    that I did pay attention to color on the trip for the

7    entire trip but -- and I do remember what I'm seeing

8    on the screen here that area that was -- that had a

9    very steep cut bank.  I do remember that area.

10        Q.   I --

11        A.   But I can't tell you if the color that's on

12   the screen corresponded to that particular area on

13   that day several years ago.  I'm sorry, I can't do

14   that.

15        Q.   Okay.  Now let me ask you about the exhibit

16   for the record.

17             The exhibit, in fact -- and this would be the

18   paper, what's going to go before the court --

19        A.   Okay.

20        Q.   -- goes before this court or any others, that

21   is green, isn't it?

22        A.   On the one in front of me now?

23        Q.   Yes.

24        A.   It definitely has a green tint to it, yes.

25        Q.   Okay.  Now, in this, you testified on direct

1    that the principle constituent of concern in the

2    IRW -- in the waters of the IRW is, in fact,

3    phosphorus; correct?

4         A.   I testified to that when, sir?  In my --

5         Q.   In your direct testimony.

6         A.   I don't remember testifying to that in my

7    direct testimony.  I mean, if I was asked the

8    question, I wouldn't be surprised if I answered it

9    that way, but I don't remember testifying to that.

10        Q.   Then let me ask you:  Is the principle issue

11   of concern in the waters of the IRW as you understand

12   it -- or let me rephrase.

13            Is a principle issue of concern, regarding

14   the waters of the IRW, its phosphorus content?

15        A.   I agree with that.

16        Q.   Okay.  In your opinion, are the waters of the

17   Illinois River Watershed impacted from phosphorus?

18        A.   Are they impacted from phosphorus?

19        Q.   Yes.

20        A.   I didn't do any analyses to evaluate impact.

21   I looked at -- at water chemistry, the phosphorus

22   concentration in the water, at great length in many

23   locations, but I didn't address the impact issue.

24        Q.   Well, from your study of concentrations of

25   phosphorus, did you determine whether or not the

1    Illinois River has been impacted by the levels of

2    phosphorus found in it?

3        A.   That's not a determination that I made in my

4    work for this case.

5        Q.   Well, then you have no opinion as to that?

6        A.   No.

7        Q.   Okay.  And so when you did the comparative

8    levels of phosphorus in the various waterbodies, you

9    were not suggesting that the Illinois River and also

10   Lake Tenkiller are not impacted by the levels of

11   phosphorus found in them, were you?

12       A.   I was not making an evaluation of whether or

13   not they were impacted; I was comparing chemistry.

14       Q.   As an expert in all of the various fields to

15   which you've testified to, what would you expect to be

16   the environmental effects of high phosphorus levels in

17   an Ozark stream?

18            MR. GEORGE:  Objection, Your Honor.  The

19   witness has testified that he didn't do that

20   evaluation and it's outside the scope.

21            MR. BULLOCK:  What I asked him for is,

22   as an expert what would he anticipate.  He clearly has

23   testified rather broadly concerning various pollutants

24   of concern.  I'm asking him why they would be of a

25   concern.

**United States District Court**

1           THE COURT:  I think it's a fair

2    question.  I'm going to give you some latitude.

3    Overruled.

4       A.   I'm sorry, Mr. Bullock.  Can you please

5    restate the question?

6       Q.   *(BY MR. BULLOCK)*  As a scientist with the

7    broad expertise to which you have testified to here,

8    what are the environmental effects that you would be

9    concerned about from high phosphorus levels in Ozark

10   streams?

11      A.   Okay.  If you increase the phosphorus

12   concentration in the stream water in a system like

13   this, which is believed to be phosphorus-limited --

14   and I don't argue with that -- if you increase the

15   phosphorus in a stream that's phosphorus-limited, in

16   some places you may get increased growth of algae or

17   macrophytes; other places that may not occur.

18           The reasons why that may not occur at some

19   places would be because something else was limiting

20   the growth of algae or macrophytes other than a

21   nutrient.  That could be light.  It could be the time

22   that it takes for the algae to grow, for example, with

23   the transport time of the water.

24           So in places where something like light or

25   transport time -- I can't think of any other variables

1    and they would be the main ones in my view -- places

2    where those were not limiting, but rather a nutrient

3    was limiting, then I would expect to see an increased

4    growth of algae.

5        Q.   Okay.  Now, similarly, would you -- is there

6    concerns about what such P levels -- what effect they

7    could have above dissolved oxygen levels?

8        A.   Well, that's -- that's going to depend.

9    That's certainly a possibility --

10       Q.   Okay.

11       A.   -- depending on the circumstances.

12       Q.   All right.

13       A.   I can explain the circumstances, if you'd

14   like me to.

15       Q.   That's fine, Doctor.  And could it also have

16   an impact upon the nature of the fish and the size of

17   fish populations?

18       A.   If the productivity of the system was

19   sufficiently high, that's a possibility.  It would

20   have to be fairly high for that to occur in my view.

21       Q.   Okay.  Did you do any work to determine what

22   the background levels of phosphorus are in the waters

23   of the IRW?

24       A.   Did I do any work to determine that?

25       Q.   Yeah.

1        A.   I would say no.

2        Q.   Okay.  But you limited it to work.  Did you

3   do a study or come to that knowledge in any other way?

4        A.   Well, I would say that I and many other

5   environmental scientists have general knowledge of

6   what background levels we would expect to see.  But

7   it's very -- as I mentioned earlier in my testimony

8   here, that's very difficult to pin that down.  Nobody

9   knows for sure what the background levels were, but

10  those of us who work in this field have a sense of

11  what the background levels were.

12       Q.   Okay.  Now, is your sense specific to the

13  Illinois River Watershed?

14       A.   I would say no.

15       Q.   Okay.  Let's talk about your testimony

16  concerning the drainage of fields.

17            You described in heavy rains that there are

18  basically two different types of drainage that you

19  find, if I understood your testimony.  One of those is

20  sheet flow; correct?

21       A.   Well, I'm not quite sure what you mean by

22  "drainage," but I do understand what "sheet flow"

23  is.

24       Q.   Well, where you end up with more water

25  falling out of the sky than can infiltrate through the

**United States District Court**

```
 1    soil for whatever reason, whether it's because the

 2    water table is high or because the soils near the

 3    surface are saturated, in either case you end up with

 4    what you -- you end up with water flowing off the

 5    field.  And just be sure that you and I are talking

 6    the same thing, what is your term for that general

 7    phenomena?

 8         A.   It would be overland flow that would be

 9    flowing across the surface.

10         Q.   Okay.  You get two different types of

11    overland flow.  One is the sheet flow; correct?

12         A.   There are many ways to slice up this issue of

13    overland flow.  If you want to talk about terms that

14    people use, I mean, there are many.  "Sheet flow" is

15    one.

16         Q.   Okay.

17         A.   It's not a term that I've used in this

18    proceeding, I don't believe, but that is a term that

19    is used.

20         Q.   It's possible that you used that term, isn't

21    it?

22         A.   I don't think so but I could be mistaken.

23         Q.   Well --

24              THE COURT:  I think he talked about the

25    infiltration and then the saturation at the lower
```

1    levels where the water table has risen.

2                    THE WITNESS:  Correct.

3        Q.   (*BY MR. BULLOCK*)  Okay.  One of the ways that

4    the water can move off of the field, though, is by an

5    phenomena that I've heard referred to as "sheet flow";

6    correct?

7        A.   That's correct.

8        Q.   And that is just as it describes, water

9    doesn't -- it's not seeking channels, it's just

10   flowing more or less in a sheet towards the lower

11   gradient?

12       A.   That is a term that is sometimes used.

13       Q.   Okay.  Now, you also have what I've heard

14   referred to as the ephemeral streams forming in the

15   fields; right?

16       A.   I wouldn't call an ephemeral stream something

17   that's forming in the fields.  An ephemeral stream is

18   a stream that's carrying water some of the time but

19   not all of the time.

20       Q.   Right, right.  But out in those fields you'll

21   have those areas, the low areas, the preferred courses

22   for the water to flow off of the field, will you not?

23       A.   Well, there are certainly some fields that

24   would have ephemeral or intermittent streams in

25   them.

1      Q.   Okay.  And you haven't done any study in the

2   IRW to determine the extent of such a stream network,

3   have you?

4      A.   Well, to a large degree, I have.

5      Q.   Okay.  And where in your report is that?  Did

6   you report on that?

7      A.   Well, we would have to look through the

8   report to determine to the extent to which I mentioned

9   the high-resolution NHD, National Hydrography Dataset.

10  I believe that it's mentioned in the report but I'm

11  not positive of that.

12     Q.   All right.  Well, let's talk about in terms

13  of those fields in which these do form.

14          These are little stream networks which exist

15  and, as you say, are dry until you get these heavy

16  rains; correct?

17     A.   Well, there are -- the stream network

18  includes streams that carry water all the time, most

19  of the time, and only under heavy rain conditions.

20  That's all part of the stream network.

21     Q.   Okay.

22     A.   That stream network in some places can be in

23  agricultural settings and other places it's not.  So

24  it depends on where we're talking about.

25     Q.   Okay.  Well, let's talk in agricultural

1    settings.

2              When the heavy rains come, the water will

3    find those channels and flow into the larger streams;

4    right?

5         A.   That can certainly occur, yes.

6         Q.   Okay.  And, in fact, if we looked at a

7    picture of the stream networks of the IRW, it would

8    show third-, fourth-, fifth-, and I think the river

9    itself gets to a sixth-level stream; correct?

10        A.   Sixth and seventh.

11        Q.   Okay.  And the first- and the second-order

12   are these ephemeral streams that we've been talking

13   about; is that true?

14        A.   I would not characterize it that way, no.

15        Q.   Okay.  What are the first- and second-order

16   streams?

17        A.   Well, if you're talking about the moderate

18   resolution NHD, which is what most people use for most

19   purposes in my view, the first -- the first- and

20   second-order streams would be what I would consider to

21   be small streams.  Some of them may be intermittent.

22   I wouldn't characterize most of them as being

23   intermittent certainly.  But if you move to the

24   high-resolution NHD, then you would pick up a larger

25   proportion of streams that would be considered to be

1    intermittent.

2         Q.   Okay.

3         A.   So that the -- the classification system into

4    Strahler orders depends on the scale at which you're

5    extracting the data to look at it.  So it can shift up

6    and down depending on your scale.

7         Q.   In terms of, for instance, 40-acre fields,

8    does that resolution go to the point where it charts

9    the drainage networks on that scale?

10        A.   It's a good question, Mr. Bullock, but I

11   can't provide you with an answer.  I can tell you the

12   scales of the NHD, if you want, but I can't make that

13   mental conversion.

14        Q.   But the point being that as you go up

15   the watercourses, that up during high -- during heavy

16   rains, that you have a little gathering systems that

17   much resemble the stream network, as we know it,

18   gathering the waters out of these fields and bringing

19   them to the larger streams; right?

20        A.   Well, it's going to depend on the field.

21   It's very site-specific.  There are many fields that

22   do not have ephemeral streams in them.  There are

23   certainly some fields that do.

24        Q.   And have you enumerated the proportion of the

25   two in this watershed?

1          A.    I have enumerated the length of stream in

2     this watershed using both the high-resolution and --

3          Q.    That's not the question, Doctor.

4          A.    So repeat the question, please, sir.

5          Q.    Okay.   Have you determined the proportion of

6     fields which lack these types of temporary stream

7     networks versus those that don't in the IRW?

8          A.    No.

9          Q.    Okay.   Those types of -- and I'm going to

10    continue to refer to them as "ephemeral

11    streams" -- those types of ephemeral stream networks,

12    they will carry with them certainly the dissolved

13    phosphorus that is found on the fields; right?

14         A.    I would not agree to that, no.

15         Q.    Well, then they will separate -- the water

16    flowing in those streams will separate out dissolved

17    phosphorus, it won't carry that?

18         A.    No.   I didn't suggest that, no.

19         Q.    Okay.   So they will carry dissolved

20    phosphorus that's in the waters where it's laying on

21    the field; right?

22         A.    If there's dissolved phosphorus in the

23    stream, then the stream is certainly able to carry

24    that phosphorus.   But it's going from the field to the

25    stream I'm having trouble with.

1      Q.   Well, that's what I'm working on.  As the

2   water falls onto the field, that water moves towards

3   these ephemeral -- towards these drainageways; right?

4      A.   Well, in general it probably will, some of it

5   through the ground and some of it perhaps over the

6   surface.

7      Q.   Okay.

8      A.   And it --

9      Q.   And we're talking about those events where

10   it's going to move over the surface.  Remember when we

11   began, we talked about that that's what I was focusing

12   on was surface flow?

13      A.   I'm sorry, sir.  But that's a complete

14   mischaracterization of how the system works.

15      Q.   Right now I'm not talking about the system.

16   I'm talking about an aspect of the system.  I'm

17   talking about overland flow, as you call it.

18      A.   But if overland flow doesn't occur, then it

19   doesn't occur.

20      Q.   Doctor, I'm saying that it is occurring.  You

21   understand that?

22      A.   So you're going to a specific place on a

23   field where overland flow occurs and asking me a

24   question about that; is that the question?

25      Q.   No.  I'm talking about when there is overland

 1   flow, first of all, okay?  You understand that?

 2       A.   Okay.  But overland flow is not going to be

 3   an entire flow; it's going to be a particular area.

 4   So if we can focus on the area, then maybe I can

 5   answer the question.

 6       Q.   Well, Doctor, let's posit that there's

 7   overland flow across this field?

 8       A.   Across the entire field?

 9       Q.   Yes.

10       A.   Well, you can posit that, but it's got no

11   relationship to reality.

12       Q.   Okay.  Well, we're going to posit that, okay?

13            THE COURT:  I mean, there are

14   theoretically areas which in your scenario may be

15   below the water table.  Where the water table has

16   risen the entire field may be saturated and you've got

17   overland flow over the entire field; right?

18            THE WITNESS:  Well, I certainly can't

19   say that that's impossible but it's not something --

20            THE COURT:  All right.  That's his

21   hypothesis here.

22            THE WITNESS:  Okay.

23       Q.   (*BY MR. BULLOCK*)  Okay.  And so the water

24   moving in that overland flow will carry at least the

25   dissolved phosphorus that's immediately on the surface

1    of that land, won't it?

2         A.   If you have overland flow and there's

3    phosphorus on the surface of the land, then I would

4    expect that some of that phosphorus on the surface

5    could be carried in that overland flow.

6         Q.   Well, it will carry the dissolved and it also

7    may or may not cover some particulate phosphorus;

8    correct?

9         A.   That would be correct.

10        Q.   Okay.  Now, just one point here before we

11   move on is that you haven't studied -- your study

12   didn't extend to a study of the groundwater in the

13   IRW, did it?

14        A.   No, it did not.

15        Q.   Okay.  And so when you talk about -- for

16   instance, I think when you were talking about the

17   water running in a ditch, you suggested that it might

18   act something like a disappearing stream, that it

19   might just seep into the ground and cease to flow and

20   then flow underground to stream channels; right?

21        A.   Well, not necessarily.  I mean, that's a

22   possibility.

23        Q.   Okay.  That was one possibility you raised in

24   this court, was it not?

25        A.   Well, I didn't raise the possibility about

 1   whether it would eventually flow into a stream or not.

 2   What I raised in this court was the possibility that

 3   as you move down the ditch, that that water may

 4   infiltrate into the soil at the bottom of that ditch.

 5   Where it goes from there is another entire question,

 6   and we can talk about that, if you'd like.

 7       Q.   Okay.  You didn't study the subsurface flow

 8   in the IRW, did you?

 9       A.   No.  I cut off my study at the bottom of the

10   soils.

11       Q.   Okay.  And as such, you have no information

12   as to whether phosphorus from the surface is actually

13   finding its way into the groundwater in this

14   watershed, have you?

15       A.   That's not something I've addressed here.

16       Q.   Okay.  So you -- as a scientist, you cannot

17   rule out that phosphorus from the surface is

18   infiltrating and finding its way eventually through

19   the channels of this karst geology into the streams of

20   the IRW, can you?

21       A.   Well, only to the extent that I can talk

22   about the soils.  Because the soils provide the buffer

23   mechanism to try to minimize or eliminate that and the

24   regulations that dictate how deep the soils have to be

25   in order to provide litter application.

1          Q.   But, first of all, as to the actual dynamics

2     of that, you haven't tested as to whether any of that

3     is sufficient to eliminate the phosphorus infiltrating

4     the groundwater, have you?

5          A.   Once we get below the soils, then that's

6     outside the area I addressed.

7          Q.   Okay.  So let's go to the cattle story that

8     you've told us.

9               You testified yesterday that cattle in

10    addition to the transport, as in terms of

11    direct-deposit of phosphorus into the stream, that

12    they also have impacts upon this overland flow issue,

13    did you not?

14         A.   Yes.  Especially locally near the stream.

15         Q.   Okay.  They compact the soil?

16         A.   In certain areas, they do.

17         Q.   Okay.  And that would be those cattle trails

18    that you'll see out in any field where the cattle move

19    perhaps between a feeder and water or to their

20    lounging area, those types of areas get compacted and

21    create channelization?

22         A.   Those and other areas, yes.

23         Q.   Okay.  And so when we get these high-flow

24    events -- or these overland flow events that you

25    describe, the water taking whatever dissolved P it

```
 1   might have in it will move into these channels created
 2   by the cattle and that will move quickly on
 3   downgradient; correct?
 4       A.   It can move downgradient.  The extent to
 5   which the water will infiltrate versus provide
 6   additional overland flow is going to be site-specific.
 7   But if there is the overland flow component, then it
 8   will move downgradient for whatever distance until you
 9   start to get the infiltration taking over the
10   situation again.
11       Q.   Okay.  And according to your testimony, I
12   have a vision that all of these cattle trails lead to
13   some running stream.  Is that the impression that
14   you're leaving here?
15       A.   No.
16       Q.   But do they frequently lead to running
17   streams?
18       A.   Well, they sometimes do.
19       Q.   Okay.
20       A.   The cattle trails are not impervious
21   surfaces.  They are more compacted perhaps than some
22   of the surrounding terrain.  And as a result of that
23   additional compaction, I would expect to see a lower
24   rate of infiltration.  But that doesn't tell us
25   whether or not that rate of infiltration is sufficient
```

 1   to accommodate the rainfall that occurs.  Sometimes it

 2   might be, sometimes not.

 3        Q.   Well, I was understanding your testimony

 4   yesterday as suggesting that cattle increase the

 5   transport of phosphorus to streams due to in part

 6   channelization.  Did I misunderstand your testimony?

 7        A.   A little bit.

 8        Q.   Okay.  Then let me see if I can sort it out,

 9   okay?

10        You haven't tested, as you say, the amount of

11   infiltration from these channels that the cattle

12   create, have you?

13        A.   No, I have not done that.

14        Q.   Okay.  You posit that there may be some

15   infiltration, but absolutely there's added compaction

16   which facilitates overland flow?

17        A.   The added compaction increases the risk of

18   overland flow --

19        Q.   Okay.

20        A.   -- if the storm is large enough.

21        Q.   All right.  And you also have the issue of

22   the cattle consuming the vegetation on the field,

23   where you talked about the fact that as they eat the

24   grass, the roots become lessened and so they lesson

25   the amount of infiltration in a field; correct?

1      A.    If you remove the vegetation, then the

2   infiltration rate will go down, that's correct.

3      Q.    Okay.  And that's not just in these riparian

4   areas, but that's up in the grazing areas of the

5   field, is it not?

6      A.    Well, typically in the grazing areas of the

7   field, you don't find very much landscape that has

8   been so severely trampled that the -- that the

9   vegetation has gone.  If it's a severely overgrazed

10  pasture, that certainly can occur but that's not the

11  norm.

12     Q.    Well do you recall -- you've testified, have

13  you not, that, in fact, you saw significant amounts of

14  overgrazing in the IRW when you toured it?

15     A.    No.

16          *(Discussion held off the record)*

17     Q.    *(BY MR. BULLOCK)*  You don't recall that

18  testimony in your deposition?

19     A.    Not -- not to substantial amounts.  I mean,

20  it varies.  There are certainly some fields that I

21  noticed that looked like they're pretty heavily

22  grazed, but I not notice a pattern of severe

23  overgrazing in the pastures at large, no.

24     Q.    Well, you saw some anecdotes of it, but you

25  didn't make any systematic study of the extent of

1    it?

2         A.   Well, there's a couple of answers to that

3    question.  One is is that in the areas that cows

4    frequent, I saw places where the vegetation was

5    completely gone for sure, but those are not in the

6    pastures at large.

7         Q.   All right.  I'm talking overgrazing.

8         A.   In the pastures at large, what I noted was

9    that there were some areas that looked like they were

10   fairly heavily grazed, but I did not come away from

11   that watershed with the impression that there was an

12   overgrazing problem, per se.

13        Q.   But that heavily grazing increases the

14   propensity for overland flow; correct?

15        A.   It can.  It depends on the situation.

16        Q.   Okay.  Now, the channelization, the reduction

17   in vegetation, and the compaction, Doctor, those are

18   all well-understood phenomena, are they not?

19        A.   That's my understanding, yes.

20        Q.   Okay.  And, in fact, in terms of nutrient

21   usage on pastures, those are foreseeable risks, are

22   they not?

23        A.   I would think so.

24        Q.   You testified briefly concerning the Arkansas

25   PI index and said that you were not an expert in that.

1   I want to know whether you are aware of whether or not

2   one of the risk factors examined by the PI index,

3   whether there is any -- let me rephrase.

4          In the Arkansas PI index, are you aware of

5   whether or not it takes into account, or whether there

6   is an assessment of, the extent of compaction,

7   channelization, or overgrazing in any particular

8   fields?

9       A.   Yes.

10      Q.   Okay.  And where did you see that?

11      A.   That is in the -- in the Arkansas phosphorus

12   index, what it includes is an estimate of runoff risk

13   potential.  In calculating that runoff risk potential,

14   they include the vegetation information that would

15   express some of these kinds of issues.

16      Q.   Some of them?

17      A.   Yes.

18      Q.   Is there -- are you saying that in terms of

19   doing the maps of these areas, that there is any

20   assessment of, for instance, a channelization caused

21   by cattle?

22      A.   No, I'm not aware of any assessment like

23   that.

24      Q.   Okay.  And in terms of the on-site assessment

25   of these areas, is it your testimony here that the

1   extent of overgrazing is assessed in that Nutrient

2   Management Plan?

3       A.   Are we talking about the phosphorus index or

4   the Nutrient Management Plan?

5       Q.   Yes.  Well, let's talk about the nutrient

6   management plan, first of all.

7       A.   Well, the Nutrient Management Plan uses the

8   phosphorus index.  So --

9       Q.   I understand.  So let's talk first about the

10  Nutrient Management Plan where they do the on-site

11  assessment of these farms, okay?

12      A.   Okay.  Yep.

13      Q.   Are you aware of whether or not those

14  Nutrient Management Plans do an assessment of the

15  health of the compaction -- or the degree of

16  compaction on any particular field?

17      A.   Well, there is an assessment of the pasture

18  condition.  And as I said -- you correctly stated I'm

19  not an expert on these, but it's my understanding that

20  a trained soil scientist or other trained individual

21  will go out and evaluate these pastures individually

22  and they will provide that information that feeds into

23  the phosphorus index calculation which does include

24  pasture condition as a component of estimating the

25  runoff risk potential.

1    Q.   Well, let's -- we'll get -- in fact, I

2    probably jumped the gun on myself.  We'll get to

3    those.

4    A.   Okay.

5    Q.   In terms of cattle, did you do any assessment

6    as to how often cattle have direct access to

7    streams?

8    A.   That was one of the things that I had in the

9    forefront of my mind on multiple occasions touring the

10   watershed is to evaluate that issue.

11   Q.   Well, did you do any analysis -- what kind of

12   analysis did you do in the Illinois River Watershed to

13   quantify how often cattle have direct access to

14   streams?

15   A.   What I did was -- was a crude visual

16   assessment from the air and from the -- and from the

17   ground of what I saw --

18   Q.   Did you --

19   A.   -- places I went.

20   Q.   I'm sorry.

21   A.   I did not perform any additional analyses of

22   that information.  It was a visual evaluation that I

23   made.

24   Q.   You didn't do any quantification of it, did

25   you?

1      A.   No, sir.

2      Q.   Let me be sure.  We're getting double

3  negatives.

4           There was no --

5      A.   I did no quantification.

6      Q.   Okay.  Did you do any documentation of your

7  observations from the air as to the number of pastures

8  that didn't have fences?

9      A.   No.  I did not count the pastures.

10     Q.   Well, did you do any documentation of your

11 observations?

12     A.   No.

13     Q.   Do you have any idea as to how much of the

14 water -- how much of the Illinois River main

15 stream -- main stem is capable of being used by

16 cattle?

17     A.   From what I observed, there was -- and I've

18 observed the same thing in many other places besides

19 the IRW -- there's a rather dramatic shift in

20 the -- in the extent of the riparian fencing as you

21 move from the small streams to the main stem river.

22 The main stem river, the places that I visited and

23 that I saw, was fairly well-fenced.  There were lots

24 of places that cattle had access, but the cattle

25 access was not the norm on the main stem.  That was

1    the norm as you moved to the smaller streams, and

2    that's rather typical.

3        Q.   Okay.  So that would also be a matter that

4    was foreseeable in terms of the transport of nutrients

5    in such a watershed, is it not?

6            MR. GEORGE:  Objection, Your Honor.  The

7    question's vague.  Foreseeable as to whom?  I'm not

8    sure --

9            MR. BULLOCK:  Well, then let me

10   rephrase.

11       Q.   *(BY MR. BULLOCK)*  That phenomena of cattle

12   having access to streams and the transport of

13   nutrients through that is well-known, isn't it?

14       A.   Well, the cattle access to streams is

15   definitely --

16       Q.   Doctor, can you answer that question?

17       A.   Well, you asked me two questions embedded in

18   one.

19       Q.   Then I will break it down.

20       A.   Okay.

21       Q.   Okay.  First part is, cattle play a transport

22   role of nutrients, particularly phosphorus, into

23   streams; correct?

24       A.   That's correct.

25       Q.   Okay.  And that phenomena is well-known?

1              MR. GEORGE:  Same objection, Your Honor.

2    Well-known as to who?  It's still vague.

3              THE COURT:  Overruled.

4        A.   I think that within the community of people

5    that study water quality effects associated with

6    agriculture it's very well-known, but I think when you

7    move outside of that community maybe it's not very

8    well-known at all.

9        Q.   (BY MR. BULLOCK)  Okay.  Is it your view that

10   cattle will stand in swiftly-running water?

11       A.   It's my view that it depends on how deep the

12   water is.  I think that my -- I'm not an expert on

13   cattle behavior, but I've observed a fair amount of it

14   in my work.

15            My view is that cattle will definitely avoid

16   deep, fast-flowing water, there's no question about

17   that.  But the fact that it's fast-flowing and shallow

18   I'm not sure is necessarily much of an impediment.

19       Q.   Of course, the question is the

20   characteristics of deep and shallow, and I think I'm

21   not going to get into that water.

22            As part of your work in this case, did you

23   undertake to quantify the amount of phosphorus

24   contributed to Lake Tenkiller by this transport of

25   cattle of what's been referred to as direct-deposit of

1    phosphorus into the streams?  Did you ever make any

2    effort to quantify that?

3        A.    I didn't make any effort to quantify the

4    transfer of anything into Lake Tenkiller.

5        Q.    Okay.  Let's talk some about your criticism

6    of the mass balance.  And you used an analogy as

7    to -- or your criticism of the mass balance in terms

8    of using it as a tool to analyze sources was that if

9    someone brought phosphorus into this watershed and put

10   it in a warehouse, that while in that warehouse it

11   wouldn't be contributing to the phosphorus load in

12   these streams.

13           Am I paraphrasing your criticism?

14       A.    Yes, that was one of my criticisms.

15       Q.    Of course, you know that the phosphorus that

16   the poultry integrator defendants bring into this

17   watershed and which goes through their poultry is not

18   then locked in a warehouse, is it?

19       A.    Not that I'm aware of.

20       Q.    Okay.  And, in fact, it's spread out onto the

21   thin, cherty soils of the Illinois River Watershed,

22   isn't it?

23       A.    It's spread on the soils in which it's

24   allowed to be spread by the regulations where farmers

25   choose to spread it in accordance with those

1    regulations.

2        Q.   But you wouldn't describe those soils as

3    constituting a warehouse, would you?

4        A.   No.

5        Q.   Okay.  Let's talk about your other potential

6    sources -- or other sources.

7            Doctor, at the conclusion of your testimony,

8    I understood you to say that you had seen no data and

9    no study which supported the view that phosphorus from

10   poultry is getting into the waters of the Illinois

11   River.  Do you recall that testimony?

12       A.   I don't think I said "no study."  If I

13   addressed study, it would have been no defensible

14   study.

15       Q.   Okay.  No defensible study.  In fact, have

16   you not, read several government studies which

17   directly point to poultry as both a possible source

18   and as an actual source, have you not?

19       A.   Well, I've certainly read reports that point

20   to poultry as a possible source.

21       Q.   Okay.

22       A.   I believe that there were reports that claim

23   that poultry was a source but didn't provide the data

24   to back up such a claim.

25       Q.   Okay.

1       A.   But I did not see any study that demonstrated

2  to me that the poultry litter contributed to

3  phosphorus in Lake Tenkiller.

4                MR. BULLOCK:   If I might approach, Your

5  Honor?

6                THE COURT:   Yes, sir.

7           *(Discussion held off the record)*

8       Q.   *(BY MR. BULLOCK)*   I have handed you what has

9  been marked as Defendants' Joint Exhibit 640.   It's a

10  Comprehensive Basin Management Plan for the Illinois

11  River Basin in Oklahoma.

12           You recognize that, do you not, Doctor?

13       A.   Yes, sir.

14       Q.   In fact, you cite to that some 19 times in

15  your report as being a reliable source?

16       A.   I didn't state whether it was a reliable

17  source or not, but I would agree with you that I've

18  cited it multiple times, yes.

19       Q.   Okay.   Let's go to page 86, down at the

20  bottom of the page, the last paragraph where it

21  says -- and I'll wait for folks to catch up -- "In the

22  past, much of the attention concerning nutrient

23  sources in the Illinois River Watershed has focused on

24  the poultry industry, and indeed this industry is a

25  significant primary source of many of the nutrients

1    available (in) the river and lake."

2         Do you see that?

3              MR. GEORGE:  Objection Your Honor.  I

4    think it was inadvertent, but it actually says

5    "available to the river," not "in the river."

6              MR. BULLOCK:  I stand corrected.

7    Q.  *(BY MR. BULLOCK)*  Do you see that?

8    A.  Yes, I do.

9    Q.  Okay.  And this comprehensive basin

10   management, in fact, was an extended and organized

11   study of the State of Oklahoma concerning particularly

12   nutrient and bacteria issues in this river; correct?

13   A.  I would not agree with that characterization.

14   Q.  Okay.

15   A.  It is not a scientific study; it's a

16   management plan.

17   Q.  Are you not also aware of the USGS

18   identifying poultry as a possible source -- as a

19   probable source and the phosphorus in the rivers of

20   the basin?

21   A.  Well, I mean, when you say "USGS," that's a

22   federal agency.

23   Q.  Yes.

24   A.  I've seen a number of reports that were

25   written by USGS scientists.  If you point me to the

 1    specific report, maybe I can respond a little bit more

 2    clearly.

 3       Q.   Okay.  Just to go back one more step in terms

 4    of the basin management plan, in terms of your review

 5    of potential sources of pollution in the IRW, isn't it

 6    true that that basin management plan was at the top of

 7    your list of sources?

 8       A.   That the plan was at the top of my list of

 9    sources?  I don't quite understand that question.

10       Q.   Well, that it was at the top of your list of

11    information concerning possible sources in this

12    watershed.

13       A.   I would agree with that.

14       Q.   Okay.

15       A.   For this particular watershed, this plan does

16    a good job of identifying potential sources.

17       Q.   Okay.

18              *(Discussion held off the record)*

19              MR. BULLOCK:  If I might approach this

20    time, and I'll try not to make -- I think I'm going to

21    leave it dry here for a few minutes.  When you get

22    burned --

23              THE WITNESS:  Thank you, sir.

24       Q.   *(BY MR. BULLOCK)* Doctor, I've handed you

25    what is -- and I believe this is admitted, but for

 1    these purposes we don't need to determine

 2    that -- Exhibit 5862, Oklahoma Exhibit.  It is a USGS

 3    report entitled, "Phosphorus concentrations loads and

 4    yields in the Illinois River Basin, Arkansas and

 5    Oklahoma, 2002-2004."

 6            Do you recognize that?

 7        A.  Yes, sir.

 8        Q.  Okay.  And that's one of the sources that you

 9    consulted in this matter?

10        A.  I have looked at this, yes.

11        Q.  Okay.  Let's go to page 4.

12        A.  Yes, sir.

13        Q.  Okay.

14            *(Discussion held off the record)*

15        Q.  *(BY MR. BULLOCK)*  Down at the bottom of the

16    first column there, about the final paragraph, about

17    the fourth line, the middle of the line --

18        A.  Okay.  Just a minute, sir.

19        Q.  Okay.

20        A.  So we're on page 4 and the first -- the

21    first column?

22        Q.  First paragraph?

23        A.  First paragraph that starts "phosphorus" --

24        Q.  I mean -- I'm sorry.  First column.

25        A.  Okay.

1        Q.   Last paragraph.

2        A.   Okay.

3        Q.   Fourth line down.

4        A.   Okay.

5        Q.   Middle of that line.

6        A.   Where it says, "such as runoff"?

7        Q.   No.  Where it says, "phosphorus

8    concentrations" --

9        A.   Okay.  Gotcha.

10       Q.   -- "in Ozark streams are typically greater in

11   streams draining agricultural lands than in those

12   draining forested lands."

13            You would agree with that; correct?

14       A.   Yes, I would.

15       Q.   And that's consistent with your testimony?

16       A.   It is.

17       Q.   "Because runoff from pastures fertilized with

18   animal manure are probable substantial sources of

19   phosphorus for the rivers in this basin."

20            Do you see that?

21       A.   I do.

22       Q.   Okay.  And do you disagree with that?

23       A.   Yes, I do.

24       Q.   Okay.  Are you also --

25       A.   That's not a conclusion of the study; it's an

1  assumption.

2      Q.   Okay.  Are you also aware of any reports from

3  the State of Arkansas regarding the same subject

4  matter?

5      A.   I have seen other studies besides this that

6  would state that poultry litter or the use of animal

7  manure would be a probable source of nutrients to the

8  streams, but none of those were studies that

9  documented that.  People assumed that -- people have

10  assumed that for years, but that doesn't mean that

11  it's a correct assumption.

12          It's necessary to collect the data and

13  determine if that assumption is correct or not, and

14  the studies that I've seen in this watershed that

15  address this are not studies that quantified that

16  issue at all.

17      Q.   Okay.  Then all of those studies would, in

18  your view, be in error?

19      A.   No.  Many of those studies are probably good

20  studies.  We're not talking about a conclusion of a

21  study here; we're talking about an assumption.  In

22  this case, it's in the study area description.  It's

23  just -- it's just an initial premise or an assumption

24  that the authors made.  The study was not intended to

25  address it at all.

1      Q.   Okay.  Then let me ask you the inverse.

2           Have you seen any study which comes to the

3      conclusion that poultry is not a substantial source of

4      the phosphorus in the streams of the IRW?

5      A.   I've not seen a study that was designed to

6      look at that question.  So the answer is no.

7      Q.   Okay.  And you didn't conduct such a study?

8      A.   I did not conduct a field study in the IRW.

9      Q.   Okay.  Did you look for any study which

10     supported that proposition?

11     A.   I looked for whatever studies I could find

12     and I ended up looking at quite a few studies.  I was

13     certainly not trying to include or exclude any study

14     based on its intent or what it was pointed towards,

15     no.

16     Q.   Well, let's get on to the sources that are

17     potential sources, possible sources, that you do

18     discuss.

19          One of the sources is wastewater-treatment

20     plants; correct?

21     A.   That's correct.

22     Q.   That's a source because we can see the pipe

23     coming out of the ground and we know that it flows

24     into the stream and the stream connects on down to the

25     lake?

*10893*

1       A.   Precisely.

2       Q.   Okay.  Now, you are aware, though, that

3    studies directed at that have determined that only 90

4    to 83 percent of the phosphorus load going into

5    Tenkiller comes from point sources, are you not?

6       A.   I'm aware of studies that such percentages of

7    the flow into Lake Tenkiller occurred under high-flow

8    conditions.  But I don't think that characterizing it

9    as point source -- I'm not sure -- the point source is

10    a moving target, it's been changing quite a lot over

11    the last 10 years.  Ten or fifteen years ago it --

12       Q.   Oh, I'm sorry.  I'm sorry.  Counsel just

13    pulled my chain and rightfully so.

14            Actually, it's 90 to 83 percent come from

15    nonpoint sources of the loading to the lake,

16    phosphorus loading; isn't that correct?

17            MR. MCDANIEL:  Excuse me, Your Honor.

18    There's no foundation for Mr. Bullock's question.  It

19    assumes facts not in evidence.

20            THE COURT:  Sustained.

21       Q.   (*BY MR. BULLOCK*)  Okay.  Doctor, the loading

22    from the point sources in this watershed is a very

23    small percentage, is it not?

24       A.   The loading from the point sources has been

25    changing dramatically.  There was an estimated 40

1  percent reduction in the point-source phosphorus, as I

2  remember, from Dr. Jarman's analysis.  So it depends

3  on what period of time you want to look at.

4       Q.   Okay.  Let's look at the 2000 to 2004 period.

5       A.   Okay.  It would certainly be -- I'm sorry.

6  Was the question the percent of point or nonpoint?

7       Q.   Those are sort of inverse numbers, are they

8  not?

9       A.   Yes, they are.

10      Q.   Okay.  Let's go on nonpoint.

11      A.   Okay.  That's not something that I quantified

12 for my -- for my report but I have -- I've seen such

13 estimates.  The percent of nonpoint is certainly well

14 over half, but I can't tell you exactly what the

15 amount is.  I mean, I can respond to a particular

16 study, if you want to show it to me.

17      Q.   Okay.  Did you look at this

18 exhibit -- this -- what is Exhibit 5862, the USGS

19 study, did you look at that in terms of this issue?

20      A.   Well, I certainly did.  But as I said, it's

21 not an issue that I -- that I addressed in my report

22 in terms of quantifying point versus nonpoint.  So I

23 would have to go back to the -- to the report and try

24 to find where the report might provide such

25 information.  If you can point it to me, then maybe I

*10895*

 1    can respond.

 2        Q.   Okay.

 3              MR. GEORGE:  Your Honor, I'd like to

 4    interpose an objection here to this line of

 5    questioning given that the witness has not quantified

 6    point versus nonpoint.  I'm not sure what we're

 7    impeaching and it's beyond the scope of direct.

 8              THE COURT:  Response?

 9              MR. BULLOCK:  I'll lay some further

10    foundation.

11        Q.   *(BY MR. BULLOCK)*  Doctor, are you suggesting

12    that point sources can account for the nutrient loads

13    in the Illinois River?

14        A.   That they can account for all the nutrient

15    loads in the IRW?  No.

16        Q.   Okay.  How about a substantial part of

17    those?

18        A.   That point sources can account for a

19    substantial part of the loads?  They certainly can.

20    And it's going to depend on where in the river and

21    under what conditions, but yes, they can.

22        Q.   And so when you -- when you -- let's talk

23    about the annual loads.  Point sources account for a

24    substantial part of the annual loads going into the

25    lake?

1          A.    Well, again, I didn't really focus on going

2    into the lake.  I focused on the Illinois River --

3          Q.    Well.

4          A.    -- and its tributary systems.  John Connolly

5    focused on going into the lake.

6          Q.    Doctor, in your direct testimony, you were

7    testifying concerning the lacustrine portion of the

8    lake and the health of it.

9          A.    The water quality, yes; not the loading of

10   phosphorus, no.

11         Q.    Yes.  Okay.  Beyond the -- do you agree with

12   me that you cannot account for within the river system

13   the phosphorus loads by merely looking at point

14   sources?

15         A.    Point sources are not the only component

16   providing phosphorus, no.

17         Q.    All right.  Did you evaluate any of the other

18   potential nonpoint sources as to what their

19   contribution might be to the streams?

20         A.    In terms of quantifying the contribution?

21         Q.    Yes.

22         A.    I didn't quantify the contribution of any

23   nonpoint sources, no.  I didn't have the data to do

24   that.

25         Q.    You could have asked to get the data, could

 1   you not?

 2        A.   I'm not sure who I would have asked.   The

 3   plaintiff's experts did not collect the data to allow

 4   me to quantify any nonpoint source.

 5        Q.   You didn't ask your clients to allow you to

 6   do that, did you?

 7        A.   We discussed the possibility early on in my

 8   involvement in this case, yes, we did.

 9        Q.   Okay.   And who decided that that would not be

10   done?

11        A.   I don't know what the final decision was.   It

12   was not my recommendation that that would be done, but

13   I put it out there as an option to be considered.

14        Q.   Okay.   And that option wasn't accepted, was

15   it?

16        A.   It wasn't suggested to be accepted.   It was

17   something that we discussed as a possibility.

18        Q.   Okay.   Well, as I understand your testimony;

19   that is, as to other potential sources which you have

20   mentioned here, your criticism of the plaintiffs is

21   that they did not consider those sources; is that

22   correct?

23        A.   My criticism is that -- is that the state

24   knew what the major potential sources were because

25   they were well covered already in the basin management

1    plan, but yet they did not design a sampling program

2    for the IRW that would allow evaluation of the

3    relative importance of those various potential

4    nonpoint sources.  So that was my major criticism

5    there.

6        Q.   Okay.  So you are aware that the plaintiffs

7    did consider the relative importance of a variety of

8    potential sources; is that not correct?

9        A.   Oh, I completely disagree with that.

10       Q.   Okay.

11       A.   The considerations that were made were

12   woefully inadequate and the data were never collected

13   to allow it in the first place.

14       Q.   Well, your testimony is that while it may

15   have been considered, that you disagree as to the

16   extent that it was considered?

17       A.   When I look at how the samples were collected

18   and the basis under which they were --

19       Q.   Doctor, I need you to answer my question,

20   please.

21       A.   Okay.  I'm sorry.  Please repeat the

22   question.

23       Q.   Okay.  Your criticism is not that the

24   plaintiffs didn't consider these matters, but it goes

25   to the extent to which these other potential sources

1 | were considered?

2 |     A.   I'm not sure I would agree with that.

3 | Because when I say -- use the word "consider," I

4 | mean -- I mean to be serious about it, not to just

5 | write it off without basis.  So I just disagree with

6 | the characterization of "consider," but you can

7 | interpret that either way.

8 |     Q.   Well, let's look at urban runoff.  As to the

9 | consideration of the role that urban runoff plays, you

10 | saw the transcript of the testimony that Dr. Engel

11 | gave to this court concerning the way that he

12 | evaluated the potential impact of urban runoff, were

13 | you not -- did you not?

14 |     A.   I looked at some of the Engel transcript.

15 | I'm not sure that I recollect him explaining what he

16 | did about urban, but he certainly didn't collect

17 | samples above and below urban areas.

18 |     Q.   So this is purely a matter that they didn't

19 | collect samples above and below, it is not a matter of

20 | whether or not they had or expressed a basis on which

21 | to consider or dismiss various potential sources;

22 | correct?

23 |     A.   Well, I didn't see an analysis in the Engel

24 | report certainly that would allow him to dismiss the

25 | importance of urban sources.  If there's something he

10900

1    said in this courtroom, then I guess I need to be

2    reminded of what he said.  I'm not sure that I read

3    all of the Engel trial testimony or not.

4         Q.   Okay.  And so to the extent that he testified

5    as to the basis on which he evaluated the impact of

6    urban runoff, you have no basis today to disagree with

7    that?

8         A.   Well, I do.  Because I know that he didn't

9    have the data to make that evaluation so I would

10   definitely disagree with it.  I don't know where he

11   would have gotten the data from.  He didn't collect it

12   in this study.

13        Q.   Other than the issue of whether he had any

14   data to do that, you're unaware of how else he might

15   have evaluated the potential impact of urban runoff?

16        A.   I'm not aware of how else he might have

17   evaluated that without any data.

18        Q.   All right.  You also understand, do you not,

19   that this case is not a watershed study as to how to

20   clean up all of the various potential sources for this

21   watershed; correct?

22        A.   I would agree with that.

23        Q.   Okay.  That it does focus upon the issue of

24   whether or not phosphorus from poultry specifically is

25   having some substantial impact on the water quality in

**United States District Court**

1   this watershed; right?

2       A.   I agree that that's the question at hand,

3   yes.

4       Q.   Okay.  But if you were looking at the

5   quantification -- or correction of the issues of urban

6   runoff, then you'd need a study that was directed at

7   urban runoff; correct?

8       A.   If you wanted to quantify urban runoff, you

9   would need a study that included an evaluation of

10  urban runoff, yes.

11      Q.   Okay.  And as you say, the plaintiffs didn't

12  do that, did they?

13      A.   No, they did not.

14      Q.   Let's talk about your septic tanks.

15           You say that they are a possible source of

16  contamination; correct?

17      A.   That's right.

18      Q.   And that suggests that you are confident that

19  they could have a sufficient magnitude of influence on

20  this watershed that they need to be investigated;

21  correct?

22      A.   I would expect the magnitude of influence to

23  be quite variable in different parts of the watershed.

24      Q.   Well --

25      A.   I think that -- that it's a topic that should

1    have been investigated.

2        Q.   But what you gave were the total numbers of

3    people that are not on septic tanks; is that true?

4        A.   An estimate of that.

5        Q.   An estimate of that.  Suggesting that due to

6    the estimate of that, that the combination of all of

7    those suggests a potential impact on the water quality

8    of this watershed; right?

9        A.   I think that's -- that's part of it, but

10   there are other issues that also suggest that you

11   would -- that you should consider septics.  But

12   certainly the number -- the sheer number of people on

13   septic systems is part of that equation, yes.

14       Q.   And I'm looking at -- it's behind tab 19 and

15   it's your Exhibit 2279.

16       A.   Yes, sir.

17       Q.   Okay.  And that shows 76,598 estimated people

18   on septic systems?

19       A.   Yes.

20       Q.   Okay.  And you've testified that you're not

21   aware of the percent to which these are -- the percent

22   of the septic systems that are not functioning at all

23   or the percent that might be functioning some but

24   still not adequately, are you?

25       A.   I'm aware of a couple of studies to address

1   that very issue in the IRW.

2        Q.   Okay.

3        A.   Yes.  And that's actually an issue that was

4   addressed in the Haraughty management report that

5   we've been talking about.  For the Oklahoma side of

6   the IRW, the study that she discussed indicated that a

7   rather high percentage were not functioning properly

8   or were poorly sited.

9        Q.   Okay.  But one of the questions here in terms

10  of the watershed generally is the amount of phosphorus

11  that could potentially be contributed by this some

12  76,000 people; correct?

13       A.   The amount of phosphorus that could be

14  contributed?  Well, I suppose that's one of the things

15  that's involved but it's certainly not the only one.

16       Q.   Well, are you not aware that the study

17  that -- that you credit, the basin management study,

18  actually says that a person is the equivalent of,

19  like, 3.7 chickens in terms of phosphorus

20  contribution?

21       A.   Well, that's not something that I remember.

22  But if you're talking about phosphorus contribution to

23  a stream or a septic effluent, then no, that's not

24  true because chickens don't use restroom facilities

25  and bathrooms.

1    Q.   But when we're talking about phosphorus

2  contribution from septic tanks, that's a relevant

3  comparison, is it not?

4    A.   No, it's not.  Because the septic tanks are

5  placing their effluent at certain locations, and the

6  poultry litter is placed in other locations and

7  they're completely different locations and different

8  opportunities for transport.  So it's not similar at

9  all.

10    Q.   Well, isn't it true, though, that the total

11  amount of phosphorus contributed by poultry -- I mean,

12  by septic tanks is actually -- or even that could be

13  contributed by septic tanks is inconsequential in

14  terms of the dynamics in this watershed?

15    A.   I certainly wouldn't conclude that.  But I'm

16  not arguing the fact that if someone conducted an

17  appropriate study, that that's a possibility that they

18  might conclude that.  I really don't know.  There are

19  a lot of septic systems and evidence indicates a lot

20  of them don't function properly.  It's something that

21  should have been evaluated to determine if it was

22  significant or not.

23    Q.   Okay.  Doctor, you have in front of you

24  the basin management plan.  If you'd go to page 88 and

25  confirm that, in fact, it shows the equivalent of 3.7

**United States District Court**

1    chickens to each person.

2         A.   Okay.  I have page 88.

3         Q.   Okay.  Let me find mine.  Okay.  And if

4    you'll go to what is the third paragraph, second

5    sentence, "This means that while one person equals 23

6    broilers in terms of the pounds of waste excreted,

7    they equal 11 broilers in terms of nitrogen excreted,

8    and only 3.7 broilers in terms of phosphorus

9    excreted."

10             Do you see that?

11        A.   I see that, yes.

12        Q.   Okay.  Let's do a little calculation then to

13   get some idea of relative risk here.

14             MR. GEORGE:  Your Honor, I apologize.

15   Before Mr. Bullock asks his question, I want to object

16   to this line of questioning.  I'm not sure what it is

17   impeaching.  We did not through Dr. Sullivan offer any

18   human equivalency analysis and I sense that's where

19   we're headed.

20             THE COURT:  I think he's impeaching this

21   idea with regard to relative contributions and other

22   potential sources and whether or not septic tanks are

23   a serious and consequential potential source.

24   Correct?

25             MR. BULLOCK:  Correct.

 1              MR. GEORGE:  Your Honor, the only point

 2    I would make is that Dr. Sullivan has not offered

 3    relative contribution opinions, and so I want to be

 4    careful that we don't head into an area that this

 5    witness was not proffered on direct.

 6              THE COURT:  Well, to the extent that he

 7    did opine, as I recall, that this is an area that

 8    should have been looked into, I think this impeaches

 9    that.  The objection's overruled.

10         Go ahead.

11              MR. BULLOCK:  Okay.

12    Q.   *(BY MR. BULLOCK)*  So let's take that to your

13    76,000 figure, and, in fact, just for some ease of

14    calculations, let's take the number of people on

15    septics to 80,000, round it up, okay?

16    A.   Okay.

17    Q.   And then I'm going to take the 3.7 and round

18    it up so that it takes four full broilers to equal one

19    of those people, okay?

20    A.   Okay.

21    Q.   Easy math, we get 320,000 chickens at that

22    point, poultry broilers.

23    A.   That would be correct.

24    Q.   Okay.  And testimony in this court is that

25    that would -- 20,000 per broiler house, we're only

 1    talking about 16 broiler houses worth of phosphorus

 2    here, aren't we?

 3         A.   I wouldn't disagree with that.

 4         Q.   Okay.  And you're aware that there's

 5    approximately 1,800 broiler houses in this watershed,

 6    are you not?

 7         A.   I would say the number's probably not too

 8    different than that.

 9         Q.   Okay.  And so do you still contend

10    that -- and by the way, that calculation would presume

11    that all of the phosphorus from all of these people

12    that are on septic systems bypasses the septic systems

13    and goes directly into the stream, wouldn't it?

14         A.   Yes, it would.

15         Q.   Okay.  And so you still contend that that is

16    a potential source that was necessary for the

17    plaintiffs to -- for the plaintiff to investigate in

18    order to determine that poultry is a significant

19    source of the phosphorus in the rivers?

20         A.   Yes.  And I can explain why.

21         Q.   Okay.  Well, you can do that on cross.  Let's

22    go to the sewage bypass.

23              Isn't it true that the total point-source

24    contribution to the lake is less than 20 percent?

25         A.   Today, I think that's probably correct.  It's

1    in that range somewhere.

2        Q.   And it has been in that range even prior to

3    the sewage upgrades, wasn't it?

4        A.   I saw estimates that were closer to double

5    that from ten to fifteen years ago.

6        Q.   Okay.

7        A.   And also estimates that the amount has

8    decreased by 40 percent over roughly a ten-year

9    period.  So it's been changing quite dramatically in

10   recent years.

11       Q.   Well, let's go to the less than 20 percent of

12   the point sources.

13            In light of that -- now, the sewage bypasses,

14   are those occasion, as you say, when you have a broken

15   sewer line, you have a backed up sewage system, and

16   you have some fault with the plan itself; correct?

17       A.   Those would be examples of that, yes.

18       Q.   Okay.  Most days the system works pretty

19   well, doesn't it?

20       A.   Typically.

21       Q.   Okay.  So is it still your testimony that in

22   light of the loading that's coming from the point

23   sources themselves, that it was necessary for the

24   plaintiffs to evaluate -- do a detailed evaluation of

25   the sewage bypass in order to determine whether

1    poultry is having some substantial impact upon the

2    waters of the IRW?

3        A.    I think it's important to consider all of the

4    potential sources, even the ones that are probably

5    relatively small.  I wouldn't say you need a

6    comprehensive investigation.  But in some of these

7    sub-basins, we're looking at areas that are relatively

8    small streams and diffuse nonpoint sources of many,

9    many kinds.

10            The plaintiffs evaluated water quality

11    throughout the entire watershed, including a lot of

12    these smaller tributaries.  The proportion of septic

13    effluent or accidental discharges or anything relative

14    to the total in the watershed is not relevant to

15    evaluating what's going on in some of the

16    smaller -- some of the smaller watersheds.  So the

17    plaintiffs and I looked at spatial patterns as an

18    important tool of evaluating what's going on.

19        Q.    Doctor, I just asked you whether or not in

20    light of the percentage, it was still necessary in

21    your view for the plaintiff to evaluate sewage bypass

22    in order to determine whether poultry waste was a

23    substantial contributor to the water quality issues in

24    the IRW.  And is that "yes" or "no"?

25        A.    It's -- they should have considered it

**United States District Court**

1    because of the way that they were able to go about

2    evaluating the role of poultry as looking at the

3    smaller sub-basins.  They should have considered it.

4        Q.   Okay.  Now, in fact, are you not aware that

5    in terms of the smaller sub-basins, that Dr. Engel did

6    a calculation similar to what we did with the 16, a

7    total of 16 poultry houses throughout the entire

8    watershed, that he did that type of an evaluation and

9    determined that the possible contribution from septic

10   was de minimis in those watersheds -- those

11   subwatersheds?

12       A.   Yes.  Based on the septic, but he got an

13   opposite result based on the urban areas.

14       Q.   Okay.  Let's talk about dirt roads.

15            Are you not also aware that Dr. Engel

16   evaluated the significance of the issue of dirt roads

17   in reaching his opinions?

18       A.   I don't remember seeing any erosion

19   calculations by Dr. Engel.

20       Q.   I didn't ask you whether there were any

21   erosion calculations.  I asked you whether Dr. Engel

22   made an evaluation as to the significance of

23   contributions from dirt roads in coming to his opinion

24   in this matter?

25       A.   I don't remember seeing a study by Dr. Engel

 1    to do that, no.

 2         Q.   Okay.  Let's talk about the issue -- one of

 3    the -- of course, a dirt road in the ordinary course

 4    of things would have just a background level of

 5    phosphorus in it; correct?

 6         A.   Are you talking about in the road surface

 7    itself?

 8         Q.   Yes.

 9         A.   Well, they would have whatever phosphorus

10    level was in it based on the materials used to

11    construct that road.

12         Q.   Okay.  Is that a -- did they enhance the

13    phosphorus level in dirt roads when they -- they cut

14    them and construct them?

15         A.   Not that I'm aware of.

16         Q.   Okay.  But you also mentioned the issue of

17    dust as one of the potential sources on those dirt

18    roads for enhancement of phosphorus levels.

19         A.   That's a possibility.

20         Q.   Okay.  And in this watershed, wouldn't one of

21    the sources of that -- of a high-phosphorus dust that

22    you would be concerned about be from the dust from the

23    spreader trucks spreading the poultry waste?

24              MR. GEORGE:  Objection, Your Honor;

25    assumes facts not in evidence.  I don't think there's

1    anything in the record about poultry dust.

2                  THE COURT:  The record doesn't have

3    anything relative to the source of the dust that

4    Dr. Sullivan testified about but he testified that it

5    was a possibility.  Overruled.

6          Go ahead.

7    Q.   *(BY MR. BULLOCK)*  Okay.

8    A.   I'm sorry.  Can you repeat the question?

9    Q.   Well, let's go about it this way.

10         Have you ever seen either personally or

11   pictures of spreader trucks spreading waste?

12   A.   I've seen pictures of spreader trucks, yes.

13   Q.   Spreading waste?

14   A.   And I've seen fields on which the poultry

15   litter had been applied.

16   Q.   The truck spreading the waste?

17   A.   I believe I have, yes.

18   Q.   Okay.  And the large plume of dust which

19   comes from that process?

20   A.   I'm not sure I would characterize it as a

21   large plume, but I have seen photographs, I'm sure,

22   that show spreader trucks and some dust behind those

23   trucks.  I'm sure I've seen that.

24   Q.   Okay.  And in terms of phosphorus enhancement

25   of the roads by dust, that would be a potential source

1   for the phosphorus enhancement; right?

2        A.   It would depend on where the water went off

3   the road through the ditches and interactions with

4   culverts and streams and that sort of thing.  But it

5   is a potential source that -- that could easily or

6   should have perhaps been evaluated in the -- in the

7   sampling effort.

8        Q.   And you'd also have on those dirt roads any

9   poultry waste that might have accidentally been spread

10  being moved from site to site; right?

11       A.   I have no idea if that sort of thing happens

12  or not.

13       Q.   Is that a potential?

14       A.   I certainly can't say it's not a potential; I

15  simply don't know.  I've not observed the trucks

16  carrying poultry litter to fields and what the

17  possibility would be that some of that poultry litter

18  would fall off the trucks.  That's not something I've

19  observed.

20       Q.   One other thing in terms of -- that I want to

21  clarify -- or a couple of things in terms of

22  Dr. Engel's poultry house density study.

23            You also did a correlation with

24  the -- the -- let me gather my thoughts here.

25            In terms of your cross-correlations, we've

1   talked about the issue of the septic systems.  In

2   terms of the cattle that you gave, the exhibit, as we

3   pointed out, dealt with Dr. Clay's calculation, but I

4   take it that you're competent to testify concerning

5   how that calculation was done?

6       A.   Dr. Clay took the cattle numbers from the ag

7   census and he simply aggregated them.  I presented

8   data where I aggregated the cattle numbers by county

9   from the same survey.  It was just a simple

10   aggregation of the data by zip code.

11       Q.   But zip codes in rural areas are much larger

12   than what the subwatersheds were, aren't they?

13       A.   Yes, they are.  That's why I did the

14   correlation over a larger land area than simply the

15   subwatersheds.

16       Q.   Okay.  So your correlations that you're

17   offering us were not merely over the subwatersheds,

18   but over some extended area?

19       A.   That's correct.

20       Q.   Okay.  And so Dr. Engel has one study and you

21   have another study?

22       A.   Correct.

23       Q.   Okay.  And how -- so that I'm -- I'm clear,

24   how did you define the area of your study?

25       A.   Well, it was the -- it was the zip codes that

1    were -- I can go back to the figure and clarify this a

2    hundred percent.  Perhaps I should do that to make

3    sure I don't say something --

4        Q.   Well, just describe to me, how did you define

5    your area that you did your study on?

6        A.   We included the zip codes that were more than

7    half inside the IRW is my recollection --

8        Q.   Now --

9        A.   -- and larger than a certain size.  Some zip

10   codes are merely post office boxes so we didn't --

11   those don't have any area.  So it was above a size

12   cutoff.

13       Q.   Doctor, I'm not trying to cut you off on this

14   one, but I want to be sure we're communicating here

15   because I'm talking about the poultry house density

16   correlations, okay?

17       A.   Correct.

18       Q.   So you didn't use the subwatersheds, you used

19   zip codes?

20       A.   Okay.  I used the subwatersheds for roads and

21   septic, and I used -- did not use the subwatersheds

22   for cattle because that was not possible for me to do.

23   So I did -- I used the zip codes for cattle.

24       Q.   Okay.  And how did you determine your house

25   count?

1     A.   We used the plaintiff's database on poultry

2  house counts and their locations, and we did the

3  analysis based on the locations of those.

4     Q.   Okay.  Now, in your analysis, did you include

5  a buffer or not?

6     A.   Not.

7     Q.   Okay.  And so your study in terms was much

8  larger than a study of the subwatersheds, wasn't it?

9     A.   For the cattle relationship, it was; for the

10  other two relationships, it was the same.

11     Q.   Okay.  Let's talk about the edge-of-field,

12  which you say is not -- or I guess you said you don't

13  know what it is representative of; is that correct?

14     A.   No one knows what it's representative of,

15  sir.

16     Q.   Okay.  Do you have any -- first of all, you

17  do understand that poultry waste is high in terms of

18  copper, zinc, and arsenic; correct?

19     A.   That's not something I evaluated.  I can give

20  you my opinion, if you want.

21     Q.   Okay.  Well, if you didn't evaluate it --

22     A.   I didn't evaluate it.

23     Q.   And you didn't evaluate the level of copper

24  zinc and arsenic in cattle waste, did you?

25     A.   No.

 1        Q.   And so when in the edge-of-fields, the

 2   analysis focused on not only phosphorus, but also the

 3   copper, zinc, arsenic, and I believe the -- what

 4   was --

 5              *(Discussion held off the record)*

 6        Q.   *(BY MR. BULLOCK)*  Or there was organic

 7   material and I think we also had some other element.

 8   It's blocking me at the moment.

 9              But you didn't evaluate it as to those

10   issues, did you?

11        A.   Another expert for the defense dealt with

12   that.  I did not deal with that.

13        Q.   Okay.  But your testimony doesn't go to that

14   at all?

15        A.   No, sir.

16        Q.   Let's do the -- let's talk next just briefly

17   concerning your geomean calculations.  As you've said,

18   those were not intended to compare -- or let me

19   rephrase.

20              In terms of the geomeans that you calculated,

21   you used anyplace where you could find five, in this

22   case, phosphorus concentrations over a seven-year

23   period; correct?

24        A.   There were some analyses that I did that were

25   based on that, that's correct.

1      Q.   Okay.  And in doing the geomean in that

2   manner, does the fact that there may have been five

3   samples taken at any particular time over a seven-year

4   period, does that truly tell you anything about the

5   water quality of any particular place?

6      A.   Yes.  It can give you a general indication of

7   what that water quality is.

8      Q.   Well, there may have been all sorts of

9   reasons for the particular sampling over a seven-year

10  period where it's so spread out; correct?

11     A.   That's -- that's correct.  But there

12  are -- that's one of the reasons why you use multiple

13  sites when you're looking for spatial patterns.

14          But the other issues is there are lots of

15  surveys, I mean, including the EPA surveys, where the

16  characterization is based on one sample only.  So

17  having seven samples or ten samples or whatever is not

18  really a particular large issue in my view.

19     Q.   And, of course, that also raises the whole

20  issue of using the means that -- because of the spread

21  of your data, the time spread of the data, the mean

22  similarly could be meaningless given that it could be

23  one particular event versus several inconsequential

24  event, right, and the mean would be overly influenced

25  by this one event when the phosphorus level spiked?

1      A.   No, I wouldn't agree with that.  I think that

2  in sites where you have more data points, then that's

3  a good thing; the more data you have the better.  And

4  that's really why I extended it out over a seven-year

5  period rather than restricting it.

6          But the fact that you have relatively few

7  data points is not an obstacle to doing a spatial

8  analysis.  It's done that way all the time.  I've

9  published lots of papers on it that way.  All the EPA

10 studies, like I said, are -- the surveys, the lake

11 surveys, stream surveys are conducted that way based

12 on one sample.  It's not unusual.

13     Q.   Are you suggesting to this court that a

14 handful of water samples taken over a seven-year

15 period provides a comparable basis for comparing the

16 phosphorus levels in the IRW collected using the

17 Scenic River's standard?

18     A.   What I'm suggesting is is that having a

19 relatively few number of samples is not an impediment

20 to examining spatial patterns.  But when you do that,

21 you have to be cognizant of the fact that at some of

22 those sites you have few samples, and therefore, you

23 don't put undue influence on any one sample and draw a

24 conclusion based on the response of one site or two

25 sites or three sites and so on.  You would not draw a

1    conclusion based on that for the very reasons that

2    you're discussing.

3            But your overall spatial pattern is a robust

4    way of looking at large data sets and something that's

5    done all the time.

6        Q.   And particularly as to doing that in

7    Oklahoma, you recognize that in addition to that

8    issue, you are also comparing remarkably different

9    waterbodies at the same time; right?

10       A.   Well, I'm not sure what you mean by

11   "remarkably different."  But, I mean, we're looking at

12   all of the streams for which there's adequate data

13   available to see what the patterns are to examine two

14   things.  One is, are the high phosphorus values

15   associated with locations where people raise a lot of

16   poultry; and the second is, to answer the question,

17   are the phosphorus values in the IRW somehow

18   dramatically different from elsewhere in the state?

19           The spatial patterns give us a very robust

20   tool to evaluate both of those questions.

21       Q.   Okay.  Well, let's first work on the one that

22   I raised, and that is the issue of remarkably

23   different waterbodies.  You answered some of that with

24   the judge, that -- I just want to be sure that you

25   understand the geographic changes in this state, how

 1   remarkably different it is from east to west.

 2        A.   I would agree that there are -- there are

 3   definite differences in the streams.  But the question

 4   is the extent to which those differences might

 5   influence the interpretation of phosphorus data.

 6        My point is, that that's not likely to be an

 7   important issue because the background phosphorus

 8   concentrations are believed to be relatively

 9   homogeneous throughout the entire country, not a huge

10   difference in what you expect to see in terms of

11   background phosphorus.

12        So whatever you see on top of that is

13   anthroprogenic, it's what people have caused, and the

14   fact that your streams are different doesn't really

15   influence that at all.

16        Q.   Okay.  Well, let's go to the issue that

17   you're -- are you suggesting that your analysis

18   negates poultry as a source of high phosphorus levels

19   in the streams of the IRW?

20        A.   What I'm saying is, is that nobody collected

21   the data to allow me or anybody else to evaluate that.

22   So --

23        Q.   No.  Doctor --

24        A.   So I'm not saying that, no.

25        Q.   Okay.  You're not saying that this analysis

1    is proof of a lack of causation, are you?

2        A.   I'm not saying that my analysis is proof of a

3    lack of causation, no.

4        Q.   Okay.  Because, in fact, an analysis of

5    whether any particular source is having an impact in a

6    particular watershed does require investigation within

7    that watershed; correct?

8        A.   I'm sorry.  I think so.  Can you please

9    repeat it?  I apologize.

10       Q.   Okay.  It is true that determining whether a

11   particular source has an impact in a particular

12   watershed requires a site-specific investigation;

13   right?

14       A.   That's correct.

15       Q.   Okay.  And so if we go out to western

16   Oklahoma and we find high phosphorus levels and we go

17   to the IRW and we find high phosphorus levels in

18   poultry, you wouldn't suggest that the western

19   Oklahoma water quality issues are determined

20   because -- on that basis that they have poultry;

21   right?

22       A.   You can't take the phosphorus concentration

23   in two streams and from looking at those tell what the

24   different sources might be in either stream, no.

25   That's not possible.

 1      Q.   Okay.  And the fact that a western Oklahoma

 2   stream might be influenced -- have high phosphorus

 3   levels as a result of a cattle feed lot or a dairy

 4   concentration doesn't tell you that the IRW could not

 5   have elevated phosphorus levels due to a concentration

 6   of poultry, could it?

 7      A.   That simple comparison would not give you

 8   that information, no.

 9      Q.   Okay.

10           MR. BULLOCK:  Judge, would this be a

11   good time to take a break, and then I think I can --

12           THE COURT:  If it is for you.

13           MR. BULLOCK:  Thank you.

14           THE COURT:  Let's take a break.

15               *(Short break)*

16           THE COURT:  Mr. Bullock, what's the

17   prognosis here of being able to --

18           MR. BULLOCK:  I think we're going to

19   succeed.

20           THE COURT:  All right.

21      Q.   *(BY MR. BULLOCK)*  Let's just do a couple of

22   things here to clean up.

23           Okay.  Doctor, let's go to tab -- it's tab

24   11.  It's actually Defendants' Joint Exhibit 1454,

25   which was the aerial of the Watts lagoon.

1        A.    Yes, sir.

2        Q.    Which, as you say, was not -- this particular

3    picture wasn't in your materials but you did talk

4    about this issue?

5        A.    Yes, I did.

6        Q.    Okay.  Now, to some extent, the significance

7    of this as a relative source would depend on the same

8    type of analysis that you and I went through with

9    the septic tanks; right?

10       A.    Well, I think in some ways, it would be -- it

11   would be related.  In this case, the effluent is

12   actually sprayed on the surface of the ground or as

13   the septic tanks are -- the effluent is distributed

14   underground so there would be some differences.

15       Q.    Okay.  But we posited that the septic tanks

16   would deliver it straight to the river and got the 16

17   houses for seventy or eighty thousand people; right?

18       A.    Yes, I recall that.

19       Q.    And there are distinctions and I'm not trying

20   to overlook those.  But do you have any estimate as to

21   the number of people served by this Watts lagoon

22   system?

23       A.    I don't remember the population of Watts, but

24   I do believe it's in my report in a table that --

25   actually that table might be in here so I can search

 1    for it, if you'd like.  I'm sure I have that

 2    information but I don't recall what the number is.

 3        Q.   Well, why don't you -- if you can do that

 4    quickly.  As you can tell, the court is going to hold

 5    me to my promise to get you off the stand.

 6        A.   If one of your assistants finds it before I

 7    do, then he can just shout it out.

 8                THE COURT:  Unless, of course, Doctor,

 9    you want to stay in Tulsa another day.

10                THE WITNESS:  No, thank you, sir.

11                MR. GEORGE:  Dr. Sullivan and

12    Mr. Bullock, tab 19, I think, is probably what you're

13    looking for.

14                MR. BULLOCK:  Thank you.  But that

15    doesn't tell you the number of people.  That's what I

16    was wondering about.

17        Q.   *(BY MR. BULLOCK)*  Does that show -- 19 show

18    the Watts -- oh.

19                MR. GEORGE:  I believe it does.

20        A.   The 316.

21        Q.   *(BY MR. BULLOCK)*  So it was included in that,

22    in terms of septic, but --

23        A.   No.  That would -- well, let me see.

24    Watts --

25        Q.   Oh, that's with the centralized so that would

 1    be right.  That's 316.

 2                   MR. BULLOCK:  Thank you, Robert.

 3         A.  Yes, yes.

 4         Q.  *(BY MR. BULLOCK)*  And so in terms of the

 5    relative -- and we don't have to go through it -- but

 6    the relative risk of this, you would look at that type

 7    of an issue in part; correct?

 8         A.  I would look at it in part, yes.

 9         Q.  Okay.  And then you also stated that there

10    was a hundred-foot setback from this spray field from

11    the river.  Do you recall that testimony?

12         A.  It's somewhere in that range, yes.

13         Q.  Okay.  And you understand that that is the

14    Oklahoma setback under the Oklahoma BMPs?

15         A.  That's correct.

16         Q.  Okay.  And are you not also aware that

17    Arkansas on a two percent slope has this as small as a

18    20-foot setback?

19         A.  Yes, I'm aware of that.

20         Q.  Okay.  And do you recall seeing this spray

21    field?  This is a very flat field, is it not?

22         A.  I believe that's correct.

23         Q.  Okay.  And so at least if the BMPs are

24    completely successful in stopping the movement of

25    phosphorus into adjoining waters, you don't have any

 1   concern about Watts lagoon, do you?

 2       A.   You're partially correct.  It really depends

 3   on whether or not there's a ditch system or some way

 4   to move that effluent water directly to the river.  I

 5   know there was some discussion in some of the material

 6   that I read about Watts that there was a swale there,

 7   and so I think it's a matter of -- the fact that it

 8   was raised as a potential problem by U.S. Fish and

 9   Wildlife Service and that they were fined would

10   suggest to me that someone doing an assessment should

11   at least look at it.  But I would agree with you that

12   it's not high on my list of the most likely

13   contributors.

14       Q.   But it was enough time to take our time

15   today?

16       A.   I think that in doing an appropriate

17   assessment of what's going, that people -- when this

18   site is located on the main stem river right by the

19   border between the two states, an area that's in

20   dispute here about what's going on, I think that the

21   people doing the investigation should have looked at

22   it, yes.

23       Q.   All right.  Now, let's go down to -- let's go

24   back to one other, and we talked about urban briefly,

25   that there have been runoff issues.

1          In terms of the land-use maps for the IRW,

2    urban runoff is anywhere from five to seven percent in

3    those maps; is that not true?

4         A.   Do you mean the percent of the area covered

5    by urban land use?

6         Q.   Yeah.

7         A.   About seven percent.  I think that's about

8    right.

9         Q.   Okay.  And are you not also aware that

10   Dr. Engel assessed urban runoff and actually provided

11   in his mass balance for urban runoff?

12        A.   His mass balance really has nothing to do

13   with evaluating the potential for urban areas to

14   contribute to streams.  It's a totally different

15   issue.

16        Q.   Okay.  Did you not note that he assigned a

17   percentage of his mass balance -- a percentage in his

18   mass balance for urban runoff's contribution to this

19   watershed?

20        A.   You're talking about when he did his

21   modeling?

22        Q.   No.  When he did his mass balance.

23        A.   When he did his mass balance, I think that in

24   his -- I would agree in his mass balance that

25   he included in that what he believed to be phosphorus

 1   being imported in the watershed with respect to urban

 2   areas, but that's got nothing to do with in or out of

 3   the stream system.  It's a totally different issue,

 4   the mass balance on the water versus the mass balance

 5   on the watershed.

 6       Q.   Your testimony is that he did not include in

 7   his mass balance anything for urban runoff?

 8       A.   No, I'm not saying that.  I'm saying that he

 9   did not include it -- nothing about his mass balance

10   was relevant to water quality issues.

11       Q.   Doctor, I didn't ask that.  I need to clarify

12   with you whether it is your view that Dr. Engel did

13   not assign in his mass balance any quantity for urban

14   runoff?

15       A.   Dr. Engel did include urban in his watershed

16   mass balance.  He did include it.

17       Q.   Urban runoff?

18       A.   I don't think it was expressed as runoff.  I

19   think it was expressed as phosphorus into the

20   watershed.

21       Q.   Okay.  We won't fuss with one another as to

22   what's in the record.  That doesn't get us to where

23   I'm going.

24           Let's talk about the Arkansas PI and Code

25   590.  I guess, first, let's talk about generally.

1    Doctor, do you have any experience in working with

2    phosphorus indices?

3        A.   With a phosphorus index?

4        Q.   Yes.

5        A.   Not outside of this case, no.

6        Q.   And how did you become -- and the only one

7    that you have any familiarity with is the Arkansas

8    phosphorus index?

9        A.   Well, I have some general familiarity with

10   the phosphorus index.  I mean, as a general tool, it's

11   used by about 47 states.  So I have a general

12   familiarity.  The issues that are included in the

13   phosphorus index are issues that I'm well familiar

14   with, but I have not worked with phosphorus indices in

15   the past.

16       Q.   How did you become familiar with phosphorus

17   indices?

18       A.   Just by reading the publications.  There was

19   a DeLaune, et al., 2004, I believe, that described the

20   phosphorus index.

21       Q.   Doctor --

22       A.   DeLaune, I think, is the correct

23   pronunciation, D-e-L-a-u-n-e, I believe.  That was a

24   publication that discussed the phosphorus index for

25   Arkansas.

 1          Then there's a recent publication that

 2   Dr. Sharpley was involved with describing the revised

 3   Arkansas phosphorus index that just went into effect

 4   very, very recently.

 5       Q.   Okay.  You don't consider yourself as an

 6   expert in phosphorus indices, though, do you?

 7       A.   No, sir.

 8       Q.   And keeping with that, you certainly wouldn't

 9   consider yourself to be an expert in Arkansas' new

10   phosphorus index, would you?

11       A.   Well, I've read what it says.  I would say my

12   expertise relates to looking at the parts of the -- of

13   the phosphorus index that apply to these issues of

14   hydrology and source and risk.  I'm familiar -- well

15   familiar with those issues, that I can read them in

16   the papers.

17          MR. BULLOCK:  Judge, I'm going to ask

18   that that be stricken.

19          THE COURT:  Sustained.

20       Q.   (BY MR. BULLOCK)  Now, you certainly do not

21   consider yourself to be an expert with respect to

22   Arkansas' new phosphorus index, do you?

23       A.   An expert, no.

24       Q.   Are you aware of any research that quantifies

25   the amount of phosphorus that would be released from a

1    field if the phosphorus index is applied to that

2    field?

3         A.   I can't think of any, no.

4         Q.   Let's talk about 590, Code 590.

5              Before this case, had you worked with the

6    NRCS Code 590?

7         A.   I've worked with some of the restrictions

8    that are embedded in the Code 590 in Oregon but not

9    specifically with the Code 590.

10        Q.   And, again, are you aware of any research

11   that quantifies the amount of phosphorus that would be

12   released from a field if the NRCS Code 590 is applied

13   to that field?

14        A.   I can't think of a specific study that

15   quantified that difference, no.

16        Q.   Okay.  Isn't one of the issues in terms of

17   nonpoint-source pollution similar to the saying of

18   death by a thousand cuts, that over a large area you

19   get a little bit of the mineral of concern, in this

20   case phosphorus, and together all of those make for

21   pollution of a waterbody?

22        A.   That's the general understanding, yes.

23        Q.   Okay.  And so the actual effectiveness of

24   Code 590 is important, is it not?

25        A.   I think that the effectiveness is important,

1   yes.

2         Q.   Okay.  Are you aware that Mr. Smith of

3   the -- or Mr. Earl Smith of the Arkansas Natural

4   Resources Commission has testified in this court that

5   the Arkansas phosphorus index has not stopped

6   nonpoint-source pollution from poultry waste?

7         A.   I read Mr. Smith's testimony.  I don't

8   remember that specific sentence so I guess I'm not

9   aware of that.  But I did read the testimony.

10        Q.   Okay.  And if, in fact, he said that, you

11  wouldn't contradict that, would you?

12        A.   I would say that for a scientist, it's not

13  possible to make that statement without the

14  appropriate research to demonstrate that.  I don't

15  believe -- I certainly have not seen that research,

16  no.

17        Q.   Okay.  Are you aware of at what point in time

18  it became mandatory that persons applying poultry

19  waste in Arkansas follow or observe the requirements

20  of the PI index?

21        A.   Well, the PI index was published in 2004, I

22  believe.  It's -- it's -- and initially there was a

23  grace period so it's -- it's within the last several

24  years.  I don't know precisely which year.

25        Q.   2007?

1      A.    That's possible.

2      Q.    Okay.  And the waste applied before the

3   implementation of such an index, from your knowledge

4   of all of the areas in which you have expertise,

5   that waste still has the potential of polluting the

6   waters of the IRW, doesn't it?

7      A.    I'm not sure I'm fully understanding the

8   question, though.  Which waste are we talking about?

9      Q.    Okay.  Let's take -- even if you want to go

10  waste before 2004 in Arkansas, that waste, if it

11  wasn't applied with all of the restrictions that you

12  might suggest, would have the potential of continuing

13  to pollute this waterbody, would it not?

14     A.    So are you talking about the phosphorus that

15  was applied before 2004 --

16     Q.    Yes.

17     A.    -- that would pollute today?

18     Q.    Yes.

19     A.    That's a good question, and I think it's a

20  very difficult question to provide an answer to.

21  Because over time the phosphorus from the fertilizer

22  is going to become incorporated into the soil, and

23  then -- a fresh application of fertilizer is far more

24  likely to move phosphorus with overland flow.

25            So the answer is I don't know.  I think that

 1   that's something that would need to be -- would need

 2   to be investigated to provide an answer to that.

 3       Q.   You can't rule that out, can you?

 4       A.   I can't rule it out, no.  But I can't rule it

 5   in either.

 6       Q.   Okay.  You didn't do any investigation or

 7   analysis to determine whether poultry operations in

 8   the Illinois River Watershed are, in fact, complying

 9   with the requirements of any phosphorus index, did

10   you?

11       A.   I didn't conduct any kind of a study to try

12   to determine the extent of compliance with any

13   regulations, no.

14       Q.   And you wouldn't presume that merely because

15   people haven't been caught, that there aren't

16   violations of the law, would you?

17       A.   Actually, I would presume that there are not

18   violations of the law, but I have no scientific

19   foundation to present to you for that.  But I would

20   presume that to be true.

21       Q.   So you would presume that because I don't get

22   a ticket going to Oklahoma City, that I didn't speed?

23       A.   No, I wouldn't presume that.  That's a

24   totally different issue.

25       Q.   Okay.  Let's --

1            MR. BULLOCK:  If I might approach,

2    Judge?

3            THE COURT:  Yes, sir.

4            THE WITNESS:  Thank you.

5       Q.   *(BY MR. BULLOCK)*  Doctor, I've handed you

6    what's been marked Defendants' Joint Exhibit 2268.  Do

7    you recognize that?

8       A.   Yes, sir, I do.

9       Q.   Okay.  That's actually a schematic that was

10   included in your report?

11      A.   Yes.

12      Q.   Okay.  And I'm going to use it here as a

13   demonstrative rather than offer it into evidence,

14   okay?

15      A.   Okay.

16      Q.   Now, this is a schematic demonstrating this

17   concept of critical source area; correct?

18      A.   Yes.

19      Q.   Okay.  It's not data driven, it's merely

20   illustrative of the discussion point?

21      A.   That's correct.

22      Q.   Okay.  So you have what is a high transport

23   area, and that would include someplace where the -- it

24   is likely that in this case phosphorus would be moved

25   off of a field and into waters; correct?

1          A.   That there would be an increase risk of that

2     occurring.

3          Q.   An increased risk.  And then on the green

4     side, you have a high P source; correct?

5          A.   Correct.

6          Q.   Now, you haven't done anything in this

7     watershed, first of all, to determine on the basis of

8     your study where there are what might be regarded as a

9     high P source?

10         A.   I have not done any independent investigation

11    of where the P sources would be high.

12         Q.   And you don't -- you haven't expressed an

13    opinion in your report as to what that might be as

14    some type of an objective level?

15         A.   In terms of what might constitute a high P

16    source?

17         Q.   Right.  What would be a high P source.

18         A.   Well, that's something that's included in the

19    phosphorus index, but it's not something that

20    I -- that I tried to quantify in my report.  You're

21    correct in that.

22         Q.   You haven't determined that?

23         A.   No.

24         Q.   Okay.  Now, under this, there is, for

25    instance -- and then that red is what you're talking

1    about in terms of a critical source area --

2         A.   Yes.

3         Q.   -- correct?

4              Under this schematic, there is testimony, for

5    instance, concerning the George's Ritter farm with an

6    STP value of 2,000, okay?  Now, that would certainly

7    be a high P source under this.

8              You would agree with that, wouldn't you?

9         A.   That would be -- as an STP, that would be a

10   component of a high P source.  In the phosphorus

11   index, the other component is the water-extractable

12   phosphorus in the litter that's been applied.  So both

13   of those are considered.  But yes, that's certainly

14   part of it.

15        Q.   But this was past litter application, Doctor.

16   So we're talking about some of this pre-2004.

17        A.   Okay.

18        Q.   Okay.  Now, it would be your testimony that

19   unless the Ritter farm is in one of these high

20   transport areas, that under this there would be no

21   attention given to a piece of land with a 2,000 STP;

22   correct?

23        A.   No.  This is not evaluated on a farm-by-farm

24   basis.  It's evaluated on a field-by-field basis.

25        Q.   Well --

1        A.   The evaluation is actually the portions of

2   the field that might be subject to transport.  So you

3   don't expect the whole farm to be in that category,

4   no.

5        Q.   We're talking about a specific field.  That

6   specific field, the field with the 2,000 STP, your

7   testimony is that unless somebody goes out and proves

8   that that's in a high-transport area, there's no

9   reason for concern that it is contributing one of

10  those thousand cuts --

11       A.   No.

12       Q.   -- to the waters of the IRW?

13       A.   No, that's not what I'm suggesting.  What I'm

14  suggesting is that across that field an evaluation

15  will be made to determine the increased risk of

16  runoff, and that's made across the entire field.  It's

17  not just a one number for one field.  You look at the

18  soil types that occur across that field, you look at

19  the hydrologic soil type that occurs there, you

20  combine that with the vegetation coverage information,

21  you combine that with the slope, and you generate a

22  probability of increased runoff.

23       Q.   Well, I'm --

24       A.   And that's all done -- that information is

25  collected to feed into the phosphorus index, and

*10940*

1    that's how the evaluation is made.

2        Q.    Doctor, I'm not talking phosphorus index

3    here.  And it looks like you and I are going to have

4    to spend more time on the phosphorus index than I had

5    anticipated.

6            But so far as you are concerned, a 2,000 STP,

7    until somebody proves it's in a high-transport area,

8    is going to be, like, locked up in your warehouse?

9        A.    A 2,000 STP, if there's no transport, I mean,

10   it is essentially locked up if there's no mechanism

11   provided for transport.

12       Q.    Okay.  Now, as we said, this is a mere

13   schematic and you haven't evaluated the IRW in terms

14   of, first of all, how extensive the high P sources

15   might be in the IRW, have you?

16       A.    I have not performed a study to try to

17   quantify that.  That's something that's been addressed

18   by many other experts in this case.

19       Q.    All right.  And you haven't attempted to

20   evaluate the potential for high transport in the IRW,

21   have you?

22       A.    Well, there's a lot of information on

23   potential for high transport in the IRW and elsewhere,

24   but I have not tried to conduct a field investigation

25   of that, no.

1    Q.   All right.  And so it is in a karst geology

2    with thin soils and a high concentration of cattle

3    which are having all of the impacts that you've

4    testified to here today -- or having impacts such as

5    you've testified to here today.  It is possible that

6    this high transport area and the high source area, in

7    fact, completely overlap, isn't it?

8    A.   Well, that's why they don't spread the litter

9    on the areas --

10   Q.   Doctor, it is -- Doctor, it is possible that

11   the two completely overlap?

12   A.   Are you talking about in terms of litter that

13   was spread in the past?

14   Q.   No.  I'm talking about your evaluation.  You

15   cannot testify as to your expertise that the high

16   transport area and the high P source in this watershed

17   do not completely overlap, can you?

18   A.   I don't know if there are areas of this high

19   P and high transport potential.  I've not tried to

20   investigate that.

21   Q.   Okay.

22        *(Discussion held off the record)*

23   Q.   *(BY MR. BULLOCK)*  The basis is, you can't

24   conclude as to how much those two overlap, can you?

25   A.   How much high STP overlaps with high

 1   transport, that's not an investigation I've tried to

 2   conduct.  I cannot tell you where they overlap.

 3       Q.   Okay.  Let's go to --

 4            MR. BULLOCK:  If I might approach, Your

 5   Honor?

 6            THE COURT:  You may.

 7            THE WITNESS:  Thank you, sir.

 8            MR. BULLOCK:  I'll try to make this

 9   short so that you can get your --

10            MR. GEORGE:  I have one objection but I

11   don't want to interrupt you.  So let me make it now,

12   if I can.

13            MR. BULLOCK:  Well, why don't you make

14   it.  That way I can deal with it.

15            MR. GEORGE:  Try to work together, Your

16   Honor.

17       Your Honor, the document's been handed up

18   that Mr. Bullock intends to examine Dr. Sullivan

19   concerning the revised phosphorus index, which I think

20   is something the court has taken judicial notice of.

21       I think the record will reflect that the

22   defendants did not solicit testimony from Dr. Sullivan

23   regarding the revised phosphorus index, and obviously

24   his report was written prior to the time that this

25   index came into me.

1          I am concerned that plaintiffs may be seeking

2     to open a door to rebuttal through the examination of

3     this witness, and I certainly want to reserve any

4     objections that we would have in that regard.

5          So I guess in terms of -- the formalness of

6     my objection is beyond the scope.  If the court allows

7     it, I just want to make clear that we're not conceding

8     that rebuttal would be permissible on this point

9     simply because they examined a witness on cross.

10          MR. BULLOCK:  Well, talk about

11     preemptory objections.

12          But even beyond that, the fact is that they,

13     defendants, introduced this very document to this

14     court --

15          THE COURT:  Is this admitted, by the

16     way?

17          MR. BULLOCK:  It is.

18          THE COURT:  All right.  It's obviously

19     relevant.  It's been in place for now what, 12 days?

20          MR. BULLOCK:  Yeah.

21          THE COURT:  And when you're talking

22     about an equitable action, an action for injunction,

23     one of the questions going on in my multiple-working

24     hypothesis is to what extent the court has to consider

25     whether or not time must be given to see whether or

1    not this is going to have any impact.  I think we have

2    to get into it.

3          You know, this is one of the dynamic problems

4    with this subject matter.  To the extent the lawsuit's

5    brought, I think it's a necessary subject.  It was

6    admitted by the defendants.  It's in place now for

7    twelve days, which is much shorter than this trial has

8    been going on.  The objection's overruled.

9          Go ahead, Mr. Bullock.

10      Q.   (BY MR. BULLOCK)  Okay.  Relative

11   to -- you've seen this.  In fact, this is what you

12   were referring to in terms of the Dr. Sharpley matter

13   with the P index?

14      A.   Yes, sir.  I have seen it and I've read it

15   but I have not studied it.

16          MR. BULLOCK:  This is, for purposes of

17   the record, Defendants' Joint Exhibit 8132.

18      Q.   (BY MR. BULLOCK)  And if you'll look -- let's

19   go to page 4 relative to the issue of additional

20   contributions from prior application.  We'll go down

21   to the third paragraph where Dr. Sharpley writes,

22   "Research in Texas, Pennsylvania, and Georgia shows

23   that the mineralization of organic P in manure that is

24   not measured in WEP prior to application can

25   contribute an additional P in runoff.  In other words,

1    there is a small but potentially significant residual

2    effect or the P release from litter during the year

3    after application, which contributes additional P to

4    runoff losses."

5           Do you see that?

6        A.  Yes, I do.

7        Q.  And that would be applicable to such places

8    as the Ritter farm with the 2,000 STP, would it not?

9        A.  No, I would not agree with that, sir.

10       Q.  Okay.  Well, let's go back to the examples of

11   their application of the Arkansas P index.  Go back to

12   page 13, Doctor.

13          You're not a -- okay.  Go ahead.

14       A.  I have page 13.

15       Q.  Okay.  You're not a plan-writer?

16       A.  No, sir.

17       Q.  Okay.  And this is a rather complicated

18   calculation that needs some expert interpretation,

19   does it not?

20       A.  I think that would be helpful.

21       Q.  Okay.  But down at the bottom of this

22   calculation, there is a line saying the estimated P

23   loss, pounds P per acre.  Do you see that?

24       A.  Yes, I do.

25       Q.  And there are -- let's see.  For all of the

1    applications -- and I'm looking at the examples from

2    pages 13 to 19 of this -- it does show some measurable

3    estimated P loss from all of these fields, doesn't

4    it?

5        A.   I believe that that's true.

6        Q.   Okay.  Ranging from .43 pounds up to as high

7    as 1.79 pounds; correct?  I guess 1.06 pounds would be

8    the lowest.

9        A.   I believe you're correct on that,

10   Mr. Bullock.

11       Q.   Okay.  And that's the estimates even applying

12   the Arkansas P index; correct?

13       A.   Well, the Arkansas P index is intended to

14   evaluate what the risk might be.  Then based on what

15   that risk is calculated or estimated to be, then

16   certain management actions follow; for example, don't

17   spread litter or introduce additional BMPs and that

18   sort of thing.

19       Q.   Okay.  Well, this actually includes

20   calculation of those such matters, does it not, within

21   this calculation?  Or do you know that?

22       A.   Well, within the calculation, it does include

23   allowance for some -- for the existing BMPs, at least

24   some of the existing BMPs, yes.

25       Q.   Okay.

**United States District Court**

1    A.   But depending on how the final rating is

2    determined from the calculation, then that will

3    instruct the farmer whether litter may be applied or

4    not, and if it is applied, what the various

5    restrictions are.

6         I'm a little bit nervous about this testimony

7    because I'm really not an expert on what's in this

8    paper.  I understand why Your Honor wants me to talk

9    about it but --

10        MR. BULLOCK:  Okay.  And I have just one

11   other question on this.  I didn't mean to cut off your

12   objection.

13        MR. GEORGE:  Well, let me hear it.  I

14   may have still have it.

15        MR. BULLOCK:  Okay.

16   Q.   *(BY MR. BULLOCK)*  Are you not aware that, in

17   fact, this basically is -- I guess I'm going to have

18   two -- this is basically an instruction to the

19   plan-writers or an explanation to the plan-writers?

20   A.   It's an explanation to the plan-writers is

21   how I would interpret it.

22   Q.   Okay.  Now, in fact, this provides, does it

23   not, that the farmer will not be told what the

24   estimate of runoff is from the fields where he is

25   applying the waste?  Isn't that true?

10948

1    A.   The farmer will be told -- well, my

2    understanding is the farmer will be told whether the

3    calculated risk is low -- I believe that there's a

4    very low, there's a low, there's a moderate, there's a

5    high, and a very high.  The farmer will be told what

6    the results of that calculation is, and then

7    associated with those designations will be various

8    requirements.

9    Q.   Okay.  But let me go to page 2, the bottom

10   sentence on page 2.

11           MR. GEORGE:  Your Honor, I do object to

12   this line of questioning.  It is well beyond the

13   scope.  I don't believe we elicited any testimony

14   about what farmers would or would not be told from

15   this witness.  Anything he would have to say about

16   that would be speculation.

17           MR. BULLOCK:  In terms of his testimony

18   that he just gave, which was completely voluntary as

19   to what farmers will be told, and now I ought to be

20   able to complete the circle as to what farmers won't

21   be told.

22           MR. GEORGE:  I apologize, Mr. Bullock.

23   The document is in evidence.  And if His Honor wants

24   to read it and there's something in there about what

25   growers will be told, then that's before the court.

1    Having this witness read from a document that he's

2    indicated he doesn't have particular expertise, and

3    now we're even beyond exploring scientific testimony

4    matters, I think is relevant.

5              THE COURT:  It's in evidence.  I'm going

6    to read it.  The objection's sustained.

7              *(Discussion held off the record)*

8              THE COURT:  All right.  I'm told by

9    Mr. Overton that this is not in evidence.

10             MR. GEORGE:  Your Honor, I believe the

11   court took judicial notice of it.  But maybe I was

12   loose in my -- maybe we've all been loose in our

13   discussion of it.

14             MR. BULLOCK:  I guess that's always a

15   question as to what judicial notice is.  But --

16             THE COURT:  Well, I mean, it may be that

17   I took judicial notice of the fact that the revised

18   Arkansas phosphorus index went into effect as of

19   January 1st of this year.  I don't know that I took

20   judicial notice of this document, did I?

21             MR. GEORGE:  You did, Your Honor.  And

22   I'll try to reset the stage.

23        You'll recall we had -- Your Honor took

24   judicial notice of the revised rules and regulations,

25   and included in those rules and regulations was a

1    reference to this article --

2              THE COURT:  There you go.  So it's

3    incorporated therein.  Thank you for the reminder.

4         So by virtue of the fact that it's reference

5    in the rules it bootstraps in this description.  Thank

6    you very much.

7              MR. BULLOCK:  I think that was the

8    explanation.

9              THE COURT:  Thank you very much.  Once

10   again, evidence of the volume involved here.  I'm glad

11   that none of you have exhibited perfect recall either.

12        Mr. George.

13             MR. GEORGE:  Thank you, Your Honor.

14   Without adding much to what we have to recall, I do

15   have just a few questions.

16             THE COURT:  Although Mr. George has come

17   pretty close.

18             MR. GEORGE:  I don't know.  There are

19   moments when it feels like it's all coming out so we

20   try to retain it.

21                **REDIRECT EXAMINATION**

22   **BY MR. GEORGE:**

23        Q.   Doctor, I want to start with the phosphorus

24   index document that we've been discussing and I want

25   to just clear up a thing or two.

1          Do you still have it in front of you?

2     A.   Yes, sir.

3     Q.   Okay.  You were asked about example 1 and

4  then there was reference made to some of these other

5  examples.  Do you understand that these are sort of

6  hypothetical fields?

7     A.   That's my understanding, yes.

8     Q.   Okay.  And Mr. Bullock asked you about the

9  estimated phosphorus loss that's reported in some of

10  these hypotheticals.  Do you recall those questions?

11     A.   Yes.

12     Q.   Okay.  And I believe you acknowledged that

13  these estimates report some measurable estimate of

14  phosphorus loss from a pasture; right?

15     A.   An approximation, yes.

16     Q.   Okay.  Doctor, do you have to apply poultry

17  litter to get measurable phosphorus losses from

18  pastures?

19     A.   No, sir.

20     Q.   Okay.  Have you studied how the phosphorus

21  loss estimates shown in these four examples compare to

22  phosphorus losses on pastures that have not received

23  poultry litter?

24     A.   No, I have not made that comparison.

25     Q.   Okay.  You were also asked on page 4 of the

1  document about mineralization and the residual effect

2  of phosphorus lease -- or release.  Do you recall

3  that question?

4      A.  Yes.

5      Q.  And the sentence there that is discussed is

6  talking about a residual release a year after

7  application; is that right?

8      A.  That's right.

9      Q.  Okay.  If you read the very next sentence --

10  and read it to yourself first, Doctor -- is it true

11  that one of the adjustments that was made in the

12  phosphorus index was to add a mineralization factor to

13  address that?

14      A.  That's true.  But I don't see which sentence

15  I was supposed to read.

16      Q.  I'm sorry.  The sentence that begins with

17  "hence."

18      A.  Hence, yes.

19      Q.  Okay.

20      A.  I see that.

21      Q.  All right.  Doctor, you were asked about some

22  of the potential sources, and I believe a fair

23  characterization of the cross was that Mr. Bullock

24  believes that some of the sources that you identified

25  might be small and within the context of the entire

1  watershed.  You were asked about septic tanks, for

2  example, as one example of that.

3         Doctor, can a potential source that may be

4  small in the scale of the entire million-acre

5  watershed nonetheless have a large localized impact on

6  water quality in small streams?

7      A.  Yes, it can.

8      Q.  And we saw in your spatial analysis, didn't

9  we, that there are a few small tributaries that are

10  not downstream from either urban areas or

11  wastewater-treatment plants that have some elevated

12  phosphorus readings; correct?

13      A.  Correct.

14      Q.  Okay.  Can sources, such as septic tanks or

15  even dirt roads, account for or perhaps influence

16  those elevations in phosphorus readings in some of

17  these localized areas?

18      A.  Well, whether or not they would account for

19  them is really difficult to say without doing a proper

20  study.  But, I mean, certainly there's a lot of

21  information in the scientific literature on the

22  importance of septic systems and the importance of

23  erosion, including bank and road erosion, on

24  phosphorus contributions.

25         So the sufficient justification, based on the

1    scientific literature, that one would want to look at

2    that issue, particularly in these smaller basins.

3        Q.   Okay.  Doctor, you were asked about the Watts

4    sewage lagoon.  Do you recall that?

5        A.   Yes, I do.

6        Q.   And we went to your table and found the

7    number of people that are serviced by that lagoon.

8            Do you recall whether there's been a history

9    of a large release from that lagoon?

10       A.   Yes, there was.

11       Q.   Do you recall the quantity?

12       A.   I don't recall -- I don't recall the number.

13   It was a large release for which Watts was fined by

14   the DEQ.

15       Q.   Let me ask you to refresh your recollection.

16   Do you have your report with you?

17       A.   Yes, I do.

18       Q.   And could you find it and turn to page 33 of

19   your report?

20       A.   Okay.  I have page 33.

21       Q.   Okay.  And if you could just look at the last

22   paragraph on page 33 and see if that refreshes your

23   recollection as to the size of that release.

24       A.   Yes.  Thank you, Mr. George.  It was 275,000

25   gallons of treated wastewater.

10955

1      Q.   Now, Doctor, you were asked about Defendants'

2  Joint Exhibit 2268, which is this schematic --

3      A.   Yes.

4      Q.   -- where the high source and the high

5  transport intersect to create a critical source area.

6  Do you recall that?

7      A.   Yes.

8      Q.   And Mr. Bullock asked you whether you had

9  identified the specific areas in the watershed of high

10  phosphorus source and high potential for transport

11  overlap.  Do you recall that?

12      A.   Yes.

13      Q.   And I believe you testified that you had not

14  evaluated that issue on a field-by-field basis;

15  correct?

16      A.   Correct.

17      Q.   Is it your understanding that's what

18  plan-writers do?

19      A.   Yes, it is.

20      Q.   Okay.  Do you have any reason, Doctor, to

21  believe that the plan-writers -- who have to be

22  certified; right?

23      A.   Correct.

24      Q.   Have to be trained soil scientists?

25      A.   Yes, sir.

 1        Q.   Do you have any reason to believe that they

 2   are unfamiliar with the geographic setting and the

 3   karst terrain of the Illinois River Watershed?

 4        A.   I have no reason to believe that.

 5        Q.   Okay.  Doctor, you were asked at one point by

 6   Mr. Bullock if you would presume that farmers violate

 7   the rules but don't get caught.  Do you recall that?

 8        A.   Yes, I do.

 9        Q.   And I believe you said you would not engage

10   in that presumption?

11        A.   I would not presume that, no.

12        Q.   Why not?

13        A.   For three reasons.  One is that the

14   plaintiffs hired a rather substantial number of

15   investigators to investigate and did not report that

16   they had found such violations.  I believe it was

17   Dr. Fisher who testified to that but I'm not positive

18   it was Dr. Fisher.  So that's the first reason.

19            The second reason is is that it's my

20   belief -- and, again, I don't have scientific

21   documentation for this -- it's my belief that the

22   farmers here are scared.  That was told to me by a

23   couple of farmers but I believe that to be true.

24            MR. BULLOCK:  Your Honor, this is

25   complete total hearsay.

 1                THE COURT:  Sustained.

 2      Q.   *(BY MR. GEORGE)*  Dr. Sullivan, have you had

 3  in-the-field experience working with farmers on

 4  conservation practices before?

 5      A.   Yes, I have.

 6      Q.   Have you generally found them to be

 7  individuals who take seriously their obligations of

 8  stewardship?

 9      A.   That's what I found, yes.

10                MR. BULLOCK:  Objection to leading.

11                THE COURT:  Sustained.

12                MR. GEORGE:  I'll pass the witness, Your

13  Honor.

14                THE COURT:  Recross?

15                MR. BULLOCK:  I'm going to surrender the

16  witness, Judge.

17                THE COURT:  You're free.

18                THE WITNESS:  Thank you, sir.

19                THE COURT:  Thank you.  The defendants

20  may call their next witness.

21                MR. TODD:  Your Honor, the last thing we

22  have in the hopper for today is the video

23  deposition --

24                MR. GEORGE:  Can I do this first?

25                MR. TODD:  Oh, sure.

10958

 1            MR. GEORGE:  I'm sorry.  I apologize for

 2   interrupting Mr. Todd, Your Honor.  But there's one

 3   matter I wanted to bring to the court's attention, and

 4   it relates to the examination of Dr. Vic Bierman that

 5   we had earlier this week.  I believe it was this week.

 6   I may have lost track.

 7            There's one exhibit, upon further discussion

 8   with Dr. Bierman, I have come to conclude contains an

 9   error.  As an officer of the court, I can't in good

10   conscious allow it to stand in the record.  It is

11   Defendants' Joint Exhibit 2415.

12            And Your Honor will recall that it's the one

13   where Dr. Bierman was showing the relative size of the

14   increases that he applied to point and nonpoint

15   sources in one of his tests.  And for the record --

16            THE COURT:  Just one second.

17            MR. GEORGE:  Oh, sure.  I'm sorry, Your

18   Honor.

19            THE COURT:  You don't happen to remember

20   what tab it is here, do you?

21            MR. GEORGE:  Oh, my goodness.

22            THE COURT:  Oh, I've got it.  I've got

23   it.  Tab 3.

24            MR. GEORGE:  You got it.  Okay.

25            THE COURT:  All right.

1           MR. GEORGE:  Your Honor, the bottom

2    panel which relates to nonpoint sources in the copy

3    that has been supplied to the court and admitted --

4           THE COURT:  Yes, sir.

5           MR. GEORGE:  -- is, in fact, a mistake

6    in copying the same graphic from the top.

7           THE COURT:  It looked -- in fact, there

8    was questioning by the plaintiff --

9           MR. GEORGE:  There was.

10          THE COURT:  -- in that regard.

11          MR. GEORGE:  That's what prompted our

12   review, Your Honor.

13          THE COURT:  Thank you.

14          MR. BULLOCK:  And I would object to

15   further argument or substitution of other exhibits at

16   this point.  They can withdraw it, if they wish, but

17   the record is as it is.

18          MR. GEORGE:  Your Honor, I am not trying

19   to catch Mr. Bullock by surprise and have no intention

20   to substitute an exhibit.  I believe we have two

21   courses of action.

22          One would be to redact the bottom panel which

23   we know is in error.  The other would be to withdraw

24   the entire exhibit.  And I'm amenable to either one,

25   Your Honor.

1              MR. BULLOCK:  Well, I think that since

2    he was questioned concerning it and asserted its

3    accuracy, the defendants have stated that it was in

4    error at this point, but the record ought to stand.

5    Otherwise, you're striking our cross which appears to

6    be a unique way to deal with a witness

7    mistestifying.

8              THE COURT:  I think there's a third way

9    to handle it here.  Just to thank Mr. George for

10   clarifying the record.  The record stands as it is.

11   Obviously, the bottom diagram has been disavowed.

12             MR. GEORGE:  Correct, Your Honor.

13             THE COURT:  We thank you very much.

14             MR. GEORGE:  Your Honor, I would point

15   out it doesn't change any of the substantive testimony

16   of the witness.  So we're not seeking to modify

17   the --

18             THE COURT:  Other than the fact that he

19   said that it's on such a scale that you simply cannot

20   perceive the differences.  So it obviously does affect

21   the substantive testimony.

22             MR. GEORGE:  Thank you, Your Honor.

23             MR. BULLOCK:  All right.

24             THE COURT:  Yeah.  That one left me

25   scratching my head.  Go ahead.

10961

1          MR. TODD:  Your Honor, the last thing we

2    have today is the deposition of Terry Peach.  I

3    believe this would be Court Exhibit 15.  The runtime

4    is one hour and one minute so it's going to take us a

5    little past five.  We can break it up or do the whole

6    thing as for the court's pleasure.

7          THE COURT:  Let's get started.

8          MR. TODD:  Okay.

9      *(Videotaped deposition of Terry Peach was played)*

10          THE COURT:  While we're waiting here, I

11   take it we need to admit this deposition as a court's

12   exhibit?

13          MR. TODD:  Yes, Your Honor.

14          THE COURT:  And this should be somewhere

15   around 14 or 15?

16          MR. TODD:  Fifteen.

17          THE COURT:  Very well.  Any objection?

18          MR. NANCE:  No, Your Honor.

19          THE COURT:  Very well.  Court's Exhibit

20   No. 15, which represents the deposition of Terry

21   Peach, designations and counter designations, will be

22   admitted.

23          MR. TODD:  Thank you, Your Honor.

24     *(Videotaped deposition of Terry Peach is continued)*

25          MR. TODD:  Your Honor, it's five

**United States District Court**

10962

 1    o'clock.  We're about halfway through I think at least

 2    by the words on the page --

 3                    THE COURT:  Let's knock it out.

 4      *(Videotaped deposition of Terry Peach is continued)*

 5                    MR. TODD:  That's it.  And the documents

 6    referenced in that are all either laws, regulations,

 7    or already in evidence.

 8                    THE COURT:  Thank you very much.

 9                    MR. TODD:  Thank you, Your Honor.

10                    *(The proceedings were recessed)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10963

1                         C E R T I F I C A T E

2

3

4           I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11          I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16          In witness whereof, I have hereunto set my

17   hand this 12th day of January 2010.

18
                        s/ Brian P. Neil
19                  _____
                        Brian P. Neil, CSR-RPR, CRR, RMR
20                      United States Court Reporter

21

22

23

24

25

**United States District Court**