IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA


STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )    No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )


VOLUME 96 - AM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 14, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE


*REPORTED BY:*           *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                         *United States Court Reporter*


**United States District Court**

11195

```
1                    A P P E A R A N C E S

2

3   For the Plaintiffs:          MR. W.A. DREW EDMONDSON
                                 MS. KELLY FOSTER
4                                Office of Attorney General
                                 State of Oklahoma
5                                313 N.E. 21st St.
                                 Oklahoma City, OK  73105
6

7                                MR. DAVID RIGGS
                                 MR. DAVID P. PAGE
8                                MR. RICHARD T. GARREN
                                 Riggs Abney Neal
9                                Turpen Orbison & Lewis
                                 502 W. 6th Street
10                               Tulsa, OK 74119

11
                                 MR. ROBERT A. NANCE
12                               MS. KELLY FOSTER
                                 Riggs Abney Neal
13                               Turen Orbison & Lewis
                                 5801 Broadway
14                               Oklahoma City, OK 73118

15
                                 MR. LOUIS W. BULLOCK
16                               MR. ROBERT BLAKEMORE
                                 Bullock Bullock &
17                               Blakemore
                                 110 W. 7th St.
18                               Suite 770
                                 Tulsa, OK 74119
19

20                               MR. FREDERICK C. BAKER
                                 MS. ELIZABETH CLAIRE XIDIS
21                               MS. INGRID L. MOLL
                                 Motley Rice LLC
22                               28 Bridgeside
                                 P.O. Box 1792
23                               Mount Pleasant, SC 29465

24

25
```

**United States District Court**

*11196*

```
 1              A P P E A R A N C E S  (Cont.)

 2

       For Tyson Foods:           MR. ROBERT W. GEORGE
 3                                 Tyson Foods, Inc.
                                   2210 West Oaklawn Drive
 4                                 Springdale, AR 72701

 5
                                   MR. FRANK R. VOLPE
 6                                 MR. MARK D. HOPSON
                                   MR. THOMAS C. GREEN
 7                                 MR. JAY THOMAS JORGENSEN
                                   MR. GORDON D. TODD
 8                                 ERIC J. IVES
                                   CARA R. VIGLUCCI LOPEZ
 9                                 Sidley Austin LLP
                                   1501 K St. NW
10                                 Washington, DC 20005

11
                                   MR. PATRICK MICHAEL RYAN
12                                 Ryan Whaley Coldiron and
                                   Shandy PC
13                                 119 N. Robinson, Rm 900
                                   Oklahoma City, OK 73102
14

15
       For Cargill:               MR. JOHN H. TUCKER
16                                 MS. THERESA HILL
                                   Rhodes Hieronymus Jones
17                                 Tucker & Gable
                                   100 W. 5th St., Ste 400
18                                 Tulsa, OK 74103

19                                 MR. DELMAR R. EHRICH
                                   MS. KRISANN KLEIBACKER LEE
20                                 Faerge & Benson
                                   90 S. 7th St., Ste 2200
21                                 Minnaepolis, MN 55402

22

23     For Simmons Foods:         MR. JOHN R. ELROD
                                   MS. VICKI BRONSON
24                                 Conner & Winters
                                   211 E. Dickson St.
25                                 Fayetteville, AR 72701
```

**United States District Court**

```
 1              A P P E A R A N C E S  (Cont.)

 2

     For Peterson Farms:           MR. A. SCOTT MCDANIEL
 3                                 MR. PHILIP HIXON
                                   MS. NICOLE LONGWELL
 4                                 McDaniel Hixon Longwell &
                                   Acord PLLC
 5                                 320 S. Boston, Ste 700
                                   Tulsa, OK 74103
 6

 7

     For George's:                 MR. GARY V. WEEKS
 8                                 MR. WOODY BASSETT
                                   MR. VINCENT O. CHADICK
 9                                 MS. K.C. TUCKER
                                   Bassett Law Firm
10                                 P.O. Box 3618
                                   Fayetteville, AR 72702
11

12

     For Cal-Maine:                MR. ROBERT SANDERS
13                                 Young Williams P.A.
                                   P.O. Box 23059
14                                 Jackson, MS 39225

15

                                   MR. ROBERT P. REDEMANN
16                                 Perrine McGivern Redemann
                                   Reid Berry & Taylor PLLC
17                                 P.O. Box 1710
                                   Tulsa, OK 74101
18

19

20

21

22

23

24

25
```

```
 1                Thursday, January 14, 2010
 2                     *  *  *  *  *
 3            THE COURT:  The court has read the State
 4   of Oklahoma's submission regarding proposed rebuttal
 5   testimony, and the state has proposed two rebuttal
 6   witnesses, Drs. Bernard Engel and Scott Wells.  I see
 7   the topics of the rebuttal testimony have been set
 8   forth specifically.
 9            Is there anything to add?
10            MS. MOLL:  Good morning, Your Honor.
11   May it please the court, we don't have anything to add
12   by way of subject matters of either Dr. Engel or
13   Dr. Wells.  I do have some comments prepared, if Your
14   Honor would indulge me, to walk through some of the
15   past pleadings and orders issued by the court and
16   rebuttal-related principles as set forth by the Tenth
17   Circuit and other courts.
18            THE COURT:  Very well.
19            MS. MOLL:  Okay.  Thank you.  I have
20   some written notes in a PowerPoint, a very brief one,
21   Your Honor, that I've prepared, but I just wanted to
22   speak from the heart for a moment, if I could.
23            I was up most of the night thinking about
24   where we have been and where we are and it's obviously
25   been a long road for everyone, and I appreciate the
```

1    time that Your Honor has put into this case and your

2    staff.  I kept coming back through the night to this

3    statement that you've made repeatedly from the bench

4    which is, we are here in a search for the truth.  And

5    that is precisely at the heart of today's argument.

6         We have very carefully tried to identify

7    those issues that would be appropriate for rebuttal

8    testimony by Drs. Engel and Wells.  As you saw in the

9    pleading we filed last night, we made the decision to

10   withdraw our pursuit of putting on Dr. Stevenson in

11   rebuttal.

12        So we believe that our rebuttal case would

13   only take a day or a day and a half.  We take very

14   seriously the amount of time that this trial has

15   taken.  We don't wish to extend it any longer than it

16   needs to be.  We all are looking forward to spending

17   more time with our families and getting back to other

18   cases, etcetera, and we don't wish to be here through

19   the springtime.  And so we're very careful in terms of

20   identifying those topics on which we thought Your

21   Honor would benefit from further testimony from these

22   two proposed rebuttal witnesses.

23        So I just offer that comment because if we

24   truly are here in the search of the truth, to allow

25   rebuttal testimony will further that goal; to disallow

1    it, would not.

2           So let me move on to the written comments

3    that I've prepared, if I could.

4                THE COURT:  You may.

5                MS. MOLL:  And I'll provide a very quick

6    road map for Your Honor as to my comments, and then to

7    the extent we need to delve into any of the categories

8    that have been identified by the state, the proposed

9    categories of rebuttal testimony by Drs. Engel and

10   Wells, Mr. Page will address those because, Your

11   Honor, I can assure you you don't want me talking

12   about coefficients.

13          So I'd first like to touch upon the court's

14   prior statements regarding rebuttal prior to the

15   commencement of trial, then address very quickly some

16   of the rulings that were issued during the course of

17   trial, and then move into principles regarding

18   rebuttal as set forth by the Tenth Circuit and other

19   courts which, I think, will help guide our discussion.

20          So let me ask Gina to put up the PowerPoint

21   and let's start with slide 1.

22          Your Honor, we've put together what I have

23   called on slide 1 the docketing time line regarding

24   rebuttal.  I'm happy to give Your Honor a hard copy of

25   this presentation if it would be useful to you.  It's

1    only about 14 slides.  If you'd like to have a hard

2    copy, I'm glad to give you one.

3              THE COURT:  If you have an extra, that

4    would be fine.  I have been through the three orders

5    that are at the heart of rebuttal and will say, as we

6    sit here before argument, that it does leave the

7    matter open for argument.  So if you would.

8              MS. MOLL:  I've included here on

9    pages -- or slides 1, 2, and 3 the docket numbers that

10   were identified by counsel yesterday.  There are a

11   couple additions, which I'll mention, which we found

12   last night after the filing and certainly after court.

13   I'll just highlight a few.  I don't want to belabor

14   the record with going through each so let me just

15   highlight a few.

16             As Your Honor is aware, in December of 2008

17   you'll notice under docket No. 1819, the state moved

18   for leave to serve rebuttal expert reports to rebut

19   opinions of three specific defense experts, Myoda,

20   Jarman, and Clay.

21             The reason why those specific experts were

22   identified is that there were -- I forget the exact

23   number -- over a dozen defense expert reports that had

24   been served by that date.  So that pleading was

25   December 31st, 2008.

1          And just for the record, Drs. Bierman and

2     Connolly had not yet -- or their reports had not yet

3     been served which is why they were not included in

4     that pleading.  Their reports were not served until

5     January of 2009.

6          But in that pleading, you'll notice I've

7     noted there at footnote 2 we explain that defendants

8     had additional expert reports that would be due in

9     January, and the state would potentially seek leave to

10    file one or more rebuttal expert reports in response

11    to them.

12         Let me skip ahead to where the court denied

13    the state's motion for leave to serve those rebuttal

14    expert reports, and that was at docket No. 1842, which

15    was issued, I believe, on January 29, 2009.

16         And there, Your Honor said that

17    rebuttal -- Your Honor denied the motion, but you

18    said, "Rebuttal expert testimony will be permitted at

19    trial to the extent that it constitutes true

20    rebuttal."  And you'll say that language, Your Honor,

21    in bold and in italics on slide No. 2.

22         So fast-forward to April of 2009 under docket

23    No. 1989 which appears on slide No. 3.  The court

24    there granted defendants' joint motion for

25    clarification of the court's January 29, 2009, orders.

1    There, Your Honor made a couple comments about

2    rebuttal, and I have highlighted the specific language

3    that I would draw your attention to on slide No. 3.

4         You commented, "Rebuttal denotes evidence

5    introduced by a plaintiff to meet new facts brought

6    out in his opponent's case in chief.  At trial, it is

7    properly within the discretion of the trial judge to

8    limit rebuttal testimony to that which is precisely

9    directed to rebutting new matter or new theories

10   presented by the defendant's case-in-chief."

11        As there is some ambiguity as to what "true

12   rebuttal" means, there is ambiguity as to what "new

13   matter" means.  So let me ask Gina to turn to slide

14   No. 14.

15        A couple courts have specifically addressed

16   what that word "new" really means in the context of

17   rebuttal.  Let me draw your attention to the *Rodriguez*

18   *v. Olin Corporation*, 780 F.2d 491 at page 496, a Fifth

19   Circuit case from 1986.  And there, the court said,

20   "New evidence for purposes of rebuttal does not mean

21   brand new.  Rather, evidence is new if the evidence

22   was not fairly and adequately presented to the trier

23   of fact before the defendant's case in chief."

24        The court also said, "Rebuttal evidence is

25   designed to meet facts not raised before the

1    defendant's case in chief, not facts which could have

2    been raised.  This rule proceeds from the view that a

3    plaintiff has the right to adduce whatever evidence is

4    necessary to establish its prima facie case and is

5    under no obligation to anticipate and negate in its

6    own case in chief any facts or theories that may be

7    raised on defense."

8           THE COURT:  Which, as a practical

9    matter, might extend a plaintiff's case if that

10   obligation were imposed upon a plaintiff.

11          MS. MOLL:  Agreed, Your Honor.

12          THE COURT:  All right.

13          MS. MOLL:  Let me further highlight for

14   the record the comments by the Sixth Circuit in the

15   *Benedict* case just for the record, *Benedict v. United*

16   *States*, 822 F.2d 1426 at page 1429, again a Sixth

17   Circuit case from 1987.

18          There, the Sixth Circuit said, "Although" --

19   and I've changed the language where you see the

20   bracketed language, Your Honor -- "Although the

21   defense evidence was not new since the

22   parties" -- sorry for the typo; it was late -- knew

23   "of its existence prior to trial, it was new for

24   rebuttal purposes.  Evidence is new if, under all the

25   circumstances, the evidence was not fairly and

1    adequate presented to the trier of fact before the

2    defendant's case-in-chief."

3           And getting to the comment that Your Honor

4    just made, if I could ask Gina to kindly pull up slide

5    No. 7.  Just going to the point that Your Honor made,

6    if a plaintiff was required to put in its own case in

7    chief everything that it might anticipate from

8    evidence from the defense, it surely would lengthen

9    the trial.

10          I highlight here on slide No. 7 several of

11   those defense experts that were disclosed who had

12   served expert reports who were deposed but who were

13   not called in the defendants' case.  This list is not

14   exclusive but certainly there are many of them:

15   Drs. Churchill, Coale, Cummings, Horne, Jarman,

16   Merritt, Ginn, Davis, and there were others who were

17   not called.

18          So we've all been together for a long

19   time, and to have added into what was already a

20   lengthy case in chief admittedly would have only

21   further extended the trial and would have respectfully

22   been a waste of the parties' resources and that of the

23   court.

24          THE COURT:  Well, particularly relevant

25   here in Jarman as to whom the state sought leave to

1    serve a rebuttal expert report.

2         All right.  Go ahead.

3         MS. MOLL:  As I mentioned earlier, the

4    state's motion for leave to serve rebuttal expert

5    reports at docket No. 1819 admittedly was limited to

6    those three reports.  When the court ruled on that

7    motion and denied it and made the comments that it did

8    in its order, the state took that to heart and did not

9    think that pursuing leave to serve additional rebuttal

10   expert reports relating to other defense experts would

11   have been a prudent thing to do since we knew the

12   court's view on rebuttal at that time.  So just so the

13   record is clear on that.

14        If I could move then into what occurred

15   during the case in chief.  I've just gone through what

16   we knew by the time trial started in terms of the

17   court's view on rebuttal, at least the state's

18   understanding.  Throughout the case in chief -- and I

19   don't think there's any dispute as to this -- the

20   state on many occasions -- and I can give you

21   examples, Your Honor -- was limited to the four

22   corners of the state's expert reports.

23        If you'll kindly turn to slide 5.  I only

24   give these citations by way of example only; it's

25   certainly not a comprehensive list.  But even in

1    defendants' own bench brief on the issue of the scope

2    of an expert's trial testimony vis-a-vis their report,

3    the defendants acknowledge -- and I'm citing from

4    docket No. 2712 -- the defendants stated to the court,

5    "This court should maintain the course it has followed

6    for the last year by limiting the state's experts'

7    trial testimony to the opinions and fair inferences

8    drawn from their timely Rule 26 disclosures, as

9    contemplated by Tenth Circuit precedent."

10         There are examples that the defendants

11   provided in their bench brief at pages 4 to 5 of that

12   pleading, where the state was limited to the four

13   corners of the expert report.

14         If Your Honor would kindly turn to slide 6,

15   I've listed here, just by way of example, where

16   defendants objected to certain questions posed by

17   Mr. Page of Dr. Fisher and where it was clear, based

18   on Your Honor's rulings as to those objections, that

19   the state would be limited to the scope of the

20   defendants' -- excuse me -- of the expert's report.

21         If Your Honor would indulge me, let me just

22   identify a few for the record.  We've cited October 8,

23   2009, trial transcript at pages 1685, line 24, through

24   1686, line 3, and pages 1694 through 1699; also the

25   trial transcript from October 13, 2009, at pages 1707

1   through 1711, page 1772, page 1778, pages 1791, 1806,

2   1814 to 1815; October 14, 2009, trial transcript at

3   pages 1976, 2006 to 2007, 2058 to 59; and there are

4   others that I've identified there.

5                THE COURT:  In attempting to maybe focus

6   in on the issue --

7                MS. MOLL:  Yeah.

8                THE COURT:  -- at hand, are there any of

9   these references that pertain to an attempt to delve

10  into the subject of what might be characterized as

11  rebuttal of a defense expert's position?

12               MS. MOLL:  Well, I have to answer Your

13  Honor this way.

14           Dr. Fisher was the first state's expert to be

15  called, as you might recall even though it was months

16  ago, and he obviously was here for several days.  And

17  based on the repeated objections by the defendants to

18  the state's attempt to perhaps go outside Dr. Fisher's

19  expert report and Your Honor's rulings, following

20  those rulings the state honored Your Honor's rulings

21  to the best of its ability and did the best it could

22  to limit further examination to those areas that were

23  expressly included within the scope of an expert

24  report.

25               THE COURT:  But you're not seeking to

1   bring Fisher in to rebut other defendants' experts'

2   testimony?

3            MS. MOLL:  That's correct.  My only

4   point is that Fisher was the first to come along, and

5   once it was clear that throughout the course of the

6   trial objections to going outside the scope of the

7   expert report would be sustained, the lawyers

8   representing the state did the best they could to

9   honor Your Honor's ruling and try to avoid objections

10  as best we could even though we still certainly got

11  plenty of them.  But certainly I think the record will

12  reflect that those types of objections were less

13  frequent later on because the state attempted to stick

14  within the four corners and expedite the proceedings.

15           So I understand your question, Your Honor.  I

16  bring up Fisher because he came first, and that seemed

17  to set the precedent of the scope of proper direct

18  examination --

19           THE COURT:  All right.

20           MS. MOLL:  -- which we attempted to

21  adhere to the best we could.

22           As Your Honor is well aware, but just so the

23  record is clear -- Gina, if you could go to slide

24  No. 8 -- the court's admission of rebuttal testimony

25  is reviewed for an abuse of discretion.  I've cited a

11210

1   Tenth Circuit case there, *United States v. Kelley*, 187

2   Fed. Appx. 876 at 888, a Tenth Circuit case from 2006.

3   There, the court said, "A district court possesses

4   considerable discretion in governing the presentation

5   of evidence, and its decisions will not be disturbed

6   absent manifest injustice to the parties."

7           THE COURT:  Finally some appellate

8   recognition of discretion.

9           MS. MOLL:  Well, my point here, Your

10  Honor, is, you will be well within your discretion to

11  allow this rebuttal testimony.

12          I would be remiss if I didn't highlight

13  something that the Second Circuit said on this point

14  of discretion.  "Such discretion should be tempered

15  greatly where the probative value of proffered

16  evidence is potentially high and where such evidence,

17  though admissible on the case in chief, was

18  unnecessary for the plaintiff to establish in its

19  prima facie case."

20          If you'll turn to slide No. 9, the Sixth

21  Circuit, in *Benedict v. United States*, 822 F.2d 1426,

22  at pages 1428 and 1429, a Sixth Circuit case from

23  1987.  This is a case that has been cited approvingly

24  by the Tenth Circuit in the *Bell* case, 946 F.2d 1506

25  at page 1512.

1            There, the Sixth Circuit set forth the

2    following standard, which is consistent with what I

3    have just stated to Your Honor, but which I think --

4    but they put it in very clear enters here.  "In the

5    exercise of sound discretion, the district court may

6    limit the scope of rebuttal testimony to that which is

7    directed to rebut new evidence or new theories

8    proffered in the defendant's case-in-chief.  However,

9    where the evidence is real rebuttal evidence, the fact

10   that it might have been offered in chief does not

11   preclude its admission in rebuttal.  Furthermore, with

12   respect to real rebuttal evidence, the plaintiff has

13   no duty to anticipate or to negate a defense theory in

14   plaintiff's case-in-chief."

15           And then later on, page 1429, they said,

16   "However, insofar as the rebuttal expert's testimony

17   would have been directed to disproving the accuracy of

18   the defendant expert's methodology and data, it was

19   proper rebuttal and should have been allowed."

20           If you'll kindly turn, Your Honor, to slide

21   No. 9.  I've identified a Tenth Circuit case which I

22   think is further illustrative of the point we're

23   trying to make here.  This is *United States v. Posey*,

24   647 F.2d 1048, at page 1052, a Tenth Circuit case from

25   1981.  If I could very quickly give Your Honor a

11212

1    little background on that case.  I think it is close

2    to on all fours.

3         *United States v. Posey* was a drug conspiracy

4    and distribution case.  In the government's case in

5    chief, the government offered the testimony of an

6    expert named Laswell who testified that he performed

7    various tests and concluded that the substances sold

8    were L-cocaine, I guess an isomer of cocaine

9    prohibited by statute.

10                   THE COURT:  L-cocaine?

11                   MS. MOLL:  That's what it was called,

12   Your Honor.  I have no idea what that is.

13                   THE COURT:  Nor I.

14                   MS. MOLL:  But in any event, that's how

15   they described it.

16         So the government in its case in chief had

17   expert testimony to prove that the type of cocaine

18   sold was the kind prohibited by statute.

19         During the defense case, the defendant

20   offered expert testimony from an expert named Shapiro

21   who testified as to two techniques that, I guess, are

22   available for distinguishing types of cocaine.  He

23   testified that the best method was a test called the

24   polarimeter test, and he criticized the government

25   expert's tests as not conclusively making the

1    distinction between the two types of cocaine, I guess,

2    that were at issue.

3           During rebuttal, the government offered the

4    expert testimony of an expert named Stevenson which

5    corroborated Laswell's testimony from the government's

6    case in chief as to the existence of L-cocaine as a

7    substance tested and that corroborated that earlier

8    testimony.

9           On appeal, the -- and the defendant was

10    convicted.  On appeal, the defendant argued that the

11    rebuttal expert's testimony was not in the nature of

12    rebuttal testimony and instead amounted to an improper

13    opening of the government's case in chief.

14           The Tenth Circuit case there stated on page

15    1052 of the case that I cited, and it referenced an

16    Eighth Circuit case, "In a case factually similar, the

17    Eight Circuit allowed the government to conduct

18    additional tests after concluding its case in chief

19    and to present the results as rebuttal evidence.  The

20    court there found the new tests served the permissible

21    rebuttal function of counteracting the testimony of

22    the opposing expert witness."

23           And then it held on at page 1052, "We

24    conclude that the polarimeter tests were properly

25    characterized and admitted as rebuttal evidence."

1          And I've cited to the *Posey* case, Your Honor,

2    on slides 10 and 11 that you have before you.

3          If you would kindly, sir, turn to slide

4    No. 12.  I've just quickly cited some other principles

5    from the Tenth Circuit and then the District of Kansas

6    which, I think, further illuminate this issue.

7          In *Tanberg v. Sholtis*, at 401 F.3d 1151, at

8    page 1166, a Tenth Circuit case from 2005, the court

9    said, "When a party opens the door to a topic, the

10   admission of rebuttal evidence on this topic becomes

11   permissible."

12         The Tenth Circuit in *United States v. Kelly*,

13   the citation I provided earlier, there the court said,

14   "Rebuttal evidence may be introduced to explain,

15   repel, contradict, or disprove an adversary's proof."

16         And then in the final case that I've cited on

17   slide 12, the *In re Cessna 208* case, 2009 U.S. Dist.

18   LEXIS 63185, at page 15, the District Court of Kansas

19   last summer held that "evidence that attacks the

20   defendants' experts' substantive testimony is proper

21   rebuttal."

22         Your Honor, I've also cited on slide 13 the

23   *Pitasi v. Stratton Corporation* case from the Second

24   Circuit.  The citation is 96 F.2d 1558, at 1562.

25   There, the Second Circuit held that the trial court

**United States District Court**

1    abused its discretion in disallowing rebuttal

2    evidence.  And if you'll indulge me just to read the

3    quote, Your Honor.

4         "The testimony that the plaintiff sought to

5    elicit was not necessary for its prima facie case.

6    Rather, it would have served the permissible rebuttal

7    function of impeaching defendant's witnesses, who had

8    testified during its case-in-chief that the side

9    entrances to this trail had never been closed.  This

10   testimony plaintiff" -- I guess I have omitted some

11   language there, Your Honor.  I apologize.  "This

12   testimony was not collateral but central to the issue

13   of the defendant's negligence.  Because this testimony

14   was highly relevant and material to impeach the

15   credibility of defendant's employees, we hold that the

16   district court erred in excluding it."

17        I apologize for the omission of language,

18   Your Honor.  This is what happens when you're

19   preparing a PowerPoint late into the night.

20        THE COURT:  I understand.

21        Now, in terms of the substance, I've taken a

22   look at the subject matter with regard to Dr. Engel.

23   I have not had time to go through and look at the

24   specific references, but I do have specific

25   recollection as to a number of those subject matters.

1          As to Dr. Wells, that proposed rebuttal

2    testimony is more limited.  Is there anything about

3    the subject matter or the substance that you want to

4    touch on?

5          MS. MOLL:  Your Honor, I would say if

6    you have specific questions about categories or if

7    there's a response necessary from any of the comments

8    that defense counsel will make, Mr. Page is ready to

9    address those.

10          I would simply note one thing in closing of

11    my own comments, and that is that as I started, we

12    have been very careful to limit what we are proposing

13    to the court as rebuttal testimony.  We have taken the

14    charge seriously to be as efficient and narrowing as

15    possible as to that and we appreciate the court's

16    time.  And I think I mentioned that we would

17    anticipate that it wouldn't take more than a day or a

18    day and a half.

19          I would just note for the record that when

20    Mr. Green stood before you on Monday morning and

21    raised the issue of rebuttal, he said -- and this is

22    from the transcript of January 11, 2010, at page 10434

23    at lines 2 to 7 -- "It was our contemplation that

24    rebuttal would be reasonably brief and to the point,

25    and we were banking on perhaps a day or day and a half

1    of rebuttal because we have some serious reservations

2    about whether there is room for a lot of rebuttal in

3    this case."

4              So our own estimation matches with that of

5    defense counsel and we have no interest in belaboring

6    the record.  We have only an interest in providing

7    Your Honor with a very narrow scope of rebuttal

8    testimony that will further the pursuit of truth.

9              Thank you.

10             THE COURT:  Thank you, Ms. Moll.

11   Mr. George.

12             MR. GEORGE:  Thank you, Your Honor.

13             Good morning, Your Honor.  You'll see that I

14   walked up to the podium with a collection of papers

15   that we, like Ms. Moll, had a late night last night.

16   A lot of different attorneys have provided me with

17   things that they think it's important for the court to

18   hear on the front end.  I want to thank all of the

19   young lawyers who were awake into the wee hours

20   pouring over the transcript.

21             I walked in, Your Honor -- just anecdotally

22   here -- to what we call the war room at the Mayo Hotel

23   late, late last night and saw a flashback into the

24   earlier days of my career, attorneys in front of

25   computers with the record wide open pouring over and

1    highlighting and tabbing things.  I promptly turned

2    around and went back to bed.  But I do want to extend

3    my appreciation --

4                    THE COURT:  See what you all have to

5    look forward to.

6                    MR. GEORGE:  But, Your Honor, it

7    occurred to me as Ms. Moll was speaking that it's very

8    easy for us as attorneys to focus on the burden and

9    the long hours that we put in.  And I do want to echo

10   Ms. Moll's comments that we're appreciative of the

11   time that the court has put in because I know Your

12   Honor, as well as your staff, have had many late

13   nights and have poured through the same information

14   that we have.  We certainly don't take for granted the

15   time and effort that the court has put forward in this

16   case.

17       Ms. Moll's, of course, correct that this

18   trial, like all trials should be, is a search for the

19   truth and Your Honor has reminded us of that, as you

20   should, repeatedly throughout the trial.

21                    THE COURT:  Well, as an advocate, it's

22   easy to lose sight of that fact.

23                    MR. GEORGE:  Certainly.

24                    THE COURT:  I've been there and I

25   understand that.

1           MR. GEORGE:  Certainly, Your Honor.

2           THE COURT:  But ultimately -- you know,

3   this is simply the most recent battle in this area.

4   It's been to the United States Supreme Court already

5   in terms of point-source discharge.  This will not be

6   the last battle.  You all are preparing yourselves for

7   further battles that inevitably will be.  So all of

8   this is not lost --

9           MR. GEORGE:  Certainly, Your Honor.

10          THE COURT:  -- this experience.  Go

11  ahead.

12          MR. GEORGE:  Thank you for those

13  remarks, Your Honor.

14          As with regard to the search for the truth,

15  as we all know, all trials must function within some

16  limitations.  It's well-settled that the process of a

17  trial and the rules and procedures that are in place

18  require some limitations and they require the parties,

19  all of us on both sides of this courtroom, to

20  discharge certain responsibilities with respect to how

21  we present evidence and the process that is involved.

22  Those limitations and responsibilities were discussed,

23  of course, at various pretrial moments in this case in

24  terms of how this lawsuit would be structured.

25          On September 15th, as part of the pretrial in

1    this case, the court observed -- and I've heard this

2    from other judges in the past -- about the often

3    refrain that you get in these cases of attorneys

4    wanting to bring in new data and new analysis.  And,

5    of course, Your Honor remarked that you always hear

6    that in these sort of cases, you know, why shouldn't I

7    be allowed to present scientific data that was created

8    last week.

9         Your Honor observed that the reason why we

10   can't have that sort of an open-ended process is we're

11   all working within the context of a lawsuit.  In

12   lawsuits, there are deadlines and it's just part of

13   the process, that there are limitations that require

14   us to go about it in the way that we do.

15        Your Honor, of course, the state selected the

16   forum and the mechanism in terms of litigation in

17   which to pursue its rights in this case and these

18   rights come with certain responsibilities.  One of

19   those responsibilities includes submitting the

20   evidence as part of their case that should have been

21   submitted, if they felt it was important, and limiting

22   any evidence that they may seek to admit as rebuttal

23   to things that truly are rebuttal.

24        With regard to the search for the truth, Your

25   Honor, I think the defendants' position is that the

1    record in this case is not small, 10,000 pages in

2    terms of just transcript that folks like Brian and

3    Terri have created through the course of this case,

4    hundreds of exhibits.  There's no shortage of truth

5    and information within the record of this case.

6          The issue is really twofold, and that is, has

7    the ground that the plaintiff seek to cover already

8    been covered in the voluminous record in this case?

9    And we're prepared to show Your Honor with respect to

10    a lot of these points that is indeed -- that is indeed

11    the case.  And then to the extent it hasn't been

12    covered, Your Honor, is it true rebuttal?  And there

13    are some legal principles that define exactly what

14    true rebuttal is.

15          Ms. Moll did a more expansive search last

16    night of the case law than I did.  I limited my search

17    to the Tenth Circuit.  There is a case, which I'll

18    pass up in a moment, that I think is squarely on point

19    and lays out the appropriate legal principles from the

20    Tenth Circuit.

21          One of the cases I want to distinguish,

22    though, that Ms. Moll cited was an Eighth Circuit

23    case, I believe it was a criminal case involving these

24    tests.  And as Your Honor knows, this is not a

25    criminal case.  Criminal cases are different in terms

 1    of how they develop up until the point of trial.  And,

 2    you know, the amount of information that the

 3    government gets about the defendant' case in pretrial

 4    leading up to a criminal matter is fundamentally

 5    different from the process that has occurred here,

 6    where both sides have made full disclosures and both

 7    sides have submitted voluminous expert reports leading

 8    up to trial.  And so, Your Honor, I'm not sure that

 9    case is really applicable even if it were a Tenth

10    Circuit case.

11              THE COURT:  Well, I'm constantly

12    reminded that these rules are flexible concepts that

13    have to be adapted for the specific trial that one is

14    dealing with.  For instance, in a medical malpractice

15    case, where I've had numerous cases on the state side,

16    the expert issues are typically far more discreet and

17    they typically focus on causation.

18              In the arena where I learned the concept of

19    rebuttal and true rebuttal, typically the primary

20    battle was that between experts, and it was fully

21    known before the trial began what the relative

22    positions of the experts were.

23              So in terms of true rebuttal, a court could

24    be more limiting in that the other expert opinion

25    could be more fairly anticipated and reasonably known.

 1             MR. GEORGE:  Right.

 2             THE COURT:  Here, however, I think what

 3     you really need to grapple with here is Ms. Moll's

 4     point, which frankly has a compelling quality to it.

 5     In a case such as this one, which is very rare, I've

 6     had experienced lawyers stop me on the street who have

 7     stuck their heads in the back of the courtroom, they

 8     have never seen in their careers something like this.

 9     The ones who have been around a long time remember one

10     case in this district that -- what was the old oil

11     case?

12             MR. TUCKER:  Home-Stake, Your Honor.

13             THE COURT:  Home-Stake Oil.  That's the

14     one case that people remember that was kind of like

15     this.

16             But in a case like this, it seems to me that

17     one should not force the plaintiff to anticipate all

18     possible defense attacks relative to the plaintiff

19     expert testimony and there possibly should be greater

20     leeway given in terms of rebuttal.  So I think that's

21     the central point here.

22             MR. GEORGE:  I think it's a fair

23     observation, Your Honor.  And we are prepared

24     to -- because I do think the fundamental issue is

25     reasonable notice and anticipation, whether the state

1   reasonably anticipated or should have reasonably

2   anticipated that the specific points that they seek to

3   rebut were going to be part of the defendants' case.

4   I think you framed the issue correctly.  And certainly

5   in a case that has more experts, you know, that test

6   might look a little different in application.

7           So we are prepared to, when I conclude my

8   general remarks, to march through the topics that the

9   state has identified and point the court to instances

10   in the record which we think demonstrate that they not

11   only should have been aware, but that they were aware

12   of those topics.  So we appreciate the test as you've

13   framed it and we believe we're prepared to meet it.

14               THE COURT:  All right.

15               MR. GEORGE:  Your Honor, with regard to

16   sort of the framework of the legal principles -- and I

17   don't think this is at all inconsistent with what Your

18   Honor just said -- I think the most instructive

19   case -- and I'll hand it up -- is *Koch v.* -- or *Koch*

20   -- I'm sorry -- *Koch v. Koch Industries* out of the

21   Tenth Circuit.  And for the record, the citation is

22   203 F.3d 1202, a Tenth Circuit case from 2000.

23           I believe it lays out all of the relevant

24   legal principles that we need to wrestle with, and

25   I've pulled out three excerpts from that case and put

1    them on the slide that is on the screen.

2              But, of course, Ms. Moll is correct.  She

3    cited, I think, a Seventh Circuit case, but there's

4    ample evidence in the Tenth Circuit that Your Honor

5    has broad discretion in terms of determining what is

6    rebuttal and what is not and whether to allow it.

7    There's no dispute, I think, between the parties that

8    Your Honor has discretion in this area.

9              The Tenth Circuit has defined rebuttal

10   evidence very similar to what we've seen from Your

11   Honor in pretrial rulings, and that is that it's

12   evidence that rebuts new evidence or theories that are

13   proffered in the defendants' case in chief.  It's not

14   a bootstrap for the plaintiffs to go back and get a

15   do-over on their prima facie case.  It must be

16   something that meets evidence that was presented in

17   the defendants' case and it must be evidence that was

18   not reasonably anticipated by the plaintiff.

19             There's two instances the Tenth Circuit has

20   recognized when the court is well within its

21   discretion to disallow rebuttal testimony.  One we've

22   talked about quite a bit today, and that is if the

23   plaintiff reasonably could have anticipated the

24   defendants' evidence.  We're going to wrestle with

25   that today as we go through these topics, Your Honor.

1          But the second one, Your Honor, I think is

2   also very relevant to this case, and that is when the

3   plaintiffs are warned that rebuttal evidence will be

4   restricted or limited in advance of trial.  Obviously,

5   when they're on notice that there may be some

6   limitations on rebuttal, that counsel's in favor of

7   the plaintiffs putting on anything that they believe

8   is necessary -- reasonably necessary in their case in

9   chief.

10          So, Your Honor, we have some history with

11  rebuttal and Ms. Moll mentioned it.  If we could turn

12  to the next slide.  I won't repeat her description of

13  all of these motions.  But, of course, there was a

14  motion for rebuttal expert reports in this case, and

15  it was a motion to rebut experts who are not now the

16  subject of their requests for rebuttal.

17          THE COURT:  Right.  But that's a

18  different procedural matter.  To some extent, the

19  court was guided by Magistrate Judge Joyner's prior

20  written statement in an order that he wrote and I was

21  reluctant to differ from that position.

22          MR. GEORGE:  I understand that, Your

23  Honor.

24          THE COURT:  And primarily because I can

25  only imagine how much money was spent in pretrial

1  here.  I don't know the number, I've often thought

2  about what that number must be, but I was loathe to

3  increase that number.

4            MR. JORGENSEN:  Not enough for my firm,

5  Your Honor.

6            THE COURT:  Mr. George may differ.

7            MR. GEORGE:  I do, Your Honor.  Your

8  Honor, as perhaps the only bill-payer in the

9  courtroom, I think I have unique perspective on this

10  whole question and I appreciate the court's

11  sensitivity to that.

12            I do acknowledge that a request to modify the

13  pretrial order for rebuttal expert reports is a little

14  bit of a different animal than --

15            THE COURT:  It really is.

16            MR. GEORGE:  But, Your Honor, there

17  is -- there is within those filings the seeds of

18  notice and some foreshadowing of the case to come.

19  Particularly relevant, Your Honor, is the state's own

20  statement as to how they intended to deal with

21  rebuttal at trial.  Of course, Your Honor denied the

22  particular rebuttal report requests for these three

23  experts, but the state in justifying its request for

24  those three experts said that these are three that we

25  think need special treatment in terms of pretrial

1  disclosures.  But you see at the bottom there, Your

2  Honor -- this is taken straight from their motion --

3  that with regard to all of the remaining defense

4  experts, "The state will rebut other aspects of the

5  defense case in its direct evidence, including expert

6  opinion, lay fact testimony, documents, or otherwise,

7  or in cross-examination."

8        And so clearly the state came into this trial

9  understanding that it had an obligation in its case to

10  reasonably anticipate for the other experts the areas

11  that they had criticized the state's experts and to

12  address that subject matter within the confines of its

13  own case.

14        Now, Ms. Moll is correct that Dr. Bierman and

15  Dr. Connolly's report, which are two of the reports --

16  or at least two of the witnesses that are at issue

17  here, were filed after Your Honor issued this order

18  and after this motion for rebuttal reports was filed.

19  But, of course, there was no subsequent motion and

20  so --

21        THE COURT:  But given the court's order,

22  that was probably a reasonable position; correct?

23        MR. GEORGE:  Well, Your Honor, we all

24  hate to test the patience of any court, but we also

25  understand our obligation to reserve our positions.

1    If we think we're entitled to something as counselors,

2    it's our obligation, even if we may be able to predict

3    a loss, to make that motion.

4                    THE COURT:  I've seen no reticence on

5    the part of either side here.

6                    MR. GEORGE:  Correct, Your Honor.  But

7    being an advocate is sometimes a frustrating process

8    of butting your head against the wall but that's what

9    we do.  That's part of our responsibility in this

10   process.

11           So if we could turn to the next slide, Your

12   Honor.  Throughout the pretrial course of this case,

13   Your Honor has been called upon a couple of different

14   times to talk about rebuttal testimony, and in

15   particular rebuttal expert testimony, and I've put on

16   the screen a few things that I think are instructive

17   and that certainly factor into this question of

18   notice.

19           Your Honor, as I mentioned earlier, denied

20   the motion for rebuttal expert reports.  The

21   defendants filed a motion for clarification because of

22   some language in that order that we were unsure of,

23   and Your Honor issued an order on that motion for

24   clarification which is found at docket 1989.

25           In that order, you provided the classic

1    definition of rebuttal, cited a Fifth Circuit case in

2    support of that, that "rebuttal denotes evidence

3    introduced by a plaintiff to meet new facts brought

4    out in his opponent's case in chief."

5         And then you went on to observe that it is,

6    of course, within your discretion to limit rebuttal

7    testimony to that which is precisely directed to

8    rebutting new matters or new theories presented by the

9    defendants' case in chief.

10        And then Your Honor in a footnote provided a

11   reflection, and I appreciated this when I read it and

12   again when I reread it last night, kind of going back

13   to the unique nature of this case and all of the work

14   that has gone into it leading up to pretrial.

15        Your Honor said, "This general rule" -- this

16   rule that if there's new facts or evidence presented,

17   it may entitle you to rebuttal -- "is unlikely to have

18   any application whatsoever in the context of expert

19   testimony at the trial of this case.  The opinions and

20   theories of defendants' experts will have been fully

21   revealed to plaintiff through expert reports."

22        And, Your Honor, we're going to show you as

23   we go through these statements today that every one of

24   the points that they seek to rebut was fully and

25   completely revealed in our expert reports that they

1    had pretrial.

2              THE COURT:  All right.  Note that I

3    qualified it by saying "may be unlikely."  And I will

4    freely admit that on May 21st, 2009, I had no idea as

5    to the volume of the expert testimony on either side

6    here.

7              MR. GEORGE:  Understood, Your Honor.

8    And I'm not trying to constrain you by putting these

9    remarks up there.  I'm just trying to explain how we

10   got to where were are.  So I do appreciate your

11   comments.

12             You went on to say, "It is unlikely that any

13   attempt by the defendants' experts to opine as to some

14   as yet unrevealed theory or opinion will be

15   permitted."

16             I'll submit to you, Your Honor, that that

17   unlikelihood has come true in this case, the

18   defendants' case, and its expert opinions have very

19   closely tracked those reports.  I don't believe that

20   any of the state's requests for rebuttal is based upon

21   some new previously undisclosed analysis.  Maybe

22   they'll identify something as we go through these but

23   I will be surprised to find that.

24             Your Honor, then as we move one step closer

25   to trial on the eve of trial in the pretrial

**United States District Court**

1   conference -- if we could go -- we're there -- to the

2   next slide -- we discussed this issue of rebuttal

3   again.  And the court reminded counsel on both sides

4   of what rebuttal is and what it's not, provided the

5   same definition that we've seen before, and once again

6   discussed its application in the context of experts.

7           And importantly, you put the state on notice,

8   Your Honor.  In the transcript at page 60, lines 2

9   through 12, you advised the state that "to the extent

10  you anticipate an attack by the defendants with

11  reference to one of your experts or one of your

12  witnesses, it would seem to be best to address that."

13          And it could be addressed, you said, on

14  redirect or if you choose on direct, but true rebuttal

15  is such that could not be fairly anticipate.

16          And so, Your Honor, to suggest -- and I don't

17  think Ms. Moll is suggesting this -- that the parties

18  were not fully aware of the working definition of

19  rebuttal in this case and the need to anticipate what

20  attacks might come on their experts as through the

21  course of this trial I think simply does

22  notwithstanding scrutiny when you look at the record.

23          The next to the last slide, Your Honor, that

24  I want to walk through with Your Honor is there have

25  been a couple of exchanges throughout this trial with

1    regard to whether or not -- whether the state has

2    somehow been denied an opportunity in their case to

3    comment on the defendants' experts.

4         I sensed in Mr. Bullock's remarks yesterday

5    that that was part of the basis for a request for

6    rebuttal.  I did not hear that today explicitly from

7    Ms. Moll.  But, Your Honor, we searched the transcript

8    last night to see if we could find any instance where

9    the state have been denied an opportunity in its case

10   to comment on one of the defense experts and we found

11   no such opportunity.

12        We found two exchanges.  There was one

13   exchange Mr. Page and the court, and it's found at the

14   transcript page 2473, with regard to Dr. Fisher.  This

15   was where you'll recall -- or maybe you won't recall,

16   Your Honor -- that at the end of Dr. Fisher's

17   examination, Mr. Page stood up and said that there was

18   a matter that was raised in opening that he believed

19   he would be entitled to present evidence on, that he

20   thought was new and outside the bounds of our expert's

21   report, and that Dr. Fisher had done some analysis, a

22   new analysis, and prepared to rebut that.

23        Your Honor, I think, correctly counseled

24   Mr. Page that we should wait and see whether the

25   defendants try to present new analysis before you

1    present any new analysis.  And so as a result of that,

2    Mr. Page elected not to proceed with Dr. Fisher.

3           But what's important to note here, Your

4    Honor, on this exchange is Dr. Fisher's not one of the

5    rebuttal witnesses that the state is seeking to put

6    on.  The new analysis that they were concerned about

7    did not come in as part of the defendants' case and so

8    that exchange really is not justification for

9    rebuttal.

10           The only other reference in the transcript

11    that seemed on point that we could find in our search

12    last night, Your Honor, occurred during the

13    examination of Dr. Connolly.  There was an objection

14    made during the direct of -- direct examination of

15    Dr. Connolly as to whether something was in his report

16    or -- I'm sorry.  Mr. Green asked Dr. Connolly to

17    comment on a statement that had been made by one of

18    the other experts in this case.

19           There was an exchange again between Mr. Page

20    and the court as to whether the court had denied the

21    plaintiffs the same opportunity, to comment on some

22    opinion or report by an expert.  And Your Honor said

23    that -- just to paraphrase -- that you didn't believe

24    you made -- you denied them any such right, and if

25    Mr. Page could refer you to something, then he might

1    have an opportunity to bring them back in rebuttal.

2              This was the issue that we discussed a little

3    bit yesterday, Your Honor, whether or not the

4    defendants through objections somehow denied the state

5    the ability to present rebuttal evidence in their case

6    in chief.  I have found no such instance in the record

7    of this case.

8              Ms. Moll -- can we pull up slide 6 of

9    Ms. Moll's presentation?  Is that possible?

10                   MR. BULLOCK:  We can do that.

11                   MR. GEORGE:  Can you all do that?

12                   *(Discussion held off the record)*

13                   MR. GEORGE:  Well, Ms. Moll, do you have

14   a copy of your PowerPoint?

15                   MS. MOLL:  The judge has one.

16                   *(Discussion held off the record)*

17                   MR. GEORGE:  I'm sorry, Your Honor.

18             So, Your Honor, I believe these are instances

19   on slide 6 where Ms. Moll or the state believes that

20   the court or the defendants have somehow prevented

21   them from offering testimony that could be arguably

22   described as rebuttal testimony.

23             I have two observations, Your Honor.  The

24   first five of those examples all relate to Dr. Fisher.

25   Of course, Dr. Fisher is not one of the experts

1    they're seeking to bring in rebuttal so I'm not going

2    to get into a line-by-line discussion of those.

3        But the last one on here -- and I think this

4    is interesting, Your Honor -- is with respect to

5    Dr. Engel.  I had someone pull the transcript so I

6    could see what happened there because Dr. Engel is one

7    of the experts they want to bring.  They've cited the

8    transcript page 6278 through 6279.

9        And, Your Honor, when you look at that

10    transcript, what happened was Dr. Engel -- there was

11    an attempt to elicit an opinion from Dr. Engel that I

12    believe was outside his expert report.  I actually

13    made the objection, Your Honor, objected that it was

14    outside his expert report, and therefore, was new

15    opinion.  Your Honor, after an exchange between

16    counsel, overruled my objection.

17        As much as that hurts me to say, it proves

18    the point, Your Honor, and that is that certainly that

19    ruling is no basis or grounds for now bringing

20    Dr. Engel back to testify to something he's already

21    testified to.

22        So, Your Honor, where does this leave us in

23    terms of how we march through this?  I do think we

24    have to take these statements one by one, and the

25    defendants are prepared to do so and I suspect the

1    state is as well.

2           But I think if we look at the last slide --

3    are we back and running?  Can we go to the last slide?

4    I think there are really -- there are two potential

5    avenues for rebuttal testimony here.

6           No. 1, rebuttal to a specific statement

7    elicited by the defendants from a defense witness is

8    fair grounds for rebuttal if it's demonstrated to have

9    been new analysis that could not have been fairly

10   anticipated.

11          No. 2, if there is an instance where the

12   court, by virtue of ruling on an objection,

13   specifically prohibited the state from eliciting an

14   anticipatory response from a state witness to an

15   anticipated defense criticism, that would be potential

16   grounds for rebuttal testimony.

17          Your Honor, I think as we move through these,

18   we need to keep those two categories in mind as we

19   evaluate the testimony in the record that supports the

20   claim for rebuttal.

21          So, Your Honor, that's really all I have in

22   terms of opening remarks.  Since the state has

23   identified the specific things that they believe

24   they're entitled to rebut, I think an efficient way to

25   proceed would be for the defendants to respond to

 1   those.  We haven't made a filing obviously, but we've

 2   looked at their citations and prepared some

 3   information.

 4        And as Your Honor can tell from the

 5   disclosure that was made last night, there's more

 6   ground to traverse with Dr. Engel than there is with

 7   some of the other experts.  There's one item, I think,

 8   that relates to Dr. Connolly.  The purported rebuttal

 9   of Dr. Connolly is the only item.  And I think just so

10   we could feel good about making some progress early,

11   maybe we should start there and then move to Dr. Wells

12   and then Dr. Engel.

13        THE COURT:  Well, particularly since on

14   your frame 6, you reference Dr. Connolly -- I haven't

15   obviously had time because I was just presented with

16   this -- does your reference here to the transcript

17   dovetail with the rebuttal testimony proposed by the

18   plaintiffs with reference to Dr. Connolly?

19        MR. GEORGE:  Let me -- Mr. Jorgensen is

20   our spokesman on Dr. Connolly.  He can probably answer

21   the court's question better than I.  So can I yield to

22   him on that point?

23        THE COURT:  Please.

24        MR. JORGENSEN:  The answer is no, Your

25   Honor.  What's on the screen there is just bringing to

United States District Court

1    the court's remembrance the standard that the court,

2    which I think is the right standard, set out, which is

3    to say to Mr. Page, if you can point me to an instance

4    where I denied you an opportunity to get into

5    something on direct, well then I'm going to give you a

6    chance on rebuttal.

7              THE COURT:  I understand that.  But I

8    just wondered whether the subject matter of the

9    dialogue with Mr. Page tied in with the subject matter

10   of that which the --

11             MR. JORGENSEN:  No, it does not, Your

12   Honor.

13             THE COURT:  -- plaintiff wishes to

14   present rebuttal.  All right.

15             MR. JORGENSEN:  No, sir.

16             THE COURT:  Since it doesn't then, let's

17   deal with the -- let's deal with the substance of the

18   proposed rebuttal.

19             MR. JORGENSEN:  Yes, Your Honor.

20             THE COURT:  With all due respect, I

21   think given the nature of this sort of case, the two

22   alternative grounds for rebuttal presented by

23   Mr. George, although frankly consistent with the

24   court's view of rebuttal coming in, with all due

25   respect, I think the court needs to be more flexible

 1   given the nature of this case.  Because obviously if

 2   one were to be too rigid in the application of that

 3   view, in a case such as this, a four-month case would

 4   become a six-month case very easily.

 5            MR. JORGENSEN:  That's understood, Your

 6   Honor.  And I'm going to take that to heart as I make

 7   my presentation very briefly here today.

 8            THE COURT:  Please.

 9            MR. JORGENSEN:  Let me begin by saying,

10   I have a plane ticket to see my wife and kids today.

11   So if I seem overly bubbly it's because nothing can

12   suppress my joy at this moment.  So --

13            THE COURT:  Well, in chambers, we've

14   talked about that.  On both sides, this has been a

15   sacrifice for all of you in that regard and I very

16   much appreciate it.

17            MR. JORGENSEN:  What a privilege, Your

18   Honor.  It's been one of the highlights of my career

19   to be here.

20            So the testimony that is offered -- or

21   proposed to be offered from Dr. Connolly is -- and I

22   quote now from the pleading that plaintiffs put

23   together last night -- the only important source of

24   soluble-reactive phosphorus in base flow is from

25   wastewater-treatment plants.

1    That's what they want to get to.  I'm not

2    sure that's exactly what Dr. Connolly said, Your

3    Honor, but I think we all understand the point.  The

4    point is, Dr. Connolly sat on the stand and said,

5    wastewater-treatment plants are controlling the algae

6    problem, to the extent there is a problem, in this

7    watershed with some exceptions, in slow-flowing areas

8    like the riverine section, or little side areas where

9    the conditions are either stagnant or inherently local

10   next to a golf course, next to a cattle field.

11        With those exceptions, the driving factor,

12   the controlling factor, of phosphorus for water

13   quality in the river and the lake is

14   wastewater-treatment plants and --

15        THE COURT:  Well now, in that regard --

16   and I think we all need to focus on this, particularly

17   in the context of findings of fact and conclusions of

18   law -- what you say is an important topic here.

19        If you'll note -- and I'm sure you haven't

20   lost this -- Mr. Bullock has now focused in a little

21   bit more closely in terms of the plaintiff's position

22   with regard to its burden of proof.  If you've noticed

23   over the last few days, he has focused -- and I think

24   properly so -- that the plaintiff's burden is not to

25   show that the land application of poultry litter is

 1    the primary source of phosphorus, but rather that it

 2    is a significant source.

 3                    MR. JORGENSEN:   Indeed, Your Honor.

 4    That's true.

 5                    THE COURT:   And once again -- and I

 6    understand the defendants wish to focus on and try to

 7    suggest that the plaintiff's burden is to prove that

 8    it is the primary source.   It is not.

 9                    MR. JORGENSEN:   I understand that

10    position, Your Honor.   And I believe the testimony of

11    Dr. Connolly establishes that wastewater-treatment

12    plants are the controlling factor.

13              So we're on the same page as to what they

14    want to come in and talk about.   The question is, is

15    it true rebuttal, as you've said.   And now I'll move

16    quickly into that.

17              The subject of whether or not

18    wastewater-treatment plants were the controlling

19    factor, whether they were the problem and are the

20    problem in this system was the subject of discovery

21    and fighting from the very first.   And as a result,

22    all the parties knew that this was going to be an

23    issue, and as a result it appeared over and over again

24    in discovery disputes, in expert reports on both

25    sides.

1          I'd like to hand out -- I'm not going to give

2     every example or we'd be here all day and I want to

3     move quickly but let me give some examples.

4          May I?

5               THE COURT:  Yes.

6               MR. JORGENSEN:  This is just an example.

7     This is the table of contents, just the table of

8     contents, of Dr. Connolly's report.  You'll see on the

9     first page he says, one of his major headings, "There

10    are many contributors of phosphorus to the Illinois

11    River and Lake Tenkiller."  That's your point you just

12    made, Your Honor.

13         But then down on 2.9, "Wastewater-treatment

14    plants appear to be the most important source of

15    bioavailable phosphorus to the system."  And then at

16    2.10, "Lake sediment phosphorus is a minor source of

17    bioavailable phosphorus."

18         It's not a small issue in his report.  On the

19    next page at section 4.2, his table of contents says

20    that he's going to talk about "much of Lake Tenkiller

21    does not see the phosphorus that enters from upstream

22    because it plunges to the lake bottom waters."  And at

23    4.3, "Reductions in phosphorus load will only impact

24    the chlorophyll-a levels in the riverine section of

25    the lake" because of that plunging.

1    And then not yet done, talking about at

2    length -- I mean, this expert report's enormously

3    long -- talking about the importance of

4    wastewater-treatment plants, at Section 7.2, he says,

5    "The improving water quality is evidence that poultry

6    litter application is not a dominant cause of water

7    quality impairment, water quality is improving despite

8    increase in poultry population, water quality

9    improvements correlate with changes in

10   (wastewater-treatment plant) loadings."

11    Now, I've only given you the table of

12   contents, but you heard Dr. Connolly's testimony from

13   the stand and you know that it amplified on that and

14   talked about all the text that was in the report.

15    But now the question is, is Dr. Connolly's

16   report the only time that the idea came up that it

17   might be wastewater-treatment plants that are the

18   problem in this system?  And let me remind Your Honor,

19   because we've had so many proceedings, of a key

20   proceeding.

21    On September 4th, 2009 -- may I?

22            THE COURT:  Yes.

23            MR. JORGENSEN:  On September 4th of this

24   year, we had a hearing here in this court, and the

25   hearing was on the subject of a pretrial motion, a

1    motion in limine.  Let me just lay the groundwork

2    because, I think, then we can move a lot more quickly.

3         Because the parties had fought in discovery

4    so much over is it wastewater-treatment plants or is

5    it not wastewater-treatment plants, the plaintiffs

6    knew that this was coming, this defense.

7         So in Dr. Engel's report, Dr. Engel had a

8    section -- now, recall the sequence in which reports

9    roll in.  Dr. Engel's report rolls in first.  There's

10   a section in Dr. Engel's report that says, and even if

11   it is wastewater-treatment plants that are the

12   problem, these defendants have processing facilities

13   and so they're responsible for the

14   wastewater-treatment plants too.

15        Then we file the motion in limine saying,

16   okay, that's not in the complaint, that's preempted by

17   the Clean Water Act, and they have NPDES permits for

18   wastewater-treatment discharges, we cannot be held

19   responsible for the wastewater-treatment plants.

20        But obviously the plaintiffs knew this was

21   our defense, and this is our motion in limine to

22   say -- which the court granted saying, you haven't

23   sued based on point-source discharges and so there

24   will be no evidence presented to the court that we are

25   responsible for wastewater-treatment plant discharges

 1    too.  But it's just a great example that they knew of

 2    our defense.

 3          We went on, I'm afraid too long, taking up

 4    your time on September 4th.  So I have only picked out

 5    just a few pages of the pages and pages of this

 6    discussion.  But let me give a sample of what we

 7    talked about.

 8          This is on page 287 of the transcript from

 9    the pretrial conference on September 4th, 2009, and

10    this is me talking.  And I said to the court, "So what

11    we're going to be saying is the elements that would

12    cause the pollution here, that would cause algae to

13    grow is the type of phosphorus that algae can eat.

14    And that comes from the wastewater-treatment plants,

15    it comes directly into the water.  There is no fate

16    and transport.  There is no getting caught up in the

17    land.  There is no how does it ever get there with the

18    miles ahead?  It goes straight into the water.  It's

19    the type of (phosphorus) that algae can eat."  It

20    actually says "it's the type of water" here but it

21    means phosphorus.

22          "That's what is creating a quantity which are

23    or will likely create a nuisance.  In contrast, we

24    have a type of phosphorus that does not grow algae or

25    at least -- I need to be more precise.  Poultry litter

1    contains both kinds and you've made that point."

2          And that's because you, I, and Mr. Page

3    already had the discussion about soluble-reactive

4    versus not soluble-reactive and wastewater-treatment

5    plants.

6          "But we will be making the point of the

7    relative differences.  This one is more likely to grow

8    algae, more easily grows algae and is close, I mean

9    directly deposited.  We," meaning the defendants, "are

10   less likely to grow algae and are far away.  So the

11   jury, when you are trying to decide what's in the

12   water, where did it come from, was it put in by us and

13   was it put in by us in a quantity which are -- which

14   is or is likely to create a nuisance?  It's

15   wastewater-treatment plants."

16          A little farther down I say, Whether or not

17   wastewater-treatment plants are the cause is a fair

18   question.  "We're going to say they have evidence

19   which Mr. Page has alluded to" -- because we talked at

20   length about the evidence that the plaintiffs said

21   they that wastewater-treatment plants were not the

22   problem -- "we're going to say they have evidence

23   which Mr. Page has alluded to which is going to be

24   perfectly legitimate to come in and say it's not the

25   cause, and we will say it is the cause, and that will

1    be the fight."

2            So if there's any suggestion that at any

3    point before trial or during trial we said, Your

4    Honor, do not let the plaintiffs say that

5    wastewater-treatment plants are not the cause, that's

6    just not true.  We said right from the first, they

7    have evidence or have tried to develop evidence,

8    they're going to say, it they can say it.

9            And then the court said, "First of all, why

10   wouldn't the limitation instruction be sufficient?"

11   This is when we still had a jury.  "I mean you're

12   going to say because of the definition of pollution

13   that you're going to raise these other possible causes

14   of algae and I understand your position, but if you're

15   going to do that couldn't the prejudice you contend

16   you're going to suffer be eliminated or at least

17   greatly eliminated or at least greatly lessened by a

18   limiting instruction?"

19           I say, "It could be.  It could be greatly

20   lessened, I think, by a limiting instruction, but I

21   just want to suggest that if I'm a juror and I hear

22   wastewater-treatment plants are the cause, and I hear

23   wastewater-treatment plants from the state are not the

24   cause and then I hear, but no matter what, these

25   people are responsible for the wastewater-treatment

1   plants, it's hard for me not to take that for any

2   purpose.  I mean your instruction would have to be

3   essentially you can't consider that for any purpose."

4          And then here's the basis of your ultimate

5   ruling, Your Honor.  You said, "I guess your response

6   would be, Judge, they don't need to know who the

7   source is because that's not what's being sued on."

8          And I say, "Exactly.  They," meaning the

9   jury, "can know it's wastewater-treatment plants and

10  there's going to be tons of evidence from the

11  plaintiffs about wastewater-treatment plants are not

12  the cause, poultry litter is the cause.  And we're

13  going (to) say, no, poultry litter is not the cause,

14  wastewater-treatment plants are the cause," and we go

15  on.

16         And then you say, "Well, just an observation.

17  You're going to have folks on this jury who are going

18  to be somewhat familiar, I imagine, with the Illinois

19  River.  And given that at least it appears, not

20  knowing the entire watershed, that algae is freely

21  growing in areas above where there are no

22  wastewater-treatment plants, I suppose some folks are

23  going to have a hard time believing that defense."

24         And then I say, "That might be true, Your

25  Honor, and if that's the case we might pay for our own

1    defense, but that doesn't make it permissible for the

2    plaintiffs to say" essentially that we are the cause

3    of the wastewater-treatment plants as well to try to

4    blame us.

5          Then Mr. Page stands up and says, "Just

6    briefly, Your Honor.  The court seemed to be

7    interested in when was this information presented to

8    the defendants," this information being Dr. Engel's

9    contention that the defendants are responsible for the

10   wastewater-treatment plants as well as nonpoint-source

11   pollution.  And he says, and "this evidence was

12   presented to the defendants as part of our case and it

13   was part of Dr. Engel's expert report."

14         If I can go to page 291, the court says, "The

15   question is why, if that's not being sued upon?"  He's

16   talking to Mr. Page.  "I mean, it seems to me that to

17   the extent that they are going to try to argue to a

18   jury that algae is caused primarily by

19   wastewater-treatment plants, you guys are going to

20   knock them over the head because, you know, my limited

21   knowledge of the IRW is such that algae is, as I said

22   to Mr. Jorgensen, algae is growing pretty fast in

23   areas where there aren't wastewater-treatment plants

24   upstream.  So, now whether that's as a result of

25   septic tanks, whether it's" --

1          THE COURT:  Let me just say to clarify,

2    the trial has since informed me that with regard to

3    Flint Creek, there is a wastewater-treatment plant

4    above --

5          MR. JORGENSEN:  Indeed.

6          THE COURT:  -- of which I was

7    unknowledgeable at the time I made that statement --

8          MR. JORGENSEN:  Indeed.

9          THE COURT:  -- because of the Siloam

10   Springs plant dumping into Sager Creek.

11         MR. JORGENSEN:  Exactly.

12         THE COURT:  So my understanding frankly

13   at that time was erroneous.

14         MR. JORGENSEN:  Exactly.  And I'm in no

15   way criticizing the court.  That's the function of

16   trials, both sides learn, the court learns, and that's

17   exactly what happened here.

18         THE COURT:  Learn more about the

19   truth.

20         MR. JORGENSEN:  Indeed we get to the

21   truth.

22         And then Mr. Page ends by saying that we're

23   going to argue about muskrats and squirrels, and

24   that's where it ends.

25         So my point is just this, Your Honor.  I

1    think Mr. George and Ms. Moll have done a nice job of

2    articulating various stands and offering them to the

3    court.  But with Dr. Connolly it's easy.  Under no

4    standard could the suggestion be made that having

5    stood at the podium and made fun of my defense,

6    Mr. Page can now say I wasn't aware that that defense

7    was going to come.

8              What has happened is, Dr. Connolly has sat on

9    the stand and presented what is the most compelling

10   scientific evidence in this case.  But the standard is

11   not, oh, that was really good evidence and now I would

12   like to have a rebuttal.

13             THE COURT:  I think what he was making

14   fun of were your cartoon muskrats and birds from the

15   preliminary injunction hearing.

16             MR. JORGENSEN:  Indeed, Your Honor.  I

17   thought about bringing that back but then I thought

18   I'd be pushing my luck.

19             THE COURT:  Thank you.

20             MR. JORGENSEN:  Your Honor, I have the

21   deposition of Dr. Connolly where his testimony -- I

22   have it right here -- where his testimony was

23   discussed at length.  You may recall the map of the

24   red squares and the blue diamonds and the green dots

25   for what's upstream of a wastewater-treatment plant,

1    what's down.

2          I could show you the plaintiffs went on for

3    hours, if not a day, with him on this topic.  It's not

4    true rebuttal.  I won't burden the court by submitting

5    it unless plaintiffs deny that they had that

6    opportunity in their deposition.

7                THE COURT:  All right.  Thank you.

8    Well, we've picked an important issue to start off

9    with.

10         So Ms. Moll -- or Mr. Page.  I'm sorry.  It

11   should be Mr. Page's response?

12               MS. MOLL:  Can we tag team this one,

13   Your Honor?

14               THE COURT:  Absolutely.  Go ahead.

15               MS. MOLL:  Thank you, Judge.  I'd like

16   to first comment, if I could, in response to

17   Mr. George's statements.  I'll paint with a

18   broadbrush, if I could.

19         I'm sitting here and I'm thinking to myself,

20   I must not be smart enough to understand how we've

21   gotten to this point.  Because as I hear the

22   defendants' position distilled, it is that in our case

23   in chief we had to put on all of our voluminous

24   evidence to prove all of our claims, then have our

25   experts explain what the defense experts said in their

 1   voluminous expert reports and depositions, and then

 2   tell Your Honor why they're wrong.

 3                    THE COURT:  Right.

 4                    MS. MOLL:  We would be a third of the

 5   way in our case in chief right now.

 6                    THE COURT:  Right.

 7                    MS. MOLL:  And as much as we've all

 8   learned from this case, I don't think we, you know,

 9   want to be here in the fall of 2010.

10        So I don't understand -- and forgive me,

11   Judge.  I'm emotional about this one for some reason

12   but we've been here for a long time.  I don't

13   understand the argument that our experts had to sit on

14   that stand and identify all of the defense experts,

15   who critiqued them in reports, had to go on and

16   explain why they were wrong in our case in chief.

17        That is all we are trying to do by way of the

18   proposed rebuttal testimony from Drs. Engel and Wells.

19   We are not seeking to put on testimony that somehow

20   bolsters testimony in our case in chief.  We are going

21   to hopefully put on rebuttal testimony that would

22   directly critique the substantive testimony of

23   Drs. Bierman and Connolly.

24                    THE COURT:  All right.  But just to make

25   clear, we're not attempting to put on any new

**United States District Court**

1    opinions, but rather to respond to their critique;

2    correct?

3                    MS. MOLL:  That's correct.

4                    THE COURT:  All right.  Could counsel

5    approach?

6              *(Bench conference held at sidebar)*

7                    THE COURT:  Unless anybody really wants

8    to spend a whole lot of time arguing about this, I

9    think I'm ready to make a decision on this.  Anybody

10   have any serious objection?

11            My inclination is to allow it.  You know,

12   we've been here too long to cut the plaintiff short

13   with respect to this.  I'm basically guided by the

14   flexibility allowed to a trial court in allowing

15   rebuttal, particularly in a long case like this where

16   I don't believe that I should strictly hold the

17   plaintiff to the standard that I would have held the

18   plaintiff to in, as I explained, a medical malpractice

19   case in state court.

20            I'm inclined to allow it frankly as long as

21   it's not new.

22                    MR. JORGENSEN:  May I just say one thing

23   Your Honor?  And then I'll defer to Mr. George to fill

24   this out.

25            In that regard, as to Dr. Engel, it's my

11256

1   understanding that the materials we've been given show

2   new analysis, a new run of the data, and so that might

3   be a slightly different camp.  Because we would need

4   to get it, analyze it over the next week, or otherwise

5   we'd be in trouble.

6               THE COURT:  Well, I don't know about new

7   runs.

8               MR PAGE:  May I speak, Your Honor?

9               MS. MOLL:  Yes.  Mr. Page.

10              MR PAGE:  What Dr. Engel has done -- and

11  we've given the information in our disclosures to the

12  defendants, they have it -- is he's taken

13  Dr. Bierman's runs that he testified to, the S & Ps,

14  and the reverse days and the 345-fold point-source

15  additions and the 14-fold nonpoint-sources additions,

16  those four sensitivity tests, and run them not through

17  Dr. Bierman's model, his so-called recalibrated model,

18  but through Engel's routing model to show the

19  differences.

20              I've tried to elicit that testimony on cross

21  and the objection was there wasn't a foundation

22  because there was no witness here to testify as to how

23  those runs occurred.

24              THE COURT:  Well, but my understanding

25  -- and granted it's limited -- but my understanding

**United States District Court**

1   was the basic criticism was that the coefficients were

2   so flexible, it allowed everything to adjust to reach

3   the results that were seen at the three locations

4   downstream.  If one runs those numbers through Engel's

5   model, it doesn't adjust the coefficients to be able

6   to reach those results downstream.  So that's a

7   meaningless exercise; right?

8              MR PAGE:  No, sir.  And the exact point

9   is the premise that you've taken away, that the

10  coefficients are flexible.

11             There are misrepresentations by Dr. Bierman

12  that the coefficients are flexible.  He even stated

13  that the coefficients were not found in the expert

14  report and those topics will be the beginning.  The

15  topics will begin that the coefficients are not

16  flexible, that they are the essential part of the

17  model, and then if you run them with the proper

18  coefficients, you have the -- the model always get the

19  same results.

20             THE COURT:  All right.  Well, this is a

21  central issue, because frankly the defendants beat

22  Engel up pretty badly in the defendants' case in

23  chief.  And if you can prove that those coefficients

24  aren't flexible basically to give the result that you

25  want, then that's an important point for the plaintiff

1    to make.

2                    MR. GEORGE:  Your Honor, may I be heard

3    briefly?

4                    THE COURT:  Yes.

5                    MR. GEORGE:  And I think your

6    understanding of the way the model works is correct,

7    and if we need to explore that further in rebuttal we

8    will.

9            But with respect to the disclosure issue,

10   which is a different animal, Mr. Page has provided in

11   the demonstratives a slide that shows a graph of the

12   output of the new runs that Dr. Engel has performed.

13   But as Your Honor heard at length with both Bierman

14   and Engel, these models every time you run them, they

15   create a ream of data with spreadsheets and files.

16   There's been no -- and those files had have to be

17   evaluated by an expert, pulled apart to determine what

18   actually is happening within the model.

19           There's been no disclosure of the new model

20   runs and those associated files that would allow the

21   defendants to prepare a cross-examination.

22                    MR PAGE:  Your Honor, may I be heard?

23           I think that's a gross hyperbole of what has

24   to happen here.  Dr. Engel took exactly what

25   Dr. Bierman did, working from his report --

1          THE COURT:  But even if it is,

2    Mr. Page -- I'm sorry to interrupt -- but even if it

3    is, Dr. Bierman ought then to be given an opportunity

4    to look at that which Dr. Engel ran to be able to

5    prepare Mr. George for cross-examination; right?

6          MR PAGE:  That's true.  I mean, I don't

7    have a problem with that, Your Honor.  I think it's

8    very simple.  The routing model -- he

9    knows -- Dr. Bierman knows what the routing model is.

10   He has the coefficients.  They're part of the

11   demonstratives.  They were part of the expert report.

12   He knows what his own variables are.  He can

13   plug -- he knows those are his hypotheticals.  Those

14   are his inputs.  He can put that in the same routing

15   model and run it.  It takes a day to run it.

16          If the defendants wants the output files,

17   we'll get them to them in a couple of days.  I mean,

18   Mr. Engel has run it and we can give them those output

19   files.

20          But, again, Your Honor, it's not a complex

21   matter.  It's a matter of just Dr. Bierman running the

22   model, which he clearly said he can do, with the

23   original coefficients that Dr. Engel used and

24   Dr. Bierman's inputs.  It takes a day to run each

25   scenario.

1            THE COURT:  Except that that's, as I

2    understand it -- and I can be corrected

3    obviously -- but my understanding is that that was

4    Bierman's point, is that the coefficients change

5    depending on what inputs you place into it.

6            MR. PAGE:  And that's wrong.  That a

7    misrepresentation.  That's exactly what the

8    rebuttal --

9            THE COURT:  All right.  I'm going to

10   give you the opportunity then to correct that

11   misimpression but it has to be fair for the defense.

12            And your suggestion, Mr. George?

13            MR. GEORGE:  Yes, Your Honor.  Certainly

14   if the court's inclined to allow some rebuttal

15   testimony on this point, Dr. Engel, who's familiar

16   with his model, can come in and speak to the question

17   of whether these coefficients are allowed to float or

18   whether they are -- they are fixed.  He can provide

19   the court with that explanation without a whole new

20   analysis of modeling runs and files that frankly the

21   defendants will not have an opportunity to be prepared

22   to cross-examine on.  I think that's the basic point.

23            It doesn't require the running of the model

24   again in another alternative scenario with a

25   production of voluminous records for the parties to

1    review.

2              MR. PAGE:  And the reason it does, Your

3    Honor, why I disagree with Mr. George, is that the

4    other testimony of Mr. Bierman is no matter what

5    inputs you put in, you get the same results.  And then

6    he shows --

7              THE COURT:  Right.  Because the

8    coefficients change.

9              MR. PAGE:  The coefficients change.

10             THE COURT:  Right.

11             MR PAGE:  And the point is is those are

12   real coefficients.  Those coefficients are

13   essential and they don't change with Engel's model --

14             THE COURT:  Okay.  But let's move from

15   the substance and try to figure out how we can fairly

16   allow you to do this because I'm going to allow you to

17   do it, all right?  But then what do we have to do

18   procedurally to be fair to the defendants?  What do

19   the defendants need to have if we -- if we start up

20   again two Mondays from now -- because next Monday is

21   Martin Luther King, and as I say, I've got my criminal

22   trial which is expected to last into Thursday -- if we

23   start up the following Monday, is that going to be

24   enough time for the defendants to prepare for the

25   cross-examination on your rebuttal?

1          MR PAGE:  Well, Your Honor, Dr. Engel,

2     it took him -- he has four computers and it took him

3     one day to make this output.

4          THE COURT:  Well, you need to provide it

5     obviously.

6          MR. PAGE:  So I can him that output on

7     Monday, give that to the defendants on Monday.

8     They'll have two weeks --

9          THE COURT:  One week.

10          MR. GEORGE:  One week.

11          MR. PAGE:  We'll start this Monday.  So

12     they have one week to do that.

13          THE COURT:  Is that enough time.

14          MR. GEORGE:  I don't believe it is, Your

15     Honor, and I'm not playing coy.

16          The production that would be necessary would

17     be the input data, the executables, which is what the

18     model runs on, and the output data.  That's going to

19     be spreadsheets that have tens of thousands of lines

20     associated with them.

21          THE COURT:  Do you need to call

22     Dr. Bierman to find out how much time it would take

23     him if he gets it on Monday?

24          MR. GEORGE:  I'm happy to place that

25     call.

1          THE COURT:  Let's take a break and find

2    out.

3               *(Short break)*

4          THE COURT:  Mr. George.

5          MR. GEORGE:  Your Honor, I have been

6    unable to get a hold of Dr. Bierman, but I've come to

7    the conclusion that given where we are in this trial,

8    we'll do whatever is necessary to be ready to

9    cross-examine Dr. Engel if he is recalled.

10          We would ask for an immediate production of

11    the modeling files.  They exist and they could be

12    loaded to an FTP site, I believe, promptly so that we

13    have the maximum amount of time with them.

14          I would also request, Your Honor, that given

15    that -- if the court is inclined to allow Dr. Engel to

16    testify as to a new model run that hasn't been

17    reviewed by our experts, that the defendants be given

18    leave to have Dr. Bierman present and, if necessary,

19    to put him on the stand for 15 or 20 minutes to

20    comment on that discreet issue.  I understand there

21    may be a broader range of things that Dr. Engel may

22    seek to testify about.

23          But we do think it would be perhaps expecting

24    more of attorneys than is realistic to think that in

25    cross-examination I could cover this highly technical

1    ground without some assistance from Dr. Bierman.

2              THE COURT:  Well, it is technical and

3    that in part informs the court's view on this issue

4    because it has become a focus here of some of the

5    defendants' experts' testimony.

6              Well, that raises two logistical issues.

7    Number one, Mr. Page can that run be provided to

8    Mr. George today or tomorrow?

9              MR PAGE:  Your Honor, during the break,

10   I got a hold of Dr. Engel, he's now in class.  I asked

11   him if I could have it to the defendants' counsel by

12   Monday and he said no problem.  What I expect is that

13   we could probably get them to them Saturday is my

14   expectation or Friday afternoon.  I just have to get

15   back in touch with Mr. Engel.

16             THE COURT:  You say it's already been

17   done?

18             MR PAGE:  Yes.  And Dr. Engel says, what

19   I'd like to do is clearly label by input, so we don't

20   have this question of what files are which again, and

21   have it ready then to be delivered to the defendants.

22   But the runs have been done, they just need to be

23   labeled, the files.

24             THE COURT:  All right.  Well, given some

25   of the testimony with regard to the organization of

**United States District Court**

```
 1    the files, obviously the defense won't have any
 2    objection to labeling those so that they know what the
 3    figures represent.
 4           Let me just order you then to get that to
 5    Mr. George as soon as possible and preferably sent out
 6    tomorrow, which then would presumably get to
 7    Mr. George by Saturday.
 8           Now, with regard to --
 9           MR. PAGE:  Your Honor, may I comment on that?
10           THE COURT:  Yes.
11           MR PAGE:  Mr. George asked me to put it
12    on an FTP site so it wouldn't even be an overnight
13    delivery.  If that's possible, we will do that.  So if
14    I have the files from Dr. Engel tomorrow and we can
15    load them into an FTP site.  My understanding is
16    they're Excel and files, and I think they're easily
17    loadible up into an FTP site and we will do that.
18           THE COURT:  All right.  Now, the second
19    issue, possible surrebuttal.  Do you wish to address
20    that or Ms. Moll?
21           MR PAGE:  I'll have my lawyer address
22    that, Your Honor.
23           MS. MOLL:  We obviously, Your Honor,
24    have no objection to Dr. Bierman being in the
25    courtroom when Dr. Engel testifies in rebuttal.  I
```

1    think the question of whether he should be able to

2    testify in surrebuttal is a question that does not

3    need to be answered today.

4                 THE COURT:  I think that's probably

5    right.

6                 MS. MOLL:  And we can address it

7    immediately following the conclusion of Dr. Engel's

8    testimony.

9                 MR. GEORGE:  Your Honor, I'm agreeable

10   to that approach.  We will -- absent Dr. Bierman being

11   on vacation, which might be possible and may explain

12   why I couldn't get him, we'll have him present in the

13   courtroom.  If we believe it's necessary, we'll seek

14   leave at that time and Your Honor can rule on it based

15   upon the record.

16                 Your Honor, I guess the last point that I

17   would want to get some clarity around, Ms. Moll had

18   indicated that she thought that the testimony on

19   rebuttal would take about a day and a half.  Candidly,

20   if we hold tightly to the discreet points listed in

21   their filing, which are very, very narrow, I mean,

22   their specific responses, certainly it's the

23   defendants' expectation we're going to say tightly to

24   those subjects as opposed to putting a witness up to

25   bolster prior testimony or, you know, free range on

1    topics.  I don't believe it will necessarily take a

2    full day and a half.

3              So I wanted to kind of surface that concern

4    and the defendants' expectation, and I hope the

5    court's, that we're going to police the line to find

6    in those disclosures during the rebuttal case.  That's

7    certainly our expectation.

8              THE COURT:  Well, I'll certainly review

9    the transcript testimony specifically set forth in the

10   State of Oklahoma's submission filed today, the 2854,

11   and we'll attempt to hold the line there with regard

12   to rebuttal --

13              MR. GEORGE:  Thank you, Your Honor.

14              THE COURT:  -- and cross-examination.

15              MR. GEORGE:  Certainly, Your Honor.

16         One more finally -- there's always two

17   "finallys" and I apologize -- someone suggested to me

18   that we probably should get some clarity around moving

19   straight from the rebuttal case to closing, and that's

20   the defendants' view as to what would be most logical

21   and helpful.  We're preparing with that understanding

22   in mind, but obviously did not want to presume the

23   court's planning and schedule.  So --

24              THE COURT:  How much time do we

25   anticipate for the end of the state's rebuttal case

1   and the filing of findings and conclusions?

2           MR. GEORGE:  Your Honor, I believe the

3   court had previously indicated about ten days -- is

4   that right? -- that the parties were to make

5   submissions within ten days, and we've been working on

6   that understanding.  Obviously, there will be some

7   time necessary to incorporate any rebuttal testimony

8   into those findings.

9           One concern that I have -- and I might be

10  speaking for all of the defendants; and if I'm not,

11  they should certainly jump up -- is if we delay

12  closing until after the submissions of those findings

13  of fact and conclusions of law, that I am concerned

14  that closing will turn into an argument as to the

15  appropriateness of those findings as opposed to what

16  we think would be more helpful, a traditional closing,

17  a big picture summarizing the things that we think are

18  important.  I would certainly hope we would not end

19  this case with a procedural skirmish over specific

20  line items in proposed submissions.

21          THE COURT:  Well, that's a good issue, a

22  good question.

23          Mr. Bullock, I think you were the one who

24  suggested --

25          MR. BULLOCK:  Well --

1            THE COURT:  -- the closing after the

2    filing of findings and conclusions.

3            MR. BULLOCK:  I still think that that's

4    most helpful.  The spector that Mr. George raises, of

5    course, is that one of our two sides will do something

6    that is ineffective in closing; that is, get into the

7    weeds and the grass and lose focus.

8            THE COURT:  If you do that, you're

9    wasting your time.

10            MR. BULLOCK:  Then you're wasting your

11    closing.

12            THE COURT:  Especially if I tightly

13    circumscribe the time.

14            MR. BULLOCK:  And what we want you to do

15    is listen to us, and so there's a certain incentive

16    there to try to do it right.  Whether we do or not

17    remains to be seen.

18        I think it will be helpful to us for another

19    very practical reason.  We're going to be working very

20    hard on the findings.  If we end up two-tracking, take

21    lawyers away from doing that right, in order to assist

22    myself and the others who will be doing the closing,

23    frankly we're going to be stretched thin on this side.

24            THE COURT:  I think that's right.  And

25    maybe I misread some of your statements here, but you

1    heard my reference to your continuing to focus on what

2    the precise issues are here, and of course that's what

3    a trial does.  So I'm inclined to favor Mr. Bullock's

4    suggestion.  I think to focus on the findings and

5    conclusions is wise.

6            Ten days, I presume, would be counting the

7    interim weekend, which would put the date, assuming

8    that we complete rebuttal on the 26th, and the motions

9    then might take a short amount of time thereafter,

10   that would put the deadline for findings and

11   conclusions on February 5th.

12           MR. GEORGE:  I think that math is

13   correct, Your Honor.

14           One other observation -- and obviously the

15   defendants will do whatever is most -- the court

16   believes is most helpful in terms of the order.  If

17   Your Honor desires to proceed with findings before

18   closing, we'll certainly obviously adhere to that.

19           But one other consideration that I think is

20   important here is the mobilization of attorneys and

21   resources for two trips as opposed to one trip.  And

22   obviously the course that we're headed down, at least

23   in the suggested proposal by Mr. Bullock, means that

24   we'd have to repopulate Tulsa next week -- or the week

25   after next for the rebuttal case and then bring those

1    resources back again the following week.

2                      THE COURT:  Although, I don't know that

3    you need to move in for the close.  I anticipate that

4    we will confine close to one day.

5                      MR. GEORGE:  Right.

6                      THE COURT:  So you need not, you know,

7    pack for an extended stay.

8                      MR. GEORGE:  Certainly, Your Honor.

9    We'll not allow anyone to book a room at the Mayo for

10   the entire week for closing, as luxurious as it is and

11   we're pleased to have stayed there, but obviously

12   there is attendant travel costs and time with

13   mobilizing attorneys.  I understand in the scale of

14   this case that that might not outweigh the

15   considerations you have in mind in terms of what will

16   be most useful.

17       But as a shareholder of Tyson Foods, I feel

18   compelled to raise it but it is an added expense that

19   I hope would be part of the consideration.  So --

20                      THE COURT:  Well, I'll leave it to you

21   as to how many folks you need for closing.  I don't

22   know that we need this army, but then of course the

23   plaintiffs did sue quite a number of defendants.

24       Mr. Tucker.

25                      MR. TUCKER:  Your Honor, there's one

**United States District Court**

*11272*

1    other matter that we didn't discuss.

2         When Your Honor talked about the rebuttal

3    issue, Dr. Wells was also suggested for rebuttal and

4    you'll recall Dr. Wells had modeling also.

5                   THE COURT:  Yes.

6                   MR. TUCKER:  And Mr. Ehrich would like

7    the address the same kinds of issues that exist with

8    Dr. Wells -- or may exist with Dr. Wells that exist

9    with regard to Dr. Engel.  But there have been zero

10   disclosures with regard to Dr. Wells even though he

11   will be brought on at the same time.

12                  THE COURT:  Good point.  Is Wells going

13   to perform any new modeling?

14                  MR. PAGE:  No, Your Honor.

15                  MR. TUCKER:  I'm sorry.  I didn't hear,

16   Your Honor.

17                  THE COURT:  He said no.

18                  MR. PAGE:  No.

19                  MR. TUCKER:  May we inquire as to when

20   we would expect disclosures from Dr. Wells?  Since we

21   would like the same length of time to prepare for him

22   as for Dr. Engel since they're interrelated.

23                  THE COURT:  I suspect the response is,

24   the disclosures are here in 2854.  But Mr. Page?

25                  MR. PAGE:  That's a pretty good

1   disclosure, Your Honor.  If there's any demonstratives

2   or exhibits, they'll be 72 hours before Monday, the

3   25th.

4                   THE COURT:  Well, let's do it a little

5   bit before that, I mean, since we have all this time.

6   Is there any reason why that couldn't be done by

7   Tuesday or Wednesday of next week?

8                   MR. PAGE:  I don't believe so, Your

9   Honor.  I talked to Dr. Wells yesterday.  I believe

10  he's available to give me any information in that

11  regard.  So could we say Tuesday of next week, Your

12  Honor?

13                  THE COURT:  Yes.  Is that satisfactory?

14                  MR. TUCKER:  Yes, Your Honor.  Thank

15  you.

16                  THE COURT:  All right.  Anything else?

17                  MR. GEORGE:  Your Honor, I apologize.

18  But there's been one other suggestion made, which I

19  think is an outstanding one, by Mr. Weeks and I wanted

20  to bring it to the court's attention.  It might

21  provide a nice balance of the cost considerations that

22  I've raised and the court's view on what would be most

23  useful and also eliminate -- or lessen some of the

24  prejudice associated with new analysis.

25                  Would it be possible to move the rebuttal

1    case and the closing to the same week, move it two

2    weeks?  And that way --

3              THE COURT:  Well, then you will not have

4    had the opportunity to use the rebuttal in preparing

5    the findings and conclusions so that's not possible.

6    And I need to rule on the two remaining aspects of the

7    52(c), which I now can do and actually hopefully focus

8    on between now and rebuttal, and then there will be

9    motions at the close of rebuttal.

10             THE COURT:  Yes.  Mr. McDaniel.

11             MR. MCDANIEL:  Yes, Your Honor.  I just

12   wanted clarity.  What date -- or has the court decided

13   on the date for closings?  I heard February 5th as

14   when the court wants to receive the proposed findings.

15             THE COURT:  We haven't gotten there, no,

16   sir.

17             MR. MCDANIEL:  Because I know we all,

18   and certainly the court, want to schedule around that.

19   So hopefully we can resolve that today.

20             THE COURT:  Mr. Overton, if findings and

21   conclusions come in by February 5th -- I know February

22   doesn't look very good because all my work has now

23   been passed to February -- do we have any day

24   available?

25             *(Discussion held off the record)*

1          THE COURT:  I take it for airline

2     schedules for both plaintiff's counsel and defendants'

3     counsel from the East Coast, the 11th would be a

4     better day than the 12th?

5          MS. MOLL:  It doesn't matter to us, Your

6     Honor.

7          THE COURT:  All right.

8          MR. JORGENSEN:  Yes, sir.

9          THE COURT:  All right.  Let's do it

10    February 11th and we'll plan to use that day.

11        All right.  Anything further?  Ms. Moll.

12         MS. MOLL:  Very quickly.  You mentioned

13    that you would be referencing the transcript pages

14    that we cited in our submission of last night at

15    docket No. 2854.

16         THE COURT:  Yes.

17         MS. MOLL:  I have a copy already

18    printed.  To save at least part of a tree, I thought

19    I'd pass it up.

20         THE COURT:  Oh, thank you very much.  Is

21    there anything further?

22         MS. HILL:  Your Honor, if I may,

23    Mr. Overton reminded me I need to clarify the record

24    with respect to our discussion yesterday.  So I am

25    formally moving to admit Defendants' Exhibit 1191-C,

1    which is our informal transcription of the video clip

2    that was shown to Dr. Olsen that we discussed on the

3    cattle and the riparian area, so for the record you

4    can deny my motion to admit Defendants' Exhibit

5    1191-C.  So I hereby move for the admission of 1191-C.

6                    THE COURT:  All right.  Frankly, it's

7    out of mind.  But any objection?

8                    MR. BULLOCK:  No objection to the

9    denial, Judge.

10                    THE COURT:  Very well.

11              *(Discussion held off the record)*

12                    THE COURT:  All right.  Based upon

13    Mr. Overton's representation to me that basically all

14    we're doing is clarifying the denial that was made on

15    the record yesterday, the Cargill's motion to admit

16    Defendants' Joint Exhibit 1191-C is denied.

17                    MS. HILL:  Thank you, Your Honor.

18                    THE COURT:  Anything further?

19                    MR. BULLOCK:  No, sir.

20                    THE COURT:  We're adjourned.

21              *(The proceedings were recessed)*

22

23

24

25

1                          C E R T I F I C A T E

2

3

4              I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11             I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16             In witness whereof, I have hereunto set my

17   hand this 14th day of January 2010.

18
                         s/ Brian P. Neil
19                   _____
                         Brian P. Neil, CSR-RPR, CRR, RMR
20                       United States Court Reporter

21

22

23

24

25