IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel,      )
W.A. DREW EDMONDSON, in his     )
capacity as ATTORNEY GENERAL    )
OF THE STATE OF OKLAHOMA,       )
et al.                          )
                                )
            Plaintiffs,         )
                                )
vs.                             )    No. 05-CV-329-GKF-PJC
                                )
TYSON FOODS, INC., et al.,      )
                                )
            Defendants.         )

VOLUME 95 – PM

TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS

JANUARY 13, 2010

BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE

*REPORTED BY:*          *BRIAN P. NEIL, CSR-RPR, RMR, CRR*
                    *United States Court Reporter*

1                        A P P E A R A N C E S

2

3   For the Plaintiffs:         MR. W.A. DREW EDMONDSON
                                MS. KELLY FOSTER
4                               Office of Attorney General
                                State of Oklahoma
5                               313 N.E. 21st St.
                                Oklahoma City, OK  73105
6

7                               MR. DAVID RIGGS
                                MR. DAVID P. PAGE
8                               MR. RICHARD T. GARREN
                                Riggs Abney Neal
9                               Turpen Orbison & Lewis
                                502 W. 6th Street
10                              Tulsa, OK 74119

11
                                MR. ROBERT A. NANCE
12                              MS. KELLY FOSTER
                                Riggs Abney Neal
13                              Turen Orbison & Lewis
                                5801 Broadway
14                              Oklahoma City, OK 73118

15
                                MR. LOUIS W. BULLOCK
16                              MR. ROBERT BLAKEMORE
                                Bullock Bullock &
17                              Blakemore
                                110 W. 7th St.
18                              Suite 770
                                Tulsa, OK 74119
19

20                              MR. FREDERICK C. BAKER
                                MS. ELIZABETH CLAIRE XIDIS
21                              MS. INGRID L. MOLL
                                Motley Rice LLC
22                              28 Bridgeside
                                P.O. Box 1792
23                              Mount Pleasant, SC 29465

24

25

**United States District Court**

```
 1                A P P E A R A N C E S  (Cont.)

 2

      For Tyson Foods:              MR. ROBERT W. GEORGE
 3                                  Tyson Foods, Inc.
                                    2210 West Oaklawn Drive
 4                                  Springdale, AR 72701

 5
                                    MR. FRANK R. VOLPE
 6                                  MR. MARK D. HOPSON
                                    MR. THOMAS C. GREEN
 7                                  MR. JAY THOMAS JORGENSEN
                                    MR. GORDON D. TODD
 8                                  ERIC J. IVES
                                    CARA R. VIGLUCCI LOPEZ
 9                                  Sidley Austin LLP
                                    1501 K St. NW
10                                  Washington, DC 20005

11
                                    MR. PATRICK MICHAEL RYAN
12                                  Ryan Whaley Coldiron and
                                    Shandy PC
13                                  119 N. Robinson, Rm 900
                                    Oklahoma City, OK 73102
14

15
      For Cargill:                  MR. JOHN H. TUCKER
16                                  MS. THERESA HILL
                                    Rhodes Hieronymus Jones
17                                  Tucker & Gable
                                    100 W. 5th St., Ste 400
18                                  Tulsa, OK 74103

19                                  MR. DELMAR R. EHRICH
                                    MS. KRISANN KLEIBACKER LEE
20                                  Faerge & Benson
                                    90 S. 7th St., Ste 2200
21                                  Minnaepolis, MN 55402

22

23    For Simmons Foods:            MR. JOHN R. ELROD
                                    MS. VICKI BRONSON
24                                  Conner & Winters
                                    211 E. Dickson St.
25                                  Fayetteville, AR 72701
```

**United States District Court**

*11100*

```
 1              A P P E A R A N C E S  (Cont.)

 2

 3   For Peterson Farms:          MR. A. SCOTT MCDANIEL
                                  MR. PHILIP HIXON
                                  MS. NICOLE LONGWELL
 4                                McDaniel Hixon Longwell &
                                  Acord PLLC
 5                                320 S. Boston, Ste 700
                                  Tulsa, OK 74103
 6

 7

 8   For George's:               MR. GARY V. WEEKS
                                  MR. WOODY BASSETT
                                  MR. VINCENT O. CHADICK
 9                                MS. K.C. TUCKER
                                  Bassett Law Firm
10                                P.O. Box 3618
                                  Fayetteville, AR 72702
11

12

13   For Cal-Maine:              MR. ROBERT SANDERS
                                  Young Williams P.A.
                                  P.O. Box 23059
14                                Jackson, MS 39225

15

                                 MR. ROBERT P. REDEMANN
16                                Perrine McGivern Redemann
                                  Reid Berry & Taylor PLLC
17                                P.O. Box 1710
                                  Tulsa, OK 74101
18

19

20

21

22

23

24

25
```

**United States District Court**

1                            I N D E X

2

3                                                    Page

4

5    *WITNESSES ON BEHALF OF THE DEFENDANTS*

6

7    **MICHAEL MCGUIRE, PH.D.**

8    Continued Cross-Examination by Ms. Xidis        11102
     Redirect Examination by Mr. Jorgensen           11109

9

10   **HERMAN J. GIBB, PH.D.**

11   Direct Examination by Mr. Green                 11115
     Cross-Examination by Mr. Bullock                11154

12

13

14

15

16

17

18

19

20

21

22

23

24

25   _____

**United States District Court**

1     Wednesday, January 13, 2010

2        * * * * *

3     THE COURT:  Ms. Xidis.

4     MS. XIDIS:  Thank you, Your Honor.

5     **CONTINUED CROSS-EXAMINATION**

6 **BY MS. XIDIS:**

7  Q.  Okay.  Doctor, before our lunch break, we

8 were talking about the comparison of some ICR data to

9 data from the IRW.

10    And, Doctor, in your comparison of the IRW

11 and ICR/TOC data, you did not do any analysis to

12 determine whether the levels of TOC in the IRW were

13 similar to those in other areas in the U.S. with

14 concentrated poultry production, did you?

15  A.  No, I did not.

16  Q.  Okay.  And in your comparison of DBP levels

17 in IRW utilities with other Oklahoma utilities, you

18 also did not do any analysis to determine whether

19 poultry waste is applied in any other watersheds in

20 Oklahoma, have you?

21  A.  No.

22  Q.  Okay.  And, in fact, you don't know whether

23 poultry waste is, in fact, applied in any of the other

24 watersheds in Oklahoma; is that correct?

25  A.  No.

1    Q.   Okay.  If you could please get out the folder

2    that we -- that is labeled SOK5212.  This is one of

3    the exhibits you discussed with Mr. Jorgensen.

4    A.   I'm afraid I've scrambled things up.  Which

5    one is it, please?

6    Q.   It's T-1 from Dr. Teaf's report.

7    A.   Oh, yes.  I have it.

8    Q.   Okay.  Doctor, I'd like you to take a careful

9    look at this table, and it doesn't say the word

10    "violation" anywhere on it, does it?

11    A.   I don't see "violation" on the table.

12    Q.   Okay.  And on the third line of the title, it

13    says the word "exceedances"; is that correct?

14    A.   Correct.

15    Q.   Okay.  And you were here for Dr. Teaf's

16    testimony?

17    A.   Yes.

18    Q.   Okay.  And during Dr. Teaf's testimony,

19    didn't he explain the difference between exceedances

20    and violations of the MCL for DBPs?

21    A.   He explained that in his testimony, but in

22    his expert report it was clear that he was trying to

23    essentially say that an exceedance was a violation.

24    Q.   Okay.  But do you agree with me in his

25    testimony in this court that he made a clear

1    differentiation between exceedances and violations?

2         A.   I think based on the sum total of his

3    testimony, that's what he understands now, yes, and

4    that's what he told the court.

5         Q.   Okay.  Thank you.  If you could now please

6    look for table T-3, which was in a folder labeled

7    SOK5214.

8         A.   What does that look like, please?  Sorry.

9         Q.   That's all right.  Can you see, it's got

10   the --

11        A.   Right.  Got it.

12        Q.   Okay.  Doctor, you agree that

13   trihalomethane-forming potential is a useful tool for

14   water-treatment plants in assessing the condition of

15   their water supplies; correct?

16        A.   If it's applied properly, yes.

17        Q.   Okay.  And given the condition of the water

18   supply in the IRW and the manner in which these

19   utilities are treating their water, there is a

20   potential for THMs to be formed; correct?

21        A.   For some THMs to be formed?

22        Q.   Yes.

23        A.   Yes.

24        Q.   And, in fact, at least some of these 18

25   utilities you've looked at THMs are, in fact, being

1    formed; correct?

2         A.    THMs are formed, yes.

3         Q.    And in your opinion as a water-treatment

4    professional, that is not a good thing; right?

5         A.    That has -- I've never said that.

6         Q.    That THMs are being formed, that's a good

7    thing, in your opinion?

8         A.    Trihalomethanes are formed as a direct result

9    of disinfecting the water so that we do not have

10   outbreaks of typhoid and cholera.  It is an

11   unavoidable consequence of the addition of

12   disinfectant.  And so therefore, it is something that

13   we have had to live with both as a -- as environmental

14   engineers as a society.  That was the whole reason for

15   the stage I and the stage II DBP rules to balance the

16   risks associated with microbial contamination with the

17   risks associated with chemical disinfection

18   byproducts.

19        Q.    Okay.  But I believe you testified earlier

20   that you thought that nine to ten percent of

21   violations in those -- I'm sorry -- nine to ten

22   percent of samples being violations of the MCL was not

23   acceptable to you; is that correct?

24        A.    That's correct.  I said I always strive for a

25   hundred percent compliance.

1    Q.   Okay.  Thank you, Doctor.  Let's turn our

2    attention to cyanotoxins.

3         Doctor, it is not your opinion that all

4    cyanotoxins produced by all cyanobacteria are always,

5    in fact, removed in conventional water treatment;

6    correct?

7    A.   That's correct.

8    Q.   Okay.  It would depend on plant design?

9    A.   It would depend upon a lot of things,

10   including the type of oxidant that's being used,

11   whether, you know, activated carbon was being used,

12   and on the particular cyanotoxin itself.

13   Q.   Okay.  And, Doctor, you don't know whether

14   the water utilities in the IRW have, in fact, been

15   designed in a manner that would remove all the

16   cyanotoxins produced in the blue-green algae in Lake

17   Tenkiller; correct?

18   A.   All I know is that there are two positive

19   samples from microcystin-LR.  There's been no evidence

20   presented on any other cyanotoxin.  So I have believe

21   that unless I'm presented with data, that those other

22   cyanotoxins do not exist, and so therefore, they do

23   not have to remove them.

24        MS. XIDIS:  Okay.  I move to strike that

25   as nonresponsive.

```
 1                    THE COURT:  Any response?

 2                    MR. JORGENSEN:  It was directly

 3   responsive.

 4                    THE COURT:  I don't believe so.  The

 5   answer is stricken.  The question was, you don't know

 6   whether the water utilities in the IRW have, in fact,

 7   been designed in a manner that would remove all of the

 8   cyanotoxins produced -- well, it says in the

 9   blue-green algae in --

10                    MS. XIDIS:  I think it's "by," I think,

11   Your Honor.

12                    THE COURT:  -- by the blue-green algae

13   in Lake Tenkiller, Doctor.  Well, it's the same

14   question.

15        Go ahead.

16     A.   I'm sorry.  I'm having trouble --

17     Q.   (BY MR. XIDIS)  I'd be happy to repeat the

18   question.

19        You don't know whether the water utilities in

20   the IRW have, in fact, been designed in a manner that

21   would remove all the cyanotoxins produced by

22   blue-green algae in Lake Tenkiller; correct?

23     A.   Could I ask a clarifying question?

24     Q.   Just try TO answer the best you can.  I think

25   it's a yes or no question, sir.
```

1      A.   I don't know.

2      Q.   Okay.  And, Doctor, someone other than

3  yourself actually drafted some of the cyanotoxin

4  portion of your report; isn't that correct?

5      A.   Yes.  I work with two staff members under my

6  direct supervision.

7      Q.   Okay.  And your opinions in this case are

8  limited to cyanotoxins in drinking water, correct, and

9  not to recreational uses?

10      A.   That's correct.

11           MS. XIDIS:  Okay.  No further questions

12  for the witness, Your Honor.

13           But I do have one housekeeping matter, which

14  was Exhibit 5202, which I believe Mr. Jorgensen

15  represented was admitted in the record.  And we've

16  checked our lists and don't show it as admitted but

17  we're happy to have it admitted and have no objection

18  to doing so.

19           THE COURT:  All right.

20           MR. JORGENSEN:  I believe my records

21  show that it is, but let's just clarify that by, we

22  move to admit it.

23           THE COURT:  That's easily done.  5202 is

24  admitted without objection, if it has not been

25  already.

1          All right.  Mr. Jorgensen.

2              MR. JORGENSEN:  Yes, Your Honor.

3                  **REDIRECT EXAMINATION**

4    **BY MR. JORGENSEN:**

5      Q.   Dr. McGuire, let's start where Ms. Xidis left

6    off.

7          Did you testify that you had seen the data

8    that the state has gathered about what cyanotoxins

9    were detected in Lake Tenkiller?

10     A.   I have seen the data, yes.

11     Q.   Okay.  And what was detected?

12     A.   Two positive samples for microcystin-LR.

13     Q.   Is that what is known about the presence of

14   cyanotoxins in the water?

15     A.   Yes.

16     Q.   And did you not -- well, I won't ask it that

17   way.

18         Did you familiarize yourself with the

19   treatment processes at the plants in the Illinois

20   River Watershed?

21     A.   Yes.

22     Q.   And are the treatment procedures that are

23   used at the plants in the Illinois River Watershed

24   sufficient to remove the cyanotoxins that you just

25   talked about, those that are known to exist?

1      A.   Yes, they are.

2      Q.   All right.  Let's talk for a minute about the

3  information collection rule -- sorry, we did all these

4  with the previous court reporter -- the information

5  collection rule.

6           I believe you were asked some questions about

7  whether you removed some data from the TOC values

8  reported by the 18 facilities.  Do you recall those

9  questions?

10     A.   Yes.

11     Q.   To what extent was your removal of those data

12  points part of a standard statistical technique to

13  exclude outliers?

14     A.   That's what a -- anybody who's analyzing data

15  has to do.  There are -- we call outliers, but in this

16  particular case it's clear to me that they're

17  mistakes.  They are some kind of analytical mistake or

18  transcription mistake.

19           So therefore, I felt fully justified, based

20  upon all of my years of experience, of excluding those

21  TOC data that didn't make any sense.  Some of them

22  were 30 and 40 milligrams per liter and there was no

23  data to support that those levels have ever been found

24  in the IRW.

25     Q.   And did you testify that they tended to be

```
 1   grouped in a particular way or from a particular

 2   location?

 3        A.   Yes.

 4        Q.   And will you remind me what that testimony

 5   was?

 6        A.   They seemed to be in the LRED water utility

 7   data sets.

 8        Q.   Can I ask you -- and I realize you've got a

 9   stack of paper up there -- to dig out Defendants'

10   Joint Exhibit 6057, which is one that Ms. Xidis gave

11   you?

12             MR. JORGENSEN:   And, Your Honor, may I

13   approach to show him what it looks like?

14             THE COURT:   You may.

15             MR. JORGENSEN:   Yeah, it's that one.

16        Q.   (BY MR. JORGENSEN)  Doctor, based on your 35

17   years of experience looking at total organic carbon

18   values around the country, are these values for the

19   IRW particularly high?  Particularly low?  How do they

20   strike you?

21        A.   They strike me as particularly low.  They're

22   certainly lower than the average we've seen around the

23   country.

24        Q.   Okay.  Let me switch gears and ask you -- I

25   believe you were asked some questions about the
```

United States District Court

1    information collection rule and whether that presented

2    you with a very large set of data samples.

3          Do you recall those questions as to total

4    organic carbon and what was the size of the

5    information collection rule?  Do you recall those

6    questions from Ms. Xidis?

7          A.   I do.

8          Q.   Is the fact that the information collection

9    rule data gathered by EPA is large and robust does

10   that make your comparison more reliable or less

11   reliable?

12         A.   Anyone doing data analysis, as in this case,

13   always wants more data.  And so these large data sets

14   are ideal for making these comparisons.

15         Q.   All right.  If I can turn your attention now,

16   Dr. McGuire, to another exhibit that Ms. Xidis handed

17   you.  This is Defendants' Joint Exhibit 6042.  I see

18   that you have it.  I want to clarify because I think

19   that there are some things said in the record that may

20   not be right.

21         Did you do a study as to whether any of these

22   are actual sources of phosphorus to the waters of the

23   Illinois River Watershed or are you just listing them

24   as potential sources?

25         A.   I just listed them as potential sources.

**United States District Court**

1    Q.  Are you testifying today that any of these

2    sources follow the fate and transport mechanisms that

3    would be necessary to get phosphorus to the water?

4    A.  I'm not testifying to that.

5    Q.  Okay.  I just wanted to clarify that.

6         Let me turn your attention to another exhibit

7    that Ms. Xidis handed you.  I believe this is 6061.

8    Do you have that one?

9              MR. JORGENSEN:  May I approach, Your

10   Honor?

11             THE COURT:  You may.

12             MR. JORGENSEN:  Yeah, that's it.

13   Q.  *(BY MR. JORGENSEN)*  Doctor, this is a

14   chart -- your chart of the 18 drinking water utilities

15   in the IRW, and I just want the record to be very

16   clear.

17        Of the six that have had issues, six of the

18   eighteen, had any of them already fixed their

19   problems?

20   A.  Yes.

21   Q.  How many?

22   A.  Three.

23   Q.  Of the three that continue to have problems,

24   is it an issue of poor water quality coming into their

25   intakes or an issue of them moving their point of

1   chlorination?

2           MS. XIDIS:  Objection, Your Honor.  This

3   has been asked and answered.

4           THE COURT:  Sustained.  It's clear.  I

5   think he's clearly answered that.

6           MR. JORGENSEN:  That's all I wanted,

7   Your Honor, was for it to be clear.  So with that, I'm

8   done.  Thank you.

9           THE COURT:  Very well.  Recross?

10          MS. XIDIS:  No further questions, Your

11  Honor.

12          THE COURT:  Very well.  You may step

13  down.

14        The defendants may call their next witness.

15          MR. GREEN:  Your Honor, it gives me

16  pleasure to call the very last witness on behalf of

17  the defendants in this case, Dr. Herman Gibb.

18              **HERMAN J. GIBB, PH.D.,**

19  *after having been first duly sworn, says in reply to*

20  *the questions propounded as follows, to-wit:*

21          THE COURT:  State your full name for the

22  record, please.

23          THE WITNESS:  Herman Jones Gibb.

24          THE COURT:  Mr. Green, you may

25  inquire.

1           MR. GREEN:  Thank you, Your Honor.

2                    **DIRECT EXAMINATION**

3   **BY MR. GREEN:**

4       Q.   Dr. Gibb, will you tell us how you are

5   currently employed, sir?

6       A.   I'm the president of Tetra Tech Sciences,

7   which is an operating unit of the Tetra Tech

8   Corporation.

9       Q.   And is that a consulting company?

10      A.   It's a consulting company, yes.

11      Q.   And what kind of consulting does it do,

12  sir?

13      A.   We do health-risk assessment consulting.

14      Q.   I'd like now to turn to your education for a

15  moment.  Can you tell us about that?

16      A.   Yes.  I have a Bachelor of Science degree

17  from Pennsylvania State University, I have a master of

18  public health and environmental health from the

19  University of Pittsburgh, and I have a Ph.D. in

20  epidemiology from Johns Hopkins University.

21      Q.   And, sir, did you have any military

22  experience while you were earning your Ph.D.

23      A.   Yes, sir.  I was commander of my detachment,

24  my Army Reserve detachment, while I was working on my

25  Ph.D. at Johns Hopkins.

 1     Q.   And did that entail any active duty,

 2  Dr. Gibb?

 3     A.   I was on active duty for three years, two

 4  years after my commission through ROTC, and then my

 5  reserve unit was mobilized for the Gulf War.

 6     Q.   And how many months on active duty did you

 7  spend in connection with that war, sir?

 8     A.   Nine months.

 9     Q.   Now, Dr. Gibb, are you currently retired from

10  the Reserves?

11     A.   Yes.  I retired as lieutenant colonel.

12     Q.   Are you associated with any university?

13     A.   Yes.  I'm on the faculty at George Washington

14  University in the School of Public Health.

15     Q.   And did you have a career at the EPA, sir,

16  before your present job?

17     A.   Yes, I did.

18     Q.   And when did you start at the Environmental

19  Protection Agency?

20     A.   1974.

21     Q.   And for how long were you at that agency,

22  sir?

23     A.   A little bit over 29 years.

24     Q.   So that would take us to what?

25     A.   About 2004, early 2004, when I left.

1    Q.   Okay.  I'd like to ask you to spend some time

2    and take us through your assignments and where you

3    worked within the EPA, if you would, sir.

4    A.   Most of my time was spent at the National

5    Center for Environmental Assessment, which is part of

6    the Office of Research and Development at EPA.

7    Q.   Okay.  Why don't you just slow down just

8    a -- just a little bit, if you will, please.

9    A.   Okay.

10    Q.   You mentioned the National Center for

11    Environmental Assessment.  What is the work of that

12    center, Dr. Gibb?

13    A.   Well, the center develops the risk assessment

14    methodology for the agency and they do some of the

15    high-profile risk assessments -- or they do the

16    high-profile risk assessments.

17    Q.   Now, when you say that the agency develops,

18    and you helped to develop, the health-risk assessment

19    methodology for the EPA, can you help us to understand

20    what that means?

21    A.   Right.  Well, the center develops guidelines

22    in how to do risk assessment.  So, for example, they

23    do exposure assessment methodology, they do

24    developmental toxicity methodology on how to assess a

25    carcinogen.  I was particularly involved with the

1    carcinogen risk assessment methodology.

2        Q.   Let's go beyond that for just a moment and

3    ask you what were some of the positions which you held

4    at the National Center for Environmental Assessment?

5        A.   Well, I started as a staff epidemiologist and

6    I was a branch chief.  I became the assistant center

7    director.  I was the associate director for health.

8        Q.   And is that the position that you had when

9    you left the EPA, Doctor?

10       A.   Pretty much.  For a couple of months

11   before -- a few months before I left I was the science

12   advisor to the director.

13       Q.   To the director of the agency?

14       A.   To the director of the National Center for

15   Environmental Assessment.

16       Q.   Okay, sir.  Now, did you have any involvement

17   in establishing water quality standards while at the

18   Environmental Protection Agency?

19       A.   Yes.  I worked particularly on the arsenic

20   standard, but I also was involved with the office of

21   water and some of the other drinking water standards.

22       Q.   Doctor, what was the result of the work that

23   you did with regard to the water quality standards

24   that relate to arsenic?

25       A.   The drinking water maximum contaminant limit

1    was lowered by fivefold as part of that work.

2        Q.   Part of the work that you did?

3        A.   Part of the work that I did.

4        Q.   Okay.  Have you, sir, received any awards

5    while you were working for the Environmental

6    Protection Agency?

7        A.   Yes, sir.  I received the Gold Medal from the

8    agency on the work that I did on arsenic.  I received

9    the agency Scientific and Technical Achievement Award

10   for my epidemiology study of chromate production

11   workers.  I received an award for international

12   environmental protection.  And -- I mean, I received a

13   number of other awards.  Just too many to describe

14   here.

15       Q.   Okay.  We won't take the time to do that.

16            Let me switch directions just a bit and ask

17   you whether you were involved in the aftermath of the

18   tragedy at the World Trade Center in this country?

19       A.   Yes.  I directed the assessment of the

20   ambient pollution that resulted from the center.  We

21   had a number of air monitors set up around the center,

22   and we had hundreds of thousands of data points which

23   we analyzed.

24       Q.   And were you analyzing them to assess their

25   health impact on the local population?

1        A.   Yes, we were.

2        Q.   Doctor, did you publish a report based on

3   your work?

4        A.   Yes, we did.

5        Q.   And did you reach any conclusions in that

6   report?

7        A.   We concluded that there wasn't -- there

8   wouldn't have been a health risk and there wasn't

9   sufficient exposure to have caused the problem.

10        Q.   To cause adverse health --

11        A.   To cause adverse health effects, correct.

12        Q.   All right.  Are you involved, or have you

13   been involved, with the World Health Organization in

14   any manner throughout your career?

15        A.   Yes.  I've worked with World Health

16   Organization for over twenty years.  I currently chair

17   a task force of the World Health Organization.  I'm

18   looking at the burden of disease from chemicals in

19   food.  I recently prepared a report on air pollution

20   for the World Health Organization.

21        Q.   Have you, sir, served on any White House

22   interagency committees?

23        A.   Yes.  I served on two White House interagency

24   committees on risk assessment and served on an

25   interagency -- a White House interagency committee on

1   mercury in the Gulf of Mexico.

2       Q.   And I presume you have but let me ask you:

3   Have you authored any publications?

4       A.   Yes.   I've authored a number of journal

5   articles and book chapters and they are included in my

6   CV.

7       Q.   Perhaps I should start by asking you to tell

8   us, or for that matter, remind us what epidemiology

9   is, sir.

10      A.   Epidemiology is the study of disease and risk

11  factors for disease.

12      Q.   And when we talk of risk assessment, what are

13  we meaning?  What is risk assessment?

14      A.   Risk assessment is taking the epidemiology

15  information, toxicology information, ancillary data,

16  and then evaluating what the risk would be to a

17  population.

18      Q.   And have you done that kind of work or that

19  kind of risk assessment during your career?

20      A.   Absolutely.  This is what I did for about

21  thirty years at the Environmental Protection Agency

22  and in the time since I've left the agency.

23      Q.   Okay.  Is it possible to give us just a

24  couple of specific examples of what you've done in

25  that regard?

1        A.    Well, for example, I did the risk assessment

2   on arsenic which I described.  I did a risk assessment

3   on chromium which then led to the epidemiology study

4   which I did.  I've done a number of chemical

5   assessments.  I mean, just too many to describe here

6   but --

7        Q.    You mentioned sodium dichromate, did you?  Is

8   there a reference to that?

9        A.    Yes.

10       Q.    Okay.  And tell us a little bit about that

11  study.  Did it lead to any changes in any regulation,

12  Doctor?

13       A.    Yes.  That study became the basis of the OSHA

14  permissible exposure limit, the current permissible

15  exposure limit, which lowered the permissible exposure

16  limit by tenfold -- by more than tenfold actually.

17       Q.    Now, with regard to that undertaking, were

18  you asked to testify before the United States Senate?

19       A.    Yes.  I was asked to testify before the

20  Senate in August of 2009 and then in October of 2009.

21  It's related to sodium dichromate exposure to which

22  soldiers have been exposed to in Iraq.  Subsequently,

23  I was interviewed by NBC Nightly News shortly after

24  the Senate testimony.

25       Q.    All right.  Doctor, are you still involved

1   with the Environmental Protection Agency in any way?

2        A.   Yes.  Last week I chaired a peer review of

3   one of their chemical assessment documents.  I

4   currently -- I recently authored a paper with people

5   from the Environmental Protection Agency that we are

6   submitting to a journal.  I regularly do peer reviews

7   of assessments that the agency has done.  Currently,

8   I'm evaluating scholarship -- or fellowship

9   applications to the agency.

10       Q.   Let me bring us more in focus here with

11  respect to the matter at hand and let me ask you, sir:

12  What have you been asked to do in connection with this

13  case, Doctor?

14       A.   I was asked to evaluate the plaintiff's

15  opinions with regard to disinfection byproducts and

16  cyanobacteria.

17       Q.   Insofar as they relate to the --

18       A.   As far as they relate to the Illinois River

19  Watershed and any health effects that these substances

20  may be causing.

21       Q.   Okay.  Now, in respect to doing that, Doctor,

22  have you reviewed any of the written opinions which

23  were submitted by one or more of the plaintiff's

24  experts?

25       A.   Yes.  I reviewed the opinions of Dr. Teaf and

*11124*

 1    Dr. Cooke.

 2        Q.   Okay.  And with respect to trial testimony,

 3    did you review either Dr. Cooke's or Dr. Teaf's trial

 4    testimony?

 5        A.   I was here for Dr. Teaf's testimony and I

 6    reviewed in more summary fashion Dr. Cooke's

 7    testimony.

 8        Q.   Let me then direct your attention to the

 9    subject of disinfection byproducts, if I may.  I'm not

10    going to go through with you how disinfection

11    byproducts are created because that's been amply

12    testified to by others during the course of this

13    trial.

14            But since you were here for Dr. Teaf's

15    testimony, can you tell us which disinfection

16    byproducts he testified about, Doctor?

17        A.   He discussed total trihalomethanes and the

18    haloacetic acids.

19            MR. GREEN:  Okay.  I'll be brief here.

20    Some of this, Your Honor, was testified to some extent

21    by Dr. McGuire, but for context I think we can move

22    through it really quickly.

23        Q.   *(BY MR. GREEN)*  Dr. Gibb, can you confirm for

24    me that the EPA has established regulatory limits for

25    trihalomethanes and haloacetic acids?

1      A.   Yes, they have.

2      Q.   And those limits, sir, where can they be

3  found?

4      A.   It's in the stage I disinfection byproducts

5  rule.

6      Q.   And that rule went into effect?

7      A.   In 1998.

8      Q.   And, Doctor, quickly those limits are for try

9  trihalomethanes and haloacetic acids?

10     A.   Eighty micrograms per liter for

11  trihalomethanes and 60 micrograms for haloacetic

12  acids.

13     Q.   All right, sir.  If you have -- if you'll

14  reach to your folder there and pull out an exhibit

15  that we've already seen here this morning, State of

16  Oklahoma 5212.

17          Do you recall this exhibit being used by

18  Dr. Teaf when he testified and actually by Doctor --

19  were you here this morning to listen to Dr. McGuire's

20  testimony as well?

21     A.   Yes.  Yes, I was.

22     Q.   All right.  So then you'll recall that

23  reference was made to it during Dr. McGuire's

24  testimony as well, sir.

25          Now, what do you understand that this exhibit

11126

1    purports to show?

2        A.   Well, it purports to show that there are what

3    Dr. Teaf termed exceedances of different values.

4    Dr. Teaf was sort of -- has a sort of potpourri of

5    criteria here which he has claimed to have been

6    exceeded, and therefore -- I mean, he drew from that

7    conclusion that there were problems with disinfection

8    byproducts.

9        Q.   Okay.  And did you under him to testify that

10   these are all single sample concentrations?

11       A.   These are all single sample concentrations,

12   correct.

13       Q.   Do you agree with Dr. McGuire's conclusion

14   here given earlier today that none of these

15   numbers -- none of these concentration values on

16   Exhibit 5212 represent regulatory violations of the

17   EPA's stage I rule?

18            MR. BULLOCK:  Judge, I'm going to object

19   to this being cumulative when one witness is asked to

20   agree with the immediately --

21            MR. GREEN:  I'll rephrase the

22   question.

23       Q.   *(BY MR. GREEN)*  Do any of these numbers, any

24   of these values, any of these concentrations reflected

25   on Exhibit 5212, do they constitute violations of the

11127

 1   EPA's maximum contaminant levels set forth in the

 2   stage I disinfection byproduct rule?

 3              MR. BULLOCK:  Continues to be

 4   cumulative.

 5              THE COURT:  Overruled.  Go ahead.

 6       A.   No.

 7       Q.   *(BY MR. GREEN)*  Now, Doctor, I'm going to

 8   just change direction here a little bit but use this

 9   chart.  I want you to look at the chloroform column,

10   if you will.  And under the chloroform column,

11   Dr. Teaf has included something called a risk-based

12   level.  Do you see that?

13       A.   Yes.

14       Q.   And there's an asterisk there after

15   "risk-based."  If we follow that asterisk down to the

16   bottom of the page, the notation says, "U.S. EPA

17   Region 6 health-based screening level."

18            Do you see that, sir?

19       A.   Yes.

20       Q.   What do you understand that to refer to?

21       A.   Well, it's a screening level that EPA Region

22   6 developed for industrial waste sites.  But it is as

23   its name implies, it is a screening value and it's

24   used to set priorities and focus risk assessment

25   efforts.  But it's not -- it does not -- I mean, if

1    you're -- if -- if a concentration is in excess of

2    that, it doesn't mean that there's a violation of

3    anything.

4        Q.    Okay.   In its drinking water regulations,

5    does the Environmental Protection Agency regulate to

6    any screening level such as this?

7        A.    No.

8        Q.    All right.   Let's move a little bit to the

9    right and look at the columns under the constituents

10   dibromochloromethane and bromodichloromethane, Doctor.

11   They also have references to risk-based concentration

12   levels and I want to ask you this question.

13           Do these risk-based levels under what I'll

14   call the bromo columns, do they represent violations

15   of EPA's stage I disinfectant byproduct rule?

16       A.    No.

17       Q.    Where do these risk-based concentrations come

18   from that Dr. Teaf has used on this chart, Exhibit

19   5212?

20       A.    They come out of the stage II rule and they

21   are -- the concentration would be associated with a

22   theoretical one-in-a-million risk.

23       Q.    Go ahead.

24       A.    It's theoretically derived.   I mean, it's --

25       Q.    Okay.

1      A.   -- not observed.

2      Q.   In that stage II rule discussion where a

3  theoretical concentration associated with a

4  one-in-a-million cancer risk, were there other

5  concentrations discussed as well?

6      A.   Yes.  He could have used -- there was a 10 to

7  the minus 5th risk that was discussed in the

8  supporting documentation that went with the stage II

9  rule.  But Dr. Teaf chose to use the 10 to the minus

10  6th risk, which, of course, means that he's going to

11  find more of what he calls exceedances over the

12  number.

13      Q.   Okay.  Let's stay on this for just a second

14  longer.

15           Even with respect, Dr. Gibb, to the

16  assessment of a one-in-a-million cancer risk, is that

17  based on human or animal studies, sir?

18      A.   Based on animal studies.

19      Q.   And are the doses low?  Average?  High?  Can

20  you categorize that?

21      A.   Doses are very high.

22      Q.   How high are they, Doctor?

23      A.   Well, the dose that would have caused -- the

24  lowest dose, which would have caused tumors in the

25  animals, is at least 10,000 times greater than the

1    concentration that would be associated with a

2    one-in-a-million risk.

3        Q.   So let me see if I can kind of put that into

4    another frame of reference.

5            How much water would an individual have to

6    drink at the maximum contaminant level to be exposed

7    to the lowest dose which would cause cancer in

8    animals?

9        A.   Well, it depends on the disinfection

10   byproduct.  But you would have to drink -- and this is

11   at the -- at the MCL, which is the highest

12   limit -- highest concentration allowed -- again, it's

13   over -- it reflects a running average of quarterly

14   samples.  But you would have to drink about at least

15   300 gallons of water up to as much as 8,000 gallons of

16   water every day for the rest of your life.

17       Q.   So, sir, what does Dr. Teaf's single sample

18   analysis reflected in Oklahoma Exhibit 5212 tell you

19   about whether these water utilities, these 18 water

20   utilities that are listed on the left side of the

21   exhibit, were in violation of the maximum contaminant

22   levels set by the EPA for disinfection byproducts?

23       A.   Well, they're not saying anything about

24   whether they were in violation of the maximum

25   contaminant limit because they are single samples.

1      Q.   Okay.  And with respect to these percentages

2   that are set out on the bottom of the chart under the

3   respective columns, from your perspective, sir, and

4   the perspective of health to the human population, are

5   these percentages at all meaningful?

6      A.   No.  They're meaningless.

7      Q.   Doctor, let me ask you whether or not the

8   Oklahoma Department of Environmental Quality has

9   adopted the EPA's stage I rule with regard to maximum

10  contaminant levels in connection with its monitoring

11  of Oklahoma's water quality?

12     A.   Yes, they have.  In fact, they refer to it on

13  their Web site.

14     Q.   There have been some references -- in fact,

15  His Honor asked a question this morning -- concerning

16  the stage II disinfectant byproduct rule.  When does

17  that go into effect?

18     A.   2012.

19     Q.   And I'd like to just confirm that that does

20  not change, does it, the maximum contaminant levels

21  for trihalomethanes or haloacetic acids?

22     A.   No, it does not.

23     Q.   What, if anything, will change from the stage

24  I rule, Doctor, to the stage II rules?

25     A.   I think -- I mean, it's a fairly large

 1    document, but I think the most important change is

 2    there will be more intensive monitoring.

 3        Q.   All right.  In your packet there, you should

 4    have a demonstrative which has the number 256 on it.

 5    Do you see that, sir?

 6        A.   Yes, I do.

 7        Q.   This is a demonstrative that Dr. Teaf

 8    discussed during his testimony when he was here at

 9    this trial.

10            What did you understand to be the point of

11    this chart, Dr. Gibb?

12        A.   Well, Dr. Teaf was trying to demonstrate that

13    these are -- have carcinogenic potential in humans.

14        Q.   Let me go kind of to the bottom line here --

15    one of the bottom lines.

16            Have studies shown a definite connection

17    between disinfection byproducts and cancer in humans?

18        A.   No.

19        Q.   Can you help me to understand what these

20    studies have been based on?

21        A.   These studies -- I mean, these

22    classifications are all based on animal data.

23        Q.   And what about the level of doses?

24        A.   And the doses are very high, I mean, to which

25    the animals are exposed.

1     Q.    When you look at these initials -- do you see

2     that in the top line of --

3     A.    Yes.

4     Q.    -- or I guess the second line of this exhibit

5     IARC and NTP and EPA?  Do you have that in view

6     there?

7     A.    Yes.

8     Q.    Are all three of those organizations

9     regulatory agencies, Doctor?

10    A.    No.  The only one is the Environmental

11    Protection Agency, which is the far right-hand column.

12    Q.    Now, these descriptors that appear in the

13    yellow portion -- possible and reasonably anticipated

14    and probable -- do they all relate to a theoretical

15    risk?

16    A.    Well, what they are is they have taken the

17    animal evidence and concluded from that that there

18    could some potential for humans.

19    Q.    Are these classifications currently in use by

20    the Environmental Protection Agency?

21    A.    Actually, these are not.  Dr. Teaf has used

22    an old -- the old classifications which came out of

23    the 1986 guidelines.  The current guidelines were

24    published in 2005.  I actually was part of those

25    guidelines, in developing those guidelines.

1      But now they would say it's -- either human

2  carcinogen or likely -- I mean, the evidence is that

3  it's a human carcinogen.  The evidence is that it's

4  likely or suggestive or there's inadequate evidence to

5  evaluate or it's not likely to be a carcinogen.

6      Q.   Okay.  If you just focused on chloroform,

7  which is the first constituent listed under this

8  chart, what would be the significance of using the

9  most recent classification?

10      A.   Well, one thing is that the agency allowed

11  for in its current guidelines is that the mode of

12  action is taken into consideration.

13      What the agency says for chloroform is that

14  it is not likely to be a carcinogen if there

15  is -- unless -- unless there is cell cytotoxicity and

16  cell regeneration and that's what happens at the high

17  doses.  So the agency recognized that the exposures to

18  which the animals were exposed were so high they were

19  causing this effect.

20      You would not see those concentrations in a

21  drinking water supply.  I mean, they're far below what

22  the animals were exposed to to have caused the

23  cell -- the cellular cytotoxicity and the cell

24  regeneration.

25      Q.   Dr. Gibb, in the latest evaluation of cancer

11135

1    risks, which I think you said -- and with respect to

2    the change in classification that took place in 2005,

3    did the Environmental Protection Agency find any of

4    these constituents that are listed on this

5    demonstrative 256 to be causally associated with an

6    increased risk of cancer in humans?

7        A.   No.

8        Q.   Now, in this trial, there has been a mention

9    of possible risks to embryos associated with using

10   chlorine to treat drinking water.  If my memory serves

11   me right, I believe we heard Dr. Cooke refer to embryo

12   toxicity, if I'm right.  Let me just ask you this.

13            What is embryo toxicity?

14       A.   Embryo toxicity would be toxicity to the

15   embryo or it would be reproductive or developmental

16   toxicity.

17       Q.   Has the Environmental Protection Agency,

18   Dr. Gibb, determined that there is any causal

19   association between disinfection byproducts and embryo

20   toxicity?

21       A.   No.

22       Q.   Let me turn to one other exhibit that I think

23   Dr. Teaf addressed, if I may.  If you will go to

24   Oklahoma Exhibit 5213, which is in your packet.

25            Do you have that in front of you, sir?

**United States District Court**

 1        A.    Yes, I do.

 2        Q.    All right.  Do you recall that Dr. Teaf made

 3    reference to this Exhibit 5213 during his testimony?

 4        A.    Yes.

 5        Q.    And what did you understand Dr. Teaf's point

 6    to be in using this chart, Dr. Gibb?

 7        A.    Well, Dr. Teaf indicated at these three

 8    facilities -- Cherokee RD No. 2, Gore PWA, and

 9    Tahlequah -- that there were what he termed

10    exceedances, again a variety of different criteria

11    which he has selected, suggesting that there were a

12    number of, I presume, violations or issues with these

13    facilities.

14        Q.    And this is with respect to finished water,

15    right, treated water?

16        A.    With respect to finished water, correct.

17        Q.    When you look at this chart, Dr. Gibb, from

18    your perspective, what's wrong with the data on this

19    chart insofar as how Dr. Teaf attempted to use it?

20        A.    Well, again, it's -- I mean, these are single

21    samples.  I think that -- again, I mean, he's using

22    dibromochloromethane, you know, risk-based values that

23    are, you know, from animals for very high exposures

24    and trying to relate that.  And from that, he's basing

25    that there is a health risk.

1          I might point out that chloroform, the MCLG

2     cites as 70, and we move over -- which we had

3     discussed earlier about the .17 screening level.  It's

4     interesting that the MCLG is the concentration below

5     which the Office of Water, headquarters of EPA,

6     believes there is no known or expected health risk,

7     yet the screening level is 400 times below that.

8          So there's obviously -- you know, this is

9     just sort of a collection of criteria which he then

10    uses to find that there are concentrations above these

11    different criteria which he has selected.

12         Q.   Do these numbers have any significance from a

13    regulatory perspective with respect to the stage I

14    disinfectant byproduct rule?

15         A.   None at all.

16         Q.   Now, just quickly, Dr. McGuire this morning

17    indicated that he had determined that there were 25

18    actual disinfection byproduct violations using the

19    rolling annual average.

20         Do you recall that testimony?

21         A.   I think he said 24.

22         Q.   Twenty-four.  I'm sorry.  Yes, 24.

23         Having heard Dr. McGuire's testimony in that

24    respect and having reviewed and seen and listened to

25    Dr. Teaf's testimony, can you reconcile their

```
 1    respective findings about disinfection byproduct
 2    violations?
 3         A.   Well, you can reconcile them because
 4    Dr. McGuire looked at actual violations.  Dr. Teaf
 5    just found numbers and then took single samples and
 6    found them to be in excess of --
 7                   MR. BULLOCK:  Judge, I'm going to object
 8    to the testimony of this witness reflecting upon what
 9    Mr. McGuire said about what Mr. Teaf said -- Dr. Teaf
10    said.
11                   MR. GREEN:  Well, let me rephrase it.
12                   THE COURT:  Well, it's duplicative, is
13    it not?
14                   MR. GREEN:  Pardon?
15                   THE COURT:  It's duplicative, right, and
16    cumulative?
17                   MR. GREEN:  Well, this exhibit wasn't
18    used in any of the testimony this morning, to the
19    extent that I'm questioning him about 5213.  But what
20    I'm just trying to simply get him to confirm is that
21    there is no way to reconcile the testimony of Dr. Teaf
22    and with his exceedances any actual -- you know, any
23    actual count of regulatory violations.  I don't think
24    that's really duplicative but --
25                   THE COURT:  I think it's clear, you
```

United States District Court

 1    know, as Ms. Xidis pointed out, he used the term

 2    "exceedances," he didn't use the term "violations."

 3                    MR. GREEN:  Very well, sir.

 4                    THE COURT:  Sustained.

 5        Q.  *(BY MR. GREEN)*  Now, Doctor, did you

 6    investigate whether there were any actual regulatory

 7    exceedances of the stage I disinfection byproduct rule

 8    at any of the three utilities that are reflected on

 9    Oklahoma Exhibit 5213?

10        A.  Yes, I did.

11        Q.  And did you prepare a demonstrative to set

12    forth the findings that you reached?

13        A.  Yes, I did.

14        Q.  Okay.  If you would retrieve our

15    Demonstrative No. 318 there from your packet, Doctor.

16        A.  This is the --

17        Q.  Pardon?

18        A.  I don't think this is the correct

19    demonstrative.

20        Q.  Okay.

21        A.  This one correct -- this one's correct.

22        Q.  The one that's on the screen?

23        A.  Right.  This is correct.

24        Q.  Yes.

25                    THE COURT:  Can we take just a second to

1    get our real-time fixed?

2                    *(Short break)*

3             THE COURT:  Mr. Green, we're up and

4    running.

5             MR. GREEN:  Okay, sir.  Thank you.

6        Q.   *(BY MR. GREEN)*  So let me just back up a

7    click here, Doctor.

8             I asked you whether you had conducted your

9    own investigation to determine whether there were any

10   actual regulatory violations of the stage I

11   disinfectant byproduct rule at any of the three

12   utilities that are listed here on Exhibit 5213?

13       A.   Yes, I did.

14       Q.   All right.  And then did you prepare a

15   demonstrative to set forth the results of your

16   investigation?

17       A.   Yes.  I looked at the years 2004, 2005, 2006,

18   2007 for those three utilities, and this comes from

19   the OED office -- the Oklahoma Department of

20   Environmental Quality annual reports.  The only one

21   that had violations of the three was Gore PWA in 2005.

22       Q.   Okay.  And is that one violation?

23       A.   And that was one violation.

24       Q.   Now, Doctor, even if there is a regulatory

25   violation, such as the one at the Gore Public Water

1    Authority in 2005, does that mean that the water is

2    unsafe to drink?

3        A.   No.  It's not -- I mean, I don't even think

4    at two times the MCL that the water would be unsafe to

5    drink.  I mean, again, the risks that are estimated

6    come from very high doses in animals.  So we have no

7    experience -- we have no evidence to confirm that

8    these risks even occur in a human population.

9        Q.   Does the Illinois River Watershed have a high

10   number of violations as compared to other areas of the

11   state?  Did you investigate that?

12       A.   Yes.

13            MR. BULLOCK:  Objection to the relevance

14   of this inquiry.

15            MR. GREEN:  It has the same relevance

16   that Your Honor found acceptable in connection with

17   the prior interrogation.

18            THE COURT:  Overruled.

19       Q.   *(BY MR. GREEN)*  With respect to this issue,

20   did you make any investigation of actual regulatory

21   violations statewide?

22       A.   Yes, I did.

23       Q.   All right.  And did you create a map or an

24   exhibit to illustrate your analysis?

25       A.   Yes, I did.

**United States District Court**

 1      Q.   All right, sir.  If we could move to pulling

 2   from your packet Defendants' Joint Exhibit 3690.  Do

 3   you have that in front of you?

 4      A.   Yes, I do.

 5      Q.   Eighty-nine.  I'm sorry.  It's 89.

 6           Okay.  Doctor, was this map or exhibit

 7   included in your report?

 8      A.   Yes, it was.

 9      Q.   And where does the data come from?  How did

10   you create this, sir?

11      A.   This comes from the Oklahoma Department of

12   Environmental Quality's SDWIS database.

13           MR. BULLOCK:  Judge, could we wait until

14   it's at least offered before we begin publishing it?

15                THE COURT:  I agree.

16                MR. GREEN:  I didn't notice that it went

17   up, Your Honor.

18           Based on Dr. Gibb's last couple of answers,

19   Your Honor, I move the admission of Defendants' Joint

20   Exhibit 3689?

21                THE COURT:  Any objection?

22                MR. BULLOCK:  Just one more in a long

23   line of exhibits that have nothing to do with proving

24   the truth or falsity of any of the matters at issue in

25   this case.

1          THE COURT:  Well, as I say, we won't

2    look at this in a vacuum but it is relevant.  The

3    objection's overruled.  3689 is admitted.

4      Q.   *(BY MR. GREEN)*  Okay.  Doctor, looking at

5    this exhibit, how does this inform your analysis about

6    regulatory violations in the Illinois River Watershed

7    as compared to other portions of the state?

8      A.   Well, I mean, you can see the Illinois River

9    Watershed is depicted on the maps for 2004, 2005,

10   2006, 2007.  And I mean, it's -- I think it's obvious

11   that the -- there are no more DBP violations in the

12   Illinois River Watershed than there are in any other

13   place in Oklahoma.

14          You can see -- I mean, some of them are

15   fairly high, like the one down on the Texas border.  I

16   think that's Tillman County.  A fairly high proportion

17   in 2006 and 2007.  I think it's Nowata County that's

18   up in the Kansas border that had a fairly high, but

19   not in the Illinois River Watershed.  It's just not

20   been -- it did not appear to be anymore violations.

21   In fact, it looks like even less violations there than

22   any other place in the state.

23     Q.   All right, Doctor.  Finally, let me draw your

24   attention to one of Dr. Teaf's ultimate opinions which

25   he testified to.

```
 1              MR. GREEN:  And I'm quoting right from
 2   the transcript, if I may, Your Honor.
 3       Q.   (BY MR. GREEN)  And Dr. Teaf said this while
 4   on the witness stand.
 5              "The breadth, both in time and space, of the
 6   detected concentrations of DBPs that are found in the
 7   Illinois River Watershed water treatment plants, the
 8   magnitude of those concentrations and the significance
 9   of the substances renders this to be a significant
10   health issue."
11              Do you remember Dr. Teaf providing the court
12   with that opinion?
13       A.   Yes, I do.
14       Q.   Do you agree with Dr. Teaf's opinion, sir?
15       A.   No, I don't.
16       Q.   Why not?
17       A.   I think this is -- I think this statement is
18   a gross misrepresentation of the information that's
19   available.  Dr. Teaf has taken sort of a collection of
20   criteria and found single samples that exceed those
21   criteria.
22              For example, he had the inconsistency of
23   using an MCLG for chloroform and then a risk-based
24   value, which themselves putting them beside each other
25   wasn't even consistent.  Taking what he called
```

1    risk-based numbers, which are based on extrapolations

2    from doses in animals that are extremely high, we

3    would never be able to detect in the human population

4    those -- those risks.

5            And then, of course, if the idea -- although

6    he may have said "exceedances" -- used the term

7    "exceedances" as opposed to "violations."  But if the

8    idea was that total trihalomethanes and haloacetic

9    acids were somehow in violation, they weren't.  So I

10   think this is -- I mean, I think he's been

11   disingenuous in the way he's presented the data.

12       Q.   All right, Doctor.  Do you still have 5212 up

13   there near you?  Let me just take you back to that for

14   a moment.

15       A.   Yes, I do.

16       Q.   Now, on the left side of that exhibit are the

17   18 water utilities drawing water from the Illinois

18   River Watershed.  Do you acknowledge that?

19       A.   Yes.

20       Q.   Sir, have you seen any information or

21   developed any information that the State of Oklahoma

22   has ever stopped any of these water utilities from

23   providing finished water to its customers in the

24   Illinois River Watershed at any time in, let's say,

25   the last decade?

1          A.   No.

2          Q.   Let me take a few moments to talk to you

3    about cyanobacteria.

4               Did you discuss cyanobacteria in your expert

5    report?

6          A.   Yes, I did.

7          Q.   And tell us briefly what cyanobacteria are,

8    sir.

9          A.   Cyanobacteria are organisms that have some

10   properties of bacteria and some algae and they

11   photosynthesize.  So there's somewhat different but

12   they can also produce some toxin.

13         Q.   Are they a recent phenomenon?

14         A.   No, they're not.  I mean, they have been

15   studied for over a hundred years and, in fact, they

16   were noted in the 12th Century.  I mean, there are

17   reports in the literature of observations of them in

18   the 12th Century.  They're also commonly referred to

19   as blue-green algae.

20         Q.   And where is this algae, this cyanobacteria,

21   found?

22         A.   Where's it found?

23         Q.   Where's it found?  Is it found everywhere?

24         A.   Oh, it's found in -- it's found throughout

25   the world.  It's found in freshwater, in marine water,

 1    and brackish water.

 2        Q.   And found throughout the United States?

 3        A.   And found throughout the United States,

 4    yes.

 5        Q.   Okay.  Do all cyanobacteria produce toxins?

 6        A.   No, not all produce toxins.  About 60 percent

 7    produce toxins.

 8        Q.   And is there a most common toxin produced by

 9    cyanobacteria?

10        A.   Most common is microcystin-LR.

11        Q.   And has this toxin, microcystin, been

12    detected in waterbodies throughout the United States

13    well beyond the Illinois River Watershed?

14        A.   Yes, it has.

15        Q.   Did you, sir, in your report prepare any map

16    or demonstrative explaining that?

17        A.   Yes, I did.

18        Q.   All right.  Why don't we take our last

19    document out of the packet here, which is Defendants'

20    Joint Exhibit 3691, Doctor.  And this was in your

21    report; is that correct?

22        A.   Yes, it was.

23        Q.   And where does the -- where does the data

24    come from that's depicted on this exhibit, Doctor?

25        A.   This is a U.S. Geological Survey map.  It was

1    published in 2000 --

2         Q.   Pardon?

3         A.   It was published, I believe, in 2008.

4         Q.   All right, sir.

5              MR. GREEN:  Your Honor, I move the

6    admission of Defendants' Joint Exhibit 3691.

7              MR. BULLOCK:  Same objection as to

8    relevance.

9              THE COURT:  All right.  And pointing to

10   Dr. Teaf's testimony that Mr. Green just read

11   highlights the relevance.  The objection's overruled.

12   3691 is admitted.

13        Q.   *(BY MR. GREEN)*  Can you just very briefly,

14   Dr. Gibb, tell us what this exhibit depicts and how

15   this informs your analysis, sir?

16        A.   Well, you can see that the blue dots are no

17   detectable microcystin and the red dots are detectable

18   microcystin.  You can see that it's found throughout

19   United States.  It's particularly found in the upper

20   Midwest, also in the East Coast.  But it doesn't -- I

21   mean -- I mean, the point being that it's found

22   throughout the United States.  It's not uncommon.

23        Q.   If you recall, Dr. Gibb, did the plaintiff's

24   experts find any evidence of microcystin during their

25   analysis of the watershed?

1    A.   The plaintiff's own experts, Camp Dresser

2  McKee, found no evidence of microcystin in the

3  examples they took.  Cooke and Welch cited a paper by

4  Lynch and Clyde in which there were five samples taken

5  in Lake Tenkiller.  Two of them contain microcystin,

6  one was at 3.3 micrograms per liter and the other one

7  was at .35 micrograms per liter.

8    Q.   And are those the only references to

9  demonstrated microcystin concentrations that you saw

10  in your investigation of this matter?

11    A.   That is the only data that I am aware of that

12  demonstrate microcystin in the Illinois River

13  Watershed.

14    Q.   Okay.  Dr. Gibb, do some states regulate

15  concentrations of microcystin?

16    A.   There are two states that I'm aware of that

17  regulate, Oregon and Vermont.

18    Q.   And are the concentrations of microcystin

19  that you just mentioned that were found by Mr. Lynch

20  and -- or Dr. Lynch and Dr. Clyde, are they above or

21  below any existing state regulatory levels?

22    A.   They are below.

23    Q.   Has the State of Oklahoma issued any

24  regulations or guidance for cyanobacteria or

25  microcystin?

```
 1        A.   No.

 2        Q.   What about the State of Arkansas?

 3        A.   No.

 4        Q.   Are there federal levels providing for

 5   acceptable concentration of -- concentration levels

 6   in, you know, the federal system for microcystin?

 7        A.   No.

 8        Q.   Now, Doctor, there has been a reference in

 9   this trial -- and I hope I'm pronouncing these

10   correctly -- cylindrospermopsis and

11   cylindrospermopsin.

12             Do you recall those references?

13        A.   Yes, yes.

14        Q.   Okay.  What's the difference between

15   cylindrospermopsis and cylindrospermopsin?

16             MR. BULLOCK:  In addition to the fact

17   that the court reporter might have difficulty

18   interpreting that, I don't believe that any of this is

19   in the doctor's report.

20             THE COURT:  Is that correct, Mr. Green?

21             MR. GREEN:  Your Honor, I will --

22             THE WITNESS:  Actually, it was in

23   Dr. Cooke's testimony.

24             THE COURT:  Well, but -- no, I'm sorry.

25   Mr. Bullock is stating that it's not in this witness'
```

 1    report.

 2                    THE WITNESS:  No, that's not correct.

 3                    THE COURT:  All right.  Go ahead,

 4    Mr. Volpe.

 5        Q.   *(BY MR. GREEN)*  If you can find -- do you

 6    have your report there, Doctor?

 7        A.   Yes.  Yes, I do.

 8        Q.   If you can find the reference, that will

 9    probably be faster.

10                    MR. GREEN:  But, Your Honor, this is a

11    situation where the plaintiff's experts surfaced the

12    reference to this toxin while on the stand, and I

13    think it is --

14                    THE COURT:  Well, but if it was in their

15    expert's report and you came next, you didn't

16    reference it, it's new.  The same rules apply.

17                    THE WITNESS:  It's -- I'm sorry.

18                    THE COURT:  But right now we're fencing

19    with ghosts and the witness says it's in his report.

20    So go ahead.

21        Q.   *(BY MR. GREEN)*  Doctor, have you found a

22    reference to this?

23        A.   Yes, I have.  If you go to -- turn to page 20

24    and paragraph 76.

25                    THE COURT:  Got it.  Overruled.  Let's

1    go.

2                    MR. GREEN:  Okay.  Thank you.

3                    THE COURT:  Let's try to have a basis

4    for your objections before --

5                    MR. BULLOCK:  I just didn't remember it.

6    I apologize.

7                    THE COURT:  Yeah, I understand.  It's a

8    big topic.  Let's go.

9        Q.  *(BY MR. GREEN)*  With respect to these two

10   constituents I just mentioned -- and I'll provide the

11   reporter with the spelling -- but what's the

12   difference between cylindrospermopsis and

13   cylindrospermopsin?

14       A.  Well, cylindrospermopsis is the genus, the

15   taxonomic genus, and cylindrospermopsin is the toxin.

16       Q.  Okay.  With respect to the toxin now,

17   cylindrospermopsin, in the course of your analysis for

18   this case, have you seen any evidence that any

19   cylindrospermopsin has ever been detected in Lake

20   Tenkiller?

21       A.  No.  And that's, you know, what I read to you

22   from my report, is that Lynch and Clyde detected no

23   cylindrospermopsin in Lake Tenkiller.

24       Q.  Has any state or federal agency reported

25   cyanobacteria outbreaks in either drinking or

1    recreational water in the state of Oklahoma?

2        A.   No.

3        Q.   What conclusions, Doctor, have you reached

4    regarding health risks presented by the presence of

5    any cyanobacteria in Lake Tenkiller or the surface

6    waters in the IRW?

7        A.   Well, there was no microcystin detected by

8    the plaintiff's experts, Camp Dresser McKee, in Lake

9    Tenkiller.  The microcystin concentrations that were

10   cited by Cooke and Welch of Lynch and Clyde -- of the

11   Lynch and Clyde report reported low concentrations.

12   There was no cylindrospermopsin detected in Lake

13   Tenkiller.

14            Cyanobacteria is common throughout the United

15   States, it's not, you know, unusual.  You know, it

16   defines cyanobacteria in a lake.  So I -- and there

17   was no Centers for Disease Control reports of

18   cyanobacteria problems in the Illinois River

19   Watershed, or Oklahoma for that matter, and there was

20   none reported by the Oklahoma Department of Health.

21       Q.   So, Doctor, do you believe that if there is

22   any cyanobacteria in the Illinois River Watershed and

23   Lake Tenkiller, do you believe it presents any risk to

24   human health?

25       A.   No.

11154

1      MR. GREEN:  Very well.  I think that's

2  all I have, Your Honor.

3      THE COURT:  Cross-examination.

4              **CROSS-EXAMINATION**

5  **BY MR. BULLOCK:**

6      Q.   Doctor, let's go back and talk about the

7  difference between minimum -- or maximum contaminant

8  loads and the maximum contaminant load goal, okay?

9      Those are two different concepts, are they

10  not?

11      A.   It's maximum contaminant level, not load.

12      Q.   Okay.  Level.  I'm sorry.  Thank you for

13  correcting me.

14      A.   Well, the difference is that the maximum

15  contaminant level is the level above which you're in

16  violation, if you have a concentration above that, if

17  you have a running quarterly sample of the maximum

18  contaminant level.  Maximum contaminant levels here

19  are trihalomethanes and the haloacetic acids.

20      Q.   Now, the maximum contaminant level goal,

21  though, is a different concept, is it not?

22      A.   The maximum contaminant level goal --

23      Q.   Doctor, can you answer my question?  Is the

24  maximum contaminant level goal a different concept --

25      A.   Well --

**United States District Court**

```
 1        Q.   -- than maximum --

 2        A.   -- it's a different -- I mean, it's different

 3   than the maximum contaminant level.

 4        Q.   Okay.  And there was a different approach in

 5   terms of setting the two, was there not?

 6        A.   Well, I'm not sure what you mean by

 7   "different approach."  Different approach to set the

 8   level or different approach to set it for these

 9   particular compounds, trihalomethanes and haloacetic

10   acids?

11        Q.   Well, let's start with for these particular

12   compounds setting the goal versus the maximum level

13   was approached from a different perspective, was it

14   not?

15        A.   The goal would have been set from a different

16   perspective.

17        Q.   Okay.

18        A.   Okay.

19        Q.   And the goal was based -- was looked -- was

20   set by the EPA looking purely at the question of human

21   health risks; is that not correct?

22        A.   The goal is set looking at human health risk,

23   and the maximum contaminant level is set as close to

24   the goal as possible considering --

25        Q.   Now, Doctor, I'm asking -- I'm going to ask
```

1      the court to strike --

2                      MR. BULLOCK:  Judge, I'm moving to

3      strike his attempting to be nonresponsive to the

4      question.

5                      THE COURT:  Yes.  His answer stands

6      after the word "risk" -- or up to the end of the word

7      "risk"; in other words, "the goal is set looking at

8      human health risk."  The rest of the answer is

9      stricken.

10                     And, Doctor, you'll have an opportunity to

11     fill in with questions from Mr. Green after

12     Mr. Bullock asks the questions.  Cross-examination is

13     usually framed by fairly direct questions which

14     generally call for fairly direct answers.

15                     Go ahead.

16         Q.   (BY MR. BULLOCK)  Okay.  So going back to the

17     goal, the evidence that the EPA had to substantially

18     rely on in setting the goals for the dissolution

19     byproducts was largely animal studies, as you say,

20     wasn't it?

21         A.   The disinfectant byproducts.

22         Q.   Yes.

23         A.   Yes.  To set -- right.  That's correct.

24         Q.   Okay.  And, in fact, in doing -- in terms of

25     human cancer studies IN light of the fact that we

1    can't administer -- with any type of ethical basis

2    administer to individuals carcinogens or possible

3    carcinogens to see the response rate, it's not unusual

4    in science to rely upon animal studies for such

5    matters, is it?

6        A.   No.  I mean, there are a number of

7    epidemiology -- I mean, I did an epidemiology study of

8    chromate production workers.  So, of course, you can

9    do studies --

10             THE COURT:  Doctor, I think you've

11   answered the question.

12             Go ahead, Mr. Bullock.

13       Q.   (*BY MR. BULLOCK*)  Okay.  And when the EPA

14   made the judgments concerning risk to human health,

15   are you contesting that was done on the basis of a

16   solid, scientific process?

17       A.   I'm sorry.  Would you restate the question.

18       Q.   I'll be happy to.

19            When the EPA set the maximum contaminant

20   level goals for these dissolution byproducts --

21       A.   Disinfectant.

22       Q.    -- are you contesting that that was set on

23   the basis of a sound, scientific process?

24       A.   There was a scientific process that set the

25   MCLG, yes.

     1          Q.   Okay.  And are you contesting the soundness

     2   of that process?

     3          A.   I'm not contesting the soundness of the

     4   process.

     5          Q.   Okay.  And, in fact, when you look at

     6   Dr. Teaf's Demo 256, in fact, for instance, for

     7   bromoform, the EPA has said that it is a probable risk

     8   to human health; is that not true?

     9          A.   Well, as I said, they've changed the

    10   classification.

    11          Q.   Okay.  Well --

    12          A.   It's an old -- he's looking at an old

    13   classification based on the 1986 guidelines.

    14          Q.   Well, Doctor, tell me whether this

    15   doesn't -- and I only brought a copy.  But this was

    16   from the disclosed materials that defendants included

    17   in their disclosure.

    18               And, for instance, is this familiar to you,

    19   this language:  "The final" -- and this is just an

    20   example -- "MCLG for bromoform is zero.  The zero MCLG

    21   is based on" -- let me get to the -- to the particular

    22   language.

    23               MR. GREEN:  Your Honor, I object.  We

    24   don't even know where this is coming from.  I mean,

    25   the materials are quite extensive --

 1             THE COURT:  Yes, sir.  You're entitled
 2   to that.
 3             MR. BULLOCK:  Okay.  This is from what
 4   was in your disclosure of -- it's actually Oklahoma
 5   Exhibit 5161, but it was a disclosure for this witness
 6   delivered to us.  Particularly, it is the ground and
 7   drinking water -- national primary drinking water
 8   regulations disinfectants and disinfectant byproducts,
 9   and I see a date on it of May 2007.  And I don't know
10   that this has been admitted.
11      Q.   *(BY MR. BULLOCK)*  But let me ask you whether
12   this language -- and this is what I'm reading for
13   bromoform --
14             MR. GREEN:  May I give the witness a
15   copy of this?
16             MR. BULLOCK:  If you have one, sure,
17   please.  That will make it easier.
18             MR. GREEN:  May I, Your Honor?
19             THE COURT:  Of course.  What page,
20   Mr. Bullock?
21             MR. BULLOCK:  I'm looking at page 36.
22             THE COURT:  I see a date of September
23   16, 1998 --
24             MR. BULLOCK:  Well --
25             THE COURT:  -- being printed in the

```
 1    Federal Register.

 2              MR. BULLOCK:  Well, I was looking at

 3    perhaps the wrong date.

 4              THE COURT:  Yeah.  What you're looking

 5    at is the date it was faxed, it looks like.

 6              MR. BULLOCK:  You're correct.

 7       Q.   (BY MR. BULLOCK)  Okay.  This is the '98

 8    language; correct?  Okay.  And that's where they say

 9    that it's a probable human carcinogen based on a

10    consideration of all relevant health data including

11    cancer and noncancer effects?

12       A.   Yes.  What --

13       Q.   Okay.

14       A.   And may I explain what I was referring to in

15    my discussion?

16       Q.   Yeah.  Please do so the record's clear.

17       A.   Okay.  And the stage II role utilized the

18    most recent -- stage II was published four years ago

19    now, okay -- the most recent guidelines which came out

20    in 2005, but what this refers to is to the old

21    evaluation done.  And so what I'm pointing out is that

22    Dr. Teaf in his evaluations referred to the old

23    classification but that's important because of the

24    chloroform --

25       Q.   Okay.
```

```
1        A.   -- evaluation.

2        Q.   Okay.  Now, one of the things -- let's talk

3   about the MCLs, the maximum contaminant levels.

4             Those, as you say, are the regulatory

5   violation -- or the regulatory standards which if you

6   violate is a violation.  And included in the setting

7   of those was an assessment of the issue of the

8   feasibility of upgrading plants to that level,

9   correct, cost and technology?

10       A.   Cost and technology going to the MCL, that's

11  correct.

12       Q.   Okay.  So if you have waters which are below

13  the MCL, then you certainly wouldn't -- let me go

14  back.

15            In terms of human health risk, is it not

16  better to be below, first of all, the MCL?  The

17  further you get below the MCL, the lower the health

18  risk would be; is that correct?

19       A.   Well, but it's a theoretical health risk.

20       Q.   Okay.  Well, but a lot in science are

21  theoretical levels, particularly when you're dealing

22  with epidemiology; is that not true?

23       A.   No, I don't agree with that.

24       Q.   Well, we talked earlier about the fact that

25  the MCLGs were the result of a sound scientific
```

1    process.

2        A.   It's a scientific process that evaluates the

3    animal data.

4        Q.   Okay.

5        A.   But, I mean, in this case the animal data.

6        Q.   And from that, people extrapolate as to

7    whether people are -- whether human beings are at

8    risk; correct?

9        A.   No, I wouldn't agree with that.

10       Q.   Well --

11       A.   The MCLs -- I mean, the Environmental

12   Protection Agency is a public health agency.  They're

13   not going -- I mean, obviously they're going to set

14   the MCLs very conservative and as close to the MCLGs

15   as possible.  I mean, they are a public health agency,

16   you want them to be protective, so they're going to

17   set very low standards -- very low regulatory levels.

18            If you were to estimate what the risk would

19   be, it would be a very low risk, a risk that, I mean,

20   actually would be impossible to detect in the human

21   population.

22       Q.   Okay.  But in the performance of their task

23   of protecting human health, they also want you to know

24   where the goal should be in terms of the minimum -- or

25   getting below a level where you believe there may be a

 1  risk to human health; right?  That's what MCLGs are

 2  about?

 3       A.  Well, would you restate the question, please?

 4       Q.  All right.  Well, obviously it wasn't formed

 5  well so I appreciate that.

 6            The MCLG --

 7       A.  Yes.

 8       Q.  -- that is set by the EPA at the level at

 9  which there's no known or anticipated adverse health

10  effects; correct?

11       A.  That's -- that's the definition.

12       Q.  Okay.  And so as you go above the MCLG level,

13  then at that point human health risks are increasing?

14       A.  Entirely theoretical.

15       Q.  Okay.  Theoretically, the best-accepted

16  theories of when people might be at risk?

17       A.  It's not the best-accepted theory.  I mean,

18  as I indicated in my direct testimony, you could be at

19  twice the MCL, not the MCLG, and still not have any

20  risk.

21       Q.  Doctor, are you rejecting then the judgments

22  of the EPA in terms of the fact that -- that as you

23  by -- as you get above the MCLG, that you are now into

24  an area where there is a possible or probable risk to

25  human health?

 1                  MR. GREEN:  I object to that

 2      characterization.  Because counsel wants to state the

 3      view of the EPA, and there is no evidence that that

 4      is, in fact, the EPA's view.

 5                  MR. BULLOCK:  Okay.  Well, let me

 6      rephrase.

 7                  THE COURT:  Thank you.

 8          Q.   *(BY MR. BULLOCK)*  Okay.  When you get above

 9      the MCLG, you are into -- or you are beyond the area

10      where it would declare that there was no known or

11      anticipated adverse health effect; right?

12          A.   Again, I mean, it's a theoretical risk and I

13      wouldn't argue with the agency's process here.  I want

14      the agency to set the MCL as low as possible given

15      cost and so forth.

16                  And if they -- and through the process of

17      the -- whatever they set the MCLG at is fine, but it

18      doesn't mean that there is any risk of those

19      concentrations we haven't demonstrated in the human

20      population.

21          Q.   Well, when you talk about -- talk about risk,

22      it is, in fact, that bad things might happen; correct?

23      It's not a certainty.  There's an uncertainty always

24      when you talk about a risk to human health?

25          A.   You can demonstrate risk in a human

1   population.

2       Q.   Okay.

3       A.   And they haven't here.

4       Q.   Well --

5       A.   Or we haven't.

6       Q.   It is their judgment, is it not -- I mean, am

7   I missing something, that above the MCLG, that it is

8   their judgment that there is some risk to human

9   health?

10      A.   Yeah.  This was a discussion that we had --

11      Q.   Well, I'm asking you, Doctor.  Am I in error

12  when I read the MCLG as being a level where the EPA is

13  informing us that above the MCLG level there is a risk

14  to human health?

15      A.   I think what the EPA is saying is that -- I

16  mean, again it's a conservative value and it's above

17  that we cannot demonstrate a risk, we can only

18  theorize a risk.  I think, as I started to say

19  earlier, it is a debate that we had at the agency.  We

20  don't know what the risks are above these estimated

21  values, particularly when it's only animal data.

22              *(Discussion held off the record)*

23      Q.   *(BY MR. BULLOCK)*  Now, let's talk for a

24  moment about cyanobacteria rather than you and I

25  continuing to chase one another around what is

1   becoming the same tree.

2           In terms of cyanobacteria, Doctor, you were

3   saying on your direct as to not having seen any data

4   in terms of the levels of cyanobacteria found in the

5   Illinois River -- or particularly in Lake Tenkiller.

6   Do you recall that?  Or limited data.  I guess you

7   talked about two -- let me go back.

8           In terms of the -- let's start like this.

9           In terms of the incidence of where

10  cyanobacteria has been detected, would you repeat for

11  me what you told the court on direct?

12          MR. GREEN:  Object, Your Honor.  He

13  testified about fifteen minutes on cyanobacteria.

14          MR. BULLOCK:  Well, let me go about it

15  like this.

16      Q.    *(BY MR. BULLOCK)*  Doctor, in fact, you are

17  aware that Dr. Teaf did report repeated instances

18  where cyanobacteria was found in samples in Lake

19  Tenkiller?

20          MR. GREEN:  Object to the form of the

21  question because it assumes a fact that really is not

22  in evidence in this trial.  I don't believe Dr. Teaf

23  testified to that at all.

24          THE COURT:  I believe this witness can

25  handle the question.  Overruled.

1        Q.   *(BY MR. BULLOCK)*  Okay.

2        A.   I don't recall.  I mean -- I mean, I don't

3   recall Dr. Teaf talking about the levels of

4   cyanobacteria found in Lake Tenkiller.

5        Q.   Do you recall -- let's see.  Well, let me

6   just do it like this so that in terms of what the

7   record is it is.

8             To the extent that Dr. Teaf reported levels

9   of cyanobacteria being found in samples in Lake

10  Tenkiller, you're not today expressing any opinion as

11  to the accuracy of such observations, are you?

12       A.   I mean, that sounds like a very hypothetical

13  to me.  You're asking me to --

14       Q.   Well, I'm just asking you whether you're

15  giving an opinion as to any testimony that Dr. Teaf

16  might have given as to the level of cyanobacteria in

17  Lake Tenkiller.  Are you giving an opinion or not?

18       A.   I don't recall that he testified to the level

19  of cyanobacteria in Lake Tenkiller.

20       Q.   Okay.  So you're giving no opinion on that?

21       A.   Well, again, I don't recall him testifying to

22  that.

23       Q.   Are you giving an opinion as to that?

24            MR. MCDANIEL:  Your Honor, this argument

25  is useless.  If there's specific testimony that

```
 1   Mr. Bullock wants this witness to respond to, he needs
 2   to confront him with that.
 3              THE COURT:  All right.  Do you have any
 4   notes, Mr. Bullock, as to what you believe this
 5   witness said with regard to Dr. Teaf's findings or
 6   conclusions relating to cyanobacteria?
 7              MR. BULLOCK:  Well, I have very sketchy
 8   notes, Judge.  I have a recollection of Dr. Teaf
 9   having offered some numbers, and then when he
10   attempted to address the issue of health risk, we got
11   into the fight over the WHO standards as to measuring
12   as to how to assess those levels.
13         But that was my recollection of the testimony
14   and as briefly and cryptically reflected in my notes,
15   but I didn't go back to the transcript to confirm
16   that.  And so -- well --
17              THE COURT:  Look, I have no notes.  I
18   tried to take good notes here.
19         What do you believe do you recall this
20   witness said with regard to Dr. Teaf and
21   cyanobacteria?  I have no notes in that regard.  We
22   can take a recess, you can go back and take a look,
23   but we're wasting time.
24              MR. BULLOCK:  Judge --
25              THE COURT:  Do you have any notes
```

 1    relating to that which you wish to ask this witness?

 2                 MR. BULLOCK:  Okay.  My notes reflect

 3    that -- well, let me move on so that I can --

 4                 THE COURT:  No.  I want you to ask the

 5    question.  If that was touched on in direct with this

 6    witness, you have -- you have a right to do that.

 7          I have no notes touching upon Dr. Teaf's

 8    comments regarding cyanobacteria.  This witness says

 9    he doesn't recall saying anything about that or that

10    Dr. Teaf touched upon cyanobacteria.

11       Q.   (BY MR. BULLOCK)  Do you recall testifying in

12    this court today that Dr. Teaf reported that there was

13    cyanobacteria present in Lake Tenkiller?

14       A.   In his testimony, no.

15       Q.   Okay.  In your testimony today, do you recall

16    testifying to that?

17       A.   Do I recall testifying to whether there was

18    cyanobacteria?

19       Q.   Whether --

20                 MR. BULLOCK:  I am going to move on,

21    Judge, just because I'm --

22       Q.   (BY MR. BULLOCK)  Let's talk about, though,

23    the relative risk of cyanobacteria, first of all, as

24    to whether there are standards.

25          Your testimony is actually that Oklahoma

 1   doesn't have a numerical standard as to cyanobacteria;

 2   is that correct?

 3        A.   That's correct.

 4        Q.   Oklahoma does have relevant standards as

 5   to -- that would cover cyanobacteria in Lake

 6   Tenkiller, do they not?

 7        A.   What are they?

 8        Q.   Well --

 9        A.   I don't know what they are.

10        Q.   -- have you examined to see whether Oklahoma

11   might have standards, other than numerical standards,

12   which would govern the development of cyanobacteria in

13   Lake Tenkiller?

14        A.   I'm not aware of any.

15        Q.   Would a standard which required that there be

16   no degradation of water quality allowed in outstanding

17   resource waters be relevant to the issue of

18   cyanobacteria?

19        A.   Very loosely, I guess.

20        Q.   Okay.  Because the growth of cyanobacteria in

21   Lake Tenkiller would be a degradation of that water,

22   would it not?

23             MR. GREEN:  Your Honor, I object.  We're

24   not here on some aesthetic narrative standard.  The

25   witness is proffered as an expert in health risks that

 1    are derived from or attached to cyanobacteria and not

 2    whether they are somehow appealing to the human eye or

 3    fail to meet some other narrative standard.

 4              THE COURT:  Well, I don't know, because

 5    I'm an expert in cyanobacteria, as to whether or not

 6    it would have violated aesthetic standards.

 7    Overruled.

 8              Go ahead.

 9              MR. BULLOCK:  Okay.

10              *(Discussion held off the record)*

11       Q.  *(BY MR. BULLOCK)*  Did you look at the

12    Oklahoma water quality standards before you gave your

13    opinion as to whether Oklahoma had a standard?

14       A.  Yes.

15       Q.  Okay.  So, for instance -- and we have these

16    in the record of the court -- but I'm looking at

17    785:45-5-10, where the standard provides that these

18    waters shall be maintained so that they will not be

19    toxic, carcinogenic, mutagenic, or teratogenic to

20    humans.

21              Now, cyanobacteria, in fact, can be toxic to

22    humans, can it not?

23       A.  Well, of course it could be toxic.

24       Q.  And so if conditions are developing within

25    the lake which -- or if cyanobacteria is developing in

1    the lake, then that would be in violation of Oklahoma

2    water quality standards, wouldn't it?

3                    MR. GREEN:  I object, Your Honor.  I

4    mean, that calls for a -- not only does it call for a

5    legal conclusion, but this is outside the scope of

6    direct beyond the zone of the witness' expertise as,

7    you know, called for in this case and I think this is

8    improper.

9           He's not even showing the witness -- having

10   the courtesy of showing the witness what standard he's

11   referring to.  But I do think this is objectionable.

12                    THE COURT:  Calls for a legal

13   conclusion.  I don't even have 45-5-10 in front of me.

14   But the legal hypothesis or basis is that if

15   conditions were developing within the lake which -- or

16   if cyanobacteria is developing in the lake, then that

17   would be a violation of Oklahoma water quality

18   standards.  That's clearly calling for a legal

19   conclusion.  Sustained.

20                    MR. BULLOCK:  Okay.

21      Q.   *(BY MR. BULLOCK)*  Cyanobacteria further would

22   be -- in sufficient concentrations will irritate the

23   skin or other organs of humans?

24      A.   Could.

25      Q.   In sufficient concentrations?

 1      A.   In sufficient concentrations.  And I don't

 2   believe that every toxin but --

 3      Q.   Are you expressing an opinion on whether

 4   toxins would fall under that language or not?

 5      A.   No.  That's not what I was indicating.

 6      Q.   Okay.

 7           MR. BULLOCK:  Give me just one moment,

 8   Judge.

 9           THE COURT:  Yes, sir.

10           *(Discussion held off the record)*

11      Q.   *(BY MR. BULLOCK)*  Just to return for a minute

12   to MCLGs.

13           They are developed to ensure the protection

14   of the entire population; correct?

15      A.   Are you reading from a publication?

16      Q.   No.  I'm reading from the notes that my

17   counsel gave me.  And so -- I mean; is that true?

18      A.   I mean, I don't know if that's the EPA

19   language but --

20      Q.   Well, would that be your interpretation of

21   it?

22      A.   I would go with the definition that the EPA

23   used as to what an MCLG is.

24      Q.   Okay.  And are they based -- are those -- one

25   last question in terms of this, or I think it's last.

11174

```
 1              Are MCLGs based on the available evidence of

 2    carcinogenic -- of carcinogenic or noncancer adverse

 3    health risks?  Let me rephrase.

 4              MCLGs are based upon the best evidence

 5    available as to both cancer and noncancer risks,

 6    aren't they?

 7        A.   They're used for cancer and noncancer risks,

 8    yes.

 9        Q.   And the best available evidence?

10        A.   Yeah.  The best available evidence, yeah.

11              THE COURT:  We're back to the same old

12    tree.  Redirect.

13              MR. GREEN:  Your Honor, just indulge me

14    for one moment.

15              THE COURT:  Yes.  Let me see if I

16    understand because we've gone around this same tree so

17    many times and I'm not sure it's enlightened the

18    fact-finder.  I'm not sure anybody's really interested

19    in enlightening the fact-finder here but that's my

20    job.

21              MCLG is a goal; correct?

22              THE WITNESS:  A goal.

23              THE COURT:  It is not the regulatory

24    standard; correct?

25              THE WITNESS:  That's correct.
```

**United States District Court**

 1              THE COURT:  All right.  Anything else

 2    you can do to clarify that for me?  And as I

 3    understand -- before you answer that, as I understand,

 4    I think by going around that tree, you focused on the

 5    following.

 6              That the MCLG is set by EPA at a level at

 7    which there is no known or anticipated adverse health

 8    effects.  Is that accurate?

 9              THE WITNESS:  That's correct.

10              THE COURT:  All right.

11              THE WITNESS:  I think the exact language

12    is no known or expected health effects, but that's

13    right.

14              THE COURT:  All right.  Anything else

15    you can do to clarify that distinction between an MCLG

16    and what an MCL limit -- what are you calling it?

17              THE WITNESS:  Maximum contaminant level.

18    Maximum contaminant level is set as close to the MCLG

19    as possible given cost and technology.

20              The MCLG, as Mr. Bullock indicated, could be

21    based on cancer effects or noncancer effects.

22    Noncancer effects are usually you're looking at doses

23    in an animal and then -- it depends on how you arrive

24    at it.  There's -- and maybe this is going beyond what

25    -- but you could use uncertainty factors to get there.

 1   Usually an uncertainty factor is -- a thousand would

 2   not be uncommon between the level where you found an

 3   effect in an animal and where the MCLG is set.

 4            They've more frequently have used what's

 5   called a benchmark dose, and that's maybe going beyond

 6   what the court -- but the benchmark dose takes --

 7                 THE COURT:  Is that a third measure?

 8                 THE WITNESS:  Well, no, it's not a third

 9   measure.  It's a way to get to the MCLG.

10                 THE COURT:  All right.

11                 THE WITNESS:  It's part of the modeling

12   effort to get to the MCLG.

13            But of course -- and the MCL is -- I mean, an

14   MCL itself is a conservative value.  I mean, we -- I

15   mean, as I indicated, EPA is a public health agency.

16   They don't set standards.  The agency has -- you know,

17   admits in its own information that these risk

18   assessments are conservative.

19                 THE COURT:  Clearly they did with

20   respect to arsenic; correct?

21                 THE WITNESS:  Of course.  So --

22                 THE COURT:  But with respect to arsenic,

23   is there a lower MCLG than that which was set as the

24   MCL?

25                 THE WITNESS:  The MCLG is -- four

1    carcinogen is zero, they generally say zero.  Because

2    the theoretical assumption is that any exposure would

3    produce some risk.

4                    THE COURT:  All right.

5                    THE WITNESS:  Now, again, that's a very

6    conservative assumption.  I mean, it's a -- it's a

7    conservative assumption, you know, but that's what

8    they do with a carcinogen.

9              With a noncarcinogen, they may look at

10   something like hepatotoxic effects in an animal, and

11   then they either use these uncertainty factors, which

12   often are a thousand, to come up with a number; or

13   they use a benchmark dose, which is a modeling

14   approach to get there.  That is also in connection

15   with certainty factors to get down to this lower MCLG.

16                   THE COURT:  Okay.  It's reflective then

17   of that which we do not know as human beings?  In

18   other words, it's a very conservative --

19                   THE WITNESS:  It's a very

20   conservative --

21                   THE COURT:  -- goal?

22                   THE WITNESS:  I mean, the MCL is

23   conservative.  I mean, we don't demonstrate risks at

24   the MCL.  I mean, we would be -- I mean, I would be

25   upset if the public health agency was, you know,

 1    setting MCLs right where we could see effects.  I

 2    mean, the MCL itself is conservative.

 3                 THE COURT:  So why set the MCLG if the

 4    MCL itself is conservative?

 5                 THE WITNESS:  Well, the MCL is where

 6    they have -- I think it's to provide some scientific

 7    aspect to it so that you can kind of tell sort of

 8    where -- where you are in relation to the MCL.  But --

 9                 THE COURT:  Is it an aspirational goal?

10                 THE WITNESS:  An aspirational goal?  I

11    don't think that they would ever -- you know, I mean,

12    they would never regulate, I think, to the MCLG.  So

13    it's --

14                 THE COURT:  But an aspirational goal

15    would be reflective of that.  You don't regulate to

16    that which is aspirational but --

17                 THE WITNESS:  I guess you could describe

18    it as such, those are aspirational, but not something

19    that one would think of as realistic and ever trying

20    to chief perhaps.  But --

21                 THE COURT:  All right.

22                 THE WITNESS:  Just because the

23    concentrations -- I mean, these -- you know, getting

24    something to zero, for example, would be, I mean,

25    extremely difficult.

```
 1              THE COURT:  All right.  Now, you were
 2   obviously involved in the setting of the MCL with
 3   respect to arsenic; correct?
 4              THE WITNESS:  I was -- right.
 5              THE COURT:  I mean, you were the
 6   prime -- you were the point person; correct?
 7              THE WITNESS:  Well, what we did -- I
 8   mean, I was in research and development, and we were
 9   arguing for a lower -- you know, we did a risk
10   assessment, okay?  What we did was the risk
11   assessment.  The risk assessment then gets factored
12   into the setting of the MCL.  And so that's what we
13   did was the --
14              THE COURT:  So actually the arsenic MCL
15   was set higher than you wished it to be set; is that
16   correct?
17              THE WITNESS:  No, not really.  I mean,
18   it was -- I mean, the old standard was 50 micrograms
19   per liter.  It was reduced to 10 micrograms per liter.
20   But, I mean, we couldn't even demonstrate that there
21   was actual risk at 50, but I think 10 was more in
22   keeping with what -- where the rest of the world was,
23   you know, with their arsenic drinking water
24   standard.
25              THE COURT:  Mr. Green.
```

1           MR. GREEN:  Your Honor, one moment.  I

2   think, Your Honor, that we are -- I think in light of

3   the colloquy that you had with the witness there, that

4   we will have no additional questions to offer.

5           THE COURT:  Very well.  Thank you very

6   much.  You are excused.

7         Now, we have the issues regarding rebuttal.

8   Motions typically would not be heard until after

9   rebuttal, and that's how I see it in terms of

10  procedure.

11        I think we need some time to focus on the

12  specific parts of the record and the -- the reports to

13  determine whether the anticipated -- or the testimony

14  plaintiff wishes to present in rebuttal could have

15  been fairly anticipated or not.

16        Do we have disclosures now with respect to

17  No. 2 and No. 3 as to the subjects or proposed

18  subjects of their testimony?  As I understand it,

19  there is not.

20           MR. BULLOCK:  No.  No, Your Honor.  I

21  gave you a brief summary of what I understand.  But

22  we --

23           THE COURT:  When can we do that?

24  Because obviously we can't really have a productive

25  conversation on that until the defendants are apprised

```
 1   of the subject matter of the proposed rebuttal.
 2                   MR. BULLOCK:  I think we anticipate
 3   doing that in the morning with the other --
 4                   THE COURT:  Well, but you're going to be
 5   hitting them cold, and I need specific references to
 6   expert reports, to testimony.  Why don't you have that
 7   done by -- can you do it by six o'clock tonight?
 8                   MR. BULLOCK:  I will sure turn the jets
 9   and do everything we can to do it.
10                   THE COURT:  Well, if you can't, I'll
11   make it seven or eight o'clock tonight.
12                   MR. BULLOCK:  Well, how about seven
13   o'clock?  That would be helpful.
14                   THE COURT:  Okay.  So by seven o'clock
15   tonight, the plaintiff needs to disclose, as to
16   proposed rebuttal witnesses 2 and 3, the subject
17   matter, the proposed testimony, so we can have a
18   meaningful discussion tomorrow morning.
19             Is there anything else we can accomplish here
20   today?
21                   MR. BULLOCK:  Have the defendants
22   rested?
23                   MR. JORGENSEN:  I was just going to say,
24   Your Honor, I can't pass up on this sweet moment.
25               (Discussion held off the record)
```

1          MS. HILL:  If it please the court, I

2    have one remaining matter.

3          In combing through the record, we have

4    realized that there are two places that perhaps the

5    record could be more complete.  On October 21st, '09,

6    Volume 26, with Teena Gunter, we admitted an

7    exhibit -- in fact, it was with direct, the state

8    admitted an exhibit.  It is Exhibit 1191-A and it is

9    the videotape, the ODAFF training video.

10          And we propose for ease of reference in the

11    record that we admit as a court exhibit a

12    transcription of that video that has already been

13    admitted.  We have shared this with the state's

14    counsel, and it's my understanding that they do not

15    have any objection to our transcription of the Teena

16    Gunter training video, Exhibit 1191.

17          So it's our intention to offer that

18    transcription, which we prepared, as a court exhibit.

19          THE COURT:  All right.  And that's 1191

20    or 1191-A?

21          MS. HILL:  It is 1191-A.

22          THE COURT:  All right.  Any objection?

23          MR. NANCE:  Your Honor, Exhibit 1191-A

24    was admitted, not for the truth of the matter, but for

25    the knowledge that it conveyed to the growers.  So if

1    the transcript is admitted for the same purpose, we

2    have no objection.

3                THE COURT:  Very well.  It will be

4    admitted for the same purpose.  Exhibit 1191-A is

5    admitted for purposes of notice.

6                MS. HILL:  Would you like our transcript

7    also to be Exhibit 1191-B, or shall we call that Court

8    Exhibit 16?

9                THE COURT:  All right.  I misunderstood.

10   So let's call that 1191-B.

11               MS. HILL:  Okay.  The transcript would

12   be 1191-B then.  1191 is the video itself.

13               THE COURT:  So what is A?

14               MS. HILL:  1191-A is the video itself.

15   B would be the transcription that we are offering

16   right now.

17               THE COURT:  All right.  That's what I

18   understood.

19          All right.  1191-A is the video, 1191-B is

20   the transcript, and 1191-B is hereby admitted.

21          Anything else?

22               MS. HILL:  Yes.  I have one more and I

23   don't know that this one will be as easy.

24          On November 18th, '09, in the

25   cross-examination of Dr. Olsen, we played an excerpt

1    of a training video.  This is Volume 48, page 5523,

2    and that discussion begins at line 15.

3         "The state has made a training video for

4    farmers and ranchers that touches on riparian area

5    management.  And I'd like to play a little segment of

6    this for you and have you watch it."

7         The discussion goes on, and on page 5524,

8    line 9, the video clip was played.  To be candid,

9    there is not an exhibit number on the video clip.

10   There was not a demonstrative to the video clip.  But

11   Dr. Olsen was confronted with a video clip that has

12   words, and we would like those words that were not

13   transcribed on the record to become part of the

14   record.

15        We propose that those be made a court exhibit

16   in and of themselves, a transcription of this short

17   video clip that was shown to Dr. Olsen on November

18   18th, 2009.  And I do believe that the state has an

19   objection to that transcription.

20             THE COURT:  All right.  Before we go to

21   the objection, let me go to the transcript so I will

22   know what we're talking about.  This is such a large

23   docket sheet, as you know, it takes awhile to load.

24          *(Discussion held off the record)*

25             THE COURT:  All right.  Does anyone have

1    the actual docket number for this particular

2    transcript for my notes?  I understand it's on the

3    screen.  Does anyone have the docket number?

4            All right.  2762, it looks like.  All right.

5    That's page 5523, line 15.

6            Now, this is not the Gunter training video?

7    Is the reference on line 15 not the Gunter training

8    video?

9            MS. HILL:  This is not the same as what

10   we just previously admitted.

11           MR. TODD:  I can tell what it was.

12           THE COURT:  Well, let me see if the

13   record is reflective.

14           All right.  So it goes to cattle and cattle

15   mineral feeders and the removal of foliage in riparian

16   areas and erosion potentially causing nutrient

17   pollution in surface waters?

18           MS. HILL:  That is correct.  And for

19   further clarity of the record, it is the ODAFF

20   training video.

21           The exhibit we just discussed, 1191-A and B,

22   that was the Teena Gunter portion of that larger

23   video.  This is a separate portion of the ODAFF

24   training video.

25           THE COURT:  All right.  Objection?

1   Mr. Nance.

2              MR. NANCE:  Yes, Your Honor.  The actual

3   video that was used with Dr. Olsen was not admitted.

4   In the record, the court already has the benefit of

5   questions directed to Dr. Olsen about what was on the

6   video.

7         Since the video itself was not admitted, we

8   see no reason to admit the text of what was said on

9   the video.  You've got everything the defendants

10  thought they needed at the time from Dr. Olsen

11  himself.  We just object to the admission of this text

12  as a court exhibit.

13             THE COURT:  The objection's sustained.

14  There is an admission by the doctor in response to

15  Mr. Green's question that the video reflected his

16  client, the State of Oklahoma, telling farmers and

17  ranchers that cattle and cattle mineral feeders and

18  removal of foliage in riparian areas and erosion can

19  cause nutrient pollution in surface waters.  It wasn't

20  timely offered.  The objection's sustained.

21          Anything else?

22             MS. HILL:  Nothing further.  Thank you,

23  Your Honor.

24             MR. NANCE:  I think Mr. Jorgensen has

25  something, Your Honor.

1          MR. JORGENSEN:  Your Honor --

2          THE COURT:  And you all are willing to

3    give him this honor?

4          MR. HOPSON:  He hasn't done anything

5    else.

6          MR. JORGENSEN:  Your Honor, before I do,

7    it's my understanding of Rule 52 in jury trials, Your

8    Honor, I'd like to -- this is being extraordinary

9    hard, extraordinary hard.

10          Your Honor, it's my understanding of Rule 52

11    that after we rest the defendants can again move for

12    judgment as a matter of law and the court can take

13    that under consideration.  I just want to make sure

14    that's the court's understanding as well.

15          THE COURT:  No.  Well, let me take a

16    look then at the specifics.  It was my understanding

17    that you can move again after rebuttal.

18          MR. JORGENSEN:  That's correct, Your

19    Honor.  And that's my understanding as well.  I'm

20    sorry I was not clear.

21          THE COURT:  You said after you rest.

22          MR. JORGENSEN:  I'm sorry.  I mean,

23    after the case is over.

24          THE COURT:  Okay.

25          MR. JORGENSEN:  With that, Your Honor,

1   I'm very pleased to say that the Tyson defendants

2   rest.

3                    THE COURT:  Very well.

4                    MR. SANDERS:  Your Honor, Cal-Maine

5   Foods, Inc. rests also.

6                    MR. MCDANIEL:  Peterson Farms rests,

7   Your Honor.

8                    MR. ELROD:  Simmons Foods rest, Your

9   Honor.

10                    MR. WEEKS:  And George's rests as well,

11   Your Honor.

12                    MR. TUCKER:  Your Honor, no more

13   Honeysuckle White for you.  Cargill rests.

14                    THE COURT:  Does that cover all the

15   defendants?

16                    THE COURT:  Mr. George.

17                    MR. GEORGE:  Sorry.  I felt left out,

18   Your Honor.

19                    THE COURT:  Cobb-Vantress.

20                    MR. GEORGE:  Yeah.  I guess it probably

21   was covered, but Cobb-Vantress as a matter of

22   formality does rest.

23            Your Honor, I appreciate that we're all going

24   to do some preparation for tomorrow to try to be as

25   efficient with the court's time in working through the

 1  rebuttal issues.

 2          Mr. Bullock, I believe, provided the court

 3  with a few references to pleadings or dockets that

 4  might be useful to the extent the court has any

 5  appetite to look at any further on this before

 6  tomorrow.  And I have a few I'd like it add to that,

 7  if I may.

 8          THE COURT:  All right.  Let me find my

 9  place in the notes so that I can put them all

10  together.

11          MR. GEORGE:  Your Honor, I'm impressed

12  at the number of pages I saw you flip from one day as

13  you were going through --

14          THE COURT:  It remains to be seen how

15  useful it is.  Go ahead, Mr. George.

16          MR. GEORGE:  It's admirable.

17      Your Honor, there has been a motion served by

18  the state to serve expert rebuttal reports, not with

19  respect to any of the witnesses that are at issue, but

20  the briefing and the court's ruling on that might be

21  relevant.

22          The state's motion was docket No. 1819, the

23  defendants' opposition can be found at 1824, the

24  state's reply at 1836, and then Your Honor's order at

25  1842.

1          There was also some briefing with regard

2    to -- some dispute as to whether they were rebuttal or

3    supplemental reports.  But with regard to Cooke and

4    Welch, they can be found, the state's motion, at 1826,

5    the opposition at 1828, the reply at 1833, and Your

6    Honor's order at 1839.

7          And then finally --

8          THE COURT:  Now, is that going to be

9    pertinent to the subject matter tomorrow?  We're

10   talking about Engel, Stevenson, and Wells.

11         MR. GEORGE:  I believe it will only

12   insofar as Your Honor provided a very well-recognized

13   definition of rebuttal and what it constitutes and

14   does not constitute in the order.  I simply provided

15   the citations to the briefs as being relevant to that

16   order.

17         THE COURT:  Well, it remains to be seen

18   if that's correct, but that's certainly the

19   understanding that I've always had.

20         MR. GEORGE:  Okay.  And then lastly,

21   Your Honor, there was a motion for clarification filed

22   by the defendants with respect to those two previous

23   orders, and since I've cited them to you I want to

24   cite the motions.

25         The motion by the defendants can be found at

1   docket 1839, the -- and 1840 -- I'm sorry.  I botched

2   that, Your Honor.  The motion can be found at docket

3   1972, the opposition by the state at docket 1985, and

4   then Your Honor's order at 1989.  You did issue a

5   clarification with respect to those two orders so I

6   bring that to the court's attention as well.

7               THE COURT:  All right.  And so the two

8   references by Mr. Bullock were to the court's two

9   orders?

10              MR. GEORGE:  I believe that's right,

11  Your Honor.

12              THE COURT:  All right.  Mr. Bullock or

13  Ms. Moll, has the plaintiff been able to find any

14  other references that I can get started with?  Because

15  this promises to require a little bit of homework.

16              MR. BULLOCK:  I know that they were

17  talking about some and working on getting them pared

18  down but I don't have them.  Perhaps we could -- we'll

19  try to supplement those this evening, though, if it

20  will help the court in the morning and the

21  defendants.

22              THE COURT:  Well, in the meantime, I'm

23  trying to work on these 52(c) motions.  It's difficult

24  to work on them while you're here in court.

25              But in any event, we will be adjourned until

11192

1    nine o'clock tomorrow morning.

2              MR. BULLOCK:  Okay.  Thank you.

3              *(The proceedings were recessed)*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**United States District Court**

11193

1                              C E R T I F I C A T E

2

3

4              I, Brian P. Neil, a Certified Court Reporter

5    for the Eastern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11             I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16             In witness whereof, I have hereunto set my

17   hand this 13th day of January 2010.

18
                        s/ Brian P. Neil
19              _____
                  Brian P. Neil, CSR-RPR, CRR, RMR
20                United States Court Reporter

21

22

23

24

25

**United States District Court**