1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   STATE OF OKLAHOMA, ex rel.  )
    W.A. DREW EDMONDSON, in his )
5   capacity as ATTORNEY GENERAL)
    OF THE STATE OF OKLAHOMA,    )
6   et al.                      )
                                )
7                Plaintiffs,  )
    vs.                         )CASE NO. 05-329-GKF-PJC
8                               )
    TYSON FOODS, INC., et al.,  )
9                               )
                                )
10               Defendants.  )

11

12

13

          TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
14                 JANUARY 26, 2010
      BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE
15               VOLUME 99, A.M. SESSION

16

17   APPEARANCES:

18

19   For the Plaintiffs:      MR. W.A. DREW EDMONDSON
                              Attorney General
20                            MS. KELLY FOSTER
                              Assistant Attorney General
21                            State of Oklahoma
                              313 N.E. 21st St.
22                            Oklahoma City, OK  73105

23

24

25

```
 1  (APPEARANCES CONTINUED)      MR. M. DAVID RIGGS
                                 MR. DAVID P. PAGE
 2                               MR. RICHARD T. GARREN
                                 Riggs Abney Neal Turpen
 3                               Orbison & Lewis
                                 502 W. 6th Street
 4                               Tulsa, OK  74119

 5

 6                               MR. ROBERT A. NANCE
                                 MS. SHARON GENTRY
 7                               Riggs Abney Neal Turpen
                                 Orbison & Lewis
 8                               5801 Broadway
                                 Extension 101
 9                               Oklahoma City, OK  73118

10                               MR. LOUIS W. BULLOCK
                                 MR. ROBERT BLAKEMORE
11                               Bullock Bullock &
                                 Blakemore
12                               110 W. 7th, Ste 770
                                 Tulsa, OK  74119
13
                                 MR. FREDERICK C. BAKER
14                               MS. ELIZABETH CLAIRE XIDIS
                                 MS. INGRID MOLL
15                               Motley Rice LLC
                                 28 Bridgeside
16                               P.O. Box 1792
                                 Mount Pleasant, SC  29465
17

18
    For Tyson Foods:             MR. ROBERT W. GEORGE
19                               Tyson Foods, Inc.
                                 2210 West Oaklawn Drive
20                               Springdale, AR  72701

21                               MR. JAY THOMAS JORGENSEN
                                 MR. THOMAS GREEN
22                               MR. MARK HOPSON
                                 MR. GORDON D. TODD
23                               Sidley Austin LLP
                                 1501 K St. NW
24                               Washington, DC  20005

25
```

```
 1   (APPEARANCES CONTINUED)

 2   For Cargill:             MR. JOHN H. TUCKER
                              MS. THERESA HILL
 3                            Rhodes Hieronymus Jones
                              Tucker & Gable
 4                            100 W. 5th St., Ste 400
                              Tulsa, OK  74103
 5
                              MR. DELMAR R. EHRICH
 6                            MS. KRISANN KLEIBACKER LEE
                              MR. BRUCE JONES
 7                            Faerge & Benson
                              90 S. 7th St., Ste 2200
 8                            Minnaepolis, MN  54402

 9   For Simmons Foods:       MR. JOHN R. ELROD
                              MS. VICKI BRONSON
10                            Conner & Winters
                              211 E. Dickson St.
11                            Fayetteville, AR  72701

12   For Peterson Farms:      MR. A. SCOTT MCDANIEL
                              MR. PHILIP HIXON
13                            MS. NICOLE LONGWELL
                              MR. CRAIG MIRKES
14                            McDaniel Hixon Longwell &
                              Acord PLLC
15                            320 S. Boston, Ste 700
                              Tulsa, OK  74103
16
     For George's:           MR. WOODY BASSETT
17                           MR. VINCENT O. CHADICK
                             MR. JAMES GRAVES
18                           MS. K.C. TUCKER
                             MR. GARY WEEKS
19                           Bassett Law Firm
                             P.O. Box 3618
20                           Fayetteville, AR  72702

21   For Cal-Maine:          MR. ROBERT SANDERS
                             Young Williams P.A.
22                           P.O. Box 23059
                             Jackson, MS 39225
23
                             MR. ROBERT P. REDEMANN
24                           Perrine McGivern Redemann
                             Reid Berry & Taylor PLLC
25                           P.O. Box 1710
                             Tulsa, OK  74101
```

1                              INDEX

2

3    REBUTTAL WITNESSES ON BEHALF OF PLAINTIFF      PAGE

4

5    DR. SCOTT WELLS

6         Cross-Examination by Mr. Ehrich          11564
          Redirect Examination by Mr. Page         11587
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2  JANUARY 26, 2010:

3          THE COURT:  Mr. George, you had spoken

4  about the defendants preparing proposed findings and

5  conclusions on the Rule 52(c) RCRA motion.  And

6  obviously that's needed, because there's a lot of

7  misunderstanding what solid waste means under RCRA.

8  Has there been any developments in that area?

9          MR. GEORGE:  I can report on that,

10  Your Honor.  And I apologize, it's taken a little

11  more time than I anticipated.  I reviewed a draft

12  last night.  I think we're very close to having

13  something to submit for your review on that point.

14  And I propose that we make the submission midday

15  tomorrow, if that's okay.

16          THE COURT:  Understandably.  As you know,

17  and I think as Mr. Bullock has said, judges read the

18  papers, and I understand when I see people saying,

19  you know, Frizzell doesn't know solid waste when he

20  steps in it.  Of course, solid waste has a specific

21  meaning under RCRA, so I think it's important for --

22  for clarity, to outline and for the law under 52(c)

23  to do that.

24          MR. GEORGE:  I agree with that entirely,

25  Your Honor, and we'll get something for the court's

1   consideration tomorrow on that point, as well as any

2   other midtrial rulings that the court has made.

3           THE COURT:  Well, but my understanding is

4   that only 52(c) requires findings and conclusions.

5           MR. GEORGE:  That's correct.

6           THE COURT:  All right.

7           MR. GEORGE:  Thank you.

8           THE COURT:  Let's continue.

9           MR. PAGE:  Your Honor, I pass the witness.

10          THE COURT:  Very well.  Mr. Ehrich.

11          MR. EHRICH:  May I inquire?

12          THE COURT:  Yes.

13                  DR. SCOTT WELLS,

14  having been previously duly sworn, was called as a

15  witness and testified as follows:

16                  CROSS-EXAMINATION

17  BY MR. EHRICH:

18  Q.   Dr. Wells, good morning.  Good to see you

19  again.

20  A.   Good morning.

21  Q.   During yesterday's testimony, you indicated

22  that you thought that the question of whether your

23  model could produce identical runs, results after

24  identical runs, was ultimately a minor issue.  Is

25  that a fair characterization of what you said?

1    A.    What I was doing was characterizing what the

2    defendant claimed in his report, based on his

3    considered materials.  And, therefore, what he did

4    and what he presented and testified about was

5    insignificant.

6    Q.    Now, Dr. Wells, you, in another life, teach

7    students, do you not?

8    A.    Yes, I do.

9    Q.    You agree it's important for your students to

10   be as accurate as possible in their coursework?  Do

11   you agree with that?

12   A.    Oh, of course.

13   Q.    And in science, a key issue, you'd agree, is

14   whether results of experiments can be reproduced?

15   That's an important step in the scientific method,

16   correct?

17   A.    That's correct.

18   Q.    And in science, we use a variety of tools to

19   conduct our experiments, to try to figure out what's

20   really going on in the world, correct?

21   A.    Yeah, it depends on what you mean by "tools."

22   I'm not quite clear.

23   Q.    Sure, and that's exactly my point.  Whether

24   something is important or not depends, at least in

25   part, on the tool that you use and what sort of

1    results one could reasonably expect from that tool,

2    correct?

3    A.   That's correct.

4    Q.   Well, here, you looked a little puzzled.  Let

5    me give you a common sense example.  For example, if

6    we were to buy together a calculator at the local

7    Wal-Mart store, we might set up a little

8    experiment.  So, for example, let's say you add 10

9    plus 10 three times, okay?  The first time you do,

10   10 plus 10 equals 20.  The second time, 10 plus 10

11   equals 19.8.  The third time, 10 plus 10 is 20.2.

12   You understand that scenario?

13   A.   Yeah, I understand what you're saying.

14   Q.   So we can agree that at least for that

15   application, we'd conclude that there's probably

16   something wrong with that calculator, wouldn't we?

17   A.   For that very basic or very simple example,

18   yes.

19   Q.   We wouldn't accept -- strike that.

20         We wouldn't expect that if we were

21   publishing this result to people that they would

22   accept our assurances that, oh, never mind, you

23   know, 19.8, 20.2, that's close enough to 20.  In

24   that application, we wouldn't accept that result?

25   A.   That's correct.

1   Q.   Now, Dr. Wells, isn't it true that Dr. Bierman

2   isn't the only person who has noted that version 3.6

3   of your CE-QUAL-W2 model doesn't precisely

4   replicate, that is the results aren't the same in

5   duplicate runs; he's not the only one who's noted

6   that, correct?

7   A.   There was an example where HydroQual in New

8   Jersey did runs that were not replicatable.   That

9   was primarily initially due to their lack of

10  experience and understanding of how to compile the

11  code.

12  Q.   Isn't it also true that you were involved in a

13  TMDL for the Spokane River involving dissolved

14  oxygen?

15  A.   Yes.

16  Q.   And you indeed are the contract -- the modeling

17  contractor for EPA and for the Washington Department

18  of Ecology; isn't that right?

19  A.   I think it's through EPA.

20  Q.   I stand corrected.   It's true, isn't it, that

21  in that TMDL, there have been some concerns

22  expressed that the 3.6 version of this lake model

23  doesn't precisely replicate the dissolved oxygen

24  output?   Isn't that true?

25  A.   There was some words to that effect, but no

1  evidence was presented by HydroQual.

2  Q.   Well, isn't it true that HydroQual's criticism

3  was that dissolved oxygen may vary between these

4  duplicate runs to a tenth or so milligram per liter

5  of dissolved oxygen?  Have you heard those words?

6  A.   No, I haven't heard those exact words.  But we

7  did do a test in terms of replication, and we found

8  that 99.99 percent of the model results in the

9  Spokane River were within .09 milligrams per liter

10 of dissolved oxygen, which is obviously below even

11 independent people measuring dissolved oxygen below

12 the detection limit.

13 Q.   Let's get at it this way.  Yesterday in your

14 testimony, you said that there might be a number of

15 reasons that duplicate runs of your model might not

16 produce identical, if you will, results; that is, it

17 might not replicate, correct?

18 A.   That's correct.

19 Q.   Among those reasons, you pointed out it might

20 be inexperience of the modeler; is that correct?

21 A.   That's correct.

22 Q.   Might be the modeler might be using erroneous

23 input files; that is, they don't match with what the

24 original run was, correct?

25 A.   I didn't say that.

1  Q.  I stand corrected.  That could be a result -- a

2  reason that the duplicate runs might not match up,

3  correct?

4  A.  Could you explain that scenario.

5  Q.  I'm sorry.  Different input files.  One input

6  file is used for one run and another input file is

7  used for another one.  You'd expect that there

8  wouldn't be duplicate or replicatable results there?

9  A.  You'll have to narrow that down a little bit.

10  It's a little vague for me.  It depends on the kind

11  of differences you're looking at in the different

12  input files.

13  Q.  Understood.  But that might be a possible

14  reason that you wouldn't get runs that are

15  identical?

16  A.  Could be.

17  Q.  Correct.  You might be using different

18  compilers, if I remember correctly what you said

19  yesterday.  That may also be a reason why you

20  wouldn't get identical runs?

21  A.  That is correct.

22        THE COURT:  Back up just a second.  When

23  you use the term "compilers," what is meant,

24  Mr. Ehrich?

25        MR. EHRICH:  Shall we ask the witness?

1          THE COURT:  Because I have no idea.  Are we

2    talking about software?  What are we talking about?

3          MR. EHRICH:  I understand it as software,

4    but perhaps we better ask the witness.

5          THE WITNESS:  Basically a model is a set of

6    instructions written in a particular language,

7    computer language.  And this particular model was

8    written in Fortran 90/95/2003.  It's a particular

9    language.  And you need a compiler, which is a piece

10   of software that interprets those instructions into

11   what we call a model executable so that you can

12   actually run it on a computational platform.

13          So it actually interprets the instructions

14   and creates code that can then be run on either a

15   PC, a MAC, a Linux box or other -- you know, a super

16   computer, etcetera.  There are many different

17   compilers that are available on different platforms.

18          THE COURT:  The difficulty I'm having in

19   talking about -- or hearing this talk about

20   different input files and different compilers, it

21   would seem to me that one could only claim

22   replication problems if you're dealing with the same

23   input files and the same compilers.  The same

24   inputs, different results.  Could you-all flesh that

25   out here.

1          MR. EHRICH:  We can.  In fact, you've

2    anticipated where we're heading.

3    Q.   (By Mr. Ehrich)  So, Dr. Wells, if a modeler

4    used the same input file, the same compiler, that is

5    the same executable, and the identical computer

6    including the identical processors, you would expect

7    that duplicate runs would be identical, would you

8    not?

9    A.   You would expect -- you would hope that they

10   would be reasonably the same, absolutely.

11   Q.   I mean out to four, six, eight significant

12   digits, you would expect that, wouldn't you?

13   A.   It depends on if you're doing just simple

14   calculations.  For example, like your illustration

15   of the calculator was three different additions,

16   which is quite different compared to, let's say, a

17   CE-QUAL-W2 model run which includes hundreds of

18   millions of calculations.

19          And one of the things that the CE-QUAL-W2

20   model does which may affect this very insignificant

21   reproducibility factor has to do with how it deals

22   with the fact that the model, as it moves along in

23   time, sometimes decides that it's going numerically

24   unstable.

25          Now, what that means is it's operating in a

1   time step much higher than it should be, and it

2   catches itself and it goes back and redoes a

3   calculation.  Now, in some cases where it reaches

4   that point of numerical instability, it may reach

5   out to a memory location somewhere that may be

6   different from one run to another.

7           That is one of the five reasons -- in fact,

8   yesterday during my testimony, as I reviewed it, I

9   only mentioned four and I forgot the fifth one, had

10  to do with this idea of time stepping and the

11  approach to numerical instability and then backing

12  off on that.

13          And in my mind, with the OpenMP, which is

14  the multiple processors, sometimes it reaches a

15  different memory location and pulls a different

16  value in, which sometimes leads to this

17  insignificant reproducibility factor.

18  Q.  But you would not expect that result if one

19  used the single processor; that is, it's less likely

20  for the outcome you described to happen with a

21  single processor?

22  A.  That is correct.

23  Q.  Now, you mentioned in the Spokane River

24  dissolved oxygen TMDL, there were comments by

25  HydroQual.  HydroQual, if I understand correctly, is

1  working with one of the point source dischargers to

2  the river, right?

3  A.   That's correct.

4  Q.   That is, so that discharger has an interest in

5  evaluating the outcome, the science underlying that

6  TMDL, correct?

7  A.   I would hope so.

8  Q.   And in this case, Dr. Bierman, retained by the

9  defendants, has an interest or had an interest in

10 evaluating the outcomes predicted by your model.

11 You'd agree that's a pretty common sense thing that

12 happens in litigation, right?

13 A.   I guess so.

14 Q.   So you're not criticizing Dr. Bierman for

15 trying to take apart your model and see whether, in

16 fact, he could make it produce the same things, the

17 same output you did, right?

18 A.   Could you rephrase that question?

19 Q.   Well, Doctor, you're not suggesting that there

20 was anything inappropriate, that wasn't good science

21 in Dr. Bierman's taking apart your model and trying

22 to make it produce the same outcome that you noted

23 in your report?  Nothing inappropriate about that?

24 A.   No, but his conclusions based on that were, I

25 think, hyperbole.

1   Q.   But you know that Dr. Bierman, in fact, was

2   unable to make the model replicate, and that led to

3   communications between your team and his team,

4   correct?  Do you remember that?

5   A.   We did not receive any communications from

6   Dr. Bierman after our one conference call discussing

7   how to run the model.

8   Q.   And you provided responses identifying the

9   precise input files, the precise compiler executable

10  and the computers that you used in your model,

11  remember that?

12  A.   Yes, there was some probably e-mail

13  correspondence.

14  Q.   Right.  In using -- and you've read

15  Dr. Bierman's testimony -- using those instructions

16  from you, he could not make the model replicate, at

17  least by his lights, correct?

18  A.   When I looked at his considered materials, it

19  was the chart that I produced yesterday, that was

20  the result of one of his replication tests.  And if

21  you looked at the average difference in temperature

22  for the whole time period, it was 0.003 degrees

23  Celsius difference between the two, which is not

24  measurable.

25  Q.   Again, a step in the process that was

1  appropriate?

2  A.   It could be.

3  Q.   Let's do this.  We've heard lots of testimony

4  in this case, from Dr. Engel, from you, about

5  loadings that were used in your lake model, both for

6  calibration and for the predictions, future

7  predictions and the hindcast.  And it's clear that

8  your model requires some input of soluble reactive

9  phosphorus; is that right?

10  A.   That is correct.

11  Q.   And you asked Dr. Engel to provide you soluble

12  reactive phosphorus data for the calibration period

13  of January 1, 2005 to September 28, 2007, correct?

14  A.   No, that's not correct.  I did not ask him for

15  the data.

16  Q.   You understood he was going to provide that?

17  A.   I asked him for the LOADEST regression, but

18  that is not the data.

19  Q.   I understand that.  What the LOADEST does is

20  provide a way to estimate concentrations of

21  phosphorus for those days for which there is not an

22  actual observed measurement, if you will, actual

23  data?

24  A.   That is correct.

25  Q.   Okay.  And he provided you this LOADEST time

1  series; that is, daily values for each of the days

2  in those -- in that calibration period, correct?

3  A.   That is correct.

4        MR. EHRICH:  Could we bring up the

5  demonstratives which have been labeled Oklahoma

6  Exhibit 5406, 5409, and 5412.

7  Q.  (By Mr. Ehrich)  Dr. Wells, can you see the

8  screen?

9  A.   They're a little bit fuzzy.

10  Q.   When we need to, I'll ask that they be

11  enlarged.  Thank you.

12       Each of these graphs has a blue line; that

13  is, there's one for the Illinois River, there's one

14  for Barren Fork, there's one for Caney Creek.  And

15  each has a blue line that is the time series of

16  daily loadings that were provided by Dr. Engel; is

17  that right?

18  A.   That is correct.  I should correct that.  It's

19  not Dr. Engel's -- Dr. Engel's LOADEST regression is

20  part of that blue line, but the blue line has been

21  altered.  So it's not just Dr. Engel's --

22  Q.   You've anticipated me.  Where it's been altered

23  is where the blue line, if you will, leaps up or

24  leaps down, touch the actual data points that you

25  inserted in your work before the calibration run; is

1   that correct?

2   A.   Correct.  The discrete data points in red, or

3   for the Illinois River I think there's some in

4   green, are the actual measured field data at those

5   sites.  And those are where we did an interpolation

6   a few days before and a few days after to reach down

7   and -- reach up and grab those data points.

8             MR. EHRICH:  Could we expand 5406 or put it

9   by itself on the screen?

10            THE WITNESS:  That's better.

11  Q.   (By Mr. Ehrich)  So what you're saying, if I

12  understand correctly, is that where there is a red

13  square or a green triangle, that represents actual,

14  that is observed data, for soluble reactive

15  phosphorus?

16  A.   That is correct.

17  Q.   And where there isn't such a symbol, that is a

18  red square or a green triangle, then the values

19  represented on that curve are from Dr. Engel's

20  LOADEST calculation?

21  A.   That is correct.

22  Q.   Got it.  Now, will you agree with me that the

23  number of days in the calibration period between

24  January 1 of 2005 and September 28 of 2007 is, if

25  the map is right, 1002 days?

1   A.   I'd have to get my calculator out and make sure

2   it's a calculator that works and do that.

3   Q.   But you'd accept that.  I mean, that seems

4   right, doesn't it?

5   A.   Yeah, it's the right order of magnitude.

6   Q.   Sure.  Will you agree with me that the number

7   of actual data points shown on Oklahoma Exhibit, I

8   guess, Demonstrative 5406 for the Illinois River,

9   that is -- is 77.  That is, for 77 days, you've got

10  actual SRP data?

11  A.   Could be on that order of magnitude.  I'd have

12  to count them.

13  Q.   It's close.

14  A.   It would not be unreasonable, just looking at

15  the number of points.

16  Q.   Right.  You know, so will you agree with me

17  that there are 925 days for which you don't have

18  actual SRP data and, instead, have the values

19  calculated by Dr. Engel?

20  A.   That's correct.  The data does not exist for

21  that time period.

22  Q.   Right.  So that if Dr. Bierman's criticism is

23  correct, that is Dr. Engel provided not SRP data but

24  soluble phosphorus data, you've got 925 days that

25  contains soluble phosphorus data; is that right --

1  or soluble phosphorus values; is that right?

2  A.    Can you rephrase your question.

3  Q.    Sure, that's a bad question.

4        If Dr. Bierman's criticism of how Dr. Engel

5  calculated loadings to give to you for your

6  calibration is correct, what that means is you have

7  925 days of loading values, daily values that are

8  not soluble reactive phosphorus but, instead, are

9  based on soluble phosphorus?

10 A.    Unfortunately, that's not correct; and the

11 reason why it's not correct is that we didn't just

12 use actual data on that particular day.  We also

13 took, if I remember right -- I'd have to go back and

14 look -- three or six days before and three or six

15 days after to smooth the curve to reach those data

16 points.

17       So, actually, every data point, there's a

18 little time window of about a week around each data

19 point where that data point influences that line.

20 So take those 73 data points and then add seven more

21 days, approximately, on top of each of those date

22 points, and you have a much different time series

23 record that's influenced by the data.

24 Q.    What that means, though, is you still have --

25 if Dr. Bierman is correct, you still have a

1  substantial fraction of those points where you have

2  neither actual SRP data or interpolated SRP data;

3  and, instead, you have, if Bierman is right, values

4  that are based on soluble phosphorus and not soluble

5  reactive phosphorus.  That's right, isn't it?

6  A.   Yes.  So if you took a data point and you took

7  a week -- let's say, three or four days on either

8  side of that data point, any of the blue lines three

9  or four days outside that data point would not be

10 influenced by that data point.

11 Q.   So now let's bring up Exhibit -- Demonstrative,

12 I guess, 5409, which is the Barren Fork.  Would you

13 agree with me, Dr. Wells, that you had actual, that

14 is observed, SRP data for 45 days in this 1002

15 calibration period for Barren Fork?

16 A.   It seems the right order of magnitude.

17 Q.   Let's go to Exhibit 5412.  And this is Caney

18 Creek, is it not?

19 A.   Yes, it is.

20 Q.   Would you agree with me that you have actual

21 SRP data for Caney Creek over this 1002 day

22 calibration period of 23 days, does that sound

23 right?

24 A.   It looks approximately correct, uh-huh.

25 Q.   And, Dr. Wells, you have not testified at least

1    -- strike that.

2         You haven't, in your deposition or in this

3    trial testimony, testified that you had, in fact,

4    gone back to Dr. Engel's LOADEST calculation to

5    verify whether he used soluble phosphorus data or

6    soluble reactive phosphorus.  You just haven't done

7    that, have you?

8    A.   That is correct.

9    Q.   Okay.  Now, let's turn to this.  I was struck

10   by your testimony yesterday that your lake model

11   exists, if I remember the phrase, independently from

12   the -- from what's happening up in the watershed.

13   Do you remember that?

14   A.   I think you may have misunderstood what I was

15   trying to say.

16   Q.   Well, let's talk about that.  If your

17   calibration is correct, do I understand your

18   testimony correctly that your lake model will

19   accurately predict water quality in the lake given a

20   particular load of phosphorus at the gauging

21   stations at the head of Lake Tahlequah?

22   A.   Correct.  The model does, to a reasonable

23   degree, reflect what's going on in the lake.

24   Q.   If your calibration is correct?  And I

25   understand you say it is, but that's --

1   A.    Yes.

2   Q.    Right.  But you agree, do you not, that your

3   lake model requires someone to specify what the

4   phosphorus loading is at the gauging stations at the

5   head of Lake Tahlequah?

6   A.    That is correct.

7   Q.    And in this case, it was Dr. Engel who provided

8   those loadings to you from his linked GLEAMS routing

9   model output, right?  That is, from his predictions

10  and his hindcast.

11  A.    Not for the calibration model.

12  Q.    I understand that.  Let's try it again.  So for

13  the predictions, future predictions, future

14  scenarios and the hindcast, it was Dr. Engel's

15  output, that is from his model, that you then used

16  in your lake model?

17  A.    Yes, of course.

18  Q.    Okay.  If I understand correctly, what you did

19  with that -- those loadings is to break those total

20  phosphorus loadings apart -- sorry, that's how I

21  think about it -- using a regression analysis to

22  specify certain components of phosphorus, and then

23  those numbers were in turn fed into your model?  Is

24  that a common sense way of thinking about it?

25  A.    That's a very big, broad-brush approach.

1  Q.   But you didn't evaluate those loading -- the

2  loadings provided by Dr. Engel from his model; that

3  is, you didn't independently evaluate the outputs

4  from his various future scenarios or his hindcast,

5  correct?

6          MR. PAGE:  Objection, Your Honor, asked and

7  answered.  Irrelevant.

8          THE COURT:  Response.

9          MR. EHRICH:  Well, Your Honor, I think that

10 this is -- this is really at the heart of what

11 Dr. Wells did and, more importantly, what he didn't

12 do.  I think we're focusing on where his model fits

13 in the link of the causation chain.  So if you'd

14 allow me, I think I can move quickly on from this

15 to, I think, the central point.

16         THE COURT:  How is this relevant here?  You

17 say -- your question is, didn't evaluate those

18 loadings, that is you didn't independently evaluate

19 the outputs from his, Engel's, various future

20 scenarios or his hindcast.

21         Put this in context for me.  How is that

22 relevant to Wells' testimony?

23         MR. EHRICH:  Perhaps I should withdraw the

24 question and try it this way.  I think I can be more

25 direct, Your Honor.

1          THE COURT:  All right.

2  Q.  (By Mr. Ehrich) Let's try it this way.  When

3  Dr. Engel issued an errata to account for the error

4  that had been made, which didn't account for half

5  the watershed, you had to issue an errata, too?

6  A.   That's correct.

7  Q.   If the future loadings predicted in the various

8  scenarios by Dr. Engel's model are found by this

9  court, for whatever reason, to be flawed, then your

10  lake model predictions are flawed as well in the

11  sense that they may not correspond to the reality of

12  what's going on in the watershed; isn't that right?

13  A.   Well, I don't think you can say the lake

14  predictions are flawed, because what's happening is

15  the model is just responding to a loading.  And as

16  you crossed me on -- during my direct testimony, it

17  doesn't differentiate between different sources of

18  P.  It's just looking at total P and the different

19  components that are used in the model.

20          So what you're looking at is how does the

21  lake respond to changes in the watershed, whether

22  they increase or decrease.  So that is what you're

23  looking at in the model.  So in that particular

24  context, the model is not flawed.

25  Q.   So if I understand you correctly, your model is

1  going to accurately predict how the lake will

2  respond to any given phosphorus loading to the lake,

3  correct?

4  A.    That is correct.

5  Q.    Okay.  But whether that phosphorus loading to

6  the lake is an accurate representation of reality,

7  your lake model just simply doesn't address?

8  A.    That's true.  It's an irrelevant question for

9  my model.

10  Q.    So, for example, your lake model doesn't say

11  anything about the sources of the phosphorus loading

12  to the lake?

13  A.    That is correct.

14  Q.    So your lake model doesn't say anything about

15  whether wastewater treatment plants, for example,

16  are the dominant source of soluble reactive

17  phosphorus to the gauging stations above the lake?

18         MR. PAGE:  Your Honor, I think this is

19  getting irrelevant and beyond the scope of

20  rebuttal.  Clearly talking about sources is not

21  something that resembled anything in this testimony.

22         THE COURT:  Sustained.

23  Q.    (By Mr. Ehrich)  Given that your model doesn't

24  -- does not have a focus as to what's happening in

25  the watershed and, instead, only focuses on the

1   response of the lake to a given phosphorus loading,

2   if those phosphorus loadings do not correspond with

3   reality, what's really going on in the watershed,

4   your outputs then will not correspond to reality

5   either?

6   A.   Could you explain a little bit more what you

7   mean by --

8   Q.   Sure.  Let's take it this way.  If the

9   phosphorus loading -- if Dr. Engel's phosphorus

10  loading to the lake is, say, 10X, what you're saying

11  is, if your model is properly calibrated, it will

12  predict water quality and dissolved oxygen

13  accurately in the lake, correct?

14  A.   Yes, uh-huh.

15  Q.   If, instead, reality is the loading to the lake

16  is only X, your model is going to accurately

17  predict, you say, the response of the lake to that X

18  loading, correct?

19  A.   Uh-huh.

20  Q.   But whether the loading to the lake is 10X or

21  X, your model simply doesn't say?

22  A.   That's correct.

23  Q.   So at the end of the day, again, I'm struck by

24  your testimony that your model is -- you know,

25  operates independently.  If this court, for whatever

1  reason, finds that Dr. Engel's phosphorus loading

2  predictions are wrong, then although your lake model

3  will accurately predict whatever loading there is,

4  you can't say that those outcomes really correspond

5  to reality?  It just doesn't answer that question.

6  A.   Yes, as I already testified, it doesn't ask any

7  questions in the watershed.

8  Q.   Got it.

9        MR. EHRICH:  That's all I have.  Thank you.

10        THE COURT:  Mr. Page.

11              REDIRECT EXAMINATION

12  BY MR. PAGE:

13  Q.   Just a couple of questions, Doctor.  I'm going

14  to ask you about the temperature test.  Did

15  Dr. Bierman provide any analysis as to whether or

16  not if his temperature fluctuations were true, for

17  the red -- did it have any impact on the results for

18  your model?

19  A.   He never ran -- could you rephrase that.

20  Q.   What I'm trying to find out is whether or not

21  there was any tests done by Dr. Bierman to determine

22  whether or not those fluctuations that he observed

23  had any impact on the modeling results.

24  A.   I didn't see anything in his report or

25  testimony to the effect that he actually was able to

1  show that the model produced a different result as a

2  result of those fluctuations.

3  Q.   And it's your opinion, sir, that those

4  fluctuations, if they did exist, are immaterial; is

5  that correct?

6  A.   Yes.

7          MR. MCDANIEL:  Objection, leading.

8          THE COURT:  Rephrase, please.

9  Q.   (By Mr. Page) Do you believe that those

10  fluctuations, if they did exist, are material?

11  A.   I don't believe that those fluctuations

12  influenced the result of the model.

13  Q.   With regard to the SRP data issues that we

14  talked about here this morning, did Dr. Bierman make

15  any runs of your model with his claimed revised or

16  properly calculated SRP data to see if it would make

17  any difference?

18  A.   No, he didn't.  But that would have been a

19  great test for him to do, to see if the model

20  results were different.

21  Q.   Thank you, sir.  I have no other questions.

22          THE COURT:  Recross.

23          MR. EHRICH:  No, Your Honor.

24          THE COURT:  Very well.  You may step down.

25          MR. PAGE:  Your Honor, that ends the

 1   State's rebuttal case.

 2           THE COURT:  Surrebuttal.

 3           MR. GEORGE:  Your Honor, we do not intend

 4   to call any witnesses in surrebuttal.  Mr. Tucker is

 5   walking to the podium.  He must have something he

 6   wants to say.

 7           MR. TUCKER:  I do not intend to dispute

 8   Mr. George, Your Honor.  But I would make the sage

 9   observation brought about by my many, many years of

10   experience that there's nothing like an impending

11   ice storm to move along a case.

12           The defendants come at the close of this

13   and ask the court under Rule 201 to take judicial

14   notice of two items that have occurred in this

15   moving-target case subsequent to our last meetings.

16           The first would be an item that appeared in

17   the Federal Register January 19, 2010 which relates

18   directly to the TMDL which is under development by

19   the EPA for the Illinois River Watershed.

20           THE COURT:  So the papers were right.

21           MR. TUCKER:  And as Your Honor will note in

22   looking at this item, there are five items on which

23   the EPA has requested -- or six items which the EPA

24   has requested or invited data be submitted by

25   outside parties, and three of those data

1  specifically relate to nonpoint sources.

2          In fact, they refer to nonpoint source

3  loading rates for nutrients by source categories.

4  They refer to agronomic practices, poultry

5  practices.  They ask questions about locations of

6  poultry houses, feedlots, pastures and cattle in the

7  watershed.

8          The second item which we would like to ask

9  the court to take judicial notice of, which is -- I

10  would say it's readily locatable on the EPA website,

11  but kind of like listening to Mr. George read

12  through those formulas yesterday, I would not begin

13  to task the court reporter with that.

14          So instead I have taken the liberty of

15  putting the EPA web link on the page at the top of

16  the document, which is a letter to the Secretary of

17  Natural Resources of Virginia by the EPA relating to

18  the Delmarva Peninsula Chesapeake Bay program which

19  under Rule 201 would be a letter defining by the EPA

20  their view of a TMDL and its relationship to the

21  analysis of nonpoint sources.

22          Specifically, they refer to the TMDL having

23  as its obligation -- one of its many obligations in

24  the Chesapeake Bay, to develop appropriate

25  mechanisms to ensure that nonpoint source load

```
 1   allocations are achieved.
 2            That would be the two requests the court
 3   (sic) would make for taking judicial notice.  For
 4   purposes of the record, we've identified the first
 5   document.  As Howard explains it, everything must
 6   have a number, or it doesn't exist in his world.
 7            THE COURT:  The fact that it doesn't exist
 8   in Mr. Overton's world isn't definitive, but the
 9   Federal Register, I think, has an independent
10   existence separate and apart from Mr. Overton or
11   this court.
12            MR. TUCKER:  The citation for that would be
13   Volume 75, No. 11, Tuesday, January 19, 2010/Notices
14   at -- appearing at page 2860, and it's agency letter
15   FRL-9104-4.
16            The other item --
17            THE COURT:  Now, that's an easier matter, I
18   think, than the second.  Any objection as to the
19   request for judicial notice as to that first item?
20   Mr. Nance.
21            MR. NANCE:  Your Honor, we do object.  The
22   evidence is closed, and the defendants have
23   announced they have no surrebuttal.  I think the end
24   has come.
25            Also, we've had no notice under 201 that
```

1  they intend to offer this.  So all of the evidence

2  that is before the court is now before the court.

3  Both sides have rested, and rebuttal and surrebuttal

4  are completed.

5         THE COURT:  Of course, the topic was

6  broached in the case-in-chief, correct, or the

7  defense portion of the case?

8         MR. NANCE:  The defense portion of the case

9  did mention the EPA TMDL, but that doesn't change

10  the fact that the evidence is closed.

11         MR. TUCKER:  I believe Mr. George said --

12  and I didn't mean to interrupt if you're not

13  finished.

14         MR. NANCE:  I think I've made my point.

15  Both sides have rested, and there's no surrebuttal.

16         MR. TUCKER:  Mr. George made the point that

17  we weren't offering any more testimony in

18  surrebuttal.  I would also note under 201, as

19  Professor Weinstein reports -- or Judge Weinstein

20  reports in his book at 201.32 --

21         THE COURT:  Ms. Moll, who is the

22  evidentiary guru is --

23         MR. TUCKER:  Making her notes.

24         THE COURT:  -- making notes.

25         MR. TUCKER:  Notice may be taken at any

1  stage of the proceedings, and we're certainly still

2  in the proceedings because the defendant has not yet

3  even submitted its close of the case motions.  And

4  with -- as far as the notice is concerned, as I read

5  Mr. Weinstein -- and I'm not sure if it's judge -- I

6  think it is.  It is Judge Weinstein, isn't it,

7  Judge?

8          THE COURT:  I believe so.

9          MR. TUCKER:  If I'm correct, Judge

10  Weinstein is conducting a proceeding today in New

11  York that may be of great interest to this court.

12          In any event, the -- he also says that when

13  you're not in trial, then it's recommended that you

14  give notice by written filing.  When you are in

15  trial, it's recommended that you give notice in open

16  court, which is what we did today.

17          THE COURT:  201(c) allows the court to take

18  judicial notice, whether requested or not.  And it

19  may well be that this first item in the Federal

20  Register is something that would be proper -- a

21  proper subject of judicial notice, given that this

22  is a dynamic set of facts and the topic was touched

23  upon during the defendants' portion of the case.

24          We'll allow defendants' obviously to

25  suggest that as one of their proposed findings of

1    fact.  I won't decide that here today.

2           Now with respect to item No. 2, that's

3    really a different matter entirely, it seems to me.

4           Anything further?

5           MR. TUCKER:  In support of that, Your

6    Honor?

7           THE COURT:  Yes.

8           MR. TUCKER:  Yes.  I would call the court's

9    attention to again Weinstein's Federal Evidence,

10   Section 201.12 Subsection (6).

11          First Circuit decision in which the Circuit

12   Court took judicial notice of a letter written by

13   the Secretary of War accepting exclusive

14   jurisdiction over all lands in Puerto Rico

15   transferred to the United States for military

16   purposes.

17          Likewise, in the Tenth Circuit in 1991, in

18   *Kapcia v. Immigration & Naturalization Service*,

19   944 F.2d 702 at 705 and 706, Tenth Circuit approved

20   judicial notice of the BIA's administrative notice

21   that solidarity became a part of the Polish

22   Coalition government.

23          Obviously neither of those have to do with

24   TMDLs, poultry litter or the EPA, but they do have

25   to do with the fact that under 201(d) that the court

1    can take judicial notice of matters which are from a

2    federal agency which are for purposes -- for all

3    purposes -- intents and purposes undisputed.

4            And this is a document which is widely

5    available on the EPA's website.  The fact that it is

6    a letter of the EPA is undisputed, and will be

7    offered for the purpose of demonstrating in response

8    to the supplemental discussions that took place

9    during the defendants' case that TMDLs do indeed

10   extend to nonpoint sources as a part of their

11   determination of allocation of responsibility, which

12   is contrary to the position that was taken by the

13   plaintiffs previously in the case.

14           THE COURT:  Well, this is the first that

15   I've been presented this.  In the first paragraph,

16   apparently President Obama, in May of 2009, issued

17   an Executive Order relative to the Chesapeake Bay

18   entitled the Chesapeake Bay Protection and

19   Restoration Executive Order.  He's entered no such

20   order relative to Lake Tenkiller.

21           I suppose you all can suggest that in your

22   proposed findings and conclusions.  I'm doubtful

23   that it has any relevance here.  You're saying that

24   generally the EPA is taking the position that TMDLs

25   now are taking into account nonpoint source?

1           MR. TUCKER:  Yes.  That goes to the point

2    that we made during our case-in-chief to the effect

3    that the EPA's TMDL, which is under way for this

4    watershed, will consider nonpoint sources and will

5    allocate nonpoint sources along with point sources

6    in determining the maximum daily loads for the

7    Illinois River Watershed.

8           THE COURT:  Is that what's set forth here

9    in the Federal Register?  Does it specifically talk

10   about the subject matter encompassing nonpoint

11   source?

12          MR. TUCKER:  What this does, is it says

13   that the EPA is developing a watershed model.  The

14   results of this model may be used to develop one or

15   more TMDLs.  They are requesting data from any

16   interested parties who are interested in the topic

17   of the Illinois River Watershed.  And at page 2861,

18   they identify six categories in which they invite

19   data to be submitted by interested parties for the

20   preparation of TMDLs.

21          And this demonstrates that among the

22   information that they are seeking or inviting is

23   information regarding poultry houses, poultry

24   locations, nutrient loadings, any modeling that

25   anyone has done having to do with loading rates.

1  That is simply consistent with what we marked as

2  Defendants' Joint Exhibit 8158, which is the EPA

3  letter which the TMDL and the Chesapeake has been

4  under way.  The letter of the President -- the

5  Executive Order of the President merely was, to use

6  a euphemism, kind of like a cattle prod to the

7  government to get its act together -- governments to

8  get their act together and get forward with it.

9  Which they note in the letter that this energized

10  them -- actually, the President energized the

11  prospect.  But the letter from the EPA to the

12  Secretary of Natural Resources makes clear that the

13  EPA's position with regard to TMDLs includes

14  developing appropriate mechanisms to ensure that

15  nonpoint source load allocations --

16        MR. NANCE:  Your Honor, we're getting into

17  the substance of the document and the truth of the

18  matter asserted.  It's clearly hearsay.

19        THE COURT:  I'm not going to take it as

20  such just because he's reading it here, Mr. Nance.

21        Let's address the second one just as the

22  first.  Under 201(c), the court can decide whether

23  or not it wishes to take judicial notice.  Of

24  course, this is in surrebuttal -- well, there is no

25  surrebuttal, as Mr. Nance said.

1          MR. NANCE:  And it's not relevant to any

2    rebuttal topic.

3          THE COURT:  As contrasted with the first

4    insofar as the first was relevant to a portion of

5    the testimony in the defense side of the case.

6          We'll take it into consideration in the

7    proposed findings and conclusions.  I don't know,

8    however, I'm a little skeptical that it's going to

9    be judicially noticed here in this case insofar as

10   it pertains to the Chesapeake Bay.

11         I have not had an opportunity to look at

12   it.  It's obviously a multipage document.  It looks

13   like it would be about a dozen pages.  Does it say

14   generally that the EPA is henceforth going to take

15   into account nonpoint sources in developing TMDLs --

16         MR. TUCKER:  Well --

17         THE COURT:  -- or just as to the Chesapeake

18   Bay?

19         MR. TUCKER:  The letter seems to indicate

20   that that's always been their view, and they don't

21   act as though there is any new to that concept.

22         THE COURT:  Well, the fact is, it is.  It's

23   clear here on the record that EPA has bit off point

24   sources first, which makes logical sense, and it's

25   going to move into nonpoint sources as time goes on.

```
 1          MR. TUCKER:  I think --

 2          THE COURT:  And it's moving into nonpoint

 3  sources, as it should.  You know, it's just ordering

 4  its priorities.  So --

 5          MR. TUCKER:  For the benefit of the clerk's

 6  record, Your Honor, we'd like to give that Federal

 7  Register a number, just to avoid that phone call

 8  that I know I'll get, which would be Defendants'

 9  Joint Exhibit 8159.

10          THE COURT:  All right.  Certainly.

11          MR. TUCKER:  If I may, as a point of

12  personal privilege, since this is the last time I'll

13  be here in the case-in-chief, I'd like on the part

14  of the defendants to thank the court for your

15  incredible patience and consideration of all the

16  parties throughout this very lengthy matter.

17          THE COURT:  Well, thank you.  I very much

18  appreciate the quality of the legal work on both

19  sides.  I'm just utterly astounded.  The amount of

20  resources that have been poured into this is

21  mind-boggling.

22          Mr. Nance.

23          MR. NANCE:  Your Honor, am I to understand

24  correctly that the Federal Register piece is being

25  noticed, but the letter is not?  I just don't know
```

1    how to deal with it in our findings.

2            THE COURT:  No, you misunderstand.  I can

3    possibly take judicial notice under 201(c).  I may

4    or may not.  And I don't have to decide today.  So I

5    won't.

6            MR. NANCE:  I just wanted to understand

7    what the court had said, and now I do.

8            THE COURT:  I'm just giving you an idea.

9    It seems to me that a Federal Register notice,

10   particularly as it pertains to this watershed, may

11   well be something that I ought to take judicial

12   notice of.  And if I were sitting on the Tenth

13   Circuit, I'd scratch my head and wonder why that

14   silly judge didn't take judicial notice of it.  But

15   I'm not deciding that today.  It hit me cold here.

16           It strikes me that the Chesapeake Bay

17   letter probably won't be something that I take

18   judicial notice of.  But I also took a fresh look at

19   Rule 52, again (c), and it specifically provides

20   that the court may, however, decline to render any

21   judgment until the close of the evidence.  I'm going

22   to decline to enter judgment on the two remaining

23   Rule 52(c) subsets, state public law nuisance and

24   statutory claims, and we'll leave that for findings

25   and conclusions.  Particularly since I have to enter

1   findings and conclusions on RCRA.  So it's six one,

2   half dozen the other.

3          Mr. Nance.

4          MR. NANCE:  Your Honor, on behalf of the

5   State, we also want to thank you for your patience

6   during these considerable proceedings and your

7   attention to a great body of evidence that the State

8   has presented.

9          THE COURT:  Well, I hope we can all wrap

10  our mind around this great body of evidence.  It's a

11  lot of information.  Thank you, Mr. Nance.

12         MR. NANCE:  Thank you, Your Honor.

13         THE COURT:  Mr. McDaniel.

14         MR. MCDANIEL:  Thank you.  It's amazing how

15  many miles we've come together in this case, isn't

16  it, Your Honor?  When we were walking to the

17  courthouse when this thing started, we walked in the

18  room sweating and pulling our jackets off.  We've

19  skated home a number of days.  We've been through

20  about three seasons.  I've never had a trial that I

21  had to have five haircuts.  There's been a lot of

22  pressure on grooming.  In fact, some of us in here

23  have just given up on shaving.  The pressure is

24  great on everyone; I recognize that.

25         But we have come a long way in the pretrial

1    conference order.  We told the court that we were

2    going to try this case in 50 days.  Today is the

3    50th day of evidence.  So whether inefficiencies

4    were met with efficiencies, either way, we got it

5    done today.

6         THE COURT:  I had forgotten that.  You had

7    said 50 days.

8         MR. MCDANIEL:  So we can say that the pain

9    was entirely unanticipated.  We knew it was a

10   difficult case, and we used every bit of time and

11   every bit of the court's patience in getting it

12   done, but here we are at the end, Your Honor.

13        And at least as a matter of formality --

14   and I appreciate the comments the court just made

15   with regard to reserving its rulings under Rule

16   52(c), but the defendants do feel like we need to,

17   as a matter of record, renew and ask the court again

18   to take under consideration all of its Rule 52(c)

19   motions on the remaining claims and that state law,

20   public nuisance, federal common law nuisance,

21   trespass and the violation of the two antipollution

22   statutes, Oklahoma Statutes Title 27A Section

23   2-6-105 and Title 2 Section 2-18.1.

24        And, Your Honor, I, just for simplicity,

25   would like to incorporate our oral motions and all

1 arguments made at the close of the plaintiff's

2 evidence.

3        In our defense case-in-chief, we feel like

4 we dealt with a lot of critical issues, but as the

5 court is quite aware, we tried to focus a lot of our

6 case on rebutting the scientific, technical evidence

7 that the plaintiffs presented in support of their

8 causation arguments.

9        And we presented testimony and analyses of

10 what we certainly contend and believe are some of

11 the nation's top experts in environmental chemistry,

12 hydrology, water quality modeling, agronomy,

13 limnology, fisheries and stream ecology, and water

14 treatment and engineering and epidemiology.

15        And, Your Honor, we feel that the case we

16 presented showed that the plaintiffs have failed to

17 support their claim for causation with sound,

18 well-supported and unbiased science that considered

19 the myriad of potential alternative sources of

20 phosphorus in the complex Illinois River Watershed

21 environment.

22        So, Your Honor, we renew these motions and,

23 in particular, urge that it's clear that the

24 plaintiff's arguments with regard to general

25 causation against the use of poultry litter

1    generally and with regard to specific causation as

2    to each defendant lack support in both law and fact.

3            We submit that these claims cannot stand,

4    and renew our request that the court enter judgment

5    under Rule 52(c).  Thank you.

6            THE COURT:  The court will exercise the

7    right to decline to render any judgment under 52(c)

8    and will issue findings and conclusions following

9    the submission by the parties and after arguments

10   made by counsel.

11           Is there anything further?

12           MR. BULLOCK:  No, sir, not from the

13   plaintiff.  Thank you very much.

14           MR. GEORGE:  Nothing from the defendants,

15   Your Honor.

16           THE COURT:  Well, it's been a journey.

17   Hard to believe it's over.  It's over for you.  It's

18   not over for me.

19           We have our schedule for the close -- the

20   closing argument.  Thank you very much for all your

21   hard work.  And we'll look forward to closing

22   arguments on the 11th.  Very well.  We'll be

23   adjourned.

24           (END OF PROCEEDINGS.)

25

```
 1                 REPORTER'S CERTIFICATE

 2   I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

 3   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

 4   MATTER.

 5

 6                         S/Terri Beeler
                           Terri Beeler, RMR, FCRR
 7                         United States Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```