**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| | ) | |
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 05-CV-0329-GKF-PJC |
| | ) | |
| TYSON FOODS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
DEFENDANTS' MOTIONS FOR PARTIAL JUDGMENT PURSUANT TO RULE 52(c)**

Trial in this case commenced on September 24, 2009, with the court as the finder of fact.

At trial, plaintiff the State of Oklahoma asserted the following claims:

1. state law public nuisance and state law nuisance *per se*;

2. violation of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA");

3. federal common law nuisance;

4. trespass; and

5. violations of 27A Okla. Stat. § 2-6-105 and 2 Okla. Stat. § 2-18.1.

*See* Pretrial Order, Dkt. No. 2641 at 2 (Sept. 24, 2009). The State rested its case-in-chief on

December 14, 2009. After the State rested, defendants brought a number of motions for judgment

on partial findings under Federal Rule of Civil Procedure 52(c). The court heard extensive argument

on these motions from all parties over the course of three days.

Among other motions, defendants sought judgment in their favor on the State's claims that

the land application of poultry litter in the Illinois River Watershed ("IRW"): (a) is and has been

a nuisance *per se*; and (b) has violated and does violate RCRA. Defendants also sought judgment

on all of the State's legal claims to the extent they are based on the assertion that bacteria from the

land application of poultry litter has caused or is causing pollution in the IRW.

On December 14, 2009, the court orally granted defendants' Rule 52(c) motion regarding the State's claim based on the theory of nuisance *per se*.[1]  The Court also granted Defendants' motion with regard to the State's claims based on allegations of risks from bacteria.[2]  On December 15, 2009, the court orally granted defendants' Rule 52(c) motion concerning the State's claim under RCRA.[3]  Defendants' other Rule 52(c) motions were denied or taken under advisement.  As to the matters taken under advisement, the court concludes that said motions ought to be and are hereby denied, and such matters should and will be addressed by the parties in connection with the upcoming closing arguments and the court's consequent findings of fact and conclusions of law.

At the time the court granted the three motions described above, the court made oral findings of fact and conclusions of law on the trial record as required by Rules 52(a) and (c).  The court now supplements those oral findings and conclusions with the following written Findings of Fact and Conclusions of Law.  The court's rulings on the motions are based both on its oral findings and conclusions, and the written findings and conclusions set forth below.

## I.    THE RULE 52(c) STANDARD

Defendants' motions are governed by Federal Rules of Civil Procedure 52(a) and 52(c).

Rule 52(a) provides in relevant part:

> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

---

[1] Tr. at 8352:2-8353:5.

[2] Tr. at 8301:11-8306:23, 8353:24-8357:7.

[3] Tr. at 8410:17-8413:5.

Fed. R. Civ. P. 52(a)(1).  Rule 52(c) provides in relevant part:

> (c) Judgment on Partial Findings.  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

Rule 52(c) authorizes a court to enter judgment on an issue during a nonjury trial if a party has been fully heard and the court finds against the party on that issue.  Rule 52(c) "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence."  Fed. R. Civ. P. 52 Advisory Committee Notes to 1991 Amendment; Charles A. Wright & Arthur Miller, 9 Fed. Prac. & Proc. Civ. §§ 2371, 2573.1 (3d ed. 2008).  In granting a motion under Rule 52(c), the court is not limited in its evaluation of the nonmovant's case as it would be on a motion for judgment as a matter of law.  9C Fed. Prac. & Proc. Civ. § 2573.1; *Rego v. ARC Water Treatment Co. of Penn.*, 181 F.3d 396, 400 (3d Cir. 1999).  Rather, under Rule 52(c), the trial court may weigh the evidence, resolve disputed issues of fact, "and decide for itself in which party's favor the preponderance of the evidence lies."  9C Fed. Prac. & Proc. Civ. § 2573.1; *see also Roth v. American Hosp. Supply Corp.*, 965 F.2d 862, 865 & n.2 (10th Cir. 1992) (applying the former Rule 41(b), the precursor to Rule 52(c)); *Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 299 & n. 4 (10th Cir. 1987); *Woods v. North Am. Rockwell Corp*. 480 F.2d 644, 645-46 (10th Cir. 1973); *Johnson v. Olathe Dist. Schools Unified School Dist.*, 316 F.Supp.2d 960, 962 (D. Kan. 2003).  In so doing, the court is not required to consider the evidence in the light most favorable to the plaintiff, but may weigh the evidence to determine whether or not the plaintiff has demonstrated

3

a factual and legal right to relief.  *See Blankenship v. Herzfeld*, 661 F.2d 840, 845 (10th Cir. 1981);

*Tatum v. United States*, 2007 WL 756695, at *1 n.1 (E.D. Okla. Mar. 6, 2007).

Applying these standards, the court grants the following motions on the stated grounds.

## II.   NUISANCE *PER SE*

### A.   Findings of Fact

1.      Among other legal claims, plaintiff the State of Oklahoma asserts that the practice

of applying poultry litter to the land in the IRW constitutes a nuisance *per se*.[4]

2.      Poultry litter is a mixture of poultry feces and the bedding (often wood shavings, or

rice or peanut hulls) on which flocks of poultry are raised.[5]  Both in the past and currently, poultry

growers, cattle ranchers, and others have spread poultry litter on fields in the IRW and elsewhere

as a fertilizer and soil amendment.[6]

3.      During the State's case-in-chief, the evidence showed that poultry litter can be used

as a fertilizer and soil amendment in a manner that does not necessarily cause a nuisance.  In other

words, poultry litter does not always cause a nuisance at all times and under any circumstances,

regardless of where or how much is applied.

4.      Witnesses presented by the State testified that the State of Oklahoma regulates the

use of poultry litter as a fertilizer.  *See*, *e.g.*, Tr. at 463:14-465:6, 482:20-485:8 (M. Tolbert); 2936:2-

5 (T. Gunter).  Under Oklahoma's regulatory system, applications of poultry litter to land in the

---

[4] Pretrial Order, Dkt. No. 2641 at pp. 2-3, pp. 10-11 ¶¶57-61, pg. 20 ¶¶43-46 (Sept. 24, 2009).

[5] *See* Tr. at 1448:16-1449:4 (S. Phillips); 1802:4-19 (B. Fisher); 3416:16-3417:1 (P. Pilkington); 4805:24-4806:7 (K. Houtchens).

[6] *See* Tr. at 1448:16-1449:4, 1453:21-1454:17 (S. Phillips); 3724:18-3725:2, 3725:25-3726:5, 3734:4-12 (J. Pigeon); 3903:25-3904:5 (R. Collins); 3958:4-19 (D. Henderson); 4500:11-21, 4589:15-4590:18 (J. Reed); 4864:3-8 (T. Alsup); 5128:2-5, 5129:5-5132:21 (G. Johnson); 6829:3-20 (R. Taylor).

Oklahoma portion of the IRW are performed by registered poultry farmers or certified applicators under the terms of an animal waste management plan ("AWMP") specific to the property where the poultry litter is to be applied.  *See*, *e.g.*, Tr. at 464:17-466:2, 467:1-470:4 (M. Tolbert); 2899:15-2900:5, 2938:25-2944:4, 2974:16-2975:18 (T. Gunter); *see also* 2 Okla. Stat. § 10-9.1, *et seq.* (Oklahoma Registered Poultry Feeding Operations Act); Okla. Admin. Code § 35:17-5-1, *et seq.* (same; "The rules . . . assist in ensuring beneficial use of poultry waste while preventing adverse effects to the waters of the State of Oklahoma."); 2 Okla. Stat. § 10-9.16, *et seq.* (Oklahoma Poultry Waste Applicators Certification Act); Okla. Admin. Code § 35:17-7-1, *et seq.* (same).

5.    The AWMPs are written by two individuals under contract with the Oklahoma Department of Agriculture, Food, and Forestry ("ODAFF"). *See* Tr. at 479:20-480:3 (M. Tolbert); 2906:25-2909:16, 2947:10-17, 2991:4-9 (T. Gunter).  On occasion, Nutrient Management Plans ("NMPs"), which perform the same function as AWMPs, are written by the National Resources Conservation Service ("NRCS").  The AWMPs are required to be site specific; that is, tailored to the characteristics of the specific parcels of land to which an AWMP relates.  *See* Tr. at 464:17-466:2, 489:23-490:11 (M. Tolbert); 2953:5-21, 2965:17-2967:11 (T. Gunter). The AWMPs provide instructions for the poultry grower or licensed litter applicator on how much litter can be applied to a parcel of property—and under what conditions—without discharge or runoff of waste from the application site to the waters of the State.  *See* Tr. at 2940:21-2944:13, 2958:18-2964:17, 2972:8-2975:19 (T. Gunter); 2 Okla. Stat. § 10-9.7(C)(6)(c).  The AWMPs provide poultry growers with instructions on "the production, handling, and distribution of wastes in a manner that prevents or minimizes degradation of air, soil, and water resources,"[7] and the parties placed AWMPs into

_____

[7] Tr. at 3859:7-18 (J. Pigeon); *see also*, *e.g.*, Tr. at 3856:24-3857:20 (J. Pigeon); 3922:24-3923:2 (R. Collins); 4099:6-4104:13, 4116:19-4117:9 (B. Anderson); 4576:22-4588:25 (W.A.

5

evidence that contain instructions to this effect, *see*, *e.g.*, Defs.' Joint Exs. 1, 3480.

6.      These facts were confirmed by a number of the witnesses the State called in its case-in-chief.  For example, the State presented the testimony of Teena Gunter, Deputy General Counsel for ODAFF, who explained that an AWMP "is a document that assists the grower in knowing what to do with their litter after -- once it's removed from the barns" and that the AWMPs incorporate "site-specific" analysis of the characteristics of each specific farmer's poultry litter, soil and proximity to streams.  Tr. at 2899:15-2900:5 (T. Gunter).

7.      Testimony presented during the State's case confirmed that the AWMPs permit application of poultry waste in Oklahoma so long as 1) the poultry waste is not applied to land when the ground is frozen; 2) discharge or runoff of waste from the application site does not occur; and 3) the timing and rate of poultry waste applications are based on the assimilation capacity of the soil profile, assuming usual nutrient losses, expected precipitation, and soil conditions.  The State's former Secretary of the Environment agreed that the announced purpose of ODAFF's rules on Registered Poultry Feeding Operations is to "assist in ensuring the beneficial use of poultry waste while preventing adverse effects to the waters of the state of Oklahoma." Tr. at 463:11-464:2 (M. Tolbert quoting Okla. Admin. Code § 35:17-5-1).  In adopting the regulations, the State of Oklahoma has permitted the application of poultry waste in the state, subject to limitations.

8.      The parties dispute the legal significance of the AWMPs and the State's regulations governing the use of poultry litter.  The Court need not resolve that legal dispute in ruling on the Defendants' Rule 52(c) motion regarding nuisance *per se*.  Rather, the evidence presented in the State's case-in-chief establishes, as a matter of fact, that the State instructs the contractors who

---

Saunders).

prepare AWMPs that they must tailor those documents to each field in a manner sufficient to prevent runoff or discharge of poultry litter to the waters of the State. *See* Tr. at 467:1-470:4 (M. Tolbert); 2940:21-2944:13, 2972:8-2975:19 (T. Gunter); 2 Okla. Stat. § 10-9.7(C)(6)(c). State officials have also informed poultry growers who take mandatory training sessions that their AWMPs "will also include particular practices which [the farmer] can use to make sure that you do not have runoff of the poultry litter from your land application sites to waterways surrounding your facilities." Tr. at 2972:8-2975:19 (T. Gunter quoting Defs.' Joint Ex. 1191-A). The State's instructions to its contractors to create AWMPs with sufficient protections to prevent pollution to the waters of the State, and its messages informing farmers that the AWMPs are sufficient to prevent such pollution, constitute a recognition that it is possible to apply poultry letter in some circumstances without creating a nuisance.

9.     The State's injunctive requests in this case recognize that the use of poultry litter as a fertilizer in the IRW does not always cause environmental harm. In this case, the State requests that the Court enter an injunction prohibiting the land application of poultry litter in the IRW on fields where the soil already contains a certain level of phosphorus. For purposes of this case, the parties have discussed the measurements of phosphorus in soils as "soil test phosphorus" or "STP." *See*, *e.g.*, Tr. at 5159:11-5161:5 (G. Johnson). The State has proposed various cutoff levels for the injunction it requests, including that application of poultry litter be prohibited on land having an STP level of greater than 65 pounds per acre or, alternatively, 120 pounds per acre.[8] Implicit in these

---

[8] *Compare* Tr. at 64:16-20 (State's opening statement), 8285:17-20, 8352:16-8353:2, 8600:7-9 (hearing on Rule 52(c) motion); *with* Tr. at 37:22-38:3 (State's opening statement), 536:5-15 (M. Tolbert), 5095:6-18, 5164:24-5165:3 (G. Johnson); *see also* Tr. at 105:3-10 (Defendants' opening statement), 8189:7-11 (hearing on Rule 52(c) motion).

requests is an acknowledgement that the land application of poultry litter does not always create a nuisance, but instead may be done under circumstances in which it does not create a nuisance.

10.     Finally, the evidence presented by the State's experts showed that poultry litter is not a nuisance in all circumstances.  In testifying about soil phosphorus, Dr. Gordon Johnson of Oklahoma State University opined that not all of the poultry litter that is generated within the IRW should be exported to other watersheds to prevent environmental harms, but rather that poultry litter applications in the IRW should be limited to fields where soil tests demonstrate that the field needs additional phosphorus compounds to promote plant growth.  *See* Tr. at 5098:8-16 (G. Johnson). Regardless of whether the Court adopts Dr. Johnson's standard, his testimony establishes that poultry litter may be used as a fertilizer within the IRW in at least some circumstances, locations or surroundings without causing harm to nearby waters or otherwise creating a nuisance.

**B.     Conclusions of Law**

1.     The standard for a nuisance *per se* is well settled under Oklahoma law.  A nuisance *per se* is "an act, occupation or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings."  *Sharp v. 251st St. Landfill, Inc.*, 810 P.2d 1270, 1276 n.6 (Okla. 1991), overruled on other grounds by *DuLaney v. Okla. State Dep't of Health*, 868 P.2d 676, 678-79 (Okla. 1993); *see also McPherson v. First Presbyterian Church*, 248 P. 561, 564-65 (Okla. 1926).  In contrast, a nuisance *per accidens* is "[a]n act, occupation, or structure, not a nuisance *per se,* but which may become a nuisance by virtue of the circumstances, location or surroundings."  *Id.*; *see also Burlington N. & Santa Fe R.R. Co. v. Spin-Galv*, No. 03-CV-162-P(J), 2004 U.S. Dist. LEXIS 30999, *13-14 (N.D. Okla. Oct. 5, 2004), overruled on other grounds by *Burlington N. & Santa Fe Ry. v. Grant*, 505 F.3d 1013, 1022, 1023, 1029 (10th Cir. 2007).

8

2.      Here, as discussed above, the State has not demonstrated that the land application of poultry litter in the IRW is "a nuisance at all times and under any circumstances, regardless of location or surroundings." *Sharp*, 810 P.2d at 1276 n.6.  The overwhelming evidence presented to this court is to the contrary.  As a result, the State has not established that the land application of poultry litter is a nuisance *per se*.[9]  The court therefore granted partial judgment in favor of defendants on the State of Oklahoma's claim of nuisance *per se*.

3.      The State's claim that the use of poultry litter as a fertilizer and soil amendment has caused a nuisance *per accidens* in the Illinois River and its tributaries or Lake Tenkiller remains an issue for decision on final findings and conclusions.

## III.    Bacteria

### A.      Findings of Fact

1.      In the Pretrial Order, the State based its claims in part on the allegation that bacteria from land-applied poultry litter have polluted the waters of the IRW and that these bacteria pose a risk to human health or the environment.  Specifically, the State alleged that "Defendants have directly or indirectly polluted the waters of the Illinois River Watershed within Oklahoma with phosphorus in the form of phosphorous compounds and bacteria from the waste generated from the raising of Defendants' poultry that is applied to lands in the Illinois River Watershed."  Pretrial Order, Dkt. No. 2641 at 2 (Sept. 24, 2009).

2.      However, at trial the State presented scant evidence regarding:  (a) the presence or absence of bacteria in the surface waters or groundwater of the IRW; (b) the type and number of those bacteria; (c) whether those bacteria present a risk to human health or the environment; or (d)

_____

[9] Tr. at 8352:2-8353:5 (Court's midtrial Rule 52(c) ruling).

whether those bacteria come from poultry litter or some other source.  These issues were discussed in great detail during the preliminary injunction hearing in this case, *see* Opinion and Order, Dkt. No. 1765 at 7 (Sept. 29, 2008), *aff'd Attorney General of the State of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 782 (10th Cir. 2009), but at the trial on the merits the State did not provide similar evidence relating to bacteria.

3.      At argument on the Rule 52(c) motions, counsel for the State said "we're not dismissing, per se, our bacterial claim.  Obviously, we want to preserve it for appellate purposes because obviously we take issue with Your Honor's Daubert rulings and those sort of things. . . . But we acknowledge those rulings and have proceeded, given the time constraints of this trial and those rulings, and recognizing that if you fix the phosphorus problem, the bacterial hearts and minds will follow."  *See* Tr. at 8302:5-15 (hearing on Rule 52(c) motion).  In other words, the State chose to focus its trial presentation on allegations of phosphorus pollution because the State believed an injunction against the land application of poultry litter based on phosphorus compounds would also address the State's concerns with regard to bacteria. The State conceded at argument that "[a]dmittedly, there's not a lot of evidence in the record on this point [that land application of poultry litter has caused the waters of the IRW to becom polluted with harmful bacteria]." *See* Tr. at 8356:3-11.

4.      If the present case were being tried to a jury, the existence of this slight evidence might persuade the Court to defer decision on this issue until the conclusion of the trial or to permit the claim to be submitted to the jury.  Because the case is being tried to the Court as finder of fact, however, the Court may address the issue at the close of plaintiff's evidence based on its view of the credibility and sufficiency of the evidence. *See Roth*, 965 F.2d at 865 & n.2; *Feldman*, 813 F.2d

at 299 & n.4; *Blankenship*, 661 F.2d at 845; *Tatum*, 2007 WL 756695, at *1 n.1; 9C Fed. Prac. & Proc. Civ. § 2573.1; *see also* Tr. at 8356:12-16.

5.      Although the record contains some limited evidence concerning the issue of bacterial pollution, the Court concludes as a matter of fact that the evidence introduced by the State is insufficient to prove that (a) the land application of poultry litter has caused the surface waters or groundwater of the IRW to become polluted with bacteria; or (b) bacteria from poultry litter pose a risk to human health or the environment in the IRW. The Court excludes from this ruling plaintiff's allegations and evidence presented by both plaintiff and defendants relating to blue-green algae (sometimes referred to as cyanobacteria).

**B.      Conclusions of Law**

1.      The State's bacteria claims are premised on allegations that the land application of poultry litter has polluted the surface waters or groundwater of the IRW with bacteria, and these bacteria present a risk to health or the environment. Although there is limited evidence on bacteria in the trial record, the Court has weighed the evidence and found as a trier of fact that the evidence produced by the State is insufficient to demonstrate that the land application of poultry litter in the IRW has caused the presence of pathogenic bacteria in the waters of the IRW, or created a risk to health or the environment. In light of the Court's conclusion that the factual evidence is insufficient to support claims of bacterial contamination, the Court has granted partial judgment in favor of Defendants on all of the State of Oklahoma's bacteria claims.[10]

---

[10] Tr. at 8301:11-8306:23, 8353:24-8357:7 (Court's midtrial Rule 52(c) ruling).

IV.     **Resource Conservation and Recovery Act (RCRA)**

A.     **Findings of Fact**

1.     Poultry litter is an agricultural commodity for which there is both a market and a market value in the IRW.  Numerous witnesses called by the State testified that poultry litter is bought, sold and traded in the IRW and has been for many years.  *See* Tr. at 3734:4-12 (J. Pigeon); 3901:10-16 (R. Collins); 4507:18-4508:3 (J. Reed); 4552:19-4553:18, 4589:15-4590:18 (W.A. Saunders) (poultry litter currently sells for $15 per ton in the barn); 6831:17-6832:5 (R. Taylor) (poultry litter has cash value).  The money that poultry growers receive from selling poultry litter is often used to offset other farm costs.  *See*, *e.g.*, Tr. at 4497:1-4498:3 (J. Reed); 4555:15-4556:2, 4590:19-4591:10 (W.A. Saunders).  Specifically, several poultry growers called by the State testified that they use the money obtained from the sale of poultry litter to purchase clean bedding to be used in raising new flocks of poultry.  *See*, *e.g.*, Tr. at 4497:1-4498:3 (J. Reed); 4555:15-4556:2, 4590:19-4591:10 (W.A. Saunders).

2.     Poultry litter has market value because it can be beneficially used as a fertilizer and soil amendment.[11]  Witnesses called by the State admitted that "[t]he main benefit of litter becomes its use as fertilizer. . . ."  Tr. at 1448:16-1449:4 (S. Phillips confirming a statement contained in Ok. Ex. 5881 at 7); *see* also Tr. at 4500:11-21 (J. Reed) (testifying that poultry litter can be superior to commercial fertilizers in certain respects).  In addition, the evidence at trial showed that poultry litter has agricultural value as a soil amendment apart from the value of the litter's nutrient content.  As Shannon Phillips, the director of the Water Quality Division of the Oklahoma Conservation

---

[11] *See* Tr. at 1448:16-1449:4, 1453:21-1454:17 (S. Phillips); 3724:18-3725:2, 3725:25-3726:5, 3734:4-12 (J. Pigeon); 3903:25-3904:5 (R. Collins); 3958:4-19 (D. Henderson); 4500:11-21, 4589:15-4590:18 (J. Reed); 4864:3-8 (T. Alsup); 5128:2-5, 5129:5-5132:21 (G. Johnson); 6829:3-20 (R. Taylor).

12

Commission, explained, some soils in Oklahoma have been depleted of organic matter, and the addition of poultry litter when it's incorporated into those soils can improve the organic matter content of the soil and can reduce the risk that the soil will erode. *See* Tr. at 1453:21-1454:17 (S. Phillips). Dr. Gordon Johnson agreed that poultry litter may provide certain micronutrients to the soil, can improve soil pH, can improve water retention of soil, and may promote aggregation of soil particles. *See* Tr. at 5129:5-5132:21.

3. One factor currently limiting litter sales outside of the IRW is that neighbors of poultry growers want to purchase the litter from nearby sources, and poultry growers accede to this local demand. *See*, *e.g.*, Tr. at 1457:8-19 (S. Phillips). Poultry growers testified they sell poultry litter to their neighbors. *See*, *e.g.*, Tr. at 3734:4-12 (J. Pigeon); 4471:15-23 (J. Reed). It is also common for poultry growers to use the poultry litter produced on their farms for their own agricultural operations. *See*, *e.g.*, Tr. at 1457:8-25 (S. Phillips); 4471:15-23, 4497:1-4498:3 (J. Reed). A number of poultry growers called by the State testified that they have multiple agricultural activities on their farms (such as raising cattle and other livestock), and that they use poultry litter to increase grass yields on their pastures for livestock. *See*, *e.g.*, Tr. at 3958:4-3959:15 (D. Henderson); 4421:19-4422:2 (S. Storm) ("Typically one of the benefits of a contractual relationship [with a poultry integrator] is that the contract grower wants the manure for their own land for fertilizing purposes."); 4574:8-19 (W.A. Saunders) (poultry litter from grower operation increased cattle production four-fold). Joel Reed testified that when he became a poultry grower, the fact he was getting the poultry litter was important to him, and that without poultry litter his cattle operations would be curtailed. *See* Tr. at 4490:4-4491:6 (J. Reed) ("If I didn't have the litter, I wouldn't be able to afford to fertilize my land and I would probably have to cut my cattle herd two-

thirds."); *see also* Tr. at 4497:1-4498:3 (J. Reed).  He was not alone.  Al Saunders testified that he became a poultry grower in part because his soil was poor and needed fertilizer, he couldn't afford commercial fertilizer, and that the poultry litter has allowed him to grow grass and expand his cattle operations.  *See* Tr. at 4570:2-4571:18 (W.A. Saunders).

4.      It is well established on this record that poultry litter has value in the marketplace as a fertilizer and soil amendment, and that poultry growers, ranchers and others in the IRW routinely use poultry litter by applying it to pastures and other crops as a fertilizer and soil amendment.[12]  For example, Shannon Phillips testified that "[p]oultry production offers agricultural producers an additional source of income with the added benefit that poultry litter is an excellent fertilizer resulting in pastures that can support additional head of cattle."  Tr. at 1446:14-1447:11 (S. Phillips quoting from Ok. Ex. 5881 at 3).  Ms. Phillips clarified that raising poultry offers cattle ranchers multiple extra sources of income because "[t]here is the potential that they could sell the litter and [using the litter as fertilizer] also provides them the opportunity to raise additional cattle."  Tr. at 1447:3-11 (S. Phillips).

5.      Poultry litter is also used as payment for services rendered.  Roger Collins, a licensed commercial poultry litter applicator, testified that he provides the service of cleaning old poultry litter out of poultry houses in exchange for the litter, which he then markets, sells, and  sometimes spreads.  *See* Tr. at 3891:22-3892:15 (R. Collins).

6.      The market for poultry litter is not limited to the IRW.  Rather, poultry litter is bought, sold and traded in a marketplace that is not necessarily defined by the boundaries of any

---

[12] *See* Tr. at 1448:16-1449:4, 1453:21-1454:17 (S. Phillips); 3724:18-3725:2, 3725:25-3726:5, 3734:4-12 (J. Pigeon); 3903:25-3904:5 (R. Collins); 3958:4-19 (D. Henderson); 4500:11-21, 4589:15-4590:18 (J. Reed); 4864:3-8 (T. Alsup); 5128:2-5, 5129:5-5132:21 (G. Johnson); 6829:3-20 (R. Taylor).

particular watershed, although economic factors tend to limit the distance litter is transported from its source.  The evidence shows that some poultry litter is and has been exported outside the IRW for use as a fertilizer.  *See* Tr. at 1369:18-1371:20, 1376:23-1380:11 (S. Phillips); 3058:9-24 (M. Henderson); 3721:15-3722:11 (J. Pigeon); 3931:15-3933:3 (R. Collins); 4306:18-4307:12 (B. McClure); 4498:4-4499:25 (J. Reed); 4553:1-18 (W.A. Saunders); 4637:11-25 (S. Patrick); Ok. Ex. 2535; Ok. Ex. 5881.

7.      The agronomic rate of a particular nutrient for a particular plant is the amount of that nutrient needed to maximize plant growth.  *See, e.g.,* Tr. at 372:25-373:2 (M. Tolbert); 955:19-25 (Fite).

8.      Plaintiff's expert Dr. Gordon Johnson acknowledged that, if there is a nitrogen deficiency in the soil of a bermudagrass pasture, land application of poultry litter can benefit the grass even in the absence of an agronomic need for phosphorus.  *See* Tr. at 5164:11-5169:13 (G. Johnson); *see also*, *e.g.*, Tr. at 4484:6-16 (J. Reed) (poultry grower's testimony that he applied litter in the absence of agronomic need for phosphorus "[b]ecause I need nitrogen to grow my grass").  Dr. Johnson testified that the phosphorus indices with which he is familiar do not limit the land application of litter to the agronomic rate for phosphorus.  *See* Tr. at 5089:4-7 (G. Johnson); *see also* Tr. at 465:7-466:2 (M. Tolbert)(existing Oklahoma law does not limit growers to the agronomic rate).

9.      The State has not produced sufficient evidence to convince the court that farmers, ranchers or other applicators in the IRW land applies, or has land-applied, poultry litter within the IRW solely to discard it.  The State's expert, Dr. Bert Fisher, was unable to testify to a practice in the IRW of land-applying poultry litter for the sole purpose of disposing of it.  *See* Tr. at 2439:1-

2440:12 (B. Fisher).  Grower Al Saunders likewise testified that he had never observed anyone land-applying poultry litter simply to get rid of it, stating that "makes no sense at all" given the monetary value of the litter.  Tr. at 4589:15-4590:18 (W.A. Saunders).

> **B.**    **Conclusions of Law**

1.    To prevail against a defendant on its claim under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B), the State must prove, among other things, that the defendant "contributed to, or is contributing to, the handling, storage, treatment, transportation or disposal of solid . . . waste."  *Burlington N. & Santa Fe Ry. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007).  The phrase "solid waste" is a legal term of art when used in the context of a RCRA claim.

2.    Under RCRA, the term "solid waste" includes material from agricultural operations to the extent that the material is "garbage, refuse" or other "discarded material."  42 U.S.C. § 6903(27).  The statute provides in relevant part:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities ....

*Id*.  The State does not claim that poultry litter is "garbage" "refuse" or "sludge" within the meaning of RCRA,[13] and therefore the court must examine whether poultry litter constitutes "other discarded material" resulting from agricultural operations.[14]

---

[13] *See* Pretrial Order, Dkt. No. 2641 at 9-10 ¶46.

[14] The State originally alleged that land-applied poultry litter is also a "hazardous waste" under RCRA, but the State is no longer pursuing that claim.  *See* Aug. 13, 2009 Summ. J. Hrg. Tr. at 150:11-151:12 (Dkt. No. 2533) (Aug. 27, 2009).

3.     The parties dispute the legal standard for determining whether a material is "discarded" and thus "solid waste" under RCRA.  The court declines to adopt either party's position wholesale.  However, this legal dispute is not determinative of the court's decision in this case.  On the record before the court, poultry litter would not qualify as "discarded material" under any of the parties' legal interpretations.

4.     Material is considered to be "discarded" where it is disposed of, thrown away or abandoned.  *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 55-56 (D.C. Cir. 2000); *see also Am. Mining Congress v. EPA*, 824 F.2d 1177, 1183-84 (D.C. Cir. 1987) ("The ordinary, plain-English meaning of the word 'discarded' is 'disposed of,' 'thrown away' or 'abandoned.'").  On this point the parties agree.  Additionally, the parties agree that the term "discarded" cannot encompass materials that are "destined for beneficial reuse or recycling in a continuous process by the generating industry itself."  *Am. Mining Congress*, 824 F.3d at 1186 (emphasis omitted).

5.     In the present case, the evidence is insufficient to establish that poultry litter is being "discarded" in the IRW by being disposed of, thrown away or abandoned.  The evidence establishes that farmers (including poultry growers, cattle ranchers and others) value poultry litter and pay a market value to obtain it.  They do so for the purpose and with the effect of using the litter as a fertilizer and soil amendment to support their agricultural enterprises.  The State itself regulates the application of poultry litter in an attempt to allow its beneficial use.  Although some poultry growers have more poultry litter than they need for their own farms (or more than they can use on their own lands under the limits established in the governing Oklahoma and Arkansas regulations), a  nascent market exists to exchange this excess litter for cash, clean bedding for new poultry flocks, or other goods or services.  The State failed in its case-in-chief to show the court that  poultry growers or

17

others are applying (or have applied) poultry litter to the land simply to be rid of it.

6.      The State argues that poultry litter is "discarded" when a forage crop needs nitrogen from poultry litter, but does not need the phosphorus contained in the litter.  But a substance does not necessarily become a solid waste within the meaning of RCRA when it is applied to the normal beneficial usage for which the product was intended merely because some aspect of the product is not fully utilized.  In other words, the fact a field in the IRW may have a high soil test phosphorus (for example, more than "agronomic need" but less than the limit established by the State's regulation) is not in itself determinative of whether poultry litter has been "discarded."

7.      In determining whether a material is a "beneficial" product or a RCRA solid waste, courts have examined whether the material has market value, and whether the party intended to throw the material away or put it to a beneficial use.  *See Safe Food & Fertilizer v. EPA*, 350 F.3d 1263, 1269 (D.C. Cir. 2003).  Neither of these factors is outcome determinative, but rather each informs the court's view of the evidence.   In this case, both factors point to the same conclusion—that poultry litter is not a RCRA "solid waste."

8.      The State argues that poultry litter must be considered a solid waste under RCRA because it is not used to raise more poultry and thus is not part of "beneficial reuse or recycling in a continuous process by the generating industry itself."  *Am. Mining Congress*, 824 F.2d at 1186. The court finds this reading of *American Mining Congress* unpersuasive.  The D.C. Circuit has made clear that, while it held that materials destined for beneficial reuse or recycling in a continuous process by the generating industry are not RCRA solid waste, that does not mean that material destined for reuse or recycling in another industry or agricultural operation is necessarily "discarded."  *See Safe Food & Fertilizer*, 350 F.3d at 1268.

18

9.      Finally, the State argues that a complaint filed by the Department of Justice in the case *United States v. Seaboard Foods, LP,* 5:06-cv-00990-HE (W.D. Okla.) (Sept. 14, 2006) (filed previously as Dkt. No. 2130-6, Ex. 91 (June 2, 2009)), establishes that animal manures are "solid waste" under RCRA.  The Court finds this argument unpersuasive.  In *Seaboard*, the EPA was primarily concerned with hog effluent leaking from plastic-lined pits and the infrastructure, including piping, that held the hog effluent.  *See Seaboard Foods* Administrative Order (filed previously as Dkt. No. 1626-8 & 1626-9, Ex. 6 (Mar. 11, 2008)).  Thus, although the *Seaboard* complaint mentioned land application of swine effluent, the government's focus was not on this practice.  Moreover, the characterization of swine effluent as a RCRA "solid waste" was merely an allegation in the complaint.  The *Seaboard* court never addressed the merit of the United States' assertion, and the government's mere allegation is not determinative on the legal issue here.

10.      The evidence presented during the State's case-in-chief establishes that poultry litter is not a "solid waste" within the meaning of RCRA and therefore the State's RCRA claim must be dismissed.

11.      For the foregoing reasons, the Court concludes that the State has failed to establish that the land application of poultry litter in the IRW constitutes the discard of a RCRA "solid waste". Because proof of the involvement of a "solid waste" is an essential element of the State's RCRA claim, the Court has granted Defendants' Rule 52(c) motion with regard to the State of Oklahoma's claim under RCRA's citizen suit provision, 42 U.S.C. § 6972(a)(1)(B).

WHEREFORE, the defendants' Rule 52(c) motions are granted in part and denied in part.

A judgment on partial findings is filed contemporaneously herewith.

IT IS SO ORDERED this 17th day of February, 2010.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma