1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   STATE OF OKLAHOMA, ex rel.  )
    W.A. DREW EDMONDSON, in his )
5   capacity as ATTORNEY GENERAL)
    OF THE STATE OF OKLAHOMA,   )
6   et al.                      )
                                )
7               Plaintiffs,  )
    vs.                         )CASE NO. 05-329-GKF-PJC
8                               )
    TYSON FOODS, INC., et al.,  )
9                               )
                                )
10              Defendants.  )

11

12

13

             TRANSCRIPT OF NONJURY TRIAL PROCEEDINGS
14                   FEBRUARY 18, 2010
       BEFORE GREGORY K. FRIZZELL, U.S. DISTRICT JUDGE
15                VOLUME 100, A.M. SESSION

16

17  APPEARANCES:

18

19  For the Plaintiffs:        MR. W.A. DREW EDMONDSON
                               Attorney General
20                             MS. KELLY FOSTER
                               Assistant Attorney General
21                             State of Oklahoma
                               313 N.E. 21st St.
22                             Oklahoma City, OK  73105

23

24

25

```
 1   (APPEARANCES CONTINUED)      MR. M. DAVID RIGGS
                                  MR. DAVID P. PAGE
 2                                MR. RICHARD T. GARREN
                                  Riggs Abney Neal Turpen
 3                                Orbison & Lewis
                                  502 W. 6th Street
 4                                Tulsa, OK  74119

 5

 6                                MR. ROBERT A. NANCE
                                  MS. SHARON GENTRY
 7                                Riggs Abney Neal Turpen
                                  Orbison & Lewis
 8                                5801 Broadway
                                  Extension 101
 9                                Oklahoma City, OK  73118

10                                MR. LOUIS W. BULLOCK
                                  MR. ROBERT BLAKEMORE
11                                Bullock Bullock &
                                  Blakemore
12                                110 W. 7th, Ste 770
                                  Tulsa, OK  74119
13
                                  MR. FREDERICK C. BAKER
14                                MS. ELIZABETH CLAIRE XIDIS
                                  MS. INGRID MOLL
15                                Motley Rice LLC
                                  28 Bridgeside
16                                P.O. Box 1792
                                  Mount Pleasant, SC  29465
17

18
     For Tyson Foods:            MR. ROBERT W. GEORGE
19                                Tyson Foods, Inc.
                                  2210 West Oaklawn Drive
20                                Springdale, AR  72701

21                                MR. JAY THOMAS JORGENSEN
                                  MR. THOMAS GREEN
22                                MR. MARK HOPSON
                                  MR. GORDON D. TODD
23                                Sidley Austin LLP
                                  1501 K St. NW
24                                Washington, DC  20005

25
```

11608

```
 1   (APPEARANCES CONTINUED)

 2   For Cargill:              MR. JOHN H. TUCKER
                               MS. THERESA HILL
 3                             Rhodes Hieronymus Jones
                               Tucker & Gable
 4                             100 W. 5th St., Ste 400
                               Tulsa, OK  74103
 5
                               MR. DELMAR R. EHRICH
 6                             MS. KRISANN KLEIBACKER LEE
                               MR. BRUCE JONES
 7                             Faerge & Benson
                               90 S. 7th St., Ste 2200
 8                             Minnaepolis, MN  54402

 9   For Simmons Foods:        MR. JOHN R. ELROD
                               MS. VICKI BRONSON
10                             Conner & Winters
                               211 E. Dickson St.
11                             Fayetteville, AR  72701

12   For Peterson Farms:       MR. A. SCOTT MCDANIEL
                               MR. PHILIP HIXON
13                             MS. NICOLE LONGWELL
                               MR. CRAIG MIRKES
14                             McDaniel Hixon Longwell &
                               Acord PLLC
15                             320 S. Boston, Ste 700
                               Tulsa, OK  74103
16
     For George's:            MR. WOODY BASSETT
17                             MR. VINCENT O. CHADICK
                               MR. JAMES GRAVES
18                             MS. K.C. TUCKER
                               MR. GARY WEEKS
19                             Bassett Law Firm
                               P.O. Box 3618
20                             Fayetteville, AR  72702

21   For Cal-Maine:            MR. ROBERT SANDERS
                               Young Williams P.A.
22                             P.O. Box 23059
                               Jackson, MS 39225
23
                               MR. ROBERT P. REDEMANN
24                             Perrine McGivern Redemann
                               Reid Berry & Taylor PLLC
25                             P.O. Box 1710
                               Tulsa, OK  74101
```

1                              **INDEX**

2

3    **CLOSING ARGUMENT**                              **PAGE**

4

5         By Mr. Bullock                        11610

6         By Mr. Page                           11636

7         By Mr. Nance                          11684

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **PROCEEDINGS**

2  **FEBRUARY 18, 2010:**

3              THE COURT:  Mr. Bullock.

4              MR. BULLOCK:  Yes, sir.

5              THE COURT:  You may proceed.

6              MR. BULLOCK:  Judge, it is a great

7  privilege, and really a relief to be to this day.  I

8  appreciate the moment when the lawyers turn over the

9  case and the difficulties of dealing with it to the

10  ultimate decision maker.  It moves the weight from

11  our shoulders to the court's.  And we appreciate

12  your taking on this very important issue where so

13  much hangs in the balance.

14              We have here today, to represent as a

15  person the State of Oklahoma, in the way of the

16  Secretary of Environment, Mr. J.D. Strong over in

17  the jury box.  Perhaps he wishes to be the one in

18  judgment, but that's not his fate today.

19              Just so that the court is aware of the way

20  that we will lay this out is that I will address the

21  court first, setting out in very general fashion our

22  case for the causation of the injuries here and the

23  liability of the defendants for those injuries.

24              Mr. Page will then address on a more

25  technical level the scientific proof of causation

 1  and injuries.  And finally, Mr. Nance will address

 2  the court concerning remedy and some of the

 3  particular defenses which have been raised,

 4  including the issues with Poultry Registry Feeding

 5  Act.

 6          It is important that I put this caveat on

 7  the closing, is that this is supplemental to the

 8  proposed findings and the Rule 52(c) arguments that

 9  the court has heard.  We're not attempting to cover

10  all of the evidence or more than briefly cover all

11  of the claims and defenses.  And so to the extent

12  that they're not covered here, I hope the court will

13  accept those others as argument and as closing

14  argument.

15          As the court is aware, this matter is about

16  the Illinois River, which is a beautiful and unique

17  part of the geology and inheritance of the state of

18  Oklahoma.  We all know, either through the

19  presentation in this courtroom or through our

20  personal experience, its beauty and its importance

21  to us.

22          I'm going to have to learn how to use this

23  here, so stick with me, if you will.

24          Of course, the history of this waterway has

25  been well known for ever since man came here.  And

1    when the recorded history began, we know that as

2    early as 1849, it was reported that this is a

3    beautiful and clear stream.  1870 it was said to be

4    one of the prettiest rivers on the continent,

5    sparkling with crystal waters.

6            1952, when this industry was only in its

7    early part of growth, it was reported that the river

8    was flowing through oak-and-hickory-clad Ozark hills

9    in a succession of sparkling riffles along quiet

10   pools.

11           In 1957, Tenkiller Lake was described as

12   Oklahoma's most beautiful lake.

13           You've heard in the presentations before

14   the court of a great number of personal

15   recollections of the river.  I can tell you from

16   personal experience that in its early years, they

17   were accurate.  It was and can be again an

18   absolutely spectacular river.

19           But that's not the reality that we're faced

20   with today.  To too great of an extent, it is a

21   green, slimy mess with its water covered with

22   invasive algae, the rocks green and the filamentous

23   green algae that you heard so much of polluting it

24   and slowing its waters and creating a number of

25   significant environmental injuries.  The lake itself

1   has turned green and with too often a scum forming

2   at the top of it.

3          Those who remember this lake remember

4   standing on bluffs and looking down 15 to 20 feet to

5   the rocks below.  Such experiences are denied

6   today's generation and will be denied to future

7   generations unless we can persuade the court of both

8   the importance and the legal reasons why the actions

9   of the defendants should be enjoined.

10          One of the things which there has been some

11  talk of in this court is to compare this waterway

12  with others in the state or region.

13          Those actually have little legal cognizance

14  that -- unless one looks at a stream in terms of --

15  or lake in terms of those things that would make it

16  a reference so that you can make scientific

17  comparisons, there's really little currency in

18  talking about whether other waterways have been

19  polluted or whether other waterways have been

20  neglected and ill-treated.  You need to look at the

21  ecoregion, the geology, the climate, the land use,

22  other potential sources, and only then do the

23  comparisons that the defendants wish to make have

24  any currency.

25          But the real question is we went from, in

1  our lifetime, the clear, sparkling waters of the

2  Illinois River and Lake Tenkiller to the green,

3  algae-choked river that we have today.  One of the

4  first questions for the court is what caused it.

5  And the evidence is actually overwhelming in this

6  case that the poultry industry's operations in this

7  watershed are a significant reason, a significant

8  cause for the damage which has been done.

9          The first indication of that, and perhaps

10  one of the easiest to grasp, is the mass balance,

11  where over 76 percent of the phosphorus coming into

12  this watershed each year is from poultry.  And you

13  compare that with the 3.2 percent for which humans

14  are responsible for and even such as commercial

15  fertilizer 7 and a half percent, and poultry

16  absolutely overwhelms all other potential sources.

17          Defendants, in response to this, said that,

18  well, just because it comes into the watershed

19  doesn't mean that it's going to get into the water,

20  that it might be, in Dr. Sullivan's words, put in a

21  warehouse.  But of course, we know that that is not

22  the fate for the poultry phosphorus which comes into

23  this watershed and goes through the defendants'

24  birds.

25          Another way to look at it, it's just in the

1   sheer volume of waste produced by this industry each

2   year.  354,000 tons of waste each year.

3          The plaintiff, the State of Oklahoma's

4   estimate of that really stands largely

5   unchallenged.  And perhaps the reason for that is

6   that it is truly a conservative estimate, that the

7   actual amount of waste being produced here is very

8   well more than the 354,000 tons.

9          Another way to look at it, and perhaps most

10  revealing, is when we look at the trend in the mass

11  balance, when you look at the fact that in 1949

12  poultry accounted for less than ten percent of the

13  phosphorus inputs and the other sources were 90

14  percent.  That changed rather dramatically between

15  1959 and 1964, when poultry went to better than 70

16  percent.  And it has substantially remained there

17  ever since.

18         Now, to give some concept as to what this

19  means, I point the court to the letter from Martin

20  Maner -- the report from Martin Maner with the State

21  of Arkansas in 1988, where he reports that the

22  poultry waste in Benton and Washington County equals

23  the waste, in terms of its nutrient values, of more

24  than 8 million people.  And none of that waste is

25  treated.

1           Defendants themselves give you an

2    indication of how we got from these clear, crystal

3    waters to the green and slimy river bottoms that we

4    have today when they pointed out when they

5    calculated in their Joint Exhibit 3125 that the mean

6    STP for fields on which the -- are targeted for

7    poultry waste, the mean is 402.  The median is 292.

8    And as the court is aware, that that is well beyond

9    anything which one would propose to be needed for

10   growing plants.

11          Making the point that the phosphorus that's

12   brought into this watershed for poultry is not put

13   into the bank that Dr. Connolly posited or the

14   warehouse that Dr. Sullivan posited is the

15   distribution of the waste that I have here.  It's

16   Exhibit 2516 of the plaintiff.

17          And the testimony was that this is a

18   conservative estimate showing the sections in which

19   we could determine that waste had been disposed,

20   understanding that in the state of Arkansas, the

21   disposition of waste is kept substantially a

22   secret.

23          It is difficult to find those records or to

24   obtain those records.  And so the actual pattern in

25   Arkansas is certainly much broader than anything

1    that we have presented here.

2          Now, once you have the waste on the fields,

3    the question -- and much time was spent here on this

4    question -- is, how does it get into the water.

5    Well, of course, the most obvious is that it just

6    runs off the fields into the streams.

7          I present to the court the stream map,

8    which is 2519, and that presents the map of the

9    third order and above streams.  It also -- in

10   shading, you can see some of the first and second

11   order streams.

12         The point of this is, just as Dr. Grip

13   described, that this is a dense network of streams.

14   Defendants' suggestion, which has been made many

15   times in this court, that the -- that there is a

16   place that the streams don't drain, that there are

17   places which perhaps are miles from a stream is pure

18   fantasy.  There are -- this is a well-drained

19   watershed.

20         It's not swampy; it's dry, cherty soils,

21   and once clear streams to drain it.  Not only that,

22   defendants themselves talked about the role the

23   cattle play in assisting the runoff and the

24   transport of the phosphorus from poultry.

25         Dr. Sullivan explained to the court the way

 1  that the cattle facilitate the transport by

 2  compaction of the soil, by the thinning of the

 3  vegetation and by channelizing the fields.

 4          Finally, there's, of course, the too much

 5  talked about and much overstated process of the

 6  occasional direct deposit by cattle.

 7          But regardless, it is clear that poultry

 8  has played a major role in getting us to where we

 9  are today.

10          Now, at the conclusion of the evidence and

11  upon the court's full review, State of Oklahoma

12  believes that there is -- that it is absolutely

13  clear that the court should find that the defendants

14  have intentionally created a nuisance in violation

15  of Oklahoma law, intentionally created a nuisance in

16  violation of federal law, and that they have also

17  violated 2-6-105 and 2-18.1 of the Oklahoma Code.

18          On the issue of causation, though, the

19  standard -- and we've spoke of this before, we

20  believe the court should look at the *Herd* case as

21  well as Judge Eagan's analysis in the *City of Tulsa*

22  case.

23          *Herd* is interesting because it really

24  reflects on many levels the same issues that this

25  court struggles with.  That is, it was a nonpoint

1   case.  It was a case of where a number of defendants

2   had deposited the mining waste in that case where it

3   could go into the winds and deposit itself nearby in

4   the towns and on the farms.

5           To paraphrase the causation standard in

6   *Herd*, this is not you grew poultry and -- this is

7   not merely a case that the defendants grew poultry;

8   it is that they grew poultry and left the waste very

9   near the contaminated community.  In fact, the

10  contaminated waters and such waste material has been

11  shown to contain the contamination that occurred in

12  that community and those waters, that that's the

13  test of causation for this case.

14          Similarly, in the *City of Tulsa* case, Judge

15  Eagan found that the test was whether each defendant

16  contributed to phosphorus loading in the watershed

17  or, as we read it, in the waters.  And the

18  phosphorus in the waters has resulted in the harm.

19  That's the question of causation that the court is

20  faced with here.

21          As for specific causation, that is, each of

22  the -- that is causation caused by each of the

23  individual defendants, what we have shown is that

24  each of these defendants has generated massive

25  quantities of poultry waste; that waste is

 1  land-applied close to the houses where it is

 2  generated; it runs off in environmentally

 3  significant amounts; that even small amounts can be

 4  and are environmentally significant in this

 5  watershed; and the P load -- those phosphorus

 6  loadings are causing injuries to the water.

 7      It is also important that the court

 8  appreciate that this -- the result of this conduct

 9  is to create an indivisible injury.  And I refer the

10  court to the *Union Texas Petroleum v. Jackson* case

11  and, again, the *City of Tulsa* case where the court

12  set out that once you have an indivisible injury, it

13  is not necessary to divide that injury, that the

14  plaintiff can look to all of the defendants and to

15  each of the defendants to remedy that pollution.

16      Let's talk some about specific causation,

17  just so that we're clear that each of the defendants

18  has been shown to have caused the injury that we are

19  talking about here.

20      First of all, we have shown the court the

21  aggregate number of the bird production by each of

22  the defendants in the watershed.  And what you see

23  is that the defendants go from Cal-Maine in the

24  period from 2000 to 2007, even while they were

25  withdrawing from the watershed, still put almost 5

1  million birds in the watershed; Tyson, 700 million

2  birds.  And the other defendants each individually,

3  their contribution of birds is set out in

4  Exhibit 2528.  And clearly we have proven that part

5  of our case as to each of them.

6          Further, we have proven that each of them

7  produce truly significant quantities of waste.  And

8  again, on Exhibit 2532, what the court sees is that

9  that ranged anywhere from almost 3,000 tons by

10  Cal-Maine, up to 167,000 tons by Tyson.

11          Now, from there, of course, once we show

12  the issue of causation comes the issue of the

13  liability of the defendants for the injuries that

14  they've caused.  And we've spent a lot of time

15  talking about vicarious liability.

16          First of all, I think the court should look

17  at the issue of direct liability.  And that is that

18  each of these defendants has structured and

19  conducted its business in the IRW such that

20  pollution of the waters of the IRW is inevitable.

21  And, in fact, the court will recall a great deal of

22  both testimony and argument concerning the

23  defendants' business model.

24          Now, what we have shown in terms of that

25  business model is that for purely economic reasons,

 1   for no other reason than to increase the bottom

 2   line, the defendants have concentrated their poultry

 3   operations, and in this case concentrated them in

 4   this watershed.  They've placed millions upon

 5   millions of birds in the IRW.  They import the

 6   phosphorus to feed those birds by the truck and

 7   trainload.  Vast quantities go into the birds, and

 8   the result is a waste which is high in phosphorus.

 9   The defendants know and acknowledge that the waste

10   is disposed of by land application.

11          And the defendants make no pretense that

12   they do nothing to manage that waste so that it

13   doesn't cause environmental injury.

14          There's also the question, though, of the

15   direct liability of three particular companies on a

16   whole different level.  That is, when we point to

17   the issue of -- when the defendants attempt to say

18   the growers are a cause, some of these defendants

19   have to point to themselves.

20          Here I have some of the evidence regarding,

21   for instance, Tyson.  Their research farm has STP

22   levels as high as 726.  Cargill's breeder farm has

23   levels as high as 958.  And it is important in terms

24   of Cargill to recognize that for years after, and I

25   believe that it's at least three, maybe as much as

1    five, after Cargill received this 958 and the other

2    soil tests for its breeder farms, it continued to

3    apply waste, only stopping on the eve of this --

4    only beginning to transport that waste out of the

5    watershed on the eve of this case.

6         And similarly, there's George's where, on

7    the Ritter farm, we find some of the highest levels

8    in the entire watershed; that is, as high as 2166

9    for George's Ritter farm.  George's, after that was

10   received, similarly continued to apply waste, but

11   eventually did begin to transport out the waste from

12   its own operations.

13        None of these defendants claim that they

14   are transporting out all of the waste from their

15   operations from -- the waste from their birds.  They

16   claim only to the extent that they're transporting

17   out all of the waste today it is only from these

18   operations.  But that does nothing to relieve these

19   defendants from the continued pollution of Oklahoma

20   waters from the runoff from these farms in Arkansas

21   into the waters of the IRW and eventually into the

22   waters of the state of Oklahoma.

23        Now, once we get past the question of

24   direct liability, there is the questions of

25   vicarious liability.

11624

1          Now, the first, and I would think the most

2    obvious point, is that the defendants should be held

3    liable under classic principal-agent theory or what

4    I learned in law school as the master-servant

5    theory.

6          Now, there are two cases on point there,

7    both of them looking at the very type of model of

8    using the contract growers for an integrator, and

9    where the integrator was found liable for the

10   environmental injuries caused.  There's *Tyson v.*

11   *Stevens*, which was an issue of odor from a hog

12   farm.  There's also a *Sierra Club v. Tyson*, which

13   was an environmental injury from ammonia release, in

14   that case from poultry.

15          The fact is that these defendants each have

16   complete and total control of the operations of

17   their growers.  Their growers are there to grow

18   birds.  And a necessary and inevitable part of that

19   task is the disposal of the waste, of the cleaning

20   out of the barns, and just -- and as such, that

21   total control clearly extends to there.

22          And, in fact, there is testimony in this

23   record that the defendants have occasionally

24   exercised that.  They have -- there's been testimony

25   concerning requiring the growers to move or dispose

1    of piles of waste.

2           There's a case of Cal-Maine with Lois

3    Hampton.  Further, their, "recommendations" to their

4    growers as exemplified by Exhibit 1283, where Tyson

5    recommends the spreading of waste immediately upon

6    moving it out of the barn.

7           I want to just for a brief moment talk

8    about this matter of recommendations and

9    suggestions.  I well appreciate the pride with which

10   the growers protested that they were independent.

11   But on the other hand, every employee well

12   understands the import of a "suggestion" from the

13   boss.  You ignore it at your peril.  These growers

14   ignore suggestions at their peril.

15          Even beyond the issue of control is the

16   issue of 427B.  427B is the issue upon which Judge

17   Eagan initially entered the summary judgment in the

18   *City of Tulsa* case, that decision, of course, having

19   been withdrawn pursuant to settlement.  But the

20   analysis, nonetheless, still works.

21          That is, she rested upon two issues there

22   when she made that conclusion.  First of all, that

23   the production of waste is a necessary --

24   necessarily follows the growing of poultry; and

25   secondly, that the defendants in that case had

1    admitted that pollution was the likely result.

2          Now, that same evidence on which she

3    depended is before this court, albeit the defendants

4    would wish today to distance themselves from that.

5          But related to the issue of the defendants

6    knowing the likely result, is the issue of the

7    intentionality of the defendants.  As I stated to

8    the court, our nuisance and trespass claims are, in

9    fact, pled as intentional torts.

10          Under the Restatement of Torts, Section

11    825, one is guilty of intentionally interfering with

12    the use of enjoyment of one's property or the

13    creation of a public -- or the interference of a

14    public right when either they act with the purpose

15    of causing it, which certainly the defendants don't

16    intend to pollute the water, but also where -- or do

17    not have the purpose of polluting the water, their

18    purpose is to make money.  And they make no

19    apologies for that, nor should they.

20          But secondly, you act with an intent when

21    you know that what you are doing is resulting or is

22    substantially certain to result from your conduct.

23          Defendants clearly -- this evidence clearly

24    establishes that the defendants in this instance

25    have acted intentionally and that they should know

1    better and do know better.

2            This is not a issue of what do their

3    growers believe.  Defendants have attempted to hide

4    behind the intent of their growers.  Of course, the

5    evidence in this case, the plaintiff's case, has not

6    addressed the issue of the intent of individual

7    growers, nor should it.

8            I'll give a quick analogy to the court.

9    Let us suppose that you have a car dealer selling a

10   junk car.  He knows the transmission is shot.  He

11   sends out, though, a young salesman who promotes

12   this as a great and sound vehicle, and the people

13   drive it off the lot.

14           Later when the dealership is charged with

15   fraud, with intentionally selling a junker, the

16   company cannot hide behind the good but uninformed

17   intent of the salesman.  The issue is what did the

18   dealer know.  What was the dealer's intent when that

19   deal went down.

20           Similarly, these companies cannot hide

21   behind whatever mistaken belief their growers might

22   have.  The issue here is when they operate their

23   poultry operations, when they produce all of this

24   waste, when they turn their back on the disposal of

25   it, what do they know to be the consequences, in the

1  words of it, the certain result, substantially

2  certain result of their conduct.

3        The evidence here is they absolutely know.

4  And there's a great deal of evidence of that.  For

5  instance, there was the Clinton task force.  This is

6  as early as 1993.  And there, Claude Rutherford, an

7  employee of Simmons, but there as an industry

8  spokesman, he reported that there would be -- that

9  from the use of poultry waste, you had environmental

10 degradation, water quality problems, problems with

11 the drinking water, and impacts on the aesthetics,

12 1993.

13        In 1998, you have Ron Mullikin with

14 Peterson, one of the smallest companies in this

15 group of defendants, and he reports to his company

16 there's no new solution in dealing with animal waste

17 and the environmental problems it's causing.  Over a

18 decade ago defendants knew.

19        Then he concludes that the solution may be

20 that our industry must make some changes in the way

21 we do business.  They have not made those changes.

22        You also have -- in terms of the

23 defendants' knowledge, you have Cargill's Best

24 Management Practices manual, where Cargill tells its

25 growers that even if you use the Best Management

1    Practices, that there will be -- some level of

2    nutrient loss will occur.  Cargill is under no

3    illusions here as to the realities of its

4    practices.

5           You have Tyson.  You recall Preston Keller,

6    who all that has survived of his PowerPoint is a

7    draft, but he explained that that was substantially

8    what he presented while he was at Tyson.  And this

9    is pre-January of 2005.  And there he presented that

10   phosphorus is mobile, it causes water quality

11   problems, and it accumulates in the soil.

12          You have George's and the statements from

13   the desk of Monty by Monty Henderson, where he

14   reports to all that wish to read it, during major

15   rain events some of the phosphorus becomes soluble

16   and washes off into streams and lakes.

17          He also tells them that continuous use on

18   the same land can increase the P levels in soil.

19   These excess levels can dissolve into runoff rain

20   water and get into streams creating an imbalance.

21          Again, you have Cargill with their

22   Precision Ag program where they identify the IRW and

23   some other surrounding areas with a high phosphorus

24   level.

25          They -- Tyson at one point tracked its

1  waste, and so did Peterson.  They all tracked --

2  both of them tracked their waste at one time, and

3  like Cargill, they all abandoned these programs for

4  operational needs, basically that they didn't want

5  to commit the resources, the money from the bottom

6  line to addressing this environmental problem.

7          You also have as evidence of their

8  knowledge the 2004 ad where the defendants

9  admitted -- or all the defendants except Cal-Maine

10  were on this ad, and they admit that poultry is one

11  of the source of the nutrients getting into these

12  waters.

13          What has happened here is not a mistake.

14  It's not an accident.  The fact that these waters

15  turned from crystal clear to the green,

16  algae-covered waters that they are is a result of

17  deliberate actions of the defendants.  They knew

18  better, but they did it anyway.

19          Their response has been, of course, first

20  to just ignore it.  And you've heard plenty of

21  claims of ignorance in this court.  Perhaps the two

22  that stand out the most is when Ron Duncan and

23  Mr. Elrod flew over the watershed, and Mr. Duncan

24  reports that he never saw a poultry house and they

25  didn't show a poultry house, even though they

1   supposedly were looking at sources for pollution.

2        There was also Dr. Sullivan, who couldn't

3   admit that the green water in his pictures was green

4   until finally after a number of uncomfortable

5   moments, I think that he decided that he had to do

6   it.

7        But after the ignoring doesn't work, they

8   then turn and they start blaming people.  They blame

9   their growers.  It's the grower's job to do it.

10  They blame the cattle, even while they are telling

11  us that the cattle, in fact, create additional

12  pathways.

13       They blame the wastewater treatment plants,

14  even though those have been addressed and have

15  reduced their loadings.  They blame septic tanks and

16  urban roads without ever calculating that these have

17  no significance compared -- I said urban -- rural

18  roads, even though these clearly have no impact

19  compared to their great number.

20       Tyson said it, though, that the number one

21  concern -- and this is Preston Keller -- number one

22  concern is not the environment, it's make a positive

23  image, public perception is very important.  And

24  what they do is give us ads to say that they will do

25  their part and -- while they do nothing and continue

 1  business as usual.

 2          I've just about completed my time, but I

 3  want to very quickly address paragraph 508 of the

 4  defendants' proposed findings where they say that

 5  "With respect to the balance of hardships, the

 6  injury to the waters of the IRW largely is an

 7  aesthetic injury.  There is no substantial threat to

 8  human health, drinking water, recreational use or

 9  wildlife.  By contrast, an order prohibiting the use

10  of litter as a fertilizer would impose substantial

11  cost upon defendants, could financially

12  devastate --" and they put in quotes, I don't know

13  where from -- "many growers and ranchers and would

14  have a damaging impact on the cattle industry and

15  economy of the IRW."

16          As for the issue of the other injuries,

17  Mr. Page will address that.  We heartily reject

18  that.

19          As to the idea that it will be devastating

20  injury to the growers and cattle industry, in light

21  of the fact that people throughout this state buy

22  commercial fertilizer to raise their cattle, that

23  clearly is a much exaggerated claim.

24          As for their own injuries, frankly, they

25  did little or nothing to address that.  But what I

```
 1   want to address is the idea, the fundamental belief

 2   that someone can destroy the beauty of this river

 3   valley and say, "but I needed to do it to make

 4   money."

 5           Judge, I'm all in favor of making money.  I

 6   wish there was a way to make some in this case, but

 7   I will tell you that it is never an excuse that I

 8   can destroy the beauty of this country to make a

 9   buck.  We are not that poor.  We are not that

10   impoverished that we will give up the beauty of this

11   landscape in the pursuit of another man's profits.

12   Thank you.

13           THE COURT:  Mr. Bullock, a couple of quick

14   questions.

15           MR. BULLOCK:  Sure.

16           THE COURT:  Let's assume for the purpose of

17   my question causation and liability.  Wrestling with

18   this statute that's been on the books in Oklahoma

19   since 1911, 50 OS Section 4, first of all, assuming

20   that that causes the common law nuisance claim to

21   fall out, I take it your position would be trespass

22   would be enough to reach the conduct of the

23   defendants?

24           MR. BULLOCK:  Absolutely trespass stands on

25   its own.  I don't agree with the premise of the
```

1    question.

2            THE COURT:  I understand.  I understand.

3    But trying to wrestle with these legal issues here.

4            Now, if, in fact, as a legal matter, 50 OS

5    Section 4 precludes the state common law nuisance

6    claim, how does it pertain -- I don't know that

7    either side has addressed this legal issue.  How

8    does it touch or affect the federal common law

9    nuisance claim?

10            I know the gravamen of the defendants'

11   position is that federal common law nuisance is out

12   because it has been displaced by federal statutory

13   law.

14            But let's assume also for the purpose of my

15   question that federal common law nuisance is not

16   displaced.  How does the state statute 50 OS

17   Section 4 apply, if at all, to the federal common

18   law nuisance claim?

19            MR. BULLOCK:  I don't believe that it can

20   at all; otherwise, what you would have is a complete

21   reversal of the constitutional scheme where federal

22   law always takes the dominant role in terms of

23   prevailing law.

24            But further, defendants have made it very

25   clear that Oklahoma statutes can't have an

 1  extraterritorial effect.  And so even if you could

 2  have -- you could turn the concept of federal law on

 3  its head and say that state law could prevail over

 4  it, then you'd still have the extraterritorial

 5  effect.  But, in fact, I don't believe that that can

 6  happen.

 7           THE COURT:  But here, of course, you have

 8  the twist that the State is the plaintiff here, and

 9  you'd have a perverse twist where, arguably, 50 OS 4

10  precludes the state nuisance claim, but may not

11  preclude the federal common law nuisance claim.  In

12  other words, the idea being that if Oklahoma

13  regulates and allows through its regulation the land

14  application of poultry litter under certain

15  limitations and parameters and, therefore, the state

16  common law nuisance claim falls out, your position

17  would be the federal common law nuisance claim may

18  still apply.

19           MR. BULLOCK:  Absolutely.  And, again, I

20  strongly challenge the premise, particularly when

21  you look at the issue of the poultry laws.  All of

22  those are set up to protect the water.  Now, they

23  may have failed in doing that, but they're not --

24  they clearly do not claim to displace the common

25  law.  And the common law remedy -- or the common law

1    claim of nuisance would still survive those

2    statutes.

3         The legislature can't pass a law to

4    determine what the science is.  And that is -- so

5    the legislature says, do these things to keep the

6    water clean.  That's not going to make the water

7    clean.  They can't declare that the water is clean.

8    And if they don't give a permit, such as you do

9    under the Clean Water Act, then the common law is

10   going to prevail.

11        And as for the concept of the right to farm

12   or the prior uses, the evidence in this record is

13   quite clear that the recreation and the use of this

14   water for drinking water and the beauty of this

15   water itself is a use which far predates the first

16   time that someone tried to grow a chicken in this

17   watershed, much less these defendants' operations.

18        So the concept that this could be protected

19   because of the poultry -- that poultry growing is

20   some type of a protected pursuit belies the previous

21   uses for this water.

22        THE COURT:  Thank you for helping me

23   wrestle with those.

24        Mr. Page.

25        MR. PAGE:  Good morning, Your Honor.

 1          THE COURT:  Good morning.

 2          MR. PAGE:  If it please the court, my name

 3  is David Page, and this morning I will be briefly

 4  addressing some of the scientific issues that are

 5  involved in this case.  And in particular,

 6  Your Honor, I've been asked to discuss with you this

 7  morning the issues of causation and injury as that

 8  evidence has been presented to you during the trial

 9  of this case.

10          THE COURT:  Is there enough here to prove

11  causation even if the court were to reject the Engel

12  routing model?

13          MR. PAGE:  Yes, sir.  And I will go through

14  many duplicate and confirmatory proofs that

15  demonstrate that, sir.

16          THE COURT:  All right.

17          MR. PAGE:  Then also I will talk about the

18  causation and injury evidence.  And, Your Honor, I

19  would like to also point out to you this morning

20  that there are many areas of causation, including

21  this issue you just asked me, that are really not in

22  dispute based on the admissions of the scientists

23  presented by the defendants in this case.

24          Now, Your Honor, I've put together a brief

25  overview of what I believe how the evidence of

1  causation and injury work together.  This schematic

2  is kind of the way I believe it works.

3          And so the first issue is waste management

4  or land application of poultry waste.  That's

5  undisputed.  So that part, which would be the first

6  aspect of the causation pathway, that is that the

7  waste is released into the environment, it's put in

8  a place where it can move into the waters of the

9  IRW, is undisputed in this case.

10          A lot of dispute, at least initially, began

11  with the runoff and infiltration.  And I'll spend a

12  lot of my time talking to you about the evidence

13  presented by the State, the concessions by the

14  defendants, and then the credibility or

15  persuasiveness of each side's evidence of runoff and

16  infiltration.

17          If you move to your right, Your Honor, and

18  follow that orange arrow, you see the water

19  impacts.  And the water impacts that are important

20  for the court to consider is have phosphorus

21  concentrations in loading in the IRW increased.

22          Again, Your Honor, the evidence of this

23  record I believe is undisputed, that the natural

24  background levels are no longer present, that

25  there's much more phosphorus entering the lake today

11639

1    than there was 50 years ago.  So, again, that factor

2    of the causation chain and pathway is undisputed.

3         Oddly enough, Your Honor, much of the rest

4    of the evidence is wholly undisputed by the

5    defendants in this case.  But let me briefly go over

6    through it.

7         The next question is what happens when you

8    add the nutrients and the phosphorus to the waters.

9         It's undisputed that it increases

10   productivity, that phosphorus in particular in this

11   watershed is the important limiting nutrient to

12   cause eutrophication or increased productivity.

13        What does that mean as a practical matter?

14   Four things.  Increased algae, and in particular

15   increased suspended algae, that is the stuff that

16   floats in the water and makes it green; increased

17   attached algae, that is the cladophora, the

18   filamentous green algae that you've heard testimony

19   about; and in particular, increased blue-green algae

20   which are now pervasive in the lake.  Again, there's

21   been no dispute --

22        THE COURT:  I take it that benthic is

23   attached?

24        MR. PAGE:  Yes, the bottom benthic.  What

25   we have here is, again, there's been no dispute that

1  this phosphorus has caused these results in this

2  watershed.

3       Now, what -- how do those injuries look?

4  What kind of injuries result?  I think there's a

5  little bit of dispute about the fish makeup in the

6  streams.  But basically, again, the injury evidence

7  has been undisputed in this case.

8       That is, there's been habitat changes,

9  aesthetics changes.  In fact, the defendants

10  actually concede that in one of their findings of

11  fact and conclusions of law, that there's

12  disinfection byproducts produced in this watershed.

13  That there are toxins that are potentially and have

14  been produced in this watershed from the blue-green

15  algaes, and that all of these result in water

16  quality standard violations which are prima facie

17  evidence of injuries.

18       So when we go to each of these separate

19  ones along the bottom here, Your Honor, we have the

20  specific evidence of each of these injuries that's

21  been presented to you.  Again, I'll point out where

22  there has been some change but mostly has been

23  wholly undisputed.

24       Now, let's first talk about causation.  And

25  I'd like to talk about it in two major areas, let's

 1    say.  First I want to point out to the court the

 2    concessions, the admissions made by the defendants'

 3    experts, then I would like to talk about our

 4    evidence.

 5            First Dr. Connolly.  Now, Dr. Connolly was

 6    the first expert that the defendants called in this

 7    case.  In fact, I believe he's referred to as their

 8    most important expert by some of counsel for

 9    defendants.

10            He had many significant admissions, many of

11    which relate to this causal pathway.  For example,

12    admitted on cross-examination that phosphorus does

13    actually run off from the fields in this watershed

14    and enter the streams of the IRW.

15            Amazingly, we spent weeks arguing and

16    objections, many, many objections, my career's worth

17    of objections in weeks of testimony where the

18    defendants tried to prevent that type of evidence.

19    And their first witness on cross-examination admits

20    it would be pretty silly to deny that phosphorus

21    does not run off the fields and get into the IRW and

22    streams and rivers.

23            He also conceded -- just to make sure, I

24    asked him in another way, is there evidence of this

25    pathway.  He said, "The answer is obviously yes."

1   That there is evidence of a pathway from manures

2   applied to the lands in the IRW, to the IRW, the

3   Illinois River in particular, and to Lake

4   Tenkiller.  "The answer is obviously yes."  That's a

5   quote from the record from Dr. Connolly.

6          Again, why would he have to admit this?

7   Well, his own -- limited, but his own investigation

8   showed that nonpoint source phosphorus was 82

9   percent of the phosphorus entering this system.

10  Obviously if it's not point source, it's nonpoint

11  source.  And nonpoint source, by definition, is, in

12  fact, runoff phosphorus.  So when his records, his

13  own evaluation, showed that it was 82 percent, he

14  had to admit that the pathways exist; otherwise, he

15  would be ignoring the obvious.

16          He also admitted with regard to the type of

17  phosphorus that's involved in this case on

18  examination, cross-examination:

19          "The vast majority of runoff events as you

20  classified them" -- referring to Dr. Connolly's

21  analysis -- "in '94 to 2003 have more dissolved

22  phosphorus than particulate phosphorus?

23          "That's correct."

24          So again he concedes as an engineer that

25  the -- not only does -- is there a substantial

```
 1   portion of runoff from phosphorus from fields

 2   getting into the streams and the river and the lake,

 3   but it's also dissolved phosphorus.  That is a vast

 4   majority, by his own evidence.

 5           So that's the predicate.  That's the

 6   predicate upon which our evidence then sits.  And

 7   frankly, Your Honor, I believe he's conceded the

 8   causal pathway.  And this is their lead witness

 9   who's conceded it.

10           So with that foundation, what additional

11   evidence does the court have to show the causal

12   pathway; that is, that poultry waste is a

13   significant contributor to phosphorus in the IRW?

14           First, the State presented a nonretained

15   expert, I think a very important and very credible

16   expert for the court to consider his testimony,

17   that's Dr. Indrajeet Chaubey.  He wasn't retained.

18   And before taking a position at Purdue University,

19   he worked for years in the IRW at the University of

20   Arkansas studying these exact issues of fate and

21   transport of poultry waste in the IRW.

22           He pointed out in his testimony that there

23   are many different ways to evaluate fate and

24   transport.  There isn't a single method,

25   Your Honor.  There are many different ways you can
```

```
 1  prove fate and transport or causation in a pollution
 2  case such as this.
 3          What is important to note is that the four
 4  key ways that he mentioned in his testimony, waste
 5  and land management, land use, mathematical
 6  relationships or the regressions of XY plots, and
 7  mathematical modeling were all employed individually
 8  and separately by the State in this case.  So any
 9  one of them would be evidence of causation and
10  pathway, but the State employed, I think, a
11  belt-and-suspenders, and maybe
12  two-belts-and-suspenders approach, employed all of
13  the analysis to see if they would be -- redundantly
14  show the same thing.
15          So let's look at the first one:  Waste and
16  land management.  Looking at an environmental case,
17  the first question that always comes out is how much
18  waste from whom.  That is always a critical question
19  to evaluate who's responsible for the waste, because
20  courts and scientists agree that it's a significant
21  aspect of proving who's responsible.
22          Here the evidence is undisputed basically
23  that the defendants produce at least 354,000 tons of
24  poultry waste each year in the IRW, and that each
25  defendant has specifically themselves generated
```

1  substantial amount of waste, and that it contains a

2  large amount of phosphorus.  In fact, it contains

3  between 8.7 and 10 million pounds of phosphorus

4  annually.

5          Now, Your Honor, if there's a million acres

6  in the IRW and there's about 10 million pounds each

7  year of phosphorus coming from poultry and about 40

8  percent of the pastures is pasture for land

9  application, that means that about 20 pounds per

10  acre each year from phosphorus from poultry could be

11  applied to these fields.  That's just basic

12  mathematics and analysis.  So, Your Honor, we have a

13  substantial fraction of poultry phosphorus that's

14  being generated as waste in this watershed.

15          Now, why is that important?  Because the

16  way it's managed.  Clearly, here we have all the

17  proof that Judge Holmes needed for finding causation

18  in the *Herd* case.  He said there's a lot of chat, a

19  lot of mining waste produced nearby and placed

20  nearby the community where the contamination

21  resulted.

22          And he also found that the contaminant of

23  concern, lead, was in the mining waste and was

24  elevated in the property and the children of

25  Picher.  He said, that enough, recognizing that

1    there was a potential aerial pathway, was to find

2    causation to get past summary judgment in that

3    case.

4           Here the evidence is undisputed.  We have a

5    substantial amount of waste that contains the

6    contaminant of concern, phosphorus.  It is placed in

7    and around the community of concern, the streams and

8    lake of the IRW.  And those streams and lake have

9    and demonstrate increased phosphorus.  That,

10   Your Honor, I contend is sufficient to pass Judge

11   Holmes' test in *Herd* and is sufficient for this

12   court to find causation by itself in this case.

13          Now, we have more than that, but I believe

14   that's sufficient for causal -- to raise a question

15   of causation in this case.

16          Now, Your Honor, we also have evidence that

17   shows that the phosphorus from the poultry waste has

18   increased the STP of the lands and that with

19   increased STP, this gift, the phosphorus waste from

20   poultry, is a gift that keeps on giving.  That is,

21   as STP levels rise, they continue to produce runoff

22   with increased phosphorus over time.

23          THE COURT:  Back up just a second.  Of

24   course, in *Herd* as you implicitly acknowledge, that

25   was a summary judgment ruling, and Judge Holmes

1   merely held that there was sufficient facts in the

2   record to preclude summary judgment for the

3   defendants.  And obviously we're we'll beyond that

4   here.  This is trial.  This is -- where you have to

5   prove it, not to simply raise the genuine issue of

6   material fact.

7        MR. PAGE:  I understand that, Your Honor,

8   and I appreciate that procedural difference in the

9   context where we are.  But I guess my point here is

10   that Judge Holmes said that was evidence of the

11   causation.  I think that shows that that much

12   evidence in and of itself is part of what goes on

13   the scale.  And clearly there needs to be the scale,

14   the weighing, then, of whether there's a

15   preponderance of evidence.  But that clearly is

16   added to the scale.

17        Now, Your Honor, another key aspect of

18   evidence in this case that was presented was the

19   mass balance analysis that Mr. Bullock has already

20   discussed with the court briefly that Dr. Engel

21   prepared.

22        That is an important aspect of evidence,

23   and that may be the single most probative evidence

24   of who are the significant contributors in this

25   case.  That evidence shows that the overwhelming --

1   three-quarters of the phosphorus that enters into

2   the watershed today and basically since about 1969

3   has been from poultry waste.

4          Now, why is that important?  Dr. Chaubey

5   said that this is an important area of determining

6   water quality impact; that is, the causal pathway.

7          In fact, Dr. Chaubey, when he was with the

8   Arkansas Water Resources Center, they undertook a

9   similar mass balance analysis.  Your Honor, if that

10  wasn't probative evidence of the causal pathway,

11  part of the evidence that would be added to the

12  scales of justice, so to speak, then the Arkansas

13  Water Resources Center wouldn't be looking at

14  similar analysis.

15         And their analysis came to the similar

16  conclusion.  That is, that poultry growers were the

17  most significant contributor of phosphorus loading

18  in the IRW.  That's phosphorus loading, Your Honor.

19  "Loading" is the term of art that's often used with

20  delivery to the waters.

21         Now, how is this evidence to be viewed by

22  the court?  Well, given that it's substantially

23  similar to an independent researcher, it should be

24  given great, I believe, deference and persuasive

25  value.

 1            THE COURT:  Refresh my recollection.  Here

 2    the context of phosphorus loading was bringing

 3    thousands of tons of potash and phosphorus into the

 4    watershed, not specifically loading of the water,

 5    correct?

 6            MR. PAGE:  The mass balance looks at

 7    phosphorus that's being brought into the watershed.

 8            THE COURT:  Into the watershed.

 9            MR. PAGE:  Into the watershed.

10            THE COURT:  But so phosphorus loading used

11    in this context on your screen 61 is talking about a

12    mass balance analysis.

13            MR. PAGE:  Yes, sir.

14            THE COURT:  All right.

15            MR. PAGE:  Yes.  But the reason I want to

16    point out the point about phosphorus loading,

17    Your Honor, is that the scientists, given the fact

18    that this phosphorus isn't put in some kind of a

19    Subtitle C landfill that has triple lining and is

20    covered --

21            THE COURT:  I understand.  But you inferred

22    that -- or implied, rather, that the phosphorus

23    loading, the term used here was in terms of loading

24    to the water.  And as I recall Dr. Chaubey's

25    testimony, he's talking about loading in a mass

1    balance type of context.

2            MR. PAGE:  Yes.

3            THE COURT:  Bringing it into the watershed.

4            MR. PAGE:  Yes, Your Honor.

5            THE COURT:  Okay.  Go ahead.

6            MR. PAGE:  That's exactly what they found,

7    because the logic is obvious that that has an

8    influence, a substantial influence on what goes into

9    the water if it's managed in the way that we have

10   here.  That is, human waste and poultry waste and

11   other livestock waste are all allowed to be released

12   into the environment.  That is, phosphorus waste.

13   They're all either land-applied or directly

14   discharged into the rivers and streams.

15           That is why that even though the direct

16   discharge may be a quicker path, eventually in this

17   IRW context, if you allow this waste to be spread

18   out on the fields, it eventually runs off into the

19   streams and makes its way into Lake Tenkiller.

20           The defendants, even though they point to a

21   lot of different potential sources, didn't quantify

22   any of them in any fashion.

23           This is an essential quantification step

24   that was done initially by Dr. Engel to predicate

25   how he would put together his model, his computer

1    model.  So this lays the foundation for determining

2    what sources are essential, which ones are the ones

3    that are necessarily important to computer model,

4    and to focus your analysis on.

5            So it was an important predicate step for

6    the computer model, but it's also an important piece

7    of evidence that demonstrates the phosphorus

8    contributions by different contributors in the IRW.

9            Now, Dr. Sullivan and Dr. Connolly tried to

10   minimize the importance of the mass balance to the

11   relationship of it getting not just in the

12   watershed, as the court pointed out, but getting in

13   the water.  And they analyzed it through a --

14   analogized it to a warehouse or a bank.

15           If that was the case, it would make a

16   difference.  But it's not.  That's what is important

17   here, Your Honor.  The fact is that ignores

18   reality.  And clearly, Dr. Chaubey and others,

19   researchers, wouldn't look at mass balance as being

20   probative to water quality if they didn't believe

21   that had an impact on their waters.

22           THE COURT:  Obviously this record is full

23   of evidence of the tendency of certain soils to

24   "bank" phosphorus.  But, obviously, you don't have a

25   secure bank.

1          MR. PAGE:  No, sir.  There's a potential of

2   absorption and adsorption.  Dr. Olsen talked about

3   the differences of those.  As a geochemist, he's

4   imminently qualified to.  And although there may be

5   some temporary banking, there's always this question

6   of equilibrium.  And there's no phosphorus in

7   rainfall, Your Honor.  It's not like nitrogen.  So

8   when that clear -- phosphorus-clear water hits that

9   phosphorus soils, there will be some dilution going

10  into the water.

11         THE COURT:  I don't believe there's

12  anything on this record to indicate the phosphorus

13  content of rainfall.  Is there?

14         MR. PAGE:  I may be mistaken.  We may not

15  have addressed that, Your Honor.

16         THE COURT:  I don't believe so.

17         MR. PAGE:  But I believe the record does

18  indicate that there's always some transference from

19  the soils to rain waters.

20         THE COURT:  There's certainly testimony

21  with regard to phosphorus runoff in periods of heavy

22  rainfall.  Go ahead.

23         MR. PAGE:  And that there's -- Your Honor,

24  I think there's also testimony that's undisputed in

25  this record that when there is higher STP, that

 1  would indicate more banked phosphorus, there is also

 2  higher runoff from those fields where there's higher

 3  STP.  So that indicates there's that transference of

 4  the phosphorus into the waters that's banked.  So

 5  like the court pointed out, it's not very secure.

 6  The next rainfall will release a portion of it; not

 7  all of it, but a portion of it.

 8          I believe, Your Honor, that Dr. Engel's

 9  testimony concerning the five percent, that is five

10  percent of the phosphorus that's applied each year,

11  that is the 8.7 to 10 million pounds, has been shown

12  through another mass balance analysis through

13  looking at what is put in through nonpoint source

14  versus point source ends up in the waters each year.

15          That testimony has been undisputed.  In

16  fact, it's corroborated by the testimony of

17  Dr. Edwards.  And his analysis was that anywhere

18  between 2.2 and 7 percent -- let me get on the right

19  slide here.  Excuse me, Your Honor.

20          There it is.  2.2 and 7.3 percent of the

21  phosphorus applied each year is lost in runoff.

22  Again, another causal evidence that's a little bit

23  closer to the mass balance getting actually in the

24  waters, because there they look at the mass balance

25  coming into the watershed and then they look at the

1    balance of phosphorus in the waters, and they

2    predict the contributions based on that.

3            Now, Your Honor, as a predicate for the

4    assumption that the mass balance analysis are

5    appropriate causal pathways, Dr. Fisher, the only

6    geologist, I believe, that testified in this case

7    and has substantial background in geochemistry and

8    has been a professor of geology at the University of

9    Tulsa and is currently teaching also, he says that

10   the topography, hydrology and geology in soils are

11   very important.  And they're clearly important in

12   this case.

13           I know the court is very aware of this

14   evidence.  I'm not going to spend a whole lot of

15   time on this.  I think the court is a student of

16   science in this area.

17           But there clearly is runoff throughout the

18   IRW.  There hasn't been any testimony offered by the

19   defendants contrary to what Dr. Fisher pointed out

20   that, even flat land, there will be runoff with

21   sufficient rainfall and that there's no area within

22   the IRW, given sufficient rainfall, where there

23   wouldn't be runoff.

24           Now, that whole question of the geology as

25   being important to this case is confirmed by three

1  different witnesses:  Dr. Fisher, who we just talked

2  about; Dr. Olsen; and Dr. Edwards, who testified

3  that, given the geology, that the potential for

4  water quality for degradation is particularly high

5  where shallow, cherty soils and karstic geology

6  greatly increase interaction between surface and

7  groundwater.

8          I believe the court has probably seen, and

9  there's been testimony that the streams will come

10  and go in this watershed; not because they dry up,

11  because they move into the groundwater and then come

12  back out.  There's been lots of testimony in this

13  case about the alluvium.  After runoff, the alluvium

14  fills up on the sides of streams and rivers, and

15  then as the water level drops, the alluvium

16  contributes to the waters.

17          So even during base flow, Your Honor, the

18  groundwater and the alluvium of this watershed

19  contribute water that is phosphorus laden.  This is

20  important.  It was important to Dr. Engel in

21  choosing that he didn't want to use a mechanistic

22  model.

23          The court may recall that the mechanistic

24  routing model, he felt, would not be effective

25  because of this interaction between surface and

1    groundwaters.  And he found that Dr. -- the doctors

2    from Oklahoma State University who had tried to use

3    a mechanistic routing model in this watershed was

4    unable to do so primarily because of the interaction

5    between groundwater and surface water.

6            So those interactions, that addition of

7    phosphorus and loss of phosphorus at different

8    points along the streams, would be problematic for

9    the mechanistic model.

10           Now, Your Honor, it's important to point

11   out just in summary on the geology, there has been

12   no contest in this case about the propensity for

13   runoff and for groundwater infiltration of

14   land-applied phosphorus due to the geology and

15   topography in this case.  That, I believe,

16   Your Honor, has not been disputed.

17           Now, the next piece of evidence and wholly

18   independent line of evidence of causation is

19   watershed modeling.  Again, Dr. Chaubey pointed out

20   that it's another way that one may determine the

21   fate and transport of a pollutant is through

22   watershed modeling.  Again, we employed that in this

23   case.  Dr. Engel employed that, Your Honor, in this

24   case.

25           Dr. Engel used a computerized model, that

1  is the GLEAMS model, and linked it with the

2  mechanistic routing model in this case.  He did so.

3  That his testimony was that he has used that same

4  process in other watersheds and that others have

5  linked models of this type.  In fact, SWAT models

6  and other models often use these type of linked

7  models to do an evaluation of a watershed.

8          The results are important to look at its

9  accuracy or its -- the strength of the results.  The

10  results are undisputed that the phosphorus for

11  nonpoint source was about 60 percent before 2003,

12  and Dr. Engel's model predicted it was 80 percent

13  after 2003.  This result, this 80 percent, this

14  model prediction result, is consistent not only with

15  USGS prediction, which I believe validates the

16  model, that is the linked model, but also is

17  consistent with Dr. Connolly's conclusion as to

18  nonpoint source.

19          Now, let's talk about the critiques.  First

20  I want to point out the experience, Your Honor.  And

21  I believe that we did do an unsuccessful challenge

22  of *Daubert* on Dr. Bierman in this case, but I think

23  the criticisms raised in that are still important.

24          Dr. Bierman has nowhere near the experience

25  in watershed modeling as Dr. Engel, and that

1  underlies his criticisms and pervades the probity

2  and the value of his criticisms.

3          On the other hand, Dr. Engel was, in fact,

4  selected by Judge Eagan as a neutral special master

5  in the *City of Tulsa* case on these very issues.

6          THE COURT:  And yet she rejected his

7  opinions, correct?

8          MR. PAGE:  I don't recall that,

9  Your Honor.  I recall that he gave an opinion as to

10 Dr. -- the SWAT model that was offered by the

11 Oklahoma State -- but that he didn't actually -- I

12 don't believe she rejected any of his opinions, Your

13 Honor.

14         THE COURT:  All right.

15         MR. PAGE:  He didn't offer a model in that

16 case.  He was critiquing the model that was offered

17 by the City of Tulsa in that case.  I believe she

18 actually adopted his analysis.

19         And, Your Honor, his testimony in this case

20 was that the lessons he learned from his evaluation

21 in Eucha-Spavinaw and the modeling work there played

22 an important -- played an important role in how he

23 selected the modeling in this case.

24         But more than that, Your Honor, Dr. Engel

25 has published and is recognized both by Purdue

 1    University and his own society of engineers as being

 2    an outstanding researcher for the last 20 years.

 3            Now, they complain that GLEAMS was not a

 4    watershed model.  Your Honor, GLEAMS is used as a

 5    watershed model in all of the -- most of the

 6    watershed models such as SWAT and HAAFA that are

 7    used throughout other places.

 8            So GLEAMS -- the portion that evaluates

 9    what is happening on the fields, that is how much is

10    running off to the edge of the field, is used by

11    GLEAMS, has been used by GLEAMS, and that has been

12    published.

13            What about the empirical versus the

14    mechanistic model?  Dr. Engel's testimony -- and I

15    don't believe it was contested -- that a mechanistic

16    model uses equations also.  But rather than one

17    equation, which we'll describe at least implicitly

18    what happens with the phosphorus in the water, the

19    amount of water in the phosphorus that goes from the

20    edge of field to Lake Tenkiller, a mechanistic model

21    would add multiple equations.  Those equations would

22    be based on observations of phosphorus in water from

23    other watersheds, and they would be adjusted based

24    on calibrations.

25            Dr. Engel's testimony was that he was

 1  concerned about the relative loadings to Lake

 2  Tenkiller.  That was what was important to him in

 3  this analysis.  So the understanding of the

 4  specifics of how phosphorus may be delayed along the

 5  way were not important.

 6           Now, why does that make sense?

 7  Fundamentally and primarily this makes it make

 8  sense:  One is geological and one is chemical.  From

 9  a geological point of view, this watershed leaks.

10  The water runs off and it runs through.  There is

11  movement of water.  This isn't like a desert

12  watershed where water isn't moving downhill to the

13  lake.

14           Second of all, chemical.  Phosphorus is

15  conserved, or it remains in the environment.  It

16  doesn't volatilize.  It may change forms along the

17  way.  It may be taken up into fish or plants.  But

18  you don't remove phosphorus from this system unless

19  you catch a fish or harvest some algae and take it

20  out of the watershed.  The phosphorus stays in this

21  system.

22           Given that, understanding of how much

23  phosphorus at any one time is in algae on the bottom

24  of the river or suspended in the river itself was

25  not important to understanding the impacts on Lake

 1  Tenkiller.

 2          We have evidence all along the way that the

 3  phosphorus persists and is there based on the

 4  sampling data and on the presence of algae and

 5  changes in water quality.  So those were important

 6  considerations for Dr. Engel in choosing this

 7  empirical model.

 8          It's important to understand, Your Honor,

 9  that at least in my experience, where you have the

10  empirical evidence, it's more persuasive than

11  predicted evidence from a model.  The mechanistic

12  can only take other empirical observations,

13  transform them into a mathematical equation and try

14  to make a prediction.

15          Here there is not a prediction.  It's known

16  how much phosphorus is getting into Lake Tenkiller.

17  Dr. Engel knows how much phosphorus is being

18  released by the wastewater treatment plants, and he

19  allocates the rest of it to different nonpoint

20  sources.  He gives the wastewater treatment plant

21  phosphorus a bye all the way to the lake.  It's the

22  rest of the phosphorus that's being put on the

23  fields that is being delayed in his model, in GLEAMS

24  and the routing model.

25          Your Honor, there was also some criticisms

1  of land use, the NLCD data.  I believe it was

2  undisputed that's used by others, that Dr. Engel did

3  not make those decisions, those are made by USGS,

4  and that there was no evaluation by Dr. Bierman as

5  to whether those criticisms had any impact.

6          The same with his criticism with regard to

7  urban area inputs into GLEAMS.  Again, there was no

8  evaluation by Dr. Bierman as to whether or not those

9  changes that Dr. Engel made, which he conceded could

10  be done with the GLEAMS model, had any impact.

11          Now, Dr. Bierman, I think rather

12  flippantly, says I don't have to do a model, that's

13  his job.  But he had the model.  He claims he's an

14  expert in it.  Why didn't he input the different

15  land use patterns and the different urban area

16  inputs he claims are wrong in Dr. Engel's model and

17  show us that there was made a difference.

18          I suggest that the lack of using the model

19  to test it indicates that his evidence, his

20  so-called evidence of lack of reliability on these

21  points are not persuasive because he could have

22  tested it and offered this evidence, and he did

23  not.  He did not test whether the land use data and

24  the inputs for urban use made any difference in the

25  results.

1          Now, I need to hurry -- keep hurrying along

2   here.  And I apologize I'm talking fast, but they

3   have limited my time here, and I can see I need to

4   move ahead.

5          The next piece of evidence has to do with

6   mathematical relationships.  And again, Dr. Chaubey

7   again gives us an independent predicate for this.

8   These are these regression analyses that we see a

9   lot of.  And he actually refers to those as giving

10  evidence of a cause and effect relationship.

11  Because, again, scientists use common sense that

12  indicates that what you do around an area of land

13  use will affect the water in that area because rain

14  comes down, causes things in the land to infiltrate

15  and run off.

16          So, did the State do this type of

17  analysis?  Yes.  Two different scientists for the

18  state independently did a regression mathematical

19  analysis evaluating land use with water quality

20  impacts.

21          Dr. Engel did that, and he found -- his

22  conclusion was as we increase poultry house density,

23  we see corresponding increases in phosphorus from

24  those watersheds.

25          Now, he simply just didn't say, well, count

1    the number of poultry houses and, therefore, I can

2    see what happens in the water quality.  He had as a

3    fundamental basis for that his evaluation along with

4    Dr. Fisher of what happens to waste in those poultry

5    houses, and that most of it, 80 percent, is land

6    applied within four miles -- five miles of the

7    poultry house in which it's generated.

8            So there was an undisputed factual

9    predicate upon which he could count poultry houses

10   to see if those land use activities would have an

11   impact on water quality.

12           He showed a very strong regression there,

13   Your Honor, which Dr. Chaubey says is evidence of

14   cause and effect.

15           Dr. Stevenson did an independent analysis.

16   He also, independently from Dr. Engel, did a poultry

17   house density analysis and also reached a scientific

18   conclusion showing evidence of cause and effect of

19   poultry house operations affecting phosphorus.

20           But Dr. Stevenson, as a biologist, went

21   farther than just raising phosphorus.  He said there

22   was a correlation between poultry houses and

23   phosphorus in the streams.  He said there was a

24   correlation between poultry houses and algal biomass

25   in the streams.  He said there's a correlation

1  between nutrients in the streams; that is,

2  phosphorus and algal biomass.  And that that algal

3  biomass affected the habitat; that is, the DO and pH

4  of these streams which have an effect on the

5  habitat, which is a water quality injury.

6          He also then said that he could see this

7  causal pathway, that there was an impact on the fish

8  communities based on poultry house density.

9          The only evidence against Dr. Stevenson's

10 analysis is from Mr. Chadwick.  And he did no

11 analysis other than evaluated the index of biotic

12 integrity for Oklahoma using the wrong type of data,

13 and he found that there's plenty of different

14 species and lots of individuals in these streams

15 even when there are lots of poultry houses.

16          What he didn't say is that he didn't tell

17 us whether or not the species' composition changed or

18 whether the number of individuals changed.

19          He conceded that those would also be

20 important injuries, but he never did that

21 evaluation.  So what he said is there's still ten

22 species, for example, and where there are poultry

23 houses and where there are not poultry houses.  He

24 didn't tell us whether the type of species change.

25 Do they go from stone rollers that like to eat the

1  algae off the bottom to maybe a cardinal shiner

2  that's more of a predator fish that likes the clear

3  waters and doesn't like the heavy algal mass.

4        Those, according to Dr. Stevenson, are also

5  evidences of injury.  So it's not just the number of

6  species.  That's what the index of biotic integrity

7  looks at.  It's a very blunt instrument evaluation

8  of biotic integrity.  You also have to look at

9  whether the species composition changed and also the

10  numbers of individuals.

11        Now we have hundreds of stonerollers, algae

12  eaters and very few cardinal shiners, even though we

13  have both species.  Again, we show a community

14  injury.

15        Let me briefly go -- I am kind of jumping

16  ahead to the injury evidence, Your Honor, but

17  sometimes they kind of flow, I guess, naturally.

18  And I apologize for that.

19        But Dr. Olsen actually gave us several

20  different types of evidence of causation.  Here is

21  the upstream/downstream.  We have evidence in this

22  case that was undisputed that we had a field where

23  there was poultry land application, and we had two

24  rainfall events where sampling was taken upstream

25  from where the runoff from that field went into a

 1  creek.  So you have a field, a creek running by the

 2  field, the field runs off into the creek.  Before

 3  that field runs off, there's a sampling event

 4  twice.

 5          Downstream contemporaneous with that runoff

 6  and the upstream sampling, there's a sampling

 7  machine taking samples.  The upstream samples were

 8  close to background, 20 micrograms or the .02

 9  milligrams per liter.  Downstream, depending on the

10  rainfall event, there are two of them, it was 470.

11  That clearly demonstrates runoff because in this

12  particular instance, we evaluated other potential

13  sources, and there were no other potential sources

14  on this field other than poultry waste land

15  application that would raise it from the 20

16  background to 470.

17          Now, how many times do we have to do this

18  to prove the point?  Your Honor, I think it's

19  reasonable you do it once, maybe twice, and it shows

20  runoff along with all the other evidence.

21          But Dr. Olsen and Dr. Fisher also did

22  another type of causation evidence, and that relates

23  to the composition of the chemicals.

24          And, Your Honor, I'm not going to spend a

25  lot of time on this today, but I will point -- this

1    is all in our findings of fact and our records.

2    But, Your Honor, in addition to just looking at

3    phosphorus, if you have a unique waste that has

4    unique chemicals in it in concentrations that are

5    unique from other waste sources that you're

6    concerned with, that is other principal sources of

7    phosphorus, then you can use those other chemicals

8    to evaluate whether or not the phosphorus that

9    you're finding in increased concentrations are from

10   the source you're concerned with.

11          Here both Dr. Fisher and Dr. Olsen found

12   that poultry waste had unique contributions of

13   copper, zinc, arsenic and potassium.  Dr. Fisher

14   focused on arsenic, zinc and copper.  He found those

15   compositional arrangements or combinations in the

16   solid media all the way down to causal pathway, and

17   he also found it in Lake Tenkiller sediments.  And

18   he found that those constituents, along with

19   phosphorus, increased as time passed based on his

20   lead-210 analysis.

21          So not only do we have increased

22   phosphorus, but we have also unique chemicals from a

23   unique source -- excuse me, unique chemicals that

24   are not found from another source, substantial

25   source in this watershed that are also rising along

1    with phosphorus.

2         I'm going to skip ahead to Dr. Olsen, who

3    also did a similar analysis with the chemicals.  And

4    here's two independent scientists determining causal

5    pathway, independent analysis, they didn't rely on

6    each other's analysis, and used a similar

7    methodology; that is, we're going to look again at

8    the combination of chemicals in poultry waste.  Look

9    at the other principal potential contributors of

10   phosphorus to the system, here wastewater treatment

11   plant and cattle, and is there something unique.

12   And again, Dr. Olsen found it to be unique.

13        Your Honor, I'm going to maybe just briefly

14   make one quick comment on this.  There's a lot of

15   slides, and perhaps the court maybe would like to

16   read them later, but I think this is what's

17   important to take away from this.  Dr. Olsen is a

18   Ph.D. geochemist.  He taught it at Colorado School

19   of Mines.  He's practiced it for 30 years.  He's the

20   only geochemist that's appeared in this courtroom.

21   Geochemistry is fate and transport.  Geochemistry

22   studies the geology and how chemicals move within

23   geological constructs.

24        He evaluated these chemicals.  He gave you

25   the opinion that these chemicals indicate -- even

1    though they have somewhat varying different

2    mobilities, he understands those mobilities, he took

3    that into consideration and still testified that

4    they indicate and they show that there is a causal

5    pathway for the phosphorus from the fields to the

6    streams into Lake Tenkiller.

7            He did this two ways, both from the

8    increased contamination you see throughout the

9    watershed and also the gradient, from higher near

10   the point of release to lower at Lake Tenkiller,

11   which would be a logical gradient pathway.

12           Your Honor, given the time, I'm going to

13   skip through these, but I believe that Dr. Olsen and

14   Dr. Fisher's work substantiate each other in that

15   analysis.

16           Your Honor, I think it's important to point

17   out that Dr. Olsen in the causation evidence of our

18   -- in our case is -- and I'm actually on slide 86,

19   Your Honor -- actually is substantiated and

20   corroborated by other independent investigators that

21   were not involved in this case.

22           The state agencies, both Arkansas and

23   Oklahoma -- I guess Oklahoma would have been

24   involved, so I'll take that statement back.  At

25   least the Arkansas state agencies have corroborated

1    the causation, USGS and USDA.  And the details of

2    that corroborative evidence are set forth in our

3    findings of fact in paragraphs 442 through 448.

4           But interesting, Your Honor, we've got

5    another concession from the defendants when they

6    called Mr. Earl Smith, who's the chief of the water

7    division of the Arkansas Natural Resources

8    Commission.  They're the equivalent of our DEQ.

9    Here's the chief of the water, he's the chief guy in

10   the water division as opposed to air or land, and

11   when asked on cross-examination, he conceded, he

12   said certainly one of the significant contributors

13   to nonpoint source impacts affecting the waters of

14   the Illinois River Watershed -- and that is in

15   context of poultry phosphorus.  So he said it's

16   clearly significant contributors.  Again, a

17   concession of a -- I would consider an expert in

18   this area called by the defendants.

19          The defendants haven't offered any reason

20   why we should discount their own witness and, again,

21   the concessions by Dr. Connolly.

22          So again, the significance of the source,

23   whether it's just a molecule or two, is, I believe,

24   also overwhelmingly supported our evidence here.

25          Arkansas Natural Resource Commission says

1  it's a significant contribution, poultry is.  That's

2  Mr. Smith's testimony here in this court.  USDA,

3  Geological Survey, Secretary of the Environment in

4  this courtroom, Dr. Engel, Dr. Olsen, and I don't

5  think I neglected to mention Dr. Fisher.

6          Now, I think I would be remiss, Your Honor,

7  if I didn't finish up my causation analysis by a

8  little review of Dr. Connolly's rather astounding,

9  unique, unsubstantiated and -- well, I think its

10  almost absurd opinion about the dominant impacts.

11          Dr. Connolly says that the dominant impact

12  of phosphorus in this watershed is wastewater

13  treatment plant.  In fact, the court asked him a

14  question to clarify that.  He said it was the

15  dominant impact.

16          Now, the first thing that I thought was

17  kind of interesting is that even though Dr. Connolly

18  says this, the defendants don't believe it.  They

19  don't even believe their own expert because they

20  spent a lot of time and effort, both in their

21  findings of fact and with Dr. Sullivan, arguing,

22  well, there's all these other nonpoint sources that

23  are important.

24          Now, if it is true that Dr. Connolly's

25  opinion that the only phosphorus of import in this

1    watershed is wastewater treatment plant, then why

2    did they spend so much time explaining the import of

3    other nonpoint source phosphorus, such as urban

4    runoff, cattle, septic tanks, critters?  They spent

5    a lot of time pointing the finger to those.  That

6    belies their own belief in their own expert.  But

7    there's more than just that.

8            Dr. Connolly's opinion is patently

9    uncredible.  He's the only one that's ever said it.

10   He's the only one that ever said it in this

11   watershed.  He's the only one that said it in any

12   watershed.  I would challenge the defendants to give

13   us any opinion in anyplace in the United States and

14   certainly in the Illinois River Watershed where an

15   expert says that nonpoint source phosphorus is not

16   important to the water quality impacts.  They can't

17   do it.  It's made up.

18           Now, why is it made up based on the facts,

19   let alone he's just all by himself?  First, he says

20   82 percent of the phosphorus load into the lake is

21   nonpoint source.  So he's asking the court, if you

22   believe his opinion, to ignore 82 percent of the

23   phosphorus.

24           Now, even if just ten percent of 82 percent

25   of the phosphorus was important, that would be --

1   from nonpoint, that would be half of what the

2   contribution is from wastewater treatment plant.  So

3   he's asking the court not only to ignore a portion

4   of it, but to ignore all of it.  He says it's not

5   important.

6         And he makes this conclusion, not

7   surprisingly, on a very limited investigation, which

8   he admits.  He says that it's the dominant source.

9         Well, let's look at the evidence in this

10  case.  The evidence in this case is undisputed that

11  prior to 2003, that is from the late 1990s, there's

12  been a reduction in point source phosphorus in this

13  watershed -- both Dr. Connolly and Dr. Engel

14  testified to this -- from point source discharges.

15  There have been upgrades to the wastewater treatment

16  plants.  From 1998 or so to 2003, the reduction has

17  been from 200,000 pounds to 90,000 pounds.  That's a

18  55 percent reduction.

19        Logically, if there's that much of a

20  reduction, we would see a corresponding improvement

21  in water quality in this watershed, yet we have not

22  seen it.  That belies the fact that soluble reactive

23  phosphorus, as he calls it, or dissolved phosphorus

24  from wastewater treatment plants is the only

25  important phosphorus for water quality in this

1   watershed.

2          Also, he points out and he concedes that

3   nonpoint source isn't all particulate.  On

4   cross-examination, he conceded that it's comprised,

5   that is nonpoint source, is comprised primarily of

6   dissolved phosphorus.

7          In fact, the evidence is undisputed from

8   Dr. Olsen is, that at least 50 percent -- or about

9   50 percent of the phosphorus running off from

10  poultry-applied fields is soluble reactive

11  phosphorus.

12         Well, one of his key tenets is soluble

13  reactive phosphorus is all that's important.  That's

14  disputed by a biologist, Dr. Stevenson, and

15  biologists Cooke and Welch.  But in any event, even

16  given that tenet, which is not to be based any

17  credibility, still nonpoint source are significant

18  contributors of the type of phosphorus he says is

19  important.

20         Again, when he -- on cross-examination, he

21  then had to admit that obviously there are runoff of

22  these important phosphoruses into the rivers and

23  streams of the IRW.

24         Now, Dr. Connolly also admitted with regard

25  to the speed aspect, you have this only SRP

1   phosphorus part, then he said, and nonpoint source

2   moves too fast.  It just goes too fast, Judge, so

3   the algae can't see it.

4          Well, he conceded on cross-examination that

5   algae does and, in fact, does grow in the Illinois

6   River.  Contrary to Mr. Duncan's picture of clear

7   water, there are some murky waters that are green in

8   the Illinois River and the Barren Fork, for that

9   matter, and there are benthic algaes in those rivers

10  also.

11         But his analysis was of Tahlequah, and he

12  looked at the -- only the main stem of the river,

13  assuming that the main stem would be relevant to all

14  the other small creeks and tributaries and that

15  somehow the main stem would be similar rainfall and

16  represent all the rainfall and the velocities

17  throughout the IRW.  That's simply not credible.

18         The other thing that's kind of amusing and,

19  frankly, gets to the point of amusing of his

20  analysis is that I guess when he gave this

21  testimony, he must think that phosphorus comes down

22  in one slug and that the algae just kind of has to

23  reach out and grab it, and if it doesn't grab that

24  molecule, tough luck, no algae growth.

25         The problem is that the algae sees lots of

1  phosphorus.  It keeps flowing by.  There's not just

2  one molecule or a big bunch of molecules running by

3  from phosphorus.  It's a continuing, consistent flow

4  of phosphorus.  And the algae can use it as it flows

5  by.

6          His velocity theory assumes that there's

7  not more phosphorus right behind the phosphorus that

8  just passed.  But logic tells us, Your Honor, that

9  that's not the case.  And the evidence of this case

10  shows that it's not the case.

11          There are lots of other issues with

12  Dr. Connolly.  We looked at his own maps, and we

13  pointed out, gee, Dr. Connolly, under base flow

14  conditions, how come we have high SRP and high algae

15  levels upgradient and on streams where there's no

16  wastewater treatment plant.  Well, he had to

17  concede, yeah, there are probably some minor

18  influence and minor impact.  His minor impact is

19  just his reaction to cross-examination.

20          He didn't evaluate poultry house

21  contributions to SRP.  He conceded that.  He only

22  looked at one source.  One source only:  Wastewater

23  treatment plant.

24          Now, Your Honor, I'm going to conclude

25  briefly with the injury evidence, and I can do this

1    very quickly because most of it is undisputed.

2         Again, as we pointed out at the beginning,

3    frankly, I don't believe the defendants have offered

4    any evidence that there has been a change in algae

5    productivity in this watershed in the last 50 years,

6    and those changes are both in suspended, attached,

7    blue-greens, and obviously changes in trophic state

8    of Lake Tenkiller.

9         Those changes affect five different types

10   of injury.  Habitat and community structure.  Now,

11   Your Honor, the evidence against that was

12   Dr. Chadwick.  We've already talked about that.  He

13   suggested that maybe there's still a good community

14   structure in the streams for fish, but there was no

15   dispute that there has been a change in the

16   community structure and evidence of change in Lake

17   Tenkiller.  That is the DO temperature squeeze.

18   Aesthetics, they actually concede there's been a

19   change in aesthetics, but I guess they just say

20   that's not important.

21        Disinfection byproducts, there's no dispute

22   that we have disinfection byproducts in this

23   watershed.  That's important because there's 22

24   wastewater treatment plants.

25        Toxins are being produced by the -- or the

1    potential for toxins are being produced by

2    blue-green algae, all resulting in water quality

3    standards.

4         Your Honor, the habitat community structure

5    has been affected in the ways shown in slide

6    No. 96.  Clearly, it's undisputed that dissolved

7    oxygen has been affected in the streams in Lake

8    Tenkiller and that's there's a change in smallmouth

9    bass and walleye.

10        The court has had the pleasure, Your Honor,

11   I would just say, I believe, in looking at the

12   pre-eminent and hearing from the pre-eminent experts

13   of stream ecology, Dr. Stevenson, and limnology in

14   lakes, Dr. Cooke and Welch.  These people --

15   Dr. Cooke and Welch are both retired.  They have no

16   real stake in this.  They've made their reputation.

17   They are the pre-eminent people of limnology, lakes

18   and reservoir studies, in this country, I believe.

19        They testified -- and there was no

20   limnologist testimony against them.  We heard a

21   little bit from Dr. Connolly, who's an engineer, and

22   we heard a little bit from Dr. Sullivan, which I'm

23   not really sure what he is, maybe he's an acid rain

24   expert, but there was no limnologist that took the

25   stand that argued with the trophic state evidence

11680

1   you heard from Dr. Cooke or the fish and habitat

2   changes that you heard from Dr. Welch.  That's

3   undisputed.

4         Your Honor, the aesthetics are apparent.

5   We've got scums in Lake Tenkiller.  We saw a picture

6   of that from Mr. Bullock.  We have disinfection

7   byproducts.  Those issues are here, Your Honor.

8         The evidence is -- the dispute is that,

9   well, there are disinfection byproducts being

10   produced in other locations.  Well, that has never

11   been a defense to an environmental case.  If it is,

12   then I would have won a lot more cases defending

13   polluters, Your Honor.  You can't just say, well,

14   other places are polluted; therefore, we don't have

15   to deal with the pollution in this place.  That

16   would be ridiculous.

17         We also have, Your Honor, the issue of

18   toxins.  Now, what Dr. Cooke testified to,

19   undisputed, is that there's been a shift in the

20   predominant algae in Lake Tenkiller today is

21   blue-green algae that produces toxins.

22         There are some Corps of Engineers samples

23   from this lake taken independent of this case that

24   have found toxins.  And there was some dispute,

25   although I don't believe it's a credible dispute,

1  that water treatment plants do not remove these

2  toxins unless you're using activated carbon.  But a

3  simple alum sand treatment will not remove these

4  small molecules of their carbon-based toxins.

5        The water quality standards that have been

6  violated are numerous.

7        And, Your Honor, I want to finish with just

8  a brief discussion about what this import means.

9  Dr. Engel, with his model, had four scenarios.  He

10  looked at what will happen if things remain the

11  same, what will happen if there's growth, what will

12  happen if there's cessation, and what will happen if

13  there's cessation and buffer strips.

14        Dr. Wells -- I'm not going to go into

15  details today, I don't have time permits -- also did

16  an evaluation with similar results for the lake.

17  And what we find, Your Honor, is what's shown on

18  Oklahoma Exhibit 1100.  If we keep the same, that's

19  the black line here, then the pollution will

20  basically remain the same.

21        Now, if poultry waste is removed, it shows

22  within the first 10 years an 18 percent reduction,

23  and over the next 50 years, about a 50 percent

24  reduction.  Why does it take so long?  Because of

25  this banked phosphorus that's in the land of the IRW

1  now that will continue to leach out over time.

2         The important point here, Your Honor, is

3  that Dr. Engel produced this analysis by removing

4  poultry, then, from his GLEAMS model.  It shows

5  again that poultry -- another piece of evidence that

6  is significant because there is a reduction in this

7  watershed.

8         Now, what we should expect to occur is the

9  growth scenario.  If this court does nothing to

10  change the activities of the defendant, then being

11  good business people, they will continue to grow and

12  they'll continue to operate the way they are today.

13         If that happens, Your Honor, then the

14  phosphorus contributions in 50 years will double.

15  And Dr. Cooke's testimony in this case, undisputed,

16  was that the hypereutrophic -- what we're seeing

17  hypereutrophic conditions in LK-4 and 3 will spread

18  all the way down to LK-01 and 2.  So we'll lose that

19  type of clarity.

20         So, Your Honor, I guess the question for us

21  today, and I'll now leave to Mr. Nance, is what is

22  the legacy that we're going to provide for our kids

23  and our grandkids and for ourselves if we get a

24  chance to live another 10 or 20 years?  Is will it

25  be a legacy of pollution, or will we have a legacy

1   that we can say that we did something important to

2   clean up the waters and restore the natural beauty

3   of this watershed?  Thank you, Your Honor.

4           THE COURT:  Thank you, Mr. Page.

5           MR. BULLOCK:  Judge, could we take our

6   morning break?

7           THE COURT:  Do we have time?

8           MR. BULLOCK:  The plan was to be finished

9   at 11:30.

10          THE COURT:  I can sit.  Mr. Nance, do you

11  need to take a break?

12          (Off-the-record discussion was had.)

13          THE COURT:  We need to send a file, but

14  we're running behind already.  Let's take maybe five

15  minutes.

16  (Whereupon a recess was had.)

17          THE COURT:  Mr. Bullock, we need to enforce

18  some discipline with regard to time.  We started at

19  9:05 on the computer clock, just maybe a minute or

20  two after 9:00 on the clock on the wall.  And I'll

21  give Mr. Nance that additional time, but we've got

22  to constrain this.

23          MR. BULLOCK:  What I was going to ask the

24  court is if we could take 10 minutes from the 45 we

25  reserved for rebuttal and put it on Mr. Nance so

1    that we then will have 35 minutes for rebuttal this

2    afternoon at the conclusion.  So that will give him

3    his 45.

4          THE COURT:  All right.  Mr. Nance, you may

5    proceed.

6          MR. BULLOCK:  One other brief point.  I

7    misspoke in terms of George's on the Ritter farm.

8    They did stop application after they got that high

9    STP of 2000 or whatever.

10         MR. WEEKS:  I appreciate that correction,

11   Your Honor.

12         THE COURT:  Mr. Nance.

13         MR. NANCE:  Your Honor, if it please the

14   court.  Since the court is evidently interested, and

15   properly so, about the defendants' defense under the

16   Oklahoma Registered Poultry Feeding Act and the

17   Animal Waste Management Plans, I'm going to jump

18   ahead and address that kind of out of order, if

19   that's all right with you.

20         The defendants note that ODAFF has

21   statutory authority, they say, to change the

22   application rate.  What the actual statute says is

23   they can propose a ruling.  And the court is

24   familiar, I'm sure, under the Administrative

25   Procedures Act that rule changes are subject to

 1  public notice and hearing and comment and subject to

 2  review by both Houses of the Legislature and by the

 3  governor.

 4          I would suggest that -- that the likelihood

 5  of that passing was summarized in another context by

 6  Mr. Fite when he said you can't fight the farm

 7  lobby.

 8          THE COURT:  Well, that's what's largely

 9  been unstated here throughout, although I tried to

10  state it at the very beginning.  We've got the NRCS,

11  you know, STP 300 standard here.

12          Now, you may disagree.  I may disagree.

13  But that's what we've got.  Basically you're -- by

14  asking this court to impose a 65 STP, you're asking

15  this court to displace something that you just said

16  has been adopted by a state agency, it's been

17  subject to state legislative review, and the

18  governor could have stopped it, correct?

19          MR. NANCE:  Well, I think incorrect because

20  of the political situation I just alluded to and

21  Mr. Fite alluded to.  But --

22          THE COURT:  But they could have done it.

23  That's the law of the state.  The State is bringing

24  this case.  We've got an STP 300 standard.  Now, you

25  know, based upon all that's been presented here,

 1  frankly, the agricultural lobby is strong in this

 2  state; right?

 3          MR. NANCE:  Yes.

 4          THE COURT:  That's the law.  And you

 5  represent the State of Oklahoma here, correct?

 6          MR. NANCE:  I do, indeed.

 7          THE COURT:  So what's this court to do?

 8  Just tell the state legislature with a bang of my

 9  gavel that that's out the window?

10          MR. NANCE:  Not at all.

11          THE COURT:  And that by disagreement by a

12  federal court, I can just make the law go away?

13          MR. NANCE:  No, you can't make the law go

14  away.  You can enforce the law and you can do equity

15  in this case, and as a remedy for the nuisance and

16  the trespass that we have in this case, you can

17  impose on these defendants an equitable remedy.  You

18  don't have to set 590 aside.  590 is a ceiling.  It

19  doesn't require application up to 300.  It says in

20  this watershed 300 is as high as you can apply.

21  But -- so you have to apply that.

22          THE COURT:  But your own state contract

23  writers are allowing them to apply up to STP 300.

24          MR. NANCE:  They are, and -- but the

25  contract plan writers can't authorize a violation of

1    the law, and that's what we're talking about here

2    today.  The law is no runoff or discharge from the

3    land application site.  Now --

4              THE COURT:  I understand, but you don't

5    have the folks up there enforcing it, right?

6              MR. NANCE:  We have two gentlemen who split

7    up this watershed and some other territory who are

8    in charge of inspections and enforcement.  And

9    you've seen the case that we've put on to prove

10   edge-of-field runoff and all of that.  They simply

11   don't have the means or the training to do what

12   we've done in this case, and that's prove serious

13   substantial nonpoint source runoff originating with

14   this industry.

15             And having shown that, I think that we are

16   -- we're entitled to the remedy I'd like to discuss

17   with you a little bit later.

18             THE COURT:  One of the things that neither

19   of you have addressed in your proposed findings and

20   conclusions, and I'd like for you to think at least

21   about the possibility of submitting supplemental

22   proposed findings and conclusions by a reasonable

23   date, but it is this general idea, and I'll throw it

24   up and allow you to shoot it down as a possible

25   approach here, but to the extent that the State of

 1   Oklahoma allows application of poultry litter up to

 2   a certain amount, that perhaps could remain, given

 3   that the State has allowed it through its

 4   regulations, but to the extent there is greater

 5   poultry litter in a barn than a grower can apply,

 6   that the defendant poultry integrators be required

 7   to provide a market either by buying it from the

 8   growers and transporting it out of state, or

 9   providing the market, being the market maker as was

10   tried previously but has since ended, to allow that

11   excess poultry litter beyond that which the State

12   itself permits to be applied on these growers' farms

13   to be transported out of state.

14         So just a thought, and we'll discuss this

15   here at the end.  Go ahead.

16         MR. NANCE:  Yes, sir.  The purpose of the

17   -- I'm going to refer to it as the act because it

18   has such a lengthy and cumbersome full title.  But

19   the purpose of the act, as testified by Ms. Gunter

20   when she was here, was, one, just to let the State

21   know who was out there doing what, how many growers,

22   what they were doing.  But the other purpose of the

23   act was to ensure that there was no pollution from

24   the operations that were registered.  And that is --

25   that's explicitly in the statute we'll look at in a

1  moment.  The act is not a safe harbor.  It's not

2  like an NPDES permit that says you can put so many

3  pounds of phosphorus in the water per day.  What the

4  act says is you can't let it leave your property.

5           And the act, I think, has had a mixed

6  result in operation, one, that we do know who the

7  operators are and we do get them some education and

8  we do give them some guidance on how to operate.

9           But what the act did was after the act came

10  into effect, it made the ability to land apply

11  conditional on compliance with the act and the

12  Animal Waste Management Plan.

13           Now, we're talking about this statute at

14  all, I assume, because the defendants are

15  responsible for the actions of their growers.

16           The court has ruled this act doesn't apply

17  to the defendants.  And so we're spending a lot of

18  time thinking about an act that does not apply to

19  the defendants in this case, but only applies to

20  their growers.  And we are not here having 77

21  proceedings or proceedings against 77 growers for

22  violating the no-runoff standard.  What we're here

23  to do is to redress the massive pollution that

24  unreasonably interferes with the water quality in

25  the state that arises from this industry and for

 1   which the defendants are directly liable as well as

 2   vicariously liable.

 3        And I'd ask the court to remember as we

 4   think about Animal Waste Management Plans that they

 5   are, as is the phosphorus index in Arkansas, a

 6   site-specific tool which gives no consideration

 7   whatsoever to the cumulative effect of the entire

 8   industry.  It's the cumulative effect of the

 9   industry, something that's beyond the ability of any

10   grower to correct, even though the runoff from their

11   operation contributes to it, that we need to remedy

12   here.

13        And there is no law that authorizes those

14   contract plan writers to go out and say that there

15   can be runoff or discharge from the planned site.

16        Ms. Gunter testified as the common sense of

17   the matter is that 300 pounds per acre is the

18   maximum.  It's not required.

19        If we could start with slide 114, please.

20   Well, that's not the one I expected.  Let me -- I

21   will -- I'll tell you what Ms. Gunter said, and

22   we'll get the slide when we can.  This was on page

23   2902.  There we go.  I see our numbers don't match.

24        THE COURT:  Which slide is it, Mr. Nance?

25        MR. NANCE:  I think it's going to be

1    numbered 115, Judge.  I'm looking at an antique

2    set.  I apologize for the confusion.

3             THE COURT:  Thank you.  I've got it.

4             MR. NANCE:  The question was:  "Does ODAFF

5    view an AWMP as a permit?"  And the answer is:

6    "No."

7             The next slide, which I guess is now 116,

8    has some more testimony from Ms. Gunter, if we could

9    go there.  The question was:  Does an AWMP permit

10   any amount of pollution to leave the application

11   site or go to the waters of the state?

12            She said the statute absolutely prohibits

13   pollution.

14            Next:  In ODAFF's view, has the State ever

15   consented to discharge or runoff of waste from a

16   land application site?

17            Not to her knowledge.

18            At the bottom of that slide that will go

19   over to the next slide:  If a grower or operator

20   under the act did everything in the precise written

21   terms of the plan, AWMP, but discharge or runoff

22   occurred from the application site, would the grower

23   be complying with the act?

24            No.

25            Would the grower be complying with the

1   requirements of the plan?

2          No.

3          Because incorporated in it is the no

4   discharge or runoff.  That's the overarching theme.

5   Whose responsibility is it?

6          It's the grower or the applicator.

7          That's the testimony and that mirrors, in

8   fact, the statute language that we'll look at in a

9   moment.

10          Even though I think the statute is clear,

11   that's ODAFF's long-standing administrative

12   interpretation of the statute, and it's entitled

13   respectfully to the court's deference.

14          You asked Mr. Bullock about title --

15   Oklahoma Statute Section 4 which has been on the

16   book for a long time and deals with things that are

17   authorized by the express terms of a statute.

18          First of all, that can only apply to

19   Oklahoma conduct.  There's nothing that Arkansas can

20   do that authorizes pollution in Oklahoma.  And they

21   haven't authorized pollution in Oklahoma.  They

22   began their regulatory regime over there in 2006,

23   which has its own variety of a no runoff and no

24   substantial runoff in Arkansas in the rules.  But

25   there has been a lot of loading from Arkansas before

1  that time.

2       And you asked Mr. Bullock about the effect

3  of this statute on the federal common law of

4  nuisance.

5       I think the best and -- I think the best

6  analysis of that is there is no Oklahoma statute,

7  express Oklahoma statute that authorizes an

8  interstate nuisance originating in Arkansas.  There

9  isn't such a statute.  There's been none argued.  So

10  clearly this section would not apply to the federal

11  interstate common law nuisance claim that we have

12  brought.

13       I'm going to go to the *Herd* case once again

14  for a different purpose because *Herd* analyzed the

15  statutory authorization defense, and I think

16  analyzed it correctly.

17       In *Herd*, the defense was, well, at least in

18  part, we've been mining on lands belonging to an

19  Indian tribe.  There's certain federal statutes that

20  talk about how to do that.  There were certain

21  federal regulations that applied and, in fact, there

22  were even form leases that applied if you were going

23  to be -- if you were going to be operating in Indian

24  country.  Federal form leases somewhat analogous,

25  perhaps, in this case to an Animal Waste Management

1  Plan.

2       Slide 117 -- thank you, Gina -- is from

3  *Herd,* as are several of the next slides.  But the

4  court in *Herd* talked about that case was not a

5  situation of the legislature acted with intent of

6  sanctioning certain nuisance-type activities for the

7  public good.

8       Well, neither has the Oklahoma legislature

9  in this case.  It has not sanctioned a nuisance

10  because there's some public good to be served by it.

11       In fact, it's prohibited nuisance from this

12  industry.  118, please.  Thank you.  Here a couple

13  more quotes from *Herd* on this slide.

14       Your Honor -- and, again, it talks about

15  kind of the rationale for the statutory

16  authorization defense.  And the first one there on

17  that slide, that the public good requires some

18  necessary nuisance, the court in *Herd* said that's --

19  that didn't apply in *Herd,* and I suggest to you it

20  doesn't apply in this case either.  *Herd quoted*

21  corpus juris, the second quote on that slide, a

22  statutory sanction may not be pled in justification

23  of acts that are authorized by the express terms of

24  the statute unless basically the legislature

25  contemplated the doing of the very act which

1  occasions the injury.

2        In this case, the legislature has

3  prohibited the very act that occasions the industry,

4  which is injury, which is runoff and discharge from

5  the application site.

6        119.  And this probably should have an

7  emphasis added on it because I think we highlighted

8  here or we bolded here some language that was not

9  bolded in the opinion.  "A license, permit or

10 franchise to do a certain act can't protect the

11 licensee who abuses the privilege by erecting or

12 maintaining a nuisance."

13        And the fact that -- on the bottom one --

14 the first one is quoting the Tenth Circuit, which is

15 in turn quoting an Oklahoma case.  The bottom quote

16 on page -- on number 119 is "The fact that a person

17 has some authority from the legislature or

18 municipality to do certain acts doesn't give the

19 right to do such acts in a way constituting an

20 unnecessary interference with the rights of others."

21        That was the court's analysis in *Herd*, but

22 I think it applies precisely to the situation we

23 have here.  They were using as a defense federal

24 statutes, federal regulations and federal form

25 leases, some of which even told them they had to

 1    leave the mine tailings in Indian country.  Told
 2    them where you had to leave it.  The court said, no,
 3    that's not an adequate statutory authorization
 4    defense.
 5           In this case, the legislature didn't
 6    contemplate runoff to the waters and say, well, the
 7    poultry industry is so important we're willing to
 8    endure that, we're willing to take a certain measure
 9    of pollution.  In fact, they said just the
10    opposite.  The legislature didn't decide that the
11    benefit of poultry growing justified the pollution
12    of waters.  In fact, it prohibited pollution.
13           119.  This is -- 119 -- I'm sorry, that's
14    one we've already looked at.  120, if we could,
15    please.
16           This is an excerpt from the Oklahoma
17    Statute Title 2, Section 10-9.7(C).  And it talks
18    about what has to be in an Animal Waste Management
19    Plan, but it says unequivocally and unambiguously,
20    "Discharge or runoff of waste from the application
21    site is prohibited."
22           So the defendants have taken a legislative
23    enactment designed to protect the environment and
24    have turned it on its head as making it a defense to
25    pollution which is entirely contrary to the defense

1    that they're using, the statutory authorization

2    defense, and should not be permitted to stand in

3    this court.

4           The court, respectfully, should respect and

5    effectuate the terms of the act rather than the fact

6    that Animal Waste Management Plans may not function

7    as intended and anticipated by the legislature.

8           In our material, we have the *Sharp* case v.

9    the 251st Street Landfill.  I think we've talked

10   about that case before.  In that case, the health

11   department had permitted a landfill, but an

12   injunction was issued because the agency decision

13   did not affect the legislative purpose.

14          In conclusion on this point, Judge, there

15   is no safe harbor in this act.  There is nothing

16   analogous to a NPDES permit.  The provision of the

17   statute is very clear; there just simply cannot be

18   pollution, there cannot be runoff, discharge or

19   pollution.  And nothing that the contract plan

20   writer does in writing a plan can authorize breaking

21   the law.

22          The defendants have foresworn any defense

23   based on laches and estoppel, but essentially make

24   that by another name, and that is, well, we relied

25   on the plans or our growers relied on the plans or

 1  we, the defendants, thought if our growers relied on

 2  the plans, there would be no runoff.

 3         Well, one, laches and estoppel don't apply

 4  against the State.  I don't think anybody is going

 5  to contradict that well-established principle of

 6  law.

 7         And so any reliance or any belief on the

 8  part of the growers or the defendants that the plans

 9  are enough is irrelevant in the present case.

10         Now -- and, in fact, I don't really think

11  the defendants believe that.  They say they did, but

12  you can't look at -- let's look at slide 107 real

13  quick, and I'm going to move through these pretty

14  quickly.  107.  We've seen this before.  This is our

15  Exhibit 1154.  It's the mass balance pie chart, and

16  it shows that 75 percent -- more than 75 percent of

17  the phosphorus coming into this watershed comes from

18  poultry.

19         Slide 108, please.  This is an excerpt from

20  the USGS document, Exhibit 5861, which says that

21  during the time period 1997 to 2001, more than 86

22  percent of the phosphorus loading came in runoff.

23         Next slide, 109.  There we go.  That's the

24  next USGS chart from 2000 to 2004.  83 to 90 percent

25  of the loading comes in runoff.

1          If the defendants look at that, they have

2    to know that they're contributing to the runoff, and

3    I believe they do.

4          Slide 110 is a new graphic, it's extremely

5    sophisticated.  It's a pie chart that just shows an

6    80/20 split.  80 percent at least of the loading in

7    this watershed is from runoff phosphorus.  The 20

8    percent is from point source phosphorus.

9          And, Judge, the regulatory systems, the

10   NPDES permits may be able to squeeze down the size

11   of that nonpoint slice a little bit from wastewater

12   treatment plants, but we're not going to get a

13   solution until we address the 80 percent of the pie

14   that's runoff.

15         And there's really two ways to do that,

16   since most of that 80 percent is going to be coming

17   from the three-quarters of the overall loading to

18   the watershed that's poultry.  A big part of that --

19   big piece of the pie is from poultry.

20         The legislative -- the administrative

21   procedures processes in Oklahoma and Arkansas simply

22   can't shrink that pie, that part of the pie, and the

23   only means to do that is an injunction by the

24   court.

25         We could attack that in two different

1  ways.  One would be to reduce the amount that comes

2  in, the 75, 76 percent of mass balance that comes

3  from poultry; or it could remove, as the court in

4  its suggested supplemental findings of fact -- I

5  think we all recognize that phosphorus has to leave

6  the watershed.

7           You've reminded me that I represent the

8  State of Oklahoma here.  The State is here on behalf

9  of the public, the hundreds of thousands of people

10 that drink the water from this watershed, that fish,

11 swim, canoe or ski there.  They have little or no

12 idea what goes on here in this courtroom.  They may

13 read press accounts about it, but they cannot have

14 appreciated how hard the court has worked and the

15 parties have worked.

16          But even if they don't know exactly what's

17 going on, I think they have a claim on your

18 conscience as a chancellor of equity to see that

19 right is done here.

20          And there's only one way.  There is no

21 plan B.  There's no other way to shrink this 80

22 percent of the pie but an injunction from this

23 court.

24          Now, the problem has arisen in this case

25 because the defendants, for economic reasons, have

1   concentrated their operations in the watershed

2   around their feed mills and their processing plants

3   and such.  It's a very efficient system.  It's

4   commendably efficient.  And it's delivering meat at

5   a reasonable price, and that's a good thing.  We

6   don't have any problem with that.

7        But because the waste is spread very near

8   where the chickens are, the turkeys are, the

9   concentration of the birds leads to concentration of

10  the waste.  And the way the defendants have managed

11  their property, which is the birds, they have

12  created a nuisance and a trespass.

13       They could have had a different business

14  model that spread their houses far and wide so that

15  the waste would be spread far and wide.  Waste would

16  maybe not then be an issue, but their transportation

17  costs would be higher.  So they've made an

18  economical decision to minimize their transportation

19  costs around their facilities, and that has led to

20  the nuisance in this case.

21       Let's look at slide 111, please.  The

22  evidence is -- in this case is unrebutted that the

23  defendants own the birds, they control the birds,

24  they dictate every term of every contract with every

25  grower.  It's a take-it-or-leave-it contract.  The

```
1   defendants control when birds are placed and picked

2   up.

3        And we're asking the court to enter an

4   injunction requiring the defendants to ensure that

5   waste from their birds is responsibly managed at the

6   defendants' expense.  And if necessary -- there may

7   be a lot of ways they can do that, and I don't want

8   to -- I don't think the court needs to micromanage

9   the relationship between the defendants and the

10  growers, but I think there needs to be -- as a

11  backstop, if nothing else works, the defendants need

12  to be enjoined from placing birds with any grower

13  who doesn't cooperate with the effectuation of the

14  injunction we're seeking, because the defendants

15  have absolute control over the birds and their

16  delivery and their timing.  And the court, I think,

17  can order that -- can control that by injunction.

18       We have to limit the amount of waste in the

19  IRW and we have to have adequate documentation about

20  where the waste is going.  And we have to

21  investigate and implement other remedies -- I'll

22  talk about that in a minute -- at the defendants'

23  expense.

24       The first step, though, needs to be a

25  moratorium on land application in the near term, and
```

1   that's just for a very practical reason, because

2   there is already -- as you recognized in your order

3   last evening, there is some infrastructure in place

4   for removing waste.  There's some, but there's not

5   enough.  There is some market for the waste, but

6   there's not enough.  And until we can get that sort

7   of thing adequately up and running, there should be

8   a moratorium on the application of waste in this

9   watershed.  And experience tells us, and there's

10   some testimony in the case that the waste can be

11   left in a house for some period of time, although

12   obviously not forever.

13         The evidence in this case demonstrates, as

14   Mr. Page said, that the phosphorus is the limiting

15   factor for algae growth in the waters of this

16   watershed.  And the evidence is really undisputed in

17   this case that the defendants' operations in this

18   watershed and the counties that include the

19   watershed produce more phosphorus than can be

20   agronomically used.  Both Oklahoma and Arkansas

21   recognize that there's nutrient surplus or nutrient

22   limitations in this watershed.

23         The unreasonable management of their birds

24   and the waste that comes from that has unreasonably

25   affected the water quality in Oklahoma, and that's

1   the nuisance, or the trespass is when the waste get

2   in the water.

3        You've heard testimony that 65 soil test

4   phosphorus is the agronomic limit for the kind of

5   crops grown in this watershed.

6        And the fact that poultry waste has

7   historically been applied for nitrogen has led to

8   the astronomical STPs that we've talked about in

9   this case.

10        Dr. Johnson told us that no farmer could

11   overapply commercial fertilizer and afford to stay

12   in business and get the kind of STPs we see here.

13        Our proposal is that in the Illinois River

14   Watershed, poultry waste may continue to be used

15   where there's a need for both nitrogen and

16   phosphorus.  That is, before the application, there

17   is an STP taken by a reputable person we suggest

18   working for or with the approval of a special master

19   to be appointed by the court where there is at the

20   time of application an STP of lower than 65.

21        But it should be applied for no more than

22   the nitrogen needs of the expected crop, reasonable

23   crop yield.  That's the way it's supposed to be done

24   now.  There are ways to calculate in 590 and other

25   places that show you if you expect a

1    three-ton-per-acre harvest of Fescue, how much

2    nitrogen you need.  There's sometimes nitrogen in

3    the soil, a little bit of nitrogen in the soil, and

4    you're supposed to put on the difference.  That

5    would inevitably, I think, elevate the STP at least

6    temporarily above 65, but not that high above 65.

7            THE COURT:  Interestingly, your own expert

8    who suggested 65 changed his testimony on the stand

9    and said, well, it's good at 120 so that you can get

10   an even 65 across the field.

11           It's a relatively recent area of science.

12   People haven't even been concerned about phosphorus

13   since up until 20 years ago.

14           MR. NANCE:  Well, and science has

15   determined what the agronomic critical level is, I

16   don't know exactly when, but for some time we know

17   65 is reliable and we're confident in it.

18           THE COURT:  For forage grasses.

19           MR. NANCE:  For forage grasses.  If you

20   look at the Code 590, it's 65 for everything.

21   Forage grasses is mostly what we're growing here.

22   Arkansas says it's 100.  Dr. Johnson said he could

23   find no scientific basis for that, certainly no

24   scientific basis for the 300 in Code 590.

25           THE COURT:  Yet his own department head

11706

 1    disagrees with him at Oklahoma State University.

 2          MR. NANCE:  Wouldn't be disagreeing with

 3    him on the agronomic critical level of 65.  I think

 4    everybody at OSU agrees on that.  The waste should

 5    be applied on fields where it's otherwise

 6    appropriate in terms of slope and nearness to

 7    streams, and all of that that's in 590 already or in

 8    the Arkansas phosphorus index.  You look like you

 9    had a question.  Okay.

10          But, Your Honor, where there isn't a need

11    for phosphorus in the watershed, the waste should be

12    moved to where it is needed or at least out of -- at

13    least out of the watershed where it can be applied

14    as appropriate there.  There's some infrastructure

15    to do that.

16          The defendants have created in the

17    Eucha-Spavinaw case the BMPs, Inc.  There's Roger

18    Collins who has testified that he's a hauler that

19    makes his living moving the stuff out.  The

20    taxpayers are doing a certain amount of this in 319

21    projects on both sides of the Arkansas line.

22          But it's time, we think, Your Honor, for

23    the defendants to assume responsibility for the

24    waste generated by their birds.

25          They should report to a special master to

1  be appointed by the court just where the waste

2  goes.  How much waste is generated, where it goes,

3  to ensure that it's applied at appropriate sites,

4  and should report any grower who is unwilling to

5  cooperate with the remedial regime we're talking

6  about.

7          There should be a remedial investigation, a

8  further remedial investigation.  On this record

9  before you right now, Your Honor, there is ample

10  evidence that there are Best Management Practices

11  that help reduce nonpoint source pollution:  Buffer

12  strips, litter transport, which is basically what

13  we're talking about, and other methods.

14          Ms. Phillips talked about her demonstration

15  projects in the Beaty and Peacheater Creek areas.

16          She also said that $20.6 million was enough

17  for 10 percent of the buffers needed in the Oklahoma

18  portion of the watershed.

19          That gives you a magnitude of how big the

20  remedial need is.  But what's not in the record

21  right now is the exact amounts, locations and costs

22  for these remedies and where they should be.

23          We would ask the court to appoint a special

24  master who would in turn find appropriate people to

25  conduct such a remedial investigation and report

1  back to the master, and the master in turn should

2  make recommendations to the court and -- about what

3  further remediation is needed beyond the 65 cutoff.

4      THE COURT:  Mr. Elrod's own videotape

5  showed farmers clear-cutting to the edge of the

6  stream, which defendants admit causes both erosion

7  there of the stream, and obviously there's no buffer

8  zone.

9      MR. NANCE:  Obviously, there's no --

10     THE COURT:  There's not much need for a

11 special master.  It's on the record here submitted

12 by the defendants.

13     MR. NANCE:  The exact amount of money

14 needed to remedy that sort of process and to buy the

15 buffer strip or lease it from the landowner, that's

16 something we don't have in the record and we think

17 that the court needs to be advised of.

18     Judge, let's look at Exhibit 335, which is

19 slide No. 112.  You've seen this before.  This is

20 one of the advertisements that defendants used.  And

21 it's -- in this advertisement, they're telling the

22 people of Oklahoma the good things they want to do.

23     And if -- Gina, if you could blow up that

24 center section.

25     We believe an injunction by the court

1  should do the things that the defendants have

2  promised and haven't done.  Develop a new

3  science-based standard for nutrient management that

4  protects our water resources.  That's the 65 STP

5  limit that we've talked about.  Incorporate that new

6  standard in Nutrient Management Plans of all poultry

7  farms.  The defendants thought that ought to be

8  done.

9          I don't know that you need to rewrite every

10  plan, but you ought to put the 65 governor on it.

11  Reduce the amount of poultry litter applied within

12  the watershed by transporting, they say, 200,000

13  tons out.  I think that's not going to be enough.

14  But they recognize the need to reduce the amount of

15  litter.

16          Funding environmental projects like farmer

17  education programs so they'll know not to clear-cut

18  right to the river.  And matching grants for litter

19  transport.  The litter should be transported at

20  their expense.

21          Although Dr. Taylor says you may be able to

22  move it, depending on the cost of commercial

23  fertilizer, 200 miles, 300 miles, some distance that

24  would get it far enough from the watershed so that

25  it could be effectively used.

1              Creating and funding a nonprofit

2    organization to acquire and maintain conservation

3    easements and buffers along streams and rivers to

4    protect against nutrient runoff and erosion.  We

5    suggest the special master would be the one that

6    would organize that effort.

7              And reporting to you how well we're doing.

8    The defendants need to report how well they're

9    doing, need to report it to the special master and

10   turn to the court so the court will know that after

11   our considerable effort in this case, there is, in

12   fact, a remedy on the way.

13             The four factors justifying an injunction.

14   I'm going to be very quick on that.  I think

15   Mr. Bullock demonstrated that we've prevailed on the

16   merits.  Mr. Page talked briefly about the harm, but

17   there's more detail for that in the findings of fact

18   and conclusions of law.

19             Threatened injury outweighs harm to the

20   other party.  Well, we've cited law, and we believe

21   it's the correct law, that when the sovereign is

22   bringing a case, you don't need to balance the

23   equities.  Particularly in health and environmental

24   matters where the government is the plaintiff, you

25   don't need to balance equities.  But even if you

1    did, the equities favor an injunction by the court.

2         The defendants, in fact, have put on no

3    substantive evidence of burden to them other than an

4    allusion to expense.  They have instead, once again,

5    hidden behind their growers, talking about the

6    hardship that would affect them.  But that's not the

7    standard for balancing of harms which you shouldn't

8    do.  Shouldn't balance in this case in any event.

9         The fact of the growers' status as

10   employees or agents does not make them parties.  But

11   the best evidence on burden to the defendants I

12   think we put on, and I mentioned Dr. Taylor talked

13   about how you could move the waste out of this

14   watershed, again, depending on cost of fuel and

15   commercial fertilizer, 200 miles, 300 miles, some

16   distance, some significant distance.  And, in fact,

17   Roger Collins is making a living doing just that.

18   And defendants are already perhaps subsidizing

19   some.  BMPs, Inc., that's not really in the record,

20   but they created the organization and they

21   recognized that it needs to be moved out.

22        Mr. Pigeon said that you can keep the

23   litter in the barn for a long time without

24   hardship.  That goes to the moratorium.

25        Dr. Johnson said that there are areas in

1    eastern Oklahoma that are phosphorus deficient.  He

2    looked at the average STPs in the 19 counties in

3    eastern Oklahoma where there was a thousand tons of

4    waste or less generated, and the average was 38.

5           That means that in those counties, there's

6    a need for phosphorus and they're nearby.  We've

7    heard testimony about background in this area was 20

8    STP.  So there's a need for phosphorus outside of

9    this watershed where it's been concentrated.

10           Ms. Phillips said that, you know, there are

11    areas where there are row crops or vegetable

12    production that need phosphorus, and this could be

13    -- this waste could be used.  Again, the defendants

14    have introduced no substantive evidence of the harm

15    to them, which if you're weighing at all, is the

16    standard.

17           The injunction won't adversely affect the

18    public interest.  There's public interest in clean

19    water.  That's why we have a federal common law

20    nuisance in part is interstate water pollution.

21    That's why we have common law nuisance in the

22    state.

23           We've cited authority that says the public

24    has a right to soil and water that's free from

25    environmental contamination.  The public interest

1    can be declared by statute.  Oklahoma has a number

2    of statutes that are in our papers that talk about

3    the policy of the State of Oklahoma is against water

4    pollution and considers it a nuisance.

5         Limiting application in the watershed to

6    areas where there's a need for phosphorus gives

7    basically the most economical use of the waste in

8    the watershed because you get the benefit from the

9    nitrogen and from the phosphorus.

10         There would be a inconvenience to some

11    people in the watershed, growers or ranchers or

12    whatever, that might have to buy supplemental

13    nitrogen if their phosphorus is too high.  That

14    actually is one of the remedial alternatives that I

15    think the court should study, is whether the

16    defendant should be required to provide at their

17    expense supplemental nitrogen within the watershed.

18         But if you move the phosphorus -- if you

19    move the waste outside the watershed, somebody who's

20    now buying commercial fertilizer will use the waste,

21    and the commercial fertilizer will have to be bought

22    inside the watershed.

23         THE COURT:  Mr. Overton, how much time does

24    Mr. Nance have?

25         THE CLERK:  He has none remaining.

1          THE COURT:  Mr. Nance, if you would, wrap

2   it up, please.

3          MR. NANCE:  I will wrap it up, Your Honor.

4   There is no plan B.  There's nothing else that will

5   do this job.

6          Only action by the court will solve it, and

7   so the State of Oklahoma asks you to enter an

8   injunction, as we have prayed for.

9          THE COURT:  Thank you very much.  In order

10  to get this matter done today, the plan was to

11  recess until one o'clock; is that correct?

12         MR. NANCE:  Yes.

13         THE COURT:  We'll be in recess until

14  one o'clock.

15  (Whereupon a recess was had.)

16              REPORTER'S CERTIFICATE

17  I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

18  TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

19  MATTER.

20

21                      S/Terri Beeler
                        Terri Beeler, RMR, FCRR
22                      United States Court Reporter

23

24

25