**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **STATE OF OKLAHOMA, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  05-cv-329-GKF-SH** |
| | ) | |
| **TYSON FOODS, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**THE STATE OF OKLAHOMA'S HEARING BRIEF**

The State of Oklahoma ("the State") respectfully submits this Hearing Brief in advance of the evidentiary hearing beginning December 3, 2024, regarding the current condition of the Illinois River Watershed ("the IRW").

### I.    Introduction

In its January 18, 2023 Findings of Fact and Conclusions of Law, Doc. 2979, this Court found, based on the evidence presented at 2009-10 trial, that: (1) the waters of the IRW have elevated phosphorus levels, *see, e.g., id.* at FOF Nos. 130, 168, & 239; (2) that the waters of the IRW in Oklahoma were injured as a result of these elevated phosphorus levels, *see, e.g., id.* at FOF Nos. 130, 168-72, 239-250, 286-88; (3) that the principal contributor of these phosphorus levels in the waters of the IRW has been and continues to be run-off from land-applied poultry waste, *see, e.g., id.* at FOF Nos. 288, 365-70, 531-32, 539, 542, 561, 585, & 586, as well as from run-off of legacy phosphorus in the soils due to the historic land-application of poultry waste, *see, e.g., id.* at FOF Nos. 81, 362, 365-70, 375, 531-32, 535, 542; COL 49 & 61.  The evidence will show that this is ***still*** the case today.  Phosphorus from the land application of poultry waste – both current and historic – continues to injure the waters of the IRW in Oklahoma.  Further, the evidence will

1

show that there exist remedies to reduce this phosphorus loading arising from the current and historic land application of poultry waste.

## II.    Issues to be litigated

Consistent with the Court's directions, the following issues are to be litigated at the evidentiary hearing:

1.  Whether the waters of the IRW in Oklahoma *still* have elevated phosphorus levels;

2.  Whether the waters of the IRW in Oklahoma are *still* injured as a result of these elevated phosphorus levels; and

3.  Whether phosphorus from current and historic land-application of poultry waste in the IRW for which Defendants are responsible is *still* a substantial contributor to these elevated phosphorus levels in the waters of the IRW in Oklahoma.[1]

As discussed below, and as will be shown during the hearing, the answer to each of these questions is an indisputable "YES."

Notably, despite Defendants' apparent desire to engage in a wholesale relitigation of the entire case, there are a large number of factual findings contained in the Court's January 18, 2023 Findings of Fact and Conclusions of Law that do not need updating and that are not subject to relitigation.  For instance, the findings pertaining to (1) the geology, topography, and soils of the IRW, (2) the historical aesthetic quality of IRW waters, (3) the regulation of the waters of the IRW, (4) uses of the waters of the IRW, (5) the behavior of phosphorus in the environment, (6) the agronomic phosphorus needs of crops in the IRW, (7) the environmental effects of high phosphorus loadings and concentrations,[2] (8) Defendants' awareness that phosphorus from land-

---

[1] Based on the Court's remarks at the November 26, 2024 hearing, it is the State's understanding that whether remedies exist to reduce the phosphorus loading to the waters of the IRW in Oklahoma that comes from poultry waste is not an issue to be litigated at the evidentiary hearing.

[2] By way of example, during the 2009-10 trial, Defense Expert Dr. John Connolly offered the opinion that nonpoint source phosphorus loading does not have a significant impact on water quality in the IRW. *See* Doc. 2979, at FOF No. 274.  This Court carefully analyzed Dr.

applied poultry waste contributes to water pollution in the IRW, (9) efforts by the State of

Oklahoma to address phosphorus loading in the IRW, and (10) Defendants' liability for the

environmental injuries caused by phosphorus in poultry waste are among the issues that need no

updating and that should not be subject to relitigation by the parties.

**III.    Overview of the State's evidentiary update[3]**

    **A.    The waters of the IRW in Oklahoma _still_ have elevated phosphorus levels**

At the hearing the State will present evidence establishing that the Illinois River and its

tributaries, as well as Lake Tenkiller, still have elevated phosphorus levels.  With regard to current

phosphorus levels in the Illinois River and its tributaries, the State will call Ms. Julie Chambers[4]

and Mr. Lance Phillips[5] of the Oklahoma Water Resources Board (OWRB), Ms. Shanon Phillips[6]

of the Oklahoma Conservation Commission (OCC), and Ms. Katie Mendoza[7] of Texas A&M

University.

---

Connolly's opinion regarding the impact of nonpoint source loading, *see id.* at FOF Nos. 274-85, and rejected it.  Specifically, contrary to Dr. Connolly's flawed opinion, this Court found that "nonpoint source phosphorus is a *significant source* of the phosphorus causing injury to the rivers and streams of the IRW and to Lake Tenkiller." *Id.* at FOF No. 288 (emphasis added). Defendants have nevertheless again identified Dr. Connolly as a witness who will offer *this very same opinion*.  Relitigation of this well-established scientific fact – that nonpoint source phosphorus causes injury to the rivers and streams of the IRW and to Lake Tenkiller – should not be permitted.

[3] The summaries below are intended to be highlights of the anticipated evidence, and not an exhaustive recitation of the evidence.

[4] For the Court's convenience, a copy of Ms. Chambers' expert report is attached as Exhibit 1.

[5] For the Court's convenience, a copy of Mr. Phillips' expert report is attached as Exhibit 2.

[6] For the Court's convenience, a copy of Ms. Phillips' expert report is attached as Exhibit 3.

[7] For the Court's convenience, a copy of Ms. Mendoza's expert report is attached as Exhibit 4.

- Mr. Phillips will provide expert testimony that the rivers and streams of the IRW continue to have elevated phosphorus levels above natural or background levels and that the phosphorus concentrations in the Illinois River, Flint Creek, and Baron Fork Creek are exceeding the total phosphorus criteria for Oklahoma scenic rivers.

- Ms. Chambers will provide expert testimony that, based on her analysis of OWRB and United States Geological Survey (USGS) water quality data that was used in putting together the 2023 Arkansas-Oklahoma Arkansas River Compact Report and the 2022 Integrated Report, trends in phosphorus loadings in the Illinois River and its tributaries show that there is an upward tick in the most recent 5-year rolling average time window (2019-23).  Notably, Ms. Chambers will also testify that when targeted high-flow water sampling from the USGS is included with the ambient (i.e., baseflow) sampling data collected in the Oklahoma portion of the IRW, the data show an increase in both average annual phosphorus loadings and concentrations at all sampling stations in the Oklahoma portion of the IRW.[8]

- Corroborating the extensive water sampling data, Ms. Mendoza will provide expert testimony that the Soil & Water Assessment Tool (SWAT) model shows that daily phosphorus loading in the Illinois River and its tributaries from 2010 to 2020 have an

---

[8]  It is anticipated that Defendants will argue that loadings are approaching the Compact Commission's 40% loading reduction goal.  As an initial matter, Ms. Chambers will testify that loadings are generally *not* meeting that goal during the most recent 5-year rolling average time window (2019-2023).  Moreover, and in any event, the 6-month rolling arithmetic means at all sampling stations still exceed the 0.037 mg/L total phosphorus criterion for the most recent time frame (2019-2023), as well as the period of record assessment time frame of 1999-2023.  Finally, it bears noting that the start point for the 40% loading reduction goal dates to the mid-1990s and the majority of the reduction occurred in the prior to the mid-2000s (when regulatory schemes were put in place).

increase in trend.  She will also provide expert testimony that there is an increasing trend in phosphorus concentrations over most of the IRW.[9]

- Ms. Phillips will provide expert testimony concerning current phosphorus levels in the IRW, address the current waterbody segments that are listed for phosphorus impairments on the State's 303(d) list, and point out not only that no waterbody segment in the Oklahoma portion of the IRW has been delisted for phosphorus, but also that the EPA in 2023 added seven waterbody segments to Arkansas's 2020 303(d) list for phosphorus exceedances.

With regard to current phosphorus levels in Lake Tenkiller, the State will call Ms. Chambers, Ms. Mendoza, and Ms. Phillips.

- Ms. Chambers will provide expert testimony that based on the extensive water quality data analyzed by the OWRB in putting together its Integrated Reports, the water quality in Lake Tenkiller has not improved since the 2009-2010 trial.

- Ms. Mendoza will provide expert testimony that the SWAT model shows that phosphorus loading trends in subbasin 46 of the IRW – the last subbasin in the IRW before the Illinois River enters into Lake Tenkiller – trended upward between 2010 and 2020.

- Ms. Phillips will testify that two waterbody segments in Lake Tenkiller remain listed for phosphorus impairment on the State's 303(d) list.

---

[9]  In those few locations that there is a decreasing trend in phosphorus concentrations, Ms. Mendoza will explain that the likely explanation is that the decreasing trend is due to the fact that there had been an increase in precipitation across the IRW from 2010 to 2020.  The resultant increased flow from this precipitation led to increased phosphorus loading, but lower phosphorus concentrations.

**B.** **The waters of the IRW in Oklahoma are _still_ injured as a result of these elevated phosphorus levels**

The State will next present evidence establishing that the Illinois River and its tributaries, as well as Lake Tenkiller, are still injured as a result of these elevated phosphorus levels.

- Mr. Phillips will go through some of this Court's core findings from the 2009-2010 trial regarding injuries to the Illinois River and its tributaries (*e.g.,* Doc. 2979 at FOF Nos. 128, 130, 168, 170, 171, & 249), and provide expert testimony that these injuries due to elevated phosphorus levels continue to this day.  By way of example, he will testify that these elevated phosphorus levels: (1) are in violation of the State's antidegradation water quality standards, (2) are causing an impairment of the aesthetics beneficial use in violation of the State's water quality standards, and (3) are causing an impairment of the fish and wildlife beneficial uses in violation of the State's water quality standards.

- Ms. Chambers will go through some of this Court's core findings from the 2009-2010 trial regarding injuries to Lake Tenkiller (*e.g.,* Doc. 2979 at FOF Nos. 239-41, 243, 245, 248, & 250), and provide expert testimony that these injuries due to elevated phosphorus levels continue to this day.  By way of example, she will testify that Lake Tenkiller is still eutrophic due to these elevated phosphorus levels, that the elevated phosphorus levels are resulting in increased algae growth, decreased water clarity, and decreased dissolved oxygen levels in the lake, and that the lake is impaired for its aesthetics, fish and wildlife, and public water supply beneficial uses.

- Ms. Phillips will provide expert testimony showing that non-point source phosphorus is still a significant source of the phosphorus causing injury to the rivers and streams of the IRW and to Lake Tenkiller, thereby confirming the validity of this Court's earlier finding from the 2009-2010 trial.  *See* Doc. 2979, at FOF No. 288.

- Mr. Ed Fite[10] of the Grand River Dam Authority will offer observational testimony that, since the 2009-2010 trial, conditions in the Illinois River and its tributaries have not materially improved with respect to algae and clarity.

- Mr. Tim Knight[11] of Nautical Adventures Scuba will offer observational testimony that continued water clarity and visibility issues in the waters of Lake Tenkiller have made dive training, dive certification, and recreational diving increasingly difficult.

- Ms. Phillips and Mr. Phillips will also testify to the significance and validity of Oklahoma's 0.037 mg/L water quality standard – namely, that at phosphorus concentrations greater than 0.037 mg/L in the water, algal species composition changes and algal biomass increases, which in turn negatively affect aesthetics and biota.

**C.     Phosphorus from current and historic land-application of poultry waste in the IRW is _still_ a substantial contributor to these elevated phosphorus levels in the waters of the IRW in Oklahoma**

In order to prove this point, the State will first show that Defendants *still* have a significant presence in the IRW.  Ms. Lynette Jordan[12] from the Oklahoma Department of Agriculture, Food, and Forestry will testify that in 2022 there were 479 poultry houses in the Oklahoma portion of the IRW.  Of those 479 poultry houses, 414 houses were attributable to Defendants.[13]  Specifically,

---

[10] Mr. Fite's topics of testimony are contained in the State's witness disclosure filing.  *See* Doc. 3058, at pp. 5-9.

[11] Mr. Knight's topics of testimony are contained in the State's witness disclosure filing.  *See* Doc. 3058, at pp. 11-13.

[12] Ms. Jordan's topics of testimony are contained in the State's witness disclosure filing.  *See* Doc. 3058, at pp. 9-11.

[13] For comparison purposes, from the 2009-10 trial the Court found that there were 425 poultry houses in the Oklahoma portion of the IRW.  *See* Doc. 2979, at FOF No. 314.

230 houses were attributable to Tyson, 112 houses were attributable to Simmons, 48 houses were attributable to Cobb, 18 houses were attributable to Cargill, and 3 houses were attributable to George's.[14]  Data showing which integrators are affiliated with which poultry houses in Arkansas is not available to the State, but Ms. Phillips will testify that her census of poultry houses in the Arkansas portion of the IRW done for the State's SWAT model yielded a count of 1345 houses in 2018.[15]  It reasonable to infer that the percentage of poultry houses currently existing in the Arkansas portion of the IRW allocable to Defendants would be similar to the percentage allocable to Defendants in the Oklahoma portion of the IRW – that is, about 85% or about 1,143 poultry houses.[16]  Ms. Phillips will testify that about five flocks cycle through a poultry house per year. Ms. Phillips will further testify that newer poultry houses in the IRW are typically significantly larger than the older houses (approximately 46,000 birds per house per flock cycle versus approximately 22,000 birds per flock cycle).  Ms. Jordan will testify that Defendant-attributable facilities in the Oklahoma portion of the IRW have the capacity to house approximately 9,234,408 birds per flock cycle.  Ms. Phillips, based upon her census of poultry houses calculates that approximately 234,557,040 birds are raised in the IRW annually, with approximately 53,027,040 being raised in the Oklahoma portion and approximately 181,530,000 million being raised in the Arkansas portion.  Just as the Court concluded in the 2009-2010 trial, the foregoing confirms that

---

[14] Ms. Phillips will testify that her census of poultry houses in the Oklahoma portion of the IRW done for the SWAT model yielded a count of 466 houses in 2018.

[15] For comparison purposes, from the 2009-10 trial the Court found that there were 1,455 poultry houses in the Arkansas portion of the IRW. *See* Doc. 2979, at FOF No. 314.

[16] The reasonableness of this inference is further supported by this Court's finding that the locations of poultry growing operations affiliated with defendants are dictated largely by the locations of defendants' respective feed mills and process plants. *See* Doc. 2979, at FOF No. 315.

Defendants (aside from Peterson and Cal-Maine) continue to "maintain[] significant poultry operations in the IRW." *See* Doc. 2979, at FOF No. 316.

Consistent with the Court's earlier findings, *see* Doc. 2979, at FOF Nos. 334-37, the current number of birds being raised in the IRW generates an enormous amount of waste. Based on Ms. Phillips' poultry house census and literature values, Ms. Mendoza will testify that 231,440 tons of poultry waste is generated annually in the IRW.[17] In short, the State will show that Defendants' birds *still* generate enormous quantities of poultry waste in the IRW: currently approximately 231,440 tons per year per Ms. Mendoza's calculation.

Next, the State will show that a significant amount of this waste – which Defendants are responsible for – is *still* land applied in the IRW. Although it is not known exactly how much poultry waste produced in the IRW is exported to outside the IRW, Ms. Phillips will testify that there are multiple indicators that suggest that it is not all being exported (*e.g.,* the current lack of equipment, infrastructure, and trucking activity, which would be necessary to indicate all the waste is being hauled out of the IRW, the lack of interest in incentive programs to haul waste out of the IRW, etc.). And Ms. Jordan will testify that ODAFF records indicate that poultry waste generated in the IRW is in fact being land applied in the IRW.

Finally, the State will show both that (1) *current* land application of poultry waste is impacting the waters of the IRW in Oklahoma, and (2) *historic* land application of poultry waste continues to impact the waters of the IRW in Oklahoma. Using the SWAT model results, Ms. Mendoza will testify that (1) approximately 96.5% of the phosphorus loading in the Illinois River and its tributaries is from nonpoint sources and approximately 3.5% of the loading is from point

---

[17] From the 2009-2010 trial, the estimated amount of poultry waste was 354,000 tons per year. *See* Doc. 2979, FOF No. 334.

sources,[18] and (2) that both current *and* historic poultry waste land application in the IRW are significant contributors to the current phosphorus loading to the Illinois River and its tributaries.[19] This conclusion regarding the contribution of legacy phosphorus to current phosphorus loading squarely aligns with this Court's earlier finding that "[e]ven years after the cessation of poultry litter application, runoff water quality can be affected because of phosphorus stored in the soil." *See* Doc. 2979, at FOF No. 375. It also aligns with the anticipated testimony from Mr. Greg Scott,[20] former Natural Resources Conservation Service State Soil Scientist for the State of Oklahoma and current soil scientist for the OCC, who will explain that phosphorus from land applied poultry waste will continue to leak from the soils of the IRW for decades (and even longer if land application continues). And it aligns with the outputs of the SWAT model, which Ms. Mendoza will testify show that poultry waste will continue to contribute to phosphorus loading in the Illinois River and its tributaries if land application of poultry waste continues in the IRW.

Further confirming that poultry waste is contributing to the phosphorus problem in the IRW, Ms. Phillips will testify that results from the OCC Rotating Basin Monitoring Program show that phosphorus concentrations in streams in the IRW vary significantly with land use and that, in general, streams with higher average total phosphorus concentrations had more pastureland and poultry houses in and nearby than streams with lower average total phosphorus concentrations.

---

[18] Ms. Phillips will also offer evidence demonstrating that non-point source loadings to the IRW are greater than point source loadings, confirming this Court's earlier finding. *See* Doc. 2979, at FOF No. 287.

[19] The legacy phosphorus contribution from the historic land application of poultry waste to the loading implicates the Peterson Defendant and the Cal-Maine Defendant, neither of which have current operations in the IRW.

[20] For the Court's convenience, a copy of Mr. Scott's expert report is attached as Exhibit 5.

**IV.     Changes in the law in no way affect the State's claims**

In its Findings of Fact and Conclusions of Law, this Court held that Defendants are liable for environmental injuries to the State caused by poultry waste generated by their birds.[21]  It has been suggested, however, that changes in Oklahoma's or Arkansas' regulatory schemes pertaining to poultry waste management might somehow affect the State's rights.[22]  This is incorrect for several reasons.

*First,* although the Oklahoma Registered Poultry Feeding Operations Act ("ORPFOA"), 2 Okla. Stat. §§ 10-9.1 to 10-9.12, has been amended since trial, it *still* plainly prohibits pollution of the waters of the State by poultry waste.  Under the ORPFOA as currently written, every poultry feeding operation is required to have a Nutrient Management Plan. *See* 2 Okla. Stat. § 10-9.7(C).[23]

---

[21] *See, e.g.,* Doc. 2979 at COL Nos. 11, 43-44 ("None of the defendants have made any provision for the appropriate management of the poultry waste.  The court concludes all defendants, by their conduct, have unreasonably interfered with the public's right to the use and enjoyment of the waters of the IRW in Oklahoma."), 49, 51 ("All defendants are vicariously liable for poultry waste causing phosphorus to physically invade the rivers and streams of the Oklahoma portion of the IRW and Lake Tenkiller."), 60-62 ("Each defendant has consciously concentrated a segment of its poultry operations in the Oklahoma portion of the environmentally-sensitive IRW; placed large numbers of its birds in this concentrated area; and imported enormous amounts of phosphorus-laden feed into the area.  Their birds annually generate hundreds of tons of poultry waste containing phosphorus the defendants have brought into the IRW.  Further, despite knowledge that the majority of the poultry waste will be land applied in close proximity to where it is generated, the defendants have not made provisions for the appropriate management of the waste.").

[22] The regulatory schemes in effect at the time the case was filed were discussed at length in the Findings of Fact and Conclusions of Law.  *See* Doc. 2979 at FOF Nos. 54-106, COL Nos. 24-29, 48.

[23] The Oklahoma Poultry Waste Applicators Certification Act ("OACA"), 2 Okla. Stat. §§ 10-9.16 to 10-9.21, requires that litter application, whether by a private or commercial applicator, "comply at all times with the provisions set forth in . . . The Nutrient Management Plan, if application is conducted on land operated by a registered poultry operation." *See* 2 Okla. Stat. § 10-9.19a(1).  All other applications in a nutrient-limited watershed must comply with a Conservation Plan. *See* 2 Okla. Stat. § 10-9.19a(2).

The Oklahoma Administrative Code's Nutrient Management Plan requirements mandate that *"[s]torage and land application of poultry waste shall not cause a discharge or runoff of significant pollutants to waters of the State or cause a water quality violation to waters of the State."*  *See* Okla. Admin Code § 35:17-5-5(c) (emphasis added); *see also* 2 Okla. Stat. §§ 10-9.7(B)(1) & (B)(4)(b) (providing that Nutrient Management Plans include "[m]easures designed to prevent the discharge of poultry waste to the waters of the state" and "[m]easures designed to ensure that poultry waste handling, treatment, management, and removal shall . . . not result in contamination of waters of the state").  Moreover, "[d]ischarge or runoff of waste from the application site is evidence that the Nutrient Management Plan requires revisions."  *See* 2 Okla. Stat. §§ 10-9.7(C)(6)(c).  Finally, it warrants noting that nothing in the Nutrient Management Plan regime requires that poultry waste be applied at the maximum land application rate (300 lbs./acre STP).  Simply put, the ORPFOA continues to plainly prohibits pollution of the waters of the State by poultry waste.

*Second,* even were the current version of the ORPFOA to be read to expressly authorize land application of poultry waste that pollutes the waters of the State (which would be a manifestly erroneous reading), such a reading would have no bearing on this case. That is so because this statute as currently written is inapplicable to the current case.  The 2024 amendments to the ORPFOA, which amended out the express prohibition on "discharge or runoff of waste from the application site" does not apply retroactively to the State's claims.[24]  *See* Okla. Const., Art. V, § 52 ("After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit.") & Art. V, § 54

---

[24] It bears reiterating that even under *current law* "[s]torage and land application of poultry waste shall not cause a discharge or runoff of significant pollutants to waters of the State or cause a water quality violation to waters of the State."  *See* Okla. Admin Code § 35:17-5-5(c).

("The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."); *State ex rel. Harris v. Three Hundred & Twenty Five Thousand & Eighty Dollars ($325,080.00),* 2021 OK 16, ¶ 15, 485 P.3d 242, 246 ("Ordinarily, statutes and amendments are to be construed to operate only prospectively, unless the Legislature clearly expresses a contrary intent.  If doubt exists, it is resolved against retroactive effect.").  The State's claims thus continue to proceed under ORPFOA as written at the time the State's lawsuit was brought in 2005.[25]

*Third,* this Court has already concluded not only that "[c]ompliance by Arkansas growers with Arkansas laws and regulations does not immunize defendants, as it is axiomatic that Arkansas cannot enact legislation permitting a continuing nuisance and/or trespass in Oklahoma," Doc. 2979 at COL No. 81, but also that "it is not uncommon for courts to apply the law of the state where the injury to the plaintiff occurred as a result of defendant's tortious conduct in another state," *id.* at COL No. 77.  Simply put, any changes in Arkansas law are of no relevance.

## V.    Conclusion

The State respectfully requests that this Court find that phosphorus from both the current and historic land application of poultry waste – poultry waste for which Defendants are legally liable, *see, e.g.,* COL Nos. 11, 44, 51, 60-61 – continues to injure the waters of the IRW in Oklahoma and conclude that the State is entitled to relief on its claims.

---

[25] Significantly, when amending the ORPFOA in 2024, the initial version of the proposed legislation in House Bill 4118 contained a provision precluding liability where land application of poultry waste occurred in compliance with a Nutrient Management Plan and making that provision applicable both prospectively and retroactively to any civil or criminal actions. H.B. 4118, 2024 Leg., 59th Leg., 2d Sess. (Okla. 2024) (Floor Version) (attached as Exhibit 6). The provision making that provision applicable both prospectively and retroactively was removed from the version of the proposed legislation that was enacted in Senate Bill 1424.  2024 Okla. Sess. Law Serv. Ch. 372 (S.B. 1424) (attached as Exhibit 7).

Date:    November 27, 2024

Respectfully Submitted,

*/s/ Gentner Drummond*

GENTNER DRUMMOND, OBA #16645
  *Attorney General*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
JENNIFER L. LEWIS, OBA #32819
  *Deputy Attorney General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct:  (405) 521-3921
jennifer.lewis@oag.ok.gov

M. David Riggs, OBA, #7583
Kristopher E. Koepsel, OBA #19147
Riggs, Abney, Neal, Turpen, Orbison &
Lewis
502 West 6th Street
Tulsa, OK 74119
(918) 587-3161

Robert A. Nance, OBA #6581
W.A. Drew Edmondson, OBA #2628
Riggs, Abney, Neal, Turpen, Orbison &
Lewis
528 N.W. 12th Street
Oklahoma City, OK 73103
(405) 843-9909

Louis W. Bullock, OBA #1305
Bullock Law Firm PLLC
110 W. 7th Street
Tulsa, OK 74119
(918) 584-2001

*/s/ Kristen M. Hermiz*
Kristen Hermiz, admitted *pro hac vice*
Frederick C. Baker, admitted *pro hac vice*
Cynthia Solomon, admitted *pro hac vice*
Madeline Becker, admitted *pro hac vice*
Motley Rice LLC

28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9186

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of November 2024, I electronically transmitted the

foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a

Notice of Electronic Filing to the ECF registrants with entries of appearance filed of record.

*/s/ Kristen M. Hermiz*
Kristen M. Hermiz
