**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:05-CV-00329-GKF-SH |
| | ) | |
| v. | ) | |
| | ) | |
| TYSON FOODS, INC., et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS CARGILL, INCORPORATED AND CARGILL TURKEY PRODUCTION, LLC'S DECEMBER 2024 TRIAL BRIEF

Pursuant to the Court's minute order (Dkt. 3039), Defendants Cargill, Incorporated and Cargill Turkey Production, LLC (collectively "Cargill") submit this trial brief. The Court had originally directed the parties to address two issues at the December 2024 trial: (1) "prudential mootness," i.e., the extent to which conditions in the Illinois River Watershed ("IRW") today are different than when the parties first tried the case in 2009-10; and (2) what remedies or injunctive relief the Court could and should lawfully impose, if any. *See* Sept. 13, 2024, Transcript at 5:15-22. At the hearing on Defendants' Expedited Motion and Brief in Support of Postponing Evidentiary Hearing and Applying the Federal Rules of Civil Procedure [Doc. 3062] held on November 26, 2024, the Court further limited the scope of the December 2024 trial to whether conditions in the watershed have changed since the time of the 2009-2010 trial in this matter. Nevertheless, because the issue of remedies is closely intertwined with the legal and factual changes over the last 15 years, Cargill addresses both issues below. After all, unless the Court knows what the proposed injunction would be, the Court cannot evaluate whether Plaintiffs are

entitled to that injunction, cannot balance that injunction against its harms, and cannot determine if the injunction would adversely affect the public interest.

In addition, as permitted by the Court's minute order, Cargill identifies at the end of this brief an objection to Plaintiffs' non-expert witnesses and exhibits. (*See* Dkt. 3039).

In a nutshell, the evidence at trial as to Cargill will show that current regulatory efforts to limit the land application of poultry litter and to improve the conditions of the waters of the IRW are continuing to make progress, and that this Court need not intervene with the extraordinary remedy of the mandatory injunction Plaintiffs seek. Since the original 2009-2010 trial in this case, the states of Oklahoma and Arkansas have entered into a compact, enacted new statutes, and adopted new regulations that limit application of poultry litter to levels the states deem safe, and water conditions in the IRW have improved as a result of those efforts and others. The scope of this Court's action would be limited to the small number of live poultry dealers who are Defendants. In contrast, the scope of the states' recent actions addresses all those who land apply poultry litter, as well as other sources of phosphorous. The injunction Plaintiffs seek in this narrow case would interfere with the states' judgments about permissible application levels and create a patchwork of requirements that would be neither workable nor useful. The changes in the legal and factual circumstances in the IRW and more broadly counsel strongly against any of the mandatory injunctive remedies as to Cargill that Plaintiffs' experts suggest.

## I. As To Cargill, Conditions In The IRW Have Changed Such That Injunctive Relief Is Not Appropriate.

The threshold issue is whether Plaintiffs' case against Cargill is prudentially "moot," i.e., whether circumstances about Cargill's growers have changed such that the Court should dismiss the case against Cargill and decline to grant any injunctive relief. To evaluate this issue, we first examine the thin existing trial record as to Cargill, then discuss how circumstances as to Cargill

growers are substantially different, which makes the argument for prudential dismissal even stronger.

**A.    As To Cargill, Plaintiffs' Initial Evidence Was Insufficient.**

As of the 2010 trial, Plaintiffs needed to prove that each Defendant caused a trespass or nuisance by citing to record evidence that each caused phosphorus pollution to specific portions of the IRW, in the *amounts* necessary to rise to the level of a trespass or nuisance. That conclusion flows inexorably from the Court's conclusion that poultry litter "may properly be used as a fertilizer within the IRW under certain circumstances and with certain limitations." Dkt. 2979 at 5. This is why the Court granted judgment as a matter of law on Plaintiffs' nuisance *per se* claim.

As to Cargill, however, the record evidence did not establish such findings. As set forth in the Findings of Fact and Conclusions of Law, Dkt. 2979 ("FFCL"), the Court merely found that Cargill:

- Had poultry operations in the IRW, including more than 23 million birds between 2000 and 2007 (FFCL ¶291);

- Provided its growers with an environmental handbook (*Id.* ¶302);

- Produced poultry waste of approximately 17,968 tons annually (*Id.* ¶334);

- Between 2001 and 2006, generated poultry waste that contained between 1,118,799 and 1,720,395 pounds of phosphorus (*Id.* ¶335);

- From 2002 to 2004, worked on a "Precision Ag" project that compared STP levels in Northwest Arkansas and surrounding areas, and which found the Northwest Arkansas/ Northeast Oklahoma area to have "high" STP levels (*Id.* ¶360)

- Did not manage poultry litter generated by its growers' birds (*Id.*);

• Acknowledged that nutrients can come "from many sources, one of which is the use of poultry litter as an organic fertilizer." (*Id.* ¶523);

• Was aware that poultry manure is composed of "relatively large amounts of phosphorus"; that phosphorus-laden soils "can be eroded by rainfall"; that excessive phosphorus in surface waters "can cause excessive plant and algae growth," and therefore that contract growers "should . . . implement an annual soil sampling program for application fields to determine nutrient concentration and to help calculate application rates." (*Id.* ¶525).

• Had a Contract Grower Environmental Best Practice Management Guide, which recognized "that some level of nutrient loss to surface and groundwater will occur despite following the recommendations in this manual; however, these losses should be lower than would occur without nutrient management." (*Id.* ¶533); and

• Had attended and sponsored a National Poultry Waste Management Symposium (*Id.* ¶550) and participated in an Animal Waste Management Task Force in 1990. (*Id.* ¶551.)

**Most notably**, the trial record contained no findings regarding the impact that any specific Cargill contract grower had on *specific* phosphorus levels in the waters of the IRW. The holes in Plaintiffs' case as to Cargill in 2010 include:

• Plaintiffs called no Cargill contract growers to testify.

• Plaintiffs presented no evidence of any sampling from the edge of any field of any Cargill contract grower. (*E.g.*, Trial Tr. at 2011:13 – 2013:7 & Pl. Ex. 2520.)

• Plaintiffs presented no upstream/downstream samples or comparisons relating to the fields of any Cargill contract grower.

• Plaintiffs presented no point-by-point fate-and-transport analysis of any Cargill-related location. (Trial Tr. at 2321:7-21 (Fisher)).

4

- Plaintiffs' regression analysis by their experts Jan Stevenson and Bernard Engel was not specific to Cargill. (*See* Trial Tr.  at 6394:17–6395:16 (Engel); 7304:22–7305:9 (Stevenson).)

- Plaintiffs' modelling by Scott Wells and Engel included nothing specific to Cargill or its contract growers. (*See* Trial Tr. at 6646:4–6647:9 (Engel); *Id*. at 6747:23-6748:8 (Wells).)

- Plaintiffs' geochemist Dr. Olsen offered no testimony that any Cargill contract grower applied turkey litter in any location that caused pollution to the waters of the IRW. (*See, e.g.*, Tr. at 5566:11 – 5568:20 (Olsen).)

**In summary:** Plaintiffs presented no evidence that Cargill or any Cargill-related contract grower caused environmental trespass or nuisance at any location, during any window of time, *at levels* that would amount to pollution. If judgment is entered against Cargill, Cargill would expect to raise these issues (among others) on appeal.

### B.    As To Cargill, The Record Evidence Now Is Even Less Supportive Of Injunctive Relief.

The record *now* is even *less* supportive of injunctive relief against Cargill, and the Court should declare the case for an injunction as to Cargill to be prudentially moot.

The general changes in water quality in the IRW are addressed in detail in the contemporaneously filed Defendants' Trial Brief, and Cargill will not repeat them here.  As to changed circumstances affecting Cargill specifically, Cargill expects to introduce evidence and testimony at trial that, as of *today*:

1. The number of Cargill contract growers in the IRW is approximately half the number of growers at the time of the original trial.

2. Some Cargill growers are new to the IRW and have never land-applied turkey litter.

3. Some Cargill growers that may have land-applied turkey litter at the time of the original trial no longer do so.

4.    Of the few Cargill growers that still land-apply poultry litter, agronomic rates comply with NMPs and AWMPs.

5.    Some Cargill growers who land-apply turkey litter under an NMP or at AWMP do so in areas far removed from sources of water, or with buffer strips already between them and water sources.

6.    Some Cargill growers sell or trade their litter to others for application outside the IRW.

Because an injunction is an equitable remedy shaped to right an "ongoing wrong," injunctions should not issue "if [they] cannot serve a proper remedial purpose." *Kohl by Kohl v. Woodhaven Learning Ctr.*, 865 F.2d 930, 934 (8th Cir. 1989). Thus, "a change in circumstances can destroy the need for an injunction." *Id.*

In *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011), the Seventh Circuit rejected injunctive relief in an environmental case largely because of changed circumstances. The concern in *Michigan* was that invasive carp would reach the Great Lakes and wreak environmental and economic havoc. Because the defendants had "mounted a full-scale effort to stop the carp from reaching the Great Lakes" and "promised that additional steps will be taken in the near future," the court rejected injunctive relief. *Id.* at 769. In other words, the court's decision was influenced in part by the voluntary remedial actions of defendants, which "diminishe[d] any role that equitable relief would otherwise play." *Id.*

Similarly here, as to Cargill, changed circumstances mean the Court should not enter any injunction. For example, growers no longer affiliated with Cargill are not subject to any injunctive relief the Court could conceivably order. Similarly, none of Plaintiffs' proposed injunctive relief would be necessary or appropriate for growers who have never land-applied poultry litter; or have

stopped land-applying it; or who are land-applying it at reasonable agronomic rates pursuant to NMPs or AWMPs; or who are only land-applying it away from sources of water, or with buffer strips already created; or who trade or sell it outside the IRW. Phosphorus levels are naturally attenuating on Cargill-affiliated farms. Although some Cargill growers still land-apply poultry litter in compliance with authorized plans, this Court has already found that poultry litter "may properly be used as a fertilizer within the IRW under certain circumstances and with certain limitations." (FFCL at 5.) Those circumstances and limitations describe Cargill's current conduct in the IRW.

If, after the Court considers the evidence of changed circumstances, the Court finds the record is as described above, no injunctive relief should be imposed as to Cargill. If the Court agrees, it need not proceed to review the next section, addressing rules and boundaries on remedies.

## II. The Court Should Not Impose Any Injunctive Relief Because None of the Remaining Equitable Factors Support Such Relief As to Cargill.

Even assuming for the sake of argument that the Court concluded that Plaintiffs had proven the existence of continued problems in the condition of the waters of the IRW, the Court should nevertheless reject Plaintiffs' suggested remedies because they are unnecessary, unworkable, and would interfere with ongoing public and private efforts to regulate land application of poultry litter.[1]

An injunction is an extraordinary equitable remedy, and it "is not a remedy which issues as of course," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982), or "'to restrain an act the injurious consequences of which are merely trifling,'" *id*. at 311 (quoting *Consol. Canal Co.*

---

[1] Although Cargill acknowledges the Court's intent to focus on prudential mootness rather than remedies at the December 2024 trial, even with such a focus, the issue of remedies is closely connected to the current public and private efforts to improve the waters of the IRW.

*v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900)). An injunction should issue only if "intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Id.* at 312 (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

"[A] permanent injunction does not automatically follow from success on the merits." *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 945 (7th Cir. 2019). That is because "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312 (citing *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941)). "Because an injunction so often affects the interests of third parties and commits the judge to active supervision, he has a duty not to issue the injunction unless satisfied that it is lawful and proper, whatever the parties may have agreed to or decided not to contest." *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985).

The possible injunctive remedies Plaintiffs' experts identify in their reports raise a number of issues that require discussion. Most prominently, Plaintiffs' suggested injunctive relief is undercut by their failure to join as parties (1) all the live poultry dealers in the IRW, (2) the contract growers who actually land-apply the poultry litter, or (3) other entities that land-apply poultry litter. The laws and regulations of Oklahoma and Arkansas already govern and limit land application of litter by all these entities, regardless of whether they are parties to this case, and a piecemeal injunction that would impose restrictions on some but not others would serve no useful purpose.

### A.  The Injunction Standard.

As discussed above, the circumstances on which the Court based its original Findings of Fact and Conclusions of Law no longer exist, undercutting the justification for an injunction.  *See, e.g., Kohl*, 865 F.2d at 934 ("a change in circumstances can destroy the need for an injunction").

But even assuming for the sake of argument that Plaintiffs were able to establish that the phosphorus issues the Court described in its January 13, 2023 Order currently exist and are still attributable to Cargill and other Defendants, to justify injunctive relief, Plaintiffs would also need to demonstrate (1) that irreparable harm will occur unless the injunction is issued; (2) that the threatened injury outweighs any harm that the injunction may cause the opposing party; and (3) that the injunction, if issued, will not adversely affect the public interest. *E.g., Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007); *see also Atty. Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) (affirming similar standard for preliminary injunction earlier in the present litigation). As the parties seeking the permanent injunction, Plaintiffs bear the burden of establishing these elements. *See Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003).

Injunctions must be "enforceable, workable, and capable of court supervision." *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 369 F.3d 293, 315 (3d Cir. 2004); *see also United States v. Paramount Pictures*, 334 U.S. 131, 161–66 (1948) (vacating injunction that would require the heavy involvement of the judiciary). Because an injunction is an equitable remedy shaped to right an "ongoing wrong," injunctions should not issue "if [they] cannot serve a proper remedial purpose." *Kohl*, 865 F.2d at 934. An injunction thus must actually be effective in curing the problem at hand.  *See Michigan*, 667 F.3d at 789-92 (affirming denial of

injunction where evidence failed to show requested relief would significantly reduce the risk of invasive carp).

### 1. The mandatory injunctive relief Plaintiffs seek has a high standard.

The injunctive relief Plaintiffs seek here is mandatory, which imposes a heavy burden on the party seeking it. The two basic types of injunctive relief apply two different standards. A preventive or prohibitive injunction bars a defendant from altering the status quo by engaging in specific future conduct. *See, e.g., Roe v. Cheyenne Mountain Conf. Resort Inc.*, 124 F.3d 1221, 1230 (10th Cir. 1997) (addressing request for injunction to bar employer from implementing drug testing policy). In contrast, a mandatory or reparative injunction "disturb[s] the status quo by ordering affirmative relief." *E.g., Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988). Because it alters the status quo, the standard for granting a mandatory injunction is stricter than that applicable to a prohibitory injunction. *Tyler v. City of Manhattan*, 857 F. Supp. 800, 820 (D. Kan. 1994). Mandatory injunctive relief "is a harsh remedial process not favored by the courts," and should be granted only under compelling circumstances. *Citizens Concerned for Separation of Church & State v. City & Cty. of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

Based on their expert disclosures, all the injunctive relief Plaintiffs seek against Cargill is mandatory relief and therefore subject to the higher standard. The overwhelming majority of land application in the IRW is of poultry litter that Defendants do not own on fields that Defendants do not operate by contract growers that Defendants do not control.[2] As a result, Plaintiffs' suggestion that the Court enjoin land application of litter is not merely a request for Cargill (and other Defendants) to cease an activity, but a request that this Court require Cargill to reach out and

---

[2] The only narrow exception is the few facilities that some Defendants own and operate.

affirmatively alter the conduct and practices of third parties. The Court must therefore apply the stricter mandatory injunction standard to all of the injunctive relief Plaintiffs request.

### 2. An injunction must be specific.

Fed. R. Civ. P. 65(d) provides that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Specificity in an injunctive order is critical because it provides (1) fairness to the party that is enjoined and (2) a basis for appellate review of the order. *Schmidt v. Lessard*, 414 U.S. 473, 476-77 (1974). An injunction cannot simply order the defendant to obey the law. *E.g., Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1530 (11th Cir. 1996) ("appellate courts will not countenance injunctions that merely require someone to 'obey the law.'"). As with its liability evidence, discussed above, Plaintiffs' possible remedies overgeneralize the situation on the ground and fail to meet the specificity requirement.

### B. Injunctive relief here would supplant and interfere with legislative policymaking and agency regulation.

Even where a plaintiff can establish an irreparable harm, courts have rejected injunctions that would confuse or interfere with other government action, including efforts to address an environmental issue. For example, in *Michigan*, discussed above, plaintiffs sought a preliminary injunction to prevent the migration of Asian carp into the Great Lakes. The Seventh Circuit affirmed the denial of the injunction, finding that "[t]he courts would not be acting alone" in crafting relief and would instead be working with, or possibly against, "a powerful array of expert federal and state actors that are engaged in a monumental effort to stop invasive carp from entering the Great Lakes." 667 F.3d at 790. The court declined to order injunctive relief, explaining that "the last thing we need is an injunction operating at cross-purposes with their efforts or imposing

needless transactional costs that divert scarce resources from science to bureaucracy." *Id.* The court also commented that "from an institutional perspective, courts are comparatively ill situated to solve this type of problem." *Id.*

The same kinds of cross purposes are manifest here. Both the Oklahoma and the Arkansas Departments of Agriculture have written to the Court expressing serious concerns that if the Court were to grant injunctive relief here, such relief may conflict with or even replace the States' statutory and regulatory efforts to address poultry litter application and water quality. The Oklahoma Agriculture Department pointed out that, in or around 2021, the USDA NRCS:

> recommended new soil test phosphorus criteria that generally does not exceed 200. In 2022, the Oklahoma Legislature passed responsive legislation, effective May 11, 2022, that required the Department to follow the preexisting standard of 300. Contrast that law with the ruling that poultry litter shall not be applied beyond a soil test phosphorus limit of 120 and should never be applied at greater than 65 pounds per acre. With respect, any such court-ordered standard will conflict with state law, making compliance confusing and untenable.

Dkt. 3037; *see also* Dkt. 3053 (Arkansas) ("the court should give due respect and consideration to the laws passed by the states and should not supplant the will of the people in Arkansas and Oklahoma as expressed through their duly elected legislative and executive branches of government."). Indeed, the conflict here is especially striking, given that the State of Oklahoma, through its Department of Agriculture, is objecting to the very injunctive remedies suggested by that same State of Oklahoma, through its Attorney General.

As noted above, these state regulations, developed over time and drafted by expert regulators, are working in limiting land application of poultry litter and improving the conditions of the waters of the IRW. The Court's consideration of any specific injunction Plaintiffs might urge should take into account considerations of comity and the relative expertise of this Court versus state regulators.

**C. Plaintiffs have identified only a small number of possible remedies, and do not actually apply any of them to the facts here.**

Based on their expert disclosures, Plaintiffs appear to have abandoned many of the remedies they had suggested in earlier submissions to the Court. This narrowed group of possible remedies includes:

1.  Cessation of the application of poultry litter on fields exceeding an STP of 65 (Expert Report of Lance Phillips);

2.  Complete cessation of the application of poultry litter in the IRW (Expert Reports of Katie Mendoza and Gregory Scott);

3.  Constructed wetlands (Expert Report of Robert W. Nairn);

4.  Buffer strips (Expert Reports of Gregory Scott and Shanon Phillips); and

5.  Removal of hay from the IRW (Expert report of Gregory Scott).[3]

At this point, other than the proposed bars on land application, Plaintiffs' experts present only *possible* remedies, *see, e.g.,* Nairn Rpt. at 2 ("it is possible to ameliorate the effects of such non point source pollution"), and do not actually propose the *adoption* of any *specific* form(s) of injunctive relief. *See* Sept. 13, 2024 Tr. at 7:19-21 ("the state bears the burden to show that the *specific form of injunctive relief* is warranted" (emphasis added)). As the Court will recall, Plaintiffs' remedies expert at the 2009-2010 trial did the same thing. Specifically, Plaintiffs' remedies expert Todd King admitted at trial that he did not have enough time or enough information to recommend a preferred remedy in his report, *see* Dec. 9, 2009 Tr. at 8022:20-

---

[3] Plaintiffs' experts also mention a number of other vague, general actions that someone might take that might reduce the phosphorus in the waters of the IRW, including field borders, bioretention cells, and "other conservation practices that trap phosphorus in runoff before it reaches downstream waterbodies." Phillips Rpt. at 39. These vague descriptions are not "the specific terms of the injunctive relief" the Court contemplates. *See* Sept. 13, 2024 Tr. at 5:10-13; *id.* at 5:15-22.

8023:15, 8054:3-8055:16, and that neither he nor anyone else had evaluated the potential effectiveness of any combination of the remedial alternatives he had examined, *id.* at 8019:5-18. Likewise here, none of Plaintiffs' new experts recommends a preferred remedy or combination of remedies among the possibilities they identify, and none addresses the potential effectiveness of any specific combinations of remedies. In particular, none of Plaintiffs' proposed experts addresses how any of the proposed remedies are feasible or could be effective when the injunction will not bind either the contract growers who apply the poultry litter to fields or to all the other live poultry dealers in the IRW, none of whom have been joined as parties to this action.

Moreover, Plaintiffs' new experts do not explain *how* their potential remedies would supposedly be implemented. For example:

- Dr. Robert Nairn suggests the use of "constructed wetlands," which he opines would help filter phosphorus from the water. *See generally* Nairn Rpt. But although he admits that the designs for such constructed wetlands "are very much site-specific," *id.* at 8, he presents the wetlands only as a generalized remedy. He does not identify a single site in the IRW where such a wetland could be constructed, he does not explain how such a wetland would be constructed or who would be qualified to construct it, and he does not address how a party constructing such a wetland would obtain the rights to the land and/or water on which the wetland would be placed or the state and federal permissions that would be necessary to do so.

- Several experts vaguely suggest the use of buffer strips. *See* Scott Rpt. at 3 ("correctly placed and well-designed buffer strips would stop the progress of phosphorus in its inevitable leakage from the land into the water"); S. Philips Rpt. at 2 ("to institute measures such as buffer strips to limit transport of legacy phosphorus into the waters of the IRW"). But again, this potential remedy is presented only in generalized terms. Neither of the experts identifies a

14

single field in the IRW on which buffer strips should be installed; neither describes what the buffer strips would be like (e.g., height, length, material, design); and neither addresses how any injunction could mandate the construction of buffer strips on land owned by contract growers who are not parties to this action.

- Plaintiffs' expert Gregory Scott suggests physically removing hay from the watershed to reduce the legacy phosphorus in the soil, but again presents only a vague, overgeneralized suggestion. He omits any details about how such a remedy would work, including such basic questions as:

  - How much hay is actually grown in the IRW, and how much is grown on fields on which poultry litter is applied?

  - Whose hay would be removed from the watershed (the contract growers' or someone else's)?

  - How much hay would need to be removed to have what effect on phosphorus levels in the water of the IRW?

  - Perhaps most importantly, how can an injunction in this case force non-parties to surrender their hay?

In addition, and perhaps most critically, none of Plaintiffs' experts makes the slightest mention of the anticipated costs of any of their possible remedies, even generally, whether those costs would be borne by the Defendants, the nonparty contract growers, other third parties, or the citizens of Oklahoma and Arkansas. A court addressing a request for an injunction "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987); *see also Sac & Fox Nation v. Norton*, 585 F. Supp. 2d 1293, 1304 (W.D. Okla. 2006) ("In

order to obtain a permanent injunction, the Plaintiff must show, among other things, that the balance of equities favors the issuance of an injunction."). This balancing of equities includes consideration of the costs that the proposed injunction would impose on the defendants and on others. *See, e.g., Michigan*, 667 F.3d at 789-790 (affirming denial of injunction in part because "the requested measures would impose substantial costs on the defendants and the public interests they represent, as well as added expenses for commerce, recreation, and tourism"); *Goal Acquisitions Corp. v. Digital Virgo*, No. 1:23-CV-1549-DII, 2024 WL 1078431, at *4 (W.D. Tex. Mar. 12, 2024) ("Because [defendant's] costs of complying with an injunction would far outweigh [plaintiff's] benefit from obtaining an injunction, the balance of equities leans in [defendant's] favor.").

Here, however, Plaintiffs' experts offer no analysis and state no opinions about the costs of any of their potential remedies, either to Cargill or to others. Moreover, given the lack of specifics in those potential remedies (e.g., which remedies would apply to which defendants, which farms should have buffer strips, the sites and sizes of any constructed wetlands, etc.) and given that Cargill received Plaintiffs' experts' reports barely a week ago, Defendants have had neither the information nor the time they needed to analyze the possible costs of these potential remedies. As a consequence, the December 2024 trial will provide the Court with no evidence based on which it could balance the equities, and will give the Court no basis on which it could issue an injunction.

In sum, the facts and opinions set out in Plaintiffs' expert reports are inadequate to meet Plaintiffs' high burden of justifying a mandatory injunction.

### 3.    The possible remedies Plaintiffs' experts propose raise serious problems.

Even assuming for the sake of argument that Plaintiffs' experts had made specific proposals for the use of these remedies in the IRW, each of the remedies presents difficult or insurmountable problems.

### a.    Cessation of the application of poultry litter on fields exceeding an STP of 65 faces several legal and practical barriers.

Plaintiffs' expert Lance Phillips suggests the possibility of barring land application of poultry litter on any field with an STP level over 65. This possible injunctive relief faces several obstacles.

### i.    Cargill does not own or control the application of the grower's turkey litter.

Barring Cargill from applying litter to fields with an STP in excess of 65 could not cure the injuries Plaintiffs claim because Cargill does not own, apply, or control the application of any of the litter at issue. The contract growers own and control the disposition of the turkey litter, as confirmed by the terms of the contracts between the growers. *Cf.* FFCL 90 (the court's finding that under Peterson's contracts, "the grower owns the poultry litter"). Indeed, the ownership of the poultry litter produced is a substantial portion of the consideration the growers receive for their work in raising the turkeys. Plaintiffs do not dispute this.

Absent such ownership or control, an injunction against Cargill barring the application of poultry litter to certain fields will not redress the Plaintiffs' claimed injuries because Cargill lacks the power to carry out such a bar. Whether framed in terms of redressability or standing, an injunction directed to a party who cannot carry it out fails as a matter of law. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 568 (1992) (holding plaintiffs seeking injunction had not established redressability of identified harm because defendant Interior Secretary lacked absolute

control over projects allegedly harming endangered species; because the agencies involved in the projects were not parties, they would not be bound by the court's order); *see also Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 35 (D.D.C. 2016) (finding that plaintiffs lacked standing because they had not sued the ministry that authorized the hunting of black rhinoceros; order directing Fish and Wildlife Service to bar imports of trophies would not, without more, remedy the identified harm).

The Court's prior holdings do not eliminate this problem. The Court stated in its Findings of Fact and Conclusions of Law that:

- "the actual structure of the integrator/grower relationship, including the growers' long term investment burden, significantly limits the growers' independence," FFCL at 88, and
- "by virtue of their contracts and the vertically integrated structure of the business, each defendant maintains control over virtually all essential aspects of poultry production, including the activities of their contract growers, *id.* at 89.

But "significantly" and "virtually" are not sufficient to support an injunction. This Court has not held, and the record contains no evidence on which it could ever hold, that Cargill owns the turkey litter their contract growers generate, that it has any right to direct the disposition of that turkey litter, or that it has any lawful means of forcing the contract growers to stop land-applying the litter to the growers' fields.

Any proposed remedy that requires Cargill to impose new conditions or contract terms on growers would also run afoul of the Packers and Stockyards Act of 1921, as amended ("PSA" or "the Act"), 7 U.S.C. §§ 181-229. Under the Act, Cargill Turkey is a "live poultry dealer" and the growers are "poultry growers," 7 U.S.C. § 182, and their relationship is heavily regulated. Cargill cannot unilaterally change the terms of the grower agreement, nor unilaterally invade non-turkey related areas of a grower's property, and any attempt to do either would violate the Act.

In particular, the 2008 Farm Bill and the regulations enacted under it expanded government regulation of the relationship between live poultry dealers and poultry growers, including the supposed imbalance the Court commented on in its Findings of Fact and Conclusions of Law. *See* FFCL at 82-89 (stating that "each defendant maintains control over virtually all essential aspects of poultry production, including the activities of their contract growers"). For example, the current regulations give growers the right to receive the contract terms, to discuss the terms with third parties, and to cancel the contract after signing. *See* 9 CFR § 201.100; 9 CFR § 201.215 (restricting dealers' rights to suspend delivery of birds); 9 CFR § 201.216 (restricting requirements that a grower make additional capital investments).

To be clear, the issue here is *not* whether Cargill can be held legally liable for an alleged nuisance or trespass committed by one of their contract growers. *See* Dkt. FFCL at 182-83. The issue here is the *separate* question of whether the Court can legally issue an injunction requiring Cargill to limit third parties' application of turkey litter that Cargill does not own and has no legal right to control. Plaintiffs have not identified any legal basis on which the Court can force Cargill to do so, and have not addressed the legal barriers to Cargill taking such action. The Court therefore cannot impose such injunctive relief.

        ii.        **Any injunction directing Cargill to coerce owners to surrender their litter or change their application practices would improperly impair the interests of the nonparty growers.**

Even assuming that Cargill had had sufficient "leverage"[4] to comply with an injunction ordering it to coerce its growers to surrender ownership of their litter or to forgo applying it to their fields, and assuming the PSA permitted such coercion, an injunction that compelled the use of

---

[4] *See* Dkt. FFCL at 87 (the Court's discussion of Dr. Rausser's testimony concerning the live poultry dealers' potential "leverage" over growers).

such leverage would improperly injure the contract growers and violate Rule 19 of the Rules of Civil Procedure. And such Court-ordered coercion would be imposed in only one watershed, the IRW, discriminating against growers who had made substantial capital investments there and giving an unfair economic advantage to growers in other watersheds. Again, the states' broad regulations of poultry litter application, which already apply statewide and to all poultry litter appliers, has proven a far better way to address these issues.

To justify an injunction, a plaintiff must demonstrate that the injunction will not impair the rights or interests of third parties. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (movant must show an injunction "would not substantially injure other interested parties")); *see also Int'l Bhd. of Teamsters Airline Div. v. Frontier Airlines, Inc.*, 628 F.3d 402, 407 (7th Cir. 2010) (injunction must protect all interested parties). Here, there is no question that Cargill Turkey Production's contract growers have an interest in applying the poultry litter that they own to their fields, and that any injunction that forces Cargill to pressure them to stop such application would impair that interest. This unavoidable adverse effect on nonparties renders the injunction impermissible.

Viewed another way, an injunction requiring Cargill to strongarm contract growers into giving up the right to apply the poultry litter that the growers own runs afoul of Rule 19's requirement of the joinder of interested parties.

Federal Rule of Civil Procedure 19(a)(1) provides in relevant part:

> (1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> *****
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> (i) as a practical matter impair or impede the person's ability to protect the interest….

Thus, an absent party whose interest will be affected by the outcome of the action is a necessary party to the action under Rule 19(a)(2)(i). *See, e.g., Smith v. Am. Federation of Musicians of U.S. and Canada,* 46 F.R.D. 24, 27 (S.D.N.Y.1968). This is true even if the absent party is not bound by the outcome of the action. *Paglin v. Saztec Int'l, Inc.,* 834 F.Supp. 1201, 1204–05 (W.D. Mo. 1993).

Here, Plaintiffs cannot dispute that the contract growers would have been subject to service of process and, given the federal question underlying this Court's jurisdiction,[5] that their joinder would not have deprived the Court of subject matter jurisdiction. Nor can Plaintiffs reasonably dispute that, as discussed above, an injunction compelling Cargill to force the growers to stop the field application of the turkey litter the growers own would as a practical matter impair the growers' rights to protect their interest in carrying out that land application. The growers are therefore "required parties" under Rule 19. *See In re Bridge Info. Sys., Inc.*, 288 B.R. 548, 555 (Bankr. E.D. Mo. 2001) (finding absent lienholders to be necessary parties because "the pending adversary proceedings may very well affect the absent parties' interest in the Debtors' real estate"). In light of the injunctive remedies that Plaintiffs now suggest,[6] Rule 19 required Plaintiffs to join these interested contract growers as parties, which Plaintiffs have never done or attempted to do. This Court should not effectively adjudicate the rights of the absent contract growers. *See, e.g., In*

---

[5] *See* Dkt. 1215 ¶ 2.

[6] There is no issue of timeliness or waiver here. Even if the effect of the injunction on the contract growers' interest were not raised by Plaintiffs' newly disclosed expert reports, the issue of joinder of a required or indispensable party generally is not waivable. On the contrary, it is an issue that courts have an independent duty to raise on their own. *See Mescalero Apache Tribe v. State of N. Mexico,* 131 F.3d 1379, 1383 (10th Cir.1997); *Symes v. Harris*, 472 F.3d 754, 760 (10th Cir. 2006). In any event, Cargill and the other Defendants raised the issue of indispensable parties in their answers. *See, e.g.,* Cargill Turkey Production Answer to FAC at 34 (Dkt. 52) ("Plaintiffs have failed to join indispensable parties."); Tyson Answer to FAC at 27 (Dkt. No. 73); Tyson Answer to SAC at 23 (Dkt. No. 1238).

*re Cambridge Biotech Corp.,* 212 B.R. 10, 18 (D. Mass. 1997) (holding that bankruptcy court's finding that absent interested party breached a cross-license without requiring that party's joinder as a party to the suit violated that party's due process rights).

      iii.      **The proposed bar would not affect all live poultry dealers in the IRW, undercutting its effectiveness.**

Third, any proposed injunction barring application of poultry litter on fields with STPs of 65 or more would be of questionable efficacy because it would apply only to the Defendants in this case, who represent only ***a small fraction*** of farmers who land-apply litter in the watershed. As Plaintiffs' own proposed exhibits show, poultry growers in the IRW have or have had contracts with many other live poultry dealers, including Aviagen, Pete & Gerry's, Arkansas Egg, Crystal Lake, and Handsome Brook. Moreover, such an injunction would generate a patchwork of standards for poultry litter applications; some contract growers would be subject to the limits imposed by the injunction, while others—perhaps even the next farm over—would be subject only to the regular Arkansas or Oklahoma application limits through the NMP programs. And of course, other farmers and cattle operators purchase poultry litter from third parties, both inside and outside the IRW, and apply it to their fields. Plaintiffs' proposed injunction would do nothing to affect the conduct of those third parties, and the cessation of litter application just on farms that also grow poultry would have little impact on water quality in the IRW. The states' universally applicable regulations have proven a far more effective means of addressing these issues than a necessarily narrow injunction would be.

In addition, Plaintiffs' decision not to join as parties either contract growers or other live poultry dealers also undercuts the effectiveness of any proposed remedies because of the easily predicted reaction of contract growers to any remedies imposed against Defendants. Growers of course are not bound forever to a particular poultry company; they can and do change who they

contract with for any number of reasons; as noted above, the PSA guarantees growers that freedom. Plaintiffs' proposed remedies against Defendants would give contract growers two choices:

- Growers could contract with Cargill or one of the other party Defendants and be subject, not only to Oklahoma and Arkansas law, but also to an injunction's more severe limits on land application, requirements for buffer strips, and potentially other constricting remedies; or

- Growers could contract with non-party live poultry dealers and be subject *only* to Oklahoma and Arkansas law.[7]

Obviously, most if not all growers would elect to contract with non-parties and avoid the more severe restrictions on their use of litter. This result is predictable and would undercut any claimed effectiveness of Plaintiffs' proposed remedies in affecting actual grower behavior or reducing litter application.

### b.  Complete cessation of the application of poultry litter in the IRW.

This potential remedy suffers from the same infirmities as the potential remedy of barring poultry litter application to fields with STPs over 65:

---

[7] The newly amended Oklahoma Registered Poultry Feeding Operations Act precludes a future similar suit by the State against any non-defendant integrator with growers in the IRW. *See, e.g.,* 2 Okla. Stat. tit. 2 §§10-9.7, 10-9.11(I). Current growers could simply migrate from an existing Defendant to a non-defendant integrator to preserve their ability to apply litter, which the record shows is integral to their business model.  Given the tight margins in the poultry industry, an injunction would create a perverse economic incentive for non-Defendant integrators to enter the IRW, recruit Defendants' contract growers, and be legislatively protected by the Oklahoma Registered Poultry Feeding Operations Act.  This places the Defendants here at a serious economic disadvantage and raises serious equal protection concerns. *See, e.g., Reed v. Reed*, 404 U.S. 71, 76, 92 S. Ct. 251, 254, 30 L. Ed. 2d 225 (1971) (holding that equal protection clause requires "that all persons similarly circumstanced shall be treated alike") (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). There is no rational basis to treat Defendants any differently than other integrators in the IRW.

- The contract growers, not Cargill, own and control the disposition of the turkey litter produced by the birds they raise, and Cargill has no contractual or other legal authority to direct that disposition;

- Even assuming that an injunction could empower Cargill to confiscate and dispose of the growers' litter, such an injunction would directly and unavoidably affect the rights of the contract growers, who are therefore required but absent parties under Rule 19; and

- Even assuming that a Court-issued injunction could authorize the Defendants to seize and dispose of their contract growers' poultry litter, that injunction would have no effect on litter applied by growers with contracts with live poultry dealers who are not parties to this action and would encourage growers to contract with non-party dealers.

In addition to these problems, any injunction that completely bars application of poultry litter in the IRW would directly contradict state law, which specifically approves such application and defines the circumstances under which such applications may occur. *See* Okla. Stat. tit. 2 § 10-9.7 ("Compliance with a Nutrient Management Plan developed under subsections B and C of this section shall be deemed compliant with Best Management Practices.").

Finally, any proposal for the complete cessation of all application of poultry litter by the Defendants' contract growers would be overbroad as a matter of law based under this Court's prior rulings in this case on Plaintiffs nuisance claim. An injunctive remedy for a nuisance or a trespass may not be broader or more burdensome than is necessary to cure the nuisance or trespass. *See, e.g., Califano v. Yamasaki,* 442 U.S. 682, 702 (1979) (noting rule that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

In this case, however, the Court has already held that "the overwhelming evidence" from Plaintiffs' own experts demonstrates, as a matter of law, that the land application of poultry litter

24

in the IRW is not *always* a nuisance. *Oklahoma v. Tyson Foods, Inc.*, 2010 U.S. Dist. LEXIS 14941 at *26-29 (N.D. Okla. Feb. 17, 2010) (granting partial Rule 52(c) judgment on Plaintiffs' claim of nuisance *per se*). Given the Court's conclusion that land application of poultry litter is not always a nuisance, an injunction that compels the complete cessation of such land application is inescapably more broad than is necessary to cure any nuisance Plaintiffs may allege. Such an injunction would completely forbid a practice that the Court has held is not always a nuisance. As a consequence, any injunction that requires complete cessation of land application of poultry litter, as Plaintiffs' experts Mendoza and Scott suggest, is unjustified as a matter of law. *See, e.g., Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 414-15 (1977) (overturning systemwide injunctive remedy where evidence did not show such a broad remedy was necessary to eliminate all vestiges of state-imposed school segregation); *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 887 (9th Cir. 2007) (reversing injunction imposing absolute bar on medium frequency sonar as unjustified).

### c. Installation of buffer strips imposes numerous legal and practical problems.

Apart from the legal problems of installing buffer strips on property owned by third parties, Plaintiffs' experts fail to even acknowledge any of the practical problems presented by buffer strips. For example, as the Court itself pointed out at the September 13, 2024 hearing, cattle paths may impair or destroy the effectiveness of buffer strips in preventing rainfall from flowing to flowing water. *See* Sept. 13, 2024 Tr. at 19:3-14. Plaintiffs' experts offer nothing to defend the claimed efficacy of buffer strips in light of such practical considerations.

Finally, state regulations in Oklahoma already permit the State to impose buffer strip requirements as part of NMPs for farmers who land-apply poultry litter near bodies of water. *See, e.g.,* 2 Okla. Stat. tit. 2 § 10-9.7 (mandating that poultry feeding operations utilize Best Management Practices, including "measures designed to prevent the discharge of poultry waste to

waters of the state"); Okla Admin. Code 35:17-5-5(a)(7)(E) (providing that "[e]dge of field, grassed strips shall separate water courses from runoff which may be carrying eroded soil and poultry waste"). Plaintiffs' experts do not acknowledge this existing power of the State, do not explain why injunctive relief would be needed to impose the same requirement, and do not address whether the buffer strip requirement they suggest would require any buffer strips or produce any reduction in phosphorus runoff not already accomplished by the existing state provisions.

### III. Objections to Non-Expert Witnesses

As directed by the Court's September 16, 2024 Minute Order, Dkt. 3039, Cargill lodges the following objection to Plaintiffs proposed non-expert trial witnesses:

Plaintiffs have listed Lynnette Jordan and Teena Gunter as witnesses for trial, designating them as "Rule 30(b)(6) Witnesses/Agency Designees." Dkt. 3058 at 9-10. Cargill has no general objection to Plaintiffs calling Ms. Jordan and Ms. Gunter as witnesses, but their purported designations as "Rule 30(b)(6) Witnesses/Agency Designees" presents problems.

Rule 30(b)(6) is a discovery rule. The rule permits a party to require an opposing corporate party to designate a witness to testify on certain specific topics, and that witness may gather information on those topics from outside sources and need not testify based on personal knowledge. See Fed. R. Civ. P. 30(b)(6). In contrast, a witness who testifies at trial may testify about a topic only if the witness has "personal knowledge of the matter." Fed. R. Evid. 602.

As a consequence, "a party may not use a Rule 30(b)(6) designation to permit a witness to testify at trial on matters of which the witness had no personal knowledge." *Antero Res. Corp. v. C & R Downhole Drilling, Inc.*, No. 4:16-CV-00668-Y, 2019 WL 13193894, at *3 (N.D. Tex. June 20, 2019); *see also Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, 8:12-cv-691-T-24-MAP, 2014 WL 4983912, at *3 (M.D. Fla. Oct. 6, 2014) ("while Rule 30(b)(6) permits [a

corporate witness'] deposition testimony to be based on matters outside his personal knowledge, Rule 602 limits his trial testimony to matters that are within his personal knowledge.")

In communications with Cargill's attorneys about this issue, Plaintiffs have represented that Ms. Jordan and Ms. Gunter will testify only to matters on which they have personal knowledge, but Plaintiffs have nevertheless refused to withdraw their purported "Rule 30(b)(6)/Agency Designee" designation of these two witnesses. Therefore, should either or both of these witnesses attempt to testify at trial as supposed Rule 30(b)(6) agency representatives instead of individuals, or should attempt to testify on matters beyond their personal knowledge, Cargill will request the Court to exclude such testimony under Rule 602.

Dated:  November 27, 2024

Respectfully Submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

*s/ Christopher H. Dolan*
Bruce Jones
Aaron D. Van Oort
Christopher H. Dolan
Jeffrey P. Justman
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Well Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Main:  (612) 766-7000
bruce.jones@faegredrinker.com
aaron.vanoort.jones@faegredrinker.com
chris.dolan@faegredrinker.com
jeff.justman@faegredrinker.com

Jacob D. Bylund, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Main (515) 248-9000
jacob.bylund@faegredrinker.com

John H. Tucker
Colin Hampton Tucker

27

Kerry R. Lewis
Theresa Noble Hill
Rhodes Hieronymus Jones Tucker & Gable PLLC
PO BOX 21100
TULSA, OK 74121-1100
918-582-1173
Jtuckercourts@rhodesokla.com
chtucker@rhodesokla.com
klewis@rhodesokla.com
thill@rhodesokla.com

*Attorneys for Cargill Incorporated
and Cargill Turkey Production, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was served electronically on

November 27, 2024 on all counsel of record.

*/s/  Christopher H. Dolan*     
Christopher H. Dolan
