# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-cv-329-GKF-SH |
| | ) | |
| TYSON FOODS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' POST-TRIAL BRIEF

Mark D. Hopson
Frank R. Volpe
Gordon D. Todd
Benjamin M. Mundel
Cody L. Reaves
David H. Kinnaird (*pro hac* forthcoming)
Sidley Austin LLP
1501 K Street, NW
Washington, D.C.  20005
(202) 736-8000
(202) 736-8711 (facsimile)
mhopson@sidley.com
fvolpe@sidley.com
gtodd@sidley.com
bmundel@sidley.com
cody.reaves@sidley.com
dkinnaird@sidley.com

*Attorneys for Tyson Foods, Inc.,*
*Tyson Poultry, Inc., Tyson Chicken, Inc.,*
*and Cobb-Vantress, Inc.*

(additional counsel listed on inside cover)

January 30, 2025

A. Scott McDaniel, OBA #16460
McDaniel Acord, PLLC
9343 East 95th Court
Tulsa, OK 74133
(918) 382-9200

*Attorney for Tyson Foods, Inc., Tyson Poultry, Inc.,
Tyson Chicken, Inc., Cobb-Vantress, Inc., and Peter-
son Farms, Inc.*

Robert George, OBA #18562
George's, Inc.
402 W. Robinson Ave.
Springdale, AR 73764
(479) 927-7249

K.C. Dupps Tucker (admitted *pro hac vice*)
Kristy E. Boehler (admitted *pro hac vice*)
The Law Group of Northwest
   Arkansas PLLC
1830 Shelby Lane
Fayetteville, AR 72704
(479) 316-3760

Perry L. Glantz (admitted *pro hac vice*)
Stinson LLP
1144 15th Street, Suite 2400
Denver, CO 80202
(303) 376-8410

Clinton Russell, OBA # 19209
Taylor, Foster, Mallett, Downs,
   Ramsey & Russell
400 West Fourth Street
Claremore, OK 74018
(918) 343-4100
crussell@soonerlaw.com

*Attorneys for George's, Inc. and George's Farms, Inc.*

John R. Elrod (admitted *pro hac vice*)
Vicki Bronson, OBA 20574
Conner & Winters, P.C.
4375 N. Vantage Drive, Suite 405
Fayetteville, AR 72703
(479) 582-5711
(479) 358-1518 (facsimile)
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Simmons Foods, Inc.*

Robert P. Redemann, OBA #7454
William D. Perrine, OBA #11955
Perrine, Redemann, Berry,
   Taylor & Frette, PLLC
1800 S. Baltimore Ave., Suite 900
Tulsa, OK 74119
(918) 382-1400
(918) 382-1499 (facsimile)
rredemann@pmrlaw.net
wperrine@pmrlaw.net

Robert E. Sanders, MSB#6446
   (admitted *pro hac vice*)
Young Wells Williams P.A.
P.O. Box 6005
Ridgeland, MS 39158-6005
(601) 948-6100
(601) 355-6136 (facsimile)
rsanders@youngwells.com

*Attorneys for Cal-Maine Foods*

John H. Tucker, OBA 9110
Theresa N. Hill, OBA 19119
Colin H. Tucker
Rhodes Hieronymus Jones
  Tucker & Gable
Two W. 2nd Street, Suite 1000
P.O. Box 21100
Tulsa, OK  74121-1100
(918) 582-1173
(918) 592-3390 (facsimile)
jtucker@rhodesokla.com
thill@rhodesokla.com
chtucker@rhodesokla.com

Jacob D. Bylund, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Main: (515) 248-9000
jacob.bylund@faegredrinker.com


Bruce Jones, admitted *pro hac vice*
Aaron D. Van Oort, admitted *pro hac vice*
Christopher H. Dolan, admitted *pro hac vice*
Jeffrey P. Justman, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Well Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Main:  (612) 766-7000
bruce.jones@faegredrinker.com
aaron.vanoort.jones@faegredrinker.com
chris.dolan@faegredrinker.com
jeff.justman@faegredrinker.com

*Attorneys for Cargill, Inc. and Cargill
Turkey Production, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

FACTS ............................................................................................................................................ 2

    I.      Poultry Farming Operations in the Illinois River Watershed ......................... 3

    II.     Statutory and Regulatory Changes ................................................................ 7

    III.    Poultry Litter in the IRW ............................................................................ 12

    IV.    Land Use and Urbanization ......................................................................... 16

    V.     Nutrient Fate & Transport ........................................................................... 18

    VI.    "Legacy Phosphorus" .................................................................................. 22

    VII.    Water Quality .............................................................................................. 24

        A.     Phosphorus Concentrations and Loads In the Rivers and Streams of
              the IRW Have Changed Since Trial. ................................................ 24

        B.     Phosphorus-Related Conditions in Lake Tenkiller Have Changed
              Since Trial. ....................................................................................... 28

ARGUMENT ................................................................................................................................ 29

    I.      The Record Remains Stale for Purposes of Prospective Relief, Rendering
         Requested Relief Moot ................................................................................ 30

    II.     Nothing in the Updated Record Excuses Plaintiffs' Severe Laches. ........... 32

        A.     Plaintiffs Cannot Be Awarded Equitable Relief After They Sat on
              Their Rights for Over Thirteen Years. ............................................. 32

        B.     Plaintiffs Cannot Be Awarded Any Relief for Harm That Could Have
              Been Mitigated by Reasonable Actions Within Their Control. ....... 33

    III.    The Court's Previous Conclusions On Direct and Vicarious Liability Are
         Inconsistent With Intervening Statutory Changes and Case Law From the
         Oklahoma Supreme Court. ........................................................................... 34

    IV.    The Updated Record Does Not Support a Conclusion that Defendants'
         Conduct Proximately Caused Plaintiffs' Injury. .......................................... 36

        A.     Plaintiffs Failed to Show that Each Defendant's Conduct Is a Cause-
              in-Fact of Pollution in the IRW. ...................................................... 37

B.    The Updated Record Shows that There Are Supervening Causes Between Each Defendant's Conduct and Pollution of the IRW....................38

V.    The Improvements in the IRW Belie Plaintiffs' Claim of Irreparable Injury.............40

VI.    Plaintiffs Claims Must Be Dismissed as Prudentially Moot. ..........................................41

CONCLUSION......................................................................................................................43

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Akin v. Mo. Pac. R.R. Co.*,
    977 P.2d 1040 (Okla. 1988) ...................................................................................38

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) .............................................................................................31

*Att'y Gen. of Okla. v. Tyson Foods, Inc.*,
    565 F.3d 769 (10th Cir. 2009) ...........................................................................36

*Benisek v. Lamone*,
    585 U.S. 155 (2018) ...........................................................................................32

*Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
    25 F.4th 1238 (10th Cir. 2022) .........................................................................36

*Davis v. Colerain Twp.*,
    51 F.4th 164 (6th Cir. 2022) .............................................................................31

*Donahue v. Kan. Bd. of Educ.*,
    827 F. App'x 846 (10th Cir. 2020) ....................................................................31

*Duncan v. Finch*,
    10 Ill. (5 Gilm.) 296 (1848) ..............................................................................32

*In re Eastern Cherokees*,
    220 U.S. 83 (1911) .............................................................................................32

*Gardner v. Incorporated City of McAlester*,
    179 P.2d 894 (Okla. 1946) ...........................................................................32, 33

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) ........................................................................35, 39, 40

*Johnson v. Ford Motor Co.*,
    45 P.3d 86 (Okla. 2002) .....................................................................................36

*Johnston v. Standard Min. Co.*,
    148 U.S. 360 (1893) ...........................................................................................32

*Long v. Ponca City Hosp., Inc.*,
    593 P.2d 1081 (Okla. 1979) ..............................................................................37

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) .............................................................................30

*N.M. Dep't of Game & Fish v. United States Dep't of Interior,*
  854 F.3d 1236 (10th Cir. 2017) ................................................................................ 41

*Okland Oil Co. v. Knight,*
  92 F. App'x 589 (10th Cir. 2003) ............................................................................ 36

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ................................................................................................ 30

*Prairie Band Potawatomi Nation v. Wagnon,*
  476 F.3d 818 (10th Cir. 2007) ......................................................................... 29, 40

*Salazar v. Buono,*
  559 U.S. 700 (2010) ................................................................................................ 31

*Seed v. EPA,*
  100 F.4th 257 (D.C. Cir. 2024) ................................................................................ 1

*Siegel v. LePore,*
  234 F.3d 1163 (11th Cir. 2000) .............................................................................. 41

*Sierra Club v. U.S. Dep't. of Energy,*
  825 F. Supp. 2d 142 (D.D.C. 2011) ........................................................................ 31

*State ex rel. Okla. Dep't of Pub. Safety v. Gurich,*
  238 P.3d 1 (Okla. 2010) .......................................................................................... 37

*United States v. Or. State Med. Soc'y,*
  343 U.S. 326 (1952) ...................................................................................... 1, 30, 31

*United States v. Swift & Co.,*
  286 U.S. 106 (1932) ................................................................................................ 31

*United States v. W.T. Grant Co.,*
  345 U.S. 629 (1953) ............................................................................................. 1, 41

*Vandenbark v. Owens-Illinois Glass Co.,*
  311 U.S. 538 (1941) ................................................................................................ 35

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ...................................................................................... 29, 31, 32

*Winzler v. Toyota Motor Sales U.S.A., Inc.,*
  681 F.3d 1208 (10th Cir. 2012) ......................................................................... 41, 42

## Statutes & Regulations

Ark. Admin. R. 138.00.05-001 ............................................................................. 7, 38

Ark. Admin. R. 138.00.05-004 ............................................................................7, 38

Enr. S.B. 1424 (May 30, 2024) ......................................................................... 10, 34

2022 Okla. Sess. Law Serv. Ch. 239 ........................................................................9

Okla. Admin. Code § 252:730-5-19(c)(3) ...............................................................12

Okla. Admin. Code § 785:46-15-14(c) .....................................................................12

Okla. Admin. Code § 785:46-15-14(b) (2008) .........................................................12

Okla. Admin. Code § 785:46-15-14(c) (2021) ..........................................................12

Okla. Stat. tit. 2, § 10-9.1(B)(14) .........................................................................7, 38

Okla. Stat. tit. 2, § 10-9.3 ......................................................................................7, 38

Okla. Stat. tit. 2, § 10-9.7 ..................................................................................7, 8, 38

Okla. Stat. tit. 2, § 10-9.11(I) ...................................................................................39

## Other Authorities

43A C.J.S. *Injunctions* § 2 ......................................................................................31

Restatement (Second) of Torts Div. 10....................................................................36

Restatement (Second) of Torts § 157 .......................................................................36

Restatement (Second) of Torts § 158 .......................................................................36

Restatement (Second) of Torts § 159 .......................................................................36

Restatement (Second) of Torts § 160 .......................................................................36

Restatement (Second) of Torts § 161 .......................................................................36

Restatement (Second) of Torts § 162 .......................................................................36

Restatement (Second) of Torts § 163 .......................................................................36

Restatement (Second) of Torts § 164 .......................................................................36

Restatement (Second) Torts § 821D cmt. E (1979)..................................................29

## INTRODUCTION

Having reopened the record to take additional evidence as to current conditions in the Illinois River Watershed ("IRW"), the question before the Court remains the same:  Does the Court have sufficient basis to proceed with entering judgment and ordering any remedy in this action?  It does not.

There is no question that Plaintiffs, officials of the State of Oklahoma ("Plaintiffs" or "State"), bear the burden to prove each and every aspect of their case, including liability and remedy.  Nor is there any question that Plaintiffs bear the burden to present a current, non-stale record sufficient to support those findings.  Doc. 3040 ("Sept. 13, 2024 Hr'g Tr.") at 7:16–21, 9:17–18; Doc. 3098 ("Nov. 26, 2024 Hr'g Tr.") at 37:12–14.  Indeed, prospective relief requires "a real threat of future violation or a contemporary violation of a nature likely to continue or recur."  *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952); *see United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he moving party must satisfy the court that relief is needed.  The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."); *Seed v. EPA*, 100 F.4th 257, 265 (D.C. Cir. 2024) (moving party must establish that there is a present harm left to enjoin).  Plaintiffs have not met their burden.

As an initial matter, the previously gathered record cannot support any judgment or prospective relief as a matter of law.[1]  While the Court rejected our motions to dismiss, it recognized the need to reopen the record to attempt to cure that deficiency.  Doc. 3023; Sept. 13, 2024 Hr'g Tr.; Nov. 26, 2024 Hr'g Tr. at 7:9–21, 37:12–14.  The record compiled during the December 2024 trial ("December

---

[1] In view of the constrained focus of the December trial, narrowly cabining the issues to be presented, we do not reassert all issues raised previously or all possible challenges to the Court's prior findings and conclusions.  Defendants maintain and reserve all prior motions raising jurisdictional, substantive, and practical challenges to the continuation of this action, and all grounds for appeal.

trial")[2] did not do so.  To the contrary, it demonstrates material changes in agronomic practices, economic activity, land use, population, and water quality, all of which fundamentally undercut reliance on the 2009-2010 trial record.  Plaintiffs failed to offer any credible evidence regarding the current conditions of Defendants' business operations, failed to offer any fate and transport or other causation evidence tying Defendants' past or present operations to injury to the waters of the State of Oklahoma, and failed to demonstrate any current, ongoing, remediable harm.  The evidence demonstrates that water quality has improved dramatically in the IRW, and that current phosphorus levels correlate with urban and point-source sources, not non-point sources.

Relevant statutory and regulatory standards, too, have changed significantly in the intervening 15 years.  Through Senate Bill 1424, which became effective just months ago, the Oklahoma legislature amended governing law to provide that Oklahoma applicators, farmers, and integrators cannot be held liable for applying poultry litter in accordance with a State-approved nutrient management plan.  Under the amended Act, if a State-approved plan is followed and discharge or runoff occurs, there can be no direct or vicarious liability for the discharge, making clear that the Oklahoma Department of Agriculture, Food and Forestry ("ODAFF")—not applicators, integrators, or poultry growers—is solely responsible for runoff prevention.

At bottom, the December trial record shows that the prior record cannot be relied upon for entering judgment and remedy, and the State failed to adduce sufficient new evidence to cure this deficiency.  This matter should be dismissed.

## FACTS

Much has changed in the IRW since 2010.[3]  *First*, Defendants' business operations have changed considerably.  *Second*, the statutory and regulatory schemes regulating the use of poultry litter

---

[2] References to the 2009-2010 trial will be made clear in context.

[3] While the original trial opened in 2009, the evidence itself was even more dated.

have become more robust. *Third*, farming practices including the generation, handling, application, and transport of poultry litter have evolved dramatically. *Fourth*, the IRW has seen significant population growth and land use changes. *Fifth*, water quality in the IRW has greatly improved. These changes together undercut reliance on the prior record, and Plaintiffs have failed to offer sufficient, credible, or relevant evidence regarding current conditions in the IRW, much less causation and injury, to support entry of judgment or imposition of a remedy.

## I.    Poultry Farming Operations in the Illinois River Watershed

In its January 2023 Order, the Court relied extensively on evidence concerning the pre-2009 scope, structure, and character of the Defendants' operations in the IRW. Doc. 2979 ("FFCL") at 82–89. At the December trial, however, Plaintiffs failed to present updated evidence regarding even the most basic aspects of Defendants' business operations. Plaintiffs offered scant current evidence pertaining to whether any Defendant owns and operates any farms, or the current contractual relationship between any Defendant and any grower in the IRW. Indeed, Plaintiffs failed to offer any evidence concerning current relationships between growers and integrators at all, relying instead on piecemeal records insufficient to impose liability.

Plaintiffs' failed attempt to use Google images to count the number of active poultry houses failed to distinguish between Oklahoma farmers contracted with Defendants and those who were not. Plaintiffs made no account for farmers who are now contracted to an integrator who is not a defendant. Tr. 497:5–8 (S. Phillips). No witness purported to connect the condition of the waters of the State of Oklahoma to Defendants' operations. Tr. 43:8–17 (Fite); Tr. 325:3–8 (L. Phillips). And the State failed to present any evidence regarding the location of poultry houses, the location of pastures fertilized by poultry litter, their proximity to a Scenic River, or soil conditions, slope, cover crops, buffer zones, or any other factor necessary to tie Defendants to any cognizable environmental impact.

The evidence that was offered demonstrates significant changes. For example, of growers contracted with Defendants in 2008–2009, only 13-14 percent—106 of the 859 growers identified— remain under contract with the same Defendant today. Tr. 1154:11–1155:21 (McDonnell); DJX2-0219-B. Plaintiffs offered no evidence regarding the current status of growers identified in the first trial. The record does not show whether they have gone out of business, started working with different integrators, or are in a "different line of business entirely." Tr. 1154:23–1155:21 (McDonnell). The State acknowledged that there are "fewer … poultry houses" in Oklahoma and that many have moved outside the watershed. Tr. 39:11–19 (Fite). Some growers left the business or moved out of the IRW following closure of a Tyson processing operation in Noel, Missouri. Tr. 739:4–740:7 (Jordan); Tr. 509:1–20 (S. Phillips). The State failed to account in its evidence for growers no longer active or related to a Defendant. Tr. 497:9–22 (S. Phillips); Tr. 509:7–16 (S. Phillips) (admitting that her analysis "included in that active number [houses that] we know, in fact, today they're not active"); Tr. 568:13–17 (S. Phillips). In short, current evidence undercuts reliance on the prior record regarding Defendants' business operations.

Both sides presented some evidence regarding poultry operations and litter generation generally, but disputed which is the more reliable source for such evidence. Arkansas and Oklahoma regulators maintain data regarding poultry operations in each State. Rather than rely on those reports, however, Plaintiffs offered their own calculations. Shanon Phillips purported to use Google Earth images to identify active poultry houses in the IRW as of 2022, which the State then used to estimate numbers of birds raised and amount of poultry litter generated. Tr. 491:18–492:6 (S. Phillips). Notably, among other problems with the method, these quantifications were not specifically attributed to the Defendants in this matter, but rather to the IRW as a whole. Tr. 492:7–14 (S. Phillips). The Court rejected the State's computer modeling evidence as novel and unreliable in the original proceeding, and the December trial evidence demonstrates that Ms. Phillips' undertaking was equally unreliable.

As an initial matter, Ms. Phillips could not identify any published or peer-reviewed basis for her methodology, nor is there any. Her novel and untested Google Earth-based house classification methodology is unreliable. Tr. 932:23–937:–15 (Vlassopoulos) (agreeing that there is no "academic literature that supports [Ms. Phillips] analysis," and that the "more reliable way" to conduct the analysis would have been "[u]sing registration information"); DJX2-0358 at 1 (house incorrectly identified as active); Tr. 1020:7–1021:4 (Fisk). The evidence established that operations come and go, houses go active and inactive, and that a house's active or inactive status cannot be determined from satellite images. Tr. 666:18–667:2 (Jordan); Tr. 740:2–7 (Jordan); Tr. 491:16–18 (S. Phillips) (admitting that "there have been some changes [in active status] since 2022 and 2024"); Tr. 933:25–934:2 (Vlassopoulos). Furthermore, the evidence shows that there are poultry and egg producers operating in the IRW other than Defendants. Ms. Phillips failed to determine whether houses she estimated were active in 2018 were associated with one of the Defendants or one of the other poultry or egg producers operating in the IRW.

Plaintiffs' bird count and litter data were similarly unreliable. The State produced a "giant mass of information" from ODAFF that "couldn't [be] follow[ed]" and did not allow calculations to be performed, Tr. 548:3–24 (S. Phillips), and made no effort at the December trial to draw conclusions from it, let alone Defendant-specific conclusions.[4] Tr. 568:18–24 (S. Phillips). In fact, Ms. Phillips'

---

[4] Notably, the State presented no evidence at the December trial that Defendants Cal-Maine Foods, Inc., Peterson Farms, Inc., or Cargill, Inc. conduct any current operations in the IRW. In their case-in-chief, Plaintiffs proffered no documentary or testimonial evidence regarding these Defendants whatsoever. In the case of Peterson Farms, the Court previously found that its operations in the IRW ceased in July 2008, and that at the time of the 2009-2010 trial, it had no relationships with contract poultry growers, and had no association with the generation of poultry litter. FFCL at 2, n. 1, 83 (¶ 294), 96 (¶ 338). In her December 2024 testimony, Shanon Phillips admitted that she was aware of Peterson Farms terminating its operations in 2008, and that her broad statements in her report and testimony about "the Defendants" do not apply to Peterson Farms. Tr. 511:2–512:14 (S. Phillips). The Court likewise previously found that Cal-Maine Foods and Cargill, Inc. had no contracts with any contract poultry growers at the time of the 2009-2010 trial, FFCL at 1–2, n.1, and Plaintiffs offered

assumptions as to house size and flock counts resulted in overestimations of millions of birds raised. Tr. 569:7–25 (S. Phillips). This, in turn, skewed the State's litter generation estimate.

Vastly more reliable is the data maintained and published by Oklahoma and Arkansas regulators regarding registered poultry feeding operations including litter generation, application, and export. The most recent comprehensive report from Oklahoma dates to 2019. The State did not explain why it stopped publishing these reports and failed to extract current data from its files, nor did it impeach the reliability of the 2018-2019 data and prior years' reports. Plaintiffs did attack the reliability of the Arkansas reports, principally as justification for their own Google Earth undertaking. But Plaintiffs' attempts to impeach the Arkansas data came up short.

The evidence showed that Arkansas officials have repeatedly explained the bases for their data to Ms. Phillips and her colleagues, responding to their purported misunderstandings as to what the data show. Tr. 1057:2–8 (Fisk); Tr. 1067:19–1068:12 (Fisk); Tr. 440:21–441:18 (S. Phillips); Tr. 443:13–449:10 (S. Phillips) (admitting that she was told "three times that" her "criticism of the Arkansas data is invalid"). Moreover, actual errors in the underlying Arkansas data due to self-reporting were minor, limited to a few years, and ultimately identified and corrected in the final annual

---

no evidence at the December trial that these Defendants have been involved with any poultry growers in the IRW since 2010 or have any current operations in the IRW.

While a witness called by the State claimed to have identified a single farm in the IRW raising breeder chickens today for "George's"—*i.e.*, either Separate Defendants George's, Inc. or George's Farms, Inc., Tr. 691:4–5 (Jordan), the State's own records demonstrate conclusively that this farm is actually located in a different watershed. *See* OKLA_PX_0104 at 1, 6, 8, 10, 12–14, 17–18, 28, 79, 82–83, 87–88, 95, 98–99, 103–04, 108–09, 112–13, 117–18, 123, 126–27, 131–32, 136, 158, 161, 164, 166, 169, 173, 178 (locating the farm within the Eucha-Spavinaw Watershed). Those same records show that the poultry litter from the only current farm identified by the State as relating to George's is exported to areas outside of both the Eucha-Spavinaw watershed and the IRW. *See* OKLA_PX_0104 at 8, 12, 14, 28 (records showing export locations, all of which are outside the IRW). For all purposes, the State has consistently treated this grower as being located in the Eucha-Spavinaw Watershed, including imposing stringent litter hauling requirements on him, until it became convenient for the Attorney General to transport him into the IRW for purposes of the December trial.

registration report presented at trial by the responsible Arkansas official, Mr. Patrick Fisk. Tr. 1018:9–1019:18 (Fisk) (explaining the corrections made in the 2019 and 2021 final reports); Tr. 1057:1–1075:9 (cross-examining Mr. Fisk on the raw data self reported by growers). Plaintiffs, furthermore, raised no reliability issues with the vast majority of poultry registration data provided by Arkansas, including no issues with or objections to the final reports published by Arkansas. DJX2-0348 (summary for FY2014–FY2023); DJX2-0050–0054; DJX2-0259A, DJX2-0260A, DJX2-0207–0209. Mr. Fisk testified compellingly regarding the collection and publication of poultry operation data in Arkansas. Tr. 983:21–984:4 (Fisk); 1000:5–25 (Fisk); 1009:11–1012:25 (Fisk). At bottom, the official figures published by both States are the most credible source of poultry operation data. Those data show a dramatic reduction in the application of poultry litter both in and outside of the IRW since the time of the 2009-2010 trial.

## II.    Statutory and Regulatory Changes

Poultry litter management and tracking in Oklahoma and Arkansas has become more robust since trial. *See* Doc. 3037 (Ltr. to Court from Oklahoma Secretary of Agriculture Blayne Arthur) (Sept. 5, 2024); Doc. 3053 (Ltr. to Court from Arkansas Secretary of Agriculture Wesley W. Ward) (Oct. 25, 2024).

*Regulatory.* At the time of the first trial, "about 20 percent of growers had not yet received an AWMP" in Oklahoma, FFCL at 24, and many growers in Arkansas—which did not mandate that applicators have a nutrient management plan until January 2007—did not have an NMP, *id.* at 34–35. Today, both States' comprehensive regulatory regimes have been in place and operating effectively for years. Both States require all poultry feeding operations to register with the state and to procure and comply with a nutrient management plan. Okla. Stat. tit. 2, §§ 10–9.1(B)(14); 10–9.3; 10–9.7; Ark. Admin. R. 138.00.05-001 (ANRC Rules, tit. XIX); Ark. Admin. R. 138.00.05-004 (ANRC Rules, tit. XXII).

Science-based NMPs are designed by plan writers trained and certified by each State. In Arkansas, plans may be written only by "a certified nutrient management plan writer," and "[a]ll plans have to be approved by the district board." Tr. 993:16–996:19; 998:23–25 (Fisk). And in Oklahoma, operators submit management plans to ODAFF, which in turn either approves or rejects the plan. Okla. Stat. tit. 2, § 10–9.7(D). These plans are "unique" to "every grower" and farm—there is no one-size-fits-all approach. Tr. 710:15–17 (Jordan). Plans are location-specific, reflecting the soils, geology, hydrology, nutrient content, and crops of each regulated field. Tr. 999:6–12 (Fisk). Plans must be renewed periodically, and more frequently when changes in land-use or management occur. Tr. 999:13–20 (Fisk); Tr. 1174:8–21 (McDonnell). NMPs allow farmers to capture the many benefits of utilizing poultry litter while mitigating any risks of excess phosphorous. Tr. 1175:11–24 (McDonnell) (noting the "number of other benefits associated with poultry litter as a soil amendment").

Plaintiffs again failed to offer any evidence of meaningful plan violations, much less that Defendants knew or should have known of such violations. Plaintiffs offered no evidence of any grower associated with a Defendant violating an NMP. In fact, the evidence established that there are few to no documented incidents where "a poultry grower or a certified litter applicator or any other individual or entity has land applied poultry litter in the Illinois River Watershed in violation of a nutrient management plan or an animal waste management plan." Tr. 551:24–552:5 (S. Phillips). Ms. Jordan testified that she was not aware of any open violation for Oklahoma growers in the IRW and could not say whether any grower had been penalized for substantive NMP violations. Tr. 706:6–17 (Jordan); 735:14–16 (Jordan). In Arkansas, "the level of compliance with nutrient management plans" is "high," with "the majority of . . . violations" being for inadequate "recordkeeping." Tr. 1000:15–20 (Fisk). State regulators regularly audit the plans to ensure they are accomplishing their goals. Tr. 994:8–18 (Fisk).

Properly designed and implemented plans are effective at both the field and watershed levels. Tr. 1177:15–1178:2 (McDonnell). State-approved NMPs are effective. Tr. 1177:15–19 (McDonnell). When soil phosphorus levels get too high, the plans limit litter application or forbid it entirely. *See, e.g.*, DJX2-0228 at 8. Periodic plan renewal serves an important compliance function by basing restrictions on current conditions. Tr. 1174:8–21 (McDonnell) (explaining that "conditions change through time," including "new BMPs"). State witnesses agreed that NMPs have resulted in "marked improvements" in water quality since trial, Tr. 11:8–13 (Fite), including "significant reduction[s]" in phosphorus in certain portions of the IRW, Tr. 467:2–12 (S. Phillips). In fact, the region is "one of the few localities in the United States that can say we improved water quality at a time when population increased threefold." Tr. 91:20–92:4 (Fite). The record shows that Oklahoma's and Arkansas's regulatory schemes—nascent at the time of trial—are now fully operational and successful.

**Statutory.** The governing statutory landscape has also materially changed since 2010. *First*, the Oklahoma legislature has reaffirmed its determination to control policy in this area. Not only has Oklahoma not acted to reduce or prohibit the use of poultry litter as a fertilizer, but it has taken affirmative action to maintain the same permitted limits this suit seeks to displace. At the time of the first trial, Oklahoma law permitted application of poultry litter on fields measuring up to STP 300 mg/kg. Intervening action by the USDA NRCS would have lowered that limit to 200 mg/kg. In May 2022, however, the Oklahoma legislature enacted legislation to restore the 300 mg/kg limit. 2022 Okla. Sess. Law Serv. Ch. 239 (H.B. 2983); *see* Tr. 433:22–434:22 (S. Phillips). The legislature thus confirmed Oklahoma's policy determination balancing any risks related to litter application against the benefits to growers, farmers, ranchers, and the public of using poultry litter up to that limit. Tr. 1175:3–24 (McDonnell).

*Second*, the Oklahoma legislature confirmed the legal relevance of NMPs. In 2024, the Oklahoma legislature enacted Senate Bill 1424, providing that "[l]and application of poultry litter in

9

compliance with a current Nutrient Management Plan shall not be the basis for criminal or civil liability in this state." Enr. S.B. 1424 at 15–16 (May 30, 2024). The Act also provided that "[c]ompliance with a Nutrient Management Plan … shall be deemed compliant with Best Management Practices." *Id.* at 5. Through this Act, which became effective on November 1, 2024, Oklahoma growers, applicators, and integrators cannot be held liable for claims based upon land application **unless** they are found to have violated an NMP.

Senate Bill 1424 specifically addressed legal liability for agricultural runoff, making clear that ODAFF—not applicators, integrators, or poultry growers—is solely responsible for runoff prevention. Although Oklahoma law previously provided that "[t]here shall be no discharge of poultry waste," it now provides that "when developing Nutrient Management Plans," Best Management Practice shall include "[m]easures designed to prevent the discharge of poultry waste to waters of the State." *Id.* at 6. Whereas the prior act "prohibited" discharge or runoff of litter from an application site, the amended Act clarifies that "[d]ischarge or runoff" is "evidence that the Nutrient Management Plan requires revisions." *Id.* at 7. Under the amended Act, if an ODAFF-approved plan is followed and runoff occurs, there can be no direct or vicarious liability for the discharge. Such a discharge would be evidence not of a violation of BMPs or an NMP, but "evidence that" the ODAFF-approved NMP "requires revisions." *Id.*

The public policy motivating these amendments is clear. The State trains writers to craft plans that prevent runoff; those experts craft field-specific plans to manage nutrients and mitigate risks on farms; and farmers are then directed to follow the plans to prevent runoff. When a farmer diligently follows the State's mandates but runoff nonetheless occurs, that farmer should not be subject to the risk of costly litigation or even criminal liability for having done so. Today, applicators, farmers, and integrators cannot be held liable for applying litter in accordance with an NMP. Those who flout their NMPs, on the other hand, are subject to enforcement, including substantial fines. This law establishes

10

the public policy of the State of Oklahoma, which the Court must take into account in determining liability based on current conduct and any claim for injunctive relief.

*Joint Study Committee.* Since the first trial, standards for measuring water quality in the IRW have also changed. In 2010, Oklahoma law provided that "[t]he thirty (30) day geometric mean total phosphorus concentration [in the IRW] shall not exceed 0.037 mg/L." FFCL at 15. These measurements were taken without meaningful regard for algal concentrations or flow conditions in the IRW. In 2013, Oklahoma and Arkansas formed a "blue ribbon" Joint Study Committee to "determine the TP threshold response level … at which any statistical shift occurs in algal species composition or algal biomass production resulting in undesirable aesthetic or water quality conditions in the Designated Scenic Rivers." OKLA_PX_0233 at 2–3. In other words, the States set out to discern the appropriate levels and conditions of aquatic phosphorous concentrations in light of their *actual*, real-world effects. The States "agree[d] to be bound by the findings of the Joint Study," and Oklahoma "agree[d] to promulgate" the TP threshold found by the study "if significantly different than the current 0.037 mg/L standard." OKLA_PX_0233 at 10.

The Committee published its findings and recommendations in 2016. *See generally* OKLA_PX_0233. It found that "a six-month average total phosphorus level of not to exceed 0.035 [mg/L] *based on water samples taken during the CRITICAL CONDITION* … was necessary to protect the aesthetic beneficial use and scenic river [] designations." OKLA_PX_0233 at 7 (emphasis added; capitalization in original). The Committee unanimously determined that the "critical condition" comprises "conditions where surface runoff is not the dominant influence of total flow and stream ecosystem processes." OKLA_PX_0233 at 4. In other words, "critical condition" means normal, not high water, flows. Tr. 771:7–22 (Connolly).

Consistent with these results, the States agreed Oklahoma would keep the 0.037 mg/L standard, but change how that standard is measured. Oklahoma pledged "to initiate rulemaking … to

11

implement the Joint Study Recommendations as they apply to the total phosphorus criterion." DJX2-0261 at 3 (Art. II (2)). Oklahoma modified its criterion to assess phosphorus concentrations, moving from a three-month *geometric* mean to a six-month *arithmetic* mean, in line with the Joint Study. *See* Okla. Admin. Code §§ 252:730-5-19(c)(3); 785:46-15-14(c). Oklahoma removed requirements to include samples of high flow that fall outside of the "critical condition" for scenic rivers. *Cf.* Okla. Admin. Code § 785:46-15-14(b) (2008), *with* Okla. Admin. Code § 785:46-15-14(c) (effective 2021). This recognizes that measurements taken under base flow conditions are most conducive to algal growth. Tr. 142:11–22 (Fite); Tr. 775:11–23 (Connolly). Accordingly, the 0.037 mg/L limit now represents a standard applicable during base flow conditions when point sources rather than non-point sources control phosphorus levels in streams, and is the point at which phosphorus levels risk supporting unacceptable high algal growth. Tr. 770:3–24 (Connolly).

## III.    Poultry Litter in the IRW

Poultry farming practices in the IRW have changed considerably since the first trial in ways that bear directly on this case.

*First*, growers today clean out poultry litter far less frequently than in 2010. While houses previously were cleaned out annually, today growers conduct full clean-outs far less frequently—typically every three to seven years—while some "keep the litter in the house[s] indefinitely." Tr. 1202:7–1203:2 (McDonnell); Tr. 1002:4–17 (Fisk). These changes were driven by bird-health and economic considerations. Tr. 1002:4–1003:13 (Fisk) (noting the "increase in 14-day mortality with fresh litter" compared to "built-up litter"); Tr. 1160:14–21 (McDonnell). Practices such as de-caking and wind-rowing extend the useful life of litter in the houses. Tr. 1160:14–21 (McDonnell); Tr. 1002:18–1003:13 (Fisk); Tr. 1004:10–1005:19 (Fisk); Tr. 401:19–402:19 (S. Phillips).

When litter is removed, it often goes to a "storage" or "stacking shed" until it is used or transported. Tr. 1004:16–1005:8 (Fisk). Through a "cost-sharing program" operated by USDA – NRCS,

which provided a "50 percent cost-share" for "the construction of" a stacking or storage shed, the "majority of growers" now have a storage facility, and "some companies will require that [a] stacking shed ... be built" at any "new facility." Tr. 1004:19–1005:8 (Fisk). These practices were not commonplace in 2009, when litter was more likely to be promptly applied. Tr. 1004:23–1005:25 (Fisk).

The composition of poultry litter has also changed, resulting in less phosphorus content. Today, Defendants incorporate additives such as phytase into poultry feed to allow birds to better absorb phosphorous naturally present in the feed. Tr. 1160:22–1161:21 (McDonnell). This eliminates the need to add phosphorous to the feed, Tr. 1211:6–25 (McDonnell) (explaining, in response to question from the Court, that phytase has "reduced the need to have that phosphorus added" to the feed), and allows the birds to incorporate phosphorus that would otherwise have passed through the birds. Tr. 1161:11–15 (McDonnell). Use of phytase results in a 15 to 25 percent reduction in the amount of phosphorus in broiler manure. Tr. 1161:16–18 (McDonnell). Use of phytase did not "start[] picking up" in the poultry industry until "around 2005," and has become widespread since then. Tr. 1210:10–22 (McDonnell); Tr. 1211:17–1212:5 (McDonnell) (explaining that "[y]ou add the enzyme, instead of the phosphorus … additive," "result[ing] in a net reduction"); Tr. 1229:25–1230:12 (McDonnell) (testifying that there have now been "four different versions" of phytase, that others are "constantly under development," and that the phytase used today is significantly more effective than the version initially developed in 2009-2010).

*Second*, these changes result in more agriculturally-useful litter. Tr. 1037:2–8 (Fisk). While litter accumulates and spends an extended amount of time in the growing houses, more carbon breaks down and more moisture evaporates. Tr. 401:19–402:19 (S. Phillips), 1042:18–1043:8 (Fisk), 1161:1–15 (McDonnell). This more nutrient-dense litter is more useful as a fertilizer and more cost-effective to ship longer distances. Tr. 1001:6–1002:2 (Fisk).

*Third*, as result, significantly more litter is exported out of the IRW now than at the time of trial, and the amount exported is substantially greater than the amount land applied in the IRW. *Id.*; DJX2-0040; Tr. 1036:1–20 (Fisk); 1048:9–19 (Fisk). Today, there exists a robust export market for poultry litter. *See generally* DJX2-0212–0215 (providing detailed statistics relating to litter exports). The OSU Extension advertises 19 different entities that provide litter export services. Tr. 1168:12–23 (McDonnell) (discussing Oklahoma Litter Market, Sellers and Service Providers (Summer 2022), https://extension.okstate.edu/programs/poultry-waste-management/media/oklahoma-litter-market-2022.pdf (last visited Jan. 17, 2025) (listing market participants)). While litter sold in 2010 for less than $20/ton, today it fetches up to $80/ton. Tr. 55:18–56:8 (Fite), 1037:14–24 (Fisk).

Changes in litter handling and storage practices have changed the economics of exporting litter, making it more "cost effective" to export litter long distance, including to states well outside the IRW for use on row crops. Tr. 1006:14–22 (Fisk). As noted, on-farm storage is now much more common, allowing farmers to store litter until it can be sold and transported, rather than having to apply it immediately. *See supra*. NMPs have constrained the amount of land available for litter application, requiring more litter to be "remove[d] … from the property." Tr. 1006:14–25 (Fisk). Urban development has similarly driven up the price of land, converting farms and pastureland to urban uses, and leaving less land on which litter can be applied. Tr. 1007:1–13 (Fisk); Tr. 1183:22–1184:2 (McDonnell) ("70 percent of the new land that was developed has been on pasture hay land"). While prior to 2010, poultry growing was most often part of a larger agricultural operation including cattle and forage crops, new poultry operations often include just enough property for the poultry house and export all the litter as another source of revenue. Tr. 1007:4–13 (Fisk). These changes have been facilitated by the development of litter broker and stockpiler operations, which store litter from different farms. Tr. 1007:14–19 (Fisk). Demand for litter to be used on row crops in Kansas and elsewhere has encouraged these businesses, which serve as a clearinghouse for buyers and allow for litter

to be stockpiled and sold when needed.  Tr. 1006:9–1008:14 (Fisk).  Uncoupling the timing of clean-outs from application makes poultry litter a yet more effective and economical fertilizer.

Growers today are exporting hundreds of thousands of tons of litter removed from their houses, including to states like Kansas, Missouri, Colorado, and Wisconsin.  Tr. 1033:9–1035:4 (Fisk).  In the four-year period from 2003–2006, only 8.8% of the litter generated in the IRW was exported out of the IRW.  FFCL at 96; DJX2-0269.  Today, by contrast, over 73% of litter removed from houses in the Oklahoma side of the IRW is exported out of the IRW; approximately 50% of the litter removed from houses in Arkansas is exported.  DJX2-0040; DJX2-0212, 0212-B, 0213, 0214, 0215.  This amounts to hundreds of thousands of tons of exported poultry litter.  *Id.*  In 2022, BMPs, Inc. alone exported 129,000 tons of poultry litter generated inside the IRW to locations outside the IRW.  *See* Tr. 114:7–13 (Fite).  The remaining litter is stored or land applied lawfully pursuant to State-approved plans.  Any application occurs, moreover, on land where Oklahoma and Arkansas permit litter to be applied.  There is no evidence as to where those parcels are or that anyone has violated any law on them.  Ordering the remaining litter out of the IRW thus would intrude on Oklahoma's balanced statutory and regulatory decisions.

Oklahoma and Arkansas data show a robust export market and decreased litter application.  In 2018, the most recent year for which Oklahoma published data, 34,590 tons of litter generated in the Oklahoma side of the IRW were exported outside the IRW, while only 12,774 tons were land applied within the Oklahoma side of the IRW.  DJX2-0040.  Arkansas's county-wide data for 2014–2023 provides an even clearer picture.  *See, e.g.*, DJX2-0050.  Data for Benton County (about "a third" of which is located in the IRW) and Washington County ("about half" of which is located in the IRW), Tr. 1025:9–14 (Fisk), show that the amount of litter removed from houses in those counties and applied there decreased to just over 4.6%, while the amount of litter transferred has increased to over 90%, DJX2-0348.  Over this ten-year period, 8.56% of litter generated was applied in the IRW, while

86.7% was transferred. *Id.* In 2023, the most recent year for which Arkansas has data, of the 236,805 tons of litter removed from houses, 11,085 tons were applied (4.68%), and 220,318 tons were transferred (93.04%). *Id.*

Arkansas also collects data showing export destinations for poultry litter. *See* DJX2-0212–0215. For 2018, a total of 106,447.18 tons of litter were shipped from Benton and Washington counties to locations outside the IRW—nearly 47% of the total litter removed from poultry houses—with 66,154.09 tons (nearly 30%) going to Kansas, Missouri, Colorado, and Wisconsin. DJX2-0212-B; Tr. 1035:17–1036:12 (Fisk). At the time of trial in 2009, exports were not traveling "that kind of distance" at the rate they are today. Tr. 1033:6–1035:4 (Fisk). The export records for 2019, 2020, and 2021 show that both the percentage of exports and the percentage of transferred litter out of the IRW are "going up." Tr. 1036:13–20 (Fisk); DJX2-0213 (showing that, in 2019, approximately 53% of litter transferred (125,285.87 total tons); *see* DJX2-0214; DJX2-0215. This "reflect[s] trends throughout the Illinois River watershed" and are expected to continue. Tr. 1037:19–24 (Fisk).

The unmistakable upshot is that, today, substantially more litter is exported from the IRW, much less litter is land applied in the IRW, and vastly less litter is land applied proximate to where it is generated as compared with the time of trial. Tr. 1169:23–1170:9 (McDonnell) ("Analyses previously developed that assumed that litter was applied in close proximity to where it was generated would need to be redone and new conclusions drawn.").

## IV.    Land Use and Urbanization

Over the past two decades, the IRW has also seen dramatic changes in land use and urbanization. According to Census Bureau data, the IRW's population increased 24% from 2010 to 2020. Tr. 909:1–7 (Vlassopoulos). Most of that population growth was concentrated in Bentonville, Rogers, Springdale, and Fayetteville, which saw a 40% increase in population from 2008–2021. Tr. 909:23–

910:19 (Vlassopoulos); Tr. 1180:3–8 (McDonnell). As human population increases, so does its accompanying impacts. Tr. 766:6–16 (Connolly).

Population growth has resulted in a concomitant increase in total loadings from wastewater treatment plants (WWTPs). Two WWTPs have come online since 2009, and the population served by WWTPs increased by 85% between 2008 and 2022. DJX2-0217-B at 2–3. WWTPs are a significant point source of phosphorus in the IRW. Improvements in wastewater treatment have decreased phosphorus *concentrations* in WWTP discharges, but total loadings have increased. Tr. 766:24–767:7 (Connolly). Indeed, outflow from WWTPs has increased so significantly as to raise the "base flow" level in the IRW. Tr. 78:6–12 (Fite); Tr. 799:13–23 (Connolly).

Population growth has driven significant land use changes. Approximately 13,000 acres of new development occurred between 2006 and 2021. Tr. 914:19–915:7 (Vlassopoulos). The rate of development also increased over this period, almost doubling from an average of 660 acres per year between 2006 and 2016 to 1,160 acres per year between 2016 and 2021. Tr. 915:20–916:16 (Vlassopoulos). This development has occurred "mostly on pasture hay land," converting land previously used for agriculture to residential or commercial uses, according to the classifications of the National Land Cover Database. Tr. 1180:18–1181:12, 1183:10–21 (McDonnell). Indeed, the evidence shows that, for the "entire headwaters," "70 percent of the new land that was developed since 2008 has been on pasture hay land." Tr. 1183:22–1184:2 (McDonnell). Aerial imaging analysis further shows that some of the areas that switched from agricultural to residential or commercial land uses were at sites of former poultry-growing operations. Tr. 919:3–13 (Vlassopoulos). These changes from agricultural to residential or commercial uses reflect the ongoing urbanization of the IRW.

Urbanization results in increased urban runoff into the rivers of the IRW. Tr. 766:10–16 (Connolly). Impervious surfaces such as paved roadways and buildings facilitate higher levels of untreated runoff into nearby waterbodies. Tr. 766:6–16; 767:15–20 (Connolly). Lighter rains that would

not cause meaningful runoff in a rural setting where rains infiltrate soil can cause runoff from impervious urban settings. Tr. 767:15–20, 833:2–10 (Connolly). Urbanization has resulted in significantly more urban runoff today than at the time of trial. Tr. 907:20–24 (Vlassopoulos). Urban runoff carries nutrients, hydrocarbons, and heavy metals, Tr. 1184:3–10 (McDonnell), and thus may contain significant phosphorus concentrations, Tr. 1186:10–19 (McDonnell). Commercial fertilizer used on golf courses, sports fields, and residential neighborhoods, as well as grass clippings and other vegetation in the storm flow, are all sources of the phosphorous contained in urban runoff. Tr. 853:7–14 (Connolly); Tr. 1186:10–19 (McDonnell). Plaintiffs failed to offer any evidence distinguishing among potential source of phosphorus, or to account for the significant differences today from the time of trial as to the potential for various sources to impact water quality.

## V.      Nutrient Fate & Transport

The parties agree that there are many different sources of phosphorous in the IRW. Both sides' witnesses agreed that nutrient impacts to waterways can be studied and modeled. Tr. 615:21–616:8 (Scott); Tr. 1188:5–15 (McDonnell). And all agreed that no such work has been done based on current conditions.

Nutrient transport from any specific field depends on factors unique to each "individual site." Tr. 617:2–6, 617:10–13, 641:15–642:24 (Scott). As Plaintiffs' witness Greg Scott explained, these include the topography of where phosphorous has been applied; soil type or composition; relative ability of the soil to absorb phosphorous due to factors such as texture, pH, saturation or porosity, and makeup of other nutrients; presence of other vegetation on the land, and agronomic practices in the area. Tr. 632:22–633:18, 635:6–19, 636:7–11, 636:12–643:23 (Scott). Plaintiffs undertook no study of the specific geologic processes of the IRW, no examination of phosphorus applied to any particular pasture in the IRW, no field analysis measuring groundwater flow direction, and no other attempt to

evaluate whether phosphorous in the soil or protected waters of the IRW relate to poultry litter . Tr. 614:14–616:15 (Scott).

Plaintiffs failed to perform any "site-specific analysis" of phosphorus in "the Illinois River watershed" or "with respect to any of these defendants." Tr. 645:5–11 (Scott); Tr. 21:14–19 (Fite) (admitting that he did "[n]ot specifically" engage in any "attempt to gather information as to poultry activities in the watershed"); Tr. 225:22–226:5 (Chambers) (testifying she was "offer[ing] no opinion on the source of the phosphorus in the Oklahoma waters" and "d[id] not trace any phosphorus in the Oklahoma waters to poultry litter from growers associated with any of the defendants in this case"); Tr. 324:22–325:8 (L. Phillips) (admitting that he did not "analyze whether any of the phosphorous in any of those rivers that [the parties] were talking about came from any of the fields that are owned or operated by growers who are affiliated with the defendants in this case," and that he did not "attribut[e] any phosphorous from any . . . particular source" of pollutants in the IRW); Tr. 437:5–12 (S. Phillips) (confirming that she had "not identified a single litter application site as a source of phosphorous in the waters of the IRW"). And the evidence likewise established that this analysis cannot be performed by looking at STP records. Tr. 643:18–645:4 (Scott).

The Court heard extensive evidence on these subjects in 2009-2010 and in its 2023 Findings and Conclusions credited some of that evidence. *See* FFCL at 106–64. The changes in the IRW discussed above fundamentally call into question the causation evidence the Court heard and credited previously, rendering it stale and unreliable today. Tr. 1170:4–18 (McDonnell) (discussing Plaintiffs' "lines of causation evidence," including "a mass balance plan, a grade analysis," and a "poultry house density analysis").

For example, the Court accorded "substantial weight" to upstream-downstream sampling "pertain[ing] to a discreet [sic] sampling location" at two specific periods in time coinciding with two separate storm events. FFCL at 157–58. These two fixed-time-stamp samples are not indicative of

conditions in the IRW today.  Tr. 48:20–22 (Fite) (testifying that storms in 2015, 2017, and 2022 changed the IRW from a physical standpoint); Tr. 62:3–9 (Fite) (testifying that "the river isn't what it was since post-trial" and  that "[i]t's changing").  For the same reasons, Dr. Caneday's observations of poultry runoff into the IRW—which this Court gave "substantial weight," FFCL at 158—can be given no weight today.  Dr. Caneday's testimony reflects a moment in time more than fifteen years ago.  The evidence at the December trial is to the contrary as both sides' witnesses testified unanimously that they had never seen poultry litter floating in the Illinois River.  *See, e.g.*, Tr. 63:4–10 (Fite); *see also* Tr. 764:4–6 (Connolly) (explaining his findings that "much has changed in the watershed in the last 15 years, changes that directly impact water quality conditions").

The poultry house density analyses conducted by Drs. Engel and Stevenson and previously credited by this Court, moreover, have been rendered unreliable.  FFCL at 136–37.  Both analyses rested on the assumption that litter was applied close to where it is generated.  That assumption is no longer valid.  Indeed, the poultry litter generation, application, and export data admitted at the December trial disproves it.  These analyses are not reliable bases for finding causation today.  Furthermore, the State introduced zero evidence regarding the current locations of any active poultry houses or poultry-litter-fertilized land and its proximity to Scenic Rivers.

Dr. Engel's mass-balance analysis suffers a similar fate as it rested on two assumptions: (1) that animals in the IRW, including poultry, are ingesting phosphorous-laden feed, and (2) that their litter is then being deposited into areas within IRW.  Both of these assumptions have been undercut.  Changes in poultry farming practices have reduced phosphorous inputs and outputs, and approximately 50% of the litter removed from houses in the Arkansas side of the IRW and over 70% of the litter from houses in the Oklahoma side of the IRW is exported outside the IRW.  Plaintiffs did not present any revised mass-balance analysis to account for these changed circumstances.  This prior evidence therefore cannot support a finding of causation today.

20

The Court also relied on Dr. Connolly's testimony in 2009 that some phosphorous from poultry litter must reach some waterways somewhere. FFCL at 81. In context, Dr. Connolly testified that such phosphorous had no demonstrable effect on water quality because: (i) the higher flow conditions that support non-point source runoff are not conducive to algal growth in the rivers; and (ii) higher flow non-point source phosphorus plunges to the hypolimnion of the lake and is not available for algal growth. *Id.* at 78–79. The Court did not previously credit Dr. Connolly's further explanation, finding instead that "nonpoint source phosphorus is a significant source of the phosphorus causing injury to the rivers and streams of the IRW and to Lake Tenkiller." *Id.* at 82.

Since 2010, additional scientific study has corroborated Dr. Connolly's analysis. Most significantly, the 2016 Joint Study's "blue ribbon commission" endorsed Dr. Connolly's emphasis on the significance of low flow conditions to water quality impacts. OKLA_PX_0233 at 2–3. Since the Study, the Oklahoma Water Resources Board ("OWRB") has defined the "critical condition" as occurring when base flow accounts for 55% or more of total flow, which Dr. Connolly adopted for his analysis. *See* Tr. 353:14–18 (L. Phillips); Tr. 770:7–14 (Connolly).[5] As Dr. Connolly explained, the Compact Commission's decision not to exclude certain OWRB high flow data that exceeded its 2,000 cfs cut-off renders the Commission's own calculations inaccurate. Tr. 882:22–884:15 (Connolly); OKLA_PX_0258 at 28 (2024 Arkansas-Oklahoma Arkansas River Compact Commission Environmental Committee Report). When the relevant flow conditions are properly accounted for, the data show that phosphorus levels correspond to the loadings from WWTP. Plaintiffs failed to establish a relationship between non-point pollution and water quality. And Plaintiffs offered no alternative causation evidence based on current conditions.

---

[5] Brian Haggard, a representative of Arkansas in the joint study committee, published research defining the critical condition as occurring when base flow is at least 80% of the total flow. Tr. 770:14–17 (Connolly).

## VI.    "Legacy Phosphorus"

Rather than addressing causation and injury based on current conditions, as directed, Plaintiffs instead referred to so-called "legacy phosphorous"—phosphorous from earlier activities that has built up in the soil.  Here too, however, the State's evidence was speculative and conclusory.

Plaintiffs offered the testimony of Greg Scott, but on direct inquired only into general principles of soil science.  Tr. 600:6–607:10 (Scott).  Only after the Court directed Plaintiffs to reopen Mr. Scott's direct examination did he discuss legacy phosphorous, but again only in general terms.  Tr. 624:19–628:8 (Scott).  Notably, Mr. Scott testified that he had undertaken no analysis as to the location of legacy phosphorous, its impact on water quality in the IRW, or its connection in any way to Defendants.[6]  Thus, although Mr. Scott testified that legacy phosphorous from soil may impact water quality under certain conditions, he cited no specific instances of such impact and did not connect any such impact to any Defendant in this case.  Without that analysis, the Plaintiffs have not met their burden on causation with respect to legacy phosphorus.

Although legacy phosphorus is related to soil, the evidence shows that soil test phosphorus levels do not present a complete picture concerning legacy phosphorus's possible entry into the water system.  Tr. 643:18–23 (Scott).  On the contrary, site-specific hydrology plays the dominant role in determining whether legacy phosphorus will dissolve into runoff.  Tr. 644:19-25 (Scott).  Indeed, Mr. Scott acknowledged that without hydrologic connectivity, phosphorous on a field will have no impact on waterways, and that, generally speaking, only a few locations in the IRW have such connectivity.  Tr. 639:12–640:10, 642:25–645:4 (Scott).  Mr. Scott and Dr. McDonnell agreed that a "very complex, multi-[variate] analysis … would be required to determine whether so-called legacy phosphorus

---

[6] Despite its rhetorical reliance on the concept of "legacy phosphorus," the State astonishingly failed to provide the Court with evidence of actual STP levels in IRW soils today associated with the Defendants, either collectively or individually.

moves from one place to another or reaches the stream." Tr. 1188:5–1189:2 (McDonnell); Tr. 633:5–18, 635:6–636:11, 645:5–11 (Scott). This analysis has not been done. Neither Mr. Scott, nor any other witness, conducted any analysis to establish that soil phosphorus from any poultry litter applications pre-dating the 2010 trial is the current cause of injury to the waters of the IRW.[7] Without such analysis, the Court cannot base causation, liability, or injury on the mere existence of legacy phosphorous.[8]

Moreover, the NMPs required by the current regulatory schemes of both Arkansas and Oklahoma are designed to prevent soil phosphorus from entering runoff. Not only do NMPs limit nutrient applications based on soil test phosphorous levels, they account for distance from fields to waterways, slope and topography of fields, groundwater vulnerability, frequency of flooding, soil saturation, and soil type. *See, e.g.* DJX2-0228 at 34–36 (example NMP Risk Analysis under Oklahoma Phosphorous Index and Oklahoma Phosphorous Assessment Worksheet). In short, NMPs are drafted to be "protective of the environment," and they consider all the factors that might affect the environment, including the current presence of phosphorus in the soil. Tr. 710:5–7 (Jordan). NMPs require best management practices on fields with *both* high and low soil test phosphorus levels, intending not just to keep soil test phosphorus levels below state-specified limits, but to control and ultimately reduce soil test phosphorus levels over time. *See* DJX2-0228 at 8 (example NMP list of required mitigating activities on fields with "low" P Assessment Rating); Tr. 990:14–19 (Fisk) (testifying that Arkansas

---

[7] This is a fatal failure of proof in Plaintiffs' case. The lack of any study of so-called legacy phosphorus dating back to 2010, combined with the undisputed evidence that numerous poultry operations were shut down and significant acreage that once received poultry litter applications has been subsumed into urban and suburban developments, and the lack of any evidence that any poultry grower contracted with any Defendant prior to the 2009-2010 trial has land-applied poultry litter in the IRW since, renders the 2009-2010 trial record stale and moot.

[8] The State's claims are limited to alleged injuries to waters, and then only to specific streams, rivers, and lakes that meet the legal standard of "waters of the State." The presence of phosphorus in privately owned lands is of no legal consequence absent a causal link (proven through reliable fate and transport evidence) between those soils and phosphorus levels present today in the waters of the State within the IRW.

plan writers address soil test phosphorus increases through "application rates or best management practices"); Tr. 1039:1–13 (Fisk) (testifying that best management practices set forth in NMPs "significantly reduce" and in some cases "prevent" runoff). Additionally, production agriculture such as growing hay can mine legacy phosphorous from the soil over time. Tr. 1055:1–3 (Fisk).

In addition, the increased urbanization in the IRW has changed how, where, and whether legacy phosphorus will enter runoff because construction activities expose phosphorus that would otherwise remain in the soil. Tr. 642:9–20 (Scott). This risk, too, is mitigated by the best management practices that builders must follow to prevent phosphorus from entering runoff. Tr. 1227:22–1228:2 (McDonnell).

In sum, Plaintiffs failed to provide any current evidence or analysis "trac[ing] phosphorus from any land application of poultry litter that may be associated with any poultry-grower associated with any of these defendants and trace the movement of that phosphorus through the waters -- or through the Illinois River watershed." Tr. 616:9–15 (Scott). Accordingly, Plaintiffs did not offer the studies, modeling, and other evidence required to conduct the complex fate and transport analysis needed to establish that phosphorous from current or historic land-application of poultry litter traceable to Defendants' contract growers is a substantial contributor to current phosphorous levels in the waters of the IRW.

## VII.   Water Quality

### A.   Phosphorus Concentrations and Loads In the Rivers and Streams of the IRW Have Changed Since Trial.

Nearly all witnesses testifying at the December trial agreed that water quality in the IRW has improved since 2009. The IRW is "one of the few localities in the United States that can say we improved water quality at a time when population increased threefold." Tr. 91:21–23 (Fite). In discussing this improvement, Mr. Fite gave "credit for the things that [Defendants'] company[ies] and others were doing in the nonpoint source arena." Tr. 92:3–4 (Fite). The streams surrounding Barron

Fork in the IRW have appeared on a list of "success stories" published in partnership with reports from the Oklahoma Water Resources Board and Oklahoma Conservation Commission. OKLA_PX_0248 at 32; Tr. 326:4–328:22 (L. Phillips).  And Lake Tenkiller, a very popular diving destination for locals and tourists, has an "excellent" water quality rating, and in fact has recently received acclaim as the "No. 11 most beautiful lake in the United States."  Tr. 187:18–22 (Knight); Tr. 236:22–24 (Chambers); Tr. 885:11–18 (Connolly); *see also* DJX2-0251 ("The sparkling blue waters of Tenkiller Lake offer water enthusiasts an abundance of recreational opportunities including water skiing, fishing, boating, tubing, and scuba diving…. The clear water and diversity of terrain attracts divers from not only Oklahoma, but the surrounding states and visitors from around the country.").

The testimony of these witnesses is corroborated by sampling data that likewise show that water quality in the IRW has improved substantially.  Oklahoma's Scenic River standard for total phosphorus concentrations is 0.037 mg/L, as measured by a six-month rolling arithmetic mean.  This standard applies only to those waterbodies in the IRW designated as Scenic Rivers.[9]  Four monitoring stations correspond to these Scenic Rivers: Flint Creek near Kansas; Baron Fork (or Barren Fork) near Eldon; Illinois River near Watts; and Illinois River near Tahlequah.  Data collected at these stations show that phosphorus concentrations have improved significantly since trial, trending downward from 1999 to 2023.  Tr. 247:4–248:22 (L. Phillips); OKLA_PX_0252 at 77–80.

Phosphorous levels overall, and total phosphorus, in particular, are "declining."  Tr. 824:11–19 (Connolly).  Six-month averages declined since trial at Flint Creek, Illinois River near Watts, and Illinois River near Tahlequah.  Tr. 802:20–804:7 (Connolly); DJX2-0217-C at 39, 41, 43.  These data show that the amount of total phosphorus measured corresponded with the discharge from the WWTPs upstream of those monitoring stations.  Baron Fork at Eldon did not show a significant

---

[9] There is no explicit Scenic River criterion for phosphorus loading.

change from 2010, but most of the six-month rolling averages were at or below 0.037 mg/L TP from 2005 to 2023. Tr. 802:3–13 (Connolly); DJX2-0217-C at 41. A comparison of volume of WWTP discharge and flow levels at Baron Fork showed that it was the only Scenic River monitoring station where WWTP discharge was not the dominant source of total flow in the river.

The amount of phosphorus in the IRW under base flow conditions, which are most conducive to algal growth, correlates with WWTP outflows, indicating that WWTPs—not agricultural runoff—are the dominant source of phosphorus during critical flow conditions. *See, e.g.,* DJX2-0217-C at 29 (figure showing annual average total phosphorous loads for WWTPs and in-river during low flow from 2007 to 2023). Improvements in phosphorus levels under these conditions since trial have corresponded to reductions in WWTPs outfall concentrations upstream. As Dr. Connolly testified, "lower flow conditions are flow conditions where we are getting little contribution from nonpoint[s], poultry litter or otherwise. And so I don't expect under these lower flows that what we're seeing here is a contribution from nonpoint sources." Tr. 790:22–791:1 (Connolly). Accordingly, nonpoint source phosphorus does not contribute materially to chlorophyll—or phytoplankton and periphyton levels—in the IRW and Lake Tenkiller. Tr. 829:19–21 (Connolly). Nonpoint source phosphorous is not having a material impact on algal growth. *Id.*

The evidence shows that the population served by WWTPs in the IRW increased substantially between 2010 and 2020. *See* DJX2-0221, Table 1; Tr. 908:9–909:7 (Vlassopoulos). Today, eleven WWTPs operating within the IRW boundary discharge point-source phosphorus into the waters. *See* DJX2-0221, Table 2; Tr. 911:8–913:22 (Vlassopoulos). The IRW's increasing population, which results in an increase in wastewater treatment, is the largest contributor of point-source phosphorus effluent in the IRW. Tr. 766:10–16 (Connolly). And despite overall improvements in water quality, urbanization has impacted the waters in the IRW by "increas[ing] impervious surfaces which affect rainfall runoff relationships and [result in] more runoff into the rivers." Tr. 767:15–20 (Connolly).

Mr. Phillips testified that Total Phosphorus data at all flow conditions showed a "highly significant" downward trend at all Scenic River monitoring stations except Barren Fork, which showed no trend.  Tr. 325:19–24, 333:19–23 (L. Phillips); OKLA_PX_0258 at 5.  Plaintiffs did not present any analysis of trends in phosphorus concentrations since the 2009-2010 trial, Tr. 363:15–21 (L. Phillips), but a comparison of the data points from approximately 2009 to 2024 demonstrated improvements in TP concentrations.  Tr. 336:12–14 (L. Phillips) (for Illinois River at Watts, recent data shows that the water quality is "getting nearer to" the Scenic River standard); Tr. 337:7–23 (L. Phillips) (for Illinois River at Tahlequah, the 2023 measurements "cluster right around" the Scenic River standard, while 2009 measurements clustered above the standard, at the trend line); Tr. 338:9–14 (L. Phillips) (for Flint Creek at Kansas, the most recent data points "clustered just above the" Scenic River standard and were "getting closer to it"); Tr. 339:15–17 (L. Phillips) (at Baron Fork, a significant numbers of the data points were around the Scenic River standard).  The most recent beneficial use assessment for aesthetics at Baron Fork was classified as "fully supporting," which means "not impaired."  Tr. 340:12–341:9 (L. Phillips).

Another State witness, Ms. Chambers, asserted that Scenic River phosphorus levels have trended upward.  Ms. Chambers testified that loads and concentrations from 2019-2023 trended upward, approaching or exceeding the Compact Commission's goal of a 40% reduction in phosphorus loads (excluding targeted high flow data) from the baseline established by data from 1980-1993.  Tr. 214:8–12 (Chambers).  In conducting her analysis, however, Ms. Chambers admitted she manually added high-flow data, which she conceded the Compact Commission does *not* include in its annually-reported loads and did not consider when setting the 40% reduction goal.  Tr. 216:23–217:20, 223:3–21 (Chambers).

In addition, Ms. Chambers conceded that the apparent increase in five-year rolling averages for total phosphorus loads and concentrations was skewed due to the inclusion of "extraordinarily

27

high flow" sampling events in one year—2019. Tr. 280:12–282:14 (Chambers). The irregular values in 2019 were due to errors in the underlying data: the datapoints used to estimate load and concentration "inexplicably included concentrations of phosphorus at flows [above 2000 cfs] that were normally excluded but not excluded in that year." Tr. 813:7–25 (Connolly). In other years, the State excluded "validated" measurements collected at higher flows by OWRB ambient monitoring and USGS storm flow targeting. *See* Tr. 893:9–18 (Connolly). Including these higher flows only in 2019 "unfairly adjust[s] the average." Tr. 813:21–814:6 (Connolly); *see also* Tr. 814:25–815:18 (Connolly). Ms. Chambers agreed that "there wasn't a trend up in the concentration of phosphorus for each calendar year from 2019 to 2023." Tr. 281:18-21 (Chambers). She further acknowledged that there was a "downward trend of total phosphorus for all four creeks in 2021" and that, in all, the data is "trending in the right direction and getting close to the .037." Tr. 251:3–252:9 (Chambers).

### B.    Phosphorus-Related Conditions in Lake Tenkiller Have Changed Since Trial.

Oklahoma assesses lake health using Carlson's Trophic State Index. Tr. 202:17–25 (Chambers). The Integrated Reports look at Lake Tenkiller in two segments: (1) the lower segment, which includes the main portion of the Lake and recreation areas; and (2) the upper segment, which includes the transitional zone where the highest phosphorus and algae concentrations are observed. Tr. 236:11–18 (Chambers). According to the 2022 Report, certain beneficial uses of the lake are impaired for phosphorus and chlorophyll-a. Tr. 205:2–206:3 (Chambers). But the Compact Commission's most recent Tropic State Index rating for the main portion of Lake Tenkiller was 51—down from 56—just one point from being reclassified as mesotrophic. Ms. Chambers agreed that this drop from 56 to 51 is a "meaningful improvement." Tr. 237:7–238:9 (Chambers). Surface Total Phosphorus on Lake Tenkiller was "pretty low." Tr. 238:22–239:2 (Chambers). Notably, the State classified the water clarity of Lake Tenkiller as "excellent" in its most recent Compact Commission report.

Tr. 236:9–237:1 (Chambers).  Whether these positive trends have continued is unknown, as the State failed to provide its completed 2024 Integrated Report.  Tr. 228:5–230:1, 231:4–17 (Chambers).

Additionally, Dr. Connolly testified that phosphorus from non-point sources likely contribute very little, if at all, to any algal growth in Lake Tenkiller.  He also testified that other scientists and experts in the field have reached the same conclusion with respect to algal concentration in the lake, which went uncontroverted by the State, and that he and these same scientists and experts would classify the lake as mesotrophic.  Tr. 838:1–840:15 (Connolly).  Dr. Connolly also testified that the dissolved oxygen issues with Lake Tenkiller do not come from non-point source phosphorus.  Because chlorophyll levels are so low in the water column, the dissolved oxygen does not come from algae being consumed by bacteria, which use oxygen, but instead comes from leaf litter and bacterial consumption of other particulates entering the lake during high-flow events.  The low chlorophyll concentrations show that the issue does not stem from phosphorus, but rather from runoff during high-flow events.  Tr. 817:8–818:8 (Connolly).

## ARGUMENT

As this Court has noted, FFCL at 208, a court should issue an injunction "only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable."  *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982).  "For a party to obtain a permanent injunction, it must prove (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."  *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 822 (10th Cir. 2007) (citations omitted).

The evidence Plaintiffs adduced at the December trial failed to meet their burden to prove that current conditions in the IRW support the merits of their claims against Defendants or demonstrate the existence of any irreparable harm if an injunction is not issued.[10]

## I.    The Record Remains Stale for Purposes of Prospective Relief, Rendering Requested Relief Moot.

Plaintiffs bear the burdens of proof and persuasion as to every aspect of their case, including on liability and on the specific remedy they seek.  This includes the burden to "show that … conditions [in the IRW] have not materially changed," Nov. 26, 2024 Hr'g Tr. at 37:12–14.  Without such a showing, the prior record in this case is stale and cannot be relied on by Plaintiffs to meet their burden to "show that [injunctive relief] is still necessary," Sept. 13, 2024 Hr'g Tr. at 7:16–19, that pollution is "still occurring," *id.* at 9:17–18, or entitlement to "the specific types of injunctive relief that [the Plaintiffs seek] to be imposed," *id.* at 7:19–21.  Plaintiffs have not met their burden to show that "conditions [in the IRW] have not materially changed," Nov. 26, 2024 Hr'g Tr. at 37:12–14.  Indeed, the evidence presented established that circumstances in the IRW have changed significantly and materially.  The 2009-2010 trial record, reflecting evidence gathered years earlier, is thus stale and not a reliable foundation for further proceedings.

Based on the non-stale evidence before this Court, Plaintiffs' requests for prospective relief are moot.  "The sole function of an action for injunction is to forestall future violations." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952).  So "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief," *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).  A court thus may grant injunctive relief only when the record shows "a real threat of a

---

[10] The remaining two elements involve specific remedies and were not addressed at the December trial.  *See, e.g.*, Doc. 3094 at 4, n.2 ("[R]emedies are not at issue during the December 3 hearing.").  Plaintiffs of course must establish those elements—the cost/benefit balance of the Plaintiffs' as-yet unspecified remedy and the adverse effect of that remedy on the public interest—before any injunction could issue.  *See, e.g.*, *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765 (7th Cir. 2011) (affirming district court decision denying injunctive relief that would have been both ineffective and costly).

future violation or a contemporary violation of a nature likely to continue or recur." *Or. State Med. Soc'y*, 343 U.S. at 333; *Davis v. Colerain Twp.*, 51 F.4th 164, 171 (6th Cir. 2022) (Murphy, J.) ("A previously harmed plaintiff may not seek a forward-looking remedy . . . without evidence that the harmful conduct will reoccur."). This requirement is baked into the test for injunctive relief, which requires a finding of irreparable harm unless the injunction is issued. *Weinberger*, 456 U.S. at 312; *see also Sierra Club v. U.S. Dep't. of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) ("[T]he irreparable harm considered by the court must be caused by the conduct in dispute[.]"); *cf. Donahue v. Kan. Bd. of Educ.*, 827 F. App'x 846, 850 (10th Cir. 2020) ("[P]ast harm cannot establish irreparable harm.").

Plaintiffs have failed to establish *present* unlawful or harmful conduct by showing Defendants are either *presently* causing an *ongoing* harm or are substantially likely to cause some *future* harm to Plaintiffs' vested interests. Without such evidence, Plaintiffs cannot establish entitlement to injunctive relief, and their claimed injury is not "likely to be redressed by the requested relief." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Accordingly, their claims for injunctive relief must be dismissed as moot and, with it, their case.

To the extent Plaintiffs seek an injunction to remedy a past harm allegedly caused by Defendants, this Court lacks jurisdiction to do so. It is well established that an injunction "is designed to prevent harm, not redress harm, and is not compensatory." 43A C.J.S. *Injunctions* § 2. And "[b]ecause injunctive relief 'is drafted in light of what the court believes will be the future course of events, ... a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.'" *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality opinion) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2961, at 393–394 (2d ed. 1995)); *see United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932) (Cardozo, J.) ("[A] court does not abdicate its power to revoke or modify" its injunction if it "has been turned through changing circumstances into an instrument of wrong."). Because Plaintiffs have failed to

establish a causal connection between any unlawful conduct by Defendants and an ongoing or future harm to their interests, they no longer have standing to seek such remedies, and their requests for such relief should be dismissed as moot.

## II.    Nothing in the Updated Record Excuses Plaintiffs' Severe Laches.

### A.    Plaintiffs Cannot Be Awarded Equitable Relief After They Sat on Their Rights for Over Thirteen Years.

Plaintiffs' requests for equitable relief are separately barred by their laches in prosecuting this action.  An injunction is an "extraordinary remedy"—it is not one "which issues as of course."  *Weinberger*, 456 U.S. at 311.  Accordingly, it is incumbent on the plaintiff, at all stages of the proceeding, to "pursue[] their claims diligently."  *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).  "It has been frequently held that the mere institution of a suit does not, of itself, relieve a person from the charge of laches, and that if he fail[s] in the diligent prosecution of the action the consequences are the same as though no action had been begun."  *Johnston v. Standard Min. Co.*, 148 U.S. 360, 370 (1893); *see also Gardner v. Incorporated City of McAlester*, 179 P.2d 894, 898 (Okla. 1946).

*Gardner* is highly instructive.  There, the Supreme Court of Oklahoma found that, because "the city was the moving party[, it] had the burden of going forward with its case.  Since it permitted the case to lie dormant for some 14 years after it was filed . . . , [the city was held to have] the burden of excusing the delay."  *Gardner*, 179 P.2d at 551.  So too here.  It has now been fifteen years since the original trial.  During most of that time, Plaintiffs sat idly by and allowed the record to go stale.  "It was the duty of the complainants to speed the cause with diligence, and [because they failed to] do that, they must suffer the just penalty of their negligence."  *Duncan v. Finch*, 10 Ill. (5 Gilman) 296, 297 (1848); *accord In re Eastern Cherokees*, 220 U.S. 83, 88–89 (1911) (refusing to issue extraordinary remedy due to "the laches of petitioners" in delaying seeking their remedy for almost three years without justification).  Plaintiffs have offered no justification for their breach of this duty, and nothing at the

December trial excused or remedied their past conduct. Accordingly, Plaintiffs "must suffer the just penalty of their negligence"—their requests for injunctive relief should be dismissed.

> **B.** **Plaintiffs Cannot Be Awarded Any Relief for Harm That Could Have Been Mitigated by Reasonable Actions Within Their Control.**

Plaintiffs' laches without question bars relief for any harm which arose after the institution of this suit. As the Oklahoma Supreme Court has held, "even where the delay in prosecuting is not sufficient to constitute a bar, [t]he court may consider it in determining what relief shall be granted." *Gardner*, 179 P.2d at 898 (quoting 30 C.J.S. *Equity* § 115, at 530).

The State alleges the waters of the IRW have been harmed due to the use of poultry litter as fertilizer. However, at no time before the 2009-2010 trial or during the fifteen years following trial has the State taken any action to limit or prohibit the use of poultry litter as fertilizer. As explained, not only has the State not limited or prohibited the use of litter, but it also has taken affirmative action to legislate maintenance of the *same permitted levels of litter application as existed during 2009*, which this suit seeks to pretermit. If the State believed the use of poultry litter is detrimental to water quality in the IRW, it could have easily revised its laws, rules, and regulations to restrict or prohibit it. The State is not entitled to court-ordered relief from alleged harm it could have mitigated or eliminated by actions within its sole control.

Plaintiffs seek to hold Defendants liable for conduct "from the date of each recorded violation to the present." FFCL at 199; *id.* at 201 n.49 ("The State seeks to hold all defendants except Peterson and Cal-Maine liable based on their past and present conduct. It seeks to hold Peterson and Cal-Maine, who have exited the IRW, liable for past conduct only."). But on this record, holding Defendants liable for such conduct would be manifestly inequitable and contrary to settled law. Plaintiffs admitted during the 2009-2010 trial that they lacked evidence of any recorded violations that caused harm to the waters of the IRW. Likewise, Plaintiffs failed to introduce evidence of any recorded violations after the close of the 2009-2010 trial. Because Plaintiffs failed to produce any evidence of even a

single recorded violation post-dating trial, Defendants cannot be held to have committed any regulatory violations or torts on any unsupported assumption that their past acts exhibited a tendency to commit similar acts in the future.

### III. The Court's Previous Conclusions On Direct and Vicarious Liability Are Inconsistent With Intervening Statutory Changes and Case Law From the Oklahoma Supreme Court.

After the 2009-2010 trial, this Court concluded that the Defendants were "directly and vicariously liable" on several claims because they "have structured and conducted their business in the Oklahoma portion of the IRW in a manner that causes pollution of the waters of the IRW." FFCL at 201. On vicarious liability, the Court found that Defendants maintained control "over virtually all essential aspects of poultry production, including the activities of their contract growers." FFCL at 89. The Court followed the reasoning of the vacated opinion in *City of Tulsa*, applying not Oklahoma law, but the Second Restatement of Torts, Section 427B, in holding that Defendants were vicariously liable for the actions of their growers because "they were aware that in the ordinary course of doing the contract work, a trespass or nuisance was likely to result." FFCL at 182–83. Both of those conclusions can no longer stand in light of intervening case law and statutory changes.

As an initial matter, Plaintiffs failed to offer any evidence as to Defendants' corporate structures and relationships today. Nor did Plaintiffs present any current evidence that Defendants knew or should have known that their operations "cause[] pollution of the waters of the IRW." FFCL at 201. Indeed, with the statutory changes made in Senate Bill 1424—most notably, amending the law to provide that growers, applicators, and integrators cannot be held directly or vicariously liable for the land application of poultry litter unless they are found to have violated an NMP—Plaintiffs cannot make that showing. Enr. S.B. 1424 at 15–16. Lacking proof of such current conditions, the Court cannot enter judgment based on allegations of "control" from more than 15 years ago.

34

Moreover, and in any event, Oklahoma law has developed in a direction inconsistent with the Court's prior conclusion. *See Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 543 (1941) ("Intervening and conflicting decisions [of a state's highest court] cause the reversal of judgments [of federal courts sitting in diversity] which were correct when entered."). Since trial, the Oklahoma Supreme Court has ruled that, to be liable for nuisance, a party must "control the instrumentality … alleged to constitute the nuisance *at the time the nuisance occurred*." *See State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 724, 728–29 (Okla. 2021) (emphasis added). Thus, Plaintiffs must prove that Defendants controlled poultry litter at the time it allegedly became a nuisance. *Id.* at 724, 731. The State failed to make this showing either in the past or under current conditions. Therefore, neither the 2009-2010 trial record nor the evidence presented at the December trial support a finding of liability under *Hunter*, as Defendants did not control the poultry litter at the time any land application or runoff occurred.

This lack of direct and vicarious liability is fatal to all of Plaintiffs' remaining claims. FFCL at 4 (listing claims set out in Final Pretrial Order). Oklahoma Statute Title 27A, § 2-6-105, is a "public nuisance" law and is—as the State has acknowledged, *see* Doc. 2873—substantively identical to Oklahoma Statute Title 2, § 2-18-1, so this rule squarely applies to both statutory claims. And it applies with equal force to the State's claim of federal common law nuisance, which the Court held is "substantively similar" to its state law counterpart. FFCL at 194 (citing *Nuveen Prem. Income Mun. Fund 4, Inc. v. Morgan Keegan & Co.*, 200 F. Supp. 2d 1313, 1316 n.2 (W.D. Okla. 2002)); *see also* Doc. 2873 at

35

299–300 (State arguing the same).[11]  Lastly, this rule applies to the State's trespass claim, to which the Court applied the same intentionality standard as nuisance.[12]

## IV.    The Updated Record Does Not Support a Conclusion that Defendants' Conduct Proximately Caused Plaintiffs' Injury.

Plaintiffs have also failed to substantiate causation based on current circumstances in the IRW. "Under Oklahoma law, . . . causation includes the traditional components of 'cause in fact' and 'legal causation.'"  *Okland Oil Co. v. Knight*, 92 F. App'x 589, 598 (10th Cir. 2003) (quoting *McKellips v. St. Francis Hosp., Inc.*, 741 P.2d 467, 470 (Okla. 1987)).  Here, Plaintiffs have failed to show that Defendants' conduct is the proximate cause of pollution in the IRW.

As this Court previously concluded, Plaintiffs' alleged injury is an "indivisible injury."  FFCL at 184.  In an indivisible-injury case involving multiple concurrent tortfeasors, including tortfeasors not party to the proceeding, a plaintiff must show "that *each defendant's act* was a contributing factor in producing the plaintiff's injuries."  *Johnson v. Ford Motor Co.*, 45 P.3d 86, 91 (Okla. 2002) (emphasis added).  This means that (1) Plaintiffs bore the burden to prove with "fate and transport" evidence that pollutants "from poultry litter actually *reached the waters* of the IRW,"  *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 778 (10th Cir. 2009) (emphasis added)—not just fifteen years ago, but to-day—and (2) Plaintiffs must show that no other event or third-party action constituted a "supervening

---

[11] As the Court previously concluded, Plaintiffs' federal common law nuisance claim is the only claim remaining that could support relief as to activities occurring in Arkansas.  *See* FFCL at 196.  And that claim is invalid because (i) it is displaced by the Clean Water Act, *see Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1259 (10th Cir. 2022), and (ii) Plaintiffs have presented no evidence regarding which Defendants still raise birds in the Arkansas portion of the IRW or where any litter has been applied in Arkansas.  There is no defendant-specific evidence in the December trial record concerning any Defendant's activity in Arkansas.

[12] The Court's January 2023 FFCL mistakenly analyzed the intentionality requirement for trespass under Restatement (Second) of Torts § 825, *see* FFCL at 197, a Section that applies only to nuisance claims.  *Compare* Restatement (Second) of Torts Division 10 (entitled "Invasions of Interest in Land Other than by Trespass," and including Sections 821A–840E on Nuisance), *with* Restatement (Second) of Torts §§ 157–164 (Trespass to Land).  Even applying the Section 825 standard to Plaintiffs' trespass claim, however, Plaintiffs failed to make out a prima facie case based on current conditions.

cause." *State ex rel. Okla. Dep't of Pub. Safety v. Gurich*, 238 P.3d 1, 4 (Okla. 2010); *see Long v. Ponca City Hosp., Inc.*, 593 P.2d 1081, 1087 (Okla. 1979) ("[Intervening cause] is not an affirmative defense. It is a denial of one of the essential elements of a cause of action in tort, i.e., that the injury was proximately caused by the defendant's negligence…. The plaintiff had the burden of proving proximate cause.").

### A.     Plaintiffs Failed to Show that Each Defendant's Conduct Is a Cause-in-Fact of Pollution in the IRW.

Plaintiffs have not carried their burden of showing that each Defendant's conduct is a cause-in-fact of pollution in the IRW. Though Plaintiffs' witnesses discussed potential sources of phosphorus in the IRW, they did not attribute phosphorus concentrations to any particular source or demonstrate that phosphorus currently in the waters of the IRW originated from growers affiliated with the Defendants in this case. Tr. 324:22–325:15 (L. Phillips). Nor did they trace phosphorus from poultry litter applied on any field to any water body in the IRW—either generally or for growers associated with Defendants. Tr. 616:3–15 (Scott). And they failed to quantify how much, if any, of the poultry population, poultry litter produced, or poultry litter purportedly applied within the IRW originated from growers affiliated with the Defendants in *this* case. Tr. 568:13–24 (S. Phillips). In short, Plaintiffs' evidence is insufficient to establish that the Defendants were the but-for cause of any current pollution in the IRW.

Moreover, even assuming Plaintiffs had made a prima facie showing on causation, Defendants' countervailing evidence affirmatively demonstrates that it was more likely than not that their conduct *did not* factually cause current phosphorus loading to exceed target levels in the IRW. No witness observed poultry litter entering or floating in the Illinois River or other Scenic Rivers. *See, e.g.*, Tr. 63:4–10 (Fite). WWTP discharges, not non-point sources, dominate phosphorus concentrations relevant to algal growth and the Scenic Rivers water quality standard. Tr. 786:8–13 (Connolly). And unlike in 2009-2010, poultry litter has now been subject for decades to robust regulatory programs that were specifically intended by Arkansas and Oklahoma to mitigate any impact to public waters. Okla. Stat.

tit. 2, §§ 10–9.1(B)(14); 10–9.3; 10–9.7; Ark. Admin. R. 138.00.05-001 (ANRC Rules, tit. XIX); Ark. Admin. R. 138.00.05-004 (ANRC Rules, tit. XXII).  Based on all the evidence before the Court, it cannot be concluded today that poultry litter is the cause of any remaining water quality issues in the IRW.

### B.    The Updated Record Shows that There Are Supervening Causes Between Each Defendant's Conduct and Pollution of the IRW.

Even if the Court were to assume that the Plaintiffs had carried their burden with respect to cause-in-fact, the evidence shows that there were supervening causes between Defendants' conduct and Plaintiffs' injury.  "A supervening cause is a new, independent and efficient cause of the injury which was neither anticipated nor reasonably foreseeable.  In other words, if the negligence complained of merely affords an opportunity that makes the injury possible and a subsequent independent act causes that injury, the opportunity is not the proximate cause of the injury."  *Akin v. Mo. Pac. R.R. Co.*, 977 P.2d 1040, 1054–55 (Okla. 1998).

The Court concluded previously that it was reasonably foreseeable that Defendants' conduct would result in pollution of the IRW because "defendants knew their growers, in the ordinary course of their work for defendants, spread poultry litter on the land in the IRW, and knew or should have known no later than the late 1990s that their growers' land application of litter was a primary source of the excess phosphorus in the waters of the IRW."  FFCL at 183.  Not only did Plaintiffs fail to offer any evidence suggesting that Defendants have any such current actual or constructive knowledge, but the evidence that was introduced at the December trial shows that the basis on which the Court relied for its original finding no longer exists.

*First*, December trial evidence shows that any litter associated with growers contracting with Defendants is applied in the IRW pursuant to an NMP.  Both States require all poultry feeding operations to register with the state and procure and comply with a site-specific nutrient management plan. Okla. Stat. tit. 2, §§ 10-9.1(B)(14), 10-9.3, 10-9.7; Tr. 998:4–8 (Fisk).  NMPs are designed specifically

to prevent nutrient runoff.  Witnesses from both Arkansas and Oklahoma concurred that compliance with NMPs is "high," with "the majority of . . . violations" being for inadequate "recordkeeping."  Tr. 1000:15–19 (Fisk); *accord* Tr. 551:6–23 (S. Phillips).  If land applying poultry litter in accordance with NMPs written by state-controlled plan writers "caused" pollution in the IRW, then the *proximate* cause of that pollution would be negligent plan writing, not applying the litter in accordance with the plan. It would be manifestly unjust to hold that Defendants proximately caused Plaintiffs' claimed injury because Defendants' contractors followed the States' instructions on land application of poultry litter to the letter.  *Cf.* Okla. Stat. tit. 2, § 10-9.11(I) (expressing as a matter of Oklahoma public policy that "[l]and application of poultry litter in compliance with a current Nutrient Management Plan shall not be the basis for criminal or civil liability in this state").

*Second*, even if one or more growers was in fact out of compliance with an NMP, the December trial evidence shows that it is not reasonably foreseeable to Defendants that such a violation will occur in the ordinary course of business.  For one thing, Plaintiffs introduced no evidence that any such violation ever occurred, *see, e.g.,* Tr. 551:24–552:5 (S. Phillips) (unaware of "any instance when a poultry grower or a certified litter applicator or any other individual or entity has land applied poultry litter in the Illinois River Watershed in violation of a nutrient management plan or an animal waste management plan approved by either Oklahoma or Arkansas"), and as discussed above, such violations are rare as a general matter.  Moreover, as many courts around the country have recently held, a third party's violation of public law is ordinarily considered a superseding or supervening cause in the absence of some special relationship between the defendant and the third party—a mere contractual relationship is insufficient.  *See Hunter*, 499 P.3d at 729–31 (collecting cases and endorsing their holdings as a matter of Oklahoma law).

Finally, Defendants introduced uncontradicted evidence that 80% to 90% of all poultry litter generated in the IRW is sold rather than spread at the farm where it is generated, with approximately

39

50% of the litter removed from houses in Arkansas being moved outside the IRW annually, and over 73% of the litter removed from houses in Oklahoma being moved outside the IRW each year.  Tr. 1022:10–1023:23, 1036:11–17 (Fisk); DJX2-0040; DJX2-0212, 0212-B, 0213, 0214, 0215.  This dramatic increase in export activity reinforces the legal conclusion that it is not reasonably foreseeable that Defendants' conduct would cause Plaintiffs' injury—indeed, it is not even reasonably foreseeable that poultry litter will be land applied by Defendants' contractors at all.  *See Hunter*, 499 P.3d at 730–31.  The Court therefore should conclude that Defendants did not proximately cause Plaintiffs' alleged injury.

## V.    The Improvements in the IRW Belie Plaintiffs' Claim of Irreparable Injury.

The evidence introduced at the December trial also undercuts Plaintiffs' claim that the current conditions in the IRW represent an irreparable injury.  As noted, to justify an injunction, Plaintiffs bear the burden of proving irreparable injury.  *See Prairie Band Potawatomi Nation,* 476 F.3d at 822.  But regardless of whether Plaintiffs characterize their "injury" as the actual phosphorus levels of the waters of the IRW or as the land application of poultry litter that Plaintiffs claim contribute to those levels, Plaintiffs cannot meet that burden.  As detailed, the evidence at the December hearing overwhelmingly demonstrated both (1) that the conditions of the waters of the IRW and Lake Tenkiller have improved substantially in the last 10 years, both generally and with respect to phosphorus load, and (2) that changes in the regulations and practices surrounding the land application of poultry litter have substantially reduced the potential for phosphorous from poultry litter to run off a field, let alone reach the waters of the IRW and cause injury.

The most recent evidence thus shows that, far from being irreparable, the conditions of which Plaintiffs complain are actually *improving* significantly without any injunctive relief from this Court. Indeed, because Plaintiffs have not to date disclosed any details about what the injunction they request would actually look like, they offer the Court no basis to conclude that any injuries they claim would

be irreparable without the injunction. Plaintiffs have failed to establish that the current conditions in the IRW constitute an injury that is irreparable without an injunction, and in fact the evidence shows just the opposite. Plaintiffs have not established a current irreparable injury, they are not entitled to an injunction, and their claims for injunctive relief should be dismissed. *See, e.g., Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("A showing of irreparable injury is 'the sine qua non of injunctive relief.'") (citation omitted); *N.M. Dep't of Game & Fish v. United States Dep't of Interior*, 854 F.3d 1236, 1245 (10th Cir. 2017) (reversing grant of preliminary injunction where government "failed to establish that it will suffer irreparable harm absent an injunction").

## VI.    Plaintiffs Claims Must Be Dismissed as Prudentially Moot.

Claims for injunctive relief "appeal to the 'remedial discretion' of" this Court, inherent in which is the "power to deny relief altogether." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012) (Gorsuch, J). Where a party fails to show that "relief is needed," or where "the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits," the proper course is "not decision but dismissal" under the doctrine of prudential mootness. *Id.*; *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953).

Circumstances in the IRW have changed considerably and materially, leaving the prior record severely undermined and unable to provide a basis for liability or injunctive relief. Defendants' business operations have changed considerably. Statutory and regulatory changes, meanwhile, including the comprehensive coverage of NMPs in Arkansas and Oklahoma and related amendments to the Oklahoma law, have dramatically changed the governing law and regulatory regimes. Poultry litter handling practices in the IRW have advanced significantly, with growers cleaning out their houses far less frequently, increased efficacy of phytase in poultry feed reducing the amount of phosphorus in litter by 15–25 percent, and litter brokers, storage facilities, and grower practices combining to create a robust litter export market that ships more than half of the litter generated in the IRW to locations

41

outside the IRW. And dramatic population growth and land use changes have led to increased urban runoff and greater point-source phosphorus contributions from WWTPs. Water quality has improved, too, with the evidence showing that the IRW is one of the few places in the United States where water quality has improved at the same time its population tripled.

In sum, the evidence shows that circumstances in the IRW have changed considerably in the fifteen years since the 2009-2010 trial. These changes undermine the prior record such that it can no longer serve as a basis for finding Defendants liable or for granting Plaintiffs injunctive relief. So too, the record evidence presented by the parties at the December trial showing changed circumstances establishes that any decision by the Court finding liability or granting an injunction can no longer be justified on the existing record. Plaintiffs failed to present any current evidence tracing phosphorus associated today or in the past with any Defendant to any injury to the waters of the IRW. The data from both States show that more than 70% of litter on the Oklahoma side and approximately 50% of the litter on the Arkansas side is exported outside the IRW. Even more, growers in both States now have nutrient management plans that are drafted by state-approved experts and—critically—responsive to changed circumstances on *each specific farm*. If updated testing or changes to a field or farm show that poultry litter should no longer be land applied at that site, or that all of a farm's poultry litter should be exported, the regulatory regimes in Oklahoma and Arkansas give both states the power to take the necessary action. These changed circumstances, core principles of federalism, and respect for the legislative judgments of both Oklahoma and Arkansas should guide the Court's exercise of its remedial discretion. *Winzler*, 681 F.3d at 1210. Viewing the record as a whole, Plaintiffs have not carried their burden to prove liability or provide a sufficient basis for injunctive relief, and the Court should dismiss.

## CONCLUSION

For the foregoing reasons, this Court should hold that Plaintiffs have failed to carry their evidentiary burden as to any of their claims to prove that circumstances have not so changed as to warrant entry of judgment and imposition of any form of relief, including injunctive relief, and this case should be dismissed.

January 30, 2025                                    Respectfully submitted,


/s/ *Gordon D. Todd*                               /s/ *A. Scott McDaniel*
Mark D. Hopson                                     A. Scott McDaniel, OBA #16460
Frank R. Volpe                                     McDaniel Acord, PLLC
Gordon D. Todd                                     9343 East 95th Court
Benjamin M. Mundel                                 Tulsa, OK  74133
  (*pro hac vice* filed)                 (918) 382-9200
Cody L. Reaves
  (*pro hac vice* filed)                  *Attorney for Tyson Foods, Inc., Tyson Poultry, Inc.,*
David H. Kinnaird                                  *Tyson Chicken, Inc., Cobb-Vantress, Inc., and Peter-*
  (*pro hac vice* forthcoming)            *son Farms, Inc.*
Sidley Austin LLP
1501 K Street, NW
Washington, D.C.  20005
(202) 736-8000
(202) 736-8711 (facsimile)
mhopson@sidley.com
fvolpe@sidley.com
gtodd@sidley.com
bmundel@sidley.com
cody.reaves@sidley.com
dkinnaird@sidley.com

*Attorneys for Tyson Foods, Inc.,*
*Tyson Poultry, Inc., Tyson Chicken, Inc., and Cobb-*
*Vantress, Inc.*

/s/ *Robert George*
Robert George, OBA #18562
George's, Inc.
402 W. Robinson Ave.
Springdale, AR  73764
(479) 927-7249

K.C. Dupps Tucker (admitted *pro hac vice*)
Kristy E. Boehler (admitted *pro hac vice*)
The Law Group of Northwest
   Arkansas PLLC
1830 Shelby Lane
Fayetteville, AR 72704
(479) 316-3760

Perry L. Glantz (admitted *pro hac vice*)
Stinson LLP
1144 15th Street, Suite 2400
Denver, CO 80202
(303) 376-8410

Clinton Russell, OBA # 19209
Taylor, Foster, Mallett, Downs,
   Ramsey & Russell
400 West Fourth Street
Claremore, OK 74018
(918) 343-4100
crussell@soonerlaw.com

*Attorneys for George's, Inc. and George's Farms, Inc.*

/s/ *John R. Elrod*
John R. Elrod (admitted *pro hac vice*)
Vicki Bronson, OBA 20574
Conner & Winters, P.C.
4375 N. Vantage Drive, Suite 405
Fayetteville, AR  72703
(479) 582-5711
(479) 358-1518 (facsimile)
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Simmons Foods, Inc.*
/s/ *Robert P. Redemann*
Robert P. Redemann, OBA #7454
William D. Perrine, OBA #11955
Perrine, Redemann, Berry,
   Taylor & Frette, PLLC
1800 S. Baltimore Ave., Suite 900
Tulsa, OK 74119
(918) 382-1400
(918) 382-1499 (facsimile)
rredemann@pmrlaw.net
wperrine@pmrlaw.net

Robert E. Sanders, MSB#6446
   (admitted *pro hac vice*)
Young Wells Williams P.A.
P.O. Box 6005

Ridgeland, MS   39158-6005
(601) 948-6100
(601) 355-6136 (facsimile)
rsanders@youngwells.com

*Attorneys for Cal-Maine Foods*

/s/ *John H. Tucker*
John H. Tucker, OBA 9110
Theresa N. Hill, OBA 19119
Colin H. Tucker
Rhodes Hieronymus Jones
   Tucker & Gable
Two W. 2nd Street, Suite 1000
P.O. Box 21100
Tulsa, OK  74121-1100
(918) 582-1173
(918) 592-3390 (facsimile)
jtucker@rhodesokla.com
thill@rhodesokla.com
chtucker@rhodesokla.com

Jacob D. Bylund, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Main: (515) 248-9000
jacob.bylund@faegredrinker.com

Bruce Jones, admitted *pro hac vice*
Aaron D. Van Oort, admitted *pro hac vice*
Christopher H. Dolan, admitted *pro hac vice*
Jeffrey P. Justman, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Well Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Main:  (612) 766-7000
bruce.jones@faegredrinker.com
aaron.vanoort.jones@faegredrinker.com
chris.dolan@faegredrinker.com
jeff.justman@faegredrinker.com

*Attorneys for Cargill, Inc. and Cargill Turkey Production, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 30, 2025, I caused this document to be filed with the Clerk of Court

through CM/ECF, which will serve copies on all registered counsel.


_/s/ Gordon D. Todd_____
Gordon D. Todd