# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STATE OF OKLAHOMA *et al.*, | | |
| *Plaintiffs,* | | No.   **4:05-cv-329-GKF-SH** |
| **v.** | | |
| TYSON FOODS, INC., *et al.*, | | |
| *Defendants.* | | |

## THE STATE OF OKLAHOMA'S BRIEF IN SUPPORT OF ITS PROPOSED FINAL JUDGMENT

GENTNER DRUMMOND, OBA #16645
  *Attorney General*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
JENNIFER L. LEWIS, OBA #32819
  *Deputy Attorney General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct:  (405) 521-3921
gentner.drummond@oag.ok.gov

M. David Riggs, OBA, #7583
Kristopher E. Koepsel, OBA #19147
Riggs, Abney, Neal, Turpen, Orbison & Lewis
502 West 6th Street
Tulsa, OK 74119
(918) 587-3161


*Counsel for Plaintiffs*

Robert A. Nance, OBA #6581
W.A. Drew Edmondson, OBA #2628
Riggs, Abney, Neal, Turpen, Orbison &
Lewis
528 N.W. 12th Street
Oklahoma City, OK 73103
(405) 843-9909

Louis W. Bullock, OBA #1305
Bullock Law Firm PLLC
110 W. 7th Street
Tulsa, OK 74119
(918) 584-2001

Frederick C. Baker, admitted *pro hac vice*
Cynthia Solomon, admitted *pro hac vice*
Kristin Hermiz, admitted *pro hac vice*
Madeline Becker, admitted *pro hac vice*
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9186

## <u>TABLE OF CONTENTS</u>

I.    **Background** ............................................................................................................... 1

II.   **Argument** ................................................................................................................. 5

    A. **Grounds exist for entry of a permanent injunction** ....................................... 5

        **1. The permanent injunction should prohibit application of poultry litter generated by the Defendants' birds to lands in the IRW that have an agronomically sufficient level for phosphorus (i.e., 65 lbs/acre STP)** ......................9

        **2. This Court should appoint a remedial special master under Rule 53 to oversee the remediation and to conduct monitoring and enforcement of the injunction** ...............................................................................................11

        **3. The Court should assess penalties against the Defendants** ......................................15

        **4. The Court should award attorneys fees and costs pursuant to a separate order and judgment** ..................................................................................17

III.  **Conclusion** ............................................................................................................. 18

# TABLE OF AUTHORITIES

## Cases

*Amoco Prod. Co. v. Village of Gambell, AK,*
  480 U.S. 531 (1987).............................................................................................7, 11

*Budinich v. Becton Dickinson and Co.,*
  486 U.S. 196 (1998)................................................................................... 17

*Center for Legal Advocacy v. Bicha,*
  2018 WL 6620776 (D. Colo. Dec. 18, 2018)....................................... 13

*Conservancy v. Lexington Coal Co., LLC,*
  2023 U.S. Dist. LEXIS 206426 (S.D.W.Va. Nov. 17, 2023) .................................. 15

*Fisher v. Okla. Health Care Auth.,*
  335 F.3d 1175 (10th Cir. 2003) ............................................................... 6

*Hatten-Gonzales v. Scrase,*
  2022 WL 655910 (D.N.M. Mar. 4, 2022) ................................................. 13

*Idaho Conservation League v. Atlanta Gold Corp.,*
  879 F. Supp. 2d 1148 (D. Idaho 2012)................................................. 7, 8

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,*
  263 F. Supp. 2d 796 (D.N.J. 2003) ........................................................ 14

*La Buy v. Howes Leather Co.,*
  352 U.S. 249 (1957)................................................................................ 13

*N.L.R.B. v. Monfort, Inc.,*
  29 F.3d 525 (10th Cir. 1994).................................................................. 14

*Nation v. San Juan Cty,*
  2017 U.S. Dist. LEXIS 211320 ............................................................... 14

*Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co.,*
  LLC, 2015 U.S. Dist. LEXIS 139507 (S.D.W.Va. Oct. 14, 2015)....................................14–15

*Prairie Band Potawatomi Nation v. Wagnon,*
  476 F.3d 818 (10th Cir. 2007).................................................................. 6

*Utah Women's Clinic, Inc. v. Leavitt,*
  75 F.3d 564 (10th Cir. 1995)................................................................... 17

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982)................................................................................11

*Yost v. Stout,*
  607 F.3d 1239 (10th Cir. 2010)............................................................... 17

## Statutes

2 Okla. Stat. § 2-18.1 ................................................................... 1, 3, 6, 18

2 Okla. Stat. §§ 10-9.1 *et seq* ........................................................................................ 9

2 Okla. Stat §§10-9.16 *et seq.* ........................................................................................ 9

27A Okla. Stat. § 2-3-504 ............................................................................... 15, 16, 17

27A Okla. Stat. § 2-6-102 ...................................................................................... 8

27A Okla. Stat. § 2-6-105 ............................................................... 1, 3, 5, 6, 8, 15, 18

**<u>Rules</u>**

Fed. R. Civ. P. 53(a)(1)(C) ................................................................................ 12, 13

Fed. R. Civ. P. 53(b)(2) ............................................................................................ 13

Fed. R. Civ. P. 53(f) .................................................................................................. 13

Fed. R. Civ. P. 58(d) ................................................................................................. 5

Fed. R. Civ. P. 58(e) ................................................................................................. 17

**<u>Other Authorities</u>**

2003 Advisory Committee's Note to Fed. R. Civ. P. 53(a)(1) ............................... 12–13

2003 Advisory Committee's Note to Rule 53(b) ....................................................... 13

2003 Advisory Committee's Note to Rule 53(c) ........................................................ 13

Poultry Feeding Operations, Oklahoma State Senate Legislative Brief (June 1998)
    https://oksenate.gov/sites/default/files/2019-12/Poultry%20Feeding%20Operations.pdf ......... 9

As directed by this Court's June 18, 2025 Order, Doc. 3162, the State of Oklahoma ("the State") submits this brief in support of its Proposed Final Judgment attached as Exhibit 1. The current Oklahoma Attorney General Gentner Drummond inherited this case when he was sworn into office on January 9, 2023, just nine days before the entry of the January 18, 2023, Findings of Fact and Conclusions of Law. Attorney General Drummond is a fifth-generation agricultural producer who greatly values the poultry industry and its economic contributions to the State. Nonetheless, all Oklahomans benefit from clean water and value the State's natural resources, including those of the treasured Illinois River Watershed. It is Attorney General Drummond's firm belief that Oklahoma can and should have a strong poultry industry and clean water. The Attorney General believes the Proposed Final Judgment preserves the vibrant poultry industry while protecting the treasured Illinois River Watershed.

## I.    Background

In its January 18, 2023 Findings of Fact and Conclusions of Law, this Court found "in favor of the State and against the Defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, for violation of 27A Okla. Stat. § 2-6-105, and for violation of 2 Okla. Stat. § 2-18.1." Doc. 2979 at 213. As grounds for its finding, this Court found, *inter alia*: the waters of the Illinois River Watershed ("IRW") have elevated phosphorus levels;[1] the principal contributor of these elevated phosphorus levels in the waters of the IRW is run-off from poultry

---

[1] *See* Doc. 2979, FOF 130 ("The court finds that phosphorus concentrations in streams and rivers of the IRW in Oklahoma are elevated beyond natural or background levels …"); FOF 168 ("Based upon the foregoing factual findings, the court finds that the rivers and streams of the IRW have elevated phosphorus concentration levels above natural or background levels."); FOF 239 ("The court finds that Lake Tenkiller has become eutrophic, and this eutrophication is caused by phosphorus concentrations in the reservoir.").

waste;[2] and banked phosphorus in the soils of the IRW due to land application of poultry waste is a source of this phosphorus run-off.[3] This Court further found and concluded that the Defendants knew their growers, in the ordinary course of their work for the Defendants, spread poultry litter on the land in the IRW, and knew or should have known no later than the late 1990s that their growers' land application of poultry waste was a primary source of the excess phosphorus in the waters of the IRW. Doc. 2979, COL 11. Once on notice, the Defendants had a duty to abate the nuisance and put a stop to the trespass, neither of which they have done. Doc. 2979, COL 11, 43, 49, 60-61, 73. Therefore, the Defendants are liable for any trespass or nuisance created by themselves and their growers. Doc. 2979, COL 11, 43-44, 49-51 (liability of the Defendants under

---

[2] *See* Doc. 2979, FOF 288 ("The court finds that nonpoint source phosphorus is a significant source of the phosphorus causing injury to the rivers and streams of the IRW and to Lake Tenkiller."); FOF 539 ("The evidence that phosphorus from land-applied poultry waste can and does run off into the waters of the IRW is convincing. As set forth below, the evidence is convincing that poultry waste is a significant source of the phosphorus causing injuries to the rivers and streams of the IRW and to Lake Tenkiller."); FOF 585 ("[I]t is clear that poultry waste is a major contributor to the levels of phosphorus in the waters of the IRW."); FOF 586 "([P]oultry waste is the principal contributor of the phosphorus causing injuries to the waters of the IRW.").

[3] *See* Doc. 2979, FOF 81 ("[T]he agronomic critical level for phosphorus in the IRW is 65 lbs./acre STP, and the land application of poultry litter in the IRW in excess of this agronomic critical level is not protective of the environment and likely results in continued phosphorus pollution."); FOF 73 (finding that at an STP of 65 lbs./acre, there is 100 percent sufficiency for the growth of grass.); FOF 77 ("[A]t land application rates in excess of agronomic need, there is no crop benefit."); FOF 362 ("Land application of poultry waste has caused the soil in many areas of the IRW to have STP levels in excess of any agronomic need for phosphorus."); FOF 531 ("Phosphorus runoff calculations made in various coefficient-based studies of land applied poultry waste in the IRW are consistent in finding that approximately five percent of the phosphorus in land-applied litter in the IRW is expected to run off in a typical year."); FOF 535 ("[T]he court accords substantial weight to the evidence that some fraction of phosphorus from land applied poultry waste runs off to the waters of the IRW."); COL 49 ("And the overwhelming evidence establishes that phosphorus from land-applied poultry waste runs off the fields in environmentally significant quantities, causing injury to the waters of the IRW."); COL 61 ("[P]oultry waste continues to be applied to the phosphorus-saturated fields in the Oklahoma portion of the IRW, where an environmentally significant portion of the phosphorus contained in the waste runs off the fields and enters the waters of the IRW.").

statutory public nuisance, federal common law public nuisance, and trespass); *id.* at COL 11, 60-63 (liability for injunctive relief against the Defendants under 27A Okla. Stat. § 2-6-105); *id.* at COL 11, 66-73 (finding liability for injunctive relief against the Defendants under 2 Okla. Stat. § 2-18.1). The Court further concluded "that the actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief." Doc. 2979, COL 93.

On June 17, 2025, following a six-day evidentiary hearing in December 2024, this Court entered its Opinion and Order. Doc. 3161. Therein, the Court "fully incorporate[d]" the January 18, 2023 Findings of Fact and Conclusions of Law. *Id.* at 2. Further, the Court found: that conditions have not materially changed since trial and the rivers and streams of the IRW and Lake Tenkiller continue to be impaired by phosphorus;[4] that the Defendants, except Defendants Peterson and Cal-Maine, have continued operations in the IRW and have continued generating significant quantities of phosphorus-rich poultry waste throughout the IRW;[5] that legacy phosphorus in the

---

[4] *See* Doc. 3161, FOF 11 ("[T]he court finds that the conditions of the IRW have not materially changed since trial, and the elevated phosphorus concentration levels have resulted in significant increases in algal biomass in the IRW's rivers and streams, which has impacted the aesthetics of the IRW's rivers and streams."); FOF 13 ("[T]he court finds that conditions have not materially changed since trial and that phosphorus concentrations in the Illinois River, Flint Creek, and Barren Fork Creek continue to exceed the total phosphorus criterion applicable to scenic rivers and the aesthetics beneficial use is impaired for total phosphorus in violation of Oklahoma water quality standards."); FOF 15 ("Lake Tenkiller continues to be eutrophic."); FOF 20 ("[E]levated phosphorus levels continue to cause injury to Lake Tenkiller, as well as the biota therein."); COL 64 ("Because the phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus which is causing actual and ongoing injury to the waters of the IRW, the conditions in the IRW have not materially changed since trial.").

[5] *See* Doc. 3161, FOF 22-23 (listing the number of poultry feeding operations, number of poultry houses, and capacity of birds affiliated with Defendants Tyson, Simmons, Cobb-Vantress, Cargill, and George's in the Oklahoma portion of the IRW); FOF 23, n. 6 (explaining that the Court had previously concluded that Defendants Peterson and Cal-Maine had ceased poultry operations in the IRW); FOF 32 ("[S]ince trial in this matter, each of the defendants—with the exception of defendants Peterson and Cal-Maine—has generated significant quantities of phosphorus-rich poultry waste in the IRW.").

soil from past application of poultry litter continues to affect the water quality in the rivers and streams of the IRW;[6] that "significant amounts of poultry waste generated by defendants' birds have been, and continue to be, land-applied in the IRW, in close proximity to the growers' farms;"[7] that "phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus causing injuries to the waters of the IRW;"[8] and that "the continuing actual and ongoing injury to the waters of the IRW constitutes irreparable harm."[9]  This Court accordingly concluded "circumstances have not 'changed since the beginning of litigation that forestall any occasion for meaningful relief.'"  Doc. 3161, COL 67 (citation omitted).  This Court further concluded that "[i]n light of the ongoing injuries, remedial measures in this case 'will have some effect in the real world.'"  *Id.* at COL 65 (citations omitted).

In its January 18, 2023 Findings of Fact and Conclusions of Law, the Court noted the injunctive relief being sought by the State against the Defendants:

> • prohibiting defendants from allowing poultry waste generated by birds they own, lease or control to be land-applied in the IRW on fields having an STP in excess of 65 lbs/acre based on a Mehlich III six inch sample;
>
> • requiring that land application in the IRW be conducted in accordance with the 65 lbs/acre limit, as well as an Animal Waste Management plan or Nutrient Management Plan;

---

[6] *See* Doc. 3161, FOF 40 ("[T]he court finds that 'legacy phosphorus' resulting from past application of poultry litter continues to affect the water quality of the rivers and streams of the IRW.").

[7] *See* Doc. 3161, FOF 46.

[8] *See* Doc. 3161, Doc. 60.

[9] *See* Doc. 3161, Doc. 63; *see also* Doc. 2979, COL 93 (Court's corresponding conclusion in January 18, 2023 Findings of Fact and Conclusions of Law stating, "actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief.").

• requiring defendants to remove from the IRW and appropriately manage, at defendants' expense, all poultry waste generated by birds they own, lease or control that cannot be land-applied in the IRW under this standard;

• prohibiting defendants from land-applying poultry waste removed from the IRW on any field having an STP in excess of 65 lbs/acre in watersheds located in whole or in part in Oklahoma that are designated nutrient surplus areas, nutrient limited watersheds or nutrient vulnerable groundwater areas;

• requiring remediation of the IRW, at defendants' expense, the exact nature of which would be determined following an investigation of remedial alternatives, also to be funded by defendants; and

• reporting, monitoring and auditing of defendants' performance of their obligations under the injunction sought from the court, as well as water quality monitoring to assess the impact of relief ordered in this case.

Doc. 2979, COL 85.  The Court also noted that the State was seeking the imposition of civil penalties for the Defendants' respective violations of 27A Okla. Stat. 2-6-105(A).  *Id.* at COL 64.

## II.    Argument

Rule 58(d) allows a party to request an order from the Court directing the entry of judgment.  Fed. R. Civ. P. 58(d).  Having determined that the State "satisfied its burden to show that conditions have not materially changed in the Illinois River Watershed following trial," Doc. 3161 at 22, this Court should direct the entry of a final judgment affording the State equitable relief and statutory penalties as set forth in Exhibit 1 to this filing and described below.

### A.    Grounds exist for entry of a permanent injunction

In broad terms, the State seeks entry of a permanent injunction that: (1) requires the cessation of land application of poultry litter generated by the Defendants' birds on fields with soil test phosphorus levels above 65 lbs/acre; and (2) appoints a special master to oversee a three-phase remediation plan that permanently and comprehensively abates the harms implicated by the Defendants' historic and ongoing conduct.  To demonstrate entitlement to this permanent injunction, the State must show: "(1) actual success on the merits; (2) irreparable harm unless the

injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *See Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (citing *Fisher v. Okla. Health Care Auth.,* 335 F.3d 1175 (10th Cir. 2003)). Here, the State has carried its burden, both in the record created at the 2009-2010 trial and in the record created at the December 2024 evidentiary hearing, to show that a permanent injunction must be entered to abate the ongoing nuisance and trespass caused by the Defendants' conduct. *See, e.g.,* Doc. 2979, COL No. 93 (concluding that "the actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief,"); Doc. 3161, COL 61-63 (affirming that "the basis for injunctive relief in the federal courts has always been irreparable injury," and that "the continuing actual and ongoing injury to the waters of the IRW constitutes irreparable harm.").

First, this Court has found, as a matter of law, that the State has actually succeeded on the merits of its claims of statutory public nuisance, federal common law nuisance, trespass, and for violations of 27A Okla. Stat. § 2-6-105 and 2 Okla Stat. § 2-18.1. *See* Doc. 2979 at 213. This Court further found that the State succeeded in demonstrating that conditions have not materially changed in the IRW following trial, and that therefore the State's claims are not constitutionally or prudentially moot. *See* Doc. 3161 at 22, COL 65 & 67.

Second, this Court has affirmed that the State has carried its burden to show that the irreparable harm suffered by the waters of the IRW will continue but for this Court's entry of a permanent injunction. *See* Doc. 3161, COL 63 (concluding that "the continuing actual and ongoing injury to the waters of the IRW constitutes irreparable harm"); Doc. 2979, COL 93 (concluding that "the actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief"). Without a court-ordered injunction, the Defendants have no incentive

to ameliorate the ongoing harms posed by permitting poultry waste application to fields within the IRW that are already saturated with phosphorus, and, furthermore, the State has no meaningful equitable order through which to enforce the Defendants' compliance with remediation efforts.

Third, the threatened injury here outweighs any purported harm that the injunctive relief may cause the Defendants. *See Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 545 (1987) ("If [environmental] injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1161-62 (D. Idaho 2012) ("Harm to environment outweighs a defendant's financial interests, particularly where violations are of a longstanding and continual nature."). The Court has reaffirmed that ongoing phosphorus pollution constitutes an "actual and ongoing injury to the waters of the [IRW.]" *See* Doc. 3161, FOF 20, COL 63, 64, 67. As explained by soil scientist and geomorphologist Gregory Scott, these ongoing injuries will continue to accumulate and affect the water quality in the rivers and streams of the IRW until phosphorus is no longer land-applied beyond the agronomic need – and even then, legacy phosphorus will continue to "leak out of the soil into water until equilibrium is achieved in the soil." *Id.* at FOF 34-40. The evidence makes clear that the threatened injury, which is already irreparable, will continue to accumulate but for equitable relief. On the other hand, the Defendants will not be greatly harmed by an injunction. At bottom, an injunctive order here would merely require the Defendants to assume responsibility for the waste generated by their birds and business model. Nearly every industry is considered responsible for the appropriate handling and disposal of its waste, and the Defendants' poultry businesses should be treated no differently. Resources contributed by the Defendants to the cessation of land application on fields with STP greater than 65 lbs./acre and to the remediation of the waters of the IRW would not only ensure the

environmental safety and longevity of the Defendants' business model at a reasonable cost, but would also still pale in comparison to the gravity of the ongoing and irreparable injury.

Lastly, the injunctive relief, if issued, will not adversely affect the public interest; rather, injunctive relief here would preserve and protect public interest, where "Oklahoma law continues to protect the State's waters as a 'valuable resource' and prohibits degradation of water quality." Doc. 3161, FOF 2; Doc. 2979, FOF 18 (setting forth the State's public policy regarding water pollution); FOF 24 (noting designations of IRW stream segments as "Scenic Rivers" constituting "outstanding resource waters").  Indeed, an order enjoining the Defendants' ongoing pollution would preserve the designated statutory beneficial uses of the waters of the IRW and Lake Tenkiller, which include their aesthetics, their fish and wildlife habitats, and their use as a public and private water supply.  *See* Doc. 3161, FOF 7, 13, 19.   Ameliorating the condition of state-protected waterways and water bodies would certainly protect public interest where the State has "declared [it] to be the public policy of this state to conserve the waters of the state and to protect, maintain and improve the quality thereof for public water supplies, for the propagation of wildlife, fish and aquatic life and for domestic, agricultural, industrial, recreational, and other legitimate beneficial uses."  27A Okla. Stat. § 2-6-102; *see* 27A Okla. Stat. § 2-6-105(A) (embodying this policy by deeming it illegal "to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of . . . waters of the state,"); *see also Idaho Conservation League*, 879 F. Supp. 2d at 1162 ("Keeping [] waters sufficiently clear of toxic elements so that they can support all the beneficial uses for which the State has designated them is a critical public interest that profoundly outweighs a company's bottom line.").

Additionally, an order enjoining the application of poultry waste to phosphorus-saturated fields upholds the public interest behind the creation of the poultry feeding operation ("PFO") and

poultry waste applicator ("PWA") regulatory scheme.  First, the Oklahoma Registered Poultry Feeding Operations Act, 2 Okla. Stat. §§ 10-9.1 *et seq*., makes clear that one of its purposes is to create "[m]easures designed to ensure that poultry waste handling, treatment, management, and removal shall: a. not create an environmental or a public health hazard, [and] b. not result in the contamination of waters of the state." *Id.* §§ 10-9.7(B)(4)(a) & (b); Doc. 2979 at FOF No. 20. Second, the Oklahoma Poultry Waste Applicators Certification Act, 2 Okla. Stat §§ 10-9.16 *et seq*., reflects the same goals by limiting the freedom to apply poultry waste where it may pose a threat to the environment. *Id.* at § 10-9.19 (requiring poultry waste applicators to inform each application by soil and poultry waste test values).  Lastly, the Act's original proposal as SB 1170 in 1998 derived from "the threat of phosphorus overloading in one of the state's largest watersheds, and the lack of regulated poultry waste management procedures," and sought to impose greater oversight on the industry in response to "heightened [public concern] by incidents such as contamination of drinking water, fish kills and nuisance odors," attributable to poultry growing operations.  Poultry Feeding Operations, Oklahoma State Senate Legislative Brief (June 1998).[10] Accordingly, all four factors indicate the need for such equitable relief, and this Court should enter a permanent injunction against the Defendants.

> **1.    The permanent injunction should prohibit application of poultry litter generated by the Defendants' birds to lands in the IRW that have an agronomically sufficient level for phosphorus (i.e., 65 lbs/acre STP)**

Having affirmed the State's entitlement to injunctive relief, this Court should enter a permanent injunction against the Defendants enjoining the application of poultry waste from the Defendants' birds to fields in the IRW that have an agronomically sufficient level of phosphorus

---

[10] Available at https://oksenate.gov/sites/default/files/2019-12/Poultry%20Feeding%20Operations.pdf.

in their soils.  This Court has found by a preponderance of the evidence that "the agronomic critical level for phosphorus in the IRW is 65 lbs/acre STP, and the land application of poultry litter in the IRW in excess of this agronomic critical level is not protective of the environment and likely results in continued phosphorus pollution."  Doc. 2979, FOF No. 81; *see also id.* at FOF 73 ("[A]t an STP of 65 lbs/acre, there is a 100 percent sufficiency [of the phosphorus requirement for growth of these grasses]."); *id.* at FOF 74 ("Science based fertilizer recommendations used by Oklahoma State University, based on decades of field and laboratory research, show a STP value of 65 is adequate for production of most crops."); *id.* at FOF 77 ("Significantly, however, there would be no noticeable difference in crop response between a field-average soil test of 120 lbs/acre and a field-average soil test of 65 lbs/acre.  Put another way, at land application rates in excess of agronomic need for phosphorus, there is no crop benefit.") (internal citations omitted).

The State has maintained throughout these proceedings that it seeks an injunction restricting poultry litter application to fields with an STP value lower than 65 lbs/acre.  *See, e.g.,* Doc. 2979, COL 85 (describing the injunction sought by the state, including "requiring that land application in the IRW be conducted in accordance with the 65 lbs/acre limit," and "prohibiting defendants from allowing poultry waste generated by birds they own, lease or control to be land-applied in the IRW on fields having an STP in excess of 65 lbs/acre.").  Notably, in its June 17 Opinion and Order, the Court confirmed that "[t]here have been no material changes in the standards since trial – the agronomic critical level for phosphorus remains 65 lbs/acre STP[.]" Doc. 3161, FOF 33 n.10.

The State's evidence makes clear that the ongoing injury to the waters of the IRW will not cease until land application in excess of the agronomic rate for phosphorus ceases.  *See, e.g.,* Doc. 3161, FOF 34-40, 48-49, 52-53, 60, COL 67; Doc. 2979, FOF 81, 362, 531, 535, COL 49, 61.

Accordingly, since "the intervention of a court of equity is essential in order effectually to protect [these] rights against injuries otherwise irremediable," and the injury itself cannot be remediated without the cessation of poultry litter application on fields with phosphorus saturation, this Court should issue an order enjoining the application of poultry litter to phosphorus-saturated fields in the IRW consistent with Section 4 of the Proposed Final Judgment. *See* Ex. 1; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *see also Amoco Prod. Co.,* 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by monetary damages and is often permanent or at least of long duration, i.e., irreparable.").

> **2.      This Court should appoint a remedial special master under Rule 53 to oversee the remediation and to conduct monitoring and enforcement of the injunction**

The State seeks appointment of a remedial special master under Rule 53 to oversee the remediation and to conduct monitoring and enforcement of the injunction. As set forth in the Proposed Final Judgment, the remediation would be conducted in a phased approach that would include a remedial investigation and planning component, an implementation component, and a monitoring component. Ex. 1, Section 2. Among the remedial options to be investigated and evaluated are (1) buffer strips, (2) increased treatment of drinking water, (3) excavation, (3) alum application to fields, (2) crop and nutrient management with nitrogen supplementation, (4) bank stabilization, (5) constructed wetlands, (6) alum application to Lake Tenkiller, (7) sediment removal from Lake Tenkiller, (8) layered aeration of Lake Tenkiller, and (9) exportation of Poultry Waste outside the Watershed for application to phosphorus-deficient soil. Ex. 1, Section 2(d) (citing to Doc. 2979, FOF 594-595). All costs and expenses associated with the remediation – including costs and expenses for the remedial investigation, evaluation, planning, implementation,

and monitoring – would be paid for by the Defendants, and these payment obligations would be joint and several.  Ex. 1, Section 2(h) & (i).

Under the Proposed Final Judgment, the special master would also be tasked with ensuring compliance with the injunction through, *inter alia*, retaining technical experts, preparing nutrient management plans, conducting inspections, collecting and analyzing records and data, and making reports.  Ex. 1, Section 3.  All costs and expenses associated with the remediation and associated compliance activities, the special master, and the performance of the special master's delegated duties set forth in the Proposed Final Judgment would be paid for by the Defendants through payments into an evergreen fund lasting not less than 30 years.[11]  *Id.* at Section 3(m) & (n).

This Court has the authority to appoint a special master to perform the tasks set out in the Proposed Final Judgment.  Specifically, under Rule 53(a) a special master may be appointed to, among other things, "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."  Fed. R. Civ. P. 53(a)(1)(C).  The Rules drafting committee explicitly recognizes that "[c]ourts have come to rely on [post-trial] masters to assist in framing and enforcing complex decrees," and further emphasizes that "[r]eliance on a master is appropriate when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent."  2003 Advisory Committee's Note

---

[11] The evergreen fund needs to be established to last not less than 30 years because the remediation will take decades.  For example, the State's expert Gregory Scott testified to the length of time needed to remove legacy phosphorus by the combination of hay removal and cessation of land application of poultry litter.  Doc. 3161 at 14 ("[F]ollowing cessation of land application, it would take up to thirty years of hay production and removal to remove legacy phosphorus placed in the soil up to a STP of 300.  During that time, if there was water available, phosphorus would continue to leak into the water.").  To safeguard against having the fund last longer than necessary, the Proposed Final Judgment includes a provision for ending the Defendants' obligations prior to 30 years under certain circumstances determined by the master and the Court, as described in the Proposed Judgment, Section 3(j).

to Fed. R. Civ. P. 53(a)(1).  Partly because "the master's role in enforcement may extend to investigation in ways that are quite unlike the traditional role of judicial officers in an adversary system," the Rule reflects that where resolution of a matter is likely to be complex or convoluted, referral to a master may likely result in a more efficient and comprehensive solution.  *Id.*

Under Rule 53(b), the appointing order can delineate the scope of the master's authority but can also afford the master reasonable discretion within the guidelines of Rule 53(f).  *See* Fed. R. Civ. P. 53(b)(2); *id.* at 53(f); *see also* 2003 Advisory Committee's Note to Rule 53(b) (noting that 53(b)(2) allows for a precise delegation of the master's duties and authorities, including "[c]lear delineation of topics for any reports or recommendations," or "protect[ing] against delay by establishing a time schedule for performing the assigned duties.").  Simply put, Rule 53(c) provides "the broad and flexible authority necessary to discharge the master's responsibilities" within the contours of the appointing order.  2003 Advisory Committee's Note to Rule 53(c); *see also La Buy v. Howes Leather Co.*, 352 U.S. 249, 259 (1957) ("The use of masters is 'to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause,' and not to displace the court.") (citation omitted).

This Court-ordered broad and flexible authority, coupled with both the time and the bandwidth to oversee a detail-oriented remediation plan, is needed here.  Indeed, federal district courts routinely appoint special masters to oversee the development and implementation of complex remedial plans where liability and legal relief have already been determined.  *See, e.g., Center for Legal Advocacy v. Bicha*, 2018 WL 6620776, at *1 (D. Colo. Dec. 18, 2018) (pursuant to parties' request, special master appointed to oversee compliance with negotiated settlement agreement); *Hatten-Gonzales v. Scrase*, 2022 WL 655910, at *1 (D.N.M. Mar. 4, 2022) (special master oversaw the creation, recommendation, and execution of remediation plan to combat

13

COVID spread in prison); *N.L.R.B. v. Monfort, Inc.,* 29 F.3d 525, 527 (10th Cir. 1994) (accepting and ordering special master's suggested remedial plan in labor rights case); *Nation v. San Juan Cty*, 2017 U.S. Dist. LEXIS 211320, at *2-3 (appointed special master developed and proposed redistricting plans to remedy Equal Protection Clause violations).

Notably, special masters are also frequently relied upon in connection with remediation schemes in complex environmental litigation, particularly where a court is "convinced beyond any doubt that unless directed otherwise by some authority . . . no remediation will occur." *Interfaith Cmty, Org. v. Honeywell Int'l Inc.,* 263 F. Supp. 2d 796 (D.N.J. 2003). In *Interfaith Community Organization*, a federal district court ordered the appointment of a Rule 53 special master "to oversee all aspects of the remediation and to ensure timely compliance with a remediation schedule" after a two-month non-jury trial bore out that the defendants had violated the Resource Conservation and Recovery Act. *Id.* Considering that "the injunctive relief this Court will grant, may require this Court to consider technical issues in the future concerning the implementation of the remedy," the district court appointed a special master to "take whatever reasonable steps are necessary to successfully carry out," the development and implementation of a remediation project. *Id.* at 830-34. In so ordering, the court weighed the defendant's awareness of the hazard "for more than twenty years" and that "[t]his problem require[d] further study," in finding the exceptional circumstances worthy of an appointed remedial special master. *Id.* at 830-834.

Similarly, a federal district court ordered the appointment of a special master where "expertise in [a] particular field, to further assist [the court] in the determination of an appropriate remedy," was warranted. *See Ohio Valley Envtl. Coalition, Inc. v. Fola Coal Co.*, LLC, 2015 U.S. Dist. LEXIS 139507, at *13-14 (S.D.W.Va. Oct. 14, 2015). In that case, upon finding that "Plaintiffs met their ultimate persuasive burden of showing . . . that [defendant's environmental]

violation caused or materially contributed to a significant adverse impact to the chemical and biological components of the applicable stream's aquatic ecosystem," the court sought to enter injunctive relief. *Id*. at *7-10. After both parties proposed remedies at a "Phase II" trial, which sought to "resolve issues of appropriate injunctive relief and/or civil penalties," the court needed more specific guidance. *Id*. at *1 n.1. Consequently, noting that "[t]he remedies proposed by [the parties] [we]re complex and costly," and the court there on its own ordered the appointment of a remedial special master, subject to the parties' objections, to "further assist [the court] in the determination of an appropriate remedy." *Id.* at *13-14. There, as here, there are several potential routes toward remediation of the IRW, and this Court should appoint a special master to aid in creating and implementing an appropriate and comprehensive remedial scheme.

These are merely two instances of a special master's appointment to oversee the development and implementation of a complex environmental remediation plan, though both reflect the concerns present in this case and in the advisory committee comments to Rule 53. *See, e.g., Conservancy v. Lexington Coal Co.*, LLC, 2023 U.S. Dist. LEXIS 206426 at *2 (S.D.W.Va. Nov. 17, 2023) (special master appointed to oversee complex remediation scheme where "the parties . . . were ultimately unable to come to a compromise"). Accordingly, longstanding federal law indicates that circumstances here warrant the oversight of an appointed special master.

### 3.    The Court should assess penalties against the Defendants

In addition to the remedial injunction described above, the Proposed Final Judgment also provides for an assessment of statutory penalties against the Defendants (other than the Defendant Peterson) for their violations of 27A Okla. Stat. § 2-6-105. *See* Ex. 1, Section 5. 27A Okla. Stat. § 2-3-504(D) states that each day upon which a violation of the statute occurs shall constitute a separate violation, and provides for penalties of not more than $10,000 for each such separate violation.

The Proposed Final Judgment takes a conservative approach toward the assessment of penalties against the Defendants.  While the State contends that it is entitled to an assessment of penalties against a Defendant based on any field having an STP value of greater than 65 lbs./acre from the earliest date of each recorded violation in ODAFF records up until the present, *see* Doc. 2979, COL 55, with this Proposed Final Judgment the State is only seeking an assessment of penalties against a Defendant based on any field having an STP value of greater than 65 lbs./acre from the earliest date of each recorded violation in ODAFF records up until the filing date of the State's Complaint (i.e., June 13, 2005).  *See* Doc. 2.

Given the severity of the Defendants' violations in Oklahoma and the long-lasting effects of this unlawful conduct on the waters of the State, penalties should be assessed against the Defendants at the maximum amount allowed -- $10,000 per day.  *See* 27A Okla. Stat. § 2-3-504(H) (listing factors to be used in setting penalty amounts) & Doc. 2979, COL 60-61 ("Each defendant has consciously concentrated a segment of its poultry operations in the Oklahoma portion of the environmentally-sensitive IRW; placed large numbers of its birds in this concentrated area; and imported enormous amounts of phosphorus-laden feed into the area.  Their birds annually generate hundreds of tons of poultry waste containing phosphorus the defendants have brought into the IRW.  Further, despite knowledge that the majority of the poultry waste will be land applied in close proximity to where it is generated, the defendants have not made provisions for the appropriate management of the waste.").  The Tyson Defendants should therefore be assessed a penalty of $28,910,000.00.  Ex. 1, Section 5(p).  The Cargill Defendants should therefore be assessed a penalty of $23,690,000.00.  Ex. 1, Section 5(q).  The George's Defendants should therefore be assessed a penalty of $5,230,000.00.  Ex. 1, Section 5(r).  The Defendant Simmons should therefore be assessed a penalty of $27,160,000.00.  Ex. 1, Section 5(s).  And the Defendant

Cal-Maine should therefore be assessed a penalty of $18,270,000.00.  Ex. 1, Section 5(t).  These penalties are separate and apart from the payments associated with the remediation and monitoring activities detailed in Sections 2 through 4 of the Proposed Final Judgement.  *See* Ex. 1, Section 5(v).

### 4.    The Court should award attorneys fees and costs pursuant to a separate order and judgment

Under 27A Okla. Stat. § 2-3-504(C), the State is entitled to an award of attorneys fees and costs.  Federal Rule of Civil Procedure 58(e) allows for such awards to be made separately from the entry of judgment.  An unresolved issue of attorneys fees generally does not prevent judgment on the merits from being final because "a request for attorney's fees . . . raises legal issues collateral to and separate from the decision on the merits."  *Budinich v. Becton Dickinson and Co.*, 486 U.S. 196, 200 (1998).  Where "an award of attorney's fees does not remedy the injury giving rise to the action," it is collateral to the merits, and the award may be resolved after the entry of final judgment without affecting the judgment's finality.  *Yost v. Stout*, 607 F.3d 1239, 1243 (10th Cir. 2010) (internal alterations omitted); *see, e.g., Utah Women's Clinic, Inc. v. Leavitt*, 75 F.3d 564, 567 (10th Cir. 1995) (post-judgment resolution of fees and costs is appropriate "particularly when the judgment contemplates significant further proceedings concerning costs and attorney's fees").

Here, the State is statutorily entitled to "attorneys fees and costs associated with the collection of [] penalties" for the Defendants' violations of Oklahoma's environmental protection statutes.  27A Okla. Stat. § 2-3-504(C).  The statute establishes that an award of attorneys fees and costs is a result of proving the merits of the alleged violations, not that proving fees and costs is integral to proving the violations themselves.  Thus, attorneys fees are "collateral to and separate from the decision on the merits" and may be resolved after the entry of final judgment.  *Budinich*, 486 U.S. at 200.  Accordingly, the Proposed Final Judgment provides that "[t]he amount of the

17

award for the State's attorneys fees and costs will be determined by the Court following subsequent briefing by the parties."  Ex. 1, Section 5(u).

## III.    Conclusion

For the foregoing reasons, the State respectfully requests that this Court enter judgment in favor of the State and against the Defendants on the State's claims for statutory public nuisance, federal common law nuisance, trespass, violation of 27A Okla. Stat. § 2-6-105, and violation of 2 Okla. Stat. § 2-18.1 and grant the relief set forth in the Proposed Final Judgment that is attached as Exhibit 1.

Dated:  July 9, 2025.

Respectfully Submitted,

s/ *Gentner Drummond*

GENTNER DRUMMOND, OBA #16645
  *Attorney General*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
JENNIFER L. LEWIS, OBA #32819
  *Deputy Attorney General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct:  (405) 521-3921
gentner.drummond@oag.ok.gov

M. David Riggs, OBA, #7583
Kristopher E. Koepsel, OBA #19147
Riggs, Abney, Neal, Turpen, Orbison & Lewis
502 West 6th Street
Tulsa, OK 74119
(918) 587-3161

Robert A. Nance, OBA #6581
W.A. Drew Edmondson, OBA #2628

18

Riggs, Abney, Neal, Turpen, Orbison &
Lewis
528 N.W. 12th Street
Oklahoma City, OK 73103
(405) 843-9909

Louis W. Bullock, OBA #1305
Bullock Law Firm PLLC
110 W. 7th Street
Tulsa, OK 74119
(918) 584-2001

Frederick C. Baker, admitted *pro hac vice*
Cynthia Solomon, admitted *pro hac vice*
Kristin Hermiz, admitted *pro hac vice*
Madeline Becker, admitted *pro hac vice*
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9186
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of July, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants with entries of appearance filed of record.

s/ *Gentner Drummond*
GENTNER DRUMMOND