# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| STATE OF OKLAHOMA *et al.*,<br><br>                        *Plaintiffs,*<br><br>   **v.**<br><br>TYSON FOODS, INC., *et al.*,<br><br>                        *Defendants.* | No.  **4:05-cv-329-GKF-SH** |

## [PROPOSED] FINAL JUDGMENT

On June 13, 2005, the State commenced the Case against the Defendants[1] seeking injunctive relief and monetary damages for the Defendants' alleged acts and omissions, and/or the acts and omissions of their growers, which the State claimed have caused damage to the Illinois River Watershed (IRW or Watershed), including damage to the biota, lands, waters, and sediments therein.

On January 18, 2023, the Court entered its Findings of Fact and Conclusions of Law "find[ing] in favor of the State and against the Defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, for violation of 27A Okla. Stat. § 2-6-105, and for violation of 2 Okla. Stat. § 2-18.1." Doc. 2979 at 213.

In the January 18, 2023 Findings of Fact and Conclusions of Law, the Court found, *inter alia*: the waters of the IRW have elevated phosphorus levels;[2] the principal contributor of these

---

[1] Terms used in this judgment are defined in Section 1.

[2] *See* Doc. 2979, FOF 130 ("The court finds that phosphorus concentrations in streams and rivers of the IRW in Oklahoma are elevated beyond natural or background levels …"); FOF 168 ("Based upon the foregoing factual findings, the court finds that the rivers and streams of the IRW have elevated phosphorus concentration levels above natural or background levels."); FOF 239 ("The court finds that Lake Tenkiller has become eutrophic, and this eutrophication is caused by phosphorus concentrations in the reservoir.").

elevated phosphorus levels in the waters of the IRW is run-off from poultry waste;[3] and banked phosphorus in the soils of the IRW due to land application of poultry waste is a source of this phosphorus run-off.[4] From the close of evidence to the entry of the January 18, 2023 Findings of Fact and Conclusions of Law, no party moved to reopen the evidentiary record to provide evidence that would have contradicted these findings.

The Court concluded that the Defendants knew their growers, in the ordinary course of their work for the Defendants, spread poultry litter on the land in the IRW, and knew or should have known no later than the late 1990s that their growers' land application of poultry waste was a primary source of the excess phosphorus in the waters of the IRW. Doc. 2979, COL 11. Once on

---

[3] *See* Doc. 2979, FOF 288 ("The court finds that nonpoint source phosphorus is a significant source of the phosphorus causing injury to the rivers and streams of the IRW and to Lake Tenkiller."); FOF 539 ("The evidence that phosphorus from land-applied poultry waste can and does run off into the waters of the IRW is convincing. As set forth below, the evidence is convincing that poultry waste is a significant source of the phosphorus causing injuries to the rivers and streams of the IRW and to Lake Tenkiller."); FOF 585 ("[I]t is clear that poultry waste is a major contributor to the levels of phosphorus in the waters of the IRW."); FOF 586 "([P]oultry waste is the principal contributor of the phosphorus causing injuries to the waters of the IRW.").

[4] *See* Doc. 2979, FOF 81 ("[T]he agronomic critical level for phosphorus in the IRW is 65 lbs./acre STP, and the land application of poultry litter in the IRW in excess of this agronomic critical level is not protective of the environment and likely results in continued phosphorus pollution."); FOF 73 (finding that at an STP of 65 lbs./acre, there is 100 percent sufficiency for the growth of grass.); FOF 77 ("[A]t land application rates in excess of agronomic need, there is no crop benefit."); FOF 362 ("Land application of poultry waste has caused the soil in many areas of the IRW to have STP levels in excess of any agronomic need for phosphorus."); FOF 531 ("Phosphorus runoff calculations made in various coefficient-based studies of land applied poultry waste in the IRW are consistent in finding that approximately five percent of the phosphorus in land-applied litter in the IRW is expected to run off in a typical year."); FOF 535 ("[T]he court accords substantial weight to the evidence that some fraction of phosphorus from land applied poultry waste runs off to the waters of the IRW."); COL 49 ("And the overwhelming evidence establishes that phosphorus from land-applied poultry waste runs off the fields in environmentally significant quantities, causing injury to the waters of the IRW."); COL 61 ("[P]oultry waste continues to be applied to the phosphorus-saturated fields in the Oklahoma portion of the IRW, where an environmentally significant portion of the phosphorus contained in the waste runs off the fields and enters the waters of the IRW.").

notice, the Defendants had a duty to abate the nuisance and put a stop to the trespass, neither of which they have done. Doc. 2979, COL 11 (citing *City of Tulsa v. Tyson Foods, Inc.,* 258 F. Supp. 2d 1263, 1295-96 (N.D. Okla. 2003), *vacated in connection with settlement*). Therefore, they are liable for any trespass or nuisance created by their growers. *Id.* at 1296. Doc. 2979, COL 11 (citing *City of Tulsa*, 258 F. Supp. 2d at 1295-96).

Furthermore, the Court ordered the State and the Defendants to meet and attempt to reach an agreement with regard to remedies to be imposed in this action. Doc. 2979 at 213.

Pursuant to the Court's order, the State and the Defendants engaged in good faith deliberations in an attempt to reach a full settlement of the litigation that would include remedies to address the State's concerns. As a part of those efforts, the parties participated in mediation. Nevertheless, the parties were unable to reach a settlement agreement, and the parties filed their status reports informing the Court that mediation had not been successful. Docs. 3008 and 3009.

On the same day as the filing of the status reports, the Defendants filed a motion to dismiss the case, alleging that conditions in the IRW had changed such that the State's claims were constitutionally and prudentially moot and arguing that granting relief on the current record would violate due process. Doc. 3010. The Court denied the motion to dismiss, Doc. 3023, and set an evidentiary hearing to address the Defendants' contention that the conditions in the IRW had materially changed following the end of trial. Docs. 3038 and 3098.

Following a six-day evidentiary hearing, the Court entered its June 17, 2025 Opinion and Order. Doc. 3161. Therein, the Court incorporated the January 18, 2023 Findings of Fact and Conclusions of Law. *Id.* at 2. Further, the Court found: conditions have not materially changed since trial and the rivers and streams of the IRW and Lake Tenkiller continue to be impaired by

phosphorus;[5] the Defendants, except Defendants Peterson and Cal-Maine, have continued operations in the IRW and have continued generating significant quantities of phosphorus-rich poultry waste throughout the IRW;[6] legacy phosphorus in the soil from past application of poultry litter continues to affect the water quality in the rivers and streams of the IRW;[7] "significant amounts of poultry waste generated by defendants' birds have been, and continue to be, land-applied in the IRW, in close proximity to the growers' farms;"[8] "phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus causing injuries to the waters of the IRW;"[9] and "the continuing actual and ongoing injury to the waters of the IRW

---

[5] *See* Doc. 3161 at 6-7 ("[T]he court finds that the conditions of the IRW have not materially changed since trial, and the elevated phosphorus concentration levels have resulted in significant increases in algal biomass in the IRW's rivers and streams, which has impacted the aesthetics of the IRW's rivers and streams."); *Id.* at 7 ("[T]he court finds that conditions have not materially changed since trial and that phosphorus concentrations in the Illinois River, Flint Creek, and Barren Fork Creek continue to exceed the total phosphorus criterion applicable to scenic rivers and the aesthetics beneficial use is impaired for total phosphorus in violation of Oklahoma water quality standards."); *Id.* ("Lake Tenkiller continues to be eutrophic."); *Id.* at 9 ("[E]levated phosphorus levels continue to cause injury to Lake Tenkiller, as well as the biota therein."); *Id.* at 21 ("Because the phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus which is causing actual and ongoing injury to the waters of the IRW, the conditions in the IRW have not materially changed since trial.").

[6] *See id.* at 9-10 (listing the number of poultry feeding operations, number of poultry houses, and capacity of birds affiliated with Defendants Tyson, Simmons, Cobb-Vantress, Cargill, and George's in the Oklahoma portion of the IRW); *Id.* at n. 6 (explaining that the Court had previously concluded that Defendants Peterson and Cal-Maine had ceased poultry operations in the IRW); *Id.* at 12 ("[S]ince trial in this matter, each of the defendants—with the exception of defendants Peterson and Cal-Maine—has generated significant quantities of phosphorus-rich poultry waste in the IRW.").

[7] *See id.* at 15 ("[T]he court finds that 'legacy phosphorus' resulting from past application of poultry litter continues to affect the water quality of the rivers and streams of the IRW.").

[8] *Id.* at 16.

[9] *Id.* at 20.

constitutes irreparable harm."[10] Thus, the Court concluded "circumstances have not 'changed since the beginning of litigation that forestall any occasion for meaningful relief.' [quoting *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997).] Accordingly, this matter is not prudentially moot."[11]

The Court finds that there is no just reason for delay as to the entry of a final judgment. The issues having been duly tried and the Court having duly entered its findings of fact and conclusions of law, **IT IS HEREBY ORDERED that judgment shall enter in favor of the State and against the Defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, for violation of 27A Okla. Stat. § 2-6-105, and for violation of 2 Okla. Stat. § 2-18.1.**

The parties shall comply with the provisions of this judgment as indicated herein.

1. <u>**Definitions**</u>

    a. "Company Farm" means any property now or hereafter owned or operated by any Defendant to raise and care for poultry owned by, or for the benefit of, that Defendant.

    b. "Contract Grower" means any person or other entity engaged in farming or other agricultural operations who contracts with any Defendant, to raise and care for poultry provided in the Watershed to the Contract Grower by any Defendant.

---

[10] *Id.* at 21; *see also*, the Court's corresponding conclusion in the January 18, 2023 Findings of Fact and Conclusions of Law, Doc. 2979 at COL 93 (stating "actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief.").

[11] Doc. 3161 at 22.

c.  "Contract Grower Farm" means any property now or hereafter owned or operated by any Contract Grower, to raise and care for poultry provided inside the Watershed to the Contract Grower by any Defendant.

d.  "Defendant" means Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., Cobb-Vantress, Inc., Cal-Maine Foods, Inc., Cargill, Inc., Cargill Turkey Production, LLC, George's, Inc., George's Farms, Inc., Peterson Farms, Inc., and Simmons Foods, Inc., and their successors and assigns (collectively "Defendants") and includes all entities owning or operating farms owned by any Defendant.

e.  "Defendants' Birds" means all birds confined on the Defendants' Company Farms or the Defendants' Contract Grower Farms.

f.  "Illinois River Watershed" ("IRW" or "Watershed") means the Illinois River Watershed encompassing approximately 1,069,530 acres located in northeastern Oklahoma (Adair, Cherokee, Delaware, and Sequoyah Counties) and northwestern Arkansas (Crawford, Benton, and Washington Counties), and depicted in State's Ex. 3351 at OSU0005147. Within the IRW are the Illinois River, as well as its major tributaries, including the Baron (aka Barren) Fork River, the Caney Creek, and the Flint Creek. State's Ex. 3351 at OSU0005160; see also Daily Trans., 10105:7-20 (Grip Testimony). The Watershed includes the 12,900 acre Tenkiller Ferry Lake. State's Ex. 3351 at OSU0005174.

g.  "Nutrient-Sensitive Watershed" means:

i.  any watershed, located in whole or in part in Oklahoma, having a waterbody listed, at the time of the relevant land application of Poultry Waste, on the Clean Water Act 303(d) list of impaired or threatened waters, whereby the

waterbody is impaired or threatened for nutrient-related causes including nitrogen, phosphorus, low dissolved oxygen in lakes, or high chlorophyll-a concentrations, and

ii. any watershed listed, at the time of the relevant land application of Poultry Waste, as a nutrient limited watershed area under Oklahoma's Water Quality Standards at Oklahoma Administrative Code 252:730-5-29 or any successor provisions to this Code section.

h. "Poultry Waste" means all byproducts associated with the confinement of poultry, including excrement, feed waste, animal carcasses, and bedding materials.

i. "STP" means soil test phosphorus.

## 2. **Remediation**

a. Remediation is necessary to reduce phosphorus loading and abate the impacts of the pollution caused by the overapplication of Poultry Waste in the Watershed. Doc. 2979 at 213; *see also*, Doc. 3161 at 21 (concluding "the continuing actual and ongoing injury to the waters of the IRW constitutes irreparable harm" and stating "[i]n light of the ongoing injuries, remedial measures in this case 'will have some effect in the real world.'").

b. The Defendants are legally responsible for remedying the phosphorus pollution of the Watershed.

c. Remediation shall be conducted in a phased approach that includes remedial investigation, planning, implementation, and monitoring.

d. Phase I comprises remedial investigation and planning. To initiate Phase I, the Court hereby orders a remedial investigation by a master (as detailed in Section 3)

to assess the status of the Poultry Waste pollution in the IRW, including but not limited to current practices relating to the disposal of Poultry Waste generated by Defendants' poultry growing operations. Further, the Court orders the development of a remediation plan by the master, based upon the findings of the remedial investigation and the evaluation of remediation options. Options to evaluate include, without limitation: buffer strips, increased treatment of drinking water, excavation, alum application to fields, crop and nutrient management with nitrogen supplementation, bank stabilization, constructed wetlands, alum application to Lake Tenkiller, sediment removal from Lake Tenkiller, layered aeration of Lake Tenkiller, and exportation of Poultry Waste outside the Watershed for application to phosphorus-deficient soil. *See* Doc. 2979, FOF 594-595. Upon review and evaluation of the plan developed and submitted by the master, the Court may take all appropriate and necessary actions, including ordering additional remedial investigation or ordering additional remediation planning. Upon the Court's approval of the plan, the Court shall order implementation of the plan.

e. Phase II will comprise implementation of one or more remediation plans that the Court approves.

f. Phase III will comprise on-going monitoring of the projects implemented in furtherance of the one or more Court-approved remediation plans.

g. Notwithstanding the provision of Section 2(f), each of the Phases I, II, and III shall include monitoring by the master of all aspects relevant to the remediation operations of those phases including, without limitation, monitoring of water quality, soil sampling, and Poultry Waste sampling.

h. The Defendants shall pay all costs and expenses associated with remediation, including costs and expenses for remedial investigation, planning, implementation, and monitoring.

i. The Defendants' payment obligations for remediation shall be joint and several.

**3. <u>Watershed Monitoring and Enforcement</u>**

a. The Court shall appoint a master to implement and oversee this judgment.

b. The master shall be charged with overseeing the provisions of the Section 2 Remediation and the Section 4 Restriction on Land Application of Poultry Waste.

c. The master shall retain technical experts and order testing, studies, and preparation of reports in furtherance of completing the work described by this judgment. The work product of the master shall be available to the public to the greatest extent permitted by law.

d. The master shall prepare the remediation plan(s) of Section 2(d) and propose such remediation plan(s) to the Court for approval.

e. To assist with Watershed monitoring and enforcement duties, the master shall recruit, train, oversee, and monitor a watershed monitoring team (WMT). The WMT members shall have the experience, training, and qualifications prescribed by state or federal law or regulations for persons designated to prepare and oversee implementation of nutrient management plans or comparable plans designed to manage agricultural operations and preserve water quality.

f. The WMT's duties shall include:

   i. monitoring compliance with this judgment;

ii. preparing nutrient management plans that comply with this judgment and all applicable laws, rules, and regulations;

iii. making periodic inspections of each Company Farm, Contract Grower Farm, and land application site to procure samples of Poultry Waste, soil, and/or water, and to conduct such other tests and make such other observations as are necessary for the WMT to determine compliance with this judgment and all applicable laws, rules, and regulations. The periodic inspections of each Company Farm, Contract Grower Farm, or land application site shall occur as often as is necessary to determine compliance, and shall be conducted at least once every year;

iv. The WMT shall inspect such relevant records or data as the Defendants or their Contract Growers may be required to maintain in order to demonstrate compliance with this judgment and all applicable laws, rules, and regulations; and

v. The WMT shall report, to the greatest extent permitted by applicable law,[12] to the Court, the Oklahoma Office of the Attorney General, the Defendants, and the state regulatory agency or commission having jurisdiction under any applicable state law, all material or repeated violations or instances of non-compliance with this judgment or any applicable law, rule, or regulation.

---

[12] As the Court has previously noted, with respect to the Arkansas portion of the IRW, due to statutory privacy protections, certain data regarding the poultry feeding operations is not publicly available. *See* Doc. 3161 at 10 (citing Ark. Code Ann. § 15-20-904(f) and testimony regarding Arkansas privacy protections).

g.  Upon each one-year anniversary date of the establishment of the WMT until modified by Court order, the WMT shall collect and disseminate, to the greatest extent permitted by applicable law, to the Oklahoma Office of the Attorney General, the Defendants, and the master the following information regarding the Company Farms and Contract Grower Farms:

   i.  The name, mailing address, and phone number of the Contract Grower or the manager of the Company Farm;

   ii.  The location of the Contract Grower Farm or Company Farm, identified by physical address, county, public land survey description to at least the level of quarter section, latitude and longitude of the road entrance to the Contract Grower Farm or Company Farm, latitude and longitude of the northwestern-most poultry house, and GIS data, including all vector data and any underlying database and all raster data created or modified by the WMT for the Contract Grower Farm or Company Farm. The latitude and longitude data shall be provided in a form readily imported to a GIS system, shall be provided in decimal degree format (dd.ddddd), and shall be measured to at least five decimal places. All latitude and longitude measurements must be at least accurate within 4.9 meters (16 feet) of the actual location;

   iii.  The size and production of such Contract Grower Farm or Company Farm in terms of number of poultry houses; length, width, and height of each poultry house; type of poultry raised in poultry house; bird capacity of each poultry house; number of birds in standing inventory per flock; number of flocks per year; and amount of Poultry Waste produced per year;

iv.  A description of all poultry house cake outs and clean outs, including (1) the dates of each cake out or clean out and (2) the fate of the removed Poultry Waste with information identifying any storage location, the transporter, and the receiving location;

v.  A description of the storage methods used to store the Poultry Waste;

vi.  A description of the transportation methods used to transport the Poultry Waste;

vii.  A description of the final disposition of the Poultry Waste, including:

1.  The volume of Poultry Waste removed from the poultry operation, specified as measured in wet or dry tons;

2.  The date of removal of such Poultry Waste from the poultry operation;

3.  The quantity of Poultry Waste land-applied on each Company Farm or Contract Grower Farm, and the quantity of Poultry Waste which is transferred or sold from each Company Farm and Contract Grower Farm each year;

4.  The identity and address of any person to whom Poultry Waste is transferred, including the certified litter applicator, the landowner, and any other recipient of the Poultry Waste;

5.  The location and acreage of each application site, including the physical address, county, public land survey description to at least the level of quarter section, latitude and longitude of a point near the center of the application site, and GIS data, including all vector data

12

and any underlying database and all raster data created or modified by the WMT for the application site. The latitude and longitude data shall be provided in a form readily imported to a GIS system, shall be provided in decimal degree format (dd.ddddd), and shall be measured to at least five decimal places. All latitude and longitude measurements must be at least accurate within 4.9 meters (16 feet) of the actual location;

6.  The soil test results and sampling date for each application site, including the STP results and sampling date;

7.  The test results for the Poultry Waste, the sampling date, the tonnage of waste applied, and the application rate relevant to each application site;

8.  The date of issuance of last nutrient management plan and the name of the WMT member who prepared the nutrient management plan for each Company Farm, Contract Grower Farm, and application site; and

9.  A certification by a responsible official of the Company Farm or the Contract Grower, as applicable, that all Poultry Waste generated at the Company Farm or the Contract Grower Farm has been managed, stored, and disposed of in compliance with this judgment.

h.  The master shall assume full and permanent responsibility to administer the employment and compensation of the WMT members, provide facilities and support for their responsibilities, and maintain records and information collected

by the WMT in the performance of its duties. The WMT members shall remain subject to the oversight and monitoring of the master during the master's term of Court appointment.

i.  Within thirty days after the date upon which this judgment is entered on the Court's docket, the Oklahoma Office of the Attorney General and the Defendants shall confer and attempt to agree on a qualified candidate for master, or in the absence of such agreement, the Oklahoma Office of the Attorney General shall submit two nominees and the Defendants collectively shall submit two nominees to the Court within the thirty-day period. The Court shall be free to appoint from these nominees or from any other person or firm not nominated by the parties if the Court deems appropriate or necessary.

j.  The master shall at all times be deemed an adjunct to the Court and shall serve at the pleasure of the Court. For a period of at least thirty years after the appointment of the master, the Defendants shall pay the costs and expenses of the master incurred in the performance of the duties of the master as defined herein.[13] The term of the master's appointment and the Defendants' aforementioned payment obligations shall commence upon appointment by the Court and end at least thirty years thereafter unless the Court orders otherwise. Notwithstanding the at least thirty-year term, if the master determines after ten years that the Defendants have

---

[13] An extended period of oversight by the master for at least thirty years is warranted because remediation of the IRW will take decades. Indeed, the Court noted testimony of the State's non-retained expert, Mr. Gregory Scott, who testified, "that, following cessation of land application, it would take up to thirty years of hay production and removal to remove legacy phosphorus placed in the soil up to a STP of 300. During that time, if there was water available, phosphorus would continue to leak into the water." Doc. 3161 at 14.

achieved full compliance with the judgment, the Defendants may file a motion with the Court seeking to end the Defendants' obligations under this judgment and this Court's jurisdiction thereover. Upon the filing of such motion, the Court shall determine, after an evidentiary hearing at which the Defendants have the burden of proof, whether the Defendants have achieved full compliance. If the Court finds that the Defendants have achieved full compliance, the Court may end the Defendants' obligations at a time determined by the Court. Likewise, notwithstanding the at least thirty-year term, if the master determines that the Defendants have not achieved substantial compliance with the judgment after twenty-nine years, the State may, at least ninety days before the end of the thirty years, file a motion with the Court seeking to extend the duration of the Defendants' obligations under this judgment and this Court's jurisdiction thereover. Upon the filing of such a motion, the Court shall determine, after an evidentiary hearing, whether the Defendants have achieved substantial compliance. If the Court finds the Defendants have not achieved substantial compliance for at least the last year preceding the hearing on the State's extension motion, the Court may extend the term of the Defendants' obligations under this judgment and retain jurisdiction for a period of time determined by the Court to ensure that Defendants come into compliance. If the Court determines that the Defendants have achieved substantial compliance, the Court may terminate the Defendants' obligations under this judgment at the thirty-year end date.

k. Any vacancy occurring for any reason during the term of the master shall be filled in the manner described in Section 3(i).

15

l.    Within sixty days of the appointment of the master and annually thereafter, the master shall file with the Court a proposed annual budget setting out the projected expenses of operating the master's office and the WMT. Subject to the consideration of any objections by the parties, the Court will approve an annual budget for the master's office and the WMT. During the course of each annual budget period, the master shall seek amendments to this budget as needed.

m.    The Defendants shall pay to an account set up and designated by the master all costs and expenses of the master as well as all costs and expenses associated with conducting the remedial investigation; the development of the remediation plan; the implementation of the remediation; the recruitment, hiring, and training of the WMT; the necessary compensation and state-mandated benefits required to employ qualified persons on the WMT; and the costs and expenses required by the WMT to carry out its monitoring and enforcement duties as provided herein. The funding obligation of the Defendants shall commence upon the date of the entry of this judgment on the Court's docket and continue for a period of at least thirty years after the date of the appointment of the master unless the Court orders otherwise.

n.    The Defendants shall pay those costs and expenses of the master and the WMT into an evergreen fund lasting not less than thirty years in the following manner:

    i.    Within five business days of appointment of the master, the Defendants shall pay $10,000,000.00 into an account designated by the office of the master to pay the initial salaries and benefits of the master, the WMT, and costs and expenses associated with the performance of their duties under this judgment.

ii.  If at any time the Defendants are notified by the master that the balance of the account identified in Section 3(n)(i) falls below $5,000,000.00, the Defendants shall within ten business days replenish the account with a payment of $5,000,000.00 (adjusted for inflation by reference to the United States Department of Labor Consumer Price Index).

iii.  The Defendants' payment obligations under this Section shall be joint and several.

o.  Unless otherwise directed by the Court, the master shall report in writing to the Court, the Oklahoma Office of the Attorney General, and the Defendants no less often than quarterly during the first two years of the master's tenure, and no less than semi-annually thereafter. To the extent permitted by applicable law, the reports to the Oklahoma Office of the Attorney General and the Defendants shall include, without limitation, apprising them of the status of preparation of nutrient management plans; all monitoring and enforcement activities, including the monitoring and enforcement of the restriction on land application of Poultry Waste and the remediation; and the costs and expenses incurred by the master and WMT during the reporting period. The reports to the Court, which shall also be furnished to the Oklahoma Office of the Attorney General and the Defendants, shall be a summary of these matters, and shall primarily focus on issues relating to the implementation and enforcement of this judgment. The reports to the Court shall be entered as a record available to the public on the docket of this case.

p.  To assist with oversight and monitoring, the Defendants shall ensure, to the extent permitted by applicable law, that each Company Farm and Contract Grower Farm

17

maintains easily visible, well-maintained signage at entrances to the farm property, indicating the name of the owner of the Company Farm, or the name of the owner of the Contract Grower Farm and the contracting company, and the contact phone number for the owner.

q. The master is entitled to judicial immunity in performing the master's duties as authorized by the orders of this Court. The WMT and advisors to the master are entitled to judicial immunity in performing services at the direction of the master within the scope of this judgment or Court-approved engagement.

## 4. Restriction on Land Application of Poultry Waste

a. A restriction of 65 lbs./acre STP for land application of Poultry Waste is appropriate and necessary to limit the land application of Poultry Waste to a level that provides the true agronomic need for plants in order to reduce the phosphorus run-off that pollutes the waters of the IRW.

b. Upon the date this judgment is recorded on the Court's docket, the Poultry Waste generated by the Defendants' Birds shall not be applied in the IRW, or in any other Nutrient-Sensitive Watershed, on land having an STP of 65 lbs./acre or greater.

c. Prior to any instance of land application, in the IRW or in any other Nutrient-Sensitive Watershed, of the Poultry Waste generated by Defendants' Birds, the land at issue must have STP results from testing: (1) conducted under the supervision of the master or the WMT, (2) within one year prior to the instance of land application, and (3) having a value of less than 65 lbs./acre STP. Such STP results shall be provided by the Defendants to the master and the WMT and shall be subject to verification by the master and the WMT prior to any instance of land application.

d.   The application rate shall be limited to two tons or less of Poultry Waste per acre. Notwithstanding the two tons or less application rate limitation, land application of Poultry Waste shall not be allowed in the IRW or in any other Nutrient-Sensitive Watershed at any rate that would cause the land to exceed 65 lbs./acre STP.

e.   From and after the date this judgment is entered on the Court's docket, the Defendants shall not continue to place birds with any Contract Grower who has been determined by the master to not be in compliance with the provisions of Section 4(b)-(d), and if ordered by the Court, the Defendant shall terminate or refuse to renew its contract with the Contract Grower. The determination of a lack of compliance may be based, without limitation, on evidence such as reliable admission of the Contract Grower, reliable admission of a representative of a Defendant, observation, photographic evidence, documentary evidence, or data provided by a Defendant or a Contract Grower.

f.   At all times after the entry of this judgment on the Court's docket, the Defendants shall be responsible for ensuring the lawful disposal of all Poultry Waste generated by Defendants' Birds, in compliance with this judgment and all applicable laws, rules, and regulations. The Defendants shall take control of the Poultry Waste produced by the Defendants' Birds and ensure that the Contract Growers cooperate with the master, allow the master reasonable and necessary access to the Defendants' Company Farms and the Defendants' Contract Grower Farms, and implement any nutrient management plans. The Defendants shall be responsible for the removal of the Poultry Waste from the poultry houses, storage, transportation,

19

and lawful disposal, including any land application of the Poultry Waste, whether that land application is inside or outside the IRW.

g.  The Defendants shall ensure that their Contract Growers have access to sufficient Poultry Waste removal equipment, storage facilities, transportation methods, and disposal methods for the Poultry Waste generated by the Defendants' Birds. The Defendants themselves shall pay all costs associated with such removal, storage, transportation, and disposal, and shall not pass such costs on to their Contract Growers either directly or indirectly.

h.  The Defendants shall hold their Contract Growers harmless for the costs of removal, storage, transportation, and disposal of Poultry Waste generated by the Defendants' Birds, whether the Defendants conduct those waste handling operations directly or contract with independent contractors to handle the Poultry Waste.

i.  The Defendant contracting with a Contract Grower shall hold the Contract Grower harmless for any loss of income that may be attendant to the Defendant taking over the responsibility for safe disposal of the Poultry Waste in compliance with this judgment.

5.  **Penalties and Attorneys Fees and Costs**

a.  The Court found the Defendants are both directly and vicariously liable for violation of the Environmental Quality Code at 27A Okla. Stat. § 2-6-105. Doc. 2979, COL 52.

b.  Specifically, the Court found, "[the Defendants] have structured and conducted their business in the Oklahoma portion of the [Watershed] in a manner that causes

pollution of the waters of the [Watershed]. Thus, they are directly liable for 'caus[ing] pollution of … waters of the state' and for 'caus[ing] to be placed … waste[s] in a location where they are likely to cause pollution.' … Each defendant has consciously concentrated a segment of its poultry operations in the Oklahoma portion of the environmentally-sensitive [Watershed]; placed large numbers of its birds in this concentrated area; and imported enormous amounts of phosphorus-laden feed into the area. Their birds annually generate hundreds of tons of poultry waste containing phosphorus the defendants have brought into the [Watershed]. Further, despite knowledge that the majority of the poultry waste will be land applied in close proximity to where it is generated, the defendants have not made provisions for the appropriate management of the waste." Doc. 2979, COL 60.

c. "As a result, poultry waste continues to be applied to the phosphorus-saturated fields in the Oklahoma portion of the [Watershed], where an environmentally significant portion of the phosphorus contained in the waste runs off the fields and enters the waters of the [Watershed]. Further, phosphorus from land-applied poultry waste that enters the waters of the [Watershed] constitutes 'pollution' for the purposes of Okla. Stat. § 2-6-105. … In sum, through their own independent conduct, defendants have 'cause[d] pollution of … waters of the state.' 27A Okla. Stat. § 2-6-105(A). Similarly, defendants are also directly liable under 27A Okla. Stat. § 2-6-105(A) because they have 'cause[d] to be placed … wastes in a location where they are likely to cause pollution of … waters of the state.'" Doc. 2979, COL 61.

d.  Further, the Court found "[the Defendants] are vicariously liable for violation of 27A Okla. Stat. § 2-6-105(A), for the conduct of their growers." Doc. 2979, COL 62.

e.  The Environmental Quality Code at 27A Okla. Stat. § 2-3-504 provides in pertinent part that:

> (A) Except as otherwise specifically provided by law, any person who violates any of the provisions of, or who fails to perform any duty imposed by, the Oklahoma Environmental Code …
>
> ***
>
> > (2) May be punished in civil proceedings in district court by assessment of a civil penalty of not more than Ten Thousand Dollars ($10,000.00) for each violation;
>
> ***
>
> (C) Any person assessed an administrative or civil penalty shall be required to pay, in addition to such penalty amount and interest thereon, attorneys fees and costs associated with the collection of such penalties.
>
> (D) For purposes of this section, each day or part of a day upon which such violation occurs shall constitute a separate violation.
>
> ***
>
> (H) In determining the amount of a civil penalty the court shall consider such factors as the nature, circumstances and gravity of the violation or violations, the economic benefit, if any resulting to the defendant from the violation, the history of such violations, any good faith efforts to comply with the applicable

22

requirements the economic impact of the penalty on the defendant, the defendant's degree of culpability, and such other matters as justice may require.

f.  27A Okla. Stat. § 2-3-504 – which includes the penalty portion of the Oklahoma Environmental Quality Code – became effective on July 1, 1993, and the parties agree that the State's claims for penalties are limited to conduct occurring in Oklahoma since July 1, 1993. Doc. 2979, COL 55.

g.  As a result of the Defendants' respective direct and vicarious liability under 27A Okla. Stat. § 2-6-105(A), *see* Doc. 2979, COL 52-62, the State is entitled to an award of penalties.

h.  Without resolving the State's contention that penalties may be assessed against a Defendant based on any field having an STP value of greater than 65 lbs./acre as reflected by Oklahoma Department of Agriculture, Food and Forestry (ODAFF) records from the date of each recorded violation to the present, *see* Doc. 2979, COL 55, at a minimum, penalties may be assessed against any Defendant having one or more fields having an STP value of greater than 65 lbs./acre, as reflected by ODAFF records, from the earliest date of such recorded violation until the filing of the State's Complaint on June 13, 2005. Doc. 2.

i.  The Defendants' respective violations are severe and have caused pollution in violation of 27A Okla. Stat. § 2-6-105(A) since the July 1, 1993, enactment of the relevant penalty provision applicable to claims arising under 27A Okla. Stat. § 2-6-105(A). Doc. 2879, COL 55, 60, 61.

j.    The Tyson Defendants[14] have and have had poultry operations in both the Oklahoma and Arkansas portions of the IRW. Doc. 2979, FOF 290. Between 2000 and 2007, more than 703 million birds belonging to the Tyson Defendants were raised in the IRW. Doc. 2979, FOF 290. A significant number of the Tyson Defendants' or their growers' fields in Oklahoma have been reported as having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A. ODAFF records with dates ranging from July 14, 1997, to June 13, 2005 (and beyond), show the Tyson Defendants' or their growers' fields in Oklahoma having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A.

k.    The Cargill Defendants[15] have and have had poultry operations in both the Oklahoma and Arkansas portions of the IRW. Doc. 2979, FOF 291. Between 2000 and 2007, more than 23 million birds belonging to the Cargill Defendants were raised in the IRW. Doc. 2979, FOF 291. A significant number of the Cargill Defendants or their growers' fields in Oklahoma have been reported as having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A. ODAFF records with dates ranging from December 18, 1998, to June 13, 2005 (and beyond), show the Cargill Defendants' or their growers' fields in Oklahoma having soil test results in excess of 65 lbs./acres STP. Doc. 2873, FOF 395, App'x A.

---

[14] The Tyson Defendants are Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken Inc., and Cobb-Vantress, Inc. Defendants Tyson Foods, Inc. controls Defendant Cobb-Vantress, Inc., Defendant Tyson Chicken, Inc., and Defendant Tyson Poultry, Inc. *See* Court's Ex. 4 at 8 (Hudson Depo.).

[15] The Cargill Defendants are Cargill, Inc. and Cargill Turkey Production, LLC. Defendant Cargill Turkey Production, LLC is a wholly-owned subsidiary of Defendant Cargill, Inc. *See* Daily Trans., 4648:3-7; 4648:25-4649:4 (Ehrich Stipulation).

l.  The George's Defendants[16] have and have had poultry operations in both the Oklahoma and Arkansas portions of the IRW. Doc. 2979, FOF 292. Between 2000 and 2007, more than 105 million birds belonging to the George's Defendants were raised in the IRW. Doc. 2979, FOF 292. A significant number of the George's Defendants' or their growers' fields in Oklahoma have been reported as having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A. ODAFF records with dates ranging from January 7, 2004, to June 13, 2005 (and beyond), show the George's Defendants' or their growers' fields in Oklahoma having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A.

m. The Defendant Simmons has and has had poultry operations in both the Oklahoma and Arkansas portions of the IRW. Doc. 2979, FOF 293. Between 2000 and 2007, more than 162 million birds belonging to Defendant Simmons were raised in the IRW. Doc. 2979, FOF 293. A significant number of the Simmons Defendants' or their growers' fields in Oklahoma have been reported as having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A. ODAFF records with dates ranging from January 5, 1998, to June 13, 2005 (and beyond), show the Simmons Defendants' or their growers' fields in Oklahoma having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A.

n.  The Defendant Cal-Maine has had (but no longer has) poultry operations in both the Oklahoma and Arkansas portions of the IRW. Doc. 2979, FOF 295. Defendant Cal-Maine has not had any production in the IRW since January 2005. Doc. 2979,

---

[16] The George's Defendants are George's Inc. and George's Farms, Inc. Defendant George's Inc. controls George's Farms, Inc. *See* Daily Trans., 3022:7-9 (Henderson Testimony).

note 1; *see also* Doc. 2979, FOF 295. Between 2000 and 2007, more than 4 million birds belonging to Defendant Cal-Maine were raised in the IRW. Doc. 2979, FOF 295. A significant number of Defendant Cal-Maine's or their growers' fields in Oklahoma have been reported as having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A. ODAFF records with dates ranging from September 11, 1998, to September 11, 2003, show Defendant Cal-Maine's or their growers' fields in Oklahoma having soil test results in excess of 65 lbs./acre STP. Doc. 2873, FOF 395, App'x A.

o. With due consideration of these factors and the other factors the Court must consider in determining the amount of a civil penalty, *see* 27A Okla. Stat. § 2-3-504(H), and fully cognizant that the maximum penalty under the statute is $10,000 per day per violation, 27A Okla. Stat. § 2-3-504(A)(2), (D), the Court determines a penalty of $10,000.00 for each violation of 27A Okla. Stat. § 2-6-105 should be assessed against each Defendant group, with each day upon which a violation occurs constituting a separate violation.

p. The Tyson Defendants are liable for a penalty of $10,000.00 per day for each day from July 14, 1997, to June 13, 2005, which is a period of 2,891 days. The Tyson Defendants shall pay to the Oklahoma Office of the Attorney General's the penalty amount of $28,910,000.00, plus post-judgment interest accruing thereon at the rate of 5.115% from the date of entry of this judgment until paid in full.

q. The Cargill Defendants are liable for a penalty of $10,000.00 per day for each day from December 18, 1998, to June 13, 2005, which is a period of 2,369 days. The Cargill Defendants shall pay to the Oklahoma Office of the Attorney General the

penalty amount of $23,690,000.00, plus post-judgment interest accruing thereon at the rate of 5.115% from the date of entry of this judgment until paid in full.

r.  The George's Defendants are liable for a penalty of $10,000.00 per day for each day from January 7, 2004, to June 13, 2005, which is a period of 523 days. The George's Defendants shall pay to the Oklahoma Office of the Attorney General the penalty amount of $5,230,000.00, plus post-judgment interest accruing thereon at the rate of 5.115% from the date of entry of this judgment until paid in full.

s.  The Defendant Simmons is liable for a penalty of $10,000.00 per day for each day from January 5, 1998, to June 13, 2005, which is a period of 2,716 days. The Defendant Simmons shall pay to the Oklahoma Office of the Attorney General the penalty amount of $27,160,000.00, plus post-judgment interest accruing thereon at the rate of 5.115% from the date of entry of this judgment until paid in full.

t.  The Defendant Cal-Maine is liable for a penalty of $10,000.00 per day for each day from September 11, 1998, to September 11, 2003, which is a period of 1,827 days. The Defendant Cal-Maine shall pay to the Oklahoma Office of the Attorney General the penalty amount of $18,270,000.00, plus post-judgment interest accruing thereon at the rate of 5.115% from the date of entry of this judgment until paid in full.

u.  The State is entitled to an award of attorneys fees and costs. The amount of the award for the State's attorneys fees and costs will be separately determined by the Court following subsequent briefing by the parties. This separate determination shall not impact the finality of this judgment.

    v.    The penalty amounts detailed in Sections 5(p-t) shall be separate and apart from those payments pertaining to the master, the WMT, and their activities that are set out in Section 3, and any payments awarded for the State's attorneys fees and costs as set out in Section 5(u).

**6.** **<u>Retention of Jurisdiction</u>**

    a.    The Court shall retain jurisdiction of the Case for the purposes of enforcing the terms of this judgment.

    b.    The orders entered by the Court with respect to this judgment, as provided herein or as otherwise may be entered by the Court in the future, shall have the force and effect of binding orders, judgments, and law, and shall therefore govern the activities of the parties to the extent specifically addressed in such orders. The terms and conditions thereof shall apply to the Watershed unless and until such orders are modified, rescinded, or vacated.

Dated:  August _____, 2025

_____

GREGORY K. FRIZZELL
UNITED STATES DISTRICT COURT JUDGE