# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, *et al.*,          )
                                      )
                Plaintiffs,          )
                                      )
v.                                    )          Case No. 05-cv-329-GKF-SH
                                      )
TYSON FOODS, INC., *et al.*,          )
                                      )
                Defendants.          )

## DEFENDANTS' BRIEF IN OPPOSITION TO
## THE STATE'S PROPOSED FINAL JUDGMENT

Mark D. Hopson
Frank R. Volpe
Gordon D. Todd
Benjamin M. Mundel
Sidley Austin LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)
mhopson@sidley.com
fvolpe@sidley.com
gtodd@sidley.com
bmundel@sidley.com

*Attorneys for Tyson Foods, Inc.,*
*Tyson Poultry, Inc., Tyson Chicken, Inc.,*
*and Cobb-Vantress, Inc.*

(additional counsel listed on inside cover)

July 30, 2025

A. Scott McDaniel, OBA #16460
McDaniel Acord, PLLC
9343 East 95th Court
Tulsa, OK  74133
(918) 382-9200

*Attorney for Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., Cobb-Vantress, Inc., and Peterson Farms, Inc.*

Robert George, OBA #18562
George's, Inc.
402 W. Robinson Ave.
Springdale, AR  73764
(479) 927-7249

K.C. Dupps Tucker (admitted *pro hac vice*)
Kristy E. Boehler (admitted *pro hac vice*)
The Law Group of Northwest
   Arkansas PLLC
1830 Shelby Lane
Fayetteville, AR 72704
(479) 316-3760

Perry L. Glantz (admitted *pro hac vice*)
Stinson LLP
1144 15th Street, Suite 2400
Denver, CO 80202
(303) 376-8410

Clinton Russell, OBA # 19209
Taylor, Foster, Mallett, Downs,
   Ramsey & Russell
400 West Fourth Street
Claremore, OK 74018
(918) 343-4100
crussell@soonerlaw.com

*Attorneys for George's, Inc. and George's Farms, Inc.*

John R. Elrod (admitted *pro hac vice*)
Vicki Bronson, OBA 20574
Conner & Winters, P.C.
4375 N. Vantage Drive, Suite 405
Fayetteville, AR  72703
(479) 582-5711
(479) 358-1518 (facsimile)
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Simmons Foods, Inc.*

Robert P. Redemann, OBA #7454
William D. Perrine, OBA #11955
Perrine, Redemann, Berry,
   Taylor & Frette, PLLC
1800 S. Baltimore Ave., Suite 900
Tulsa, OK 74119
(918) 382-1400
(918) 382-1499 (facsimile)
rredemann@pmrlaw.net
wperrine@pmrlaw.net

Robert E. Sanders, MSB#6446
   (admitted *pro hac vice*)
Young Wells Williams P.A.
P.O. Box 6005
Ridgeland, MS  39158-6005
(601) 948-6100
(601) 355-6136 (facsimile)
rsanders@youngwells.com

*Attorneys for Cal-Maine Foods*

John H. Tucker, OBA 9110
Theresa N. Hill, OBA 19119
Colin H. Tucker
Rhodes Hieronymus Jones
  Tucker & Gable
Two W. 2nd Street, Suite 1000
P.O. Box 21100
Tulsa, OK  74121-1100
(918) 582-1173
(918) 592-3390 (facsimile)
jtucker@rhodesokla.com
thill@rhodesokla.com
chtucker@rhodesokla.com

Jacob D. Bylund, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Main: (515) 248-9000
jacob.bylund@faegredrinker.com


Bruce Jones, admitted *pro hac vice*
Aaron D. Van Oort, admitted *pro hac vice*
Christopher H. Dolan, admitted *pro hac vice*
Jeffrey P. Justman, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Well Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Main:  (612) 766-7000
bruce.jones@faegredrinker.com
aaron.vanoort.jones@faegredrinker.com
chris.dolan@faegredrinker.com
jeff.justman@faegredrinker.com

*Attorneys for Cargill, Inc. and Cargill*
*Turkey Production, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..............................................................................................iii

INTRODUCTION ...............................................................................................................1

BACKGROUND ..................................................................................................................2

ARGUMENT........................................................................................................................3

I.    The Remedies Oklahoma Requests Are Unlawful and Unwarranted. ........................3

    A.    Enjoining land application of poultry litter on fields exceeding 65 lbs./acre STP
is not warranted. .............................................................................................4

        1.    General Drummond has not proven irreparable harm.............................5

            a.    The record lacks current causation evidence. .............................5

            b.    The State has an adequate, alternative remedy. ...........................6

            c.    General Drummond's proposed injunction goes far further than
necessary to redress the injury. ....................................................7

        2.    The balance of the equities favors defendants. .......................................9

        3.    The State's injunction would harm the public interest...........................11

        4.    Any injunction would improperly punish Defendants for conduct invited and
allowed by the State of Oklahoma. .......................................................14

    B.    General Drummond has failed to prove any basis for remediation. ...................15

    C.    The Court should not refer the case to a special master. ...................................17

        1.    Referral would violate Article III. .........................................................18

        2.    Referral would violate Rule 65............................................................20

        3.    Referral is not justified under Rule 53. ..................................................21

    D.    General Drummond's Civil Penalty Demands Are Unwarranted........................23

        1.    Due process and agency principles prohibit imposing civil penalties based on
conduct Defendants did not personally commit...................................24

        2.    Defendants' good-faith, minimally culpable conduct does not warrant civil
penalties................................................................................................25

3.  There is no basis for awarding daily penalties. ....................................................28

4.  The Attorney General's total penalty request violates Defendants' rights to due process and protection against excessive fines. ..........................................31

E.  Defendant-specific Arguments ..........................................................................32

1.  Defendants who no longer have poultry operations or contracts in the IRW are not subject to certain forms of injunctive relief. ..........................................32

a.  The Withdrawn Defendants will have no ongoing connection to or relationship with poultry operations in the IRW. ....................................33

b.  The proposed injunctive relief mostly does not apply to companies without ongoing poultry operations or contracts. ....................................33

2.  George's ..............................................................................................................38

3.  Peterson Farms ..................................................................................................41

II.  The Court Should Enter a Take-Nothing Judgment or, at Most, Order Defendants to Take Reasonable and Modest Future Action in the IRW. ......................................41

III.  The Court Should Defer Ruling on Any Award of Attorneys' Fees, Including Any Fees the State Owes Defendants. ....................................................................................43

CONCLUSION ....................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felton,*
　521 U.S. 203 (1997) ................................................................................................................. 5

*In re Ames Dep't Stores, Inc.,*
　76 F.3d 66 (2d Cir. 1996) ...................................................................................................... 23

*Att'y Gen. of Okla. v. Tyson Foods, Inc.,*
　565 F.3d 769 (10th Cir. 2009) ........................................................................................... 5, 16

*Azar v. Allina Health Servs.,*
　587 U.S. 566 (2019) ............................................................................................................... 12

*Bagnell v. Floyd,*
　No. 17-CV-049-GKF-JFJ, 2018 WL 1177413 (N.D. Okla. Mar. 6, 2018) ....................... 35

*Bartlett-Collins Co. v. Surinam Navigation Co.,*
　381 F.2d 546 (10th Cir. 1967) ............................................................................................. 21

*Beasley v. Texas & P. Ry. Co.,*
　191 U.S. 492 (1903) ............................................................................................................... 11

*Bierman v. Aramark Refreshment Servs., Inc.,*
　198 P.3d 877 (Okla. 2008) .................................................................................................... 24

*BMW of N. Am., Inc. v. Gore,*
　517 U.S. 559 (1996) ............................................................................................................... 31

*Bristow First Assembly of God v. BP p.l.c.,*
　No. 15-CV-523-GKF-CDL, 2022 WL 1811200 (N.D. Okla. Apr. 13, 2022) ................. 5, 30

*Bronson v. Swensen,*
　500 F.3d 1099 (10th Cir. 2007) ........................................................................................... 35

*Burlington N.R.R. Co. v. Dep't of Revenue,*
　934 F.2d 1064 (9th Cir. 1991) ............................................................................................. 20

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,*
　244 F. Supp. 2d 41 (N.D.N.Y. 2003) .................................................................................. 28

*City of New York v. Mickalis Pawn Shop, LLC,*
　645 F.3d 114 (2d Cir. 2011) ................................................................................................. 18

*Com. State Bank of Roseville v. Gidney,*
   174 F. Supp. 770 (D.D.C 1959), *aff'd,* 278 F.2d 871 (D.C. Cir. 1960) ................................. 7

*Dayton Bd. of Ed. v. Brinkman,*
   433 U.S. 406 (1977) ......................................................................................................... 7, 9

*Deborah G. Mallow IRA SEP Inv. Plan v. McClendon,*
   No. CIV-12-436-M, 2012 WL 2036748 (W.D. Okla. June 6, 2012) ................................. 6

*eBay v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) .............................................................................................................. 9

*Facio v. Jones,*
   929 F.2d 541 (10th Cir.1991) ............................................................................................. 35

*Field v. Holland,*
   10 U.S. (6 Cranch) 8 (1810) ............................................................................................... 18

*Fitzgerald v. Mountain States Tel. & Tel. Co.,*
   68 F.3d 1257 (10th Cir. 1995) ............................................................................................ 24

*Free the Nipple-Fort Collins v. City of Fort Collins,*
   916 F.3d 792 (10th Cir. 2019) ............................................................................................ 13

*M.G. ex rel. Garcia v. Armijo,*
   117 F.4th 1230 (10th Cir. 2024) ........................................................................................ 20

*Guedes v. ATF,*
   920 F.3d 1 (D.C. Cir. 2019) ............................................................................................... 12

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ............................................................................................................. 43

*Hisp. Affs. Project v. Perez,*
   141 F. Supp. 3d 60 (D.D.C. 2015) ..................................................................................... 13

*Horne v. Dep't of Agric.,*
   576 U.S. 350 (2015) ............................................................................................................. 14

*Horne v. Flores,*
   557 U.S. 433 (2009) ............................................................................................................... 5

*Hudson v. Sch. Dist. of Kansas City,*
   578 S.W.2d 301 (Mo. Ct. App. 1979) ................................................................................ 36

*Kimberly v. Arms,*
   129 U.S. 512 (1889) ............................................................................................................. 18

*King v. State*,
    130 P.2d 105 (Okla. Crim. App. 1942) ........................................................... 31

*Kleinman v. City of Austin*,
    310 F. Supp. 3d 770 (W.D. Tex. 2018) ......................................................... 28

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999) ......................................................................................... 24

*La Buy v. Howes Leather Co.*,
    352 U.S. 249 (1957) .................................................................................. 18, 21

*Lentz v. Mason*,
    961 F. Supp. 709 (D.N.J. 1997) ..................................................................... 25

*Liptak v. United States*,
    748 F.2d 1254 (11th Cir. 1984) ..................................................................... 21

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ......................................................................................... 22

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) ......................................................................................... 14

*Madrigal Audio Labs., Inc. v. Cello, Ltd.*,
    799 F.2d 814 (2d Cir. 1986) ........................................................................... 22

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ........................................................................................... 7

*Meeropol v. Meese*,
    790 F.2d 942 (D.C. Cir. 1986) ....................................................................... 22

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ...................................................................... 9, 17

*Missouri v. Illinois*,
    200 U.S. 496 (1906) ......................................................................................... 14

*Moore v. Texaco, Inc.*,
    244 F.3d 1229 (10th Cir. 2001) ..................................................................... 29

*Nat'l Wildlife Fed'n v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) ....................................................................... 14

*New York v. United States*,
    505 U.S. 144 (1992) ......................................................................................... 23

*In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010,*
   148 F. Supp. 3d 563 (E.D. La. 2015)..............................................................28

*Oklahoma v. Tyson Foods, Inc.,*
   258 F.R.D. 472 (N.D. Okla. 2009) ..............................................................12

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
   810 F.3d 631 (9th Cir. 2015)..............................................................19

*Ex parte Peterson,*
   253 U.S. 300 (1920)..............................................................18

*Petroleum Exploration v. Pub. Serv. Comm'n of Ky.,*
   304 U.S. 209 (1938)..............................................................18

*Phelps v. Hamilton,*
   122 F.3d 1309 (10th Cir. 1997) ..............................................................35

*Prairie Band Potawatomi Nation v. Wagnon,*
   476 F.3d 818 (10th Cir. 2007) ..............................................................4, 9, 11

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
   324 U.S. 806 (1945)..............................................................15

*Preiser v. Newkirk,*
   422 U.S. 395 (1975)..............................................................34

*Printz v. United States,*
   521 U.S. 898 (1997)..............................................................23

*Purzel Video GmbH v. Smoak,*
   11 F. Supp. 3d 1020 (D. Colo. 2014) ..............................................................15

*R.R. Comm'n of Tex. v. Pullman Co.,*
   312 U.S. 496 (1941)..............................................................12

*Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.,*
   960 F. Supp. 2d 988 (D. Minn. 2013)..............................................................36

*SEC v. Ormont Drug & Chem. Co.,*
   739 F.2d 654 (D.C. Cir. 1984) ..............................................................37

*Schell v. OXY USA Inc.,*
   814 F.3d 1107 (10th Cir. 2016) ..............................................................35

*SEC v. Jarkesy,*
   603 U.S. 109 (2024)..............................................................18

*SEC v. Pentagon Cap. Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013) ..............................................................................27

*Skydive Arizona, Inc. v. Quattrocchi,*
    673 F.3d 1105 (9th Cir. 2012) .............................................................................7

*St. Louis, I.M. & S. Ry. Co. v. Williams,*
    251 U.S. 63 (1919) ..............................................................................................31

*Stauble v. Warrob, Inc.,*
    977 F.2d 690 (1st Cir. 1992) ......................................................................... 19, 20

*Stern v. Marshall,*
    564 U.S. 462 (2011) ............................................................................................18

*Street v. City of Harrisonville,*
    No. 18-00477, 2018 WL 4088083 (W.D. Mo. Aug. 27, 2018) ...........................7

*Texas v. DHS,*
    123 F.4th 186 (5th Cir. 2024) .............................................................................13

*Timbs v. Indiana,*
    586 U.S. 146 (2019) ............................................................................................31

*Trial Lawyers Coll. v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch,*
    23 F.4th 1262 (10th Cir. 2022) ...........................................................................16

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................................................27

*Tull v. United States,*
    481 U.S. 412 (1987) ............................................................................................32

*TXO Prod. Corp. v. Alliance Res. Corp.,*
    509 U.S. 443 (1993) ............................................................................................31

*In re United States,*
    816 F.2d 1083 (6th Cir. 1987) ...........................................................................21

*United States v. Bajakajian,*
    524 U.S. 321 (1998) ....................................................................................... 31, 32

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018) .........................................................................26

*United States v. Halper,*
    490 U.S. 435 (1989) ............................................................................................32

*United States v. Or. State Med. Soc'y,*
  343 U.S. 326 (1952) ................................................................................................5

*United Tactical Sys., LLC v. Real Action Paintball, Inc.,*
  No. 14-cv-04050, 2014 WL 6788310 (N.D. Cal. Dec. 2, 2014) ...........................9

*Untied States v. Microsoft Corp.,*
  147 F.3d 935 (D.C. Cir. 1998) ................................................................ 18, 19, 21

*Vallario v. Vandehey,*
  554 F.3d 1259 (10th Cir. 2009) ............................................................................21

*Wilver v. Fisher,*
  387 F.2d 66 (10th Cir. 1967) ................................................................................18

## Constitutional Provisions

U.S. Const. amend. VIII ...............................................................................................31

U.S. Const. amend. XIV, § 1 ........................................................................................31

Okla. Const. art. II, § 7 .................................................................................................31

Okla. Const. art. II, § 9 .................................................................................................31

## Statutes & Regulations

33 U.S.C. § 1319(d) .....................................................................................................28

42 U.S.C. § 6972(e) ......................................................................................................43

138-00-021 Ark. Code R. § 2201.1 .............................................................................14

Ark. Act of Apr. 17, 2025, No. 820 .............................................................................17

Ark. Admin. R. 138.00.05-001 ....................................................................................25

Ark. Admin. R. 138.00.05-004 ....................................................................................25

Ark. Code Ann. § 15-20-1108 .....................................................................................25

Okla. Admin. Code § 35:17-5-1 ...................................................................................14

Okla. Admin. Code § 35:17-5-2 (2010) .......................................................................14

Okla. Stat. tit. 2, § 10-9.1 ...................................................................................... 14, 25

Okla. Stat. tit. 2, § 10-9.3 .............................................................................................25

Okla. Stat. tit. 2, § 10-9.7 ............................................................................... 8, 11, 14, 25

Okla. Stat. tit. 2, § 10-9.11 ............................................................................................ 25, 26

Okla. Stat. tit. 2, § 10-9.19a (2010) ............................................................................... 14

Okla. Stat. tit. 12, § 940(A) ............................................................................................ 43

Okla. Stat. tit. 27A, § 2-3-504 ........................................................................... 23, 27, 28, 32

Okla. Stat. tit. 27A, § 2-6-105 .................................................................................... 27, 28, 29

Okla. Stat. tit. 45, § 729 ................................................................................................. 27

Okla. Stat. tit. 75, § 303 ................................................................................................. 11

**Other Authorities**

Fed. R. Civ. P. 16(b)(4) ................................................................................................. 15

Fed. R. Civ. P. 34 .......................................................................................................... 15

Fed. R. Civ. P. 53 ..................................................................................................... 21, 22

Fed. R. Civ. P. 65(d)(1) ................................................................................................. 20

Curtis Killman, *Case Against State Attorney General Candidate Dismissed After Settlement Over Killing of Trees on Federal Land*, Tulsa World (Dec. 17, 2021), tinyurl.com/498es7t3 ................................................................................................. 1

Restatement (Second) of Torts § 909 ............................................................................. 24

Press Conference Remarks of Gov. Kevin Stitt, Dailymotion (Apr. 23, 2025), tinyurl.com/6jxcnmrs ................................................................................................. 17

# INTRODUCTION[1]

After failing repeatedly at either trial to present substantial evidence supporting an appropriate and permissible remedy, the Attorney General now asks this Court to impose a vastly overbroad, mandatory injunction; to assess more than $100 million in standardless civil penalties; and otherwise to outsource the remedial phase of this litigation, along with a blank check, to a private special master. Each and every element of General Drummond's[2] proposal lacks a legal or evidentiary basis, and it should be rejected *in toto*.

General Drummond's proposed remedy would run roughshod over Oklahoma law and public policy. Oklahoma's legislature and governor have determined that the environmental and economic considerations of poultry litter are best balanced via a comprehensive-permitting regime administered by the State's technical experts. General Drummond's proposed judgment would displace that regime, replacing it with a special master unbounded by any legal, policy, or financial mandate.

General Drummond holds himself out as a friend to industry and a careful steward of the environment. Doc. 3163 at 1. In truth, he is neither.[3] He proposes crushing liability for an industry thousands of Oklahomans rely on for their livelihoods, yet seeks remedies that have not been proven to protect the environment. General Drummond's proposal is most notable for what it elides—

---

[1] Defendants continue to object to the Court's determination of liability and all findings of fact and conclusions of law necessary to that determination. For purposes of this filing, Defendants accept the Court's findings and conclusions but in proposing potential remedies Defendants make no admissions and waive no claims or objections. Defendants preserve all such claims and objections and all bases for appeal.

[2] Attorney General Drummond has informed Defendants that Secretary of the Environment Starling has asked to be removed as a plaintiff in this matter. *See* Ex. 3, Email from Jennifer L. Lewis to Defendants' Counsel (July 7, 2025). Defendants consented to that removal weeks ago but Secretary Starling remains in the case. It is therefore unclear to Defendants the extent to which the proposed judgment reflects just General Drummond's preferences, or also reflects the considered judgment of the chief environmental regulator for the State of Oklahoma. Defendants respectfully urge the Court to also hear from Secretary Starling, particularly with respect to the imposition of penalties under state environmental laws.

[3] *See* Curtis Killman, *Case Against State Attorney General Candidate Dismissed After Settlement Over Killing of Trees on Federal Land*, Tulsa World (Dec. 17, 2021), tinyurl.com/498es7t3.

responsibility for imposing any specific prospective remedy, which it punts to a special master; and responsibility for transferring tens of millions of public funds to out-of-state plaintiffs' lawyers, which his proposed judgment would necessarily do.

Ultimately, however, any remedy must be cabined by the law and evidence actually presented in the case, and must balance the harms of an injunction and reflect the public interest. Focusing on those bases, the Court should enter a take-nothing judgment or, at most, enter a judgment consistent with the laws and policies of the States of Oklahoma and Arkansas, that does not trammel Defendants' legitimate business operations, and that respects the rights of the many impacted third parties not before the Court.

## BACKGROUND

Remedy evidence in this matter is scant. At trial in 2009, the State presented a single remedies witness, Mr. Todd King, who offered only a "preliminary" study of the remedial "options." Trial Tr. 7990:18–7991:7.[4] Mr. King excused his noncommittal testimony on the basis that he had been given neither enough time nor information to offer conclusive opinions. *See Id.* at 8022:12–8023:15. The Court admonished Mr. King that, "this being a lawsuit, the decision has to be made" based on evidence submitted at trial. *Id.* at 8012:9–10. Yet trial came and went without Mr. King or any other witness offering a firm opinion as to the appropriate remedy in light of its efficacy, costs and benefits, and burdens imposed on the defendants and people of Oklahoma and Arkansas. Based on that shortcoming, Defendants moved for judgment under Rule 50(c), but the Court ruled that the issue was not properly part of a Rule 50(c) motion and could be addressed later. *Id.* at 8475:7–21.

Fifteen years later, that evidentiary gap remains. To be sure, the Court initially required that this past December's trial would include presentation of evidence on "the specific terms of the

---

[4] In this brief, "Trial Tr." refers to transcripts from the trial in 2009–10, while "Hr'g Tr." refers to transcripts from the December 2024 evidentiary hearing.

injunctive relief . . . upon which plaintiffs bear the burden of proof." Doc. 3040, Hr'g Tr. 5:9–22 (Sep. 13, 2024). In late November, however, the Court announced that the December hearing "shall not address remedies." Doc. 3098, Status Conf. Tr. 4:4–5 (Nov. 26, 2024). As the Court explained, "wrestl[ling] with the issue of remedies would be premature,"[5] and in any event the "plaintiff had adequate opportunity to address its requested remedies at trial." *Id.* at 4:9–12. At the December hearing the Court excluded evidence addressing remedies, *e.g.*, Hr'g Tr. 66:17–25, 69:12–15, 610:3–25, and also rejected the State of Arkansas' attempt to address the impacts of anticipated remedial orders. Doc. 3159. In view of the Court's rulings, Defendants have had no opportunity to tender their remedies evidence. *See* Ex. 5, Expert Report of T. McDonnell & T. Sullivan, at 2.

The Court has now elected to forego any evidence regarding remedies, and the Attorney General apparently agrees. Doc. 3162. Instead, General Drummond has submitted a proposed judgment that seeks: (1) a prohibitory injunction providing that "the Poultry Waste generated by the Defendants' Birds shall not be applied in the IRW, or in any other Nutrient-Sensitive Watershed, on land having an STP of 65 lbs./acre or greater"; (2) a mandatory remediation injunction, accompanied by the 30-year appointment of a special master to investigate, recommend, and enforce remediation efforts; and (3) over $100 million in civil penalties. Doc. 3163-1 ("Proposed Final J."). General Drummond did not offer any evidence to justify his proposal, and the record is now closed.

## ARGUMENT

### I.     The Remedies Oklahoma Requests Are Unlawful and Unwarranted.

For reasons already briefed at great length, Defendants maintain that the record does not support a finding of liability. But even accepting *arguendo* the Court's findings and conclusions, the record still lacks evidence to support the imposition of any remedies. And even if some remedy were

---

[5] General Drummond concurred. *See* Ex. 4, Oct. 4, 2024 Letter to John H. Tucker at 2 ("[A]ddressing the details of remedies is a subject for a later date—not the focus of the evidentiary hearing.").

theoretically warranted, the Court should reject General Drummond's judgment. The proposed injunction is overly broad, miscalculates the balances of equities, and would harm the public interest. General Drummond has not proven any entitlement to extensive remediation, and the proposed special master would violate both Article III and the rules of civil procedure. Finally, the Court should not award any civil penalties at all, let alone penalties based on General Drummond's excessive calculation.

### A. Enjoining land application of poultry litter on fields exceeding 65 lbs./acre STP is not warranted.

The Court should rebuff General Drummond's blanket request to enjoin land application of poultry litter on all fields exceeding 65 lbs./acre STP. To be entitled to a permanent injunction, plaintiffs must show: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (cleaned up). General Drummond has not made this showing.

He has failed to show irreparable harm for three reasons: (1) the record lacks any current evidence showing a causal link between litter applications and phosphorous levels in the IRW; (2) the State of Oklahoma has an alternative remedy through its existing permitting authority; and (3) in any event, his proposal wrongly equates STP levels with pollution of the waters of the IRW, and is thereby overbroad. General Drummond also gets the balance of equities all wrong, providing minimal relief while severely burdening economically critical operations. And his proposal takes no account of the public interest, running roughshod over state-mandated permitting procedures and the interests of numerous parties not before the Court.

      **1.**    **General Drummond has not proven irreparable harm.**

      **a.**    **The record lacks current causation evidence.**

Prospective injunctive relief requires current evidence. *Horne v. Flores*, 557 U.S. 433, 447–48 (2009); *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952). In a case like this, the requirement for current evidence includes reliable fate and transport evidence connecting the conduct to be prospectively enjoined to the alleged injury. *See Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 778 (10th Cir. 2009).[6] The record lacks any such evidence.

Causation evidence from 15–20 years ago is neither current nor reliable. Hr'g Tr. 1169:23–1171:17. Nor is the evidence presented at the December 2024 trial, particularly as to causation, sufficient to justify any prospective relief. The Court properly excluded the opinions of the State's only causation witness, Kate Mendoza, as scientifically unreliable. Doc. 3095 (Dec. 1, 2024 Order Excluding Kate Mendoza Opinions). No other witness presented any evidence connecting current water quality conditions in the IRW today to the farms raising birds today in the IRW, much less to land where litter is actually being applied today. *See, e.g.*, Hr'g Tr. 615:8–616:15 (Scott); *id.* at 1169:23–1171:17 (McDonnell).[7]

The causation evidence is particularly lacking when evaluated for each individual defendant. Consider, for example, the George's Defendants. The only witness to address recent litter application

---

[6] The requirement of proof of "fate and transport" is simply the concept of specific causation applied in the context of a watershed. "'[S]pecific causation' is not established if an expert offers an opinion that an injury 'could have' resulted from a particular cause—the expert must provide testimony that it actually *did* result from that cause." *Bristow First Assembly of God v. BP p.l.c.*, No. 15-CV-523-GKF-CDL, 2022 WL 1811200, at *4 (N.D. Okla. Apr. 13, 2022) (Frizzell, J.) (quoting *Hall v. Conoco*, 886 F.3d 1308, 1317 (10th Cir. 2018)).

[7] Although the Court's June 2025 Opinion includes findings about the number of poultry houses in the IRW still raising birds for the Defendants in 2023 and the volume of poultry litter *generated* within the IRW during that same year (*see* 2023 FOF ¶¶ 22–24), that evidence does not prove a link between recent or ongoing poultry litter *applications* in the IRW and water quality impacts. General Drummond's own witnesses concede this point. Hr'g Tr. 488–90 (S. Phillips) (admitting that phosphorus concentrations in streams cannot be predicted merely by proximity to or density of poultry houses and that "there would be other factors you'd have to consider.").

in the IRW was ODAFF employee Lynette Jordan. Her testimony included a presentation of data through 2023 from a "[Poultry Feeding Operations] access database" or "litter spreadsheet," which purported to show the disposition of poultry litter generated on IRW poultry farms. Hr'g Tr. 674:10–675:1; 698–714; *see also* Hr'g Ex. OKLA_PX_230 (database exhibit). That dataset fails to identify any instance in which a grower contracted with George's land applied litter in the IRW in recent years. In fact, PX230 does not mention George's or even the sole grower specifically identified by the Court as still actively raising poultry for George's in the Oklahoma portion of the IRW. *See* Doc. 3161, n.7 (discussing "Pugh Farms"). The uncontroverted evidence shows that Pugh Farms has been consistently exporting its litter to Kansas. *See* Hr'g Ex. OKLA_PX_0104 at 00008, 00012, 00014, & 00028. General Drummond failed to present causation evidence tying any farm location where George's birds are being raised today, or have been raised in the past, to ongoing injuries to the waters of the IRW.

A similar evidentiary gap exists for each and every defendant.[8] That failure of proof alone mandates denial of General Drummond's request for any prospective injunction as to future litter applications by growers under contract with any Defendant.

### b.    The State has an adequate, alternative remedy.

An injunction should also not issue if the moving party has an adequate alternative remedy. *See, e.g., Deborah G. Mallow IRA SEP Inv. Plan v. McClendon*, No. CIV-12-436-M, 2012 WL 2036748, at

---

[8] As another example, General Drummond has not presented evidence supporting specific causation and failed to acknowledge the complexity of field-specific agronomic needs reflected in Nutrient Management Plans. General Drummond introduced a 2023 Nutrient Management Plan for former Cargill-contracted growers Keith and Jerri Mitchell, but that document indicates that all fields in their operation had "Low" Soil Test Phosphorus Index Levels, indicating an agronomic need for additional phosphorus. DJX-0228, at 8. Even General Drummond does not dispute that, when soil phosphorus is low, poultry litter can be applied to meet crop needs without posing a risk of any phosphorus runoff. *Id.* at 11–12. General Drummond has similarly failed to introduce any evidence indicating how excess phosphorus would have entered the waters of the IRW from the specific fields of growers under contract with specific Defendants. This illustrates that, in the absence of evidence tracing phosphorus from applied litter to the waters of the IRW—especially where agronomic need exists—the evidence provided by the State does not establish causation between land-applied poultry litter and heightened phosphorus levels in the IRW.

*3 (W.D. Okla. Jun. 6, 2012). Oklahoma already has broad authority to issue, modify, and enforce litter application permits. The proposed injunction is therefore unnecessary.

The Attorney General here asks the Court for authority Oklahoma already has. Indeed, the State can and already has adopted a more comprehensive remedy than General Drummond proposes; the State could adopt new regulations governing all poultry litter application anywhere in the state. The problem is not a lack of authority, but the fact that the State's executive and regulatory agencies disagree with General Drummond's claims and proposed relief. In the 20 years of this litigation, neither ODAFF nor ODEQ has chosen to impose any of the restrictions that General Drummond now asks this Court to impose.

General Drummond's inability to impose these restrictions himself does not alter the fact that his client can. "Adequate remedy at law means a remedy vested in the complainant, to which he may at all times resort at his own option, fully and freely, without let or hindrance." *Com. State Bank of Roseville v. Gidney*, 174 F. Supp. 770, 779–80 (D.D.C 1959), *aff'd,* 278 F.2d 871 (D.C. Cir. 1960) (cleaned up). Here, Oklahoma could at any time implement the demanded remedy but has chosen not to. General Drummond cannot use his own client's unwillingness to act to justify judicial relief that would override his own client's decisions and usurp his own client's power.

### c.    General Drummond's proposed injunction goes far further than necessary to redress the injury.

"Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). An injunction thus must be "tailor[ed]" to prevent the "specific violations" proven. *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977). In other words, courts cannot "enjoin conduct that has not been found to violate any law," *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012), or that "bear[s] no relationship to [plaintiff's] injuries," *Street v. City of Harrisonville*, No. 18-00477, 2018 WL 4088083, at *4 (W.D. Mo. Aug. 27, 2018).

The only harm recognized in this case is "injury to the waters of the IRW." Doc. 2979, 2023 Conclusion of Law ("COL") ¶ 93; Doc. 3161, 2024 COL ¶ 63. To redress this harm, General Drummond proposes barring application of poultry waste on any "land having an STP of 65 lbs./acre or greater." Proposed Final J. ¶ 4(b). But not all such land contributes to pollution of the IRW's waters, nor has any specific field been shown to contribute. As General Drummond's own witness agreed, "one can't simply look at STP records and say . . . this field has high STP, and therefore, this field is likely contributing [phosphorous] to that . . . river or lake over there." Hr'g Tr. 643:18–23 (Scott). In fact, the State's runoff expert testified that a majority of the pollution comes from a small portion of the land. *Id.* at 643:12–17 ("most" phosphorous in the waters of the IRW "comes from a fairly small number of places"), 654:3–7 (same). Oklahoma policymakers agree, which is why they directed the State Board of Agriculture to account for "site conditions" when determining appropriate "land-application rates of poultry waste." Okla. Stat. tit. 2, § 10-9.7.

General Drummond's proposed injunction ignores his own expert's testimony that, whatever a field's STP measurement, there must be "hydrologic connectivity from field to stream for [phosphorous] to move from that field to that stream." Hr'g Tr. 640:7–642:24 (Scott). Yet no witness for the State at any point "undert[ook] to trace phosphorous from any land application of poultry litter that may be associated with any poultry-grower associated with any of these defendants . . . through the Illinois River watershed." *Id.* at 615:8–616:15.

It is no answer that this Court has found that "run off from land-applied poultry waste . . . caus[es] injuries to the waters of the IRW." 2023 Finding of Fact ("FOF") ¶ 543; 2024 FOF ¶ 60. Even accepting for liability purposes that some runoff from *some* fields caused *some* harm to *some* waters of the state (general causation), that is insufficient to support an injunction against *all* application on *all* fields owned by *all* farmers under contract with any Defendant (specific causation). Such an injunction improperly would enjoin conduct that has not been proven to contribute to the claimed harm.

*See Brinkman*, 433 U.S. at 417. Having failed to prove that land application of poultry waste on any field—must less every field—with an STP exceeding 65 lbs./acre contributes to contamination of the waters of the IRW, General Drummond cannot now obtain an injunction prohibiting all such conduct.

Lastly, the proposal to enjoin conduct in "any other Nutrient-Sensitive Watershed" lacks any support in the record. Proposed Final J. ¶ 4(b). The record before the Court concerns "injury to the waters of the IRW" only. 2023 COL ¶ 93; 2024 COL ¶ 63. The record contains no evidence regarding other watersheds, let alone Defendants' operations or alleged injuries in such watersheds. The Court again should resist the invitation to "enjoin conduct that has not been found to violate any law." *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-cv-04050, 2014 WL 6788310, at *24 (N.D. Cal. Dec. 2, 2014).

### 2.    The balance of the equities favors defendants.

To secure permanent injunctive relief, General Drummond must prove "that, considering the balance of hardships between the plaintiff and defendant[s], a remedy in equity is warranted." *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "[T]he threatened injury [must] outweigh[ ] the harm that the injunction may cause the opposing party" in order to warrant issuing an injunction. *Prairie Band*, 476 F.3d at 822 (citation omitted). He has not carried his burden.

**a.** General Drummond's proposed injunction is unlikely to prevent the relevant injury as it ignores the many other sources that contribute phosphorous to the waters of the IRW. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 789–92 (7th Cir. 2011) (injunction properly denied where evidence failed to show relief would significantly reduce harm at issue). These include cattle ranching, urbanization, and many other point and non-point sources.[9] *See* 2023 FOF ¶¶ 570–71, 563, 566, 573–

---

[9] It is no answer to claim all of these activities release "legacy phosphorous" originally sourced from poultry litter, as the record contains no evidence quantifying or sourcing "legacy phosphorous" in the IRW, tracing it back to poultry litter application, or tracking its contributions to harm to the waters of the IRW.

78, 581–84.

Nor does the proposed injunction even address all poultry farming. Rather, it would omit the many poultry operations in the IRW that were not parties to this suit. The excluded operations would be free to continue applying poultry litter unabated by Court order and subject only to their State-approved nutrient management plans. No one should be surprised if these businesses enjoy substantial growth from the competitive windfall of an injunction against Defendants only. Growers may well elect to move to non-Defendant producers to avoid judicial constraints on how they can use their poultry litter on their land, further reducing the impact of injunctive relief on water quality. This likely outcome further illustrates the flawed basis of the requested relief.

**b.** As noted, Defendants have had no opportunity to offer evidence as to the balance of harms relating to the proposed injunction, but such evidence as there is suggests the burdens placed on Defendants will be immense. Limiting application of poultry litter to fields measuring below 65 STP is tantamount to ordering thousands of tons of poultry litter to be trucked out of the IRW each year. The proposed relief will also burden growers. General Drummond concedes as much in proposing that defendants "hold their Contract Growers harmless" for the losses associated with his proposed injunction and fully fund all litter storage and removal operations, Proposed Final J. ¶ 4(h)–(i)—a naked attempt to manufacture compensation for what would otherwise be an illegal taking, and to insulate the Attorney General from reaping the consequences of his proposal at the ballot box. But this provides no mechanism for evaluating costs, determining which are compensable, or deciding which Defendant or Defendants must contribute.[10] The 65-STP rule may hamper Defendants' ability

---

[10] For example, if a grower uses synthetic fertilizer in lieu of poultry litter, is the cost of buying the synthetic fertilizer a loss? Does it net against the revenue from selling poultry litter? What if the farmer could sell the poultry litter but instead chooses to buy a truck and haul it to his own land outside the IRW—does he then get to claim the entire cost of the synthetic fertilizer as a loss? Do the Defendants have to pay for his new truck? What of the Defendants who will no longer operate in the IRW by the time relief is issued? Are they on the hook for indemnifying growers, too? General Drummond's

to profitably conduct business in the IRW at all, to their detriment and to the detriment of their employees, agents, and those with whom they contract. The balance of equities favors Defendants.

### 3.    The State's injunction would harm the public interest.

The State's proposed injunction is also inappropriate because it will "adversely affect the public interest." *Prairie Band*, 476 F.3d at 822; *see also Beasley v. Tex. & P. Ry. Co.*, 191 U.S. 492, 498 (1903) (this consideration alone may justify "refus[ing]" an injunction). Here too, General Drummond has failed to present any evidence on the public impact of his proposal. What we know from the existing record, though, is that accepting General Drummond's proposed 65-STP rule would ignore the interests of the many stakeholders not before this Court and end run the State's regulatory process.

a. Granting General Drummond's requested injunction would amount to a de facto modification of hundreds of poultry growers' Nutrient Management Plans ("NMPs")—replacing the existing STP limit with 65 lbs./acre—without regard to any site-specific characteristics and without the process mandated by Oklahoma law. If the State of Oklahoma wanted to achieve this result, it could do so by legislation or regulation or by revising individual field-specific plans as they come up for renewal under Oklahoma's recently revised environmental standards.[11] *See* Okla. Stat. tit. 2, § 10-9.7.

Either way, the process would be a public one; interested stakeholders would be on notice and have a chance to share their view with decisionmakers. *See* Okla. Stat. tit. 75, § 303 (requiring public notice and opportunity for comment for "adoption," "amendment," or "revocation" of a regulation). Those procedures matter. At the state level no less than the federal, the opportunity for public comment "gives affected parties fair warning of potential changes in the law and an opportunity to be

---

proposed "hold harmless" provision is so flimsy and unworkable that it seems designed only to allow General Drummond to blame the Court for any complaints from any constituents about remedies imposed by this Court.

[11] Ironically, the simplest and fairest way to achieve General Drummond's stated goals in this case would be to enjoin the State of Oklahoma from approving NMPs allowing poultry litter to be spread on any property in the IRW with an STP above 65 lbs./acre. But the State of Oklahoma has already determined that such a restriction does not properly balance the many competing interests involved.

heard on those changes—and it affords the [decisionmaker] a chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019).

By inviting this Court to impose a 65-STP limit, General Drummond hopes to amend the law without any opportunity for public comment, and in the process to "avoid the political accountability that would attend [his] own policy reversal." *Guedes v. ATF*, 920 F.3d 1, 23 (D.C. Cir. 2019). "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies," *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941), so the Court should reject General Drummond's request on this basis alone.

**b.** General Drummond's proposed end run would impact not only Defendants but also thousands of businesses and individuals not before the Court. Most notable of these is the State of Arkansas. As this Court has recognized with respect to other interested sovereigns, Arkansas has an "interest, as a sovereign, in governing and regulating resources within its jurisdiction," including the waters and lands surrounding the IRW. *Oklahoma v. Tyson Foods, Inc.*, 258 F.R.D. 472, 481 (N.D. Okla. 2009).

> [Arkansas] has enacted several legislative acts for land use over the past 25 years that balances agricultural and environmental considerations. These laws require site specific nutrient management plans written by technical experts that provide detailed instructions on locations, amounts, and timing of poultry litter applications.

Doc. 3053 (letter from Arkansas Secretary of Agriculture). General Drummond would have this Court replace those laws with a blanket 65-STP mandate, and in the process "impair and impede" Arkansas's sovereign judgment about the appropriate way to regulate poultry litter application on land within its borders. *Tyson Foods*, 258 F.R.D at 481.

The same is true as to many non-sovereigns not before the Court yet who will nonetheless be impacted by any judgment imposed. Poultry farmers or growers—including those who contract with Defendants here and the other growers, cattlemen, and hay farmers not included in Oklahoma's suit— as well as litter brokers or haulers—all have a vested stake in the outcome of this litigation. Hr'g Tr. 1160:14–21, 1202:7–1203:2 (McDonnell) (growers have developed economically beneficial

12

practices to transfer or store litter); *id.* at 1004:19–1005:8 (Fisk) (discussing cost sharing programs for poultry growers premised on investment in stacking sheds and new facilities); *id.* at 1168:12–23 (McDonnell) (OSU Extension advertises 19 different entities that provide litter export services); *id.* at 1037:14–24 (Fisk) (selling litter may be profitable); DJX2-0040, 0212, 0212-B, 0213, 0214, & 0215 (indicating that 73% of litter produced in Oklahoma today passes through the export market and is applied outside of the IRW).

These actors have made investments and entered into contracts premised on existing poultry-litter regulations—not General Drummond's proposed scheme. *See Hisp. Affs. Project v. Perez*, 141 F. Supp. 3d 60, 74 (D.D.C. 2015) (substantial harms to absent third parties weighs against injunctive relief). Impairing those contracts and destabilizing the livelihoods of countless individuals is not in the public interest. But it is precisely what the Attorney General asks this Court to do.

Ironically, in a suit alleging trespass, General Drummond asks the Court effectively to facilitate trespass onto private property, and the seizure of private property. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 807 (10th Cir. 2019) ("It's always in the public interest to prevent the violation of a party's constitutional rights." (cleaned up)); *Texas v. DHS*, 123 F.4th 186, 213 (5th Cir. 2024) ("[T]he public interest supports clear protections for property rights from government intrusion and control."). Poultry farmers, cattle ranchers, and other private landowners, not Defendants, own the land on which poultry houses are located, cattle are grazed, and poultry litter may be applied. Yet the Attorney General asks the Court to permit a special master and his team to enter private property to take soil samples and conduct other monitoring activities. So too, by ordering Defendants to "take control" of poultry litter produced by their birds, Proposed Final J. ¶ 4(f), the Attorney General pro-poses a "physical appropriation" of the growers' personal property, a *per se* taking if done directly.

*Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015).[12] Nor does the proposed injunction afford third parties any opportunity to be heard. *Cf. Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 315–16 (D.C. Cir. 1987). The proposed injunction's impacts on third parties strongly weigh against approval.

> ### 4.    Any injunction would improperly punish Defendants for conduct invited and allowed by the State of Oklahoma.

In all events, Defendants should not be enjoined because Oklahoma has unclean hands. "Where, as here, the plaintiff has sovereign powers, and deliberately permits discharges similar to those of which it complains, it not only offers a standard to which the defendant has the right to appeal, but . . . it warrants the defendant in demanding the strictest proof that the plaintiff's own conduct does not produce the result, or at least so conduce to it, that courts should not be curious to apportion the blame." *Missouri v. Illinois*, 200 U.S. 496, 522 (1906). Defendants so demand here, and this Court must deny any equitable relief on that basis.

It is undisputed that Oklahoma and Arkansas recognize that land application of poultry litter is "beneficial" and expressly authorize it. Okla. Admin. Code § 35:17-5-1; *see also* 138-00-021 Ark. Code R. § 2201.1 (same). Both also regulate litter application practices to capture benefits while minimizing harms. *See* Doc. 2979 at 4–6, 24–25; Okla. Stat. tit. 2, §§ 10-9.1(B)(1), 10-9.7(B)–(C)(5), 10-9.19a(1) (2010); Okla. Admin. Code § 35:17-5-2 (2010). Defendants and growers have tailored their conduct to these regulations. Indeed, this Court expressly recognized that "the defendants themselves comply with state and federal regulations—including litter application rates and instructions set forth in Animal Waste Management Plans ("AWMPs") or NMPs—on company-owned or operated farms." 2023 FOF ¶ 95.

Nevertheless, General Drummond proposes an injunction that would have this Court reach

---

[12] The Attorney General's suggestion to order construction of "buffer strips," "bank stabilization," and "constructed wetlands," Proposed Final J. ¶ 2(d), would likewise amount to a *per se* taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430 (1982) ("permanent physical occupation" of real property is per se taking).

across state lines into the sovereign territory of Arkansas and prohibit conduct that his home state of Oklahoma still authorizes.[13] *See* 2023 FOF ¶¶ 71, 78. This unconscionably puts Defendants in a trap of the State's own making. *See Purzel Video GmbH v. Smoak*, 11 F. Supp. 3d 1020, 1030 (D. Colo. 2014) (doctrine of unclean hands applies when the party seeking equitable relief is guilty of unconscionable conduct directly related to the matter at issue). That "closes the doors of a court of equity" to General Drummond, who is "tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant[s]." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

### B.    General Drummond has failed to prove any basis for remediation.

In addition to a prohibitory injunction, General Drummond also seeks a mandatory remedial injunction, which similarly lacks any evidentiary basis. At trial, when the Attorney General "had adequate opportunity to address its requested remedies," Doc. 3098 at 4:11–12, he called a single witness, Mr. King, who offered nothing more than a "preliminary" menu of remedial "options." Tr. 7990:18–7991:7. Mr. King admitted offering nothing more, explaining that the Attorney General's office had not provided the time or information necessary for a proper analysis. *See id.* at 8022:12–8023:15; Fed. R. Civ. P. 16(b)(4), 34. At the end of the 2010 trial, the State's remedy evidence remained a menu of "remedial options" to "be investigated." 2023 FOF ¶ 594.

General Drummond has shunned any opportunity to fill that gap. He opposed efforts to include remedies evidence in the December trial, *supra* at 3, and opposed Defendants' attempts to make a remedies record, Hr'g Tr. 66:17–25, 1234:21–1235:3, 1236:22–23. And, despite his earlier view that remedies would be addressed at "a later date," General Drummond has now proposed sweeping injunctive relief without a scintilla of additional evidence to supplement the existing stale and inadequate

---

[13] In fact, Oklahoma has continued to issue AWMPs throughout this lawsuit, and it candidly acknowledged that its suit "reflects a disagreement with current State law and regulations." 2023 FOF ¶ 86.

record.

The inadequacies in the current record are evident in General Drummond's attempt to argue around the balance-of-harms and public interest elements. *See* Doc. 3163 at 7–8. He baldly asserts that "the Defendants will not be greatly harmed by an injunction," *id.* at 7, but cannot be more specific because he cannot say what that injunction would be. Likewise, General Drummond vaguely asserts that reducing the phosphorus levels in the IRW and improving water quality would not "adversely affect the public interest," *id.* at 8—but how can anyone know that without knowing what methods will accomplish these ends? The Attorney General's own expert Todd King "expect[ed] there to be significant [public] concerns with many of th[e] remedial alternatives" he proposed. Trial Tr. 8114:18– 8117:7. And because General Drummond has refused to propose any specific remediation order or offer any evidence in support of such relief, the Defendants have had no opportunity to challenge the assertions concerning the balance of harms or the public interest, or to present their own evidence. Defendants previously moved for judgment under Rule 50(c) in 2009, but the Court ruled that the issue was not properly part of a Rule 50(c) motion and could be addressed later. Trial Tr. 8475:7–13. The issue is once again before the Court, and the same evidentiary gap precludes the State's requested relief.

Fault for the evidentiary shortfall lies at General Drummond's feet. It is his burden, after all, to prove not only Defendants' liability but also his entitlement to an injunction, *Tyson Foods*, 565 F.3d at 776, a burden that is even "greater" here since "the requested injunction is 'mandatory' rather than 'prohibitory,'" *Trial Lawyers Coll. v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1274 (10th Cir. 2022). As explained below, General Drummond cannot pass off that responsibility to a special master; he must make his case in court. Nor can he meet his burden by simply refusing to state what the proposed injunction will be; the Court cannot evaluate the balance of equities or public interest of granting an injunction if the party seeking the injunction does not state its terms. *See*

*Michigan*, 667 F.3d at 789 ("In light of the multifarious ideas the states have for an injunction in this case, there can be no doubt that caution must be our word of the day.").[14]

To be clear, had General Drummond attempted to make his remedial case, Defendants were fully prepared to meet his submission with expert testimony that the "preliminary" remedial "options" proposed by Mr. King are untenable. *See* Ex. 5 (McDonnell & Sullivan report). But he did not do so, and now the record is closed. Having failed to present any evidence on the appropriate remedial steps, the Court should deny General Drummond's request for remediation of any sort.

### C.    The Court should not refer the case to a special master.

Cognizant of these evidentiary shortcomings, the Attorney General proposes to outsource fact finding and remedy-crafting to a special master.[15] This proposal, however, is contrary to law. Referral on General Drummond's terms—with authority to effectively craft an injunction and determine compliance—would defy the Constitution's requirement that only Article III judges wield judicial power. Deferring the terms of the remedial plan to a master also contravenes Rule 65's requirement that any injunction specifically define the conduct to be restrained or required. The proposed referral would also not be justified under Rule 53, because it would unduly waste resources and time on matters that this Court is capable of handling itself.

---

[14] General Drummond's assessment of the public interest is not apparently shared by his co-plaintiff, Secretary Starling, *see supra* n.2; by Governor Stitt, Press Conference Remarks of Gov. Kevin Stitt at 10:46–14:15 (Apr. 23, 2025), tinyurl.com/6jxcnmrs; or by the elected lawmakers in Arkansas, *see, e.g.*, Ark. Act of Apr. 17, 2025, No. 820 (H.B. 1928) (no liability for actions consistent with NMPs); Doc. 3053, Oct. 25, 2024 Letter from Arkansas Secretary of Agriculture; Doc. 3159, Arkansas Attorney General's Motion for Leave to File Amicus Brief.

[15] The Attorney General's need to secure expensive remediation has little to do with the needs of Oklahomans and much to do with the needs of his private attorneys. Plaintiffs' counsel are also entitled to take up to 33.33% of any cash award, and up to 33.33% of the cash value of any remedial relief entered (not to exceed 50% of the total cash payment). *See* Doc. 1085-4. Manufacturing expensive relief thus gives the Attorney General's private lawyers a greater claim to take millions of dollars of public funds.

1.    **Referral would violate Article III.**

Article III's command is plain: If a suit is "within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." *Stern v. Marshall*, 564 U.S. 462, 484 (2011). No more may Congress "withdra[w] from judicial cognizance" matters entrusted to the Third Branch, *SEC v. Jarkesy*, 603 U.S. 109, 127 (2024), than a court can itself "refer the entire decision of a case" to someone else, *Kimberly v. Arms*, 129 U.S. 512, 524 (1889). A court, to be sure, may seek "aid . . . in the performance of specific judicial duties" from special masters and others, *Ex parte Peterson*, 253 U.S. 300, 312 (1920), but a special master cannot "displace the court," *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957). Rather, the court must "determine by its own judgment the controversy presented." *Kimberly*, 129 U.S. at 524.

**a.** General Drummond's proposed special master violates these legal limitations. To start, the proposed delegation of "broad power" to the special master "to determine the content of an injunction" poses "[s]erious constitutional" concerns—all the more so because the master would "effectively wield the court's power of contempt" as well. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011); *see Field v. Holland*, 10 U.S. (6 Cranch) 8, 21 (1810) (Marshall, C.J.) ("agents and officers of the court" like auditors "do not decree"); *Untied States v. Microsoft Corp.*, 147 F.3d 935, 954 (D.C. Cir. 1998) ("The concern about nonconsensual references turns on the determination of rights . . . ."). Under the Attorney General's proposal, the master is not only to undertake an investigation, serve as fact finder, and develop a remedial plan—"without limitation" on what that would entail—but also "to implement and oversee th[e] judgment." Proposed Final J. ¶¶ 2(d), 3(a)–(b). What's more, the master is to "report" and "determine" compliance. *Id.* ¶¶ 3(f), 4(j). It is hard to think of a more central Article III power than the "extraordinary powe[r]" of the injunction. *Petroleum Exploration v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 222 (1938); *see Wilver v. Fisher*, 387 F.2d 66, 69 (10th Cir. 1967) (appointing master to supervise interrogatory answers "border[ed] on an abdication of

judicial function"). Here, the special master would determine the scope and enforceability of any injunction.

Even more troubling is General Drummond's proposal to empower the special master to determine compliance with "all applicable laws, rules, and regulations." *E.g.*, Proposed Final J. ¶ 3(f)(iii)–(v). Delegating the power to determine such compliance is tantamount to determining liability, and "[n]onconsensual reference of fundamental issues of liability to a master for adjudication is not consonant with . . . Article III." *Stauble v. Warrob, Inc.*, 977 F.2d 690, 696 (1st Cir. 1992); *see Microsoft*, 147 F.3d at 955–56 (similar). That is especially true because the scope of "*all* applicable laws, rules, and regulations" extends well beyond those already raised and addressed in this suit. "A court's equitable power lies only over the merits of the case or controversy before it" and does not authorize relief for "claims not pled in the complaint." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015).

Compounding these problems is the proposal to give the special master power to "recruit, train, oversee, and monitor" a whole team, no matter its number, salaries, or duties. Proposed Final J. ¶ 3(e). The master's appointment is to last for at least 30 years, and Defendants are to pay $10 million up front, and $5 million more whenever the master's coffers run dry. *Id.* ¶¶ 3(j), (m)–(n). Such blank-check authority is far beyond what a special master is legally allowed to do.

In short, General Drummond's special master would determine the scope of its own investigation, hire whatever team he wants, make whatever factual findings he wants, determine whatever injunctive remedies he wants, and enforce the terms of that injunctive relief—all without any judicial guidance, but with an unlimited budget. Good work if you can find it. Fortunately, Article III does not permit such wholesale abdication of the judicial role.

**b.** The fact that the Court might reserve power to review the special master's work is no cure. For one thing, under the Attorney General's proposal, the master would have authority to make

numerous decisions without independent action of the Court. *See, e.g.*, Proposed Final J. ¶ 3(j) (permitting Defendants to move to end their obligations early "if the master determines after ten years that [they] have achieved full compliance"); *id.* ¶ 4(c) (prohibiting certain land applications of litter without prior testing by master); *id.* ¶ 4(e) (prohibiting placing birds "with any Contract Grower who has been determined by the master to not be in compliance with the provisions of Section 4(b)–(d)"). In any event, since "the record in this case is voluminous, the factual issues are tangled, and the legal issues are largely factbound, . . . even the most searching review" of a master's determinations "would not be a satisfactory substitute for" proceeding in the first instance before an Article III court. *Stauble*, 977 F.2d at 698 (addressing possibility of appellate review); *cf. Burlington N.R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1072 (9th Cir. 1991) (stating that "no circumstances [would] justify so extreme a delegation of judicial power" where "the district court would 'make the final determination'" after receiving a special master's report and the parties' objections).

### 2.    Referral would violate Rule 65.

The proposed referral would also violate Rule 65's proscription on vague injunctions. Rule 65 requires "every" injunction to "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). An injunction is not specific enough if it does not "adequately inform a defendant of its obligations" or allow courts "to determine whether the defendant is complying." *M.G. ex rel. Garcia v. Armijo*, 117 F.4th 1230, 1249 (10th Cir. 2024).

General Drummond's proposed judgment comes up short. The judgment describes injunctive terms generally and permits the special master, not the Court, to fill in the details. *See, e.g.*, Proposed Final J. ¶¶ 4(a)–(c) (restricting waste application on to-be-determined land); *id.* ¶ 4(e) (prohibiting bird placement with to-be-determined growers). Until the master speaks, Defendants will have no yardstick by which to measure conduct or compliance. Such an injunction is no better than one impermissibly

"referring to [a separate] document." Fed. R. Civ. P. 65(d)(1)(C). Indeed, some provisions of the judgment would require compliance with unspecified "laws, rules, and regulations" by reference. Proposed Final J. ¶ 4(f). A party seeking an injunction cannot "eschew any effort to give content" to the relief sought, as General Drummond proposes to do here, thus leaving the terms at a "stratospheric level of abstraction." *Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) (citation omitted).

### 3.    Referral is not justified under Rule 53.

The proposed referral also fails Rule 53. When a judge is available in the district, the court may appoint a master without consent to try all or part of a case only if there's "some exceptional condition" or "the need to perform an accounting or resolve a difficult computation of damages." Fed. R. Civ. P. 53(a)(1)(B). "The core of" Rule 53 is "that appointment of a master must be the exception and not the rule." *Id.* (advisory committee note to 2003 amendment); *see Bartlett-Collins Co. v. Surinam Navigation Co.*, 381 F.2d 546, 550 (10th Cir. 1967).

The Supreme Court's decision in *La Buy* is instructive. There, the Court rejected that "unusual complexity of issues of both fact and law" amounted to exceptional circumstances justifying a special master. 352 U.S. at 259. "On the contrary," complexity "is an impelling reason for trial before a regular, experienced trial judge rather than before a temporary substitute appointed on an ad hoc basis and ordinarily not experienced in judicial work." *Id.* Further, congestion of the Court's docket, the possibility of lengthy proceedings, and even all three factors combined could not justify referral. *See id.* The attempted delegation warranted the extraordinary remedy of mandamus. *See id.* at 256. Accordingly, "[b]eyond matters of account, difficult computation of damages, and unusual discovery, 'it is difficult to conceive of a reference of a nonjury case that will meet the rigid standards of the *La Buy* decision.'" *Liptak v. United States*, 748 F.2d 1254, 1257 (11th Cir. 1984) (per curiam) (quoting 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2605, at 791 (1971)); *accord In re United States*, 816 F.2d 1083, 1087 (6th Cir. 1987); *Microsoft*, 147 F.3d at 956.

The circumstances of this case are not "exceptional" within the meaning of Rule 53. The Court is fully able—and duty-bound—to decide all legal questions that may arise based on the evidence. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). The Court has *more* familiarity than a master with the factual issues that may arise during the implementation of any remedy the Court may order. If resolving the remedies stage proves difficult, this Court can do what every court does "whenever faced with unfamiliar factual or legal issues"—"educate [it]self" with the help of the adversarial system. *Madrigal Audio Labs., Inc. v. Cello, Ltd.*, 799 F.2d 814, 818 n.1 (2d Cir. 1986). General Drummond's proposed referral thus does not direct a special master to address discovery disputes or arcane matters that "cannot be effectively and timely addressed by an available district judge or magistrate judge." Fed. R. Civ. P. 53(a)(1)(C). Rather, he would have the Court impermissibly direct the special master to conduct the trial of the remedies portion of General Drummond's case against the Defendants.

Finally, referral would cause "unreasonable expense [and] delay." Fed. R. Civ. P. 53(a)(3). Under General Drummond's proposed judgment, defendants have to pay not only for remediation efforts but also tens of millions of dollars for a special master. Further, any matters that cannot be settled by the parties before the master will have to come before this Court for resolution, so referral just adds an extra layer of proceedings and, therefore, delay. *See* Fed. R. Civ. P. 53(f) (de novo review for factual and legal issues); *Meeropol v. Meese*, 790 F.2d 942, 961 (D.C. Cir. 1986) ("If the master makes significant decisions without careful review by the trial judge, judicial authority is effectively delegated to an official who has not been appointed pursuant to article III of the Constitution; if the trial judge carefully reviews each decision made by the master, it is doubtful that judicial time or resources will have been conserved to any significant degree.").

Against all this, one can only wonder whether referral to a special master is ultimately aimed not at saving judicial resources, but at insulating the Attorney General from political accountability while generating a payday for his outside lawyers. General Drummond surely knows that his continued

pursuit of this case is deeply unpopular with many of his constituents, and his approach shifts responsibility for the burdens to come to the Court and an unelected, unaccountable special master. *Cf. Printz v. United States*, 521 U.S. 898, 930 (1997) ("By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes."); *New York v. United States*, 505 U.S. 144, 169 (1992) ("But where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.").

Neither Article III, nor Rule 65, nor a reasonable exercise of Rule 53 authority justifies referral to a special master on General Drummond's proposed terms.

### D.    General Drummond's Civil Penalty Demands Are Unwarranted.

The Court should also reject the demand for civil penalties. As an initial matter, the evidence bearing on penalties is practically non-existent because there has been no hearing on remedies, and despite prior requests for earlier disclosure, the State has only now indicated the amount of penalties it seeks. The Court has discretion to refuse to impose penalties. *See* Okla. Stat. tit. 27A, § 2-3-504(A)(2) (penalties "may" be assessed). In exercising that discretion, § 2-3-504(H) requires the Court to consider several factors. But the parties have had no opportunity to offer evidence bearing on those factors. Evidence from the original trial is outdated, and the Court did not take evidence on remedies at the December 2024 hearing. With such a slim record, any award of penalties would be impermissible. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 70 (2d Cir. 1996) ("[D]ue process requires that courts provide notice and opportunity to be heard before imposing *any* kind of sanctions."). The slim record we do have shows that Defendants acted in good faith and have minimal culpability, rendering any penalty unjustified. Even if some penalty were permissible, General Drummond's request is grossly

excessive and exceeds constitutional bounds.

> **1.      Due process and agency principles prohibit imposing civil penalties based on conduct Defendants did not personally commit.**

Most, if not all, of the conduct on which General Drummond seeks to impose civil penalties is not Defendants' conduct. General Drummond is asking for penalties to be imposed on Defendants for actions taken by growers, farmers, cattle ranchers, litter applicators, and other third parties. Under General Drummond's view, the only thing Defendants did personally was fail to use their economic leverage to require different conduct from some of these company-contracted growers. This is not a basis for imposing any civil penalties, for several reasons.

First, "agency principles limit vicarious liability for punitive awards." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 541 (1999); *see also* Restatement (Second) of Torts § 909 (limiting circumstances where punitive damages can "properly be awarded against a master or other principal because of an act by an agent"). Penalties are meant to punish those who engage in misconduct, so they are presumptively limited to those who committed the misconduct. The misconduct the Attorney General alleges is applying poultry litter to fields under certain conditions. Defendants took no such actions, and imposing civil penalties on Defendants based on third-party conduct is legally unsupported. *See Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1264 (10th Cir. 1995) (rejecting request for punitive damages against company based on actions of the company's agent, in part because the facts giving rise to alleged misconduct only became known to defendant "many years later").[16]

Nor can penalties be imposed on Defendants for failing to prohibit others from engaging in state-approved nutrient management activities that become unlawful only when aggregated with other

---

[16] Oklahoma has allowed one exception to the ordinary rule that punishment is imposed on a party only for its own conduct, holding employers liable for their employees' conduct. *See Bierman v. Aramark Refreshment Servs., Inc.*, 198 P.3d 877, 884 (Okla. 2008). Here, the State has never contended that the growers were Defendants' employees—and, indeed, growers, ranchers, and others who use fertilizer are independent business owners.

approved litter applications. Nor, for that matter, may they be imposed for failing to prevent growers from simply owning fields measuring above a judicially-announced STP threshold. Courts seldom penalize one party for failing to control a third-party's behavior. *Cf., e.g.*, *Lentz v. Mason*, 961 F. Supp. 709, 715–16 (D.N.J. 1997) (defendant not an "operator" under CERCLA where no "actual control" of property); *id.* at 716 ("CERCLA casts its net wide, but it does not draw in persons or entities who have no connection to hazardous waste disposal, other than the knowledge that it is going on."). Defendants are not aware of any authority in the environmental context imposing civil penalties for failing to prevent a third party from taking otherwise lawful action—especially action expressly permitted under state law and regulations. For these reasons alone, the Court should decline to impose any civil penalty.

### 2. Defendants' good-faith, minimally culpable conduct does not warrant civil penalties.

In any event, no penalties are warranted on this thin record. In deciding whether to award civil penalties, the Court must consider "any good faith efforts to comply with the applicable requirements . . . [and] the defendant's degree of culpability." Both factors counsel against imposing penalties.

**a.** Defendants had a good-faith belief that their conduct was lawful given their compliance (and their growers' compliance) with Oklahoma's and Arkansas's regulatory permit schemes. Indeed, both States' comprehensive regulatory regimes have been in place and operating effectively for years. Both States require all poultry feeding operations to register with the state and to comply with a nutrient management plan. Okla. Stat. tit. 2, §§ 10-9.1(B)(14); 10-9.3; 10-9.7; Ark. Admin. R. 138.00.05-001 (ANRC Rules, tit. XIX); Ark. Admin. R. 138.00.05-004 (ANRC Rules, tit. XXII). Both states also just updated the protections offered to those who comply with their plans. *See* Okla. Stat. tit. 2, §§ 10-9.7, 10-9.11, and Ark. Code Ann. § 15-20-1108. The evidence at trial established that Defendants have a near-perfect track record of compliance with these regimes. Indeed, plaintiffs' witnesses admitted that there are few to no documented incidents in which "a poultry grower or a certified litter applicator

or any other individual or entity has land applied poultry litter in the Illinois River Watershed in violation of a nutrient management plan." *See* Hr'g Tr. 551:24–552:5 (S. Phillips). A grower complying with the "[r]ecommended application rate" listed on one of those plans would have believed in good faith that he was fully complying with state law. State's Trial Ex. 2739A at 2. Additionally, with the track record of compliance detailed above, Defendants, whose growers relied on the technical expertise of the state in determining the limit of any land application in the watershed pursuant to their approval of nutrient management plans, should receive credit for complying, not be punished when the plaintiff in this case controls the instrumentalities to lower the application rates with which Defendants and their growers have demonstrated a clear propensity to comply. If Defendants are to be held liable for growers' conduct, they also ought to receive the benefit of growers' good-faith belief.

Even though the Court concluded that permit compliance "does not immunize defendants from liability," 2023 COL ¶ 28, that conclusion does not preclude a finding that defendants' permit compliance demonstrates a good-faith effort to comply with the law. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1195 (10th Cir. 2018) (noting that defendants may receive "the benefit of their good-faith reliance" on the law even where mistake of law is not a defense to liability). Given the extensive evidence of Defendants' good-faith compliance, penalties are not appropriate.

**b.** Likewise, the degree of culpability of any individual defendant is minimal. Rather than distinguishing among individual Defendants, this Court made a finding that thousands of individually lawful litter applications by growers caused harm in the aggregate when combined with phosphorous from other sources, s*ee, e.g.,* 2024 FOF ¶ 46—a finding which the Oklahoma legislature expressly rejected as against the public policy of Oklahoma, Okla. Stat. tit. 2, § 10-9.11. The Court could not have made individualized findings because the Attorney General presented no evidence at that level. *See, e.g.*, Hr'g Tr. 645:5–11 (Scott admitting he failed to perform any site-specific analysis of phosphorus "with respect to any of these [D]efendants"); *id.* at 21:14–19 (Fite making similar concession). Nor

can the Court merely assume that each Defendant contributed to the State's harm equally. Defendants' operations vary in scale, location, and duration, *see id.* at 39:16–22 (Fite); *id.* at 689:6–14; 690:19–24 (Jordan), and yet state witnesses conceded that they did not "analyze whether any of the phosphorous in any of those rivers that [the parties] were talking about came from any of the fields that are owned or operated by growers who are affiliated with the defendants in this case." *Id.* at 324:22–325:8 (L. Phillips); *id.* at 437:5–17 (S. Phillips).

General Drummond's failure to differentiate culpability among defendants precludes imposition of civil penalties under § 2-3-504(A)(2) because such penalties cannot be imposed jointly and severally. Section 2-3-504 allows for the imposition against "*the* defendant"—singular—based on "*each* violation." *See* Okla. Stat. tit. 27A, § 2-3-504(A)(2), (H); *see also SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287–88 (2d Cir. 2013) (securities law does not permit joint-and-several penalties based on similar language). And when the Oklahoma legislature "wishes to" impose joint-and-several penalties, "it knows how to say just that." *Trump v. Hawaii*, 585 U.S. 667, 692 (2018); *see, e.g.*, Okla. Stat. tit. 45, § 729 (entities that mine without a permit and its agents are "jointly and severally liable" for "resulting fines"). Accordingly, General Drummond must prove each individual Defendant's responsibility for specific injuries. He has not and cannot. There is no basis for civil penalties on this record.

**c.** Even if some penalties were warranted, General Drummond's request for "the maximum amount allowed"—$10,000 per violation—vastly exceeds penalties awarded under these laws. Doc. 3163 at 16. Oklahoma cases involving violations of Okla. Stat. tit. 27A, § 2-6-105 have resulted in penalties ranging from $300 to $235,000, even for violations spanning several years. *See, e.g., ODEQ v. Relyea*, No. CJ-2021-309 (Okla. Dist. Ct. Payne Cnty. Feb. 17, 2022) ($5,250 penalty for violating prior administrative order by dumping solid waste); *ODEQ v. Frye*, No. CV-2013-139 (Okla. Dist. Ct. Canadian Cnty. Feb. 14, 2014) ($300 penalty for violating prior administrative order by land-applying untreated sewage); *United States v. City of Okmulgee*, No. 6:06-CV-00009 (E.D. Okla. Apr. 14, 2006)

27

($470,000 penalty for seven years of unlawful discharges of untreated sewage and other pollutants into protected waters). That's a far cry from $10,000 daily for over a decade.

The trend is the same on the federal side. In considering the statutory penalty factors under the Clean Water Act, which are materially identical to those applicable here, *compare* Okla. Stat. tit. 27A, § 2-3-504(H), *with* 33 U.S.C. § 1319(d), federal courts routinely impose awards far below the statutory maximum. *See, e.g.*, *Kleinman v. City of Austin*, 310 F. Supp. 3d 770, 782–83 (W.D. Tex. 2018) (ordering a "nominal" civil penalty of $25,000 based on several factors balanced in favor of defendant despite total mitigation cost of $12.5 million); *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 244 F. Supp. 2d 41, 49–54 (N.D.N.Y. 2003) (identifying mitigating factors to reduce defendants' civil penalty from the maximum $57,500,500 down to $5,749,000); *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of Mexico, on Apr. 20, 2010*, 148 F. Supp. 3d 563, 583 (E.D. La. 2015) (identifying mitigating factors warranting civil penalty of "only 4.5% of the maximum penalty").

### 3.    There is no basis for awarding daily penalties.

General Drummond's penalties request is grossly excessive. Far from taking "a conservative approach," Doc. 3163 at 16, General Drummond requests over *$100 million* in total penalties. But General Drummond's definition of a "violation" of Okla. Stat. tit. 27A, § 2-6-105(A) is overbroad, and even under his strained definition, fatal failures of proof persist.

**a.** General Drummond contends that a defendant committed a discrete "violation" of Okla. Stat. tit. 27A, § 2-6-105(A) on each day that one of its growers possessed "one or more fields having an STP value of greater than 65 lbs./acre." Proposed Final J. ¶ 5(h). That definition is flawed in two critical ways.

First, this again improperly conflates field STP values with "pollution of any waters of the state." Okla. Stat. tit. 27A, § 2-6-105(A). As discussed, whatever its STP value, land application of poultry litter to a field cannot contribute to phosphorous pollution of the waters of the IRW unless

28

there is a hydrological connection between that field and the IRW's waters. And as General Drummond's own witness conceded, only a small portion of the fields in the IRW have such a connection. *See supra* § I.A.1.a. General Drummond's 65 STP criterion is thus vastly overbroad.

Second, even if an over-65-STP field has the requisite hydrological connection, General Drummond wrongly equates a grower's mere possession of such a field to a violation of § 2-6-105(A) by a Defendant. The text of § 2-6-105(A) is clear that it is violated only by taking some "action"— either (1) "caus[ing] pollution of any waters of the state" or (2) "plac[ing] or caus[ing] to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state." Merely owning property on a given day does not "d[o] anything to cause . . . pollution," and so cannot be the basis of a violation under § 2-6-105(A). *Moore v. Texaco, Inc.*, 244 F.3d 1229, 1231–32 (10th Cir. 2001). And General Drummond has not pointed to any record evidence from which this Court could draw conclusions about the specific days on which phosphorus in a given field more likely than not ran off into the IRW.

Likewise, the Court did not find that the mere ownership of a particular field caused pollution; rather, it found that an action—"land application of poultry litter . . . in excess of" 65 lbs./acre STP— harmed the waters of the IRW. 2023 FOF ¶ 81. Consistent with § 2-6-105(A), this Court's prior findings, and the State's own evidence, the only "violation" that could arguably qualify for a civil penalty is an instance of land application of poultry litter on a field with hydrological connectivity to the waters of the IRW and an STP measurement over 65 lbs./acre. General Drummond has no evidence of any such instance. Once again, proof of general causation is insufficient to prove specific causation.

**b.** Even accepting General Drummond's overbroad conception of a statutory violation, critical failures of proof undermine his $103,260,000 total penalty request. He relies on a single item of "evidence": an appendix attached to his proposed findings of fact, which purportedly shows a list of growers (and the associated defendant) who had a field measuring above 65 STP at some point

between 1993 and 2005. *See* Doc. 2873-1. This appendix was neither offered as evidence nor admitted by the Court. *Cf.* Trial Tr. 8134:3–8144:6; 8625:4–8630:13 (admitting "various ODAFF documents," but not General Drummond's proffered appendix). And General Drummond has not established that the document could meet the requirements of a summary document under Rule of Evidence 1006.

But even assuming the appendix were properly before the Court, it does not prove that the grower applied poultry litter to each of those fields, either before or after the STP reading.[17] Nor do the records prove that each of those fields exceeded 65 lbs./acre STP for each and every one of the days General Drummond seeks penalties. Nor could they have. The State's ODAFF records purport to show various dates on which the individual Defendants' or their growers' "fields in Oklahoma [had] soil test results in excess of 65 lbs./acre STP." Proposed Final J. ¶ 5(j). These records, however, are far too sparse to support continuous daily penalties. For instance, with respect to the Tyson Defendants, ODAFF records were taken only on 37 discrete dates within the range General Drummond requests maximum penalties for. Doc. 2873, FOF ¶ 395, App'x A at 1–5. This represents just 1.3% of those 2,891 days. Put differently, General Drummond requests maximum penalties for *2,854* days on which he has not proven that: (i) any Tyson-contracted grower's fields exceeded 65 lbs./acre STP; (ii) any Tyson-contracted grower applied poultry litter to such a field; or (iii) any phosphorous from such a field ran off into the IRW.[18] This record cannot support the State's requested nine-figure penalty.

---

[17] It would be error to merely assume that poultry litter was applied. For example, Cargill-contracted grower Clyde Masters had a field above the 65 STP threshold on August 27, 2001 and October 11, 2002, but his Registered Feeding Operation Inspection Checklists from 2003 and 2004 confirm he did not apply litter to the field after being directed not to by ODAFF. Trial Ex. CARGILL 79B at 3, 5, 8, 12, 18.

[18] The same problem applies to each Defendant. For Cargill, the appendix includes just seven dates of soil test results in excess of 65 lbs./acre STP from December 18, 1998 to June 13, 2005, or 0.3% of the days for which he has requested maximum civil penalties. For George's, it's four dates or 0.75% of penalty days requested; for Simmons, it's 20 dates or 0.7% of penalty days requested; and for Cal-Maine, it's eight dates or 0.43%. Doc. 2873, FOF ¶ 395, App'x A at 6–9. In the case of Peterson Farms, the appendix makes no reference to any soil tests whatsoever.

    **4.**     **The Attorney General's total penalty request violates Defendants' rights to due process and protection against excessive fines.**

Furthermore, General Drummond's maximum penalty request of over $100 million violates multiple protections under both the federal and Oklahoma constitutions.

First, if the Court were to award anything approaching General Drummond's request for $100 million in penalties, it would violate Defendants' due process rights. *See* U.S. Const. amend. XIV, § 1; Okla. Const. art. II, § 7. Courts have consistently held that punitive awards that are "grossly excessive" violate due process. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) (noting constitutional limits on punitive damages); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 453–54 (1993) (collecting cases). Courts use a similar excessiveness standard to evaluate the constitutionality of statutory damages. *See, e.g.*, *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919) (statutory damages award violates due process where penalty is "so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable"); *King v. State*, 130 P.2d 105, 108 (Okla. Crim. App. 1942) (statutory penalty unconstitutional where "it is so excessive as to shock the sense of mankind" (citation omitted)). Here, because Defendants did not personally commit the violations identified in the Court's January 2023 order (only the growers applied litter, and always with state permission), coupled with Defendants' good-faith, minimally culpable conduct, imposing General Drummond's request for over $100 million in civil penalties would constitute a "grossly excessive" penalty because it would be "wholly disproportioned" to Defendants' conduct.

Second, General Drummond's penalty request violates Defendants' right to be free from excessive fines. *See* U.S. Const. amend. VIII; Okla. Const. art. II, § 9. The federal constitution's Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)). The Excessive Fines Clause has been incorporated against the States. *See Timbs v. Indiana*, 586 U.S. 146, 150 (2019). "[A] civil sanction that cannot fairly be said

31

*solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment[.]" *United States v. Halper*, 490 U.S. 435, 448 (1989) (emphasis added). For the punishment not to be excessive, it "must bear some relationship to the gravity of the offense it is designed to punish." *Bajakajian*, 524 U.S. at 334. A punitive sanction violates the Excessive Fines Clause "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* Here, the civil penalties under § 2-3-504 are punitive—the plain text of § 2-3-504 says so. *See* Okla. Stat. tit. 27A , § 2-3-504(A)(2) ("[A]ny person who violates any of the provisions of, or who fails to perform any duty imposed by, the Oklahoma Environmental Quality Code . . . *[m]ay be punished* in civil proceedings in district court by assessment of a civil penalty" of not more than $10,000 per violation (emphasis added)); *see also Tull v. United States*, 481 U.S. 412, 423 (1987) (ruling that substantively similar penalties in CWA were punitive "to further retribution and deterrence" and "to impose punishment"). And for the reasons described above, imposing General Drummond's request for over $100 million in civil penalties would be grossly disproportional to Defendants' conduct.

E.    **Defendant-specific Arguments**[19]

1.    **Defendants who no longer have poultry operations or contracts in the IRW are not subject to certain forms of injunctive relief.**

Some of the injunctive relief General Drummond proposes can only apply to entities with ongoing poultry operations or contracts in the IRW. As of July 23, 2025, Defendants Cal-Maine Foods, Inc., Peterson Farms, Inc., Cargill Inc., and Cargill Turkey Production LLC (collectively, "the

---

[19] As the Court has directed Defendants to file a single brief , certain Defendants (Cal-Maine; Peterson Farms; Cargill, Inc.; Cargill Turkey Production; and George's) raise Defendant-specific arguments here. Each of these arguments is raised on behalf of only the Defendant(s) identified in the section header or opening paragraph of the section. Any Defendant that does not join a particular Defendant-specific argument requests an opportunity to address any modifications that may be subsequently proposed by AG Drummond or adopted by the Court in response to the arguments raised in this section. The Defendants raising these individual arguments otherwise join the balance of this brief in full, and in raising these additional arguments as to their unique circumstances in no way concede that Attorney General Drummond is entitled to, or the Court has sufficient basis to order, any of the relief sought.

Withdrawn Defendants") do not have such operations or contracts. Hence, some of the injunctive relief cannot be ordered as to them.

### a. The Withdrawn Defendants will have no ongoing connection to or relationship with poultry operations in the IRW.

The Court has already recognized that Defendants Cal-Maine Foods, Inc., Peterson Farms, Inc., and Cargill, Inc. have had no contracts with poultry growers in the IRW for over a decade. *See* Doc. 2979 at 1, n.1 (Cal-Maine), 2, n.1 (Peterson), 1–2, n.1 (Cargill, Inc.).[20] Cargill Turkey Production (CTP) will likewise have exited the IRW as of July 23, 2025. *See* Ex. 6, Declaration of Trevor Stahl ("Stahl Decl.") ¶¶ 2–18. In January 2025, CTP notified all of its poultry growers in the IRW that their contracts would be terminated effective on or before August 1, 2025, and that Cargill was closing its poultry processing facility in Arkansas. Stahl Decl. ¶ 2 & Ex. A.[21] The last turkey flock from a contract grower in the IRW was processed by CTP on July 23, 2025. Stahl Decl. ¶ 6. Thus, as of July 23, 2025, none of the Withdrawn Defendants will have any "leverage" over any grower to influence how it manages its litter or land, or any other continuing contact with the IRW. Stahl Decl. ¶ 18; *see generally id.* ¶¶ 9–17 & Exs. A–B thereto (explaining the completeness and extent of CTP's withdrawal from the IRW).

### b. The proposed injunctive relief mostly does not apply to companies without ongoing poultry operations or contracts.

General Drummond proposes three categories of injunctive relief, of which only one could possibly apply to the Withdrawn Defendants.

---

[20] Despite this acknowledgement, the Court's January 18, 2023, Findings of Fact and Conclusions of Law often mistakenly uses the term "the Withdrawn Defendants" to attribute characteristics or conduct of one Cargill entity to both Cargill Inc. and Cargill Turkey Production LLC. *See, e.g.,* 2023 FOF ¶ 291 ("The Cargill Defendants began poultry operations in the IRW in the mid-1960s."); *id.* ("Between 2000 and 2007, more than 23 million birds belonging to the Cargill Defendants were raised in the IRW."). Any judgment should accurately reflect the separate identities of the two Cargill entities; it would be clear error to attribute any action to Cargill, Inc. after 2004.

[21] Many of the 1000+ terminated employees have been offered opportunities to transfer to operations in other states. Stahl Decl. ¶ 3.

*First*, General Drummond seeks relief aimed at the future application of poultry litter, including bans on application, restrictions on bird placement, and the handling and removal of litter. None of this applies to Defendants no longer operating in the IRW. *Second*, General Drummond seeks relief aimed at individual growers and their land, including buffer strips, excavation, alum application, to fields, crop and nutrient management with nitrogen supplementation, bank stabilization, and constructed wetlands. Proposed Final J. at 8. All these options require altering the growers' land or interfering with their farming operations. Hence, and for similar reasons, they cannot apply to the Withdrawn Defendants, who have no ongoing relationships with any growers in the IRW. *Third*, General Drummond seeks non-grower-specific relief aimed at remediating the continuing impacts of past actions. These might include drinking water treatment, and alum application, sediment removal, and layered aeration of Lake Tenkiller. Proposed Final J. ¶ 2(d). Only this third category of non-grower-specific remedial relief could possibly apply to the Withdrawn Defendants.

For the following reasons, the Court may not impose other types of injunctive relief on the Withdrawn Defendants.

**<u>Prospective Relief</u>:** The Court lacks the power to impose on the Withdrawn Defendants any prospective injunctive relief addressing future poultry operations and future contracts in the IRW. As of the date of the Court's ruling on the Plaintiffs' request for injunctive relief, the Withdrawn Defendants will have no poultry operations in the IRW and no contracts with IRW contract growers. Hence, as to those non-existent operations and non-existent contracts, there is no risk to the plaintiffs, nothing to enjoin, and nothing to be gained from an injunction.

On these facts, the Court lacks Article III power to issue an injunction. "A federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (cleaned up). General Drummond's claim for prospective injunctive relief against the Withdrawn Defendants can no longer

provide practical relief, and the claim is therefore moot and must be dismissed. *See Facio v. Jones,* 929 F.2d 541, 544 (10th Cir. 1991) ("plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured [by the defendant] in the future."); *Bagnell v. Floyd*, No. 17-CV-049-GKF-JFJ, 2018 WL 1177413, at *4 (N.D. Okla. Mar. 6, 2018) (Frizzell, J.) (where prisoner has been transferred from facility allegedly creating inhumane conditions, claim for "prospective injunctive relief" must be dismissed as moot) (citing *Jordan v. Sosa*, 654 F.3d 1012, 1027–28 (10th Cir. 2011)); *see also Schell v. OXY USA, Inc.*, 814 F.3d 1107, 1114–21 (10th Cir. 2016) (dismissing appeal as moot after appellant sold its interests in leases affected by the declaratory judgment appealed, noting appeal was "an effort to secure an impermissible advisory opinion"). Viewed another way, the claims for *prospective* injunctive relief against the Withdrawn Defendants must be dismissed because General Drummond no longer has standing to assert them. *See Phelps v. Hamilton*, 122 F.3d 1309, 1316 (10th Cir. 1997) ("[T]he Supreme Court [has] made clear that plaintiffs may lack standing to seek prospective relief when the challenged conduct is no longer continuing.").

The Court should therefore reject that portion of General Drummond's proposed judgment that seeks prospective injunctive relief against the Withdrawn Defendants.

**Grower-specific Remedial Relief:** The Court also lacks the power to impose on the Withdrawn Defendants any grower-specific remedial relief addressing the consequences of past poultry operations in the IRW, because the Withdrawn Defendants have no current grower contracts or relationships to be used by the Court (properly or not) to try to effectuate such relief.

Courts cannot and will not issue injunctions that require a party to do the impossible—to do what it has no legal right or practical ability to do. Courts cannot do so because an injunction ordering the impossible will not provide any redress to the plaintiff, and the plaintiff thus lacks standing to seek it. *See, e.g., Bronson v. Swensen*, 500 F.3d 1099, 1111–12 (10th Cir. 2007) (holding that "[t]he redressability prong [of the standing test] is not met when a plaintiff seeks relief against a defendant with no power"

35

to correct the challenged activity). And courts will not order a defendant to perform the impossible because doing so violates basic principles of equity. *Hudson v. Sch. Dist. of Kansas City*, 578 S.W.2d 301, 312 (Mo. Ct. App. 1979) ("It is … a principle of the equity jurisprudence surrounding the use of injunctive relief that the court will not issue an injunction when the order of the court to be embodied in an injunction is impossible of performance.") (citing *Hribernik v. Reorganized Sch. Dist. R-3*, 276 S.W.2d 596 (Mo. App. 1955)); *Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc.*, 960 F. Supp. 2d 988, 995 (D. Minn. 2013) (granting motion to modify consent decree "to relieve [party] of a requirement that cannot feasibly be accomplished").

Here, all Defendants dispute the notion that they have any legal right, ability, or obligation to enter onto land of growers with whom they have contractual relationships for the purpose of dictating practices that are not integral to the poultry production. But even if they did, no such ability can exist for the Withdrawn Defendants. General Drummond's suggested grower-specific "remediation options" (e.g., buffer strips, alum applications to fields) all require entering onto and altering the contract growers' farmland. The Court's January 2023 Findings of Fact and Conclusions of Law rested on findings that "by virtue of their contracts and the vertically integrated structure of the business, each defendant maintains control over virtually all essential aspects of poultry production, including the activities of their contract growers." Doc. 2979 at 82–89, 182–83.[22] Whatever the prior validity of those narrow findings, they have no purchase now as those business relationships no longer exist.

The Withdrawn Defendants cannot be ordered to force poultry growers in the IRW to do anything, because that would require them to do the impossible. Nor could such an order be enforced. As the D.C. Circuit has noted:

> The sound discretion of an equity court does not embrace enforcement through

---

[22] The Court did not find that the Defendants possessed either control or legal authority as to growers' lands or agricultural practices that are not essential to poultry production (e.g., pasture management or riparian access for cattle operations). And, the record before the Court would not support such a finding.

contempt of a party's duty to comply with an order that calls him to do an impossibility. …It would be unreasonable and unjust to hold in contempt a defendant who demonstrated that he was powerless to comply.

*SEC v. Ormont Drug & Chem. Co.*, 739 F.2d 654, 656 (D.C. Cir. 1984) (citing *NRDC v. Train,* 510 F.2d 692, 713 (D.C. Cir. 1975) and *Maggio v. Zeitz,* 333 U.S. 56, 59, 69 (1948)) (cleaned up). In short, the Court should reject all grower-specific remedial injunctive relief against the Withdrawn Defendants, including any direction to any special master to consider such grower-specific remedial injunctive relief as a "remediation option." *See* Proposed Final J. ¶ 2(d).

**Costs**: Given that only a small fraction of the injunctive relief General Drummond seeks could possibly be imposed on the Withdrawn Defendants, the Court should also reject the provisions in General Drummond's proposed judgment that seek to impose joint and several liability on *all* Defendants for *all* costs of remediation and of the special master and related expenses. *See* Proposed Final J. at 9, 17. Although the Court has held that the phosphorus level in the waters of the IRW is an "indivisible injury," *see* Doc. 2979 at 184–85, the remedies suggested in the proposed judgment are clearly divisible. If the Court were to order any injunctive relief that costs money (which all Defendants disagree with, for reasons stated above), it should limit responsibility for the costs of any such relief to the Defendant or Defendants subject to them.

For example, General Drummond's proposed judgment contemplates that the proposed special master would regulate the future application of any poultry litter generated by Defendants' birds. Proposed Final J. at 18–19.[23] The Withdrawn Defendants will have no birds and produce no poultry litter in the IRW, so they should not be ordered to pay any of the costs of special master monitoring and regulation. Such costs can be readily identified with and assigned to the entities that are involved.

---

[23] Although the wording of the State's proposed judgment is broad and imprecise, the Withdrawn Defendants assume that this passage intends to make each Defendant responsible for the poultry litter generated by its own contract growers. It is difficult to see how any Defendant could be responsible for poultry litter generated by any other Defendant, or indeed would even know of its existence.

General Drummond's supporting brief offers no reason or authority for ordering the Withdrawn Defendants to pay the costs of monitoring and regulating other entities' ongoing operations.

Similarly, the Withdrawn Defendants should not be ordered to pay for the costs of grower-specific remedial injunctive relief for growers they have no contracts or business relationships with. Again, it can be readily identified which entities a grower has contracts and ongoing business with. Only those entities, if they are a Defendant, could conceivably be ordered to pay for steps that grower takes. The Withdrawn Defendants should not be held jointly and severally liable for the costs of a Special Master's consideration of "remediation options" that could not possibly ever apply to the Withdrawn Defendants, and General Drummond offers no analysis or authority suggesting otherwise.

In sum, given the absence of any current growers or operations in the IRW connected to Defendants Cal-Maine Foods, Inc., Peterson Farms, Inc., Cargill Inc., or Cargill Turkey Production LLC, the only injunctive relief that the Court could possibly grant against the Withdrawn Defendants would be non-grower specific remediation. Any judgment should therefore limit any joint and several liability for costs of remediation or costs incurred by the special master to costs related to such non-grower-specific remediation.

### 2.    George's

Without implying that the evidence is sufficient to support a penalty award as to any defendant, George's respectfully submits that evidence before this Court compels rejection of General Drummond's request for a penalty based upon the conduct of its former growers in Oklahoma. Ignoring for now the question of whether the statutes during the relevant time period even authorized vicarious liability against parties who contract with Oklahoma farmers, it strains credulity to suggest that the farmers relevant to the George's penalty calculation acted with any culpability.

General Drummond's penalty claim rests entirely on a post-trial compilation of STP values supposedly gleaned from ODAFF records (hereinafter, the "STP Appendix"). *See* Proposed Final J.

¶ 5(l) (citing Doc. 2873, FOF ¶ 395, App'x A). The STP Appendix lists **two** farmers (Ricky Reed and Kenneth Glenn) as allegedly having been associated with "Defendant-Integrator George's" at some point in time. STP App'x A at 7. According to General Drummond that document shows test results in excess of 65 lbs./acre STP on "fields in Oklahoma" associated with those two farmers.[24] Proposed Final J. ¶ 5(j). There is no evidence presented as to what sources of phosphorus produced the STP levels claimed to have existed in 2004 through 2007.

Importantly, General Drummond has not proven that poultry litter continued to be applied by these growers to those fields after they reached whatever threshold of concern or regulatory standard he now seeks to impose retroactively. Neither of these farmers testified at either trial conducted in this case but some facts cutting strongly against their culpability can be gleaned from ODAFF records admitted during the 2010 trial.

As to Ricky Reed, George's would point this Court to his Animal Waste Management Plan which was admitted as evidence during the examination of Teena Gunter. *See* DJX3480. That plan was prepared in November 2006, which is *after* the soil sample dates reported for this farm in the STP Appendix. Even a cursory review of DJX3480 shows that the technical expert assigned by ODAFF to assess the potential for Mr. Reed's farm to cause pollution to the waters of the State had far more information available to him about Mr. Reed's farm management practices than General Drummond has attempted to present to this Court. And based on that information, ODAFF authorized Mr. Reed to continue land applying litter to fields including fields with STP levels above 65 lbs./acre. DJX3480-0004 (application rates). The plan issued by ODAFF to Mr. Reed informed him that "[t]he law requires that Natural Resources Conservation Service (NRCS) recommendations for litter application rates be followed." DJX3480-0003. Those rates were formulated based on STP ranges of up to 250 (for full

---

[24] If to believed at all, the compilation also shows that several fields for these two farmers reported STP levels below the 120 lbs./acre threshold this Court previously selected as an important threshold for reviewing STP levels shown in this same compilation. *See* 2023 FOF ¶ 358.

application rates) or 400 (for half rate applications) rather than General Drummond's 65 lbs./acre new litigation standard. Clearly, ODAFF assessed no culpability on the part of Mr. Reed for the STP levels upon which General Drummond's penalty request rests. This Court should reach the same conclusion.

Mr. Glenn's Animal Waste Management Plan was not introduced as evidence, but the Court can be confident that he too received one from ODAFF after the soil sample dates reported for this farm in the STP Appendix. *See* OK. Ex. 2644B, ODAFF records for Kenneth Glenn's farm including at Bates ODAFF_SUPP_05-08_002084, 2008 Annual Inspection Checklist (indicating inspector's on-site review of an Animal Waste Management Plan dated June 18, 2007). This Court was not asked to inspect this farm (nor should it be expected to have done so), but ODAFF did between the time when the soils were tested and the first trial conducted in 2010. And, after reviewing soil test results, waste handling procedures, litter storage facilities, and other information pertinent to the management of this farm (*see id.*), ODAFF issued a report finding **no violations** at this farm. *Id.* Perhaps General Drummond believes his judgment is superior to that of the ODAFF inspector. But, when it comes to culpability for a civil penalty, the question is what conclusion a reasonable farmer, or the integrator they contract with, would reach about the behavior in question based upon the information available to them at the time. The record evidence as to Kenneth Glenn strongly suggests that his interactions with ODAFF inspectors would cause a reasonable person to conclude that he was acting responsibly as long as he followed the terms of his state-issued Animal Waste Management Plan. This Court has previously found an absence of proof that poultry growers in the Oklahoma portion of the IRW violated the terms of their Animal Waste Management Plans. 2023 FOF ¶¶ 88–98. Certainly, General Drummond has presented no such evidence specific to Mr. Glenn. In the absence of such evidence, this Court should assess no culpability on the part of Mr. Glenn and George's, and, therefore, deny the penalty request to the extent it is based on the management of his farm.

### 3.    Peterson Farms

Peterson Farms submits that it is entitled to a judgment of no liability. General Drummond would fix 65 STP as the bright line for causing pollution, and therefore, incurring liability. Yet the record is devoid of evidence against Peterson Farms respecting this standard, and thus, judgment for Peterson Farms is necessary. Specifically, General Drummond's STP Appendix makes no reference to any Peterson Farms-associated applications over 65 STP. Hence, General Drummond made no record that any Peterson Farms associated applications caused any pollution that requires remediation or a prospective injunction prohibiting applications over 65 STP. Furthermore, Peterson Farms cannot be liable for any attorneys' fees, as any such fees stem from the recovery of civil penalties, a claim that General Drummond has dismissed against Peterson Farms.

## II.    The Court Should Enter a Take-Nothing Judgment or, at Most, Order Defendants to Take Reasonable and Modest Future Action in the IRW.

Defendants continue to object on numerous grounds to the Court's finding of liability. Regardless, Defendants submit for the Court's consideration two proposed final judgments.

**A.** Exhibit 1 is the judgment to which General Drummond is entitled (again, *arguendo*) based on the evidence in the record: a declaration of defendants' liability, and nothing else. As explained above, the State has never presented competent evidence on the appropriate remedy in this case. *See supra* Background, § I.B. The result of that failure of proof should be the take-nothing judgment proposed in Exhibit 1. Such a judgment would acknowledge the value of Oklahoma's natural resources while giving Oklahoma's newly-updated state laws the opportunity to protect those resources according to the balance of interests that Oklahoma's elected representatives adopted.

**B.** If the Court is willing to excuse General Drummond's evidentiary shortcomings, the proposed judgment attached as Exhibit 2 goes as far as this record could even arguably support. Under this judgment, for a period of 10 years (subject to extension), Defendants who continue to operate in the IRW would, among other things: (1) withhold placement of flocks with growers who have

41

materially violated certain permit terms; (2) not place birds in newly-constructed broiler houses in the IRW unless the grower agrees to transport all litter out of the IRW; (3) fund a $4 per ton subsidy to be applied toward the purchase and transport costs for each ton of litter their IRW broiler growers agree to export from the IRW; and (4) on certain grower lands and with the growers' consent, fund 50% of the cost of constructing riparian buffers on the growers' land.[25]

Such an order would strike an appropriate balance between protecting the waters of the IRW and burdening Defendants' operations, while meaningfully accounting for the many interested public stakeholders. This proposal places primary responsibility for regulating land application of poultry litter on those best equipped to regulate: the experts in the state agencies in charge of poultry litter permitting. If the State of Oklahoma believes, now or in the future, that its nutrient management plans are not sufficiently protective of the environment, then it can change them pursuant to well-established legal processes. This proposal, in short, provides General Drummond, and the State of Oklahoma whose interests he claims to represent, everything necessary to obtain complete relief.

Defendants' proposal also best accounts for the public interest. It respects the property rights of growers by allowing them to control what happens on their land and with their poultry litter, yet provides economic incentives for those growers to make decisions that may reduce phosphorous loading in the IRW. And it respects the rights of Oklahomans and Arkansans to have public policy decided by their elected representatives, rather than a single Oklahoma politician or an unaccountable special master. Disputes over how best to protect Oklahoma's natural resources are an unavoidably political question. The "right" answer cannot be obtained solely by laboratory experiments or legal reasoning. It requires balancing competing interests, weighing value propositions, and hearing from the people. Defendants' proposal does so by handing the remainder of this dispute to the institutions

---

[25] This is intended only as a summation of the terms of the proposed final judgment provided as Exhibit 2. To the extent this summary conflicts with the terms of the proposed judgment provided as Exhibit 2, the terms of Exhibit 2 control.

that can most legitimately and capably handle that task.

### III. The Court Should Defer Ruling on Any Award of Attorneys' Fees, Including Any Fees the State Owes Defendants.

Defendants agree that an award of costs and attorneys' fees, if any, should be determined after the Court enters final judgment on the merits. The amount of a fee award will depend on, among other things, the extent of relief obtained, *see Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983), and would be offset by any fees the State owes defendants as the prevailing parties on the State's RCRA and nuisance per se claims, *see* 42 U.S.C. § 6972(e); Okla. Stat. tit. 12, § 940(A).

### CONCLUSION

For the foregoing reasons, this Court should reject the Attorney General's proposed judgment and should enter a take-nothing judgment or, failing that, enter a proposed order requiring Defendants to take steps to ensure that their growers comply with state poultry-litter laws.

July 30, 2025                                    Respectfully submitted,


/s/ *Gordon D. Todd*
Mark D. Hopson
Frank R. Volpe
Gordon D. Todd
Benjamin M. Mundel
Sidley Austin LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)
mhopson@sidley.com
fvolpe@sidley.com
gtodd@sidley.com
bmundel@sidley.com

*Attorneys for Tyson Foods, Inc.,*
*Tyson Poultry, Inc., Tyson Chicken, Inc., and Cobb-*
*Vantress, Inc.*

/s/ *A. Scott McDaniel*
A. Scott McDaniel, OBA #16460
McDaniel Acord, PLLC
9343 East 95th Court
Tulsa, OK 74133
(918) 382-9200

*Attorney for Tyson Foods, Inc., Tyson Poultry, Inc.,*
*Tyson Chicken, Inc., Cobb-Vantress, Inc., and Peter-*
*son Farms, Inc.*

/s/ *Robert George*
Robert George, OBA #18562
George's, Inc.
402 W. Robinson Ave.
Springdale, AR  73764
(479) 927-7249

K.C. Dupps Tucker (admitted *pro hac vice*)
Kristy E. Boehler (admitted *pro hac vice*)
The Law Group of Northwest
   Arkansas PLLC
1830 Shelby Lane
Fayetteville, AR 72704
(479) 316-3760

Perry L. Glantz (admitted *pro hac vice*)
Stinson LLP
1144 15th Street, Suite 2400
Denver, CO 80202
(303) 376-8410

Clinton Russell, OBA # 19209
Taylor, Foster, Mallett, Downs,
   Ramsey & Russell
400 West Fourth Street
Claremore, OK 74018
(918) 343-4100
crussell@soonerlaw.com

*Attorneys for George's, Inc. and George's Farms, Inc.*

<div style="display:flex">
<div>

/s/ *John R. Elrod*
John R. Elrod (admitted *pro hac vice*)
Vicki Bronson, OBA 20574
Conner & Winters, P.C.
4375 N. Vantage Drive, Suite 405
Fayetteville, AR  72703
(479) 582-5711
(479) 358-1518 (facsimile)
jelrod@cwlaw.com
vbronson@cwlaw.com

*Attorneys for Simmons Foods, Inc.*

/s/ *Robert P. Redemann*
Robert P. Redemann, OBA #7454
William D. Perrine, OBA #11955
Perrine, Redemann, Berry,
   Taylor & Frette, PLLC
1800 S. Baltimore Ave., Suite 900
Tulsa, OK 74119
(918) 382-1400
(918) 382-1499 (facsimile)
rredemann@pmrlaw.net
wperrine@pmrlaw.net

Robert E. Sanders, MSB#6446
   (admitted *pro hac vice*)
Young Wells Williams P.A.
P.O. Box 6005
Ridgeland, MS  39158-6005
(601) 948-6100
(601) 355-6136 (facsimile)
rsanders@youngwells.com

*Attorneys for Cal-Maine Foods*

</div>
<div>

/s/ *John H. Tucker*
John H. Tucker, OBA 9110
Theresa N. Hill, OBA 19119
Colin H. Tucker
Rhodes Hieronymus Jones
   Tucker & Gable
Two W. 2nd Street, Suite 1000
P.O. Box 21100
Tulsa, OK  74121-1100
(918) 582-1173
(918) 592-3390 (facsimile)
jtucker@rhodesokla.com
thill@rhodesokla.com
chtucker@rhodesokla.com

Jacob D. Bylund, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH
LLP
801 Grand Avenue, 33rd Floor
Des Moines, IA  50309
Main: (515) 248-9000
jacob.bylund@faegredrinker.com

Bruce Jones, admitted *pro hac vice*
Aaron D. Van Oort, admitted *pro hac vice*
Christopher H. Dolan, admitted *pro hac vice*
Jeffrey P. Justman, admitted *pro hac vice*
FAEGRE DRINKER BIDDLE & REATH
LLP
2200 Well Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Main:  (612) 766-7000
bruce.jones@faegredrinker.com
aaron.vanoort.jones@faegredrinker.com
chris.dolan@faegredrinker.com
jeff.justman@faegredrinker.com

*Attorneys for Cargill, Inc. and Cargill Turkey Production, LLC*

</div>
</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 30, 2025, I caused this document to be filed with the Clerk of Court

through CM/ECF, which will serve copies on all registered counsel.


<u>/s/ *Gordon D. Todd*</u>
Gordon D. Todd