IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **STATE OF OKLAHOMA** *et al.*, <br> *Plaintiffs,* <br><br> v. <br><br> **TYSON FOODS, INC.**, *et al.*, <br> *Defendants.* | No. 4:05-cv-329-GKF-SH |

**THE STATE OF OKLAHOMA'S REPLY TO DEFENDANTS' BRIEF IN OPPOSITION TO THE STATE'S PROPOSED FINAL JUDGMENT**

**Introduction**

Under Oklahoma law, it is the duty of the Attorney General "to prosecute and defend all actions and proceedings in any of the federal courts in which the state is interested as a party." 74 Okla. Stat. § 18b(A)(2).  As the Attorney General, I will uphold my legal duty, here and in every other case that I am called upon to prosecute and defend on behalf of Oklahoma.

**Argument**

**I.   The Court should enter the State's proposed final judgment**

For the reasons set forth in the State's opening brief, both the Court's findings and conclusions and the applicable law fully support entry of the State's proposed final judgment. *See* Doc. 3163.  The State will not restate these compelling reasons here, but rather briefly address the defendants' meritless arguments against entry of this proposed final judgment that were raised in their responsive brief.[1]

**A.   The defendants' arguments against the State's proposed injunction are meritless**[2]

---

[1] Under Northern District of Oklahoma Local Rule LCvR7(d), response briefs are limited to twenty-five pages, absent leave of the Court.  The defendants' response brief exceeded the Rule's page limit by eighteen pages.

[2] As acknowledged by both sides, there are four basic requirements for issuance of an injunction.  The defendants do not appear to dispute that the "success on the merits" requirement has been satisfied.

1

1. **Irreparable harm**

Contrary to the defendants' assertions, Doc. 3164 at 4-8, the Court has explicitly found the State has suffered irreparable harm. *See* Doc. 2979 at COL 93; Doc. 3161 at COL 63. More specifically, contrary to the defendants' assertions, Doc. 3164 at 5-6, the record does indeed contain current causation evidence. *See, e.g.,* Doc. 3161 at FOF 60 ("phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus causing injuries to the waters of the IRW"); *id.* at FOF 40 (causation resulting from run-off of legacy phosphorus from past applications of poultry waste); Doc. 2979 at COL 21 ("each defendant has contributed significantly to phosphorus loading of, and injuries to, the waters of the IRW").

Further, contrary to the defendants' assertions, Doc. 3164 at 6-7, injunction is an appropriate and recognized remedy under the causes of action under which the State prevailed. *See* 50 Okla. Stat. § 8 (providing for abatement remedy for violations of 50 Okla. Stat. § 1); 27A Okla. Stat. § 2-3-504(A)(4) & (F)(2) (providing for injunction remedy for violations of the Oklahoma Environmental Quality Code); 2 Okla. Stat. § 2-16(B) & (C) (providing for injunction as remedy for violations of the Oklahoma Agricultural Code); *Fairlawn Cemetery Ass'n v. First Presbyterian Church*, 496 P.2d 1185 (Okla. 1972) (providing for injunction as a remedy for trespass); *State of Illinois v. City of Milwaukee*, 599 F.2d 151, 165 (7th Cir. 1979) (providing for injunction as a remedy for federal common law public nuisance), *rev'd on different grounds, Illinois v. Milwaukee*, 451 U.S. 304 (U.S. 1972). The defendants have put forth no legal authority as to why the State cannot avail itself of an injunctive remedy in this case.

Finally, contrary to the defendants' assertions, Doc. 3164 at 7-9, the proposed injunction is not overbroad as phosphorus from all land-applied poultry waste has the propensity to run-off and cause pollution. *See, e.g.,* Doc. 2979 at FOF 531 ("approximately five percent of the phosphorus

in land-applied litter in the IRW is expected to run-off in a typical year"); *id.* at FOF 535 ("some fraction of phosphorus from land applied poultry waste runs off to the waters of the IRW"); *id.* at FOF 542 ("phosphorus that has run off from land-applied poultry waste generated by poultry waste generated by poultry is a significant source of the phosphorus causing injuries to the waters of the IRW").[3] The State's proposed injunction – which would limit land applications of poultry waste to that amount necessary to satisfy agronomic need (i.e., 65 lbs./acre STP) – is entirely reasonable and not overbroad.

### 2. Balance of the equities

The defendants' assertion that the proposed injunction is unlikely to address the State's injuries, Doc. 3164 at 9-10, ignores this Court's findings. The defendants had the opportunity to show at both the 2009 trial and the 2024 hearing that sources of phosphorus other than poultry waste were allegedly responsible for the State's injuries, and on both occasions, they failed to do so. *See, e.g.,* Doc. 2979 at FOF 586 ("while other sources contribute to phosphorus loading of the IRW, poultry waste is the principal contributor of the phosphorus causing injuries to the waters of the IRW"); Doc. 3161 at FOF 59-60 (affording "little weight" to the defendants' alternative sources theory, and finding that "phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus causing injuries to the waters of the IRW").

---

[3] The defendants also assert that there is an absence of proof of hydrologic connectivity in the IRW. Doc. 3164 at 8. Not true. *See, e.g.,* Doc. 2979 at FOF 402 ("the geology of the IRW permits and/or contributes to phosphorus contamination of the waters of the IRW"). And the defendants assert that the State has failed to connect phosphorus run-off to any particular field for which the defendants are liable. Doc. 3164 at 8-9. But such proof is not required. *See* Doc. 2979 at COL 21 ("Tracing or quantification of the exact contribution is not necessary, and the State need not track phosphorus from any particular field to the waters of the IRW.").

The defendants' argument that the proposed injunction will burden the defendants, Doc. 3164 at 10-11, is incorrect. The only so-called "burden" that will befall the defendants is that they – just like any other business – will bear the cost of responsibly managing their waste stream. Such a so-called "burden" is in reality no real burden at all. It is called being a responsible corporate citizen.

### 3. Public interest

The defendants assert that the proposed 65 lbs./acre STP limitation on land application of poultry waste "would ignore the interests of the many stakeholders not before this Court and end run the State's regulatory process." Doc. 3164 at 11. This is incorrect. The proposed injunction is consistent with the existing regulatory scheme that the third-party stakeholders are required to follow. Indeed, although the Oklahoma Registered Poultry Feeding Operations Act ("ORPFOA"), 2 Okla. Stat. §§ 10-9.1 to 10-9.12, has been amended since the 2009 trial, it *still* plainly prohibits pollution of the waters of the State by poultry waste.[4] Under the ORPFOA as currently written, every poultry feeding operation is required to have a Nutrient Management Plan. *See* 2 Okla. Stat.

---

[4] Even were the ORPFOA to be read to expressly authorize land application of poultry waste that pollutes the waters of the State (which would be a manifestly erroneous reading), such a reading would have no bearing on this case. That is so because this statute as currently written is inapplicable to the current case. The 2024 amendments to the ORPFOA, which amended out the express prohibition on "discharge or runoff of waste from the application site" does not apply retroactively to the State's claims. *See* Okla. Const., Art. V, § 52 ("After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit.") & Art. V, § 54 ("The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."); *State ex rel. Harris v. Three Hundred & Twenty Five Thousand & Eighty Dollars ($325,080.00)*, 2021 OK 16, ¶ 15, 485 P.3d 242, 246 ("Ordinarily, statutes and amendments are to be construed to operate only prospectively, unless the Legislature clearly expresses a contrary intent. If doubt exists, it is resolved against retroactive effect."). The State's claims thus continue to proceed under ORPFOA as written at the time the State's lawsuit was brought in 2005.

§ 10-9.7(C).[5]  The Oklahoma Administrative Code's Nutrient Management Plan requirements mandate that *"[s]torage and land application of poultry waste shall not cause a discharge or runoff of significant pollutants to waters of the State or cause a water quality violation to waters of the State."* See Okla. Admin. Code § 35:17-5-5(c) (emphasis added); *see also* 2 Okla. Stat. §§ 10-9.7(B)(1) & (B)(4)(b) (providing that Nutrient Management Plans include "[m]easures designed to prevent the discharge of poultry waste to the waters of the state" and "[m]easures designed to ensure that poultry waste handling, treatment, management, and removal shall . . . not result in contamination of waters of the state"). Moreover, "[d]ischarge or runoff of waste from the application site is evidence that the Nutrient Management Plan requires revisions." *See* 2 Okla. Stat. §§ 10-9.7(C)(6)(c). Finally, it warrants noting that nothing in the Nutrient Management Plan regime requires that poultry waste be applied at the maximum land application rate (300 lbs./acre STP). Simply put, the ORPFOA plainly prohibits pollution of the waters of the State by poultry waste, and thus a remedy requiring the defendants to remove all excess poultry waste from the IRW going forward would not run afoul of this regulatory scheme.

Neither should this Court be troubled by any impact that the proposed injunction might have in Arkansas. This Court has already concluded that "[c]ompliance by Arkansas growers with Arkansas laws and regulations does not immunize defendants, as it is axiomatic that Arkansas cannot enact legislation permitting a continuing nuisance and/or trespass in Oklahoma," Doc. 2979 at COL 81. And the State's requested relief would not violate principles of federalism as "it is not

---

[5] The Oklahoma Poultry Waste Applicators Certification Act ("OACA"), 2 Okla. Stat. §§ 10-9.16 to 10-9.21, requires that litter application, whether by a private or commercial applicator, "comply at all times with the provisions set forth in . . . The Nutrient Management Plan, if application is conducted on land operated by a registered poultry operation." *See* 2 Okla. Stat. § 10-9.19a(1). All other applications in a nutrient-limited watershed must comply with a Conservation Plan. *See* 2 Okla. Stat. § 10-9.19a(2).

5

uncommon for courts to apply the law of the state where injury to the plaintiff occurred as a result of defendant's tortious conduct in another state." *Id.* at COL 76-77; *see also id.* at COL 96 ("Although Arkansas has a regulatory scheme pertaining to the management of poultry waste, that scheme must yield to the law set forth in *Cameron* and its progeny.  Moreover, it is axiomatic that Arkansas cannot 'permit' nonpoint source pollution of Oklahoma's waters.").

Finally, the defendants' suggestion that the proposed injunction would "effectively [] facilitate trespass onto private property, and the seizure of private property," Doc. 3164 at 13-14, does not withstand scrutiny because it ignores the fact that the proposed injunction is directed at the defendants, not farmers.  Doc. 3163-1 at 7 ("[t]he Defendants are legally responsible for remedying the phosphorus pollution of the Watershed."); *id.* at 9 ("[t]he Defendants shall pay all costs and expenses associated with remediation"); *id.* at 18-20 (describing the restriction on land application of poultry waste as pertaining to the defendants' Birds); *id.* at 20 ("[t]he Defendants shall ensure that their Contract Growers have access to sufficient Poultry Wate removal equipment, storage facilities, transportation methods, and disposal methods for the Poultry Waste generated by the Defendants' Birds.  The Defendants themselves shall pay all costs associated with such removal, storage, transportation, and disposal, and shall not pass such costs on to their Contract Growers either directly or indirectly."); *id.* ("[t]he Defendants shall hold their Contract Growers harmless for the costs of removal, storage, transportation, and disposal of Poultry Waste generated by the Defendants' Birds"); *id.* ("[t]he Defendant contracting with a Contract Grower shall hold the Contract Grower harmless for any loss of income that may be attendant to the Defendant taking over the responsibility for safe disposal of the Poultry Waste in compliance with this judgment."). This Court has concluded as a matter of law that the defendants are vicariously (and in some instances directly) liable "for poultry waste causing phosphorus to physically invade the rivers and

6

streams of the Oklahoma portion of the IRW and Lake Tenkiller." Doc. 2979 at COL 51. Thus, enjoining the defendants from continuing to place their birds with farmers who refuse to cooperate in responsibly managing the poultry waste for which the defendants are legally liable is certainly within the Court's jurisdiction.

### 4. Unclean hands

The defendants make the remarkable assertion that the State has unclean hands because the "conduct [was] invited and allowed by the State of Oklahoma." Doc. 3164 at 14-15. As discussed above, nothing in Oklahoma law gives the defendants an invitation or authorization to pollute the waters of the IRW in Oklahoma, and tellingly the defendants omit any discussion of Oklahoma Administrative Code § 35:17-5-5(c) in their brief.

### B. The defendants' assertion that the State has failed to prove any basis for remediation is meritless

The defendants' assertion that the State has failed to prove any basis for remediation ignores the myriad of evidence establishing that land application of poultry waste at levels above 65 lbs./acre STP (i.e., the agronomic need) is waste disposal and causes pollution. *See* Doc. 2979 at FOF 77 (citing TR at 5174:3-16; 5022:2-6, 5174:4-8, 5022:7-9, 5022:19-5023:9 (Johnson)); *id.* at FOF 372-376 (citing TR at 1852:16-1853:10 (Fisher)); TR at 5027:15-5028:2, 5028:3-10, 5029:18-22, 5037:12-17, 5037:21-5038:3 (Johnson); OK Ex. 3312 at ADEQ-2226; DJX640 at p. 89; Ct. Ex. 8, B. Haggard Dep. at 9:08-16; TR of Dec. 2024 Hearing at 542:11-21 (S. Phillips). It also ignores the fact that the defendants' own witnesses vouched for the efficacy of riparian buffers in helping to control phosphorus pollution, *see* TR of Dec. 2024 Hearing at 853:20-857:4 (Connolly); TR of Dec. 2024 Hearing at 1039:1-11 (Fisk), and that the defendants themselves in their so-called "reasonable and modest" proposal provide for the construction of riparian buffers. Simply put, there is indeed a basis for remediation.

### C. The defendants' arguments against the State's proposed appointment of a special master are meritless

The defendants assert that the special master would impermissibly perform tasks that only the Court can perform, but in doing so, they mischaracterize the special master's role. *See* Doc. 3164 at 17-23 (e.g., inaccurately arguing that the State "would have the Court impermissibly direct the special master to conduct the trial of the remedies portion of [the State's] case against the defendants"). Under the proposed final judgment, the special master would (1) conduct a remedial investigation and propose remedial plans *to the Court for Court approval*, Proposed Final Judgment, § 3(d) & § 2(d), (2) implement those remedial plans that are *approved by the Court*, Proposed Final Judgment, § 2(e), (3) conduct ongoing monitoring of the projects implemented under the *Court-approved* remedial plans, Proposed Final Judgment, § 2(f), (4) oversee the *Court-ordered* restrictions on the land application of poultry waste, Proposed Final Judgment, § 3(b), and (5) report to the parties and *the Court* regarding violations of the final judgment, Proposed Final Judgment, § 3(f)(v). None of these functions displace the Court; rather these functions are well-defined and are conducted under the supervision of the Court. The defendants' mischaracterizations and hyperbole aside, the use of a special master as set out in the proposed final judgment is fully consistent with Federal Rule of Civil Procedure 53 and the caselaw interpreting it. *See* Doc. 3163 at 11-15.

### D. The defendants' arguments against an assessment of penalties are meritless

The defendants' assertions that the State's penalty request is excessive, *see* Doc. 3164 at 23-32, ignores the fact that the State's penalty request is extraordinarily conservative. The request is limited to violations dating only up to the date the complaint was filed. *See* Doc. 3163 at 16. Contrary to the defendants' assertion, *see* Doc. 3164 at 29-30, these violations are, moreover, supported by evidence in the trial record. *See* Doc. 2873, Ex. A (listing trial exhibits).

Furthermore, the penalty request does indeed differentiate culpability among the defendants; the penalty is calculated on a defendant-by-defendant basis. *See* Doc. 3163 at 16; Proposed Final Judgment, § 5. Yet further, the defendants' assertion that their conduct was in "good-faith" and "minimally culpable," *see* Doc. 3164 at 25-26, is belied by the Court's findings and conclusions. *See* Doc. 2979, COL 60-61 (concluding the defendants acted "consciously" and with "knowledge"). The maximum allowable penalty is thus justified.

Finally, the defendants' suggestion that penalties are being assessed for conduct the defendants did not personally commit, *see* Doc. 3164 at 24-25, also ignores the Court's finding that, in addition to being vicariously liable, the defendants are directly liable because they have, *inter alia*, "'cause[d] to be placed . . . wastes in a location where they are likely to cause pollution of . . . waters of the state.'" Doc. 2979, COL 61 (quoting 27A Okla. Stat. 2-6-105(A)).

### E.   Defendant-specific arguments

The defendants' assertion that those defendants who no longer have operations in the IRW should be excluded from the proposed injunction must be rejected. *See* Doc. 3164 at 32-41. First, there can be no disputing that each of these defendants is liable for the legacy phosphorus in the watershed – phosphorus which will continue to cause injury for years to come. *See* Doc. 3161 at FOF 33-40. These defendants should contribute to the remediation of this legacy phosphorus. Second, there are no guarantees that these defendants will indefinitely refrain from resuming operations in the IRW; should they do so, they must be bound by the injunction. Otherwise, the State would be faced with the perverse situation where a defendant would be incentivized to temporarily cease its operations in the IRW, escape the requirements of the injunction, and then soon thereafter resume its unlawful pollution-causing conduct in the IRW with impunity.

**II.      The defendants' proposed "take-nothing" judgment should be rejected, as should their proposal that they take "reasonable and modest future action"**

The defendants' proposal that the Court enter a "take-nothing" judgment should be rejected. The defendants have been found liable for injuring the waters of the IRW in Oklahoma, and this injury is continuing. Without facing any consequences for their failure to properly manage their poultry waste in the IRW, the defendants will have no reason to change their ways, and this irreplaceable resource in northeast Oklahoma will be lost forever. Similarly, the defendants' proposal that they take "reasonable and modest future action" should be rejected as it is facially unreasonable. The defendants' proposal fails to acknowledge that it is the defendants *themselves* who are responsible for the appropriate management of the poultry waste that their birds generate. Doc. 2979 at COL 44, 51, 60-62. The defendants' proposal, for instance, would allow for the continued land application of poultry waste at levels above agronomic need and at levels that would result in continued pollution of the water. Simply put, the defendants must be held to account for the ongoing injury caused by their past, current, and – if not enjoined – future failures to appropriately manage this poultry waste, and the defendants' proposal does little to nothing to accomplish this requirement.

## Conclusion

For the reasons set forth in the State's opening brief, this brief, and the Court's 2023 and 2025 findings and conclusions, the State's proposed final judgment should be entered.

Respectfully Submitted,

*s/Gentner Drummond*

GENTNER DRUMMOND, OBA #16645
  *Attorney General*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
JENNIFER L. LEWIS, OBA #32819
  *Deputy Attorney General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct:  (405) 521-3921
gentner.drummond@oag.ok.gov

M. David Riggs, OBA, #7583
Kristopher E. Koepsel, OBA #19147
Riggs, Abney, Neal, Turpen, Orbison & Lewis
502 West 6th Street
Tulsa, OK 74119
(918) 587-3161

Robert A. Nance, OBA #6581
W.A. Drew Edmondson, OBA #2628
Riggs, Abney, Neal, Turpen, Orbison & Lewis
528 N.W. 12th Street
Oklahoma City, OK 73103
(405) 843-9909

Louis W. Bullock, OBA #1305
Bullock Law Firm PLLC
110 W. 7th Street
Tulsa, OK 74119
(918) 584-2001

Frederick C. Baker, admitted *pro hac vice*
Cynthia Solomon, admitted *pro hac vice*
Kristin Hermiz, admitted *pro hac vice*
Madeline Becker, admitted *pro hac vice*
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9186
*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of August, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants with entries of appearance filed of record.

*s/Gentner Drummond*
GENTNER DRUMMOND