# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA *ex rel.* )
GENTNER DRUMMOND, in his capacity as )
Attorney General of the State of Oklahoma and )
OKLAHOMA SECRETARY OF ENERGY )
AND ENVIRONMENT JEFF STARLING )
in his capacity as the TRUSTEE FOR )
NATURAL RESOURCES FOR THE )
STATE OF OKLAHOMA, )
          )
         Plaintiffs, )
          )
v. )      Case No. 05-CV-00329-GKF-SH
          )
TYSON FOODS, INC., )
TYSON POULTRY, INC., )
TYSON CHICKEN, INC., )
COBB-VANTRESS, INC., )
CAL-MAINE FOODS, INC., )
CARGILL, INC., )
CARGILL TURKEY PRODUCTION, LLC, )
GEORGE'S, INC., )
GEORGE'S FARMS, INC., )
PETERSON FARMS, INC., and )
SIMMONS FOODS, INC., )
          )
         Defendants. )

## JUDGMENT

In its Findings of Fact and Conclusions of Law, this court found in favor of the State and against defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, for violation of 27A Okla. Stat. § 2-6-105, and for violation of 2 Okla. Stat. § 2-18.1. Doc. 2979 at 213. Among other things, the court found that the waters of the Illinois River Watershed (IRW) have elevated phosphorus levels;[1] that the principal contributor of these elevated

---

[1] *See* Doc. 2979, FOF 130 ("The court finds that phosphorus concentrations in streams and rivers of the IRW in Oklahoma are elevated beyond natural or background levels …"); FOF 168 ("Based upon the foregoing factual findings, the court finds that the rivers and streams of the IRW have elevated phosphorus concentration levels above natural or background levels."); FOF 239 ("The

phosphorus levels in the waters of the IRW is run-off from poultry waste;[2] and that banked phosphorus in the soils of the IRW due to land application of poultry waste is a source of this phosphorus run-off.[3]

The court concluded that the defendants knew their growers, in the ordinary course of their work for the defendants, spread poultry litter on the land in the IRW, and knew or should have known no later than the late 1990s that their growers' land application of poultry waste generated by the defendants' poultry was a primary source of the excess phosphorus in the waters of the

_____

court finds that Lake Tenkiller has become eutrophic, and this eutrophication is caused by phosphorus concentrations in the reservoir.").

[2] *See* Doc. 2979, FOF 288 ("The court finds that nonpoint source phosphorus is a significant source of the phosphorus causing injury to the rivers and streams of the IRW and to Lake Tenkiller."); FOF 539 ("The evidence that phosphorus from land-applied poultry waste can and does run off into the waters of the IRW is convincing. As set forth below, the evidence is convincing that poultry waste is a significant source of the phosphorus causing injuries to the rivers and streams of the IRW and to Lake Tenkiller."); FOF 585 ("[I]t is clear that poultry waste is a major contributor to the levels of phosphorus in the waters of the IRW."); FOF 586 "([P]oultry waste is the principal contributor of the phosphorus causing injuries to the waters of the IRW.").

[3] *See* Doc. 2979, FOF 81 ("[T]he agronomic critical level for phosphorus in the IRW is 65 lbs./acre STP, and the land application of poultry litter in the IRW in excess of this agronomic critical level is not protective of the environment and likely results in continued phosphorus pollution."); FOF 73 (finding that at an STP of 65 lbs./acre, there is 100 percent sufficiency for the growth of grass.); FOF 77 ("[A]t land application rates in excess of agronomic need, there is no crop benefit."); FOF 362 ("Land application of poultry waste has caused the soil in many areas of the IRW to have STP levels in excess of any agronomic need for phosphorus."); FOF 531 ("Phosphorus runoff calculations made in various coefficient-based studies of land applied poultry waste in the IRW are consistent in finding that approximately five percent of the phosphorus in land-applied litter in the IRW is expected to run off in a typical year."); FOF 535 ("[T]he court accords substantial weight to the evidence that some fraction of phosphorus from land applied poultry waste runs off to the waters of the IRW."); COL 49 ("And the overwhelming evidence establishes that phosphorus from land-applied poultry waste runs off the fields in environmentally significant quantities, causing injury to the waters of the IRW."); COL 61 ("[P]oultry waste continues to be applied to the phosphorus-saturated fields in the Oklahoma portion of the IRW, where an environmentally significant portion of the phosphorus contained in the waste runs off the fields and enters the waters of the IRW.").

IRW. Doc. 2979, COL 11. Once on notice, the defendants had a duty to abate the nuisance and put a stop to the trespass, neither of which they have done. Doc. 2979, COL 11 (citing *City of Tulsa v. Tyson Foods, Inc.,* 258 F. Supp. 2d 1263, 1295-96 (N.D. Okla. 2003), *vacated in connection with settlement*). Therefore, the defendants are liable for any trespass or nuisance created by their growers. *Id.* at 1296. Doc. 2979, COL 11 (citing *City of Tulsa*, 258 F. Supp. 2d at 1295-96).

The court directed the parties to meet and attempt to reach an agreement with regard to remedies to be imposed in this action.  The parties participated in mediation with retired Tenth Circuit Chief Judge Deanell Reece Tacha but were unable to reach a settlement agreement.

The defendants then filed a motion to dismiss, alleging that conditions in the IRW had changed such that the State's claims were constitutionally and prudentially moot, and arguing that granting relief would violate due process. The Court denied the motion to dismiss, and set an evidentiary hearing to address the defendants' contention that conditions in the IRW had materially changed following the end of trial. Docs. 3038 and 3098.

Following a six-day evidentiary hearing, the Court entered an Opinion and Order in which it found, among other things, that:  conditions have not materially changed since trial and the rivers and streams of the IRW and Lake Tenkiller continue to be impaired by phosphorus;[4] the

---

[4] *See* Doc. 3161 at 6-7 ("[T]he court finds that the conditions of the IRW have not materially changed since trial, and the elevated phosphorus concentration levels have resulted in significant increases in algal biomass in the IRW's rivers and streams, which has impacted the aesthetics of the IRW's rivers and streams."); *Id.* at 7 ("[T]he court finds that conditions have not materially changed since trial and that phosphorus concentrations in the Illinois River, Flint Creek, and Barren Fork Creek continue to exceed the total phosphorus criterion applicable to scenic rivers and the aesthetics beneficial use is impaired for total phosphorus in violation of Oklahoma water quality standards."); *Id.* ("Lake Tenkiller continues to be eutrophic."); *Id.* at 9 ("[E]levated phosphorus levels continue to cause injury to Lake Tenkiller, as well as the biota therein."); *Id.* at 21 ("Because the phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus which is causing actual and ongoing injury to the waters of the IRW, the conditions in the IRW have not materially changed since trial.").

defendants, except defendants Peterson and Cal-Maine, have continued operations in the IRW and have continued generating significant quantities of phosphorus-rich poultry waste throughout the IRW;[5] legacy phosphorus in the soil from past application of poultry litter continues to affect the water quality in the rivers and streams of the IRW;[6] "significant amounts of poultry waste generated by defendants' birds have been, and continue to be, land-applied in the IRW, in close proximity to the growers' farms;"[7] "phosphorus run-off from land-applied poultry waste continues to be a significant source of phosphorus causing injuries to the waters of the IRW;"[8] and "the continuing actual and ongoing injury to the waters of the IRW constitutes irreparable harm."[9] Thus, the court concluded "circumstances have not 'changed since the beginning of litigation that forestall any occasion for meaningful relief.' [quoting *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997).] Accordingly, this matter is not prudentially moot."[10]

---

[5] *See id.* at 9-10 (listing the number of poultry feeding operations, number of poultry houses, and bird capacity per flock in the Oklahoma portion of the IRW); *Id.* at n. 6 (explaining that the Court had previously concluded that defendants Peterson and Cal-Maine had ceased poultry operations in the IRW); *Id.* at 12 ("[S]ince trial in this matter, each of the defendants—with the exception of defendants Peterson and Cal-Maine—has generated significant quantities of phosphorus-rich poultry waste in the IRW.").

[6] *See id.* at 15 ("[T]he court finds that 'legacy phosphorus' resulting from past application of poultry litter continues to affect the water quality of the rivers and streams of the IRW.").

[7] *Id.* at 16.

[8] *Id.* at 20.

[9] *Id.* at 21; *see also*, the court's corresponding conclusion in its Findings of Fact and Conclusions of Law, Doc. 2979 at COL 93 (stating "actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief.").

[10] Doc. 3161 at 22.

The issues having been duly tried and the court having entered its findings of fact and conclusions of law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment shall be and is hereby entered in favor of the State and against the Defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, for violation of 27A Okla. Stat. § 2-6-105, and for violation of 2 Okla. Stat. § 2-18.1.

The State seeks a permanent injunction as one of its remedies. "For a party to obtain a permanent injunction, it must prove: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (citation omitted). The State has proven both actual success on the merits and irreparable harm unless the injunction is issued. *See* FF&CL, Doc. 2979, pp. 217-218. As for the third and fourth requirements, the parties have now briefed their respective arguments. *See* Doc. 3164, pp. 21-26, and Doc. 3172, pp. 3-7.

Considering the balance of hardships between the State and the defendants, the court concludes that an injunction is warranted. The State persuasively asserts that the hardship that will befall the defendants is that they—like responsible businesses—will bear the costs of: first, remediating the extensive damage they've caused in the past; and second, managing more responsibly the poultry waste generated by their birds from this point forward. However, to balance the equities, and as set forth below, the court adopts a less stringent STP standard than that requested by the State, as the court finds from the evidence and testimony presented by the State at trial that nutrient utilization standards that are protective of the environment require only that animal manure applications do not result in soil test phosphorus levels that exceed 120. *See*

5

FF&CL, Doc. 2979, p. 33.  Further, permitting soil test phosphorus levels up to 120 ensures that the vast majority of fields have sufficient phosphorus and prevents localized deficiencies due to soil variability.  *Id.*  Enforcement of the claims on which the State has prevailed by the injunction set forth below strikes a balance between the business interests of the poultry industry, but also the interests of the public in enforcement of the laws protective of the environment, specifically: statutory public nuisance, federal common law nuisance, trespass, 27A Okla. Stat. § 2-6-105, and 2 Okla. Stat. § 2-18.1.

As for whether the injunction, if issued, will adversely affect the public interest, the court finds and concludes that it will not.  Though defendants call attention to the vested business interests of themselves, their contract growers, cattlemen, and hay farmers in the outcome of this litigation, both they and the public at large have an interest in the enforcement of the environmental claims on which the State has prevailed.  The injunction set forth below is consistent with the regulatory scheme that third-party stakeholders are required to follow, as Oklahoma law applicable to this action plainly prohibits pollution of the waters of the State by poultry waste.  As for the public at large, its interest is not only in the production of poultry products, but in the responsible disposal of poultry waste in compliance with the law.

The State seeks prohibitory injunctive relief in restricting land application of poultry waste, as well as mandatory injunctive relief to remediate damage, monitor the watershed, and enforce the injunction.  "It is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedial process not favored by the court." *Citizens Concerned, etc. v. City & Cty. of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980). "[C]aution is especially important appropriate [when] the type of injunction sought is mandatory rather than prohibitory." *Signature Props. Int'l, Ltd. v. City of Edmond*, 310 F.3d 1258, 1269 (10th

Cir. 2002). The court finds the circumstances presented here to be compelling. First, remediation is necessary to mitigate the damage caused by defendants to the waters of the IRW by the land application of waste from defendants' poultry. Remediation can only be achieved in this highly contested lawsuit by adoption of a mandatory injunction. Second, the IRW is comprised of over a million acres and runs 145 miles from East to West through the Ozarks of Northwest Arkansas and Northeast Oklahoma. A master must be appointed to oversee the investigation and planning of the remediation to be performed over this large watershed, to oversee and implement the ongoing remediation, to monitor compliance with the restrictions imposed by this Judgment on the land application of defendants' poultry waste, and to monitor the progress of the remediation and the restrictions. This court cannot reasonably perform these tasks itself, particularly in the wake of the *McGirt* decision and the resultant explosion of this court's criminal docket. The need to appoint a master and necessary staff is therefore a compelling circumstance requiring an injunction which is, in part, mandatory.

Premises considered, the parties shall comply with the provisions of this Judgment set forth below.

## 1. **Definitions**

   a. "Company Farm" means any property now or hereafter owned or operated by any Defendant to raise and care for poultry owned by, or for the benefit of, that Defendant.

   b. "Contract Grower" means any person or other entity engaged in farming or other agricultural operations who contracts with any Defendant, to raise and care for poultry provided in the Watershed to the Contract Grower by any Defendant.

c. "Contract Grower Farm" means any property now or hereafter owned or operated by any Contract Grower, to raise and care for poultry provided inside the Watershed to the Contract Grower by any Defendant.

d. "Defendant" means Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken, Inc., Cobb-Vantress, Inc., Cal-Maine Foods, Inc., Cargill, Inc., Cargill Turkey Production, LLC, George's, Inc., George's Farms, Inc., Peterson Farms, Inc., and Simmons Foods, Inc., and their successors and assigns (collectively "Defendants") and includes all entities owning or operating farms owned by any Defendant.

e. "Defendants' Birds" means all birds confined on the Defendants' Company Farms or the Defendants' Contract Grower Farms.

f. "Illinois River Watershed" ("IRW" or "Watershed") means the Illinois River Watershed encompassing approximately 1,069,530 acres located in northeastern Oklahoma (Adair, Cherokee, Delaware, and Sequoyah Counties) and northwestern Arkansas (Crawford, Benton, and Washington Counties), and depicted in State's Ex. 3351 at OSU0005147. Within the IRW are the Illinois River, as well as its major tributaries, including the Baron (aka Barren) Fork River, the Caney Creek, and the Flint Creek. State's Ex. 3351 at OSU0005160; see also Daily Trans., 10105:7-20 (Grip Testimony). The Watershed includes the 12,900 acre Tenkiller Ferry Lake. State's Ex. 3351 at OSU0005174.

g. "Poultry Waste" means all byproducts associated with the confinement of poultry, including excrement, feed waste, animal carcasses, and bedding materials.

h. "STP" means soil test phosphorus.

i.  "Withdrawn Defendants" means Cal-Maine Foods, Inc., Cargill, Inc., Cargill Turkey Production, LLC, and Peterson Farms, Inc.

2.  **Remediation**

a.  Remediation is necessary to reduce phosphorus loading and abate the impacts of the pollution caused by the overapplication of Poultry Waste in the Watershed. Doc. 2979 at 213; *see also*, Doc. 3161 at 21 (concluding "the continuing actual and ongoing injury to the waters of the IRW constitutes irreparable harm" and stating "[i]n light of the ongoing injuries, remedial measures in this case 'will have some effect in the real world.'").

b.  The Defendants are legally responsible for remedying the phosphorus pollution of the Watershed.

c.  Remediation shall be conducted in a phased approach that includes remedial investigation, planning, implementation, and monitoring.

d.  Phase I comprises remedial investigation and planning. To initiate Phase I, the court hereby orders a remedial investigation by a master (as detailed in Section 3) to assess the status of the Poultry Waste pollution in the IRW, including but not limited to current practices relating to the disposal of Poultry Waste generated by Defendants' poultry growing operations. Further, the court orders the development of a remediation plan by the master, based upon the findings of the remedial investigation and the evaluation of remediation options. Options to evaluate include, without limitation: buffer strips, increased treatment of drinking water, excavation, alum application to fields, crop and nutrient management with nitrogen supplementation, bank stabilization, constructed wetlands, sediment removal from

Lake Tenkiller, layered aeration of Lake Tenkiller, and exportation of Poultry Waste outside the Watershed for application to phosphorus-deficient soil. *See* Doc. 2979, FOF 594-595. Upon review and evaluation of the plan developed and submitted by the master, the court may take all appropriate and necessary actions, including ordering additional remedial investigation or ordering additional remediation planning. Upon the court's approval of the plan, the court shall order implementation of the plan.

e.  Phase II will comprise implementation of one or more remediation plans that the court approves.

f.  Phase III will comprise on-going monitoring of the projects implemented in furtherance of the one or more court-approved remediation plans.

g.  Notwithstanding the provision of Section 2(f), each of the Phases I, II, and III shall include monitoring by the master of all aspects relevant to the remediation operations of those phases including, without limitation, monitoring of water quality, soil sampling, and Poultry Waste sampling.

h.  The Defendants shall pay all costs and expenses associated with remediation, including costs and expenses for remedial investigation, planning, implementation, and monitoring.

i.  The Defendants' payment obligations for remediation shall be joint and several. *See* Okla. Stat. §§ 832(A), (B) ("When two or more persons become jointly or severally liable in tort for the same injury to person or property . . . there is a right of contribution among them . . .. The right of contribution exists only in favor of

the tort-feasor who has paid more than their pro rata share of the common liability . . ..").

**3. <u>Watershed Monitoring and Enforcement</u>**

a. The court shall appoint a master to implement and oversee this judgment.

b. The master shall be charged with overseeing the provisions of the Remediation set forth in Section 2 and the Restriction on Land Application of Poultry Waste set forth in Section 4.

c. The master shall retain technical experts and order testing, studies, and preparation of reports in furtherance of completing the work described by this judgment. The work product of the master shall be available to the public to the greatest extent permitted by law.

d. The master shall prepare the remediation plan(s) of Section 2(d) and propose such remediation plan(s) to the court for approval.

e. To assist with Watershed monitoring and enforcement duties, the master shall recruit, train, oversee, and monitor a watershed monitoring team (WMT). The WMT members shall have the experience, training, and qualifications prescribed by state or federal law or regulations for persons designated to prepare and oversee implementation of nutrient management plans or comparable plans designed to manage agricultural operations and preserve water quality.

f. The WMT's duties shall include:

    i. monitoring compliance with this judgment;

    ii. preparing nutrient management plans that comply with this judgment and all applicable laws, rules, and regulations;

iii. making periodic inspections of each Company Farm, Contract Grower Farm, and land application site to procure samples of Poultry Waste, soil, and/or water, and to conduct such other tests and make such other observations as are necessary for the WMT to determine compliance with this judgment and all applicable laws, rules, and regulations. The periodic inspections of each Company Farm, Contract Grower Farm, or land application site shall occur as often as is necessary to determine compliance, and shall be conducted at least once every year;

iv. The WMT shall inspect such relevant records or data as the Defendants or their Contract Growers may be required to maintain in order to demonstrate compliance with this judgment and all applicable laws, rules, and regulations; and

v. The WMT shall report, to the greatest extent permitted by applicable law,[11] to the court, the Oklahoma Office of the Attorney General, the Defendants, and the state regulatory agency or commission having jurisdiction under any applicable state law, all material or repeated violations or instances of non-compliance with this judgment or any applicable law, rule, or regulation.

g. Upon each one-year anniversary date of the establishment of the WMT until modified by court order, the WMT shall collect and disseminate, to the greatest extent permitted by applicable law, to the Oklahoma Office of the Attorney

---

[11] As the court has previously noted, with respect to the Arkansas portion of the IRW, due to statutory privacy protections, certain data regarding the poultry feeding operations is not publicly available. *See* Doc. 3161 at 10 (citing Ark. Code Ann. § 15-20-904(f) and testimony regarding Arkansas privacy protections).

General, the Defendants, and the master the following information regarding the Company Farms and Contract Grower Farms:

    i.   The name, mailing address, and phone number of the Contract Grower or the manager of the Company Farm;

   ii.   The location of the Contract Grower Farm or Company Farm, identified by physical address, county, public land survey description to at least the level of quarter section, latitude and longitude of the road entrance to the Contract Grower Farm or Company Farm, latitude and longitude of the northwestern-most poultry house, and GIS data, including all vector data and any underlying database and all raster data created or modified by the WMT for the Contract Grower Farm or Company Farm. The latitude and longitude data shall be provided in a form readily imported to a GIS system, shall be provided in decimal degree format (dd.ddddd), and shall be measured to at least five decimal places. All latitude and longitude measurements must be at least accurate within 4.9 meters (16 feet) of the actual location;

   iii.   The size and production of such Contract Grower Farm or Company Farm in terms of number of poultry houses; length, width, and height of each poultry house; type of poultry raised in poultry house; bird capacity of each poultry house; number of birds in standing inventory per flock; number of flocks per year; and amount of Poultry Waste produced per year;

   iv.   A description of all poultry house cake outs and clean outs, including (1) the dates of each cake out or clean out and (2) the fate of the removed

Poultry Waste with information identifying any storage location, the transporter, and the receiving location;

v. A description of the storage methods used to store the Poultry Waste;

vi. A description of the transportation methods used to transport the Poultry Waste;

vii. A description of the final disposition of the Poultry Waste, including:

1. The volume of Poultry Waste removed from the poultry operation, specified as measured in wet or dry tons;

2. The date of removal of such Poultry Waste from the poultry operation;

3. The quantity of Poultry Waste land-applied on each Company Farm or Contract Grower Farm, and the quantity of Poultry Waste which is transferred or sold from each Company Farm and Contract Grower Farm each year;

4. The identity and address of any person to whom Poultry Waste is transferred, including the certified litter applicator, the landowner, and any other recipient of the Poultry Waste;

5. The location and acreage of each application site, including the physical address, county, public land survey description to at least the level of quarter section, latitude and longitude of a point near the center of the application site, and GIS data, including all vector data and any underlying database and all raster data created or modified by the WMT for the application site. The latitude and longitude data

14

shall be provided in a form readily imported to a GIS system, shall be provided in decimal degree format (dd.ddddd), and shall be measured to at least five decimal places. All latitude and longitude measurements must be at least accurate within 4.9 meters (16 feet) of the actual location;

6. The soil test results and sampling date for each application site, including the STP results and sampling date;

7. The test results for the Poultry Waste, the sampling date, the tonnage of waste applied, and the application rate relevant to each application site;

8. The date of issuance of last nutrient management plan and the name of the WMT member who prepared the nutrient management plan for each Company Farm, Contract Grower Farm, and application site; and

9. A certification by a responsible official of the Company Farm or the Contract Grower, as applicable, that all Poultry Waste generated at the Company Farm or the Contract Grower Farm has been managed, stored, and disposed of in compliance with this judgment.

h. The master shall assume full and permanent responsibility to administer the employment and compensation of the WMT members, provide facilities and support for their responsibilities, and maintain records and information collected by the WMT in the performance of its duties. The WMT members shall remain

subject to the oversight and monitoring of the master during the master's term of Court appointment.

i.  Within thirty days after the date upon which this judgment is entered on the court's docket, the Oklahoma Office of the Attorney General and the Defendants shall confer and attempt to agree on a qualified candidate for master, or in the absence of such agreement, the Oklahoma Office of the Attorney General shall submit two nominees and the Defendants collectively shall submit two nominees to the court within the thirty-day period. The court shall be free to appoint any of these nominees or any other person or firm not nominated by the parties if the court deems appropriate or necessary.

j.  The master shall at all times be deemed an adjunct to the court and shall serve at the pleasure of the court. For a period of at least thirty years after the appointment of the master, the Defendants shall pay, as set forth herein, the costs and expenses of the master incurred in the performance of the duties of the master as defined herein.[12] The term of the master's appointment and the Defendants' aforementioned payment obligations shall commence upon appointment by the court and end at least thirty years thereafter unless the court orders otherwise. Notwithstanding the term of at least thirty-years, if the master determines after ten years that the

---

[12] An extended period of oversight by the master for at least thirty years is warranted because remediation of the IRW will take decades. As noted in the court's Opinion and Order of June 17, 2025, Soil Scientist and Geomorphologist Gregory Scott testified that "following cessation of land application, it would take up to thirty years of hay production and removal to remove legacy phosphorus placed in the soil up to a STP of 300. During that time, if there was water available, phosphorus would continue to leak into the water." Doc. 3161 at 14. *See also* FF&CL, Doc. 2979 at ¶ 375.

Defendants have achieved full compliance with the judgment, the Defendants may file a motion with the court seeking to end the Defendants' obligations under this judgment and this court's jurisdiction thereover. Upon the filing of such motion, the court shall determine, after an evidentiary hearing at which the Defendants have the burden of proof, whether the Defendants have achieved full compliance. If the court finds that the Defendants have achieved full compliance, the court may end the Defendants' obligations at a time determined by the court. Likewise, notwithstanding the thirty-year term, if the master determines that the Defendants have not achieved substantial compliance with the judgment after twenty-nine years, the State may, at least ninety days before the end of the thirty years, file a motion with the court seeking to extend the duration of the Defendants' obligations under this judgment and this Court's jurisdiction thereover. Upon the filing of such a motion, the court shall determine, after an evidentiary hearing, whether the Defendants have achieved substantial compliance. If the court finds the Defendants have not achieved substantial compliance for at least the last full year preceding the hearing on the State's extension motion, the court may extend the term of the Defendants' obligations under this judgment and retain jurisdiction for a period of time determined by the court to ensure that Defendants come into compliance. If the court determines that the Defendants have achieved substantial compliance, the court may terminate the Defendants' obligations under this judgment at the thirty-year end date.

k. Any vacancy occurring for any reason during the term of the master shall be filled in the manner described in Section 3(i).

17

l.   Within sixty days of the appointment of the master and annually thereafter, the master shall file with the court a proposed annual budget setting out the projected expenses of operating the master's office and the WMT. Subject to the consideration of any objections by the parties, the court will approve an annual budget for the master's office and the WMT. During the course of each annual budget period, the master shall seek amendments to this budget as needed.

m.   The master shall keep a record of all costs and expenses associated with conducting the remedial investigation; the development of the remediation plan; the implementation of the remediation; the recruitment, hiring, and training of the WMT; the necessary compensation and state-mandated benefits required to employ qualified persons on the WMT; and the costs and expenses required by the WMT to carry out its monitoring and enforcement duties as provided herein.  The master shall designate the costs and expenses as related to either "Remediation" or "Restriction on Land Application of Poultry Waste."  The Defendants shall pay to an account set up and designated by the master all costs and expenses set forth above.  The Defendants' payment obligation as to costs and expenses related to "Remediation" shall be joint and several.  The Withdrawn Defendants shall have no payment obligation as to costs and expenses related to "Restriction on Land Application of Poultry Waste."  All other Defendants' payment obligation as to costs and expenses related to "Restriction on Land Application of Poultry Waste" shall be joint and several.   The funding obligation of the Defendants shall commence thirty days after the date of the entry of this judgment on the Court's

docket and continue for a period of at least thirty years after the date of the appointment of the master unless the Court orders otherwise.

n.  The Defendants shall pay those costs and expenses of the master and the WMT into an evergreen fund lasting not less than thirty years in the following manner:

    i.  Within five business days of appointment of the master, the Defendants shall pay $10,000,000.00 into an account designated by the office of the master to pay the initial salaries and benefits of the master, the WMT, and costs and expenses associated with the performance of their duties under this judgment.

    ii.  If at any time the Defendants are notified by the master that the balance of the account identified in Section 3(n)(i) falls below $5,000,000.00, the Defendants shall within ten business days replenish the account with a payment of $5,000,000.00 (adjusted for inflation by reference to the United States Department of Labor Consumer Price Index).

o.  Unless otherwise directed by the court, the master shall report in writing to the court, the Oklahoma Office of the Attorney General, and the Defendants no less often than quarterly during the first two years of the master's tenure, and no less than semi-annually thereafter. To the extent permitted by applicable law, the reports to the Oklahoma Office of the Attorney General and the Defendants shall include, without limitation, apprising them of the status of preparation of nutrient management plans; all monitoring and enforcement activities, including the monitoring and enforcement of the restriction on land application of Poultry Waste and the remediation; and the costs and expenses incurred by the master and WMT

during the reporting period. The reports to the court, which shall also be furnished to the Oklahoma Office of the Attorney General and the Defendants, shall be a summary of these matters, and shall primarily focus on issues relating to the implementation and enforcement of this judgment. The reports to the court shall be entered as a record available to the public on the docket of this case.

p.  To assist with oversight and monitoring, the Defendants shall ensure, to the extent permitted by applicable law, that each Company Farm and Contract Grower Farm maintains easily visible, well-maintained signage at entrances to the farm property, indicating the name of the owner of the Company Farm, or the name of the owner of the Contract Grower Farm and the contracting company, and the contact phone number for the owner.

q.  The master is entitled to judicial immunity in performing the master's duties as authorized by the orders of this court. The WMT and advisors to the master are entitled to judicial immunity in performing services at the direction of the master within the scope of this judgment or court-approved engagement.

## 4.  Restriction on Land Application of Poultry Waste

a.  A restriction of 120 lbs./acre STP for land application of Poultry Waste is appropriate and necessary to limit the land application of Poultry Waste to a level that provides the true agronomic need for plants in order to reduce the phosphorus run-off that pollutes the waters of the IRW.

b.  Upon the date this judgment is recorded on the court's docket, the Poultry Waste generated by the Defendants' Birds shall not be applied in the IRW on land having an STP of 120 lbs./acre or greater.

c.  Prior to any instance of land application in the IRW of Poultry Waste generated by Defendants' Birds, the land at issue must have STP results from testing: (1) conducted under the supervision of the master or the WMT, (2) within one year prior to the instance of land application, and (3) having a value of less than 120 lbs./acre STP. Such STP results shall be provided by the Defendants to the master and the WMT and shall be subject to verification by the master and the WMT prior to any instance of land application.

d.  The application rate shall be limited to two tons or less of Poultry Waste per acre. Notwithstanding the two tons or less application rate limitation, land application of Poultry Waste shall not be allowed in the IRW at any rate that would cause the land to exceed 120 lbs./acre STP.

e.  From and after the date this judgment is entered on the court's docket, the Defendants shall not continue to place birds with any Contract Grower who has been determined by the master to not be in compliance with the provisions of Section 4(b)-(d), and if ordered by the court, the Defendant shall terminate or refuse to renew its contract with the Contract Grower. The determination of a lack of compliance may be based, without limitation, on evidence such as reliable admission of the Contract Grower, reliable admission of a representative of a Defendant, observation, photographic evidence, documentary evidence, or data provided by a Defendant or a Contract Grower.

f.  At all times after the entry of this judgment on the court's docket, the Defendants shall be responsible for ensuring the lawful disposal of all Poultry Waste generated by Defendants' Birds, in compliance with this judgment and all applicable laws,

rules, and regulations. The Defendants shall take control of the Poultry Waste produced by the Defendants' Birds and ensure that the Contract Growers cooperate with the master, allow the master reasonable and necessary access to the Defendants' Company Farms and the Defendants' Contract Grower Farms, and implement any nutrient management plans. The Defendants shall be responsible for the removal of the Poultry Waste from the poultry houses, storage, transportation, and lawful disposal, including any land application of the Poultry Waste, whether that land application is inside or outside the IRW.

g.  The Defendants shall ensure that their Contract Growers have access to sufficient Poultry Waste removal equipment, storage facilities, transportation methods, and disposal methods for the Poultry Waste generated by the Defendants' Birds. The Defendants themselves shall pay all costs associated with such removal, storage, transportation, and disposal, and shall not pass such costs on to their Contract Growers either directly or indirectly.

h.  The Defendants shall hold their Contract Growers harmless for the costs of removal, storage, transportation, and disposal of Poultry Waste generated by the Defendants' Birds, whether the Defendants conduct those waste handling operations directly or contract with independent contractors to handle the Poultry Waste.

i.  The Defendant contracting with a Contract Grower shall hold the Contract Grower harmless for any loss of income that may be attendant to the Defendant taking over the responsibility for safe disposal of the Poultry Waste in compliance with this judgment.

5. **Penalties and Attorneys Fees and Costs**

a. The court found the Defendants are both directly and vicariously liable for violation of the Environmental Quality Code at 27A Okla. Stat. § 2-6-105. Doc. 2979, COL 52, 60.

b. Specifically, the court found, "[the Defendants] have structured and conducted their business in the Oklahoma portion of the [Watershed] in a manner that causes pollution of the waters of the [Watershed]. Thus, they are directly liable for 'caus[ing] pollution of … waters of the state' and for 'caus[ing] to be placed … waste[s] in a location where they are likely to cause pollution.' … Each defendant has consciously concentrated a segment of its poultry operations in the Oklahoma portion of the environmentally-sensitive [Watershed]; placed large numbers of its birds in this concentrated area; and imported enormous amounts of phosphorus-laden feed into the area. Their birds annually generate hundreds of tons of poultry waste containing phosphorus the defendants have brought into the [Watershed]. Further, despite knowledge that the majority of the poultry waste will be land applied in close proximity to where it is generated, the defendants have not made provisions for the appropriate management of the waste." Doc. 2979, COL 60.

c. "As a result, poultry waste continues to be applied to the phosphorus-saturated fields in the Oklahoma portion of the [Watershed], where an environmentally significant portion of the phosphorus contained in the waste runs off the fields and enters the waters of the [Watershed]. Further, phosphorus from land-applied poultry waste that enters the waters of the [Watershed] constitutes 'pollution' for the purposes of Okla. Stat. § 2-6-105. … In sum, through their own independent

conduct, defendants have 'cause[d] pollution of … waters of the state.' 27A Okla. Stat. § 2-6-105(A). Similarly, defendants are also directly liable under 27A Okla. Stat. § 2-6-105(A) because they have 'cause[d] to be placed … wastes in a location where they are likely to cause pollution of … waters of the state.'" Doc. 2979, COL 61.

d.  Further, the court further found "[the Defendants] are vicariously liable for violation of 27A Okla. Stat. § 2-6-105(A), for the conduct of their growers." Doc. 2979, COL 62.

e.  As a result of the Defendants' respective direct and vicarious liability under 27A Okla. Stat. § 2-6-105(A), *see* Doc. 2979, COL 52-62, the State is entitled to an award of penalties.

f.  27A Okla. Stat. § 2-3-504 – which includes the penalty portion of the Oklahoma Environmental Quality Code – became effective on July 1, 1993, and the parties agree that the State's claims for penalties are limited to conduct occurring in Oklahoma since July 1, 1993.  Doc. 2979, COL 55.

g.  Section § 2-3-504 of title 27A provides, in pertinent part:

    (A) Except as otherwise specifically provided by law, any person who violates any of the provisions of, or who fails to perform any duty imposed by, the Oklahoma Environmental Quality Code …

    ***

        (2) May be punished in civil proceedings in district court by assessment of a civil penalty of not more than Ten Thousand Dollars ($10,000.00) for each violation;

24

\*\*\*

(C) Any person assessed an administrative or civil penalty shall be required to pay, in addition to such penalty amount and interest thereon, attorneys fees and costs associated with the collection of such penalties.

(D) For purposes of this section, each day or part of a day upon which such violation occurs shall constitute a separate violation.

\*\*\*

(H) In determining the amount of a civil penalty the court shall consider such factors as the nature, circumstances and gravity of the violation or violations, the economic benefit, if any, resulting to the defendant from the violation, the history of such violations, any good faith efforts to comply with the applicable requirements, the economic impact of the penalty on the defendant, the defendant's degree of culpability, and such other matters as justice may require.

h. Thus, § 2-3-504 requires that the State establish a "violation" and, further, "caps total daily penalties at $10,000." *NVI, LLC v. Okla. Dep't of Envt'l Quality,* 276 P.3d 1069, 1077 (Okla. Civ. App. 2012).

i. To determine the penalties to be imposed, the court adopts the "top down" methodology utilized by some courts to impose fines under the Clean Water Act and other statutes. *See Pound v. Airsol Co.*, 498 F.3d 1089, 1095 (10th Cir. 2007) (concluding that "top down" approach was not mandatory, but "satisfactory" to determine Clean Air Act penalties). Pursuant to the "top down" approach, the court

"begin[s] by calculating the maximum possible penalty," then considers the statutory factors "to determine what degree of mitigation, if any, is proper." *Id.*

j.  Looking first to the maximum possible penalty, the State contends that penalties may be assessed against a Defendant based on any field having an STP value of greater than 65 lbs./acre as reflected by Oklahoma Department of Agriculture, Food and Forestry (ODAFF) records from the date of each recorded violation to the present, or, at a minimum, against any Defendant having one or more fields having an STP value of greater than 65 lbs./acre, as reflected by ODAFF records, from the earliest date of such recorded violation until either withdrawal of operations from the Watershed or the filing of the State's Complaint on June 13, 2005.  Based on what it describes as a "significant number" of soil test results in excess of 65 lbs./acre STP, the State asks the court to impose penalties in the amount of $10,000 per day against each Defendant for the period spanning from the individual Defendant's earliest documented soil test result in excess of 65 lbs./acre STP in ODAFF records—often in 1997 or 1998—to the date of the filing of the Complaint—June 13, 2005—or withdrawal from the Watershed, with each day being a separate violation.  Thus, the State effectively asks that the court treat each separate violation as an ongoing violation.[13]

---

[13] The State's proposal would result in the following maximum possible penalties against each Defendant:  (1) **Tyson Defendants** – $28,910,000.00 for the period from July 14, 1997 to June 13, 2005; (2) **Cargill Defendants** – $23,690,000.00 for the period from December 18, 1998 to June 13, 2005; (3) **George's Defendants** – $5,230,000.00 for the period from January 7, 2004 to June 13, 2005; (4) **Simmons** – $27,160,000.00 for the period from January 5, 1998 to June 13, 2005; and (5) **Cal-Maine** – $18,270,000.00 for the period from September 11, 1998 to September 11, 2003.

k.  However, the State fails to establish that excessive STP levels continued in the individual tested fields beyond the soil test date.  Although the court previously found that "[e]levated STPs decline slowly," Doc. 2979, FF 349, the State offered no additional evidence as to the rate of decline in the specific tested fields or factors affecting same.  The court is limited to the evidence presented during the nonjury trial and December 2024 evidentiary hearing.  Given the dearth of evidence regarding the specific tested fields having an excessive STP value and the length of time those excessive STP levels persisted, the State fails to establish ongoing violations for purposes of the statute.[14]

l.  As previously stated, § 2-3-504 permits imposition of penalties "for each violation." Having reviewed the evidence, the State has demonstrated 248 total documented instances in the ODAFF files of fields having an STP value of greater than 65 lbs./acre, comprised of the following:

i.  **Tyson Defendants**[15] – 106 violations, resulting in a maximum possible penalty of $1,060,000.00.  *See* [OKEX 2729B; OKEX 2730B; OKEX 6942G; OKEX 2565B; OKEX 2765B; OKEX 6942H; OKEX 2815B; OKEX 2816B; OKEX 2818B; OKEX 6942B; OKEX 2825B; OKEX 2830B; OKEX 2831B; OKEX 2834B; OKEX 2847B; OKEX 69421; OKEX 2856B; OKEX 2857B; OKEX 2858B; OKEX 6942C; OKEX

---

[14] Although the State has established ongoing injury to the IRW *as a whole* so as to warrant injunctive relief, penalties under § 2-3-504 are limited to specific violations and therefore require particularity.

[15] The Tyson Defendants are Tyson Foods, Inc., Tyson Poultry, Inc., Tyson Chicken Inc., and Cobb-Vantress, Inc. Defendants Tyson Foods, Inc. controls Defendant Cobb-Vantress, Inc., Defendant Tyson Chicken, Inc., and Defendant Tyson Poultry, Inc. *See* Court's Ex. 4 at 8 (Hudson Depo.).

6942C; OKEX 2859B; OKEX 2859C; OKEX 2860B; OKEX 2861B; OKEX 6942J; OKEX 2868B; OKEX 2688B; OKEX 2884B; OKEX 2885B; OKEX 2907B; OKEX 2707B; OKEX 2933B; and OKEX 2934B];

ii. **Cobb-Vantress** – 29 violations, resulting in a maximum possible penalty of $290,000.00. *See* [OKEX 2672B; OKEX 2864B; OKEX 2865B; OKEX 2695B; OKEX 2910B; OKEX 6942F; OKEX 2926B; OKEX 2703B; and OKEX 2930B];

iii. **Cargill Defendants**[16] – 22 violations, resulting in a maximum possible penalty of $220,000.00. *See* [OKEX 2772B; CAR 79B; CAR 82B; OKEX 2690B; OKEX 2890B; and OKEX 2891B];

iv. **George's Defendants**[17] – 22 violations, resulting in a maximum possible penalty of $220,000.00. *See* [OKEX 2644B; OKEX 2792B; OKEX 2685B; OKEX 2879B; and OKEX 6942E];

v. **Simmons** – 47 violations, resulting in a maximum possible penalty of $470,000.00. *See* [OKEX 2739B; OKEX 2768B; OKEX 2774B; OKEX 2780B; OKEX 2821B; OKEX 2835B; OKEX 2660B; OKEX 2658B; OKEX 2877B; OKEX 6942D; OKEX 2686B; OKEX 2880B; OKEX 2881B; OKEX 2899B; and OKEX 2928B]; and

---

[16] The Cargill Defendants are Cargill, Inc. and Cargill Turkey Production, LLC. Defendant Cargill Turkey Production, LLC is a wholly-owned subsidiary of Defendant Cargill, Inc. *See* Daily Trans., 4648:3-7; 4648:25-4649:4 (Ehrich Stipulation).

[17] The George's Defendants are George's Inc. and George's Farms, Inc. Defendant George's Inc. controls George's Farms, Inc. *See* Daily Trans., 3022:7-9 (Henderson Testimony).

vi. **Cal-Maine** – 22 violations, resulting in a maximum possible penalty of $220,000.00. *See* [OKEX 2798B; OKEX 6063B; OKEX 2855B; and OKEX 2914B].

m. Looking next to the statutory factors, as previously stated, the court must consider the following: the nature, circumstances and gravity of the violation or violations, the economic benefit, if any, resulting to the Defendant from the violation, the history of such violations, any good faith efforts to comply with the applicable requirements, the economic impact of the penalty on the Defendant, the Defendant's degree of culpability, and such other matters as justice may require.

n. The court finds significant the evidence that some of the tested soil fields did not exceed the Oklahoma-NRCS Code 590 standards. In nutrient limited watersheds, litter may not be applied to any land with an STP level greater than 300. The State first designated the Oklahoma portion of the Watershed as "Nutrient Limited" effective July 1, 2006. Prior to that time, the non-nutrient limited Code 590 standards applied to the Watershed, including the STP cap of 400 pounds per acre. Doc. 2979, FF 71.

o. Although the Oklahoma agricultural standards are insufficient to protect the environment and comply with Oklahoma's environmental laws, Defendants' efforts to satisfy the NRCS Code 590 standards demonstrate efforts to comply with certain applicable Oklahoma standards and warrant mitigation of penalties. Accordingly, the court declines to impose penalties for fields with STP levels below 400 prior to July 1, 2006, the date that the State first designated the Oklahoma portion of the Watershed as "Nutrient Limited."

29

p.  As a result of the court's consideration of the "good faith efforts to comply with applicable requirements" factor, the court reduces the penalties to the following:

    i.  **Tyson Foods, Inc.** – 16 violations, resulting in a penalty of $160,000.00. *See* [OKEX 2729B at OKDA0000083; OKEX 2730B at OKDA0000257; OKEX 2825B at OKDA0008691, OKDA0008746, OKDA0008748, OKDA0008750, OKDA0008752, and OKDA0008754; OKEX 2856B at OKDA0013748, OKDA0013786, OKDA0013789, OKDA0013791, and OKDA0013792; OKEX 2858B at OKDA0013871; OKEX 2861B at OKDA0014113; and OKEX 2907B at OKDA0017894];

    ii.  **Cobb-Vantress** – 3 violations, resulting in a penalty of $30,000.00. *See* [OKEX 2864B at OKDA0014490, OKDA0014492; and OKEX 2926B at OKDA0019688].

    iii.  **Cargill Inc.** – 6 violations, resulting in a penalty of $60,000.00. *See* [OKEX 2772B at OKDA0003084 to OKDA0003087; CAR 79B at OKDA0010121 and OKDA0010144];

    iv.  **George's, Inc.** – 1 violation, resulting in a penalty of $10,000.00. *See* [OKEX 6942E at ODAFF (DEC07) 004896];

    v.  **Simmons** – 9 violations, resulting in a penalty of $90,000.00. *See* [OKEX 2739B at OKDA0000749, OKDA 0000751; OKEX 2774B at OKDA0003153 to OKDA0003155; OKEX 2780B at OKDA0003605; OKEX 2821B at OKDA0008407 to OKDA0008408; and OKEX 2928B at OKDA00019726]; and

vi. **Cal-Maine** – 7 violations, resulting in a penalty of $70,000.00. *See* [OKEX 2798B at OKDA0005575 to OKDA0005576; OKEX 6063B at OKDA0005575 to OKDA0005576; OKEX 2855B at OKDA00013649, OKDA0013651; and OKEX 2914B at OKDA0018790].

q. The court next considers the nature, circumstances, and gravity to the violations and finds that the violations are severe and have caused pollution in the IRW. Doc. 2979, COL 55, 60, 61. Thus, this factor does not warrant mitigation of penalties.

r. The State presented no evidence with respect to the economic benefit, if any, resulting to each Defendant from the violations or the economic impact of the penalty on the Defendants and therefore these factors are neutral.

s. The court previously considered the Defendants' history of violations as reflected in the ODAFF records in connection with the efforts to comply with applicable regulations factor. Further, given the irreparable harm caused to the Watershed as a result of Defendants' conduct, no additional mitigation is warranted based on Defendants' history.

t. Finally, the Defendants are highly culpable, as Defendants did little or nothing to monitor or control their growers' disposal of poultry waste. Doc. 2979, FF 360. Thus, the court declines to reduce penalties further.

u. Based on the foregoing, defendant Tyson Foods, Inc. shall pay to the Oklahoma Department of Environmental Quality Revolving Fund the penalty amount of $160,000.00, plus post-judgment interest accruing thereon at the rate of 3.58% from the date of entry of this judgment until paid in full. *See* 27A Okla. Stat. § 2-3-

504(G) ("Except as otherwise provided by law, administrative and civil penalties shall be paid into the Department of Environmental Quality Revolving Fund.").

v.   Defendant Cobb-Vantress shall pay to the Oklahoma Department of Environmental Quality Revolving Fund the penalty amount of $30,000.00, plus post-judgment interest accruing thereon at the rate of 3.58% from the date of entry of this judgment until paid in full.

w.   Defendant Cargill, Inc. shall pay to the Oklahoma Department of Environmental Quality Revolving Fund the penalty amount of $60,000.00, plus post-judgment interest accruing thereon at the rate of 3.58% from the date of entry of this judgment until paid in full.

x.   Defendant George's, Inc. shall pay to the Oklahoma Department of Environmental Quality Revolving Fund the penalty amount of $10,000.00, plus post-judgment interest accruing thereon at the rate of 3.58% from the date of entry of this judgment until paid in full.

y.   Defendant Simmons shall pay to the Oklahoma Department of Environmental Quality Revolving Fund the penalty amount of $90,000.00, plus post-judgment interest accruing thereon at the rate of 3.58% from the date of entry of this judgment until paid in full.

z.   Defendant Cal-Maine shall pay to the Oklahoma Department of Environmental Quality Revolving Fund the penalty amount of $70,000.00, plus post-judgment interest accruing thereon at the rate of 3.58% from the date of entry of this judgment until paid in full.

aa. The State is entitled to an award of attorneys fees and costs. The amount of the award for the State's attorneys fees and costs will be separately determined by the court following subsequent briefing by the parties. This separate determination shall not impact the finality of this Judgment.

bb. The penalties detailed in Sections 5(p) through 5(z) are separate and distinct from those payments pertaining to the master, the WMT, and their activities as set forth in Section 3.

**6.** **Retention of Jurisdiction**

a. The court shall retain jurisdiction of this case for the purposes of enforcing the terms of this Judgment.

b. The orders entered by the court with respect to this Judgment, as provided herein or as otherwise may be entered by the court in the future, shall have the force and effect of binding orders, judgments, and law, and shall therefore govern the activities of the parties to the extent specifically addressed in such orders.

ENTERED at Tulsa, Oklahoma, this 19th day of December, 2025.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE