IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA *ex rel.* GENTNER DRUMMOND, in his capacity as Attorney General of the State of Oklahoma and OKLAHOMA SECRETARY OF ENERGY AND ENVIRONMENT JEFF STARLING in his capacity as the TRUSTEE FOR NATURAL RESOURCES FOR THE STATE OF OKLAHOMA, <br><br> Plaintiffs, <br><br> v. <br><br> TYSON FOODS, INC., TYSON POULTRY, INC., TYSON CHICKEN, INC., COBB-VANTRESS, INC., CAL-MAINE FOODS, INC., CARGILL, INC., CARGILL TURKEY PRODUCTION, LLC, GEORGE'S, INC., GEORGE'S FARMS, INC., PETERSON FARMS, INC., and SIMMONS FOODS, INC., <br><br> Defendants. | Case No. 05-CV-00329-GKF-SH |

**OPINION AND ORDER**

This matter comes before the court on defendants' Motion for Stay Pending Appeal [Doc. 3203]. For the reasons set forth below, the motion is granted in part and denied in part.

**I.   Background/Procedural History**

The parties are familiar with the factual and procedural history of this matter and therefore the court includes only the facts relevant to the instant motion.

The State of Oklahoma brought this case against defendants alleging that defendants have polluted and continue to pollute the waters of the Illinois River Watershed (IRW) with phosphorus

and bacteria from the waste generated from defendants' poultry and applied to lands in the IRW. The parties tried the case to the court for fifty-two days over the course of five months.

The court subsequently issued its Findings of Fact and Conclusions of Law, finding in favor of the State of Oklahoma and against defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, and violations of Okla. Stat. tit. 27A, § 2-6-105 and Okla. Stat. tit. 2, § 2-18.1. It further found and concluded that "actual and ongoing injury to the waters of the IRW constitutes irreparable harm and warrants injunctive relief." [Doc. 2979 at p. 217]; *see also* [*Id*. at pp. 207, 212-13].

Further, following a subsequent six-day evidentiary hearing, the court found and concluded that "conditions of the IRW have not materially changed since trial," and that phosphorus run-off from land-applied poultry waste continued to be a significant source of phosphorus, causing actual and ongoing injuries to the waters of the IRW. [Doc. 3161, pp. 6-7, 20-22].

On December 19, 2025, the court entered the Judgment. [Doc. 3192]. The Judgment includes three primary forms of relief: (1) remediation, (2) restriction on land application of poultry waste, and (3) penalties.

With respect to remediation, the Judgment contemplates a phased approach that includes remedial investigation, planning, implementation, and monitoring, all funded by defendants and overseen by a court-appointed master. [*Id*. at pp. 9-20].

As to the restriction on land application of poultry waste, the Judgment prohibits, in the IRW, land application of poultry waste generated by defendants' birds on land having an STP of 120 lbs./acre or greater. [*Id.* at p. 20]. Nor shall land application of poultry waste be permitted in the IRW at any rate that would cause the land to exceed 120 lbs./acre STP. [*Id.* at p. 21]. To that end, defendants shall ensure that their contract growers have access to sufficient poultry waste

removal equipment, storage facilities, transportation methods, and disposal methods for poultry waste generated by defendants' birds, and the defendants shall hold their Contract Growers harmless for the costs of removal, storage, transportation, and disposal of poultry waste generated by defendants' birds.  [*Id.* at p. 22].

Finally, pursuant to Okla. Stat. tit. 27A, § 2-3-504, the Judgment imposes civil penalties against defendants Tyson Foods, Inc., Cobb-Vantress, Cargill, Inc., George's, Inc., Simmons, and Cal-Maine.  [*Id.* at pp. 31-32].

Defendants now seek to stay the Judgment pending appeal.  Alternatively, defendants ask the court to stay the injunctive portions of the Judgment pending the U.S. Court of Appeals for the Tenth Circuit's consideration of defendants' motion for stay pending appeal.  [Doc. 3203; Doc. 3204; Doc. 3222].

## II.   Analysis

Defendants seek to stay pending appeal the monetary obligations of the Judgment without bond pursuant to Fed. R. Civ. P. 62(b), and to stay pending appeal the injunctive portions of the Judgment pursuant to Fed. R. Civ. P. 62(c).

*A.   Monetary Obligations*

Pursuant to Federal Rule of Civil Procedure 62, execution on a money judgment is automatically stayed "for 30 days after its entry, unless the court orders otherwise." Fed. R. Civ. P. 62(a).  Further, "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Fed. R. Civ. P. 62(b).  District courts have "inherent discretionary authority" in setting supersedeas bonds. *Miami Int'l Realty Co. v. Paynter,* 807 F.2d 871, 873 (10th Cir. 1986).  "This includes 'the discretion to reduce or waive the bond requirement if the appellant demonstrates a present financial ability to respond to the judgment that is likely to

continue or if the appellant's present financial condition is such that posting a full bond would impose an undue financial burden.'" *Harris v. City Cycle Sales, Inc.*, No. 21-2264-EFM, 2023 WL 8622240, at *1 (D. Kan. Dec. 12, 2023).

The State does not object to a stay of the monetary portions of the Judgment without requiring defendants to post a bond. [Doc. 3203-1, p. 2; Doc. 3228, p. 5]. Further, there appears to be no dispute that defendants possess the present financial ability to respond to the Judgment. [Doc. 3203-1]. Under the circumstances, the court concludes that a stay pending appeal of the monetary portions of the Judgment, without bond, is warranted.

  B. *Injunctive Relief*

As a general rule, "[u]nless the court orders otherwise," a "final judgment in an action for an injunction" is not stayed pending appeal. Fed. R. Civ. P. 62(c)(1). However, "[w]hile an appeal is pending . . . the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). To determine whether to grant a stay pending appeal, the court considers four factors: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder,* 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776 (1987)). "The first two factors . . . are the most critical," and [t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion." *Nken*, 556 U.S. at 433-34.

1. Likelihood of Success on the Merits

As previously stated, "a strong showing" that defendants are likely to succeed on the merits is required. "It is not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 434 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)).

Defendants first argue that they are likely to succeed on the merits because "growers' compliance with state nutrient management plans is a complete defense to liability." [Doc. 3204, p. 15; *see also id.* at pp. 15-18]. However, the court previously considered and rejected defendants' arguments in this regard. Specifically, the court concluded that state nutrient management plans, or animal waste management plans, "are not sufficiently specific for the court to conclude, as a matter of law, that all of defendants' actions that created the nuisance were 'expressly authorized by law,'" particularly given Okla. Stat. tit. 2, § 10-9.7(B)(4)'s mandate that "[p]oultry waste handling, treatment, management and removal shall not . . . create an environmental or public health hazard" or result in the contamination of waters of the state. [Doc. 2979, p. 195]. The decision of the Oklahoma Court of Civil Appeals in *Vulcan Construction Materials, LLC v. City of Tishomingo*, 526 P.3d 1171, 1176 (Okla. Civ. App. 2022), on which defendants rely, is not to the contrary.

In *Vulcan,* the Oklahoma Court of Civil Appeals considered "a direct conflict between a state law and a local ordinance." *Id.* at 1174. In that case, state law limited the use of water by mining companies operating on or near the Arbuckle-Simpson aquifer to an amount referred to as the company's "equal proportionate share." *Id.* at 1173. However, the law regulated only a company's *use*, and permitted the mines "to withdraw more than their equal proportionate share so long as they replenish the aquifer as required." *Id.* at 1175. In 2015, the City of Tishomingo amended its ordinances to define "nuisance" to include the withdrawal of groundwater from the

Pennington Creek subsurface watershed, which emanates from the Arbuckle-Simpson aquifer, in excess of the "equal proportionate share." *Id.* at 1174. In considering whether state law preempted the City's ordinance, the court recognized that "[t]he mines were fully permitted and doing that which state law specifically allows" and concluded that "where there is a direct state statute on point, a municipality cannot make an end-run around that statute." *Id*. at 1175-76. Thus, the City ordinance was preempted. *Id.*

Here, as previously recognized by this court, although a state regulation establishes a maximum land application rate of 300 lbs./acre STP, it does not require land application at that rate. [Doc. 2979, p. 196]. Further, Oklahoma law requires that every poultry operation have a Nutrient Management Plan, which among other things, must ensure that "[s]torage and land application of poultry waste shall not cause a discharge or runoff of significant pollutants to waters of the State or cause a water quality violation to waters of the State." Okla. Admin. Code § 35:17-5-5(c); *see also* Okla. Stat. tit. 2, §§ 10-9.7(B)(1), (C); Okla. Stat. tit. 2, §§ 10-9.7(B)(4), (C) (superseded effective July 1, 2015). Further, nutrient management plans must be designed to ensure that poultry waste handling, treatment, management, and removal shall not "create an environmental or public health hazard" or "result in contamination of waters of the state." Okla. Stat. tit. 2, § 10-9.7(B)(4); Okla. Stat. tit. 2, §§ 10-9.7(B)(4), (C) (superseded effective July 1, 2015); *see also* [Doc. 2979, pp. 193-196]. Thus, state law prohibits excessive land application of poultry waste and compliance with nutrient management plans is no defense to liability.

Defendants next argue that they are likely to succeed on the merits as they "cannot be held vicariously liable for any legal violation committed by growers." [Doc. 3204, p. 18]. Again, the court has previously considered and rejected this argument. [Doc. 2979, p. 187-88]. Nevertheless, defendants contend the court erred because "Oklahoma law precludes holding a person liable in

nuisance when he 'did not control the instrumentality alleged to constitute the nuisance at the time it occurred,'" and defendants "did not control growers' application or sale of poultry litter." [Doc. 3204, pp. 18-19 (citing *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 728 (Okla. 2021); *Phillips Petroleum Co. v. Stephenson,* 129 P.2d 575 (Okla. 1942))].

Defendants apply *Hunter* and *Phillips Petroleum* too broadly. In *Phillips,* Harry Pingry owned certain real property in the Town of Ralston and contracted with Phillips Petroleum Company to operate a filling station thereon. *Phillips*, 129 P.2d at 575. However, in October of 1938, Phillips abandoned the filling station. *Id.* Pursuant to the contract between the parties, Pingry removed the underground fuel tanks and returned them to Phillips. *Id.* Removal of the tanks resulted in a hole, which Pingry filled. *Id.* at 576. Five months later, Roxie Stephenson was injured when she fell, allegedly as a result of the hole created by removal of the tanks being inadequately filled. *Id.* at 575. Limiting its holding to those facts, the court concluded that Phillips "was not maintaining the alleged nuisance" and therefore "there existed no duty on its part to protect the plaintiff under the circumstances." *Id.* at 576.

Turning to *Hunter,* in that decision, the Oklahoma Supreme Court primarily held that Oklahoma public nuisance law does not extend to traditional products liability claims against product manufacturers. *Hunter,* 499 P.3d at 725-31. In doing so, the Court recognized the unremarkable proposition that "[a] manufacturer does not have control of its product once it is sold." *Id*. at 727. The court reasoned:

> The State asks this Court to broadly extend the application of the nuisance statute, namely to a situation where a manufacturer sold a product (for over 20 years) that was later alleged to constitute a nuisance. A product manufacturer's responsibility is to put a lawful, non-defective product into the market. There is no common law tort duty to monitor how a consumer uses or misuses a product after it is sold. Without control, a manufacturer also cannot remove or abate the nuisance—which is the remedy the State seeks from [defendant] in this case.

*Hunter,* 499 P.3d at 728 (internal footnote and citation omitted).

*Phillips* and *Hunter* stand for the simple principle that liability cannot be imposed absent an ongoing duty or conduct directed toward the nuisance. *See Phillips*, 129 P.2d at 576; *Hunter,* 499 P.3d at 728. Further, the Oklahoma Supreme Court's statements in *Phillips* and *Hunter* were bound to the facts of those cases. *See Phillips*, 129 P.2d at 576 (emphasis added) ("*Under all the foregoing facts* we hold that the [defendant] was not maintaining the alleged nuisance . . . and there existed no duty on its part to protect the plaintiff *under the circumstances.*"); *Hunter*, 499 P.3d at 723 (considering whether nuisance extends to manufacturing, marketing, and selling products). Unlike in *Hunter*, defendants were not manufacturing a product and therefore the decision is inapplicable.[1] *Hunter,* 499 F.3d at 725-31. Nor did defendants cease operations in the IRW and terminate their relationships with the growers prior to the creation of the alleged nuisance as in *Phillips*. Rather, defendants maintained and, in some instances, continue to maintain poultry operations in the IRW through a vertically-integrated business model. [Doc. 2979, pp. 87-94; Doc. 3161, pp. 9-11, 15-16]. The structure of the model and resulting relationship "significantly limits the growers' independence," as defendants, not the growers, own the birds, supply the feed consumed by the birds, decide when and where the birds will be placed and picked up, and specify or make recommendations regarding clean-outs and cake-outs of houses. [Doc. 2979, pp. 89-93]. "By virtue of their contracts and the vertically integrated structure of the business, each defendant

---

[1] In fact, in *Hunter*, the Oklahoma Supreme Court recognized that public nuisance "has historically been linked to the use of land by the one creating the nuisance" and therefore Oklahoma law "has limited . . . public nuisance liability to defendants (1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable." *Hunter,* 499 F.3d at 724. Here, defendants are liable for precisely that—participating in poultry operations in the IRW in a manner that has damaged the waters thereof.

maintains control over virtually all essential aspects of poultry production, including the activities of their contract growers." [*Id.* at p. 94].

Based on defendants' then-ongoing control of poultry production, *Phillips* and *Hunter* are factually distinguishable. Nor have defendants demonstrated that they were under no duty to protect against a nuisance under the circumstances. Thus, *Phillips* and *Hunter*'s limited holdings do not suggest that defendants are likely to succeed on the merits.

Defendants argue that any control element is incompatible with the RESTATEMENT (SECOND) OF TORTS § 427B, on which the court relied in its Findings of Fact and Conclusions of Law [Doc. 2979]. However, as discussed above, the court reads *Phillips* and *Hunter* to require an existing duty or conduct with respect to the nuisance, rather than "control" in the traditional sense, to warrant liability. Section 427B's recognition that "[o]ne who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve . . . the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such . . . nuisance" is consistent with such an existing duty or relationship. RESTATEMENT (SECOND) OF TORTS § 427B. Further, the court notes that the RESTATEMENT is consistent with long-standing Oklahoma precedent. *See Tankersley v. Webster*, 243 P.745, 747 (Okla. 1925). Moreover, the Oklahoma Supreme Court has previously adopted RESTATEMENT principles into its nuisance law. S*ee Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272, 277 (Okla. 1996). Thus, as recognized in the court's Findings of Fact and Conclusions of Law, an Oklahoma court would

likely apply Restatement (Second) of Torts § 427B and defendants are unlikely to succeed on the merits with respect to this issue.[2]

Finally, defendants offer a litany of reasons as to why the injunction is independently likely to be reversed, none of which are persuasive.

First, the defendants' federalism concerns are baseless as the Judgment does not "displace" Oklahoma's regulatory scheme. Rather, the Judgment "is consistent with the regulatory scheme that third-party stakeholders are required to follow," and serves to protect Oklahoma waters as required by Oklahoma law. [Doc. 3192, pp. 6-7]. Further, as previously recognized by this court, defendants can be liable for their conduct in Arkansas, and "Arkansas cannot 'permit' nonpoint source pollution of Oklahoma's waters." [Doc. 2979, pp. 200, 218].

Further, the Judgment does not require that the master or watershed management team members trespass on private property owned by nonparties. As recognized by the State, the Judgment permits inspection and testing "under the supervision of the master or the WMT" where an individual chooses to land apply poultry waste. [Doc. 3192, p. 21]. Nor does the Judgment require defendants to engage in "theft" or "to do things they have no legal right to do." [Doc. 3204, p. 24]. Rather, the Judgment simply requires that defendants bear the costs, and hold the growers harmless, for the removal, storage, transportation, and disposal of poultry waste and, if the grower refuses to comply with the master, terminate or refuse to renew its contract with that grower. [Doc. 3192, pp. 21-22].

---

[2] The court rejects defendants' contention that defendants cannot be held liable because they did not know that their chicken-growing services were likely to cause a nuisance. The court previously found that "the defendants knew their growers, in the ordinary course of their work for defendants, spread poultry litter on the land in the IRW, and knew or should have known no later than the late 1990s that their growers' land application of litter was a primary source of the excess phosphorus in the waters of the IRW." [Doc. 2979, p. 188].

As to defendants' assertion that "the injunction will inflict serious harm on third parties," including poultry farmer and growers, cattlemen and hay farmers, litter brokers and haulers, [Doc. 3204, p. 24], the court acknowledges the concerns of these third parties, and recognizes their contributions to Oklahoma's economy, society, and culture.  However, the court considered their interest in crafting the Judgment and, as stated therein, the Judgment sufficiently balances the interests of the defendants and those third parties with the interest of the public in enforcement of laws protective of the environment.  [Doc. 3192, pp. 5-6].

Defendants next contend that the court issued the injunction without holding the State to its burden of proof.  This is not so.  Rather, the court has, on multiple occasions, concluded that the State had satisfied its burden and appointed a master to oversee compliance with the specific remedies ordered, all of which is entirely permissible under Federal Rule of Civil Procedure 53. Fed. R. Civ. P. 53(a)(1)(C), (c).

Finally, the record was sufficient and defendants' arguments to the contrary are unavailing. *See* [Doc. 2989, pp. 31-36, 184-85].

For the forgoing reasons, defendants have not made the requisite "strong showing" that they are likely to succeed on the merits.  *See Nken,* 556 U.S. at 434.  Thus, this first factor weighs against imposition of a stay pending appeal.

    2.    <u>Irreparable Injury to Defendants</u>

The court must next consider whether defendants have demonstrated that they will be "irreparably injured absent a stay." *Nken,* 556 U.S. at 434. "[S]imply showing some 'possibility of irreparable injury'" is insufficient. *Id.* (quoting *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) ("[S]peculative harm does not amount to irreparable injury.").

Defendants first argue that, absent a stay, the companies with continuing operations in the IRW will be "force[d] . . . to spend millions in unrecoverable compliance costs." [Doc. 3204, p. 25]. "Economic loss 'usually does not, in and of itself, constitute irreparable harm.'" *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). However, the Tenth Circuit has recognized that financial loss "that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Com. of the United States of America v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010); *see also Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (collecting cases).

Defendants present evidence that, to ensure that poultry waste is not land applied in the IRW at a rate that would cause the land to exceed 120 lbs./acre as required by the Judgment, they will incur additional costs and expenses to transport or dispose of the litter. *See* [Doc. 3204-1, p. 5; Doc. 3204-2, pp. 3-4; Doc. 3204-6, pp. 2-5]. Simmons estimates that such costs may exceed one million dollars, [Doc. 3204-2, p. 4], but provides no explanation or factual basis for the estimate. Regardless of the amount incurred, however, it is likely that sovereign immunity would preclude recovery of such costs against the State if the Judgment is overturned and therefore any such expenses constitute irreparable harm. *Chamber of Commerce of the United States of America*, 594 F.3d at 771.

Defendants also contend that "[c]omplying with the judgment will also cause unrecoverable losses of reputation, goodwill, profits, and market share to the defendants with continued operations in the IRW." [Doc. 3204, pp. 26-28]. Defendants' alleged loss reputation, goodwill, and market share is speculative and therefore does not amount to irreparable injury. *See Schrier*, 427 F.3d at 1267. The court entered its Findings of Fact and Conclusions of Law nearly

two years ago concluding that defendants had polluted the waters of the IRW. [Doc. 2979]. Yet, defendants offer no evidence of any actual, concrete loss of reputation or goodwill. Nor have defendants offered any evidence of lost profits in the interim. Further, although defendants express concern that they will lose relationships with third-party growers, defendants provide no evidence beyond their own expressions of concern. Accordingly, defendants have failed to show irreparable harm in the form of lost reputation, goodwill, profits, and market share.

Based on the foregoing, the court concludes that defendants will suffer some irreparable harm if the Judgment is overturned absent a stay. However, the extent of the harm to defendants has not been adequately quantified. While the court agrees that defendants will incur expenses associated with complying with the poultry waste restriction portion of the Judgment, defendants' assertion that the costs will be "in the millions" is unsubstantiated and speculative.[3] Accordingly, the factor weighs only slightly in favor of a stay.

### 3. Substantial Injury to the State

The court next considers whether the issuance of a stay will substantially injure the State. *Nken,* 556 U.S. at 434. This court has repeatedly found that phosphorus from land-applied poultry waste continues to be a significant source of phosphorus, causing injuries to the waters of the IRW.

---

[3] Further, insofar as defendants contend that that the Judgment will require "rapid restructuring," [Doc. 3204-1, p. 3], and that costs for removing, hauling, and applying litter were not included in their cost structures, [Doc. 3204-2, p. 4], the assertions are belied by the record. During the December 2024 evidentiary hearing, Tim Alsup, Agriculture Manager for Cargill Turkey, testified that poultry companies, including Cargill, set up a company to "facilitate and develop markets to export litter out of the Illinois River Watershed." [Doc. 3138, p. 8]. Further, defendants presented evidence that from 2014 to 2023 in Benton and Washington Counties, Arkansas, the percentage of litter applied was trending downward, and litter being transferred out was trending upward. [Doc. 3145, p. 127; Doc. 3135, p. 9; DJX2-0212B]. The trends were driven, in part, by the demand for litter. [Doc. 3145, p. 128]. Patrick Fisk, Director of the Livestock and Poultry Division for the Arkansas Department of Agriculture, testified that the trends in Arkansas reflect trends throughout the IRW and that he expects those trends to continue. [Doc. 3135, p. 10].

[Doc. 2979, pp. 169-70, 182-83, 200-04, 217-18; Doc. 3161, pp. 20-22]. In fact, the court has characterized poultry waste as the "principal contributor of the phosphorus causing injuries to the waters of the IRW." [Doc. 2979, p. 183]. Water is a "valuable" resource to be protected in Oklahoma, Okla. Admin. Code § 252:730-3-1(a), and injury to Oklahoma waters amounts to irreparable harm. [Doc. 2979, pp. 217-18; Doc. 3161, pp. 21-22]. The continuing and irreparable injury to the waters of the IRW as a result of land-applied poultry waste constitutes a substantial injury to the State and therefore this third factors weighs against issuance of a stay.[4] *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.").

    4.    Public Interest

Finally, the court considers whether a stay is in the public interest. As an initial matter, the third and fourth factors—harm to the opposing party and public interest—"merge when the Government is the opposing party," as here. *Nken*, 556 U.S. at 435; *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 112 (10th Cir. 2024). Accordingly, for the same reasons discussed above, the public interest factor weighs against imposition of a stay.

Further, even when independently considered, the public interest weighs against a stay. As previously stated, it is the policy of Oklahoma that "[w]aters of the state constitute a valuable resource and shall be protected, maintained, and improved for the benefit of all the citizens." Okla.

---

[4] The court disagrees with defendants' assertion that there exists no "urgency in taking measures to remediate the IRW." [Doc. 3204, p. 28]. This court previously found that "[e]levated STP levels increase the amount of dissolved phosphorus in runoff" and that "[e]levated STPs decline slowly." [Doc. 2979, pp. 34, 104]. Permitting defendants' growers to land apply poultry waste in a manner that increases the STP above 120 lbs./acre will result in increased dissolved phosphorus runoff for an extended period of time and, therefore, increased pollution.

Admin. Code § 252:730-3-1(a); *see also* Okla. Stat. tit. 27A, §§ 2-6-102, 2-6-105. The Judgment will prevent the continued pollution of the waters of the IRW to the public's benefit. *See* [Doc. 2979, pp. 50-78 (recognizing degradation of use and aesthetics as a result of ongoing phosphorus pollution)]. The court acknowledges and understands the concerns of ranchers who apply poultry litter to their pastures and businesses which clean litter out of poultry houses and spread poultry litter in the IRW. However, defendants have not demonstrated that these concerns outweigh the interest of the general public in preventing further pollution of the valuable waters of the IRW. For all of these reasons, the fourth factor, the public interest, weighs against a stay.

     5.     Balancing the Factors

Based on the foregoing, only the second factor—irreparable harm—weighs in favor of a stay and then only slightly. In contrast, the remaining three factors—likelihood of success, substantial injury to the State, and the public interest—weigh heavily against a stay. Thus, the court declines to stay the injunctive portions of the Judgment.

For the same reasons, defendants' alternative request that the court stay the injunctive portions of the Judgment pending the U.S. Court of Appeals for the Tenth Circuit's consideration of defendants' motion for stay pending appeal.

### III.   Conclusion

WHEREFORE, defendants' Motion for Stay Pending Appeal [Doc. 3203] is granted in part and denied in part. The motion is granted insofar as it seeks to stay the monetary portions of the Judgment. The motion is otherwise denied.

IT IS SO ORDERED this 16th day of January, 2026.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE