# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, *et al.*

Plaintiffs,

vs.

Case No.  05-CV-0329-GKF-SH

TYSON FOODS, INC., *et al.*

Defendants.

## CONSENT JUDGMENT

A.      Plaintiffs, the State of Oklahoma ("State") and the Oklahoma Secretary of Energy and Environment, in his capacity as trustee for natural resources for the State of Oklahoma ("Secretary," and collectively with the State, "Plaintiffs") filed a civil Complaint on June 13, 2005 alleging that Peterson Farms, Inc. ("Peterson") and various other defendants degraded and impaired the lands, waters, and other natural resources of the Illinois River Watershed ("IRW"). For the avoidance of doubt, the IRW is the watershed with its terminus at Tenkiller Ferry Lake ("Lake Tenkiller") and with its headwaters in Northwest Arkansas. The 8-Digit Hydrologic Unit Code for this watershed is 11110103.  In this Consent Judgment, IRW means the Illinois River Watershed encompassing approximately 1,069,530 acres located in northeastern Oklahoma (Adair, Cherokee, Delaware, and Sequoyah Counties) and northwestern Arkansas (Crawford, Benton, and Washington Counties) and depicted in State's Ex. 3351 at OSU0005147.  Within the IRW are the Illinois River, as well as its major tributaries, including the Baron (aka Barren) Fork River, the Caney Creek, and the Flint Creek.  State's Ex. 3351 at OSU0005160; *see also* Daily Trans., 10105:7-20 (Grip Testimony).  The IRW includes the 12,900 acre Tenkiller Ferry Lake.  State's Ex. 3351 at OSU0005174.

1

B.      After decades of litigation, Plaintiffs and Peterson (the "Parties"; singularly a "Party") have agreed to the entry of this consent judgment ("Consent Judgment") in full settlement of all claims that were brought or could have been brought against Peterson in the above-styled proceedings. As to Peterson, this Consent Judgment supersedes and replaces the Judgment (Doc. No. 3192) entered by the Court on December 19, 2025 (the "December 19, 2025, Judgment"). Peterson does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the Complaint. This Consent Judgment shall not be used against Peterson as evidence of liability, fault, or wrongdoing in any proceeding, and shall not have collateral estoppel or res judicata effect as to issues not expressly resolved herein.

C.      The Parties agree, and the Court by entering this Consent Judgment finds, that this Consent Judgment, and the remedial and monetary obligations thereunder, address only the acts or omissions of Peterson, as alleged in the Complaint, and do not address the alleged acts and omissions of any other person or entity, aside from those expressly released herein.

D.      The Parties agree, and the Court by entering this Consent Judgment finds, that this Consent Judgment has been negotiated by the Parties in good faith and the terms memorialized in this Consent Judgment will avoid further prolonged and complex litigation and appeal between the Parties.

E.      This Consent Judgment constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Judgment, and the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Judgment.

F.    The Parties waive any right they may have to appeal as to each other from the December 19, 2025, Judgment and all earlier decisions by this Court, as well as from this Consent Judgment as submitted. For the avoidance of doubt, if this Consent Judgment is not adopted as submitted, both Parties retain the right to appeal as to each other from the December 19, 2025, Judgment and all earlier decisions by this Court. If this Consent Judgment is not adopted as submitted, both Parties agree to work together in good faith to negotiate and submit a Consent Decree that meets the Court's approval. Within five (5) days of the Effective Date, Peterson will withdraw as a movant from the request(s) for a stay of the December 19, 2025, Judgment. Plaintiffs retain the right to appeal vis-à-vis other Defendants, until and unless that right is extinguished by other Consent Judgments.

**NOW, THEREFORE,** without admission by Peterson of the allegations in the Complaint, and upon the consent and agreement of the Parties to this Consent Judgment, it is hereby **ORDERED, ADJUDGED, and DECREED** as follows:

## I. JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action. This Court also has personal jurisdiction over the Parties. Solely for the purposes of this Consent Judgment and any enforcement of its provisions, Peterson waives all objections and defenses that it may have to jurisdiction of the Court.

2.    The Parties have read and understand this Consent Judgment and enter into it voluntarily, each having been advised by their undersigned counsel of the meaning and effect of each provision of this Consent Judgment.

3

## II. EFFECTIVE DATE

3.        The effective date of the Consent Judgment (the "Effective Date") shall be the day the Court enters the Parties' proposed Consent Judgment.  The Parties agree to work together in good faith to achieve the entry of this proposed Consent Judgment as submitted and to oppose any efforts by others who are not Parties to this Consent Judgment to challenge it.  The Parties also agree to make best efforts to encourage third parties to support the terms and intent of this Consent Judgment.  The Parties agree to work together cooperatively to support the aims of the Consent Judgment by encouraging engagement with stakeholders and participation in educational programs to increase the likelihood of implementation of practices that reduce the impact of excess phosphorus in the IRW. Peterson agrees not to challenge any consent judgment previously filed in this case.

## III. MONETARY RELIEF AND WITHDRAWAL OF NOTICE OF APPEAL

4.        Thirty-five (35) days after the Effective Date, provided that no appeal or objection regarding this Consent Judgment is pending on such date and that Plaintiffs have provided Peterson with the account information and other information it requires to make the payment to them, Peterson will: (a) voluntarily dismiss Peterson's appeal as to the December 19, 2025, Judgment, currently pending in the U.S. Court of Appeals for the Tenth Circuit as Case No. 26-5001; and (b) make a one-time payment in the amount of $950,000.00 to the State (the "Monetary Relief Fund") for purposes including, but not limited to, remediation or conservation projects in the IRW and for payment of attorney's fees and litigation costs in an amount to be determined either by order of the Court or by agreement between the State and its outside private lawyers.  In the event an appeal or objection regarding this Consent Judgment is pending on the date that is thirty-five (35) days after the Effective Date, Peterson's obligations under this Paragraph 4 will be suspended until thirty

4

(30) days after the date when such appeal or objection is resolved, unless Peterson's obligations under this Paragraph are no longer enforceable as a result of the appeal or objection.

5.      No part of the Monetary Relief Fund shall constitute, nor shall it be construed as, or treated as constituting payment for penalties, fines, treble or multiple damages, forfeitures, or punitive recoveries.

### IV. LITTER REMOVAL

6.      **Litter Removal Commitments.**  In the event Peterson or a Peterson Successor (defined as any entity formed or owned in whole or in part by one or more of the officers and/or shareholders of Peterson at the time of its dissolution) resumes or commences poultry growing operations in the IRW, Peterson, through its own efforts and/or coordinated efforts with independent contract growers raising its birds, shall meet or exceed the following requirements after the Effective Date[1]:

| Time Period | Land Application Restrictions |
|---|---|
| Years 1 & 2 | No more than 20% of litter removed each year from poultry houses in the IRW owned or operated by or under contract with Peterson (each an "Peterson IRW Grower" and collectively the "Peterson IRW Growers") will be land applied to soils located within either the Oklahoma or Arkansas portions of the IRW.<br><br>None of the litter exported from the IRW to meet the foregoing requirement may be land applied to soils located within any Oklahoma Nutrient Sensitive Watershed ("ONSW") defined below.[2] |
| Years 3 & 4 | No more than 10% of litter removed each year from poultry houses of the Peterson IRW Growers will be land applied to soils located within either the Oklahoma or Arkansas portions of the IRW. |

---

[1] As of the date of this signing, Peterson certifies that no poultry houses in the IRW are owned or operated by Peterson or any producer under contract with Peterson.  Any future obligations of Peterson beyond the initial monetary relief and the payment into the Special Master escrow fund will be triggered upon Peterson or a Peterson Successor resuming or commencing poultry growing operations in the IRW, either individually or through contract poultry growers.

[2] Neither this provision, nor any other provision in this Consent Judgment, allows for, or should be construed as allowing for, non-compliance with any and all applicable laws, regulations, rules, court orders, and judgments.

| | None of the litter exported from the IRW to meet the foregoing requirement may be land applied to soils located within any ONSW. |
|---|---|
| Years 5-10 | No more than 5% of litter removed each year from poultry houses of the Peterson IRW Growers will be land applied to soils located within either the Oklahoma or Arkansas portions of the IRW.<br><br>None of the litter exported from the IRW to meet the foregoing requirement may be land applied to soils located within any ONSW. |

"Year 1" for purposes of the foregoing land application restrictions shall be the twelve (12) month period commencing on the first day of the first month following the Effective Date, and each subsequent year shall commence on the one-year anniversary and end twelve (12) months thereafter. For compliance purposes the percentages in the table above shall be based on the weight of litter removed each year from the houses of the Peterson IRW Growers. If the weight of a load of litter removed from a house of a Peterson IRW Grower cannot be reasonably determined using a scale, such litter will not be land applied in the IRW or in any other ONSW, and such litter will not be included in calculations for showing Peterson's compliance with the litter removal requirements of this Paragraph 6. Poultry litter removed from a house and stored temporarily in a covered litter shed or stacking shed or in any other manner allowed by state law shall not be considered "removed" for purposes of the foregoing restrictions unless and until such stored litter is subsequently hauled away from the farm or land applied to soils in a manner compliant with all applicable laws, regulations, rules, court orders, and judgments, including this Consent Judgment. For the calculations for showing Peterson's compliance with the litter removal requirements of this Paragraph 6, the weight of the litter removed from a house of a Peterson IRW Grower is the weight of the litter at the time the litter is removed from the farm or applied to land on the farm. The land application restrictions described for "Years 5-10" in the table above may be extended by mutual written agreement of the Parties, or under the conditions set forth in Paragraph 24 for additional time periods after the conclusion of "Year 10."

6

"Oklahoma Nutrient Sensitive Watershed" (each an "ONSW" and collectively the "ONSWs") means those watersheds shown in the map in Attachment A. The watersheds shown in the map in Attachment A each include a waterbody listed on the 2022 Oklahoma 303(d) List of Impaired Waters[3], whereby the waterbody is impaired for nutrient-related causes including nitrogen, phosphorus, low dissolved oxygen in lakes, or high chlorophyll-a concentrations.

Peterson will ensure that the Peterson IRW Growers have access to sufficient poultry litter removal equipment, storage facilities, transportation methods, and disposal methods for the poultry litter generated by the Peterson IRW Growers. Peterson will pay all costs associated with such removal, storage, transportation, and disposal, and will not pass such costs on to the Peterson IRW Growers either directly or indirectly.  Peterson will hold the Peterson IRW Growers harmless for the costs of removal, storage, transportation, and disposal of poultry litter generated by the Peterson IRW Growers. Further, Peterson will hold the Peterson IRW Growers harmless for any loss of income that may be attendant to Peterson taking over the responsibility for disposal of the litter in compliance with this Consent Judgment.

For the purposes of the litter hauling requirements of this Paragraph 6 and the certification requirements of Paragraphs 10, 13, 14, and 16, Peterson encompasses Peterson and any Peterson Successor.

7.        **Covenant Not to Sue.** Provided that Peterson complies with the land application restrictions described in Paragraph 6 if it has Peterson IRW Growers, the State will not bring any claim, alleging or asserting that Peterson is liable for contamination (through any known or

---

[3] The 2022 Oklahoma 303(d) List of Impaired Waters is Appendix C of the 2022 Integrated Report on Water Quality in Oklahoma. Appendix C is available at https://oklahoma.gov/content/dam/ok/en/deq/documents/water-division/OK_2022-Appendix-C-Final.pdf.

reasonably discoverable constituents of poultry litter as of the Effective Date) to the land, surface waters or groundwaters within the IRW including Lake Tenkiller, arising from or relating to poultry litter generated by current or former Peterson IRW Growers. The foregoing covenant not to sue shall apply for the duration of the Term specified in Paragraph 23 and additional time periods, if any, for which the Parties mutually agree to extend the land application restrictions in accordance with Paragraph 6 above. If the Parties mutually agree to extend the land application restrictions in accordance with Paragraph 6 above, to claim the benefit of the covenant not to sue under this Paragraph 7, or pursuant to Paragraph 24, for any time period after the conclusion of "Year 10," Peterson will provide, upon request, either written certification that it has no Peterson IRW Growers or written records from the Peterson IRW Growers and the litter haulers demonstrating that, for the time period at issue, it has continued to meet the land application restrictions described for Year 10 in the table included in Paragraph 6.

## V.  SPECIAL MASTER[4]

8.        Within thirty (30) days after the Effective Date, the State will apply to the Court for the appointment of a special master to monitor compliance by Peterson with the applicable land application restrictions of Paragraph 6. Peterson will not oppose such appointment; however, Peterson will be afforded the opportunity to object, consistent with Paragraph 9 below, to the person or entity selected by the State. The special master will be entitled to judicial immunity in the performance of his or her duties within the scope of the special master's court-approved

---

[4] If Plaintiffs enter into subsequent Consent Judgments that provide for a different term to describe the role of the special master, the Parties intend that the same person or entity oversee all defendants. Further, if the Court appoints a special master under the December 19, 2025, Judgment with respect to any other defendant, the Parties intend that the same person or entity oversee all defendants, with the special master's oversight of Peterson governed by the requirements of this Consent Judgment.

engagement under this Consent Judgment. Notwithstanding any provision of this Paragraph 8 or Paragraph 9 below, if, on the Effective Date or within thirty (30) days thereafter, there is a person or entity engaged by the Court as a special master with respect to a consent judgment entered into in this case between the State and another defendant, then the Court will appoint that same person or entity as the special master to monitor compliance by Peterson with the applicable restrictions of Paragraph 6 with respect to this Consent Judgment.

9.    The special master shall meet the following minimum requirements: (a) knowledgeable by experience or training in agricultural practices; (b) knowledgeable by experience or training in water quality concerns related to agriculture; and (c) no prior involvement as a lawyer, witness or consultant for any party to this proceeding. The State shall confer with Peterson on the selection of the person or entity to serve as the special master. If the Parties are unable to agree on the person or entity to serve as the special master, then the State will petition the Court for approval of the person or entity selected by the State with Peterson being afforded an opportunity to submit an objection to the Court within ten (10) days of the State's petition. The Court shall be free to appoint the person or entity selected by the State for special master or any other person or entity meeting the minimum requirements for the special master, if the Court deems appropriate or necessary. Any vacancy of the special master's position occurring for any reason during the Term shall be filled in the manner described in this Paragraph 9.

10.    Within sixty (60) days of the conclusion of each year in which Peterson or any Peterson Successor is in business, Peterson will either certify in writing and under oath that (1) it does not have any Peterson IRW Growers during the relevant time period or (2) if Peterson has Peterson IRW Growers, that it has met the applicable land application restrictions in Paragraph 6,

9

and in the latter case will provide the special master with business records and supporting documentation sufficient to substantiate such compliance.

11.     For any period of time during the tenure of this Consent Judgment in which Peterson has Peterson IRW Growers, Peterson shall cooperate with all reasonable requests by the special master to obtain and/or inspect records of Peterson, the Peterson IRW Growers and the haulers removing litter from the farms of Peterson IRW Growers to the extent necessary to monitor compliance with the litter application restrictions of Paragraph 6. If the special master believes that additional information is needed to assess Peterson's compliance with the terms of this Consent Judgment, he or she shall first request that information from Peterson. If Peterson does not provide the requested information to the special master's satisfaction, he or she may petition the Court, which petition shall set forth the requested information, an explanation as to why the information is needed to assess Peterson's compliance with the terms of this Consent Judgment and efforts to obtain that information from Peterson. Both Peterson and Plaintiffs may be heard regarding the request. In the event that the special master wishes to conduct an onsite inspection, the special master must show the Court by a preponderance of the evidence why such an inspection is necessary to effectuate the terms of this Consent Judgment.

12.     Within thirty-five (35) days of the Effective Date, Peterson will arrange for direct payment of $50,000.00 to the State for deposit into an escrow account to be used to pay for the services and/or expenses of the special master in monitoring compliance with the litter application restrictions of Paragraph 6. The State will approve distributions from the escrow account to the special master. Once the escrow account established under this Consent Judgment is exhausted, the State shall be responsible thereafter for funding any future cost of compliance monitoring by the special master, including by using funds obtained from other sources, including other

10

defendants. At any time after the second anniversary of the Effective Date and before the end of the Term of this Consent Judgment, the State, at its sole discretion, may utilize funds paid by Peterson into the escrow account described in this Paragraph 12 to pay for the services and/or expenses of the special master in monitoring the compliance of other defendants that are not a parties to this Consent Judgment and that have entered, or subsequently enter, into separate consent judgments with the State concerning this case. Any surplus or balance remaining in the escrow account as of the termination of this Consent Judgment shall be used by the State for remediation or conservation of the IRW.

13.     If, during the Term of this Consent Judgment, the special master believes that Peterson has Materially failed to meet the land application restrictions of Paragraph 6 for any time when Peterson has Peterson IRW Growers, the special master shall provide written notice of the violation to Peterson and the Oklahoma Attorney General. "Material" in this context shall mean that Peterson failed to meet an applicable land application restriction of Paragraph 6 by more than five percent (5%) for any time when Peterson has Peterson IRW Growers.[5] If, during the Term of this Consent Judgment, the special master believes that Peterson has failed to provide written certification of compliance with Paragraph 6 or written certification that it had no Peterson IRW Growers during the relevant time period, if Peterson or a Peterson Successor is required to so certify pursuant to Paragraph 10, the special master shall provide written notice of the violation to Peterson and the Oklahoma Attorney General. During the sixty-day period after providing notice, the special master shall make himself or herself reasonably available to meet with Peterson and

---

[5] By way of illustration only, during Year 1, if 100,000 tons of litter was removed from the houses of the Peterson IRW Growers, and more than 21,000 tons of such litter was land applied in the IRW, in any ONSW or ONSWs, or in any combination of the IRW and any ONSW or ONSWs, then Peterson would have Materially failed to meet the land applications restrictions of Paragraph 6.

11

the Oklahoma Attorney General to discuss the substance of the alleged violation, including but not limited to the reason(s) for the special master's belief that Peterson is in violation, and the special master shall consider in good faith any additional evidence or arguments that Peterson chooses to submit to demonstrate its compliance with this Consent Judgment and any additional evidence or arguments that the State chooses to submit to demonstrate non-compliance with this Consent Judgment.

14.     If, after considering any additional evidence or arguments presented by Peterson and the State, the special master concludes that a Material violation of the land application restrictions of Paragraph 6 or a failure to provide the written certification that Peterson had no Peterson IRW Growers during the relevant time period occurred, in the event that Peterson or a Peterson Successor is required to so certify pursuant to Paragraph 10, then Peterson will make a one-time payment to the State equal to the sum of (1) $10,000 plus (2) $30/ton for each ton of litter that produced the violation.[6] Any payment to the State for a Material violation of the land application restrictions of Paragraph 6 will be used for remediation or conservation projects in the IRW or will be used to pay for the services of the special master at the State's sole discretion. If, after considering any additional evidence or arguments presented by Peterson and the State, the special master concludes that Peterson has failed to provide written certification that it had no Peterson IRW Growers during the relevant time period, the special master has the discretion to direct Peterson to make a one-time payment to the State of up to $10,000 to remedy the violation.

15.     If Peterson disputes the existence of a Material violation or the calculation of a penalty amount, Peterson may, within thirty (30) days of the issuance of a penalty demand, petition

---

[6] By way of an illustration only, if 5,000 tons of litter more than was permitted under Paragraph 6 was land applied in the IRW, then the stipulated penalty for that violation would be $160,000 computed as follows: $10,000 + (5,000 tons x $30).

the Court to resolve any such dispute. Peterson shall pay any undisputed amount before petitioning the Court but may withhold payment of any disputed amount until thirty (30) days after the determination is made without incurring any interest or further penalty provided the Court determines that the dispute was instituted in good faith. The Court may award reasonable attorney's fees and costs to the prevailing party in a proceeding initiated under this Paragraph 15. A Material violation of the land application restrictions of Paragraph 6 will also require Peterson to contribute an amount separate from the penalty amount and equal to $50,000.00, or any lesser amount the Court concludes is necessary to effectuate the purposes of this Consent Judgment, to the escrow account described in Paragraph 12.

16.    The special master shall annually prepare a report describing the status of Peterson's compliance with the provisions of this Consent Judgment including progress toward and/or satisfaction of the land application restrictions set forth in Paragraph 6; any Material violation of the land application restrictions set forth in Paragraph 6; or failure to provide a written certification if it does not have any Peterson IRW Growers during the relevant time period, if Peterson or a Peterson Successor is required to so certify pursuant to Paragraph 10; and any penalty demands. Such reports shall be delivered to the Oklahoma Attorney General and to the Court. The annual reports required under this Paragraph 16 shall be treated by the State and the Court as public records provided that no information specifically identifying the name or location of poultry farms or landowners is contained within such reports.

## VI. STATE NUTRIENT MANAGEMENT LAWS NOT SUPERSEDED

17.    Litter applications occurring within the IRW during the Term of the Consent Judgment, if any, and applications occurring after the expiration of the Term of the Consent Judgment will remain subject to all state litter management laws and regulations as amended from

13

time to time including laws and regulations requiring adherence to state-issued nutrient management plans.

## VII. EFFECT OF SETTLEMENT AND RELEASE

18.     This settlement is conditioned upon the approval of the Consent Judgment by the Court. As of the Effective Date, the State, on behalf of itself and all officers, agencies, divisions, subdivisions, departments, and persons acting or claiming to act on its behalf ("Releasing Parties") shall fully, finally, and forever release, relinquish and discharge Peterson together with any and all their past and current direct and indirect, corporate parents (including holding companies), owners, subsidiaries, affiliates, departments, divisions, joint ventures, predecessors, and successors, and each of their respective past and current, direct or indirect, officers, directors, trustees, partners, managing directors, shareholders, managers, members, employees, attorneys, equity holders, agents, beneficiaries, executors, insurers, advisors, assigns, heirs, legal or other representatives, only in his/her/its capacity on behalf of Peterson (the "Released Parties") from any and all manner of claims, demands, actions, suits or causes of action, that the Releasing Parties ever had, now have, or hereafter can, shall, or may ever have, on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, losses, damages, and the consequences thereof that have been asserted, or could have been asserted, under federal or state law in any way arising out of or relating in any way to the conduct alleged or that could have been alleged in the case as it concerns poultry litter in the Illinois River Watershed, any waterways, groundwater or waters of the State in the Illinois River Watershed, and/or Lake Tenkiller (the "Released Claims"). For avoidance of doubt, the Parties agree that all liabilities and obligations of the Released Parties as defined in this Consent Judgment under the provisions of the December 19, 2025, Judgment are

14

Released Claims for purposes of this Consent Judgment. The Releasing Parties further agree that they will not file, or encourage others to file or pursue, any claim against the Released Parties arising out of, or relating to, the Released Claims. However, in the event a non-party to this Consent Judgment files or pursues any claim against the Released Parties arising out of, or relating to, the Released Claims, the State reserves any and all rights to intervene or take other actions necessary to protect the State's interests provided that any such advocacy by the State is not inconsistent with this Consent Judgment. For the avoidance of doubt, the State's reservation of rights includes the right to file a motion to intervene, at the State's sole discretion, in any and all cases where the State is implicated as a necessary party.

19.    The Parties agree the Peterson IRW Growers were never sued by the State in this lawsuit. However, for the avoidance of doubt, as of the Effective Date, the Releasing Parties shall fully, finally, and forever release, relinquish and discharge any person that is or was previously under contract with any Released Party for the production or care of poultry or eggs in the Illinois River Watershed (the "Released Peterson IRW Growers") from any Released Claim. The Releasing Parties further agree that they will not file, or encourage others to file or pursue, any claim against the Released Peterson IRW Growers arising out of, or relating to, the Released Claims. However, in the event a non-party to this Consent Judgment files or pursues any claim against the Released Peterson IRW Growers arising out of, or relating to, the Released Claims, the State reserves any and all rights to intervene or take other actions necessary to protect the State's interests provided that any such advocacy by the State is not inconsistent with the terms of this Consent Judgment. For the avoidance of doubt, the State's reservation of rights includes the right to file a motion to intervene, at the State's sole discretion, in any and all cases where the State is implicated as a necessary party. The Released Parties agree not to use this Consent Judgment as

15

the reason or basis for any decision not to renew contracts with Released Peterson IRW Growers. Notwithstanding the preceding sentence, nothing in this Consent Judgment obligates the Released Parties to renew or extend any contract with any particular Released Peterson IRW Growers.

20.    As of the Effective Date, all claims asserted in relation to this action by Peterson against third party defendants shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).

21.    It is the express intention of the State to reserve any rights, claims or causes of action that the State may have against any person other than the Released Parties and Released Peterson IRW Growers but to release fully and completely the Released Parties and Released Peterson IRW Growers.   Therefore, in consideration of the payments and commitments by Peterson specified in this Consent Judgment, the State agrees to a reduction of any damages awarded against other defendants to this lawsuit on a joint and several basis to the extent of the pro-rata share of the liability of the Released Parties and Released Peterson IRW Growers. It is specifically intended that the Released Parties and Released Peterson IRW Growers are, and shall be, to the extent permitted by law, released with respect to any liability or alleged liability as a joint tortfeasor regarding the Released Claims.  The State further agrees and intends that this Consent Judgment shall also release any and all claims for damages to the extent of any several share of fault for which contribution might otherwise be had against the Released Parties and Released Peterson IRW Growers regarding the Released Claims, and the Court so Orders.

## VIII. ATTORNEYS' FEES AND COSTS

22.    Provided that this Consent Judgment is entered without material modification of the terms negotiated by the Parties and is not thereafter successfully challenged or vacated, Peterson waives and releases any right available to it at law to seek to recover its attorney's fees,

16

costs and expenses incurred in connection with this lawsuit from the State. The State reserves the right to apply to the Court, at an appropriate time, for an award of its attorney's fees and litigation costs incurred in connection with this lawsuit. The State further reserves the right, if necessary, to petition the Court for a determination of the costs and fees owed by the State to the outside or private counsel representing the State in this litigation as a result of this settlement between the State and Peterson. The Parties agree, however, that Peterson's liability under any award or determination for costs or attorneys' fees by the Court, including by not limited to any award arising from the December 19, 2025, Judgment, has been fully satisfied and released under the terms of this Consent Judgment, provided that this Consent Judgment is not successfully challenged. For the avoidance of doubt, the Parties further agree that Peterson's liability for any award or determination by the Court for costs or attorneys' fees, whether based upon work performed by private or outside attorneys or by attorneys who are current or former employees of the State, has been fully satisfied and released under the terms of this Consent Judgment.

## IX. TERM AND TERMINATION

23.     Unless extended by the Court in accordance with Paragraph 24, the obligations of Peterson under the Consent Judgment and the Court's continuing jurisdiction over this settlement will automatically terminate ten (10) years from the Effective Date ("Term").

24.     Prior to expiration of the Term, the State may petition the Court to retain jurisdiction beyond the Term only upon a showing by clear and convincing evidence that Peterson has materially violated the provisions of this Consent Judgment and has failed or refused to adequately cure or remedy such violations within a reasonable time following Peterson's receipt of written notice of such violations. The State shall bear the burden of proof as to any petition asking for a continuation of the Court's jurisdiction beyond the Term. If the State prevails on such petition, the

17

Court shall retain jurisdiction to the extent necessary for Peterson to cure or remedy the violations proven by the State and the provisions of this Consent Judgment will remain in force until Peterson shows by clear and convincing evidence that Peterson has cured or remedied such violations.

## X. NOTICES

25.      Any notice, report, or other communication required or permitted under this Consent Decree shall be in writing and shall be deemed to have been duly given when: (i) mailed by United States registered or certified mail, return receipt requested; (ii) mailed by overnight express mail or deposited for delivery with any other nationally recognized overnight or same-day delivery service; (iii) sent as a PDF attachment to electronic mail; or (iv) delivered in person, to the Parties at the following addresses:

To Plaintiffs:

Gentner Drummond, OBA #16645
Amie Ely, OBA #35840
Garry M. Gaskins, II, OBA #20212
Jennifer L. Lewis, OBA #32819
Oklahoma Office of Attorney General
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
gentner.drummond@oag.ok.gov
amie.ely@oag.ok.gov
garry.gaskins@oag.ok.gov
jennifer.lewis@oag.ok.gov
IRW-poultry-settlement@oag.ok.gov

To Peterson:

Blake Evans
2651 N Peabody Pl
Fayetteville, AR 72704
blakeevans@gmail.com

A Party may change the names or addresses where notice is to be given by providing notice to the other Parties of such change in accordance with this Paragraph 25.

18

## XI. SIGNATORIES

26.     Each Undersigned signatory certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Judgment and to execute and legally bind such Party to this document.

State of Oklahoma and the
Oklahoma Secretary of Energy and Environment

GENTNER DRUMMOND, OBA #16645
*Attorney General*
GARRY M. GASKINS, II, OBA #20212
*Solicitor General*
JENNIFER L. LEWIS, OBA #32819
*Deputy Attorney General*
OFFICE OF ATTORNEY GENERAL STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Direct: (405) 521-3921
gentner.drummond@oag.ok.gov

M. David Riggs, OBA #7583
Kristopher E. Koepsel, OBA #19147
Riggs, Abney, Neal, Turpen, Orbison & Lewis
502 West 6th Street
Tulsa, OK 74119
(918) 587-3161

Robert A. Nance, OBA #6581
W.A. Drew Edmondson, OBA #2628
Riggs, Abney, Neal, Turpen, Orbison & Lewis
528 N.W. 12th Street
Oklahoma City, OK 73103
(405) 843-9909

Louis W. Bullock, OBA #1305
Bullock Law Firm PLLC
110 W. 7th Street
Tulsa, OK 74119
(918) 584-2001

Frederick C. Baker, admitted *pro hac vice*
Cynthia Solomon, admitted *pro hac vice*
Kristin Hermiz, admitted *pro hac vice*
Madeline Becker, admitted *pro hac vice*
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9186

*Counsel for Plaintiffs*

20

Peterson Farms, Inc.

Blake Evans
(for purposes of winding down the affairs of dissolved Peterson Farms, Inc. pursuant to Arkansas Statute Section 4-26-1104)


Counsel for Peterson Farms, Inc.:

A. Scott McDaniel, OBA # 16460
McDaniel Acord, PLLC
9343 E 95th Ct.
Tulsa, OK  74133
(918) 382-9200
smcdaniel@ok-counsel.com


IT IS SO ORDERED this _____ day of February 2026.


_____
HON. GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE

21

ATTACHMENT A



Oklahoma Nutrient Sensitive Watersheds

**Nutrient Sensitive Watersheds**

| Label | Watershed Name |
|---|---|
| 1 | Lake Carl Etling |
| 2 | Fort Supply Reservoir |
| 3 | Elk City Lake |
| 4 | Rocky Lake |
| 5 | Lake Vanderwork |
| 6 | Tom Steed Lake |
| 7 | Lake Waurika |
| 8 | Walters Lake |
| 9 | Lake Humphreys and Clear Lake |
| 10 | Lake Ellsworth / Lake Lawtonka |
| 11 | Taylor Lake |
| 12 | Lake Chickasha |
| 13 | Fort Cobb Reservoir |
| 14 | Clinton Lake |
| 15 | Great Salt Plains Reservoir |
| 16 | Lake Overholser |
| 17 | Lake Arcadia |
| 18 | Lake of the Arbuckles |
| 19 | Liberty and Guthrie City Lakes |
| 20 | Lake Carl Blackwell |
| 21 | Boomer Lake |
| 22 | Lake Ponca |
| 23 | Hulah Lake |
| 24 | Copan Lake |
| 25 | Pawnee Lake |
| 26 | Shell Lake |
| 27 | Greenleaf Lake |
| 28 | Fort Gibson Reservoir |
| 29 | Wewoka Lake |
| 30 | Lake Thunderbird |
| 31 | Lake Atoka |
| 32 | Holdenville Lake |
| 33 | Wister Lake |
| 34 | New Spiro Lake |
| 35 | Brushy Creek Lake |
| 36 | Lake Tenkiller / Illinois River |
| 37 | Eucha and Spavinaw Lakes |
| 38 | Grand Lake |
| 39 | Fairfax Lake |
| 40 | Lake Ozzie Cobb |

**Legend**

COUNTIES

Illinois River Watershed

Nutrient Sensitive Watersheds

22