## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA *ex rel.*                )
GENTNER DRUMMOND, in his capacity as       )
Attorney General of the State of Oklahoma and )
OKLAHOMA SECRETARY OF ENERGY               )
AND ENVIRONMENT JEFF STARLING              )
in his capacity as the TRUSTEE FOR         )
NATURAL RESOURCES FOR THE                  )
STATE OF OKLAHOMA,                         )
                                           )
       Plaintiffs,                     )
                                           )
v.                                         )
                                           )   Case No. 05-CV-00329-GKF-SH
TYSON FOODS, INC.,                         )
TYSON POULTRY, INC.,                       )
TYSON CHICKEN, INC.,                       )
COBB-VANTRESS, INC.,                       )
CAL-MAINE FOODS, INC.,                     )
CARGILL, INC.,                             )
CARGILL TURKEY PRODUCTION, LLC,            )
GEORGE'S, INC.,                            )
GEORGE'S FARMS, INC.,                      )
PETERSON FARMS, INC., and                  )
SIMMONS FOODS, INC.,                       )
                                           )
       Defendants.                     )

## <u>ORDER</u>

This matter comes before the court on the Joint Motion for Entry of Consent Judgment [Doc. 3229] of plaintiff State of Oklahoma and defendants George's, Inc. and George's Farms, Inc. (collectively, "George's"); the Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling [Doc. 3268] of the State and defendants Tyson Foods, Inc.; Tyson Poultry, Inc.; Tyson Chicken, Inc.; and Cobb-Vantress, Inc. (collectively, "Tyson"); the Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling [Doc. 3269] of the State and defendants Cargill Incorporated and Cargill Turkey Production, LLC (collectively, "Cargill"); and the Joint

Motion for Entry of Consent Judgment and Request for Indicative Ruling [Doc. 3279] of the State and defendant Peterson Farms, Inc. ("Peterson").  For the reasons set forth herein, the motions are denied.

**Background/Procedural History**

On January 18, 2023, the court entered Findings of Fact and Conclusions of Law [Doc. 2979], finding in favor of the State and against defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, and violations of Okla. Stat. tit. 27A, § 2-6-105 and Okla. Stat. tit. 2, § 2-18.1.  The court directed the parties "to meet and attempt to reach an agreement with regard to remedies to be imposed in this action."  The court advised that "[t]he agreed remedies, if any, must be approved by the court," and "[i]n the event the parties [we]re unable to reach an accord, the court shall enter judgment."  [*Id.* at p. 218].

On September 13 and 14, 2023, the parties engaged in mediation sessions with retired Tenth Circuit Judge Deanell Reece Tacha.  The parties subsequently engaged in an all-day, in-person mediation session with Judge Tacha on October 12, 2023, but were unable to reach an agreed-upon resolution.  [Doc. 3008; Doc. 3009].

On October 26, 2023, defendants filed a motion seeking dismissal of this case based on defendants' contentions that plaintiffs' claims for injunctive relief were moot and that proceeding on the record, at that time, would violate their due-process rights.  The court denied the motion and set this matter for evidentiary hearing.  [Doc. 3023; Doc. 3038].

The court held an evidentiary hearing on December 3, 2024 to December 6, 2024 and December 16 and December 17, 2024, to address "the contention made by the defendants, upon which the plaintiff has the burden of proof, that the conditions in the [Illinois River Watershed] materially changed following the end of trial."  [Doc. 3137; Doc. 3098, p. 4].

In an Opinion and Order of June 17, 2025, the concluded that the State had satisfied its burden to show that conditions had not materially changed in the IRW following trial. [Doc. 3161]. The court therefore directed briefing as to a proposed final judgment.

On December 19, 2025, the court entered the Judgment, which includes a thirty-year term and three primary forms of relief: (1) remediation, (2) restriction on land application of poultry waste, and (3) civil penalties. [Doc. 3192].

With respect to remediation, the Judgment contemplates a phased approach that includes remedial investigation, planning, implementation, and monitoring, overseen by a court-appointed special master. [*Id*. at pp. 9-20]. Costs and expenses of the special master shall be paid by defendants through monies deposited into an Evergreen Fund, beginning with an initial deposit of $10,000,000. [*Id*. at p. 19]. If at, any time, the balance of the Evergreen Fund falls below $5,000,000, defendants shall replenish the account with an additional payment of $5,000,000. [*Id*.].

As to the restriction on land application of poultry waste in the IRW, the Judgment limits the land application of poultry waste to a level that provides the true agronomic need for plants in order to reduce the phosphorus run-off that pollutes the waters of the IRW. Based upon Specifically, the Judgment provides that the poultry waste generated by the defendants' birds shall not be applied on land having a Soil Test Phosphorus (STP) measure of 120 lbs./acre or greater. [*Id.* at p. 20]. Nor shall land application of poultry waste be permitted at any rate that would cause the land to exceed 120 lbs./acre STP. [*Id.* at p. 21]. To that end, the Judgment requires that defendants' contract growers have access to sufficient poultry waste removal equipment, storage facilities, transportation methods, and disposal methods for poultry waste generated by defendants' birds, and the defendants shall hold their Contract Growers harmless for the costs of removal,

storage, transportation, and disposal of poultry waste generated by defendants' birds. [*Id.* at p. 22]. Pursuant to Judgment, the court shall appoint a special master who shall be charged with overseeing remediation of the IRW and the restrictions on land application of poultry waste. [*Id.* at p. 11].

Finally, pursuant to Okla. Stat. tit. 27A, § 2-3-504, the Judgment imposes civil penalties against defendants Tyson Foods, Inc., Cobb-Vantress, Cargill, Inc., George's, Inc., Simmons, and Cal-Maine. [*Id.* at pp. 31-32].

Defendants appealed. Thereafter, defendants filed a motion to stay the Judgment during the pendency of the appeal.

In an Opinion and Order of January 16, 2026, the court stayed the monetary portions of the Judgment, but declined to stay the injunctive portions.

On January 14, 2026, the State and George's filed the Joint Motion for Entry of Consent Judgment. [Doc. 3229]. The court set the motion for hearing on February 2, 2026, but, at the request of the parties, continued the hearing to February 27, 2026. [Doc. 3263].

On February 5, 2026, the court directed that, on or before February 19, 2026, the State and George's submit supplemental briefing directed to Federal Rule of Civil Procedure 60(b), as well as *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994). [Doc. 3265].

On February 12, 2026, the State and Tyson filed their Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling. [Doc. 3268]. That same day, the State and Cargill filed their Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling. [Doc. 3269]. The court set the motions for hearing on March 6, 2026. [Doc. 3278].

On February 19, 2026, the State and George's submitted the supplemental brief directed to Rule 60(b) and *Bancorp*. [Doc. 3273].

On February 24, 2026, the State and Peterson's filed the Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling.  [Doc. 3279].  The court set the motion for hearing with Cargill's and Tyson's respective motions.  [Doc. 3281].

On February 27, 2026, the court held a hearing on the State's and George's joint motion. [Doc. 3286; Doc. 3287].

On March 4, 2026, with leave of court, the State, Tyson, Cargill, and Peterson filed a Joint Supplemental Brief Supporting Entry of the Consent Judgment.  [Doc. 3292].

On March 6, 2026, the court held a hearing on the State's joint motions with Tyson, Cargill, and Peterson.  [Doc. 3293; Doc. 3296].

## Proposed Consent Judgments

Prior to considering the motions, it is first necessary to discuss the proposed consent judgments.  Although they include some substantively different terms, the four proposed consent judgments adopt the same basic framework.

*First,* the settling defendants would make a one-time payment, in varying amounts, to a Monetary Relief Fund.[1]  The monies shall be used "for purposes including, but not limited to, remediation or conservation projects in the IRW and for payment of attorney's fees and litigation costs in an amount to be determined either by order of the Court or by agreement between the State and its outside private lawyers."  [Doc. 3229-1, p. 5; Doc. 3268-1, p. 5; Doc. 3269-1, p. 5; Doc. 3279-1, p. 5].  The parties state that the Attorney General will oversee the remediation or conservation projections.  [Doc. 3296, p. 8].

---

[1] George's shall make a one-time payment in the amount of $5,000,000 [Doc 3229-1, p. 5]; Tyson shall make a one-time payment in the amount of $18,050,000 [Doc. 3268-1, p. 5]; Cargill shall make a one-time payment in the amount of $6,175,000 [Doc. 3269-1, p. 5]; and Peterson shall make a one-time payment in the amount of $950,000 [Doc. 3279-1, p. 5].

*Second,* the settling defendants would land-apply decreasing percentages of the total amount of poultry waste removed each year from poultry houses they or their contract growers own or operate.   The land application restrictions are based on the weight of the litter removed from the poultry house, rather than soil test phosphorous (STP) levels.  [Doc. 3229-1, pp. 6-8; Doc. 3268-1, pp. 6-8; Doc. 3269-1, pp. 6-8; Doc. 3279-1, pp. 6-8]; *see also* [Doc. 3287, pp. 10-11].  For example, with respect to the proposed consent judgments with George's and Tyson, the percentage of poultry waste to be land applied in the IRW from poultry houses they control would decrease from 40% in years 1 and 2  to 20% in years 5, 6 and 7.  [Doc. 3229-1, p. 6; Doc. 3268-1, pp. 6-7; Doc. 3269-1, p. 6; Doc. 3279-1, pp. 6-7].  A special master would monitor the settling defendants' compliance with the land application restrictions. [Doc. 3229-1, pp. 9-12; Doc. 3268-1, pp. 9-13; Doc. 3269-1, pp. 9-14; Doc. 3279-1, pp. 9-14].

*Third,* with respect to the special master, each settling defendant would make a payment for deposit into an escrow account to be used to pay for the services and/or expenses of the special master in monitoring compliance with the litter application restrictions.[2]  [Doc. 3229-1, p. 10; Doc. 3268-1, p. 11; Doc. 3269-1, p. 11; Doc. 3279-1, p. 11].  The account would be controlled by the Attorney General.  [Doc. 3287, pp. 14-15].

*Fourth,* upon approval of the proposed consent judgments, the State shall "fully, finally, and forever release, relinquish and discharge" the settling defendants from

> any and all manner of claims, demands, actions, suits or causes of action . . . arising out of or relating in any way to the conduct alleged or that could have been alleged in the case as it concerns poultry litter in the Illinois River Watershed, any waterways, groundwater or waters of the State in the Illinois River Watershed and/or Lake Tenkiller (the "Released Claims").

---

[2] George's would deposit $250,000 [Doc. 3229-1, p 10]; Tyson would deposit $950,000 [Doc. 3268-1, p. 11]; Cargill would deposit $325,000 [Doc. 3269-1, p. 11]; and Peterson would deposit $50,000 [Doc. 3279-1, p. 11].   The payments to the Monetary Relief Fund would total $30,175,000.

[Doc. 3229-1, p. 13; Doc. 3268-1 pp. 14-15; Doc. 3269-1, pp. 14-15; Doc. 3279-1, p. 15]. Additionally, the parties "agree the IRW Growers were never sued by the State in this lawsuit," but, "for the avoidance of doubt," the State would release "any person that is or was previously under contract with any Released Party for the production or care of poultry or eggs in the Illinois River Watershed" from any Released Claim. [Doc. 3229-1, p. 14; Doc. 3268-1, p. 15; Doc. 3269-1, p. 15; Doc. 3279-1, p. 16].

The proposed consent judgments as to George's and Tyson would be for seven-year terms. [Doc. 3229-1, p. 16; Doc. 3268-1, p. 17]. The proposed consent judgments as to Cargill and Peterson would be for ten-year terms. [Doc. 3269-1, p. 18; Doc. 3279-1, p. 18]. None of the proposed consent judgments include the imposition of civil penalties pursuant to Okla. Stat. tit. 27A, § 2-3-504. [Doc. 3296, p. 14], unlike the penalties imposed in this court's Judgment.

Given the structural similarities between the four proposed consent judgments, the court analyzes the four motions together.

### Analysis

The movants agree that the proposed consent judgments would "supersede[] and replace[] the Judgment . . . entered by the Court on December 19, 2025" as to each settling defendant. [Doc. 3229-1, p. 3; Doc. 3268-1, p. 3; Doc. 3269-1, p. 3; Doc. 3279-1, p. 3]. Accordingly, the movants seek to set aside the Judgment and the court must examine Federal Rule of Civil Procedure 60(b).

Pursuant to Federal Rule of Civil Procedure 60(b),

> [o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons:

***

(5)     the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(5), (6).  "A Rule 60(b) motion for relief from judgment is an extraordinary remedy and may be granted only in exceptional circumstances."  *Jackson v. Los Lunas Cmty. Program,* 880 F.3d 1176, 1191-92 (10th Cir. 2018).  "The determination on vacatur is an equitable one, but the presumption is in favor of retaining the judgment, which 'should stand unless a court concludes that the public interest would be served by a vacatur.'"  *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 76 F.3d 1142, 1144 (10th Cir. 1996) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994)).  The movants seek vacatur pursuant to Rule 60(b)(5) and 60(b)(6).[3]  The court separately considers each subsection.

   A.     *Federal Rule of Civil Procedure 60(b)(5)*

Looking first to Rule 60(b)(5), the Rule "permits relief from a judgment or order if '[1] the judgment has been satisfied, released, or discharged; [2] it is based on an earlier judgment that has been reversed or vacated; *or* [3] applying it prospectively is no longer equitable.'"  *Jackson,* 880 F.3d at 1192 (quoting Fed. R. Civ. P. 60(b)(5)).  As recognized by the Tenth Circuit, "[u]se of the disjunctive 'or' demonstrates 'that each of the provision's three grounds for relief is independently sufficient.'"  *Jackson,* 880 F.3d at 1192 (quoting *Horne v. Flores,* 557 U.S. 433, 454 (2009)).

---

[3] In the supplemental briefs, the parties contend that "changed circumstances warrant ***modification*** of the December 19 Judgment." [Doc. 3273, p. 7]; *see also* [Doc. 3292, p. 6 ("The court should modify the judgment under Rule 60(b)(5).")].  However, the parties' requests cannot be fairly characterized as "modifications."  BLACK'S LAW DICTIONARY defines "modify" as "[t]o make somewhat different; to make small changes to (something) by way of improvement, suitability, or effectiveness."  *Modify,* BLACK'S LAW DICTIONARY (12th ed. 2024).  The settling parties do not seek to make "small changes" to the Judgment.  Rather, the settling parties seek to "supersede[] and replace[] the Judgment." [Doc. 3229-1, p. 3; Doc. 3268-1, p. 3; Doc. 3269-1, p. 3; Doc. 3279-1, p. 3].

The movants first assert that, by virtue of the settlement agreements as set forth in the proposed consent judgments, the Judgment has been released or discharged.[4]  However, the proposed Consent Judgments are each "conditioned upon the approval of the Consent Judgment by the Court." [Doc. 3229-1, p. 13; Doc. 3268-1, p. 14; Doc. 3269-1, p. 14; Doc. 3279-1, p. 15]. Thus, the State has only contingently released the Judgment and *has not* released or discharged defendants from their obligations under the Judgment as required by the Rule. *See* [Doc. 3296, p. 5].  For these reasons, Rule 60(b)(5)'s provision for satisfaction, release, or discharge of the judgment is inapplicable.

The movants next argue that applying the Judgment prospectively is no longer equitable.[5] *See* Fed. R. Civ. P. 60(b)(5) ("[T]he court may relieve a party . . . from a final judgment [where] . . . applying it prospectively is no longer equitable.").

As an initial matter, the Rule provides relief only from "judgments that have prospective application or effect."  *United States v. Melot,* 712 F. App'x 719, 720-21 (10th Cir. 2017) (unpublished).[6]  The court's Judgment includes the imposition of civil penalties, which are not prospective. *Melot,* 712 F. App'x at 721 ("A money judgment, on the other hand, simply remedies a past wrong; it isn't executory and doesn't require the court to supervise any future changing

---

[4] Movants do not assert that the Judgment has been satisfied nor could they do so as the provision of the Rule requires the court "to focus on whether the movant has satisfied each obligation set forth in the [judgment]." *Jackson,* 880 F.3d at 1201.  Defendants have not.

[5] The parties do not contend that Rule 60(b)(5)'s provision for vacatur where the judgment "is based on an earlier judgment that has been reversed or vacated" applies. *See* Fed. R. Civ. P. 60(b)(5).

[6] "Unpublished decisions are not precedential but may be cited for their persuasive value."  10th Cir. R. 32.1(A).

conditions."). Accordingly, vacatur of the civil penalties portion of the Judgment pursuant to this provision of Rule 60(b)(5) is impermissible.

However, the primary focus of the Judgment is prospective relief and therefore the court considers whether it is no longer equitable to apply the Judgment. Pursuant to this subprovision of Rule 60(b)(5), "a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction . . . in light of such changes.'" *Horne,* 557 U.S. at 447 (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997)).

The movants contend that the proposed consent judgments and the asserted "expanded substantive provisions" included therein constitute a significant change in factual conditions that warrant relief. *See* [Doc. 3292, pp. 6-7; Doc. 3273, pp. 10-11]. However, the parties cite no binding precedent for the proposition that a post-judgment settlement agreement constitutes a "significant change . . . in factual conditions" for purposes of Rule 60(b)(5). Rather, although not considering Rule 60(b)(5) specifically, the U.S. Supreme Court has concluded that "exceptional circumstances" to warrant vacatur "do not include the mere fact that the settlement agreement provides for vacatur." *U.S. Bancorp Mortg. Co.,* 513 U.S. at 29.[7] Under the circumstances, the court cannot conclude that defendants have shown a "significant change . . . in factual conditions" based upon the proposed settlements as reflected in the consent judgments.

---

[7] For the reasons discussed herein, the parties have not shown "exceptional" or "extraordinary" circumstances.

Nor have the movants demonstrated that continued enforcement of the Judgment would be "detrimental to the public interest." *Horne,* 557 U.S. at 447; *see also Jackson*, 880 F.3d at 1194. Although the court must adopt a "flexible approach to evaluating the equities," *Jackson*, 880 F.3d at 1201, "a critical question in th[e] Rule 60(b)(5) inquiry is whether the objective of the District Court's [judgment] . . . has been achieved." *Horne*, 557 U.S. at 450.  That is

> where the basis of the Rule 60(b)(5) motion is that continued enforcement of the decree is no longer equitable, instead of inquiring narrowly whether the specific obligations of a [judgment] have been attained, the court must broadly inquire whether the party obligated by the [judgment] is at that time in compliance with federal law.

*Jackson,* 880 F.3d at 1202.

The court previously concluded that "defendants, by their conduct, have unreasonably interfered with the public's right to the use and enjoyment of the waters of the IRW in Oklahoma. The State's injuries from phosphorous concentrations in the rivers and streams of the IRW and Lake Tenkiller are significant." [Doc. 2979, p. 201].  As a result, the court held that "[d]efendants are liable to the State for statutory public nuisance and for federal common law nuisance with respect to their conduct in the Oklahoma portion of the IRW and their conduct in the Arkansas portion of the IRW." [*Id.*].  Further, less than a year ago, this court found that phosphorous run-off from land-applied poultry waste continues to be a significant source of phosphorous, causing actual and ongoing injury to the waters of the IRW, and that conditions have not materially changed in the IRW.  [Doc. 3161, pp. 20-22].  Settling defendants have presented no evidence that run-off from land-applied poultry waste has ceased to be a source of phosphorous, causing injury to the IRW waters such that the objectives of the Judgment—abatement of the nuisance and compliance with federal law—have been achieved.  In light of the ongoing nuisance, settling

defendants are not "in compliance with federal law" and vacatur pursuant to Rule 60(b)(5) must be denied for this additional reason. *See Jackson,* 880 F.3d at 1202.

A comparison of the proposed consent judgments with the Judgment reveals the following:

- The proposed consent judgments do not limit the application of poultry waste to reduce phosphorus runoff into the waters of the IRW. The record makes clear that land application of poultry manure at rates in excess of agronomic need elevates the level of phosphorus in the soil and increases the concentration of phosphorus in the runoff. In order to limit the application of poultry waste to reduce phosphorus runoff, the current Judgment prohibits the application of poultry waste at any rate that would cause STP to exceed 120 lbs./acre. The proposed consent judgments simply do not prevent the application of poultry manure at rates exceeding agronomic need and would result in continuing phosphorus pollution.

- The proposed consent judgments are insufficient in duration. Based on testimony by Soil Scientist and Geomorphologist Gregory Scott that "following cessation of land application, it would take up to thirty years of hay production and removal to remove legacy phosphorous placed in the soil up to a STP of 300," this court concluded that a thirty-year period of oversight by a special master is warranted. Yet, the proposed consent judgments would expire in only ten years with respect to Cargill and Peterson and would expire in only seven years with respect to George's and Tyson. The parties cite no evidence suggesting that a seven (or ten) year term is sufficient to remediate phosphorus pollution in the waters of the IRW or ensure that no additional pollution occurs. Rather, during the February 27 hearing, the State conceded it did not believe that remediation could be achieved in the short term. [Doc. 3287, pp. 9-10].

- The proposed "Monetary Relief Fund" contained in the proposed consent judgments would fail to provide sufficient monies to remediate the phosphorus pollution caused by the settling defendants. Under the terms of the proposed consent judgments, the Monetary Relief Fund is "for purposes including, but not limited to, remediation or conservation projects in the IRW and for payment of attorney's fees and litigation costs in an amount to be determined either by order of the Court or by agreement between the State and its outside private lawyers." See, e.g., [Doc. 3229-1, p. 5]. The State advised the court at the February 27 hearing that, pursuant to the terms of the contract between the State and outside counsel, "no more than 50 percent" of the Monetary Relief Fund would be expended on attorney fees and costs. If half of the Monetary Relief Fund of $30,175,000 is paid to outside counsel, only $15,087,500 would remain "for purposes including, but not limited to, remediation" of the phosphorus pollution caused by the defendants' overapplication of poultry manure. In contrast, the court's Judgment contemplates a remedial investigation by a special master, followed by a remediation plan funded by defendants' payments into an evergreen fund and implemented by the special master over the next thirty years. The proposed Monetary Relief Fund simply does

not constitute an adequate remedy to warrant vacatur of the Judgment.          .

- Under the proposed consent judgments, the defendants would pay no penalties to the Oklahoma Department of Environmental Quality Revolving Fund for their violations of Oklahoma's Environmental Quality Code, in contrast to the penalties imposed by the court on pp. 23-33 of the Judgment.

- The proposed consent judgments do not assure that the amount of poultry waste applied to the lands of the IRW will decrease. At the hearing held March 6, the State conceded that, under the terms of the proposed consent judgments, if the amount of poultry waste produced by a settling defendant was to increase significantly, the amount of poultry waste applied to the land could actually increase despite the percentage restrictions contained in the proposed consent judgments. [Doc. 3296, pp. 9-10].

For all these reasons, the movants have not shown that applying the Judgment prospectively is no longer equitable. Accordingly, Federal Rule of Civil Procedure 60(b)(5) is inapplicable, and the parties' motions are denied insofar as vacatur is sought under subpart (b)(5).

B.      *Federal Rule of Civil Procedure 60(b)(6)*

Movants also rely on Federal Rule of Civil Procedure 60(b)(6) pursuant to which a court may grant relief from a final judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The Tenth Circuit has described the provision "as a 'grand reservoir of equitable power to do justice in a particular case,'" but has cautioned that "a district court may grant a Rule 60(b)(6) motion, 'only in extraordinary circumstances and only when necessary to accomplish justice.'" *Kile v. United States*, 915 F.3d 682, 687 (10th Cir. 2019) (quoting *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 579 (10th Cir. 1996)); *see also Johnson v. Spencer*, 950 F.3d 680, 700-01 (10th Cir. 2020) (internal citation omitted) (quoting *McGraw v. Barnhart*, 450 F.3d 493, 505 (10th Cir. 2006)) ("Although 'the rule should be liberally construed when substantial justice will thus be served,' 'relief under Rule 60(b)(6) is extraordinary and reserved for exceptional circumstances.'"). The court begins its analysis with *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994). *See In re Renfrow*, No. 22-CV-00381-SH, 2022 WL 17668704,

at *4 (N.D. Okla. Dec. 14, 2022) ("With any request for vacatur after settlement, consideration must start with [*Bancorp*].").

In *Bancorp*, the Court held that "mootness by reason of settlement" generally "does not justify vacatur of a judgment under review." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 29. Recognizing that "the determination is an equitable one," however, the Court acknowledged that "exceptional circumstances may conceivably counsel in favor of" vacatur. *Id.* But "the mere fact that the settlement agreement provides for vacatur" is insufficient. *Id.* The Court reasoned as follows:

> As always when federal courts contemplate equitable relief, our holding must also take account of the public interest. Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur. Congress has prescribed a primary route, by appeal as of right and certiorari, through which parties may seek relief from the legal consequences of judicial judgments. To allow a party who steps off the statutory path to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would—quite apart from any considerations of fairness to the parties—disturb the orderly operation of the federal judicial system.

*Id.* at 26-27 (internal quotations and citations omitted). The Court further noted that permitting vacatur of judgments under appellate review as a matter of course "may *deter* settlement at an earlier stage," because "[s]ome litigants, at least, may think it worthwhile to roll the dice rather than settle in the district court . . . if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur." *Id.* at 27-28.

*Bancorp* considered vacatur of binding appellate decisions, not district court judgments, and does not preclude the requested relief. However, as recognized by another court in this district, "numerous courts have applied *Bancorp* outside its original context." *In re Renfrow,* 2022 WL 17668704, at *6; *see also Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1129 n.20 (10th Cir. 2010) ("[*Bancorp's*] rationale also governs the district court's decision

whether to vacate its own judgment pursuant to Fed. R. Civ. P. 60(b).").  In fact, "[i]n the decades since *Bancorp*, its equitable considerations have been consistently applied by courts in the Tenth Circuit and beyond to conclude that, absent 'exceptional circumstances,' mootness of an appeal by reason of settlement generally does not justify vacatur of an underlying judgment."  *In re Renfrow*, 2022 WL 17668704, at *5.  Further, the movants agree that *Bancorp* provides a general framework for the court's analysis of the motions.  [Doc. 3287, p. 26; Doc. 3296, pp. 19, 30].  Thus, the court turns to the considerations articulated in *Bancorp*.

The court acknowledges differences in this case and *Bancorp*.  Significantly, unlike in *Bancorp*, both prevailing and losing parties request vacatur.  *See Major League Baseball Props., Inc. v. Pac. Trading Cards, Inc.*, 150 F.3d 149, 152 (2d Cir. 1998) ("Unlike *Bancorp*, therefore, the victor in the district court wanted a settlement as much as, or more than, the loser did.").

Further, the parties in *Bancorp* had been granted certiorari with respect to a precedential appellate decision, whereas, in this matter, defendants' appeals are in their early stages.  Accordingly, vacatur at this juncture would avoid further litigation through appeal, at least with respect to the settling defendants.[8]

And yet, in other, more significant ways, this case implicates the concerns expressed by the U.S. Supreme Court in *Bancorp*.

In *Bancorp*, the Supreme Court acknowledged that, because vacatur is an equitable determination, a court must consider "the nature and character of the conditions which have caused the case to become moot."  *Rio Grande Silvery Minnow*, 601 F.3d at 1129 (quoting *U.S. Bancorp*

---

[8] Simmons and Cal-Maine have not reached settlement agreements with the State and, presumably, their appeals would continue.  Accordingly, regardless of whether the court vacates its Judgment in favor of the proposed consent judgments, the State will incur costs and expenses associated with those appeals.  Moreover, that Simmons and Cal-Maine have not settled creates significant administration and management issues, discussed herein.

*Mortg. Co.*, 513 U.S. at 24). The Court observed "[t]he principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 24.

As recognized by the Supreme Court in *Bancorp*, "exceptional circumstances" to justify vacatur "do not include the mere fact that the settlement agreement provides for vacatur." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 29. Further, although the parties cite the public's interest in settlement, generally, the Court recognized that "while the availability of vacatur may facilitate settlement after the judgment under review has been rendered and certiorari granted (or appeal filed), it may *deter* settlement at an earlier stage." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 27-28. "*Some* litigants, at least, may think it worthwhile to roll the dice rather than settle in the district court . . . if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 28; *see also Okla. Radio Assocs. v. Fed. Dep. Ins. Corp.*, 3 F.3d 1436, 1444 (10th Cir. 1993) ("The furthering of settlement of controversies is important and desirable, but there are significant countervailing considerations which we must also weigh. A policy permitting litigants to use the settlement process as a means of obtaining the withdrawal of unfavorable precedents is fraught with the potential for abuse.").

The need for vacatur rests entirely upon the parties and therefore weighs against the requested relief. The court entered the Findings of Fact and Conclusions of Law over three years ago. At that time, the court directed the parties "to meet and attempt to reach an agreement with regard to remedies to be imposed in this action." [Doc. 2979, p. 218]. The parties conferred for months but were unable to independently reach a resolution. The parties next requested mediation before Judge Tacha, which the court so directed. Again, the parties were unable to reach a resolution. As late as November 5, 2025, the State indicated that the parties were engaged in "on-

going settlement negotiations." [Doc. 3184, p. 2]. Yet, no resolution was reached as to any party until after entry of the Judgment. Had the parties truly wished to reach a negotiated resolution of this matter *without regard to outcome*, such agreement could have been reached at any time in the nearly three years between the court's Findings of Fact and Conclusions of Law and the Judgment. The parties' failure to do so suggests they "roll[ed] the dice" and now seek to erase the result of that gamble through vacatur. *See U.S. Bancorp Mortg. Co.*, 513 U.S. at 27-28. Providing relief from the court's Judgment, under the circumstances, may suggest to other litigants in this district that they need not engage in good-faith settlement negotiations in the earlier stages of litigation because any disagreeable consequences can be eradicated through a post-judgment settlement.

Further, the court must take into account the public's interest. *See U.S. Bancorp Mortg. Co.*, 513 U.S. at 26. As recognized by the Supreme Court in *Bancorp*, "Congress has prescribed a primary route, by appeal as of right and certiorari, through which parties may seek relief from the legal consequences of judicial judgments," *Id.* The parties began traveling that route, *see* [Doc. 3198 to 3200; Doc. 3202], but now seek to reverse course and "step[] off the statutory path."[9] *U.S. Bancorp Mortg. Co.*, 513 U.S. at 26. However, the interest of the public is often best served through "orderly operation of the federal judicial system." *Id.* Defendants having filed Notices of Appeal, this court lacks jurisdiction over this matter. It is for the Tenth Circuit, not this court, to

---

[9] It is of no consequence that the parties have made the settlements contingent upon vacatur and have not yet dismissed the respective appeals. As explained by the U.S. Court of Appeals for the Second Circuit: "The parties cannot change that result by sleight of the draftsman's hand—making the settlement contingent upon, rather than in contemplation of, vacatur. Unlike a motion made after settlement is complete, the appeal in this case is not yet moot. But it would become moot were we to grant the vacatur, once the remaining terms of the settlement agreement were complied with. The contingent nature of the settlement does not alter the equitable calculus. '[T]he losing part[ies are still] voluntarily forfeit[ing their] legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering [their] claim to the equitable remedy of vacatur.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 547 F.3d 109, 113 (2d Cir. 2008) (quoting *U.S. Bancorp*, 513 U.S. at 25).

determine the Judgment's future and the parties "are not free to contract about [its] existence."

*Okla. Radio Assocs.,* 3 F.3d at 1444 (quoting *In re Mem'l Hosp. of Iowa Cnty., Inc.*, 862 F.2d 1299,

1303 (7th Cir. 1998)).

Rather than focusing on the public's interest in the "orderly operation of the federal judicial

system," the parties urge the court to consider the public's interest in the proposed consent

judgments themselves.  However, the proposed consent judgments "do[] not present . . . the kind

of action that would furnish compelling reasons for vacatur."  *Schell v. Oxy USA Inc.*, 814 F.3d

1107, 1123 (10th Cir. 2016).  In addition to the reasons listed on pages 12 and 13 above, the

following factors weigh against vacatur:

- The proposed structure is unworkable.  Defendants Cal-Maine and Simmons have not reached settlement agreements with the State in this matter.  Thus, the court's December 19 Judgment stands as to those defendants, regardless of the action taken by the court as the proposed consent judgments.  As a result, Cal-Maine and Simmons are required to contribute to the Evergreen Fund established by the December 19 Judgment to finance remediation projects, overseen by the Special Master.  In contrast, the settling defendants would contribute to the Special Monetary Fund, an account distinct from the Evergreen Fund, in order to finance attorney's fees and costs, as well as "remediation and conservation projects" chosen by the Attorney General, rather than the Special Master.  The Special Master would have no authority with respect to remediation under the terms of the proposed consent judgments.  The dueling judgments create a situation where insufficient funds are provided for the Special Master's enumerated duty to remediate, and insufficient details are provided as to any remediation or conservation projects to be overseen by the Attorney General.  Further, Cal-Maine and Simmons must comply with this court's restriction of 120 lbs./acre STP for land application of poultry waste.  However, the proposed consent judgments relieve the settling defendants of their obligations to comply with the STP restrictions in favor of Litter Removal Limitations.  Accordingly, the Special Master would be tasked with monitoring Litter Removal Limitations as to some defendants, but Soil Test Phosphorous limits as to the nonsettling defendants.

- The proposed consent judgments would fail to adequately fund the duties of the special master contemplated by those agreements.  Nor would the special master be adequately equipped to ensure the settling defendants' compliance with the Litter Removal Commitments, as the proposed consent judgments include no staffing or administrative provisions.  The settling defendants would pay a total of only $1,325,000 to fund seven to ten years of the special master's responsibilities to monitor compliance with litter removal requirements over the million-acre watershed.  Once those monies are depleted, it appears likely that Oklahoma taxpayers would be paying the special master's fees and expenses.

- During the hearings on the motions, the State conceded that up to fifty percent (50%) of the settling defendants' one-time payments into the Monetary Relief Fund could be expended on attorney's fees and costs, rather than remediation. [Doc. 3287, p. 7; Doc. 3296, pp. 5-6]. However, the fifty-percent limitation is not included in any of the proposed consent judgments and, as a result, the State could devote more of the funds to attorney's fees, rather than remediation or conservation. Further, payment of attorney's fees and costs to outside counsel would be controlled by agreements between the State and its outside private lawyers and not subject to judicial review. [Doc. 3287, pp. 6-7].

- The proposed consent judgments contain releases of nonparty contract growers that are or were previously under contract with the settling defendants. The proposed releases exceed the scope of this litigation and this court lacks the jurisdiction to include such releases in this case. If the State and the defendants wish to release any potential claims against the contract growers, they may do so in a separate agreement. Furthermore, the proposed release is unnecessary to protect current contract growers in light of paragraph 4(h) of the court's Judgment requiring the defendants to hold their contract growers harmless for the costs of removal, storage, transportation and disposal of poultry waste generated by the defendants' birds.

- Finally, although the court does not wish to discount the concerns of contract growers in the Illinois River Watershed, the asserted economic harm to the poultry industry and Oklahoma poultry farmers is too speculative to justify a finding of exceptional circumstances. *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 76 F.3d 1142, 1145 (10th Cir. 1996); *Amoco Oil Co. v. U.S. Env'tl Prot. Agency*, 231 F.3d 694, 700 (10th Cir. 2000).

For all these reasons, the movants have not demonstrated "extraordinary circumstances"

that justify relief from the Judgment under Rule 60(b)(6). Thus, the motions must be denied.[10]

---

[10] Although this court lacks jurisdiction to grant the parties' requested relief, the court may properly consider and deny the motions. *West v. Ortiz*, No. 06-1192, 2007 WL 706924, at *5 n.5 (10th Cir. 2007) (unpublished); *Blinder, Robinson & Co. v. U.S. Secs. & Exch. Comm'n,* 748 F.2d 1415, 1420 (10th Cir. 1984) ("In ordinary civil cases the rule is that after an appeal has been taken the district court retains jurisdiction to consider and deny a Rule 60(b) motion."); *see also* Fed. R. Civ. P. 62.1(a)(2) ("If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may . . . deny the motion."); Fed. R. Civ. P. 62.1 advisory committee's note to 2009 adoption ("After an appeal has been docketed and while it remains pending, the district court cannot grant a Rule 60(b) motion without a remand. But it can entertain the motion and deny it, defer consideration, or state that it would grant the motion if the court of appeals remands for that purpose or state that the motion raises a substantial issue.").

## Conclusion

WHEREFORE, the Joint Motion for Entry of Consent Judgment [Doc. 3229] of plaintiff State of Oklahoma and defendants George's, Inc. and George's Farms, Inc.; the Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling [Doc. 3268] of the State and defendants Tyson Foods, Inc.; Tyson Poultry, Inc.; Tyson Chicken, Inc.; and Cobb-Vantress, Inc.; the Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling [Doc. 3269] of the State and defendants Cargill Incorporated and Cargill Turkey Production, LLC; and the Joint Motion for Entry of Consent Judgment and Request for Indicative Ruling [Doc. 3279] of the State and defendant Peterson Farms, Inc. are denied.

IT IS SO ORDERED this 8th day of April, 2026.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE