**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA *ex rel.* GENTNER DRUMMOND, in his capacity as Attorney General of the State of Oklahoma and OKLAHOMA SECRETARY OF ENERGY AND ENVIRONMENT CHRIS SCHINNERER in his capacity as the TRUSTEE FOR NATURAL RESOURCES FOR THE STATE OF OKLAHOMA, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 05-CV-00329-GKF-SH |
| TYSON FOODS, INC., TYSON POULTRY, INC., TYSON CHICKEN, INC., COBB-VANTRESS, INC., CAL-MAINE FOODS, INC., CARGILL, INC., CARGILL TURKEY PRODUCTION, LLC, GEORGE'S, INC., GEORGE'S FARMS, INC., PETERSON FARMS, INC., and SIMMONS FOODS, INC., | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

This matter comes before the court on the Joint Motion to Vacate the Judgment Under Rule 60(b) [Doc. 3340] of plaintiffs State of Oklahoma *ex rel.* Gentner Drummond, in his capacity as Attorney General of the State of Oklahoma, and Chris Schinnerer, in his capacity as the Trustee for Natural Resources for the State of Oklahoma, and defendants Tyson Foods, Inc.; Tyson Poultry, Inc.; Tyson Chicken, Inc.; Cobb-Vantress, Inc. (collectively, "Tyson"); Cal-Maine Foods, Inc. ("Cal-Maine"); Cargill, Inc.; Cargill Turkey Production, LLC (collectively, "Cargill");

George's, Inc.; George's Farms, Inc. (collectively, "George's"); Peterson Farms, Inc. ("Peterson"); and Simmons Foods, Inc. ("Simmons"). For the reasons set forth herein, the motion is denied.

**Background/Procedural History**

On January 18, 2023, the court entered Findings of Fact and Conclusions of Law [Doc. 2979], finding in favor of the State and against defendants on the State's claims of statutory public nuisance, federal common law nuisance, trespass, and violations of Okla. Stat. tit. 27A, § 2-6-105 and Okla. Stat. tit. 2, § 2-18.1. The court directed the parties "to meet and attempt to reach an agreement with regard to remedies to be imposed in this action." The court advised that "[t]he agreed remedies, if any, must be approved by the court," and "[i]n the event the parties are unable to reach an accord, the court shall enter judgment." [*Id.* at p. 218].

On June 12, 2023, based on the parties' request, the court ordered this matter to mediation before retired Tenth Circuit Judge Deanell Reece Tacha. [Doc. 2997].

On September 13 and 14, 2023, the parties engaged in mediation sessions with Judge Tacha. The parties subsequently engaged in an all-day, in-person mediation session with Judge Tacha on October 12, 2023, but were unable to reach an agreed-upon resolution. [Doc. 3008; Doc. 3009].

On October 26, 2023, defendants filed a motion seeking dismissal of this case based on defendants' contentions that plaintiffs' claims for injunctive relief were moot and that proceeding on the record, at that time, would violate their due-process rights. The court denied the motion and set this matter for evidentiary hearing. [Doc. 3023; Doc. 3038].

The court held an evidentiary hearing on December 3, 2024 to December 6, 2024 and December 16 and December 17, 2024, to address "the contention made by the defendants, upon

which the plaintiff has the burden of proof, that the conditions in the [Illinois River Watershed] materially changed following the end of trial." [Doc. 3137; Doc. 3098, p. 4].

In an Opinion and Order of June 17, 2025, the court concluded that the State had satisfied its burden to show that conditions had not materially changed in the IRW following trial. [Doc. 3161]. The court therefore directed briefing as to a proposed final judgment.

On December 19, 2025, the court entered the Judgment, which includes a thirty-year term and three primary forms of relief: (1) remediation, (2) restriction on land application of poultry waste, and (3) civil penalties. [Doc. 3192].

With respect to remediation, the Judgment contemplates a phased approach that includes remedial investigation, planning, implementation, and monitoring, overseen by a court-appointed special master. [*Id.* at pp. 9-20]. Costs and expenses of the special master shall be paid by defendants through monies deposited into an Evergreen Fund, beginning with an initial deposit of $10,000,000. If, at any time, the balance of the Evergreen Fund falls below $5,000,000, defendants shall replenish the account with an additional payment of $5,000,000. [*Id.* at p. 19].

As to the restriction on land application of poultry waste in the IRW, the Judgment limits the land application of poultry waste to a level that provides the true agronomic need for plants in order to reduce the phosphorus run-off that pollutes the waters of the IRW. Specifically, the Judgment provides that the poultry waste generated by the defendants' birds shall not be applied on land having a Soil Test Phosphorus (STP) measure of 120 lbs./acre or greater. [*Id.* at p. 20]. Nor shall land application of poultry waste be permitted at any rate that would cause the land to exceed 120 lbs./acre STP. [*Id.* at p. 21]. To that end, the Judgment requires that defendants' contract growers have access to sufficient poultry waste removal equipment, storage facilities, transportation methods, and disposal methods for poultry waste generated by defendants' birds,

and the defendants shall hold their Contract Growers harmless for the costs of removal, storage, transportation, and disposal of poultry waste generated by defendants' birds. [*Id.* at p. 22]. Pursuant to the Judgment, the special master shall be charged with overseeing remediation of the IRW and the restrictions on land application of poultry waste. [*Id.* at p. 11].

Finally, pursuant to Okla. Stat. tit. 27A, § 2-3-504, the Judgment imposes civil penalties against defendants Tyson Foods, Inc., Cobb-Vantress, Cargill, Inc., George's, Inc., Simmons, and Cal-Maine in the following amounts: (1) Tyson – $160,000; (2) Cobb-Vantress – $30,000; (3) Cargill – $60,000; (4) George's – $10,000; (5) Simmons – $90,000; and (6) Cal-Maine – $70,000. [*Id.* at pp. 31-32].

Defendants appealed. Thereafter, defendants filed a motion to stay the Judgment, and, in an Opinion and Order of January 16, 2026, the court stayed the monetary portions of the Judgment, but did not stay the injunctive portions. [Doc. 3241].

On January 14, 2026, the State and George's filed a Joint Motion for Entry of Consent Judgment. [Doc. 3229]. Thereafter, Tyson, Cargill, and Peterson, with the State, filed separate Joint Motions for Entry of Consent Judgments. [Doc. 3268; Doc. 3269; Doc. 3279]. On February 27, 2026, the court held a hearing on the State's and George's joint motion and, on March 6, 2026, the court held a hearing on the State's joint motions with Tyson, Cargill, and Peterson. [Doc. 3286; Doc. 3287; Doc. 3293; Doc. 3296].

In an Order of April 8, 2026, the court denied the Joint Motions for Entry of Consent Judgment. [Doc. 3300]. The court first concluded that, because the State had only contingently released the Judgment, Rule 60(b)(5)'s provision for satisfaction, release, or discharge of judgment was inapplicable. [*Id.* at p. 9]. Nor had the movants demonstrated that applying the Judgment prospectively was no longer equitable as contemplated by Rule 60(b)(5). [*Id.* at pp. 9-13]. Finally,

the court concluded that movants had not shown "extraordinary circumstances" to justify relief under Rule 60(b)(6). [*Id.* at pp. 13-19]. Specifically, the court reasoned that the "need for vacatur [by reason of settlement] rest[ed] entirely upon the parties" and that the public interest would not be served by vacatur. [*Id.* at pp. 16-18].

The State, Tyson, Cargill, George's, and Peterson appealed the court's denial of the motions for entry of consent judgment. [Doc. 3299; Doc. 3301; Doc. 3303; Doc. 3305; Doc. 3307].

On July 15, 2026, in the U.S. Court of Appeals for the Tenth Circuit, the parties filed a Joint Motion to Vacate Judgment. Therein, the parties stated that they had negotiated a settlement agreement ("Settlement") and requested that the Circuit vacate the Judgment based on same and remand to this court to enable the parties to dismiss this litigation and effectuate the Settlement. The parties also sought a stay of the appeals in light of the Settlement.

In an Order of August 17, 2026, the Tenth Circuit directed a limited remand of the appeals and cross-appeals challenging the Judgment to allow this court "to consider the parties' request for relief from the judgment in light of the changed circumstances in the first instance." [Doc. 3338, p. 7]. The Circuit also stayed the Judgment pending further order of the court. [*Id.* at p. 8].

On September 9, 2026, the parties having filed nothing in this court, the undersigned directed that any motion and/or brief seeking relief from the court's Judgment based on the Settlement be filed on or before September 30, 2026. [Doc. 3339].

On September 22, 2026, the parties filed the Joint Motion to Vacate the Judgment Under Rule 60(b). [Doc. 3340]. On September 23, 2026, the parties filed the Settlement, with a stated effective date of July 10, 2026, as an Addendum to the Joint Motion. [Doc. 3341].

**Terms of the Settlement**

The court briefly summarizes the relevant provisions of the Settlement.

*First,* the Settlement provides for the creation of an Environmental Relief Fund through the defendants' collective payment of $41,671,000. Pursuant to the agreement, the funds shall be used for: (1) transfer to the Oklahoma Conservation Commission for the purpose of furthering "environmental stewardship of Oklahoma's scenic waterways," and (2) payment of litigation fees and expenses incurred by the State and/or its outside private attorneys in connection with this lawsuit. [Doc. 3341, p. 4]. Additionally, the Settlement requires defendants to "support the construction of riparian buffer strips" when an "IRW Grower"[1] with land abutting Lake Tenkiller or a designated scenic river in the IRW and who continues to land apply poultry litter is either required by state regulations to install a vegetative riparian buffer or voluntarily elects to do so. Under that provision, defendants agree to fund 50% of the costs to construct and install those riparian buffer strips. [*Id.* at p. 5]. However, the total cost for construction of any individual riparian buffer strip shall not exceed "the greater of $5,000 dollars per acre or $100,000 in total," and all riparian buffer strips constructed pursuant to the Settlement must be completed within three years of July 10, 2026. [*Id.*].

*Second,* in order to "satisfy" or "discharge" the penalties imposed in the Judgment, the defendants shall place into an escrow account, titled the "Penalty Fund," the following amounts: (1) Cargill – $60,000; (2) George's – $10,000; (3) Tyson (including Cobb-Vantress) – $190,000; (4) Cal-Maine – $70,000; and (5) Simmons – $90,000. [*Id.* at p. 6]. The Penalty Fund is to be paid to the Oklahoma Department of Environmental Quality Revolving Fund. [*Id.* at pp. 6-7].

[1] The term "IRW Grower" is not defined in the Settlement, but likely refers to defendants' contracted poultry growers.

*Third,* the defendants shall land-apply decreasing percentages of the total amount of litter removed each year from poultry houses they or their contract growers own or operate in the IRW. The land application restrictions are based on the weight of the litter removed from the poultry house, rather than soil test phosphorous (STP) levels. [*Id.* at pp. 7-11].

The parties agree to engage Scott Stoodley as Auditor to audit compliance with the litter removal commitments. [*Id.* at p. 11]. Defendants shall deposit a total of $1.9 million, consisting of the following amounts, into an escrow account, called the Auditor Fund, to fund the Auditor's services and expenses: (1) Cargill – $325,000; (2) George's – $250,000; (3) Peterson – $50,000; (4) Tyson – $950,000; (5) Cal-Maine – $150,000; and (6) Simmons – $175,000. Further, the Settlement contemplates payment of monetary penalties into the Auditor Fund for Material violations of the litter removal obligations. [*Id.* at pp. 13-15]. Once the Auditor Fund is exhausted, the State shall be responsible for funding any further auditing activities under the Settlement. [*Id.* at p. 12].

*Fourth,* concurrent with the execution of the Settlement, the State shall execute a "full and final release of the December 19, 2025 Judgment," with the intent that it qualify as a "release" within the meaning of Federal Rule of Civil Procedure 60(b). [*Id.* at 15]. Additionally, the parties shall cooperate to secure "Termination of the IRW Lawsuit," meaning both vacatur of the Judgment and dismissal with prejudice of the lawsuit. [*Id.*]. However, in the event that the parties are unsuccessful in securing Termination of the IRW Lawsuit within six months of the Settlement's Effective Date, the funds placed in escrow shall revert to defendants and the Settlement shall not be enforceable by any party against any other party. [*Id.* at p. 18].

Additionally, the Settlement includes the following provision:

> As of the Effective Date, the State, on behalf of itself and all officers, agencies, divisions, subdivisions, departments, and persons acting or claiming to act on its

> behalf, including but not limited to the Secretary (the "Releasing Parties"), shall and does fully, finally, and forever release, relinquish and discharge the Defendants together with any and all their past and current direct and indirect, corporate parents (including holding companies), owners, subsidiaries, affiliates, departments, divisions, joint ventures, predecessors, and successors, and each of their respective past and current, direct or indirect, officers, directors, trustees, partners, managing directors, shareholders, managers, members, employees, attorneys, equity holders, agents, beneficiaries, executors, insurers, advisors, assigns, heirs, legal or other representatives, only in his/her/its capacity on behalf of a Defendant (the "Released Parties") from any and all manner of claims, demands, actions, suits or causes of action, that the Releasing Parties ever had, now have, or hereafter can, shall, or may ever have, on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected, actual or contingent, liquidated or unliquidated claims, injuries, losses, damages, and the consequences thereof that have been asserted, or could have been asserted, under federal or state law in any way arising out of or relating in any way to the conduct alleged or that could have been alleged in the case as it concerns poultry litter in the Illinois River Watershed, any waterways, groundwater or waters of the State in the Illinois River Watershed, and/or Lake Tenkiller (the "Released Claims"). For avoidance of doubt, the Parties agree that all liabilities and obligations of the Released Parties as defined in this Settlement under the provisions of the December 19, 2025 Judgment are Released Claims for purposes of this Settlement.

[*Id.* at pp. 18-19]. Contingent upon termination of this lawsuit, the parties agree to dismiss with prejudice all claims asserted in relation to this action by any defendant or third-party defendant in severed lawsuit, Case No. 06-CV-503-GKF-SH. [*Id.* at p. 21]. The State further covenants not to assert any Released Claim against an independent contract grower that is currently, or has been during the pendency of the IRW Lawsuit, under contract with any defendant in the IRW to care for poultry and, contingent upon termination of this lawsuit, each defendant shall release each such independent grower of any claim for indemnification paid in connection with this lawsuit. [*Id.* at pp. 20-21].

*Fifth*, all parties waive and release any right to recover attorneys' fees, costs, and expenses incurred in connection with this lawsuit from any other party to this case. [*Id.* at p. 22].

*Finally,* the Settlement contemplates a seven-year term from the Effective Date of July 10, 2026. [*Id.* at p. 22].

**Analysis**

The parties seek vacatur of the Judgment under Federal Rule of Civil Procedure 60(b), which provides, in relevant part, as follows:

> [o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons:
>
> ***
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(5), (6). Regardless of the applicable subsection, "[a] Rule 60(b) motion for relief from judgment is an *extraordinary* remedy and may be granted only in *exceptional* circumstances." *Jackson v. Los Lunas Cmty. Program,* 880 F.3d 1176, 1191-92 (10th Cir. 2018) (emphasis added). "The determination on vacatur is an equitable one, but the presumption is in favor of retaining the judgment, which 'should stand unless a court concludes that the public interest would be served by a vacatur.'" *19 Solid Waste Dep't Mechs. v. City of Albuquerque*, 76 F.3d 1142, 1144 (10th Cir. 1996) (internal citation omitted) (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994)).

*A. Federal Rule of Civil Procedure 60(b)(5)*

The parties state that "[t]he most straightforward way to resolve the case is to hold that the judgment has been 'satisfied, released, or discharged' under Federal Rule of Civil Procedure 60(b)(5)." [Doc. 3340, p. 6]. Although the Settlement includes a "release" provision, it also provides that, in the event that the parties are unsuccessful in securing vacatur of the Judgment and dismissal of this lawsuit, then "th[e] Settlement shall not be enforceable by any Party against any other Party." [Doc. 3341, p. 18]. Thus, the Settlement remains conditioned upon vacatur of the

Judgment and dismissal of this matter. The parties cite no binding precedent that Rule 60(b)(5) applies to conditional releases, nor has the court identified any. Further, the cases on which the parties rely are factually distinguishable and therefore not persuasive. *See Banik v. Ybarra*, 805 F. App'x 266, 268-69 (5th Cir. 2020) (unpublished) (remanding for consideration of whether only the monetary damages portions of judgment should be vacated based on release). Accordingly, Rule 60(b)(5)'s provision for "satisf[action], release[], or discharge[]" of the Judgment is inapplicable.

Regardless, the fact of release is insufficient. "Rather, relief under Rule 60(b)(5) 'is an extraordinary remedy' limited to 'exceptional circumstances.'" *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 446 (10th Cir. 2023); *see also Christiansen v. Coyle*, No. 14-CV-00025-JNP, 2017 WL 4712216, at *2 (D. Utah Oct. 18, 2017) (applying Rule 60(b)(5) to a discharged judgment but declining to vacate same because the parties had not demonstrated exceptional circumstances). For the reasons discussed on pages 13 to 17 below, the parties fail to show exceptional circumstances.

The parties next argue that applying the Judgment prospectively is no longer equitable.[2] *See* Fed. R. Civ. P. 60(b)(5) ("[T]he court may relieve a party . . . from a final judgment [where] . . . applying it prospectively is no longer equitable."). Pursuant to this subprovision, "a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).

[2] The parties do not contend that Rule 60(b)(5)'s provision for vacatur where the judgment "is based on an earlier judgment that has been reversed or vacated" applies. *See* Fed. R. Civ. P. 60(b)(5).

In its Order of April 8, 2026, this court previously declined to characterize a post-judgment settlement conditioned upon vacatur as a "significant change . . . in factual conditions" for purposes of Rule 60(b)(5), noting that, although not considering Rule 60(b)(5) specifically, the U.S. Supreme Court has concluded that "exceptional circumstances" to warrant vacatur "do not include the mere fact that the settlement agreement provides for vacatur." *See* [Doc. 3300 at p. 10 (quoting *U.S. Bancorp Mortg. Co.,* 513 U.S. at 29)]. The court sees no reason to revisit its prior conclusion and the Settlement does not constitute "a significant change . . . in factual conditions" to warrant relief under Rule 60(b)(5).

Moreover, even applying a "flexible approach to evaluating the equities," the parties have not demonstrated that continued enforcement of the Judgment would be "detrimental to the public interest." *Jackson*, 880 F.3d at 1201. Despite claiming to have "t[aken] to heart this Court's concerns with the [proposed] consent judgments," [Doc. 3340, p. 22], the Settlement, like the proposed consent judgments before it, is inadequate and does not constitute a durable remedy to ensure compliance with the law. Specifically, having reviewed the Settlement:

- The "Environmental Relief Fund" is subject to few restraints and nebulous oversight. As previously stated, the Settlement provides for a collective payment of $41,671,000 by defendants to be used for (1) transfer to the Oklahoma Conservation Commission for the purpose of furthering "environmental stewardship of Oklahoma's scenic waterways" and (2) payment of litigation fees and/or expenses incurred by the State, including its outside private attorneys, in this lawsuit. Significantly, the Settlement does not specify how much of the Fund will be used for environmental stewardship and how much will pay attorney's fees and litigation expenses. Both the public and this court are left to guess. Assuming that, like the proposed consent judgments, up to 50% of the Fund could be used for payment of attorney's fees and litigation costs, only $20,835,500 would remain for environmental stewardship. Moreover, the Settlement does not define "scenic waterways," nor does it appear to be a term of art under Oklahoma law. The court notes that three of the six "scenic rivers" identified by Oklahoma law in Title 82, § 896.5 lie outside of the IRW. Insofar as "scenic waterways" includes waterways outside of the IRW, the term is overinclusive, exceeds the scope of this litigation, and diminishes the already insufficient funds available for environmental stewardship within the IRW. Finally, the Settlement does not specify the person or agency responsible for allocating the Fund. Absent such details, the public

has no assurance that the monies will be spent appropriately, or that recourse may be available in the event of mismanagement.

- The Settlement unreasonably limits defendants' exposure with respect to the construction of riparian buffer strips in the IRW. First, the Settlement includes geographical constraints. Defendants are obligated to fund riparian buffer strips only on IRW Growers' farms with land abutting Lake Tenkiller or a designated scenic river in the IRW where litter continues to be land applied. Further, the Settlement requires that defendants pay only 50% of the cost to construct and install these riparian buffer strips and, even then, defendants' potential economic exposure for any individual riparian buffer is limited to the greater of $5,000 per acre or $100,000 in total. In addition, defendants' obligation to partially fund those buffer strips is limited to projects initiated by IRW Growers who voluntarily elect to install the buffers or where "required by their state-issued nutrient management plan." There is no evidence in the record that a material number of IRW Growers would voluntarily expend their money for 50% of the cost of riparian buffer strips, nor have the parties submitted any such evidence. Finally, defendants' obligation to fund riparian buffer strips is temporally limited to three years from July 10, 2026. This arrangement is plainly insufficient to effect meaningful change in the IRW, and excess costs will ultimately fall on Oklahoma taxpayers.

- The Settlement again does not limit the application of poultry waste to reduce phosphorus runoff into the waters of the IRW. As previously stated, the record makes clear that land application of poultry manure at rates in excess of agronomic need elevates the level of phosphorus in the soil and increases the concentration of phosphorus in the runoff. The Settlement does not prohibit the application of poultry waste so as to prohibit the STP from exceeding 120 lbs./acre and therefore does not prevent the application of poultry manure at rates exceeding agronomic need. Accordingly, the Settlement, like the proposed consent judgments, would result in continuing phosphorous pollution.

- The Settlement is again insufficient in duration. The Settlement provides a seven-year term from the Effective Date of July 10, 2026. By including such a limited term, the parties fail to meaningfully reckon with the testimony by Soil Scientist and Geomorphologist Gregory Scott that "following cessation of land application, it would take up to thirty years of hay production and removal to remove legacy phosphorous placed in the soil up to a STP of 300," as well as this court's prior Orders. The evidence is clear—a seven-year term is insufficient to remediate phosphorous pollution in the waters of the IRW or to ensure that no additional pollution occurs. [Doc. 3300, p. 12].

- Because the Land Application Restrictions are virtually identical to those included in the proposed consent judgments with respect to George's and Tyson, the Settlement's Land Application Restrictions do not assure that the amount of poultry waste applied to the lands of the IRW will decrease. *See* [Doc. 3300, p. 13].

- The Settlement again fails to ensure that the Auditor (effectively, the special master) is adequately compensated and equipped to ensure defendants' compliance with the Litter Removal Commitments. Like the proposed consent judgments, the Settlement includes no

staffing or administrative provisions. Further, the total of $1,900,000 required for the Auditor Fund is insufficient to support seven years of the Auditor's responsibilities to monitor compliance with litter removal requirements over the million-acre watershed. As previously stated, the court is deeply concerned that, once those monies are depleted, Oklahoma taxpayers will foot the bill for the Auditor's expenses.

Based on the foregoing, the court cannot conclude that enforcement of the Judgment, and the comprehensive remediation obligations imposed therein, is "detrimental to the public interest" or that applying the Judgment prospectively is no longer equitable. Accordingly, the parties have not shown that vacatur under Federal Rule of Civil Procedure 60(b)(5) is warranted.

*B. Federal Rule of Civil Procedure 60(b)(6)*

Finally, the parties seek vacatur under Federal Rule of Civil Procedure 60(b)(6), pursuant to which a court may grant relief from a final judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The Tenth Circuit has described the provision "as a 'grand reservoir of equitable power to do justice in a particular case,'" but has cautioned that "a district court may grant a Rule 60(b)(6) motion, 'only in extraordinary circumstances and only when necessary to accomplish justice.'" *Kile v. United States*, 915 F.3d 682, 687 (10th Cir. 2019) (quoting *Cashner v. Freedom Stores, Inc*., 98 F.3d 572, 579 (10th Cir. 1996)).

As previously stated, the parties seek vacatur based on the Settlement. However, "mootness by reason of settlement" generally "does not justify vacatur of a judgment under review." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994). Recognizing that "the determination is an equitable one," however, the Court acknowledged that "exceptional circumstances may conceivably counsel in favor of" vacatur. *Id.* But "the mere fact that the settlement agreement provides for vacatur" is insufficient. *Id.*

To make this equitable determination, the court considers "both the private interests of the movant—*i.e.*, whether the movant had demonstrated 'equitable entitlement to the extraordinary

remedy of vacatur'—and the interests of the public and the federal judiciary." *In re Renfrow*, No. 22-CV-00381-SH, 2022 WL 17668704, at *5 (N.D. Okla. Dec. 14, 2022) (citing *U.S. Bancorp Mortg. Co.,* 513 U.S. at 26-29).

Looking first to whether the parties have demonstrated entitlement to the "extraordinary" remedy of vacatur, the court considers the litigants' conduct. *See Amoco Oil Co. v. U.S. E.P.A.*, 231 F.3d 694, 699 (10th Cir. 2000).

Although the undersigned appreciates the efforts of the Tenth Circuit mediator, as recognized by other courts, "there is no 'general safe harbor providing for vacatur whenever parties reach a mutually satisfactory resolution through judicially encouraged settlement discussions on appeal.'" *Easter Unlimited, Inc. v. Rozier*, No. 18-CV-6637-KAM-ARL, 2022 WL 4468613, at *2 (E.D.N.Y. Apr. 20, 2022); *see also Summit Fin. Res., L.P. v. Kathy's Gen. Store, Inc.*, No. 08-2145-CM, 2011 WL 3666607 (D. Kan. Aug. 22, 2011) (denying motion to vacate judgment based on settlement agreement reached with the assistance of the Tenth Circuit Mediator's Office). Rather, the court considers the entirety of the parties' conduct.

The parties litigated this case in such a manner as to require the investment of significant judicial resources. The docket of this matter reflects 3,344 docket entries. Defendants filed multiple pretrial motions to dismiss. The State's motion for preliminary injunction required an eight-day evidentiary hearing. Ultimately, the parties tried this case for fifty-two days over the course of five months, resulting in a trial transcript of 11,889 pages and 8,392 pages of admitted exhibits. The court subsequently issued the 219-page Findings of Fact and Conclusions of Law.

But the parties were not done. Despite asking the court to order mediation before Judge Tacha, the parties did not reach a settlement agreement following entry of the court's Findings of Fact and Conclusions of Law. Instead, defendants filed a post-trial motion to dismiss. Although

the court denied the motion, it set for evidentiary hearing "the contention made by the defendants, upon which the plaintiff has the burden of proof, that the conditions in the IRW materially changed following the end of trial." [Doc. 3023; Doc. 3098, p. 4]. Following a six-day evidentiary hearing, on June 17, 2025, the court issued a 22-page Opinion and Order in which it concluded that the State had satisfied its burden to show that conditions had not changed in the IRW following trial. Again, the parties did not negotiate a prejudgment settlement after the court's Opinion and Order of June 17, and, on December 19, 2025, the court entered the Judgment.

As previously recognized by this court, the parties' failure to negotiate a settlement in the period between the Findings of Fact and Conclusions of Law and the Judgment suggests they "roll[ed] the dice" and now seek to erase the result of that gamble through vacatur. *See U.S. Bancorp Mortg. Co*., 513 U.S. at 27-28. Further, it is axiomatic that "[o]ne who seeks equity must do equity." *Cont'l Oil Co. v. Osage Oil & Refin. Co*., 57 F.2d 527, 531 (10th Cir. 1932). Defendants have litigated this case in such a protracted manner as to monopolize the judicial resources of this court for years, often for the sole purpose of delay. As for the State, the timing of plaintiff's decision to settle suggests the influence of political pressures over substance. Such conduct falls short of the equity required for the extraordinary remedy of vacatur. *Amoco Oil Co.*, 231 F.3d at 699; *see also U.S. Bancorp Mortg. Co*., 513 U.S. at 25 (quoting *Sanders v. United States*, 373 U.S. 1, 17 (1963)) ("The denial of vacatur is merely one application of the principle that '[a] suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks.'").

The court next considers the public interest. *Amoco Oil Co.*, 231 F.3d at 699. The parties point out that vacatur "avoid[s] the burden, risks, and cost of an appeal." [Doc. 3340, p. 25]. But

this is true in every case where the parties reach a post-judgment settlement and is not indicative of "exceptional circumstances."

Further, although vacatur may avoid prospective costs, the parties' argument "ignores the considerable judicial resources that have already been expended in litigating the issues in this case, which resources would be expended for nought if vacatur were ordered." *Aetna Cas. & Sur. Co. v. Home Ins. Co*., 882 F. Supp. 1355, 1358 (S.D.N.Y. 1995). "[T]he public paid for this use of court resources through its tax dollars," and therefore the Judgment is "'not merely the property' of the litigants, to be used as a bargaining chip in their settlement negotiations." *de Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176-BLOOM, 2023 WL 3970930, at *5 (S.D. Fla. June 13, 2023) (quoting *U.S. Bancorp Mortg. Co.,* 513 U.S. at 26); *see also U.S. Bancorp Mortg. Co.,* 513 U.S. at 26 ("Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur."). This is particularly true in this matter where, for the reasons discussed herein, the public has an interest in prospective application of the Judgment over the Settlement. *See supra* pp. 11-13.

Vacatur may also serve to deter settlement in future matters. As recognized by the Supreme Court, "while the availability of vacatur may facilitate settlement after the judgment under review has been rendered and certiorari granted (or appeal filed), it may *deter* settlement at an earlier stage." *U.S. Bancorp Mortg. Co*., 513 U.S. at 27-28. "*Some* litigants, at least, may think it worthwhile to roll the dice rather than settle in the district court . . . if, but only if, an unfavorable outcome can be washed away by a settlement-related vacatur." *U.S. Bancorp Mortg. Co*., 513 U.S. at 28. "Such a result would hardly conserve judicial resource[s] and might encourage parties

to use district court proceedings as a settlement mechanism." *Summit Fin. Res., L.P.*, 2011 WL 3666607, at *2.

Finally, as recognized by the Tenth Circuit, "'the public gains a strong interest in protecting the finality of judgments' after they are entered." *Compañía de Inversiones Mercantiles S.A.*, 58 F.4th at 459 (quoting *Nelson v. City of Albuquerque,* 921 F.3d 925, 929 (10th Cir. 2019)). "Respecting final judgments protects against 'the costs, uncertainty, and even disrespect reflected by repeated and otherwise unfounded challenges to [courts'] judgments.'" *Compañía de Inversiones Mercantiles S.A.*, 58 F.4th at 459 (quoting *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republi*c, 864 F.3d 172, 176 (2d Cir. 2017)).

For all of these reasons, the parties have not demonstrated "extraordinary circumstances" that justify relief from the Judgment under Rule 60(b)(6). Thus, the motion to vacate must be denied.

**Conclusion**

WHEREFORE, the Joint Motion to Vacate the Judgment Under Rule 60(b) [Doc. 3340] of plaintiffs State of Oklahoma *ex rel.* Gentner Drummond, in his capacity as Attorney General of the State of Oklahoma, and Chris Schinnerer, in his capacity as the Trustee for Natural Resources for the State of Oklahoma, and defendants Tyson Foods, Inc.; Tyson Poultry, Inc.; Tyson Chicken, Inc.; Cobb-Vantress, Inc.; Cal-Maine Foods, Inc.; Cargill, Inc.; Cargill Turkey Production, LLC; George's, Inc.; George's Farms, Inc.; Peterson Farms, Inc.; and Simmons Foods, Inc. is denied.

IT IS SO ORDERED this 18th day of November, 2026.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE